Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
Rishi P. Satia, Bar No. 301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY  10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Willard K. Tom, *pro hac vice*
willard.tom@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C.  20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>          Plaintiff,<br><br>vs.<br><br>GOOGLE LLC et al.,<br><br>          Defendants. | Case No. 3:20-cv-05671-JD |
| PURE SWEAT BASKETBALL, INC., et. al,<br>          Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC et al.,<br><br>          Defendants. | Case No. 3:20-cv-05792-JD |
| PEEKYA APP SERVICES, INC., et. al,<br>          Plaintiffs,<br><br>vs.<br><br>GOOGLE LLC et al.,<br><br>          Defendants. | Case No. 3:20-cv-06772-JD<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC GAMES, INC.'S COMPLAINT AND DEVELOPERS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES ON COMMON ISSUES**<br><br>Judge:         Hon. James Donato<br>Courtroom:  11, 19th Floor<br>Hearing:      January 28, 2021 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................ 1

ISSUES TO BE DECIDED ................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 3

I.  INTRODUCTION ................................................................................................. 3

II.  STATEMENT OF FACTS .................................................................................... 5

    A.  Summary of Plaintiffs' Allegations ........................................................... 5

    B.  Summary of Plaintiffs' Claims .................................................................. 7

III.  LEGAL STANDARD ........................................................................................... 8

IV.  PLAINTIFFS FAIL TO ALLEGE GOOGLE UNLAWFULLY MONOPOLIZED THE ALLEGED "ANDROID APP DISTRIBUTION MARKET" ................................. 9

    A.  Google Has No Duty Under The Antitrust Laws To Allow Competing App Stores On Google Play ........................................................................... 9

        1.  Controlling Supreme Court and Ninth Circuit authorities have rejected Plaintiffs' asserted duty to deal. ............................................ 9

        2.  Plaintiffs ignore this principle by challenging Google's unilateral decision to not distribute competing app stores in Google Play. ............. 11

        3.  Epic cannot avoid the "refusal to deal" line of cases by "artfully pleading" a refusal to deal as concerted action. ...................................... 12

    B.  Plaintiffs Fail To Allege Anticompetitive Harm Because They Concede Alternative Avenues of App Distribution ............................................... 13

        1.  Plaintiffs fail to allege that the MADAs with OEMs foreclose alternative avenues of distribution. ........................................................ 15

        2.  Plaintiffs concede that app developers can directly distribute their apps (and app stores) to users. ............................................................... 17

V.  PLAINTIFFS FAIL TO ALLEGE AN ANTITRUST CLAIM IN CONNECTION WITH THE ALLEGED ANDROID IAP PROCESSING MARKET ............................ 19

    A.  Google Has No Antitrust Duty to Change Its Policies To Allow IAPs On Apps Distributed Through Google Play To Run Through Rival Billing Systems ..................................................................................................... 19

    B.  Plaintiffs Fail To Allege Anticompetitive Harm In The Alleged IAP Market ........................................................................................................ 20

    C.  Developer Plaintiffs' and Epic's Alternative Tying Claim Also Fails ................. 21

VI.  PLAINTIFFS' CALIFORNIA STATE LAW CLAIMS FAIL FOR THE SAME REASONS ............................................................................................................ 22

VII.  CONCLUSION ................................................................................................... 25

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
LOS ANGELES

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ......................................14

*Aerotec Int'l, Inc. v. Honeywell, Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ..............................................................................................21

*AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*,
No. C 16-00443 WHA, 2016 WL 3648623 (N.D. Cal. July 6, 2016) ....................................25

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010)................................................................................14, 15, 18

*Apple Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................................................16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................................8, 9, 17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ..............................................................................................................11

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)...............................................................................................14

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001)..................................................................................................24

*Church & Dwight Co. v. Mayer Labs, Inc.*,
868 F. Supp. 2d 876 (N.D. Cal. 2012) ..................................................................................17

*Cty. of San Jose v. Office of the Com'r of Baseball*,
776 F.3d 686 (9th Cir. 2015)..................................................................................................24

*CZ Servs. v. Express Scripts Holding Co.*, No. 3:18-cv-04217-JD,
2020 WL 4368212 (N.D. Cal. July 30, 2020) .......................................................................24

*Drum v. San Fernando Valley Bar Ass'n*,
182 Cal. App. 4th 247 (2010)...........................................................................................24, 25

*Eastman v. Quest Diagnostics Inc.*,
108 F. Supp. 3d 827 (N.D. Cal. 2015) ..................................................................................24

*Eastman v. Quest Diagnostics Inc.*, No. 15-CV-00415-WHO, 2016 WL 1640465
(N.D. Cal. Apr. 26, 2016),
*aff'd* 724 Fed. App'x 556 (9th Cir. 2018) ............................................................................23

*Freeman v. San Diego Assn. of Realtors*,
77 Cal. App. 4th 171 (1999)..................................................................................................23

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

*FTC v. Qualcomm*,
  969 F.3d 974 (9th Cir. 2020) ........................................................................................ *passim*

*hiQ Labs Inc. v. LinkedIn Corp.*,
  No. 17-cv-03301-EMC, __ F. Supp. 3d __,
  2020 WL 5408210 (N.D. Cal. Sept. 9, 2020) ...............................................................12, 20

*Kaufman v. Time Warner*,
  836 F.3d 137 (2d Cir. 2016) ...................................................................................................21

*Morrison v. Viacom, Inc.*,
  66 Cal. App. 4th 534 (1998) ...................................................................................................23

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064  (10th Cir. 2013) ............................................................................................21

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ................................................................................14, 15, 18

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) .....................................................................................................10, 11, 20

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal. App. 4th 656 (2005) .................................................................................................23

*PNY Techs., Inc. v. SanDisk Corp.*,
  No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ..................................14

*Pure Sweat Basketball, Inc. v. Google LLC*,
  No. CV-05792-JD, Dkt. No. 56 .................................................................................................6

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
  199 F. Supp. 2d 362 (M.D.N.C. 2002) ...................................................................................17

*Rick-Mik Enters. v. Equilon Enters.*,
  532 F.3d 963 (9th Cir. 2008) ..................................................................................................21

*Sambreel Holding LLC v. Facebook, Inc.*
  906 F. Supp. 2d 1070 (S.D. Cal. 2012) .....................................................................12, 13, 21

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ................................................................................................22

*SC Manufactured Homes, Inc. v. Liebert*,
  162 Cal. App. 4th 68 (2008) .............................................................................................22, 23

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001)
  *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001) .......................................................9

*Tele Atlas N.V. v. Navteq Corp.*,
  397 F. Supp. 2d 1184 (N.D. Cal. 2005) ....................................................................................23

*Toscano v. Prof'l. Golfers Ass'n.*,
  258 F.3d 978 (9th Cir. 2001) .............................................................................................12, 20

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

*U.S. v. Microsoft Corp.*,
    253 F.3d 24 (D.C. Cir. 2001) ................................................................................................22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................. *passim*

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
    190 F.3d 974 (9th Cir. 1999) ...............................................................................................15

**Statutes**

Cartwright Act ............................................................................................................22, 23
    §16727 .........................................................................................................................23, 24

Sherman Act .......................................................................................................... *passim*
    §1 ............................................................................................................................ *passim*
    §2 ............................................................................................................................ *passim*

**Rules**

Rule 12 ...........................................................................................................................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 28, 2021 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 11 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Hon. James Donato, Defendants Google LLC; Google Payment Corp.; Google Ireland Limited; Google Commerce Ltd.; Google Asia Pacific Pte. Ltd. (collectively, "Google"), will and hereby do move the Court to dismiss Plaintiff Epic Games, Inc.'s Complaint (*Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD, Dkt. No. 1) ("Epic") and Developer Plaintiffs' First Consolidated Class Action Complaint (*Pure Sweat Basketball, Inc. and Peekya App Services, Inc. v. Google LLC*, No. 3:20-cv-05792-JD, Dkt. No. 56) ("PSB") (collectively the "Complaints").  More specifically, this Motion seeks to dismiss the Complaints in their entirety for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b).

This Motion is supported by:  this Notice of Motion and Motion; a Memorandum of Points and Authorities as to common grounds for dismissal that relate to both Epic and the Developer Plaintiffs; a separate five-page Memorandum of Points and Authorities as to grounds for dismissal of damages claims specific to the Developer Plaintiffs; the accompanying Request for Judicial Notice; the [Proposed] Order filed herewith; the pleadings and papers on file herein, and such other matters that may be presented to the Court at the hearing.

## COMMON ISSUES TO BE DECIDED

1.  Should the Court dismiss Plaintiffs' claims brought under Section 1 and Section 2 of the Sherman Act related to the purported "Android App Distribution Market" (Epic Counts 1-3; PSB Counts 1, 2) because:

   a.  Google has no duty under the antitrust laws to aid a competing app store, or to deal on terms preferred by rivals, suppliers, or customers?  *See* Part IV.A.

   b.  Plaintiffs fail to allege any foreclosure, much less substantial foreclosure, in the purported relevant market and therefore have not alleged harm to competition?  *See* Part IV.B.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

2.   Should the Court dismiss Plaintiffs' claims brought under Section 1 and Section 2 of the Sherman Act related to the purported "Android In-App Payment Processing Market" (Epic Counts 4, 5; PSB Counts 3-5) because:

    a.   Google has no duty under the antitrust laws to distribute apps that use rival billing systems or to deal on terms preferred by rivals, suppliers, or customers?  *See* Part V.A.

    b.   Plaintiffs fail to allege harm to competition in the purported relevant market?  *See* Part V.B.

3.   Should the Court dismiss Plaintiffs' tying claims brought under Section 1 of the Sherman Act related to the purported "Android In-App Payment Processing Market" (Epic Count 6; PSB Count 6) because:

    a.   Plaintiffs cannot recast a lawful refusal to deal as illegal tying?  *See* Part V.A.

    b.   Plaintiffs fail to allege separate products as opposed to components of a single business method?  *See* Part V.B.

    c.   Plaintiffs fail to allege a *per se* tying claim and cannot support a rule of reason theory in the absence of harm to competition in the alleged tied product market?  *See* Part V.C.

4.   Should the Court dismiss Plaintiffs' claims brought under the Cartwright Act (Epic Counts 7-10, PSB Count 8) because they fail for the same reasons their Sherman Act claims fail? *See* Part VI.

5.   Should the Court dismiss Plaintiffs' derivative claims brought under the "unlawful" and "unfair" prongs of California's Unfair Competition Law ("UCL") (Epic Count 11, PSB Count 7) because the challenged conduct that forms the basis of these claims is permissible under the antitrust laws?  *See* Part VII.

## SEPARATE ISSUES TO BE DECIDED RE: DEVELOPER PLAINTIFFS

6.   Should the Court dismiss Developer Plaintiffs' damages claims premised on an alleged overcharge theory because, under *Apple v. Pepper*, 139 S.Ct. 1514 (2019), app developers are not entitled to such damages?  *See* concurrently filed Separate Memorandum of Points and Authorities Re: Defendants' Motion to Dismiss Developers' Claim for Damages.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.      INTRODUCTION**

3          For over a decade, in the face of intense competition, Google has invested substantial

4    resources to develop and expand the Android ecosystem.  Although Google's bet on Android has

5    benefited device makers, software application ("app") developers, and ultimately consumers,

6    Plaintiffs—a putative class of app developers and Epic Games, an app developer and "would-be

7    competitor"—ask this Court to rewrite the rules by which the Android ecosystem has prospered

8    and competition has thrived.  While Plaintiffs may believe they would benefit even more if the

9    Court forced Google to help its rivals compete or redesign its terms of service to their liking, the

10   Supreme Court and this Circuit have made crystal clear that forcing companies to change the

11   terms by which they deal with competitors, customers, or suppliers is not the function of antitrust

12   law.

13         Google offers mobile device makers (i.e., Original Equipment Manufacturers or "OEMs")

14   the Android operating system ("OS") under an open-source license.  At the same time, Google—

15   like many licensors—also offers a suite of apps, including its popular Google Play app store, that

16   OEMs may elect to pre-install on their devices.  Google's Android model, offering an alternative

17   mobile ecosystem to Apple's iOS for developers and consumers, has produced immense benefits.

18   OEMs benefit because free access to a customizable and high-quality OS helps them attract

19   device users in a rapidly evolving industry that includes large Android mobile device makers,

20   such as Samsung and LG, as well as Apple, a formidable player with a competing platform.  App

21   developers benefit from the ability to reach hundreds of millions of consumers who have

22   confidence in the reliability and security of the ecosystem.  And consumers benefit because they

23   enjoy more choice resulting from greatly expanded output and dynamic innovation.  The result

24   has been a dramatic expansion of Android app distribution, benefiting the entire ecosystem, while

25   supporting Android's competitive position against Apple's iOS.

26         Plaintiffs' complaints concede these objectively observable procompetitive outcomes.

27   They acknowledge that millions of apps are now available to Android mobile users not only

28   through Google's popular app store, Google Play, but also through other app stores and direct

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

distribution channels.  Plaintiffs concede that the two largest sellers of Android mobile devices in the U.S.—Samsung and LG—have their own app stores that are or can be pre-installed on their mobile devices.  Plaintiffs likewise concede that consumers may install apps, and even competing app stores, directly from the internet.  Epic's own *Fortnite* app is readily available to Android users for free directly through Epic's own website.

After long benefitting from Google's support of open distribution of Android apps, Plaintiffs now complain, in essence, that Google should change the terms under which it grants app developers access to, and allows use of, Google's own app store, Google Play.  As Plaintiffs concede, Google Play is popular—and for good reason.  Google has invested significant resources to protect the safety and reliability of its app store.  Yet Plaintiffs want to force Google to aid competitors and compel it to redesign Google Play and the Android OS to Plaintiffs' liking.  However—with limited exceptions inapplicable here—Google has no duty to deal with its competitors, and no duty to agree to terms that Plaintiffs desire.  Google, for example, need not allow other app stores to free-ride on its investments by distributing them inside its own app store.  Google may also refuse to distribute apps that integrate rival billing systems for in-app purchases because doing so would allow app developers that distribute apps for free and only monetize in-app content—like Epic does with *Fortnite*—to free-ride on Google's significant investment in Google Play by avoiding Google's fee entirely.  Plaintiffs may want to take advantage of Google Play's popularity on their preferred terms—using Google Play's distribution to reach a large audience while preventing Google from charging for that distribution—but the antitrust laws do not impose any obligation on Google to do so.  To the contrary, under settled antitrust law, even leading firms may refuse to deal with a rival, customer, or supplier on the terms they prefer.  This alone undermines a central tenet of Plaintiffs' antitrust claims; Google's refusal to deal on terms preferred by others is not an actionable antitrust claim as a matter of law.

Plaintiffs' complaints also are self-defeating because they acknowledge the availability of Android app stores other than Google Play.  This affords Android app developers distribution avenues, and therefore access to Android users, outside of Google Play.  As Plaintiffs concede, many Android mobile devices sold in the U.S., such as those made by Samsung, have pre-

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1  installed app stores other than Google Play; and all Android mobile devices support direct

2  downloading of apps and app stores from the internet.  Plaintiffs also concede other potential

3  routes to distribute their apps, including Microsoft Xbox, Sony PlayStation, Nintendo Switch,

4  PCs, Macs, and iOS devices.  None of these alternative app stores or avenues for app distribution

5  (whether Android or non-Android) involve any use of Google Play's billing system for app or in-

6  app purchases ("IAP").  Consequently, even accepting Plaintiffs' alleged market definitions for

7  purposes of this motion, Plaintiffs' own allegations contradict their claim that Google has harmed

8  competition in the alleged relevant markets by foreclosing competitive alternatives to Google

9  Play for app distribution or IAP billing.

10     At bottom, while Plaintiffs try to invoke antitrust buzzwords, their allegations only

11  reinforce that Android is a competition success story.  In the face of intense competition with

12  Apple's iOS devices, Google has ushered in a dramatic expansion of overall output and consumer

13  choice, leading to a more competitive mobile marketplace.  While Plaintiffs may demand that

14  Google Play distribute rival app stores, or operate under different terms that may benefit Google's

15  competitors, the antitrust laws do not require Google to accede to such demands.  Or, as the Ninth

16  Circuit recently reiterated, "[c]ompetitors are not required to engage in a lovefest." *FTC v.*

17  *Qualcomm*, 969 F.3d 974, 994 (9th Cir. 2020) (quoting *Aerotec Int'l, Inc. v. Honeywell, Int'l,*

18  *Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)).  The Court should dismiss these complaints.

19  **II.     STATEMENT OF FACTS**

20      **A.     Summary of Plaintiffs' Allegations**

21      The Complaints are lengthy, but the relevant allegations[1] can be distilled as follows:

22      Google owns and develops the Android OS.  OEMs can license the Android OS from

23  Google at no cost.  Android's free and widespread availability, as well as its high quality, have

24  made it the most popular mobile device OS in the world.  *See* Epic Games Compl. (*Epic Games,*

25  *Inc. v. Google LLC*, No. CV-05671-JD, Dkt. No. 1) ("Epic") ¶52.  Google also develops and

26  separately licenses to OEMs, again at no cost, its popular proprietary app store, Google Play, as

27

28

---

[1] Google summarizes the allegations for purposes of this motion but does not adopt Plaintiffs' characterization of Google's conduct and reserves all defenses.

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1   well as a suite of popular proprietary apps, such as Gmail, Google Maps, and YouTube.  End

2   users can search for and download apps on Google Play and other app stores to make their device

3   more useful.  Epic ¶60.

4          Google licenses its suite of proprietary apps through a Mobile Application Distribution

5   Agreement ("MADA").  Google Play is a highly desirable app store that OEMs want to pre-

6   install on their devices because of "the variety and number of apps and contents available to users

7   uniquely through the Google Play Store."  Developers First Consolidated Class Action Complaint

8   (*Pure Sweat Basketball, Inc. v. Google LLC*, No. CV-05792-JD, Dkt. No. 56) ("PSB") ¶74; *see*

9   *also* Epic ¶72.  Android OEMs are not required to ship Android devices with Google Play, but, if

10  they choose to do so, the MADA includes certain requirements such as convenient placement of

11  Google Play on the device's home screen.  Epic ¶82.  Plaintiffs do not identify any restrictions in

12  the MADA that prohibit OEMs from installing a different app store, and, in fact affirmatively

13  allege that Samsung and LG, two large OEMs, can and do pre-install their own competing app

14  stores.  Epic ¶71; PSB ¶74.

15         Third-party app developers, such as Epic, may use Google Play to distribute their apps to

16  consumers, under terms governed by the Google Play Developer Distribution Agreement

17  ("DDA") and Developer Program Policies.  Epic ¶90; PSB ¶102.  However, Google reserves the

18  right to remove apps from Google Play if it determines, "in its sole discretion," that the app, *inter*

19  *alia*, violates the DDA, applicable policies, or other terms of service.  *See* Declaration of Brian C.

20  Rocca in support of Motion to Dismiss and Request for Judicial Notice ("Rocca Decl.") ¶ 3,

21  Exhibit A ("DDA") at §8.3; Epic ¶153; PSB ¶237.  Plaintiffs allege that Google unilaterally sets

22  the terms of the DDA and the Developer Program Policies.  Epic ¶91; PSB ¶103.

23         Google charges developers only a nominal one-time $25 fee to set up a Play developer

24  account.  PSB ¶14 n.32.  To ensure a high level of quality among apps distributed via Play,

25  Google screens them for malware (PSB ¶116) and mandates certain requirements, such as

26  customer support availability for paid apps (DDA §4.7), privacy protections for end users (DDA

27  §4.8), and protections against apps that could harm devices or other apps (DDA §4.9).

28  Developers are under no obligation to charge *anything* for their apps (DDA §3.7).  Developers

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

have complete freedom to define their business model (*see, e.g.*, DDA §3.3).  For example, a developer can offer an app for free and support it with ads.  Or a developer can charge an upfront price for the app.  Many developers allow users to download an app for free—so users can try it "risk free"—and only later charge for additional content or subscriptions through IAP.  Epic ¶112.  If a developer makes its app available to consumers through Play for free, Google gets paid nothing at all.  *See, e.g.*, DDA §3.7.  If developers, in their sole discretion, elect to monetize an app delivered through Play (either upfront or later though IAP), Google's fee is 30% of the sale price (except when it is reduced to 15% for subscriptions after the first year).  PSB ¶14 & n.31. For the subset of apps that have IAP, Google requires those purchases to go through Google Play's billing system.  Epic ¶23.  Google will not approve an app for distribution through Google Play if a developer violates Google's Play's guidelines and seeks to evade Google Play's billing system for IAP.  Epic ¶128.

Beside distribution through Google Play and other pre-installed Android app stores, Android app developers may also deliver apps to consumers directly through a website or email. Epic ¶61 & n.7.  Epic avails itself of this option.[2]  Consumers can install competing app stores, such as Amazon's Appstore, in the same manner, and developers may deliver their apps to consumers via those competing stores.  PSB ¶¶75, 119; Epic ¶¶72, 100.  Developers are free to use whatever billing system they wish for apps delivered through rival app stores (in accordance with those app stores' own billing policies) or directly to users.  Google is paid nothing for apps or in-app purchases delivered outside of Play.

**B.    Summary of Plaintiffs' Claims**

Plaintiffs claim that Google has monopolized two alleged markets: (1) the "Android App Distribution Market" and (2) the "Android In-App Payment Processing Market."  PSB ¶73; Epic ¶¶62, 114.

With respect to the alleged Android App Distribution Market, the central pillar of Plaintiffs' theory of anticompetitive harm is that Google unlawfully maintains its alleged

---

[2] *See* https://www.epicgames.com/fortnite/en-US/mobile/android/get-started.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

monopoly in Android app distribution by refusing to allow competitor app stores inside Google Play, thus blocking rivals from a "logical and effective way to distribute app stores—which are themselves mobile apps[.]"  PSB ¶101; *see also* Epic ¶89.  Aside from this refusal, Plaintiffs also challenge Google's agreements with OEMs, which they claim "discourage"—but do not claim prohibit—OEMs from pre-installing alternative app stores, and Android's security warnings and settings, which they again claim "discourage"—but do not claim prohibit—users from directly downloading rival app stores or apps.  PSB ¶104; *see also* Epic ¶57.  Developer Plaintiffs bring claims of monopolization and attempted monopolization under Section 2 of the Sherman Act (Counts 1-2).  Epic also brings a monopolization claim under Section 2 of the Sherman Act (Count 1), and adds claims under Section 1 of the Sherman Act challenging Google's agreements with OEMs and the DDA as unreasonable restraints of trade (Counts 2-3).

With respect to the alleged Android In-App Payment Processing Market, Plaintiffs, in essence, challenge Google's policy of requiring apps distributed through Google Play to use Google Play's billing system for IAP if they choose to sell in-app content (PSB ¶170; Epic ¶123), and Google's refusal to distribute apps through Google Play if they integrate a rival billing system for IAP.  Epic ¶¶127-29; *see also* PSB ¶236.  Epic brings claims for monopolization under Section 2 (Count 4), and for unreasonable restraint of trade and tying under Section 1 (Counts 5-6).  Developer Plaintiffs bring the same claims but add an attempted monopolization claim under Section 2 (Counts 3-6).

Finally, Plaintiffs bring derivative state law claims based on the same theories under California's Cartwright Act and Unfair Competition Law (UCL) (Counts 7-11 for Epic; Counts 7-8 for Developer Plaintiffs).

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint meets this plausibility requirement only where it contains factual allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

at 678.  Where the allegations are "merely consistent with" misconduct, a complaint fails to state a claim.  *Id.* (citation omitted).  Courts are permitted to draw on "judicial experience and common sense" in evaluating whether the allegations plausibly state a claim.  *Id.* at 679.  The Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001).

## IV.  PLAINTIFFS FAIL TO ALLEGE GOOGLE UNLAWFULLY MONOPOLIZED THE ALLEGED "ANDROID APP DISTRIBUTION MARKET"

### A.  Google Has No Duty Under The Antitrust Laws To Allow Competing App Stores On Google Play

Plaintiffs concede that Android OEMs have no obligation to license Play, but do so because of its popularity with app developers and users.  PSB ¶74; Epic ¶72.  Plaintiffs further concede that if OEMs do elect to license Play, those OEMs retain the ability under the MADAs to pre-install—and end users have the ability to download and use—competing app stores.  Epic ¶71, PSB ¶119.  Nonetheless, Plaintiffs argue that the antitrust laws require Google to help its competitors by distributing competing app stores *through* Google's Play, claiming it "would be a logical and effective way to distribute app stores."  PSB ¶¶101, 105; Epic ¶¶89, 93.  This claim fails as a matter of law because Google is under no duty to aid a rival or deal on terms preferred by suppliers or customers.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP* ("*Trinko*"), 540 U.S. 398, 408 (2004).

#### 1.  Controlling Supreme Court and Ninth Circuit authorities have rejected Plaintiffs' asserted duty to deal.

Earlier this year, the Ninth Circuit reaffirmed the bedrock antitrust principle that even an alleged monopolist has no duty under the antitrust laws to deal, whether at all or on different terms.  *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020), *reh'g en banc denied* (9th Cir. Oct. 28, 2020).  Thus, a plaintiff's antitrust claim fails if, as here, it is premised on the defendant's duty to help a competitor compete.

"As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'"  *Id.* at 993 (quoting *Aerotec Int'l,*

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD; 3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1   *Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016)).  "Likewise, 'the Sherman Act

2   does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely

3   private business, freely to exercise his own independent discretion as to parties with whom he

4   will deal.'"  *Id.* (quoting *Trinko*, 540 U.S. at 408).  As the Ninth Circuit in *Qualcomm* explained,

5   "[t]his is because the antitrust laws, including the Sherman Act, 'were enacted for the protection

6   of *competition*, not *competitors*.'"  *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

7   U.S. 477, 488 (1977) (emphasis in *Qualcomm*)).

8           In *Trinko*, the Supreme Court dismissed antitrust claims brought by a consumer based on

9   Verizon's alleged failure to share its network with competing local exchange carriers (LECs),

10  which the LECs needed to compete for downstream customers.  540 U.S. at 408.  The plaintiff

11  alleged that Verizon either failed to fill competitive LECs' orders at all or did so in an untimely

12  fashion to "deter potential customers [of rivals] from switching" away from Verizon.  *Id.* at 404-

13  05.  On a Rule 12 challenge, the Court held that even a monopolist may not be compelled "to

14  share the source of their advantage" and explained that a refusal to deal does not harm

15  competition as a matter of law:

16          Firms may acquire monopoly power by establishing an infrastructure that renders
            them uniquely suited to serve their customers.  Compelling such firms to share the
17          source of their advantage is in some tension with the underlying purpose of
            antitrust law, since it may lessen the incentive for the monopolist, the rival, or both
18          to invest in those economically beneficial facilities.

19  *Id.* at 407-08.

20          The Supreme Court reiterated these principles in *Pac. Bell Tel. Co. v. linkLine Commc'ns,*

21  *Inc.* ("*linkLine*"), 555 U.S. 438 (2009).  In *linkLine*, the plaintiff alleged that a monopolist DSL

22  provider had "refused to deal with the plaintiffs" by setting a high wholesale price for DSL access

23  and a low retail price for DSL Internet service.  *Id.* at 443.  This practice "allegedly 'exclude[d]

24  and unreasonably impede[d] competition,' thus allowing AT&T to 'preserve and maintain its

25  monopoly control of DSL access to the Internet.'"  *Id.* at 443-44.  Relying on *Trinko*, the Court

26  rejected the claim—again at the pleadings stage—holding that "[a]s a general rule, businesses are

27  free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of

28  that dealing."  *Id.* at 448.  The Court further emphasized that "[c]ourts are ill suited 'to act as

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1   central planners, identifying the proper price, quantity, and other terms of dealing' .... No court

2   should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Id*.

3   at 452-53 (quoting *Trinko*, 540 U.S. at 408, 415).

4   **2.  Plaintiffs ignore this principle by challenging Google's unilateral
     decision to not distribute competing app stores in Google Play.**

5

6   Google developed the Android OS and Google Play, an infrastructure for powering

7   mobile devices and efficiently distributing apps for those devices.  *See* PSB ¶¶2, 5, 44; Epic ¶¶12,

8   60.  Plaintiffs claim that Google's refusal to allow competing app stores on Google Play has

9   harmed competition and, specifically, Epic as a potential competitor.  *See* PSB ¶118; Epic ¶89.  In

10  Plaintiffs' view, Google *must* allow rival app stores inside Google Play so that users can "replace

11  or supplement the Google Play Store on their devices with competing app stores."  Epic ¶92.  But

12  "[c]ompelling such firms to share the source of their advantage is in some tension with the

13  underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival,

14  or both to invest in those economically beneficial facilities."  *Trinko*, 540 U.S. at 407-08.  Under

15  *Trinko*, *linkLine*, and *Qualcomm*, Google is not required to share its source of competitive

16  advantage, or to make it easier for rivals to compete. Google's alleged refusal to do so is not

17  actionable conduct under the antitrust laws.

18  The "one, limited exception" to this general rule—announced in *Aspen Skiing Co. v.*

19  *Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)—does not apply.  *See Qualcomm*, 969 F.3d

20  at 993.  The Ninth Circuit has held that a duty to deal may be found under *Aspen Skiing* in the

21  rare circumstances that three criteria are met: (1) the defendant terminated a voluntary and

22  profitable course of dealing; (2) "the only conceivable rationale or purpose is to sacrifice short-

23  term benefits in order to obtain higher profits in the long run from the exclusion of competition;"

24  and (3) "the refusal to deal involves products that the defendant already sells in the existing

25  market to other similarly situated customers."  *Id*. at 993-94 (internal citations and quotation

26  marks omitted).  However, Plaintiffs do not even attempt to allege any of the *Aspen Skiing* criteria

27  to support this limited exception.

28

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

11

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

As such, a primary focus of Plaintiffs' antitrust claims—an alleged refusal to deal with and assist competitors—fails as a matter of law.[3]

### 3. Epic cannot avoid the "refusal to deal" line of cases by "artfully pleading" a refusal to deal as concerted action.

Nor can Epic sidestep the lack of any duty for Google to deal with its competitors by recasting it as a Section 1 "unreasonable restraint of trade" claim. *See* Epic Count 3.

"[Section] 1 of the Sherman Act targets [only] *concerted* anticompetitive conduct." *Qualcomm*, 969 F.3d at 989 (emphasis in original). An agreement cannot form the basis of a claim under Section 1 where the terms of that agreement are unilaterally set by the defendant, even if a counterparty accepts or acquiesces to its terms. For example, in *hiQ Labs Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, __ F. Supp. 3d __, 2020 WL 5408210, at *10 (N.D. Cal. Sept. 9, 2020), the court, relying on the *Trinko* line of cases, dismissed the plaintiff's duty-to-deal claim. The plaintiff "trie[d] to get around this problem by claiming … concerted action between LinkedIn and its members" based on LinkedIn's User Agreement, which prevented hiQ (as a user) from accessing public data on LinkedIn. *Id.* at *12. The court still rejected the claim. It noted that Section 1 claims "typically involve concerted action between multiple defendants or between a defendant and a third party that harms the plaintiff – not concerted action between the defendant and the plaintiff. hiQ cites no precedent for this novel theory." *Id.*; *see also Toscano v. Prof'l. Golfers Ass'n.*, 258 F.3d 978, 983-84 (9th Cir. 2001) (finding no concerted action when "local sponsors' contracts demonstrated only that they agreed to purchase a product" not that they committed "to a common scheme in restraint of trade"). Similarly, in *Sambreel Holding LLC v. Facebook, Inc.*, the plaintiff brought Section 1 claims based on a user agreement that Facebook "unilaterally impose[d]" on "Application Developers." 906 F. Supp. 2d 1070, 1077 (S.D. Cal. 2012). The court dismissed the claim because the complaint failed to allege "concerted effort among the Application Developers and Facebook … as opposed to unilateral action on the part of

---

[3] Plaintiffs' Section 2 claims also fail for the independent reason because they do not plead facts that would establish the required harm to competition in the alleged relevant markets. *Qualcomm*, 969 F.3d at 990; *see* Part IV.B. *supra*.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1   Facebook." *Id*. at 1076.

2          So too here.  Epic challenges Section 4.5 of the DDA, which states that developers "may

3   not use Google Play to distribute or make available any Product that has a purpose that facilitates

4   the distribution of software applications and games for use on Android devices outside of Google

5   Play."  Epic ¶153.  But this provision reflects unilateral terms by which Google allows

6   distribution of apps on Google Play, as Epic must concede.  Epic ¶91.  A business has the "right

7   to determine the terms on which it will permit its Application Developers to use" a platform

8   because there "is no fundamental right to use" the platform.  *Sambreel*, 906 F. Supp. 2d at 1080

9   (citing *Trinko*, 540 U.S. at 408).  And a business has the right to control its own product and

10  establish the terms with which its "users, application developers and advertisers must comply in

11  order to utilize its product."  *Id.* at 1075.

12         Thus, there is no allegation of any *concerted* anticompetitive conduct between Google and

13  anyone else.  To the contrary, the Complaints allege that Google unilaterally set the terms about

14  which Plaintiffs complain, and the various counterparties—developers, including potential app

15  store competitors like Epic—were "forced" to accept the "non-negotiable" terms.  Epic ¶¶82, 91,

16  152; PSB ¶¶69, 103, 247.  But Google has the right to determine the terms on which it will permit

17  app developers to use Google Play.  Plaintiffs' attack is thus directed to Google's unilateral (and

18  lawful) decision to not allow competing app stores on Google Play, which does not, as a matter of

19  law, involve the type of concerted action that unreasonably restrains trade as required under

20  Section 1.

21         **B.    Plaintiffs Fail To Allege Anticompetitive Harm Because They Concede
                   Alternative Avenues of App Distribution**
22

23         Without their central "duty to deal" claim, the remnants of Plaintiffs' claims regarding the

24  alleged "Android app distribution market" fail because they present no plausible allegations that

25  Google's conduct has injured competition in the relevant market.  At best, Plaintiffs complain that

26  Google's conduct "discourages" competitive alternatives to Google Play, but they do so while

27  conceding the availability of alternative avenues for app distribution.  Plaintiffs allege, for

28  example, that OEMs are deterred from pre-installing, and users from sideloading, rival app stores.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

PSB ¶¶118, 122; Epic ¶¶82, 96.  Notably, however, Plaintiffs concede OEMs pre-install alternative app stores and that any user may directly download apps or alternative app stores if they wish to do so.  *See* Epic ¶¶71-72, 100; PSB ¶¶74-75, 119.  Thus, Plaintiffs fail to allege that Google has foreclosed *any* portion of the alleged market, much less a substantial portion of the market as required by law.

For purposes of both Sections 1 and 2 of the Sherman Act, a plaintiff's initial burden is to establish that the conduct at issue had a substantial anticompetitive effect in the alleged relevant market.  *Qualcomm*, 969 F.3d at 991.  In other words, the challenged conduct "must harm the competitive process and thereby harm consumers."  *Id.* (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 24, 58 (D.C. Cir. 2001)).  Alleging that conduct reduces consumers' choices or raises prices is not sufficient to establish the requisite anticompetitive harm.  *Id.*  "Both effects are fully consistent with a free, competitive market."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).

Plaintiffs must, therefore, allege that Google's conduct "'foreclose[s] competition in a substantial share of the line of commerce affected.'"  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (quoting *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997)).  But "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition any part of the relevant market….  Competitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more."  *Omega*, 127 F.3d at 1163; *see also PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322, at *9 (N.D. Cal. July 2, 2014) (dismissing complaint because plaintiff "again fails to adequately plead that there are no 'potential alternative channels of distribution' by which it can reach ultimate consumers") (citing *Omega,* 127 F.3d at 1163); *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035 JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) (dismissing antitrust claims because plaintiff "does not allege that it has been foreclosed from selling its products and, in fact, has alleged that direct sales and licensing agreements are

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1    alternative distribution channels for the same software products"). Nor can Plaintiffs complain

2    that the alternative avenues of distribution are "inadequate substitutes" for their preferred method

3    of distribution. *Omega*, 127 F.3d at 1163. The antitrust laws neither guarantee a particular route

4    to market, nor require Google to equip a rival with a "legitimate competitive advantage." *Id*.

5         Plaintiffs not only fail to allege substantial foreclosure, they fail to allege facts sufficient

6    to establish *any actual* foreclosure since they affirmatively concede there are alternative avenues

7    of distribution. Mere allegations that Google "discourages" use of alternative app stores is not

8    enough. *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 1996 n.1 (under "the Sherman Act, the plaintiff

9    must prove that the [challenged agreements] *actually* foreclosed competition") (emphasis added).

10   Therefore, Plaintiffs' Android App Distribution Market claims fail as a matter of law.

11                    **1.    Plaintiffs fail to allege that the MADAs with OEMs foreclose**
                             **alternative avenues of distribution.**
12

13        Plaintiffs claim that Google's agreements with OEMs "discourage" them "from pre-

14   installing any competing app stores." PSB ¶104, Epic ¶82. First, no OEM making an Android

15   device is required to license Google Play or any other Google app. *See, e.g.*, PSB ¶¶62-63.

16   Second, Plaintiffs' allegations fall short of alleging actual foreclosure or exclusivity, and

17   Plaintiffs do <u>not</u> allege the MADAs prohibit OEMs from pre-installing rival app stores. Instead,

18   Plaintiffs allege that "[w]ith the exception of app stores designed for and installed only on mobile

19   devices sold by those respective OEMs, such as Samsung Galaxy Apps and the LG Electronics

20   App Store, no other Android app store is pre-installed on more than 10% of Android devices."

21   Epic ¶71. This allegation is fatal to Plaintiffs' claim of actual foreclosure. While Epic may want

22   to avoid this dispositive flaw by focusing on the "other" app stores that are pre-installed on

23   allegedly less than 10% of Android devices, it cannot "except" OEM app stores that are pre-

24   installed on a much higher percentage of devices from the analysis (artfully omitting any

25   allegations regarding, for example, Samsung's share of Android mobile devices). *See W. Parcel*

26   *Exp. v. United Parcel Serv. of Am., Inc*., 190 F.3d 974, 976 (9th Cir. 1999) ("Because the

27   contracts do not preclude consumers from using other delivery services, they are not exclusive

28   dealings contracts that preclude competition in violation of the Sherman Antitrust Act.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1    Plaintiffs nevertheless claim that the MADAs are somehow coercive: "[i]f a manufacturer

2    of an Android OS device wanted (or wants) to pre-install the popular YouTube or Google Maps

3    apps on devices sold in the U.S., it has to take the Google Play store as well." PSB ¶7.  But

4    Plaintiffs fail to allege any facts to support the implication that OEMs do not want to license or

5    pre-install Google Play and are only *forced* to do so because of the MADAs.  Instead, Plaintiffs

6    allege the *opposite*—i.e., Google Play is a popular app desired by OEMs, independent of the

7    MADAs.  *See* Epic ¶72, PSB ¶74.

8    Plaintiffs thus importantly concede that OEMs pre-install Play not because of any

9    obligation under the MADAs but because it is the best app store available.  *See* PSB ¶74

10   ("According to Samsung, it would 'not be commercially feasible for an OEM to ship Android

11   devices without Google Play pre-installed due to the variety and number of apps and contents

12   available to users uniquely through the Google Play Store.'"); Epic ¶72 ("Android OEMs … find

13   it commercially unreasonable to make and sell phones without the Google Play Store, and they

14   view other app stores as poor substitutes for the Google Play Store because of the lower number

15   and lesser quality of apps they offer.").  These concessions doom Plaintiffs' MADA allegations;

16   having a superior product, even if it results in an alleged monopoly, is not an antitrust violation,

17   but the essence of competition.  *Qualcomm*, 969 F.3d at 990 (citing *United States v. Grinnell*

18   *Corp.*, 384 U.S. 563, 570–71 (1966)).  Plaintiffs' contradictory and unsupported allegations

19   implying that Google has coerced OEMs into pre-installing Google Play thus carry no weight.

20   *See Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (granting motion to

21   dismiss where antitrust claim did not plausibly allege an independent market because the

22   allegations were internally contradictory).

23   In any case, while conceding the availability of alternate sources for app distribution, the

24   Developer Plaintiffs, for example, complain that "Google crams too many apps into the Google

25   Play store. With so many apps in one store, consumers cannot discover the vast majority of

26   them."  PSB ¶138.  If so, however, Google Play does not impede alternate channels of promoting

27   and making available apps to end users but *invites* competition on the merits from those app

28   stores that can allegedly offer less cluttered or easier-to-use app stores for consumers.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

Plaintiffs finally allege that *if* an OEM chooses to pre-install Google Play, it must initially place it on the "home screen."  Epic ¶82; PSB ¶95 n.95.  But Plaintiffs' allegations regarding Google's placement requirements fall short of alleging actual foreclosure of rival app stores. There is no allegation that MADAs prevent rival app stores from also being pre-installed on the home screen, or that end users are prohibited from downloading alternative app stores and placing them on their home screen.  *See, e.g.*, *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 387-90 (M.D.N.C. 2002) (finding no substantial foreclosure because challenged agreements "d[id] not preclude the display of competing products" in stores); *see also Church & Dwight Co. v. Mayer Labs, Inc.*, 868 F. Supp. 2d 876, 912 (N.D. Cal. 2012) (citing *Omega*, 127 F. 3d at 1163 and *Reynolds*, 199 F. Supp. 2d at 390) (noting that for purposes of a foreclosure analysis, the "proper foreclosure rate would probably take into account only stores in which the defendant had an exclusive contract" and not, for example, any store "in which plaintiffs still had an opportunity to display and promote their products, even though defendant required a percentage of available signage").  Nor is there any allegation that MADAs prevent rival app stores from being pre-installed elsewhere on a device or that consumers do not know how to swipe their device screens to see other apps.  *See Iqbal*, 566 U.S. at 679 (a court may determine whether a claim is plausible by "draw[ing] on its judicial experience and common sense").

### 2. Plaintiffs concede that app developers can directly distribute their apps (and app stores) to users.

Android also permits an end user to install any app directly from a website.  Epic ¶94. Epic's *Fortnite* app, for example, is available to Android users directly through Epic's website. Epic ¶96.  Plaintiffs also concede that all Android users are freely able to install competitive app stores, such as Amazon's Android app store.  PSB ¶119.  Plaintiffs further concede that a consumer who wants to install a competing app store, such as Amazon's Appstore, as an alternative to Google Play need only take three quick actions—go to the Amazon link, check a security setting and click "Okay" at the security warning, and install the app store.  *Id.*; *see also* Epic ¶97 (identifying only two security messages regarding direct downloading and installing apps onto a device).  Thus, the availability of direct distribution defeats any claim that Google has

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD
DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1    foreclosed alternative distribution paths. *See Omega*, 127 F.3d at 1163.

2          Plaintiffs, however, complain about "intimidating" or "ominous" warnings that Android

3    provides when an app store or other app is downloaded from outside of Google Play.  Epic ¶97,

4    PSB ¶121.  But Plaintiffs never claim Google should ignore malware or other security issues, and

5    Google is under no duty to implement, or forego, security warnings in a manner that rival app

6    stores or app developers prefer.  *See* Section IV.A.1, *supra*.

7          Moreover, how Google implements a product feature or improvement to address malware

8    risks and other security threats "does not violate Section 2, even if it is performed by a

9    monopolist and harms competitors as a result."  *Allied Orthopedic*, 592 F.3d at 999-1000.  "To

10   weigh the benefits of an improved product design against the resulting injuries to competitors is

11   not just unwise, it is unadministrable.  There are no criteria that courts can use to calculate the

12   'right' amount of innovation, which would maximize social gains and minimize competitive

13   injury."  *Id*. at 1000.  Here, the complaints show that attempting to determine the "right" response

14   to security threats would be difficult, if not impossible, with Epic suggesting no security warnings

15   and the operation of "neutral security software operating in the background" (Epic ¶103), while

16   Developer Plaintiffs suggest different (or no) warnings depending on the reputation of the "store

17   operator (or other developer)."  PSB ¶122.

18                                              * * *

19         With no duty to deal and no claim of actual foreclosure (much less substantial

20   foreclosure), and thus no harm to competition, Plaintiffs' allegations with respect to the alleged

21   Android App Distribution Market are reduced to this fundamental claim: Google should design its

22   products differently to advantage Plaintiffs' business model.  But Google has no such duty.

23   Plaintiffs "are free to [distribute] directly, to develop alternative distributors, or to compete for the

24   services of the existing [OEMs]. Antitrust laws require no more."  *Omega*, 127 F.3d at 1163.

25         Plaintiffs' claims regarding the alleged Android App Distribution Market should be

26   dismissed for failing to state an antitrust claim as a matter of law.

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

## V.    PLAINTIFFS FAIL TO ALLEGE AN ANTITRUST CLAIM IN CONNECTION WITH THE ALLEGED ANDROID IAP PROCESSING MARKET

### A.    Google Has No Antitrust Duty to Change Its Policies To Allow IAPs On Apps Distributed Through Google Play To Run Through Rival Billing Systems

Plaintiffs also claim that Google has engaged in anticompetitive conduct with respect to an alleged Android In-App Payment Processing Market, defined as "the payment processing solutions that Android developers could turn to and integrate into their Android apps to process the purchase of such in-app digital content." Epic ¶114, PSB ¶170. Plaintiffs attempt to plead this claim as either an alleged monopolization of the IAP market, or a "restraint of trade" in that market. Epic Counts 4-5, 8; PSB Counts 3-5. But in essence, Plaintiffs are trying to use the antitrust laws to force Google to change how Google Play operates. They want to force Google to allow apps that integrate rival billing systems to be distributed through Google Play. If Google was forced to distribute such apps, developers could enjoy the benefits of Google Play while preventing Google from charging *anything* for the admittedly valuable distribution services Google Play provides. *See, e.g.*, PSB ¶¶56, 58, 74; Epic ¶¶60, 72. These claims fail under the same refusal to deal principles discussed above.

To understand Plaintiffs' claims, it is helpful to understand how Google is compensated for distributing and supporting apps on Google Play. Google, just like other app stores such as the Amazon Appstore, charges a distribution fee for apps purchased on Google Play and IAP for apps distributed through Google Play. Epic ¶37, PSB ¶133 n.132. Besides an initial $25 fee to set up a Google Play developer account (PSB ¶14 n.32), Google charges nothing for apps distributed for free on Google Play, and collects no fees for app purchases and IAP in apps distributed outside of Google Play. DDA §3.7 ("If the Product is free, You will not be charged a Service Fee."). Many developers distribute their apps for free through Google Play, but then sell in-app content at a later point in time. For example, Epic's *Fortnite* game "is free to download and play" but "makes additional content available for in-app purchasing on a la carte basis or via a subscription-based Battle Pass." Epic ¶112. For these developers, Google is paid nothing for the initial app download, but earns a distribution fee on subsequent IAP. *Id.* ¶37. Google may unilaterally refuse to accept apps for distribution if they integrate rival billing services for IAP

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

(*see id*. ¶128) because, otherwise, app developers could free-ride on Google's investment by shifting monetization from up-front payments to IAP.  Google, for example, would not be able to charge at all for distribution services if Epic could bill *Fortnite* players directly and avoid Google Play's billing system.

Google is under no duty to accept apps for distribution through Google Play if the app purposely integrates a rival billing provider to evade Google Play's billing system.  "As a general rule, business are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing" *linkLine*, 555 U.S. at 448; *see also Trinko*, 540 U.S. at 408; *Qualcomm*, 969 F.3d at 993.  The antitrust laws thus preclude such a claim, and there can be no Section 2 liability as a matter of law.

Nor can Plaintiffs claim Google's refusal to deal amounts to an unreasonable restraint of trade under Section 1.  The complaints challenge Google's unilateral developer policy requiring that IAPs go through Google Play's billing system.  Epic ¶¶91, 152, PSB ¶247.  As is the case with Plaintiffs' claims regarding app distribution, this theory fails because Plaintiffs have not alleged an agreement that unreasonably restrains trade.  There is no concerted action as required under Section 1 where the challenged terms of an agreement or related policies are unilaterally set by the defendant.  *See, e.g.*, *Toscano*, 258 F.3d at 983-84; *hiQ Labs Inc.*, No. 17-cv-03301-EMC, __ F. Supp. 3d __, 2020 WL 5408210, at *12.

### B.    Plaintiffs Fail To Allege Anticompetitive Harm In The Alleged IAP Market

Like their app distribution claims, Plaintiffs' IAP claims fail because they state no cognizable harm to competition.  There is no foreclosure of competition because alternative app stores are not foreclosed from the alleged Android App Distribution Market and Google imposes no restraint on the use of rivals' billing systems for IAPs on apps distributed through alternative app stores.  For example, use of Google's IAP is neither required nor even contemplated for IAPs on apps distributed through competing app stores offered by Samsung, LG, Amazon, and others, or through direct distribution.  Developers also may use non-Android avenues to distribute apps, as Epic does (Epic ¶65), such as through Microsoft Xbox, Sony PlayStation, Nintendo Switch, PCs, Macs, and iOS devices, and use different billing systems for IAPs on apps distributed

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1   through these channels.  With no foreclosure of app distribution, there is necessarily no

2   foreclosure in the alleged IAP processing market.

3          **C.      Developer Plaintiffs' and Epic's Alternative Tying Claim Also Fails**

4          Plaintiffs alternatively claim that Google is "tying" distribution through Google Play with

5   IAP processing.  *See* Epic Count 6; PSB Count 6.  But these claims fail for similar reasons.

6          First, one cannot save a defective refusal to deal claim by recasting it as a tying claim.

7   *See Sambrell*, 906 F. Supp. 2d at 1080 (citing *Trinko*, 540 U.S. at 408) (rejecting Section 1 tying

8   claim because Facebook "has a right to dictate the terms on which it will permit its users to take

9   advantage of the Facebook social network"); *see also Aerotec*, 836 F.3d at 1180 (rejecting the

10  argument "that a refusal to deal with competitors may form the basis of a tying claim"); *Novell,*

11  *Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079 (10th Cir. 2013) (Gorsuch, J.) ("Whether one

12  chooses to call a monopolist's refusal to deal with a rival an act or omission, interference or

13  withdrawal of assistance, the substance is the same and it must be analyzed under the traditional

14  test" for a refusal to deal).

15         Second, even accepting that Plaintiffs are alleging "tying" rather than a refusal to deal, the

16  claim still fails because Google's billing system is an integral part of the method of business

17  Google is offering for the subset of apps distributed through Google Play that charge for app and

18  in-app purchases.  Google provides app developers with a route to distribution.  Google is

19  agnostic as to whether and how app developers choose to monetize their apps.  And for those

20  developers that choose to charge for their apps or in-app content, Google is agnostic as to whether

21  the developer monetizes its app by charging for the app upfront or later through selling in-app

22  content.  In both instances, Google charges a fee.  Thus, for those app developers that charge for

23  app and in-app purchases, Google Play's billing system is a fully integrated part of the

24  distribution services Google is offering through Play.  As such, "IAP processing" is not a separate

25  product and the tying claims fail.  *Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963, 974-75 (9th

26  Cir. 2008) (dismissing tying claim for failure to allege a separate tied product when defendant

27  was offering integral components of a business method); *see also Kaufman v. Time Warner*, 836

28  F.3d 137, 145 (2d Cir. 2016) (affirming dismissal of tying claim where plaintiff failed to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1     adequately allege cable boxes were a separate product from cable services).

2          Finally, and in all events, Plaintiffs' tying claims fail to allege harm to competition in the

3 relevant market.  Although Plaintiffs attempt to allege "*per se*" tying claims, the claims should be

4 assessed under the rule of reason.  The alleged tie involves platform software products—Google

5 Play and its integrated billing system—and "novel business practices" in a technology market,

6 namely Google's development of the Android OS and Play; Google's free licenses to that

7 software; and Google's business model of generating revenue from a small subset of apps

8 distributed through Play.  Such business practices, even if they are labeled a "tie", are evaluated

9 under the rule of reason. *See Microsoft*, 253 F.3d at 84 ("the rule of reason, rather than *per se*

10 analysis, should govern the legality of tying arrangements involving platform software

11 products"); *Qualcomm*, 969 F.3d at 990-991 (quoting *Microsoft*, 253 F.3d at 91) ("novel business

12 practices—especially in technology markets—should not be 'conclusively presumed to be

13 unreasonable and therefore illegal'").

14          Consequently, Plaintiffs' *per se* tying claims must be dismissed.  Under the rule of reason,

15 the tying claims fail because developers are free to use rival billing systems when distributing

16 apps through the many alternative distribution avenues, and thus there is no anticompetitive harm

17 in the relevant market.  *See* Section V.B., *supra*.

18 **VI.  PLAINTIFFS' CALIFORNIA STATE LAW CLAIMS FAIL FOR THE SAME**
**REASONS**
19

20          Plaintiffs also bring claims under California's Cartwright Act on the same theories that

21 form the basis of their federal antitrust law claims.  *See* Epic Counts 7-9; PSB Count 8.

22 Generally, decisions interpreting the Sherman Act are instructive as to the analysis of claims

23 under the Cartwright Act.  *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4

24 (9th Cir. 2014).  Here, authority interpreting the Cartwright Act mirrors federal authority with

25 respect to Plaintiffs claims.  First, there is no antitrust claim under the Cartwright Act where there

26 is no duty to deal.  *See SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 87 (2008)

27 (noting in case dismissing Cartwright Act claims that the "law is well settled that absent a

28 violation of public policy or statute, [a defendant] may choose to do business with whomever it

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1  wishes") (citing *Trinko*, 540 U.S. at 407-08); *see also Freeman v. San Diego Assn. of Realtors*, 77

2  Cal. App. 4th 171, 195 (1999) ("The antitrust laws do not preclude a party from unilaterally

3  determining the parties with which, or the terms on which, it will transact business."); *People's*

4  *Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 667 (2005) (noting, in the

5  context of a UCL claim based on alleged anticompetitive conduct, "the right to refuse to deal

6  remains sacrosanct").  Nor can a plaintiff escape dismissal by recasting a refusal to deal as illegal

7  tying.  *See SC Manufactured Homes*, 162 Cal App. 4th at 87-88 (dismissing tying claims under

8  the Cartwright Act because the defendant did not "foreclose" customers from conducting business

9  with plaintiff, but rather "refus[ed] to deal directly with plaintiff by refusing to provide plaintiff

10  the ability" to conduct business on its preferred terms).  Second, where, as here, there is no

11  substantial foreclosure or harm to competition, there is no Cartwright Act claim.  *See Eastman v.*

12  *Quest Diagnostics Inc.*, No. 15-CV-00415-WHO, 2016 WL 1640465, at \*5-8 (N.D. Cal. Apr. 26,

13  2016), *aff'd* 724 Fed. App'x 556, 559 n.2 (9th Cir. 2018) (dismissing Sherman Act and

14  Cartwright Act exclusive dealing claims for failure to allege substantial foreclosure).

15      Additionally, Epic cannot state a tying claim under Section 16727 of the Cartwright Act.

16  *See* Epic Count 10.  Section 16727 prohibits conditioning the sale of "goods, merchandise,

17  machinery, supplies, [or] commodities" on "the condition, agreement or understanding that the ...

18  purchaser … not use or deal in the goods, merchandise, machinery, supplies, commodities, or

19  services of a competitor."  Thus, under the plain language of the statute, it only applies when the

20  tying product is a "tangible" good, not a service or license.  *See, e.g.*, *Morrison v. Viacom, Inc.*,

21  66 Cal. App. 4th 534, 548 (1998) (dismissing tying claim under Section 16727 because the statute

22  "does not apply when the tying product is a service"); *Tele Atlas N.V. v. Navteq Corp.*, 397 F.

23  Supp. 2d 1184, 1192 (N.D. Cal. 2005) (explaining that Section 16727 only "forbid[s] tying

24  arrangements with respect to tangible goods").  Epic's tying claim is premised on Google

25  allegedly tying "Android app distribution" to "Android in-app payment processing." Epic ¶179.

26  But Epic alleges that it "consumes app distribution *services*" in the purported Android app

27  distribution market.  *E.g.*, *id.* ¶149 (emphasis added).  Because Epic alleges the tying product is

28  "distribution services" and not "goods, merchandise, machinery, supplies, [or] commodities,"

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

1   Epic's claim under Section 16727 must be dismissed.

2        Finally, Plaintiffs bring claims under both the "unlawful" and "unfair" prongs of

3   California's Unfair Competition Law (UCL).  Epic Count 11; PSB Count 7.  Both the "unlawful"

4   claims and the "unfair" claims are based on alleged violations of the antitrust laws.  Epic ¶235-37,

5   PSB ¶¶258, 260-61.  Developer Plaintiffs also allege that Google "has behaved unfairly and in

6   violation of the public policy as alleged herein," but does not specifically identify misconduct

7   against public policy except for Google's purportedly "exclusionary and anticompetitive

8   behavior." PSB ¶¶260-61.

9        A UCL claim under the "unlawful" prong fails for the same reason antitrust claims fail.

10  *See Cty. of San Jose v. Office of the Com'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015) ("An

11  independent claim under California's UCL is therefore barred so long as [defendant's] activities

12  are lawful under the antitrust laws."); *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d 827,

13  838 (N.D. Cal. 2015) (dismissing UCL claims as "derivative" of defective monopolization claim).

14       Plaintiffs' "unfair" claim fails for the same reason.  In competitor cases—applicable to

15  Epic, an alleged "would-be competitor"—"a business practice is 'unfair' only if it 'threatens an

16  incipient violation of the antitrust laws.'" *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App.

17  4th 247, 254 (2010) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163,

18  187 (1999)); *see also CZ Servs. v. Express Scripts Holding Co.*, No. 3:18-cv-04217-JD, 2020 WL

19  4368212, at *8 (N.D. Cal. July 30, 2020) (Donato, J.).  With respect to Developer Plaintiffs (and

20  Epic to the extent it is not considered a competitor), the challenged conduct is not "unfair" if it is

21  permissible under the antitrust laws. "If the same conduct is alleged to be both an antitrust

22  violation and an 'unfair' business act or practice for the same reason—because it unreasonably

23  restrains competition and harms consumers—the determination that the conduct is not an

24  unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward

25  consumers." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).  Thus, "conduct that

26  is 'deemed reasonable and condoned under the antitrust laws' could not support a claim under the

27  unfair prong of the UCL. 'To permit a separate inquiry into essentially the same question under

28  the unfair competition law would only invite conflict and uncertainty and could lead to the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS

enjoining of procompetitive conduct.'" *AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.*, No. C 16-00443 WHA, 2016 WL 3648623, at *87 (N.D. Cal. July 6, 2016) (quoting *Chavez*, 93 Cal. App. 4th at 375).

Because Google has not violated the antitrust laws and has no duty to deal with competitors or with Plaintiffs on their preferred terms, the "unfair" UCL claim necessarily fails as well. *Id.* at *26 (dismissing "unfair" UCL claim on the pleadings because under Section 2 of the Sherman Act, the defendant had "no duty to release a standalone … product"); *Drum*, 182 Cal. App. 4th at 254 (dismissing "unfair" UCL claim "a private party generally may choose to do or not to do business with whomever it pleases").

## VII.   CONCLUSION

Plaintiffs' claims suffer from threshold defects and should be dismissed.

Dated: November 13, 2020                             MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Brian C. Rocca*

Brian C. Rocca
*Attorneys for Defendants*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

Case Nos. 3:20-cv-05671-JD; 3:20-cv-05792-JD;
3:20-cv-06772-JD

DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS EPIC'S AND DEVELOPERS' COMPLAINTS