1
2
3
4

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

5
6
7
8
9
10
11
12
13
14
15

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

16

*Attorneys for Plaintiff Epic Games, Inc.*

17
18

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| EPIC GAMES, INC., a Maryland Corporation,<br><br>                              Plaintiff,<br><br>        v.<br><br>GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP.,<br><br>                              Defendants. | Case No. 3:20-CV-05671-JD<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................... 1

PARTIES........................................................................................................... 13

JURISDICTION AND VENUE ....................................................................... 15

INTRADISTRICT ASSIGNMENT ................................................................. 17

RELEVANT FACTS ........................................................................................ 17

I.  Google Dominates the Merchant Market for Mobile Operating Systems. ......... 17

    A.  The Merchant Market for Mobile Operating Systems ............................. 17

        i.  Product Market Definition ............................................... 17

        ii.  Geographic Market Definition........................................ 19

    B.  Google's Monopoly Power in the Merchant Market for Mobile OSs ...... 20

II.  Google Unlawfully Maintains a Monopoly in the Android App Distribution Market......................................................................................................... 23

    A.  The Android App Distribution Market ..................................................... 25

        i.  Product Market Definition ............................................... 25

        ii.  Geographic Market Definition........................................ 26

    B.  Google's Monopoly Power in the Android App Distribution Market ...... 27

    C.  Google's Anti-Competitive Conduct Concerning the Android App Distribution Market .................................................................................. 33

        i.  Google's Conduct Toward OEMs and Mobile Network Operators....................................................................... 33

        ii.  Google's Conduct Toward App Distributors and Developers........ 47

        iii.  Google's Conduct Toward Consumers........................................... 50

    D.  Anti-Competitive Effects in the Android App Distribution Market......... 55

III.  Google Unlawfully Acquired and Maintains a Monopoly in the Android In-App Payment Processing Market. ................................................................. 57

    A.  The Android In-App Payment Processing Market.................................... 57

1            i.      Product Market Definition ............................................................ 57

2            ii.     Geographic Market Definition..................................................... 59

3       B.    Google's Monopoly Power in the Android In-App Payment

4           Processing Market ................................................................................ 59

5       C.    Google's Anti-Competitive Conduct Concerning the Android In-App

6           Payment Processing Market ...................................................................... 60

7       D.    Anti-Competitive Effects in the Android In-App Payment Processing

8           Market.................................................................................................... 62

9   COUNT 1:  Sherman Act § 2 (Unlawful Monopoly Maintenance in the  Android

10           App Distribution Market) ...................................................... 63

11   COUNT 2:  Sherman Act § 1  (Unreasonable restraints of trade concerning

12           Android App Distribution Market:  OEMs) ...................................... 64

13   COUNT 3:  Sherman Act § 1  (Unreasonable restraints of trade concerning

14           Android App Distribution Market:  Developer Distribution Agreement)........... 66

15   COUNT 4:  Sherman Act § 2 (Unlawful Monopolization and Monopoly

16           Maintenance in the  Android In-App Payment Processing Market) ................. 67

17   COUNT 5:  Sherman Act § 1   (Unreasonable restraints of trade concerning

18           Android In-App Payment Processing Market: Developer Distribution

19           Agreement) ............................................................................ 68

20   COUNT 6:  Sherman Act § 1  (Tying Google Play Store to Google Play Billing)....... 70

21   COUNT 7:  California Cartwright Act (Unreasonable restraints of trade in

22           Android App Distribution Market: OEMs) ......................................... 71

23   COUNT 8:  California Cartwright Act (Unreasonable restraints of trade in

24           Android App Distribution Market: Developer Distribution Agreement)........... 73

25   COUNT 9:  California Cartwright Act (Unreasonable restraints of trade in

26           Android In-App Payment Processing Market: Developer Distribution

27           Agreement) .......................................................................... 75

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT 10:  California Cartwright Act (Tying Google Play Store to Google Play
      Billing) ................................................................................................................ 77

COUNT 11:  California Unfair Competition Law ........................................................ 79

PRAYER FOR RELIEF ............................................................................................. 80

1    On the basis of documents produced to date by Defendants Google LLC,

2    Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited,

3    and Google Payment Corp. (collectively, "Google"), it is clear that very carefully

4    phrased arguments in Google's pending motion to dismiss give a misleading picture of

5    the full scope of Google's anticompetitive conduct. Accordingly, although Plaintiff

6    Epic Games, Inc. ("Epic") believes its initial Complaint was more than sufficient, it

7    hereby alleges, by its undersigned counsel, as a First Amended Complaint, with

8    knowledge with respect to its own acts and on information and belief as to other

9    matters, as follows:

10    **PRELIMINARY STATEMENT**

11    1.    In 1998, Google was founded as an exciting young company with a

12    unique motto: "Don't Be Evil". Google's Code of Conduct explained that this

13    admonishment was about "how we serve our users" and "much more than that . . . it's

14    also about doing the right thing more generally".[1] Twenty-two years later, Google has

15    relegated its motto to nearly an afterthought, and is using its size to do evil upon

16    competitors, innovators, customers, and users in a slew of markets it has grown to

17    monopolize. This case is about doing the right thing in one important area, the Android

18    mobile ecosystem, where Google unlawfully maintains monopolies in multiple related

19    markets and engages in unlawful restraints of trade, denying consumers the freedom to

20    enjoy their mobile devices—freedom that Google always promised Android users

21    would have.

22    2.    Google acquired the Android mobile operating system more than a

23    decade ago, promising repeatedly over time that Android would be the basis for an

24    "open" ecosystem in which industry participants could freely innovate and compete

25

26

27

28

---

[1] Kate Conger, *Google Removes 'Don't Be Evil' Clause from Its Code of Conduct*, Gizmodo (May 18, 2018), https://gizmodo.com/google-removes-nearly-all-mentions-of-dont-be-evil-from-1826153393.

without unnecessary restrictions.[2]  Google's CEO, Sundar Pichai, represented in 2014 that Android "is one of the most open systems that I've ever seen".[3]  And Andy Rubin, an Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[4]  Since then, Google has changed its course of conduct, deliberately and systematically closing the Android ecosystem to competition, breaking the promises it made.  Google's anti-competitive conduct has now been condemned by regulators the world over.

3.     Epic brings claims under Sections 1 and 2 of the Sherman Act and under California law to end Google's unlawful monopolization and anti-competitive restraints in two separate markets:  (1) the market for the distribution of mobile apps to Android users and (2) the market for payment processing solutions for digital content within Android mobile apps.  Epic seeks to end Google's unfair, monopolistic and anti-competitive actions in each of these markets, which harm device makers, app developers, app distributors, payment processors, and consumers.

4.     **Epic does not seek monetary compensation from this Court for the injuries it has suffered**.  Epic likewise does not seek a side deal or favorable treatment from Google for itself.  Instead, Epic seeks injunctive relief that would make

---

[2] *See, e.g.*, Google Blog, News and notes from Android team, *The Benefits & Importance of Compatibility*,  (Sept. 14, 2012), https://android.googleblog.com/2012/09/the-benefits-importance-of-compatibility.html ("We built Android to be an open source mobile platform freely available to anyone wishing to use it . . . .  This openness allows device manufacturers to customize Android and enable new user experiences, driving innovation and consumer choice."); Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw ("Android is one of the most open systems that I've ever seen"); Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog ("At its core, Android has always been about openness").

[3] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

[4] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

First Amended Complaint for Injunctive Relief     2

1    good on Google's broken promise:  an open, competitive Android ecosystem for all

2    users and industry participants.  Such injunctive relief is sorely needed.

3           5.     Google has eliminated competition in the distribution of Android

4    apps using myriad contractual and technical barriers.  Google's actions force app

5    developers and consumers into Google's own monopolized "app store"—the Google

6    Play Store.  Google has thus installed itself as an unavoidable middleman for app

7    developers who wish to reach Android users and vice versa.  Google uses this monopoly

8    power to impose a tax that siphons monopoly profits for itself every time an app

9    developer transacts with a consumer for the sale of an app or in-app digital content.

10   Google further siphons off all user data exchanged in such transactions to benefit its

11   own app designs and advertising business.

12          6.     The conduct described below shows that Google's persistent

13   monopoly is the result of deliberate efforts by Google to achieve and maintain it.  Not

14   content with the contractual and technical barriers it has carefully constructed to

15   eliminate competition, Google uses its size, influence, power, and money to induce third

16   parties into anticompetitive agreements that further entrench its monopolies.  For

17   example, Google has gone so far as to share its monopoly profits with business partners

18   to secure their agreement to fence out competition, has developed a series of internal

19   projects to address the "contagion" it perceived from efforts by Epic and others to offer

20   consumers and developers competitive alternatives, and has even contemplated buying

21   some or all of Epic to squelch this threat.

22          7.     If not for Google's anti-competitive behavior, the Android

23   ecosystem could live up to Google's promise of open competition, providing Android

24   users and developers with competing app stores that offer more innovation, significantly

25   lower prices, and a choice of payment processors.  Such an open system is not hard to

26   imagine.  Two decades ago, through the actions of courts and regulators, Microsoft was

27   forced to open up the Windows for PC ecosystem.  As a result, PC users have multiple

28   options for downloading software onto their computers, either directly from developers'

websites or from several competing stores.  No single entity controls that ecosystem or imposes a tax on all transactions.  And Google, as the developer of software such as the Chrome browser, is a direct beneficiary of this competitive landscape.  Android users and developers likewise deserve free and fair competition.

*     *     *

8.     In today's world, virtually all consumers and businesses stay connected, informed, and entertained through smart mobile computing devices such as smartphones and tablets.  Mobile applications ("apps") are innovative software products that greatly contribute to those devices' value.  Consumers the world over use smart mobile devices and mobile apps to video chat with friends, pay bills, stay current with the news, listen to music, watch videos, play games, and more.

9.     Epic develops and distributes entertainment, social networking and utility applications for personal computers, gaming consoles, and smart mobile devices. Epic operates a store for the distribution of personal computer apps, which it would have expanded to distribute Android apps but for Google's conduct.  Epic also develops and licenses *Unreal Engine,* a powerful software suite available to third-party developers that allows them to create and distribute three-dimensional and immersive digital content and apps, including Android apps, movies, and other three-dimensional environments.  Google's practices have impacted each of Epic's lines of business.



10.    **App Development:**  Epic develops multiple applications, including *Fortnite*, *Fall Guys* and *Rocket League*, the social networking app *Houseparty*, and apps that support Epic's *Unreal Engine*, such as *Live Link Face*, which enables users to capture facial animation with their mobile phones.

11.    *Fortnite* is a massive virtual world where hundreds of millions of people connect, meet, play, talk, compete, dance, or attend concerts and cultural events. *Fortnite Battle Royale* offers users competitive gameplay as well as the opportunity to mingle, watch movies, attend concerts or participate in cultural events with friends and other users.  *Fortnite Creative Mode* allows users to design and build their own experiences within the *Fortnite* universe.

      a. *Fortnite* is free for everyone to download and experience, including by playing games, attending events, socializing with friends or creating new content.  To generate revenue, Epic offers users various in-app purchases of content for use within the app, such as digital avatars, costumes, dances, concert or movie-themed items, or other cosmetic enhancements.



b. In the first year after *Fortnite* was released in 2017, it attracted over 125 million users; in the years since, *Fortnite* has topped 400 million users and has become a global cultural phenomenon.

12. **App Distribution:** Epic operates an online app store, the Epic Games Store, which it launched in 2018. Titles available on the Epic Games Store include popular gaming apps (*e.g.*, the *Grand Theft Auto* franchise) and non-gaming apps (*e.g.*, Spotify, iHeartRadio). The Epic Games Store also distributes at least one third-party app store, itch.io. It offers developers an 88/12 revenue share arrangement for all revenues from the sale of a developer's games through the Epic Games Store. For in-app purchases, the Epic Games Store provides developers the choice of using the developer's own payment processor (at no fee) or Epic's own payment solution, Epic Direct Payment (for a fee equal to a 12% share of sales revenue).

13. **Unreal Engine**: First launched in 1998, Epic's *Unreal Engine* is a powerful, three dimensional environment graphics engine used to build digital three-dimensional environments for multiple uses including architecture projects, film & television production, medical training, and more. *Unreal Engine* is used to create software applications on all major platforms (PC, Mac, Android, iOS, major gaming consoles and more) and for use in films, television and other fields.

a. The *Unreal Engine*'s source code is free to use. For developers who use *Unreal Engine* to develop and sell their games or other projects commercially, Epic typically collects a 5% royalty after the developer reaches $1 million in gross sales. Alternatively, developers can negotiate custom or royalty-free licenses with Epic.

b. *Unreal Engine* powers some of the world's most popular digital games, including (in addition to *Fortnite*) PlayerUnknown's Battlegrounds (known as "PUBG"), ARK, Gears of War, Borderlands, and Batman: Arkham City.

First Amended Complaint for Injunctive Relief     6

c.  The *Unreal Engine* is also used far beyond the realm of video games. *Unreal Engine* received its first Emmy in 2018 for its contribution to televised broadcasts such as the 2018 Winter Olympics, Super Bowl LII, and numerous e-sports tournaments.  Since 2016, *Unreal Engine* has been used in more than 100 film and television productions.  For example, *The Mandalorian*—Disney's television series in the *Star Wars* franchise—was filmed on a stage set within a huge oval LED display.  The exteriors and interiors—virtually every background and set—were created in *Unreal Engine* and displayed in real time behind the actors.  Similarly, the popular HBO series *Westworld* turned to *Unreal Engine* to develop many of its visual effects.  Car makers, including Audi and Ford, have used *Unreal Engine* for a variety of uses including automotive design and engineering, as well as developing digital showrooms in which customers can configure their vehicles with high-fidelity visuals.  In aviation, Gulfstream visualizes its jets for its employees and clients.  *Unreal Engine* has even helped brain surgeons train for and perform some of the most intricate and challenging aspects of brain surgeries by allowing for detailed real-time digital anatomy simulations.  In total, *Unreal Engine* boasts a community of 11 million users.

d.  As noted above, utility apps designed for use with *Unreal Engine* are available in the Google Play Store, including, *Unreal Match 3* and *Action RPG Game Sample*, both of which help developers learn how to use *Unreal Engine* to develop their own mobile games.

14.  Similar to a PC or a Mac personal computer, smart mobile devices use an "operating system" or "OS" to provide core device functionality and to enable the operation of compatible programs.  As with PCs, the commercial viability of an OS

1  for mobile devices (a "mobile OS") depends on the availability of a large number of

2  compatible apps that cater to the preferences and needs of users.

3        15.    Google controls the most ubiquitous OS in mobile devices, the

4  Android OS.  Android OS is used by billions of users the world over, and boasts nearly

5  3 million compatible apps.

6        16.    Android is the only commercially viable OS that is widely available

7  to license by companies that design and sell smart mobile devices, known as original

8  equipment manufacturers ("OEMs").  Accordingly, when OEMs select a mobile OS to

9  install on their devices, they have only one option:  Google's Android OS.  Google

10 therefore has monopoly power in the market for mobile operating systems that are

11 available for licensing by OEMs (the Merchant Market for Mobile Operating Systems

12 (*infra* Part I)).

13       17.    Google has not been satisfied with its control of the Android OS.

14 Notwithstanding its promises to make Android devices open to competition, Google has

15 deliberately changed its course of conduct, erecting contractual and technological

16 barriers that foreclose competing ways of distributing apps to Android users, ensuring

17 that the Google Play Store accounts for nearly all the downloads of apps from app stores

18 on Android devices.  Google thus maintains a monopoly over the market for distributing

19 mobile apps to Android users, referred to herein as the "Android App Distribution

20 Market" (*infra* Part II).

21       18.    For example, through a series of revenue-sharing and licensing

22 agreements with OEMs, Google bundles the Google Play Store with a set of other

23 Google services that Android OEMs must have on their devices (such as Gmail, Google

24 Search, Google Maps, and YouTube) and conditions the licensing of those services on

25 an OEM's agreement to pre-install the Google Play Store and to prominently display it.

26 Google then interferes with OEMs' ability to make third-party app stores or apps

27 available on the devices they make, including through its so-called "Anti-Fragmentation

28 Agreements" ("AFAs") that foreclose OEMs from modifying Android to offer fast and

simple (or "frictionless") downloading of apps in the same way they are offered through Google Play. These restrictions effectively foreclose competing app stores—and even single apps—from what could be a primary distribution channel. Google's documents show that it pushes OEMs into making Google Play the exclusive app store on the OEMs' devices through a series of coercive carrots and sticks, including by offering significant financial incentives to those that do so, and withholding those benefits from those that do not. Google's documents further show that Google has erected these contractual barriers to competition for Android app distribution in the recognition that Google stands to lose billions of dollars if Android app distribution were opened to competition and competing Android app stores, including an "Epic Store", were allowed to "gain full traction".

19. Epic's experience with one OEM, OnePlus, is illustrative. Epic struck a deal with OnePlus to make Epic games available on its phones through an Epic Games app. The Epic Games app would have allowed users to seamlessly install and update Epic games, including *Fortnite*, without obstacles imposed by Google's Android OS. But Google forced OnePlus to renege on the deal, citing Google's "particular[] concern" about Epic having the ability to install and update mobile games while "bypassing the Google Play Store".

20. Another OEM, LG, told Epic that its contract with Google did not allow it to enable the direct distribution of apps, and that the OEM could not offer any functionality that would install and update Epic apps except through the Google Play Store.

21. Google also enforces anti-competitive restrictions against app developers and distributors. Specifically, Google contractually prohibits app developers and would-be distributors from offering on the Google Play Store any app that could be used to download other apps, *i.e.*, any app that could compete with the Google Play Store in app distribution. And Google further requires app developers to distribute apps through the Google Play Store if they wish to advertise those apps through valuable

advertising channels controlled by Google, such as ad placements on Google Search or on YouTube that are specially optimized to advertise mobile apps.

22.    Finally, Google stifles or blocks consumers' ability to download app stores and apps directly from developers' websites.  As anyone who has tried to download directly on an Android device knows, it is significantly different than the simple process available on a personal computer:  directly downloading *Fortnite* on an Android device can involve a dozen steps, requiring the user to change default settings and bravely click through multiple dire warnings.  Accordingly, leading Google Play executives have acknowledged that directly downloading *Fortnite* from a source other than Google Play is "an awful experience", and developers like Epic should "worry that most will not go through the 15+ steps".  And even if a persistent user manages to install a competing app store, Google has prevented such stores from competing on equal footing with the Google Play Store by restricting them from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store.

23.    Google engages in these anticompetitive acts to eliminate consumer choice and competition in mobile app distribution.  Google has no legitimate justification for these restrictions.  Google therefore has changed its course of conduct, breaking its promise that Android would be an "open" ecosystem in which other participants could participate fairly.

24.    But Google does not stop at app distribution.  Google also imposes anti-competitive restrictions in the separate Market for Android In-App Payment Processing (*infra* Part III).

25.    App developers who sell digital content for consumption within apps require seamless payment processing solutions to execute purchases.  App developers, including Epic, have developed payment processing solutions internally.  Others may use a host of payment processing solutions offered by multiple competing third parties.

26.     Google, however, ties distribution through its Google Play Store with developers' exclusive use of Google's own payment processing solution, called Google Play Billing, to process in-app purchases of digital content.  Indeed, app developers that distribute through the Google Play Store are even prohibited from offering Android users the *choice* of additional payment processing options alongside Google's for digital content.  And because Google has a monopoly in the Android App Distribution Market, app developers cannot practically avoid this anti-competitive tie by electing app distribution through an alternative channel.

27.     The result is that in every in-app transaction for digital content, it is Google, not the app developer, that collects the payment in the first instance.  Google then taxes the transaction at up to an exorbitant 30% rate, remitting the remaining 70% to the developer who actually made the sale.  This 30% commission is often ***ten times*** higher than the price typically paid for the use of other electronic payment solutions.

28.     Moreover, through this tie, Google inserts itself as an intermediary between each seller and each buyer for every purchase of digital content within the Android ecosystem, collecting for itself the personal information of users, which Google then uses to give an anti-competitive edge to its own advertising services and mobile app development business.

29.     Google's anticompetitive conduct has substantially foreclosed competing stores from offering consumers and developers choice in distribution and payment processing.  Indeed, Epic, which distributes apps through its own store to users of personal computers, would open a store to compete with Google's and offer developers more innovation, better security, and more choice, including for in-app payment processing.  App developers would not have to pay Google's supra-competitive tax of 30%, as the price of distribution and payment processing alike would be set by market forces rather than Google's fiat.  Developers could address any payment-related issues (such as refunds) directly with their own customers, rather than

First Amended Complaint for Injunctive Relief      11

1    through Google.  And users and developers, jointly, would get to decide whether users'
2    data should be utilized for other purposes.

3              30.    Google's anti-competitive conduct has injured Epic, both as an app
4    developer and as a potential competitor in app distribution and payment processing.
5    Epic repeatedly approached Google and asked to negotiate relief that would stop
6    Google's unlawful and anti-competitive restrictions on app developers and consumers.
7    But Google would not budge.

8              31.    Because of Google's refusal to stop its ongoing anti-competitive and
9    unlawful conduct, on August 13, 2020, Epic began providing *Fortnite* users the choice
10   of using Epic's own direct payment tool as an alternative to Google's overpriced billing
11   tool, sharing with users who chose to use Epic's payment tool the resulting savings.



23             32.    In retribution, Google removed *Fortnite* from Google Play Store
24   listings, preventing new users from obtaining the game.  Google also prevented Android
25   users who acquired *Fortnite* from the Google Play Store from obtaining app updates
26   they needed to continue playing with their friends and family.
27             33.    Epic has publicly advocated for years that Google cease the anti-
28   competitive conduct addressed in this First Amended Complaint.  Google refused to

First Amended Complaint for Injunctive Relief        12

change its industry-impacting conduct.  Instead, Google offered to placate Epic by offering it preferential terms on side deals, such as YouTube sponsorships and cloud services, if Epic agreed to distribute *Fortnite* in the Google Play Store and acceded to Google's 30% tax.  Google has reached preferential deals with major mobile app developers, such as Activision Blizzard, as part of an initiative Google originally called Project Hug and now refers to as the Apps and Games Velocity Programs.  These deals allow Google to keep its monopolistic behavior publicly unchallenged.  But Epic is not interested in any side deals that might benefit Epic alone while leaving Google's anti-competitive restraints intact; instead, Epic is focused on opening up the Android ecosystem for the benefit of ***all*** developers and consumers.

34.     Accordingly, Epic seeks injunctive relief in court.  Google's conduct has caused and continues to cause Epic financial harm, but Epic is ***not*** bringing this case to recover these damages; Epic is not seeking any monetary relief, but rather only an order enjoining Google from continuing to impose its anti-competitive conduct on the Android ecosystem.

## PARTIES

35.     Plaintiff Epic Games, Inc. is a Maryland corporation with its principal place of business in Cary, North Carolina.  Epic was founded in 1991 by a college student named Tim Sweeney.  Mr. Sweeney ran Epic out of his parents' basement and distributed, by mail, Epic's first commercial personal computer software, a game named *ZZT*.  Since then, Epic has developed several popular entertainment software products that can be used on an array of platforms—such as personal computers, gaming consoles, and smart mobile devices.  Epic also creates and distributes *Unreal Engine*, a powerful software suite that allows competing developers and others to create realistic three-dimensional content, including video games, architectural recreations, television shows, and movies.  An Epic subsidiary also develops and distributes the popular *Houseparty* app, which enables video chatting and social gaming on smart mobile devices and personal computers.  Worldwide,

approximately 400 million users have signed up to use Epic's apps and services, and each day 30 to 40 million individuals log into an Epic app, such as *Fortnite*, *Rocket League*, *Houseparty,* or the Epic Games Store.

36.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

37.     Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Ireland contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

38.     Defendant Google Commerce Limited ("Google Commerce") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.  Google Commerce contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

39.     Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a private limited company organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and a subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

40.     Defendant Google Payment Corp. ("Google Payment") is a Delaware corporation with its principal place of business in Mountain View, California, and a subsidiary of Google LLC.  Google Payment provides in-app payment processing services to Android app developers and Android users and collects a 30% commission on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within such apps.

## JURISDICTION AND VENUE

41.     This Court has subject-matter jurisdiction over Epic's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Epic's state law claims pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of Plaintiff, on the one hand, and of Defendants, on the other, and the amount in controversy exceeding $75,000.

42.     This Court has personal jurisdiction over the Defendants.  Google LLC and Google Payment are headquartered in this District.  All Defendants have engaged in sufficient minimum contacts with the United States and have purposefully availed themselves of the benefits and protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements.  Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

43.     Each of the Defendants except Google Payment is party to a Google Play Developer Distribution Agreement (the "DDA") with Epic.  Section 16.8 of the DDA provides that the parties "agree to submit to the exclusive jurisdiction of the federal or state courts located within the county of Santa Clara, California to resolve any legal matter arising from or relating to this Agreement".  Section 16.8 further provides that "[a]ll claims arising out of or relating to this Agreement or Your relationship with Google under this Agreement will be governed by the laws of the State of California,

excluding California's conflict of laws provisions." The claims addressed in this Complaint relate to the DDA or to Epic's relationship with Google under the DDA, or in the alternative such claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over each Defendant, so that the exercise of pendent personal jurisdiction would be proper.

44.     Google Payment is party to a Google Payments—Terms of Service—Seller Agreement with Epic. Section 11.3 of that Agreement provides that "[t]he exclusive venue for any dispute related to this Agreement will be the state or federal courts located in Santa Clara County, California, and each party consents to personal jurisdiction in these courts." Section 11.3 further provides that "The laws of California, excluding California's choice of law rules, and applicable federal United States laws will govern this Agreement." The dispute between Google Payment and Epic relates to the parties' Agreement, or in the alternative Epic's claims arise out of the same nucleus of operative facts as other claims as to which the Court may exercise personal jurisdiction over Google Payment, so that the exercise of pendent personal jurisdiction would be proper.

45.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Epic's claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

**INTRADISTRICT ASSIGNMENT**

46.    Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

**RELEVANT FACTS**

**I.    Google Dominates the Merchant Market for Mobile Operating Systems.**

47.    To understand how Google effectively monopolizes the Android App Distribution and Android In-App Payment Processing Markets, as described below in Parts II and III, it is helpful to understand the background of smart mobile devices and how Google effectively dominates the related Merchant Market for Mobile Operating Systems through its control over the Android operating system.

**A.    The Merchant Market for Mobile Operating Systems**

i.    Product Market Definition

48.    Smart mobile devices are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multi-purpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music, or playing games.  Smart mobile devices include smartphones and tablet computers.  Many consumers may *only* have a smart mobile device and no other computer.  Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related markets.

49.    Like laptop and desktop personal computers, mobile devices require an operating system—or "OS"—that enables multi-purpose computing functionality.  A mobile OS, just like the OS of any computer, is a piece of software that provides basic functionality to users of mobile devices such as button controls, touch commands, motion commands, and the basic "graphical user interface", which includes "icons" and other visual elements representing actions that the user can take.  A mobile OS also manages the basic operations of a smart mobile device, such as cellular or WiFi connectivity, GPS positioning, camera and video recording, speech recognition, and

1   other features.  In addition, a mobile OS permits the installation and operation of mobile
2   apps that are compatible with the particular OS and facilitates their use of the device's
3   OS-managed core functionality.

4          50.    To ensure that every user can access the basic functions of a mobile
5   device "out of the box", that is at the time he/she purchases the device, an OEM must
6   pre-install an OS on each device prior to its sale.  This is similar to a personal computer
7   that comes pre-installed with Microsoft Windows for PC or Apple's macOS for a Mac
8   computer.  OEMs design mobile devices to ensure the device's compatibility with a
9   particular OS the OEM chooses for a particular model of mobile device, so that the
10  device may utilize the capabilities of that OS.  For OEMs, the process of implementing
11  a mobile OS requires significant time and investment, making switching to another
12  mobile OS difficult, expensive, and time-consuming.

13         51.    The vast majority of OEMs do not develop their own OS and must
14  choose an OS that can be licensed for installation on smart mobile devices they design.
15  There is therefore a relevant Merchant Market for Mobile OSs comprising mobile OSs
16  that OEMs can license for installation on the smart mobile devices they manufacture.
17  The market does not include proprietary OSs that are not available for licensing, such as
18  Apple's mobile OS, called iOS.  Historically, the Merchant Market for Mobile OSs has
19  included the Android OS, acquired and further developed by Google; the Tizen mobile
20  OS, a partially open-source mobile OS that is developed by the Linux Foundation and
21  Samsung; and the Windows Phone OS developed by Microsoft.

22         52.    Some consumers continue to use cellular phones that do not have
23  multi-purpose, computing functions.  These simple phones resemble older "flip
24  phones", for example; they are not part of the smart mobile device category.  These
25  phones do not support mobile apps such as *Fortnite* or *Houseparty* and are instead
26  typically limited to basic cellular functionality like voice calls and texting.  The simple
27  operating systems on these phones, to the extent they exist, cannot support the wide

28

array of features supplied by the OSs on smart mobile devices and are not part of the

Merchant Market for Mobile OSs defined herein.

53.     To the extent that electronic devices other than smart mobile devices

use operating systems, those OSs are not compatible with mobile devices, and therefore

are not included in the Merchant Market for Mobile OSs defined herein.  For example,

computing devices that are not handheld and portable, that are not capable of multi-

purpose computing functions and/or that lack cellular connectivity—such as desktop

computers, laptops, or gaming consoles—are not considered to be "smart mobile

devices".  Gaming devices like Sony's PlayStation 4 ("PS4") and Microsoft's Xbox are

physically difficult to transport, require a stable WiFi or wired connection to operate

smoothly, and require an external screen for the user to engage in game play.  Thus,

even for games, if a gamer owns, for example, a dedicated, non-portable gaming

console such as a PS4, which connects to and enables gaming via his/her TV, he/she

would not consider that PS4 a reasonable substitute for a mobile device like a

smartphone (and therefore would not consider the OS for the PS4 a reasonable

substitute for a mobile OS), nor would he/she consider the version of any game created

for his/her PS4 to substitute for the mobile app version of such a game.  That is because

the portability (and typically for smartphones the cellular connectivity) of the mobile

devices enable the consumer to play mobile games away from home or anywhere in the

home.  Indeed, for this reason, game developers often distribute multiple versions of an

app, each of which is programmed for compatibility with a particular type of device and

its operating system.

ii.     Geographic Market Definition

54.     OEMs license mobile OSs for installation on mobile devices

globally, excluding China.  Google's operations in China are limited, and it does not

make available many of its products for mobile devices sold within China.  This is

based in part on legal and regulatory barriers to the distribution of mobile OS-related

software imposed by China.  Further, while Google contractually requires OEMs

licensing Android outside of China not to sell any devices with competing Android-compatible mobile OSs, it imposes no such restriction on devices sold within China. Because the OEMs that sell Android mobile devices both within and outside China have committed to this contractual restriction, such OEMs must sell, outside of China, devices with Google's Android OS.  The geographic scope of the relevant Merchant Market for Mobile OSs is therefore worldwide, excluding China.

**B.      Google's Monopoly Power in the Merchant Market for Mobile OSs**

55.      Google has monopoly power in the Merchant Market for Mobile OSs through its Android OS.  As determined by the European Commission during the course of its investigation of Android, the Android OS, licensed to OEMs in relevant respects by Google, is installed on over 95% of all mobile devices sold by OEMs utilizing a merchant mobile OS.  Indeed, Android OS is installed on nearly 75% of all smart mobile devices sold by *all* OEMs, including even those OEMs that use a proprietary mobile OS they developed exclusively for their own use (such as Apple's iOS).

56.      A mobile ecosystem typically develops around a mobile OS, such as the Android OS.  The "Android ecosystem" is a system of mobile products (such as devices, apps and accessories) designed to be inter-dependent and compatible with each other and the Android OS.  Ecosystem participants include an array of participating stakeholders, such as Google, OEMs that make Android-compatible devices, developers of Android-compatible apps, Android app distribution platforms, including app stores, the makers of ancillary hardware such as headphones or speakers, cellular carriers, and others.

57.      Mobile ecosystems benefit from substantial network effects—that is, the more developers that design useful apps for a specific mobile OS, the more consumers will be drawn to use the relevant OS for which those apps are designed; the more consumers that use an OS, the more developers want to develop even more apps for that OS.  As determined in *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30

(D.D.C. 2000), new entrants into an operating system market thus face an "applications barrier to entry". An applications barrier to entry arises because a new operating system will be desirable to consumers only if a broad array of software applications can run on it, but software developers will find it profitable to create applications that run on an operating system only if there is a large existing base of users.

58.   To overcome this challenge and to attract app developers and users, Google has continuously represented that Android is an "open" ecosystem and that any ecosystem participant could create Android-compatible products without unnecessary restrictions. Indeed, Google LLC's CEO, Sundar Pichai, represented in 2014 that Android "is one of the most open systems that I've ever seen".[5]  And Andy Rubin, an Android founder who is described by some as the "Father of Android", said when he departed Google in 2013 that "at its core, Android has always been about openness".[6]

59.   But the current reality is quite different. Despite these claims of openness, Google has now effectively closed the Android ecosystem through its tight control of the Android OS. And, as the dominant OS licensor, Google benefits from substantial network effects which makes participation on its platform a "must-have" market for developers.

60.   As further described below, Google uses the Android OS to restrict the apps and app stores OEMs are permitted to pre-install on the devices they make and to impose deterrents to the direct distribution of competing app stores and apps to Android users, all at the expense of competition in the Android ecosystem.

61.   Because of Google's monopoly power in the Merchant Market for Mobile OSs, OEMs, developers and users cannot avoid such effects by choosing another mobile OS. OEMs such as ZTE and Nokia have stated that other non-

---

[5] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

[6] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

proprietary OSs are poor substitutes for the Android OS and are not a reasonable alternative to licensing the Android OS.  One important reason is that other mobile OSs presently do not support many high-quality and successful mobile apps, which consumers find essential or valuable when choosing a mobile device.  These circumstances have biased consumers against the purchase of mobile devices with non-proprietary mobile OSs other than Android OS.  OEMs thus have no choice but to agree to Google's demands because it is critical that they be able to offer a popular mobile OS and corresponding ecosystem to consumers who are choosing which mobile device to purchase.

62.     The Android OS was designed to be, and advertised as, "open source", in that OEMs and others may use portions of the OS without a license from Google, or even create customized versions of the OS for their own purposes, called Android "forks".  But in reality, the Android OS is "open source" in name only.  Google has entered into so-called Anti-Fragmentation Agreements ("AFAs") with Android mobile OEMs that have prevented them from creating Android forks for mobile devices and which prevent OEMs from modifying Android to offer competing app stores without restrictions.  Among other things, the AFAs prohibit OEMs from taking "any actions that may cause or result in the fragmentation of Android", which is determined in Google's "sole discretion".  Further, Android OEMs agree only to distribute "Android Compatible Devices", meaning that they may not ship *any* devices running an Android fork.  Android Compatible Devices also must comply with the "Android Compatibility Definition" document and pass the "Android Compatibility Test Suite", both of which are maintained by Google.  Among other things, the Android Compatibility Definition document requires OEMs to prompt users explicitly for permission to allow direct downloading of apps outside Google Play.  The AFAs also prohibit Android OEMs from distributing certain software on devices that are not Android Compatible Devices, and bar OEMs from distributing, creating or promoting "a

third-party software development kit (SDK) derived from Android or derived from Android Compatible Devices".

63.     More recently, after the European Commission began investigating Google's Android-related practices, including the AFAs, Google transitioned to a new form of agreement with Android OEMs called the Android Compatibility Commitment ("ACC").  But the ACC terms are only marginally less restrictive than the AFA terms in that they allow OEMs to manufacture non-Android Compatible Devices on behalf of a third party and that are marketed under a third-party brand.  However, they still substantially foreclose OEMs from distributing and marketing their own devices, including Android forks.  Entering into an AFA or ACC is a precondition to an OEM being able to enter into a Mobile Application Distribution Agreement ("MADA") and Revenue Sharing Agreement ("RSA"), which are described below.  As a result, all or almost all commercially significant mobile Android OEMs are bound by an AFA or ACC, which helps Google ensure that mobile OEMs do not develop an Android fork that could compete with Google's own version of the Android OS or provide features that would support third-party app stores that compete with Google Play.

64.     Google's conduct described herein creates a further barrier to entry into the Merchant Market for Mobile OSs by, among other things, restricting the ability of OEMs to support alternatives to Google's version of Android and making it more difficult for consumers to switch to other mobile OSs.

## II.     Google Unlawfully Maintains a Monopoly in the Android App Distribution Market.

65.     Mobile apps make mobile devices more useful and valuable because they add functionality to the mobile device that caters to the specific interests of each mobile device user.  For example, they facilitate video chats with friends and family, banking online, shopping, job hunting, photo editing, reading digital news sources, editing documents, or playing a game like *Fortnite Battle Royale*.  Many workers use their smart mobile device to check work schedules, access company email, or use other

employer software while outside the workplace.  For many consumers, a smartphone or tablet is the only way to access these functions, because the consumer does not own a personal computer or because the consumer can only access the Internet using a cellular connection.  But even when a consumer can perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable, important, and distinct.

66.     Whereas some apps may be pre-installed by OEMs, OEMs cannot anticipate all the various apps a specific consumer may desire to use.  Moreover, many consumers have different preferences as to which apps they want, and it would be undesirable for OEMs to load the devices they sell with unwanted apps that take up valuable space on the mobile device.  And many apps that consumers may ultimately use on their device will be developed after they buy the device.  Accordingly, consumers who seek to add new functionalities to a mobile device and customize the device for their own use need to obtain and install mobile apps themselves after purchasing their device.  Currently, on Android devices, this is done most often through the Google Play Store, Google's own "app store".  The Google Play Store is a digital portal set up by Google and through which mobile apps can be browsed, searched for, purchased (if necessary), and downloaded by a consumer.  App stores such as the Google Play Store, alongside several other ways by which apps can be distributed to the hundreds of millions of consumers using Android-based mobile devices, constitute the Android App Distribution Market, defined below.

67.     Through various anti-competitive acts and unlawful restraints on competition, Google has substantially foreclosed competition and maintained a monopoly in the Android App Distribution market, causing ongoing harm to competition and injury to OEMs, app distributors, app developers, and consumers. Google's restraints of trade belie representations Google currently makes to developers that "as an open platform, Android is about choice" and that app developers "can distribute [their] Android apps to users in any way [they] want, using any distribution

approach or combination of approaches that meets [their] needs", including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers".[7]

### A.    The Android App Distribution Market

#### i.    Product Market Definition

68.    There is a relevant market for the distribution of apps compatible with the Android OS to users of mobile devices (the "Android App Distribution Market"). This Market includes all the channels by which mobile apps may be distributed to the hundreds of millions of users of mobile devices running the Android OS. The Market primarily includes Google's dominant Google Play Store, with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind. Nominally only, the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also within this market.

69.    App stores allow consumers to easily browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps, using the mobile device itself and an Internet connection. OEMs find it commercially unreasonable to ship a smart mobile device to a consumer without at least one app store installed, as a consumer's ability to obtain new mobile apps is an important part of the value provided by smart mobile devices.

70.    App stores selling mobile apps are currently OS-specific, meaning they distribute only apps that are compatible with the specific mobile OS on which the app store is used. A consumer who has a mobile device running the Android OS cannot use apps created for a different mobile operating system. An owner of an Android OS device will use an Android compatible app store, and such app stores distribute only Android-compatible mobile apps. That consumer may not substitute an Android app store with, for example, Apple's App Store, as that app store is not available on Android

---

[7] Google Play Developers Page, *Alternative Distribution Options*, https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed July 20, 2021).

First Amended Complaint for Injunctive Relief        25

devices, is not compatible with the Android OS, and does not offer apps that are compatible with the Android OS.  Non-Android mobile app distribution platforms—such as the Windows Mobile Store used on Microsoft's Windows Mobile OS or the Apple App Store used on Apple iOS devices—cannot substitute for Android-specific app distribution platforms, and they are therefore not part of the Android App Distribution Market defined herein.

71.     Likewise, stores distributing personal computer or gaming console software are not currently compatible with the Android OS and do not offer Android-compatible apps:  the Epic Games Store distributes software compatible with personal computers, the Microsoft Store for Xbox distributes software compatible with the Xbox game consoles, and the PlayStation Store distributes software compatible with the PlayStation game consoles.  A user cannot download mobile apps for use on his/her Android device by using such non-Android OS, non-mobile software distribution platforms.  They therefore are not part of the Android App Distribution Market.

72.     The same is true even when an app like *Fortnite* is available for different types of platforms running different operating systems, because only the OS-compatible version of that software can run on a specific type of device or computer. Accordingly, as a commercial reality, an app developer that wishes to distribute mobile apps for Android mobile devices must develop an Android-specific version of the app and avail itself of the Android App Distribution Market.

73.     In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for the distribution of mobile apps to users of all mobile devices, whether Android or Apple's iOS.

ii.     Geographic Market Definition

74.     The geographic scope of the Android App Distribution Market is worldwide, excluding China.  Outside of China, app distribution channels, including app stores, are developed and distributed on a global basis; OEMs, in turn, make app stores,

1   such as the Google Play Store, available on Android devices on a worldwide basis

2   (except in China).  China is excluded from the relevant market because legal and

3   regulatory barriers prevent the operation of many global app stores, including the

4   Google Play Store, within China.  Additionally, app stores prevalent in China are not

5   available, or have little presence, outside of China.

6   **B.   Google's Monopoly Power in the Android App Distribution Market**

7   75.   Google has monopoly power in the Android App Distribution

8   Market.

9   76.   Google's monopoly power can be demonstrated by, among other

10  things, Google's massive market share in terms of apps downloaded.  The European

11  Commission determined that, within the Market, more than 90% of Android app

12  downloads through app stores have been done through the Google Play Store.  Indeed,

13  although app stores for merchant mobile OSs other than Android are not included in the

14  Android App Distribution Market, the European Commission found that the only such

15  app store with any appreciable presence was the Windows Mobile Store, which was

16  compatible with the Windows Mobile OS.  The Commission determined that even if the

17  Windows Mobile Store share was included in the market, the Google Play Store would

18  still have had a market share greater than 90%.  Google admits as much.  A 2017

19  internal Google report confirmed that "[the Google] Play Store dominates in all

20  countries", including the United States.  Google has recognized that in one quarter (June

21  to September 2016), app installations through channels other than Google Play

22  (including direct downloads and competing app stores) amounted to a mere 4.4% of

23  Android app downloads in the United States.

24  77.   Other existing Android mobile app stores do not discipline Google's

25  exercise of monopoly power in the Android App Distribution Market.  No other app

26  store is able to reach nearly as many Android users as the Google Play Store.

27  According to the European Commission, the Google Play Store is pre-installed by

28  OEMs on practically all Android mobile devices sold outside of China.  As a result, no

1   other Android app store comes close to that number of pre-installed users.  With the

2   exception of app stores designed for and installed only on mobile devices sold by those

3   respective OEMs, such as Samsung Galaxy Apps and the LG Electronics App Store, no

4   other Android app store is pre-installed on more than 10% of Android devices, and

5   many have no appreciable market penetration at all.  Aptoide, for example, is an

6   Android app store that claims to be the largest "independent" app store outside of China,

7   but it comes pre-installed on no more than 5% of Android mobile devices.

8           78.    Because of Google's success in maintaining its monopoly in Android

9   app distribution, there is no viable substitute to distributing Android apps through the

10  Google Play Store.  As a result, the Google Play Store offers over 3 million apps,

11  including all of the most popular Android apps, compared to just 700,000 apps offered

12  by Aptoide, the Android app store with the next largest listing.  The Google Play Store

13  thereby benefits from ongoing network effects based on the large number of

14  participating app developers and users.  The large number of apps attracts large numbers

15  of users, who value access to a broad range of apps, and the large number of users

16  attract app developers who wish to access more Android users.  Android OEMs find it

17  commercially unreasonable to make and sell phones without the Google Play Store, and

18  they view other app stores as poor substitutes for the Google Play Store because of the

19  lower number and lesser quality of apps they offer.

20          79.    As further proof of its monopoly power, Google imposes a supra-

21  competitive commission of 30% on the price of apps purchased through the Google Play

22  Store, which is a far higher commission than would exist under competitive conditions.

23          80.    Furthermore, Google's monopoly power in app distribution is not

24  constrained by competition at the smart mobile device level.  Before a consumer can

25  even consider purchasing an app, she must purchase a device on which to install and run

26  apps.  There are currently only two smartphone operating systems with significant

27  market share, each at the core of a separate, differentiated ecosystem of devices,

28  accessories, apps and services:  Apple's iOS and Google's Android OS.  When a

consumer wishes to purchase a smartphone, the first choice she must make therefore is which operating system she wants the device to run and which mobile ecosystem she wants to participate in.  Android device users face significant switching costs and lock-in to the Android ecosystems that serves to protect Google's monopoly power, and consumers are unable to account for Google's anticompetitive conduct when they purchase a smart mobile device.

81.   *First*, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching.  Consumers choose a smartphone based in part on the OS that comes pre-installed on that device and the ecosystem in which the device participates (in addition to a bundle of other features, such as price, battery life, design, storage space, and the range of available apps and accessories).  Once a consumer has selected a smartphone, the consumer cannot replace the mobile OS that comes pre-installed on it with an alternative mobile OS.  Rather, a consumer who wishes to change the OS must purchase a new smartphone entirely, which is an investment that most consumers do not make more often than every two or three years. Many Android phones are cheaper than non-Android (*i.e.*, Apple) phones; for those users, a comparably-priced non-Android alternative simply isn't available.  In addition, mobile OSs have different designs, controls, and functions that consumers must learn to navigate.  Over time, consumers who use Android devices learn to operate efficiently on the Android OS.  For example, the Android OS layout differs from iOS in a wide range of functions, including key features such as searching and installing "widgets" on the phone, organizing and searching the phone's digital content, configuring control center settings, and organizing photos.  The cost of learning to use a different mobile OS is part of consumers' switching costs.

82.   *Second*, switching from Android devices may also result in a significant loss of personal and financial investment that consumers put into the Android ecosystem.  Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new

1    mobile OS may mean losing access to such products or to data.  Even if versions of such

2    apps and products are available within the new ecosystem chosen by the consumer, the

3    consumer would have to go through the process of downloading them again onto the

4    new devices and may have to purchase them anew.  As a result, the consumer may be

5    forced to abandon his or her investment in at least some of those apps, along with any

6    purchased in-app content and consumer-generated data on those apps.  Because apps

7    and device functionalities may not synchronize or operate efficiently across operating

8    systems, existing Android users also face costs associated with "mixing and matching"

9    different operating systems if they attempt to purchase a non-Android device.  Whether

10   across a consumer's own set of personal devices (*e.g.*, a phone and a tablet), or across

11   the consumer's family or business, "mixing and matching" operating systems can

12   significantly diminish the utility of applications, which raises an additional and

13   significant barrier to switching.

14           83.    *Third*, consumers are not able to avoid the switching costs and lock-

15   in to the Android OS ecosystem by acquiring more information prior to the purchase of

16   the Android device.  The vast majority of mobile device consumers have no reason to

17   inquire, and therefore do not know about, Google's anticompetitive contractual

18   restraints and policies.  Furthermore, these consumers rationally do not give much

19   weight to Google's anticompetitive conduct and anticompetitive fees when deciding

20   whether to purchase an Android device.  Consumers consider many features when

21   deciding which smartphone or tablet to purchase, including design, brand, processing

22   power, battery life, functionality, and cellular plan.  These features are likely to play a

23   substantially larger role in a consumer's decision as to which smart mobile device to

24   purchase than Google's anticompetitive conduct in the relevant markets, particularly

25   given that a consumer may consider the direct monetary cost of Google's conduct to be

26   small relative to the price of smart mobile devices, if the consumer is even aware of the

27   conduct or assigns it such a cost at all.  For example, over time a typical Android user

28   may make multiple small purchases of paid apps and in-app digital content—

accumulating to $100 or less annually—but may spend several hundreds of dollars at once to purchase an Android smart mobile device.

84.     Consumers are also unable to determine the "lifecycle price" of devices—*i.e.*, to accurately assess at the point of purchase how much they will end up spending in total (including on the device and all apps and in-app purchases) for the duration of their ownership of the device.  Consumers cannot know in advance of purchasing a device all of the apps or in-app content that they may want to purchase during the usable lifetime of the device.  Consumers' circumstances may change. Consumers may develop new interests.  They may learn about new apps or in-app content that becomes available only after purchasing a device.  New apps and in-app content will continue to be developed and marketed after a consumer purchases a smartphone or tablet.  All of these factors may influence the amount of consumers' app and in-app purchases.  Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices.  This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

85.     Because consumers face substantial switching costs and lock-in to the Android OS, developers can only gain access to these users by also participating in the Android ecosystem.  Thus, developers face an even greater cost in not participating in the Android ecosystem—loss of access to hundreds of millions of Android OS users.

86.     Google's anticompetitive restraints and policies serve to maintain and increase the switching costs described above.  For example, by restricting the manner in which consumers can discover, download and install app stores that compete with the Google Play Store and by restricting the functionality of such competing stores (*see* paragraphs 122-141 below), Google blocks the emergence of competing multiplatform app stores that could lower switching costs by cataloguing or tracking a user's apps and purchases across different OSs.  These various restrictions that increase

switching costs impede the adoption of competing OSs, and thereby help perpetuate and strengthen Google's monopoly.

87.     Moreover, the close relationship that Google maintains with Apple further reduces Google's incentive to compete, innovate, and invest in app distribution because Google benefits by cooperating with its "competitor" Apple.  As Google's founder and former CEO Larry Page once told Apple CEO Steve Jobs during a private meeting in 2010 about a "partnership" between Android and iOS:  "there will always be places we compete, and places where we cooperate".   For example, for over 15 years, Google has maintained an agreement with Apple whereby Google pays Apple a significant percentage of revenue derived from searches run on iOS devices—an estimated *$8-12 billion per year* in recent years, according to the U.S. Department of Justice—in exchange for Apple making Google Search the default search engine on the Safari browser, Siri voice command searches, and other search access points on Apple's devices.  Default status on Apple devices is valuable to Google because Google search advertising is Google's main revenue source.  And, through its agreements with Apple, Google ensures that its own search (and therefore search advertising) will be used on virtually *all* mobile devices, whether iOS or Android, as most consumers are unlikely to change these settings on their phone and will become Google Search users by default. Because Android and iOS account for over 99% of smartphone OSs installed on mobile devices, Google's agreement with Apple guarantees that Google will generate revenue from virtually all smartphone OS users, regardless of whether they choose to purchase iOS or Android devices.

88.     Because Google reaps considerable profits from iOS users through its search arrangements with Apple, Google is not incentivized to compete more with Apple at the smartphone OS level and expend more resources attracting users from iOS to Android than it currently does.  If it did not profit significantly from searches on iOS devices, Google might be more incentivized to, among other things, differentiate its Android platform from Apple with respect to the commissions it charges on app

First Amended Complaint for Injunctive Relief      32

1    transactions.  If Android competed with iOS on app transactions, the market

2    competition would make Android apps cheaper for users and attract developers to

3    launch their apps first (or even only) on Android.  Instead, Google and Apple are cozy

4    duopolists, offering virtually the same terms to developers and changing those terms in

5    tandem (if at all).  After a meeting involving senior executives of Google and Apple,

6    notes of the meeting were exchanged between the two companies.  The notes reflect:

7    "Our vision is that we work as if we are one company".

8         **C.    Google's Anti-Competitive Conduct Concerning the Android App
              Distribution Market**

9         89.    Google has willfully and unlawfully maintained its monopoly in the

10   Android App Distribution Market through a series of related anti-competitive acts that

11   have substantially foreclosed competing ways of distributing apps to Android users.

12              i.    Google's Conduct Toward OEMs and Mobile Network Operators

13        90.    Google imposes anti-competitive constraints on Android OEMs

14   based on their need for access to a viable Android app store and other important services

15   provided by Google.

16        91.    *First*, Google conditions OEMs' licensing of the Google Play Store,

17   as well as other essential Google services and the Android trademark, on OEMs'

18   agreements to provide the Google Play Store with preferential treatment compared to

19   any other competing app store.  Specifically, to access the Google Play Store, Android

20   OEMs (which, as noted above, include virtually all OEMs that obtain an OS on the

21   merchant market) have signed a Mobile Application Distribution Agreement

22   ("MADA") with Google.  A MADA confers a license to a bundle of products

23   comprising proprietary Google apps, Google-supplied services necessary for

24   functioning of mobile apps, and the Android trademark.  Through its MADAs with

25   Android OEMs, Google requires OEMs to locate the Google Play Store on the "home

26   screen"[8] of each mobile device.  Android OEMs must further pre-install up to 30

27

28       [8] The default "home screen" is the default display, prior to any changes made by users, that appears
         without scrolling when the device is in active idle mode (*i.e.*, is not turned off or in sleep mode).

Google mandatory apps and must locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services. These requirements ensure that the Google Play Store is the most visible app store any user encounters and place any other app store at a significant disadvantage.

92.     Absent this restraint, OEMs could pre-install and prominently display alternative app stores to the purchasers of some or all of their mobile devices, allowing competing app stores the ability to vie for prominent placement on Android devices, increased exposure to consumers and, as a result, increased ability to attract app developers to their store. As an app distributor, Epic could and would negotiate with OEMs to offer consumers more choice with a prominently displayed app store. This would increase the distribution opportunities for Epic's own apps, as well as a variety of apps developed by third parties.

93.     *Second*, Google's AFA and ACC compatibility standards require OEMs to implement Google's restrictions and foreclose OEMs from modifying Android to offer frictionless direct downloading of apps outside Google Play.

94.     *Third*, Google forecloses developers' ability to effectively distribute Android app stores and apps directly to consumers outside the Google Play Store, including by entering "exclusivity" agreements with certain OEMs ensuring that Google Play is the *only* app store that may be pre-installed on the devices the OEMs sell.

95.     As Google's own documents recognize, pre-installation of apps and app stores by an OEM presents a unique and particularly important opportunity for competing app distributors and app developers to reach Android users outside Google Play, especially new distributors seeking a foothold in Android app distribution. An OEMs' pre-installation of an icon corresponding to an app or app store on the device provides users of those devices convenient, trusted access to apps or app stores, without requiring consumers to seek out and acquire such apps or app stores on their own. Some OEMs may even compete for device buyers by offering mobile devices that

provide such easy access to desirable apps and app stores.  For example, as described below, Epic invested substantial resources in optimizing a special, state-of-the-art version of *Fortnite* for OnePlus, an Android OEM, in exchange for OnePlus's agreement to enable a "one-touch" installation of *Fortnite* on its devices—only for that agreement to be blocked by Google's anti-competitive conduct.

96.     Fearful that Epic and others would successfully begin distributing competing app stores in this way, Google designed and undertook coercive steps to foreclose this possibility.  Specifically, Google has since 2019 entered agreements with certain OEMs restricting the OEMs from pre-installing other app stores on most or all of the new Android devices they sell.  Pursuant to these exclusivity agreements, Google agrees to share with OEMs monopoly profits Google earns from its Search business (and in some cases, profits from the Play Store itself), in exchange for these OEMs' agreement not to pre-install alternative app stores.  As described below, Google reached these agreements after specifically recognizing the competitive threat to its monopoly that Epic and other potential Android app distributors posed and Google intentionally designed these agreements to lock in Google's monopoly power in "high monetizing" geographies.

97.     In 2018, Epic decided to launch *Fortnite* on Android—but not on Google Play.  Epic developed and made available a *Fortnite Launcher* app (which later became *Epic Games Launcher*) that could be directly downloaded from its website and then used to install *Fortnite* (and, later, other Epic apps) on Android devices.  Epic also entered into a Collaboration Agreement with Samsung pursuant to which Samsung would make available *Fortnite* to users of Samsung devices via the Samsung Galaxy Store.  Historically, Samsung's app store had performed poorly—Google estimated that users spent only 3% of the time on the Samsung Galaxy Store that they spent on the Google Play Store.  But Epic's partnership with Samsung and determination to bypass Google Play for distribution of *Fortnite* struck fear into senior Google executives, not only because it meant the loss of 30% of revenues that would be generated by the

Android version of one of the most popular apps in the world, but also because Epic was paving the way for other Android app developers to distribute their apps without relying on Google Play.

98.     In particular, documents that Google's Finance Director for Platforms and Ecosystems prepared for the CFO of Alphabet around the time of *Fortnite's* launch on Android showed that Google feared what it termed a "contagion risk" resulting from more and more app developers forgoing Google Play.  Google feared that the "contagion" would spread in this way:  first, inspired by Epic's example, "[p]owerful developers" such as "Blizzard, Valve, Sony, Nintendo"—creators of some of the most popular and profitable entertainment—would be "able to go on their own", bypassing Play by directly distributing their own apps.  Then, other "[m]ajor developers", including Electronic Arts, King, Supercell and Ubisoft, will choose to "co-launch off Play", collaborating to forego Google's distribution services as well.  And finally, Google even identified a risk that "[a]ll remaining titles [will] co-launch off Play".  Google calculated the total at-risk revenue from the threatened loss of market share in Android app distribution to be $3.6B, with the probability-weighted loss "conservative[ly]" estimated at $550M through 2021.  Google also recognized that the "[r]ecent Fortnite + Samsung partnership further amplifies risk & urgency of problem" facing its monopoly position in Android app distribution.  Google was determined not to let this happen.

99.     The first step Google took to prevent this "contagion" was its decision to offer Epic a special deal to launch *Fortnite* on Google Play.  In July 2018, senior Google executives held a special, irregular "off-cycle" meeting of its Business Council, comprised of some of the Google's highest ranking executives including Alphabet's CFO.  At this meeting, the Google Play team sought approval for a "[c]ustom, cross-PA [cross–product area] partnership with Epic Games worth up to $208M (incremental cost to Google of $147M) over 3 years".  The notes from this meeting indicate that Google believed Epic was choosing to distribute *Fortnite* off

Google Play "to express frustration [about] closed ecosystems (iOS, consoles) through use of [direct downloading] on Android to distribute via their website" and that such an action would "threaten Play revenue ($130M) and [the] broader business model". The rationale for the deal also included the "[h]igh risk of contagion", with "up to $310M in revenue at risk". When one Google executive asked for "the exact Play store rev share if we can get to the deal with them", a Director of Finance responded that "[t]he key premise of this proposal is that we would protect the rev share terms and hold them at the 70/30 split in line with our current business model to ensure we don't establish a precedent that puts at risk our broader ecosystem". He represented to the Business Council that the additional revenue share to Epic was roughly 5%, meaning, after accounting for the special benefits Google had determined to offer, Google would receive an effective discounted revenue share of 25% rather than the standard 30% share. The Business Council approved the offer to Epic.

100.   As part of these efforts, senior Google Play managers began reaching out to Epic. One manager contacted Epic's Vice President and Co-Founder to gauge Epic's interest in a special deal and, among other things, discussed "the experience of getting Fortnite on Android" via direct downloading. The manager's call notes state that she viewed direct downloading *Fortnite* as "frankly abysmal" and "an awful experience", and that Epic should "worry that most will not go through the 15+ steps".

101.   Google recognized that Epic might not accept its offer. "As a potential alternative", a senior Google executive proposed that Google "consider approaching Tencent", a company that owns a minority stake in Epic, "to either (a) buy Epic shares from Tencent to get more control over Epic", or "(b) join up with Tencent to buy 100% of Epic". Another senior Google executive suggested that if Epic chose not to launch *Fortnite* on Google Play, Google could "lock down Play/Android and [not] allow sideloading (or make it very hard to sideload (policy position or even architecture) - difficult move in the face of the EC decision but we have good privacy/security arguments about why sideloading is dangerous to the user)".

102.   Epic rejected Google's special deal, opting instead to distribute *Fortnite* for Android via Epic's website and through a partnership with the large Android OEM, Samsung.  In the immediate wake of that decision, to discourage consumers from direct downloading *Fortnite*, the Google Play security team began collecting "exciting" statistics on "fake apps caught by [Google Play Protect] from off-Play downloads" that it shared not with Epic or users, but rather with a Google Communications Manager for use in "coverage" by journalists of Epic's decision to launch *Fortnite* off Google Play.

103.   More broadly, Epic's decision to launch *Fortnite* for Android off Google Play motivated Google to execute a series of anticompetitive actions to limit the "contagion".  Among other initiatives discussed below, Google increased its focus on the nascent competitive threats posed by Epic and others who may be able to offer alternative app stores on Android, including by negotiating for pre-installation of such app stores with OEMs.  In a 2019 presentation prepared by Google Play's finance team, Google estimated that the most likely scenario among the scenarios it considered was that Epic would strike a deal for the distribution of its Epic Games Store with "1 mobile OEM" or as many as "3-5 mobile OEMs", in addition to the Collaboration Agreement it had entered with Samsung.  Google forecasted that Epic's Android store would attract numerous developers who would "migrate Mature Western/US titles to Epic store", which would capture "50% spend in those games on those devices".  Indeed, Google recognized that Epic's entry could dramatically reduce the barriers faced by new market entrants:  "[e]very developer that follows Epic's path & launches on the Epic store will have less friction & a larger addressable user base than title before it".  And even if a developer attracted fewer users by supporting a new market entrant rather than relying on Google Play, they could still earn more revenue due to the favorable 88/12 revenue share offered by the Epic Games Store:  "[d]evelopers can afford to take a ~20% performance hit on Epic store (due to 88% rev share) and still break-even".  In the 2019 document, Google estimated that entry by Epic Games Store alone threatened a "[m]ost

[l]ikely loss" of $350M of Google's monopoly revenue, and a "[m]ax risk" of $1.4B, by 2022; Google also identified a probability weighted combined loss of $1.1B and $6B of total at-risk revenue "if other store(s)", including those distributed by Samsung and Amazon, were able to "gain full traction".

104.   Recognizing the threat that preinstalled app stores could pose to Google Play's dominance, Google took action to ensure that OEMs would not enter into partnerships with distributors like Epic.  Less than a year after having been found by the European Commission to have monopoly power in an Android app distribution market, Google devised and executed a plan to eliminate the risk of the "contagion" of competition that was threatening Google's monopoly.

105.   Google's anticompetitive conduct proceeded in this way:  Google began offering OEMs the chance to participate in its "Premier Device Program" beginning in 2019.  Although Google had previously offered OEMs that signed its restrictive MADAs the chance to participate in an RSA, the new "Premier" tier RSAs and similar agreements contain even more restrictions on OEMs.  Google's own documents recognize that the "Premier" tier agreements mandate "Google exclusivity and defaults for all key functions:  No apps with APK install rights" on Premier devices, meaning that the OEM cannot install any apps with the ability to install other apps (in other words, app stores, or the *Fortnite Launcher* Epic sought to distribute outside of Play).  Google recognized that the new Premier agreements result in "Exclusivity" for Google Play on covered devices.  In exchange for these exclusivity commitments, Google offered OEMs various forms of financial incentives, including 4% of Google's Search revenues earned on the covered devices (on top of the 8% of Search revenues Google already commits to OEMs who sign a non-Premier RSA and a MADA), as well as other financial incentives such as monthly bonuses.  For certain OEMs, including LG and Motorola, Google also agreed to pay between 3-6% of "Play spend" incurred on Premier devices manufactured by the OEMs, structuring the deal "to increase overall appeal" and lock-in its monopoly power in "high monetizing [geographies]" (such as in

the United States, where LG and Motorola sell the most popular Android mobile devices outside of Samsung devices). Google's RSAs play a significant role in inducing OEMs to sign a MADA, because OEMs cannot have the benefits of an RSA without being a party to a MADA.

106.   Although the exact terms of the agreements vary, to take one illustrative example, Google executed a "Premier" tier RSA with OEM HMD Global, which sells Nokia-branded mobile devices, effective December 1, 2019, through November 30, 2022.

107.   Section 5.1 of Google's RSA with HMD Global requires that each "Premier Device" (*i.e.*, those devices that comply with all restrictions contained in Section 5) comply with "all requirements set forth in Attachment C (Premier Service Access Points)", which mandates that the Google Play app "[i]con is placed on the Default Home Screen and Google Play app is set as default marketplace for applications, games, books, movies, music, and all other digital content (including subscriptions)".

108.   Moreover, under Section 5.1(d), HMD Global is required to comply with the "Premier Device Program Requirements Document". Epic believes based on the reference in the RSA to "restriction[s] on the installation of applications with INSTALL-PACKAGE permissions set forth in Section 3.7 (Application Preloads) of the Premier Device Program Requirements", that this document is likely to contain further anticompetitive requirements. Google also has published "Premier Tier Program Requirements" on its "Android Partners" website—a document that appears to be related to the "Premier Device Program Requirements Document" that Google has not yet produced. There, Google provides again that Android OEMs releasing devices designated as "Premier" must not include apps that might compete with Google Play. In Section 3.7, Google commands that "[a]pplication preloads" "MUST NOT contain INSTALL_PACKAGES permissions", *i.e.* must not be able to install other applications, an essential function of an app store. Google further instructs that pre-loaded apps

"MUST NOT overlap with the following Google preloads in terms of the applications, features or functionality: . . . Google Play".  Google also expressly prohibits "[first-party] installers and [third-party] engines powering [first-party] installers . . . without Google's prior review and approval", and makes clear that such installers may not "promote Alternative Services", which includes alternative app stores.  Further, preloaded apps that are permitted "MUST be available in Google Play", further ensuring that Android app developers cannot forego Google's app distribution services or the anti-competitive restrictions Google imposes on developers.

109.   As a further restriction, Section 5.2, relating to the configuration of Google Play and other Google Apps, requires that HMD Global agree that it "will not . . . include in any manner on a Premier Device . . . any Alternative Service, or any application, bookmark, product, service, icon, launcher, Hotword, Gesture, or functionality that has the primary purpose of providing access to any Alternative Service" nor may "introduce, promote, or suggest (including via over-the-air prompt) an Alternative Service to an End User". The agreement defines Alternative Service as including any "Alternative Play Service", defined as "any service that is substantially similar to Google Play (as determined by Google in its sole discretion)".

110.   In addition, under Section 11.1, entitled "Shared Revenue", Google expressly conditions HMD Global's receipt of "Shared Net Play Transaction Revenue" and "Shared Net Ad Revenue" on HMD Global maintaining compliance with the requirements of "Sections 3 through 5 (regarding Device requirements)".

111.   More recently, Google has reached agreements with OEMs in the form of "Mobile Incentive Agreements" ("MIAs").  In one such agreement involving Motorola, Google conditioned Motorola's receipt of "Monthly Incentives" on Motorola's promises not to "include in any manner on a Foundation Tier Device . . . Any Alternative Service, or any application, service, or functionality that has the primary purpose of providing access to any Alternative Service" and not "to introduce, promote or suggest (including via over-the-air prompt) an Alternative Service to an End

User" on such devices.  The "Alternative Services" prohibited by Google include any "Alternative Play Service", which is defined to mean "any service that is substantially similar to Google Play (as determined by Google in its sole discretion".

112.   Google's efforts to foreclose competition in this way were a resounding success.  Within a matter of months after the Premier Device Program began, Google recognized that the program had successfully eliminated the "risk of contagion".  By May 2020, many of the world's largest and most popular Android OEMs had agreed to Google Play exclusivity for most of their new Android devices.  Motorola and LG—which Google had targeted for extra financial incentives—both committed nearly all (98% and 95%) of their devices to the Premier program.  The giant Chinese conglomerate BBK—which manufactures and sells a range of Android devices under its Oppo, Vivo and OnePlus brands, among others—had designated around 70% of its new devices as "Premier".  Other brands participating in the program included Xiaomi (40%), HMD (which manufactures devices with the Nokia Mobile brand) (100%), Sony (50%), Sharp (50%) and "Other" (80%).  In a presentation prepared by and presented to senior Google Play executives, Google noted that in the short time since the beginning of the program, over 200 million new devices were covered.  The same presentation shows that Google believed that the new RSAs successfully eliminated the "risk of app developer contagion"; noting that there was "no risk" under the "Current Premier tier".

113.   In the same presentation, Google recognized that the Premier Device Program had "impact[ed]" "Epic's ability to preload" its apps by negotiating with OEMs.  Google's Premier RSAs (and MIAs) thus intentionally and directly resulted in the substantial foreclosure of an important, alternative method of app distribution on Android:  installation by OEMs.  Indeed, Epic had reached an agreement with OnePlus, one of the brands owned by BBK, to allow users of OnePlus mobile devices to seamlessly install *Fortnite* and other Epic apps by touching an Epic Games app on their devices—without encountering any obstacles typically imposed by the Android OS on

apps directly downloaded from developers.  In conjunction with this agreement, Epic designed a version of *Fortnite* for certain OnePlus devices that delivers a state-of-the-art framerate (the frequency at which consecutive images appear on the device's screen), providing an even better user experience for *Fortnite*.  Although the original agreement between Epic and OnePlus contemplated making this installation method available worldwide, Google demanded that OnePlus not implement its agreement with Epic with the limited exception of mobile devices sold in India.  OnePlus informed Epic that Google was "particularly concerned that the Epic Games app would have ability to potentially install and update multiple games with a silent install bypassing the Google Play Store".[9]  Further, OnePlus advised that any waiver of Google's restriction "would be rejected due to the Epic Games app serving as a potential portfolio of games and game updates".  As a result, OnePlus mobile device users in India can install Epic apps seamlessly without using the Google Play Store, while users outside India cannot.

114.  Another OEM who participated in a Premier RSA, LG, also told Epic that it had a contract with Google "to block side downloading off Google Play Store this year", but that the OEM could "surely" make Epic apps available to consumers if the Google Play Store were used.  Google prevented LG from pre-installing the Epic Games app on LG devices.

115.  Google's Premier Device Program was not publicly known, and was not known to Epic, before Google recently began producing relevant documents in this litigation.  Google has sought to conceal its most restrictive anticompetitive conduct by, among other things, including in the agreements themselves a provision restricting signatories from making "any public statement regarding [the] Agreement without the other party's prior written approval".  Google then used the confidentiality it imposed on OEMs to argue, in its Motion to Dismiss, that Android OEMs are *not* prohibited from "pre-installing alternative app stores", and that Epic failed to sufficiently allege the

---

[9]  A "silent install" is an installation process free of the dire security warnings that Google triggers when apps are directly downloaded, such as the "one touch" process on which Epic and OnePlus had agreed.

1    exclusivity agreements it concealed.  (Dkt. 91 at 9 ("OEMs retain the ability under the
2    MADAs to pre-install . . . competing app stores"); *see also id.* at 8 ("Plaintiffs also
3    challenge Google's agreements with OEMs, which they claim 'discourage'—but do not
4    claim prohibit—OEMs from pre-installing alternative app stores"); *id.* at 15 ("Plaintiffs'
5    allegations fall short of alleging actual foreclosure or exclusivity, and Plaintiffs do not
6    allege the MADAs prohibit OEMs from pre-installing rival app stores" (emphasis in
7    original)); *id.* at 17 ("Nor is there any allegation that MADAs prevent rival app stores
8    from being pre-installed elsewhere on a device.").)  Google's representations also
9    obscured its efforts to ensure that Google Play would retain exclusivity on the default
10   screen through other OEM agreements.  (Dkt. 91 at 17 ("There is no allegation that
11   MADAs prevent rival app stores from also being pre-installed on the home screen . .
12   .").)  The revelations in Google's recent document productions (which are thus far
13   incomplete) make clear that the exceedingly carefully phrased arguments and
14   representations Google made in connection with its Motion to Dismiss are inconsistent
15   with Google's own documents.

16           116.   In the absence of this conduct, Epic could and would negotiate with
17   OEMs to make *Fortnite* and other Epic apps directly available to consumers, free from
18   Google's anti-competitive restraints.  OEMs could then compete for the sale of mobile
19   devices based in part on the set of apps offered on the OEMs' devices.  But Google
20   substantially forecloses alternative ways of distributing Android apps other than through
21   its own monopolized app store, harming competition among OEMs and among app
22   developers, to the detriment of consumers.

23           117.   Google has also historically leveraged revenue share agreements to
24   discourage mobile network operators ("MNOs") from creating competing app stores.
25   Many consumers contract with an MNO to enable their devices to communicate and
26   access the Internet over cellular networks.  Prominent MNOs in the United States
27   include AT&T Mobility, T-Mobile, and Verizon Wireless.  In 2009, shortly after the
28   launch of Android and Google Play's predecessor, Android Market, Google began

1  discussing using revenue share agreements to address the "challenge" of MNOs and

2  OEMs looking to create their own app stores.  Google's goal was to "[i]ncentivize

3  partners[s] to drive developer and user communities towards Android market".

4          118.   Google increased the market share of Android Market by adopting

5  revenue share agreements that split the revenue from app purchases with certain MNOs.

6  Google knew at the time that "Mobile operators are not willing to give up the revenue

7  stream on content distribution . . . Will block Market if we don't share revenue".

8  Beginning in 2009, Google entered into revenue share agreements with various MNOs

9  that split Android Market revenue between app developers, MNOs, and Google.  Under

10  these arrangements, app developers typically received 70% of a given purchase, while

11  MNOs received 20-25% and Google received the remaining 5-10% for its operating and

12  transaction costs.  Google understood that this 20-25% revenue share for MNOs

13  "[p]rovide[d] incentive for operators to distribute Android market" by "offset[ting the]

14  opportunity cost" of giving up their own app distribution channels.

15          119.   In its Motion to Dismiss, Google has argued that the existence of

16  Samsung's Galaxy Store—which exists only on devices that Samsung sells—is

17  somehow "fatal to Plaintiffs' claim of actual foreclosure".  But documents discussing

18  Google's "Project Banyan" demonstrate how Google attempted to negotiate a deal with

19  Samsung that would prevent the Galaxy Store from becoming a competitive threat and

20  impose Google's anti-competitive Google Play Billing tie on apps distributed by

21  Samsung.  In April 2019, Google executives traveled to Korea to meet with Samsung to

22  discuss an "app distribution" proposal.  Internal documents presented to Google's

23  Business Council reveal the details of this proposal.  *First*, Google sought Samsung's

24  agreement that Google Play would host the apps and games distributed by the Galaxy

25  Store and that Google Play would provide "infrastructure support to Galaxy Store

26  (including Play Billing)", ensuring that Google's in-app payment solution would be

27  used in apps distributed through the Galaxy Store.  Because Samsung would thus "forgo

28  store services revenue", Google planned to make annual payments to Samsung of "up to

$60M, which was Google's top-end estimate of the "current . . . operating profit of [the] Galaxy Store" but a small fraction of the "likely 2022 margin risk to Play". *Second*, the Business Council documents indicate that Google sought Samsung's agreement that "Play and Galaxy Store" would be the "only app stores on Default Home Screen", ensuring that Samsung could not provide convenient placement to any other competing app store. Google recognized that such a deal, in conjunction with a developer-focused plan described below called "Project Hug", would "mitigate[] risk that top game developers de-prioritize Google Play for title distribution" and secure the "Play revenue / margin at risk", which was "up to $6B / $1.1B in 2022" alone. In an email exchange following Google's visit to Samsung's headquarters in Korea, Samsung indicated that it was "willing to accept [Google's] proposal to distribute Android apps through [the Google] Play store, with Samsung maintaining a front end of Galaxy store", but asked that Google allow users to choose between Samsung IAP and Google Play Billing. In internal emails that followed, Google Play and Android executives noted their opposition to the idea of allowing Galaxy users even the option to use Samsung IAP, and one executive relayed ideas from the head of Android that in response to Samsung's request, Google could "[r]equest a revshare on [Samsung's] hardware margin (I'm serious) in exchange for their own IAP", charge Samsung "a license fee for Play in exchange for their own IAP", or "[o]ffer revshare or bounty for IAP on Play if they don't have their own IAP platform".

120.   Project Banyan was not Google's first attempt to buy out Samsung's app store. Google emails show that in 2011, senior Android executives were "having discussions with Samsung to get them to stop distributing apps through Samsung App store". Other documents reveal that in late 2013, Google again met with Samsung to discuss the possibility that "Samsung Apps should no longer compete directly with Google Play", that it would "only have 200 apps" that would appear "for limited time" and be "boutique and complimentary [sic] to Google Play", and that "Samsung Apps could link to Google Play for many purchases if the right infrastructure is in place". As

one Google employee explained, "Samsung's duplication of our services on Android is one of the critical issues with the partnership right now. Samsung Apps relative to Google Play is one of the most glaring."

121. Google ultimately chose not to pursue Project Banyan as authorized by the Business Council. However, the Complaint filed by 36 States and the District of Columbia in *State of Utah, et al. v. Google LLC, et al.*, alleges that Google then sought "a different implementation toward the same anticompetitive goal" as part of a new effort, "Project Agave". Epic does not have the details of any deal Google reached with Samsung as part of Project Agave because Google has not yet produced many underlying documents to Epic, and Google has maintained redactions over the States' relevant allegations when Google produced the States' Complaint to Epic. But documents that Google has produced to Epic reveal that Google sought an "[i]ndividual surgical deal[]" with Samsung, in which Google would secure, among other things, "play protections" and in exchange give Samsung a "rev share on browsers and assistant", a percentage "of Play rev share on IAP powered by Google", and "Billing integrations for App Gallery".

    ii. <u>Google's Conduct Toward App Distributors and Developers</u>

122. Google imposes anti-competitive restrictions on competing app distributors and developers that further entrench its monopoly in Android App Distribution.

123. *First*, Google prevents app distributors from providing Android users ready access to competing app stores. Specifically, even though competitive app stores themselves are mobile apps that could easily be distributed through the Google Play Store, Google prohibits the distribution of any competing app store through the Google Play Store, without any technological or other justification.

124. Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers

1  to sign before they can distribute their apps through the Google Play Store.  Each of the
2  Defendants, except Google Payment, is a party to the DDA.

3          125.   Section 4.5 of the DDA provides that developers "may not use
4  Google Play to distribute or make available any Product that has a purpose that
5  facilitates the distribution of software applications and games for use on Android
6  devices outside of Google Play."  The DDA further reserves to Google the right to
7  remove and disable any Android app that it determines violates this requirement.  The
8  DDA is non-negotiable, and developers that seek access to Android users through the
9  Google Play Store must accept Google's standardized contract of adhesion.

10          126.   In the absence of these unlawful restraints, competing app
11  distributors could allow users to replace or supplement the Google Play Store on their
12  devices with competing app stores, which users could easily download and install
13  through the Google Play Store.  App stores could compete and benefit consumers by
14  offering lower prices and innovative app store models, such as app stores that are
15  curated to specific consumers' interests—*e.g.*, an app store that specializes in games or
16  an app store that only offers apps that increase productivity.  Without Google's unlawful
17  restraints, additional app stores would provide additional platforms on which more apps
18  could be featured, and thereby, discovered by consumers.  Epic has been damaged
19  through its inability to provide a competing app store (as it does on personal computers)
20  and by the loss of the opportunity to reach more Android users directly in the ways that
21  personal computers allow developers to reach consumers without artificial constraints.

22          127.   *Second,* Google conditions app developers' ability to effectively
23  advertise their apps to Android users on being listed in the Google Play Store.
24  Specifically, Google markets an App Campaigns program that, as Google says, allows
25  app developers to "get your app into the hands of more paying users" by "streamlin[ing]
26  the process for you, making it easy to promote your apps across Google's largest
27  properties".  This includes certain ad placements on Google Search, YouTube, Discover
28  on Google Search, and the Google Display Network, as well as with Google's "search

partners", that are specially optimized for the advertising of mobile apps. However, in order to access this valuable advertising space through the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to but for Google's restrictions.

128.    *Third*, "responding to Epic's decision to launch Fortnite completely off of Play and build their own store, and the likeliness of others to follow suit or consider launching off Play on other stores (notably Samsung)", Google launched an initiative called "Project Hug", now referred to as the Games Velocity Program. As explained by Android executives in internal documents, Project Hug, which was created and developed alongside Project Banyan, was "a hug developers close and show love plan", or "a surge plan to throw extra love/promotion to top developers and games (including Tencent portfolio companies)".   As Google Play and Android executives explained to the Business Council in April 2019, in the same presentation that secured the approval of Project Banyan, Google's plan was to spend hundreds of millions of dollars on secret deals with over 20 top developers that were "most at risk . . . of attrition from Play", in order to prevent these developers from competing with Google Play and inspiring the widespread "contagion" effect that Google feared. Google's documents reveal that a majority of the Project Hug developers were "[a]gitated or inquired about revenue share", and several had "[c]onsidered [their] own distribution and/or payments platforms".  Other Project Hug presentations prepared for senior executives note that "Fortnite would have been substantially more successful had they launched on Play", but "other developers might follow Epic's path for various reasons". The Business Council approved Project Hug as part of a package with Project Banyan

First Amended Complaint for Injunctive Relief        49

1    and, by December 2020, Google had signed deals with the vast majority of the

2    developers it targeted.

3                        iii.    <u>Google's Conduct Toward Consumers</u>

4            129.    Google directly and anti-competitively restricts the manner in which

5    consumers can discover, download and install mobile apps and app stores.  Although

6    Google nominally allows consumers to directly download and install Android apps and

7    app stores—a process that Google pejoratively describes as "sideloading"—Google has

8    ensured, through a series of technological impediments imposed by the Android OS,

9    that direct downloading remains untenable for most consumers.

10           130.    But for Google's anticompetitive acts, Android users could freely

11   download apps from developers' websites, rather than through an app store, just as they

12   might do on a personal computer.  There is no reason that downloading and installing an

13   app on a mobile device should differ from downloading and installing software on a

14   personal computer.  Millions of personal computer users download and install software

15   directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader.

16   Personal computer users do this easily and safely.

17           131.    Direct downloading on Android mobile devices, however, differs

18   dramatically.  Google ensures that the Android process is technically complex,

19   confusing and threatening, filled with dire warnings that scare most consumers into

20   abandoning the lengthy process.  Google understands this, and staff members have

21   acknowledged internally that the difficulty Google imposes on consumers who wish to

22   direct download leads to a "[p]oor user experience," in that there are "15+ steps to get

23   app [via sideloading] vs 2 steps with Play or on iOS".   For example, depending on the

24   version of Android running on a mobile device, downloading and installing *Fortnite* or

25   any other Epic app on an Android device could take as many as 16 steps or more,

26   including requiring the user to make changes to the device's default settings and

27   manually granting various permissions while being warned that doing so is dangerous.

28

1   Below are the myriad steps an average Android user has to go through in order to

2   download and install *Fortnite* directly from Epic's secure servers.



3
4
5
6
7
8
9
10
11
12

13          132.   Below are two of the intimidating messages and warnings about the

14   supposed danger of directly downloading and installing apps that consumers encounter

15   during this process.

16
17
18
19
20
21
22
23
24
25
26
27
28

First Amended Complaint for Injunctive Relief        51



133.   As if this slog through warnings and threats were not enough to ensure the inferiority of direct downloading as a distribution method for Android apps, Google denies downloaded apps the permissions necessary to be seamlessly updated in the background—instead, Google allows such updates only for apps downloaded via Google Play Store.  The result is that consumers in most instances must manually approve every update of a "sideloaded" app.  In addition, depending on the OS version and selected settings, such updates may require users to go through many of the steps in the downloading process repeatedly, again triggering many of the same warnings.  This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

134.   Google further restricts direct downloading under the guise of offering protection from malware.  When Google deems an app "harmful", Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the app from a consumer's device.  And direct downloading has been prevented entirely on the

Android devices that are part of Google's so-called Advanced Protection Program ("APP"). Consumers who have enrolled in APP are unable to directly download apps; their Android device can only download apps distributed in the Google Play Store or in the rare instance of another pre-installed app store that Google has pre-approved for an OEM to offer on its devices. App developers therefore cannot reach APP users unless they first agree to distribute their apps through the Google Play Store or through a separate Google-approved, OEM-offered app store, where available. Google's invocation of security is an excuse to further strangle an app developer's ability to reach Android users, as shown by a comparison to personal computers, where users can securely purchase and download new software without being limited to a single software store owned or approved by the user's anti-virus software vendor.

135. Direct downloading is also nominally available to competing app distributors who seek to distribute competing Android app stores directly to consumers. However, the same restrictions Google imposes on the direct downloading of apps apply to the direct downloading of app stores. Indeed, Google Play Protect has flagged at least one competing Android app store, Aptoide, as "harmful", further hindering consumers' ability to access a competing app store.

136. Google prohibits apps downloaded from "sideloaded" app stores, like apps directly downloaded from a developer's website, from being automatically updated in the background.[10] Thus, direct downloading is not a viable way for app stores to reach Android users, any more than it is a viable alternative for single apps; the only difference is that the former do not have *any* alternative, ensuring the latter are forced into the Google Play Store.

137. Google understands that the myriad barriers it erects to direct downloading have the effect of protecting its app distribution monopoly and limiting

---

[10] In the latest announced, but as of yet unreleased, version of Android (which was announced after this lawsuit was filed), Google vaguely promised to "make third-party app stores easier to use on Android 12"; however, the details of any improvements remain unclear. Sameer Samat, *Android 12 Beta: Designed for you*, May 18, 2021, https://blog.google/products/android/android-12-beta/.

developers' ability to distribute their apps.  In an internal document titled "Response to Epic", a Google employee explained that the "install friction" associated with direct downloading was "not only a bad experience" for users but that Google knew "from its data that it will drastically limit [Epic's] reach".  The document goes on to explain that "[f]uture [*Fortnite*] updates will be challenged re: targeting, update experience via web"; that the direct downloading approach was "most associated with malicious apps", which would be "incompatible with [Epic's] brand/demographics"; and that "[t]he approach will create significant user confusion, since [Google Play] will still attract [billions] of users who will search for Fortnite and run into deadends that aren't clear how to resolve".

138.   But for Google's restrictions on direct downloading, Epic and other app distributors and developers could directly distribute their stores and apps to those consumers who would be open to a process outside an established app store.  But as explained above, Google makes direct downloading substantially and unnecessarily difficult, and in some cases prevents it entirely, further narrowing this already narrow alternative distribution channel.

139.   There is no legitimate reason for Google's conduct.  Indeed, for decades the users of personal computers have been able to install software acquired from various sources without being deterred by anything like the obstacles erected by Google.  For many years, a user has been able to navigate to the Internet webpage sponsored by the developer of software he/she desires, click once or twice to download and install an application, and be up and running, often in a matter of minutes.  The operating systems used by personal computers efficiently facilitate this download and installation (unlike Android), and security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

140.   Google's anti-competitive and unjustified restrictions on distributing apps through any means other than its own app store contradict its own claims that

1   Android app developers can "us[e] any distribution approach or combination of

2   approaches that meets your needs", and that developers can even provide consumers

3   "apps from a website or [by] emailing them directly to users."[11]  In reality, Google

4   specifically prevents app developers from effectively availing themselves of alternative

5   distribution channels that Google touts as available.

6       141.   Through these anti-competitive acts, including contractual provisions

7   and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly

8   over Android mobile app distribution.  Google Play Store downloads have accounted for

9   more than 90% of downloads through Android app stores, dwarfing other available

10   distribution channels.

11   **D.   Anti-Competitive Effects in the Android App Distribution Market**

12       142.   Google's anti-competitive conduct has substantially foreclosed

13   competition in the Android App Distribution Market, affecting a substantial volume of

14   commerce in this Market and causing anti-competitive harms to OEMs, competing

15   mobile app distributors, mobile app developers, and consumers.

16       143.   Google's conduct harms OEMs by forcing them to dedicate to the

17   Google Play Store and other mandatory Google applications valuable space on their

18   devices' "home screen", even if they would rather use that real estate for other purposes,

19   including to offer alternative app stores.  Individually and together, these requirements

20   limit OEMs' ability to innovate and compete with each other by offering innovative and

21   more appealing (in terms of price and quality) distribution platforms for mobile apps.

22   Google's restrictions also interfere with OEMs' ability to compete with each other by

23   offering Android devices with tailored combinations of pre-installed apps that would

24   appeal to particular subsets of mobile device consumers.

25

26

27   _____

28   [11] Google Play Developers Page, *Alternative Distribution Options,*
https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed July 20, 2021).

144.   Google's conduct harms would-be competitor app distributors, such as Epic, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

145.   Google's anti-competitive conduct harms app developers, such as Epic, which are forced to agree to Google's anti-competitive terms and conditions if they wish to reach many Android users, such as through advertising on Google's valuable advertising properties.  Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps.  By restricting developers in such a way, Google ensures that the developer's apps will be distributed on the Google Play Store, and that Google is then able to monitor and collect a variety of information on the apps' usage, which it can then use to develop and offer its own competing apps that are, of course, not subject to Google's supra-competitive taxes.

146.   Both developers and consumers are harmed by Google's supra-competitive taxes of 30% on the purchase price of apps distributed through the Google Play Store, which is a much higher transaction fee than would exist in a competitive market.  Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers incentive and capital to develop new apps and content.

147.   Consumers are further harmed because Google's control of app distribution reduces developers' ability and incentive to distribute apps to consumers in different and innovative ways—for example, through genre-specific app stores.  By restraining the distribution market and eliminating the ability and incentive for competing app stores, Google also limits consumers' ability to discover new apps of interest to them.  More competing app stores would permit additional platforms to feature diverse collections of apps.  Instead, consumers are left to sift through millions

of apps in one monopolized app store, where Google controls which apps are featured and identified or prioritized in user searches.

## III.   Google Unlawfully Acquired and Maintains a Monopoly in the Android In-App Payment Processing Market.

148.   By selling digital content within a mobile app rather than (or in addition to) charging a price for the app itself, app developers can make an app widely accessible to all users, then charge users for additional digital content or features, thus still generating revenue from their investment in developing new apps and content.  This is especially true for mobile game developers.  By allowing users to play without up-front costs, developers permit more players to try a game "risk free" and only pay for what they want to access.  *Fortnite*, for example, is free to download and play, but makes additional content available for in-app purchasing on an à la carte basis or via a subscription-based Battle Pass.  App developers who sell digital content rely on in-app payment processing solutions to process consumers' purchases in a seamless and efficient manner.

149.   When selling digital content, Android app developers are unable to utilize the multitude of electronic payment processing solutions generally available on the market to process other types of transactions.  Instead, through contractual restrictions and its monopoly in app distribution, Google coerces developers into using its own in-app payment processing solution by conditioning developers' use of Google's dominant Google Play Store on the use of Google's payment processor for digital content, thereby acquiring and maintaining monopoly power in the Android In-App Payment Processing Market.  Google thus ties its Google Play Store to its own proprietary payment processing solution, Google Play Billing, substantially foreclosing competition.

### A.   The Android In-App Payment Processing Market

#### i.   Product Market Definition

150.   There is a relevant antitrust market for payment processing solutions for the purchase of digital content, including virtual gaming products, that is consumed

within Android apps (the "<u>Android In-App Payment Processing Market</u>").  The Android In-App Payment Processing Market includes the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of such in-app digital content.

151.   Absent Google's unlawful conduct, app developers could integrate a compatible payment processor into their apps to facilitate the purchase of in-app digital content.  Developers also would have the capability to develop their own in-app payment processing functionality.  And developers could offer users a choice among multiple payment processors, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more.

152.   Google offers separate payment solutions for the purchase of digital content and for other types of purchases even within mobile apps.  Google Play Billing can be used for the purchase of digital content and virtual gaming products, while Google offers a separate tool, Google Pay, to facilitate the purchase of physical products and services within apps.

153.   It is particularly important that app developers who sell in-app digital content be able to offer in-app transactions that are seamless, engrossing, quick, and fun.  For example, a gamer who encounters a desirable "skin" within *Fortnite*, such as a Marvel superhero, may purchase it nearly instantly for a small price without leaving the app.  Although *Fortnite* does not offer content that extends gameplay or gives players competitive advantages, other game developers offer such products—for example, "boosts" and "extra lives"—that extend and enhance gameplay.  It is critical that such purchases can be made during gameplay itself, rather than in another manner.  If a player were required to purchase game-extending extra lives outside of the app, the player may simply stop playing.

154.   As another example, if a user of a mobile dating app encounters a particularly desirable potential dating partner, he/she can do more than "swipe right" or "like" that person, but can also purchase a digital item that increases the likelihood that

the potential partner will notice his/her profile.  If the user could not make that purchase quickly and seamlessly, he/she would likely abandon the purchase and may even stop "swiping" in the app altogether.

155.   It is therefore essential that developers who offer digital content be able to seamlessly integrate a payment processing solution into the app, rather than requiring a consumer to go elsewhere, such as to a separate website, to process a transaction.  Indeed, if an app user were directed to process a purchase of digital content outside of a mobile app, the user might abandon the purchase or stop interacting with the mobile app altogether.

156.   Mobile game developers particularly value the ability to allow users to make purchases that extend or enhance gameplay without disrupting or delaying that gameplay or a gamer's engagement with the mobile app.  For these reasons, and in the alternative, there is a relevant antitrust sub-market for payment processing solutions for the purchase of virtual gaming products within mobile Android games (the "<u>Android Games Payment Processing Market</u>").

ii.   <u>Geographic Market Definition</u>

157.   The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China.  Outside China, in-app payment processing solutions, such as Google Play Billing, are available on a worldwide basis.  By contrast, in-app payment processing solutions available in China are not available outside of China, including because Google prevents the use of non-Google payment processing solutions for all apps distributed through the Google Play Store, which as noted above dominates distribution of apps outside of China.

**B.    Google's Monopoly Power in the Android In-App Payment Processing Market**

158.   Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

159.   For apps distributed through the Google Play Store, Google requires that the apps use *only* its own in-app payment processor, Google Play Billing, to process in-app purchases of digital content and for all purchases within Android games.  And because 90% or more of Android-compatible mobile app downloads conducted through an app store have been done through the Google Play Store, Google has a monopoly in these Markets.

160.   For the vast majority of transactions, Google charges a 30% commission for Google Play Billing.[12]  This rate reflects Google's market power, which allows it to charge supra-competitive prices for payment processing within the market. Indeed, the cost of alternative electronic payment processing solutions, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be ***one tenth*** of the 30% cost of Google Play Billing.

| **Electronic Payment Processing Solution** | **Base U.S. Rate[13]** |
| --- | --- |
| PayPal | 2.9% |
| Stripe | 2.9% |
| Square | 2.6%-3.5% |
| Braintree | 2.9% |

## C.   Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market

161.   Through provisions of the DDA that Google imposes on all developers who seek to access Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing solution, Google Play Billing.  Section 3.2 of the DDA

---

[12] Seven months after this lawsuit was filed, Google instituted a new policy reducing the Play Store commission to 15% for a developer's first $1 million in annual revenue.  Sameer Samat, *Boosting Developer Success on Google Play*, *Android Developers Blog* (Mar. 16, 2021), https://android-developers.googleblog.com/2021/03/boosting-dev-success.html.

[13] The base U.S. rates in these examples include an additional fixed fee per transaction of $0.30 or less in addition to the listed percentage.

requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and in-app digital content.

162.   Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require in relevant part that:

- Developers offering "Play-distributed apps must use [Google Play Billing] as the method of payment if they require or accept payment for access to features or services, including any app functionality, digital content or goods".

- Developers offering products within any category of app downloaded on Google Play must use Google Play Billing as the method of payment, except for the following cases:

  o Payment is primarily for physical products or services,

  o Payment is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).

163.   Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their mobile apps, depriving app developers and consumers alike a choice of competing payment processors.  For example, Epic offers its own in-app payment processing solution that it could integrate, alongside Google's and others, into Epic mobile apps. Epic consumers could then choose to process their payment using Google's solution, Epic's solution, or another solution altogether.  These restraints result in a substantial foreclosure of competition.

164.   In December of 2019, Epic submitted a build of *Fortnite* to Google Play that enabled users to make in-app purchases through Epic's own payment processor.  Upon review of the submission, Google Play rejected the application, citing its violation of Google's Payments policy as well as an unrelated issue raised by

Google.  In January 2020, Epic again submitted a *Fortnite* build that resolved the unrelated issue but still enabled users to use Epic's own payment processor.  Google again rejected Epic's submission.

165.    Epic was prevented from offering *Fortnite* on the Google Play Store, and therefore unable to reach many Android users, until it submitted a new version of *Fortnite* that only offered Google Play Billing.  Google has damaged Epic by foreclosing it from the Android in-app payment processing market.

166.    Google has no legitimate justifications for its tie.  If it were concerned, for example, about the security of its users' payment information, then it would not permit alternative payment processing for certain transactions made on Android phones for physical products or digital content consumed outside an app.  But Google does allow alternative payment processing solutions in that context, with no diminution in security.

### D.    Anti-Competitive Effects in the Android In-App Payment Processing Market

167.    Google's conduct harms competition in the Android In-App Payment Processing Market (and, in the alternative, in the Android Games Payment Processing Market) and injures app developers, consumers, and competing in-app payment processors.  Google's conduct substantially forecloses competition.

168.    Google's conduct harms would-be competitor in-app payment processors, who would otherwise have the ability to innovate and offer consumers alternative payment processing solutions that offer better functionality, lower prices, and better security.  For example, in the absence of Google's Developer Program Policies, Epic could offer consumers a choice of in-app payment processor for each purchase made by the consumer, including a choice of Epic's own payment processor at a lower cost and with better customer service.

169.    Google also harms app developers and consumers by inserting itself as a mandatory middleman in every in-app transaction.  When Google acts as payment processor, Epic is unable to provide users comprehensive customer service relating to

in-app payments.  Google has little incentive to compete through improved customer service because Google faces no competition and consumers often blame Epic for payment-related problems.  In addition, Google is able to obtain information concerning Epic's transactions with its own customers, which Google could use to give its ads and Search businesses an anti-competitive edge, even when Epic and its own customers would prefer not to share their information with Google.  In these ways and in others, Google directly harms app developers' relationships with the users of their apps.

170.    Finally, Google raises app developers' costs and consumer prices through its supra-competitive 30% tax on in-app purchases, a price it could not maintain if it had not foreclosed competition for such transactions.  The resulting increase in prices for in-app content likely deters some consumers from making purchases and deprives app developers of resources they could use to develop new apps and content. The supra-competitive tax rate also reduces developers' incentive to invest in and create additional apps and related in-app content.

## COUNT 1:  Sherman Act § 2
### (Unlawful Monopoly Maintenance in the Android App Distribution Market) (against all Defendants except Google Payment)

171.    Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

172.    Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

173.    The Android App Distribution Market is a valid antitrust market.

174.    Google holds monopoly power in the Android App Distribution Market.

175.    Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anti-competitive acts described herein, including conditioning the licensing of the Google Play Store, as well as other essential Google

services and the Android trademark, on OEMs' agreement to provide the Google Play Store with preferential treatment.  Google has done this by incentivizing OEMs to enter agreements that prevent alternative app stores from being installed on the default Home Screen of Android devices and coercing OEMS into making the Google Play Store exclusive on their devices, by restricting OEMs from offering frictionless downloading of apps outside of Google Play through compatibility standards in the AFA and ACC, by imposing technical restrictions and obstacles on both OEMs and developers which prevent the distribution of Android apps through means other than the Google Play Store, and by conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

176.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

177.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

178.   As a potential competing app distributor and as an app developer, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 2:  Sherman Act § 1**
**(Unreasonable restraints of trade concerning**
**Android App Distribution Market:  OEMs)**
**(against all Defendants except Google Payment)**

179.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

180.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

1   in restraint of trade or commerce among the several States, or with foreign nations".

2   15 U.S.C. § 1.

3          181.   Google has entered into agreements with OEMs that unreasonably

4   restrict competition in the Android App Distribution Market.  These include MADAs

5   with OEMs that condition their access to the Google Play Store and other "must have"

6   Google services on the OEM offering the Google Play Store as the primary and often

7   the only viable app store on Android mobile devices.

8          182.   These agreements also include exclusivity agreements that prevent

9   OEMs from pre-installing alternative app stores on a substantial portion of new Android

10  devices, including devices that are sold in markets with the largest monetization

11  opportunities.  Google also has entered agreements that prevent alternative app stores

12  from being installed on the default Home Screen of Android devices.

13         183.   Through the AFA and ACC compatibility standards, Google restricts

14  OEMs from offering frictionless downloading of apps outside of Google Play.

15         184.   These agreements serve no legitimate or pro-competitive purpose

16  that could justify their anti-competitive effects, and thus unreasonably restrain and

17  substantially foreclose competition in the Android App Distribution Market.

18         185.   Google's conduct affects a substantial volume of interstate as well as

19  foreign commerce.

20         186.   Google's conduct has substantial anti-competitive effects, including

21  increased prices and costs, reduced innovation and quality of service, and lowered

22  output.

23         187.   As a potential competing app distributor and as an app developer that

24  consumes app distribution services, Epic has been harmed by Defendants' anti-

25  competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic

26  has been foreclosed from the market and has suffered and continues to suffer damages

27  and irreparable injury, and such damages and injury will not abate until an injunction

28  ending Google's anti-competitive conduct issues.

**COUNT 3:  Sherman Act § 1**
**(Unreasonable restraints of trade concerning**
**Android App Distribution Market:  Developer Distribution Agreement)**
**(against all Defendants except Google P**ayment)

188.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

189.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

190.   Google forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of being distributed through Google's app store, the Google Play Store.  The relevant provisions of these agreements unreasonably restrain and substantially foreclose competition in the Android App Distribution Market.

191.   Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play".  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play".  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

192.   These agreements serve no legitimate or pro-competitive purpose that could justify their anti-competitive effects, and thus unreasonably restrain and substantially foreclose competition in the Android App Distribution Market.

193.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

194.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

195.   As a potential competing app distributor and as an app developer that consumes app distribution services, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has been substantially foreclosed from the market and has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 4:  Sherman Act § 2
### (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market)
### (against all Defendants)

196.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

197.   Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

198.   The Android In-App Payment Processing Market is a valid antitrust market.  In the alternative, the Android Games Payment Processing Market is a valid antitrust market.

199.   Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

200.   Google has unlawfully acquired monopoly power in these Markets, including through the anti-competitive acts described herein.  And however Google initially acquired its monopoly, it has unlawfully maintained its monopoly, including through the anti-competitive acts described herein.

201.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

202.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

203.   As an app developer and as the developer of a competing in-app payment processing solution, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 5:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android In-App Payment Processing Market: Developer Distribution Agreement)
### (against all Defendants)

204.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

205.   Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

206.   Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play Store.  The relevant provisions of these agreements

1    unreasonably restrain and substantially foreclose competition in the Android In-App
2    Payment Processing Market.

3          207.   Section 3.2 of the DDA requires that Android app developers enter
4    into a separate agreement with Google's payment processor, Defendant Google
5    Payment, in order to receive payment for apps and content distributed through the
6    Google Play Store.  This includes payments related to in-app purchases of digital
7    content.  Further, Google's Developer Program Policies, compliance with which Section
8    4.1 of the DDA makes obligatory, require that apps distributed through the Google Play
9    Store "must use [Google Play In-app Billing, offered by Google Payment] as the
10   method of payment" for such in-app purchases.  While Google's Policies exclude
11   certain types of transactions from this requirement, such as the purchase of "primarily
12   . . . physical" goods and services or of digital content that may be consumed outside of
13   the app itself, Google expressly applies its anti-competitive mandate to all "Play-
14   distributed apps . . . if they require or accept payment for access to features or services,
15   including any app functionality, digital content or goods", which includes *Fortnite*.

16         208.   The challenged provisions serve no sufficient legitimate or pro-
17   competitive purpose and unreasonably restrain and substantially foreclose competition
18   in the Android In-App Payment Processing Market and, in the alternative, the Android
19   Games Payment Processing Market.

20         209.   Defendants' conduct affects a substantial volume of interstate as well
21   as foreign commerce.

22         210.   Defendants' conduct has substantial anti-competitive effects,
23   including increased prices and costs, reduced innovation and quality of service, and
24   lowered output.

25         211.   As an app developer and as the developer of a competing in-app
26   payment processing solution, Epic has been harmed by Defendants' anti-competitive
27   conduct in a manner that the antitrust laws were intended to prevent.  Epic has been
28   substantially foreclosed from the market and has suffered and continues to suffer

1  damages and irreparable injury, and such damages and injury will not abate until an

2  injunction ending Google's anti-competitive conduct issues.

3  **COUNT 6:  Sherman Act § 1**
   **(Tying Google Play Store to Google Play Billing)**

4  **(against all Defendants)**

5  212.   Epic restates, re-alleges and incorporates by reference each of the

6  allegations set forth in the rest of this Complaint as if fully set forth herein.

7  213.   Defendants' conduct violates Section 1 of the Sherman Act, which

8  prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

9  in restraint of trade or commerce among the several States, or with foreign nations."

10 15 U.S.C. § 1.

11 214.   Google has unlawfully tied its in-app payment processor, Google

12 Play Billing, to the Google Play Store through its DDAs with app developers and its

13 Developer Program Policies.

14 215.   Google has sufficient economic power in the tying market, the

15 Android App Distribution Market.  With Google Play Store installed on nearly all

16 Android OS devices and over 90% of downloads on Android OS devices being

17 performed by the Google Play Store, Google has overwhelming market power.

18 Google's market power is further evidenced by its ability to extract supra-competitive

19 taxes on the sale of apps through the Google Play Store.

20 216.   The availability of the Google Play Store for app distribution is

21 conditioned on the app developer accepting a second product, Google's in-app payment

22 processing solution.  Google's foreclosure of alternative app distribution channels forces

23 developers like Epic to use Google's in-app payment processing solution, which Google

24 has expressly made a condition of reaching Android users through its dominant Google

25 Play Store.

26 217.   The tying product, Android app distribution, is distinct from the tied

27 product, Android in-app payment processing, because app developers such as Epic have

28 alternative in-app payment processing options and would prefer to choose among them

independently of how an Android app is distributed.  Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

218.   Google's conduct substantially forecloses competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

219.   Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

220.   In the alternative only, even if Google's conduct does not constitute a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

221.   As an app developer which uses in-app payment processing solutions and as the developer of a competing in-app payment processing solution, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 7:  California Cartwright Act**
**(Unreasonable restraints of trade in Android App Distribution Market: OEMs)**
**(against all Defendants except Google Payment)**

222.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

223.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

224.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

225.   The Android App Distribution Market is a valid antitrust market.

226.   Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market.  Namely, Google has entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices.  These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

227.   These agreements also include exclusivity agreements that prevent OEMs from pre-installing alternative app stores on a substantial portion of new Android devices, including devices that are sold in markets with the largest monetization opportunities.  Google has also entered agreements that prevent alternative app stores from being installed on the default Home Screen of Android devices.

228.   Through the AFA and ACC compatibility standards, Google restricts OEMs from offering frictionless downloading of apps outside of Google Play.

229.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

230.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

231.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has

its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

232.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 8:  California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market: Developer Distribution Agreement)
### (against all Defendants except Google Payment)

233.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

234.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

235.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

236.   The Android App Distribution Market is a valid antitrust market.

237.   Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android App Distribution Market.

238.   Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Section 4.1 of the DDA requires that all developers "adhere" to Google's Developer Program Policies.  Under the guise of its so-called

"Malicious Behavior" Policy, Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through the Google Play Store, even though there is no legitimate technological or other impediment to distributing a competing app store through the Google Play Store.

239.   These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android App Distribution Market.

240.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service, and lowered output.

241.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

242.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

243.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 9:  California Cartwright Act
## (Unreasonable restraints of trade in Android In-App Payment Processing Market:
## Developer Distribution Agreement)
## (against all Defendants)

244.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

245.   Google's actps and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition.  *See* §§ 16720, 16726.

246.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

247.   The Android App Distribution Market and Android In-App Payment Processing Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust markets.

248.   Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

249.   Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android In-App Payment Processing Market.

250.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA

makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "primarily . . . physical" goods and services or of digital content that may be consumed outside of the app itself, Google expressly and discriminatorily applies its anti-competitive mandate to all "Play-distributed apps . . . if they require or accept payment for access to features or services, including any app functionality, digital content or goods", which includes *Fortnite*.

251.   These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

252.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

253.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute and use its own in-app payment processor.

254.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

255.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 10:  California Cartwright Act
### (Tying Google Play Store to Google Play Billing)
### (against all Defendants)

256.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

257.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition.  *See* §§ 16720, 16726.

258.   Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

259.   The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." § 16727.

260.   As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

261.   Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android In-App Payment Distribution Market.  With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power.

1   Google's market power is further evidenced by its ability to extract supra-competitive
2   taxes on the sale of apps through the Google Play Store.

3          262.   The availability of the Google Play Store for app distribution is
4   conditioned on the app developer accepting a second product, Google's in-app payment
5   processing solution.  Google's substantial foreclosure of alternative app distribution
6   channels forces developers like Epic to use Google's in-app payment processing
7   solution, which Google has expressly made a condition of reaching Android users
8   through its dominant Google Play Store.

9          263.   The tying product, Android app distribution, is separate and distinct
10  from the tied product, Android in-app payment processing, because app developers such
11  as Epic have alternative in-app payment processing options and would prefer to choose
12  among them independently of how an Android app is distributed.  Google's unlawful
13  tying arrangement thus ties two separate products that are in separate markets.

14         264.   Google's conduct substantially forecloses competition in the
15  Android In-App Payment Processing Market and, in the alternative, in the Android
16  Games Payment Processing Market, affecting a substantial volume of commerce in
17  these Markets.

18         265.   Google has thus engaged in a *per se* illegal tying arrangement and
19  the Court does not need to engage in a detailed assessment of the anti-competitive
20  effects of Google's conduct or its purported justifications.

21         266.   Even if Google's conduct does not form a *per se* illegal tie, an
22  assessment of the tying arrangement would demonstrate that it is unreasonable under the
23  Cartwright Act, and therefore, illegal.

24         267.   Google's acts and practices detailed above unreasonably restrain
25  competition in the Android In-App Payment Processing Market and, in the alternative,
26  in the Android Games Payment Processing Market.

27         268.   Google's conduct harms Epic which, as a direct result of Google's
28  anti-competitive conduct, is paying a supra-competitive commission rate on in-app

purchases processed through Google's payment processor and has forgone commission revenue it would be able to generate if its own in-app payment processor were not unreasonably restricted from the market.

269.   As an app developer which uses in-app payment processing solutions and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.

270.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

271.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 11:  California Unfair Competition Law
### (against all Defendants)

272.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

273.   Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

274.   Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition.  Specifically, it develops and distributes apps for the Android mobile platform, and has developed and distributes a processor for in-app purchases, and Google's conduct has unreasonably restricted Epic's ability to fairly compete in the relevant markets with these products.

275.   Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

276.   Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

277.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is unreasonably prevented from freely distributing mobile apps or its in-app payment processing tool, and forfeits a higher commission rate on the in-app purchases than it would pay absent Google's conduct.

278.   Epic seeks injunctive relief under the Unfair Competition Law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Epic and against Defendants:

A.   Issuing an injunction prohibiting Google's anti-competitive and unfair conduct and mandating that Google take all necessary steps to cease such conduct and to restore competition;

B.   Awarding a declaration that the contractual restraints complained of herein are unlawful and unenforceable;

C.   Awarding any other equitable relief necessary to prevent and remedy Google's anti-competitive conduct; and

D.   Granting such other and further relief as the Court deems just and proper.

Dated:  July 21, 2021

Respectfully submitted,

By:      /s/ Paul J. Riehle

**FAEGRE DRINKER BIDDLE &
REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700