Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:20-cv-05671-JD<br>Case No. 3:21-md-02981-JD<br><br>**PLAINTIFF EPIC GAMES, INC.'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date: June 2, 2022 at 10:00 a.m.<br>Courtroom: 11, 19th Floor<br>Judge: Hon. James Donato |

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on June 2, 2022, at 10:00 a.m., in the United States District Court for the Northern District of California, before the Honorable James Donato, Plaintiff Epic Games, Inc. ("Epic") will move this Court pursuant to Federal Rule of Civil Procedure 65 for a Preliminary Injunction restraining Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp. (collectively, "Google"), its officers, agents, servants, employees and attorneys, and all persons in active concert or participation with Google, from removing, de-listing, refusing to list or otherwise making unavailable the app Bandcamp, including rejecting or refusing to distribute any update of such app, from the Google Play Store on the basis that Bandcamp offers in-app payments through means other than Google Play Billing or on any pretextual basis.[1]

This Motion is made on the grounds that:  (1) Epic is likely to succeed on the merits of its claims that Google's conduct violates the Sherman Act, the Cartwright Act and California's Unfair Competition Law; (2) absent a preliminary injunction, Epic is likely to suffer irreparable harm; (3) the balance of harms tips sharply in Epic's favor; and (4) the public interest supports an injunction.  This Motion is based upon the Complaint in this action, this Notice of Motion and Motion, the Proposed Order Granting Plaintiff's Motion for a Preliminary Injunction ("Proposed Order"), the Declaration of Steven Allison ("Allison Decl.") along with its accompanying exhibit, the Declaration of Ethan Diamond ("Diamond Decl.") along with its accompanying exhibits, the Declaration of Joshua Kim ("Kim Decl.") along with its accompanying exhibits, the

---

[1] Epic has noticed this Motion for June 2, 2022, the first Thursday at least 35 days from the filing of this Motion, in accordance with Paragraph 11 of this Court's Standing Order for Civil Cases and Northern District of California Civil Local Rule 7-2(a).  Because Google's policy change that is the subject of this Motion will take effect on June 1, 2022, Epic intends to meet and confer with Google following the filing of this Motion to seek Google's agreement not to enforce the new policy while this Motion is pending.  If the parties cannot reach agreement, Epic will move to shorten time for the Court to hear the Motion under Civil Local Rule 6-3, or in the alternative, to temporarily restrain Google from enforcing the June 1, 2022 policy change pending resolution of this Motion.

Declaration of Shawn Grunberger ("Grunberger Decl.") along with its accompanying exhibits, the Declaration of Lauren A. Moskowitz ("Mosk. Decl.") along with its accompanying exhibits, the Declaration of Steven Tadelis ("Tadelis Decl."), all matters with respect to which this Court may take judicial notice, and such oral and documentary evidence as may be presented to the Court.  Plaintiff hereby requests, pursuant to Federal Rule of Civil Procedure 65 and Northern District of California Civil Local Rules 7-2 and 65-2, that the Court issue a preliminary injunction in the form of the Proposed Order filed herewith.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.   GOOGLE'S NEW POLICY WILL IRREPARABLY HARM EPIC AND THOUSANDS OF ARTISTS. ................................................................................................................. 3

II.  EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS. ........................................... 6

    A.   Google Anticompetitively Maintains Its Monopoly Power in the Android App Distribution Market. ...................................................................................... 6

        1.   Google Built Its Monopoly Using 'Bait and Switch' Tactics. ................................ 7

        2.   Google Erected Insurmountable Barriers to Entry. ................................................. 8

        3.   Google Paid Potential Competitors Not To Compete. ............................................ 9

        4.   Google's Conduct Has Anticompetitive Effects that Injure Epic. ........................ 12

    B.   Google's Tie of Google Play Billing to Google Play Is Unlawful. ....................... 12

        1.   Google's Tie Is *Per Se* Illegal Under Federal and State Law. ............................ 12

        2.   Google Is Now Coercing More Developers Into Using GPB. .............................. 14

        3.   Google's Tie Has Substantial Anticompetitive Effects. ....................................... 14

III. BALANCE OF HARMS TIPS FIRMLY IN EPIC'S FAVOR. ......................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
    534 F. App'x 633 (9th Cir. 2013) ........................................................................4

*Apple Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011) ..........................5

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466, 484 (9th Cir. 2021) ........................................................................7

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ........................................................................13

*CollegeNet, Inc. v. Common Application, Inc.*,
    355 F. Supp. 3d 926 (D. Or. 2018) ........................................................................13

*Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd.*,
    2014 WL 4679001 (C.D. Cal. Sept. 18, 2014) ..........................................................1, 15

*F.T.C. v. Actavis, Inc.*,
    570 U.S. 136 (2013)........................................................................9

*F.T.C. v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ........................................................................6

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ........................................................................3

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    2022 WL 1132814 (9th Cir. Apr. 18, 2022) ........................................................................3

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015) ........................................................................12

*Indep. Techs., LLC v. Otodata Wireless Network, Inc.*,
    836 F. App'x 531 (9th Cir. 2020) ........................................................................6

*Palmer v. BRG of Georgia, Inc.*,

   498 U.S. 46 (1990)......................................................................................................9

*Pimentel v. Dreyfus*,

   670 F.3d 1096 (9th Cir. 2012) ...................................................................................3

*SC Manufactured Homes, Inc. v. Leibert*,

   162 Cal. App. 4th 68 (2008) ....................................................................................13

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,

   695 F.3d 676 (7th Cir. 2012) ................................................................................4, 5

*United States v. Bazaarvoice, Inc.*,

   2014 WL 203966 (N.D. Cal. Jan. 8, 2014)................................................................9

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,

   540 U.S. 398 (2004)...................................................................................................9

*W. Power Sports, Inc. v. Polaris Indus. Partners L.P.*,

   951 F.2d 365, 1991 WL 266523 (9th Cir. 1991) ....................................................15

**Statutes & Rules**

Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq* ................................6, 12, 13

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* .........................6

Sherman Act, 15 U.S.C. § 1 ......................................................................................9, 12

Sherman Act, 15 U.S.C. § 2 ........................................................................................3, 6

<u>**PRELIMINARY STATEMENT**</u>

This case challenges, among other unlawful conduct, Google's: (1) conduct in the market for the distribution of apps on Android, where it has a monopoly through its Google Play Store ("Google Play"), and (2) use of that monopoly to illegally tie its Google Play Billing ("GPB") product to Google Play and impose a fee on all purchases that Google forces through GPB. The case is set for trial in April 2023. This Motion is necessary to preserve the status quo and prevent Google from implementing a change to its GPB policies that would cause Epic irreparable harm before this case can be decided. Since Google first launched its in-app payments product in 2011, it has exempted from its tie developers that sell digital content consumed outside the app. (Mosk. Decl., Ex. 8 at '284 ("Payments Policy" or "Policy").) This Policy exemption has applied to a wide range of apps, including music services like Epic's Bandcamp app. Now, Google is closing the exemption and expanding its illegal tie. Specifically, Google has threatened to remove any apps, including Bandcamp, from Google Play on June 1, 2022, if they do not adopt GPB for the sale of all digital content. Epic therefore seeks preliminary injunctive relief.

Bandcamp, acquired by Epic in a transaction that closed last month, is an online record store and music community used by more than 500,000 independent artists and 11,000 independent labels to connect with their fans online. (Diamond Decl. ¶ 10.) Consistent with Google's Policy exemption, Bandcamp has used the payment solution of its choice—tailored to the needs of its business—to allow artists and labels to sell music and merchandise directly to their fans through its Android app. Bandcamp's ability to use its preferred payment solution is critical because GPB does not provide Bandcamp with the services it needs and comes at a price that Bandcamp cannot afford. (*Id.* ¶¶ 27-28.) After more than a decade of allowing developers to choose their own payment solutions for purchases of digital content that could be consumed outside their apps, Google is now changing its Policy under the guise of a "clarification" that it announced in September 2020. On April 21, 2022, Google confirmed that it will enforce its new Policy against Bandcamp, including by removing the app from Google Play on June 1, 2022, if Bandcamp does not integrate GPB. (*Id.* ¶ 39.)

The new Policy will cause irreparable harm.  As Bandcamp told Google in June and August 2021, the Policy change does not work for Bandcamp's community or business.  (Kim Decl. ¶¶ 9, 16.)  Beyond the financial impact of the newly imposed revenue share, integrating GPB would undermine Bandcamp's ability to serve fans and artists.  (Diamond Decl. ¶ 28.)  Integrating GPB may require Bandcamp to switch from paying out artists within 24 to 48 *hours* of a sale (an essential feature of Bandcamp's offering) to paying out artists 15 to 45 *days* after a sale—a significant blow to the artists who rely on Bandcamp to make a living and continue making music.  (Diamond Decl. ¶¶ 29-30; Grunberger Decl. ¶¶ 23-27.)  In addition, Bandcamp is a large marketplace where artists and labels add and edit thousands of digital and physical items each day and have full control over pricing—a type of marketplace that GPB is not equipped to accommodate.  (Diamond Decl. ¶ 33; Grunberger Decl. ¶¶ 30-34.)  If Epic were forced to turn off digital sales in the app in lieu of integrating GPB, fans and artists would become less engaged with Bandcamp, and Epic would lose mobile users and artists at a time when building momentum is essential for Epic to grow the Bandcamp app into a global platform that connects musicians and creators.  (Allison Decl. ¶¶ 22-23.)

All told, Google's Policy change will cause Epic irreparable harm by forcing it to make the untenable choice between (i) trying to integrate GPB—which is incompatible with the way Bandcamp operates; (ii) removing the in-app option to purchase digital goods—which would transform the app from a marketplace to a window shop; or (iii) being ejected from Google Play altogether, which would cut Bandcamp off from the primary app distribution channel on Android.  The related harms to the public interest, including to the independent artists who rely on Bandcamp, also weigh strongly in favor of a preliminary injunction.  (*See infra* Section I.)

Epic is also likely to succeed on the merits of its antitrust and unfair competition claims.  Indeed, Google's Policy change is just the latest in a long line of anticompetitive acts designed to illegally foreclose competition within the Android ecosystem.  Google unlawfully maintains a monopoly over the distribution of apps on Android by deploying "bait and switch" tactics, erecting insurmountable barriers to entry, and paying actual and potential competitors billions of dollars not to compete against Google Play.  Google uses that monopoly power to force apps

distributed through Google Play to use GPB for in-app purchases of digital content, which is an unlawful tie.  (*See infra* Section II.)

Preserving the status quo would not harm Google; it would simply require Google to continue operating as it has for over a decade.  The balance of harms weighs firmly in favor of Epic, and a preliminary injunction should issue.  (*See infra* Section III.)

<u>ARGUMENT</u>

To obtain a preliminary injunction, a plaintiff must show that "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 2022 WL 1132814, at *5 (9th Cir. Apr. 18, 2022).  Under the Ninth Circuit's "sliding scale" approach, "a stronger showing of one element may offset a weaker showing of another."  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012); *see also Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).  Each factor weighs in favor of granting Epic's Motion and preserving the status quo of the past decade.

## I.    GOOGLE'S NEW POLICY WILL IRREPARABLY HARM EPIC AND THOUSANDS OF ARTISTS.

Google's new Payments Policy, if permitted, threatens to irreparably harm Epic and thousands of artists who rely on the Bandcamp app.

*First*, Bandcamp's payment solution is custom built to maximize efficiency and minimize costs, allowing artists to be paid within 24 to 48 hours of a sale.  (Diamond Decl. ¶ 29; Grunberger Decl. ¶ 26.)  This is an essential feature of the Bandcamp app that sets it apart.  (Diamond Decl. ¶ 29.)  Using GPB, by contrast, would materially affect Bandcamp's payout process, because Google does not send payouts to developers until 15 to 45 days after a sale.  (Grunberger Decl. ¶ 27.)  To continue the practice of sending payouts to artists within only 24 to 48 hours, Bandcamp would need to either try to advance these payouts or wait until it receives the money from Google, the delay from which would harm the artists who rely on Bandcamp to make a living and continue making music.  (Diamond Decl. ¶ 30; Grunberger Decl. ¶ 27.)  Therefore, switching to GPB threatens to cause significant harm to the app's reputation with

1    artists as a reliable source of weekly or even daily income, making it less attractive to current and

2    prospective artists.  *See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th

3    Cir. 2013) (finding irreparable harm based on "threatened loss of . . . customers or goodwill").

4         *Second*, integrating GPB threatens to destroy another of Bandcamp's key selling points to

5    artists—namely, its ability to give artists around 82% of the revenue earned from their sales.

6    (Diamond Decl. ¶¶ 6, 27.) ████████████████████████████████████████████████

7    ████████████████████████████████ (Mosk. Decl., Ex. 80.)  While Google has offered

8    Bandcamp a revenue share of 10% (in exchange for other concessions) (Kim Decl. ¶ 24), paying

9    Google even a 10% revenue share would force Epic to change Bandcamp's current business

10   model or else operate the Bandcamp business at a long-term loss.[1]  (Allison Decl. ¶ 20; Diamond

11   Decl. ¶ 27.)  *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012)

12   (finding irreparable harm where franchisor's policy change would cause "a significant change to

13   [franchisee's] business model").  In theory, Epic could pass on those costs to fans or artists

14   (Allison Decl. ¶ 20; Diamond Decl. ¶ 27), but either change would cause irreparable harm to

15   Epic by damaging its reputation and turning fans and artists away from the app and against Epic

16   (Allison Decl. ¶ 25).  In addition, a material degradation of the Bandcamp app or violation of its

17   core principles within three months of Epic's acquisition would irreparably harm Epic's

18   reputation with artists.  (*Id.*)

19        *Third*, Bandcamp's existing payment solution is fully integrated with PayPal, which

20   allows the Bandcamp support team to offer quality customer support without leaving the

21   Bandcamp payment system.  (Diamond Decl. ¶ 32; Grunberger Decl. ¶ 29.)  Integrating GPB

22   would require significant time and effort to build a new infrastructure to provide the same quality

23   of support using GPB.  (*Id.*)  Further, artists use Bandcamp to sell both digital and physical

24   goods (*e.g.*, albums and merchandise), but because GPB cannot be used for the sale of physical

25   goods, artists would have to deal with two different payment systems if Bandcamp adopts GPB

26

27   ---
     [1] For the period from January 1, 2020 through March 16, 2022, Bandcamp's overall take rate on
     gross sales and the gross profit margin on its digital marketplace was approximately 13% and

28   7.5% respectively, leaving very little to cover operating expenses, let alone a platform fee.
     (Diamond Decl. ¶ 12.)

1  for digital sales, causing confusion among artists dealing with two different payment schedules.

2  (Diamond Decl. ¶ 31; Grunberger Decl. ¶ 28.)

3  *Fourth*, GPB requires itemized pricing catalogs for every item available for purchase in

4  the app.  Complying with that requirement would seriously harm an app like Bandcamp, a large

5  marketplace in which artists and labels add and edit thousands of digital and physical items each

6  day and have full control over pricing, including the ability to allow fans to name their own price

7  for items and the ability to set the price of an item in the currency of their choice.  (Diamond

8  Decl. ¶ 33; Grunberger Decl. ¶¶ 7, 30-34.)  Moreover, GPB is only designed to pay out

9  developers—it does not support running an open marketplace or facilitate a developer seeking

10  to pay out thousands of merchants (*e.g.*, artists).  (Grunberger Decl. ¶ 25.)

11  *Fifth*, the Payments Policy threatens to permanently harm Epic's ability to grow the

12  Bandcamp Android app into a global platform with more fans and artists, which is essential to

13  building the audience base and momentum necessary to connect musicians with creators in

14  search of high-quality music.  (Allison Decl. ¶ 23.)  Epic's ability to attract content creators will

15  suffer if its pool of music creators is diminished, which will have immediate and long-term

16  consequences to growing the Bandcamp community.  (*Id*. ¶ 24.)  Epic is actively working to

17  build its creator marketplace.  (*Id*. ¶ 15.)  Music services like Bandcamp, and the network of fans

18  and artists Bandcamp has built, are critical to that goal—it is why Epic acquired Bandcamp.

19  (*Id*. ¶¶ 15-16.)  And mobile apps are the most important driver of new users, as such apps are

20  increasingly becoming the only way younger consumers engage with each other and with content

21  online.  (*Id*. ¶ 11.)  While Bandcamp theoretically could disable in-app sales of digital goods on

22  Android to comply with the new Policy, as it has been forced to do on iOS, this threatens to cut

23  off Bandcamp from this growing pool of current and prospective users.  (*Id*. ¶¶ 22-24.)  If Epic's

24  new music service is cut off from or degraded on Android, Epic would lose access to mobile

25  users at a time when momentum in audience-building is the key to developing its

26  creator-to-creator marketplace.  (*Id*. ¶ 23.)  *See Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943,

27  949 (N.D. Cal. 2009) (harm to "competitive position" and "market share" support a finding of

28  irreparable harm), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

## II.    EPIC IS HIGHLY LIKELY TO SUCCEED ON THE MERITS.

Discovery has already substantiated the core allegations in Epic's Complaint:  Google has a monopoly over Android app distribution, and uses its monopoly power to illegally tie its payment product—GPB—to its app distribution product—Google Play.  The basis for this Motion is Google's Policy change to expand its unlawful tie to apps like Bandcamp that sell digital goods that can be consumed outside the app.

To prevail on the tying claims underlying this Motion, Epic must prove either that Google has market power in the tying product market (*i.e.*, app distribution on Android) under the Sherman Act, or sufficient economic power in the tying product market to coerce the purchase of the tied product under the Cartwright Act.  Therefore, to demonstrate the tie and its anticompetitive effects, Epic begins by explaining how Google has violated Section 2 of the Sherman Act (and California's Unfair Competition Law) through its monopoly maintenance in the market for the distribution of mobile apps to users of Android devices (*i.e.*, the tying product market).  (*See infra* Section II.A.)[2]  Epic then explains the illegality of Google's tie and the harms caused to developers like Bandcamp, including the tie's anticompetitive effects in the Android app distribution market and the market for in-app payment solutions on Android.  (*See infra* Section II.B.)

Under the Ninth Circuit's "sliding scale" approach, the overwhelming evidence showing Epic's likelihood of success weighs strongly in favor of preliminary relief.  *See Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, 836 F. App'x 531, 533 (9th Cir. 2020) ("Where a party can show a strong chance of success on the merits, he need only show a possibility of irreparable harm.").

### A.    Google Anticompetitively Maintains Its Monopoly Power in the Android App Distribution Market.

A plaintiff can demonstrate monopoly power by (1) "defin[ing] the relevant market, (2) show[ing] that the defendant owns a dominant share of that market, and (3) show[ing] that

---

[2] Conduct violates Section 2 where the defendant possesses monopoly power in the relevant market, willfully acquires or maintains that power, and causes antitrust injury.  *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

1   there are significant barriers to entry and [] existing competitors lack the capacity to increase

2   their output". *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,* 20 F.4th 466, 484 (9th Cir.

3   2021).  As explained below and in the declaration of Epic's expert economist, Steven Tadelis,

4   Epic satisfies all three prongs.  (Tadelis Decl. ¶¶ 10-40, 46-54, 86-88.)  There is a relevant

5   product market for the distribution of Android-compatible apps to users of Android mobile

6   devices.  (*Id.* ¶¶ 10-40, 86-88 (defining the Android app distribution market).)  Google

7   dominates that market—Google Play is installed on virtually all Android devices, ████████

8   ████████████████████████████████████████████████████████████████████

9   ██████  (*Id.* ¶¶ 46-47; *see also* Mosk. Decl., Ex. 53 at '229.R.)  The Android app distribution

10  market has significant barriers to entry, both inherent and manufactured by Google, which have

11  foreclosed competition.  (Tadelis Decl. ¶¶ 48-54.)

12         Google has built and maintained its monopoly by (1) deploying a series of "bait and

13  switch" tactics, (2) erecting insurmountable barriers to entry, and (3) paying potential

14  competitors not to compete.

15                 **1.      Google Built Its Monopoly Using 'Bait and Switch' Tactics.**

16         Since 2008, when Google launched Google Play's predecessor, Android Market, Google

17  has pursued a simple plan to build a monopoly over app distribution:  ██████████████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████  providing the network effects necessary to sustain growth, ████████

20  ██████████████████████████████████████████████████  (Mosk.

21  Decl., Ex. 5 at '225-'226.)  As part of this plan, Google cleared the field for Android Market by

22  paying wireless carriers not to compete.  Specifically, Google offered carriers a 25% cut of

23  revenue from Android Market in exchange for their tacit commitment not to pursue their own

24  app stores.  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████  (*Id.*, Ex. 4 at '905.)  ████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

1    (*Id.*, Ex. 2 at '609.)  In 2012, ████████████████████████ Google

2    rebranded it Google Play, ████████████████████████████████

3    ███████████████  (*Id.*, Ex. 9 at '919.R; Ex. 10 at '269.)

4        Google used similar anticompetitive tactics on developers.  Google lured developers to

5    create apps for Android with the claim that it "does not take a percentage" of revenues.  (*Id.*, Ex.

6    1.)  Then Google reneged. ████████████████████████████████████

7    ██████████████████████████████████████████████████████

8    ████████████████████████████████████████████

9    ██████████████████████  (*Id.*, Ex. 3 at '483-'484.)  ████████████

10   ██████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████  (*Id.* at '481.)  Google's recent Policy change is yet another

13   "bait and switch" for apps like Bandcamp, which were lured to Google Play with an exemption

14   that is now being taken away in order to force them to pay a revenue share they cannot afford.

15            **2.    Google Erected Insurmountable Barriers to Entry.**

16       Google has gone to great lengths to foreclose competition. ████████████████████

17   ██████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ███████  (Mosk. Decl., Ex. 13 at '006.R-'008.R.) ████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████  (*Id.* at '007.R.)  Google considered ████████████

22   ████████████████████████████████████████████████

23   ██████████████████████████████████████████  to foreclose

24   competition.  (*Id.*)  Google proceeded with the second and third of these proposals.  (*See infra*

25   Section II.A.3.b.)

26        ██████████  Google directed its anticompetitive efforts ████████████████████  . The

27   Google Play team was concerned that ████████████████████████████████████████

28   ██████████████████████████████████  (*Id.*, Ex. 26 at '942.R.)  ████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████ (*Id.*, at '954.R.) ████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ███████████████████████████████████████████████.[3] (*Id.*, at

6 '951.R.)  To date, Google's restrictions have worked exactly as planned, ███████

7 ████████████████████████████████████████████████████

8 █████ (*Id.*, Ex. 109; Ex. 102.)  The substantial barriers to entry—and Google's capitalization on

9 those barriers to entry—are undeniable.  *See, e.g.*, *United States v. Bazaarvoice, Inc.*, 2014 WL

10 203966, at *49 (N.D. Cal. Jan. 8, 2014) (finding market power based, in part, on internal

11 documents "herald[ing]" the "substantial barriers to entry").

### 3. Google Paid Potential Competitors Not To Compete.

13     Since 2019, Google has unlawfully protected its monopoly by (a) paying off top app

14 developers to stop them from developing and launching competing Android app stores; and

15 (b) paying off OEMs to abandon competing Android app stores.  In so doing, Google has

16 betrayed its founding motto ("Don't Be Evil"), committing "the supreme evil of antitrust".  *See*

17 *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)

18 ("collusion" is "the supreme evil of antitrust"); *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 152 (2013)

19 (an agreement where a party with no claim for damages "walks away with money simply so it

20 will stay away" from the market is anticompetitive).  Both programs are also clear violations of

21 Section 1.  *See, e.g.*, *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990).

#### a. Google Paid Top App Developers Not To Compete.

23     In 2019, to block the development of competing Android app stores, Google launched an

24 initiative known as "███████████" (later rebranded "Project Hug" or the "Games Velocity

25 Program").  (Mosk. Decl., Ex. 40.)  Google spent ████████ on secret deals with the top

26 app developers that were "████████" of "████████"—meaning developers that ████████

---

[3] Google prohibits OEMs from offering frictionless downloading of alternative app stores (or any other app outside Google Play) through the compatibility standards in its Anti-Fragmentation Agreements and Android Compatibility Commitments.  (*Id.*, Ex. 81 at 60; Ex. 36 at '772.)

1  ████████████████████████████████████████████████████████████

2  █████████ (*Id.*, Ex. 86 (███ Tr.) at 172:3-22; Ex. 39 at '822.R.)  Project Hug was intended to

3  contain the ██████████████████████████████████████████

4  ████████████ (*Id.*, Ex. 86 (███ Tr.) at 142:1-143:22; 152:5-20.)  Between 2019 and

5  2020, Google signed Project Hug deals with ██ developers.  (*Id.*, Ex. 67 at '697.R.)  The general

6  structure of each deal was the same: ███████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████

9  ███████████████ (*Id.*, Ex. 39 at '828.R.)  Google thus systematically deprived developers of

10  any incentive to launch their own stores or to partner with other nascent stores on Android.

11      Google's Project Hug deal with the game developer ████████ is illustrative.  ████████

12  ████████████████████████████████████████ (*Id.*, Ex. 55 at '919;

13  Ex. 86 (███ Tr.) at 263:20-264:5.) ██████████████████████████████████

14  █████████████████████████████████████████████████████

15  ██████ (*Id.*, Ex. 106 at '495-'497.) █████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ██[4] (*Id.*, Ex. 56 at '561-'562) ██████████████████████████████

18  ████████████████████ (*Id.*, Ex. 107 at '435, '441.)

19      ████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ███████████████████████████████████ (*Id.*, Ex. 67 at '705.R.)

22      b.    <u>Google Paid OEMs Not To Compete and Tried the Same with Samsung.</u>

23      For years, Google has coerced OEMs into giving Google Play preferential treatment over

24  competing app stores.  Specifically, Google has conditioned OEMs' licensing of Google Play, as

25  well as other essential Google services and the Android trademark, on OEMs' agreements to

26  ─────────────────────

27  [4] ████████████████████████████████████████████████████████

28  ████████████████████████████ (*Id.*, Ex. 54 at '773; Ex. 62 at '104.)

1   pre-install and place Google Play on the home-screen of each mobile device. (*Id.*, Ex. 90

2   (███████ Tr.) at 92:20-93:6.) █████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   █████████████████████████████████████████████ (*Id.*, Ex. 90

5   (███████ Tr.) at 243:21-245:03, 245:19-246:06; Ex. 45 at '107.R.)  To address the

6   competitive threat, in June 2019, Google approved a program to pay OEMs a percentage of

7   revenues from both Search and Google Play in exchange for exclusivity for Google Play through

8   a new revenue share agreement Google labeled "███████".  (*See id.*, Ex. 45 at '155.R.) ████

9   ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████ (*Id.*, Ex. 45 at '115.R.; Ex. 90 (███████ Tr.) at 303:16-23.)

12   ████████████████████████████████████████████████████

13   ████ (*Id.*, Ex. 45 at '107.R.)

14         By May 2020, many of the world's largest and most popular Android OEMs had agreed

15   to Google Play exclusivity for most of their new Android devices, further entrenching Google's

16   monopoly and guaranteeing expanded network effects.  (*Id.*, Ex. 61 at '465.R.)[5]  A presentation

17   by ████ Google ███████████ touted that the ███████ program had successfully eliminated

18   the "risk of app developer contagion" by preventing OEMs from preloading any app store other

19   than Google Play.  (*Id.*, at '465.R.-'466.R.)

20         In 2019, Google also attempted to negotiate a deal with Samsung to prevent Samsung's

21   Galaxy Store from competing with Google Play.  (*Id.*, Ex. 39 at '835.R.)  Google and Samsung

22   ████████████████████████████████████████████████

23   ████████████████████ (*Id.*, Ex. 43 at '430.)  Google offered to pay Samsung ████████

24   ████████████████████████████████████████████████████████████████████

25   ████ (*Id.*, Ex. 43 at '431-'432.)

26

27   ─────────────────

28   [5] As of May 2020, the percentage of each OEM's new Android devices with Google Play exclusivity was as follows:  HMD/Nokia (100%), Motorola (98%), LG (95%), BBK (70%), Sony (50%), Sharp (50%) and Xiaomi (40%).  (*Id.*, Ex. 61 at '465.R.)

1 ██████████████████████████████████████████████

2 ████████████████████████████████ (*Id.*, Ex. 43 at '430.)

3       **4.**      **Google's Conduct Has Anticompetitive Effects that Injure Epic.**

4      Google's conduct causes anticompetitive effects, which in turn, injure consumers and

5 developers. For example, Google's monopoly allows it to charge supra-competitive prices (*i.e.*,

6 its 15% to 30% fee), which causes developers to pay Google money that otherwise would be

7 used to lower prices for consumers, hire employees and/or invest in new innovations for their

8 apps. (Tadelis Decl. ¶¶ 101-110.) But for Google's conduct, distributors would compete for

9 developers and users based on the quality of their services, including app curation, safety

10 features (*e.g.*, privacy controls), mechanisms for app discovery and novel pricing models. (*Id.*,

11 ¶¶ 111-113.) Developers, in turn, would be free to choose the distribution option best suited to

12 their business. (*Id.*) These are precisely the types of harms the antitrust laws are intended to

13 prevent. *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015).

14 Bandcamp, for example, would benefit from distribution options with different pricing models

15 (*e.g.*, lower fees) and less onerous conditions (*e.g.*, no requirement to use the distributor's own

16 payment solution). (Diamond Decl. ¶¶ 27-28; Allison Decl. ¶¶ 20-21; *see also supra* Section I.)

17     **B.**    <u>**Google's Tie of Google Play Billing to Google Play Is Unlawful.**</u>

18      Google uses its unlawfully maintained monopoly power in the Android app distribution

19 market to insist that apps distributed through Google Play—which, as discussed above, is

20 developers' only real choice to reach Android users—must use GPB as the exclusive payment

21 solution for in-app purchases of digital goods and services. (Mosk. Decl., Ex. 68 at 21.)

22 Google's tie violates Section 1 and the Cartwright Act.

23       **1.**      **Google's Tie Is *Per Se* Illegal Under Federal and State Law.**

24      "For a tying claim to suffer *per se* condemnation [under the Sherman Act], a plaintiff

25 must prove: (1) that the defendant tied together the sale of two distinct products or services;

26 (2) that the defendant possesses enough economic power in the tying product market to coerce its

27 customers into purchasing the tied product; and (3) that the tying arrangement affects a not

28 insubstantial volume of commerce in the tied product market." *Cascade Health Sols. v.*

*PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).  The elements of a *per se* tying arrangement under the Cartwright Act are met where "(1) . . . the sale of the tying product was linked to the sale of the tied product . . . ; (2) the party had sufficient economic power in the tying market to coerce the purchase of the tied product; (3) a substantial amount of sale was affected in the tied product; and (4) the complaining party sustained pecuniary loss." *SC Manufactured Homes, Inc. v. Leibert*, 162 Cal. App. 4th 68, 86 (2008).  Each prong of both standards is easily satisfied here.

*First*, Google ties GPB to distribution through Google Play by threatening to cut off distribution if developers do not use GPB.  (Mosk. Decl., Ex. 68 at 21.)  *Second*, Google's monopoly power in the tying product market (Android app distribution) is established in Section II.A, above, and Google wields that monopoly power to force developers to use GPB.  *See CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 955 (D. Or. 2018) ("[F]orcing (or coercion) is likely if the seller has power in the tying product market.").  As Bandcamp's own experience shows, but for Google's tie, developers would not voluntarily choose GPB.  (*See* Diamond Decl. ¶¶ 27-33.)  *Third,* Google's tie plainly affects the requisite level of commerce.  The tie (and accompanying fee) affects billions of dollars' worth of in-app transactions each year, ████████████████████████████████████ (Tadelis Decl. ¶¶ 56, 74-75, 89; *see also* Mosk. Decl., Ex. 42 at '896.)  The fourth element of the Cartwright Act is satisfied by the increased costs to Epic and its Bandcamp app associated with complying with the tie.  (*See supra* Section I.)

The evidence of Google's coercion is undeniable.  There is widespread dissatisfaction with GPB among developers.[6] ███████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████ (Mosk. Decl., Ex. 17 at '441; Ex. 22 at '774.)  Even Google's own YouTube refused for years to utilize GPB—██████████████████ ████████████████████████████████████ (*Id.*, Ex. 63 at

---

[6] Developers have resisted GPB because ████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████ (Mosk. Decl., Ex. 21 at '450.)

1  '818.)  The 15% to 30% fee that Google imposes on in-app transactions through GPB is divorced

2  from any value that Google offers developers.  ████████████████████████████████████

3  ███████████████████████████████████████████████████████████████████

4  ███████████████████████████████████████████████████████████████████████

5  ████  (*Id.,* Ex. 50 at '860; Ex. 48 at '587.R.)  ██████████████████████████████

6  ███████████████████████████████████████████████████████  (*id.,* Ex.

7  47 at '631),  ███████████████████████████████  (*id.,* Ex. 37 at '552.R.)

8  Google cannot dispute that developers are coerced into using GPB and paying arbitrary fees.

9  **2.      Google Is Now Coercing More Developers Into Using GPB.**

10  Google previously exempted from the tie apps like Bandcamp that sell digital content that

11  could be consumed outside the app (*e.g.*, songs).  Google's Policy change expands its tie into

12  new territory—and is driven by one primary goal:  increasing profit margins.

13  ██████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ████████████████████  (Mosk. Decl., Ex. 18.)  ██████████████████████

16  ███████████████████████████████████████████████████████████████████

17  (*Id.*, Ex. 21 at '441, '453, '485.)  ██████████████████████████

18  █████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████  (*Id.*, Ex. 27 at '863-'864.)  Google nevertheless ████████████

21  and extend its anticompetitive tie to developers, like Bandcamp, that had been lured to Google

22  Play with the exemption.  (*Id.*, Ex. 19 at '833.)  █████████████████████████

23  ████████████████████████████████████[7]  (*Id.*, Ex. 21 at '483.)

24  **3.      Google's Tie Has Substantial Anticompetitive Effects.**

25  Google's tying arrangement is also plainly illegal under a rule of reason analysis.  *See W.*

26  *Power Sports, Inc. v. Polaris Indus. Partners L.P.*, 951 F.2d 365, 1991 WL 266523, at *2 (9th

27  [7] ████████████████████████████████████████████████████████

28  ████████████████████████████████████████  (*Id.*, Ex. 51 at '314.)

1   Cir. 1991) ("The rule of reason analysis requires the fact-finder to analyze the anticompetitive

2   effects along with any pro-competitive effects to determine whether the [arrangement] is

3   unreasonable on balance.").  The tie causes anticompetitive effects in both the in-app payment

4   solutions market and the market for app distribution on Android.  (Tadelis Decl. ¶¶ 101-113.)

5   ██████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████ (Mosk. Decl., Ex. 71 at '121.R.) ██████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████ (*Id.* at '157.R, '170.R-

10  '171.R.) ██████████████████████████████████████

11  ████████████████████████████████████████████

12  ██████████████████████████  The tie's anticompetitive effects ripple across both markets,

13  harming developers like Bandcamp by increasing costs and depriving them of the freedom to

14  choose the payments or distribution method of their choice.  (Tadelis Decl. ¶¶ 110-113; *see*

15  *supra* Section I.)

16          In sum, Epic is highly likely to succeed on the merits of its claims that Google unlawfully

17  maintains a monopoly in the Android app distribution market and uses that monopoly power to

18  force developers to use GPB through an illegal tie.

19  **III.    BALANCE OF HARMS TIPS FIRMLY IN EPIC'S FAVOR.**

20          The balance of harms strongly favors Epic.  On one hand, absent an injunction, Epic and

21  its Bandcamp app, as well as thousands of artists and independent labels, would suffer imminent

22  irreparable harm.  On the other hand, Google will suffer no harm if its status quo of the past

23  decade is maintained and Google is prevented from extending its illegal tie.  *See Deckers*

24  *Outdoor Corp. v. Ozwear Connection Pty Ltd.*, 2014 WL 4679001, at *13 (C.D. Cal. Sept. 18,

25  2014) (finding no hardship from an injunction requiring a party to comply with the law).

26

27

28

Dated:  April 28, 2022

Respectfully submitted,

By: _____
     Lauren A. Moskowitz

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Vanessa A. Lavely (*pro hac vice* forthcoming)
vlavely@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*