# EXHIBIT 74

```
                                              VOLUME 1

                                              Pages 1 - 214

              UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

EPIC GAMES, INC.,            )
                             )
        Plaintiff,           )   NO. C-20-5640 YGR
                             )
    vs.                      )   Monday, May 3, 2021
                             )
APPLE, INC.,                 )   Oakland, California
                             )
        Defendant.           )   BENCH TRIAL
_____)
APPLE, INC.,                 )
                             )
        Counterclaimant,     )
    vs.                      )
                             )
EPIC GAMES, Inc.,            )
                             )
        Counter-Defendant.   )
_____)


           REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   BY:  KATHERINE B. FORREST, ESQUIRE
                        GARY A. BORNSTEIN, ESQUIRE
                        YONATAN EVEN, ESQUIRE

                     (Appearances continued.)

Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
                        Official Court Reporter


       TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC**

| | |
|---|---|
| 1 | **A.** Yes, I am. |
| 2 | **Q.** And you worked in that capacity for several years at |
| 3 | Google? |
| 4 | **A.** Correct. |
| 5 | **Q.** To have native apps on both iOS and Android, did Down |
| 6 | Dog have to write software separately for each? |
| 7 | **A.** Yes.  Although the majority of our code is shared, yes. |
| 8 | **Q.** And did you use Apple's API in order to create the |
| 9 | software for your iOS app? |
| 10 | **A.** Yes, I don't believe it's possible to make an app, even |
| 11 | open, on an iOS device without using Apple's APIs and SDK. |
| 12 | **Q.** Was there anything special about Apple's API or SDKs? |
| 13 | **A.** Not particularly. |
| 14 | **Q.** Would you characterize them as average, below average, |
| 15 | above average? |
| 16 | **A.** I would say average.  We have implemented substantially |
| 17 | the same functionality on web, Android, and iOS.  And I |
| 18 | don't believe any one of the three was substantially |
| 19 | different. |
| 20 | **Q.** Have you been happy with your experience distributing apps |
| 21 | to the App Store and Apple's enforcement of its policies? |
| 22 | **A.** Not particularly. |
| 23 | **Q.** Why don't you just abandon App Store distribution? |
| 24 | **A.** There is no other way for us to allow our users to access |
| 25 | any iOS app. |

1  Q.  And why does that matter to you?
2  A.  Need of apps provide the best experience for a lot of
3  technical reasons around functionality and performance.  It's
4  also, for better or for worst, where users have learned to go.
5  I think if a friend tells you about this thing Down Dog, they
6  have been using on their phone, they are most likely to go
7  search for Down Dog in the App Store.
8  Q.  Are you able to tell what type of operating system a
9  customer uses to subscribe to your services?
10 A.  Yes.
11 Q.  And can you tell what type of device a customer uses to
12 take a class?
13 A.  To some level of specificity, yes.
14 Q.  What percentage of Down Dog's revenues comes from iOS
15 users?
16 A.  It's roughly 50 percent; where iOS users refer to users
17 practicing on the native iOS app but not necessarily
18 purchasing with in-app purchases.
19 Q.  In your experience, do users who take a class on the iOS
20 app typically switch to taking a class on the web?
21 A.  Typically no.
22 Q.  What percentage, if you know, of users that first take a
23 class on iOS later take a class on the web?
24 A.  I believe it's between 2 and 5 percent.
25 Q.  Do users switch between taking a class on an iOS device

1  and taking a class on an Android device?
2  **A.** No.
3  **Q.** What percentage of users take a class on an iOS device
4  and then later take a class on an Android device?
5  **A.** I believe that number is 2 and a half percent.
6  **Q.** And we've talked about this, but currently users can get
7  Down Dog's iOS only through the App Store, correct?
8  **A.** That's correct.
9  **Q.** If you were allowed to distribute your apps outside of the
10  App Store, would you do it?
11  **A.** I think it depends on the specific distribution method,
12  but we would certainly be open to it.
13  **Q.** If the distribution method was similar to what is allowed
14  over the web, would you distribute your iOS differently --
15  your iOS app differently on iOS?
16  **A.** Yes. Certainly if users could visit our website and
17  install directly from our website, we would support that.
18  **Q.** If Apple increased its commission on the App Store by
19  20 percent, would Down Dog then leave the iOS environment?
20  **MS. DEARBORN:** Objection, Your Honor. Calls for
21  speculation.
22  **THE COURT:** Lay some -- ask him if he has an opinion.
23  You are going to have to lay foundation for that.
24  **MR. EARNHARDT:** Okay. Sure.
25

**BY MR. EARNHARDT:**

**Q.** Are you in charge of determining where your subscriptions are sold?

**A.** Yes.

**Q.** Does the pricing of those subscriptions impact where you offer them?

**A.** Yes.

**Q.** Based on that, if Apple increased its commission on the App Store by 20 percent, would Down Dog leave the iOS ecosystem?

  **MS. DEARBORN:** Objection, Your Honor.

  **THE COURT:** Overruled. You can cross.

  **THE WITNESS:** I think it is unlikely. I think it is more likely that we would increase the price on iOS.

**BY MR. EARNHARDT:**

**Q.** If Apple increased the annual developer fee to $200 instead of $99, would Down Dog leave the iOS ecosystem?

**A.** No.

**Q.** And why not?

**A.** That fee is very small compared to our revenue.

**Q.** And why isn't it sufficient for Down Dog to only be offered on Android devices?

**A.** Again, there is very little cross over between Android and with iOS for any particular user. In our case specifically, we've grown almost entirely by word of mouth. We have done

1  almost no marketing, which means users tell their friends and
2  family about Down Dog.  If half of their friends and family
3  can't download Down Dog because they have an iOS device and
4  not an Android, then that actually amounts to basically
5  halving our growth rate, which is something that compounds
6  over time.  So it substantially reduces the ability for us to
7  grow.
8      At some point I looked at the top 40 health and fitness
9  apps, according to Apple's own top charts.  And at the time
10 only two of those top 40 did not also have an Android app,
11 which suggests that it is very hard to be a popular consumer
12 app while only supporting one platform.
13 Q.  As far as you know, has anyone at Down Dog, including
14 yourself, had any communications of any kind with anyone at
15 Epic Games?
16 A.  No.
17 Q.  Have you been given any incentive to testify here today?
18 A.  No.
19 Q.  By anyone?
20 A.  No.
21 Q.  Are you at all concerned about testifying publicly
22 regarding your views as to Apple's policies?
23 A.  Yes.
24 Q.  And why are you concerned?
25 A.  In the past, Apple has openly told developers that they

1  shouldn't go public with their complaints.  I believe there
2  was -- in the app review guidelines it stated if you run to
3  the press and trash us, it never helps.
4  Q.  That was in the guidelines?
5  A.  That was in the guidelines.
6  Q.  Do you believe that you have ever experienced retaliation
7  from Apple?
8  A.  I'm not sure.  Our most recent update was submitted
9  roughly one week after Epic listed me as a witness.  And that
10 update was delayed for 33 days without any explanation from
11 Apple as to the reason for the delay.  We asked explicitly.
12 We messaged them twice asking for the reason for the delay.
13     In the past we have never had an app be in review for more
14 than a few days, so 33 days was definitely exceptional.  We
15 never got a response from Apple; though it finally was
16 approved -- again, without any explanation -- last Thursday.
17 Q.  It was approved last Thursday?
18 A.  Correct.
19 Q.  When you were deposed in this matter had it been approved?
20 A.  It had not.
21 Q.  Did you testify about the facts that you just told this
22 Court during your deposition?
23 A.  Yes, I did.
24 Q.  And then the app was approved last Thursday?
25 A.  Yes.

1        **MR. EARNHARDT:**  Pass the witness, Your Honor.

2        **THE COURT:**  Looks like now is a good time to take our
3    second recess of the day.

4        What I am going to ask, Mr. Simon, you are prohibited from
5    talking to the lawyers on either side, from talking to the
6    parties on either side, from talking frankly to anybody about
7    anything to do with this case.

8        Do you understand?

9        **THE WITNESS:**  I do.

10       **THE COURT:**  All right.  With that admonishment to the
11   witness, we will stand in recess until 1:15.

12       (Recess taken at 12:33 p.m.; resumed at 1:15 p.m.)

13       **THE CLERK:**  Remain seated.  Court is back in session.

14       **THE COURT:**  You have a witness?

15       **MS. FORREST:**  Your Honor, I have one housekeeping
16   matter, if I might?

17       **THE COURT:**  We are back on the record.  The record
18   will reflect that the parties are present.

19       Ms. Forrest.

20       **MS. FORREST:**  Yes, Your Honor.

21       On the open matter of the documents related to the
22   third-party information, the parties have conferred and
23   reached agreement that for DX3774, the entire document is
24   received into evidence but the version that will go up on to
25   the box will have one word redacted at Bates numbered page

SIMON - CROSS / DEARBORN

```
 1   40587 --
 2             THE COURT:  Hold on.
 3       I'll tell you what:  Just put it on the record and make
 4   sure I get a copy of it so that I know what's been sealed.
 5             MS. FORREST:  Yes.  Thank you, Your Honor.
 6       It's one word on Bates numbered page Epic 04058769.  And
 7   we'll hand Your Honor an appropriate copy.
 8       The second is on DX3818.  The parties have conferred on
 9   some numerical redactions on various pages, and I will hand a
10   copy to Your Honor of that as well.
11             THE COURT:  Okay.  That is agreed-upon redactions?
12             MR. DOREN:  It is, Your Honor.
13             THE COURT:  All right.  Based upon that stipulation,
14   the stipulation is accepted.
15             MS. FORREST:  Thank you, Your Honor.
16             THE COURT:  Okay.
17       You abided by my order, sir?
18             THE WITNESS:  I did.
19             THE COURT:  All right.
20       You may proceed with cross-examination.
21             MS. DEARBORN:  Thank you, Your Honor.
22                         CROSS-EXAMINATION
23   BY MS. DEARBORN:
24   Q.  Good afternoon Mr. Simon.
25   A.  Good afternoon.
```