Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

| | |
|---|---|
| EPIC GAMES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | NO. 20-cv-05671-JD |
| ) | |
| GOOGLE LLC, et al., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

| | |
|---|---|
| IN RE: GOOGLE PLAY STORE ) | NO. 21-mdl-2981-JD |
| ANTITRUST LITIGATION ) | |
| _____) | |

San Francisco, California
Thursday, May 12, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Epic Games:

           CRAVATH SWAINE & MOORE LLP
           Worldwide Plaza
           825 Eighth Avenue
           New York, New York  10019
      BY:  **LAUREN ANN MOSKOWITZ, ESQ.**


           FAEGRE DRINKER BIDDLE & REATH LLP
           Four Embarcadero Center
           27th Floor
           San Francisco, California  94111
      BY:  **PAUL J. RIEHLE, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
           Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Plaintiff Pure Sweat Basketball, Inc.:
                         HAGENS, BERMAN, SOBOL, SHAPIRO LLP
                         715 Hearst Avenue
                         Suite 202
                         Berkeley, California 94710
                    BY:  **BENJAMIN J. SIEGEL, ESQ.**

                         FAEGRE DRINKER BIDDLE & REATH LLP
                         Four Embarcadero Center
                         27th Floor
                         San Francisco, California  94111
                    BY:  **PAUL J. RIEHLE, ESQ.**


For Plaintiff State of California:
                         OFFICE OF THE CALIFORNIA
                           ATTORNEY GENERAL
                         455 Golden Gate Avenue
                         Suite 11000
                         San Francisco, California  94102
                    BY:  **PAULA L. BLIZZARD, ESQ.**
                         **BRIAN WANG, ESQ.**


For Plaintiff State of Utah:
                         OFFICE OF THE UTAH ATTORNEY GENERAL
                         160 East 300 South
                         Fifth Floor
                         Salt Lake City, Utah  84114
                    BY:  **LAUREN M. WEINSTEIN, ESQ.**


For Consumer Plaintiffs:
                         BARTLIT BECK LLP
                         54 West Hubbard Street
                         Chicago, Illinois  60654
                    BY:  **JOHN D. BYARS, ESQ.**


     (Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Match Plaintiffs:

HUESTON HENNIGAN LLP
620 Newport Center Drive
Suite 1300
Newport Beach, California  92660
BY:  **DOUGLAS J. DIXON, ESQ.**



HUESTON HENNIGAN LLP
523 West 6th Street
Suite 400
Los Angeles, California  90014
BY:  **JOSEPH A. REITER, ESQ.**


For Defendants:

O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006-4001
BY:  **BENJAMIN G. BRADSHAW, ESQ.**



MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, California  90071-3426
BY:  **GLENN D. POMERANTZ, ESQ.**
**KURUVILLA JOSEPH OLASA, ESQ.**



MORGAN LEWIS AND BOCKIUS LLP
One Market - Spear Street Tower
San Francisco, California  94105
BY:  **BRIAN C. ROCCA, ESQ.**
**MINNA L. NARANJO, ESQ.**

| | |
|---|---|
| 1 | **Thursday - May 12, 2022**                                    **11:09 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 |     **THE COURTROOM DEPUTY:**  Calling Civil 20-5671, Epic |
| 4 | Games Inc. versus Google LLC, and 21-multidistrict-2981, In Re |
| 5 | Google Play Store Antitrust Litigation.  Counsel? |
| 6 |     **MS. MOSKOWITZ:**  Good morning, Your Honor.  Lauren |
| 7 | Moskowitz -- no relation to the prior case -- from Cravath |
| 8 | Swaine & Moore on behalf of Epic Games. |
| 9 |     **MR. RIEHLE:**  Good morning, Your Honor.  Paul Riehle, |
| 10 | Faegre Drinker for Epic Games. |
| 11 |     **MS. MOSKOWITZ:**  There are some other plaintiffs here |
| 12 | as -- in the context of the MDL. |
| 13 |     **THE COURT:**  Okay.  Where's the Match person? |
| 14 |     **MR. DIXON:**  Good morning, Your Honor.  Doug Dixon, |
| 15 | Hueston Hennigan, representing the Match entities. |
| 16 |     **THE COURT:**  Dixon? |
| 17 |     **MR. DIXON:**  Yes, sir. |
| 18 |     **THE COURT:**  All right.  Defendants? |
| 19 |     **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn |
| 20 | Pomerantz on behalf of the defendants. |
| 21 |     **MR. ROCCA:**  And good morning, Your Honor, it's Brian |
| 22 | Rocca, along with Minna Naranjo, also for defendants. |
| 23 |     **THE COURT:**  All right.  Who's taking the lead on the |
| 24 | plaintiffs' side? |
| 25 |     **MS. MOSKOWITZ:**  Your Honor, Lauren Moskowitz. |

1          **THE COURT:**  And Mr. Pomerantz?

2          **MR. POMERANTZ:**  Yes, Your Honor.  I will be addressing

3   the Bandcamp motion, to the extent you have questions,

4   specifically.

5          **THE COURT:**  Well, I do.  Look, here is where I tap the

6   brakes a little bit.  You know, we spent an enormous amount of

7   time trying to formulate a schedule for me to hear this in an

8   orderly fashion, because it's a complicated case.  I have a hot

9   tub plan.  I'm going to ask you at the end of today for another

10  tutorial.  We all, collectively, you all and I have spent quite

11  a bit of time plotting out the trials and doing everything

12  else.

13         And, you know, now these two injunction motions have come

14  in which are going to spill the apples all out of the cart, all

15  over the street.  And I don't want to do that.  I just don't.

16  So we have to come up with some pragmatic way of addressing

17  what the issue is.  I will maybe start with Google.  I mean,

18  why now?  Why is all this happening now for Epic's acquisition

19  of Bandcamp, and I guess Match.com?

20         **MR. POMERANTZ:**  Yes, Your Honor.

21         **THE COURT:**  What's the rush?  It looks like you've

22  been doing this for a decade.  I understand there are business

23  plans and so on, so I'm not saying just because you've done it

24  for a while your hands are tied, but we're only eight months,

25  what, ten months from trial, right?  Trial's in April, 2023?

1          **MS. MOSKOWITZ:**  That's right.

2          **THE COURT:**  Can't you just wait?

3          **MR. POMERANTZ:**  Your Honor, this isn't something new.

4     Back in September of 2020, Google told Bandcamp and other

5     similarly situated, you have to comply with the billing policy.

6          Bandcamp came to us then in April, 2021.  We gave them a

7     year to figure it out.  There's work to be done to integrate a

8     billing system into an app.  And we offered our services to

9     help them with that.

10          In August of 2021, we offered for those handful of apps

11    that had not yet fully integrated, we said:  Let us know if you

12    need more time.  And Bandcamp came to Google, and said we need

13    more time.  And what they said in writing is (As read):

14          "We need more time because design and

15          implementation efforts are taking longer than

16          anticipated."

17          They were going to comply.  They were working on it.  And

18    they just needed more time to design and implement it.  So,

19    what changed?  Well, what changed was in March of 2022, Epic

20    acquired Bandcamp.  And they didn't say anything to us when the

21    March 31 deadline came and went.  And then a couple of weeks

22    ago they sent an email and they said: We don't intend to

23    comply.

24          And Google wrote back and said the same thing they had

25    said to Bandcamp before it was affiliated with Epic, and it

1   said -- I'm reading the email (As read):

2          "Could we get on a quick call to discuss possible

3      paths forward?  We look forward to restoring the

4      positive and constructive conversations we had with

5      Bandcamp's COO Mr. Kim between April and August of

6      2021, where we found that we had a lot in common.  We

7      have a shared perspective on managing our platform

8      business and we want to find joint solutions."

9      That's what we said just a couple of weeks ago.  And then

10  we got a very terse response from Bandcamp.  And that, that

11  response was:

12          "Thanks for the offer to chat.  But if Google

13      doesn't intend to withdraw this policy for all

14      developers, then I don't think there's a need for

15      further discussion."

16      So what's really going on here is that Bandcamp was

17  working with us to comply.  And they needed some more time.

18  And Epic is now trying to use their acquisition of Bandcamp as

19  a weapon in this lawsuit.

20      And, Your Honor's entirely right.  We have a schedule

21  here.  Bandcamp should do what it said it was going to do, work

22  with us to design and implement it.  And by the way, we have --

23          **THE COURT:**  You said that Google told Bandcamp, when?

24  In September of 2021?

25          **MR. POMERANTZ:**  I'm sorry; we told them in September

1   of 2020.

2          **THE COURT:**  2020, that this was happening.

3          **MR. POMERANTZ:**  That we're going to give you a year.

4   And then --

5          **THE COURT:**  Just to make sure, Mr. Pomerantz, you're

6   telling me that in September of 2020, Google told Bandcamp:

7   You're going to have to go -- you're going to have use the

8   Google Play billing system.

9          **MR. POMERANTZ:**  Correct.  It wasn't just Bandcamp.

10         **THE COURT:**  I understand.

11         **MR. POMERANTZ:**  But Bandcamp definitely got it.  And

12   they don't deny that.  In fact, they attach that notice in

13   their preliminary injunction papers.

14         **THE COURT:**  All right.

15         **MR. POMERANTZ:**  And then, 11 months later, Google

16   offered to extend it for those app developers who hadn't yet

17   fully integrated.  And Bandcamp came to us and said:  We're one

18   of those developers.  Please give us six more months.  And they

19   specifically represented that they had -- they needed more time

20   to design and implement the new policy.  And we took them at

21   their word.  In fact, we said:  Yes, please let us know how we

22   could help you.

23       Because for many of these app developers, they do need

24   help in integrating because each app is a little different, and

25   they have to integrate into our billing system.

1          So we offered them six more months.  And then, heard

2     nothing from them.  They never said "We're not going to comply"

3     until the middle of April, after the Epic acquisition.

4          And so our view is that they should just work with us.

5     We'll finish the integration; we'll work with them to finish

6     the integration.  We can go to trial next --

7               THE COURT:  Well, what you're saying is it's a problem

8     of their own making.

9               MR. POMERANTZ:  Absolutely, Your Honor.  And there's

10     case law about that, as Your Honor knows, in the preliminary

11     injunction context.

12               THE COURT:  That's why I said it.  Okay.

13          Ms. Moskowitz?

14          MS. MOSKOWITZ:  Your Honor, the September, 2020,

15     action that counsel referred to was a month and a half after we

16     filed this lawsuit that is being heard on a track that is

17     headed towards a trial in April.  This is about status quo.

18          We filed this lawsuit in August of 2020.  Google issued a

19     blog post supposedly clarifying an existing policy.  But what

20     the existing policy was, was that there was an exemption, an

21     express exemption -- which we attached to our motion -- that

22     said that physical goods as well as digital goods that would be

23     consumed outside of the app would not be subject to the Google

24     Play billing requirement.

25          The clarification, so to speak, that they called it, was

1    that Google Play billing was going to be required for all.   But

2    that was not clear -- clear as mud that -- what that meant, and

3    to whom it would apply.

4        Bandcamp did reach out over the course of months -- and

5    that's outlined in Mr. Kim's declaration -- to try to

6    understand:  Does this apply to us?  What does this mean?

7    We've had this exemption for the last decade, as have other

8    apps like it, for music and things like that.

9        And Google did tell Bandcamp in August of 2021 that it

10   would, in fact, be subject to this new policy change.   And

11   Bandcamp did ask for an extension.   It was one of the apps,

12   like many others that aren't here today who are represented by

13   developer counsel, because they don't have the ability and the

14   resources to go up against Google, and risk retaliation and

15   being kicked off of the store.

16       What happened was Epic did acquire Bandcamp.   And promptly

17   thereafter, we are in this suit, we are challenging the exact

18   conduct at issue here.   We did our diligence.   We reached out

19   to Google, and we filed this preliminary injunction --

20           THE COURT:   Here's what concerns me.   Bandcamp didn't

21   have a problem.   They said:   Just give us more time and we'll

22   make it work.   Right?   I mean that's what -- look --

23           MS. MOSKOWITZ:   Those are the words they used.

24           THE COURT:   We're doing all this -- I did not get full

25   briefing, so we're just talking among friends here to some

1    extent.  But what concerns me is that it seems quite plain that

2    Bandcamp knew -- regardless of any initial uncertainty,

3    Bandcamp knew no later than August of 2021, it had to switch to

4    the Google Play billing system.  And they were working on it.

5    And they didn't file the lawsuit; they didn't bring an

6    injunction.  It's now, what, eight months later, and Bandcamp

7    has new ownership, your client, Epic.  And now, now it's gotten

8    folded in.  I mean, on that basis alone, irreparable harm is

9    sort of hard to maintain.  If Bandcamp seriously thought that

10   it was facing the Armageddon that your papers indicate, they

11   probably would have filed on September 1 of 2021.  And they

12   didn't.  They said:  We'll make this happen.  And hit some

13   roadblocks, I guess.

14        But, so, let me just tell you.  I'm not deciding this case

15   on the merits in this context.  I'm just not going to do it.

16   This is an inappropriate -- the merits of the

17   preliminary-injunction motion are so inextricably intertwined

18   with the knotty, difficult -- K-N-O-T-T-Y -- difficult and

19   challenging issues in this case that I'm not going to do a

20   fly-by preliminary injunction context, and do that.

21        Now, having said that, we have a sliding scale in our

22   circuit, as you all know, and a serious question is enough.

23   Okay?  There's no doubt it's a serious question.  I will rule

24   on that right now.  There is a serious question in this case.

25   Nobody in this room is going to disagree with that.  How that

1    question gets answered, who knows.  But there -- there's

2    unanimity on the proposition that this is a serious question.

3         So I think there are several courses of action I would

4    like you to discuss.  First -- this is in no particular order,

5    and you know this better than I do.  So I'm going to rely on

6    your good professional assessment of what's happening.  And

7    then, I'll intervene as necessary, get involved as necessary.

8         One is just fold this into the case, and we'll get it all

9    the done in April.  And not have this going on right now.

10        Two is you work out some deal.  Maybe Google could just

11   not do something for ten more months.  Okay?  Contingent on

12   the, you know, trial date.  I'm not asking forever, and I'm not

13   asking through an appeal which I'm sure will follow, but maybe

14   just through trial.  Okay?  Who knows?  You know, you might get

15   a defense verdict, and you won't have to worry about anything.

16   But the plaintiffs may hit a home run.  I don't know.  But,

17   Google, just defer for ten more months, for a couple of -- you

18   know, the litigants here.  Maybe there's something in between

19   that you could work out.

20        If you can't do that, then I'll start with the premise

21   that it's a serious question.  But, you know, this so-called

22   sliding scale we have is, if you start from that premise, you

23   have to show that the balance of the hardships tips sharply in

24   the plaintiffs' favor.  Which means a very strong showing of

25   irreparable harm.  It may be that it's there, but I'm not

1   entirely persuaded yet.  And I haven't heard from Google.  So I

2   can't -- I can't do anything about that now.  Maybe we'll have

3   a little round of briefing afterwards, if necessary.  We'll

4   work all the schedule out in just a minute.

5       But I will say as some preliminary thoughts, it's not at

6   all clear to me why there's not a money damages remedy --

7   assuming you're right, you all on the plaintiffs' side win,

8   it's not clear to me why a money damages remedy for Bandcamp or

9   Match would not be adequate.

10      It's not clear to me that -- I don't know anything about

11  the Match story.  I just got the case.  I just wanted them to

12  be here.  But if it's a similar timeline, it's not clear to me

13  why, after eight months or more of notice, irreparable harm is

14  genuinely in dispute.  I have written many times, as have many

15  other judges, that the, you know, if you delay, you don't get

16  paid.  That's just the way it works.  You can't come -- can't

17  wait for eight months and come in saying:  Oh, the house is on

18  fire.  That doesn't work.

19      I'm also just not clear why, you know, Bandcamp or Match

20  would be disparately impacted from any other app on Google

21  app -- the Google Play store.  This is all a uniform policy

22  that Google's doing, I gather it is.  Is that right,

23  Mr. Pomerantz?

24          MR. POMERANTZ:  Yes, yes, we have a policy that

25  applies to all of the apps that do in-app purchases.

```
 1              THE COURT:  Right.
 2              MR. POMERANTZ:  Which is what we're talking about
 3      here.
 4              THE COURT:  So, let's say, I'm just guessing here, I
 5      think it is called SoundCloud?  Is that a competitor to
 6      Bandcamp?
 7              MS. MOSKOWITZ:  Your Honor, I'm not actually sure if
 8      that is a competitor of Bandcamp.  I do know that there are a
 9      number of music apps that have been subject to this policy
10      change, which has not been uniformly applied.  And Google is
11      expanding its tie to these apps now, during the pendency of
12      this lawsuit.  They reached a deal with Spotify, yet another
13      music company, Google's --
14              THE COURT:  Well, Spotify and Bandcamp are totally
15      different.  As I understand Bandcamp, it's sort of an
16      artist-driven site where you can, you know, the classic -- in
17      my day the classic garage band cuts a CD -- I know nobody does
18      this anymore, but classic garage band cuts a CD and wants to
19      market it directly to an eager public.  That's what Bandcamp
20      facilitates.  Right?
21              MS. MOSKOWITZ:  Yes, it does.  That's its marketplace.
22              THE COURT:  Spotify is totally different.  All I'm
23      saying is it's not clear to me that Bandcamp is going to lose
24      out to any other competitor, because it sounds like they're
25      going to be similarly situated.  In other words, they're going
```

1    to be facing demand by Google, or -- not demand, but a request

2    by Google that they change their billing system in the same

3    way.

4        So -- and there are other outlets.  I mean, Android is

5    important, Google's important.  There's no doubt about it.

6    That's why it's a serious question.  But there's Apple.  And

7    I'm sure Bandcamp's on Apple.  Maybe it's not.

8            MS. MOSKOWITZ:  Your Honor, Bandcamp is on Apple.  It

9    is forced to be what's called a "Reader only."  It is not

10   permitted to sell in-app digital purchases without using

11   Apple's in-app payment, and pay the tax, which is now what

12   Google is trying to do, even though for the last decade it was

13   not in that same shoe.  So --

14           THE COURT:  I get it.  I mean, Apple is probably a bad

15   choice anyway.  But anyway, I understand what you're saying.

16   So, those are some of the issues I have.  Okay?

17       Now, here's what I would like you to do.  Meet as

18   colleagues, see if you can work something out.  Okay?  Each

19   side going to have bend.  All right?  You're going to have to

20   be willow trees, not redwoods.  You each are going to have the

21   bend.  And get your clients to bend.  Probably more of an issue

22   for Mr. Pomerantz than for the plaintiffs.  But anyway -- maybe

23   I'm wrong.  But you've got to get your clients to bend.  Work

24   something out so that we can keep our schedule.  That's my main

25   priority.  Okay?

1    If you cannot do that, I don't need an explanation and I

2  shouldn't hear one.  But if you cannot do that, I will decide

3  it.  But I'm really going to focus -- I'm not doing the merits.

4  So I'm not going to take any likelihood of success on the

5  merits arguments.  They are too intertwined with the heart of

6  this case for me to do on the fly, and in a responsible

7  fashion.  I haven't had the hot tubs yet.  I haven't seen any

8  of the evidence yet.  I haven't had any *Daubert* motions yet.

9  We haven't done class cert.  We've done nothing.  I'm not going

10  to do that, in the absence of a clear record, in a case of this

11  magnitude.

12    I will accept, as we talked about, the operating premise

13  that it is a serious question.  You're going to have to fit

14  yourself into the balance of the hardships analysis after that.

15  So if there is briefing, it will be on that issue:  Why is it

16  that the balance of hardship tips sharply in the plaintiffs'

17  favor?  Okay?  Put everything in there.  you know, delay, this,

18  notice, money.  Can't -- it's irreparable, if none of that

19  works, whatever you want to say.  But that will be the focus.

20    If I have to, I'll do a TRO.  Mr. Pomerantz, I'm hoping

21  Google can see its way to not do anything on June 1st.  Can you

22  make that commitment now?

23        **MR. POMERANTZ:**  Um, I will make the commitment that I

24  will -- I'll definitely pass that message along.

25        **THE COURT:**  All right.

1          **MR. POMERANTZ:**  And I think we can -- what I would

2      make a commitment is we're going to work with them over the

3      next week or so to figure out an answer here for Your Honor.

4          **THE COURT:**  I want to get to the time in just a

5      moment.  But, okay.  You're heading in the right direction.

6      But I will tell you, I mean, status quo, *pendente lite*, as we

7      like to say, I will do it on the first if we can't -- if I feel

8      like we haven't --

9          **MR. POMERANTZ:**  Your Honor, we're not going to put

10     Your Honor in a position to do that on June 1st just because of

11     that schedule.  We'll work with Your Honor's schedule to do

12     that.

13         **THE COURT:**  Okay, perfect.

14         **MR. DIXON:**  Your Honor, I'm sorry -- I would hope that

15     that status quo would mean that Google will continue to approve

16     the app updates that they're rejecting under this current

17     policy.  So they're already changing the status quo, which is

18     part of that reason why Match has had to come into court.

19         We have been submitting updates even after this March 31st

20     deadline.  They continue to approve them, even though they

21     still allowed for an alternative in-app payment system.  But

22     starting April 20th, Google started rejecting our updates.

23     These are critical updates, as we put in our papers.

24         So we sincerely appreciate Your Honor's suggestion that

25     Google should maintain the status quo.  But that needs to

1    include approving the updates, and not rejecting them just

2    because they continue to include an alternative in-app payment

3    system, like many have for a decade.

4         **THE COURT:**  Well, I don't know -- you know better than

5    I do what's in the status quo.  You can discuss --

6         **MR. ROCCA:**  Your Honor, I'm here to discuss Bandcamp.

7         **THE COURT:**  Yeah.

8         **MR. ROCCA:**  So Mr. Dixon walked up, and he's kind of

9    interjecting a Match issue.  The issue he's raising I

10   understand, but it's not the issue with Bandcamp.  Bandcamp is

11   not raising that concern.  I don't think they update like Match

12   does.

13       But in any event, we will work with Bandcamp over the next

14   week.  You have my commitment.  We will work with them over the

15   next week.  And I hope to come back at the end of that week

16   with a joint proposal.  And if not, we will come back with

17   alternative proposals.

18        **THE COURT:**  Are you okay with a week, Ms. Moskowitz?

19        **MS. MOSKOWITZ:**  Yes, Your Honor.  Just a note, that we

20   are concerned that this is just asking for status quo.  We

21   didn't move for a preliminary injunction in this case.  We

22   didn't want to have to come here to inject the merits issues

23   here.  But we are -- in fact, they're dealing with a change in

24   the status quo.  And if Google will just agree to withdraw this

25   policy until trial, then that's all we're asking.

1          **THE COURT:**  Well, you're going to discuss that with

2     Mr. Pomerantz, and see what you two can work out, or some

3     in-between thing.

4          **MS. MOSKOWITZ:**  (Nods head)

5          **THE COURT:**  But my -- my simple question was:  Can you

6     live with doing it over a week?  Are you okay with that?

7          **MS. MOSKOWITZ:**  We will do our best to have that

8     discussion in the next week.  We are eager to get this

9     resolved.

10         **THE COURT:**  Probably start doing it on the way out.

11    Figuratively, I mean, because I want a report in week.  That's

12    what I'm saying.  I want a statement in a week.  And you either

13    outline your deal, or you tell me you don't, and then I'll do a

14    briefing schedule.  But I'm not going to be able to do anything

15    by June 1st.  If I have to, I'll just do a status quo thing,

16    and give you some time to get this done.

17         And then, if you can't do it, though, just please propose

18    a briefing schedule along the lines that I've indicated, and,

19    you know, I'll take it from there.  Although, I really -- I am

20    confident -- I really -- you all are much deeper into it than I

21    am.  But I'm confident you should be able to work something

22    out.  I mean, this is not -- it doesn't seem to me to be a

23    make-or-break issue for Google.  But we'll see.

24         **MR. POMERANTZ:**  Your Honor, we heard your guidance and

25    your thoughts on irreparable injury and on likelihood of

1   success.  And I would just say we don't have to agree on what

2   the status quo is between counsel.  I actually think the status

3   quo is very different than what they think the status quo is.

4   They've known for two years that they were supposed to comply,

5   and Bandcamp was ready to do so last August, to work with us.

6   That's the status quo.

7       But in any event, I will use this next week to work in

8   good faith with them, and try, the best we can -- I'll work

9   with my client, too -- to come up with something that works for

10  us and works for them.

11          **THE COURT:**  All I'm asking -- and of course, I'm not

12  asking you both to agree on:  This is the state of reality

13  today.  You don't have to do that.  You don't have to do that.

14  You just need to get some kind of arrangement in place.  You do

15  need to include Match.  Match.com.

16          **MR. POMERANTZ:**  I'm going to let Mr. Rocca deal with

17  that, with Mr. Dixon.  And I will --

18          **THE COURT:**  Well, I don't need to hear anything more,

19  but you need to include them in this week's worth of

20  discussion.

21          **MR. POMERANTZ:**  Okay.

22          **THE COURT:**  And then just let me know.

23          **MR. POMERANTZ:**  Just to be clear, we will definitely

24  talk directly with Mr. Dixon --

25          **THE COURT:**  Yes.

1          **MR. POMERANTZ:**  -- and Match.

2          **THE COURT:**  Yeah.

3          **MR. POMERANTZ:**  And in the meantime, there is a TRO

4    motion pending.  I take it you don't want us to respond --

5          **THE COURT:**  I'm holding everything in abeyance until

6    you have this week opportunity to talk.

7          **MR. POMERANTZ:**  We'll do that.

8          **THE COURT:**  It will be -- we built a pyramid, a

9    beautiful pyramid.  I'm not going to tear it down.  Just not

10   going to do it.  Okay?

11         **MR. POMERANTZ:**  Yes, Your Honor.

12         **THE COURT:**  It would be the wrong thing to do for this

13   case.  It would be a disservice to the fair and efficient

14   administration of justice to dump all that in favor of an

15   on-the-fly, off-the-cuff preliminary injunction merits, which

16   is what they are.  The Rules of Evidence don't even apply.  So

17   it's just -- it's just not the right setting.  Now, if I have

18   to do something, I will.  That's what I'm here for.  But I'm

19   encouraged by the mutual expressions of cooperation.

20       So, while you're here, is there anything else happening

21   that you'd like to discuss?  Any discovery issues?  Anything

22   else?

23         **MS. MOSKOWITZ:**  There are -- there are -- for the most

24   part, we are at a pace --

25         **THE COURT:**  Oh, it's been great.  I've been very happy

1  to see not many letters.

2          **MS. MOSKOWITZ:**  But there is one issue that is likely

3  to come to a head in the next couple of days, and likely, in

4  front of Your Honor next week.  I'm happy to pass the mic to

5  Mr. Byars.

6          **THE COURT:**  Let's see if we can just do it now.

7          **MR. BYARS:**  Your Honor, John Byars, from Bartlit Beck.

8  I represent consumers, but I believe I'm speaking on behalf of

9  all the plaintiffs here.

10      We're likely going to be filing -- just want to give you a

11  heads-up -- sometime in the next week or so a motion concerning

12  Google's destruction of instant messages.  And this has to do

13  with Google not turning off an auto-delete mechanism on an

14  instant messaging platform that their employees use for

15  business communications, including communications that are

16  relevant --

17          **MR. RIEHLE:**  Is this an internal-to-Google IM system?

18          **MR. BYARS:**  Yes, Your Honor.

19          **THE COURT:**  Does this go to document preservation?  Is

20  that what this is about?

21          **MR. BYARS:**  It's a document preservation issue.

22          **THE COURT:**  Tell me about it.  What happens?

23          **MR. BYARS:**  Sure.  We refer to it as "Google Chats."

24  Discovery has shown that Google uses Google Chats for business

25  communications, including communications that are highly

1    relevant to this case.

2        That system, a certain subset of chats called one-to-one

3    chats, we believe that means that those are chats when there're

4    just two participants, that is -- are subject to an automatic

5    deletion mechanism that destroys those chats every 24 hours.

6            **THE COURT:**  Daily.  Really.

7            **MR. BYARS:**  Yes.

8            **THE COURT:**  Okay.

9            **MR. BYARS:**  Google has the ability to turn that

10   auto-deletion mechanism off, administratively.  They have not

11   done so.  They have said that they will not tell us why they

12   have not done so.

13       And so we -- we believe, and we believe we can show, that

14   they have been systematically deleting relevant documents,

15   which obviously deprives plaintiffs of --

16           **THE COURT:**  Documents?  Or just chats?

17           **MR. BYARS:**  Well, instant messages.

18           **MR. RIEHLE:**  Okay.  But you don't attach anything to

19   those.

20           **MR. BYARS:**  No.  When I'm saying "documents," I meant

21   the instant --

22           **THE COURT:**  I understand.  It's literally like a text

23   message.  You don't attach -- in fact, it's even more

24   primitive.  A text message on your phone, you can put in a

25   photograph, you can put in a document.  But this is even

1    simpler than that.  It's just words back and forth between two

2    people.

3            **MR. BYARS:**  It is words back and forth between two

4    people.  Frankly, I don't know; they may be able to attach

5    documents.  I'm not sure, Your Honor.

6            **THE COURT:**  Okay.

7            **MR. BYARS:**  But I don't think that this is a primitive

8    system.  You can have a robust conversation on Google Chat.

9            **THE COURT:**  Well, I wouldn't use the word "primitive."

10   I know, I may have -- it's simple.  It's just meant to be fast.

11   In other words, when you don't have time for email or something

12   else, you --

13           **MR. ROCCA:**  Your Honor --

14           **THE COURT:**  You zip off a quick IM on the Google Chat.

15   But --

16           **MR. POMERANTZ:**  Your Honor, we have --

17           **THE COURT:**  I was going to say, have you talked about

18   this yet?

19           **MR. POMERANTZ:**  Not -- we've not talked about it

20   before this, but we talked about it with Your Honor in

21   December.  This very issue.

22           **THE COURT:**  We did.

23           **MR. POMERANTZ:**  Yes.  And Your Honor said:  Guys,

24   don't raise that at the status conference; I want motions.  And

25   then Your Honor also ordered us each to respond to

1  interrogatories.  And we did each respond to interrogatories in

2  January.

3              **THE COURT:**  Yeah.

4              **MR. POMERANTZ:**  So that was January; this is May.  We

5  are four months later.  They've never, ever, come to us and

6  said they were going to do anything about it until a few days

7  ago, your Honor, and they said they were going to bring a

8  motion for sanctions.

9         Your Honor has a rule about motion for sanctions.  Bring

10 them promptly as soon as the issue arises.  We thought this

11 issue had gone away.  Because indeed, we had made an offer to

12 them.  We said:  Look, we'll show you our instructions to our

13 employees about document retention.  There's some case law that

14 says that it's privilege, and there's some case law that says

15 it's not privileged.  Let's just agree to exchange our

16 instructions, so we can see yours and you can see ours, and

17 then let's meet and confer about it.

18        And they didn't take us up on that offer.  They didn't

19 take us up on that offer.  And then four months later, they had

20 the gall to first tell us they are going to bring a motion for

21 sanctions, notwithstanding the rules of this Court.  And

22 second, they come up into the status conference, not a letter

23 motion, and try to get Your Honor invested in this issue.  Not

24 telling us they were going to do that.

25             **THE COURT:**  Well, I asked.

1    **MR. POMERANTZ:**  No, I understand.  But they shouldn't

2   be up here even raising it, because Your Honor has told us to

3   bring these things by letter motion, and --

4    **THE COURT:**  I may have said that, but actually, my

5   habit in MDLs and larger cases is to do this.  That's why we

6   have the quarterly -- I don't know what I said in December.

7   I'm not saying that I'm being misquoted, by any means.  But I

8   may have just reached the end of my tether that day, and didn't

9   want to hear anything more.  But as a policy, I do actually

10  like to have this so I don't have to read the letter brief.

11   But in any event, it sounds like you two need to talk.  So

12  don't file anything yet.  Okay?  Take a little time and talk it

13  over with Mr. Pomerantz.  Okay?  And then if you can't work it

14  out, then you can file a letter brief.

15   **MR. POMERANTZ:**  And Your Honor, just to be clear,

16  there is already an agreed-upon meet-and-confer for tomorrow.

17   **THE COURT:**  Oh.  Okay.

18   **MR. POMERANTZ:**  We already agreed on that.  So this is

19  clearly some sort of tactic to get Your Honor invested in the

20  issue that is I think just not the right way for this kind of

21  case to go forward.  We worked really well with the other side.

22  Really well.

23   **THE COURT:**  Well, why don't you fold this into your

24  meet-and-confer then, okay?

25   **MR. BYARS:**  Your Honor --

1          **MR. POMERANTZ:**  It's on this issue -- the

2    meet-and-confer is only on this issue.  There was --

3          **THE COURT:**  Just this, yeah.

4          **MR. POMERANTZ:**  Just this issue.

5          **MR. BYARS:**  So Your Honor, just a couple of things

6    there.  We have been raising this issue since April of 2021.

7    Yes, there were interrogatories that were exchanged.

8          The issue of what was said in -- what Google told their

9    employees with respect to document preservation and a hold

10   notice, I think it is irrelevant for this particular issue.  I

11   mean, they have an auto-delete mechanism that they didn't turn

12   off.  That didn't become clear until a February meet-and-confer

13   that we had after the interrogatory responses.  And we have

14   been working internally among our four plaintiffs groups --

15   it's not going to be five -- to try to run this issue to

16   ground.  So there's -- there's -- this is an issue for which

17   Google's had a lot of notice.

18         And, yes, we are going to meet and confer tomorrow.  We're

19   going to follow the Court's rules.  And we will be -- if we

20   cannot reach a resolution, I'm not sure how they remedy

21   destruction of documents.  Then --

22         **THE COURT:**  If I may, this is all kind of moot,

23   because they're gone now.  All the chats are gone.  You're not

24   going to -- I mean, it seems to me that you would have been

25   most interested in the historical chats preceding the filing of

1    the lawsuits.

2         Typically, you know, once a lawsuit is filed, preservation

3    orders and preservation expectations kick in.  That's a

4    slightly different matter.  And as a practical matter, there

5    are also attorney/client issues, work product -- I mean, it's

6    just not the same fruitful vineyard that -- pre-lawsuit.

7         But the pre-lawsuit things are gone.  So I don't know what

8    it is you would want me to do.  There's just no way for Google

9    to do anything with --

10        **MR. BYARS:**  There are a couple of matters here.  One,

11   we think, based on the evidence that's been shown, that they

12   had an obligation to start preserving documents well in advance

13   of these lawsuits being filed.  So I don't think the date of

14   preservation obligations is the filing of --

15        **THE COURT:**  No, it's true, reasonably anticipated

16   litigation is when the duty comes in.  I mean, that's an

17   extremely fuzzy concept, but I'm not saying you're wrong.  All

18   I'm saying is you're not going to get the chats.

19        So you're basically going to be asking me for preclusion

20   sanctions?  Or what -- what are you going to be asking me for?

21        **MR. BYARS:**  Well, I think right now what we're

22   contemplating is either an adverse-inference sanction, or

23   notifying the jury that there was this -- there were these

24   chats; they were deleted.  And we weren't able to see what the

25   content of these chats were.

1    So, you know, we're willing to propose some alternative

2    solutions.

3         **THE COURT:**  Well, what I'm easing into is -- so this

4    is very different from saying just produce the documents.  Has

5    much more heft and weight.  So you're going to have to put on a

6    very good basis for why.

7         I'll tell you off the bat, I may be totally wrong and I

8    look forward to being corrected if I am.  When you have email

9    and memos and documents and everything else, the chats seems

10   the tail on the dog, in terms of where you're going to find

11   good evidence.

12        Maybe it's not.  Maybe the chat is more than:  Would you

13   like to grab a bánh mì after this meeting?  But maybe it is.

14   Maybe super-important information is flying around.  It seems

15   unlikely to me.  But you're going to have to show me that

16   before I get anywhere close to preclusive sanctions.

17        **MR. BYARS:**  And Your Honor, I understand that.  And we

18   take this very, very seriously.  And we believe that we have

19   evidence that shows exactly that.  And that's what we would

20   present in our motion.

21        **MR. POMERANTZ:**  Your Honor, just to understand the

22   road that they're heading down, the reason why we asked them to

23   answer the same kinds of interrogatories is because there's

24   spoliation issues on their side.

25        It's clear, for example, that Epic was anticipating

1   litigation -- more than anticipating, actively discussing it --

2   well before they sent around any sort of a hold notice.  And

3   we -- we don't want to -- to us, to go down, to have warfare

4   over that kind of issue when we all have so much to do in this

5   case, and now more, doesn't seem a useful road to go down.

6       We have not pressed it yet because we thought actually

7   everybody had agreed this isn't a useful -- this isn't a

8   productive use of our time.  But those issues are out there,

9   based on the evidence we have with respect to some of the

10  others.

11      And I'm not trying to get Ms. Moskowitz -- I'm not really

12  trying to accuse anybody here.  I was ready to drop the issue,

13  frankly.

14          THE COURT:  It's mutually-assured destruction.

15          MS. MOSKOWITZ:  It's not, Your Honor.  I just have to

16  correct it.  There's not a single document that they can tell

17  us has been deleted.  The fact of when we reasonably

18  anticipated litigation has had no effect.  Not a single

19  document was destroyed.  We preserved our chats, and Google did

20  not.  That's the difference.  It has nothing to do with when we

21  reasonably anticipated litigation.

22      If they have something, they can raise it.  They didn't.

23  We have a really serious issue where witnesses have testified

24  from Google that they, in fact, took conversations, substantive

25  business conversations, offline to chats, and they are

1  evaporated.  And we have no evidence of it.  That justifies an

2  adverse inference, and we will look forward to putting that on

3  paper.

4        **THE COURT:**  Let me suggest this.  You have your

5  meet-and-confer tomorrow.  Make sure everybody talks.  Okay?

6  And if you can't work it out, I would rather have you finish

7  the main event first, okay?

8        And then just two weeks after tomorrow, you can send me a

9  joint proposal on what you would like to do with this chat

10 issue, whether it's bilateral, or whatever that permutation is

11 going to be.

12       And when I say what would you like to do, I think my

13 typical letter brief may not be enough.  But I'm not going to

14 -- I'm not doing this -- I mean, we will have to have people

15 come in and have witnesses.  It's going to be a whole deal.

16 Okay?

17       So I don't like doing these things on the paper where I

18 get one view and the other view, and I can't ask any questions.

19 It's a credibility issue, it's an evidentiary issue, and it's

20 probably going to have to have a hearing.

21       So just be aware, if that's the road you want to go down,

22 and I believe that's required, we'll do it.  But it's just not

23 going to be a three-page letter.

24       **MR. POMERANTZ:**  I think, Your Honor, that a first step

25 would be to put something in front of Your Honor to decide

1   whether that's even necessary.  Because my guess is when you

2   see the facts laid out for all the parties involved, it's just

3   not going to be useful.

4          **THE COURT:**  If you want to make a sort of a proffer on

5   both sides, I'll certainly be happy to see that.

6          **MR. POMERANTZ:**  Thank Your Honor.

7          **THE COURT:**  And maybe, maybe that's not a bad idea.

8   Just thinking off the top of my head, if there's somebody who

9   has had -- you know:  Chats don't mean anything and they're not

10  -- we don't do anything with them, then I would like to see

11  that.  If somebody else says:  Chats are vital to Google's

12  business practices and internal communications, I'll probably

13  want to see that as well.

14         **MR. BYARS:**  Understood, Your Honor.

15         **THE COURT:**  If I get both, just, another hearing.

16         **MR. POMERANTZ:**  There's more to the story and they're

17  just trying to duck it by claiming the instruction that we gave

18  our employers are irrelevant.  They're far from irrelevant.

19  And we'll work through that.

20         **THE COURT:**  All right.  Okay.  Is there anything else

21  for today?

22         **MR. BYARS:**  Yes, Your Honor.

23         **THE COURT:**  Yeah.

24         **MR. BYARS:**  We also have -- you may also see an issue

25  that -- concerning privilege log and claims of privilege that

1    Google is making.

2              **THE COURT:**  Yes.

3              **MR. BYARS:**  This is the communicate-with-care issue

4    that the DOJ raised in the search case a few weeks ago.  We're

5    trying to work with Google on that right now, so it's certainly

6    not ripe we are continuing to have meet-and-confers.

7         I just don't want you to be surprised if you get -- if we

8    raise that with the Court.

9              **THE COURT:**  All right.  Well, just at a high level,

10   what's the issue?

11             **MR. BYARS:**  So the issue is Google has an internal

12   policy called "Communicate with Care" whereby they instruct

13   their employees to copy attorneys on sensitive business

14   communications.  And we think that these -- that -- we think

15   that that's pretextual.  There's no actual attorney advice

16   being sought.

17        For instance, in the search case, Google voluntarily

18   re-reviewed, I think, on the order of 40,000 documents on their

19   privilege log.  Ended up de-privileging, I think it was on the

20   order of 20,000 documents.  So this is a real issue for them.

21   It's a real issue for us.

22             **THE COURT:**  Do you have the logs here?

23             **MR. BYARS:**  I don't have the logs here, Your Honor.

24             **THE COURT:**  I mean, have they been provided?  Or is

25   that still --

1    **MR. POMERANTZ:**  Your Honor, again, this is an issue

2    that I just really think that -- while Your Honor, I guess,

3    likes some issues raised in status conference, we have always

4    had notice with each other.  Usually we submit something in

5    advance.  Here, I realize that this is going on pretty quickly.

6    But they're raising an issue that we are in the middle of

7    meet-and-confer on.  He's not setting forth all the facts.

8        We have produced literally hundreds -- probably thousands

9    of documents in this case that say "Privileged" on it because

10   somebody copied a lawyer on it, in case that lawyer had advice.

11   We looked at those documents, and we said:  No, not privileged.

12   And we produced it.  Even though it says "Privileged."

13       And Your Honor, I'm sure you saw it in private practice

14   when you were there, where sometimes you'd have businesspeople

15   think it might be privileged, so they write it, just in case.

16   And then you end up producing it, because the lawyers decide it

17   is not privileged.

18       **THE COURT:**  Let me just jump in.  So this was not a

19   regularly-scheduled status conference, okay?  So, I thought

20   while you were here, maybe there were a couple of issues that

21   were ripe.  I don't think these are ripe.

22       But in advance -- I think we've already been doing this,

23   but if we haven't this is my practice in similar cases -- at

24   our next status conference, you two work out an agenda that you

25   both agree on so that we don't have these kind of things.  And

```
 1    then I will go off of your agenda.

 2        You just file that, saying:  Here are the proposed points.

 3    I won't guarantee I'm going to do all of them, but at least you

 4    will know ahead of time what's on the menu, and there's no

 5    secret menu.  Okay?

 6        MR. BYARS:  We're happy to do that, Your Honor.  I

 7    just wanted to make you aware.

 8        THE COURT:  No, I understand.

 9        MR. BYARS:  And I'm not trying to argue the merits of

10    either of these --

11        THE COURT:  We're not doing that.  So don't worry

12    about that.

13        MR. BYARS:  One final thing, and this concerns class

14    cert briefing, Your Honor.  More of a housekeeping issue.

15        THE COURT:  Oh.

16        MR. BYARS:  That's coming up pretty quickly.  We would

17    like to request a 40-page limit for opening briefs, with Google

18    having a response limit of 45, and then replies being 30.

19        This case is very complex, involves multiple markets, and

20    consumers have, I think it's 11 claims.  Section 1 claims,

21    Section 2 claims, Cartwright, multiple economic -- econometrics

22    models.  I believe that developers are supportive of that.

23        We've raised the issue with Google.  They're opposed to

24    the additional pages.

25        THE COURT:  Talking about one brief per side, right?
```

1              **MR. BYARS:**  My understanding was it was you get an

2     opening brief, they have a response, and then there's a reply.

3              **THE COURT:**  Well, but, I thought we were doing this

4     per side.  I'm not going to get 120 pages or 160 pages just

5     from the plaintiffs.  I can't do that.  I thought it was 40

6     pages for everybody.

7         These issues -- I mean, the consumer class is the

8     developer.  All right, so there are two classes.   Right?

9              **MR. BYARS:**  Yes, Your Honor.

10             **THE COURT:**  I can't do 80 pages.  That's just way too

11    much.  I don't think you need it.  I mean, you're going to get

12    certified or you're not.

13        Why would it take 40 pages to go over certification?  The

14    core claims for Cartwright Act are going to be driven off the

15    federal stuff, for the most part.  That's California law, right

16    back to it's intended to match federal precedent, a corporate

17    federal precedent.  So why do you need 40 pages?

18             **MR. BYARS:**  So 40 pages -- and I do want to make sure

19    that I understand.  Are you suggesting that developers and

20    class plaintiffs --

21             **THE COURT:**  No.  You can do separate entities.

22             **MR. BYARS:**  All right, thank you.

23             **THE COURT:**  I'm not -- you know, there's a

24    cumulativeness aspect of it, too.  So --

25             **MR. BYARS:**  Okay.  So Your Honor, we're dealing with,

1   as I said, multiple markets, conduct that goes back over a

2   decade.  And, you know, our economist in particular has built

3   two different econometrics models.  We are trying to be as

4   succinct as possible.  Forty-five pages is hard.  But we want

5   to be reasonable.

6       An additional few pages, up to 40 pages, it's -- that's

7   going to be hard for us to do, given the issues.

8          **THE COURT:**  Why?  Why is it so hard?  I mean, on the

9   plaintiffs' side, I'm presuming there's going to be a very

10  consistent view of Google's conduct.  And if there isn't, I'm

11  going to be concerned.  But -- so, you all should have that in

12  common.

13      So I don't need -- each one of you do not need to do ten

14  pages on Google's conduct that is the mirror image of each

15  other.  You should be able to have some efficiency in having

16  one overview.

17      Now, how it affects developers and consumers is probably

18  going to be different.  But the core facts should have -- I

19  would imagine, have some -- even maybe even considerable

20  overlap.  And you have 23(a) and the (b)(3) factors.

21      And why would it take that much effort to get a class?

22  I've had a number of antitrust cases, and it has not taken that

23  much effort.  So --

24          **UNIDENTIFIED MAN:**  May I be heard, Your Honor?

25       **MR. BYARS:**  Just one more thing; I'm sorry.

1        *Capacitors*, I think you did 35, 40, 30.

2          **THE COURT:**  But that was one set.  I didn't get 40 and

3 then another 40, and then another 30 and another 30 and another

4 40 -- I mean, you're doubling everything.

5       You each should do one, 40 pages.  That's 80 pages.  Just

6 to start.  *Capacitors* was 35.  So, it's a lot more.  So, I'm

7 not going to do that.  You talk -- I'm not going to do it now.

8 If I have to later, I'll think about it.

9        But you all need to come up with a better sense of how

10 you're going to maximize efficiencies and common issues, and,

11 you know, maybe even doing the standards section.  I mean, I'm

12 happy -- you know, the standards aren't going to be different

13 for you, all of you, than the application model.  Maybe some

14 nuances.  But you need to work out something where it's

15 non-duplicative, and far fewer pages.  But --

16          **UNIDENTIFIED MAN:**  May I be heard on this?

17         **THE COURT:**  I'm not going to get, on the main briefs,

18 200 pages, 160 or 200 pages on class cert, not even counting

19 declarations.  That's just not going to happen.  Okay?  So, not

20 approved at this point.  Maybe later.  But you've got to work

21 out a proposal.

22       Okay?  All right.  Thanks very much.

23         **MR. BYARS:**  Thank you.

24         **THE COURT:**  So one week from today for the main event.

25         **MS. NARANJO:**  We have one additional administrative

1   issue that we were actually discussing in meet-and-confers with

2   -- relating to the class cert issues.

3       There's a sealing procedure that this Court has, and

4   understanding that Your Honor does not want to have additional

5   pages, we think that the class --

6           **THE COURT:**  I'm saying right now it's not approved.

7   I'm not foreclosing forever.  But --

8           **MS. NARANJO:**  This for sealing issues relating to

9   class cert.

10          **THE COURT:**  What's the sealing issue?

11          **MS. NARANJO:**  Your standing order has Paragraph 31,

12  which requires a combined administrative motion to seal at the

13  end of briefing.

14      We were -- parties, I believe, are in agreement that it

15  would be more efficient to forego any motions to seal in the

16  interim briefs.  So while class cert, opening briefs,

17  opposition briefs and reply briefs are being filed, we were

18  hoping to forego those interim motions to seal, and submit an

19  omnibus administrative motion to seal at the end.

20          **THE COURT:**  Oh.  Fine to me.

21      Any problem with that, plaintiffs?

22          **MR. SIEGEL:**  Ben Siegel of Hagens Berman for the

23  developer plaintiffs.  Good to see you again, Your Honor.

24      Just as long as Your Honor understands that that means

25  that we'd be filing the opening in the opposition, the reply

1   briefs completely under seal, and so nothing would be --

2   nothing would be public until the very end, there would be an

3   omnibus sealing motion.

4           THE COURT:  I usually deny sealing motions, in the

5   most part.  This is a public courtroom.  I've written about

6   this extensively.  And very little will end up getting sealed

7   under prevailing standards.  This is not a star chamber, and it

8   is not an arbitration.  If it takes 30 days before a brief gets

9   filed publicly, I don't have a problem with that.  Okay?

10      But, just word to the wise, read my prior decisions on

11  sealing.  I embrace the idea that this is a courtroom of the

12  People of the United States, which means they get to see and

13  hear and look at everything I do, when I decide a case.

14  Particularly one of this magnitude.

15      So I can just tell you from my long experience in this

16  sector, antitrust cases and with similar issues to this one,

17  and similar parties, there will be a small subset of materials

18  that may be sufficiently sensitive to warrant sealing.  But in

19  my experience, both sides go way overboard.  And, I don't seal.

20  So if it takes another 30 days to get through that, I'm fine

21  with that.

22          MR. SIEGEL:  Okay.  But --

23          THE COURT:  Just a couple of things.  Take this to

24  heart.  Read my orders on sealing.  Okay?  Because I really am

25  not going to burn a lot of time on this, when the standards are

1    clear.  It's not what your client wants.  It's what serves the

2    People of the United States, and the interests of justice.  And

3    we need to take that in heart and tell your clients that's the

4    way it's going to be treated.

5        The other thing is don't send me unredacted -- don't send

6    me redacted chambers copies.  I don't need them.  Okay?  When

7    you send me the unredacted ones, don't staple them, clip them.

8    And don't put them in envelopes, put them in binders.  I'll

9    take a look at them that way.

10        Now, you're also supposed to get together and work out

11    what's actually going to be sealed or not.  So make sure you do

12    that.  And then I just get a little statement at the end.

13        Why can't you also -- I mean, why can't you just file a

14    redacted version at the same time?  I mean, why do we have to

15    -- why do -- why do we even have to do that?  I mean, I don't

16    mind having that omnibus sealing motion at the end, that's

17    fine.  Why not just file redacted versions at the same time?

18        (Off-the-Record discussion between counsel)

19        **MS. NARANJO:**  We can meet and confer on that process.

20        (Off-the-Record discussion between counsel)

21        **MR. SIEGEL:**  We can see if that's possible.  As

22    plaintiffs, we agree with Your Honor that, you know, usually

23    not our documents that they're asking to be sealed.

24        **THE COURT:**  I know.  In Epic's case, it might be

25    different.

1          **MR. SIEGEL:**  I just have one question, just

2    administratively, with regard to the page limits issue.  If we

3    meet and confer and we can't reach resolution, how should we

4    bring it before the Court?  It is important --

5          **MR. RIEHLE:**  Come and see me, and we'll talk it over.

6    Okay?  But I just -- 200 pages for a class cert motion, all in,

7    without even looking at the materials in support?  It's just a

8    non-starter.  That means another 100 pages of briefing,

9    probably per expert.  That means, you know, typically, 100 to

10   500 pages of exhibits.  Okay?

11        I mean, just be real.  It's not going to happen, in this

12   courtroom or any courtroom in the United States.  It's just not

13   going to happen.

14        So, come up -- you know, you're the master of this case.

15   Come up with a solution for me.

16          **MR. SIEGEL:**  Okay.  We'll --

17          **MR. RIEHLE:**  Segment it, share it, break it down,

18   overlap, whatever you need to do.  But just come up with it.

19   But just saying:  The only answer is I'm going to bury the

20   judge under a Mount Everest of documents, that's not the

21   answer.  It's not -- that will not be your answer.

22          **MR. SIEGEL:**  We understand, and we don't want to give

23   you guys -- give you more paper than you'd be happy with.  I

24   think the issue with us is that a lot of times with class

25   certification, the expert reports have not all been submitted

1    prior to the opening motion, and depositions haven't been taken

2    yet.

3         In this case because of the way the schedule is

4    constructed, all the expert reports -- we have three

5    independent experts plus one shared expert.  They (Indicating)

6    have several independent experts.  They've submitted their

7    expert reports.  We deposed their experts, whether -- they will

8    be ended.

9         So just with all the expert work that's been done so far,

10   it's difficult to fit in our analysis of how the Rule 23

11   factors apply in light of the reports and the testimony.

12   That's why we just think we need some extra pages.

13        I -- for developer plaintiffs, we don't think we need much

14   more than 25, but we do think --

15        **THE COURT:**  I've got to tell you, if it takes that

16   much work, you may not be entitled to certification.  It

17   shouldn't be this -- look.  This is -- all class certification

18   is procedural.  Does it make sense to go forward as a class?

19   If you can't persuade me of that in a reasonable amount of

20   space, you're probably going to lose.

21        If I have to read 500 pages of expert reports to figure

22   out you meet the qualifications for a (b)(3) class, I'm going

23   to have serious doubts that you meet the qualifications for a

24   (b)(3) class.  So you need to embrace that.  Okay?

25        **MR. SIEGEL:**  I don't think it will --

**THE COURT:**  If it takes forever to tell me why you should get certified, you're probably not starting from a position of strength.  And you need to be honest with that.  Okay?

Don't -- I mean, the answer isn't move two tons of dirt to plant, you know, the tree.  You either plant the tree, or you don't.  If you have to move two tons of soil before you do that, you're probably not planting the tree in the right earth.  Okay?  So I'm just going to be fair with you about that.  It's like summary judgment.  If it takes that much tap-dancing, you've got a problem.  Okay?

Now, I always set my schedules so that all the expert work is done because it is -- it is extremely unwise to have class cert motions pending when you don't even know what the experts are going to say.  So I've set you up, okay?  So now you should be taking the time -- I can't remember whether it was Mark Twain or someone else -- take the time to make it simple. That's on you.  Take the time to make it simple.  You've had plenty of time.  Okay?  All your expert work is in.

I'm talking about both sides here.  Okay?  If it takes Google a mountain of work to tell me that there isn't a class, they are probably not in a position of strength, either.

This isn't that complicated.  Rule 23 is not that complicated.  And I've written a lot about it.  And I urge you to read it, because that is what I'm going to be relying on for

1   my approach to your motion.  Okay.

2          **MR. SIEGEL:**  We'll take that to heart.  Thank you,

3   Your Honor.

4          **MS. MOSKOWITZ:**  Your Honor, one more thing.  I

5   apologize.  Just, the -- Google raising the sealing question

6   just reminded me.

7          There is -- obviously, our preliminary injunction papers

8   were filed in redacted form and under seal, in full.  Given the

9   stay of the PI, I think we've reached out to the deputy that we

10  shouldn't do that.

11          But, should we be proceeding to meet and confer on the

12  sealing issues with the PI during the pendency of our

13  meet-and-confers and following up on that?  How would you like

14  us to proceed?

15          **THE COURT:**  That's fine.  You can talk about it, yeah.

16          **MR. DIXON:**  Your Honor, if I may raise a related issue

17  to that.

18          We are trying to get access to the confidential

19  information in that brief.  We've asked Google to please

20  provide us with permission to see their confidential

21  information in Epic's PI brief.  And we said we would

22  stipulate.  We brought them a PO, we sent them an amended PO

23  this morning saying we'd like to be brought in under the

24  umbrella.  They so far have refused, so we haven't been able to

25  see it.  So it's related --

1          **THE COURT:**  You sent it to them this morning?

2          **MR. DIXON:**  Yes, Your Honor.

3          **THE COURT:**  Well, it's only noon.  Give the man until

4    5:00 p.m. at least.

5          **MR. DIXON:**  Fair enough, Your Honor.  Let me clarify.

6      We asked them on Monday to get access to this.  We heard

7    back from them yesterday saying:  No.  We said:  Here's the PI.

8    We just want to be able to get access to it, given the

9    timeliness and the impending deadlines.

10         **THE COURT:**  I'm sure there's no problem.  Is there?

11         **MR. ROCCA:**  No, Your Honor.  Brian Rocca representing

12   Google.  My Android device, Your Honor, has been turned off

13   while I'm in court, so I haven't seen the email this morning

14   yet.

15     But what I said yesterday is:  Welcome to the party; let's

16   talk about protective order.  We'll work it out.  And that's

17   what we'll do.  And we can fold that into the discussions this

18   week, no problem.  All the --

19         **THE COURT:**  Listen, let's get everybody a chance to

20   get their things done.  I'm not saying you did this, but don't

21   send an email at 10:00 and then write me an email at 10:15 and

22   say you haven't gotten an answer.  That's not the way it works.

23     Okay?  All right.  Thanks very much.

24     (Proceedings concluded)

25

**CERTIFICATE OF REPORTER**

 I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Friday, May 13, 2022