Karma M. Giulianelli (SBN 184175)
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com

Hae Sung Nam (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com

*Interim Co-Lead Counsel for the Proposed Classes*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>RELATED ACTIONS:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD<br><br>*In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD<br><br>*State of Utah, et al., v. Google LLC, et al.*, Case No. 3:21-cv-05227-JD<br><br>*Match Group, LLC, et al. v. Google LLC, et al.*, Case No. 3:22-cv-02746-JD | No. 3:20-CV-05761-JD<br><br>**CONSUMER PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM IN SUPPORT**<br><br>Hearing Date: August 4, 2022<br>Hearing Time: 10:00 a.m.<br>Courtroom: Courtroom 11, 19th Floor<br>Judge: The Honorable James Donato |

1

**NOTICE OF MOTION AND MOTION FOR CLASS CERITIFICATION**

2

**PLEASE TAKE NOTICE** that on August 4, 2022, at 10:00 a.m., before the Honorable

3

James Donato, of the United States District Court of the Northern District of California, San Fran-

4

cisco Division, 450 Golden Gate Avenue, San Francisco, California, Courtroom 11, 19th Floor,

5

Plaintiffs Mary Carr, Daniel Egerter, Zack Palmer, Serina Moglia, Matthew Atkinson, and Alex

6

Iwamoto, on behalf of themselves and all others similarly situated, will and do now move the Court

7

for an order granting Plaintiffs' Motion for Class Certification pursuant to Federal Rules of Civil

8

Procedure 23.

9

Plaintiffs seek entry of an order: (1) certifying a proposed Rule 23(b)(3) class; (2) certifying

10

a proposed Rule 23(b)(2) class; (3) appointing Plaintiffs Mary Carr, Daniel Egerter, Zack Palmer,

11

Serina Moglia, Matthew Atkinson, and Alex Iwamoto as representatives of the classes; and (4) ap-

12

pointing Karma M. Giulianelli of Bartlit Beck LLP and Hae Sung Nam of Kaplan Fox & Kil-

13

sheimer LLP as Co-Lead Class Counsel for the classes. Plaintiffs propose that the classes for their

14

Sherman Act Sections 1 and 2 claims (Counts 1-6) as well as their Cartwright Act (Counts 7-10)

15

and Unfair Competition (Count 11) claims, be defined as follows:

16

**RULE 23(b)(3) MULTISTATE DAMAGES CLASS:**

17

All persons in the following U.S. states and territories:

18

> Alabama, Georgia, Hawaii, Illinois, Kansas, Maine, Michigan, Ohio, Penn-
> sylvania, South Carolina, Wisconsin, Wyoming, American Samoa, Guam,
> Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands

19

20

who paid for an app through the Google Play Store[1] or paid for in-app digital content

21

(including subscriptions or ad-free versions of apps) through Google Play Billing on
or after August 16, 2016, to the present.

22

**RULE 23(b)(2) MULTISTATE INJUNCTIVE RELIEF CLASS:**

23

All persons in the following U.S. states and territories:

24

> Alabama, Georgia, Hawaii, Illinois, Kansas, Maine, Michigan, Ohio, Penn-
> sylvania, South Carolina, Wisconsin, Wyoming, American Samoa, Guam,
> Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands

25

26

who currently own a mobile phone or tablet with an authorized and preinstalled ver-
sion of Google's Android OS capable of accessing the Google Play Store.

27

28

---

[1] Capitalized terms "Google Play Store," "Google Play Billing," and "Defendants" are used in the
same sense as defined in the operative consumer Complaint. ECF No. 241.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Excluded from both Classes are Defendants and their officers, directors, employees, and successors; any person or entity who has (or had during the class period) a controlling interest in any Defendant; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on behalf of any Defendant; any judicial officer presiding over this action and the members of those officers' immediate families and judicial staffs; all governments and their agencies; and any juror assigned to this action.

This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, all filed supportive declarations and exhibits, the expert reports of Dr. Hal Singer and Dr. Douglas Schmidt, the records on file in this action, and any argument that may be presented at or before the hearing on this Motion.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

STATEMENT OF COMMON FACTS ..........................................................................3

I.      THE PROPOSED CLASSES AND THE JOINT PROSECUTION
        AGREEMENT WITH THE STATES ................................................................3

II.     COMMON CLASSWIDE EVIDENCE OF THE RELEVANT MARKET ......................4

III.    COMMON CLASSWIDE EVIDENCE OF GOOGLE'S UNLAWFUL
        CONDUCT ........................................................................................................4

IV.     COMMON EVIDENCE OF CLASSWIDE ANTITRUST IMPACT ............................10

        A.      Common Evidence Establishes that Google's Take Rate Is Supra-
                Competitive ..........................................................................................10

        B.      Common Economic Evidence Shows that All or Virtually All Class
                Members Are Injured by Google's Conduct .........................................12

        C.      Aggregate Damages Are Calculated on a Classwide Basis ...................13

ARGUMENT ...............................................................................................................14

I.      THE REQUIREMENTS OF RULE 23(a) ARE MET IN THIS CASE ...........................14

        A.      Rule 23(a)(1)'s Numerosity Requirement Is Satisfied ..........................14

        B.      Rule 23(a)(2)'s Commonality Requirement Is Satisfied .......................14

        C.      Rule 23(a)(3)'s Typicality Requirement Is Satisfied .............................15

        D.      The Rule 23(a)(4) and 23(g) Adequacy Requirements Are Satisfied ....16

II.     RULE 23(b)(3)'S REQUIREMENTS ARE SATISFIED IN THIS CASE ......................17

        A.      The Predominance Requirement Is Met ................................................17

                1.      Plaintiffs' Sherman Act Claims Present Common Questions
                        That Will Predominate ..............................................................18

                2.      Plaintiffs' State Law Claims Present Common Questions
                        That Will Predominate ..............................................................20

                3.      Common Questions Predominate on Impact and Damages ........20

        B.      The Superiority Requirement Is Met .....................................................24

III.    THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED IN THIS CASE ............24

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alaska Airlines v. United Airlines*,
  948 F.2d 536 (9th Cir. 1991) ................................................. 18

*Alcantar v. Hobart Serv.*,
  800 F.3d 1047 (9th Cir. 2015) .............................................. 14

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................. 17

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019) ........................................................... 1

*B.K., by her next friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) ................................................ 15

*Castellar v. Mayorkas*,
  No. 17-cv-00491-BAS-AHG, 2021 U.S. Dist. LEXIS 170342 (S.D. Cal. Sept. 8, 2021).......... 3

*D&M Farms v. Birdsong Corp.*,
  Civil Action No. 2:19-cv-463, 2020 WL 7074140 (E.D. Va. Dec. 2, 2020) ............................. 23

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
  24 F.4th 1262 (9th Cir. 2022) ........................................... 2, 19

*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*,
  55 Cal. App. 5th 381 (2020) ................................................ 20

*Giuliano v. Sandisk Corp.*,
  No. C 10-02787 SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) ................................... 19

*Goldwasser v. Ameritech Corp.*,
  222 F.3d 390 (7th Cir. 2000) ............................................... 20

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................. 16

*In re Apple iPhone Antitrust Litig.*,
  No. 4:11-cv-06714-YGR, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ........................ 18, 23

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012) ................................................................. 16

*In re Capacitors III*,
   No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. 2018) ..................... 19

*In re Disposable Contact Lens Antitrust Litig.*,
   329 F.R.D. 336 (M.D. Fla. 2018) ............................................................ 21

*In re Elec. Books Antitrust Litig.*,
   No. 11-MD-2293 (DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ............ 12

*In re Fine Paper Antitrust Litig.*,
   82 F.R.D. 143 (E.D. Pa. 1979) ............................................................... 22

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020) ...................................................... 18, 24

*In re High-Tech Employee Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................. 15

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) ................................................................. 17

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) ............................................................. 19

*In re Mercedes-Benz Antitrust Litig.*,
   213 F.R.D. 180 (D. N.J. 2003) ............................................................... 22

*In re Microcrystalline Antitrust Litig.*,
   218 F.R.D. 79 (E.D. Pa. 2003) ............................................................... 24

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   No. C 09-1967 CW, 2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ........................... 25

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) ............................................................ 23

*In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litig.*,
   MDL No. 2445, 13-md-2445, 2019 WL 4735520 (E.D Pa. Sep. 27, 2019) ............................. 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ............................................................................. 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) .......................................................................... 3, 21

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ............................................................................... 22

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) ................................................................................. 22

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) .................................................................................................. 12

*Kamm v. Calif. City Dev. Co.*,
  509 F.2d 205 (9th Cir. 1975) ................................................................................... 24

*Messner v. Northshore Univ. Health Sys.*,
  669 F.3d 802 (7th Cir. 2012) ................................................................................... 17

*Ohio v. American Express*,
  138 S. Ct. 2274 (2018) ............................................................................................. 11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*,
  31 F.4th 651 (9th Cir. Apr. 8, 2022) ................................................... 2, 17, 21, 22

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ................................................................................... 25

*Ruiz Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ................................................................................. 15

*Senne v. Kansas City Royals Baseball Corp.*,
  934 F.3d 918 (9th Cir. 2019) ................................................................................... 14

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ................................................................................. 18

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ............................................................................................. 2, 17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................................... *passim*

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) ................................................................................................ 24

**Other Authorities**

6 W. RUBENSTEIN, *Newberg on Class Actions* § 20:28. (5th ed.) ................................................. 18

Jean-Charles Rochet and Jean Tirole, *Platform Competition in Two-Sided Markets*,
   1 J. EUR. ECON. ASSN. 990 (2003) .......................................................................................... 11

**Rules**

Fed. R. Civ. P. 23(b)(3) .................................................................................................................. 14

Fed. R. Civ. Proc. 23(b)(2) ..................................................................................................... 2, 25

## MEMORANDUM OF POINTS AND AUTHORITIES

For years, Google has engaged in exclusionary practices that have allowed it to obtain a dominant position in the market for distributing Android mobile device applications (apps) and to thwart rival app stores from emerging. Google uses its power to inflate the prices of Android apps by taking, with limited exceptions, a 30% slice of every app sale through the Google Play Store. Google has also unlawfully extended its monopoly power in the Android App Distribution Market to the In-App Aftermarket through its requirement that developers use Google's billing services for all in-app sales and its prohibition on steering to alternate providers—allowing Google to take a cut in perpetuity of every subsequent purchase of digital content in each app.[2]

Internal Google documents reveal that its meteoric rise against such titans as Amazon, Samsung, AT&T, T-Mobile, Motorola, and Verizon was the product of a calculated, multifaceted strategy to eliminate competition. That strategy included an array of conduct that courts have long found to be exclusionary—bribes, deception, contractual restrictions, and pretextual technological barriers—which secured and maintain the Play Store's insurmountable lead over potential competitors.

The Consumer Plaintiffs purchased apps from the Play Store or made in-app purchases through Google Play Billing. Consumers paid Google directly for these purchases, and, accordingly, are direct purchasers who may sue Google under federal antitrust laws. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). But for Google's anticompetitive conduct, Plaintiffs and class members would have paid lower prices for apps and in-app purchases and would have benefitted from expanded choice. Plaintiffs seek damages from and injunctive relief against Google, and therefore seek certification of both a Rule 23(b)(3) damages class of consumers and a (b)(2) injunctive relief class of current owners of devices operating with an authorized version of Google's Android OS.[3]

---

[2] "Android App Distribution Market" and "In-App Aftermarket" are defined in the Class Certification Report of Hal J. Singer, Ph.D. Ex. 2 (Singer Rpt.) ¶¶ 2, 22-32. All exhibit citations are citations to the exhibits to the Giulianelli Declaration, filed herewith.

[3] As used in this memorandum, "Android OS" refers to Google's licensed version of Android, as opposed to other versions of the freely available "open-source" version. *See* Ex. 4 (Expert Report of D. Schmidt) at 8-9.

Plaintiffs' claims depend upon central, common questions of fact and law, each of which focuses on Google's conduct and is capable of classwide resolution. They include: (1) whether Google has monopoly power in the Android App Distribution Market and the In-App Aftermarket; (2) whether Google's contractual restrictions on manufacturers, carriers, and developers are unreasonable restraints of trade; and (3) whether Google's practices impacted class members and resulted in supra-competitive prices paid by consumers. With respect to the last issue, Plaintiffs have developed expert economic evidence capable of demonstrating that Google did indeed cause classwide antitrust injury. That evidence will show that virtually all members of the proposed class were injured by Google's "coercive activity," "prevent[ing] its victims from making free choices between market alternatives," which constitutes cognizable antitrust injury. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1274 (9th Cir. 2022). That evidence also includes a methodology for calculating aggregate damages to the class, as well as class members' individual damages.

Because common questions about Google's conduct will be the focus at trial, Plaintiffs satisfy Rule 23(b)(3)'s requirement that common questions "predominate over any questions affecting only individual members." None of the differences among class members (for example, which specific purchases were made) are of the kind that defeat class certification. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651, 678 (9th Cir. Apr. 8, 2022) (en banc) (common impact can be found "even when the market involves diversity in products, marketing, and prices"); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (certification is proper where common issues predominate even where "other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members"). Certification of an injunctive relief class is appropriate because Google "has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

As explained in further detail below, the Court should certify classes under both Rule 23(b)(3) and (b)(2), appoint Plaintiffs as class representatives, and appoint Karma M. Giulianelli of Bartlit Beck LLP and Hae Sung Nam of Kaplan Fox & Kilsheimer LLP as co-lead class counsel.

**STATEMENT OF COMMON FACTS**

## I.   THE PROPOSED CLASSES AND THE JOINT PROSECUTION AGREEMENT WITH THE STATES

The classes Plaintiffs propose differ from those pleaded.[4] The proposed Rule 23(b)(3) class is limited to seventeen states and territories in lieu of the nationwide class pleaded because Plaintiffs have entered a Cooperation and Joint Prosecution Agreement (the "Joint Prosecution Agreement") with Attorneys General who have brought *parens patriae* claims. *See* Ex. 1. To pursue consumers' claims against Google most effectively and efficiently, Plaintiffs' Counsel and the thirty-nine Attorneys General asserting *parens patriae* claims in this case agreed in the Joint Prosecution Agreement that class certification would be sought only for consumers in states, districts and territories that have not asserted a *parens patriae* claim in this action.[5] Plaintiffs' Counsel and the Attorneys General also agreed to continue working jointly for the benefit of *all* U.S. consumers.

A second difference in the proposed classes is that Plaintiffs do not seek certification of a "repealer states" class. Because Google has consistently included a choice-of-law provision in its user agreements designating California law as controlling in litigation brought by users, California law governs the state law claims of all class members, regardless of where they reside and regardless of whether a particular state has "repealed" *Illinois Brick*.

Plaintiffs have also proposed a Rule 23(b)(2) injunctive relief class in part based on the Supreme Court's recognition that "individualized monetary claims belong in Rule 23(b)(3)," while "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The proposed (b)(2) class does not completely overlap with the proposed (b)(3) class, in that the former is limited to current Android users, while the latter includes anyone who was an Android user who purchased an app or in-app digital content using Google Play Billing during the class period.

---

[4] *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583 (N.D. Cal. 2010) (permitting adjustments to class definition at the class certification stage); *Castellar v. Mayorkas*, No. 17-cv-00491-BAS-AHG, 2021 U.S. Dist. LEXIS 170342 (S.D. Cal. Sept. 8, 2021) ("The definition of the class at the class certification stage may diverge from that set forth in the Complaint ....").

[5] If for any reason a State cannot or does not pursue its *parens patriae* claims, Rule 23 provides the necessary flexibility to expand a class to include residents of that State, as Rule 23 permits the Court to modify a certified class.

## II. COMMON CLASSWIDE EVIDENCE OF THE RELEVANT MARKET

The relevant antitrust markets in this case will be defined by common evidence. Virtually all mobile devices throughout the world (more than 99%) use either Apple's iOS, exclusive to Apple devices, or Google's Android OS, licensed to multiple Original Equipment Manufacturers ("OEMs"), giving it over 99% of the smartphone market for licensed mobile operating systems. Ex. 2 (Singer Rpt.) at ¶ 37. Once a consumer buys an Apple or Android device, she has no choice but to use the app stores that are available for that device, meaning there is no direct competition between Apple and Google for a consumer's app or in-app business. Ex. 4 (Schmidt Rpt.) at 5-6 (explaining incompatibility of mobile operating systems). Google maintains near complete control over the relevant Android App Distribution Market, and, because of its restrictions, over the In-App Aftermarket for services used to transact the sale of in-app content. Google's expert accepts these market definitions for class certification purposes. S*ee* Ex. 5 (Burtis Rpt.) ¶ 43.

## III. COMMON CLASSWIDE EVIDENCE OF GOOGLE'S UNLAWFUL CONDUCT

Common evidence related to Google's anticompetitive conduct will be the main focus of any trial. Plaintiffs will prove through common evidence that Google's dominance was acquired in both the Android App Distribution Market and In-App Aftermarket by anticompetitive means. Common evidence will show Google unlawfully: (1) paid carriers rents too high for a competitor to profitably enter; (2) imposed contractual restrictions on OEMs; (3) prohibited developers from steering their customers to competitors; (4) bribed major developers; (5) erected overly restrictive and pretextual technological barriers and misleading warnings to deter consumers from download-ing apps outside the Play Store; (6) ██████████████████ and (7) leveraged its power into the separate in-app services market by tying its separate Google Play Billing product to every in-app sale of digital content.

***First,*** Google paid ██████████ to mobile carriers, making it unpalatable for them to compete with Google's app store. Initially, Google ████████████████████████ █████ pushing out carriers and third parties from profitably participating in carrier distribution chan-nels. In the early days of Android smartphones, Google appreciated that ██████████ ████████████████████████████████ Ex. 6

1    (GOOG-PLAY-001423609). Google's solution █████████████████████████████

2    ███████████████████████████████████████████████████████████ until a point

3    where █████████████████████████████████████████████████████████████████████

4    ███████████████████████████████ *Id.* To enact this plan, Google initially gave 70% of revenue to

5    app developers, ███████████████ and kept only the remaining ████████ *See, e.g.*, Ex. 7 (GOOG-

6    PLAY-001385324) at -345. Google's cut was small enough that it ████████████████████

7    ██████████████████████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████████████ Ex. 8,

9    (GOOG-PLAY-005564421); Ex. 9 (GOOG-PLAY-001075142) at -143. Google recognized that

10   ███████████████████████████████████████████████████████████████████████████████

11   █████████████ Ex. 10, (GOOG-PLAY-001547487) at -488 (███████████████████████

12   █████████████████████████████████████████████████████).

13       By 2013, █████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████ We cut carriers in to dis-

15   incentivize building their own stores and fragmenting the ecosystem. ████████ Ex. 11 (GOOG-

16   PLAY-000439987.R) at -012.R. ████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████████████

18   ████████████ Ex. 12 (GOOG-PLAY-005559390.R) at -395.R. With its monopoly solidified,

19   ███████████████████████████████████████████████████████████████████████████████

20   Ex. 13 (GOOG-PLAY- 001337211) at -226. ███████████████████████████████████

21   ███████████████████████████████████████████████████████████████████████████████

22   ███████████████████████████████████████████████████████████████████████████████

23   ████████████ consistent with its public promise that "Google does not take a percentage" of the

24   revenues from app distribution, but, ██████████████████████████[7] By increasing its take

25   ────────────────────────────────────────────────────────────────────────────

26   [6]██████████████████████████████████████████████████████. Ex. 14 (GP MDL-
     TMO-0001831) at -838; Ex. 15 (GP MDL-TMO-0002071) at -094; ████████ Ex. 16 (GOOG-

27   PLAY-003604601) at -603; ████████. Ex. 17 (GOOG-PLAY-003604896) at -910; Ex. 18
     (GOOG-PLAY-003605103) at -106; Ex. 19 (GOOG-PLAY4-002178046) at -049.

28   [7] Ex. 21, ("Android Market: Now available for users", published on October 22, 2008, https://an-
     droid-developers.googleblog.com/2008/10/androidmarket-now-available-for-users.html).

1    ███████ to 30% of each transaction, Google quickly began enjoying supra-competitive margins.

2    Ex. 20 (GOOG-PLAY-000445443.R) at -461.R.

3    **Second,** Google has imposed a variety of exclusionary contractual restraints on OEMs of

4    mobile devices. Although Google offers many of its own apps for "free," Google requires any

5    OEM that wishes to install even a single Google app to preinstall a bundle of Google apps called

6    Google Mobile Services ("GMS"), including Search, Maps, Chrome, Gmail, YouTube, and the

7    Play Store. Ex. 22 (GOOG-PLAY-003776161.R) at -177.R (manufacturers "███████████████

8    ██████). GMS not only contains Google's most popular apps, but also application programming

9    interfaces ("APIs") necessary for the majority of third-party apps to work. Ex. 4 (Schmidt Rpt.) at

10   10-12. OEMs therefore have no commercially viable alternative but to license GMS. To gain ac-

11   cess to those critical APIs, however, an OEM must enter into a Mobile Application Distribution

12   Agreement ("MADA") in which Google requires the OEM to preinstall the Play Store on its de-

13   vices and to prominently display it on the home screen.[8] Google knows the importance of promi-

14   nent placement, observing internally, "████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████ Ex. 25 (GOOG-PLAY-

16   000292207.R) at -226.R; Ex. 26 (GOOG-PLAY-000832471); Ex. 27 (GOOG-PLAY-006355073)

17   (███████████████████████████████████████████████████████████████████████████████████").

18   On top of the MADA requirements, Google has recently ███████████████████████

19   ████████████████████████████████████████████████████████████████████████████████████████

20   ████████████████████████████ Ex. 28 (GOOG-PLAY-000443763.R) at -773.R. Google recently

21   entered into ████████████████████████████████████████████████████████████████████████████

22   ██████████████████████████████████████████ Ex. 2 (Singer Rpt.) ¶ 117.

23   ████████████████████████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████ Ex. 28 (GOOG-PLAY-000443763.R) at -775.R.

25   Google expected ██████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████ Ex. 29  (GOOG-PLAY4-

27   _____

28   [8] Illustrative examples include ██████████████ MADA and ██████████████ MADA. Ex. 23
     (GOOG-PLAY-000808375); Ex. 24 (GOOG-PLAY-004552342); *see also* Ex. 2 (Singer Rpt.) at
     45 ¶ 97 (discussing preinstallation and prominent displacement requirements).

1    007239946). By May 2020, Google executives declared ████████████████████████

2    ███████████████████████████████████████████████████████████

3    ███████████████████████████ Ex. 30 (GOOG-PLAY-000558461.R) at -465.R, -466.R. These

4    agreements alone substantially foreclose competition.

5    **Third,** Google erected roadblocks between the software developers who write Android apps

6    and the consumers who buy them, effectively preventing the two sides from doing business outside

7    the Play Store. In what it previously called a "non-compete" provision in its agreements with app

8    developers, Google's Developer Distribution Agreements ("DDAs")—which developers must ex-

9    ecute to offer their apps on the Play Store—prohibit developers from steering customers to lower-

10   priced app stores or websites to download apps or buy in-app content. Ex. 31 (GOOG-PLAY-

11   000225435) ("████████████████████████████████████████████). They also

12   forbid developers from using the Play Store "to distribute or make available any Product that has

13   a purpose that facilitates the distribution of software applications and games for use on Android

14   devices outside of Google Play."[9] Google's Payments Policy forbids developers from using alter-

15   native payment processors. Ex. 34 (Google Play Payments Policy, https://sup-

16   port.google.com/googleplay/android-developer/answer/9858738). These contractual provisions,

17   which are not justified by any technical or security reason, restrain competition for transacting the

18   purchase of in-app content.

19   And Google imposes what is essentially a gag order on the free flow of information. In order

20   for a developer to distribute an app through the Play Store, the developer must agree not to use

21   consumer information it obtains through the sale of its apps or in-app content in the Play Store to

22   direct the consumer to purchase apps or in-app content outside the Play Store. The DDA thus

23   *permanently* precludes developers from using their own customers' information to steer elsewhere.

24   Ex. 35, (GOOG-PLAY-000053875) at -876 § 4.9.

25   **Fourth,** Google paid top developers to prevent competitors from gaining an edge. ████████

26   ████████████████████████████████████████████████████████████

27   ███████████████████████ Ex. 36 (GOOG-PLAY-003332817.R) at -823.R-824.R. At the

28   ───────────────
[9] Google first called this a "Non-Compete" provision. Ex. 32 (GOOG-PLAY-000054021) at -022. By 2014, Google renamed it "Alternative Stores." Ex. 33 (GOOG-PLAY-000054039) at -041.

same time, Google learned that ████████████████████████████████████████
████████████████████████████████████████████████████████████

████ which would have allowed ████████ to compete more effectively. Ex. 37 (GOOG-PLAY-004509271) at -272; Ex. 36 (GOOG-PLAY-003332817.R) at -835.R. Fearing "████████" Google hatched a plan and gave it a secret internal codename: "Project ████████" Ex. 38 (GOOG-PLAY-000560173.R) at -178.R-179.R.

████████████████████████████████████████████████████████ Ex. 39 (GOOG-PLAY-000000807) at -808 (bold in original). Because Google's 30% take was "████████████" the Project ████

████████████████████████████ 0 ████████████████████████████

████████████████████[11] As a Google employee characterized it, Google was "████████████████████████████████████████ and other competitors. Ex. 43 (Koh Dep. Tr.) at 362:22-363:1, 364:13-365:4, 367:4-16. Project ████████ worked. ████████████████████████████████████████████████████ Ex. 43 (Koh Dep. Tr.) at 368:4-369:4; Ex. 44, (GOOG-PLAY-004146689.R) at -697.R ████████████████████████).

*Fifth,* Google has deliberately created unnecessary technical obstacles to prevent consumers from purchasing apps and in-app content outside the Play Store. Google has purposely made it difficult for consumers to download apps from rival app stores, requiring consumers to navigate a cumbersome "sideloading" process. Ex. 4 (Schmidt Rpt.) at 22-23, 27-35. For example, at one point, installation of ████████████ on an Android device required consumers to navigate a complicated ████████ Ex. 45 (GOOG-PLAY-000297309.R) at -310.R-314.R. When a

---

[10] Ex. 40 (GOOG-PLAY-004588725) at -726 (noting that "████████████████████"); Ex. 41 (GOOG-PLAY-000559379.R) at 382.R, 384.R; Ex. 39 (GOOG-PLAY-000000807); Ex. 42 (GOOG-PLAY-000229696).

[11] ████████████████████████████████████████████ *See* Ex. 39 (GOOG-PLAY-000000807) at -810.

CONSUMER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION NO. 3:20-CV-05761-JD

1  user attempts to change the default security setting that blocks downloads of apps outside the Play

2  Store, including alternative app stores, Android displays misleading warnings, such as that chang-

3  ing settings would make ████████████████████████████████████████████████ ." Ex. 4,

4  (Schmidt Rpt.) at 28-31. Android uses onerous download warnings even for reputable companies

5  and would-be competitors like Amazon, terming it an "unknown source" even though less burden-

6  some mechanisms exist to validate the safety of the app. *Id.* at 37-41. Internally, Google refers to

7  these extra steps and warnings as ████████ " Ex. 4 (Schmidt Rpt.) at 32-33, in recognition that the

8  steps stop consumers from and deny competitors the ability to provide the same one-click service

9  Google can provide.

10      ***Sixth,*** ██████████████████████████████████████

11  █████ Over the past several years, Google perceived ████████████████████████ as a potential com-

12  petitor to the Play Store. Ex. 46 (GOOG-PLAY-004253884) at -907. To prevent competition from

13  ████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████████

15  ████████████████████ " Ex. 47 (GOOG-PLAY-001449339). Google attempted to ████████████████

16  ████████████████████████████████████ As Google put it ████████████████████████████████

17  ████████████████████████████████████████████ ' Ex. 48 (GOOG-PLAY-006359924).

18  Specifically, ████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████ Ex. 49 (GOOG-PLAY4-004259430). In these discussions, Google told

21  █████████████████████████████████████████████████████████ ' Ex. 50 (GOOG-

22  PLAY-000860818) at -823 ████████████████████████████████████████████████████

23  ████████████████████████████████ " Ex. 51 (GOOG-PLAY-007384816) at -818; *see*

24  *also* Ex. 52 (Rosenberg Dep. Tr.) at 117:19–118:18. ███████████████████████████████

25  ████████████████████████████████████████████████ ' Ex. 51 (GOOG-PLAY-

26  007384816) at -818. ████████████ is not the only significant market participant that Google

27  ████████████████████████████████████ The architect of Google's early Android strategy

28  wrote in 2009 that "████████████████████████████████████████████████

1                                       Ex. 53 (GOOG-PLAY4-000810048). Google has

2 continued to

3                                      *See, e.g.,* Ex. 54 (GOOG-PLAY-

4 005566485) (Google messaging document noting that

5                          . Ex. 55 (Bankhead Tr.) at 410:21-416:25 (discussing

6

7 .

8 **Seventh,** Google leverages its power over app distribution into the aftermarket for services in

9 connection with the sale of in-app content. Google's insistence that developers use its services for

10 transacting in-app purchases in perpetuity reaps Google billions of dollars annually. Google's in-

11 volvement in those sales is technologically unnecessary, but its requirement that all but a few de-

12 velopers use Google Play Billing to transact their in-app sales of digital content has to date been

13 non-negotiable. And that requirement has allowed Google to impose itself as an unnecessary mid-

14 dleman, taking a supra-competitive toll of up to 30% for all in-app purchases in perpetuity, a fee

15 that the Google Play team

16                                       Ex. 56 (GOOG-PLAY-

17 000565541.R) at -552.R; Ex. 57 (GOOG-PLAY-004506631). Consumers, in turn, are stuck paying

18 the lion's share of Google's overcharge.

19 **IV.     COMMON EVIDENCE OF CLASSWIDE ANTITRUST IMPACT**

20       Plaintiffs rely on widely accepted economic models and other economic evidence common

21 to the proposed classes to evaluate the effects of Google's conduct on consumers. Using common,

22 economic evidence and widely accepted models, Dr. Hal Singer's analysis shows that in the ab-

23 sence of Google's anticompetitive conduct, Plaintiffs and class members would have paid lower

24 prices and benefitted from enhancements to output, quality, and choice.

25       **A.     Common Evidence Establishes that Google's Take Rate Is Supra-Competitive**

26       Consumer Plaintiffs will prove that Google's 30% headline take rate is supra-competitive

27 through Dr. Singer's economic modeling of a "but-for world" free of Google's anticompetitive

28 conduct in both the Android App Distribution Market and the In-App Aftermarket. For the Android

App Distribution Market, Dr. Singer uses the Rochet-Tirole model, a widely cited model that enables economists to estimate competitive prices in a two-sided market. *See Ohio v. American Express*, 138 S. Ct. 2274, 2281 (2018) (citing Jean-Charles Rochet and Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. Eur. Econ. Assn. 990, 1013 (2003)). For the In-App Aftermarket, Dr. Singer uses a standard single-sided economic model to determine competitive prices, because absent Google's anticompetitive insertion of itself into the transaction, aftermarket transactions would involve solely the developer and consumer. Ex. 2 (Singer Rpt.) at ¶ 33. In both cases, Dr. Singer's models generate competitive take rates that can determine classwide impact.

For the Android App Distribution Market, Dr. Singer calibrates the Rochet-Tirole model for the specific circumstances presented in this case and computes a competitive price in a competitive market with at least one other comparable app store. Ex. 2 (Singer Rpt.) at ¶¶ 184-194. Dr. Singer's analysis confirms that Google's dominance in the Android App Distribution Market enables Google "to extract a supra-competitive take rate on all paid App downloads." *Id.* at 72 ¶ 169. He determines that Google's average take rate on app sales would fall from ███—which is slightly below the "headline" take rate of 30% due to discounts Google gives certain developers— to a "but-for take rate" of ███ for initial downloads of an app. *Id.* at 91 ¶ 205. Recognizing that the take rate for some developers deviates from the headline rate, Dr. Singer determines that the competitive take rates for these developers can be computed by applying the same proportion of real-world discounts to the competitive anchor rate. Ex. 2 (Singer Rpt.) at ¶¶ 194, 259.

To supplement his modeling, Dr. Singer compares platform take rates for similar two-sided digital platforms without the anticompetitive restraints Google imposes. *Id.* at ¶¶ 195-205 & Table 4. That comparative analysis shows Google's average ███ take rate is significantly higher than in comparable digital platforms in competitive environments, which range from 18% to 25%, confirming Google's supra-competitive pricing across the class. *Id.* at ¶ 205.

As he does with the Android App Distribution Market, Dr. Singer uses a well-accepted economic model to determine whether Google charges supra-competitive take rates in the In-App Aftermarket and to quantify any resulting damages to consumers. The model, which considers Google's marginal costs, demand elasticities, and other factors, incorporates the common-sense

economic principle that as competition increases, Google's take rate would be pushed "closer to the marginal cost of providing any services associated with In-App Content," while allowing Google a premium above marginal cost to account for consumer brand loyalty to Google. *Id.* at ¶¶ 208-13. Calibrating that model for the facts of this case, Dr. Singer concludes that Google's take rate in the competitive In-App Aftermarket would be ███ considerably lower than Google's actual average take rate of ███ for in-app purchases. *Id.* at ¶¶ 206-220 & Table 5.

Again, Dr. Singer reviews common evidence on the relevant competitive landscape to confirm his results. While payment processing alone is not the only service provided by Google in the aftermarket, it is "a key component of [those] services." *Id.* at ¶ 221. Examining the take rates charged in the highly competitive payment processing industry with capable participants such as PayPal, Stripe, and Amazon Pay, Dr. Singer finds "materially lower" take rates ranging from approximately 2.9-3.95%, with varying fixed fees. *Id.* at 101, ¶ 221 & Table 6. This corroborates that Google's competitive take rate for in-app purchases would be significantly lower than the ███ that Google charges today. *Id.* at 101 ¶ 221 & Table 6. Because these potential competitors are currently foreclosed by virtue of Google's tie from competing with Google in the In-App Aftermarket for the full range of services provided by Google Play Billing, allowing entry by these and other firms in the but-for world would have effects classwide. Ex. 2 (Singer Rpt.) at ¶¶ 138, 207.

## B.   Common Economic Evidence Shows that All or Virtually All Class Members Are Injured by Google's Conduct

Because the precise ways in which competition would develop in a but-for world are difficult to predict due to Google's conduct, Dr. Singer models two potential but-for worlds, each with common methods.[12] First, a rival app store would force Google to compete by offering developers a lower take rate. Dr. Singer models consumer impact from this outcome by calculating pass-through from developers of savings from the lower take rates. *Id.* § V.D. Second, a rival app

---

[12] Plaintiffs are not required to predict exactly how competition would manifest itself. *See, e.g., In re Elec. Books Antitrust Litig.*, No. 11-MD-2293 (DLC), 2014 WL 1282293, at *27 (S.D.N.Y. Mar. 28, 2014) (it was "unsurprising" that an economic expert "did not develop an opinion about ... important features of a but-for world" because, "[a]fter all, the but-for world does not exist"); *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.").

store would force Google to compete by offering consumers incentives in the form of coupons or reward points. Dr. Singer separately models the impact of these increased consumer incentives. *Id.* § V.E. Both models lead to the conclusion that all or virtually all consumers would benefit in a world free of Google's anticompetitive conduct.

**First**, Dr. Singer's models show that all or almost all class members would have benefited from lower prices resulting from reduced take rates. Ex. 2 (Singer Rpt.) at ¶¶ 223-226. Dr. Singer applies a commonly used logit demand system to model demand curves and developer pass-on of the reduced take rates discussed above for each of the thirty-five categories of apps the Google Play Store uses  *Id.* at V.D.3. Dr. Singer's calculations show the pass-through rates ranging from ██████████████ depending on the application category. *Id.* at ¶ 239 & Table 8. As with his other econometric modeling, Dr. Singer confirms his analysis by referencing real-world evidence of pass-through from 33% to 105% by apps that can avoid Google's In-App Aftermarket restrictions or Apple's similar restraints. *Id.* at ¶¶ 241-244.

**Second**, Dr. Singer models an alternative scenario in which Google competes for consumers by increasing its Google Play Points loyalty program. Using the Rochet-Tirole model, he finds classwide impact with an average of ████ in consumer savings per transaction. *Id.* at § V.E. In this competitive but-for world, which does not depend upon developer pass-on, Google would award Play Points in proportion to all purchases made by Class members, resulting in uniformly lower effective prices, and therefore impact all or virtually all Class members. *Id.* at ¶ 256.

**C.    Aggregate Damages Are Calculated on a Classwide Basis**

Having determined the extent of the overcharge for both app and in-app purchases, Dr. Singer applies those percentages to Google's respective sales of apps and in-app content to calculate aggregate damages nationwide and by state. *Id.* at ¶ 274, Table 11, & Appendix 6. Dr. Singer calculates the aggregate damages for all consumers nationwide from Google's overcharge in the Android App Distribution Market to be ██████████ or the Class Period through the end of 2020. *Id.* In the In-App Aftermarket, where consumers spend much more, he calculates aggregate nationwide damages to be ██████████ *Id.* While unnecessary at this stage, Dr. Singer goes a step

further to show how individual damage calculations can be performed with a common formulaic method. *Id.* at § VII & Table 13.

## ARGUMENT

A party seeking class certification must prove that the proposed class "satisfies the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 927 (9th Cir. 2019) (cleaned up). The "proposed class must also meet the requirements of one or more of the 'three different types of classes' set forth in Rule 23(b)." *Id.* Here, Plaintiffs propose two classes, one seeking money damages under Rule 23(b)(3), and the other seeking injunctive relief under Rule 23(b)(2). A (b)(3) damages class is appropriate when two additional elements are met: predominance and superiority. Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(2), on the other hand, requires only that the party opposing the class have acted or refused to act on grounds that apply generally to the class." *Senne*, 934 F.3d at 928 (cleaned up).

## I.   THE REQUIREMENTS OF RULE 23(a) ARE MET IN THIS CASE

### A.   Rule 23(a)(1)'s Numerosity Requirement Is Satisfied

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Here, there are tens of millions of class members, so numerosity is easily satisfied.

### B.   Rule 23(a)(2)'s Commonality Requirement Is Satisfied

Rule 23(a)(2)'s commonality requirement is met because numerous questions of law and fact related to Google's unlawful conduct and its uniform impact on the class will be the centerpiece of any trial in this action. Rule 23(a)(2) requires the proposed class claims to pose "questions of law or fact common to the class." In other words, the "claims must depend upon a common contention," that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

"[A] common contention need not be one that *will be* answered, on the merits, in favor of the class. It only must be of such a nature that it is *capable of* classwide resolution." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (cleaned up) (emphasis added). "Where the

circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *B.K., by her next friend Tinsley v. Snyder*, 922 F.3d 957, 968 (9th Cir. 2019) (cleaned up). "For purposes of Rule 23(a)(2), even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (cleaned up). "Antitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'" *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (quoting *Wal-Mart*, 564 U.S. at 350).

Plaintiffs' claims here depend upon several central, common questions of fact and law, discussed in more detail below, *infra* Part II.B, each of which focuses on Google's conduct and are capable of classwide resolution: (1) whether Google has monopoly power in the Android App Distribution Market and the In-App Aftermarket; (2) whether Google's contractual restrictions on manufacturers, carriers, and developers are unreasonable restraints of trade; and (3) whether Google's practices impacted class members and resulted in supra-competitive prices paid by consumers. Commonality is readily satisfied.

## C.      Rule 23(a)(3)'s Typicality Requirement Is Satisfied

Rule 23(a)(3) requires the claims of a class representative to be "typical" of the claims of the class. "Representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (cleaned up). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Tinsley*, 922 F.3d at 970. Plaintiffs' Sherman Act and state claims are the same as other proposed class members. They are based on the same conduct by Google detailed above resulting in the same measures of damages to all and the identical need for injunctive relief against Google's anticompetitive conduct. As proposed in Dr. Singer's report, all class members will be utilizing a common method of demonstrating impact, further showing that the typicality standard is met in this case.

### D.     The Rule 23(a)(4) and 23(g) Adequacy Requirements Are Satisfied

The fourth Rule 23(a) requirements is that the representative plaintiffs "fairly and adequately protect the interests of the class." Rule 23(a)(4). Rule 23(g)(4) also requires class counsel to "fairly and adequately represent the interests of the class." "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 308 (N.D. Cal. 2010), *abrogated by In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 755 n.7 (9th Cir. 2012) (cleaned up; quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

There are no conflicts of interest between the Plaintiffs and the proposed classes. And each of the proposed Class Representatives have, and will continue to, adequately represent the classes by taking an active part in the action. Each has actively participated in discovery, has familiarity with the nature of the action, reviewed the operative complaint before it was filed, and have made Google Play app or in-app purchases on Android devices.[13]

After having been appointed Co-Lead Interim Class Counsel under Rule 23(g)(3),[14] proposed Co-Lead Class Counsel have vigorously prosecuted the class claims since the inception of this action. They have engaged in nearly 22 months of extensive discovery coordination with Google and the other MDL plaintiffs, including: 17 depositions of Google fact witnesses; preparing for the depositions of numerous critical third-party witnesses; issuing more than 60 third-party subpoenas; meeting and conferring with Google and third parties on discovery issues multiple times a week; and reviewing approximately three million documents produced by Google and hundreds of thousands of documents produced by third parties. They have also hired experts who have worked over the course of a year and a half to develop opinions, including on antitrust injury

---

[13] *See, e.g.*, Ex. 58 (Carr Tr.) at 20:13-21:9; 23:7-11; 24:10-25:3; 31:4-5; 32:18-34:1; 122:25-123:3; Ex. 59 (Egerter Tr.) at 48:6-49:5; 52:15-53:7; 53:21-54:24; 126:5-126:16; Ex. 60 (Palmer Tr.) at 18:12-19:19:24; 25:3-27:4; 39:1-11; 49:17-22; 55:2-56:5; 193:16-21; Ex. 61 (Atkinson Tr.) 54:10-57:25; 69:1-70:21; 77:8-80:25; 97:4-99:3; 141:2-142:13; 191:6-24; Ex. 62 (Moglia Tr.) at 36:5-37:11; 40:19-46:11; 52:12-61:10; 82:1-83:8; 147:13-151:20; Ex. 63 (Iwamoto Tr.) 14:17-15:3; 37:11-38:20; 73:14-75:24; 89:4-20; 121:8-122:18; 131:13-25; 278:7-25.

[14] *See* ECF No. 128. Resumes covering their extensive experience in antitrust litigation are submitted again herewith Ex. 64 (Giulianelli Resume); Ex. 65 (Nam and Kaplan Fox Resume).

CONSUMER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION NO. 3:20-CV-05761-JD

1   and damages and technical issues. Giulianelli Decl. ¶ 2. Finally, Counsel coordinated extensively

2   with the Court Appointed Consumer Steering Committee,[15] and numerous State Attorneys' Gen-

3   eral to determine that it was in the best interests of consumers nationwide for Interim Class Counsel

4   to enter into the Joint Prosecution Agreement, combining resources such that all parties could more

5   effectively focus on their claims against Google.

6   　　　The adequacy requirement has been satisfied, and Co-Lead Interim Class Counsel should

7   be appointed Co-Lead Class Counsel.

8   **II.      RULE 23(b)(3)'S REQUIREMENTS ARE SATISFIED IN THIS CASE**

9   　　　**A.      The Predominance Requirement Is Met**

10   　　　The predominance requirement is met in this case because the vast majority of important

11   questions will be resolved through classwide evidence. "The predominance inquiry asks whether

12   the common, aggregation-enabling, issues in the case are more prevalent or important than the

13   non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (cleaned up).

14   　　　　Predominance is not a matter of nose-counting. Rather, more important questions apt
15   　　　　to drive the resolution of the litigation are given more weight in the predominance
　　　　analysis over individualized questions which are of considerably less significance to
16   　　　　the claims of the class.

17   *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (cleaned up); *see also*

18   *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012) ("The text of Rule

19   23(b)(3) itself contemplates that such individual questions will be present."). Courts cannot "de-

20   cline to certify a class that will require determination of some individualized questions at trial, so

21   long as such questions do not predominate over the common questions." *Olean*, 31 F.4th at 668.

22   　　　The Supreme Court has said that "[p]redominance is a test readily met in certain cases

23   alleging … violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625

24   (1997). This is because the focus of an antitrust trial is the defendant's conduct. The same will be

25   true in this case. Whether Google's conduct violated federal or state law are not questions that vary

26   from class member to class member.

27

28   ─────────────

[15] The Court appointed Elizabeth Pritzker as liaison counsel, and Nanci Nishimura, Peggy Wedg-
worth, and George Zelcs as members of the steering committee. ECF No. 128.

### 1.   Plaintiffs' Sherman Act Claims Present Common Questions That Will Predominate

Plaintiffs' Sherman Act Claims depend on proof of Google's anticompetitive conduct. "Section 2 monopolization claims readily lend themselves to common evidence" because they require proof of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (quoting *Alaska Airlines v. United Airlines*, 948 F.2d 536, 541 (9th Cir. 1991)). "Courts have routinely certified classes alleging that a monopolist's conduct caused a direct and uniform overcharge, as overcharge cases often rely on facts common across the class such as the existence of a relevant market, the defendant's monopoly power, and the existence of the illegal course of conduct." 6 W. RUBENSTEIN, *Newberg on Class Actions* § 20:28. (5th ed.) (collecting cases). Plaintiffs' Section 1 claims likewise turn on common questions. "[U]nder Section 1, a plaintiff must demonstrate: (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (cleaned up).

The common questions identified above concerning the contours of the relevant markets, whether Google has power in those markets, and whether Google acquired and maintained power through a web of exclusionary contracts and conduct will be the overriding focus of any trial. "The violation turns on *defendants'* conduct and intent along with the effect on the market, *not* on individual class members." *In re Glumetza*, 336 F.R.D. at 475.

***First,*** the definitions of the relevant markets—and Google's power in those markets—will be determined by common evidence. *See In re Apple iPhone Antitrust Litig.*, No. 4:11-cv-06714-YGR, 2022 WL 1284104, at *11 (N.D. Cal. Mar. 29, 2022) (expert's "opinion on market definition constitutes common proof that could resolve whether a relevant market exists"). Though Google does not challenge market definition for purposes of class certification, it may be disputed at trial, and resolution of that issue will turn on mountains of common evidence, as will a determination of Google's power in that market. Both will include common economic analysis of issues such as

Google's market share and ability to exclude competition and to raise prices above competitive levels. *Supra* Statement of Common Facts § II; *see In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 131 (C.D. Cal. 2007) ("the Court's focus is the process of defining the relevant market, and this process will clearly be predominated by common questions of law and fact").

**Second**, and central to the issues of this litigation, Google's pattern of unlawful conduct, including the seven major areas of conduct set out in Part III of the Statement of Common Facts above, will be the core of any trial in this action. The facts of Google's conduct with respect to carriers, OEMs, developers, and consumers, the application of the law to those facts, and determinations of whether Google's conduct violates the Sherman Act will be hotly disputed at trial but are all paradigmatic common questions. Each is "of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Their determination will be based on common evidence of Google's conduct, evidence that will not vary from class member to class member.

**Third**, the antitrust impact of Google's conduct will be proven by common evidence. "A private antitrust plaintiff must prove the existence of antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1273 (9th Cir. 2022) (cleaned up). At the class certification stage, "[w]hat really matters is whether the class can point to common proof that will establish antitrust injury … on a class wide basis." *In re Capacitors III*, No. 17-md-02801-JD, 2018 WL 5980139, at *8 (N.D. Cal. 2018) (cleaned up). Through the expert testimony of Dr. Singer described above, *supra* § IV.A-B, Plaintiffs will present extensive statistical and econometric evidence that all or nearly all class members were injured. *Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) ("the relevant question is whether Plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury and damages can be proven on a class-wide basis through the use of a common methodology"). As discussed above, Google documents and testimony, along with industry benchmarks, will further substantiate that Google caused antitrust injury. Consumers

CONSUMER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION NO. 3:20-CV-05761-JD

"forced to pay an alleged monopolistic overcharge … have satisfied the antitrust injury require-ment." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398 (7th Cir. 2000) (cleaned up).

**Fourth,** damages also present common questions that can be resolved classwide through economic evidence. As discussed above, Dr. Singer has calculated aggregate overcharges using well-accepted economic methodologies that are common to the entire class. Ex. 2 (Singer Rpt.) at 130. He has also gone a step further and has shown how individualized damage calculations can be performed in a common, formulaic manner. *Id.* at 131-34, § VII & Table 13.

In short, each of the major questions of fact and law that will be resolved at trial will turn on common questions, which will predominate over any individual issues.

### 2. Plaintiffs' State Law Claims Present Common Questions That Will Predominate

Plaintiffs' state law claims present common questions because all such claims are governed by California law and implicate the same common facts discussed above. For the entire class pe-riod, Google's Terms of Services have provided that "California law will govern all disputes aris-ing out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules." *See* Ex. 66, Google Policies, *Terms of Services* (eff. Jan. 5, 2022), https://policies.google.com/terms; Ex. 67, Google Policies, *Google's Archived Terms of Services*, https://policies.google.com/terms/archive (links to March 31, 2020 Terms; October 25, 2017 Terms; and April 14, 2014 Terms). California law thus applies to all class members.

Plaintiffs' Cartwright Act claims (Counts 7-10) and federal claims are based on the same unlawful conduct. They therefore pose the same common predominating questions of fact identi-fied above. *See*, *e.g.*, *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 55 Cal. App. 5th 381, 399 (2020) (noting similarity of Sherman Act and Cartwright Act analysis of key antitrust issues). Plaintiffs' California Unfair Competition Law claim (Count 11) also presents common questions, including whether Google has engaged in deceptive or unfair trade practices.

### 3. Common Questions Predominate on Impact and Damages

As described in Part IV.B., Dr. Singer has established a common economic framework to demonstrate that all or nearly all proposed class members are impacted by Google's restrictions.

And as described in Part IV.C., he has also shown the aggregate damages suffered by proposed class members, as well as a methodology to calculate individual damages.

Consumers expect that Google will use the report of its economist, Dr. Burtis, to argue that there is too much heterogeneity in the market to find common impact in the counterfactual but-for world. But "variations in products and complexities in a distribution chain do not preclude an estimation of whether an overcharge impacted end purchasers." *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 420 (M.D. Fla. 2018) (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 603 (N.D. Cal. 2010), amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011)); *see also In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, MDL No. 2445, 13-md-2445, 2019 WL 4735520, at *31 (E.D Pa. Sep. 27, 2019) (noting that "district courts have ... rejected contentions ... that differences in purchasing decisions defeated class certification on issues of antitrust impact" and citing cases). None of the hypothetical issues Google may raise defeat predominance in this case.

***First,*** Dr. Burtis claims that Google would engage in highly individualized take-rate negotiations with developers in a competitive but-for world, complicating common impact. Ex. 7 (Burtis Rpt.) § VI.A. But Dr. Burtis's speculation does not track Google's behavior in the actual world—where it has kept its take rate largely uniform, with adjustments largely in the context of formulaic programs or ███████████████████████████ Ex. 3, Singer Reply Rpt. ¶¶ 8-10. Nor does she explain why Google would change that approach when faced with competition or how it would be feasible for Google to individually negotiate with thousands of developers. In any event, Dr. Singer's methodology allows for common calculation of reduced take rates from the "headline take rate" in the but-for world. As Dr. Singer explains, "it is reasonable to assume that those developers that secured discounts off the inflated rate of 30 percent would have also secured the discounts off a lower, headline rate." Ex. 3, Singer Reply Rpt. ¶ 7.

Consistent with this, the Ninth Circuit has held that antitrust schemes can affect "all market participants, creating an inference of class-wide impact even when prices are individually negotiated," and it rejected "different bargaining power" among market participants as a rationale for denying class certification in antitrust cases. *Olean*, 31 F.4th at 671, 677 (citing *In re Urethane*

*Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014); *In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143, 151-52 (E.D. Pa. 1979) (granting certification despite concerns about diversity of product, marketing practices, and pricing in conspiracy cases because conspiracy is "the overriding pre-dominant question"). The Ninth Circuit further held that there are well-accepted econometric tech-niques—some of which Dr. Singer utilized in this case—for demonstrating "antitrust impact in markets with individualized differences among purchasers." *Olean*, 31 F.4[th] at 674; *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (rejecting argument that a putative class of "diverse businesses, facing different competitive environments and paying widely differ-ent prices" defeats certification).

**Second,** Dr. Burtis argues that consumers who exclusively make low-dollar purchases would be unharmed because of allegedly high per-transaction fees for low-dollar-value transac-tions from third-party payment processors. But this, too, ignores prevailing practices involving "micropayment" rates. Ex. 3 (Singer Reply) at ¶ 15. Further, in a more competitive world, eco-nomics predicts that competing payment processors would eschew minimum per transaction fees (as they already have) if they want to win the business of lower-priced apps. Ex 3, Singer Reply Rpt. ¶ 14-16. Differences in payment processing costs for small transactions—to the extent they even exist—do not require individualized analysis. *See In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 187 (D. N.J. 2003) (rejecting contention that "the idiosyncrasies of each transaction also preclude the possibility that common issues will predominate on the element of impact.").

**Third,** Dr. Burtis argues that individualized inquiry is required to determine some devel-opers' marginal costs, pricing strategies, and competitive conditions, and, accordingly, the degree of pass-on to consumers. Ex. 5, Burtis Rpt. §§ VI.B.1, VI.B.2, VI.B.3. But as explained in Dr. Singer's reply report, many of Dr. Burtis's assertions rest on shaky or speculative factual founda-tions, and Dr. Singer's methodology is not compromised by any such differences. Ex. 3, Singer Reply Rpt. ¶¶ 21-32. For instance, while Dr. Burtis claims that developer "focal point" pricing ending in $.99 would prevent pass-on for many applications in a competitive world, she ignores the evidence that (1) Google until very recently prohibited U.S. developers from charging less than $.99; and (2) even in the *actual* world, when developers are allowed to steer, a significant number

of them do divert from this pricing. *Id.* ¶¶ 26-29. If developers could save money by steering to lower-cost alternatives, which Google currently forbids, they would do so. Her analysis is also contrary to economic logic in the literature on "psychological pricing." *Id.* ¶ 30.[16]

As a variation on this theme, Dr. Burtis criticizes Dr. Singer's models' reliance on average inputs and results for his but-for take rates. Ex. 5, Burtis Rpt. ¶ 340. Her similar arguments have been rejected in *D&M Farms v. Birdsong Corp.*, Civil Action No. 2:19-cv-463, 2020 WL 7074140, at *1, *6, *8 (E.D. Va. Dec. 2, 2020) (granting class certification and disregarding Dr. Burtis's accusation that plaintiffs relied upon averages attributable to the entire class instead of those applicable to each proposed class member); and *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 614, 616, 617 (N.D. Cal. 2009) (granting class certification while rejecting Dr. Burtis's argument that using aggregated and averaged data in an econometric model could yield "false-positive pass-through").

***Finally,*** Dr. Burtis claims that actions Google might take in a but-for competitive world, such as ███████████████████████████████████████████████████ owering security, ████████████████████ would differentially affect consumers, leaving some uninjured. Ex. 7, Burtis Rpt. §§ VI.C.4, VI.C.5, VI.D. Dr. Burtis's parade of horribles is based entirely on speculation and runs counter to standard economic principles. As Dr. Singer notes, "Economic principles prescribe that as competition increases, firms compete more vigorously for customers on all dimensions, including services." Ex. 3, Singer Reply Rpt. ¶ 64. It is, therefore, unlikely that Google would take steps like degrading security or lowering services to developers in the face of competition, when it hasn't done so in the actual world. Ex. 3, Singer Reply Rpt. ¶¶ 46-49, 64-66. Not only has Google declined to take these steps, ██████████████████████████████████████ ███████████████████████████████████ Ex. 3, Singer Reply Rpt. ¶¶ 41-44, 52 & n.97. Dr. Burtis's

---

[16] Although the Court in *In re Apple Iphone Antitrust Litig.*, 2022 WL 1284104, at *8, faulted plaintiffs for their expert's failure to consider focal-point pricing in his model, there the plaintiffs' expert testified that he would expect to see focal-point pricing in a but-for world, and the Court found that the record had "overwhelming evidence suggest[ing] that developers would choose to price their apps at focal points ending in 99 cents." Neither is true here. Plaintiffs have established a record demonstrating that focal-point pricing is not integral to developers' pricing in a but-for world where Google's anticompetitive conduct no longer constrains developers' actions, and, therefore, it is unnecessary to include in a pricing model. Ex. 3 (Singer Reply) ¶¶ 26-30.

speculation that Google *might* take steps in the but-for world that differentially impact the class, ██████████████████████████ does not defeat the predominance of common questions. *In re Microcrystalline Antitrust Litig.*, 218 F.R.D. 79, 92-93 (E.D. Pa. 2003) ("Antitrust cases nearly always require some speculation as to what would have happened under competitive conditions … but this is not fatal to class certification.")

Any attempt by Google to inject individualized issues is unavailing. The central issues in this case—Google's anticompetitive monopolization and its common impact on consumers—will be tried through evidence common to the class, which is why monopolization cases are readily certified. *See In re Glumetza*, 336 F.R.D. at 475 (N.D. Cal. 2020).

**B.  The Superiority Requirement Is Met**

Rule 23(b)(3) provides a non-exhaustive list of four factors "[a]s an aid for determining the superiority question." *Kamm v. Calif. City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975). "Rule 23(b)(3)'s superiority test requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175-76 (9th Cir. 2010). As for class members' interests in individually controlling the prosecution or defense of separate actions, "where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Id.* at 1175. The second and third factors—litigation already begun and desirability of concentrating the litigation in the particular forum—favor certification. Google antitrust litigation is already "concentrated" before this Court. The first and fourth factors—class members' interests in individually controlling the prosecution and manageability—also favor certification. Litigating Plaintiffs' claims as a class action will be fair, efficient, and superior to other available methods for fairly and efficiently adjudicating the controversy.

**III.  THE REQUIREMENTS OF RULE 23(b)(2) ARE SATISFIED IN THIS CASE**

A class seeking injunctive or declaratory relief should be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory

remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (cleaned up). "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014).

In this case, Rule 23(b)(2)'s straightforward requirement is plainly met. The evidence Plaintiffs have presented in support of their certification motion, discussed more fully above, demonstrates that Google has acted "or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

Google's conduct at issue is not specific to any consumer. Google has acted "on grounds that apply generally to the class." If that conduct violates the Sherman Act, the Cartwright Act, or Unfair Competition Law then a declaration that Google's conduct is unlawful, and an injunction enjoining Google from continuing to engage in that conduct, would be "appropriate respecting the class as a whole." *Parsons*, 754 F.3d at 689. "Because an injunction would offer all class members 'uniform relief' from [ongoing antitrust harms], class certification is appropriate under Rule 23(b)(2)." *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. C 09-1967 CW, 2013 WL 5979327, at *7 (N.D. Cal. Nov. 8, 2013) (certifying (b)(2) class in Sherman Act case).

## CONCLUSION

This case presents numerous, pivotal common questions of law and fact. The evidence at trial will plainly focus on Google's conduct, not issues or evidence specific to individual plaintiffs. Moreover, as Dr. Singer has demonstrated, Plaintiffs will rely on economic models that generate common answers to those questions. Plaintiffs have, therefore, demonstrated that the injuries they and class members have sustained are classwide and warrant classwide relief. The requirements of Rule 23 are satisfied in this case, and the Court should therefore certify the proposed classes.

Respectfully submitted,

By: */s/ Karma M. Giulianelli*

**BARTLIT BECK LLP**
Karma M. Giulianelli (SBN 184175)
Glen E. Summers (SBN 176402)
Jameson R. Jones (pro hac vice)
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com
glen.summers@bartlitbeck.com
jameson.jones@bartlitbeck.com

**BARTLIT BECK LLP**
John Byars (pro hac vice)
Lee Mason (pro hac vice)
54 W. Hubbard St., Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
john.byars@bartlitbeck.com
lee.mason@bartlitbeck.com

**KOREIN TILLERY, LLC**
George A. Zelcs (pro hac vice)
Randall Ewing, Jr. (pro hac vice)
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com

Stephen M. Tillery (pro hac vice)
Michael E. Klenov (SBN 277028)
Carol O'Keefe (pro hac vice)
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

By: */s/ Hae Sung Nam*

**KAPLAN FOX & KILSHEIMER LLP**
Hae Sung Nam (pro hac vice)
Robert N. Kaplan (pro hac vice)
Frederic S. Fox (pro hac vice)
Donald R. Hall (pro hac vice)
Aaron L. Schwartz (pro hac vice)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
hnam@kaplanfox.com
rkaplan@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
aschwartz@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
lking@kaplanfox.com
kherkenhoff@kaplanfox.com

**PRITZKER LEVINE, LLP**
Elizabeth C. Pritzker (SBN 146267)
Bethany Caracuzzo (SBN 190687)
Caroline Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 805-8532
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

**COTCHETT, PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (SBN 152621)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
James G. Dallal (SBN 277826)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nnishimura@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy J. Wedgworth (pro hac vice)
Robert A. Wallner (pro hac vice)
Elizabeth McKenna (pro hac vice)
Blake Yagman (pro hac vice)
Michael Acciavatti (pro hac vice)
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229
pwedgworth@milberg.com
rwallner@milberg.com
emckenna@milberg.com
byagman@milberg.com
macciavatti@milberg.com

*Counsel for the Proposed Class*

1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing was served on May 26, 2022 upon all counsel of record via the Court's electronic notification system.

*/s/ Karma M. Giulianelli*