# EXHIBIT 6

Page 1

1   UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   ------------------------------------X
    IN RE GOOGLE PLAY STORE ANTITRUST
4   LITIGATION
5
    Case No. 3:21-md-02981-JD
6
7   THIS DOCUMENT RELATES TO:
8
    Epic Games Inc. V. Google LLC, et al.
9   Case No.: 3:20-cv-05671-JD
10
    In re Google Play Consumer Antitrust
11  Litigation
    Case No.: 3:20-cv-05761-JD
12
13  In re Google Play Developer Antitrust
    Litigation
14  Case No.: 3:20-cv-05792-JD
15
16  State of Utah, et al. V. Google LLC,
    et al.
17  Case No.: 3:21-cv-05227-JD
18  ------------------------------------X
19       ** HIGHLY CONFIDENTIAL **
20    REMOTE VIDEOTAPED DEPOSITION OF
21       MICHAEL ALAN WILLIAMS, Ph.D.
22             May 11, 2022
23              8:13 a.m.
24
    Reported By:
25  Maureen Ratto, RPR, CCR

Page 312

1        WILLIAMS - HIGHLY CONFIDENTIAL
2    subscriptions and in-app content on
3    Google Play?
4           A.    Yes, sir.
5           Q.    What is that opinion?
6           A.    That the vast majority of the
7    app prices wouldn't change and, in
8    particular, the percentage of developers
9    that have at least one product
10   monetization type combination, again,
11   that's what Dr. Burtis called a SKU, and
12   I'm wishing I had, to save space here,
13   that the percentage of developers that
14   have at least one product monetization
15   type combination with a passthrough rate
16   of less than 100% is -- is about 99%.
17               So it's just extremely rare
18   for developers to have really any
19   positive passthrough rate, much less one
20   at 100% or higher.
21          Q.    So, again, if we assume that
22   Google would have charged a lower service
23   fee, but for its alleged conduct, do you
24   have an opinion about whether consumers
25   generally would have paid lower prices

Page 313

```
 1         WILLIAMS - HIGHLY CONFIDENTIAL
 2    for app subscriptions and in-app content
 3    on Google Play?
 4         A.    Yes, sir.
 5         Q.    What is that opinion?
 6         A.    They would not have. The
 7    passthrough rates for the vast majority
 8    of instances are zero.
 9         Q.    How confident are you in that
10    opinion?
11         A.    I'm extremely confident. I've
12    looked at every single instance in which
13    there was a change in a service fee.
14    That's what's in figure 3. I've done a
15    difference-in-difference analysis that
16    I'm very confident in. So I'd say I'm
17    very confident.
18              I would also note that I
19    believe Dr. Burtis is largely in
20    agreement with me. Her report contains an
21    analysis that's like the first one I did.
22    Although, she actually was able to find
23    some data that I didn't have and if I
24    recall correctly, I believe she concluded
25    that 98% of the SKUs that she examined
```

Page 314

```
 1        WILLIAMS - HIGHLY CONFIDENTIAL
 2   had a zero passthrough rate.
 3        Q.    To your knowledge, has any
 4   other Plaintiffs' expert in this case
 5   evaluated passthrough?
 6        A.    Yes.
 7        Q.    Who?
 8        A.    Dr. Singer has a passthrough
 9   analysis in his opening report.
10        Q.    Do you have an understanding
11   as to which party retained Dr. Singer as
12   an expert?
13        A.    I believe it's the proposed
14   Consumer Class.
15        Q.    Have you reviewed Dr. Singer's
16   passthrough analyses?
17        A.    From his opening report I
18   have, yes. I have not reviewed what he
19   may or may not have said in his reply
20   report.
21        Q.    And in your understanding,
22   what does Dr. Singer purport to find with
23   respect to passthrough?
24        A.    I believe he finds passthrough
25   rates on the order of 99% for -- I think
```

Page 322

1     WILLIAMS - HIGHLY CONFIDENTIAL
2     He says he does but then he throws it
3     away.
4         Q.    What do you mean that "he
5     throws it away"?
6         A.    Well, he doesn't actually use
7     it. He talks about it, he has a logit --
8     a bunch of logit demand elasticity that
9     in my opinion are all wrong anyway, but
10    then he throws that analysis away when he
11    actually calculates the passthrough
12    rates.  And he says the passthrough rates
13    are simply one minus the shares of those
14    38 categories he got from Google.
15        Q.    Do you believe that is a
16    reliable methodology for evaluating
17    passthrough?
18        A.    I do not.
19        Q.    Why not?
20        A.    I don't believe the -- I don't
21    believe the logit analysis -- I don't
22    believe the way that the products are
23    aggregated has anything to do with any
24    antitrust markets. I don't believe the
25    passthrough rates are in fact '99% in the

```
                                           Page 323
 1       WILLIAMS - HIGHLY CONFIDENTIAL
 2   actual world or the but-for world.
 3            These -- these passthrough
 4   rates of his are a complete, in my
 5   opinion, complete fictions based on 38
 6   totally ad hoc groupings of products that
 7   he got -- based on a document that he got
 8   from Google. He doesn't look at any
 9   actual data in the real world to think
10   about what the passthrough rates really
11   look like. It defies common sense if you
12   actually look -- forget about
13   regressions, forget about what Dr. Burtis
14   and I did in our examination of product
15   -- of changes in product prices as it
16   followed changes in service fees. Just
17   look at the actual app prices. They
18   almost never changed and that makes sense
19   if you think about it. Why would they
20   change them? Their costs are completely
21   sunk. The marginal costs are basically
22   zero. They just don't change these prices
23   very often. So when they get a change in
24   the service fee they don't -- it just
25   doesn't cause them to change their
```

Page 372

```
 1              C E R T I F I C A T E
 2              I, MAUREEN M. RATTO, a
 3     Registered Professional Reporter, do
 4     hereby certify that prior to the
 5     commencement of the examination,
 6     MICHAEL ALAN WILLIAMS, Ph.D. was sworn
 7     by me to testify the truth, the whole
 8     truth and nothing but the truth.
 9              I DO FURTHER CERTIFY that the
10     foregoing is a true and accurate
11     transcript of the proceedings as taken
12     stenographically by and before me at
13     the time, place and on the date
14     hereinbefore set forth.
15              I DO FURTHER CERTIFY that I am
16     neither a relative nor employee nor
17     attorney nor counsel of any of the
18     parties to this action, and that I am
19     neither a relative nor employee of such
20     attorney or counsel, and that I am not
21     financially interested in this action.
22
23                     [signature: Maureen Ratto]
24     _____
       MAUREEN M. RATTO, RPR
25     License No. 817125
```