1   Brian C. Rocca, Bar No. 221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, Bar No. 215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, Bar No. 248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, Bar No. 259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, Bar No. 301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105-1596
    Telephone: (415) 442-1000
8   Facsimile:  (415) 442-1001

9   Richard S. Taffet, *pro hac vice*
    richard.taffet@morganlewis.com
10  **MORGAN, LEWIS & BOCKIUS LLP**
    101 Park Avenue
11  New York, NY  10178-0060
    Telephone: (212) 309-6000
12  Facsimile: (212) 309-6001

13  Daniel M. Petrocelli, Bar No. 97802
    dpetrocelli@omm.com
14  Stephen J. McIntyre, Bar No. 274481
    smcintyre@omm.com
15  **O'MELVENY & MYERS LLP**
    1999 Avenue of the Stars, 7th Fl.
16  Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
17
    Ian Simmons, *pro hac vice*
18  isimmons@omm.com
    Benjamin G. Bradshaw, Bar No. 189925
19  bbradshaw@omm.com
    **O'MELVENY & MYERS LLP**
20  1625 Eye Street, NW
    Washington, DC 20006-4001
21  Telephone: (202) 383-5106
    Facsimile: (202) 383-5414
22
    *Counsel for Defendants*
23

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, Bar No. 282090
kyle.mach@mto.com
Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Emily C. Curran-Huberty, Bar No. 293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, pro hac vice
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al.*
*in In re Google Play Consumer Antitrust*
*Litigation; In re Google Play Developer*
*Antitrust Litigation; Epic Games, Inc. in*
*Epic Games, Inc. v. Google LLC; State of*
*Utah et al. v. Google LLC et al.*

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600

*Counsel for Defendants*

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' CLASS CERTIFICATION MOTION** |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Judge James Donato |

## TABLE OF CONTENTS

<div align="right">Page</div>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.      FACTS RELEVANT TO CLASS CERTIFICATION ........................................ 3

        A.      Google Play ........................................................................................... 3

        B.      Google Play's Business Model ............................................................... 3

        C.      The Putative Consumer Classes ............................................................. 4

        D.      Fees and Prices ....................................................................................... 5

        E.      Play Points .............................................................................................. 5

II.     EXPERT ANALYSIS OF DR. MICHELLE BURTIS ...................................... 6

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 8

I.      PLAINTIFFS CANNOT DEMONSTRATE THAT ALL OR NEARLY ALL
        CLASS MEMBERS SUFFERED ANTITRUST IMPACT USING COMMON
        PROOF. ........................................................................................................... 8

        A.      Plaintiffs Have No Common Proof of Pass-Through. ............................ 9

                1.      Individual Issues Predominate Because Pass-Through Requires An
                        App-By-App Analysis Not Susceptible To Common Proof. .................... 9

                2.      Dr. Singer's Pass-Through Model Is Based On Theoretical
                        Assumptions Instead Of Analyses Typically Relied Upon By Other
                        Courts. ....................................................................................... 13

        B.      Individual Issues Predominate Because Not All Developers Would Be
                Subject To Lower Service Fees In The But-For World. ....................................... 16

        C.      Plaintiffs' Play Points Model Is Not Common Proof Of Impact. ......................... 18

        D.      Many Class Members May Be Worse Off In Plaintiffs' But-For World. ............. 19

        E.      Plaintiffs Have No Common Method Of Calculating Damages. .......................... 21

II.     PLAINTIFFS' COUNSEL ARE NOT ADEQUATE BECAUSE THEIR JOINT
        PROSECUTION AGREEMENT CREATES CONFLICTS. .............................. 22

III.    THE COURT CANNOT CERTIFY AN INJUNCTIVE RELIEF CLASS. ...................... 23

CONCLUSION .............................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Allen v. Dairy Farmers of Am., Inc.*,
5
    279 F.R.D. 257 (D. Vt. 2011) ..................................................................................... 25

6
*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) ...................................................................... 19, 20, 21
7

*Apple Inc. v. Pepper*,
8
    139 S. Ct. 1514 (2019) ........................................................................................... 9

9
*In re Apple iPhone Antitrust Litig.*,
10
    2022 WL 1284104 (N.D. Cal. 2022) ............................................................... 11, 12

11
*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ...................................................................................... 13
12

13
*Berni v. Barilla S.p.A.*,
    964 F.3d 141 & 148 (2d Cir. 2020) ....................................................................... 25

14
*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
15
    141 F.R.D. 144 (N.D. Cal. 1991) .......................................................................... 13

16
*In re Capacitors III*,
17
    2018 WL 5980139 (N.D. Cal. 2008) .................................................................. 8, 14

18
*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .................................................................................................. 21

19
*D&M Farms v. Birdsong Corp.*,
20
    2020 WL 7074140 (E.D. Va. 2020) ...................................................................... 18

21
*In re Digital Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017) .................................................................. 15, 20, 25
22

23
*In re Disposable Contact Lens Antitrust Litig.*,
    329 F.R.D. 336 (M.D. Fla. 2018) .......................................................................... 14

24
*Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*,
25
    1993 WL 527928 (E.D. Mich. 1993) ..................................................................... 13

26
*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    2013 WL 12387371 (N.D. Cal. 2013) ................................................................... 23
27

28
*Earl v. Boeing Co.*,
    21 F.4th 895 (5th Cir. 2021) ................................................................................... 22

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)................................................................. 15, 24

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004)...................................................................... 13

*In re Flash Memory Antitrust Litig.*,
    2010 WL 2332081 (N.D. Cal. 2010)......................................... 15, 16, 17, 18

*In re Florida Cement & Concrete Antitrust Litig.*,
    278 F.R.D. 674 (S.D. Fla. 2012) ................................................................... 15

*In re Glumetza Antitrust Litig.*,
    336 F.R.D. 468 (N.D. Cal. 2020) ................................................................. 14

*Grace v. Apple, Inc.*,
    328 F.R.D. 320 (N.D. Cal. 2018) ................................................................. 24

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) .................................................... 10, 15, 17

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................................... 22

*In re High-Tech Emp. Antitrust Litig.*,
    289 F.R.D. 555 (N.D. Cal. 2013) ................................................................... 7

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................................................... 10, 16

*Kayes v. Pacific Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995) ........................................................................ 22

*Kottaras v. Whole Foods Market, Inc.*,
    281 F.R.D. 16 (D.D.C. 2012) ....................................................................... 20

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ........................................................................ 21

*In re Lithium Ion Batteries Antitrust Litig.*,
    2018 WL 1156797 (N.D. Cal. 2018)...................................................... 11, 12

*Lou v. Ma Labs., Inc.*,
    2014 WL 68605 (N.D. Cal. 2014)................................................................ 23

*In re Mercedes-Benz Antitrust Litig.*,
    213 F.R.D. 180 (D.N.J. 2003) ...................................................................... 14

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2013 WL 5979327 (N.D. Cal. 2013)............................................................ 25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc)............................................................................*passim*

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) ............................................................................ 12, 14

*Orr v. Shicker*,
  953 F.3d 490 (7th Cir. 2020).......................................................................................... 23

*In re Paxil Litig.*,
  218 F.R.D. 242 (C.D. Cal. 2003) ............................................................................ 24, 25

*Pickett v. Iowa Beef Processors*,
  209 F.3d 1276 (11th Cir. 2000)..................................................................................... 25

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  2021 WL 5632089 (W.D. Mo. 2021)............................................................................ 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869 (Rail Freight II)*,
  934 F.3d 619 (D.C. Cir. 2019) ...................................................................................... 13

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009).......................................................................................... 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) .................................................................................. 18

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ................................................................... 14, 24, 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) .................................................................................. 14

*B.K. by next friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019)..................................................................................... 7, 24

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .................................................................................................... 7

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ....................................................................................................... 10

*United States v. Tobias*,
  935 F.2d 666 (4th Cir. 1991).......................................................................................... 23

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014)...................................................................................... 14

*Vincent v. Hughes Air W., Inc.*,
  557 F.2d 759 (9th Cir. 1977).......................................................................................... 23

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002) ............................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................................... 6, 7

*Williams v. Apple, Inc.*,
    338 F.R.D. 629 (N.D. Cal. 2021) .......................................................................... 24

**Other Authority**

F.R.C.P. Rule 23 ................................................................................................. passim

1

## **INTRODUCTION**

2       Class certification should be denied here for a simple reason: real-world data show that

3   the vast majority of putative class members suffered no antitrust impact, which means individual

4   "mini-trials" would be necessary to identify any consumers who may have been injured.

5   Plaintiffs spend the bulk of their motion (ECF No. 280 ("Mot.")) attacking Google's business

6   practices by misconstruing evidence and brushing aside competitive realities.  Contrary to

7   Plaintiffs' claims, Google's business practices with respect to Android and Google Play ("Play")

8   have increased competition, expanded access to mobile devices, and facilitated an explosion of

9   app development that has benefited consumers and developers.  Plaintiffs ignore these benefits,

10  and instead argue that Play is akin to a "payment processor," failing to account for the incredible

11  value it provides to billions of users.  But even accepting Plaintiffs' liability theory, the focus at

12  class certification is whether Plaintiffs have common evidence that can identify which (if any)

13  class members suffered antitrust impact as a result of Google's conduct.  They do not.

14      Plaintiffs seek to certify a class of consumers that purchased software applications

15  ("apps"), subscriptions, and in-app purchases ("IAPs") from developers.  They claim Google's

16  conduct resulted in higher service fees, and that developers passed through those fees by raising

17  prices for *all* consumers.  Plaintiffs rest this theory entirely on their expert, Dr. Hal Singer, who

18  opines that the laws of economics predict that ***all*** developers would change prices in response to

19  changes in Google's service fee.  But Dr. Singer cannot reconcile his theoretical formulas with

20  real-world evidence showing that pass-through of the service fee is a rare exception, not the rule.

21  When Google has lowered its service fees in the past, ████████████████████████████

22  Dr. Singer has no sound explanation for why the data resoundingly contradict his theory.

23      These data show that Plaintiffs cannot assume that the developer of each app would set

24  lower prices if Google charged lower service fees.  Plaintiffs must prove whether developers

25  would have reduced prices for each of the approximately ██████ unique apps involved in

26  purchases by more than ███████ putative class members.  After all, roughly ████████ of those

27  consumers, or ████, only made purchases from one app.  If that app's developer did not pass

28  through any service fees, then those millions of consumers were not injured.  That is why pass-

1    through must be proven for each app to identify whether each consumer was injured.

2          Pass-through depends on facts that vary by app: *e.g.*, the developer's marginal costs,

3    pricing strategy, and competitive conditions.  Dr. Singer concedes he has no model to estimate or

4    account for these variables, meaning Plaintiffs would have to conduct app-by-app analyses for

5    hundreds of thousands of different apps to identify any consumers who were injured.  Courts

6    regularly deny certification where impact depends on such an individualized question.  And that

7    would not be the only one.  Because Google has responded to competition by reducing service

8    fees for some developers but not others, a "mini-trial" also would be necessary to determine

9    whether a developer would have been subject to a lower service fee in the but-for world.

10         Plaintiffs' alternative Play Points theory fares no better.  Plaintiffs claim that, in the but-

11   for world, Google would have increased rewards in its Play Points loyalty program.  However,

12   ███████████████████████████████████████████ Thus, to prove which consumers suffered

13   antitrust impact under this Play Points theory, Plaintiffs must prove which consumers would have

14   made a different decision to enroll and use points in the but-for world.  Dr. Singer concedes that

15   he has no model to determine what each consumer would have done regarding Play Points, which

16   means Plaintiffs would need to prove that fact consumer by consumer.

17         Plaintiffs' motion fails for additional reasons.  *First*, many consumers benefit from the

18   business model Plaintiffs have challenged, and Plaintiffs have no common method of proving

19   whether a particular consumer would have been better off with or without that model.  *Second*, an

20   agreement between Plaintiffs' counsel and the State AGs creates financial conflicts and dual

21   loyalties that prevent Plaintiffs' counsel from adequately representing the proposed class.

22   *Finally*, Plaintiffs have not met the standards to certify an injunctive relief class that includes

23   consumers who never made any purchases in Play because they cannot show that an injunction

24   would be appropriate for all class members.  They have not specified the injunction they seek, nor

25   shown that an injunction is needed to remedy any harm to consumers who have benefited from

26   Play without paying a cent.  If anything, issuing an injunction requiring Google to change its

27   business model would harm consumers who benefit from Play without paying anything.

28         The Court should deny Plaintiffs' motion for class certification.

1

**BACKGROUND**

2   **I.    FACTS RELEVANT TO CLASS CERTIFICATION**

3        **A.    Google Play**

4        Play is a platform that facilitates transactions between consumers and developers.

5   Declaration of Sujal Shah, Ex. A (Expert Report of Dr. Michelle Burtis ("Burtis")) ¶ 59.

6   Developers offer, and consumers find and download, apps for Android devices through Play. *Id.*

7   As of May 5, 2021, there were over 4 million apps listed in Play with widely differentiated

8   functions, from games to productivity to entertainment to dating to tools.  Games are also highly

9   differentiated, ranging from casual puzzle games to complex role-playing games that demand

10  considerable memory and graphics capabilities. *Id.* ¶ 157.  Developers choose the category in

11  which to list their apps on Play, and apps in each category are highly varied. *Id.* ¶ 158.

12       Developers have many options for monetizing apps distributed on Play, including selling

13  the app ("paid app"), selling a subscription to access content in the app ("subscription app"),

14  selling digital content in the app ("IAP app"), or showing ads in the app. *Id.* ¶ 53.  Roughly 90%

15  of apps are completely free, meaning they are free to download and do not offer IAP or

16  subscriptions (though they may display ads). *Id.* Ex. 1.  ████████████████████████

17  ████████████████████████████████████████  *Id.* Ex. 22.  Most developers that offer

18  IAPs or subscriptions adopt a "freemium" model in which consumers can download and use an

19  app for free, with the option to purchase a subscription or IAP for additional functionality. *Id.*

20  ¶¶ 54–56.  During the class period, ████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████  *See id.* Ex. 22.

23       **B.    Google Play's Business Model**

24       Besides a one-time $25 fee, which Plaintiffs do not challenge, Google does not charge

25  developers anything to list or distribute apps on Play. *Id.* ¶ 60 & n.39.  Instead, Google monetizes

26  Play in part by charging a service fee on sales of paid apps, subscriptions, and IAPs.  Google does

27  not charge the developer a service fee unless the developer makes money; Google's service fee is

28  a percentage of the revenue ("consumer spend") generated by these sales. *Id.* ¶ 62.  This is a

common business model employed by a number of Google's competitors including, for example, Apple, Samsung, Amazon, Steam, and Microsoft Xbox. *Id.* Ex. 28.

Nearly all consumer spend by U.S. consumers—███—is on subscriptions and IAP, not paid apps. *Id.* Ex. 4. Play's Payments Policy requires developers selling subscriptions and/or IAPs in apps distributed through Play to use Google Play's billing system. This ensures that consumers have a safe, trusted, and secure billing system and that Google can efficiently collect fees for the value Play provides, which includes distribution to nearly 3 billion users; protection from malware and other unwanted apps; developer tools to launch and grow apps; and user tools to manage purchases, subscriptions, and parental controls. Shah Decl., Ex. J ("Feng Dep."), at 62:11–21, 113:18–114:24.

Google's service fees have changed over time, and it has "moved beyond a 'one size fits all' service fee model." Burtis n.131. Some developers pay a 30% fee, which for a long time was industry standard. *Id.* n.55. Certain developers are eligible for programs that have service fees at ███████████. *Id.* ¶ 84. ███████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████ In January 2018, Google reduced its service fee for subscriptions after the first year to 15%, and in January 2022, reduced the service fee for all subscriptions to 15%. *Id.* ¶ 71. In July 2021, Google reduced its service fee for the first $1 million in annual developer earnings to 15%. *Id.*

### C.   The Putative Consumer Classes

During the class period,[1] over ███████ putative class members purchased a paid app, subscription, and/or IAP from over ███████ unique apps. Declaration of Michelle Burtis, Ex. A (Burtis Rev. Ex. 20).[2] Roughly ███████ putative class members only made purchases from one app during the class period, and ███████ only made a ***single purchase*** during the class period. *Id.*, Ex. B (Burtis Rev. Ex. 21); *id.*, Ex. D (Burtis Rev. Ex. 24). More than █

---

[1] Although Plaintiffs' class period goes to the present, Google's data production only goes through July 2021. Unless otherwise noted, "class period" refers to August 2016 to July 3, 2021.
[2] These numbers may be overstated because they refer to distinct consumer IDs in Google's databases, and a consumer may have more than one consumer ID. Burtis n.102.

████ putative class members ████ spent *less than $5* during the class period, and more than half the putative class spent less than ██. *Id.*, Ex. C (Burtis Rev. Ex. 23).

There are also millions of Android device users that do not purchase any paid apps, subscriptions, or IAPs. From 2016 to 2021, there were an estimated 108 to 131 million Android smartphone users in the United States.[3] During that time, only approximately ████ U.S. consumers purchased a paid app, subscription, and/or IAP through Play. Burtis Ex. 20.[4]

### D.   Fees and Prices

Developers, not Google, set the prices for paid apps, subscriptions, and IAP they sell through Play.[5] As explained in more detail below, whether a developer would choose to lower its price in response to a lower service fee depends on a number of factors, including the developer's marginal costs, focal point pricing, the competition faced by the developer, and other idiosyncratic factors. *See* Burtis ¶¶ 142–56. Google's service fee may not affect how a developer sets prices. For example, a number of named Developer Plaintiffs testified that ████ ████ *E.g.*, Shah Decl., Ex. B ("Ellis Dep.") at 256:9–22 (LittleHoots); *id.*, Ex. C ("Scalise Dep.") at 212:9–214:11 (Rescue Pets); *id.*, Ex. D ("Czeslawski Dep.") at 306:4–307:3 (PSB).

Notably, real-world data show that when Google reduced service fees for certain developers, ████ For individual items (SKUs) sold by developers subject to a reduction in the service fee, ████ ████ Burtis ¶ 176. Executives of several Developer Plaintiffs' class representatives testified ████ ████. Scalise Dep. at 214:12–24 (Rescue Pets); Czeslawski Dep. at 315:17–316:6 (PSB); Ellis Dep. at 265:21–266:4 (LittleHoots).

### E.   Play Points

Google introduced a rewards program, Play Points, in the U.S. in November 2019. Burtis

---

[3] https://www.statista.com/statistics/232786/forecast-of-andnioid-users-in-the-us/.
[4] This figure overstates the number of consumers that made a purchase because it is based on distinct consumer IDs and not individual consumers. *See* n.2, above.
[5] For most of the class period, prices ranged from a minimum $0.99 to a maximum $400 price. Play recently changed the minimum price allowed to $0.05. Burtis n.33.

¶ 352.  Consumers must register for the program and earn "loyalty points" based on purchases.  *Id*. ¶¶ 352–53.  Play Points can be redeemed for Play Credits, to purchase items in Play, or redeemed for special IAPs.  *Id*. ¶ 352.  From November 2019 through 2021, ████████ of U.S. consumers registered for Play Points.  *Id*. ¶ 354.  From the launch of the program through July 3, 2021, no more than ██████████████ of U.S. consumers have redeemed Play Points, either by using points to purchase an item or exchanging points for Play Credits.  *Id*. ¶ 355.

## II.  EXPERT ANALYSIS OF DR. MICHELLE BURTIS

Accounting for these and other facts explained below, Google's expert, Dr. Michelle Burtis, opines that individual analysis of impact is necessary for the following reasons:

- Whether any developer would lower prices to consumers in response to a lower service fee requires an individualized analysis considering a host of factors.  *Id*. ¶¶ 23–25.
- Dr. Singer's opinion that pass-through would be universal is "verifiably wrong" because when Google reduced service fees, ████████████████████████████  *Id*. ¶ 29.
- Google would not uniformly reduce service fees in the but-for world, and determining which apps would be subject to lower rates requires an individual analysis.  *Id*. ¶¶ 11–20.
- Not all consumers sign up for Play Points, and ██████████████████████████, so proof of an injury from a reduction in Play Points requires individual proof of whether each consumer would have signed up and used those points.  *Id*. ¶¶ 36.
- Many putative class members benefited from the challenged conduct by obtaining free apps and secure devices; an individualized analysis would be required to determine whether each consumer would have been better off in the but-for world.  *Id*. ¶¶ 37, 40.

Based on this evidence, Dr. Burtis concludes that Plaintiffs cannot rely on common evidence to show that all or nearly all class members were impacted.

## LEGAL STANDARD

Plaintiffs must prove by a preponderance of the evidence that their proposed classes satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, as well as Rule 23(b)(2) and (b)(3).  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–65 (9th Cir. 2022) (en banc).  This "rigorous analysis" will "[f]requently . . . overlap with the merits."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  "[W]here necessary," courts may "resolv[e] expert disputes" to determine whether Rule 23's requirements are met.  *Olean*, 31 F.4th at 666 (alteration and quotation marks omitted).

Rule 23(b)(3) requires Plaintiffs to show that common questions "are more prevalent or more important than the . . . individual issues." *Id.* at 664 (quotation marks omitted). This requires proof that "essential elements of the cause of action, such as . . . an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666 (quotation marks omitted). Antitrust impact—that is, "the fact of damage that results from a violation of the antitrust laws"—is "critically important for . . . Rule 23(b)(3)'s predominance requirement." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 565–66 (N.D. Cal. 2013) (quotation marks omitted).

Class certification is inappropriate when "the need to identify uninjured class members will predominate and render an adjudication unmanageable," such as when plaintiffs propose "no further way—short of full-blown, individual trials"—to determine whether class members were injured. *Olean*, 31 F.4th at 669 n.13 (quotation marks omitted). Moreover, "where injury-in-fact is a required element of a claim, as it is in an antitrust action, a class cannot be certified based on an expectation that the defendant will have no opportunity to press at trial genuine challenges to allegations of injury-in-fact." *Id.* at 669 (citation omitted). "When a class is defined so broadly as to include a great number of members who for some reason could not have been harmed . . . the class is defined too broadly to permit certification." *Id.* at n.14 (quotation marks omitted). Indeed, the Supreme Court has held that "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). This Court must thus "determine whether individualized inquiries into this standing issue would predominate over common questions." *Olean*, 31 F.4th at 668 n.12.

To certify a class seeking an injunction under Rule 23(b)(2), plaintiffs must show that "a single injunction . . . would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. Plaintiffs must describe the "general contours" of the relief they seek, and that relief must be "more specific than a bare" instruction "to follow the law." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quotation marks omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **ARGUMENT**

### I.   **PLAINTIFFS CANNOT DEMONSTRATE THAT ALL OR NEARLY ALL CLASS MEMBERS SUFFERED ANTITRUST IMPACT USING COMMON PROOF.**

As Plaintiffs acknowledge, "what really matters is whether the class can point to common proof that will establish antitrust injury . . . on a class wide basis." Mot. at 19 (quoting *In re Capacitors III*, 2018 WL 5980139, at *8 (N.D. Cal. 2008)).  But Plaintiffs have no common proof that developers would have passed through lower service fees in the but-for world—or that developers would have had lower service fees at all.  Nor do they have common proof of which consumers would have been injured under their Play Points theory.  That is fatal to class certification because, as the Ninth Circuit noted in *Olean*, courts have "held that Rule 23(b)(3)'s predominance requirement is not satisfied when the need to identify uninjured class members will predominate." 31 F.4th at 669 n.13 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869 (Rail Freight II)*, 934 F.3d 619, 625 (D.C. Cir. 2019) and *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53–54 (1st Cir. 2018)).  Plaintiffs also fail to account for the benefits many class members received from Google's conduct.  Finally, because Plaintiffs lack a common method for calculating damages, individual damages issues will predominate.

These problems are all amplified by Plaintiffs' decision to seek certification limited to consumers "in [17] U.S. states and territories," but not states whose State AGs are plaintiffs. Mot. at i & 3.  Plaintiffs do not explain whether their proposed class is limited to current residents of the 17 states and territories or includes individuals who were present in one of those jurisdictions when they made a purchase, or something else.  Regardless, during the class period, millions of Play consumers likely moved between a class state and a non-class state.  An individual may have purchased nothing while a Georgia resident (in the class) but then moved to California (not in the class) and made a purchase there.  Thus, beyond the individualized inquiries discussed below, it will be necessary to consider each individual transaction and determine where the user resided or was located at the time of purchase to determine if it is part of the claim. Plaintiffs do not propose any method for sustaining their burden to make this showing with common proof.

1

2

3

**A.      Plaintiffs Have No Common Proof of Pass-Through.**

        **1.      Individual Issues Predominate Because Pass-Through Requires An App-By-App Analysis Not Susceptible To Common Proof.**

4

5

6

7

8

9

10

11

12

13

14

15

      Plaintiffs' main theory of antitrust impact depends on "pass-through from developers." Mot. at 12.  As the Supreme Court has explained, if the developer of an app did not pass on service fees by raising prices, then a consumer of that app was not injured.  *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1523 (2019) (no damages where "consumers would pay the same retail price regardless of whether Apple's commission was 10 percent or 30 percent").  Approximately ▓▓▓▓▓ consumers—▓▓ of the proposed class—made purchases involving one app.  Burtis Decl., Ex. B (Burtis Rev. Ex. 23).  These consumers were not injured if the developer of the app did not pass-through any allegedly inflated service fees through higher prices.  Plaintiffs lack common proof of pass-through needed "to identify uninjured class members."  *Olean*, 31 F.3d at 669 n.13.  Plaintiffs' proof of impact consists entirely of expert testimony from Dr. Singer, Mot. at 12–13, which is unreliable and inadmissible for the reasons explained in Google's *Daubert* motion, ECF No. 282.

16

17

18

19

20

21

22

23

24

25

26

      Regardless, unlike *Olean*, this is not a case where a defendant merely disputes whether the factfinder should find a plaintiffs' expert "persuasive[]" or "unpersuasive."  31 F.4th at 667, 678. The problem here is that Plaintiffs' expert evidence is not "capable of resolving a class-wide question in one stroke," an issue that *Olean* directs district courts to resolve.  *Id.* at 666.  Dr. Singer's opinion is based on a theoretical model that contradicts real-world data that pass-through was rare.  The only analysis of actual service fee and price data in the record (by Google's expert Dr. Burtis) shows that when Google reduced service fees for many transactions in 2018, 2021, and 2022, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  *See* Burtis ¶ 103, Fig. 13.  An analysis of more limited data by the Developer Plaintiffs' expert puts the percentage of apps that pass through any amount of lower costs to consumers at ▓▓▓▓.  *Id.* at 291 n.348.

27

28

      Evidence that pass-through was ▓▓▓▓ shows that pass-through must be ***proven*** for each app, not assumed for all apps.  Proof of pass-through is "more complex" because it "must account

for the actions of innocent intermediaries who allegedly passed on the overcharge." *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 499 (N.D. Cal. 2008). This can make "the predominance standard more difficult to meet." 6 Newberg on Class Actions § 20:53 (5th ed.); *cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977) (noting "difficulties that have been encountered" with "statistical techniques used to estimate" pass-through). The sheer number of unique app transactions involved here amplifies the challenge. Whether a developer would have passed through a lower service fee to consumers in the but-for world requires analyzing pass-through for each of the roughly ▇▇▇▇ unique apps involved in purchases by putative class members. Thus, in order "to identify uninjured class members" without "render[ing] an adjudication unmanageable," *Olean*, 31 F.4th at 669 n.13, the factfinder must have a method of proving pass-through for every one of the hundreds of thousands of apps involved in transactions by putative class members.

Plaintiffs have no such model. As the real-world data confirms, whether a developer would pass through a lower service fee depends on multiple variables—marginal costs, focal point pricing, competitive conditions, and other idiosyncratic factors—that defy common proof. That app-by-app analysis of pass-through is not "susceptible to generalized, class-wide proof" because Plaintiffs "will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Thus, "the only way to fully assess pass-through in this action would be" through "thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment." *GPU*, 253 F.R.D. at 505.

**Marginal costs.** In the standard economic model that Dr. Singer identifies for how an increase in service fees would affect a developer's price, any effect depends on the developer's marginal cost. Shah Decl., Ex. G ("Singer Dep.") at 105:8–106:3, 107:23–109:14; *id.*, Ex. H (Expert Report of Dr. Hal Singer ("Singer")) ¶ 225 & n.495. Thus, if a developer's marginal cost of producing an additional IAP is zero, then according to Dr. Singer, "prices would not adjust" and there would be no pass-through—even if a developer paid a lower service fee. Singer Dep. at 109:15–110:3. Economic literature recognizes that many digital goods have zero marginal costs. Burtis ¶¶ 142–43. Dr. Singer's report relies on an article stating that the "replication cost of

digital goods is zero." Singer Dep. at 95:22–98:19.[6]  And Dr. Singer testified that the "150th

sword" purchased in a videogame "doesn't cost any more to replicate."  Singer Dep. at 98:10–19.

Thus, under Dr. Singer's economic model, pass-through depends on marginal costs, but

Plaintiffs have no common proof of each developer's marginal costs for each app.  As Dr. Singer

testified, "the marginal cost to a developer of supplying an additional in-app purchase could vary

from developer to developer."  Singer Dep. at 95:15–18.  Dr. Singer did not try to estimate any

developer's marginal costs, *id.* at 90:20–91:2, 91:22–92:7, or use the standard economic model

that depends on them.  *Id.* at 382:6–15.  Instead, he used a simple ratio that "doesn't actually

depend on what the marginal cost of the developer is": the quantity of an app's transactions

divided by the quantity of transactions in the category in which the developer lists the app in Play.

*Id.* at 91:3–8; *see id.* at 190:20–192:3 (testifying that the "beauty" of this formula is that "we

don't need to estimate the marginal costs").  Dr. Singer's model simply ignores the individualized

issues specific to marginal costs that must be examined to determine whether a developer would

have raised prices and thus whether a consumer who purchased from that developer was injured.

**Focal point pricing.**  Proof of pass-through also requires an inquiry into whether the

developer of each app uses "focal point pricing," a "well-established concept in economics" in

which firms set prices ending in "99" cents.  *Id.* at 197:19–198:4; Burtis ¶ 149.  The prices for

some ▮▮▮ of U.S. consumers' retail app transactions ended in "99," and over ▮▮▮ developers

used prices ending in "99" during the class period.  Burtis ¶ 149, Fig. 7; *id.* at Table 9; *cf. In re

Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 (N.D. Cal. 2022) ("overwhelming

evidence suggests that developers would choose to price their apps at focal points ending in 99

cents").  Pass-through is unprofitable where "the reduction from one" focal price point "to the

next would be so large that the developer would lose profits."  Burtis ¶ 150.

Dr. Singer's formula does not account for focal point pricing.  Singer Dep. at 205:19–

206:8.  This alone is grounds for denying certification.  *In re Lithium Ion Batteries Antitrust

Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. 2018) (denying certification where expert failed to

---

[6] Shah Decl., Ex. E (Avi Goldfarb & Catherine Tucker, *Digital Economics*, 57 J. Econ. Lit. 3, 12 (2019) (DX 335)).

"adequately account for the effects of focal point pricing"); *In re Optical Disk Drive Antitrust Litig.* ("*ODD*"), 303 F.R.D. 311, 325 (N.D. Cal. 2014) (same where expert did not address "the common practice in the industry of selling products costing in the hundreds of dollars at prices just under the next $100 mark"); *Apple iPhone*, 2022 WL 1284104, at *8 (same in part because "focal pricing" showed that expert's model did not reliably "determin[e] but-for pricing").

Plaintiffs claim to "have established a record demonstrating that focal-point pricing is not integral to developers' pricing in a but-for world" and "is unnecessary to include in a pricing model." Mot. at 23 n.16 (citing Shah Decl., Ex. I (Expert Reply Report of Dr. Hal Singer ("Singer Reply")) ¶¶ 26–30). But Dr. Singer admitted the opposite—that "focal point pricing is an important consideration here," Singer Dep. at 202:2–7, and the portion of Dr. Singer's Reply Report cited by Plaintiffs only underscores the need for an app-by-app inquiry. There, Dr. Singer speculates that developers "*could*" end their prices in "9" rather than "99", and hypothesizes how departing from focal point pricing *could* be profitable under certain assumptions. Singer Reply ¶¶ 29–30 (emphasis added). But, yet again, determining whether any developer *would* do so in the but-for world requires data about each app.[7]

**Competitive conditions.** A developer's price also may depend on the competition it faces, which varies from app to app. Burtis ¶ 155–60. Dr. Singer agrees that "competition among developers makes their pricing interdependent" and that "the prices that developers charge in the but-for world could depend on what their competitors charge." Singer Reply ¶ 118; Singer Dep. at 167:3–6; *see also* Scalise Dep. at 212:9–19 (███████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████). Yet Plaintiffs have no common method to account for how the varied competition faced by hundreds of thousands of different apps affects how developers set prices for those apps. Given Dr. Singer's admitted failure to "put forth a model . . . to determine which apps in each category are complements and which are substitutes," Singer Dep. 159:15–25, Dr. Singer's method cannot account for variations in

---

[7] Google required developers to charge at least $.99, Mot. at 22, but that restriction applies to 17% of U.S. consumer transactions, not the 80% of other transactions that also ended in "99."

competition that he concedes affect pass-through. That is fatal to Plaintiffs' certification bid. *See Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) (denying certification where "the but-for-price-what a customer would pay" depended on variable "competitive dynamics"); *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 1993 WL 527928, at *5 (E.D. Mich. 1993) (same where plaintiffs did not "account the varying markets for dry cleaning and laundry supplies"); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (same where sales took place in a "diversity of markets").

**Other idiosyncratic factors.** There are many other reasons why a developer may not pass through a service fee reduction. For example, if the developer would have invested savings from reduced service fees in improving or marketing its app instead of reducing prices, the app's consumer was not injured. Although Dr. Singer testified that "standard economics would give developers an incentive to respond to lower service fees by reducing prices *and* improving quality," he "doesn't measure whether any developer would actually invest, or how much they would invest, in improving the quality of their app in the but-for world." Singer Dep. at. 53:24–54:3 (emphasis added), 56:14–57:5. A developer may also simply ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Scalise Dep. at 207:14–17. Or the developer may think ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Czeslawski Dep. at 316:7–317:5 (PSB did not lower prices following a service fee reduction because "[w]e still feel this is a fair price for our app"); Ellis Dep. at 241:7–13 (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮). Plaintiffs have no method other than thousands of mini-trials to prove which developers would have actually reduced prices, and for which products, in response to lower service fees.[8]

### 2. Dr. Singer's Pass-Through Model Is Based On Theoretical Assumptions Instead Of Analyses Typically Relied Upon By Other Courts.

Plaintiffs insist they have common proof of impact from pass-through because "there are

---

[8] *Olean* directs that a class not be "defined so broadly as to include a great number" of uninjured members, which is dispositive here. 31 F.4th at 669 n.14. It likewise follows that Plaintiffs cannot demonstrate, through common evidence, injury in fact to all class members, or that no more than a *de minimis* number of class members are uninjured. *See Rail Freight II*, F.3d at 624–625; *Asacol*, 907 F.3d at 53–54.

1    well-accepted econometric techniques—some of which Dr. Singer utilized in this case—for

2    demonstrating 'antitrust impact in markets with individualized differences among purchasers.'"

3    Mot. at 22 (quoting *Olean*, 31 F.4th at 674).  This is misleading.  Although Dr. Singer "typically"

4    analyzes pass-through by "regressing retail price changes on wholesale price changes," Singer

5    Dep. at 134:25–135:6, he did not run any regression to calculate pass-through rates here, *id.* at

6    164:18–165:12.  Instead, Dr. Singer employed a formula that always predicts pass-through and

7    thus "assumes the very proposition that the [Plaintiffs] are now offering it, in part, to show."

8    *ODD*, 303 F.R.D. at 321 (denying class certification).  As Dr. Singer testified, his pass-through

9    formula of 100 minus the ratio of an app's transactions to transactions in the category the

10   developer chose "will always produce a pass-through rate" so long as an app does not account for

11   100% of a given category, which no app does.  Singer Dep. at 181:23–183:7.

12         This case is therefore unlike the cases cited by Plaintiffs where experts analyzed the

13   effects of price-fixing using regressions.[9]  For example, in *Olean*, plaintiffs' experts "performed a

14   separate regression analysis to determine if [the alleged] overcharges passed through to the"

15   plaintiffs.  31 F.4th at 683.  Such regressions, if properly conducted, may "control for the effects

16   of the differences among class members and isolate the impact of the alleged antitrust violations

17   on the prices paid by class members."  *Id.* at 677.[10]  Dr. Singer ran no such regression.

18         Instead, Dr. Singer claims that the conclusion that "all or almost all developers would pass

19   through to consumers at least a portion of any savings from" reduced service fees "flows from the

20   elementary economic principle that prices depend on costs."  Singer Reply ¶ 70; *see* Singer ¶ 223.

21

22   [9] *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 (10th Cir. 2014); *In re Vitamins
     Antitrust Litig.*, 209 F.R.D. 251, 266–67 (D.D.C. 2002); *Capacitors*, 2018 WL 5980139, at *6; *In*
23   *re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 421 (M.D. Fla. 2018); *In re TFT-
     LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 602–03 (N.D. Cal. 2010).
24   [10] Plaintiffs' cases are inapposite for additional reasons.  Two involved evidence from guilty pleas
     "showing that defendants themselves acknowledged that 'their collusion had a wide impact on
25   prices.'"  *Capacitors*, 2018 WL 5980139, at *8; *see also TFT-LCD*, 267 F.R.D. at 605 (citing
     guilty pleas).  *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468 (N.D. Cal. 2020), and *In re*
26   *Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12 (E.D.
     Pa. 2019), are distinguishable because they involved allegations that all consumers who would
27   have purchased lower-priced generic drugs rather than brand versions were harmed by the
     exclusion of the generic drugs from the market.  And defendants in *In re Mercedes-Benz Antitrust*
28   *Litig.*, 213 F.R.D. 180 (D.N.J. 2003), "were homogeneous, selling mass-produced luxury
     automobiles and providing essentially inter-changeable services."  *Id.* at 189.

1   But a *theory* of universal pass-through is not common proof.  *See GPU*, 253 F.R.D. at 496 (expert

2   "may not meet his burden by simply stating that 'economic theory' dictates that prices for retail

3   and wholesale purchases generally go up together"); *In re Flash Memory Antitrust Litig.*, 2010

4   WL 2332081, at *11 (N.D. Cal. 2010) (rejecting method based on "economic theory of pass-

5   through" because pass-through was "more complex than the theoretical model").

6       Plaintiffs' reliance on Dr. Singer's theory of universal pass-through is particularly

7   improper where real-world evidence shows that ▌▌▌▌▌▌▌▌▌▌▌  Unlike Dr. Burtis,

8   Dr. Singer has not done any analysis of pass-through using actual data on prices and service fees.

9   Singer Dep. at 141:18–142:17.  His failure to account for real-world data "casts doubt on whether

10  there was any pass-through at all," which is yet another well-accepted ground for denying

11  certification.  *See In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *12

12  (W.D. Mo. 2021) (rejecting pass-through theory because evidence showed that retailers

13  "maintained the same retail price" despite changes in their wholesale cost); *In re Digital Music

14  Antitrust Litig.*, 321 F.R.D. 64, 94 (S.D.N.Y. 2017) ("determining the correct pass-through would

15  require conducting separate inquiries for each [digital music service]" where evidence showed

16  that Walmart charged a uniform retail price, suggesting a zero pass-through rate for Walmart's

17  sales); *see also Olean*, 31 F.4th at 666 ("where necessary," district courts may "resolv[e] expert

18  disputes"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (similar).

19      Courts have so held in cases involving both Dr. Burtis and Dr. Singer.  *See Flash Memory*,

20  2010 WL 2332081, at *11 (denying certification where Dr. Burtis presented evidence that

21  "different retailers respond to cost changes in different ways, with some choosing not to pass-

22  through cost changes"); *In re Florida Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685

23  (S.D. Fla. 2012) (denying certification despite Dr. Singer's opinion that "pass through *should*

24  occur" because evidence showed direct purchasers "did not consistently pass on" price increases).

25      Dr. Singer asserts that the real-world data are not informative because Google reduced

26  service fees while engaged in the challenged conduct, which prohibited developers from

27  "steering" users to platforms other than Google Play using in-app communications.  Singer Reply

28  ¶ 100.  However, Dr. Singer has not conducted any empirical analysis of steering on real-world

1    pass-through rates.  Singer Dep. at 239:2–13, 240:2–241:1, 246:3–12.  Moreover, Dr. Singer

2    testified that there are "explanations for how pass-through would occur in the presence of the

3    anti-steering restraint," *id*. at 242:15–22, and that he "would expect pass-through regardless of the

4    anti-steering restrictions."  *Id*. at 242:23–244:3.[11]

5           Plaintiffs' reliance on unproven theories on steering cannot erase real-world data showing

6    that pass-through occurred in only ▮ of SKUs when Google reduced service fees.  As the

7    Supreme Court has explained, when it comes to pass-through, "in the real economic world rather

8    than an economist's hypothetical model, the latter's drastic simplifications generally must be

9    abandoned."  *Illinois Brick*, 431 U.S. at 742 (cleaned up).  Plaintiffs have no answer to real-world

10   evidence showing that prices did not change with service fees.  That evidence shows that pass-

11   through is not universal, but depends on multiple factors that vary from app to app.  The only way

12   for Plaintiffs to account for those variables for each app would be thousands of app-by-app mini-

13   trials that will overwhelm any common issues.  Indeed, while the need for individualized proof to

14   "identify *uninjured* class members" alone suffices to "render an adjudication unmanageable,"

15   class-wide adjudication is all the more improper where the rarity of any real-world correlation

16   between service fees and prices suggests that "individual trials" will be necessary to identify any

17   fraction of class members who actually *were* injured by pass-through.  *Olean*, 31 F.4th at 669

18   n.13 (emphasis added).

19          **B.    Individual Issues Predominate Because Not All Developers Would Be Subject**
             **To Lower Service Fees In The But-For World.**
20

21          Plaintiffs also cannot demonstrate predominance because they have no method of

22   common proof that all or nearly all developers would be subject to lower service fees in the but-

23   for world.  If developers would not have paid reduced service fees in the but-for world, there

24   would be no savings to pass through and no injury to consumers.  *See, e.g.*, *Flash Memory*, 2010

25   _____

     [11] An app-by-app analysis would be necessary even if more "steering" would have resulted in
26   more pass-through.  As Plaintiffs note, "developers are allowed to steer" in numerous ways,
     including by charging lower prices on platforms with lower fees.  Mot. at 22.  One would expect
27   all developers to do so if Dr. Singer were right that higher costs always result in higher prices.
     Singer Dep. at 224:8–24, 229:22–230:11; Burtis ¶ 169.  In reality, developers of apps such as
     Minecraft, iHeartMedia, and Pandora Plus charge the same price on their website as on Google
28   Play. Burtis ¶ 169.  Dr. Singer's examples of developers that do charge less on their website,
     Singer Reply ¶ 101, simply confirms the need for an app-by-app analysis.

1  WL 2332081, at *10–12 (indirect purchaser plaintiffs' failure to show common impact on direct

2  purchasers "alone" was sufficient to deny certification).  Because ███ of consumers purchased

3  from a single app, determining whether each app would have been subject to a lower service fee

4  rate is necessary to determine whether each consumer was injured.

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████

8  ███████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 ███████  Google has also reduced service fees in other targeted ways, such as reducing fees for

12 subscriptions.  Plaintiffs provide no reason why Google would change its strategy in the but-for

13 world and reduce service fees across the board to meet enhanced competition.  *Id.* ¶ 113.  That is

14 not the strategy that Google's competitors have used.  The Amazon Appstore offered developers

15 of 20 of the top 100 games in Japan lower service fees and incentives, and ████████████

16 ████████████████████████████████████████  *Id.* ¶¶ 119–20.

17      The fact that Google has reduced service fees to some developers shows that an app-by-

18 app analysis is required to determine which apps' service fees would be lower in the but-for

19 world.  "As a general matter, antitrust claims predicated on negotiated transactions, as opposed to

20 purchases based on list prices, often entail consideration of individualized proof of impact."

21 *Flash Memory*, 2010 WL 2332081, at *8 (denying certification where a few direct purchasers

22 comprised the bulk of sales and had "significant negotiating power"); *GPU*, 253 F.R.D. at 490–

23 491 (denying certification where many direct purchasers had significant bargaining power).

24      To prove how Google's targeted approach would affect each developer's service fee rate

25 in the but-for world, Plaintiffs would have to either marshal individualized proof for each

26 developer accounting for their value to the Play Store and their ability to transact elsewhere,

27 Burtis ¶¶ 232–36, or show that Google would abandon a targeted approach.  The former would

28 defeat predominance and the latter is missing from Plaintiffs' motion.  Dr. Singer simply uses

averages to calculate a "headline" rate for Google, and claims that Google's individual

negotiations would mechanically occur off of that rate.  Singer ¶¶ 258–59; Mot. at 11, 21.  Courts

have rejected that approach as an improper attempt to mask individualized issues.  *See Flash*

*Memory*, 2010 WL 2332081, at *12 (predominance not satisfied where expert's model failed to

take into account "individual variations" and looked only "at an average price trend").[12]

### C.    Plaintiffs' Play Points Model Is Not Common Proof Of Impact.

In one paragraph, Plaintiffs posit an alternative theory of impact: consumers allegedly

were injured not because they paid too much but because Google paid them too little.  Without

the challenged conduct, Plaintiffs say, more competition would have led Google to "increase[e]

its Google Play Points loyalty program."  Mot. at 13.  Plaintiffs still have no common method of

"identify[ing] uninjured class members" because they cannot show which apps and consumers

would have joined the Play Points program in the but-for world.  *Olean*, 31 F.3d at 669 n.13.

██████████████ of U.S. consumers enrolled in Play Points and ████████ redeemed

Play Points.  Burtis Rep. ¶ 358; Singer Reply ¶ 98; Singer Dep. at 288:11–16, 289:17–23.  The

millions of consumers who did not enroll were not injured by any reduced Play Points offerings

unless, in the but-for world, they would have signed up and redeemed Points.  Plaintiffs have no

method short of mini-trials to prove which consumers would have done so.  Importantly, Dr.

Singer has not "identified any model to determine which users would have signed up for [P]lay

[P]oints in the but-for world," Singer Dep. at 295:5–20, or that can determine which of the

putative class members "would have signed up for [P]lay [P]oints and who would have used

them."  *Id.* at 297:8–21; *see id.* at 296:6–19.  When asked whether "every member of the putative

class would have signed up for the [P]lay [P]oints program and used [P]lay [P]oints," Dr. Singer

said that was a "fair assumption."  *Id.* at 298:22–299:10.  But assumptions are not common proof.

Dr. Singer claims that if Google had offered Play Points equivalent on average to about

---

[12] Plaintiffs argue that courts have accepted experts' reliance on averages, Mot. at 23, but the experts in the cases they cite applied a regression model to actual data to model impact on consumer prices.  *See D&M Farms v. Birdsong Corp.*, 2020 WL 7074140, at *8 (E.D. Va. 2020); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613 (N.D. Cal. 2009).  It is one thing to use a regression to show an average effect on prices as experts in these cases did.  It is another to assume an average effect as Dr. Singer does in this case.

1  ███████ of a consumer's transaction, then all members of the class would have signed up for

2  them. *Id.* at 296:6–19, 297:8–21.  This just assumes away the need to determine the amount of

3  Play Points each consumer would have earned, and whether that amount would have motivated

4  them to sign up.  Different consumers might value the same amount of Play Points differently—

5  just as, according to Dr. Singer, "[a] $10 gift card for Chick-Fil-A" or "a jar of change

6  accumulating in the closet might be worth more to some consumers than others."  Singer Reply at

7  ¶ 99.  Over ███████ class members ████ spent less than $5 on Play.  Burtis Decl., Ex. C

8  (Burtis Rev. Ex. 23).  Dr. Singer has not even tried to show that points equal to ████ of that

9  consumer spend—less than ████—would have been sufficient to motivate *all* of these millions

10  of consumers to sign up for Play Points when only a fraction did so in the real world.[13]

11          **D.**    **Many Class Members May Be Worse Off In Plaintiffs' But-For World.**

12       A class also cannot be certified where many members of the putative class benefited from

13  the challenged conduct such that plaintiffs' but-for world would have created "winners and

14  losers."  If a plaintiff cannot "account[] or control[] for the benefits that many class members

15  receive from the exclusionary conduct on a class-wide basis," then "the Court cannot conclude

16  that Plaintiffs have shown that common evidence is available to show class-wide impact."  *Allied*

17  *Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 169 (C.D. Cal. 2007).

18       Consumers have access to millions of apps that are completely free and can enjoy

19  "freemium" apps without any upfront payment (or any payment at all).  They pay nothing to

20  download, for example, Facebook, Uber, Airbnb, banking apps, or government agency apps.

21  Rather than charge for these apps, and many other free apps, Google primarily supports Play with

22  service fees on IAP and subscriptions, which account for ████ of Play's fees for the valuable

23  services that Play provides.  Burtis ¶ 57.  According to Plaintiffs, however, in the but-for world,

24  developers would pay none of this revenue because they would use their own billing systems.  *Id.*

25  ¶ 269; Singer Dep. at 309:4–310:7.  In other words, Plaintiffs' but-for world would ██████████

26  ████████████████████████████████  Shah Decl., Ex. F ("Burtis Dep.") at 307:6–17.

27

28  [13] The ████ figure is also irrelevant because it reflects an estimate that Dr. Singer derived using "the sum of all promotions," not just Play Points.  Singer ¶ 253.

In that scenario, Google would have incentives to design its ecosystem differently, leaving some consumers who benefit from Google's current system worse off.  Dr. Singer agrees that one "should assume that Google is a profit-maximizing firm" that will take lawful steps to earn some of the profits that it would lose in the but-for world.  Singer Dep. at 300:15–302:21.  That is why, as Dr. Burtis explains, ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████  Dr. Burtis also explains that, in the but-for world, consumers may lose access to valuable features.  For example, in a world without existing Android security standards, security-conscious consumers would be worse off because they would face costs to keep their data and devices secure.  Burtis ¶¶ 190–96.  Even if the impact of these changes were small, they could cause net harm to consumers—such as the ██████ of class members who spent less than $5 during the class period and suffered (at most) █████ in damages, or the █████████ of class members that spent less than $50 and suffered (at most) █████ in damages.[14]

In short, while Play has enabled millions of consumers to obtain safe and secure free apps, some consumers may have paid more and received less in Plaintiffs' but-for world.  "The result is to shuffle the position of [consumers] in the but-for world in a manner that defies predictability with common evidence."  *Allied Orthopedic*, 247 F.R.D. at 169; *see also Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 23–24 (D.D.C. 2012) (denying certification when individualized inquiry needed to determine "net injury"); *Digital Music*, 321 F.R.D. at 95 (same).

Dr. Singer claims Google would not switch business models because the availability of free apps benefits the Android ecosystem in ways Google would not sacrifice if it faced more competition.  Singer Reply ¶ 54.  Setting aside this concession that Google's current model

---

[14] Maximum alleged damages in this example is the difference between a 30% fee and a 14.8% fee and assumes (contrary to fact) 100% pass through.  E.g., ($5 x 0.3) – ($5 x 0.148) = $0.75.

benefits consumers and developers, internal Google documents show that ██████████
████████████████████████████████████████████████████ Burtis ¶ 269

n.321.  Moreover, the State AGs allege that Google should charge service fees to all developers,

including those that pay no such fees today, Plaintiff States' Complaint, ECF No. 188, ¶ 189, and

Plaintiffs' counsel are seeking fees for the success of those claims.  *See* Section II, below.

Dr. Singer also notes that while Google ████████████████████████████

██████████   Singer Reply ¶ 54.  But Plaintiffs are attacking Google's current business model.

Google believes its business model is lawful and the best one for consumers and developers, ██

████████████████████████████████████   Further, the question here is whether

Google would have adopted an alternative if it was ***forbidden*** from pursuing its current strategy

or charging a service fee on IAPs that go through another billing system.  ██████████████

████████████████████████████████ Burtis ¶ 197.[15]

Plaintiffs' inability to "account[] or control[] for the benefits that many class members

receive from the exclusionary conduct on a class-wide basis" precludes a finding that "common

evidence is available to show class-wide impact."  *Allied Orthopedic*, 247 F.R.D. at 169.  For

these same reasons, there are "fundamental conflicts of interest . . . among the proposed class

members," making certification "inappropriate."  *Id.* at 177.

**E.  Plaintiffs Have No Common Method Of Calculating Damages.**

The proposed class also cannot be certified because "the complexity of damages

calculations . . . defeat[s] predominance."  *Olean*, 31 F.4th at 681.  While individualized damages

do not alone defeat certification, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013),

Plaintiffs' damages model must establish that "damages are capable of measurement on a

classwide basis."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  It does not.  Because

Plaintiffs' damages are based on allegedly high service fees that are passed through to consumers,

---

[15] Plaintiffs also insist that Google would not change its business model because it would be
profitable with the but-for service fee rate.  Mot. at 12; Singer Reply ¶ 50.  But neither Plaintiffs
nor Dr. Singer explain why a developer would choose to use Google Play's billing service and
pay ██████ if, as Plaintiffs claim, the developer could use its own billing system and pay Google
nothing.  Nor do Plaintiffs address the fact that ████████████████████████████
███████████████████████ Burtis Dep. at 308:9–24.

Mot. at 13, Plaintiffs have no common method of calculating class-wide damages for the same reasons they lack common proof of impact. *See* pp. 8–22, above; Burtis ¶ 100 n.110. Plaintiffs cannot show that savings to consumers would have been "fairly uniform" in the but-for world, *Earl v. Boeing Co.*, 21 F.4th 895, 899 (5th Cir. 2021); instead, this Court will need to conduct "individualized mini-trials to determine each class member's damage award," *Olean*, 31 F.4th at 682 n.31. Indeed, what Dr. Singer calls the standard economic model shows that variations in developers' marginal costs can result in dramatic variations in damages calculations.[16]

## II. PLAINTIFFS' COUNSEL ARE NOT ADEQUATE BECAUSE THEIR JOINT PROSECUTION AGREEMENT CREATES CONFLICTS.

Under Rule 23(a)(4), class counsel are inadequate if they "have any conflicts of interest with other class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). This standard prohibits "even the appearance of divided loyalties of counsel." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (cleaned up). Here, Plaintiffs' counsel have direct conflicts with the proposed class because of their Joint Prosecution Agreement ("JPA") with the State AGs. Although Plaintiffs' counsel pled a nationwide class, they now seek to represent only consumers who are ***not*** residents of the party states in *State of Utah et al. v. Google LLC, et al.* Yet under the JPA, Plaintiffs' counsel continue to have a financial interest in the claims of consumers they no longer seek to represent because they can claim attorney's fees out of funds recovered by the State AGs. This arrangement creates improper incentives and dual loyalties that conflict with counsel's duty to the proposed class.

*First*, the JPA gives Plaintiffs' counsel financial interests that do not depend on a successful result for the class. Under the JPA, Plaintiffs' counsel can seek fees from "any recovery created by resolution of" the State AG claims for work performed while they "still represent[] clients with live claims in the case." ECF No.279-3, Ex. 1 (JPA), p. 3. Thus, unlike a traditional contingency in which counsel's fees depend on their client's recovery, under the JPA, counsel's ability to keep earning fees depends on the ***absence*** of a settlement providing a

---

[16] The standard model Dr. Singer identified in his report assumes a developer's total marginal costs are equal to marginal costs divided by (1 – service fee). Singer ¶ 225; Singer Dep. at 106:11–108:16. Each developer's marginal costs therefore directly affect the calculation of the upper limit on pass-through damages.

recovery for the proposed class.  This gives Plaintiffs' counsel an incentive to keep the class

claims alive as long as possible, warping counsel's evaluation of whether a settlement is in the

class's best interests.  The JPA therefore impermissibly "disjoin[s] the contingency financial

interests of the contracting representatives from the class." *Rodriguez v. W. Publ'g Corp.*, 563

F.3d 948, 959 (9th Cir. 2009).

      *Second*, the JPA gives Plaintiffs' counsel dual loyalties to the narrowed class and the four

named plaintiffs who do not reside in states within the narrowed class definition.[17]  Counsel

"cannot simultaneously represent a class and prosecute either individual or class claims against

the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs

or class members in the cases." *Lou v. Ma Labs., Inc.*, 2014 WL 68605, at *2 (N.D. Cal. 2014)

(finding counsel inadequate and denying class certification) (quoting 1 McLaughlin on Class

Actions 4:39 (10th ed.)).  This conflict precludes certification because a class "deserves to be

championed by its counsel unencumbered by their duties to other clients." *Id.*

      Plaintiffs have not identified any precedent approving an agreement giving class counsel

an interest in funds recovered by consumers who are represented, and whose claims are being

litigated, exclusively by State AGs.  *Compare In re Dynamic Random Access Memory (DRAM)*

*Antitrust Litig.*, 2013 WL 12387371, at *7 (N.D. Cal. 2013), *R. & R. adopted*, 2014 WL

12879521 (splitting common fund fee award among class counsel and State AGs who represented

the same consumers).  To the contrary, absent a gross imbalance in contributions to the litigation,

"if the third parties hire their own attorneys and appear in the litigation, the original claimant

cannot shift to them his attorney's fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 770 (9th

Cir. 1977); *see United States v. Tobias*, 935 F.2d 666, 668–69 (4th Cir. 1991) (similar).  The JPA

creates conflicts that make Plaintiffs' counsel inadequate to represent the class.

**III.   THE COURT CANNOT CERTIFY AN INJUNCTIVE RELIEF CLASS.**

      Plaintiffs' three perfunctory paragraphs cannot establish that "final injunctive relief or

---

[17] Plaintiffs Carr (Washington resident), Egerter (California resident), Palmer (Massachusetts resident); and Moglia (New York resident) cannot serve as class representatives because they are not in the proposed class. *Orr v. Shicker*, 953 F.3d 490, 499 (7th Cir. 2020).

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs' proposed injunctive relief class includes any person in 17 states or territories with an Android device "capable of accessing the Google Play Store"—regardless of whether they have made any purchases through Play. Mot. at i. The proposed injunctive relief class thus includes consumers who have not paid a cent for digital content in apps installed from Play.

*First*, Plaintiffs have not "described the general contours of an injunction that would provide relief to the whole class." *B.K.*, 922 F.3d at 972. Now-Circuit Judge Koh's decision denying certification of a 23(b)(2) class in *Grace v. Apple, Inc.*, 328 F.R.D. 320 (N.D. Cal. 2018), is instructive. There, "the only statement approaching a legal argument" in plaintiffs' motion was that "'[c]ertification under Rule 23(b)(2) is proper because Apple's wrongful conduct affected all Class members in the same way.'" *Id.* at 349. Here, the only sentence in Plaintiffs' motion containing an argument for an injunctive relief class is that "Google's conduct at issue is not specific to any consumer." Mot. at 24–25. In *Grace*, the plaintiffs made a "boilerplate request" for "'injunctive relief to remedy Apple's continuing wrongful conduct.'" 328 F.R.D. at 349–50. Here, Plaintiffs' motion says nothing about their requested injunction at all, and their complaint prays vaguely for an order "enjoining Defendants from monopolizing the Android Application Distribution Market" and "engaging in anticompetitive conduct." Plaintiffs' own authority holds that such conclusory treatment cannot warrant certifying a 23(b)(2) class. *See Suboxone*, 421 F. Supp. 3d at 70 (denying certification where plaintiffs "relegated their request for 23(b)(2) certification to a mere two paragraphs in their Motion and two more brief paragraphs in their reply brief"); *see also Williams v. Apple, Inc.*, 338 F.R.D. 629, 657 (N.D. Cal. 2021) (same given "Plaintiffs' failure to meaningfully analyze the injunctive class in their motion").

For the same reasons, Plaintiffs have failed to demonstrate that their request for injunctive relief predominates over the monetary relief sought, as required under Rule 23(b)(2). *See, e.g.*, *Ellis*, 657 F.3d at 986 ("Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." (quotation marks omitted)); *In re Paxil Litig.*, 218 F.R.D. 242, 247 (C.D. Cal. 2003) (denying certification under 23(b)(2) where "the vague description of the nature of the actions sought to be enjoined suggests that the value of the

1  injunctive relief requested is dwarfed by the value of the monetary damages requested").

2  *Second*, Plaintiffs have not shown that consumers who never paid for an app or IAP using

3  Play will be injured absent an injunction.  All class members "*must* stand to benefit" from an

4  injunction, and a Rule 23(b)(2) class cannot be certified "when injunctive relief is not proper for

5  every class member." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 & 148 (2d Cir. 2020).

6  Again, Plaintiffs' own authority is in accord.  *See Suboxone*, 421 F. Supp. 3d at 70 (denying

7  certification of 23(b)(2) class because "the proposed injunctive relief in the form of 'corrective

8  disclosures' will not benefit patients who no longer take Suboxone film").  Plaintiffs' inclusion of

9  consumers who have never purchased any app or made any IAP distinguishes this case from *In re*

10  *NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327 (N.D. Cal. 2013),

11  where "all class members . . . would potentially be subject to ongoing antitrust harms resulting

12  from the continued unauthorized use of their names, images, and likenesses." *Id.* at *7.

13  *Third*, the class representatives cannot adequately represent class members who have paid

14  nothing for apps or IAP and would be harmed by an injunction requiring Google to suspend

15  features of the Android and Play business model that has benefited them enormously at no cost.

16  Courts regularly deny certification of injunctive relief classes that include members who would be

17  harmed by the requested injunction.[18]  That rule prevents injunctive relief here because an

18  injunction eliminating Google's challenged conduct could harm consumers who have not paid for

19  apps or made IAPs by resulting in charges for free apps or changes in features of Play they value.

20  Plaintiffs' request to certify a class that would be harmed by the relief they request underscores

21  that this case is not appropriate for class treatment.

22  <center>**CONCLUSION**</center>

23  For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

24

25  [18] *See, e.g.*, *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011) (denying
   certification where requested injunction "will materially transform the manner in which
26  defendants do business," resulting in "harm which will not be shared by each of the proposed
   class representatives"); *Digital Music*, 321 F.R.D. at 91 (denying certification where at least some
27  class members would be harmed if injunction were granted); *Pickett v. Iowa Beef Processors*, 209
   F.3d 1276, 1280 (11th Cir. 2000) (class improper "when it consists of members who benefit from
28  the same acts alleged to be harmful to other members").

1

2      Dated: June 23, 2022                          By: /s/ Sujal J. Shah
                                                          Sujal J. Shah
3

4                                                    Brian C. Rocca, S.B #221576
                                                     brian.rocca@morganlewis.com
5                                                    Sujal J. Shah, S.B #215230
                                                     sujal.shah@morganlewis.com
6                                                    Michelle Park Chiu, S.B #248421
                                                     michelle.chiu@morganlewis.com
7                                                    Minna Lo Naranjo, S.B #259005
                                                     minna.naranjo@morganlewis.com
8                                                    Rishi P. Satia, S.B #301958
                                                     rishi.satia@morganlewis.com
9                                                    **MORGAN, LEWIS & BOCKIUS LLP**
                                                     One Market, Spear Street Tower
10                                                   San Francisco, CA 94105
                                                     Telephone: (415) 442-1000
11                                                   Facsimile: (415) 422-1001
12
                                                     Richard S. Taffet, pro hac vice
13                                                   richard.taffet@morganlewis.com
                                                     **MORGAN, LEWIS & BOCKIUS LLP**
14                                                   101 Park Avenue
                                                     New York, NY 10178
15                                                   Telephone: (212) 309-6000
                                                     Facsimile: (212) 309-6001
16
                                                     Daniel M. Petrocelli, S.B. #97802
17                                                   dpetrocelli@omm.com
                                                     Stephen J. McIntyre, S.B. #274481
18                                                   smcintyre@omm.com
                                                     **O'MELVENY & MYERS LLP**
19                                                   1999 Avenue of the Stars Los Angeles,
                                                     California 90067
20                                                   Telephone: (310) 553-6700
                                                     Facsimile: (310) 246-6779
21
                                                     Ian Simmons, pro hac vice
22                                                   isimmons@omm.com
                                                     Benjamin G. Bradshaw, S.B. #189925
23                                                   bbradshaw@omm.com
                                                     **O'MELVENY & MYERS LLP**
24                                                   1625 Eye Street, NW
                                                     Washington, DC 20006
25                                                   Telephone: (202) 383-5300
                                                     Facsimile: (202) 383-5414
26

27

28

1

2

3     Neal Kumar Katyal, pro hac vice
     neal.katyal@hoganlovells.com
     Jessica L. Ellsworth, pro hac vice

4     jessica.ellsworth@hoganlovells.com
     **HOGAN LOVELLS US LLP**

5     555 Thirteenth Street, NW
     Washington, D.C. 20004

6     Telephone: (202) 637-5600
     Facsimile: (202) 637-5910

7

8     *Counsel for Defendants*

9     Kyle W. Mach, S.B. #282090
     kyle.mach@mto.com

10    Justin P. Raphael, S.B. #292380
     justin.raphael@mto.com

11    Emily C. Curran-Huberty, S.B. #293065
     emily.curran-huberty@mto.com

12    **MUNGER, TOLLES & OLSON LLP**

13    560 Mission Street, Twenty Seventh Floor
     San Francisco, California 94105

14    Telephone: (415) 512-4000

15

16    Glenn D. Pomerantz, S.B. #112503
     glenn.pomerantz@mto.com

17    Kuruvilla Olasa, S.B. #281509
     kuruvilla.olasa@mto.com

18    **MUNGER, TOLLES & OLSON LLP**
     350 South Grand Avenue, Fiftieth Floor

19    Los Angeles, California 90071
     Telephone: (213) 683-9100

20

21    Jonathan I. Kravis, pro hac vice
     jonathan.kravis@mto.com

22    **MUNGER, TOLLES & OLSON LLP**
     601 Massachusetts Avenue NW, Suite 500E

23    Washington, D.C. 20001
     Telephone: (202) 220-1100

24

25    *Counsel for Defendants Google LLC et al. in*
     *In re Google Play Consumer Antitrust*

26    *Litigation; In re Google Play Developer*
     *Antitrust Litigation; Epic Games, Inc. in Epic*

27    *Games, Inc. v. Google LLC; State of Utah et*
     *al. v. Google LLC et al.*

28

**<u>Certificate Pursuant to Local Rule 5-1(h)(3)</u>**

I, Sujal J. Shah, am the ECF User whose credentials are being used to file DEFENDANTS'

OPPOSITION TO PLAINTIFFS' CLASS CERTIFICATION MOTION. In compliance with Local

Rule 5-1(h)(3), I hereby attest that counsel for Defendants have concurred in this filing.


Dated: June 23, 2022                                  By _____*/s/ Sujal J. Shah*_____

Sujal J. Shah