1   Brian C. Rocca, S.B. #221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, S.B. #215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, S.B. #248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, S.B. #259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, S.B. #301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105
    Telephone: (415) 442-1000
8
    Richard S. Taffet, *pro hac vice*
9   richard.taffet@morganlewis.com
    **MORGAN, LEWIS & BOCKIUS LLP**
10  101 Park Avenue
    New York, NY 10178
11  Telephone: (212) 309-6000

12  Jonathan I. Kravis, *pro hac vice*
    Jonathan.kravis@mto.com
13  **MUNGER, TOLLES & OLSON LLP**
    601 Massachusetts Avenue NW, Suite 500E
14  Washington, DC 20001
    Telephone: (202) 220-1130
15
    *Attorneys for Defendants*
16

17

18

19

20

21

22

Ian Simmons, *pro hac vice*
isimmons@omm.com
Benjamin G. Bradshaw, S.B. #189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300

Daniel M. Petrocelli, S.B. #97802
dpetrocelli@omm.com
Stephen J. McIntyre, S.B. #274481
smcintyre@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 553-6700

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100

Kyle W. Mach, Bar No. 282090
kyle.mach@mto.com
Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Emily C. Curran-Huberty, Bar No. 293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000

23

24

25

26

27

28

Morgan, Lewis &
Bockius LLP

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO MATCH'S COMPLAINT
Case Nos. 3:22-cv-02746-JD; 3:21-md-02981-JD

1
2
3
4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

5
6
7
8
9
10

**IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Match Group, LLC. et al. v. Google LLC et al.,* Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**DEFENDANTS' ANSWER, DEFENSES, AND COUNTERCLAIMS TO MATCH'S COMPLAINT**

**DEMAND FOR JURY TRIAL**

11

## <u>INTRODUCTION</u>

12 Google Play allows a developer to distribute its apps for free to billions of Android users

13 around the world without paying a single cent to Google unless and until it makes a sale. Yet, in

14 filing their complaint, Match Group now attempts to fully disregard its agreement with Google

15 and take advantage of Google Play's value by misusing antitrust laws to force Google to give

16 away its valuable services for free.

17 While Match Group claims that Google Play only provides payment processing, that

18 simply isn't true. Google Play provides tools and a global distribution platform that has allowed

19 Match Group to thrive and build a successful network of users that is critical for its dating

20 apps. Match Group now seeks to access Google Play's global distribution platform and users

21 and leverage Google's substantial investments in the platform, all for free.

22 Match Group's Complaint is a cynical attempt to take advantage of Google Play's tools

23 and global distribution platform and sidestep the reasonable service fees that come with these

24 benefits. Even worse, Match Group aims to undermine user experience to improve its own

25 bottom line. A senior vice-president at Match Group shockingly acknowledged that Match

26 Group's true concern about Google Play's billing system is the ease with which users can cancel

27 their subscriptions using Google's account management tools. He wrote:

28

Match's deceptive approach to subscription cancellation has been called out by the Federal Trade Commission (FTC) and other consumer protection agencies.  The FTC filed a complaint alleging that Match requires a cumbersome process to cancel certain subscriptions that leads consumers to think they have canceled when they have not.  Match executives have acknowledged that the Match cancellation process is "hard to find, tedious and confusing."  In 2017, Match's head of customer service admitted that it takes "up to 7 or 8 clicks to complete the flow to turn off [subscriptions] if you can even figure out how to do it."  *See FTC v. Match Group, Inc.*, Case No. 3:19-cv-02281 (N.D. Tex.) at ¶¶ 55-61.

Match Group's troubling perspective on consumer billing demonstrates exactly why Google Play's billing system is an integral part of a consumer's overall experience on Google Play.  Google Play's billing system gives consumers a consistent, safe, and secure way to pay for apps, subscriptions, and in-app purchases.  This experience leads to more consumer transactions, which in turn generates demand for developers to ***continually innovate*** to create new and better apps and in-app products.  Google Play's billing system thus benefits users and developers alike, and is a key part of the success of the Android ecosystem.

Match Group disguises its true motives by alleging copycat and fundamentally defective antitrust theories.  In so doing, Match Group ignores that Android competes aggressively against Apple's iOS.  And, by providing Android as an open source mobile operating system ("OS") to smartphone manufacturers ("OEMs") for free, Google has expanded access to smartphones and the marketplace for mobile apps, creating enormous incentives for developers to invest in apps that make virtually every sector of the American economy more efficient, affordable and accessible for users.  Match Group also ignores that, unlike competitors with closed ecosystems (like Apple's iOS), Google does not require Android users or developers to use Google Play to download, install, or distribute apps on Android smartphones.  Rather, those developers and users can freely choose the app stores and other platforms they wish to use to interact with app

1 consumers.  Match Group itself has taken advantage of the choice afforded by Android and

2 Google Play by distributing its apps on other app stores, like the Samsung Galaxy Store, which

3 comes preloaded on a significant portion of devices in the United States.  Match Group complains

4 of foreclosure where there is none.

5 **RESPONSE TO NUMBERED PARAGRAPHS**

6 The section headings in the Complaint do not require a response.  To the extent that the

7 section headings contain allegations requiring a response, Google denies all such allegations.

8 1.      Defendants Google LLC, Google Ireland Limited, Google Commerce Ltd., Google

9 Asia Pacific Pte. Limited, and Google Payment Corp. (collectively "Google") deny the allegations

10 in Paragraph 1, except admit that Google LLC acquired the Android mobile operating system and

11 that Android is an open ecosystem that, at its core, has always been about openness. Google avers

12 that Google users use Google Play's billing system ("Google Play Billing") for in-app purchases

13 with respect to apps distributed through Google Play with some exceptions, including purchasing

14 physical goods and purchasing digital content elsewhere that is consumed within the app.

15 2.      Google denies the allegations in Paragraph 2, except avers that Google provides

16 benefits to developers, including Match Group, including discoverability made possible by

17 distribution, e-learning opportunities, free tools for developers to effectively build apps for

18 Android devices, testing and monitoring tools, and a global digital payment infrastructure to

19 enable developers to transact with users using the most effective payment methods regardless of

20 where the developers or users are located.  Google further avers that Google has enabled

21 developers to create revenue streams for themselves.

22 3.      Google denies the allegations in Paragraph 3, and avers that, during the time when

23 Match Group distributed its apps through Google Play, Match Group app users had the choice

24 whether to pay for services using Google Play Billing or another mechanism because it was

25 possible to purchase subscriptions and upgrades outside of Google Play for use in the version of

26 the Match Group app available on Google Play.

27

28

4.      Google denies the allegations in Paragraph 4, except admits one or more defendants receive a payment for in-app purchases with respect to apps distributed through Google Play and charge up to 30% as a service fee.

5.      Google denies the allegations in Paragraph 5.

6.      Google denies the allegations in Paragraph 6, and avers that Google charges a service fee when a developer chooses to charge for app downloads, in-app purchases, or subscriptions for content distributed on Google Play, and Google is paid for the extensive services it provides developers and the sizable investment it makes in Google Play's tools, software, and technology, only if and when a user pays for an app, in-app product, or subscription.

7.      Google denies the allegations in Paragraph 7.

8.      Google denies the allegations in Paragraph 8.

9.      Google denies the allegations in Paragraph 9. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 about Match Group and its users.

10.     Google denies the allegations in Paragraph 10. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 about Match Group and its users.

11.     Google denies the allegations in Paragraph 11, except avers that Android users and developers have access to its open ecosystem.

12.     Google denies the allegations in Paragraph 12.

13.     Google denies the allegations in Paragraph 13.

14.     Google denies the allegations in Paragraph 14.

15.     Google denies the allegations in Paragraph 15.

16.     Google denies the allegations in Paragraph 16, and respectfully refers the Court to the developer agreements for a complete and accurate statement of their contents.

17.     Google denies the allegations in Paragraph 17.

18.    Google denies the allegations in Paragraph 18, but admits the existence of lawsuits involving Google and state Attorneys Generals and the Department of Justice and the existence of government investigations and inquiries.

19.    Google denies the allegations in Paragraph 19, and respectfully refers the Court to the cited legislation for a complete and accurate statement of their contents.

20.    Google denies the allegations in Paragraph 20.

21.    Google denies the allegations in Paragraph 21.

22.    Google denies the allegations in Paragraph 22.

23.    Google admits to the existence of a new pilot program for User Choice Billing, but otherwise denies the allegations in Paragraph 23.

24.    Google denies the allegations in Paragraph 24.

25.    Google denies the allegations in Paragraph 25.

26.    Google denies the allegations in Paragraph 26.

27.    Google denies the allegations in Paragraph 27.

28.    Google denies the allegations in Paragraph 28.

29.    Google denies the allegations in Paragraph 29.

30.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

31.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32.

33.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33.

34.    Google denies the allegations in Paragraph 34, except admits that Google LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Mountain View, California, and that Google LLC is a party to the

MORGAN, LEWIS &
BOCKIUS LLP

Google Play Developer Distribution Agreement ("DDA"). Google further admits that Google LLC is a subsidiary of XXVI Holdings Inc., which is a Delaware corporation and a subsidiary of Alphabet Inc.  Google further admits that Alphabet Inc. is a publicly traded company that is incorporated and existing under the laws of the State of Delaware and that maintains its principal executive offices in Mountain View, California.

35.     Google denies the allegations in Paragraph 35, except admits that Google Ireland Limited is organized under the laws of Ireland with its principal place of business in Dublin, Ireland, is a subsidiary of Google LLC, and is a party to the DDA.

36.     Google denies the allegations in Paragraph 36, except admits that Google Commerce Ltd. is organized under the laws of Ireland with its principal place of business in Dublin, Ireland and is a party to the DDA.

37.     Google denies the allegations in Paragraph 37, except admits that Google Asia Pacific Pte. Ltd. is organized under the laws of Singapore with its principal place of business in Mapletree Business City, Singapore and is a party to the DDA.

38.     Google admits the allegations in Paragraph 38.

39.     The allegations in Paragraph 39 are legal conclusions not subject to admission or denial. To the extent a response is required, Google does not dispute subject matter jurisdiction.

40.     The allegations in Paragraph 40 are legal conclusions not subject to admission or denial.  To the extent a response is required, Google does not dispute—for purposes of this action only—the personal jurisdiction of this Court, but Google otherwise denies the allegations in Paragraph 40.

41.     Google denies the allegations in Paragraph 41, except admits that each of the defendants, except Google Payment Corp., is a party to the DDA, to which document Google respectfully refers the Court for a complete and accurate statement of its contents. Google further avers that the allegations in the fourth sentence are legal conclusions not subject to admission or denial, and to the extent a response is required, Google does not dispute—for purposes of this action only—personal jurisdiction of this Court.

42.     The allegations in Paragraph 42 are legal conclusions not subject to admission or denial. To the extent a response is required, Google does not dispute—for purposes of this action only—the venue of this action, and respectfully refers the Court to the cited statutory codes for a complete and accurate statement of their contents.

43.     The allegations in Paragraph 43 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 43.

44.     Google avers that internet and mobile devices are used by billions of users over the world, but is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46.     Google admits that MGI offers dating services through its subsidiaries Tinder®, Match®, OkCupid® PlentyOfFish®, and OurTime®, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46.

47.     Google admits that MGI companies offer services that can be used by users to connect with one another, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47.

48.     Google admits that Match Group's Tinder is a dating service and app, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48.

49.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49.

50.     Google admits that Tinder offers various subscription tiers and a la carte digital purchase options, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50.

51.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

1    52.    Google is without knowledge or information sufficient to form a belief as to the

2  truth of the allegations in Paragraph 52.

3    53.    Google admits that Match offers multiple subscription plans, including a plan

4  without a charge, but is without knowledge or information sufficient to form a belief as to the

5  truth of the remaining allegations in Paragraph 53.

6    54.    Google admits that Match offers services through its mobile app, but is without

7  knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

8  Paragraph 54.

9    55.    Google is without knowledge or information sufficient to form a belief as to the

10  truth of the allegations in Paragraph 55.

11    56.    Google admits that OkCupid offers multiple subscription plans, including a plan

12  without a charge, but is without knowledge or information sufficient to form a belief as to the

13  truth of the remaining allegations in Paragraph 56.

14    57.    Google admits that PlentyofFish is a dating service, but is without knowledge or

15  information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57.

16    58.    Google admits that PlentyofFish offers multiple subscription options, but is

17  without knowledge or information sufficient to form a belief as to the truth of the remaining

18  allegations in Paragraph 58.

19    59.    Google admits the allegations in the first two sentences of Paragraph 59. Google is

20  without knowledge or information sufficient to form a belief as to the truth of the remaining

21  allegations in Paragraph 59.

22    60.    Google denies the allegations in Paragraph 60, except admits that companies that

23  design and sell smart mobile devices are known as OEMs.

24    61.    Google denies the allegations in Paragraph 61, except admits that smart mobile

25  devices generally use an operating system to provide core device functionality and to enable the

26  operation of programs.

27

28

1    62.    Google denies the allegations in Paragraph 62, except admits that OEMs may

2    select an OS for devices they manufacture.

3    63.    Google denies the allegations in Paragraph 63.

4    64.    Google denies the allegations in Paragraph 64, except admits that Apple operates

5    its own OS.

6    65.    Google denies the allegations in Paragraph 65.

7    66.    Google denies the allegations in Paragraph 66, except admits that Google LLC

8    acquired the Android mobile operating system in 2005.

9    67.    Google denies the allegations in Paragraph 67, except admits that it takes

10    significant money, time, and resources to develop an OS.

11    68.    Google denies the allegations in Paragraph 68.

12    69.    Google denies the allegations in Paragraph 69.

13    70.    Google admits the allegations in Paragraph 70.

14    71.    Google admits the allegations in Paragraph 71, but is without knowledge or

15    information sufficient to form a belief as to the truth of the allegations in Paragraph 71 about the

16    time users spend online on their smart mobile devices.

17    72.    Google denies the allegations in Paragraph 72, except admits that "[a]pp stores

18    allow users to easily browse, search for, access reviews on, purchase, download, and install

19    mobile apps."

20    73.    Google denies the allegations in Paragraph 73.

21    74.    Google denies the allegations in Paragraph 74.

22    75.    Google denies the allegations in Paragraph 75, and avers that evidence shows that

23    users can and do switch and multi-home among and between different OSs.

24    76.    Google denies the allegations in Paragraph 76.

25    77.    Google denies the allegations in Paragraph 77.

26    78.    Google denies the allegations in Paragraph 78.

27

28

79.     Google denies the allegations in Paragraph 79, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

80.     Google denies the allegations in Paragraph 80.

81.     Google denies the allegations in Paragraph 81, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

82.     Google denies the allegations in Paragraph 82.

83.     Google denies the allegations in Paragraph 83.

84.     Google denies the allegations in Paragraph 84.

85.     Google denies the allegations in Paragraph 85, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

86.     Google admits that there are app developers that provide only dating apps, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86.

87.     Google denies the allegations in Paragraph 87, and respectfully refers the Court to the cited document for a complete and accurate statement of its contents.

88.     Google denies the allegations in Paragraph 88, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

89.     Google denies the allegations in Paragraph 89.

90.     Google denies the allegations in Paragraph 90.

91.     Google denies the allegations in Paragraph 91, except admits that one or more of the defendants have agreements called Mobile Application and Distribution Agreements ("MADAs").

92.     Google denies the allegations in Paragraph 92, except admits that one or more of the defendants have MADAs.

93.     Google denies the allegations in Paragraph 93, except admits that Google offers apps and services, including Google Play, Google Search, Google Maps, YouTube, and Gmail.

94.     Google denies the allegations in Paragraph 94, except admits that Google Play Services contains Google's proprietary application programming interfaces.

95.     Google denies the allegations in Paragraph 95.

96.     Google denies the allegations in Paragraph 96, except admits that mobile manufacturers have a choice whether to enter into a MADA to distribute devices with proprietary Google apps, including the Google Play Store, and that these agreements contain various provisions regarding placement of certain apps for the initial out-of-the-box settings, though the specific terms have changed overtime.

97.     Google denies the allegations in Paragraph 97.

98.     Google denies the allegations in Paragraph 98, and respectfully refers the Court to the quoted Google presentation for a complete and accurate statement of its contents.

99.     Google denies the allegations in Paragraph 99.

100.    Google denies the allegations in Paragraph 100.

101.    Google denies the allegations in Paragraph 101.

102.    Google denies the allegations in Paragraph 102, except admits that DDA is an agreement between Google and developers and that developers are generally required to enter into the DDA to distribute apps through Google Play.

103.    Google admits the allegations in Paragraph 103.

104.    Google denies the allegations in Paragraph 104, except admits that app stores are a widely used, accessible channel for distribution of apps.

105.    Google denies the allegations in Paragraph 105.

106.    Google denies the allegations in Paragraph 106, except admits that Google's App Campaigns program offers app developers highly desirable and optimized ad placements on some of Google's advertisement platforms.

107.    Google denies the allegations in Paragraph 107, except admits that one or more of the defendants have agreements called MADAs and optional revenue sharing agreements with some OEM and mobile network operator ("MNO") partners.

108.    Google denies the allegations in Paragraph 108, and respectfully refers the Court to the cited agreements for a complete and accurate statement of their contents.

109.    Google denies the allegations in Paragraph 109.

110.    Google denies the allegations in Paragraph 110, and respectfully refers the Court to the cited agreements for a complete and accurate statement of their contents.

111.    Google denies the allegations in Paragraph 111.

112.    Google denies the allegations in Paragraph 112.

113.    Google denies the allegations in Paragraph 113.

114.    Google denies the allegations in Paragraph 114.

115.    Google denies the allegations in Paragraph 115, except admits that the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights held a hearing titled "Antitrust Applied: Examining Competition in App Stores" on April 21, 2021. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115 regarding what Match Group or MGI were asked to do.

116.    Google denies the allegations in Paragraph 117, except admits that Mr. Sine appeared before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on April 21, 2021, and respectfully refers the Court to the cited testimony for a complete and accurate statement of its contents.

117.    Google denies the allegations in Paragraph 117, except admits that Mr. Sine appeared before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on April 21, 2021, and respectfully refers the Court to the cited testimony for a complete and accurate statement of its contents.

118.    Google denies the allegations in Paragraph 117, except admits that Mr. Sine appeared before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on April 21, 2021, and respectfully refers the Court to the cited testimony for a complete and accurate statement of its contents.

119.    Google denies the allegations in Paragraph 119.

1    120.    Google denies the allegations in Paragraph 120.

2    121.    Google denies the allegations in Paragraph 121, except avers that users can

3    download apps directly from a developer's website if they choose via sideloading and that

4    multiple app stores and access points to apps exist, as users can and do multi-home in accessing

5    apps.

6    122.    Google denies the allegations in Paragraph 122.

7    123.    Google denies the allegations in Paragraph 123.

8    124.    Google denies the allegations in Paragraph 124.

9    125.    Google denies the allegations in Paragraph 125, except avers that Google provides

10   valuable security screening and safeguards to protect the user experience.

11   126.    Google denies the allegations in Paragraph 126.

12   127.    Google denies the allegations in Paragraph 127, and avers that users select their

13   mobile device for many reasons, including that users prefer a mobile device with an app store pre-

14   installed, and that users want a secure mobile device.  Google also avers that evidence shows that

15   users can and do switch and multi-home among and between mobile and nonmobile ecosystems,

16   including between Android and iOS.

17   128.    Google denies the allegations in Paragraph 128, and respectfully refers the Court

18   to the Anti-Fragmentation Agreement and Android Compatibility Commitment for a complete

19   and accurate statement of their contents.

20   129.    Google denies the allegations in Paragraph 129.

21   130.    Google denies the allegations in Paragraph 130.

22   131.    Google denies the allegations in Paragraph 131.

23   132.    Google denies the allegations in Paragraph 132.

24   133.    Google denies the allegations in Paragraph 133.

25   134.    Google denies the allegations in Paragraph 134.

26   135.    Google denies the allegations in Paragraph 135.

27   136.    Google denies the allegations in Paragraph 136.

28

137.    Google denies the allegations in Paragraph 137.

138.    Google admits the allegations in Paragraph 138.

139.    Google admits that consumers spend money on in-app purchases of digital content, goods, services, and upgrades, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 139.

140.    Google denies the allegations in Paragraph 140.

141.    Google denies the allegations in Paragraph 141.

142.    Google denies the allegations in Paragraph 142, except avers that evidence shows that users can and do switch and multi-home among and between mobile and nonmobile ecosystems, including between Android and iOS.

143.    Google denies the allegations in Paragraph 143, except admits that Google users use Google Play Billing for purchases through Google Play with some exceptions, including purchasing physical goods and purchasing digital content elsewhere that is consumed within the app.

144.    Google denies the allegations in Paragraph 144.

145.    Google admits that PayPal, Braintree, Adyen and Worldpay process payments for certain Android apps. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 145 about Match Group. Google otherwise denies the allegations in Paragraph 145.

146.    Google denies the allegations in Paragraph 146.

147.    Google denies the allegations in Paragraph 147.

148.    Google denies the allegations in Paragraph 148.

149.    Google denies the allegations in Paragraph 149.

150.    Google denies the allegations in Paragraph 150.

151.    Google denies the allegations in Paragraph 151, and respectfully refers the Court to the DDA and Google's Developer Program Policies for a complete and accurate statement of their contents.

1    152.    Google denies the allegations in Paragraph 152, and respectfully refers the Court

2    to the Google's Developer Program Policies for a complete and accurate statement of their

3    contents.

4    153.    Google denies the allegations in Paragraph 153.

5    154.    Google denies the allegations in Paragraph 154.

6    155.    Google denies the allegations in Paragraph 155.

7    156.    Google denies the allegations in Paragraph 156, except admits that one or more

8    defendants receive a payment for in-app purchases with respect to apps distributed through

9    Google Play, and charge up to 30% as a service fee. Google avers that beginning on January 1,

10   2018, the service fee on subscriptions was reduced from 30% to 15% in the second year. Google

11   further avers that beginning on July 1, 2021, the service fee was reduced to 15% for the first $1

12   million of revenue on digital goods or services every developer earns each year.

13   157.    Google denies the allegations in Paragraph 157.

14   158.    Google denies the allegations in Paragraph 158.

15   159.    Google denies the allegations in Paragraph 159.

16   160.    Google denies the allegations in Paragraph 160, and respectfully refers the Court

17   to the cited document for a complete and accurate statement of its contents.

18   161.    Google denies the allegations in Paragraph 161.

19   162.    Google denies the allegations in Paragraph 162.

20   163.    Google denies the allegations in Paragraph 163.

21   164.    Google denies the allegations in Paragraph 164.

22   165.    Google denies the allegations in Paragraph 165.

23   166.    Google denies the allegations in Paragraph 166.

24   167.    Google denies the allegations in Paragraph 167.

25   168.    Google denies the allegations in Paragraph 168.

26   169.    Google denies the allegations in Paragraph 169.

27   170.    Google denies the allegations in Paragraph 170.

28

1    171.    Google denies the allegations in Paragraph 171.

2    172.    Google denies the allegations in Paragraph 172.

3    173.    Google denies the allegations in Paragraph 173.

4    174.    Google denies the allegations in Paragraph 174, except admits that Google users

5    use Google Play Billing for purchases through Google Play with some exceptions, including

6    purchasing physical goods and purchasing digital content elsewhere that is consumed within the

7    app.

8    175.    Google is without knowledge or information sufficient to form a belief as to the

9    truth of the allegations in Paragraph 175 and on that basis denies the allegations on Paragraph

10   175.

11   176.    Google is without knowledge or information sufficient to form a belief as to the

12   truth of the allegations in Paragraph 176 and on that basis denies the allegations on Paragraph

13   176.

14   177.    Google is without knowledge or information sufficient to form a belief as to the

15   truth of the allegations in Paragraph 177 and on that basis denies the allegations on Paragraph

16   177.

17   178.    Google is without knowledge or information sufficient to form a belief as to the

18   truth of the allegations in Paragraph 178 and on that basis denies the allegations on Paragraph

19   178.

20   179.    Google is without knowledge or information sufficient to form a belief as to the

21   truth of the allegations in Paragraph 179 and on that basis denies the allegations on Paragraph

22   179.

23   180.    Google is without knowledge or information sufficient to form a belief as to the

24   truth of the allegations in Paragraph 180 and on that basis denies the allegations on Paragraph

25   180.

26   181.    Google is without knowledge or information sufficient to form a belief as to the

27   truth of the allegations in Paragraph 181 about Match Group's "in-house in-app payment system"

28

1   and on that basis denies the allegations in the second sentence of Paragraph 181.  Google denies

2   the remainder of the allegations in Paragraph 181.

3          182.    Google is without knowledge or information sufficient to form a belief as to the

4   truth of the allegations in Paragraph 182 and on that basis denies the allegations on Paragraph

5   182.

6          183.    Google is without knowledge or information sufficient to form a belief as to the

7   truth of the allegations in Paragraph 183 and on that basis denies the allegations on Paragraph

8   183.

9          184.    Google denies the allegations in Paragraph 184.

10         185.    Google denies the allegations in Paragraph 185, and respectfully refers the Court

11  to the cited presentation for a complete and accurate statement of its contents.

12         186.    Google admits that most of Match Group's apps had been available on the Android

13  Market before Google launched the Play Store, but is without knowledge or information

14  sufficient to form a belief as to the truth of the remaining allegations in Paragraph 186.

15         187.    Google denies the allegations in Paragraph 187, except admits that Google and

16  Match Group met to discuss Match Group's Android apps after the launch of Google Play.

17         188.    Google denies the allegations in Paragraph 188.

18         189.    Google is without knowledge or information sufficient to form a belief as to the

19  truth of the allegations in Paragraph 189 about Tinder.  Google denies the remainder of the

20  allegations in Paragraph 189.

21         190.    Google denies the allegations in Paragraph 190.

22         191.    Google denies the allegations in Paragraph 191.

23         192.    Google denies the allegations in Paragraph 192.

24         193.    Google is without knowledge or information sufficient to form a belief as to the

25  truth of the allegations in Paragraph 193 and on that basis denies the allegations on Paragraph

26  193.

27         194.    Google denies the allegations in Paragraph 194.

28

195.    Google denies the allegations in Paragraph 195.

196.    Google denies the allegations in Paragraph 196.

197.    Google denies the allegations in Paragraph 197.

198.    Google denies the allegations in Paragraph 198.

199.    Google denies the allegations in Paragraph 199.

200.    Google denies the allegations in Paragraph 200, except avers that Google clarified its payment policy in September 2020.

201.    Google denies the allegations in Paragraph 201, and respectfully refers the Court to the cited blog post for a complete and accurate statement of its contents.

202.    Google denies the allegations in Paragraph 202, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

203.    Google denies the allegations in Paragraph 203, and respectfully refers the Court to the cited documents for a complete and accurate statement of their contents.

204.    Google denies the allegations in Paragraph 204.

205.    Google denies the allegations in Paragraph 205.

206.    Google denies the allegations in Paragraph 206, except admits that legislation regarding the app ecosystem was considered in South Korea.

207.    Google denies the allegations in Paragraph 207.

208.    Google denies the allegations in Paragraph 208.

209.    Google denies the allegations in Paragraph 209, except admits that Fortnite app was removed from Google Play on August 13, 2020 as a result of Epic's breach of the terms of its contract with Google LLC, Google Ireland Limited, Google Commerce Ltd., and Google Asia Pacific Pte., and avers that Epic's deception and fraud were planned and executed over a period of many months.

210.    Google denies the allegations in Paragraph 210, and respectfully refers the Court to the referenced announcement for a complete and accurate statement of its contents.

211.    Google denies the allegations in Paragraph 211.

1    212.   Google denies the allegations in Paragraph 212.

2    213.   Google denies the allegations in Paragraph 213.

3    214.   Google denies the allegations in Paragraph 214.

4    215.   Google denies the allegations in Paragraph 215.

5    216.   Google denies the allegations in Paragraph 216.

6    217.   Google denies the allegations in Paragraph 217.

7    218.   Google denies the allegations in Paragraph 218.

8    219.   Google denies the allegations in Paragraph 219.

9    220.   Google reasserts and hereby incorporates by reference its responses to each

10   Paragraph of Plaintiff's Complaint, as though fully set forth herein.

11   221.   The allegations in Paragraph 221 are legal conclusions not subject to admission or

12   denial. To the extent a response is required, Google respectfully refers the Court to the cited Act

13   for a complete and accurate statement of its contents.

14   222.   Google denies the allegations in Paragraph 222, except admits that DDA is an

15   agreement between Google and developers and that developers are generally required to enter

16   into the DDA to distribute apps through Google Play.

17   223.   The allegations in Paragraph 223 are legal conclusions not subject to admission or

18   denial. To the extent a response is required, Google denies the allegations in Paragraph 223.

19   224.   Google denies the allegations in Paragraph 224.

20   225.   Google denies the allegations in Paragraph 225.

21   226.   Google denies the allegations in Paragraph 226, except admits that Google users

22   use Google Play Billing for purchases through Google Play with some exceptions, including

23   purchasing physical goods and purchasing digital content elsewhere that is consumed within the

24   app.

25   227.   Google denies the allegations in Paragraph 227.

26   228.   Google denies the allegations in Paragraph 228.

27   229.   Google denies the allegations in Paragraph 229.

28

1    230.    Google denies the allegations in Paragraph 230, except admits that it engages in
2    interstate and foreign commerce.

3    231.    The allegations in Paragraph 231 are legal conclusions not subject to admission or
4    denial. To the extent a response is required, Google denies the allegations in Paragraph 231.

5    232.    Google denies the allegations in Paragraph 232.

6    233.    Google reasserts and hereby incorporates by reference its responses to each
7    Paragraph of Plaintiff's Complaint, as though fully set forth herein.

8    234.    The allegations in Paragraph 234 are legal conclusions not subject to admission or
9    denial. To the extent a response is required, Google respectfully refers the Court to the cited Act
10   for a complete and accurate statement of its contents.

11   235.    Google denies the allegations in Paragraph 235.

12   236.    Google denies the allegations in Paragraph 236.

13   237.    Google denies the allegations in Paragraph 237.

14   238.    Google denies the allegations in Paragraph 238.

15   239.    Google denies the allegations in Paragraph 239.

16   240.    Google denies the allegations in Paragraph 240.

17   241.    Google reasserts and hereby incorporates by reference its responses to each
18   Paragraph of Plaintiff's Complaint, as though fully set forth herein.

19   242.    The allegations in Paragraph 242 are legal conclusions not subject to admission or
20   denial. To the extent a response is required, Google respectfully refers the Court to the cited Act
21   for a complete and accurate statement of its contents.

22   243.    Google denies the allegations in Paragraph 243, except admits that one or more of
23   the defendants have entered into agreements with OEMs and developers.

24   244.    Google denies the allegations in Paragraph 243, except admits that one or more of
25   the defendants have entered into agreements with OEMs.

26

27

28

1  245.   Google denies the allegations in Paragraph 245, except admits that developers are

2  generally required to enter into the DDA to distribute apps through Google Play. Google

3  respectfully refers the Court to the DDA for a complete and accurate statement of its contents.

4  246.   Google denies the allegations in Paragraph 246.

5  247.   Google denies the allegations in Paragraph 247.

6  248.   Google denies the allegations in Paragraph 248.

7  249.   Google denies the allegations in Paragraph 249, except admits that it engages in

8  interstate and foreign commerce.

9  250.   Google denies the allegations in Paragraph 250.

10  251.   Google reasserts and hereby incorporates by reference its responses to each

11  Paragraph of Plaintiff's Complaint, as though fully set forth herein.

12  252.   Google denies the allegations in Paragraph 252, except admits that developers are

13  generally required to enter into the DDA to distribute apps through Google Play.

14  253.   Google denies the allegations in Paragraph 253.

15  254.   Google denies the allegations in Paragraph 254.

16  255.   Google denies the allegations in Paragraph 255.

17  256.   Google denies the allegations in Paragraph 256.

18  257.   Google denies the allegations in Paragraph 257.

19  258.   Google denies the allegations in Paragraph 258, except admits that it engages in

20  interstate and foreign commerce.

21  259.   Google denies the allegations in Paragraph 259.

22  260.   Google reasserts and hereby incorporates by reference its responses to each

23  Paragraph of Plaintiff's Complaint, as though fully set forth herein.

24  261.   The allegations in Paragraph 261 are legal conclusions not subject to admission or

25  denial. To the extent a response is required, Google respectfully refers the Court to the cited Act

26  for a complete and accurate statement of its contents.

27  262.   Google denies the allegations in Paragraph 262.

28

263.    Google denies the allegations in Paragraph 263, except admits that DDA is an agreement between Google and developers and that developers are generally required to enter into the DDA to distribute apps through Google Play.

264.    Google denies the allegations in Paragraph 264.

265.    Google denies the allegations in Paragraph 265.

266.    Google denies the allegations in Paragraph 266.

267.    Google denies the allegations in Paragraph 267.

268.    Google denies the allegations in Paragraph 268.

269.    Google denies the allegations in Paragraph 269, except admits that it engages in interstate and foreign commerce.

270.    Google denies the allegations in Paragraph 270.

271.    Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

272.    The allegations in Paragraph 272 are legal conclusions not subject to admission or denial. To the extent a response is required, Google respectfully refers the Court to the cited Act for a complete and accurate statement of its contents.

273.    Google denies the allegations in Paragraph 273.

274.    Google denies the allegations in Paragraph 274.

275.    Google denies the allegations in Paragraph 275.

276.    Google denies the allegations in Paragraph 276.

277.    Google denies the allegations in Paragraph 277, except admits that it engages in interstate and foreign commerce.

278.    Google denies the allegations in Paragraph 278.

279.    Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

280.    Google denies the allegations in Paragraph 280.

281.    Google denies the allegations in Paragraph 281.

1    282.    Google denies the allegations in Paragraph 282.

2    283.    Google denies the allegations in Paragraph 283.

3    284.    The allegations in Paragraph 284 are legal conclusions not subject to admission or

4    denial. To the extent a response is required, Google denies the allegations in Paragraph 284.

5    285.    Google denies the allegations in Paragraph 285, except admits that it engages in

6    interstate and foreign commerce

7    286.    Google denies the allegations in Paragraph 286.

8    287.    Google reasserts and hereby incorporates by reference its responses to each

9    Paragraph of Plaintiff's Complaint, as though fully set forth herein.

10    288.    The allegations in Paragraph 288 are legal conclusions not subject to admission or

11    denial. To the extent a response is required, Google respectfully refers the Court to the cited Act

12    and case for a complete and accurate statement of their contents.

13    289.    The allegations in Paragraph 289 are legal conclusions not subject to admission or

14    denial. To the extent a response is required, Google denies the allegations in Paragraph 289.

15    290.    The allegations in Paragraph 290 are legal conclusions not subject to admission or

16    denial. To the extent a response is required, Google denies the allegations in Paragraph 290.

17    291.    Google denies the allegations in Paragraph 291, except that "Google Play is a

18    distribution platform that enables users to download, install, and manage apps from their smart

19    mobile devices."

20    292.    The allegations in Paragraph 292 are legal conclusions not subject to admission or

21    denial. To the extent a response is required, Google denies the allegations in Paragraph 292.

22    293.    The allegations in Paragraph 293 are legal conclusions not subject to admission or

23    denial. To the extent a response is required, Google denies the allegations in Paragraph 293.

24    294.    The allegations in Paragraph 294 are legal conclusions not subject to admission or

25    denial. To the extent a response is required, Google denies the allegations in Paragraph 294.

26    295.    The allegations in Paragraph 295 are legal conclusions not subject to admission or

27    denial. To the extent a response is required, Google denies the allegations in Paragraph 295.

28

MORGAN, LEWIS &
BOCKIUS LLP

23
DEFENDANTS' ANSWER AND COUNTERCLAIMS TO MATCH'S COMPLAINT
Case Nos. 3:22-cv-02746-JD; 3:21-md-02981-JD

296.     The allegations in Paragraph 296 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 296.

297.     The allegations in Paragraph 297 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 297.

298.     Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

299.     The allegations in Paragraph 299 are legal conclusions not subject to admission or denial. To the extent a response is required, Google respectfully refers the Court to the cited Act for a complete and accurate statement of its contents.

300.     The allegations in Paragraph 300 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 300.

301.     Google denies the allegations in Paragraph 301, except admits that one or more of the defendants have entered into agreements with OEMs.

302.     Google denies the allegations in Paragraph 302, except admits that DDA is an agreement between Google and developers and that developers are generally required to enter into the DDA to distribute apps through Google Play.

303.     Google denies the allegations in Paragraph 303.

304.     Google denies the allegations in Paragraph 304.

305.     Google denies the allegations in Paragraph 305.

306.     Google denies the allegations in Paragraph 306.

307.     Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

308.     The allegations in Paragraph 308 are legal conclusions not subject to admission or denial. To the extent a response is required, Google respectfully refers the Court to the cited Act for a complete and accurate statement of its contents.

309.     Google denies the allegations in Paragraph 309.

310.     Google denies the allegations in Paragraph 310.

311.    Google denies the allegations in Paragraph 311.

312.    Google denies the allegations in Paragraph 312.

313.    Google denies the allegations in Paragraph 313.

314.    Google denies the allegations in Paragraph 314.

315.    Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

316.    The allegations in Paragraph 316 are legal conclusions not subject to admission or denial. To the extent a response is required, Google respectfully refers the Court to the cited Act for a complete and accurate statement of its content.

317.    The allegations in Paragraph 317 are legal conclusions not subject to admission or denial. To the extent a response is required, Google respectfully refers the Court to the cited Acts for a complete and accurate statement of their content.

318.    The allegations in Paragraph 318 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 318.

319.    The allegations in Paragraph 319 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 319.

320.    The allegations in Paragraph 320 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 320.

321.    The allegations in Paragraph 321 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 321.

322.    Google denies the allegations in Paragraph 322.

323.    The allegations in Paragraph 323 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 353.

324.    Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

325.     Google admits, on information and belief, that Match Group distributes and license applications, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 325 about Match Group.

326.     Google denies the allegations in Paragraph 326, except admits that Google has knowledge of user downloads.

327.     Google denies the allegations in Paragraph 327.

328.     The allegations in Paragraph 328 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 328.

329.     Google denies the allegations in Paragraph 329.

330.     The allegations in Paragraph 330 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 330.

331.     Google reasserts and hereby incorporates by reference its responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

332.     The allegations in Paragraph 332 are legal conclusions not subject to admission or denial. To the extent a response is required, Google is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 332 and on that basis denies the allegations on Paragraph 332.

333.     Google denies the allegations in Paragraph 333, except admits that Google has knowledge of user downloads.

334.     Google denies the allegations in Paragraph 335.

335.     The allegations in Paragraph 335 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 335.

336.     Google denies the allegations in Paragraph 336.

337.     The allegations in Paragraph 337 are legal conclusions not subject to admission or denial. To the extent a response is required, Google denies the allegations in Paragraph 337.

1    **Answer to Plaintiffs' Prayer for Relief:** To the extent that an answer is required to the

2    Prayer for Relief, Google denies the allegations contained therein. Google further states that

3    Plaintiffs are not entitled to any remedies sought in the Complaint.

4                    <u>**AFFIRMATIVE OR ALTERNATIVE DEFENSES**</u>

5           In addition to the reasons stated above, Plaintiff is not entitled to relief, and Google is

6    entitled to judgment in its favor and against Plaintiff, on the basis of the following Affirmative or

7    Alternative Defenses, pleaded in the alternative to the extent they may be found to be

8    inconsistent.  Google further states that Plaintiff is not entitled to injunctive relief, including any

9    injunctive relief that is worldwide in scope or that would extend beyond Epic.  In asserting these

10   defenses, Google does not assume the burden of proof on any issue that would otherwise rest on

11   Plaintiff.  Further, Google reserves all affirmative defenses under Federal Rule of Civil Procedure

12   8(c) and any other defenses, at law or in equity, that may now exist or in the future be available

13   based on discovery and further factual investigation in this case.

14                              <u>**First Defense**</u>

15                      **(Failure to State a Cause of Action)**

16          The Complaint fails to state a claim upon which relief can be granted.

17                             <u>**Second Defense**</u>

18                     **(Legitimate Business Justifications)**

19          Any and all of Google's actions alleged by Plaintiff were lawful, justified, procompetitive,

20   and carried out in Google's legitimate business interests and constitute bona fide competitive

21   activity, the benefits of which significantly outweigh any alleged anticompetitive effects.

22                              <u>**Third Defense**</u>

23   **(Relief Contrary to Public Interest, Inequitable, Impractical, and Unworkable)**

24          The relief sought by Plaintiff would be contrary to the public interest, harm consumers,

25   and is otherwise inequitable, impractical, and unworkable.

26

27

28

**Fourth Defense**

**(Privilege to Protect Own Economic Interest)**

The relief sought by Plaintiff is barred, in whole or in part, by Google's privilege to protect its own economic interest.

**Fifth Defense**

**(International Comity)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of international comity, insofar as Plaintiff seeks injunctive relief affecting transactions and conduct occurring outside the United States jurisdiction.

**Sixth Defense**

**(Failure to Join an Indispensable Party)**

The Complaint fails to join necessary and indispensable parties, including, but not limited to, consumers and developers of apps distributed for free on Google Play.

**Seventh Defense**

**(Foreign Trade Antitrust Improvements Act)**

Plaintiff's claims are barred, in whole or in part, by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, insofar as Plaintiff makes claims concerning transactions or alleged conduct involving trade or commerce with foreign nations outside U.S. jurisdiction.

**Eighth Defense**

**(*Noerr-Pennington* Doctrine)**

Plaintiff's causes of action are barred, in whole or in part, by the *Noerr-Pennington* doctrine.

**Ninth Defense**

**(Unclean Hands)**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands for the reasons asserted below in Google's Counterclaims.

1

**Tenth Defense**

2

(***In Pari Delicto***)

3       Plaintiff's claims are barred, in whole or in part, by the doctrine of *in pari delicto* and/or

4  Plaintiff's equal involvement in the alleged antitrust violation.

5

**Eleventh Defense**

6

(**Estoppel**)

7       Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

8

**Twelfth Defense**

9

(**Dormant Commerce Clause**)

10       Plaintiffs' claims are barred in whole or in part by the Dormant Commerce Clause.

11

**RESERVATION OF DEFENSES**

12       Google reserves the right to assert additional defenses when it determines the particulars

13  of Plaintiff's claims, which are not apparent on the face of the Complaint.  Google reserves the

14  right to amend this Answer to add, delete, or modify defenses based upon legal theories that may

15  be or will be divulged through clarification of Plaintiff's Complaint, through discovery, or

16  through further legal analysis of Plaintiff's position in this litigation.

17

**JURY DEMAND**

18       Google demands a trial by jury on all issues so triable.

19

**GOOGLE'S COUNTERCLAIMS IN REPLY**

20       Defendants and Counter-plaintiffs Google LLC, Google Ireland Limited, Google

21  Commerce Ltd., and Google Asia Pacific Pte. Ltd. (collectively, "Google"), on personal

22  knowledge as to their own acts, and on information and belief as to all others based on their own

23  and their attorneys' investigation, allege the following Counterclaims against Plaintiffs and

24  Counter-defendants Match Group, LLC, Humor Rainbow, Inc., Plentyoffish Media ULC, and

25  People Media, Inc. (collectively "Match Group").

26       Match Group, a multibillion dollar publicly-traded company, has profited immensely from

27  Google Play.  Match Group has accessed billions of Android users through Google Play and, as a

28

1    result, tens of millions of users have opted to download Match Group's apps from the safe, secure

2    platform provided by Google Play.  Match Group pays *nothing* to Google for any of these

3    downloads or for the multitude of other services and tools that Google has provided to Match,

4    including app development and optimization tools, such as application programming interfaces

5    (APIs) and app performance reports that Google provides to all developers.  For those minority of

6    users whom the Match Group charges a fee, Google generally collects a 15% fee, half the amount

7    other major app transaction platforms charge.  Google has been clear and consistent as to

8    compensation from Day 1:  Google receives *nothing* from an app developer *unless and until* a

9    developer opts to charge a user for an app download, in-app purchase, or subscription.  When the

10   app developer is paid, Google is entitled to a fee that is consistent with, or below, competitive

11   prices.  Match Group voluntarily entered into this arrangement by signing the Google Play

12   Developer Distribution Agreement (the "DDA") – a binding contract.

13          By choosing to make its apps available through Google Play, Match Group has ready

14   access to billions of users and potential users of its apps and has earned hundreds of millions of

15   dollars as a result.  Yet Match Group wants more.  It now attempts to ignore the terms to which it

16   expressly agreed and further enrich itself by contending it should pay *nothing* at all to

17   Google.  Not only would that deprive Google of any consideration for the immense investment in

18   Android and the direct benefits it provides Match Group through the Google Play store, it would

19   also place Match Group in an advantaged position relative to other app developers who honor

20   their agreements and compensate Google in good faith for the benefits they receive.  Match

21   Group never intended to comply with the contractual terms to which it agreed, and deceived

22   Google by misrepresenting its true intentions.  Instead, Match Group provokes this legal and

23   public relations confrontation in an attempt to deprive Google of the benefit of its bargain with

24   Match Group and to gain unfair advantage over other app developers.

25          Google therefore brings the following counterclaims to seek all available remedies from

26   Match Group, including but not limited to monetary relief resulting from Match Group's breach

27   of contract, its bad faith dealings with Google, its intentional misrepresentations concerning

28

compliance with its promises, and a declaratory judgment permanently excluding Match Group from Google Play.

## I.     JURISDICTIONAL STATEMENT

### A.     Jurisdiction

1.     The Court has subject matter jurisdiction over Google's counterclaims pursuant to 28 U.S.C. § 1367 because each of Google's counterclaims arises out of the same transaction or occurrence and the same common nucleus of operative facts as Match Group's claims brought under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.

2.     Match Group has subjected itself to personal jurisdiction by filing its Complaint in the Northern District of California.  Match Group has further subjected itself to personal jurisdiction in this District because it has engaged in minimum sufficient contacts with this District and has purposefully availed itself of the benefits and protections of both United States and California law such that the exercise of jurisdiction over Match Group would comport with due process requirements.  Moreover, all claims between Google and Match Group arising out of or relating to the DDA are governed by the laws of the State of California, and the parties agreed to submit to jurisdiction within this District.  DDA, § 16.8.

### B.     Venue

3.     Venue is proper in this District because Match Group brought this action and thereby consented to venue.  Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Match Group's claims occurred in this District.

## II.     THE PARTIES

4.     Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and has its principal place of business in Mountain View, California.

5.     Google Ireland Limited is a company incorporated in Ireland with its principal place of business in Dublin, Ireland.

6.       Google Commerce Ltd. is a company incorporated in Ireland with its principal place of business in Dublin, Ireland.

7.       Google Asia Pacific Pte. Ltd. is a company incorporated in Singapore with its principal place of business in Mapletree Business City, Singapore.

8.       Match Group, LLC is a wholly owned subsidiary of Match Group, Inc., a publicly traded Delaware corporation based in Dallas, Texas.  Match Group, LLC has its principal place of business in Dallas, Texas.

9.       Humor Rainbow, Inc. is a wholly owned subsidiary of Match Group, Inc.. Humor Rainbow, Inc. is a New York corporation with its principal place of business in Dallas, Texas.

10.      PlentyofFish Media ULC is a wholly owned subsidiary of Match Group, Inc.. PlentyofFish Media ULC is a Canadian corporation with its principal place of business in Vancouver, British Columbia, Canada.

11.      People Media, Inc. is a wholly owned subsidiary of Match Group, Inc.  People Media, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.

### III.      BACKGROUND

#### A. Android App Distribution and Google Play

12.      Started in a Silicon Valley garage in 1998, Google is one of the most innovative technology companies on the planet.  In 2008, Google introduced the open-source Android operating system.  To this day, Google licenses Android for free.

13.      Google also operates Google Play, an online store where people go to find and enjoy their favorite apps, games, movies, TV shows, books, and more on their Android devices.

14.      Google Play is not the only Android app store – developers and users enjoy a wide array of options for distributing, downloading, and installing apps on Android devices, including third-party app stores, direct downloads, and web apps – but many developers and users prefer Google Play because of its discoverability features, wide selection, and security and privacy protections.  Match Group also distributes its apps on several other Android app stores, Apple's

App Store, and through websites that are accessible on any mobile or desktop device with a browser.

15.     Thus, Google Play competes not only with other Android app stores, but Google and Android also compete with Apple iOS and the Apple App Store, as well as other available platforms for app transactions, including developer websites and non-mobile platforms.

16.     Developers do not have to distribute apps through Google Play, but those that choose to do so must enter into the DDA, which is a "legally binding contract between [a developer] and Google in relation to [that developer's] use of Google Play to distribute [that developer's] Product." DDA § 2.1. The DDA also incorporates Google's Developer Program Policies. *See* DDA § 4.1.

17.     The DDA "covers both Products that users can access for free and Products that users pay a fee to access." DDA § 3.2. Under the DDA, Google does not collect a service fee unless a developer chooses to monetize an app distributed on Google Play—and even then only if the developer charges for downloads, in-app purchases, or subscriptions. As the DDA states, "You may also choose to make Products available for free. If the Product is free, You will not be charged a Service Fee." DDA § 3.7. Approximately 97% of developers have apps available on Google Play and pay no fees, meaning Google Play allows the great majority of developers to reach a worldwide audience of *billions*, all without having to pay Google a penny (other than a nominal, one-time fee of $25 to set up a Google Play developer account).

18.     Under the DDA, developers who choose to monetize apps distributed through Google Play are not required to choose any particular monetization strategy. They have a variety of monetization options at their disposal, including paid distribution (i.e., charging a price to download the app), sale of in-app products, subscriptions, and advertisements.

19.     When a developer chooses to charge for app downloads, in-app purchases, or subscriptions for content distributed on Google Play, Google charges a service fee of up to 30% of the price charged by the developer. At present, the vast majority of developers are eligible for a reduced service fee of 15% or less, and this is the rate that applies to subscriptions that Match

Group sells to users for access to additional features in its apps.  What this means is that, under the DDA, Google is paid for the extensive services and value it provides developers and the sizable investment it makes in Google Play's tools, software, and technology, *only* if and when a developer chooses to sell *and* a user chooses to pay for an app, in-app product, or subscription.  This business model allows Google to efficiently collect the service fee payments from developers. And, those service fee payments are used to support and invest in the Google Play ecosystem, so that ***all*** developers, big or small, from wealthy conglomerates to a teenager in their basement, can choose a monetization model that works for them (including no monetization and "freemium" models) and can continuously benefit from new and innovative Google Play and Android tools and features.

20.     Google Play's Payment policy (which is incorporated into Section 4.1 of the DDA) provides that only when a developer charges for downloads, certain in-app purchases, or subscriptions in apps distributed on Google Play, the developer must use Google Play's integrated billing system, a trusted and secure digital payment infrastructure.

21.     Under the DDA and its incorporated policies, developers must also submit their apps and app updates to Google for review and approval before that content is made available on Google Play.  To be approved, an app must comply with Google's Restricted Content, Malware, and Mobile Unwanted Software policies.  Complying with these policies ensures the safety and integrity of Android and provides valuable security screening and safeguards to protect the user experience.

22.     Developers who sign the DDA agree to "use Google Play only for purposes that are permitted by this Agreement and any applicable law, regulation, or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries)."  DDA § 4.6.  The DDA grants Google the right to "reject, remove, suspend, limit the visibility of a Product on Google Play" if "a Product or any portion thereof . . . violates this Agreement, applicable policies, or other terms of service."  DDA §§ 8.3, 10.3.

23.     Of course, a developer does not have to agree to the DDA to distribute an app on Android.  The DDA only applies to apps distributed on Google Play.  *See* DDA § 2.1.  Neither the DDA, nor Google's policies, nor Android itself precludes developers from making available Android apps to users through preloading deals with OEMs, competing app stores, or directly from a website.  Google does not collect service fees from apps made available through these competing channels.  And Google collects no service fees when developers use the tools provided to them for free by Google to develop their apps that in turn are distributed on stores that compete with Google Play.

24.     Moreover, even when a developer, including Match Group, chooses to connect with users through Google Play, it can opt to have users pay for in-app content outside of the app.  For example, a developer like Match Group can have users pay for subscriptions through the developer's website, then log into the Play-distributed app and use the subscription in the app.  Google collects no service fees from payments for in-app content made outside of the app.

25.     Where in-app or other paid transactions are made through Google Play, users benefit from convenient payment and subscription management tools.  Payments for app subscriptions, games, ad-free apps, or other in-app purchases can be made through a single trusted and convenient payment processor used by Google Play so that the user does not have to incur the risks of providing credit card or other payment information to dozens of different developers, many of whom are not well-known and are not located in the U.S.  Google Play's secure integrated digital payment infrastructure enables developers to transact with users, regardless of where those developers or users are located, local currencies, or preferred form of payment.  Among these payment options is direct carrier billing, which allows a user to purchase in-app content by including the charge on the user's cell phone bill.  Google Play also offers gift cards for sale in thousands of retail outlets, which may be purchased with cash or any other retail payment method and then redeemed on Google Play for any in-app purchase.  Both of these are convenient options for those who either have no credit card or prefer not to use it.

26.     Google Play's integrated billing system safely collects and stores users' payment information, ensures users have accurate and detailed information on what they are buying, how much, and from whom, prevents redundant or unintentional purchases, and provides post-purchase receipts.  Google Play's billing system also allows users to have one clear centralized point of contact for customer support and refunds, and provides users with optional financial safety tools such as its cross-app budgeting feature, parental controls, and the option to authenticate every purchase.

27.     In addition, Google Play's billing system provides for convenient refunds for app purchases that were either not authorized by the user or were made accidentally, and provides subscription management services so user can view and manage all in-app subscriptions in a single place, receive reminders before a subscription renews or a trial period ends, and quickly and easily cancel a subscription at any time that the user no longer wants.  Google Play's billing system APIs also protect developers from financial threats such as refund fraud.

**B.  Match Group**

28.     Match Group is a dating app developer.  It is a publicly traded company with a current market capitalization of approximately $22 billion.  Match Group has developed, or has obtained through acquisitions, a number of dating apps, including Match.com, Tinder, OKCupid, Plenty of Fish, Our Time, Hinge, Black People Meet, Pairs, Hawaya: Meet Muslim Singles, and many others.

29.     Match Group's apps use the "freemium" business model where a user downloads and uses a dating app with basic, core features for free, but can purchase in-app features or upgrade to a premium tier subscription to experience additional features.  For example, under the free version of Tinder, users have limited use of the "Swipe Right" feature to "match" with another user and do not know when a match may have read their messages.  A user can purchase a subscription to a premium tier of Tinder to have unlimited use of the "Swipe Right" feature, or can purchase a "Read Receipts" feature in packs of 5, 10 and 20.  These features are available on

a website or through the app, regardless of where the user made the original in-app or subscription purchase.

30.     Match Group has exploited the "freemium" model to achieve widespread availability of its apps.  Users can "try out" Match Group's apps without having to pay anything. This is important because the success of a dating app depends on whether it is "discoverable" by users so that a critical mass of users can connect with each other.  The dating app freemium business model thus depends on broad, free (or very low-cost) availability of a developer's apps.  Match Group (and all other developers) can adopt a "freemium" model under the DDA to access Google Play's billions of users worldwide and have Google absorb the costs of reviewing apps for safety and hosting them on its servers.  Google takes the risk as to whether users will choose to use Google Play's billing services for in-app transactions and subscriptions over other app stores or directly through Match Group's websites, in which case Google would receive no payment for the benefits it confers on Match Group.

31.     Relying on its ability to make its apps available for free or by a "freemium" model, Match Group apps have been downloaded nearly 100 million times from Google Play, with Match Group paying nothing to Google for any of the costs of app hosting or for making those apps available to such large number of Google Play users.  Match Group, in turn, has realized hundreds of millions of dollars in revenue from the small percentage of that large free user base who decide to pay for additional app functionality.  For example, ▮▮▮▮ users downloaded the Android version of Match Group's Tinder app from 2018 to 2021, but only ▮▮▮▮ of those ▮▮▮ made a purchase through the app.  Similarly, of the ▮▮▮▮ users who downloaded the Android version of Match Group's Plenty of Fish app from 2019 to 2021, only ▮▮▮▮ made a purchase through the app.  Thus, only approximately ▮▮ of the Google Play users of Match Group's apps pay anything, while ▮▮ use the apps for free.

32.     Under the DDA, Match Group can also allow users to use in-app features and subscriptions in their Google Play-downloaded apps, regardless of where a user purchases the features or subscription.  For example, a user can pay for a subscription through a Match Group

website then open the Google Play downloaded app and use the subscription in the app.  Or a user can pay for a subscription in a Match Group app downloaded on the user's iPad, then switch to an Android phone, download the same app from Google Play, and use the subscription in the Google Play downloaded app.  Google collects no service fee from either of these types of in-app and subscription purchases.

33.     Indeed, Match Group's own data reveal its use of these alternative methods.  For example, in 2021 Match Group's U.S. revenue for its popular Tinder app received through the Tinder website was almost ███████. For its Match app, ████████ in 2021 U.S. revenue came from users paying via Match's website.

34.     Match Group is also able to make its apps available not only through other Android app stores but also Apple's App Store, and it does so to a far greater extent than through Google Play.  Match documents reveal that its most popular app, Tinder, had ████████ active U.S. users on its iOS app in 2021 with only ████████ users on its Android app.  In terms of financials, in 2021, ████████ of Match Group's U.S. revenue came from payments made through its Tinder app on iOS and only ████████ came from payments made through its Android app.  Thus, approximately ██% of revenue for subscriptions that could be used in the Android Tinder app were made outside of the app.  For its Match app, beyond the payments made via Match's website, ████████ in 2021 revenue from its iOS app and ████████ from its Android app.  Thus, approximately ██% of payments for subscriptions that could be used in the Android Match app were made outside of the Android app.

35.     Match Group also has the option to distribute its apps through Google Play but to require users to pay for subscriptions or other in-app content elsewhere, such as through a website.  Google's Payments policy does not apply to this option, and Google collects nothing from the paid transactions outside of Google Play, even though Match Group relied on Google tools to develop its apps, and benefits from the vast exposure and discoverability afforded by Google Play.

36.     Thus, on the one hand, Match Group reaps enormous benefits from its relationship with Google and from all of the services that Google provides to it.   On the other hand, anything Google earns is from the small percentage of Match Group app users who choose to download Match Group's apps from Google Play *and* decide to purchase a subscription or other in-app product from within that app itself, rather than through an alternative such as Match Group's websites or another app platform like Apple's App Store.

## C.  Match Group's History of Deceptive Business Practices

37.     Match Group's financial success has also resulted from a long history of deceptive and unfair business practices specifically in connection with its billing and subscription services.  Match Group consistently makes it difficult, if not impossible, for users to cancel recurring paid subscriptions to its apps.  Match Group's billing and subscription practices have been the subject of repeated scrutiny as deceptive by federal and state law enforcement and consumer protection agencies.  Match Group has been named as a defendant in litigation relating to its billing and subscription practices filed by multiple California District Attorneys relating to such practices, *People of State of California v. Match Group*, Case No. 20CV02496 (Super. Ct., Santa Cruz), and by the Federal Trade Commission, *FTC v. Match Group*, Case No. 19-cv-02281-K (N.D. Tex.).

38.     Communications with Google reveal the importance of such challenged practices to Match Group's business, and the actual reason for Match Group's objection to Google's billing policies  For example, in one communication, Match Group made plain that a prime complaint with Google's policies is that Google makes it too easy for users to unsubscribe from Match Group's apps, which while good for users is, from Match Group's perspective, bad for Match Group's bottom line: "███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████" Match Group further complained that Google Play offers more convenience to Android customers than Match Group and other app stores, which – in Match Group's view – does not sufficiently

1  obstruct a customer's attempts to cancel. "█████████████████████████

2  ████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ███████████████████████████"

5       39.    In other words, underlying Match Group's complaints against Google is that

6  Google protects users from the type of deceptive and misleading practices for which Match

7  Group has been repeatedly sued, and which Match Group depends upon as a core aspect of its

8  business.

9            **D. Match Group Agrees to the Terms of the Developer Distribution Agreement**

10       40.    Match Group made its first app available through Google Play in 2010, when

11  Match.com entered into the DDA on March 10, 2010 and published its app on March 25,

12  2010.  Match Group subsequently entered into over thirty other DDAs across its app portfolio

13  between 2010 and June 2020.  Match Group entered into each iteration of the DDA with full

14  knowledge of its terms.

15       41.    Match Group also knew well that it could choose how to monetize its apps,

16  including through the free-to-download and "freemium" model that it has used to its great

17  commercial advantage, where Match Group app users can purchase digital content outside of the

18  Google Play downloaded app and consume such content within that app.  And, Match Group fully

19  understood that for those transactions Google would receive no service fee.

20       42.    Match Group also knew well that it did not have to agree to the DDA to make its

21  apps available.  The DDA only applies to apps distributed on Google Play.  *See* DDA § 2.1.  Nor

22  does the DDA or Payments Policy require content that users pay for that is consumed in an app to

23  be purchased in the app itself, as developers are permitted to collect payments outside of the app,

24  such as through a website.  Indeed, Match Group takes advantage of these available alternative

25  options to distribute its apps and obtain payment for in-app content.

26       43.    Where Match Group decides to make its apps available through Google Play and,

27  further, to allow users to pay for digital content from within the app, it agreed to the DDA's

28

1  provision that "You and Your Product(s) must adhere to the Developer Program Policies."  DDA

2  ¶ 4.1.  Google's Payments policy provides that "Play-distributed apps requiring or accepting

3  payment for access to in-app features or services, including any app functionality, digital content

4  or goods (collectively 'in-app purchases'), must use Google Play's billing system for those

5  transactions [with exceptions for non-digital products or purchases in Korea]."  The policy adds:

6  "Examples of app features or services requiring use of Google Play's billing system include, but

7  are not limited to, in-app purchases of: . . . subscription services (such as fitness, game, dating,

8  education, music, video, service upgrades and other content subscription services."  While Match

9  Group had contended – incorrectly – that language in a previous version of the Payments policy

10 did not apply to its apps, on September 28, 2020, 21 months ago, Google clarified its Payments

11 policy language as reflected above.  The DDA expressly provides that Google may make changes

12 to the DDA at any time, and a developer then has the option to terminate its use of Google Play,

13 but if it does not do so then its continued use of Google Play constitutes agreement to any

14 modified terms of the DDA.  DDA ¶¶ 15.1-15.3.  Match Group's continued use of Google Play to

15 distribute its apps thus constitutes its agreement to the clarified September 2020 Payments policy

16 language.  Despite the advantages derived under the DDA, including the ability to use Google's

17 development tools and to make its apps available to billions of Google Play users without

18 constraint on the ability to use its own websites and other app transactions platforms and without

19 having to pay Google any fee, Match Group willfully and intentionally breached the DDA by

20 refusing to comply with Google's Payments policies.

21       **E.  Match Group Continuously and Intentionally Misled Google Regarding a**

22            **Willingness to Comply With the DDA**

23       44.    To date, Match Group has not complied with the DDA's Payment policy.  To

24 avoid termination of its apps on Google Play for such non-compliance, Match Group has

25 continuously misled Google, intentionally and in bad faith, regarding its intention to ultimately

26 comply with the DDA.  Starting no later than August 2021, Google reasonably relied on Match

27 Group's misrepresentations and deceptive conduct, which induced Google to allow Match Group

28

apps to continue on Google Play and to agree to extend the time for Match Group to come into compliance specifically with Google's Payments policy requirements.

45.     In October 2017, Google informed Match Group, and other developers, that Google would require compliance with the DDA's agreed to Payments policy.  Match Group initially stated (incorrectly) that the Payments policy did not apply to its apps.  But Match Group's most popular app, Tinder, was already compliant with the Payments policy and had been using Google Play's billing system for all in-app purchases from its launch in 2013.

46.     After informing Match Group that it needed to bring its other apps into compliance with the Payments policy, Google immediately began working with Match Group to address feedback and technical concerns relating to Google Play's billing system requirements.  Google expended significant resources addressing Match Group's concerns, including by investing many engineering hours to develop billing features that Match Group requested to support its apps consistent with Google Play's system. Despite those efforts, Tinder – a Match Group app that had been fully compliant for years – stopped routing in-app payments solely through Google Play's billing system in July 2019.

47.     Google also met directly with Match Group to explain the policy clarification, and to develop an integration plan for Match Group apps' compliance.

48.     On September 28, 2020, Google publicly announced a clarification to its Payments policy that made crystal clear that for transactions on Google Play the DDA required developers to use Google Play's billing system for digital items, subscription services, app functionality or content, and cloud software and services.  Google advised that "[a]ny existing app that is currently using an alternative billing system in violation of this policy will need to remove it to comply with this update."  Google afforded non-compliant developers over a year, until September 30, 2021, to make any necessary changes to meet their agreed upon contractual obligations.

49.     Match Group received notice of Google's clarification no later than September 28, 2020 with Google's public announcement.  Match Group and Google worked towards what

1   Google thought would be a beneficial relationship for both parties and where Match Group would

2   come into compliance with the Payments policy within the designated period.  Match Group gave

3   no indication of any intention other than to comply with its agreed upon contractual obligations

4   on or before the impending compliance deadline of September 30, 2021.

5        50.    Between August 16 and 26, 2021, however, each of Match Group's 30+ apps

6   submitted an electronic form to Google requesting an extension beyond September 30, 2021 to

7   bring Match Group into compliance with the DDA.  The form was accessible to all developers

8   and states: "This extension is intended to aid developers that need more time to comply with

9   Google Play's Payments policy.  Do you need more time to comply with Google Play's Payments

10   policy?"  Match Group responded "Yes" for all of its 30+ apps, while adding gratuitous and self-

11   serving complaints about the DDA's terms to which it had already agreed.  Match Group gave no

12   indication that the extension it sought was for any reason other than to bring itself into

13   compliance with the DDA.

14        51.    Google acknowledged Match's request for an extension, stating:  "We've reviewed

15   the information in your application form and determined your app is eligible for an extension

16   until March 31, 2022 to come into compliance with Google Play's Payments policy."  Match

17   Group did not respond further regarding any intent other than to become compliant with the

18   DDA.

19        52.    Relying on Match Group's representations regarding the purpose of the extension,

20   Google continued to assist Match Group to meet its obligations.  As late as March 2022, Google

21   worked with Match Group to address purported concerns about billing features, assuring Match

22   Group that Google Play supported large value SKUs, 2/4/8 month subscription periods, additional

23   forms of payment, installment payments, and age-gating the app, among other billing features

24   raised by Match Group.

25        53.    Based on its interactions with Match Group during the extension period, it began

26   to become apparent that Match Group's request for an extension was pretextual and its

27   representations that it would comply with the DDA were false.  Notwithstanding Google's

28

1   investment of time and effort to assist Match Group's compliance with the Payment policy, and

2   Match Group's apparent ability in the past to implement technical features necessary to support

3   Google Play's billing system in Match Group apps, to date Match Group has taken no steps to

4   become compliant with the Payment policy.

5          54.      Google's good faith reliance on Match Group misrepresentations and misleading

6   conduct concerning compliance with the DDA caused Google to allow Match Group apps to

7   remain on Google Play, thereby affording Match Group with all of the benefits developers realize

8   from Google Play, all the while depriving Google Play of consideration in exchange.  If Google

9   had known Match Group's true intentions of never complying with the DDA starting at least as

10  early as August 2021, Google would have, as it is entitled to do under the DDA, removed Match

11  Group's apps from Google Play.

12                       **IV.    <u>CLAIMS AND PRAYER FOR RELIEF</u>**

13                                    <u>COUNT I</u>

14                                **Breach of Contract**

15         55.      Google realleges and incorporates by reference each of the allegations set forth

16  above.

17         56.      Match Group entered into a valid and enforceable contract with Google, the DDA.

18         57.      Google performed all of its obligations under the DDA.

19         58.      Under the DDA, Match Group is required to pay and Google is entitled to collect a

20  service fee on the in-app sale of digital goods, including subscriptions.  DDA § 3.4.  For example,

21  the DDA, and incorporated Payments policy expressly requires that Match Group use Google

22  Play's billing system for in-app purchases in apps downloaded through Google Play and that

23  Google be paid a service fee on such in-app purchases.  DDA §§ 3.4, 4.1.  Google Play's

24  Payments policy also requires that apps distributed through Google Play "may not lead users to a

25  payment method other than Google Play's billing system."

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP

59.     Match Group materially and intentionally breached the DDA by using its own external payment systems in its apps made available through Google Play and by failing to pay Google's agreed-to service fees on its in-app transactions.  DDA §§ 3.4, 4.1.

60.     As a direct result of Match Group's breaches of the DDA, Google has suffered injury, including monetary damages (plus interest) on a global basis.

61.     Match Group's breaches of the DDA are ongoing causing Google continuing damages.

62.     Google is entitled to an award of attorneys' fees under Section 14.1 of the DDA, which covers "any and all losses, liabilities, damages, costs, and expenses (***including reasonable attorneys' fees***) arising out of or accruing from [Match's] use of the Play Console and Google Play in violation of this Agreement." (emphasis added)

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing

63.     Google realleges and incorporates by reference each of the allegations set forth above.

64.     Match Group entered into a valid and enforceable contract with Google, the DDA.

65.     The DDA, and incorporated Payments policy, among other things, expressly requires that Match Group use Google Play's billing system for in-app purchases in apps downloaded through Google Play and that Google be paid a service fee on such in-app purchases.  DDA §§ 3.4, 4.1.  The DDA and incorporated policies prohibit Match Group from making sales to users through payment systems other than Google Play Billing in order to avoid Google's service fee.

66.     From at least as early as August 2021, Match Group engaged in conduct in connection with its obligations under the DDA, which deprived Google and frustrated its rights under the DDA.  As set forth in paragraphs 50 through 54 above, Match Group intentionally and in bad faith misled Google to believe that Match Group would make necessary modifications to

comply with the DDA's Payment policy, upon which Google reasonably relied to its detriment, which induced Google to allow Match Group's apps to remain available on Google Play.

67.     As a direct result of Match Group's intentional and bad faith conduct, it breached its implied covenant of good faith and fair dealing, causing Google to suffer monetary damages on a global basis.

## COUNT III

### False Promise

68.     Google realleges and incorporates by reference each of the allegations set forth above.

69.     In August 2021, Match Group pretextually requested an extension to come into compliance with the terms of the DDA, knowing full well that it had no intention of doing so.  Google, in good faith and reasonably, relied on Match Group's continuing statements and actions which indicated an intention to comply with the DDA, to agree to an extension of time for Match Group's compliance with the Payments policy from September 30, 2021 until March 31, 2022.

70.     Match Group's specific misrepresentations regarding its intention to comply with the DDA include the August 2021 request of Peter Foster for an extension, Match Group's further representation later in August 2021, that it was updating its apps to comply with the DDA and Google's Payment Policy, and its further representations that it needed additional time to do so, including, for example, an August 19, 2021 communication from Casey Daniell on behalf of Match.com LLC affirmatively responding to Google's inquiry if Match Group required an extension in order to comply with Google Play's Payments policy.

71.     Match Group did not intend to perform this promise when it made it. This is demonstrated by the fact that Match Group did not bring *any* of its apps into compliance with the DDA and Google's Payments policy during the extension period and, on information and belief, Match Group made no good faith effort to do so.  As discussed in paragraphs 45-46 and 53,

Match Group had the knowledge and ability to bring its apps into compliance, it just chose not to do so in bad faith.

72.     Match Group intended that Google rely on this promise by granting Match Group an extension so that Match Group could continue to breach the DDA and Google's Payments policy without Google pulling Match Group's apps from Google Play as permitted under the DDA.

73.     Google reasonably relied on Match Group's promise.  Google would not have granted the extension if it knew that Match Group would not bring its apps into compliance with the DDA and Google's Payments policy during the extension period.

74.     Match Group did not perform the promised act.  It did not bring its apps into compliance with the DDA and Google's Payments policy during the extension period.  It made no good faith effort to do so.  Match Group's misrepresentations about its intent to perform and its failure to perform were committed and authorized by one or more officers, directors, or managing agents of Match Group.  The August 2021 misrepresentations regarding Match's need for an extension in order to bring its apps into compliance with the Payments policy included communications from Peter Foster, Match's General Manager, Global Advertising & Brand Solutions, and a submission by Casey Daniell, Match's Director, Configuration Management.  In addition, Match's CEO communicated directly with Google during the extension period about the need to bring Match's apps into compliance with the terms of the DDA during that period and authorized or ratified Match's decision to seek the extension with no intention of performing the promised work to bring Match's apps into compliance.

75.     Google has suffered monetary damages and incurred unnecessary costs on a global basis as a direct result of Match Group's false promise.

76.     Google's reliance on Match Group's promise was a substantial factor in causing its harm.

**COUNT IV**

**Quasi-Contract / Unjust Enrichment**

77.     Google realleges and incorporates by reference each of the allegations set forth above.

78.     Match Group has been unjustly enriched at Google's expense by inducing Google to make modifications to its billing systems and provide distribution and other services to Match Group at Match Group's request under the understanding that such services were in furtherance of Match Group bringing its apps into compliance with the DDA, which Match never intended to do.

79.     Match Group has unjustly retained these benefits, and continues to do so, without compensating Google.

80.     Google seeks restitution of any such amounts by which Match has been unjustly enriched at Google's expense.

**COUNT V**

**Declaratory Judgment**

81.     Google realleges and incorporates by reference each of the allegations set forth above.

82.     There is an actual, substantial, continuing, and justiciable controversy between Google and Match Group regarding their respective rights under the DDA.

83.     Google has the right to terminate Match Group as a registered Google Developer and to remove an app from Google Play.

84.     In light of Match Group's breach of its contractual obligations (and its misrepresentations that it would bring its Android apps into compliance with the parties' contract), Google notified Match Group of Google's intent to remove Match Group's apps from Google Play if Match Group did not cure its breaches.

85.     Google therefore has standing to seek declaratory judgment of its rights under its contracts with Match Group, including the DDA.

86.     Google seeks and is entitled to a declaratory judgment that: (a) the DDA is a valid, lawful, and enforceable contract; (b) Match Group breached that agreement; and (c) Google has the contractual right under the DDA to remove Match Group's apps from Google Play and terminate Match Group as a registered Google Developer due to its breach.

## V.     JURY DEMAND

87.     Google demands a trial by jury on all issues so triable.

## VI.     PRAYER

Wherefore, Counterclaimant Google respectfully requests that the Court:

A.     Decree that Match Group is liable for breach of its contractual obligations under the DDA and enter a Declaratory Judgment as set forth above;

B.     Decree that Match Group is liable for breach of its implied covenant of good faith and fair dealing;

C.     Decree that Match Group was unjustly enriched;

D.     Award Google compensatory damages, punitive damages, attorney's fees, and interest (including, without limitation, under Cal. Civ. Code sections 3288 and 3289);

E.     Award restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Match Group as a result of its conduct;

F.     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: July 11, 2022          By:   */s/ Brian Rocca*
                                   Brian C. Rocca

                                   Brian C. Rocca, S.B #221576
                                   brian.rocca@morganlewis.com
                                   Sujal J. Shah, S.B #215230
                                   sujal.shah@morganlewis.com
                                   Michelle Park Chiu, S.B #248421
                                   michelle.chiu@morganlewis.com

Morgan, Lewis &
Bockius LLP

49

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO MATCH'S COMPLAINT
Case Nos. 3:22-cv-02746-JD; 3:21-md-02981-JD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

By:  /s/ *Ian Simmons*
     Ian Simmons

Ian Simmons, *pro hac vice*
isimmons@omm.com
Benjamin G. Bradshaw, S.B. #189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Daniel M. Petrocelli, S.B. #97802
dpetrocelli@omm.com
Stephen J. McIntyre, S.B. #274481
smcintyre@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

1
                                                    By: */s/ Glenn Pomerantz*
                                                        Glenn D. Pomerantz
2
                                                        Glenn D. Pomerantz, Bar No. 112503
3                                                       glenn.pomerantz@mto.com
                                                        Kuruvilla Olasa, Bar No. 281509
4                                                       kuruvilla.olasa@mto.com
                                                        **MUNGER, TOLLES & OLSON LLP**
5                                                       350 South Grand Avenue, 50th Floor
                                                        Los Angeles, CA 90071-3426
6                                                       Telephone: (213) 683-9100

7                                                       Kyle W. Mach, Bar No. 282090
                                                        kyle.mach@mto.com
8                                                       Justin P. Raphael, Bar No. 292380
                                                        justin.raphael@mto.com
9                                                       Emily C. Curran-Huberty, Bar No. 293065
                                                        emily.curran-huberty@mto.com
10                                                      **MUNGER, TOLLES & OLSON LLP**
                                                        560 Mission Street, 27th Floor
11                                                      San Francisco, CA 94105-2907
                                                        Telephone: (415) 512-4000
12
                                                        Jonathan I. Kravis, *pro hac vice*
13                                                      Jonathan.kravis@mto.com
                                                        **MUNGER, TOLLES & OLSON LLP**
14                                                      601 Massachusetts Avenue NW, Suite 500E
                                                        Washington, DC 20001
15                                                      Telephone: (202) 220-1130

16

17                                                  *Attorneys for Defendants Google LLC, et al.*

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO MATCH'S COMPLAINT
Case Nos. 3:22-cv-02746-JD; 3:21-md-02981-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ECF ATTESTATION

I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories hereto.

Dated: July 11, 2022

By:    */s/ Brian Rocca*
Brian C. Rocca