Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE     )
ANTITRUST LITIGATION        )  **NO. 21-md-02981 JD**
_____)

San Francisco, California
Thursday, August 4, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Epic Games:

                  CRAVATH SWAINE AND MOORE LLP
                  825 Eighth Avenue
                  New York, New York 10019
        **BY:  LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**

For the Consumer Class Plaintiffs:

                  KAPLAN FOX AND KILSHEIMER LLP
                  850 Third Avenue - 14th Floor
                  New York, New York 10022
        **BY:  HAE SUNG NAM, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, RMR, CRR
              CSR No. 14421, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For the Consumer Class Plaintiffs:

                    BARTLIT BECK LLP
                    1801 Wewatta Street - Suite 1200
                    Denver, Colorado 80202
          BY:   **KARMA M. GIULIANELLI, ATTORNEY AT LAW**

                    BARTLIT BECK LLP
                    54 West Hubbard Street - Suite 300
                    Chicago, Illinois 60654
          BY:   **LEE M. MASON, ATTORNEY AT LAW**

For Plaintiff Brian McNamara:

                    COTCHETT, PITRE & MCCARTHY LLP
                    San Francisco Airport Office Center
                    840 Malcolm Road
                    Burlingame, California 94010
          BY:   **NANCI NISHIMURA, ATTORNEY AT LAW**
                **JAMES G.B. DALLAL, ATTORNEY AT LAW**

For Plaintiff Daniel Egerter:

                    PRITZKER LEVINE LLP
                    1900 Powell Street - Suite 450
                    Emeryville, California  94608
          BY:   **ELIZABETH PRITZKER, ATTORNEY AT LAW**

For State of California:

                    OFFICE OF THE ATTORNEY GENERAL
                    OF CALIFORNIA
                    California Department of Justice
                    455 Golden Gate Avenue - Suite 11000
                    San Francisco, California 94102
          BY:   **PAULA L. BLIZZARD, ATTORNEY AT LAW**

For State of Utah:
                    OFFICE OF THE UTAH ATTORNEY GENERAL
                    160 East 300 South - Fifth Floor
                    Salt Lake City, Utah 84114
          BY:   **BRENDAN P. GLACKIN, ATTORNEY AT LAW**
                **LAUREN M. WEINSTEIN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:**  (CONTINUED)

For Plaintiff Pure Sweat Basketball, Inc:

                         HAGENS BERMAN SOBOL SHAPIRO LLP
                         715 Hearst Avenue - Suite 202
                         Berkeley, California  94710
                    BY:  **BENJAMIN J. SIEGEL, ATTORNEY AT LAW**
                         **BEN M. HARRINGTON, ATTORNEY AT LAW**

                         SPERLING & SLATER P.C.
                         55 West Monroe Street - Suite 3200
                         Chicago, Illinois  60603
                    BY:  **EAMON P. KELLY, ATTORNEY AT LAW**

For State of North Carolina:

                         NORTH CAROLINA DEPARTMENT OF JUSTICE
                         Post Office Box 629
                         Raleigh, North Carolina  27690
                    BY:  **SARAH BOYCE, ATTORNEY AT LAW**

For Plaintiff Match Group, LLC:

                         HUESTON HENNINGAN LLP
                         523 West 6th Street - Suite 400
                         Los Angeles, California  90014
                    BY:  **JOSEPH A. REITER, ATTORNEY AT LAW**

For Plaintiff Peekya App Services, Inc.:

                         HAUSFELD LLP
                         1700 K Street NW - Suite 650
                         Washington, D.C.  20006
                    BY:  **MELINDA R. COOLDIGE, ATTORNEY AT LAW**

For Defendants:
                         MORGAN LEWIS & BOCKIUS LLP
                         One Market Street
                         Spear Street Tower
                         San Francisco, California 94105
                    BY:  **BRIAN C. ROCCA, ATTORNEY AT LAW**
                         **SUJAL SHAH, ATTORNEY AT LAW**
                         **MINNA L. NARANJO, ATTORNEY AT LAW**


        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

1    **APPEARANCES:**  (CONTINUED)

2    For Defendants:

3                            MUNGER, TOLLES & OLSON LLP
                             560 Mission Street, 27th Floor
4                            San Francisco, California 94105
                     BY:    **JUSTIN P.  RAPHAEL, ATTORNEY AT LAW**
5
                             MUNGER TOLLES & OLSON LLP
6                            350 South Grand Avenue - 50th Floor
                             Los Angeles, California 90071
7                    BY:    **GLENN D. POMERANTZ, ATTORNEY AT LAW**
                            **KURUVILLA J. OLASA, ATTORNEY AT LAW**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - August 4, 2022**                              **10:11 a.m.** |

2                          **P R O C E E D I N G S**

3                             ---o0o---

4          **THE CLERK:**  Calling Civil 20-5761 and Civil

5    Multi-District Litigation 21-2981, In Re: Google Play Consumer

6    Antitrust Litigation.

7          Counsel, please state your appearances for the record.

8          **MS. GIULIANELLI:**  Good morning, Your Honor, it's Karma

9    Giulianelli from Bartlit Beck on behalf of the consumers.  And

10   with me, I have Hae Sung Nam from Kaplan Fox; Lee Mason of my

11   firm, Bartlit Beck; Elizabeth Pritzker from Pritzker Levine and

12   Nanci Nishimura from Cotchett.

13         **THE COURT:**  Okay.  Okay.  Yes, please.

14         **MR. POMERANTZ:**  Good morning, Your Honor, Glenn

15   Pomerantz from Munger Tolles Olson.

16         At counsel table with me from my firm is Justin Raphael,

17   who will be arguing the class certification motion, and

18   Kuruvilla Olasa, who will be taking Google's position on the

19   motion for preliminary approval.  And I'm with the developer

20   class.

21         **THE COURT:**  All right.  Okay.

22         **MR. POMERANTZ:**  Mr. Rocca can introduce himself and

23   his staff.

24         **MR. ROCCA:**  Hello, Your Honor, Brian Rocca from Morgan

25   Lewis; Sujal Shah from Morgan Lewis and Minna Naranjo.

1          **THE COURT:**  Okay.  We will do the developer thing

2     second.  So, Ms. Giulianelli, why should a class be certified?

3          **MS. GIULIANELLI:**  For many reasons that we would like

4     to address, Your Honor.

5          Before I start, may I hand up -- because I like these and

6     I think that they are helpful -- a book of demonstratives which

7     include excerpts from the expert proceeding transcripts and

8     some questions -- answers to the questions that Your Honor

9     specifically --

10         **THE COURT:**  Sure.

11         **MS. GIULIANELLI:**  -- asked at the end.

12         **THE COURT:**  Okay.

13         **MS. GIULIANELLI:**  And we would like to specifically

14    address the questions that Your Honor asked about at the last

15    hearing.

16         **THE COURT:**  Okay.

17         **MS. GIULIANELLI:**  And they appear on slide 2.

18         Now, I would like to say that to the extent that

19    Your Honor has questions about the key *Daubert* issues regarding

20    antitrust injury -- and we intend to get to those pretty

21    quickly -- including whether the logit pass-on model is

22    generally reliable and can be used here.

23         My colleague, Lee Mason, would be prepared -- and I think

24    welcome the opportunity -- to speak to those.  I'm ready to

25    speak to those as well, but I think Mr. Mason would be great.

1       **THE COURT:**  Okay.

2       **MS. GIULIANELLI:**  Before we get to the first question,

3   however, of antitrust injury, I have one point.  I don't think

4   that there could be any reasonable dispute that most of the

5   issues in this case including Google's anticompetitive conduct

6   and the elements of the claim will be resolved through common

7   evidence.

8       We can't lose site of that, of course, because as the

9   Ninth Circuit, the Supreme Court have made clear, even if one

10  common question predominates, a class, the 23(b)(3) should be

11  certified.

12      Now, the first question that Your Honor had was how to

13  determine antitrust injury.  Common issues will predominate

14  there as well.

15      As this Court I think in *Capacitors* --

16      **THE COURT:**  It's not really common issues.  It is

17  common evidence.  That's what I'm most interested in.

18      **MS. GIULIANELLI:**  Yes.

19      **THE COURT:**  Everybody's issues are common.  Whether

20  they are going to be proved up in one fell swoop with common

21  evidence, that's the question.

22      **MS. GIULIANELLI:**  And we have common evidence that can

23  establish antitrust injury on a classwide basis, and that is

24  Dr. Singer's model.  He has provided a common methodology for

25  determining antitrust injury across the class and also for

1  calculating damages with a common methodology and regardless of

2  the application purchased.

3        Now, recall, Your Honor -- and I don't want to spend much

4  time on this unless Your Honor would like to hear it -- that

5  starting with the developer side of the platform, we have a

6  common list price that was derived from generally accepted

7  literature on two-sided markets.

8        That's the Rochet-Tirole model.  And in the aftermarket,

9  that is the Landes-Posner model using real-world data from this

10  case.

11        **THE COURT:**  Just -- now, the real-world data is what?

12        **MS. GIULIANELLI:**  The real-world data comes from

13  Google's transactional database; Google's actual pricing -- you

14  know, the actual take rates; the developer's -- all of the

15  developer's pricing in the world.

16        And slides 6 and 7 just here show the inputs to those

17  models and Dr. Burtis' admission that the models are generally

18  accepted.

19        At slides 8 and 11 -- I'm prepared to argue this.  I'm not

20  sure if Your Honor is the most interested in this based on your

21  questions, but slides 8 and 11 show why the use of market-wide

22  data in those models is entirely appropriate in this case.

23        **THE COURT:**  Well, let me ask you this:  There is no

24  dispute that the consumers were buying apps directly from

25  Google; right?

1        MS. GIULIANELLI:  Correct.

2        THE COURT:  Okay.  So just let's forget about the

3   econometric models.  What is just the raw material from Google

4   that is being used to say 30 percent was the average alleged

5   overcharge?

6        MS. GIULIANELLI:  So from Google -- Google charges the

7   developers generally -- with some very specific exceptions that

8   it's implemented sort of recently, 15 percent for some

9   categories of developers -- 30 percent.  And we know the actual

10  amount that Google is charging each developer based on the

11  transaction database.

12       THE COURT:  You know that because why?  What's in it?

13  Is it a letter?  Is it a contract?

14       MS. GIULIANELLI:  It is a program.  So Google

15  basically has programs for the -- you know, the common headline

16  take rate is 30 percent, and that generally applies to all of

17  the developers.

18     Now, recently Google has changed for certain categories of

19  developers, for instance, subscription developers in their

20  second year.

21       THE COURT:  I'm fine with all that.  Let's just focus

22  on the basics.

23       MS. GIULIANELLI:  Yes.

24       THE COURT:  You can have some variation.  That's not

25  fatal to a class.

1          **MS. GIULIANELLI:**  So we know what Google charges

2    developers.

3          **THE COURT:**  Let me just make sure I understand.  If

4    there is an app that I, as a consumer, want to buy and it's --

5    it always ends in 99; right?  So it is 4.99.  I go into the

6    store.  I buy it.  I gave Google $4.99.  Google gets that

7    money.  And then Google takes 30 percent out of it and gives

8    the rest to the developers.

9          **MS. GIULIANELLI:**  That's basically the way it works,

10   yes, Your Honor.

11         **THE COURT:**  Google, you have any problem with that?

12         **MR. RAPHAEL:**  Your Honor, I think at a high level for

13   purposes of today that's correct.  The actual passing through

14   of the funds is a bit more complicated than that, but I think

15   the direction Your Honor is going in, I think that's probably

16   fine at the level of the principle.

17         **THE COURT:**  Okay.  So why is that enough to certify?

18   I mean, what more do I need to do?  Whether I'm right or not,

19   who knows.  We are just looking at:  Is there common evidence

20   to show that the class as a whole was overcharged?  And what

21   more do I need than that?

22         **MS. GIULIANELLI:**  I don't think Your Honor needs a

23   whole lot more than that because we have a model showing that

24   there is common evidence to determine what the but-for world

25   take rate would be; in other words, how it would fall if Google

faced competition.  And we can do that on a market-wide basis.

And Dr. Singer explained how he has a common headline but-for world take rate in using the Rochet-Tirole model.

**THE COURT:**  Isn't there kind of a natural experiment also because hasn't Google been consistently cutting the rate to 15 percent?

**MS. GIULIANELLI:**  I don't think that Google has been consistently cutting the rate to 15 percent, but Google has given -- for certain categories of developers; that is, subscription developers in the second year and developers making under a million dollars a year for the first million -- a 15 percent discount generally.

And so Google has cut it for categories of developers, and we see that and we know what it has cut it for.  So they have done that recently.

I don't think that that's -- so we know what those take rates are.  I don't think that that's a natural experiment in the sense that Google's anticompetitive conduct continues in today's world.  So that is not the but-for take rate.

**THE COURT:**  I thought Dr. Singer's but-for charge was 15 percent.

**MS. GIULIANELLI:**  On a blended overall basis, it is around 15 percent.  When -- and what I mean by that is if you are looking at the primary market, the application distribution market and the aftermarket, which is the -- the distribution of

1    in-app products, both of those come out to about 15 percent.

2        But there are two separate market with two separate

3    models, and I don't think there is any -- much dispute that the

4    models are generally accepted for determining the but-for world

5    take rate in those relevant markets, which for purposes of

6    class certification at least Google is not disputing the

7    relevant markets.

8        Now, we understand at the merits they might.  But on a

9    blended basis, it is about 15 percent overall for all of them.

10   The common headline take rate --

11       **THE COURT:**  How are you going to get to that but-for

12   15 percent on the basis of common evidence?

13       **MS. GIULIANELLI:**  We are going to get to that using

14   two models; the Rochet-Tirole model, which is the foundational

15   sort of two-sided market model, and that's what Dr. Singer

16   explained.  And that model models what happens when there is

17   competition basically.

18       Another app store comes in and then Google would drop its

19   prices using all of the real-world inputs that Your Honor sees

20   on slide 6, I think, is -- and Dr. Singer went through that at

21   the expert proceeding.

22       So that's one of the models to model the but-for world

23   headline take rate.

24       **THE COURT:**  Well, just tell me what is the input from

25   the model from the evidence.

1          **MS. GIULIANELLI:**  If you will turn to slide 6, we have

2     a bunch of different inputs to the model.  So, for instance, we

3     have -- the inputs are from Google's -- the transactional

4     database.  So we have consumer expenditures, basically the

5     values.  We have the Google revenues.  We have the actual paid

6     transactions.  We have, you know, the different -- Google's

7     marginal costs from the documents.

8          And then -- and I think this is one thing that we are --

9     you know, basically, you know, the app -- the average

10    market-wide app distribution -- I mean, the application product

11    pricing, so that's all real-world data.  And those are the

12    inputs to the models.

13         **THE COURT:**  Okay, so the pass-through rate is the

14    logit formula; right?

15         **MS. GIULIANELLI:**  Correct.  And I think we should

16    probably, if Your Honor wants, get there because that is, I

17    think, disputed -- well, I know it is disputed.  That is one of

18    the main disputes actually -- and we have here -- so that's --

19    so you determine the but-for world take rate using the

20    Rochet-Tirole model.

21         Now, before we get to the pat -- and one of the inputs to

22    that, if you are looking at the take rate for the developers is

23    the pass-through rate; and that's the logit model which we

24    would like to address.

25         **THE COURT:**  Right.  Let me just jump in.  So in order

1    for the Rochet-Tirole model to accurately and reliably forecast

2    a but-for charge, okay, that Google would charge developers,

3    the logit base pass-through rate is an essential variable?

4           **MS. GIULIANELLI:**  That is correct for one of the

5    models, yes.  And that is when you are accurately forecasting,

6    as Your Honor said, the but-for rate that Google would charge

7    to developers.  Now, it bears noting before we --

8           **THE COURT:**  Is there no other -- I mean, isn't there

9    some documentary evidence?

10       Is there anybody at Google who wrote an e-mail saying, you

11   know, "all things being equal in a different world, we would

12   have charged only 15 percent?"

13       Is there anything that verifies other than this logit

14   model?

15          **MS. GIULIANELLI:**  Is there anything that verifies what

16   Google would have charged or developers would have charged?

17          **THE COURT:**  Google would have charged.  We are just

18   talking about the but-for Google rate.

19          **MS. GIULIANELLI:**  Yeah, I mean, I think we have a lot

20   of evidence in the record of -- from Google of what Google

21   would have charged had there been more competition including in

22   some very specific areas where Google has faced a little bit

23   more competition like it has the Living Room Accelerator

24   Program where there are certain kinds of developers, streaming

25   developers; and Google has been forced to drop its rate there.

1          Google also has a lot of business model planning

2    documents, for sure, where it has talked about -- and, in fact,

3    it has -- started to drop, you will see, a couple of these

4    programmatic drops to 15 percent, the take rate.

5          So we could amass and we have amassed in the depositions

6    and I think in the expert reports they go through plenty of

7    Google documents indicating that the take rate is too high and

8    that Google is looking at dropping, you know, the take rate.

9          But-for purposes of class certification what we have done

10    is -- and, by the way there are -- you know, so there is a lot

11    of evidence there, and we have benchmarks and evidence from,

12    you know, others that is confirmatory of Dr. Singer's --

13          **THE COURT:**  What kind of benchmarks?

14          **MS. GIULIANELLI:**  Well, bench -- well, for example,

15    like I think we have -- they are in Dr. Singer's report, but we

16    have a table of other platforms like the Epic Store recently or

17    the Microsoft Store in Dr. Singer's report, which I can pull up

18    for Your Honor if you want it, we -- of --

19          **THE COURT:**  All right.  So --

20          **MS. GIULIANELLI:**  -- of these benchmarks, but for

21    purposes of -- and we will get you that exact citation.

22          **THE COURT:**  Well, I know you -- I'm sorry.  I'm just

23    not going to hang my hat on logit.  So I'm asking you to help

24    me out by telling me it is more than just a formula.

25          **MS. GIULIANELLI:**  It --

1          **THE COURT:**  What I hear you saying is there are

2    benchmarks that Dr. Singer looked at, real-world benchmarks --

3    two of them being Microsoft and Epic -- there are also internal

4    Google documents, planning documents, you know, e-mails,

5    meeting minutes, deposition testimony, indicating that

6    15 percent would have been more or less the landing point had

7    the world been different.  So is that all fair?

8          **MS. GIULIANELLI:**  I think that is fair.  We have

9    Google documents.  But I do have a couple -- so yes, that is

10   fair.  And I will point you to the table on the benchmarks and

11   Google's own reduction of the rate in certain circumstances

12   where it has faced more competition like IRAP.

13         But going to logit, I think there is one other point

14   there.  When Your Honor asked about the pass-on as one of the

15   variables in the Rochet-Tirole model, that is about -- that is

16   a variable when you are calculating basically the take rate,

17   the rate that Google would charge developers.

18         We also have another model briefly, and that is a model

19   where Google gives direct consumer subsidies and that's on

20   slide 4 of the deck.

21         That model does not rely on pass-on as a variable, okay,

22   not logit.  But I think that logit -- if we could -- and we

23   will get to that in a minute because I think that this is a

24   very generally accepted, including in antitrust economics and

25   for pass-on methodology -- but before we get to logit because

1    we think -- we have a lot to say about its acceptance here.

2        If you look at slide 4, that's just a depiction of what we

3    call the play points model, and that model models the direct

4    consumer subsidy because remember, Your Honor, Google sits in

5    the middle as a platform and it competes for developers but it

6    also competes for consumers or it would compete for consumers

7    in the but-for world if there were another app store.

8        So what Dr. Singer modeled using the same Rochet-Tirole

9    model but when you are modeling the consumer subsidy, pass-on

10   is not an input to that model.  It doesn't rely on logit at

11   all.  And that we've called the play points model.

12       In the but-for world, it is kind of like, you know, it

13   increased direct subsidies.  Google would offer consumers

14   discounts, more subsidies in the form of rewards, to come to

15   their platform.

16       So Google doesn't really dispute, I don't think, the

17   reliability of the model.  It argues that, you know, consumers

18   wouldn't value the points or something else.

19       **THE COURT:**  You know, this is Rule 23.

20       **MS. GIULIANELLI:**  Yes.

21       **THE COURT:**  Okay.  So we don't need to go this deep in

22   the weeds.  There are just some fairly straightforward

23   questions.

24       Does it make sense for 21 million -- isn't that roughly

25   the class size, 21 million consumers?

```
 1              MS. GIULIANELLI:  I think we have more transactions,

 2    but --

 3              THE COURT:  Tell me, how many people are in the class?

 4              MS. GIULIANELLI:  I think we have something like

 5    90 million transactions.

 6              THE COURT:  How many people are in the class?

 7              MS. GIULIANELLI:  The number of people -- I would have

 8    to look it up -- but basically it would be everybody that

 9    purchased using an -- using an Android -- you know, using the

10    Google Play Store applications on Android.

11              THE COURT:  Okay.  Well, how many people do you

12    estimate that to be?

13              MS. GIULIANELLI:  I estimate -- I think it is

14    90 million people.  There are certainly 90 million and it does

15    make sense -- because we have a common methodology for

16    calculating those damages across the class, so it does make

17    sense to certify a class with that many people.

18         That was one of the questions that Your Honor had at the

19    last hearing.  And classes that large are certified all of the

20    time.  For example, in the *Apple* throttling --

21              THE COURT:  Just one second.

22              MS. GIULIANELLI:  Sure.

23              THE COURT:  I thought somewhere in your papers you

24    said that the class you are seeking is 21 million people.  Is

25    that not right?
```

1    **MS. GIULIANELLI:** Oh, yes, Your Honor, it is -- so I

2    was answering nationwide because what -- and this goes to the

3    class, 21 million --

4        **THE COURT:** I'm asking a very simple question.  You

5    want me to certify a class for you.  How many people do you

6    want me to put into your class?

7        **MS. GIULIANELLI:** 21 million -- there are 90 million

8    nationwide; 21 million here because those are the transactions

9    in the 17 states and jurisdictions for which we are moving.

10       **THE COURT:** Why is it 21 million people you are going

11   to be able to prove -- we have already done the 30 percent

12   accused overcharge; okay.  Now we are talking about the

13   back-end.  Now, we have already gone over this a little bit.

14     So you have some real-world data.  You have got some

15   benchmarks.  You have a couple other things and you have got

16   this logit formula.

17     Now, let's just talk about logit.  Now why is logit okay

18   here for this pass-through rate that is an essential part of

19   that RT formula?

20       **MS. GIULIANELLI:** I am happy to address that and I'm

21   prepared to or Mr. Mason --

22       **THE COURT:** Leave it up to you.

23       **MS. GIULIANELLI:** -- would be fabulous at addressing

24   that, and he is going to explain why it is generally used in

25   antitrust economics including cases like this where they are

1  estimating pass-on.

2          **THE COURT:**  All right.

3          **MR. MASON:**  Good morning, Your Honor.

4      So on the logit model, I want to start with the general

5  acceptance of the model generally in the field of economics.

6  And so first logit is generally accepted and it is widely used

7  in antitrust cases like this.

8      And the Miller article that Dr. Singer relies upon derives

9  the one minus share formula to measure pass-through, and

10  everyone agrees with those derivations, at least as they state

11  in the Miller article.

12      So first, with the logit model generally Dr. Burtis has

13  admitted that it's used all the time and economic literature

14  confirms that it is standard across a variety of applications.

15      And second, it is used specifically in the field of

16  antitrust economics; and it is regularly used to calculate out

17  changes in cost-effect prices.

18      And the Werden and Froeb article that you have on slide 12

19  of your deck shows that the logit model is commonly used to map

20  a change in merging parties' cost that come down from merger

21  synergies into a change in price.

22      And the merger context is a lot like this case.  So the

23  basic idea there is here is; that you will map how firms will

24  change their prices based on cost savings.

25      Savings in Werden come from a merger and in other merger

1    cases that have applied it, but the savings here are also from

2    a consolidation of power just like the overcharges in a merger

3    case.

4         And the reason economists use logit and mergers is that

5    they can't have a backwards looking look at changes and cost

6    because the cost savings haven't happened yet because you are

7    looking at the merger as it is happening.

8         And the same is true here.  So Google's take rate has

9    remained constant for the vast majority of transactions,

10   92.4 percent are still at 30 percent.

11        So Dr. Singer's analysis first confirms that the logit

12   model fits the data we have in this case.  And that's the logit

13   demand curves, and he talked about this quite a lot at the hot

14   tub that he ran 35 regressions at the demand categories or the

15   app categories to note the consumer demand explained how price

16   changes affected those app shares in the category.

17        So that's confirmatory evidence using real-world data in

18   this case, but the logit model fits and describes how

19   developers are competing based on the price of an app.

20        And then once he has done that, he can use the formulas

21   that are derived in the Miller article to calculate

22   pass-through on the developer-by-developer and app-by-app

23   basis.

24        And I'm happy to go into any more details of the analysis

25   if you like.

1    **THE COURT:**  So just on the front end, okay, the

2    30 percent, you are saying that Dr. Singer ran logit to show

3    that -- show what, that the developers were passing through the

4    entire 30 percent?

5    **MR. MASON:**  Not quite, Your Honor.  So Dr. Singer

6    looked at historical price changes, so the developers' final

7    consumer prices, and used that as the independent variable to

8    see how they affect the dependent variable, the developers'

9    share, within the category.

10   So then based on that he could determine that a logit

11   demand curve, which is just a shape of a demand curve,

12   described the demand developers were facing in this case.

13   And then the next step from that analysis of the actual

14   data in this case, he used the formula which is derived from

15   the logit demand curve, is inherent to the curve that he

16   confirmed applied in this case, to determine if developers were

17   given a reduction in price how they would change their prices

18   in order to maximize profits in accordance with the demand

19   curve that they faced.

20   **THE COURT:**  Okay, so that is all common evidence that

21   would be used for everybody on the consumer side.

22   **MR. MASON:**  Exactly.  It would be able to basically

23   put the output of the Rochet-Tirole model, which gives you the

24   change in take rate, and then the output of the logit model;

25   see the pass-through.  And that can be done on a category

basis.  It can be done on an app-by-app basis all with common

evidence formulaically to essentially spit out an overcharge

that each consumer in the class would have faced.

      **THE COURT:**  Okay.  Let's hear from Google.  So you

understand the exercise.  This is Rule 23.  This is not a

non-substantive motion; okay.

    We are looking only at:  Does it make sense for everybody

on the Plaintiffs' side to travel as a group or do they need to

fly individually.

    And so I'm sure I have tipped my hand to some extent.  I'm

having trouble seeing why flying as a group is a bad idea so...

      **MR. RAPHAEL:**  Well, Your Honor, I think the issue here

is we have a novel class and a novel formula and a novel

agreement with the states, which maybe we will get to later;

but just focusing on the issues --

      **THE COURT:**  Novelty is not inherently suspect.

Novelty is good in many cases.

      **MR. RAPHAEL:**  Understood, Your Honor, but I think in

this case the novelty violates fundamental principles of

economics that their expert conceded as well as I think the

well-established case law from the Ninth Circuit and a number

of other cases.

    And so I think from that exchange with the Court I just

want to clear up sort of what fits where because I think that

will set up why the logit model here cannot be used to predict

1   with common evidence whether there is antitrust impact, which

2   the Court has said that's what really matters at class

3   certification.

4        So their proposed class, as Your Honor said, has

5   21 million consumers, and those consumers had transactions with

6   300,000 different apps; right.  So that's everything from

7   Thomas The Train to the Swimming app --

8            THE COURT:  I know I said 21 million, but I think one

9   of you pointed out that over 8 million are just purchasers of

10  one app; right?

11           MR. RAPHAEL:  Precisely, Your Honor, and I think

12  that --

13           THE COURT:  So it is really in some ways 14 million --

14  I mean, 8 million people -- 8-and-a-half, 9 million, whatever

15  the number was are buying -- who is that, by the way?  Nobody

16  ever told me.  Who is that one popular app that --

17           MR. RAPHAEL:  Well, it is not a single app,

18  Your Honor.  There is 40 percent of the class, roughly

19  8 million, have had a transaction with any one app.  They only

20  had one app associated with their transactions.  And I think

21  that matters very much, Your Honor.

22           THE COURT:  I see.  It is not one app.  It is one --

23  okay, all right.

24           MR. RAPHAEL:  And I think that matters very much

25  because if there was no pass-through for the app that was

1  associated with those people's transactions, then that's

2  8 million uninjured people potentially, at least, Your Honor;

3  right.

4      So they need a method to determine even if there was that

5  overcharge at the -- what they call the take rate level, at the

6  service fee level, right, if we -- even if we just assume that

7  for purposes of argument, they need to show how that -- if that

8  was passed through to each of the 20 million consumers -- and

9  the only method they have to do that is Dr. Singer's, what they

10 call the logit model.  It is really just that one minus the

11 share formula.

12     That is their only basis -- it is their only supposedly

13 common evidence for doing that.

14     And, Your Honor, that one minus the share formula has

15 never been used in any antitrust case.

16     **THE COURT:**  I don't think that's right.  I was

17 pressing your colleague about evidence that is outside of the

18 formula, and she says she has internal Google documents,

19 business plans, deposition testimony, maybe some developer

20 testimony.  Thirty percent does not seem to be something that's

21 purely the invention of mathematics based on real-world data.

22     **MR. RAPHAEL:**  No, Your Honor.  I just want to clear

23 something up because I think there was potentially some

24 conversation about what Ms. Giulianelli said.

25     My understanding is that the evidence she was referring

1   to, other than Dr. Singer's formula, related to calculating

2   what the service fee would be in the but-for world, not whether

3   it was passed through.

4        On that point I don't recall any other evidence that was

5   remotely common or, frankly, any other evidence at all in their

6   papers as to what pass-through would be.

7        So I think on pass-through -- I'm sure Ms. Giulianelli

8   will correct me -- but on pass-through it essentially comes

9   down to the one minus the share formula.  That's what has been

10  argued through the briefs, and I think that was what was

11  Dr. Singer's position at the hot tub.

12       So if there is other evidence they are contending that

13  shows pass-through common evidence, I think this would be the

14  first that we have heard of it.

15       I think what we are really talking about here is this one

16  minus the share formula.  And this formula comes from a single

17  article.  It has not been used to do pass-through in any

18  antitrust case.

19       The logit model on which it is based, they have one

20  article that suggests it is done in mergers.  And I think,

21  Your Honor, there is two facts here that show that this logit

22  model can't be used here.  And I think, frankly, they are

23  undisputed.

24       The first, Your Honor, is that their article -- and I

25  would like to just hand up a few pages of documents where I

1    think Your Honor can see this quite clearly.  Can I do that?

2            **THE COURT:**  Hand it to Ms. Clark.

3            **MS. GIULIANELLI:**  May I see?

4            **COURT REPORTER:**  Can I get your name again?

5            **MR. RAPHAEL:**  Sure, for the reporter my name is Justin

6    Raphael for Google.

7            **COURT REPORTER:**  Thank you.

8                    (Pause in the proceedings.)

9            **MR. RAPHAEL:**  So, Your Honor, there's two facts that I

10   think show clearly that the logit model cannot be used in the

11   circumstances of this case; that there is no economic support

12   for doing that.

13                    (Pause in proceedings.)

14           **THE COURT:**  Oh, do you have another copy?

15           **MR. RAPHAEL:**  Yes.

16           **THE COURT:**  Thank you.  Okay, go ahead.  All right.

17   Go ahead.

18           **MR. RAPHAEL:**  So the first fact, Your Honor, is that

19   the service fee here is a percentage of the price charged.

20       In the economic literature that is known as an ad valorem

21   cost as opposed to a per unit cost.  So a per unit cost would

22   be 30 percent.  An ad valorem cost is -- sorry, a per unit cost

23   is 30 cents.  An ad valorem cost is 30 percent.

24       And the second fact -- and I will go through these with

25   what I handed up because I think it's quite clear.  The second

1    fact the Court needs to understand is that all of the apps in

2    each category on which this logit formula is based are

3    concededly not substitutes.

4         So if Your Honor will turn to tab 4 in what I have handed

5    up, you will see on page 452, it should be the second page with

6    text -- and we have highlighted it for the Court -- it says

7    that suppose a per unit tax is levied on each product in the

8    model; right.

9         So the only article where this formula comes from, the

10   only one they have ever been able to point to says "a per unit

11   cost."

12        It is undisputed, Your Honor, that we don't have a per

13   unit cost here.  And so there is literally no economics article

14   in the record suggesting that this formula can be used in the

15   circumstances of this case where we have an ad valorem cost

16   that's a percentage of the price charged.

17        That has never been done before.  There is no economic

18   evidence in the record suggesting that anyone has ever done it

19   or that it could be done.  No economist has even suggested that

20   it could be done.

21             **THE COURT:**  Okay, that's fine.  Why is it wrong?

22             **MR. RAPHAEL:**  It is wrong, Your Honor, because I think

23   the data show -- you know, Your Honor talked about data.  We

24   have this, to some degree, maybe a natural experiment.  We have

25   data suggesting that pass-through was not universal.

1    There was a variation -- in fact, dramatic variation -- in

2    pass-through.

3        **THE COURT:**  I don't have a problem with that.  In

4    fact, it must have been you.  I don't remember.  There has been

5    a lot of information in the case.

6        Somebody said something up to 16 percent of developers had

7    different charges from Google and presumably were passing

8    through different amounts to consumers as a result of that.

9    That's fine.

10       You know, the world is not expected to be entirely

11   homogenous.  This is the United States District Court.  There

12   are going to be some unraveling of the blanket here and there.

13   It doesn't mean that the blanket as a whole; i.e., a class, is

14   a bad idea.

15       So I'm fine with the fact that there is some -- some rough

16   edges and it is not one size fits all.  It doesn't have to be

17   to certify a class.

18       **MR. RAPHAEL:**  Well, Your Honor, I don't think --

19       **THE COURT:**  The -- the recent decision in the *Bumble*

20   *Bee Tuna* case makes that abundantly clear.  You can have

21   substantial variations and as long as -- as long as the main

22   dispositive questions are all subject to the same evidence,

23   common methods of proof, you got a class.

24       Now, whether you win or lose on the merits, totally

25   different issue.  We all agree on that; okay.  You can still

1   have a class and kill the other side on the merits.  There is

2   no dispute about that, but the question is:  Let's say

3   21 million consumers brought individual suits, are they going

4   to be using a different pool of evidence in each and every one

5   of those cases to prove that Google engaged in an

6   anticompetitive overcharge?

7        Right now I think the evidence overwhelmingly says no.

8   They are all going to be using more or less the same evidence.

9        If that is correct, as I believe it to be, that means

10  Rule 23 has been satisfied.

11       That's what I need to hear from you.  Why is that not the

12  case?

13            **MR. RAPHAEL:**  Well, Your Honor, I think the -- I'm

14  glad you mentioned the *Olean* decision because I think the *Olean*

15  decision shows exactly why class certification has to be denied

16  here.

17       And I think what the *Olean* decision explains is that it is

18  not merely the expert walking into the court and saying:  "I

19  have one model and apply it to everyone."

20       The *Olean* court explained -- and I think this is at

21  footnote 13 of the opinion at page 678 as well in the

22  discussion of the new motor vehicle case -- and the court

23  explained that what the Plaintiffs need is a model that is

24  capable of showing who was injured and who was not; that there

25  can't be so many factors at play that are uncontrolled for;

1  that the Plaintiffs aren't able to show who was injured and who

2  was not.

3      Now, here we have pass-through rates in 2 percent,

4  8 percent.  Here, the search is going to be for consumers who

5  were injured rather than who weren't.

6      And the court in *Olean* found that the Plaintiffs had that

7  evidence because they had a regression.

8      And as I think Your Honor is familiar with from past

9  cases, from *Capacitors*.

10      **THE COURT:**  *Olean* is a price fixing case.  So let's

11  just worry about your monopolization case; okay.

12      I'm still not -- I understand what you are saying.  I

13  mean, we all agree on the principles; but you are not telling

14  me why as an evidentiary matter what I said is not right, which

15  is if 21 million people sued, they would still all be using,

16  90 percent or more of the same evidence, to prove Google was

17  guilty.

18      **MR. RAPHAEL:**  Your Honor, we --

19      **THE COURT:**  I'm not seeing how any of these people

20  would be different.  And if that's the case, economy,

21  efficiency, and the administration of justice indicate that

22  Rule 23 makes sense in this context.

23      **MR. RAPHAEL:**  Well, Your Honor, each Plaintiff -- with

24  each Plaintiff, we are going to be able to come in and point

25  out all of the factors that will affect the pass-through with

1    respect to -- and Your Honor had talked about the 8 million

2    that had one app.  We are going to be able to come in and talk

3    about the factors that affect whether there would be

4    pass-through for that app.

5         One of them is focal point pricing.  There's the

6    competitors they face, as Your Honor pointed out last time.

7    There is the cost structure.

8         We can just focus on focal point pricing as an example,

9    right, 97 percent of the prices in the actual world ended in

10   99; right.  And Dr. Singer says that is an important

11   consideration here.

12        If the service fee does go down, are they going to change

13   the price from 1.99 to 1.92?  We tend not to see prices like

14   that.  We didn't see them in the actual world.

15        And in the three cases in this district involving

16   allegations of pass-through, the court said if you don't

17   account for that -- if you don't account for factors like focal

18   point pricing, then the Plaintiffs don't have common evidence

19   that is going to be able to do the trial in one fell swoop

20   because we are going to have to ask for every single

21   intermediary would they set pricing at focal point prices or

22   not.

23        And just -- I mean, we have the *Apple* case, the

24   *Lithium-Ion Battery* case.  We have the *Optical Disk Drive* case.

25        Maybe just focus on the *Apple* case because I think it is

1   the most recent, and I think it is probably the closest to the

2   facts of this case.

3        So in the *Apple* case the Plaintiffs had a theory pretty

4   similar to what the Plaintiffs have here that if the service

5   fee in the Apple app store was lower, then the prices of the

6   apps and -- in the Apple app store would be lower as well.

7        And the Plaintiffs' expert there -- there was overwhelming

8   evidence of focal point pricing, just like we have here,

9   97 percent of the prices have focal points.  And their expert

10  didn't account for focal point pricing.

11       The model wasn't capable of capturing that factor.  And

12  Judge Gonzalez-Rogers said:  "That model is discluded.  I'm

13  denying class certification because it is not picking up on the

14  factors that will affect pass-through."

15            **THE COURT:**  I don't necessarily agree with that.  I'm

16  sorry.  I just don't think that is necessarily right.  I don't

17  think that is a barrier to Rule 23.  Maybe fodder for

18  cross-examination, maybe other things for trial.  The fact that

19  you can impeach the model does not mean that the class can't be

20  certified.

21            **MR. RAPHAEL:**  Well, I think, Your Honor, that what we

22  have here is more than impeaching the model as to whether --

23  again, I compare it to the case with regressions, which is what

24  we usually see.  It is what Dr. Singer used --

25            **THE COURT:**  You usually see in price fixing cases.  In

1   monopolization cases you see all different sorts of things.  I

2   know from my experience.  Section 2 is just a different

3   analysis.

4        You know, price fixing cases are often off-the-shelf,

5   linear regressions that everybody agrees on and have been

6   carved in stone for decades.

7        Section 2 is more complicated, more sophisticated.  It is

8   more dynamic.  It is a different proposition.  So, I'm not -- I

9   don't think focusing on these Section 1 cases is going to help

10  you here.

11       **MR. RAPHAEL:**  Well, Your Honor, I guess -- I do agree,

12  Your Honor, that the pass-through here is more complicated.  I

13  think the problem is in a case that is more complicated we have

14  a formula that is vastly more simple, and we have a formula

15  that is being used in circumstances where Dr. Singer conceded

16  that it can't be used.

17       **THE COURT:**  I don't think he conceded that.

18       **MR. RAPHAEL:**  Could I point Your Honor to the

19  transcript?

20       **THE COURT:**  No, that's okay.  I was here.  Okay.

21  Anything else on common evidence and why that doesn't

22  predominate?

23                    (Pause in proceedings.)

24       **MR. RAPHAEL:**  Your Honor -- you know, Your Honor, I

25  would just say that I think Dr. Singer's model does not capture

1  the factors that he himself conceded are -- are factors in

2  whether there is going to be pass-through for each individual

3  Plaintiff.

4      Each individual Plaintiff had some collection of apps.

5  All of those apps have different price structures.  They have

6  different cost structures.  They have different competitors,

7  and the Plaintiffs have absolutely no method to account for any

8  of those factors.

9      The only thing that it depends on -- their whole

10  pass-through theory, the only thing it depends on is these app

11  categories.

12     And I think that that's -- under the *Olean* decision that

13  says they need a model that is capable of accounting for and

14  controlling these factors that will affect the variation.  I

15  don't think that that comes close to the *Olean* standard.

16         **THE COURT:**  Okay.  Plaintiffs, closing thoughts?

17         **MS. GIULIANELLI:**  I do have a couple of things,

18  Your Honor, to say.  I think Your Honor is right.  Dr. Singer

19  never conceded that this logit model was novel.

20     In fact, it is not novel.  It is used in mergers and

21  situations like this all of the time, which is very similar to

22  monopolization.

23     And the one -- when Google's Counsel says it is really

24  just the one minus share formula, that is mathematically

25  derived from published, peer-reviewed literature.  And there is

1  no dispute that the math is correct, and that it was derived

2  from there.

3      So what we have is a dispute, I think, about whether a per

4  unit cost or an ad valorem cost is the appropriate level of

5  cost.

6      Now, the experts dispute this.  I think that that's for

7  the trial and on the merit, but there is nothing in the

8  published literature that says it is limited to a per unit

9  cost.

10      And if you look at the derivation, there is this term "T"

11  and that is not limited to a per unit cost.  They mention per

12  unit cost, but the article says it's a general model of

13  pass-through.  That's what it says.  It says it is a general

14  model of pass-through using the one minus share formula which

15  is derived from some very, very complicated mathematics.

16      We have six formulas and we have it on one of the slides

17  that I'm happy to go through but I have the feeling that this

18  is probably something Your Honor doesn't want to hear at that

19  level.

20      But the point is that there is a common general --

21          THE COURT:  It is not a matter of -- it is just a

22  matter of whether I need to do this, and I don't think that I

23  do.

24      Let me ask you this -- you should close out that

25  thought -- but 21 million people, that's not inherently a fatal

number.  It is a lot of people.  So I want to get some sense about manageability.  There is a point where you can have a class that is too big.

Now, I don't know if 21 million is that number or not but I want to hear about that.  Why don't you just finish your thought on that logit point and then let's talk about size; okay.

**MS. GIULIANELLI:**  The only thought on the logit point is that it is a reliable generally -- it is a reliable common methodology that can be applied here, and I think this goes straight to Your Honor's question of manageability.

So Your Honor asked how you could calculate -- this is two related questions, question number 2 and I think number 3 in the deck -- how you can calculate independent -- individual damages app-by-app using this model.  And Dr. Singer ran through that common methodology for doing.  That it is on slide 25 if Your Honor wants to look at it later.

Basically, the point is that this can be looking at each individual's damages including those that bought only one application can be done using each member's own purchase history in the class; and it can be done on an app-by-app basis using the common methodology that Dr. Singer has provided here.

There are different pass-on rates and there are different damages for each consumer, but they are derived using the same model.  It's math.  It is coding.  And that can be done

1    regardless of the application and the consumer.  Same set of

2    facts and --

3         **THE COURT:**  Let me just jump in.  So let's say it is

4    21 million people in this class that you want me to certify.

5    Is it the case then that Google has all the class period,

6    okay -- whatever it is, five years, whatever -- pardon me --

7    Google has complete purchase records for each individual, which

8    app they bought, when they bought it, how much they bought it

9    for, it's all electronic.  This can all be done very quickly

10   with some data analysis program, you know, whatever, a

11   spreadsheet; okay.

12        So for each person you could figure out their total

13   purchases subject to a potential refund for an overcharge,

14   assuming you hit a home run and ring the bell and you get to

15   that point, who knows -- maybe you will; maybe you won't -- you

16   can do all that electronically, and it is rock solid; and it is

17   all just done at the -- literally at the speed of electrons and

18   you don't have to ask anyone to submit claim forms or anything

19   else; right?

20        **MS. GIULIANELLI:**  Well, I think that's basically

21   right.  On the claim forms that the claims administrative

22   process people would have to come and charge; but if Your Honor

23   can go to slide 26, you are exactly right in that this is an

24   excerpt from Google's transactional database.  And you will see

25   here that Google actually has all of this information that

1    Your Honor asked about.  Google knows --

2         THE COURT:  All right.  What is this on 26?

3         MS. GIULIANELLI:  Slide 26 is basically an excerpt

4    from some of the transaction database that Google maintains.

5         MR. RAPHAEL:  Your Honor, this is -- this appears to

6    be a picture of something from Google's database.  I don't know

7    where it came from or what -- I mean, it looks to be a screen

8    capture of something that seems like an internal Google

9    database.

10        MS. GIULIANELLI:  Right.

11        MR. RAPHAEL:  That's what Ms. Giulianelli is

12   representing it is.  I have not seen this in any of the

13   briefing.  It wasn't disclosed --

14        THE COURT:  I will ask you the same question in just a

15   moment.  Let's assume that this is a screenshot of transaction

16   database.

17        MS. GIULIANELLI:  This is a screenshot of what Google

18   produced to us, to our experts in this case.  And it is

19   answering Your Honor's question somewhat about manageability.

20        Now, what we have here is that -- Google's transactional

21   data identifies each customer by its own unique customer ID.

22   You can see the app the customer purchased, the date that it

23   was purchased, the billing address -- so state-by-state -- you

24   can see the amount paid.

25        So Google has all of this information, and they provided

```
 1    it to us.

 2             THE COURT:  So each individual consumer has a unique

 3    ID number?

 4             MS. GIULIANELLI:  Correct.  Right here in the

 5    transactional --

 6             THE COURT:  Just a moment.  And that sticks with the

 7    consumer for the class period?

 8             MS. GIULIANELLI:  It does.

 9             THE COURT:  So they bought something in 2019 and they

10    took a break and they did the digital detox; took a break;

11    decided that life was colorful enough without it.  They went

12    back in 2022, they would still have the same ID.

13             MS. GIULIANELLI:  I think unless the customer

14    changed -- and Google's Counsel will correct me if I'm wrong --

15    their Gmail address.

16        But when a customer buys something through Google Play

17    billing, which is required by Google in this case, the customer

18    has to sign up with Google.  They give their information to

19    Google.  They give their credit card.  They give their payment

20    information, and they have to have a Gmail address and they

21    have to have a customer ID.  And that's what you see here.

22        Now, the customer ID on this, I think, was anonymized by

23    Google before they provided it to us, and I have a bunch of

24    letters that we went back and forth when we were getting the

25    transactional data for personal privacy information; but the
```

1    point is Google -- these are actual real-world customers from

2    their database.

3        They have an ID and each customer has an ID.  So that's

4    associated with a Gmail address.  And all the customer needs to

5    know is their Gmail address, and then Google is able to match

6    the information.

7             THE COURT:  Has to be Gmail?  They can't have --

8         MS. GIULIANELLI:  Well, I think Google requires Gmail.

9    That's my understanding.  I could be wrong but I'm pretty sure

10   I am not.  Google's Counsel -- so when you sign up for a Google

11   account and you buy through Google Play billing, you have a

12   Google customer ID.

13            THE COURT:  Is that right, Counsel, you have to have

14   Gmail?

15        MR. RAPHAEL:  I don't believe that's right,

16   Your Honor.  I would say that a lot of what Ms. Giulianelli is

17   bringing up was not in the briefing, so I'm not really sure --

18            THE COURT:  I'm asking.

19        MR. RAPHAEL:  What I'm saying, Your Honor, is I don't

20   believe that's correct.

21            THE COURT:  Okay, well, let's pause for a moment.  So

22   look, you understand what I'm asking.  I mean, look, it stands

23   to reason -- and Ms. Giulianelli is providing the evidence that

24   supports that proposition that Google knows exactly who bought

25   what when and how much they paid and how to reach them because

1    that's the business.

2        So is there any reason for that -- to call that into

3    question?  In other words, this should be super easy to figure

4    out -- even though it is a giant class and it gives me -- I

5    have got to think about that -- but it is not really a hard

6    class to deal with because of all of the electronic

7    information.

8        **MR. RAPHAEL:**  Well, just -- I don't agree, Your Honor,

9    but let me just say with respect to all the information,

10   certainly Google has information about what purchases were made

11   and who made them.

12       I don't know specifically whether we have the information

13   with respect to whether -- how the class intends to do this, so

14   I don't want to represent that we do because I don't believe

15   that we have been told precisely how this will work and what

16   fields and so forth.  So I just want to make sure this is

17   clear.

18       **THE COURT:**  I'm asking a simpler question.

19       **MR. RAPHAEL:**  I do think --

20       **THE COURT:**  I find it hard to believe that Google, of

21   all companies, doesn't have a highly detailed database of every

22   transaction through the Google store.  Now, are you telling me

23   that's not right?

24       **MR. RAPHAEL:**  Your Honor, there is extensive

25   transactional data.  I'm not suggesting that there isn't.

1          **THE COURT:**  Okay.

2          **MR. RAPHAEL:**  I do think that -- I don't think that

3    solves the manageability problem, Your Honor, because I think

4    if we think about how is this going to look at a trial, we are

5    going to come in -- we have a due process right to come in and

6    say to each one of these 8 million or 21 million people "you

7    weren't injured because look at the app you bought; look at

8    that developer's marginal cost; look at that developer's

9    competitors; look at that developer's commitment to focal point

10   pricing; look at that developer's commitment to reinvesting

11   savings back into their app;" all of these things that affect

12   whether they are injured.

13         And if we come into the courtroom with that evidence with

14   one person -- let's just focus on one person -- and then what

15   are they going to do?  What evidence do they have to address

16   all of those factors that we have?  They don't have evidence

17   that will --

18         **THE COURT:**  We are talking about something else right

19   now.  If we need to get -- if we get to the point -- and who

20   knows, as I have said repeatedly, whether you will or not -- if

21   we get to the point where we have to communicate with the class

22   and let them know that this is the amount of money they are

23   entitled to get and they are bound by the judgment and here is

24   how you get your check, I mean, all of that sounds pretty easy

25   because there is a giant database which can be electronically

1    manipulated in relatively common and simple ways.  Is there any

2    reason that you disagree with that?

3         **MR. RAPHAEL:**  Your Honor, I certainly agree there is a

4    lot of data, and I would suspect that there might be ways we

5    could figure out how -- what purchase -- you know, who bought

6    what and when; but I can't represent it can be done in a

7    particular way because I haven't heard exactly how they are

8    trying to do it.

9         **THE COURT:**  I understand.

10        **MR. RAPHAEL:**  I'm not denying there is a lot of data

11   and that there's people --

12        **THE COURT:**  I'm not asking you to be the settlement

13   administrator.  I'm just asking you to tell me whether you

14   anticipate any and I'm hearing the answer is no.

15      Okay, I mean, that goes a long way to making me feel a lot

16   better about 21 million people, which is still large.  It is

17   really just a manageability issue.

18        **MR. RAPHAEL:**  Your Honor, can I just point out one

19   more thing on that?

20        **THE COURT:**  Sure.

21        **MR. RAPHAEL:**  I mean, I do think we have this issue of

22   who is in what state and the residency of people in one state.

23   They point out billing addresses.  I don't know whether those

24   would precisely map on when you are talking about individuals

25   that can change their addresses and --

1          **THE COURT:**  Well, that is a solvable problem.  I'm not

2    too worried about that.  Let me -- I just don't understand what

3    you are doing with the State Attorney Generals.  You have

4    carved up the country.  Now, what does that mean for damages?

5          **MS. GIULIANELLI:**  Let me address that exactly.  That

6    was the fourth question that Your Honor had.

7          So I would like to spend just a brief minute on the

8    background of the agreement and how it came to be and then

9    answer how we are going to do the damages.

10         Your Honor, might remember that the consumer class filed

11   this lawsuit with the class representatives almost a year --

12   and then almost a year later the states brought the same claims

13   in 39 jurisdictions for the same damages claims, for the same

14   consumers under federal law.

15         And so for the efficiency of this litigation, what we were

16   looking at was two sets of people, the State AGs in their

17   parents capacity and the class, who had been working on this

18   for nearly a year representing the same consumers and the same

19   jurisdictions.

20         So for the efficiency of the litigation we entered into an

21   agreement that we would jointly prosecute the claims against

22   Google.  And, you know -- and so, you know, you have the joint

23   prosecution agreement in there.

24         One of the important terms of the agreement is the states

25   are going to pursue damages claims, just as we are, and will

1    distribute the net proceeds to the consumers who were injured,

2    just as we will.

3          And so what we have done pursuant to this agreement, for

4    the efficiency of the litigation, was agree that we would move

5    for class certification in the 17 jurisdictions that are not

6    covered by the State AGs claims because there is no need for

7    double recovery here.

8          We are not looking for double recovery.  So as long as the

9    states, which they are, are pursuing damages claims, the same

10   damages under federal antitrust law, for their consumers in

11   those jurisdictions, we are pursuing the claims for the

12   consumers in the 17 jurisdictions for which we have now moved

13   to certify a class.

14         So we are working together to do that but our -- and

15   that's where which got the confusion between the 90 million and

16   the 21 million -- because nationwide it is 90 million, but we

17   are seeking to certify basically 21 --

18         **THE COURT:**  It is 90 million with every Plaintiff

19   group.

20         **MS. GIULIANELLI:**  Correct, correct.

21         **THE COURT:**  Okay.

22         **MS. GIULIANELLI:**  And so that's -- and really how that

23   operates is we will hopefully have a certification for the 17

24   states which are not covered by the State AGs parents claims

25   which are the same -- you know, same claims.

1          So we are all basically rowing in exactly the same

2    direction here pursuing same anticompetitive conduct, same

3    everything across the nation that Google has entered into; but

4    we are working hand-in-hand with the State AGs because they are

5    willing and ready and able and have brought claims for the

6    consumers in their states to recover the damages.

7          And I'm -- we have had all of these filings, Your Honor,

8    in the last day that Google brings up about the class

9    representatives.  And I'm happy to address those or Your Honor

10   can read the filings if Your Honor wants.

11             THE COURT:  I think I'm okay on that.

12             MS. GIULIANELLI:  Okay.

13             THE COURT:  So, okay.  Thank you.  I will take this

14   under submission.

15             MR. RAPHAEL:  Can I be heard on that, Your Honor?

16             THE COURT:  Sure.  Any closing thoughts?

17             MR. RAPHAEL:  I just think that class counsel left

18   something out, which is that they are -- their agreement

19   provides that they will be able to get fees from the Attorney

20   General action where there are consumers who they will not

21   represent even if the class is certified.  And I think --

22             THE COURT:  Well, who knows.

23             MR. RAPHAEL:  -- that creates some issues that we

24   raised in --

25             THE COURT:  That's for another day.  I'm not awarding

1   fees to anybody at all.  Whether that day comes to pass, who

2   knows.  I can guarantee to Google it is not going to be a

3   situation where somebody gets something for nothing.  That is

4   just not going to happen, okay, so don't worry about that.

5       I don't -- I don't think that's a counsel versus putative

6   class member conflict.  Anyway, I'm not worried about that.

7       Just so -- okay.  While you are -- is everybody here?

8   Maybe everybody is not here.  Everybody is not here.  I was

9   going to ask, people are asking for more time now and all sorts

10  of things, but that's fine.  It's okay.

11          MR. GLACKIN:  Your Honor, everybody is here.

12          THE COURT:  Everybody is here; okay?  Well, would you

13  rather just come back in a couple weeks for a status

14  conference?  How about that?

15          MS. GIULIANELLI:  I think -- well, since we all have

16  filed this, I think the issue is that currently the expert

17  reports are due on August 15th.  And so if there is going to be

18  even a month extension of time, we would need to know that now.

19  That's the only issue I see about the status conference.

20          THE COURT:  Well, should we just -- why don't you come

21  on up and make your appearances.

22          MR. GLACKIN:  Brendan Glackin, Special Assistant

23  Attorney General for the State of Utah representing the States.

24          THE COURT:  All the States?

25          MR. GLACKIN:  Correct.

```
 1                THE COURT:  Okay.

 2                MR. REITER:  Good morning, Your Honor, Joseph Reiter

 3      on behalf of the Match Plaintiffs.

 4                MS. MOSKOWITZ:  Good morning, Your Honor, Lauren

 5      Moskowitz for Epic Games.

 6                THE COURT:  Oh, okay.  All right.  Okay.  So what

 7      is -- what is Google's perspective on more time?

 8                MR. POMERANTZ:  We are actually --

 9                COURT REPORTER:  Your name, please.

10                MR. POMERANTZ:  My name is Glenn Pomerantz.  I

11      previously introduced myself.  We are happy with any one of

12      three results.

13                THE COURT:  Three, okay.

14                MR. RAPHAEL:  We can keep the current schedule.  We

15      can move the entire schedule by a month or we can move -- as

16      the States are requesting or we can move the entire schedule by

17      three months as one of Match's request.

18           What we want, Your Honor, is a single trial with all of

19      the Plaintiffs.

20                THE COURT:  I agree.  That's what I want too.

21                MR. POMERANTZ:  We want that.  The other two things

22      that we would like --

23                THE COURT:  Mr. Pomerantz, you mean move the trial --

24      move everything by --

25                MR. POMERANTZ:  Everything moves by a month or
```

1  everything moves by three months.  Those are alternative

2  requests from various people on this side.  We are okay with

3  either one.  We just need three things.  One trial with

4  everybody.

5          THE COURT:  Before I do that, can you remind me, is it

6  April of next year?

7          MR. POMERANTZ:  It is, early April, April 3rd.

8          MS. MOSKOWITZ:  April 3rd.

9          THE COURT:  This would be like a July trial?

10         MR. POMERANTZ:  Any of those dates would be fine.

11 What we want, though, Your Honor, is two other things.  We want

12 the spacing of the events.  We all worked together with

13 Your Honor to come up with that spacing.  We need to keep the

14 general spacing.

15         THE COURT:  That's fine.

16         MR. POMERANTZ:  And then the other thing we would ask

17 for is no new fact discovery.

18         THE COURT:  I agree.  I agree.  Okay, that's fine

19 with -- an end is coming, so okay.

20         MS. MOSKOWITZ:  Your Honor, may I just be heard?  I

21 think Epic Games is the one party that does not want an

22 extension at all including of the trial date, and we included

23 that position in the States' request.  April 3rd is already

24 30 months from the initial case management conference, which is

25 well over what Your Honor --

1          **THE COURT:**  What is another 90 days?  I mean,

2    seriously?  Is it really going to make or break Epic?  I don't

3    think so.

4          **MS. MOSKOWITZ:**  The injunctive relief that we are

5    seeking -- the trial has been bumped multiple times already and

6    April 3rd we have been operating on since February when

7    Your Honor set it, which was already four months after the

8    parties had requested.  So we do think we are prejudiced by any

9    extension here.  We are ready to go.

10          **THE COURT:**  I thought Epic was a non-jury trial.

11   Aren't you a bench trial?

12          **MS. MOSKOWITZ:**  We wanted to be.  But we heard

13   Your Honor clearly; that you were going to do this once.  So we

14   have been waiting.  We waited for class cert even though that

15   is not an issue for us.  We have been sort of sitting and

16   waiting and trying to be as part of this group's schedule, but

17   the States' issue and Match's issue sort of dragging us back

18   further is prejudicing Epic even further.  We are ready.  We

19   want to go.

20          **THE COURT:**  Okay.  Match?

21          **MR. REITER:**  Thank you, Your Honor.

22          **THE COURT:**  How about 45 days?  Let's just split -- I

23   will be a mediator.  We will just split the -- zero to 90, we

24   will pick 45.  Can you live with that?

25          **MR. REITER:**  Your Honor, I wish I could but three

1    months is really the minimum that we need right now.  Just

2    looking at the deposition schedule, we've got, by my count, at

3    least a dozen depos that haven't been noticed by us that we

4    need to participate in and then 15 depositions most likely just

5    for the Match case.  I mean, 45 days, there is very little time

6    to get all that done in addition to just, on our side, having

7    to review --

8         **THE COURT:**  You could have filed earlier.  I mean, it

9    is not like you didn't know this was happening.  There is a

10   certain point where I can deal a little bit, but I can't just

11   act like you are the only person in the room.  Do you

12   understand that?

13        **MR. REITER:**  I understand that, Your Honor.  We don't

14   want to be here asking for this.  We have been doing everything

15   we can to avoid that result.  We have experienced some

16   unexpected delays.

17        Just as an example, I didn't get Google's document

18   productions to the other Plaintiffs until last month.  It took

19   six weeks just to get that data actually processed, sent to us

20   and uploaded on our end.  This record is enormous.  There is

21   over --

22        **THE COURT:**  I mean, I understand that and I'm not -- I

23   don't want to hear about it, but you got a huge head start.

24   Now, you have got this enormous bolus of data that all the

25   parties have been working hard to harvest for you.  I

1  understand you've got to review it and it takes time and you

2  have a special relationship to the client, but it seems like

3  you have plenty of room not to recreate the wheel.

4      **MR. REITER:**  And we are not -- to be very clear, we

5  are not recreating the wheel at all.  Our discovery requests

6  have been targeted to Match specific issues, so will our

7  depositions.

8      This is really about giving our experts enough time to get

9  up to speed on the existing record and then also, Your Honor,

10  counterclaims were filed against us less than a month ago.

11      So we have a motion to dismiss pending.  That won't even

12  be heard until September 8th.  And just briefly on that point,

13  I think with respect to Google's proposal, we are fine with

14  everything except the idea that there should be no new

15  discovery served.

16      I want to be very clear.  We don't have any intent to be

17  serving a substantial amount of new discovery, but I do require

18  some -- I will need a little bit of optionality there just

19  because of the fact that counterclaims were filed very recently

20  and after we had actually served our written discovery.

21      **THE COURT:**  So you want mainly counterclaim discovery?

22      **MR. REITER:**  Yes, Your Honor.

23      **THE COURT:**  Mr. Pomerantz, that doesn't seem too

24  unreasonable.

25      **MR. POMERANTZ:**  But the counterclaim discovery is

1  clearly part of the original discovery the two parties

2  exchanged.  It is all the same story.

3      So the original requests go to exactly the issues that we

4  are talking about, and we have been engaged with them for --

5  literally for months trying to figure out how to do targeted

6  discovery.  Both sides recognize we can't do massive discovery

7  with Match's late entry, and they made a deliberate choice

8  here, Your Honor.

9      We now have documents that were produced that show that

10 they went to the States two-and-a-half years ago with exactly

11 these claims, and then they chose to sit on the sidelines for

12 two-and-a-half years while Mr. Glackin and Ms. Moskowitz and

13 others went ahead and gathered this huge record.

14     We need to bring an end to all of this document discovery

15 that we have had in this case, and that's what we have worked

16 with Match on.  We both gave on the meet-and-confers to have

17 targeted discovery.  We both gave on the meet-and-confers to

18 have a limited number of depositions.  I think it is like six

19 or eight per side.

20     We all reached those agreements already with full

21 knowledge of the counterclaim.  Those agreements were reached

22 with the counterclaim.

23         MR. REITER:  That's -- Your Honor --

24         MR. POMERANTZ:  Your Honor, I think that if you look

25 at the counterclaim and you compare it to the allegations in

1   the case, it is just the Match story.  It is just the story of

2   what did Match do and what did --

3            THE COURT:  Breach of contract?  What is the --

4            MR. POMERANTZ:  It is largely breach of contract.  It

5   is also false promise because if Your Honor remembers, they got

6   an extension of time to integrate Google Play billing; and we

7   now believe they got an extension by saying they intended to

8   comply with the policy when, in fact, they never intended to

9   comply.  But that's the basic story; that all of the documents

10  that we are exchanging go to.  There is no new discovery they

11  need on the counterclaim.

12           THE COURT:  Can you remind me, when was the discovery

13  cut-off?

14           MR. POMERANTZ:  It is August 8th right now.

15           THE COURT:  Oh, it is.  You want a little bit more

16  time?

17           MR. POMERANTZ:  We are okay with current schedule,

18  30 days, 90 days, as long as we get a single trial.

19           THE COURT:  How about 45?  Let's be Solomonic.  Can

20  everybody -- States, I haven't heard from the States.  That's

21  more than you wanted; right.  You are getting two extra weeks.

22           MR. GLACKIN:  It is more than we wanted, Your Honor.

23           THE COURT:  Don't say anymore.  I might take it back.

24                          (Laughter)

25           MR. POMERANTZ:  Your Honor, if I can just ask for one

1    thing?

2            **THE COURT:**  Yes.

3            **MR. POMERANTZ:**  Let us then work with everybody to --

4    how to figure out how to redo the deadlines for those 45 days.

5            **THE COURT:**  Here is what I want you to do:  Submit a

6    new thing -- now, I'm going to task Mr. Pomerantz and Match,

7    just be reasonable -- if, Match, and you, Google, have a couple

8    of things you can't get done by October 1st or whatever the

9    new -- it's okay.  I don't need to hear -- a couple depos to

10   finish, you can do it.  All right.  I don't need to be

11   involved.  Just, you need to do it three weeks after because of

12   travel or whatever, that's fine.

13           **MR. POMERANTZ:**  We read your mind because we have all

14   been operating with that assumption.

15           **THE COURT:**  Okay, that goes for everybody.  All right.

16   You can round out anything.  You don't need to come to me

17   unless somebody is upset about something, then I will take care

18   of it.

19       There will be a date.  And if you-all want to do something

20   after the date, it's okay with me as long as it doesn't affect

21   me.  So long as it doesn't delay anything on my end, that's

22   fine.  If it starts eating into my time to get ready for big

23   things, then I will have a problem; but short of that, you-all

24   can do whatever you want.

25       So I guess we will do, what is it, June something, July

1   something for trial?

2         MR. POMERANTZ:  I think 45 days would put it mid to

3   late May.

4         MS. MOSKOWITZ:  Your Honor, that is the issue because

5   a mid-May trial, Your Honor had said you don't want holidays

6   interrupting; so that's why if we start mid-May, that's the

7   Memorial Day, we are going to --

8         THE COURT:  That's a Monday.  Nobody goes anywhere.

9   That's fine.

10        MS. MOSKOWITZ:  Okay.  So you are thinking Your Honor

11  has availability then for mid-May because I just want to make

12  sure that we don't get bumped more.

13        THE COURT:  The good news about Article III is I can

14  do anything that I want.

15                     (Laughter)

16        THE COURT:  So the answer is yes.

17        MS. MOSKOWITZ:  Okay.

18        THE COURT:  I will have availability when I need to

19  have availability.

20        MR. POMERANTZ:  Your Honor, one other thing in terms

21  of schedule.

22        THE COURT:  Yes.

23        MR. POMERANTZ:  So earlier this week Match filed a

24  motion to dismiss our counterclaim.  I don't think Match was in

25  the case when Your Honor told all of the rest of us you don't

 1 | want motions to dismiss.  We actually didn't file one heeding
 2 | your guidance.  Epic didn't file one heeding your guidance.
 3 |      **THE COURT:**  And with good reason.  I mean, it's
 4 | just -- anyway, go ahead, so...
 5 |      **MR. POMERANTZ:**  We will obviously file the opposition
 6 | if we need to Your Honor.
 7 |      **THE COURT:**  Well, Match, I mean, look, it is a breach
 8 | of contract.  What do you want me to do?  I mean, they said you
 9 | breached the contract.  I'm not going to resolve that on a
10 | motion to dismiss.  It is clearly a fact dispute.
11 |      **MR. REITER:**  Well, Your Honor, I think you can take a
12 | look at their allegations and they make admissions that made
13 | very clear that they could have no breach of contract claim.
14 |      **THE COURT:**  Okay, let me just jump in.  When you start
15 | saying the other side has conceded, you are just telling me
16 | there is a fact dispute.  I'm sure Mr. Pomerantz is going to
17 | say they didn't make any, quote-unquote, admissions.  At that
18 | point you are well outside of Rule 8 and 12(b)6.
19 |      **MR. POMERANTZ:**  Your Honor, it is the kind of motion
20 | that says "dismiss this part of the breach of contract claim
21 | but not that part of the breach of contract claim."
22 |      It just seems to us with how busy we all are, we shouldn't
23 | be wasting our time on a motion to dismiss.  We are all working
24 | hard.  We actually are all working together on this.  I just
25 | think the motion to dismiss is a distraction.

1          **THE COURT:**  Before I round out that thought, what are

2     people thinking about summary judgment?  Plaintiffs?

3          **MS. GIULIANELLI:**  Well, I can speak to consumers.  I

4     don't think there would be any basis to grant summary judgment

5     in this case at all.

6          **THE COURT:**  All right.  That's a good answer.  States?

7     How about States?

8          **MR. GLACKIN:**  It is very hard for me to imagine how

9     summary judgment would be appropriate in this case.

10         **THE COURT:**  All right.  I think that's all right.

11    Epic?

12         **MS. MOSKOWITZ:**  Same.  And cutting that out actually

13    allows us to find the time without actually moving the trial

14    schedule, by the way.

15         **THE COURT:**  Okay.  Good judo move.  Match?

16         **MR. REITER:**  Well, Your Honor, with respect to the

17    motion to dismiss, I do think this is a great opportunity to

18    narrow the scope of this case moving forward.

19         They filed five counterclaims, and I think I will ask you

20    just please read the motion.  I think they are meritorious

21    arguments.  If those are not granted, then I believe we would

22    be seeking summary judgment on those claims.

23         **THE COURT:**  Defendant.

24         **MR. POMERANTZ:**  Obviously we are seriously considering

25    filing a summary judgment motion, and we are still working on

1  what those arguments will be.  We would hope, Your Honor, would

2  at least allow us to file one we will see what the merits are.

3      **THE COURT:**  I'm not going to.  I know some of my

4  colleagues are a little tight fisted about it.  I'm not among

5  them.  The odds are very high that I would just carry it

6  through trial anyway.

7      Look, you know as well as I do, perhaps even better,

8  Mr. Pomerantz, Section 2 is -- it's not impossible to get

9  summary judgment but it is not very common.

10      **MR. POMERANTZ:**  We will keep that in mind, Your Honor.

11  We are not going to waste your time or our time on this.  We

12  are seriously considering it, and we will obviously let the

13  Plaintiffs know if and when we make a decision about whether to

14  file one and if so, what the arguments will be.

15      **THE COURT:**  Well, I would like to keep -- things have

16  been moving relatively well.  I would like to keep everything

17  focused.

18      Don't file anything on the motion to dismiss.  I will

19  review the opening brief.  If I think there needs to be

20  something that I would benefit from, I will call for a

21  response.  In the meantime, you are relieved from doing that.

22      And why don't you submit a joint proposed scheduling order

23  with the 45 -- this will be the last one; okay.  This is it.  I

24  can't -- you know, tax that any farther than I have so far

25  unless there is some seriously good reason.

1    So this is it.  This is the last time.  And while you are

2 all here, anything else?

3         MR. POMERANTZ:  Your Honor, just to be clear, on that

4 new schedule, there will be no new fact discovery.  Whatever is

5 on the table is on the table.  I just want to be clear because

6 I think --

7         THE COURT:  Yeah, subject to any, you know, side deals

8 that you want to work out that don't impact my end of the

9 schedule, that's all fine.

10         MR. POMERANTZ:  The only other thing that is on the

11 table is the preliminary approval of the settlement with the

12 developer class.

13         THE COURT:  That is coming up next.

14         MR. POMERANTZ:  Thank you, Your Honor.

15         MS. MOSKOWITZ:  Your Honor, just briefly, there were a

16 couple things on your plate to help us finish up discovery.

17 There is a dispute about an Activision deposition, for example,

18 that was a letter brief that was filed.

19         THE COURT:  Okay.

20         MS. MOSKOWITZ:  That's the main -- that's the main, I

21 think --

22         THE COURT:  That's it, just Activision?

23         MS. MOSKOWITZ:  Yes, there is a pending issue that I

24 think we are hopefully working out on a Steam -- on an Epic

25 discovery issue that Google had raised, but I think we are

1  close to resolving that, so I don't think Your Honor needs to

2  act on that unless Glenn Pomerantz disagrees.

3      But I think those are the main discovery issues that are

4  open in front of Your Honor and because it involves a third

5  party with Activision --

6          **THE COURT:**  I don't think they are here.

7          **MS. MOSKOWITZ:**  They are not.  I don't need to argue

8  it.  I just wanted to raise it to Your Honor to see if we can

9  get that cleared up so we can get that done in time.

10         **THE COURT:**  I will try to get that done in the next

11 week or so.

12         **MR. POMERANTZ:**  Your Honor, just so I can follow up,

13 Ms. Moskowitz is correct.  We submitted a letter brief, a

14 discovery dispute, relating to Steam -- Steam Deck.  We are

15 close to working that out with them, so I would ask you just to

16 hold off on that at least for a few more days and we will send

17 you a communication.

18         **THE COURT:**  Perfect, okay.  That's good.

19     Okay, let's take a five-minute break and then we will do

20 the developers.

21         **MS. MOSKOWITZ:**  Thank you, Your Honor.

22         **THE CLERK:**  All rise court is in recess.

23              (Recess taken at 11:22 a.m.)

24          (Proceedings adjourned at 11:22 a.m.)

25                    ---oOo---

1

2

3                          **CERTIFICATE OF REPORTER**

4              I certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:    Friday, August 5, 2022

8

9

10

11       _____

12              Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25