# REDACTED VERSION

# Exhibit A6
## to
## C. Cramer Declaration

# EXHIBIT 13

CONFIDENTIAL

# Google | **Android**

OC Quarterly Review – Q4 2010
Oct 12, 2010

Andy Rubin, Paul Gennai, Aditya Agarwal,
Matt Hershenson, Hiroshi Lockheimer, Jamie Rosenberg



GOOG-PLAY-001337211

CONFIDENTIAL

**Agenda**

- OCQ
  - ○ Highlights/Lowlights
  - ○ P&L and Key Metrics
  - ○ Launch Roadmap

- 2011 Key Questions
  - ○ Strategic Topics
  - ○ Music

- Resource Asks for 2011

Google
Google Confidential and Proprietary  **2**

GOOG-PLAY-001337212

CONFIDENTIAL

## Highlights and Lowlights

- **Highlights**
  - Significant expansion of Android Market internationally
    - 18 new buyer and 20 new seller countries
    - 9 new currencies supported (total of 13) + buyer display currency
  - Rapid growth in new device activations
    - First day of 250k+ activations on 07/15
  - First $5M month for Android Market in August
  - $155M/yr ads revenue run-rate (+29% Q/Q)[1]
  - Launch of Droid X and Droid 2 by Motorola (Verizon), Galaxy S by Samsung (all 4 US carriers)

- **Lowlights**
  - Music deals: Not as far as we'd like to be in the negotiations; complicated by label demands for YouTube and Search changes
  - Android Market: App quality and store performance still an issue; not launched in all countries; no story for China
  - Team was doing too much: Cancelled the Zeus game device; delay of the tablet launch
  - Scaling: More demand than we can accommodate (OEMs, car manufacturers, etc.) – continue to miss some opportunity

---

1.   Ads revenue run-rate: annualized daily revenues as of 09/30



Google Confidential and Proprietary   **3**

CONFIDENTIAL

# Key Metrics Update

- **Devices**
  - 37M Android devices activated to EOQ(+77% Q/Q) -- 39M as of 10/11
  - 211K Android devices with Google services activated per day (+55% Q/Q)[1]
  - 22 OEMs, 192 device SKUs, 121 countries[2]

- **Search & Ads**
  - 53M daily SRP (+64% Q/Q vs. +26% overall mobile)
  - 2.4 searches/day per 7-day active device
  - $155M/yr ads revenue run-rate (+29% Q/Q)
  - $7.0/yr ads revenue per 7-day active device

- **Market Apps**
  - 89K apps in Android Market (+27% Q/Q)[3]
  - 33K Paid Apps (+16% Q/Q)
  - Monthly run-rate of $6M; avg order value $3.3

**All-Time Activated Devices**
Millions



36.9M devices

**Android Market Applications**
Thousands



89K Apps

---

1. 7-day average as of 09/30 was 211K activations. 7-day average as of 06/30 was 136K
2. Devices, and Countries count is for "greater than 1000" devices
3. In Q3, we took down ~30K apps on Android Market due to policy violations

GOOG-PLAY-001337214

CONFIDENTIAL

## Android P&L

### Strong revenue growth due to increase in the number of Android devices

- Android continues to be #2 contributor to Google mobile ads revenues (predict #1 in 2012)
- Continued growth expected in 2011 from Ads and App Sales, with additional revenue opportunity from Music and other digital content
- Continue to invest in the areas of Engineering and Marketing.

**Smartphone Shipments[5]**



| amounts shown in USD millions | 2009 Actual | 2010 Forecast | 2010 Plan | 2010 Δ vs. Plan | 2011 Target | 2012 Target | 2013 Target | 2010 Y/Y Growth |
|---|---|---|---|---|---|---|---|---|
| Ads | 15.7 | 114.2 | 65.4 | 48.9 | 418.1 | 838.7 | 1,263.3 | 627% |
| App Sales | 1.1 | 6.3 | 2.7 | 3.6 | 30.7 | 101.7 | 282.4 | 470% |
| DTC | 0.0 | 114.5 | 560.6 | (446.1) | - | - | - | NA |
| **Revenue** | **16.8** | **235.1** | **628.7** | **(393.6)** | **448.8** | **940.4** | **1,545.8** | **1298%** |
| TAC | 2.9 | 41.6 | 24.4 | (17.1) | 155.6 | 312.1 | 470.1 | 1343% |
| Operations | 0.5 | 1.9 | 1.2 | (0.7) | 3.9 | 4.1 | 4.3 | 274% |
| COS - DTC | 0.3 | 110.4 | 482.8 | 372.4 | - | - | - | NA |
| **Gross Margin** | **13.1** | **81.2** | **120.2** | **(39.0)** | **289.4** | **624.2** | **1,071.4** | **519%** |
| Sales | 3.2 | 5.1 | 5.2 | 0.1 | 7.3 | 7.7 | 8.1 | 57% |
| Marketing | 16.6 | 52.4 [1] | 57.3 | 4.9 | 42.7 | 44.9 | 47.1 | 216% |
| PM | 1.9 | 8.2 | 3.1 | (5.1) | 11.0 | 11.5 | 12.1 | 327% |
| Engineering | 41.2 | 93.5 | 94.8 | 1.3 | 119.3 | 125.3 | 131.6 | 127% |
| Legal | 2.1 | 38.9 [2] | 1.9 | (37.0) | 36.4 | 38.2 | 40.1 | 1753% |
| **Product Contribution** | **(51.9)** | **(116.8)** | **(42.1)** | **(74.7)** | **72.6** | **396.6** | **832.0** | **125%** |









1. Incl. $6.9M for Nexus S Online Marketing, not yet approved
2. Redacted - Privileged
3. YTD 2010 headcount expenses $137M ($198M for FY 2010. Delta of $60M: $20M Marketing, $25M Eng, $12M Legal)
4. Positive Product Contribution by Q3 2011
5. Source: Gartner

GOOG-PLAY-001337215

Google Confidential and Proprietary   5

CONFIDENTIAL

# Upcoming launches

| | Q4-2010 | Q1-2011 |
|---|---|---|
| **Platform Releases** | • **Gingerbread**<br>• Lightly refreshed, more polished UI<br>• Near Field Communication (NFC)<br>• VOIP/SIP support; enhanced Audio/ Video support<br>• Various gaming improvements<br>• API for front-facing cameras and gyroscopes | • **Honeycomb**<br>• 'Holographic' interface; button-less<br>• Digital media purchase and consumption<br>• Rewrite of Google apps for tablet form-factor<br>• Addition of "fragments" APIs<br>• Support for SMP; Hardware acceleration of 2D<br>• Improved notification system<br>• Market improvements; Browser improvements<br>• Video Chat; better enterprise support |
| **Lead Devices** | • **Nexus S**<br>• Faster CPU; Curved super AMOLED screen<br>• Integrated NFC to support mobile payments<br>• Two cameras + Flash<br>• US distribution through Best Buy | • **Motorola Stingray**<br>• 10.1 inch tablet; Nvidia Tegra T20 processor<br>• Two cameras: 5 megapixel rear facing, 2 megapixel front-facing<br>• US distribution through Verizon |
| **Showcase Devices** | • **Tablets**<br>• Samsung Tab (Verizon, Sprint, AT&T)<br>• **Phones**<br>• HTC: Desire HD (EU), myTouch 4G (T-Mobile), Lexicon (Verizon)<br>• Motorola: Droid Pro (Verizon) | • **Tablets**<br>• LG and Samsung devices based on Honeycomb<br>• **Phones**<br>• HTC: "Mecha" (Verizon – 1st LTE device) |
| **Google Get** | • **Android Market (Apps)**<br>• 24 additional buyer countries, 2 additional seller countries<br>• Launch of web store interface (First public launch of **Google Get** branding)<br>• Direct carrier billing; In-app billing; Paypal<br>• Content rating system; AFMA | • **Google Get**<br>• Unified store interface for apps, music, books and movies/TV; web and device front ends<br>• **Skyjam**<br>• Music web consumption app<br>• **Android Market (Apps)**<br>• Trusted developer program |

GOOG-PLAY-001337216

CONFIDENTIAL

GOOG-PLAY-001337217

Case 3:21-md-02981-JD   Document 325-2   Filed 08/19/22   Page 9 of 229

# Nexus S – The next Google Experience device

- **Device**
  - Curved super AMOLED screen
  - Integrated NFC to support mobile payments
  - RFID reader & writer
  - Front facing camera
  - Fast CPU; Based on Samsung Galaxy S platform

- **Nexus Device Strategy**
  - Ensure there is a current and competitive Android device available in the market
  - Google UI and features
  - Unlocked; OTA updates by Google

- **Distribution & Marketing**
  - Launch 11-Nov-2010
  - GSM phone, sold unlocked at Best Buy stores
  - $6.9M for online marketing, $2.0M for co-marketing with Best Buy, giant Nexus phones for display at 130 outlets[1]

- **Future**
  - Car Phone Warehouse Q1
  - Carriers worldwide Q2



1) Print & Retail Advertising by Retailers. In addition, plan is to give away ~1500 seeding devices

Google
Google Confidential and Proprietary   7

CONFIDENTIAL

## Nexus S Kiosks



GOOG-PLAY-00133721B

CONFIDENTIAL

**Agenda**

- OCQ
  - ○ Highlights/Lowlights
  - ○ P&L and Key Metrics
  - ○ Launch Roadmap

- 2011 Key Questions
  - ○ Strategic Topics
  - ○ Music

- Resource Asks for 2011

GOOG-PLAY-001337219

CONFIDENTIAL

# Andy's Mom



Before and After photos:  Mrs. Rubin was a worrier

Google
Google Confidential and Proprietary 10

GOOG-PLAY-001337220

CONFIDENTIAL

## How do we retain control of something we gave away?

- We credit Android's rapid adoption to the fact that we made it available under an open source license

- Because of its Apache licensing model, we sent a strong signal that we are not controlling the platform (vs. GPL or dual license model)

- Because Google was historically seen as a threat to operators, giving up control was a key component of operators adopting Android

- This is one reason Android is considered one of the most commercially successful Linux distributions

- **Takeaway:  Open source reduces friction and increases adoption**

GOOG-PLAY-001337221

Google
Google Confidential and Proprietary 11

CONFIDENTIAL

## If we gave it away, how can we ensure we get to benefit from it?

Create policies that allow us to drive the standard

- Be the shepherds of the standard we created – we are in the lead because of our head start. Maintaining the pace will guarantee our lead.

- Do not develop in the open. Instead, make source code available after innovation is complete

- Lead device concept: Give early access to the software to partners who build and distribute devices to our specification (ie, Motorola and Verizon). They get a non-contractual time to market advantage and in return they align to our standard.

- We created the first app store for Android and it got critical mass quickly. The store now has value and partners want access to it because of the number of apps available.

- Own the ecosystem we enabled: Evolve the app store. Set the rules. Define developer monetization opportunity. Train developers on our APIs. Give developers one place where they get wide distribution. Provide a global opportunity & payment system. Help developers get distribution via revshare with operators. Extend app store to other devices and other market segments (ie, Google TV)

**Takeaway:  Provide incentives -- carrots rather than sticks**

GOOG-PLAY-001337222

Google
Google Confidential and Proprietary 12

CONFIDENTIAL

# Carrots are healthy food, but carrying a stick can save lives

**Anti-Fragmentation Agreements**

- Prevents our partners from taking actions that result in fragmentation:
  - Distributing HW or SW that is not Android compatible
  - Creating and distributing competing SDKs

**GMS Agreements**

- Aligns incentives through distribution of Google services:
  - Provides access to Google's marketplace and apps
  - Enables revenue sharing on certain services
  - Anti-fragmentation signed as part of this agreement

**Stops our partners and competitors from forking Android and going alone**

**Lead Device Program**

- Provides early access to the Android source-code for OEMs that help us build lead devices
  - Incentivizes participation in the Android program
  - Ensures Google services are installed

**Compatibility Test Suite + CDD**

- Tests Android implementations to ensure our developers' apps run on a maximum number of devices
  - Required before OEMs can provide access to Android market
  - CDD allows us to define the platform roadmap

**We define the standard and shape the ecosystem**

**Market Revshare Agreements**

- Revshare with operators gets us distribution
- Operator "channels" help ensure they participate in our ecosystem



Google Confidential and Proprietary **13**

GOOG-PLAY-001337223

CONFIDENTIAL

## Carrots are healthy food (cont'd)

**Resourcing and Support**

- Only provide engineering support to commercial partners

**OHA Marketing Agreement**

- The marketing arm of "openess"

**Search Revshare**

- Carriers get upside in adopting Android
  - Offsets the cost of bandwidth (ie, youtube)

**Promotes adoption of our services**

**Device Approvals**

- We approve every device with GMS before it launches

**Poison Pill**



Google Confidential and Proprietary•14

CONFIDENTIAL

# Our application and advertising services helped build Android into a $43B / year ecosystem; these same services protect Android

*Android created a hardware and services ecosystem worth over $43B a year*[(1)]



Services: $20.3B
(Carriers)

Hardware: $22.8B
(ODM/OEM)

$190M

Google: $80M

Carrier: $40M

Devs: $60M

Pubs: $10M

**Apps and Ads**

This value was developed by being **open** and **not placing ourselves in competition** with our OEM and carrier partners

*Our apps and ads services have made this this possible, and work to protect our position*

- **Solved the Unix/Linux fragmentation problem by providing scale and consistency within an open platform**
  - Single brand
  - Worldwide user and developer reach
  - Global partnerships
  - Global payments network

- **Provided a viable, open solution for services that consumers now <u>expect</u> in a smartphone**

These services inherently rely on scale to succeed – no one partner can easily fragment and replicate the complete platform

**Harvest**

*With our scale we can add services that generate direct revenue for Google:*

- **Digital Content** – Q1 launch of Google's own content store
- **Advertising** – Increased device integration; improved use of voice
- **Mobile Wallet** – Trials beginning in Q4
- **And more…**

Notes:   (1)   Based on August 2010 run-rate

Google

Google Confidential and Proprietary **15**

CONFIDENTIAL

# Android Strategy – Moving to Phase 3



GOOG-PLAY-001337226

CONFIDENTIAL

GOOG-PLAY-001337227

# Music – Product development and negotiations progressing; remain on track for a Q1 launch

| Product Update |
|---|

- **Buy once, play everywhere:**
    - Google login connects your devices and frees you from the hassles of wires, syncing, file management and backup
    - Stream immediately after purchase, and download whenever you like, to wherever you like
- **Makes discovery and shopping fun**
    - Purchase on the web or on your tablet; Google Music has layouts for both
    - Be greeted with amazing recommendations every time you visit
- **Works with ALL of your music**
    - Google Music works with ALL of your music, not just with songs purchased from the Google store
    - Matched music has accurate meta data and album art; allows for 'upgrading' of your existing library
- **Playlists done right**
    - The same technology used for recommendations in the Google Store adapts to let you create magic playlists
    - Magic mixes are pre-assembled from your collection to match a variety of moods and situations like dinner parties

| Negotiation Update |
|---|

- **Sony & WMG:** Nearing non-binding signed term sheets for global rights
- **EMI:** Moving more slowly but low risk
- **UMG:** Still far apart, highest risk
- **Publishers:** Need deal with NMPA; discussions started but complicated by link to Viacom case[1]

- Demands for Google anti-piracy reforms and YT changes

| Schedule |
|---|

- **US Launch**
    - Announce at CES in January (TBD)
    - February 16th to launch alongside the Honeycomb tablet; web UI launching at the same time
    - Phone application to follow; will be built and back-ported to Froyo+ phones
- **International**
    - Targeting 8-10 markets by EOY 2011

---

1.   Need deal with licensing arm of National Music Publishers Association (Harry Fox), but NMPA is a plaintiff in the companion class action in Viacom case.  Discussions under way but challenging



CONFIDENTIAL

## Music P&L: $1.5 - $3.0B business by 2013

**Music Download Service**

- ~3 songs/user/mo
- Adoption
  - ~10% of Android Devices [1]
  - ~1% Web Users (approx 10% of Chrome user-base) [2]
- **$0.99-$1.29 per song; 71% rev share to labels & pubs**

**Music Locker**

- 1500 songs/user [3] with ~50% match rate (~4GB of storage/user)
- Adoption
  - 2% - 5% of Android Devices
  - ~0.2% Web Users (approx 2% of Chrome user-base)
- **$29.99 / yr; 65% rev share to labels & pubs**
- 3-months free trial period to Users

### Base Case

| In Millions | Yr 1 | Yr 2 | Yr 3 | |
|---|---|---|---|---|
| Download Users | 4.3 | 21.2 | 41.2 | → Aggressive 52M |
| **Gross Revenue, Downloads** | **$87** | **$514** | **$1,258** | |
| Payments to Labels and Pubs | $62 | $364 | $889 | |
| Net Revenue, Downloads | $25 | $150 | $368 | |
| Music Locker Subscribers | 0.9 | 4.2 | 9.6 | → Aggressive 27M |
| **Gross Revenue, Music Locker** | **$10** | **$76** | **$208** | |
| Storage and Streaming Costs | $9 | $13 | $19 | |
| Payments to Labels and Pubs | $7 | $52 | $141 | |
| Net Revenue, Music Locker | ($7) | $12 | $47 | |
| **Gross Revenue, Ads** | **$2** | **$11** | **$22** | |
| Net Revenue, Ads | $0 | $2 | $3 | |
| **Total Gross Revenue** | **$99** | **$601** | **$1,487** | → Aggressive $3,057M |
| Storage Costs | $8 | $10 | $12 | |
| Streaming Costs | $2 | $3 | $7 | |
| Payments to Labels & Publishers | $69 | $416 | $1,031 | |
| Ads Rev Share (Labels, Pubs, and Carriers) | $2 | $9 | $19 | |
| Total Net Revenue | $19 | $163 | $418 | → Aggressive $791M |
| % Margin | 19% | 27% | 28% | |
| Total Transaction Costs | $6 | $38 | $93 | |
| Customer Support Costs | $5 | $14 | $29 | |
| Marketing Costs | $20 | $24 | $45 | |
| Headcount Costs | $24 | $40 | $45 | |
| Discretionary budget for non-Music content | $4 | $5 | $8 | |
| Total Product Contribution | ($41) | $43 | $200 | → Aggressive $432M; 14% |
| % Margin | -41% | 7% | 13% | |

1. Executive assumptions for Adoption rate, with triangulation from Music Forecast, 2009 to 2014, Forrester Research. "Pay to download Music" ~20% of online adults in US; 8% EU in Q3'09. "Visit online music websites like last.fm, Pandora" US 11%, EU 5%.
2. Implied penetration of internet users based on performance equivalent to Amazon's 2008 – 2010 market share growth
3. Average of 1,500 songs/sub/year in their library. Avg of 1,538 for digital music buyers based on US Music Forecast, 2009 to 2014, Forrester Research
4. Locker also assumes a min. per sub, 65% of $24.99
5. Locker assumes streaming of 15 hours of music/sub/mo, 92MB based on 210kbps bit-rate, $0.08 as the network backbone cost/GB delivered
6. Transaction costs: 1.9% of revenues + $0.30/transaction, with 5 songs bundled in a transaction
7. Marketing at ~3% of revenues, except Yr 1 which requires additional investment.



Google Confidential and Proprietary 18

GOOG-PLAY-001337228

CONFIDENTIAL

# Android Market – Fixing the here and now, preparing for revolution

| **Improving the current Android Market** | **Preparing for the Google Content Store** |
|---|---|

**Expanding Android Market internationally:**



**Buyer Countries**

- Previously Launched[1]: 14
- New Total Countries[2]: 32

**Seller Countries**

- Previously Launched: 9
- New Total Countries: 29

- **Improving our billing**
  - Clearer pricing – displaying all prices in the user's home currency
  - Direct carrier billing – reducing the friction to purchasing a paid app
  - In-app billing – some developers telling us that 30-40% of revenues come from in-app purchases
  - Paypal integration – enabling Paypal as a form of payment

- **Improving application quality**
  - Pro-active review and take-down of applications
  - Launching a content rating system (Teen, Mature, etc.)
  - Trusted developer program – ensuring we discover and promote the best applications in the Market

- Establish Google as the place to buy, consume and interact with others about media
  - Compelling UI for discovering and consuming content across platforms
  - Huge selection: broad and deep selection of media across all types
  - Always available: all your media is at your fingertips on your Android device and from any internet connected computer

---

1. Prior to 9/30 launch of 18 new buyer and 20 new seller countries
2. Total countries, EOY 2010.

Google Confidential and Proprietary 19

CONFIDENTIAL

# Android Market Policy Changes

- "Openness" is our core message
- Anyone can submit an app
  - Posted app becomes available immediately
  - Must adhere to our published policies
    - www.android.com/us/developer-distribution-agreement.html
    - www.android.com/market/terms/developer-content-policy.html
- Users can flag apps as inappropriate
  - Flagged apps get manually reviewed
- Infringing apps can be brought to our attention by DMCA or Trademark review requests
  - Manually reviewed
  - 3-strikes rule:  If a developer gets an app removed 3 times, then developer gets banned

NEW!

- Small team does proactive reviews
  - We remove apps that violate our published policies
  - Goal is to takedown apps within 60 minutes of being posted
  - Future goal is to shrink this to 5 minutes
  - Apps do not show up in recommendation engine "new apps" until reviewed

Google
Google Confidential and Proprietary 20

GOOG-PLAY-001337230

CONFIDENTIAL

## Android Market Policy Changes (cont'd)

NEW!

- Trusted developer program
    - We badge developers with "trivia" like badges
    - Sold > 1M, Kid safe, Privacy Aware, etc.
    - Badges show up on developer bios and apps they create
    - Extensible
    - Can be used for discovery and ranking
- Content rating system to be launched Q1
    - ESRB style ratings
    - Developers self-rate apps, we verify and override if necessary

 Trusted by Google

 Kid Safe

 Privacy Aware

 One Million downloads

GOOG-PLAY-001337231

CONFIDENTIAL

## Re-entering China… with Android

### Under consideration:

- Launch Android market in China in Q3

- Partner with China Mobile to secure distribution

- Use carrier billing as payment system

- Attend to takedown requests from Government

### Result:

- Captures growing China market for Android

- Doesn't fork Android in China

- Google gets to come back in an open and friendly way using the Android brand

GOOG-PLAY-00137232

CONFIDENTIAL

## Music – Screenshots and demos





GOOG-PLAY-001337233

CONFIDENTIAL

## Android Market Screenshots / Demos



GOOG-PLAY-001337234

Google Confidential and Proprietary 25

Google

# Demo

CONFIDENTIAL

**Agenda**

---

- OCQ
  - ○ Highlights/Lowlights
  - ○ P&L and Key Metrics
  - ○ Launch Roadmap

- 2011 Key Questions
  - ○ Strategic Topics
  - ○ Music

- Resource Asks for 2011

GOOG-PLAY-001337236

CONFIDENTIAL

## 2011 Resource Asks Summary

**Invest in Engineering, Marketing, and Music Business**

### +186 FTEs

- +126 Engineering:

    - +100 SWEs: 60 SWEs on Music, 40 SWEs on misc Android efforts (parallel development, legacy support)

    - +12 UI: Tablets UI, refresh the phone UI

    - +10 Hardware: Hardware development, lab testing, and market analysis with OEMs

    - +4 Content Partner Managers: Android Market apps for new verticals

- +40 Business Management for Music & Digital Content: Store Ops, Content & Partner Ops, and Content Licensing. Support international launches

- +8 PM: Scale in line with total Eng growth using 15:1 Eng: PM ratio

- +8 PSO: support carrier billing, GMS distribution in JAPAC

- +4 Marketing: Nexus, Content, and Co-marketing efforts.

GOOG-PLAY-00137237

Google
Google Confidential and Proprietary 27

CONFIDENTIAL

GOOG-PLAY-001337238

## 2011/ Q4 2010 Resource Asks Summary (Cont'd)

### $240M - $263M Expenses: 2011 [1]

- $60M Marketing: $20M Music/ Content Store, $25M Co-marketing, $10M Direct2Consumer/Nexus, and $5M Ecosystem Momentum

- $50M Marketing: Special Project for Music Launch

- Redacted - Privileged

- $24M Seeding & Dogfood devices; same run-rate as 2010

- $15M Two Technology Acquisitions [2]

- $5M TVCs: Hardware development, lab testing, and market analysis with OEMs

- $54M - $77M Music:

    - $8M - $25M Storage costs ($252M upper bound per the SRE team [3])

    - $2M - $8M Streaming costs

    - $35M Min. guarantees to Labels and Publishers

    - $5M Customer Support: 33 FTEs and 50 Vendors. Support Music and Apps [4]

    - $4M Content Acquisition & Vendor Support (production, editorial etc.)

### $7M Expenses: Q4 2010

- $6.9M Online Marketing for Nexus S

- $0.3M Customer Support: 10 FTEs and 9 Vendors for Android Market Apps and ramp-up for Digital store launch.

1. Est. 2011 TAC $156M.
2. Technology Acquisitions work-in-progress in 2010: $8M Widevine DRM Tech Lic., $7M for Nexus brand
3. Range of storage and streaming costs based on 'Base' and 'Aggressive' Case. Estimates from the SRE team are upper bounds , assuming 30M users by YE 2011
4. $9M in total customer support costs in 2011. $3M Fixed costs, ~16 FTEs, under Nikesh's org

Google

CONFIDENTIAL

## 2011 Goals

1. Ship Tablet lead device with Motorola & Verzion in Q1
2. Ship Music and Google Get in Q1
3. Ship Honeycomb to open source and enable many more tablets
4. Fix Android Market with big push in Q2
5. Expand payment options internationally
6. Re-enter China in Q3
7. Make music social in Q3
8. Go big with AT&T in Q4
9. Go big with Vodafone in Q4
10. Make music global in Q4

Google
Google Confidential and Proprietary 29

GOOG-PLAY-001337239

CONFIDENTIAL

# Thank you!



GOOG-PLAY-001337240

Google Confidential and Proprietary  31

Google

# Appendix

# Android Market – Stats

**Number of Published Applications**
(Thousands)



**Number of Publishers**
(Thousands)

CONFIDENTIAL

## Android Devices – Stats

**Daily Device Activations**
(Thousands)





Google
Google Confidential and Proprietary **33**

CONFIDENTIAL

# Marketing Plan: Android

| | Key Initiatives | |
|---|---|---|
| | **Strategic Themes** | **Proposed Budget ($M)** |
| 1 | **Establish 'pure Google' line of Nexus phones as a viable option for consumers**<br>• Launch Nexus xx phones with key retail/carrier partners in key US/International markets<br>• Establish positioning that Nexus is THE phone to get for early adopters/Google fans who love to get Google's innovations first, directly from Google, without filters.<br>• Sell xx million phones | 10 |
| 2 | **Establish leadership in Tablet category through active co-marketing on launches**<br>• Co-Manage ███████ tablet launch at CES with ████████████<br>• Co-Manage releases of Android 3.0 tablets by LG and Samsung | 10 |
| 3 | **Drive Ecosystem momentum through active engagement at industry events**<br>• Plan and execute Android presence at MWC 2011<br>• Support growth of developer network through presence at Google I/O, GDDs, speaker events, etc.<br>• Work with O'Reilly on Android World conference (San Diego, Oct 2011) | 5 |
| 4 | **• Actively engage with key strategic partners on co-marketing around hero launches**<br>• Win in Japan with ████████████<br>• Actively support ██████ strategy to become the carrier of choice for Android in the US<br>• Work directly with OEMs on hero launches targeting EMEA markets | 15 |
| 5 | **• Become a credible player in digital goods retailing**<br>• Build sustained marketing campaign to launch/promote Google Music<br>• Expand campaign to x markets globally by end of 2011 | 20 |

**Total Budget** $60M (▲%)     **HC** +4 (NA)     **Impact** Revenue impact, key metric, or qualitative result

GOOG-PLAY-001337244

Google

Google Confidential and Proprietary

CONFIDENTIAL

## Smartphone and Tablet Projections

| All activations, millions | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Phones | 60 | 147 | 268 | 435 |
| *Android % of Smartphone Install Base [1]* | *9%* | *16%* | *22%* | *28%* |
| *Source: GSSO Fact Pack [2]* | *10%* | *17%* | *25%* | *33%* |
| Tablets | | 10 | 25 | 45 |

1. Android Market Share is calculated on 7-day active devices and not on all-time activations
2. GSSO (Global Sales Strategy & Ops): Fact pack with "official" market size and forecast numbers

Google
Google Confidential and Proprietary 35

CONFIDENTIAL

## Ads Revenues Forecast

| devices & revenues forecast in millions | 2010 | 2011 | 2012 | 2013 | CAGR ('10 - '13) |
|---|---|---|---|---|---|
| All-time Phone Activations | 60 | 147 | 268 | 435 | 93% |
| 7DAs: Phones | 43 | 94 | 161 | 241 | 78% |
| All-time Tablet Activations | - | 10 | 25 | 45 | NA |
| 7DAs: Tablets | - | 10 | 25 | 40 | NA |
| Phone RPMs | $9.2 | $8.7 | $7.9 | $7.1 | -8% |
| Queries per day per phone | 1.48 | 1.48 | 1.48 | 1.48 | 0% |
| Gross Ads Revenues - phones | $115.0 | $323.8 | $541.6 | $766.7 | 88% |
| Gross Ads Revenues - tablets | $0.0 | $94.3 | $297.1 | $496.6 | NA |
| **Total Gross Ads Revenues** | **$115.0** | **$418.1** | **$838.7** | **$1,263.3** | **122%** |
| Rev Share % | 37% | 37% | 37% | 37% | 0% |
| Rev Share $ | $42.8 | $155.6 | $312.1 | $470.1 | 122% |
| Net Ads Revenues | $72.2 | $262.5 | $526.6 | $793.2 | 122% |

1. Ads Revenues modeled based on RPMs and Queries per day per device
2. RPMs decrease 8% annually from 2010 to 2013 as Android grows internationally
3. Queries per day per device and Rev Share % staying flat
4. 2010 Android Ads revenues constitute 64% Search, and 36% Display. Search share likely to increase from 64% to 80% in 2013
5. Assumes Tablets monetize at least 4x that of a Phone.

GOOG-PLAY-001337246

CONFIDENTIAL

## App Sales Revenues Forecast

| devices & revenue forecast in millions | 2010 | 2011 | 2012 | 2013 | CAGR ('10 - '13) |
|---|---|---|---|---|---|
| All-time Phone Activations | 60 | 147 | 268 | 435 | 93% |
| 7DAs: Phones | 43 | 94 | 161 | 241 | 78% |
| All-time Tablet Activations | - | 10 | 25 | 45 | NA |
| 7DAs: Tablets | - | 10 | 25 | 40 | NA |
| First Installs per device | 65 | 65 | 65 | 65 | 0% |
| % Paid Installs - phones | 0.96% | 1.44% | 2.30% | 3.92% | 60% |
| Avg Paid Transaction Price | $3.34 | $3.34 | $3.34 | $3.34 | 0% |
| App Sales Gross Revenues - phones | $50.6 | $214.6 | $638.3 | $1,706.7 | 223% |
| App Sales Gross Revenues - tablets | $0.0 | $31.3 | $175.1 | $552.7 | NA |
| **Total App Sales Gross Revenues** | **$50.6** | **$245.9** | **$813.3** | **$2,259.4** | **255%** |
| Rev Share %, paid to developers and carriers | 88% | 88% | 88% | 88% | 0% |
| Rev Share $ | $44.3 | $215.1 | $711.7 | $1,977.0 | 255% |
| Net App Sales Revenues, booked to Google | $6.3 | $30.7 | $101.7 | $282.4 | 255% |

1. App Sales Revenues modeled based on Installs per device, % paid installs, and average paid transaction price
2. # of installs consistent with the last 3 months, ~65 per device
3. Key driving assumption, percentage of D/Ls paid for: assume 3.92% in 2013 from current 0.96%
4. % paid installs on a tablet are twice that of a phone
5. Average Paid transaction price to stay flat.

1. Competition in the store will decrease average paid transaction price. However, average selling price of a Tablets app will be higher than Phone. And, high-quality games are generally sold higher than the average price.

Google
Google Confidential and Proprietary 37

GOOG-PLAY-001337247

CONFIDENTIAL

# Enterprise support is improving, but there's some way to go

*We've come a long way in supporting enterprise use-cases in Android...*

- **Network Security**
  - 802.11i (Wifi) security standards
  - L2TP and PPTP VPN

- **Device Management UI and APIs**
  - Remote wipe / lock
  - Password policies (require password, password complexity, etc.)

- **Exchange Support**
  - Email, contacts and calendar support
  - Integrated device management

*... however, some key features are still missing*

- **Security Related**
  - Encryption of flash memory
  - Password refresh interval / expiration support

- **Network Related**
  - SSLVPN or pure IPSec (Cisco) VPN
  - Certificate management
  - Proxy support

- Prevents access to some work data
- Prevents access to some corporate networks
- Puts us at a disadvantage relative to iPhone

**How this can be addressed**

- Planning to incorporate encryption and new password features in 1H 2011 (requires approximately 3 months of engineering work)
- Still sizing the required effort to improve network support

Google
Google Confidential and Proprietary 38

GOOG-PLAY-001337248

CONFIDENTIAL

## 2011 Resource Asks Details – Headcount

| | 2010 Forecast | Incremental HC Ask | Comments |
|---|---|---|---|
| Music + Core Android – Eng | ~295 | +104 | 60 SWEs on Music, 40 SWEs on misc Android efforts. 4 Content Partner Managers on Android Market Apps |
| Business Management - Music & Digital Content | 29 | +40 | Support non-US launch. Store Ops, Content & Partner Ops, and Content Licensing |
| Marketing | 7 | +4 | Nexus, Content, and Co-marketing efforts |
| Phone + Tablets UI – Eng | 15 | +12 | Tablets UI; refresh the phone UI to match std tablet UI |
| Hardware Development & Testing | 1 | +10 | Hardware development, lab testing, and market analysis with OEMs |
| PM | 16 | +8 | 15:1 Eng:PM ratio |
| Sales (PSO) | 23 | +8 | Support carrier billing, GMS distribution in JAPAC |
| Legal | 8 | | |
| **TOTALS** | **394** | **+186** | |

GOOG-PLAY-001337249

CONFIDENTIAL

# 2011 Resource Asks Details - Expenses

| $M | 2010 Forecast | Total Dollar Ask ($M)* | Comments |
|---|---|---|---|
| Marketing Expenses | $52 | $60 | Marketing efforts for Tablets, Music, and Phones |
| Marketing Expenses | NA | $50 | Special Project for Music Launch |
| Legal Expenses | Redacted - Privileged | | |
| Device giveaways and dogfood devices | $24 | $24 | Seeding and dogfood devices; same run-rate as 2010 |
| Technology Acquisitions | $20 | $15 | - Work in progress: $8M Widevine DRM Tech Lic., $7M for Nexus brand acq.<br>- 2011: two other tech. acq. |
| Hardware Development & Testing | NA | $5 | Hardware development, lab testing, and market analysis with OEMs |
| Storage & Networking Costs for Music | NA | $10 - $33 | |
| Content Acquisition Costs | NA | $35 | Min. guarantees to Labels and Publishers |
| Customer Support:<br>Android Market Apps + Music | $0.3 | $5 | 33 FTEs and 49 Vendors |
| Music - Content Acquisition (Metadata) & Vendor Support | NA | $4 | Content Acquisition & Vendor Support (production, editorial etc.) |
| **TOTALS** | **$127** | **$240 - $263**<br>*(excl. TAC)* | |

1.    Est. 2011 TAC $156M.

GOOG-PLAY-001337250

CONFIDENTIAL

## Key Strategic Topics

Q: How are we prioritizing the various ideas for earning revenue on top of our Android platform, and what targets are we setting for ourselves over the next 30 months?

A: Must minimally be competitive in market to meet consumer expectations. Second priority is a bubble sort on the large opportunities in device-enabled services (ie, things with ecosystems).

Q: What platform control points do we need to maintain in order to be successful?

A: Must own the ecosystem that the platform enables.

Q: What are the trade-offs on overall adoption vs google experience devices?

A: There needs to be only one viable Google Experience device in market at any given time (per device category).

Q: What features or product gaps are gating Android adoption for Enterprise? How are they being addressed/prioritized?

A: Need more ActiveSync EAS coverage. Need encrypted filesystem (secure and open is an oxymoron). Need way to onboard certificates. All scheduled to upcoming releases.

Q: What progress has been made on Music? Are we striking the right balance between supporting a tight Android product launch schedule and the overall Music BD/product needs of the company?

A: Scheduled to launch Feb 2011. We believe this product will see strong adoption.

Q: What progress has been made in fixing Marketplace app discoverability? What are the timelines for resolving the billing & payment issues (including international)? How will we manage abuse?

A: Good progress, but needs more attention. Product Management needs to be improved. Product Strategy needs to evolve.

Q: How do we ensure Google is never locked out of Android phones (the Verizon-Bing risk)?

A: We can't. Android is Open Source. We can, however, utilize control points to ensure our continued benefit. (see separate slides)

Google

Google Confidential and Proprietary 41

GOOG-PLAY-001337251

CONFIDENTIAL

**More information**

- Honeycomb features
  - goto/honeycomb-at-a-glance

- Gingerbread features
  - goto/gingerbread-at-a-glance

- Music vision
  - goto/music-at-a-glance

GOOG-PLAY-001337252

# REDACTED VERSION

# Exhibit A7
# to
# C. Cramer Declaration

# EXHIBIT 14

Confidential

### GOOGLE PLAY CARRIER BILLING AGREEMENT
### (GOOGLE PLAY FOR MOBILE OPERATORS)



**Google Inc.**
1600 Amphitheatre Parkway
Mountain View, CA 94043

**Android Partnerships:** ▮▮▮
**Android Partner Engineering:**
**Google Legal:** ▮▮▮

| COMPANY CONTACT DETAILS | | | |
|---|---|---|---|
| | Company Contact Information: | Company Technical Contact: | Company Legal Notices to: |
| Attention: | | | Vice President and Deputy General Counsel |
| Title: | | | Legal Department |
| Address, City, State, Postal Code, Country: | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| Phone: | | | |
| Fax: | | | |
| Email: | | | |

**Effective Date: August 1, 2013**

**Term:** Starting on the Effective Date and continuing through August 1, 2016 (inclusive) ("**Term**")

**Renewal Term:** None.

This Google Play Carrier Billing Agreement, including all exhibits hereto (collectively referred to as the "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made by and between:

**GOOGLE INC.**, a Delaware corporation, for itself and its Affiliates (collectively, "**Google**"), and

▮▮▮ a company incorporated under the laws of ▮▮▮ whose registered office is at ▮▮▮ ▮▮▮ ("**Company**").

### 1.   DEFINITIONS

**1.1**   "**Actively Promote**" or "**Actively Promoting**" means the proactive promotion of Google Play as a key value proposition of a Device, including point of sale promotion, media advertising and general consumer-focused promotion of Google Play or Google Play Client.

**1.2**   "**Affiliate(s)**" means any current or future company controlling, controlled by or under common control with a party to this Agreement, where "control" shall mean ownership of or the power to direct, directly or indirectly, fifty percent (50%) or more of the shares or voting rights of such company.

**1.3**   "**Alternative Store**" means any marketplace or store preloaded on a Device or otherwise made available by or on behalf of Company that enables distribution of Android-based products or other products or applications to End Users of Devices.

**1.4**   "**Android**" means the Android software stack for devices, as made available under the Android Open Source Project, which is located at the following URL: http://source.android.com/, as updated from time to time.

**1.5**   "**Android Application**" means an Android-based software application (excluding Digital Content) that can be downloaded from Google Play to a Device.

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

1.6   **"Authorized OEM"** means a device manufacturer that has a license from Google to distribute Google Play Client.

1.7   **"Company Discretionary Refund"** means a discretionary refund of a DCB Paid Transaction to an End User made by Company and does not include refunds made by Company under Sections 9.7(a) or (b).

1.8   **"Company Fee"** means, for a particular DCB Paid Transaction, the DCB Fee and the Transaction Fee.

1.9   **"Credit Card Fee"** means 25% of the gross transaction value of valid credit card and debit card transactions settled through Google Wallet on Devices that (a) is attributable to the initial one-time download of an In-App Purchase or Android Application to Devices by End Users via the Google Play Client or Google Play Website; and (b) occur between the Effective Date and December 31, 2013. The Credit Card Fee does not apply to revenue generated by the Android Application after downloading, whether payable to Google or a third party. The Credit Card Fee is subject to adjustment for refunds, chargebacks, reversals, and other customary and reasonable adjustments at Google's sole discretion.

1.10  **"DCB"** or **"Direct Carrier Billing"** means a wireless subscriber payment method to bill End Users for DCB Paid Transactions through Company's billing system.

1.11  **"DCB Fee"** means, for a particular DCB Paid Transaction, the percentage of GTV specified as the "DCB Fee" in **Exhibit B.**

1.12  **"DCB Monthly Invoice"** means an invoice Google provides to Company showing the DCB Monthly Total, Transaction Fees, DCB Fees, and refunds for DCB Paid Transactions for the immediately preceding month.

1.13  **"DCB Monthly Total"** means the total monthly amount processed by Company for DCB Paid Transactions, less adjustment for refunds, reversals and other reasonable adjustments.

1.14  **"DCB Paid Transaction"** means the purchase by an End User, during the Term of an Android Application, Digital Content or In-App Purchase (as applicable) using DCB via (a) a Device; or (b) the Google Play Website, when a Device is selected as the destination device. For the sake of clarity, a DCB Paid Transaction does not include any no-charge subsequent downloads of, or access to, the same Android Application, Digital Content, or In-App Purchase using other Devices registered to the same End User account. DCB Paid Transaction does include recurring purchases by an End User of an Android Application, Digital Content, or In-App Purchase (e.g., as part of a subscription). DCB Paid Transaction does not include the purchase of Digital Content without the use of DCB.

1.15  **"DCB Wind-Down Period"** means a six (6) month wind-down period for DCB during which refunds and other adjustments will be processed.

1.16  **"Developer"** means a third party that distributes Android Applications, Digital Content or other content on Google Play or via In-App Purchases.

1.17  **"Default Home Screen"** means the default top-level screen of a Device within the Device Top that appears without scrolling in both portrait and landscape modes when the Device is in active idle mode (i.e. not in sleep mode), prior to any changes made by End Users.

1.18  **"Device"** means each device used with a Company SIM and/or enabled for DCB that: (a) is manufactured by an Authorized OEM; (b) complies with the then-current Android Compatibility Definition document (which may be updated from time to time), which can be found at the Android compatibility website (http://source.android.com/compatibility) and successfully passes the then-current Android Compatibility Test Suite (CTS); and (c) is pre-loaded with Google Play Client in compliance with this Agreement.

1.19  **"Device Top"** means, with respect to the default navigation hierarchy of a Device, the default top-level screen from which an End User can launch applications.

1.20  **"Digital Content"** means consumable digital media and content that is not a software application, and includes without limitation electronic books, electronic periodicals, video and music.

2

GP MDL-TMO-0001832

Confidential

1.21   "Direct Carrier Billing Charge" means amounts authorized and owed by End Users to Company for DCB Paid Transactions.

1.22   "End User" means an end user of a Device.

1.23   "Google Billing API" means a set of proprietary APIs, as updated by Google in its sole discretion from time to time, accessible by Company for the purpose of interfacing Company's billing system with Google to enable DCB.

1.24   "Google Content" means Digital Content sourced by Google and made available by Google for free or as paid content to End Users via Google Play and which (a) Google has licensed the rights to distribute, or (b) does not require any license to distribute (e.g. non-copyrighted books).

1.25   "Google Mobile Branding Guidelines" means Google's brand treatment guidelines for mobile in effect from time to time (and any content contained or referenced therein), which are located at http://www.google.com/wssynd/mobile_guidelines.html                                             and http://www.google.com/permissions/guidelines.html (or such other URLs as may be provided by Google from time to time), together with such additional brand treatment guidelines for mobile as Google may make available to Company from time to time.

1.26   "Google Play" means the marketplace(s) created and operated by Google, by which Android Applications and Digital Content are distributed.  Google reserves the right to re-name any such marketplace from time to time.

1.27   "Google Play Client" means the machine-readable binary code of the software application required to access and use Google Play that is provided by Google to Authorized OEMs under a separate agreement between Google and the Authorized OEM, and any modifications or updates thereto that Google may make available to Authorized OEMs hereunder from time to time in its sole discretion.

1.28    "Google Play Website" means the Google Play website located at https://play.google.com/store (as such URL may be updated by Google from time to time).

1.29   "Google    Wallet    Privacy    Policy"    means    the    policy    located    at https://wallet.google.com/files/privacy.html or such other URL as Google may provide.

1.30   "GTV" means, for a particular DCB Paid Transaction, the gross transaction value chargeable to End Users excluding: (I) taxes collected on behalf of the Developer (or Google in the case of Google Content); (II) adjustments for refunds, chargebacks, reversals and other customary and reasonable adjustments at Google's sole discretion; (III) any revenue generated in connection with Android Applications, Digital Content, or In-App Purchases after the initial DCB Paid Transaction; and (IV) any revenue generated in connection with Android Applications, Digital Content, or In-App Purchases without use of DCB.

1.31   "In-App Purchase" means Digital Content purchased for use on Devices from an Android Application through the in-app billing mechanism provided by or on behalf of Google found at http://developer.android.com/guide/market/billing/billing_overview.html, as such mechanism or URL may be updated or replaced from time to time.  In the event Google permits the sale of Android Applications through the in-app billing mechanism provided by or on behalf of Google, the parties will discuss the terms by which the parties will share the related revenue.

1.32   "Intellectual Property Rights" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations and re-instatements thereof, now or hereafter in force and effect worldwide.

1.33   "Partner Channel" has the meaning given to that term in Exhibit A.

1.34   "Search Agreement" means the Android Search Revenue Share Agreement for Mobile Operators between the parties with an effective date of February 1, 2013.

1.35   "Service" means the wireless service owned and/or operated by Company that allows End Users using a Device to access the Internet.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0001833

Confidential

1.36 "**Territories**" means the country or countries in which promotion, distribution and operation of Google Play Client is permitted, under the conditions as provided by Google to Company upon execution of this Agreement, which may be updated by Google from time to time but will in any event include the fifty states of the United States of America.   Distribution of Google Play Client outside of the Territories is prohibited. "**Territory**" shall be construed accordingly.

1.37 "**Total DCB Fee**" means, for a particular period, the DCB Fees for all DCB Paid Transactions in that period.

1.38 "**Trademarks**" means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

1.39 "**Transaction Fee**" means, for a particular DCB Paid Transaction, the percentage of GTV specified as the "Transaction Fee" in **Exhibit B.**

2. **FEE ELIGIBILITY**

2.1 **Company Fee Requirements.** Company shall only be eligible to receive the Company Fee if Company adheres to the terms and conditions of this Agreement including but not limited to the sections noted below.   The parties agree that Company's inadvertent failure to comply with the sections noted below on a small number of Devices will not disqualify it from receiving the Company Fee provided that Company cures the non-compliance as soon as reasonably practicable.   In the event Company fails to cure the non-compliance in a timely manner, Google may initiate the Escalation Process (as defined in Section 9.6).  In the event the Escalation Process does not cure the non-compliance and the parties do not otherwise come to resolution regarding the non-compliance, then Google may terminate this Agreement upon written notice to Company.

   (a) Placement and appearance of Google Play Client in accordance with Section 2.2;

   (b) Implementation of Google Play Client in accordance with Sections 2.3 and 2.4; and

   (c) Compliance with the Google Mobile Branding Guidelines.

2.2 **Placement.**  Company shall ensure that the Google Play Client is placed on the Device Top of each Device sold or otherwise distributed by Company as follows:

   (a) on the Default Home Screen; or

   (b) on a panel immediately adjacent to the Default Home Screen,

   and at all times by at least equal placement with any Alternative Store.

2.3 **Confirmation of Compatibility.**  Company must obtain a written statement that a device meets the then-current Android Compatibility Definition document (as described in Section 1.17 above) from each applicable Authorized OEM before Company distributes that Device.

2.4 **Territories.**  Company shall only sell or otherwise distribute Devices in the Territories (and no other territory).  Additionally, where Google specifies a specific version of Google Play Client be distributed in a particular Territory, Company shall distribute only such version in that Territory.

3. **DIRECT CARRIER BILLING**

3.1 **Implementation.**

   (a) Company agrees to support DCB.  Google will provide the Google Billing API, and Company will be responsible for: (i) integrating its billing system with the Google Billing API; and (ii) operating the integration code between Company's billing system and the Google Billing API  The parties will mutually agree on the details of implementing DCB.

   (b) Company shall use the Google Billing API solely for the purpose of fulfilling its obligations under this Agreement and shall not, and will not allow third parties under its control to, copy, modify, create a derivative work of, reverse engineer, decompile, translate, disassemble the Google Billing API, or otherwise attempt to extract the source code of the Google Billing API or any component thereof.

4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

3.2 **Initiation of Direct Carrier Billing.** To the extent it is available and ▇▇▇▇ sharing of it is consistent with disclosures made by Google to End Users, Company will provide End User-related information via the Google Billing API to enable the applicable End User to make a purchase through DCB. To the extent consistent with disclosures made by Google to End Users, such information will include the End User's full name, billing address, country, zip code and phone number. Google will use this information in accordance with the Google Wallet Privacy Policy (as it may be amended from time to time) solely to operate the Google Wallet service and establish DCB as a payment option in the End User's Google Wallet account, and for no other purpose. Google may in its sole discretion decline to establish DCB as a payment option for an End User, or limit, suspend, or cancel the use of DCB by an End User and Company may limit, suspend, or cancel the use of DCB by an End User in its sole discretion. Without limiting the foregoing, Company may impose DCB purchase limits (e.g., daily, monthly or per transaction limits) and may reject DCB Paid Transactions to the extent that they exceed such limits or if an End User is delinquent in paying an amount due to Company or otherwise has not maintained their account in good-standing.

3.3 **Regulatory and Compliance Requirements.** Each party shall comply with all applicable laws, regulations, standards, rules, consent decrees and orders of any federal, state or local governmental or regulatory authority, or other body having jurisdiction over such party (collectively, "**Laws**") with respect to such party's activities in connection with DCB Paid Transactions. The parties agree that a party does not breach this Agreement if it takes a reasonable action (or reasonably omits to take an action otherwise required under this Agreement) in order to comply with any applicable Law. Each party will use reasonable efforts to notify the other party prior to taking such action. At all times during the Term and thereafter, Google will provide all reasonably requested cooperation to enable Company to comply with any Law that establishes obligations in connection with End Users' Google Play purchases or associated refunds or any other aspect of DCB Paid Transactions.

3.4 **Disclosures and Terms of Service.** The parties agree that when an End User agrees to engage in a DCB Paid Transaction, Company will be deemed to have the sole and exclusive right to collect payment directly from the End User for such DCB Paid Transaction. Company and Google will each be responsible for providing terms and disclosures to the End User, including their respective Terms of Service, in order to enable the provision of DCB to End Users. Company will determine and provide the appropriate terms and disclosures with regard to the status of the End User as an End User of Company's DCB. Google will determine and provide the appropriate terms and disclosures to the End User as an End User of Google Wallet account. Google will determine the manner in which the respective terms and disclosures are presented to End Users in the Google Play user interface, subject to Company's approval as to the sequence in which such terms and disclosures are presented, which will not be unreasonably withheld. Neither Party will take any action such that an End User is denied the opportunity to review and accept (or reject) the other Party's terms and disclosures, as applicable.

3.6 **End User Support.**

(a) Company is responsible for End User service related to billing and collection inquiries related to DCB. Nothing will authorize or obligate Company to terminate or remove from a Device any Android Application, Google Content, or In-App Purchase for which an End User received a refund.

(b) For Google Play issues unrelated to DCB, Company will direct the End User to Google, or for issues relating to a specific application, the applicable Developer. If the issue cannot be resolved with the Developer, Company may contact Google at http://support.google.com/wallet/bin/request.py?&&contact_type=claimb, which may be updated by Google from time to time. Company will direct End Users to the applicable Developer for all Android product-related support.

4. **PARTNER CHANNEL.**

4.1 By execution of this Agreement, Google authorizes and will enable Company to promote Android Applications via its own Partner Channel as provided for and defined in Exhibit A.

5. **RESTRICTIONS**

5.1 **Restricted Promotion.** Company shall not Actively Promote, and shall not authorize or assist any third party (including its Affiliates, resellers, distributors and OEMs) to Actively Promote, Google Play in any territory that is not a Territory or where Google has not otherwise expressly authorized in writing Google Play to be Actively Promoted under this Agreement.

5

Confidential

5.2    **General Restrictions.** Except to the extent required by law, Company shall not, and shall not authorize or assist any third party to: (a) disassemble, de-compile or otherwise reverse engineer Google Play Client or otherwise attempt to learn the source code or algorithms underlying Google Play Client; (b) create derivative works from or based on Google Play Client or Google Play, whether for an Alternative Store or otherwise; (c) except as expressly set forth in this Agreement or as separately authorized by Google, provide, sell, license, distribute, lease, lend, or disclose Google Play Client or Google Play to any third party; (d) use Google Play Client or Google Play for unauthorized purposes; (e) exceed the scope of any license granted to Company under this Agreement; (f) ship, divert, transship, transfer, export or re-export Google Play Client, or any component thereof, into any country or use it in any manner prohibited by any export control laws, restrictions, or regulations administered by the U.S. Commerce Department's Bureau of Export Administration, the U.S. Department of Treasury's Office of Foreign Assets Control or any other applicable government agency; (g) preload, install or launch Google Play Client or Google Play (or otherwise act or fail to act) such that an End User is denied the opportunity to review and accept (or reject) the relevant Google Play terms of service; (h) serve or otherwise place any advertisements during the launch process of the Google Play Client or Google Play; (i) offer, download or install, or authorize or assist any third party to offer, download or install, any additional products during the launch process of the Google Play Client or Google Play; or (j) use any portions of Google Play Client or Google Play or information gained from Google Play Client, Google Play, or from Google or any Google Affiliate, to assist or encourage any third parties to use Google Play Client or Google Play on devices other than Devices or via any distribution method other than Google Play.  For purposes of clarity, nothing in this Agreement authorizes Company to distribute Google Play Client in any manner other than on Devices.

## 6.    UPDATES, TESTING AND DEVICES

6.1    **Over-the-air Updates.** Google may update Google Play Client and related software on Devices over-the-air at Google's sole discretion. Company shall not prevent such updates.

6.2    **Ongoing Testing and Support.** Company shall, where reasonably required by Google:

(a)    assist Google with ongoing testing of Devices and Google Play Client; and

(b)    provide information, equipment and/or assistance as may be reasonably necessary to allow Google to make available and operate Google Play Client on Devices to End Users and to make Google Play available on the Service and to Devices (including over-the-air updates to Google Play Client).

6.3    **Test SIMs.** For each Territory, Company will ensure that Google has no less than five (5) SIM cards that Google can use to access the Service for testing purposes. Such SIM cards must:

(a)    provide Google with unlimited data access on the Service;

(b)    be provisioned for use with DCB (if applicable), and

(c)    remain active for the duration of the Term

6.4    **Changes and Modifications.** If Google modifies the Google Mobile Branding Guidelines, the Client IDs or any other technical specifications, and the modification requires action by Company, then, provided Google is not making such modification in bad faith, Company will take the necessary action as soon as reasonably possible but in any event no later than 30 days from receipt of notice from Google  However, if such modification is not technically feasible or causes a not-insignificant expense or unreasonable burden, Company will notify Google as soon as possible but in any event within 15 days of being notified of the modification, and the parties will work together to reach a reasonable resolution that is generally acceptable to Google's mobile partners.  If Company reasonably believes that the proposed reasonable resolution is not technically feasible or would cause a significant expense (including resource expenses associated with an unreasonable burden) relative to the revenues generated from payments in this Agreement, Company shall have the right to suspend or terminate with 10 days written notice the obligations related to the affected Device(s) and Google Application(s) if Google is unwilling to support the previous version.

6.5    **Respect of Networks/Sites.** Each party will avoid adversely impacting the networks and/or sites of the other party, will notify each other as soon as possible of any related issues, and will work together to resolve such issues.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    GP MDL-TMO-0001836

Confidential

6.6 **Open Devices.** The parties will create an open environment for Devices by making Google Play and Android application programming interfaces (APIs) available (subject to the terms of this Agreement) and open on Devices.

6.7 **Open Internet Access.** Company will use diligent efforts to ensure that Google Play and all Android Applications, Digital Content and Google Content downloaded from Google Play will have unrestricted access to the Internet through the Service, subject to the terms and conditions applicable to End Users' use of the Service.

7. **MANAGEMENT AND SUPPORT**

7.1 **Points of Contact.** Company and Google shall each appoint a partner manager (the "**Partner Manager**") who shall be the single point of contact for all business and operational activities associated with this Agreement. Company and Google shall each appoint a single technical account manager (the "**Technical Account Manager**") who shall be the single point of contact for all technical and deployment activities associated with Google Play. Company and Google shall notify the other of the name and contact details for Partner Manager and Technical Account Manager (name and contact information subject to change, upon notice, from time to time).

7.2 **Support.** Each party will provide End User support services to its end users in its discretion and at its own expense. For issues related to Android Applications or Digital Content (including with respect to In-App Purchases), Company will direct End Users to the applicable Developer for support. Company will provide support services to End Users for Company's data services and network at its own expense.

7.3 **Escalation of Support Cases Involving Google Applications.** Prior to making any support request to Google regarding Google Play, Company will first use reasonable efforts to fix any error, bug, malfunction, or network connectivity defect on its own without any escalation to Google.

8. **DATA COLLECTION AND REPORTS**

8.1 **Data Collection.** Each party's privacy and security policies shall apply with respect to the user information collected by it. Subject to each party's privacy policy, such party will provide the other reasonable aggregate information about usage of Google Play Client on Devices during the Term, in order to help each party improve End Users' experience with Google Play Client. Such information will not include any personally identifiable information.

8.2 **Google Reports.** During the Term, Google shall, within 10 business days after the end of each calendar month, provide to Company the DCB Monthly Invoice. Google will provide each DCB Monthly Invoice in a form meeting the requirements set forth in Exhibit C. If there are no DCB Paid Transactions during a given calendar month, Google is not obligated to send the DCB Monthly Invoice.

8.3 **AICPA Standards and Audit.**

(a) Beginning six months after the Effective Date, Google will provide the latest independent 3rd party assessment of controls performed in accordance with AICPA attestation standards, which may include a SSAE 16 SOC 1 Type II, SOC 2 Type II or AT Section 101, upon thirty (30) days prior written request and no more frequently than once per calendar year. The subservice provider reports will cover at least a six month period and will be made available to Company no later than December 15th for each calendar year or portion thereof during the Term.

(b) In the event the reports provided pursuant to Section 8.3(a) do not sufficiently resolve Company's concerns regarding Google's revenue reporting obligations under this Agreement, then Company will provide Google written notice (i) specifying those concerns; and (ii) notifying Google it would like to participate in the Escalation Process (as defined below)

(c) In the event that Company has participated in the Escalation Process pursuant to Section 8.3(b) and the Escalation Process has not resolved Company's concerns, then, during the Term and upon thirty (30) days prior written notice, Company, at its own expense, may retain a mutually acceptable internationally recognized independent auditor whose fees are not contingency-based to review and audit Google's relevant records. Such audit shall:

(i) be subject to Google's reasonable security and confidentiality requirements, and in no circumstances may the auditors copy or remove any records from Google's site. Auditors may

7

Confidential

prepare written reports of their findings based on their review of Google's records, as long as these reports do not include copies of Google records;

(ii)     occur no more than once per year and not during the first three (3) weeks or the last three (3) weeks of a calendar quarter, and

(iii)    take place during Google's normal business hours and within a maximum period of 15 working days on site at Google, and

(iv)    cover a period not to exceed the previous 12 months.

If the audit shows an underpayment or overpayment to Google for any quarter, then Company or Google (as applicable) shall, within thirty (30) days after completion of such audit, pay or credit such underpaid or overpaid amounts to the other party

## 9.    PAYMENT AND TAXES

**Payments**

9.1     **Treatment of Revenues.** Except as expressly set forth in this Agreement or as may otherwise be agreed between Google and Company in writing, Google and Company shall each retain any and all revenue generated from provision of their respective products or services, and neither party shall be required to account to the other or otherwise make any other payment to the other in connection with the Service, Google Play, the Google Play Client, Google products or services, Devices, or any revenue generated from them.

9.2     **Billing and Collections for DCB Paid Transactions.** Company will have the sole right to carry out the billing and collection of DCB Paid Transactions from End Users. In that regard, an End User's payment to Company of DCB Paid Transactions will be in lieu of such End User's payment obligation to Google, any Developer, or any other third party. Google will be responsible for settlement with, and payment to, Developers. Company may, in its sole discretion, select a bank to process payments from Company's accounts to Google's accounts. Company will have sole discretion as to whether, and to what extent, to pursue collection against any End User. Nothing in this Agreement authorizes Google or Developers to collect payment for DCB Paid Transactions directly from the End User, and Google will not seek to collect any such payment from End User or authorize Developers to seek to collect any such payment.

9.3     **Credit Card Fee.** For each calendar month from the Effective Date until December 31, 2013, Google shall pay Company the Credit Card Fee in the currencies notified to Company by Google  The transactions, adjustments and other relevant metrics, as compiled by Google, shall be the records used in calculating the payments under this Agreement.  Payments made to Company by Google under this Agreement will be made no later than the last day of the month following the calendar month in which the applicable revenue was generated.  Google has no obligation to pay Company the Credit Card Fee for any transactions that occur on or after January 1, 2014.

9.4     **Calculation of the DCB Fee.** The transactions, adjustments and other relevant metrics, as compiled by Google, will be the records used in calculating the DCB Fee. Google will provide information regarding, and Company will agree to, the rounding method algorithm used to calculate revenue share amounts. However, if Company identifies a discrepancy, both parties agree to resolve the discrepancy pursuant to the process set forth in Section 9.6 herein.

9.5     **Payment.** Company (itself or via its billing services vendor) will pay Google the DCB Monthly Total less the Transaction Fees and DCB Fees specified in Exhibit B as set out in each DCB Monthly Invoice within 30 days after the end of the month to which the DCB Monthly Invoice relates (e.g  for a Paid Transaction in March, payments must be remitted by April 30). Company is responsible for any bank charges assessed by Company's bank.  Electronic payment (via ACH or wire transfer only) representing the DCB Monthly Total from Google's monthly reports (as provided pursuant to Section 8 2) less the Transaction Fees and DCB Fees specified in Exhibit B, and subject to Company's right to dispute reported amounts pursuant to the process in Section 9.6, will be remitted to Google Company (itself or its billing services vendor) will send Google a remittance advice email showing the summary of payment made to Google. The remittance advice email will be sent to Google prior to or on the day that payment is posted to Google's designated account.

9.6     **Disputes.** In the event of a dispute relating to the amounts due from Company to Google set forth in the DCB Monthly Invoice, Company will notify Google in writing prior to the monthly payment date

8

Confidential

detailing the items in dispute. Google and Company will work in good faith to exchange information to resolve the issue within thirty (30) days, including relevant details of such dispute (i.e., settlement report). If a dispute described in Section 9.6 is not resolved prior to the payment date, Company will pay the amount set forth in the DCB Monthly Invoice and the parties will continue to work in good faith to resolve the issue. If the parties agree that the dispute is due to an error on the part of Google, Google will appropriately adjust Company's next monthly payment or, if Company does not owe a further monthly payment, pay an additional amount to Company to correct such error. If a dispute is not promptly resolved, Company may notify Google that it desires to participate in the Escalation Process and Google will participate in good faith. For the purposes of this Agreement, "Escalation Process" means a process by which each party attempts in good faith to resolve disputes and, if necessary within 30 days following the commencement of such resolution efforts, escalate the disputes for resolution to senior executives nominated by each party. The senior executives will endeavor to discuss (via telephone, in person, and/or in such other manner as they may elect) and resolve any disputes that have been escalated to them within four (4) weeks of such escalation.

9.7     **Refunds.**

(a)     If either (i) an End User cancels a DCB Paid Transaction in accordance with the terms of the Google Play refund policy, or (ii) a Developer or Google initiates a refund to an End User in relation to a DCB Paid Transaction, or as required by any applicable Law, Google will notify Company of such cancellation or refund, and Company will refund the End User's account accordingly or not present the charge to the End User. Company will also refund the End User's account or not present the charge to the End User if otherwise required by Law.

(b)     **Mass Refunds.** In consultation with Google, Company may issue "mass refunds" to all affected End Users for applicable purchases (e.g., for Android Applications, Digital Content and/or In-App Purchases that are determined to interfere with the proper operation of a Device).

(c)     If Company initiates a Company Discretionary Refund to an End User in relation to a DCB Paid Transaction (i.e. separately from the procedures described in clauses 9.7(a) or (b), Company will nonetheless pay the corresponding Direct Carrier Billing Charge to Google notwithstanding such Company Discretionary Refund.

(d)     Google will initiate a credit to Company for those Company Discretionary Refunds issued by Company where (i) the transactions in which the Android Application, Digital Content or In-App Purchase was fraudulent or not as described to the End User or the transaction was unauthorized and initiated by Google or a Developer; (ii) Company notifies Google of such Company Discretionary Refunds (e.g., as part of the daily chargeback files provided by Company) no later than ninety (90) days from the date of the fraudulent or unauthorized DCB Paid Transaction; and (iii), Google reasonably finds that such Company Discretionary Refunds are due to unauthorized transactions initiated by a Developer or Google, or purchases of fraudulent Android Applications, Digital Content or In-App Purchases.

(e)     For each Company Discretionary Refund, Company shall credit the total Direct Carrier Billing Charge to the applicable End User.

(f)     **Timing of Refunds.** For all refunds contemplated in this Section 9.8, Company will pay back the applicable End User within the time period required by Law

9.8     **[INTENTIONALLY RESERVED]**

9.9     **Authorization:** Google reserves the right to seek payment from Company pursuant to Section 9 5 for any DCB Paid Transactions for which Company provides a valid authorization through the Google Billing API. Google will not seek payment for a DCB Paid Transaction if Company does not authorize it through the Google Billing API.

9.10    **Bad Debt Processing.** Company's obligation to pay Google for an authorized DCB Paid Transaction is in no way subject to Company's ability or schedule to collect payment from End Users for any such Paid Transaction.

9.11    In addition to other rights and remedies Google may have, Google may withhold and offset against its payment obligations under this Agreement, offset against its payment obligations under the Search Agreement, or require Company to pay to Google within thirty (30) days of any invoice, any amounts Google may have overpaid to Company in prior periods under this Agreement. The party receiving

9

GP MDL-TMO-0001839

Confidential

payment will be responsible for any bank charges assessed by the recipient's bank.

**Taxes and Other Charges**

9.12   **Tax and Other Charges Related to Android Applications, Digital Content and In-App Purchases.**  Google or its designees (including, at Google's discretion, Developers) will be responsible for calculating all taxes applicable to Google Play purchases and for making such information available for presentation to End Users in connection with their use of Google Play. Company will not be responsible for any such calculations or for presenting such tax information to End Users.  Google will notify Company of applicable taxes and total tax amount as instructed by Google for End User purchases using DCB.  Company will include the total tax amount, as provided by Google, on the End User's monthly bill   Company will remit total tax amount to Google as described in Section 9.5.  If Company is subject to any governmental investigation, audit or other inquiry or process (a "Tax Inquiry") regarding taxes or similar fees that Google or Developers are obligated to collect or pay in connection with Google Play or any Android Applications, Digital Content or In-App Purchases, then Company may refer the governmental entity(ies) participating in such Tax Inquiry to Google and Google will cooperate in good faith and at its expense to provide, in place of Company, all relevant information and assistance requested in connection with such Tax Inquiry.

9.13   **Other Tax-Related Obligations of the Parties.**  All payments from Google to Company under this Agreement are exclusive of taxes imposed by any governmental entity.  Company will pay properly billed applicable transaction taxes, such as sales tax, use tax, or value-added tax (other than any VAT that is recoverable by Google) directly imposed on Company by applicable law with respect to the transactions for services provided under this Agreement.  Company shall not be responsible for other taxes generally applicable to Google such as property, gross income, net income and commercial activity type taxes.  When Google has the legal obligation to collect any applicable taxes from Company, the appropriate amount shall be timely invoiced to and paid by Company "net thirty (30) days" from the date of invoice or other notification.  Google shall promptly remit such collected taxes to the appropriate governmental taxing authorities.  If Google is legally required to withhold taxes from its payments to Company and remit such taxes to the local taxing jurisdiction, then Google shall pay to Company the remaining net amount after the taxes have been withheld.  Google shall promptly provide to Company a copy of an official tax receipt or other appropriate evidence of any taxes imposed on payments made under this Agreement.   Company shall promptly provide Google with such documentation as may be required by the applicable governmental entity in order for Google to process payments hereunder (including, without limitation a valid certificate of Company's exemption from obligation to pay taxes as authorized by the appropriate governmental entity), and Google may withhold any payments required to be made hereunder until Company has provided such documentation.  If Google requests in writing, Company shall promptly provide Google with original or certified copies of requested tax payments or other sufficient evidence of tax payments at the time such payments are made by Company pursuant to this 9.13.  When Company has the legal obligation to collect any applicable taxes, the appropriate amount shall be invoiced to and paid by Google unless Google provides Company with a valid tax exemption certificate authorized by the appropriate taxing authority.

10.   **TERM AND TERMINATION**

10.1   **Term.**  This Agreement shall commence on the Effective Date and shall continue for the Term, unless earlier terminated as provided in this Agreement.

10.2   **Termination of this Agreement.** Either Google or Company may suspend or terminate this Agreement with immediate effect by giving written notice to the other if the other party:

   (a)      is in material breach of this Agreement where the breach is incapable of remedy;

   (b)      is in material breach of this Agreement where the breach is capable of remedy and fails to remedy that breach within 30 days after receiving written notice of such breach; or

   (c)      ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within 90 days

10.3   [Intentionally omitted]

10.4   **Change of Control.**  Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), the party experiencing the change of control will provide written notice to the other party within 30 days after the change of control.  If either party

10

GP MDL-TMO-0001840

Confidential

undergoes a change of control involving an entity that the other party reasonably determines is a competitor in a material portion of the other party's business, the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives the written notice under this Section 10.4, and the termination will be effective 30 days from delivery of the termination notice.

10.5    **Special Suspension.** Notwithstanding anything to the contrary, in the event that the government or controlling body of any country or territory in which Google Play Client is distributed or made available imposes any law, restriction or regulation that makes it illegal to distribute or make available Google Play Client, or any portion thereof, into such country or territory, or if any such law, restriction or regulation places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**") then Google shall have the right to suspend the distribution and/or availability of Google Play Client in such country or territory until such time as such law, restriction or regulation is repealed or nullified or modified such that there it is no longer illegal or a Substantial Burden, as applicable, for Google Play Client to be distributed or made available in such country or territory ("**Special Suspension**").

10.6    **Effect of Termination of this Agreement**  Upon expiration or termination of this Agreement for any reason:

    (a)    all rights and licenses granted hereunder shall immediately cease except to the extent that such rights and licenses are necessary for the parties to exercise their rights during the DCB Wind Down Period pursuant to Section 10.7;

    (b)    Company shall not remove, alter or block access to Google Play Client for existing End Users for 18 months from the date of termination or expiration; and

    (c)    Google and Company shall each return or destroy (and a duly appointed representative shall certify to such destruction) all copies of Confidential Information in its possession which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived back up copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory.

10.7    **Wind-Down Period.** After termination or expiration of this Agreement, the DCB Wind-Down Period will begin. No new DCB Paid Transactions will be initiated during the DCB Wind-Down Period. The parties will cooperate in good faith to address any wind-down issues in a timely manner.

10.8    **Survival.** The provisions of Sections  (Definitions), 5 (Restrictions), 10.6 (Effect of Termination), 10 7 (Wind-Down Period), 10.8 (Survival), 11 (Confidentiality and Publicity), 12.5 (Proprietary Rights), 13 2 (Disclaimer), 14 (Liability), 15 (Indemnification) and 16 (Miscellaneous), shall survive expiration or termination of this Agreement   Section 9 shall survive expiration or termination of this Agreement solely with the respect to any payments owed by either party to the other that accrued in accordance with the terms of this Agreement.

## 11.    CONFIDENTIALITY AND PUBLICITY

**Confidentiality**

11.1    "**Confidential Information**" is information disclosed by one party (or Affiliate) to the other party (or Affiliate) under this Agreement that is marked as confidential or would normally under the circumstances be considered confidential information of the disclosing party. Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another party.

11.2    The recipient will not disclose the Confidential Information, except to affiliates, employees, and agents who need to know it and who have agreed in writing to keep it confidential. The recipient, its affiliates, employees, and agents may use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to protect it. The recipient may also disclose Confidential Information when required by law after giving reasonable notice to discloser.

**Publicity**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    GP MDL-TMO-0001841

Confidential

**11.3**   Neither party may make any public statement regarding this Agreement without the other's prior written approval except when required by law after giving reasonable notice to the other.

**12.   TRADEMARKS**

**12.1**   **General.**  Each party shall own all right, title and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks.  Some, but not all examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time).  Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of the first party; and all rights not expressly granted herein are deemed withheld. Further, Google does not grant, and Company shall not acquire, pursuant to this Agreement, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of Developers.  All use by Google of Company Trademarks (including any goodwill associated therewith) shall inure to the benefit of Company and all use by Company of Google Trademarks (including any goodwill associated therewith) shall inure to the benefit of Google.

**12.2**   **License to Google Trademarks.**  Subject to Google's written approval prior to each use of a Google Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, nonexclusive and non-sublicensable license during the Term to display those Google Trademarks expressly authorized for use in this Agreement, solely for the purposes expressly set forth herein. Notwithstanding anything to the contrary, Google may revoke the license granted herein to use Google's Trademarks upon providing Company with written notice thereof and a reasonable period of time to cease such usage.  Furthermore, in its use of any Google Trademarks, Company agrees to adhere to the Google Mobile Branding Guidelines.

**12.3**   Company shall not, and shall not authorize or assist any third party to produce any consumer packaging or materials for Devices sold or otherwise distributed by Company that identifies or suggests that Google is the manufacturer of the Device. In this regard, Company will use commercially reasonable efforts to ensure that any Device packaging or user guide produced by Company identifies Authorized OEM as the manufacturer of the Device and provides contact details of the Authorized OEM in the applicable Territories in which the Device is distributed.

**12.4**   **License to Company Trademarks.**  Subject to the terms and conditions of this Agreement and to Company's branding guidelines provided to Google from time to time, Company grants to Google a limited, nonexclusive and non-sublicensable license during the Term to display the Company Trademarks in connection with marketing and promotional materials or as otherwise solely for the purposes of this Agreement.   Notwithstanding anything to the contrary, Company may revoke the license granted herein to use its Trademarks upon providing Google with written notice thereof and a reasonable period of time to cease such usage.

**12.5**   **Proprietary Rights.**  Except to the extent expressly set forth in this Agreement, neither party will acquire, under this Agreement, any right, title or interest in, or license to, any Intellectual Property Rights belonging to the other party or to the other party's licensors.

**13.   REPRESENTATIONS, WARRANTIES AND DISCLAIMER**

**13.1**   **Representations and Warranties.**  Each party represents and warrants to the other that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder and will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.

**13.2**   **Disclaimer.**  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 13.1, GOOGLE PLAY CLIENT AND/OR ANY OTHER GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND GOOGLE EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.  GOOGLE DOES NOT WARRANT THAT GOOGLE PLAY CLIENT AND/OR ANY OTHER GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER WILL MEET ALL OF COMPANY'S REQUIREMENTS OR THAT PERFORMANCE OF SUCH SERVICES WILL BE UNINTERRUPTED, VIRUS-FREE, SECURE OR ERROR-FREE.    OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 13.1, COMPANY MAKES NO WARRANTY OF ANY KIND TO GOOGLE WITH RESPECT TO THE DEVICES, SERVICES OR ANY OTHER PRODUCT OR SERVICE PROVIDED HEREUNDER, AND EXPRESSLY DISCLAIMS ANY

12

GP MDL-TMO-0001842

Confidential

AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

**14.     LIMITATION OF LIABILITY**

**14.1     Limitations.**  Subject to Section 14.2: (a) Limitation on Indirect Liability. NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES, EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY.  (b) Limitation on Amount of Liability.  NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR MORE THAN THREE MILLION U.S. DOLLARS ($3,000,000.00 USD) OR, IF HIGHER, THE NET AMOUNT RECEIVED AND RETAINED BY COMPANY UNDER THIS AGREEMENT DURING THE 24 MONTHS BEFORE THE CLAIM ARISES.  For clarity, the foregoing cap on liability does not limit Company's express payment obligations to the other party under Section 9 and Exhibit B of this Agreement).

**14.2     Exceptions to Limitations.**  These limitations of liability do not apply to breaches of confidentiality obligations, violations of Intellectual Property Rights (including without limitation a breach of the license to use Trademarks under Section 12), indemnification obligations, or breaches by Company of Section 2.4.

**14.3     Allocation of Risk.**  The parties agree that (a) the mutual agreements made in this Section 14 reflect a reasonable allocation of risk, and (b) that each party would not enter into the Agreement without these limitations on liability.

**15.     INDEMNIFICATION**

**15.1     By Google.**  Google will indemnify, defend and hold harmless Company from and against all liability, damages and costs (including settlement costs) arising out of any third party lawsuit or proceeding brought against Company based upon or otherwise arising out of: (a) any breach or claimed breach of the first sentence of Section 13.1; or (b) any claim that Google Play Client or Google Trademarks infringe any copyright, trade secret, trademark or U.S. patent of such third party, or (c) any claim related to Google's advertising, marketing or promotion of Google Play or Google Play Client Notwithstanding the foregoing, in no event shall Google have any obligations or liability under this Section 15.1 arising from: (i) modifications of Google Play Client or the Google Trademarks by any party other than Google; (ii) combination of Google Play Client or the Google Trademarks with any other software or products or any other materials; or (iii) distribution, use or access to Google Play or Google Play Client or the Google Trademarks other than in accordance with this Agreement.  Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to Google Play Client or the Google Trademarks which are alleged or believed by Google to infringe the rights of a third party, and in such case Company will have no further obligations under Section 10.6(b) with respect to the Google Play Client   Google shall have no obligations under this Section 15.1 regarding Android or any products, applications or content distributed through Google Play.

**15.2     By Company.**  Company will indemnify, defend and hold harmless Company from and against all liability, damages and costs (including settlement costs) arising out of any third party lawsuit or proceeding brought against Google based upon or otherwise arising out of: (a) any breach or claimed breach of Section 13.1; (b) Company's or any third party's improper or unauthorized replication, packaging, marketing, distribution, or installation of Google Play Client, including without limitation claims based on representations, warranties, or misrepresentations made by Company; (c) any claim that any Company Trademark used in accordance with Section 12.4 infringes any Intellectual Property Right; (d) any claim related to Company's advertising, marketing or promotion of any Devices.

**15.3     Conditions of Indemnification.**  The party seeking indemnification must promptly notify the other party of the claim and cooperate with the other party in defending the claim, provided that any delay in notification shall not relieve the indemnifying party of its obligations hereunder except to the extent that the delay impairs its ability to defend and indemnify.  The indemnifying party has full control and authority over the defense, except that (a) the other party may join in the defense with its own counsel at its own expense, and (b) any settlement requiring the party seeking indemnification to admit liability or to pay any money or other otherwise adversely affects the indemnified party's rights of interests will require that party's prior written consent, such consent not to be unreasonably withheld.  THE INDEMNITIES ABOVE ARE THE ONLY REMEDY UNDER THIS AGREEMENT FOR VIOLATION OF

13

GP MDL-TMO-0001843

Confidential

A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.

**16.    MISCELLANEOUS**

16.1    **Notices.** All notices of termination or breach must be in writing and addressed to the attention of the other party's Legal Department and primary contact, and any such notice must be sent by personal courier, overnight courier or US mail and will be deemed given when verified by written receipt. The email address for notices being sent to Google's Legal Department is ███████████████. Except as otherwise specified in this Agreement, other communications and notices will be deemed given on receipt, as verified by written or automated receipt or by electronic log (as applicable). All other notices must be in writing and addressed to the other party's primary contact.

16.2    **Force Majeure.** Neither party will be liable for failure or delay in performance to the extent caused by beyond its reasonable control.

16.3    **Third Party Service Providers.** (a) Each party shall be permitted to use the services of third party service providers ("**Third Party Service Providers**") to assist it in otherwise operating or maintaining that party's business and shall be entitled to delegate any or all of its rights under this Agreement to its Third Party Service Providers; (b) provided that, (i) the party using such Third Party Service Provider shall be responsible for the performance of such third party and its compliance with this Agreement to the same extent as if such third party's activities were performed directly by such party, (ii) such Third Party Service Providers shall be bound to obligations (including Section 11) no less than those contained in this Agreement; and (iii) the parties will not use as a Third Party Service Provider in relation to implementation of this Agreement any entity whom the other party would reasonably be expected to not want to work with (and the parties will reasonably resolve any issues regarding this Section 16.3).

16.4    **Assignment.** Neither party may assign or transfer any part of this Agreement without the written consent of the other party, except to an Affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement, (b) the assigning party remains liable for obligations under the Agreement if the assignee defaults on them, and (c) the assignor has notified the other party of the assignment. Any other attempt to transfer or assign is void.

16.5    **No Waiver; Severability; No Agency; No Third-Party Beneficiaries.** Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement. If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of the Agreement will continue in force unaffected. This Agreement does not create any agency, partnership or joint venture between the parties. This Agreement does not confer any benefits on any third party unless it expressly states that it does.

16.6    **Controlling Law.** This Agreement is governed by New York law, excluding New York's choice of law rules. ALL CLAIMS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF NEW YORK COUNTY, NEW YORK, USA, AND THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

16.7    **Entire Agreement; Amendments; Counterparts.** This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject. ████████████████████████████████████████. Any amendment must be in writing signed by both parties and expressly state that it is amending this Agreement  The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0001844

Confidential



GOOGLE INC.





15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

## EXHIBIT A

### Partner Channel

Google will enable Company to promote up to one twenty-five (125) Android Applications comprised of the following three (3) categories (the "**Partner Channel**") in Google Play on Devices as follows:

**1.      Strategic Applications (Up to 25)**

1.1      "**Strategic Applications**" are Android Applications owned by, or licensed to, and uploaded by Company. They must be published under Company's name. Products in this category must relate directly to Company's core network and product offerings including, but not limited to, Billing Account Manager, SMS counter, Wi-Fi Hotspot application, Network address book or special dialling application. Applications or games with functions and capabilities that are largely similar to other titles that are currently available in Google Play for all users are not qualified to be classified as Strategic Applications. Google reserves the right to review applications that are being promoted in this category and take down applications that do not meet the definition of Strategic Applications.

1.2      Strategic Applications have no maximum time limit for inclusion in the Partner Channel

**2.      Promotional Applications (Up to 25)**

2.1      "**Promotional Applications**" are "new" Android Applications that are created by Developers exclusively for Company's End Users and are featured in the Partner Channel (in a single country) for a period of time of up to 90 days (the "**Promotional Period**"). New Application Exemption: Any existing paid application (being an application which is usually provided to an End User for a charge) may qualify as a Promotional Application for the Partner Channel if it is offered for free during the Promotional Period (even if it is identical in name or functionality as long as the paid version of the identical application is left in the Google Play general population). A derivative of an existing application with a new name may be included in the Partner Channel as a Promotional Application as long as the original application on which the derivative is based is left in the Google Play general population. Google reserves the right to remove a Promotional Application if the Developer of that application removes the "original" application from Google Play at any time prior to or during the Promotional Period.

2.2      When Company activates a Promotional Application that has been uploaded by the Developer for inclusion in a Partner Channel, the Promotional Application will be promoted on the Partner Channel during the Promotional Period for up to a maximum of 90 days. Promotional Applications must be removed from the Partner Channel upon expiry of the Promotional Period.

2.3      Promotional Applications cannot be included in the Partner Channel more than once, even if the Promotional Application was promoted for a period that is less than the Promotional Period.

**3.      Non Exclusive Applications (Up to 125)**

3.1      "**Non Exclusive Applications**" are Android Applications that have previously been uploaded by Developers in Google Play.

3.2      Company may "tag" any Non-Exclusive Application for inclusion in the Partner Channel up to the 125 maximum allowed.

3.3      The maximum number of Non Exclusive Applications shown in the Partner Channel is determined by subtracting the number of Promotional Applications and the number of Strategic Applications from the number 125. For example, if Company had 25 Promotional Applications and 23 Strategic Applications, it would be able to promote a total of 77 Non Exclusive Applications for inclusion in its channel (125 – 25 – 23 = 77).

**4.      Presentation of Applications in the Partner Channel**

4.1      Android Applications promoted on the Partner Channel will be presented to End Users in the same manner as they are within the general Google Play population of Android Applications.

4.2      The Partner Channel will be presented to End Users of Partner's Devices with access to the Service.

16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

## EXHIBIT B

### Net GTV

1.  Fees payable for DCB Paid Transactions (excluding paid Google Content).

| Company Fee | DCB Fee | Transaction Fee |
|---|---|---|
| ▅▅▅▅ | ▅▅▅▅ | ▅▅▅▅ |

2.  Fees payable for DCB Paid Transactions for paid Google Content.

| Company Fee | DCB Fee | Transaction Fee |
|---|---|---|
| ▅▅▅▅ | ▅▅▅▅ | ▅▅▅▅ |

17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Confidential

## Exhibit C

**Google Billing Report Categories**

Billing Agreement ID

Correlation ID

Order Creation Time

Transaction Time

Currency

Item Price

Carrier Payment

Note. Google maintains the right to change the Billing Report Categories list provided directly above in this Exhibit C at its sole discretion, with reasonable written notice provided to Company, and provided that any revised set of Billing Report Categories provided by Google must provide sufficient information to enable Company to cross-reference and reconcile Google's reports with Company's records regarding calculating DCB Fees.

18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0001848

# REDACTED VERSION

# Exhibit A8
# to
# C. Cramer Declaration

# EXHIBIT 15

Google Confidential

## ANDROID SEARCH AND GOOGLE PLAY REVENUE SHARE AGREEMENT
## FOR MOBILE OPERATORS



Google Inc.
1600 Amphitheatre Pkwy
Mountain View, CA 94034

Google SPD Rep: ███
Google Sales Engineer: ███
Google Legal Contact: ███



| | Company Contact Information: | Company Technical Contact: | Company Legal Notices to: |
|---|---|---|---|
| **COMPANY:** ███ | | | |
| Attention: | ███ | ███ | ███ |
| Title: | ███ | ███ | ███ |
| Address, City, State, Postal Code, Country: | ███ | ███ | ███ |
| Email: | ███ | ███ | |

**Effective Date:** as of September 1, 2013
**Term:** Starting on the Effective Date and continuing through December 31, 2015 (inclusive) ("Term")
**Renewal Term:** None.

This Search and Google Play Revenue Share Agreement, including all exhibits hereto (collectively referred to as the "**Agreement**"), effective as of the date noted above (the "**Effective Date**") (it being understood that, notwithstanding anything to the contrary set forth herein: (i) Exhibit E of this Agreement that describes the percentages of Net GTV and DCB Transaction Fees payable to the Company shall not be effective until January 1, 2014 and (ii) until January 1, 2014, the Net GTV and DCB Transaction Fee percentages payable to the Company that are described in Amendment Number 1 to the Android Market Revenue Share Agreement dated October 1, 2011 shall apply instead of Exhibit E, provided that all other matters relating to Google Play, Net GTV and DCB shall, as of the Effective Date, be governed by this Agreement) is made by and between:

**GOOGLE INC.**, a Delaware corporation, for itself and its Affiliates (collectively, "**Google**"); and

███, a company incorporated under the laws of ███ whose registered office is at ███ ("**Company**").

## 1.   DEFINITIONS

1.1    "**Actively Promote**" or "**Actively Promoting**" means the proactive promotion of Google Applications or Google Mobile Search Service as a key value proposition of a Device, including point of sale promotion, media advertising and general consumer-focused promotion of Google Applications or Google Mobile Search Service.

1.2    "**Ad**" means a revenue-producing advertisement served by Google to an End User under this Agreement.

1.3    "**Ad Revenues**", for any period during the Term, means Ad revenues that are recognized by Google in such period and attributed to Ads resulting from Directed Traffic.

1.4    "**Affiliate**" means any entity controlling, controlled by or under common control with a party to

1

Google Confidential

this Agreement, where "control" shall mean ownership or the power to direct, directly or indirectly, fifty percent (50%) or more of the shares or voting rights of such entity.

1.5 "Alternative Store" means any marketplace or store preloaded on a Device or otherwise made available by or on behalf of Company that enables distribution of Android-based products or other products or applications to End Users of Devices.

1.6 "Android" means the Android software stack for devices, as made available under the Android Open Source Project, which is located at the following URL: http://source.android.com/, as updated from time to time.

1.7 "Android Application" means an Android-based software application (excluding Digital Content) that can be downloaded from Google Play to a Device.

1.8 "Android Compatible Devices" means each Device sold or otherwise distributed by Company during the Term of this Agreement and any Ramp-Down Period that: (a) is purchased from an Authorized OEM; (b) complies with the then-current Android Compatibility Definition document (as updated from time to time), which can be found at the Android compatibility website (http://source.android.com/compatibility) and successfully passes the then-current Android Compatibility Test Suite (CTS); and (c) is used to access the Wireless Service.

1.9 "Authorized OEM" means a device manufacturer that has a license from Google to distribute Google Applications on Android Compatible Devices.

1.10 "Client Application" means any application, plug-in, helper, component, or other executable code that runs on an End User's Device.

1.11 "Client ID" means a unique alphanumeric code that Google provides to Company pursuant to this Agreement that is used to identify Google Phone Top Search Applications, Google Mobile Search Service and Google Play Client usage on Devices and to track valid purchases for payment purposes, as such Client IDs may be modified by Google from time to time in its sole discretion.

1.12 "Company Service(s)" means the mobile data services provided by Company to End Users in the Territory, including the Portal, but excluding the Google Deliverables provided hereunder. For clarity, as further detailed in Section 16.6, the parties agree that products or services of ▇▇▇▇▇▇▇▇ and MVNOs listed in Exhibit C (only if such MVNO device's software configuration is determined and fully controlled by ▇▇▇▇ and provided that in order to qualify for payments under this Agreement, the applicable device(s) must comply with the requirements of this Agreement.

1.13 "Deduction" for any period during the Term means the sum of ▇▇▇▇▇▇▇▇ of Ad Revenues for such period.

1.14 "Developer" means a developer that distributes Android Applications, Digital Content and other content on the Google Play.

1.15 "Default Home Screen" means the default top-level screen of a Device that appears without scrolling in both portrait and landscape modes when the Device is in active idle mode (i.e. not in sleep mode), prior to any changes made by End Users.

1.16 "Destination Page" means any web page (or equivalent), which may be accessed by clicking on any portion of any Search Result or Ad.

1.17 "Device" means each device that runs Android sold or otherwise distributed by Company during the Term of this Agreement and any Ramp-Down Period.

1.18 "Devices" refers to both Android Compatible Devices and Non-Compatible Android Devices.

2

Google Confidential

1.19    "**Digital Content**" means consumable digital media and content that is not a software application, including without limitation electronic books, electronic periodicals, video and music.

1.20    "**Direct Carrier Billing**" or "**DCB**" means a wireless subscriber payment method to bill End Users for Paid Transactions through Company's billing system.

1.21    "**DCB Transaction**" means a Paid Transaction using Direct Carrier Billing.

1.22    "**Directed Traffic**" means web traffic to the Google Mobile Search Service generated directly by End Users as a result of Valid Queries that originate within the **Search Entry Points** set forth in **Exhibit D**.

1.23    "**End User**" means an end user of a Device.

1.24    "**Fraudulent Act**" means an act which (a) directly or indirectly generates queries, actions, impressions of or clicks on Search Results or Ads through any automated, deceptive, fraudulent or other invalid means (including, but not limited to, click spam, robots, macro programs, and Internet agents); or (b) encourages or requires End Users or any other persons, either with or without their knowledge, to click on Ads or take other actions regarding Ads through offering incentives or any other methods that are manipulative, deceptive, malicious or fraudulent.

1.25    "**Google Applications**" means the machine-readable binary code version of the Google applications listed in **Exhibit A**, as modified or updated by Google from time to time in its sole discretion. Google Applications are provided to Company via an Authorized OEM and include any modifications or updates thereto that Google may make available to Company via an Authorized OEM.

1.26    "**Google Mobile Branding Guidelines**" means Google's brand treatment guidelines for mobile in effect from time to time (and any content contained or referenced therein), which are located at http://www.google.com/wssynd/mobile_guidelines.html and http://www.google.com/permissions/guidelines.html (or such other URLs as may be provided by Google from time to time), together with such additional brand treatment guidelines for mobile as Google may make available to Company from time to time.

1.27    "**Google Content**" means Digital Content sourced by Google and made available by Google for free or as paid content to End Users via Google Play and which (a) Google has licensed the rights to distribute, or (b) does not require any license to distribute (e.g. non-copyrighted books).

1.28    "**Google Mobile Search Site**" means each Google-hosted web site on which the Google Mobile Search Service is hosted, currently located at http://www.google.com, as such URL may be updated by Google from time to time upon notice to Company.

1.29    "**Google Mobile Search Service**" means the search service made available by Google on the Google Mobile Search Site.

1.30    "**Google Play**" means the marketplace created and operated by Google, which allows registered Developers in certain countries to distribute Android Applications.

1.31    "**Google Play Client**" means the machine-readable binary software application that enables End User access to Google Play that is provided by Google to Authorized OEMs under a separate agreement between Google and the Authorized OEM, and any modifications or updates thereto that Google may make available to Authorized OEMs hereunder from time to time in its sole discretion.

1.32    "**Google Play Web Site**" means the Google Play web site located at: https://market.android.com/ (as such URL may be updated by Google from time to time).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002073

Google Confidential

1.33    "Google Phone Top Search Application" or "PTS" means the machine-readable binary code version of the search application provided by Google, which resolves to the Google Mobile Search Site via the Google Mobile Search Service.

1.34    "Google Products" means the Google Mobile Search Service, the Google Mobile Search Site, and the Google Applications.

1.35    "GTV" means, for a particular Paid Transaction, the gross transaction value chargeable to End Users excluding: (i) taxes; (ii) adjustments for refunds, chargebacks, reversals and other adjustments at Google's sole discretion; and (iii) any revenue generated in connection with Android Applications, Google Content, or In-App Purchases after the initial Paid Transaction.

1.36    "In-App Purchase" means Digital Content purchased for use on Android Compatible Devices from an Android Application through the in-app billing mechanism provided by or on behalf of Google found at http://developer.android.com/guide/market/billing/billing_overview.html, as such mechanism or URL may be updated or replaced from time to time.

1.37    "Intellectual Property Rights" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations and re-instatements thereof, now or hereafter in force and effect worldwide.

1.38    "Net GTV" means, for a particular Paid Transaction, the percentage of GTV Google pays to Company under the terms of this Agreement as specified in **Exhibit E**, which may vary depending on payment method and type of purchase.

1.39    "Net Ad Revenue" for any period means Ad Revenues for such period minus the Deduction for such period.

1.40    "Non-Compatible Android Device" means each device sold or otherwise distributed by Company during the Term of this Agreement and any Ramp-Down Period that (a) runs the Android platform, (b) does not meet the requirements to be an Android Compatible Device, and (c) is used to access the Wireless Services.

1.41    "Optional Google Applications" are the Google Applications listed in Exhibit A, which are provided to Company via an Authorized OEM in connection with this Agreement, and any modifications or updates thereto that Google may make available to Company via an Authorized OEM from time to time in its sole discretion. Google may change such list of Optional Google Applications from time to time. Optional Google Applications are licensed to the Authorized OEM, and have the same rights and obligations as Google Applications except that the requirements set forth in Section 2.2.3 (Placement Requirements for Android Devices) and Section 2.3.1 (Notification and Requirements of Non-Compatible Android Devices) shall not apply and Company has the option of including the Optional Google Applications on an Android Compatible Device.

1.42    "Paid Transaction" means the purchase by an End User of an Android Application, Google Content or In-App Purchase (as applicable) to an Android Compatible Device. For the sake of clarity, a Paid Transaction does not include any subsequent downloads of, or access to, the same Android Application, Google Content, or In-App Purchase using other Android Compatible Devices registered to the same End User account.

1.43    "Partner Channel" has the meaning given to that term in **Exhibit B.**

1.44    "Query" means a search query entered by an End User where results are provided by the Google Mobile Search Service.

1.45    "Results Page" means a Google-hosted page that contains Search Results and/or Ads.

1.46    "Search Result" means a search result that results from a Valid Query and that is provided

4

Google Confidential

by Google to End Users as part of the Google Mobile Search Service.

1.47   **"Territory" or "Territories"** means the country or countries in which distribution of Google Applications and/or Optional Google Applications is permitted under the conditions provided by Google to Company upon execution of this Agreement, which may be updated by Google from time to time. Distribution of Google Applications and/or Optional Google Applications, products or services outside of the Territories is prohibited.

1.48   **"Total Net GTV"** means, for a particular period, Net GTV for all Paid Transactions in that period.

1.49   **"Trademarks"** means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

1.50   **"Valid Query"** means a Query received by Google which: (a) contains the applicable Client ID as specified by Google to Company; (b) is not generated by any Fraudulent Act, as reasonably determined by Google; and (c) has not been modified, deleted, or appended in whole or in part by Company except as technically required in order to fulfil the obligations of this Agreement.

1.51   **"Wireless Service"** means the wireless service owned and/or operated by Company that allows End Users using a Device to access Internet.

1.52   The words **"include"** and **"including"** shall not limit the generality of any words preceding them.

1.53   References to **"party"** or **"parties"** in this Agreement refers to Google or Company as the context requires.

2.   **REQUIREMENTS FOR DEVICE DISTRIBUTION AND GOOGLE MOBILE SEARCH SERVICES**

2.1   **Google Approval and Launch.** Company shall not implement or distribute Google Applications on Android Compatible Devices until it has received Google's prior written approval (not to be unreasonably withheld) to ensure adherence to the terms and conditions of this Agreement, including but not limited to the Google Mobile Branding Guidelines.

2.2   **Android Compatible Device Distribution Requirements.**

2.2.1   **Confirm Compatibility.** With regard to Android Compatible Devices, Company will be entitled to receive payment and withhold fees (e.g. withholding of Total Net GTV and DCB Transaction Fees) hereunder only if it has obtained proof of compatibility from an Authorized OEM before distributing such Android Compatible Devices. Google will not unreasonably withhold proof of compatibility if a device successfully passes the published CTS and meets the requirements in the published Compatibility Definition Document for the applicable Android platform version.

2.2.2   **Preload All Google Applications.** Company shall ensure that Authorized OEMs preload the Google Applications on all Android Compatible Devices so that, after preload, an icon representing each Google Application shall appear on the Android Compatible Device as specified in the Placement Requirements below. In addition, (a) preload of a Google Application shall be limited to installation of the Google Application, and shall not involve launch of the Google Application, and (b) End User selection of an icon representing an already preloaded Google Application shall launch such Google Application. Google will make reasonable efforts to provide email notice to the Company contact listed in this Agreement at least 60 days prior to the addition of any additional Google Applications to Exhibit A.

2.2.3   **Placement Requirements for Android Compatible Devices.** Unless otherwise approved by Google in writing: (1) Company will require that Authorized OEMs preload all

5

Google Confidential

Google Applications approved in the applicable Territory or Territories on each Android Compatible Device; (2) all Google Applications will be placed no more than one menu below the Default Home Screen; (3) Company will ensure that Google Play Client is placed on the Default Home Screen, or on a panel immediately adjacent to (one swipe to the left or right of) the Default Home Screen, and at all times with at least equally discoverable placement with any Alternative Store; and (4) Company must meet the Search Entry Point requirements in Exhibit D on each Android Compatible Device. The requirements outlined in this Section 2.2.3 will not prohibit Company customers from modifying the Default Home Screens after sale of the device and such modification will not be considered a breach by Company of this Agreement.

2.3    **Non-Compatible Android Device Distribution Requirements.**

**2.3.1 Notification and Requirements for Non-Compatible Android Devices.** Company must provide Google with prior written notice if it wants to distribute a Non-Compatible Android Device. Company and Google will review the specifications of the Non-Compatible Android Device, and Google will determine in its sole discretion whether the Non-Compatible Android Device is eligible for payment of revenue share pursuant to this Agreement by providing written approval.

(a) If Google determines that the Non-Compatible Android Device is eligible for payment:

(i) Unless otherwise approved by Google in writing, Company will prohibit any OEM from preloading any Google Applications on Non-Compatible Android Devices;

(ii) On each such Non-Compatible Android Device, Company only needs to meet the Browser Chrome and Default Home Page on Browser Search Entry point requirements set forth in **Exhibit D;** and

(iii)    Company must meet the requirements in Section 3.4.

(b) If Google determines that the Non-Compatible Android Device is not eligible for payment, Company may still distribute such Non-Compatible Device but will not be required to meet the rights and obligations under this Agreement for such Non-Compatible Android Device.

**3.    GENERAL REQUIREMENTS**

3.1    **Client ID.** Company shall ensure that the appropriate Client ID as specified by Google is configured on Devices prior to distribution of such Devices. Company will be entitled to receive payment and withhold fees (e.g. withholding of Total Net GTV and DCB Transaction Fees) hereunder only with respect to Devices that either (a) contain the Client ID or (b) are wifi-only devices linked to an End User's existing DCB account with Company.

3.2    **Confirmation of Compatibility.** Subject to the exception in Section 2.3.1.b, Company must obtain proof of compatibility from Authorized OEM before Company distributes Devices.

3.3    **Territories.** Company shall only distribute Devices in the Territories (and no other territory). Additionally, where Google specifies a specific version of a Google Application be distributed in a particular Territory, Company shall distribute only such version in that Territory.

3.4    **Conflicting Services.** During the Term, Company will not, and will not allow any third party to implement on a Device any application, product or service which is the same as or substantially similar to the Google Search widget or the Google Mobile Search Service (or any part thereof) (a "**Search Conflicting Service**"). For the sake of clarity, Company may pre-load applications that do not include general web search functionality. User-selected services that are Conflicting Services will not constitute a breach of this Section 3.4

3.5    **DCB Transaction Fee Requirements.** Company shall only be eligible to receive DCB Transaction Fees if Company adheres to the terms and conditions of this Agreement, including but not limited to:

8

GP MDL-TMO-0002076

Google Confidential

(a) the placement and appearance of Google Play Client in accordance with Section 2.2.3 and

(b) compliance with the Google Mobile Branding Guidelines.

**4.**

4.1 **Network Location Provider Application.** The following requirements apply to Authorized OEMs' development of Android Compatible Devices with regards to Network Location Provider and shall not be inhibited by Company:

(a) Network Location Provider will be turned off by default.

(b) The appropriate prompts are displayed to the End User seeking the End User's consent to use Network Location Provider as provided by Google. Company shall not prevent the End User from providing consent prior to enabling Network Location Provider or any application making use of Network Location Provider.

(c) Network Location Provider will be configured as the default network-based location provider on all Android Compatible Devices.

(d) All features of Network Location Provider shall be enabled, including network-based location resolution, anonymous network location data collection, and reverse-geocoding.

4.2 **Partner Channel And Direct Carrier Billing.**

(a) By execution of this Agreement, Google will enable Company to promote Android Applications via its own Partner Channel as provided for and defined in **Exhibit B**.

(b) Company shall provide Direct Carrier Billing in accordance with **Exhibit F**.

4.3 **Google Legal Terms.** Company shall not prevent the appropriate Google Terms of Service, Privacy Policy and Legal Notices as provided by Google to be made available to the End User.

4.4 **Open Devices.** The parties will create an open environment for Android Compatible Devices by making Google Applications and Android application programming interfaces (APIs) available and open on Android Compatible Devices and will take no action to limit or restrict the Android platform.

4.5 **Open Internet Access.** Company will use diligent efforts to ensure that Google Applications and all applications downloaded from Google Play will have unrestricted access to the Internet through the Wireless Service. Company will take no action to limit or restrict Android or Device functionality or services, whether pre-loaded on Android Compatible Devices or downloaded by End Users using the Google Play Client.

**5.   RESTRICTIONS**

5.1 **Restricted Promotion.** Company shall not Actively Promote, and shall not allow any third party (including its Affiliates, resellers, distributors and OEMs) to Actively Promote, Google Applications in any location that is not a Territory or where Google has not otherwise given express written authorization in writing that Google Applications be Actively Promoted under this Agreement.

5.2 **General Restrictions** Except to the extent required by law, Company shall not, and shall not allow any third party to: (a) disassemble, de-compile or otherwise reverse engineer Google Applications or otherwise attempt to learn the source code or algorithms underlying Google Applications; (b) create derivative works from or based on Google Applications; (c) except as

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          GP MDL-TMO-0002077

Google Confidential

expressly set forth in this Agreement, provide, sell, license, distribute, lease, lend, or disclose Google Applications to any third party; (d) use Google Applications for unauthorized purposes; (e) exceed the scope of any license granted to Company under this Agreement; (f) ship, divert, transship, transfer, export or re-export Google Applications, or any component thereof, into any country or use it in any manner prohibited by any export control laws, restrictions, or regulations administered by the U.S. Commerce Department's Bureau of Export Administration, the U.S. Department of Treasury's Office of Foreign Assets Control or any other applicable government agency; (g) preload, install or launch Google Applications (or otherwise act or fail to act) such that an End User is denied the opportunity to review and accept (or reject) the relevant Google Applications terms of service; (h) serve or otherwise place any advertisements during the launch process of the Google Applications; (i) offer, download or install, or allow any third party to offer, download or install, any additional products during the launch process of the Google Applications; or (j) use any portions of Google Applications or information gained from Google Applications, or from Google, to assist or encourage any third parties to use Google Applications on devices other than Android Compatible Devices.   For purposes of clarity, Company will only distribute Google Applications on Android Compatible Devices.

5.3    **Search Services:  Policy Obligations.**   Company will not, and will not knowingly or negligently allow any third party to:

(a)    edit, change the order of the information contained in, or filter any Search Results or Ads (including commingling Search Results or Ads with non-Google provided search results or advertising), frame any website page containing any Search Results, Ads or any Destination Page, display any Search Results or Ads to any third parties other than End Users, or display any Search Results or Ads in pop-up, pop-under, exit windows, expanding buttons, or animation or other similar methods;

(b)    implement any click tracking of Search Results or Ads or other monitoring of Search Results or Ads;

(c)    redirect an End User away from the Destination Page, provide a version of the Destination Page different from the page an End User would access by going directly to the Destination Page, intersperse any content between any Search Results or Ads and any Destination Page, or do or fail to do anything that any way implies that Google is responsible for any Destination Page;

(d)    directly or indirectly access, launch and/or activate the Google Mobile Search Service through or from any Client Application or means other than in accordance with this Agreement;

(e)    "crawl" or "spider" information obtained from Google Applications (including, but not limited to, Search Results, or Ads); or

(f)    index or in any other non-transitory manner store or cache information obtained from Google Applications (including, but not limited to, Search Results, or Ads).

5.4    **Monitoring Queries.** Company may monitor Queries in connection with its legal obligations as a mobile service provider, provided that such monitoring is solely for the purpose of fulfilling such legal obligations and does not affect the integrity of any Queries, Search Results, the Google Mobile Search Service, the Google Applications or the End User experience.

5.5    **No Connectivity Notice.**    Where an End User launches an Android Compatible Device's web browser or launches a Google Application and there is no data connectivity available, Company will not block, alter, or prevent in any way the presentation of any message to such End User indicating lack of data connectivity.

5.6    License Grant.

8

GP MDL-TMO-0002078

Google Confidential

    (a)      Google Applications.

(i) License Grant. Subject to the terms and conditions of this Agreement, Google hereby grants to Company a nontransferable, nonsublicensable, nonexclusive license during the Term to: (1) reproduce, display, and perform the Google Application(s) to the extent necessary to exercise the right granted in (2); and (2) distribute the Google Application(s) directly to End Users in the Territory.

**6.**    UPDATES, TESTING AND DEVICES

6.1    **Over-the-air Updates.** Google may update Google Applications and related software on Devices over-the-air at Google's sole discretion. Company shall not prevent such updates.

6.2    **Ongoing Testing and Support.** Company shall, where reasonably required by Google:

    (a)    assist Google with ongoing testing of Devices and Google Applications;

    (b)    in a timely manner load Android-based applications on Devices representative of those distributed by Company and run tests that Google may provide from time to time to help assess the correct operation and presentation of Google Applications and other Android-based applications and provide the test results to Google; and

    (c)    provide information, equipment and/or assistance as may be reasonably necessary to allow Google to make available and operate Google Applications on Devices to End Users and to make Google Applications available on the Wireless Service and to Devices (including over-the-air updates to Google Applications).

6.3    **Test Devices.** Company will, or will ensure that the Authorized OEM will, deliver to Google no less than two (2) Devices representative of Devices used by End Users for Google's approval. Google may use such Devices to test the operation and presentation of relevant Google products, services and sites. If at any time the Devices provided hereunder are no longer capable of displaying the current implementation of relevant Google products, services or sites, Company will provide Google with replacement Devices as required.

6.4    **Test SIMs.** For each Territory, Company will ensure that Google has no less than five (5) SIM cards that Google can use to access the Wireless Service for testing purposes. Such SIM cards must:

    (a)    provide Google with unlimited data access on the Wireless Service;

    (b)    be provisioned for use with DCB (if applicable); and

    (c)    remain active for the duration of the Term.

**7.**    MANAGEMENT AND SUPPORT

7.1    **Points of Contact.** Company and Google shall each appoint a partner manager (the "Partner Manager") who shall be the single point of contact for all business and operational activities associated with this Agreement. Company and Google shall each appoint a single technical account manager (the "Technical Account Manager") who shall be the single point of contact for all technical and deployment activities associated with this Agreement. Company and Google shall notify the other of the name and contact details for Partner Manager and Technical Account Manager (name and contact information subject to change, upon notice, from time to time.

7.2    **Support.** Google will provide End User support for Google Applications as is made generally available to users of Google Applications. Company will act as the primary and direct contact with End Users for all Google Applications service issues and will request support from Google if necessary. For issues related to Android Applications, Company will direct End

9

Google Confidential

Users to the applicable Developer for support. Company will provide support services to End Users for Company's data services and network at its own expense.

**8.    COMPLIANCE WITH PRIVACY POLICIES AND REPORTS**

8.1    **Privacy and Security.** Each party's privacy and security policies shall apply with respect to the user information collected by it. The parties shall comply with their applicable privacy and security policies and all data privacy and security laws applicable to user information. The parties will provide each other reasonable aggregate information about usage of Google Applications on Android Compatible Devices during the Term in order to help each party improve End Users's experience with Google Applications, consistent with each party's privacy policies. Such information will not include any personal information.

8.2    **Company Report.** Company shall provide to Google a monthly report during the Term within 30 days after the end of each calendar month setting out the total number of Android Compatible Devices distributed during that month by Company. Company shall send such reports to android-partner-report@google.com (or such other email address as may be notified by Google to Company for this purpose).

8.3    **Google Report.** Google shall provide to Company a monthly report during the Term within 30 days after the end of each calendar month setting out for that month the GTV, refund amounts, chargebacks, one-off adjustments (manual debit or credit for a transaction), net activity and amounts payable by Google to Company pursuant to this Agreement. Google shall also make available any Reports that are made generally available to all partners. Reports set forth in this Section  will be provided separately for, or will be broken out by, each Client ID provided to Company by Google (e.g., Company, ████████████████ , MVNOs, provided the MVNOs will be aggregated as a group and there will not be a separate report for each MVNO).

**9.    PAYMENT AND TAXES**

**Payments**

9.1    Subject to the terms and conditions of this Agreement, Google shall pay a share of applicable Net Ad Revenues to Company as set forth in **Exhibit C.** Except as otherwise agreed between Google and Company in writing, Google and Company shall each retain any and all revenue generated from provision of their respective products or services. No party shall be required to account (except as set forth in this Agreement) to the other or otherwise make any other payment to the other regarding the Google Products, the Wireless Services, Devices or any revenue generated from them.

9.2    If, for any reason, a refund is issued to an End User for an individual Paid Transaction, Google will deduct the applicable percentage of this refund (including related chargebacks, reversals and other adjustments applicable to such refund) from its monthly payment of Total Net GTV to Company or require Company to pay to Google the applicable percentage of the refund amounts within 30 days of an invoice. Additional terms governing refunds for DCB Transactions are set out in **Exhibit F.**

9.3    Google will at its sole discretion select a payment processor to pay Company Total Net GTV. Google reserves the right to change the payment processor or add new payment processors at any time with written (including email) notice to ████ prior to making the change. If a selected payment processor has specific requirements in order to pay Company the Total Net GTV, Google reserves the right to change its requirements from time to time.

9.4    In order to comply with applicable law and regulations, Google operates multiple local Affiliates to process transactions. Developers may enter into contracts with these Affiliates, and payments from Google to Company may be made by one or more of these Affiliates (for example, Google Payment Limited in the United Kingdom).

9.5    **Bank Details.** For payment and tax purposes, Company must provide information including,

10

Google Confidential

but not be limited to, Bank account number, Bank account address, Bank account ABA/Routing/SWIFT Number, Beneficiary name, and Company Tax ID Number. Failure to provide this information in a timely fashion will result in delays of any payments due. Company will not receive Total Net GTV for any transactions prior to Google's receipt of the above information.  Company must ensure that its bank account is set up to receive payments in multiple currencies.

9.6    In addition to other rights and remedies Google may have, Google may offset any payment obligations to Company that Google may incur under this Agreement..  Google may also withhold and offset against its payment obligations under this Agreement, or require Company to pay to Google within thirty (30) days of any invoice, any amounts Google may have overpaid to Company in prior periods under this Agreement. The party receiving payment will be responsible for any bank charges assessed by the recipient's bank.

9.7    Google will make a one-time payment to ▇▇▇ equal to ▇▇▇▇▇▇▇.

**Taxes and Other Charges**

9.8    All payments under this Agreement are exclusive of taxes imposed by any governmental entity.  If Google is legally required to withhold taxes from its payments to Company and remit such taxes to the local taxing jurisdiction, then Google shall pay to the Company the remaining net amount after the taxes have been withheld and promptly provide to Company a copy of an official tax receipt or other appropriate evidence of any taxes imposed on payments made under this Agreement.  When Company has the legal obligation to collect any applicable taxes, the appropriate amount shall be invoiced to and paid by Google unless Google provides Company with a valid tax exemption certificate authorized by the appropriate taxing authority.

## 10.    TERM AND TERMINATION

10.1    **Term.**  This Agreement shall commence on the Effective Date and shall continue for the Term, unless earlier terminated as provided in this Agreement.

10.2    **Termination of this Agreement.** Either Google or Company may suspend or terminate this Agreement with immediate effect by giving written notice to the other if the other party:

(a)    is in material breach of this Agreement where the breach is incapable of remedy;

(b)    is in material breach of this Agreement where the breach is capable of remedy and fails to remedy that breach within 30 days after receiving written notice of such breach; or

(c)    ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within 90 days.

10.3    **Material Breach.**  Notwithstanding the foregoing, the parties agree that a breach of any terms regarding Section 2 (Requirements), Section 3.4 3.4 (Conflicting Services), Section 5 (Restrictions), Section 11 (Confidentiality) and/or Section 12 (Trademarks) shall be deemed to be a material breach of this Agreement.

10.4    **Change of Control.**  Upon a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), (a) the party experiencing the change of control will provide written notice to the other party within 30 days after the change of control, and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives the written notice in subsection (a) of this Section 10.4.

10.5    **Special Suspension.**  Notwithstanding anything to the contrary, in the event that the government or controlling body of any country or territory in which Google Applications are distributed or made available imposes any law, restriction or regulation that makes it illegal to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
GP MDL-TMO-0002081

Google Confidential

distribute or make available Google Applications, or any portion thereof, into such country or territory, or if any such law, restriction or regulation places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**") then Google shall have the right to suspend the distribution and/or availability of Google Applications in such country or territory until such time as such law, restriction or regulation is repealed or nullified or modified such that there it is no longer illegal or a Substantial Burden, as applicable, for Google Applications to be distributed or made available in such country or territory ("**Special Suspension**").

10.6   **Effect of Termination of this Agreement**. Upon expiration or termination of this Agreement for any reason:

    (a)   all rights and licenses granted hereunder shall immediately cease except to the extent that such rights and licenses are necessary for the parties to exercise their rights during the Ramp-Down Period pursuant to Section 10.7;

    (b)   Company will not receive Total Net GTV for any Google Play purchases or a share of Net Ad Revenue after the date of termination or expiry of this Agreement;

    (c)   Company shall not remove, alter or block access to Google Applications for existing End Users for 18 months from the date of termination or expiration; and

    (d)   Google and Company shall each return or destroy (and a duly appointed representative shall certify to such destruction) all copies of Confidential Information in its possession which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived backup copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory.

10.7   **Ramp-Down**. Subject to Section 10.8 below, for a period of six (6) months following expiration or termination of this Agreement ("**Ramp-Down Period**") Company may continue to distribute all models of Android Compatible Devices being distributed in compliance with the terms and conditions of this Agreement as of the date of expiry or termination with Google Applications pre-loaded on each such Android Compatible Device ("**Inventory**") and without removing, altering or blocking access to Google Applications in accordance with the terms and conditions of this Agreement, and Company shall have the right to use the Google Trademarks in accordance with this Agreement in connection with such Inventory. Company must make available and maintain Google Applications for End Users during the Ramp-Down Period. Google may require repayment by Company of chargeback payments for six (6) months after the end of Ramp-Down Period ("**Chargeback Period**"). Google may cease the Ramp-Down Period if Company is in breach of the terms of this Agreement and (if the breach is capable of cure) has not cured such breach after thirty (30) days after written notice.

10.8   **No Ramp-Down**. Notwithstanding Section 10.7, there shall be no Ramp-Down Period in the event that termination of this Agreement is due to Company's material breach.

10.9   **Survival**. The provisions of Sections 1 (Definitions), 5 (Restrictions), 10.6 (Effect of Termination), 10.7 (Ramp-Down), 10.8 (No Ramp-Down), 10.9 (Survival), 11 (Confidentiality and Publicity), 12.5 (Proprietary Rights), 13.2 (Disclaimer), 14 (Limitation of Liability), 15 (Indemnification) and 16 (Miscellaneous) shall survive expiration or termination of this Agreement.

**11.   CONFIDENTIALITY AND PUBLICITY**

**Confidentiality**

11.1   "**Confidential Information**" is information disclosed by one party (or Affiliate) to the other party (or Affiliate) under this Agreement that is marked as confidential or would normally under the circumstances be considered confidential information of the disclosing party.

12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002082

Google Confidential

Confidential Information does not include information that the recipient already knew, that becomes public through no fault of the recipient, that was independently developed by the recipient, or that was rightfully given to the recipient by another party.

11.2    The recipient will not disclose the Confidential Information, except to Affiliates, employees, and agents who need to know it and who have agreed in writing to keep it confidential. The recipient, its Affiliates, employees, and agents may use Confidential Information only to exercise rights and fulfill obligations under this Agreement, while using reasonable care to protect it. The recipient may also disclose Confidential Information when required by law after giving reasonable notice to discloser.

**Publicity**

11.3    Neither party may make any public statement regarding this Agreement without the other's prior written approval except when required by law after giving reasonable notice to the other.

## 12.    TRADEMARKS

12.1    **General.** Each party shall own all right, title and interest, including without limitation all Intellectual Property Rights, relating to its Trademarks. Some, but not all examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time). Except to the limited extent expressly provided in this Agreement, neither party grants, and the other party shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of the first party; and all rights not expressly granted herein are deemed withheld. Further, Google does not grant, and Company shall not acquire, any right, title or interest (including, without limitation, any implied license) in or to any Trademarks of Developers. All use by Google of Company Trademarks (including any goodwill associated therewith) shall inure to the benefit of Company and all use by Company of Google Trademarks (including any goodwill associated therewith) shall inure to the benefit of Google. No party shall challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor shall any party attempt to register any Trademarks or domain names that are confusingly similar to those of the other party.

12.2    **License to Google Trademarks.** Subject to Google's written approval prior to each use of a Google Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, nonexclusive and non-sublicensable license during the Term to display those Google Trademarks expressly authorized for use in this Agreement, solely for the purposes expressly set forth herein. Notwithstanding anything to the contrary, Google may revoke the license to use Google's Trademarks upon providing Company with written notice thereof and a reasonable period of time to cease such usage. Furthermore, in its use of any Google Trademarks, Company agrees to adhere to the Google Mobile Branding Guidelines.

12.3    Company shall not, and shall not allow any third party to produce any consumer packaging or materials for the Devices that identifies or suggests that Google is the manufacturer of the Devices. In this regard, Company shall ensure that any Devices packaging or user guide produced by Company identifies Authorized OEM as the manufacturer of the Devices and provides contact details of the Authorized OEM in the applicable Territories in which the Devices are distributed.

12.4    **License to Company Trademarks.** Subject to the terms and conditions of this Agreement and to Company's branding guidelines provided to Google from time to time, Company grants to Google a limited, nonexclusive and non-sublicensable license during the Term to display the Company Trademarks in connection with marketing and promotional materials or as otherwise solely for the purposes of this Agreement. Notwithstanding anything to the contrary, Company may revoke the license granted herein to use its Trademarks upon providing Google with written notice thereof and a reasonable period of time to cease such usage.

13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002083

Google Confidential

12.5    **Proprietary Rights.**  (a) Company acknowledges that, as between the parties, Google (and/or its licensors) retains all right, title and interest, including without limitation all rights in copyrights, trademarks, trade secrets, patents and know-how, in and to Google Applications and the Google Trademarks.  Company has, and shall acquire, no rights in the foregoing except those expressly granted by this Agreement.  Google shall not be restricted from selling, licensing, modifying, or otherwise distributing Google Applications and/or the Google Trademarks to any third party.  (b) Google acknowledges that, as between the parties, Company (and/or its licensors) retains all right, title and interest, including without limitation all rights in copyrights, trademarks, trade secrets, patents and know-how, in and to the Wireless Service and the Company Trademarks.  Google has, and shall acquire, no rights in the foregoing except those expressly granted by this Agreement.  Except as set forth in this Agreement, Company shall not be restricted from selling, licensing, modifying, or otherwise distributing the Wireless Service and/or the Company Trademarks to any third party.

13.    **REPRESENTATIONS, WARRANTIES AND DISCLAIMER –**

13.1    **Representations and Warranties.**  Each party represents and warrants to the other that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder and will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.  Company represents and warrants that it has and will maintain throughout the Term all rights, authorizations and licenses that are required with respect to any Company content or the Wireless Service, and that Company's content or the Wireless Service, and their use, distribution, sale and license, do and shall continue to comply with all applicable foreign, federal, state, and local laws, rules and regulations.

13.2    **Disclaimer.**  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 13.1, ANY GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER ARE PROVIDED "AS IS" AND WITHOUT WARRANTY OF ANY KIND AND GOOGLE EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. GOOGLE DOES NOT WARRANT THAT GOOGLE PRODUCTS OR SERVICES PROVIDED HEREUNDER WILL MEET ALL OF COMPANY'S REQUIREMENTS OR THAT PERFORMANCE OF SUCH SERVICES WILL BE UNINTERRUPTED, VIRUS-FREE, SECURE OR ERROR-FREE.  OTHER THAN THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 13.1, COMPANY MAKES NO WARRANTY OF ANY KIND TO GOOGLE WITH RESPECT TO THE DEVICES, AND EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

14.    **LIMITATION OF LIABILITY**

14.1    **Limitations.**  Subject to Section 14.2: (a) Limitation on Indirect Liability. NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR ANY DAMAGES OTHER THAN DIRECT DAMAGES, EVEN IF THE PARTY IS AWARE OR SHOULD KNOW THAT SUCH DAMAGES ARE POSSIBLE AND EVEN IF DIRECT DAMAGES DO NOT SATISFY A REMEDY.  (b) Limitation on Amount of Liability. NEITHER PARTY MAY BE HELD LIABLE UNDER THIS AGREEMENT FOR MORE THAN FIVE MILLION US DOLLARS ($5,000,000 USD).

14.2    **Exceptions to Limitations.**  These limitations of liability do not apply to: (a) breaches of confidentiality obligations, violations of Intellectual Property Rights (including without limitation a breach of the license to use Trademarks under Section 12), indemnification obligations; or (b) breaches by Company of Sections 3.4 and 5 (Conflicting Services and Restrictions).

14.3    **Allocation of Risk.**  The parties agree that (a) the mutual agreements made in this Section 14 reflect a reasonable allocation of risk, and (b) that each party would not enter into the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    GP MDL-TMO-0002084

Google Confidential

Agreement without these limitations on liability.

## 15.    INDEMNIFICATION

15.1    **By Google.**  Google will defend, or at its option settle, any third party lawsuit or proceeding brought against Company based upon or otherwise arising out of: (a) any breach or claimed breach of the first sentence of Section 13.1; or (b) any claim that Google Applications or Google Trademarks infringe any copyright, trade secret or trademark of such third party. Notwithstanding the foregoing, in no event shall Google have any obligations or liability under this Section 15.1 arising from: (i) modifications of Google Applications or the Google Trademarks by any party other than Google; (ii) combination of Google Applications or the Google Trademarks with any other software or products or any other materials, and (iii) distribution, use or access to the Google Applications or the Google Trademarks otherwise than in accordance with this Agreement.  Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to Google Applications or the Google Trademarks which are alleged or believed by Google to infringe the rights of a third party.  Google shall have no obligations under this Section 15.1 regarding Android or any third party products distributed through the Google Play.

15.2    **By Company.**  Company will defend, or at its option settle, any third party lawsuit or proceeding brought against Google based upon or otherwise arising out of: (a) any breach or claimed breach of Section 13.1 ("Representations and Warranties"), (b) Company's or any third party's improper or unauthorized replication, packaging, marketing, distribution, or installation of Google Applications, including without limitation claims based on representations, warranties, or misrepresentations made by Company; (c) any breach or claimed breach of Section 2.2.3 (Placement Requirements for Android Devices), Section 2.3.1 (Notification and Requirements of Non-Compatible Android Devices), and Section 5 ("Restrictions"); (d) any claim that any Devices (or application installed thereon by or for Company other than Google applications, including Google Applications), or any Company Trademark infringes any Intellectual Property Right; (e) any claim related to Company's advertising, marketing or promotion of any Devices; or (f) any third party claim arising out of or resulting from an End User's use of any Device (or application installed by or for Company other than Google applications, including Google Applications), including without limitation any actions or claims in product liability, tort, contract or equity.

15.3    **Conditions of Indemnification.**  The party seeking indemnification must promptly notify the other party of the claim and cooperate with the other party in defending the claim.  The indemnifying party has full control and authority over the defense, but the other party may join in the defense with its own counsel at its own expense.  THE INDEMNITIES ABOVE ARE THE ONLY REMEDY UNDER THIS AGREEMENT FOR VIOLATION OF A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.

## 16.    MISCELLANEOUS

16.1    **Notices.**  All notices of termination or breach must be in writing and addressed to the attention of the other party's Legal Department. The email address for notices being sent to ██████ is ████████████████. The email address for notices being sent to Google's Legal Department is legal-notices@google.com.  Notice will be deemed given on receipt, as verified by written or automated receipt or by electronic log (as applicable).  All other notices must be in writing and addressed to the other party's primary contact.

16.2    **Force Majeure.**  Neither party will be liable for inadequate performance to the extent caused by a condition (for example, natural disaster, act of war or terrorism, riot, labor condition, governmental action, and Internet disturbance) that was beyond the party's reasonable control.

16.3    **Assignment.**  Neither party may assign or transfer any part of this Agreement without the written consent of the other party, except to an Affiliate but only if (a) the assignee agrees in writing to be bound by the terms of this Agreement, (b) the assigning party remains liable for obligations under the Agreement if the assignee defaults on them, and (c) the assignor has

15

Google Confidential

notified the other party of the assignment. Any other attempt to transfer or assign is void.

16.4   **No Waiver; Severability; No Agency; No Third-Party Beneficiaries.** Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement. If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of the Agreement will continue in force unaffected. This Agreement does not create any agency, partnership or joint venture between the parties. This Agreement does not confer any benefits on any third party unless it expressly states that it does.

16.5   **Controlling Law.** . This Agreement and the rights and obligations of the parties are governed by the substantive and procedural laws of the state of New York, without regard to any conflict of laws principles. This Agreement will not be governed or interpreted in any way by referring to any law based on the Uniform Computer Information Transactions Act (UCITA), even if that law is adopted in New York. The parties expressly acknowledge that the United Nations Convention on Contracts for the International Sale of Goods (UNCISG) does not apply to this Agreement.

16.6   **COMPANY AFFILIATES.** The terms and conditions under this Agreement, shall apply to Company's MVNO partners listed in Exhibit C, and █████████████████████████████████ ████████, which are wholly owned subsidiaries of Company, provided that (i) only ████████ ████████████████ shall be provisioned for DCB and eligible to receive DCB Transaction Fees) and (ii) Company will be responsible for MVNOs' and for ████████'s (including ████ by ████████), ████████'s performance under this Agreement and compliance with the terms and conditions of this Agreement. Google may enforce its rights under this Agreement, at law and in equity against ██████████████████████████████████████████ the parties may mutually agree to add additional MVNOs and additional ████████████ to this Agreement.

16.7   **Entire Agreement; Amendments; Counterparts.** This Agreement is the parties' entire agreement relating to its subject and supersedes any prior or contemporaneous agreements on that subject. Any amendment must be in writing and expressly state that it is amending this Agreement. The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002086

Google Confidential

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

COMPANY:                                    GOOGLE INC

     



17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Google Confidential

## EXHIBIT A

### GOOGLE APPLICATIONS

1. Google Play Client (does not include products downloaded from Google Play),
2. Google Play Movies
3. Google Play Magazines
4. Calendar Sync,
5. Contacts Sync,
6. Gmail,
7. Google+,
8. Google Play Books,
9. Google Calendar,
10. Google Maps for Mobile,
11. Google Play Music,
12. Google Partner Setup,
13. Google Search (including Google Now)
14. Google Services Framework,
15. Google Street View,
16. Google Talk,
17. Google Videos,
18. Google Voice Search,
19. Market Updater,
20. Media Uploader,
21. Network Location Provider,
22. Set Up Wizard,
23. YouTube,
24. Widevine
25. Google Chrome

### OPTIONAL GOOGLE APPLICATIONS

1. Finance
2. Google Earth
3. Google Shopper
4. Google Voice
5. Google Wallet
6. News and Weather
7. Orkut

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002088

Google Confidential

## EXHIBIT B

### PARTNER CHANNEL

Google will enable Company to promote up to twenty-five (25) Android Applications comprised of the following three (3) categories (the "**Partner Channel**") in Google Play on Android Compatible Devices as follows:

**1.     Strategic Applications (Up to 15)**

1.1     "**Strategic Applications**" are Android Applications owned by, or licensed to, and uploaded by Company. They must be published under Company's name. Products in this category must relate directly to Company's core network and product offerings including, but not limited to, Billing Account Manager, SMS counter, Wi-Fi Hotspot application, Network address book or special dialling application. Applications or games with functions and capabilities that are largely similar to other titles that are currently available in Google Play for all users are not qualified to be classified as Strategic Applications. Google reserves the right to review applications that are being promoted in this category and take down applications that do not meet the definition of Strategic Applications.

1.2     Strategic Applications have no maximum time limit for inclusion in the Partner Channel.

**2.     Promotional Applications (Up to 5)**

2.1     "**Promotional Applications**" are "new" Android Applications that are created by Developers exclusively for Company's End Users and are featured in the Partner Channel (in a single country) for a period of time of up to 90 days (the "**Promotional Period**"). New Application Exemption: Any existing paid application (being an application which is usually provided to an End User for a charge) may qualify as a Promotional Application for the Partner Channel if it is offered for free during the Promotional Period (even if it is identical in name or functionality as long as the paid version of the identical application is left in the Google Play general population). A derivative of an existing application with a new name may be included in the Partner Channel as a Promotional Application as long as the original application on which the derivative is based is left in the Google Play general population. Google reserves the right to remove a Promotional Application if the Developer of that application removes the "original" application from Google Play at any time prior to or during the Promotional Period.

2.2     When Company activates a Promotional Application that has been uploaded by the Developer for inclusion in a Partner Channel, the Promotional Application will be promoted on the Partner Channel during the Promotional Period for up to a maximum of 90 days. Promotional Applications must be removed from the Partner Channel upon expiry of the Promotional Period.

2.3     Promotional Applications cannot be included in the Partner Channel more than once, even if the Promotional Application was promoted for a period that is less than the Promotional Period.

**3.     Non Exclusive Applications (Up to 40)**

3.1     "**Non Exclusive Applications**" are Android Applications that have previously been uploaded by Developers in the Google Play.

3.2     Company may "tag" any Non Exclusive Application for inclusion in the Partner Channel up to the 25 maximum allowed.

3.3     The maximum number of Non Exclusive Applications shown in the Partner Channel is determined by subtracting the number of Promotional Applications and the number of Strategic Applications from the number 40. For example, if Company had 2 Promotional Applications and 3 Strategic Applications, it would be able to promote a total of 35 Non

19

GP MDL-TMO-0002089

Google Confidential

Exclusive Applications for inclusion in its channel (40 – 2– 3 = 35).

**4.**    **Presentation of Applications in the Partner Channel**

4.1    Android Applications promoted on the Partner Channel will be presented to End Users in the same manner as they are within the general Google Play population of Android Applications.

4.2    The Partner Channel will be presented to End Users of Company's Android Compatible Devices with access to the Wireless Service.

20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002090

Google Confidential

## EXHIBIT C

## REVENUE SHARE FOR SEARCH

1.      Subject to the terms and conditions of this Agreement, for each calendar month during the Term, Google shall pay Company ▮ of Net Ad Revenue beginning January 1, 2014.  The following revenue shares will be paid as follows prior to January 1, 2014,

| Month/Year | Revenue Share for Android and Non-Android Devices |
|---|---|
|  |  |
| September 2013 | ▮ |
| October 2013 | ▮ |
| November 2013 | ▮ |
| December 2013 | ▮ |

2.      Google may send uncompensated test Queries and traffic to the relevant Google Products or make uncompensated clicks on Ads or generate uncompensated impressions of or actions regarding Ads at any time.  The number of clicks on Ads or other relevant metrics, as compiled by Google, will be the number used in calculating payments hereunder, provided that Google will work with Company to resolve any good faith dispute in the revenue share amount.  Payments required under this Exhibit C will be made by the last day of the calendar month following the calendar month in which the applicable Ads were displayed.

3.      Google's obligation to make payments under this Section will not commence until Google, at its sole discretion and under no further obligation, decides to implement and generate revenue from Ads in connection with the relevant Google Product.

4.      For clarity, this Exhibit C will not apply to (a) End User-selected traffic to Google products or services that is not Directed Traffic (such as traffic generated by End User input or bookmarking of URLs into a browser or End User-initiated download of Google products or services) or (b) Company bookmarking or unapproved implementation of Google products or services.

5.      Notwithstanding anything herein to the contrary, except as otherwise approved by Google in writing, Company will not be entitled to receive any payments or withhold any fees hereunder, including without limitation Net Ad Revenue, Total Net GTV and DCB Transaction Fees, unless it meets all of the: (a) Search Entry Point requirements in Exhibit D on each Android Compatible Device, and (b) Android Compatible Device Distribution Requirements set forth in Section 2.2.

6.      Google will not be liable for payment in connection with (a) any amounts which result from Queries that are not Valid Queries, invalid impressions of (or clicks on) Ads, or invalid actions regarding Ads, generated by any person, bot, automated program or similar device, including, without limitation, through any Fraudulent Act, in each case as reasonably determined by Google; or (b) impressions of, clicks on or actions regarding Ads, delivered through an implementation which is not initially approved by Google pursuant to the Agreement, does not correctly use the Client ID or subsequently fails to meet Google's implementation requirements and specifications.

8.      All payments due to Company for a percentage of Net Ad Revenue will be in U.S. Dollars.  Any charges for converting foreign currency will be Company's responsibility.

21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002091

Google Confidential

9.        **MVNOs**

No amounts will be payable by Google for any MVNO unless and until the applicable MVNO: (i) implements all Placement Requirements for Android Compatible Devices per Section 2.2.3 of this Agreement and (ii) meets the Conflicting Services requirements of Section 3.4.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002092

Google Confidential

## EXHIBIT O

### SEARCH ENTRY POINTS FOR DIRECTED TRAFFIC

The Search Entry Points, and related requirements are:

| Search Entry Point | Mandatory | Minimum Placement |
|---|---|---|
| Google Phone Top Search Application (PTS) | Yes | Default Home Screen except where OEM customized user experience does not leave sufficient space otherwise must be no more than one swipe away left or right from Default Home Screen |
| Browser chrome | Yes | Browser chrome set to send invalid URLs as search query to Google.com |
| Google Voice Search | Yes | Application Tray |
| Google Search Icon in Application Tray | Yes | Application Tray |
| Menu Key | Yes | Where menu key brings up search option for general web search, such search shall launch the Google Search Widget. |
| Hard Key | Optional | N/A |
| Default Home Page on Browser | Yes | Google search is set as sole search option on default home page on browser. |

23

GP MDL-TMO-0002093

Google Confidential

## EXHIBIT E

### Net GTV

**1. Net GTV and DCB Transaction Fee payable for Paid Transactions on Devices (excluding paid Google Content) beginning January 1, 2014.** This includes Paid Transactions (excluding paid Google Content) on the Google Play Website, where a Device is selected as the destination device at the time of such Paid Transaction.

| Form of Payment | Net GTV payable | DCB Transaction Fee |
|---|---|---|
| Direct Carrier Billing | ■ | ■ |

**2. Net GTV and DCB Transaction Fee payable for Paid Transactions on Devices for paid Google Content beginning January 1, 2014.** This includes Paid Transactions for Google Content on the Google Play Website.

| Form of Payment | Net GTV payable | DCB Transaction Fee |
|---|---|---|
| Direct Carrier Billing | ■ | ■ |

24

Google Confidential

## EXHIBIT F

### Direct Carrier Billing ("DCB") Terms

Terms not defined in this Exhibit F will have the meaning set out in the Agreement. All terms and conditions of the Agreement are incorporated by reference and apply to this Exhibit F except when varied below. In the event of a conflict between the terms and conditions of the Agreement and the terms and conditions of this Exhibit F, this Exhibit F will govern and supersede.

**1. Definitions**

1.1. "**Company Discretionary Refund**" means a discretionary refund of a DCB Transaction to an End User made by Company.

1.2. "**DCB Monthly Invoice**" means an invoice Google provides to Company showing the DCB Monthly Total and DCB Transaction Fee for DCB Transactions for the immediately preceding month.

1.3. "**DCB Monthly Total**" means the total monthly amount processed by Company for DCB Transactions, less adjustment for refunds, reversals and other reasonable adjustments.

1.4. "**DCB Wind-Down Period**" means a six (6) month wind-down period for DCB during which refunds and other adjustments will be processed.

1.5. "**Google Billing API**" means a set of **proprietary APIs accessible** by Company for the purpose of interfacing Company's billing system to the Google Play to enable DCB.

1.6. "**Google       Wallet       Privacy     Policy**"     means      the      policy     located     at https://wallet.google.com/files/privacy.html or such other URL as Google may provide.

1.7. "**Uncollected Billed Amounts**" DCB Monthly Total amounts that are uncollected and past due, including bad debts, fraudulent charges, short payments by End Users, and other payment shortfalls and delinquencies related to Direct Carrier Billing.

**2. Implementation:**  By signing this Addendum, Company agrees to support DCB.  Google will provide the Google Billing API, and Company will be responsible for: (i) integrating its billing system with the Google Billing API; and (ii) operating the integration code between Company's billing system and the Google Billing API. The parties will mutually agree on the details of implementing DCB.

Company shall use the Google Billing API solely for the purpose of fulfilling its obligations under this Agreement and shall not, and will not allow third parties under its control to, copy, modify, create a derivative work of, reverse engineer, decompile, translate, disassemble the Google Billing API, or otherwise attempt to extract the source code of the Google Billing API or any component thereof.

**3. Payment, Calculation of Net GTV, Billing, Invoicing, Disputes, Refunds, Bad Debt Processing, and Authorization**

3.1. **DCB Transaction Fee:** In addition to Net GTV, as consideration for Company's provision of Direct Carrier Billing for Paid Transactions, Company will withhold ▮▮▮ of the DCB Monthly Total ("DCB Transaction Fee").

3.2  **Payment:** Company (itself or via its billing services vendor) will pay Google the DCB Monthly Total less the DCB Transaction Fee as set out in each DCB Monthly Invoice.  Payment must be made electronically (via ACH or wire transfer only) within 45 days after the end of the month to which the Monthly Invoice relate (e.g. for a DCB Transaction in March, payments must be remitted by April 30). Company is responsible for any bank charges assessed by Company's bank. Company (itself or its billing services vendor) will send Google a remittance advice email to the email address provided by Google to Company and showing the summary of payment made

25

GP MDL-TMO-0002095

Google Confidential

to Google. The remittance advice email will be sent to Google prior to or on the day that payment is posted to Google's designated account.

3.3. a.    **Calculation of Net GTV:**  The transactions, adjustments and other relevant metrics, as compiled by Google, will be the records used in calculating the revenue share payments under this Addendum. Google will provide, and Company will agree to, the rounding method algorithm used to calculate revenue share amounts. However, if Company identifies a discrepancy, both parties agree to resolve the discrepancy pursuant to the process set forth in section 3.7 herein.

3.4. **Authorization:** Google reserves the right to seek payment for any DCB Transactions for which Company provides a valid authorization through the Google Billing API.  Google will not seek payment for a DCB Transaction if Company does not authorize it through the Google Billing API.

3.5. **Billing:** Company will be responsible for the billing and collection of DCB Transactions from End Users. In that regard, an End User's payment to Company of DCB Transactions will be in lieu of such End User's payment obligation to Google, any Developer, or any other third party.  Google will be responsible for settlement with, and payment to, Developers.

3.6. **Invoicing:** Google will, within 10 days after the end of each calendar month, provide Company with a DCB Monthly Invoice.  If there are no DCB Transactions during a given month, Google may provide no DCB Monthly Invoice.

3.7. **Disputes:** In the event of a dispute relating to the amounts due to Google set forth in the monthly report provided by Google, Company will notify Google in writing prior to the monthly payment date detailing the items in dispute.  Google and Company will work in good faith to exchange information to resolve the issue before the payment is due, including relevant details of such dispute (i.e. Company to provide its version of a line item settlement report). If the dispute is not resolved prior to the payment date and the disputed amount is less than five (5%) percent of the total amount due to Google (the "Dispute Threshold Amount") that month, Company will pay the amount set forth in Google's report and the parties will continue to work in good faith to resolve the issue.  If the parties agree that the dispute is due to an error on the part of Google, Google will appropriately adjust Company's next monthly payment.  If the dispute cannot be resolved and the dispute discrepancy is less than the Dispute Threshold Amount, the monthly report provided by Google will be the final determining numbers for purposes of calculating payments owed by Company.  However, if (A) disputed discrepancies are equal to or greater than the Dispute Threshold Amount as calculated for a given month, or (B) disputes of any amount continue for three (3) successive months, Company will pay all undisputed amounts to Google and may withhold payment of disputed amounts.  In the event Company withholds disputed amounts for more than sixty (60) days after the monthly payment date that payment would otherwise be due, parties agree to work with the designated Partner Managers set forth in the Agreement and executive level escalation, if required, to resolve the dispute.  Should the dispute not be resolved at this level, Company, at its discretion, can seek to resolve such dispute in accordance with Section 15.5 of this Agreement.  For the sake of clarity, if Company does not choose to resolve such dispute in accordance with Section 15.5 of this Agreement Google's numbers will still be the determining numbers for purposes of calculating payments.

3.8. **Refunds:**

3.8.1. If either Developer or Google initiates a refund to an End User in relation to a DCB Transaction, Google will direct Company to refund the DCB Transaction to End User's account, and Google will credit Company for issuing the refund.

3.8.2. If Company initiates a Company Discretionary Refund to an End User in relation to a DCB Transaction (i.e. separately from the procedures described subsection 3.7), Company will nonetheless pay the DCB Monthly Total to Google notwithstanding such Company Discretionary Refund.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002096

Google Confidential

3.8.3. If Company issues Company Discretionary Refunds pursuant to subsection 3.8.2 in respect of a Paid Transaction for a Fraudulent Android Application, Content or In-App Purchase, Company must notify Google of such Company Discretionary Refunds no later than ninety (90) days from the date of such Paid Transaction. If Google finds that such Company Discretionary Refunds are due to a Fraudulent Android Application, Content or In-App Purchase Google will initiate a credit to Company for issuing such Company Discretionary Refunds For purposes of this Addendum, a "Fraudulent Android Application, Content or In-App Purchase" is an Android Application, Content, or In-App Purchase that itself causes damage to the End User's Android Device (e.g. malware) or defrauds the End User through lack of content, faulty operation, or substantial divergence from the Developer's description."

3.9. For each refund of DCB Transactions contemplated in Section 3.8 above Company shall credit the Net GTV (as applicable) and DCB Transaction Fee to the applicable End User.

3.10. **Timing of Refunds.** For all refunds contemplated in Section 3.8 above, Company will pay back the applicable End User no later than (2) two billing cycles from the time the refund was initiated.

4. Bad Debt Processing: Company's obligation to pay Google for an authorized transaction that uses Direct Carrier Billing is in no way subject to Company's ability or schedule to collect payment from End Users for any such transaction. Notwithstanding the previous sentence, Company reserves the right to suspend Direct Carrier Billing as set forth in Section 10 below. Company will make payment to Google for Direct Carrier Billed Amounts authorized by Company pursuant to the authorization process agreed by the Parties and in accordance with the terms of this Exhibit.

5. Initiation of Direct Carrier Billing. To the extent it is available, Company will provide End User-related information via the Google Billing API to enable the applicable End User to make a purchase through DCB. Such information will include the End User's full name, billing address, country, zip code and phone number. Google will use this information solely to establish DCB as a payment option in the End User's Google Wallet account and to operate the Google Wallet service, consistent with the Google Wallet Privacy Policy, as amended from time to time. Google may in its sole discretion decline to establish DCB as a payment option for an End User, or to limit, suspend, or cancel the use of DCB by an End User and Company may limit, suspend, or cancel the use of DCB by an End User in its sole discretion.

6. **Regulatory and Compliance Requirements:** Each party will meet all applicable regulatory and compliance requirements for DCB Transactions.

7. **Disclosures and Terms of Service.** Company and Google will each be responsible for providing terms and disclosures to the End User, including their respective Terms of Service, in order to enable the provision of DCB, to End Users. Company will determine and provide the appropriate terms and disclosures with regard to the status of the End User as an End User of Company's DCB and Google will determine and provide the appropriate terms and disclosures to the End User as an End User of Google Wallet. Google will determine the manner in which the respective terms and disclosures are presented to End Users in the Google Play user interface, subject to Company's approval as to the sequence in which such terms and disclosures are presented, which will not be unreasonably withheld. Neither Party will take any action such that an End User is denied the opportunity to review and accept (or reject) the other Party's terms and disclosures, as applicable.

8. **End User Support.**

8.3. Company is responsible for End User service related to billing and collection inquiries related to DCB. Nothing will authorize or obligate Company to terminate or remove from a Device any Android Application, Google Content, or In-App Purchase for which an End User received a refund.

8.4. For Google Play issues unrelated to billing, Company will direct the End User to the applicable Developer. If the issue cannot be resolved with the Developer, Company may

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GP MDL-TMO-0002097

Google Confidential

contact Google at http://support.google.com/wallet/bin/request.py?&&contact_type=claimb, which may be updated by Google from time to time. Company will continue to direct End Users to the applicable Developer for all Android product-related support.

9. **Taxation:** Developer will be the merchant of record. Google will notify Company of applicable taxes and total tax amount for End User Google Play purchases. Company will consume total tax amount, from Google, and include total tax amount on End User's monthly bill. Company will remit total tax amount to Google as described in this Exhibit.

10. **Wind-Down of Direct Carrier Billing:** After termination or expiration of this Addendum, the Ramp Down period under the Agreement will apply to DCB. After the Ramp Down period is over, the DCB Wind-Down Period will begin. No new DCB Transactions will be initiated during the DCB Wind Down Period. The parties will cooperate in good faith to address any wind-down issues in a timely manner.

11. **Uncollected Billed Revenue:** Company will determine if total Uncollected Billed Amounts exceeds ten percent (10%) of total DCB Amounts during the previous six (6) month period (the "Bad Debt Threshold"). Company may terminate this Exhibit in accordance with Section 10 of the Agreement. Notwithstanding the foregoing, if Bad Debt Threshold exceeds ten percent (10%), Company shall have the right, in its sole discretion, to suspend or terminate DCB with thirty (30) days written notice to Google. In such instances, the parties will cooperate reasonably to suspend, or wind-down in the case of termination, DCB, including but not limited to, immediate removal of DCB as a payment option in Google Play, immediate suspension of any supporting network/services connectivity (except as necessary to carry out refunds on existing transactions), removal of any reference to DCB on respective websites and marketing materials, and ensure that proper funds are allocated to pay for processed orders.

28

# FILE UNDER SEAL

# Exhibit A9
# to
# C. Cramer Declaration

# REDACTED VERSION

# Exhibit A10
# to
# C. Cramer Declaration

# EXHIBIT 17



# AMENDMENT FIVE
## TO THE
## ███████-GOOGLE
## CO-DEVELOPED DEVICE STRATEGIC MARKETING AGREEMENT

This Amendment Five (the "Amendment No. 5") further amends the ███████-Google Co-Developed Device Strategic Marketing Agreement between Google Inc. ("Google") and ████████ ██ ███ ███████████████ dated October 1, 2009 (the "Agreement") and is effective as of October 1, 2014 by and between the same Parties.

Whereas the Parties entered into the Agreement and desire to extend its term and otherwise amend the Agreement as provided herein.

Therefore, the Parties agree as set forth in this Amendment as follows below.

Except as expressly amended herein, the Agreement shall remain unaltered and in full force and effect. In the event of any conflict or inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall control. Capitalized terms not defined herein shall have the same meaning as the identical capitalized terms in the Agreement, unless otherwise stated.

**GOOGLE INC.**



Google and ███████ Proprietary and Confidential

1

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



1.  Section 3.2 as amended in Paragraph 6 of Amendment 1 is hereby amended by deleting such Section in its entirety and replacing it with the following:

    "3.2    The Term of the Agreement is amended to end on June 30, 2020, subject to any wind down period agreed pursuant to Section 19.5 (the "**Term**")."

2.  The definition of "Device" in Section 2.54 is hereby deleted and replaced, as Section 2.52, with the following:

    "2.52   "**Device**" means an Android-powered device (including a tablet) that: (i) is approved by Google for distribution of Google Applications and Android Applications; (ii) complies with the Android Compatibility Definition document and successfully passes the Android Compatibility Test Suite ("CTS") (each as notified to ▬▬ and available at http:/source.android.com/compatibility and as updated from· time to time); (iii) is manufactured by an OEM; (iv) enables access to, at a minimum, the Google Applications and the Android Applications set forth on updated Exhibits 3 and 4 (regarding Devices) and attached hereto, unless otherwise mutually agreed by the Parties as to a particular Device; and (v) includes the Client ID.  Devices will be available for purchase by ▬▬ or its authorized agents and resellers from an OEM or a Reseller as contemplated herein.  Google may add Google Applications and Android Applications to Exhibits 3 and 4, but if ▬▬ believes that Google is unreasonably adding to either list, then ▬▬ may escalate the issue pursuant to Section 19.6 (Escalation).  The Parties agree that issues regarding near-field communication ("NFC") are outside the scope of this Agreement, and therefore nothing in this Agreement will require ▬▬ to give Google control over the secure element of a device."

3.  Sections 14.1 through 14.11, inclusive, are hereby deleted and replaced by the attached Exhibit 8.

4.  Sections 14.12 through 14.22, inclusive, are hereby deleted and replaced by the attached Exhibit 9.

5.  In Section 15.1(b), the reference to "twice" is hereby deleted and replaced with "once".

6.  In Section 25.2, the reference to ▬▬▬▬ is hereby deleted and replaced with ▬▬▬▬.

7.  Section 19.1 is amended by deleting such Section in its entirety and replacing it with the following:

    "19.1   **Term Extension.**  The Parties may mutually agree to a one (1) year extension of the Term prior to the expiration of any then-current Term."

8.  The fourth and fifth sentences of Section 19.5 is hereby deleted and replaced with the following:

▬▬▬  ▬  ▬▬▬▬▬▬▬▬▬

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604897



down period whether or not this Agreement is terminated for ███████ breach."

9. Exhibit 3 (Google Applications) to the Agreement is hereby deleted and replaced with the attached "Exhibit 3".

10. Exhibit 8 (General Web Search Access Points For Directed Traffic) to the Agreement is hereby deleted and replaced with the attached "Exhibit 8".

11. ██████n hereby changes the names of the recipients of notices established in the Agreement. Any notice sent to Verizon in accordance with Section 27.1 shall be sent to the following:



copy to:



12. ███████ hereby changes the names of the individuals listed in Exhibit 1 as follows:



13. Google hereby changes the names of the individuals listed in Exhibit 1 as follows:

Google Project Manager
Alwin Chi
█████████████

3

Google and Verizon Wireless Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604898



████████████

Google Team Manager
Ted Hillestad
████████████████

████████████

Google Senior Executive
Hiroshi Lockheimer

████████████████

Google and ████████ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604899



## EXHIBIT 3

### Google Applications

Google Play Client (does not include products downloaded from Google Play), Calendar Sync, Contacts Sync, Gmail, Google+ (including Google+ Photos), Google Play Books, Google Calendar, Google Maps, Google Play Music, Google Partner Setup, Google Search (including Google Now), Google Chrome, Google Services Framework, Google Street View, Google Talk, Google Play Movies, Google Play Newsstand, Google Play Games, Google Drive, Google Backup and Restore, Google Voice Search, Media Uploader, Network Location Provider, Set Up Wizard, YouTube, Google WebView Component, Google Hangouts, and Widevine.



\*\*This list of Google Applications may be changed by Google from time to time by previous two (2) week's written notice to ███████. If ███████ believes that Google is unreasonably changing the list of Google Applications, then ███████ may escalate the issue pursuant to Section 19.6 (Escalation).

Google and ███████s Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY          GOOG-PLAY-003604900



## EXHIBIT 8

### Revenue Share for General Web Search

1. **Definitions.**  In this Exhibit 8 and elsewhere in this Agreement:

(a) **"Ad(s)"** means keyword targeted hyperlinked, graphical (such as banner) and other advertisement(s) resulting from a Valid Query which may be displayed by Google on a Results Page.

(b) **"Ad Revenue(s)"** means, in relation to any particular period during the Term, Ad revenues that are both (i) attributed to Ads and (ii) recognized by Google in accordance with US GAAP for that period.

(c) **"Application Tray"** means a screen that is accessible one level from the Default Home Screen and displays icons representing the primary library of applications on a Device.

(d) **"Client ID"** means unique alphanumeric code(s) provided by Google to ▮▮▮▮ to be used by Verizon in accordance with the Google Data Protocol to identify each Query and/or Directed Traffic, as such Client IDs may be modified by Google from time to time in its sole discretion upon notice to Verizon.

(e) **"Deduction"** means for any period during the Term ▮▮▮ of the Ad Revenues for such period PLUS, at Google's sole discretion, any applicable costs paid for mapping data and content used within Google Applications not to exceed ▮▮▮ per active user per month PLUS, subject to Section 2(i) of this Exhibit 8, any additional costs up to a cap of ▮▮ of aggregate Ad Revenues during the Term of the Agreement.

(f) **"Default Home Screen"** means the default display of a Device, prior to any changes made by Customers, that appears without scrolling in both portrait and landscape modes when the Device is in active idle mode (i.e. not in sleep mode).

(g) **"Directed Traffic"** means web traffic (including web traffic using Wi-Fi) to the Google Mobile Search Service generated directly by Device Customers as a result of Valid Queries that originate: (i) within the General Web Search Access Points set forth in this Exhibit 8 that conform with the mandatory placement requirements set forth in this Exhibit 8; or (ii) from an external device (*e.g.* smart watch, smart glasses, fitness tracker) that utilizes the search capabilities of a Device.  For clarity, only one Client ID is associated with any specific search query and it is ▮▮▮▮ responsibility (working with OEMs) to ensure the ▮▮▮▮▮ is installed on all Search Access Points.

(h) **"Fraudulent Act"** means act(s) which: (a) directly or indirectly generate queries, actions or impressions of or clicks on Search Results or Ads through any automated, deceptive, fraudulent or other invalid means (including, but not limited to, click spam, robots, macro programs, and Internet agents); or (b) encourage or require Co-Developed Device Customers or any other persons, either with or without their knowledge, to click on Ads or take other actions regarding Ads through offering incentives or any other methods that

Google and ▮▮▮▮▮▮ Proprietary and Confidential

6

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604901



are manipulative, deceptive, malicious or fraudulent.

(i) **"General Web Search"** means search functionality that produces search results by searching a large proportion of indexable web sites, and where such search results may also include, unless excluded herein, other non-web site results.

(j) **Google Data Protocol"** means the instructions applicable to the implementation of the Search Box(es), as supplied by Google to the applicable OEM and/or ████.

(k) **"Google Mobile Search Site"** means the Google-hosted web site(s) on which the Google Mobile Search Service is hosted, currently located at the URL: www.google.com, as such URL may be updated by Google from time to time upon notice to ████.

(l) **"Google Mobile Search Service"** means the General Web Search service made available by Google on the Google Mobile Search Site.

(m) **"Google Products"** means the Google Mobile Search Service, the Google Mobile Search Site, and the Google Application(s).

(n) **"Net Ad Revenue"** for any period means Ad Revenues for such period MINUS the Deduction for such period.

(o) **"Phone Top"** means with respect to the default navigation hierarchy of a Device UI, the top-most level screen from which applications can be launched by a Customer, which for clarity, may include screens that are adjacent to the Default Home Screen.

(p) **"Query"** means a search query entered by a Co-Developed Device Customer, by way of the Google Search Phone-Top application which is transmitted to Google in order to obtain Search Results.

(q) **"Results Page"** means any Google hosted page which may contain Search Result(s) and Ads.

(r) **"Search Result(s)"** means any search result(s) resulting from a Valid Query which may be displayed by Google on a Results Page.

(s) **"Valid Query"** means a Query received by Google, which: (a) contains the applicable Client ID as provided by Google; (b) is formatted in accordance with the applicable Google Data Protocol requirements; (c) has not been modified, deleted, or appended in whole or in part by ████ or ████████ except as permitted under this Agreement; and (d) is not generated by any Fraudulent Act, as reasonably determined by Google.

2. **Revenue Share**

(a) For purposes of sharing revenue as set forth anywhere in this Agreement:

7

Google and ████ Proprietary and Confidential



(i) references to "Co-Developed Device" shall include "Device" so that revenue sharing will include both Co-Developed Devices and Devices, subject to the revenue sharing requirements set forth in this Agreement; and (ii) references to "Co-Developed Device Customer" shall include "Device Customers" and vice versa so that references to Customers will include both Co-Developed Device Customers and Device Customers.

(b) Subject to the terms and conditions of this Agreement, for each calendar month during the Term, ████ shall receive ████████ of the Net Ad Revenues attributable to Directed Traffic during such month, provided however that (i) for October 2014, ████ shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month, (ii) for November 2014, ████ shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month, (iii) for December 2014, ████ shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month, (iv) for January 2015, ████ shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month, (v) for February 2015, ████ shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month, (vi) for March 2015, ████ shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month, and (vii) for April 2015, Verizon shall receive ████████████ of the Net Ad Revenues attributable to Directed Traffic during such month.

(c) Google may send uncompensated test Queries and traffic to the relevant Google Products or make uncompensated clicks on Ads or generate uncompensated impressions of or actions regarding Ads at any time. The number of clicks on Ads or other relevant metrics, as compiled by Google, will be the number used in calculating payments hereunder. Payments required under this Section will be made by the last day of the calendar month following the calendar month in which the applicable Ads were displayed.

(d) Google's obligation to make payments under this Exhibit 8 will not commence until Google, at its sole discretion and under no further obligation, decides to implement and generate revenue from Ads in connection with the relevant Google Product.

(e) For clarity, Google's obligation to share revenue pursuant to Paragraph b(i) of this Exhibit 8 will not apply to Customer-selected traffic to Google products or services that is not Directed Traffic (such as traffic generated by Customer input or bookmarking of independently requested URLs into a browser or End User-initiated download of Google products or services). In addition, Google's obligation to share revenue pursuant to this Exhibit 8 will not apply to ████ bookmarking or unapproved implementation of Google products or services.

(f) Google will not be liable for payment in connection with: (i) any amounts which result from Queries that are not Valid Queries, invalid impressions of (or clicks on) Ads, or invalid actions regarding Ads, generated by any person, bot, automated

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604903



program or similar device, including, without limitation, through any Fraudulent Act, in each case as reasonably determined by Google; or (ii) impressions of, clicks on or actions regarding Ads, delivered through an implementation which is not initially approved by Google pursuant to the Agreement, does not correctly use the Client ID or subsequently fails to meet Google's implementation requirements and specifications.

(g) Payments required under this Exhibit 8 regarding Google Products shall be made by the last day of the calendar month following the calendar month in which the applicable Ads were displayed and shall be in U.S. Dollars and will be made by electronic transfer to the account notified to Google by ▆▆▆ for that purpose.

(h) In respect of a Google Product, Google may withhold and offset against its payment obligations under this Agreement, or require ▆▆▆ to pay to Google within 30 days of any invoice, any amounts Google may have overpaid to ▆▆▆ in prior periods in relation to that Google Application (and no other Google Application). The Party receiving payment will be responsible for any bank charges assessed by the recipient's bank.

(i) If its costs increase, Google reserves the right to proportionately increase the Deduction from time to time during the Term of this Agreement by an amount not in excess of ▆ of Ad Revenues by providing advance written notice to ▆▆▆, together with reasonable support for such increase that distinguishes the new costs from those covered by the existing ▆▆▆ costs set out in the definition of "Deduction". For the avoidance of doubt, ▆▆▆ shall not be liable to pay Google's costs, as such costs are deducted from Ad Revenues before Net Ad Revenues are payable to Verizon.

(j) All payments due to ▆▆▆ for the applicable percentage of Net Ad Revenue will be in U.S. Dollars. Any charges for converting foreign currency will be ▆▆▆ responsibility.

(k) Google will provide ▆▆▆ with a report summarizing Ad Revenues resulting from Directed Traffic.

(l) Below are the General Web Search Access Points, and related requirements, for Directed Traffic:

Google and ▆▆▆ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604904



**General Web Search Access Points For Directed Traffic**

| Search Entry Point | Mandatory | Minimum Placement |
|---|---|---|
| Browser chrome | Yes | Browser chrome set to send invalid URLs as search query to Google.com, where search queries initiated via such invalid URLs, for clarity, shall be considered Directed Traffic |
| Google Search Widget | Yes | Default Home Screen |
| Google Chrome | Yes | Google Chrome set to send invalid URLs as search query to Google.com, where search queries initiated via such invalid URLs, for clarity, shall be considered Directed Traffic |
| Google Voice Search | Yes | Application Tray |
| Google Search Icon in Application Tray | Yes | Application Tray |
| Menu Key | Optional | N/A |
| Hard Key | Optional | N/A |
| Default Home Page on Browser | Optional | Default home page on browser set to Google.com or, if applicable, local Google domain in the country Device is distributed. For clarity, a Customer may independently change the default home page of the browser, which shall not impact Google's obligation to share search accessed by other search entry points and other revenue under this Agreement with ▉▉▉. |

3. **Device Distribution Requirements**

(a) **Confirm Compatibility**. With regard to Devices, ▉▉▉ will be entitled to receive payment hereunder only if it has obtained proof of compatibility from an OEM before distributing such Android Compatible Devices. Google will validate proof of

Google and ▉▉▉ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604905



compatibility if a device successfully passes the published CTS and meets the requirements in the published Compatibility Definition Document for the applicable Android platform version. For clarity, Google's requirements for preloading of the Google Applications are separate from and not included in the published CTS and Compatibility Definition Documents.

(b) **Preload Google Applications.** Google will only have an obligation to pay Net Ad Revenues for a Device if ▇▇▇▇ ensures that the Authorized OEM preloads the Google Applications (excluding Optional Google Applications) approved by Google for such Device's features and functionality so that, after preload, an icon representing each such Google Application shall appear on the Device as specified herein. In addition, (i) preload of a Google Application shall be limited to installation of the Google Application, and shall not involve launch of the Google Application, and (ii) ▇▇▇▇ will require OEMs to ensure the end user's selection of an icon representing an already preloaded Google Application shall launch such Google Application.

(c) **Placement Requirements for Android Compatible Devices.** Unless otherwise approved by Google in writing, Google will only have an obligation to pay Net Ad Revenues if ▇▇▇▇ ensures that all Devices meet the following requirements: (i) all Google Applications approved by Google for each Device's features and functionality in the applicable Territory or Territories must be preloaded by the OEM on each Device; (ii) all preloaded Google Applications will be placed no more than one menu below the Default Home Screen or in the Application Tray; and (iii) each Android Compatible Device must meet the mandatory (if marked "Yes") Search Access Point requirements described above.

4. **Non-Compatible Android Device Distribution Requirements**

▇▇▇▇ must provide Google with prior written notice if it wants to distribute a Non-Compatible Android Device under the terms of this Agreement. For purposes of this Section, **"Non-Compatible Android Device(s)"** means any device sold or otherwise distributed by Company during the Term of this Agreement and any Wind-Down Period (as described in Sections 19.5-19.7) that: (a) runs the Android platform and (b) does not meet the requirements to be a Device. Company and Google will review the specifications of the Non-Compatible Android Device, and Google will determine in its sole discretion whether the Non-Compatible Android Device is eligible for payment of revenue share pursuant to this Agreement by providing written approval.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



## EXHIBIT 9

### Google Play Market Revenue and Revenue Share

1.1    In this Exhibit and elsewhere in this Agreement:

(a)    **"Developer"** means a developer that distributes Android Applications on Google Play. "Developer" does not include Google or any Affiliate.

(b)    **"Digital Content"** means consumable digital media and content that is not a Google Play Offering, including without limitation electronic books, video, periodicals, music, in-game currency, additional features, additional levels, and other digital items for enhancing a Google Play Offering.

(c)    **"DCB"** means the billing of end users through ▮▮▮▮ billing system as a form of wireless subscriber payment.

(d)    **"Google Content"** means digital media and content that is not a Google Play Offering, including without limitation electronic books, video, and music made available by Google as paid content to Customers via Google Play and which (a) Google has licensed the rights to distribute to Customers, or (b) does not require any license to distribute (e.g. non-copyrighted books).

(e)    **"Google Play Offerings"** means Android-based applications distributed by Developers through the Google Play Client that can be downloaded from any channel in Google Play, and further including applications downloaded by ▮▮▮▮ Customers from a Web-based Google Play Client or online store through the Google Play Client on a Device or Co-Developed Device.  For clarity, Google Play Offerings shall not include Google Content.

(f)    **"GTV"** means, for a particular Paid Transaction, the gross transaction value charged to Customers excluding: (i) any applicable fees owed to Developers for Google Play Offerings; (ii) taxes that Google may collect on behalf of Developer; (iii) adjustments for refunds, chargebacks, and reversals that Google issues to Customers at its sole discretion; (iv) any subsequent downloads of the same Google Play Offering, Google Content, or In-App Purchases to other Devices registered to the same Customer account unless the subsequent download involves a Paid Transaction; and (v) any revenue generated in connection with Google Play Offerings, Google Content, or In-App Purchases other than revenue generated directly from Paid Transactions (*e.g.*, revenue from advertising).

(g)    **"In-App Purchase"** means Digital Content purchased and delivered or made available by a Developer for use within a Google Play Offering through the in-app billing mechanism provided by or on behalf of Google found at http://developer.android.com/google/play/billing/billing_overview.html as such mechanism or URL may be updated or replaced from time to time.  If Google makes material changes to the in-app billing mechanism, Google will provide

12

Google and ▮▮▮▮  Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604907



written notice to ██████ 30 days before such changes take effect.

(h)     **"Net GTV"** means the amounts listed on the attached **"Exhibit 10"**.

(i)     **"Paid Transaction"** means the purchase by a Customer of: (a) a Google Play Offering downloaded to Devices or Co-Developed Devices or Google Content downloaded or streamed to Devices or Co-Developed Devices made via (i) the Google Play Client or (ii) the Google Play Web Site; and (b) In-App Purchases from Devices or Co-Developed Devices (as applicable).  Any subsequent downloads of the same Google Play Offering, Google Content, or In-App Purchase to other Devices registered to the same Customer Account shall not be a Paid Transaction unless there is a purchase for such subsequent download.  Paid Transactions include only those paid by DCB, credit card or debit card and not by any other means.

1.2     In order to receive payment of Net GTV, Verizon shall ensure that the Google Play Client is preloaded on the Default Home Screen.  Except as expressly set forth in this Agreement, neither Party shall be required to account to the other or otherwise make any payment to the other Party regarding the Google Play Client or any revenue generated therefrom.  For clarity, the Parties agree that all payment and payment reporting obligations required by this Agreement shall be subject to the Section 15 audit rights of the Agreement.

1.3     **Google Play Placement Requirements.** Google agrees to place a ██████ folder of applications on the front page of the Applications category of the Google Play Client.

1.4     During the Term, by the tenth day following the end of each calendar month, Google shall provide to ██████ two reports: one for Paid Transactions billed through DCB during the preceding calendar month; and a second report for all other Paid Transactions during the preceding calendar month.  At a minimum, these reports must include the time period covered, the gross sales from all Paid Transactions during the time period, the total refunds and other adjustments made by Google during the time period, and total Net GTV for the time period.  These reports will be based on the transactions, adjustments, and other relevant metrics as compiled by Google.  Google will pay ██████ the Net GTV by the end of the calendar month.

1.5     For each calendar month during the Term, for Paid Transactions, Google shall pay ██████ Net GTV on a monthly basis and in the currencies notified to ██████ by Google.  Any charges for converting foreign currency shall be the responsibility of ██████.  The transactions, adjustments and other relevant metrics, as compiled by Google, shall be the records used in calculating the payments under this Agreement.

1.6     In order to comply with applicable law and regulations, Google operates multiple local Affiliates to process transactions.  Developers who sell Google Play Offerings enter contracts with these Affiliates and payments from Google to ██████ may be made by one or more of these Google Affiliates (for example, Google Payment Corp. in the United States).

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604908



1.7     Google reserves the right to change the payment processor of GTV at anytime. Such selected payment processor shall comply with the terms of this Agreement. If the selected payment processor has specific requirements in order to pay ███ Net GTV, such requirements (and ongoing, any changes) will be notified to ███ in advance.

1.8     For payment and tax purposes, ███ and each of its Affiliates authorized to distribute Devices must provide information including, but not be limited to, Bank account number, Bank account address, Bank account ABA/Routing/SWIFT Number, Beneficiary name, and ███ Tax ID Number. Failure to provide this information in a timely fashion will result in delays of any payments due. ███ will not receive Net GTV for any transactions prior to Google's receipt of the above information. ███ must ensure that its bank account is set up to receive multiple currencies.

1.9     If, for any reason, a refund for a Google Play Offering is issued to a Customer for a payment transaction, either ███ shall refund the Net GTV to Google in respect of that transaction or Google shall deduct an amount equal to the refund from any amount due and payable by Google to ███.

1.10    Additional Revenue Sharing Services. The Parties intend that Google Applications will be included in the revenue sharing terms of this Agreement if and when Google begins to generate revenue from such Google Applications, subject to mutual agreement of the Parties on each such inclusion, including with respect to any modified terms and conditions intended to reflect differentiated aspects of such Google Applications with respect to business model, legal or regulatory concerns, or otherwise.

Google and ███ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604909



## EXHIBIT 10

### Net GTV

**1. Fee payable for Paid Transactions (excluding paid Google Content).** This includes Paid Transactions (excluding paid Google Content) on Google Play using the following forms of payment.

During the period beginning on October 1, 2014 through June 30, 2015:
DCB: █████ of GTV
Credit Card/Debit Card █████ of GTV

During the period beginning on July 1, 2015 through June 30, 2016:
DCB: █████ of GTV
Credit Card/Debit Card: 16% of GTV

During periods after June 30, 2016:
DCB: █████ of GTV
Credit Card/Debit Card █████ of GTV

**2. Fee payable for Paid Transactions for paid Google Content.** This includes Paid Transactions for Google Content on Google Play using the following forms of payment.

During the period beginning on October 1, 2014 through June 30, 2015:
DCB: ███ of GTV
Credit Card/Debit Card: ███ of GTV

During the period beginning on July 1, 2015 through June 30, 2016:
DCB: ███ of GTV
Credit Card/Debit Card: ███ of GTV

For annual periods after July 1, 2016 (provided, that Google reserves the right to reduce the below referenced DCB percentage with prior written notice to ██████, upon providing to ██████ reasonable support for such reduction):
DCB: ███ of GTV
Credit Card/Debit Card: ███ of GTV

15

Google and ██████████ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

# EXHIBIT 17





# AMENDMENT FIVE
## TO THE
## ██████-GOOGLE
## CO-DEVELOPED DEVICE STRATEGIC MARKETING AGREEMENT

This Amendment Five (the "Amendment No. 5") further amends the ██████-Google Co-Developed Device Strategic Marketing Agreement between Google Inc. ("Google") and ████████ ███ ███ █████████ dated October 1, 2009 (the "Agreement") and is effective as of October 1, 2014 by and between the same Parties.

Whereas the Parties entered into the Agreement and desire to extend its term and otherwise amend the Agreement as provided herein.

Therefore, the Parties agree as set forth in this Amendment as follows below.

Except as expressly amended herein, the Agreement shall remain unaltered and in full force and effect.  In the event of any conflict or inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall control.  Capitalized terms not defined herein shall have the same meaning as the identical capitalized terms in the Agreement, unless otherwise stated.

**GOOGLE INC.**



Google and ██████████ Proprietary and Confidential

1

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



1. Section 3.2 as amended in Paragraph 6 of Amendment 1 is hereby amended by deleting such Section in its entirety and replacing it with the following:

   "3.2    The Term of the Agreement is amended to end on June 30, 2020, subject to any wind down period agreed pursuant to Section 19.5 (the "**Term**")."

2. The definition of "Device" in Section 2.54 is hereby deleted and replaced, as Section 2.52, with the following:

   "2.52   "**Device**" means an Android-powered device (including a tablet) that: (i) is approved by Google for distribution of Google Applications and Android Applications; (ii) complies with the Android Compatibility Definition document and successfully passes the Android Compatibility Test Suite ("CTS") (each as notified to ████ and available at http:/source.android.com/compatibility and as updated from· time to time); (iii) is manufactured by an OEM; (iv) enables access to, at a minimum, the Google Applications and the Android Applications set forth on updated Exhibits 3 and 4 (regarding Devices) and attached hereto, unless otherwise mutually agreed by the Parties as to a particular Device; and (v) includes the Client ID.  Devices will be available for purchase by ████ or its authorized agents and resellers from an OEM or a Reseller as contemplated herein.  Google may add Google Applications and Android Applications to Exhibits 3 and 4, but if ████ believes that Google is unreasonably adding to either list, then ████ may escalate the issue pursuant to Section 19.6 (Escalation).  The Parties agree that issues regarding near-field communication ("NFC") are outside the scope of this Agreement, and therefore nothing in this Agreement will require ████ to give Google control over the secure element of a device."

3. Sections 14.1 through 14.11, inclusive, are hereby deleted and replaced by the attached Exhibit 8.

4. Sections 14.12 through 14.22, inclusive, are hereby deleted and replaced by the attached Exhibit 9.

5. In Section 15.1(b), the reference to "twice" is hereby deleted and replaced with "once".

6. In Section 25.2, the reference to ████████ is hereby deleted and replaced with ████████.

7. Section 19.1 is amended by deleting such Section in its entirety and replacing it with the following:

   "19.1   **Term Extension.**  The Parties may mutually agree to a one (1) year extension of the Term prior to the expiration of any then-current Term."

8. The fourth and fifth sentences of Section 19.5 is hereby deleted and replaced with the following:

████████ ██ ████████████

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



down period whether or not this Agreement is terminated for ▮▮▮▮ breach."

9. Exhibit 3 (Google Applications) to the Agreement is hereby deleted and replaced with the attached "Exhibit 3".

10. Exhibit 8 (General Web Search Access Points For Directed Traffic) to the Agreement is hereby deleted and replaced with the attached "Exhibit 8".

11. ▮▮▮▮ hereby changes the names of the recipients of notices established in the Agreement. Any notice sent to Verizon in accordance with Section 27.1 shall be sent to the following:



copy to:



12. ▮▮▮▮ hereby changes the names of the individuals listed in Exhibit 1 as follows:



13. Google hereby changes the names of the individuals listed in Exhibit 1 as follows:

<u>Google Project Manager</u>
Alwin Chi
▮▮▮▮▮▮▮▮

Google and Verizon Wireless Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY          GOOG-PLAY-003604898



███████████

Google Team Manager
Ted Hillestad
███████████████

███████████

Google Senior Executive
Hiroshi Lockheimer

███████████████

Google and ████████ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604899



## EXHIBIT 3

### Google Applications

Google Play Client (does not include products downloaded from Google Play), Calendar Sync, Contacts Sync, Gmail, Google+ (including Google+ Photos), Google Play Books, Google Calendar, Google Maps, Google Play Music, Google Partner Setup, Google Search (including Google Now), Google Chrome, Google Services Framework, Google Street View, Google Talk, Google Play Movies, Google Play Newsstand, Google Play Games, Google Drive, Google Backup and Restore, Google Voice Search, Media Uploader, Network Location Provider, Set Up Wizard, YouTube, Google WebView Component, Google Hangouts, and Widevine.

**This list of Google Applications may be changed by Google from time to time by previous two (2) week's written notice to . If ████ believes that Google is unreasonably changing the list of Google Applications, then ████ may escalate the issue pursuant to Section 19.6 (Escalation).

5

Google and ████████ s Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



## EXHIBIT 8

### Revenue Share for General Web Search

1. **Definitions.**  In this Exhibit 8 and elsewhere in this Agreement:

(a)  "**Ad(s)**" means keyword targeted hyperlinked, graphical (such as banner) and other advertisement(s) resulting from a Valid Query which may be displayed by Google on a Results Page.

(b)  "**Ad Revenue(s)**" means, in relation to any particular period during the Term, Ad revenues that are both (i) attributed to Ads and (ii) recognized by Google in accordance with US GAAP for that period.

(c)  "**Application Tray**" means a screen that is accessible one level from the Default Home Screen and displays icons representing the primary library of applications on a Device.

(d)  "**Client ID**" means unique alphanumeric code(s) provided by Google to ▮▮▮ to be used by Verizon in accordance with the Google Data Protocol to identify each Query and/or Directed Traffic, as such Client IDs may be modified by Google from time to time in its sole discretion upon notice to Verizon.

(e)  "**Deduction**" means for any period during the Term ▮▮ of the Ad Revenues for such period PLUS, at Google's sole discretion, any applicable costs paid for mapping data and content used within Google Applications not to exceed ▮▮ per active user per month PLUS, subject to Section 2(i) of this Exhibit 8, any additional costs up to a cap of ▮▮ of aggregate Ad Revenues during the Term of the Agreement.

(f)  "**Default Home Screen**" means the default display of a Device, prior to any changes made by Customers, that appears without scrolling in both portrait and landscape modes when the Device is in active idle mode (i.e. not in sleep mode).

(g)  "**Directed Traffic**" means web traffic (including web traffic using Wi-Fi) to the Google Mobile Search Service generated directly by Device Customers as a result of Valid Queries that originate: (i) within the General Web Search Access Points set forth in this Exhibit 8 that conform with the mandatory placement requirements set forth in this Exhibit 8; or (ii) from an external device (*e.g.* smart watch, smart glasses, fitness tracker) that utilizes the search capabilities of a Device.  For clarity, only one Client ID is associated with any specific search query and it is ▮▮▮ responsibility (working with OEMs) to ensure the ▮▮▮▮ is installed on all Search Access Points.

(h)  "**Fraudulent Act**" means act(s) which: (a) directly or indirectly generate queries, actions or impressions of or clicks on Search Results or Ads through any automated, deceptive, fraudulent or other invalid means (including, but not limited to, click spam, robots, macro programs, and Internet agents); or (b) encourage or require Co-Developed Device Customers or any other persons, either with or without their knowledge, to click on Ads or take other actions regarding Ads through offering incentives or any other methods that

Google and ▮▮▮▮  Proprietary and Confidential

6



are manipulative, deceptive, malicious or fraudulent.

(i) **"General Web Search"** means search functionality that produces search results by searching a large proportion of indexable web sites, and where such search results may also include, unless excluded herein, other non-web site results.

(j) **Google Data Protocol"** means the instructions applicable to the implementation of the Search Box(es), as supplied by Google to the applicable OEM and/or ▮▮▮▮.

(k) **"Google Mobile Search Site"** means the Google-hosted web site(s) on which the Google Mobile Search Service is hosted, currently located at the URL: www.google.com, as such URL may be updated by Google from time to time upon notice to ▮▮▮▮.

(l) **"Google Mobile Search Service"** means the General Web Search service made available by Google on the Google Mobile Search Site.

(m) **"Google Products"** means the Google Mobile Search Service, the Google Mobile Search Site, and the Google Application(s).

(n) **"Net Ad Revenue"** for any period means Ad Revenues for such period MINUS the Deduction for such period.

(o) **"Phone Top"** means with respect to the default navigation hierarchy of a Device UI, the top-most level screen from which applications can be launched by a Customer, which for clarity, may include screens that are adjacent to the Default Home Screen.

(p) **"Query"** means a search query entered by a Co-Developed Device Customer, by way of the Google Search Phone-Top application which is transmitted to Google in order to obtain Search Results.

(q) **"Results Page"** means any Google hosted page which may contain Search Result(s) and Ads.

(r) **"Search Result(s)"** means any search result(s) resulting from a Valid Query which may be displayed by Google on a Results Page.

(s) **"Valid Query"** means a Query received by Google, which: (a) contains the applicable Client ID as provided by Google; (b) is formatted in accordance with the applicable Google Data Protocol requirements; (c) has not been modified, deleted, or appended in whole or in part by ▮▮▮▮ or ▮▮▮▮▮▮▮▮ except as permitted under this Agreement; and (d) is not generated by any Fraudulent Act, as reasonably determined by Google.

2. **Revenue Share**

(a) For purposes of sharing revenue as set forth anywhere in this Agreement:

7

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY          GOOG-PLAY-003604902



(i) references to "Co-Developed Device" shall include "Device" so that revenue sharing will include both Co-Developed Devices and Devices, subject to the revenue sharing requirements set forth in this Agreement; and (ii) references to "Co-Developed Device Customer" shall include "Device Customers" and vice versa so that references to Customers will include both Co-Developed Device Customers and Device Customers.

(b) Subject to the terms and conditions of this Agreement, for each calendar month during the Term, ▇▇▇ shall receive ▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during ▇▇▇ month, provided however that (i) for October 2014, ▇▇▇ shall receive ▇▇▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month, (ii) for November 2014, ▇▇▇ shall receive ▇▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month, (iii) for December 2014, ▇▇▇ shall receive ▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month, (iv) for January 2015, ▇▇▇ shall receive ▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month, (v) for February 2015, ▇▇▇ shall receive ▇▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month, (vi) for March 2015, ▇▇▇ shall receive ▇▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month, and (vii) for April 2015, Verizon shall receive ▇▇▇▇▇ of the Net Ad Revenues attributable to Directed Traffic during such month.

(c) Google may send uncompensated test Queries and traffic to the relevant Google Products or make uncompensated clicks on Ads or generate uncompensated impressions of or actions regarding Ads at any time. The number of clicks on Ads or other relevant metrics, as compiled by Google, will be the number used in calculating payments hereunder. Payments required under this Section will be made by the last day of the calendar month following the calendar month in which the applicable Ads were displayed.

(d) Google's obligation to make payments under this Exhibit 8 will not commence until Google, at its sole discretion and under no further obligation, decides to implement and generate revenue from Ads in connection with the relevant Google Product.

(e) For clarity, Google's obligation to share revenue pursuant to Paragraph b(i) of this Exhibit 8 will not apply to Customer-selected traffic to Google products or services that is not Directed Traffic (such as traffic generated by Customer input or bookmarking of independently requested URLs into a browser or End User-initiated download of Google products or services). In addition, Google's obligation to share revenue pursuant to this Exhibit 8 will not apply to ▇▇▇ bookmarking or unapproved implementation of Google products or services.

(f) Google will not be liable for payment in connection with: (i) any amounts which result from Queries that are not Valid Queries, invalid impressions of (or clicks on) Ads, or invalid actions regarding Ads, generated by any person, bot, automated

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604903



program or similar device, including, without limitation, through any Fraudulent Act, in each case as reasonably determined by Google; or (ii) impressions of, clicks on or actions regarding Ads, delivered through an implementation which is not initially approved by Google pursuant to the Agreement, does not correctly use the Client ID or subsequently fails to meet Google's implementation requirements and specifications.

(g) Payments required under this Exhibit 8 regarding Google Products shall be made by the last day of the calendar month following the calendar month in which the applicable Ads were displayed and shall be in U.S. Dollars and will be made by electronic transfer to the account notified to Google by ███████ for that purpose.

(h) In respect of a Google Product, Google may withhold and offset against its payment obligations under this Agreement, or require ███████ to pay to Google within 30 days of any invoice, any amounts Google may have overpaid to ███████ in prior periods in relation to that Google Application (and no other Google Application).  The Party receiving payment will be responsible for any bank charges assessed by the recipient's bank.

(i) If its costs increase, Google reserves the right to proportionately increase the Deduction from time to time during the Term of this Agreement by an amount not in excess of ██ of Ad Revenues by providing advance written notice to ███████, together with reasonable support for such increase that distinguishes the new costs from those covered by the existing ██ costs set out in the definition of "Deduction". For the avoidance of doubt, ███████ shall not be liable to pay Google's costs, as such costs are deducted from Ad Revenues before Net Ad Revenues are payable to Verizon.

(j) All payments due to ███████ for the applicable percentage of Net Ad Revenue will be in U.S. Dollars. Any charges for converting foreign currency will be ███████ responsibility.

(k) Google will provide ███████ with a report summarizing Ad Revenues resulting from Directed Traffic.

(l) Below are the General Web Search Access Points, and related requirements, for Directed Traffic:

9

Google and ███████ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY          GOOG-PLAY-003604904



**General Web Search Access Points For Directed Traffic**

| Search Entry Point | Mandatory | Minimum Placement |
|---|---|---|
| Browser chrome | Yes | Browser chrome set to send invalid URLs as search query to Google.com, where search queries initiated via such invalid URLs, for clarity, shall be considered Directed Traffic |
| Google Search Widget | Yes | Default Home Screen |
| Google Chrome | Yes | Google Chrome set to send invalid URLs as search query to Google.com, where search queries initiated via such invalid URLs, for clarity, shall be considered Directed Traffic |
| Google Voice Search | Yes | Application Tray |
| Google Search Icon in Application Tray | Yes | Application Tray |
| Menu Key | Optional | N/A |
| Hard Key | Optional | N/A |
| Default Home Page on Browser | Optional | Default home page on browser set to Google.com or, if applicable, local Google domain in the country Device is distributed. For clarity, a Customer may independently change the default home page of the browser, which shall not impact Google's obligation to share search accessed by other search entry points and other revenue under this Agreement with ▮▮▮▮. |

3.  **Device Distribution Requirements**

(a)  **Confirm Compatibility**. With regard to Devices, ▮▮▮▮ will be entitled to receive payment hereunder only if it has obtained proof of compatibility from an OEM before distributing such Android Compatible Devices. Google will validate proof of

10

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY          GOOG-PLAY-003604905



compatibility if a device successfully passes the published CTS and meets the requirements in the published Compatibility Definition Document for the applicable Android platform version. For clarity, Google's requirements for preloading of the Google Applications are separate from and not included in the published CTS and Compatibility Definition Documents.

(b) **Preload Google Applications.** Google will only have an obligation to pay Net Ad Revenues for a Device if ▮▮▮ ensures that the Authorized OEM preloads the Google Applications (excluding Optional Google Applications) approved by Google for such Device's features and functionality so that, after preload, an icon representing each such Google Application shall appear on the Device as specified herein. In addition, (i) preload of a Google Application shall be limited to installation of the Google Application, and shall not involve launch of the Google Application, and (ii) ▮▮▮ will require OEMs to ensure the end user's selection of an icon representing an already preloaded Google Application shall launch such Google Application.

(c) **Placement Requirements for Android Compatible Devices.** Unless otherwise approved by Google in writing, Google will only have an obligation to pay Net Ad Revenues if ▮▮▮ ensures that all Devices meet the following requirements: (i) all Google Applications approved by Google for each Device's features and functionality in the applicable Territory or Territories must be preloaded by the OEM on each Device; (ii) all preloaded Google Applications will be placed no more than one menu below the Default Home Screen or in the Application Tray; and (iii) each Android Compatible Device must meet the mandatory (if marked "Yes") Search Access Point requirements described above.

### 4. Non-Compatible Android Device Distribution Requirements

▮▮▮ must provide Google with prior written notice if it wants to distribute a Non-Compatible Android Device under the terms of this Agreement. For purposes of this Section, **"Non-Compatible Android Device(s)"** means any device sold or otherwise distributed by Company during the Term of this Agreement and any Wind-Down Period (as described in Sections 19.5-19.7) that: (a) runs the Android platform and (b) does not meet the requirements to be a Device. Company and Google will review the specifications of the Non-Compatible Android Device, and Google will determine in its sole discretion whether the Non-Compatible Android Device is eligible for payment of revenue share pursuant to this Agreement by providing written approval.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604906



## EXHIBIT 9

### Google Play Market Revenue and Revenue Share

1.1   In this Exhibit and elsewhere in this Agreement:

(a)   **"Developer"** means a developer that distributes Android Applications on Google Play. "Developer" does not include Google or any Affiliate.

(b)   **"Digital Content"** means consumable digital media and content that is not a Google Play Offering, including without limitation electronic books, video, periodicals, music, in-game currency, additional features, additional levels, and other digital items for enhancing a Google Play Offering.

(c)   **"DCB"** means the billing of end users through ███████ billing system as a form of wireless subscriber payment.

(d)   **"Google Content"** means digital media and content that is not a Google Play Offering, including without limitation electronic books, video, and music made available by Google as paid content to Customers via Google Play and which (a) Google has licensed the rights to distribute to Customers, or (b) does not require any license to distribute (e.g. non-copyrighted books).

(e)   **"Google Play Offerings"** means Android-based applications distributed by Developers through the Google Play Client that can be downloaded from any channel in Google Play, and further including applications downloaded by ███████ Customers from a Web-based Google Play Client or online store through the Google Play Client on a Device or Co-Developed Device. For clarity, Google Play Offerings shall not include Google Content.

(f)   **"GTV"** means, for a particular Paid Transaction, the gross transaction value charged to Customers excluding: (i) any applicable fees owed to Developers for Google Play Offerings; (ii) taxes that Google may collect on behalf of Developer; (iii) adjustments for refunds, chargebacks, and reversals that Google issues to Customers at its sole discretion; (iv) any subsequent downloads of the same Google Play Offering, Google Content, or In-App Purchases to other Devices registered to the same Customer account unless the subsequent download involves a Paid Transaction; and (v) any revenue generated in connection with Google Play Offerings, Google Content, or In-App Purchases other than revenue generated directly from Paid Transactions (*e.g.*, revenue from advertising).

(g)   **"In-App Purchase"** means Digital Content purchased and delivered or made available by a Developer for use within a Google Play Offering through the in-app billing mechanism provided by or on behalf of Google found at http://developer.android.com/google/play/billing/billing_overview.html as such mechanism or URL may be updated or replaced from time to time. If Google makes material changes to the in-app billing mechanism, Google will provide

12

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY-003604907



written notice to ████ 30 days before such changes take effect.

(h)   **"Net GTV"** means the amounts listed on the attached **"Exhibit 10"**.

(i)   **"Paid Transaction"** means the purchase by a Customer of: (a) a Google Play Offering downloaded to Devices or Co-Developed Devices or Google Content downloaded or streamed to Devices or Co-Developed Devices made via (i) the Google Play Client or (ii) the Google Play Web Site; and (b) In-App Purchases from Devices or Co-Developed Devices (as applicable).   Any subsequent downloads of the same Google Play Offering, Google Content, or In-App Purchase to other Devices registered to the same Customer Account shall not be a Paid Transaction unless there is a purchase for such subsequent download.  Paid Transactions include only those paid by DCB, credit card or debit card and not by any other means.

1.2   In order to receive payment of Net GTV, Verizon shall ensure that the Google Play Client is preloaded on the Default Home Screen.   Except as expressly set forth in this Agreement, neither Party shall be required to account to the other or otherwise make any payment to the other Party regarding the Google Play Client or any revenue generated therefrom.   For clarity, the Parties agree that all payment and payment reporting obligations required by this Agreement shall be subject to the Section 15 audit rights of the Agreement.

1.3   **Google Play Placement Requirements.** Google agrees to place a ████ folder of applications on the front page of the Applications category of the Google Play Client.

1.4   During the Term, by the tenth day following the end of each calendar month, Google shall provide to ████ two reports: one for Paid Transactions billed through DCB during the preceding calendar month; and a second report for all other Paid Transactions during the preceding calendar month.  At a minimum, these reports must include the time period covered, the gross sales from all Paid Transactions during the time period, the total refunds and other adjustments made by Google during the time period, and total Net GTV for the time period.  These reports will be based on the transactions, adjustments, and other relevant metrics as compiled by Google.  Google will pay ████ the Net GTV by the end of the calendar month.

1.5   For each calendar month during the Term, for Paid Transactions, Google shall pay ████ Net GTV on a monthly basis and in the currencies notified to ████ by Google.   Any charges for converting foreign currency shall be the responsibility of ████.   The transactions, adjustments and other relevant metrics, as compiled by Google, shall be the records used in calculating the payments under this Agreement.

1.6   In order to comply with applicable law and regulations, Google operates multiple local Affiliates to process transactions.  Developers who sell Google Play Offerings enter contracts with these Affiliates and payments from Google to ████ may be made by one or more of these Google Affiliates (for example, Google Payment Corp. in the United States).

Google and ████ Proprietary and Confidential

13

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY



1.7     Google reserves the right to change the payment processor of GTV at anytime.  Such selected payment processor shall comply with the terms of this Agreement.  If the selected payment processor has specific requirements in order to pay ██████ Net GTV, such requirements (and ongoing, any changes) will be notified to ██████ in advance.

1.8     For payment and tax purposes, ██████ and each of its Affiliates authorized to distribute Devices must provide information including, but not be limited to, Bank account number, Bank account address, Bank account ABA/Routing/SWIFT Number, Beneficiary name, and ██████ Tax ID Number.  Failure to provide this information in a timely fashion will result in delays of any payments due.  ██████ will not receive Net GTV for any transactions prior to Google's receipt of the above information.  ██████ must ensure that its bank account is set up to receive multiple currencies.

1.9     If, for any reason, a refund for a Google Play Offering is issued to a Customer for a payment transaction, either ██████ shall refund the Net GTV to Google in respect of that transaction or Google shall deduct an amount equal to the refund from any amount due and payable by Google to ██████

1.10    Additional Revenue Sharing Services.  The Parties intend that Google Applications will be included in the revenue sharing terms of this Agreement if and when Google begins to generate revenue from such Google Applications, subject to mutual agreement of the Parties on each such inclusion, including with respect to any modified terms and conditions intended to reflect differentiated aspects of such Google Applications with respect to business model, legal or regulatory concerns, or otherwise.

Google and ██████ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604909



**EXHIBIT 10**

**Net GTV**

**1. Fee payable for Paid Transactions (excluding paid Google Content).** This includes Paid Transactions (excluding paid Google Content) on Google Play using the following forms of payment.

During the period beginning on October 1, 2014 through June 30, 2015:
DCB: ███ of GTV
Credit Card/Debit Card ███ of GTV

During the period beginning on July 1, 2015 through June 30, 2016:
DCB: ███ of GTV
Credit Card/Debit Card: 16% of GTV

During periods after June 30, 2016:
DCB: ███ of GTV
Credit Card/Debit Card ███ of GTV

**2. Fee payable for Paid Transactions for paid Google Content.** This includes Paid Transactions for Google Content on Google Play using the following forms of payment.

During the period beginning on October 1, 2014 through June 30, 2015:
DCB: ███ of GTV
Credit Card/Debit Card: ███ of GTV

During the period beginning on July 1, 2015 through June 30, 2016:
DCB: ███ of GTV
Credit Card/Debit Card: ███ of GTV

For annual periods after July 1, 2016 (provided, that Google reserves the right to reduce the below referenced DCB percentage with prior written notice to ███, upon providing to ███ reasonable support for such reduction):
DCB ███ of GTV
Credit Card/Debit Card: ███ of GTV

Google and ███ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-003604910

# REDACTED VERSION

# Exhibit A11
# to
# C. Cramer Declaration

# EXHIBIT 18

## AMENDMENT SIX
## TO THE
## ███████ -GOOGLE
## CO-DEVELOPED DEVICE STRATEGIC MARKETING AGREEMENT

This Amendment Six (the "Amendment No. 6") further amends the ████████ Google Co-Developed Device Strategic Marketing Agreement between Google Inc. ("Google") and ████████████████████████ dated October 1, 2009 (the "Agreement") and is effective as of October 26, 2015 by and between the same Parties.

Whereas the Parties entered into the Agreement and desire to extend its term and otherwise amend the Agreement as provided herein.

Therefore, the Parties agree as set forth in this Amendment as follows below.

Except as expressly amended herein, the Agreement shall remain unaltered and in full force and effect. In the event of any conflict or inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall control. Capitalized terms not defined herein shall have the same meaning as the identical capitalized terms in the Agreement, unless otherwise stated.

|  |  |
|---|---|
| ███████████████████ | **GOOGLE INC.** |
| Signature: ███████████ | Signature: ████████████ |
| Name: ████████████ | Name: ████████████ |
| Title: ████████████ | Title: ████████████ |

I

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

1. The following definition in Section 2 of the Agreement is deleted in its entirety and replaced with the following.

2.5. "**Google Play Developer Distribution Agreement**" means the terms and conditions that a Developer enters into before making Android Applications, Digital Content or other content available on Google Play, located at https://play.google.com/about/developer-distribution-agreement.html (as such URL may be updated or replaced by Google from time to time).

2. The following definition is added to Exhibit 9, Section 1.1:

"(j) "**Google Play Website**" means the Google Play website located at: https://play.google.com/store (as such URL may be updated by Google from time to time)."

3. The following definitions in Exhibit 9, Section 1.1 are deleted in their entirety and replaced with the following:

(b) "**Digital Content**" means consumable content, digital media and features applied to such digital media, including without limitation electronic books, electronic periodicals, video and music. The deletion of examples from the previous definition is not meant to suggest that these examples are not encompassed within this amended definition.

(d) "**Google Content**" means Digital Content sourced by Google, and Google or Google Affiliate-controlled Android Products featuring content sourced by Google, that are made available by Google for free or on a paid basis to Customers and which (a) Google has licensed the rights to distribute separately from the Google Play Developer Distribution Agreement, (b) Google does not require any license to distribute (e.g. non-copyrighted books), or (c) Google makes available to Customers through YouTube .

(g) "**In-App Purchase**" means the purchase of Digital Content or Google Content made from an Android Application on a Device through the in-app billing mechanism provided by or on behalf of Google found at http://developer.android.com/google/play/billing/billing_overview.html, as such mechanism or URL may be updated or replaced from time to time. If Google makes material changes to the in-app billing mechanism, Google will provide written notice to ▮▮▮▮ thirty (30) days before such changes take effect.

(i) "**Paid Transaction**" means the purchase by a Customer using DCB or credit card or debit card, as applicable of (a) a Google Play Offering, either from Google Play on a Device, or through an In-App Purchase, or from the Google Play Website; (b) Google Content, either from Google Play on a Device, through an In-App Purchase, or from a Google Website; or (c) Digital Content (excluding Google Content), either from Google Play on a Device, or through an In-App Purchase, or from the Google Play Website."

2



Google and ▮▮▮▮▮ Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

4. Exhibit 10 (Net GTV) to the Agreement is hereby deleted and replaced with the attached "Exhibit 10".



3

Google and [redacted] Proprietary and Confidential

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

## Exhibit 10

## Net GTV

### 1. Fee payable for Paid Transactions (excluding paid Google Content).

During the period beginning on October 1, 2014 through June 30, 2015:
DCB: ▮ of GTV
Credit Card/Debit Card: ▮ of GTV

During the period beginning on July 1, 2015 through June 30, 2016:
DCB: ▮ of GTV
Credit Card/Debit Card: ▮ of GTV

During periods after June 30, 2016:
DCB: ▮ of GTV
Credit Card/Debit Card: ▮ of GTV

### 2. Fee payable for Paid Transactions for Google Content.

During the period beginning on October 1, 2014 through June 30, 2015:
DCB: ▮ of GTV
Credit Card/Debit Card: ▮ of GTV

During the period beginning on July 1, 2015 through June 30, 2016:
DCB: ▮ of GTV
Credit Card/Debit Card: ▮ of GTV

For annual periods after July 1, 2016 (provided, that Google reserves the right to reduce the below referenced DCB percentage with prior written notice to ▮ upon providing to ▮ reasonable support for such reduction):
DCB: ▮ of GTV
Credit Card/Debit Card: ▮ of GTV

4

Google and ▮ Proprietary and Confidential

# REDACTED VERSION

# Exhibit A12
# to
# C. Cramer Declaration

# EXHIBIT 19

**From:** Ted Hillestad <██████@google.com>
**To:** Joan Braddi <██████@google.com>
**Subject:** Re: Verizon Update ....
**Cc:** Steven Hahn <██████@google.com>, Fareed Adib <██████@google.com>

Great thanks Joan!
--ted


On Wed, Oct 29, 2014 at 7:21 PM, Joan Braddi ██████@google.com> wrote:

> Yes, this clarifies.
> Thanks
> Joan

On Wed, Oct 29, 2014 at 6:41 PM, Ted Hillestad ██████@google.com> wrote:

> Hi Joan,
> Sorry I wasn't clear earlier. ████████████████
> ████████████████████████████████
> ████████████████████  ████████████
> ██████████
>
> Does this help clarify?
>
> Thanks.
> --ted



On Wed, Oct 29, 2014 at 6:15 PM, Joan Braddi ███████@google.com> wrote:

Hi Ted:
I'm not sure what iii. highlighted for search is referring to.

████████████████████████████████████████████████████████

*Let me know if I don't have the full context.*

Joan

On Wed, Oct 29, 2014 at 5:12 PM, Ted Hillestad ████████@google.com> wrote:

Hi Joan thanks for the question. And yes sorry for any confusion on the fact there are two amendments, appreciate you taking a look at this second one.

Before we make a change to the amendment language and run the change by ██████, here are my thoughts on how I think we might already be covered. Let me know if you think this goes far enough to ensure ████████ ████████████████.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Thanks again Joan, let me know if this is OK with you to proceed.

Best,
--ted

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

On Wed, Oct 29, 2014 at 4:39 PM, Joan Braddi ████ @google.com> wrote:

Hi Ted:
Thanks as I did not know there were two agreements to approve as I thought I approved the link you just sent.

However, in re-reading the Simba Exec summary, I do have a couple of questions.

████ ████████████████████████████████████████████████████████████████
████████████████████████████████
██████████████████████████████████████████████████ ████████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████

████████████████████████████████████████████████████████████████████████

Joan

On Wed, Oct 29, 2014 at 2:55 PM, Ted Hillestad ████████ @google.com> wrote:

Hi Joan, just wanted to follow-up and see if you had any questions on the ████████████████ as well ([217958])
before you approve in Simba? I saw you approved the ████████████ yesterday.
Thanks again for your support.
--ted

On Tue, Oct 28, 2014 at 5:12 PM, Joan Braddi ████ @google.com> wrote:

Me too.

On Tue, Oct 28, 2014 at 5:10 PM, Ted Hillestad ████████████ @google.com> wrote:

Of course, no problem at all, thanks for the questions! And thanks again for the time last week. I really do
appreciate you taking so much time out of your schedule to chat. I enjoyed the time.
Best,
--ted

On Tue, Oct 28, 2014 at 5:07 PM, Joan Braddi ████ @google.com> wrote:

Thanks.  Makes sense.

On Tue, Oct 28, 2014 at 4:46 PM, Ted Hillestad ████████████ @google.com> wrote:

████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

On Tue, Oct 28, 2014 at 4:30 PM, Joan Braddi ████ @google.com> wrote:

Thanks Ted.
What happens to ████████████████████████████████

On Tue, Oct 28, 2014 at 4:27 PM, Ted Hillestad ████████████ @google.com> wrote:

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY                    GOOG-PLAY4-002178048

Hi Joan,
The effective date is October 1st.
Thanks.
--ted


On Tue, Oct 28, 2014 at 4:24 PM, Joan Braddi ███ @google.com> wrote:

Fareed and/or Ted:
What is the effective date of this agreement (when these new terms and timelines start)?  Is it Nov 1? Oct 1?

On Tue, Oct 28, 2014 at 10:05 AM, Fareed Adib ████████ @google.com> wrote:

Team,
I wanted to give you some really good news. We have received a final redline from ████ after bird-
dogging them for the last 10 days. We are about to launch the deal folder this morning for the formal approval
process.

To summarize, the deal is based on the agreed upon terms (as a reminder here are the broad strokes):



We are aiming to close this by the end of the month for multiple reasons. If anyone would like more detail
than please feel free to reach out.

I know Jon Gold and Travis are running the financial impact analysis for the projected close, which they can
share with the group.

Thanks,
Fareed and Ted


--
This email and the information it contains are confidential and may be privileged. If you received this communication by
mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went
to the wrong person.
The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided
solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No
legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties
involved.




--
This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone
else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

                GOOG-PLAY4-002178049

--
This email and the information it contains are confidential and may be privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person.
The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties involved.

--

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

--
This email and the information it contains are confidential and may be privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person.
The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties involved.

--

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

--
This email and the information it contains are confidential and may be privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person.
The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties involved.

--

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-002178050

--
This email and the information it contains are confidential and may be privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties involved.

--

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

--
This email and the information it contains are confidential and may be privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties involved.

--

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

--
This email and the information it contains are confidential and may be privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. The above communication may include discussions or proposals of a potential business arrangement, and if so, are provided solely as a basis for further discussion, and should not be intended to and do not constitute a legally binding obligation. No legally binding obligations will be created, implied, or inferred until an agreement in final form is executed in writing by all parties involved.

--

This email may be confidential or privileged. If you received this communication by mistake, please don't forward it to anyone else, please erase all copies and attachments, and please let me know that it went to the wrong person. Thanks.

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY4-002178051

# REDACTED VERSION

# Exhibit A13
# to
# C. Cramer Declaration

# EXHIBIT 20



Google

# Play Update @ CFO Council

September 20, 2018
Privileged & Confidential

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Play Financial Overview - Revenue & Profitability**

| in USD ($M) | 2016 Actuals | 2017 Actuals | 2018 Outlook | Y/Y% '17 | '18 |
|---|---|---|---|---|---|
| **Total Revenue** | $5,310 | $6,853 | $8,657 | 29% | 26% |
| **Total COS** | | | | | |
| **Gross Profit** | | | | | |
| % | | | | | |
| **Total OpEx** | | | | | |
| **Op Profit** | | | | | |
| % | | | | | |

**Play is very large and growing at healthy rates**
● *Attributable to healthy Apps business and launch & scaling of Ads business*

**Highly profitable and consistently improving margins**
● *Efficiencies in transaction costs and growth of ~100% gross margin based Ads revenue*

**Goals for today:**

+ **Form common understanding of recent changes in competitive landscape and how they impact the risks and opportunities for Play**
+ **Share strategies that Play leadership is pursuing and discuss how leveraging x-PA collaboration may contribute to enhanced solves and success of potential investment strategies**

2

Google

Confidential + Proprietary

GOOG-PLAY-000445444.R





GOOG-PLAY-000445446.R



- Transaction cost reductions over years & Payroll to revenue growth ratio
- If interest in doing a deep dive in cost structure then happy to take a follow on

- Link to detailed breakdown appendix slide
- Link to Trix

-

  Marketing A&P ■■■

- G&A Allocation Breakdown: ■■■
- REWs ■■■; Finance: ■■; Legal: ■■; POps: ■■; Central: ■■; Public Relations: ■
- Ads & Commerce
- Sales & Marketing Allocation Breakdown: ■■■
- Marketing ■■■ (■HC)
- GBO ■■■ (■ HC) -- gCon, Ingestion for content, Partnerships (Books)
- Non-Cash House Ads ■■■
- TI Allocations ■■■ Operating Expenses from two types of costs (Original TI Costs & Inherited (Rews, Pops, etc); costs come from five different TI costs pools
- Resource Economy - C&S (Allocation method: ■■■■■■■ ■■■■■)
- Resource Economy - Networking (Allocation Method: Actual cost multiplied by

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Resource Economy - Other  (overhead activities, such as: SRE support, Corp Fleet resources (InSIDE), TI C&S and networking cost) Allocated

- Corp Eng- Direct Allocation for PA Specific; For general services, proportional

- Privacy and Security-

- Other COS: Localization, Amort of Intangible Assets

**Long Term Play revenue outlook – Line of sight to ███ if we mitigate ecosystem risks & continue to invest in new opportunities**



**Path to ███ - Agenda for today**

1. **Protect User Trust & Safety & Play/Google reputation**
2. **Enhance Developer ties & value proposition**
3. **Transform User relationship**
4. **Leverage X-Google assets**

+ *Initiatives not discussed today:*
  *- Product innovation (e.g high fidelity gaming solves which are key)*

  *- Diversify revenue streams*

  *- Emerging markets*
  *- FOP expansion*
  *- Ads*
  *- Media & Entertainment*

2018E          2019F                    2023F

*2018 Plan Fixed FX rates (Core performance revenue only)*

6

Google

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Link to original slide

Respond: Declared Code Yellow in Q1 → removed 1.7M non-compliant apps
Exited Code Yellow in early Q3 by reducing Brandspam abuse by 90%

Investments to Monitor: On track to ramp ▮▮▮▮ TVCs to expand thorough kids app
reviews (▮▮▮ in '18 investment)

Expect need for additional investments, likely in form of HC:
Hired a seasoned engineering executive with relevant background to build a
dedicated engineer team on user safety & trust
Planning to revamp ML-based Classifiers and forming an "intelligence desk" to
proactively counter rising threats

Operation is in-bound based
Brandspam: use of brands to generate install, the app is non-compliant (e.g. violent
content)
Response: offensive approach to attack the problem. Monitor: Defensive approach
Store is a different place, looks a different now.

GOOG-PLAY-000445450.R





Speaker notes:



of JP / Global (ex. JP) ▮▮▮▮ = ▮▮▮▮▮▮
of JP / Global (ex. JP) ▮▮▮▮ = ▮▮▮▮▮▮
How many developers does ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ cover? ▮▮▮▮▮▮



Don't have to stretch very far to get to the ▮▮▮
Put a caveat on the probability (indicate that it's conservative in voice over)

In addition to these scenarios, users could switch to iPhone resulting in further substantial downsides
Probabilities given that Fortnite does not launch on Play. $s rounded to 2 significant figures. Totals may not equal sum of rounded numbers.
Source: Play FP&A. Sheet.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1. Launch developers cover ▆ of JP HVU spend
2. Very targeted investment (▆ of cost is going towards HVUs)

3. ▆ churn is reducing ▆ churn of the joined members. Concurrently the stretch goal is to have ▆ of HVUs join. So combined the goal would be ▆▆▆▆▆ reduction from the ▆, from ▆ to ▆. We split up the goals since 2-3 years later HVU trends may be different.
4. ▆▆ in revenue for HVU churn reduction only applies to all countries (JP, KR, US, TW HK) assuming the same 5% churn reduction of ▆ joined HVUs in a steady annualized run rate.
5. ▆ in revenue that is covered under this program in 2020 if the team launches in JP,KR,US,TW,HK, and enrollees represent ▆ of total revenue, providing defensive value against competitive platforms

6. High revenue concentration among our top developers has created an environment ripe for disruption. Competitive Android stores like OneStore and Amazon have reached ▆▆ of developer revenue, mainly by attracting Play HVUs with discounts
7. Launch timing: JP (9/22), KR (Q2'19), US (Q4'19)
8. Mechanics: Users (1) earn points for every Play purchase and/or for installing select apps and (2) use points on Play credit, discounted IAP, game credits and exclusive in-game items
9. User benefit: Total giveback to users starting at ▆ (for Bronze level), with HVUs receiving ▆▆
   (higher giveback than most programs for CCs, airlines, shopping, partially made possible by devs funding IAP discounts and credits)

10. JP launch collaboration with JP Pixel launch (Gold status w/ purchase + 1,000 points)

11. GPP success metrics:
    https://docs.google.com/presentation/d/19UH94o1rzqjl_ircgKbc4NanmVTQsoxI8Qk
    Rd7AB4ks/edit#slide=id.g41250be554_0_0

12. Finance Review:
    https://docs.google.com/presentation/d/15fakqGTuf6Z6yQDaDbEWptT8ZwPKpn7Ot
    HgTqREHrrk/edit#slide=id.g3ece8e49e0_0_10

13. Older PPS from Jan (don't use only if you need it!):
    https://docs.google.com/presentation/d/10fvW_6dO0duOcSVAehbl4P1sUYIW1HVTx
    nusvI-ZTUY/edit#slide=id.g2d27bc6192_0_15



**Link to original slide**

**Terms: Dev receives up to** ███ **of Play spend as a GCP credit**
███████████████████████ **If dev eligible for** ██████████████ **, and wants to**
████████████████████████████
**Duration:** ████████ **Based on pilot results, program may be extended)**
**# of Devs: targeting 30-50**
**Geography: All geos, excluding Canada, Brazil, and India**
**Budget:** ██████ **funded by** ███ **)**



Google Analytics is separate from Cloud/Firebase.  There is a distinct Google Analytics for Firebase within the Google Analytics umbrella, however.





GOOG-PLAY-000445459.R



GOOG-PLAY-000445460.R



2014 & 2015 includes Music; 2016-2018 excludes Music
Estimated Op Profit for 2014 if excluding Music = ▮▮▮▮

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Launch US Q2'19
Acquire ▮ subscribers and be margin positive by year ▮
▮ - ▮ in revenue by year ▮

New recurring revenue stream for developers
Google drives buyer acquisition, so developers can focus on creating engaging experiences

Sticky, direct relationships with paying users
Aggregation of curated content from across Play attracts both individuals and families to buy into the ecosystem

Diversified revenue growth
More paying users and successful developers reduce reliance on handful of HVUs and titles

Opportunities for stronger partnerships
Differentiated offering helps carriers and OEMs retain existing users and attract underserved user segments

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Outlook as of v8; YTD thru Jul Actuals, RoY = Aug-Dec; link to waterfall

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000445463.R



## Top Market: Japan Apps challenged at ▮ YTD growth y/y[1]

**Japan Apps Revenue**
Q3 Continues to Shrink y/y

**Buyers/Spend per Buyer**
▮ y/y (New buyers ▮ y/y) ▮▮

**Developers**
Y/Y growth ▮▮▮▮

**Android**
Play revenue has been stable to improving at 83% of iOS
YTD. *(AppAnnie source)*

[1] Data through Sep'18 fcst.

20

Google

Confidential • Proprietary



V8 Outlook



FY 2017 Actuals vs. FY 2018 Projection (v6)  link to trix
G&A Allocation Breakdown: ▉
REWs: ▉     Finance: ▉  Legal: ▉  POps: ▉  Central: ▉  Public Relations: ▉

Marketing A&P ▉
Sales & Marketing Allocation Breakdown: ▉
Marketing ▉      ▉ HC)
GBO ▉   ( ▉ HC) - gCon,
Non-Cash House Ads ▉

TI Allocations:  Operating Expenses from two types of costs (Original TI Costs & Inherited (Rews, Pops, etc); costs come from five different TI costs pools
Resource Economy - C&S (Allocation method: ▉
▉
Resource Economy - Networking (Allocation Method: ▉
▉
Resource Economy - Other  (overhead activities, such as: SRE support, Corp Fleet resources (InSIDE), TI C&S and networking cost) Allocated ▉
▉
Corp Eng- Direct Allocation for PA Specific; For general services, ▉
▉

GOOG-PLAY-000445466.R

Privacy and Security-

Other COS: Localization, Amort of Intangible Assets, Latchsky placeholder, etc

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Key message for this slide:

Purpose of FOP launches: FOP launches enable Android users to transact on Play Platform.

Country's FOP opportunity signaled by high Play Connected and low FOP connected/ buyer penetration.

Geo differences in payment preferences, shifting/evolving digital payments landscape

Key emerging market priorities require concurrent commerce platform development & Play store content/demand creation

GOOG-PLAY-000445468.R



GOOG-PLAY-000445469.R

# FILE UNDER SEAL

# Exhibit A14
# to
# C. Cramer Declaration

# REDACTED VERSION

# Exhibit A15
# to
# C. Cramer Declaration

# EXHIBIT 23

**Contract ID:** 549756

## MOBILE APPLICATION DISTRIBUTION AGREEMENT (MADA) (3PL)

| | |
|---|---|
| **1. "Company"** | Full Legal Name: <br><br> *Address for legal notices:* <br><br><br> Street Address: <br><br> City, state/province, postal code, and country: <br><br><br><br> Attn: <br> Fax: <br> Email: |
| **2. "Google"** | Google LLC <br> *Address for legal notices:* <br> Google LLC <br> 1600 Amphitheatre Parkway <br> Mountain View, California 94043, USA <br> Attn: Legal Department <br> Fax: 650-618-1806 <br> Email: legal-notices@google.com |
| **3. State of Incorporation / Organization** | Company: <br> Google LLC : Delaware |
| **4. "Effective Date"** | 12/01/2018 (must be start of calendar month) |
| **5. "Term"** | Starting on the Effective Date and continuing through 12/31/2019 (inclusive) 1 year. |

The parties agree to the terms of this Agreement and have caused this Agreement to be signed by their duly authorized representatives.

**Company:**

**By:**

**Name:**

**Title:**

**Date:** Dec 3, 2018

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY       GOOG-PLAY-000808375

**Google LLC**

**By:**

**Name:** ███ ███ ███ 2018.12.06
**Title:** Hiroshi Lockheimer 15:27:54 -08'00'
Authorized Signatory
**Date:**

## BACKGROUND

WHEREAS:

A.    Google offers an integrated suite of mobile services on a non-exclusive, royalty-free basis to Android device manufacturers that have executed an Android Compatibility Commitment;

B.    Company desires to license Google's suite of mobile services to provide a consistent high-quality out-of-the-box user experience on Company's Android Compatible Devices supplied outside the European Economic Area ("**EEA**");

C.    Nothing in this Agreement is intended to restrict Company or end users from installing third-party services on devices with Google's suite of mobile services, including services with similar functionality; and

D.    Company is under no obligation to install Google Applications on any of its Android devices.

## AGREEMENT
## TERMS AND CONDITIONS

## 1.    DEFINITIONS.

**1.1** **"3PL"** means a company (i) that is designated by Google to provide testing or support services for Google Applications, and (ii) with whom Company has a separate signed agreement to receive such services.

**1.2** **"Affiliate(s)"** means any company controlling, controlled by or under common control with a party, where "control" will mean ownership, directly or indirectly, of the shares of a company representing fifty percent (50%) or more of the voting rights in this company.

**1.3** **"Android"** means the open-source application framework, libraries, runtime,

    GOOG-PLAY-000808376

and kernel which are published at http://source.android.com (or successor sites), and any software development kits made available at http://developer.android.com (or successor sites).

**1.4 "Android Compatible Device(s)"** means, for each version of the Android platform, a Company phone or tablet not supplied into the EEA that complies with the Android Compatibility Definition Document ("CDD"), which can be found at the Android compatibility website (http://source.android.com/compatibility), as updated from time to time.

**1.5 "Android Content"** means software, content and digital materials designed for use on Android devices.

**1.6 "Assert**" means to bring, threaten to bring, or continue any legal proceeding in any forum to enforce a right, whether created by a claim or a counterclaim or otherwise, and whether administrative, judicial, arbitral or otherwise, including any proceeding before the United States International Trade Commission.

**1.7 "Assist App"** means an Android system application that an End User may use to obtain information and perform actions.

**1.8 "Client ID"** means unique alphanumeric code(s) that Google provides to Company that is used to identify Devices.

**1.9 "Compatibility Test Suite" or "CTS"** means an automated testing program to test devices using Android for compliance with the CDD that is published at http://source.android.com.

**1.10 "Compliance Target"** means that as measured on the 28th day of a particular calendar month, Security Updates have been performed with a security patch level no more than 90 days old on the following: at least 75% of Security Mandatory Device Models as of July 31, 2018; and 100% of Security Mandatory Device Models after January 31, 2019. Google will determine whether the Security Update obligation is fulfilled when at least 5% of End Users on each Security Mandatory Device Model is up to date using a security patch level defined by Google in an Android Security Bulletin published at https://source.android.com/security/bulletin/ (the URL link might be changed from time to time by Google) within the prior 90 days.

**1.11 "Confidential Information**" means information that one party (or an Affiliate) discloses to the other party under this Agreement that is marked as confidential or would normally be considered confidential information under the circumstances. It does not include information that becomes public through no fault of the recipient, that is independently developed by the recipient, or that is rightfully given to the recipient by a third party without confidentiality obligations.

**1.12 "Core Applications"** means the following Google Applications: Search, Chrome, Gmail, Maps, YouTube, Play, Drive, Play Music, Play Movies, Duo, and

GOOG-PLAY-000808377

Photos.

**1.13 "CTS Report"** means the complete, unaltered report that is generated after the CTS is completed.

**1.14 "Default Home Screen"** means the default display of a Device, including the lock screen and/or the notification tray, prior to any changes made by End Users that appears without scrolling (i) after initial boot-up, (ii) after each subsequent power-up, or (iii) after an End User selects the "home" icon.

**1.15 "Device"** means each Android Compatible Device branded or marketed with Company or third party Trademarks (in each case as listed in Exhibit A) with a unique build fingerprint that (i) runs Android only (and no alternative software platform) and has a screen size no greater than 18 inches, (ii) is distributed with Google Applications (as described in this Agreement), (iii) is approved by Google pursuant to Section 4.8 (Google Approval and Launch), and (iv) is intended for use by End Users.  For Company devices running Android other than phones or tablets, Google may (x) require Company to enter into separate terms and conditions to license Google Applications, (y) approve such device (such approval may be provided over email) as a Device, or (z) reject such device for the distribution of Google Applications.

**1.16 "Device Model"** means the name of a Device as it is sold and marketed to the End User.

**1.17 "End User(s)"** means a human end user of a Device.

**1.18 "Final Embed Date"** means the latest possible date Company can accept updated Google Applications from Google for a specific Device deployment.

**1.19 "GMS Requirements"** means the list of requirements specified at https://support.google.com/androidpartners_gms/answer/7351400?hl=en&ref_topic=6167664 (as such URL may be changed or replaced by Google at its sole discretion from time to time).

**1.20 "Google Applications"** means the machine-readable binary code version of the Google applications listed in the Google Product Geo Availability Chart, and any modifications or updates to such applications.

**1.21 "Google GNSS Assistance Information"** means information that is transmitted by Google to a SUPL Enabled Terminal in response to a request received by Google as described in Section 4.10(b).

**1.22 "Google Hotword Engine"** means Google-developed software components, which may include software that runs on the digital signal processor of a Device (if available), which allow End Users to use the Google Hotword functionality.

**1.23 "Google Mobile Branding Guidelines"** means Google's mobile brand

GOOG-PLAY-000808378

treatment guidelines (and any content contained or referenced therein), which are located at https://source.android.com/source/brands.html/ and https://www.google.com/permissions/guidelines.html (as such URLs may be changed or replaced by Google at its sole discretion from time to time), together with such additional brand treatment guidelines Google may make available to Company from time to time.

**1.24 "Google Play"** means the marketplace created and operated by Google, through which Android Content is distributed.

**1.25 "Google Product Geo Availability Chart"** means the list of Google Applications and associated information (including geo-availability) set out at https://support.google.com/androidpartners_gms/answer/6173341 (as such URL may be changed or replaced by Google at its sole discretion from time to time).

**1.26 "Hotword"** means a voice-activated trigger that enables voice commands on the Device, which can be provided by either Google (a "Google Hotword"), Company (a "Company Hotword"), or a third party.

**1.27 "Intellectual Property Rights"** means all patent rights, copyrights, semiconductor chip protection rights, moral rights, rights in trade secrets, trademark rights, database rights, and any other intellectual property rights (registered or unregistered) throughout the world.

**1.28 "Launch"** means the initial distribution of a Device in accordance with the terms of this Agreement.

**1.29 "Location ID"** means a unique alphanumeric identifier as defined in the OMA SUPL Internal Location Protocol specification.

**1.30 "Security Updates"** means the installation of a Google-provided security patch on a Device such that all Common Vulnerabilities and Exposures ("CVE") posted in the public security bulletin for the date of the update are fixed, unless otherwise approved by Google in writing.

**1.31 "Security Mandatory Device Model"** means a Device Model that has been launched after January 31, 2018 and has more than 100,000 End User activations.

**1.32 "SUPL Enabled Terminal"** means a Device which is capable of communicating with a SUPL (Secure User Plane Location) network to aid in the process of obtaining its location.

**1.33 "SUPL Request"** means a request for Google GNSS Assistance Information sent to Google and originating from a SUPL Enabled Terminal.

**1.34 "Telecom Operator"** means a company that provides wireless service that allows End Users to access the Internet on a Device.

**1.35 "Territories"** means the country or countries, not including a country or

GOOG-PLAY-000808379

countries within the EEA, in which distribution of Google Applications is permitted as set forth in the Google Product Geo Availability Chart, which Google may update in its sole discretion.

**1.36 "Third-Party Legal Proceeding"** means any formal legal proceeding filed before a court or government tribunal (including any civil, administrative, investigative or appellate proceeding) by a third party that is not affiliated with Google or Company.

**1.37 "Trademarks"** means the trade names, trademarks, service marks, logos, domain names and other distinctive brand features of each party as owned by such party from time to time.

## 2. GOOGLE APPLICATIONS.

**2.1 License to the Google Applications.** Subject to the terms and conditions of this Agreement (including compliance with Section 2.3) and the GMS Requirements, and subject to Company being in compliance with a valid and effective Android Compatibility Commitment, Google grants to Company a nontransferable, nonexclusive, no cost license during the Term (under Google's Intellectual Property Rights) to (a) distribute the Google Applications on Devices in the Territories, and (b) reproduce the Google Applications to the extent necessary to exercise the license granted in this Section 2.1. I Company may only distribute a Device with Google Applications if it makes all Core Applications authorized for distribution in the applicable Territory available on such Device, unless otherwise approved by Google in writing. For the avoidance of doubt, Google may license such Google Applications under Intellectual Property Rights that Google owns or has the right to license without payment to or consent from a third party.

**2.2 Sublicense.** Company may sublicense the license granted in Section 2.1 to the following entities listed below provided that Company has entered into a written agreement with each such entity that contains obligations and restrictions that are no less protective of Google than the obligations and restrictions applicable to Company set out in this Agreement and makes Google a third-party beneficiary:

(a) Third parties, including but not limited to Telecom Operators, retailers or OEMs with whom Company has an agreement solely for use with Devices that have received Google's prior written approval pursuant to Section 4.8(a);

(b) Resellers and distributors only for purposes of distributing Devices and only when Google Applications are pre-installed on Devices; and

(c) Company's Affiliates and contractors (including 3PLs) solely for internal testing, evaluation, manufacturing and development purposes (i.e. not commercial distribution) with respect to Devices.

(d) For the sake of clarity, Company will remain liable for all acts and

GOOG-PLAY-000808380

omissions of its sublicensees.

**2.3   License Limitations**.  Company may not, and may not allow or encourage any Affiliate or third party to:

(a)   disassemble, de-compile, or otherwise reverse engineer the Google Applications or obtain the source code or algorithms underlying the Google Applications;

(b)   create derivative works from or based on the Google Applications;

(c)   provide, sell, license, distribute, lease, lend, or disclose the Google Applications to any third party, except as expressly permitted in this Agreement;

(d)   ship, divert, transship, transfer, export, or re-export the Google Applications, or any component thereof, into any country or use it in any manner prohibited by any applicable export control laws, restrictions, or regulations;

(e)   distribute a Device in a Territory unless the subset of Google Applications  required for distribution in that Territory are pre-installed on that Device, except as otherwise approved by Google in writing;

(f)   distribute a Device in a Territory without Google's prior written approval pursuant to Section 4.8 (Google Approval and Launch);

(g)   distribute a version of a Google Application in a Territory other than the specific version of that Google Application authorized by Google for that Territory;

(h)   serve or otherwise place any advertisements during the launch process of a Google Application;

(i)   offer, download, or install any additional products during the launch process of a Google Application;

(j)   interfere with or limit the display or acceptance of the applicable Google Terms of Service for a Google Application;

(k)   redirect an End User away from, block access to, frame, modify, or change the look or feel of any web page or web site accessed via a Google Application, or place anything on or near any web site page that in any way implies that Google is responsible for the contents of such page;

(l)   insert into a Google Application any viruses, worms, date bombs, time bombs, or other code that causes the Google Application to cease operating, or to damage, interrupt, allow access to, or interfere with any Google Application or End User data;

(m)   modify, or interfere with the operation of, the Google Applications;

(n)   direct, instruct or encourage the End User to change the out-of-box settings of a Device; or

(o)   interfere with Google's over-the-air updates of Google Applications.

**2.4   Delivery**.  Google will develop and deliver the Google Applications to Company and may update such Google Applications from time to time.  Company will only distribute the then-current versions of Google Applications on Devices and will promptly update all versions of Google Applications intended for distribution on Devices no later than sixty (60) days after such update is made available.

**2.5   App Updates**.  Google may auto-update Google Applications on Devices over-the-air.

## 3.   INTELLECTUAL PROPERTY & OTHER PROPRIETARY RIGHTS.

**3.1   Ownership**.  Each party (and its licensors) retains all right, title and interest in its Intellectual Property Rights, including its Trademarks.  Neither party obtains any Intellectual Property Rights pursuant to this Agreement (including implied licenses), except those rights expressly licensed and subject to all of the terms and conditions of this Agreement.

(a)   Google (and/or its licensors) retains all right, title and interest, including all Intellectual Property Rights, in and to the Google Applications, Google GNSS Assistance Information and the Google Trademarks.   Examples of Google Trademarks are located at: http://www.google.com/permissions/trademarks.html (or such other URLs Google may provide from time to time).  Google is not restricted from selling, licensing, modifying, or otherwise distributing the Google Applications, Google GNSS Assistance Information and/or the Google Trademarks to any third party.

(b)   Company (and/or its licensors) retains all right, title and interest, including all Intellectual Property Rights, in and to the Devices (excluding Google Applications and Android) and the Company Trademarks.  Company is not restricted from selling, licensing, modifying, or otherwise distributing the Devices and/or the Company Trademarks to any third party except as otherwise set forth in this Agreement.

(c)   All use by Google of Company Trademarks (including any goodwill associated therewith) will inure to the benefit of Company, and all use by Company of Google Trademarks (including any goodwill associated therewith) will inure to the benefit of Google.  Neither party may challenge or assist others to challenge the Trademarks of the other party (except to protect such party's rights with respect to its own Trademarks) or the registration thereof by the other party, nor will either party attempt to register

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

any Trademarks or domain names that are confusingly similar to those of the other party.

**3.2** **License to Google Trademarks**.  Subject to Google's prior written approval for each use of a Google Trademark and to the terms and conditions of this Agreement, Google grants to Company a limited, non-exclusive and non-sublicensable license during the Term to display those Google Trademarks solely for the purposes of this Agreement.  Google may revoke the license granted in this Section upon providing Company written notice and a reasonable period of time to cease such usage.  Company's use of Google Trademarks is subject to the Google Mobile Branding Guidelines.

**3.3** **License to Company Trademarks**.  Subject to the terms and conditions of this Agreement, Company grants to Google a limited, non-exclusive and non-sublicensable license during the Term to display those Company Trademarks solely for the purposes of this Agreement.  Company may revoke the license granted in this Section upon providing Google written notice and a reasonable period of time to cease such usage.

**3.4** **Packaging**.  Company may not, and may not direct, instruct or encourage any third party to produce any consumer packaging or materials for the Device that identifies or suggests that Google is the manufacturer of the Device.  For any Device packaging or user guide produced by Company, Company will identify itself as the manufacturer of the Device and provide contact details in the applicable Territories where the Device is distributed.

**3.5** **Open Source Licenses**.  Portions of the Google Applications or Android may be provided with notices and open source licenses from third parties that govern the use of those portions, and any licenses granted hereunder do not alter any rights and obligations Company may have under such open source licenses.

**4.** **DEVICE IMPLEMENTATION REQUIREMENTS**.

**4.1**  As between the parties, Company is solely responsible for the distribution of the Devices and managing its inventory.  Company is under no obligation to install Google Applications on any of its Android devices.

**4.2** **Geo-Availability of Google Applications.** Company agrees not to, and not to encourage any third party to, distribute or actively promote Google Applications, Google products or Google services outside of the Territories.  If Google updates the Google Product Geo Availability Chart, Company will implement the relevant changes on devices yet to be manufactured in compliance with such updated chart within sixty (60) days after such update is made available.

**4.3** **Security Update Requirements.**  Company agrees to the following security-related requirements for each Security Mandatory Device Model:

(a)   Provide at least four Security Updates within the first calendar year of

GOOG-PLAY-000808383

Launch of a Device;

(b)   Produce Security Updates for at least two years from the Device Launch date;

(c)   Submit each of the produced Security Updates for Google approval pursuant to Section 4.8(a); and

(d)   Make the Google approved Security Updates available to End Users using Google OTA or Company's own solution.

(e)   If in any month, the Compliance Target for Security Update Requirements is not met, Google reserves the right to withhold approval of any future Company Devices.

**4.4   Placement Requirements; Device Setup**.  In return for Google granting a no cost license to Google Applications for distribution on Devices under this Agreement, unless Google otherwise approves in writing, Company agrees to the following placement and setup requirements with respect to Android Compatible Devices distributed or launched during the Term that it elects to configure as Devices:

(a)   distribute all Core Applications approved in the applicable Territory or Territories in accordance with the Google Product Geo Availability Chart;

(b)   distribute on the Default Home Screen (but excluding the lockscreen and notification tray):

(i)   a Google-provided widget;

(ii)   the Google Play Store icon; and

(iii)   an icon clearly labeled or branded "Google" that provides direct access to the Core Applications (using the icons and text Google provides or approves in writing).

(c)   ensure that any distributed Google Application that is not a Core Application is placed no more than one level below the Default Home Screen;

(d)   ensure that the Google Terms of Service, Privacy Policy and Legal Notice (which will be provided to Company by Google) are available as instructed by Google;

(e)   ensure that a Google Application that is distributed will not launch without an explicit action from an End User,

(f)   ensure that an End User's selection of an icon representing a distributed Google Application, or use of a Google Hotword (if any), will

GOOG-PLAY-000808384

launch such Google Application;

(g)   set Google as the default Assist App and follow the Google-provided set-up screen guidelines, which may be updated from time to time;

(h)   ensure that any and all long press and long touch activities on the "Home" button on Devices with physical or soft navigation buttons will directly access the Assist App;

(i)   with respect to initial device setup:

> (i)   initiate Google account login via the setup wizard immediately after establishing network connectivity.  Company may present its terms of service after establishing network connectivity but will not insert a Company or third-party account login process until after the Google account login.

> (ii)   present End User with the Google Services page, which Company may not modify,

> (iii)   follow Google's provided guidelines, and

> (iv)   allow End User to skip all account logins, including Google, Company and third-party logins;

(j)   ensure that use of the Google Applications complies with the Google Mobile Branding Guidelines;

(k)   display a Google Trademark (as identified by Google) on the initial screen during the boot sequence;

(l)   preload Google-provided Android WebView as the default provider for the webpage-rendering APIs as defined in the Android SDK;

(m)   ensure that the settings for Google accounts and services are not modified and are as discoverable as those of Company or any third party;

(n)   configure the appropriate Client ID, if applicable, as provided by Google and implement any modified Client IDs within thirty (30) days of Google's notice to Company;

(o)   implement the "Home button animation" pursuant to the Google-provided guidelines if the Google Assistant is enabled on the Android Compatible Device and such Android Compatible Device has a soft "Home" button; and

(p)   implement the Google Hotword if the device supports Hotwords (including support when screen is off).

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000808385

**4.5** **No Exclusivity**.  Other than the placement and set-up requirements for Google Applications set forth in Section 4.4, this Agreement does not restrict or limit Company from preloading or determining the placement of its own or third party applications or services on its Android devices.

**4.6** **No Connectivity Notice**.  When an End User launches a Device's web browser or launches a Google Application and there is no data connectivity available, Company will not block, alter or prevent in any way the presentation of any message to such End User indicating lack of data connectivity.

**4.7** **Device Samples; Testing**.  Company will provide the materials and information listed below:

> (a)   At least thirty (30) days prior to the Final Embed Date for each Launch of each Device Model, Company will deliver to Google at least four (4) device samples for such Device Model for Google's approval as set out in Section 4.8 (Google Approval and Launch).

> (b)   Company will assist Google with ongoing testing of devices provided under this Section, including running Android Content and tests and providing any information, equipment and/or assistance reasonably requested by Google for such purpose in a timely manner.

**4.8** **Google Approval and Launch**. Prior to the Launch of each Device Model, Google will have the opportunity to review and approve, in its sole discretion, the Device and Company's implementation of Google Applications on the Device. Following receipt of approval by Google for the Launch of a Device under this Section 4.8, Company may begin distribution in accordance with that approval.  To facilitate Google's review, Company will work with a 3PL in order to conduct compatibility testing (and cannot conduct its own testing), even if it is itself a 3PL.

> (a)   With respect to Section 2.2(a), Company will apply for Google's pre-approval of each Device.  Google's pre-approval for each Device must be sought by Company as soon as reasonably practicable, but must be at least 90 days before the planned first date of commercial distribution to a Telecom Operator, retailer, OEM or other third party. In order to start the pre-approval process, Company will send a written request to Google with a description of the Device, including basic specifications, the names of the distributors or retailers who will distribute the Device, the names of the Telecom Operator to which the distributors or retailers may re-distribute, and any other information Google requests.  Such written request can be done via email. Company may not proceed with the development of such Device until Google has granted its prior written consent for each distributor and/or retailer.

> (b)   Company will submit all Device-related information and test reports required for Google's approval to 3PL, as such requirements may be updated by Google from time to time;

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000808386

(c)   Company will notify Google and 3PL via email (or via a website provided by Google) of the Launch no fewer than thirty (30) days before such Launch;

(d)   Company will have a fix for all security vulnerabilities listed in the security bulletins, 60 days and older, posted on http://source.android.com/security unless otherwise approved by Google in writing;

(e)   Company will submit the Device's final software build for the Launch; and

(f)   Company will obtain Google's written approval (which may be by way of email) via 3PL for any subsequent Launches of a Device Model after the Launch of such Device Model, which includes any software changes made to such previously approved Launch, by:

> (i)   notifying 3PL via email (or via a website provided by Google) before each Launch no less than thirty (30) days before such Launch;
>
> (ii)   submitting required test reports to 3PL; and
>
> (iii)   submitting to 3PL the Device's final software build for such Launch.

**4.9   Telecom Operator, Retailer and other Third-Party Customer Restrictions**. Notwithstanding Section 2.2, the placement and distribution obligations contained in Section 4.4 (Placement Requirements) and Section 4.8 (Google Approval and Launch) may conflict with restrictions placed upon Company by its Telecom Operator, retailer or other third-party customers that obtain Devices from Company. If a conflict arises, Company will notify Google in writing, and Google may, in its sole discretion, waive its placement and distribution requirements for that particular build and Device. For the sake of clarity, for any new build or Device intended for a Telecom Operator customer, Company agrees to comply with the Placement Requirements and Google Approval and Launch process.

**4.10 Network Location Provider and Google GNSS Assistance Information**.

(a)   **Network Location Provider.** Company agrees to:

> (i)   turn off Network Location Provider by default;
>
> (ii)   display appropriate prompts to End Users seeking End Users' consent to use Network Location Provider as provided by Google and Company will not prevent the End User from providing consent prior to enabling Network Location Provider or any application making use of Network Location Provider;

GOOG-PLAY-000808387

(iii)   configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices; and

(iv)   enable all features of Network Location Provider, including network-based location resolution, anonymous network location data collection, and reverse-geocoding.

(b)   **Google GNSS Assistance Information.**

(i)   **License of Google GNSS Assistance Information.**  Google grants to Company a non-exclusive, non-sublicensable, worldwide, royalty-free license to use the Google GNSS Assistance Information, as supplied to Company by Google's SUPL server, solely for the purposes of providing location information to either End Users or applications used by End Users on Devices, in accordance with this Agreement.

(ii)   **Google GNSS Assistance Information.**  Each time the Google SUPL server receives a SUPL Request that includes the applicable Location ID and complies with the SUPL protocol, Google will transmit Google GNSS Assistance Information to the requesting SUPL Enabled Terminal.

(iii)   **Re-distribution.**  Company will not re-distribute, transfer, sell, lease, syndicate, sub-syndicate, lend, or use for co-branding, timesharing, service bureau or other unauthorized purposes any Google GNSS Assistance Information, or access to any Google GNSS Assistance Information, without Google's prior written consent.

(iv)   **Technical Requirements of Accessing Google GNSS Assistance.**  Google GNSS Assistance Information is transmitted using the SUPL protocol and secured with SSL.  Company will ensure that every SUPL Enabled Terminal using Google GNSS Assistance (a) provides a mechanism to update the list of root certificates via the SUPL certificate injection interface defined in the Android Open Source Project Hardware Abstraction Layer, and (b) can set up a successful SSL session with Google's SUPL server.

**4.11 Hotwords.**  Company agrees to the following with respect to Hotwords:

(a)   Company may only use the Google Hotword Engine to detect the Google Hotword, and unless the parties mutually agree otherwise in writing, only the Google Hotword can invoke Google Search.  If Company wishes to have its own apps and/or services invoke Google Search, Google must approve in writing.

(b)   Company may implement its own or third party Hotword engine(s) for

Company Hotword or a third party's Hotword(s).  If Company implements its own Hotword engine(s), Company will work with Google to ensure that all Hotword engines and Hotwords are implemented in a compatible manner on a Device and that each performs its function in the manner intended prior to its approval as a Device.

(c)   To the extent Company or a third party uses voice recognition software loaded on the Digital Signal Processor (DSP) of a Device, Google must be given opportunity to gain the same accessibility to End User for Google Hotword Engine.

(d)   Google's Hotword will be equally discoverable and accessible to End User and with the same quality implementation as other Hotwords.

**4.12 <u>Prohibited Behavior</u>.**  No application that Company preloads or has installed on the Device will do any of the following:

(a)   intentionally create, facilitate the creation of, or exploit any security vulnerabilities in an End User's Device.

(b)   interfere with an End User's expected operation and use of the Device.

(c)   engage in an activity that violates any applicable law or regulation.

(d)   contain any viruses, worms, trojan horses, or the like.

(e)   mislead, deceive or otherwise violate the End User's privacy.

## 5.   <u>GENERAL REQUIREMENTS</u>.

**5.1   <u>Payments</u>.**  Unless otherwise agreed in a separate written agreement signed by both parties, the parties will each retain all revenue generated from provision of their respective products or services.  Neither party will be required to account to the other or otherwise make any payment to the other regarding the Google Applications, Google GNSS Assistance Information, Google products or services, the Devices, or any revenue generated therefrom.

**5.2   <u>Reports</u>.**  Within thirty (30) days of the end of each calendar quarter during the Term, Company will provide a written report of the total number of Devices distributed with a Google Application during such calendar quarter (broken out by Territory and Device Model within each Territory).  These reports will be submitted to android-partner-report@google.com.

**5.3   <u>Data Collection and Reporting</u>.**  Each party's applicable privacy and security policies will apply with respect to End User information collected by such party. The parties will provide each other reasonable aggregate information about usage of the Devices during the Term in order to help each party improve End Users' experience with the Device, consistent with each party's privacy policies. Such aggregate information will not include or involve any personally identifiable

information.

**5.4   Points of Contact**.  Company and Google will each appoint a partner manager (the "Partner Manager") who will be the single point of contact for all business and operational activities.  Company will contact 3PL for any issues concerning testing or support services.

**5.5   Support**.  As between the parties, Company is solely responsible for customer care and support of its users (including End Users).  Support for Google Applications may only be provided by Google, and is provided at Google's sole discretion.

**5.6   Export Compliance**.  Company will comply with all applicable export and re-export control laws and regulations, including (i) the Export Administration Regulations ("EAR") maintained by the U.S. Department of Commerce, (ii) trade and economic sanctions maintained by the U.S. Treasury Department's Office of Foreign Assets Control, and (iii) the International Traffic in Arms Regulations ("ITAR") maintained by the U.S. Department of State.

**6.   TERM AND TERMINATION.**

**6.1   Term**.  Unless terminated earlier in accordance with Section 6.2, this Agreement will begin on the Effective Date and continue until the end of the Term.

**6.2   Termination**.

(a)   Either party may suspend performance of its obligations under this Agreement or terminate this Agreement if:

(i)   the other party is in material breach of this Agreement where the breach can be remedied, but the other party fails to remedy that breach within thirty (30) days after written notice of such breach;

(ii)   the other party is in material breach of this Agreement more than twice regardless of whether such breach can be remedied; or

(iii)   the other party ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within ninety (90) days.

(b)   Either party may terminate this Agreement immediately upon written notice upon a breach by the other party of Section 2 (Google Applications), Sections 3.2 and 3.3 (Trademarks), Section 7.1 (Confidentiality), Section 11.2 (Change of Control), or upon any material breach of this Agreement where the breach cannot be remedied.

(c)   In the event that a government or controlling body of any country or Territory in which the Google Applications are distributed or made available imposes any law, restriction, or regulations that (i) makes it illegal to

distribute or make available the Google Applications, or any portion thereof, in or into such country or Territory, or (ii) places a substantial burden on Google (where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment), then Google may suspend at any time the distribution and/or availability of such Google Applications in such country or Territory ("**Special Suspension**").

(d)   Google may terminate this Agreement immediately upon written notice (i) if Company or its Affiliates Asserts an Intellectual Property Right infringement claim based on a Google Application; (ii) if Company or its Affiliates ceases to be a licensee to all the rights of any open source licenses used in Company's implementation of Android; (iii) if Company terminates the Android Compatibility Commitment to which Google and Company are a party; or (iv) at anytime in its sole discretion.

**6.3   Effect of Termination**.  Subject to Section 6.4, on expiration or termination of this Agreement:

(a)   all rights and licenses granted hereunder will immediately cease;

(b)   Company will immediately cease reproducing, offering, or distributing the Google Applications; and

(c)   Company will return or destroy all copies of the Google Applications and any other Confidential Information in its possession which it is aware and to which it has access and is reasonably able to destroy or delete, including from all hard disks and memory.

(d)   Neither party will be liable to the other for any damages resulting solely from termination of this Agreement.

**6.4   Sell-Off Right**.  For a period of thirty (30) days following the end of the Term or termination of this Agreement by Company pursuant to Section 6.2(a) or (b) ("**Sell-Off Period**"), Company may distribute all Google Applications preloaded on the Device inventory  ("**Inventory**") as of the last date of the Term or termination date of this Agreement, as the case may be, and may use the Google Trademarks in accordance with this Agreement in connection with the distribution of such Inventory ("**Sell-Off Right**").  For the sake of clarity, the Sell-Off Right will not apply if this Agreement is suspended or terminated by Google pursuant to Section 6.2 (Termination).

**6.5   Survival**.  The following provisions and any other provisions which under their terms or by implication ought to survive, will survive any termination or expiration of this Agreement: the defined terms in the Information Table; and Sections 1 (Definitions), 2.3 (License Limitations), 2.4 (Delivery), 3 (Intellectual Property & Other Proprietary Rights), 4.3. (Security Update Requirements), 6.5 (Survival), 7.1 (Confidentiality Obligations), 8.3 (Disclaimer), 9 (Limitation of Liability), 10 (Defense

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

of Third-Party Legal Proceedings), and 11 (General).

## 7. **CONFIDENTIALITY AND PR.**

**7.1 Confidentiality Obligations**.  The recipient of any Confidential Information will not disclose such information, except to Affiliates, employees, agents, or professional advisors ("**Delegates**") who need to know it and who have a legal obligation to keep it confidential.  The recipient will use the Confidential Information only to exercise rights and fulfill obligations under this Agreement.  The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations.  The recipient may disclose Confidential Information when required by law after giving reasonable notice to the discloser, if permitted by law.

**7.2 Publicity**.  Neither party may make any public statement regarding this Agreement without the other party's written approval.  Notwithstanding the foregoing, Google and its Affiliates may include Company's Android Compatible Devices and Company's name in presentations, marketing materials, press releases, and customer lists (which includes, without limitation, customer lists posted on Google websites) for marketing purposes. Google may publish Device information uploaded pursuant to Section 4.8(a) and the results of each test report(s) after the applicable Device is Launched.

## 8. **REPRESENTATIONS, WARRANTIES, AND DISCLAIMER.**

**8.1**   Each party represents and warrants that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.

**8.2**   Company represents and warrants that:

(a)   it has and will maintain through the Term all rights, authorizations, and licenses that are required with respect to:

(i)    the Devices;

(ii)   any materials provided by Company to be distributed by Google (including Company's Device builds); and

(iii)   any Company content or services;

(b)   the Devices, materials provided by Company to Google (including Company's Device builds), and Company's content or services, and their use, distribution, sale and license, do and will continue to comply with all applicable foreign, federal, state, and local laws, rules and regulations; and

(c)   any materials provided by Company to be distributed by Google (including Company's Device builds) will comply with all applicable open-

source licensing requirements.

**8.3**  **Disclaimer**.  EXCEPT FOR THE EXPRESS WARRANTIES MADE BY THE PARTIES IN THIS AGREEMENT, THE PARTIES DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT.

## 9.    LIMITATION OF LIABILITY.

**9.1**  In Section 9, "**Liability**" means any liability, whether under contract, tort, or otherwise, including for negligence.

**9.2**  Nothing in this Agreement excludes or limits either party's Liability for

(a)   death or personal injury resulting from its negligence or the negligence of its employees or agents;

(b)   fraud or fraudulent misrepresentation;

(c)   breaches by Company of Section 2 (Google Applications) or Section 3 (Intellectual Property & Other Proprietary Rights);

(d)   breach of Section 7 (Confidentiality and PR); or

(e)   matters for which liability cannot be excluded or limited under applicable law.

**9.3**  Subject to Sections 9.2 and 10.6:  (a) neither party will be liable (under any theory or circumstance) for (i) lost revenues; (ii) indirect, special, incidental or consequential damages (whether or not foreseeable or contemplated by the parties as of the Effective Date); or (iii) exemplary or punitive damages; and (b) neither party's aggregate liability for any claim arising out of or related to this Agreement will exceed $100,000 USD.

**9.4**  Subject to Section 9.2, to the maximum extent permitted by law, each party's exclusive remedy for breaches of this Agreement will be monetary damages, except that either party may seek injunctive relief in connection with breaches or potential breaches of confidentiality under Section 7.1.

**9.5**  **Allocation of Risk**.  The parties agree that (a) the mutual agreements made in this Section 9 reflect a reasonable allocation of risk, and (b) that neither party would enter into this Agreement without these limitations on liability.

## 10.   DEFENSE OF THIRD-PARTY LEGAL PROCEEDINGS.

**10.1 By Google**.  Subject to Section 10.5 (Conditions), Google will defend (at its sole expense), or at its option settle, any Third-Party Legal Proceeding brought against Company after the Effective Date to the extent the Third-Party Legal

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000808393

Proceeding arises from:

(a)   a breach of Google's representations and warranties; or

(b)   any claim that use of (i) Google Applications on Devices shipped by Company in accordance with this Agreement and during the Term, or (ii) Google Trademarks used by Company in accordance with this Agreement and during the Term infringes any copyright, trade secret or trademark of the third party bringing the Third-Party Legal Proceeding against Company.

**10.2 Exceptions**.  Google will have no obligations or liability under Section 10.1 arising from:

(a)   Company's breach of this Agreement;

(b)   modifications of the Google Applications or the Google Trademarks by anyone other than Google;

(c)   combination of the Google Applications or the Google Trademarks with any other materials;

(d)   failure to use the most current, supported version of the Google Applications or Google Trademarks provided under this Agreement;

(e)   Android or any third party products distributed through Google Play;

(f)   causes of action that arise outside the Term of this Agreement; or

(g)   lawsuits or proceedings related to a Third-Party Legal Proceeding brought against Company prior to the Effective Date.

**10.3 Reservation of Rights**.  Google, in its sole and reasonable discretion, reserves the right to terminate Company's continued distribution of or access to the Google Applications or the Google Trademarks which are alleged or believed by Google to infringe the rights of a third party.

**10.4 By Company**.  Subject to Section 10.5 (Conditions) Company will defend (at its sole expense), or at its option settle, any Third-Party Legal Proceeding brought against Google after the Effective Date to the extent the Third-Party Legal Proceeding arises from:

(a)   a breach of Company's representations and warranties;

(b)   Company's or any third party's improper or unauthorized replication, packaging, marketing, distribution, or installation of the Google Applications, including without limitation claims based on representations, warranties, or misrepresentations made by Company;

(c)   any breach or claimed breach of Sections 2.3 (License Limitations) or

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000808394

4.2 (Geo-Availability of Google Applications);

(d)   any claim related to Company's or any third party's advertising, marketing or promotion of any Devices;

(e)   any claim that any Device (or application installed on a Device other than the Google Applications), or any Company Trademark infringes any Intellectual Property Right; or

(f)   any claim arising from an End User's use of any Device (or application installed on a Device other than the Google Applications), including any actions or claims in product liability, tort, contract or equity.

**10.5** **Conditions**.  The provisions in this Section 10 are conditioned on the following:

(a)   The party seeking defense of a Third-Party Legal Proceeding (the "Defended Party") must promptly notify the other party (the "Defending Party") of the Third-Party Legal Proceeding and cooperate reasonably with the Defending Party to resolve the Third-Party Legal Proceeding.  If a breach of this Subsection (a) prejudices the defense of the Third-Party Legal Proceeding, the Defending Party's obligations under this Section 10 will be reduced in proportion to the prejudice.

(b)   The Defended Party must tender sole control of the Third-Party Legal Proceeding to the Defending Party who then has full control and authority over the defense, including selection of controlling counsel, except that:

(i)    the Defended Party must deliver a written tender notice in accordance with Section 11.1 (Notices) of this Agreement;

(ii)    any settlement requiring the Defended Party to admit liability, pay money, or take (or refrain from taking) any action, will require the Defended Party's prior written consent;

(iii)   the Defended Party may object to the Defending Party's choice of controlling counsel on the basis of any then-existing conflict of interest that cannot be waived under applicable rules of professional responsibility; and

(iv)   the Defended Party may appoint its own non-controlling counsel at its own expense.

**10.6** **Sole Rights and Obligations**.  THE PROVISIONS OF THIS SECTION 10 STATE THE PARTIES' ONLY RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT FOR A VIOLATION OF A THIRD PARTY'S INTELLECTUAL PROPERTY RIGHTS.  The provisions of this Section 10 do not include any obligation or liability for a Defending Party to pay any awards, costs, or damages

GOOG-PLAY-000808395

awarded by any applicable court, tribunal or governmental body against a Defended Party.  The obligations and liabilities under this Section 10 are not subject to the limitation of liability in Section 9.3.

11. **GENERAL.**

**11.1 Notices**.  All notices of termination or breach must be in English, in writing and addressed to the other party's Legal Department.  The address for notices to Google Legal Department is legal-notices@google.com. All other notices must be in English, in writing and addressed to the other party's primary contact.  Notice will be treated as given on receipt, as verified by written or automated receipt or by electronic log (as applicable).

**11.2 Assignment**.  Neither party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where: (a) the assignee agrees in writing to be bound by the terms of this Agreement; (b) the assigning party remains liable for obligations under this Agreement if the assignee defaults on them; and (c) the assigning party has notified the other party of the assignment.  Any other attempt to assign is void.

**11.3 Change of Control**.  During the Term, if a party experiences a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction): (a) that party will give written notice to the other party within 30 days after the change of control; and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 days after it receives that written notice.

**11.4 Subcontracting**.  Either party may subcontract any of its obligations under this Agreement but will remain liable for all subcontracted obligations and its subcontractors' acts or omissions.

**11.5 Force Majeure**.  Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

**11.6 No Waiver.**  Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

**11.7 No Agency.**  This Agreement does not create any agency, partnership or joint venture between the parties.

**11.8 No Third Party Beneficiaries**.  This Agreement does not confer any benefits on any third party unless it expressly states that it does.

**11.9 Counterparts**.  The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

**11.10 Amendments**.  Any amendment must be in writing, signed by both parties,

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

and expressly state that it is amending this Agreement.

**11.11 <u>Entire Agreement</u>.**  This Agreement states all terms agreed between the parties and supersedes all other agreements between the parties relating to its subject matter.  In entering into this Agreement, neither party has relied on, and neither party will have any right or remedy based on, any representation or warranty (whether made negligently or innocently), except those expressly stated in this Agreement.

**11.12 <u>Severability</u>.**  If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of this Agreement will continue in force unaffected.

**11.13 Governing Law**. This Agreement is governed by California law, excluding California's choice of law rules.  All claims arising out of or relating to the subject matter of this Agreement will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and the parties consent to personal jurisdiction in those courts.

## EXHIBIT A

LEX L11

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

# FILE UNDER SEAL

# Exhibit A16
# to
# C. Cramer Declaration

# REDACTED VERSION

# Exhibit A17
# to
# C. Cramer Declaration

# EXHIBIT 25



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000292207.R

Winning with users and developers . . .

- We operate in a crowded marketplace where **users and developers have many alternatives**
- Users and developers **make choices every day** among these alternatives
- Some alternative offers are very compelling for **specific user and developer segments** (and these segments vary in value to Google)
- It is challenging -- especially across our large organization -- to **make decisions about where / when / how to react**, if at all
- But, growing our business requires **evolving the Google Play value proposition compared to alternative offers**, and we need to do it systematically

Google

Confidential + Proprietary





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000292210.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Another consideration: How many users and developers are actually choosing Google Play vs. going with the default product with the largest Android device footprint?

GOOG-PLAY-000292213.R



CASE STUDY
## In Japan, this focus is working well for Amazon

**Amazon App Store Revenue, Japan** *(estimated)*

- Amazon App Store has **20 of the top 100 Play game titles** in Japan (including Monsterstrike)
- Approximately 5 - 10% of HVUs (for these titles) have migrated to Amazon
- Estimate Amazon ARR = ███, or ██ of Play
- Potential for Amazon to more than double this if it can:
  - Expand coverage to 25 of the top 100 Play game titels in Japan
  - Migrate 15% of HVUs

Google



No alternative is mimicking Google Play exactly. They all have some focus. Implication: All of these alternatives can grow (have grown) and can continue without bumping into one another. They can each pursue an area of focus that is unique and put pressure on Play to follow. The challenge is that Google Play's activity system doesn't lend itself well to following each and every alternative offer at the same time. Very difficult to be the "everything to everyone" store and win with all users and all developers!

Each alternative here:
Knows which users are most important
Can target them effectively
Innovates and responds to user needs quickly

For the "implications" column: It's not that Google is slow and lacks agility. We do have those things (though I'm sure they could be improved). It's that we are trying to do these things in the confines our our existing activity system, which does not lend itself to doing all of these things at once in the exact same way as each alternative player.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000292215.R



iOS
Apps & Games BD tracking iOS gap and incorporating into OKRs
Pixel

JP/KR
Dragonball (?)
Speed bump
Engagement with top developers e.g., ████████████████████
███████████ to ensure Play prioritized for new titles
Tentpole campaigns around key titles not released on 3rd party stores e.g., █████
Multiple cashback campaigns to counter 3rd party store discounts
Search revenue sharing discussions with carriers
Considering user loyalty program
Considering developer loyalty program

9Apps / sideloading
P2P
Cache & Sync
Sideloaded IAP blocking
Build for Billions program
Asked 9Apps to de-list scraped Google apps from store

What we didn't do
Match 3P store discounts
Ask developers to delist from 3P stores, pay for content exclusivity (e.g., offer developers

GOOG-PLAY-000292216.R

preferential revenue share etc.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Not a comprehensive recommendation, but a way to get started.

This is not just an analytical exercise. Yes, we can improve our focus on long-term trends and try to predict what's coming, but it's very difficult to do and that work alone doesn't motivate action. It certainly doesn't help if I recommend we track everything so that, once something hits our radar, I then ask everyone to react to it in all possible ways. (An overstatement, but that's the concern.)

Consistent, Considered, continuous - better prepared and planning. Everything feels reactive and therefore urgent.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Understanding user and developer choice in 2018 means all teams have to behave differently*

Considering user and developer alternatives to Google Play should be a *reflexive part of all activities*, from product development through to marketing and measurement

- **Growth Strategy.** Which segments of users are more important to Play this year? Next year?
- **Product Launch.** How does the new feature compare to alternatives (vs. just Play)?
- **Engineering / Design.** What (technical) constraints do we have compared to alternative products? Should we address them?
- **User Research.** What are the stated reasons users choose alternatives over Play?
- **Experimentation.** How can I test the way Play performs vs. alternatives?
- **Product Positioning.** What frame-of-reference should users have when thinking about Play?
- **Campaign Design + Messaging.** What do I want users to compare Play to?
- **Financial Planning.** What assumptions should I make about use of alternative products?

\* This is not (and should not be) a research reporting exercise. It's *"Winning with Users and Developers,"* and not *"Reading Reports About 3P App Stores"*

12

Google

Confidential + Proprietary



GOOG-PLAY-000292220.R

- **We want Apps store alternatives e.g., Amazon JP to be a pillar for planning in 2018 with attention from all x-fn teams**, because:

  ○ Competition is increasing, Amazon in JP is a great illustration of the severity of new threats we face

  ○ Our current approach to competitive challenges is reactive, ad-hoc and has a real opportunity cost

  ○ For discussion: proposed changes to help us respond better to competitive threats

14

Google

Confidential + Proprietary



There are many different types of competition -- horizontally and vertically -- that compete for engagement (and spend) for Android / Google users

We typically think about just 3P OTT app stores and that is where we will focus the discussion today. But there are many other services delivering part of Google Play value proposition, from WebAPKs to Xiaomi to FB Messenger to WeChat

Key takeaway - there really is a lot out there to track and understand. Many people in the room have spent time thinking about these players over the course of the past year on different, perhaps ad hoc projects.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000292222.R



Why are these competitors having so much success against us? Is it a passing trend or something that will continue?

Would argue that our competitors have evolved. Rather than competing across the spectrum they are targeting small but meaningful / valuable segments of the population.

This isn't a fair fight, it is much too easy for them to attack and much too hard for us to defend. We should expect these "focused micro-competitors" are the new normal



COMPETITION IS INCREASING

## Competition is increasing - 3 examples you all know …

|  | 9Apps | OneStore | Amazon |
|---|---|---|---|
| **Launched / first encountered** | • 2014 - 2016 | • July 2016 | • Late 2016 / early 2017 |
| **Current traction** | • 7M MAU globally[1],<br>• 60M monthly installs (50M from IN, ▮ of IN Play installs) | • ~3M MAU in KR[2]<br>• Carries 32 of Play top 100 games<br>• ▮▮▮ of Play KR revenue | • 12-13M MAU globally, ~10M in US alone[3]<br>• Carries 20 of Play top 100 games in JP, 34 in US<br>• $25M revenue in JP (▮ of Play JP rev)[4] |

Excludes lots of other alternatives: game streaming (e.g., PS Now), web based alternatives (e.g., Facebook HTML5 gaming, Yahoo JP's Game Plus) that aren't "apps stores" in the traditional sense

17

Google

Confidential + Proprietary

GOOG-PLAY-000292224.R

COMPETITION IS INCREASING

## ... of these Amazon JP is the most severe threat we have encountered to date

|  | What Amazon is doing to gain traction? | Why this keeps us up at night? |
|---|---|---|
| **Developers** | • Amazon offering range of x-Amazon incentives (leveraging Twitch, AWS etc.) in exchange for publishing on Amazon app store including: <br> ○ Preferred rev-share (75%) <br> ○ Large coin-back campaign at launch <br> ○ Sponsorship for eSports' event | • Our business is very fragile - with high user (████ of revenue from HVUs) and developer concentration (xx% of revenue from top 10 devs) <br><br> • Amazon strategy is built on attacking this concentration directly - they are focused on attracting titles with high % of HVU spend and migrating the HVUs to Amazon apk |
| **Users** | • Amazon incentivizes buyers through discounts of up to 30%+ on in app purchases <br> ○ 15% Amazon coin discounts (evergreen) <br> ○ Coin-back campaigns for IAP (occasionally) | • Amazon ambition is to become a central developer hub: helping developers build, distribute & monetize all through Amazon |

SOURCE: Amazon App Store Financial Risk Assessment (Jun 2017); Amazon JP response plan (May 2017)

18

Google

Confidential + Proprietary

GOOG-PLAY-000292225.R



So if we take a specific example - Amazon JP. What do we offer? What does Amazon offer?

If we were honest we would admit that most users and developers aren't consciously "choosing" they are going with the default. If they really had to choose, how would they do that and would they choose us?

GOOG-PLAY-000292226.R



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Id | Date | Text |
|---|---|---|
| 1 | 07/31/2017 14:43:15 | Ash -- Maybe there's a simpler way we can show this? This slide is only going to be on screen for a minute, and it's a lot of text, $, #s, and scenarios to parse without losing the audience's attention. |
| | | ████l@google.com |

Google

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000292228.R

OUR CURRENT APPROACH

## Our current approach to competitive challenges is reactive, ad-hoc and has a real opportunity cost

**Our approach to competitive threats so far has been:**

- **Reactive** - see threats only when they are generally quite large already

- **Extreme** - we either ignore the threat or treat it like an existential threat with nothing in the middle

- **Ad hoc** - no systematic way to assess severity of (or stack rank) competitive threats

- **Superficial** - our response typically is limited to developer and consumer offers (promo, cashback etc.) and penalties, not fundamentally rethinking how we build product, communicate to our users etc.

- **Silo'ed** - haven't really engaged with our PAs that often are facing similar challenges

**Cost of this approach**

- Super Mario Run

- Lineage II

- <need inputs from Sarin>???

Google

Confidential + Proprietary

GOOG-PLAY-000292229.R

PROPOSALS FOR DISCUSSION

For discussion: proposed changes to help us respond better to competitive threats

**Goals**

- Increase visibility into competition, add structure to our assessment of competitive threats

- Drive proactive, strategic x-fn response to competition

**Proposals**

- Quarterly competitor review in PBF (review severity, trajectory of top competitive threats, see proposal here)

- Make competitive consideration part of big projects e.g., Product steering, marketing reviews etc. to consider how new features / launches address competition

Can build on these goals & proposals if we want App store alternatives to be a 2018 planning theme

33

Google

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# REDACTED VERSION

# Exhibit A18
# to
# C. Cramer Declaration

# EXHIBIT 26



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000832471



NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000832472

thanks!

NON-PARTY HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

GOOG-PLAY-000832473