# REDACTED VERSION

# Exhibit A32
# to
# C. Cramer Declaration

# EXHIBIT 47



CONFIDENTIAL

GOOG-PLAY-001449339

On Mon, Nov 25, 2013 at 11:09 PM, Lan Roche <lanroche@google.com> wrote:
Hey Michael,

I think that the extent of the conversation that I am aware of is that Samsung reached out to John L. with this proposal at a high level and he passed it along to Jamie / Hiroshi for a temperature check.  Our leadership was luke warm on it (I think we all are ;-)) but we need to give this proposal one good run through and see if we should recommend our leadership reconsider in some form.  I am not sure if there is any other context for this.  Samsung is very eager to understand if we are willing to consider anything.

Thanks,
Lan

On Mon, Nov 25, 2013 at 11:22 AM, Paul Gennai <pgennai@google.com> wrote:
I haven't heard of any conversations having happened around this.

On Mon, Nov 25, 2013 at 10:56 AM, Michael Siliski <msiliski@google.com> wrote:
Paul, do you know where these conversations are at? I haven't had any conversations since the last discussion with Jamie, but if you have any updates can you pass them along?

Lan, happy to chat once I catch up on context.

On Mon, Nov 25, 2013 at 9:59 AM, Lan Roche <lanroche@google.com> wrote:
Thanks Michael.  Have you seen these exact proposals before?

I would like to run through each one quickly with you to see if these proposals are (1) something we would never do (2) something we would consider doing if Samsung makes it worth our while or (3) something we will probably do on our own at some point.

Can we sit down for a short time between Thanksgiving and New Years.  I need to get a feel for if there is any traction here.

Thanks,
Lan

On Mon, Nov 25, 2013 at 8:15 AM, Michael Siliski <msiliski@google.com> wrote:
Hi Lan,

I've talked this over with Jamie a while ago, so I believe he has all my feedback. Completely agree this is a really important area and if we could arrive at an agreement it'd be a big opportunity. I don't think I have anything new to share since that initial discussion though.

On Sun, Nov 24, 2013 at 9:42 PM, Lan Roche <lanroche@google.com> wrote:
Hey Michael,

As you know, Samsung's duplication of our services on Android is one of the critical issues with the partnership right now.  Samsung Apps relative to Google Play is one of the most glaring.  Samsung has reached out and in effect made a proposal on the features they would



CONFIDENTIAL

I have the smart switch deck.


Thanks,

Lan

---------- Forwarded message ----------
From: **Praveen Timmashetty - SISA** <praveen1.t@samsung.com>
Date: Thu, Nov 21, 2013 at 10:52 AM
Subject: RE: Invitation: Samsung Google Review @ Thu Nov 21, 2013 12:30pm - 1:20pm (lanroche@google.com)
To: "lanroche@google.com" <lanroche@google.com>, Eric Kim - SISA <ericcho.kim@samsung.com>

Let's use the attached document for discussion.



**Praveen Timmashetty**

**Product Manager, Emerging Products**

Media Solutions Center America (MSCA)

2665 N. First Street San Jose, CA 95134

Mobile: 408.799.8337 Email: praveen1.t@sisa.samsung.com




-----Original Appointment-----
**From:** lanroche@google.com [mailto:lanroche@google.com]
**Sent:** Thursday, November 14, 2013 11:19 AM
**To:** lanroche@google.com; Eric Kim - SISA; MTV-44-1-Durban (18) GVC; Praveen Timmashetty - SISA
**Subject:** Invitation: Samsung Google Review @ Thu Nov 21, 2013 12:30pm - 1:20pm (lanroche@google.com)
**When:** Thursday, November 21, 2013 12:30 PM-1:20 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** MTV-44-1-Durban (18) GVC




more details »

**Samsung Google Review**

Address 1625 Charleston Rd. Mountain View CA 94043

Agenda:

GOOG-PLAY-001449342



CONFIDENTIAL

GOOG-PLAY-001449343



CONFIDENTIAL

GOOG-PLAY-001449344

# FILE UNDER SEAL

# Exhibit A33
# to
# C. Cramer Declaration

# FILE UNDER SEAL

# Exhibit A34
# to
# C. Cramer Declaration

# REDACTED VERSION

# Exhibit A35
# to
# C. Cramer Declaration

# EXHIBIT 50



CONFIDENTIAL

GOOG-PLAY-000860818



CONFIDENTIAL

GOOG-PLAY-000860819



CONFIDENTIAL

ADDITIONAL CONTEXT ONLY FOR FYI – DO NOT EXPECT THIS TO COME UP IN THE MEETING



CONFIDENTIAL                                                    GOOG-PLAY-000860821



CONFIDENTIAL                                                                    GOOG-PLAY-000860822



CONFIDENTIAL

GOOG-PLAY-000860823



CONFIDENTIAL                                                            GOOG-PLAY-000860824

# FILE UNDER SEAL

# Exhibit A36
# to
# C. Cramer Declaration

# FILE UNDER SEAL

# Exhibit A37
# to
# C. Cramer Declaration

# REDACTED VERSION

# Exhibit A38
# to
# C. Cramer Declaration

# EXHIBIT 54

Message
_____

**From:**     Eric Chu [       @google.com]
**Sent:**     7/13/2010 6:54:36 AM
**To:**       Andy Rubin [       @google.com]
**CC:**       Maarten Hooft [       @google.com]; Hiroshi Lockheimer [       @google.com]
**Subject:**  Re:   Gaming Status Update - Guidance Requested


Hi Andy,

Below are the key bullets we came up with.  Please let us know what you think.  If you agree these are the right points, what are your thoughts on how/when these points should be communicated to ▮

Thanks
Eric

- Google and ▮ will work together to identify an appropriate launch device for our joint initiative.  We should target middle of 2011 (back to school).

- Google and ▮ will jointly develop and maintain ▮ as the primary game platform that will bridge portable and mobile gaming.

  o     ▮ must take over development and maintenance of ▮ with Google.  No further *lead* involvement from ▮

  o     ▮ needs to be included in ▮ either as part of the first launch of ▮ or a subsequent update (which will be at an agreed upon time).

  o     ▮ and Google will together encourage developers to bring their games to Z for portability between Android and ▮

  o     ▮ should not introduce a 4th platform, ▮, to confuse developers.  ▮ and/or Google may choose to support Unity or other companies to provide tools that enable games portability across Android, PSP2, iOS, or other mobile platforms.

- ▮ needs to work with Google to construct a business model that will be acceptable to carriers

  o     Google is willing to honor the ▮ revenue share for the first 90 days of new games.  Afterwards, Android Market normal revenue share applies.

  o     ▮ revenue share to developers must be consistent and no more than the standard 70% Google provides currently.

  o     Games can only be exclusive to ▮ for the first 90 days.

- ▮ needs to commit to a mutually agreed 1 year pipeline of sufficient number of tier-1 ▮ native ▮ quality titles and ▮ titles.  This includes a sufficient number of mutually agreed upon anchor ▮ native and ▮ launch titles with the availability of the first device.

- ▮ launch of ▮ 1st and 2nd party titles on Android must be no later than launches on other mobile devices or platforms.

- ▮ needs to commit to XX amount of marketing spend to promote games in ▮ on Android Market in the first year.




Andy Rubin wrote:

Agree, but you were more wishy-washy than we can be :-)

Cancel ██ for good.

Go back to ██ and ask them:

1) Given the ██ is canceled, here are the business terms we must address in order to get █ gaming into Android
2) If the solution includes ████████ ██ can't be the supplier

Why don;t you write me the list of 5 or so bullet points you want for ██ and we'll agree before moving forward.


On Mon, Jul 12, 2010 at 1:37 PM, Eric Chu ████████ @google.com> wrote:

Hiroshi, Maarten, Jennie, and I talked and we're all in agreement with the following:

Combination of the issues listed below, ██ not being able to deliver devices, & lack of time to fix these problems make this project not feasible at this point.

Assuming ██ management still can't make you feel comfortable with their ability to deliver devices tomorrow, we should cancel the ██ device project.

Since working with ██ still has value with the right deal, we should let them know that we can't launch this year due to ██. Let them know our terms on the business side to make this interesting beyond ██. If they can meet our terms, we should work with them to find another device to launch gaming next year.

In the meanwhile, we should double down on Stingray and get game developers on what we have today..

If you're in agreement with this direction, we need to work out details on how/when we'll communicate this to ██ and ██. I presume we'll leverage ██ inability to deliver devices to start the conversation.

Please let Hiroshi, Maarten, & I know how you want us to proceed.

Thanks
Eric



Andy Rubin wrote:

This doesn't look good.

What is the team's consensus?  Should we cancel the project?



On Mon, Jul 12, 2010 at 11:05 AM, Eric Chu ████████ @google.com> wrote:

Hi Andy,

                                                      GOOG-PLAY-005566486

We met with ███ Thursday and Friday to make progress on ███

It is becoming clear is that while ███



Current model will
hurt the adoption of Android Market by carriers and lock valuable games to
███

In addition, due to ███

For example, in
order to lock down the list of ███ titles, it involves ███

Below are the details.  We need your guidance to nail down our positions.
We also need your help to emphasize our positions to ███ senior management
to drive them to move much faster than they have been.  I continue to think
there's significant value for us from an Android/██ partnership but I do
think a few of these key terms need to be adjusted...

Thanks
Eric


██████████ Strategy

Ownership & Evolution



Having a core part of Android controlled by an OEM long term will be a
challenge.  If not structured correctly, this will slow us down and make
other OEMs uncomfortable with having one of their competitor control a part
of Android.  Z either needs to be developed privately by Google and ██ or
structured as something similar to Webkit.  Either way, we need to increase
our staffing and influence/control the development of Z...



It is clear that nothing has changed from what they shared with us 1 month
ago at the details level. ███████████████████



We either need to get
Sony to commit to include ▮▮▮▮ into ▮▮▮ or we need ▮▮▮ to commit to
create porting tools to make it easy for developers to port their games
written natively to ▮▮ or ▮▮▮ to the other system.

▮▮▮▮▮▮▮▮▮▮ Business Direction

Wall Garden

To make this work, I believe there are 2 paths:

▮▮▮ expiration for exclusivity and ▮▮▮ revenue share.  This will enable
▮▮ to harvest most of the economic benefits of new titles while giving
carriers some way of monetizing these games.
Give Google/OEM the ability to not include ▮▮▮▮▮▮▮▮▮▮▮ is a carrier
say no....

Games Pipeline

It seems that ▮▮▮ is serious about wanting to bring great titles to the

project.  We need your help to send a strong message to ▮▮▮ senior
management on the importance of this and we need to include this in the
contract.

GOOG-PLAY-005566489

# REDACTED VERSION

# Exhibit A39
# to
# C. Cramer Declaration

# EXHIBIT 55

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4    ----------------------------------------------x
 5   IN RE GOOGLE PLAY STORE            Case No.
     ANTITRUST LITIGATION               3:21-md-02981-JD
 6
 7   THIS DOCUMENT RELATES TO:
 8   Epic Games Inc. v. Google LLC, et al.,
     Case No: 3:20-cv-05671-JD
 9
     In re Google Play Consumer
10   Antitrust Litigation,
     Case No: 3:20-cv-05761-JD
11
     In re Google Play Developer
12   Antitrust Litigation,
     Case No: 3:20-cv-05792-JD
13
14   State of Utah, et al.,
     v. Google LLC, et al.,
15   Case No: 3:21-cv-05227-JD
16   ----------------------------------------------x
17       *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
18
19              VIDEOTAPED DEPOSITION OF
20                   PAUL BANKHEAD
21              Thursday, May 12, 2022
22                    Volume 2
23
24   Reported By: Lynne Ledanois, CSR 6811
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 223

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4    -----------------------------------------------x

5    IN RE GOOGLE PLAY STORE              Case No.

     ANTITRUST LITIGATION                 3:21-md-02981-JD

6

7    THIS DOCUMENT RELATES TO:

8    Epic Games Inc. v. Google LLC, et al.,

     Case No: 3:20-cv-05671-JD

9

     In re Google Play Consumer

10   Antitrust Litigation,

     Case No: 3:20-cv-05761-JD

11

     In re Google Play Developer

12   Antitrust Litigation,

     Case No: 3:20-cv-05792-JD

13

14   State of Utah, et al.,

     v. Google LLC, et al.,

15   Case No: 3:21-cv-05227-JD

16   -----------------------------------------------x

17

18            Videotaped deposition of PAUL BANKHEAD,

19   taken at MORGAN LEWIS & BOCKIUS, 1400 Page Mill

20   Road, Palo Alto, California, commencing at 9:01

21   a.m., on Thursday, May 12, 2022, before Lynne

22   Ledanois, Certified Shorthand Reporter No. 6811.

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 224

1                    APPEARANCES

2    Counsel for Plaintiff Epic Games, Inc. in:

3    Epic Games, Inc. v Google LLC, et al:

4                 CRAVATH, SWAINE & MOORE LLP

5                 BY: YONATAN EVEN

6                     ELIZABETH SHEREFF

7                 Attorneys at Law

8                 825 Eighth Avenue

9                 New York, New York 10019

10                 yeven@cravath.com

11                 eshereff@cravath.com

12

13   Counsel for the Proposed Class In re: Google

14   Play Developer Antitrust Litigation and Pure

15   Sweat Basketball, Inc:

16                 HAGENS BERMAN SOBOL SHAPIRO LLP

17                 BY: TED WOJCIK

18                 Attorney at Law

19                 1301 Second Avenue

20                 Suite 2000

21                 Seattle, Washington 98101

22                 tedw@hbsslaw.com

23

24

25   ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 225

1                    APPEARANCES

2

3    Counsel for the Consumer Plaintiffs In re:

4    Google Play Consumer Antitrust Litigation:

5              KAPLAN FOX & KILSHEIMER LLP

6              BY: HAE SUNG NAM

7                  AARON SCHWARTZ

8              Attorneys at Law

9              850 Third Avenue

10             New York, New York 10022

11             hnam@kaplanfox.com

12             aschwartz@kaplanfox.com

13

14   Counsel for Google LLC, et al:

15             MUNGER TOLLES & OLSON LLP

16             BY: JONATHAN KRAVIS

17                 DANE P. SHIKMAN

18             Attorneys at Law

19             601 Massachusetts Avenue NW

20             Suite 500E

21             Washington, DC 20001

22             jonathan.kravis@mto.com

23             dane.shikman@mto.com

24

25   ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                         Page 226
 1                    APPEARANCES

 2

 3    Counsel for District of Columbia:

 4              OFFICE OF THE ATTORNEY GENERAL

 5              BY: ADAM GITLIN

 6              Attorney at Law

 7              400 6th Street, NW

 8              Suite 10100

 9              Washington, DC 20001

10              adam.gitlin@dc.gov

11

12    Counsel for State of Utah:

13               LIEFF CABRASER HEIMANN & BERNSTEIN LLP

14               BY: BRENDAN GLACKIN

15               275 Battery Street

16               29th Floor

17               San Francisco

18               bglackin@agutah.gov

19

20    ALSO PRESENT:

21    Kevin McMahon, Videographer

22

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 232

1   Veritext; I'm the videographer.  The court reporter

2   is Lynne Fred the firm Veritext.

3            I'm not related to any party in this

4   action, nor am I financially interested in the

5   outcome.

6            Counsel have already stated their

7   appearances in Volume 1.  If there are any

8   objections, please state them.

9            The court reporter may now administer the

10  oath.

11           THE REPORTER:  The witness was previously

12  sworn.  Go ahead, counsel.

13

14                   PAUL BANKHEAD,

15   having been previously sworn, testified as follows:

16  _____

17                    EXAMINATION

18  BY MR. EVEN:

19       Q    Good morning, Mr. Bankhead.  Thank you for

20  joining us again.

21           Are you ready to proceed with the

22  deposition?

23       A    Yes.

24       Q    And you understand you're still under

25  oath?

Page 233

1      A    Yes.

2      Q    A couple of housekeeping issues, one is

3  you mentioned yesterday that you knew that Mr. Samat

4  and Mr. Rosenberg were deposed in this case;

5  correct?

6      A    Yes.

7      Q    And you mentioned that you knew that

8  because you asked counsel about that; right?

9      A    Yes.

10     Q    What prompted you to ask counsel about

11  Mr. Samat and Mr. Rosenberg specifically?

12          MR. KRAVIS:  Paul, in answering the

13  question, I'll just instruct you not to reveal the

14  content any of communications between you and

15  counsel.

16          THE WITNESS:  Curiosity.

17  BY MR. EVEN:

18     Q    Were you curious about anyone other than

19  Mr. Samat and Mr. Rosenberg?

20     A    No.

21     Q    Why did they stand out in your mind as

22  people who you were curious about?

23     A    I don't know.

24     Q    While you were working at Google, did you

25  use text for business purposes?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 410

1    that came in I believe yesterday.  Subject to that

2    reservation, I pass the witness.

3                 Off the record.

4                 THE VIDEOGRAPHER:  We're going off the

5    record.  The time is 3:31 p.m.

6                 (Recess taken.)

7                 THE VIDEOGRAPHER:  We're back on the

8    record.  The time is 3:33 p.m.

9                 Please proceed.

10                        EXAMINATION

11   BY MR. KRAVIS:

12       Q    Good afternoon, Mr. Bankhead.

13       A    Good afternoon.

14       Q    I'm going to ask you just a few questions

15   now about some of the topics that we've covered over

16   the last few days if that's all right.

17       A    Okay.

18       Q    You understand that you're still under

19   oath; right?

20       A    Correct.

21       Q    I would like to direct your attention now

22   to what has previously been marked as Plaintiff's

23   Exhibit 910.

24            I would like you to turn to the page of

25   Plaintiff's Exhibit 910 that ends with the Bates

Page 411

1    Number 0411 in the bottom corner.

2              Do you see that?

3         A    Yes.

4         Q    About three-quarters of the way down the

5    page, there is an email written by you on

6    August 24th, 2016 at 9:00 a.m.

7              Do you see that?

8         A    Yes.

9         Q    On the first bullet you write, "I think we

10   all agree that it's really bad for the ecosystem and

11   users for FB to start installing 3P APKs."

12             FB, is that Facebook?

13        A    Yes.

14        Q    And 3P, is that third party?

15        A    Yes.

16        Q    What does it mean for Facebook to start

17   installing 3P APKs?

18        A    It means that Facebook, through some

19   technical means, likely through their headless app

20   installer, would install apps at Facebook's discretion

21   on the user's phone without -- just that.

22        Q    And why in your view was that really bad

23   for the ecosystem and users -- actually, let's start

24   with ecosystem.

25             Why in your view was it really bad for the

Page 412

1   ecosystem?

2        A    It would require additional work for

3   developers because they would have to -- in addition

4   to submitting their app to the Play Store for

5   distribution, if they wanted to set up an advertising

6   campaign on Facebook, they would also have to go to

7   the effort of submitting that APK to Facebook, who I

8   do not believe had the infrastructure to do some of

9   the advanced targeting and selection required to make

10  sure that when a user gets an app, that it actually

11  works in their country and on their device.

12            Also, for the ecosystem, it would --

13  because those developers were unlikely to change the

14  package name of their -- they were likely to submit

15  a similar version or the same version as what was

16  submitted on Play, but it could have the same

17  package name or not.

18            And it could end up in a situation where

19  neither Facebook or Google or the other app stores

20  on the device could, upon inspection, understand who

21  had installed this app and, therefore, who should

22  update it and when it should be updated, which could

23  sow confusion.

24        Q    How about users, how would it be really

25  bad for users?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 413

1      A      Users in my opinion would have had a

2   situation where they were much more likely to

3   accidentally install software on their phone given how

4   aggressive Facebook was being with their treatment,

5   which could bloat their device and leave them with a

6   bad experience on their Android device.

7             They could also become confused if app

8   clobbering or app updating between various app

9   stores or packages with app stop permissions took

10  place, they could lose track of what was the status

11  of their app.

12     Q      In the next sentence you write, "The

13  question is how best to structure AlleyOop to

14  motivate FB to avoid going down that path."

15            Now, how was it that AlleyOop would

16  motivate Facebook to avoid installing third-party

17  APKs?

18     A      We felt that we could increase the

19  conversion rate from the ad click to the app install

20  relative to the traditional deep link experience to an

21  extent that Facebook would not -- would see some of

22  the revenue upside of -- that Facebook would have not

23  give up all of the revenue upside associated with

24  doing by themselves relative to the original deep

25  link.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 414

1      Q     The idea was that AlleyOop would be one

2   alternative to Facebook to avoid the practice that

3   you're describing as really bad for the ecosystem

4   and for users.  Is that fair to say?

5      A     Yes.

6            MR. GLACKIN:  Object to form.

7   BY MR. KRAVIS:

8      Q     In the third bullet down here you write,

9   "I think of this as negotiations with a country who

10  wants to go nuclear.  It's bad for the world, so we

11  give them something they want in exchange for

12  slowing or stopping development of their nuclear

13  program."

14           What did you mean by that, this is like

15  negotiations with a country who wants to go nuclear?

16           MR. EVEN:  Objection, form.

17  BY MR. KRAVIS:

18     Q     You can answer.

19     A     What I mean is that in this case, having app

20  install permissions on the device is a very

21  significant power for good and for evil on the device

22  and in general, having that be spread too widely

23  increases user confusion and security risks, which is

24  the bad part of it.

25           In the case of Facebook, I didn't -- I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 415

1    wasn't aware of a business problem that they had

2    that required them to do this and so I felt like we

3    could solve their business problem without giving

4    them -- without them necessarily needing to acquire

5    these, install and update permissions and then

6    everybody theoretically should have been happy.

7         Q    So in this analogy, the nuclear power is

8    the ability to install third-party APKs?

9         A    Yes.

10        Q    On the next page, the next bullet, you

11   write, "AlleyOop is essentially ███████████████

12   ███████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ███████████████████████████████████████████████

15   ██████████████████████████████

16             First of all, when you wrote here

17   "AlleyOop is essentially ████████████████████████

18   ███████████████ did you mean like ██████████████████

19   ███████████████████ or did you mean something else?

20             MR. EVEN:  Objection.

21             THE WITNESS:  Something else.

22   BY MR. KRAVIS:

23        Q    What did you mean?

24        A    What I meant is that ████████████████████

25   ████████████████████████████████████████████████████

1 ██████████████████████████████

2 ██████████████████████████████

3 ██████████████████████████████

4      Q    When you say here, "so they don't fragment

5  the ecosystem," what did you mean by that?

6           What did you mean by "fragment the

7  ecosystem" in this context?

8      A    I meant requiring developers to submit apps

9  to multiple places in order to have app discovery

10 happen on Facebook.  And for users to have to deal

11 with multiple apps on their phone updating other apps

12 in the -- in an inordered manner.

13     Q    In this context in the sense in which you

14 used the term in this email, is fragmenting the

15 ecosystem good for the Android ecosystem or bad for

16 the Android ecosystem or something else?

17          MR. EVEN:  Objection.

18          THE WITNESS:  In this wording,

19 fragmented -- fragmentation would be considered bad

20 for the ecosystem.

21 BY MR. KRAVIS:

22     Q    Why in this context would fragmenting the

23 ecosystem be bad for the Android ecosystem?

24     A    It's more work for Facebook.  It's more work

25 for the developers and more confusion for the users.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 439

1          I, LYNNE M. LEDANOIS, a Certified

2     Shorthand Reporter of the State of California, do

3     hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that a record of the proceedings was made by me

7     using machine shorthand which was thereafter

8     transcribed under my direction; that the foregoing

9     transcript is a true record of the testimony given.

10          Further, that if the foregoing pertains to

11     the original transcript of a deposition in a Federal

12     Case, before completion of the proceedings, review

13     of the transcript [X] was [ ] wasn't requested.

14          I further certify I am neither financially

15     interested in the action nor a relative or employee

16     of any attorney or party to this action.

17          IN WITNESS WHEREOF, I have this date

18     subscribed my name.

19

20     Dated: May 13, 2022.

21

22

23

             _Lynne Marie Ledanois_

24          _____

             LYNNE MARIE LEDANOIS

25          CSR No. 6811

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 442

1    In Re Google Play Store Antitrust Litigation

2    5/12/2022 - Paul Bankhead, V2 (#5122898)

3                    ACKNOWLEDGEMENT OF DEPONENT

4         I, Paul Bankhead, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Paul Bankhead                        Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25

# REDACTED VERSION

# Exhibit A40
# to
# C. Cramer Declaration

# EXHIBIT 56

Google

Play Business Model Thoughts

Attorney client privileged

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000565542.R



| Id | Date | Text |
|---|---|---|
| 1 | 04/19/2019 17:00:34 | or services |



## What is the value for Play customers?

All of the developers who are *out-of-scope* for GPB (Play Billing) receive the benefits of:

1. Play's distribution network across 2.6B Android devices
2. Play Protect
3. Play Console tools (Beta testing,  pre-launch reporting, store listing experiments, etc.)
4. App updates

Apps required to use GPB get the following value:

1. Secure payment platform
2. Access to market-specific FOPs such as DCB, Gift cards
3. New features such as Account Hold, Wolverine, Free Trials etc.
4. Billing customer service

Source: Sam Tolomei deck (LINK)

Value received for free appears to be much larger than value paid for

**PRIVILEGED AND CONFIDENTIAL**

 Google Play

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Id | Date | Text |
|----|------|------|
| 2 | 04/22/2019 05:08:22 | Google Play Billing? |
| 1 | 04/22/2019 05:08:22 | Yup. |

Google Play



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| Id | Date | Text |
|----|------|------|
| 3 | 04/19/2019 17:05:59 | Negative values here are counterintuitive unless they is some netting out going on. |

## Sources of value

Outcomes / Performance based (similar to AdWords)
- Per user bounties (CPA)
- Per install fee
- Per renewal conversion

Services based (similar to Cloud)
- Android services
- Distribution
- App servicing
- Engagement
- Transactions
- Customer service...

 Google Play

## Approaches

Vary rev share / economics, keep model similar

- Based on vertical
- Tiered, based on scale
- Tiered, based on level of service
- Sharebacks
  - ○ Performance based sharebacks
  - ○ Marketing spendbacks

Charge for on something else

- Outcomes
- Services
- Physical goods transactions
- Nothing! (Build a revenue model based on platform-level / Google-wide (ads, etc) benefits.)

 Google Play



GOOG-PLAY-000565551.R



Keep rev share @ 30%

No change

**Pros**
- Consistent, easy
- Aligns with iOS

**Cons**
- No rationale, other than copying Apple
- Already showing as untenable for many apps/games developers
- Only applicable to developers who use in-app digital goods

**Impact**
- ~$2B impact on 2018 consumer spend if we lose any 3 of top 10 devs on GPB
- Impending subscription dev "apocalypse"
  - many devs do not see economics working on Android vs iOS
  - Observe not using GPB

PRIVILEGED AND CONFIDENTIAL

Source: Sam Tolomei deck (LINK)

Google Play

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Performance Based

## App distribution based business model

Charge devs based on app updates/active install base, reflecting value of consumption by devs

| Pros | Cons | Impact* |
|------|------|---------|
| – Revenue no longer focuses on small group of in-app digital good devs <br> – Easy to understand -- "You pay for what you use" <br> – 50% discount vs iOS rev share, aligns with LTV <br> – Renders GPB no longer a focal point | – Introduces dis-incentive for large user bases <br> – Changes economics of existing business models-- heavily penalizes OEMs pre-installed apps <br> – Treats all app updates/installs equally, while user LTV differs by region <br> – Large partners suddenly get a very large bill-- unlikely if they will go along with it | – Google's apps account for 33% of all app updates/active installs, so Google gets a $1.8B bill <br><br> – <br><br> – Economics come out to ~$0.05 per active install |

Source: Sam Tolomei deck (LINK)

**PRIVILEGED AND CONFIDENTIAL**

* Using 2018 revenue from GPB rev share, proportionally allocated based on active device installs/updates
* Does not account for how install was acquired
* Assumes a 6% rev share (breakeven) on in-app digital transactions

Google Play

GOOG-PLAY-000565553.R



| Id | Date | Text |
|----|------|------|
| 1 | 04/08/2019 16:21:56 | this may be a good thing for the ecosystem |

Services Based

## Rev share on all in-app transactions -- physical + digital

Rev share on all in-app commerce, not just digital goods

**Pros**

- Revenue no longer focuses on small group of in-app digital good devs, but focuses on all commerce*
- Provides secure payment solution for ALL transactions
- Generates many new FOPs / NPUs

**Cons**

- Will likely face severe backlash from established commerce players (Amazon, Walmart)
- Internally politically disastrous
- Likely pushes payments to mWeb from in-app
- Provides disincentive to invest in Android vs iOS app
- DCB not permitted for physical goods today

**Impact****

- ~1B new FOPs generated on Android
- Potential for strong new revenue growth due to business

Source: Sam Tolomei deck (LINK)

* Could potentially scope in ads, though would be very very difficult
** Rev share model is very TBD

**PRIVILEGED AND CONFIDENTIAL**

Google Play

| Id | Date | Text |
|----|------|------|
| 4 | 04/22/2019 05:07:00 | DCB = ??? |
| 2 | 04/22/2019 05:07:00 | (Direct Carrier Billing) |

Google Play

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Services Based

## Change to 20% rev share
New rev share is 20%

**Pros**

- Brings Play rev share in-line with upper end of desktop gaming stores
- 50% discount vs iOS rev share, which accounts for lower user LTV on Play vs iOS

**Cons**

- No rationale for 20% vs any other number other than competitive benchmark (link)
- Unclear if 20% retains future Fortnites
- Only applicable to developers who use in-app digital goods

**Impact**

- $2.4B in revenue impact on 2018 consumer spend
- *(likely extreme case, as it does not account for increased volume of purchases at lower rev share)*

**PRIVILEGED AND CONFIDENTIAL**

Source: Sam Tolomei deck (LINK)

Google Play

GOOG-PLAY-000565557.R

Hybrid

## 20% rev share but 1st $100K earned @ 0% rev share

Creates an Indie-dev carve-out to support diverse ecosystem and fledgling startups

| Pros | Cons | Impact |
|---|---|---|
| - Gives Indie creators a break, fighting narrative that small creators will struggle on Play | - May upset larger devs that they get no break (unlike Valve) | - $2.7B in revenue impact on 2018 consumer spend ($240M impact for indie-carve out, $2.4B for overall rev share decrease to 20%) |
| - Brings Play rev share in-line with upper end of desktop gaming stores | - No rationale for 20% vs any other number other than competitive benchmark (link) | - *(likely extreme case, as it does not account for increased volume of purchases at lower rev share)* |
| - 50% discount vs iOS rev share, aligns with LTV | - Unclear if 20% retains future Fortnites | |
| | - Only applicable to developers who use in-app digital goods | |

**PRIVILEGED AND CONFIDENTIAL**

Source: Sam Tolomei deck (LINK)

Google Play

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Hybrid

## FOP usage based transactions
Variable rev share based on FOP selected

**Pros**

- Pay for value you use-- if devs only use credit cards in Western market, we'd account for that
- Clear "pay to play" in regions where DCB & store credit is meaningful
- Showcases power of GPB (DCB is 22% of commerce, Store Credit 13% globally)

**Cons**

- Creates incentive for devs to steer users towards cheaper FOPs
- FOP rev shares not too dissimilar -- 4.5% for CC, ~8% for DCB (10% for gift cards)
- Penalizes devs focused on DCB / emerging markets, as they'd pay higher rates for already lower LTV users
- **Potentially stronger disincentive to pursue NBU**

**Impact\*\***

- *Requires direction on if we are OK with lower revenue*
- Very TBD on how would price margin for FOPs

PRIVILEGED AND CONFIDENTIAL       Source: Sam Tolomei deck (LINK)

Google Play



Outlier

## GPB becomes non-exclusive-- allow 3rd party payments

GPB begins to compete on price/services for business across digital and non-digital goods

**Pros**

- Promotes competition
- Showcases GPB's billing success and global footprint-- DCB and credits are already available
- Provides a native, secure payment solution for physical goods

**Cons**

- Apple could offer a billing alternative on Android
- Likely "race to the bottom" on pricing vs Stripe, competitors
- DCB not an issue for physical goods today

**Impact****

- xxxM New FOPs
- Strong new revenue source, or huge negative impact on revenue, depending on adoption/disintegration

PRIVILEGED AND CONFIDENTIAL

Source: Sam Tolomei deck (LINK)

Google Play

| Id | Date | Text |
|----|------|------|
| 2 | 04/08/2019 16:31:41 | combining this with ala carte for other services could be interesting. |
| | | Drive strict x-action costs very low while looking for other value added services of Play. |

Google Play

## Some links...

- Sam's deck (LINK)
- Paul's brainstorm doc (LINK)
- Mike's model (LINK)
- Old PPS with some ideas (LINK)
- Banyan deck (LINK)

Google

Confidential + Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000565562.R

# EXHIBIT 59

Page 1

1

2  UNITED STATES DISTRICT COURT

3  FOR THE NORTHERN DISTRICT OF CALIFORNIA

4  SAN FRANCISCO DIVISION

5  ---------------------------------------X

6  IN RE GOOGLE PLAY STORE ANTITRUST
   LITIGATION,

7
   Case No. 3:21-md-02981-JD

8
   THIS DOCUMENT RELATES TO:

9

10 Epic Games Inc. v. Google LLC, et al.
   Case No.:  3:20-cv-05671-JD

11
   In re Google Play Consumer Antitrust

12 Litigation
   Case No.:  3:20-cv-05761-JD

13
   In re Google Play Developer Antitrust

14 Litigation
   Case No.:  3:20-cv-05792-JD

15
   State of Utah, et al. v. Google LLC, et al.

16 Case No.:  3:21-cv-05227-JD

17 ---------------------------------------X

18

19          ** HIGHLY CONFIDENTIAL **

20       REMOTE VIDEOTAPED DEPOSITION OF

21                DANIEL EGERTER

22          Thursday, January 20, 2022

23

24 Reported By:

25 Linda J. Greenstein

Page 2

1

2                         January 20, 2022

3                          8:35 A.M. PST

4

5        Highly Confidential Remote Videotaped

6     Deposition of Daniel Egerter, taken by

7     Defendant, before Linda J. Greenstein, a

8     Shorthand Reporter and Notary Public within

9     and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 3

 1

 2     A  P  P  E  A  R  A  N  C  E  S:  (All Via Remote)

 3

 4

 5     PRITZKER LEVINE LAW, L.L.P.
       Attorneys for Consumer Class Plaintiffs and
 6     Witness in Google Play Consumer Antitrust
       Litigation
 7                 1900 Powell Street
                   Suite 450
 8                 Emeryville, California 94608
 9     BY:         ELIZABETH C. PRITZKER, ESQ.
                   ecp@pritzkerlevine.com
10                 415.692.0772
11                    - AND -
12     KAPLAN, FOX & KILSHEIMER, L.L.P.
       Co-Counsel for Consumer Class Plaintiffs in
13     Google Play Consumer Antitrust Litigation
                   850 Third Avenue
14                 New York, New York 10022
15     BY:         KATHLEEN HERKENHOFF, ESQ.
                   212.687.1980
16                 kherkenhoff@kaplanfox.com
17
18     SPERLING & SLATER, P.C.
       Attorneys for Developer Class Plaintiffs
19                 55 West Monroe Street
                   Suite 3200
20                 Chicago, Illinois 60603
21     BY:         MARTIN AMARO, ESQ.
                   312.445.4944
22                 mamaro@sperling-law.com
23

24

25
```

Page 4

```
1
2    A  P  P  E  A  R  A  N  C  E  S:  (Continued)
3
4
5    MUNGER, TOLLES & OLSON, L.L.P.
     Attorneys for the Defendant Google LLC, et
6    al:
              560 Mission Street, 27th Floor
7             San Francisco, California 94105
8    BY:      KYLE W. MACH, ESQ.
              415.512.4044
9             kyle.mach@mto.com
10            NICK R. SIDNEY, ESQ.
              213.683.9265
11            nick.sidney@mto.com
12
13
     OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
14   ANTITRUST LAW SECTION
     Attorneys for State of California
15            455 Golden Gate Avenue
              Suite 11000
16            San Francisco, California 94102
17   BY:      ADAM MILLER, ESQ.
              415.510.3883
18            adam.miller@doj.ca.gov
19
20
21
22   Also Present:
23   Howard Brodsky, Videographer
24   Jake Franks, Veritext Concierge
25
```

Page 8

1          HIGHLY CONFIDENTIAL - DANIEL EGERTER
2                   Will the court reporter please
3          swear in the witness.
4                      DANIEL EGERTER,
5     having been first duly sworn/affirmed, was
6     examined and testified as follows:
7     EXAMINATION BY
8     MR. MACH:
9          Q.    Good morning, sir.  It's a
10    pleasure to meet you.
11                  Can you hear me -- can the
12    witness hear me?
13         A.    Yes.
14         Q.    Could you pronounce your last
15    name for me, please?
16         A.    Egerter.
17         Q.    Egerter; is that right?
18         A.    Yes, Egerter.
19         Q.    Egerter, okay.  I'm going to do
20    my best to get that straight in the course
21    of the day today.  Thank you, sir.
22                  And where do you currently
23    reside?
24         A.    ██████████████████████████████
25    ████████████████████████████████████

```
                                         Page 48
 1      HIGHLY CONFIDENTIAL - DANIEL EGERTER
 2    anything if you win the case?
 3         A.    I -- I haven't heard about
 4    receiving anything for participating in
 5    this case, no.  I don't expect.
 6              MR. MACH:  If we could please
 7         mark as Defense Exhibit 87 the
 8         document that's marked 02 and in the
 9         title it says "Consolidated Second
10         Amended Class Action Complaint."
11              And, Mr. Egerter, you should see
12         that appear in a moment in the "Marked
13         Exhibits" folder.  You'll probably
14         have to refresh.
15                   (Defense Exhibit 87
16         marked for identification, multi-page
17         document, complaint.)
18    BY MR. MACH:
19         Q.    While that's loading, let me ask
20    a preliminary question.
21              Have you seen the complaint that
22    was filed in this case?
23         A.    Yes.
24         Q.    On behalf of the class
25    plaintiffs?
```

```
 1        HIGHLY CONFIDENTIAL - DANIEL EGERTER
 2           A.     Yes.
 3           Q.     And did you review it before it
 4     was --
 5           A.     Yes, yes.  As a layperson.
 6           Q.     Has what's been marked as
 7     Exhibit 87 appeared in your "Marked
 8     Exhibits" folder?
 9           A.     Yeah, it just showed up.
10           Q.     Great.  Would you mind loading
11     that for me?  It may take a moment.
12                  Do you recognize this as the
13     complaint that you reviewed?  You see it
14     was filed on December 20, 2021.
15           A.     It looks like a lot -- a lot of
16     things I've seen.
17                  I'm looking for my signature.
18           Q.     I don't think this is a document
19     you would have signed, sir.  I'll just
20     contribute that.
21                  I'm just asking whether you
22     believe it to be a version of the complaint
23     that you've seen.
24           A.     Quite possibly.  I mean, it's a
25     long -- it's a long document.  I -- I don't
```

```
                                          Page 52
 1       HIGHLY CONFIDENTIAL - DANIEL EGERTER
 2    Google Play Store.
 3         Q.    Okay.  Scroll with me --
 4         A.    Is that referring to a specific
 5    -- specific entity or is it -- or is it a
 6    -- I don't know.  The answer is no.
 7         Q.    Okay.  Could you scroll with me,
 8    please, to paragraph 179.  It's on the page
 9    marked 44 of 80.
10              MS. PRITZKER:  Was that 179?
11              MR. MACH:  It is, counsel.
12         A.    179.  "Through its
13    anticompetitive restrictions."
14              I'm there.
15         Q.    Do you see it says:
16              "Through its anticompetitive
17    restrictions, Google provides developers
18    with no choice but to use Google Play and
19    Google Play Billing for all in-app
20    transactions."
21              Do you see that, sir?
22         A.    Yes.
23         Q.    And what's your understanding
24    for the basis of the originations in
25    paragraph 179?
```

```
                                      Page 53
```

 1        HIGHLY CONFIDENTIAL - DANIEL EGERTER

 2                MS. PRITZKER:   Objection as to

 3        form.

 4        A.    That it -- that it's placing

 5   restrictions on developers, that Google is

 6   placing restrictions on developers that are

 7   anticompetitive.

 8        Q.    Shifting gears a little bit,

 9   were you asked by anyone to search for

10   documents for the purpose of producing them

11   in this litigation?

12        A.    What was the question?

13        Q.    Were you asked by anyone to

14   search for documents so that they could be

15   produced in this litigation?

16        A.    I -- no, no one asked me to

17   search for documents.

18        Q.    Some documents that I --

19        A.    I --

20        Q.    You go ahead.

21        A.    I was asked to produce a list of

22   the apps that I had gotten off of the Play

23   Store.

24        Q.    You have provided some

25   information and also some email in

```
                                        Page 54
```

1    HIGHLY CONFIDENTIAL - DANIEL EGERTER

2    connection with this litigation.

3              Are you aware of that, sir?

4         A.    Yes.

5         Q.    Okay.  And how did you identify

6    -- strike that.

7              How, if you know, were those

8    documents identified for production in this

9    case?

10        A.    My understanding was that my

11   entire digital world was down -- was

12   accessed, and there was a search made for

13   items that you asked to be discovered.

14        Q.    Okay.  And did you conduct that

15   search?

16        A.    No, I did not conduct that

17   search.

18        Q.    Am I correct to assume counsel

19   conducted the search?

20             MS. PRITZKER:  Objection as to

21        form.

22        A.    That is my understanding.  That

23   a firm hired by my counsel that does that

24   sort of thing did it.

25        Q.    And do you know whether that

Page 126

1      HIGHLY CONFIDENTIAL - DANIEL EGERTER

2          Q.    So if you will look with me,

3      please -- I'm having a little bit of a

4      technical glitch here.  Give me a moment.

5                If you look with me, please, at

6      the page that ends in 10, do you see where

7      the AllTrails Pro app is listed there?

8          A.    Yes.

9          Q.    And it looks like you paid 29.99

10     for the AllTrails Pro app through Google

11     Play.

12               Is that correct, sir?

13         A.    Correct.

14         Q.    And you made that purchase in

15     August of 2020; correct?

16         A.    Correct.

17         Q.    When you purchased the AllTrails

18     Pro app, do you remember whether you looked

19     to see whether that product was available

20     for a lower price outside of the app store?

21         A.    I don't think I did.

22         Q.    And what is the AllTrails Pro

23     app?

24         A.    It's an app that you can use for

25     hiking, mountain biking, biking, running.

Page 174

1    GOOGLE PLAY STORE ANTITRUST LITIGATION

2    1/20/2022 - DANIEL EGERTER

3         ACKNOWLEDGEMENT OF DEPONENT

4       I, DANIEL EGERTER, do hereby declare

5    that I have read the foregoing transcript, I

6    have made any corrections, additions, or

7    changes I deemed necessary as noted on the

8    Errata to be appended hereto, and that the same

9    is a true, correct and complete transcript of

10   the testimony given by me.

11

12   _____   _____

13   DANIEL EGERTER                Date

14   *If notary is required

15

16        SUBSCRIBED AND SWORN TO BEFORE ME THIS

17        _____ DAY OF _____, 20___.

18

19

20        _____

21        NOTARY PUBLIC

22

23

24

25

Page 175

2                  C E R T I F I C A T E

4        I, Linda J. Greenstein, Professional

5    Shorthand Reporter and Notary Public in and

6    for the State of New York, do hereby

7    certify that, DANIEL EGERTER, the witness

8    whose deposition is hereinbefore set forth,

9    was duly sworn and that such deposition is

10   a true record of the testimony given by the

11   witness to the best of my skill and

12   ability.

13       I further certify that I am neither

14   related to or employed by any of the

15   parties in or counsel to this action, nor

16   am I financially interested in the outcome

17   of this action.

18       IN WITNESS WHEREOF, I have hereunto set

19   my hand this 21st day of January 2022.

22                   Linda J. Greenstein

24   My commission expires:   January 30, 2025

# REDACTED VERSION

# Exhibit A42
## to
## C. Cramer Declaration

# EXHIBIT 60

HIGHLY CONFIDENTIAL

Page 1

1   UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF CALIFORNIA
3   SAN FRANCISCO DIVISION
4   *******************************
    IN RE GOOGLE PLAY STORE      Case No.
5   ANTITRUST LITIGATION         3:21-md-02981-JD
6
    THIS DOCUMENT RELATES TO:
7
    Epic Games, Inc. v. Google LLC,
8   et al.,
    Case No:  3:20-cv-05671-JD
9
    In re Google Play Consumer
10  Antitrust Litigation,
    Case No:  3:20-cv-05761-JD
11
    In re Google Play Developer
12  Litigation,
    Case No:  3:20-cv-05792-JD
13
    State of Utah, et al., v. Google
14  LLC, et al.,
    Case No:  3:21-cv-05227-JD
15  *******************************
16
17              ** HIGHLY CONFIDENTIAL **
18      REMOTE VIDEO DEPOSITION BY VIRTUAL ZOOM OF
19                 ZACHARY PALMER
20             Friday, January 21, 2022
21                  10:00 a.m.
22
23
24   Reported by:  Judith McGovern Williams

Page 2

1    APPEARANCES (Appearing remotely):

2    MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN

3     Peggy J. Wedgworth, Esquire

4     Michael Acciavatti, Esquire

5     800 S. Gay Street

6     Suite 1100

7     Knoxville, Tennessee  37939

8     866-252-0878

9     pwedgworth@milberg.com

10    macciavatti@milberg.com

11    On behalf of the Consumer Plaintiffs

12    and the witness

13

14   KAPLAN FOX & KILSHEIMER LLP

15    Kathleen Herkenhoff, Esquire

16    1999 Harrison Street

17    Suite 1560

18    Oakland, California  94612

19    415-772-4700

20    kherkenhoff@kaplanfox.com

21    On behalf of the Consumer Plaintiffs

22    and the witness

23

24

HIGHLY CONFIDENTIAL

```
                                            Page 3

 1    REMOTE APPEARANCES (continued):

 2    SPERLING & SLATER P.C.

 3     Barry Frett, Esquire

 4     55 W. Monroe

 5     Suite 3200

 6     Chicago, Illinois  60603

 7     312-641-3200

 8     bfrett@sperling-law.com

 9     On behalf of Proposed Class In re:  Google Play

10     Developer Antitrust Litigation and Pure Sweat

11     Basketball, Inc.

12

13    O'MELVENY & MYERS, LLP

14     Stephen McIntyre, Esquire

15     400 South Hope Street

16     Los Angeles, California  90071

17     213-430-6000

18     smcintyre@omm.com

19    and

20

21

22

23

24
```

HIGHLY CONFIDENTIAL

Page 4

```
 1    REMOTE APPEARANCES (continued):

 2    O'MELVENY & MYERS, LLP

 3      Kendall Collins, Esquire

 4      1625 Eye Street, NW

 5      Washington, DC  20006

 6      202-383-3565

 7      kendallcollins@omm.com

 8      On behalf of Google Defendants

 9

10    OFFICE OF THE ATTORNEY GENERAL

11      Adam Miller, Esquire

12      Deputy Attorney General V

13      Antitrust Law Section

14      455 Golden Gate Avenue, Suite 11000

15      San Francisco, California  94102

16      415-510-4400

17      adam.miller@doj.ca.gov

18      On behalf of the State of California

19

20    Also present:

21      Amelia Schneider, Videographer

22      Paul Rafferty, Concierge

23

24
```

HIGHLY CONFIDENTIAL

Page 10

```
 1        from Kaplan Fox also for the consumer plaintiffs
 2        and the witness.  Thank you.
 3                   MR. FRETT:  Barry Frett from
 4        Sperling & Slater on behalf of the developer
 5        class.
 6                   MR. MILLER:  Adam Miller on behalf of
 7        plaintiff State of California.
 8                   THE WITNESS:  Zack Palmer, witness.
 9                   THE VIDEOGRAPHER:  Will the court
10        reporter please swear in the witness and we can
11        proceed.
12                        - - -
13                   ZACHARY PALMER, first having been
14        satisfactorily identified by the production of
15        his driver's license and duly sworn by the
16        Notary Public, testified under oath as follows
17        in answer to examination by MR. McINTYRE:
18             BY MR. McINTYRE:
19        Q.    Good morning, sir.  Can you please state
20     your name for the record?
21        A.    Zachary Palmer.
22        Q.    And what is your date of birth?
23        A.    ███████
24        Q.    ████████████████
```

HIGHLY CONFIDENTIAL

1      Q.     Have you spoken with any of them?

2      A.     I have not.

3      Q.     Have you had any communication with any of

4   the other plaintiffs through any means?

5      A.     I have not.

6      Q.     Have you read anyone else's deposition

7   transcripts from this case?

8      A.     I have not.

9      Q.     Now you understand, sir, that you are a

10   plaintiff in a lawsuit against Google?  Correct?

11      A.     Yes.

12      Q.     Now in this lawsuit that you have brought

13   against Google, what are you accusing Google of

14   doing?

15      A.     I am accusing them of overcharging and

16   being anticompetitive in their market.

17      Q.     How are they anticompetitive?

18      A.     By being the only option around and making

19   it very difficult for anyone else to try to have an

20   app store or do any of their own billing.

21      Q.     What do you mean they are the only option

22   around?

23              MS. WEDGWORTH:  Objection.  If you

24      will just pause slightly so I can make

1       objections.  Objection as to form.

2       A.    I mean that there are in other usable app

3    stores for the Android.

4            BY MR. McINTYRE:

5       Q.    No other usable app stores?

6            MS. WEDGWORTH:  Objection as to form.

7       A.    Correct.  That is what I stated.

8            BY MR. McINTYRE:

9       Q.    So how -- now this is your lawsuit that

10    you have brought against Google.  What do you

11    allege that Google has done to --

12            MS. WEDGWORTH:  Objection as to form.

13    I am sorry.  Were you not through?

14            MR. McINTYRE:  Fine.

15            BY MR. McINTYRE:

16       Q.    What do you allege that Google has done?

17            MS. WEDGWORTH:  Objection as to form.

18       A.    I relied on my attorneys for the exact

19    verbiage that they used, because I am not

20    100 percent sure on the exact legalities.  However,

21    I am alleging that they have made it impossible for

22    me to get anything through an outside developer or

23    an outside in-app store without going through them,

24    making it so I have to pay whatever they decide.

HIGHLY CONFIDENTIAL

Page 25

1         Q.    Please let me know once this document

2      appears.  You may have to refresh the platform.

3                   MR. McINTYRE:  For the record, I

4         believe that this document will be introduced as

5         Defendants' Exhibit Number 93.

6                        (Consolidated Second Amended Class

7                  Action Complaint marked Defendants'

8                  Exhibit 93 for identification.)

9                  BY MR. McINTYRE:

10        Q.    Do you have that document in front of you,

11     Mr. Palmer?

12        A.    I do not, I am still waiting for the page

13     to load.  I apologize.

14        Q.    No problem.

15        A.    I am opening it now.

16                     (Pause.)

17        A.    Okay.  It is opened.

18        Q.    Have you seen this document before,

19     Mr. Palmer?

20        A.    Yes.

21        Q.    And what is this document?

22        A.    This is one of the complaints, I believe

23     the most recent one.

24        Q.    And this is the second amanded complaint

Page 26

```
1     filed by the consumer class?  Correct?
2         A.    It -- if you say second, I -- I'm not sure
3     of the exact number, if it is the second or the
4     third.  It is not part of the title and I don't
5     remember the exact dates from when each amendment
6     was posted.
7         Q.    On the very first page, do you see where
8     it says "Consolidated Second Amended Class Action
9     Complaint"?
10        A.    Oh, yes.  I do apologize for missing the
11    word "second" before.
12        Q.    No problem.  And do you see at the header
13    it says that this document was filed on
14    December 20, 2021?
15        A.    Yes, sir.
16        Q.    Now you have seen this document before?
17    Correct?
18        A.    Yes.
19        Q.    Is this one of the documents you reviewed
20    in preparation for your deposition?
21        A.    Yes.
22        Q.    And you understand that you are one of the
23    plaintiffs that filed this complaint against
24    Google?  Correct?
```

HIGHLY CONFIDENTIAL

Page 27

1          A.     Yes.

2          Q.     Now did you review this document before it

3      was filed in December?

4          A.     Yes.

5          Q.     You reviewed the allegations in this

6      document before it was filed?

7          A.     Yes.

8          Q.     Did you provide any edits or comments to

9      your attorneys on the allegations before this

10     document was filed?

11         A.     Not that I remember.

12         Q.     Okay.  Now I would like you to turn to

13     page 10 of this document.  If you are looking in

14     the header of the document, you will see that there

15     are page numbers.

16         A.     So page 10 of 80?

17         Q.     Yes.

18         A.     Okay.

19         Q.     Now please look at the bottom part of that

20     page, do you see paragraph 25?

21         A.     I do.

22         Q.     And this paragraph describes yourself?  Is

23     that correct?

24         A.     Correct.

HIGHLY CONFIDENTIAL

Page 39

1      anything has been.

2            BY MR. McINTYRE:

3      Q.     Do you own a Samsung device?  Correct?

4      A.     Yes.

5      Q.     And in fact you have owned a number of

6      Samsung devices; right?

7      A.     Yes.

8      Q.     What Samsung phone do you currently use?

9      A.     I currently use a Note 20 Ultra.

10     Q.     Samsung is an OEM?  Right?

11     A.     I believe so.

12     Q.     You testified a moment ago that Samsung

13     phones come preloaded with the Samsung Galaxy

14     Store?  Correct?

15     A.     Yes.

16     Q.     When you take a new Samsung phone out of

17     the box and turn it on, the Samsung Galaxy Store is

18     right there on the home screen, isn't it?

19     A.     It is not.  Not that I remember.

20     Q.     Not to your recollection?

21     A.     No.

22     Q.     When you took your current phone -- can

23     you remind me what kind of phone you are currently

24     using?

HIGHLY CONFIDENTIAL

Page 49

1       A.    I have not.  No.

2       Q.    Have you made any in-app purchases for

3    reasons related to your job?

4       A.    I have not.

5       Q.    Have you purchased any subscriptions for

6    reasons related to your job?

7       A.    I have not.

8       Q.    Now aside from the jobs that we just

9    discussed, have you had any other sources of income

10   over the past five years?

11      A.    No.

12      Q.    Mr. Palmer, were you at any point asked by

13   anyone to search for documents for the purpose of

14   producing them in discovery in this litigation?

15      A.    I believe my lawyers did some things at

16   one point.

17      Q.    Now without going into the substance of

18   any communications with your lawyers, what have you

19   done to search for or collect documents in

20   connection with this litigation?

21      A.    I believe an IT firm went through and

22   acquired what they needed.

23      Q.    What device did they use?

24             MR. McINTYRE:  I am sorry.  Strike

1     refreshing.  I believe I have it open now.

2         Q.     Okay.  If you would like, Mr. Palmer, you

3     can take a minute to review this document.

4         A.     Thank you.  Okay.

5         Q.     Do you recognize this document,

6     Mr. Palmer?

7         A.     I believe so.  Yes.

8         Q.     Now looking at the first page, the title

9     of this document is "Defendants First Set of

10    Requests of Production of Documents and for

11    Inspection to Consumer Plaintiffs."  Do you see

12    that?

13        A.     Yes.

14        Q.     And so you have seen this document before?

15    Correct?

16        A.     Yes.

17        Q.     Do you have an understanding as to what

18    this document is?

19        A.     I believe so.

20        Q.     Well, what is your understanding of this

21    document?

22        A.      It is a document of which states that

23    Google is requesting the plaintiffs to show in

24     terms of various documents and such.

Page 56

1      Q.     Have you undertaken any efforts yourself

2   to collect or search for the documents requested

3   here?

4      A.     Only that which has been asked of me by my

5   attorneys.

6      Q.     A few minutes ago, you mentioned that an

7   IT firm had access to a couple of your devices and

8   your email account.  Right?

9      A.     Yes.

10      Q.     And you mentioned that you provided some

11   other documents to your attorneys, such as screen

12   shots and receipts.  Correct?

13      A.     Yes.

14      Q.     Now other than what we have just

15   described, have you done anything else to search

16   for the documents requested in this exhibit?

17      A.     I do not believe so.

18      Q.     Mr. Palmer, are you aware that your

19   attorneys produced more of your documents just last

20   night?

21      A.     I believe so.  Yes.

22      Q.     And it was about 100 pages of documents.

23   Is that consistent with your understanding?

24      A.     I'm not sure how many pages it came out

HIGHLY CONFIDENTIAL

```
                                          Page 193
 1        Q.    I have got it.  So you buy the Google
 2    through Google Play, and then you read it through
 3    the Google Play Books app?
 4        A.    Correct.
 5        Q.    Do you download free apps from Google
 6    Play?
 7        A.    I have.  Yes.
 8        Q.    That includes apps where you don't have to
 9    pay anything ever to use them?  Right?
10              MS. WEDGWORTH:  Objection as to form.
11        A.    Correct.
12              BY MR. McINTYRE:
13        Q.    Have you ever paid to download an app from
14    Google Play app?
15        A.    Not that I'm aware of, but I'm not sure.
16        Q.    And as you described earlier, in some
17    cases you have downloaded free-to-download apps
18    that then had in-app purchases or subscriptions,
19    right?
20              MS. WEDGWORTH:  Objection as to form.
21        A.    Correct.
22              BY MR. McINTYRE:
23        Q.    What was your answer?
24        A.    Correct.
```

HIGHLY CONFIDENTIAL

Page 331

1                          CERTIFICATE

2      Commonwealth of Massachusetts

3      Plymouth, ss.

4

5

6              I, Judith McGovern Williams, a Notary

7      Public in and for the Commonwealth of

8      Massachusetts, do hereby certify:

9              That ZACHARY PALMER, the witness whose

10     deposition is hereinbefore set forth, was duly

11     sworn by me and that such deposition is a true

12     record of the testimony given by the said witness.

13             IN WITNESS WHEREOF, I have hereunto set my

14     hand this 24th day of January, 2022.

15

16

                    Judith McGovern Williams

17              Registered Professional Reporter

                 Certified Realtime Reporter

18         Certified Shorthand Reporter No. 130993

19

20     My Commission expires:

21     April 19, 2024

22

23

24

HIGHLY CONFIDENTIAL

Page 334

1    In Re Google Play Store Antitrust Litigation

2    1/21/2022 - Zachary Palmer (#4973566)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Zachary Palmer, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Zachary Palmer                Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

# REDACTED VERSION

# Exhibit A43
# to
# C. Cramer Declaration

# EXHIBIT 61

Page 1

1
2   UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF CALIFORNIA
3   SAN FRANCISCO DIVISION
    Case No. 3:21-md-02981-JD
4   ---------------------------------------x
    IN RE GOOGLE PLAY STORE
5   ANTITRUST LITIGATION
6
    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. V. Google LLC, et al.,
    Case No: 3:20-cv-05671-JD
8
    In re Google Play Consumer
9   Antitrust Litigation,
    Case No: 3:20-cv-05761-JD
10
    In re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12
    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  ---------------------------------------x
15
16          **HIGHLY CONFIDENTIAL
            UNDER PROTECTIVE ORDER**
17
18          Remote Videotaped Deposition by
19  Virtual Zoom OF MATTHEW ATKINSON, taken
20  on Friday, March 18, 2022 at 10:08 a.m.
21  Eastern Standard Time, before Dawn
22  Matera, a Certified Shorthand Reporter
23  and Notary Public for the State of New
24  York.
25

Page 2

REMOTE APPEARANCES:

     SPERLING & SLATER P.C.
     Counsel for the Proposed Class In Re
     Google Play Developer Antitrust
     Litigation and Pure Sweat Basketball,
     Inc.
          22 N. Front Street
          Suite 1100
          Memphis, Tennessee 38103-2162
      By:  BARRY FRETT, ESQ.
           bfrett@sperling-law.com


     MILBERG COLEMAN BRYSON PHILLIPS
     GROSSMAN LLC
     Counsel for the Proposed Class In Re
     Google Play Consumer Antitrust
     Litigation and the Witness
          900 West Morgan Street
          Raleigh, North Carolina 27603
      By:  PEGGY WEDGWORTH, ESQ.
           pwedgworth@milberg.com

           MICHAEL ACCIAVATTI, ESQ.
           One Pennsylvania Plaza
           19th Floor
           New York, New York 10119

     COTCHETT PITRE & McCARTHY
     Counsel for the Proposed Class In Re
     Google Play Consumer Antitrust
     Litigation
          2716 Ocean Park Boulevard
          Suite 3088
          Santa Monica, California 90405
      By:  JAMES DALLAL, ESQ.
           jdallal@cpmlegal.com

Page 3

1
2   REMOTE APPEARANCES: (Continued)
3
4        MUNGER TOLLES & OLSON LLP
         Counsel for Google Defendants
5            560 Mission Street
             27th Floor
6            San Francisco, California 94105-3089
7        By:  NICK SIDNEY, ESQ.
                nick.sidney@mto.com
8              KYLE MACH, ESQ.
                kyle.mach@mto.com
9
10
         CALIFORNIA DEPARTMENT OF JUSTICE
11       OFFICE OF THE ATTORNEY GENERAL
             455 Golden Gate Avenue #11000
12           San Francisco, California 94102
13       By:  BRIAN WANG, ESQ.
                Deputy Attorney General III,
14              Antitrust Section
15
16   Also present:
17       MARCO SOZIO, Videographer
18       DYLAN BRASCH, Concierge
19                   ~oOo~
20
21
22
23
24
25

```
                                            Page 6
 1      MATT ATKINSON - Highly Confidential
 2         Sperling & Slater on behalf of the
 3         developer class.
 4              MR. WANG:   Brian Wang,
 5         California Department of Justice on
 6         behalf of the State of California.
 7    M A T T   A T K I N S O N, having been
 8    first duly sworn by Dawn Matera, a Notary
 9    Public, was examined and testified as
10    follows:
11    EXAMINATION BY MR. SIDNEY:
12        Q.    Good morning, Mr. Atkinson.
13        A.    Good morning.
14        Q.    Just to start us off, could you
15    state your full name for the record.
16        A.    Matthew John Atkinson.
17        Q.    Thank you.  And what is your
18    current residential address?
19        A.    ███████████████████████████
20    ████████████████████████
21        Q.    Thank you.  And is that where
22    you're sitting today for the deposition?
23        A.    Yes.
24        Q.    Is anyone else there with you
25    or are you alone in the room?
```

```
                                          Page 54
 1     MATT ATKINSON - Highly Confidential
 2        to Defendants' Preservation
 3        Interrogatories, was previously
 4        marked.]
 5              [DX Exhibit 97, Consumer Class
 6        Plaintiffs' Objections and Responses
 7        to Defendants' First Set of
 8        Interrogatories, was previously
 9        marked.]
10        Q.    While he's doing that,
11   Mr. Atkinson, could you just describe for
12   me your claims in this lawsuit against
13   Google?
14        A.    Sure.  My claims would be very
15   simple.  We're alleging, which is also
16   listed in the complaint, that Google does
17   seem to have some sort of monopoly, and
18   as well as possible overcharge of apps.
19        Q.    And when you say some sort of
20   monopoly, what do you mean by that?
21        A.    Basically there is not any
22   competition besides Google Play Store.
23        Q.    Any competition for what?
24              MS. WEDGWORTH:  Objection as to
25        form.
```

1    MATT ATKINSON - Highly Confidential

2        A.    Phone applications.

3        Q.    I just want to make sure I got

4    the answer, you said phone applications,

5    right?

6        A.    Correct.

7        Q.    Okay.  So when you refer to

8    competition for phone applications, are

9    you referring to the development of

10   applications or distribution or something

11   else?

12            MS. WEDGWORTH:  Objection as to

13       form.

14       A.    Distribution through various

15   channels such as other app stores.

16       Q.    Okay.  And then you also

17   mentioned the possible overcharge.  What

18   were you referring to there?

19       A.    Through speaking with my

20   attorneys and reading the complaint, it

21   does seem that there may be some sort of

22   overcharge that Google is taking from us

23   as well as developers.

24       Q.    And when you say "us," are you

25   referring to the consumer class?

1    MATT ATKINSON - Highly Confidential

2        A.    Correct.

3        Q.    Okay.  What about you,

4    personally, do you believe that Google is

5    overcharging you?

6        A.    I do, yes.

7        Q.    Okay.  In what respect do you

8    believe that Google is overcharging you?

9        A.    I'm not sure what you mean.

10       Q.    So you believe that you've been

11   overcharged by Google.  My question is

12   what have you been overcharged?  And that

13   can be a dollar amount or with respect to

14   a particular kind of transaction.

15            MS. WEDGWORTH:  Objection as to

16       form.

17       A.    Processing of applications, for

18   example pricing of paid apps and paid

19   digital content.

20       Q.    So your claim is when you

21   purchase a paid app or digital content

22   through Google, you believe that Google

23   is overcharging?

24       A.    Correct.

25       Q.    Who sets the price for the

Page 57

1    MATT ATKINSON - Highly Confidential

2  content that you purchase?

3              MS. WEDGWORTH:  Object as to

4      form.

5      A.    I believe it would be both a

6  cooperation between Google and the

7  developer.

8      Q.    What do you mean by a

9  cooperation between Google and the

10  developer?

11      A.    My understanding, and again, I

12  am working with my attorneys and their

13  experts, similar to any other transaction

14  work, you have a supplier and you have a

15  manufacturer for distribution.  The

16  manufacturer has, let's say a wholesale

17  cost.  Then the retailer or the

18  distributor would tack on their fees.

19      Q.    And in that example, are you

20  referring to the app developer as

21  manufacturer and Google as the retailer

22  or the distributor?

23              MS. WEDGWORTH:  Objection as to

24      form.

25      A.    Correct.

Page 69

1    MATT ATKINSON - Highly Confidential

2        Q.    In the marked exhibits folder,

3    you should have DX 93.  Could you please

4    pull that up.  Let me know when you have

5    it.

6        A.    Yes, I do have it.

7        Q.    Well, this is the consolidated

8    second amended class action complaint.

9    Do you see that on the first page?

10       A.    I do.

11       Q.    And this is one of the

12   documents that refreshed your

13   recollection as part of preparing for

14   today's deposition, right?

15       A.    Correct.

16       Q.    What about this refreshed your

17   recollection?

18       A.    Reading over the complaint, as

19   far as what we're looking for in the

20   case, as well as what's being alleged.

21       Q.    Can you point me to any

22   particular part of this document that

23   refreshed your recollection?

24       A.    Just looking for page numbers

25   here.

Page 70

1    MATT ATKINSON - Highly Confidential
2        Q.      The page numbers in blue at the
3    top is probably the easiest to refer to.
4        A.      Okay.
5                MS. WEDGWORTH:   And
6        Mr. Atkinson, I will remind you that
7        any communications with your attorneys
8        you cannot disclose.  If you can
9        answer the question without revealing
10       communications with your attorneys,
11       you may do so.
12       A.      The whole document refreshed
13   everything.
14       Q.      And did you read the document
15   from cover to cover and that's what
16   refreshed your recollection?
17       A.      I did go through it, go through
18   it and kind of skimmed over it, yes.
19       Q.      Did you review this document
20   before it was filed with the court?
21       A.      I believe so, yes.
22       Q.      And before it was filed, did
23   you make any edits or suggest any
24   changes?
25       A.      Not that I can recall.

```
 1     MATT ATKINSON - Highly Confidential
 2       form.
 3       A.    Again, I am not an economy
 4   expert, but I don't believe there would
 5   be very much retention there, as long as
 6   they felt they were getting sufficient
 7   profit.
 8       Q.    Okay.  You can set that
 9   document aside.  Were you asked by anyone
10   to search for documents for the purpose
11   of producing documents in this
12   litigation?
13       A.    Yes.
14       Q.    And how did you go about
15   identifying the documents that needed to
16   be produced?
17       A.    I spoke with my attorneys with
18   regards to what was needed.
19       Q.    And then did you go look for
20   documents yourself?
21       A.    Yes.
22       Q.    And did you search your
23   electronic devices and online accounts?
24       A.    No.  I provided that
25   information to my attorneys so they can
```

```
 1     MATT ATKINSON - Highly Confidential
 2   do that.
 3       Q.    Okay.  They conducted the
 4   search for you?
 5       A.    Correct.  They would have
 6   conducted e-mail searches for me, yes.
 7       Q.    Okay.  Did you review any paper
 8   files?
 9       A.    What do you mean by paper
10   files?
11       Q.    Like physical hard copy
12   documents that you have that couldn't be
13   searched electronically?
14       A.    Not to my recollection.
15       Q.    Are you aware of any hard copy
16   documents that you have that relate in
17   any way to this litigation?
18       A.    Not that I can recall.
19       Q.    Okay.  What about searching
20   electronic files on computers other than
21   e-mail?
22       A.    I don't recall if that was done
23   or not.
24       Q.    Do you save documents to the
25   hard drive or desktop of any computers?
```

1      MATT ATKINSON - Highly Confidential

2         A.     Do I?

3         Q.     Yes.

4         A.     Yes.

5         Q.     Are any of those documents

6   related to Google Play or your purchase

7   of mobile devices?

8         A.     I don't believe so.  If I

9   remember correctly, all of the receipts

10  would be sent electronically to my Gmail

11  account.

12        Q.     Okay.  Have you sent any

13  e-mails to anybody related to this

14  lawsuit, other than your attorneys?

15        A.     Not to my knowledge.

16        Q.     Did you provide information to

17  your attorneys about your Google account,

18  e-mail addresses?

19        A.     Yes.

20        Q.     And did you give them all of

21  the Google accounts that you use?

22        A.     Yes, I gave them the ones that

23  I recall using, yes.

24        Q.     Have you deleted any documents

25  that are related to Google Play or your

```
                                          Page 80
 1      MATT ATKINSON - Highly Confidential
 2   mobile devices?
 3      A.     Not knowingly.  I also did my
 4   best to prevent an auto deletion as well.
 5      Q.     Okay.  If you could look at the
 6   document that's been marked as DX 95.
 7   Let me know when you have that up.
 8      A.     I have it.
 9      Q.     Just for the record, this is a
10   document entitled Consumer Class
11   Plaintiffs' Objections and Responses to
12   Defendant's Preservation Interrogatories.
13   Have you seen this document before?
14      A.     Yes.
15      Q.     Do you understand this to be
16   the responses from you and the other
17   consumer class representatives to
18   Google's questions about document
19   preservation?
20      A.     That is correct.
21      Q.     Did your attorneys at some
22   point instruct you to preserve documents
23   relating to this lawsuit?
24      A.     I believe that may be a
25   communication between me and my attorney.
```

```
 1     MATT ATKINSON - Highly Confidential
 2        A.     One moment, it's loading.
 3               Yes, I do.
 4        Q.     And this says "Identify by make
 5   and model all electronic devices,
 6   including without limitation handheld
 7   devices, consoles, televisions, personal
 8   computers or tablets on which you have
 9   downloaded apps or made in-app
10   purchases."  Do you see that?
11        A.     Yes, I do.
12        Q.     And the response that your
13   counsel provided on your behalf is on
14   page 6 under Response of Class Plaintiff
15   Matthew Atkinson.  Do you see that
16   section?
17        A.     Yes.
18        Q.     And listed here is the Samsung
19   Galaxy J7 phone.  That's the same Galaxy
20   J7 that we talked about a little bit ago,
21   right?
22        A.     Yes.
23        Q.     And then there is a Motorola
24   G Stylus phone which you have currently,
25   right?
```

1      MATT ATKINSON - Highly Confidential

2          A.     Yes.

3          Q.     And it sounds like you first

4    got the Galaxy J7 phone around 2019 or

5    2020; is that right?

6          A.     Yes.

7          Q.     And there is no phone listed

8    here that you had between 2015 and 2019,

9    right?

10         A.     Correct.

11         Q.     So would you agree as to the

12   phones that you had between 2015 and

13   2019, this response is not fully

14   accurate?

15              MS. WEDGWORTH:   Objection as to

16      form.

17         A.     It is accurate to the knowledge

18   that I had at that time.

19         Q.     Okay.  But you are aware that

20   you've had other smartphones before 2019

21   that are not listed in this response,

22   right?

23         A.     Yes.

24         Q.     And you just, sitting here

25   today, cannot recall the make and model

1    MATT ATKINSON - Highly Confidential
2   of those phones, right?
3        A.    That is correct.
4        Q.    Did you undertake any steps to
5   search for information about the make and
6   model of the phones that you had between
7   2015 and 2019?
8        A.    Yes.
9        Q.    And how did you search for
10  that?
11       A.    Because I had the same carrier,
12  I did a search on my carrier's website to
13  see if they had a history of prior
14  activated devices, but I do not recall
15  seeing any there.
16       Q.    Did you search your e-mail as
17  well?
18       A.    I don't recall.
19       Q.    Okay.  The third line of this
20  response says Sony PlayStation 3, do you
21  see that?
22       A.    Yes.
23       Q.    When did you first get the Sony
24  PlayStation 3?
25       A.    If I had to take a rough guess,

1      MATT ATKINSON - Highly Confidential

2                (DX Exhibit 250, Document Bates

3          stamped GOOG-Play-007376202, was so

4          marked for identification, as of this

5          date.)

6          A.     Okay.

7                MS. WEDGWORTH:  Nick, do you

8          know which Google account this is

9          from?

10                MR. SIDNEY:  This is from the

11          Revive Health info Google account and

12          the Bates number of the document is

13          GOOG-Play-007376202.

14          Q.     Let me know when you see that,

15      Mr. Atkinson.

16          A.     DX 250, tab 10?

17          Q.     That's correct.

18          A.     Yes, I do see the single page.

19          Q.     If you zoom in, row 10 there

20      lists KeepSafe as well; do you see that?

21          A.     Yes.

22          Q.     And to the right of the

23      KeepSafe name in column G, it says

24      149.99, do you see that?

25          A.     I am trying to scroll over

```
 1    MATT ATKINSON - Highly Confidential
 2   here.  I have to Zoom out to get farther
 3   over there.
 4            Yes, I do see it now.
 5     Q.    Okay.  And was this a lifetime
 6   subscription to KeepSafe that you
 7   purchased?
 8     A.    It appears to be that it was a
 9   one-time payment to make it available for
10   life, yes.
11     Q.    And you purchased this in April
12   2017, right?
13     A.    It appears to be, yes.
14     Q.    Do you continue to use KeepSafe
15   today?
16     A.    On occasion.  I believe it is
17   currently installed, but I don't
18   regularly add anything to it anymore.
19     Q.    Okay.  But at the time you
20   purchased this, a lifetime subscription
21   to KeepSafe was important to you for
22   maintaining the security and backup of
23   your photos, right?
24            MS. WEDGWORTH:  Objection as to
25       form.
```

1    MATT ATKINSON - Highly Confidential

2   of this exhibit.

3        A.    Would that be 253?

4        Q.    Correct.

5        A.    Okay.

6        Q.    And you mentioned earlier that

7   you frequently purchase in-app purchases

8   for games that you've downloaded from

9   Google Play, right?

10       A.    Yes.

11       Q.    And do you ever purchase apps

12   where the app itself is paid and you need

13   to purchase the app in order to download

14   it at all?

15       A.    I believe I have purchased a

16   few, yes.  I can't remember exactly what

17   they were.  But there probably have been

18   a few where I paid the purchase of the

19   app.

20       Q.    Would it be fair to say,

21   though, that a vast majority of your

22   purchases at Google Play are in-app

23   purchases, right?

24       A.    Yes.

25       Q.    So let's just look at the first

Page 256

1

2                    CERTIFICATION

3

4           I, DAWN MATERA, a Notary Public

5    for and within the State of New York, do

6    hereby certify:

7           That the witness whose testimony

8    as herein set forth, was duly sworn by

9    me; and that the within transcript is a

10   true record of the testimony given by

11   said witness.

12          I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I

15   am in no way interested in the outcome of

16   this matter.

17          IN WITNESS WHEREOF, I have

18   hereunto set my hand this 20th day of

19   March, 2022.

20

21

22   _____

23            DAWN MATERA

24

25

Page 261

1    In Re Google Play Store Antitrust Litigation

2    3/18/2022 - Matthew Atkinson (#5107348)

3                   ACKNOWLEDGEMENT OF DEPONENT

4       I, Matthew Atkinson, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Matthew Atkinson                    Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

# REDACTED VERSION

# Exhibit A44
# to
# C. Cramer Declaration

# EXHIBIT 63

1

2　UNITED STATES DISTRICT COURT

　FOR THE NORTHERN DISTRICT OF CALIFORNIA

3　SAN FRANCISCO DIVISION

　------------------------------------------X

4　IN RE GOOGLE PLAY STORE ANTITRUST

　LITIGATION

5

　Case No. 3:21-md-02981-JD

6

7　THIS DOCUMENT RELATES TO:

8

　Epic Games Inc. v. Google LLC, et al.

9　Case No.: 3:20-cv-05671-JD

10

　In re Google Play Consumer Antitrust

11　Litigation

　Case No.: 3:20-cv-05761-JD

12

13　In re Google Play Developer Antitrust

　Litigation

14　Case No.: 3:20-cv-05792-JD

15

　State of Utah, et al. v. Google LLC, et al.

16　Case No.: 3:21-cv-05227-JD

　------------------------------------------X

17

18　　　　　　* * * HIGHLY CONFIDENTIAL * * *

19　　　　　REMOTE VIDEOTAPED DEPOSITION OF

20　　　　　　　　　SERINA MOGLIA

21　　　　　　Thursday, February 10, 2022

22

23　Reported by:

24　Judith Castore, CLR

25

Page 2

1

2

3                    February 10, 2022

4                    10:15 a.m.

5

6       HIGHLY CONFIDENTIAL VIDEOTAPED REMOTE

7   DEPOSITION of SERINA MOGLIA, held at the

8   above-mentioned date and time, before Judith

9   Castore, a Certified Livenote Reporter and Notary

10   Public of the State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                            Page 3

 1
 2                   A P P E A R A N C E S
 3    (ALL PARTIES APPEARED VIA ZOOM VIDEOCONFERENCE)
 4
          ON BEHALF OF:  Consumer Class
 5        Plaintiffs in Google Play Consumer Antitrust
          Litigation
 6              KAPLAN, FOX & KILSHEIMER, L.L.P.
                1999 Harrison Street, Suite 1560
 7              Oakland, California 94612
                BY:   KATHLEEN HERKENHOFF, ESQ.
 8                    kherkenhoff@kaplanfox.com
 9
10        ON BEHALF OF:  Consumer Class
          Plaintiffs in Google Play Consumer Antitrust
11        Litigation
                COTCHETT, PITRE & MCCARTHY,
12              40 Worth Street, 10th Floor
                New York, New York 10013
13              BY:   JAMES DALLAL, ESQ.
                      jdallal@cpmlegal.com
14
15        ON BEHALF OF: Developer Class Plaintiffs and
          Pure Sweat Basketball
16              SPERLING & SLATER, P.C.
                55 West Monroe Street, Suite 3200
17              Chicago, Illinois 60603
                BY:   BARRY FRETT, ESQ.
18                    mdickler@sperling-law.com
19
20        ON BEHALF OF: Defendant Google, LLC, et al.
                O'MELVENY & MYERS, LLP
21              7 Times Square, Times Square Tower
                New York, New York 10036
22              BY:   MIA GONZALEZ, ESQ.
                      mgonzalez@omm.com
23                    KENDALL COLLINS, ESQ.
                      kcollins@omm.com
24
25
```

Page 4

1
2            A P P E A R A N C E S (cont'd)
3
4       OFFICE OF THE TENNESSEE ATTORNEY
        GENERAL
5       ANTITRUST LAW SECTION
        Attorneys for State of Tennessee
6            425 5th Avenue North
             Nashville, Tennessee 37243
7            BY:   HAMILTON MILLWEE, ESQ.
                   Hamilton.Millwee@ag.tn.gov
8
9
10      ALSO PRESENT:
11           ANTHONY PICCIRILLI, Legal Video
             Specialist
12           Veritext Legal Solutions
13
14           DYLAN BRASCH, Legal Video Specialist
             Veritext Legal Solutions
15
16
17
18
19
20
21
22
23
24
25

```
                                                    Page 9
 1          HIGHLY CONFIDENTIAL - MOGLIA

 2     S-E-R-I-N-A  M-O-G-L-I-A,

 3              Having been duly sworn by a Notary Public

 4     within and for the State of New York, stated an

 5     address as  ████████████████████████████████

 6     ██████, was examined and testified as follows:

 7     EXAMINATION BY MS. GONZALEZ:

 8          Q    Thank you.

 9              So before we get started with

10     the substance, I just wanted to go over

11     a couple of preliminary matters today.

12     The first is that, because we have a

13     court reporter who will be taking down

14     everything we say today, we need to try

15     not to talk over each other.  I know

16     that can be a little challenging if

17     there is Zoom delays, but I will do my

18     best, you know, not to jump in while

19     you are talking.  And I would ask that

20     you try to do the same.

21              Similarly, the court reporter

22     needs audible responses.  So, you know,

23     no head nodding or head shaking so the

24     court reporter can get down your

25     answers.
```

```
                                          Page 36
```

1           HIGHLY CONFIDENTIAL - MOGLIA
2    that should say DX93.
3           A    Yes, I got it.
4           Q    Okay.
5                (Consolidated Second Amended
6           Class Action Complaint, was marked
7           Defendants' Exhibit 93, for
8           identification, as of this date.)
9           Q    Okay.  So this is a long
10   document.  You're welcome to scroll
11   through it, but, you know, I'm not
12   expecting you to read it word for word
13   right now.  I will direct you to
14   specific paragraphs.  But you can take
15   a minute to scroll through.
16          A    Okay.
17          Q    Have you seen this document
18   before?
19          A    Yes, I have.
20          Q    Do you know what the document
21   is?
22          A    It's in regards to this
23   lawsuit.
24          Q    Do you understand it to be
25   the complaint or a complaint filed in

                                                      Page 37

1          HIGHLY CONFIDENTIAL - MOGLIA
2    this lawsuit?
3          A     Yes.
4          Q     Have you read the document
5    before?
6          A     Yes, I have looked over it.
7          Q     Did you review it before it
8    was filed with the court?
9                MS. HERKENHOFF:   Object to
10         form.
11         A     Yes.
12         Q     Did you make any edits to the
13   document when you reviewed it?
14               MS. HERKENHOFF:   Object to
15         form.
16               I will let you answer.  To
17         the extent any edits were
18         communicated to counsel, that's
19         privileged communication.  But if
20         you can answer otherwise, I will
21         permit you to do so.
22         A     I rely on my counsel to do
23   that.
24         Q     So is that a, no, you didn't
25   make any edits?

Page 40

1          HIGHLY CONFIDENTIAL - MOGLIA
2    to the present.
3              So is it accurate that your
4    first purchase from the Google Play
5    Store was August 16, 2016?
6              MS. HERKENHOFF:  Object to
7         form.
8         Q    You can answer.
9         A    To the best of my knowledge.
10        Q    Okay.  And the last part of
11   the sentence says that you paid Google
12   directly for those purchases.
13             To the best of your knowledge
14   is that accurate?
15        A    Yes.
16        Q    If you could scroll up to
17   paragraph 5 which is on page 5 of 80.
18             Yep, right there.
19             Okay.  So paragraph 5 says:
20   Google has unlawfully maintained a
21   monopoly over the market for
22   distributing mobile apps to users of
23   Android mobile devices (hereinafter,
24   the Android Application Distribution
25   Market), as well as a monopoly in the

1          HIGHLY CONFIDENTIAL - MOGLIA

2    aftermarket for distribution of and

3    associated payment systems for digital

4    accessories or enhancements to those

5    applications (hereinafter, the In-App

6    Aftermarket).

7              In your view, what has Google

8    done to unlawfully maintain a monopoly

9    over the market for distributing mobile

10   apps to users of Android mobile

11   devices?

12             MS. HERKENHOFF:  Object to

13        form.

14        A    Well, when you go into these

15   apps, it's mostly all Google-based.

16        Q    I'm sorry.  What do you mean

17   by -- that "it's mostly all

18   Google-based"?

19        A    So when you go open your

20   phone and you go into your phone, it's,

21   like, the Google apps are already --

22   like, the Play Store already downloaded

23   into your phone.

24        Q    And are there any other apps

25   that are -- any other Google apps that

Page 42

1         HIGHLY CONFIDENTIAL - MOGLIA

2    are already on your phone?

3              MS. HERKENHOFF:  Object to

4         form.

5         A     The phone does come with a

6    lot of Google apps on it.

7         Q     And is it your view that all

8    of those Google apps together is what

9    Google is using to allegedly maintain

10   this unlawful monopoly?

11             MS. HERKENHOFF:  Object to

12        form.

13        A     Yes.

14        Q     Going back to that

15   paragraph 5, the second part of the

16   paragraph.

17             In your view, what has Google

18   done to maintain a monology in the

19   aftermarket for distribution of and

20   associated payment systems for digital

21   accessories or enhancements to those

22   applications?

23             MS. HERKENHOFF:  Object to

24        form.

25        A     Can you rephrase it in a

```
                                          Page 43
```

1          HIGHLY CONFIDENTIAL - MOGLIA

2    different way, please?

3          Q    Sure.

4                So the first part that I just

5    asked you a couple of minutes ago was

6    about an allegation related to

7    distributing mobile apps for Android

8    mobile devices.  As I understand it,

9    this second part of paragraph 5 relates

10   to allegations about what Google has

11   done in the aftermarket or in sort of

12   lay terms, like Google Billing and

13   Google Payment through the apps

14   distributed on Android devices.

15               Does that help?

16               MS. HERKENHOFF:  Object to

17        form.

18         A    Not really.

19         Q    Okay.  Are you aware of

20   allegations in your complaint related

21   to Google Play Billing?

22               MS. HERKENHOFF:  Object to

23        form.

24         A    Yes.

25         Q    And, in your words, what are

```
                                        Page 44
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2    those allegations?
 3               MS. HERKENHOFF:  Object to
 4        form.
 5        A    I don't know how to answer
 6    that.
 7        Q    Okay.  Let's scroll down the
 8    page a bit to paragraph 7.
 9        A    On that same page, page 5?
10        Q    Yes.  Yes.
11        A    Okay.  Sorry.  I moved it too
12    much.
13        Q    Did you find paragraph 7?
14        A    I did.
15        Q    Okay.  Paragraph 7 says:
16    Google requires OEMs not only to
17    preinstall the Google Play Store on
18    their mobile devices as a condition for
19    licensing Google's Android OS with its
20    accompanying GM suite, but also to
21    locate the Google Play Store on the
22    homepage of each mobile device.  These
23    restrictions in Google's OEM agreements
24    interfere with an OEM's ability to make
25    other third-party app stores or apps
```

```
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2    easily accessible on their devices and
 3    practically block competitive stores
 4    from obtaining preferential placement,
 5    effectively foreclosing competing app
 6    stores - and even single apps - from
 7    the most effective and efficient
 8    distribution channel.
 9              Do you see that?
10       A    I see the number 7 on page --
11    yeah.  So, yes, page 5, number 7.  I
12    see where you were semi reading.  Yes.
13       Q    Okay.  Just I read that
14    paragraph out loud.
15       A    Yes.
16       Q    Okay.  When I said -- or when
17    it says, in that paragraph, OEM, do you
18    understand that to mean original
19    equipment manufacturer?
20              MS. HERKENHOFF:  Object to
21         form.
22       A    Yes.
23       Q    And do you understand that
24    Samsung is an OEM?
25              MS. HERKENHOFF:  Object to
```

Page 46

1          HIGHLY CONFIDENTIAL - MOGLIA

2     form.

3     A    Yes.

4     Q    This paragraph is saying that

5  Google requires OEMs, such as Samsung,

6  to place the Google Play Store on the

7  home screen of their devices; is that

8  correct?

9          MS. HERKENHOFF:  Object to

10     form.

11     A    Correct.

12     Q    And we'll talk about this

13  more later, but you have owned several

14  Samsung devices, right?

15     A    Yes, I have.

16     Q    And those Samsung devices

17  came preloaded with apps, correct?

18          MS. HERKENHOFF:  Object to

19     form.

20     A    Correct.

21     Q    And when you open up a new

22  Samsung device, do you see the Samsung

23  Galaxy Store on the home screen?

24          MS. HERKENHOFF:  Object to

25     form.

```
                                            Page 52
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2    for this litigation.
 3          A    I produced my own.
 4          Q    You mean you gave your own
 5    documents to your counsel; is that what
 6    you're saying?
 7          A    Yes.
 8          Q    Okay.  I'm going to pull up
 9    another exhibit.  It's a document that
10    had previously been marked as
11    Defendants' Exhibit 94.
12               (Defendants' First Set of
13          Requests for Production of
14          Documents and for Inspection to
15          Consumer Plaintiffs, was marked
16          Defendants' Exhibit 94, for
17          identification, as of this date.)
18          A    Again, should I refresh it or
19    should I wait a few minutes to see it
20    if it refreshes?
21          Q    I think you can probably
22    refresh.
23          A    Okay.
24          Q    I'm not 100 percent sure what
25    it looks like on your end, but...
```

1          HIGHLY CONFIDENTIAL - MOGLIA

2       A    Okay.  I have three now, so

3   is it one that starts with the E?

4       Q    Yes, I believe so.  And it

5   should have a yellow sticker on it that

6   says Exhibit DX0094.

7       A    Yes, I have it.

8       Q    Okay.  Just take a minute to

9   scroll through it.

10       A    Okay.

11       Q    Have you seen this document

12   before?

13       A    I believe so, yes.

14       Q    Do you recall reading the

15   document?

16       A    I recall looking it over,

17   yes.

18       Q    Okay.  If you scroll down

19   to -- if you can scroll down to -- I

20   guess it's page 7.  Yep.  There is a

21   list of requests for productions.

22       A    So would it say page 7 at the

23   bottom of the page?

24       Q    Oh, yes.

25       A    Yes.

```
                                    Page 54
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2              Okay.  I'm on the page.
 3      Q    Okay.  You see where it says
 4  "Request for Production" and then there
 5  is a list of requests going through
 6  number 46?
 7      A    Well, then 46 would go onto
 8  the next page?
 9      Q    Yeah.
10      A    Okay.  Yes.
11      Q    Okay.  How did you go about
12  searching for documents responsive to
13  this request -- or these requests?
14      A    I had a vendor --
15              (Clarification by the
16      reporter.)
17      A    I had a vendor debug my phone
18  and look at the e-mails.
19      Q    Okay.  The first part of that
20  answer, that you had a vendor debug
21  your phone, what do you mean by that?
22              MS. HERKENHOFF:  And I'm
23      going to interject that the vendor
24      was retained by counsel and is
25      essentially a consulting agent of
```

Page 55

```
 1        HIGHLY CONFIDENTIAL - MOGLIA
 2        counsel.
 3               So I would instruct you only
 4        to the answer as to the facts of
 5        what was done.  Please do not
 6        communicate as to any
 7        communications that we had
 8        concerning that appointment or
 9        that vendor.
10               Can you restate the question?
11               MS. GONZALEZ:  Sure.
12        Q    I'm just trying to understand
13   what you mean by a vendor debugged your
14   phone.
15        A    With my counsel, they, I
16   guess, scanned my phone.
17        Q    Okay.  And when you said that
18   you reviewed e-mails, was that you
19   reviewing your e-mails or was the
20   vendor involved in that as well?
21               MS. HERKENHOFF:  Object to
22        form.
23        A    The vendor was involved in
24   that.
25        Q    Did you -- other than
```

```
                                        Page 56
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2     e-mails, did you search for any other
 3     electronic files?
 4          A     No.
 5          Q     Did you search through any
 6     paper files?
 7          A     No.
 8          Q     Did you search any computers?
 9               MS. HERKENHOFF:  Object to
10          form.
11          A     Did who search any computers?
12          Q     Well, I guess let me clarify.
13               Did the vendor only take
14     information from your current mobile
15     device?
16               MS. HERKENHOFF:  Object to
17          form.
18          A     Yes.
19          Q     Okay.  So does that mean that
20     the vendor did not debug or scan any
21     prior mobile devices that you may have?
22               MS. HERKENHOFF:  Object to
23          form.
24          A     No.
25          Q     And what about any computers?
```

```
                                            Page 57
1           HIGHLY CONFIDENTIAL - MOGLIA
2    Did the vendor debug or scan any
3    computers?
4              MS. HERKENHOFF:  I am going
5         to object to form.  And also, to
6         the extent, again, her answer
7         reveals any privileged
8         communications, I would caution
9         her not to state that.  So I am
10        not sure that she can answer your
11        question.
12             But if you can answer
13        independent of privileged
14        communications, you can answer.
15        Otherwise, I instruct you not to
16        answer.
17        A    I'm going to follow my
18   counsel.
19        Q    Okay.  Basically all I'm
20   looking for is a yes or no.  Did the
21   vendor scan other devices?  I'm not
22   asking for what you discussed with your
23   counsel.
24             MS. HERKENHOFF:  On that, I
25        will object to form.  I still
```

1              HIGHLY CONFIDENTIAL - MOGLIA
2         believe it could -- she may not
3         know independent of communications
4         with counsel, but if she does, she
5         can answer that yes or no.
6         A    I'm still going to go with my
7    counsel.
8         Q    So other than whatever
9    electronic files the vendor collected
10   and e-mails, did you provide your
11   counsel with any other -- documents
12   from any other source to produce?
13             MS. HERKENHOFF:  I'm going
14        to --
15             MS. GONZALEZ:  Go ahead.
16             MS. HERKENHOFF:  I think that
17        reveals communications to what she
18        gave to me, so can you just ask
19        her what other files she gathered
20        for this case?
21             MS. GONZALEZ:  Sure.  Thank
22        you.
23        Q    What other files did you
24   gather for this case other than those
25   we've already talked about?

```
                                    Page 59
 1        HIGHLY CONFIDENTIAL - MOGLIA
 2        A     I have screenshots of my apps
 3   that were on my phone.
 4        Q     Did you take those
 5   screenshots?
 6        A     Yes, I personally took those
 7   screenshots.
 8        Q     Okay.  Are those screenshots
 9   of your current phone?
10             MS. HERKENHOFF:  Object to
11        form.
12        A     Not my current phone.
13        Q     Which -- if you remember
14   which phone -- or on which phone did
15   you take the screenshots?
16        A     My phone prior to this one.
17        Q     Do you remember the make or
18   model of that phone?
19        A     It's the Galaxy 10.
20        Q     And as far as you can recall,
21   have you deleted any documents or files
22   that are covered by the document
23   request that I just showed you?
24             MS. HERKENHOFF:  Object to
25        form.
```

```
                                        Page 60
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2      A     Not that I could recall, no.
 3      Q     Were you instructed to
 4   preserve documents relating to the
 5   subject matter of this case?
 6            MS. HERKENHOFF:  That's a yes
 7      or no, otherwise it could reveal
 8      privileged communications and I
 9      instruct you not to answer
10      further.
11            MS. GONZALEZ:  Yeah.
12      Q     I'm just asking for a yes or
13   no.
14      A     Yes.
15      Q     And did you take any steps to
16   ensure the documents were preserved?
17            MS. HERKENHOFF:  Object to
18      form.
19      A     Yes.
20      Q     And what were those steps?
21      A     I have the other phone.
22      Q     Sorry.  I didn't hear you.
23      A     I have the other phone in my
24   possession.
25      Q     What do you mean by "the
```

```
                                        Page 61
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2    other phone"?
 3          A    The phone that the documents
 4    have come from, the S10 phone, I have
 5    it in my possession.
 6          Q    Okay.  And that's the prior
 7    phone from which you took the
 8    screenshots; is that right?
 9          A    Correct.
10          Q    Okay.
11              MS. HERKENHOFF:  Counsel, is
12          this a good time for a break?
13          We've been going for an hour.  I
14          don't know if the witness needs a
15          break.
16              MS. GONZALEZ:  Sure.  Yeah,
17          it's fine by me to take a break
18          now.
19              VIDEOGRAPHER:  The time is
20          11:14.  This is the end of Session
21          Number 1 and we are now off the
22          record.
23              (Whereupon, a brief recess
24          was taken.)
25              VIDEOGRAPHER:  The time is
```

```
                                                    Page 81
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2   long list of services I have just
 3   listed for you, can you think of any
 4   other Google products or services that
 5   you have used?
 6               MS. HERKENHOFF:  Object to
 7        form.
 8        A    Not that I could think of at
 9   this time.
10        Q    And putting aside the YouTube
11   subscription that we've talked about,
12   is it fair to say that, to the extent
13   you have used these other services, you
14   have been able to use them for free?
15               MS. HERKENHOFF:  Object to
16        form.
17        A    I believe so, yes.
18        Q    Do you know whether the
19   Google Services that you have used are
20   all synched to the same Google account,
21   your ███████████████████?
22        A    I believe they are.
23        Q    So we're now going to switch
24   topics a bit and talk about your
25   devices.
```

```
1        HIGHLY CONFIDENTIAL - MOGLIA
2              So when was the first time
3   you used an Android device?
4        A     I have used Android devices,
5   I think, pretty much since I have had a
6   cell phone.
7        Q     And do you recall about when
8   you first got a cell phone?
9        A     Maybe 20 years ago, a little
10  bit less.
11       Q     Have you ever owned an
12  iPhone?
13       A     I have never owned an iPhone.
14       Q     And why did you just use
15  Android devices over alternative
16  devices?
17             MS. HERKENHOFF:  Object to
18       form.
19       A     I just think Android devices
20  are simpler and a lot more advanced
21  than other devices.
22       Q     What do you mean by
23  "advanced"?
24       A     Like, the technologies that
25  they have on Samsung usually comes out
```

```
                                        Page 83
 1          HIGHLY CONFIDENTIAL - MOGLIA
 2   prior to Apple products or something
 3   like that, other products.
 4        Q    And for your Android devices,
 5   have those always been Samsung devices?
 6             MS. HERKENHOFF:  Object to
 7        form.
 8        A    I believe so, yes, they have.
 9        Q    When you say that, in your
10   view, Android devices are simpler, what
11   do you mean by that?
12        A    I don't really know how to
13   answer that.  I have always been an
14   Android Samsung person, so I can't
15   really answer that much.
16        Q    And by "simpler," do you mean
17   user-friendly?
18             MS. HERKENHOFF:  Object to
19        form.
20        A    Yeah, you could say that.
21             MS. GONZALEZ:  Okay.  All
22        right.  So now I'm going to
23        introduce what's been previously
24        marked as Defendants' Exhibit 97.
25             (Consumer Class Plaintiffs'
```

Page 147

1        HIGHLY CONFIDENTIAL - MOGLIA

2        form.

3        A    To the best of my knowledge.

4        Q    Okay.  And if you turn to the

5   page that's marked 5398.

6        A    Yes.

7        Q    I'm -- sorry.  I'm going to

8   withdraw that question because we've

9   already talked about that.

10           Okay.  If you turn to the

11   page 5402.

12        A    Okay.

13        Q    Do you see, about two-thirds

14   of the way down, the page there is

15   something called Sticker of I Love

16   America?

17           Do you see that?

18        A    Yes, I do.

19        Q    And -- sorry.  Were you going

20   to say something?

21        A    No.

22           MS. HERKENHOFF:  No.

23        Q    And do you see that dollar

24   value is listed at $2.14?

25        A    Yes, I do.

```
                                      Page 148

 1          HIGHLY CONFIDENTIAL - MOGLIA
 2          Q     And do you know whether this
 3    is an app or whether you purchased this
 4    through an app?
 5          A     I believe it's purchased
 6    through an app.
 7          Q     And which app was that?
 8          A     PictureGrid.  I'm not sure of
 9    the exact name of it.
10          Q     Okay.  What is PictureGrid?
11                MS. HERKENHOFF:  Object to
12          form.
13          A     It's a photo editing.
14          Q     Photo editing app?
15          A     Excuse me?
16          Q     Sorry.  It's a photo editing
17    app?
18          A     Correct.  You can make, like,
19    collages on it with pictures.
20          Q     Got it.
21                And I assume that's an app
22    that you got through the Google Play
23    Store; is that correct?
24          A     I believe so, yes.
25          Q     Okay.  Let's turn to the next
```

1          HIGHLY CONFIDENTIAL - MOGLIA
2     page, so the one marked 5403.
3          A     Okay.
4          Q     And in the top half of that
5     page there is something called Stickers
6     of Party Baloon?
7          A     Yes.
8          Q     Do you see that for 1.99?
9          A     Yes.
10         Q     Is that also an in-app
11    purchase from PictureGrid?
12         A     Yes.
13         Q     Okay.  If you go to the next
14    page, the one marked 5404.
15         A     Yes.
16         Q     At the top of that page there
17    is a line item that's called the 300
18    spoons for $5.36.
19              Do you know what that is?
20         A     It's from one of the other
21    games that I used to play.  I believe
22    it's the Crazy Kitchen.
23         Q     And is it fair to say that's
24    an in-app purchase through Crazy
25    Kitchen?

```
1           HIGHLY CONFIDENTIAL - MOGLIA
2       A     That is correct.
3       Q     And could you just describe
4   what 300 spoons means?  Is that, like,
5   a point system or a -- like a currency
6   within the app?
7               MS. HERKENHOFF:  Object to
8       form.
9       A     I believe it's just if you
10  want to buy, like, a -- maybe, like, a
11  dish or something.  You have to use
12  spoons to buy a dish or...
13      Q     Okay.  Makes sense.
14              Okay.  So sticking on the
15  same page, the next line down is
16  something called 50 spoons.
17              I assume that's similar to
18  the 300?
19      A     Correct.  It's the same
20  thing.
21      Q     Okay.  And then the next line
22  down, Sticker of Take My Heart, is that
23  also an in-app purchase from
24  PictureGrid?
25              MS. HERKENHOFF:  Object to
```

```
                                    Page 151

1          HIGHLY CONFIDENTIAL - MOGLIA
2        form.
3        A    Correct.
4        Q    And then the next line down,
5   Sticker of beloved, is that also an
6   in-app purchase from PictureGrid?
7              MS. HERKENHOFF:  Same
8        objection.
9        A    That's correct.
10       Q    And then there is -- I won't
11  go through each one of these line by
12  line, but there is three more listed on
13  this page:  The Backgrounds of Stars,
14  Party Fun, School Life.
15             Are those also all purchased
16  through PictureGrid?
17             MS. HERKENHOFF:  Object to
18       form.
19       A    Correct.
20       Q    Okay.  Thank you.
21             If you turn to the very last
22  of this exhibit, the one ending in
23  5407.
24       A    Yes.
25       Q    The top of the page there is
```

Page 203

1

2                     C E R T I F I C A T I O N

3

        STATE OF NEW YORK  )

4                          ) ss.:

        COUNTY OF NEW YORK )

5

6              I, JUDITH CASTORE, Shorthand Reporter

7         and Notary Public within and for the State

8         of New York, do hereby certify:

9              That SERINA MOGLIA, the witness whose

10        deposition is hereinbefore set forth, was

11        duly sworn by me and that this transcript

12        of such examination is a true record of

13        the testimony given by such witness.

14             I further certify that I am not

15        related to any of the parties to this

16        action by blood or marriage and that I am

17        in no way interested in the outcome of

18        this matter.

19             IN WITNESS WHEREOF, I have hereunto

20        set my hand this 11th day of February,

21        2022.

22                      *Judith Castore*

23

           _____

24                     JUDITH CASTORE

25

```
                                                   Page 206
```

1    In Re Google Play Store Antitrust Litigation

2    2/10/2022 - Serina Moglia (#5065281)

3                ACKNOWLEDGEMENT OF DEPONENT

4        I, Serina Moglia, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Serina Moglia                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

# REDACTED VERSION

# Exhibit A45
# to
# C. Cramer Declaration

1   Brian C. Rocca, Bar No. 221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, Bar No. 215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, Bar No. 248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, Bar No. 259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, Bar No. 301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105-1596
    Telephone:  (415) 442-1000
8   Facsimile:   (415) 442-1001

9   Richard S. Taffet, *pro hac vice*
    richard.taffet@morganlewis.com
10  **MORGAN, LEWIS & BOCKIUS LLP**
    101 Park Avenue
11  New York, NY  10178-0060
    Telephone: (212) 309-6000
12  Facsimile: (212) 309-6001

13  Daniel M. Petrocelli, Bar No. 97802
    dpetrocelli@omm.com
14  Stephen J. McIntyre, Bar No. 274481
    smcintyre@omm.com
15  **O'MELVENY & MYERS LLP**
    1999 Avenue of the Stars, 7th Fl.
16  Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700
17
    Ian Simmons, *pro hac vice*
18  isimmons@omm.com
    Benjamin G. Bradshaw, Bar No. 189925
19  bbradshaw@omm.com
    **O'MELVENY & MYERS LLP**
20  1625 Eye Street, NW
    Washington, DC 20006-4001
21  Telephone: (202) 383-5106
    Facsimile: (202) 383-5414
22
    *Counsel for Defendants*
23

24

25

26

27

28

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, Bar No. 282090
kyle.mach@mto.com
Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Emily C. Curran-Huberty, Bar No. 293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, pro hac vice
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al.*
*in In re Google Play Consumer Antitrust*
*Litigation; In re Google Play Developer*
*Antitrust Litigation; Epic Games, Inc. in*
*Epic Games, Inc. v. Google LLC; State of*
*Utah et al. v. Google LLC et al.*

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD

Case No. 3:21-md-02981-JD

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CLASS CERTIFICATION MOTION**

Judge James Donato

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

I.     FACTS RELEVANT TO CLASS CERTIFICATION ................................................ 3

     A.     Google Play .................................................................................................... 3

     B.     Google Play's Business Model ....................................................................... 3

     C.     The Putative Consumer Classes ..................................................................... 4

     D.     Fees and Prices .............................................................................................. 5

     E.     Play Points .................................................................................................... 5

II.     EXPERT ANALYSIS OF DR. MICHELLE BURTIS.............................................. 6

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 8

I.     PLAINTIFFS CANNOT DEMONSTRATE THAT ALL OR NEARLY ALL CLASS MEMBERS SUFFERED ANTITRUST IMPACT USING COMMON PROOF. ................................................................................................................... 8

     A.     Plaintiffs Have No Common Proof of Pass-Through. ............................. 9

         1.     Individual Issues Predominate Because Pass-Through Requires An App-By-App Analysis Not Susceptible To Common Proof. .................. 9

         2.     Dr. Singer's Pass-Through Model Is Based On Theoretical Assumptions Instead Of Analyses Typically Relied Upon By Other Courts. ................................................................................................... 13

     B.     Individual Issues Predominate Because Not All Developers Would Be Subject To Lower Service Fees In The But-For World. ..................................... 16

     C.     Plaintiffs' Play Points Model Is Not Common Proof Of Impact. ......................... 18

     D.     Many Class Members May Be Worse Off In Plaintiffs' But-For World.............. 19

     E.     Plaintiffs Have No Common Method Of Calculating Damages.......................... 21

II.     PLAINTIFFS' COUNSEL ARE NOT ADEQUATE BECAUSE THEIR JOINT PROSECUTION AGREEMENT CREATES CONFLICTS. ........................................... 22

III.     THE COURT CANNOT CERTIFY AN INJUNCTIVE RELIEF CLASS. ...................... 23

CONCLUSION ................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
    279 F.R.D. 257 (D. Vt. 2011) ........................................................................................... 25

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................... 19, 20, 21

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ..................................................................................................... 9

*In re Apple iPhone Antitrust Litig.*,
    2022 WL 1284104 (N.D. Cal. 2022) ........................................................................... 11, 12

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ............................................................................................ 13

*Berni v. Barilla S.p.A.*,
    964 F.3d 141 & 148 (2d Cir. 2020) ................................................................................ 25

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
    141 F.R.D. 144 (N.D. Cal. 1991) ................................................................................... 13

*In re Capacitors III*,
    2018 WL 5980139 (N.D. Cal. 2008) ........................................................................... 8, 14

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ......................................................................................................... 21

*D&M Farms v. Birdsong Corp.*,
    2020 WL 7074140 (E.D. Va. 2020) ............................................................................... 18

*In re Digital Music Antitrust Litig.*,
    321 F.R.D. 64 (S.D.N.Y. 2017) ........................................................................... 15, 20, 25

*In re Disposable Contact Lens Antitrust Litig.*,
    329 F.R.D. 336 (M.D. Fla. 2018) ................................................................................... 14

*Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*,
    1993 WL 527928 (E.D. Mich. 1993) ............................................................................. 13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    2013 WL 12387371 (N.D. Cal. 2013) ............................................................................ 23

*Earl v. Boeing Co.*,
    21 F.4th 895 (5th Cir. 2021) .......................................................................................... 22

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ............................................................................. 15, 24

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
   223 F.R.D. 506 (S.D. Ill. 2004) ............................................................................... 13

*In re Flash Memory Antitrust Litig.*,
   2010 WL 2332081 (N.D. Cal. 2010) ..................................................... 15, 16, 17, 18

*In re Florida Cement & Concrete Antitrust Litig.*,
   278 F.R.D. 674 (S.D. Fla. 2012) .............................................................................. 15

*In re Glumetza Antitrust Litig.*,
   336 F.R.D. 468 (N.D. Cal. 2020) ............................................................................ 14

*Grace v. Apple, Inc.*,
   328 F.R.D. 320 (N.D. Cal. 2018) ............................................................................ 24

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................ 10, 15, 17

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................ 22

*In re High-Tech Emp. Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013) .............................................................................. 7

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) .......................................................................................... 10, 16

*Kayes v. Pacific Lumber Co.*,
   51 F.3d 1449 (9th Cir. 1995) .................................................................................. 22

*Kottaras v. Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012) .................................................................................. 20

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) .................................................................................. 21

*In re Lithium Ion Batteries Antitrust Litig.*,
   2018 WL 1156797 (N.D. Cal. 2018) ................................................................. 11, 12

*Lou v. Ma Labs., Inc.*,
   2014 WL 68605 (N.D. Cal. 2014) ........................................................................... 23

*In re Mercedes-Benz Antitrust Litig.*,
   213 F.R.D. 180 (D.N.J. 2003) ................................................................................. 14

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   2013 WL 5979327 (N.D. Cal. 2013) ....................................................................... 25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc)................................................................ *passim*

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ................................................................ 12, 14

*Orr v. Shicker*,
   953 F.3d 490 (7th Cir. 2020)........................................................................ 23

*In re Paxil Litig.*,
   218 F.R.D. 242 (C.D. Cal. 2003) .............................................................. 24, 25

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000)..................................................................... 25

*In re Pre-Filled Propane Tank Antitrust Litig.*,
   2021 WL 5632089 (W.D. Mo. 2021) ........................................................... 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869 (Rail Freight II)*,
   934 F.3d 619 (D.C. Cir. 2019) .................................................................... 13

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009)........................................................................ 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) ................................................................. 18

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
   421 F. Supp. 3d 12 (E.D. Pa. 2019) ................................................... 14, 24, 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010) ................................................................. 14

*B.K. by next friend Tinsley v. Snyder*,
   922 F.3d 957 (9th Cir. 2019).................................................................... 7, 24

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) .................................................................................. 7

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .................................................................................... 10

*United States v. Tobias*,
   935 F.2d 666 (4th Cir. 1991)........................................................................ 23

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014)..................................................................... 14

*Vincent v. Hughes Air W., Inc.*,
   557 F.2d 759 (9th Cir. 1977)........................................................................ 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002) ............................................................................. 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................................... 6, 7

*Williams v. Apple, Inc.*,
    338 F.R.D. 629 (N.D. Cal. 2021) ........................................................................ 24

**Other Authority**

F.R.C.P. Rule 23 ................................................................................................ passim

**INTRODUCTION**

Class certification should be denied here for a simple reason: real-world data show that the vast majority of putative class members suffered no antitrust impact, which means individual "mini-trials" would be necessary to identify any consumers who may have been injured. Plaintiffs spend the bulk of their motion (ECF No. 280 ("Mot.")) attacking Google's business practices by misconstruing evidence and brushing aside competitive realities.  Contrary to Plaintiffs' claims, Google's business practices with respect to Android and Google Play ("Play") have increased competition, expanded access to mobile devices, and facilitated an explosion of app development that has benefited consumers and developers.  Plaintiffs ignore these benefits, and instead argue that Play is akin to a "payment processor," failing to account for the incredible value it provides to billions of users.  But even accepting Plaintiffs' liability theory, the focus at class certification is whether Plaintiffs have common evidence that can identify which (if any) class members suffered antitrust impact as a result of Google's conduct.  They do not.

Plaintiffs seek to certify a class of consumers that purchased software applications ("apps"), subscriptions, and in-app purchases ("IAPs") from developers.  They claim Google's conduct resulted in higher service fees, and that developers passed through those fees by raising prices for *all* consumers.  Plaintiffs rest this theory entirely on their expert, Dr. Hal Singer, who opines that the laws of economics predict that ***all*** developers would change prices in response to changes in Google's service fee.  But Dr. Singer cannot reconcile his theoretical formulas with real-world evidence showing that pass-through of the service fee is a rare exception, not the rule. When Google has lowered its service fees in the past, nearly all developers ***did not*** change prices. Dr. Singer has no sound explanation for why the data resoundingly contradict his theory.

These data show that Plaintiffs cannot assume that the developer of each app would set lower prices if Google charged lower service fees.  Plaintiffs must prove whether developers would have reduced prices for each of the approximately 272,500 unique apps involved in purchases by more than 21 million putative class members.  After all, roughly 8.4 million of those consumers, or 39%, only made purchases from one app.  If that app's developer did not pass through any service fees, then those millions of consumers were not injured.  That is why pass-

1    through must be proven for each app to identify whether each consumer was injured.

2         Pass-through depends on facts that vary by app: *e.g.*, the developer's marginal costs,

3    pricing strategy, and competitive conditions.  Dr. Singer concedes he has no model to estimate or

4    account for these variables, meaning Plaintiffs would have to conduct app-by-app analyses for

5    hundreds of thousands of different apps to identify any consumers who were injured.  Courts

6    regularly deny certification where impact depends on such an individualized question.  And that

7    would not be the only one.  Because Google has responded to competition by reducing service

8    fees for some developers but not others, a "mini-trial" also would be necessary to determine

9    whether a developer would have been subject to a lower service fee in the but-for world.

10        Plaintiffs' alternative Play Points theory fares no better.  Plaintiffs claim that, in the but-

11   for world, Google would have increased rewards in its Play Points loyalty program.  However,

12   most consumers did not enroll in or use the program.  Thus, to prove which consumers suffered

13   antitrust impact under this Play Points theory, Plaintiffs must prove which consumers would have

14   made a different decision to enroll and use points in the but-for world.  Dr. Singer concedes that

15   he has no model to determine what each consumer would have done regarding Play Points, which

16   means Plaintiffs would need to prove that fact consumer by consumer.

17        Plaintiffs' motion fails for additional reasons.  *First*, many consumers benefit from the

18   business model Plaintiffs have challenged, and Plaintiffs have no common method of proving

19   whether a particular consumer would have been better off with or without that model.  *Second*, an

20   agreement between Plaintiffs' counsel and the State AGs creates financial conflicts and dual

21   loyalties that prevent Plaintiffs' counsel from adequately representing the proposed class.

22   *Finally*, Plaintiffs have not met the standards to certify an injunctive relief class that includes

23   consumers who never made any purchases in Play because they cannot show that an injunction

24   would be appropriate for all class members.  They have not specified the injunction they seek, nor

25   shown that an injunction is needed to remedy any harm to consumers who have benefited from

26   Play without paying a cent.  If anything, issuing an injunction requiring Google to change its

27   business model would harm consumers who benefit from Play without paying anything.

28        The Court should deny Plaintiffs' motion for class certification.

1

## BACKGROUND

2

## I.      FACTS RELEVANT TO CLASS CERTIFICATION

3

### A.      Google Play

4

Play is a platform that facilitates transactions between consumers and developers.

5  Declaration of Sujal Shah, Ex. A (Expert Report of Dr. Michelle Burtis ("Burtis")) ¶ 59.

6  Developers offer, and consumers find and download, apps for Android devices through Play.  *Id.*

7  As of May 5, 2021, there were over 4 million apps listed in Play with widely differentiated

8  functions, from games to productivity to entertainment to dating to tools.  Games are also highly

9  differentiated, ranging from casual puzzle games to complex role-playing games that demand

10  considerable memory and graphics capabilities.  *Id.* ¶ 157.  Developers choose the category in

11  which to list their apps on Play, and apps in each category are highly varied.  *Id.* ¶ 158.

12

Developers have many options for monetizing apps distributed on Play, including selling

13  the app ("paid app"), selling a subscription to access content in the app ("subscription app"),

14  selling digital content in the app ("IAP app"), or showing ads in the app.  *Id.* ¶ 53.  Roughly 90%

15  of apps are completely free, meaning they are free to download and do not offer IAP or

16  subscriptions (though they may display ads).  *Id.* Ex. 1.  Free apps accounted for 36% to 79% of

17  the apps installed by the proposed class representatives.  *Id.* Ex. 22.  Most developers that offer

18  IAPs or subscriptions adopt a "freemium" model in which consumers can download and use an

19  app for free, with the option to purchase a subscription or IAP for additional functionality.  *Id.*

20  ¶¶ 54–56.  During the class period, the class representatives only made a purchase from 4% to

21  12% of the apps they installed on their devices, meaning they enjoyed 88% to 96% of the apps

22  they installed without buying anything using Google Play's billing system.  *See id.* Ex. 22.

23

### B.      Google Play's Business Model

24

Besides a one-time $25 fee, which Plaintiffs do not challenge, Google does not charge

25  developers anything to list or distribute apps on Play.  *Id.* ¶ 60 & n.39.  Instead, Google monetizes

26  Play in part by charging a service fee on sales of paid apps, subscriptions, and IAPs.  Google does

27  not charge the developer a service fee unless the developer makes money; Google's service fee is

28  a percentage of the revenue ("consumer spend") generated by these sales.  *Id.* ¶ 62.  This is a

common business model employed by a number of Google's competitors including, for example, Apple, Samsung, Amazon, Steam, and Microsoft Xbox.  *Id.* Ex. 28.

Nearly all consumer spend by U.S. consumers—99%—is on subscriptions and IAP, not paid apps.  *Id.* Ex. 4.  Play's Payments Policy requires developers selling subscriptions and/or IAPs in apps distributed through Play to use Google Play's billing system.  This ensures that consumers have a safe, trusted, and secure billing system and that Google can efficiently collect fees for the value Play provides, which includes distribution to nearly 3 billion users; protection from malware and other unwanted apps; developer tools to launch and grow apps; and user tools to manage purchases, subscriptions, and parental controls.  Shah Decl., Ex. J ("Feng Dep."), at 62:11–21, 113:18–114:24.

Google's service fees have changed over time, and it has "moved beyond a 'one size fits all' service fee model."  Burtis n.131.  Some developers pay a 30% fee, which for a long time was industry standard.  *Id.* n.55.  Certain developers are eligible for programs that have service fees at 15%, ▮, or ▮▮▮▮.  *Id.* ¶ 84.  In response to competition, Google also lowered certain developers' effective service fees through bespoke deals.  *Id.* ¶ 68.  Developers in these programs or with these deals accounted for ▮▮ of U.S. consumers' spend in 2021.  *Id.* Ex. 17.  In January 2018, Google reduced its service fee for subscriptions after the first year to 15%, and in January 2022, reduced the service fee for all subscriptions to 15%.  *Id.* ¶ 71.  In July 2021, Google reduced its service fee for the first $1 million in annual developer earnings to 15%.  *Id.*

### C.     The Putative Consumer Classes

During the class period,[1] over 21 million putative class members purchased a paid app, subscription, and/or IAP from over 272,500 unique apps.  Declaration of Michelle Burtis, Ex. A (Burtis Rev. Ex. 20).[2]  Roughly 8.4 million (39%) putative class members only made purchases from one app during the class period, and 4.4 million (20%) only made a ***single purchase*** during the class period.  *Id.*, Ex. B (Burtis Rev. Ex. 21); *id.*, Ex. D (Burtis Rev. Ex. 24).  More than 3

---

[1] Although Plaintiffs' class period goes to the present, Google's data production only goes through July 2021.  Unless otherwise noted, "class period" refers to August 2016 to July 3, 2021.

[2] These numbers may be overstated because they refer to distinct consumer IDs in Google's databases, and a consumer may have more than one consumer ID.  Burtis n.102.

1   million putative class members (15%) spent *less than $5* during the class period, and more than

2   half the putative class spent less than $50.  *Id.*, Ex. C (Burtis Rev. Ex. 23).

3        There are also millions of Android device users that do not purchase any paid apps,

4   subscriptions, or IAPs.  From 2016 to 2021, there were an estimated 108 to 131 million Android

5   smartphone users in the United States.[3]  During that time, only approximately 92 million U.S.

6   consumers purchased a paid app, subscription, and/or IAP through Play.  Burtis Ex. 20.[4]

7        **D.    Fees and Prices**

8        Developers, not Google, set the prices for paid apps, subscriptions, and IAP they sell

9   through Play.[5]  As explained in more detail below, whether a developer would choose to lower its

10  price in response to a lower service fee depends on a number of factors, including the developer's

11  marginal costs, focal point pricing, the competition faced by the developer, and other

12  idiosyncratic factors.  *See* Burtis ¶¶ 142–56.  Google's service fee may not affect how a developer

13  sets prices.  For example, a number of named Developer Plaintiffs testified that they did not

14  consider Google's service fee when setting prices.  *E.g.*, Shah Decl., Ex. B ("Ellis Dep.") at

15  256:9–22 (LittleHoots); *id.*, Ex. C ("Scalise Dep.") at 212:9–214:11 (Rescue Pets); *id.*, Ex. D

16  ("Czeslawski Dep.") at 306:4–307:3 (PSB).

17       Notably, real-world data show that when Google reduced service fees for certain

18  developers, most of them *did not* reduce prices.  For individual items (SKUs) sold by developers

19  subject to a reduction in the service fee, "less than 2% of prices" for IAPs and subscriptions—and

20  only "between 1% and 13% of prices" for paid apps—changed after a service fee rate decline.

21  Burtis ¶ 176.  Executives of several Developer Plaintiffs' class representatives testified they *did*

22  *not* lower prices following a service fee reduction.  Scalise Dep. at 214:12–24 (Rescue Pets);

23  Czeslawski Dep. at 315:17–316:6 (PSB); Ellis Dep. at 265:21–266:4 (LittleHoots).

24       **E.    Play Points**

25       Google introduced a rewards program, Play Points, in the U.S. in November 2019.  Burtis

26

---

27  [3] https://www.statista.com/statistics/232786/forecast-of-andriod-users-in-the-us/.
    [4] This figure overstates the number of consumers that made a purchase because it is based on distinct
    consumer IDs and not individual consumers.  *See* n.2, above.
28  [5] For most of the class period, prices ranged from a minimum $0.99 to a maximum $400 price.  Play
    recently changed the minimum price allowed to $0.05.  Burtis n.33.

¶ 352.  Consumers must register for the program and earn "loyalty points" based on purchases.

*Id.* ¶¶ 352–53.  Play Points can be redeemed for Play Credits, to purchase items in Play, or

redeemed for special IAPs.  *Id.* ¶ 352.  From November 2019 through 2021, ███████ of U.S.

consumers registered for Play Points.  *Id.* ¶ 354.  From the launch of the program through July 3,

2021, no more than approximately ███ of U.S. consumers have redeemed Play Points, either by

using points to purchase an item or exchanging points for Play Credits.  *Id.* ¶ 355.

## II.     EXPERT ANALYSIS OF DR. MICHELLE BURTIS

Accounting for these and other facts explained below, Google's expert, Dr. Michelle

Burtis, opines that individual analysis of impact is necessary for the following reasons:

- Whether any developer would lower prices to consumers in response to a lower service fee requires an individualized analysis considering a host of factors.  *Id.* ¶¶ 23–25.

- Dr. Singer's opinion that pass-through would be universal is "verifiably wrong" because when Google reduced service fees, developers mostly did not lower prices.  *Id.* ¶ 29.

- Google would not uniformly reduce service fees in the but-for world, and determining which apps would be subject to lower rates requires an individual analysis.  *Id.* ¶¶ 11–20.

- Not all consumers sign up for Play Points, and only a fraction of those users ever redeem those points, so proof of an injury from a reduction in Play Points requires individual proof of whether each consumer would have signed up and used those points.  *Id.* ¶¶ 36.

- Many putative class members benefited from the challenged conduct by obtaining free apps and secure devices; an individualized analysis would be required to determine whether each consumer would have been better off in the but-for world.  *Id.* ¶¶ 37, 40.

Based on this evidence, Dr. Burtis concludes that Plaintiffs cannot rely on common evidence to

show that all or nearly all class members were impacted.

## LEGAL STANDARD

Plaintiffs must prove by a preponderance of the evidence that their proposed classes

satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements, as well as

Rule 23(b)(2) and (b)(3).  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31

F.4th 651, 663–65 (9th Cir. 2022) (en banc).  This "rigorous analysis" will "[f]requently . . .

overlap with the merits."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  "[W]here

necessary," courts may "resolv[e] expert disputes" to determine whether Rule 23's requirements

are met.  *Olean*, 31 F.4th at 666 (alteration and quotation marks omitted).

1

2

3   Rule 23(b)(3) requires Plaintiffs to show that common questions "are more prevalent or more important than the . . . individual issues." *Id.* at 664 (quotation marks omitted).  This requires proof that "essential elements of the cause of action, such as . . . an antitrust violation or antitrust impact, are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666 (quotation marks omitted).  Antitrust impact—that is, "the fact of damage that results from a violation of the antitrust laws"—is "critically important for . . . Rule 23(b)(3)'s predominance requirement."  *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 565–66 (N.D. Cal. 2013) (quotation marks omitted).

Class certification is inappropriate when "the need to identify uninjured class members will predominate and render an adjudication unmanageable," such as when plaintiffs propose "no further way—short of full-blown, individual trials"—to determine whether class members were injured.  *Olean*, 31 F.4th at 669 n.13 (quotation marks omitted).  Moreover, "where injury-in-fact is a required element of a claim, as it is in an antitrust action, a class cannot be certified based on an expectation that the defendant will have no opportunity to press at trial genuine challenges to allegations of injury-in-fact."  *Id.* at 669 (citation omitted).  "When a class is defined so broadly as to include a great number of members who for some reason could not have been harmed . . . the class is defined too broadly to permit certification."  *Id.* at n.14 (quotation marks omitted).  Indeed, the Supreme Court has held that "[e]very class member must have Article III standing in order to recover individual damages."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  This Court must thus "determine whether individualized inquiries into this standing issue would predominate over common questions."  *Olean*, 31 F.4th at 668 n.12.

To certify a class seeking an injunction under Rule 23(b)(2), plaintiffs must show that "a single injunction . . . would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.  Plaintiffs must describe the "general contours" of the relief they seek, and that relief must be "more specific than a bare" instruction "to follow the law."  *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quotation marks omitted).

1

## ARGUMENT

2

### I.   PLAINTIFFS CANNOT DEMONSTRATE THAT ALL OR NEARLY ALL CLASS MEMBERS SUFFERED ANTITRUST IMPACT USING COMMON PROOF.

3

4          As Plaintiffs acknowledge, "what really matters is whether the class can point to common

5   proof that will establish antitrust injury . . . on a class wide basis."  Mot. at 19 (quoting *In re*

6   *Capacitors III*, 2018 WL 5980139, at *8 (N.D. Cal. 2008)).  But Plaintiffs have no common proof

7   that developers would have passed through lower service fees in the but-for world—or that

8   developers would have had lower service fees at all.  Nor do they have common proof of which

9   consumers would have been injured under their Play Points theory.  That is fatal to class

10  certification because, as the Ninth Circuit noted in *Olean*, courts have "held that Rule 23(b)(3)'s

11  predominance requirement is not satisfied when the need to identify uninjured class members will

12  predominate." 31 F.4th at 669 n.13 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL*

13  *No. 1869 (Rail Freight II)*, 934 F.3d 619, 625 (D.C. Cir. 2019) and *In re Asacol Antitrust Litig.*,

14  907 F.3d 42, 53–54 (1st Cir. 2018)).  Plaintiffs also fail to account for the benefits many class

15  members received from Google's conduct.  Finally, because Plaintiffs lack a common method for

16  calculating damages, individual damages issues will predominate.

17          These problems are all amplified by Plaintiffs' decision to seek certification limited to

18  consumers "in [17] U.S. states and territories," but not states whose State AGs are plaintiffs.

19  Mot. at i & 3.  Plaintiffs do not explain whether their proposed class is limited to current residents

20  of the 17 states and territories or includes individuals who were present in one of those

21  jurisdictions when they made a purchase, or something else.  Regardless, during the class period,

22  millions of Play consumers likely moved between a class state and a non-class state.  An

23  individual may have purchased nothing while a Georgia resident (in the class) but then moved to

24  California (not in the class) and made a purchase there.  Thus, beyond the individualized inquiries

25  discussed below, it will be necessary to consider each individual transaction and determine where

26  the user resided or was located at the time of purchase to determine if it is part of the claim.

27  Plaintiffs do not propose any method for sustaining their burden to make this showing with

28  common proof.

1

**A.      Plaintiffs Have No Common Proof of Pass-Through.**

2

3

**1.      Individual Issues Predominate Because Pass-Through Requires An App-By-App Analysis Not Susceptible To Common Proof.**

4

Plaintiffs' main theory of antitrust impact depends on "pass-through from developers."

5

Mot. at 12.  As the Supreme Court has explained, if the developer of an app did not pass on

6

service fees by raising prices, then a consumer of that app was not injured.  *See Apple Inc. v.*

7

*Pepper*, 139 S. Ct. 1514, 1523 (2019) (no damages where "consumers would pay the same retail

8

price regardless of whether Apple's commission was 10 percent or 30 percent").  Approximately

9

8.4 million consumers—39% of the proposed class—made purchases involving one app.  Burtis

10

Decl., Ex. B (Burtis Rev. Ex. 23).  These consumers were not injured if the developer of the app

11

did not pass-through any allegedly inflated service fees through higher prices.  Plaintiffs lack

12

common proof of pass-through needed "to identify uninjured class members."  *Olean*, 31 F.3d at

13

669 n.13.  Plaintiffs' proof of impact consists entirely of expert testimony from Dr. Singer, Mot.

14

at 12–13, which is unreliable and inadmissible for the reasons explained in Google's *Daubert*

15

motion, ECF No. 282.

16

Regardless, unlike *Olean*, this is not a case where a defendant merely disputes whether the

17

factfinder should find a plaintiffs' expert "persuasive[]" or "unpersuasive."  31 F.4th at 667, 678.

18

The problem here is that Plaintiffs' expert evidence is not "capable of resolving a class-wide

19

question in one stroke," an issue that *Olean* directs district courts to resolve.  *Id.* at 666.  Dr.

20

Singer's opinion is based on a theoretical model that contradicts real-world data that pass-through

21

was rare.  The only analysis of actual service fee and price data in the record (by Google's expert

22

Dr. Burtis) shows that when Google reduced service fees for many transactions in 2018, 2021,

23

and 2022, developers in the data set only reduced prices for about 2% of products subject to the

24

service fee reductions.  *See* Burtis ¶ 103, Fig. 13.  An analysis of more limited data by the

25

Developer Plaintiffs' expert puts the percentage of apps that pass through any amount of lower

26

costs to consumers at only 8%.  *Id.* at 291 n.348.

27

Evidence that pass-through was minimal shows that pass-through must be ***proven*** for each

28

app, not assumed for all apps.  Proof of pass-through is "more complex" because it "must account

for the actions of innocent intermediaries who allegedly passed on the overcharge." *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 499 (N.D. Cal. 2008). This can make "the predominance standard more difficult to meet." 6 Newberg on Class Actions § 20:53 (5th ed.); *cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977) (noting "difficulties that have been encountered" with "statistical techniques used to estimate" pass-through). The sheer number of unique app transactions involved here amplifies the challenge. Whether a developer would have passed through a lower service fee to consumers in the but-for world requires analyzing pass-through for each of the roughly 272,500 unique apps involved in purchases by putative class members. Thus, in order "to identify uninjured class members" without "render[ing] an adjudication unmanageable," *Olean*, 31 F.4th at 669 n.13, the factfinder must have a method of proving pass-through for every one of the hundreds of thousands of apps involved in transactions by putative class members.

Plaintiffs have no such model. As the real-world data confirms, whether a developer would pass through a lower service fee depends on multiple variables—marginal costs, focal point pricing, competitive conditions, and other idiosyncratic factors—that defy common proof. That app-by-app analysis of pass-through is not "susceptible to generalized, class-wide proof" because Plaintiffs "will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Thus, "the only way to fully assess pass-through in this action would be" through "thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment." *GPU*, 253 F.R.D. at 505.

**Marginal costs.** In the standard economic model that Dr. Singer identifies for how an increase in service fees would affect a developer's price, any effect depends on the developer's marginal cost. Shah Decl., Ex. G ("Singer Dep.") at 105:8–106:3, 107:23–109:14; *id.*, Ex. H (Expert Report of Dr. Hal Singer ("Singer")) ¶ 225 & n.495. Thus, if a developer's marginal cost of producing an additional IAP is zero, then according to Dr. Singer, "prices would not adjust" and there would be no pass-through—even if a developer paid a lower service fee. Singer Dep. at 109:15–110:3. Economic literature recognizes that many digital goods have zero marginal costs. Burtis ¶¶ 142–43. Dr. Singer's report relies on an article stating that the "replication cost of

digital goods is zero." Singer Dep. at 95:22–98:19.[6]  And Dr. Singer testified that the "150th

sword" purchased in a videogame "doesn't cost any more to replicate." Singer Dep. at 98:10–19.

Thus, under Dr. Singer's economic model, pass-through depends on marginal costs, but

Plaintiffs have no common proof of each developer's marginal costs for each app.  As Dr. Singer

testified, "the marginal cost to a developer of supplying an additional in-app purchase could vary

from developer to developer." Singer Dep. at 95:15–18.  Dr. Singer did not try to estimate any

developer's marginal costs, *id.* at 90:20–91:2, 91:22–92:7, or use the standard economic model

that depends on them.  *Id.* at 382:6–15.  Instead, he used a simple ratio that "doesn't actually

depend on what the marginal cost of the developer is": the quantity of an app's transactions

divided by the quantity of transactions in the category in which the developer lists the app in Play.

*Id.* at 91:3–8; *see id.* at 190:20–192:3 (testifying that the "beauty" of this formula is that "we

don't need to estimate the marginal costs").  Dr. Singer's model simply ignores the individualized

issues specific to marginal costs that must be examined to determine whether a developer would

have raised prices and thus whether a consumer who purchased from that developer was injured.

**Focal point pricing.**  Proof of pass-through also requires an inquiry into whether the

developer of each app uses "focal point pricing," a "well-established concept in economics" in

which firms set prices ending in "99" cents.  *Id.* at 197:19–198:4; Burtis ¶ 149.  The prices for

some ***97%*** of U.S. consumers' retail app transactions ended in "99," and over 80,000 developers

used prices ending in "99" during the class period.  Burtis ¶ 149, Fig. 7; *id.* at Table 9; *cf. In re

Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 (N.D. Cal. 2022) ("overwhelming

evidence suggests that developers would choose to price their apps at focal points ending in 99

cents").  Pass-through is unprofitable where "the reduction from one" focal price point "to the

next would be so large that the developer would lose profits."  Burtis ¶ 150.

Dr. Singer's formula does not account for focal point pricing.  Singer Dep. at 205:19–

206:8.  This alone is grounds for denying certification.  *In re Lithium Ion Batteries Antitrust

Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. 2018) (denying certification where expert failed to

---

[6] Shah Decl., Ex. E (Avi Goldfarb & Catherine Tucker, *Digital Economics*, 57 J. Econ. Lit. 3, 12 (2019) (DX 335)).

"adequately account for the effects of focal point pricing"); *In re Optical Disk Drive Antitrust Litig.* ("*ODD*"), 303 F.R.D. 311, 325 (N.D. Cal. 2014) (same where expert did not address "the common practice in the industry of selling products costing in the hundreds of dollars at prices just under the next $100 mark"); *Apple iPhone*, 2022 WL 1284104, at *8 (same in part because "focal pricing" showed that expert's model did not reliably "determin[e] but-for pricing").

Plaintiffs claim to "have established a record demonstrating that focal-point pricing is not integral to developers' pricing in a but-for world" and "is unnecessary to include in a pricing model." Mot. at 23 n.16 (citing Shah Decl., Ex. I (Expert Reply Report of Dr. Hal Singer ("Singer Reply")) ¶¶ 26–30). But Dr. Singer admitted the opposite—that "focal point pricing is an important consideration here," Singer Dep. at 202:2–7, and the portion of Dr. Singer's Reply Report cited by Plaintiffs only underscores the need for an app-by-app inquiry. There, Dr. Singer speculates that developers "*could*" end their prices in "9" rather than "99", and hypothesizes how departing from focal point pricing *could* be profitable under certain assumptions. Singer Reply ¶¶ 29–30 (emphasis added). But, yet again, determining whether any developer *would* do so in the but-for world requires data about each app.[7]

**Competitive conditions.** A developer's price also may depend on the competition it faces, which varies from app to app. Burtis ¶ 155–60. Dr. Singer agrees that "competition among developers makes their pricing interdependent" and that "the prices that developers charge in the but-for world could depend on what their competitors charge." Singer Reply ¶ 118; Singer Dep. at 167:3–6; *see also* Scalise Dep. at 212:9–19 (Rescue Pets CEO testifying he considered prices of similar apps when setting prices for Rescue Pets to ensure its prices "aren't out of the realm of reasonability and they are not too low either"). Yet Plaintiffs have no common method to account for how the varied competition faced by hundreds of thousands of different apps affects how developers set prices for those apps. Given Dr. Singer's admitted failure to "put forth a model . . . to determine which apps in each category are complements and which are substitutes," Singer Dep. 159:15–25, Dr. Singer's method cannot account for variations in

---

[7] Google required developers to charge at least $.99, Mot. at 22, but that restriction applies to 17% of U.S. consumer transactions, not the 80% of other transactions that also ended in "99."

competition that he concedes affect pass-through.  That is fatal to Plaintiffs' certification bid.  *See Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004) (denying certification where "the but-for-price-what a customer would pay" depended on variable "competitive dynamics"); *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 1993 WL 527928, at *5 (E.D. Mich. 1993) (same where plaintiffs did not "account the varying markets for dry cleaning and laundry supplies"); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (same where sales took place in a "diversity of markets").

**Other idiosyncratic factors.**  There are many other reasons why a developer may not pass through a service fee reduction.  For example, if the developer would have invested savings from reduced service fees in improving or marketing its app instead of reducing prices, the app's consumer was not injured.  Although Dr. Singer testified that "standard economics would give developers an incentive to respond to lower service fees by reducing prices ***and*** improving quality," he "doesn't measure whether any developer would actually invest, or how much they would invest, in improving the quality of their app in the but-for world."  Singer Dep. at. 53:24–54:3 (emphasis added), 56:14–57:5.  A developer may also simply pocket the savings, *see* Ellis Dep. at 267:16–268:3, or donate it to charity, *see* Scalise Dep. at 207:14–17.  Or the developer may think its prices are "fair" or neither "super expensive" nor "too cheap."  *See* Czeslawski Dep. at 316:7–317:5 (PSB did not lower prices following a service fee reduction because "[w]e still feel this is a fair price for our app"); Ellis Dep. at 241:7–13 (when Little Hoots set prices, "we wanted it to feel like it wasn't super expensive," "[b]ut we also didn't want it to feel too cheap either").  Plaintiffs have no method other than thousands of mini-trials to prove which developers would have actually reduced prices, and for which products, in response to lower service fees.[8]

### 2.   Dr. Singer's Pass-Through Model Is Based On Theoretical Assumptions Instead Of Analyses Typically Relied Upon By Other Courts.

Plaintiffs insist they have common proof of impact from pass-through because "there are

---

[8] *Olean* directs that a class not be "defined so broadly as to include a great number" of uninjured members, which is dispositive here. 31 F.4th at 669 n.14.  It likewise follows that Plaintiffs cannot demonstrate, through common evidence, injury in fact to all class members, or that no more than a *de minimis* number of class members are uninjured. *See Rail Freight II*, F.3d at 624–625; *Asacol*, 907 F.3d at 53–54.

1  well-accepted econometric techniques—some of which Dr. Singer utilized in this case—for

2  demonstrating 'antitrust impact in markets with individualized differences among purchasers.'"

3  Mot. at 22 (quoting *Olean*, 31 F.4th at 674).  This is misleading.  Although Dr. Singer "typically"

4  analyzes pass-through by "regressing retail price changes on wholesale price changes," Singer

5  Dep. at 134:25–135:6, he did not run any regression to calculate pass-through rates here, *id.* at

6  164:18–165:12.  Instead, Dr. Singer employed a formula that always predicts pass-through and

7  thus "assumes the very proposition that the [Plaintiffs] are now offering it, in part, to show."

8  *ODD*, 303 F.R.D. at 321 (denying class certification).  As Dr. Singer testified, his pass-through

9  formula of 100 minus the ratio of an app's transactions to transactions in the category the

10  developer chose "will always produce a pass-through rate" so long as an app does not account for

11  100% of a given category, which no app does.  Singer Dep. at 181:23–183:7.

12      This case is therefore unlike the cases cited by Plaintiffs where experts analyzed the

13  effects of price-fixing using regressions.[9]  For example, in *Olean*, plaintiffs' experts "performed a

14  separate regression analysis to determine if [the alleged] overcharges passed through to the"

15  plaintiffs.  31 F.4th at 683.  Such regressions, if properly conducted, may "control for the effects

16  of the differences among class members and isolate the impact of the alleged antitrust violations

17  on the prices paid by class members."  *Id.* at 677.[10]  Dr. Singer ran no such regression.

18      Instead, Dr. Singer claims that the conclusion that "all or almost all developers would pass

19  through to consumers at least a portion of any savings from" reduced service fees "flows from the

20  elementary economic principle that prices depend on costs."  Singer Reply ¶ 70; *see* Singer ¶ 223.

21

22  [9] *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 (10th Cir. 2014); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266–67 (D.D.C. 2002); *Capacitors*, 2018 WL 5980139, at *6; *In re Disposable Contact Lens Antitrust Litig.*, 329 F.R.D. 336, 421 (M.D. Fla. 2018); *In re TFT-

23  *LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 602–03 (N.D. Cal. 2010).

24  [10] Plaintiffs' cases are inapposite for additional reasons.  Two involved evidence from guilty pleas "showing that defendants themselves acknowledged that 'their collusion had a wide impact on

25  prices.'"  *Capacitors*, 2018 WL 5980139, at *8; *see also TFT-LCD*, 267 F.R.D. at 605 (citing guilty pleas).  *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468 (N.D. Cal. 2020), and *In re

26  *Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12 (E.D. Pa. 2019), are distinguishable because they involved allegations that all consumers who would

27  have purchased lower-priced generic drugs rather than brand versions were harmed by the exclusion of the generic drugs from the market.  And defendants in *In re Mercedes-Benz Antitrust

28  *Litig.*, 213 F.R.D. 180 (D.N.J. 2003), "were homogeneous, selling mass-produced luxury automobiles and providing essentially inter-changeable services."  *Id.* at 189.

1   But a *theory* of universal pass-through is not common proof. *See GPU*, 253 F.R.D. at 496 (expert

2   "may not meet his burden by simply stating that 'economic theory' dictates that prices for retail

3   and wholesale purchases generally go up together"); *In re Flash Memory Antitrust Litig.*, 2010

4   WL 2332081, at *11 (N.D. Cal. 2010) (rejecting method based on "economic theory of pass-

5   through" because pass-through was "more complex than the theoretical model").

6           Plaintiffs' reliance on Dr. Singer's theory of universal pass-through is particularly

7   improper where real-world evidence shows that pass-through is exceptional. Unlike Dr. Burtis,

8   Dr. Singer has not done any analysis of pass-through using actual data on prices and service fees.

9   Singer Dep. at 141:18–142:17. His failure to account for real-world data "casts doubt on whether

10  there was any pass-through at all," which is yet another well-accepted ground for denying

11  certification. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *12

12  (W.D. Mo. 2021) (rejecting pass-through theory because evidence showed that retailers

13  "maintained the same retail price" despite changes in their wholesale cost); *In re Digital Music

14  Antitrust Litig.*, 321 F.R.D. 64, 94 (S.D.N.Y. 2017) ("determining the correct pass-through would

15  require conducting separate inquiries for each [digital music service]" where evidence showed

16  that Walmart charged a uniform retail price, suggesting a zero pass-through rate for Walmart's

17  sales); *see also Olean*, 31 F.4th at 666 ("where necessary," district courts may "resolv[e] expert

18  disputes"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (similar).

19          Courts have so held in cases involving both Dr. Burtis and Dr. Singer. *See Flash Memory*,

20  2010 WL 2332081, at *11 (denying certification where Dr. Burtis presented evidence that

21  "different retailers respond to cost changes in different ways, with some choosing not to pass-

22  through cost changes"); *In re Florida Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 685

23  (S.D. Fla. 2012) (denying certification despite Dr. Singer's opinion that "pass through *should*

24  occur" because evidence showed direct purchasers "did not consistently pass on" price increases).

25          Dr. Singer asserts that the real-world data are not informative because Google reduced

26  service fees while engaged in the challenged conduct, which prohibited developers from

27  "steering" users to platforms other than Google Play using in-app communications. Singer Reply

28  ¶ 100. However, Dr. Singer has not conducted any empirical analysis of steering on real-world

1    pass-through rates.  Singer Dep. at 239:2–13, 240:2–241:1, 246:3–12.  Moreover, Dr. Singer

2    testified that there are "explanations for how pass-through would occur in the presence of the

3    anti-steering restraint," *id*. at 242:15–22, and that he "would expect pass-through regardless of the

4    anti-steering restrictions."  *Id*. at 242:23–244:3.[11]

5            Plaintiffs' reliance on unproven theories on steering cannot erase real-world data showing

6    that pass-through occurred in only 2% of SKUs when Google reduced service fees.  As the

7    Supreme Court has explained, when it comes to pass-through, "in the real economic world rather

8    than an economist's hypothetical model, the latter's drastic simplifications generally must be

9    abandoned."  *Illinois Brick*, 431 U.S. at 742 (cleaned up).  Plaintiffs have no answer to real-world

10   evidence showing that prices did not change with service fees.  That evidence shows that pass-

11   through is not universal, but depends on multiple factors that vary from app to app.  The only way

12   for Plaintiffs to account for those variables for each app would be thousands of app-by-app mini-

13   trials that will overwhelm any common issues.  Indeed, while the need for individualized proof to

14   "identify *uninjured* class members" alone suffices to "render an adjudication unmanageable,"

15   class-wide adjudication is all the more improper where the rarity of any real-world correlation

16   between service fees and prices suggests that "individual trials" will be necessary to identify any

17   fraction of class members who actually *were* injured by pass-through.  *Olean*, 31 F.4th at 669

18   n.13 (emphasis added).

19           **B.      Individual Issues Predominate Because Not All Developers Would Be Subject
                       To Lower Service Fees In The But-For World.**

20

21           Plaintiffs also cannot demonstrate predominance because they have no method of

22   common proof that all or nearly all developers would be subject to lower service fees in the but-

23   for world.  If developers would not have paid reduced service fees in the but-for world, there

24   would be no savings to pass through and no injury to consumers.  *See, e.g.*, *Flash Memory*, 2010

25   _____

26   [11] An app-by-app analysis would be necessary even if more "steering" would have resulted in
     more pass-through.  As Plaintiffs note, "developers are allowed to steer" in numerous ways,
     including by charging lower prices on platforms with lower fees.  Mot. at 22.  One would expect
27   all developers to do so if Dr. Singer were right that higher costs always result in higher prices.
     Singer Dep. at 224:8–24, 229:22–230:11; Burtis ¶ 169.  In reality, developers of apps such as
     Minecraft, iHeartMedia, and Pandora Plus charge the same price on their website as on Google
28   Play. Burtis ¶ 169.  Dr. Singer's examples of developers that do charge less on their website,
     Singer Reply ¶ 101, simply confirms the need for an app-by-app analysis.

WL 2332081, at *10–12 (indirect purchaser plaintiffs' failure to show common impact on direct purchasers "alone" was sufficient to deny certification).  Because 39% of consumers purchased from a single app, determining whether each app would have been subject to a lower service fee rate is necessary to determine whether each consumer was injured.

Google's service fee rates differ across developers because different apps have different levels of popularity and importance.  Google has responded to competition by reducing service fees for some apps but not others.  For example, Google offers special programs that reduce service fees for certain types of audio, video, and reading apps that could sell digital content outside the app, and has negotiated bespoke deals with important game developers pursued by other app stores.  Burtis ¶¶ 117–18.  These apps accounted for ▮ of total U.S. consumer spend. *Id*. ¶ 118.  Google has also reduced service fees in other targeted ways, such as reducing fees for subscriptions.  Plaintiffs provide no reason why Google would change its strategy in the but-for world and reduce service fees across the board to meet enhanced competition.  *Id*. ¶ 113.  That is not the strategy that Google's competitors have used.  The Amazon Appstore offered developers of 20 of the top 100 games in Japan lower service fees and incentives, and ▮ has negotiated ▮ *Id*. ¶¶ 119–20.

The fact that Google has reduced service fees to some developers shows that an app-by-app analysis is required to determine which apps' service fees would be lower in the but-for world.  "As a general matter, antitrust claims predicated on negotiated transactions, as opposed to purchases based on list prices, often entail consideration of individualized proof of impact." *Flash Memory*, 2010 WL 2332081, at *8 (denying certification where a few direct purchasers comprised the bulk of sales and had "significant negotiating power"); *GPU*, 253 F.R.D. at 490–491 (denying certification where many direct purchasers had significant bargaining power).

To prove how Google's targeted approach would affect each developer's service fee rate in the but-for world, Plaintiffs would have to either marshal individualized proof for each developer accounting for their value to the Play Store and their ability to transact elsewhere, Burtis ¶¶ 232–36, or show that Google would abandon a targeted approach.  The former would defeat predominance and the latter is missing from Plaintiffs' motion.  Dr. Singer simply uses

averages to calculate a "headline" rate for Google, and claims that Google's individual

negotiations would mechanically occur off of that rate.  Singer ¶¶ 258–59; Mot. at 11, 21.  Courts

have rejected that approach as an improper attempt to mask individualized issues.  *See Flash*

*Memory*, 2010 WL 2332081, at \*12 (predominance not satisfied where expert's model failed to

take into account "individual variations" and looked only "at an average price trend").[12]

## C.    Plaintiffs' Play Points Model Is Not Common Proof Of Impact.

In one paragraph, Plaintiffs posit an alternative theory of impact: consumers allegedly

were injured not because they paid too much but because Google paid them too little.  Without

the challenged conduct, Plaintiffs say, more competition would have led Google to "increase[e]

its Google Play Points loyalty program."  Mot. at 13.  Plaintiffs still have no common method of

"identify[ing] uninjured class members" because they cannot show which apps and consumers

would have joined the Play Points program in the but-for world.  *Olean*, 31 F.3d at 669 n.13.

████████████ of U.S. consumers enrolled in Play Points and ██████ redeemed

Play Points.  Burtis Rep. ¶ 358; Singer Reply ¶ 98; Singer Dep. at 288:11–16, 289:17–23.  The

millions of consumers who did not enroll were not injured by any reduced Play Points offerings

unless, in the but-for world, they would have signed up and redeemed Points.  Plaintiffs have no

method short of mini-trials to prove which consumers would have done so.  Importantly, Dr.

Singer has not "identified any model to determine which users would have signed up for [P]lay

[P]oints in the but-for world," Singer Dep. at 295:5–20, or that can determine which of the

putative class members "would have signed up for [P]lay [P]oints and who would have used

them."  *Id.* at 297:8–21; *see id.* at 296:6–19.  When asked whether "every member of the putative

class would have signed up for the [P]lay [P]oints program and used [P]lay [P]oints," Dr. Singer

said that was a "fair assumption."  *Id.* at 298:22–299:10.  But assumptions are not common proof.

Dr. Singer claims that if Google had offered Play Points equivalent on average to about

---

[12] Plaintiffs argue that courts have accepted experts' reliance on averages, Mot. at 23, but the experts in the cases they cite applied a regression model to actual data to model impact on consumer prices.  *See D&M Farms v. Birdsong Corp.*, 2020 WL 7074140, at \*8 (E.D. Va. 2020); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613 (N.D. Cal. 2009).  It is one thing to use a regression to show an average effect on prices as experts in these cases did.  It is another to assume an average effect as Dr. Singer does in this case.

1    eight percent of a consumer's transaction, then all members of the class would have signed up for

2    them.  *Id*. at 296:6–19, 297:8–21.  This just assumes away the need to determine the amount of

3    Play Points each consumer would have earned, and whether that amount would have motivated

4    them to sign up.  Different consumers might value the same amount of Play Points differently—

5    just as, according to Dr. Singer, "[a] $10 gift card for Chick-Fil-A" or "a jar of change

6    accumulating in the closet might be worth more to some consumers than others."  Singer Reply at

7    ¶ 99.  Over 3.1 million class members (15%) spent less than $5 on Play.  Burtis Decl., Ex. C

8    (Burtis Rev. Ex. 23).  Dr. Singer has not even tried to show that points equal to 8.7% of that

9    consumer spend—less than ▮▮▮▮—would have been sufficient to motivate *all* of these millions

10   of consumers to sign up for Play Points when only a fraction did so in the real world.[13]

11         **D.**     **Many Class Members May Be Worse Off In Plaintiffs' But-For World.**

12         A class also cannot be certified where many members of the putative class benefited from

13   the challenged conduct such that plaintiffs' but-for world would have created "winners and

14   losers."  If a plaintiff cannot "account[] or control[] for the benefits that many class members

15   receive from the exclusionary conduct on a class-wide basis," then "the Court cannot conclude

16   that Plaintiffs have shown that common evidence is available to show class-wide impact."  *Allied*

17   *Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 169 (C.D. Cal. 2007).

18         Consumers have access to millions of apps that are completely free and can enjoy

19   "freemium" apps without any upfront payment (or any payment at all).  They pay nothing to

20   download, for example, Facebook, Uber, Airbnb, banking apps, or government agency apps.

21   Rather than charge for these apps, and many other free apps, Google primarily supports Play with

22   service fees on IAP and subscriptions, which account for 99% of Play's fees for the valuable

23   services that Play provides.  Burtis ¶ 57.  According to Plaintiffs, however, in the but-for world,

24   developers would pay none of this revenue because they would use their own billing systems.  *Id.*

25   ¶ 269; Singer Dep. at 309:4–310:7.  In other words, Plaintiffs' but-for world would put nearly all

26   of Google's revenue from Play "at risk."  Shah Decl., Ex. F ("Burtis Dep.") at 307:6–17.

27

28       [13] The 8.7% figure is also irrelevant because it reflects an estimate that Dr. Singer derived using "the sum of all promotions," not just Play Points.  Singer ¶ 253.

1    In that scenario, Google would have incentives to design its ecosystem differently, leaving

2    some consumers who benefit from Google's current system worse off.  Dr. Singer agrees that one

3    "should assume that Google is a profit-maximizing firm" that will take lawful steps to earn some

4    of the profits that it would lose in the but-for world.  Singer Dep. at 300:15–302:21.  That is why,

5    as Dr. Burtis explains, Google employees have analyzed alternative Play models involving

6    different fee structures, ███████████████████████████████████████████

7    ███████████████████████████████████.  Burtis ¶¶ 187–89, 201; *see*

8    Feng Dep. at 353:4–355:24 (describing how, in response to complaints that Google did not charge

9    free apps for distribution, Google considered alternative business models such as "████████

10   ████████████████████████████████████████████████

11   █████████  Dr. Burtis also explains that, in the but-for world, consumers may lose access to

12   valuable features.  For example, in a world without existing Android security standards, security-

13   conscious consumers would be worse off because they would face costs to keep their data and

14   devices secure.  Burtis ¶¶ 190–96.  Even if the impact of these changes were small, they could

15   cause net harm to consumers—such as the 15% of class members who spent less than $5 during

16   the class period and suffered (at most) $0.75 in damages, or the over 50% of class members that

17   spent less than $50 and suffered (at most) $7.60 in damages.[14]

18   In short, while Play has enabled millions of consumers to obtain safe and secure free apps,

19   some consumers may have paid more and received less in Plaintiffs' but-for world.  "The result is

20   to shuffle the position of [consumers] in the but-for world in a manner that defies predictability

21   with common evidence."  *Allied Orthopedic*, 247 F.R.D. at 169; *see also Kottaras v. Whole*

22   *Foods Market, Inc.*, 281 F.R.D. 16, 23–24 (D.D.C. 2012) (denying certification when

23   individualized inquiry needed to determine "net injury"); *Digital Music*, 321 F.R.D. at 95 (same).

24   Dr. Singer claims Google would not switch business models because the availability of

25   free apps benefits the Android ecosystem in ways Google would not sacrifice if it faced more

26   competition.  Singer Reply ¶ 54.  Setting aside this concession that Google's current model

27

28   ───────────────

[14] Maximum alleged damages in this example is the difference between a 30% fee and a 14.8%
fee and assumes (contrary to fact) 100% pass through.  E.g., ($5 x 0.3) – ($5 x 0.148) = $0.75.

benefits consumers and developers, internal Google documents show that ███████████

could *increase* the quality of Play by reducing the number of low-quality apps.  Burtis ¶ 269

n.321.  Moreover, the State AGs allege that Google should charge service fees to all developers,

including those that pay no such fees today, Plaintiff States' Complaint, ECF No. 188, ¶ 189, and

Plaintiffs' counsel are seeking fees for the success of those claims.  *See* Section II, below.

Dr. Singer also notes that while Google considered these alternative models, it never

adopted them.  Singer Reply ¶ 54.  But Plaintiffs are attacking Google's current business model.

Google believes its business model is lawful and the best one for consumers and developers, so it

is not surprising that Google has not adopted an alternative.  Further, the question here is whether

Google would have adopted an alternative if it was ***forbidden*** from pursuing its current strategy

or charging a service fee on IAPs that go through another billing system.  Google's internal

documents confirm that it would actively consider alternatives.  Burtis ¶ 197.[15]

Plaintiffs' inability to "account[] or control[] for the benefits that many class members

receive from the exclusionary conduct on a class-wide basis" precludes a finding that "common

evidence is available to show class-wide impact."  *Allied Orthopedic*, 247 F.R.D. at 169.  For

these same reasons, there are "fundamental conflicts of interest . . . among the proposed class

members," making certification "inappropriate."  *Id.* at 177.

**E.      Plaintiffs Have No Common Method Of Calculating Damages.**

The proposed class also cannot be certified because "the complexity of damages

calculations . . . defeat[s] predominance."  *Olean*, 31 F.4th at 681.  While individualized damages

do not alone defeat certification, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013),

Plaintiffs' damages model must establish that "damages are capable of measurement on a

classwide basis."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  It does not.  Because

Plaintiffs' damages are based on allegedly high service fees that are passed through to consumers,

---

[15] Plaintiffs also insist that Google would not change its business model because it would be
profitable with the but-for service fee rate.  Mot. at 12; Singer Reply ¶ 50.  But neither Plaintiffs
nor Dr. Singer explain why a developer would choose to use Google Play's billing service and
pay ████ if, as Plaintiffs claim, the developer could use its own billing system and pay Google
nothing.  Nor do Plaintiffs address the fact that only a small percentage of developers would need
to switch to put nearly all of Google's revenue "at risk."  Burtis Dep. at 308:9–24.

Mot. at 13, Plaintiffs have no common method of calculating class-wide damages for the same reasons they lack common proof of impact.  *See* pp. 8–22, above; Burtis ¶ 100 n.110.  Plaintiffs cannot show that savings to consumers would have been "fairly uniform" in the but-for world, *Earl v. Boeing Co.*, 21 F.4th 895, 899 (5th Cir. 2021); instead, this Court will need to conduct "individualized mini-trials to determine each class member's damage award," *Olean*, 31 F.4th at 682 n.31.  Indeed, what Dr. Singer calls the standard economic model shows that variations in developers' marginal costs can result in dramatic variations in damages calculations.[16]

## II.   PLAINTIFFS' COUNSEL ARE NOT ADEQUATE BECAUSE THEIR JOINT PROSECUTION AGREEMENT CREATES CONFLICTS.

Under Rule 23(a)(4), class counsel are inadequate if they "have any conflicts of interest with other class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  This standard prohibits "even the appearance of divided loyalties of counsel." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (cleaned up).  Here, Plaintiffs' counsel have direct conflicts with the proposed class because of their Joint Prosecution Agreement ("JPA") with the State AGs.  Although Plaintiffs' counsel pled a nationwide class, they now seek to represent only consumers who are ***not*** residents of the party states in *State of Utah et al. v. Google LLC, et al.*  Yet under the JPA, Plaintiffs' counsel continue to have a financial interest in the claims of consumers they no longer seek to represent because they can claim attorney's fees out of funds recovered by the State AGs.  This arrangement creates improper incentives and dual loyalties that conflict with counsel's duty to the proposed class.

*First*, the JPA gives Plaintiffs' counsel financial interests that do not depend on a successful result for the class.  Under the JPA, Plaintiffs' counsel can seek fees from "any recovery created by resolution of" the State AG claims for work performed while they "still represent[] clients with live claims in the case." ECF No.279-3, Ex. 1 (JPA), p. 3.  Thus, unlike a traditional contingency in which counsel's fees depend on their client's recovery, under the JPA, counsel's ability to keep earning fees depends on the ***absence*** of a settlement providing a

---

[16] The standard model Dr. Singer identified in his report assumes a developer's total marginal costs are equal to marginal costs divided by (1 – service fee).  Singer ¶ 225; Singer Dep. at 106:11–108:16.  Each developer's marginal costs therefore directly affect the calculation of the upper limit on pass-through damages.

1    recovery for the proposed class.  This gives Plaintiffs' counsel an incentive to keep the class

2    claims alive as long as possible, warping counsel's evaluation of whether a settlement is in the

3    class's best interests.  The JPA therefore impermissibly "disjoin[s] the contingency financial

4    interests of the contracting representatives from the class." *Rodriguez v. W. Publ'g Corp.*, 563

5    F.3d 948, 959 (9th Cir. 2009).

6         *Second*, the JPA gives Plaintiffs' counsel dual loyalties to the narrowed class and the four

7    named plaintiffs who do not reside in states within the narrowed class definition.[17]  Counsel

8    "cannot simultaneously represent a class and prosecute either individual or class claims against

9    the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs

10   or class members in the cases." *Lou v. Ma Labs., Inc.*, 2014 WL 68605, at *2 (N.D. Cal. 2014)

11   (finding counsel inadequate and denying class certification) (quoting 1 McLaughlin on Class

12   Actions 4:39 (10th ed.)).  This conflict precludes certification because a class "deserves to be

13   championed by its counsel unencumbered by their duties to other clients." *Id.*

14        Plaintiffs have not identified any precedent approving an agreement giving class counsel

15   an interest in funds recovered by consumers who are represented, and whose claims are being

16   litigated, exclusively by State AGs.  *Compare In re Dynamic Random Access Memory (DRAM)*

17   *Antitrust Litig.*, 2013 WL 12387371, at *7 (N.D. Cal. 2013), *R. & R. adopted*, 2014 WL

18   12879521 (splitting common fund fee award among class counsel and State AGs who represented

19   the same consumers).  To the contrary, absent a gross imbalance in contributions to the litigation,

20   "if the third parties hire their own attorneys and appear in the litigation, the original claimant

21   cannot shift to them his attorney's fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 770 (9th

22   Cir. 1977); *see United States v. Tobias*, 935 F.2d 666, 668–69 (4th Cir. 1991) (similar).  The JPA

23   creates conflicts that make Plaintiffs' counsel inadequate to represent the class.

24   **III.    THE COURT CANNOT CERTIFY AN INJUNCTIVE RELIEF CLASS.**

25        Plaintiffs' three perfunctory paragraphs cannot establish that "final injunctive relief or

26

27   _____

[17] Plaintiffs Carr (Washington resident), Egerter (California resident), Palmer (Massachusetts
resident); and Moglia (New York resident) cannot serve as class representatives because they are

28   not in the proposed class.  *Orr v. Shicker*, 953 F.3d 490, 499 (7th Cir. 2020).

corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs' proposed injunctive relief class includes any person in 17 states or territories with an Android device "capable of accessing the Google Play Store"—regardless of whether they have made any purchases through Play. Mot. at i. The proposed injunctive relief class thus includes consumers who have not paid a cent for digital content in apps installed from Play.

*First*, Plaintiffs have not "described the general contours of an injunction that would provide relief to the whole class." *B.K.*, 922 F.3d at 972. Now-Circuit Judge Koh's decision denying certification of a 23(b)(2) class in *Grace v. Apple, Inc.*, 328 F.R.D. 320 (N.D. Cal. 2018), is instructive. There, "the only statement approaching a legal argument" in plaintiffs' motion was that "'[c]ertification under Rule 23(b)(2) is proper because Apple's wrongful conduct affected all Class members in the same way.'" *Id.* at 349. Here, the only sentence in Plaintiffs' motion containing an argument for an injunctive relief class is that "Google's conduct at issue is not specific to any consumer." Mot. at 24–25. In *Grace*, the plaintiffs made a "boilerplate request" for "'injunctive relief to remedy Apple's continuing wrongful conduct.'" 328 F.R.D. at 349–50. Here, Plaintiffs' motion says nothing about their requested injunction at all, and their complaint prays vaguely for an order "enjoining Defendants from monopolizing the Android Application Distribution Market" and "engaging in anticompetitive conduct." Plaintiffs' own authority holds that such conclusory treatment cannot warrant certifying a 23(b)(2) class. *See Suboxone*, 421 F. Supp. 3d at 70 (denying certification where plaintiffs "relegated their request for 23(b)(2) certification to a mere two paragraphs in their Motion and two more brief paragraphs in their reply brief"); *see also Williams v. Apple, Inc.*, 338 F.R.D. 629, 657 (N.D. Cal. 2021) (same given "Plaintiffs' failure to meaningfully analyze the injunctive class in their motion").

For the same reasons, Plaintiffs have failed to demonstrate that their request for injunctive relief predominates over the monetary relief sought, as required under Rule 23(b)(2). *See, e.g.*, *Ellis*, 657 F.3d at 986 ("Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." (quotation marks omitted)); *In re Paxil Litig.*, 218 F.R.D. 242, 247 (C.D. Cal. 2003) (denying certification under 23(b)(2) where "the vague description of the nature of the actions sought to be enjoined suggests that the value of the

1  injunctive relief requested is dwarfed by the value of the monetary damages requested").

2  *Second*, Plaintiffs have not shown that consumers who never paid for an app or IAP using

3  Play will be injured absent an injunction.  All class members "*must* stand to benefit" from an

4  injunction, and a Rule 23(b)(2) class cannot be certified "when injunctive relief is not proper for

5  every class member." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 n.28 & 148 (2d Cir. 2020).

6  Again, Plaintiffs' own authority is in accord.  *See Suboxone*, 421 F. Supp. 3d at 70 (denying

7  certification of 23(b)(2) class because "the proposed injunctive relief in the form of 'corrective

8  disclosures' will not benefit patients who no longer take Suboxone film").  Plaintiffs' inclusion of

9  consumers who have never purchased any app or made any IAP distinguishes this case from *In re*

10 *NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327 (N.D. Cal. 2013),

11 where "all class members . . . would potentially be subject to ongoing antitrust harms resulting

12 from the continued unauthorized use of their names, images, and likenesses."  *Id.* at *7.

13     *Third*, the class representatives cannot adequately represent class members who have paid

14 nothing for apps or IAP and would be harmed by an injunction requiring Google to suspend

15 features of the Android and Play business model that has benefited them enormously at no cost.

16 Courts regularly deny certification of injunctive relief classes that include members who would be

17 harmed by the requested injunction.[18]  That rule prevents injunctive relief here because an

18 injunction eliminating Google's challenged conduct could harm consumers who have not paid for

19 apps or made IAPs by resulting in charges for free apps or changes in features of Play they value.

20 Plaintiffs' request to certify a class that would be harmed by the relief they request underscores

21 that this case is not appropriate for class treatment.

22                          **CONCLUSION**

23     For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

24

25 [18] *See, e.g.*, *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011) (denying
   certification where requested injunction "will materially transform the manner in which
26 defendants do business," resulting in "harm which will not be shared by each of the proposed
   class representatives"); *Digital Music*, 321 F.R.D. at 91 (denying certification where at least some
27 class members would be harmed if injunction were granted); *Pickett v. Iowa Beef Processors*, 209
   F.3d 1276, 1280 (11th Cir. 2000) (class improper "when it consists of members who benefit from
28 the same acts alleged to be harmful to other members").

1

2     Dated: June 23, 2022                              By: /s/ Sujal J. Shah
                                                           Sujal J. Shah
3

4                                                        Brian C. Rocca, S.B #221576
                                                         brian.rocca@morganlewis.com
5                                                        Sujal J. Shah, S.B #215230
                                                         sujal.shah@morganlewis.com
6                                                        Michelle Park Chiu, S.B #248421
                                                         michelle.chiu@morganlewis.com
7                                                        Minna Lo Naranjo, S.B #259005
                                                         minna.naranjo@morganlewis.com
8                                                        Rishi P. Satia, S.B #301958
                                                         rishi.satia@morganlewis.com
9
                                                         **MORGAN, LEWIS & BOCKIUS LLP**
10                                                       One Market, Spear Street Tower
                                                         San Francisco, CA 94105
11                                                       Telephone: (415) 442-1000
                                                         Facsimile: (415) 422-1001
12

13                                                       Richard S. Taffet, pro hac vice
                                                         richard.taffet@morganlewis.com
14                                                       **MORGAN, LEWIS & BOCKIUS LLP**
                                                         101 Park Avenue
15                                                       New York, NY 10178
                                                         Telephone: (212) 309-6000
16                                                       Facsimile: (212) 309-6001

17
                                                         Daniel M. Petrocelli, S.B. #97802
18                                                       dpetrocelli@omm.com
                                                         Stephen J. McIntyre, S.B. #274481
19                                                       smcintyre@omm.com
                                                         **O'MELVENY & MYERS LLP**
20                                                       1999 Avenue of the Stars Los Angeles,
                                                         California 90067
21                                                       Telephone: (310) 553-6700
                                                         Facsimile: (310) 246-6779
22

23                                                       Ian Simmons, pro hac vice
                                                         isimmons@omm.com
24                                                       Benjamin G. Bradshaw, S.B. #189925
                                                         bbradshaw@omm.com
25                                                       **O'MELVENY & MYERS LLP**
                                                         1625 Eye Street, NW
26                                                       Washington, DC 20006
                                                         Telephone: (202) 383-5300
27                                                       Facsimile: (202) 383-5414
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Neal Kumar Katyal, pro hac vice
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, pro hac vice
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants*

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Jonathan I. Kravis, pro hac vice
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al. in
In re Google Play Consumer Antitrust
Litigation; In re Google Play Developer
Antitrust Litigation; Epic Games, Inc. in Epic
Games, Inc. v. Google LLC; State of Utah et
al. v. Google LLC et al.*

1  <u>**Certificate Pursuant to Local Rule 5-1(h)(3)**</u>

2      I, Sujal J. Shah, am the ECF User whose credentials are being used to file DEFENDANTS'

3  OPPOSITION TO PLAINTIFFS' CLASS CERTIFICATION MOTION. In compliance with Local

4  Rule 5-1(h)(3), I hereby attest that counsel for Defendants have concurred in this filing.

5

6  Dated: June 23, 2022                    By _____ */s/ Sujal J. Shah* _____
                                                           Sujal J. Shah
7

# REDACTED VERSION

# Exhibit A46
# to
# C. Cramer Declaration

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT C

# CONFIDENTIAL-FILED UNDER SEAL

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

## Revised Exhibit 23 of Burtis Report

# REDACTED VERSION

# Exhibit A47
# to
# C. Cramer Declaration

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT G

# CONFIDENTIAL-FILED UNDER SEAL

Page 1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   --------------------------------------X
    IN RE GOOGLE PLAY STORE
4   ANTITRUST LITIGATION
5   Case No.  3:21-md-02981-JD
6

    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No. 3:20-cv-05671-JD
8

    In Re Google Play Consumer
9   Antitrust Litigation
    Case No. 3:20-cv-05671-JD
10

    In Re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12

    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  --------------------------------------X
15
16              VIDEOTAPE DEPOSITION
17               HAL SINGER, PH.D.
18            Thursday, May 12, 2022
19               9:07 a.m. (EST)
20
21
22
23
24  Reported by:
25  Ryan K. Black, RPR, CLR, Notary Public

Page 2

1

2

3

4                  Thursday, May 12, 2022

5

6          Video Deposition of HAL SINGER, PH.D.,

7    taken at the Law Offices of Munger, Tolles &

8    Olson, LLP, 601 Massachusetts Avenue NW

9    Washington, DC, beginning at 9:07 a.m.,

10   before Ryan K. Black, a Registered

11   Professional Reporter, Certified Livenote

12   Reporter and Notary Public and for the

13   District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 3

1   A P P E A R A N C E S:
2     CRAVATH, SWAINE & MOORE, LLP
      BY:  ERIC J. ZEPP, ESQ. - Via Zoom
3     825 8th Ave
      New York, New York  10019
4     212.474.1000
      ezepp@cravath.com
5     Representing - Epic Games, Inc. In Re:
                        Epic Games, Inc. V. Google
6                       LLC, et al.
7

      BARTLIT BECK LLP
8     BY:  KARMA M. GIULIANELLI, ESQ.
      1801 Wewatta Street
9     Suite 1200
      Denver, Colorado  80202
10    303.592.3100
      karma.giulianelli@bartlitbeck.com
11    Representing - Consumer Class Plaintiffs
12

      HAUSFELD LLP
13    BY:  AMY ERNST, ESQ. - Via Zoom
      325 Chestnut Street
14    Unit 900
      Philadelphia, Pennsylvania  19106
15    215.985.3270
      aernst@hausfeld.com
16    Representing - Plaintiff Developers
17

      MUNGER, TOLLES & OLSON LLP
18    BY:  JUSTIN R. RAPHAEL, ESQ.
      560 Mission Street
19    27th Floor
      San Francisco, California  94105
20    415.512.4000
      justin.raphael@mto.com
21    Representing - Defendants
22
23   ALSO PRESENT:
24     Emmanuel Pezoa - Legal Videographer
       Yajing Jiang, Ph.D - Charles River Associates
25     Kevin Caves, Ph.D - Econ One

Page 4

1                    I N D E X

2    TESTIMONY OF:  HAL SINGER, PH.D            PAGE

3    By Mr. Raphael............................6, 391

4    By Mr. Giulianelli..........................389

5                    E X H I B I T S

6    EXHIBIT          DESCRIPTION            PAGE

7    Exhibit 333    Hal Singer Ph.D's Opening Expert

8                   Report...........................27

9    Exhibit 334    Hal Singer Ph.D's Reply Report...27

10   Exhibit 335    an article titled Digital Economics

11                  by Avi Goldfarb and

12                  Catherine Tucker.................96

13   Exhibit 336    a document titled Economics Letters

14                  - Using Cost Pass-through To

15                  Calibrate Demand, by Miller, Remer

16                  and Sheu........................117

17   Exhibit 337    an article titled The Antitrust

18                  Logit Model For Predicting

19                  Unilateral Competitive Effects,

20                  by Gregory J. Werden and

21                  Luke M. Froeb...................156

22   Exhibit 338    a document titled Expert Report of

23                  Michelle M. Burtis, Ph.D.......364

24

25

Page 5

1           THE VIDEOGRAPHER:  Good morning.  We are
2   on the record at 9:07 a.m. on May 12, 2022.  This
3   is the video-recorded deposition of Hal Singer
4   taken in the matter of In re:  Google Play Store
5   Antitrust Litigation, filed in the United States
6   District Court, Northern District of California,
7   San Francisco Division, Case No.
8   3:21-MD-02981-JD.
9           My name is Emmanuel Pezoa, from the firm
10  Veritext Legal Solutions.  The court reporter is
11  Ryan Black, from the firm Veritext Legal
12  Solutions.
13          Will the court re -- court reporter
14  please swear in the witness?
15                    *     *     *
16  Whereupon --
17             HAL JASON SINGER, PH.D.,
18  called to testify, having been first duly sworn
19  or affirmed, was examined and testified as
20  follows:
21                    *     *     *
22          THE REPORTER:  And, Counsel, if you want
23  to state your appearances for the record, that
24  would be great.
25             MR. RAPHAEL:  Sure.

Page 6

1          Justin Raphael, Munger Tolles & Olson,

2    for the defendants.

3          MS. GIULIANELLI:  Karma Giulianelli,

4    from Bartlit Beck, for the consumer class.

5          MS. JIANG:  Yajing Jiang from Charles

6    River Associates.

7          MR. RAPHAEL:  Is there anyone on the

8    line who wants to introduce themselves?

9          MS. ERNST:  This is Amy Ernst.  I'm here

10   with Hausfeld for the plaintiff developers.

11          THE VIDEOGRAPHER:  Thank you.  You may

12   proceed.

13          MR. ZEPP:  Eric Zepp here, from Cravath

14   Swaine & Moore, on behalf of Epic Games.

15          MR. CAVES:  I'm Kevin Caves, with Econ

16   One on behalf of the Commercial developers.

17                     EXAMINATION

18   BY MR. RAPHAEL:

19      Q.   All right.  Dr. Singer, will you just

20   state your name for the record?

21      A.   Hal Jason Singer.

22      Q.   And, Dr. Singer, you've been deposed

23   many times; is that right?

24      A.   Yes.

25      Q.   How many times would you say you've been

Page 53

1   developers are passing through savings in order

2   to induce customers to switch to the -- and

3   download the app from the developer's website.

4           So it's not just theory.  I mean,

5   obviously, theory is on my side; but I think we

6   have -- we have good evidence to bear as well.

7       Q.   But you would agree that standard

8   economic theory tells us that developers would

9   have incentives to respond to lower service fees

10  by reducing their prices?

11      A.   Correct.

12      Q.   Okay.  And standard economics also

13  tells us that competition drives firms to make

14  competitive investments in product quality,

15  right?

16      A.   Yes.  I believe that, as I said, that

17  in -- in a but-for world with lower take rates

18  and this new-found cash flow that the developers

19  would enjoy, not all of it is going to go into

20  the pockets of the owners.  But -- but some of

21  that will be reinvested and -- and -- and in

22  services and features that -- that make the app a

23  better experience for the user.

24      Q.   Right.  So standard economics would give

25  developers an incentive to respond to lower

Page 54

1    service fees by reducing prices and improving

2    quality?

3        A.    Correct.

4        Q.    Now, in your reports, do you have any

5    model that will tell the Court or the jury which

6    developer will follow the incentives to improve

7    quality and which developer will follow the

8    incentives to reduce price?

9        A.    Well, I think all developers will reduce

10   price.  My opinion on quality is that it would

11   happen at a -- at a general level, but that is

12   not my proof of impact.  My proof of impact turns

13   on the price response.

14       Q.    Have you done any analysis to determine

15   whether any developer would improve the -- the

16   quality of their app in a world with reduced

17   service fees?

18       A.    I don't think I've done analysis.

19   I'm -- I'm aware of some testimony, and we'd have

20   to go into my footnotes of developers testifying

21   that they would do something to that effect.  But

22   I -- that's more me just citing a developer than

23   -- you know, than doing -- I took your question

24   to mean original analysis, like trying to model

25   the quality dimension.  I don't do that.

Page 90

1    predicts.

2        A.    Correct.

3        Q.    Okay.  And you're aware, aren't you,

4    that developers choose the category for their app

5    when they list it in Google Play?

6        A.    Yes.

7        Q.    Now, in your reports, have you

8    calculated or estimated the marginal cost of

9    supplying an additional app subscription or

10   in-app purchaser for any developer?

11       A.    I haven't estimated the marginal cost,

12   but I have cited record evidence and economic

13   literature establishing that they do, in fact,

14   incur marginal costs.  And I -- I also have the

15   opinion that processing payments are marginal

16   cost, and I also have the opinion that the take

17   rate is a marginal cost.  So I --

18       Q.    Okay.

19       A.    -- leave it at that.

20       Q.    Okay.  So in your reports, though, you

21   haven't calculated or estimated the marginal cost

22   of supplying an additional app subscription or

23   in-app purchase for any developer.

24       A.    No.  And the models don't call for that.

25   The -- at least in the short run, all the models

Page 91

1   require is that they face a positive marginal

2   cost, and I'm confident they do.

3       Q.   All right.  So the pass-through formula

4   you've used in your reports doesn't actually

5   depend on what the marginal cost of the developer

6   is.

7               MS. GIULIANELLI:  Objection.

8               THE WITNESS:  That's fair.

9               Do you want to -- I think we're an hour

10  and a half in?

11              MS. GIULIANELLI:  You want to --

12              MR. RAPHAEL:  Happy to take a break.

13              MS. GIULIANELLI:  -- a break?

14              THE WITNESS:  Okay.  Yes.

15              THE VIDEOGRAPHER:  Please stand by.

16              We're now off the record.  The time is

17  10:40 a.m.

18              (Recess taken.)

19              THE VIDEOGRAPHER:  We're now on the

20  record.  The time is 10:50 a.m.

21  BY MR. RAPHAEL:

22      Q.   Dr. Singer, have you put forth any

23  method in your reports to determine what each

24  developer's marginal costs are, other than

25  service fees?

Page 92

1      A.   Well, other than the service fees

2   and the processing fees, I haven't estimated

3   precisely the marginal costs.  But I have studied

4   the issue of whether they do incur other marginal

5   costs, and I've come to the conclusion that they

6   do; and I cite record evidence in economics

7   articles.

8      Q.   And so economics articles would be a

9   good source to determine what the marginal costs

10   for the developers are other than the service

11   fees and transaction fees?

12      A.   For identifying the categories of

13   marginal costs but not to -- not to estimate

14   precisely what -- what it is in, say, percentage

15   terms.

16      Q.    Okay.  Now, your opinion is that

17   acquiring an app -- strike that.

18          Your opinion is that downloading an

19   app and making in-app purchases are separate

20   transactions involving separate products.

21      A.   I wouldn't quite put it that way.  I

22   would say that the -- the services that are being

23   offered in the in-app for -- in support of in-app

24   transactions are different.  It's a different

25   suite of services than the services being offered

Page 95

1  consumer is complete?

2      A.   Certainly not the sales costs.

3  Certainly not the processing fee.  Certainly not

4  the take rate.

5      Q.   How about the other costs that you've

6  listed here in your report?

7      A.   It's possible that some of those other

8  marginal costs identified by Ghose and Han would

9  occur subsequent to -- to a particular

10  transaction, --

11      Q.   Okay.

12      A.   -- but could still be considered as

13  variable costs in the sense that they rise

14  with -- with output.

15      Q.   Okay.  Could the marginal cost to a

16  developer of supplying an additional in-app

17  purchase vary from developer to developer?

18      A.   Sure.

19      Q.   And could some developers have zero

20  marginal costs for an in-app purchase?

21      A.   No.

22      Q.   Could you go to Page 153 of your report?

23      A.   You must mean my initial report

24  because --

25      Q.   Correct.

Page 96

1      A.    -- the reply is not -- okay.

2            Page 153?

3      Q.    Yes, sir.

4      A.    Okay.

5      Q.    Do you see there second from the top

6   there's an article by Avi Goldfarb and Catherine

7   Tucker called "Digital Economics"?

8      A.    Yes.

9      Q.    So that's an article that you've relied

10   on in your report?

11      A.    Yes.

12      Q.    Are you familiar with that article?

13      A.    In part, yes.

14      Q.    Okay.  Do you know if that article says

15   anything about what marginal costs might be for a

16   digital good?

17      A.    No.  But if it were just a digital good,

18   I think that might be too broad of a category.

19   We're talking about in-app transactions here.

20            MR. RAPHAEL:  I'm going to mark this as

21   Exhibit 335.

22            (Exhibit No. 335, an article titled

23   Digital Economics by Avi Goldfarb and Catherine

24   Tucker, was introduced electronically.)

25            THE REPORTER:  Here you go, sir.

```
                                              Page 97
 1              THE WITNESS:  Thanks.
 2     BY MR. RAPHAEL:
 3          Q.   Do you see Exhibit 335, Dr. Singer?
 4          A.   I do.
 5          Q.   And what is it?
 6          A.   It -- it appears to be the article that
 7     I cited.
 8          Q.   That's the "Digital Economics" article
 9     by Tucker and Goldfarb?
10          A.   Yes.
11          Q.   And -- and could you go to Page 12 of
12     the article?
13          A.   If you'd let me just -- one second.  I'd
14     -- I'd like to just read the abstract quickly.
15          Q.   Would you go to Page 12, please?
16          A.   Hold on one second.
17               Okay.  Page 12.
18               Okay.
19          Q.   Do you see at -- further down, say,
20     two-thirds of the way down in the left column,
21     there's a header that says, "The replication cost
22     of digital goods is zero"?
23          A.   Yes.
24          Q.   So this article that you relied on in
25     your report says that "The replication costs of
```

Page 98

1   digital goods is zero," correct?

2       A.   Correct.

3       Q.   Now, are you familiar with V-Bucks?

4       A.   Oh.  Can I put this to the side?

5       Q.   For now, yes.

6       A.   Yeah.

7            And I would just note for the record

8   that replication costs and marginal costs are not

9   the same.

10      Q.   Well, how are they different?

11      A.   Oh.  What -- what Goldfarb is not taking

12  into consideration here is that to sell the extra

13  unit you have to pay a processing fee.  That's a

14  marginal cost.

15           So it's true that to create the next

16  sword -- the 150th sword doesn't cost any more to

17  replicate that sword, but that doesn't mean there

18  aren't any marginal costs incurred in the

19  transaction.

20      Q.   Understood.

21           All right.  Could some developers have

22  negative marginal costs for in-app purchases?

23      A.   It's hard to -- to fathom that.

24      Q.   What if a developer generates

25  advertising revenue as the result of an in-app

Page 105

1    being reflected in the prices of apps in the

2    transaction data.

3        Q.    Right.   And your opinion is that

4    Google's service fees, to the extent that they

5    are supercompetitive, is equivalent to an

6    increase in the developer's marginal cost.

7        A.    It can be understood that way, yes.

8        Q.    Right.   And in your report, you've

9    modeled the proper economic way to calculate how

10   a profit-maximizing developer would set prices

11   based on marginal costs.

12       A.    I have.   And --

13       Q.    Right.

14       A.    -- and, as you know, it depends on

15   the -- the nature of the demand and the demand

16   specification that you assume, right?   Each

17   demand specification you assume is going to apply

18   at different pass-through rates.

19       Q.    Right.   So could you go to Page 104 of

20   your report, your opening report, please?

21       A.    Sure.

22       Q.    And you'll see this is a continuation of

23   the Paragraph 225 from the previous page.

24            And you've got a formula there that has

25   "P minus C star divided by P equals one divided

Page 106

1    by E sub D."

2            Do you see that?

3        A.    Yes.   That's the classic Lerner markup.

4        Q.    Right.   So that's -- that's the proper

5    economic model for how a profit maximizing

6    developer would set prices based on marginal

7    costs, right?

8        A.    That model describes the markup over

9    marginal cost as the function of the elasticity

10   of demand faced by the developer.

11       Q.    Right.   And -- and this model on Page

12   104 of your opening report, that -- that's --

13       A.    So --

14       Q.    -- the correct economic mod -- economic

15   way to model how the change in marginal costs

16   will affect the price that the developer charges.

17       A.    It's the -- it's the way to think

18   about it at -- at a very, very high level of

19   abstraction.   But, as you know, to actually

20   estimate the pass-through rate here, I have to

21   make an assumption about the demands curve and --

22   and -- and the precise nature of demand that a --

23   the developer faces, right?

24            Once you --

25       Q.    Understood.

1    A.    -- make a -- once you make that

2  decision, you get these pass-through rules,

3  right?  And the pass-through rules -- whether you

4  go linear or logit or -- or constant elasticity

5  -- are going to express pass-through as a

6  function of things that do not include the

7  marginal cost.

8    Q.    Understood.  But this formula on Page

9  104 of your report is the correct economic way to

10  model the relationship between the developer's

11  price and the marginal cost in general?

12    A.    Well, I just want to put that caveat in

13  there.  It's the -- it's the -- definitely the

14  way to think about it and why it's in my

15  preamble, right?

16        But when I go to model the precise

17  amount of pass-through, I have to make an

18  assumption about what kind of demand the

19  developer faces, right?  And that -- that puts

20  me to a -- takes me to a pass-through rule that

21  isn't necessarily going to be denominated in

22  terms of costs.

23    Q.    Understood.  So -- but -- but this mod

24  -- this economic model you've described in Page

25  104 of your report, that's generally accepted in

Page 108

1    economics.

2         A.   Yes.

3         Q.   Now, if you just look at the cost term

4    there, C star, and the -- the C star in that

5    formula that you have on Page 104 of your report

6    is equal to C divided by one minus T, right?

7         A.   Correct.

8         Q.   And -- and in that -- in that cost term

9    I just described, T is the service fee rate?

10        A.   Correct.

11        Q.   And C is the developer's per-unit

12   marginal cost other than the service fee?

13        A.   Correct.  Processing and the like, yes.

14   Any other --

15        Q.   Okay.

16        A.   Any other types of marginal costs.

17        Q.   Okay.  And so one input into the

18   generally accepted economic model of how the

19   profit-maximizing developer would set pri --

20   prices is the marginal costs other than the

21   service fee.

22        A.   For short-run profit maximization, the

23   answer is, yes, that this model, at this high

24   level of ab -- of abstraction, is a function of

25   the marginal cost.

1    Q.   Right.  And in terms of how the price is

2   a function of mar -- of --of -- of marginal cost,

3   the -- the -- the formula you've got here on Page

4   104, in that formula, the effect of a change in

5   the service fee -- let me -- let me put it

6   differently.

7         The formula you've got on Page 104, the

8   effect on prices will be -- as a result of a

9   change in the service fee will be proportional to

10   the marginal costs other than the service fee.

11    A.   In -- for short-run profit maximization,

12   yes.  For -- for long-run profit maximization,

13   this is not -- this is not the -- the way that

14   you'd get to the effect on price.

15    Q.   Okay.  Now, -- so let me just ask,

16   looking at this cost term here, C -- C star, if C

17   in that formula, which is the marginal cost other

18   than the service fee, if that's zero, then the

19   service fee rate will not have any effect on the

20   ultimate price charged according to this model,

21   correct?

22    A.   Let me just say this:  It -- it's --

23   it's never zero in the real world.  But -- but if

24   you want me to ask -- answer the hypothetical,

25   counterfactually, if we had -- if we had a zero

Page 110

1   marginal cost, then by this model, and this model

2   alone, then in the short run, prices would not

3   adjust to the take rate.

4           As I explain in my report, there's all

5   sorts of reasons why we would still, even in that

6   extreme and counterfactual assumption, would

7   expect prices to change with the change in the

8   take rate, including from steering, including

9   from having to cover all costs in the long

10  run, --

11      Q.   Okay.

12      A.   -- including from sticky prices.

13      Q.   Okay.  Now, let me just ask again,

14  hypothetically, if that term C, which are the

15  marginal costs other than the service fee rate

16  in your formula on Page 104, if that term is

17  negative, then a reduction in the service fee

18  rate will actually lead to an increase in the

19  price that the developer would charge.

20      A.   I haven't done that one yet, but I

21  think you've got the -- the sign correct.  If you

22  multiply, in that example, 1.43 by a negative

23  cost, I think that there -- there would be a

24  negative relationship in the short run for this

25  equation.

Page 134

1   period.

2   BY MR. RAPHAEL:

3       Q.   But the pass-through formula you have

4   would predict changes in the pass-through rate

5   from week to week or month to month if the share

6   changes.  Fair?

7       A.   If one were so inclined to measure it on

8   -- on a monthly or nanosecond basis, yes, you

9   could get very strange results.

10      Q.   Okay.  Could the formula you've got

11  here, the "M minus Q sub J divided by M," could

12  that be used to calculate pass-through rates in

13  any case where you know the unit market share of

14  an intermediary alleged to have passed on an

15  overcharge?

16      A.   I -- I -- I'd be reluctant to say that

17  the logit model could be applied to any case.

18  I'd want to confirm, first, as I did here, that

19  the logit model does a good job explaining the

20  relationship between prices and shares, as it

21  does here.

22          So I think you need some empirical

23  foundation before applying the logit model.

24  I think that would be a good -- good practice.

25      Q.   Okay.  Have you used the formula that

Page 135

1   you used to calculate pass-through in this case

2   to calculate pass-through in any other case?

3        A.   I do not believe I have.  In other

4   cases, what I'm typically doing is regressing

5   retail price changes on wholesale price changes.

6        Q.   Okay.

7        A.   And that -- that's just not available

8   here.

9        Q.   All right.  To your knowledge, has

10  any economist used the formula you've used to

11  calculate pass-through in this case to calculate

12  pass-through in some other case?

13       A.   I -- I don't -- I don't know enough -- I

14  can't follow how pass-through is calculated in

15  every antitrust case.  I can tell you that the

16  logit assumption is one of the most common

17  assumptions that's used in antitrust cases there

18  is.

19       Q.   But --

20       A.   All right?

21       Q.   But you're not aware of this formula

22  being used to calculate pass-through in another

23  case.

24       A.   Oh.  Pass-through?  Well, the formula

25  is used to calculate price effects from, say,

Page 141

 1   has imposed throughout the class period.

 2          This is why their examples are so

 3   tortured.  They're looking at these slight little

 4   variations that either barely applied to an app

 5   or where prices couldn't change because of Google

 6   restriction.  So I -- I did everything that I

 7   could possible.  I'm telling you that the most

 8   comprehensive thing that -- that relates would be

 9   the relationship between ad valorem sales taxes

10   at -- at the state level and prices, which do

11   -- are -- there's a tight relationship between

12   those two, right?

13       Q.   Right.  But the analysis of ad valorem

14   sales taxes doesn't use actual data regarding

15   developers' service fees and prices in the actual

16   world, correct?

17       A.   That is correct.

18       Q.   Okay.  And so you haven't done any

19   analysis -- using actual data on prices and

20   service fees for the entire set of developers

21   that's at issue in this case, you haven't done

22   any comprehensive analysis regarding the

23   relationship between those things, correct?

24       A.   I told you I could not do it given the

25   nature of the lack of variation --

Page 142

1        Q.   And because --

2        A.   -- in Google's --

3        Q.   -- you couldn't --

4        A.   Almost every transaction.

5             MS. GIULIANELLI:  Hey, hey.  Let --

6   let --

7             THE WITNESS:  Almost every transaction

8   is occurring at 30 percent.  You -- you need

9   variation in the treatment variable in order to

10  tease out the relationship.  And if Google

11  doesn't do it because of its restraints

12  preventing competition, I can't -- I can't run a

13  test of what you're asking for.

14  BY MR. RAPHAEL:

15       Q.   Right.  And because you feel like you

16  couldn't do it, you didn't do it?

17       A.   Correct.

18       Q.   Okay.  Now, the Miller -- let's go back

19  to the exhibit, I think it was 336, which was the

20  Miller article?

21       A.   Yes.

22       Q.   Now, if you'll to go to the top of Page

23  452, we were talking earlier about Expression 2

24  which refers to the per-unit tax.  Do you recall

25  that?

Page 159

1    in the Staples and Office Depot case, that paper

2    clips and a ruler aren't necessarily substitutes;

3    but if the people generally tend to buy those

4    things from the same place, they can belong in

5    the same product market.

6        Q.   So -- but -- but it's not your opinion

7    that all apps in each Google Play app category

8    are substitutes.

9        A.   I just gave an example of Excel and Word

10   as being more -- more of complements, right?  But

11   -- but when you think about the -- the cat -- the

12   productivity suite that Google is offering, that

13   -- that's clearly a substitute to what -- what

14   Microsoft is offering in its productivity suite.

15       Q.   Right.  So some of the apps in each

16   Google Play category could be complements,

17   correct?

18       A.   They could be.

19       Q.   And some could be substitutes.

20       A.   They could be, yes.

21       Q.   Right.  And you haven't put forth a

22   model in your report to determine which apps in

23   each category are complements and which are

24   substitutes?

25       A.   No.  And it's not necessary to get the

Page 164

1      Q.   Let me -- let me ask a different

2    question.  You haven't calculated what those

3    switching costs are.

4      A.   I haven't calculated it, no.

5      Q.   All right.  So you ran a regression in

6    your opening report, correct?

7      A.   Well, I ran so many, I'm not sure which

8    one you're speaking of.

9      Q.   So let me -- fair point.

10          You ran a set of regressions in your

11   opening report.

12     A.   Yes.

13     Q.   Okay.  Now, those regressions are

14   testing the elasticity of demand for apps based

15   on a change in the price of the app, right?

16     A.   As instrumented via change in the tax

17   rate, correct.

18     Q.   Okay.  Now, the regression you ran in

19   preparing your opening report isn't measuring how

20   a service fee change affects the price of an app

21   or an in-app purchase, right?

22     A.   Correct.  We've been through this

23   before.  If -- if Google had varied its service

24   fee across more than a tiny amount of

25   transactions, I -- I could have employed a

Page 165

1    different model, but I couldn't given the

2    restraint.

3          Q.   Right.  So just -- I -- I understand.

4    I just want to make sure we're clear about what

5    your regression does and -- and it doesn't do.

6               The regressions that you ran in your

7    opening report isn't measuring the effect of the

8    service fee on the price of the app or the in-app

9    purchases, right?

10         A.   Correct.  It's doing something close so

11   that I can make a prediction about how a change

12   in the service fee would change the prices.

13         Q.   And you haven't run any regression that

14   measures how a change in the service fee affects

15   the price of an app or in-app purchases?

16         A.   I've -- I haven't -- well, I've tested

17   and -- and analyzed the regressions that were run

18   by Dr. Williams and Burtis that -- that purport

19   to do that or that attempt to do that, but those

20   experiments are so fatally flawed and botched

21   that there is no learning to be done.  There's --

22   there's no -- there's no economic knowledge that

23   can be gleaned from those botched experiments.

24         Q.   Right.  Now, the prices that developers

25   charge in the but-for world might depend on

1   would have been set are the prices that would

2   have been set most likely for the long haul.

3       Q.   Okay.  And the prices that developers

4   charge in the but-for world could depend on what

5   their competitors charge.

6       A.   Yes.

7       Q.   Can you think of any factors that could

8   cause one developer to pass on a reduced service

9   fee in the form of a lower price and -- and would

10  make another developer not do so?

11      A.   Well, under the logit model, the

12  pass-through rate will be different depending

13  upon the share of the developer and the app

14  category.  So anything that contributed to the

15  app developer having different share would

16  allow -- would be the basis for a different

17  pass-through rate.

18      Q.   Can you think of any other factors

19  that would affect whether one developer would

20  pass through a reduced service fee and another

21  developer wouldn't?

22      A.   Oh.  "Wouldn't?"  I mean, no.  Wouldn't,

23  it's hard for me to conceive of, because almost

24  any -- any demand structure that I have would

25  have used, whether linear, logit or constant

Page 181

1    that uses a dollar amount of sales tax?

2        A.   Well, in the field -- it's one of the

3    fields in the transaction data that says "taxes",

4    and it -- it is -- it is stated in dollars, I

5    believe, not as percentage.  So we get to see

6    what the relationship is between those changes,

7    right, as -- as predictive -- how predictive they

8    are to changes in prices.  The fact that they may

9    be denominated in dollars doesn't mean they don't

10   come from ad valorem.  I'm pretty confident that

11   they are always -- or that generally -- just to

12   be safe, they're generally set as a percentage of

13   revenues.

14       Q.   Understood.  But as you input them into

15   your model regarding the relationship between the

16   sales taxes and the prices, they were in dollar

17   terms and not percentage terms?

18       A.   I believe that's the case.  I can -- I

19   can check that out for you in a break, but I

20   believe that the way that it's entered into the

21   database is as dollars.

22       Q.   Got it.

23            Now, going back to your formula for

24   pass-through, which, again, is essentially a

25   hundred minus the quantity share of the apps

Page 182

1   transactions in its category, right?

2       A.   That's for the app developer, but I

3   don't present it that way in the report.  I

4   present it, as you know, at the category level.

5       Q.   Understood.

6       A.   Okay.

7       Q.   But that's the general math of the

8   formula?

9       A.   That's the math.

10      Q.   Right.  Fair to say that that math will

11  always produce a pass-through rate, unless the

12  app developer or -- has a hundred percent of a

13  Google Play category?

14      A.   I think it's fair that -- that you'll

15  get a positive pass-through rate.  You won't

16  necessarily get a big one, but you'll get a

17  positive pass-through rate with the exception

18  of the guy who dominates the field.  And, you

19  know, again, this is -- hopefully this is

20  intuitive to the non-economist in that -- in that

21  your share is capturing your dominance in this

22  arena of competition.  And so what the logit

23  model is telling us is that the more dominant you

24  are, the less -- the smaller percentage of the

25  pass -- of a cost saving you share with your --

Page 183

1    with your client.

2         Q.   Right.  But just so we're clear, unless

3    the app has a hundred percent quantity share in

4    the category, your formula will predict a

5    positive pass-through rate?

6         A.   For a given app developer, that -- that

7    is correct, yes.

8         Q.   Okay.  Now, you talked earlier about

9    the pass-through formula you have, potentially

10   predicting different rates from month to month or

11   week to week.  We talked about that a little bit.

12        A.   Yeah.  If you were to measure it on a

13   monthly basis, there would be some variation that

14   you wouldn't get if you were to measure it across

15   the -- the class period.  That is correct.

16        Q.   Right.  And your opinion is that it's

17   not appropriate to measure it on that short of a

18   time scale, correct?

19        A.   Correct.

20        Q.   Right.  And what's the economic basis

21   for why it's inappropriate to measure it on that

22   week to week or month to month or those sorts of

23   time frames?

24        A.   I don't think that an app developer

25   is going to revisit its pricing on a -- on a

Page 197

1   apply to a model of logit demand if the -- if the
2   model in Paragraph 104 is a generic model?
3       A.   Well, because the logit pass-through
4   rule states pass-through as a function of
5   industry concentration and not of cost, and so
6   when you asked me why doesn't -- you're asking me
7   basically why isn't the pass-through rate under
8   logit changing with the change in costs.  It
9   doesn't.  It's just a property of the logit
10  demand.  It doesn't make the math on 104 wrong.
11  It doesn't make the logit wrong.  It just -- it's
12  no longer a function of cost.
13      Q.   So the property of the logit demand
14  model that you used for your pass-through is that
15  the price is a function of the concentration and
16  not of the cost?
17      A.   The pass-through is a function of the
18  concentration, not of the cost, correct.
19      Q.   All right.  What is focal point pricing?
20      A.   Focal point pricing is the notion that a
21  consumer might focus on the -- on the first digit
22  before the decimal, as opposed to the last two.
23  So it explains why a lot of firms end -- end
24  their prices in 99 cents, or other -- or other
25  combinations.  Just a greater focus on the first

Page 198

1    -- on the stuff before the decimal place than --

2    than after the decimal place.

3        Q.   Okay.  And do you -- focal point pricing

4    is a well-established concept in economics?

5        A.   Sure.

6        Q.   And in the real world, many developers

7    price transactions only at certain focal points?

8            MS. GIULIANELLI:  Objection.

9            THE WITNESS:  We -- we've -- I've given

10   you all the stats that I think you could ever

11   want to see and more, but, you know, we know that

12   a lot do but a lot don't.  You know, 20 percent

13   of the top 200 don't end in 99 cents, right,

14   which is a big number.

15   BY MR. RAPHAEL:

16       Q.   So fair to say, though, that in the real

17   world some developers price in way that seems

18   like they're focal point pricing and some

19   developers don't?

20       A.   Given -- given the constraints that

21   Google imposed on some developers, yes, they

22   -- you know, they did price at 99 cents.

23       Q.   Well, what analysis have you done, sir,

24   in your reports to determine what effect Google

25   -- any constraints that Google imposed on

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 202

1    BY MR. RAPHAEL:

2        Q.   I guess what I'm asking is, is it your

3    opinion that focal point pricing doesn't explain

4    any developers' pricing in the actual world?

5        A.   No, I think that's too harsh.  I think

6    that focal point pricing is an important

7    consideration here.

8        Q.   Okay.  Now, and -- and the price floor

9    you talked about of setting prices at 99 cents,

10   that wouldn't affect developers who set their

11   prices quite a bit above 99 cents?

12       A.   That's fair.  I think that, when we

13   looked at the data, it's about -- it's about 20

14   percent of developers were at that 99 cent, so I

15   agree with you that -- that those would be the

16   ones who were constrained from -- from moving

17   downward.

18       Q.   Okay.  So the other 80 percent of

19   developers wouldn't be affected by what you're

20   calling the price floor that Google had in place?

21       A.   Correct.

22       Q.   Okay.

23       A.   With one caveat in the sense that there

24   could be spillover effects from a floor being set

25   at 99 on what the next step up would be, but I

1   out, for the purposes of impact, is to say that

2   if all app developers within a category achieved

3   a certain cost reduction by virtue of enhanced

4   competition and, thereby, lower take rate, how

5   much of that would be shared with consumers in

6   the aggregate across the category.  And, you

7   know, what I'm hearing is, oh, my God, have you

8   ruled out 99-cent things or things that end in 9?

9   No, we haven't -- we haven't ruled that out.  But

10  we're talking about the share of the costs that

11  are being saved in the aggregate across a

12  category.  We can allow for 79-cent pricing, we

13  can allow for 99-cent pricing, 29-cent pricing in

14  the but-for world.  We're not putting any

15  restrictions on -- on what the price of a

16  particular app in a particular plan at a

17  particular point in time are.

18  BY MR. RAPHAEL:

19      Q.   Right.  So I just want to make sure I

20  get an answer to my question.  So your model for

21  a pass-through isn't trying to take account in

22  any specific way for the phenomenon of focal

23  point pricing?

24      A.   I -- I don't -- I don't think that the

25  mod -- that particular logit estimate of the 89

1    percent is accounting or needs to take account.

2    I think I need to account for it in my overall

3    opinions about what the but-for world would look

4    like.  But the logit model is just telling us

5    what the implied pass-through rate is given a

6    reduction in costs, given the concentration

7    -- the typical concentration we see within

8    categories in -- you know, in the app industry.

9         Q.    Okay.  Your regressions regarding the

10   logit demand, did they have any fixed effect or

11   other mechanism to control for focal point

12   pricing?

13        A.    Well, they did use fixed effects.  I

14   don't know if you meant to say that, but they

15   don't have a separate control variable for focal

16   point.  But it is true, now that you brought this

17   up, we do have app fixed effects, right?  So to

18   the extent that an app stayed constant at a given

19   price over time or always ended at 99 -- let me

20   just say for the record what fixed effects is.

21   Quite literally, it's controlling for any of

22   these attributes of the app that are constant

23   over time.  And so if that tendency to want to

24   end in 99 or 79 or 69 is constant, then, yes, my

25   regressions control for it.

Page 224

1    monopoly power.

2         Q.    Okay.  Now, service fees on platforms

3    other than Google Play are marginal costs for

4    developers as well, right?

5         A.    The service fee or the take rate charged

6    by Google to the developer can be understood as a

7    marginal cost.

8         Q.    And when service fees are charged to

9    developers on other platforms that may compete

10   with Google Play, those are also properly

11   understood as marginal costs for the developers?

12        A.    Correct.

13        Q.    Okay.  So if we saw service fees on

14   other platforms that are lower than Google Play's

15   service fees, those would be lower marginal costs

16   to those developers.  Fair?

17        A.    Fair.

18        Q.    Okay.  Now, would you predict, then,

19   that -- well, strike that.

20             In fact, it's true that many developers

21   do not charge different prices on platforms that

22   compete with Google Play that offer lower service

23   fees.

24        A.    There are examples of that, sure.

25        Q.    And do you know how many developers

Page 229

1    record.   The time is 2:08 p.m.

2              (Recess taken.)

3              THE VIDEOGRAPHER:  We're now on the

4    record.   The time is 2:10 p.m.

5    BY MR. RAPHAEL:

6         Q.   Now that you've got your microphone

7    fixed, it's true, according to your report, that

8    some other app stores charge lower service fees

9    for some transactions than Google charges on

10   Google Play?

11        A.   Yes.   These -- these diminished

12   competitors, in part by virtue of the challenged

13   conduct, are charging lower, as economic theory

14   would predict they would charge lower.  How else

15   would they get someone to switch?

16        Q.   Right.   And is it the case that all

17   developers charge lower prices on other app

18   stores that have lower service fees?

19             MS. GIULIANELLI:  Objection.

20             THE WITNESS:  Not all, no.

21   BY MR. RAPHAEL:

22        Q.   So some developers charge the same price

23   on other app stores than Google Play where there

24   are lower service fees?

25        A.   I would -- I would assume that's a safe

Page 230

1    -- yeah, that is a safe assumption that you could

2    find examples of app prices being the same across

3    stores under today's, you know, diminished

4    competition where these rivals aren't really

5    offering meaningful substitution opportunities.

6        Q.   Have you done any analysis in your

7    reports to determine whether the majority of

8    developers on the Google Play store and another

9    app store charged the same or different prices

10   across stores?

11       A.   No, I haven't.

12       Q.   Okay.  Now, in your report, I think you

13   note that different PC gaming platforms charge

14   different service fees?

15       A.   Sure.

16       Q.   Right?  So Microsoft now charges a 12

17   percent service fee on -- on PC gaming?

18       A.   Yes.

19       Q.   Okay.  And Steam charges more than 12

20   percent for its PC gaming platform?

21       A.   I think I give the percentages in my

22   report, but I -- I don't recall them being far

23   off from each other.  I think it's a more

24   competitive marketplace.

25       Q.   Right.  Well, let's go to -- let's

Page 239

1  developers.

2      Q.   Right.  But other than what's in Table

3  9, have you done any empirical analysis of the

4  effect on developers' ability or inability to

5  steer on whether they lowered their prices in

6  response to lowered service fees?

7      A.   Other than 9, I -- I don't -- I haven't

8  done one, but what you're asking is a bit of a

9  trick question, which is, in the presence of

10  steering, we -- in the presence of an

11  anti-steering restraint, it is very hard to go

12  out and measure what the effect of steering would

13  be on -- on pass-through or app pricing.

14      Q.   Okay.  Now, your opinion is that

15  directing customers from inside the app

16  downloaded from the Play Store to options outside

17  of the Play Store is the most efficient channel

18  for steering?

19      A.   Correct.

20      Q.   Okay.  Now, what -- what empirical

21  analysis have you done to support that opinion?

22      A.   Yeah.  This has been asked and answered,

23  but I'll -- we'll go back through it again, if

24  you want.

25          And let me have the question back again,

1   please.

2       Q.   Have you done any empirical analysis to

3   support your opinion that directing customers

4   from inside the app downloaded from the Play

5   Store to options outside of the Play Store is

6   the most efficient channel for steering?

7       A.   So I think -- I think it's the same

8   answer that I gave you this morning, that I

9   haven't done original empiricism, but I -- I'm

10  aware that Google has not prevented steering on

11  billboards, television advertisements and

12  Internet advertisements, but they have prevented

13  steering from within the app itself once it's

14  downloaded on the Play Store.  And that tells me

15  that, to Google, it's the most important channel.

16  Why would Google block it otherwise, right?  So I

17  feel like it's a very natural inference for an

18  economist to make that this is the most -- this

19  is the most efficient.

20          If you -- put it this way:  For you to

21  go any other path would incur new costs that you

22  wouldn't otherwise incur by steering within

23  the app store, right?  To get someone else's

24  attention on a billboard, you've gotta pay money.

25  You don't need to do that when it's inside of

Page 241

1    your own app.

2        Q.    Do you agree that payment systems

3    that require exiting the app to complete the

4    transaction aren't reasonable substitutes for

5    Google Play billing?

6            MS. GIULIANELLI:  Objection.

7            THE WITNESS:  I didn't understand it,

8    so --

9    BY MR. RAPHAEL:

10       Q.    Are payment systems that would require

11   exiting the app to complete a transaction

12   reasonable substitutes for developers or

13   consumers to using Google Play billing?

14           MS. GIULIANELLI:  Same objection.

15           THE WITNESS:  I don't know if I have an

16   opinion here, and I'm just not aware of any

17   payment processor who requires the customer

18   to leave the app in order to consummate the

19   purchase?  I just -- I'm just not aware -- I'm

20   just not aware that that would even -- that is

21   even a thing.  I wasn't aware of that.

22   BY MR. RAPHAEL:

23       Q.    Okay.  Is there a term in your

24   pass-through rate formula for the extent to which

25   developers can steer?

Page 242

1      A.   No.

2      Q.   Why not?

3      A.   Well, as you know, I ultimately
4  chose the logit model, and the logit model's
5  pass-through formula simplifies to a function of
6  market share, which is not a term for steering.

7      Q.   All right.  So the -- the logit
8  pass-through formula that you used to calculate
9  the pass-through rates doesn't depend on
10 steering?

11     A.   I would say that steering ensures the
12 pass-through is going to be positive.  Logit
13 allows us to estimate precisely what it's going
14 to be.

15     Q.   Okay.  So fair to say, then, that the --
16 the logit model pass-through formula that you've
17 used in your report depends on steering?

18     A.   No, I don't think it depends on steering
19 because we can come up with -- we can come up
20 with explanations for how pass-through would
21 occur in the presence of the anti-steering
22 restraint.

23     Q.   So you -- there's reasons why
24 steering would occur despite the anti-steering
25 restrictions?

Page 243

1        A.    No, there's reasons why pass-through

2   would occur.

3        Q.    Oh, excuse me.   Okay.   So there are

4   reasons why -- why you would expect pass-through

5   regardless of the anti-steering restrictions?

6        A.    Correct.   I think that while it's true

7   that the anti-steering restrictions make for a

8   very potent impediment to steering and

9   pass-through, there are other ways in which

10  pass-through would occur, even without steering.

11  If I could, you know, Google has modeled

12  different worlds, and so I've kind of mimicked

13  the assumption of where the developer could

14  choose its payment processor, right?   And you can

15  imagine a world where developers look around at a

16  whole bunch of payment processors in kind of an

17  open and unfettered market and go with the

18  payment processor offering a competitive rate, or

19  one of the lowest rates, and then competition

20  among developers in the same category would put

21  downward pressure on the prices that they charge

22  to their customers.

23        So there are -- there are mechanisms

24  that get you to pass-through and lower prices

25  outside of steering.   But I'll always hold, until

Page 244

1    I'm blue in the face, that steering is like a

2    supercharger.  It would -- it would -- it would

3    boost all of these properties.

4        Q.   Have you done any analysis to determine

5    by how much it would supercharge all these

6    properties?

7        A.   No.  But -- no.  But what I'm assuming,

8    I mean, at least in my -- when I wrote this

9    report, I'm assuming that the challenged conduct

10   is gone, and part of the challenged conduct is

11   the anti-steering restrictions.  And so I'm

12   confident that there would be pass-through; that

13   it would be positive.  Now the question is,

14   what's the tool in economics that I can use to

15   reliably estimate the extent of the pass-through,

16   and that was the logit model.

17       Q.   Right.  Now, Google doesn't restrict any

18   marketing or advertising of other platforms

19   -- strike that.

20            Google doesn't restrict developers from

21   marketing or advertising transactions on other

22   platforms outside of the app that's been

23   downloaded from Google Play.

24       A.   That's correct.  There -- there's

25   -- Google understands that there would be a

Page 246

1    Q.   Well, I'm just saying -- I guess

2    what I'm asking is -- maybe I'll ask it this

3    way:  Have -- have you done any analysis that

4    compares the profitability of steering for

5    developers via in app communications versus

6    steering using outside of the app communications?

7    A.   I haven't, but I know this:  That to go

8    outside would require a newfound advertising cost

9    that would not otherwise be incurred if you could

10   do it in-app.  And that would necessarily lower

11   the profitability of that -- of that steering

12   relative to steering within the app.

13   Q.   Have you done any empirical analysis in

14   your report of whether it would be profitable for

15   any particular developer to reduce prices by a

16   full focal point?

17   A.   I don't know what that means.

18   Q.   Well, --

19   A.   What's a full focal point?

20   Q.   Well, you told me what -- what's your

21   definition of a focal point?

22   A.   Well, we talked about how it's focusing

23   the attention on the left side of the decimal

24   place so you can kind of go high on the right and

25   it's not really going to scare off the customers.

Page 288

1    the play points program?

2        A.    The reason why that's the case is that

3    at ███ percent or whatever paltry offering that

4    Google's making given the impaired competition

5    that it caused, it's not even worth figuring it

6    out.  It's like -- it's like asking here's a few

7    pennies, go -- go spend.  Like, I don't -- don't

8    bother me, I'm not going to enroll and learn how

9    to use the play points when it's set at ███

10   percent.

11       Q.    My question was in the actual world,

12   it's correct that only some consumers signed up

13   for the play points program?

14       A.    In its -- in its existing state of

15   chintziness, yes, very few people availed

16   themselves of -- of the -- of the program.

17       Q.    And, in fact, in the actual world, only

18   some of the people who did sign up for the play

19   points program actually used the play points they

20   earned?

21       A.    I asked the question why bother.  When

22   it's effectively zero, why bother?

23       Q.    Okay.  But my question was, in the

24   actual world, only some of the people who signed

25   up for the play points program actually used the

Page 289

1    play points that they earned?

2        A.   I can accept that -- that when the

3    -- when the subsidy was at ██ percent or

4    whatever paltry amount that was offered, that

5    very -- you'd get very little participation in

6    the program.

7        Q.   So the answer to my question is yes?

8        A.   I can -- I can accept.  I haven't

9    studied what percentage redeemed, but when it's

10   so small -- like, imagine instead of a ██ it was

11   0.0 or 0.0001, right, and you asked me the

12   question, Hal, why isn't anyone, you know,

13   spending time figuring out how to redeem play

14   points, right?  I'd say because we're literally

15   taking a penny off of their -- off of a $10

16   purchase.  Why would you go through it?

17       Q.   I understand that you think that the

18   play points were paltry.  My question is it's

19   just a fact that only some of the people that

20   signed up for the play points program used their

21   play points, right?

22       A.   I can accept that fact.  I haven't

23   studied what percentage have.

24       Q.   Okay.  So in your reports, you haven't

25   identified any model to determine which

Page 295

1   -- the -- the flip, you know, where it occurs,

2   but I can -- I can conceive that ███ is so paltry

3   that it just wouldn't make a difference for

4   consumers.

5        Q.   Okay.  Now, in your reports have you

6   identified any model to determine which users

7   would have signed up for play points in the

8   but-for world?

9        A.   No.  I don't need to because what the

10  model is giving me is what Google would pay in

11  the aggregate across all consumers in terms of

12  subsidy.  So that 8 percent that comes out of the

13  play points model, and doing by memory, is what

14  happens in the aggregate.  So, it's conceivable

15  that -- that some consumers aren't contributing

16  to that -- to that 8 percent or some people are

17  doing it disproportionately, but that is going to

18  be the average subsidy that comes about via the

19  -- that if the locus of competition were to occur

20  on the points side of the market.

21       Q.   So the answer to my question is, no, you

22  -- in your reports you haven't put forth any

23  model to determine which users would have signed

24  up for play points in the but-for world?

25       A.   I don't think I need to, just to be

Page 296

1    clear --

2         Q.   I'm not asking you whether you need to.

3         A.   Okay.

4         Q.   So I'm going to ask my question again.

5         A.   Okay.

6         Q.   In your reports, did you put forth any

7    model to determine in the but-for world which

8    users would have signed up for the play points

9    program?

10        A.   That's not what the model is calling

11   for.  I'll be clear, the model wants to know

12   -- the model is solving for the size of the

13   subsidy across all consumers, right, and if the

14   model is telling us 8 percent, the way to

15   interpret that -- that -- that parameter is that,

16   on average, the subsidy offered to consumers in

17   the but-for world, if the locus of competition

18   were exclusively on the play points side, right,

19   would be 8 percent.

20        Q.   Right.  And so the model that you put

21   forward in your report regarding play points

22   isn't telling us anything about what individual

23   consumers would do with respect to signing up for

24   the play points program or using their play

25   points, correct?

1      A.   I think the model is.  I think that at 8

2  percent, the economic intuition -- well, this is

3  the intuition that I'm drawing from the model --

4  is that when the benefit gets so large, that is

5  going to spur participation and usage in the

6  system.

7      Q.   Great.

8           Your -- your testimony here today, sir,

9  is that you have a model in your reports that can

10  tell the Court and the jury in this case which of

11  the members of the putative class would have

12  signed up for play points and who would have used

13  them?

14           MS. GIULIANELLI:  Objection to the form.

15           THE WITNESS:  I didn't say that.  I said

16  that if the but-for subsidy were to rise to 8

17  percent, then it would be embraced -- the play

18  points system would be embraced across the class

19  just as the way that the points system in the

20  AMEX marketplace is embraced across American

21  Express users.

22  BY MR. RAPHAEL:

23      Q.   Okay.  So I want to -- I want to be

24  clear.  You have -- your testimony is that in the

25  but-for world, every member of the putative class

Page 298

1   would sign up for the play points program and use

2   their play points?

3              MS. GIULIANELLI:   Objection.

4              THE WITNESS:   I cannot -- this is the

5   first time I've been asked that question.   I'm

6   just hearing it afresh, right?   I cannot fathom

7   why a user would say, no, take back -- I was

8   going to spend a hundred dollars and I realize

9   you're trying to give me $8, but, no, I don't

10  want the $8, I want to spend the full hundred

11  myself.   It would be crazy -- it would be crazy

12  to -- to do that.

13  BY MR. RAPHAEL:

14       Q.   Sir, in the actual world, some consumers

15  don't sign up for play points or don't use the

16  play points that they earn, correct?

17       A.   We've established, I hope, that when you

18  get ███████ back on a hundred dollar purchase,

19  I'd say to myself I'm a busy dude, I don't know

20  if I'm going to sign up for this thing and go

21  through the hassle for the ██████ subsidy.

22       Q.   Right.   And so your testimony is that if

23  Google changed the play points rate that you've

24  put in your report, that every member of the

25  putative class would have signed up for the play

Page 299

1   points program and used play points?

2              MS. GIULIANELLI:   Objection.

3              THE WITNESS:   I think -- I think it's a

4   fair assumption.   Like, the model certainly is

5   not calling on this, but I think it's a fair

6   assumption that once it goes up to 8 percent that

7   -- that everyone who is making purchases would

8   -- would either redeem it or at least enroll so

9   as to be able -- to be capable of taking the

10  subsidy at -- at those terms.

11  BY MR. RAPHAEL:

12     Q.    That's an assumption, though, that

13  you're making.   It's not what the model tells

14  you?

15     A.    Well, the model spits out, just to be

16  clear, what the average subsidy is across all

17  users.

18     Q.    Now, you -- would you agree with me that

19  the counterfactual experiment lies at the heart

20  of antitrust analysis?

21     A.    Sure.   I mean, it's an important thing.

22  It's -- I don't know if it's at the heart, but

23  you need -- you need to have a counterfactual.

24  You need to model the counterfactual.

25     Q.    Could you describe for me the

Page 300

1   methodology you used to construct

2   counterfactuals?

3       A.   In general?

4       Q.   Yes.

5       A.   We try to preserve all the attributes of

6   the actual world, Google choosing a singular

7   headline rate that applies to everyone.  And we

8   -- and we deviate only in the restraints that are

9   being challenged.  So we try to model a world in

10  which everything is identical.  We call it the

11  ceteris paribus assumption.  But we try to model,

12  holding everything else constant, what would

13  competition have looked like in the absence of

14  this set of restraints.

15      Q.   Understood.  Now, in the actual world

16  Google is a profit-maximizing firm?

17      A.   In the actual and in the but-for, I'll

18  give you that.  It's always profit maximizing.

19      Q.   That's what I would think.

20      A.   I mean, you take that away from me -- I

21  mean, you take that away from an economist, we

22  don't say a lot.  We're very quiet at cocktail

23  parties if you take that away.

24      Q.   So that's where I was going to go.  I

25  just want to make sure I understand in the -- in

Page 301

1    the correctly constructed but-for world, an

2    economist should assume that Google is a

3    profit-maximizing firm.

4         A.    Absolutely.

5         Q.    Now, your opinion is that Google would

6    earn lower profits if it eliminated the

7    challenged conduct?

8         A.    Lower profits but still enormous sums,

9    yes.

10        Q.    But lower?

11        A.    Lower, yes.

12        Q.    Right.  So if Google's a

13   profit-maximizing firm and it lost profits in the

14   but-for world without the challenged conduct,

15   would you expect Google to take steps to try to

16   earn those profits through some other means?

17        A.    Not if they're anticompetitive.  I mean,

18   if a court has told that you that, you know, the

19   tie-in was illegal, you can't reconstruct the tie

20   through some other means to try to bring back

21   those -- those anticompetitive profits.

22        Q.    Well, let me ask a clearer question:  If

23   Google's a profit-maximizing firm, in a world

24   without the challenged conduct where you say

25   Google would earn lower profits, would you expect

Page 302

1    Google to try to take any lawful or competitive
2    means to earn back those profits?
3        A.    Well, with the caveat, it's not just
4    anything lawful, it's gotta be something that is
5    profit maximizing.  Like, for example, Dr. Burtis
6    likes to talk about, you know, all of a sudden
7    charging for free apps, you know, the idea that
8    Google would charge for free apps is as silly as
9    charging for searches on Google Search.  The idea
10   would -- it would just violate the entire
11   business model.  So it has to be -- I'm with you
12   that it has to be profit maximizing.
13       Q.    Right.  Right.  But in a but-for world
14   where Google had lower profits, as a
15   profit-maximizing firm, they would try to do
16   anything else to earn back those profits if it
17   was profit-maximizing?
18       A.    Well, a few -- a few other criteria.
19   It's gotta be profit maximizing, and it's gotta
20   be legal and procompetitive.  You can't replicate
21   the tie-in through some other means.
22       Q.    Is there anything anticompetitive about
23   Google charging the developers for the use of its
24   intellectual property?
25       A.    The -- the mere charging in the absence

Page 309

1    purchase transactions where other firms serve as

2    the payment processor?

3         A.    Well, I -- I want to push back on that,

4    respectfully, just a bit, if I could, all right,

5    because you're disavowing all the advertising

6    revenue, you're disavowing what it made in the --

7    in the market for app distribution, you're

8    disavowing what it's making on all the other 60

9    percent of the transactions that it is

10   consummating the in-app transactions on.  So I

11   just want the record to -- to be crystal clear

12   that it's not like Google is just left on the

13   street, you know, begging for -- for cash out

14   there, right?

15        Q.    So, let's talk about a particular

16   transaction in the but-for world where the app

17   has been downloaded for free.

18        A.    Okay.

19        Q.    So in that scenario, Google would not

20   have earned any service fee from the transaction

21   in the app distribution market.

22        A.    Right.

23        Q.    And then there's a transaction in the

24   in-app aftermarket where Google doesn't serve as

25   the payment processor.  Do you -- do you have

Page 310

1    that?

2        A.    Yeah.

3        Q.    Okay.   In -- in that transaction in the

4    but-for world, setting aside advertising that

5    Google might have -- might have earned through

6    some other way, Google's not earning any service

7    fee at all on that transaction?

8        A.    That's fair.

9        Q.    Okay.   Now, I think your opinion in your

10   report is that in the but-for world, Google would

11   earn a service fee rate of ████ percent on in-app

12   transactions for which it served as the payment

13   processor?

14       A.    And not just the payment processor, on

15   all the -- the whole suite of aftermarket

16   services.

17       Q.    Okay.   Well, does Google provide any

18   aftermarket services on the transactions for

19   which it doesn't serve as payment processor?

20            MS. GIULIANELLI:   Objection to form.

21            THE WITNESS:   Well, we -- we've never

22   seen that world, right?   So you're asking me if

23   -- am I assuming that they're not?   Because in

24   the real world they're tying -- they're forcing

25   themselves to be in every transaction.

# REDACTED VERSION

# Exhibit A48
## to
## C. Cramer Declaration

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT J

## CONFIDENTIAL-FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

1                    UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4        ---------------------------------------------x

5        IN RE GOOGLE PLAY STORE          Case No.

         ANTITRUST LITIGATION             3:21-md-02981-JD

6

7        THIS DOCUMENT RELATES TO:

8        Epic Games Inc. v. Google LLC, et al.,

         Case No: 3:20-cv-05671-JD

9

         In re Google Play Consumer

10       Antitrust Litigation,

         Case No: 3:20-cv-05761-JD

11

         In re Google Play Developer

12       Litigation,

         Case No: 3:20-cv-05792-JD

13

14       State of Utah, et al.,

         v. Google LLC, et al.,

15       Case No: 3:21-cv-05227-JD

16       ---------------------------------------------x

17

18         *HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*

19        REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

20                         RICHARD FENG

21                  Friday, January 14, 2022

22                   Volume 1 (Pages 1-396)

23

24       Reported By: Lynne Ledanois, CSR 6811

25

HIGHLY CONFIDENTIAL

Page 2

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4    ---------------------------------------------x

5    IN RE GOOGLE PLAY STORE        Case No.
     ANTITRUST LITIGATION           3:21-md-02981-JD

6

7    THIS DOCUMENT RELATES TO:

8    Epic Games Inc. v. Google LLC, et al.,
     Case No: 3:20-cv-05671-JD

9

     In re Google Play Consumer
10   Antitrust Litigation,
     Case No: 3:20-cv-05761-JD

11

     In re Google Play Developer
12   Litigation,
     Case No: 3:20-cv-05792-JD

13

14   State of Utah, et al.,
     v. Google LLC, et al.,

15   Case No: 3:21-cv-05227-JD

16   ---------------------------------------------x

17

18           Remote videotaped deposition of

19     RICHARD FENG, taken in Palo Alto, California,

20     commencing at 8:59 a.m., on Friday,

21     January 14, 2022 before Lynne Ledanois,

22     Certified Shorthand Reporter No. 6811

23

24

25

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

```
                                           Page 3

 1                    REMOTE APPEARANCES

 2    Counsel for Plaintiff Epic Games, Inc. in:

 3    Epic Games, Inc. v Google LLC, et al:

 4                 CRAVATH, SWAINE & MOORE LLP

 5                 BY: BRENT BYARS

 6                     ZACHARY JARRETT

 7                     DANIEL OTTAUNICK

 8                     DANIEL KUMAGAI

 9                 Attorneys at Law

10                 825 Eighth Avenue

11                 New York, New York 10019

12                 bbyars@cravath.com

13

14    Counsel for Google LLC, et al:

15                 MORGAN LEWIS & BOCKIUS LLP

16                 BY: BRIAN ROCCA

17                     NICHOLAS PFEIFFER

18                 Attorneys at Law

19                 1 Market Plaza

20                 One Market Street

21                 San Francisco, California 94105

22                 brian.rocca@morganlewis.com

23

24

25    ///
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 4

1                 REMOTE APPEARANCES

2

3    Counsel for the Proposed Class In re: Google

4    Play Developer Antitrust Litigation and Pure

5    Sweat Basketball, Inc:

6                 HAUSFELD LLP

7                 BY: KYLE BATES

8                     DANIEL KEES

9                 Attorneys at Law

10                600 Montgomery Street

11                Suite 3200

12                San Francisco, California 94111

13                kbates@hausfeld.com

14

15   Counsel for the Proposed Class In re: Google

16   Play Consumer Antitrust Litigation:

17                BARTLIT BECK

18                BY: GLEN E. SUMMERS

19                    KARMA GIULIANELLI

20                Attorneys at Law

21                1801 Wewetta Street

22                Suite 1200

23                Denver, Colorado 80202

24                gsummers@bartlitbeck.com

25   ///

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 5

1              REMOTE APPEARANCES

2

3    Counsel for Plaintiffs in Proposed Class:

4                KOREIN TILLERY LAW OFFICE

5                BY: RANDALL EWING

6                Attorney at Law

7                505 North 7th Street

8                Suite 3600

9                Saint Louis, Missouri 63101

10               rewing@koreintillery.com

11

12   Counsel for Plaintiff States:

13               NORTH CAROLINA DEPARTMENT OF JUSTICE

14               ATTORNEY GENERAL

15               BY: JONATHAN MARX

16                   RAVEN DeMONIA

17                   CAROLINE BROCK

18               Attorneys at Law

19               1 South Wilmington Street

20               Raleigh, North Carolina 27601

21               nmarx@ncdoj.gov

22

23

24

25   ///

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 6

1              REMOTE APPEARANCES

2

3    Also Present:

4    Bret Hampton, Videographer

5    Timothy Tupiak, Veritext Tech

6    Ken Maikish, Google In-House Counsel

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1            I N D E X   O F   E X A M I N A T I O N

2

3   Examination by:                          Page

4        Mr. Bates                            15

5        Mr. Byars                           252

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   ///

Page 12

1              Friday, January 14, 2022

2                   8:59 a.m.

3 _____

4              VIDEOGRAPHER:  Good morning.

5         We're on the record at 8:59 a.m.

6         on January 14th, 2022.

7              Please note microphones are

8         sensitive and may pick up

9         whispering, private conversations

10        and cell interference.

11             Please turn off all cell

12        phones or place them away from the

13        microphones as they can interfere

14        with the deposition audio.

15             Audio and video recording

16        will continue to take place unless

17        all parties agree to go off the

18        record.

19             This is Media Unit Number 1

20        of the video-recorded deposition

21        of Paul Feng in the matter Re:

22        Google Play Store Antitrust

23        Litigation filed in the

24        U.S. District Court, Northern

25        District of California, San

Page 13

1        Francisco Division.  Case

2        number 3:21-md-02981-JD.

3              This deposition is being

4        held virtually on Zoom.

5              My name is Bret Hampton from

6        the firm Veritext; I'm the

7        videographer.  The court reporter

8        is Lynne Ledanois from Veritext.

9              I'm not authorized to

10       administer an oath, I'm not

11       related to any party in this

12       action, nor am I financially

13       interested in the outcome.

14             Would counsel and everyone

15       present please identify who you

16       represent.  After that, the court

17       reporter may swear in the witness.

18       Thank you.

19             MR. BATES:  Good morning.

20       Kyle Bates from the firm of

21       Hausfeld for the developer

22       plaintiffs.  With me also is my

23       colleague Daniel Kees.

24             MR. BYARS:  This is Brent

25       Byars from Cravath Swaine & Moore

HIGHLY CONFIDENTIAL

**Page 14**

1    representing plaintiff and counter

2    defendant Epic Games.  And with me

3    is Daniel Ottaunick also from

4    Cravath.

5         MR. SUMMERS:  Glen Summers

6    with Bartlit Beck LLP on behalf of

7    the consumer class.  With me is

8    Randall Ewing of the Korein

9    Tillery firm.

10         MR. MARX:  Jonathan Marx

11    with the North Carolina Department

12    of Justice on behalf of the state

13    plaintiffs in the Google action.

14         MR. ROCCA:  Good morning.

15    This is Brian Rocca of Morgan

16    Lewis representing Google

17    defendants as well as the witness,

18    Mr. Feng.

19         I'm joined by my colleague

20    Cole Pfeiffer of Morgan Lewis and

21    in-house counsel for Google, Ken

22    Maikish.

23

24              PAUL FENG,

25    having been duly sworn, testified as follow

Page 15

1                       EXAMINATION

2        BY MR. BATES:

3             Q      Good morning, Mr. Feng.   How

4        are you?

5             A      I'm good.   How are you?

6             Q      Good.   Thank you.

7                    We met off the record just a

8        moment ago.   But again, my name is

9        Kyle Bates.   I'm one of the attorneys

10       representing the developer plaintiffs

11       in this case.

12                   Do you understand that?

13            A      I do.

14            Q      Okay.   Have you had your

15       deposition taken before, Mr. Feng?

16            A      Yes.

17            Q      How many times?

18            A      I believe once.

19            Q      And when was that?

20            A      I want to say it was around

21       2010, but it was a few years ago.

22            Q      Can you tell me generally

23       what kind of a case it was in which

24       you gave deposition testimony?

25            A      My recollection is that it

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

HIGHLY CONFIDENTIAL

Page 62

1       Q     I see.  So Google Play

2    Billing is a framework of features

3    that allows developers to do the three

4    things that your team is responsible

5    for, selling paid apps, in-app

6    purchases and Play Pass; is that

7    correct?

8       A     Google Play Billing is

9    broader than just features for

10   developers.

11      Q     Can you describe what Google

12   Play Billing is for me?

13      A     As I noted, Google Play

14   Billing is an integral part of Play.

15   And it is the set of features that

16   allow, one, developers to build

17   premium paid features into their apps,

18   but also the features for users to

19   easily and seamlessly purchase those

20   items, consume those items and have a

21   good purchasing experience.

22      Q     What is your involvement in

23   the development and implementation of

24   Google Play Billing?

25      A     I lead the team that builds

Page 113

1          variety of different people.

2                  Are there specific

3          conversations?  Do you want me to

4          list dozens of people?

5    BY MR. BATES:

6          Q      I don't.  Was Sameer Samat

7      involved in the conversations about

8      changing the service fee percentage

9      that you were involved in?

10          A      Yes.

11          Q      What is Mr. Samat's title?

12          A      Sameer is VP of product

13      management responsible for Play,

14      Android, Wear, something like that.

15          Q      I see.  He's your superior;

16      is that correct?

17          A      He is, yes.

18          Q      What is the basis for the

19      percentage of the service fee that's

20      charged to developers?

21          A      So as I noted earlier, our

22      service fee has -- there's not one

23      service fee.  Our service fee varies

24      and over the years, you know, the --

25      that we've added wrinkles and

HIGHLY CONFIDENTIAL

Page 114

1    components to how the service fee is

2    charged.

3              And so -- but at the end of

4    the day, the service fee is the fee we

5    charge for all of the services and

6    value that we believe we provide to

7    developers who use Google Play, right.

8              So that includes -- it is

9    not a transaction fee.  It's a fee for

10   the access to all of the users who use

11   Play, it is a fee for all the services

12   and tools we provide to help you get

13   your app built.

14             It's a fee for distribution.

15   It's a fee for -- yes, for

16   monetization capabilities that we

17   offer.

18             And there's features that we

19   use -- we build that allow developers

20   to optimize and manage the lifetime

21   value of their users and also funds

22   Android.

23             So that's the basis for the

24   service fee.

25        Q    I see.  So it's a trade;

Page 353

1    of this concern, but, yes, we did

2    consider other ways to charge

3    developers.

4        Q    Was this not a concern at

5    all when you were considering other

6    ways to charge developers?

7        A    I wouldn't say that it

8    wasn't a concern.  It's certainly the

9    case that various people would point

10   out, like developers, regulators,

11   legislators would point out, it seems

12   like that you're not charging everyone

13   and that seems unfair.

14             I think we have good reasons

15   for that.  We deliver a ton of value

16   to game developers.

17             I'm not sure that I

18   completely agree that the value for

19   free appears to be much greater than

20   the value for paid.  We definitely

21   deliver a lot of value.  We've talked

22   about that value in this deposition

23   for digital goods providers.

24             It's a business model that

25   worked, it's a business model that we

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

HIGHLY CONFIDENTIAL

Page 354

1    have had since the beginning of Play

2    and it's worked out really well for a

3    lot of these digital goods developers,

4    right.

5              But it is something that

6    people have highlighted.  It is

7    something that various stakeholders

8    have argued is unreasonable.  And so

9    we considered it as we thought about

10   are there ways we can make -- we can

11   improve our business model.

12             The reality is that even

13   developers who use Play billing

14   benefit substantially from having all

15   those apps that don't pay a service

16   fee.

17             The apps that are not paying

18   a service fee attract users that make

19   the Play platform and Play -- and

20   Android much more valuable for

21   everyone, including Google Play

22   Billing developers.

23             So we think that the model

24   continues to make sense.  But, yes, we

25   have thought about it, you know, and

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 355

1    we've considered alternatives.

2              The other thing to highlight

3    is that those alternatives also have a

4    cost.  We've considered other ways to

5    charge and we haven't made too many of

6    these changes yet because they have

7    other downsides.  But we could charge

8    in other ways.

9              Today's model allows us to

10   charge only when developers make

11   money, like if we were to charge for

12   other -- in other ways, like let's say

13   we ███████████████████████████████ or

14   let's say we ███████████████████████████

15   ███████████████  you might see much fewer

16   developers and much less content on

17   Android and the downsides for the

18   entirety of the ecosystem might be

19   substantially worse.

20             So, yes, it was a concern.

21   It's something we always think about.

22   We hear it, but I'm not sure that it

23   was the only reason that we embarked

24   on these business model questions.

25             MR. BYARS:  I move to strike

# REDACTED VERSION

# Exhibit A49
# to
# C. Cramer Declaration

Karma M. Giulianelli (SBN 184175)
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com

Hae Sung Nam (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com

*Interim Co-Lead Counsel for the Proposed Classes*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>RELATED ACTIONS:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD<br><br>*In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD<br><br>*State of Utah, et al., v. Google LLC, et al.*, Case No. 3:21-cv-05227-JD<br><br>*Match Group, LLC, et al. v. Google LLC, et al.*, Case No. 3:22-cv-02746-JD | No. 3:20-CV-05761-JD<br><br>**CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: August 4, 2022<br>Hearing Time: 10:00 a.m.<br>Courtroom: Courtroom 11, 19th Floor<br>Judge: The Honorable James Donato |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.    Common Questions Predominate, Satisfying Rule 23(b)(3) .................................2

    A.    Dr. Singer's Model Shows All Developers Would Be Subject to
        Lower Take Rates Absent Google's Monopolization...............................2

    B.    Consumer Plaintiffs Will Prove Pass-Through with Classwide
        Evidence ...................................................................................................4

        1.    Dr. Singer's Model Is Sound Classwide Proof of Pass-
            Through.......................................................................................4

        2.    App-By-App Analysis Is Not Required to Demonstrate
            Pass-Through...............................................................................5

        3.    Dr. Burtis's Misguided Claim that There are Uninjured
            Class Members Does Not Undermine Class Certification.........9

    C.    Dr. Singer's Play Points Model Provides Further, Independent
        Common Proof of Antitrust Impact ..........................................................9

    D.    Class Members Will Not Be Worse Off In the But-For World .........................10

    E.    Dr. Singer Provides a Common Method of Calculating Damages ......................11

II.   An Injunctive Relief Class Is Justified Under Rule 23(b)(2)...........................................12

III.  All Four of the Rule 23(a) Factors Are Met ...................................................................13

CONCLUSION..................................................................................................................15

**TABLE OF AUTHORITIES**

**Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ................................................................. 11

*B.K. by next friend Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019) ...................................................................... 12

*Berni & Barilla S.p.A.*,
  964 F.3d 141 (2d Cir. 2020) ........................................................................ 13

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) .................................................................................... 14

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  No. 15-CV-01696-YGR, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ................ 13

*Cummings v. Connell*,
  316 F.3d 886 (9th Cir. 2003) ...................................................................... 15

*In re Apple iPhone Antitrust Litig.*,
  No. 11-cv-6714-YGR, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) .................... 8

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ..................................................................... 6

*In re Electronic Books Antitrust Litig.*,
  Case No. 11-md-02293 (DLC) (S.D.N.Y.) ..................................................... 14

*In re Flash Memory Antitrust Litig.*,
  No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ....................... 3

*In re FPI/Agretech Sec. Litig.*,
  105 F.3d 469 (9th Cir. 1997) ...................................................................... 14

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) .................... 8

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007) ................................................................... 11

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) .................... 15

*In re Optical Disk Drive Antitrust Litig.*,
  303 F.R.D. 311 (N.D. Cal. 2014) .............................................................. 5, 8

*In re Optical Disk Drive Antitrust Litig.*,
  No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal., Feb. 8, 2016) .................... 10

*In re Packaged Seafood Prod. Antitrust Litig.*,
  332 F.R.D. 308 (S.D. Cal. 2019), *aff'd on reh'g en banc sub nom. Olean*,
  31 F.4th 651 ............................................................................................ 8

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  No. 14-02567-MD-W-GAF, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) .............. 6

*In re Suboxone Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ............................................................. 13

*Kamakahi v. Am. Society for Reproductive Med.*,
    305 F.R.D. 164 (N.D. Cal. 2015) ........................................................... 11

*MacRae v. HCR Manor Care Services, LLC*,
    Case No. SA CV 14-00715-DOC (RNBx), 2018 WL 8064088 (C.D. Cal. Dec. 10,
    2018) ....................................................................................... 13

*Mueller v. Puritan's Pride, Inc.*,
    No. 3:16-cv-06717-JD, 2021 WL 5494254 (N.D. Cal. Nov. 23, 2021) ................... 12

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods, LLC*,
    31 F.4th 651 (2022) (en banc) ........................................................ passim

*Paul, Johnson, Alston & Hunt v. Graulty*,
    886 F.2d 268 (9th Cir. 1989) ............................................................. 14

*Sandoval v. M1 Auto Collisions Ctrs.*,
    309 F.R.D. 549 (N.D. Cal. 2015) .......................................................... 15

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ............................................................ 12

**Statutes**

15 U.S.C. § 15c(b)(2) ......................................................................... 15

**Other Authority**

*Newberg on Class Actions* § 3:75 ............................................................ 15

# INTRODUCTION

In its opposition, Google derides consumers for spending the "bulk of their motion … attacking Google's business practices." Dkt. 300 ("Opp.") at 1. But Google's monopolistic conduct demonstrates the enormous amount of common evidence of wrongdoing that would predominate over any individualized issues at trial. The conduct at issue includes predation, an array of exclusionary contracts, and numerous bribes and threats aimed at potential competitors. A trial on Google's anticompetitive schemes will require the presentation of voluminous common evidence, which will plainly predominate over any individualized issues.

Committing the very transgression Google falsely accuses consumers of, Google's opposition focuses on arguments about the merits of the case, including its criticisms of Dr. Singer's substantive analysis, that are inappropriate at the class certification stage. Those arguments also fail on the merits for the same reason they fail in the *Daubert* context.

The main thrust of Google's opposition—that pass-through is "not susceptible to generalized class-wide proof"—is foreclosed by the Ninth Circuit's recent decision in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC*, 31 F.4th 651 (2022) (en banc). Google argues that pass-through is "exceptional" (based on its own economist's analysis), and therefore must be proven with individualized evidence. Opp. at 15. Google's economist is free to take this position—one that Plaintiffs will prove is fundamentally flawed—but it cannot outweigh Dr. Singer's reliable methodology assessing classwide damages. Instead, Google merely argues that "plaintiffs' evidence relating to the common question … [is] unpersuasive and unlikely to succeed." *Olean*, 31 F.4th at 667. Plaintiffs can prove their case with common evidence, and certification is warranted. It will be up to the jury to decide whether the evidence is persuasive. *Id.*

Google is also wrong that its monopolization has benefitted some consumers. Google argues that competition would harm consumers by forcing it to                    or to reduce security. Speculation that                              for the first time in its history—causing some class members to pay *more* under competitive conditions—is no reason to deny class certification. There is no reason or economic rationale to suggest competition would lead Google to make its product worse, and acceptance of its argument would allow any

monopolist to escape liability through unilateral speculation about what it would be willing to do if it lost monopoly power. In any event, this, too, is a question for the merits.

## ARGUMENT

### I.     Common Questions Predominate, Satisfying Rule 23(b)(3)

Ignoring the overwhelming predominance of undisputedly common issues in this monopolization case, Google focuses just on antitrust injury, claiming that "Plaintiffs have no common proof" of pass-through, that Google would "lower service fees at all," or that consumers "would have been injured under their Play Points theory." Opp. at 8. But Google's argument ignores Dr. Singer's expert analysis demonstrating common impact through well-accepted economic models and is a rehash of its *Daubert* motion, which fails for multiple reasons. *See* Dkt. 298 ("*Daubert* Opp."). Dr. Singer's modeling reliably demonstrates common impact. *Id.*

#### A.     Dr. Singer's Model Shows All Developers Would Be Subject to Lower Take Rates Absent Google's Monopolization

As explained in Plaintiffs' opening brief, Dr. Singer's models of the App Distribution Market and In-App Aftermarket demonstrate that Google's 30% headline take rate is supra-competitive, and that Google would be forced to lower prices in the but-for world. Dkt. 280 ("Mot.") at 10-11. Aside from questioning an input, Google does not challenge the reliability of that model in its *Daubert* briefing. Dkt. 282 ("*Daubert* Br.") at 13-14. Instead, Google appears to argue that "not all developers would be subject to lower service fees in the but-for world" because it would keep its 30% take rate in the face of competition, competing with other stores *only* through a "targeted approach" of offering discounts to some developers. Opp. at 16-17. Most importantly, whether Google's contention has merit can be resolved on a classwide basis and, therefore, cannot defeat class certification. Second, Google's argument has no support in economics, the law, or the facts.

***First***, it is false that Google and its competitors have employed a "targeted approach" to pricing. *Id.* at 17. Google has used its uniform 30% take rate for the vast majority of developers, with negotiated programs formulaically reducing its rate from the headline rate representing

of U.S. developers. Ex. 3[1] (Singer Reply) ¶ 8. Likewise, Google's recent

---

[1] Exhibit citations in this reply refer to the consecutively-numbered exhibits of the Giulianelli Declaration filed in support of class certification, Dkt. 280-1, and the Giulianelli Declaration filed in support of this reply.

pricing reductions from 30% to 15% for the first $1 million in developer revenue per year and for subscription products apply uniformly to *all* developers. Ex. 68 (https://android-developers.googleblog.com/2021/03/boosting-dev-success.html); Ex. 69 (https://android-developers.googleblog.com/2021/10/evolving-business-model.html). Even for the "bespoke" Project Hug deals—which are anticompetitive and would be absent in the but-for world—Google's headline take rate was "non-negotiable." Ex. 40 (GOOG-PLAY-004588725); Ex. 2 (Singer Rpt.) ¶¶ 110-14.[2] A key Google executive confirmed that Google doesn't "typically negotiate individually with developers on the rev share" because "we had interest in advancing the ecosystem as a collective, and so that was a principle from the beginning." Ex. 70 (Rosenberg Dep.) 123:22-124:23. A uniform approach is Google's norm, and individualized discounts are the exception. Likewise, contrary to Google's suggestion, entrants have already attempted to compete with cheaper take rates for *all* developers. International stores offer 20% (One Store) and 25% (Aptoide). Ex. 2 (Singer Rpt.) ¶¶ 196-98.

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* ¶¶ 104-09.

**Second**, Google ignores that a competitive but-for world would foster more general competition than the current world constrained by Google's monopoly power. Google's anticompetitive conduct affects "all market participants, creating an inference of class-wide impact" that cannot be undone due to "different bargaining power." *Olean*, 31 F.4th at 671, 677; *see also* Mot. at 21-22 (citing further cases). In an open market, it is unrealistic to expect that Google would individually negotiate with tens of thousands of developers. Ex. 3 (Singer Reply) ¶ 10. Without Google's contractual and technical restrictions, *all* apps would have the ability to freely steer to cheaper alternatives. And Google recognized that if ███████████████████████, the result would ████████████████████ and Google would ███████████████████

███████████████████ Ex. 71 (GOOG-PLAY-000542516.R) at -532. In other words, Google's current ability to price discriminate by discounting only certain large developers reflects its market power. Ex. 2 (Singer Rpt.) ¶ 148. In short, Google would be

---

[2] This case is nothing like *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010), where three direct purchasers who controlled 82% of the market made "*individualized* negotiations and contracts with Defendants." *Id.* at *9.

forced to compete on price for *all* developers if it could not rely on its anticompetitive conduct to stymy competitors.

*Third*, that some developers may negotiate *even lower* prices in the but-for world does not defeat common impact. Dr. Singer's model accounts for those deals by extending the discount achieved in the actual world, albeit from the lower but-for headline rate. Ex. 3 (Singer Reply) ¶¶ 7-12. And Dr. Singer reliably shows that Google's take rate would be lower for *all* apps in the but-for world. For example, as noted above, Google has a policy favoring uniformity and it uses form Developer Distribution Agreements for all developers. Ex. 2 (Singer Rpt.) ¶ 119 & n.276.

### B.   Consumer Plaintiffs Will Prove Pass-Through with Classwide Evidence

#### 1.   Dr. Singer's Model Is Sound Classwide Proof of Pass-Through

Dr. Singer provides reliable proof of pass-through, "a class-wide question[,] in one stroke." *Olean*, 31 F.4th at 666. Google attacks this pass-through model, claiming that it relies on theoretical assumptions, that it fails to employ regressions, and that it cannot identify uninjured class members. These arguments ignore the rigorous work Dr. Singer performed to validate his work.

Google claims that Dr. Singer did not run any regressions to calculate pass-through, and instead relied on "a *theory* of universal pass-through." Opp. at 14-15.[3] But Dr. Singer did not simply rely on a theory. He ran regressions on real-world market shares and prices using each of Google's 35 app categories as a separate demand system to determine the demand curve faced by *each* developer and to test the fit of the logit model to the data. Ex. 2 (Singer Rpt.) ¶¶ 235-38 & Table 7. Google has not challenged those regressions. Only after the logit model proved to fit the data, Dr. Singer calculated pass-through for *each* app using the standard logit pass-through formula, derived mathematically in peer-reviewed literature, based on each app's share of the category in which it competed. *Id.* ¶ 239. The result is a model that calculates pass-through on an app-by-app level using established economic methods. *Id.* ¶¶ 235-39; Ex. 72 (Singer Dep.) 130:12-25.

---

[3] Google notes that Dr. Singer did not use his usual approach of "regressing retail price changes on wholesale price changes," Opp. at 14, but omits that the same deposition answer confirms that "that's just not available here." Ex. 72 (Singer Dep.) 134:24-135:8. Google's supra-competitive prices infect the entire period for which data is available, and no wholesale pricing exists given the two-sided platform structure of the market. *See id.* 138:16-142:13. Dr. Singer therefore turned to the well-accepted economic models in his report. Ex. 2 (Singer Rpt.) ¶168.

Nor did Dr. Singer simply assume universal pass-through—the model calculates a pass-through rate only if the logit demand explains the variation in the market share data within a category, which Dr. Singer validated. Unlike in *In re Optical Disk Drive Antitrust Litigation*, 303 F.R.D. 311 (N.D. Cal. 2014), Dr. Singer ran regressions to confirm the applicability of the model; he did not merely "assume[] the very proposition" he was trying to prove. *Id.* at 321.

Contrary to Google's suggestions, Dr. Singer also used real-world data. ***First***, Dr. Singer confirmed the applicability of the logit model using Google's voluminous transaction data. Dr. Singer ran regressions to confirm that real world price changes explained changes in market shares for the applications. Those regressions allowed Dr. Singer to confirm that the demand for the applications within the various Google "app categories" is interdependent—that is, an app's share within a given category declines with increases in the price of that app. Ex. 2 (Singer Rpt.) ¶¶ 235-38. ***Second***, Dr. Singer's analysis of developers' reaction to taxes in the real world confirmed cost pass-through. *Id.* ¶ 244. ***Third***, Dr. Singer examined (and rejected) the data underlying the flawed analysis of Dr. Burtis. *Id.* ¶¶ 242-44; Ex. 3 (Singer Reply) ¶¶ 112-15.

In short, none of Google's criticisms of Dr. Singer's pass-through model undermine its rigor or preclude its use as classwide proof of antitrust impact.

**2.   App-By-App Analysis Is Not Required to Demonstrate Pass-Through**

Dr. Singer's reliable proof of impact—which as explained above, considers the pass-through rate of each app individually through the application of a well-accepted economic model—means that no further individualized app-by-app analysis is required to prove Plaintiffs' claims. Google's argument to the contrary relies on the flawed analysis of its economist, Dr. Burtis. She concluded that when Google applied a limited "service fee" (or take rate) reduction under the market conditions that exist today, pass-through was "rare." Opp. at 9. Google thus argues that "pass-through must be ***proven*** for each app." *Id.* (emphasis in original). But the *Olean* court rejected arguments like these: "[A] district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." 31 F.4th at 667. Google's expert unsurprisingly disagrees on the merits, but that is no barrier to class certification. Opp. at 9.

In any event, Google's merits arguments are wrong. Google's claim that Dr. Singer has "no answer to real-world evidence showing that prices did not change with service fees," Opp. at 16, ignores the many fatal flaws in Dr. Burtis's and the developers' expert analyses. The one-month and six-month time horizons used by Dr. Burtis are insufficient to show the long-run effects of lower prices in the but-for world. Ex. 3 (Singer Reply) ¶¶ 103. Google's anticompetitive conduct infected the initial pricing of applications, which economic evidence suggests would linger due to sticky prices. *Id.* ¶¶ 114-15. Both experts analyzed pass-through after a 2018 price reduction for second-year subscriptions, but ignored that Google's pricing rules do not allow developers to sep-arately discount second-year subscriptions, making pass-through of that price reduction virtually impossible. *Id.* ¶ 122 & n.248 (citing Ex. 73 (Scalise Dep.) at 269:9-21). Dr. Burtis's model suffers from numerous other flaws, including failing to use appropriate controls and using artificially small product-groups. Ex. 3 (Singer Reply) ¶¶ 102-33.

Google cannot paper over those flaws by claiming only its expert uses "actual data." As discussed, Dr. Singer employed regression analysis using real-world pricing data to confirm the applicability of his economic modeling of pass-through.[4] Google's mere assertion that pass-through is "exceptional" is not supported by the factual record. For that reason, the cases Google cites do not undermine the pertinency of Dr. Singer's model. *In re Pre-Filled Propane Tank Anti-trust Litig.*, No. 14-02567-MD-W-GAF, 2021 WL 5632089, at *12 (W.D. Mo. Nov. 9, 2021) (ex-cluding pass-through analysis limited to 3 retailers and less than 10% of total sales); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 94 (S.D.N.Y. 2017) (excluding expert opinion for ignoring 20% of the market and for fatal flaw that "renders his inference from the regression invalid").

The remainder of the individualized factors Google says require further app-by-app analy-sis are simply recast versions of its *Daubert* arguments. For the same reason those arguments fail at *Daubert*, they fail to raise individualized issues that defeat class certification.

**Marginal Costs.** Dr. Singer's model does not ignore marginal costs. The peer-reviewed literature on which Dr. Singer relied for his standard pass-through formula demonstrated that the

---

[4] Dr. Singer did not analyze pass-through of Google's take rate changes against real world data because, as he testified, those changes were too miniscule to allow robust testing. Ex. 72 (Singer Dep.) 138:16-141:12. Dr. Burtis's analysis of the same data is flawed for that reason.

formula is derived mathematically from a profit-maximation model in which marginal cost is a key component. Ex. 3 (Singer Reply) ¶ 71. Based on that derivation, Dr. Singer calculates pass-through based on the *change* in each developer's marginal costs from a reduced take rate. *Id.* ¶ 72. To argue otherwise, Google relies on the same misconstrued deposition testimony and faulty economics it did in its *Daubert* motion. *See Daubert* Opp. at 7-8.[5] Dr. Burtis opines that pass-through is "less likely" when a developer's marginal costs are zero. Ex. 5 (Burtis Rpt.) ¶¶ 142-43; Ex. 3 (Singer Reply) ¶¶ 21-24. Google has pointed to zero evidence that any app developers' marginal costs are actually zero. The best it can do is to note that "replication costs" are sometimes zero, Opp. at 10-11, but as the full deposition answer Google only partially cited notes, replication costs are merely one type of marginal costs. Ex. 72 (Singer Dep.) 97:19-98:19 (noting it "doesn't cost any more to replicate that sword, but that doesn't mean there aren't any marginal costs incurred in the transaction."). As Dr. Singer demonstrated, developers face numerous other marginal costs like Google's take rate, taxes, customer service, and server hosting. Ex. 3 (Singer Reply) ¶¶ 21-25. Given this unrebutted evidence, analysis of *levels* of developers' marginal costs is unnecessary.

**Focal Point Pricing.** Nor will proof of pass-through require app-by-app inquiry of focal point pricing as Google contends. Google misleadingly suggests that Dr. Singer conceded that focal point pricing is an "important consideration" in the but-for world solely by quoting a response to a question asking whether focal point pricing "explain[s] any developers' pricing in the *actual world*." Ex. 72 (Singer Dep.) 202:2-7 (emphasis added). As Dr. Singer explained, developers' behavior in the face of Google's restraints are not necessarily predictive of the but-for world. *Id.* at 197:19-207:6; Ex. 3 (Singer Reply) ¶¶ 26-31. Nonetheless, Google's transaction data records over 130 million U.S. transactions at prices that do not end in "99." Ex. 3 (Singer Reply) ¶¶ 26-31. As of February 2022, Google reduced the minimum app price from $0.99 to $.05 worldwide. *Id.* ¶ 29 & n.58. Even in the actual world, developers depart from focal point pricing, and Google itself has eased restrictions which effectively required focal point pricing at the $0.99 price point. And Dr. Singer's model does in fact allow for developers to retain focal-point pricing with price

---

[5] Google's reference to a "standard economic model" that Dr. Singer purportedly chose not to use, is an economic model that *cannot* calculate pass-through because it does not provide a method for determining a developer's demand curve. Ex. 72 (Singer Dep.) 106:4-107:22; *Daubert* Opp. at 7.

points ending in 9. Ex. 3 (Singer Reply) ¶ 31. Dr. Singer's consideration of these factors is suffi-cient for his model to support certification. *See In re Packaged Seafood Prod. Antitrust Litig.*, 332 F.R.D. 308, 343 (S.D. Cal. 2019) (finding that "[t]he Court is not persuaded" by defendants' argument that expert "ignored loss-leader and focal point pricing" because the expert "in fact discusses both in his report"), *aff'd on reh'g en banc sub nom. Olean*, 31 F.4th 651.[6] Dr. Singer's model reliably considered the role focal point pricing would play in the but-for world.

**Competitive Conditions.** Google ignores that Dr. Singer's logit model measures, and controls for, the competitive conditions faced by developers in each of Google's 35 app categories. Dr. Singer determined that the logit model he employed explained real-world variation in prices and shares within an app category. Ex. 2 (Singer Rpt.) ¶ 238; Ex. 3 (Singer Reply) ¶ 70. In other words, the logit model verifiably described the competitive conditions faced by developers.[7] It yields the economically intuitive result that a highly concentrated app category where there is less competition will have a low pass-through rate, and an unconcentrated app category where there is more competition will have a high pass-through rate. *Id.* ¶ 73. Dr. Singer's modeling already accounts for competitive conditions, and no further individualized analysis is required.

**"Other Idiosyncratic Factors."** Google's argument that Dr. Singer failed to consider "other idiosyncratic factors" is another *Daubert* argument that mischaracterizes Dr. Singer's work. Dr. Singer's models are agnostic to how developers choose to use the portion of savings not passed through to consumers. Ex. 2 (Singer Rpt.) ¶ 266. Speculation that some developers may spend the remainder of their savings on marketing, improvements to their apps, or in donations to charity neither undermines his pass-through calculation nor requires individualized analysis. *Daubert*

---

[6] Google's cases all involved significantly different evidence of, and theories supporting, focal point pricing. *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) (finding that theory of pass-through based on lower quality to compensate for battery costs in laptops was unsupported by record); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. at 324-25 (finding that pass-through of cost that is "relatively small portion of the cost" of products priced at $100 increments defeated class certification); *In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022) (finding expert should have considered focal point pricing where record included "overwhelming evidence" of focal point pricing in but-for world, including expert's own admission).

[7] While Google is correct that Dr. Singer did not model "which apps in each category are complements and which are substitutes," Opp. at 12-13, he explained in the same answer that "it's not necessary to get the implied pass-through rate." Ex. 72 (Singer Dep.) 159:21-160:1; *see* Dkt. 298 (*Daubert* Opp.) at 13 (further discussing suitability of categories for logit model).

Opp. at 9. In short, Google's "other idiosyncratic factors" are irrelevant to the determination of whether Plaintiffs have provided a reliable methodology for calculating antitrust injury.

### 3. Dr. Burtis's Misguided Claim that There are Uninjured Class Members Does Not Undermine Class Certification

Google's argument that class members who purchased from only one app may not be injured if that app's developer did not pass through Google's supracompetitive costs is just a restatement of Dr. Burtis's error-riddled analysis that pass-through is "a rare exception." Opp. at 1. Dr. Singer's analysis proves otherwise that virtually all class members *have* been harmed. *Supra* I.A.

Moreover, Google's argument is nearly identical to the argument the Ninth Circuit rejected in *Olean*, 31 F.4th at 669.[8] There, defendants' expert argued that 28% of the class was not overcharged. *Id.* at 680. The court found that this fact did not defeat class certification in part because the expert focused on "class members with no or limited transactions during the benchmark period," and "did not make a factual finding that 28 percent of the [class] … were uninjured." *Id.* The same is true here. Dr. Burtis identifies class members who made few purchases but does not identify which apps those individuals purchased or whether those apps would be priced the same in the but-for world. Dr. Burtis can argue at trial that some class members with limited purchases may not be injured, but without more, that cannot defeat class certification. *Id.* at 682. Dr. Singer's model is reliable evidence of antitrust impact that "each class member could have relied on … to establish liability if he or she had brought an individual action." *Id.* at 679-81.

### C. Dr. Singer's Play Points Model Provides Further, Independent Common Proof of Antitrust Impact

Dr. Singer's Play Points model independently demonstrates antitrust impact through the increased rewards consumers would receive in the but-for world. *See* Ex. 2 (Singer Rpt.) ¶¶ 245-56. Google says that Dr. Singer "assum[ed] away the need to determine the amount of Play Points each consumer would have earned," Opp. at 19, but Dr. Singer calculated that figure—8.7% of transaction value. Ex. 2 (Singer Rpt.) ¶ 253. The remainder of Google's argument repeats its

---

[8] Google cites footnote 13 of *Olean* throughout its opposition, for the unremarkable proposition that individualized questions about uninjured class members can sometimes defeat class certification. Opp. at 7, 8, 9, 10, 16, 18. The *Olean* court merely recognized that, "on the particular facts of the cases before them," courts have found that the "need to identify uninjured class members" can predominate. *Olean*, 31 F.4th at 669 n.13. Google never engages with *Olean*'s actual holding.

*Daubert* contentions that Dr. Singer failed to model how many class members would sign up for and use Play Points in the but-for world. First, whether consumers spend the points or value them differently is irrelevant to class certification. *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *9 (N.D. Cal., Feb. 8, 2016) ("Defendants' focus on the subjective desires of individual consumers is misplaced, and is not supported by legal precedent requiring any such approach."). Unspent Play Points have intrinsic value, Ex. 3 (Singer Reply) ¶ 99, and the loss of consumer subsidies shows common impact. Second, Google's current opt-in model and relatively low participation rates do not mean Dr. Singer must model participation in the but-for world. Current participation rates are attributable to the limited Play Points program—subsidies average           per transaction because Google's anticompetitive conduct shields it from real competition, and therefore the need to attract consumers to its store. Ex. 72 (Singer Dep.) at 293:21-294:9, 297:8-21; Ex. 3 (Singer Reply) ¶ 98; *Daubert* Opp. at 3-4 (discussing same arguments).

### D. Class Members Will Not Be Worse Off In the But-For World

Google speculates that some class members will be worse off in the but-for world, thereby defeating common impact, because Google would degrade its own services and features in the face of competition. Those self-serving merits arguments run contrary to basic economics, Google's own business model, and the facts in the record.

To begin, it defies belief that Google would respond to competition by                  or degrading security. *See* Mot. at 23-24. Basic economics teaches that "as competition increases, firms compete more vigorously for customers on all dimensions." *Id.* (quoting Ex. 3 (Singer Reply) ¶ 64.)

Moreover, Google's opposition severely overstates the extent to which the but-for world would deprive Google of revenue for its services. Opp. at 19. Dr. Singer models that Google would retain a 60% market share resulting in                  in profit in 2020 and                  in 2021 from its but-for take rates alone. Ex. 2 (Singer Rpt.) ¶¶ 219, 269. Google also ignores its substantial advertising revenue from ads placed in the Play Store, bringing Google Play's but-for profits up to                  in 2020 and                  in 2021. *Id.* ¶ 269. These substantial figures don't account for the other significant revenues Google earns from advertising on its own and others' apps and

products on Android. *Id.* ¶ 271. Google would risk these substantial revenues if it started providing a lower quality product or charging consumers for services that have always been free.

Separately, Google has consistently rejected the measures Dr. Burtis claims it would take. Mot. at 23-24.

would run counter to Google's core business strategies across all of its products. Google consistently offers free access to its products (including Search, Gmail, Maps, YouTube, and others). Google recognizes that free apps "make[] Android more successful as an operating system" and "Android is important to Google." *See* Ex. 70 (Rosenberg Dep.) 410:8-413:14. The economic evidence shows that Google would not depart from its core business model, but to the extent Google wants to argue otherwise, that is an issue for the merits. *See In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 143-44 (C.D. Cal. 2007) (rejecting, at class certification, arguments based on defendants' expert report, including claim that some class members would have been worse off in the but-for world, "because they relate to the merits").

Here, all consumers would be better off if there were competition.[9] The benefits to consumers that Google touts (security protections and free access to a store) are unrelated to its exclusionary conduct. Google simply argues that if its exclusionary conduct is barred, it will degrade its products rather than competing by improving its offerings. That is contrary to the facts and to well-established economic principles. Ex. 3 (Singer Reply) ¶ 2 n.3; *cf. Kamakahi v. Am. Society for Reproductive Med.*, 305 F.R.D. 164, 193 (N.D. Cal. 2015) (rejecting defendants' argument that substitution in the but-for world defeats class certification because the Ninth Circuit "does not favor denial of class certification on the basis of speculative conflicts" among the class).

### E.      Dr. Singer Provides a Common Method of Calculating Damages

For the same reasons that Dr. Singer's economic models provide common proof of antitrust impact, those models provide a classwide means of calculating damages. Google provides no independent argument for this point, simply restating the same mischaracterization of a "standard economic model" in Dr. Singer's report. *See* Opp. at 22 & n.16; *supra* n.7. Even if some

---

[9] Google relies upon *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007), a case in which some class members received "discounts and deals on Tyco products" as a result of the exclusionary contracts "that would be *unavailable to them in the but-for world*." *Id.* at 168-70 (emphasis in original).

1   individualized damages determinations were required, "there is no per se rule that a district court

2   is precluded from certifying a class if plaintiffs may have to prove individualized damages at trial,"

3   and Google has made no effort to make a showing why this case is different. *Olean*, 31 F.4th 651,

4   681-82.[10] Damages calculations are no barrier to class certification.[11]

5   **II.      An Injunctive Relief Class Is Justified Under Rule 23(b)(2)**

6           Google argues that Rule 23(b)(2) has not been satisfied because: (1) Plaintiffs have not

7   adequately described the injunction, (2) Plaintiffs have not shown that all class members are in-

8   jured, and (3) an injunction would harm some class members. Each argument fails.

9           ***First***, Rule 23(b)(2) will "ordinarily" be met "when plaintiffs have described the general

10  contours of an injunction ... that can be given greater substance and specificity at an appropriate

11  stage in the litigation." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019).

12  Moreover, Rule 23(b)(2) is met when "class members complain of a pattern or practice that is

13  generally applicable to the class as a whole." *Mueller v. Puritan's Pride, Inc.*, No. 3:16-cv-06717-

14  JD, 2021 WL 5494254, at *8 (N.D. Cal. Nov. 23, 2021) (*quoting Walters v. Reno*, 145 F.3d 1032,

15  1047 (9th Cir. 1998)). Consumers have satisfied these standards. The Complaint alleges in detail

16  the anticompetitive conduct that Plaintiffs seek to end. Dkt. 241 ¶¶ 4, 6-11, 14-22. Plaintiffs' expert

17  reports also set forth at length conduct ripe for injunctive relief, including, but not limited to, re-

18  moving technical barriers to other app stores; Ex. 2 (Singer Rpt.) ¶¶ 95-96; Ex. 4 (Schmidt Rpt.)

19  ¶¶ 27-41; removing the tie requiring Google Play Billing for in-app transactions; Ex. 2 (Singer

20  Rpt.) ¶¶ 27-29, 31; and permitting developers to steer consumers to other platforms; *id.* ¶¶ 169-75.

21          There is no merit to Google's related argument that monetary relief predominates over

22  injunctive relief for the 23(b)(2) class. Monetary damages are sought only for a separate 23(b)(3)

---

23

24  [10] Here, as elsewhere, Google relies on a footnote in *Olean* while ignoring the holding. *See* Opp.
    at 22 (quoting *Olean*, 31 F.4th at 682 n.31). Google's brief separately quotes *Olean* for the propo-

25  sition that "the complexity of damages calculations … defeat[s] predominance." Opp. at 21 (quot-
    ing *Olean* 31 F.4th at 681). The court actually said: "[T]he Tuna Suppliers have not argued that

26  the complexity of damages calculations would defeat predominance here." 31 F.4th at 681. Plain-
    tiffs respectfully submit that Google's quotation does not comport with paragraph 23 of this

27  Court's Standing Order for Civil Cases.

28  [11] Google briefly argues that the proposed class's limitation to 17 states and territories would in-
    troduce individualized issues as to the residence of each class member, Opp. at 8, but its own data
    includes billing addresses, allowing mechanical determinations of each class member's residence.

---

CONSUMER PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION NO. 3:20-CV-05761-JD

class. "District courts may certify both a 23(b)(2) class for the portion of the case concerning in-junctive and declaratory relief and a 23(b)(3) class for the portion of the case requesting monetary damages." *Buchanan v. Tata Consultancy Servs., Ltd.*, No. 15-CV-01696-YGR, 2017 WL 6611653, at *23 (N.D. Cal. Dec. 27, 2017); *see also MacRae v. HCR Manor Care Services, LLC*, No. SA CV 14-00715-DOC (RNBx), 2018 WL 8064088, at *8 (C.D. Cal. Dec. 10, 2018).

*Second*, Google's argument that 23(b)(2) class members who made no purchase are un-harmed is flawed. Google's anticompetitive conduct harms all users by reducing output and elim-inating consumer choice. Google has foreclosed consumers' ability to download apps from competitors, and its fees have restricted the growth and improvement of apps. *See* Ex. 2 (Singer Rpt.) ¶¶ 54-166, 257-67. Each member of the proposed 23(b)(2) class is a current Android user, is subject to ongoing antitrust violations, and would benefit from injunctive relief. Google's cases concerning past users are inapposite. *See* Opp. at 25 (citing *Berni & Barilla S.p.A*., 964 F.3d 141, 147 n.28 & 148 (2d Cir. 2020) (finding prospective relief would not redress class members with only past harms); *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 70 (E.D. Pa. 2019) (same).

*Third*, Google's contention that users who download free apps would be harmed by in-junctive relief is a merit-based issue and should not defeat class certification. As noted, *supra* Part I.D, Google's parade of horribles that would accompany its loss of monopoly power is self-serving speculation at best. To the extent class members have benefited from Google Play, those benefits did not flow from the challenged anticompetitive conduct. The 23(b)(2) class should be certified.

## III.    All Four of the Rule 23(a) Factors Are Met

Consumers have established that each Rule 23(a) factor is met. There is no dispute that numerosity, commonality, and typicality have been established. *See* Opp. at 4 (conceding there are "21 million putative class members"); Mot. at 4-13, 14-15 (identifying numerous common ques-tions); Mot. at 15 (establishing typicality). Indeed, Google's opposition mentions these factors only in its recitation of the legal standard. Opp. at 6.

Google generally does not dispute the adequacy of the class representatives and class coun-sel either. Near the end of its brief, however, Google argues that the Joint Prosecution Agreement signed by the Court-appointed Steering Committee and 39 State Attorneys General creates

conflicts of interest for class counsel. But this argument is meritless. The JPA does not create any conflicts of interest. It merely represents a recognition by the State AGs that class counsel performed considerable work for the benefit of consumers in *all states* prior to the State AGs bringing their claims,[12] and that the significant work class counsel continue to perform for the benefit of the proposed class likewise inures to the benefit of consumers in *all states*. *See* Ex. 1 (JPA).

The JPA recognizes that class counsel can request fees from a common fund for work they perform that benefits plaintiffs other than the proposed class. This is entirely consistent with longstanding jurisprudence on attorneys' fees for common funds. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989) ("[I]t is well settled that the lawyer who creates a common fund is allowed an *extra* reward, beyond that which he has arranged with his client...."). Regardless, the Court will determine any fee award. *In re FPI/Agretech Sec. Litig.*, 105 F.3d 469, 474 (9th Cir. 1997) (affirming fee award to law firm who tried case, rather than to counsel who had stopped work despite "Joint Prosecution Agreement" requiring fees to be split).

And there is nothing unusual or inappropriate in class counsel seeking fees for work that benefits a common fund performed in cooperation with state attorneys general. For example, in *In re Electronic Books Antitrust Litigation*, class counsel represented consumers in certain states in parallel with attorneys general representing consumers in other states under their *parens patriae* authority. Class counsel made a fee application over a common fund created for all consumers who benefited from the settlement and the application was approved. *See In re Electronic Books Antitrust Litig.*, Case No. 11-md-02293 (DLC) (S.D.N.Y.) at Dkt. 685 (order approving class counsel fee application in connection with settlement agreement including plaintiff states), & at Dkt. 667 (class counsel's fee declaration detailing coordinated work effort with counsel for plaintiff states). Close cooperation between class counsel and state attorneys general toward common objectives *benefits* consumers through more effective and efficient work. It should be encouraged,

---

[12] Class counsel filed their Complaint on behalf of consumers in all states 11 months before the State AGs brought overlapping *parens patriae* claims for consumers in 39 of the states.

not attacked. The JPA *avoids* a scenario in which class counsel and the States would be pursuing largely the same claims for the same relief on behalf of the same individuals.

Google also argues that class counsel have an interest in keeping the case alive as long as possible, because "counsel's ability to keep earning fees depends on the ***absence*** of a settlement." Opp. at 22-23. But class counsel are not being paid by the hour; their fees are entirely at risk. So their interests are aligned with class members as they have every incentive to recommend a timely, favorable settlement to the class representatives, and, ultimately, for court approval.

Google is mistaken in its assertion that four plaintiffs cannot serve as class representatives based on their residence.[13] These plaintiffs have, in essence, opted out of the States' action to serve as class representatives. *See* 15 U.S.C. § 15c(b)(2). Just as class representatives often represent residents of other states in federal antitrust actions, there is nothing unusual about this arrangement. Nonetheless, the interests of the proposed class do not differ from the claims of consumers in other states, and consumers nationwide have the same interests and the same incentives, regardless of who is representing them. Therefore, class counsel's representation of these clients creates no conflict even if some individual plaintiffs were not class members. "In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed." *Newberg on Class Actions* § 3:75; *see also Sandoval v. M1 Auto Collisions Ctrs.*, 309 F.R.D. 549, 570 (N.D. Cal. 2015) (denying motion to disqualify counsel for representing classes in separate proceedings).

At best, Google raises highly speculative arguments that the JPA "creates conflicts," but "[t]he mere potential for a conflict of interest in not sufficient to defeat class certification," and certification should not be denied "on the basis of speculative conflicts." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *4 (N.D. Cal. Dec. 23, 2010) (*quoting Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)). Class counsel are experienced and well-suited to represent the consumer class. Google's attack on their adequacy should be rejected.

## CONCLUSION

For the foregoing reasons, the Court should certify both classes under Rule 23.

---

[13] Two class representatives (Atkinson and Iwamoto) reside in class states. Dkt. 241 ¶¶ 27-28.

Respectfully submitted,

By: */s/ Karma M. Giulianelli*

**BARTLIT BECK LLP**
Karma M. Giulianelli (SBN 184175)
Glen E. Summers (SBN 176402)
Jameson R. Jones (*pro hac vice*)
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com
glen.summers@bartlitbeck.com
jameson.jones@bartlitbeck.com

**BARTLIT BECK LLP**
John Byars (*pro hac vice*)
Lee Mason (*pro hac vice*)
54 W. Hubbard St., Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
john.byars@bartlitbeck.com
lee.mason@bartlitbeck.com

**COTCHETT, PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (SBN 152621)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
James G. Dallal (SBN 277826)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nnishimura@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

By: */s/ Hae Sung Nam*

**KAPLAN FOX & KILSHEIMER LLP**
Hae Sung Nam (*pro hac vice*)
Robert N. Kaplan (*pro hac vice*)
Frederic S. Fox (*pro hac vice*)
Donald R. Hall (*pro hac vice*)
Aaron L. Schwartz (*pro hac vice*)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
hnam@kaplanfox.com
rkaplan@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
aschwartz@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
lking@kaplanfox.com
kherkenhoff@kaplanfox.com

**PRITZKER LEVINE, LLP**
Elizabeth C. Pritzker (SBN 146267)
Bethany Caracuzzo (SBN 190687)
Caroline Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 805-8532
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

**KOREIN TILLERY, LLC**
George A. Zelcs (*pro hac vice*)
Randall Ewing, Jr. (*pro hac vice*)
David Walchak (SBN 323422)
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
dwalchak@koreintillery.com

Stephen M. Tillery (*pro hac vice*)
Michael E. Klenov (SBN 277028)
Carol O'Keefe (*pro hac vice*)
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy J. Wedgworth (*pro hac vice*)
Robert A. Wallner (*pro hac vice*)
Elizabeth McKenna (*pro hac vice*)
Blake Yagman (*pro hac vice*)
Michael Acciavatti (*pro hac vice*)
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229
pwedgworth@milberg.com
rwallner@milberg.com
emckenna@milberg.com
byagman@milberg.com
macciavatti@milberg.com

*Counsel for the Proposed Class*

1

**CERTIFICATE OF SERVICE**

2      The undersigned certifies that a true and correct copy of the foregoing was served on July

3   14, 2022 upon all counsel of record via the Court's electronic notification system.

4

5                                        */s/ Karma M. Giulianelli*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# REDACTED VERSION

# Exhibit A50
# to
# C. Cramer Declaration

# EXHIBIT 70

# FILED UNDER SEAL

HIGHLY CONFIDENTIAL

Page 1

1   ** H I G H L Y   C O N F I D E N T I A L **
2   UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF CALIFORNIA
3   SAN FRANCISCO DIVISION
    Case No. 3:21-md-02981-JD
4   ------------------------------------X
    IN RE GOOGLE PLAY STORE
5   ANTITRUST LITIGATION
6
    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No: 3:20-cv-05671-JD
8
    In re Google Play Consumer
9   Antitrust Litigation,
    Case No: 3:20-cv-05761-JD
10
    In re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12
    State of Utah, et al.,
13  v. Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14
    ------------------------------------X
15
                     February 10, 2022
16                   9:04 a.m.
17
18      Videotaped Deposition of JAMIE
19  ROSENBERG, taken by Plaintiffs, pursuant to
20  Notice, held via Zoom videoconference,
21  before Todd DeSimone, a Registered
22  Professional Reporter and Notary Public.
23
24
25

HIGHLY CONFIDENTIAL

Page 2

```
 1   A P P E A R A N C E S :
 2   Counsel for Plaintiff Epic Games, Inc. in:
     Epic Games, Inc. v Google LLC, et al:
 3
     CRAVATH, SWAINE & MOORE LLP
 4   825 Eighth Avenue
     New York, New York 10019
 5   BY: YONATAN EVEN, ESQ.
            yeven@cravath.com
 6        DAVID KUMAGAI, ESQ.
           dkumagai@cravath.com
 7        RAVI SINGH, ESQ.
           rsingh@cravath.com
 8
 9
     Counsel for Google LLC, et al:
10
     MUNGER, TOLLES & OLSON LLP
11   350 South Grand Avenue
     50th Floor
12   Los Angeles, California 90071-3426
     BY:  GLENN D. POMERANTZ, ESQ.
13          glenn.pomerantz@mto.com
          LAUREN N. BECK, ESQ.
14          lauren.beck@mto.com
15
16
     Counsel for the Proposed Class In re:
17   Google Play Developer Antitrust Litigation
     and Pure Sweat Basketball, Inc:
18
     HAGENS BERMAN SOBOL SHAPIRO LLP
19   715 Hearst Avenue
     Suite 202
20   Berkeley, California 94710
     BY:  BEN HARRINGTON, ESQ.
21          benh@hbsslaw.com
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 3

```
 1   A P P E A R A N C E S: (Continued)
 2   Counsel for the Proposed Class In re:
     Google Play Consumer Antitrust Litigation:
 3
     BARTLIT BECK LLP
 4   1801 Wewetta Street
     Suite 1200
 5   Denver, Colorado 80202
     BY: KARMA M. GIULIANELLI, ESQ.
 6       karma.giulianelli@bartlitbeck.com
         GLEN E. SUMMERS, ESQ.
 7         glenn.summers@bartlitbeck.com
 8             - and -
 9   BARTLIT BECK LLP
     54 West Hubbard Street
10   Courthouse Place
     Suite 300
11   Chicago, Illinois 60654
     BY:  LEE MASON, ESQ.
12         lee.mason@bartlitbeck.com
13
14
15   Counsel for Plaintiff States:
16
     OFFICE OF THE UTAH ATTORNEY GENERAL
17   111 South Main Street
     Suite 1800
18   Salt Lake City, Utah 84111
     BY:  BRENDAN GLACKIN, ESQ.
19         bglackin@agutah.gov
20
21   OFFICE OF THE MISSOURI ATTORNEY GENERAL
     615 East 13th Street
22   Suite 401
     Kansas City, Missouri 64106
23   BY:   STEPHEN HOEPLINGER, ESQ.
           stephen.hoeplinger@ago.mo.gov
24
25
```

HIGHLY CONFIDENTIAL

Page 4

1    ALSO PRESENT:

2       JEREMY JACOBSON, Law Clerk, Cravath

3       KATE SMITH, ESQ., Google

4       STEPHEN KENT, Videographer

5       PAUL RAFFERTY, Veritext Concierge Tech

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 123

```
 1    all the engineering resources to create
 2    this new product, the money we were
 3    proposing to invest, you know, if the net
 4    effect wasn't going to be to improve the
 5    user experience or improve the developer
 6    experience, then it wasn't going to be, you
 7    know, a worthwhile project for us to
 8    undertake.
 9         Q.    And one thing that it meant was
10    developers playing ████████ and Google off
11    against one another to get a better revenue
12    share deal, right?
13         A.    It could -- it could have been
14    that, although, you know, that's typically
15    not how we manage our revenue share.  We
16    have a published -- a published policy, but
17    it could, you know, more commonly be
18    around, you know, promotional
19    consideration, exclusivity, you know,
20    access to technical features, those types
21    of things as well.
22         Q.    Now, you referred a couple of
23    times to the fact that you have a published
24    policy with respect to the revenue share
25    deal.  Does that mean that you don't
```

HIGHLY CONFIDENTIAL

Page 124

1    typically negotiate individually with

2    developers on the rev share?

3         A.     Typically that's right.  We

4    have done some programs for certain

5    categories of developers with certain goals

6    for those programs and defined criteria,

7    but typically we don't, outside the context

8    of those programs, wouldn't be negotiating

9    it individually with developers on rev

10   share.

11        Q.     Why not?

12        A.     I think it was a principle of

13   ours to have, you know, an understood --

14   understood and kind of fair articulation of

15   our model to the ecosystem.  We had -- we

16   had interest in advancing the ecosystem as

17   a collective, and so that was a principle

18   from the beginning.

19        Q.     And does that remain a

20   principle of Google's today as well?

21        A.     Presumably, like I said, I'm

22   less close to it in the past few years,

23   but, you know, at the time it was.

24        Q.     Okay.  Now, going back to this

25   Exhibit 785, and I'm looking at the bottom

HIGHLY CONFIDENTIAL

Page 410

1   Google Play came many years later.

2        Q.     And when you say that the focus

3   of the business model was on participating

4   in transactions of digital goods, what is

5   that referring to?

6        A.     That refers to the revenue

7   share model associated with purchases.

8        Q.     Okay.  And it's fair to say

9   that many applications that are offered in

10  the store are -- there is no revenue share

11  associated with many of them because they

12  are distributed for free and people don't

13  buy anything for some -- for many

14  applications?

15             MR. POMERANTZ:  Objection to

16  the form.

17       A.     That's true.  I think for more

18  than -- more than 90 percent of the apps in

19  the store, there is -- there is no cost to

20  the developer for distribution other than

21  the fee of signing up to the store.

22       Q.     More than 90 percent of

23  applications in the store even today are

24  free and do not offer any in-app purchases

25  of digital goods, right?

1         A.      I believe that's true.

2         Q.      Around that, around that

3    number, I'm not trying to hold you to 90

4    percent versus 91, but it is a substantial

5    number?

6         A.      Yes.

7         Q.      And Google's business model

8    continues to include distribution of many

9    of those applications for which it will

10   never get paid other than the initial

11   developer fee, right?

12              MR. POMERANTZ:  Objection to

13   the form.

14        A.      So I don't necessarily agree

15   with the characterization that that's part

16   of our business model.  As I talked about

17   before, we feel an obligation to cultivate

18   the entire app ecosystem for Android and

19   make the platform available to developers

20   of all types, with all types of apps,

21   including developers that make apps that

22   are free.

23              So, you know, we have invested

24   in building out the scale to be able to do

25   that and support any and all developers,

HIGHLY CONFIDENTIAL

Page 412

1    whether they charge in their apps or not.
2    But the business model we chose was to
3    participate when there is a charge for a
4    digital good in that.
5          Q.      And how does making the
6    platform available to even developers who
7    offer their apps for free help Google?
8          A.      Well, making the platform
9    available to developers who offer the apps
10   for free makes Android more successful as
11   an operating system.  It provides more
12   functionality to end users of an Android
13   device.  Android is important to Google.
14   We want to see Android be successful.  So
15   supporting the broadest possible collection
16   of apps we think is good for Android.
17         Q.      And what benefits does Google
18   get from the success of Android?
19         A.      The success of -- well, Android
20   brings -- brings a smart device operating
21   system to billions of devices around the
22   world.  To the extent those devices are
23   connected to the internet and able to do
24   internet things, that's good for Google.
25   More people engaging with Google over the

HIGHLY CONFIDENTIAL

Page 413

1  internet is good for our desire to grow our
2  services and make them successful and
3  helpful.
4       Q.     And those services include the
5  services that Google provides with respect
6  to search, correct?
7       A.     Search, e-mail, maps, YouTube,
8  you know, many things at Google depend on
9  users having a device that is connected to
10 the internet and performs well.
11      Q.     And many of those things are
12 revenue generating for Google, such as
13 search and advertising, right?
14      A.     Some of them are, yes.
15             MS. GIULIANELLI:  I don't have
16 any other questions.  Thank you for your
17 time.  You have been very gracious.
18             MR. EVEN:  I actually have a
19 couple of more, if I may.  Not to suggest
20 that you have not been gracious.
21 EXAMINATION BY MR. EVEN:
22      Q.     So I have a couple of things to
23 ask you.  One is earlier today you
24 discussed the issue of fragmentation with
25 Ms. Giulianelli.  Do you remember that?

HIGHLY CONFIDENTIAL

Page 428

1                    CERTIFICATION

2

3        I,   TODD DeSIMONE, a Notary Public for

4     and within the State of New York, do hereby

5     certify:

6        That the witness whose testimony as

7     herein set forth, was duly sworn by me; and

8     that the within transcript is a true record

9     of the testimony given by said witness.

10        I further certify that I am not related

11     to any of the parties to this action by

12     blood or marriage, and that I am in no way

13     interested in the outcome of this matter.

14        IN WITNESS WHEREOF, I have hereunto set

15     my hand this 11th day of February, 2022.

16

17

18

19     _____

20             TODD DESIMONE

21

22

23

24

25

# REDACTED VERSION

# Exhibit A51
# to
# C. Cramer Declaration

# EXHIBIT 71

# FILED UNDER SEAL



GOOG-PLAY-000542516.R

Upfront questions

1. Who is Play's customer?
2. What value does the customer get?

PRIVILEGED AND CONFIDENTIAL

Google Play

## Who is our Play's monetized customer?

Current monetized customer: Developers with **in-app, digital goods purchase**

*Out of scope developers:*



- Offer in-app purchases for physical goods (Uber, Amazon)
- Monetize via in-app ads (Facebook, Pinterest)
- Don't monetize at all (Samsung Messages)
- SDKs

**PRIVILEGED AND CONFIDENTIAL**

Google Play

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Id | Date | Text |
|----|------|------|
| 1 | 04/25/2019 21:04:49 | + Premium apps |

Google Play





## What is the value for Play customers?

All of the developers who are *out-of-scope* for GPB receive the benefits of:

1. • Play's distribution network across 2.6B Android devices
2. • Play Protect
3. • Play Console tools (Beta testing, pre-launch reporting, store listing experiments)
4. • App updates

Apps required to use GPB get the following value:

1. • Secure payment platform
2. • Access to market-specific FOPs such as DCB, Gift cards
3. • New features such as Account Hold, Wolverine, Free Trials etc.
4. • Billing customer service

Value received for free appears to be much larger than value paid for

**PRIVILEGED AND CONFIDENTIAL**

Google Play



## What is our cost to deliver the value of Google Play to developers?

- **Transaction costs on GPB:** ▮ rev share is break-even cost (weighted avg FOP transaction cost, includes customer service + infrastructure costs)
- **Fixed costs:** unclear how to assess costs for Play Console & app distribution/management across Android fleet

Transactions are potentially incorrect. Use with caution

| FOP Type | Cost per transaction |
|---|---|
| Credit Card | |
| Gift Card | |
| PayPal | |
| DCB Total | |
| US | |
| BR | |
| MX | |
| FR | |
| GB | |
| Others | |

**PRIVILEGED AND CONFIDENTIAL**

Google Play



## What is our **strategy** for Play and GPB?

- Do we view GPB as only a solution for in-app, digital payments only?

- How do we think about developers who are *out-of-scope* for GPB, but getting a ton of benefit from Play (distribution, app development tools, security)?

PRIVILEGED AND CONFIDENTIAL

 Google Play







Rev share on ▮

Rev share on all in-app commerce, not just digital goods

**New Business Model**

**Pros**

▬ ████
████████
████

▬ Provides secure payment solution for ████ transactions

▬ Generates many new FOPs / NPUs

**Cons**

▬ Will likely face severe backlash from ████

▬ Internally politically disastrous

▬ Likely pushes payments to mWeb from in-app

▬ Provides disincentive to invest in Android vs iOS app

▬ DCB not an issue for ████

**Impact\*\***

▬ ~1B new FOPs generated on Android

▬ Potential for strong new revenue growth due to business

…ld potentially scope in ads, though would be very very difficult
\*\* Rev share model is very TBD

**PRIVILEGED AND CONFIDENTIAL**

▶ Google Play



Changes to existing model

## Keep rev share @ 30%

**Pros**
- Consistent, easy
- Aligns with iOS

**Cons**
- No rationale, other than copying Apple
- Already showing as untenable for many apps/games developers
- Only applicable to developers who use in-app digital goods

**PRIVILEGED AND CONFIDENTIAL**

**Impact**
- ▇ impact on 2018 consumer spend if ▇
- Impending subscription dev "apocalypse"

-many devs do not see economics working on Android vs

Google Play

   GOOG-PLAY-000542528.R



GOOG-PLAY-000542529.R



Changes to existing model

Creates an ▮▮▮▮▮▮▮▮ to support diverse ecosystem and fledgling startups

**Pros**

- Gives ▮ creators a break, fighting narrative that small creators will struggle on Play
- Brings Play rev share in-line with upper end of ▮▮▮▮▮▮▮▮ stores
- 50% discount vs iOS rev share, aligns with LTV

**Cons**

- May upset larger devs that they get no break (unlike ▮▮▮▮)
- No rationale for ▮ vs any other number other than competitive benchmark ([link](#))
- Unclear if ▮ retains future Fortnites/Netflixs
- Only applicable to developers who use in-app digital goods

**Impact**

- ▮▮ in revenue impact on 2018 consumer spend (▮▮ impact for indie-carve out, ▮ for overall rev share decrease to ▮) *(likely extreme case, as it does not account for increased volume of purchases at lower rev share)*

**PRIVILEGED AND CONFIDENTIAL**

▶ Google Play



Changes to
existing model

**Pros**

Clear ▮▮▮▮ in
regions where DCB & store
credit is meaningful

▬ Showcases power of GPB
(DCB is ▮▮ of commerce,
Store Credit ▮▮ globally)

**Cons**

▬ Creates incentive for devs
to steer users towards
cheaper FOPs

▬ FOP rev shares not too
dissimilar -- ▮▮ for CC,
▮▮ for DCB ▮▮ for gift
cards)

▬ Penalizes devs focused on
DCB / emerging markets, as
they'd pay higher rates for
already lower LTV users

▬ Potentially stronger
PROBLEM with ConteR Supp NBU

**Impact\*\***

▬ *Requires direction on if
we are OK with lower
revenue*

▬ Very TBD on how would
price margin for FOPs

Google Play



**New Business Model**

# GPB becomes non-exclusive-- allow 3rd party payments

GPB begins to compete on price/services for business across digital and non-digital goods

**Pros**
- Promotes competition
- Showcases GPB's billing success and global footprint-- DCB and credits are already available
- Provides a native, secure payment solution for physical goods

**Cons**
- Apple could offer a billing alternative on Android
- Likely "race to the bottom" on pricing vs Stripe, competitors
- DCB not an issue for physical goods today

**Impact\*\***
- xxxM New FOPs
- Strong new revenue source, or huge negative impact on revenue, depending on adoption/disintegration

**PRIVILEGED AND CONFIDENTIAL**

Google Play

Others?

GOOG-PLAY-000542533.R



GOOG-PLAY-000542534.R



# Competitive Rev Share Landscape

Game Stores

Discord 90-10

Epic 88-12 (Note: if a developer publishes on the Epic store, then will wave the 5% fee if they associated with using UE4)

Steam 70-30 <$10M; 75-25 <$50M; 80-20 >$50M

Kartridge 100-0 $<=10k; 70-30 >$10k

Facebook Instant Games 70-30

He opened by explaining Steam's reasoning: that bigger games are more valuable to Steam and bring more people to the platform, therefore Valve is willing to 'pay more' for them.

Samsung Store -- 70/30 for non-"Galaxy Store Partners", 80/20 for Galaxy Store Partners -- also able to mutually agree on a new rev share

Cloud -- usage based

Amazon -- 8%-15% for sellers on Amazon.com (physical goods), based on category

Garena/LINE off-store consumable purchases

HIGHLY CONFIDENTIAL

GOOG-PLAY-000542535.R

# REDACTED VERSION

# Exhibit A52
# to
# C. Cramer Declaration

# EXHIBIT 72

# FILED UNDER SEAL

Page 1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   ------------------------------------X
    IN RE GOOGLE PLAY STORE
4   ANTITRUST LITIGATION
5   Case No.  3:21-md-02981-JD
6

    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No. 3:20-cv-05671-JD
8

    In Re Google Play Consumer
9   Antitrust Litigation
    Case No. 3:20-cv-05671-JD
10

    In Re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12

    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  ------------------------------------X
15
16              VIDEOTAPE DEPOSITION
17                HAL SINGER, PH.D.
18             Thursday, May 12, 2022
19                9:07 a.m. (EST)
20
21
22
23
24  Reported by:
25  Ryan K. Black, RPR, CLR, Notary Public

Page 2

1

2

3

4                      Thursday, May 12, 2022

5

6           Video Deposition of HAL SINGER, PH.D.,

7      taken at the Law Offices of Munger, Tolles &

8      Olson, LLP, 601 Massachusetts Avenue NW

9      Washington, DC, beginning at 9:07 a.m.,

10     before Ryan K. Black, a Registered

11     Professional Reporter, Certified Livenote

12     Reporter and Notary Public and for the

13     District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1    A P P E A R A N C E S:
 2      CRAVATH, SWAINE & MOORE, LLP
        BY:  ERIC J. ZEPP, ESQ. - Via Zoom
 3      825 8th Ave
        New York, New York  10019
 4      212.474.1000
        ezepp@cravath.com
 5      Representing - Epic Games, Inc. In Re:
                       Epic Games, Inc. V. Google
 6                     LLC, et al.
 7
        BARTLIT BECK LLP
 8      BY:  KARMA M. GIULIANELLI, ESQ.
        1801 Wewatta Street
 9      Suite 1200
        Denver, Colorado  80202
10      303.592.3100
        karma.giulianelli@bartlitbeck.com
11      Representing - Consumer Class Plaintiffs
12
        HAUSFELD LLP
13      BY:  AMY ERNST, ESQ. - Via Zoom
        325 Chestnut Street
14      Unit 900
        Philadelphia, Pennsylvania  19106
15      215.985.3270
        aernst@hausfeld.com
16      Representing - Plaintiff Developers
17
        MUNGER, TOLLES & OLSON LLP
18      BY:  JUSTIN R. RAPHAEL, ESQ.
        560 Mission Street
19      27th Floor
        San Francisco, California  94105
20      415.512.4000
        justin.raphael@mto.com
21      Representing - Defendants
22
23    ALSO PRESENT:
24      Emmanuel Pezoa - Legal Videographer
        Yajing Jiang, Ph.D - Charles River Associates
25      Kevin Caves, Ph.D - Econ One
```

1           THE WITNESS:   Thanks.

2    BY MR. RAPHAEL:

3        Q.   Do you see Exhibit 335, Dr. Singer?

4        A.   I do.

5        Q.   And what is it?

6        A.   It -- it appears to be the article that

7    I cited.

8        Q.   That's the "Digital Economics" article

9    by Tucker and Goldfarb?

10       A.   Yes.

11       Q.   And -- and could you go to Page 12 of

12   the article?

13       A.   If you'd let me just -- one second.  I'd

14   -- I'd like to just read the abstract quickly.

15       Q.   Would you go to Page 12, please?

16       A.   Hold on one second.

17            Okay.  Page 12.

18            Okay.

19       Q.   Do you see at -- further down, say,

20   two-thirds of the way down in the left column,

21   there's a header that says, "The replication cost

22   of digital goods is zero"?

23       A.   Yes.

24       Q.   So this article that you relied on in

25   your report says that "The replication costs of

Page 98

1    digital goods is zero," correct?

2        A.    Correct.

3        Q.    Now, are you familiar with V-Bucks?

4        A.    Oh.  Can I put this to the side?

5        Q.    For now, yes.

6        A.    Yeah.

7              And I would just note for the record

8    that replication costs and marginal costs are not

9    the same.

10       Q.    Well, how are they different?

11       A.    Oh.  What -- what Goldfarb is not taking

12   into consideration here is that to sell the extra

13   unit you have to pay a processing fee.  That's a

14   marginal cost.

15             So it's true that to create the next

16   sword -- the 150th sword doesn't cost any more to

17   replicate that sword, but that doesn't mean there

18   aren't any marginal costs incurred in the

19   transaction.

20       Q.    Understood.

21             All right.  Could some developers have

22   negative marginal costs for in-app purchases?

23       A.    It's hard to -- to fathom that.

24       Q.    What if a developer generates

25   advertising revenue as the result of an in-app

Page 106

1   by E sub D."

2          Do you see that?

3      A.   Yes.  That's the classic Lerner markup.

4      Q.   Right.  So that's -- that's the proper

5   economic model for how a profit maximizing

6   developer would set prices based on marginal

7   costs, right?

8      A.   That model describes the markup over

9   marginal cost as the function of the elasticity

10  of demand faced by the developer.

11     Q.   Right.  And -- and this model on Page

12  104 of your opening report, that -- that's --

13     A.   So --

14     Q.   -- the correct economic mod -- economic

15  way to model how the change in marginal costs

16  will affect the price that the developer charges.

17     A.   It's the -- it's the way to think

18  about it at -- at a very, very high level of

19  abstraction.  But, as you know, to actually

20  estimate the pass-through rate here, I have to

21  make an assumption about the demands curve and --

22  and -- and the precise nature of demand that a --

23  the developer faces, right?

24          Once you --

25     Q.   Understood.

1      A.   -- make a -- once you make that

2    decision, you get these pass-through rules,

3    right?  And the pass-through rules -- whether you

4    go linear or logit or -- or constant elasticity

5    -- are going to express pass-through as a

6    function of things that do not include the

7    marginal cost.

8      Q.   Understood.  But this formula on Page

9    104 of your report is the correct economic way to

10   model the relationship between the developer's

11   price and the marginal cost in general?

12     A.   Well, I just want to put that caveat in

13   there.  It's the -- it's the -- definitely the

14   way to think about it and why it's in my

15   preamble, right?

16          But when I go to model the precise

17   amount of pass-through, I have to make an

18   assumption about what kind of demand the

19   developer faces, right?  And that -- that puts

20   me to a -- takes me to a pass-through rule that

21   isn't necessarily going to be denominated in

22   terms of costs.

23     Q.   Understood.  So -- but -- but this mod

24   -- this economic model you've described in Page

25   104 of your report, that's generally accepted in

Page 130

1    logit demand system?

2         A.    Cor --

3         Q.    Equation 6.

4         A.    Correct.

5         Q.    Yeah.  And just to make sure I

6    understand what you did, you -- you then ran a

7    regression to test whether the structure of

8    demand for apps was logit.

9         A.    I think that's fair, that I -- I did try

10   to assess which demand assumption best explained

11   the patterns in the data.

12        Q.    Okay.  Now -- and then you took the

13   formula from that Miller article -- after you ran

14   the regression to test the logit demand, you took

15   that formula and you calculated pass-through

16   rates for each category of apps in the Google

17   Play store?

18        A.    Correct.  It begins at the app level,

19   and it's aggregated up to the category.  But,

20   yes, ultimately I wanted a -- I wanted a

21   pass-through rate for the category.

22        Q.    Right.  Did you calculate pass-through

23   rates for any individual app?

24        A.    Yes.  You have to.  On your way to get

25   to the category, you have to.

1   period.

2   BY MR. RAPHAEL:

3       Q.   But the pass-through formula you have

4   would predict changes in the pass-through rate

5   from week to week or month to month if the share

6   changes.  Fair?

7       A.   If one were so inclined to measure it on

8   -- on a monthly or nanosecond basis, yes, you

9   could get very strange results.

10      Q.   Okay.  Could the formula you've got

11  here, the "M minus Q sub J divided by M," could

12  that be used to calculate pass-through rates in

13  any case where you know the unit market share of

14  an intermediary alleged to have passed on an

15  overcharge?

16      A.   I -- I -- I'd be reluctant to say that

17  the logit model could be applied to any case.

18  I'd want to confirm, first, as I did here, that

19  the logit model does a good job explaining the

20  relationship between prices and shares, as it

21  does here.

22           So I think you need some empirical

23  foundation before applying the logit model.

24  I think that would be a good -- good practice.

25      Q.   Okay.  Have you used the formula that

1   you used to calculate pass-through in this case

2   to calculate pass-through in any other case?

3       A.   I do not believe I have.  In other

4   cases, what I'm typically doing is regressing

5   retail price changes on wholesale price changes.

6       Q.   Okay.

7       A.   And that -- that's just not available

8   here.

9       Q.   All right.  To your knowledge, has

10  any economist used the formula you've used to

11  calculate pass-through in this case to calculate

12  pass-through in some other case?

13      A.   I -- I don't -- I don't know enough -- I

14  can't follow how pass-through is calculated in

15  every antitrust case.  I can tell you that the

16  logit assumption is one of the most common

17  assumptions that's used in antitrust cases there

18  is.

19      Q.   But --

20      A.   All right?

21      Q.   But you're not aware of this formula

22  being used to calculate pass-through in another

23  case.

24      A.   Oh.  Pass-through?  Well, the formula

25  is used to calculate price effects from, say,

1     A.    -- my answer?

2           -- when they -- when they're able to

3     avoid Google's, or in the case of YouTube, it was

4     Apple's take rate.

5     Q.    Well, Table 9's not a comprehensive

6     analysis of all developers, right?

7     A.    Well, it's not comprehensive because of

8     the challenged conduct here, right?  It -- the

9     -- we don't -- we don't get to see steering in --

10    in the real world because of the restraint,

11    right?  But the case in part, or in large part,

12    is about challenging that restraint.

13          So it is -- it is difficult to -- to

14    take advantage or exploit natural experiments

15    given Google's conduct here.

16    Q.    Right.  I'm -- I'm just asking.  You

17    didn't do any comprehensive analysis of any

18    relationship between service fees in the actual

19    world and developer's prices in the actual world.

20    A.    The -- the closest I did to that was I

21    did a comprehensive analysis of taxes at the

22    state level on prices -- app prices.  And I found

23    such a good relationship between those two that

24    it -- it is strongly indicative that to the

25    extent that the take rate works the same as an ad

Page 139

1    valorem sales tax, you would also believe that

2    changes in take rates, all right, --

3        Q.    Right.

4        A.    -- would -- if -- if they were allowed

5    or induced through competition, would also be

6    -- would be predicted to cause changes in prices.

7        Q.    My question was you didn't do any

8    comprehensive analysis of the relationship

9    between service fees in the actual world and

10   developers' prices in the actual world using

11   actual data regarding those things.

12       A.    I couldn't.  I just explained why that

13   Google, for the most part -- if you look in terms

14   of share transactions -- were well in the high

15   90s of -- of take rates between 29 percent and 30

16   percent.

17            So for the vast majority of the class

18   period, Google has been charging the same take

19   rate.  And now you're asking me could I do a

20   comprehensive analysis across all transactions?

21   I have bad news for you.  Across most or almost

22   all transactions, there has been no variation in

23   the take rate to exploit.

24       Q.    Okay.  So I'm -- I understand you feel

25   like you couldn't have done it.  But I'm asking

1    you did you do any analysis of the relationship

2    between service fees in the actual world and

3    developers' prices in the actual world using

4    actual data.

5        A.    I did for Table 9 in my report for that

6    handful of examples, but I -- the next best thing

7    that I could do -- because you need variation.

8        Q.    Sir, I'm going to -- I'm going to

9    interrupt you because you're not answering my

10   question.

11            My question is, Did you do any

12   comprehensive analysis using actual data of the

13   relationship between service fees and the prices

14   that developers actually charged?

15            MS. GIULIANELLI:  And I'm going to ask

16   you that you allow the witness to answer the

17   question because I believe he was answering it.

18            THE WITNESS:  I think I have done

19   comprehensive analysis.  As you know, your --

20   your experts put forward experiments where they

21   think they're exploiting changes in service fees

22   looking -- and going and looking for changes

23   in prices, so I -- I have.  I've looked at

24   everything possible that would allow to you do it

25   in light of the restraints that -- that Google

1    has imposed throughout the class period.

2            This is why their examples are so

3    tortured.  They're looking at these slight little

4    variations that either barely applied to an app

5    or where prices couldn't change because of Google

6    restriction.  So I -- I did everything that I

7    could possible.  I'm telling you that the most

8    comprehensive thing that -- that relates would be

9    the relationship between ad valorem sales taxes

10   at -- at the state level and prices, which do

11   -- are -- there's a tight relationship between

12   those two, right?

13       Q.   Right.  But the analysis of ad valorem

14   sales taxes doesn't use actual data regarding

15   developers' service fees and prices in the actual

16   world, correct?

17       A.   That is correct.

18       Q.   Okay.  And so you haven't done any

19   analysis -- using actual data on prices and

20   service fees for the entire set of developers

21   that's at issue in this case, you haven't done

22   any comprehensive analysis regarding the

23   relationship between those things, correct?

24       A.   I told you I could not do it given the

25   nature of the lack of variation --

1      Q.    And because --
2      A.    -- in Google's --
3      Q.    -- you couldn't --
4      A.    Almost every transaction.
5           MS. GIULIANELLI:  Hey, hey.  Let --
6    let --
7           THE WITNESS:  Almost every transaction
8    is occurring at 30 percent.  You -- you need
9    variation in the treatment variable in order to
10   tease out the relationship.  And if Google
11   doesn't do it because of its restraints
12   preventing competition, I can't -- I can't run a
13   test of what you're asking for.
14   BY MR. RAPHAEL:
15      Q.    Right.  And because you feel like you
16   couldn't do it, you didn't do it?
17      A.    Correct.
18      Q.    Okay.  Now, the Miller -- let's go back
19   to the exhibit, I think it was 336, which was the
20   Miller article?
21      A.    Yes.
22      Q.    Now, if you'll to go to the top of Page
23   452, we were talking earlier about Expression 2
24   which refers to the per-unit tax.  Do you recall
25   that?

Page 159

1    in the Staples and Office Depot case, that paper

2    clips and a ruler aren't necessarily substitutes;

3    but if the people generally tend to buy those

4    things from the same place, they can belong in

5    the same product market.

6         Q.   So -- but -- but it's not your opinion

7    that all apps in each Google Play app category

8    are substitutes.

9         A.   I just gave an example of Excel and Word

10   as being more -- more of complements, right?  But

11   -- but when you think about the -- the cat -- the

12   productivity suite that Google is offering, that

13   -- that's clearly a substitute to what -- what

14   Microsoft is offering in its productivity suite.

15        Q.   Right.  So some of the apps in each

16   Google Play category could be complements,

17   correct?

18        A.   They could be.

19        Q.   And some could be substitutes.

20        A.   They could be, yes.

21        Q.   Right.  And you haven't put forth a

22   model in your report to determine which apps in

23   each category are complements and which are

24   substitutes?

25        A.   No.  And it's not necessary to get the

Page 160

1   implied pass-through rate.

2       Q.    Right.

3            Could you go to Paragraph 78 of your

4   reply report -- well, actually, let me ask you:

5   Are you opining that all apps in each category

6   are part of a cluster market?

7       A.    No.  You -- you saw in my report.  I'm

8   saying that they don't need to necessarily be a

9   market, a relevant market, for antitrust

10  purposes, and I give you a citation for that.

11           I think that if you -- if you really

12  wanted to -- if you forced it into that box,

13  which is unnecessary and unnatural, that you

14  could -- you could get there by -- by

15  understanding the categories functioning

16  more like a cluster market.

17      Q.    Right.  But you're not actually offering

18  the opinion that all of the apps in each category

19  are part of a cluster market.

20      A.    No.  I -- I'm offering the opinion that

21  -- that everything within the category -- that

22  the category definitions from Google define the

23  -- the contours or the arena of competition among

24  apps in that category.

25      Q.    Okay.  And, again, let's go to Paragraph

1    apply to a model of logit demand if the -- if the
2    model in Paragraph 104 is a generic model?
3        A.    Well, because the logit pass-through
4    rule states pass-through as a function of
5    industry concentration and not of cost, and so
6    when you asked me why doesn't -- you're asking me
7    basically why isn't the pass-through rate under
8    logit changing with the change in costs.  It
9    doesn't.  It's just a property of the logit
10   demand.  It doesn't make the math on 104 wrong.
11   It doesn't make the logit wrong.  It just -- it's
12   no longer a function of cost.
13       Q.    So the property of the logit demand
14   model that you used for your pass-through is that
15   the price is a function of the concentration and
16   not of the cost?
17       A.    The pass-through is a function of the
18   concentration, not of the cost, correct.
19       Q.    All right.  What is focal point pricing?
20       A.    Focal point pricing is the notion that a
21   consumer might focus on the -- on the first digit
22   before the decimal, as opposed to the last two.
23   So it explains why a lot of firms end -- end
24   their prices in 99 cents, or other -- or other
25   combinations.  Just a greater focus on the first

                                        Page 198

1    -- on the stuff before the decimal place than --

2    than after the decimal place.

3        Q.   Okay.  And do you -- focal point pricing

4    is a well-established concept in economics?

5        A.   Sure.

6        Q.   And in the real world, many developers

7    price transactions only at certain focal points?

8            MS. GIULIANELLI:  Objection.

9            THE WITNESS:  We -- we've -- I've given

10   you all the stats that I think you could ever

11   want to see and more, but, you know, we know that

12   a lot do but a lot don't.  You know, 20 percent

13   of the top 200 don't end in 99 cents, right,

14   which is a big number.

15   BY MR. RAPHAEL:

16       Q.   So fair to say, though, that in the real

17   world some developers price in way that seems

18   like they're focal point pricing and some

19   developers don't?

20       A.   Given -- given the constraints that

21   Google imposed on some developers, yes, they

22   -- you know, they did price at 99 cents.

23       Q.   Well, what analysis have you done, sir,

24   in your reports to determine what effect Google

25   -- any constraints that Google imposed on

1    developers, in terms of how they price, had on

2    whether developers used focal point pricing?

3        A.   So the problem is that Google only

4    recently released its developers from the

5    shackles of this 99 cent constraint, and it did

6    so so recently that it actually postdates the end

7    of the database that we're looking at.

8             So there's no analysis that I can

9    perform to see how many of those who were at 99

10   would come down.  But I will tell you this, and

11   it's important, that Google did it at the demands

12   of the developers; they were responding to the

13   demand the developers wanted to go below 99 on

14   certain transactions.

15            The second thing I want to point out,

16   just kind of as a matter of basic economics, is

17   that if 99 was so magical that forces of nature

18   would take developers there on their own, why

19   would Google need to impose the floor, right?  So

20   the very fact that Google imposed a floor on

21   developers tells me as an economist that Google

22   didn't trust that market forces would bring us to

23   99 cents, that Google had to artificially lift

24   everyone to 99.  And Google was conflicted in

25   this role.  Google understood that if a price war

1   broke out among developers such that we had guys

2   who were otherwise going to be at 99, some would

3   go to 49, some would go to 79, that's less

4   revenue -- that's less revenue for Google.  So

5   Google had incentives to want to keep prices not

6   falling below a price floor.

7        Q.   So other than the -- the 99 cent price

8   floor that you're referring to, are you referring

9   to any or have you offered an opinion that any

10  other constraints by Google would affect a

11  developer's ability to depart from focal point

12  pricing?

13       A.   Absolutely.

14       Q.   Okay.

15       A.   The anti-steering rule, --

16       Q.   Okay.

17       A.   -- right?  So I go through kind of a

18  long example, but I thought it was important, of

19  -- of the developer who was at 1.99, and then

20  given the opportunity to steer finds that 1.79,

21  you know, under 50 percent steering the sharing

22  rule, would be profit maximizing, right?  So

23  Google did not present opportunities to steer.

24  And so then for your experts to say, Hey, there

25  isn't any steering here, well, I mean, they were

Page 201

1    constrained by Google.  Had they been given the

2    opportunity to deviate from the 99 and had it

3    been profit-maximizing to do so in order to --

4    you know, to save the delta between what Google's

5    take rate was and the rival's take rate, it would

6    have happened in spades, right, but it didn't,

7    and it didn't because of the constraints.

8         Q.    Sir, is it your opinion that no

9    developer in the actual world was committed to

10   focal point pricing?

11             MS. GIULIANELLI:  Objection.

12             THE WITNESS:  I don't think that people

13   commit to focal point pricing.  I think that

14   focal point pricing is -- is a function of what

15   your competitors are doing.  It's a function of

16   the rules of the road that you're operating

17   under.  It's a function of whether or not you

18   have steering opportunities.

19             So it's -- it's -- it's very

20   complicated.  But I will say that what Dr. Burtis

21   said on this point, which is that because we see

22   a lot of 99, we're necessarily going to see a lot

23   of 99 in the but-for world, I say not true.  It's

24   not true, because it itself is constrained by the

25   conduct -- by the challenged conduct.

1   BY MR. RAPHAEL:

2       Q.   I guess what I'm asking is, is it your

3   opinion that focal point pricing doesn't explain

4   any developers' pricing in the actual world?

5       A.   No, I think that's too harsh.  I think

6   that focal point pricing is an important

7   consideration here.

8       Q.   Okay.  Now, and -- and the price floor

9   you talked about of setting prices at 99 cents,

10  that wouldn't affect developers who set their

11  prices quite a bit above 99 cents?

12      A.   That's fair.  I think that, when we

13  looked at the data, it's about -- it's about 20

14  percent of developers were at that 99 cent, so I

15  agree with you that -- that those would be the

16  ones who were constrained from -- from moving

17  downward.

18      Q.   Okay.  So the other 80 percent of

19  developers wouldn't be affected by what you're

20  calling the price floor that Google had in place?

21      A.   Correct.

22      Q.   Okay.

23      A.   With one caveat in the sense that there

24  could be spillover effects from a floor being set

25  at 99 on what the next step up would be, but I

1   just wanted to put that out there that that's one

2   consideration.  But in general, if you're looking

3   for -- if you want to go looking for where the

4   constraint hit hardest, you would look at the

5   guys who were stuck at 99.

6       Q.   Okay.  Does your formula for calculating

7   pass-through rates account for focal point

8   pricing in any way?

9       A.   Well, it's solving for a percentage of

10  the cost savings that would be passed through to

11  end users, so I just think it's orthogonal.  It's

12  just not -- it's not that it accounts or doesn't

13  account, it's just it's telling us something

14  else.  It's telling us how a developer would

15  pass-through a save -- a reduction in marginal

16  costs to its end user.

17      Q.   Okay.  But you -- you say it's

18  orthogonal.  I just -- just want to make sure

19  we're clear.  Does your formula for calculating

20  pass-through rates account for focal point

21  pricing?

22      A.   I don't think the -- the -- the logit

23  model is -- is thinking about these rigidities

24  that we see in the actual world caused in part by

25  the challenged conduct.  But when you move to a

Page 204

1   but-for world without these restraints, without
2   the price floor, without the anti-steering rules,
3   we're going to see a wider spread of prices for
4   sure.  And, again, the last thing I want to say
5   is that what the formula is giving us in the
6   aggregate for a category is the percentage of
7   share.  It's not telling us -- we're not asking
8   the model -- if you go to my final tables, which
9   breaks it out by -- by app category, we're trying
10  to use it to estimate damages in terms of
11  overcharges to the consumers.  We -- we're not
12  using the model to make a precise prediction of
13  what Tinder would charge its customers in the
14  but-for world in October of 2019.  That's not
15  what -- we're not asking that of the model, all
16  right?
17       Q.   So your model is not actually -- your
18  pass-through model is not trying to predict what
19  any developer would have charged its customers in
20  the but-for world during the class period?
21            MS. GIULIANELLI:  Objection.
22            THE WITNESS:  I don't think that we are
23  aiming for the price of a given app in a given
24  month on a given plan.  That's not what we're
25  trying to estimate.  What we're trying to figure

1   out, for the purposes of impact, is to say that

2   if all app developers within a category achieved

3   a certain cost reduction by virtue of enhanced

4   competition and, thereby, lower take rate, how

5   much of that would be shared with consumers in

6   the aggregate across the category.  And, you

7   know, what I'm hearing is, oh, my God, have you

8   ruled out 99-cent things or things that end in 9?

9   No, we haven't -- we haven't ruled that out.  But

10  we're talking about the share of the costs that

11  are being saved in the aggregate across a

12  category.  We can allow for 79-cent pricing, we

13  can allow for 99-cent pricing, 29-cent pricing in

14  the but-for world.  We're not putting any

15  restrictions on -- on what the price of a

16  particular app in a particular plan at a

17  particular point in time are.

18  BY MR. RAPHAEL:

19      Q.   Right.  So I just want to make sure I

20  get an answer to my question.  So your model for

21  a pass-through isn't trying to take account in

22  any specific way for the phenomenon of focal

23  point pricing?

24      A.   I -- I don't -- I don't think that the

25  mod -- that particular logit estimate of the 89

1   percent is accounting or needs to take account.

2   I think I need to account for it in my overall

3   opinions about what the but-for world would look

4   like.  But the logit model is just telling us

5   what the implied pass-through rate is given a

6   reduction in costs, given the concentration

7   -- the typical concentration we see within

8   categories in -- you know, in the app industry.

9       Q.   Okay.  Your regressions regarding the

10  logit demand, did they have any fixed effect or

11  other mechanism to control for focal point

12  pricing?

13      A.   Well, they did use fixed effects.  I

14  don't know if you meant to say that, but they

15  don't have a separate control variable for focal

16  point.  But it is true, now that you brought this

17  up, we do have app fixed effects, right?  So to

18  the extent that an app stayed constant at a given

19  price over time or always ended at 99 -- let me

20  just say for the record what fixed effects is.

21  Quite literally, it's controlling for any of

22  these attributes of the app that are constant

23  over time.  And so if that tendency to want to

24  end in 99 or 79 or 69 is constant, then, yes, my

25  regressions control for it.

1      Q.   Okay.  But only to that extent?

2      A.   Yeah.  But it would be weird if -- if

3   there were an app who had a taste for focal point

4   price and then lost the taste then had it back.

5   It seems like those -- that tendency would be an

6   innate tendency that would be fixed over time.

7      Q.   Okay.  Have you tested whether

8   Dr. Burtis used a representative sample to

9   analyze pass-through rates using real world data?

10      A.   Well --

11           MS. GIULIANELLI:  Objection.

12           THE WITNESS:  -- I know that -- that

13   -- that the revenues that are accounted for in

14   her treatment group are infinitesimally small.

15   Something on the order of 1 percent or 2 percent

16   of an app developer's revenues.  And I can say

17   this:  That if you're in the subscription

18   category and you can only find, you know, this

19   teeny fraction of -- of developers and there's

20   two kind of representatives as problems:  One is

21   that it's too small of a share of the affected

22   developers' revenues to matter; but, then, two,

23   it also turns out to be too small of a share of

24   -- of revenues in the industry to matter.

25   So my -- my bottom-line position is this:  That

Page 293

1    Google.

2    BY MR. RAPHAEL:

3       Q.    So the answer to my question is yes, all

4    developers would participate in the play points

5    program in the but-for world?

6             MS. GIULIANELLI:   Objection.

7             THE WITNESS:   I -- I like the way that I

8    said it better, which is that if a developer

9    thought that a substantial percentage of its

10   customers were going to be redeeming points via

11   this new and improved program, and if Google made

12   some kind of requirement that said you have to

13   sign a piece of paper so that you can accept the

14   payments under this program, the developers would

15   do it.

16   BY MR. RAPHAEL:

17      Q.    Do you know if Google has that

18   requirement in the actual world?

19      A.    I don't know if the Google has the

20   requirement in the actual world.

21      Q.    Would that change your opinion as to

22   what would happen in the but-for world?

23      A.    No.  Because the program, for all intent

24   and purposes, is effectively zero right now.

25   Google doesn't need to be generous with its

Page 294

1  points program because Google is immunized from

2  competition.  Now, I think it would be

3  considering to look at career where Google was

4  forced because of one store to increase its

5  subsidy to around █ percent and all of a sudden

6  that's starting to approach something real.  You

7  know █ percent is not real.  █ percent

8  actually might make a difference on purchase, and

9  I'll just leave it at that.

10      Q.   What's your standard for the percentage

11  of cash back accounted for by play points that

12  would make a difference to competition?

13      A.   Not about difference to competition.

14  It's what would be sufficiently generous such

15  that consumers would partake in the program.

16      Q.   And what amount of a cash back would be

17  sufficiently generous that consumers would

18  partake in the play points program?

19      A.   Well, when you think about, like, AMEX

20  customers partaking in their points that American

21  Express gives back, I think AMEX is more generous

22  than 0.2 percent.  In fact, Williams has the --

23  the percentage that AMEX shares with its -- with

24  its customers.  It's over 1 percent.

25           So, you know, I don't know exactly the

1      A.    I think the model is.  I think that at 8

2   percent, the economic intuition -- well, this is

3   the intuition that I'm drawing from the model --

4   is that when the benefit gets so large, that is

5   going to spur participation and usage in the

6   system.

7      Q.    Great.

8           Your -- your testimony here today, sir,

9   is that you have a model in your reports that can

10  tell the Court and the jury in this case which of

11  the members of the putative class would have

12  signed up for play points and who would have used

13  them?

14          MS. GIULIANELLI:  Objection to the form.

15          THE WITNESS:  I didn't say that.  I said

16  that if the but-for subsidy were to rise to 8

17  percent, then it would be embraced -- the play

18  points system would be embraced across the class

19  just as the way that the points system in the

20  AMEX marketplace is embraced across American

21  Express users.

22  BY MR. RAPHAEL:

23     Q.    Okay.  So I want to -- I want to be

24  clear.  You have -- your testimony is that in the

25  but-for world, every member of the putative class

Page 397

1                    C E R T I F I C A T E

2

3        I do hereby certify that I am a Notary

4    Public in good standing, that the aforesaid

5    testimony was taken before me, pursuant to

6    notice, at the time and place indicated; that

7    said deponent was by me duly sworn to tell the

8    truth, the whole truth, and nothing but the

9    truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition

13   is a true and correct record of the testimony

14   given by the witness; and that I am neither of

15   counsel nor kin to any party in said action, nor

16   interested in the outcome thereof.

17

18        WITNESS my hand and official seal this

19   13th day of May, 2022.

20

21

22        _____

23                  Notary Public

24

25

# REDACTED VERSION

# Exhibit A53
# to
# C. Cramer Declaration

1    Brian C. Rocca, S.B. #221576
     brian.rocca@morganlewis.com
2    Sujal J. Shah, S.B. #215230
     sujal.shah@morganlewis.com
3    Michelle Park Chiu, S.B. #248421
     michelle.chiu@morganlewis.com
4    Minna Lo Naranjo, S.B. #259005
     minna.naranjo@morganlewis.com
5    Rishi P. Satia, S.B. #301958
     rishi.satia@morganlewis.com
6    **MORGAN, LEWIS & BOCKIUS LLP**
     One Market, Spear Street Tower
7    San Francisco, CA 94105
     Telephone: (415) 442-1000
8    Richard S. Taffet, *pro hac vice*
     richard.taffet@morganlewis.com
9    Ian Simmons, *pro hac vice*
     isimmons@omm.com
10   **MORGAN, LEWIS & BOCKIUS LLP**
     101 Park Avenue
11   New York, NY 10178
     Telephone: (212) 309-6000
12   Benjamin G. Bradshaw, S.B. #189925
     bbradshaw@omm.com
13   **O'MELVENY & MYERS LLP**
14   1625 Eye Street, NW
     Washington, DC 20006
15   Telephone: (202) 383-5300
     Daniel M. Petrocelli, S.B. #97802
16   dpetrocelli@omm.com
     Stephen J. McIntyre, S.B. #274481
17   smcintyre@omm.com
     **O'MELVENY & MYERS LLP**
18   1999 Avenue of the Stars
     Los Angeles, California 90067
19   Telephone: (310) 553-6700

20   *Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al. in In re Google Play Consumer Antitrust Litigation; In re Google Play Developer Antitrust Litigation; Epic Games, Inc. in Epic Games, Inc. v. Google LLC; State of Utah et al. v. Google LLC et al.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| 22   **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>23   THIS DOCUMENT RELATES TO:<br><br>24<br><br>25   *In Re Google Play Consumer Antitrust Litigation*, Case No. 3:20-CV-05761-JD | Case No. 3:21-md-02981-JD<br><br>**FILED UNDER SEAL**<br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br>Date:          August 4, 2022<br>Time:         10:00 a.m.<br>Judge:        Hon. James Donato<br>Courtroom: 11, 19th Floor, 450 Golden Gate Ave, San Francisco, California 94102 |

Case No. 3:20-CV-05761-JD

1

## NOTICE OF MOTION

2   **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE THAT** on August 4, 2022 at 10:00 a.m., or as soon thereafter

4   as the matter may be heard, in Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San

5   Francisco, California, 94102, before the Honorable James Donato, the undersigned Defendants

6   ("Defendants"), will and hereby do move the Court for an order excluding the testimony of

7   Consumer Plaintiffs' proffered expert Dr. Hal J. Singer, on the ground that it is not admissible

8   under Federal Rule of Evidence 702.  This motion is based upon this Notice of Motion, the

9   attached Memorandum of Points and Authorities, the concurrently-filed declaration of Justin P.

10  Raphael, and the exhibits to that declaration, the concurrently-filed Proposed Order, the pleadings

11  and records on file in this action, and upon any additional evidence and argument that may be

12  presented before or at the hearing of this motion.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:20-CV-05761-JD

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

ISSUE TO BE DECIDED ................................................................................................ 1

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 4

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT ................................................................................................................... 6

I.      DR. SINGER'S PASS-THROUGH FORMULA IS NOT RELIABLE. .................. 6

     A.      Dr. Singer's Pass-Through Formula Is Not Generally Accepted and
            Contradicts His Own View of Accepted Economics. ................................. 6

     B.      Dr. Singer's Pass-Through Rate Formula Ignores Actual Data. .............................. 9

     C.      Dr. Singer's Pass-Through Rate Formula Does Not Account for Focal Point
            Pricing. ...................................................................................................... 11

     D.      Dr. Singer's Pass-Through Rate Formula Relies on the Unsubstantiated
            Assumption that All Apps in a Google Play Category Are Substitutes. ................. 12

     E.      Dr. Singer's Pass-Through Formula Reflects Undisclosed Analyses. ..................... 12

II.      DR. SINGER'S FORMULA FOR CALCULATING COMPETITIVE SERVICE
      FEES IS NOT RELIABLE. ............................................................................. 13

III.      DR. SINGER'S METHOD FOR CALCULATING ALLEGED INDIVIDUAL
       CONSUMER IMPACT IS NOT RELIABLE. ................................................ 14

IV.      DR. SINGER'S MODEL REGARDING PLAY POINTS IS NOT A RELIABLE
       METHOD OF COMMON PROOF OF ANTITRUST IMPACT. ....................... 14

CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

CASES

*In re Air Cargo Shipping Servs. Antitrust Litigation*,
   No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .........................13

*In re Apple iPhone Antitrust Litigation*,
   No. 11-cv-6714-YGR, 2022 WL 1284104 (N.D. Cal. Mar. 29, 2022)
   ...........................................................................................................3, 11, 12, 14

*Bourjaily v. United States*,
   483 U.S. 171 (1987) ...........................................................................................5

*Boyar v. Korean Air Lines Co.*,
   954 F. Supp. 4 (D.D.C. 1996) ..........................................................................12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .........................................................................................11

*In re Capacitors Antitrust Litigation* (No. III),
   No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .........................5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .................................................................................1, 5, 6, 9

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995).............................................................................6

*DSU Medical Corp. v. JMS Co.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) ...............................................................5

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011)..............................................................................5

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997).................................................................................6, 9, 10, 15

*In re Graphics Processing Units Antitrust Litigation*,
   253 F.R.D. 478 (N.D. Cal. 2008) ....................................................................1, 14

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977).........................................................................................9

*Laumann v. NHL*,
   117 F. Supp. 3d 299 (S.D.N.Y. 2015).................................................................3

Case No. 3:20-CV-05761-JD

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*In re Lithium Ion Batteries Antitrust Litigation*,
    No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018)..................................3, 11

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .........................................................................................................12

*Milan v. Clif Bar & Co.*,
    No. 18-cv-02354-JD, 2021 WL 4427427 (N.D. Cal. Sept. 27, 2021) ........................................2

*Ollier v. Sweetwater Union High School District*,
    768 F.3d 843 (9th Cir. 2014).................................................................................................10

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002)................................................................................................6

**FEDERAL RULES**

Fed. R. Evid. 702.....................................................................................................................1, 5

Fed. R. Evid. 702(b) ..................................................................................................................6

Fed. R. Evid. 702(c) ..................................................................................................................5

Fed. R. Evid. 702(d) ..................................................................................................................6

**OTHER AUTHORITIES**

Avi Goldfarb & Catherine Tucker, *Digital Economics*, 57 J. Econ. Lit. 3 (2019)............................7

Google Play, "Choose a category and tags for your app or game," Google Support,
    https://support.google.com/googleplay/android-developer/answer/9859673 ...........................12

Nathan Miller, Marc Remer & Gloria Sheu, *Using Cost Pass-Through to Calibrate
    Demand*, 118 Econ. Ltrs. 452 (2013) ......................................................................................8

1

**ISSUE TO BE DECIDED**

2      Whether the Court should exclude the expert opinions of the Consumer Plaintiffs' expert

3   Dr. Hal J. Singer as unreliable under Rule 702 of the Federal Rules of Evidence and *Daubert v.*

4   *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

5

**INTRODUCTION**

6      Consumer Plaintiffs allege that developers passed on service fees for the Google Play Store

7   by charging consumers higher prices for downloading apps, subscribing to apps, and buying

8   digital content used in apps ("in-app purchases" or "IAPs").  Plaintiffs' expert, Dr. Hal Singer, has

9   proffered what he calls a "deceptively straightforward" model to prove this pass-through on a

10  class-wide basis.  Dr. Singer's pass-through model is unreliable.

11      The putative class of millions of consumers in the United States downloaded many

12  thousands of different kinds of apps from the Play Store.  Ninety percent of the apps in the Play

13  Store are completely free; consumers pay nothing to download them, subscribe to them, or buy

14  IAPs in them.  Consumer Plaintiffs' case involves the small fraction of apps for which developers

15  charge consumers for a download, a subscription, or an IAP.  Developers set the prices for those

16  transactions, which are subject to service fees.  Consumer Plaintiffs' theory of antitrust injury is

17  that (1) Google unlawfully foreclosed competition for the Play Store, (2) absent this conduct,

18  Google would have charged lower service fees, and (3) rather than investing these reduced fees in

19  improving or marketing their apps, developers would have passed the reduced fees on by charging

20  lower prices for apps, subscriptions, and IAPs.

21      Theories of antitrust impact that depend on pass-through are "more complex" because they

22  "must account for the actions of innocent intermediaries who allegedly passed on the overcharge."

23  *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008).  Here, the

24  "intermediaries" are thousands of developers of different apps with different marginal costs,

25  competitors and business strategies.  Dr. Singer has not run any regression or other econometric

26  analysis to identify which of the developers would have reduced their prices if they were subject to

27  lower service fees and by how much.  In fact, Dr. Singer has not measured pass-through using any

28  data regarding what developers actually did when Google reduced its service fees in the real

-1-
Case No. 3:20-CV-05761-JD

1    world.  Rather, according to Dr. Singer, each app's pass-through rate can be calculated using a

2    simple ratio:  the number of transactions involving that app divided by the total number of

3    transactions involving apps in the same category in the Play Store.  All Dr. Singer does to

4    calculate the app's pass-through rate is to subtract that ratio from 100.  Thus, if 1% of transactions

5    in the Weather category involve a particular app, Dr. Singer calculates that the developer of that

6    app would have passed on 99% of any service fee above the competitive level.  That is it.

7         The Court should exclude Dr. Singer's opinions based on this bare bones formula.  *First*,

8    the formula is not "a generally accepted method," *Milan v. Clif Bar & Co.*, No. 18-cv-02354-JD,

9    2021 WL 4427427, at *6 (N.D. Cal. Sept. 27, 2021) (Donato, J.), because it departs from what Dr.

10   Singer himself identifies as standard economics in his own reports.  Google's service fees are

11   calculated as a percentage of the prices that developers charge.  According to the economic model

12   that Dr. Singer describes as "generally accepted" and included in his report, whether an increase in

13   such costs affect prices (if at all) depends on a firm's other marginal costs.  Dr. Singer concededly

14   did not use this accepted model because he could not possibly determine the marginal costs of

15   each of the thousands of developers that transacted with the putative consumer class.  Instead, Dr.

16   Singer used a formula based on an app's category share, which he conceded "doesn't actually

17   depend on what the marginal cost of the developer is." Ex.[1] 1, Singer Dep. at 91:3–8.  A pricing

18   model that does not depend on costs does not reflect standard economics.  Dr. Singer also testified

19   that, according to standard economics, if developers paid lower service fees, then they would have

20   had incentives to compete by investing in improving their apps.  However, Dr. Singer's pass-

21   through model does not account for whether reduced service fees would have led developers to

22   reinvest in their own products, not pass on the reduction to consumers.

23        *Second*, real-world data shows that Dr. Singer's pass-through rate formula is not reliable.

24   Dr. Singer's formula predicts that lower service fees *always* lead to lower prices.  However, real

25   world data from the class period show that when Google reduces its service fees to some

26   developers, those developers *almost never* reduce their prices.  Dr. Singer's pass-through rate

27   _____

28   [1] All references to "Ex." are exhibits to the concurrently-filed declaration of Justin P. Raphael.

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    formula thus "substitutes mathematical assumptions for actual, readily-obtainable information."

2    *Laumann v. NHL*, 117 F. Supp. 3d 299, 315–16 (S.D.N.Y. 2015) (excluding expert testimony).

3         *Third*, Dr. Singer's pass-through rate formula does not account for "focal point pricing,"

4    the widely used strategy of setting prices ending in "9" or "99," which could explain why

5    developers might not have reduced prices if they were subject to lower service fees.  This exact

6    shortcoming has led other courts in this District to exclude expert testimony, and this Court should

7    do the same.  *E.g.*, *In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714-YGR, 2022 WL 1284104,

8    at *8 (N.D. Cal. Mar. 29, 2022); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420

9    YGR, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018).

10        *Fourth*, Dr. Singer's formula depends on a premise that he admits he cannot substantiate.

11   Even though his pass-through formula is derived from a model of demand in which all apps in

12   each Play Store category are substitutes, at deposition Dr. Singer disclaimed any opinion that all

13   apps in each Play Store category actually are substitutes.  Ex. 1, Singer Dep. at 158:14–16.  That

14   leaves Dr. Singer unable to opine that a necessary condition for his formula is met.

15        *Finally*, Dr. Singer's pass-through formula reflects undisclosed tests.  Dr. Singer chose his

16   formula from several others reflecting differently structured demand curves.  Dr. Singer tested

17   those formulas, but Consumer Plaintiffs did not disclose the results, so Google cannot test Dr.

18   Singer's opinion that his formula best fits the structure of demand for apps.  That is prejudicial

19   because Dr. Singer himself testified that pass-through depends on the structure of demand.

20        Dr. Singer offers an alternative opinion that all consumers suffered antitrust impact

21   because, in the but-for world, Google would have provided a more generous Play Points loyalty

22   program.  This opinion, too, is unreliable because it reflects assumption rather than analysis.  Most

23   consumers did not sign up for the Play Points Program and many of those who did earn Play

24   Points never used them.  Dr. Singer, however, admits that he has no model to determine which

25   consumers would have signed up for and used Play Points in the but-for world.  Rather, he calls it

26   a "fair assumption" that all consumers would have done so.  That is not a reliable method of

27   common proof of antitrust impact.

28        The Court should exclude Dr. Singer's testimony from class certification proceedings.

**BACKGROUND**

Consumer Plaintiffs' theory of antitrust impact is that they would have paid lower prices for apps, subscriptions, and IAPs in the but-for world.  This theory proceeds in two steps:  (1) if Google had not engaged in allegedly anticompetitive conduct, then Google would have faced more competition and responded by lowering service fees, and (2) developers subject to lower service fees would have charged less for apps, subscriptions, and IAPs.  *See* Consumer Second Am. Compl. ¶ 208, ECF No. 241.  Dr. Singer purports to have a model for each step.

**Service Fee Rate Model.**  Dr. Singer's method for calculating the service fee rates that Google would have charged in a more competitive market consists of a series of mathematical equations.  One of the inputs into those equations is the average pass-through rate that Dr. Singer has calculated.  *See* Ex. 2, Singer Rep. ¶ 125; Ex. 1, Singer Dep at 337:4–19.  This means that if a developer would not have passed through a reduced service fee, then Google would not have reduced its service fee.  The but-for service fee rate would thus be the same as the real-world rate, meaning that Google would not have overcharged that developer.  *See* Ex. 3, Burtis Rep. ¶ 335.

**Pass-Through Rate Model.**  Dr. Singer's method for calculating pass-through rates consists of mere arithmetic.  Google organizes apps into categories for purposes of cataloging them in the Play Store.  Those categories do not reflect any economic analysis of substitution.  Developers can choose the categories when they submit their apps.  Ex. 1, Singer Dep. at 90:3–6.  Dr. Singer nevertheless attributes decisive economic significance to developers' category choices.  He opines that a developer will pass through a change in service fees at a rate equal to 100 minus the percentage of transactions in the app's category accounted for by that app (Ex. 2, Singer Rep. ¶ 239), or:  **100% – [Number of App's Transactions / Number of Transactions of all Apps in Same Category]**.  Ex. 1, Singer Dep. at 131:5–132:2.  Thus, for example, if an app in the Health category has 2% of transactions, then it will change prices by 98% of any change in service fees.

This formula guarantees pass-through for virtually all apps.  As Dr. Singer admitted, his formula always "predicts" pass-through so long as an app does not have 100% of transactions in a given category, which no app does.  Ex. 1, Singer Dep. at 181:23–183:7.  Dr. Singer's formula also predicts what he calls "very strange results":  an app's pass-through rate, and thus its prices,

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

will change week to week or month to month as the app's share of transactions in its category moves up or down based on consumers' buying habits.  *Id.* at 134:3–9.

**No Regression Related to Pass-Through.**  Dr. Singer has not run any regression to calculate pass-through rates.  Ex. 1, Singer Dep. at 164:18–165:12.  The regression he ran "isn't measuring how a service fee change affects the price of an app or in-app purchase."  *Id.*  His regression measures how changes in developers' prices for apps, subscriptions, and IAPs affect demand for those transactions.  Ex. 2, Singer Rep. ¶ 236; Ex. 1, Singer Dep. at 164:10–17.

**Play Points.**  Dr. Singer offers an alternative opinion related to Google Play Points, a "loyalty points program" that Dr. Singer calls a "subsidy" for transactions in the Play Store.  Ex. 2, Singer Rep. ¶ 245.  Less than ▮▮▮ of U.S. consumers participated in the Play Points Program and only ▮▮ of U.S. consumers redeemed Play Points.  Ex. 3, Burtis Rep. ¶ 358; Ex. 4, Singer Reply Rep. ¶ 98.  According to Dr. Singer, Google offered a total amount of Play Points equivalent to an average of $0.02 per transaction in the real world, but would have offered Play Points equivalent to an average of $0.77 per transaction (or 8.7%) in the but-for world.  Ex. 2, Singer Rep. at 122, Table 10.  However, Dr. Singer has not developed a model to determine which consumers would have signed up for or redeemed Play Points in the but-for world.  Ex. 1, Singer Dep. at 295:5–20, 296:6–19, 297:8–21.

## LEGAL STANDARD

Plaintiffs have the burden to prove that Dr. Singer's testimony is admissible.  *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1146–47 (N.D. Cal. 2003).  Under Rule of Evidence 702, at class certification this court acts as a "gatekeeper" to ensure that expert testimony is reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

*First*, the Court must ensure that Dr. Singer's testimony is "the product of reliable principles and methods."  Fed. R. Evid. 702(c).  This Court has explained that this requires assessing whether Dr. Singer has used "a generally accepted method for determining antitrust impact . . . ."  *In re Capacitors Antitrust Litig.* (No. III), No. 17-md-02801-JD, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018) (Donato, J.).

*Second*, the Court must scrutinize "what basis [Dr. Singer] has" for his opinions. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). The Court must ensure that Dr. Singer's methodology is "based on sufficient facts or data" and "that he has "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (d); *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (citation omitted). This standard "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590–91. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## ARGUMENT

## I.   DR. SINGER'S PASS-THROUGH FORMULA IS NOT RELIABLE.

### A.   Dr. Singer's Pass-Through Formula Is Not Generally Accepted and Contradicts His Own View of Accepted Economics.

Dr. Singer's pass-through rate formula does not reflect a generally accepted economic method for calculating whether, and how much, firms pass on costs structured like Google's service fees. Dr. Singer (1) does not use the generally accepted economic pricing model set forth in his own report and (2) does not account for the standard economic prediction (also in his report) that developers would have incentives to use savings on service fees to invest in their apps.

A "pass-through rate[]" is "the ratio of the dollar change in a developer's profit-maximizing price resulting from a one-dollar change in marginal cost." Ex. 2, Singer Rep. ¶ 239; Ex. 1, Singer Dep. at 103:18–104:12. In Paragraph 225 of his report, Dr. Singer provides the model "that's generally accepted in economics" for how an increase in service fees would affect a developer's price. Ex. 1, Singer Dep. at 105:8–106:3, 107:23–108:2; Ex. 2, Singer Rep. ¶ 225. This model reflects an important difference between what economists call "per-unit" costs and *ad valorem* costs. "Per unit" costs are a dollar amount per transaction. Google's service fees are *ad valorem* costs: a percentage of the price charged. Ex. 1, Singer Dep. at 104:13–20.

According to the generally accepted economic model that Dr. Singer sets forth in his

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

report, an economist calculating how changes in a service fee will affect how each developer sets prices must have information on each developer's marginal costs, if any.  This is because, according to the model, if changes in *ad valorem* costs would affect a developer's prices, any effect would be proportional to the developer's other, per-unit marginal costs.  *See* Ex. 2, Singer Rep. ¶ 225 & n.495; Ex. 1, Singer Dep. at 105:8–106:3, 107:23–109:14.  Specifically, the effect of a service fee on the costs that affect a developer's price is modeled using the expression $C / (1 - t)$, where $C$ are the developer's marginal costs and $t$ is the service fee rate.  Ex. 2, Singer Rep.¶ 225.  Thus, each developer's marginal costs are an input into determining how the service fee rate will affect how a developer sets prices.  Ex. 1, Singer Dep. at 108:17–25.

The generally accepted principle that service fees' effects on prices depend on developers' marginal costs means that those effects will vary from developer to developer because, as Dr. Singer concedes, "the marginal cost to a developer of supplying an additional in-app purchase vary [sic] from developer to developer."  Ex. 1, Singer Dep. at 95:15–18.  Indeed, Dr. Singer concedes that if a developer's cost of producing an additional in-app purchase is zero, then "prices would not adjust" if a developer paid a lower service fee, *id.* at 109:15–110:3, *i.e.*, there would be no pass-through and no injury to consumers from a transaction with that developer.   This is not hypothetical:  Dr. Singer relies on an article in his report stating that the "replication cost of digital goods is zero."  *Id.* at 95:22–98:19; Ex. 5, Avi Goldfarb & Catherine Tucker, *Digital Economics*, 57 J. Econ. Lit. 3, 12 (2019) (DX 335); *see also* Ex. 3, Burtis Rep. ¶¶ 142-143.

Dr. Singer did not calculate pass-through rates using the generally accepted economic model—set forth in his own report—that *ad valorem* costs affect prices proportional to other marginal costs.  Ex. 1, Singer Dep. at 382:6–15.  Dr. Singer candidly admitted that he did not use the standard economic model "because it's—it's difficult to—to estimate the change in marginal cost from the developer's perspective."  *Id.* at 129:10–17.  Indeed, Dr. Singer testified that a each developer's marginal costs are "a variable that might be impossible to observe."  *Id.* at 196:12-24.  Dr. Singer thus has not estimated *any* developer's marginal costs other than service fees.  *Id.* at 90:20–91:2, 91:22–92:7.  As a result, Dr. Singer lacks what his own report identifies as a necessary input for calculating any effect of Google's service fees on developer's prices.

To evade that problem, Dr. Singer used a formula set forth in Paragraph 239 of his report that, as he admitted at deposition, does not do "anything [] to reflect the fact that the affect [*sic.*] on the price will be proportional to other marginal costs." Ex. 1, Singer Dep. 124:18–127:13; *see also id.* at 186:6–18.  Dr. Singer borrowed that formula from a 2013 article which expressly states that its formulas are designed to calculate how a "*per-unit*" cost, not an *ad valorem* cost, affects prices.  *Id.* at 116:14–118:3, 123:3–11; *see* Ex. 2, Singer Rep. at 111 n.516 (citing Nathan Miller, Marc Remer & Gloria Sheu, *Using Cost Pass-Through to Calibrate Demand*, 118 Econ. Ltrs. 452 (2013) (DX 336)).  Dr. Singer admitted that this pass-through formula "doesn't actually depend on what the marginal cost of the developer is." Ex. 1, Singer Dep. at 91:3–8.  In fact, Dr. Singer testified that "the beauty" of his pass-through formula is that "we don't need to estimate the marginal costs in order to get the pass-through rate," *id.* at 190:20–192:3, and that he "went with" it "because I didn't need to estimate the marginal costs of the developer."  *Id.* at 195:20–196:24.

Thus, as Dr. Singer testified, in his formula, "pass-through is a function of the concentration" of an app's category, "not of the cost" borne by the developer.  *Id.* at 197:13–18.  A pricing model that does not depend on costs contradicts fundamental economics.  After all, Dr. Singer opines that "[o]ne of the most universal principles of economics is that prices depend on costs." Ex. 2, Singer Rep. ¶ 223.  Thus, Dr. Singer has never used his formula to calculate pass-through in any other case and could not identify any published paper that has done so.  Ex. 1, Singer Dep. at 151:8–152:2.  Even the Developer Plaintiffs' expert, who is adverse to Google, testified that Dr. Singer's formula reflects "complete fictions" and "defies common sense." Ex. 6, Williams Dep. at 322:20–323:5.

Dr. Singer also does not account for the principle that "standard economics would give developers an incentive to respond to lower service fees by reducing prices and improving quality." Ex. 1, Singer Dep. at 53:24–54:3.  Dr. Singer's report states:  "Standard economics shows that competition drives firms to make competitive investments in product quality to keep pace with rivals." Ex. 2, Singer Rep. ¶ 233.  But Dr. Singer admitted that his pass-through model "doesn't measure whether any developer would actually invest, or how much they would invest, in improving the quality of their app in the but-for world." Ex. 1, Singer Dep. at 56:14–57:5.  Dr.

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Singer therefore has no basis to opine that any developer, let alone all developers, would have passed on savings from reduced service fees instead of investing them in improving app quality.

Ultimately, the pass-through formula that Dr. Singer revealingly calls "deceptively straightforward," Ex. 4, Singer Reply Rep. ¶ 68, proves far too much.  The Supreme Court has recognized that pass-through is not straightforward at all.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977) (noting the "difficulties that have been encountered" with "statistical techniques used to estimate" pass-through).  Dr. Singer's logic is that service fees are "economically analogous to a tax on developers" and "[e]lementary economics shows how taxes are passed on to buyers," Ex. 2, Singer Rep. ¶ 244, but the Supreme Court has rejected "simplifying assumptions" that "overcharges" are "equivalent to an excise tax."  *Illinois Brick*, 431 U.S. at 741 & n.25.  "[I]n the real economic world rather than an economist's hypothetical model, the latter's drastic simplifications generally must be abandoned."  *Id.* at 742 (internal quotation marks omitted).  Just so here.  The Court should exclude Dr. Singer's opinions based on a pricing model that has nothing to do with costs and reduces complex pricing for thousands of different developers to calculating each app's proportion of transactions in a category.

**B.      Dr. Singer's Pass-Through Rate Formula Ignores Actual Data.**

Dr. Singer's use of a formula that does not account for basic economics results in "simply too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.  "[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact [is] whether it can be (and has been) tested," and "the court ordinarily should consider the known or potential rate of error."  *Daubert*, 509 U.S. at 593–94.  Dr. Singer, however, has not tested his formula using data reflecting how developers set prices when Google actually reduced service fees during the class period.  In that respect, Dr. Singer departed from the practice he "typically" uses of "regressing retail price changes on wholesale price changes."  Ex. 1, Singer Dep. at 134:25–135:6.

Google reduced service fees for many transactions in 2018, 2021 and 2022.  Ex. 4, Singer Reply Rep. ¶ 9.  Dr. Singer's formula predicts that *every* developer would pass on reduced service fees by reducing prices.  Ex. 1, Singer Dep. at 89:19–23.  However, an analysis of data in the real

1  world shows that developers in the data set only reduced prices for about ▉ of products subject

2  to service fee reductions.  *See* Ex. 3, Burtis Rep. at 103, Fig. 13.  An analysis of other data by the

3  Developer Plaintiffs' expert shows that developers only reduced prices for about ▉ of products

4  subject to service fee reductions.  *Id.* at 101 n.348; *see also* Ex. 6, Williams Dep. at 312:21-314:2.

5  Thus, the pass-through that Dr. Singer predicts for *all* apps in fact occurred for almost none

6  of them.  Indeed, several of the Developer Plaintiff class representatives state in sworn discovery

7  responses that they "never adjusted the price of ]their] apps or in-app products in response to

8  changes in Google's service fees."  Ex. 7, Pl. Rescue Pets' Suppl. Resp. to Def.'s Interrog. No. 18;

9  Ex. 8, Pl. LittleHoots' Suppl. Resp. to Def.'s Interrog. No. 18; Ex. 9, Pl. Pure Sweat Basketball's

10  Suppl. Resp. to Def.'s Interrog. No. 18.  (Dr. Singer did not rely on any developer's testimony.

11  Ex. 1, Singer Dep. at 237:18–22.)  Moreover, numerous other developers also offer apps,

12  subscriptions, and IAPs at the same price on Google Play as on platforms where they pay either

13  lower service fees or no service fees at all, Ex. 1, Singer Dep. at 224:8–24, 229:22–230:11; Ex. 3,

14  Burtis Rep. ¶ 169, undermining Dr. Singer's logic that lower fees always mean lower prices.

15  Dr. Singer gets nowhere by suggesting that developers may not have reduced their prices

16  because they cannot "steer" users to platforms other than Google Play using in-app

17  communications.  Ex. 4, Singer Reply Rep. ¶ 100.  Dr. Singer testified that his pass-through

18  formula does not depend on steering.  Ex. 1, Singer Dep. at 242:15–22.  Indeed, his formula relies

19  entirely on shares of transactions in categories of apps in the Play Store.  Dr. Singer also testified

20  that he "would expect pass-through regardless of the anti-steering restrictions."  Ex. 1, Singer Dep.

21  at 242:23–244:3.  Moreover, Dr. Singer has not conducted any empirical analysis of any inability

22  to steer on real-world pass-through rates, *id.* at 239:2–13, 240:2–241:1, 246:3–12, or even

23  analyzed any developer's returns on investment from steering in-app or otherwise.  *Id.* at 74:23–

24  76:9.  Thus, Dr. Singer's steering explanation for the "gap between the data and the opinion

25  proffered," *Joiner*, 522 U.S. at 146, reflects speculation that is "inherently unreliable."  *Ollier v.*

26  *Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014).

27  Evidence that virtually no developers that paid lower service fees reduced prices to

28  consumers is proof that Dr. Singer's pass-through formula is not reliable.  "Expert testimony is

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp. Ltd.*

2    *v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

3    **C.    Dr. Singer's Pass-Through Rate Formula Does Not Account for Focal Point**
         **Pricing.**

4    A third reason why Dr. Singer's pass-through rate formula is not reliable is that it "does

5    not adequately account for the effects of focal point pricing, and therefore fails to yield reliable

6    conclusions." *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797 at *3. Focal point

7    pricing is a "well-established concept in economics" in which firms set prices ending in "99,"

8    which consumers can perceive as significantly more attractive than prices just one cent higher.

9    Ex. 1, Singer Dep. at 197:19–198:4; Ex. 3, Burtis Rep. ¶ 149. Developers have widely adopted

10   this strategy:  ███  of U.S. consumers' retail app transactions involved prices ending in '99, Ex. 3,

11   Burtis Rep. ¶ 149, and over  ████  developers used prices ending in "99" during the class period.

12   *Id.* at 111, Table 9. *Cf. Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 ("with respect to

13   focal-point pricing, overwhelming evidence suggests that developers would choose to price their

14   apps at focal points ending in 99 cents.").

15   Dr. Singer admits that "focal point pricing is an important consideration here." Ex. 1,

16   Singer Dep. at 202:2–7. Indeed, focal point pricing is one reason why developers may not have

17   reduced prices if they paid lower service fees. Developers that rely on focal point pricing would

18   not reduce prices in response to lower service fees "if the reduction from one" focal price point "to

19   the next would be so large that the developer would lose profits." Ex. 3, Burtis Rep. ¶ 150.

20   Dr. Singer's pass-through formula does not account for focal-point pricing at all. Ex. 1,

21   Singer Dep. at 205:19–206:8. Given this oversight, it is not surprising that Dr. Singer's model

22   produces results that are flatly inconsistent with focal-point pricing. According to Dr. Singer's

23   model, developers that paid lower service fee rates would have reduced prices by less than a

24   dollar, *i.e.*, above the next lowest focal point. Ex. 4, Singer Reply Rep. ¶ 28. And according to the

25   model, more than 99% of developers would have abandoned focal point pricing if they were

26   subject to lower service fees. *See* Ex. 3, Burtis Rep. ¶ 315, and Table 9.

27   Judge Gonzales Rogers recently excluded testimony that Apple's allegedly

28

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

supercompetitive service fees for its App Store resulted in higher prices for all consumers of apps in the Store because the expert's "model does not provide a reliable method for determining but-for pricing in the presence of focal pricing."  *Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8.  Dr. Singer's pass-through rate model does not do so, either, and likewise is inadmissible.

### D.   Dr. Singer's Pass-Through Rate Formula Relies on the Unsubstantiated Assumption that All Apps in a Google Play Category Are Substitutes.

Dr. Singer's pass-through rate formula also is not reliable because he admits the premise it depends on is not true.  *E.g.*, *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 8–9 (D.D.C. 1996) ("[A] number of [] cases exclude expert testimony because the factual assumption upon which it was based was faulty and plainly contradicted by the evidence.").  Dr. Singer's category-share formula reflects a demand structure ("logit") whose fundamental feature is that "all goods in the market where demand is being measured are substitutes."  Ex. 1, Singer Dep. 158:6–13; Ex. 2, Singer Rep. ¶ 224; Ex. 4, Singer Reply Rep. ¶¶ 75-77; *see also* Ex. 3, Burtis Rep. ¶ 308; *id.* at 107 n.363.  But Dr. Singer disclaimed any opinion that "all apps in each Google Play app category are substitutes," Ex. 1, Singer Dep. at 158:14–159:14; *see also id.* at 159:21–160:1.  He testified that some apps in each category could be complements rather than substitutes.  *Id.* at 159:15–18.[2]  Dr. Singer's failure to opine that a necessary premise of his pass-through formula exists renders his formula unreliable.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 & n.19 (1986) (affirming exclusion of expert testimony based on assumptions that were "implausible and inconsistent with record evidence").

### E.   Dr. Singer's Pass-Through Formula Reflects Undisclosed Analyses.

Finally, Dr. Singer's pass-through formula should be excluded because it is based on

---

[2] Indeed, it is obvious that not all apps in each category are substitutes.  *See* Ex. 3, Burtis Rep. ¶¶ 158, 308.  Because developers choose a category for their app when they list it in Google Play, Ex. 1, Singer Dep. at 90:3–6, the categories cannot reflect any relationship between prices and demand for apps in the category.  As a result, the Business category includes both  "package tracking" and "email management" apps; the Finance category includes "ATM finders" and apps related to insurance; and the Productivity category includes both calendar apps and calculator apps.  *See* Google Play, "Choose a category and tags for your app or game," Google Support, https://support.google.com/googleplay/android-developer/answer/9859673.

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

undisclosed analyses.  Dr. Singer concedes that "the pass-through rate is going to depend on the shape of the demand curve."  Ex. 1, Singer Dep. at 152:3–6.  Dr. Singer's pass-through formula assumes a "logit" demand curve.  *See* Ex. 2, Singer Rep. ¶ 236.  Although the article on which Dr. Singer relied includes formulas that assume other demand structures, Dr. Singer decided that logit was the "best model" after testing two others.  Ex. 1, Singer Dep. at 152:7–153:6.  However, Dr. Singer did not disclose those tests in his reports, *id.* at 152:24–153:12, 174:17–25, so Google has no basis to assess whether his pass-through formula best reflects the structure of real-world demand.  Consumer Plaintiffs' failure to disclose analyses necessary to test Dr. Singer's pass-through formula requires excluding his testimony based on the formula.  *See* Standing Order for Discovery in Civil Cases ¶ 17 ("FRCP 26(a)(2)(B) requires disclosure of all opinions, bases, reasons and other information considered by an expert.")[3]

## II.      DR. SINGER'S FORMULA FOR CALCULATING COMPETITIVE SERVICE FEES IS NOT RELIABLE.

Dr. Singer's model for showing that Google's service fees would have been lower for all developers in the first place depends on using his unreliable pass-through rate formula as an input in calculating service fee rates.  *See* Ex. 2, Singer Rep. ¶ 264 (explaining variables in but-for service fee calculation, including pass-through).  Because Dr. Singer's pass-through rate formula is unreliable, calculating service fees based on that formula will be unreliable as well.

Dr. Singer's formula for calculating service fee rates in a more competitive market also yields absurd results.  *E.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2014 WL 7882100, at *57–59 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (excluding regression yielding "absurd" results).  Dr. Singer predicts that, in the but-for world, Google would have charged service fees of 10% for apps in the Entertainment app category and 9.7% for apps in the Music and Audio categories.  *See* Ex. 2, Singer Rep. at 134, Table 14.  However, Dr. Singer's own calculations

---

[3] Dr. Singer did not test the formula for AIDS demand to see if that structure of demand best fit the demand for apps.  Ex. 1, Singer Dep. at 153:13–154:8.  That is problematic because Dr. Singer does not know whether he would even be able to calculate any pass-through rates using the AIDS formula if demand for apps reflected AIDS demand.  *Id.* at 154:9–21.

1  estimate that Google's marginal costs are ███ of current revenues. *Id.* ¶ 212. A formula that

2  predicts service fees insufficient to cover Google's marginal costs is unreliable. *See In re Apple*

3  *iPhone Antitrust Litig.*, 2022 WL 1284104, at *5 ("It is not logical that a but-for world would

4  generate market [service fee] rates which do not anticipate any profit in the foreseeable future.").

## III.   DR. SINGER'S METHOD FOR CALCULATING ALLEGED INDIVIDUAL CONSUMER IMPACT IS NOT RELIABLE.

6
7  Dr. Singer has not calculated the service fee that any individual developer would have been

subject to in a more competitive market or how much any individual developer would have

8  reduced prices to consumers. Dr. Singer has instead calculated *average* service fee and pass-

9  through rates for each developer and posited methods for generating individual rates based on

10 those averages. Ex. 2, Singer Rep. ¶¶ 239, 263. This method is unreliable because it uses average

11 pass-through rates for all apps in the same category. *Cf. In re Graphics Processing Units Antitrust*

12 *Litig.*, 253 F.R.D. at 494 ("Sometimes the prices used by economists are averages of a number of

13 different prices charged to different customers or for somewhat different products. Using such

14 averages can lead to serious analytical problems.") Dr. Singer effectively assumes that all apps in

15 the same category would reduce prices by the same proportion. Dr. Singer has no support for this

16 assumption, which cannot be squared with his concession that not all apps in a category are

17 substitutes.

## IV.   DR. SINGER'S MODEL REGARDING PLAY POINTS IS NOT A RELIABLE METHOD OF COMMON PROOF OF ANTITRUST IMPACT.

19
20 Dr. Singer proffers an alternative opinion related to Google's Play Points program, a

21 "loyalty points program" which Dr. Singer calls a "subsidy" for transactions in the Play Store. Ex.

22 2, Singer Rep. ¶ 245. Less than ███ of U.S. consumers participated in the Play Points

23 Program and only ██ of U.S. consumers redeemed Play Points. Ex. 3, Burtis Rep. ¶ 358; Ex. 4,

24 Singer Reply Rep. ¶ 98. According to Dr. Singer, Google offered Play Points equivalent to $0.02

25 per transaction in the real world, but "the Play Points program would be expanded to be worth an

26 average of $0.77 per transaction, or approximately 8.7 percent of consumer spend (in the

27 competitive but-for world)." Ex. 2, Singer Rep. ¶ 253. Dr. Singer claims that if Google had

28 offered Play Points equivalent on average to approximately ███████ of a consumer's

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1  transaction, then "the [P]lay [P]oints system would be embraced across the class just as the way

2  that the points system in the AMEX marketplace is embraced across American Express users."

3  Ex. 1, Singer Dep. at 296:6–19, 297:8–21.

4       This is not a reliable method for proving antitrust impact on all consumers.  Dr. Singer

5  conceded that "very few people availed themselves" of the Play Points program in the actual

6  world, and that "only some of the people that signed up for the [P]lay [P]oints program used their

7  [P]lay [P]oints."  Ex. 1, Singer Dep. at 288:11–16, 289:17–23.  However, Dr. Singer admitted that

8  he has not "identified any model to determine which users would have signed up for [P]lay

9  [P]oints in the but-for world," *id.* at 295:5–20, and has no model "that can tell the Court and the

10  jury in this case which of the members of the putative class would have signed up for [P]lay

11  [P]oints and who would have used them."  *Id.* at 297:8–21; *see also id.* at 296:6–19.

12       Thus, when asked whether his opinion is that "every member of the putative class would

13  have signed up for the [P]lay [P]oints program and used [P]lay [P]oints," Dr. Singer merely

14  characterized this as a "fair assumption."  Ex. 1, Singer Dep. at 298:22–299:10.  Dr. Singer has not

15  justified that assumption in his reports.  He has not explained why an average of 8.7% in benefits

16  would have been sufficient to motivate every member of the putative class to sign up and use Play

17  Points—including the over ▮▮▮ class members (▮▮) who spent less than ▮ during the

18  class period or the over ▮ million class members (▮▮) who only made one purchase during the

19  class period for whom the amount of benefits would be very small.  Ex. 3, Burtis Rep. at 35, Table

20  3, Exhibit 24.  Dr. Singer's reports do not analyze that issue.  Nor do his reports include any

21  showing that such benefits are in any way comparable in value to the loyalty points offered to

22  American Express cardholders or any analysis of the redemption rates of those points.

23       Dr. Singer has simply assumed the conclusion that all consumers would have signed up

24  and used Play Points.  Such "*ipse dixit* of the expert" is not a reliable opinion on common antitrust

25  impact.  *Joiner*, 522 U.S. at 146.

26                **CONCLUSION**

27       The Court should exclude the expert opinions of Dr. Hal J. Singer.

28

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Respectfully submitted,

DATED:  May 26, 2022

By:      */s/ Justin P. Raphael*
Justin P. Raphael

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al. in In re Google Play Consumer Antitrust Litigation; In re Google Play Developer Antitrust Litigation; Epic Games, Inc. in Epic Games, Inc. v. Google LLC; State of Utah et al. v. Google LLC et al.*

Daniel M. Petrocelli, S.B. #97802
dpetrocelli@omm.com
Stephen J. McIntyre, S.B. #274481
smcintyre@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

-16-

Ian Simmons, *pro hac vice*
isimmons@omm.com
Benjamin G. Bradshaw, S.B. #189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants*

Case No. 3:20-CV-05761-JD
NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# REDACTED VERSION

# Exhibit A54
# to
# C. Cramer Declaration

# EXHIBIT 1
## CONFIDENTIAL-FILED UNDER SEAL

Page 1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   ------------------------------------X
    IN RE GOOGLE PLAY STORE
4   ANTITRUST LITIGATION
5   Case No.  3:21-md-02981-JD
6

    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No. 3:20-cv-05671-JD
8

    In Re Google Play Consumer
9   Antitrust Litigation
    Case No. 3:20-cv-05671-JD
10

    In Re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12

    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  ------------------------------------X
15
16            VIDEOTAPE DEPOSITION
17              HAL SINGER, PH.D.
18          Thursday, May 12, 2022
19              9:07 a.m. (EST)
20
21
22
23
24  Reported by:
25  Ryan K. Black, RPR, CLR, Notary Public

Page 53

1    developers are passing through savings in order

2    to induce customers to switch to the -- and

3    download the app from the developer's website.

4             So it's not just theory.  I mean,

5    obviously, theory is on my side; but I think we

6    have -- we have good evidence to bear as well.

7        Q.    But you would agree that standard

8    economic theory tells us that developers would

9    have incentives to respond to lower service fees

10   by reducing their prices?

11       A.    Correct.

12       Q.    Okay.  And standard economics also

13   tells us that competition drives firms to make

14   competitive investments in product quality,

15   right?

16       A.    Yes.  I believe that, as I said, that

17   in -- in a but-for world with lower take rates

18   and this new-found cash flow that the developers

19   would enjoy, not all of it is going to go into

20   the pockets of the owners.  But -- but some of

21   that will be reinvested and -- and -- and in

22   services and features that -- that make the app a

23   better experience for the user.

24       Q.    Right.  So standard economics would give

25   developers an incentive to respond to lower

Page 54

1   service fees by reducing prices and improving

2   quality?

3        A.    Correct.

4        Q.    Now, in your reports, do you have any

5   model that will tell the Court or the jury which

6   developer will follow the incentives to improve

7   quality and which developer will follow the

8   incentives to reduce price?

9        A.    Well, I think all developers will reduce

10  price.  My opinion on quality is that it would

11  happen at a -- at a general level, but that is

12  not my proof of impact.  My proof of impact turns

13  on the price response.

14       Q.    Have you done any analysis to determine

15  whether any developer would improve the -- the

16  quality of their app in a world with reduced

17  service fees?

18       A.    I don't think I've done analysis.

19  I'm -- I'm aware of some testimony, and we'd have

20  to go into my footnotes of developers testifying

21  that they would do something to that effect.  But

22  I -- that's more me just citing a developer than

23  -- you know, than doing -- I took your question

24  to mean original analysis, like trying to model

25  the quality dimension.  I don't do that.

1   impression here.  It does account for the

2   differentiated nature of the products within the

3   category that it faces.  And so the extent that

4   that differentiation is driven in part by quality

5   differences across apps within a category, it

6   does.  It does account for it.

7            But -- but I'm taking your question to

8   mean -- I'm still going back, and I'll just say

9   it again, that I don't have a separate model

10  apart from the model that -- that you're aware of

11  that -- that -- that attempts to measure changes

12  in quality enhancements by apps in a but-for

13  world, you know, absent the restraints.

14     Q.   But, in fact, the model you have

15  regarding the alleged reduction in prices doesn't

16  measure the amount that any developer will invest

17  in quality either, right?

18     A.   It -- so to be careful, it -- it

19  measures -- by -- by taking into account the

20  differentiation among apps in -- in the same

21  category, it takes -- it takes quality into

22  account.  But whether or not it -- it seek -- it

23  does not seek to measure changes in quality that

24  would come about from a more competitive

25  landscape.

1      Q.   And -- and it doesn't measure whether

2   any developer would actually invest, or how much

3   they would invest, in improving the quality of

4   their app in the but-for world.

5      A.   I think that's fair.  Just to be clear,

6   I don't seek to measure the change in investment

7   and -- and quality in the but-for world.

8      Q.   Now, your analysis of a potential

9   but-for world assumes entry by a rival app store

10  platform that has a comparable number and quality

11  of apps as the Play Store.

12     A.   I -- I don't think I'm ever that

13  explicit in -- in the offerings of the rival.

14  But what I will tell you it -- it turns on, and

15  we're talking about the Rochet-Tirole model, the

16  -- the one in the app distribution market, just

17  to be clear.  Is that -- can we -- can we speak

18  to that one?  I -- I'm prepared to speak to that

19  one, at least, and to answer this question,

20  'cause you talked about a rival app store.

21     Q.   Well, does -- do diff -- do different

22  versions of your model assume different rivals in

23  the but-for world?

24     A.   Absolutely.  So remember I -- I've --

25  I've got a model for the app distribution market

Page 74

```
 1   traffic to alternative app stores, you looked

 2   at what developers did in the actual world.

 3            MS. GIULIANELLI:  Objection to form.

 4            THE WITNESS:  In part.  I -- I look at

 5   what developers did or try to do in the actual

 6   world.  I look at the fact that there's a lawsuit

 7   that is largely about the anti-steering rules.

 8   I look at the -- the economic literature on

 9   steering.  Also, just there's economic meaning

10   in -- we -- in the -- the most effective

11   distribution path.  You know, when we -- I've

12   done exclusive dealing cases before and we're

13   always focused on what channel got shut out and

14   was it -- was it the most efficient distribution

15   channel?  I'm sure you're aware of this.

16            And -- and I think that being able to

17   communicate to the -- to your customers that

18   there are lower cost alternatives outside of the

19   Play Store.  When they're in the Play Store, or

20   when they're in your app, is the most efficient

21   way.

22   BY MR. RAPHAEL:

23      Q.   Have you estimated the cost of any

24   mechanism for driving traffic to alternative app

25   stores for any developer other than steering?
```

Page 75

```
 1          MS. GIULIANELLI:  Ob -- ob -- ob --
 2    objection.
 3          THE WITNESS:  I haven't estimated, but I
 4    can -- I can tell you that if you go out and buy
 5    a billboard on a highway, right, and you -- we
 6    could go look at the billboard price, right, but
 7    it -- I don't think you need to do an empirical
 8    assessment of the traffic generation of a
 9    billboard vis-á-vis communicating to your
10    customer within the app while you've got the
11    customer's attention that, Hey, if you go outside
12    and -- and download my app from an alternative
13    store or an alternative -- or consummate the
14    transaction through an alternative processor,
15    there's no doubt that that would be the more
16    potent or effective means of communication.
17    BY MR. RAPHAEL:
18      Q.   You haven't done any empirical
19    analysis of which method of driving traffic to an
20    alternative app store is most efficient for any
21    developer, correct?
22      A.   I have not sought to estimate the
23    returns to investing in billboards, I have not
24    sought the returns to investing in television
25    advertising for -- for Internet transactions,
```

                                                    Page 76

1    and I've not sought to estimate the returns to
2    investing -- oh, I'm trying to think where else
3    you can do it --
4         Q.   Well, you haven't -- you haven't -- you
5    haven't estimated the returns to investing of any
6    kind of advertising for any developer, correct?
7         A.   I think it's fair to say that I have not
8    -- I have not considered the return to these
9    alternative advertising channels.  But I also
10   point out that the fact that Google does not fret
11   about the developer advertising there implies
12   that Google was concerned about blocking the most
13   efficient distribution channel.  That's what the
14   case is about.
15        Q.   Okay.  Now, do you know -- some
16   developers steer in the actual world, correct?
17        A.   Some do.  Very few, but, yes, some do.
18        Q.   All right.  Have you estimated how -- in
19   your reports how many more developers would have
20   to steer in the but-for world to pressure Google
21   to reduce service fees?
22             MS. GIULIANELLI:  Objection to the form.
23             THE WITNESS:  The -- the model does not
24   require me to come up with the estimate of the
25   amount who would steer, no.  Just a sufficient

Page 89

1    Android.  I took your question to mean for the

2    phone -- for the production of a phone.

3         Q.   Well, isn't the Android operating system

4    an input into the production of the phone?

5         A.   It is.  It is an input into the

6    production of the phone, yes.

7         Q.   Okay.  So if Google offers OEMs a

8    negative price for And -- the Android operating

9    system in the form of -- or as the -- the -- the

10   revenue-share agreements, wouldn't that be

11   equivalent to a reduction in the marginal cost of

12   producing the phone?

13        A.   I -- I'd -- I'd have to think about

14   that.  It's not how I would explain it, you know,

15   to a economics class.  Put it that way.  I see it

16   as a -- as a source of revenue, not a -- not a

17   -- not a -- not -- not entering the cost

18   function.

19        Q.   Okay.  Now, your opinion is that every

20   developer that would have paid lower service fees

21   in the but-for world would have also reduced

22   prices, correct?

23        A.   That's correct.

24        Q.   Okay.  And that's what your pass-through

25   formula that you've provided in your report

Page 90

1   predicts.

2        A.    Correct.

3        Q.    Okay.  And you're aware, aren't you,

4   that developers choose the category for their app

5   when they list it in Google Play?

6        A.    Yes.

7        Q.    Now, in your reports, have you

8   calculated or estimated the marginal cost of

9   supplying an additional app subscription or

10  in-app purchaser for any developer?

11       A.    I haven't estimated the marginal cost,

12  but I have cited record evidence and economic

13  literature establishing that they do, in fact,

14  incur marginal costs.  And I -- I also have the

15  opinion that processing payments are marginal

16  cost, and I also have the opinion that the take

17  rate is a marginal cost.  So I --

18       Q.    Okay.

19       A.    -- leave it at that.

20       Q.    Okay.  So in your reports, though, you

21  haven't calculated or estimated the marginal cost

22  of supplying an additional app subscription or

23  in-app purchase for any developer.

24       A.    No.  And the models don't call for that.

25  The -- at least in the short run, all the models

Page 91

1    require is that they face a positive marginal
2    cost, and I'm confident they do.
3         Q.   All right.  So the pass-through formula
4    you've used in your reports doesn't actually
5    depend on what the marginal cost of the developer
6    is.
7              MS. GIULIANELLI:  Objection.
8              THE WITNESS:  That's fair.
9              Do you want to -- I think we're an hour
10   and a half in?
11             MS. GIULIANELLI:  You want to --
12             MR. RAPHAEL:  Happy to take a break.
13             MS. GIULIANELLI:  -- a break?
14             THE WITNESS:  Okay.  Yes.
15             THE VIDEOGRAPHER:  Please stand by.
16             We're now off the record.  The time is
17   10:40 a.m.
18             (Recess taken.)
19             THE VIDEOGRAPHER:  We're now on the
20   record.  The time is 10:50 a.m.
21   BY MR. RAPHAEL:
22        Q.   Dr. Singer, have you put forth any
23   method in your reports to determine what each
24   developer's marginal costs are, other than
25   service fees?

1      A.   Well, other than the service fees

2   and the processing fees, I haven't estimated

3   precisely the marginal costs.  But I have studied

4   the issue of whether they do incur other marginal

5   costs, and I've come to the conclusion that they

6   do; and I cite record evidence in economics

7   articles.

8      Q.   And so economics articles would be a

9   good source to determine what the marginal costs

10  for the developers are other than the service

11  fees and transaction fees?

12     A.   For identifying the categories of

13  marginal costs but not to -- not to estimate

14  precisely what -- what it is in, say, percentage

15  terms.

16     Q.    Okay.  Now, your opinion is that

17  acquiring an app -- strike that.

18          Your opinion is that downloading an

19  app and making in-app purchases are separate

20  transactions involving separate products.

21     A.   I wouldn't quite put it that way.  I

22  would say that the -- the services that are being

23  offered in the in-app for -- in support of in-app

24  transactions are different.  It's a different

25  suite of services than the services being offered

```
                                              Page 95
 1   consumer is complete?
 2       A.    Certainly not the sales costs.
 3   Certainly not the processing fee.  Certainly not
 4   the take rate.
 5       Q.    How about the other costs that you've
 6   listed here in your report?
 7       A.    It's possible that some of those other
 8   marginal costs identified by Ghose and Han would
 9   occur subsequent to -- to a particular
10   transaction, --
11       Q.    Okay.
12       A.    -- but could still be considered as
13   variable costs in the sense that they rise
14   with -- with output.
15       Q.    Okay.  Could the marginal cost to a
16   developer of supplying an additional in-app
17   purchase vary from developer to developer?
18       A.    Sure.
19       Q.    And could some developers have zero
20   marginal costs for an in-app purchase?
21       A.    No.
22       Q.    Could you go to Page 153 of your report?
23       A.    You must mean my initial report
24   because --
25       Q.    Correct.
```

Page 96

1      A.    -- the reply is not -- okay.

2            Page 153?

3      Q.    Yes, sir.

4      A.    Okay.

5      Q.    Do you see there second from the top

6    there's an article by Avi Goldfarb and Catherine

7    Tucker called "Digital Economics"?

8      A.    Yes.

9      Q.    So that's an article that you've relied

10   on in your report?

11     A.    Yes.

12     Q.    Are you familiar with that article?

13     A.    In part, yes.

14     Q.    Okay.  Do you know if that article says

15   anything about what marginal costs might be for a

16   digital good?

17     A.    No.  But if it were just a digital good,

18   I think that might be too broad of a category.

19   We're talking about in-app transactions here.

20           MR. RAPHAEL:  I'm going to mark this as

21   Exhibit 335.

22           (Exhibit No. 335, an article titled

23   Digital Economics by Avi Goldfarb and Catherine

24   Tucker, was introduced electronically.)

25           THE REPORTER:  Here you go, sir.

```
                                             Page 97
 1              THE WITNESS:  Thanks.
 2     BY MR. RAPHAEL:
 3          Q.   Do you see Exhibit 335, Dr. Singer?
 4          A.   I do.
 5          Q.   And what is it?
 6          A.   It -- it appears to be the article that
 7     I cited.
 8          Q.   That's the "Digital Economics" article
 9     by Tucker and Goldfarb?
10          A.   Yes.
11          Q.   And -- and could you go to Page 12 of
12     the article?
13          A.   If you'd let me just -- one second.  I'd
14     -- I'd like to just read the abstract quickly.
15          Q.   Would you go to Page 12, please?
16          A.   Hold on one second.
17               Okay.  Page 12.
18               Okay.
19          Q.   Do you see at -- further down, say,
20     two-thirds of the way down in the left column,
21     there's a header that says, "The replication cost
22     of digital goods is zero"?
23          A.   Yes.
24          Q.   So this article that you relied on in
25     your report says that "The replication costs of
```

Page 98

1   digital goods is zero," correct?

2       A.   Correct.

3       Q.   Now, are you familiar with V-Bucks?

4       A.   Oh.  Can I put this to the side?

5       Q.   For now, yes.

6       A.   Yeah.

7            And I would just note for the record

8   that replication costs and marginal costs are not

9   the same.

10      Q.   Well, how are they different?

11      A.   Oh.  What -- what Goldfarb is not taking

12  into consideration here is that to sell the extra

13  unit you have to pay a processing fee.  That's a

14  marginal cost.

15           So it's true that to create the next

16  sword -- the 150th sword doesn't cost any more to

17  replicate that sword, but that doesn't mean there

18  aren't any marginal costs incurred in the

19  transaction.

20      Q.   Understood.

21           All right.  Could some developers have

22  negative marginal costs for in-app purchases?

23      A.   It's hard to -- to fathom that.

24      Q.   What if a developer generates

25  advertising revenue as the result of an in-app

                                        Page 103

1          Can you give any examples of marginal

2   costs that would be included in the short run, as

3   you defined it, for a developer but would not be

4   included in the long run, as you define it?

5      A.   Oh, no, no.  It doesn't work that way,

6   right?

7          As you move to the long run, the

8   categories expand.  So everything -- every kind

9   of cost that would be considered marginal in the

10  short run, would also be considered marginal or

11  variable in the long run.

12     Q.   Okay.  Now, pass-through rates are the

13  ratio of the dollar change in the developer's

14  profit-maximizing price that results from a

15  dollar change in marginal cost.

16     A.   Can I just hear it back just to make

17  sure?

18     Q.   The pass-through rate is a ratio of a

19  dollar change in a developer's profit-maximizing

20  price that results from a dollar change in the

21  developer's marginal cost.

22     A.   I think that that is a fair way to put

23  it, yes.

24     Q.   Okay.  And so any formula for the

25  pass-through rate should account for the

Page 104

1   relationship between a change in the marginal

2   cost and prices.

3       A.   Not necessarily.

4       Q.   So -- well, I just want to be -- I don't

5   think I'm saying anything controversial.  The --

6   the -- the pass-through rate is trying to measure

7   the relationship between how a marginal cost

8   changes and how a price changes.

9       A.   Correct.

10      Q.   Right.  The effect of the change in

11  marginal cost on the price.

12      A.   Correct.

13      Q.    Okay.  Now, Google's service fee is

14  what an economist would call "an ad valorem fee,"

15  correct?

16      A.   I think that's fair.

17      Q.   And an ad valorem fee is one that is

18  calculated based on a percentage of the price

19  that is charged?

20      A.   Correct.

21      Q.   Okay.  And sales taxes often are ad

22  valorem fees as well.  They're a percentage of

23  the price?

24      A.   Yes.  And as I said earlier, we see

25  changes in sales prices -- in -- in sales taxes

1    being reflected in the prices of apps in the

2    transaction data.

3       Q.   Right.  And your opinion is that

4    Google's service fees, to the extent that they

5    are supercompetitive, is equivalent to an

6    increase in the developer's marginal cost.

7       A.   It can be understood that way, yes.

8       Q.   Right.  And in your report, you've

9    modeled the proper economic way to calculate how

10   a profit-maximizing developer would set prices

11   based on marginal costs.

12      A.   I have.  And --

13      Q.   Right.

14      A.   -- and, as you know, it depends on

15   the -- the nature of the demand and the demand

16   specification that you assume, right?  Each

17   demand specification you assume is going to apply

18   at different pass-through rates.

19      Q.   Right.  So could you go to Page 104 of

20   your report, your opening report, please?

21      A.   Sure.

22      Q.   And you'll see this is a continuation of

23   the Paragraph 225 from the previous page.

24           And you've got a formula there that has

25   "P minus C star divided by P equals one divided

Page 106

1   by E sub D."

2           Do you see that?

3       A.   Yes.   That's the classic Lerner markup.

4       Q.   Right.   So that's -- that's the proper

5   economic model for how a profit maximizing

6   developer would set prices based on marginal

7   costs, right?

8       A.   That model describes the markup over

9   marginal cost as the function of the elasticity

10  of demand faced by the developer.

11      Q.   Right.   And -- and this model on Page

12  104 of your opening report, that -- that's --

13      A.   So --

14      Q.   -- the correct economic mod -- economic

15  way to model how the change in marginal costs

16  will affect the price that the developer charges.

17      A.   It's the -- it's the way to think

18  about it at -- at a very, very high level of

19  abstraction.   But, as you know, to actually

20  estimate the pass-through rate here, I have to

21  make an assumption about the demands curve and --

22  and -- and the precise nature of demand that a --

23  the developer faces, right?

24          Once you --

25      Q.   Understood.

Page 107

1       A.   -- make a -- once you make that
2   decision, you get these pass-through rules,
3   right?  And the pass-through rules -- whether you
4   go linear or logit or -- or constant elasticity
5   -- are going to express pass-through as a
6   function of things that do not include the
7   marginal cost.
8       Q.   Understood.  But this formula on Page
9   104 of your report is the correct economic way to
10  model the relationship between the developer's
11  price and the marginal cost in general?
12      A.   Well, I just want to put that caveat in
13  there.  It's the -- it's the -- definitely the
14  way to think about it and why it's in my
15  preamble, right?
16          But when I go to model the precise
17  amount of pass-through, I have to make an
18  assumption about what kind of demand the
19  developer faces, right?  And that -- that puts
20  me to a -- takes me to a pass-through rule that
21  isn't necessarily going to be denominated in
22  terms of costs.
23      Q.   Understood.  So -- but -- but this mod
24  -- this economic model you've described in Page
25  104 of your report, that's generally accepted in

Page 108

1    economics.

2         A.    Yes.

3         Q.    Now, if you just look at the cost term

4    there, C star, and the -- the C star in that

5    formula that you have on Page 104 of your report

6    is equal to C divided by one minus T, right?

7         A.    Correct.

8         Q.    And -- and in that -- in that cost term

9    I just described, T is the service fee rate?

10        A.    Correct.

11        Q.    And C is the developer's per-unit

12   marginal cost other than the service fee?

13        A.    Correct.  Processing and the like, yes.

14   Any other --

15        Q.    Okay.

16        A.    Any other types of marginal costs.

17        Q.    Okay.  And so one input into the

18   generally accepted economic model of how the

19   profit-maximizing developer would set pri --

20   prices is the marginal costs other than the

21   service fee.

22        A.    For short-run profit maximization, the

23   answer is, yes, that this model, at this high

24   level of ab -- of abstraction, is a function of

25   the marginal cost.

1      Q.   Right.  And in terms of how the price is

2   a function of mar -- of --of -- of marginal cost,

3   the -- the -- the formula you've got here on Page

4   104, in that formula, the effect of a change in

5   the service fee -- let me -- let me put it

6   differently.

7           The formula you've got on Page 104, the

8   effect on prices will be -- as a result of a

9   change in the service fee will be proportional to

10  the marginal costs other than the service fee.

11     A.   In -- for short-run profit maximization,

12  yes.  For -- for long-run profit maximization,

13  this is not -- this is not the -- the way that

14  you'd get to the effect on price.

15     Q.   Okay.  Now, -- so let me just ask,

16  looking at this cost term here, C -- C star, if C

17  in that formula, which is the marginal cost other

18  than the service fee, if that's zero, then the

19  service fee rate will not have any effect on the

20  ultimate price charged according to this model,

21  correct?

22     A.   Let me just say this:  It -- it's --

23  it's never zero in the real world.  But -- but if

24  you want me to ask -- answer the hypothetical,

25  counterfactually, if we had -- if we had a zero

1  marginal cost, then by this model, and this model

2  alone, then in the short run, prices would not

3  adjust to the take rate.

4       As I explain in my report, there's all

5  sorts of reasons why we would still, even in that

6  extreme and counterfactual assumption, would

7  expect prices to change with the change in the

8  take rate, including from steering, including

9  from having to cover all costs in the long

10  run, --

11     Q.   Okay.

12     A.   -- including from sticky prices.

13     Q.   Okay.  Now, let me just ask again,

14  hypothetically, if that term C, which are the

15  marginal costs other than the service fee rate

16  in your formula on Page 104, if that term is

17  negative, then a reduction in the service fee

18  rate will actually lead to an increase in the

19  price that the developer would charge.

20     A.   I haven't done that one yet, but I

21  think you've got the -- the sign correct.  If you

22  multiply, in that example, 1.43 by a negative

23  cost, I think that there -- there would be a

24  negative relationship in the short run for this

25  equation.

Page 116

1   Remer and Sheu, right?

2       A.   Correct.

3       Q.    Okay.  Now, if -- if we could look at

4   -- well, let me just ask you:  The article you

5   relied upon for the pass-through formula by

6   Miller, Remer and Sheu that formula using a

7   per-unit tax rather than an ad valorem tax,

8   right?

9       A.   No.  It's much more general than that.

10  They are looking at just -- under any logit

11  demand model, they're asking what is the optimal

12  pass-through rule when the firms in -- are

13  competing under the logit model.

14      Q.   Could you go to the -- Paragraph 239 of

15  your report?

16      A.   Sure.

17      Q.   To the bottom of Page 110.

18      A.   Okay.

19      Q.   And do you see there you have a

20  formula that's "M minus Q sub J divided by M"?

21      A.   Yes.

22      Q.   And that's your formula for the

23  pass-through rate, correct?

24      A.   It -- it is the logit formula.  I wish I

25  had invented it.  But it's the logit formula,

                                                    Page 117

1  yes.

2       Q.    Right.   And that's the formula you've

3  used to calculate pass-through rates in this

4  case.

5       A.    Correct.

6       Q.    And that formula is derived from

7  Equation 6 of the Miller, Remer and Sheu article

8  that you've cited in your report.

9       A.    Correct.

10      Q.    Okay.   Now, let me mark as Exhibit 356

11  the Miller and Sheu article.

12            (Exhibit No. 336, a document titled

13  Economics Letters - Using cost pass-through to

14  calibrate demand, by Miller, Remer and Sheu, was

15  introduced.)

16  BY MR. RAPHAEL:

17      Q.    Is Exhibit 356 [sic] the article you've

18  relied on to derive the pass-through rate formula

19  you've used in this case?

20      A.    Yes.

21      Q.    Could you go to Page 452 of that

22  article?

23            And in the left column just below the

24  header numbered 2, do you see that there's a

25  paragraph that begins, "Now suppose that a

1  per-unit tax is levied on each product in the

2  model"?  Do you see that?

3      A.   Yes.

4      Q.   So the general model of cost

5  pass-through from the article that you relied on

6  for your pass-through rate formula assumes a

7  per-unit tax, correct?

8      A.   Well, this is in a different section.

9  This is in Section 2.  I'm looking at Section 3.

10      Q.   Is it your testimony, sir, that the

11  logit demand model in Equation 6 in the Miller,

12  Sheu and Remer article you relied on for your

13  pass-through formula includes an ad valorem tax?

14      A.   There's no -- there's no tax needed.

15  This is what the -- this is what the pass-through

16  rate would be under logit regardless of whether

17  there's a tax.

18      Q.   Sir, my question was whether the formula

19  -- the Equation 6 from the article you relied

20  upon for your pass-through formula in your report

21  assumes an ad valorem tax.

22      A.   No.  Equation 6 does not assume an ad

23  valorem tax.

24      Q.   Okay.

25      A.   No, it does not.

Page 123

1    incremental cost, we're going to get the

2    pass-through in this model.

3        Q.   Okay.  I just want to understand:  The

4    Miller article that you relied on for your

5    pass-through formula uses a per-unit tax,

6    correct?

7        A.   I've acknowledged that in a prior

8    section, in Section 2, there is a -- a per-unit

9    tax assumed.  Yes, that is --

10       Q.   And --

11       A.   -- correct.

12       Q.   And how about Equation 6 that is derived

13   from that general model, which is the equation

14   you relied on for your pass-through formula?

15   Does that assume a per-unit tax?

16       A.   There's no mention of the per-unit tax

17   in -- in Part 3, so I don't think that a per-unit

18   tax is necessary to solve for this pass-through

19   rate.

20       Q.   Your testimony is that the Equation 6

21   isn't derived from the general model of

22   pass-through on Page 452?

23       A.   I cannot find the per-unit tax mentioned

24   either in the surrounding text of Part 3 or in

25   the math.  Maybe you could point me to it.

1      Q.   Well --

2      A.   I -- I think that the way Equation 6

3  should be interpreted is how prices change in the

4  logit model given a change in marginal cost,

5  period.

6      Q.   Right.  But, sir, you've testified that

7  to the extent that the -- to the extent that the

8  price will change -- strike that.

9           You've testified that to the extent that

10  the service fee is a change in the marginal cost,

11  it will affect the price of a -- of the

12  transaction proportional to the other marginal

13  costs, correct?

14      A.   In -- in a very general statement of the

15  demand model, that is true.  But once you go into

16  -- to the logit, the cost no longer enters into

17  the pass-through formula.

18      Q.   Okay.  So let's go -- why don't we go to

19  Table 5 of your report.

20      A.   Okay.

21      Q.   And that's on Page 98 of your opening

22  report.

23           Now, if you look at the top of the

24  table, this is the actual world, right?  And you

25  see that there you have something called "Google

Page 125

1    Price," which I think is Google's average service
2    fee across in-app purchase transactions in the
3    actual world, correct?
4         A.   Yes.
5         Q.   And that figure is ████████
6         A.   Correct.
7         Q.   Now you say, "In the but-for world,
8    Google's average service fee will drop to ████████
9    for in-app purchases," right?
10        A.   Correct.
11        Q.   And so the difference there in Google's
12   service fee on average to developers for in-app
13   purchases is ██████?
14        A.   Correct.
15        Q.   So the reduction in the service fee
16   between the actual and but-for world on average
17   that you've calculated for in-app purchases would
18   be ██████, correct?
19        A.   Assuming you're doing the ██████ minus
20   ██████?
21        Q.   Right.
22        A.   That's correct, yes.
23        Q.   Okay.  Now, that reduction in service
24   fee will affect the price of the transaction that
25   is charged to the consumer proportional to other

Page 126

1  marginal costs, correct?

2      A.   I think not in Stage 1 when I do the

3  logit.  It's not -- it's no longer going to

4  necessarily be proportional.  I think that in

5  Stage 2, when we do a conversion of how we use

6  the pass-through in the Rochet-Tirole model, we

7  are taking into account the proportionality.

8      Q.   Okay.  But in -- in -- the -- the way

9  that you've done it here in Table 5 is that

10 you've just taken the pass-through rate of 89.9

11 percent, which is the average you calculated, and

12 you've just applied that to the entire reduction

13 in service fee that you've calculated, right?

14     A.   I don't understand the question.  Sorry.

15     Q.   So, you have consumer savings per

16 transaction of $1.34, right, for in-app purchases

17 in the but-for world?

18     A.   Oh, yes.  Yes.

19     Q.   Okay.  So that's just 89.9 percent,

20 which is the pass-through rate that you've

21 calculated on average of the reduction in the

22 service fee of $1.49, right?

23     A.   Correct.

24     Q.   So your model for how prices will be set

25 in the but-for world for in -- at -- for in-app

1    purchases just assumes that all of the reduction

2    in service fee will be passed through as a

3    reduction in marginal cost, at least to the

4    extent of the pass-through rate, right?

5         A.    Not all of it.  89 percent of it.

6         Q.    Right.  But you haven't done anything

7    here to reflect the fact that the affect on the

8    price will be proportional to other marginal

9    costs, correct?  You've just taken the

10   pass-through rate of 89 percent and applied it to

11   the reduction in service fee.

12        A.    That's correct.  For in-app, that is

13   correct.

14        Q.    Okay.  And that's reflective of the

15   general pass-through model you've -- you know,

16   you've used to calculate and propose to calculate

17   damages in this case.  Table 5 is.

18        A.    Well, for -- for the in-app market, yes.

19   For -- for the treatment in the app distribution

20   market, it's a little more complicated --

21        Q.    Right.

22        A.    -- the way that the pass-through rate

23   enters the calculus.

24        Q.    Right.  So just -- and just so we're

25   clear, the -- the method that you've used for

Page 129

1    then applied the difference in the pass-through
2    rate from Table 5, you know, you would expect to
3    get the same results.
4         A.   I'm not -- not sure if I'm following.
5    But I -- but I can say that there are other ways
6    that you could go from -- from the -- from the
7    formula in 104, but all of them would require you
8    to make an assumption about the nature of the
9    demand.
10        Q.   Okay.  Could you use the formula in
11   Paragraph 225 of your report that's on Page 104
12   to calculate the change in marginal cost for the
13   developer and then apply the pass-through rate to
14   that?
15        A.   Not really, because it's -- it's
16   difficult to -- to estimate the change in
17   marginal cost from the developer's perspective.
18        Q.   And that's because you don't know the
19   other marginal costs.
20        A.   Cor -- we don't -- we -- we know of
21   their existence, but we -- we don't know what
22   their magnitudes are.
23        Q.   Okay.  The formula from Miller,
24   Remer and Sheu that you used to derive your
25   pass-through formula, that's associated with a

1          Q.    Did you calculate them for -- on a de
2     -- developer -- per-developer basis or a per-app
3     basis?
4          A.    It was at the app level.
5          Q.    Okay.  And if you'll go to -- again,
6     back to Paragraph 239 with your pass-through rate
7     formula.
8          A.    Okay.
9          Q.    And you have the formula there
10    "M minus Q sub J divided by M," right?
11         A.    Right.
12         Q.    And "M" is the size of the market?
13         A.    Correct.
14         Q.    And "Q sub J" is the number of
15    transactions involving a particular app.
16         A.    Correct.
17         Q.    Okay.  And the market here, this term
18    "M," is, essentially, the total number of
19    transactions of apps in the same category as the
20    app whose pass-through rate you're trying to
21    measure.
22         A.    Correct.
23         Q.    And so basically the formula to
24    calculate the pass-through rate for any app that
25    you've put forward is a hundred minus the app

                                        Page 132

1   share of all transactions in its category.

2       A.   Fair.

3       Q.   So just by --

4       A.   Over -- careful caveat:  Over the course

5   of the class period.

6       Q.   Okay.

7       A.   We're not going to look at it on a

8   daily basis.  We're not going to look at like

9   Dr. Burtis.  We're not going to look at it on a

10  monthly.

11      Q.   Okay.

12      A.   We're doing it over the -- over the

13  class period, over the database, over the range

14  of data.

15      Q.    Okay.  And why do you do it over the

16  class -- whole class period?

17      A.    Because I don't think it makes sense as

18  an economic matter that a firm is going to be

19  updating its -- its prices or its pass-through

20  rates on a daily basis.  I think that the

21  appropriate measure passed through.  There's,

22  basically, going to be too much volatility in the

23  -- in the share, right?  If you literally were to

24  do it down to the nanosecond, you'd be -- you'd

25  be getting different pass-through rates at -- at

1   period.

2   BY MR. RAPHAEL:

3       Q.   But the pass-through formula you have

4   would predict changes in the pass-through rate

5   from week to week or month to month if the share

6   changes.  Fair?

7       A.   If one were so inclined to measure it on

8   -- on a monthly or nanosecond basis, yes, you

9   could get very strange results.

10      Q.   Okay.  Could the formula you've got

11  here, the "M minus Q sub J divided by M," could

12  that be used to calculate pass-through rates in

13  any case where you know the unit market share of

14  an intermediary alleged to have passed on an

15  overcharge?

16      A.   I -- I -- I'd be reluctant to say that

17  the logit model could be applied to any case.

18  I'd want to confirm, first, as I did here, that

19  the logit model does a good job explaining the

20  relationship between prices and shares, as it

21  does here.

22           So I think you need some empirical

23  foundation before applying the logit model.

24  I think that would be a good -- good practice.

25      Q.   Okay.  Have you used the formula that

Page 135

1   you used to calculate pass-through in this case
2   to calculate pass-through in any other case?
3       A.   I do not believe I have.  In other
4   cases, what I'm typically doing is regressing
5   retail price changes on wholesale price changes.
6       Q.   Okay.
7       A.   And that -- that's just not available
8   here.
9       Q.   All right.  To your knowledge, has
10  any economist used the formula you've used to
11  calculate pass-through in this case to calculate
12  pass-through in some other case?
13      A.   I -- I don't -- I don't know enough -- I
14  can't follow how pass-through is calculated in
15  every antitrust case.  I can tell you that the
16  logit assumption is one of the most common
17  assumptions that's used in antitrust cases there
18  is.
19      Q.   But --
20      A.   All right?
21      Q.   But you're not aware of this formula
22  being used to calculate pass-through in another
23  case.
24      A.   Oh.  Pass-through?  Well, the formula
25  is used to calculate price effects from, say,

1    and straightforward to do.  Like, if -- I can't

2    imagine someone saying, "Oh, the linear model

3    gives you 0.5 always, so I'm going to publish a

4    paper and I'm going to show you here's the

5    implied pass-through rate."  I don't think that's

6    the kind of thing that a journal would be excited

7    to publish, right?

8         Q.   Well, let me ask it this way:  Have

9    you -- have you seen any -- are you aware of

10   any published paper by an economist in a

11   peer-reviewed journal that has used the formula

12   related to logit demand from this Miller article

13   to calculate pass-through in any industry?

14        A.   Just pa -- I'm not.  But pass-through

15   just isn't an area where -- empirical-applied

16   pass-through rates?  I -- I -- I imagine that

17   the number of publications of -- of implied

18   pass-through rates, or even -- even observed

19   directly pass-through rates, is just not fodder

20   for -- for publication.  It's just not -- it's --

21   it's the kind of thing that an -- that it would

22   be more likely to come up in an antitrust case

23   where the economist has to estimate pass-through.

24        Q.   Right.  But you haven't -- you're just

25   not aware of any article where an economist has

1   done that in a -- in a peer-reviewed piece.

2       A.   I'm not -- I'm not aware of it, no.

3       Q.   Okay.  Now, you would agree that the

4   pass-through rate is going to depend on the shape

5   of the demand curve.

6       A.   Sure.

7       Q.   And the Miller article that you relied

8   on for your pass-through formula has several

9   other formulas for other shape demand curves that

10  you didn't use.

11      A.   I ended up doing a lot of different

12  demand curves.  But the one that I ultimately

13  used and relied upon was the logit model.

14      Q.   Okay.  And why did you choose the

15  formula from the Miller article that was

16  associated with logit demand?

17      A.   Well, hold on.  That was a non sequitur.

18           I -- once I figured out the logit was

19  the best model at explaining the variation in the

20  data, that took me to the implied pass-through

21  rate from the logit model.

22      Q.   Understood.  And what did you do to

23  figure out that the -- let me ask it differently.

24           Did you -- did you test the structure of

25  demand using any other formula besides the

Page 153

1  formula associated with logit demand?

2      A.   Yes.

3      Q.   What other structures of demand did you

4  test?

5      A.   I tested linear and I tested constant

6  elasticity.

7      Q.   Okay.  And did you describe those tests

8  in your report?

9      A.   No.  Because I ultimately didn't rely on

10  them.  The -- they just did not do as -- as good

11  of a job and explain variations in the data as

12  the logit model.

13      Q.   Okay.  And then how about the AIDS

14  demand?  Did you -- in your reports, did you talk

15  about any test that you did to see whether demand

16  for apps fit that structure of demand?

17      A.   No.

18      Q.   Okay.  Why not?

19      A.   I felt that the logit did such a good

20  job at explaining variation, that the way to kick

21  the tires was to try linear and -- and constant

22  elasticity.  These are the three, you know,

23  primary models.  I'd grant you that A -- the AIDS

24  is also up there, but I felt that I had -- I had

25  run a sufficient test to convince me that -- that

1    the logit model was giving us the best fit of the

2    data, and it was giving us -- it lent itself --

3    through Miller it lent itself to pass-through

4    rates that were producing numbers that were

5    reliable and that varied across app categories.

6              And, you know, and as I said before,

7    logit is a very common system.  So I felt very --

8    I felt very good in -- in using it.

9         Q.   Right.  But you haven't used any -- you

10   haven't used the formula from the AIDS demand

11   from the Miller article that you relied on to

12   calculate pass-through rates.

13        A.   That's true.  I have not.

14        Q.   Do you know if that formula would

15   actually solve?

16        A.   I'd have to -- I'd have to employ it to

17   be able to -- to tell you whether or not I could

18   -- I could get im -- implied pass-through rates.

19        Q.   So sitting here today, you don't know

20   one way or the other.

21        A.   I don't.

22

23

24        Q.   Okay.  Now, logit demand has the

25   independence of relevant alternatives property?

Page 158

1    they would land on Microsoft's productivity

2    package would be higher than if they were to land

3    on some obscure package within productivity apps.

4    I mean, it's -- it's very intuitive.  It's very

5    natural.

6         Q.   Now, your pass-through formula is based

7    on logit demand.

8         A.   Yes.

9         Q.   And one feature of logit demand is that

10   all goods in the market where demand is being

11   measured are substitutes.

12        A.   I think that's a general -- that is

13   generally the case.  That's fine.

14        Q.   Okay.  Is it your opinion that all apps

15   in each Google Play app category are substitutes?

16        A.   No.  And that's why I invoked this

17   concept of cluster markets.  Like, you could --

18   you could take Microsoft's Excel and Microsoft's

19   Word and ask me if they're substitutes, and I

20   would say at -- at that level, they're not.

21   But -- but when you think about the fact that

22   Microsoft and Google are actually competing with

23   a package of productivity apps, that -- that it

24   would make sense to think of that as something

25   more akin to a cluster market the way that we saw

1    in the Staples and Office Depot case, that paper

2    clips and a ruler aren't necessarily substitutes;

3    but if the people generally tend to buy those

4    things from the same place, they can belong in

5    the same product market.

6         Q.   So -- but -- but it's not your opinion

7    that all apps in each Google Play app category

8    are substitutes.

9         A.   I just gave an example of Excel and Word

10   as being more -- more of complements, right?  But

11   -- but when you think about the -- the cat -- the

12   productivity suite that Google is offering, that

13   -- that's clearly a substitute to what -- what

14   Microsoft is offering in its productivity suite.

15        Q.   Right.  So some of the apps in each

16   Google Play category could be complements,

17   correct?

18        A.   They could be.

19        Q.   And some could be substitutes.

20        A.   They could be, yes.

21        Q.   Right.  And you haven't put forth a

22   model in your report to determine which apps in

23   each category are complements and which are

24   substitutes?

25        A.   No.  And it's not necessary to get the

Page 160

1    implied pass-through rate.

2         Q.    Right.

3              Could you go to Paragraph 78 of your

4    reply report -- well, actually, let me ask you:

5    Are you opining that all apps in each category

6    are part of a cluster market?

7         A.    No.  You -- you saw in my report.  I'm

8    saying that they don't need to necessarily be a

9    market, a relevant market, for antitrust

10   purposes, and I give you a citation for that.

11             I think that if you -- if you really

12   wanted to -- if you forced it into that box,

13   which is unnecessary and unnatural, that you

14   could -- you could get there by -- by

15   understanding the categories functioning

16   more like a cluster market.

17        Q.    Right.  But you're not actually offering

18   the opinion that all of the apps in each category

19   are part of a cluster market.

20        A.    No.  I -- I'm offering the opinion that

21   -- that everything within the category -- that

22   the category definitions from Google define the

23   -- the contours or the arena of competition among

24   apps in that category.

25        Q.    Okay.  And, again, let's go to Paragraph

Page 164

1      Q.   Let me -- let me ask a different

2  question.  You haven't calculated what those

3  switching costs are.

4      A.   I haven't calculated it, no.

5      Q.   All right.  So you ran a regression in

6  your opening report, correct?

7      A.   Well, I ran so many, I'm not sure which

8  one you're speaking of.

9      Q.   So let me -- fair point.

10          You ran a set of regressions in your

11  opening report.

12     A.   Yes.

13     Q.   Okay.  Now, those regressions are

14  testing the elasticity of demand for apps based

15  on a change in the price of the app, right?

16     A.   As instrumented via change in the tax

17  rate, correct.

18     Q.   Okay.  Now, the regression you ran in

19  preparing your opening report isn't measuring how

20  a service fee change affects the price of an app

21  or an in-app purchase, right?

22     A.   Correct.  We've been through this

23  before.  If -- if Google had varied its service

24  fee across more than a tiny amount of

25  transactions, I -- I could have employed a

Page 165

1   different model, but I couldn't given the

2   restraint.

3        Q.   Right.  So just -- I -- I understand.

4   I just want to make sure we're clear about what

5   your regression does and -- and it doesn't do.

6             The regressions that you ran in your

7   opening report isn't measuring the effect of the

8   service fee on the price of the app or the in-app

9   purchases, right?

10       A.   Correct.  It's doing something close so

11   that I can make a prediction about how a change

12   in the service fee would change the prices.

13       Q.   And you haven't run any regression that

14   measures how a change in the service fee affects

15   the price of an app or in-app purchases?

16       A.   I've -- I haven't -- well, I've tested

17   and -- and analyzed the regressions that were run

18   by Dr. Williams and Burtis that -- that purport

19   to do that or that attempt to do that, but those

20   experiments are so fatally flawed and botched

21   that there is no learning to be done.  There's --

22   there's no -- there's no economic knowledge that

23   can be gleaned from those botched experiments.

24       Q.   Right.  Now, the prices that developers

25   charge in the but-for world might depend on

1    these other dimensions that I just gave you --

2    you know, consistently downward sloping,

3    statistically significant -- and -- and you're

4    looking for a tie-breaker that -- that at that

5    point comparing the R-squared could make sense.

6        Q.   So you're saying that you ran -- you ran

7    regressions using linear and log-linear demand?

8        A.   Or constant -- we call it "constant" --

9        Q.   "Constant" --

10       A.   -- "elasticity."

11       Q.   "Constant elasticity" demand, and you

12   saw R-squareds that were lower than the R-squared

13   you got for logit?

14       A.   Yes.  But I don't want you to think that

15   that was dispositive.  That was one of many

16   dimensions over which I made the -- the call.

17       Q.   Right.  But the regressions you ran for

18   linear and constant-elasticity demand, those

19   weren't included in the reports or the backup to

20   your reports that you disclosed, right?

21       A.   I did not turn over those regressions,

22   but you can -- your -- your economists can run

23   them for themselves to get confirmation that --

24   that they don't do as good of a job explaining

25   that data.

Page 181

1  that uses a dollar amount of sales tax?

2      A.   Well, in the field -- it's one of the

3  fields in the transaction data that says "taxes",

4  and it -- it is -- it is stated in dollars, I

5  believe, not as percentage.  So we get to see

6  what the relationship is between those changes,

7  right, as -- as predictive -- how predictive they

8  are to changes in prices.  The fact that they may

9  be denominated in dollars doesn't mean they don't

10  come from ad valorem.  I'm pretty confident that

11  they are always -- or that generally -- just to

12  be safe, they're generally set as a percentage of

13  revenues.

14      Q.   Understood.  But as you input them into

15  your model regarding the relationship between the

16  sales taxes and the prices, they were in dollar

17  terms and not percentage terms?

18      A.   I believe that's the case.  I can -- I

19  can check that out for you in a break, but I

20  believe that the way that it's entered into the

21  database is as dollars.

22      Q.   Got it.

23          Now, going back to your formula for

24  pass-through, which, again, is essentially a

25  hundred minus the quantity share of the apps

1    transactions in its category, right?

2        A.    That's for the app developer, but I

3    don't present it that way in the report.  I

4    present it, as you know, at the category level.

5        Q.    Understood.

6        A.    Okay.

7        Q.    But that's the general math of the

8    formula?

9        A.    That's the math.

10       Q.    Right.  Fair to say that that math will

11   always produce a pass-through rate, unless the

12   app developer or -- has a hundred percent of a

13   Google Play category?

14       A.    I think it's fair that -- that you'll

15   get a positive pass-through rate.  You won't

16   necessarily get a big one, but you'll get a

17   positive pass-through rate with the exception

18   of the guy who dominates the field.  And, you

19   know, again, this is -- hopefully this is

20   intuitive to the non-economist in that -- in that

21   your share is capturing your dominance in this

22   arena of competition.  And so what the logit

23   model is telling us is that the more dominant you

24   are, the less -- the smaller percentage of the

25   pass -- of a cost saving you share with your --

Page 183

1    with your client.
2         Q.    Right.   But just so we're clear, unless
3    the app has a hundred percent quantity share in
4    the category, your formula will predict a
5    positive pass-through rate?
6         A.    For a given app developer, that -- that
7    is correct, yes.
8         Q.    Okay.   Now, you talked earlier about
9    the pass-through formula you have, potentially
10   predicting different rates from month to month or
11   week to week.   We talked about that a little bit.
12        A.    Yeah.   If you were to measure it on a
13   monthly basis, there would be some variation that
14   you wouldn't get if you were to measure it across
15   the -- the class period.   That is correct.
16        Q.    Right.   And your opinion is that it's
17   not appropriate to measure it on that short of a
18   time scale, correct?
19        A.    Correct.
20        Q.    Right.   And what's the economic basis
21   for why it's inappropriate to measure it on that
22   week to week or month to month or those sorts of
23   time frames?
24        A.    I don't think that an app developer
25   is going to revisit its pricing on a -- on a

1      Q.    And that amount that is passed through

2   as a price deduction is $1.34 on average for

3   in-app purchases of price reduction in the

4   but-for world?

5      A.    Correct.

6      Q.    So here you've assumed that the -- for

7   in-app purchases in the but-for world, the -- all

8   of the reduction in Google's service fee is a

9   marginal cost that will affect the price that

10  developers set in the but-for world?

11     A.    Correct.

12     Q.    Now -- and in -- in calculating how

13  prices will be set in the but-for world based on

14  a reduction of this service fee, again, in the

15  in-app purchase context, this calculation doesn't

16  reference the developer's other marginal costs in

17  any way?

18     A.    Correct.

19     Q.    Okay.  Now, if you could go to Page

20  -- sorry, again, back to paragraph -- Page 104 of

21  your report with the formula in Paragraph 225, so

22  the -- you have this cost term here C star.  Do

23  you see that?

24     A.    Yes.

25     Q.    And that's C, which are the developer's

1    mean, perhaps that's the percentage, but the

2    dollar amount depends on what the other marginal

3    costs are?

4        A.    Yeah.   But you don't need to.   That's

5    why I expressed it just as C here.   I didn't need

6    to use a dollar for my example.   But -- but I can

7    just tell you, we can do the math here, but as

8    you toggle between 30 and 15 percent, the delta

9    on that -- on that coefficient is going to be

10   1.43 minus 1.18, and that should be understood as

11   a change in percent, right -- change in

12   percentage points of the boosting power of the

13   take rate.

14       Q.    Understood.   I just want to -- I just

15   want to be clear because I'm going to -- I want

16   us to just do some math here and see where it

17   goes, --

18       A.    Okay.

19       Q.    -- if you'll follow me.

20             So the -- if -- if the developers'

21   marginal cost is a dollar and the service fee

22   rate changes from 30 percent to 15 percent, your

23   economic model on Page 104 of your report says

24   that the effective marginal cost will drop by 25

25   cents.

Page 191

1        A.    If that's the difference of 43 and 18,

2    sounds right, yeah, times the cost, I think

3    that's fair.  Yeah, it's the equivalent of, like,

4    a 25 cent.

5        Q.    Okay.  But if you go back to Table 5,

6    your -- your calculations for damage purposes say

7    that the reduction in marginal cost is $1.49,

8    right?  On average, right?

9        A.    Correct.

10        Q.    Okay.  So what marginal cost of the

11    developer besides the service fees does that

12    $1.49 reflect?

13        A.    A different one.

14        Q.    Which one?

15        A.    Oh, whatever the -- whatever the unknown

16    marginal cost is to the developers on average.  I

17    mean, the beauty of the -- of the logit is that

18    we don't need to estimate the marginal costs in

19    order to get to the pass-through rate.  But there

20    is a marginal cost going on in the background,

21    as the math simplifies when you saw for the

22    pass-through rate, such that you don't need to

23    know what it is.

24        Q.    Right.  So the logit model in the

25    formula you've used does not depend in any way on

```
                                          Page 192
 1   what the other developer's marginal cost is?
 2        A.    Not a precise estimate of what it is.
 3   Just it depends on the fact, I believe, --
 4        Q.    Right.
 5        A.    -- that there is a marginal cost.
 6        Q.    So -- so let's assume that the average
 7   marginal cost of all de -- of all developers was
 8   a dollar --
 9        A.    Well, why would you assume that when the
10   price here is at      ?  Are we going to assume
11   that -- that the margins are that high on average
12   for the developers?
13        Q.    Well, I mean, to be clear, you haven't
14   calculated any of this, right?
15        A.    I didn't need to calculate it.
16        Q.    Okay.  And because you didn't need to
17   you didn't?
18        A.    Correct.
19        Q.    Okay.  So -- but if it were the case
20   that the average marginal cost for all developers
21   were a dollar, then the average reduction in
22   service -- the average reduction in the effective
23   marginal costs for developers would be 25 cents
24   according to your formula in Paragraph 225 and
25   not      that you have in Table 5?
```

Page 195

1    that's being charged for these transactions here.
2    So you're -- you're giving -- you're assuming
3    quite a luxurious margin for the app developer to
4    make that -- that math hold.
5         Q.   Fine, sir.  I'm just asking whether, if
6    that were the case, that the math that I'm giving
7    you, that the effective reduction in marginal
8    costs from a 30 percent service fee to a 15
9    percent service fee for a developer with a dollar
10   marginal cost would be 25 cents instead of the
11   ██████?
12        A.   All I'll -- all I'll grant you is that
13   if you go to your equation -- your preferred
14   equation on Page 104 and make the assumptions
15   that you did with a dollar and the move from 30
16   to 15, the math would suggest 25 -- 25 percentage
17   points of the margin cost.  If you assume the
18   margin cost is a dollar, then it would be 25
19   cents.
20        Q.   Right.  And so what I'm -- what I'm
21   -- so you agree with me, then, that if you
22   actually calculated the average marginal cost for
23   what -- for a developer on an in-app purchase, it
24   could change the effective marginal cost paid by
25   the increase for the developer in an amount

1   that's less than the ████ that you have here in

2   Table 5?

3        A.   No, you don't need to do that under the

4   logit model.  I will grant you that under Page

5   104, the generalized equation, that had I used

6   that to estimate my pass-through, that it would

7   depend on the marginal cost.  But knowing that I

8   couldn't observe the marginal cost, right, I

9   -- among myriad other reasons that I gave you, I

10  went with the logit model because I didn't need

11  to estimate the marginal cost of the developer.

12       Q.   Right.  So you -- so you went with the

13  logit model for pass-through that you used in

14  your report rather than the formula in page -- on

15  Page 104 that depends on marginal costs because

16  you couldn't observe the marginal costs?

17       A.   No.  That wasn't the only reason.  It

18  was another beneficial property of logit that it

19  doesn't require you to go out and estimate a

20  variable that might be impossible to observe,

21  right?  And so -- but that's not -- that's not

22  the only reason or the primary reason why I chose

23  logit.  It just happens to be a beneficial

24  property.

25       Q.   Why would the model in Paragraph 225 not

1   apply to a model of logit demand if the -- if the

2   model in Paragraph 104 is a generic model?

3       A.   Well, because the logit pass-through

4   rule states pass-through as a function of

5   industry concentration and not of cost, and so

6   when you asked me why doesn't -- you're asking me

7   basically why isn't the pass-through rate under

8   logit changing with the change in costs.  It

9   doesn't.  It's just a property of the logit

10  demand.  It doesn't make the math on 104 wrong.

11  It doesn't make the logit wrong.  It just -- it's

12  no longer a function of cost.

13      Q.   So the property of the logit demand

14  model that you used for your pass-through is that

15  the price is a function of the concentration and

16  not of the cost?

17      A.   The pass-through is a function of the

18  concentration, not of the cost, correct.

19      Q.   All right.  What is focal point pricing?

20      A.   Focal point pricing is the notion that a

21  consumer might focus on the -- on the first digit

22  before the decimal, as opposed to the last two.

23  So it explains why a lot of firms end -- end

24  their prices in 99 cents, or other -- or other

25  combinations.  Just a greater focus on the first

```
                                              Page 198
 1   -- on the stuff before the decimal place than --
 2   than after the decimal place.
 3       Q.   Okay.  And do you -- focal point pricing
 4   is a well-established concept in economics?
 5       A.   Sure.
 6       Q.   And in the real world, many developers
 7   price transactions only at certain focal points?
 8           MS. GIULIANELLI:  Objection.
 9           THE WITNESS:  We -- we've -- I've given
10   you all the stats that I think you could ever
11   want to see and more, but, you know, we know that
12   a lot do but a lot don't.  You know, █ percent
13   of the top █ don't end in 99 cents, right,
14   which is a big number.
15   BY MR. RAPHAEL:
16       Q.   So fair to say, though, that in the real
17   world some developers price in way that seems
18   like they're focal point pricing and some
19   developers don't?
20       A.   Given -- given the constraints that
21   Google imposed on some developers, yes, they
22   -- you know, they did price at 99 cents.
23       Q.   Well, what analysis have you done, sir,
24   in your reports to determine what effect Google
25   -- any constraints that Google imposed on
```

Page 202

```
 1  BY MR. RAPHAEL:
 2      Q.   I guess what I'm asking is, is it your
 3  opinion that focal point pricing doesn't explain
 4  any developers' pricing in the actual world?
 5      A.   No, I think that's too harsh.  I think
 6  that focal point pricing is an important
 7  consideration here.
 8      Q.   Okay.  Now, and -- and the price floor
 9  you talked about of setting prices at 99 cents,
10  that wouldn't affect developers who set their
11  prices quite a bit above 99 cents?
12      A.   That's fair.  I think that, when we
13  looked at the data, it's about -- it's about █
14  percent of developers were at that 99 cent, so I
15  agree with you that -- that those would be the
16  ones who were constrained from -- from moving
17  downward.
18      Q.   Okay.  So the other █ percent of
19  developers wouldn't be affected by what you're
20  calling the price floor that Google had in place?
21      A.   Correct.
22      Q.   Okay.
23      A.   With one caveat in the sense that there
24  could be spillover effects from a floor being set
25  at 99 on what the next step up would be, but I
```

1   out, for the purposes of impact, is to say that

2   if all app developers within a category achieved

3   a certain cost reduction by virtue of enhanced

4   competition and, thereby, lower take rate, how

5   much of that would be shared with consumers in

6   the aggregate across the category.  And, you

7   know, what I'm hearing is, oh, my God, have you

8   ruled out 99-cent things or things that end in 9?

9   No, we haven't -- we haven't ruled that out.  But

10  we're talking about the share of the costs that

11  are being saved in the aggregate across a

12  category.  We can allow for 79-cent pricing, we

13  can allow for 99-cent pricing, 29-cent pricing in

14  the but-for world.  We're not putting any

15  restrictions on -- on what the price of a

16  particular app in a particular plan at a

17  particular point in time are.

18  BY MR. RAPHAEL:

19       Q.   Right.  So I just want to make sure I

20  get an answer to my question.  So your model for

21  a pass-through isn't trying to take account in

22  any specific way for the phenomenon of focal

23  point pricing?

24       A.   I -- I don't -- I don't think that the

25  mod -- that particular logit estimate of the 89

1    percent is accounting or needs to take account.

2    I think I need to account for it in my overall

3    opinions about what the but-for world would look

4    like.  But the logit model is just telling us

5    what the implied pass-through rate is given a

6    reduction in costs, given the concentration

7    -- the typical concentration we see within

8    categories in -- you know, in the app industry.

9        Q.   Okay.  Your regressions regarding the

10   logit demand, did they have any fixed effect or

11   other mechanism to control for focal point

12   pricing?

13       A.   Well, they did use fixed effects.  I

14   don't know if you meant to say that, but they

15   don't have a separate control variable for focal

16   point.  But it is true, now that you brought this

17   up, we do have app fixed effects, right?  So to

18   the extent that an app stayed constant at a given

19   price over time or always ended at 99 -- let me

20   just say for the record what fixed effects is.

21   Quite literally, it's controlling for any of

22   these attributes of the app that are constant

23   over time.  And so if that tendency to want to

24   end in 99 or 79 or 69 is constant, then, yes, my

25   regressions control for it.

Page 224

1   monopoly power.

2        Q.    Okay.  Now, service fees on platforms

3   other than Google Play are marginal costs for

4   developers as well, right?

5        A.    The service fee or the take rate charged

6   by Google to the developer can be understood as a

7   marginal cost.

8        Q.    And when service fees are charged to

9   developers on other platforms that may compete

10  with Google Play, those are also properly

11  understood as marginal costs for the developers?

12       A.    Correct.

13       Q.    Okay.  So if we saw service fees on

14  other platforms that are lower than Google Play's

15  service fees, those would be lower marginal costs

16  to those developers.  Fair?

17       A.    Fair.

18       Q.    Okay.  Now, would you predict, then,

19  that -- well, strike that.

20            In fact, it's true that many developers

21  do not charge different prices on platforms that

22  compete with Google Play that offer lower service

23  fees.

24       A.    There are examples of that, sure.

25       Q.    And do you know how many developers

Page 229

1   record.   The time is 2:08 p.m.

2            (Recess taken.)

3            THE VIDEOGRAPHER:   We're now on the

4   record.   The time is 2:10 p.m.

5   BY MR. RAPHAEL:

6       Q.   Now that you've got your microphone

7   fixed, it's true, according to your report, that

8   some other app stores charge lower service fees

9   for some transactions than Google charges on

10  Google Play?

11      A.   Yes.   These -- these diminished

12  competitors, in part by virtue of the challenged

13  conduct, are charging lower, as economic theory

14  would predict they would charge lower.   How else

15  would they get someone to switch?

16      Q.   Right.   And is it the case that all

17  developers charge lower prices on other app

18  stores that have lower service fees?

19            MS. GIULIANELLI:   Objection.

20            THE WITNESS:   Not all, no.

21  BY MR. RAPHAEL:

22      Q.   So some developers charge the same price

23  on other app stores than Google Play where there

24  are lower service fees?

25      A.   I would -- I would assume that's a safe

Page 230

1    -- yeah, that is a safe assumption that you could
2    find examples of app prices being the same across
3    stores under today's, you know, diminished
4    competition where these rivals aren't really
5    offering meaningful substitution opportunities.
6         Q.   Have you done any analysis in your
7    reports to determine whether the majority of
8    developers on the Google Play store and another
9    app store charged the same or different prices
10   across stores?
11        A.   No, I haven't.
12        Q.   Okay.  Now, in your report, I think you
13   note that different PC gaming platforms charge
14   different service fees?
15        A.   Sure.
16        Q.   Right?  So Microsoft now charges a 12
17   percent service fee on -- on PC gaming?
18        A.   Yes.
19        Q.   Okay.  And Steam charges more than 12
20   percent for its PC gaming platform?
21        A.   I think I give the percentages in my
22   report, but I -- I don't recall them being far
23   off from each other.  I think it's a more
24   competitive marketplace.
25        Q.   Right.  Well, let's go to -- let's

1  skipped a 2.  Let me say it again.  3(d)(2)(c).

2  BY MR. RAPHAEL:

3       Q.   Okay.  We'll come back to that.

4       A.   Okay.

5       Q.   Have you reviewed transcripts of any

6  testimony by any of the developer plaintiffs in

7  this case?

8       A.   Yes.  I think I cite some testimony from

9  some developers.  I -- I'm not sure if they're

10  plaintiffs in the case, but I -- I recall citing

11  some testimony, at least in my reply, by a

12  developer.

13            MS. GIULIANELLI:  And I -- and I'm just

14  going to keep in mind the expert stipulation with

15  respect to the disclosure of materials relied

16  upon.

17  BY MR. RAPHAEL:

18       Q.   Okay.  So have you relied on any

19  developers' testimony in forming your opinions

20  about how developers would set prices in the

21  but-for world?

22       A.   I don't recall having done that.

23       Q.   Okay.  Now, what analysis have you done

24  to determine the extent to which an inability to

25  steer affected developers from reducing prices in

Page 239

1   developers.

2        Q.    Right.  But other than what's in Table

3   9, have you done any empirical analysis of the

4   effect on developers' ability or inability to

5   steer on whether they lowered their prices in

6   response to lowered service fees?

7        A.    Other than 9, I -- I don't -- I haven't

8   done one, but what you're asking is a bit of a

9   trick question, which is, in the presence of

10  steering, we -- in the presence of an

11  anti-steering restraint, it is very hard to go

12  out and measure what the effect of steering would

13  be on -- on pass-through or app pricing.

14       Q.    Okay.  Now, your opinion is that

15  directing customers from inside the app

16  downloaded from the Play Store to options outside

17  of the Play Store is the most efficient channel

18  for steering?

19       A.    Correct.

20       Q.    Okay.  Now, what -- what empirical

21  analysis have you done to support that opinion?

22       A.    Yeah.  This has been asked and answered,

23  but I'll -- we'll go back through it again, if

24  you want.

25              And let me have the question back again,

Page 240

1    please.

2        Q.   Have you done any empirical analysis to

3    support your opinion that directing customers

4    from inside the app downloaded from the Play

5    Store to options outside of the Play Store is

6    the most efficient channel for steering?

7        A.   So I think -- I think it's the same

8    answer that I gave you this morning, that I

9    haven't done original empiricism, but I -- I'm

10   aware that Google has not prevented steering on

11   billboards, television advertisements and

12   Internet advertisements, but they have prevented

13   steering from within the app itself once it's

14   downloaded on the Play Store.  And that tells me

15   that, to Google, it's the most important channel.

16   Why would Google block it otherwise, right?  So I

17   feel like it's a very natural inference for an

18   economist to make that this is the most -- this

19   is the most efficient.

20            If you -- put it this way:  For you to

21   go any other path would incur new costs that you

22   wouldn't otherwise incur by steering within

23   the app store, right?  To get someone else's

24   attention on a billboard, you've gotta pay money.

25   You don't need to do that when it's inside of

Page 241

```
 1   your own app.
 2        Q.   Do you agree that payment systems
 3   that require exiting the app to complete the
 4   transaction aren't reasonable substitutes for
 5   Google Play billing?
 6             MS. GIULIANELLI:  Objection.
 7             THE WITNESS:  I didn't understand it,
 8   so --
 9   BY MR. RAPHAEL:
10        Q.   Are payment systems that would require
11   exiting the app to complete a transaction
12   reasonable substitutes for developers or
13   consumers to using Google Play billing?
14             MS. GIULIANELLI:  Same objection.
15             THE WITNESS:  I don't know if I have an
16   opinion here, and I'm just not aware of any
17   payment processor who requires the customer
18   to leave the app in order to consummate the
19   purchase?  I just -- I'm just not aware -- I'm
20   just not aware that that would even -- that is
21   even a thing.  I wasn't aware of that.
22   BY MR. RAPHAEL:
23        Q.   Okay.  Is there a term in your
24   pass-through rate formula for the extent to which
25   developers can steer?
```

Page 242

1        A.    No.

2        Q.    Why not?

3        A.    Well, as you know, I ultimately

4    chose the logit model, and the logit model's

5    pass-through formula simplifies to a function of

6    market share, which is not a term for steering.

7        Q.    All right.  So the -- the logit

8    pass-through formula that you used to calculate

9    the pass-through rates doesn't depend on

10   steering?

11       A.    I would say that steering ensures the

12   pass-through is going to be positive.  Logit

13   allows us to estimate precisely what it's going

14   to be.

15       Q.    Okay.  So fair to say, then, that the --

16   the logit model pass-through formula that you've

17   used in your report depends on steering?

18       A.    No, I don't think it depends on steering

19   because we can come up with -- we can come up

20   with explanations for how pass-through would

21   occur in the presence of the anti-steering

22   restraint.

23       Q.    So you -- there's reasons why

24   steering would occur despite the anti-steering

25   restrictions?

1     A.   No, there's reasons why pass-through

2  would occur.

3     Q.   Oh, excuse me.  Okay.  So there are

4  reasons why -- why you would expect pass-through

5  regardless of the anti-steering restrictions?

6     A.   Correct.  I think that while it's true

7  that the anti-steering restrictions make for a

8  very potent impediment to steering and

9  pass-through, there are other ways in which

10  pass-through would occur, even without steering.

11  If I could, you know, Google has modeled

12  different worlds, and so I've kind of mimicked

13  the assumption of where the developer could

14  choose its payment processor, right?  And you can

15  imagine a world where developers look around at a

16  whole bunch of payment processors in kind of an

17  open and unfettered market and go with the

18  payment processor offering a competitive rate, or

19  one of the lowest rates, and then competition

20  among developers in the same category would put

21  downward pressure on the prices that they charge

22  to their customers.

23          So there are -- there are mechanisms

24  that get you to pass-through and lower prices

25  outside of steering.  But I'll always hold, until

1   I'm blue in the face, that steering is like a
2   supercharger.  It would -- it would -- it would
3   boost all of these properties.
4        Q.   Have you done any analysis to determine
5   by how much it would supercharge all these
6   properties?
7        A.   No.  But -- no.  But what I'm assuming,
8   I mean, at least in my -- when I wrote this
9   report, I'm assuming that the challenged conduct
10  is gone, and part of the challenged conduct is
11  the anti-steering restrictions.  And so I'm
12  confident that there would be pass-through; that
13  it would be positive.  Now the question is,
14  what's the tool in economics that I can use to
15  reliably estimate the extent of the pass-through,
16  and that was the logit model.
17       Q.   Right.  Now, Google doesn't restrict any
18  marketing or advertising of other platforms
19  -- strike that.
20            Google doesn't restrict developers from
21  marketing or advertising transactions on other
22  platforms outside of the app that's been
23  downloaded from Google Play.
24       A.   That's correct.  There -- there's
25  -- Google understands that there would be a

Page 245

1   newfound cost to be incurred by the developer to
2   advertise in those outside fora, and recognizes
3   that that would be a less-efficient means of
4   communicating, or leading to use Google's word,
5   the customer to a lower-cost platform.
6        Q.   Right.  In your reports, have you done
7   any analysis to determine the profitability of
8   steering via any channel, whether in app or
9   outside the app, for any developer?
10       A.   Well, I did -- I give an analysis
11  -- well, I give a numerical example of how
12  steering -- remember, this is the one that begins
13  with the $1.99 price --
14       Q.   Right.
15       A.   -- could improve the profitability of a
16  -- of a developer.
17       Q.   Right.  But you haven't done any
18  analysis of using, say, actual data of the
19  profitability of steering in any channel for any
20  developer using actual data?
21       A.   I have, because Table 9 in my initial
22  report shows steering with -- with price
23  reductions.  And so, presumably, they wouldn't --
24  these apps would not be charging a lower price on
25  their website if it weren't profitable to do so.

1    Q.   Well, I'm just saying -- I guess

2   what I'm asking is -- maybe I'll ask it this

3   way:  Have -- have you done any analysis that

4   compares the profitability of steering for

5   developers via in app communications versus

6   steering using outside of the app communications?

7    A.   I haven't, but I know this:  That to go

8   outside would require a newfound advertising cost

9   that would not otherwise be incurred if you could

10   do it in-app.  And that would necessarily lower

11   the profitability of that -- of that steering

12   relative to steering within the app.

13    Q.   Have you done any empirical analysis in

14   your report of whether it would be profitable for

15   any particular developer to reduce prices by a

16   full focal point?

17    A.   I don't know what that means.

18    Q.   Well, --

19    A.   What's a full focal point?

20    Q.   Well, you told me what -- what's your

21   definition of a focal point?

22    A.   Well, we talked about how it's focusing

23   the attention on the left side of the decimal

24   place so you can kind of go high on the right and

25   it's not really going to scare off the customers.

Page 288

1    the play points program?

2        A.   The reason why that's the case is that

3    at ▮▮ percent or whatever paltry offering that

4    Google's making given the impaired competition

5    that it caused, it's not even worth figuring it

6    out.  It's like -- it's like asking here's a few

7    pennies, go -- go spend.  Like, I don't -- don't

8    bother me, I'm not going to enroll and learn how

9    to use the play points when it's set at ▮▮

10   percent.

11       Q.   My question was in the actual world,

12   it's correct that only some consumers signed up

13   for the play points program?

14       A.   In its -- in its existing state of

15   chintziness, yes, very few people availed

16   themselves of -- of the -- of the program.

17       Q.   And, in fact, in the actual world, only

18   some of the people who did sign up for the play

19   points program actually used the play points they

20   earned?

21       A.   I asked the question why bother.  When

22   it's effectively zero, why bother?

23       Q.   Okay.  But my question was, in the

24   actual world, only some of the people who signed

25   up for the play points program actually used the

Page 289

1   play points that they earned?

2        A.   I can accept that -- that when the

3   -- when the subsidy was at ███████ or

4   whatever paltry amount that was offered, that

5   very -- you'd get very little participation in

6   the program.

7        Q.   So the answer to my question is yes?

8        A.   I can -- I can accept.  I haven't

9   studied what percentage redeemed, but when it's

10  so small -- like, imagine instead of a ███ it was

11  ███████████, right, and you asked me the

12  question, Hal, why isn't anyone, you know,

13  spending time figuring out how to redeem play

14  points, right?  I'd say because we're literally

15  taking ███████ off of their -- off of a $10

16  purchase.  Why would you go through it?

17       Q.   I understand that you think that the

18  play points were paltry.  My question is it's

19  just a fact that only some of the people that

20  signed up for the play points program used their

21  play points, right?

22       A.   I can accept that fact.  I haven't

23  studied what percentage have.

24       Q.   Okay.  So in your reports, you haven't

25  identified any model to determine which

Page 295

1   -- the -- the flip, you know, where it occurs,

2   but I can -- I can conceive that ███ is so paltry

3   that it just wouldn't make a difference for

4   consumers.

5       Q.   Okay.  Now, in your reports have you

6   identified any model to determine which users

7   would have signed up for play points in the

8   but-for world?

9       A.   No.  I don't need to because what the

10  model is giving me is what Google would pay in

11  the aggregate across all consumers in terms of

12  subsidy.  So that 8 percent that comes out of the

13  play points model, and doing by memory, is what

14  happens in the aggregate.  So, it's conceivable

15  that -- that some consumers aren't contributing

16  to that -- to that 8 percent or some people are

17  doing it disproportionately, but that is going to

18  be the average subsidy that comes about via the

19  -- that if the locus of competition were to occur

20  on the points side of the market.

21      Q.   So the answer to my question is, no, you

22  -- in your reports you haven't put forth any

23  model to determine which users would have signed

24  up for play points in the but-for world?

25      A.   I don't think I need to, just to be

Page 296

1   clear --

2        Q.   I'm not asking you whether you need to.

3        A.   Okay.

4        Q.   So I'm going to ask my question again.

5        A.   Okay.

6        Q.   In your reports, did you put forth any

7   model to determine in the but-for world which

8   users would have signed up for the play points

9   program?

10       A.   That's not what the model is calling

11   for.  I'll be clear, the model wants to know

12   -- the model is solving for the size of the

13   subsidy across all consumers, right, and if the

14   model is telling us 8 percent, the way to

15   interpret that -- that -- that parameter is that,

16   on average, the subsidy offered to consumers in

17   the but-for world, if the locus of competition

18   were exclusively on the play points side, right,

19   would be 8 percent.

20       Q.   Right.  And so the model that you put

21   forward in your report regarding play points

22   isn't telling us anything about what individual

23   consumers would do with respect to signing up for

24   the play points program or using their play

25   points, correct?

Page 297

1      A.    I think the model is.  I think that at 8

2  percent, the economic intuition -- well, this is

3  the intuition that I'm drawing from the model --

4  is that when the benefit gets so large, that is

5  going to spur participation and usage in the

6  system.

7      Q.    Great.

8            Your -- your testimony here today, sir,

9  is that you have a model in your reports that can

10  tell the Court and the jury in this case which of

11  the members of the putative class would have

12  signed up for play points and who would have used

13  them?

14           MS. GIULIANELLI:   Objection to the form.

15           THE WITNESS:   I didn't say that.  I said

16  that if the but-for subsidy were to rise to 8

17  percent, then it would be embraced -- the play

18  points system would be embraced across the class

19  just as the way that the points system in the

20  AMEX marketplace is embraced across American

21  Express users.

22  BY MR. RAPHAEL:

23      Q.    Okay.  So I want to -- I want to be

24  clear.  You have -- your testimony is that in the

25  but-for world, every member of the putative class

Page 298

1  would sign up for the play points program and use

2  their play points?

3          MS. GIULIANELLI:  Objection.

4          THE WITNESS:  I cannot -- this is the

5  first time I've been asked that question.  I'm

6  just hearing it afresh, right?  I cannot fathom

7  why a user would say, no, take back -- I was

8  going to spend a hundred dollars and I realize

9  you're trying to give me $8, but, no, I don't

10  want the $8, I want to spend the full hundred

11  myself.  It would be crazy -- it would be crazy

12  to -- to do that.

13  BY MR. RAPHAEL:

14      Q.  Sir, in the actual world, some consumers

15  don't sign up for play points or don't use the

16  play points that they earn, correct?

17      A.  We've established, I hope, that when you

18  get two cents back on a hundred dollar purchase,

19  I'd say to myself I'm a busy dude, I don't know

20  if I'm going to sign up for this thing and go

21  through the hassle for the ███████ subsidy.

22      Q.  Right.  And so your testimony is that if

23  Google changed the play points rate that you've

24  put in your report, that every member of the

25  putative class would have signed up for the play

1   points program and used play points?

2            MS. GIULIANELLI:  Objection.

3            THE WITNESS:  I think -- I think it's a

4   fair assumption.  Like, the model certainly is

5   not calling on this, but I think it's a fair

6   assumption that once it goes up to 8 percent that

7   -- that everyone who is making purchases would

8   -- would either redeem it or at least enroll so

9   as to be able -- to be capable of taking the

10  subsidy at -- at those terms.

11  BY MR. RAPHAEL:

12      Q.   That's an assumption, though, that

13  you're making.  It's not what the model tells

14  you?

15      A.   Well, the model spits out, just to be

16  clear, what the average subsidy is across all

17  users.

18      Q.   Now, you -- would you agree with me that

19  the counterfactual experiment lies at the heart

20  of antitrust analysis?

21      A.   Sure.  I mean, it's an important thing.

22  It's -- I don't know if it's at the heart, but

23  you need -- you need to have a counterfactual.

24  You need to model the counterfactual.

25      Q.   Could you describe for me the

1       Q.   Right.   And, so, therefore, you haven't

2   done that?

3       A.   Correct.   Correct.

4       Q.   I just want to be clear that in your

5   model for the but-for world service fee rates,

6   the pass-through rate, the average pass-through

7   rate you've calculated, is an input into that

8   service fee rate model?

9       A.   For the two-sided market model, the

10  -- in the app distribution --

11      Q.   Yes.

12      A.   -- the pass-through rate is input into

13  determining how the optimal take rate in the

14  subsidy model, the subsidy gets chosen, that's

15  correct.

16      Q.   Right.   And is that also true for the

17  combined model?

18      A.   That's true for the combined model as

19  well.

20      Q.   And so if the pass-through rate, then --

21  again, you're not going to agree with this.   But

22  if the pass-through rate were zero, okay, that

23  your model for the but-for service fee rate would

24  yield the same rate as in the actual world?

25      A.   I don't know if I've gone in and put

Page 382

1      Q.   But it's not determinative?

2      A.   I don't think it's determinative.  I

3  just think it's helpful and I think that it was

4  worth pointing out, and I gave it about as much

5  attention as it deserves.

6      Q.   So I want to just make sure we're clear.

7  We talked a lot about this formula in Paragraph

8  224 regarding the profit-maximizing price.  This

9  is Page 104 of your report.

10     A.   Yes.  You like this formula a lot.

11     Q.   I just want to be clear.  Have you used

12 that to -- used that formula to calculate any

13 pass-through rates in this case?

14     A.   No, that was not the formula that I

15 used.

16     Q.   Okay.  Now, Google Play has different

17 storefronts for different countries?

18     A.   That's fair.

19     Q.   And now as an economist, why do you

20 think Google offers different storefronts for

21 different countries?

22     A.   Well, Google must think that the

23 differences in the audience is sufficiently

24 important so as to warrant the design of a

25 different storefront.  You know, it's expensive

Page 397

1                        C E R T I F I C A T E

2

3          I do hereby certify that I am a Notary

4    Public in good standing, that the aforesaid

5    testimony was taken before me, pursuant to

6    notice, at the time and place indicated; that

7    said deponent was by me duly sworn to tell the

8    truth, the whole truth, and nothing but the

9    truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition

13   is a true and correct record of the testimony

14   given by the witness; and that I am neither of

15   counsel nor kin to any party in said action, nor

16   interested in the outcome thereof.

17

18          WITNESS my hand and official seal this

19   13th day of May, 2022.

20

21

22          _____

23                    Notary Public

24

25

Page 401

1    GOOGLE PLAY STORE ANTITRUST LITIGATION

2    5/12/2022 - HAL SINGER, PH.D.

3         ACKNOWLEDGEMENT OF DEPONENT

4        I, HAL SINGER, PH.D., do hereby declare

5    that I have read the foregoing transcript, I

6    have made any corrections, additions, or

7    changes I deemed necessary as noted on the

8    Errata to be appended hereto, and that the same

9    is a true, correct and complete transcript of

10   the testimony given by me.

11

12   _____   _____

13   HAL SINGER, PH.D.             Date

14   *If notary is required

15

16        SUBSCRIBED AND SWORN TO BEFORE ME THIS

17        _____ DAY OF _____, 20___.

18

19

20        _____

21        NOTARY PUBLIC

22

23

24

25

# REDACTED VERSION

# Exhibit A55
# to
# C. Cramer Declaration

Karma M. Giulianelli (SBN 184175)
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com

Hae Sung Nam (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7715
hnam@kaplanfox.com

*Interim Co-Lead Counsel for the Proposed Classes*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION** | No. 3:20-CV-05761-JD |
| RELATED ACTIONS: | |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | **CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION** |
| *In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD | |
| *State of Utah, et al., v. Google LLC, et al.*, Case No. 3:21-cv-05227-JD | Hearing Date: August 4, 2022 Hearing Time: 10:00 a.m. Courtroom: Courtroom 11, 19th Floor Judge: The Honorable James Donato |
| *Match Group, LLC, et al. v. Google LLC, et al.*, Case No. 3:22-cv-02746-JD | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................1

ARGUMENT ........................................................................................................3

I.      Dr. Singer's Direct Consumer Subsidy Analysis Is Reliable and Supports Class
        Certification Even Absent His Pass-Through Analysis ...............................3

II.     Dr. Singer's Pass-Through Analysis Is Reliable..........................................5

        A.      Dr. Singer's Use of the Logit Model to Calculate Pass-Through of a
                Change in Marginal Costs Is Reliable and Regularly Used in
                Antitrust Economics................................................................................5

        B.      Google's Other Arguments Against the Acceptance of the Model
                Are Misplaced .........................................................................................7

        C.      Dr. Singer's Pass-Through Model Is Based on Reliable Data............................9

                1.      Dr. Singer Considered Real-World Data ................................. 10

                2.      Focal-Point Pricing Does Not Undermine Dr. Singer's
                        Model ....................................................................................... 11

                3.      Dr. Singer Properly Used Google's App Categories ............... 12

        D.      Dr. Singer Properly Disclosed the Basis for his Pass-Through
                Analysis..................................................................................................13

III.    Dr. Singer's Formula For Calculating Google's Competitive Take Rate Is
        Reliable ..........................................................................................................14

IV.     Dr. Singer's Use of Averages in Calculating Consumer Impact Is Reliable ...................15

CONCLUSION.....................................................................................................15

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR.
HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

1

**TABLE OF AUTHORITIES**

**Cases**

*Allegra v. Luxottica Retail North America*,

    No. 17-CV-5216 (PKC) (RLM), 2022 WL 42867 (E.D.N.Y. Jan. 5, 2022) ........................... 5

*Apple v. Pepper*,

    139 S. Ct. 1514 (2019) ................................................................................................ 9

*Bazemore v. Friday*,

    478 U.S. 385 (1986) .................................................................................................. 14

*Blood Reagents Antitrust Litig.*,

    No. 09-2081, 2015 WL 6123211 (E.D. Pa. Oct. 19, 2015) ........................................ 13

*Chinitz v. Intero Real Estate Servs.*,

    No. 18-cv-05623-BLF, 2020 WL 7391299 (N.D. Cal. July 22, 2020) .................................. 13

*DZ Reserve v. Meta Platforms, Inc.*,

    Case No. 3:18-cv-04978-JD, 2022 WL 912890 (N.D. Cal. Mar. 29, 2022) .............................. 7

*Hemmings v. Tidyman's Inc.*,

    285 F.3d 1174 (9th Cir. 2002) ................................................................................. 10

*Illinois Brick Co. v. Illinois*,

    431 U.S. 720 (1977) ................................................................................................... 9

*In re Apple iPhone Antitrust Litig.*,

    2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ................................................... 11, 14

*In re Capacitors Antitrust Litig. (No. III)*,

    No. 14-CV-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .................................. 10

*In re Dial Complete Marketing and Sales Practices Litig.*,

    320 F.R.D. 326 (D.N.H. 2017) ................................................................................... 5

*In re Mushroom Direct Purchaser Antitrust Litig.*,

    No. 06-0620, 2015 WL 5767415 (E.D. Pa. July 29, 2015) ......................................... 4

*In re Online DVD-Rental Antitrust Litig.*,

    779 F.3d 934 (9th Cir. 2015) ..................................................................................... 4

ii

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR.
HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

*In re Optical Disk Drive Antitrust Litig.*,

    No. 3:10-md-2143, 2016 WL 467444 (N.D. Cal., Feb. 8, 2016)..........................................4, 15

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,

    31 F.4th 651 (9th Cir. 2022) .....................................................................15

*Tyson Foods, Inc. v. Bouaphakeo*,

    577 U.S. 442 (2016)..................................................................................15

*V5 Technologies, LLC v. Switch, Ltd.*,

    Case No. 2:17-cv-02349-KJD-NJK, 2020 WL 6688732 (D. Nev. Nov. 12, 2020)...................5

*Victorino v. FCA US LLC*,

    No. 16cv1617-GPC(JLB), 2018 WL 2767300 (S.D. Cal. June 7, 2018)............................6, 14

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,

    No. CV 11-515-LPS-CJB, 2015 WL 12806484 (D. Del. Sept. 25, 2015)...............................14

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

**INTRODUCTION**

Dr. Singer's expert report demonstrates through common evidence and well-accepted economic and econometric modeling that Google's anticompetitive behavior harmed tens of millions of consumers nationwide. Dr. Singer's report relies on two models that independently demonstrate common impact on these consumers: (a) one models the overcharge in fees (or "take rate") that Google has charged developers, and the consumer harm from the overcharge that developers have passed on to consumers; and (b) a separate model independently demonstrates consumer harm through increased subsidies Google would offer directly to consumers in a competitive market. Google's motion focuses almost entirely on the pass-through portion of the first model. Google's criticisms of Dr. Singer's pass-through model are without merit and do not warrant exclusion. Google addresses the direct consumer-subsidy model—which provides an independent basis for class certification—only briefly at the end of its motion. Those criticisms are also without merit. Both of Dr. Singer's analyses are reliable and support class certification.

In support of its motion, Google repeatedly mischaracterizes the record, case law, and Dr. Singer's words when it argues that the pass-through model is not generally accepted. Dr. Singer's pass-through model isn't novel and doesn't ignore marginal costs. The model is regularly used by antitrust economists to study consumer price impacts resulting from a change in costs—indeed, it accounts for the change in marginal costs as one of its variables. In addition, Dr. Singer confirmed that the model applies to this case by applying standard econometric techniques—uncontested by Google or its experts—to Google's own data. Unable to show that the well-established model used by Dr. Singer is unreliable, Google makes a series of misplaced arguments about the reliability of facts and assumptions made by Dr. Singer. But Dr. Singer's analysis is reliable, and Google's arguments are, at best, matters for cross examination, not exclusion. The Court should deny Google's blunderbuss motion challenging Dr. Singer's report.

**BACKGROUND**

Dr. Singer authored a comprehensive expert report and reply report in support of class certification, marshalling economic evidence of Google's anticompetitive conduct and its impact on consumers. Ex. 1 (Singer Rpt). Google focuses solely on Dr. Singer's analysis of antitrust

impact and does not challenge his qualifications or move to exclude his other opinions. Dkt. 282 (hereinafter "Mot."). To prove antitrust impact on a class-wide basis, Dr. Singer models two ways in which all (or nearly all) proposed class members would have benefitted had Google not undertaken its anticompetitive campaign to monopolize the relevant markets. Both analyses are reliable.

In his first model, Dr. Singer demonstrates common impact in a but-for world characterized by lower take rates for developers. Google does not challenge the methodology Dr. Singer uses to calculate Google's lower competitive take rates in a but-for world except to the extent those models rely on his pass-through model for inputs. Mot. at Part II.

Dr. Singer then calculates how the resulting *change* in developer marginal costs in the but-for world would impact the price of apps. Ex. 1 (Singer Rpt.) ¶¶ 222-44. Google's take rate—a toll that all developers pay for every sale—is a marginal cost for developers. *Id.* ¶¶ 224-25. Standard economics shows that if a firm bears higher marginal costs, it will pass on those costs to consumers by charging more. *Id.* ¶ 223; *see also* Ex. 4, N. GREGORY MANKIW, PRINCIPLES OF MICROECONOM-ICS 273, 285 (Cengage Learning 8th ed. 2018). In a competitive world, the take rate would have been lower, and developers would have charged less. Instead, the cost of Google's supra-competitive take rate was passed along to consumers as higher prices.

To calculate the precise amount of pass-through, it is necessary to know the demand curve faced by developers. Ex. 1 (Singer Rpt.) ¶ 223. Accordingly, Dr. Singer ran regressions—which, again, Google does not challenge—to determine that a logit demand system accurately reflects the demand curve Android developers in each of the app categories used by Google Play face. Ex. 1 (Singer Rpt.) ¶¶ 236-38. Armed with this knowledge, Dr. Singer used the standard formula for calculating the profit-maximizing pass-through rate for a developer facing a logit demand curve. Ex. 1 (Singer Rpt.) ¶¶ 239-40. Google derides this formula as overly simplistic and suggests it is Dr. Singer's invention, Mot. at 4,[1] but the formula is derived from the logit demand model in peer-reviewed literature—*as Google's own expert admits*. Ex. 1 (Singer Rpt.) ¶ 239; Ex. 5 (Burtis Dep.) 187:3-189:13 (discussing Ex. 6, Nathan Miller, Marc Remer, & Gloria Sheu, *Using cost pass-*

---

[1] Google twice claims that Dr. Singer proffered a "'deceptively straightforward' model." Mot. at 2, 9. Dr. Singer actually said that Google's expert ignored "the calculations that work in the background to produce a deceptively straightforward result." Ex. 2 (Singer Reply) ¶ 68.

*through to calibrate demand*, 118 ECONOMICS LETTERS 451 (2013) (PX937)). Applying that formula, Dr. Singer calculates pass-through for each of the 35 app categories used, and optimized by, Google in operating its business. Ex. 1 (Singer Rpt.) Table 8.[2]

In his second model, Dr. Singer demonstrates common impact through increased consumer subsidies Google would have provided to consumers but for its unlawful conduct. Ex. 1 (Singer Rpt.) ¶¶ 245-56. Google does not argue that Dr. Singer's model should be excluded because it is not generally accepted in the field, or that there are flaws with his calculation showing an increase in consumer subsidies from ███ per transaction to $0.77 per transaction. Mot. at 14-15. Instead, it argues that not all consumers value rewards in the same way—an argument that could be made for any consumer benefit, including even money.

## ARGUMENT

### I.  Dr. Singer's Direct Consumer Subsidy Analysis Is Reliable and Supports Class Certification Even Absent His Pass-Through Analysis

Dr. Singer's analysis of consumer impact through increased consumer subsidies via the Play Points program is a reliable methodology for calculating class-wide antitrust impact without the need to consider pass-through. Ex. 1 (Singer Rpt.) ¶¶ 245-56. Google does not take issue with the modeling that Dr. Singer performed, but rather argues that Dr. Singer's opinion is unreliable solely because he did not model the percentage of consumers who would have signed up for and used Play Points in the but-for world. Mot. at 14-15. Both of Google's arguments miss the point.

*First*, Google's argument that Dr. Singer must show every user would sign up for Play Points in the but-for world is a factual dispute for cross-examination recast as a methodological failing. Google argues that the ███████ participation rates from the opt-in model Google currently uses mean that Dr. Singer must model such participation in the but-for world. Mot. at 15. But as Dr. Singer explained, the Play Points subsidy "is effectively ████████████," and it is unsurprising that consumers do not sign up for an average of "█████ back." Ex. 3 (Singer Dep.) at 293:21-294:9; 298:4-21. By contrast, standard economic principles suggest participation would be a non-issue in the but-for world. Play Points is already available to all consumers, with no minimum

---

[2] Google argues the model produces "very strange results" because prices can fluctuate from week-to-week or month-to-month but fails to note that only occurs if the model is applied over an arbitrarily short period, an error only Google's expert committed. Ex. 3 (Singer Dep.) at 131:23-134:9.

expenditure to join. Ex. 7 (Burtis Rpt.) ¶ 353. Google could automatically enroll users to a more fulsome program, just as credit card companies and other rewards programs already do. Ex. 2 (Singer Reply) ¶ 98. Even if Google maintained an opt-in model, an 8.7 percent discount, ██ times the current discount, would drive near universal participation. *Id.*; Ex. 3 (Singer Dep.) at 297:8-298:12.

Google has not shown why Dr. Singer must account for current low participation rates—an artifact of Google's exclusion of competition that would have spurred it to compete for consumers—through separate economic modeling. *See In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) ("I am only to consider the reliability of the expert's method, which may properly include making assumptions so long as those assumptions are sufficiently grounded in available facts.") (internal quotation marks omitted). And courts have already rejected Google's premise that an expert must perform some sort of a study to determine how each separate consumer would value the same benefits that would result from competition. *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143, 2016 WL 467444, at *9 (N.D. Cal., Feb. 8, 2016) ("Defendants' focus on the subjective desires of individual consumers is misplaced, and is not supported by legal precedent requiring any such approach.").

**Second**, Dr. Singer need not model redemption rates of Play Points to show antitrust impact. Even unredeemed points have "intrinsic option value," in that they still may be redeemed in the future, just as gift cards or cash may be spent in the future. Ex. 2 (Singer Reply) ¶ 99; *see, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 952 (9th Cir. 2015) (acknowledging, in context of class settlement of antitrust claims, the intrinsic economic value to consumers of gift cards that provide a set amount of money to use on their choice of a large number of products). Consumers are better off with an 8.7 percent discount than without one.

Neither of Google's arguments faulting Dr. Singer for failing to separately model away low consumer participation and redemption in Google's current paltry Play Points program render his analysis unreliable. Dr. Singer reliably demonstrates the benefits of a more robust Play Points program, adopted in the face of fair competition, to all or nearly all class members, and this analysis alone is reliable and can support class certification without considering pass-through.

## II.    Dr. Singer's Pass-Through Analysis Is Reliable

Google's scattershot challenges do not undermine the reliability of Dr. Singer's thorough work described above.

### A.    Dr. Singer's Use of the Logit Model to Calculate Pass-Through of a Change in Marginal Costs Is Reliable and Regularly Used in Antitrust Economics

Although Google claims Dr. Singer's model of pass-through is not "generally accepted," Mot. at 6-9, it presents no direct support. Nor can it. The logit demand system used by Dr. Singer is a generally accepted economic method, as even Dr. Burtis concedes. Ex. 7 (Burtis Rpt.) ¶ 306 (logit models are "frequently used in economics"); *see also* Ex. 5 (Burtis Dep.) 187:3-7. Economic literature confirms that the "most widely used discrete choice model is logit" and that it is "the ideal rather than a restriction." Ex. 8 (Kenneth Train, *Logit, in* DISCRETE CHOICE METHODS WITH SIMULATION 34-75), at 34, 36 (cited by Ex. 7 (Burtis Rpt.) ¶ 306 n.363). Likewise, courts have approved economists' use of logit models to estimate price impact in antitrust and unfair trade practices cases. *Allegra v. Luxottica Retail North America*, No. 17-CV-5216 (PKC) (RLM), 2022 WL 42867 at *56-57, 60 (E.D.N.Y. Jan. 5, 2022) (denying motion to exclude analysis of deceptive trade practice on consumer prices based on logit model); *V5 Technologies, LLC v. Switch, Ltd.*, Case No. 2:17-cv-02349-KJD-NJK, 2020 WL 6688732, at *2 (D. Nev. Nov. 12, 2020) (denying motion to exclude testimony in antitrust case relying on multinomial logit model); *In re Dial Complete Marketing and Sales Practices Litig.*, 320 F.R.D. 326, 330-31, 333 (D.N.H. 2017) (denying motion to exclude testimony using logit models to calculate consumer demand for product feature).

Google cannot credibly claim that formulas derived from logit demand systems are unreliable for calculating pass-through. Dr. Singer cites a peer-reviewed paper using the same standard logit model to calculate pass-through of cost savings from a merger. Ex. 2 (Singer Reply) ¶ 77 n.150 (citing Ex. 9 (Gregory Werden & Luke Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy* 10(2) Journal of Law, Economics, & Organization 407, 419 (1994)). The logit model is "commonly employed in antitrust analysis of mergers involving differentiated products." Ex. 6 (Miller *et al.* (PX937)) at 452. Like in the merger context, Dr. Singer uses logit to examine how changes in costs impact consumer prices.

Unable to claim the logit model is junk science, Google instead derides the pass-through formula derived from the model as "bare bones." Mot at 2.[3] To make that argument, Google focuses solely on the *final* step of Dr. Singer's analysis, which calculates pass-through based on an app's share of a category, while ignoring the complex econometric work enabling and validating that calculation. Specifically, two key analyses—both unchallenged by Google—demonstrate the economic rigor that underlies Dr. Singer's pass-through calculation.

Dr. Singer first ran regressions on Google's real-world transaction data to confirm the demand curve faced by developers in the Play Store conforms to the logit model. Ex. 1 (Singer Report) ¶ 235. To make that determination, Dr. Singer ran regressions on an app-by-app level, treating each of Google's 35 app categories as a separate demand system. *Id.* ¶¶ 235-38 & Table 7. Those regressions determined that the logit demand model accurately described how actual historical price changes affected actual consumer demand within app categories. *Id.* In other words, the regressions show that when prices rose for an app within a category, consumer demand shifted to other apps in that category following the pattern predicted by the logit model. *Id.*

Once Dr. Singer determined the logit model was the right fit to describe consumer purchasing behavior, he turned to peer-reviewed literature to determine the profit-maximizing pass-through rate for each developer based on that model. *Id.* ¶ 239 (citing Ex. 6 (Miller *et al.* (PX937)) at 452-53). Starting from the basic proposition that firms maximize profit by setting marginal revenue equal to marginal cost, the article derives a formula from the logit demand system for how the profit-maximizing price *changes* as a developers' marginal costs *change*. Ex. 2 (Singer Reply) ¶ 72. These calculations, which derived the formula Dr. Singer ultimately used, consider all relevant economic variables, *including* price and marginal cost to arrive at the logit pass-through formula. Ex. 2 (Singer Reply) ¶¶ 71-72. That the final formula derived from this process is simple does not mean the underlying economics are simple, any more than the simplicity of E=MC$^2$ suggests that the underlying physics are invalid due to the simplicity of the final formula.

---

[3] Regardless, simplicity is no basis for exclusion. *Victorino v. FCA US LLC*, No. 16cv1617-GPC(JLB), 2018 WL 2767300, at *2 (S.D. Cal. June 7, 2018) (rejecting challenge to class expert because "[w]hile the mathematical formula … is a simple formula, it was created after careful review of the facts of the case, the theories alleged and consideration of different variables.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.      Google's Other Arguments Against the Acceptance of the Model Are Misplaced

The majority of Google's arguments under the heading that "Dr. Singer's Pass-Through Formula Is Not Generally Accepted" do not relate to that question. Mot. at 6-9. These arguments are all misplaced and, at best, cross-examination points restyled as methodological arguments.

***First***, using cherry-picked deposition testimony, Google disingenuously argues that an equation cited in Dr. Singer's report, but not directly used by Dr. Singer to calculate pass-through, is "the model 'that's generally accepted in economics'" for calculating pass-through. Mot. at 6-7 (emphasis added) (citing Ex. 3 (Singer Dep.) at 105:8-106:3, 107:23-108:2). Google's motion ignores a crucial fact: that equation—which demonstrates how a firm calculates a profit-maximizing price—*cannot* by itself be used to calculate pass-through. Ex. 1 (Singer Rpt.) ¶¶ 224-25. Google omits that Dr. Singer explains why in response to the same set of questions it misleadingly quotes: "[W]hen I go to model the precise amount of pass-through, I have to make an assumption about what kind of demand the developer faces." Ex. 3 (Singer Dep.) at 106:4-107:22; *see also id.* at 113:5-114:2. In other words, to calculate the profit-maximizing amount of pass-through, an economist *must* choose a demand model, which Dr. Singer did with the logit model. One *cannot* estimate pass-through based on a generic demand curve.[4] Unsurprisingly, Google does not cite its own economist once in support of its argument that Dr. Singer should have used the equation in ¶ 224 to calculate pass-through. Mot. 6-9.

***Second***, Google repeatedly distorts the role marginal costs play in Dr. Singer's analysis. Dr. Singer does not ignore marginal costs. The logit pass-through formula considers marginal costs by measuring the *change* in developers' marginal costs. Ex. 2 (Singer Reply) ¶ 72 (citing Ex. 6 (Miller *et al.* (PX937)) at 452, 453). While the simplified pricing equation in ¶ 224 of the Singer Report includes the level of marginal cost, application of the logit demand model causes the absolute level of marginal costs to drop out of the equation, meaning the pass-through calculation depends solely on the *change* in marginal costs. Ex. 2 (Singer Reply) ¶ 71; Ex. 3 (Singer Dep.) at

---

[4] But even if the equation Google's motion argues should have been used could have model pass-through, the "choice of one particular data analysis method over another goes to the weight of his opinion, not its admissibility." *DZ Reserve v. Meta Platforms, Inc*., Case No. 3:18-cv-04978-JD, 2022 WL 912890 at *8 (N.D. Cal. Mar. 29, 2022).

113:5-115:13. This makes sense because a pass-through rate is, by definition, the *change* in price resulting from a change in cost. Ex. 1 (Singer Rpt.) ¶ 239. As noted above, Google has not challenged Dr. Singer's choice of the logit model as unreliable, nor could it.[5]

Next, Google places undue significance on the distinction between per-unit costs (costs that are the same regardless of price) and *ad valorem* costs (expressed as a percentage of price) but can point to no basis in economics for that alleged significance. Google falsely claims that Dr. Singer's model is drawn from an article that "expressly states" its formulas apply to per-unit costs, not *ad valorem* costs. The article says no such thing. Ex. 6 (Miller *et al.* (PX937)) (presenting "[g]eneral model of cost pass-through" and, while applying it to a "per-unit tax," presenting no limitation to per-unit costs).

The distinction between *ad valorem* and per-unit costs theoretically matters only if a short-term profit maximizing firm faces *zero* marginal costs aside from the changing take rate. Ex. 2 (Singer Reply) ¶ 31. In fact, this is Google's only marginal cost argument with *any* support from its economist. Mot. at 6-9. But Google's own expert reports and economic literature show developers face other marginal costs like sales taxes, customer support, and processing costs of user information. Ex. 7 (Burtis Rpt.) ¶¶ 144-46; Ex. 10 (Anindya Ghose & Sang Pil Han, *Estimating Demand for Mobile Applications in the New Economy*, 60(6) MANAGEMENT SCIENCE 1470, 1474 (2013); Ex. 2 (Singer Reply) ¶¶ 21-25. Google has identified zero evidence that any developer actually faces zero marginal costs, and its expert is only willing to say that *if* developers have zero marginal costs, then a take-rate change is "less likely to lead to a change in the retail price of the app." Ex. 7 (Burtis Rpt.) ¶¶ 142-43; *see also* Ex. 3 (Singer Dep.) at 97:24-98:19 ("replication costs" mentioned in Mot. Ex. 5 are "not the same" as marginal costs). To the contrary, analysis of Google's data shows that taxes, another *ad valorem* cost, are typically passed on in full, inconsistent with Google's zero-marginal cost argument. Ex. 2 (Singer Reply) ¶¶ 23 & n.51; 244.

---

[5] Google selectively quotes deposition testimony to suggest that Dr. Singer "went with" the logit model solely to evade calculating marginal costs, Mot. at 8. Dr. Singer's full answer notes it was one reason "among myriad other reasons" and was "not the only reason or the primary reason why I chose logit." Ex. 3 (Singer Dep.) at 195:20-196:24. Nor could it have been the reason. *All* of the demand models in the article cited by Dr. Singer find that the pass-through rate depends on the *change*, and not the *level*, of marginal cost. Ex. 6 (Miller *et al.* (PX937)).

**Third,** Google's invocation of *Illinois Brick* is a red herring and gets it nowhere. *Illinois Brick* does not bar Dr. Singer's analysis here, because the Supreme Court has held that app store consumers are direct purchasers who may recover under the federal antitrust laws. *Apple v. Pepper*, 139 S. Ct. 1514 (2019). As direct purchasers, consumers are "entitled to the *full amount* of the unlawful overcharge," because "[t]he overcharge has not been passed on by anyone to anyone." *Id.* at 1525 (2019) (emphasis in original). It is Google's burden, not Plaintiffs', to demonstrate that some portion of the overcharge would not affect consumer app prices. *Id.* at 1523. Nor did *Illinois Brick*—as Google suggests—reject the proposition that overcharges are an equivalent to an excise tax. Mot. at 9. To the contrary, it explained that "an overcharge *can* be calculated using the economic theorems for the incidence of an excise tax." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 741 n.25 (1977) (emphasis added).

**Fourth,** Google suggests the model fails to account for developers who would invest in their product with savings from a lower take rate. Mot. at 8-9. That is misdirection. Dr. Singer's models are agnostic to how developers choose to use the portion of savings that are not passed through to consumers. Ex. 1 (Singer Rpt). ¶ 266. The logit model predicts pass-through rates ranging from 25% to 96% in each app category. Ex. 1 (Singer Rpt.) at Tables 13 & 14. Developers could reinvest some or all the remaining 4% to 75% of savings, or pocket it as profit—Dr. Singer's modeling is not undermined by either outcome. And, in any event, Google's argument that an economist must model whether increased costs are passed along in the form of higher prices, or instead result in decreased investment in product development, would effectively exclude the expert testimony in myriad antitrust cases where economists have shown consumer impact in the form of higher prices.

### C.    Dr. Singer's Pass-Through Model Is Based on Reliable Data

Most of Google's challenges to Dr. Singer's pass-through model concern facts Google claims he failed to consider and assumptions Google claims he made. But those are not a basis for exclusion. As this Court recognizes, "[t]he appropriate concerns at this stage are not about the quality of the data [the expert] used or whether he included all potential variables in his model… Those observations may be grist for a good cross-examination at trial, but they do not play a

material role" in *Daubert*. *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264-JD, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.").

### 1. Dr. Singer Considered Real-World Data

Google wrongly contends Dr. Singer ignores real-world data. In fact, Dr. Singer considered and used the available data to the extent it was reliable—and he considered and rejected unreliable data and assumptions (as economists regularly do).

To begin, Dr. Singer did not use his "typical" approach of "regressing retail price changes on wholesale price changes," Mot. at 9 (citing Ex. 3 (Singer Dep.) at 134:25-135:6), because wholesale pricing data simply does not exist for Google Play. Ex. 3 (Singer Dep.) at 136:13-20.

Google also complains that Dr. Singer failed to credit Google's expert's and the developer class certification expert's analyses of price reductions following limited take rate reductions in 2018 and 2021. As explained in Dr. Singer's reply report, methodological failures infect Dr. Burtis's analysis of the 2018 and 2021 changes. For example, Dr. Burtis's analysis of the 2018 take rate change—which applied only to second-year subscriptions—ignores that Google Play provides no mechanism for a developer to change second-year subscription prices. Ex. 2 (Singer Reply) ¶ 122. Dr. Burtis's analyses also are infected by numerous other flaws, including failure to measure over a sufficiently long-time horizon, failure to include a control group, and reviewing changes over artificially small product-groups rather than by app or developer. *Id.* ¶¶ 102-33. At best, the analyses demonstrate price stickiness, which would benefit the class in the but-for world where a competitive take rate would have been set at the outset. *Id.* ¶ 115. More fundamentally, Google's average overall take rate remained near constant throughout the class period, despite Google's minor changes in 2018 and 2021, providing almost no basis to examine more significant changes in take rate that would result from full competition. Ex. 3 (Singer Dep.) 138:16-141:12.

Contrary to Google's suggestions, Dr. Singer tested his model on significant actual data, running regressions on Google's transaction data to determine that the logit model was a good fit. Ex. 1 (Singer Rpt.) ¶¶ 237-38. He analyzed developers' experience with sales tax to confirm that

developers pass through costs to consumers. *Id.* ¶ 244. And he analyzed pass-through from the limited number of major developers who can effectively offer lower prices on their websites in spite of Google's anti-steering restraints. *Id.* ¶¶ 242-43 & Table 9. As evidenced by Dr. Burtis's failures, broader real-world experiments are not possible because of Google's continuous anticompetitive conduct. Ex. 2 (Singer Reply) ¶¶ 112-15. A but-for world characterized by steering, permanent widespread lower take rates, and other pro-competitive benefits would facilitate pass-through, resulting in a competitive price for the consumer. *Id.*

Finally, Google's claim that Dr. Singer relied on no developer testimony is, once again, false. Dr. Singer relied on trial testimony in *Epic v. Apple* from Match.com's Adrian Ong confirming that increased costs from Apple's take rate led to higher prices. Ex. 1 (Singer Rpt.) ¶ 227 & n.501. And testimony from Dan Scalise of Rescue Pets, a developer class representative, confirmed a fatal flaw in Dr. Burtis's and the developer class expert's analysis of ██████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 2 (Singer Reply) ¶ 122 & n.248 (citing Ex. 11 (Scalise Dep.) at 269:9-21). Google fails to note this testimony.

## 2.    Focal-Point Pricing Does Not Undermine Dr. Singer's Model

Google incorrectly claims that focal point pricing undermines Dr. Singer's models of pricing in the but-for world. Unlike in the case cited by Google, there is no "overwhelming evidence" in this case suggesting that "developers would choose to price their apps at focal points ending in 99 cents." *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022). To the contrary, Dr. Singer provides significant economic analysis suggesting that developers would break from focal point pricing in the but-for world. Even now, developers are already willing to depart from focal point pricing. More than 20% of the top paid apps in the Play Store have prices that do not end in ".99." Ex. 2 (Singer Reply) ¶ 26. And until recently, Google imposed a minimum price of $0.99, which would be absent in the but-for world. Google recently lifted that restraint because developers *asked* for flexibility from having to price at a minimum of $0.99, showing that developers do not view a price ending in $0.99 as sacrosanct, or even desirable. Ex. 2 (Singer Reply) ¶ 29, & n.58; Ex. 12 (GOOG-PLAY-000355570.R) at -597.R.

1    Further, in the but-for world, the opportunity to steer consumers to cheaper platforms for

2  in-app purchases would result in departure from focal point pricing to incentivize consumers to

3  switch. Ex. 2 (Singer Reply) ¶ 28; Ex. 3 (Singer Dep.) at 200:7-202:7. Although still constrained

4  by Google's anticompetitive conduct, major developers have departed from focal point pricing to

5  take advantage of their severely limited opportunity to steer with reduced prices. Ex. 1 (Singer

6  Rpt.) at Table 9. Finally, to the extent developers prefer to maintain "supermarket-style" pricing

7  in the but-for world, Dr. Singer's models allow for them to retain prices ending in "9," while still

8  passing savings on to consumers, as is observed in the actual world. Ex. 2 (Singer Reply) ¶ 30 &

9  Figure 3. His impact model produces aggregate overcharges within a category; there are myriad

10  pricing combinations—including those ending in "9"—that add up to his aggregate overcharge.

11    Dr. Singer considered evidence of focal point pricing in his report and reliably determined

12  that his models were sufficient to calculate damages. Ex. 3 (Singer Dep.) at 203:6-206:8.

13    **3.    Dr. Singer Properly Used Google's App Categories**

14    Record and economic evidence support Dr. Singer's use of Google's app categories. Con-

15  trary to Google's claim, the logit model does not require that all apps within a category are perfect

16  substitutes. Ex. 3 (Singer Dep.) 158:6-160:1 (noting "it's not necessary" to determine which apps

17  are substitutes "to get the implied pass-through rate."). While it "is generally the case" that goods

18  in a logit demand system are substitutes, this does not imply that all goods are interchangeable. *Id.*

19  Economic literature confirms that logit allows for extensive product differentiation, while recog-

20  nizing that consumers are likelier to shift to goods seen as near-substitutes. Ex. 2 (Singer Reply)

21  ¶ 77; Ex. 13 (Simon Anderson & Andre de Palma, *The Logit as a Model of Product Differentiation*

22  44 OXFORD ECONOMIC PAPERS 51-67 (1992)) at 53 (noting "there are many characteristics of prod-

23  ucts which consumers value differently"); Ex. 8 (Train) at 47 (describing "proportionate shifting").

24    Record evidence shows that Google's app categories are economically reasonable group-

25  ings of consumer preferences. Ex. 2 (Singer Reply) ¶¶ 75-77. Google publicly tells developers that

26  "Categories and tags help users to search for and discover the most relevant apps in the Play Store,"

27  Ex. 2 (Singer Reply) ¶ 75, and uses those same categories for its own internal analyses of consumer

28  spend. *E.g.*, Ex. 14 (GOOG-PLAY-000579868.R) at -870.R; Ex. 2 (Singer Reply) ¶ 75 (compiling

other Google analyses). Developers are incentivized to categorize their apps with the apps of their competitors to lead consumers to their apps; it would make no sense for a developer to place its app in a category of apps that do not relate to it. Google itself recognizes that "developers engage more with category-specific content." *Id.* ¶ 76; Ex. 15 (GOOG-PLAY-000303918.R) at -926.R.

Dr. Singer's regressions—which confirmed the logit model fits the data—are strong independent evidence that the app categories used by Google in its ordinary course of business appropriately defined the scope of substitution possibilities for app users. The logit model would only fit the data if there were some substitution between the apps in the chosen categories—and here, Dr. Singer's regressions, which were calibrated to the app categories, determined that the "logit demand model explains the vast majority (more than 85 percent) of the variation" in the demand for Apps and In-App Content in the real world. Ex. 2 (Singer Reply) ¶ 70; Ex. 1 (Singer Rpt.) ¶ 238. In other words, as an app developer's price increased, its share within the category declined following the logit model's predicted demand curve.

The record and Dr. Singer's confirmatory regressions establish that any assumptions he made in using Google's app categories as an input in his model were reliable and appropriate. To the extent Google thinks otherwise, that can be a cross issue. *See Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *14 (E.D. Pa. Oct. 19, 2015) (admitting expert testimony reliant upon assumption about business model with "some support for those assumptions in the record" because any weaknesses "bear on the weight of the evidence rather than admissibility").

## D.    Dr. Singer Properly Disclosed the Basis for his Pass-Through Analysis

Dr. Singer has properly disclosed the basis for his pass-through analysis. Google's motion faults Dr. Singer solely for not disclosing calculations testing two alternative demand curves to the logit model. Mot. at 13. But Google ignores that the expert stipulation and order in this case requires disclosure only of data "***relied upon*** by the expert witness as a basis for the expert witness's opinion(s)." Dkt. 55 ¶¶ 4, 7 (emphasis added); *contrast with* Mot. at 13 (quoting "considered by an expert" standard); *see also Chinitz v. Intero Real Estate Servs.*, No. 18-cv-05623-BLF, 2020 WL 7391299, at *4 (N.D. Cal. July 22, 2020) (noting that the default Rule 26(a) "considered" standard is significantly broader than a "relied upon" standard). Dr. Singer clearly testified that

13

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

1   while he tested other demand curves, he did not describe them in his report "[b]ecause I ultimately

2   didn't rely on them." Ex. 3 (Singer Dep.) 152:22-153:12. And, in any event, Google's experts have

3   all the data they need to run alternative regressions themselves and doing so would have led them

4   to the same conclusion—that the logit model best fits the data. Ex. 3 (Singer Dep.) 174:17-25. [6]

5   **III.    Dr. Singer's Formula For Calculating Google's Competitive Take Rate Is Reliable**

6           Dr. Singer's calculation of Google's competitive take rates is reliable. Google raises only

7   two criticisms of Dr. Singer's modeling—that it relies on his pass-through calculations and that it

8   yields allegedly "absurd results." Mot. at 13-14. Neither is availing.

9           *First*, as explained above, *supra* Part II, Dr. Singer's pass-through calculations are reliable.

10  And even assuming Dr. Singer's pass-through calculations were flawed (which they are not), pass-

11  through is just one of many inputs to the econometric models Dr. Singer used to determine com-

12  petitive take rates. Ex. 1 (Singer Rpt.) Tables 3 & 5. Criticisms with one variable are not grounds

13  for exclusion of an expert's testimony. *See Victorino v. FCA US LLC*, 2018 WL 2767300, at *3

14  ("Under Rule 702 and Daubert, the proper analysis is not whether some of the inputs can be ques-

15  tioned…"); *Bazemore v. Friday*, 478 U.S. 385, 400, (1986) ("Normally, failure to include variables

16  will affect the analysis' probativeness, not its admissibility.").

17          *Second*, Dr. Singer's model does not predict service fees too low to cover Google's mar-

18  ginal costs, as Google claims. Dr. Singer "conservatively estimated" Google's marginal costs at

19  ▮▮▮ but estimated that the actual figure could range from ▮ to ▮▮. Ex. 1 (Singer Rpt.) ¶¶ 87

20  & n. 183, 192 n.388, 212. Neither the 10% fee for Entertainment apps, nor the 9.7% fee for Music

21  and Audio apps falls below the range of estimates of Google's marginal costs. *Id.* at Table 14.

22  Moreover, that Google's rates in 2 of 35 categories fall close to Google's marginal costs does not

23  mean Google could not "anticipate any profit in the foreseeable future." Mot. at 14 (quoting *Apple*

24  *iPhone Antitrust Litig.*, 2022 WL 1284104, at *5). Google does not (and cannot) contend that the

25

26

---

27  [6] Google's belated invocation of Rule 26 alone shows lack of prejudice. *W.L. Gore & Assocs., Inc.*
    *v. C.R. Bard, Inc.*, No. CV 11-515-LPS-CJB, 2015 WL 12806484, at *4-5 (D. Del. Sept. 25, 2015)

28  (noting that delayed Rule 26 motion "embed[ed] … in its *Daubert* motion" "seriously undermines
    its contention that there was a lack of disclosure here that has caused it prejudice.")

Play business would be unprofitable under Dr. Singer's model—and the fact that Google may make more money distributing some app categories than others is unsurprising.[7]

## IV.    Dr. Singer's Use of Averages in Calculating Consumer Impact Is Reliable

Finally, Google argues that Dr. Singer's consumer impact calculations are unreliable because he employs average take rates and pass-through rates. Mot. at 14. But far from obscuring differences between class members or leading to incorrect conclusions, an average take rate across developers accurately reflects market conditions. In the actual world, Google has consistently used uniform and formulaic take rate structures. Ex. 2 (Singer Reply) ¶¶ 7-10. There is no reason to expect that Google would radically depart from this practice and individually negotiate take rates for thousands of developers, developer-by-developer, in the but-for world. *Id.* ¶ 10.

With respect to the pass-through rates, Dr. Singer does not assume "that all apps in the same category would reduce prices by the same proportion," Mot. at 14. Dr. Singer did in fact calculate the pass-through rate on the *individual* app level, based on each app's share of the category, before presenting the average levels in summary. Ex. 3 (Singer Dep.) 130:22-25. Using the same methodology, he could easily calculate pass-through at the app level if necessary for his final damages calculation. *Id.* at 393:11-394:11. But Google has not suggested why an average is unreliable in this context, and there is nothing inherently wrong with the use of averages in calculations in a class action or any other case. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016) (admissibility of representative or statistical evidence turns on "degree to which the evidence is reliable"); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F.4th 651, 665, 677 (9th Cir. 2022) ("Plaintiffs frequently offer expert evidence, including statistical evidence or class-wide averages, to prove that they meet the prerequisites of Rule 23(b)(3)."); *Optical Disk Drive Antitrust Litig.*, 2016 WL 467444, at *10 (finding that "the appropriate degree to which data should be aggregated to derive reliable results fall on the 'merits' side of the line").

## CONCLUSION

The Court should deny Google's motion to exclude the opinions of Dr. Singer.

---

[7] Indeed, Google has already shown a willingness to offer even lower take rates for apps in these categories. Ex. 7 (Burtis Rpt.) ¶ 64 n.45 (LRAP++ take rate of ███); Ex. 16 (GOOG-PLAY-010736506) (offer to ███ of ██ effective take rate).

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

Respectfully submitted,

By: */s/ Karma M. Giulianelli*

**BARTLIT BECK LLP**
Karma M. Giulianelli (SBN 184175)
Glen E. Summers (SBN 176402)
Jameson R. Jones (pro hac vice)
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140
karma.giulianelli@bartlitbeck.com
glen.summers@bartlitbeck.com
jameson.jones@bartlitbeck.com

**BARTLIT BECK LLP**
John Byars (pro hac vice)
Lee Mason (pro hac vice)
54 W. Hubbard St., Suite 300
Chicago, IL 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
john.byars@bartlitbeck.com
lee.mason@bartlitbeck.com

**COTCHETT, PITRE & MCCARTHY, LLP**
Nanci E. Nishimura (SBN 152621)
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
James G. Dallal (SBN 277826)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
nnishimura@cpmlegal.com
azapala@cpmlegal.com
ecastillo@cpmlegal.com
jdallal@cpmlegal.com

By: */s/ Hae Sung Nam*

**KAPLAN FOX & KILSHEIMER LLP**
Hae Sung Nam (pro hac vice)
Robert N. Kaplan (pro hac vice)
Frederic S. Fox (pro hac vice)
Donald R. Hall (pro hac vice)
Aaron L. Schwartz (pro hac vice)
850 Third Avenue
New York, NY 10022
Tel.: (212) 687-1980
Fax: (212) 687-7715
hnam@kaplanfox.com
rkaplan@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
aschwartz@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
lking@kaplanfox.com
kherkenhoff@kaplanfox.com

**PRITZKER LEVINE, LLP**
Elizabeth C. Pritzker (SBN 146267)
Bethany Caracuzzo (SBN 190687)
Caroline Corbitt (SBN 305492)
1900 Powell Street, Suite 450
Emeryville, CA 94608
Telephone: (415) 805-8532
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
bc@pritzkerlevine.com
ccc@pritzkerlevine.com

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR.
HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

1

**KOREIN TILLERY, LLC**
George A. Zelcs (pro hac vice)
Randall Ewing, Jr. (pro hac vice)
David Walchak (SBN 323422)
205 North Michigan, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
dwalchak@koreintillery.com

Stephen M. Tillery (pro hac vice)
Michael E. Klenov (SBN 277028)
Carol O'Keefe (pro hac vice)
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525
stillery@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

**MILBERG PHILLIPS GROSSMAN LLP**
Peggy J. Wedgworth (pro hac vice)
Robert A. Wallner (pro hac vice)
Elizabeth McKenna (pro hac vice)
Blake Yagman (pro hac vice)
Michael Acciavatti (pro hac vice)
One Penn Plaza, Suite 1920
New York, New York 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229
pwedgworth@milberg.com
rwallner@milberg.com
emckenna@milberg.com
byagman@milberg.com
macciavatti@milberg.com

*Counsel for the Proposed Class*

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONSUMER PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR.
HAL J. SINGER ON CLASS CERTIFICATION NO. 3:20-CV-05761-JD

1

**CERTIFICATE OF SERVICE**

2      The undersigned certifies that a true and correct copy of the foregoing was served on

3  June 23, 2022 upon all counsel of record via the Court's electronic notification system.

4

5                                                             */s/ Karma M. Giulianelli*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# REDACTED VERSION

# Exhibit A56
# to
# C. Cramer Declaration

# EXHIBIT 3

# FILED UNDER SEAL

Page 1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   -------------------------------------X
    IN RE GOOGLE PLAY STORE
4   ANTITRUST LITIGATION
5   Case No.  3:21-md-02981-JD
6
    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No. 3:20-cv-05671-JD
8
    In Re Google Play Consumer
9   Antitrust Litigation
    Case No. 3:20-cv-05671-JD
10
    In Re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12
    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  -------------------------------------X
15
16          VIDEOTAPE DEPOSITION
17             HAL SINGER, PH.D.
18          Thursday, May 12, 2022
19              9:07 a.m. (EST)
20
21
22
23
24  Reported by:
25  Ryan K. Black, RPR, CLR, Notary Public

Page 2

1

2

3

4          Thursday, May 12, 2022

5

6          Video Deposition of HAL SINGER, PH.D.,

7   taken at the Law Offices of Munger, Tolles &

8   Olson, LLP, 601 Massachusetts Avenue NW

9   Washington, DC, beginning at 9:07 a.m.,

10  before Ryan K. Black, a Registered

11  Professional Reporter, Certified Livenote

12  Reporter and Notary Public and for the

13  District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   A P P E A R A N C E S:
 2     CRAVATH, SWAINE & MOORE, LLP
       BY:  ERIC J. ZEPP, ESQ. - Via Zoom
 3     825 8th Ave
       New York, New York  10019
 4     212.474.1000
       ezepp@cravath.com
 5     Representing - Epic Games, Inc. In Re:
                       Epic Games, Inc. V. Google
 6                     LLC, et al.
 7
       BARTLIT BECK LLP
 8     BY:  KARMA M. GIULIANELLI, ESQ.
       1801 Wewatta Street
 9     Suite 1200
       Denver, Colorado  80202
10     303.592.3100
       karma.giulianelli@bartlitbeck.com
11     Representing - Consumer Class Plaintiffs
12
       HAUSFELD LLP
13     BY:  AMY ERNST, ESQ. - Via Zoom
       325 Chestnut Street
14     Unit 900
       Philadelphia, Pennsylvania  19106
15     215.985.3270
       aernst@hausfeld.com
16     Representing - Plaintiff Developers
17
       MUNGER, TOLLES & OLSON LLP
18     BY:  JUSTIN R. RAPHAEL, ESQ.
       560 Mission Street
19     27th Floor
       San Francisco, California  94105
20     415.512.4000
       justin.raphael@mto.com
21     Representing - Defendants
22
23   ALSO PRESENT:
24     Emmanuel Pezoa - Legal Videographer
       Yajing Jiang, Ph.D - Charles River Associates
25     Kevin Caves, Ph.D - Econ One
```

Page 4

1                      I N D E X

2    TESTIMONY OF:  HAL SINGER, PH.D           PAGE

3    By Mr. Raphael..............................6, 391

4    By Mr. Giulianelli..........................389

5                    E X H I B I T S

6    EXHIBIT           DESCRIPTION              PAGE

7    Exhibit 333    Hal Singer Ph.D's Opening Expert

8                   Report...........................27

9    Exhibit 334    Hal Singer Ph.D's Reply Report...27

10   Exhibit 335    an article titled Digital Economics

11                  by Avi Goldfarb and

12                  Catherine Tucker.................96

13   Exhibit 336    a document titled Economics Letters

14                  - Using Cost Pass-through To

15                  Calibrate Demand, by Miller, Remer

16                  and Sheu........................117

17   Exhibit 337    an article titled The Antitrust

18                  Logit Model For Predicting

19                  Unilateral Competitive Effects,

20                  by Gregory J. Werden and

21                  Luke M. Froeb...................156

22   Exhibit 338    a document titled Expert Report of

23                  Michelle M. Burtis, Ph.D.......364

24

25

Page 5

1           THE VIDEOGRAPHER:  Good morning.  We are
2    on the record at 9:07 a.m. on May 12, 2022.  This
3    is the video-recorded deposition of Hal Singer
4    taken in the matter of In re:  Google Play Store
5    Antitrust Litigation, filed in the United States
6    District Court, Northern District of California,
7    San Francisco Division, Case No.
8    3:21-MD-02981-JD.
9           My name is Emmanuel Pezoa, from the firm
10   Veritext Legal Solutions.  The court reporter is
11   Ryan Black, from the firm Veritext Legal
12   Solutions.
13          Will the court re -- court reporter
14   please swear in the witness?
15                    *     *     *
16   Whereupon --
17              HAL JASON SINGER, PH.D.,
18   called to testify, having been first duly sworn
19   or affirmed, was examined and testified as
20   follows:
21                    *     *     *
22          THE REPORTER:  And, Counsel, if you want
23   to state your appearances for the record, that
24   would be great.
25          MR. RAPHAEL:  Sure.

1           Justin Raphael, Munger Tolles & Olson,
2     for the defendants.
3           MS. GIULIANELLI:  Karma Giulianelli,
4     from Bartlit Beck, for the consumer class.
5           MS. JIANG:  Yajing Jiang from Charles
6     River Associates.
7           MR. RAPHAEL:  Is there anyone on the
8     line who wants to introduce themselves?
9           MS. ERNST:  This is Amy Ernst.  I'm here
10    with Hausfeld for the plaintiff developers.
11          THE VIDEOGRAPHER:  Thank you.  You may
12    proceed.
13          MR. ZEPP:  Eric Zepp here, from Cravath
14    Swaine & Moore, on behalf of Epic Games.
15          MR. CAVES:  I'm Kevin Caves, with Econ
16    One on behalf of the Commercial developers.
17                      EXAMINATION
18    BY MR. RAPHAEL:
19       Q.   All right.  Dr. Singer, will you just
20    state your name for the record?
21       A.   Hal Jason Singer.
22       Q.   And, Dr. Singer, you've been deposed
23    many times; is that right?
24       A.   Yes.
25       Q.   How many times would you say you've been

Page 97

1          THE WITNESS:   Thanks.

2     BY MR. RAPHAEL:

3          Q.    Do you see Exhibit 335, Dr. Singer?

4          A.    I do.

5          Q.    And what is it?

6          A.    It -- it appears to be the article that

7     I cited.

8          Q.    That's the "Digital Economics" article

9     by Tucker and Goldfarb?

10         A.    Yes.

11         Q.    And -- and could you go to Page 12 of

12    the article?

13         A.    If you'd let me just -- one second.  I'd

14    -- I'd like to just read the abstract quickly.

15         Q.    Would you go to Page 12, please?

16         A.    Hold on one second.

17               Okay.  Page 12.

18               Okay.

19         Q.    Do you see at -- further down, say,

20    two-thirds of the way down in the left column,

21    there's a header that says, "The replication cost

22    of digital goods is zero"?

23         A.    Yes.

24         Q.    So this article that you relied on in

25    your report says that "The replication costs of

Page 98

1   digital goods is zero," correct?

2       A.   Correct.

3       Q.   Now, are you familiar with V-Bucks?

4       A.   Oh.  Can I put this to the side?

5       Q.   For now, yes.

6       A.   Yeah.

7            And I would just note for the record

8   that replication costs and marginal costs are not

9   the same.

10      Q.   Well, how are they different?

11      A.   Oh.  What -- what Goldfarb is not taking

12  into consideration here is that to sell the extra

13  unit you have to pay a processing fee.  That's a

14  marginal cost.

15           So it's true that to create the next

16  sword -- the 150th sword doesn't cost any more to

17  replicate that sword, but that doesn't mean there

18  aren't any marginal costs incurred in the

19  transaction.

20      Q.   Understood.

21           All right.  Could some developers have

22  negative marginal costs for in-app purchases?

23      A.   It's hard to -- to fathom that.

24      Q.   What if a developer generates

25  advertising revenue as the result of an in-app

1    being reflected in the prices of apps in the

2    transaction data.

3        Q.    Right.  And your opinion is that

4    Google's service fees, to the extent that they

5    are supercompetitive, is equivalent to an

6    increase in the developer's marginal cost.

7        A.    It can be understood that way, yes.

8        Q.    Right.  And in your report, you've

9    modeled the proper economic way to calculate how

10   a profit-maximizing developer would set prices

11   based on marginal costs.

12       A.    I have.  And --

13       Q.    Right.

14       A.    -- and, as you know, it depends on

15   the -- the nature of the demand and the demand

16   specification that you assume, right?  Each

17   demand specification you assume is going to apply

18   at different pass-through rates.

19       Q.    Right.  So could you go to Page 104 of

20   your report, your opening report, please?

21       A.    Sure.

22       Q.    And you'll see this is a continuation of

23   the Paragraph 225 from the previous page.

24            And you've got a formula there that has

25   "P minus C star divided by P equals one divided

Page 106

1    by E sub D."

2          Do you see that?

3      A.   Yes.   That's the classic Lerner markup.

4      Q.   Right.   So that's -- that's the proper

5    economic model for how a profit maximizing

6    developer would set prices based on marginal

7    costs, right?

8      A.   That model describes the markup over

9    marginal cost as the function of the elasticity

10   of demand faced by the developer.

11     Q.   Right.   And -- and this model on Page

12   104 of your opening report, that -- that's --

13     A.   So --

14     Q.   -- the correct economic mod -- economic

15   way to model how the change in marginal costs

16   will affect the price that the developer charges.

17     A.   It's the -- it's the way to think

18   about it at -- at a very, very high level of

19   abstraction.   But, as you know, to actually

20   estimate the pass-through rate here, I have to

21   make an assumption about the demands curve and --

22   and -- and the precise nature of demand that a --

23   the developer faces, right?

24          Once you --

25     Q.   Understood.

1      A.   -- make a -- once you make that

2   decision, you get these pass-through rules,

3   right?  And the pass-through rules -- whether you

4   go linear or logit or -- or constant elasticity

5   -- are going to express pass-through as a

6   function of things that do not include the

7   marginal cost.

8      Q.   Understood.  But this formula on Page

9   104 of your report is the correct economic way to

10  model the relationship between the developer's

11  price and the marginal cost in general?

12     A.   Well, I just want to put that caveat in

13  there.  It's the -- it's the -- definitely the

14  way to think about it and why it's in my

15  preamble, right?

16          But when I go to model the precise

17  amount of pass-through, I have to make an

18  assumption about what kind of demand the

19  developer faces, right?  And that -- that puts

20  me to a -- takes me to a pass-through rule that

21  isn't necessarily going to be denominated in

22  terms of costs.

23     Q.   Understood.  So -- but -- but this mod

24  -- this economic model you've described in Page

25  104 of your report, that's generally accepted in

Page 108

1    economics.

2        A.    Yes.

3        Q.    Now, if you just look at the cost term

4    there, C star, and the -- the C star in that

5    formula that you have on Page 104 of your report

6    is equal to C divided by one minus T, right?

7        A.    Correct.

8        Q.    And -- and in that -- in that cost term

9    I just described, T is the service fee rate?

10       A.    Correct.

11       Q.    And C is the developer's per-unit

12   marginal cost other than the service fee?

13       A.    Correct.  Processing and the like, yes.

14   Any other --

15       Q.    Okay.

16       A.    Any other types of marginal costs.

17       Q.    Okay.  And so one input into the

18   generally accepted economic model of how the

19   profit-maximizing developer would set pri --

20   prices is the marginal costs other than the

21   service fee.

22       A.    For short-run profit maximization, the

23   answer is, yes, that this model, at this high

24   level of ab -- of abstraction, is a function of

25   the marginal cost.

                                        Page 113

1    profit-maximization formula, that the -- the

2    pass-through rate is going to be proportional to

3    the other marginal costs.  I'll give you that.

4    BY MR. RAPHAEL:

5        Q.   Now, in your reports, you haven't used

6    this economic model from par -- from Paragraph

7    225 in Page 104 to actually calculate how

8    developers' prices would change if Google

9    reduced its service fees.

10       A.   I disagree with that characterization,

11   because this is the generic statement of the

12   model before you specify what kind of demand the

13   developer is facing.

14           But when you begin -- when you move over

15   to the logit model, or you do it for any demand

16   specification for that matter, you're never

17   moving away from this underlying model of profit

18   maximization, right?  It's always flowing from

19   the same place.  There's still something that is

20   the equivalent of the Lerner Optimum Markup Rule

21   and the logit demand specification, right, as --

22   as you see in 103 and 104.

23           This is always undergirding.  This is

24   like the basic building block.  The logit is just

25   an example of what this would look like when you

1   give me an assumption about the nature of the

2   demand faced by the app developer.

3       Q.   Okay.  But if you knew -- you -- you've

4   used a logit model to estimate the nature of

5   demand, right?

6       A.   Correct.

7       Q.   And could that be the term "E sub D" in

8   your formula on Page 104?

9       A.   Yes.  It is related to -- that "E sub D"

10  is -- characterizes or captures the nature of the

11  demand.  And now we're getting more specific.

12  Now we're saying, "What if they face a logit

13  demand system?"

14      Q.   Right.

15      A.   Uh-huh.

16      Q.   And so if you knew the elasticity of

17  demand in this formula and you knew what "C star"

18  was, you could use this formula to calculate what

19  the but-for world price would be, correct?

20      A.   You would have to assume -- you could

21  only use this formula, I believe, for a constant

22  elasticity demand.  I -- I -- I want to -- I want

23  to go back and kind of make sure this is right,

24  but I've given you what the pass-through rate is,

25  mathematically at least, algebraically, when you

1   do a linear assumption, when you do a constant

2   elasticity assumption, and when you do a logit

3   assumption.

4        Q.   Uh-huh.

5        A.   Right?

6             And to answer your question, I think

7   that the -- the linear and the logit models

8   are going to allow the elasticity of demand to

9   change, whereas the constant elasticity by

10  definition is going to take that elasticity as a

11  given.  And so that's the only one in which the

12  elasticity is going to hang around in your

13  pass-through model -- your pass-through rule.

14       Q.   Okay.  Now, Google's -- in your opinion,

15  Google's service fee's akin to a tax.

16       A.   Yes.

17       Q.    Okay.  And if it were a tax, Google's

18  service fee would be an ad valorem tax.

19       A.   Yes.

20       Q.   And, again, that means that the service

21  fee is a percentage of the price.

22       A.   Correct.

23       Q.   Now, for your logit pass-through model

24  to actually calculate the pass-through rate in

25  this case, you relied on an article by Miller,

Page 130

1    logit demand system?

2        A.    Cor --

3        Q.    Equation 6.

4        A.    Correct.

5        Q.    Yeah.  And just to make sure I

6    understand what you did, you -- you then ran a

7    regression to test whether the structure of

8    demand for apps was logit.

9        A.    I think that's fair, that I -- I did try

10   to assess which demand assumption best explained

11   the patterns in the data.

12       Q.    Okay.  Now -- and then you took the

13   formula from that Miller article -- after you ran

14   the regression to test the logit demand, you took

15   that formula and you calculated pass-through

16   rates for each category of apps in the Google

17   Play store?

18       A.    Correct.  It begins at the app level,

19   and it's aggregated up to the category.  But,

20   yes, ultimately I wanted a -- I wanted a

21   pass-through rate for the category.

22       Q.    Right.  Did you calculate pass-through

23   rates for any individual app?

24       A.    Yes.  You have to.  On your way to get

25   to the category, you have to.

1      Q.   Did you calculate them for -- on a de

2  -- developer -- per-developer basis or a per-app

3  basis?

4      A.   It was at the app level.

5      Q.   Okay.  And if you'll go to -- again,

6  back to Paragraph 239 with your pass-through rate

7  formula.

8      A.   Okay.

9      Q.   And you have the formula there

10  "M minus Q sub J divided by M," right?

11      A.   Right.

12      Q.   And "M" is the size of the market?

13      A.   Correct.

14      Q.   And "Q sub J" is the number of

15  transactions involving a particular app.

16      A.   Correct.

17      Q.   Okay.  And the market here, this term

18  "M," is, essentially, the total number of

19  transactions of apps in the same category as the

20  app whose pass-through rate you're trying to

21  measure.

22      A.   Correct.

23      Q.   And so basically the formula to

24  calculate the pass-through rate for any app that

25  you've put forward is a hundred minus the app

Page 132

```
 1   share of all transactions in its category.
 2         A.    Fair.
 3         Q.    So just by --
 4         A.    Over -- careful caveat:  Over the course
 5   of the class period.
 6         Q.    Okay.
 7         A.    We're not going to look at it on a
 8   daily basis.  We're not going to look at like
 9   Dr. Burtis.  We're not going to look at it on a
10   monthly.
11         Q.    Okay.
12         A.    We're doing it over the -- over the
13   class period, over the database, over the range
14   of data.
15         Q.    Okay.  And why do you do it over the
16   class -- whole class period?
17         A.    Because I don't think it makes sense as
18   an economic matter that a firm is going to be
19   updating its -- its prices or its pass-through
20   rates on a daily basis.  I think that the
21   appropriate measure passed through.  There's,
22   basically, going to be too much volatility in the
23   -- in the share, right?  If you literally were to
24   do it down to the nanosecond, you'd be -- you'd
25   be getting different pass-through rates at -- at
```

1   different points in time.

2          I think it's much more sound, from an

3   economic perspective, to look at it over a longer

4   period of time.

5      Q.   So just if you applied your model on a,

6   say, daily or monthly basis for -- if you applied

7   your pass-through model on a daily or a monthly

8   basis, you would -- it would predict changes in

9   the price that developers charge that you don't

10  actually see in the real world.

11         MS. GIULIANELLI:  Objection to form.

12         THE WITNESS:  No, it would imply changes

13  in pass-through rates.

14         And it's important to note that I've now

15  tested, because Dr. Burtis found a few months,

16  you know, where somebody changes or someone goes

17  to a hundred, and I've now calculated that there

18  is very little variation across all apps as you

19  toggle through time.  She's not that sensitive to

20  doing it.  Of course, she can cherry-pick a

21  particular example that makes it look sensitive.

22         But we actually did the estimation,

23  and it turns out that the -- the app -- on -- on

24  average, a given app's implied pass rate is very

25  close to what it is across the entire damages

Page 134

1    period.

2    BY MR. RAPHAEL:

3        Q.   But the pass-through formula you have

4    would predict changes in the pass-through rate

5    from week to week or month to month if the share

6    changes.  Fair?

7        A.   If one were so inclined to measure it on

8    -- on a monthly or nanosecond basis, yes, you

9    could get very strange results.

10       Q.   Okay.  Could the formula you've got

11   here, the "M minus Q sub J divided by M," could

12   that be used to calculate pass-through rates in

13   any case where you know the unit market share of

14   an intermediary alleged to have passed on an

15   overcharge?

16       A.   I -- I -- I'd be reluctant to say that

17   the logit model could be applied to any case.

18   I'd want to confirm, first, as I did here, that

19   the logit model does a good job explaining the

20   relationship between prices and shares, as it

21   does here.

22           So I think you need some empirical

23   foundation before applying the logit model.

24   I think that would be a good -- good practice.

25       Q.   Okay.  Have you used the formula that

1  you used to calculate pass-through in this case
2  to calculate pass-through in any other case?
3      A.   I do not believe I have.  In other
4  cases, what I'm typically doing is regressing
5  retail price changes on wholesale price changes.
6      Q.   Okay.
7      A.   And that -- that's just not available
8  here.
9      Q.   All right.  To your knowledge, has
10  any economist used the formula you've used to
11  calculate pass-through in this case to calculate
12  pass-through in some other case?
13      A.   I -- I don't -- I don't know enough -- I
14  can't follow how pass-through is calculated in
15  every antitrust case.  I can tell you that the
16  logit assumption is one of the most common
17  assumptions that's used in antitrust cases there
18  is.
19      Q.   But --
20      A.   All right?
21      Q.   But you're not aware of this formula
22  being used to calculate pass-through in another
23  case.
24      A.   Oh.  Pass-through?  Well, the formula
25  is used to calculate price effects from, say,

Page 136

1    mergers.  It's one of the most common, you know,

2    formulas that are used.

3         Q.   Sure.  Well, --

4         A.   Cert --

5         Q.   -- ju -- just to be clear, the actual

6    formula that you used in this case in Paragraph

7    239, are you aware of that particular formula

8    being used for -- in any other case to calculate

9    pass-through?

10        A.   I -- I would -- I haven't seen -- I'm

11   only away of what's been used in cases that I've

12   calculated pass-through, --

13        Q.   Fair enough.

14        A.   -- all right?

15             And in those cases, I typically have the

16   luxury of having a database that I -- that allows

17   me to relate retail prices with wholesale prices.

18   That -- that didn't happen here.  That is kind of

19   my -- the standard way I -- I go about doing it.

20             Here, there was no analogous database.

21        Q.   Right.  So in the usual case, you look

22   at the actual pricing data to determine the

23   pass-through rate.

24        A.   Well, here I actually did look at the

25   actual pricing data, right?  I wanted to convince

1   myself that -- that prices -- movements in prices

2   could explain a given app's share within a

3   category.  It turns out it can.  It does it

4   really well.  I also wanted to convince myself

5   that changes in taxes did a good job explaining

6   prices.

7           So until I could -- I used that, as you

8   know, as my instrument in the first stage of my

9   -- of my regressions.  So I wanted to get my

10  hands dirty with the real data to get comfort in

11  knowing that the logit model did it -- did the

12  best job possible of explaining the variations in

13  the -- in the data that we see -- in the

14  transaction data.

15      Q.   Well, sir, did you do anything in this

16  case to measure a correlation between service

17  fees and actual prices that were charged for

18  transactions by developers?

19      A.   Yes.  Remember, there's a Table -- and I

20  think it's Table 9 -- in my initial report that

21  looks at how app developers have charged

22  differently for their -- for their apps --

23      Q.   But Table --

24      A.   -- when they -- can I just finish --

25      Q.   Sure.

1      A.   -- my answer?

2           -- when they -- when they're able to

3  avoid Google's, or in the case of YouTube, it was

4  Apple's take rate.

5      Q.   Well, Table 9's not a comprehensive

6  analysis of all developers, right?

7      A.   Well, it's not comprehensive because of

8  the challenged conduct here, right?  It -- the

9  -- we don't -- we don't get to see steering in --

10  in the real world because of the restraint,

11  right?  But the case in part, or in large part,

12  is about challenging that restraint.

13          So it is -- it is difficult to -- to

14  take advantage or exploit natural experiments

15  given Google's conduct here.

16      Q.   Right.  I'm -- I'm just asking.  You

17  didn't do any comprehensive analysis of any

18  relationship between service fees in the actual

19  world and developer's prices in the actual world.

20      A.   The -- the closest I did to that was I

21  did a comprehensive analysis of taxes at the

22  state level on prices -- app prices.  And I found

23  such a good relationship between those two that

24  it -- it is strongly indicative that to the

25  extent that the take rate works the same as an ad

1    valorem sales tax, you would also believe that

2    changes in take rates, all right, --

3         Q.    Right.

4         A.    -- would -- if -- if they were allowed

5    or induced through competition, would also be

6    -- would be predicted to cause changes in prices.

7         Q.    My question was you didn't do any

8    comprehensive analysis of the relationship

9    between service fees in the actual world and

10   developers' prices in the actual world using

11   actual data regarding those things.

12        A.    I couldn't.  I just explained why that

13   Google, for the most part -- if you look in terms

14   of share transactions -- were well in the high

15   90s of -- of take rates between ██ percent and 30

16   percent.

17             So for the vast majority of the class

18   period, Google has been charging the same take

19   rate.  And now you're asking me could I do a

20   comprehensive analysis across all transactions?

21   I have bad news for you.  Across most or almost

22   all transactions, there has been no variation in

23   the take rate to exploit.

24        Q.    Okay.  So I'm -- I understand you feel

25   like you couldn't have done it.  But I'm asking

1    you did you do any analysis of the relationship

2    between service fees in the actual world and

3    developers' prices in the actual world using

4    actual data.

5        A.   I did for Table 9 in my report for that

6    handful of examples, but I -- the next best thing

7    that I could do -- because you need variation.

8        Q.   Sir, I'm going to -- I'm going to

9    interrupt you because you're not answering my

10   question.

11            My question is, Did you do any

12   comprehensive analysis using actual data of the

13   relationship between service fees and the prices

14   that developers actually charged?

15            MS. GIULIANELLI:  And I'm going to ask

16   you that you allow the witness to answer the

17   question because I believe he was answering it.

18            THE WITNESS:  I think I have done

19   comprehensive analysis.  As you know, your --

20   your experts put forward experiments where they

21   think they're exploiting changes in service fees

22   looking -- and going and looking for changes

23   in prices, so I -- I have.  I've looked at

24   everything possible that would allow to you do it

25   in light of the restraints that -- that Google

1   has imposed throughout the class period.

2           This is why their examples are so

3   tortured.  They're looking at these slight little

4   variations that either barely applied to an app

5   or where prices couldn't change because of Google

6   restriction.  So I -- I did everything that I

7   could possible.  I'm telling you that the most

8   comprehensive thing that -- that relates would be

9   the relationship between ad valorem sales taxes

10  at -- at the state level and prices, which do

11  -- are -- there's a tight relationship between

12  those two, right?

13      Q.   Right.  But the analysis of ad valorem

14  sales taxes doesn't use actual data regarding

15  developers' service fees and prices in the actual

16  world, correct?

17      A.   That is correct.

18      Q.   Okay.  And so you haven't done any

19  analysis -- using actual data on prices and

20  service fees for the entire set of developers

21  that's at issue in this case, you haven't done

22  any comprehensive analysis regarding the

23  relationship between those things, correct?

24      A.   I told you I could not do it given the

25  nature of the lack of variation --

Page 152

1    done that in a -- in a peer-reviewed piece.

2         A.   I'm not -- I'm not aware of it, no.

3         Q.   Okay.  Now, you would agree that the

4    pass-through rate is going to depend on the shape

5    of the demand curve.

6         A.   Sure.

7         Q.   And the Miller article that you relied

8    on for your pass-through formula has several

9    other formulas for other shape demand curves that

10   you didn't use.

11        A.   I ended up doing a lot of different

12   demand curves.  But the one that I ultimately

13   used and relied upon was the logit model.

14        Q.   Okay.  And why did you choose the

15   formula from the Miller article that was

16   associated with logit demand?

17        A.   Well, hold on.  That was a non sequitur.

18             I -- once I figured out the logit was

19   the best model at explaining the variation in the

20   data, that took me to the implied pass-through

21   rate from the logit model.

22        Q.   Understood.  And what did you do to

23   figure out that the -- let me ask it differently.

24             Did you -- did you test the structure of

25   demand using any other formula besides the

Page 153

1   formula associated with logit demand?

2        A.   Yes.

3        Q.   What other structures of demand did you

4   test?

5        A.   I tested linear and I tested constant

6   elasticity.

7        Q.   Okay.  And did you describe those tests

8   in your report?

9        A.   No.  Because I ultimately didn't rely on

10  them.  The -- they just did not do as -- as good

11  of a job and explain variations in the data as

12  the logit model.

13       Q.   Okay.  And then how about the AIDS

14  demand?  Did you -- in your reports, did you talk

15  about any test that you did to see whether demand

16  for apps fit that structure of demand?

17       A.   No.

18       Q.   Okay.  Why not?

19       A.   I felt that the logit did such a good

20  job at explaining variation, that the way to kick

21  the tires was to try linear and -- and constant

22  elasticity.  These are the three, you know,

23  primary models.  I'd grant you that A -- the AIDS

24  is also up there, but I felt that I had -- I had

25  run a sufficient test to convince me that -- that

Page 158

1    they would land on Microsoft's productivity

2    package would be higher than if they were to land

3    on some obscure package within productivity apps.

4    I mean, it's -- it's very intuitive.  It's very

5    natural.

6         Q.   Now, your pass-through formula is based

7    on logit demand.

8         A.   Yes.

9         Q.   And one feature of logit demand is that

10   all goods in the market where demand is being

11   measured are substitutes.

12        A.   I think that's a general -- that is

13   generally the case.  That's fine.

14        Q.   Okay.  Is it your opinion that all apps

15   in each Google Play app category are substitutes?

16        A.   No.  And that's why I invoked this

17   concept of cluster markets.  Like, you could --

18   you could take Microsoft's Excel and Microsoft's

19   Word and ask me if they're substitutes, and I

20   would say at -- at that level, they're not.

21   But -- but when you think about the fact that

22   Microsoft and Google are actually competing with

23   a package of productivity apps, that -- that it

24   would make sense to think of that as something

25   more akin to a cluster market the way that we saw

1   in the Staples and Office Depot case, that paper

2   clips and a ruler aren't necessarily substitutes;

3   but if the people generally tend to buy those

4   things from the same place, they can belong in

5   the same product market.

6       Q.   So -- but -- but it's not your opinion

7   that all apps in each Google Play app category

8   are substitutes.

9       A.   I just gave an example of Excel and Word

10  as being more -- more of complements, right?  But

11  -- but when you think about the -- the cat -- the

12  productivity suite that Google is offering, that

13  -- that's clearly a substitute to what -- what

14  Microsoft is offering in its productivity suite.

15      Q.   Right.  So some of the apps in each

16  Google Play category could be complements,

17  correct?

18      A.   They could be.

19      Q.   And some could be substitutes.

20      A.   They could be, yes.

21      Q.   Right.  And you haven't put forth a

22  model in your report to determine which apps in

23  each category are complements and which are

24  substitutes?

25      A.   No.  And it's not necessary to get the

Page 160

1   implied pass-through rate.

2        Q.    Right.

3             Could you go to Paragraph 78 of your

4   reply report -- well, actually, let me ask you:

5   Are you opining that all apps in each category

6   are part of a cluster market?

7        A.    No.  You -- you saw in my report.  I'm

8   saying that they don't need to necessarily be a

9   market, a relevant market, for antitrust

10  purposes, and I give you a citation for that.

11            I think that if you -- if you really

12  wanted to -- if you forced it into that box,

13  which is unnecessary and unnatural, that you

14  could -- you could get there by -- by

15  understanding the categories functioning

16  more like a cluster market.

17       Q.    Right.  But you're not actually offering

18  the opinion that all of the apps in each category

19  are part of a cluster market.

20       A.    No.  I -- I'm offering the opinion that

21  -- that everything within the category -- that

22  the category definitions from Google define the

23  -- the contours or the arena of competition among

24  apps in that category.

25       Q.    Okay.  And, again, let's go to Paragraph

```
 1   these other dimensions that I just gave you --
 2   you know, consistently downward sloping,
 3   statistically significant -- and -- and you're
 4   looking for a tie-breaker that -- that at that
 5   point comparing the R-squared could make sense.
 6        Q.   So you're saying that you ran -- you ran
 7   regressions using linear and log-linear demand?
 8        A.   Or constant -- we call it "constant" --
 9        Q.   "Constant" --
10        A.   -- "elasticity."
11        Q.   "Constant elasticity" demand, and you
12   saw R-squareds that were lower than the R-squared
13   you got for logit?
14        A.   Yes.  But I don't want you to think that
15   that was dispositive.  That was one of many
16   dimensions over which I made the -- the call.
17        Q.   Right.  But the regressions you ran for
18   linear and constant-elasticity demand, those
19   weren't included in the reports or the backup to
20   your reports that you disclosed, right?
21        A.   I did not turn over those regressions,
22   but you can -- your -- your economists can run
23   them for themselves to get confirmation that --
24   that they don't do as good of a job explaining
25   that data.
```

1    that's being charged for these transactions here.

2    So you're -- you're giving -- you're assuming

3    quite a luxurious margin for the app developer to

4    make that -- that math hold.

5         Q.   Fine, sir.  I'm just asking whether, if

6    that were the case, that the math that I'm giving

7    you, that the effective reduction in marginal

8    costs from a 30 percent service fee to a 15

9    percent service fee for a developer with a dollar

10   marginal cost would be 25 cents instead of the

11   $1.49?

12        A.   All I'll -- all I'll grant you is that

13   if you go to your equation -- your preferred

14   equation on Page 104 and make the assumptions

15   that you did with a dollar and the move from 30

16   to 15, the math would suggest 25 -- 25 percentage

17   points of the margin cost.  If you assume the

18   margin cost is a dollar, then it would be 25

19   cents.

20        Q.   Right.  And so what I'm -- what I'm

21   -- so you agree with me, then, that if you

22   actually calculated the average marginal cost for

23   what -- for a developer on an in-app purchase, it

24   could change the effective marginal cost paid by

25   the increase for the developer in an amount

1    that's less than the $1.49 that you have here in

2    Table 5?

3         A.    No, you don't need to do that under the

4    logit model.  I will grant you that under Page

5    104, the generalized equation, that had I used

6    that to estimate my pass-through, that it would

7    depend on the marginal cost.  But knowing that I

8    couldn't observe the marginal cost, right, I

9    -- among myriad other reasons that I gave you, I

10   went with the logit model because I didn't need

11   to estimate the marginal cost of the developer.

12        Q.    Right.  So you -- so you went with the

13   logit model for pass-through that you used in

14   your report rather than the formula in page -- on

15   Page 104 that depends on marginal costs because

16   you couldn't observe the marginal costs?

17        A.    No.  That wasn't the only reason.  It

18   was another beneficial property of logit that it

19   doesn't require you to go out and estimate a

20   variable that might be impossible to observe,

21   right?  And so -- but that's not -- that's not

22   the only reason or the primary reason why I chose

23   logit.  It just happens to be a beneficial

24   property.

25        Q.    Why would the model in Paragraph 225 not

1    broke out among developers such that we had guys

2    who were otherwise going to be at 99, some would

3    go to 49, some would go to 79, that's less

4    revenue -- that's less revenue for Google.  So

5    Google had incentives to want to keep prices not

6    falling below a price floor.

7        Q.   So other than the -- the 99 cent price

8    floor that you're referring to, are you referring

9    to any or have you offered an opinion that any

10   other constraints by Google would affect a

11   developer's ability to depart from focal point

12   pricing?

13       A.   Absolutely.

14       Q.   Okay.

15       A.   The anti-steering rule, --

16       Q.   Okay.

17       A.   -- right?  So I go through kind of a

18   long example, but I thought it was important, of

19   -- of the developer who was at 1.99, and then

20   given the opportunity to steer finds that 1.79,

21   you know, under 50 percent steering the sharing

22   rule, would be profit maximizing, right?  So

23   Google did not present opportunities to steer.

24   And so then for your experts to say, Hey, there

25   isn't any steering here, well, I mean, they were

1   constrained by Google.  Had they been given the

2   opportunity to deviate from the 99 and had it

3   been profit-maximizing to do so in order to --

4   you know, to save the delta between what Google's

5   take rate was and the rival's take rate, it would

6   have happened in spades, right, but it didn't,

7   and it didn't because of the constraints.

8       Q.   Sir, is it your opinion that no

9   developer in the actual world was committed to

10  focal point pricing?

11          MS. GIULIANELLI:  Objection.

12          THE WITNESS:  I don't think that people

13  commit to focal point pricing.  I think that

14  focal point pricing is -- is a function of what

15  your competitors are doing.  It's a function of

16  the rules of the road that you're operating

17  under.  It's a function of whether or not you

18  have steering opportunities.

19          So it's -- it's -- it's very

20  complicated.  But I will say that what Dr. Burtis

21  said on this point, which is that because we see

22  a lot of 99, we're necessarily going to see a lot

23  of 99 in the but-for world, I say not true.  It's

24  not true, because it itself is constrained by the

25  conduct -- by the challenged conduct.

1    BY MR. RAPHAEL:

2        Q.   I guess what I'm asking is, is it your

3    opinion that focal point pricing doesn't explain

4    any developers' pricing in the actual world?

5        A.   No, I think that's too harsh.  I think

6    that focal point pricing is an important

7    consideration here.

8        Q.   Okay.  Now, and -- and the price floor

9    you talked about of setting prices at 99 cents,

10   that wouldn't affect developers who set their

11   prices quite a bit above 99 cents?

12       A.   That's fair.  I think that, when we

13   looked at the data, it's about -- it's about 20

14   percent of developers were at that 99 cent, so I

15   agree with you that -- that those would be the

16   ones who were constrained from -- from moving

17   downward.

18       Q.   Okay.  So the other 80 percent of

19   developers wouldn't be affected by what you're

20   calling the price floor that Google had in place?

21       A.   Correct.

22       Q.   Okay.

23       A.   With one caveat in the sense that there

24   could be spillover effects from a floor being set

25   at 99 on what the next step up would be, but I

1   just wanted to put that out there that that's one

2   consideration.  But in general, if you're looking

3   for -- if you want to go looking for where the

4   constraint hit hardest, you would look at the

5   guys who were stuck at 99.

6       Q.   Okay.  Does your formula for calculating

7   pass-through rates account for focal point

8   pricing in any way?

9       A.   Well, it's solving for a percentage of

10  the cost savings that would be passed through to

11  end users, so I just think it's orthogonal.  It's

12  just not -- it's not that it accounts or doesn't

13  account, it's just it's telling us something

14  else.  It's telling us how a developer would

15  pass-through a save -- a reduction in marginal

16  costs to its end user.

17      Q.   Okay.  But you -- you say it's

18  orthogonal.  I just -- just want to make sure

19  we're clear.  Does your formula for calculating

20  pass-through rates account for focal point

21  pricing?

22      A.   I don't think the -- the -- the logit

23  model is -- is thinking about these rigidities

24  that we see in the actual world caused in part by

25  the challenged conduct.  But when you move to a

Page 204

1   but-for world without these restraints, without

2   the price floor, without the anti-steering rules,

3   we're going to see a wider spread of prices for

4   sure.  And, again, the last thing I want to say

5   is that what the formula is giving us in the

6   aggregate for a category is the percentage of

7   share.  It's not telling us -- we're not asking

8   the model -- if you go to my final tables, which

9   breaks it out by -- by app category, we're trying

10  to use it to estimate damages in terms of

11  overcharges to the consumers.  We -- we're not

12  using the model to make a precise prediction of

13  what Tinder would charge its customers in the

14  but-for world in October of 2019.  That's not

15  what -- we're not asking that of the model, all

16  right?

17      Q.   So your model is not actually -- your

18  pass-through model is not trying to predict what

19  any developer would have charged its customers in

20  the but-for world during the class period?

21          MS. GIULIANELLI:  Objection.

22          THE WITNESS:  I don't think that we are

23  aiming for the price of a given app in a given

24  month on a given plan.  That's not what we're

25  trying to estimate.  What we're trying to figure

1    out, for the purposes of impact, is to say that

2    if all app developers within a category achieved

3    a certain cost reduction by virtue of enhanced

4    competition and, thereby, lower take rate, how

5    much of that would be shared with consumers in

6    the aggregate across the category.  And, you

7    know, what I'm hearing is, oh, my God, have you

8    ruled out 99-cent things or things that end in 9?

9    No, we haven't -- we haven't ruled that out.  But

10   we're talking about the share of the costs that

11   are being saved in the aggregate across a

12   category.  We can allow for 79-cent pricing, we

13   can allow for 99-cent pricing, 29-cent pricing in

14   the but-for world.  We're not putting any

15   restrictions on -- on what the price of a

16   particular app in a particular plan at a

17   particular point in time are.

18   BY MR. RAPHAEL:

19        Q.   Right.  So I just want to make sure I

20   get an answer to my question.  So your model for

21   a pass-through isn't trying to take account in

22   any specific way for the phenomenon of focal

23   point pricing?

24        A.   I -- I don't -- I don't think that the

25   mod -- that particular logit estimate of the 89

1    percent is accounting or needs to take account.

2    I think I need to account for it in my overall

3    opinions about what the but-for world would look

4    like.  But the logit model is just telling us

5    what the implied pass-through rate is given a

6    reduction in costs, given the concentration

7    -- the typical concentration we see within

8    categories in -- you know, in the app industry.

9         Q.   Okay.  Your regressions regarding the

10   logit demand, did they have any fixed effect or

11   other mechanism to control for focal point

12   pricing?

13        A.   Well, they did use fixed effects.  I

14   don't know if you meant to say that, but they

15   don't have a separate control variable for focal

16   point.  But it is true, now that you brought this

17   up, we do have app fixed effects, right?  So to

18   the extent that an app stayed constant at a given

19   price over time or always ended at 99 -- let me

20   just say for the record what fixed effects is.

21   Quite literally, it's controlling for any of

22   these attributes of the app that are constant

23   over time.  And so if that tendency to want to

24   end in 99 or 79 or 69 is constant, then, yes, my

25   regressions control for it.

Page 293

1   Google.

2   BY MR. RAPHAEL:

3       Q.   So the answer to my question is yes, all

4   developers would participate in the play points

5   program in the but-for world?

6           MS. GIULIANELLI:   Objection.

7           THE WITNESS:   I -- I like the way that I

8   said it better, which is that if a developer

9   thought that a substantial percentage of its

10  customers were going to be redeeming points via

11  this new and improved program, and if Google made

12  some kind of requirement that said you have to

13  sign a piece of paper so that you can accept the

14  payments under this program, the developers would

15  do it.

16  BY MR. RAPHAEL:

17      Q.   Do you know if Google has that

18  requirement in the actual world?

19      A.   I don't know if the Google has the

20  requirement in the actual world.

21      Q.   Would that change your opinion as to

22  what would happen in the but-for world?

23      A.   No.   Because the program, for all intent

24  and purposes, is effectively zero right now.

25  Google doesn't need to be generous with its

Page 294

1   points program because Google is immunized from
2   competition.  Now, I think it would be
3   considering to look at career where Google was
4   forced because of one store to increase its
5   subsidy to around █ percent and all of a sudden
6   that's starting to approach something real.  You
7   know ███ percent is not real.  ███ percent
8   actually might make a difference on purchase, and
9   I'll just leave it at that.
10      Q.   What's your standard for the percentage
11  of cash back accounted for by play points that
12  would make a difference to competition?
13      A.   Not about difference to competition.
14  It's what would be sufficiently generous such
15  that consumers would partake in the program.
16      Q.   And what amount of a cash back would be
17  sufficiently generous that consumers would
18  partake in the play points program?
19      A.   Well, when you think about, like, AMEX
20  customers partaking in their points that American
21  Express gives back, I think AMEX is more generous
22  than 0.2 percent.  In fact, Williams has the --
23  the percentage that AMEX shares with its -- with
24  its customers.  It's over 1 percent.
25           So, you know, I don't know exactly the

1      A.    I think the model is.  I think that at 8

2  percent, the economic intuition -- well, this is

3  the intuition that I'm drawing from the model --

4  is that when the benefit gets so large, that is

5  going to spur participation and usage in the

6  system.

7      Q.    Great.

8            Your -- your testimony here today, sir,

9  is that you have a model in your reports that can

10 tell the Court and the jury in this case which of

11 the members of the putative class would have

12 signed up for play points and who would have used

13 them?

14           MS. GIULIANELLI:  Objection to the form.

15           THE WITNESS:  I didn't say that.  I said

16 that if the but-for subsidy were to rise to 8

17 percent, then it would be embraced -- the play

18 points system would be embraced across the class

19 just as the way that the points system in the

20 AMEX marketplace is embraced across American

21 Express users.

22 BY MR. RAPHAEL:

23     Q.    Okay.  So I want to -- I want to be

24 clear.  You have -- your testimony is that in the

25 but-for world, every member of the putative class

1   would sign up for the play points program and use

2   their play points?

3            MS. GIULIANELLI:   Objection.

4            THE WITNESS:   I cannot -- this is the

5   first time I've been asked that question.   I'm

6   just hearing it afresh, right?   I cannot fathom

7   why a user would say, no, take back -- I was

8   going to spend a hundred dollars and I realize

9   you're trying to give me $8, but, no, I don't

10  want the $8, I want to spend the full hundred

11  myself.   It would be crazy -- it would be crazy

12  to -- to do that.

13  BY MR. RAPHAEL:

14       Q.   Sir, in the actual world, some consumers

15  don't sign up for play points or don't use the

16  play points that they earn, correct?

17       A.   We've established, I hope, that when you

18  get ███████ back on a hundred dollar purchase,

19  I'd say to myself I'm a busy dude, I don't know

20  if I'm going to sign up for this thing and go

21  through the hassle for the ███████ subsidy.

22       Q.   Right.   And so your testimony is that if

23  Google changed the play points rate that you've

24  put in your report, that every member of the

25  putative class would have signed up for the play

Page 393

1    the allocation of damages, as you recall, I do

2    have a method for allowing a certain amount of

3    granularity, at least at the category level,

4    with respect to both the take rate and the

5    pass-through rate.

6         Q.   Right.  And does -- your model of

7    allocation of damages, is that a hybrid model?

8         A.   I could do it for the hybrid model.  The

9    only one that I think you've seen it for the take

10   rate competition.

11        Q.   But in your reports you haven't done a

12   hybrid model that does the damages allocation for

13   each individual transaction.

14        A.   I don't do it at the transaction level.

15   I don't do it at the customer/app payer level.

16   But I could -- if the fact-finder were so

17   inclined to allocate damages that way, the table

18   could go on for hundreds of thousands or millions

19   of rows, and we could get -- we could get to you

20   the -- with granularity, the pass-through rate

21   and the but-for take rate for each app/consumer

22   payer, if you were so inclined.  I think that

23   would be very painful, --

24        Q.   Right.

25        A.   -- and I didn't want to show you that in

1   the report because it would -- it would go on for

2   so long.  So I showed it to you at the category

3   level.

4       Q.    And in those millions of rows that you

5   described, would each one of those rows have a

6   net change in play points and the pass-through of

7   the service fee rate that would -- that would,

8   essentially, be -- would lower the amount that

9   Google takes home compared to the actual world?

10      A.    You could derive that, yes, for each

11  row.  You could.

12      Q.    But is it your opinion that that would

13  actually be the case for every single row if you

14  applied the hybrid model at the individual

15  transaction level?

16      A.    How about at the -- I wouldn't do it at

17  the tran -- we could did it, how about this, for

18  customer/app payers.  There would still be

19  millions, right?

20      Q.    Sure.

21      A.    Is that enough?  We don't need to go

22  into the tens of millions.

23      Q.    Sure.

24      A.    If you were so inclined, you could

25  compute the -- the net takings, if you will, by

Page 397

1                    C E R T I F I C A T E

2

3         I do hereby certify that I am a Notary

4    Public in good standing, that the aforesaid

5    testimony was taken before me, pursuant to

6    notice, at the time and place indicated; that

7    said deponent was by me duly sworn to tell the

8    truth, the whole truth, and nothing but the

9    truth; that the testimony of said deponent was

10   correctly recorded in machine shorthand by me and

11   thereafter transcribed under my supervision with

12   computer-aided transcription; that the deposition

13   is a true and correct record of the testimony

14   given by the witness; and that I am neither of

15   counsel nor kin to any party in said action, nor

16   interested in the outcome thereof.

17

18        WITNESS my hand and official seal this

19   13th day of May, 2022.

20

21

22        _____

23                    Notary Public

24

25

# REDACTED VERSION

# Exhibit A57
# to
# C. Cramer Declaration

# EXHIBIT 12

# FILED UNDER SEAL



CONFIDENTIAL

GOOG-PLAY-000355570.R

Today we want to review the pricing guidance initiative that Commerce have been partnering with Growth Consulting, Console, ProdOps and other teams on and get early feedback on the initiative to unlock more buyers through providing localized pricing insights and tools to our developers. We also want to discuss one of the key capabilities in order for developers to price locally - the ability to price below $1 USD. We have enabled this in many markets already and we want to expand the list of markets and would love to get a decision for the same.

GOOG-PLAY-000355571.R

**What is localized pricing?**

Customers around the world have varying degrees of purchasing power. Localized pricing is a way to reach buyers who are priced out of monetized experiences in apps and games

Google Play

As we know, Play's end users are not all the same. Many have varying degrees of purchasing power depending on their location, income status and needs. Localized pricing is a way to reach buyers who have been historically priced out of monetized experiences in apps and games.

CONFIDENTIAL

GOOG-PLAY-000355572.R

**Using local price points to unlock buyers is not new; common practice across many digital industries**



"When you submit a game to Steam, **Valve automatically suggests prices for local currencies in other regions.** You have the option to change these numbers at will...likely a combination of current exchange rates, regional sales trends, and other factors" - *The weird economics behind steam prices around the world, PC Gamer*



"..What India doesn't have, however, is a culture of spending on video...**In India, where a movie can cost as little as 29 rupees** (44 cents) and monthly subscriptions are as little as 200 rupees ($3)... **Prime costs $15 per year** — whereas Netflix charges over $7.50 per month." - *How Netflix Lost Big to Amazon in India, Wired*

Google Play

The idea of Localized pricing is not new. Other platforms have been taking advantage of specialized pricing by market. Steam for example, suggests adjusted prices by region to developers on their platform. And another interesting case study is the journey Amazon prime went through lowering prices in India to capture market share - Prime costs as low as $1.25/month or $15/year in IN

CONFIDENTIAL

GOOG-PLAY-000355573.R



We're also seeing devs on Play seeing dramatic growth by focusing on regional users. Free Fire has had a regional growth strategy which includes identifying pricing and payment strategies by market. And that regionally sensitive strategy has been very successful for them at the same time as other publishers have largely ignored those markets. Other developers like Miniclip and IGG to name a couple have also experimented with localized pricing as well. Anecdotes like these got us excited about extending this knowledge to more developers on the platform so they too could have a meaningful presence and grow in emerging markets.

CONFIDENTIAL



Talking to these developers, it's clear that they have made buyer penetration in emerging markets an explicit priority and shifted their pricing strategies accordingly.

CONFIDENTIAL



The developers who did adopt regional pricing are also seeing more benefits that increased buyers, they also report a higher retention with users making additional purchases at the same rate as those buying at higher price points. They also like that they are not dependent on a few whales.

GOOG-PLAY-000355576.R

## Localized Pricing Guidance Goals

*Offer a world class Pricing Guidance System that helps developers best monetize our diverse, global user base by helping to **adjust prices to better reflect local demand.***

**Objectives we want to achieve for Developers**

- Convert users to paying users in the game (spender conversion)
- Increase buyer rate (PAU/DAU)
- Net neutral/+ve short term revenue without cannibalization*

**Plan**

- Analysis : Play data insights and features that are the most useful for pricing guidance for developers
- Research : Identify developers and markets that will most benefit
- Develop : Tools for these developers to enable localized pricing

*long term, we want to be able to demonstrably show LTV improvement

Google Play

Our goal is to offer a world class price guidance system so more developers can advantage of localized pricing to monetize our diverse, global user base by adjusting prices to better reflect local demand. This pricing system will analyze an app or game's SKU distribution and compare it against peers, genre leaders at a country level and surface those opportunities to our developers. Our objectives are about increasing spender conversion and buyer rate while also avoiding revenue cannibalization. Here developer and google incentives are very aligned as we try to adapt for users everywhere.

GOOG-PLAY-000355577.R



So what have we done already and what does this project that could complement that work? Play already has been projects in this area. We already offer more localized promotions to help convert buyers in these markets. We also offer some localization tools such currency conversion, suggest charm pricing and calculate FX rates.

Where we can really do more is providing pricing guidance or tools and that's what we want to focus on today : For example, lowering minimum prices in countries to reflect purchasing power parity better so developers can price lower if they want to. We do this in certain markets and ahve seen promising results and later in the deck, we will bring up a proposal to expand to more markets and eventually to have min prices reflect PPP more globally. We also think we can do more in providing more pricing insights looking at Play data to help developers correct this value mismatch using the levers that they have : introducing new SKUs at different price points for example. We could then go a step further and enable developers to test different prices.



Let's deep dive into localized pricing guidance first

CONFIDENTIAL



As part of the localized pricing plan,  one of the key concerns that we already knew in having different prices in different markets, especially for big developers was around arbitrage abuse so we wanted to add that a workstream from the start. Next, we wanted to do some initial developer research and understand needs in this space. Next was to understand what insights we can actually get using Play data and tools we can build that would be helpful to inform regional pricing strategies. Lastly, we wanted to have a plan on how best to turn this into a scaled offering that growth consulting can take forward and could be incorporated into Console. We kicked off these workstreams in Q2 with the goal to build a localized pricing prototype that could help prove out the concept and inform how we scale.

In the next few slides, I'll go through the progress we made in each of these workstreams.  Just note that while both games and apps are part of this initiative, we have started with games initially, so the focus of this presentation will be mostly games, although the underlying framework can be applied to both games and subs. We plan to build a subs specific version in Q4/Q1.

GOOG-PLAY-000355580.R

As we talked about earlier, some devs were concerned about users intentionally spoofing location for the explicit purpose of gaining access to lower prices in another country. This is spearheaded by the abuse team - where they leveraged signals from ARES and created a model to detect arbitrage based on location for many use cases, one of which is price related arbitrage. Our goal is to identify the size of the problem as well as refine the model further if needed. This was dark launched for all transactions i.e. doesn't actually block transactions, but just flags them so we can analyze.  We compared abuse in the ▇▇▇▇▇▇▇▇ we were running to overall #s. So far, there seems to negligible abuse. We are currently working on refining this model and launching a live version.  Once that's fixed, we plan to launch live for all transactions in Q4.

Now I'll hand over to Dafna to talk through some of the developer research and findings

CONFIDENTIAL

To assess the interest level and understand key concerns and needs we did some initial outreach through various ways: we had a small survey for top managed developers, we collaborated with the marketing team to survey over 200 developers as part of our Developer Research Community.
We also interviewed BD managers and developers directly as well as reviewed existing external and internal research.

The feedback we've received in a variety of methods seem to align. We got some good directional product insights, and looks like there is a lot of interest in the topic.
Another insight we found very interesting is that

developers care deeply about increasing their buyer penetration in global markets.

33% of all developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative). This number when up to 43% for companies with over 250 employees.

As a next step the console team is also planning a UX research to go deeper into developer pricing practices and get feedback on our proposals

CONFIDENTIAL

GOOG-PLAY-000355583.R



So what are developers asking us for?
The top feature ask is around price point recommendation. Even when they want to localize prices, they don't know by how much. Should the India price for example be ½ as the US price? 1/10?

They also want us to help assess their performance, and even provide the testing tools, and even some of the more sophisticated developers don't have the right tools to a/b testing prices.

As Neethi mentioned, some are concerned about price arbitrage and they rely on us to help.

GOOG-PLAY-000355584.R

Latestly, they look for easy solutions they can understand.
For smaller Developers this might mean a one-click solutions, but it's also a lot about education and how to

18% of IAP developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative)
33% of all developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative)
43% of companies with 250+ employees said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative)

CONFIDENTIAL



Ok so how are we testing and validating the product and who are we working with? Our plan breaks up into three phases - high touch, medium touch and console. In order to get quick feedback on the methodology and insights, we partnered with a High Touch GVP partner who was willing to implement our advice, share feedback and help us iterate quickly. We have used the feedback from this EAP to iterate and validate the product with even more developers through Growth Consulting. Finally, we will leverage those learnings to scale insights and tools through self service functionality in the Console.

GOOG-PLAY-000355586.R



For our high touch partners, we've offered two service levels - Option 1 is Play providing pricing insights for specific countries by benchmarking an app against its peers and genre. Our Price Benchmarking report would highlight SKU coverage gaps and the value deficit for SKUs for players. Example slide from the report is shown on the right. The Developer would test these recommendations and share their results with Play.

Option 2 is the full service option that includes the Price Benchmarking report but we would also A/B test the recommended prices for the developer and share results of the experiment with them. The developer would make the necessary changes assuming that the

GOOG-PLAY-000355587.R

experiment was successful. We're currently running pricing experiments with  So far, the results are very promising where one of the variants is seeing significant uplift in buyers, orders and overall spend. ▮ is encouraged and we've begun engagement with another studio at the developer –

I'll add that there are two advantages of the full service for Play: 1. We control the data resulting from the pricing analysis so we can measure the effectiveness of our pricing recommendations and 2. We can explore what a potential price A/B testing product could look like.

--
▮ asked if we could do the experiment for them. The complexity of organizing and testing SKUs across markets was something they didn't want to deal with.

GOOG-PLAY-000355588.R



We've had a few learnings given our conversations with developers and working with ▇ on the EAP. Our goal is to surface opportunities and provide guidance - the developers should decide on what they want to do with that information. ▇ for instance wanted to test a blanket 50% off all SKUs in specific markets. They wanted to be aggressive but others might not choose to be.

Even sophisticated developers don't invest a whole lot of time into pricing strategies across markets. Even when they implement localized pricing, they approach it in an ad-hoc fashion because they don't have context into the opportunity. We can point their biggest opportunities across markets and even recommend specific SKUs they should introduce. That context is

GOOG-PLAY-000355589.R

invaluable.

█████ was willing to manage the PR risk, handling customer support issues, etc. that resulted from the experiment, although they haven't seen any issues so far


Neethi's notes on uplift :

For ████ we got stat sig orders and buyers pretty quickly at 5% but we had to go to 20% for an arm and run it for 2 weeks to get stat sig on spend. We heard from ██████████ too that they have to run the experiments for longer to understand impact on LTV and not just move money around. Not all developers will be willing to take that PR risk for running for so long. So we are workign wtih bizops to fund other ways to measure impact from localized pricing from a spend perspective. One idea is that just like Play, in many games HVUs account for most of the spend. While we don't want HVU cannibalization, we expect most of the spend uplift to come from non HVUs. So we did an analysis to calculate uplift without HVUs and we saw some encouraging results. We need to explore this more as we look at success metrics besides buyer and order uplift.

CONFIDENTIAL



So what is our plan for Q4 and in 2021?

We plan to expand the ▮▮▮▮ EAP to more titles at the company targeting more countries. We will also engage with ▮▮▮▮ starting with option 1. On the apps side, we're currently narrowing down a partner to work with - we've had strong interest from subs developers. We're working with growth consulting to iterate, scale and automate the insights and reach even more developers. We've generated a list of partners that we will be delivering pricing consultations starting this quarter and into 2021.

And we're actively in conversations with the Console team to bring these insights to the console. We're leveraging what we learn from high touch and medium

GOOG-PLAY-000355591.R

touch to inform the design of pricing insights in the console. Relatedly, we're also evaluating if the price a/b testing product has broad applicability.

CONFIDENTIAL

GOOG-PLAY-000355592.R



GOOG-PLAY-000355593.R

## Sub dollar proposal: executive summary

- Developers have been asking for the ability to set **very low value SKUs** (sub-dollar)
- We have traditionally limited the prices to ~1 USD, but we have **opportunity to go lower**
- We want to go **as low as transaction costs allow** but there are some considerations we need to take into account like changes in the FOP mix that impact fees, FX rates changes and Loyalty
- We tested lowering the minimum prices in 20 markets, primarily emerging markets like India & Brazil
- There's evidence that sub-dollar pricing has the **potential to unlock new buyers so we want to expand further**

Proposal:

1. Lower the minimum prices in 20 additional markets & test sub-dollar pricing in mature markets
2. Work with xfn teams (Finance, Payments, Loyalty, etc.) on a path forward for a global roll out

Google Play

CONFIDENTIAL



A key component of price localization is adjusting the prices to the local purchasing power and consumer expectations, and in many markets this means offering very low prices, which is what refer to as sub-dollar pricing.

Let's take Spotify for example.

Many of us are familiar with the US pricing, were the shortest duration is monthly and the minimum price is USD 9.99 for a month

In India however, you can buy daily or weekly subscriptions with a cost as low as 13 INR which is about 17 US Cents. The monthly subscription price is also localized at INR 129 or USD 1.72

GOOG-PLAY-000355595.R

Sub-Dollar pricing is expected to unlock new buyers, especially in emerging markets, and as we discussed before, increasing the buyer share is one of the top KPIs for our developers.



Besides buyer uplift, there are many other benefits to sub-dollar pricing.

This is great for our users, making paid digital content more accessible to them. According to our surveys in SEA and LatAm,  price was mentioned as the top reason when we asked Play "nevers" why that have never made a purchase on Play.

From the developers perspective, they want more flexibility around their pricing. Many Developers that tested sub dollar pricing find this strategy effective, and they have asked us to expand the sub dollar capability to more markets.

CONFIDENTIAL

GOOG-PLAY-000355597.R

In addition to making our users and developers happy, this is also good for the regulatory environment, giving developers more control. It's also helping us support the Payments team negotiating lower fees from our payment partners.

CONFIDENTIAL

GOOG-PLAY-000355598.R



The reason we are discussing this today, is because developers are not always able to offer those low prices due to our pricing policy in which we define the SKU price range developers can set in the console. Why don't we just allow 1c SKUs? We limit the minimum price due to our transaction costs.
As a rule, the min price is set to the local currency equivalent of 1 USD, but we have an opportunity to go lower while still covering our transaction costs.
In parallel, we are also aiming to drive down transactions costs, by negotiating better deals with our payment partners, or launching more FOPs with lower fees.

In an effort to better align our price ranges with the

GOOG-PLAY-000355599.R

local demand, in 2015 we have lowered the minimum prices in 20 key emerging markets, such as india, brazil and indonesia, and today, we are proposing to expand it to more markets.

I'll hand it over to tung who will share some of the results.

E.g. 7 BOB Bolivian boliviano = 1 USD
10 THB = 0.32 USD
2200 TZS Tanzanian shilling = 0.95 USD

CONFIDENTIAL

GOOG-PLAY-000355600.R



Countries listed here represented ▮▮▮ of total sub $0.50 transactions in the 20 launched countries

Methodology: Look at the trend for sub $0.50 transactions and $1+ pricing by country to identify the point where there is a trend divergence. Predicted sub $0.50 order volume is based on the assumption that sub $0.50 would continue to perform in line with the trend of $1+ transaction which was observed before the divergence. Observed vs predicted is based on the average difference between June 2019 – Feb 2020. The time period was selected to eliminate impact of COVID and there was not wide adoption of sub $0.5 before Q1 2019 in many countries

- is this statistical
- are you comparing users with similar treatment/behaviors
- limitation - don't have a holdback group, launched 100% in this country. to do causal impact - need more time to find counterfactual

GOOG-PLAY-000355601.R

We wanted to share our proposal for a phased approach to expand sub-dollar pricing, and today we are also asking for your approval to enable the next set of countries.

The first step will be expanding sub-dollar to more countries with lower purchasing power, as well as to markets where the competitors minimum prices are lower.
We also want to test with mature markets to inform global expansion decisions, so we are partnering with Play BD and G1 to allow testing low value SKUs in KR and the US as a temporary experiment.

The second phase will be driving developer adoption via Play BD, as well as the localized pricing guidance project.

And lastly, we want to consider mature markets as well, and define our approach for a full global roll out

GOOG-PLAY-000355602.R

In the next slide we'll show the detailed list of the next set of countries and the proposed new minimum prices.

I'll go over the high-level methodology, and Tung can provide more details if you have any questions.

At a high-level, we set the price at which the average transaction cost for low value transactions at the current FOP mix will not exceed ██ As an additional safety measure we have also mostly capped the proposed minimum price at the local currency equivalent of ██ except in cases where the competitor's price was still lower, in which we've allowed up to ██ avg transaction cost.

GOOG-PLAY-000355603.R



## Next steps

**Now**
- Get feedback on the proposal → today
- Incorporate feedback and finalize country list and prices

**Q4'20 - H1'21**
- Launch the next set of countries and check buyer uplift
- Test in mature markets with ▮▮▮▮▮▮▮▮ (US)
- Partner with Payments to drive down transaction costs
- Partner with Play BD to reach Developers at scale on sub-dollar adoption (e.g. Play BD playbook)
- Drive sub-dollar adoption through medium touch consultations for pricing guidance

**H2'21**
- Analyze results and feedback for launched markets, make a recommendation on global expansion

Google Play

GOOG-PLAY-000355605.R

appendix

Google Play

CONFIDENTIAL

GOOG-PLAY-000355606.R

10/16/2020 – 10/26/2020 at ▮▮▮

NF S (trix)

| | Orders | | | | | | |
|---|---|---|---|---|---|---|---|
| Arm | Orders Treatment | Orders Control | gross_difference | percent_difference | percent_difference_stderr | percent_difference_effect_size | percent_difference_lower | percent_difference_upper |
| arm1 | | | | | | | |
| arm2 | | | | | | | |

| | Spends | | | | | | |
|---|---|---|---|---|---|---|---|
| Arm | Spends Treatment | Spends Control | gross_difference | percent_difference | percent_difference_stderr | percent_difference_effect_size | percent_difference_lower | percent_difference_upper |
| arm1 | | | | | | | |
| arm2 | | | | | | | |

Google Play

GOOG-PLAY-000355607.R

10/16/2020 – 10/26/2020 at ███

### Orders

| Arm | Orders Treatment | Orders Control | gross_differe nce | percent_di fference | percent_different ce_stderr | percent_differe nce_effect_size | percent_differe nce_lower | percent_differen ce_upper |
|---|---|---|---|---|---|---|---|---|
| arm1 | | | | | | | | |
| arm2 | | | | | | | | |

### Spends

| Arm | Spends Treatment | Spends Control | gross_differe nce | percent_di fference | percent_different ce_stderr | percent_differe nce_effect_size | percent_differe nce_lower | percent_differen ce_upper |
|---|---|---|---|---|---|---|---|---|
| arm1 | | | | | | | | |
| arm2 | | | | | | | | |

Google Play

CONFIDENTIAL



So why are Developers so interested?
First of all, they care about revenue, of course, but they also really value buyer penetration, and understand that in order to get there they need to be thoughtful about their regional pricing strategies.
50% of Developers who monetize via IAPs ranked buyer penetrations as one of their top 3 KPIs. This goes up to 71% for large companies.

This have limited resources and rely on us to help them save time and reduce the work required from them.
This is of course true for smaller Developers, but even larger ones are often less advanced than we think. We example ▮▮▮▮▮▮▮▮ wants to learn from us on how to do regional pricing.

They do care about price parity with iOS, but they still was us to provide the guidance, and are also comfortable using Android as the testing platform to inform their broader pricing strategy.

The last point to highlight is that in order to prioritize this they need to see the opportunity sizing, and insights into how that can work for them.

GOOG-PLAY-000355609.R

18% of IAP developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative) 33% of all developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative) 43% of companies with 250+ employees said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative)

18% of IAP developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative) 33% of all developers said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative) 43% of companies with 250+ employees said optimizing for higher buyer penetration is more important (even with short term revenue being neutral/ slightly negative)

CONFIDENTIAL

GOOG-PLAY-000355610.R



Now I know alot of you have a hypothesis that subdollar pricing will convert the wrong quality of users, so I wanted to show this chart to disprove that

This is a bit of tricky chart to read, but let me try and explain it

When we look at the behavior of users making their first purchase ~40% of them will make additional purchasers in the next 30 days. That is quite promising. When we segment this by the price point of that first purchase we don't see any difference. Users for whom that first purchase was subdollar are just as likely to make additional purchases, so these are the same quality users as those making their first purchase at higher price points

GOOG-PLAY-000355611.R



The localized pricing guidance project that we're working on will do just that. How big is the opportunity? if you consider just the users in SEA, one of our fastest growing regions, have ~1/20th the purchasing power as those in top 8 markets. It's not just SEA; if you look at the facts across BRIIM (Brazil, Russia, India, Indonesia and Mexico) and other markets, we see the same themes emerging over and over again where the products being built are not always appropriately priced for users in those markets. It's not just the opportunity, there's also demand from users.

The chart on the right is from a survey that shows the top reasons why users don't make a purchase on mobile. The blue is the top cited reason and it's because offerings are too expensive.



## Learnings for Wave 2

**Learning**

**Positive results** overall: order and buyer lift

Developers often don't have the know-how to price sub-dollar and they **need our help**

Our prices could be **even lower** in emerging markets

Some Developers are hesitant to adopt if not available in **all markets**; some Developers are specifically interested in testing sub-dollar pricing in **mature markets** (e.g KakaoTalk in KR, G1 in the US)

Opportunity to **improve margins** for sub-dollar transactions by negotiating more favorite terms with Payment partners

**Risk:** Sub-dollar pricing implications on **Loyalty**

**Implications for wave 2**

Google Play

GOOG-PLAY-000355613.R

| Id | Date | Text |
|----|------|------|
| 1 | 10/27/2020 17:40:30 | sgtm!<br>adding ███████ @google.com to confirm the countries. also would you be able to share the full list of launched + pipeline markets? |
| 1 | 11/10/2020 05:42:21 | ██████ @google.com added this. Does this sound right? |
| 1 | 11/10/2020 05:42:21 | The launch timing of the unlaunched markets is still tentative, but I will update this sheet with the latest information I have: https://docs.google.com/spreadsheets/d/129bzA7wNw-m84cKgQqQFCleJaprfKFaPRtw7XpLjpY4/edit#gid=0 |

Google Play

GOOG-PLAY-000355614.R



I think these slides should come after we talk about what we did in 2019. We can we lowered prices and we a) saw a spike in FTB at sub-dollar b) and they buy at the same rate as others c) we see incremental order lift d) there are other benefits to sub-dollar. Then follow up with but we want to do more - expand it to more countries and then show the proposal.

GOOG-PLAY-000355615.R

| Id | Date | Text |
|----|------|------|
| 2 | 10/27/2020 01:18:59 | add the numbers for the mix shift |

Google Play

GOOG-PLAY-000355616.R



I think these slides should come after we talk about what we did in 2019. We can we lowered prices and we a) saw a spike in FTB at sub-dollar b) and they buy at the same rate as others c) we see incremental order lift d) there are other benefits to sub-dollar. Then follow up with but we want to do more - expand it to more countries and then show the proposal.

GOOG-PLAY-000355617.R



I think these slides should come after we talk about what we did in 2019. We can we lowered prices and we a) saw a spike in FTB at sub-dollar b) and they buy at the same rate as others c) we see incremental order lift d) there are other benefits to sub-dollar. Then follow up with but we want to do more - expand it to more countries and then show the proposal.

GOOG-PLAY-000355618.R

## Developer care about revenue but they often prioritize buyer penetration when it comes to emerging markets

- **33%** of developers say that for regional markets higher buyer penetration is more important than overall revenue uplift

- This goes up to **43%** for large developers (company size > 250) and **53%** for subscription developers



*Based of a

Google Play

CONFIDENTIAL

GOOG-PLAY-000355619.R

| Id | Date | Text |
|---|---|---|
| 3 | 10/26/2020 16:56:02 | look for direct feedback on sub dollar |
| 2 | 10/26/2020 16:56:02 | this dev slide can be appendix -- and can be linked in the benefits slide in slide 16 under dev. saying they love it, since you've already quoted them in that slide. |

Google Play

CONFIDENTIAL



We wanted to dig a little deeper into the business case and identify the biggest opportunities and Carolina from my team lead this highlevel opportunity analysis.

First we looked at the total size of the market. We identified over ▮▮▮▮ developers who monetize in 2+ fast-growth markets, who cover almost ▮▮ in annual spend.

Then we prioritized the markets according to factors like spend and growth rates, as well as developer interest, and identified the first 8 markets and longer tail of 11 markets based on additional interest and regional adjacencies. We also picked the top gaming genres.

To estimated the potential upside, we found some hero apps at the genre / country level, and calculated uplift through estimating that these other games in each genre could reach ▮▮▮▮▮▮ of hero app Buyer / DAU %



GOOG-PLAY-000355622.R



GOOG-PLAY-000355623.R

| Id | Date | Text |
|----|------|------|
| 4 | 10/27/2020 04:17:35 | update |

Google Play

CONFIDENTIAL

GOOG-PLAY-000355624.R



## Scaling through Console

*Bring proven guidance and tools to developers at scale*

Play Console is currently working on two projects that will provide a foundation for future pricing insights:

1. █████████████████████████████████████████████████████████
2. █████████████████████████████████████████████████████████

In order to prioritize future investment, in Q4 we are working with UXR, PA, and BD to evaluate:

████████████████████████████████████████████

Once the above are resolved, we will need to evaluate against other priorities. We expect to have a resource conflict with Play Billing policy, which takes precedent.

Google Play

GOOG-PLAY-000355625.R



GOOG-PLAY-000355626.R



**WIP**

1  Enable the next set of countries:

| Countries | Country selection rational | Proposed new Min price |
|---|---|---|
|  |  |  |

2  Launch globally (pending on the performance)

Benefits of a global launch:
- ✓ Taking a portfolio approach and being consistent across markets
- ✓ Gives global Developers the option to standardize pricing across markets
- ✓ Recent removal of Visa fixed fee for ▇▇▇▇ transactions has improved sub dollar transaction economics:
  - ○
  - ○ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Google Play

| Id | Date | Text |
|---|---|---|
| 6 | 10/26/2020 23:27:15 | ████████@google.com this is something paul f said today about play pass pricing :) does it make sense as a benefit here? |
| 7 | 10/27/2020 01:25:56 | update |
| 8 | 10/27/2020 01:26:40 | next step - work with xfn to launch and activate (e.g. go global) |
| 5 | 10/27/2020 01:26:55 | wave 3 |

Google Play

CONFIDENTIAL

## Current state

Permanent Country Change
- We previously implemented reduction of minimum app pricing (min price lowered from ~1 USD to 0.1-0.5 USD) in 20 markets (BR, CL, CO, EG, HU, ID, IN, MX, MY, NG, PE, PH, PL, RU, SA, TH, TR, UA, VN, ZA) and have seen positive results.
- Due to FX fluctuations the min prices in 29 additional countries is significantly lower than ███████████ even though they were never formally approved for sub dollar pricing █████████████

- Wave 1 countries were selected based on the following logic: large number of transactions + higher percentage of small amount transactions + low PPP (with some manual filtering)
- Min price was set as no less than ████ of fixed fees (need to confirm exact methodology)

Exceptions/Whitelisting
- No formal exception process. Merch can submit a request to allow exceptions, which is intended for short term promotions. This process isn't formal and has multiple issues (no clear eligibility criteria, ownership or approval, it disables the entire pricing ranges on an entire app level, and it isn't always removed in time) - need to formalize a process.

Google Play

# REDACTED VERSION

# Exhibit A58
# to
# C. Cramer Declaration

# EXHIBIT 14

# FILED UNDER SEAL



## Notes on Methodology

**Excludes China and Apple first party apps**
- Consumer spend on iOS is about ~$3.5B annually in China (92% is games)
- Apple first party apps deliver an additional ~$2.6B (biggest apps are Pages, Numbers, and Keynote, biggest markets are US,CN)

**Apps considered**
- Education category is excluded in this analysis
- Apps that are on Android-only are excluded from the developer and category-level analysis
- Only included devs who have >$1000/month spend on either Play or iOS
- Numbers have been annualized based on monthly average of last 3 months
- No manual verification of content gaps, data is a combination of Playfull and App Annie so some inaccuracies may persist

**Gap definitions**
- Content gap = apps are not on Play
- Policy gap = apps are on Play but not monetizing
- Performance gap = apps are on Play and monetizing

**Market view**
- User market has been used for this analysis

Google play

Google Confidential and Proprietary



## Executive Summary

**Apps spend is underperforming by [redacted] when compared to iOS, performance gap is largest driver**

- **Market share**
  - Play Apps spend = 15% total apps spend
  - Play Games spend = 43% total games spend
- **Business Diversity**
  - Play Spend is 10%/90% Apps/Games
  - iOS Spend is 33%/66% Apps/Games
- **Total Play Spend Gap for Apps [redacted] vs. [redacted] for Games**
  - [redacted] Content* Gap - driven by Torso & Tail apps in Tools
  - Policy Gap - driven by Head apps in music, entertainment, and social
  - Performance Gap - driven by Head across all categories
  - Note: There are also a few apps that outperform on Play [redacted] from apps like [redacted] ($[redacted], [redacted] etc.)
- **Market Impact: Global Apps Spend on iOS dominated by NA & EMEA, maps to largest Play gaps**
- **Tablet Impact: iPad Accounts for 25% of the gap**

**Proposals to address the Gaps:**

- Grow Scaled BD to close persistent Apps content gaps
- Enforce policies and require use of Play Billing for Apps IAP and Subscription services
- Direct & Scaled BD drive growth opportunities using data-driven tools to identify highest potential opportunities (Jarvis)

*Content gaps reflect apps that are not on Play - these may become Policy gaps if they were to build for the platform

Google play

Google Confidential and Proprietary

Surplus apps outperform iOS by [redacted] annually.. [redacted] contributes [redacted] out of that [redacted]... next one is [redacted] at [redacted]





Others = <span style="background:black;color:black">████</span> LATAM



All App Categories contribute to the Spend gap

**Content Gap:** Largest in Tools where apps are designed to be unique to each platform
**Policy Gap:** Largest in Social & Music where Music & Dating apps choose not to implement Play billing
**Performance Gap:** Significant across all categories





Content = 340 missing developers deliver ~█████, 16.5k missing developers deliver ~███
→ Torso & Tail
Policy = 107 developers deliver ~$█████ 2.3k developers deliver █████→ Head
Performance = 36 developers deliver ~$█████ the next 450 deliver █████ → Head

108 apps devs make 1M+ on play
1000 devs make 1M+ on iOS

GOOG-PLAY-000579873.R



Of the top 10 missing spend apps, xx are based in yy market
However, there are 300+ more developers making over $1M on iOS - need to manually map their markets



-- Pilot flight planning and services, subscription apps
- office suite, coming to Android, paid apps
- navigation, paid app
- history & education, paid app
- social network boosting, IAP packs for likes, followers
- GPS, paid app
- office suite, paid app
- services marketplace, IAP credit purchasing from service providers
- chat app, IAP
- recently banned? music streamer and downloader, paid app

| Id | Date | Text |
|---|---|---|
| 1 | 10/28/2015 17:20:22 | _Marked as resolved_ |
| 2 | 10/28/2015 17:20:31 | _Re-opened_ |
| 3 | 10/28/2015 17:23:31 | Sure: There are lots of tool devs (e.g. ClockworkMod, CyanogenMod) that build for custom ROMS, which are, inherently, an Android-only tool.  Also cleaners, boosters & AntiVirus (e.g. from Liquidum, AVG Mobile) are Android-only |
| 1 | 10/28/2015 19:18:31 | How about launcher and widget-type Tools devs?<br><br>Sent from Android device. |
| 2 | 10/28/2015 19:25:38 | We are looking for areas that are not applicable to android only |
| 1 | 10/28/2015 20:40:51 | +███████@google.com +███████@google.com  - do you have any examples of developers who build tools for only android platform and not for iOS.. |
| 4 | 10/28/2015 20:40:51 | I think you and BV might actually be able to pull this more easily systematically that I.  The main tool devs that I work with are building tools that leverage Android-only functionality  or build on both platforms. |

Google play

Google Confidential and Proprietary

GOOG-PLAY-000579875.R



## Policy Gap - ███ with over 50% in Social & music

**Summary:**
- Spend gap concentrated in US & EMEA at ████ and Social & Music at ████
- Business needs drive decisions
  - Existing billing infrastructure lowers value of Play solution
  - Missing features prevent adoption

**Top apps contributing to gap:**
- Over 50% of gap is contained in Social & Music - 10 of 12 developers making $10M+ on iOS and ████ is ████ of total gap
- Another 95 developers make over $1M on iOS

Google play

Google. Confidential and Proprietary



## Performance Gap - [redacted] from top ~500 devs

**Summary:**
- Spend gap concentrated in EMEA at [redacted] and US at [redacted]
- Lifestyle represents [redacted]% of developers making $[redacted]+ and [redacted]% making $[redacted]+
- Contributing factors are lack of sim ship, platform performance constraints (music)

**Top apps contributing to gap:**
- Very good relationships and strong investment from top apps
- Consistent underperformance with respect to conversion rates, retention, etc.

[redacted]

Google play

Google Confidential and Proprietary

Launch delay
Platform performance constraints
Missing product features

Add developer market contribution

## Different BD approaches required for each Gap

**Content =** ██████
- Direct = ████
- Scale = ████

**Policy =** ████
- Direct = ███
- Scale = ████

**Performance =** ████
- Direct = ███
- Scale = ████

**Challenge**: Content Gap is highly fragmented across markets and categories, largely with Torso and Tail developers. It's unclear that Android versions would deliver comparable spend benefit.

**Proposal**: Staff Scaled BD to close fragmented Apps content gaps

**Year 1 Spend Estimate:** ████
(Close 10% of Gap * 15% Performance handicap)

**Challenge**: Policy Gap is highly concentrated in markets (NA, EMEA) and categories (Social, Music). There are real short term spend implications but more concerning is the long term impact on growing our active buyer base.

**Proposal**: Enforce policies and require use of Play Billing for Apps IAP and Subscription services

**Year 1 Spend Estimate:** ████
(15% Performance of Total)

**Challenge**: Performance Gap is highly fragmented across markets, categories, and developer needs. Requires a more robust understanding of business drivers and additional BD resources.

**Proposal**: Direct & Scaled BD can drive growth opportunities using data-driven tools to identify highest potential opportunities (Jarvis)

**Year 1 Spend Estimate:** ████
(Increase Play Performance by 50%)

Google play

Google Confidential and Proprietary

| Id | Date | Text |
|---|---|---|
| 1 | 10/26/2015 17:50:13 | Yes, they are spend #s, have updated. The slide is saying that using BD levers (and policy) that we believe ███ is addressable in the first year. |
| 2 | 10/26/2015 17:54:19 | The largest difference in how Apple treats apps (compared to how they treat games) is visibility in marketing campaigns.<br><br>We're refreshing app categories to improve discovery, in some cases these will more closely align with Apples.<br><br>Overall, the intent was to focus on where the apps business is today with respect to consumer spend (slides 1-10) and tee up some early ideas on BD solutions, not a comprehensive set across all functional activities. We can remove these if they are distracting for today's discussion. |
| 1 | 10/26/2015 20:53:14 | I assume these numbers are spend and not revenue.  Is this slide saying that of the ███ gap, we believe only ███ is addressable? |
| 1 | 10/26/2015 20:53:14 | Jamie -<br>I think there is a more detailed analysis we could do to see what a reasonable upside estimate is on closing the performance gap.  However, it would be based on a lot of assumptions that I'm not sure we could validate until we actually start doing....rather than analyzing. |
| 2 | 10/26/2015 20:54:22 | These proposals don't mention product opportunities.  Does the App Store treat app categories differently than we do in Play?  Does Apple do anything in its store or other parts of its UI to better promote and encourage the use of apps? |
| 2 | 10/26/2015 20:54:22 | ███ is an obvious product initiative that could support closing performance gaps. |

Google play

Google Confidential and Proprietary



## Tablet performance: iPad accounts for 25% of iOS Gap

iPad Spend is **23x** Android Tablet….but only accounts for **25%** of iOS Spend Gap

**23% apps spend on iOS comes from iPad**
(8% of tablet apps spend on Play comes from tablets)

**EMEA and NA have 25% apps spend on iOS from iPad**
Regional breakdown of tablet apps spend on Play is consistent

**in 2015 140M android tablets have been sold vs 54M iPads (Source: IDC) - per unit underperformance is 60X**

Google play

Google Confidential and Proprietary

| Id | Date | Text |
|----|------|------|
| 3 | 10/26/2015 18:36:35 | Is there a product opportunity to make Android tablets perform better in this area?  If so, what would it be? |
| 3 | 10/26/2015 18:36:35 | The gap is so large it warrants a deeper look overall. |

Google play

Google Confidential and Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Summary

**Current state of apps business**

- Apps are underperforming by ▮▮▮▮ when compared to iOS (not including China or Apple apps)
- Project ▮▮▮▮ is addressable in the near term through targeted app acquisition, tighter policy enforcement, and proactive consultation
- There are some bright spots
  - Many top performers are using Play billing, we can contribute to optimizing performance
  - Apps are delivering as many buyers as games (with lower LTVs), more work to determine which markets and which categories are delivering active buyers and how to grow contribution

**BD Levers**

- Staff Scaled BD to close Apps content gaps
- Enforce policies and require use of Play Billing for Apps IAP and Subscription services
- Direct & Scaled BD can drive greater growth using data-driven tools to identify highest potential opportunities (Jarvis)

Google play

Google Confidential and Proprietary

Appendix

Google play

Google Confidential and Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

GOOG-PLAY-000579883.R



GOOG-PLAY-000579884.R

# REDACTED VERSION

# Exhibit A59
# to
# C. Cramer Declaration

# EXHIBIT 15

# FILED UNDER SEAL



# Google Play
# Developer Marketing

## 2016 Plan

Patricia Correa & team: Adriana Puchianu, Amelie Jammes, Anuj Gulati, Dominic Elliott, Dorothy Kelly, Francesca Di Felice, Jijia Huang, Kacey Fahey, Laura Della Torre, Laura Willis, Leticia Lago, Lily Sheringham, Nori Fujii, Nuno Santos, Robin McClelland

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOOG-PLAY-000303919.R

## Dev Marketing Mission
Design and drive the content, channels, campaigns and programs across developer segments and markets, to empower all developers to succeed on Google Play & Android

Google

Confidential & Proprietary



Social engagement rate = number of engagements (likes/retweets/favorites/etc) divided by total impressions. Benchmark for the whole blog is 0.1.
Events: APAC 133, EMEA, 50, AMERICAS, 36 - reach: APAC: 240k, EMEA, 3k, AMERICAS, 8.5k

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Id | Date | Text |
|----|------|------|
| 1 | 02/16/2018 22:11:10 | ▮▮▮▮▮▮@google.com  Here's the stat. Also found  in this deck.<br><br>https://docs.google.com/presentation/d/17hXxBZss6r70tc8yQRsSZG-d7nR8w8a5N79BMPoBevk/edit#slide=id.g6179506b9_3284  _Assigned to Dorothy Kelly_ |

Google

Confidential & Proprietary

GOOG-PLAY-000303922.R

## Perception is improving…

For Google Play, external [business] perception is positive and improving

*"When it comes to app store downloads, Google Play is king."* – Venture Beat

*"Google Play is becoming serious business."* – Financial Times

*"Google Play Gaining Ground Against Apple, As Android App Downloads Outnumber iOS 2-to-1"* – Marketing Land

*"It looks as though Play is growing faster than iOS and might overtake it this year."* – Benedict Evans

Developer perception is also changing, although more work needs to be done

*"While the conventional wisdom is to build first for iOS, if we had to do it all over again, I would launch on Android first, or at the same time as iOS. More than half of The Hunt's downloads are to Android devices."*

— Tim Weingarten, CEO, The Hunt

*"Google play a big role because in certain territories, without Google [Play], we cannot imagine our distribution, and it's really nice to see users worldwide playing with our apps and having fun."*
— Iza Login, Deputy CEO & Co-founder, Outfit7

*"We did the math. We looked at whether the upside in terms of incremental subscriptions would more than offset the 30% we pay to Google, and in fact it does."*
— Paul Smurl, GM, Core Digital Products, The New York Times

Google

Confidential & Proprietary

GOOG-PLAY-000303923.R



## ...but challenges remain

Consumers spent over $13B on Play apps and games in 2015, 32% YoY growth

However, developer performance remains suboptimal with a $6.4B revenue gap, and XXXM install gap.

Athena, launched in July, drives all reward decisions. Scale partner scores grew from 1.8 to 2.4.

Data missing (sim ship, Android studio use) and refinement required for differing market dynamics. Direct score remains flat at 2.9.

Dev Marketing grew from 5 to 11 pmms (+6 TVCs)

But the Business Development team grew to 100+ which exponentially stretches dev marketing resources. There are also 2 new developer marketing teams at Google (Ads and Platforms) who we need to more closely align with.

Google

Confidential & Proprietary

*iPhone is a metonymy.*
*Green Bubbles are not cool.*
*Don't know vs social exclusion.*

*See here for where we don't have athena data:*
*https://docs.google.com/spreadsheets/d/12eTIKxHpARwOyqVU5DdJtDw5Yg0*
*whD_j6ZnI7LL-QAI/edit#gid=2073440896*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Learnings & Insights**

| In 2015 we learned that... | So in 2016 we will... |
|---|---|
| • Too many product launches = noise to developers | • Tier announcements and focus on fewer more impactful product launches |
| • Developers engage more with category-specific content and with localized content | • Create category-specific content and targeted marketing initiatives |
| • Anything we do online is still difficult (site, blog, etc.) | • Go mobile |
| • Outbound comms in OK, but we need a better way to help developers find information they are seeking (inbound) | • Improve onboarding flow on DAC, go mobile and leverage more xfn and xpa channels |
| • We have good reach but need to track the impact of initiatives | • Work more closely to StratOps and add Dev Insights functions to focus on higher impact initiatives and measure results |

Google

Confidential & Proprietary

## 2016 Play PA Goals

- Extend the reach of Play beyond the borders of the store, enabling **10x growth** in contextual discovery while refocusing the store destination on richer, deeper, more premium experiences in **key verticals and user segments**

- Create the best development, distribution, and business management platform in the world, delivering **measurable strategic value** to our developers while driving a **higher quality app catalog**

- **Bring the Next Billion apps users onto Play,** driving reach and engagement through locally-tailored products, with specific emphasis on China and India

Google

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOOG-PLAY-000303928.R





GOOG-PLAY-000303930.R

| Id | Date | Text |
|----|------|------|
| 1 | 03/02/2016 04:14:10 | ████████@google.com I filled out top-level strategy, how would you like to fill out Key Deliverables? |

Google

Confidential & Proprietary



- High value gamers push
- Casual gaming push: improve frequency of play and spend
- High-quality apps showcase -- to combat perception that Apple has better quality apps
- Google Play for Families push

GOOG-PLAY-000303932.R



**Play's Market Potential: GDP x Smartphone Penetration x Android Share**
**Play's Ability to Harvest Market Potential: Play's Average Revenue per User (ARPU)**

GOOG-PLAY-000303933.R



Segments 1-10

GOOG-PLAY-000303934.R

GOOG-PLAY-000303935.R





| Id | Date | Text |
|----|------|------|
| 1 | 02/22/2016 21:23:22 | ██████ @google.com do you have any updates for these numbers? |



GOOG-PLAY-000303938.R





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



+   Secrets guide localized into PT-BR, owned by ██████████

GOOG-PLAY-000303941.R

| Id | Date | Text |
|----|------|------|
| 1 | 01/29/2016 21:50:45 | ██████@google.com this is based on current HC & budget. |
| 2 | 01/29/2016 21:50:45 | And do we want to mention the plan on addressing #4 here? |

Google

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





GOOG-PLAY-000303944.R



GOOG-PLAY-000303945.R



GOOG-PLAY-000303946.R



Can't edit notes from original deck





## In 2016 we will…

1.  … **reach 1M developers** across our channels, marquee programs and xfn collaboration.
2.  … use the agreed **developer narrative** throughout all our developer outreach.
3.  … start delivering **insights and thought leadership content** to our target audiences and internally.
4.  … deepen our **understanding of developers** through the developer insights program.
5.  … determine aspirational **developer perception** and deliver initiatives that will take us there.
6.  … **raise awareness** of key features that impact performance, quality and satisfaction.
7.  … **scale category & market expertise** to many more developers.
8.  … measure **developer satisfaction** and deliver initiatives to improve it.
9.  … expand the global reach, relevance, and efficacy of our **marketing channels**.
10. … build a happy and smart **team** to increase our output, x-fn collaboration, and impact.

Google

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## H1 2016 priorities

1. Launch the Developer Insights Program, establish baseline scores for DSAT and feature awareness, and grow those scores in Q2
2. Strong Play presence at I/O, SXSW (apps) and GDC (games) including our annual Play party
3. Launch category best-practices, events & toolkits (+Playtime, Connect, Bootcamps toolkits)
4. Launch products: Westinghouse, Sidewinder, and Family Library
5. Launch Google-wide dev narrative with Apps Ads Mktg, Dev Plat Mktg, & Dev Rel
6. Launch Secrets app beta
7. Launch the co-marketing brand guide
8. Update developer recognition and awards programs (EC, TD, Google Play Awards @ I/O, etc.)
9. Measure developer perception pre- and post-events
10. PLACEHOLDER: MARKETING CHANNELS ENHANCEMENTS

Google

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



GOOG-PLAY-000303952.R



# Developer segmentation by performance

**Developer Reach**

Focus on ~50K developers covering 99% of total revenues, 97% of total installs, and all top apps in all categories across 44 Litra markets

| BD Segments | # Developers | Cumulative Developers | Install Share (%) | Spend Share (%) | Cumulative Installs (%) | Cumulative Spend (%) |
|---|---|---|---|---|---|---|
| 1 | 188 | 188 | 39.2% | 60.3% | 39.2% | 60.3% |
| 2 | 368 | 556 | 7.0% | 13.6% | 46.2% | 73.9% |
| 3 | 377 | 933 | 8.4% | 5.5% | 54.6% | 79.4% |
| 4 | 547 | 1480 | 7.6% | 3.3% | 62.2% | 82.7% |
| 5 | 773 | 2253 | 7.0% | 5.2% | 69.2% | 87.9% |
| 6 | 1226 | 3479 | 6.7% | 2.4% | 75.9% | 90.3% |
| 7 | 2413 | 5892 | 6.3% | 3.3% | 82.2% | 93.6% |
| 8 | 5044 | 10936 | 6.4% | 2.4% | 88.6% | 96.0% |
| 9 | 15725 | 26661 | 6.1% | 2.3% | 94.7% | 98.3% |
| 10 | 29159 | 55820 | 3.0% | 1.4% | 97.7% | 99.7% |
| 11 | 184624 | 240444 | 2.3% | 0.3% | 100% | 100.0% |

Google

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



- We have a narrative / overarching structure for how we talk about our offerings to build apps and businesses
- And it's easy to use to ensure we're all marketing across pillars whoever we're talking to
- You can see see here there's a high level view, and all of our other business neatly fall into the buckets - making integration of content and cross sell extremely easy
- Goal is to lock down the messaging hierarchies so all teams can easily use them and go to market more easily together

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Id | Date | Text |
|----|------|------|
| 2 | 01/04/2016 12:13:35 | I'm a little lost with this one :-) |
| 3 | 01/04/2016 18:58:57 | [REDACTED]@google.com have you seen this event app that's in development? https://drive.google.com/a/google.com/file/d/0B087Ap9FazO6ckIiQzNvQU1jcVU/view They are matching Develop to Cloud, AdWords to Grow, AdMob to Earn. Loads of other products/tools, including Play are nowhere to be seen. |
| 1 | 01/14/2016 17:54:35 | I feel like someone coming to the narrative completely new might be a bit confused about this slide.<br><br>The Google Works for Apps and the Smart Monetization Engine narratives don't really fit with ours. For example, someone in another team (like LCS or DevRel) would have a tough time deciding what narrative to put in a "Growth" presentation to a developer for example.<br><br>Might be better not to go into too many of the different narratives here until we have a better idea of how they work together? |
| 3 | 01/14/2016 17:54:35 | Who is leading that app project or how did you find that brief? This is the first I've heard of this. |

Google                                                                Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



SO, Events. They're very important for a few reason:

We can tell our story when the industry gathers in a high impact, consistent way -- reach the eco-system, we also find clients
They appear to be one of the primary ways we're reaching app developers -- so reach is huge

But, We have a few problems, my favorite is the 'who's first wins problem' -- which event organisers love as they sell to Google multipel times
So what are we proposing to do?
Have a strategic approach to BOTH hosted and industry events, and be choiceful about what we want to land.  This breaks into ~5 categories you can see here

To zoom in that in detail I have another slide, but it's not built for presenting --

GOOG-PLAY-000303956.R



This grouping of 5 here is how we're looking at the event types we have that are influencing ad spend and moneitzation decisions and we want ver clear strategies and execution models around each one.

| Id | Date | Text |
|----|------|------|
| 4 | 01/14/2016 17:57:08 | Replaced E3 as we don't have a presence. Neither does Consumer. |
| 4 | 01/14/2016 17:59:17 | In some cases we will also have other teams, like the News Roadshow, which will also include AMP, Newsstand & others |
| 5 | 01/14/2016 17:59:17 | We also need a line item for Connect. Note, we're not supporting workshops/bootcamps this year outside of the toolkit for DevRel |

Google

Confidential & Proprietary

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



So first, I want to let you all know that the marketing teams targeting developers are on it!

We know we have work to do and we're coming together as a virtual team to do that.

I estimate we probably own around ¾ of the reach / comms from Google to app developers so this is a great start.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



| Id | Date | Text |
|---|---|---|
| 1 | 01/28/2016 00:44:34 | Can we own Catalog Quality OKR in Athena Score?: e.g. "Satisfactory" Athena Score for unmanaged partners xx% --> xx%, average Athena Score of the all apps x.x -> x.x. I am afraid that awareness and perception figures can be skewed and not reliable since they are based on survey. |

Google

Confidential & Proprietary

# REDACTED VERSION

# Exhibit A60
# to
# C. Cramer Declaration

# EXHIBIT 16

# FILED UNDER SEAL

Message

| | |
|---|---|
| **From:** | Caity Downey [██████@google.com] |
| **Sent:** | 7/24/2020 7:37:55 PM |
| **To:** | Suveer Kothari [██████@google.com] |
| **CC:** | Pooja Kapoor[██████@google.com]; Purnima Kochikar [██████@google.com]; Tamzin Taylor [██████@google.com]; Sarah Karam [██████@google.com]; Danielle Stein [██████@google.com]; Kenny Chiu [██████@google.com] |
| **Subject:** | Next Steps on ██████ Google Play Billing negotiation |

Hi Suveer,

We wanted to provide a quick update on the next steps for the ████ Play Billing negotiation. Product conversations continue to proceed well, without major issues. On economics, ████ shared its counteroffer, which, if implemented, would create an economic loss for Play ██████ effective rev share, where Google's breakeven point is ███.

| | Google proposal | ████ initial counter proposal | ████ full counter proposal |
|---|---|---|---|
| **Proposal** | A one-time bounty of ████ price for a subscriber's first paid month ████ paid for subsequent renewals) | While ████ was modelling its rev share counter offer, it proposed carving out paying rev share on the following: ████████████████████ | ████ reduced the effective rev share by asking to create different fees based on who processes the payment. This effectively results in:<br>• ████ processed transactions at ████ per subscriber<br>• ████ processed transactions at ████ per subscriber<br>If Google acquires the user, Google will receive an additional ████ (marketing bounty)<br>████ also asked to ████████ |
| **Effective Rev Share**<br>*Google's breakeven is ██* | ███ | ████ | ██████ |
| **Other considerations** | | | ████████████ Internal investigation found that providing this data to ████ would be a sizable and highly complex project. |

Next steps:
• Finance is modelling counteroffer options, which we will review with you and Don on Monday (7/27) afternoon. Thank you for your flexibility while OOO.
• PlayBD would like to go to BC on Thursday (7/30) to receive guardrails for the negotiation floor.
• If needed, Don may connect with ████ next week to ensure that we are able to productively move forward before the policy announcement.

Right now, the Play Billing policy announcement is still tentatively scheduled for the week of August 4th, but may be moved out due to the now-postponed Congressional hearing.

Best,
Caity

--

CONFIDENTIAL



**Caity Downey**
Top Partners

GOOG-PLAY-010736507

# REDACTED VERSION

# Exhibit A61
# to
# C. Cramer Declaration

1   Brian C. Rocca, S.B. #221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, S.B. #215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, S.B. #248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, S.B. #259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, S.B. #301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105
    Telephone: (415) 442-1000
8
    Richard S. Taffet, *pro hac vice*
9   richard.taffet@morganlewis.com
    Ian Simmons, *pro hac vice*
10  isimmons@omm.com
    **MORGAN, LEWIS & BOCKIUS LLP**
11  101 Park Avenue, New York, NY 10178
    Telephone: (212) 309-6000
12
    Benjamin G. Bradshaw, S.B. #189925
13  bbradshaw@omm.com
    **O'MELVENY & MYERS LLP**
14  1625 Eye Street, NW Washington, DC 20006
    Telephone: (202) 383-5300
15
    Daniel M. Petrocelli, S.B. #97802
16  dpetrocelli@omm.com
    Stephen J. McIntyre, S.B. #274481
17  smcintyre@omm.com
    **O'MELVENY & MYERS LLP**
18  1999 Avenue of the Stars
    Los Angeles, California 90067
19  Telephone: (310) 553-6700

    Glenn D. Pomerantz, S.B. #112503
    glenn.pomerantz@mto.com
    Kuruvilla Olasa, S.B. #281509
    kuruvilla.olasa@mto.com
    **MUNGER, TOLLES & OLSON LLP**
    350 South Grand Avenue, Fiftieth Floor
    Los Angeles, California 90071
    Telephone: (213) 683-9100

    Kyle W. Mach, S.B. #282090
    kyle.mach@mto.com
    Justin P. Raphael, S.B. #292380
    justin.raphael@mto.com
    Emily C. Curran-Huberty, S.B. #293065
    emily.curran-huberty@mto.com
    **MUNGER, TOLLES & OLSON LLP**
    560 Mission Street, Twenty Seventh Floor
    San Francisco, California 94105
    Telephone: (415) 512-4000

    Jonathan I. Kravis, *pro hac vice*
    jonathan.kravis@mto.com
    **MUNGER, TOLLES & OLSON LLP**
    601 Massachusetts Avenue NW, Suite 500E
    Washington, D.C. 20001
    Telephone: (202) 220-1100

    *Counsel for Defendants*

---

20              UNITED STATES DISTRICT COURT

21      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

22  | **IN RE GOOGLE PLAY CONSUMER** | Case No. 3:21-md-02981-JD |
    | **ANTITRUST LITIGATION** | |
23  | | **FILED UNDER SEAL** |
    | THIS DOCUMENT RELATES TO: | **DEFENDANTS' REPLY IN SUPPORT OF** |
24  | | **DAUBERT MOTION TO EXCLUDE** |
    | | **TESTIMONY OF DR. HAL J. SINGER ON** |
25  | *In re Google Play Consumer Antitrust* | **CLASS CERTIFICATION** |
    | *Litigation*, Case No. 3:20-cv-05761-JD | Date:    August 4, 2022 |
26  | | Time:   10:00 a.m. |
    | | Judge:  Hon. James Donato |
27  | | Courtroom: 11, 19th Floor, 450 Golden Gate |
    | | Ave, San Francisco, California, 94102 |
28

---

Plaintiffs' Opposition reveals the deception in Dr. Singer's "deceptively straightforward" pass-through formula, Singer Reply Rep. at ¶ 72:  the formula is "straightforward" only because it ignores real-world data, accepted economic models, and focal point pricing.

For decades, courts have recognized "the difficulties and uncertainties involved" in pass-through analysis, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 743 (1977), which makes proof of antitrust impact "more complex."  *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008).  According to Plaintiffs, however, pass-through is actually "simple." Opp. at 6.  To determine the pass-through rate for an app based on the "Thomas & Friends" children's television series, Dr. Singer divided the number of in-app purchases for that app by the total number of items sold in the thousands of other apps in the "Games" category—including "Doom," which has a "Violence, Blood and Gore" warning, and "Poker—Texas Hold 'Em."  He then subtracted that percentage from 1 and claims the difference is the pass-through rate.  That's it.

Plaintiffs compare this formula to $E=MC^2$, Opp. at 6, but it is "junk science."  *In re Capacitors Antitrust Litig*. (No. III), No. 14-CV-03264-JD, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018).  The accepted way to determine whether developers would have changed prices if service fees were lower is to analyze data on whether developers changed prices when service fees actually went down, as Google's expert did.  Dr. Singer has performed that kind of analysis in other cases, but he did not do so here.  Instead, he predicted the prices developers would charge by counting how much they sold compared to apps that are not substitutes.  Dr. Singer has never used this formula to calculate pass-through before and Plaintiffs cite no case where a court has permitted an economist to testify about pass-through using any method remotely like it.  Plaintiffs have not met their burden to show why this Court should be the first.

*First*, Dr. Singer's pass-through formula models costs contrary to an accepted economic principle set forth in his own report:  when fees that are a percentage of a firm's prices—so-called *ad valorem* costs—change, the effect on prices depends on the firm's marginal costs that have not changed.  Dr. Singer concedes that he has not estimated developers' marginal costs.  That should be the end of the matter:  if prices depend on costs, Dr. Singer's formula cannot reliably predict developers' prices when it is missing an input required to model their costs.  Plaintiffs' mantra that

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION

Dr. Singer has used a "logit model" means nothing.  Dr. Singer's "logit model" is just the formula that Plaintiffs do not argue accounts for developers' marginal costs distinct from service fees.

*Second*, Plaintiffs cannot answer why real-world data show the opposite of what Dr. Singer's formula predicts.  Dr. Singer's formula predicts pass-through by *all* developers, but, in fact, almost no developers who paid lower service fees in the real world reduced prices.  Plaintiffs' speculation about "steering" to platforms *other than* Google Play cannot fill this gulf between Dr. Singer's theory and reality regarding prices on Play.  Dr. Singer testified that his formula predicts pass-through even without steering and that he has not studied how steering affects pass-through.

*Third*, Dr. Singer's logit model is so far off because a fundamental assumption of that model is concededly missing.  Dr. Singer testified that a logit model assumes all products in the model are substitutes, but admitted he is not offering the opinion that all apps in each category his model uses are substitutes.  Plaintiffs do not argue the apps in each category are substitutes.

*Fourth*, Plaintiffs do not seriously dispute that Dr. Singer has not accounted for focal point pricing, which has led multiple courts in this District to reject expert testimony in antitrust cases.  Plaintiffs simply argue that some developers do not use focal point pricing.  That says nothing about how Dr. Singer accounts for the developers who *do* use focal point pricing.  He doesn't.

Finally, Plaintiffs also have not demonstrated that Dr. Singer's opinions regarding Play Points are reliable.  Plaintiffs do not dispute that most users did not enroll in or redeem Play Points or that Dr. Singer has no model to determine whether each consumer would have done so in a but-for world.  Plaintiffs cite no analysis by Dr. Singer to support the bare assertion that higher subsidies would have driven enrollment to "near-universal" levels, and cite no evidence to support their speculation that Google would have enrolled all users by default.  Opp. at 4.

## I.   DR. SINGER'S PASS-THROUGH FORMULA IS NOT RELIABLE.

### A.   Dr. Singer's Pass-Through Formula Contradicts Accepted Economic Principles Regarding How Changes In Service Fees Will Affect Prices.

If "prices depend on costs," Mot. Ex. 2, Singer Rep. ¶ 223, then Dr. Singer's formula for predicting developers' prices must correctly model their costs.  But Dr. Singer's pass-through formula models developers' costs contrary to accepted economics he *describes in his own report*.

1    Google's service fees are a percentage of the price that developers charge.  In economics, a

2    change in a cost calculated that way affects prices proportionally to the firm's marginal costs.

3    Mot. Ex. 2, Singer Rep. ¶ 225 & n. 495; Mot. Ex. 1, Singer Dep. at 105:8–106:3, 107:23–109:14.

4    Dr. Singer testified that "the pass-through rate is going to be proportional to the other marginal

5    costs," Mot. Ex. 1, Singer Dep. at 112:13–113:3; *see also id.* at 105:8–106:3, 107:23–109:14, and

6    that "one input into the generally accepted economic model of how the profit-maximizing

7    developer would set [] prices is the marginal costs other than the service fee." *Id.* at 108:17–25.

8    In light of this testimony, it is puzzling that Plaintiffs argue that Google "can point to no basis in

9    economics" for "the distinction between per-unit costs (costs that are the same regardless of price)

10   and *ad valorem* costs (expressed as a percentage of price)."  Opp. at 8.  In Paragraph 225 of his

11   report, Dr. Singer uses different math to model each type of cost:  the per-unit cost term "**C**" "is

12   modified" to **C\***, which is a proportion:  $C / (1 - t)$, where **C** is per-unit marginal costs and $t$ is the

13   service fee rate.  Mot. Ex. 2, Singer Rep. at ¶ 225.

14          Dr. Singer testified that his pass-through formula does not account for this standard

15   economic model:  "Q. … in calculating how prices will be set in the but-for world based on a

16   reduction of this service fee, … in the in-app purchase context, this calculation doesn't reference

17   the developer's other marginal costs in any way?  A. Correct…."  Mot. Ex. 1, Singer Dep. at

18   186:6–18; *see also id.* at 124:18–127:13.  In fact, there is no way that Dr. Singer's pass-through

19   formula could account for developers' marginal costs because he has not even estimated any such

20   costs for any developer.  *Id.* at 90:20–91:2, 91:22–92:7.  Plaintiffs get nowhere by arguing that an

21   economist must still "choose a demand model" to operationalize the model in Paragraph 225.

22   Opp. at 7.  No matter what Dr. Singer needed to do to build a pass-through formula, he had to

23   account for the accepted economic principle that changes in *ad valorem* fees will affect prices

24   proportional to marginal costs.  However, Dr. Singer has not even measured developers' marginal

25   costs, let alone accounted for them.  The Court can stop there.

26          **B.    Plaintiffs' Arguments About The "Logit Model" Do Not Change this Fact.**

27          Plaintiffs attempt to defend Dr. Singer's formula as a "logit model."  Opp. at 5–8.  But

28   what Plaintiffs call the "logit model" is just a simplified version of a formula described in a 2013

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION

1   article.  Mot. Ex. 10, Nathan H. Miller et al., *Using Cost Pass-Through to Calibrate Demand*, 118

2   Econ. Ltrs. 451, 451 (2013).  Dr. Singer's regression "isn't measuring how a service fee change

3   affects the price of an app or an in-app purchase."  Mot. Ex. 1, 164:18–165:12.  Rather, in the

4   regression, "demand for a given App (or In-App Content) is modeled as a function of the price of

5   that App (or the price of the In-App Content)."  Mot. Ex. 2, Singer Rep. at ¶ 235; *see also* Mot.

6   Ex. 1, at 164:10–17.  Dr. Singer's regression thus measures what happens when prices change, not

7   whether prices would change if service fees changed.  Dr. Singer thus discards the regression's

8   results when calculating pass-through, relying solely on his formula: **1 – an app's unit share of**

9   **the category chosen by the developer**.  That is all the "logit model" is.  *See id.* at 116:14–117:9.

10      Plaintiffs' argument that "the logit demand model causes the absolute level of marginal

11  costs to drop out of the equation," Opp. at 7, is exactly why the formula contradicts standard

12  economics.  The standard model in Paragraph 225 of Dr. Singer's report shows that whether a

13  change in the *service fee* affects prices depends on the *level* of the developer's marginal costs.

14  When those marginal costs "drop out of the equation," the equation loses an essential input.

15  Plaintiffs cannot paper over this problem by arguing that a change in the service fee is a change in

16  marginal costs.  In the standard model, whether a change in the service fee changes the

17  developer's cost structure depends on the developer's costs *other* than the service fee.  That is why

18  the expression $C / (1 - t)$ includes separate terms for $C$ (marginal costs) and $t$ (the service fee rate).

19  Dr. Singer's formula must account for both terms, but it concededly does not do so.

20      Dr. Singer's source for his "logit model" makes clear that the model does not account for a

21  cost proportional to prices like Google's service fees.  In explaining their "General Model," the

22  2013 article's authors state:  "Now suppose that a ***per-unit tax*** is levied on each product in the

23  model—the tax perturbs marginal costs and allows for the derivation of cost pass-through."  Mot.

24  Ex. 10, Miller at 452 (emphasis added).  The article says nothing about percentage fees (or taxes).

25  Plaintiffs suggest this does not matter, but they concede that the difference between per-unit costs

26  and percentage fees "matters" because if a firm's marginal costs are zero, then a change in the

27  service fee will not result in a price increase.  Opp. at 8.

28      Plaintiffs do not argue that *no* developer's marginal costs are zero.  Reversing their burden,

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION

1   Plaintiffs instead argue that *Google* has identified "zero evidence that any developer actually faces

2   zero marginal costs." *Id.* That is incorrect. One of Dr. Singer's key sources assumes that video

3   game developers have "no marginal cost." Jean-Charles Rochet & Jean Tirole, Platform

4   Competition in Two-Sided Markets, 1(4) *European Economic Association* 990, 1012 (2003).

5   Another of Dr. Singer's sources states that the "replication cost of digital goods is zero." Mot. Ex.

6   5 at 12. Dr. Burtis similarly opines that "[f]or some apps, subscriptions, and IAPs, marginal costs

7   are likely to be zero or close to zero." Mot. Ex. 3, Burtis Rep. at ¶ 143 & n. 151. In response,

8   Plaintiffs rely on an article whose authors "*assume* that marginal costs may not *necessarily* be zero

9   in a mobile app setting." Mot. Ex. 10 at 1474 (emphasis added). The article does not point to

10  some economic consensus that *all* developers face non-zero marginal costs. There is none.

11      Plaintiffs also fail to show how Dr. Singer's formula accounts for what he calls "standard

12  economics" that developers would have incentives to re-invest service-fee savings. Mot. at 8–9.

13  Plaintiffs argue that "Dr. Singer's models are agnostic as to how developers choose to use the

14  portion of savings that are *not* passed on." Opp. at 9 (emphasis added). That says nothing about

15  what Dr. Singer did to determine whether developers would not pass on *any* portion of the savings

16  because they would re-invest all of the savings. Dr. Singer's model does not address that issue.

17      None of Plaintiffs' cases referring to logit models, Opp. at 5, involved pass-through or a

18  formula anything like the one Dr. Singer has used here. The court in *V5 Techs., LLC v. Switch,*

19  *Ltd.*, No. 2:17-cv-02349-KJD-NJK, 2020 WL 6688732 (D. Nev. Nov. 12, 2020), rejected a

20  challenge to an expert's qualifications because he had not "taught a course specifically dedicated

21  to Multinomial Logit Models." *Id.* at *2. That is not Google's argument here. Plaintiffs' other

22  cases involved experts for consumer fraud plaintiffs who used logit in connection with surveys on

23  "willingness to pay." *Allegra v. Luxottica Retail N. Am.*, No. 17-CV-5216 (PKC)(RLM), 2022

24  WL 42867, at *56 (E.D.N.Y. Jan. 5, 2022); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320

25  F.R.D. 326, 330 (D.N.H. 2017). Dr. Singer has not done that here.

26      Plaintiffs' lack of precedent for Dr. Singer's formula is hardly surprising given the well-

27  recognized "difficulties with sophisticated statistical methodology" required to prove pass-though.

28  *Illinois Brick*, 431 U.S. at 742. Plaintiffs' rejoinder that they are direct purchasers, Opp. at 9,

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION

1   misses the point that courts have been skeptical of pass-through because "in the real economic

2   world rather than an economist's hypothetical model, the latter's drastic simplifications generally

3   must be abandoned." *Illinois Brick*, 431 U.S. at 742.  So too here:  Dr. Singer's "deceptively

4   straightforward" formula is unreliable because it does not account for the accepted economic

5   principle that changes in proportional fees affect prices proportional to a firm's marginal costs.

6           **C.      Dr. Singer's Formula Does Not Account For Real-World Data.**

7           The proper way to examine what prices developers would have charged if they paid lower

8   service fees is to examine the prices developers *actually* charged when they paid lower service

9   fees.  Google's expert Dr. Burtis did that analysis here and Dr. Singer has done that kind of

10  analysis in prior cases.  Mot. Ex. 1 at 134:25–135:5.  Here, however, Dr. Singer did not analyze

11  pass-through using actual pricing data, which show exactly the opposite of what his pass-through

12  formula predicts.  Dr. Singer's formula predicts pass-through for all developers, but real-world

13  data show that only a tiny fraction of developers whose service fees Google reduced then reduced

14  prices.  Mot. Ex. 3, Burtis Rep. 103, Fig. 13.  Plaintiffs engage in drive-by criticisms of Dr. Burtis'

15  analysis showing this, Opp. at 10, but do not dispute that pass-through was the rare exception

16  rather than the rule.[1]  Plaintiffs say nothing about the analysis of Developer Plaintiffs' expert, Dr.

17  Williams, which reached the same conclusion.  Mot. Ex. 6, Williams Dep. at 312:21–314:2.

18          Plaintiffs assert that "Dr. Singer tested his model on significant actual data."  Mot. at 10.

19  Not quite.  *First*, Plaintiffs cite Table 9 of Dr. Singer's report, Opp. at 11, which refers to six apps.

20  Mot. Ex. 2, Singer Rep. at 115.  That is not "significant actual data" or a counterpoint to Dr.

21  Burtis' analysis of hundreds of thousands of data points.  *Second*, Plaintiffs state that Dr. Singer

22  ran "regressions on Google's transaction data to determine that the logit model was a good fit."

23  Opp. at 10.  But, as noted, those regressions do not measure pass-through.

24

25

_____

26  [1] Plaintiffs argue that Dr. Burtis's analysis of Google's 2018 service fee reduction for subscriptions after the first year "ignores that Google Play provides no mechanism for a developer to change second-year subscription rates."  Opp. at 10.  Even if that were true, it says nothing about why pass-through was so rare following Google's 2021 rate reduction that applied to paid apps, IAPs, and subscriptions, or the fact that Dr. Burtis found the same lack of pass through when observing over 400,000 IAP SKUs, none of which were subscriptions.  *See* Burtis Exs. 36, 50.

27

28

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION

1          *Third*, Plaintiffs get nowhere by arguing that Dr. Singer has shown that sales taxes "are

2    typically passed on in full."  Opp. at 8.  This case is not about sales taxes, which are highly

3    regulated by state laws that, among other things, often require including sales taxes as a separate

4    line item on an invoice.  *See generally* Walter Hellerstein et al., *State and Local Taxation* 650

5    (10th ed. 2014).  Moreover, Dr. Singer's analysis of sales taxes and prices for transactions via

6    Google Play proves nothing about *developers*' pass-through because *Google* charges and collects

7    sales taxes on those transactions.  Mot. Ex. 12, Singer Rep. at n. 537.  Thus, Dr. Singer's evidence

8    is merely that *some* companies add sales tax to their customers' purchases.  That unremarkable

9    fact does not show that *all* developers would pass-through *service fees* or explain why the data

10   show that almost no developers did so when Dr. Singer predicted that all of them would.  Firms

11   may approach service fees differently than sales taxes, which are not at issue here.

12         Plaintiffs fall back on arguing that "broader real-world experiments are not possible

13   because of Google's continuous anticompetitive conduct."  Opp. at 11.  The only such conduct

14   they identify is supposed limitations on "steering" users to other platforms using in-app

15   communications.  *Id.*  This makes no sense.  Developers can and sometimes do charge different

16   prices in Play and on other platforms.  Plaintiffs do not explain why pass-through of lower service

17   fees on *Google Play* depends on in-app communications directing consumers to *other* platforms.

18   Dr. Singer thus testified that his pass-through formula does not depend on steering:  "Q. Okay. So

19   fair to say, then, that the [] logit model pass-through formula that you've used in your report

20   depends on steering?  A. No, I don't think it depends on steering because we can come up with []

21   with explanations for how pass-through would occur in the presence of the anti-steering restraint."

22   Mot. Ex. 1, Singer Dep. at 242:15–22.  Dr. Singer "would expect pass-through regardless of the

23   anti-steering restrictions," *id.* at 242:23–244:3, but that pass-through did not happen.  Plaintiffs do

24   not address that testimony or Dr. Singer's concession that he has not conducted any empirical

25   analysis of steering's effect on pass-through rates.  *Id.* at 239:2–13, 240:2–241:1, 246:3–12.

26   **D.    <u>Dr. Singer's Pass-Through Formula Is Unreliable Because a Necessary
       Condition for the Formula is Concededly Missing.</u>**

27         One reason why Dr. Singer's "logit model" makes dramatically wrong predictions is that a

28

1   fundamental condition for the model is concededly missing.  Dr. Singer testified that "one feature

2   of logit demand is that all goods in the market where demand is being measured are substitutes."

3   Mot. Ex. 1, Singer Dep. at 158:9–13.  As his own source explains, in a logit model, "each good is

4   a substitute for all others in the choice set."  Gregory J. Werden & Luke M. Froeb, *The Antitrust*

5   *Logit Model for Predicting Unilateral Competitive Effects*, 70 Antitrust L.J. 257 (2002).  Dr.

6   Singer treats "each of Google's 35 categories as a separate demand system," Opp. at 6, but

7   Plaintiffs do not argue that all apps in each category are substitutes—nor could they, as the

8   "Thomas" and "Doom" example illustrates.  Dr. Singer even admitted he is not opining that apps

9   in each category are substitutes.  Mot. Ex. 1, Singer Dep. at 158:14–159:18.  This is fatal to the

10  reliability of his "logit model."  If the prices of apps in a category are unrelated, then an app's

11  share in that category cannot inform what price the app's developer would charge.  Thus, Dr.

12  Singer's model predicts very different pass-through rates for the same app in different categories,

13  showing that the model's results are essentially arbitrary.  *See* Mot. Ex. 3, Burtis Rep. ¶¶ 310–312

14  & Exs. 54–55; Mot. Ex. 2, Singer Reply Rep. ¶ 79.

15      Plaintiffs' rejoinder is that "Google's app categories are economically reasonable

16  groupings of consumer preferences."  Opp. at 12.  But Plaintiffs do not define what that means or

17  why it is meaningful to predict developers' prices or pass-through.  Dr. Singer did not testify that

18  one feature of logit demand is that all products are "economically reasonable groupings of

19  consumer preferences," and Plaintiffs' own sources regarding logit models refer to "sets of

20  substitutes," Opp. Ex. 13, at 52–59, and "Substitution Patterns."  Opp. Ex. 8, at 45–49.  Plaintiffs

21  cite nothing for their assertion that evidence that "the logit model fits the data" is proof that the

22  categories "defined the scope of substitution patterns for app users," Opp. at 13.

23      Dr. Singer cannot reliably testify based on a logit model where an assumption necessary to

24  that model concededly does not hold.

25      **E.**     **Dr. Singer's Pass-Through Formula Does Not Account For Focal Point Pricing.**

26      Dr. Singer's pass-through formula also is unreliable because it "does not adequately

27  account for the effects of focal point pricing. . . ."  *In re Lithium Ion Batteries Antitrust Litig.*, No.

28  13-MD-2420 YGR, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018).  Dr. Singer testified, and

1   Plaintiffs do not dispute, that focal point pricing is a "well-established concept in economics,"

2   Mot. Ex. 1, Singer Dep. at 197:19–198:4, and "an important consideration here." *Id.* at 202:5–7.

3   Nor do Plaintiffs contest that many developers use focal point pricing.  Yet Plaintiffs do not point

4   to any term in Dr. Singer's formula that addresses focal point pricing or any analysis by Dr. Singer

5   showing that every developer would profit by breaking from focal point pricing.

6        Plaintiffs note that some developers do not use focal point pricing.  *See* Opp. at 11, 12.

7   That says nothing about whether developers who *do* use focal point pricing would stop doing so if

8   they paid lower service fees.  Dr. Singer has not analyzed that issue for any developer, let alone

9   shown that all developers would have done so.  As such, his pass-through "model does not provide

10  a reliable method for determining but-for pricing in the presence of focal pricing." *In re Apple*

11  *iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29,

12  2022) (excluding expert testimony).

13  **II.     DR. SINGER'S SERVICE FEE FORMULA IS NOT RELIABLE.**

14       Plaintiffs concede that Dr. Singer's formula for calculating Google's but-for service fee

15  depends on his pass-through analysis.  Mot. at 13.  They argue that "pass-through is just one of

16  many inputs" into Dr. Singer's service fee formula.  Opp. at 14.  But Plaintiffs do not dispute that,

17  if a developer would not pass through a lower service fee, then Dr. Singer's service fee formula

18  indicates that Google's service fee is competitive.  Mot. at 4.  Thus, pass-through is not just a

19  variable: it drives Dr. Singer's result.  Because Dr. Singer's pass-through formula is unreliable, his

20  service fee formula is, too.[2]  The service fee formula also is unreliable because it uses average

21  inputs, including an average pass-through rate.  Plaintiffs' argument that this "reflects market

22  conditions," Opp. at 15, is a non-sequitur.  If anything, the fact that Google reduced service fees

23  for some developers and not others shows that individualized, not average, inputs are required.

24  **III.    DR. SINGER'S OPINIONS REGARDING PLAY POINTS ARE NOT RELIABLE.**

25       Plaintiffs have not shown that Dr. Singer has a reliable method to support his alternative

---

26  [2] Plaintiffs do not dispute that Dr. Singer predicts that Google would have charged service fee

27  rates for apps in the Entertainment and Music and Audio categories lower than his estimate of Google's costs.  Mot. at 12–14.  Plaintiffs point to a passing reference to costs ranging from ■ to

28  ■, Opp. at 14, but that range extends at least as high as the service fee rate estimates.

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION

1  theory that all consumers would have earned more valuable Play Points in the but-for world.

2  Plaintiffs do not dispute that less than ▮▮▮▮▮ of U.S. consumers participated in the Play Points

3  program and only ▮▮▮ of U.S. consumers redeemed Play Points.  Mot. Ex. 3 at ¶ 355.  Nor do

4  Plaintiffs dispute that Dr. Singer has "not identified any model to determine which users would

5  have signed up for [P]lay [P]oints in the but-for world," Mot. Ex. 1 at 288:11–16, 289:17–23, or

6  "who would have used them."  *Id.* at 297:8–21.

7        Plaintiffs do not identify any basis for what Dr. Singer testified was only a "fair

8  assumption" that "every member of the putative class would have signed up for the [P]lay Points

9  program and used [P]lay [P]oints."  *Id.* at 298:22–299:10.  Plaintiffs speculate that "Google could

10  automatically enroll users to a more fulsome program," as some other companies do.  Opp. at 4.

11  But Plaintiffs cite no evidence—not one Google document and not one line of testimony—that

12  Google would have done this.  They do not explain or show why Google would have made a

13  different decision than grocery stores that require customers to sign up for rewards programs.

14        Plaintiffs argue that Google would have offered an ▮▮▮ discount, which "would drive

15  near universal participation."  Opp. at 4.  But Plaintiffs do not point to any analysis supporting this

16  assumption and Dr. Singer did none.  Plaintiffs incorrectly argue that *In re Optical Disk Drive*

17  *Antitrust Litigation*, No. 3:10-MD-2143, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016), excuses this

18  lack of evidence.  The Court in *Optical Disk* merely held that consumers could have suffered

19  injury if evidence showed that they paid more for a product than it was "objectively worth."  *Id.* at

20  *9.  That principle does not support Dr. Singer's opinion here because that opinion depends on

21  showing that consumers would have changed their behavior, not merely that they would have

22  gotten a better deal.  Even if Dr. Singer had proof that Play Points would have been more valuable

23  in a but-for world, that would not prove impact on consumers who never earned any Play Points

24  because they never enrolled in the program.  Dr. Singer has no model or evidence to prove which

25  consumers would have enrolled in a but-for world.  *Optical Disk* did not hold that an expert does

26  not need evidence to testify that consumers would have changed their behavior.

27  **IV.**   **CONCLUSION**

28        The Court should exclude Dr. Hal Singer's testimony in adjudicating class certification.

1   Respectfully Submitted,

2   DATED:  July 14, 2022

3                                                   By:    _/s/ Justin P. Raphael_

4                                                          Justin P. Raphael

5                                                          Kyle W. Mach, S.B. #282090
                                                           kyle.mach@mto.com
6                                                          Justin P. Raphael, S.B. #292380
                                                           justin.raphael@mto.com
7                                                          Emily C. Curran-Huberty, S.B. #293065
                                                           emily.curran-huberty@mto.com
8                                                          **MUNGER, TOLLES & OLSON LLP**
9                                                          560 Mission Street, Twenty Seventh Floor
                                                           San Francisco, California 94105
10                                                         Telephone: (415) 512-4000

11                                                         Glenn D. Pomerantz, S.B. #112503
                                                           glenn.pomerantz@mto.com
12                                                         Kuruvilla Olasa, S.B. #281509
                                                           kuruvilla.olasa@mto.com
13
                                                           **MUNGER, TOLLES & OLSON LLP**
14                                                         350 South Grand Avenue, Fiftieth Floor
                                                           Los Angeles, California 90071
15                                                         Telephone: (213) 683-9100

16                                                         Jonathan I. Kravis, _pro hac vice_
17                                                         jonathan.kravis@mto.com
                                                           **MUNGER, TOLLES & OLSON LLP**
18                                                         601 Massachusetts Avenue NW, Suite 500E
                                                           Washington, D.C. 20001
19                                                         Telephone: (202) 220-1100

20                                                         Daniel M. Petrocelli, S.B. #97802
21                                                         dpetrocelli@omm.com
                                                           Stephen J. McIntyre, S.B. #274481
22                                                         smcintyre@omm.com
                                                           **O'MELVENY & MYERS LLP**
23                                                         1999 Avenue of the Stars
                                                           Los Angeles, California  90067
24                                                         Telephone: (310) 553-6700
                                                           Facsimile: (310) 246-6779
25

26

27

28

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION

Ian Simmons, *pro hac vice*
isimmons@omm.com
Benjamin G. Bradshaw, S.B. #189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants*

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION