EXHIBIT L

1    HUESTON HENNIGAN LLP
     John C. Hueston, State Bar No. 164921
2    jhueston@hueston.com
     Douglas J. Dixon, State Bar No. 275389
3    ddixon@hueston.com
     620 Newport Center Drive, Suite 1300
4    Newport Beach, CA 92660
     Telephone:  (949) 229-8640
5
     Joseph A. Reiter, State Bar No. 294976
6    jreiter@hueston.com
     Michael K. Acquah, State Bar No. 313955
7    macquah@hueston.com
     William M. Larsen, State Bar No. 314091
8    wlarsen@hueston.com
     Julia L. Haines, State Bar No. 321607
9    jhaines@hueston.com
     523 West 6th Street, Suite 400
10   Los Angeles, CA 90014
     Telephone:  (213) 788-4340
11
     *Attorneys for Plaintiffs Match Group, LLC;*
12   *Humor Rainbow, Inc.; PlentyofFish Media ULC;*
     *and People Media, Inc.*

13

14                 **UNITED STATES DISTRICT COURT**

15                **NORTHERN DISTRICT OF CALIFORNIA**

16   MATCH GROUP, LLC, a Delaware         Case No.
     corporation; HUMOR RAINBOW, INC.,
17   a New York corporation;              **FIRST AMENDED** COMPLAINT
     PLENTYOFFISH MEDIA ULC, a            **FOR (1) VIOLATIONS OF THE**
18   Canadian corporation; and PEOPLE     **SHERMAN ACT; (2) VIOLATIONS**
     MEDIA, INC., a Delaware corporation, **OF THE CARTWRIGHT ACT; (3)**
19                                        **UNFAIR COMPETITION; (4)**
                  Plaintiffs,            **TORTIOUS INTERFERENCE WITH**
20                                        **CONTRACT; AND (5) TORTIOUS**
             v.                           **INTERFERENCE WITH**
21                                        **PROSPECTIVE ECONOMIC**
     GOOGLE LLC; GOOGLE IRELAND           **ADVANTAGE**
22   LIMITED; GOOGLE COMMERCE
     LIMITED; GOOGLE ASIA PACIFIC
23   PTE. LIMITED; and GOOGLE             **DEMAND FOR JURY TRIAL**
     PAYMENT CORP.,
24
                  Defendants.
25

26

27

28

                                    COMPLAINT

6271671

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 11

PARTIES ................................................................................................................. 1313

JURISDICTION AND VENUE .............................................................................. 1414

DIVISIONAL ASSIGNMENT ............................................................................... 1515

BACKGROUND ..................................................................................................... 1515

    A.   Match Group Provides Popular Online Dating Services ................................ 1515

    B.   Google Has Monopolized the Marketplace for Mobile and Licensable
        Operating Systems ......................................................................................... 1919

    C.   Google Has Unlawfully Maintained a Monopoly in the Market for
        Distribution of Android Apps ....................................................................... 21

    D.   Google Also Has Market Power in the Market for Dating App
        Distribution ................................................................................................... 2525

    E.   Google Devises and Uses Exclusionary Contracts, Illegal Tying, and
        Predatory Practices to Block Competitors and Ensure Google Play's
        Dominance ..................................................................................................... 28

        1.   Google Uses Exclusionary Contracts with OEMs ............................. 2929

        2.   Google Uses Exclusionary Contracts with App Developers ............... 3131

        3.   Google Uses Payment Incentives and Predatory Practices ................. 3232

        4.   Google Uses Technological Roadblocks, Contractual
           Restrictions, and False Information to Make Direct App
           Downloads Impractical ....................................................................... 3636

        5.   Google's Anti-Competitive Conduct Destroys Competition in
           the Android App Distribution Market or, Alternatively, the
           Dating App Distribution Market ......................................................... 3939

    F.   Google Unlawfully Seized and Maintains a Monopoly in the Market
        for Android App In-App Payment Processors ............................................... 4141

        1.   Google Uses Illegal Ties and Exclusive Contracts to Mandate
           Use of Google Play Billing ................................................................. 4444

        2.   Google Abuses Its Monopoly Power by Imposing an
           Arbitrary and Unconscionable Tax on Consumers and App
           Developers .......................................................................................... 4646

        3.   Google's Conduct Destroys Competition in the Android App

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

TABLE OF CONTENTS (cont.)

Page

IAP Market and Harms Consumers and App Developers .................... ~~51~~51

G. Match Group Offers Consumers an Alternative and Competitive In-App Payment Option .................................................................. ~~53~~53

H. Google Allows Match Group's Apps to Remain on Google Play, Recognizing That Match Group's Payment Options Do Not Violate Google's Policies ............................................................................ 55

I. Abusing its Monopoly Power, Google Abruptly Changed Its Policies ............ ~~58~~58

J. Google's Anti-Competitive Conduct Has Irreparably Harmed Match Group and its Customers ............................................................ 64

FIRST CAUSE OF ACTION .................................................................... ~~66~~66

SECOND CAUSE OF ACTION ................................................................ ~~68~~68

THIRD CAUSE OF ACTION .................................................................... ~~69~~69

FOURTH CAUSE OF ACTION .................................................................. ~~71~~71

FIFTH CAUSE OF ACTION ...................................................................... ~~73~~73

SIXTH CAUSE OF ACTION ...................................................................... ~~75~~75

SEVENTH CAUSE OF ACTION .................................................................. 78

EIGHTH CAUSE OF ACTION .................................................................... 80

NINTH CAUSE OF ACTION ....................................................................... 81

TENTH CAUSE OF ACTION ...................................................................... 83

ELEVENTH CAUSE OF ACTION ................................................................ 85

TWELFTH CAUSE OF ACTION .................................................................. 87

THIRTEENTH CAUSE OF ACTION ............................................................ 88

FOURTEENTH CAUSE OF ACTION ........................................................... 90

FIFTEENTH CAUSE OF ACTION ............................................................... 91

PRAYER FOR RELIEF ........................................................................... ~~87~~93

Formatted
Formatted
Formatted
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Field Code Changed
Formatted
Formatted
Field Code Changed
Formatted
Formatted

## INTRODUCTION[1]

1.     This is a case about the strategic manipulation of markets, broken promises, and abuse of power that Google LLC[2] has employed to illegally foreclose competition in the world's biggest mobile device ecosystem, Android, and become one of the largest, most powerful companies in the world.  Google convinced billions around the world to use the Android mobile operating system ("Android" or "Android OS") on promises of an open ecosystem, flexibility, and a focus on the user.  Through those platitudes and promises and the anticompetitive tactics detailed in this complaint, Google illegally monopolized the market for distributing apps on Android devices with its Google Play Store ("Google Play")—making it today the only viable choice a mobile application ("app") developer has to reach Android users.  Now, Google seeks to eliminate user choice of payment services and raise prices on consumers by extending its dominance to the separate market for in-app payment ("IAP") processors on Android. It is conditioning app availability on Google Play with exclusive use of its own in-app payment processing product, Google Play Billing, where it can charge supra-competitive prices and monetize the personal data of billions of digital app users.

2.     Ten years ago, Match Group was Google's partner. We are now its hostage. Google lured app developers to its platform with assurances that we could offer users a choice over how to pay for the services they want.  But once it monopolized the market for Android app distribution with Google Play by riding the coattails of the most popular app developers, Google sought to ban alternative in-app

---

[1] For the purposes of this complaint, the term "Match Group" includes only the operating entities named as Plaintiffs. Match Group LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc. are part of the Match Group family of companies with the ultimate parent company Match Group, Inc. ("MGI"), a nonoperating holding company.  MGI's other subsidiaries are not included in the definition of "Match Group" in this complaint.  Match Group asserts the allegations in this complaint upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief, including an investigation conducted by its attorneys.

[2] Unless noted otherwise, throughout this complaint, "Google" refers to Google LLC and all other Google entity defendants.

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

payment processing services so it could take a cut of nearly every in-app transaction on Android. This Complaint lays bare Google's misdeeds that made it possible.

3.     Google monetizes Android, in part, by operating Google Play and a separate in-app payment processing service called Google Play Billing.  Over the last decade, through bait and switch tactics that exploited the very app developers it so ardently courted and claimed to support and by paying off potential competitors not to compete, Google has grown Google Play into the only viable Android app marketplace.  If a developer wants users to find its app, that app must be on Google Play.

4.     But that was not enough for Google.  It also wanted to control the much more lucrative in-app payment processing market on Android.  Every year, consumers spend tens of billions of dollars on Android apps.  And that number increases every year.  When those transactions involve the purchase of "digital goods or services" using Google Play Billing, Google keeps as much as 30% for itself.   Google disingenuously calls this extortionate tax a "fee" even though it is nearly ten times the actual fees other payment processors charge in competitive marketplaces.

5.     Further, what constitutes a "digital good or service" is ill-defined and arbitrarily applied.  Clothing and food delivery and ride sharing apps do not qualify.  But Match Group's dating apps do qualify, even though they enable users to meet in the real world for a date, just like a ride sharing app enables a user to find a driver in the real world for a ride.

6.     Google's "fee" also bears no relation to the cost or value of services Google provides developers.  Indeed, all developers with apps on Google Play benefit from the exact same services, and they all pay Google a $25.00 registration fee.  Yet only the small handful who sell "digital goods and services," again, as arbitrarily defined by Google, pay the Google tax, which results in pure non-competitive profit to Google.  It also allows Google to collect massive volumes of user data that Google can then monetize.

7.      Blinded by the possibility of getting an ever-greater cut of the billions of dollars users spend each year on Android apps, Google set out to monopolize the market for how users pay for their Android apps.  But it had to be sly in the way it went about doing so.

8.      After acquiring Android, Google knew that its growth depended on Android and Google Play offering the most popular apps to users.  So to entice developers to offer their apps through Google Play, Google historically allowed many app developers to offer their own payment processing services for in-app purchases or offer those services alongside Google Play Billing.  While Google required the purchase price to be the same regardless of the payment service employed, this gave users and developers a choice.  Developers who were satisfied with Google's one-size-fits-all Google Play Billing service could utilize it.  But for developers for whom Google Play Billing was not a good fit—for example, because it restricted subscription payment plans or did not allow developers to provide discounts—they could opt to offer their own payment processing system.  And such developers spent considerable time, effort, and money doing just that, and most users appreciated the choice. This included several of Match Group's brands.

9.      Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc. (collectively, "Match Group") operate popular dating apps, including Match Group, LLC's Tinder®, the world's most popular dating app.  Match Group started the online dating category back in 1995 and has been instrumental in making the dating app industry an important and everyday part of a single's dating experience. Match Group's platforms are responsible for millions of marriages, relationships, and families.  And, although Match Group's dating apps have been available on Android for many years, they did not always offer the ability to make in-app purchases because Google Play Billing lacked features that are important to consumers and that Match Group's web-based payment solutions had offered for years. Google recognized, however, that once Match Group offered in-app purchases

through Android apps, even if it was through Match Group's own payment system, customers would become accustomed to paying inside the app, making it difficult for Match Group to redirect users to purchase subscriptions and upgrades outside the app—*e.g.*, on Match Group websites. This would increase the propensity of users to only use the Android app and further entrench the Android ecosystem, all of which benefits Google's bottom line.

10.   So Google assured Match Group that if it enabled in-app purchases in its dating apps on Android, Match Group could use its own payment systems for in-app purchases, whether on their own or alongside Google Play Billing. And Match Group went along. On some apps, Match Group launched in-app purchases on Android using both Google Play Billing and its own in-house payment processing system. But Match Group learned that users in the United States prefer to use Match Group's own payment services over Google Play Billing a majority of the time, as demonstrated on Match Group's Tinder app.

11.   Similarly, despite building Android on promises of being an "open" ecosystem, over time, Google has forced original equipment manufacturers ("OEMs") to accept contractual limitations requiring them to give Google Play insurmountable advantages over competing app stores. For example, Google required OEMs to pre-install Google Play on the home screen of every Android device in exchange for access to essential Google services. Google also developed a program whereby OEMs received a percentage of Google's search and Google Play Billing revenue if they provided Google Play exclusively. Google also limits access to competing app stores by imposing technological restraints on Android OS users.

12.   Fast-forward to 2022. Android is now the dominant licensable mobile operating system ("OS") in existence and used by nearly 70% of all smart mobile devices globally. And Google Play is equally dominant, processing over 90% of all Android app downloads across the globe: Android device users downloaded apps from Google Play more than 111 billion times last year—translating to nearly $48

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

*billion* in app revenue through Google Play in 2021.[3]  No competing Android app store has more than 5% of the market.

13.     With total domination of the Android app distribution market now in hand, Google turned to its goal of monopolizing the in-app payment processing market.  In 2020, Google announced that it would require all apps that sell its vaguely defined "digital goods and services" to use Google Play Billing exclusively starting in September 2021.  No more alternatives to Google Play Billing would be allowed.  No more user choice.  It is Google Play Billing or nothing for users and app developers.  And the punishment for noncompliance is severe: banishment from Google Play.

14.     Google's policy change eliminated the promised exception that had previously enticed Match Group and other popular apps—like streaming services—to offer in-app purchases and spend time, effort, and money to develop their own in-app payment systems.  Now that Google controlled the only real choice for developers to market their apps to Android users, Google held all the power and no longer needed their support.

15.     Google's motivation is obvious: monopolizing the Android in-app payment processing market allows Google to impose a 15-30% tax on the billions of dollars users spend on so-called "digital goods or services" on Android.  The timing is obvious, too, given Google's lackluster financial performance in the first quarter of 2022.  That tax comes out of the pockets of consumers in the form of higher prices and the revenue that app developers would and should otherwise earn for the sale of their services.  Monopolizing the in-app payment processing market also allows Google to collect reams of sensitive consumer data—such as consumer identities and pricing, credit card information, propensity to purchase dating services, etc.—that Google can further monetize, as well as use to build competing apps or services.

---

[3] *See* Statista, *Worldwide gross app revenue of Google Play from 2016 to 2021*, available online at https://www.statista.com/statistics/444476/google-play-annual-revenue/ (last visited Apr. 26, 2022).

6182535

16.     Google further ensures that such transactions only occur on Google Play Billing by including onerous, one-sided terms in its developer agreements.  Google's developer agreement is an adhesion contract—in other words, Google dictates the terms and app developers can either agree to Google's terms or be excluded.  One of those terms is an anti-steering provision, which prohibits developers from communicating with users inside their apps about a user's ability to purchase upgrades or additional functionality outside the app, including at lower prices, through, for example, the developer's own website.

17.     Google therefore controls it all: the dominant marketplace for Android apps; the only means to purchase apps in the marketplace; and the messaging inside the marketplace so that consumers cannot learn of lower-priced options elsewhere.

18.     Match Group is not the first to sound the alarm on Google's unlawful conduct, nor is it an isolated voice.  Many other app developers, consumers and, more recently, a coalition of 37 state Attorneys General, have filed lawsuits condemning Google's actions and seeking to prevent the same illegal conduct.[4]  Those lawsuits followed separate antitrust actions by the Department of Justice and states that challenged Google's abuse of monopoly power in similar contexts.[5]  Other government investigations and entities, including the United States House of Representatives Judiciary Committee,[6] the United States Senate Judiciary

---

[4] *See, e.g., State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD (N.D. Cal.); *In Re Play Store Antitrust Litigation*, Case No. 3:21-md-02981-JD (N.D. Cal.); *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD (N.D. Cal.).

[5] *United States of America et al. v. Google LLC*, Case No. 1:20-cv-03010-APM (D.D.C.); *The State of Texas et al.* v. *Google LLC*, Case No. 4:20-cv-00957-SDJ (E.D. Tex.).

[6] *See* Investigation of Competition in Digital Markets, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary at 213 (2020).

- 6 -
COMPLAINT

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

1   Committee,[7] the European Commission,[8] the Competition Commission of India,[9] the

2   French Ministry of Finance,[10] the German Federal Cartel Office,[11] the Cabinet

3   Secretariat of Japan,[12] the United Kingdom Competition and Markets Authority,[13] the

4   Competition Commission of South Africa,[14] the Australia Competition and Consumer

5   Commission,[15] and the Netherlands Authority for Consumers and Markets[16] all have

6

7   [7] *See* Executive Business Meeting, U.S. Senate Committee of the Judiciary (Feb. 3, 2022),
8   available online at https://www.judiciary.senate.gov/meetings/02/03/2022/executive-business-meeting-2 (last visited April 26, 2022).

9   [8] Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal
    Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine
10  (July           18,           2018),           available           online           at
    https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 (last visited Apr. 26, 2022).

11  [9] *See* Economic Times, *CCI to complete probe into Google Play Store policy within 60 days* (Jan. 5,
    2022), available online at https://m.economictimes.com/tech/technology/cci-to-complete-probe-
12  into-google-play-store-policy-within-60-days/articleshow/88717171.cms (last visited Apr. 26 2022);
    Economic Times, CCI probe finds Google's Play Store billing guidelines 'unfair' and
13  'discriminatory'        (Mar.        31,        2022),        available        online        at
    https://economictimes.indiatimes.com/tech/technology/cci-probe-finds-googles-play-store-billing-
14  guidelines-unfair-and-discriminatory/articleshow/90550596.cms (last visited Apr. 26, 2022).

15  [10] *See* Bloomberg, *Google Slapped with French Fine Over Abusive App Store Practices* (March 29,
    2022), available online at https://www.bloomberg.com/news/articles/2022-03-29/google-slapped-
16  with-french-fine-over-abusive-app-store-practices (last visited Apr. 26, 2022).

17  [11] *See* Bloomberg Law, *Google Subject to New, Tougher Supervision by German Regulator*, available
    online at        https://news.bloomberglaw.com/privacy-and-data-security/google-subject-to-new-
18  tougher-supervision-by-german-regulator (last visited Apr. 26, 2022).

19  [12] *See* Nikkei Asia, *Apple and Google under Antitrust Scrutiny in Japan for Mobile OS*, available
    online at https://asia.nikkei.com/Business/Technology/Apple-and-Google-under-antitrust-scrutiny-
20  in-Japan-for-mobile-OS (last visited Apr. 26, 2022).

21  [13] *See* United Kingdom Competition & Markets Authority, Mobile Ecosystems Market Study Interim
    Report        (Updated        Jan.        26,        2022),        available        online        at
22  https://www.gov.uk/government/publications/mobile-ecosystems-market-study-interim-
    report/interim-report (last visited Apr. 26, 2022).

23  [14] *See* George Herald, *SA Publishers to Challenge Google and Meta Competition Commission*,
    available        online        at        https://www.georgeherald.com/News/Article/Business/sa-publishers-to-
24  challenge-google-and-meta-at-competition-commission-202112070346 (last visited Apr. 26, 2022).

25  [15] *See* Reuters, *Google Misled Consumers Over Data Collection—Australian Watchdog*, available
    online at https://www.reuters.com/technology/australia-finds-google-misled-customers-over-data-
26  collection-regulator-2021-04-16/ (last visited Apr. 26, 2022); Reuters, Australia Plans to Make
    Google    Offer    Alternative    Search    Engines    on    Smartphones,    available    online    at
27  https://www.reuters.com/technology/australia-plans-make-google-offer-alternative-search-engines-
    smartphones-2021-10-28/ (last visited Apr. 26, 2022).

28  [16] *See* Reuters, *With Apple Fight Ongoing, Dutch Watchdog ACM to Investigate Google Play Store
    Practices*, available online at https://www.reuters.com/technology/dutch-watchdog-acm-
    investigate-google-play-store-practices-2022-05-04/ (last visited May 9, 2022).

- 7 -
COMPLAINT

6182535

1  scrutinized Google's business practices and likewise concluded that Google has
2  monopolized the Android app distribution market and engaged in improper tying and
3  other anti-competitive acts.

4      19.    Many countries around the world have taken action in direct response to
5  Google's anti-competitive behavior.  For example, the European Union recently
6  reached agreement on the Digital Markets Act ("DMA").  Hailed as the "most
7  sweeping legislation to regulate tech since the European privacy law was passed in
8  2018,"[17] the DMA places limitations and restrictions on "gatekeeper" platforms like
9  Google by, among other things, requiring them to allow third-party payment options
10 for in-app payments and alternative app stores and prohibiting discriminatory fees.
11 Similarly, the government of Republic of Korea targeted Google's exercise of
12 monopoly power in the mobile app market by, among other things, amending the
13 Telecommunications Business Act to prohibit platform operators like Google from
14 forcing its IAP systems and levying discriminatory fees on app developers.

15     20.    Through all the enforcement actions and new regulation across the globe,
16 it is clear that Google's business model has either already been or soon will be
17 declared illegal in roughly half the world.  The entire world is recognizing that Google
18 has manipulated laws passed to protect innovation, competition, and a free market in
19 the most calculated manner to destroy innovation and competition.

20     21.    Despite scrutiny from governments, private plaintiffs, and antitrust
21 authorities throughout the world, Google has continued to flout official sanctions with
22 its anti-competitive and illegal conduct—displaying a disturbing disregard for
23 consumers, developers, regulators, and established antitrust law alike.  Google's
24 power, based on its own actions, is apparently unmitigated: Google has found it more
25 profitable to pay fines or evade them through lengthy appeals, choosing to continue

26

27 [17] *See* The NYTimes, *E.U. Takes Aim at Big Tech's Power With Landmark Digital Act* (March 24,
28 2022), available online at https://www.nytimes.com/2022/03/24/technology/eu-regulation-apple-
   meta-google.html (last visited Apr. 26, 2022).

- 8 -
COMPLAINT

6182535

to engage in anti-competitive conduct by collecting its fees up to the last possible moment, rather than revise its policies that have been internationally rebuked for harming consumers.**[18]**

22.     Initially, it appeared that Google may have paid heed to its sinking reputation on the global stage. Google originally postponed its September 2021 ultimatum for app developers to exclusively use Google Play Billing until March 31, 2022.  But as this new deadline approached, Google dug in its heels even as public lawsuits, investigations, regulatory orders, and new legislation cascaded against Google's anti-competitive practices.  Instead of changing its policies, it resorted to offering hush money to developers, including Match Group, in the form of hundreds of millions of dollars in credits and rebates (with myriad strings attached) to give up its own payment processor and stop advocating that government officials protect consumers and developers from Google's harmful conduct.   In fact, Google threatened to retract such an offer from Match Group, Inc. ("MGI") on the eve of an MGI officer's planned testimony about Google's stranglehold on app developers before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights.

23.     Less than a week before Google's March 31, 2022, deadline, Google announced a new "pilot program" (misleadingly) labeled "User Choice Billing." Under this new "pilot program," developers may offer a "choice" of billing platforms but with a catch: one of those options must be Google Play Billing and only ***Google*** determines who can participate in this new program. So far, the only developer Google selected appears to be Spotify, the popular music streaming service with hundreds of millions of active users.  Match asked to participate, but, despite the fact that Match has offered users a choice of payment systems in its Android apps for

---

**[18]** The Associated Press, *Google is Appealing a $5 Billion Antitrust Fine in the EU* (Sept. 27, 2021), available online at https://www.npr.org/2021/09/27/1040889789/google-eu-android-appeal-antitrust (last visited Apr. 26, 2022) (citing the multi-year litigation and Google's record-breaking penalty).

6182535

nearly a decade, Google refused, telling Match that User Choice Billing is only a pilot program at a "very early stage" and that it could not confirm when or whether it would be expanded beyond Spotify.  That is pretext.

24.     In reality, the User Choice Billing "pilot program" is nothing more than a political stunt designed to thwart regulatory scrutiny of Google Play Billing and a thinly veiled attempt to lure certain hold-out developers, like Spotify, to begin using Google Play Billing.  To understand why Google has only offered this option to Spotify, all one has to do is follow the money.  Spotify previously did not allow purchases on Android through its app because it refused to pay Google's tax; instead, users who wished to purchase a Spotify subscription had to do so through Spotify's website or desktop app.  Now, through User Choice Billing, Google will be able to impose its tax on some portion of the hundreds of millions of dollars of Spotify subscriptions that will happen inside the Spotify Android app, where Google previously received nothing.  With this context, it's clear that User Choice Billing is nothing more than a Potemkin village erected to project the appearance of competitive freedom to regulators without presenting a genuine option to developers while finally giving Google access to revenues from Spotify's highly valuable music streaming business.  In truth, User Choice Billing demonstrates how little Google values transparency to consumers, developers, or regulators, let alone real market choice.

25.     And this is an old trick. As previously mentioned, Google has allowed developers like Match Group to offer users a choice of billing platforms for nearly a decade—and it continues to allow apps like Uber and Lyft to operate their own payment processors, despite the very limited differences between the services their apps offer (digitally connecting a driver and passenger for an in-real-life trip) and those offered by Match Group apps (digitally connecting two potential daters for an in-real-life date).  Google's announcement of a new exception less than eight days before its new general policy went into effect disallowing developers from continuing to operate in the same way they have for years both undermines any possible

- 10 -
COMPLAINT

procompetitive justification Google could attempt to offer (though none exists) and sends a clear message to app developers: behave, and this could be you.  For example, both Match Group and Spotify were asked to testify before the Senate Judiciary Subcommittee on Competition Policy, Antitrust and Consumer Rights.  Match Group spoke out against Google's anti-competitive behavior at the hearing, but Spotify did not, even when asked direct questions about Google.  Not so coincidentally, Spotify was invited to "pilot" User Choice Billing while Google has pulled the rug out from under Match Group, ending the true user choice that Match Group apps have offered to its Android app users for years.  There's no need for a "pilot" test of a program that's been in use for a decade.

26.     Google's behavior is not just hypocritical—it violates the law.  At bottom, Google's policy change is a blatant attempt to expand Google's monopoly position and market power in the Android ecosystem.  Google changed its policy to eliminate competing in-app payment providers, increase Google's control over app distribution and in-app payments, and substantially increase the number of transactions from which Google can extract sensitive consumer data and unconscionable, supra-competitive fees.  Google's policy change also harms app developers and users.  It allows Google to collect vast quantities of data by inserting itself as the middleman in all transactions of digital goods on Android devices.  This further ensures that users will continue to use the Android platform since Google and not the developer will control the payment information and relationship with the customer, permitting Google to further exploit user data for commercial gain.  Google uses that data to support its vast advertisement business by, among other things, selling access to the data back to the developers (who would otherwise be able to collect it themselves).  Google's ability to collect user data also enables Google to compete with apps across numerous market segments by targeting those apps' best customers.  In changing its policies to entrench its dominance, Google has abused its monopoly power in violation of federal and California law.

27.     Google's actions will also irreparably harm Match Group and tortiously interfere with its customer relationships.  Match Group invested significant capital to develop, implement, and market its in-app payment systems.  Around the world, millions of consumers have used those payment systems to subscribe and pay for services on Match Group's apps.  Many of those users have relied on Match Group's services through its payment platform and expect them to continue.  If Google succeeds in banning Match Group's in-app payment options—a result that seems inevitable now that Google has begun rejecting updates to Match Group's apps even after allowing them for the first few weeks following the March 31 deadline—Match Group will have to abandon its prior investments and incur substantial, additional, and unnecessary costs to redesign its apps and ensure continuity of service for its customers.  But despite Match Group's best efforts to mitigate the damage, Google's unlawful acts will inevitably and irrevocably disrupt many of Match Group's customer contracts and economic relationships.

28.     Moreover, if Match Group does not comply with Google's policy change, Google has made clear that it will remove Match Group's apps from Google Play—a death knell threat for Match Group that Google already carried out against another app developer, Epic Games, Inc.—and/or no longer allow for app updates.  If that occurs, more than one billion Android device users around the world could be prevented from downloading Match Group's apps through Google Play or purchasing upgrades, leaving Match Group with no viable means to reach those consumers given Google's monopoly.   Meanwhile, current users of Match Group's apps will experience reduced functionality and lose the ability to download critical software updates, subscribe to enhanced digital content, or renew their paid-for subscriptions.  Match Group will suffer irreparable damage to its customer relationships, reputation, profits, and goodwill.

29.     To protect its business and customer relationships, Match Group has no choice but to file this lawsuit.

6182535

**PARTIES**

30.  Plaintiff Match Group, LLC ("MGL") is a wholly owned subsidiary of MGI, a publicly traded Delaware corporation based in Dallas, Texas.  MGL has its principal place of business in Dallas, Texas.  MGL operates the Match® and Tinder® dating services, among others.

31.  Plaintiff Humor Rainbow, Inc. is a wholly owned subsidiary of MGI. Humor Rainbow, Inc. is a New York corporation with its principal place of business in Dallas, Texas.  Humor Rainbow, Inc. operates the OkCupid® dating service.

32.  Plaintiff PlentyofFish Media ULC is a wholly owned subsidiary of MGI. PlentyofFish Media ULC is a Canadian corporation with its principal place of business in Vancouver, British Columbia, Canada.  PlentyofFish Media ULC operates the PlentyofFish® dating service.

33.  Plaintiff People Media, Inc. is a wholly owned subsidiary of MGI.  People Media, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas.  People Media, Inc. operates the OurTime® dating service, among others.

34.  Defendant Google LLC ("Google LLC" or, collectively with the other Google entities, "Google") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google LLC is the primary operating subsidiary of Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers throughout the United States who distribute their Android apps through Google Play and is thus a party to the anti-competitive conduct at issue here.  Further, Google LLC is the primary decision-maker for the anti-competitive conduct at issue herein.  That anti-competitive conduct emanates from Google LLC in California.

35.  Defendant Google Ireland Limited ("Google Ireland") is a limited company organized under the laws of Ireland with its principal place of business in Dublin, Ireland.  Google Ireland is a subsidiary of Google LLC. Google Ireland

6182535

1    contracts with all app developers that distribute their apps through Google Play and
2    is therefore a party to the anti-competitive conduct at issue herein.

3        36.    Defendant Google Commerce Limited ("Google Commerce") is a limited
4    company organized under the laws of Ireland with its principal place of business in
5    Dublin, Ireland.   Google Commerce is a subsidiary of Google LLC.   Google
6    Commerce contracts with all app developers that distribute their apps through Google
7    Play and is therefore a party to the anti-competitive conduct at issue herein.

8        37.    Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific") is a
9    private limited company organized under the laws of Singapore with its principal
10   place of business in Mapletree Business City, Singapore.   Google Asia Pacific is a
11   subsidiary of Google LLC.  Google Asia Pacific contracts with all app developers that
12   distribute their apps through Google Play and is therefore a party to the anti-
13   competitive conduct at issue herein.

14       38.    Defendant Google Payment Corp. ("Google Payment") is a Delaware
15   corporation with its principal place of business in Mountain View, California.  Google
16   Payment is a subsidiary of Google LLC.

17                        **JURISDICTION AND VENUE**

18       39.    This Court has subject matter jurisdiction over Match Group's federal
19   antitrust claims pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.  The
20   Court has supplemental jurisdiction over Match Group's state-law claims pursuant to
21   28 U.S.C. § 1367.

22       40.    This Court has personal jurisdiction over Google because its headquarters
23   and principal place of business are in this District, and some or all of the challenged
24   conduct emanated from or occurred in this District.

25       41.    In addition, Google has consented to this Court's jurisdiction.   With
26   respect to all of the Google entities other than Google Payment, Paragraph 16.8 of
27   Google's Developer Distribution Agreement provides that all claims arising out of or
28   relating to the agreement or Match Group's relationship with Google under the

6182535

1   agreement will be resolved in a federal or state court located within the county of
2   Santa Clara, California.  With respect to Google Payment, Section 11.3 of the Google
3   Payments—Terms of Service—Seller agreement between Match Group and Google
4   Payment provides that the "exclusive venue for any dispute related to this Agreement
5   will be the state or federal courts located in Santa Clara County, California, and each
6   party consents to personal jurisdiction in these courts."  The dispute between Match
7   Group and Google (including Google Payment) arises from and relates to Google's
8   practices including through the Developer Distribution Agreement and Google
9   Payments—Terms of Service—Seller agreement.

10      42.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because
11  Google maintains its principal places of business in the State of California and in this
12  District, because a substantial part of the events or omissions giving rise to Match
13  Group's claims occurred in this District, and because, pursuant to 28 U.S.C.
14  § 1391(c)(3), any Defendants not resident in the United States may be sued in any
15  judicial district and their joinder with others shall be disregarded in determining
16  proper venue. In the alternative, personal jurisdiction and venue are proper under
17  Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Google may be found
18  in or transact business in this District.

19                          **DIVISIONAL ASSIGNMENT**

20      43.      Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be
21  assigned to a particular Division of this District, but shall be assigned on a District-
22  wide basis.

23                                **BACKGROUND**

24      A.      **Match Group Provides Popular Online Dating Services**

25      44.      The widespread proliferation of internet and mobile devices has changed
26  the ways that humans connect with one another.  Online dating services and apps are
27  now some of the most popular methods for finding a significant other.  Today,
28  approximately one-third of all marriages in the US begin on a dating app, as well as

6182535

over 40% of all relationships, making online dating apps the single most popular way couples meet today.  Further, in certain populations such as the LGBTQI+ community over 70% of all relationships begin online.

45.    MGI, through its predecessors and portfolio companies, has pioneered this trend and helped hundreds of millions of people forge meaningful connections all over the world.

46.    MGI, through its portfolio of companies, currently offers dating services in more than 40 languages.  While MGI does not itself develop or operate apps, its key brands (operated through subsidiaries including MGL and the other Match Group Plaintiffs) include Tinder®, Match®, OkCupid® PlentyOfFish®, and OurTime®. Collectively, millions of users subscribe to Match Group's services.

47.    MGI's companies, including MGL, offer services that generally help users connect with one another using profile information and search and matching functions.  Compared to traditional ways of meeting people, Match Group's services offer users access to a larger pool of people than they could otherwise meet; the ability to efficiently filter that pool of people based on user preferences; and more comfortable and convenient ways to connect.

48.    **Tinder** is Match Group's most popular dating brand. Tinder is a dating service and app that presents profile cards of other Tinder users on one user's screen to give him or her the opportunity to "Like" the other user, or alternatively, to decline interest in the other user.  After reviewing one or more photographs and a short biography associated with a profile, users can "Like" a potential match, or "Nope" (to pass).  If two users express mutual interest, they are a match and can begin a conversation through a chat feature on the platform.

49.    Tinder's unique approach to dating took the industry and world by storm. Within two years of its debut in 2012, Tinder was processing over one billion "Likes" or "Nopes" and producing approximately 12 million matches per day.  Today, Tinder

- 16 -
COMPLAINT

6182535

1   is the #1 downloaded dating app worldwide and has tens of millions of active users.

2   No other dating app has achieved Tinder's level of popularity.

3       50.    Tinder is available to users at no charge.  Users also have the option of

4   purchasing various subscription tiers, which currently include Tinder Plus®, Tinder

5   Gold™, and Tinder Platinum®.  Each subscription tier offers users different enhanced

6   features such as, among others, unlimited "Likes."  In addition to the Tinder Plus,

7   Tinder Gold, and Tinder Platinum subscriptions, Tinder offers options to purchase

8   many of the same benefits as á la carte digital purchases.  Tinder's á la carte offerings

9   are similarly popular with users.  More than ten million users purchase Tinder's

10  subscriptions or á la carte digital services.

11      51.    Tinder launched as a mobile-only app (the "Tinder app").  Like other

12  dating apps, the value that Tinder provides to users depends, in part, on the size of the

13  network it offers—more users means more potential matches which, in turn, means

14  that users are more likely to find a compatible match.[19]

15      52.    **Match.com ("Match")** was the service that Match Group first launched

16  in 1995 when it pioneered the internet dating industry, and it remains one of the most

17  popular dating services and apps in the world.  Match users answer several questions

18  about themselves and their interests to create a detailed profile to help them find the

19  perfect match.

20      53.    Match's basic account is available for no charge and allows users to

21  browse profiles and conduct searches, send "Likes" to other users, view up to six "Top

22  Picks" daily, see which users have used the Super Like feature to indicate a higher

23  level of interest, and send a limited number of messages to other users.  Users can

24

25

26  _____

    [19] D'Arcy Coolican and Li Jin, "The Dynamics of Network Effects," *Andreessen Horowitz* (Dec. 13,
27  2018), available online at https://a16z.com/2018/12/13/network-effects-dynamics-in-practice/ (last
    visited Apr. 26, 2022) ("At its core, the theory behind network effects suggests that platforms and
28  products with network effects get better as they get bigger — not just in value to users, but also in
    accruing more resources to improve their product . . . .").

6182535

also upgrade to Match's Standard and Premium subscription plans, which offer users additional features.

54.    Match originally launched as a website-based service.  But since 2010, Match has also offered its complete suite of services through its mobile app where users can create their profile, send messages, and purchase Standard and Premium subscriptions and Power-Ups.  Like with Tinder, of the millions of Match users, a sizable percentage purchase digital services through Match's mobile apps.

55.    **OkCupid** launched as the first free online dating site in 2003.  OkCupid users can answer thousands of questions on everything from climate change to cilantro to connect with other users on what matters most to them.

56.    OkCupid's basic accounts are available for free.  Users can also upgrade to OkCupid Basic or to OkCupid Premium.  OkCupid Basic provides users an ad-free experience with the ability to send unlimited likes.  OkCupid Premium provides users all the benefits of Basic, as well as the ability to see which users have "liked" them before making the decision to like another user.  OkCupid offers auto-renewing subscription plans, as well as á la carte digital purchases.  Of OkCupid's millions of users, a sizable percentage purchase both subscriptions and á la carte digital services through the OkCupid app.

57.    **PlentyofFish** launched as a free online dating service in 2003 and operates throughout the world from its Vancouver, Canada headquarters. PlentyofFish encourages users to build meaningful relationships through low-pressure experiences including events, live streaming, games and more.

58.    Like Tinder, Match, and OkCupid, PlentyofFish offers a premium subscription service that allows users to see more extended profiles of potential matches, see who is interested in them, send more likes every day, among other benefits.  PlentyofFish offers both subscription and á la carte purchasing options, and millions of users purchase digital services through PlentyofFish's app.

6182535

**B.**   **Google Has Monopolized the Marketplace for Mobile and Licensable Operating Systems**

59.   People can access any of the Match Group apps mentioned above using a smart mobile device.  Smart mobile devices are handheld, portable electronic devices that provide various computing functions, including wireless internet connection and browsing, navigation, social media, and entertainment.  Around the world, there are approximately 3.8 billion smart mobile device users.  For most people, their smart mobile devices are a vital and inseparable part of their lives that have largely replaced laptop and desktop computers.

60.   Several companies manufacture smart mobile devices on a wide scale. These companies are known as original equipment manufacturers ("OEMs").  Apple, Samsung, LG, and Motorola are the most prominent OEMs within the United States.

61.   Smart mobile devices require an OS to function.  The OS provides basic functionality such as controls, touch commands, graphics, and other visual representations showing the actions the user can take.  An OS is required for a smart mobile device to connect to the internet and access cellular service.

62.   OEMs design smart mobile devices to work with a particular OS.  OEMs pre-install that OS on their smart mobile devices to ensure that the devices are immediately usable to consumers upon purchase.

63.   Virtually all OEMs (other than Apple) license an OS from a third party rather than design their own.  Thus, there is a relevant market for licensable, mobile OSs (the "Licensable Mobile OS Market").  The Licensable Mobile OS Market extends worldwide, excluding China.

64.   Apple operates its own proprietary OS (Apple's "iOS"), which is not available for licensing to other smart mobile device manufacturers.  Therefore, the Licensable Mobile OS Market does not include Apple's iOS or any other non-licensable OSs for smart mobile devices.

6182535

65.     In addition, the Licensable Mobile OS Market does not include OSs that run on devices other than smartphones—*e.g.*, laptops or basic ("flip") phones—because those OSs offer far fewer and more limited functionalities and would require substantial time and investment to make them compatible for use with smart mobile devices.  Similarly, the Licensable Mobile OS Market does not include non-mobile electronic devices like desktop computers or gaming consoles.

66.     Google has a monopoly in the Licensable Mobile OS Market.  Google owns Android, which it acquired in 2005.  As of July 2020, over 99% of smartphones sold by manufacturers that license an OS use Android.  More broadly, nearly 70% of *all* smart mobile devices globally use Android.[20]  In short, Google's Android OS is the dominant mobile OS in the world.

67.     Google's Android benefits from high barriers to entry.  It takes significant money, time, and resources to develop an alternative OS.  But even companies willing to make those investments and capable of doing so cannot meaningfully compete with Android.  Rather, Android enjoys strong network effects and positive feedback loops that further entrench its dominance.  That is, the more that app developers design useful apps and services for Android, the more users purchase Android devices, and the more attractive the Android OS is to device manufacturers and app developers.  This is the self-enforcing cycle that Google counted on when it promised an open ecosystem, flexibility, and focus on the user to court developers to join a new open-distribution OS to compete with iOS; now, Google's enormous market power ensures that app developers cannot leave its platform even after Google reneges on those same promises.

68.     Moreover, once a consumer purchases and commits to an Android device, they cannot easily switch to a device running iOS from Apple, the other monopolist in what U.S. Senator Amy Klobuchar described as "twin monopolies" who "use[]

---

[20] *See* Stat Counter, OS Market Share Worldwide, available online at https://gs.statcounter.com/os-market-share/mobile/worldwide (last visited Apr. 26, 2022).

6182535

1  their market power to charge up to a 30% tax on competing app developers."  First,
2  the consumer would lose their investment in their previously purchased device, a
3  handheld computer costing hundreds of dollars that many consumers purchase using
4  monthly payment plans.  The consumer would also lose their investment in digital
5  content and apps that only run on Android.  Second, the consumer would lose
6  functionality and data integration with other smart devices that run on Android—
7  including tablets, speakers, smartwatches, televisions, cameras, and even
8  refrigerators—unless that consumer makes a significant financial investment to
9  purchase all new devices.  Third, the consumer would face various technological
10 obstacles involved with learning and utilizing a new operating system, including
11 different designs, controls, and functionality.

12     69.    For these reasons, no company has successfully entered the Licensable
13 Mobile OS Market in over a decade, even though many large and highly successful
14 technology companies (*e.g.*, Samsung, Microsoft, and others) have tried to do so.

15     **C.    Google Has Unlawfully Maintained a Monopoly in the Market for**
16            **Distribution of Android Apps**

17     70.    Mobile apps are software programs that run on smart mobile devices and
18 enhance their functionality.  Among other things, apps can be used to shop, order
19 food, arrange transportation and travel, social network, email, read the news, listen to
20 music, receive mental health advice, follow exercise routines, and play games.

21     71.    Apps are the primary way that users of smart mobile devices access
22 content and services.  In the United States, nearly 90% of the time that users spend
23 online on their smart mobile devices occurs in apps.[21]

24     72.    Before using an app on a smart mobile device, a user must first download
25 and install it.  Apps are made available through an "app store"—*i.e.*, an app that sells
26 other apps—that is installed on the user's smart mobile device.  App stores allow

27

28

[21] Comscore, 2019 Report Global State of Mobile 7 (2019).

- 21 -
COMPLAINT

6182535

1  users to easily browse, search for, access reviews on, purchase, download, and install

2  mobile apps.

3      73.    There is a relevant market for the distribution of Android apps (the

4  "Android App Distribution Market").  The Android App Distribution Market includes

5  all channels that are available to download apps on a smart mobile device that runs

6  the Android OS.

7      74.    The Android App Distribution Market does not include distribution

8  channels for apps that do not use Android, such as the Apple App Store.  Those app

9  stores do not compete with Android app stores because they require a non-Android

10 OS to function.  That is, apps developed for Android only work on Android devices,

11 while apps developed for Apple's iOS only work on iOS devices.  Android OS users

12 cannot even access the Apple App Store and vice versa.  And because consumers

13 almost categorically only have either an Apple or Android smart mobile device—*i.e.*,

14 they do not "multi-home"—and rarely switch from one OS to another, app developers

15 like Match Group effectively must develop separate versions of their apps that can

16 work on Android or iOS to reach these dedicated segments of device users.  A

17 monopolist app distributor on Android mobile devices is not constrained from raising

18 prices, or reducing quality or innovation, by app distribution on Apple's devices (or

19 any other mobile devices) due to market imperfections such as high switching and

20 information costs.  That is a separate reason why the Apple App Store does not

21 constrain competition in the Android App Distribution Market or otherwise provide

22 an economic substitute for Android App Distribution.

23     75.    In addition, Android consumers are highly unlikely to switch to a non-

24 Android OS in response to a small price increase or reduction in quality in the Android

25 App Distribution Market.  As discussed, consumers who switch to a device running a

26 different OS lose their significant financial investment in their previously purchased

27 devices and apps on that device, lose access to their digital subscriptions, lose digital

28 content and investments of time, lose functionality with other devices that run on the

6182535

1  same OS as their current device, and must overcome various technological obstacles.
2  These high switching costs and the technological barriers mentioned above effectively
3  lock Android devices users into the Android ecosystem that Google has created.

4  76.  Google's market power over app distribution is also not constrained by
5  the Apple App Store because for developers, distribution on iOS is not an economic
6  substitute.  Apps written for iOS cannot be run on an Android device and vice versa
7  because the operating systems are written in different programming languages with
8  different compatibility requirements.  For many of the developers who do have the
9  resources to write their apps in both languages, it is not viable to abandon the Android
10 platform because there are so many Android users.  To reach a diverse consumer base,
11 developers must distribute on both platforms or they will not be able to reach a
12 significant portion of mobile device users.  That is particularly true for apps that
13 facilitate interaction among users or rely on network effects, like dating apps where
14 iOS users do not only date other iOS users and Android users do not only date Android
15 users.

16 77.  The Android App Distribution Market extends worldwide, excluding
17 China.  App distribution channels, including Google Play, are distributed and
18 available on Android devices across the globe.  In China, however, most app stores,
19 including Google Play, are prohibited.  The app stores that are available in China are
20 rarely used outside of China.

21 78.  Google has monopolized the Android App Distribution Market.  Google
22 owns, controls, and distributes the dominant Android app store in the world: Google
23 Play.  Although there are alternative Android app stores available (*e.g.*, the Amazon
24 Appstore, Samsung Galaxy Store, and Aptoide) and methods to directly download
25 apps from the internet, none of those options have any appreciable share of the
26 Android App Distribution Market.

27
28

6182535

79.     Rather, more than 90% of all downloads of Android apps are completed using Google Play.[22]  In 2021 alone, Android device users downloaded apps from Google Play more than 111 billion times.[23]  Google Play also comes pre-installed on 90% to 100% of all Android-based devices around the world (excluding China).[24]  In addition, Google Play currently has more than 3.48 million apps (and 2.5 billion monthly users, as of July 2021), while one of its closest rivals (the Amazon Appstore) has only 460,000.[25]  And Google itself has estimated that users spend only 3% of the time on the Samsung Galaxy Store (another of its closest competitors) as they spend on Google Play.  As alleged by a coalition of state Attorneys General, a 2017 internal Google report confirmed that the "Play Store dominates in all countries," including the United States, and that app downloads from sideloading or other app stores comprised only 4.4% of Android app downloads within the United States from June to September 2016.

80.     Google's monopoly in the Android App Distribution Market is further evinced by its ability to set supra-competitive prices for app purchases and the large profit margins that it extracts.  As explained further below, Google charges up to a 30% "fee" when consumers pay to download an app from Google Play or make in-app purchases of digital content from an already downloaded app through its mandatory Google Play Billing for app developers of such digital services.  From this extravagant tax, Google generates billions of dollars in revenue each year.  And there is no reason to assume that Google's policy change for "digital" goods and services will not soon expand into apps that offer "physical" goods and services as well.

---

[22] European Commission, Case No. AT.40099, Google Android ("EC Google Android decision") at Table 5.

[23] Statista, *Annual Number of App Downloads from the Google Play Store Worldwide from 2016 to 2021 (in billions)*, available online at https://www.statista.com/statistics/734332/google-play-app-installs-per-year/ (last visited Apr. 26, 2022).

[24] Table 4.  EC Google Android decision.

[25] Statista, *App stores - Statistics & Facts*, available online at https://www.statista.com/topics/1729/app-stores/ (last visited Apr. 26, 2022).

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

81.     As the United Kingdom Competition and Markets Authority recently concluded in its interim report on the mobile ecosystems market:

> On Android devices, [90% to 100%] of native apps are downloaded from the Play Store. Although alternative app download methods do exist on Android, these are not viable or popular alternatives to the Play Store for the majority of users or app developers. Alternative app stores can be pre-loaded on Android devices (for example, those of the main device manufacturers) but face significant barriers in attracting a sufficient number of app developers and users to be successful. Further, Google's agreements with manufacturers mean that the Play Store is pre-installed and prominently displayed on the vast majority all Android devices.[26]

82.     Google has seized and unlawfully maintained its monopoly over the Android App Distribution Market through various anti-competitive practices, including using bait-and-switch tactics, designing and enforcing high barriers to market entry, and drawing on its vast wealth from its many businesses to pay off potential competitors.    Absent Google's unlawful conduct, consumers could download Android apps through two alternative means: (1) downloads from competing Android app stores and (2) direct downloads from websites.  But Google has imposed technological and contractual restrictions that have effectively foreclosed both alternatives, thereby forcing virtually all consumers and app developers to use Google Play.

**D.     Google Also Has Market Power in the Market for Dating App Distribution**

83.     In the alternative only, there is a relevant market for the distribution of dating apps to users of all mobile devices, whether Android or Apple's iOS (the

---

[26] United Kingdom Competition & Markets Authority, *Mobile Ecosystems Market Study Interim Report* (Updated Jan. 26, 2022), available online at https://www.gov.uk/government/publications/mobile-ecosystems-market-study-interim-report/interim-report (last visited Apr. 26, 2022).

6182535

"Dating App Distribution Market").  The Dating App Distribution Market extends worldwide, excluding China.

84.    Google wields durable market power in the Dating App Distribution Market.  Of the top ten dating apps by downloads, as of 2016, Google Play likely accounts for approximately 75% of dating app downloads.[27]  Since that time, downloads from Google Play have doubled.[28]

85.    In the alternative only, dating apps constitute an economically distinct submarket of the larger market for app distribution.  Most app stores, including Google Play and Apple's App Store, categorize dating apps separately from other apps.  Dating apps largely do not charge for app downloads but instead operate under a "freemium" model: users may access the service for free but may pay for a premium experience or features.  Dating apps are also unique when compared against other types of subscription-based apps because users aim to find a successful relationship and thus to stop paying for a dating app subscription, and as a result tend to have shorter subscription periods: "Upon finding a compatible partner, users typically terminate their site subscription."[29]

86.    Dating apps are profitable—with over 18 different dating apps earning more than $1 million in revenue in just the first quarter of 2019, and many earning much more—and thus tend to subsidize other categories of apps.[30]  Indeed, in 2021,

---

[27] Newzoo, *Mobile Dating Apps: Tinder on Top but Rivals Attract Serious Attention*, available online at           https://newzoo.com/insights/articles/mobile-dating-apps-tinder-top-rivals-serious-attention/ (last visited Apr. 26, 2022).

[28] Statista, *Google Play App Installs Per Year*, available online at https://www.statista.com/statistics/734332/google-play-app-installs-per-year/ (last visited Apr. 26, 2022).

[29] *See, e.g.*, Yue Wu and V. "Paddy" Padmanabhan, Harvard Business Review, *The Strategy Puzzle of Subscription-Based Dating Sites*, available online at https://hbr.org/2019/01/the-strategy-puzzle-of-subscription-based-dating-sites (last visited Apr. 26, 2022).

[30] *See* Sensor Tower, *Record Number of Dating Apps Surpassed $1 Million in Q1 2019*, available online at https://sensortower.com/blog/dating-apps-1-million-revenue-q1-2019 (last visited Apr. 26, 2022).

6182535

global dating app revenue reached $5.61 billion with 323 million users.[31] Dating apps have distinct providers, like Match Group, that specialize in the production of only dating apps, and distinct consumers; *i.e.*, people looking for romantic relationships or other types of social connections offered by dating apps.

87.    As the Netherlands Authority for Consumers and Markets (*i.e.*, Dutch antitrust authorities) recently found, dating apps are uniquely positioned because even more than other types of social apps, dating apps "heavily rely on network effects: the greater the odds of a successful match are, the more appealing it becomes to use the app. . . . Dating-app providers are therefore forced, even more so than the average app provider, to be present in both [Apple's] App Store and Google Play."[32]

88.    In the alternative only, dating apps, which are provided on mobile devices, are distinct from other dating services.  Convenience to users, immediacy of connections, and large networks available through the internet separate dating apps from traditional, offline dating services, which often have more overhead costs that are passed on to consumers.  Dating apps are also in a different market than other online dating services. As the Netherlands Authority for Consumer and Markets explained, "[w]ebsites (mobile and desktop), too, are not alternatives for dating-app providers" because the "same functionalities cannot be offered as within an app."  For those reasons, "consumers prefer using apps" and offering an app is "critical" for dating service providers.[33] Although some of Match Group's dating apps have offered web versions for years, in many cases even preceding the app version and costing less, users tend to prefer accessing dating services via apps and only a small percentage make purchases through both the app and web versions of Match Group's dating services, to the extent they are available; a much larger percentage of users

---

[31] Business of Apps, *Dating App Revenue and Usage Statistics*, https://www.businessofapps.com/data/dating-app-market/ (last visited Apr. 26, 2022).

[32] The Netherlands Authority for Consumers and Markets, Case No. ACM/19/035630 / Document No. ACM/UIT/568584.

[33] *Id.*

6182535

purchase subscriptions and other digital services through the app only. Match Group's prior experimentation with encouraging users to switch from apps to its web-based services have been unsuccessful.[34] Not surprisingly, on-the-go mobility is a critical feature for dating app consumers.

89.    In the alternative only, dating apps are also distinct from other types of apps, such as mobile gaming apps.  In addition to the reasons mentioned above such as the differences in business models, distinct producers and consumers, and perception as a distinct market by market participants, mobile devices are the *only* viable distribution channel for dating apps.  Unlike mobile gaming apps, users do not use dating apps on platforms like gaming consoles.  And in contrast to other types of apps, mobile app distribution is uniquely important for dating apps because users rely on the ability to receive real-time push notifications, geolocation, and other features like the Swipe Right feature that are more conveniently performed by smart mobile devices.  Dating apps are also distinct from other types of apps because users typically want to connect with other users who are nearby to them, so users and app developers rely on location services that are generally built-in to smart mobile devices, but which may not always be available on other types of devices (*e.g.*, a desktop computer).

**E.    Google Devises and Uses Exclusionary Contracts, Illegal Tying, and Predatory Practices to Block Competitors and Ensure Google Play's Dominance**

90.    Google has employed various anti-competitive tactics to secure unassailable competitive advantages for Google Play and harm its competitors and consumers alike.

---

[34] Rule 52 Order, *Epic v. Apple*, No. 4:20-cv-05640 at 93 (N.D. Cal. 2021) ("[B]oth Down Dog and Match Group have testified that they have been unable to entice users to other platforms with lower prices.").

**1.     Google Uses Exclusionary Contracts with OEMs**

91.     Google uses its Mobile Application Distribution Agreement ("MADA") with OEMs to impose contractual restrictions and exclusivity provisions.

92.     As a practical matter, OEMs have no choice but to enter a MADA with Google.  Unless they enter a MADA, Google prohibits OEMs from using Android—their only viable OS option for developing smart mobile devices—or the Android trademark.

93.     Google also requires OEMs to enter a MADA as a precondition to licensing a bundle of proprietary Google apps and services ("Google Mobile Services").  Google Mobile Services includes Google Play and other popular apps and services, including Google Search, Google Maps, YouTube, and Gmail.

94.     In addition, Google conditions access to Google Play Services on entering a MADA.  Google Play Services contains Google's proprietary application programming interfaces ("APIs").  All of Google's proprietary apps, and many third-party apps, cannot function without Google Play Services.  Nor can many essential features and functionalities that consumers and app developers now rely on, including push notifications, location features, accessing a device's sensors, streaming tools, and tools to generate ad revenue.  Accordingly, if an Android device manufacturer chose not to install Google Play Services, the apps that require Google Play Services and other critical device functions would not work, making the device unappealing and potentially unusable.

95.     For these reasons, OEMs cannot manufacture a commercially viable Android device unless they enter a MADA.  That gives Google substantial leverage and the ability to include exclusionary and anti-competitive terms in the MADA on a take it or leave it basis.  Google's control of the market enabled this "take it or leave it" paradigm.

96.     Through those unilateral terms, Google has ensured Google Play's dominance while handicapping its competitors.  For starters, the MADA requires

6182535

OEMs to pre-install Google Play on their devices.[35]  The MADA also requires the OEMs to prominently locate the Google Play icon on the home screen of their devices. That makes Google Play the "default" app store on Android devices and the most accessible and prominently displayed app store that users encounter.

97.     Although OEMs can pre-install other app stores, those app stores cannot overcome the competitive advantages that Google's anti-competitive conduct provides Google Play.  Google Play's default status is incredibly powerful.  Indeed, most users never change their default settings and instead continue to use default apps for their device's entire lifecycle even when there are better alternatives.

98.     Google is well aware of the significant anti-competitive advantage it receives from Google Play's default status.  A 2017 Google presentation on Amazon's app store stated, candidly, "If we were honest we would admit that most users and developers aren't consciously 'choosing' they are going with the default.  If they really had to choose, how would they do that and would they choose us?"  And in conversations with Samsung, one of its competitors, Google acknowledged that Google Play's exclusive placement on the home screen "limits discoverability for Amazon [Appstore]."

99.     Other requirements in Google's MADA make it even more difficult for competing app stores to compete with Google Play.  The MADA does not require OEMs to pre-install only Google Play; rather, OEMs are required to pre-install an entire bundle of Google apps.  Over time, Google has increased the number of apps subject to this requirement so that OEMs today must install up to thirty Google apps. The MADA also requires OEMs to give all of these Google apps preferential placement on the device's home screen or the very next screen.  That eliminates the

---

[35] Even if the MADA did not include this requirement, OEMs would still be required to pre-install Google Play.  The reason is that Google bundles the Google Play store with Google Play Services. As explained above, OEMs cannot produce a viable, functional device that is appealing to consumers without Google Play Services.

6182535

1   opportunity for competing app stores to come pre-installed on the most visible and
2   important locations on a device, further diminishing their relevancy and use.

3       100.   As further proof of Google Play's market power, while alternative app
4   stores exist on Android, they have such little market penetration that many developers
5   do not even bother to list their apps there. For example, while Tinder is available on
6   other Android app stores in addition to Google Play, the number of downloads (and
7   resulting revenue) is miniscule compared to app downloads and revenue resulting
8   from Google Play.  For Match Group's other popular brands, PlentyofFish and Match
9   are only available on Google Play, while OkCupid is only available through Google
10  Play or the Xiaomi store.  The number of additional users Match Group could reach
11  through these alternative app stores simply does not justify the resources and time
12  necessary to support those additional app stores.

13      101.  Absent Google's licensing restraints, alternative app stores could
14  negotiate with Android device manufacturers to have their app stores pre-installed
15  and prominently displayed on devices.  Users, app developers, and Android device
16  manufacturers would benefit from increased competition and choices.  But Google's
17  imposition of its unilateral licensing scheme effectively requires device
18  manufacturers to pre-install Google Play and give it vastly preferential treatment,
19  while depriving competing app stores of the same opportunities and placing them at
20  a severe disadvantage.

21          **2.    Google Uses Exclusionary Contracts with App Developers**

22      102.  Google also restricts Android app developers, including Android dating
23  app developers, from offering (and users from accessing) alternative app stores.  All
24  app developers that use Google Play are bound by the Google Play Developer
25  Distribution Agreement and the incorporated Developer Program Policies
26  (collectively, the "DDA").

27      103.  Pursuant to the DDA, app developers "may not use Google Play to
28  distribute or make available any product that has a purpose that facilitates the

- 31 -
COMPLAINT

1   distribution of software applications and games for use on Android devices outside of
2   Google Play."

3       104.   App stores are the most widely used, accessible, and natural channel for
4   distributing apps.  But for Google's restriction, would-be competitors could distribute
5   their app stores through Google Play and thereby reach the widest audience of
6   possible users.  Alternatively, those developers could make their app stores available
7   through apps that are downloaded from Google Play.

8       105.   But in order specifically to protect Google Play's dominance, Google has
9   strategically and contractually foreclosed both options.   Indeed, Google has
10  strategically modified the DDA's language over time to specifically address and block
11  the distribution of competing app stores, including the Amazon Appstore.

12      106.  Separately, Google exploits its dominance in online advertising to
13  discourage app developers from offering competing app stores.  Google has "a
14  monopoly in the markets for general online search and search advertising."[36]
15  Google's App Campaigns program offers app developers highly desirable and
16  optimized ad placements on some of Google's largest and most popular advertisement
17  platforms, including Google Search and YouTube.  But Google prohibits Android app
18  developers from accessing that valuable ad placement unless they first agree to list
19  their app on Google Play.

20          **3.   Google Uses Payment Incentives and Predatory Practices**

21      107.  OEMs that have entered a MADA can also enter Revenue Share
22  Agreements ("RSAs") with Google.  Google also makes the RSAs available to mobile
23  network operators ("MNOs")—*e.g.*, AT&T, T-Mobile, Verizon Wireless, and Sprint.

24      108.  Pursuant to the RSAs, OEMs and MNOs can obtain a portion of the
25  revenue that Google earns from advertising and Google Play.  Google laid this scheme

26

27  _____

28  [36] Investigation of Competition in Digital Markets, Subcommittee on Antitrust, Commercial and
    Administrative Law of the Committee on the Judiciary at 14 (2020).

6182535

1   even before the launch of Google Play, offering MNOs a 25% cut of the revenue from

2   its predecessor Android Market so that they did not provide their own app stores.

3       109.   The RSAs provide yet another valuable incentive for OEMs to enter the

4   MADA.   Again, Google leverages that incentive to impose a host of other

5   requirements that ensure Google Play's dominance.

6       110.   Google has deliberately used the RSAs to reduce opportunities for app

7   stores that would compete with Google Play.   In general, the RSAs prohibit the OEMs

8   and MNOs from competing with Google.   At times, the RSAs have also expressly

9   barred OEMs from pre-installing third-party app stores that would compete with

10  Google Play.   Google entered into these RSAs because it knew that without them,

11  OEMs and MNOs could launch their own competing app stores—threatening

12  Google's dominance in the Android App Distribution Market.

13      111.   Recently, one of Google's competitors, Epic Games, reported that Google

14  had blocked certain OEMs from offering competing app stores.   As Epic detailed in

15  its own lawsuit, Google "demanded" that device manufacturer "OnePlus not

16  implement its agreement with Epic" to "allow users of OnePlus mobile devices to

17  seamlessly install Fortnite and other Epic games by touching an Epic Games app on

18  their devices," thereby bypassing Google Play.   As alleged by a coalition of state

19  Attorneys General, Google fretted internally about the risk of "broad contagion" if

20  other developers began bypassing Google Play, in particular that "Fortnite may

21  legitimate []Samsung['s competing app] store & 3rd party stores; fragmenting app

22  distribution on Android."   Epic also reported that Google used its agreement with LG

23  to "prevent[] LG from pre-installing the Epic Games app on LG devices."[37]

24      112.   As yet another method of protecting its monopoly, Google developed a

25  targeted strategy to dismantle a competing app store offered by Samsung.   Samsung

26  is the largest manufacturer of Android devices in the world and has created its own

27  _____

28  [37] *See Epic Games, Inc. v. Google LLC, et al.*, Case No. 3:20-CV-05671-JD (N.D. Cal.) Dkt. 82 at
    ¶¶ 113–14.

6182535

app store called the Samsung Galaxy Store.  Although the Samsung Galaxy Store has performed poorly compared to Google Play (it has 5% or less of the Android App Distribution Market, while Google controls over 90%), Google feared that Samsung would gain more users through exclusive agreements with app developers. Accordingly, Google deployed a multi-faceted campaign to suppress the Samsung Galaxy Store.  Through a plan it called "Project Banyan," Google offered Samsung up to $60 million per year to integrate the Samsung Galaxy Store with Google Play, including that Google Play Billing would be used for purchases made through apps distributed through the Samsung Galaxy Store.  Google also attempted to get Samsung to agree that Google Play and the Samsung Galaxy Store would be the only app stores on the default home screen, thereby ensuring that Samsung could not provide up-front placements for any other app stores on the devices it manufactured. In other words, Google tried to pay Samsung to stop competing.

113.   When Samsung rejected the Project Banyan proposal, Google launched a new strategy it called Project Agave which, according to a suit brought against Google by 37 state Attorneys General, "was merely a different implementation toward the same anti-competitive goal."  The Attorneys General's allegations detail a payment scheme by which Google would "directly disincentivize Samsung from seeking to add popular titles from [Google Play] to the Galaxy Store or to partner with developers on exclusive new titles for the Galaxy Store."  Even though Samsung did not accede, Google had convinced many of the world's largest and most popular Android OEMs to Google Play exclusivity by May 2020, a success that Google internally touted as preventing "contagion."

114.   Google also developed a strategy coined "Project Hug" to pay hundreds of millions of dollars to key app developers to deter them from offering their apps via distribution channels outside Google Play.  With Google's power and limitless funds, the effort succeeded.  By the end of 2020, Google had reached deals with most of the developers it targeted, at the obvious expense of consumer choice.

6182535

115.   But Google did not deter Match Group or its ultimate parent company, MGI, despite its efforts to do so.  For example, on April 21, 2021, the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights held a hearing examining competition in app stores. Jared Sine, Chief Business Affairs and Legal Officer of MGI, was asked to testify at this hearing.

116.   The evening before Mr. Sine's testimony and after MGI began disseminating to the press the written testimony that Mr. Sine submitted to the subcommittee, Sarah Karam, Director of Partnerships at Google Play, requested "5 minutes to chat" with Peter Foster, General Manager of Global Advertising and Brand Solutions for Match Group. During the call, Ms. Karam asked Mr. Foster whether Mr. Sine was aware of all the elements of MGI's relationship with Google, including discussions between Google and MGI around an "incentive program" Google had offered MGI to offset a portion of the payments MGI would be required to make to Google for app store "fees" once Google effected a policy change mandating the use of Google Play Billing. This program could be worth hundreds of millions of dollars. Ms. Karam did not ask Mr. Foster for MGI to provide any consideration; instead, she expressed concern that Mr. Sine's planned testimony described the relationship between Google and MGI in a more negative light than Google had hoped. Ms. Karam asked that Mr. Foster relay Google's perspective to Mr. Sine in advance of the hearing—in effect, to convey Google's threat.

117.   Mr. Sine proceeded to testify before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on April 21, 2021, consistent with his prepared remarks. He critiqued Google for persuading Match Group "to join the Android ecosystem under the false pretenses of an open platform, where [Match Group] would not be required to use Google's payment processor or pay the 30 percent tax" and described Google's effort to improperly "leverage[e] its monopoly power to change the rules" on Match Group and other developers.

118.   Mr. Sine was not the only one to criticize Google's monopolistic practices at the hearing. Some of the harshest criticisms came from the Subcommittee members. For example, Senator Blumenthal commented that "Google [is] here to defend the patently indefensible. If you presented this fact pattern in a law school antitrust exam, the students would laugh the professor out of the classroom because it's such an obvious violation of our antitrust laws." He was also quick to question Google's motives in Ms. Karam's call to Mr. Foster the night before Mr. Sine's testimony, describing it as "an insult to this committee" and calling for an investigation.

119.   Google did not invite Match Group to participate in "User Choice Billing." By contrast, Spotify's silence about Google during the hearing resulted in an invitation to participate in "User Choice Billing."

120.   Through Project Hug, Project Banyan, and Project Agave, Google prevented app developers from circumventing Google Play and offering their apps through third-party app stores—a threat of actual competition Google referred to internally as a "contagion."

**4.     Google Uses Technological Roadblocks, Contractual Restrictions, and False Information to Make Direct App Downloads Impractical**

121.   Although in theory Google allows Android device users to download and install apps from websites, few users have independent knowledge of this option or can perform the steps necessary to do it. Google calls this download process "sideloading"—a name that reflects Google's strong preference for consumers to download apps from Google Play and disdain for what it perceives to be a backdoor workaround to Google's closed Android ecosystem. Consistent with that attitude, Google has gone out of its way to construct technological roadblocks that make this process infeasible for all but the most technologically advanced users.

6182535

122.   Google requires Android users who sideload an app to follow typically more than a dozen different and difficult steps, such as changing their devices' default settings and manually granting permissions.

123.   During this process, Google also tries to dissuade the user, who is inundated with repeated, alarming, and misleading warnings.  For example, Google falsely informs users that competing app stores "can harm your device."  For the rare user who decides to press on, Google then misrepresents that "your phone is not allowed to install unknown apps from this source," while giving the user the ability to click on only two vague options (1) "Cancel" and (2) "Settings."  Google also displays messages that say "your [device] and personal data are more vulnerable to attack by apps from unknown sources.  By installing apps from this source, you agree that you are solely responsible for any damage to your [device] or loss of data that may result from [using these apps]."  As alleged by a coalition of state Attorneys General, Google staff have internally acknowledged that sideloading requires "15+ steps to get app" versus just "2 steps with Play."

124.   Google has no legitimate justification for making direct downloads so difficult.  Such downloads are routine and easy on non-Android devices, such as personal computers, and even those that run Google's Chrome browser.

125.   Moreover, Google publicly advertises Android as "secure to the core" and containing robust security measures.  According to Google, it "analyzes every app that it can find on the internet" for potential harm.  Google also claims that Android's security features scan "more than 100 billion apps every day."  If these claims are true, then Google has no basis to categorically label all sideloaded apps as potentially harmful.  Indeed, as alleged by a coalition of state Attorneys General, Google's own data states that "only 0.68% of devices that installed apps from outside of Google Play" contain potentially harmful apps.

126.   Even when a user perseveres to overcome Google's obstacles and successfully downloads a competing app store, Google ensures that the competing

6182535

app store's functionality cannot match that of Google Play or provide the same amount of content.  The Android OS only allows apps downloaded via Google Play to be automatically updated.  For other apps that are not downloaded from Google Play, a user must follow a burdensome process to manually download each update or bug fix.  Without the ability to update, most apps quickly lose their functionality.  As reflected in its internal communications, Google is well aware that requiring users to manually install every update and bug fix—rather than having updates automatically install in the background, as is done for apps downloaded via Google Play—provides a bad user experience, thereby disincentivizing users from downloading apps outside of Google Play.

127.   Nor can Android device users easily switch to an alternative OS to avoid Google's restrictions.  Once a customer has purchased a smart mobile device, they cannot replace the OS without purchasing a new device.  Moreover, each OS has a different interface and design.  Therefore, were a customer to switch devices and utilize an OS that did not require Google Play, they would be required to re-learn how to use their device.  Furthermore, because many apps and in-app content are designed for and only compatible with a single OS, switching to a new OS may cause the customer to lose access to services they already paid for and personal data.  Thus, there are many barriers and disincentives to changing devices.

128.   Google also uses contractual restrictions to prevent OEMs from facilitating the sideloading of competing app stores.  In addition to a MADA, Google requires OEMs that license the Android OS to enter an Anti-Fragmentation Agreement ("AFA") or Android Compatibility Commitment ("ACC").  Both prohibit OEMs from taking actions that result in the fragmentation of Android or Android "forks"—*i.e.*, versions of Android that are incompatible with Google's existing ecosystem of apps and software.  The AFA and ACC prevent OEMs from modifying Android to make sideloading easier; to the contrary, they require OEMs to implement Google's burdensome restrictions and misleading warnings.

6182535

**5.     Google's Anti-Competitive Conduct Destroys Competition in the Android App Distribution Market or, Alternatively, the Dating App Distribution Market**

129.   Because of Google's anti-competitive conduct in the Android App Distribution Market, OEMs are required to pre-install Google Play on their devices, app developers are effectively required to distribute their apps through Google Play, and nearly all consumers are funneled into using Google Play without meaningful access to any viable alternative app store.  In other words, Google Play "effectively functions as a gatekeeper for software distribution on a majority of the world's mobile devices."[38]

130.   The sum of Google's anti-competitive conduct is that Google Play benefited from a flywheel effect: the more that Google Play came to dominate in consumer perception, the more app developers are effectively forced to distribute via Google Play.  At the same time, the benefit of distributing through other app stores decreased, further cementing Google's market dominance.

131.   Google's anti-competitive conduct in the Android App Distribution Market or, alternatively, the Dating App Distribution Market, harms app developers. App developers, including Match Group, are forced to rely on a single distribution channel for their Android apps.  Google's restrictions prevent and disincentivize developers from developing alternative and more efficient distribution channels that could reach wider or more targeted audiences, including specialized app stores or direct downloads.  The lack of alternative channels and competition likely decreases overall sales for app developers. In addition, Google's control over Android and its infiltration of OEMs and MNOs provides plenty of opportunity to introduce higher and higher entry barriers.

---

[38] Investigation of Competition in Digital Markets, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary at 219 (2020).

6182535

132. App developers are also harmed because Google abuses its monopoly power in the Android App Distribution Market or, alternatively, the Dating App Distribution Market, to charge supra-competitive fees that reduce the developers' revenues. Even when app developers pass on those fees to consumers, the app developers are harmed because the increased price leads consumers to purchase fewer apps and less digital content.

133. Google's conduct also harms consumers and app developers by snuffing out innovation in the Android App Distribution Market or, alternatively, the Dating App Distribution Market. For example, Amazon created a new model of app distribution and monetization through Amazon Underground, which allowed Amazon to pay developers directly based on the amount of time that consumers spent interacting with apps. Amazon Underground, however, was shuttered due to Google's restrictions on the distribution of app stores. Loss of innovation and choice directly harms both consumers and app developers in the Android App Distribution Market and/or the Dating App Distribution Market.

134. In addition and/or in the alternative, Google's conduct also reduces the total output of app distribution within the Android App Distribution Market and/or the Dating App Distribution Market. While the overall number of apps and app downloads has increased over the past decade, that is primarily the result of growth in other, distinct markets, such as the overall market for smart mobile devices, as well as increasing innovation in mobile apps, and other forces that have increased output in spite of, rather than as a result of, Google's conduct. Compared to the hypothetical world in which Google did not impose anti-competitive restrictions through its contractual agreements and other conduct alleged above, output would be higher in the absence of Google's anti-competitive conduct.

135. Consumers are likewise harmed when they are forced to pay Google's tax as incorporated into app developers' prices. In addition, consumers are harmed by

6182535

1  the lack of competition in the market, which limits consumer choice and opportunities

2  to discover new apps.

3      136.  Through Google's conduct, Google is able to insert itself as an

4  intermediary between each seller and each buyer for every purchase of digital content

5  within an Android app.  That middleman position allows Google to collect and

6  selectively share (usually for a price) personal information about the user.  Google

7  then uses that information to give itself an anti-competitive edge in advertising and in

8  developing new apps that compete with existing apps on Google Play (which Google

9  is able to undercut, since it does not have to pay the up to 30% fee to itself).  Google's

10 anti-competitive conduct thus further harms both users—who must give their user

11 information to Google, rather than the app developer the users thought they had a

12 relationship with—and app developers.

13     137.  Google Play is unlikely to face any meaningful competition soon.

14 Because it dominates the Android App Distribution Market or, alternatively, the

15 Dating App Distribution Market, Google Play benefits from strong network effects

16 that further insulate it from competitors and entrench its dominance.  As noted above,

17 Google Play offers substantially more apps than any competitor.  That large universe

18 of available apps attracts even more users, which in turn makes Google Play that much

19 more indispensable for app developers to use.

20     **F.**   **Google Unlawfully Seized and Maintains a Monopoly in the Market**

21          **for Android App In-App Payment Processors**

22     138.  Some app developers charge a fee to download their apps.  Others, like

23 Match Group, make their apps free to download and charge for additional digital

24 content, subscriptions, or features.

25     139.  Consumers spend large amounts of money on in-app purchases of digital

26 content, goods, services, and upgrades.  In 2021, global app sales exceeded $133

27

28

- 41 -
COMPLAINT

6182535

billion.[39]  These payments are processed by in-app payment service providers.  For the purposes of this complaint, in-app payment (or "IAP") refers only to payments for "digital goods and services," but it is also possible to purchase physical goods and services within some apps.

140.    There is a relevant market for service providers that process payments for digital content within Android apps (the "Android App IAP Market").  The Android App IAP Market consists of the payment processing solutions that Android app developers may use to process in-app purchases of digital content on devices that run Android OS.

141.    The Android App IAP Market extends worldwide, excluding China.

142.    Service providers that process payments outside of apps (*e.g.*, through a website) are not part of the Android App IAP Market, which focuses on the distinct category of payment processing within mobile apps.  Consumers require the ability to make immediate and frictionless payments for purchases without leaving the app.  Otherwise, if a user were redirected to a website or other platform, that would interrupt their experience and likely lead them to abandon the purchase.  For example, Tinder users commonly use the app to review profiles and "Like" other users that they hope will "Like" them back.  Users who pay to upgrade to Tinder Platinum can message a user they "Liked" before that user decides whether to "Like" them back.  Users can also purchase upgrades to ensure their profile is seen faster by other users who they liked.  Requiring users to exit the app and interrupt their experience to make these purchases would make the upgrades far less useful and convenient.

143.    The Android App IAP Market consists primarily of Google's propriety IAP provider, Google Play Billing, which is run by Google's wholly owned subsidiary, Google Payment.  Because Google Play Billing controls app transactions,

---

[39] Sarah Perez, *App Stores to See Record Consumer Spend of $133 Billion in 2021, 143.6 Billion New App Installs*, Tech Crunch (Dec. 7, 2021), https://techcrunch.com/2021/12/07/app-stores-to-see-record-consumer-spend-of-133-billion-143-6-billion-new-app-installs/ (last visited Apr. 26, 2022).

6182535

1    Google controls customer service.  For example, Google Play Billing is the direct
2    contact for users who request refunds or want to change their subscription status.  The
3    app developer must also rely on Google Play Billing to satisfy those customer
4    concerns.  Google Play Billing also has direct access to a wealth of consumer data
5    that is easily monetized, especially by large companies like Google that specialize in
6    utilizing and profiting from consumer data analytics.  Google can also discipline users
7    who violate app community policies by terminating and refunding subscriptions or
8    payment tiers.

9        144.   There is widespread dissatisfaction among app developers with Google
10   Play Billing.  As a glaring example, even YouTube—Google's own app—took
11   advantage of an exemption to avoid using Google Play Billing.

12       145.   There are other IAP service providers that app developers and consumers
13   could use to process payments for Android apps, including but not limited to PayPal,
14   Braintree, Adyen, and Worldpay.  Several app developers, including Match Group,
15   have also created proprietary IAP systems.

16       146.   None of those IAP service providers, however, have a meaningful share
17   of the Android App IAP Market or even the opportunity to compete with Google.
18   Rather, as explained further below, Google (through nonnegotiable contracts)
19   illegally mandates use of Google Play Billing for the purchase of digital content
20   within Android apps.  Because more than 90% of all downloads of Android apps are
21   completed using Google Play, and Google requires use of Google Play Billing for the
22   purchase of digital content within those same apps, Google also has close to a 90%
23   share of the Android App IAP Market.

24       147.   Indeed, Google has trained users to expect that they will be able to pay
25   within apps by integrating Google Play Billing within Google's own apps and
26   enforcing requirements that the majority of apps allow IAP through Google Play
27   Billing.  For types of digital transactions where Google allows (or, in Match Group's
28   case, previously allowed) developers to offer in-house IAP services, app developers

1   have followed suit.  Consumers now expect to make purchases within apps, and do

2   not meaningfully substitute that purchasing behavior through web browsers.

3       148.   Google dominates the Android App IAP Market and exercises that market

4   power over Android apps, including dating apps.  Google has the ability to set and

5   maintain supra-competitive prices, which it has used to extract a tax of up to 30%—

6   more than ten times what Google could charge in a competitive market.  Google's

7   exercise of market power creates enormous profit margins for Google Play, even

8   considering only direct revenue—*i.e.*, excluding the other ways Google profits from

9   Android and Google Play, such as the various ways Google monetizes consumer data.

10  In 2019, Google Play collected $11.2 billion in overall revenue and booked $8.5

11  billion in gross profit and $7 billion in operating income—an operating margin of

12  over 62% that is likely an underestimate.  Google's extraordinarily high profit

13  margins, coupled with the lack of new market entrants, are strongly indicative of

14  market power.

15      **1.    Google Uses Illegal Ties and Exclusive Contracts to Mandate**

16          **Use of Google Play Billing**

17      149.   Consistent with its early assurances explained above, Google previously

18  allowed app developers to use the IAP service provider of their choice to process

19  payments for apps purchased through Google Play.  That flexibility benefited both

20  app developers and consumers and enticed them to use Google Play.  Google's

21  competitors typically offered lower costs and better services, including more payment

22  method options and more timely payments.

23      150.   Controlling and monetizing the dominant Android app store in the world,

24  however, apparently was not enough for Google.  Google now requires that all app

25  developers use Google Play Billing to process payments for apps and digital content

26  within Android apps on Google Play.

27      151.   The requirement that app developers use Google Play Billing is set forth

28  in Google's Developer Program Policies, which are incorporated into the DDA.

6182535

1   Google mandates that developers "must use Google Play's billing system as the
2   method of payment" when (a) "charging for app downloads from Google Play" and
3   (b) "requiring or accepting payment for access to in-app features or services,
4   including any app functionality, digital content or goods."

5          152.   Google also expressly prohibits these developers from offering apps that
6   "lead users to a payment method other than Google Play's billing system."  Thus,
7   even if developers offer alternative payment mechanisms (*e.g.*, the ability to pay
8   through their website), Google effectively gags them from using their app to inform
9   users of that option. Though it has been inconsistent in the past, Google now
10  stringently enforces that policy by preventing apps distributed through Google Play
11  from even informing customers about alternative payment processing options that
12  may provide lower prices.

13         153.   Google's policy is an abuse of monopoly power and illegal tying.  Google
14  has used its control over the Android OS to create a monopoly over the Android App
15  Distribution Market or, alternatively, the Dating App Distribution Market.  And it is
16  now using its monopoly power over the Android App Distribution Market or,
17  alternatively, the Dating App Distribution Market, to accomplish an illegal tie.  That
18  is, Google offers app developers and consumers access to Google Play—which
19  Google has made the default and only viable app store—on the condition that the app
20  developers and consumers use a tied and separate Google product (Google Play
21  Billing) to purchase any app or digital content within the app; if an app developer like
22  Match Group refuses to comply with Google's mandate to use Google Play Billing,
23  Google will remove it from Google Play, as it previously did with Epic Games's
24  Fortnite app.

25         154.   By imposing these requirements, Google guarantees that it can inject
26  itself into the relationships between users and app developers, accessing and
27  controlling even more consumer data than Google already extracts from Google Play.
28  Google now obtains valuable and detailed data every time a consumer pays to

6182535

download an app or makes an in-app purchase for digital content through Google Play Billing.  Google then monetizes that data through its search and advertising business.  Google also uses that data to monitor and gain an advantage over competitors.

        **2.   Google Abuses Its Monopoly Power by Imposing an Arbitrary and Unconscionable Tax on Consumers and App Developers**

155.   Even worse, Google uses the illegal tie to take significant amounts of money straight from the pockets of consumers and app developers.  Specifically, pursuant to Google's Payments Policy (incorporated in the DDA), Google unilaterally imposes a "fee" of up to 30% from the purchase price for transactions processed by Google Play Billing.

156.   Faced with a wave of investigations from regulatory agencies, legislation designed to break open monopoly markets, and litigation over its 30% tax, Google recently changed its "fee" to 15% on a developer's first $1 million of revenue and on "automatically renewing subscription services purchased by subscribers."  Even this 15% "fee" is well in excess of the fees charged by other payment processors, and the 30% "fee" remains in place for á la carte or one-time digital purchases and other non-recurring purchases of digital content, goods, or services.  Google recently touted its "reduced" 15% "fee" as making it the "most developer friendly app store"—as if it should be applauded for being the favorite Soprano among only two.

157.   Google's decision to change its fee structure is not the result of increased competition, price pressure, or any other market forces.  It is purely a reaction to the increasing legal and regulatory scrutiny on Google's anti-competitive conduct and is designed to present the illusion that market forces are driving the price of Google's payment processing services down.  Not so.  Google's dominance in the market has only increased, but so has the external scrutiny that threatens that dominance.  And Google has been careful to leave the full 30% tax intact on the app developers and digital products that are most profitable for Google.

6182535

158.   Not only does Google extract its tax on app downloads, it also imposes the tax on in-app purchases of digital content or features as well.  That means Google automatically generates revenue any time a consumer makes a purchase for digital content or features through an app that was downloaded from Google Play.

159.   For many years, Google referred to this fee as a "Transaction Fee."  But Google cannot plausibly contend that the "fee" reflects Google's actual cost of processing transactions on Google Play Billing.  Many other payment processors charge significantly lower fees that range from 1%-3% of the transaction value.  For example, PayPal, Square, Stripe, and Braintree all charge under 3% of the transaction value—less than one tenth of Google's maximum rate.  Indeed, Google's Chrome Web Store charges only 5% for each app download.  And Google does not charge *any* fees to merchants who accept its Google Pay digital wallet platform as a form of payment.  The only meaningful difference between the Chrome Web Store, Google Pay, and Google Play is that the Chrome Web Store and Google Pay must compete with other companies.

160.   Recognizing this, Google changed the name of its fee from a "Transaction Fee" to a "Service Fee" in its DDA on November 5, 2019.  While Google said that the name change "better reflect[s] the range of services that Google provides to developers covered by the fee," it failed to identify what those purported "services" are, demonstrate why a 30% service fee was necessary, or explain why the 30% fee applies *only to consumer-purchased digital goods and services* when other apps receive the same services from Google, but pay no service fee.  While Google Play Billing includes features like transaction history and refunds, those are standard features of payment processors and offered by companies like PayPal that would be able to compete against Google in the absence of Google's policies.  Indeed, many payment processors offer more and better features than Google Play Billing. Google's policies have decreased innovation in the Android App IAP Market.

6182535

161.   Nor has Google ever shown that its "fee," specifically for sales of digital goods and services, is justified.  Over the years, Google has argued that it reviews apps for performance, security, consumer privacy, safety, or content problems—none of which, of course, is exclusive to apps that sell digital, rather than physical, goods and services.  Google already imposes a separate, universal $25 submission fee on every app developer that uses Google Play, and does not offer any additional "performance," "security" or "safety" features to apps that pay Google's service fee versus those that do not, including any additional features related to the sales of digital goods and services.  That $25 submission fee, in addition to other revenue Google Play collects from sales of apps and in-store advertising, compensates Google for its purported services related to security and app review—not the up to 30% "fee" for paid apps and in-app purchases that Google (by its own estimates) applies to only 3% of apps.[40]  Indeed, Google's own meeting minutes reflect internal "discomfort" with the amount of its fee.  And, when asked where the 30% number came from, one Google employee responded, "pretty sure [Apple CEO] Steve Jobs just made it up for itunes," further demonstrating that the fee bears no relation to the services Google purportedly provides.  When determining a viable price for Google's payment processing services in other market segments, such as subscription streaming services accessed through Google search, Google staff suggested that a 5% "fee" would be appropriate because Google faced competition from "payment platforms like Stripe" that offered rates around "2-4%."

162.   Moreover, Google extracts a colossal amount of consumer data from Google Play and Google Play Billing, which Google monetizes in its search and advertising business.[41]  Indeed, Google's efforts to impose Google Play Billing on

---

[40] https://support.google.com/googleplay/android-developer/answer/11131145?hl=en#:~:text=Developers%20are%20subject%20to%20a,to%20offer%20at%20no%20charge (last visited Apr. 26, 2022).

[41] Google also uses Google Play to monitor competing apps and gather market intelligence that it leverages to its advantage.

6182535

developers is more about ensuring that it and it alone has access to and can monetize the personal data about Match Group's users and subscribers than user privacy. Making matters worse, Match Group must then pay significant sums to Google's search and advertising business, which is built, in part, on Match Group's user and subscriber data, to help maintain an online presence and acquire potential users—this is on top of the 30% tax Google extracts from Match Group for in-app purchases. Thus, even absent charging its tax, Google's methods of harvesting consumer data for commercial purposes generate significant streams of revenue that are more than sufficient to maintain Google Play.

163. Google's arguments to the contrary are non-sensical and inconsistent. According to Google, its "fee" prevents app developers from "free riding" on Google Play. But only a small fraction (approximately 3%) of the millions of apps available on Google Play are required to pay the 30% tax—not to mention the fact that for years, app developers like those in Match Group's portfolio were never required to pay the tax or use Google Play Billing. Some of the other apps use alternative means to generate revenue (*e.g.*, advertising like Facebook) and are therefore not required to use Google Play Billing. And, while Google could attempt to collect a tax on those alternative forms of revenue, it does not. Relatedly, Google excludes large categories of purchases from the requirement to use Google Play Billing. Google's Payment Policy states that Google Play Billing "must not be used" for "the purchase or rental of physical goods" or "physical services." For this reason, popular apps like Amazon, Uber, Postmates, DoorDash, and TaskRabbit need not use Google Play Billing nor pay Google's 30% tax because Google has unilaterally deemed their offerings "physical." Meanwhile, Match Group's apps, which facilitate in-person meetings and others that offer goods and services Google has deemed "digital" are required to pay that supra-competitive fee to line Google's pockets and, to the extent that fee does cover any of Google's actual expenses, subsidize other app developers. Contrary to Google's arguments, its arbitrary imposition of a service fee on only a small minority

of apps *encourages* the very behavior that Google labels "free riding" when applied to the sale of "digital goods or content."  Although, no one can completely "free ride" on a Google service because these app brands—like Match Group—must also pay Google Search's fees to attract users in the first place.

164.  Google's targeting of only some app developers is also inconsistent with its claim that the fees compensate Google for providing tools and services on Google Play that purportedly benefit *all* app developers.  The *only* service provided in exchange for the 30% fee that is not provided to *all* developers is the processing of the payment.

165.  Further, Google's underinclusive policy severely undercuts Google's claims that requiring use of Google Play Billing is necessary to provide security and reliability for consumer purchases.  If those concerns were valid (and they are not), Google would not allow some of the most popular apps, with the largest number of users, to use their own payment system—let alone the 85% of apps that do not have to use Google Play Billing, such as those that offer physical goods and services (until Google changes its policy to capture those profits, too).  Nor would Google have knowingly permitted Match Group's apps to offer their own payment system for years, or announce an exception of Spotify only a week before Google's new policy went into effect.  Either Google does not care about the consumers of those apps, or Google's rationale for imposing Google Play Billing on apps like those from Match Group is a thin façade.

166.  In short, Google's "fee" is entirely arbitrary and selectively enforced.  It is also a total windfall for Google.  In 2021 alone, Google earned billions of dollars from its tax.  And those billions of dollars are on top of untold ill-gotten gains through Google later deciding to compete with popular, successful apps after harvesting and analyzing consumer purchase data—and the fact that Google can undercut those competitors because Google is not subject to its own 30% tax.

6182535

167.   In a fair, competitive market, Google could never charge such an onerous tax because Android app developers could switch to another service.  As explained above, however, Google has a monopoly on the Android App Distribution Market or, alternatively, the Dating App Distribution Market.  Google is now abusing its power by forcing Android app developers to give up large portions of their revenue or risk losing access to an entire market of Android device users.

### 3.   Google's Conduct Destroys Competition in the Android App IAP Market and Harms Consumers and App Developers

168.   Google's conduct forecloses competition in the Android App IAP market. In the absence of Google's tying and other illegal conduct, competing payment processors could develop alternative and improved payment options.  Consumers would benefit from more choices, lower prices, better customer service, and improved functionality.  Competitors and app developers would benefit from more customer transactions and could improve their customer relationships.  There are no pro-competitive efficiencies from Google's tie of app distribution and payment processing services that outweigh the harm to consumers, developers, and would-be competitors to Google.

169.   Because of Google's anti-competitive conduct, however, most app developers and consumers have only once choice for their purchasers—Google Play Billing—where they are required to pay Google's above-market "fees."  Google's "fee" drastically reduces the revenue that app developers, including many startups, can earn to recoup their investments.  As a result, these companies have less ability and incentives to innovate, develop new technology, increase marketing, offer lower prices to consumers, and otherwise expand.

170.   By requiring that apps purchased through Google Play use Google Play Billing for the purchase of digital content, developers lose features such as (1) information about failed consumer IAP transactions, such as the reason for payment failures, which Google does not provide to developers; (2) features that

6182535

1  minimize "involuntary churn," which occurs when a user's short-term credit card

2  issues result in canceling or otherwise "churning" a subscription; (3) data about

3  consumers' prior credit card payment ability; (4) free trial services; (5) the ability to

4  offer tailored payment options and promotions; and (6) customized cancellation

5  experiences, such as post-cancellation surveys, among other examples.

6      171.  Google's conduct raises consumer prices as well.  Many app developers

7  cannot absorb Google's taxes and instead must pass them down, in whole or part, to

8  consumers.  The resulting increase can deter consumers from purchasing apps or

9  making in-app purchases, which further decreases the revenue and incentives for app

10  developers.

11      172.  As the Director General of the Competition Commission of India recently

12  explained—in finding that Google's non-negotiable "fee" of up to 30% was unfair

13  and discriminatory in violation of India antitrust law—Google's "fees" increase the

14  cost for app developers, adversely affect competition in downstream markets where

15  Google's proprietary apps are competing against third-party apps, increase the

16  switching costs for users (who will have to change payment providers from Google

17  Play Billing if they leave Android), and disincentivize innovation by discouraging

18  developers from developing their own payment processing systems.  The Director

19  General also found that Google's conduct excludes competition from the Android

20  App IAP Market by preventing other entrants into the market.

21      173.  Google's anti-competitive conduct in the Android App IAP Market also

22  suppresses competition in the Android App Distribution Market or, alternatively, the

23  Dating App Distribution Market, by making it increasingly difficult for app

24  consumers to switch platforms. So far, Google and Apple—the two dominant IAP

25  and app distribution providers for Android and iOS, respectively—have successfully

26  restrained inter-OS competition.  But as the popularity and profitability of apps

27  continue to climb, evolving technology and growing competitive pressures in app

28  distribution markets could reduce switching costs and improve competition.  Google

6182535

1   can ward off these changes by increasing switching costs from Android through its

2   IAP policies.  Google's control over IAP is critical to that endeavor because Google

3   is the intermediary between app developers and their consumers. Through Google

4   Play Billing, Google can turn up switching costs throughout a variety of measures;

5   for example, requiring onerous cancellation procedures or forbidding flexible

6   subscriptions.

7   **G.   Match Group Offers Consumers an Alternative and Competitive In-**

8   **App Payment Option**

9   174.   Although Google now broadly requires app developers and consumers to

10  use Google Play Billing for purchases of digital content, its policies previously

11  allowed some developers to use alternative, competing payment processors.   As

12  relevant here, under Google's Payments Policy, app developers were previously not

13  required to use Google Play Billing when "[p]ayment [was] for digital content that

14  may be consumed outside the app itself."

15  175.   Match Group brands that offer apps for download on Google Play—

16  Tinder, Match, OkCupid, PlentyofFish, OurTime, and others—squarely fall within

17  this exception because even though consumers expect to *purchase* in-app digital

18  content within Match Group's dating apps, they may also consume that content on the

19  web (on a desktop computer or laptop).  The same is true of one of Match Group's

20  competitors, Bumble.

21  176.   The users of these apps also consume digital content outside the app itself

22  when they have in-person interactions with the individuals with whom they match.

23  For example, when Tinder users upgrade to Tinder Plus, Tinder Gold, or Tinder

24  Platinum subscriptions, or purchase Super Likes and Boosts, they are paying for

25  digital content to facilitate and enhance their in-person interactions.  This is another

26  reason why Match Group's apps were not required to use Google Play Billing.

27  177.   Accordingly, in full compliance with Google's policy at the time, most of

28  the Match Group brands mentioned above has offered its apps for download from

- 53 -
COMPLAINT

1   Google Play without requiring use of Google Play Billing.  Some of these brands

2   never offered Google Play Billing as a payment option, while others have given

3   consumers the choice of paying through their respective in-house in-app payment

4   system or Google Play Billing.

5       178.  Specifically, MGL first published its Match app on Google Play (then

6   named Android Market) in 2010; the Match app allows payment through credit card

7   and PayPal, and does not offer Google Play Billing.  The Tinder app was published

8   on Google Play in July 2013 and offers the option to pay through Google Play Billing

9   or credit card.  OkCupid was added to Google Play in 2010 and offers Google Play

10   Billing, credit card, and PayPal.  PlentyofFish also joined Google Play in 2010, and

11   offers credit card and PayPal payment options, without offering Google Play Billing.

12   OurTime similarly offers a credit card payment option without offering Google Play

13   Billing.

14       179.  Match Group has found that its in-house in-app payment systems are

15   better for consumers and Match Group.  With an in-house system, Match Group can

16   ensure that its consumers receive high-quality customer service when payment issues

17   arise.

18       180.  Match Group's in-house in-app payment option also supports many

19   features that are not available on Google Play Billing even though they enhance the

20   user experience and facilitate payments.  For example, Match Group's in-house IAP

21   systems support payment methods that consumers choose to use but Google Play

22   Billing does not support, including iDEAL and SEPA Direct Debit (which allow users

23   to pay directly from their bank account).

24       181.  Further, unlike Match Group's in-house in-app payment system, Google

25   Play Billing also does not allow users to make installment payments on a recurring

26   basis.  Match Group's in-house in-app payment system enables the user to make

27   monthly payments for subscriptions, which most consumers prefer over paying a

28   lump sum.  By contrast, Google Play Billing requires the whole fee upfront, which

1   could deter users who are concerned about the immediate financial commitment or
2   who may not be able to financially afford a one-time payment.

3       182.   By using its own in-house in-app payment system, Match Group is able
4   to also access payment data that Match Group can use to keep bad actors off its apps.
5   Unlike Google, Match Group does not monetize this data (*e.g.*, in advertising).
6   Rather, Match Group uses payment information to perform registered sex offender
7   checks and check for fraudulent transactions.  For these reasons, Match Group's
8   access to customer payment data is critical to the security of its apps and safety of its
9   users.

10      183.   Match Group's data show that consumers prefer using Match Group's in-
11  house in-app payment option.  As of March 2022, a majority of U.S. Tinder in-app
12  purchase revenue on Android used the brand's in-house in-app payment option
13  instead of Google Play Billing.

14      **H.**     **Google Allows Match Group's Apps to Remain on Google Play,**
15             **Recognizing That Match Group's Payment Options Do Not Violate**
16             **Google's Policies**

17      184.   Google knows that Match Group offered its apps on Google Play in
18  compliance with Google's policy.  Even though many of Match Group's brands have
19  offered their own payment services for years, Google knowingly permitted these apps
20  to remain on Google Play and received the associated benefits, including the ability
21  to gather consumer data and sell targeted advertising along with the traffic and user
22  interest Match Group brands brought to Google Play.

23      185.   When Google rebranded its existing Android Market to launch Google
24  Play in 2012, Google told its developers that it thinks about revenue in two ways: how
25  to "give users flexible ways to pay" and how to give developers "flexible ways to
26  monetize your applications."[42]   In that same presentation, Google's engineering

27  ─────────────────

28  [42] Google Developers YouTube Channel, *Google I/O 2012-Android Apps in Google Play*,
    https://www.youtube.com/watch?v=TlVhNVFjeZo at 13:44-14:06 (last visited Apr. 26, 2022).

6182535

director thanked developers "for building incredible apps and games in the Play Store," for "helping the Google Play store and the Android platform become the fastest growing mobile platform around," and for "delighting hundreds of millions of users with your products."[43]  Google was acknowledging the obvious truth that an app store needs popular apps to attract users and keep their loyalty.

186.   Most of Match Group's apps had been available on Android Market well before Google launched the Play Store.  But while Match Group made those services available to Android users, many of Match Group's apps did not allow users to make in-app purchases due to Google's policies.

187.   After the launch of Google Play, Match Group and Google met to discuss enabling in-app purchases on Match Group's Android apps.  At the time—and to this date—Match Group had significant concerns about using Google Play Billing as the exclusive payment processor for its dating apps.  To start, there is Google's exorbitant tax of up to 30%, which far exceeds what other payment processing systems charge.  But there are also significant feature gaps between Google Play Billing and other payment processing services, including Match Group's in-house in-app payment system.  In particular, for dating apps like those Match Group operates, running in-house payment processing allows Match Group to gather additional data that helps Match Group operate its services successfully.  That data is not monetized but is instead used to, among other things, aid Match Group's customer service and safety efforts.  Further, because dating apps generally rely on a freemium model and involve shorter subscription lengths than other types of subscription-based apps, operating in-house payment processing allows Match Group to provide better customer service that is more responsive to the needs of its users.

188.   Match Group conveyed its concerns to Google during that initial meeting.  And in response, Google agreed that Match Group could continue using its own

---

[43] *Id.* at 0:45-1:06.

1   payment processors in Android apps distributed through Google Play.  Google made

2   similar promises to other developers, assuring them that Google "does not take a

3   percentage" of revenues.

4        189.   Google and Match Group had further discussions in the spring of 2019

5   when Tinder started offering alternative payment options.  Before then, Tinder users

6   only had the option of using Google Play Billing to make payments for in-app

7   purchases.  In April 2019, following the lead of its sister brands, Tinder started giving

8   consumers an alternative option of making a payment directly to Match Group with a

9   credit card.

10        190.   Shortly thereafter, in May 2019, Google reached out to MGI executives

11   to discuss its decision.  After several e-mail and phone conversations, representatives

12   from Google and MGI met on August 23, 2019, at Google's offices in Mountain

13   View, California.

14        191.   At the meeting, MGI explained (as it had previously) that its decision

15   complied with the then-operative version of Google's DDA.  MGI also explained that

16   offering its own payment option was the best option for the Tinder business and its

17   users—a majority of whom in the United States chose the in-house in-app payment

18   system rather than Google Play Billing.  For these reasons, and others, MGI informed

19   Google at the meeting that it intended to continue to allow its customers to pay directly

20   with a credit card.

21        192.   Thereafter, Google took no action, which falsely assured Match Group

22   that Match Group's brands (and MGI's other brands) could continue to use their own

23   payment options and Google Play without unlawful interference from Google.

24        193.   Match Group reasonably believed that Google recognized and accepted

25   that Match Group's payment options complied with its obligations to Google and/or

26   was protected under the law.

27        194.   In reliance on Google's actions, Match Group distributed its apps on

28   Google Play, established a vast network of economic relationships with users on

6182535

1     Android devices, and offered its own payment option.  It also expended time,

2     resources, and capital to continue to develop and offer its own payment options.

3     **I.**     <u>**Abusing its Monopoly Power, Google Abruptly Changed Its Policies**</u>



13     195.  Despite its promises and assurances, Google has attempted to rachet up

14     pressure on developers for years, attempting to impose its tax on app developers like

15     Match Group that offer subscription services outside of the app itself, as well as other

16     popular app providers like Netflix and Hulu.  Google now threatens to remove Match

17     Group and other app developers from Google Play unless they stop competing with

18     Google Play Billing by offering their own payment processing services.  Google's

19     decision to end a voluntary course of dealing with Match Group and other app

20     developers—one that has been both competitive and highly lucrative for Google—

21     shows Google's willingness to forgo short-run benefits to reduce competition in the

22     Android App IAP Market over the long run.

23     196.  Google has claimed that its Google Play Billing policies have remained

24     consistent over time.  Not so.  Even just comparing various versions of the DDA and

25     its incorporated policies over time, Google has gradually increased the scope of its

26     payments policy.  While Google launched In-App Billing—the predecessor to Google

27     Play Billing—in 2011, it did not introduce a policy purportedly requiring use of In-

28     App Billing until August 2012.  At the time, as discussed above, Google allowed two

6182535

significant exceptions: for purchases Google alone determines to be "physical" goods (including goods sold in both physical and digital forms—*e.g.*, a newspaper subscription that included both delivery of a physical paper and online access) and digital goods that may be "consumed outside the app itself" (*e.g.*, an online dating subscription that also provides benefits on the web version of the dating service). Subscription services were also not previously under the scope of the policy. Google's gradual enlargement of the number and types of apps and in-app purchases subject to the requirement to use In-App Billing (or later Google Play Billing) is tantamount to a price increase and, on information and belief, has driven significant increases in Google's profits.

197.   Google has also grown more aggressive at enforcing its payments policy over time. Google's efforts to force app developers to use Google Play Billing dates to at least 2013, when Google began pressuring Match to offer in-app purchases in its Android apps through In-App Billing. At the time, Google was happy to permit Match to offer its own payment processing services—so long as Match also offered Google Play Billing.

198.   In October 2017, Google first began privately informing developers at the Playtime Conference that it would begin enforcing stricter IAP restrictions. At the time, Google sought to entice Match Group and other major subscription apps to switch to Google Play Billing voluntarily, although it threatened to begin enforcing IAP requirements in early 2018. Match Group met with Google to discuss a compromise position on IAP processing in November 2017, but Google refused to budge.

199.   As legislators and antitrust authorities around the world increased their scrutiny of Google's app store practices, including imposing record-breaking fines and penalties against Google for antitrust violations, Google largely paused its efforts to force app developers into using Google Play Billing until summer 2020, when it again set a deadline for app developers of July 15, 2020. Google delayed that deadline

1   after learning of a United States House Judiciary Committee hearing on Online
2   Platforms and Market Power, at which Google CEO Sundar Pichai ultimately
3   testified.  Google knew that enforcing its desired Google Play Billing policy at the
4   time would (rightfully) draw even further antitrust scrutiny from the U.S. Congress.

5       200.   On September 28, 2020, Google updated its Payments Policy in the DDA
6   to require that all app developers and consumers use Google Play Billing to purchase
7   apps from Google Play and make in-app purchases of digital content. Thus, after over
8   a year of allowing Tinder to operate its own payment system (and allowing Match
9   Group's other brands to do so for even longer), Google unilaterally changed its policy
10  and reversed its prior course of dealing.

11      201.   In announcing this change, Google falsely represented that it had merely
12  "clarified" its Payments Policy.  In a blog post, Google claimed that it had "always
13  required developers who distribute their apps on [Google] Play to use Play Store's
14  billing system if they offer in-app purchase of digital goods and pay a service fee from
15  a percentage of the purchase."[44]

16      202.   That is not true.   As explained above, Google's Payments Policy
17  expressly did not require the use of Google Play Billing when users purchased "digital
18  content that may be consumed outside the app itself."  Google's new Payments Policy
19  removed that exception and added entirely new language that targets Match Group's
20  apps.  In particular, Google's new Payments Policy states that apps must use Google
21  play Billing for "in-app purchase of . . . subscription services (such as . . . dating)."

22      203.   In addition, Google previously did not require use of Google Play Billing
23  for subscription streaming services for music and video.  But having allowed and
24  enticed these entities to build large networks of customers on Google Play, Google
25  then reversed course—knowing that these services were dependent on Google Play
26
27  ───────────────
28  [44] Android Developers Blog, *Listening to Developer Feedback to Improve Google Play* (Sept. 28,
    220), available online at https://android-developers.googleblog.com/2020/09/listening-to-developer-
    feedback-to.html (last visited Apr. 26, 2022).

6182535

1  for app distribution.  Google's September 28, 2020, update to the DDA added new
2  language requiring apps to use Google Play Billing for "in-app purchase of . . .
3  subscription services (such as . . . music, video)."

4      204.  It is not surprising that Google's abrupt rejection of its prior course of
5  dealing targets some of the largest and most popular app developers offered on Google
6  Play, including Match Group, Netflix, and Hulu.  Google has expanded its illegal tie
7  to dramatically increase the number of purchases from which Google can extract
8  unconscionable taxes.

9      205.  To further entrench its monopoly, Google's Payments Policy also
10 prohibits app developers from "lead[ing] users to a payment method other than
11 Google Play's billing system" via Google Play or within the app itself.

12     206.  Google imposed a September 30, 2021, deadline for all existing apps to
13 comply with its new policy. As that date approached, the Assembly of the Republic
14 of Korea (Korea's legislative body) was actively considering legislation to bring
15 fairness to the app ecosystem.  In a transparent effort to convince Korean lawmakers
16 not to move forward, Google announced it was extending the deadline again, this time
17 to March 31, 2022, for some apps.  New apps submitted after January 20, 2021, were
18 required to comply immediately.  Despite Google's actions, and because Members of
19 the Korean Assembly had determined that Google's app store business harmed both
20 consumers and developers, the Korean legislation passed to become the first of its
21 kind making mandatory usage of Google Play Billing illegal in Korea.

22     207.  At the same time, Google was attempting to entice major app developers
23 like Match Group to voluntarily switch to Google Play Billing with offers of favorable
24 pricing and advertising spend.  In December 2020, Google offered Match Group a
25 marketing program that would have required roughly $300 million in advertising
26 spend, of which Google promised to "co-invest in 1/3 of all marketing campaign costs
27 up to a maximum of $507 million."  At the same time, the point of the deal was what
28 Google described as its "Product Requirements": Match Group would need to become

6182535

an "exemplar of Android Apps within the Google Ecosystem" by, among other things, "ensur[ing] that apps offer subscriptions in app and are *fully compliant with the latest Play Billing Policy.*"

208.   Google's proposed deal was little better than an attempt to pay off Match Group to stop competing with Google's payment processing business.

209.   Google has a policy and practice of removing any noncompliant apps from Google Play.  In August 2020, for example, Google removed the Fortnite app from Google Play immediately after its owner, Epic, started offering its own payment option.  That Google is willing to shut down one of the world's most popular gaming apps—and has now turned its fire to the world's most popular dating apps—demonstrates Google's willingness to forgo short-term profits to reduce competition in the Android App IAP Market by harming smaller competitors—like Match Group—that can offer their own in-app payment processing.

210.   Less than a week before Google's March 31, 2022, deadline, Google announced that it would offer (yet another) new exception to its purported payments policy with "User Choice Billing," but only to a select group of app developers.  So far, Google has announced that, at least initially, only Spotify—which declined to testify about Google's anti-competitive conduct in front of the congressional Antitrust Committee—was chosen to participate.  Spotify offers a popular music streaming service with hundreds of millions of active users but did not previously allow in-app purchases on Android.  On March 23, 2022, Google announced that Spotify would be able to benefit from the same deal Google previously promised Match: Spotify would "introduce[e] Google Play [Billing]," but would be allowed to operate its "current billing system."  Before Google's announcement, Spotify users on Android had been directed to pay by web browser.

211.   Google's   User   Choice   Billing   "pilot   program"   announcement conspicuously fails to note that Google had offered the same policy to developers like Match for years—and continues to allow apps like Uber and Lyft the ability to operate

their own payment processors.  In reality, Google is playing favorites—under the guise of a "pilot program," Google bestows special "User Choice Billing" status upon developers who keep quiet about Google's anti-competitive behavior and punish those who, like Match Group, dare to speak out.  Google's announcement of an exception, which in reality just narrows its former practice, fewer than eight days before disallowing other app developers from receiving the same benefits undermines any possible procompetitive justification Google could attempt to offer and indeed contradicts all of the rationales Google has previously offered for extending Google Play Billing.

212.  Google has no pro-competitive or lawful reason for its actions.  For example, Google Play Billing is not some technical requirement that Google cannot waive, nor is it necessary to protect user security or otherwise advance any of Google's (pretextual) reasons for its policy changes—because if Google Play Billing were any of those things, Google would not have made so many exceptions over the years permitting apps to use Google Play without requiring Google Play Billing, including for Match Group for the past several years or Spotify more recently (along with "physical" in-app purchase providers, like Uber, who have never been required to use Google Play Billing).  Nor can Google claim that its supra-competitive "fee" is necessary to compensate Google for services that Google provides to app developers who pay the fee, when—as explained above—Google provides the same services to the other 97% of app developers who pay no fee but Google's $25 submission fee to place an app on Google play.  Indeed, as the Director General of the Competition Commission of India recently found, through Google's own admission, Google does not provide any additional services to app developers who pay Google's supra-competitive fee; Google provides the same services to free apps that it provides to paid apps or apps offering digital in-app purchases.

213.  In context, Google's billing policy changes reflect the sharp left turn the company has made from its purported founding principles, which remain enshrined

6182535

1    at "about.google/philosophy." Google lists "ten things" from the company's early
2    days that it hopes still "hold[] true" and invites the rest of the world to "hold [it] to
3    that." The first: "Focus on the user and all else will follow." Google's conduct now
4    squeezes out user choice. The second: "It's best to do one thing really, really well."
5    Yet it has expanded its monopoly across several distinct markets, including app
6    distribution and in-app payment markets. Another, "[d]emocracy on the web works,"
7    is undermined by Google's suppression of competition in favor of its own preferred
8    policies, without allowing users or app developers a single vote. And, especially
9    ironic in light of the urgent tattoo of complaints from both private and public sectors,
10   "[y]ou can make money without doing evil." Antitrust authorities around the world
11   have attempted to hold Google to these founding principles, but so far, Google has
12   chosen to pay fines and big legal teams rather than give up its new principles of
13   monopoly.

14        214.  Google is continuing to exploit its power as a monopolist in the Android
15   App Distribution Market or, alternatively, the Dating App Distribution Market, to
16   maintain a system whereby it can extract an arbitrary and unconscionable service tax
17   of up to 30% for each and every in-store purchase or in-app purchase. Google seeks
18   to accomplish this by illegally tying use of Google Play to use of Google Play Billing
19   and through the other anti-competitive conduct alleged herein.

20        **J.    Google's Anti-Competitive Conduct Has Irreparably Harmed Match
21             Group and its Customers**

22        215.  As discussed above, Google's conduct destroys competition in the
23   Android App IAP and Android App Distribution Markets or, alternatively, the Dating
24   App Distribution Market, while inflicting harm on app developers, consumers, and
25   would-be competitors.

26        216.  Google's conduct will also irreparably harm Match Group and its
27   customers. When given the option, most of Match Group's customers prefer Match
28   Group's payment system, which offers users more flexibility in how to pay, better

6182535

customer service, and other benefits, to Google Play (for apps that offer Match Group's payment systems). Absent Google's anti-competitive policies, Match Group would continue to allow customers to choose which in-app payment solution to use for each purchase. But Google has deprived them of that choice by leveraging its monopoly power to require that all purchases be processed through Google Play Billing.

217. Google's requirement that all purchases be made through Google Play Billing also harms Match Group's ability to provide customer service for in-app purchase transactions. When in-app purchases are made through Match Group's payment system, Match Group can work directly with its customers to ensure that any issues are resolved to their satisfaction. By requiring the use of Google Play Billing, Google has anchored itself in the middle of the transaction, even though it lacks the same incentives to provide good customer service that brands have because customers are likely to (and frequently do) blame Match Group, rather than Google, if something goes wrong.

218. Match Group brands have also lost access to important consumer information that they use to keep bad actors off their platforms, check for people under the age of 18, and check for fraudulent transactions. That information is now in the hands of Google, which can use it to monetize its ads and search businesses or even potentially to compete with Match Group.

219. Finally, Google imposes a supra-competitive service "fee" of up to 30% on app developers and consumers. Google could not maintain this tax absent the actions it has taken to destroy competition in the Android App IAP and Android App Distribution Markets or, alternatively, the Dating App Distribution Market.

1

## **FIRST CAUSE OF ACTION**

2

### **Unlawful Tying of Google Play to Google Play Billing; Sherman Act § 1**

3

### **(Against all Defendants)**

4     220.  Match Group realleges and incorporates by reference the allegations in

5 each of the preceding paragraphs as though fully set forth herein.

6     221.  Section 1 of the Sherman Act prohibits "[e]very contract, combination in

7 the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among

8 the several States, or with foreign nations." 15 U.S.C. § 1.

9     222.  Google's DDA is a contract between Google and app developers,

10 including Match Group.  The DDA requires app developers to exclusively use Google

11 Play Billing to process purchases of apps from Google Play or in-app digital content.

12     223.  Google has violated Section 1 of the Sherman Act because the DDA

13 unlawfully conditions use of the tying product (Google Play) on using a tied product

14 (Google Play Billing).

15     224.  Google has substantial market power in the tying market (the Android

16 App Distribution Market and/or, alternatively, the Dating App Distribution Market).

17 Google Play is the dominant Android app store in the world.  Over 90% of all

18 downloads of Android apps are completed using Google Play.

19     225.  Google's unlawful tying interferes with the relationship between

20 Google's would-be competitors and consumers.  Absent Google's unlawful tying,

21 consumers could use competing in-app payment service providers, including the

22 services offered by Match Group, to purchase apps from Google Play and in-app

23 digital content.  Google's illegal tying prevents those consumers from using and app

24 developers from offering any competing in-app payment service provider.  Google

25 has therefore leveraged its monopoly power in the tying market to harm its

26 competitors in the tied market.

27     226.  Google Play Billing is a separate product from Google Play.  Google Play

28 is a distribution platform that enables users to download, install, and manage apps

6182535

1    from their smart mobile devices.  Google Play Billing, by contrast, is a payment
2    processing solution for, among other things, purchasing digital content within apps
3    on Android devices.  The products are distinct and may be obtained separately.  Some
4    of Match Group's apps and their users have never used Google Play Billing even
5    though they regularly use Google Play—indeed, consumers prefer using Match
6    Group's in-house payment option over Google Play Billing.  In addition, many other
7    popular apps that offer non-digital content for purchase, such as Facebook, Amazon,
8    Uber, DoorDash, and Task Rabbit do not use Google Play Billing even though they
9    regularly use Google Play.

10        227.  Google's illegal tying has severe anti-competitive effects as described
11   herein.  Among other things, it eliminates competition in the Android App IAP
12   Market, allows Google to charge supra-competitive fees that increase costs for app
13   developers, increases prices for consumers, inhibits innovation, reduces consumer
14   choice and access to improved features available on other payment processors,
15   interferes with and impairs the relationship between app developers and their
16   consumers, and leads to poorer quality of customer service, thus harming competition
17   and consumers.

18        228.  Google has no pro-competitive or lawful reason for its illegal tying.
19   Match Group's brands and other app developers have offered their own in-app
20   payment options for years.  Google knowingly permitted those alternative payment
21   options.  Google only recently changed its policies to prevent those alternative
22   payment options so that it can extend its control over the Android App IAP Market
23   and extract supra-competitive fees from an even larger set of transactions, affecting
24   billions of dollars of in-app transactions annually.

25        229.  Alternatively, to the extent that Google can claim pro-competitive
26   justifications for its conduct, those benefits are outweighed by the anti-competitive
27   effects of Google's conduct and could have been achieved through less anti-
28   competitive and harmful means.

6182535

230.   Google's illegal tying affects a substantial volume of interstate and foreign commerce.  Consumers purchase tens of billions of dollars of apps from Google Play and in-app purchases every year.

231.   Google's tying arrangement is *per se* illegal.  In the alternative, Google's tying arrangement violates the rule of reason.

232.   Match Group has suffered and continues to suffer damages and irreparable harm as a result of Google's illegal tying.

**SECOND CAUSE OF ACTION**

**Unlawful Monopoly Maintenance**

**in the Android App Distribution Market or, Alternatively, the Dating App**

**Distribution Market; Sherman Act § 2**

**(Against all Defendants Except Google Payment)**

233.   Match Group realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

234.   Section 2 of the Sherman Act prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

235.   Google has a monopoly in the Android App Distribution Market or, alternatively, the Dating App Distribution Market.  Over 90% of all downloads of Android apps are completed using Google Play.

236.   Google has willfully maintained that monopoly power through the anti-competitive and exclusionary conduct described herein.  Among other things, Google uses exclusionary contracts with OEMs and MNOs (*e.g.*, the MADA, AFA, ACC) and app developers (the DDA), predatory practices and payment incentives, and technological barriers.  These anti-competitive practices give Google Play substantial competitive advantages and effectively limit app developers or consumers from using Google Play's competitors.  Google has engaged in a continuous course of unlawful and anti-competitive conduct.

237.   Google's conduct has severe anti-competitive effects as described herein. Among other things, it practically forecloses competition in the Android App Distribution Market or, alternatively, the Dating App Distribution Market, reduces consumer choice, allows Google to charge supra-competitive fees that increase costs for consumers and app developers, inhibits innovation, and reduces quality of service.

238.   There are no pro-competitive justifications for Google's conduct.  In the alternative, any pro-competitive benefits are outweighed by the anti-competitive effects of Google's conduct and could have been achieved through less anti-competitive and less harmful means.

239.   Google's conduct affects a substantial volume of interstate and foreign commerce.

240.   Match Group has suffered and continues to suffer damages and irreparable harm as a result of Google's illegal conduct.

<div align="center">

**THIRD CAUSE OF ACTION**

**Unreasonable Restraints of Trade**

**in the Android App Distribution Market or, Alternatively, the Dating App**

**Distribution Market: Sherman Act § 1**

**(Against all Defendants Except Google Payment)**

</div>

241.   Match Group realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

242.   Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.

243.   Google has entered into agreements with OEMs and app developers that unreasonably restrict competition in the Android App Distribution Market (or alternatively, the Dating App Distribution Market).

244.   Google has required OEMs—as a condition of using the Android OS, Google Play, and other "must have" Google services—to enter MADAs, AFAs,

6182535

ACCs and other agreements that require OEMs to pre-install and offer Google Play as the default, primary, and often only app store on Android devices, while severely disadvantaging Google's competitors and impeding customers from using other options.

245.   Moreover, Google has leveraged Google Play's dominance to coerce app developers like Match Group to agree to anti-competitive terms in the DDA that further restrict competition in the Android App Distribution Market (or alternatively, the Dating App Distribution Market).  Pursuant to section 4.5 of the DDA, developers "may not use Google Play to distribute or make available any product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Separately, Google conditions access to a critical advertising channel for app developers—Google's App Campaigns program—on a developer's agreement to distribute its apps on Google Play.

246.   Google has engaged in a continuous course of unlawful and anti-competitive conduct.

247.   Google's conduct has severe anti-competitive effects as described herein. Among other things, it practically forecloses competition in the Android App Distribution Market (or alternatively, the Dating App Distribution Market), reduces consumer choice, allows Google to charge supra-competitive fees that increase costs for app developers, increases prices for consumers, inhibits innovation, reduces consumer choice and access to improved features available on other payment processors, interferes with and impairs the relationship between app developers and their consumers, and leads to poorer quality of customer service, thus harming competition and consumers.

248.   Google's conduct has no legitimate or pro-competitive purpose to justify its anti-competitive effects.  Alternatively, to the extent that Google has pro-competitive justifications for its conduct, those benefits are outweighed by the anti-

6182535

1   competitive effects of Google's conduct and could have been achieved through less

2   anti-competitive and harmful means.

3       249.   Google's conduct affects a substantial volume of interstate and foreign

4   commerce.

5       250.   Match Group has suffered and continues to suffer damages and

6   irreparable harm as a result of Google's illegal conduct.

7                              **FOURTH CAUSE OF ACTION**

8                              **Unreasonable Restraint of Trade**

9                   **in the Android App IAP Market; Sherman Act § 1**

10                                **(Against all Defendants)**

11      251.   Match Group realleges and incorporates by reference the allegations in

12   each of the preceding paragraphs as though fully set forth herein.

13      252.   As a precondition to distributing apps on Google Play, Google forces app

14   developers to agree to terms in Google's DDA that unreasonably restrain competition

15   in the Android App Distribution Market (or alternatively, the Dating App Distribution

16   Market).   The DDA requires app developers to enter a separate agreement with

17   Google's payment processor, Google Payment, to process and receive payment from

18   consumer purchases.   Specifically, the DDA requires app developers to exclusively

19   use Google Play Billing to process purchases of apps from Google Play or in-app

20   digital content.   The DDA further prevents app developers from using their app to

21   inform users of external payment options other than Google Play Billing.

22      253.   These requirements unreasonably restrain trade in violation of Section 1

23   of the Sherman Act, which prohibits "[e]very contract, combination in the form of

24   trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

25   States, or with foreign nations."  15 U.S.C. § 1.

26      254.   Google's conduct has severe anti-competitive effects as described herein.

27   Among other things, it eliminates competition in the Android App IAP Market, allows

28   Google to charge supra-competitive fees that increase costs for app developers,

increases prices for consumers, inhibits innovation, reduces consumer choice and access to improved features available on other payment processors, interferes with and impairs the relationship between app developers and their consumers, and leads to poorer quality of customer service, thus harming competition and consumers.

255.   In the alternative, Google has imposed these unreasonable restraints of trade in an attempt to monopolize the Android App IAP Market.  Because Google already has a monopoly in the Android App Distribution Market or, alternatively, the Dating App Distribution Market, and Google uses contractual agreements to force app developers to exclusively use Google Play Billing for purchases of apps from Google Play and in-app digital content, there is a dangerous probability that Google will obtain monopoly power in the Android App IAP Market.

256.   Google's conduct serves no legitimate or pro-competitive purpose. Match Group's brands and other app developers have offered their own in-app payment options for years, and Google Play Billing has provoked widespread dissatisfaction among developers.  Google knowingly permitted those alternative payment options.  Google only recently changed its policies to prevent those alternative payment options so that it can extend its control over the Android App IAP Market and extract supra-competitive fees from an even larger set of transactions.

257.   Alternatively, to the extent that Google has pro-competitive justifications for its conduct, those benefits are outweighed by the anti-competitive effects of Google's conduct and could have been achieved through less anti-competitive and harmful means.

258.   Google's conduct affects a substantial volume of interstate and foreign commerce.

259.   Match Group has suffered and continues to suffer damages and irreparable harm as a result of Google's illegal conduct.

6182535

**FIFTH CAUSE OF ACTION**

**Unlawful Exclusive Dealing in the Android App IAP Market; Sherman Act § 1**

**(Against all Defendants)**

260.   Match Group realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

261.   Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

262.   Google has a durable monopoly in the Android App Distribution Market or, alternatively, the Dating App Distribution Market. Google Play is the dominant Android app store in the world. Over 90% of all downloads of Android apps are completed using Google Play. Alternatively, Google enjoys market power in the Android App Distribution Market or, alternatively, the Dating App Distribution Market.

263.   As a precondition to distributing apps on Google Play, Google requires app developers to enter Google's DDA. The DDA further requires that app developers enter a separate agreement with Google Payment to process and receive payment from consumer purchases. Specifically, the DDA requires all app developers to use Google Play Billing as the sole method of payment for purchases of apps from Google Play and in-app digital content. Thus, the DDA prohibits app developers from using Google Play unless they agree not to use a competing in-app payment service provider for purchases of in-app digital content. That is an unlawful exclusive dealing arrangement imposed by Google.

264.   Google has used this exclusive dealing arrangement to maintain a monopoly in the Android App IAP Market. Because more than 90% of all downloads of Android apps are completed using Google Play, and Google requires use of Google Play Billing for the purchase of digital content within those same apps, Google also has close to a 90% share of the Android App IAP Market.

6182535

265.   In the alternative, Google has used this exclusive dealing arrangement in an attempt to monopolize the Android App IAP Market.  Because Google already has a monopoly in the Android App Distribution Market or, alternatively, the Dating App Distribution Market, and Google requires app developers to exclusively use Google Play Billing for purchases of apps from Google Play and in-app digital content, there is a dangerous probability that Google will obtain monopoly power in the Android App IAP Market.  Alternatively, Google's market power in the Android App Distribution Market or, alternatively, the Dating App Distribution Market creates a dangerous probability that Google will obtain monopoly power in the Android App IAP Market.

266.   Google's exclusive dealing arrangement has severe anti-competitive effects as described herein.  Among other things, it eliminates competition in the Android App IAP Market, allows Google to charge supra-competitive fees that increase costs for app developers, increases prices for consumers, inhibits innovation, reduces consumer choice and access to improved features available on other payment processors, interferes with and impairs the relationship between app developers and their consumers, and leads to poorer quality of customer service, thus harming competition and consumers.

267.   Google has no pro-competitive or lawful reason for its exclusive dealing arrangement.  Match Group's brands and other app developers have offered their own IAP payment options for years, and Google Play Billing has provoked widespread dissatisfaction among developers.  Google knowingly permitted those alternative payment options.  Google only recently changed its policies to prevent those alternative payment options so that it can extend its control over the Android App IAP Market and extract supra-competitive fees from an even larger set of transactions.

268.   Alternatively, to the extent that Google has pro-competitive justifications for its conduct, those benefits are outweighed by the anti-competitive effects of

- 74 -
COMPLAINT

6182535

Google's conduct and could have been achieved through less anti-competitive and harmful means.

269. Google's exclusive dealing arrangement affects a substantial volume of interstate and foreign commerce. Consumers purchase tens of billions of dollars of apps from Google Play and in-app purchases every year.

270. Match Group has suffered and continues to suffer damages and irreparable harm as a result of Google's exclusive dealing arrangement.

**SIXTH CAUSE OF ACTION**

**Per Se Unreasonable Restraints of Trade**

**Concerning ~~Unlawful Monopoly Maintenance~~**

**~~in the~~ Android App ~~IAP~~Distribution Market:**

**Project Hug (Games Velocity Program) and**

**other Agreements with Developers; Sherman Act § ~~2~~ 1**

**(Against all Defendants except Google Payment)**

271. Match Group realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

272. Google's conduct constitutes a *per se* violation of Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

273. Through formal agreements and understandings (together "agreements"), including but not limited to Google's "Project Hug" initiative, inclusive of the Games Velocity Program in its different iterations, Google paid its potential competitors to induce them to agree not to distribute apps on Android in competition with the Google Play Store, either through their own competing app store ███████████ ███████. (*See supra* at ¶ 114, 120.) Specifically, Google identified developers who were "most at risk . . . of attrition from Play" and systematically approached each of them with an offer of an agreement ████████████████████

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***



274.   For example, according to a Google internal email sent from Google's Managing Director of Global Partnerships to other executives at Google,

275.   Google understood that

- 76 -
COMPLAINT

6182535



. Given the inherent advantages of the Google Play Store from its pre-installation on all Android phones, its preferential placement on all Android phones, Google's exclusivity agreements with nearly all OEMs and the myriad technical restrictions that Google imposes on alternative Android app stores (*see supra* at ¶¶ 96 – 101), it was important for

has not entered the Android App Distribution Market to date.

276.  As another example,

Google understood and intended that

has not entered the Android App Distribution Market to date.

277.

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

278.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

279.   As an app developer that consumes app distribution services, Match Group has been harmed by Google's anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Google's anti-competitive conduct deprives Match Group and other developers from the benefits afforded by more robust competition in the market for app distribution services.  Google's conduct allows Google to charge higher prices to developers than would prevail in a competitive market.  It also deprives Match Group and other developers of the choice of accessing competing app stores through which they could distribute their apps.  Match Group and other developers are also deprived of the unique services and promotions that a competing app store might provide.

280.   Match Group has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**SEVENTH CAUSE OF ACTION**

**Unreasonable Restraints of Trade**

**Concerning Android App Distribution Market:**

**Project Hug (Games Velocity Program) and Apps Velocity Program**

**and other Agreements with Developers; Sherman Act § 1**

**(Against all Defendants except Google Payment)**

281.   Match Group realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

282.   Google's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 1.

- 78 -
COMPLAINT

6182535

283.   Google has entered into anti-competitive agreements, including but not limited to Project Hug agreements, ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ Project Hug agreements, under the Games Velocity Program and Apps Velocity Program, with at least ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.  (*See* Letter from B. Rocca to Y. Even dated September 23, 2022 regarding Google's Responses and Objections to Epic's Fourth Set of Interrogatories).   Match Group believes that Google has continued negotiating Project Hug and Apps Velocity Programs ▋▋▋▋▋▋▋▋▋▋▋

284.  As explained above, these agreements impose ▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋ and for some agreements, including Google's agreements with developers ▋▋▋▋▋▋▋▋ , also to ▋▋▋▋▋▋▋▋▋▋

285.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

286.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

287.   These agreements serve no legitimate or pro-competitive purpose sufficient to justify their anti-competitive effects, and thus unreasonably restrain and substantially foreclose competition in the Android App Distribution Market.

288.   As an app developer that consumes app distribution services, Match Group has been harmed by Google's anti-competitive conduct in a manner that the antitrust laws were intended to prevent. ███████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████   Google's conduct also leads to higher prices and reduced innovation and output in the Android App Distribution Market.

289.   Match Group has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**EIGHTH CAUSE OF ACTION**

**Unlawful Monopoly Maintenance**

**in the Android App IAP Market; Sherman Act § 2**

**(Against all Defendants)**

290.   Match Group realleges and incorporates by reference the allegations in each of the preceding paragraphs as though fully set forth herein.

~~272.~~291.   Section 2 of the Sherman Act prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

~~273.~~292.   Google has a monopoly in the Android App IAP Market.  Because more than 90% of all downloads of Android apps are completed using Google Play, and Google requires use of Google Play Billing for the purchase of those apps or digital content within those apps, Google also has close to a 90% share of the Android App IAP Market.

1   274.293.   Google has willfully maintained that monopoly power through the

2   anti-competitive and exclusionary conduct described herein.  Among other things,

3   Google has exploited its monopoly over the Android App Distribution Market (or

4   alternatively, its market power in the Dating App Distribution Market) and imposed

5   illegal ties, unreasonable restraints of trade, and exclusive dealing arrangements to

6   obtain and maintain its monopoly over the Android App IAP Market.  Google has

7   engaged in a continuous course of unlawful and anti-competitive conduct.

8   275.294.   Google's conduct has severe anti-competitive effects as described

9   herein.  Among other things, it eliminates competition in the Android App IAP

10   Market, allows Google to charge supra-competitive fees that increase costs for app

11   developers, increases prices for consumers, inhibits innovation, reduces consumer

12   choice and access to improved features available on other payment processors,

13   interferes with and impairs the relationship between app developers and their

14   consumers, and leads to poorer quality of customer service, thus harming competition

15   and consumers.

16   276.295.   There are no pro-competitive justifications for Google's conduct.

17   In the alternative, any pro-competitive benefits are outweighed by the anti-

18   competitive effects of Google's conduct and could have been achieved through less

19   anti-competitive and less harmful means.

20   277.296.   Google's conduct affects a substantial volume of interstate and

21   foreign commerce.

22   278.297.   Match Group has suffered and continues to suffer damages and

23   irreparable harm as a result of Google's illegal conduct.

24   **SEVENTHNINTH CAUSE OF ACTION**

25   **Attempted Monopolization of the Android App IAP Market; Sherman Act § 2**

26   **(Against all Defendants)**

27   279.298.   Match Group realleges and incorporates by reference the

28   allegations in each of the preceding paragraphs as though fully set forth herein.

6182535

280.299.    Over the years, Google has changed its policies to require more and more app developers to exclusively use Google Play Billing to process app and in-app purchases.  Most recently, on September 28, 2020, Google imposed a policy change that requires all app developers to exclusively use Google Play Billing for all purchases of in-app digital content from apps that were downloaded from Google Play.

281.300.    To the extent Google does not already have a monopoly in the Android App IAP Market, Google changed its policy with the specific intent of monopolizing that market and blocking Google's would-be competitors.

282.301.    Google already has a monopoly in the Android App Distribution Market or, alternatively, the Dating App Distribution Market.  Over 90% of all downloads of Android apps are completed using Google Play.  Because Google requires all Android app developers to process the purchase of those apps or in-app digital content within those same apps, there is a dangerous probability that Google will obtain monopoly power in the Android App IAP Market.  Alternatively, Google's market power in the Android App Distribution Market or, alternatively, the Dating App Distribution Market creates a dangerous probability that Google will obtain monopoly power in the Android App IAP Market.

283.302.    Google's conduct has severe anti-competitive effects as described herein.  Among other things, it eliminates competition in the Android App IAP Market, allows Google to charge supra-competitive fees that increase costs for app developers, increases prices for consumers, inhibits innovation, reduces consumer choice and access to improved features available on other payment processors, interferes with and impairs the relationship between app developers and their consumers, and leads to poorer quality of customer service, thus harming competition and consumers.

284.303.    There are no pro-competitive justifications for Google's conduct.  In the alternative, any pro-competitive benefits are outweighed by the anti-

6182535

1    competitive effects of Google's conduct and could have been achieved through less

2    anti-competitive and less harmful means.

3        ~~285.~~304.    Google's conduct affects a substantial volume of interstate and

4    foreign commerce.

5        ~~286.~~305.    Match Group has suffered and continues to suffer damages and

6    irreparable harm as a result of Google's illegal conduct.

7                    ~~EIGHTH~~TENTH **CAUSE OF ACTION**

8    **Unlawful Tying of Google Play to Google Play Billing; Cartwright Act**

9                    **(Against all Defendants)**

10        ~~287.~~306.    Match  Group  realleges  and  incorporates  by  reference  the

11    allegations in each of the preceding paragraphs as though fully set forth herein.

12        ~~288.~~307.    California Business and Professions Code Section 17600 *et seq.*,

13    also known as the Cartwright Act, prohibits a seller from using "its market power in

14    one market to force or coerce a buyer to purchase its product or service in a distinct

15    market." *UAS Management, Inc. v. Mater Misericordiae Hospital*, 169 Cal. App. 4th

16    357, 368–69 (2008).

17        ~~289.~~308.    Google has violated the Cartwright Act by unlawfully conditioning

18    use of the tying product (Google Play) on also using a tied product (Google Play

19    Billing).

20        ~~290.~~309.    Google has substantial economic power in the tying market (the

21    Android App Distribution Market and/or alternatively, the Dating App Distribution

22    Market).  Google Play is the dominant Android app store in the world.  Over 90% of

23    all downloads of Android apps are completed using Google Play.

24        ~~291.~~310.    Google Play Billing is a separate product from Google Play.

25    Google Play is a distribution platform that enables users to download, install, and

26    manage apps from their smart mobile devices.  Google Play Billing, by contrast, is a

27    payment processing solution for purchasing apps from Google Play and purchasing

28    digital content within apps that were downloaded from Google Play.  The products

1    are distinct and may be obtained separately.  Many of Match Group's apps and their
2    users have never used Google Play Billing even though they regularly use Google
3    Play—indeed, consumers prefer using Match Group's in-house payment option over
4    Google Play Billing.  In addition, many other popular apps that offer non-digital
5    content for purchase, such as Facebook, Amazon, Uber, DoorDash, and Task Rabbit
6    do not use Google Play Billing even though they regularly use Google Play.

7         292.311.    Google used its economic power in the tying market to coerce app
8    developers, including Match Group, to use Google Play Billing.

9         293.312.    Google has no pro-competitive or lawful reason for its illegal tying,
10   and there are less restrictive alternatives available.  Match Group's apps and other app
11   developers have offered their own payment options for years.  Google knowingly
12   permitted those alternative payment options.  Google only recently changed its
13   policies to prevent those alternative payment options so that it can extract supra-
14   competitive fees, affecting billions of dollars of in-app transactions annually.

15        294.313.    Alternatively, to the extent that Google has pro-competitive
16   justifications for its conduct, those benefits are outweighed by the anti-competitive
17   effects of Google's conduct and could have been achieved through less anti-
18   competitive and harmful means.

19        295.314.    Google's illegal tying has severe anti-competitive effects as
20   described herein.  Among other things, it eliminates competition in the Android App
21   IAP Market, allows Google to charge supra-competitive fees that increase costs for
22   app developers, increase prices for consumers, inhibits innovation, reduces consumer
23   choice and access to improved features available on other payment processors,
24   interferes with and impairs the relationship between app developers and their
25   consumers, and leads to poorer quality of customer service, thus harming competition
26   and consumers.

27

28

6182535

1    296.315.   Google's illegal tying affects a substantial volume of interstate and

2  foreign commerce.  Consumers purchase tens of billions of dollars of apps from

3  Google Play and in-app purchases every year.

4    297.316.   Match Group has suffered and continues to suffer damages and

5  irreparable harm as a result of Google's illegal tying.

6  **NINTHELEVENTH CAUSE OF ACTION**

7  **Unreasonable Restraints of Trade**

8  **in the Android App Distribution Market or, Alternatively, the Dating App**

9  **Distribution Market; Cartwright Act**

10  **(Against all Defendants Except Google Payment)**

11    298.317.   Match Group realleges and incorporates by reference the

12  allegations in each of the preceding paragraphs as though fully set forth herein.

13    299.318.   California Business and Professions Code Section 17600 *et seq.*,

14  also known as the Cartwright Act, prohibits the "combination of capital, skill or acts

15  by two or more persons" which restrains trade or otherwise harms competition.  *See*

16  Cal. Bus. & Prof. Code §§ 16720, 16726.

17    300.319.   Google has entered into agreements with OEMs and app

18  developers that unreasonably restrict competition in the Android App Distribution

19  Market (or alternatively, the Dating App Distribution Market).

20    301.320.   Google has required OEMs—as a condition of using the Android

21  OS, Google Play, and other "must have" Google services—to enter MADAs, AFAs,

22  ACCs, and other agreements that require OEMs to pre-install and offer Google Play

23  as the default, primary, and often only app store on Android devices, while severely

24  disadvantaging Google's competitors and preventing consumers from using other

25  options.

26    302.321.   Moreover, Google has leveraged Google Play's dominance to

27  coerce app developers like Match Group to agree to anti-competitive terms in the

28  DDA that further restrict competition in the Android App Distribution Market (or

6182535

alternatively, the Dating App Distribution Market).  Pursuant to section 4.5 of the DDA, developers "may not use [Google Play] to distribute or make available any product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  Separately, Google conditions access to a critical advertising channel for app developers—Google's App Campaigns program—on developer agreement to distribute their apps on Google Play.

303.322.  Google's conduct has severe anti-competitive effects as described herein.  Among other things, it practically forecloses competition in the Android App Distribution Market (or alternatively, the Dating App Distribution Market), reduces consumer choice, allows Google to charge supra-competitive fees that increase costs for app developers, increases prices for consumers, inhibits innovation, reduces consumer choice and access to improved features available on other payment processors, interferes with and impairs the relationship between app developers and their consumers, and leads to poorer quality of customer service, thus harming competition and consumers.

304.323.  Google's conduct has no legitimate or pro-competitive purpose to justify its anti-competitive effects.  Alternatively, to the extent that Google has pro-competitive justifications for its conduct, those benefits are outweighed by the anti-competitive effects of Google's conduct and could have been achieved through less anti-competitive and harmful means.

305.324.  Google has profited from its anti-competitive conduct.  Among other ways, Google has imposed and extracted supra-competitive fees on all transactions completed through Google Play Billing.

306.325.  Match Group has suffered and continues to suffer damages and irreparable harm as a result of Google's illegal conduct.

6182535

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

1    ~~TENTH~~TWELFTH **CAUSE OF ACTION**

2    **Unreasonable Restraints of Trade**

3    **in the Android App IAP Market; Cartwright Act**

4    **(Against all Defendants)**

5    ~~307.~~326.    Match Group realleges and incorporates by reference the

6    allegations in each of the preceding paragraphs as though fully set forth herein.

7    ~~308.~~327.    California Business and Professions Code Section 17600 *et seq.*,

8    also known as the Cartwright Act, prohibits the "combination of capital, skill or acts

9    by two or more persons" which restrains trade or otherwise harms competition.  *See*

10   Cal. Bus. & Prof. Code §§ 16720, 16726.

11   ~~309.~~328.    As a precondition to distributing apps on Google Play, Google

12   forces app developers to agree to anti-competitive and exclusionary terms in the DDA

13   that unreasonably restrain competition in the Android App IAP Market.  Specifically,

14   Google forces app developers to enter into a separate agreement with Google's

15   payment processor, Google Payment, to receive payment for apps and in-app

16   purchases of digital content.  Google forces app developers to exclusively use Google

17   Play Billing to complete all purchases of apps from Google Play and in-app digital

18   content even though there are numerous and better alternatives available.  Google also

19   prevents app developers from using their app to inform users of external payment

20   options other than Google Play Billing.

21   ~~310.~~329.    Google's conduct has severe anti-competitive effects as described

22   herein.  Among other things, it eliminates competition in the Android App IAP

23   Market, allows Google to charge supra-competitive fees that increase costs for app

24   developers, increases prices for consumers, inhibits innovation, reduces consumer

25   choice and access to improved features available on other payment processors,

26   interferes with and impairs the relationship between app developers and their

27   consumers, and leads to poorer quality of customer service, thus harming competition

28   and consumers.

1   311.330.   Google's conduct serves no legitimate or pro-competitive purpose.

2   Match Group's brands and other app developers have offered their own in-app

3   payment options for years, and Google Play Billing has provoked widespread

4   dissatisfaction among developers.  Google knowingly permitted those alternative

5   payment options.   Google only recently changed its policies to prevent those

6   alternative payment options so that it can extract supra-competitive fees.

7   312.331.   Alternatively, to the extent that Google has pro-competitive

8   justifications for its conduct, those benefits are outweighed by the anti-competitive

9   effects of Google's conduct and could have been achieved through less anti-

10   competitive and harmful means.

11   313.332.   Google has profited from its anti-competitive conduct.

12   314.333.   Match Group has suffered and continues to suffer damages and

13   irreparable harm as a result of Google's illegal conduct.

14   **ELEVENTHTHIRTEENTH CAUSE OF ACTION**

15   **Unfair Competition under Cal. Bus. & Prof. Code Section 17200, *et seq.***

16   **(Against all Defendants)**

17   315.334.   Match Group realleges and incorporates by reference the

18   allegations in each of the preceding paragraphs as though fully set forth herein.

19   316.335.   California Business and Professions Code Section 17200 *et seq.*

20   ("Section 17200"), also known as the California Unfair Competition Law ("UCL"),

21   provides a private right of action against any person who engages in "unfair

22   competition."  Any person who has "suffered injury in fact and has lost money or

23   property as a result of the unfair competition," may bring suit.  The UCL has three

24   "prongs," prohibiting any "unlawful," "fraudulent" or "unfair" business act or

25   practice.

26   317.336.   Google has violated the "unlawful prong," because its conduct

27   violates the Sherman Act and Cartwright Act as explained above.

28

6182535

1    318.337.    Google has also violated the "unfair" prong.  Unfair practices under

2    the UCL are not limited to actual antitrust violations.  Unfair practices also include

3    conduct that threatens an incipient violation of antitrust laws or violates the policy or

4    spirit of the antitrust laws.  Google's anti-competitive conduct violates the strong

5    public policy embodied in the Sherman Act, Cartwright Act, and elsewhere against

6    behavior that threatens or harms competition and threatens an incipient violation of

7    such laws.

8    319.338.    Google has violated the "fraudulent" prong by engaging in conduct

9    likely to deceive members of the public.  Google has induced Match Group and other

10   app developers to use Google Play on false pretenses that they would not be required

11   to use Google Play Billing or pay Google's tax.  Consistent with the terms of the

12   DDA, Google has permitted Match Group's apps and other apps to bypass Google

13   Play Billing for years.  Google's actions and DDA falsely assured Match Group and

14   other app developers that it could do the same.   In reliance on Google's

15   representations, Match Group distributed its apps on Google Play, established a vast

16   network of economic relationships with users on Android devices, and developed and

17   offered its own payment options.  Now that Match Group has done so, as was its legal

18   and contractual right, Google has reneged on its prior representations and changed its

19   policy to target Match Group's apps.

20   320.339.    Google's unlawful, unfair, and fraudulent conduct has caused and

21   continues to cause substantial and irreparable competitive and commercial injury to

22   Match Group.  Match Group has lost revenue and profits as a result of Google's

23   conduct.  Match Group may never recover the lost users, reputation, goodwill, brand

24   equity, or network effects diminished by Google's conduct.  The ongoing damage to

25   Match Group's reputation, goodwill, brand equity, and network effects caused by

26   Google's breach of its promise is difficult to remedy and cannot be fully remedied

27   through compensatory damages alone.

28

6182535

1  ~~321.~~340.  These substantial injuries are not outweighed by any

2  countervailing benefits to consumers.  To the contrary, consumers benefit when they

3  have the option of using other in-app payment service providers.

4  ~~322.~~341.  Unless restrained, Google will continue to cause further

5  competitive and commercial harm to Match Group.

6  ~~323.~~342.  Match Group has no adequate remedy at law and is entitled to

7  injunctive relief and restitution under Section 17203 of the California Business and

8  Professions Code to maintain the status quo—whereby Match Group is permitted to

9  use its in-house in-app payment system—during this litigation.

10                    **~~TWELFTH~~FOURTEENTH CAUSE OF ACTION**

11                          **Tortious Interference with Contract**

12                              **(Against all Defendants)**

13  ~~324.~~343.  Match Group realleges and incorporates by reference the

14  allegations in each of the preceding paragraphs as though fully set forth herein.

15  ~~325.~~344.  By downloading a Match Group app and creating an account, each

16  user agrees to be bound by the applicable terms of service.  In return, the relevant

17  Match Group brand grants the user a license to access and use the online dating

18  services provided by the Match Group app.  These terms and conditions make up the

19  clauses of the contracts between each Match Group brand and the users of its apps.

20  ~~326.~~345.  At all relevant times, Google knew of these contracts.  Google has

21  knowledge of each and every time a user downloads a Match Group app from Google

22  Play.

23  ~~327.~~346.  Google has and continues to intentionally and knowingly disrupt

24  Match Group's contractual relationships with its users by enforcing its unlawful new

25  policy against Match Group, including threatening to sever Match Group's access to

26  Google Play.  Google's conduct has interfered and continues to interfere with Match

27  Group's contractual relationships with Match Group users on Android devices by

28  reducing the functionality of Match Group's apps and preventing users from

6182535

1   upgrading to premium subscriptions and other digital products.  Google's conduct has

2   caused and will cause Match Group users on Android devices to stop using Match

3   Group's apps and paying for premium subscriptions and other digital products.

4       ~~328.~~347.   There is no legitimate justification for Google's tortious

5   interference with Match Group's contractual relationships.

6       ~~329.~~348.   Google has caused and continues to cause substantial and

7   irreparable competitive and commercial injury to Match Group.  Match Group has

8   lost revenue and profits as a result of Google's conduct.  Match Group may never

9   recover the lost users, reputation, goodwill, brand equity, or network effects

10   diminished by Google's conduct.  The ongoing damage to Match Group's reputation,

11   goodwill, brand equity, and network effects caused by Google's breach of its promise

12   is difficult to remedy and cannot be fully remedied through compensatory damages

13   alone.  Match Group is entitled to injunctive relief to maintain the status quo—

14   whereby Match Group is permitted to use its ~~in-house~~ in-app-payment system—

15   during this litigation.

16       ~~330.~~349.   Google's wrongful acts and conduct described above were willful,

17   oppressive, and malicious, and Match Group is therefore entitled to punitive damages

18   according to proof.

19                **~~THIRTEENTH~~FIFTEENTH CAUSE OF ACTION**

20           **Tortious Interference with Prospective Economic Advantage**

21                     **(Against all Defendants)**

22       ~~331.~~350.   Match Group realleges and incorporates by reference the

23   allegations in each of the preceding paragraphs as though fully set forth herein.

24       ~~332.~~351.   Match Group and its brands have economic relationships with

25   users of its apps that carry a probability of future economic benefit to Match Group.

26       ~~333.~~352.   At all relevant times, Google knew of these economic

27   relationships.  Google has knowledge of each and every time a user downloads a

28   Match Group app from Google Play.

6182535

1    334.353.   Google has and continues to intentionally and knowingly disrupt

2  Match Group's economic relationships with its users by enforcing its unlawful new

3  policy against Match Group, including threatening to sever Match Group's access to

4  Google Play.  Google's conduct has interfered and continues to interfere with Match

5  Group's contractual relationships with Match Group users on Android devices by

6  reducing the functionality of Match Group's apps and preventing users from

7  upgrading to premium subscriptions and other digital products.  Google's conduct has

8  caused and will cause Match Group users on Android devices to stop using Match

9  Group's apps and paying for premium subscriptions and other digital products.

10    335.354.   Google committed independently wrongful acts by tortiously

11  interfering with Match Group's prospective economic relationships, including

12  because Google's actions violated the Sherman Act, the Cartwright Act, and the UCL

13  as described herein.

14    336.355.   Google has caused and continues to cause substantial and

15  irreparable competitive and commercial injury to Match Group.  Match Group has

16  lost revenue and profits as a result of Google's conduct.  Match Group may never

17  recover the lost users, reputation, goodwill, brand equity, or network effects

18  diminished by Google's conduct.  The ongoing damage to Match Group's reputation,

19  goodwill, brand equity, and network effects caused by Google's breach of its promise

20  is difficult to remedy and cannot be fully remedied through compensatory damages

21  alone.  Match Group is entitled to injunctive relief to maintain the status quo—

22  whereby Match Group is permitted to use its in-house in-app payment system—

23  during this litigation.

24    337.356.   Google's wrongful acts and conduct described above were willful,

25  oppressive, and malicious, and Match Group is therefore entitled to punitive damages

26  according to proof.

27

28

6182535

1                               **PRAYER FOR RELIEF**

2        Match Group prays for judgment and relief against Google as follows:

3        1.     A judgment in favor of Match Group and against Google on all causes of

4 action;

5        2.     For orders temporarily, preliminarily, and permanently enjoining Google

6 and its employees, agents, affiliates, and anyone acting on their behalf from engaging

7 in the anti-competitive, unfair, and tortious conduct described herein, including orders

8 enjoining Google from (a) preventing Match Group from offering its own payment

9 options for users, (b) preventing Match Group's apps from accessing or distributing

10 their apps and services on Google Play, (c) preventing Match Group's apps from

11 informing or directing customers to payment methods other than Google Play Billing,

12 (d) retaliating against Match Group in the app review process, including but not limited

13 to by delaying approval of Match Group's app updates, and (e) charging above-market

14 fees for processing purchases of apps and in-app digital content;

15        3.     For compensatory, consequential, and punitive, including treble, damages

16 for injuries directly and proximately caused by Google, as described herein, according

17 to proof;

18        4.     For attorneys' fees and costs, including the costs of suit incurred

19 herein; and

20        5.     For such other and further relief as the Court may deem just and fair.

21

22                              **DEMAND FOR JURY TRIAL**

23        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

24 request a trial by jury.

25

26

27

28

6182535

1    Dated:  October 7, 2022          HUESTON HENNIGAN LLP

2

3                                     By: *Douglas J. Dixon*            Formatted: Font: Italic, Underline
                                          Douglas J. Dixon
4

5                                     John C. Hueston
                                      jhueston@hueston.com
6                                     Douglas J. Dixon
                                      ddixon@hueston.com
7                                     620 Newport Center Drive, Suite 1300
                                      Newport Beach, CA 92660
8                                     Telephone:    (949) 229-8640
                                      Facsimile:    (888) 775-0898
9

10                                    Joseph A. Reiter
                                      jreiter@hueston.com
11                                    Michael K. Acquah
                                      macquah@hueston.com
12                                    William M. Larsen
                                      wlarsen@hueston.com
13                                    Julia L. Haines
                                      jhaines@hueston.com
14                                    523 West 6th Street, Suite 400
                                      Los Angeles, CA 90014
15                                    Telephone:    (213) 788-4340
                                      Facsimile:    (888) 775-0898
16

17                                    Attorneys for Plaintiffs
                                      Match Group, LLC; Humor
18                                    Rainbow, Inc.; PlentyofFish Media
                                      ULC; and People Media, Inc.

19

20

21

22

23

24

25

26

27

28
                                      - 94 -
                                     COMPLAINT

6182535