**Volume 1**

**Pages 1 - 144**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE | ) |
| ANTITRUST LITIGATION | ) NO. 21-md-02981-JD |
| ——————————————————————— | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| Epic Games, Inc. vs. Google LLC, et al., | ) |
| Case No. 3:20-cv-05671-JD | ) |
| | ) |
| In Re Google Play Consumer Antitrust | ) |
| Litigation, Case No. 3:20-cv-05761-JD | ) |
| | ) |
| State of Utah, et al. v. Google LLC, | ) |
| et al., Case No. 3:21-cv-05227-JD | ) |
| | ) |
| Match Group, LLC, et al. vs. Google LLC, | ) |
| et al., Case No. 3:22-cv-02746-JD | ) |
| ——————————————————————— | ) |

San Francisco, California
Thursday, January 12, 2023

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**IN RE EVIDENTIARY HEARING ON CHAT PRESERVATION**</u>

<u>**APPEARANCES**</u>:

For Plaintiff Epic Games in C 20-05671 JD:
                          CRAVATH SWAINE AND MOORE LLP
                          825 Eighth Avenue
                          New York, New York 10019
                   BY:  **LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**
                        **GARY A. BORNSTEIN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiff Epic Games in C 20-05671 JD:
                       FAEGRE DRINKER BIDDLE & REATH LLP
3                      Four Embarcadero Center
                       27th Floor
4                      San Francisco, California 94111
                  BY:  **PAUL J. RIEHLE, ATTORNEY AT LAW**
5

6   For the Consumer Class Plaintiffs in C 20-05671-JD:
                       KAPLAN FOX AND KILSHEIMER LLP
7                      850 Third Avenue
                       14th Floor
8                      New York, New York 10022
                  BY:  **HAE SUNG NAM, ATTORNEY AT LAW**
9                      **AARON L. SCHWARTZ, ATTORNEY AT LAW**

10                     BARTLIT BECK LLP
                       1801 Wewatta Street
11                     Suite 1200
                       Denver, Colorado 80202
12                BY:  **KARMA M. GIULIANELLI, ATTORNEY AT LAW**
                       **GLEN E. SUMMERS, ATTORNEY AT LAW**
13
                       BARTLIT BECK LLP
14                     54 West Hubbard Street
                       Suite 300
15                     Chicago, Illinois 60654
                  BY:  **JOHN D. BYARS, ATTORNEY AT LAW**
16

17  For Plaintiff Brian McNamara/In Re Google Play Consumer
    Antitrust Litigation, C 20-07361 JD:
18                     COTCHETT, PITRE & MCCARTHY LLP
                       San Francisco Airport Office Center
19                     840 Malcolm Road
                       Burlingame, California 94010
20                BY:  **NANCI E. NISHIMURA, ATTORNEY AT LAW**

21

    For Plaintiffs in Carroll/In Re Google Play Consumer Antitrust
22  Litigation, C 20-07379 JD:
                       PRITZKER LEVINE LLP
23                     1900 Powell Street - Suite 450
                       Emeryville, California 94608
24                BY:  **ELIZABETH C. PRITZKER, ATTORNEY AT LAW**

25            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1  APPEARANCES:   (CONTINUED)

 2  For State of Utah and the Plaintiff States in C 21-05227-JD:
                            OFFICE OF THE UTAH ATTORNEY GENERAL
 3                          160 East 300 South
                            Fifth Floor
 4                          Salt Lake City, Utah 84114
                      BY:  LAUREN M. WEINSTEIN
 5                         BRENDAN P. GLACKIN
                           ASSISTANT ATTORNEYS GENERAL
 6

 7  For Match Group LLC in C 22-02746-JD:
                            HUESTON HENNIGAN LLP
 8                          620 Newport Center Drive, Suite 1300
                            Newport Beach, California 92660
 9                    BY:  DOUGLAS J. DIXON, ATTORNEY AT LAW

10

11  For Defendants:
                            MORGAN LEWIS & BOCKIUS LLP
12                          One Market Street, 28th Floor
                            Spear Street Tower
13                          San Francisco, California 94105-1596
                      BY:  BRIAN C. ROCCA, ATTORNEY AT LAW
14                         MICHELLE PARK CHIU, ATTORNEY AT LAW

15                          MUNGER TOLLES & OLSON LLP
                            350 South Grand Avenue
16                          Fiftieth Floor
                            Los Angeles, California 90071
17                    BY:  GLENN D. POMERANTZ, ATTORNEY AT LAW

18                          MUNGER, TOLLES & OLSON LLP
                            601 Massachusetts Avenue NW
19                          Washington, D.C. 20004
                      BY:  JONATHAN KRAVIS, ATTORNEY AT LAW
20

21  Also Present:          Phillip Nickels
                           Senior Trial Technology Strategist
22                         Munger Tolles & Olson

23

24

25
```

```
 1                          I N D E X

 2

 3    Thursday, January 12, 2023 - Volume 1

 4
      DEFENDANTS' WITNESSES                        PAGE   VOL.
 5
      LOPEZ, GENARO
 6     (SWORN)                                      13     1
      Direct Examination by Mr. Rocca              14     1
 7    Cross-Examination by Ms. Moskowitz           51     1
      Redirect Examination by Mr. Rocca            75     1
 8

 9    ROSENBERG, JAMIE
       (SWORN)                                      77     1
10    Direct Examination by Mr. Kravis             78     1
      Cross-Examination by Ms. Moskowitz           88     1
11    Redirect Examination by Mr. Kravis          104     1

12

13    ROPE, ANDREW
       (SWORN)                                     108     1
14    Direct Examination by Ms. Chiu              108     1
      Cross-Examination by Ms. Weinstein          117     1

15

16                        E X H I B I T S

17    PLAINTIFFS' EXHIBITS                  IDEN  EVID   VOL.

18     PX-9                                       68     1

19     PX-11                                      67     1

20     PX-16                                      96     1

21     PX-25                                      98     1

22     PX-31                                      70     1

23     PX-37                                      92     1

24     PX-68                                      65     1

25
```

**I N D E X**

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| PX-103 | | 71 | 1 |
| PX-106 | | 67 | 1 |
| PX-120 | | 101 | 1 |

**E X H I B I T S**

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| DXCH-1 | | 28 | 1 |
| DXCH-2 | | 51 | 1 |
| DXCH-8 | | 82 | 1 |
| PX-67 | | 84 | 1 |
| DXCH-104 | | 21 | 1 |
| DXCH-105 | | 23 | 1 |
| DXCH-106 | | 24 | 1 |
| DXCH-107 | | 29 | 1 |
| DXCH-108 | | 31 | 1 |

PROCEEDINGS

```
 1   Thursday - January 12, 2023                        1:05 p.m.

 2                        P R O C E E D I N G S

 3                            ---o0o---

 4        THE CLERK:  Calling Civil 20-5671, Epic Games, Inc. vs.

 5   Google LLC; Civil 20-5761, In Re Google Play Consumer Antitrust

 6   Litigation; Civil 21-5227, State of Utah vs. Google;

 7   Multidistrict Litigation 21-2981, In Re Google Play Antitrust

 8   Litigation; and Civil 22-2746, Match Group LLC vs. Google.

 9        Counsel, please state your appearances for the record.

10        MR. BORNSTEIN:  Your Honor, Gary Bornstein.

11        THE CLERK:  I need -- I'm going to need --

12        THE COURT:  Oh.  Microphone, please.

13        THE CLERK:  Counsel, please use the microphone.

14        MR. BORNSTEIN:  Good afternoon, Your Honor.  Gary

15   Bornstein for Epic Games.

16        MS. MOSKOWITZ:  Good afternoon, Your Honor.  Lauren

17   Moskowitz, also for Epic.

18        MS. WEINSTEIN:  Good afternoon, Your Honor.  Lauren

19   Weinstein, the State of Utah Attorney General's Office, on

20   behalf of the State of Utah and the plaintiff states.

21        MR. GLACKIN:  Good afternoon, Your Honor.  Brendan Glackin

22   for the states.

23        MS. GIULIANELLI:  Good afternoon.  Karma Giulianelli for

24   the consumers.

25        THE CLERK:  Counsel in the back, come forward and use the
```

**PROCEEDINGS**

1    microphone.

2        **MR. BYARS:**  Good afternoon, Your Honor.  John Byars from

3    Bartlit Beck for consumer plaintiffs.

4        **MR. SUMMERS:**  Also Glen Summers of Bartlit Beck for the

5    consumer plaintiffs.

6        **MR. DIXON:**  Good afternoon, Your Honor.  Doug Dixon of

7    Hueston Hennigan for Match Group LLC.

8        **MS. NAM:**  Good afternoon, Your Honor.  Hae Sung Nam for

9    the consumer plaintiffs.

10        **MR. POMERANTZ:**  Good afternoon, Your Honor.  Glen

11    Pomerantz of Munger, Tolles & Olson on behalf of defendants.

12    And with me is my colleague Jonathan Kravis of our firm.  Also,

13    Mr. Phil Nickels is sitting up front there.  He's going to be

14    running the technology on our side.

15        And we apologize.  He's sitting there because the cord on

16    our side, the cable doesn't work.

17        **THE COURT:**  Oh, it's fine.

18        **MR. POMERANTZ:**  Thank you.

19        **MR. ROCCA:**  Your Honor, it's Brian Rocca and my partner

20    Michelle Park Chiu from Morgan Lewis representing Google

21    defendants.

22        **THE COURT:**  Okay.  Is that it?

23        Now, if you are fully immunized -- or vaccinated, I should

24    say.  If you're fully vaccinated and you're comfortable, you

25    can take off your masks.  Leave it up to you, but you're

**PROCEEDINGS**

 1    perfectly free to do that.

 2        Okay.  Who are we going to start with?

 3        **MR. POMERANTZ:**  Your Honor, I know that you had said in a

 4    recent order that you wanted to discuss scheduling.

 5        We had jointly submitted a stipulation for a July 31 --

 6        **THE COURT:**  Oh, no.

 7        **MR. POMERANTZ:**  -- trial date.

 8        **THE COURT:**  We'll do that later.

 9        **MR. POMERANTZ:**  Okay.

10        **THE COURT:**  I just want to get --

11        **MR. POMERANTZ:**  You want to start with --

12        **THE COURT:**  I want to get going with the witnesses,

13    please.  Yeah, that'd be great.

14        **MR. POMERANTZ:**  That's fine, Your Honor.

15        So I thought what I -- if Your Honor would allow me, I

16    just want to give you a brief roadmap for the witnesses that

17    we're calling today so you know what the lineup is and who they

18    are and what they'll be discussing.

19        **THE COURT:**  Let me find that.  Okay.  I have your list.

20    All right.

21        **MR. POMERANTZ:**  All right.  So we will start with

22    Mr. Genaro Lopez.  He is the information governance lead at

23    Google.

24        He's going to directly address two of the three issues

25    that you identified in your order.  First, he'll address the

 1  use and operation of Google's chat system.  He's going to

 2  explain what Google does to retain chats.  He's going to

 3  explain how that differs from ways that it retains e-mails and

 4  other kinds of electronic documents, and he'll explain why

 5  those differences exist.

 6      He'll also explain why Google's retention and preservation

 7  of e-mails and of chats is reasonable, why they do something

 8  different for each kind, and that it's consistent with the way

 9  that Google's employees use these various types of

10  communication.

11      And then he'll also address the second topic in your

12  order, which is the guidelines for chat content.

13      We'll then call Mr. Jamie Rosenberg.  Mr. Rosenberg is

14  currently a part-time consultant for Google, but he was a

15  senior executive for a number of years at Google, and he

16  stepped down from that position in September of last year.

17      The plaintiffs asked to have Mr. Rosenberg here today, and

18  we agreed with them to make him available.  We will question

19  him briefly, and we'll ask him about his own use of chats, and

20  we'll describe what -- he will describe what a typical chat is

21  in the way that he uses chats.

22      The next witness is Mr. Tian Lim.  That's T-i-a-n L-i-m.

23  Mr. Lim was the one who we asked to have --

24      **THE COURT:**  Oh.  So no Lawrence Koh?

25      **MR. POMERANTZ:**  Correct.  The plaintiffs asked for Tian

1    Lim instead of Mr. Koh.

2          **THE COURT:**  Okay.

3          **MR. POMERANTZ:**  Again, that's another witness.

4          **THE COURT:**  All right.

5          **MR. POMERANTZ:**  Now, Mr. Lim was the one who we asked to

6    have testify here remotely, and that didn't work.

7          So this morning we -- he was available to -- for a

8    deposition.  We did our 15 minutes or so of questioning.  They

9    followed with 20 or 30 minutes of their questioning.

10         So we do seek guidance as to how you want Mr. Lim to

11   testify here today.  I think the parties, the technology people

12   on both side are scrambling to get it all put together for

13   Your Honor.  The entire --

14         **THE COURT:**  Okay.  So it's 45 minutes of testimony?

15         **MR. POMERANTZ:**  About 45 minutes.  We can play it here

16   from beginning to end.  We can submit it to Your Honor and you

17   can watch it at a later time.

18         We seek your guidance, really, as to how you would like

19   Mr. Lim to testify.

20         **THE COURT:**  Now, what's his area going to be?

21         **MR. POMERANTZ:**  He is like Mr. Rosenberg in the sense that

22   they've asked for him to testify.  We briefly go over his use

23   of chats, his use of other types of documents at Google.

24         Again, he also -- just so Your Honor is clear, he left

25   Google's employ last week.  He's in the week between jobs, and

**PROCEEDINGS**

1   then he starts at a new employer next week.

2       **THE COURT:**  Okay.  Are you still going to do Mr. Rope and

3   Mr. Schnell?

4       **MR. POMERANTZ:**  And then we're going to do Mr. Rope as our

5   last witness, and then they will call Mr. Schnell.

6       **THE COURT:**  All right.  Let me take Mr. Lim -- do you have

7   a disk or something I can get?

8       **MR. POMERANTZ:**  I'm sure we can provide that.

9       **THE COURT:**  It does not have to be today.

10      **MR. POMERANTZ:**  Okay.

11      **THE COURT:**  But by early next -- by early next week.

12      **MR. POMERANTZ:**  We will work with them.  We'll get that to

13  you, Your Honor.

14      **THE COURT:**  Okay.  All right.  I'll probably just watch

15  the disk.

16      **MR. POMERANTZ:**  Okay.

17      **THE COURT:**  All right?  Okay.

18      **MR. POMERANTZ:**  And then, after all of those witnesses,

19  I think, pursuant to Your Honor's order, we'll have argument.

20  I don't think it'll be lengthy argument, given all the

21  briefing, but we'll have argument and I will handle that.

22      I thought if it would be helpful to Your Honor, we have

23  three arguments, and I can say them in less than one minute,

24  just so that Your Honor has a framework for understanding why

25  we're putting on the evidence that we're putting on.

**PROCEEDINGS**

1      Briefly, our three arguments are as follows:  first,

2    that Google's preservation of chats and, frankly, other

3    documents was both reasonable and proportional, as the rules

4    require.  And given the way that chats are used --

5         **THE COURT:**  You know, Mr. Pomerantz, I do want to hear

6    what you have to say.  I need an evidentiary foundation first.

7         **MR. POMERANTZ:**  That's why I said I would be brief.

8         **THE COURT:**  Why don't we --

9         **MR. POMERANTZ:**  I will stop.  I will stop.

10        **THE COURT:**  I know you think everything's great; they

11   think everything's terrible.  I get it.

12                         (Laughter.)

13        **THE COURT:**  But let me do the witnesses, and then --

14        **MR. POMERANTZ:**  That's totally fine.

15        **THE COURT:**  -- I'll be a much more informed consumer of

16   your argument at that point.  Okay?

17        **MR. POMERANTZ:**  I totally get that.

18        Mr. Rocca is going to handle Mr. Lopez, who's our first

19   witness.

20        **THE COURT:**  Okay.  Let's bring him in.

21        **MR. ROCCA:**  Brian Rocca for Google.

22        Your Honor, Google calls Genaro Lopez.

23    (Witness enters the courtroom and steps forward to be sworn.)

24        **THE CLERK:**  Please come forward and take the witness

25   stand.

**PROCEEDINGS**

1        Stand and raise your right hand.

2                        **GENARO LOPEZ**,

3    called as a witness for the Defendants, having been duly sworn,

4    testified as follows:

5        **THE WITNESS:**  I do.

6        **THE CLERK:**  Please be seated.

7        Move the microphone in front of you.

8        **THE WITNESS:**  All right.

9        **THE CLERK:**  Please state your full name for the Court and

10   spell your last name.

11       **THE WITNESS:**  Genaro Lopez, L-o-p-e-z.

12       **THE CLERK:**  And what's your first name?

13       **THE WITNESS:**  Genaro, G, as in "George," e-n-a-r-o.

14       **THE CLERK:**  Thank you.

15       **MR. ROCCA:**  Your Honor, with your permission, I have a

16   smaller binder that's a subset of the exhibits.  It might be

17   more efficient if I hand the exhibits to Mr. Lopez.  It'll be

18   easier for him.  And I have a copy for the Court as well.

19       **THE COURT:**  Good.  Yes, please.

20       Do you have two copies for me?

21       **MR. ROCCA:**  I'll get one more copy.

22       **MS. MOSKOWITZ:**  Can I have one too, please?

23       **MR. ROCCA:**  It's the same exhibit binder you have with the

24   exhibits.

25       **MS. MOSKOWITZ:**  Yeah, but do you have one for me, or no?

**LOPEZ - DIRECT / ROCCA**

1      Thank you.

2                    **<u>DIRECT EXAMINATION</u>**

3    **BY MR. ROCCA:**

4    **Q.**   Mr. Lopez, can you please, again, introduce yourself for

5    the Court?

6    **A.**   Yes.  I'm Genaro Lopez.

7    **Q.**   Where are you currently employed?

8    **A.**   I work for Google.

9    **Q.**   Where are you based?

10   **A.**   I'm based in the Bay Area.  My office is here in

11   San Francisco, and I live in Berkeley, California.

12   **Q.**   How long have you been employed at Google?

13   **A.**   A little over three years.

14   **Q.**   What is your current job title?

15   **A.**   I am the information governance lead.

16   **Q.**   As information governance lead, what are your job

17   responsibilities?

18   **A.**   Yeah.  I manage a team that's responsible for ensuring

19   that Google's corporate data is appropriately retained,

20   communicated to employees, secured, and disposed of after its

21   useful life.

22   **Q.**   Why does Google need someone like you, information

23   governance lead, to help manage information as you just

24   described?

25   **A.**   Yeah.  Well, Google is a very complex and diverse place.

**LOPEZ - DIRECT / ROCCA**

1    So I spend a lot of my time helping to coordinate our

2    activities across functions, internal teams, to make sure that,

3    to the fullest extent possible, we're making holistic decisions

4    about our management of corporate data.

5    **Q.**    Do you have any prior experience in information

6    management?

7    **A.**    Yes.

8    **Q.**    Please briefly describe that to the Court.

9    **A.**    Yeah.  So prior to Google, I spent almost a decade at

10   Nike, where I was the director of information governance.

11   **Q.**    Briefly describe your educational background.

12   **A.**    I have a bachelor's in biology from UC Berkeley and a J.D.

13   from Lewis & Clark Law School.

14   **Q.**    Are you a practicing lawyer?

15   **A.**    No.

16   **Q.**    Do you have any professional certifications related to

17   information management?

18   **A.**    Yes.  I have an Information Governance Professional

19   certificate from ARMA International.

20   **Q.**    Mr. Lopez, as information governance lead, do you play a

21   role in setting the retention periods for categories of

22   documents at Google?

23   **A.**    Yes.

24   **Q.**    What is your general approach for setting those retention

25   periods?

**LOPEZ - DIRECT / ROCCA**

1  **A.**   We look at and evaluate the business value of the item in

2  question and set our retention periods appropriately.

3  **Q.**   Let's talk about now how Google employees create

4  information.

5      What are the primary tools that Google employees use to

6  document their business activities?

7  **A.**   Yeah.  Primarily, we use the different applications in the

8  Google Workspace suite.

9  **Q.**   And can you describe what those applications are?

10 **A.**   Yeah.  They're things like Gmail, Docs, Sheets, and

11 Slides.

12 **Q.**   What are Sheets?

13 **A.**   Yeah.  Sheets are like a spreadsheet, like Microsoft

14 Excel.

15 **Q.**   Got it.  What is Google Drive?

16 **A.**   Google Drive is a cloud-based storage solution.

17 **Q.**   Does each employee at Google have a Google Drive account?

18 **A.**   Yes.  Yes, we do.

19 **Q.**   Can you describe to the Court what types of documents

20 employees typically store in their Google Drive account?

21 **A.**   Yeah.  A typical Google Drive will have all of the things

22 that you would create via one of those Google Workspace apps,

23 as well as any other file formats that you might receive or

24 create in the course of your job; things like PDFs, other file

25 formats that might come from Office 365.

1   **Q.**   For purposes of this next series of questions, Mr. Lopez,

2   let's assume there's no litigation hold in place.

3        Is there a company retention policy that automatically

4   deletes documents stored on an employee's Google Drive?

5   **A.**   No, there's not.

6   **Q.**   What does that mean from a document retention perspective?

7   **A.**   That means that that item will remain on our systems

8   indefinitely unless removed by the Googler themselves.

9   **Q.**   Do you take that approach with Google Drive because of the

10  nature of the business information retained there?

11  **A.**   Yes, we do.

12  **Q.**   Can you please describe that for the Court?

13  **A.**   Yeah.  So we -- we evaluate the items in our Google Drives

14  as the most business critical for the company.  Some of them

15  need to be retained indefinitely because they are foundational

16  documents.  Some of them relate to really critical IP.  So we

17  do everything we can to ensure we're not unintentionally losing

18  any of those items.

19  **Q.**   Let's talk now about communications.  What is the primary

20  tool that Google employees use to communicate about their

21  business activities?

22  **A.**   We primarily use Gmail.

23  **Q.**   Does each employee have a corporate Gmail account?

24  **A.**   Yes, we do.

25  **Q.**   Again, assuming there's no legal hold in place, is there a

**LOPEZ - DIRECT / ROCCA**

1  standard retention policy for e-mails that are stored in an

2  employee's Gmail account?

3  **A.**   Yes, there is.

4  **Q.**   What is that policy?

5  **A.**   That is 18 months by default.

6  **Q.**   Earlier you testified that Google Drive documents can be

7  kept indefinitely.  Why is there a different approach with

8  respect to Gmail?

9  **A.**   Yeah.  And that all comes back to the business value

10  assessment of e-mails versus items in a Drive and the fact that

11  for most Googlers, 18 months is a sufficient amount of time for

12  them to complete work on a specific project, the topics that's

13  probably included in e-mails; and then when 18 months has

14  passed, there's likely very little archival or reference value

15  in an e-mail.

16  **Q.**   If a Google employee has a business need to keep an e-mail

17  longer than the 18 months, is there a way for them to do that?

18  **A.**   Yes.

19  **Q.**   Can you please describe that briefly?

20  **A.**   Sure.  Googlers have access to a special label to mark

21  individual e-mails as "Indefinite," and they are able to do

22  that at their discretion.

23  **Q.**   Okay.  Let's talk now about Google Chat.  What is

24  Google Chat?

25  **A.**   Google Chat is a communications instant messaging tool.

**LOPEZ - DIRECT / ROCCA**

1   Q.   In laymen's terms, what is "instant messaging tool"?

2   A.   Yeah.  It's like sending a text message.  It's just a way

3   to quickly communicate with other individual employees.

4   Q.   Why does Google offer Google Chat as a tool for its

5   employees?

6   A.   It's all about enhancing collaboration and communication

7   among employees.

8   Q.   As lead of information governance, what is your general

9   expectation of how Google employees typically use chats?

10  A.   Yeah.  Typically, it's those quick, one-off, "Hey, I have

11  a quick question for you.  Want to grab coffee?"  You know,

12  those types of kind of time-sensitive kind of queries and

13  conversations.

14  Q.   Is it possible for an employee to use Google Chats to

15  convey important information?

16  A.   Yes.

17  Q.   Is it possible for employees to use Google Chats to

18  communicate for the purpose of building a community at Google?

19  A.   Absolutely.

20  Q.   Can you give an example of that?

21  A.   Sure.  So, for example, we have internal group chats on

22  any number of topics.  I have a long-standing group chat with a

23  series of co-workers and friends where we now share the most

24  sensitive things:  birth announcements, someone gets a

25  promotion.  All of those types of things happen in our group

**LOPEZ - DIRECT / ROCCA**

 1    chats.

 2    **Q.**   Are there different types of Google Chats?

 3    **A.**   Yes.

 4    **Q.**   Please describe those for the Court.

 5    **A.**   Yeah.  The main types of chats are one-on-one group chats

 6    and what are called rooms or spaces.

 7    **Q.**   Let's take those in turn.

 8          You mentioned one-on-one chats.  How do one-on-one chats

 9    work?

10    **A.**   Very straightforward.  It's simply one person having a

11    conversation with one other person.

12    **Q.**   At this point, Mr. Lopez, can you please refer in your

13    exhibit to Exhibit 104, which is in a 104 tab.

14    **A.**   Mm-hmm, yep.

15    **Q.**   What is that exhibit?

16    **A.**   Yeah.  This is a screenshot of a one-on-one chat.

17    **Q.**   Does this screenshot accurately depict what a sample

18    one-on-one chat at Google would look like?

19    **A.**   Yes, it does.

20    **Q.**   Can you please describe for the Court the elements of

21    what's on this screenshot?

22    **A.**   Yeah.  So what you see here is the names of the people who

23    are involved in the one-on-one chat.  So here it's Jeffrey

24    Clark and Ann Gray.

25          You also see some information about the retention periods

1    that attached to this chat, the history state of the

2    conversation.  You can see that both in the top and in the

3    reply bar.

4         And then on the left-hand side, you see a list of all of

5    the other conversations that this person has been involved in.

6    Might have been a while ago.  Might have been 20 minutes ago.

7    But it's all there on the left-hand bar.

8         **MR. ROCCA:**  Your Honor, at this point, Google requests

9    that Exhibit 104 be admitted into evidence for the Court's

10   consideration.

11        **THE COURT:**  It's admitted.

12        (Defense Exhibit DXCH-104 received in evidence.)

13   **BY MR. ROCCA:**

14   **Q.**   You also mentioned group chats.  What is a group chat?

15   **A.**   Yeah.  A group chat is just a conversation between three

16   or more people.

17   **Q.**   What is the difference between a one-on-one chat and a

18   group chat?

19   **A.**   It's just the number of people involved.

20   **Q.**   At this point, Mr. Lopez, if you can turn to Exhibit 105

21   in your binder.  It should be one tab over.

22        Do you see that exhibit?

23   **A.**   Yep.

24   **Q.**   What is that?

25   **A.**   This is a screenshot of a group chat.

1    **Q.**   Does this screenshot accurately reflect what a typical

2    group chat would look like at Google?

3    **A.**   Yes, it does.

4    **Q.**   Again, if you could describe the elements of what's on the

5    screen for the Court.

6    **A.**   Sure.  So obviously, there are more people involved in

7    this chat.  So at the top, you see the names, as much as screen

8    real estate will allow.  There are nine members here.  So you

9    see who's involved in the chat.  You see, again, the retention

10   and the history state indicators on the screen.  You see the

11   conversation stream, who's -- the different messages.  And

12   then, again, on the left-hand side, you see a running list of

13   all the other conversations that this particular employee is

14   involved in.

15   **Q.**   Mr. Lopez, are group chats always related to business

16   issues?

17   **A.**   No.

18   **Q.**   Can you please give the Court an example of what you mean?

19   **A.**   Yeah.  So like we talked about before, there is no

20   limitation on the topic of a group chat.  And so internally, we

21   have even really sensitive things, like folks who are in

22   recovery and they have a community and an ongoing group chat

23   where they share their own personal stories, really sensitive

24   information.  And those all are happening on -- via group chat.

25          **MR. ROCCA:**  Your Honor, Google requests that Exhibit 105

 1   be admitted into evidence.

 2           **THE COURT:**  All right.  It's admitted.

 3           (Defense Exhibit DXCH-105 received in evidence.)

 4   **BY MR. ROCCA:**

 5   **Q.**   Mr. Lopez, the third category you mentioned were something

 6   called rooms and spaces.  Do you recall that?

 7   **A.**   Yes.

 8   **Q.**   Please describe those for the Court.

 9   **A.**   Yeah.  Those are more topic- or project-based type of

10   conversations that are specifically oriented around a

11   particular item or subject matter.

12   **Q.**   Please turn to Exhibit DXCH-106.  That's the next tab in

13   your binder.

14           Are you there?

15   **A.**   Yes.

16   **Q.**   What is that exhibit?

17   **A.**   Yep.  This is a screenshot of a threaded room.

18   **Q.**   Does this accurately depict what a threaded room looks

19   like?

20   **A.**   Yes, it does.

21   **Q.**   Can you describe for the Court what's in this

22   threaded room example?

23   **A.**   Sure.  So, yeah, as a difference from the group chats that

24   we were just looking at, this has a name.  So "Design Systems"

25   is the topic of this room or this -- yeah, this room.  There

 1   are 22 members in this room.  And as before, you'll see the

 2   individual messages and the names of the folks who are involved

 3   in that room conversation.

 4       **MR. ROCCA:**  Your Honor, Google requests that

 5   Exhibit DXCH-106 be admitted into evidence.

 6       **THE COURT:**  It is admitted.

 7       (Defense Exhibit DXCH-106 received in evidence.)

 8   **BY MR. ROCCA:**

 9   **Q.**   Mr. Lopez, are Google employees provided any guidelines on

10   how chats are retained in the normal course of business?

11   **A.**   Yes.

12   **Q.**   What are those guidelines?

13   **A.**   We have a Google Chat retention policy that's made

14   available to employees.

15   **Q.**   If you'll turn to the first tab in that binder, which is

16   DXCH-1.  Please let me know when you're there.

17   **A.**   Okay.  Yep.

18   **Q.**   What is this document?

19   **A.**   This is the Google Chat retention policy I just mentioned.

20   **Q.**   Is this a true and correct copy of the Chat retention

21   policy?

22   **A.**   Yes.

23   **Q.**   And is this policy maintained in the normal course of

24   business at Google?

25   **A.**   Yes.

**LOPEZ - DIRECT / ROCCA**

1   **Q.**   Would you please read the first sentence of the first

2   paragraph of this Chat retention policy.

3   **A.**   Sure.  So (as read):

4           "Our Google Chat retention policy aims to reduce

5           redundant, obsolete, and trivial information in

6           corporate chats."

7   **Q.**   My question is:  Why is that an aim of the Google Chat

8   retention policy, to reduce redundant, obsolete, and trivial

9   information?

10  **A.**   Yeah.  Very simply, it's because Google, like any large

11  organization, is experiencing an explosion of information

12  that's created by every single employee every single day in

13  their everyday roles.  So it's really critical for us to do

14  everything we can to minimize the amount of obsolete or trivial

15  information and try to ensure that we're only keeping those

16  items that are absolutely necessary to do our jobs.

17  **Q.**   Now, are there privacy issues that you have in mind when

18  you try to achieve this aim?

19  **A.**   Yes.

20  **Q.**   Can you please describe that for the Court?

21  **A.**   Sure.  You know, one of the things that I monitor in my

22  role are developments in things like Europe's GDPR regulation.

23  California has CCPA.  All of those are focused on ensuring that

24  we have a legitimate business reason to continue to retain data

25  on our systems.

**LOPEZ - DIRECT / ROCCA**

1     And so we take the same philosophical approach and make

2   sure that we're asking ourselves what is the reason why we are

3   continuing to retain this.  And if we can't answer that

4   question, then we should be doing everything we can to minimize

5   that retention.

6   **Q.**   Beyond the privacy issue, are there any other policy

7   issues that you have in mind when you develop this policy?

8   **A.**   Yeah, there are a few other considerations that we take

9   into account.  There's the -- the common fact of the storage.

10  The cost of storage of exploding volumes of data is expensive.

11     We also think about the cybersecurity risks associated

12  with keeping large volumes of unnecessary data in our systems.

13  That's a really attractive target to any bad actor who might be

14  looking to breach our systems.

15     And then we look at it from the employees' perspective,

16  which is when it's all about productivity and efficiency,

17  because there's nothing more frustrating than having to sift

18  through large collections of old files just to try to find the

19  one that's actually related to what you're up to on that

20  particular day.

21  **Q.**   Let's look at some of the bullet points in this retention

22  policy, again referring to Exhibit 1.

23     The first bullet says, quote (as read):

24        "24 hours if history is off."

25     Do you see that?

1    **A.**    Yes.

2    **Q.**    What does that mean?

3    **A.**    That means that if you're in a one-on-one chat and the

4    history is off, that will only be retained for 24 hours.

5    **Q.**    Is that 24-hour retention setting for history-off chats a

6    standard feature of the Google Chat product?

7    **A.**    Yes, this is a standard product feature, and it's the same

8    for all Google Workspace customers around the globe.

9    **Q.**    The next bullet says (as read):

10          "30 days for history-on chats with just one

11       other person."

12       Do you see that?

13    **A.**    Yes.

14    **Q.**    What does that mean?

15    **A.**    Yeah.  This means that if you are in a same one-on-one

16    chat and you've turned history on, those messages will be

17    retained for 30 days.

18    **Q.**    From an information governance perspective, does the

19    30-day retention period for history-on one-on-one chats reflect

20    any particular view on the business value of a chat

21    communication?

22    **A.**    Yes.

23    **Q.**    Please explain that.

24    **A.**    Yeah.  So we think about differentiating between the

25    business value of an e-mail, which is a very formal, very

**LOPEZ - DIRECT / ROCCA**

1   substantive type of communication, to a one-on-one chat, which

2   even with history on is judged to be less substantive, probably

3   more quick one-on-one, you know, conversation back and forth.

4   And so as a result, we've adjusted the retention period for

5   those one-on-one conversations.

6        **MR. ROCCA:**  Your Honor, Google requests that DXCH-1 be

7   admitted into evidence.

8        **THE COURT:**  It's admitted.

9        (Defense Exhibit DXCH-1 received in evidence.)

10  **BY MR. ROCCA:**

11  **Q.**   Mr. Lopez, what steps does an employee need to take in

12  order to turn history on for a chat?

13  **A.**   Yeah.  Very straightforward.  So in the product, there's a

14  little three-button menu.  You click on that.  The next section

15  you get to has a button that says "Turn history on."

16  **Q.**   If you refer to Exhibit DXCH-107 in your binder,

17  Mr. Lopez.

18  **A.**   Yep.

19  **Q.**   Can you please tell the Court what that is?

20  **A.**   Sure.  So the left-hand screenshot is just showing where

21  you're starting from.  So you're in a one-on-one chat; the

22  history is off.

23       Then you would click on those three dots up on the upper

24  right.  That would open a menu.  That's the center screenshot.

25  There you see a prominent option which says "Turn on history."

1        If you click on that "Turn on history" button, now when

2    you return to the chat, you'll see that history is now on.

3    Q.   Does this exhibit with these steps accurately reflect the

4    steps for turning history on?

5    A.   Yes.

6    Q.   Is there any other terminology that Googlers use when

7    referencing history on?

8    A.   Yeah.  So we internally use the terms "history on" or

9    "on the record."  They're synonymous.  And actually, if you

10   look at the support pages for Google Vault, they use the terms

11   side by side in the same sentence to indicate they are

12   synonymous.

13   Q.   If an employee turns history on for a particular

14   conversation, how long does that setting remain in place for

15   the conversation?

16   A.   Yeah.  That setting will remain the same until manually

17   changed by that user.

18        MR. ROCCA:  Your Honor, Google requests that DXCH-107 be

19   admitted into evidence.

20        THE COURT:  It is admitted.

21        (Defense Exhibit DXCH-107 received in evidence.)

22   BY MR. ROCCA:

23   Q.   Mr. Lopez, besides turning history on, are there any other

24   tools available within the Google Chat product to help

25   employees retain a message?

1   **A.**    Yes.

2   **Q.**    Please describe that.

3   **A.**    Yeah.  Within the product, there's a feature called

4   "Forward to inbox" that allows a user to select an individual

5   message and up to four preceding messages and send those to

6   their e-mail inboxes for longer-term archiving.

7   **Q.**    If you flip to Exhibit 108 in your binder, can you please

8   tell the Court what this exhibit is?

9   **A.**    Yep.  This is a screenshot showing the steps to forward

10  messages to your inbox.

11  **Q.**    Can you briefly describe what the Court is seeing in this

12  exhibit?

13  **A.**    Yeah.  So as before, in this case, you're wanting to

14  forward an individual message.  So the three dots will hover

15  over an individual message.  That will take you to a menu.

16  Within that menu, there's an option named "Forward to inbox."

17  Click on that and the action will happen.

18  **Q.**    And what inbox does this refer to?

19  **A.**    Yeah.  This is sending to your personal Gmail inbox, where

20  it will then be subject to the 18-month default retention

21  period.

22  **Q.**    Does Exhibit 108 accurately reflect the steps necessary to

23  use the "Forward to inbox" function?

24  **A.**    Yes.

25         **MR. ROCCA:**  Your Honor, at this point, Google requests

1    that DXCH-108 be admitted into evidence.

2           **THE COURT:**  Admitted.

3           (Defense Exhibit DXCH-108 received in evidence.)

4    **BY MR. ROCCA:**

5    **Q.**   Now, let's turn back to the retention policy, which was

6    Exhibit 1, Tab 1 of your binder.

7           If you recall, Mr. Lopez, we had covered the first two

8    bullets.  Now I want to get to the third set of bullets.

9           Can you briefly describe for the Court what that set of

10   bullets is addressing?

11   **A.**   Yeah.  So this is describing, if you're in a group chat or

12   a room or space where the history is on, those messages will be

13   retained for 18 months.

14   **Q.**   The fourth standalone bullet says, quote (as read):

15           "18 months for chats in a threaded room (history

16           is always on and can't be turned off)."

17           Do you see that?

18   **A.**   Yes.

19   **Q.**   Why is history always on and can't be turned off for chats

20   in a threaded room?

21   **A.**   Yeah.  That's just one of the options that the product

22   team created.  So it has a different type of settings than the

23   other types of chats that we've talked about.

24   **Q.**   And how does the 18-month retention period for threaded

25   rooms and spaces compare to the retention period for e-mails we

1   had talked about earlier?

2   **A.**   Yeah.  They very intentionally are the same.  And we think

3   that that's helpful for employees to start to -- who are more

4   familiar with the 18-month default in e-mail, and they can then

5   understand the way that their messages will be retained in the

6   same 18-month time period.

7   **Q.**   From an information governance perspective, can you please

8   again make it clear.  Why does Google have a shorter retention

9   period for chats compared to e-mails?

10  **A.**   Solely related to the expected business value of those

11  messages versus e-mails that might be in your inbox.

12  **Q.**   From your perspective as lead for information governance

13  at Google, is it a sensible approach to have a different

14  retention period for chats than these other types of documents

15  we talked about earlier?

16  **A.**   Absolutely.  It is a best practice to be tailoring the

17  retention periods to the business value of the type of

18  information.  And having a one-size-fits-all is not a

19  recommended best practice, and so we try to be really specific

20  and tailor the retention periods to the type of information

21  involved.

22      **THE COURT:**  May I?

23      What do you mean by "business value"?

24      **THE WITNESS:**  Yeah.  I mean the archival or reference

25  value; what's the likelihood that that employee will have to

1    refer back to that information because it's, you know, relevant

2    to some other project that they're working on.

3    **BY MR. ROCCA:**

4    **Q.**   Now, Mr. Lopez, so far we've been talking about Google's

5    retention policies in the absence of a legal hold.

6         I'd like to now ask you about retention and preservation

7    policies that come into play when a legal hold is in place.

8         Do you have any role in implementing legal holds for

9    specific matters?

10   **A.**   No.

11   **Q.**   Do you have a general understanding of how Google

12   approaches this from a standard practice perspective?

13   **A.**   Yes.

14   **Q.**   Is there any general guidance available to Google

15   employees related to the preservation of chats that may be

16   subject to a legal hold?

17   **A.**   Yes.

18   **Q.**   Where is that guidance maintained?

19   **A.**   That's maintained in a FAQs page that accompanies our

20   Chat retention policy.

21   **Q.**   Please turn to Exhibit 2, DXCH-2 in the binder.

22        Are you with me?

23   **A.**   Yep.

24   **Q.**   What is this document?

25   **A.**   This is the page of the FAQs that I just described.

1   **Q.**   Is this a true and correct copy of the Chat retention

2   FAQs?

3   **A.**   Yes.

4   **Q.**   Is this a document that's maintained in the normal course

5   of business at Google?

6   **A.**   Yes.

7   **Q.**   Midway down, Mr. Lopez, there is a question that says,

8   quote (as read):

9           "Under what circumstances should history

10          settings be turned on in Chat?"

11          Do you see that?

12  **A.**   Yep.

13  **Q.**   What is the response?

14  **A.**   Yeah.  We outline two specific scenarios where history

15  should be on.

16          One of them is, if you are on legal hold and there's a

17  topic that comes up in your conversation that's related to that

18  hold, you are expected to turn history on at that point if it's

19  not already on.

20          And then also, if the subject matter of your conversation

21  is of substantive business value, you are expected to also turn

22  history on at that point for longer-term archiving.

23  **Q.**   And, again, is this FAQ document available internally at

24  Google to all employees who are looking for information on chat

25  retention?

1    **A.**    Yes.  It's a live page.  It's available 24/7.

2    **Q.**    Now let's turn to this particular case.

3         Do you have an understanding of how Google's standard

4    approach for chats was implemented specifically for the

5    employees on legal hold for this case?

6    **A.**    Yes.

7         **MR. ROCCA:**  Your Honor, before moving on to the next

8    series of questions, we would like the Court's guidance on an

9    attorney-client privilege issue.

10        We're prepared to provide testimony from Mr. Lopez on the

11   specific Chat preservation instructions that were included in

12   the litigation hold notice for employees for this specific

13   case.  We think that that testimony may be helpful for

14   the Court because the Court asks about guidelines for chat

15   content as part of this hearing.

16        **THE COURT:**  Just talk to me.  You don't have to -- so

17   what's the issue?  You have a litigation hold that a lawyer

18   wrote, and you're worried about sharing it.  Is that the issue?

19        **MR. ROCCA:**  The issue is, Your Honor, the legal hold

20   notice itself is privileged.  We want to provide testimony to

21   you, if it would be helpful to the Court, about the specific

22   preservation practices for chats.

23        **THE COURT:**  Is it in here?

24        **MR. ROCCA:**  It is not -- the legal hold is not in there,

25   Your Honor.  It's a privileged document.

1      And what we would like is an order or clarification that

2    by providing the testimony, we are not waiving any privilege.

3      **THE COURT:**  That's fine, but let me ask you a question.  I

4    thought this witness had nothing to do with legal holds.

5      **MR. ROCCA:**  He is aware -- that's not what the testimony

6    was, Your Honor.

7      **THE COURT:**  He said:  I have no role in implementing legal

8    holds.  That was his testimony.

9      So did he do this one?  I'm just asking.  Did he do this

10   one for some reason?

11     **MR. ROCCA:**  He did not do this specific one, but he's

12   aware as information governance.

13     **THE COURT:**  Are we going to hear from somebody who did

14   this one?

15     **MR. ROCCA:**  We're aware of somebody that -- we have two

16   witnesses who are aware of the specific instructions in this

17   case.  And Mr. Lopez can provide --

18     **THE COURT:**  You say "aware of," though.  Who actually --

19   who is the point person in the company?  Are we going to hear

20   from that person?

21     **MR. ROCCA:**  Your Honor, Google has a large legal

22   department.  There's a large team working on these cases,

23   inside counsel and outside counsel.

24     Mr. Lopez is familiar with the legal hold notice in this

25   case and can provide the general -- both the general guidance

1    that's applicable across matters but, also, how it was

2    implemented in this case.

3        **THE COURT:**  Well, okay.  I'm just asking.  Is there anyone

4    who actually worked on this, that had the job inside of Google

5    to work with the legal team to disseminate all this?

6        **MR. ROCCA:**  I do not believe that Mr. Lopez -- Mr. Lopez

7    did not work as a litigator on this case.

8        **THE COURT:**  All right.  When you say he's "aware of," if

9    all he did was just read the policy before coming in -- is that

10   what you're saying?  That's all he knows?  He just read it

11   before he came in?  He didn't actually do anything in the

12   company?

13       **MR. ROCCA:**  Mr. Lopez is aware of the general policy that

14   applies for legal matters, and we're prepared to provide that

15   information to the Court, provided it's not a waiver of

16   privilege.

17       **THE COURT:**  Mr. Rocca, just one building block at a time.

18   How is Mr. Lopez aware of this?  Did he just read the policy

19   before he came in to testify?  Is that how he's aware of it?

20       **MR. ROCCA:**  May I ask the witness, Your Honor?

21       **THE COURT:**  Oh, sure.  Yeah.

22       How do you know about this policy?  I'll ask you.

23       **THE WITNESS:**  Yeah.  So this specific policy, my team owns

24   and manages.

25       **THE COURT:**  Let me just step back.  You just heard our

 1  discussion.  Look, this is a bench trial.  We don't have to

 2  worry -- or a bench hearing.

 3       How do you know anything about the hold for this case?

 4       **THE WITNESS:**  It's -- yeah.  I've read what the notice

 5  says that's provided to custodians.

 6       **THE COURT:**  When did you read that?

 7       **THE WITNESS:**  I don't know the exact date, but it was at

 8  some point -- at some point after this matter commenced.

 9       **THE COURT:**  All right.  So in preparation -- basically, in

10  preparation for this hearing; is that right?

11       **THE WITNESS:**  Not specifically in perception.  Just as my

12  general duties of being aware of what we're doing internally.

13       **THE COURT:**  When was that?  Last month?  Six months ago?

14       **THE WITNESS:**  Oh, I would say a year ago, at least.

15       **THE COURT:**  A year ago.  Okay.  So who in the company

16  actually rolled this out to people?  Who did the groundwork?

17       **THE WITNESS:**  That's a great question.  I wasn't involved

18  in that, and so I couldn't answer.

19       **THE COURT:**  All right.  Well, we can do what we can do.

20       Go ahead.

21       **MS. MOSKOWITZ:**  Your Honor, can I lodge an objection to

22  this whole line of questioning, both for the foundational

23  aspect that Your Honor raised, but also based on the fact that

24  Google is expressly asking to use privilege as both a sword and

25  a shield.

1          We were expressly refused production of this litigation

2     hold.  And we repeatedly asked and Google said "no."  And now

3     they want to use that and Mr. Lopez's reading of that in court

4     when we've never had the benefit of that.  So that's just

5     classic sword/shield, and they shouldn't be able to do it.

6          **THE COURT:**  Well, you had not provided it to your

7     colleagues?

8          **MR. ROCCA:**  Your Honor, it's attorney-client privileged.

9     We offered multiple times, time and time again, to a non-waiver

10    agreement where we would provide it on the condition that they

11    wouldn't argue "Oh, you've waived privilege."  They declined

12    that.  They also said repeatedly that it's irrelevant to any of

13    these issues.

14         So now they're saying that they're objecting --

15         **THE COURT:**  Let me -- I'm sorry.  Let me just jump in.

16         Did you actually give it to them or not?

17         **MR. ROCCA:**  No.  They do not have the privileged legal

18    hold notice.  We offered it to them repeatedly.

19         **THE COURT:**  What is the waiver concern?  What are you

20    worried about for waiver?

21         **MR. ROCCA:**  Your Honor, we're worried about respecting the

22    privilege in a situation where if we reveal information in a

23    hearing, that the plaintiffs will assert that we've opened the

24    door in ways that we don't understand before we were providing

25    the testimony.  So we just want a very simple clar- --

1      THE COURT:  I understand that.  But what subject-matter

2   waiver are you worried about?  It's clearly not going to be all

3   the legal work you're doing.

4      I'm having trouble understanding, even if there were a

5   waiver -- and remember, I'm going to decide that; so you don't

6   have that much to worry about -- what is the waiver?  I mean,

7   it's just a document retention policy; right?

8      MR. ROCCA:  It's a litigation hold notice that uniformly

9   across the case law is privileged.

10      Mr. Lopez is prepared to testify about the chat retention

11   instruction, what custodians were expected to do.  And we don't

12   want to waive all topics in the legal hold, the lawyers'

13   attorney work product in evaluating the case and how they

14   describe the case to the custodians.  We want to provide

15   the Court, if the Court would find it helpful, the litigation

16   hold language with respect to chats.

17      THE COURT:  Well, of course I have to see it.  This whole

18   thing is about did you preserve this properly or not.

19      Why didn't you work this out before you came in?

20      MS. MOSKOWITZ:  Your Honor, we --

21      MR. ROCCA:  We tried to.

22      THE COURT:  Why are we doing this on the fly?

23      MS. MOSKOWITZ:  Your Honor, we assumed, when they refused

24   to produce it to us, that they would not be using it.

25      THE COURT:  I'm sorry.  I have to jump in.

**LOPEZ - DIRECT / ROCCA**

 1      Your colleague here says they --

 2      **MS. MOSKOWITZ:**  That's wrong.

 3      **THE COURT:**  -- offered it to you on a silver platter and

 4  you said "no."

 5      **MS. MOSKOWITZ:**  I'm sorry, Your Honor.  That's not right.

 6      So what happened was, we asked for it.

 7      They said, only if you agree that they are not waiving the

 8  privilege, which, of course, we will not agree because you

 9  cannot use privileged documents as both a sword and a shield.

10      They also insisted that the plaintiffs give our litigation

11  hold, even though that's not at issue at all.

12      We never said their litigation hold was irrelevant.  We

13  asked for it, and we tried to get discovery on it for purposes

14  of this hearing, and they said "no."

15      We assumed it wasn't going to come up.  We asked them

16  yesterday to confirm it after Mr. Lopez's summary made it sound

17  like they were going to do it.  They wouldn't confirm that they

18  weren't, obviously, because they intended to all along.

19      And we did file that submission.  Understanding that

20  Your Honor didn't want to hear from the parties on any filings,

21  we did try to raise it as soon as we realized it was an issue.

22      **THE COURT:**  That actually is not the issue.  What I don't

23  like -- and no judge likes -- is getting a raft of motions

24  functionally less than 12 business hours before a hearing.

25  That's all I'm saying.  Okay?  It's not that I don't want to

1  hear from you.  I don't want to hear from you when I have ten

2  minutes to prepare, figuratively speaking.  That's the issue.

3      **MS. MOSKOWITZ:**  Understood.

4      **THE COURT:**  All right.  Look, why don't you ask your

5  questions without showing him the hold.  You should be able to

6  ask him questions about the hold without showing him the hold.

7      **MR. ROCCA:**  And just --

8      **MS. MOSKOWITZ:**  And, Your Honor, we will take the position

9  that that just -- you'll decide it, but that that is a waiver

10 of all of the instructions that they provided.

11     **THE COURT:**  Not a waiver.  You can ask the questions.

12 What happened?  What did the company do?  What were people

13 told?  That's fine.  Okay?  But you don't have to show him the

14 thing you're worried about.

15     **MR. ROCCA:**  Your Honor, counsel just said they're going to

16 take the position that it's a waiver of all privilege.  She

17 admitted exactly the issue.

18     **THE COURT:**  Can I share something with you?  It's my

19 position that counts.

20     **MR. ROCCA:**  And so --

21     **THE COURT:**  And I'm taking the position that you can ask

22 the questions and you're not going to face a waiver because I

23 will decide the waiver issue.  Okay?

24     **MR. ROCCA:**  Thank you, Your Honor.

25     **THE COURT:**  I've given you the biggest blanket I can give

 1    you to wrap yourself in.  So just go ahead and do it.

 2    All right?

 3        **MR. ROCCA:**  Very well, Your Honor.

 4    **Q.**   Mr. Lopez, in this litigation specifically, the

 5    Google Play cases, what specific actions did Google instruct

 6    custodians to take with respect to Google Chats?

 7        **MS. MOSKOWITZ:**  Your Honor, I will object again, just on

 8    foundation, for him being able to talk about the specific steps

 9    that anyone took.

10        **THE COURT:**  Let's see what he says and we'll go from

11    there.

12        Go ahead.

13        **THE WITNESS:**  Yeah.  So in the legal hold notice, there

14    are two specific instructions related to chats.

15        One is that folks on legal hold are asked not to use the

16    product to discuss any topics that are related to their legal

17    hold.  And also, if they do find themselves in a conversation

18    that strays into a topic related to the legal hold, they're

19    asked to turn history on at that point to make sure that those

20    messages are properly preserved.

21    **BY MR. ROCCA:**

22    **Q.**   Mr. Lopez, does Google have the technical ability to set

23    "History on" as the default for all employees on legal hold?

24    **A.**   Yes.

25    **Q.**   Why don't you do that?

1   A.   Yeah.  So our decision not taking that route is based on a

2   variety of different factors.  The most, you know, kind of

3   relevant to my work is that would lead to a massive

4   over-retention of corporate data.

5       And then, very specifically, because of the way the

6   product works, it wouldn't actually change any of the history

7   settings for existing conversations.  So that would have very

8   little effect to the active conversations of the custodians

9   involved.

10  Q.   So let's focus on that piece of --

11      THE COURT:  If I may, just pardon me.

12      So Google never did a blanket preservation order for chats

13  relevant to this case; is that right?

14      THE WITNESS:  I believe on-the-record chats are preserved.

15      THE COURT:  Which chats?

16      THE WITNESS:  The chat messages that were exchanged when

17  the history was on, on the product.

18      THE COURT:  But the question that you were just asked, if

19  I understood it -- and you can help me if I didn't -- is:  Does

20  Google have the ability, figuratively speaking, to flip a

21  switch and preserve all chats?  You said "yes."  You didn't

22  choose to do that, but the answer is "yes."

23      My question is:  Did Google, in fact, flip that switch and

24  preserve all chats with respect to this litigation?

25      THE WITNESS:  Well, just to clarify, the switch that we're

1   talking about is to set the default.  So it's kind of a

2   starting point of a conversation.  So it doesn't change the

3   ability to toggle history on or off.

4       And like we were just talking about, if you have an

5   existing conversation and we were to flip that switch, it

6   wouldn't change the history setting of any existing

7   conversation.  Only new conversations that were started after

8   that switch was flipped would start with history on, which

9   would be the effect of making the change that we were just

10  talking about.

11      **THE COURT:**  I understand that.  You save only after the

12  switch is on.  I get that.  Is that what you're saying?

13      **THE WITNESS:**  Yeah.

14      **THE COURT:**  I get that.

15      But did Google at any point turn the switch on for

16  everybody's chat related to this case?

17      **THE WITNESS:**  No.

18  **BY MR. ROCCA:**

19  **Q.**  Mr. Lopez, let's go back to Exhibit --

20      **THE COURT:**  I'm sorry.  Why not?  You were saying, why did

21  Google choose not to preserve all the chats?

22      **THE WITNESS:**  Yeah.  Because to -- you know, in our

23  estimation, the kind of substantive business value of chats is

24  sufficiently low that we were confident that custodians would

25  take the instruction seriously.  They would follow -- they

1    would make sure that any relevant conversations were being

2    preserved because history was turned on in those cases and that

3    all the other conversations they were involved in were able to

4    continue in the history-off state that they were previously.

5         THE COURT:  Okay.  So, basically, you left it up to each

6    individual Google employee to decide about the history?

7         THE WITNESS:  Yes.

8         THE COURT:  Okay.  And did anybody ever audit that?  Did

9    anybody in your department ever audit the chats to make sure

10   that nothing relevant to the litigation was getting missed?

11        THE WITNESS:  That's the thing.  We don't actually monitor

12   the substance of employee conversations.  So we wouldn't -- we

13   wouldn't be able to know that.

14        THE COURT:  All right.  So there was never any check to

15   make sure relevant evidence wasn't being missed?

16        THE WITNESS:  No.  We wouldn't have the ability to do

17   that.

18        THE COURT:  Okay.  And just one other -- if I may, just

19   one other question.

20        You mentioned earlier that the chat space was kind of a

21   place where people felt maybe more comfortable about airing,

22   I think you said, substance abuse issues, personal concerns and

23   the like.  Is that right?

24        THE WITNESS:  That was a group chat versus a -- a space

25   was more where, like, substantive project conversations were

1    happening.  So a group chat was what we were talking about.

2         THE COURT:  Okay.  But in your experience, is Google Chat

3    a place where people feel a little more -- sort of letting

4    their hair down, so to speak, more likely to give personal

5    opinions, that kind of a thing?

6         THE WITNESS:  It's definitely more informal, yeah.

7         THE COURT:  Things that they may not necessarily want to

8    put in an e-mail?

9         THE WITNESS:  Anything under the sun that they want to

10   communicate, for sure.

11        THE COURT:  Okay.  But is it seen as something -- as a

12   place where you might say something you didn't necessarily --

13   that you thought might be too sensitive or something that you

14   didn't want to put in an e-mail?

15        THE WITNESS:  That hasn't been my experience.  I think

16   it's more down to the expediency and the speed of the

17   communication which is why you go to Chat versus using e-mail

18   for your other communications.

19        THE COURT:  Okay.  Please.

20   BY MR. ROCCA:

21   Q.   Mr. Lopez, if Google were to take a big group of

22   custodians and turn the default history on, how would that

23   impact the group chat conversations that the Court was just

24   referring to that are of the more personal nature, in your

25   experience?

1    **A.**    Yeah.  So the challenge with doing that is that you then

2    may surprise participants in group chats that were previously

3    comfortable having a conversation in a history-off state

4    because they knew those sensitive items were not going to be

5    available for longer than 24 hours.  You are then changing and

6    maybe surprising folks.  And, you know, with the kind of longer

7    time frame that those messages might be available, folks might

8    be less willing to share, you know, kind of those really

9    sensitive, important pieces of information.

10   **Q.**   What impact would it have on the chat behavior of

11   participants in those groups in your experience at Google?

12   **A.**    Yeah.  I think it would just make it a less intimate space

13   to have a conversation.  I think it would just change the

14   nature and folks would just be less willing to share, which,

15   you know, as we're all kind of working from home more, is even

16   more important in just building communities and relationships

17   internally.

18   **Q.**   Finally, Mr. Lopez, have you heard of the concept of an

19   organizational unit?

20   **A.**    Yes.

21   **Q.**   For purposes of the chat product, what is an

22   organizational unit?

23   **A.**    Yeah.  So as far as I understand -- and this is the

24   non-engineer speaking -- an organizational unit is basically

25   just a way for a system admin to group users for the purpose of

**LOPEZ - DIRECT / ROCCA**

1   setting things like the privileges and the permissions that

2   those users are allowed to do.

3   **Q.**   Does Google have the technical ability to create separate

4   organizational units that include legal hold recipients and

5   then change the chat retention setting for that organizational

6   unit?

7   **A.**   Yes.

8   **Q.**   Is there a problem with that approach?

9   **A.**   Yes.

10  **Q.**   What is the problem?

11  **A.**   Yeah.  So the challenges that taking that route would

12  create are both on the technical complexity side -- the fact

13  that we have hundreds or, in some cases, thousands of employees

14  on legal hold at any given moment.  If you're managing

15  membership for that shifting collection of individuals, that

16  becomes very difficult from an admin perspective.  And then as

17  we talked about before, putting folks in a different OU doesn't

18  actually change the history setting for any existing

19  conversations that they're already involved in.

20  **Q.**   You just referred to "OU."  That means organizational

21  unit?

22  **A.**   Yes.  Thank you.

23  **Q.**   And finally, you mentioned before concerns about

24  cybersecurity or security.  Can you please, once again, explain

25  what the issue is with respect to that?

**LOPEZ - DIRECT / ROCCA**

1   **A.**   Yeah.  So Google, like many large organizations, is

2   concerned about the proliferation of information, corporate

3   data.  So things like having large volumes of obsolete or

4   redundant information in our systems is a really attractive

5   target to bad actors who would love to find something that they

6   could use to reputationally damage the company.  They might use

7   it strategically in ways that we can't predict.  And so we work

8   closely with our InfoSec partners to make sure that we're

9   minimizing and only keeping those items that are absolutely

10  business critical.

11  **Q.**   And you said reputational damage to the company.  How

12  about for individuals who are chatting about something that may

13  be personal to them?

14  **A.**   Yeah.  Absolutely.  I mean, this is a huge privacy

15  concern.  And just on a personal level, no one would love to

16  see their most intimate conversations available to the public.

17  So it's just on a very personal level, we do everything we can

18  to minimize that.

19       **MR. ROCCA:**  That's all I have at this time, Your Honor.

20       **THE COURT:**  Can I ask you, Mr. Lopez, what other

21  litigation holds are you knowledgeable about?

22       **THE WITNESS:**  None.

23       **THE COURT:**  This is the only one?

24       **THE WITNESS:**  Of the specifics, yes.

25       **THE COURT:**  Okay.  Pass the witness?

**LOPEZ - CROSS / MOSKOWITZ**

 1          MR. ROCCA:  Your Honor, I don't know if I moved

 2    Exhibit DXCH -- those were the FAQs -- into evidence.

 3          THE COURT:  What do we have, Ms. Clark?

 4          MR. ROCCA:  Number 2.  Sorry.  Tab 2.

 5          THE CLERK:  You did not.

 6          MR. ROCCA:  Your Honor, may I move Exhibit 2 into

 7    evidence?

 8          THE COURT:  Exhibit 2?  Yes, it's admitted.

 9          (Defense Exhibit DXCH-2 received in evidence.)

10          MR. ROCCA:  Thank you, Your Honor.

11          MS. MOSKOWITZ:  Thank you, Your Honor.

12                        <u>CROSS-EXAMINATION</u>

13    BY MS. MOSKOWITZ:

14    Q.    Good afternoon, Mr. Lopez.  My name is Lauren Moskowitz.

15    I represent Epic Games, and I'll be questioning you on behalf

16    of all the plaintiffs here today.

17          A couple of things off the top.  You say that the primary

18    way that Google employees communicate is to use Gmail.  Do you

19    remember saying that?

20    A.    Yes.

21    Q.    Did you do any quantitative analysis to understand how

22    many chats are sent within Google on a daily basis?

23    A.    No.

24    Q.    So you can't tell us how many chats versus how many

25    e-mails are sent on a given day?

**LOPEZ - CROSS / MOSKOWITZ**

1    **A.**    No.

2    **Q.**    And you talked about history on and history off a little

3    bit.  Do you remember that?

4    **A.**    Yes.

5    **Q.**    And you said history on is called "on the record"; right?

6    **A.**    That's right.

7    **Q.**    And history off is called "off the record" at Google;

8    right?

9    **A.**    They're used synonymously, yep.

10   **Q.**    And in terms of the normal course document retention, you

11   said that the history-on chats are preserved for either 30 days

12   or 18 months, depending on how many participants?

13   **A.**    That's right.

14   **Q.**    And history-off chats are preserved for only 24 hours;

15   correct?

16   **A.**    That's right.

17   **Q.**    And we confirmed with you earlier, it sounds like that

18   when history on is turned on, it applies only to messages sent

19   after that setting change; right?

20   **A.**    That's correct.

21   **Q.**    So even if a history on is later in the chat, the prior

22   discussions will be deleted after 24 hours; right?

23   **A.**    Unless you've used the "Forward to inbox" feature that we

24   discussed.

25   **Q.**    Unless you have.  So if you haven't, just based on the

1   history settings, those chats before the setting change go away

2   and are deleted forever after 24 hours?

3   **A.**   That's right.

4   **Q.**   And there's no way to recover those deleted chats after

5   that 24 hours expires; correct?

6   **A.**   Correct.

7   **Q.**   And you talked a little bit about the e-mail retention of

8   18 months.  Do you recall that?

9   **A.**   Yes.

10  **Q.**   And you said that employees could opt out and make

11  individual e-mails indefinitely saved; right?

12  **A.**   That's right.

13  **Q.**   Do you make that option available for chats?

14  **A.**   No.

15  **Q.**   And the default policy for threaded rooms is history on,

16  but the default is history off for all other chats; right?

17  **A.**   There are multiple different kinds of rooms.  So if we're

18  talking about threaded rooms, they're always on.  But there are

19  also flat rooms where you have the option to toggle history,

20  like for the other chat types.

21  **Q.**   So for all other chat types other than threaded rooms,

22  history is off by default?

23  **A.**   That's right.

24  **Q.**   The Court asked you -- well, withdrawn.

25          You talked about setting retention periods based on the

**LOPEZ - CROSS / MOSKOWITZ**

1  business value to Google.  Do you recall that?

2  **A.**    Yes.

3  **Q.**    But in terms of when a litigation hold scenario is in

4  place, the business value to Google is not the same as what is

5  relevant for preservation for litigation purposes.  Would you

6  agree with that?

7  **A.**    There is a different obligation that attaches for sure.

8  **Q.**    The business value to Google really doesn't have anything

9  to do with what those obligations are; right?

10  **A.**    It's not part of the -- the analysis at that point; you're

11  right.

12  **Q.**    And when a litigation hold is in place, Google preserves

13  all e-mails from relevant custodians automatically; right?

14  **A.**    That's right.

15  **Q.**    Custodians don't have to do anything to make sure that

16  their e-mails are preserved; correct?

17  **A.**    That's right.

18  **Q.**    And custodians cannot override that automated preservation

19  of their e-mails; correct?

20  **A.**    That's right.

21  **Q.**    You don't require employees to manually select individual

22  e-mails to be marked as that "Indefinite"; right?

23  **A.**    That's right.

24  **Q.**    And so Google does not leave it up to their employees to

25  decide which e-mails are preserved; correct?

1   **A.**   That's right.

2   **Q.**   And for on-the-record chats, those are also similarly

3   automatically retained; right?

4   **A.**   That's right.

5   **Q.**   Don't require any individual action by a user to preserve

6   history on, on-the-record chats; right?

7   **A.**   That's right.

8   **Q.**   But you don't do the same thing for off-the-record chats;

9   right?

10   **A.**   That's right.

11   **Q.**   I think you already said in response to the Court's

12   question that Google relies entirely on individual employees to

13   decide which of their one-on-one or group chats will be

14   preserved.  Correct?

15   **A.**   Correct.

16   **Q.**   And the way that those chats will be preserved if the

17   employee affirmatively decides to preserve them is, one,

18   manually turning history on for going forward; two, copying and

19   pasting that chat into some Google document; or, three,

20   forwarding that chat to e-mail.  Correct?

21   **A.**   That's right.

22   **Q.**   An employee could, of course, forget to preserve a

23   relevant chat.  Would you agree?

24   **A.**   The product is agnostic as to the usage of it.

25   **Q.**   Understood.  So you concede, then, it is possible that an

1   employee could forget to preserve a chat; right?

2   **A.**   It's possible.

3   **Q.**   And if they forget and history is off, like it is by

4   default, that chat is deleted forever; correct?

5   **A.**   Like all the other chats that that person's involved in in

6   a history-off state, correct.

7   **Q.**   And, of course, even if they have all the right

8   intentions, they might not understand what topics that they're

9   communicating about might be relevant for litigation.  Would

10  you agree with that?

11  **A.**   I couldn't speak to the individual topics that individual

12  employees are having conversations about.

13  **Q.**   Well, do you have an understanding as to the topics that

14  are encompassed by this litigation?

15      **MR. ROCCA:**  Objection.  Relevance.

16      **THE COURT:**  Overruled.

17      **THE WITNESS:**  Generally.

18  **BY MS. MOSKOWITZ:**

19  **Q.**   So do you think that you could go through all of the

20  employees' e-mails and chats and decide which were relevant for

21  this litigation and which weren't?

22  **A.**   No.  I'm not that familiar with this item.

23  **Q.**   And do you have any basis to say that individual document

24  custodians were able to do that?

25  **A.**   I don't have an opinion on that.  I don't know.

**LOPEZ - CROSS / MOSKOWITZ**

1   Q.   And in terms of this forward-to-e-mail thing, we saw that

2   screenshot.  Do you remember that?

3   A.   Yes.

4   Q.   Would it surprise you that there are zero instances of any

5   chats that were forwarded to e-mail produced in the 1.7 million

6   documents produced in this case?

7   A.   That would surprise me, yeah.

8   Q.   And would it surprise you that plaintiffs found only one

9   document that had any copy-and-pasted chats in it?

10  A.   Yes, that would surprise me.

11  Q.   Did you do any investigation among the custodians in this

12  case to understand their practices in that regard?

13  A.   I don't directly work with custodians in my role.

14  Q.   So the answer is no, you've spoken to none of the

15  custodians in this case?

16  A.   It's not my role; so the answer is no.

17  Q.   All right.  We talked a bit about what Google could have

18  done; and you talked about, on direct, that Google could have

19  changed the settings to preserve all chats for all custodians.

20  Do you remember that?

21  A.   We talked about the default history setting for

22  custodians.  That's not the same as all chats for all

23  custodians.

24  Q.   Well, history on are automatically preserved forever for a

25  litigation hold; correct?

1    A.    Assuming that the conversation's taking place in a

2    history-on state, that's right.

3    Q.    Yes.  And so changing the default to history on would be a

4    step towards ensuring that all chats were preserved for

5    purposes of a litigation hold; right?

6    A.    Well, like we talked about, that doesn't actually affect

7    any existing conversations.  And for most of us internally, we

8    have the same set of conversations ongoing at all times.  So

9    the practical effect of changing the default is very little in

10   terms of increased preservation of chats.

11   Q.    So your testimony is that because you can't do anything to

12   stop the deletion of everything that came before today, that

13   you might as well not even bother flipping the switch today to

14   at least ensure, going forward, it's preserved.  Is that your

15   testimony?

16   A.    No.  The testimony is that the balances are reasonable

17   from our perspective in terms of employee responsibility and

18   choice and where the defaults are set in the product.

19   Q.    Technologically, Google could change the default to

20   history on for all custodians; right?

21   A.    That's right.

22   Q.    And Google could have stopped that setting from being able

23   to be changed by individual users; right?

24   A.    That's right.

25   Q.    That's exactly what Google does for threaded rooms; right?

**LOPEZ - CROSS / MOSKOWITZ**

1    **A.**    That's the way those rooms work, correct.

2    **Q.**    And in addition, even if Google didn't do anything,

3    individuals who are subject to a legal hold could have changed

4    their personal default settings as well; right?

5    **A.**    Yes.

6    **Q.**    They could have changed their personal default so that all

7    conversations they start have history on; right?

8    **A.**    That's right.

9    **Q.**    And that's, in fact, right in DX-2, which is in evidence;

10   right?

11   **A.**    Yes.

12   **Q.**    That's one of the Q&As; right?

13   **A.**    That's right.

14   **Q.**    All right.  Why don't we just look at it really quick,

15   just to make sure we're all on the same page here.

16       I'm on DX-2 and I'm on the Q&A that says "Can I" -- at the

17   last page, the question is (as read):

18            "Can I change my history defaults?"

19       Do you see that?

20   **A.**    Yep.

21   **Q.**    And the answer is (as read):

22            "Yes, but be mindful about the risks of

23       over-retaining chat conversations."

24       Right?

25   **A.**    That's right.

**LOPEZ - CROSS / MOSKOWITZ**

1    Q.   Then it goes on (as read):

2              "If you still wish to change your personal

3         default setting so that the conversations you start

4         have History On by default, you can do so by joining

5         this [sic] group . . . ."

6         Right?

7    A.   That's right.

8    Q.   Did anybody -- did you do anything to ensure that the

9    37 custodians opted into this group?

10   A.   No.

11   Q.   Do you have any understanding as to whether any of them

12   did?

13   A.   Not my role; so I don't actually know the answer to that.

14   Q.   All right.  And you also talked about these organizational

15   units that could have been used; right?

16   A.   That's right.

17   Q.   So that is one of the options Google could have taken to

18   ensure that individual custodians had history on by default;

19   right?

20   A.   Yeah.  As I explained, there are significant challenges

21   with going down that route.  So that's why our system

22   administrators, our technical teams have chosen not to.

23   Q.   Yeah, the problems you talked about, I wrote them down.

24   You can correct me if I'm wrong.

25        That Google just has thousands of employees under a hold

**LOPEZ - CROSS / MOSKOWITZ**

1    at any given time?

2    **A.**    That's one of the aspects.

3    **Q.**    All right.  So it's -- you do manage to do this

4    preservation for e-mails for all those folks, though; right?

5    **A.**    That's because everyone's in the same organizational unit;

6    so it's very straightforward to make that.

7    **Q.**    Okay.  So you're just basically saying it was just going

8    to be too many clicks of a button?

9    **A.**    As a non-engineer, I can't actually answer the technical

10   issues that you're describing.

11   **Q.**    Okay.  So you really can't say whether and to what extent

12   the fact that thousands of employees would be subject to a hold

13   have any bearing on whether Google could have done this

14   organizational unit; right?

15   **A.**    As far as I understand, the technical challenges I

16   described are accurate.

17   **Q.**    It's technologically possible, though.  So you're talking

18   about a different challenge than technical; correct?

19   **A.**    I suppose so.  But I don't think we're talking about

20   possible versus best practice, and what we're --

21   **Q.**    I think we are, actually.  That is what I'm asking you.

22   I'm asking you what is possible.

23   **A.**    Well, then I answered the question.  The answer is yes, it

24   is possible.

25   **Q.**    Right.  And so Google makes a choice that it doesn't want

1    to spend whatever the resources are to, in fact, achieve that

2    result?

3    **A.**   In light of the significant challenges I highlighted, the

4    choices are what we've made, yes.

5    **Q.**   Yeah.  Just to be clear, you've not said what the

6    challenges are.  All you've said is the number of employees

7    that would be subject to it, but you haven't -- you've said

8    you're not an engineer.  So what is the basis for you saying

9    what these challenges would be?

10   **A.**   Conversations with the technical team that actually

11   manages this.

12       **MS. MOSKOWITZ:**  All right.  Move to strike as hearsay,

13   Your Honor.

14       **THE COURT:**  Oh, it's a bench trial.  Overruled.  But I'll

15   give it the weight that I think it's entitled.

16       Go ahead.

17   **BY MS. MOSKOWITZ:**

18   **Q.**   All right.  And then the other problem, as I wrote it

19   down, is that it only saves things going forward.  And we just

20   talked about that; right?

21   **A.**   That's right.

22   **Q.**   So the fact that it only saves going forward, the choice

23   was made that you just aren't going to do it because it doesn't

24   save everything that ever happened?

25   **A.**   I think we were talking about as to the direct effect of

1   making this change and the fact that it would have a limited

2   impact on the existing conversations already in place.

3   **Q.**   You keep saying that.  But just to be clear, you don't

4   know what's happening in those chats; right?

5   **A.**   I'm not speaking to the substance of those chats.

6   **Q.**   Right.  So you can't speak to what would have happened in

7   these chats the days after turning history on for any of them;

8   right?

9   **A.**   I -- I couldn't answer that question, as I've explained.

10  I -- I don't know the substance of those conversations.

11  **Q.**   So you talked a bit about chats being used for social

12  discussion among Google employees; right?

13  **A.**   That's right.

14  **Q.**   I have to think you're not saying -- you're not testifying

15  that Google employees do not also use chats to conduct

16  substantive business communications; right?

17  **A.**   No.  We actually directly covered that in my conversation

18  with Mr. Rocca.

19  **Q.**   There's no limit to what people can do over Chat at

20  Google; right?

21  **A.**   That's right.  It's a technology product.

22  **Q.**   Yeah.  You can attach documents even?

23  **A.**   That's right.

24  **Q.**   And you don't monitor the chats, I think you said.  Right?

25  **A.**   That's right.

1    Q.   You can't -- you can only speak to how you use chats.  You

2    can't actually speak to how any of the businesspeople at issue

3    in this case use chats; right?

4    A.   That's right.

5    Q.   And you -- you cannot quantify the proportion of chats

6    that are happening on a daily basis that are social versus

7    substantive business communications?

8    A.   I know of no way that you would actually be able to

9    accomplish that.

10   Q.   All right.  And have you reviewed any of the substantive

11   business communications that Google has produced that happened

12   over Chat in this case?

13   A.   No.

14        MS. MOSKOWITZ:  All right.  I am going to show you some

15   documents.

16        Your Honor, may we approach with binders?

17        THE COURT:  Oh, sure.

18        MS. MOSKOWITZ:  Thank you.

19   Q.   Let's just look at a couple of examples of chats that

20   Google has produced.  If you could turn to PX-68 in your

21   binder, please.

22        THE COURT:  Are you all going to put these things up

23   electronically?

24        MS. MOSKOWITZ:  As soon as I move them in, I can.  I just

25   didn't want to do it prematurely, Your Honor, but I do intend

LOPEZ - CROSS / MOSKOWITZ

1    to move these in and show them.

2    **Q.**   This is a chat from June 23rd, 2020, between Susan -- I

3    actually don't know how to say her name.  Wojcicki?  Do you

4    know it?

5    **A.**   Wojcicki.

6    **Q.**   -- Wojcicki and Hiroshi Lockheimer.

7         Do you see that?

8    **A.**   Yes.

9    **Q.**   And apologies.  Can I just call her "Susan," even though

10   that's not proper, who runs YouTube?  Yes?

11   **A.**   Sure.

12   **Q.**   And Mr. Lockheimer runs Android and Google Play; right?

13   **A.**   That's right.

14       **MS. MOSKOWITZ:**  All right.  Your Honor, I move this into

15   evidence, PX-68.

16       **THE COURT:**  All right.  It's admitted.

17          (Plaintiffs' Exhibit PX-68 received in evidence.)

18       **MS. MOSKOWITZ:**  All right.  If we could publish that.

19   **Q.**   In this chat, Mr. Lockheimer and Susan were discussing a

20   Google Play billing policy change.  Do you see that?

21   **A.**   Yes.

22          (Witness examines document.)  I'm sorry.  I'm just

23   catching up on the actual text on the page.

24       **THE COURT:**  While he's doing that, there's a weird

25   striping on the display.

 1      **MS. MOSKOWITZ:**  Yes, there is.

 2      **THE COURT:**  Do you see that?

 3      **MS. MOSKOWITZ:**  I do.

 4      **THE COURT:**  It's something on the broadcasting end.  This

 5   happens periodically.

 6      (Addressing Mr. Nickels):  Is it something you can fix?

 7   Do you see it on the monitor?  You can't fix it?

 8      (Addressing the witness):  Oh, actually, is your monitor

 9   on?

10      **THE WITNESS:**  Yeah.

11      **THE COURT:**  Can you turn it off?

12      **THE WITNESS:**  Sure.  Is there a --

13      **THE COURT:**  Little button on the...

14      **THE WITNESS:**  -- button somewhere?

15                        (Pause in proceedings.)

16      **THE COURT:**  You can just put it up.  Maybe, if we have a

17   short break, one of the more tech people can take a look at it.

18      **MS. MOSKOWITZ:**  Okay.

19      **THE COURT:**  Go ahead.

20      **MS. MOSKOWITZ:**  Thank you, Your Honor.

21   **Q.**   So we're looking at PX-68 in evidence.  And this is a

22   substantive business discussion between these two senior

23   executives at Google; correct?

24   **A.**   That's what it looks like, yep.

25      **MS. MOSKOWITZ:**  All right.  Why don't you flip to PX-11,

1  please.  This is a February 8th, 2016, chat between two Google

2  employees.

3         Which I will also move into evidence, Your Honor.

4         **THE COURT:**  It's admitted.

5         **THE CLERK:**  I'm sorry.  What was the number?

6         **MS. MOSKOWITZ:**  PX-11.

7            (Plaintiffs' Exhibit PX-11 received in evidence.)

8  **BY MS. MOSKOWITZ:**

9  **Q.**   Are you there?

10 **A.**   Yes.

11 **Q.**   This is also a substantive business discussion between two

12 Google employees; correct?

13 **A.**   It looks like it, yep.

14 **Q.**   If you could turn to PX-106, please.  This is a March 3rd,

15 2021, chat between Karan Gambhir and Mike, Michael Marchak.  Do

16 you see that?

17                (Official Reporter clarifies.)

18 **BY MS. MOSKOWITZ:**

19 **Q.**   -- 2021 chat between K-a-r-a-n, Gambhir, G-a-m-b-h-i-r,

20 and Michael Marchak, M-a-r-c-h-a-k.

21        Do you see that?

22 **A.**   Yes.

23        **MS. MOSKOWITZ:**  Your Honor, I move PX-106 into evidence.

24        **THE COURT:**  Admitted.

25           (Plaintiffs' Exhibit PX-106 received in evidence.)

LOPEZ - CROSS / MOSKOWITZ

1    BY MS. MOSKOWITZ:

2    Q.    And these two individuals are members of the Google Play

3    team; right?

4    A.    I don't actually know their role at the company.

5    Q.    This is a substantive business discussion between these

6    two employees; correct?

7    A.    It appears to be, yep.

8    Q.    Google employees know that the default is for their chats

9    to be off the record; right?

10   A.    Yes.

11   Q.    And they know that off-the-record chats are not retained;

12   right?

13   A.    I assume so.

14   Q.    So they know that if they do want to talk about something

15   sensitive, whatever that might mean, without leaving behind a

16   record, they can do that over Google Chat; right?

17   A.    I don't have an idea of their mental state when they use

18   the product; so no ability to answer that.

19        MS. MOSKOWITZ:   All right.  Why don't you take a look at

20   PX-9.  This is GOOG-PLAY-007653956.  This is a March 2021

21   document regarding "Play Apps BD Updates."

22        Let me know when you have that.

23        And, Your Honor, I will move this into evidence.

24        THE COURT:   Okay.  It's admitted.

25            (Plaintiffs' Exhibit PX-9 received in evidence.)

LOPEZ - CROSS / MOSKOWITZ

1    BY MS. MOSKOWITZ:

2    Q.   And really, it's a long document.  I'm really going to

3    focus just on the first page.  There's a heading (as read):

4            "Read me before inputting to this document."

5    Do you see that?

6    A.   Yep.

7    Q.   And this is some points for communications between what

8    are called BDMs -- that's business development managers; right?

9    A.   I actually don't know what that stands for.  We have a lot

10   of acronyms internally.

11   Q.   I've noted.

12       The fourth instruction here states, quote (as read):

13           "Comment freely but please be aware that this

14       doc is not privileged."

15       End quote.  And it says, continues, quote (as read):

16           "For anything sensitive, please move to

17       Chat/video call."

18       Do you see that?

19   A.   Yep.

20   Q.   Let's please look at PX-31, GOOG-PLAY4-003752440.  This is

21   a document for a September 13th, 2018, event entitled

22   "Roundtable Breakfast with Don Harrison."  Do you see that?

23   A.   Yes.

24       MS. MOSKOWITZ:  Your Honor, I move this into evidence as

25   well.

1          **THE COURT:**  Admitted.

2               (Plaintiffs' Exhibit PX-31 received in evidence.)

3     **BY MS. MOSKOWITZ:**

4     **Q.**   Don Harrison is one of the most senior Google executives,

5     the head of all of Google's partnerships; correct?

6     **A.**   I actually don't know his role.

7     **Q.**   Do you know even whether he's a custodian in this case?

8     **A.**   I don't.  And I don't actually recognize his name.  So as

9     I said, Google is a really big place.

10    **Q.**   Mm-hmm.  All right.  Why don't we look under -- there's a

11    heading -- if you go to the third page of the document, ending

12    in Bates 2442, there's a "Play" heading.  Let me know if you

13    see that.

14    **A.**   Yep.

15    **Q.**   Do you see there's some crossed-out language in there?

16    **A.**   Yes.

17    **Q.**   And there's a comment that's left next to that

18    struck-through language.  It says, quote (as read):

19               "Since it's a sensitive topic, I prefer to

20          discuss off-line or over Hangout."

21          Do you see that?

22    **A.**   Yes.

23    **Q.**   So we see that word "sensitive" there; right?

24    **A.**   That's right.

25    **Q.**   And this is about business, not someone's personal

**LOPEZ - CROSS / MOSKOWITZ**

1   substance abuse issues; right?

2   **A.**   It appears that that's the case.

3   **Q.**   Are you aware that businesspeople at Google warn their

4   colleagues when their chats are off the -- on the record?

5   Excuse me.  On the record.

6   **A.**   No.  I've not been involved in those conversations.

7   **Q.**   Let's look at PX-103, please, GOOG-PLAY 010510815,

8   February 9th, 2021, chat message between an individual and

9   Sameer Samat, S-a-m-e-e-r S-a-m-a-t.  Do you see that?

10  **A.**   Yes.

11      **MS. MOSKOWITZ:**  Your Honor, I move PX-103 into evidence.

12      **THE COURT:**  Admitted.

13      (Plaintiffs' Exhibit PX-103 received in evidence.)

14  **BY MS. MOSKOWITZ:**

15  **Q.**   This is a one-on-one chat between these two folks; right?

16  **A.**   That's what it looks like.

17  **Q.**   I take it you don't know that Mr. Samat is the head of

18  Google Play?

19  **A.**   No.

20  **Q.**   February 9th, 2021, is after this case started; right?

21  **A.**   I don't actually know the start date of this case.

22  **Q.**   Okay.  There's a lengthy chat that I don't think we need

23  to spend time on, but you would agree that's a substantive

24  business communication; right?

25  **A.**   It appears to be.

```
 1   Q.   And in response, Mr. Samat wrote simply, quote (as read):
 2            "Please keep in mind this chat history is not
 3        off."
 4        Do you see that?
 5   A.   I see that.
 6   Q.   So Mr. Samat was reminding his colleague he should watch
 7   what he says because the chat was not off the record and, thus,
 8   would be retained; right?
 9        MR. ROCCA:  Objection.  That calls for speculation.
10        THE COURT:  Overruled.
11        Whatever you understand it to mean, Mr. Lopez.
12        THE WITNESS:  Yeah.  I think it's just a general reminder
13   to be mindful of what you're communicating via the Chat
14   product.
15   BY MS. MOSKOWITZ:
16   Q.   And that's while the litigation hold was in place in this
17   case; correct?
18   A.   Again, I --
19        MR. ROCCA:  Lacks founda- -- excuse me.
20        Objection.  Lacks foundation.
21        THE COURT:  Try it again.
22   BY MS. MOSKOWITZ:
23   Q.   Do you understand when the litigation hold was put in
24   place in this case, the one you testified about earlier having
25   read?
```

1  **A.**   I don't know the exact date.

2  **Q.**   Do you have any understanding that it was before February

3  of 2021?

4  **A.**   Generally, yes.

5  **Q.**   So it was in place before February 2021?

6  **A.**   Well, that's what I'm asking.  Is that -- is that true?

7  **Q.**   I'm asking if you know anything about it.

8  **A.**   I don't actually know.  I don't know the specific dates.

9  **Q.**   All right.  So you see the chat abruptly ends.  There's

10 nothing else in this chat that happens after Mr. Samat's

11 statement; right?

12 **A.**   At least on the piece of paper in front of me, that's --

13 **Q.**   I can represent --

14 **A.**   -- that's what I can see.

15 **Q.**   -- to you that's exactly how Google produced it to us.

16      Do you take that?

17 **A.**   Sure.

18 **Q.**   All right.  If history was turned off immediately after

19 Mr. Samat's statement and the continued conversation happened

20 after history was turned off, the chat, as produced, would look

21 exactly like it does in front of you right now; right?

22 **A.**   That's right.

23 **Q.**   And sitting here today, you have no idea whether that's

24 exactly what happened?

25 **A.**   I don't know what happened, yeah.

1          THE COURT:  If I may, so looking at that exhibit,

2   Mr. Lopez, 103.

3          THE WITNESS:  Yes.

4          THE COURT:  This is a chat.  This is the text of a chat?

5          THE WITNESS:  That's right.

6          THE COURT:  So a chat has no character limits?  You can go

7   on and on and on like this?

8          THE WITNESS:  That's right.

9          THE COURT:  Okay.  And you can put in links to other

10  websites and that kind of a thing?

11         THE WITNESS:  That's right.

12         THE COURT:  And you said you could attach a document.  How

13  do you do that?

14         THE WITNESS:  Yeah.  So you basically just drag and drop

15  the document into the chat.

16         THE COURT:  Say you had a hundred-page Excel spreadsheet.

17  Could you drag and drop that to a chat?

18         THE WITNESS:  Yeah, you could.

19         THE COURT:  Okay.  And that would not get preserved?  In

20  the 24-hour deletion cycle, that's the default, the document

21  and the text would both be expunged?

22         THE WITNESS:  That's right.

23         THE COURT:  Okay.

24         All right.  Go ahead.

25         MS. MOSKOWITZ:  Your Honor, I have no further questions.

LOPEZ - REDIRECT / ROCCA

1    Thank you.

2           **THE COURT:**  All right.

3           **MR. ROCCA:**  Brief redirect, Your Honor.

4           **THE COURT:**  Briefly.

5           **MR. ROCCA:**  Very brief.

6           **THE COURT:**  We're getting short on time.

7           **MR. ROCCA:**  Very brief.

8           **THE COURT:**  Yeah.  Go ahead.  Yeah.

9                        <u>**REDIRECT EXAMINATION**</u>

10   **BY MR. ROCCA:**

11   **Q.**   The example that the Court just gave with the Excel that

12   was attached, if that Excel was in an employee's Google Drive,

13   would that be retained in Google Drive?

14   **A.**   Yes.

15   **Q.**   Turn to Exhibit 106, which was one of the exhibits used.

16   This is dated March 3rd, 2021.  Are you with me?

17   **A.**   Yep.

18   **Q.**   Was this document preserved?

19   **A.**   Yes.

20   **Q.**   Was history turned on?

21   **A.**   Yes.

22   **Q.**   Was it produced in this litigation?

23   **A.**   Yes.

24   **Q.**   And finally, I want to refer you to Exhibit 104, which was

25   from my binder, the earlier binder.

**LOPEZ - REDIRECT / ROCCA**

1    **A.**    Yep.  Okay.

2    **Q.**    On the left side, you described those earlier as

3    conversations; right?

4    **A.**    That's right.

5    **Q.**    If Google were to turn default on, history on for a

6    custodian Jeffrey Clark, in this example, how would that impact

7    the history-on setting for all of those conversations on the

8    left side?

9    **A.**    It would not impact the history setting at all for any of

10   those conversations.

11   **Q.**    So for existing conversations that are on the left side

12   here, that technological change wouldn't impact the history

13   state of those existing conversations; right?

14   **A.**    That's right.

15       **MR. ROCCA:**  Nothing further, Your Honor.

16       **THE COURT:**  I just have a couple of follow-ups.

17       You're the first witness; so you get all the questions.

18       **THE WITNESS:**  Sure.

19       **THE COURT:**  So do you know how many people inside Google

20   got the litigation hold for this case?

21       **THE WITNESS:**  I don't.

22       **THE COURT:**  Okay.  Do you know how many people inside

23   Google actually preserved their chats in relation to this case?

24       **THE WITNESS:**  I don't.

25       **THE COURT:**  Did anybody -- did you or anybody else that

**PROCEEDINGS**

1   you know of ever do any kind of an analysis or study to figure

2   out how expensive it would be or how burdensome it would be to

3   preserve chats just for this case?

4       **THE WITNESS:**  I don't know.

5       **THE COURT:**  You didn't do that?

6       **THE WITNESS:**  I didn't.

7       **THE COURT:**  And you don't know anybody else who did?

8       **THE WITNESS:**  No.

9       **THE COURT:**  Okay.

10      Okay.  Thanks.  Careful on the way down.  It's a steep,

11  steep step.

12      **THE WITNESS:**  Okay.  Thank you.

13                      (Witness excused.)

14      **THE COURT:**  Okay.  Who's next?

15      **MR. KRAVIS:**  Jonathan Kravis, Your Honor.

16      Google calls Mr. Jamie Rosenberg.

17   (Witness enters the courtroom and steps forward to be sworn.)

18      **THE WITNESS:**  Okay.

19      **THE CLERK:**  Please raise your right hand.

20                      **JAMIE ROSENBERG**,

21  called as a witness for the Defendants, having been duly sworn,

22  testified as follows:

23      **THE WITNESS:**  I do.

24      **THE CLERK:**  Please be seated.

25      Please --

**ROSENBERG - DIRECT / KRAVIS**

1      **THE COURT:**  We're going to have to move it along a bit --

2    okay? -- because we're getting short on time.

3      **MR. KRAVIS:**  Yes, Your Honor.

4      **THE COURT:**  Go ahead.

5      I'm sorry, Ms. Clark.

6      **MR. KRAVIS:**  Good afternoon, sir.

7      **THE CLERK:**  One second.

8      Please state your full name for the Court and spell your

9    last name.

10      **THE WITNESS:**  My name is Jamie Rosenberg,

11   R-o-s-e-n-b-e-r-g.

12      **THE CLERK:**  Thank you.

13                      **DIRECT EXAMINATION**

14   BY MR. KRAVIS:

15   **Q.**   Good afternoon, sir.

16   **A.**   Good afternoon.

17   **Q.**   What is your name?

18   **A.**   My name is Jamie Rosenberg.

19   **Q.**   Where are you employed?

20   **A.**   Well, I'm currently a part-time advisor at Google.

21   **Q.**   And how long have you worked at Google?

22   **A.**   I was in a full-time capacity for 12 years up until

23   September of 2022 and then, after a short break, moved into

24   this part-time role in November.

25   **Q.**   What was the last full-time position that you held at

1    Google before you went part-time?

2    **A.**    I was vice president, running a strategy team for our

3    platforms and ecosystems organization.

4    **Q.**    And when did you hold that position?

5    **A.**    I was in that position as my focus from May 2020 until

6    September of 2022.

7    **Q.**    And what were your responsibilities in that role?

8    **A.**    We operated that team like an internal consultancy, where

9    leaders in the organization would bring us projects -- kind of

10   like a management consulting firm, if you will.  They would

11   bring us projects.  We would do the projects for them as

12   clients, produce some sort of results that would typically help

13   them get to a decision or a strategy formulation, something

14   like that.

15   **Q.**    And in that role, that vice president role you were

16   describing, what was your involvement with the Play Store?

17   **A.**    It was -- it was fairly minimal and infrequent.  In the

18   time frame prior to May 2020, the Play team had built its own

19   strategy apparatus, and so we didn't typically get a lot of

20   projects from the Play team.  More of our projects came from

21   other parts of the organization.

22        Sometimes I personally was pulled in on a consultative

23   basis on some topics because of my history with Play, but my

24   team didn't work on Play very much.

25   **Q.**    Now, are you familiar with an instant messaging platform

**ROSENBERG - DIRECT / KRAVIS**

1  called Google Chat?

2  **A.**    Yes, I am.

3  **Q.**    And do you use Google Chat to communicate with your

4  co-workers?

5  **A.**    I do.

6  **Q.**    And when you were working in that full-time capacity,

7  about how often would you say that you used Chat?

8  **A.**    I would typically use it every day.

9  **Q.**    And what kinds of things would you typically use Chat for?

10  **A.**    Typically, I would use it for logistics and coordination.

11  I may have just come out of a meeting and wanted to ask my

12  assistant to set up a follow-up with someone who was in the

13  meeting, or we may -- we may be heading to a meeting across

14  campus and wanting to meet somewhere five minutes early to

15  huddle up and so we would say, "Where are we going to meet?"

16      Sometimes meeting management in real time, if we were in

17  meeting with a partner, we may have a group chat about like "We

18  need to move on with the agenda now" or "This team is outside

19  the door waiting to come in and present," those types of

20  things.

21      Meeting readiness:  "Can you please add this slide to the

22  deck so that we have the full picture for the meeting," those

23  types of things.  Sometimes a quick factual clarification that

24  I needed in real time.

25  **Q.**    I just want to show you a few examples.  If you could grab

**ROSENBERG - DIRECT / KRAVIS**

1  that white binder that you have in front of you.  I'm going to

2  ask you to look at the tab that's labeled DXCH-8, Exhibit 8.

3  **A.**   Just putting my glasses on, if that's okay.

4       DX-8, you said?

5  **Q.**   Yes.

6  **A.**   Okay.

7  **Q.**   Do you have that in front of you?

8  **A.**   I do.

9  **Q.**   Do you recognize Exhibit 8?

10 **A.**   I don't remember this chat specifically, but I believe

11 that I had it.

12 **Q.**   And what is it?

13 **A.**   This is a conversation between me and one of our

14 administrative assistants.  She wasn't my full-time

15 administrative assistant; so mine must have been on vacation

16 and she was subbing in.

17      And I think this is just back-and-forth about a number of

18 scheduling questions that either she had for me or I had for

19 her.

20 **Q.**   And is this an example of the kind of use of Chat that you

21 were describing earlier for logistics or scheduling purposes?

22 **A.**   Yes, this is a good example of that.

23      **MR. KRAVIS:**  Your Honor, at this time we move

24 Exhibit DXCH-8 into evidence.

25      **THE COURT:**  Admitted.

**ROSENBERG - DIRECT / KRAVIS**

1          (Defense Exhibit DXCH-8 received in evidence.)

2    **BY MR. KRAVIS:**

3    **Q.**   I think you said a moment ago that sometimes you would use

4    Chat either in preparation for or in the course of a meeting.

5    Did I hear that right?

6    **A.**   Yes.

7    **Q.**   Okay.  Let me ask you to take a look at the exhibit that's

8    marked PX-67.  It's also going to be in that same binder.

9    **A.**   Okay.

10   **Q.**   Mr. Rosenberg, what is PX-67?

11   **A.**   Just judging from the context and the people involved

12   here, this looks like a group chat that was happening in real

13   time during a meeting with one of our business partners, AT&T.

14   **Q.**   And the other people who are on this chat besides

15   yourself, do you recognize who those people are?

16   **A.**   I do.

17   **Q.**   And who --

18   **A.**   Most of them, yes.

19   **Q.**   Go ahead.

20   **A.**   Oh, who the people --

21   **Q.**   Yeah.

22   **A.**   So Adrienne was a member of our business development team.

23          The next one, that was a woman, Supriya, on our marketing

24   team.

25          Hiroshi Lockheimer, we've talked about in this room.  He

**ROSENBERG - DIRECT / KRAVIS**

1  was the leader of our platforms organization.

2       Kesh, on the next page, was a member of our business

3  development team, as was Ted Hillestad.

4       So these are people who would have been in that meeting.

5  **Q.**   So let me direct you now to the -- one, two, three, four,

6  five, six -- seventh chat down from the top.  It's from

7  Adrienne M. on June 18th, 2020, at 18:20 hours.  Do you see

8  that?

9  **A.**   I see that.

10  **Q.**   And do you see where it reads (as read):

11       "@Jamie Rosenberg want to ask about personnel

12       move before we move on?"

13       Do you see that?

14  **A.**   Yes, I see that.

15  **Q.**   What is your understanding of what's going on there?

16  **A.**   This would be an example of what I would call an agenda

17  prompt, which is -- you know, we had an agenda or topic prompt

18  where we had a certain number of things -- goals for the

19  meeting, things that we wanted to ask about to the partners in

20  the room.

21       This was Adrienne reminding me that we wanted to ask about

22  some personnel changes on the AT&T side and to find an

23  opportunity to wedge it into the conversation.

24  **Q.**   So would this be an example of the kind of chat you were

25  describing earlier, using it to talk about an agenda for a

**ROSENBERG - DIRECT / KRAVIS**

1   meeting or what's happening in a meeting as it's occurring?

2   **A.**   Right.   Like a meeting management type of thing.

3   **Q.**   Let me show you just one more example.   If I could ask you

4   to turn to PX-92, please.   It's in the same binder.

5       **MR. KRAVIS:**   I'm sorry.   Your Honor, may I move PX-67 into

6   evidence?

7       **THE COURT:**   Yes, it's admitted.

8       (Defense Exhibit PX-67 received in evidence.)

9       **MR. KRAVIS:**   Thank you.

10  **Q.**   Okay.   Mr. Rosenberg, PX-92, what is this one?

11  **A.**   This is a chat between me and Jonathan Nagao, who was a

12  member of our business development partnership team in Japan.

13  **Q.**   And what are you using the chat for in this exchange?

14  **A.**   So one of the -- one of the aspects of my role that I

15  retained in this strategy capacity is approver -- final

16  approver on a lot of contracts related to Android, for example,

17  on behalf of our platforms team.   And this is essentially

18  Jonathan nudging me to go into our formal deal approval tool

19  and approve the deal, telling me that, you know, the feedback

20  was addressed and the deal is now ready for my approval.

21  **Q.**   And is this an example of, as you were describing earlier,

22  using Chat for a quick factual clarification on something

23  you're working on?

24  **A.**   That was sort of a -- that came up in the latter part, but

25  it looks like it was moved to some other medium.   In the former

1    part, it's more an example of coordination and logistics:   Can

2    you go do this thing in this other place?

3    **Q.**   Now, Mr. Rosenberg, would you typically use Chat for

4    substantive business communications?

5    **A.**   No, not typically.

6    **Q.**   What are the tools that you would typically use at Google

7    for substantive business communications?

8    **A.**   The main -- the main tool for me would be -- would be

9    meetings.   That was how my day was filled up.   In those

10   meetings, we would often review slide decks, documents.   I

11   found those to be a far more robust media to get into the

12   details on a lot of these topics.

13        E-mail was good too, and we used that commonly to -- more

14   commonly to kind of run to ground maybe a specific topic as

15   opposed to a more robust strategy conversation or exercise.

16   **Q.**   And when you say "e-mail," you're referring to your use of

17   Gmail?

18   **A.**   Correct.

19   **Q.**   And when you were talking about the slide decks, you're

20   referring to -- those would be documents stored on

21   Google Drive?

22   **A.**   Yes.

23   **Q.**   Now, Mr. Rosenberg, let me ask you about your experience

24   with the level of candor that you tend to see from Google

25   employees in chats.

**ROSENBERG - DIRECT / KRAVIS**

1          In your experience, do Google employees tend to be more

2     candid in chats, or do they tend to be just as candid as in

3     e-mails, or is it something different?  How would you describe

4     it?

5          **MS. MOSKOWITZ:**  Objection.

6          **THE COURT:**  It's a little anecdotal.  I mean, it's one

7     fellow out of thousands of people at Google.  I mean, you can

8     ask the question, but I'm not sure that one person's practice

9     who's not related to the Play Store is going to be all that

10    helpful to me.

11         **MR. KRAVIS:**  Well, let me -- may I just show one example

12    then, Your Honor?

13         **THE COURT:**  Sure.

14    **BY MR. KRAVIS:**

15    **Q.**   Mr. Rosenberg, let me direct you to Exhibit 96, which is

16    also -- DX-96, which is also in your binder.

17         Mr. Rosenberg, what is Exhibit 96?

18    **A.**   It looks like this was an e-mail to me from nine and a

19    half years ago.

20    **Q.**   And, Mr. Rosenberg, let me direct your attention to the

21    first full sentence in the second paragraph.  Could you read

22    that for us, please?

23    **A.**   (As read):

24              "BTW, the 2 million e-book number for Amazon has

25         a ton of vanity press crap in it (self-published)

**ROSENBERG - DIRECT / KRAVIS**

1           where they make no money, and also counts PD."

2     **Q.**   Mr. Rosenberg, would you describe this as a candid

3     communication that you received by e-mail, not by Chat?

4     **A.**   I would.

5     **Q.**   Mr. Rosenberg, finally, let me ask you about -- take you

6     back to the time when you were in that last full-time role.

7     I think you testified a moment ago that you were in that last

8     full-time position between May of 2020 and September of 2022.

9     Do I have that right?

10    **A.**   Yes.

11    **Q.**   Now, this litigation began in August of 2020.  It sounds

12    like you were in that last full-time role at the time the

13    lawsuit was filed.  Do I have that right?

14    **A.**   Yes.

15    **Q.**   And in that role, did you typically use Chat to

16    communicate with Google employees who worked on Play?

17    **A.**   No, not typically.

18    **Q.**   And why is that?

19    **A.**   Well, as I mentioned, in that role, my team didn't do very

20    many projects for Play.

21          Also, if I were involved in a discussion about Play, it

22    would typically be because I was a member of a leadership team

23    that was asked -- that was invited to a meeting or asked to

24    weigh in on a document.  It wouldn't -- it wouldn't be via a

25    chat communication.

ROSENBERG - CROSS / MOSKOWITZ

1    Q.    And, Mr. Rosenberg, when you were in that last full-time

2    role, did you ever intentionally delete any chats related to

3    this litigation?

4    A.    No, I did not.

5         **MR. KRAVIS:**  Thank you, Mr. Rosenberg.

6         I have no further questions.

7         **THE COURT:**  Okay.  You want to pass the witness to what

8    should be a brief exam, I would imagine.

9         **MS. MOSKOWITZ:**  Thank you, Your Honor.  May I proceed?

10        **THE COURT:**  Yes.

11        **MS. MOSKOWITZ:**  Thank you.

12                      <u>**CROSS-EXAMINATION**</u>

13   BY MS. MOSKOWITZ:

14   Q.    Good afternoon, Mr. Rosenberg.

15   A.    Good afternoon.

16   Q.    My name is Lauren Moskowitz.  I represent Epic Games, and

17   I'll be questioning you on behalf of the plaintiffs.

18        You just ended your direct by talking about what your role

19   was at the time this litigation was commenced.  Do you remember

20   that?

21   A.    I do.

22   Q.    And I think you -- you said your team wasn't responsible

23   for Google Play, but you acknowledge that you were consulted

24   and communicated about Google Play throughout the rest of your

25   tenure at Google; correct?

1   **A.**   That happened from time to time.

2   **Q.**   Right.  You received plenty of e-mails about Google Play

3   issues throughout the rest of 2020 and 2021 and 2022; correct?

4   **A.**   I might have been on e-mails as part of larger groups that

5   were included on those e-mails.

6   **Q.**   You were involved; right?  It's not a "might."  You know

7   you got those e-mails; right?  Do I have to show them to you?

8   **A.**   No.  If you're asking whether I received e-mails about

9   Google Play during that period, yes, I did.

10  **Q.**   And you also participated in chats about issues relating

11  to this lawsuit throughout that time; right?

12  **A.**   I don't know.

13  **Q.**   Do you remember your counsel just showed you one?

14  **A.**   A chat relating to the lawsuit?

15  **Q.**   About the MADA and the contract from December of 2020,

16  PX-92?

17  **A.**   There was a -- yes, I remember seeing a chat about MADA.

18  **Q.**   Right.  Do you understand whether MADAs are at issue in

19  this case or not?

20  **A.**   I'm not familiar with the specific details of the case.

21  **Q.**   You can't tell me sort of what topics are and are not

22  relevant to this case; right?

23  **A.**   Not in detail, no.

24  **Q.**   All right.  So moving ahead here, you testified that you

25  used Google Chat, I think you said probably a few times a day

ROSENBERG - CROSS / MOSKOWITZ

1    for various purposes.  Right?

2    **A.**    Yes.

3    **Q.**    So you were at Google for 11 years, I think.  If we do the

4    math, we're talking about thousands and thousands of chats;

5    right?

6    **A.**    Potentially.

7    **Q.**    Do you have any reason to believe it's not thousands and

8    thousands of chats?

9    **A.**    No, not necessarily.

10   **Q.**    You testified to your counsel about various ways that you

11   used Chat and saw some examples of those.  Do you remember

12   that?

13   **A.**    I do.

14   **Q.**    I just want to make sure I understand your testimony.  I

15   want to make sure I heard it.

16        Did you -- is it your testimony that you did not use Chat

17   for substantive business discussions at all?

18   **A.**    That was not my testimony.

19   **Q.**    So you did, in fact, use Chat -- in addition to those

20   other reasons, you also used Chat to conduct substantive

21   business discussions; correct?

22   **A.**    Not that I recall, but it's possible.

23   **Q.**    Do you think it didn't happen?

24   **A.**    It's possible.

25   **Q.**    All right.  Let's look.  Let's look at a couple.

**ROSENBERG - CROSS / MOSKOWITZ**

1        Let's hand up those books.  Sorry we didn't do that.

2    Let's hand those up, please.

3        While that's being handed up, you recall sitting for a

4    deposition in this case?

5    **A.**    I do.

6    **Q.**    All right.  And do you remember testifying about

7    Project Banyan in that deposition?

8    **A.**    I do.

9    **Q.**    And Project Banyan is a code name for a potential deal

10   where Google proposed paying $200 million to Samsung in

11   exchange for, among other things, Samsung agreeing to use

12   Google Play instead of the Samsung store to distribute apps?

13   **A.**    I would characterize it a bit differently, but

14   Project Banyan was related to a potential collaboration with

15   Samsung on app stores.

16   **Q.**    And it was on the order of hundreds of millions of

17   dollars?

18   **A.**    There were economics involved, yes.

19   **Q.**    On the order of $200 million?

20   **A.**    That, I -- that sounds familiar as part of our proposal.

21   **Q.**    And Mr. Kolotouros, Jim Kolotouros, K-o-l-o-t-o-u-r-o-s,

22   managed Google's relationship with Samsung; is that right?

23   **A.**    He managed -- yes.  He was a member of our business

24   development team, and the Samsung account was one of the

25   accounts he was responsible for.

ROSENBERG - CROSS / MOSKOWITZ

1    Q.    And you and Mr. Kolotouros discussed this $200 million

2    deal over Google Chat; right?

3    A.    I don't recall.

4    Q.    All right.  Let's look at PX-37 in your binder, please,

5    GOOG-PLAY-001974461, a June 8th, 2019, e-mail between

6    Mr. Kolotouros and yourself.

7          Please let me know when you're there.

8    A.    Yes, I see it.

9    Q.    And it may look familiar.  It was marked during your

10   deposition as Exhibit 786.  Do you see that?

11   A.    Yes.

12        **MS. MOSKOWITZ:**  Your Honor, I move PX-37 into evidence.

13        **THE COURT:**  It's admitted.

14        (Plaintiffs' Exhibit PX-37 received in evidence.)

15   BY MS. MOSKOWITZ:

16   Q.    According to your e-mail that you sent at 10:28 a.m. -- do

17   you see where I am?

18   A.    Yes.

19   Q.    At 10:28 a.m., you said in this e-mail to Mr. Kolotouros,

20   quote (as read):

21        "You mentioned in our IM chat yesterday that

22        Samsung broached the topic of asking for rev share on

23        the Play Store."

24        Do you see that?

25   A.    I do.

**ROSENBERG - CROSS / MOSKOWITZ**

1   Q.   So you're referencing in an e-mail the fact that you had a

2   Google Chat conversation with Mr. Kolotouros about negotiations

3   with Samsung; correct?

4   A.   Yes.

5   Q.   And those chats no longer exist; right?

6   A.   I assume they don't.

7   Q.   And they no longer exist because when you had those

8   conversations, your chat history was turned off and so was

9   Mr. Kolotouros's; correct?

10  A.   I can't speak for his, but mine was turned off.

11  Q.   You also understood that he kept his off too?

12  A.   I -- I didn't -- didn't know that.

13  Q.   Okay.  All right.  Well, we have his testimony.

14       So the only reason we ever knew that these chats even

15  existed is the mention of them in an instant message -- I'm

16  sorry -- of an instant message in this e-mail; right?

17  A.   I assume so.

18  Q.   Okay.  Can I get your agreement that the IM chat

19  referenced in this e-mail was not the only conversation you had

20  with Mr. Kolotouros about the status of negotiations with

21  Samsung and other OEMs?

22  A.   Not the only conversation --

23  Q.   This wasn't the only chat you ever had with him; right?

24  A.   I don't -- I don't know if it was.

25  Q.   Do you think it was even possible that that was the single

1  chat you ever had with Mr. Kolotouros over your entire time

2  working with him at Google?

3       **MR. KRAVIS:**  Objection.  Vague.  And misstates the prior

4  testimony.

5       **THE COURT:**  Overruled.

6       **THE WITNESS:**  I'm sorry.  Can you repeat the question?

7  **BY MS. MOSKOWITZ:**

8  **Q.**   Sure.  I'm trying to understand if it's your testimony

9  that you think it's even in the realm of possibility that the

10  one chat referenced in this e-mail that we don't have was the

11  only time you ever communicated over Chat with Mr. Kolotouros.

12  **A.**   No, it wasn't the only time I communicated over Chat with

13  him.

14  **Q.**   And you had substantive business communications with him

15  over Chat; right?

16  **A.**   Not typically, no.

17  **Q.**   But you did it; right?  You did have some; right?

18  **A.**   Are you -- if I could just ask a question.  Are you

19  clarifying -- are you categorizing this as a substantive

20  business conversation?

21  **Q.**   Well, let's see what your definition is because I think

22  that might be part of the problem.

23  **A.**   Right.

24  **Q.**   Do you think having a chat about negotiation status with a

25  $200 million deal with Samsung is a substantive business

ROSENBERG - CROSS / MOSKOWITZ

1   communication?

2   **A.**   It would be, but what I want to point out to you is that

3   the rest of the discussion on that topic was happening in

4   e-mail.

5   **Q.**   Yeah, I get that --

6   **A.**   And so what we --

7   **Q.**   -- there's something in the e-mail.

8   **A.**   What we did here is actually bring the conversation into

9   the -- into the e-mail.

10  **Q.**   We will never know if that's right; right?  We don't have

11  the chat.  You can't tell me that's what happened, can you?

12  **A.**   I -- I don't know, but I know that the discussion was

13  happening in the e-mail and we added this topic to that

14  discussion.

15  **Q.**   Yeah, I got the e-mail.  We're very happy to have the

16  e-mails.  I'm talking about the chat.  You cannot tell me what

17  was and was not in that chat; right?

18  **A.**   I don't recall what was in the chat.

19  **Q.**   And you had other substantive business communications with

20  Mr. Kolotouros over Chat; right?

21  **A.**   It's possible that I did.

22  **Q.**   It's likely you did; right?

23  **A.**   I -- I don't know.

24  **Q.**   All right.  How about other people?  You had substantive

25  business communications over Chat with other Google employees

ROSENBERG - CROSS / MOSKOWITZ

1   over the time you worked at Google; correct?

2   **A.**   It wouldn't be typical, but it's possible.

3   **Q.**   It's not only possible.  I just want to understand your

4   testimony.  Do you or do you not concede that you did have

5   substantive business communications over Chat with colleagues

6   at Google over your time there?

7   **A.**   I don't recall the chat conversations I had.

8         **MS. MOSKOWITZ:**  All right.  PX-16, please, March, 17th,

9   2017, chat between you and Ashish, A-s-h-i-s-h, Pimplapure,

10  P-i-m-p-l-a-p-u-r-e.  Let me know when you have it.

11        And I will move this PX-16 into evidence, please,

12  Your Honor.

13        **THE COURT:**  It is admitted.

14        (Plaintiffs' Exhibit PX-16 received in evidence.)

15  **BY MS. MOSKOWITZ:**

16  **Q.**   Do you have it?

17  **A.**   I do have it.

18  **Q.**   This is a conversation over Chat between you and

19  Mr. Pimplapure, who was one of the individuals responsible for

20  the Google relationship with Samsung; right?

21  **A.**   Yes.

22  **Q.**   This is an eight-page-long chat conversation; right?

23  **A.**   I see that.

24  **Q.**   Yeah.  And it lasted over six hours; right?

25  **A.**   I could double-check, but I believe you on that.

1   Q.   All right.  And without having to spend time reading this

2   out loud, can you agree that this is a substantive business

3   communication that you had over Chat at Google?

4   A.   So there are a couple of things going on here.  One is, we

5   are coordinating on getting to a final contract signature, and

6   so we're trying to -- I think we were going back and forth on,

7   you know, where are we on that.  So more in the sort of

8   logistics realm.

9   Q.   Okay.  So you put this in the logistical bucket?

10  A.   Part of it.  And then another part of it was preparing for

11  a meeting that was going to happen and going back and forth in

12  terms of what we needed in advance of the meeting.  I mean,

13  there's certainly topic -- you know, topics here that are

14  implicated, but it's in reference to this contract or it's in

15  reference to the meeting that's about to happen.

16  Q.   Just a clean question.  Does this chat contain substantive

17  business discussions at Google or not?

18  A.   So this chat includes discussions about business topics,

19  but the reason I struggle with the question is they're very

20  incomplete.  Like, this is not where the entire discussion is

21  happening.  It's not where the full issue is being -- is being

22  framed up.

23  Q.   That may be true, but it contains part of the discussion

24  on a substantive business topic; agree?

25  A.   I would characterize this more as coordination.

1    **MS. MOSKOWITZ:**  Okay.  PX-25, please, July 20, 2018, chat

2    between you and Mr. Borchers, B-o-r-c-h-e-r [sic].  Let me know

3    when you have it.

4        I will move PX-25 into evidence, please.

5        **THE COURT:**  Admitted.

6        (Plaintiffs' Exhibit PX-25 received in evidence.)

7    **BY MS. MOSKOWITZ:**

8    **Q.**   You there?

9    **A.**   I have it.

10   **Q.**   All right.  This is a chat describing business counsel at

11   Google approving a proposal to offer Epic 100 to 200 million

12   dollars to try to persuade it to launch Fortnite on

13   Google Play.  Do you see that?

14   **A.**   I don't see those numbers mentioned here, but I see the

15   reference to business counsel.

16   **Q.**   And there was a discussion in Chat about the strategy of

17   how to make that offer and how to make it more attractive than

18   whatever Samsung might be offering; right?

19   **A.**   Yeah, based on the cont- -- I don't remember this chat

20   specifically; but based on the context, I think we were nearing

21   a meeting with Epic.  Bob, who was running marketing for us at

22   the time, was reaching out to me, asking if I had everything I

23   needed for the meeting.

24   **Q.**   Okay.  So was this a substantive business communication,

25   in your view?

**ROSENBERG - CROSS / MOSKOWITZ**

1    **A.**   Again, I would put this more in that sort of

2    coordination/meeting readiness category.

3    **Q.**   Okay.  All right.  That's good to know.

4        All right.  So let's talk about the holds.  You've been

5    placed under many litigation holds over your time at Google;

6    right?

7    **A.**   I believe so, yes.

8    **Q.**   During the last five or six years at Google, do you recall

9    a time where you were not under at least one litigation hold?

10   **A.**   I don't.

11   **Q.**   And is it fair to say that in the aggregate, the holds

12   cover pretty much every aspect of your job?

13   **A.**   I assumed they did.

14   **Q.**   Let's see.  So I think you talked about not really

15   communicating after the litigation hold.  Is that your -- is

16   that your testimony, that you didn't really communicate over

17   Chat after getting a hold?

18   **A.**   I don't recall --

19   **Q.**   Okay.

20   **A.**   -- testifying exactly that way.

21   **Q.**   All right.  So you did use chats after getting the

22   litigation holding?

23   **A.**   Yes.  I use Chat every day.

24   **Q.**   You recall receiving live training on written

25   communications several times throughout your career at Google;

**ROSENBERG - CROSS / MOSKOWITZ**

1    right?

2    **A.**    I definitely recall training -- receiving training once or

3    twice.

4    **Q.**    And those were live discussion sessions with a group of

5    people; right?

6    **A.**    Yes, typically.

7    **Q.**    And many people at Google received that same training you

8    got; right?

9    **A.**    I think others did, yes.

10   **Q.**    And those training sessions were presented by lawyers?

11   **A.**    The ones that I was in, yes.

12   **Q.**    And those trainings included presentation slides?

13   **A.**    Yes.

14       **MS. MOSKOWITZ:**    Please take a look at PX-120.   This is a

15   June 14th, 2021, slide deck.

16       I would move PX-120 into evidence, please, Your Honor.

17       **THE COURT:**    What is this?

18       **MS. MOSKOWITZ:**    What is it?

19       **THE COURT:**    Yes.

20       **MS. MOSKOWITZ:**    Oh, we are going to talk about it.   It is

21   a presentation that Google trains its employees on how to,

22   quote, communicate with care.

23       **MR. KRAVIS:**    I object on relevance grounds.   This is

24   irrelevant.   It has nothing to do with the issues before

25   the Court at the hearing.   This is a separate issue that was

1    litigated by the state plaintiffs in another case.  They did

2    not prevail there.  It is not relevant here.

3         **MS. MOSKOWITZ:**  A very different issue.  And I'm happy to

4    lay the foundation by pointing everyone's attention to the

5    relevant pages.

6         **THE COURT:**  Okay.  It's admitted.  Go ahead.

7         **MS. MOSKOWITZ:**  Thank you.

8         (Plaintiffs' Exhibit PX-120 received in evidence.)

9    **BY MS. MOSKOWITZ:**

10   **Q.**   So the first page is -- it shows that it's an interactive

11   set of slides, right, that you click through?

12   **A.**   I assume so, yes.

13   **Q.**   And if you turn to the second page --

14        **THE COURT:**  Well, have you ever seen this document

15   before --

16        **THE WITNESS:**  I don't recall this --

17        **THE COURT:**  -- Mr. Rosenberg?

18        **THE WITNESS:**  I don't recall this specifically.  This is

19   not -- this is the not training that I remember.

20        **THE COURT:**  He has to be familiar with it before you start

21   asking questions.

22   **BY MS. MOSKOWITZ:**

23   **Q.**   Okay.  You received "Communicate with Care" training;

24   correct?

25   **A.**   I did receive training, but I don't -- I don't recognize

1    this particular training.

2         **MS. MOSKOWITZ:**  All right.  Your Honor, I think the

3    contents, even if not this specific document, may have been

4    provided in the training.  Can I ask whether he has received

5    training along the lines of some of the contents of

6    these pages?

7         **THE COURT:**  If you want to use it as a door opener, sure,

8    but don't ask him to testify about a document he hasn't seen

9    before.

10   **BY MS. MOSKOWITZ:**

11   **Q.**   Okay.  Did you receive training from Google that reminded

12   employees that Google is in the public eye and often in the

13   courthouse and has to produce documents in connection with

14   those proceedings?

15   **A.**   I don't know if that was the specific content of the

16   training I received.

17   **Q.**   Did you have that understanding as a Google employee?

18   **A.**   Which -- understanding of what?  Sorry?

19   **Q.**   That Google was going to have to produce lots of records

20   in lots of litigation and government proceedings based on

21   Google being in the public eye.

22   **A.**   I mean, I had that understanding generally.  I don't know

23   if that understanding came from one of these trainings.

24   **Q.**   Okay.  So do you recall ever being presented with

25   hypothetical scenarios of how to approach communicating about

ROSENBERG - CROSS / MOSKOWITZ

1    certain issues in those trainings?

2    **A.**   I don't recall.

3    **Q.**   Do you ever recall getting trained on moving conversations

4    over to Chat in connection with those trainings?

5    **A.**   I don't recall.

6    **Q.**   Okay.  Well, we'll reserve that for closing.  I'll move

7    on.

8        During your time at Google, you kept your chat history off

9    the entire time; correct?

10   **A.**   Correct.  I didn't change the default.

11   **Q.**   And when you were deposed on February 10th of 2022, your

12   chat history was still turned off; correct?

13   **A.**   Correct.

14   **Q.**   You have done nothing to preserve chats for purposes of

15   this litigation; correct?

16   **A.**   I have not done anything to preserve chats for this

17   litigation.

18       **MS. MOSKOWITZ:**  I pass the witness, Your Honor.

19       **THE COURT:**  Did you get one of those litigation hold

20   notices for this case?

21       **THE WITNESS:**  I did.

22       **THE COURT:**  Okay.

23       Okay.  Is that it?

24       **MR. KRAVIS:**  Your Honor, may I just very briefly inquire

25   about these exhibits?

1    **THE COURT:**  Very briefly, please.

2    **MR. KRAVIS:**  Thank you.

3                    <u>**REDIRECT EXAMINATION**</u>

4    BY MR. KRAVIS:

5    **Q.**   Mr. Rosenberg, very briefly.  I think I heard you testify

6    on direct examination that the last full-time position you held

7    at Google was from March of 2020 until September of 2022.  Did

8    I have that right?

9    **A.**   May of 2020 --

10   **Q.**   May of 2020.

11   **A.**   -- to September of 2022.

12   **Q.**   Thank you.  Yes.

13        And I think, as we had discussed, you were in that

14   position when this litigation was filed in August of 2020.  Do

15   I have that right?

16   **A.**   Yes.

17   **Q.**   Can I ask you to just take a look at Plaintiffs'

18   Exhibit 37, one of the exhibits you were shown.  What's the

19   date on that exhibit?

20   **A.**   The date is June 8th, 2019.

21   **Q.**   Before the lawsuit was filed?

22   **A.**   Yes.

23   **Q.**   Plaintiffs' Exhibit 16, can you take a look at that.  The

24   date of that one is March 17th, 2017?

25   **A.**   Correct.

**ROSENBERG - REDIRECT / KRAVIS**

1    **Q.**   Before the lawsuit was filed?

2    **A.**   Yes.

3    **Q.**   Plaintiffs' Exhibit 25, July 20th, 2018.

4    **A.**   Yes.

5    **Q.**   Before the lawsuit was filed?

6    **A.**   Yes.

7         **MR. KRAVIS:**  Thank you, Mr. Rosenberg.

8         Nothing further.

9         **THE COURT:**  Okay.  How much more do we have for witness

10   time?

11        **MR. POMERANTZ:**  Your Honor, we only have one more witness,

12   and that's Mr. Rope.

13        **THE COURT:**  Oh, okay.

14        **MR. POMERANTZ:**  We think our direct is about 12 minutes

15   for Mr. Rope.  I don't know their cross.

16        And then I think they have one witness that they're going

17   to call.

18        **MR. SUMMERS:**  Your Honor, we have one live witness, an

19   expert, Ron Schnell; but then we also have several short --

20        **THE COURT:**  An expert?

21        **MR. SUMMERS:**  -- video clips that I was going to work into

22   my closing argument; and I think they're very important, given

23   the issues that have been raised there.

24        **THE COURT:**  Well, here's my situation.  One of our new

25   colleagues is being ceremonially installed at 4 o'clock.  So

1    I'm running out of time.

2         **MR. SUMMERS:**  Your Honor --

3         **THE COURT:**  How about this?  Are you all from out of

4    state?

5         You are.  Okay.

6         **MR. SUMMERS:**  Your Honor, I have a suggestion.

7         Mr. Schnell -- there are a few screenshots.  He was going

8    to do a live demonstration of Chat and how you can go through

9    it.  He can be done --

10        **THE COURT:**  I think I've got Chat.  I'm not sure I need

11   any more on that.

12        **MR. SUMMERS:**  What I was going to say is, there may be

13   three slides that I think are very important.  If the other

14   side will stipulate to me using them in the argument -- and I

15   can show them to them at the break -- we can withdraw

16   Mr. Schnell.

17        **THE COURT:**  Oh, okay.

18        **MR. SUMMERS:**  And --

19        **THE COURT:**  I'll tell you what.  Why don't we just take --

20        **MR. SUMMERS:**  But we're going to need time for that

21   argument because --

22        **THE COURT:**  Let's just take about five -- a good five,

23   seven minutes, max, and you can talk with Mr. Pomerantz.  Okay?

24        All right.  We'll be back in about -- you can step down.

25        **THE WITNESS:**  Thank you.

**PROCEEDINGS**

1                        (Witness excused.)

2          **THE CLERK:**  All rise.  Court is in recess.

3                     (Recess taken at 2:58 p.m.)

4                     (Proceedings resumed at 3:05 p.m.)

5          **THE CLERK:**  We're back on the record.

6          **THE COURT:**  Okay.  What did you decide --

7          **MS. CHIU:**  Your Honor --

8          **THE COURT:**  -- for the expert?

9          **MS. CHIU:**  Yes, Your Honor.  My name is Michelle Chiu for

10   Google.

11         Good news.  We've been able to significantly reduce the

12   amount of questions we have for Mr. Rope.  So we'd like to call

13   him to the stand at this time.  I think it'll be rather

14   shorter.

15         **THE COURT:**  Oh.  Well, what about the expert?

16         **MR. SUMMERS:**  I just heard that it sounds like we have an

17   arrangement.  If they can do him in less than ten minutes and

18   we can do a cross faster than that, we can probably squeeze it

19   in.

20         **THE COURT:**  But what about Mr. Schnell?

21         **MR. SUMMERS:**  We would withdraw Mr. Schnell and finish by

22   4:00.

23         **THE COURT:**  Okay.  So by agreement, Mr. Schnell is

24   withdrawn, and we're going to do Mr. Rope.  Is that right?

25         **MR. SUMMERS:**  And there are a couple of slides that we've

1   agreed --

2       **THE COURT:**  Sure.

3       **MR. SUMMERS:**  -- the Court can see without a sponsoring

4   witness.

5       **THE COURT:**  Okay.

6    (Witness enters the courtroom and steps forward to be sworn.)

7       **THE CLERK:**  Please raise your right hand.

8   <u>**ANDREW ROPE**</u>,

9   called as a witness for the Defendants, having been duly sworn,

10  testified as follows:

11      **THE WITNESS:**  Yes, I do.

12      **THE CLERK:**  Please be seated.

13      Please state your full name for the Court and spell your

14  last name.

15      **THE WITNESS:**  Andrew Rope, R-o-p-e.

16      **THE CLERK:**  Thank you.

17  <u>**DIRECT EXAMINATION**</u>

18  **BY MS. CHIU:**

19  **Q.**   Good afternoon, Mr. Rope.  Where are you currently

20  employed?

21  **A.**   I'm currently employed at Google.

22  **Q.**   And in what city at Google are you based?

23  **A.**   I'm based in the Mountain View, California, office.

24  **Q.**   What is your current job title?

25  **A.**   Current title is scaled operations manager on the legal

**ROPE - DIRECT / CHIU**

1    team.

2    **Q.**   Can you just give us a brief description of what those

3    responsibilities entail?

4    **A.**   Sure.  In general, I support the operational teams that

5    run discovery and also support the general litigation teams at

6    Google.

7    **Q.**   Mr. Rope, as part of your work at Google, are you familiar

8    with the legal holds that Google implements when a litigation

9    is involving Google?

10   **A.**   Yes, in general.

11   **Q.**   Mr. Rope, when Google is involved in litigation, what is

12   the general process that takes place in terms of preserving

13   information for litigation?

14   **A.**   When Google's involved in litigation, the general practice

15   would be to do an investigation to understand what the case

16   generally deals with and identify individuals that may possess

17   potentially relevant information, and then they will issue a

18   legal hold.

19       The legal hold will put in place certain technical

20   controls to prevent deletion of certain categories of

21   information.

22       And there are also legal hold notices sent to the

23   individuals subject to the hold that cover general categories

24   of information and certain instructions.

25   **Q.**   Is it standard practice for Google to issue a litigation

1   hold notice in all matters where Google is a party?

2   **A.**   Yes, that's the standard practice.

3   **Q.**   And what categories of data are preserved when a legal

4   hold is implemented?

5   **A.**   When the legal hold is implemented, the e-mail data or

6   Gmail data is preserved; Google Workspace files, which includes

7   Docs, Sheets, Slides; and also Google Drive content, which can

8   include other file types.

9   **Q.**   Mr. Rope, we've been talking about Google's general

10  practices when a legal hold is in place.  I'd like to talk to

11  you a little bit about the specific legal hold that was put

12  into this litigation.

13      Are you familiar with that?

14  **A.**   Generally, yes.

15  **Q.**   And were you specifically responsible for implementing the

16  legal hold or hold notice in this case?

17  **A.**   No, I was not.

18  **Q.**   But did you take steps to familiarize yourself with the

19  steps that were taken in this litigation?

20  **A.**   Yes.  I'm generally familiar with the standard process

21  that we follow, and I became familiar with the steps taken in

22  this case.

23      **THE COURT:**  If I may jump in, who actually did the hold in

24  this case at Google?  What's the person's name?

25      **THE WITNESS:**  I don't know the individual's name, but it

1    would be a member of the legal team.  It's probably an attorney

2    or paralegal that --

3        **THE COURT:**  It wasn't you?

4        **THE WITNESS:**  It was not me, no.

5        **THE COURT:**  Have you done any other litigation holds at

6    Google?

7        **THE WITNESS:**  No.  I don't issue litigation holds as part

8    of my role.

9        **THE COURT:**  So all you did was read something to get ready

10   for today?  Is that basically it?

11       **THE WITNESS:**  I -- I -- I don't know that I read the exact

12   hold notice for this matter, but I'm familiar generally with

13   the instructions --

14       **THE COURT:**  All right.  You've never done a hold before at

15   Google, a litigation hold?

16       **THE WITNESS:**  I have not personally issued a legal hold.

17       **THE COURT:**  And you didn't do the one in this case?

18       **THE WITNESS:**  No.

19       **THE COURT:**  I'm sorry.  I just -- what is the value of

20   this?

21       **MS. CHIU:**  Your Honor, perhaps I can ask a few foun- --

22       **THE COURT:**  I can read the documents as well as the

23   witness.

24       **MS. CHIU:**  I understand, Your Honor.  Perhaps I can ask a

25   few foundational questions to indicate Mr. Rope's familiarity

1    with what would be in a legal hold.

2        THE COURT:  His familiarity is based on reading the hold.

3    I can do the same thing.  So what do you want to ask that's

4    pertinent and useful to me in this case?

5        MS. CHIU:  We will provide some testimony --

6        THE COURT:  Can I just ask?  This is a rhetorical

7    question.  Why didn't you bring the person responsible for all

8    this?  It's some nameless individual at Google, which I find

9    quite mysterious, given the size of this case.  Why are we

10   hearing --

11       (Addressing the witness):  I'm sorry.  I'm talking about

12   you like you're not in the room, but you are.

13       Why are we hearing from this individual and not the person

14   who actually had the hands-on responsibility?

15       MS. CHIU:  Your Honor, I don't believe there is actually

16   one individual that could be responsible.

17       THE COURT:  Any individual who was actually involved.

18       MS. CHIU:  I understand that, Your Honor.

19       THE COURT:  We've heard from everybody who has never had

20   anything to do with this.  Why haven't we heard from someone

21   who actually had a role in the hold?

22       MS. CHIU:  Your Honor, we believe Mr. Rope has the

23   sufficient testimony or information that would be responsive to

24   the categories that you provided us.

25       We understand your question.  And I just have a couple

```
 1    more follow-up questions for Mr. Rope, and then we'll be

 2    finished.

 3          THE COURT:  Let's make it quick, please.

 4    BY MS. CHIU:

 5    Q.   Mr. Rope, was a legal hold notice issued in this

 6    litigation?

 7    A.   Yes.

 8    Q.   Do you know when that was issued?

 9    A.   I believe the initial notice and hold was put in place in

10    September of 2020, shortly after the complaint was filed.

11    Q.   Did Google send any updates or reminders regarding the

12    hold notice?

13    A.   Yes.  The standard practice would be to send reminders

14    about every six months.  I believe four reminders were sent in

15    this particular matter.

16    Q.   Mr. Rope, are you aware how many individuals are subject

17    to the legal hold for this case?

18    A.   I believe the current number is about 360 individuals.

19    Q.   Do you know how many of those individuals are custodians

20    for this litigation?

21    A.   I believe the number is about 40.

22    Q.   I'd like to talk to you a little bit about the production

23    of documents in this case.

24          THE COURT:  Can I just -- if I may.

25          How do you know these numbers?
```

1    **THE WITNESS:**  We have an internal tracking system that we

2    use to track litigation holds and different case -- case data,

3    and so I reviewed that to familiarize myself.

4    I also talked with members of the legal team that were

5    responsible for issuing those holds.

6    **THE COURT:**  Thank you.

7    **BY MS. CHIU:**

8    **Q.**   Mr. Rope, are you generally familiar with the production

9    of documents in this litigation?

10   **A.**   In general, yes.

11   **Q.**   How many documents in total has Google produced?

12   **A.**   I believe the number is about 3.1 million documents --

13   yes, documents.  Thank you.

14   **Q.**   And how many pages is that?

15   **A.**   I believe that translates to about 21 million pages.

16   **Q.**   And how many of those documents were -- excuse me.  How

17   many chats were collected in this litigation?

18   **A.**   I believe the number is about 176,000.

19   **Q.**   And how many -- and were those chats collected from all

20   the custodians in this case?

21   **A.**   That's my understanding.

22   **Q.**   And how many chats were produced?

23   **A.**   I believe it was roughly 3,000.

24   **MS. CHIU:**  Your Honor, at this time I have no further

25   questions.

**PROCEEDINGS**

1    **THE COURT:**  So of these 360 or so Google employees who got

2    the hold notice, how many of them opted to preserve their

3    chats?

4    **THE WITNESS:**  I don't know how many of the overall 360.

5    I believe we collected chat messages from all of the

6    custodians, which was that smaller number of about 40.

7    **THE COURT:**  Okay.  But you don't know how many of the 360

8    elected to preserve their chats?

9    **THE WITNESS:**  I haven't -- I don't know that, no.

10   **THE COURT:**  Is that tracked at Google?

11   **THE WITNESS:**  I'm not familiar.  I mean, I know the legal

12   team issues notices and has subsequent follow-up discussions

13   with individuals subject to hold.  I don't know the particulars

14   of this case.

15   **THE COURT:**  Okay.  But, for example, on whatever that

16   database is that you looked at to get that 360 number --

17   **THE WITNESS:**  Yes.

18   **THE COURT:**  -- there's not a column that says "Chats Are

19   Being Preserved" for each person?

20   **THE WITNESS:**  Well, yes, it would say that chats are being

21   preserved, and that would include on-the-record or history-on

22   chats.

23   **THE COURT:**  Oh, so there is a column that says that for

24   each person?

25   **THE WITNESS:**  It would say the types of -- or the

1    categories of information that are being preserved for each

2    person.

3        THE COURT:  Oh.  So for each of those 360 people, you can

4    tell whether or not they preserved their chats?

5        THE WITNESS:  We can tell that Chat was one of the

6    categories of information subject to the hold.  Again, I think

7    it's been testified to prior.  An individual would still have

8    to set the history to on.

9        THE COURT:  That's what I'm asking.  I know they were

10   told:  It's up to you to preserve it or not.

11       What I'm trying to figure out is the next step.  Is there

12   an actual record of who elected to do the preservation?

13       THE WITNESS:  We would know that from checking the -- from

14   that 176,000 chats that were messaged, which participants were

15   included.  But I'm not aware of another way to track which of

16   the 360 total had done that.

17       THE COURT:  How many people did that 176,000 chats come

18   from?  Do you know?

19       THE WITNESS:  I'm sorry.  I don't know the exact number.

20   I believe it included all the 40 custodians, but I'm not sure

21   who else was included in that number.

22       THE COURT:  Was it, at most, 40 of the 360 people?

23       THE WITNESS:  I think it would be at minimum, because we

24   did get chat messages from each of the 40 custodians.  So

25   additional --

ROPE - CROSS / WEINSTEIN

1    **THE COURT:** But you don't know what the upper number might

2    be?

3    **THE WITNESS:** Exactly. I don't know the upper number.

4    **THE COURT:** Okay. Sorry. Go ahead.

5                        <u>**CROSS-EXAMINATION**</u>

6    BY MS. WEINSTEIN:

7    **Q.** Good afternoon, Mr. Rope. My name is Lauren Weinstein. I

8    represent the states, and I'll be examining you today on behalf

9    of the plaintiffs.

10       You have no personal knowledge of the litigation hold in

11   this case aside from glancing at it; right?

12   **A.** I'm familiar with the general practice and what generally

13   goes in our hold notices.

14   **Q.** You didn't disseminate the litigation hold for this case?

15   **A.** I'm sorry. By "disseminate," do you mean did I issue and

16   send that out to individuals?

17   **Q.** Correct.

18   **A.** No, I did not.

19   **Q.** Okay. And you didn't personally provide instructions to

20   the custodians in this case about acting in accordance with

21   that litigation hold, did you?

22   **A.** No, I personally did not.

23   **Q.** Do you know who did?

24   **A.** No, I don't know. I believe it would be members of the

25   legal team.

**ROPE - CROSS / WEINSTEIN**

1    Q.   You testified you talked to people responsible for the

2    hold in this case.  Who did you talk to?

3    A.   I talked with Google's legal team, which includes internal

4    and outside counsel, lawyers.

5    Q.   What are the names of those people?

6    A.   I don't remember every name.

7    Q.   Do you remember any names, a single name?

8    A.   Yes.  I mean, the counsel who's present here today are

9    included in people that I've talked with.  I've also talked

10   with -- I don't remember the exact names.  There were some

11   paralegals and other -- other folks that worked on -- on the

12   hold.

13   Q.   What are the names of the paralegals?

14   A.   I believe one individual is Aaron Madfes.  I don't

15   remember the other -- other folks that I spoke with.

16   Q.   And those people are not here today; correct?

17   A.   I don't believe so, no.

18   Q.   Do you know why you're here today and they're not?

19   A.   I believe as part of my role, I'm generally familiar with

20   our -- how we effectuate legal holds.  And I do support both

21   operational teams that do the subsequent steps to collect,

22   process, make those documents available for preview -- sorry --

23   review and, ultimately, production.

24   Q.   But you did not specifically do anything on this

25   litigation hold; correct?

**ROPE - CROSS / WEINSTEIN**

1   **A.**   I didn't personally, no.

2   **Q.**   In your declaration -- you submitted a declaration in this

3   case; right?

4   **A.**   Yes.

5   **Q.**   In connection with this spoliation motion?

6   **A.**   I submitted a declaration related to this motion, yes.

7   **Q.**   On November 3rd, 2022?

8   **A.**   I don't know the exact date, but that sounds about right.

9   **Q.**   Sounds generally right?  Okay.

10  **A.**   Yes.

11  **Q.**   And in that declaration, you attested that (as read):

12          "Google . . . employed custodial interviews with

13          individuals likely to have discoverable information

14          to identify data sources Google may need to

15          preserve."

16          Correct?

17  **A.**   If -- yeah.  If I could take a look at the declaration, I

18  could certainly confirm that.  But that sounds --

19  **Q.**   Any reason to believe that's not right?

20  **A.**   No.  That sounds generally right, yeah.

21          **THE COURT:**  Well, do you have one you can hand to him?

22          **MS. WEINSTEIN:**  Yes, sir, I do.  In the interest of

23  time --

24          **THE COURT:**  Well, we don't have to go too fast.

25          **MS. WEINSTEIN:**  Okay.  Sounds good.

1          Thank you very much.  Please give a copy to counsel as

2     well.

3          **THE COURT:**  I don't need it.  I have one.  Thank you.

4     **BY MS. WEINSTEIN:**

5     **Q.**   This is PX-163.

6          You don't need copies over there?

7          Sir, is this the declaration you submitted in this matter?

8     One of them?

9     **A.**   Yes, looks like it.

10    **Q.**   Yeah.  On the last page, it has your signature; right?

11    Andrew Rope?

12    **A.**   Yes.  I think I did that with Docusign, yeah, electronic

13    signature.

14    **Q.**   You meant to sign this; right?  Nobody signed it for you?

15    **A.**   Yes.  I signed it electronically, yes.

16    **Q.**   And you swore that the information in this declaration is

17    true and correct; right?

18    **A.**   Yes.  To the best of my ability, yes.

19    **Q.**   The information in here is true and correct, isn't it?

20    **A.**   Yes.  As far as I know, yes.

21    **Q.**   Okay.  And you -- look at paragraph 15, please, that is on

22    page 3, which you should be on already.  It has your signature

23    on it.  That's language I just read to you, isn't it?

24         (As read):

25              "Google also employed custodial

1            interviews . . . ."

2        Do you see that?

3    **A.**   Yes, that's right.

4    **Q.**   You were not personally involved in any of those custodial

5    interviews, were you?

6    **A.**   No.

7    **Q.**   And you heard Mr. Rosenberg testify that he doesn't -- he

8    couldn't tell us all the issues that are relevant to this

9    litigation; correct?

10   **A.**   I don't recall the testimony exactly, but, yeah, I think I

11   heard him say something similar to that, yeah.

12   **Q.**   And you can't tell us whether any of the other

13   36 custodians from Google in this case could tell us all the

14   issues relevant to this litigation, could you?

15   **A.**   I'm not sure how they would answer.  No, I don't know.

16   **Q.**   You have no basis for doing that?

17   **A.**   No.  I haven't spoken with the individuals.  I'm not sure.

18   **Q.**   You haven't spoken to the 37 custodians in this case?  Was

19   that what you just said?

20   **A.**   I have not spoken with them, no.

21   **Q.**   Are you aware that plaintiffs in this case issued

22   interrogatories concerning Google's document preservation

23   efforts?

24   **A.**   It sounds familiar, yes.

25   **Q.**   Okay.  Let's have PX-140, please.  Thank you.

**ROPE - CROSS / WEINSTEIN**

1    This is Defendants Google LLC's responses and objections

2    to plaintiffs' document preservation interrogatories.  You see

3    that on the second page?

4    **A.**   Yes.

5    **Q.**   Okay.  And were you involved in the preparation of these

6    interrogatory responses?

7    **A.**   Let me review.

8    (Witness examines document.)  No, I don't believe I was

9    part of the preparation for responses.

10   **Q.**   Were you involved in any of the investigation that

11   Google's legal team took to prepare these interrogatory

12   responses?

13   **A.**   I don't believe so.

14   **Q.**   Do you know who was?

15   **A.**   I'd assume, broadly, it would be members of the legal

16   team.  I don't know individually.

17   **Q.**   So you don't know?

18   **A.**   (No audible response.)

19   **Q.**   I'm sorry.  Did you respond to my question?  I didn't hear

20   you.

21   **A.**   I don't know individual names of people that would have

22   been involved in that investigation.

23   **Q.**   Let's look at Interrogatory Number 4.  This is on page 11.

24   It says (as read):

25   "For each Custodian, state the start and end

1          date, if applicable, of each litigation hold

2          applicable to the Custodian during the Custodial

3          Period for that Custodian."

4          Do you see that?

5    A.    Sorry.  Is that page 11?

6    Q.    Yes, sir.  Page 11, Interrogatory Number 4.

7    A.    Okay.  Yes, I'm there now.

8    Q.    Okay.  And if you look at page 12, which is the end of

9    this response, it says (as read):

10          ". . . Google responds that the start and end

11          dates for each legal hold Custodians received in this

12          litigation are set forth in Exhibit 'B.'"

13   MS. CHIU:  Your Honor, I object to this line of

14   questioning.  Mr. Rope just testified that he was not involved

15   in preparing or doing the investigations for these responses,

16   and so there's no foundation for him to confirm the information

17   in this document.

18   MS. WEINSTEIN:  These are Google's sworn interrogatory

19   responses.  And this is, I think, going to be helpful to

20   questions Your Honor was asking about who was on hold and who

21   preserved chats.

22   THE COURT:  Well, it will only be helpful if he actually

23   knows.  So you can try.

24   BY MS. WEINSTEIN:

25   Q.   Do you have any reason to believe that the sworn

1  interrogatory responses that Google submitted are incorrect,

2  Mr. Rope?

3  **A.**   I don't know that I've reviewed these before, but I don't

4  have any reason to doubt that what Google would submit would be

5  accurate.

6  **Q.**   Okay.  It's not Google's ordinary practice to submit

7  inaccurate things to the Court, is it?

8      **MS. CHIU:**  Objection, Your Honor.  Argumentative.

9      **THE COURT:**  Overruled.

10      **THE WITNESS:**  I will say, as part of my work, I've seen

11  interrogatory responses before, and I know that sometimes

12  information is revised when we find additional information.

13      I don't have any reason to believe that our legal team or

14  anybody would submit inaccurate information.

15  **BY MS. WEINSTEIN:**

16  **Q.**   Are you unwilling to tell me that the information in here

17  is accurate to the best of your knowledge?

18      **THE COURT:**  I think he's saying he doesn't know.

19      **MS. WEINSTEIN:**  Okay.  Thank you, Your Honor.

20  **Q.**   So Exhibit B is --

21      **THE COURT:**  He doesn't know, but he doesn't want to hang

22  his colleagues out to dry.

23                      (Laughter.)

24      **MS. WEINSTEIN:**  That's evident.

25  **Q.**   So Exhibit B states the individuals that are on hold and

**ROPE - CROSS / WEINSTEIN**

1  the dates on the hold.  If you want to turn to it, you're more

2  than welcome to do so.  Is that correct to the best of your

3  knowledge?

4  **A.**   Okay.  Exhibit B.  Yes.

5  **Q.**   Okay.  If you go back to page 13, this is Interrogatory

6  Number 5, it states (as read):

7          "For each Custodian, state whether during the

8      time periods for the Custodian identified in response

9      to Interrogatory Number 4, the Custodian preserved

10     any Google Chats by enabling a history function or

11     turning off an auto-delete function."

12     You see that?

13  **A.**   Yes.

14  **Q.**   Okay.  On page 14, midway through -- this is lines 7 and

15  8 -- the response refers to Exhibit C of this interrogatory.

16  **A.**   Yes, I see that.

17  **Q.**   Okay.  If you turn to Exhibit C, you'll see that it lists

18  11 individuals.

19  **A.**   Yes, I see 11 individuals listed there.

20  **Q.**   So there are 11 of the 37 custodians who ever recalled

21  turning their history on on Chat?

22     **MS. CHIU:**  Your Honor, we renew our objection.  Mr. Rope

23  has already testified he's not familiar with the contents of

24  these responses.  And at this point, I think he's simply

25  reading them into the record, which Your Honor is capable of

1    doing, as are any of us.

2        **THE COURT:**  Well, we're here now, but there is a point to

3    that.  But I understand what you're doing.

4        Okay.  So let me just be clear.  So you're saying that

5    Exhibit C is Google's sworn representation that out of the

6    40 custodians -- is that what you're saying?

7        **MS. WEINSTEIN:**  37, Your Honor, but, yes.

8        **THE COURT:**  Not out of the 360 hold recipients, but just

9    out of the 37 or so custodians, only these individuals

10   preserved their chats?

11       **MS. WEINSTEIN:**  Only these 11 preserved Google Chats by

12   turning history on ever.

13       **THE COURT:**  All right.

14       **MS. CHIU:**  Your Honor, I don't think that's a fair

15   interpretation of the response.

16       **THE COURT:**  Well, I'll read the response.  Okay.

17       Okay.  Anything else for this witness?

18       **MS. WEINSTEIN:**  Yes, Your Honor.  Just very briefly, if I

19   could.

20   **Q.**   Sir, you're not on the product team responsible for Chat,

21   are you?

22   **A.**   No.

23   **Q.**   And you don't have any degrees in computer science?

24   **A.**   No.

25   **Q.**   Do you know if anybody from the Chat product team is

**ROPE - CROSS / WEINSTEIN**

1   present in the courtroom today?

2   **A.**   I don't know.

3   **Q.**   Okay.  Google issued its first set of legal hold notices

4   in connection with this litigation in September 2020, didn't

5   it?

6   **A.**   Yes, that's my understanding.

7   **Q.**   That's what it says in your declaration, right,

8   paragraph 11?

9   **A.**   Yes.

10  **Q.**   Was the September 2020 hold notice the first hold notice

11  Google issued in response to allegations concerning the

12  Play Store?

13  **A.**   I -- I don't know.  I mean, there could be many other

14  matters that involved the Play Store.  I'm not sure.

15      It's my understanding that this was the first set of hold

16  notices issued in relation to this particular matter.

17  **Q.**   And you know that Google received a civil investigative

18  demand from the Department of Justice in 2019; correct?

19  **A.**   I'm -- I don't know the date of that, no.

20  **Q.**   So you don't know that that CID covered Google's conduct

21  with respect to the Play Store?

22  **A.**   I don't remember hearing about that matter.  I'm not sure.

23  **Q.**   You don't remember?  Okay.  Let me see if I can refresh

24  your recollection.

25      Please give a copy to counsel.

1          This is a copy of the civil investigative demand issued by

2     the Department of Justice to Google dated October 7th, 2019.

3     Does this document refresh your recollection regarding whether

4     such a CID was issued?

5          **MS. CHIU:**  Your Honor, we object.  This document was not

6     on the exhibit list for this hearing that was submitted before

7     today, and we object to counsel using it.

8          **MS. WEINSTEIN:**  As counsel knows, both sides reserved the

9     right to not include documents in their exhibit list if they

10    were solely going to be used to impeach or refresh

11    recollection.

12         **THE COURT:**  Let's hear what the question is; then I'll

13    decide.

14         **MR. POMERANTZ:**  Your Honor, I was the one who was party to

15    that agreement, and that is not what happened here.

16         And this isn't rebuttal.  It's a guy who says, "I didn't

17    remember."

18         **MS. WEINSTEIN:**  It's refreshing his recollection.

19         **MR. POMERANTZ:**  They know what rebuttal or impeachment is,

20    and this is not -- we clearly had an understanding.  And,

21    actually, I appreciated the good faith they -- I thought they

22    entered into here because they gave us a long list of exhibits

23    that they actually ended up using.  Every single exhibit that

24    was used with the other two witnesses was disclosed to us on

25    the list.

1      It's just not fair to start dumping documents here and

2  calling them rebuttal or impeachment.  That was not the deal we

3  had.

4      **THE COURT:**  Let me -- what is the question?

5      **MS. WEINSTEIN:**  I said it was to refresh his recollection.

6  Both sides expressly reserved that right.  And, of course, this

7  is a good faith --

8      **THE COURT:**  The question is, did you know --

9      **MS. WEINSTEIN:**  The question is whether this refreshes his

10  recollection that the DOJ issued a civil investigative demand

11  to Google in October 2019 concerning the Play Store.

12      **MR. POMERANTZ:**  Your Honor, refreshing recollection never

13  came up in the conversations that I had with them.

14      **THE COURT:**  Well, okay.

15      Does this refresh your recollection about a CID that

16  Google got?

17      **THE WITNESS:**  I mean, I can read the -- read the document.

18  I don't recall seeing this.

19      **THE COURT:**  Is it triggering any memories of being

20  involved in this?

21      **THE WITNESS:**  I don't recall ever seeing this -- this

22  particular document.

23      **THE COURT:**  Okay.  Any other questions?  We do have to

24  wrap it up.

25      **MS. WEINSTEIN:**  Yes, Your Honor.  Just very briefly, a few

1   more questions, not on any documents.

2        You can set this one aside, Your Honor -- or, I'm sorry --

3   Mr. Rope.

4   **Q.**   Mr. Rope, I'm going to ask you a few questions about

5   preservation of chats.  I'm talking about off-the-record chats,

6   not threaded rooms or spaces.  You understand?

7   **A.**   Yes.

8   **Q.**   Okay.  Did a Google administrator turn history on for any

9   employees in response to the CID I just showed you, if you

10  know?

11  **A.**   I don't know.

12  **Q.**   Did a Google administrator turn history on for any

13  employees after Epic served its complaint in this case?

14  **A.**   I don't know.

15  **Q.**   Did a Google administrator turn history on for any

16  employees after the consumer class served its complaint?

17  **A.**   No, I don't know.

18  **Q.**   How about after the states filed their complaint?

19  **A.**   I don't know.

20  **Q.**   To this day, has a Google administrator turned history on

21  for any of the Google employees subject to a litigation hold

22  for this matter?

23  **A.**   Not that I'm aware of.  I don't know.

24       **MS. WEINSTEIN:**  Thank you.

25       No further questions.

1    **THE COURT:**  Okay.  Here's what I would like to do.  I

2    actually think I need to hear a little bit more.

3    I'm going to put this in the minute order, but I would

4    like to have answers to the following questions.

5    Number one, how many --

6    I'm sorry.  You can step down.  Be careful on the way

7    down.

8                        (Witness excused.)

9    **THE COURT:**  Number one, how many of the Google individuals

10   who received a litigation hold elected to preserve their chats?

11   So we've heard testimony there are about 360 people who got the

12   hold notice.  How many of those people actually preserved their

13   chats?

14   If it's possible -- meaning not too much work.  If it's

15   some work, that's okay, but not too much work -- when did those

16   individuals elect to start preserving their chats, by date?

17   I'd also like to know that for those people who did elect

18   to preserve their chats, did they stop at any point?  And if

19   so, when?

20   I'd like to know has there been any case -- any case -- in

21   which Google has been a party in the last five years where the

22   company has systematically preserved chats or prevented

23   deletions of chats or suspended -- turned history on -- however

24   you want to put it -- I want to know if there's been any case

25   in the United States in the last five years where Google has

**PROCEEDINGS**

preserved the chats systematically and not just left it up to individual users to make their own call.  So that's what -- I need more on that.

If you can present that in a written form, that's fine. If you want to bring somebody in for further testimony, that's fine.

I do want to have a more expanded opportunity for closing. Let me just give you some initial thoughts.  All right?  These are all tentative thoughts.  It's a little more than what I typically say of "speaking among friends," but it's by no means a finding and I could very well change my thinking on it, depending on how we go.

But I'll tell you where I am right now.  And that is, I think there's little doubt on the evidence that we've heard so far that Chat, Google's Chat function could, in fact, have contained evidence relevant, as "relevance" is defined in the Federal Rules of Evidence, to this case.

I think the evidence also shows that Google did not systematically preserve those chats but, instead, left the preservation of chats to the discretion of each individual who received a hold notice.

It also is clear to me from the evidence that Google never monitored the chats to see if relevant evidence was possibly being lost.

I'm concerned about all this for a variety of reasons, but

1   one of them is, at our very first case management conference in

2   October of 2020, Docket Number 45, Google represented to me

3   that it had taken all appropriate steps to preserve all

4   evidence relevant to the issues reasonably evident in this

5   action.  I'm finding that representation to the Court to be

6   hard to square with what appears to have been failure to

7   preserve the chats.  So I'd like to hear more about whether

8   that representation was, in fact, accurate or not.

9        I also want to hear about when the chat issue first came

10  up.  Now, this is the first I'm hearing about it.  I don't know

11  when it came up between the parties.  But I have to say, a good

12  argument can be made that if Google didn't intend to preserve

13  the chats, they should have told me about that in October of

14  2020.  We could have had a much better discussion about why and

15  what you're going to do and burden and everything else.  I

16  don't recall that happening.  Now, maybe it did, and you can

17  help me figure that out, but I don't recall that happening.

18       At the very least, you should have shared that with your

19  colleagues across the aisle and had a discussion with them

20  because they're a stakeholder in the collection of that

21  evidence.  I don't believe that happened either.  So I want to

22  hear more about that.

23       Now, I also want to hear, assuming I stick with those

24  tentative impressions, what the remedy is going to be.  Now,

25  I'll just tell you, think of it as a U-curve, U-shaped curve.

**PROCEEDINGS**

1    The 10 percent side that says, "You win by default, plaintiffs"

2    is just not going to happen.  All right?  That's not going to

3    happen.  So don't even propose that to me.  The next 10 percent

4    of just inviting the jury to conclude that Google's guilty

5    because they didn't produce chats is not going to happen.  I'm

6    not going to do that.

7         On the other hand, I'm not going to let -- assuming I

8    stick with these tentative conclusions, I'm not going to let

9    Google get away with this is.  There is going to be a

10   substantial trial-related penalty.  Now, what that is, I don't

11   know.  I'm thinking purely off the top of my head.  Here are

12   some options that I have considered.

13        Well, you know what?  I'm not going to do that.

14        I want you to tell me, in the first instance, what you

15   think an appropriate remedy is.  Now, you have to put some

16   specificity on it.  Just saying, "Oh, you know, the general

17   principles of FRCP 37(e)(2)," that's not going to help me.  You

18   need to tell me exactly what you would like to have done in

19   this case.

20        As I said, this is a sizable, important, complicated

21   antitrust case.  I'm not going to give an invitation to the

22   jury to decide it all on the basis of missing chats.  It's just

23   not fair.  I think that could be a due process violation.

24        The reason I say that is, this is going to be a challenge

25   for the jury.  I have a hundred percent confidence in juries.

 1    I embrace them, as all of my trial court judge colleagues do.

 2    But it's going to be too tempting, in my view, for a jury to

 3    say:  Well, let's not puzzle out all the expert evidence, all

 4    the documentary evidence and everything else.  Judge said if we

 5    think they didn't produce something, we can conclude that

 6    they're guilty.

 7         I'm not going to do that.  That's just too tempting.

 8         On the other hand, maybe it's fair -- well, all right.

 9    I'll tell you what I'm thinking -- maybe it's fair that

10    plaintiffs get to examine witnesses at trial in front of the

11    jury about the failure to preserve chats.  Okay?  I'm not going

12    to give an adverse inference, but maybe the jury should hear

13    about that.  Maybe that's the penalty that would fit the case.

14         Another option is Google is precluded from arguing there's

15    no evidence for X, for example, on summary judgment or maybe in

16    closing or opening statement to the jury, since Google, if I

17    ultimately conclude this -- and I haven't yet -- but if I

18    ultimately conclude this, that Google, in fact, suppressed

19    potentially relevant evidence, it's not fair to allow them to

20    say, "Well, the plaintiffs never showed you evidence of X."

21    That's partly attributable to the fact they didn't produce the

22    evidence.

23         So these are the things that I'm thinking about.  I'm

24    looking forward to your guidance.

25         When would you like to meet again?  I would be happy to do

 1   it again next week.  Now that the ball is rolling, I don't want

 2   to derail it too much.  But what do you all think about that?

 3        And I am going to extend your dates.  I know I promised to

 4   talk about trial dates.  Everyone's going to get more time.

 5   I'm probably going to do an October trial.  Okay?  I'm just

 6   jam-packed between whatever this first date was and October.

 7   So maybe, like, I think September 25th is the date I had in

 8   mind.

 9        **MR. POMERANTZ:**  I'm sorry, Your Honor?

10        **THE COURT:**  September 25.

11        **MR. POMERANTZ:**  October 25?

12        **THE COURT:**  September 25.  Sorry.

13        **MR. POMERANTZ:**  I would like to address that, but I did

14   want to address the timing of when we all come back on this

15   issue.

16        **THE COURT:**  Sure.  Go ahead.

17        **MR. POMERANTZ:**  You gave us a bunch of questions, and

18   I think I need to talk to my client --

19        **THE COURT:**  Well, I'm going to put them on the --

20        **MR. POMERANTZ:**  I do want to --

21        **THE COURT:**  I might edit them a little bit; so don't talk

22   to them yet.  But I'll put it in the minute order.  Okay?

23        **MR. POMERANTZ:**  Okay.  And whatever those questions are, I

24   want to give you the answers.  I want to give you complete

25   answers.

**PROCEEDINGS**

1    **THE COURT:**  Good.  I'd like to hear them.

2    **MR. POMERANTZ:**  What I would like to be able to do is get

3    the questions, talk to my client, talk to plaintiffs so that we

4    can make -- find a time -- you know, dates that work for all of

5    us, and give some proposed -- see what works on Your Honor's

6    calendar.

7    **MR. SUMMERS:**  Your Honor, if I may.

8    **THE COURT:**  Sure.

9    **MR. SUMMERS:**  I'm concerned this is the delay game.  We'd

10   like to proceed next week.

11       In terms of the answers, we already have most of the

12   answers, in fact, I think all of them, in sum or substance.

13       They've already stated in their sworn interrogatory

14   responses that they have no way technologically of determining

15   when or if Chats is turned on or off for particular custodians.

16       They have told us that only 11 of the 37 actual key

17   custodians ever, ever once, by their recollection, turned

18   history on during the relevant time period.  As to 26 of 37,

19   it's undisputed they never did.  And I have the video clips of

20   others who will -- many, including some of the ones they say

21   recall doing it.

22       Anyway, according to their rogs, they have to go by the

23   recollection of these individuals.  Maybe that's why they need

24   to do a survey or some kind of e-survey for the 267 people.

25   But there is really no evidence on some of these issues.

 1          As to when we raised this issue, it was April of 2021, and

 2     we got misdirection --

 3          **THE COURT:**  Let me just -- I really have to -- I have two

 4     minutes, literally.  But just remind me how that came up on

 5     your end.  How did you first --

 6          **MR. SUMMERS:**  We noticed a dearth of chats.  We had heard,

 7     we saw references to chats.  We couldn't find any chats.

 8          We asked them:  Where are the chats?

 9          We got evasion.  We got:  Well, people -- these are

10     automatically deleted; and until the litigation was filed,

11     you're not going to see a lot of pre-litigation stuff.

12          That's the first response we got.

13          Then we said:  Well, we're not seeing any post-litigation

14     stuff.

15          **THE COURT:**  Okay.  I think you're winding up for a

16     closing.

17          **MR. SUMMERS:**  Yeah.  But then they said -- but one more,

18     Judge.

19          **THE COURT:**  Hold on.

20          **MR. SUMMERS:**  Then they said --

21          **THE COURT:**  Hold on.

22          **MR. SUMMERS:**  -- Technologically, we can't do it.

23          **THE COURT:**  Wait, wait, wait, wait.  Please, you're going

24     to have to let me take the lead here.

25          But prior to your raising the issue, Google never came to

 1  plaintiffs first and said, "I want to talk with you" -- words

 2  to the effect of "We have this Chat thing.  It's kind of a

 3  mess.  I want to talk to you about it"?

 4      They didn't say --

 5      **MR. SUMMERS:**  No.  We got misdirection at every turn for

 6  months, if not over a year.

 7      **MR. POMERANTZ:**  Your Honor, again, we will -- you deserve

 8  the story here.  We will give it to you.

 9      I actually think that there's a lot of harsh terminology

10  there that doesn't befit what actually ended up happening here.

11      All I'm saying is that Your Honor --

12      **THE COURT:**  Mr. Pomerantz, just to jump in, I have to

13  say -- and I think you would appreciate this.  I'm not going to

14  ask you to take a position on that, but the best practice would

15  have been to tell me at the first case management conference:

16  We have this electronic body of documents and chats and e-mails

17  and other stuff, and the chats are a problem.  And here's why

18  they're a problem:  We've got a billion of them and it costs

19  $10 each, whatever.

20      But it should not have come up at this late date in this

21  context.

22      **MR. POMERANTZ:**  Your Honor, I --

23      **THE COURT:**  That's important to me because your case

24  management statement -- which I don't believe you signed

25  because I don't believe you were in the case at the time but

 1   somebody on your side did, on Google's behalf -- told me this

 2   situation was well in hand with respect to preservation.

 3        **MR. POMERANTZ:**  I understand, Your Honor.

 4        **THE COURT:**  And I am going to be upset if that turns out

 5   to have been a misrepresentation to me.

 6        **MR. POMERANTZ:**  I understand.

 7        **THE COURT:**  It's one thing for the plaintiffs.  It is

 8   another to misrepresent it to the United States District Court.

 9        But I'm not taking argument on that now.  I am just going

10   to hear about it later.  I need a date.  Let's just quickly

11   pick a date.

12        You said you want to meet and confer, Mr. Pomerantz?

13        **MR. POMERANTZ:**  I want two things.  Your Honor is thinking

14   about some pretty strong remedies here.

15        **THE COURT:**  Maybe not.  You have a chance to tell me --

16        **MR. POMERANTZ:**  I appreciate that because there's a lot we

17   have to say that wasn't said in the courtroom here today.

18        **THE COURT:**  Well, we're going to have a closing --

19        **MR. POMERANTZ:**  I hear you.

20        **THE COURT:**  -- and you can tell me all that.

21        And I do want --

22        **MR. POMERANTZ:**  I just want to have enough time to answer

23   your questions fully, and I don't think we should be rushed

24   because Mr. Summers is excited to give you his closing

25   argument.

**PROCEEDINGS**

 1          **THE COURT:**  All right.

 2          **MR. POMERANTZ:**  I would like to be able to get back to you

 3     by -- what's today?  Today's Thursday -- by Monday.  Monday is

 4     a holiday.  By Tuesday.

 5          **THE COURT:**  Tuesday is fine.

 6          **MR. POMERANTZ:**  And we will tell you when we will be

 7     ready, and then you can pick whatever date works for

 8     Your Honor.

 9          **THE COURT:**  That's fine.  But I want it by the end of the

10     month.  Okay?

11          **MR. POMERANTZ:**  Yeah, for sure.

12          **THE COURT:**  Not March.

13          **MR. POMERANTZ:**  No, I don't want -- listen, this has been

14     a lot of work for all of us.  I'd like to get this resolved too

15     because it's a very important case that has to go forward.  And

16     as Your Honor is going to see, there's plenty of --

17          **THE COURT:**  Mr. Pomerantz, this is exactly my point.  It's

18     been a lot of work for me and my chambers too.

19          **MR. POMERANTZ:**  And I apologize for that.

20          **THE COURT:**  I am mystified about why this sideshow is even

21     happening when someone just should have taken a minute in

22     October of 2020 and said, "Your Honor, we need some guidance on

23     chats."  That didn't happen, and it's on you.  Not you

24     personally, not your firm, but whoever was representing Google.

25     And I do fault them for that.

1      **MR. POMERANTZ:**  I understand.

2      **THE COURT:**  Regardless of how this turns out, I do fault

3  them for that --

4      **MR. POMERANTZ:**  We want --

5      **THE COURT:**  -- particularly after telling me everything

6  was well in hand.

7      **MR. POMERANTZ:**  I know it's important.

8      **THE COURT:**  That's where I'm coming from.  And we'll have

9  a full chance to discuss it.

10      That's all I can do for you right now.  I have to go join

11  my colleague.

12      **MR. POMERANTZ:**  Trial date.

13      **THE COURT:**  Thank you all for coming in.  It was actually

14  quite productive.

15      **MR. POMERANTZ:**  Can I say one thing about trial date?

16      **THE COURT:**  Oh, yes.  Trial date, yeah.

17      **MR. POMERANTZ:**  I'm sorry.

18      **THE COURT:**  Go ahead, yeah.

19      **MR. POMERANTZ:**  So Google has a case brought by

20  the Department of Justice and, actually, some of the states

21  here that starts trial on September 12th.  There are --

22      **THE COURT:**  Oh.

23      **MR. POMERANTZ:**  -- overlapping witnesses.

24      **THE COURT:**  Where?

25      **MR. POMERANTZ:**  In Washington, D.C.  It's in front of

**PROCEEDINGS**

1    Judge Mehta in Washington, D.C.

2         There are overlapping witnesses.  There's overlapping

3    in-house counsel.  We would ask that if you're going to move it

4    to September, that you move it to at least mid-October or end

5    of October because that trial -- they haven't actually given a

6    specific estimate, but they're estimating four to six weeks.

7         **THE COURT:**  I tell you what.  You discuss that.

8         I just have one question.  Is anything that happened there

9    going to be preclusive in any way here?

10        **MR. POMERANTZ:**  I think they're different issues.

11        **THE COURT:**  Totally different?

12        **MR. POMERANTZ:**  I think so, yes, Your Honor.

13        **MR. GLACKIN:**  I don't know the answer to that question.

14    Brendan Glackin for the states.

15        I want to point out also, Your Honor, that that trial is a

16    bench trial, not a jury trial.  And so there will be

17    considerably more flexibility in the presentation of evidence

18    and witnesses, I would expect.

19        **THE COURT:**  It also makes it more likely it's going to

20    stick as a trial date.  I'll just tell you that.

21        **MR. POMERANTZ:**  It's been there since the very beginning,

22    Your Honor.  And I did talk to the outside counsel for Google

23    in that case.  It's not me.  None of the lawyers here are

24    involved.  But I do -- we do request --

25        **THE COURT:**  Well, add that to --

**PROCEEDINGS**

1     **MR. POMERANTZ:**  -- the second week of October.

2     **THE COURT:**  Add that to your discussion.  Okay?

3     **MR. POMERANTZ:**  We'll talk to them about it.

4     **THE COURT:**  With respect to trial date.

5     **MR. POMERANTZ:**  Thank you, Your Honor.

6     **THE COURT:**  I can do that.

7     Okay.  Thanks so much, and hope to see you soon.

8     **THE CLERK:**  All rise.  Court is in recess.

9          (Proceedings adjourned at 3:45 p.m.)

10

11                **CERTIFICATE OF REPORTER**

12        I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:  Saturday, January 14, 2023

16

17

18                    _Ana Dub_

19    _____

20    Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                Official United States Reporter

21

22

23

24

25