1   Brian C. Rocca, S.B. #221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, S.B. #215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, S.B. #248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, S.B. #259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, S.B. #301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105
    Telephone: (415) 442-1000
8
    Richard S. Taffet, *pro hac vice*
9   richard.taffet@morganlewis.com
    **MORGAN, LEWIS & BOCKIUS LLP**
10  101 Park Avenue
    New York, NY 10178
11  Telephone: (212) 309-6000
12

13  *Counsel for Defendants Google LLC, et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**

This Document Relates To:

*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD

*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD

*State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD

*Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge:      Hon. James Donato

# TABLE OF CONTENTS

Page

I.   ISSUES TO BE DECIDED ..................................................................................1

II.  INTRODUCTION .............................................................................................1

III. BACKGROUND ...............................................................................................3

IV.  ARGUMENT ....................................................................................................6

    A.   Legal Standard ......................................................................................6

    B.   Google Is Entitled to Summary Judgment on Plaintiffs' Claims that Google Unlawfully Prohibits the Distribution of Other App Stores on Google Play ............6

    C.   Google Is Entitled to Summary Judgment on Plaintiffs' Claims Challenging Three Agreements with Developers as a *Per Se* Violation of the Sherman Act ............9

    D.   Google Is Entitled to Summary Judgment on Plaintiffs' Claims Related to Early-Android Carrier Agreements ............14

    E.   Consumer Plaintiffs and States Do Not Have Antitrust Standing to Recover Damages on IAPs and Subscriptions ............17

    F.   Google Is Entitled to Summary Judgment on Plaintiffs' Tying Claims ............20

        1.   GPB is the mechanism by which Google collects its service fee for Google Play and not a distinct product ............21

        2.   Even if viewed as separate products, Google Play and GPB are not tied ............23

V.   CONCLUSION ................................................................................................24

-i-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*20th Century Ins. Co. v. Liberty Mut. Ins. Co.,*
965 F.2d 747 (9th Cir. 1992) ................................................................................................6

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,*
190 F.3d 1051 (9th Cir. 1999) .................................................................................2, 17, 19

*Am. Needle, Inc. v. Nat'l Football League,*
560 U.S. 183 (2010) ..............................................................................................................8

*In re Animation Workers Antitrust Litig.,*
87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...............................................................................14

*Apple Inc. v. Pepper,*
139 S. Ct. 1514 (2019) ...................................................................................................19, 20

*In re ATM Fee Antitrust Litig.,*
554 F. Supp. 2d 1003 (N.D. Cal. 2008) ............................................................................10

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
9 F.4th 1102 (9th Cir. 2021) ..............................................................................................11

*Brantley v. NBC Universal, Inc.,*
675 F.3d 1192 (9th Cir. 2012) ............................................................................................20

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.,*
485 U.S. 717 (1988) ............................................................................................................12

*California ex rel. Harris v. Safeway, Inc.,*
651 F.3d 1118 (9th Cir. 2011) .........................................................................................9, 10

*Cascade Health Sols. v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) ..................................................................................20, 21, 23

*Chamber of Com. of the U.S.A. v. City of Seattle,*
890 F.3d 769 (9th Cir. 2018) .........................................................................................10, 11

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
433 U.S. 36 (1977) ..............................................................................................................10

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984) ..............................................................................................................8

*Dimidowich v. Bell & Howell,*
803 F.2d 1473 (9th Cir. 1986) ...............................................................................11, 12, 13

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ............................................................................19

-ii-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989)................................................................................15

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ...............................................3, 8, 21, 22

*Feitelson v. Google Inc.*,
    80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................19

*Frame-Wilson v. Amazon.com, Inc.*,
    591 F. Supp. 3d 975 (W.D. Wash. 2022) ...........................................................11

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ...........................................................................................13

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)....................................................................7, 10, 17

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
    343 F.3d 1000 (9th Cir. 2003), *amended on denial of reh'g*, 352 F.3d 367 (9th
    Cir. 2003) ............................................................................................................18

*In re Glumetza Antitrust Litig.*,
    611 F. Supp. 3d 848 (N.D. Cal. 2020) ...............................................................16

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    681 F.3d 1055 (9th Cir. 2012)............................................................................16

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990) ...........................................................................................17

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) .........................................15, 16, 17, 18

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) .....................................................................................12, 13

*Metro Indus. Inc. v. Sammi Corp.*,
    82 F.3d 839 (9th Cir. 1996)................................................................................13

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    269 F. Supp. 2d 1213 (C.D. Cal. 2003)..............................................................18

*Meyer v. Qualcomm Inc.*,
    2009 WL 539902 (S.D. Cal. Mar. 3, 2009)........................................................18

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015)............................................................................11

*National Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*,
    782 F. Supp. 2d 1047 (C.D. Cal. 2011)................................................................6

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021) .........................................................................7

-iii-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ...........................................................................................7

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ..........................................................................................2, 11, 12

*Oliver v. SD-3D LLC*,
   751 F.3d 1081 (9th Cir. 2014) .........................................................................................14

*Pace Indus. Inc. v. Three Phoenix Co.*,
   813 F.2d 234 (9th Cir. 1987) .....................................................................................13, 14

*Paladin Assocs., Inc. v. Montana Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ......................................................................................3, 23

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 996 (6th Cir. 1999) ..........................................................................................15

*Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*,
   2022 WL 595696 (9th Cir. Feb. 28, 2022) ....................................................................16

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
   532 F.3d 963 (9th Cir. 2008) ......................................................................3, 21, 22, 23

*Riley v. Bd. of Trustees of California State Univ.*,
   2015 WL 2198247 (N.D. Cal. May 11, 2015) ..................................................................6

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
   637 F.2d 1376 (9th Cir. 1981) ........................................................................................11

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ........................................................................................15

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) .............................................................................................10

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ...........................................................................................................10

*Toscano v. Prof'l Golfers Ass'n*,
   258 F.3d 978 (9th Cir. 2001) ............................................................................................8

*U.S. Airways v. Sabre Holdings Corp*,
   938 F.3d 43 (2d Cir. 2019) ..............................................................................................15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .....................................................................................................2, 7

*Virginia Vermiculite Ltd. v. Historic Green Springs*,
   307 F.3d 277 (4th Cir. 2002) ............................................................................................8

*Wood v. Santa Barbara Chamber of Commerce, Inc.*,
   705 F.2d 1515 (9th Cir. 1983) ........................................................................................16

-iv-

**STATE STATUTES**

Cal. Bus. & Prof. Code § 16750.1 ..................................................................................................14

Cal. Bus. & Prof. Code § 17208 ....................................................................................................14

**STATUTES - OTHER**

N.C. Gen. Stat. § 75-16.2 ..............................................................................................................14

N.Y. Gen. Bus. Law § 340 ............................................................................................................14

N.Y. Gen. Bus. Law § 349 ............................................................................................................14

Utah Code Ann. § 76-10-3117 ......................................................................................................14

-v-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

## I.   ISSUES TO BE DECIDED

*First*, whether Google has a duty to distribute its rivals' products or deal with its rivals on terms they prefer.

*Second*, whether the Games Velocity Program agreements between Google and its developer customers should be evaluated under the rule of reason or subject to *per se* invalidation.

*Third*, whether the statute of limitations bars Plaintiffs' claims related to Google's revenue-sharing agreements with cellular carriers.

*Fourth*, whether Consumer Plaintiffs and Plaintiff States lack antitrust standing to recover damages on subscriptions and in-app purchases.

*Fifth*, whether Google has unlawfully tied the distribution of apps through the Google Play store to the use of Google Play's billing service.

## II.   INTRODUCTION

Android is one of the most popular operating systems in the world.  Millions of consumers use Android devices every day, and thousands of developers offer millions of apps on Android. Android's success in the marketplace is no accident.  Google has invested billions of dollars in Android, creating competition with the iPhone while giving away Android for free.  As part of its efforts to build Android, Google built the Google Play store, a trusted place for consumers to obtain apps and in-app content and for developers to make apps and in-app content available to consumers.

Plaintiffs' lawsuits challenge fundamental features of Android and the Google Play store— design choices, investments, and platform rules that Google has implemented to make its products competitive.  Google looks forward to vindicating itself at trial and defending the innovation that made Android successful.  But several of Plaintiffs' claims contravene clear principles of law, and thus have no place before a trier of fact.  Google therefore brings this targeted motion for partial summary judgment, which will narrow this sprawling antitrust case for trial.

*First*, Plaintiffs claim that Google has violated the antitrust laws by refusing to distribute rival app stores within its own Google Play app store.  But the law is clear:  Google has no duty to

1   act as a distributor for its rivals' products or to deal with its rivals on terms they may prefer.

2   *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

3      *Second*, Epic Games and Match Group (but not Consumers or States) claim that Google

4   entered into *per se* unlawful agreements with three developer customers of the Play store.  But the

5   rule of reason, not the *per se* rule, applies to those agreements as a matter of law.  To be clear,

6   Google is *not* challenging, at summary judgment, Epic and Match's separate rule of reason claim

7   that these same agreements harmed competition.  Google will show at trial that these agreements

8   are pro-competitive efforts to satisfy its developer customers and compete with Apple.  But the

9   mode of antitrust analysis—*per se* versus the rule of reason—is a pure issue of law that can and

10  should be decided before trial to avoid uncertainty regarding Plaintiffs' burden, the jury

11  instructions, and Google's available defenses.  Here, the very nature of the challenged agreements

12  and the vertical relationship between Google and these developer customers foreclose application

13  of the *per se* rule, even if, as Plaintiffs contend, these agreements have a "horizontal" effect.  *See*

14  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (explaining that vertical restraints are

15  assessed under the rule of reason).

16     *Third*, the statute of limitations bars Plaintiffs' claims related to Google's agreements with

17  cellular carriers.  In the early years of Android, when cellular carriers controlled what app stores

18  could be preinstalled on phones, Google paid carriers to distribute Google's app store.  Plaintiffs'

19  claims that Google's nascent app store—which had virtually no market share at the time—

20  somehow exercised monopoly power over companies like AT&T and Verizon and forced them to

21  abandon their own app stores make no sense.  But the Court need not reach that question because

22  the challenged carrier agreements all expired outside the limitations period.

23     *Fourth*, Consumer Plaintiffs and Plaintiff States (on behalf of the consumers in their states)

24  lack antitrust standing to recover damages on subscriptions and in-app purchases.  "Antitrust

25  injury requires the plaintiff to have suffered its injury in the market where competition is being

26  restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir.

27  1999).  Here, Consumers and States have asserted that Google restrained competition in two

28  distinct markets: (1) an "Android app distribution market" and (2) a market for "in-app billing

-2-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

services" sold to *developers*.  But Consumer and State Plaintiffs' alleged injuries on in-app purchases and subscriptions did not occur in either of these alleged markets.  This is because, as defined by Plaintiffs, neither market involves the retail sale to *consumers* of any in-app purchases and subscriptions.  Plaintiffs elected not to define *any* antitrust market involving the sale of in-app purchases and subscriptions to consumers.  Consumers and States therefore cannot demonstrate that consumers suffered injury on those purchases in a "market where competition is being restrained."

*Fifth*, Plaintiffs contend that Google unlawfully tied the distribution of apps through the Google Play store to the use of Google Play's billing service ("GPB").  It is true that the very small subset of Google Play developers that must pay Google a service fee on certain in-app transactions must process those transactions and remit the service fee to Google using GPB.  But, as a matter of law, a product (here, app distribution on Google Play) and the means of collecting payment for that product (here, GPB) are not distinct products that can be unlawfully tied.  *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971, 974-75 (9th Cir. 2008) (rejecting similar tying claim on the pleadings); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 968-70 (N.D. Cal. 2021) (applying *Rick-Mik* to Apple's requirement that developers use Apple's billing service to process in-app transactions).

Plaintiffs' tying claims also fail for a second, independent reason.  Coercion is an essential element of a tying claim.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).  But developers are not required to use the allegedly tied product (GPB) as a condition of using the alleged tying product (app distribution on the Google Play store).  To the contrary, the vast majority of developers that use Google Play do not use GPB.  The only Google Play developers that use GPB are the small minority of developers who owe Google service fees.

## III.    **BACKGROUND**[1]

Instead of using Android solely to build its own devices, like Apple does with iOS,

---

[1] This section provides background and context to this motion, and is supported by facts not reasonably in dispute, but Defendants do not rely on the facts here for their motion.  The undisputed facts that form the basis for this motion are detailed in the Argument section.

1   Google's innovative vision for Android was that it would enable mobile device manufacturers

2   (known as "OEMs") to develop a wide array of devices at different price points.  *See, e.g.*, Match

3   FAC[2] ¶¶ 60, 64, 66; Ex. 1, Merits Report of Hal J. Singer, Ph.D. ("Singer Merits Rep.") ¶¶ 17, 47,

4   Oct. 19, 2022.  Accordingly, Google has always licensed Android to OEMs for free.

5        Google also offers OEMs a free license to a suite of Google software, including products

6   such as Search, Google Maps, Gmail, and YouTube, as well as a series of Application

7   Programming Interfaces (APIs) that provide services to app developers.  *See, e.g.*, Dkt. No. 279-

8   25, No. 20-cv-5761 (GOOG-PLAY-000808375) (2018 Motorola MADA).  OEMs that choose this

9   free license get the ability to build devices that give consumers everything they expect from a

10  smartphone right out of the box—just like they would get with an iPhone.  *Id.*

11       The first Android devices were launched in 2008, just after Apple unveiled the iPhone.

12  *See* Ex. 2, Expert Report of Dr. Marc Rysman ("Rysman Merits Rep.") ¶ 37.  Since then, Google's

13  vision for Android has been an enormous consumer success story.  Billions of consumers around

14  the world use a wide array of Android devices produced by numerous different OEMs—from

15  high-end Samsung Galaxy devices to more basic models available to users in the developing

16  world.  *See* MDL Dkt. No. 325-1 Ex. A2 (Singer Class. Cert. Rep.) ¶ 55.  Indeed, millions of

17  consumers worldwide who cannot afford an iPhone can access an Android smartphone.  *Cf.* Ex. 1,

18  Singer Merits Rep. ¶ 47.  This has dramatically expanded the potential set of users for mobile

19  apps, driving investment and innovation that has generated products and apps tailored to almost

20  every consumer need and taste.

21       In Google's view, Android could not have succeeded without a high-quality app store.

22  After all, apps greatly enhance the utility of a smartphone—facilitating access to a wide array of

23  functionality beyond making and receiving calls and texts.  Ex. 3, Rosenberg Dep. 171:10-20, Feb.

24  10, 2022.  And because a user's smartphone experience is so reliant on apps, every smartphone—

25  whether an iPhone or an Android phone—needs a quality app store to compete.  The Google Play

26

27  ────────────────

28  [2] First Amended Complaint, No. 3:22-cv-02746, Dkt. No. 95 (N.D. Cal. Nov. 17, 2022), MDL
    Dkt. No. 380 ("Match FAC").

1   store is Google's app store.  It brings together app developers and app users.  It provides a set of

2   services that enable developers to distribute apps and sell digital content to users—such as a

3   storefront where users can discover content, security features to keep transactions secure, and

4   billing services that enable developers to sell products in hundreds of countries and dozens of

5   currencies.  Epic SAC[3] ¶ 66; Ex. 2, Rysman Merits Rep. ¶ 48; Ex. 4, GOOG-PLAY-008166885;

6   Ex. 5, GOOG-PLAY-000057598; Ex. 6, GOOG-PLAY-000057609.

7          Google does not charge users anything to use the Play store, and most developers—more

8   than 90%—do not pay Google service fees to use the Play store, either.[4]  *See* Ex. 7, Samat Dep.

9   Ex. PX713, at 3 (Sameer Samat, *Listening to Developer Feedback to Improve Google Play*,

10   Android Blog (Sept. 28. 2020)) (in preceding twelve months, only 3% of developers had paid fees

11   to Play).  More than 90% of apps in the Play store are free and developers pay Google nothing

12   when users download them; they can acquire millions of new users without paying Google

13   anything.  *Id.*  Developers do not pay Google any money in service fees unless they make money

14   from (1) paid app downloads from the Play store or (2) selling subscriptions or digital goods in

15   apps downloaded from the Play store, the latter of which are known as in-app purchases ("IAPs").

16   *See* Ex. 8, GOOG-PLAY-000621470.  GPB is the mechanism that Google uses to collect payment

17   from the (relatively few) developers that incur service fees.[5]

18          Unlike iPhone users, who are required to use Apple's App Store, Android users can choose

19   between app stores.  Rule 52 Order After Trial on the Merits at 29, *Epic Games, Inc. v. Apple Inc.*,

20   No. 4:20-cv-05640-YGR (N.D. Cal. Sept. 10, 2021), Dkt. No. 812.  Indeed, most Android devices

21   come preloaded with multiple app stores.  For example, Samsung Galaxy devices come preloaded

22   with both the Samsung Galaxy Store and the Google Play store.  *See* Ex. 1, Singer Merits Rep.

23   n.463.  Android users can also choose to download app stores that are not preinstalled on their

---

[3] Second Amended Complaint for Injunctive Relief, No. 3:20-CV-05671, Dkt. No. 341 (N.D. Cal. Nov. 17, 2022), MDL Dkt. No. 378 ("Epic SAC").

[4] All developers pay a one-time $25 registration fee for the use of Google Play.  Ex. 1, Singer Merits Rep. ¶ 89.  Plaintiffs do not challenge this de minimis fee.

[5] Ex. 9, GOOG-PLAY-005031379*; see also* Ex. 1, Singer Merits Rep. ¶ 35; Match FAC ¶ 3.

-5-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1    devices, or to download apps directly from other sources, such as a website.  *See* Match FAC ¶ 78;

2    States' FAC[6] ¶ 78; Epic SAC ¶ 22; Consumers' SAC[7] ¶ 10.

3    **IV.    ARGUMENT**

4         **A.    Legal Standard**

5         A court must grant a motion for summary judgment if "the pleadings and discovery, read

6    in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to

7    any material fact," and the "moving party is entitled to judgment as a matter of law."  *20th*

8    *Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 750 (9th Cir. 1992).  And as this Court has

9    explained, under the 2010 Amendments to Rule 56, a Court may grant "*partial* summary judgment

10   to dispose of less than the entire case and even just portions of a claim or defense."  *Riley v. Bd. of*

11   *Trustees of California State Univ.*, 2015 WL 2198247, at *2 (N.D. Cal. May 11, 2015) (Donato,

12   J.) (emphasis added).  Thus, this "Court can, when warranted, selectively fillet a claim or defense

13   without dismissing it entirely."  *Id.*  Indeed, the Rule makes clear that a "Court '*shall*' issue

14   summary judgment when warranted by the facts and the law."  *Id.* (emphasis added); *National*

15   *Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1052 (C.D.

16   Cal. 2011) (explaining that partial summary judgment is appropriate when "it will narrow the

17   issues for trial").

18        **B.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims that Google
            Unlawfully Prohibits the Distribution of Other App Stores on Google Play**

19

20        Google spent over a decade building the Google Play store into a trusted source for apps.

21   That effort began in 2008, when Google first launched Android Marketplace, the predecessor to

22   the Google Play store.  *E.g.*, Ex. 1, Singer Merits Rep. n.45; Consumers' SAC ¶ 77.[8]  Plaintiffs

23   now seek to freeride on Google's investments in the Google Play store and to compel Google to

24   extend the benefits of the Google Play store to its competitors.  Specifically, they allege that

25   _____

26   [6] First Amended Complaint, No. 3:21-cv-05227, Dkt. No. 188 (N.D. Cal. Nov. 1, 2021) ("States'
     FAC").

27   [7] Consolidated Second Amended Class Action Complaint, No. 3:20-cv-05761, Dkt. No. 241 (N.D.
     Cal. Dec. 20, 2021), MDL Dkt. No. 172 ("Consumers' SAC").

28   [8] All expert reports cited in this motion were submitted on behalf of one or more Plaintiffs.

Google's policy of refusing to distribute other app stores through the Google Play store is anticompetitive and violates Section 1 and 2 of the Sherman Act. Match FAC ¶¶ 236, 245; Epic SAC[9] ¶¶ 188-195; States' FAC ¶¶ 107, 260, 276-284; Consumers' SAC ¶¶ 145-147, 225, 239-247, 262-263. These claims fail as a matter of black letter antitrust law because Google has no duty to distribute its competitors' products.

Under Section 2 of the Sherman Act, "[a]s the Supreme Court has repeatedly emphasized, there is no duty to deal under the terms and conditions preferred by a competitor's rivals." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (internal quotation marks and alterations omitted). To the contrary, "the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408 (internal alterations and quotation marks omitted). "Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) (Gorsuch, J.). And "[t]his general no-duty-to-deal rule holds even where a monopolist refuses to deal with its competitor merely 'in order to limit entry' — in other words, because it wants to prevent that rival from competing with it." *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 24 (D.D.C. 2021) (quoting *Trinko*, 540 U.S. at 407).

Here, Google has elected not to use its own app store, resources, and investments to distribute its rivals' app stores. There is nothing surprising about that decision, which is fully protected (and supported) under the antitrust laws. The Supreme Court's decision in *Trinko* is directly on point. There, the Court held that Verizon had no obligation under the antitrust laws to "share its network with competitors." *Trinko*, 540 U.S. at 401.

Plaintiffs may attempt to evade *Trinko* by resorting to Section 1 of the Sherman Act, but any such effort would be unavailing. Plaintiffs might point to the fact that Google's policy forbidding other app stores on the Google Play store is also embodied in the Developer

---

[9] Unlike other Plaintiffs, Epic does not appear to claim that Google's policy violates Section 2 of the Sherman Act.

-7-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

Distribution Agreement ("DDA"), the terms and conditions that developers must follow to use the Google Play store.  They may argue that even if Google could unilaterally impose its no-app-store policy under Section 2 of the Sherman Act, Section 1 proscribes entering into an "agreement" to the same effect.  That argument would be incorrect, because Plaintiffs are ultimately challenging Google's unilateral policy and design decision.

The Sherman Act recognizes the important distinction between unilateral and concerted action.  Section 1 of the Sherman Act does not apply to "the entire body of private contract."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010).  Rather, it "applies only to *concerted* action that restrains trade."  *Id.* at 190 (emphasis added).  Concerted action exists only when the challenged conduct "joins together 'independent centers of decisionmaking.'"  *Id.* at 196 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)).  By contrast, unilateral conduct—such as a refusal to deal, whether embodied in a company's terms and conditions or not—cannot form a claim under Section 1 of the Sherman Act.  In *Toscano v. Professional Golfers Association*, for example, the Ninth Circuit held that Section 1 did not encompass an agreement by local sponsors to adhere to the PGA Tour's rules and regulations.  The Ninth Circuit explained that where one party "merely agreed to purchase products or provide a service under conditions set by the other party" there is no "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 983-85 (9th Cir. 2001); *see also Virginia Vermiculite Ltd. v. Historic Green Springs*, 307 F.3d 277, 280-83 (4th Cir. 2002) (holding that acceptance of a gift deed containing restrictive covenants did not satisfy Section 1 because it was not concerted activity).

The DDA is unilateral conduct and cannot give rise to a Section 1 claim.  Like the contract at issue in *Epic Games, Inc. v. Apple Inc.*, the DDA "is a unilateral contract" under the antitrust laws, and "a developer must accept its provisions (including the challenged restrictions) to distribute [apps] on [Google Play]."  *Epic Games*, 559 F. Supp. 3d at 1035.  And as in *Toscano*, Google "independently set the terms of the [DDA], and the [developers] merely accepted them."  258 F.3d at 984.  Plaintiffs themselves acknowledge that the DDA is the result of unilateral conduct, alleging that Google "*forces* app developers to enter its standardized DDA[.]"  *E.g.*, Epic

SAC ¶ 226 (emphasis added); *see also* Match FAC ¶ 102; Consumers' SAC ¶ 146; States' FAC ¶ 278.  That is unilateral, not concerted action.

In sum, Google's refusal to distribute its rivals' product cannot give rise to antitrust liability, regardless of whether Plaintiffs challenge this refusal under Section 1 or Section 2.

### C.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims Challenging Three Agreements with Developers as a *Per Se* Violation of the Sherman Act

Google entered into "Games Velocity Program"[10] (GVP) agreements with top game developers that provided incentives for those developers to invest in making their apps and digital content available on the Google Play store.  *See, e.g.,* Ex. 10, GOOG-PLAY-007273439; Ex. 11, GOOG-PLAY-000929031.  In exchange, the developers agreed to distribute their apps through the Google Play store, maintain feature parity between their apps on the Google Play store and the same apps on other stores, and release their apps on the Google Play store at the same time as they released the same apps through other app stores.  Epic SAC ¶ 198; Match FAC ¶ 273.

Google's view is that these agreements are highly pro-competitive: the agreements offered valuable incentives to top game developers to keep them on the Google Play store and thereby enhanced the attractiveness of the store to consumers.  Plaintiffs disagree; their view is that the purpose and effect of these incentive agreements was to prevent three particular developers from opening competing app stores.  Ex. 12, Epic Games, Inc. Responses and Objections to Defendants' Amended Fifth Set of Interrogatories dated Jan. 19, 2023 ("Epic's R&Os to Google's Fifth Amended Rogs") Nos. 26-28; Ex. 13, Plaintiff Match Group, LLC's' et al.'s Responses and Objections to Defendants' Contention Interrogatories dated Jan. 19, 2023 ("Match's R&Os to Google's Contention Rogs") Nos. 24-31; *see also* MDL Dkt. No. 479 (stipulating that Match and Epic's *per se* claims apply only to three particular developers).  The Court need not resolve this disagreement, nor need it decide whether the agreements were procompetitive or anticompetitive.  Rather, to the extent this disagreement is submitted to a jury, it should be resolved under the rule

---

[10] These agreements are also sometimes described as "Project Hug" agreements.

of reason, the presumptive default standard for antitrust claims. *See California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011).

Epic and Match (but not other Plaintiffs) have asserted both *per se* and rule of reason claims. For the purposes of summary judgment, Google challenges only the *per se* claims and leaves the rule of reason claim for another day.[11]

Even if Epic and Match's characterizations of these GVP agreements were entirely correct (which they are not), the agreements must be analyzed under the rule of reason as a matter of black letter law. The Court previously deferred addressing this question when it granted Epic and Match's motion (over Google's objection) to amend their Complaints to add their new Section 1 claims. *See* MDL Dkt. No. 374. But this question is now ripe for summary judgment, and the Court should not stay its hand. Indeed, "the decision of what mode of analysis to apply—per se, rule of reason, or otherwise—is entirely a question of law for the Court" that can be resolved on summary judgment. *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1007, 1010 (N.D. Cal. 2008) (granting partial summary judgment and holding that "application of the per se rule would be inappropriate"); *see Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) ("Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment.").

Resolving the applicable mode of antitrust scrutiny will give the parties clarity regarding the issues to be tried. *Per se* and rule of reason claims have different elements and different available defenses that will require different jury instructions. The parties should know before trial which burdens of proof apply and whether the trier of fact will be instructed on two different theories regarding the same conduct, so that they can tailor their opening statements and presentation of evidence accordingly.

As noted, the rule of reason "is the presumptive or default standard," *Safeway*, 651 F.3d at 1133, while "[p]er se liability is reserved for only those agreements that are so plainly

---

[11] Match and Epic's *per se* claims extend to only three developers. MDL Dkt. No. 479.

anticompetitive that no elaborate study of the industry is needed to establish their illegality," *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quotations marks omitted).  The Ninth Circuit has noted that *per se* treatment is particularly unsuited to dynamic markets, "*especially* in technology markets." *Qualcomm, Inc.*, 969 F.3d at 990-91; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977) (holding that the rule of reason applied in case involving vertical nonprice restraints); *cf. Chamber of Com. of the U.S.A. v. City of Seattle*, 890 F.3d 769, 787 (9th Cir. 2018) (digital platforms "present novel challenges and contexts for regulation").  The GVP agreements are not subject to *per se* invalidation.

First, the GVP agreements are vertical in nature: they are "between firms at different levels of distribution." *Am. Express Co.*, 138 S. Ct. at 2284.  *Per se* treatment is reserved for horizontal agreements, *i.e.*, those between competitors.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191-92 (9th Cir. 2015).  By contrast, "nearly every [] vertical restraint" is "assessed under the rule of reason." *Am. Express Co.*, 138 S. Ct. at 2284; *accord Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021).[12]  Plaintiffs do not and cannot dispute that, with respect to the Google Play Store, developers are Google's customers. *E.g.*, Ex. 14, Bernheim Dep. 66:24-67:10, Apr. 6, 2023; Ex. 15, Rysman Dep. 141:6-10, Mar. 10, 2023; Ex. 16, Singer Merits Dep. 196:21-197:4, Apr. 4, 2023.  Indeed, Plaintiffs themselves allege that the agreements relate to the three developers as *customers* distributing apps on the Google Play store.  Epic SAC ¶ 198; Match FAC ¶ 273.

Plaintiffs contend that the GVP agreements have horizontal elements, too.  *E.g.*, Epic SAC ¶ 198.  But that contention is immaterial[13] because hybrid agreements—agreements with both

---

[12] Indeed, not even all horizontal agreements are treated as *per se* unlawful.  *See, e.g., Aya Healthcare Servs., Inc.*, 9 F.4th at 1108 (analyzing horizontal agreements under rule of reason and finding them lawful).

[13] Although the Court need not resolve this issue, Google disputes that the agreements have horizontal elements:  The written agreements themselves do not prohibit developers from operating competing app stores, and the mere fact that developers that buy Google's services will be less inclined to build their own app store does not distinguish these agreements from the myriad other agreements entered by businesses making ordinary procurement decisions regarding whether they will make an input or buy it.

-11-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

horizontal and vertical elements—are also evaluated under the rule of reason.  *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1385 (9th Cir. 1981) ("[T]he presence of a horizontal element does not require the use of a per se rule.").

*Second*, Epic's and Match's own interrogatory responses confirm that the GVP agreements should be analyzed under the rule of reason.  When asked to identify *all* the terms of the alleged agreements not to launch competing Android app stores, Epic and Match merely pointed to the written GVP contracts.[14]  Epic and Match do not, because they cannot, point to any provision of those contracts that prohibits any developer from launching an app store.  Rather, Epic and Match resort to arguing that the contracts' incentives had the "effect" of causing the developers not to launch competing stores.  *See* Ex. 12, Epic's R&Os to Google's Fifth Amended Rogs Nos. 26-28; Ex. 13, Match's R&Os to Google's Contention Rogs Nos. 24-26; Epic SAC ¶ 198 (alleging that the agreements "had the *actual and intended effect* of inducing the developer not to launch an app store") (emphasis added).  That does not make the agreements horizontal:  "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988).  By invoking the contracts' "effects," Epic and Match demonstrate that the rule of reason should apply.  After all, the "goal" of the rule of reason is to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest," and it thus "requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s *actual effect*' on competition." *Am. Express Co.*, 138 S. Ct. at 2284 (citation omitted and emphasis added).  Match and Epic's assertion that it is not the agreements themselves that are illegal, but the agreements' effects, confirms that the alleged effects–and the procompetitive benefits–must be weighed under the rule of reason.

---

[14] *See* Ex. 12, Epic's R&Os to Google's Fifth Amended Rogs Nos. 26-28; Ex. 13, Match's R&Os to Google's Contention Rogs Nos. 24-26.

*Third*, *per se* treatment cannot apply to the GVP agreements because they involve multi-faceted incentives from Google to its customers.  A court can apply *per se* condemnation only where there is ample judicial precedent regarding similar agreements such that courts "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007); *see also Dimidowich*, 803 F.2d at 1481 (holding that rule of reason applied because "[w]e do not have enough experience with this type of arrangement to say with any confidence that [the restraint] . . . almost always will be anticompetitive"); *Metro Indus. Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996) ("Where the conduct at issue is not a garden-variety horizontal division of a market, [courts] have eschewed a *per se* rule and instead have utilized rule of reason analysis.").  *Cf. FTC v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (abandoning rule of reason "is appropriate only where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" (citation omitted)).  There is simply no tradition of courts condemning agreements in which a firm offers incentives to customers willing to make investments in the firm's product.

To the contrary, the Supreme Court has held that the "complexities" of multi-faceted value exchanges require rule of reason treatment.  *Id.*  In *Actavis*, for example, the FTC challenged as anticompetitive multi-faceted agreements between a brand pharmaceutical company and generic drug companies.  *Id.* at 145-46.  The FTC alleged that those agreements eliminated competition between the brand and generic companies.  *Id.*  The Supreme Court rejected the FTC's argument that such agreements should be treated as presumptively unlawful and instead instructed courts to apply the rule of reason.  *Id.* at 158-159.  The Court explained that the "likelihood" of such payments "bringing about anticompetitive effects" depended on, among other things, their "independence from other services for which [they] might represent payment."  *Id.* at 159.  Here, too, Plaintiffs allege that the GVP agreements that provided on their face for certain incentives to developers to prioritize Play were, in fact, payoffs not to compete.  Here, too, the "complexities" of disentangling the business arrangements on the face of the agreements from the alleged hidden payments not to compete require application of the rule of reason.  *Id.*

**D.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims Related to Early-Android Carrier Agreements**

Plaintiffs' claims challenging Google's long-expired revenue-sharing deals with cellular carriers such as T-Mobile and AT&T are barred by the four-year statute of limitations and the doctrine of laches.  *See* 15 U.S.C. § 15a (setting out four-year statute of limitations); *accord Pace Indus. Inc. v. Three Phoenix Co.*, 813 F.2d 234, 236 (9th Cir. 1987) (four-year statute of limitations for federal antitrust claims); *Oliver v. SD-3D LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("[I]n applying laches, we look to the same legal rules that animate the four-year statute of limitations under [the Clayton Act].").  Plaintiffs' parallel state law claims are similarly time-barred.[15]  Plaintiffs thus cannot hold Google liable on any claim based on these early-Android carrier agreements.

When Google launched Google Play (then known as "Android Market"), cellular carriers controlled which app stores could be preloaded on devices on their networks.  *See, e.g.*, Consumers' SAC ¶ 132; Ex. 3, Rosenberg Dep. 168:16-169:5.  Google entered into contracts in which carriers agreed to preinstall Google Play on devices on their network, and Google agreed to provide the carriers with a share of revenue earned via credit card purchases on the Play Store ("carrier RSAs").[16]  *See, e.g.*, Ex. 17, GOOG-PLAY4-006402390 (AT&T Carrier RSA).  Plaintiffs allege that Google's revenue sharing was an exercise of monopoly power over the major cellular carriers that gave them no choice but to abandon their own app stores or forgo installing other third-party app stores.  *See* Consumers' SAC ¶¶ 131-135; States' FAC ¶¶ 131-135; *id.* ¶¶ 237-243; Epic SAC ¶¶ 117-118; Match FAC ¶¶ 107-110, 236.

---

[15] California's Cartwright Act has a statute of limitations "functionally identical" to the Sherman Act's, and California's UCL "similarly provides for a four-year statute of limitations."  *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) (citing Cal. Bus. & Prof. Code §§ 16750.1, 17208).  Plaintiffs' other state law claims are also time-barred.  *See, e.g.*, N.C. Gen. Stat. § 75-16.2 (four years); Utah Code Ann. § 76-10-3117 (four years); N.Y. Gen. Bus. Law § 340 (four years); N.Y. Gen. Bus. Law § 349 (three years).

[16] These early carrier RSAs are distinct from other agreements Google has entered into with carriers concerning revenue sharing from Google's search business.  Those latter agreements are not at issue in this litigation.

Even setting aside that these claims make no sense, they are time-barred.  As Plaintiffs concede, Google entered into carrier RSAs beginning in 2009, more than a decade before Plaintiffs filed suit.  *See, e.g.*, States' FAC ¶ 128; Epic SAC ¶ 118; Consumers' SAC ¶ 132; *cf.* Match FAC ¶ 108.[17]  Plaintiffs have not disputed that all of these agreements expired by July of 2016, more than four years before Plaintiffs first filed suit in August 2020, and five years before State Plaintiffs filed suit in July 2021.[18]  *See, e.g.*, Ex. 16, Singer Merits Dep. 286:9-14 (noting Google reduced carrier revenue-shares in "about 2012."); Dkt. 213, Epic's Mot. for a Preliminary Injunction, at 8 (indicating that Google had "slashed" most carrier revenue shares by 2012); Ex. 2, Rysman Merits Rep. ¶ 98 (citing a 2015 presentation for the proposition that Google "eliminated carrier revenue share from the sale of apps and in-app content on Google Play").  Accordingly, the statute of limitations on these claims has run.

No exception to the default limitations period applies.  *First*, Plaintiffs cannot invoke the "continuing violation" doctrine.  That exception to the four-year limitations period requires an "overt act" within the limitations period that is "new and independent."  *See Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (internal quotation marks omitted).  Plaintiffs have not identified any "overt acts" within the limitations period that can restart the clock.  It is irrelevant as a matter of law whether the carrier revenue-sharing contracts had some effect that lingered into the limitations period.  That is because courts "look to a defendant's overt acts, rather than the effect of those acts."  *See, e.g.*, *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 996, 1021 (6th Cir. 1999).  Thus, profiting from a contract entered into before the limitations period is not a "new and independent act" sufficient to create a continuing violation.  *See Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (even passive receipt of profits from an

---

[17] *See Epic Games v. Google*, No. 20-cv-05671, Dkt. No. 1 (Aug. 13, 2020); *Carr v. Google*, No. 20-cv-5761, Dkt. No. 1 (Aug. 16, 2020); *Utah v. Google*, No. 21-cv-05227, Dkt. No. 1 (July 7, 2021); *Match v. Google*, No. 22-cv-02746, Dkt. No. 1 (May 9, 2022).

[18] Google continued to pay some revenue share to carriers after this date, but those agreements are limited to instances where a transaction occurs via "direct carrier billing" ("DCB"), wherein users are billed directly by their carrier for Play purchases—an option that is popular largely in international markets.  *E.g.*, Ex. 2, Rysman Merits Rep. ¶ 98.  Plaintiffs have no claim or allegation relating to DCB revenue-sharing agreements.

illegal contract does not restart the statute of limitations for federal antitrust claims); *accord U.S. Airways v. Sabre Holdings Corp*, 938 F.3d 43, 68 (2d Cir. 2019) ("US Airways has failed to identify, and we are not otherwise aware of, authority to support the proposition that each act taken in performance of a contract necessarily constitutes an overt act for purposes of the continuing-violation rule."). *Cf. e.g., Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 822 (N.D. Cal. 2022) (no affirmative act where Plaintiffs had not pleaded that Facebook entered into a relevant agreement in the limitations period).

*Second*, Plaintiffs cannot establish that Google "fraudulently concealed" the carrier RSAs. To prove fraudulent concealment, Plaintiffs must prove that Google "*affirmatively misled*" them and that plaintiffs lacked actual or constructive knowledge of the relevant facts. *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (emphasis added); *see also Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*, 2022 WL 595696, at *2 (9th Cir. Feb. 28, 2022) (mem.) ("To show fraudulent concealment, plaintiffs must plead facts showing that the defendant affirmatively misled it."). Absent a duty to disclose a deal, a business does not fraudulently conceal a deal by keeping details private. *Reveal Chat HoldCo LLC*, 2022 WL 595696, at *2 ("Developers claim that Meta's statements about the scope and reasons for its 2015 actions mislead them, but the antitrust laws do not obligate Meta to share its motivations for its business decisions with the Developers."); *see also id.* (citing cases); *see also In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 863 (N.D. Cal. 2020) ("Failure to disclose information does not constitute affirmative concealment absent a duty to disclose," or a prior misleading statement).

Plaintiffs cannot show any misleading statement or conduct by Google, nor can they show that they lacked knowledge of the RSA deals or of their expiration. *Hexcel Corp.*, 681 F.3d at 1060 (quoting *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983). Details regarding the carrier RSAs have been public since at least August 2014. *E.g.*, Ex. 18, Amir Efrati, *Verizon Preps Challenge to Google's App Store,* The Information (Aug. 20, 2014), https://www.theinformation.com/articles/verizon-preps-challenge-to-google-s-app-store.

Plaintiffs have alleged that Google initially represented that revenue sharing with the carriers would make the Play store revenue neutral, before it later eliminated the revenue share and

-16-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

began earning a profit.  *See, e.g.*, Match FAC ¶¶ 3, 82.  To the extent that Plaintiffs' claim is that Google misled the carriers, that could not constitute fraudulent concealment as to *Plaintiffs*, who are not carriers.[19]

### E.   Consumer Plaintiffs and States Do Not Have Antitrust Standing to Recover Damages on IAPs and Subscriptions

Consumer Plaintiffs and Plaintiff States lack standing to recover antitrust damages for purchases of subscriptions and in-app purchases.  Plaintiffs elected not to define any antitrust market involving the sale of in-app purchases and subscriptions *to consumers*, let alone alleged that Google restrained competition in such a market.  Consumers and States thus cannot demonstrate that *they* suffered any injury in a "market where competition is restrained," and lack standing to recover damages on in-app purchases and subscriptions.

"To state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must allege causal antitrust injury." *Klein*, 580 F. Supp. 3d at 826.  The States, too, must prove antitrust injury to consumers whose injuries they seek to recover via *parens patriae* claims. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 218–19 (1990) (*parens patriae* claims require proof of antitrust injury to consumers).  Under Ninth Circuit law, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190

---

[19] Accordingly, the Court need not decide whether Google in fact misled carriers—it can grant partial summary judgment without reaching that question.  At any rate, any theory that Google's statements about its revenue sharing with carriers were themselves anticompetitive would fail as a matter of law because Plaintiffs cannot prove that Google made any "intentionally false promise." *Qualcomm Inc.*, 969 F.3d at 996 (citation omitted).  Plaintiffs cannot point to any statement by Google in which it promised to anyone—carriers, developers or consumers—that it would continue its revenue sharing arrangement with carriers indefinitely, or would never earn a profit on Android Market (which later became Play). *See* Ex. 15, Rysman Dep. 308:3-16; Ex. 20, Schwartz Dep. 285:23-286:7; Ex. 16, Singer Merits Dep. 342:18-22.  Nor could such an inference be reasonable where Google's revenue share agreements with carriers had fixed terms, providing that the revenue sharing would end absent a renewal of the agreement. *See, e.g.*, Ex. 17, GOOG-PLAY4-006402390 (AT&T Carrier RSA, specifying fixed term and no renewals).  In those circumstances, general statements about Google's early expectations for its nascent app store cannot be actionable misrepresentations or establish fraudulent concealment.

F.3d 1051, 1057 (9th Cir. 1999).  Accordingly, a plaintiff must be "in the restrained market," either as "a consumer of the alleged violator's goods or services or a competitor of the alleged violator."  *Klein*, 580 F. Supp. 3d at 827 (citation omitted); *see also Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003) ("Consumers *in the market where trade is allegedly restrained* are presumptively the proper plaintiffs to allege antitrust injury." (emphasis added) (citation omitted), *amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003)).  Likewise, California's Cartwright Act, under which Consumer Plaintiffs bring parallel claims, requires a plaintiff to demonstrate that their injuries occurred in the same market as the allegedly anticompetitive conduct.  *Meyer v. Qualcomm Inc.*, 2009 WL 539902, at *9 (S.D. Cal. Mar. 3, 2009); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003) (requiring "that the party be a participant in the restrained market" in order to have antitrust standing).  Put simply, Plaintiffs must show that they suffered injury in a market where competition was restrained.

Consumers' and States' experts have defined two markets: (1) an "Android app distribution market" and (2) a market for "in-app billing services."  Neither involves the retail sale of IAPs or subscriptions to consumers.  Ex. 16, Singer Merits Dep. 51:10-22; Ex. 15, Rysman Dep. 137:18-21.  As to the first, Plaintiffs' experts have conceded that their alleged Android app distribution market does not involve IAPs or subscriptions at all.  Ex. 1, Singer Merits Rep. ¶ 33 (noting that "In-App Content on the user's phone" is "not present in the Android App Distribution Market").

As to the second market—the alleged market for "in-app billing services"—Plaintiffs do claim that this market involves IAPs, but their experts are clear that the participants in this market are Google and *developers*, rather than *consumers*.  According to Plaintiffs' experts, in this market, Google sells in-app billing services to developers, which the developers then use to sell IAPs and subscriptions to consumers.  In other words, the product in the in-app billing market— payment processing through GPB—is not for sales of IAPs or subscriptions, but for an *input* into developers' sales of IAPs and subscriptions.  The States' expert Dr. Rysman states this clearly: "Google provides billing services directly to developers, who use billing services as an input to

1   sell the in-app content product to users." Ex. 2, Rysman Merits Rep. ¶ 137.  In his words, the In-

2   App Billing Market "focus[es] on developers choosing between competing in-app billing service

3   providers"; the "developers are the customers of these services." *Id.* ¶ 138; *see also id.* ¶ 269

4   ("Consumers do not buy in-app billing APIs or receive transaction tokens.").  Consumers' expert,

5   Dr. Singer, agrees:  "The In-App Aftermarket involves transactions between developers and sellers

6   of services, including payment processing, record keeping, and unlocking of content, *needed to*

7   *consummate a purchase* of In-App Content." Ex. 1, Singer Merits Rep. ¶ 33.  Dr. Singer thus

8   testified that developers, not Google, sell subscriptions and IAPs.  *See* Ex. 19, Singer Class Cert.

9   Dep. 46:2-22, May 12, 2022 (Q. And developers are the sellers of the apps and the subscriptions

10  and the in-app purchases. THE WITNESS: I think it's fair to say the developers are the sellers of

11  those -- those three items, yes.").

12          Consumer Plaintiffs and State Plaintiffs thus have not defined any market for the sale of

13  IAPs and subscriptions to consumers.  There is therefore no market in which they have antitrust

14  standing to recover for damages on IAPs and subscriptions.  *Am. Ad Mgmt*, 190 F.3d at 1057; *see*

15  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136

16  (N.D. Cal. 2008) ("[T]he law requires that plaintiffs be participants in the relevant market

17  alleged."); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027-28 (N.D. Cal. 2015) ("Plaintiffs

18  have failed to allege that they have suffered 'antitrust injury' in the same market as and

19  sufficiently close to the alleged anticompetitive conduct to allow them to pursue private antitrust

20  remedies against Defendant.").  Plaintiffs could have attempted to define a market in which

21  consumers purchase IAPs and subscriptions from Google, but chose not to do so—that is fatal

22  from the perspective of antitrust standing.[20]

23          *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), is not to the contrary.  In that case, the

24  plaintiffs *did* expressly allege a market for the sale of apps to consumers.  Specifically, the

---

[20] It is true that Dr. Singer offers an alternative damages model in which he assumes that both app
distribution and in-app payment services are part of the same market.  However, Dr. Singer
testified that "you couldn't have a tie" in the combined market that forms the basis of his
alternative damages model. Ex. 16, Singer Merits Dep. 53:13-54:2.  Accordingly, to the extent
that Consumer Plaintiffs and States rely on that model, their tying claim must be dismissed.

plaintiffs alleged "that Apple has monopolized the *retail market for the sale of apps* and has unlawfully used its monopolistic power to charge consumers higher-than-competitive prices." *Id.* at 1518 (emphasis added).  Apple therefore did not argue in the Supreme Court, as Google does here, that the plaintiffs' injury did not occur in the market that allegedly had been restrained. Apple instead argued that federal law "allows consumers to sue only the party who sets the retail price, whether or not that party sells the good or service directly to the complaining party." *Id.* at 1521.  That is not Google's argument here.  The Supreme Court in *Pepper* held that the plaintiffs there had standing because they alleged "that a monopolistic *retailer* ([]Apple) has used its monopoly to overcharge consumers." *Id.* at 1519 (emphasis added).  Plaintiffs here do not allege any market in which Google is a retailer to consumers of IAPs or subscriptions.  Because Consumer and State Plaintiffs have failed to allege that consumers suffered an injury in the market in which Google's allegedly anticompetitive conduct occurred, they lack standing to bring these claims.

### F.       Google Is Entitled to Summary Judgment on Plaintiffs' Tying Claims

Plaintiffs each assert a tying claim under Section 1 of the Sherman Act, alleging that Google engages in unlawful tying by requiring developers who distribute apps via Google Play (the tying product) to use GPB (the allegedly tied product).  *See* States' FAC ¶ 211; Consumers' SAC ¶ 271; Epic SAC ¶ 234, Match FAC ¶ 153.  This claim fails as a matter of law for two reasons.  First, Plaintiffs cannot get past the first, essential element of any tying claim: that Google "tied together the sale of *two distinct products* or services." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (elements of a *per se* tying claim) (emphasis added); *see Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-1200 (9th Cir. 2012) (elements of a rule of reason tying claim).  Google Play and GPB are not "two distinct products or services," *id.* at 1197 & n.7, as a matter of law.  Second, Plaintiffs cannot show, based on the undisputed facts and under Ninth Circuit precedent, that Google Play and GPB are tied.  Indeed, most developers that use Google Play do not and are not required to use GPB.

1          **1.    GPB is the mechanism by which Google collects its service fee for
2                 Google Play and not a distinct product**

3          To establish that a defendant has unlawfully tied two products, a plaintiff must first prove

4    that there are, in fact, "two distinct products" at issue.  *PeaceHealth*, 515 F.3d at 913.  But a

5    product and the means of collecting payment for that product are not distinct products.  *See Rick-*

6    *Mik Enters.*, 532 F.3d at 971, 974-75; *Epic Games, Inc.*, 559 F. Supp. 3d at 968-70.

7          The Ninth Circuit's decision in *Rick-Mik*, which was decided on the pleadings, is

8    controlling on this common-sense point.  *Rick-Mik*, 532 F.3d at 974-75.  The plaintiffs were gas

9    station operators that purchased franchises from Equilon.  *Id.* at 966.  Equilon's franchise

10   agreements required the plaintiffs (1) to use Equilon to process credit card payments at the gas

11   stations and (2) to pay transaction fees to Equilon on the sales of gas at their stations.  *See id.* at

12   966, 968, 972.  Equilon used the "credit card proceeds" to recover the "money the franchisee

13   owe[d] Equilon for the gasoline Equilon deliver[ed] to the franchisee" and to collect a transaction

14   fee; Equilon then remitted the balance to the gas station franchisees.  *Id.* at 974.  The *Rick-Mik*

15   plaintiffs alleged that Equilon had unlawfully tied two distinct products: "the franchises and the

16   credit-card processing services."  *Id*. at 966.  According to the plaintiffs, absent the alleged tie,

17   they could obtain "lower transaction fees from others for credit-card processing."  *Id.*  The district

18   court dismissed that claim on the pleadings, and the Ninth Circuit affirmed.

19         The Ninth Circuit held that Equilon's credit card processing services were not a "separate

20   and distinct product" from the gas franchise itself but were "an essential part of [the] franchise."

21   *See id.* at 974.  The requirement that franchisees use Equilon for credit card processing allowed

22   Equilon to directly collect money the franchisees owed it, assess a transaction fee, and refund

23   unauthorized transactions.  "Th[is] arrangement gives Equilon some ability to ensure the quality

24   and reliability of credit card processing and helps guard against franchise default and unauthorized

25   transactions."  *Id.*  In these circumstances, the "franchise and the method of processing credit

26   transactions are not separate products, but part of a single product (the franchise)."  *Id.*

27         *Rick-Mik* demonstrates why Google Play and GPB are not separate products, but part of a

28   single product.  Just like Equilon provided a product (Equilon franchises) to its franchisee

-21-

1    customers, Google provides a product (Google Play) to its developer customers.  Like Equilon,

2    Google charges for the value of this product by assessing a service fee on certain transactions.

3    Epic SAC ¶ 160; States' FAC ¶ 195; Consumers' SAC ¶ 14; Match FAC ¶ 1.  And just like

4    Equilon required franchisees to use its own credit-card processing services, Google requires its

5    developer customers to use Google's own billing service, GPB.  *Id.*  This enables Google to

6    efficiently collect its fee for the services it offers via the Google Play store, including app

7    distribution.  *See* Ex. 20, Schwartz Dep. 44:13-19, 49:17-23, Mar. 28, 2023 (acknowledging that

8    the service fee is for a bundle of services provided by the Google Play store, including app

9    distribution); *see also* Ex. 15, Rysman Dep. 223:14-18 (acknowledging that the service fee funds

10   distribution as well as billing).  Using GPB to collect its fee also gives Google "some ability to

11   ensure the quality and reliability of" transactions in the Play store.  *Rick-Mik*, 532 F.3d at 974.

12        Another court in this district applied *Rick-Mik* to reject a tying claim in materially identical

13   circumstances.  In *Epic Games, Inc. v. Apple Inc.*, Epic Games made the same argument it makes

14   here: it alleged that Apple had unlawfully tied app distribution to its in-app payments system

15   ("IAP").  *Epic Games*, 559 F. Supp. 3d at 1044.  Just like in this case, Epic claimed that Apple

16   engaged in an unlawful tie when it required developers that sell digital goods in apps downloaded

17   from the Apple App Store to use IAP.  *See id.* at 1046.  Applying *Rick-Mik*, Judge Gonzalez

18   Rogers rejected Epic's tying claim because Apple's IAP is not a separate, tied product, but, rather,

19   is integrated with Apple's App Store.  As Judge Gonzalez Rogers explained, IAP is "a

20   comprehensive system to collect commission and manage in-app payments" that is "not bought or

21   sold." *Id.* at 1046.  Judge Gonzales Rogers accordingly concluded:  *"*Here, as [in *Rick-Mik*], IAP

22   is but one component of the full suite of services offered by iOS and the App Store."  *Id.*  That

23   conclusion regarding Apple's App Store and billing system applies equally to Google's Play store

24   and GPB.  GPB is one of many services offered by the Google Play store, and Google uses GPB to

25   manage in-app payments and collect its fee for the services the Google Play store provides.  *See*

26   Ex. 20, Schwartz Dep. 44:13-19, 49:17-23.

27        Plaintiffs may argue that GPB is not technologically necessary for Google Play to function

28   or that various payment processors might offer payment processing services for a lower fee.  Such

-22-

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

facts are immaterial.  The plaintiffs in *Rick-Mik* similarly alleged that if Equilon did not require payment to be made through its billing system, the franchisees "would be able to purchase credit and debit card processing services through many other credit and debit card processing service providers on more favorable terms and conditions." *Rick-Mik*, 532 F.3d at 968.  That allegation, taken as true on a motion to dismiss, did not change the Court's conclusion.  Thus, it is immaterial whether Google *could* allow developers to use different platforms for collecting its fee, or that Plaintiffs believe they would obtain more favorable terms and conditions on a different platform.

GPB is Google's preferred method of collecting its fee for the services it provides with Google Play.  Under applicable precedent, the mechanism for collecting a fee for a product is not, as a matter of law, a "distinct product" that is capable of being tied.  Accordingly, Google is entitled to summary judgment on Plaintiffs' claim that it tied GPB to Google Play.

### 2.    Even if viewed as separate products, Google Play and GPB are not tied

Even if the Court were to determine that GPB may be treated as a separate product from Google Play, Plaintiffs must establish that Google Play and GPB are "tied together." *Peace Health*, 515 F.3d at 913.  To do so, Plaintiffs must show that Google has "coerced or forced its customer to buy the tied product in order to obtain the tying product." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).  Plaintiffs cannot do so.  Developers can use Google Play without using GPB.  In fact, the vast majority do.

Google does not condition access to Google Play on the use of GPB and most developers that use Google Play do not use GPB.  *See* Ex. 7, Samat Dep. Ex. PX713, at 3 (Sameer Samat, *Listening to Developer Feedback to Improve Google Play*, Android Blog (Sept. 28. 2020)) (in preceding twelve months, only 3% of developers had paid fees to Play).  Many developers are able to use Google Play even though they do not monetize their apps at all—that is, they make their apps available for free and do not monetize in-app activity.  *See, e.g.*, States' FAC ¶ 189; *cf.* Consumers' SAC ¶ 60.  That includes, for example, apps made available for banking services, real estate services, public safety services, and basic utility apps (*e.g.*, calculators).  Those developers provide valuable services and indisputably benefit from the Play store's platform, but they do not use GPB and owe Google no service fees.  *See* States' FAC ¶ 185 (listing examples of "very

valuable commercial apps" that "benefit from being on the Google Play Store" but do not monetize by selling digital goods).

Even developers that choose to monetize their apps are not required to use GPB.  Plaintiffs themselves "admit that Google does not require that developers choose a particular monetization strategy," and developers can pursue many monetization strategies beyond the sale of in-app purchases.  Match Answer ¶ 18, MDL Dkt. 335.  As Plaintiffs concede, some developers that choose to monetize do so with advertising in the apps they distribute via the Play Store.  *Id.*  This includes, for example, ads in a banner at the top of the screen, full screen ads for a few seconds, or ads that offer consumer rewards for interactions with the ad.  These developers use Google Play but do not pay Google any service fees and thus do not use GPB.

It is true that a concededly "small subset" of developers who *choose* to monetize through *in-app* purchases of digital goods on Google Play—and thus must pay Google service fees on such transactions—are generally required to use GPB.  *See* States' FAC ¶ 189.  Plaintiffs' tying claim reflects the theory that they have the right to decide how they will pay for what they owe.  The antitrust laws confer no such entitlement.  Plaintiffs' tying claim fails as a matter of law and should be dismissed.

**V.**   **CONCLUSION**

The Court should grant Google's motion for partial summary judgment.

1    DATED: April 20, 2023                    Respectfully submitted,

2

3                                             By:          /s/ *Glenn D. Pomerantz*
                                              Glenn D. Pomerantz
4
                                              Glenn D. Pomerantz, S.B. #112503
5                                             glenn.pomerantz@mto.com
                                              Kuruvilla Olasa, S.B. #281509
6                                             kuruvilla.olasa@mto.com
                                              Nicholas R. Sidney, S.B. #308080
7                                             nick.sidney@mto.com
                                              **MUNGER, TOLLES & OLSON LLP**
8                                             350 South Grand Avenue, Fiftieth Floor
                                              Los Angeles, California 90071
9                                             Telephone: (213) 683-9100

10                                            Kyle W. Mach, S.B. #282090
                                              kyle.mach@mto.com
11                                            Justin P. Raphael, S.B. #292380
                                              justin.raphael@mto.com
12                                            Emily C. Curran-Huberty, S.B. #293065
                                              emily.curran-huberty@mto.com
13                                            Dane P. Shikman, S.B. #313656
                                              dane.shikman@mto.com
14                                            **MUNGER TOLLES & OLSON LLP**
                                              560 Mission St., Suite 2700
15                                            San Francisco, CA 94105
                                              Telephone: (415) 512-4000
16                                            Facsimile: (415) 512-4077

17                                            Jonathan I. Kravis, *pro hac vice*
                                              jonathan.kravis@mto.com
18                                            **MUNGER, TOLLES & OLSON LLP**
                                              601 Massachusetts Avenue NW, Suite 500E
19                                            Washington, D.C. 20001
                                              Telephone: (202) 220-1100
20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants Google LLC, et al.*

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1

## E-FILING ATTESTATION

2    I, Glenn D. Pomerantz, am the ECF User whose ID and password are being used to file

3    this document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that counsel for

4    Defendants have concurred in this filing.

5

6                                                    */s/ Glenn D. Pomerantz*

7                                                    Glenn D. Pomerantz

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28