# EXHIBIT 3

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4   _____
 5   IN RE:  GOOGLE PLAY STORE ANTITRUST LITIGATION
     Case No. 3:21-md-02981-JD
 6
 7   THIS DOCUMENT RELATES TO:
 8   Epic Games Inc. v.  Google LLC, et al.
     Case No.  3:20-cv-05671-JD
 9
     In Re:  Google Play Consumer Antitrust Litigation
10   Case No.  3:20-cv-05761-JD
11
     State of Utah, et al. v. Google LLC, et al.
12   Case No.  3:21-cv-05227-JD
13
     Match Group LLC, et al., v. Google LLC, et al.
14   Case No.  3:22-cv-02746-JD

15   _____

                    ** CONFIDENTIAL **
16
17               DEPOSITION OF MARC S. RYSMAN, PhD,
18   called as a witness by and on behalf of Google LLC,
19   pursuant to the applicable provisions of the
20   Federal Rules of Civil Procedure, before P. Jodi
21   Ohnemus, RPR, RMR, CRR, CA-CSR #13192, NH-LSR #91,
22   MA-CSR #123193, and Notary Public, within and for
23   the Commonwealth of Massachusetts, at 100 Cambridge
24   Street, Boston, Massachusetts, on Friday, March 10,
25   2023, commencing at 9:07 a.m.
```

CONFIDENTIAL

Page 2

1    APPEARANCES:

2                      MOLO LAMKEN LLP

3                      BY:  Lauren Weinstein, Esq.

4                      600 New Hampshire Avenue, NW

5                      Washington, DC  20037

6                      202 556-2018

7                      Lweinstein@mololamken.com

8                             -and-

9                      LIEF CABRASER HEIMANN & BERNSTEIN

10                      BY:  Brendan P. Glackin, Esq.

11                      275 Battery Street

12                      San Francisco, CA  94111

13                      415 956-1000

14                      Bglackin@lchb.com

15                             -and-

16                      BENEDICT LAW GROUP PLLC

17                      BY:  Brendan Benedict, Esq.

18                      (Via Telephone)

19                      Michael Altelorando, Esq.

20                      42 W. 38th Street, Suite 1002

21                      New York, NY  10018

22                      212 287-9501

23                      Brendan@benedictlawgroup.com

24                      Maltebrando@benedictlawgroup.com

25                      For the States

CONFIDENTIAL

Page 3

```
1   APPEARANCES:   (CONT'D)

2

3                   BARTLIT BECK LLP

4                   BY:  Karma M. Giulianelli, Esq.

5                   1801 Wewetta Street, Suite 1200

6                   Denver, CO  80202

7                   303 592-3100

8                   Karma.giulianelli@bartlitbeck.com

9                        -and-

10                  (Via Telephone)

11                  KAPLAN FOX & KILSHEIMER LLP

12                  BY:  Hae Sung Nam, Esq.

13                  850 Third Avenue, 14th Floor

14                  New York, NY  10022

15                  Hnam@kaplanfox.com

16                  For the consumers

17

18                  HUESTON HENNIGAN LLP

19                  BY:  Tate Harshbarger

20                  523 West 6th Street, Suite 400

21                  Los Angeles, CA  90014

22                  213 788-4752

23                  Tharshbarger@hueston.com

24                  For Match Group

25
```

CONFIDENTIAL

Page 4

```
1   APPEARANCES:   (CONT'D)

2

3                   CRAVATH SWAINE & MOORE LLP

4                   BY:  Eric Zepp, Esq.

5                   Worldwide Plaza

6                   825 Eighth Avenue

7                   New York, NY  10019

8                   212 474-1829

9                   Ezepp@cravath.com

10                  For Epic Games

11

12

13                  (Via Telephone)

14                  STATE OF TENNESSEE

15                  OFFICE OF THE ATTORNEY GENERAL

16                  BY:  Ethan Bowers, Esq.

17                  301 6th Avenue N

18                  Nashville, TN  37243

19                  615 741-3491

20                  Ethan.bowers@ag.tn.gov

21                  For the State of Tennessee

22

23

24

25
```

CONFIDENTIAL

```
                                              Page 5

 1   APPEARANCES:   (CONT'D)

 2

 3                     (Via Telephone)

 4                     NEW YORK STATE OFFICE OF THE

 5                     ATTORNEY GENERAL

 6                     BY:  Bryan L. Bloom, Esq.

 7                     Timothy O'Neill, Esq.

 8                     The Capitol

 9                     Albany, NY  12224-0341

10                     Bryan.bloom@ag.ny.gov

11                     Timothyoneill@ag.ny.gov

12                     For New York State

13

14

15                     (Via Telephone)

16                     STATE OF UTAH

17                     OFFICE OF THE ATTORNEY GENERAL

18                     BY:  Bahader S. Khan, Esq.

19                     350 N. State Street, Suite 230

20                     Salt Lake City, UT  84114

21                     801 366-0260

22                     Bahader.khan@ag.ut.gov

23                     For the State of Utah

24

25
```

CONFIDENTIAL

```
                                            Page 6

 1   APPEARANCES:   (CONT'D)

 2

 3                      MUNGER TOLLES & OLSON LLP

 4                      BY:  Justin P. Raphael, Esq.

 5                      350 S. Grand Avenue, 50th Floor

 6                      Los Angeles, CA  90071

 7                      415 512-4085

 8                      Justin.raphael@mto.com

 9                      For Google LLC

10

11

12   ALSO PRESENT:

13

14                      (Via Telephone)

15                      Jeanette Teckman, Esq.

16                      in-house counsel, Match Group

17

18                      Shawn Budd, Video Operator

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 7

1                        I N D E X

2

3    TESTIMONY OF:                                    PAGE

4

5    MARC S. RYSMAN, PhD

6    (By Mr. Raphael)                                    9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 8

1                    **E X H I B I T S**

2    **EXHIBIT            DESCRIPTION                    PAGE**

3

4    **Exhibit 1057      Expert Report of Marc            9**

5                       **Rysman, October 3, 2022**

6    **Exhibit 1058      Expert Rebuttal Report of        9**

7                       **Dr. Marc Rysman, December**

8                       **23, 2022**

9    **Exhibit 1059      Merits Report of Hal J.          70**

10                      **Singer, PhD**

11   **Exhibit 1060      Game Change:  The Future of     189**

12                      **Video Games**

13   **Exhibit 1061      spreadsheet, AMZ-GP_00002471    358**

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

```
 1                (Exhibit 1057, Expert Report of Marc
 2                Rysman, October 3, 2022.)
 3                (Exhibit 1058, Expert Rebuttal Report of
 4                Dr. Marc Rysman, December 23, 2022.)
 5                VIDEO OPERATOR:  We are on the record.
 6      This is the videographer speaking, Shawn Budd, with
 7      Veritext Legal Solutions.  Today's date is March
 8      10th, 2023.  The time is 9:07 a.m.  We are here in
 9      Boston, Massachusetts, to take the video deposition
10      of Dr. Marc Rysman in the matter of Google Play
11      Store Antitrust Litigation.
12                Would counsel please introduce themselves
13      for the record.
14                MS. WEINSTEIN:  Lauren Weinstein on behalf
15      of the states.  With me are my colleagues, Brendan
16      Glackin and Brendan Benedict.
17                MS. GIULIANELLI:  Karma Giulianelli on
18      behalf of consumers.
19                MR. HARSHBARGER:  Tate Harshbarger on
20      behalf of Match plaintiffs.
21                MR. RAPHAEL:  Justin Raphael, Munger
22      Tolles & Olson, for Google.
23                Is there anyone on the phone?
24                MS. WEINSTEIN:  We did telephonic
25      appearances on the record.
```

CONFIDENTIAL

Page 43

1      Q.   Have you read any portion of any report

2 that Doctor Singer submitted in this case?

3          MS. WEINSTEIN: Objection to form.

4      A.   I rely on one number that he produces in

5 my rebuttal report.

6      Q.   Okay. Move to strike as nonresponsive.

7          Have you read any portion of any report

8 that Doctor Singer submitted in this case?

9          MS. WEINSTEIN: Objection to form.

10          And there's no basis for moving to strike.

11 He's trying his best to answer your questions.

12      A.   Sorry. Ask one more time.

13      Q.   Have you read any portion of any report

14 that Doctor Singer submitted in this case?

15          MS. WEINSTEIN: Objection to form.

16      A.   I did not personally read the report, no.

17      Q.   Have you read transcripts of depositions

18 of any other plaintiff expert?

19      A.   No.

20      Q.   Have you communicated with any other

21 expert that any plaintiff has retained to testify

22 in this litigation?

23          MS. WEINSTEIN: Objection to form.

24      A.   No.

25      Q.   Have you communicated with any app

CONFIDENTIAL

Page 44

1   developer or their counsel regarding any issue

2   related to this litigation?

3            MS. WEINSTEIN:  Objection to form.

4       A.   No.

5       Q.   Do you know Google's expert, Catherine

6   Tucker?

7            MS. WEINSTEIN:  Objection to form.

8       A.   Personally?

9       Q.   Well, either personally or professionally.

10      A.   Yes.

11      Q.   You've appeared with Doctor Tucker on

12  panels?

13      A.   Yes.

14      Q.   You've cited Doctor Tucker's work?

15      A.   Yes.

16      Q.   Is Doctor Tucker an expert on the

17  economics of platforms?

18           MS. WEINSTEIN:  Objection to form and to

19  scope.

20      A.   Yes.

21      Q.   Is Doctor Tucker one of the leading

22  experts on the economics of platforms?

23           MS. WEINSTEIN:  Same objections.

24      A.   I'm happy to characterize her as one of

25  the leading experts on economics of platforms.

```
 1            Do you think Hal Singer has the academic
 2   body of work or qualifications to be a member of
 3   the faculty at Boston University?
 4            MS. WEINSTEIN:  Objection to form and to
 5   scope.
 6       A.   He might fit in in -- in parts of the
 7   faculty at Boston University.
 8       Q.   In the economics department?
 9       A.   He probably would not fit in in the
10   economics department, but there's other parts of
11   Boston University where he would be more natural.
12       Q.   Which parts?
13       A.   I would think the law school.
14       Q.   Okay.  Do you know plaintiffs' expert
15   Stephen Schwartz?
16       A.   I don't know Stephen Schwartz.
17       Q.   Ever heard of him?
18            MS. WEINSTEIN:  Objection to form.
19       A.   I don't know.  I don't know Stephen
20   Schwartz.
21       Q.   Are you offering any estimate of damages
22   based on overcharges to consumers?
23            MS. WEINSTEIN:  Objection to form.
24       A.   Yes.
25       Q.   And that estimate of damages for
```

 1    overcharges to consumers depends on pass through of
 2    a service fee rate that's charged by Google; right?
 3            MS. WEINSTEIN:  Objection to form.
 4        A.    Yeah, it depends on how the -- the level
 5    of damages depends on how the rates that you --
 6    that Google charges affect the prices that app
 7    developers charge.
 8        Q.    Right.  And so if Google -- strike that.
 9            If developers would not pass through the
10    service fees that they pay to Google to consumers,
11    then there wouldn't be overcharge damages?
12            MS. WEINSTEIN:  Objection to form.
13        A.    Sorry.  Say the question again.
14        Q.    Sure.
15            If developers would not pass through any
16    elevated service fee that they pay to Google, then
17    consumers would not experience any overcharge
18    damages; right?
19            MS. WEINSTEIN:  Same objection.
20        A.    Yeah, I agree with that.
21        Q.    But your report takes no position on what
22    the pass-through rate is; right?
23        A.    That's correct.
24        Q.    So -- and you don't opine on the level of
25    reductions in Google's commissions that would be

1    passed on?

2        A.    That's correct.

3        Q.    So you don't have an opinion whether it is

4    more likely that the pass-through rate is zero

5    percent or 100 percent?

6        A.    That's right.

7        Q.    Your -- your total damages figure just

8    assumes 100 percent pass through; right?

9            MS. WEINSTEIN:  Objection to form.

10       A.    No.

11       Q.    What pass-through rate does your damages

12   analysis assume?

13       A.    My damages analysis is set up to be robust

14   to any pass-through rate.  So I consider several

15   pass-through rates.  I consider zero percent.  I

16   consider 100 percent.  And ultimately the damages

17   number that I adopt is the one with the zero

18   percent because that's the most conservative.

19       Q.    Have you calculated any figure of damages

20   with a pass-through rate other than zero percent or

21   100 percent?

22           MS. WEINSTEIN:  Objection to form.

23           You can testify as to what you relied on.

24       A.    Yes.

25       Q.    What -- what pass-through figure did you

Page 52

1   use other than zero percent or 100 percent to

2   calculate damages?

3       A.   Well, as we discussed, I used the -- I

4   used the -- this we did not discuss.  I take it

5   back.

6            I used a pass-through rate that was

7   proposed by Hal Singer, and I used a pass-through

8   rate that was proposed by Doctor Leonard.

9       Q.   Okay.  Any other pass-through rates that

10  you used to calculate damages?

11      A.   I don't recall any further ones, no.

12      Q.   Could you go to paragraph 321 of your

13  reply report.  This is Exhibit 1058.

14           MS. WEINSTEIN:  321, you said?

15           MR. RAPHAEL:  Yes.

16           MS. WEINSTEIN:  Thank you.

17           Page 171.

18      Q.   Do you see the second sentence of

19  paragraph 321 says (as read):

20           "If I had wanted to evaluate pass-through

21  rates, I would have developed a model with

22  mechanisms to address pass through."

23           Do you see that?

24      A.   Yes.

25      Q.   What do you mean by that?

1            MS. WEINSTEIN:  And, Doctor Rysman, if you

2    need to review anything else in this document to

3    answer the question, you may.

4        A.    Doctor Leonard states that my model

5    makes -- has implications about pass through, but I

6    disagree with that.  The point of the model is to

7    be flexible with regards to pass through; and if --

8    and in particular I mean if I had wanted the model

9    to capture pass through, I would have changed the

10   model in some way to be -- to address that.

11       Q.    How would you have changed it?

12       A.    Well, that would be speculation.  I would

13   need to study pass through.

14       Q.    Okay.  So you haven't studied the pass

15   through in this case at all?

16            MS. WEINSTEIN:  Objection to form.

17            And you can testify as to what you relied

18   upon.

19       A.    Yeah, I don't have -- I don't provide an

20   opinion on pass through in the report.

21       Q.    Okay.  Would you have used a standard

22   logit model to calculate pass through --

23            MS. WEINSTEIN:  Objection to form.

24       Q.    -- if you had been trying to do that?

25            MS. WEINSTEIN:  Excuse me.

1   model is based on a single representative consumer

2   that buys every app; right?

3       A.   So the way I think about it in this case

4   is that consumers -- all consumers spend the same

5   share on these different apps.  There could be a

6   lot of heterogeneity in how much income or how much

7   budget the consumers apply to the different apps.

8       Q.   Okay.  But is it true that your model's

9   based on a single representative consumer that buys

10  every app?

11          MS. WEINSTEIN:  Objection to form.

12      A.   That's a reasonable description of the

13  model.  I would just say that I do think of them

14  as -- I do think of their -- it allows for

15  heterogeneity in how much consumers spend on each

16  app, although they're all going to buy, as you say,

17  some share of -- of every app.

18          And, again, the model is well known to be

19  consistent with, let's say, a logit-type model,

20  which wouldn't have the feature that you're

21  describing.

22      Q.   Okay.  So your app variety model is trying

23  to calculate how much happier consumers would be if

24  they had more variety of apps; right?

25          MS. WEINSTEIN:  Objection to form.

1    A.    Yes.

2    Q.    Okay.  And your app variety model is not

3   trying to calculate the actual dollars that

4   consumers would have in their pocket but for

5   Google's anticompetitive conduct; right?

6         MS. WEINSTEIN:  Objection to form.

7    A.    I calculate the dollar value they would

8   need to be indifferent between a world where Google

9   had imposed this anticompetitive conduct and when

10  they didn't impose this competitive --

11  anticompetitive conduct.

12   Q.    Right.  What you're doing with your app

13  variety model is you're trying to assign a value to

14  the additional happiness that consumers would

15  experience if they had additional app variety?

16        MS. WEINSTEIN:  Objection to form.

17   A.    Yes.  And what I'm doing is a standard

18  approach in economics for valuing new goods or the

19  value of variety.

20   Q.    But just to be clear, that model is not

21  trying to calculate the actual dollars that

22  consumers would have in their pocket if they had an

23  additional app variety; right?

24        MS. WEINSTEIN:  Objection to form.

25   A.    That's correct.

CONFIDENTIAL

1      Q.   Now, your app variety model is trying to

2  measure how much happier consumers would be and

3  assign a value to that for consumers in the

4  aggregate; right?

5      A.   The number I propose is an aggregate --

6  the damages number I propose is an aggregate

7  damages number.

8      Q.   And you're not trying to use the app

9  variety model to determine how any individual

10  consumer was harmed?

11          MS. WEINSTEIN:  Objection to form.

12      A.   I don't do that calculation.

13      Q.   Right.  And, in fact, your app variety

14  model, I think you mentioned, is designed to, sort

15  of, average out what you called the heterogeneity

16  of -- between different individual consumers;

17  right?

18          MS. WEINSTEIN:  Objection to form.

19      A.   I think of it as summing over the

20  heterogeneity to get this description of damages

21  for the entire, let's say, like a state for a given

22  year.

23      Q.   Right.  You can't use your app variety

24  model to calculate how much happier any individual

25  consumer would have been in the but-for world or

1    accurate in this case.  I make many decisions to be

2    conservative.  And so I think what I would be

3    developing would be a conservative number on --

4    of -- and from my perspective, conservative

5    generates a lower damages number.

6        Q.    Would using your app variety model in this

7    case reliably tell you what the additional

8    happiness that any individual consumer would

9    experience from additional app variety?

10            MS. WEINSTEIN:  Objection to form.

11       A.    I think it would be reasonable -- I could

12   see it being reasonable to use my model for -- at

13   the level of an individual applying it to

14   individual spending.  I've made some conservative

15   assumptions.

16       Q.    Is spending the only variable between

17   consumers that's relevant to the happiness they

18   would get from additional app variety?

19            MS. WEINSTEIN:  Objection to form.

20       A.    Say the question again.

21       Q.    Is the variation between what different

22   consumers spend the only variation between them

23   that is relevant to calculating how much additional

24   happiness each of them would get from additional

25   app variety?

1        MS. WEINSTEIN:  Objection to form.

2      A.   If I wanted to address -- so my model

3   handles heterogeneity and spending across apps.  If

4   I wanted to address more heterogeneity, I would --

5   might have to adjust the model.

6      Q.   Right.  And do you think that there is

7   more heterogeneity between consumers other than

8   spending that's relevant to figuring out how much

9   better off they would be if they got additional app

10  variety?

11        MS. WEINSTEIN:  Objection to form.

12     A.   There certainly could be.

13     Q.   You might have to know how much they value

14  each particular app, for example?

15        MS. WEINSTEIN:  Objection to form.

16     A.   I use spending as a proxy for how much

17  they value apps on the App Store -- the Play Store.

18  Excuse me.

19     Q.   All right.  So your model models the value

20  of variety consumers proportionately to how they

21  spend in the actual world; right?

22        MS. WEINSTEIN:  Objection to form.

23     A.   Yeah.  The outcome of my model is that

24  people that spend more money on the Play Store will

25  value additional variety more.

1    It's a very reasonable one that I think most

2    economists would think of for analyzing this

3    market.  And it's appealing in many ways.

4        Q.   Okay.  So -- but you haven't done any

5    analysis in your report to determine whether it's

6    true that consumers that spent more in the actual

7    world would value app variety more in the but-for

8    world?

9            MS. WEINSTEIN:  Objection to form.

10       A.   I haven't analyzed specifically that

11   question.  Although I do think it's reasonable that

12   consumers that spend more on the -- on the Play

13   Store will value new variety and lower prices more.

14       Q.   So let me ask you this:  A consumer that

15   spent $10,000 on Fortnite and made no other

16   purchases in the actual world, does your model

17   imply that that person would value variety more

18   than a consumer that spent $1 on 500 different

19   apps?

20           MS. WEINSTEIN:  Objection to form.

21       A.   Does my model imply that the first

22   consumer would value new variety more than the

23   second consumer --

24       Q.   Yes.

25       A.   -- is that the question?

1        Yes, it does.  But I would just say it's

2    not -- it's meant to be an approximation of the way

3    the model captures how consumers value apps.  And

4    so it could be that in the counterfactual world the

5    consumer that spends $10,000 on Fortnite found one

6    other app that they liked better than Fortnite and

7    moved -- spent now nothing on Fortnite and $12,000

8    on some alternative app.  So my model doesn't

9    attempt to model all of that level of interaction,

10   but I think that's a reasonable way to think about

11   the world.

12       Q.   Right.  And just to be clear, though, in

13   your reports you haven't done any analysis to

14   determine whether any of the examples you just gave

15   actually reflect what would happen in -- in the

16   but-for world; right?

17            MS. WEINSTEIN:  Objection.  Form.

18       A.   I don't have evidence showing that's

19   exactly the dynamic that would take place.

20       Q.   Doctor Rysman, what apps would have

21   entered in a but-for world without Google's

22   conduct?

23            MS. WEINSTEIN:  Objection to form.

24       A.   I don't identify specific apps that would

25   have entered.  So my approach to studying entry is

1    that Doctor Tucker mentioned that actually did

2    enter with an Android app in the actual world;

3    right?

4        A.    They did eventually enter, yes, with some

5    delay.

6        Q.    Okay.  So what I'm asking is can you name

7    one app that would have entered in the but-for

8    world but never entered with an Android app in the

9    actual world?

10            MS. WEINSTEIN:  Objection to form.

11       A.    Yeah, that's obviously a difficult

12   statement to make, what app that never entered

13   would have entered in the -- in this but-for world,

14   but I do not identify specific apps that would have

15   done that.

16       Q.    Have you assumed that the additional

17   variety from the apps you say would have entered

18   would have been equally valuable to consumers in

19   different states?

20            MS. WEINSTEIN:  Objection to form.

21       A.    They would have been valuable in my model;

22   and then my damages, the damages number that I

23   proposed, they would have been proportionately

24   valuable to the spending on -- of consumers in

25    these different states.

```
 1   right?
 2          MS. WEINSTEIN:  Objection to form.
 3      A.   The model that I use is -- shows up in
 4   both micro and macroeconomics.  I agree, it's sort
 5   of probably more widely used in macroeconomics.
 6      Q.   Okay.  Have you -- have you seen this sort
 7   of model used in any antitrust case?
 8          MS. WEINSTEIN:  Objection to form and
 9   scope.
10      A.   What do you mean by "this sort of model"?
11      Q.   The kind of model of a large economy that
12   you describe in your report.
13          MS. WEINSTEIN:  Same objections to form
14   and scope.
15      A.   Yeah, I'm not aware of it being used in an
16   antitrust case.  Although I'm not an expert on
17   every antitrust case that's out there.
18      Q.   Sadly not.
19          MS. WEINSTEIN:  Object to the
20   editorialization by counsel.
21      Q.   So you're modeling the Android app
22   ecosystem as if it were its own large economy?
23          MS. WEINSTEIN:  Objection to form.
24      A.   That's a fine way to describe it.
25      Q.   Your app variety model assumes that all
```

1    apps are the same in a number of ways; right?

2            MS. WEINSTEIN:  Objection to form.

3        A.   My app variety model makes that

4    assumption, but I provide several parts of analysis

5    to check that that's a reasonable assumption.

6        Q.   Okay.  And you call that assumption the

7    symmetry assumption; right?

8        A.   I forget exactly where I use the word

9    symmetry, but I'm -- symmetry's a reasonable word

10   to use here.

11       Q.   Okay.  And this assumption that all apps

12   are the same in a number of ways, you would agree

13   that that's an abstraction; right?

14           MS. WEINSTEIN:  Objection to form.

15       A.   Yeah, I'll just point out that in my

16   demand estimation I allow the apps to be very

17   different.  I -- app -- what's known as "app fixed

18   effects."  So that's allowing substantial

19   heterogeneity across apps in terms of their

20   quality.

21       Q.   Okay.  But your app variety model assumes

22   that all apps had the same prices; right?

23           MS. WEINSTEIN:  Objection to form.

24       A.   In the damages model, the way I solve it,

25   I assume that all -- well, I allow all apps to have

1    the same prices, but I also provide some

2    theoretical analysis to show that that's not a

3    restrictive requirement.

4         Q.   Okay.  But I'm just asking, as a factual

5    matter, your app variety model assumes that all

6    apps have the same prices; right?

7              MS. WEINSTEIN:  Objection to form.

8         A.   I solve the model as if all apps have the

9    same prices.

10        Q.   But in the real world, you would agree,

11   that all apps don't have the same prices; right?

12             MS. WEINSTEIN:  Objection to form.

13        A.   I agree.

14        Q.   And your app variety model assumes that

15   all apps have the same marginal costs; right?

16             MS. WEINSTEIN:  Objection to form.

17        A.   I let all the apps have the same marginal

18   cost; but, again, I provide theoretical analysis to

19   show that that's not a restrictive assumption.

20        Q.   I understand.  But in the real world all

21   apps don't have the same marginal costs, do they?

22             MS. WEINSTEIN:  Objection to form.

23        A.   I would be surprised if they all had the

24   same marginal cost in the real world.

25        Q.   And your app variety model assumes that

1    all apps have the same entry cost, doesn't it?

2           MS. WEINSTEIN:  Objection to form.

3       A.   Yes, I assume that all apps have the same

4    entry cost in the way I solve the damages model.

5       Q.   But in the real world, all apps don't have

6    the same entry cost, do they?

7           MS. WEINSTEIN:  Objection to form.

8       A.   I agree with what you say.  I would just

9    say again that in this literature that I'm drawing

10   on, these would be really standard assumptions to

11   make to be able to provide answers in questions

12   like this one where there's, you know, hundreds of

13   thousands of apps interacting.

14      Q.   Right.  But that literature that you're --

15   well, I'll go back to that, but your app variety

16   model assumes that all apps have the same quantity

17   of sales; right?

18          MS. WEINSTEIN:  Objection to form.

19      A.   When I solve the damages model, all apps

20   have the same quantity, that's true.  But, again, I

21   provide analysis to show that that's an

22   approximate -- a reasonable approximation and that

23   it's not driving the results.

24      Q.   But in the real world all apps don't have

25   the same quantity of sales; right?

CONFIDENTIAL

1          MS. WEINSTEIN:  Objection to form.

2      A.   That's correct, and I address that in my

3  demand estimation.

4      Q.   Right.  And your app variety model assumes

5  that all apps have the same quality, doesn't it?

6          MS. WEINSTEIN:  Objection to form.

7      A.   When I solve the damages model, I assume

8  that all apps have the same quality; but, again, I

9  control for quality when I do the estimation.  So

10  I'm allowing for the apps to have different

11  qualities when I estimate the demand curve; and,

12  again, I have theoretical analysis showing that

13  this approximation that I'm doing is a reasonable

14  one and isn't driving the results.

15      Q.   Okay.  But in the real world you would

16  agree that all apps don't have the same expected

17  quality; right?

18          MS. WEINSTEIN:  Objection to form.

19      A.   I agree with that, yes.

20      Q.   Okay.  Now, you talk about the theoretical

21  literature would say that the assumptions you've

22  made about apps being the same would support those

23  assumptions as reasonable; right?

24      A.   I think the method that I use is

25  acceptable in the economics literature for studying

Page 100

1    a market like this one.

2        Q.   And the economics literature that you're

3    describing, are the authors of the papers in those

4    literature trying to determine damages for

5    consumers based on conduct that happened in the

6    actual world?

7            MS. WEINSTEIN:  Objection to form.

8        A.   I'd have to think, but certainly it would

9    be natural in these papers to use the models to

10   construct welfare or equivalent variation, which is

11   the calculation I use to construct damages.

12       Q.   Okay.  Have you -- are you familiar with

13   any economist that's used the app variety model

14   that you've used in this case to calculate damages?

15           MS. WEINSTEIN:  Objection to form.

16       A.   Well, I understand damages to be a term

17   that's associated with antitrust litigation, and so

18   you wouldn't naturally talk about damages in an

19   academic paper.  We would talk about consumer

20   welfare.  Like I said, compensating variation or

21   equivalent variation, and models like this could be

22   used to make calculations like that.

23       Q.   So the answer to my question, though, is

24   no.  You've never seen any economists use the app

25   variety model that you used in this case to

1    calculate damages?

2              MS. WEINSTEIN:  Objection to form.

3              He answered your question.

4        A.   I guess the answer is yes, but I would not

5    have -- I'd be very surprised to ever see that

6    because we don't use -- calculating damages is not

7    a natural part of an academic economics paper.

8        Q.   Your app variety model assumes that each

9    app generates revenue through the sale of a single

10   product at a single price; is that right?

11             MS. WEINSTEIN:  Objection to form.

12       A.   That's correct.

13       Q.   But that's not true of all apps in the

14   real world; right?

15             MS. WEINSTEIN:  Objection to form.

16       A.   That's correct.

17       Q.   In fact, many free apps have multiple SKUs

18   for subscriptions for different kinds of IAPs?

19             MS. WEINSTEIN:  Objection to form.

20       A.   Without taking a position on my knowledge

21   of exactly the words you just used, I understand

22   that in the real world, apps may or a developer may

23   monetize an app through several different prices or

24   products at some level.  I think it's fairly

25   standard in this literature to extract away from

1    multiproduct pricing in order to kind of generate

2    results that are useful.

3        Q.   It's standard in the economic literature

4    you're relying on to abstract away from the

5    circumstances of the real world?

6        A.   Well, every model is an abstraction away

7    from the circumstances of the real world.  There's

8    no model that captures every single element of the

9    real world.  So it's standard in this literature

10   and in all of the economics literature.

11       Q.   And your app variety model assumes that

12   each app competes with the other 465,000 or so apps

13   that charge for downloads, subscriptions, or IAPs;

14   right?

15           MS. WEINSTEIN:  Objection to form.

16       A.   Yes.

17       Q.   But in the real world, all 465,000 of

18   those apps don't compete with each other, do they?

19           MS. WEINSTEIN:  Objection to form.

20       A.   Well, let's say -- just to pick on your

21   number -- there's only so many apps available in a

22   given year.  I only allow competition between those

23   apps in the same year.  So the number is

24   substantially less than 400,000.

25       Q.   Okay.  But it's not your testimony that

Page 104

1      Q.   But you have no opinion about whether all

2   apps in the Google Play Store or all apps in a

3   particular category in that store compete with each

4   other?

5           MS. WEINSTEIN:  Objection to form.

6           He answered your question.

7      A.   I don't have a -- I'm not providing an

8   opinion on specifically that issue.

9      Q.   How many apps does your model estimate

10  would have entered if Google had charged lower

11  service fees in the but-for world?

12     A.   How many apps would have entered in the

13  but-for world?

14     Q.   Yes.

15     A.   I provide that in a -- I have a figure

16  showing that, I think, in the rebuttal report.

17     Q.   And do you remember what that figure is?

18          MS. WEINSTEIN:  Objection to form.

19     A.   I can picture it.  I don't know the number

20  off the top --

21     Q.   Does 338,000 sound right?

22          MS. WEINSTEIN:  Objection to form.

23          If you want to look at your report, you

24  can.

25     A.   That sounds about right for the model

Page 105

1    where I've -- where I allow for zero pass through.

2        Q.   Have you conducted any analysis of whether

3    more apps have been entering since Google reduced

4    service fees?

5            MS. WEINSTEIN:   Objection to form.

6            You can answer about what you relied upon.

7        A.   Yes.

8        Q.   Have you done any statistical analysis

9    showing a correlation between reduced service fees

10   and increased app entry?

11           MS. WEINSTEIN:   Same objection and

12   caution.

13       A.   I provide a figure in my rebuttal report

14   that shows an increase in the apps entering

15   directly after the reduction in service fees.

16       Q.   Have you conducted a regression or any

17   other statistical analysis to try to isolate any

18   causal factor between the reduction in Google's

19   service fee and the number of apps in the Play

20   Store?

21           MS. WEINSTEIN:   Same objection and

22   caution.

23       A.   I don't have an econometric analysis like

24   that in the -- in the reports.

25       Q.   Are you offering any opinion that any

1    variety.

2        Q.    Have you analyzed any Google data

3    regarding the reduction in service fee and the

4    number of apps to draw a conclusion that Google's

5    reduction in service fees caused the rate of app

6    entry to increase?

7            MS. WEINSTEIN:   Objection to form.

8            You can testify about what you relied

9    upon.

10       A.    I'm not sure what you mean.   I used the

11   model to show that a reduction in service fee will

12   lead to more entry of apps and greater variety for

13   consumers.   And then I have the -- a figure showing

14   that directly after Google's reduction in service

15   fees there was an increase in the number of apps on

16   the market.   So...

17       Q.    But you've done no analysis --

18           MS. WEINSTEIN:   Excuse me.

19           Doctor Rysman, did you finish answering

20   his question?

21           THE WITNESS:   I did.

22           MS. WEINSTEIN:   Okay.

23       Q.    You've done no analysis to determine

24   whether the increase in the number of apps

25   following Google's reduction in service fees

1    reflects a causal relationship between those two

2    figures; right?

3            MS. WEINSTEIN:  Objection to form.

4            He's answered this question twice.

5       A.    I don't have a regression analysis

6    analyzing this -- the relationship between the

7    increase in apps following the reduction in service

8    fees and the reduction in service fees.

9       Q.    And -- and you've done no analysis to

10   determine whether the prediction of your model

11   about app entry in the but-for world accurately

12   predicts what happened when Google reduced service

13   fees in the actual world?

14           MS. WEINSTEIN:  Objection to form.

15      A.    Well, there will be many issues with, sort

16   of, using the model in this way that you describe,

17   I think.  But I would just say that the model is

18   carefully calibrated to match Google data and draws

19   parameters from calculations I did with Google data

20   or from other parts of the literature that made the

21   results more conservative.

22      Q.    Fair enough.

23           But for whatever reason, you've done no

24   analysis to determine whether your model of the

25   but-for world accurately predicts what you see in

1   data on the actual world regarding app entry after

2   Google reduced service fees?

3          MS. WEINSTEIN:  Objection to form.

4      A.   I don't have a specific comparison of the

5   model to this particular reduction in fees that

6   you're describing.  This -- in the data I think

7   there would be substantial problems with doing that

8   comparison.  And -- but I would just say, again,

9   the model shows an increase in output and variety

10  or, if I allow for pass through, a reduction in

11  prices; and that comes from a model that's matched

12  to the data as -- as -- in a way that I think is

13  appropriate.

14     Q.   Other than your app variety model of the

15  but-for world, do you have any basis for any

16  conclusion that Google's reduction in service fees

17  in the actual world caused app entry to increase?

18         MS. WEINSTEIN:  Objection to form.

19     A.   Well, I have a figure showing that app

20  entry went up directly after the reduction in fees.

21     Q.   Any other basis for drawing a causal

22  opinion about Google's reduction in service fees

23  and increased app entry?

24     A.   Generally as an economist I think it makes

25  sense.  So I think it's a very sensible eco- -- as