# EXHIBIT 35

HUESTON HENNIGAN LLP
John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Douglas J. Dixon, State Bar No. 275389
ddixon@hueston.com
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

Joseph A. Reiter, State Bar No. 294976
jreiter@hueston.com
Michael K. Acquah, State Bar No. 313955
macquah@hueston.com
William M. Larsen, State Bar No. 314091
wlarsen@hueston.com
Julia L. Haines, State Bar No. 321607
jhaines@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340

Attorneys for Plaintiffs Match Group, LLC;
Humor Rainbow, Inc.; PlentyofFish Media ULC;
and People Media, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATCH GROUP, LLC, a Delaware corporation; HUMOR RAINBOW, INC., a New York corporation; PLENTYOFFISH MEDIA ULC, a Canadian corporation; and PEOPLE MEDIA, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP. <br><br> Defendants. | Case No. 5:22-cv-02746 <br><br> **DECLARATION OF PETER FOSTER IN SUPPORT OF PLAINTIFFS MATCH GROUP, LLC'S, HUMOR RAINBOW, INC.'S, PLENTYOFFISH MEDIA ULC'S, AND PEOPLE MEDIA, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

I, Peter Foster, declare as follows:

1.    I am employed by Match Group, LLC. My title is General Manager, Global Advertising and Brand Solutions. I submit this declaration in support of Match Group LLC's, Humor Rainbow, Inc.'s, PlentyofFish Media ULC's, and People Media, Inc.'s (collectively, "Match Group's")[1] Motion for a Temporary Restraining Order.

2.    I have served in my current position since 2016. My responsibilities include overseeing Match Group's advertising business across its portfolio of dating services and mobile applications. In addition, since January 2020, I have served as senior relationship manager of distribution platforms for mobile applications.

3.    I have personal knowledge of the facts and representations herein, except when explicitly noted that my knowledge is based on information obtained from others or based on information and belief. If called to testify, I could and would do so.

## Match Group's Portfolio of Dating Services and Mobile Applications

4.    Match Group owns and operates the following brands of popular dating services and mobile applications ("apps") for Android devices, among others:

5.    **Tinder** is Match Group's most popular dating brand. Tinder is a dating service and app that presents profile cards of other Tinder users on one user's screen to give him or her the opportunity to "Like" the other user, or alternatively, to decline interest in the other user. After reviewing one or more photographs and a short biography associated with a profile, users can "Like" a potential match, or "Nope" (to pass). If two users express mutual interest, they are a match and can begin a conversation through a chat feature on the platform.

---

[1] The term "Match Group" includes only the operating entities named as Plaintiffs. Match Group LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc. are part of the Match Group family of companies with the ultimate parent company Match Group, Inc. ("MGI"), a nonoperating holding company. MGI's other subsidiaries are not included in the definition of "Match Group" in this matter. The Plaintiffs operate brands, including Tinder and Match.com (Match Group LLC), OkCupid (Humor Rainbow, Inc.), PlentyofFish (PlentyofFish Media, ULC) and OurTime (People Media, Inc.) among others.

DocuSign Envelope ID: 3D391919-8189-46D1-8269-52B99638159A

6.  Tinder's basic account is available to users at no charge. But users can upgrade to one of Tinder's paid subscription services, including Tinder Plus®, Tinder Gold™, or Tinder Platinum®. Each subscription tier offers users different enhanced features such as, among others, unlimited "Likes." In addition to the Tinder Plus, Tinder Gold, and Tinder Platinum subscriptions, Tinder offers options to purchase many of the same benefits as á la carte digital purchases. Tinder has tens of millions of active users. More than ten million users purchase Tinder's subscriptions or á la carte digital services.

7.  **Match.com** ("Match") launched in 1995. Match users answer several questions about themselves and their interests to create a detailed profile to help them find the perfect match.

8.  Match's basic account is available for no charge and allows users to browse profiles and conduct searches, send "Likes" to other users, view up to six "Top Picks" daily, see which users have used the Super Like feature to indicate a higher level of interest, and send a limited number of messages to other users. Users can also upgrade to Match's Standard and Premium subscription plans, which offer users additional features. Like with Tinder, of the millions of Match users, a sizable percentage purchase digital services through Match's mobile app.

9.  **OkCupid** launched as the first free online dating site in 2003. OkCupid users can answer thousands of questions to connect with other users on what matters most to them. OkCupid's basic accounts are available for free. Users can also upgrade to OkCupid Basic or to OkCupid Premium. OkCupid Basic provides users an ad-free experience with the ability to send unlimited likes. OkCupid Premium provides users all the benefits of Basic, as well as the ability to see which users have "liked" them before making the decision to like another user. OkCupid offers subscription plans, as well as á la carte digital purchases. Of OkCupid's millions of users, a sizable percentage purchase both subscriptions and á la carte digital services through the OkCupid app.

10. **PlentyofFish** launched as a free online dating service in 2003. PlentyofFish encourages users to build meaningful relationships through low-pressure experiences including events, live streaming, games and more.

11. Like Tinder, Match, and OkCupid, PlentyofFish offers a premium subscription service that allows users to see more extended profiles of potential matches, see who is interested in them, send more likes every day, among other benefits. PlentyofFish offers both subscription and á la carte purchasing options, and millions of users purchase digital services through PlentyofFish's app.

12. **OurTime** is a dating service for individuals 50 years of age and older. Like the other apps discussed above, OurTime offers a subscription service that allows users to access additional features.

13. Collectively, Match Group's apps have nearly one hundred million active users.

## Match Group Distributes its Android Apps Through Google Play

14. Users who choose to use the mobile app version of Match Group's dating services must download the app onto a compatible smart mobile device. To download the apps, users generally must access distribution platforms associated with the operating system which allows the device they are using to function. For the Android operating system, that is the Google Play Store ("Google Play").

15. Because of Google's market power and the reality—both natural and imposed by Google—of high entry barriers and switching costs for mobile device platforms, app developers like Match Group that seek to reach Android device users are effectively required to offer their apps in Google Play. Android app developers have no practical alternative for reaching Android users. More than 90% of all downloads of Android apps are completed using Google Play.[2]

---

[2] European Commission, Case No. AT.40099, Google Android ("EC Google Android decision") at Table 5.

16.     Similarly, the overwhelming majority of users who download Match Group's apps to Android devices use Google Play. For example, in 2021, more than 97% of Android device users who registered new Tinder accounts downloaded Tinder from Google Play.

**For Many App Developers, Google Ties Use of Google Play to Use of a Separate Google Product – GPB**

17.     All app developers that use Google Play are bound by the Google Play Developer Distribution Agreement and the incorporated Developer Program Policies.

18.     A true and correct copy of Google's most recent Developer Distribution Agreement ("DDA") is attached as **Exhibit 1**.

19.     A true and correct copy of Google's most recent Developer Program Policy regarding Payments (the "Payments Policy") is attached as **Exhibit 2**.

20.     The Payments Policy provides that app developers "must use Google Play's billing system as the method of payment" for in-app purchases of "functionality, digital content or goods," including "subscription services (such as fitness, game, dating, education, music, video, service upgrades and other content subscription services)." It also expressly prohibits developers from "lead[ing] users to a payment method other than Google Play's billing system." **Exhibit 2**.

21.     The Payments Policy's requirement to use Google Play Billing ("GPB") currently does not apply, among other things, to "the purchase or rental of physical goods (such as groceries, clothing, housewares, electronics)," "the purchase of physical services (such as transportation services, cleaning services, airfare, gym memberships, food delivery, tickets for live events); or a remittance in respect of a credit card bill or utility bill (such as cable and telecommunications services)." **Exhibit 2**.

**Google Extracts Up to a 30% Tax on Transactions Processed by GPB**

22.     Under the DDA, app developers are required to pay "Service fees" to Google for each transaction processed by GPB. Specifically, as of January 1, 2022,

DocuSign Envelope ID: 3D381919-8189-46D1-8299-52B99E38159A

1  Google charges a fee between 15-30% of the price of any transaction processed by
2  GPB. A true and correct copy of a Google web page, "Service fees," so stating is
3  attached as **Exhibit 3**.

4      23.    For auto-renewing subscriptions to Match Group's apps, Google's policy
5  requires Match Group to pay a fee of 15% of the purchase price. However, for á la
6  carte purchases, Match Group must pay Google 30% of the purchase price. **Exhibit 3**.
7  A substantial portion of the purchases made by users of Match Group's apps are for á
8  la carte purchases. As an example, á la carte revenue comprised over 25% of Tinder's
9  revenue from Android users in 2021.

10     24.    In any event, irrespective of whether Google imposes a fee of 15% or
11 30%, the fee is exponentially greater than the charges imposed by other payment
12 processors. Many other payment processors charge significantly lower fees that range
13 from 1%-3% of the transaction value. For example, PayPal, Square, Stripe, and
14 Braintree all charge under 3% of the transaction value—less than one-tenth of
15 Google's maximum rate. Google's Chrome Web Store charges only 5% for each app
16 download. Google does not charge any fees to merchants who accept its Google Pay
17 digital wallet platform as a form of payment.

18     25.    Google has claimed that its "service fees" "reflect[] the value provided
19 by Android and Google Play and is how we earn money as a business." A true and
20 correct copy of a Google web page, "Understanding Google Play's service fee," so
21 stating is attached as **Exhibit 4**. However, Google excludes large categories of apps
22 from the requirements to use GPB and pay its fees. All apps on Google Play receive
23 the same purported benefits that Google offers in an attempt to justify its fees, yet
24 Google imposes the fees on only a tiny fraction of the apps on Google Play. According
25 to Google, only "3% of developers on Google Play are subject to a service fee" at all.
26 **Exhibit 4**. It is hard to understand why 97% of the developers on Google Play are not
27 required to use GPB or pay its fees, when Match Group's apps are.

28

26.     For example, and as I mentioned above, Google excludes apps that offer "physical goods" or "physical services" from these requirements. For this reason, popular apps like Amazon, Uber, Postmates, DoorDash, and TaskRabbit need not use GPB or pay its "service fees" because Google has unilaterally deemed their offerings "physical." Thus, ride sharing apps are excluded for enabling the meetings of drivers and passengers, but dating apps are included for facilitating the meeting of two people for an in-person date.

27.     Moreover, Google already imposes a separate, universal $25.00 registration fee on every app developer that uses Google Play, and does not offer any additional "performance," "security," or "safety" features to apps that pay Google's service "fee" versus those that do not, including any other features related to the sales of digital goods and services.

28.     Match Group has paid several hundred million dollars to Google in "service fees" from in-app purchases made by users who chose to use GPB. On information and belief, Google has further monetized Match Group's apps by gathering valuable consumer data, which Google uses to sell targeted advertising.

**For More than a Decade, Google Did Not Require Match Group to Use GPB or Pay its Fees**

29.     Google previously allowed app developers, including Match Group, to use the payment option of their choice. In July 2012, Google began requiring some app developers and consumers to use GPB for purchases of digital content. Yet even after July 2012, under Google's previous Payments Policy, app developers were not required to use GPB when "[p]ayment [was] for digital content that may be consumed outside of the app itself." A true and correct copy of a Google web page, "Payments," so stating as of August 21, 2020, is attached as **Exhibit 5**.

30.     Match Group's apps available for download on Google Play—Tinder, Match, OkCupid, PlentyofFish, OurTime, and others—fell within this exception for two independent reasons. First, each app has offered a website that users can access

with a desktop computer, laptop, or mobile device. *See* www.tinder.com, www.match.com, www.okcupid.com, www.pof.com, www.ourtime.com. On these websites, users can "consume[]" "digital content" they paid for "outside the app itself."

31. Second, the digital content that users pay for facilitates in-person interactions by matching users. For example, when Tinder users pay for premium features, they are paying for digital content that helps them create connections, facilitate meetings, and interact with other users in-person. Tinder users can use that digital content outside the app itself during in-person interactions by, among other ways, carrying on conversations that initiated in the app or discussing pictures from their profiles.

32. Accordingly, in compliance with Google's policy at the time, the apps mentioned above have been offered on Google Play without requiring use of GPB. Some of them never offered GPB as a payment option, while others have given consumers the choice of paying through GPB or alternative options.

33. Specifically, Match Group LLC first published its Match app on Google Play (then named Android Market) in 2010; the Match app allows payment through credit card and PayPal, and does not offer GPB.

34. OkCupid was added to Google Play in 2010 and offers GPB, credit card, and PayPal options.

35. PlentyOfFish joined Google Play in 2010, and offers credit card and PayPal payment options, without offering GPB.

36. OurTime joined Google Play in 2014 and offers a credit card payment option without offering GPB.

37. The Tinder app was published on Google Play in July 2013. At first, Tinder offered only GPB. In April 2019, after Tinder began to allow users to create and access their accounts on Tinder's website, and consistent with Google's Payments Policy at the time, Tinder began to allow its users to make payments via credit card.

38.     In May 2019, Google contacted Match Group to discuss its decision to allow an alternative payment option. On information and belief, after several e-mail and phone conversations, representatives from Google and Match Group met on August 23, 2019, at Google's offices in Mountain View, California. Thereafter, Match Group did not make changes to or remove Tinder's alternative payment option because it complied with the then-operative version of Google's DDA and Match Group believed it was the best option for Tinder and its users—most of whom in the United States chose Match Group's payment system rather than GPB. Following the meeting, Google took no action and allowed Match Groups' apps to continue to use their own payment options and Google Play.

**Google Abruptly Changed its Policy to Require Match Group to Use GPB**

39.     On September 28, 2020, Google abruptly changed its Payments Policy to require that all app developers exclusively use GPB to process in-app purchases of digital content. Thus, after over more than a decade of allowing Match Group to offer alternative payment options, Google unilaterally changed its policy and reversed its prior course of dealing. **Exhibit 2**.

40.     In announcing this change, Google misleadingly represented that it had merely "clarified" its Payments Policy. In a blog post, Google claimed that it had "always required developers who distribute their apps on [Google] Play to use Google Play's billing system if they offer in-app purchases of digital goods, and pay a service fee from a percentage of the purchase." A true and correct copy of a Google Android Developers Blog web page, "Listening to Developer Feedback to Improve Google Play," so stating is attached as **Exhibit 6**.

41.     That is not true. As explained above, Google's Payments Policy previously did not require the use of GPB when users purchased "digital content that may be consumed outside of the app itself." **Exhibit 5**. Google's new Payments Policy removed that exception and added new language that specifically targets Match Group's apps. In particular, Google's new Payments Policy added new language

1  stating that apps must use GPB for "in-app purchase of . . . *subscription services (such*
2  *as . . . dating*)." **Exhibit 2** (emphasis added).

3        42.    Similarly, Google previously did not require use of GPB for subscription
4  streaming services for music or video. But Google's new Payments Policy added new
5  language requiring apps to use GPB for "in-app purchase of . . . subscription services
6  (such as . . . music, video)." *Id.*

7        43.    After announcing the change to its Payments Policy, Google offered
8  Match Group the opportunity to participate in an "incentive program," to offset the
9  increase in fees and loss of functionality incurred by switching to GPB.  The fact that
10  Google offered an "incentive program" if Match Group switched to exclusively use
11  GPB is an acknowledgment by Google that its policy will harm Match Group. But the
12  incentives Google offered are nowhere near enough to compensate for that harm;
13  indeed, no amount of money would compensate Match Group for that harm. In
14  addition, as Match Group has explained to Google, the incentive program suffers from
15  numerous flaws, including it is overly complicated, impractical to implement, will
16  require significant changes to Match Group's apps and systems, eliminates user
17  choice, and is bad for users as explained below.

18  **Google Repeatedly Delayed Enforcing its Deadline, While Granting Arbitrary**
19  **Exemptions**

20        44.    Google initially imposed a September 30, 2021, deadline for all existing
21  apps to comply with its new policy. As that date approached, the Assembly of the
22  Republic of Korea (Korea's legislative body) was considering legislation to bring
23  fairness to the app ecosystem, which passed in November 2021. *See* https://developers-
24  kr.googleblog.com/2021/11/enabling-alternative-billing-in-korea-en.html.   In   what
25  appears to have been an effort to convince Korean lawmakers not to move forward,
26  Google announced on July 16, 2021, that it was extending the deadline, this time to
27  March 31, 2022, for some apps. New apps submitted after January 20, 2021, were
28  required to comply immediately. A true and correct copy of a Google Android

DocuSign Envelope ID: 3D291918-8189-46D1-9366-53B09638158A

1    Developers Blog web page, "Allowing developers to apply for more time to comply

2    with Play Payments Policy," so stating is attached as **Exhibit 7**.

3        45.    Subsequently, in October 2021, Google extended the deadline in India to

4    April 2022. Then, in December 2021, Google extended the deadline in India again to

5    October 31, 2022. Google enacted these extensions in the face of scrutiny from the

6    Competition Commission of India. In light of all these extensions that Google granted,

7    as well as the European Union's recent agreement on the Digital Markets Act,[3] Match

8    Group reasonably believed that Google would also extend the March 31, 2022 deadline

9    that applied to Match Group's apps.

10       46.    Shortly before Google's March 31, 2022, deadline for most apps to switch

11   to exclusively use GPB, I learned of Google's announcement of a "pilot program"

12   labeled "User Choice Billing." Under this so-called "pilot program," developers may

13   offer a "choice" of billing platforms, provided one of those options is GPB.

14       47.    Only Google determines who can participate in this program. Match

15   Group asked to participate. But Google refused, telling Match Group that "User Choice

16   Billing" is only a "pilot program." To the best of my knowledge, the only developer

17   Google has selected for the "pilot" is Spotify—the popular music streaming service

18   with hundreds of millions of active users. Yet, Spotify has historically not allowed in-

19   app purchases of any kind or paid any GPB fees to Google, whereas Match Group has

20   allowed in-app purchases for many years, including use of GPB, and paid Google

21   hundreds of millions of dollars in associated fees. Match Group is far more qualified

22   than Spotify to participate in the pilot program.

23       48.    Google's disparate treatment of Spotify and Match Group follows their

24   divergent testimony by each before Congress about Google's anticompetitive conduct.

25   On April 21, 2021, the Senate Judiciary Subcommittee on Competition Policy,

26

27   _____

28   [3] *See* The NYTimes, *E.U. Takes Aim at Big Tech's Power With Landmark Digital Act* (March 24, 2022), available online at https://www.nytimes.com/2022/03/24/technology/eu-regulation-apple-meta-google.html (last visited Apr. 26, 2022).

Antitrust, and Consumer Rights held a hearing examining competition in app stores. Jared Sine, Chief Business Affairs and Legal Officer of MGI, was asked to testify at this hearing.

49.     The evening before Mr. Sine's testimony and after MGI began disseminating to the press the written testimony that Mr. Sine submitted to the subcommittee, Sarah Karam, Director of Partnerships at Google Play, requested "5 minutes to chat" with me.

50.     On the call, Ms. Karam asked me whether Mr. Sine was aware of all the elements of Match Group's relationship with Google, including discussions around the "incentive program" Google had previously offered to offset a portion of the payments Match Group would be required to make to Google for app store "fees." After mentioning the incentive program, Ms. Karam then expressed concern that Mr. Sine's planned testimony described the relationship between Google and Match Group in a more negative light than Google had hoped. Ms. Karam asked me to relay Google's perspective to Mr. Sine before the hearing.

51.     Mr. Sine proceeded to testify before the Senate Judiciary Subcommittee on Competition Policy, Antitrust, and Consumer Rights on April 21, 2021, consistent with his prepared remarks. He critiqued Google for persuading Match Group "to join the Android ecosystem under the false pretenses of an open platform, where [Match Group] would not be required to use Google's payment processor or pay the 30 percent tax" and described Google's effort to improperly "leverage[e] its monopoly power to change the rules" on Match Group and other developers.

52.     Mr. Sine was not the only one to criticize Google's monopolistic practices at the hearing. Some of the harshest criticisms came from the Subcommittee members. For example, Senator Blumenthal commented that "Google [is] here to defend the patently indefensible. If you presented this fact pattern in a law school antitrust exam, the students would laugh the professor out of the classroom because it's such an obvious violation of our antitrust laws." He was also quick to question Google's

motives in Ms. Karam's call to me the night before Mr. Sine's testimony, describing it as "an insult to this committee" and calling for an investigation.

53.     Spotify also testified at the hearing but said nothing about Google. Spotify then received an offer to participate in "User Choice Billing." Match Group did not.

**Google Recently Started Enforcing its Policy Change by Rejecting Match Group's App Updates**

54.     Match Group frequently updates its apps to, among other things, implement new software, improve functionality, address bugs, and enhance security. Match Group submits app updates to Google for review and approval.

55.     Typically, Match Group submits these app updates to Google every other week. Google reviews the updated apps for compliance with Google's policies and, if approved, publishes the apps on Google Play.

56.     Just recently, Google has started rejecting Match Group's app updates for not requiring the exclusive use of GPB for in-app purchases.

57.     On April 20, 2022, Google rejected an update submitted by OkCupid for not complying with the Payments policy—specifically, for allowing a "non-Google Play[] billing system." A true and correct copy of this rejection is attached as **Exhibit 8**.

58.     On April 25, 2022, Google rejected updates submitted by OurTime and Match for failing to comply with Google's Payment Policy. A true and correct copy of this rejection is attached as **Exhibit 9**.

59.     On April 28, 2022, Google rejected a Tinder update for the same reason. A true and correct copy of this rejection is attached as **Exhibit 10**.

60.     As explained below, Google's rejections of Match Group's app updates have already harmed Match Group and its users by depriving them of critical app updates. Without the ability to receive updates, users' apps will quickly lose functionality and become obsolete.

61. According to Google, on June 1, 2022, it will remove Match Group's apps from Google Play unless the apps accede to Google's new Payments Policy and exclusively use GPB. A true and correct copy of a Google web page, "Understanding Google Play's Payments Policy," so stating is attached as **Exhibit 11**.

62. Match Group thus has only two alternatives: (1) lose access to Google Play or (2) comply with Google's mandate. As detailed below, either will irreparably harm Match Group for numerous reasons.

**Banning Its Apps from Google Play Will Irreparably Harm Match Group**

63. A ban of Match Group's apps from Google Play would be a death knell for Match Group's business for several reasons:

64. **Lack of viable options to reach Android users**. If Google removes Match Group's apps from Google Play, the more than one billion Android device users around the world could not download Match Group's apps from or make in-app purchases through Google Play, leaving Match Group with no viable means to reach those consumers.

65. There is no realistic alternative to Google Play because no other Android app store comes anywhere close to the number of users that the Play Store has. More than 90% of all downloads of Android apps are completed using Google Play.[4] Google Play also comes pre-installed on 90% to 100% of all Android-based devices around the world (excluding China).[5]

66. Apple's App Store is not a substitute for Google Play because apps developed for Android only work on Android devices, while apps developed for Apple's iOS only work on iOS devices. Android users cannot even access the Apple App Store and vice versa. Nor do most users switch phone platforms based solely on

---

[4] European Commission, Case No. AT.40099, Google Android ("EC Google Android decision") at Table 5.
[5] Table 4. EC Google Android decision.

app availability. There are many disincentives to do so. First, the consumer would lose their investment in their previously purchased device. The consumer would also lose their investment in digital content and apps that only run on Android. Second, the consumer would lose functionality and data integration with other smart devices that run on Android—including tablets, speakers, smartwatches, televisions, cameras, and even refrigerators—unless that consumer makes a significant financial investment to purchase all new devices. Third, the consumer would face various technological obstacles and investments of time involved with learning and utilizing a new operating system, including different designs, controls, and functionality.

67.     Because of these market realities, many of which Google intentionally created or exacerbated, Match Group will lose its only viable method of reaching more than half of its potential users on June 1 unless it complies with Google's mandate and exclusively uses GPB for in-app purchases.

68.     **Loss of app functionality**. Google's rejection of updates to, and/or removal of Match Group's dating apps, from Google Play, will quickly make these apps obsolete and preclude subscribers from accessing the premium services for which they have already paid. The Android OS only allows apps downloaded via Google Play to be automatically updated. For other apps that are not downloaded from Google Play, a user must follow a burdensome process to manually download each update or bug fix. Without the ability to obtain automatic updates from Google Play to fix bugs and other issues, Android device users will lose functionality and the user experience will suffer. These users similarly will be unable to receive new features or critical safety updates that Match Group makes available to users on other devices. Relatedly, the inability to update apps would cause differences between versions of Match Group's apps used on Android versus other operating systems (e.g., Apple). This will cause compatibility issues and decrease valuable network effects (see below).

69.     **Loss of users/network effects**. One of the most attractive attributes of Match Group's apps are their broad install bases. Users gravitate toward apps they

believe offer the richest pool of users and thus the greatest selection and chance of a romantic match. But the absence of Match Group's apps on Google Play would, over time, significantly hamper the network effects that make these apps so popular and users expect to receive. So too would the loss of functionality discussed above. Match Group's apps' user bases would shrink when compared to their competitors, causing even more users (including users on non-Android devices) to leave Match Group's apps as a result.

70.      Though users could still access their accounts through Match Group's apps' respective websites, users overwhelmingly prefer to use Match Group's apps. For example, as of 2021, less than 5% of Tinder's users relied exclusively on the Tinder website, and a similar percentage used the Tinder website in combination with the Tinder app; the remaining 91% of Tinder users relied solely on the Tinder app. Similarly, the vast majority of Tinder users who purchase digital products do so through the Tinder app. In 2021, for all Tinder users who purchased subscriptions or à la carte digital products, approximately 98% did so through the Tinder app rather than Tinder's website.

71.      **Loss of market share**. The dating app market is fiercely competitive, with many competing options available to users (*e.g.,* Bumble, Coffee Meets Bagel). There is low cost to a user who wants to switch services, and there is a consistent stream of new services and entrants. If Google were to ban Match Group's apps from Google Play, then users who visit Google Play will have the option of downloading apps for many of Match Group's competitors, but not Match Group's apps.

72.      **Interference with contracts**. As discussed in further detail below, Google's policy change will interfere with Match Group's contracts with its users and subscribers.

DocuSign Envelope ID: 3D201918-8189-46D1-9366-52B99G881F8A

**Complying with Google's Mandate Will Irreparably Harm Match Group**

73.    Match Group cannot avoid irreparable harm by complying with Google's mandate, which is the only other alternative according to Google's new Payments Policy.

74.    **Loss of Match Group's significant investments and substantial redesign of its software and products**. To comply with Google's mandate, Match Group will have to abandon prior investments that it has made and incur substantial, additional, and otherwise unnecessary costs to redesign its apps, ensure continuity of service for its customers, alter its current payment methodologies, and restructure its subscription plans and price offerings. In short, Match Group would have to substantially change how its brands have done business for over a decade and substantially change the experience that millions of users have on our apps. Moreover, Match Group would have to put other projects on hold, including updating apps and rolling out new features that its customers could otherwise use.

75.    **Inability to offer better and customer-preferred payment options**. Match Group has found that its payment systems are better for customers and Match Group. By offering alternative payment options, either alone or as an alternative to GPB, Match Group can provide better experiences for users, better customer service, more flexibility in payment options, and enhance user safety.

76.    For example, by utilizing its own alternate payment options, Match Group also can improve users' payment flow for in-app purchases. Unlike GPB, Match Group's alternative payment options offer users an easy checkout process involving input of their payment info plus just a single, added click to complete their checkout (known as "1-click checkout"). Conversely, if Match Group's users are required to switch to using GPB, they will have to enter their payment information into Google and follow additional steps. This will confuse and deter customers who are accustomed to using Match Group's easy process. Many users will inevitably "churn out" – i.e., end their customer relationship with Match Group – because this effort is too difficult

DocuSign Envelope ID: 3D201918-8189-46D1-9366-52B006381F8A

77.  Match Group's payment systems also support features that enhance the user experience and facilitate payments, which GPB does not support. For example, GPB does not allow app developers to choose which payment methods should be offered to users (e.g., credit card, PayPal), which can be crucial for an app's success, as consumer preferences are different from one country to another. Instead, the decision is made by Google at its sole discretion.

78.  GPB also offers limited flexibility in the design of subscription plans. Tinder, for example, offers recurring (auto-renewing) subscriptions of various lengths. GPB, however, only supports recurring subscriptions for specific predefined durations of time (one week, one month, three months, six months and one year) and imposes a renewal period of the same duration. This makes it impossible for Match Group to provide its users more choice by offering subscriptions for different lengths of time or renewal period duration. For example, with the exclusive use of GPB, Match Group cannot offer users a two-month subscription as an initial commitment period renewed monthly. GPB's lack of flexibility causes friction in Match Group's apps' users' experiences, which degrades the user experience and leads to further loss of users.

79.  Further, unlike Match Group's payment systems, GPB does not allow users to make installment payments on a recurring basis. Match Group's payment systems enables the user to make monthly payments for subscriptions, instead of paying a lump sum. By contrast, GPB does not offer an installment payment option, which could deter users who are concerned about the immediate financial commitment or who may not be able to financially afford it.

80.  On information and belief, GPB also limits apps' ability to make special offers to its users, such as discounted subscriptions. While GPB allows certain special offers (known as introductory offers by Google), it does not allow a user to subscribe to the same special offer several times. This means that if a user benefits from, say, a 30% discount on their one-month subscription to try the service, app developers cannot provide the same discount for a second time – which could be done if other payment

- 17 -

systems were used. Not only does this lead to negative consequences for consumers, but also it has negative consequences for app developers, as certain customers will only re-subscribe if they receive a special offer. Additional special offers could include, for example, "retention" offers, which would provide an existing subscriber a discount at the next renewal point in their subscription in order to encourage them to continue their subscription. GPB does not provide the ability to do that.

81.    Another drawback of using GPB to process subscriptions is that Google imposes a limit on the number of unique products and services that Match Group can offer. GPB initially limited Match Group's Tinder app to only 1000 stock-keeping units ("SKUs"), which prevented Match Group from creating new offerings to sell to its users. In March 2021, Match Group contacted Google regarding the issues created by GPB's SKU limit. In response, Google warned Match Group that the more products it hoped to offer its users, the more the app's performance would decline.

82.    In addition, GPB allows developers to offer a subscription SKU for special introductory pricing only once. This restriction prevents Match Group from making follow-up offers to reinvigorate (or "win back") existing users whose purchase behavior has slowed or otherwise changed. Similarly, GPB does not allow Match Group to make so-called retention offers—like a discount at the next renewal point of a user's subscription—to retain existing subscribers. Match Group has this flexibility with other payment options.

83.    GPB also does not allow rule-based regional pricing. Using its own alternate payment options, Match Group has the ability to programmatically set the introductory price for a product SKU in a particular locale (e.g. Bay Area-specific pricing). GPB does not support this. Again, Match Group has this flexibility with other payment options.

84.    GPB also does not offer an easy way to offer bundles (grouping consumable products together), which is a common practice and one that increases user adoption of multiple products.

85.     Match group also has more flexibility in its customer service solutions (including refunds, credits, payment methods, and scheduling) when utilizing its own alternate payment options instead of GPB. Required use of GPB will limit Match Group's ability to resolve customer service issues tied to billing for customers who would have preferred to use a different payment method.

86.     Match Group's data shows that consumers prefer using Match Group's payment options. For example, as of March 2022, a majority of Tinder in-app purchase revenue on Android used Tinder's payment system instead of GPB.

87.     Match Group's data also shows that users opting for Match Group's payment systems tend to renew existing subscriptions more often compared to users paying through GPB. Match Group data shows a 10% lower renewal rate for its apps' users that use GPB versus alternative Match Group options.

88.     Further, Match Group has received numerous complaints resulting from transactions processed via GPB. Users, for example, have complained of issues like (a) transactions failing to process, (b) duplicate charges incorrectly applied to user accounts, (c) incorrect charges associated with subscriptions users did not enter or long had cancelled, and (d) inability to access premium features despite paying through GPB, among many, many others.

89.     **Inability to resolve payment issues and provide customer service**. With its own systems, Match Group can ensure that its consumers receive high-quality customer service when payment issues arise. When Google processes the payments, however, it becomes the "merchant of record" and inserts itself as an intermediary. Google then provides app developers with a limited amount of transaction data. This limits Match Group from troubleshooting payment issues. Google does not have a robust reporting infrastructure that Tinder could use, for example, to respond to errors in user payments (e.g., it could happen that some payments were not activated). Google lacks the same incentives to provide good customer service that Match Group has

1  because customers are likely to (and often do) blame Match Group (rather than
2  Google) if something goes wrong.

3       90.    **Loss of critical data**. More generally, the lack of transaction data from
4  GPB precludes Match Group from obtaining data it could use to optimize its business
5  and improve its services. For example, by using its own payment systems, Match
6  Group can also access payment data that Match Group can use to enhance security and
7  keep users safe. Unlike Google, Match Group does not monetize this data (e.g., in
8  advertising). Rather, Match Group uses payment information to perform registered sex
9  offender screenings and check for fraudulent transactions.

10       91.    **Loss of reputation and goodwill**. All the issues discussed above will
11  damage Match Group's reputation and goodwill. In the crowded dating app market,
12  Match Group's apps' reputations for providing an enjoyable, safe, and seamless dating
13  experience is crucial. If Google removes the Match Group's apps from Google Play,
14  increased functionality issues, version discord, and user confusion and discontent will
15  result. Similar issues will arise if Match Group complies with Google's requirement
16  to exclusively use GPB. This forced conversion requires awkward in-app user
17  messaging instructing the change and extra steps for current customers, in addition to
18  all of the other negative impacts and reductions in offerings discussed above.

19       92.    **Interference with contracts**. As discussed in further detail below, even
20  if Match Group complies, Google's policy change will interfere with Match Group's
21  contracts with its users and subscribers.

22  **Google's Policy Change Will Cause Further Irreparable Harm by Interfering**
23  **with Match Group's Contracts**

24       93.    Match Group brands have contracts with their users that are set forth in
25  terms of use and similar agreements.

26       94.    A true and correct copy of Tinder's Terms of Use is attached as **Exhibit**
27  **12**.

28

95.     A true and correct copy of PlentyofFish's Terms of Use Agreement is attached as **Exhibit 13**.

96.     A true and correct copy of Match's Terms of Use is attached as **Exhibit 14**.

97.     A true and correct copy of OurTime's Terms and Conditions is attached as **Exhibit 15.**

98.     A true and correct copy of OkCupid's Terms and Conditions is attached as **Exhibit 16**.

99.     Users of these apps agree to the applicable terms of use when they create accounts in exchange for, among other things, limited "license[s] to access and use [Match Group's] services." Exhibit 14 (Match.com Terms of Use) at § 6 ("For as long as you comply with these Terms, Match grants you a personal, worldwide, royalty-free, non-assignable, non-exclusive, revocable, and non-sublicensable license to access and use our Services. . . ."); Exhibit 16 (OkCupid Terms & Conditions) at § 6 (same); Exhibit 13 (PlentyofFish Terms of Use Agreement) at § 6; Exhibit 12 (Tinder Terms of Use) at § 6; Exhibit 15 (OurTime Terms and Conditions) at § 6. Collectively, these apps have millions of active users on Android devices in the United States.

100.    Relatedly, millions of those users have purchased subscriptions in exchange for the right (consistent with the terms of use to which they have agreed) to access additional services and content for the length of their subscription — e.g., one-month, six-month, or twelve-months – which automatically renews until terminated by the user. *See, e.g.*, Exhibit 12 (Tinder Terms of Use) at § 10 ("If you terminate or cancel your subscription, you may use your subscription until the end of your then-current subscription term."); Exhibit 14 (Match.com Terms of Use) at § 8; Exhibit 16 (OkCupid Terms & Conditions) at § 8; Exhibit 13 (PlentyofFish Terms of Use Agreement) at § 8; Exhibit 15 (OurTime Terms and Conditions) at § 8. Many users have also purchased the right to use á la carte features.

DocuSign Envelope ID: 3D201918-8189-46D1-9366-52B00681586A

101. In Google Play, Google provides links where consumers can access the terms of use and similar agreements for Match Group's apps. Thus, Google is aware of these contracts. In addition, Google is aware that users of Match Group's apps purchase subscriptions and á la carte features. Indeed, GPB processes some of these transactions made by users of Tinder and other apps.

102. These contracts will be disrupted and interfered with if Google removes Match Group's apps from Google Play, or Match Group is forced to comply with Google's change to the Payments Policy.

103. First, removal of Match Group's apps from Google Play will disrupt the contracts of existing customers who need to replace their Android device due to loss or damage and who failed to or otherwise could not transfer existing apps to their new device. Because these customers would lack the ability to download the apps to their replacement devices from Google Play, they would lose access to the apps, including features they paid for through a subscription or á la carte.

104. Although Match Group could in theory educate these users on alternative download options, doing so would be difficult and ineffective. For example, Google technically allows Android device users to download and install apps from websites, but few users have independent knowledge of this option or can perform the steps necessary to do it. Google calls this download process "sideloading" and it has gone out of its way to construct technological roadblocks that make this process needlessly difficult. Google requires Android users who sideload an app to follow typically more than a dozen different and difficult steps, such as changing their devices' default settings and manually granting permissions. During this process, Google also tries to dissuade the user, who is inundated with repeated, alarming, and misleading warnings.

105. Second, Google's new Payments Policy will disrupt customers' subscriptions. If Match Group's apps are banned from Google Play, the subscriptions for those apps that were paid for using GPB would not automatically renew and continue, as they are contractually set to do. If Match Group complies with Google's

policy change, then subscribers that currently use Match Group's alternative payment options will need to eventually switch to GPB, including when making any change to their subscription or purchase of additional features. That switch requires additional user actions and steps, including creating a GPB account and entering payment details, which could confuse and deter users – who are accustomed to Match Group's easier payment options – and interfere with these transactions.

106. In addition, GPB does not permit existing subscribers to update their credit card information on file before their subscription renews. Thus, users who wish to utilize a different credit card to renew their subscription (e.g., because their former credit card has expired since the prior billing cycle) must wait until the subscription renewal process initiates and fails, before they can update their card information. This added hurdle will cause Match Group to lose additional customers.

107. Third, as discussed previously, Match Group frequently updates its apps (typically every other week) to fix bugs, enhance functionality, add new features, and other reasons. Google recently rejected Match Group's updates and has threatened to remove its apps from Google Play altogether, which would make it infeasible for Match Group to distribute updated apps to Android users. As explained further above, without the ability to update, users of Match Group's apps will quickly stop functioning as intended and will quickly lose app features and functionality, including those that customers paid for.

1   I declare under penalty of perjury under the laws of the State of California that

2   the foregoing is true and correct.

3   Executed on this 10th day of May, 2022, at Lafayette, California.

4

5   *Peter Foster*

6   ─────────────────────────────
    9BC048D8D162437...          Peter Foster

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28