# EXHIBIT 4
# PUBLIC REDACTED VERSION

ATTORNEYS' EYES ONLY

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN FRANCISCO DIVISION
 3
    IN RE GOOGLE PLAY STORE     :  Case No.
 4  ANTITRUST LITIGATION        :  3:21-md-02981-JD
                                :
 5                              :
    This Document Relates To:   :
 6                              :
    State of Utah et al. v.     :
 7  Google LLC et al.           :
    Case No. 3:21-cv-05227-JD   :
 8                              :
    Match Group, LLC et al. v. :
 9  Google LLC et al.           :
    Case No. 3:22-cv-02746-JD   :
10                              :
    Epic Games Inc. v. Google   :
11  LLC et al.                  :
    Case No. 3:20-cv-05671-JD   :
12                              :
    In Re Google Play           :
13  Consumer Antitrust          :
    LItigation                  :
14  Case No. 3:20-cv-05761-JD   :
15
16          ** ATTORNEYS' EYES ONLY **
17            TUESDAY, APRIL 4, 2023
18
19        Video Recorded and Remote Zoom
    Deposition of HAL J. SINGER, Ph.D., taken
20  pursuant to Notice, at the law offices of
    Munger, Tolles & Olson LLP, 601 Massachusetts
21  Avenue NW, Washington, DC, commencing at
    approximately 9:11 a.m., on the above date,
22  before Rose A. Tamburri, RPR, CM, CCR, CRR,
    USCRA Speed and Accuracy Champion and Notary
23  Public.
24
25
```

```
                                                  Page 2
```

1    APPEARANCES:
2
3

         UTAH OFFICE OF THE ATTORNEY GENERAL
4        BY:  LAUREN WEINSTEIN, ESQUIRE
         160 East 300 South, 5th Floor
5        P.O. Box 140872
         Salt Lake City, Utah  84114
6        Representing the State of Utah
7
8        BARTLIT BECK LLP
         BY:  KARMA M. GIULIANELLI, ESQUIRE
9        1801 Wewetta Street, Suite 1200
         Denver, Colorado  80202
10       karma.giulianelli@bartlitbeck.com
         Representing Interim Co-Lead Class
11       Counsel for Plaintiffs and the Proposed
         Class in In re Google Play Consumer
12       Antitrust Litigation
13
14
         HUESTON HENNIGAN LLP
15       BY:  TATE HARSHBARGER, ESQUIRE
         523 West 6th Street, Suite 400
16       Los Angeles, California  90014
         tharshbarger@hueston.com
17       (Via Remote Zoom)
         Representing Match Group Inc., et al.
18
19
         CRAVATH, SWAINE & MOORE LLP
20       BY:  ERIC ZEPP, ESQUIRE
         Worldwide Plaza
21       825 Eighth Avenue
         New York, New York  10019
22       ezepp@cravath.com
         Representing Plaintiff Epic Games
23
24
25

ATTORNEYS' EYES ONLY

Page 3

```
 1   APPEARANCES, CONTINUED:

 2

 3        MUNGER, TOLLES & OLSON LLP
          BY:  JUSTIN P. RAPHAEL, ESQUIRE
 4        560 Mission Street, 27th Floor
          San Francisco, California  94105
 5        Representing the Defendants
          Google LLC et al.

 6

 7

 8   ALSO PRESENT:

 9

          BRYAN BLOOM, ESQUIRE
10        Attorney General's Antitrust
          Bureau of New York

11

12        GLEN FORTNER, Videographer

13

     (Via Remote Zoom)

14

15        BRANDON KRESSIN, ESQUIRE

16        TATE HARSHBARGER, ESQUIRE

17        ADAM HOEFLICH, ESQUIRE

18        STEPHEN MYERS

19        DR. KEVIN CAVES

20

21

22

23

24

25
```

ATTORNEYS' EYES ONLY

**Page 4**

1

**I N D E X**

2

3  TESTIMONY OF:  HAL J. SINGER, Ph.D.

4

   By Mr. Raphael.....................7, 423

5

   By Ms. Giulianelli....................423

6

7

8

**E X H I B I T S**

9

EXHIBIT NO.        DESCRIPTION           PAGE NO.

10

   DX-1112     Merits Reply Report of Hal        6

11              J. Singer, Ph.D.

12  DX-1113     University of Utah Campus        20

               Directory

13

   DX-1114     Logit Chapter from Kenneth       92

14              Train Textbook

15  DX-1115     Apple Slide Deck - Bates        253

               Nos. DX-4526.001 - 138

16

   DX-1116     Daniel L. McFadden Nobel        410

17              Prize Lecture, December 8,

                2000

18

19

20

21

22

23

24

25

ATTORNEYS' EYES ONLY

Page 5

1

2    DEPOSITION SUPPORT INDEX

3

4    DIRECTION TO WITNESS NOT TO ANSWER

5    Page      Line

6    None

7

8    REQUEST FOR PRODUCTION OF DOCUMENTS

9    Page      Line      Description

10   None

11

12

13

14

15   STIPULATIONS

16   Page      Line

17   None

18

     PREVIOUSLY MARKED EXHIBITS REFERRED TO

19

     EXHIBIT NUMBER                  PAGE REFERENCED

20

     DX-1059                                22

21

22

23

24

25

ATTORNEYS' EYES ONLY

Page 13

```
 1              And do you get compensated in any
 2   way for the amount that Econ One bills for the
 3   staff time that was spent on this matter?
 4       A.   Yes.
 5       Q.   And how does that work?
 6       A.   So in -- in general, I keep a
 7   percentage of the billings of the -- of the
 8   staff who are beneath me, who are working in
 9   support of me, yes.
10       Q.   And what percentage is that?
11       A.   So, in general, it's 30 percent,
12   but -- but with -- with the -- with the
13   exception of the -- of the fairly senior level
14   person, I'm keeping 20 percent.
15       Q.   Okay.
16              And so just total compensation for
17   your work in this matter, both your work
18   personally, as well as your share of the
19   staff's work, do you have any estimate of
20   that?
21       A.   I do not.
22       Q.   Do you think it's more or less than
23   $2 million?
24       A.   My personal compensation?  I don't
25   think it's $2 million, no.
```

1   alternatively, the overcharge can take the

2   form of a suppressed subsidy.

3               I just want to make sure -- I

4   couldn't tell if your question allowed for

5   that -- that second one.

6       Q.   Understood.  I appreciate that.

7               Let's just -- let's talk about

8   the -- the overcharge side, setting aside the

9   subsidy for a moment.  Okay?

10      A.   To be clear, they're both

11  overcharges, right, but -- but I -- I think

12  I'm -- I think I get your drift.  But you'll

13  -- how about we'll talk about take rate side.

14      Q.   Well, you know, I'm not going to say

15  the take rate side, but I'll -- I'll get to --

16  I appreciate the clarification.

17              MS. GIULIANELLI:  This could take

18  all day.  Objection.

19              MR. RAPHAEL:  I appreciate your

20  clarification.  I will -- I'll ask questions

21  so I'm not confusing you.  Okay?

22              THE WITNESS:  All right.  Okay.

23  BY MR. RAPHAEL:

24      Q.   So if a consumer purchased an app, a

25  subscription or an in-app purchaser from a

Page 56

1  developer --

2       A.    Um-hmm.

3       Q.    -- and that developer would not have

4  lowered its prices if it paid lower service

5  fees, setting aside your subsidy model, that

6  consumer was not overcharged as to that

7  purchase?

8       A.    Well, I think you're -- you're asking

9  me to assume if there are no damages, then

10 there are no damages, and I think -- which is

11 tautological.  But -- but we -- my model and

12 my view of the world is that every developer

13 will, particularly over the long run, reduce

14 its prices in response to reduction in its

15 costs.  That's -- that's my hopefully very

16 uncontroversial view; right?

17           So I have to respectfully dis --

18 reject the assumption that's baked in that --

19 that this developer for some reason defies

20 economics, defies empiricism and pockets

21 100 percent of the take rate reduction.  I

22 think that's what you're asking me to assume.

23           But what I'll grant you is that if

24 you -- if you're willing to make those

25 uneconomic assumptions, that -- that -- that

ATTORNEYS' EYES ONLY

Page 57

1  certain developers defy economics and pocket

2  100 percent of the take rate, then when you go

3  down the take rate path, you won't get to

4  damages.

5      Q.   Okay.

6           So your opinion is that all

7  developers, if they experience a service fee

8  reduction, will lower the price of their

9  product to consumers?

10      A.   I'd like to put -- give a little more

11  granularity to the hypothetical 'cause the --

12  the way that you phrased it, you could have a

13  take rate reduction for a day touching one

14  percent of your revenues, right?

15           So I just want to make sure that

16  if we can rule out, kind of, silly scenarios

17  and talk about a sustained -- in my but-for

18  world, we're talking about the advent of

19  competition, you know, Circa 2009, 2010, they

20  weren't talking about a sustained long-term

21  reduction in take rate.

22           And it is my view that every

23  developer under those circumstances, long-term

24  touching all of their revenues, felt by

25  everyone, then I do think economics would

Page 72

```
 1   this transaction to be consummated on this
 2   alternative platform, and I don't want you to
 3   go there because you -- you love me; I want to
 4   go -- I want you to go there because you're
 5   going to be better off, too, so here's a
 6   portion, right?
 7               That -- that is the, kind of, the
 8   natural mechanism that's going to facilitate
 9   pass-through in steering -- pass-through in
10   the but-for world, but it is not necessary.
11       Q.   Just so we're clear, steering is not
12   a necessary condition to pass-through in your
13   view?
14       A.   I think I can't say it any
15   differently.  It's not strictly necessary, but
16   it is certainly helpful.
17       Q.   I just want to make sure I'm clear on
18   the Logit model.
19               If there were one transaction
20   involving a dating app and 100 transactions
21   involving all apps in the dating category, you
22   calculate the pass-through rate by dividing
23   one by 100 to get one percent share; right?
24       A.   I may have missed it, but I take for
25   each developer, I calculate its share, right,
```

Page 73

```
 1   within a given year or a given time period

 2   within the category.

 3        Q.    Right.

 4        A.    That is correct, okay, but I couldn't

 5   tell that from your -- from your hypothetical.

 6        Q.    Right.

 7               So maybe I'll just cut through it

 8   and say it's true, under your Logit model for

 9   pass-through, that each developer's

10   pass-through rate is the inverse of their

11   share of their category?

12        A.    It's one minus the share.  Not quite

13   the inverse, but one minus the share of

14   their -- of their category, that's right.

15        Q.    And so the only way that an app's

16   pass-through rate would be -- would be zero is

17   if the app had a 100 percent share of its

18   category?

19        A.    Correct.

20        Q.    You calculated the service fee rate

21   that Google supposedly would have charged

22   without the challenged conduct with a

23   Rochet-Triole model and a Landes-Posner model;

24   right?

25        A.    Among others, but yes.
```

1    had just been talking about our kids and

2    wives.

3              Anyway, let's -- let's keep

4    talking about dating apps.

5              MS. GIULIANELLI:  Move to strike.

6    BY MR. RAPHAEL:

7        Q.   Now, you have a pass-through rate for

8    Tinder that is substantial, in the order of

9    65 percent?

10       A.   I don't have it memorized, but it is

11   what it is.  It's whatever their -- their

12   share is of the category that Tinder has

13   selected to market itself, in which has a lot

14   of economic meaning.

15       Q.   So in your view, would it be wrong to

16   assume that the pass-through rate for Tinder

17   is zero percent?

18       A.   Yeah, that -- when you say, "wrong,"

19   it would -- it would violate the predictions

20   of the Logit model.  I don't think that that's

21   what Tinder's pass-through rate would be in

22   the but-for world, it would not be zero.

23       Q.   So if the Match plaintiffs' expert

24   had opined that Tinder would pocket all of a

25   reduced service fee in the but-for world, it

1    would be your opinion that that would be

2    inconsistent with economics?

3                MS. GIULIANELLI:   Objection to the

4    form.

5                THE WITNESS:   Yes, totally wrong.

6    BY MR. RAPHAEL:

7        Q.   Your pass-through model is based on

8    categories of apps in the Google Play Store?

9        A.   Correct, with one important caveat.

10   It's not just that Google gets to select the

11   categories or has selected the categories, but

12   conditional on selecting the categories, the

13   developer then selects which category they

14   want -- they want in on and they want to

15   market themselves on.

16               So I feel like you have two very

17   important pieces of economic information

18   there.

19       Q.   Okay.

20               So Google decides which categories

21   exist in the Play Store; right?

22       A.   Correct.

23       Q.   And developers then choose which

24   category they want their app to be in; right?

25       A.   Correct.

Page 83

1    going to be able to name them, but I -- I -- I
2    seem to recall a Nobel Prize maybe 15 years
3    ago for -- for applied -- an applied
4    microeconomist who was using Logit and
5    other -- other types of regressions for the --
6    the dependent variable could only take on the
7    value -- well, for certain restrictions on --
8    on the nature of the -- of the model.
9        Q.    Now, you cite in your report a
10   textbook by Kenneth Train.
11       A.    Yes.
12       Q.    Kenneth Train is an economist at the
13   University of California, Berkeley?
14       A.    That sounds right.  I believe he --
15   he may have moved around, but -- but -- but
16   I -- I can take your word for it.
17       Q.    Is that a standard textbook on Logit
18   or discrete choice models?
19       A.    Yes.
20       Q.    Can you think of a more authoritative
21   source on Logit or discrete choice models than
22   the Kenneth Train textbook?
23       A.    Well, I think that any econometric
24   textbook is going to cover Logit; it's fairly
25   basic.  So I think that any -- any well

Page 84

1    received or widely used econometric text that

2    covers Logit could be just as -- as valuable

3    as -- as the Train text.

4         Q.   Are there many situations in which

5    the Logit model is not appropriate?

6         A.   I don't know if I would say, "many,"

7    because we -- we see it being applied

8    routinely by economists in the antitrust

9    space, but there are certain assumptions

10   that -- that -- that are implicit lurking

11   behind Logit, just as there are assumptions

12   lurking behind every economic model.

13        Q.   And one of the -- oh --

14        A.   Can I just finish?  I'm sorry.

15        Q.   Sorry.  Sorry.

16        A.   -- that you would like ideally to be

17   satisfied.  In certain cases, it's difficult

18   to employ the tests for whether those

19   assumptions are satisfied as -- as is the case

20   here.  But -- but I -- I'll grant you that

21   there are certain restrictions about

22   preferences in the Logit, but -- but there are

23   restrictions in every -- in every economic

24   model.

25        Q.   And one of the restrictions on the

Page 85

1    Logit model is known as the independence of a

2    relevant alternative's property?

3         A.   Yes.

4         Q.   And the independence of a relevant

5    alternative's property says that all products

6    being studied in the Logit model should be

7    substitutes in proportion to their share?

8         A.   I think that's fair.

9         Q.   Okay.

10              Now, if the indepen -- indepen --

11   if the -- well, let's back up.

12              Can we call it the independence of

13   a relevant alternative's property IIA?

14        A.   Sure.

15        Q.   Okay.

16              And if the IIA assumption is not

17   satisfied in the Logit model, then the Logit

18   model can lead to unrealistic forecasts; is

19   that right?

20        A.   I'm not going to say so necessarily.

21   I think that it could produce estimates that

22   are different than the true parameters that

23   you're hoping to estimate, but I think the

24   word that you used was unreliable?  And I

25   felt --

1      Q.    Well --

2      A.    -- I felt like that was too harsh.

3      Q.    Well, let me just ask you this:

4            Does your Logit model satisfy the

5      IIA property?

6      A.    I believe it does, yes.

7      Q.    And if your Logit model does not

8      satisfy IIA, would that lead you to have any

9      concern that its forecasts are unrealistic?

10     A.    Well, it would depend on -- on how

11     badly these assumptions were violated.  So I

12     think that they're not.  I think that the --

13     the groupings here were economically

14     reasonable.  These are not my groupings; these

15     are Google's groupings that are then

16     self-selected by the -- by the apps.

17            And there are tests for IIA, I

18     think Haus -- Hausman and maybe McFadden have

19     developed a test.  It's -- it has its flaws as

20     well.  Those tests are not feasible here

21     because we don't have consumer level data.

22     We're -- we're just seeing the apps shares.

23     So we'd have to drop the entire app out of the

24     dataset, in which case you'd get the same

25     findings, and so you'd always affirm the IIA.

1          Your experts, of course, didn't
2    show that IIA wasn't satisfied through those
3    tests either, which I think is confirmation
4    that we can't do those tests.  But I feel
5    confident the IIA is reasonably satisfied
6    here.
7               MS. GIULIANELLI:  We can -- you
8    can continue on, but at some point, let's take
9    a break.  We're -- I don't want to interrupt
10   your --
11              MR. RAPHAEL:  I'm happy to take a
12   break now.
13              THE WITNESS:  Great.
14              THE VIDEOGRAPHER:  Going off
15   record, the time is 10:37.
16              (Whereupon, a recess was taken at
17   the above time.)
18              THE VIDEOGRAPHER:  Going back on
19   the record.  The time is 10:47.
20   BY MR. RAPHAEL:
21       Q.   Dr. Singer, is it your opinion that
22   Google established the categories in the Play
23   Store with the IIA property in mind?
24       A.   That is doubtful.  I think the record
25   evidence tells us that Google established the

```
 1    categories based largely on how Apple chose
 2    its categories.
 3                Now, it's possible that just as a
 4    -- a pool player doesn't have physics in the
 5    back of their mind, that they're -- they're
 6    respecting the laws of physics.  I think
 7    that's a famous Bill Friedman quote, that when
 8    Google is assembling its categories, it's
 9    doing it in a way that satisfies the IIA.
10                But it certainly would be
11    astounding if -- if they had, if some
12    marketing person had the IIA at the top of the
13    mind when they were selecting the categories.
14        Q.    Right.
15                Because to your knowledge,
16    Google's decision with -- to establish the
17    categories in the Google Play Store was made
18    as a matter of marketing?
19                MS. GIULIANELLI:  Objection to
20    form.
21                THE WITNESS:  I think -- I think
22    that as I just stated, the record evidence
23    suggests that Google was -- ████████████████
24    ██████████████████████████████████████, and
25    I think that ultimately Google wants to
```

ATTORNEYS' EYES ONLY

Page 89

1  maximize the profits of the -- of the Play

2  Store, and so it wants consumers to be able to

3  find things easily and sensibly and it's --

4  it's profit drivenal; how about that?

5  BY MR. RAPHAEL:

6      Q.   And in trying to maximize the

7  profitability of the Play Store, Google

8  established the categories by reference to the

9  categories in the Apple App Store; is that

10 right?

11     A.   In part, yes.  That Google -- that

12 Apple made presumably intelligent choices,

13 Apple's App Store was doing well and -- and

14 Google figured that ████████████████████

15 ████████████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████

18 ██████████████████████████.

19     Q.   Okay.

20          If the IIA assumption is not

21 satisfied, then the Logit model can lead to

22 unrealistic forecasts.

23          Do you agree with that?

24     A.   No, I think -- I think you asked me

25 that earlier, and I think that it depends on

Page 90

1    the degree to which it's not satisfied, right?

2               In any econometric model, just

3    even ordinary lease squares, we -- we -- we

4    make all sorts of demands on the nature of the

5    error terms in the model, just as we do here.

6    And there are -- there are errors, there are

7    violations and there are other violations.

8    And so I wouldn't -- I wouldn't condemn it

9    based on -- on some small violation.

10              I think -- I think that if the

11   categories were haphazardly assigned or done

12   without any kind of economic logic such that

13   consumers did not perceive, or at least some

14   consumers did not perceive the elements to be

15   substitutes, that -- that you could get

16   unreliable forecasts.

17      Q.   Okay.

18              So if consumers do not believe

19   that the products being studied in the Logit

20   model are substitutes, you can get unreliable

21   forecasts?

22              MS. GIULIANELLI:  Objection to the

23   form.

24              THE WITNESS:  I think that the

25   better -- the better requirement, or the more

```
 1    formal requirement, is that if -- if this
 2    property of substitution that is at the heart
 3    of Logit, which is this proportional
 4    substitution, that people tend to go places
 5    with higher shares, then you could get a less
 6    accurate forecast than -- than -- than you
 7    would hope.
 8              I think that unreliable is -- is
 9    fairly strong language, so I'm reluctant to go
10    that far.
11              MR. RAPHAEL:  Okay.
12    BY MR. RAPHAEL:
13        Q.   And what is the standard for when IIA
14    has been violated to such a degree that you
15    think that the -- using the Logit model would
16    lead to forecasts that are inaccurate?
17        A.   So here's some things I -- I would
18    want to look for, is did the categories make
19    economic sense, all right?  Is there -- is
20    there good economic basis to believe that both
21    the developers and the consumers perceived
22    those cat -- categories to define the contours
23    of competition?  And I think we have that
24    here.
25              But the second thing that I'd want
```

Page 92

1     to look at is how well the model fits.  So the

2     proof is in the pudding.  If we get the wrong

3     sign, for example, on the price term, or if we

4     get an insignificant coefficient or if the

5     R-squared of the model were low, those would

6     all be indications that the IIA was violated

7     and the Logit was not, at least applied in

8     that contingency, was not a good fit.

9                 But all of those -- all of those

10    things are pointing in the right direction.

11    And that's why I have confidence, so much

12    confidence in the Logit applied here.

13         Q.   All right.

14                 MR. RAPHAEL:  I'm going to mark

15    this as an exhibit, which is Defendants', I

16    think, 1114.

17                 (Whereupon, a document was marked,

18    for identification purposes, as Exhibit

19    DX-1114.)

20    BY MR. RAPHAEL:

21         Q.   All right.

22                 So Defendants' Exhibit 1114 is the

23    Logit chapter from the Kenneth Train textbook

24    that you've cited in your report.

25         A.   Okay.

ATTORNEYS' EYES ONLY

1    Q.   And I'd like you to go to page 48 of

2    the document.   And you'll see at the top of

3    page 48 of the Train textbook, Professor Train

4    writes that, "Proportionate substitution can

5    be realistic for some situations, in which

6    case the logit model is appropriate.   In many

7    settings, however, other patterns of

8    substitution can be expected, and imposing

9    proportionate substitution through the logit

10    model can lead to unrealistic forecasts."

11              Do you see that?

12    A.   I do see that.   I don't know if we're

13    talking about the Logit pass-through model

14    here.   I think this is just the Logit model in

15    econometrics generally, and so I'm not clear

16    what -- which forecast Train is speaking to.

17    I don't think that he's speaking to the

18    forecast of pass-through that I'm using.

19    Q.   Well, Dr. Singer, you relied on this

20    article in support of the Logit pass-through

21    model that you used in your report, didn't

22    you?

23    A.   That's correct, but I'm just pointing

24    out that Train's -- Train's usage of the word

25    "forecast" most likely is speaking to a

ATTORNEYS' EYES ONLY

Page 94

1   different forecast than the forecast that I'm

2   using the Logit model for -- hold on -- for

3   pass-through.

4       Q.    Okay.

5             Is it your testimony that your

6   Logit pass-through model does not have to be

7   consistent with general properties of Logit

8   models?

9       A.    I think that the IIA does have to be

10  respected, but I think that it's a very

11  particular application of Logit and a very

12  particular prediction of what a firm's

13  pass-through rate would be, and that's the

14  forecast on which I'm relying.

15      Q.    Do you disagree with what Professor

16  Train wrote on page 48 of the article that you

17  cited in support of your Logit model?

18      A.    There's nothing in here that I would

19  necessarily disagree with, but when he uses

20  the word "forecast," what I'd like to do is --

21  is study the chapter more generally to see

22  which particular forecast he has in mind and

23  whether that has anything to do with the

24  forecast that I am making.

25             For example, if -- if what he's

Page 95

1    trying to predict are, say, the -- the

2    predicted shares within a category and he

3    thinks that those forecasts could be off,

4    that's not the forecast that I'm making.  So

5    it's just the word "forecast" is so general

6    that it's hard for me to -- to say that it has

7    much relevance here.

8         Q.   Do you agree that the Logit model can

9    produce seriously misleading forecasts if IIA

10   fails?

11        A.   Seriously misleading forecasts?

12        Q.   Um-hmm.

13        A.   Well, so here we're trying to predict

14   pass-through rates, and I don't think that our

15   pass-through rate forecast is going to be

16   seriously misleading for some minor infraction

17   of the IIA.  And in particular, you know,

18   what's happening is that on a technical

19   matter, we're -- we're concerned about some

20   unobserved attribute being correlated with the

21   error terms.  But if the groupings are done in

22   an intelligent fashion, all these error terms

23   are going to cancel.  They're going to wash

24   out.

25                   And so I feel like -- I feel like

1    goodness of fit of the Logit model, and -- and

2    one of the ancillary or corollary assumptions

3    that are embedded therein is the IIA.  I feel

4    like if, for a given category, we had gotten

5    the wrong sign or an insignificant coefficient

6    or a low R-squared, or we had designed the

7    categories ourselves, divorced from economic

8    reality, which we didn't, that any of those

9    outcomes would have caused me to be less

10   confident in the applicability of the Logit

11   model.  But every one of those indicators were

12   pointing towards yes.

13        Q.   My question, Dr. Singer, was when you

14   conducted your regression, were you intending

15   to test whether the IIA assumption was met?

16        A.   I think I -- I don't know if my

17   answer is any different.  The intention was to

18   test whether the Logit model did a good job

19   explaining the data, but implicit in that is

20   that the IIA assumption is satisfied.

21        Q.   When you conducted your regression,

22   was it your intent to test the IIA's

23   assumption in particular?

24        A.   I think that indirectly, indirectly,

25   because IIA is at the heart of Logit, when I'm

1    testing for the goodness of fit for Logit, I'm

2    implicitly testing for whether the IIA is

3    satisfied.

4        Q.   So you were like the pool player with

5    physics; is that right?

6        A.   I don't know if I was like the pool

7    player.

8        Q.   You weren't intending to test Logit,

9    but the test that you conducted you now say is

10   a test of Logit -- of the IIA assumption?

11              MS. GIULIANELLI:  Just objection

12   to the form.

13              MR. RAPHAEL:  Let me -- I'll

14   strike that and ask a different question.

15   BY MR. RAPHAEL:

16       Q.   When you conducted your regression

17   with respect to the Logit model, did you have

18   the IIA assumption in mind?

19       A.   Yes.

20       Q.   Okay.

21              And was it your intent, in

22   conducting that regression, to test whether

23   the IIA assumption was met?

24       A.    I think indirectly, that was in the

25   back -- that was an intent.  My -- my -- the

1    intent that was at the front of my mind was
2    will the Logit model do a good job or a bad
3    job at explaining substitution patterns within
4    a given category, right?  And implicit in that
5    objective is whether the IIA was satisfied.
6        Q.   Did you cite any published economics
7    article in your reports to establish that it's
8    appropriate to test the IIA assumption using
9    the kind of regression that you did?
10       A.   I don't think I've cited articles in
11   my report that my test was a test of IIA.  I
12   think that I feel confident that IIA was
13   satisfied by virtue of the fact that Google
14   selected the categories, the developers
15   selected in, the model fit well and then
16   finally, I tested the model under other demand
17   specifications.
18             There was quite literally nothing
19   else that I could do and there was nothing
20   that your expert did in rebutting it, zero.
21       Q.   Right.
22       A.   Nothing.  Dr. Leonard did no test of
23   the IIA.
24       Q.   Right.
25             Other than the regression that you

Page 103

1    did, there was no way for you to test whether
2    the IIA assumption was met; is that right?
3         A.   No, that's not right.  You're not --
4    you're not hearing what I'm saying.
5              I have confidence that the IIA was
6    satisfied because these are economically
7    sensible categories that were designed by
8    Google, that were selected into by the
9    developers.  And then when we go to do the
10   actual fit, had the results come back
11   differently, had the coefficients been the
12   wrong sign, had they not been significantly
13   significant, had the R-squareds been low, and
14   then had another demand model done a better
15   job at explaining the variation of the
16   substitution patterns in the data, I would
17   have abandoned Logit.
18        Q.   Okay.
19             Other than your regression, was
20   there any test you are aware of that you could
21   have applied to determine whether the IIA
22   assumption was met?
23        A.   Yes, and I now feel like I'm
24   repeating myself.  There is the
25   Hausman-McFadden test.

1      Q.   But you couldn't apply that here,

2   could you?

3      A.   Let me finish.  Let me just finish.

4           Yeah, the Hausman-McFadden test

5   requires you to drop all consumers from the

6   data who selected a particular choice and then

7   re-estimate the model and -- and compare the

8   coefficients, right?

9           Yes, you cannot do that here

10  because we don't have that kind of granularity

11  in the data.

12     Q.   Are you aware of any source in

13  economics that indicates that it is an

14  appropriate and reliable way to test for the

15  IIA assumption to do the kind of regression

16  that you did here?

17     A.   I don't think that that's how you'd

18  find it in a textbook.  I think that the way

19  that an econometrician would counsel you is

20  you have an assumption about how consumers

21  choose within a category; right?  If the model

22  doesn't fit well, then that would tend to

23  indicate that assumption is violated.  But it

24  starts with the -- with the goodness of fit of

25  the model itself.

1      Q.    Okay.

2            Are you aware of any source in

3      economics that indicates that it's a reliable

4      way to test for the IIA assumption to do the

5      kind of regression that you did?

6      A.    Let me hear it back.  I'm sorry.

7      Q.    Are you aware of any source in

8      economics that indicates that doing the

9      regression that you did is an appropriate and

10     reliable way to test for whether the IIA

11     assumption is met?

12     A.    I don't know if -- if I can point

13     you, sitting here, to an economic source for

14     that proposition, but what -- what economics

15     counsels is that to determine whether a model

16     is appropriate, you need good economic

17     foundation and you need a goodness of fit in

18     the data.

19           And then finally, what I did is I

20     tried alternative specifications.  I don't

21     think there's anything else that we can do.

22     Q.    Okay.

23           Are you aware of any source in

24     economics that goodness of fit is an

25     appropriate way to test for the IIA

1    assumption?

2        A.    No.    The way that the economics will

3    tell you is that goodness of fit will tell you

4    if the Logit is a -- is a -- is the relevant

5    way to describe preferences in substitution

6    patterns here.

7                    Now, IIA is lurking in the

8    background of all of that.

9        Q.    Right.

10                   But you're not aware of any source

11   in economics that goodness of fit is an

12   appropriate way to test for the IIA assumption

13   directly?

14                   MS. GIULIANELLI:  Objection to the

15   form.

16                   THE WITNESS:  I think that if you

17   go into the economic literature and you see

18   the vast application of Logit in antitrust,

19   mergers in particular, I think that for an

20   economist or an agency, or an agency's

21   economist to feel good about using Logit, what

22   they care most about is whether the categories

23   were constructed intelligently and with a good

24   grounding in economics and in -- in record

25   evidence.

Page 118

1   doesn't do a good job here.

2   BY MR. RAPHAEL:

3       Q.   Did you consider in your reports or

4   are relying on any model of log linear demand?

5           MS. GIULIANELLI:  And I'm going to

6   object to -- to the question there to the

7   extent that it calls for something not relied

8   upon.

9           THE WITNESS:  It is -- it is

10  certainly possible, and I don't know this for

11  certain, but it is certainly possible that

12  when my modelers are trying out different

13  demand specifications, that they would have

14  tried out a log linear.  But I -- sitting

15  here, I don't know that for a fact.

16  BY MR. RAPHAEL:

17      Q.   Do you have any view on whether log

18  linear would be an appropriate model of demand

19  for the apps and app transactions at issue in

20  this case?

21      A.   I don't have a view, but at the end

22  of the day, I'm agnostic as to what's the best

23  fit, you know.  If -- if -- if -- if a -- if

24  there's another model out there that does a

25  better job at -- at explaining the data, then

ATTORNEYS' EYES ONLY

Page 119

1    I -- I should consider it.

2        Q.    A log linear demand model is not

3    subject to the IIA property; right?

4        A.    It is not subject to IIA, but it

5    imposes other restrictions on the error terms,

6    right?

7                So there is no model that is, you

8    know, restriction-free.  Every model that

9    you -- that you employ has certain lurking

10   assumptions about the error terms, every

11   model, right?

12                And -- and so I'll leave it at

13   that.

14       Q.    You agree that developers set their

15   prices ending in 99 cents the vast majority of

16   the time?

17                MS. GIULIANELLI:  Objection to the

18   form.

19                THE WITNESS:  I don't know if it's

20   the vast majority.  I know that they often do,

21   but we've seen every price point in the data;

22   I've got a figure that shows every price

23   point.

24                And we should also know that 99

25   was a restriction that was imposed by Google

Page 123

1   would -- that would somehow not move, and it's

2   something below a half a percent.   It's de

3   minimus.

4       Q.   Right.   So let's -- let's look at

5   that.   That's page 203 of your opening Merits

6   report.

7       A.   Okay.

8       Q.   And this is Table 17.

9       A.   Yes.

10      Q.   So you find there that some non-zero

11  amount of developers would not reduce their

12  prices if they were committed to having their

13  prices end in 9; isn't that right?

14      A.   Correct.

15      Q.   Do you know how many developers

16  that -- that amounts to?

17      A.   Sitting here, I don't, but it's --

18  should be easy to figure out the backup.

19      Q.   Did you run a version of this table

20  in your reports with the assumption that

21  developers would want to set prices ending in

22  99?

23      A.   I did not.

24      Q.   Okay.

25           And do you know the percentage of

1               What the Miller article that is

2     published peer reviewed that I'm using is

3     looking at a different experiment, which is

4     what happens when there's a systematic

5     increase in the cost of all competitors within

6     a market.  Very different experiment.

7          Q.    Okay.

8               And the Miller article you cited,

9     does that refer to a per unit cost -- sorry,

10    I'll ask a different question.

11              The Miller article that you cited

12    for your Logit model, does that refer to an ad

13    valorem cost in any way?

14         A.    It refers to a perturbation in the

15    marginal cost.  And the way that Miller

16    motivates the perturbation, which is a

17    frustrating word, is -- is through a per unit

18    tax.

19              Economists, when employing the

20    Logit model, often try to exploit taxes as an

21    instrument that moves a firm's costs around so

22    as to infer what the pass-through rate would

23    be.

24         Q.    Right.

25              But my question was does -- the

Page 138

1  Miller article does not refer to a ad valorem
2  cost in any way?
3      A.   I don't think that it explicitly
4  refers, but it talks about perturbations in
5  marginal costs and the ad valorem tax that
6  Google imposes perturbs the firm's marginal
7  costs.
8      Q.   Well, changes in ad valorem costs and
9  per unit costs perturb marginal costs in
10  different ways; right?
11      A.   Oh, they could, but what the
12  derivative is going to tell you is how the
13  optimal price change is given an
14  infinitesimally small change in the firm's
15  marginal cost.  And the ad valorem tax is
16  going to do that, is going to -- is going to
17  change the marginal cost, as will a per unit
18  tax.
19      Q.   But you would use different math to
20  find how a change in an ad valorem cost
21  changes the marginal cost compared to a per
22  unit change in cost; right?
23      A.   No, we can -- I don't know what you
24  mean by different costs, but we can solve to
25  the last decimal place the degree to which

1      Q.    Is it your opinion that your sales

2   tax regressions show that developers have

3   actually changed their pre-tax prices in

4   response to changes in sales tax rates?

5      A.    I think so, yes.

6      Q.    Okay.

7            And your regression is

8   specifically measuring whether that happened?

9      A.    Yeah.   In particular, the second

10  specification, you know, the one I'm

11  remembering a parameter of .7, is telling us

12  that we see -- we see developers stepping up

13  and taking a bit of the burden of the tax,

14  this is called tax incidence in

15  microeconomics, applied microeconomics, and as

16  expected, the pain is going to be shared in

17  some way between the consumer and the

18  producer.

19            And this analysis, very

20  traditional analysis of tax incidence, is

21  telling us that the developers were willing,

22  on average, to -- to bear a portion of the

23  load.

24     Q.    Well, you say, "on average."

25            Is it -- does your analysis find

Page 144

1  that all developers reduce prices when sales

2  tax rates changed?

3       A.   I don't know if it can go as far as

4  all, and that's a strong word.  I think that

5  we're looking at our central tendencies in the

6  database.

7       Q.   Okay.

8            So it's not your opinion that your

9  sales tax regression shows that all developers

10 reduce their prices when their sales rate tax

11 changed?

12      A.   I think that would be too strong of a

13 statement.  I think that their -- the data --

14 that the results could be consistent with the

15 majority, the vast majority doing so, but a

16 few not.  I don't think that it can speak to

17 all, I don't think in any regression.

18      Q.   Well, do you know what percentage of

19 developers changed their prices when their

20 sales tax rate changed?

21      A.   Sitting here, I can't tell you.  I

22 think that that's something that is solvable,

23 but sitting here, I can't tell you what their

24 --

25      Q.   Did you estimate that in your

Page 145

1  reports?

2      A.   I don't think so.

3      Q.   Okay.

4           And price stickiness didn't stop

5  developers from changing their price when

6  their sales tax rate changed; right?

7      A.   Correct.  It may have impeded it to

8  some extent, but it -- it didn't fully stop it

9  because of the coefficients that we find.

10     Q.   And in your tax regression, the

11 independent variable is the tax rate; right,

12 the percentage?

13     A.   I think that's right, but it's

14 possible that we multiplied it by the -- the

15 value of the -- of the app, itself.  I just

16 would have to go back in the code.  But that's

17 what's driving variation for sure on the

18 right-hand side of the regression.

19     Q.   You don't know whether your

20 independent variable for the tax regression is

21 the percentage of the sales tax or the gross

22 amount?

23     A.   Sitting here, I just -- that's

24 something I can't recall, but -- but I will

25 fully acknowledge that that's what's driving

1    you tried to do the derivative in your head.

2              I think that when you look at the

3    traditional models of pass-through, which,

4    remember, are a derivative of the -- if you

5    think of it as a derivative of the Lerner

6    index, it's -- it's looking at how the profit

7    maximizing price changes in response to a

8    change in cost.

9              And then you look at the most

10   common functional forms.  You'll often see

11   that marginal cost drops out of the

12   pass-through equation.

13   BY MR. RAPHAEL:

14      Q.   Well, does it drop out when you're

15   looking at an ad valorem cost?

16      A.   In this case, it drops out of the

17   pass-through equation, yes.

18      Q.   Okay.

19              And can the amount of a

20   developer's marginal cost, other than the

21   service fee, affect the amount of

22   pass-through?

23      A.   Not under the Logit model that I'm

24   using.  It's conceivable it could in others,

25   but in my Logit model -- not -- in the Logit

 1   model, it's not mine, in the Logit model, it

 2   tells you what portion of every dollar in

 3   marginal cost reduction is going to be passed

 4   through to the user.

 5              And when you think about how to

 6   calculate that reduction in marginal cost, it

 7   doesn't turn on the other marginal costs; it

 8   turns instead on the developer's price and the

 9   change in the take rate.

10      Q.   Right.

11              So your Logit model that you used,

12   the estimate of pass-through damages is not

13   affected by any developer's marginal costs

14   other than the service fee?

15              MS. GIULIANELLI:  Object to the

16   form.

17              THE WITNESS:  I think that

18   mechanically, you don't need to know the other

19   marginal costs in order to implement the Logit

20   model, but this is an important caveat.  I

21   just want to make sure that you know that that

22   Logit model, and any other derivative of

23   the -- of -- let's call it the first order

24   condition or the profit maximizing price, all

25   takes into account the cost; that is, the

Page 149

1    costs are in the formula when you take the
2    first derivative, right?
3              You start with a profit function,
4    you take the derivative, and you get the
5    profit maximizing price.  Then you take
6    another derivative of that profit maximizing
7    price with respect to a change in cost.  It
8    just so happens that under the most common
9    functional demand forms, the marginal cost
10   falls out of the math.
11             So I just want to make sure the
12   record is clear.  To go implement Logit, to go
13   implement Linear, you don't need to know the
14   firm's other marginal costs, but that's not to
15   say that they play no role in the pass-through
16   calculus.
17   BY MR. RAPHAEL:
18       Q.   Have you estimated in your reports
19   any developers' marginal costs other than the
20   service fee?
21       A.   No, and I feel like you asked me this
22   before.  I'm confident that they have other
23   marginal costs, but I haven't estimated at the
24   developer level what their other marginal
25   costs are.

1          The most -- I mean, the most

2    obvious one would be processing fees.  But

3    there are other marginal costs, royalty fees

4    that they pay, but -- but I haven't estimated

5    those at the developer level.

6          Q.   One of the inputs into your

7    pass-through model is Google's market share in

8    a world without the challenged conduct.

9          A.   Not in the pass-through model.  Did

10   you mean to say -- it certainly -- Google's

11   market share is in Rochet-Triole and it's in

12   Landes-Posner.

13         Q.   Yes.  One of your inputs into

14   calculating what Google's but-for service fee

15   would be is Google's market share in the

16   but-for world.

17         A.   Correct.

18         Q.   And you estimated that share to be 60

19   percent; right?

20         A.   I -- I used as an input the

21   60 percent because that's the best that the

22   economic literature in busting up monopolies

23   can -- can give to us.

24              I also, you know, would note --

25   yes, that is -- that is the best estimate that

1    I could find in the literature.

2        Q.   Okay.

3             And that market share estimate is

4    based on an article that attempted to estimate

5    AT&T's market share in the longest in its

6    telephone market in the 1980s?

7        A.   Yes, with one important caveat that

8    you left out, which was after AT&T's

9    anti-competitive tie was unwound, right?

10            What I -- what I was looking for

11   was the closest analogue in antitrust history

12   in which a dominant firm that had extended its

13   leverage from one market into another was

14   forced to unbundle or break apart the tie.

15   There aren't a lot of such episodes, right, in

16   the history of antitrust for reasons that we

17   could describe -- discuss over coffee, but we,

18   in any event, it's a network industry; it's

19   the monopoly, where the tie gets removed.

20   It's been studied ad nauseam by economists

21   for -- for the price effects that can be

22   attributable.  And so I thought that

23   60 percent was the best estimate.

24            And in any event, it turns out

25   my -- my in-app model for damages is not that

1   sensitive to the 60; that is, as you put in

2   different inputs for 60, you go to 70 or if

3   you think that Google share would have fallen

4   to 50, it just turns out that the model is not

5   that sensitive to that input.

6       Q.   Well, do you disagree that if

7   Google's but-for market share is 75 percent,

8   that your damages figure falls by over

9   40 percent?

10      A.   No, it wouldn't.  It would not.

11           So you're saying if all you did --

12  see, what -- what Dr. Leonard, respectfully,

13  did was that he kept changing two parameters

14  at a time.  He kept changing the but-for share

15  and the actual share.  If he held everything

16  constant for Landes-Posner, if you change just

17  the but-for share, say, by 10 percentage

18  points, you get, depending on which direction

19  you go, you get something on the order of a 5

20  percentage point swing in damages.

21           And so what -- what that's telling

22  you is that the input is important, but the

23  results don't vary significantly, or let's

24  just say the results aren't amplified based on

25  the change in this input; that they're, in

1   being sued for -- for similar allegations of
2   the challenged conduct that's here.
3        Q.   Are you offering an opinion in this
4   case that Apple is engaged in any
5   anti-competitive conduct?
6        A.   I -- I have not offered that opinion,
7   but I can rule out putting Apple in the
8   benchmark when it is the subject of -- of
9   antitrust scrutiny for having engaged in many
10  similar strategies here and charging, you
11  know, what I believe to be a super-competitive
12  take rate in perpetuity on ancillary
13  transactions.
14       Q.   Let's talk about your Play Points
15  model for a minute.
16       A.   Okay.
17       Q.   Just so we're clear, users have to
18  opt in to Play Points?
19       A.   Yes.
20       Q.   And in the actual world, less than
21  ███████  of Play Store users actually opted
22  in to Play Points; right?
23       A.   Right.  Google is so skimpy with its
24  subsidy today that it blunts the incentives of
25  consumers to -- to opt in.  There are costs to

Page 163

1    opting in and participating in a loyalty

2    program, and if the benefits for doing so are

3    paltry, that could affect how many people take

4    advantage of the program.

5        Q.    Right.

6              There are costs to opting into a

7    rewards program; right?

8        A.    Yes.

9        Q.    Okay.

10             And in the -- in your Play Points

11   damages model, you assume that all Play Store

12   users would have signed up for the Play Points

13   program?

14       A.    No.

15       Q.    You don't?

16       A.    No, not necessarily.  What I'm trying

17   to solve for is the extent of a subsidy that

18   Google would have offered across -- in the

19   aggregate across all users, but I don't think

20   that I'm necessarily assuming that each user

21   avails itself.  It's possible that it would,

22   but my -- my damages model for aggregate

23   damages is looking at the savings to the class

24   if Google were to be more generous in its

25   subsidy program.

ATTORNEYS' EYES ONLY

Page 164

1      Q.    Your Play Points model measures the

2   damages that consumers would have incurred in

3   the aggregate?

4              MS. GIULIANELLI:   Objection to the

5   form.

6              THE WITNESS:   I think that my

7   model is being offered for an estimate of

8   aggregate damages, among other things; I think

9   it also speaks to injury and impact.  But I --

10  I -- I believe that that -- that -- that

11  parameter that comes out that we're interested

12  in, which is the price on the consumer side of

13  the market, is telling you across all

14  consumers, this is -- this is what -- what --

15  what Google will pay.

16  BY MR. RAPHAEL:

17     Q.    Does your Play Points model tell the

18  jury how much a user who did not sign up for

19  Play Points in the actual world was damaged?

20     A.    You could estimate, for a given

21  member of the class, you could estimate what

22  the reduction in -- in his or her net payments

23  would be relative to what they spent in the

24  actual world.  And you wouldn't abandon that

25  exercise simply because they didn't use Play

Page 165

1    Points in the real world.  In the real world,

2    the reason why most people or many people

3    didn't use it is because Google was so skimpy

4    with the offering.

5              In a but-for world in which Google

6    is forced through competition to employ a more

7    generous points model, including making the

8    enrollment easier, they'd -- they'd be forced

9    to.  Under -- in a competitive market, it

10   would be reasonable to assume that -- that

11   most, if not all, consumers in the class

12   would -- would partake and -- and take

13   advantage of that -- of that program.

14        Q.   Are you offering the opinion that all

15   users in the but-for world would have signed

16   up for the Google Play Points program?

17        A.   Economists tend to be reluctant to

18   say all, like do I know with certainty or to a

19   reasonable certainty that every single class

20   member signs up?  I don't know if the model

21   can tell us that.

22              What the model is telling us is

23   what's the -- what is the aggregate or average

24   subsidy that Google offers.  And I think that

25   it is reasonable to infer that if the subsidy

1   gets sufficiently large such that it is a

2   meaningful reward, that most, if not all,

3   consumers will take advantage of it in the

4   but-for world.

5       Q.   Have you estimated what portion of

6   users would have signed up for the Play Points

7   program in the but-for world?

8       A.   I feel like that question is no

9   different from the -- from the last.

10           I have not given an empirical

11  estimate of the proportion.  I think it's very

12  high, it could be close to 100 percent, but

13  there's no requirement that it's a hundred

14  percent for the model to -- to hold.

15      Q.   If I were to come to you with a user

16  chosen at random from the data that you've

17  looked at of people that used the Google Play

18  Store, could your model tell me whether that

19  user would have signed up for the Google Play

20  Points program in the but-for world?

21      A.   I don't think the model tells you

22  whether a user will sign, but what the model

23  can tell you is what the subsidy, what the

24  predicted subsidy would be for that user.  And

25  if the subsidy is as large as these models are

1    implying, whether it's the Rochet-Triole model

2    or the Amazon model, these are big numbers;

3    we're talking about ██████ percent savings.

4                  It seems like a safe inference is

5    that if a -- if Google wants to credit you

6    between ██ and ██ percent, I'm going by

7    memory, of the -- of the price of partaking in

8    all the fun of its Play Store, that most, if

9    not all, consumers will avail themselves of

10   that option.

11        Q.   Have you calculated the minimum value

12   of the Play Points subsidy that would be

13   necessary to get any consumer to sign up for

14   Play Points?

15        A.   I haven't calculated it down to the

16   decimal, but my opinion is this; that in the

17   actual world, with a -- with a paltry subsidy

18   of ████████████████, you see many people not

19   availing themselves of the option.

20                  In a but-for world where the

21   subsidy is in the order of ████████ percent,

22   if we -- if Google matches Amazon, I think a

23   safe inference is that all or almost all

24   consumers will avail themselves of that

25   option.

Page 168

1        Q.   Well, your Play Points model, though,
2    is about the percentage of the price that
3    would be credited back to consumers, not the
4    percentage of Google's revenue; right?
5        A.   Oh, no, no, no.  Hold on.  We're on
6    the same page, I think.  It's the percentage
7    of the price from the consumer's perspective;
8    right?
9        Q.   Right.
10       A.   And so if -- if in a but-for world,
11   Google takes its subsidy from, say, ███
12   ██████  to  ████████, right, that is a
13   material change in the terms of the program,
14   at which point you're looking at all your
15   friends who are getting ████████ off and you
16   say hey, sign me up, I'll take some of that,
17   too.
18       Q.   Right.
19            Have you calculated the percentage
20   credit on the price that would be necessary
21   for any consumer to find it worth it to
22   overcome the cost of signing up and sign up
23   for the Play Points program?
24       A.   I haven't calculated the percentage,
25   but I will say that in a but-for world where

1    Google is going head-to-head with a -- with a

2    competitor who is competing on this dimension,

3    whether it's Amazon or Facebook or Samsung,

4    that Google would make sure that whatever

5    enrollment costs there were, they would not be

6    so prohibitive as to allow that rival to eat

7    their lunch.

8        Q.   Have you done any analysis of the

9    elasticity of demand for the Play Points

10   program?

11       A.   I have done elasticity of demand of

12   consumers with respect to pricing in the App

13   Store.  So to the extent that Play Points or

14   any subsidy changes pricing, you could figure

15   out what the sensitivity would be.

16       Q.   But you haven't tested whether what

17   happens when Google changes its Play Points

18   subsidy and how that affects whether people

19   sign up for the Play Store -- for the Play

20   Points program; you haven't done that?

21       A.   Well, it's a bit of a trick question

22   here, because Google has been at -- at this

23   paltry ███████████, you know, since the advent

24   at least in the U.S.

25               Now, there are some experiments

1    that you might be able to look at.  In Korea

2    and Japan, I think that Google tried to meet

3    the limited competition that -- that occurred

4    there with an increase in the subsidy.  But I

5    haven't studied -- I haven't studied what the

6    reaction would be.

7              I think it's safe to infer that

8    Google felt, and this is just kind of basic

9    economics, that Google felt compelled to meet

10   the competition because they feared that if

11   they didn't -- if they weren't competitive on

12   that dimension, they would lose customers.

13       Q.   Your Play Points model also uses the

14   elasticity of demand from an article about

15   AT&T long distance in the 1980s?

16       A.   That's of the rival elasticity,

17   that's right.

18       Q.   Right.

19              And that's drawn from the same

20   article as the article where you got the

21   but-for share for Google; right?

22       A.   Correct.

23       Q.   And you didn't calculate the

24   elasticity of demand in the but-for world

25   yourself?

Page 171

```
 1       A.   Well, this is -- remember what we're
 2  talking about is the rival supply elasticity.
 3  So Google by the tie doesn't allow any rival
 4  to enter and expand, and now you're asking me
 5  where's your -- where's your model, Singer,
 6  for how PayPal or Stripe, you know, would have
 7  responded to an increase in Google's price.
 8  They couldn't come in by virtue of the tie.
 9            So I don't think that -- that
10  life, by virtue of Google's restrictions and
11  the challenged conduct here, is going to allow
12  us to test for rival supply elasticity
13  particularly in the but-for world.
14       Q.   You didn't present your Amazon Coin
15  damages model at the class certification
16  stage?
17       A.   That's correct.
18       Q.   Why not?
19       A.   I don't think that I had data at
20  that -- at that time to estimate Amazon's
21  subsidy.
22       Q.   And your Amazon Coins damages model
23  is used for calculating aggregate damages?
24            MS. GIULIANELLI:  Objection to the
25  form.
```

Page 172

1         THE WITNESS:  Correct.  That --
2    that's fair, among other things.  But I think
3    that the primary purpose here, now that we're
4    at the merits, is what the -- what aggregate
5    damages are.
6    BY MR. RAPHAEL:
7        Q.    And if I -- again, if I took a user
8    at random from the -- from the data on the
9    users of the Google Play Store, could your
10   Amazon Coins model tell me whether -- how much
11   in subsidy that consumer would have received?
12       A.    Yes.
13       Q.    And could it tell -- and -- and is
14   your idea that the subsidies in your Amazon
15   Coins model would have been part of a program
16   that all users would have signed up for?
17       A.    I think that once you get into the
18   ██████████████  range, I think that it would be
19   irrational and illogical for a consumer to
20   pass up that savings.  They would figure out a
21   way to get enrolled.
22       Q.    Okay.
23             But you -- again, you haven't
24   studied, with respect to your Amazon Coins
25   model, the percentage of savings that would be

Page 173

1    necessary to get all users of the Google Play
2    Store to sign up?
3        A.    The model isn't going to tell us
4    that, but I think basic economics would
5    dictate that if the subsidy got that large,
6    all or almost all consumers would avail
7    themselves of the program.
8        Q.    Have you studied whether there's any
9    consumer who just finds the idea of being
10   enrolled in a loyalty program so cumbersome
11   and annoying that there's no amount of reward
12   that they would take to actually sign up?
13       A.    I don't think that that can -- can
14   happen in the but-for world because I think
15   that two things, is that the subsidy, once it
16   gets ███████████████████, I mean, that's --
17   that becomes a real savings to the consumer;
18   and number two, Google can't throw up so many
19   frictions in its but-for loyalty program that
20   it -- it tends to impede the usage of the
21   program.
22             That -- if people thought that --
23   that it was difficult to enroll and Amazon was
24   up and running or Facebook was up and running
25   with its loyalty program and it made it

1    easier, I think there would be a giant, you

2    know, sucking sound as people switched over.

3        Q.    Okay.

4             And again, if a user did not sign

5    up for Google's subsidy program that you're

6    positing in your Amazon Coins model, would

7    that consumer have been any better off in the

8    but-for world under your Amazon Coins model?

9        A.    I think so, because even if you don't

10   avail yourself of the option, so long as

11   credits are accumulating, that -- that a

12   consumer could perceive that as --

13       Q.    Sorry.

14       A.    -- as a savings.

15       Q.    Let me clarify my question.

16            If a user did not sign up for the

17   subsidy program and therefore was not eligible

18   to earn any subsidies in your hypothetical for

19   your Amazon Coins model, would that consumer

20   be any better off in the world that you've

21   posited?

22            MS. GIULIANELLI:  And just

23   objection to the form.

24            THE WITNESS:  Yeah, what -- what

25   you're doing is you're -- you're assuming that

```
1    there's a sign-up process in the but-for
2    world, right.  So I just use Starbucks points
3    this morning, which is where I start, and I
4    usually go -- I go to a different place in the
5    afternoon, but I start at Starbucks.  And --
6    and I don't remember having to enroll in the
7    Starbucks program.  I mean, it just was --
8    just when I got the app on my phone, I was
9    enrolled in the Starbucks app.
10             So you're -- you're -- you're
11   creating this assumption that Google is going
12   to create some frictions, and they might do
13   that now because they don't have competition.
14   But in a but-for world in which a rival is
15   attacking them with a ███████  subsidy and
16   easy enrollment, then it would be in Google's
17   best interest to also use easy enrollment; in
18   fact, maybe even auto enrollment.
19   BY MR. RAPHAEL:
20        Q.   Okay.
21             Are there loyalty programs that
22   don't use auto enroll?
23        A.   I'm thinking about all the ones that
24   I'm enrolled in and I -- you know, I can't --
25   I don't even have -- it seems to me that when
```

1    you join an airline, you're auto enrolled,

2    credit cards, auto enrolled.  I don't -- I

3    don't remember filling out an application to

4    enroll in almost any loyalty program.

5        Q.   You ever go to a drugstore or a

6    grocery store and they ask you if you want to

7    sign up for the rewards card?

8        A.   Yes.  CVS asked me, that's -- that's

9    true.

10       Q.   Right.

11            And so does your Play Points model

12   and Amazon Coins model assume that Google will

13   automatically enroll all users in a subsidy

14   program?

15       A.   It doesn't assume auto enrollment,

16   but -- but it does, I think, presume that if

17   competition is occurring on that dimension,

18   Google is going to make the enrollment costs

19   seamless and trivial or -- or nonexistent, in

20   which case they would use auto enrollment.

21            MS. GIULIANELLI:  Happy to have

22   you continue, but at some point, let's take a

23   break just because I think --

24            MR. RAPHAEL:  Sure.

25            MS. GIULIANELLI:  -- it's getting

Page 177

1    to be lunch, close to lunch.

2              MR. RAPHAEL:  Yeah.  No problem.

3              I'm getting close to finishing

4    this topic, so maybe we just do that and we'll

5    be done and take a break.

6    BY MR. RAPHAEL:

7        Q.   Your Play Points model assumes that

8    the Play Store would have a durable incumbency

9    advantage in the but-for world?

10       A.   The Play Points model does, as do

11   many of my models, credit an incumbency

12   advantage, and -- and therefore, yeah, offers

13   what I think is a conservative estimate of

14   damages.

15       Q.   Why have you not made the same

16   assumption in your Amazon Coins model?

17       A.   The Amazon Coins model presumes that

18   Google fully matches Amazon's offer.  And I

19   think that's reasonable for -- for several

20   reasons.  One is that I think that Amazon

21   would pose a sufficient threat that Google

22   would have to take it seriously when they

23   actually -- actually consider having to go all

24   the way down.

25              And number two, I feel like the

Page 178

```
1    types of services that we're -- that we're
2    talking about here could reasonably be
3    understood as being homogenous, in which case
4    we do get -- economics would predict prices
5    that are the same between the incumbent and
6    the rivals.
7             So just long way of answering,
8    I've got one set of models that allows for an
9    incumbency advantage, in which case Google is
10   able to command a price premium vis-a-vis its
11   attackers, and I've got the Amazon model that
12   presumes that Google would not be able to
13   command a premium.
14            And I think that -- I think that
15   they're both reasonable, but I think that
16   those are the bounds around which the possible
17   damages could be.
18   Q.   Well, your Amazon Coins model
19   estimates ██████████████████ more in damages
20   than the Play Points model; right?
21   A.   Well, I don't know if it's ██████
22   ████████, but I -- I will grant you that it is
23   an increase in the -- in the -- in the subsidy
24   from, and I'm going by memory, maybe
25   ██████████████ under Play Points up to ██████████████.
```

Page 179

1   So that's what's doing the work.

2           The base of transactions are no

3   different in the two models.  So ████ ████████

4   sounds like a lot, but we're actually just

5   toggling between say ██ ████████ subsidy to a

6   ██ ████████ subsidy --

7       Q.    Well --

8       A.    -- which I don't think is that --

9   that large of a range.

10      Q.    As between the Play Points model and

11  the Amazon Coins model, which do you think is

12  a more reliable model of the but-for world?

13      A.    I don't -- I don't know if I have an

14  opinion as to which one is more reliable.  I

15  think they're both reliable.  I think that

16  I've set the bounds now on -- on -- on what

17  damages could be.  And one is certainly more

18  conservative, which is the one that -- that

19  allows Google to preserve a -- an incumbency

20  advantage.

21          So I think that it's -- I think

22  that it's fine to offer the two and -- but

23  I -- but I feel it's a bit unfair to say --

24  it's like asking me to choose between my

25  daughters.  You know, these are two good

1  models and I think they're both reasonable.

2      Q.   So you can't say whether it's more

3  reliable for the -- to estimate damages at the

4  ███████████████████ that you have for the

5  Amazon Coins model or the ████████████████████

6  that you have for the Play Points model?

7      A.   No.  And you keep -- you keep going

8  back to the difference in the magnitude.

9  That's just because we have such a large base

10  of spending.

11          What we're really trying to figure

12  out is as we toggle between the ████████████ of

13  the Play Points and █████████████, which is about

14  ██████████████████████, should we -- should we

15  credit Google with an incumbency advantage or

16  should we not.

17          I think there are legitimate

18  arguments that would suggest that if entry by

19  a rival were to occur early enough in the

20  place for experience, then it would be -- it

21  would be too charitable to Google to credit it

22  with an incumbency advantage, right?  If

23  Google were facing a rival right out of the

24  gate, right, what's the source of its -- of

25  its incumbency advantage?

Page 181

1      Q.   Have you formed an opinion as to

2  which of the numerous different damages models

3  that you have is the most reliable one for the

4  jury in this case?

5      A.   I think it's -- it's hard to compare

6  models that are meant to do different things,

7  right?  We've got some models that are meant

8  to -- to come up with but-for take rates and

9  pass-through in the -- in the primary market.

10  We've got a different model that's meant to

11  predict the but-for take rate in the

12  aftermarket.

13           I don't know how one would say

14  that one is better than the other.  I feel

15  like these are the best that economics has to

16  offer for each of the -- each of the problems

17  that I've been given.

18      Q.   Did you consider using any other App

19  Store as a benchmark for your subsidy model

20  rather than the Amazon App Store?

21      A.   It's -- it's certainly possible I

22  considered.  One -- one problem that I had,

23  for example, with the ONE Store is that the

24  ONE Store is competing along both dimensions.

25  I think they took their take rate down and

ATTORNEYS' EYES ONLY

Page 182

1    they did a more generous subsidy program.   And
2    remember, in this -- when we go down this
3    branch of the tree, we're thinking about
4    competition that only occurs on one dimension;
5    namely, take rate.
6              And the second thing that -- that
7    worried me about ONE Store is that it's --
8    it's specific to Korea and Amazon was -- was
9    global.  And so I felt that -- that we just
10   didn't have as good of a benchmark as Amazon
11   for -- for that parameter.
12        Q.   Okay.
13        A.   Oh, there's one more reason, too, is
14   that I don't think we have the magnitude of
15   ONE Store's subsidy.  We have the dollar
16   amount, I found press articles that said it's
17   X hundreds of millions of dollars, but I --
18   I -- I wasn't able to -- to generate a -- a
19   subsidy in terms of percent of spend for ONE
20   Store.
21        Q.   Okay.
22              MS. GIULIANELLI:   Pretty soon we
23   can take a break for lunch.
24              MR. RAPHAEL:   Sure.
25   BY MR. RAPHAEL:

Page 183

```
 1      Q.   Did you -- did you analyze whether
 2   any of the benchmark App Stores in Table 7
 3   offer subsidies and whether you could use
 4   those as benchmarks?
 5      A.   I did not.
 6      Q.   Okay.
 7           Just a couple more questions and
 8   we can take a break for lunch.
 9      A.   Okay.
10      Q.   Now, users sign up for Play Points
11   and then they earn points when they make
12   purchases; right?
13      A.   Correct.
14      Q.   And Amazon Coins have to be purchased
15   separately?
16      A.   Correct.
17      Q.   Did you consider whether that
18   difference could affect whether the Amazon
19   Coins program is a proper benchmark?
20      A.   I certainly considered it, and I just
21   want to make clear that in my -- in my but-for
22   world under this model, I am not positing that
23   Google mimics Amazon's program verbatim,
24   right.  I recognize there are differences in
25   the program.
```

1          What -- what I'm interested in in
2    looking at the Amazon experiment is the size
3    of the subsidy.  These are -- these are monies
4    that were actually redeemed by Amazon's
5    consumers and that's the -- that's the input
6    that my model is calling for.
7         Q.   Did you consider whether any
8    differences between the Amazon Coins program
9    and the Play Points program could affect how
10   much Amazon offered as a subsidy?
11        A.   I mean, I studied the differences in
12   the program, but I can't -- I can't think of a
13   good reason sitting here, maybe you can give
14   me one, for why that difference in the program
15   would cause the subsidy to vary.  I just -- I
16   can't think of one.
17        Q.   Well, when users buy Amazon Coins
18   separately and they can't be converted back to
19   cash; right?
20             MS. GIULIANELLI:  I'm sorry, did
21   you say can or can't?  I just...
22   BY MR. RAPHAEL:
23        Q.   When users buy Amazon Coins
24   separately, they can't convert those Amazon
25   Coins back to cash; right?

ATTORNEYS' EYES ONLY

Page 185

1      A.   I think that's right.

2      Q.   And so could the fact that once

3   consumers have purchased Amazon Coins, they're

4   stuck with them, lead Amazon to try to offer

5   significant discounts to get people to buy

6   Amazon Coins?

7      A.   I don't think so.

8      Q.   Have you analyzed that issue at all?

9      A.   No, but that -- it just doesn't sound

10   reasonable as an economic matter.

11      Q.   All right.  Last line here.

12           You looked -- in your Amazon Coins

13   model, you looked at the share of consumer

14   discounts for purchases on Amazon's App Store

15   as a third-party App Store, not on Amazon

16   devices; right?

17      A.   Correct.

18      Q.   And why did you do that?

19      A.   Because I -- I felt that the best

20   competitive benchmark would be how an

21   independent App Store would price on someone

22   else's platform.

23      Q.   And you made that decision even

24   though you would agree that the vast majority

25   of Amazon's revenue from the App Store and

1    discounts were ███████████████████████?
2         A.   I don't know if it's the vast
3    majority.  I do know that Amazon is at a hard
4    time because of challenged conduct here from
5    getting on to Android phones, but I haven't
6    done a decomposition of the -- of where
7    it's -- where its App Store revenues are
8    coming from.
9                   MR. RAPHAEL:  Okay.  Why don't we
10   take a break now.
11                  THE VIDEOGRAPHER:  Going off the
12   record.  The time is 12:26.
13                  (Whereupon, a luncheon recess was
14   taken at the above time.)
15                  THE VIDEOGRAPHER:  Going back on
16   the record.  The time is 13:03.
17   BY MR. RAPHAEL:
18        Q.   All right.
19                  Dr. Singer, let's go back to your
20   regression that you ran in connection with
21   your Logit model.
22                  That regression finds a
23   correlation between the price that a developer
24   charges and the share of that developers' app
25   category?

1      A.    Close.   It's just -- yeah, the share

2   of that developer within its category, that's

3   right, its market share.

4      Q.    Right.

5            And so what the regression is

6   looking at is if the developer changes its

7   price, does that reduce its share of the app

8   category; right?

9      A.    Right.   Implying that -- that there

10  would be substitution away from that app

11  towards what consumers perceive to be

12  substitutes.

13     Q.    Right.

14           And does the regression that you

15  ran that looks at the change in price and its

16  effect on the developer's share of its

17  category tell you anything about where the

18  substitution, as you put it, comes from?

19     A.    Where it comes from is, of course,

20  the app who is raising the price.  Did you

21  mean to say where it's going?  I don't --

22  where it's coming from --

23     Q.    Ah, thank you for that.

24     A.    Okay.

25     Q.    I'll ask a better question.

ATTORNEYS' EYES ONLY

Page 188

1    A.    Okay.

2    Q.    So your regression that you ran in

3  connection with your Logit model, does it tell

4  you where, when a developer raises its price,

5  where consumers will substitute to within the

6  category?

7    A.    This -- this particular model, or at

8  least for this purpose of a model, or this

9  stage of the model, it is simply telling you

10  that the developer loses share.  But once you

11  know that the model fits and is the best

12  demand system for the data, you can infer that

13  users are moving around the category in

14  proportion to the market share of the -- of

15  the other goods.

16    Q.    Okay.

17          But the regression is one of the

18  things you used to determine the fit of the

19  model; right?

20    A.    Correct.

21    Q.    Okay.

22          And the regression, itself, does

23  not tell you when a developer raises its price

24  or lowers its price, I guess, to which apps do

25  the other -- do the consumers substitute;

Page 189

1    right?  It doesn't tell you that?

2        A.    Correct.

3        Q.    Do you agree that the relevant

4    product market should include all competitive

5    constraints?

6        A.    No.

7        Q.    Is product quality --

8        A.    Can I -- also, can I just say why?  I

9    mean I --

10       Q.    Sure.

11       A.    Just to be clear, you don't need to

12   include all competitive constraints because

13   there could be some very weak constraints that

14   don't prevent the exercise of market power.

15            So if the guidelines are telling

16   you to include only those that are necessary

17   in order to effectuate a price increase over

18   competitive levels, so that was the only part

19   I was pushing back on.

20            It's not all competitive

21   constraints, right?  It's not every one under

22   the sun.  And maybe we could define what you

23   mean by competitive.  But -- but I took it to

24   mean literally any competitive including weak,

25   right?  We don't need weak constraints to be