Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000

*Counsel for Defendants Google LLC, et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>This Document Relates To:<br><br>*Match Group, LLC et al. v. Google LLC et al.,* Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br>**PUBLIC-REDACTED VERSION**<br><br>**DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:     Hon. James Donato |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. STATEMENT OF ADDITIONAL FACTS .................................................................... 3

    A. The Google Play Store ......................................................................................... 3

    B. Google Policies Have Always Required Match to Use Google's Billing System. ................................................................................................................. 3

    C. Google's September 2020 Policy Clarification Made It More Explicit That Match and Other Developers Selling Digital Goods Must Use GPB. ..................... 7

    D. Google Expended Time and Engineering Resources at Match's Request. ............... 8

    E. Google Extended the Deadline to Comply with Its Payments Policy Only for Developers like Match That Indicated They Needed More Time to Comply. ........... 9

    F. Match Affirmatively Misrepresented to Google That It Intended to Comply. ......... 9

III. ARGUMENT ................................................................................................................ 11

    A. Summary Judgment is Inappropriate for Google's Breach of Contract Claim. ....... 11

        1. Match Cannot Dispose of Google's Breach of Contract Claims for the Period Between October 1, 2021 and March 31, 2022. ........................ 11

            (a) Match's Modification Theory Ignores Disputes of Material Fact. .................................................................................... 12

            (b) Match's Waiver Theory Ignores Disputes of Material Fact. ............ 14

    B. Summary Judgment is Inappropriate for Google's False Promise Claim. ............... 16

        1. A Jury Could Find That Match Made a "Material Misrepresentation." ................................................................................. 16

        2. Match Admits That Its Representations Were False. ................................. 19

        3. A Jury Could Find That Google Relied on Match's Misrepresentations. ................................................................................. 20

        4. The Facts Support Google's Claim for Damages and Punitive Damages. ................................................................................................ 22

    C. Summary Judgment is Inappropriate for Google's Claim That Match Breached the Implied Covenant of Good Faith. ...................................................... 23

    D. Summary Judgment is Inappropriate for Google's Unjust Enrichment Claims. ................................................................................................................ 25

IV. CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Astiana v. Hain Celestial Group, Inc.*,
    783 F.3d 753 (9th Cir. 2015)....................................................................................25

*Auntie Anne's, Inc. v. Wang*,
    No. CV 14-01049 MMM (Ex), 2014 WL 11728722 (C.D. Cal. July 16, 2014).......................14

*Cottle v. Plaid Inc.*,
    536 F. Supp. 3d 461 (N.D. Cal. 2021) ........................................................................19

*Curley v. Wells Fargo & Co.*,
    No. 13–cv–03805 NC, 2014 WL 988618 (N.D. Cal. Mar. 10, 2014).......................................24

*Frlekin v. Apple, Inc.*,
    979 F.3d 639 (9th Cir. 2020)....................................................................................11

*Glen Holly Entertainment Inc. v. Tektronix Inc.*,
    343 F.3d 1000 (9th Cir. 2003)..............................................................................16, 17

*N. Cal. Collection Services. Inc. of Sacramento v. Central Sierra Construction, Inc.*,
    No. 2:06-CV-01899 JAM DAD, 2008 WL 3876266 (E.D. Cal. Aug. 20, 2008) .....................22

*Phillips v. JP Morgan Chase Bank, N.A.*,
    No. 11-CV-1404 W (MDD), 2011 WL 13101726 (S.D. Cal. Nov. 14, 2011)..........................17

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)....................................................................................12

*Public Storage v. Sprint Corp.*,
    No. CV 14-2594-GW, 2015 WL 1057923 (C.D. Cal. Mar. 9, 2015)...................................14, 15

*Rincon Center Associates v. Chrysler MacNally Corp.*,
    No. C 97-2840 CRB, 1998 WL 410886 (N.D. Cal. July 16, 1998) .....................................14, 15

*Ryan-Beedy v. Bank of N.Y. Mellon*,
    293 F. Supp. 3d 1101 (E.D. Cal. 2018) ........................................................................16

*Wood v. Apodaca*,
    375 F. Supp. 2d 942 (N.D. Cal. 2005) ........................................................................20

## TABLE OF AUTHORITIES
### (Cont'd)

**Page(s)**

**STATE CASES**

*Bailey v. Breetwor,*
206 Cal. App. 2d 287 (1962)...................................................................................13, 14

*Barrett v. Bank of America,*
183 Cal. App. 3d 1362 (1986)...........................................................................................12

*Craig v. White,*
187 Cal. 489 (1921)...........................................................................................................15

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.,*
30 Cal. App. 4th 54 (1994)...............................................................................................14

*Gould v. Corinthian Colleges, Inc.,*
192 Cal. App. 4th 1176 (2011).........................................................................................14

*Granadino v. Wells Fargo Bank, N.A.,*
236 Cal. App. 4th 411 (2015)...........................................................................................17

*Guzman v. Visalia Community Bank,*
71 Cal. App. 4th 1370 (1999)....................................................................................12, 18

*Hill Transportation Co v. Southwest Forest Industries, Inc.,*
266 Cal. App. 2d 702 (1968)............................................................................................17

*Hoffman v. 162 North Wolfe LLC,*
228 Cal. App. 4th 1178 (2014).........................................................................................16

*Huy Fong Foods, Inc. v. Underwood Ranches, LP,*
66 Cal. App. 5th 1112 (2021)...........................................................................................19

*Major v. Western Home Insurance Co.,*
169 Cal. App. 4th 1197 (2009)...................................................................................13, 14

*Monster Energy Co. v. Schechter,*
7 Cal. 5th 781 (2019)........................................................................................................12

*Moore v. Wells Fargo Bank, N.A.,*
39 Cal. App. 5th 280 (2019).............................................................................................24

*Motown Record Corp. v. Brockert,*
160 Cal. App. 3d 123 (1984)............................................................................................13

*Panagotacos v. Bank of America,*
60 Cal. App. 4th 851 (1998).......................................................................................12, 13

1

## TABLE OF AUTHORITIES
### (Cont'd)

2

**Page(s)**

*Spinks v. Equity Residential Briarwood Apartments*,
    171 Cal. App. 4th 1004 (2009) ................................................................................................23

*Wade v. Diamond A Cattle Co.*,
    44 Cal. App. 3d 453 (1975) ..................................................................................................12

*Warner Construction Co. v. City of Los Angeles*,
    2 Cal. 3d 285 (1970) ....................................................................................................16, 17, 19

**STATE STATUTES**

Cal. Civ. Code § 1698(c) ..................................................................................................................14

Cal. Civ. Code § 1710 ......................................................................................................................16

Cal. Civ. Code § 3294 ......................................................................................................................23

**TREATISES**

55 Cal. Jur. 3d § 2 ............................................................................................................................25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# I.      INTRODUCTION

In their motion for summary judgment, Match Plaintiffs (hereinafter "Match Group" or "Match") simply offer their own view of the facts and insist that all of their claims are undisputed. Along the way, Match casts aside or ignores evidence that contradicts its story—including statements it made to Google *in writing*, assurances from Match's own CEO, and contract terms that directly contradict Match's narrative.

The Court need not and should not decide these disputed facts at this stage. The bottom line is that Match has not made a serious effort to establish a right to summary judgment. Nor could it; there are myriad genuine issues of material fact in connection with each of the Counterclaims that Match now seeks to dismiss.

Google's app store, Google Play, provides extensive benefits to developers like Match—it offers Match access to billions of users, and as a result, tens of millions of users have opted to download Match's apps using Google Play's safe and secure platform. For the millions of users who download Match for free and do not make any in-app purchases, Match does not pay Google *anything* for the services Google Play provides.

In exchange for these services, Match agreed to comply with Google's Developer Distribution Agreement ("DDA"). Under the DDA and the Payments Policy it incorporates, when Match opts to monetize its apps through in-app purchases and subscriptions, it must use Google Play's billing service ("GPB") and pay Google a service fee (today, typically 15% of each purchase). This has always been the case, but Match maintained that it fell into an exception that allowed it to use Google Play entirely for free even as Match charged its customers millions of dollars directly through Google Play-distributed apps. In 2020, Google announced a clarification that made the existing policy even more explicit: apps like Match's that sell digital goods must use GPB if they want to distribute through Google's (otherwise virtually free) Play store. This requirement allows Google to earn money on the Google Play store for all the services it provides.

But Match does not comply with Google's policies. The record reveals two key reasons. First, Match wants to reap immense benefits from Google Play, including access to its billions of users, for free. Second, Match dislikes certain pro-consumer features of GPB, such as its

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

transparent cancellation policies. *See* Declaration of Kyle W. Mach ("Mach Decl.") Ex. 1, Swidler Dep. 155:25-157:3 (███████████████████████████████████████████ ███████████████). Those features help Match's customers, but hurt Match's bottom line.

Google worked hard and in good faith to bring Match into compliance with the DDA. In return, Match engaged in subterfuge and delay tactics. Those tactics included misrepresentations about its intention to comply with Google's policies by March 31, 2022. Match's promises proved false, and Match is in breach of its obligations under the DDA even today. Google's counterclaims target Match's breach of the DDA and the harm caused by its repeated false statements that it would comply with the DDA when, as it now admits, it never intended to do so.

Regarding Google's breach of contract claim, Match admits that it does not have a basis to dismiss Google's claim in full. Instead, Match asks the Court to slice certain discrete periods from the claim, primarily on theories of waiver. Yet Match ignores evidence that undermines those waiver theories, including language in Google's contract with Match that provides that conduct "will not be taken to be a formal waiver of Google's rights." Dkt.[1] No. 486-4 (Reiter Ex. 3).

Regarding Google's false promise claim, Match insists that it did not make an actionable misrepresentation because Match did not make a "clear and unequivocal" promise to "exclusively" use GPB. Dkt. No. 488-1 (Match Mot. for Partial Summ. J. ("Mot.")) at 15. But the law does not require the exactitude Match demands. Even if it did, contrary to Match's assertions, Google does not contend that Match promised to "use GPB exclusively," (*id*. at 15-21), but rather that Match promised that it would "comply" with its agreement with Google. *Id*. at 7-8, 11-12. Match could have complied in a number of ways, some requiring the use of GPB and others not. And there can be no doubt that sufficient evidence of this promise exists; among other things, Match made the promise in writing and its CEO confirmed it in statements to Google. Match's arguments seeking to dismiss the implied covenant and unjust enrichment claims fail for most of the same reasons.

The material facts are disputed and Google has every right to present its evidence to a jury. Match can try to provide contrary evidence, but there is no serious basis for summary judgment.

---

[1] All "Dkt. Nos." reference the MDL docket, Case No. 3:21-md-02981, unless otherwise specified.

## II.        STATEMENT OF ADDITIONAL FACTS

### A.        The Google Play Store

Google Play provides extensive benefits to developers, including Match. Google Play allows developers to distribute their apps to billions of users in 190 countries. It provides app store search tools to help users discover relevant apps. Dkt. Nos. 480-7 & 480-8 (Google MSJ Exs. 6, 7). It offers services like app testing and monitoring. And it offers a secure digital payments system, GPB, that allows developers to transact with users around the world. Dkt. No. 483 (Google's MSJ at 5, citing MSJ Ex. 2, Ex. 4, Ex. 5, and Ex. 6). For over a decade, the Google Play store has enabled developers to reach billions of customers and earn billions of dollars in revenue. Ex. 2, GOOG-PLAY-0009909081 at -101; *see also* Dkt. No. 380 (Match First Amended Complaint ("Match FAC")) ¶¶ 1, 4.

Users expect a safe, secure, and seamless experience on Google Play and GPB is a cornerstone of how Google meets those expectations. Dkt. No. 480-8 (Google MSJ Ex. 7). GBP uses one of the world's most advanced security systems to protect consumers' information. *Id*. It gives users one clear point of contact for customer support and refunds, and offers easy-to-use subscription management tools, like renewal notices and cancellation tools that make it as easy for users to cancel subscriptions as it is to buy them in the first place. Dkt. No. 480-10 (Google MSJ Ex. 9). GPB also offers users financial safety tools like budgeting features, parental controls, and the option to authenticate every purchase. *See, e.g.*, Ex. 3, GOOG-PLAY-000064735.

Google Play is also a business. It charges service fees on Google Play transactions that support its investment in the Google Play store, the Android operating system, and the tools and technology Google provides developers. Google earns virtually nothing on these investments until developers sell apps or in-app digital content through GPB. Dkt. No. 480-8 (Google MSJ Ex. 7).

### B.        Google Policies Have Always Required Match to Use Google's Billing System.

Google requires developers wishing to distribute apps through Google Play to adhere to the DDA. The DDA sets the terms and conditions that developers must follow if they want to take advantage of Google Play's services. Dkt. No. 486-4 (Reiter Ex. 3). If a developer violates the DDA, Google has the right to remove, reject, or suspend that developer's applications. *Id*., Section

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

8.3. Match does not dispute that it agreed to the terms of the DDA. *See* Dkt. No. 394 ¶ 40.

The DDA also contains a non-waiver provision, Section 16.2, that states that the developer "agree[s] that if Google does not exercise or enforce any legal right or remedy contained in [the DDA] … this will not be taken to be a formal waiver of Google's rights and that those rights or remedies will still be available to Google." Dkt. No. 486-4 (Reiter Ex. 3). This means that if a developer violates the DDA Google could remove that developer's application from Google Play. But choosing not to does not waive Google's right to seek remedies for the breach. *Id.*

The DDA requires developers to adhere to Google's Developer Program Policies, which includes its Payments Policy. Dkt. No. 486-4 (Reiter Ex. 3, Section 4.1); Dkt. No. 486-5 (Reiter Ex. 4). Developers have choices about how (and whether) to monetize their apps under the Payments Policy. Most of those choices do not require the use of GPB. And most do not require developers to pay service fees: apart from a one-time $25 registration fee, developers do not pay Google anything for using Google Play unless they make money through paid app downloads, or by selling subscriptions or digital goods in apps downloaded from the Google Play store. Because ██████████ of apps in the Google Play store are free, the vast majority of developers pay Google nothing to distribute their apps. Dkt. No. 480-8 (Google MSJ Ex. 7); Dkt. No. 480-9 (Google MSJ Ex. 8). Developers who monetize their apps in other ways—including through advertising, or by allowing users to purchase the content they access in the app elsewhere ("consumption only")—also do not pay service fees under the Payments Policy. For example, in 2021 Match received ██████████ for its popular Tinder app via its website. Dkt. No. 388-1 ("Google's Answer and Counterclaims") ¶ 33. Users could access the content they purchased on Tinder's website via its app and Match paid Google nothing for those transactions.

Only developers who choose to monetize their apps through paid downloads or in-app purchases ("IAPs") of digital goods are required to use Google Play Billing under the Payments Policy. Since 2011, when Google first launched support for IAP, the Payments Policy has required developers who sell paid apps or IAPs to exclusively use GPB. Dkt. No. 488-5 (Reiter Ex. 5) at 24–25, 29. Specifically, the policy stated that developers offering in-app purchases must use GPB with two exceptions, when the payment: (1) is "solely for physical products" or (2) "is for digital

1   content that may be consumed outside the app itself (e.g. songs that can be played on other music

2   players.)" Dkt. No. 486-5 (Reiter Ex. 4) at GOOG-PLAY-000064254.

3        This latter exception (the "outside the app" exception) addressed a narrow use case: it

4   allowed apps to sell content (such as mp3s or ebooks) that could be used in other applications or

5   transferred between devices. *See* Ex. 4, Rasanen Dep. 257:9-18, 258:4-17, Aug. 17, 2022 (███

6   ██████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ███████████████); Ex. 5, Kochikar Dep. 278:24-25, Aug. 31, 2022 (███████████

10  ███████████████████).

11       Dating apps like those offered by Match, which sell digital content largely consumed

12  within its apps, did not qualify for the "outside the app" exception and were thus required to

13  exclusively use GPB for in-app purchases.[2] *See* Ex. 5, Kochikar Dep. 278:20-22; *see also* Ex. 4,

14  Rasanen Dep. 244:11-14 ████████████████████████████████████████████████

15  █████████████████████████████). However, some developers like Match

16  construed the exception to apply when they offered a website that allowed users to access their

17  digital content. *See* Ex. 4, Rasanen Dep. 260:14-261:13 (testifying that ████████████████

18  █████████████████████████████████████████████████████████████).

19       Google did not agree with this interpretation. *See* Ex. 4, Rasanen Dep. 259:20-24

20  (██████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████. *See*

22  Ex. 4, Rasanen Dep. 355:10-24; *see also* Ex. 7, MATCHGOOGLE00080723 (██████████

23  █████████████████████████████████████████████

24  █████████████████████████). Match's own damages expert, Steven

25  ———————————————

26  [2] Where Google's fee applies, it is 15% for subscriptions—applicable to the majority of Match's
    revenue—and for the first $1 million of a developer's earnings each year. For non-subscription

27  products after the first $1 million, the fee is generally 30%. Google offers a number of programs at
    a fee of less than 15%. Approximately 3% of developers are subject to any service fee, Dkt. No.

28  488-3 (Reiter Ex. 1), and ████ qualify for 15% or less, Ex. 6, GOOG-PLAY-005955080.

1    Schwartz, ██████████████████████████████████████████████████████████

2    ████████████████████████████████. Ex. 8, Schwartz Dep. 71:13-20, Mar. 28, 2023.

3          It is undisputed that Match's apps continued to violate the policy. *See* Mot. at 2, 10 (not

4    disputing that Match refused to comply with the DDA after March 31, 2022). Google chose not to

5    remove Match's apps from Google Play for noncompliance. It recognized that the "outside the

6    app" exception was open to misinterpretation, and that developers could interpret the language as

7    ambiguous. Ex. 5, Kochikar Dep. 278:20-279:13. Google instead chose to work with Match and

8    other developers to explore new features within GPB to try to bring them into compliance. *See* Ex.

9    9, Barras Dep. 68:5-12, Sept. 13, 2022 ████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████

11   ████████████████████████████); *see also* Ex. 5, Kochikar Dep. 280:1-13.

12         Despite Google's efforts, Match did not bring its apps into compliance with the Payments

13   Policy, and Google became increasingly concerned that ████████████████████████████

14   ████████████████████. *See* Dkt. No. 488-6 (Reiter Ex. 6, GOOG-PLAY-011114937) at

15   -942; Ex. 10, GOOG-PLAY-009206383 at -385. In addition to allowing Google to collect service

16   fees, GPB provides a trusted user experience that gives users control and transparency. For

17   subscriptions, for example, it allows users to manage and cancel subscriptions all in one place. *See*

18   Dkt. No. 488-66 (Reiter Ex. 6, GOOG-PLAY-011114937) at -942; *see also* Ex. 11, Karam Dep.

19   48:3-5, Sept. 28, 2022 (GPB is ████████████████████████████████████████

20   ████████████████████████████). Apps that sold digital content but did not use GPB could

21   provide a negative user experience by making it hard to cancel subscriptions or get refunds. For

22   example, Match's app Tinder previously used GPB exclusively but began to offer other forms of

23   payment in April 2019. Dkt. No. 486-36 (Reiter Ex. 35, Foster Decl.) ¶ 37). It then became harder

24   for users to cancel subscriptions, leading to poor user experiences and reviews. *See* Dkt. No.

25   488-66 (Reiter Ex. 6, GOOG-PLAY-011114937) at -942 (████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1     █████████████████████████████████████████████████

2     ███████████████████ Ex. 11, Karam Dep. 154:1-15. Google was not alone in its concerns:

3     █████████████████████████████████████████████████

4     ██████████████████████████████ *See* Ex. 1, Swidler Dep. 155:25-157:3.

5         Indeed, when Match conducted an experiment comparing its own payment system to GPB,

6 it found ████████████████████████████████████████████

7     █████████████████████████████████████████████████

8     ████████████████████████████████████ Ex. 12, DX928.

9 In other words, Match was concerned █████████████████████████

10 ██████████ *See* Ex. 13, GOOG-PLAY-001214668. This is among the reasons Google requires

11 GPB for digital goods and subscriptions: to ensure that its users can feel confident they'll be

12 treated fairly when making a purchase on Google's platform.

13        **C.**    **Google's September 2020 Policy Clarification Made It More Explicit That**

14              **Match and Other Developers Selling Digital Goods Must Use GPB.**

15         After several years of communicating with developers about the importance of GPB and

16 working to improve GPB's reach and features, Google decided to clarify its policy. *See* Ex. 14,

17 Samat Dep. 105:7-14, Nov. 8, 2022 (████████████████████████████████

18 █████████████████████████████████████████████

19 ████████████████████). Google ██████████████████████████ and

20 Match ██████████████████████████. *See* Ex. 15, MATCHGOOGLE00053644.

21         On September 28, 2020, Google announced it was updating the language of its Payments

22 Policy in response to "feedback that our policy language could be more clear regarding which

23 types of transactions require the use of Google Play's billing system[.]" Ex. 28, PX2053. Google

24 stated that "[w]e've always required developers who distribute their apps on Google Play to use

25 Google Play's billing system if they offer in-app purchases of digital goods" but Google was

26 responding to feedback that its current language "was causing confusion" and so Google had

27 "clarified the language in our Payments Policy to be more explicit[.]" *Id.* It noted that the

28 requirement "isn't new" and it had "always been the intention of this long standing policy." *Id.*

The updated Payments Policy emphasized that "Google Play's billing system is required for developers offering in-app purchases of digital goods and services distributed on Google Play," Ex. 27, PX2640, including digital items and subscription services (including related to dating). Google gave apps "a year (until September 30, 2021) to complete any needed updates." Dkt. No. 480-8 (Google MSJ Ex. 7). Developers could comply with the Payments Policy in a number of ways—including by adopting GPB, or by moving to a consumption-only model. *See* Ex. 2, GOOG-PLAY-0009909081 at -105.

In an effort to ease the transition to GPB for some of its most important partners, Google created an Apps Velocity Program ("AVP") that offered cross-Google "service packs" providing promotions, advertising, and other support to developers. *See* Ex. 10, GOOG-PLAY-009206383 at -389. AVP ███████████████████████████████████████████████████████████████████████ . *See id.* at -391 (██████████████████████████████████████████ ); Ex. 16, GOOG-PLAY-004684227 at -231 (██████████████████████████████████████████ ). ███████████████████████████████████████████████████████████████████████ . *See* Ex. 17, GOOG-PLAY-011456496 at -496. ███████████████████████████ . *See* Ex. 18, GOOG-PLAY-007759245 at -252.

**D.     Google Expended Time and Engineering Resources at Match's Request.**

Based on conversations it had with Match, Google believed that Match was working to bring its apps into compliance by the September 30, 2021 deadline. Declaration of Sarah Karam ("Karam Decl.") ¶ 5; *see also* Ex. 18, GOOG-PLAY-007759245 at -251 (████████████████████ ). Match employees ████████████████████████████ . *See* Ex. 19, MATCHGOOGLE00054280 (████████████████████████████████████████████████████ ). Match gave every impression that it was working toward compliance, even ████████████████ . *See* Ex. 11, Karam Dep. 231:3-20.

1    Match requested Google add several features to GPB, and Google worked with Match and

2    invested resources to add them. Google engaged in ████████████████████████████

3    ████████████████████████████████████████████ (Ex. 20,

4    GOOG-PLAY-011456562) including ██████████████████████████████████

5    ██████████" Dkt. No. 488-13 (Reiter Ex. 13); Ex. 21, MATCHGOOGLE00022843

6    (████████████████████████████████████████████).

7    Match-specific features for GPB included ████████████████████████████

8    ████. See Karam Decl. ¶ 7; Ex. 20, GOOG-PLAY-011456562 at -568.

9    Google prioritized many of the features that Match requested and expended resources to

10   build them because it understood that doing so would assist Match in complying with Google's

11   policy. Karam Decl. ¶ 7; Ex. 11, Karam Dep. 249:14-19. This included solutions for ██████

12   ████████████████████████. See Ex. 20, GOOG-PLAY-011456562 at -563. Google built

13   them because it believed, based on Match's statements and conduct, that Match intended to

14   comply. If Match had not requested some of these features, like ████████████████████████

15   ██████████████████, Google would not have prioritized them. Karam Decl. ¶ 7.

16        **E.      Google Extended the Deadline to Comply with Its Payments Policy Only for**

17                  **Developers like Match That Indicated They Needed More Time to Comply.**

18        Google announced on July 16, 2021 that it was giving developers that needed more time to

19   comply with the Payments Policy the option to request a 6-month extension. Dkt. No. 486-37

20   (Reiter Ex. 36). Google published a blog post titled "Allowing developers to apply for more time

21   to comply with Play Payments Policy." *Id.* It noted that partners had "been making steady progress

22   toward the September 30[, 2021] deadline" but that Google had heard from "developers all over

23   the world that the past year has been particularly difficult, especially for those with engineering

24   teams in regions that continue to be hard hit by the effects of the global pandemic. . . ." *Id.* Google

25   thus decided to give developers "an option to request a 6-month extension, which will give them

26   until March 31, 2022 to comply with our Payments policy." *Id.*

27        **F.      Match Affirmatively Misrepresented to Google That It Intended to Comply.**

28        Shortly after that announcement, in August 2021, Peter Foster (Match) emailed Brandon

Barras (Google) that "I am reaching out regarding Google's announcement that it is granting extensions to its September 30, 2021 deadline for apps to use Google Play's billing system exclusively. In light of this extension, Match will continue to use its bespoke payment system to process payments." Dkt. No. 486-22 (Reiter Ex. 21) at 5. Mr. Barras clarified that Match could not merely refuse to comply, but instead needed to formally appeal for an extension for each of its apps, using an application that required an answer to "why [Match] need[s] more time." *Id.* at 4.

On August 19, 2021, Match submitted that form, which was titled "Requesting Additional Time to Comply with Google Play Payments Policy." Dkt. No. 488-3 (Reiter Ex. 1). In it, Match represented that it would comply. The form asked: "This extension is intended to aid developers that need more time to comply with Google Play's Payments policy. Do you need more time to comply with Google Play's Payments policy?" Match answered "Yes." *Id.* The form also asked Match to "Please explain why you need additional time to comply with Google Play's Payments policy." Match answered that "[o]ur bespoke payment system is critical to our user experience. Due to significant feature gaps (payment/subs/discounts), Google's system is not a suitable substitute and exclusive use of Google's systems will meaningfully harm our users (inflate prices) & undermine our business." *Id.* Google sent a response acknowledging Match's "request for additional time to bring [its] app into compliance with the Google Play Billing policy." *Id.* Google confirmed two days later, thanking Match for requesting additional time, and granting an extension to March 31, 2022 "to come into compliance with Google Play's Payments policy." *Id.*

When Match requested this extension, Google believed that Match intended to comply by that extended deadline, given that Match had affirmed that, "Yes," it needed more time to comply. Karam Decl. ¶ 6. Google only granted extensions to developers like Match who filled out the form agreeing they needed more time to comply. *Id.* ¶ 9. Absent that extension, Google could have enforced its policies on October 1, 2021. *Cf. id.* ("Developers who did not answer 'yes' to that question or otherwise did not submit the extension request were not granted extension past the then-applicable September 30, 2021 compliance deadline.").

Based on Match's application affirming that it sought the extension specifically to comply, Google continued to invest resources to build GPB features Match requested. *See* Ex. 22, GOOG-

1   PLAY-011270112 at -115 (████████████████████████████████████████

2   ████████████████████████). As the March deadline approached, Match continued to

3   represent to Google that it intended to comply. Its CEO, Sharmistha Dubey, stated that ████

4   ██████████████████████████████████. Ex. 11, Karam Dep. 269:24-270:3.

5        Google's trust in its partner developers and the representations they made on the forms

6   submitted to Google proved to be reasonable and appropriate. ████████████████████

7   ████████████████████████████████. Karam Decl. ¶ 8.

8   **III.    ARGUMENT**

9        Summary judgment is appropriate only "when there is no genuine dispute as to any

10  material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979

11  F.3d 639, 643 (9th Cir. 2020) (citation omitted). All evidence is viewed "in the light most

12  favorable to the non-moving party." *Id.* (citation omitted).

13       **A.    Summary Judgment Is Inappropriate for Google's Breach of Contract Claim.**

14       Match asks the Court to break Google's breach of contract claim into three periods—

15  before October 1, 2021, between October 1, 2021 and March 31, 2022, and after March 31,

16  2022—and to evaluate each as a separate claim. Match concedes that it has no argument to dispose

17  of Google's claims for the last period. *See* Mot. at 12 n.6. Match also recognizes that Google has

18  *already* conceded that it is not seeking any damages for the first period, making further analysis by

19  the Court unnecessary.[3] Mot. at 11-12 (citing Reiter Decl. ¶ 31, Ex. 29). That leaves only the

20  middle period, between October 1, 2021 and March 31, 2022, in dispute.

21       **1.    Match Cannot Dispose of Google's Breach of Contract Claims for the**

22             **Period Between October 1, 2021 and March 31, 2022.**

23

24  [3] Google does not seek any damages for Match's breach prior to September 2021 and believes it
    would be a waste of judicial resources to litigate declaratory judgment for this period. Google,

25  however, reserves rights to present evidence from prior to September 2021, including the
    existence of express non-waiver language in the DDA, as relevant to any breach of contract and

26  false promise claims that remain in the litigation (Dkt. No. 388-1, Google's Answer and
    Counterclaims ¶¶ 55-62, 68-76), as well as to defend itself against any claim based on the theory

27  that the 2020 clarification was a material change from its previous policy. *See, e.g.,* Match FAC
    ¶¶196-214, 298-305, 311-312, 326-332, 338-339.

28

Match argues that Google either (1) modified its rights under the DDA such that Match was no longer required to comply with the Payments Policy during this period, or (2) waived its right to enforce compliance until March 31, 2022. Mot. at 13-14. Both arguments ignore disputed facts that preclude summary judgment.

(a)     **Match's Modification Theory Ignores Disputes of Material Fact.**

Match argues that, by granting an extension from October 1, 2021 to March 31, 2022, Google modified the DDA to permanently excuse Match's breach during the extension period. Mot. at 14. This is incorrect. "Modification" is a change to the underlying agreement that requires mutual assent. *Wade v. Diamond A Cattle Co.*, 44 Cal. App. 3d 453, 457 (1975). Assent is not mutual "unless the parties all agree upon the same thing in the same sense." *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019) (citation omitted). "[T]erms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract." *Panagotacos v. Bank of America*, 60 Cal. App. 4th 851, 855-56 (1998) (citation omitted). "The interpretation of the purported acceptance or rejection of an offer is a question of fact." *Guzman v. Visalia Cmty. Bank*, 71 Cal. App. 4th 1370, 1376 (1999). Match, as the party claiming a modification, has the burden to prove the elements of the asserted modification. *Barrett v. Bank of America*, 183 Cal. App. 3d 1362, 1370 (1986).

Match offers no discussion of the law or its application to the facts. Match fails even to provide the specific terms of its alleged modification. It rests instead on the generic proclamation that "Google's written extensions modified the DDA such that the Match Plaintiffs were not required to exclusively use GPB until after March 31, 2022." Mot. at 14. This failure to identify the supposedly modified terms of the DDA is fatal to Match's argument; Match cannot meet its burden of proving the elements of modification without even identifying the supposed terms of the modification.[4] Google, moreover, cannot fully respond to Match's claims without these elements.

Match's position appears to be that the parties agreed that Match could continue to violate

---

[4] Match, having failed to assert the elements of its argument in its Motion, should not be able to fix this deficiency in reply once Google no longer has an opportunity to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

the Payments Policy for an additional six months with no further obligations from Match—not even a commitment by Match to comply at the *end* of the six-month extension. But Match cannot show that Google agreed to that entirely one-sided modification. First, Google's offer of an extension stated that it was only available and intended to aid developers that needed more time to comply with the Payments Policy. *See, e.g.*, Dkt. No. 488-3 (Reiter Ex. 1) (application form title: "Requesting Additional Time to Comply with Google Play's Payments Policy").[5] Match now asserts that it never intended to comply, despite its false statement that it would do so. Mot. at 14. There is no evidence that Google assented to an extension without Match's concomitant intent to comply, and Match presents no evidence of any such assent. *See Panagotacos*, 60 Cal. App. 4th at 855-56 (no mutual assent if acceptance is not unqualified and unconditional).

Second, Match fails to show that Google assented to forego damages for the six-month extension period in the event Match failed to meet even the extended deadline. Even if Match could show that "the DDA was modified to prohibit enforcement of the DDA until after March 31, 2022," Mot. at 14, Match points to no evidence suggesting that Google was agreeing to not seek damages for non-compliance prior to that date in the event that Match failed to comply by the extended deadline. Match cannot present proof of the contract modification at all, let alone evidence that would entitle it to summary judgment.

Match's claim of a "modification" fails for an independent reason: modification of a written contract requires new consideration. *See, e.g.*, *Motown Rec. Corp. v. Brockert*, 160 Cal. App. 3d 123, 133 (1984) ("[M]odification must be supported by new consideration.") (citations omitted). Match shows none. The DDA already required compliance with the Payments Policy, and to obtain the extension, developers merely had to submit a form stating they would comply— as they were already bound to do. *See* Dkt. No. 486-22 (Reiter Ex. 21).[6] *See Bailey v. Breetwor*,

---

[5] Google's response to Match's request likewise indicated that the extension was specifically to *comply*. Dkt. No. 488-3 (Reiter Ex. 1) ("your app is eligible for an extension until March 31, 2022 *to come into compliance with Google Play's Payments policy*.") (emphasis added).

[6] Match cites *Major v. W. Home Ins. Co.*, 169 Cal. App. 4th 1197, 1210-11 (2009), as modified on denial of reh'g (Jan. 30, 2009), presumably to suggest that no consideration is required when the original contract provides for modification. But the DDA offers none of the specificity of the

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   206 Cal. App. 2d 287, 292 (1962) (modification not valid where a party offers new consideration

2   and the other promises the performance due under the prior contract); Cal. Civ. Code §1698(c).

3                         **(b)      Match's Waiver Theory Ignores Disputes of Material Fact.**

4             Match alternatively argues that Google waived its claims for the 6-month period in which

5   it granted Match an extension to comply. Mot. at 14. Waiver requires a "clear expression" of

6   intent to relinquish a right and full knowledge of the facts. *Rincon Ctr. Assocs. v. Chrysler*

7   *MacNally Corp.*, No. C 97-2840 CRB, 1998 WL 410886, at *4 (N.D. Cal. July 16, 1998). The

8   party claiming waiver must prove it by clear and convincing evidence. *DRG/Beverly Hills, Ltd. v.*

9   *Chopstix Dim Sum Cafe & Takeout III, Ltd.*, 30 Cal. App. 4th 54, 60 (1994). Because it hinges on

10  intent, waiver nearly always presents a fact issue for the jury. *Cf., e.g.*, *Pub. Storage v. Sprint*

11  *Corp.*, No. CV 14-2594-GW (PLAx), 2015 WL 1057923, at *18 (C.D. Cal. Mar. 9, 2015).

12            Here, disputed issues of fact preclude summary judgment on waiver. For example, Match

13  ignores non-waiver language in the DDA. Section 16.2 provides that:

14            "You agree that if Google does not exercise or enforce any legal right or remedy
              contained in this Agreement (or which Google has the benefit of under any applicable
15            law), this will not be taken to be a formal waiver of Google's rights and that those rights
              or remedies will still be available to Google." Dkt. No. 486-4 (Reiter Ex. 3) § 16.2).
16
    Only *written* intent to waive enforcement can overcome such a non-waiver provision. *See Gould v.*

17  *Corinthian Colls., Inc.*, 192 Cal. App. 4th 1176, 1180 (2011) (non-waiver provisions "militate

18  against a finding of waiver under most circumstances"). "[T]he existence of such a clause supports

19  a reasonable inference" that Google "did not intend to waive any provision of [the] agreement[]

20  unless it expressed such an intent in writing." *Auntie Anne's, Inc. v. Wang*, No. CV 14-01049

21  MMM (Ex), 2014 WL 11728722, at *14 (C.D. Cal. July 16, 2014). There is no such written

22  waiver or any evidence, let alone undisputed evidence, that overcomes this language. Although the

23

24  _____

25  contract in *Major*. *See id.* at 1211 (modification was merely "to comply with the original terms of
    the policy," and thus was "no alteration" at all). The clause Match points to, Mot. at 14, merely
26  acknowledges that separate addenda *could* exist. *See* Dkt. No. 486-4 (Reiter Ex. 3 (DDA)) § 16.1
    ("This Agreement, including any addenda You may have agreed to separately, constitutes the
27  entire legal agreement between You and Google and governs Your use of Google Play and
28  completely replaces any prior agreements between You and Google in relation to Google Play.").

extension form and related communications gave Match additional time to comply with the

Payments Policy, none stated that Google waived its right to seek damages *after* the extended

deadline. *Cf.* Dkt. No. 488-3 (Reiter Ex. 1) (offering no assurance that Google would not seek

damages from developers who sought an extension but failed to comply by the deadline).

Google, moreover, could not have waived rights because it acted without full knowledge of

the relevant facts. *See Craig v. White*, 187 Cal. 489, 498 (1921); *see also Rincon Ctr. Assocs.*,

1998 WL 410886, at *4. As Match concedes, the form to secure an extension required Match to

affirm that it needed more time *to comply. See* Mot. at 7 ("In response to the form's question,

'[t]his extension is intended to aid developers that need more time to comply with Google Play's

Payments policy. Do you need more time to comply with Google Play's Payments policy?', a

drop-down menu offered a 'Yes' or 'No' response, and the Match Plaintiffs selected 'Yes'").[7]

Google testimony confirms the plain meaning that the extension was only for purposes of coming

into compliance. *See* Ex. 9, Barras Dep. 249:18-250:4 ███████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ ). Match cannot show that Google provided the extension with

full knowledge of Match's intention to not ultimately comply with the DDA—as waiver requires.

*See, e.g.*, *Pub. Storage*, 2015 WL 1057923, at *19 (party arguing waiver at summary judgment

"must show, despite a clear and convincing standard and antiwaiver provision . . . that there are no

disputed facts"). Disputed material facts preclude summary judgment on Match's assertions of

---

[7] Match suggests that it was not promising to comply when it submitted the extension form, which
Match concedes bore the title "Requesting Additional Time to Comply with Google Play
Payments Policy." Dkt. No. 488-3 (Reiter Ex. 1). According to Match, its submission simply
agreed Match was unready to comply *at that time*, and never indicated Match intended to comply
on any timeframe. *Cf.* Mot. at 8 ("Google's standard form did not ask if a developer planned to
comply or when."). The record indicates that Google took submission of the extension forms as a
declaration by the developers that they intended to comply—in line with the purpose of the
extension described on the forms. *See* Mot. at 7 ("[t]his extension is intended to aid developers
that need more time to comply with Google Play's Payments policy."); Ex. 11, Karam Dep. 263:6-
12 ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ ); Karam Decl. ¶ 10.

"waiver"—for which Match bears the burden of presenting clear and convincing proof.

### B.    Summary Judgment Is Inappropriate for Google's False Promise Claim.

A false promise is a "subspecies of fraud." *Ryan-Beedy v. Bank of N.Y. Mellon*, 293 F. Supp. 3d 1101, 1109 (E.D. Cal. 2018) (citation omitted). To prevail on its claim, Google will ultimately need to prove, "(1) a material misrepresentation; (2) knowledge of falsity; (3) intent to defraud or induce reliance; (4) justifiable reliance; and (5) resulting damage. *Id.* Because disputes of material fact exist for each of these elements, summary judgment on this claim must be denied.

#### 1.    A Jury Could Find That Match Made a "Material Misrepresentation."

Match argues that Google's claim should be dismissed because "the Match Plaintiffs never promised to exclusively use GPB." Mot. at 15. Its position is based on a misreading of the legal standard and a misunderstanding of Google's claim.

Match claims that "[a]n alleged false promise must be 'clear and unequivocal'" in order to be actionable. Mot. at 15. This is incorrect. In false promise cases, the nature of the "promise" is variable: actionable deceits include "[t]he *suggestion*, as a fact, of that which is not true, by one who does not believe it to be true" and "[t]he *suppression* of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." *See* Cal. Civ. Code § 1710 (emphasis added). Even "nondisclosure or concealment may constitute actionable fraud . . . when the defendant had exclusive knowledge of material facts not known to the plaintiff . . . or when the defendant actively conceals a material fact from the plaintiff . . . or when the defendant makes partial representations but also suppresses some material facts." *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1187 (2014). No fiduciary obligation is necessary for these standards to apply; a sufficient "relationship between the parties is present if there is some sort of transaction between the parties." *Id.* (citations omitted). The California Supreme Court has held that "misleading half truths" can be a sufficient basis for liability. *Warner Contr. Co. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970).

Match incorrectly relies on cases involving promissory estoppel rather than false promise. *Glen Holly Ent. Inc. v. Tektronix Inc.* involved both claims for fraud/misrepresentation and for promissory estoppel. 343 F.3d 1000, 1017 (9th Cir. 2003). Match assumes that the standards are

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

the same, but the *Glen Holly* Court assessed the two claims under different standards—and Match cites the promissory estoppel standard, not the fraud standard. Match further relies on *Granadino v. Wells Fargo Bank*, a case that required a "clear and unambiguous" promise for a promissory estoppel claim, but involved no false promise claim. 236 Cal. App. 4th 411, 417 (2015).[8]

Match also misstates the nature of its false promise. Match denies that it "promised to exclusively use GPB," but that is irrelevant. Google does not contend that Match made that promise but rather a more general one—to "*comply*" with Google's policies. Dkt. No. 388-1, Google's Answer and Counterclaims ¶¶ 69-71. Match could have complied with Google's policy in a number of ways, only some of which required using GPB. Dkt. No. 486-19, Reiter Ex. 18. Indeed, the vast majority of apps on Google Play comply *without* GPB, Dkt. No. 480-8 (Google MSJ Ex. 7) (only 3% of apps paid fees to Google Play in preceding twelve months), a path open to Match as well. *See* Ex. 20, GOOG-PLAY-011456562 at -564 (█████████████ ████████████████████); Ex. 23, MATCHGOOGLE00105403 at -404 (█████████ ███████████████████████████████████████████████████████).

The real nature of Match's false promise is straightforward and clear enough to meet even the heightened standard Match applies—and certainly demonstrates a dispute of a material fact. In September 2020, Google informed developers that those out of compliance with Google's policies would be required to comply. Dkt. No. 480-8 (Google MSJ Ex. 7). Match then █████████ ███████████████████████████████████████. *See* Ex. 18, GOOG-PLAY-007759245

---

[8] Match also cites *Phillips v. JP Morgan Chase Bank, N.A.*, No. 11–CV–1404 W (MDD), 2011 WL 13101726, at *9 (S.D. Cal. Nov. 14, 2011)—an unpublished decision that stated that "[p]romises in promissory fraud or promissory estoppel claims must be clear and unequivocal." *Id.* at *9. *Phillips*, however, recognized that the legal standards for the two claims are not the same: "JP Morgan argues that, in the promissory estoppel context, the Phillipses failed to plead a definite promise, reliance, or injury . . . Assessing those arguments instead in the promissory fraud context, the Court disagrees." *Id.* (internal citation omitted). Moreover, *Phillips* relied on a state court decision that does not reach the conclusion for which it is cited. *See Hill Transp. Co. v. Sw. Forest Indus., Inc.*, 266 Cal. App. 2d 702, 708 (1968) (holding that a false promise requires a clear "intention not to perform," not a clear promise). In any case, *Phillips* does not control this issue of state law, which the California Supreme Court has spoken to, *Warner*, 2 Cal. 3d at 294, and Match's statements were clear enough to satisfy even the high bar Match applies.

1    at -251 (noting that Match ████████████████████████████); *see also* Karam

2    Decl. ¶ 5 (stating that Google ████████████████████████████████████

3    ██████████████████████████████████). It engaged in extensive discussions and

4    weekly meetings with Google over ███████████████████████. *See* Dkt. No.

5    488-13 (Reiter Ex. 13) at -916 (████████████████████████████

6    █████████████████████████████████████████████████

7    ████████). Google then invested in those features, believing that it was working in partnership

8    with Match to bring Match into compliance with Google's Payment Policy. *See* Karam Decl. ¶ 7.

9        Match subsequently gave Google multiple, express indications that it intended to comply

10   with Google's policies. After Google announced in July 2021 that it was allowing developers

11   more time to comply, Match indicated that it would continue to use its own billing system not

12   because it did not intend to comply, but because Google was "granting extensions." Dkt. No. 486-

13   22 (Reiter Ex. 21) at 5. Google informed Match that such extensions were not automatic, but

14   required the submission of a request to Google about why Match needed more time. *Id.* at 4. On

15   that form, Match stated its intention to comply. The form emphasized that an extension was

16   "intended to aid developers that need more time to comply with Google Play's Payments policy."

17   Dkt. Nos. 488-3 & 488-4 (Reiter Exs. 1, 2). In response to the question "Do you need more time to

18   comply with Google Play's Payments policy?" Match answered with an unequivocal "Yes." Dkt.

19   No. 488-3 (Reiter Ex. 1). This is an express false representation that it would comply—or, at the

20   very least, a jury could so find. Match again indicated it would comply when ███████████

21   █████████████████████. Ex. 11, Karam Dep. 269:24-270:3.

22        Match argues that it disclosed its preference for its own payment system to Google. But

23   nowhere does it assert that it ever informed Google that it did not intend to comply during the

24   extension period. That is because Match never did so. Match's complaints about GPB also did not

25   reverse its promise to comply—particularly here, where compliance did not necessarily require

26   Match to adopt GPB. *See Guzman*, 71 Cal. App. 4th at 1376 ("[A]n acceptance is not invalidated

27   by the fact that it is 'grumbling,' or that the offeree makes some simultaneous 'request.'").

28

Even if Match's construction of the exchange were credited, its complaints are irrelevant. "Where the implied promise is certain enough to cause reasonable reliance, there is no reason it cannot be a proper basis for fraud. *Parties may not avoid liability for fraud simply because they leave to implication what they clearly intend to communicate*." *Huy Fong Foods, Inc. v. Underwood Ranches, LP*, 66 Cal. App. 5th 1112, 1124 (2021) (emphasis added). A jury could find that Match's statement that it "need[ed] more time to comply" at least implied that Match would comply with the DDA, as that conclusion is consistent with the natural interpretation of that phrase. *See Warner*, 2 Cal. 3d at 294 (fraud arises where "the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead"); *see also* Karam Decl. ¶ 10 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."). Such an implication establishes a false promise under the law. *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021), is informative. There, the court held that where the defendant "displayed screens that made it appear as if Plaintiffs were providing information to their financial institutions," but did not disclose that Plaintiffs were "actually providing their login information to" the defendant itself, the defendant could be liable for false promise. *Id*. at 494. Plaintiffs were not required to show the defendant explicitly stated users were providing information to their financial institutions, because the circumstances naturally implied it. *See id.* The same is true here; the natural inference from Match's request for more time to comply is that it intended to comply.

## 2.    Match Admits That Its Representations Were False.

There is no dispute that Match's representations were false. Match readily admits that it never had any intention of using the extension to bring its apps into compliance with the DDA and Payments Policy, notwithstanding that this was the extension's sole purpose. Mot. at 7:20-8:7. Even without that admission, it is undisputed that Match did not comply with the Payments Policy during the extension period or to the present, and "[i]n promissory fraud claims where the aspect to which fraud is alleged is within the defendant's control at all times, an allegation that defendant

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

did not fulfill their obligation is sufficient to create an inference that they never intended to do so." *Wood v. Apodaca*, 375 F. Supp. 2d 942, 949 (N.D. Cal. 2005).

> **3.**     **A Jury Could Find That Google Relied on Match's Misrepresentations.**

When Match requested Google extend its compliance deadline to March 31, 2022, Google believed Match was promising to comply by that date. Karam Decl. ¶ 6. A jury could find this reliance reasonable in light of Match's prior course of conduct and its explicit statements that it needed "more time to comply." Mot. at 7. If Google knew that Match did not intend to comply, Google could have enforced its policies starting on October 1, 2021. *Cf.* Karam Decl. ¶¶ 6, 9. Google also ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████. *See* Ex. 22, GOOG-PLAY-011270112 at -115; Karam Decl. ¶7. Notably, Match has no explanation for Google's conduct other than reliance on Match's words and actions. Match's four arguments to the contrary are all incorrect, and each raises factual issues that preclude summary judgment.

*First*, Match contends that Google could not have relied on its statements that it intended to "comply" because, according to Match, other evidence makes that promise ambiguous. Mot. at 20-21. As discussed above, Match's promise was more than sufficient under the law. And although Match points to evidence that it expressed doubt about its commitment to comply, Mot. at 20-21, this does nothing more than *confirm* that a dispute of material fact exists. For example, Match's CEO told Google that ██████████████████. Ex. 11, Karam Dep. 269:24-270:3. Even if, as Match contends, it sent mixed messages to Google about its intentions, a jury could reasonably conclude that Match's course of conduct, its written statement that it intended to comply, and Match's CEO's ██████████████████████████ support liability.

*Second*, Match argues there can be no reliance because Google admitted it did not rely on Mr. Foster's August 5, 2021 letter—*before* the false promise on which Google bases its claim— when considering whether to grant an extension, or on Match's form when considering how to allocate resources. Mot. at 21. Match is correct that Google did not rely on Mr. Foster's letter. Rather, Google told Match it needed to formally apply for an extension, and Google relied on Match's affirmative representations in that request when deciding to grant an extension. Google's

1  reliance on Match's extension request is evident by Google's decision not to enforce its policies

2  against Match starting October 1, 2021, and Match's citation to Ms. Karam's testimony about

3  Google's allocation of resources is inapposite, incomplete, and ambiguous. *See* Ex. 11, Karam

4  Dep. 264:5-19 (█████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████); Ex. 22, GOOG-PLAY-011270112 at -

8  115 (█████████████████████████████████████████████████████████████████

9  █████). Because a reasonable jury could infer that Google relied on Match's representations,

10  summary judgment is inappropriate.

11      *Third*, Match claims that Google could not have relied on Match's representations that it

12  "need[ed] more time to comply" because Google uniformly granted such requests. This is a *non*

13  *sequitur* at best. Google granted extensions because, as the form itself explains, the "extension[s

14  were] intended to aid developers that need[ed] more time to comply with Google Play's Payments

15  policy," Dkt. No. 488-3 (Reiter Ex. 1), and Google ████████████████████████████

16  ████████████████████████████████████████████████████████████████████

17  ████████ Karam Decl. ¶ 10. Google's reliance on developers' representations proved reasonable:

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████. *Id.* at ¶ 8.

20      Match's final contention—that Google did "nothing to confirm" its understanding of

21  Match's statements that it intended to comply—is also wrong. After Google announced it would

22  offer developers extra time to comply, Match informally indicated that it would continue to use its

23  own billing system because Google was "granting extensions." Dkt. No. 486-22 (Reiter Ex. 21) at

24  5. This suggested Match was seeking an "extension" with the intention to comply, but Google

25  followed up to inform Match that such extensions required a formal request, *see id.* at 4. When

26  Match submitted that form, it doubled down, responding "Yes" to the written question, "Do you

27  need more time to comply with Google Play's Payments policy?" Mot. at 7. Match's CEO then

28  ████████████████████████████████████████████. Ex. 11, Karam Dep. 269:24-

270:3.[9] It is difficult to discern what more Google *could* have done to verify Match's undisclosed intention not to comply, or why it would have been necessary for Google to demand more assurance. The jury could find that Google reasonably relied on Match's multiple written statements, especially when coupled with ███████████████████████████████████ .

**4.    The Facts Support Google's Claim for Damages and Punitive Damages.**

Google can prove damages for Match's false promise in two ways: the service fees Match would have owed and the resources Google expended to build Match's requested GPB features. First, as a direct result of Match's course of dealing with Google and express indication that it planned to comply with Google's policies, Google did not enforce its policies against Match starting October 1, 2021 (the deadline for apps that did not seek an extension). Had Match not misrepresented its intentions, Google could have sought a service fee on purchases within Match's apps beginning October 1, 2021. *See* Dkt. No. 488-26 (Reiter Ex. 30, Oct. 3, 2022 Expert Report of Dr. Gregory Leonard) ¶¶ 36-37. Match's motion does not address these damages, even though Google's expert quantified them. *See id.* This alone satisfies the damages element.

Second, Google invested resources to develop GPB features Match requested. ████████ ██████████████████████████████████████████████████████████ , Ex. 20, GOOG-PLAY-011456562 at -568, ████████████████████████████████████████████ ██████ . Ex. 18, GOOG-PLAY-007759245 at -251. ██████████████████████████ ███████████████████████████████████ . Ex. 22, GOOG-PLAY-011270112 at -115. ██████████████████████████████████████████████████ ██████████████████████ . Karam Decl. ¶ 7.

Match argues that Google cannot prove this second category of damages because its

---

[9] Match cites to *N. Cal. Collection Servs. Inc. of Sacramento v. Central Sierra Constr., Inc.*, No. 2:06-CV-01899 JAM DAD, 2008 WL 3876266 (E.D. Cal. Aug. 20, 2008), but that decision does not support the proposition that a defendant can escape liability because the recipient of a false promise did not double- and triple-check if the defendant continued to stand by the falsehood. The court simply held that a "sophisticated Nevada construction company with experience conducting out-of-state operations" could not reasonably rely on its insurer to determine obligations owed under another state's workers' compensation laws without some inquiry verifying them. *Id.* at *5.

1   30(b)(6) deponent, Sarah Karam, stated that ███████████████████████████████

2   ███████████████████████████████. Mot. at 22. But Ms. Karam simply noted that ███

3   ████████████████████████████████████████ and clarified that ██████

4   ███████████████████████████████████████████████████████████

5   ████████████████████ Ex. 11, Karam Dep. 265:1-3, 264:12-19. A jury could thus find that

6   Google incurred harm by continuing to invest because of Match's false promise.

7          Match also incorrectly disputes Google's right to claim punitive damages. First, Match

8   argues that punitive damages are not available for Google's breach of contract, unjust enrichment,

9   or breach of the implied covenant of good faith and fair dealing claims. Mot. at 24-25. But this is

10  not in dispute: Google seeks punitive damages only on its false promise claim. Next, Match argues

11  that Google cannot recover punitive damages on its false promise claim because Match did not

12  state that it would use GPB exclusively. Mot. at 25. Match once again misstates Google's claim.

13  Google contends that Match falsely promised to bring its apps into compliance with Google's

14  policy, either by using GPB, by going consumption only, or by using another compliance method.

15         A party, like Match, that has engaged in a subspecies of fraud can be liable for punitive

16  damages. Cal. Civ. Code § 3294 (punitive damages recoverable "where it is proven by clear and

17  convincing evidence that the defendant has been guilty of oppression, fraud, or malice"); *see also*

18  *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1052 (2009) ("With

19  respect to the clear and convincing standard for punitive damages, it is not plaintiff's obligation to

20  prove her claim in opposing a motion for summary adjudication. It is only necessary to provide a

21  prima facie showing of facts to sustain a favorable decision if the evidence submitted is

22  believed."). Match promised to comply with Google's Payment Policy (a promise it did not intend

23  to keep and did not keep); Google relied on that promise and suffered damages in the form of lost

24  revenue and investment. A jury could thus find that Google is entitled to punitive damages.

25         **C.     Summary Judgment Is Inappropriate for Google's Claim That Match**

26                 **Breached the Implied Covenant of Good Faith.**

27         Match's challenge to Google's claim that it breached the implied covenant of good faith is

28  derivative of its arguments regarding Google's false promise claim, and fails for the same reason.

As Match states, a defendant is liable for breach of the implied covenant of good faith where the "defendant deprived the plaintiff of a benefit conferred by the contract in violation of the parties' expectations at the time of contracting." *Curley v. Wells Fargo & Co.*, No. 13–cv–03805 NC, 2014 WL 988618, at *5 (N.D. Cal. Mar. 10, 2014). "The failure to deal fairly or in good faith gives rise to an action for damages." *Moore v. Wells Fargo Bank, N.A.*, 39 Cal. App. 5th 280, 291 (2019). "A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable," and "[t]he issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily a question of fact unless only one inference [can] be drawn from the evidence." *Id.* at 292 (cleaned up).

Match intentionally and in bad faith misled Google to believe that Match would comply with the DDA's Payments Policy, which induced Google to allow Match's apps to remain on Google Play. First, Match's extension forms—which required Match affirm that, "Yes," it was seeking an extension for more time *to comply* with Google's billing policy—secured a billing enforcement extension from Google on false terms. *See* discussion, *supra*, at pp. 16-21. Second, Match ███████

███████. *See, e.g.*, Karam Decl. ¶ 7. Match's CEO, Sharmistha Dubey, also ███████

███████. *See* Ex. 11, Karam Dep. 269:24-271:3.

While Google held weekly meetings with Match and invested in features it requested, *see* Ex. 24, DX938, *supra*, Match internally ███████

███████

███████. *See, e.g.*, Ex. 25, Purves Dep. 267:18-268:13. Match ███████

███████. *Id.* Evidence from years prior suggests Match ███████

███████. *See* Ex. 26, DX0885 ███████

███████

███████

███████

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1   ████████████████████████████████████████████ A jury could find Match sought

2   an extension and negotiated about GPB with no intent to deliver on its promise, but merely to

3   ████████████████ to avoid its contractual obligations. *Id.*

4         **D.    Summary Judgment Is Inappropriate for Google's Unjust Enrichment Claims.**

5         Match's challenge to Google's quasi-contract claim is largely derivative of its points as to

6   Google's false promise claim, and fails for the same reasons. Unjust enrichment is a viable claim

7   for relief in California where a "defendant has been unjustly conferred a benefit 'through mistake,

8   fraud, coercion, or request.' The return of that benefit is the remedy 'typically sought in a quasi-

9   contract cause of action.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)

10  (quoting 55 Cal. Jur. 3d § 2). Match argues that Google's quasi-contract claim fails because the

11  DDA defines the rights of the parties. This is wrong. Google's quasi-contract claim is based on

12  Google's delivery of distribution services to Match at no cost based on Match's false

13  representation that it intended to comply with the Payments Policy by March 31, 2022. Nowhere

14  in the DDA is Google obligated to provide distribution services at no charge while a developer

15  uses its own billing system. Indeed, Match concedes that when Google clarified its policy in

16  September 28, 2020, it made clear that "'dating' apps would be required to use GPB exclusively

17  for in-app purchases" by September 30, 2021. *See* Mot. at 6-7.

18        Match thus asked Google to provide distribution and other services without any service fee

19  during the extension period, understanding that Google was forgoing its fee to assist Match Group

20  in complying with the DDA.[10] *See* Ex. 11, Karam Dep. 269:24-270:3. And Google indeed did not

21  collect service fees for that period. *Cf.*, e.g., Dkt. No. 486-36 (Reiter Ex. 35, Foster Decl.) ¶ 62.

22  Google's expenditures to provide Match distribution during the extension are recoverable.

23  **IV.    CONCLUSION**

24        The Court should deny Match's motion for partial summary judgment.

25

26  _____

27  [10] Match also ████████████████████████████████████████████████████ *See* Karam Decl. ¶ 7. Although Google would be

28  entitled to restitution for these investments, it is not seeking restitution for its development costs.

1   DATED: May 18, 2023                    Respectfully submitted,

2

3                                          By:      /s/ Kyle W. Mach
                                               Kyle W. Mach
4
                                               Glenn D. Pomerantz, S.B. #112503
5                                              glenn.pomerantz@mto.com
                                               Kuruvilla Olasa, S.B. #281509
6                                              kuruvilla.olasa@mto.com
                                               Nicholas R. Sidney, S.B. #308080
7                                              nick.sidney@mto.com
                                               **MUNGER, TOLLES & OLSON LLP**
8                                              350 South Grand Avenue, Fiftieth Floor
                                               Los Angeles, California 90071
9                                              Telephone: (213) 683-9100

10                                             Kyle W. Mach, S.B. #282090
                                               kyle.mach@mto.com
11                                             Justin P. Raphael, S.B. #292380
                                               justin.raphael@mto.com
12                                             Emily C. Curran-Huberty, S.B. #293065
                                               emily.curran-huberty@mto.com
13                                             Dane P. Shikman, S.B. #313656
                                               dane.shikman@mto.com
14                                             **MUNGER TOLLES & OLSON LLP**
                                               560 Mission St., Suite 2700
15                                             San Francisco, CA 94105
                                               Telephone: (415) 512-4000
16                                             Facsimile: (415) 512-4077

17                                             Jonathan I. Kravis, *pro hac vice*
                                               jonathan.kravis@mto.com
18                                             **MUNGER, TOLLES & OLSON LLP**
                                               601 Massachusetts Avenue NW, Suite 500E
19                                             Washington, D.C. 20001
                                               Telephone: (202) 220-1100
20

21

22

23

24

25

26

27

28

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Counsel for Defendants Google LLC, et al.*

DEFENDANTS' OPPOSITION TO MATCH PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# E-FILING ATTESTATION

I, Kyle W. Mach, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that counsel for Defendants have concurred in this filing.

*/s/ Kyle W. Mach*
Kyle W. Mach