# Exhibit 4

Pages 1 - 121

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION             )    **NO. 21-md-02981 JD**
_____  )

San Francisco, California
Tuesday, July 19, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Epic Games:
        CRAVATH SWAINE AND MOORE LLP
        825 Eighth Avenue
        New York, New York 10019
        BY:  **LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**

        FAEGRE DRINKER BIDDLE & REATH LLP
        Four Embarcadero Center
        27th Floor
        San Francisco, California 94111
        BY:  **PAUL J. RIEHLE, ATTORNEY AT LAW**

For the Consumer Class Plaintiffs:
        KAPLAN FOX AND KILSHEIMER LLP
        850 Third Avenue
        14th Floor
        New York, New York 10022
        BY:  **HAE SUNG NAM, ATTORNEY AT LAW**
             **GREGORY K. ARENSON, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
             CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For the Consumer Class Plaintiffs:
                  BARTLIT BECK LLP
                  1801 Wewatta Street
                  Suite 1200
                  Denver, Colorado 80202
        BY:  **KARMA M. GIULIANELLI, ATTORNEY AT LAW**

                  BARTLIT BECK LLP
                  54 West Hubbard Street
                  Suite 300
                  Chicago, Illinois 60654
        BY:  **LEE M. MASON, ATTORNEY AT LAW**


For Plaintiff Brian McNamara:
                  COTCHETT, PITRE & MCCARTHY LLP
                  San Francisco Airport Office Center
                  840 Malcolm Road
                  Burlingame, California 94010
        BY:  **JAMES G.B. DALLAL, ATTORNEY AT LAW**


For State of California:
                  OFFICE OF THE ATTORNEY GENERAL
                    OF CALIFORNIA
                  California Department of Justice
                  455 Golden Gate Avenue
                  Suite 11000
                  San Francisco, California 94102
        BY:  **PAULA L. BLIZZARD, ATTORNEY AT LAW**


For State of Utah:
                  OFFICE OF THE UTAH ATTORNEY GENERAL
                  160 East 300 South
                  Fifth Floor
                  Salt Lake City, Utah 84114
        BY:  **BRENDAN P. GLACKIN, ATTORNEY AT LAW**
              **LAUREN M. WEINSTEIN, ATTORNEY AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendants:
                             MORGAN LEWIS & BOCKIUS LLP
 3                           One Market Street
                             Spear Street Tower
 4                           San Francisco, California 94105
                   BY:   BRIAN C. ROCCA, ATTORNEY AT LAW
 5                       SUJAL SHAH, ATTORNEY AT LAW

 6                           MUNGER, TOLLES & OLSON LLP
                             560 Mission Street, 27th Floor
 7                           San Francisco, California 94105
                   BY:   JUSTIN P.  RAPHAEL, ATTORNEY AT LAW
 8
                             MUNGER TOLLES & OLSON LLP
 9                           350 South Grand Avenue
                             Fiftieth Floor
10                           Los Angeles, California 90071
                   BY:   GLENN D. POMERANTZ, ATTORNEY AT LAW
11

12   Also Present:       Michelle M. Burtis, Ph.D.
                         Hal J. Singer, Ph.D.
13                       Nathan Hatch

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          And that is the standard methodology that we use, and

 2     that's the methodology that I used in the graph that we were

 3     just looking at.

 4          **THE COURT:**  Okay.  Let's just pause there.

 5          Dr. Singer?

 6          **DR. SINGER:**  Yes.  Thank you.

 7          And Dr. Burtis went into a bit of 2(d), which is fine, in

 8     that section.  And I have some really important points I'd like

 9     to make in 2(d).  But I think because she came back to 2(a), to

10     attack the logit, I think it makes most sense if we take out

11     2(a) and then, if we could, maybe move to 2(d) --

12          **THE COURT:**  Fine.

13          **DR. SINGER:**  -- afterwards.

14          Okay.  So on the logit model, I just have four points.

15          But before I even start off, I just want to say this.

16     Dr. Burtis cited something I said during my deposition.  And

17     you should know, Your Honor, that I tend to do mostly

18     monopolization cases.  And just as Dr. Burtis said, when I look

19     at pass-through, as I'm doing right now in the *Pork Antitrust*

20     case, I'm looking at changes in the wholesale prices on changes

21     in the retail price.  Right?

22          In this case, by contrast, we have a problem, and that is

23     the take rate on 93 percent of the transactions in the

24     database --

25          Can you put up Slide 4, please?

     1          92.4 percent of the transactions in the database were all

     2     at that headline 30 percent rate.  It is impossible to try to

     3     find how app prices vary in response to changes in take rates

     4     when the take rates don't change.  It's a problem.  Right?

     5          And even in that very teeny-tiny segment of the pie, the

     6     3.1 percent, the 4-point -- where Dr. Burtis goes looking for

     7     experiments to exploit, it's all botched.  And I'm going to

     8     show that to you when we get to 2(d).  You can't get any

     9     information out of those changes in the small part of the

    10     triangle, small part of that figure.  Okay?

    11          So let me now make my -- what we are trying to do is that,

    12     given this limited sample of changes in take rates, I looked

    13     for an economic model of consumer demand that would allow me to

    14     make predictions of how an app developer would change its price

    15     in response to a change in the take rate, given the nature of

    16     the demand that that app developer faced.  Okay?  That's why

    17     we're here.

    18          Point Number 2, the logit model captures the demand faced

    19     by app developers.  I couldn't use it if it didn't.  Okay?  The

    20     logit model is a generally accepted methodology based on

    21     published literature in the field.

    22          Can I see Slide 5, please?

    23          I was a little surprised when Dr. Burtis said she had

    24     never seen it used.  She certainly has read my expert report.

    25     Here is a published article, Your Honor, by Werden and Froeb of

1    the Department of Justice in the context of a merger review.

2    And in a merger, the merging parties always like to claim that

3    there are going to be some cost savings that come about from

4    allowing the two firms to merge.  And in a typical merger

5    analysis, the economists debate whether the price effect from

6    those cost savings can negate the loss in competition by

7    allowing two rivals to merge.  And whoever wins that battle is

8    going to have the net -- whether it's going to be a net price

9    savings for consumers --

10                    (Court reporter clarifies.)

11       **DR. SINGER:**  So the merger opponents are going to claim

12   that the anticompetitive effects dominate, and the merger

13   proponents are going to argue that the cost savings dominate.

14   But that's the battle.

15       And in those battles, in those merger battles -- which I

16   don't partake in because my practice tends to take me into

17   monopolization, which is why I answered the question as I did

18   in my deposition.  In those merger battles, the logit model is

19   commonly used to map a change in the merging parties' costs

20   that come about from merger synergies into a change in price.

21       If you think about it, it's precisely what I'm trying to

22   do here.  I need a model that would allow me to map a change in

23   cost that come about from a lower take rate into a change in

24   the app developer's pricing.

25       Now, let me move now to --

 1          But what I'm offering is a common methodology that will

 2     give you the predicted pass-through rate for all developers.

 3          **THE COURT:**  Well, just pause for a moment.

 4          **DR. SINGER:**  Sure.

 5          **THE COURT:**  Just tell me how that -- what the methodology

 6     is that allows you to reliably and accurately predict, just for

 7     lack of a better word, that developers' greed is not going to

 8     get in the way.

 9          In other words, how do you know someone's not going to

10     say, "This is fantastic.  Google has gouged me 30 percent.  Now

11     they're only gouging me 15.  That other 15 is going right in my

12     account"?

13          **DR. SINGER:**  I think the question, as I'm internalizing

14     it, is:  How do you know that the logit model is reliable to

15     make predictions in the but-for world here?  That's how I'm

16     internalizing it.  Is that okay?

17          **THE COURT:**  That's fine.

18          **DR. SINGER:**  All right.  And you don't know until you test

19     it.  And so the very first thing that I did was I gathered all

20     the data and I ran separate regressions by category.

21          And the logit model makes a very specific prediction about

22     the relationship between an app's share within its category and

23     its price; and, in particular, the prediction is that as the

24     app's price goes up, it should lose share within the category,

25     reflecting the fact that all of these apps within the category

 1    are substitutes in some way, in some way.

 2          And I estimated this model for every category, and I found

 3    a very tight fit.  What I mean by that is that the coefficient

 4    that related an app developer's price with an app developer's

 5    share was negative and statistically significant at the highest

 6    levels of statistical significance, the 1 percent level.  And

 7    the R-squared was over 86 percent.  That is, the model -- the

 8    logit model was explaining 86 percent of the variation in an

 9    app's share within the category.

10          **THE COURT:**  But 86 percent is a little low, isn't it?

11          **DR. SINGER:**  Now, in terms of R-squared, Your Honor, it's

12    actually pretty high in terms of published work in R-squared.

13          But the real statistic of the two that matters is the

14    p-value on those price parameters.  What I found was that for

15    34 of the 35 categories, transportation is an outlier.  It was

16    a category that Google actually removed in 2016.  But

17    transactions -- a few scant transactions remained, so I left it

18    in as a category.

19          For 34 out of 35, the data obeyed the prediction of the

20    logit model.  Right?  I couldn't have used the logit model's

21    implied pass-through rate of one minus the developer's share

22    unless I tested and confirmed for myself --

23          **THE COURT:**  You think there's a single number that can be

24    used for all of the consumer transactions?

25          **DR. SINGER:**  I don't.  I don't, Your Honor.

 1   demand faced by apps.

 2        **MR. RAPHAEL:**  Right.  And one feature of a logit demand

 3   model is that all goods in the market where demand is being

 4   measured are substitutes; is that right?

 5        **DR. SINGER:**  I think that all goods have to be substitutes

 6   to some extent.  And that could be a very light extent.  There

 7   could be --

 8        **MR. RAPHAEL:**  In fact, it's very particular, isn't it,

 9   Dr. Singer?  In a logit model, all of the goods in the market

10   being studied have to be substitutes in proportion to their

11   shares of that market; isn't that correct?

12        **DR. SINGER:**  I think that's fair, yes.

13        **MR. RAPHAEL:**  And is it your opinion in this case that all

14   apps in every Google Play category are substitutes in perfect

15   proportion to their share?

16        **DR. SINGER:**  Not in perfect proportion.  But the P-values

17   on that coefficient that relates price or predicted price -- we

18   use tax rates, Your Honor, to predict a price in Stage I as an

19   instrument -- on the apps share, every one of them with the

20   exception of transportation was statistically significant at

21   the highest levels.  That's telling you that the prediction of

22   a logit is true in this case.  It didn't have to be true.  And

23   had I gotten the wrong sine or insignificant coefficients, I

24   would have gone looking for a different demand system.

25        **MR. RAPHAEL:**  Dr. Singer, is it your opinion that every

app in each Google Play category is a substitute?

**DR. SINGER:**  I don't think that every one is a good

substitute necessarily.  I think Microsoft Excel and Microsoft

PowerPoint are in the productivity category.  Does that mean

the category is defined insanely?  No, because Microsoft has a

cluster or a package of productivity apps that goes up against

Google's package of productively apps.

So it doesn't surprise me that you can find some silly

examples -- Thomas the Train and Doom -- you can find some

silly examples that probably aren't close.  But if you're right

and that's what generally characterizes the data, that is, if

Google just willy-nilly slapped these categories together and

you just have a random collection of apps, then when I go to

estimate the logit model, Your Honor, the fit, the goodness of

fit would be zero.  The P-values -- right? -- wouldn't be as

good as they are.  They wouldn't be statistically significant.

That's confirmation that the categories, as designed by

Google in the ordinary course of business, which is also very

similar to what Apple's categories looked like, are meaningful.

They are a meaningful arena of competition around which one can

use for estimating shares for the logit model.

**MR. RAPHAEL:**  But they're not substitutes, are they?

**THE COURT:**  I don't have a problem with that.  I think

that's fine.

Okay.  One or two more questions, Mr. Raphael.