***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

Karma M. Giulianelli (SBN 184175)
karma.giulianelli@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100

Hae Sung Nam (*pro hac vice*)
hnam@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980

*Co-Lead Counsel for the Class in In re Google Play Consumer Antitrust Litigation*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc. in Epic Games, Inc. v. Google LLC et al.*

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY GENERAL**
160 E 300 S, 5th Floor
P.O. Box 140872
Salt Lake City, UT 84114-0872
Telephone: (801) 366-0260

*Counsel for the Plaintiff States*

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et al.*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC et al.*, Case
No. 3:20-cv-05671-JD

*In re Google Play Consumer Antitrust
Litigation*, Case No. 3:20-cv-05761-JD

*State of Utah et al. v. Google LLC et al.*,
Case No. 3:21-cv-05227-JD

*Match Group, LLC et al. v. Google LLC et
al.*,
Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Judge:  Hon. James Donato

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION AND STATEMENT OF ISSUES ............................................................ 1

LEGAL STANDARD ............................................................................................................. 3

ARGUMENT .......................................................................................................................... 4

I.      Google Is Not Entitled to Summary Judgment that § 4.5 of the DDA Is Lawful ....................... 4

      A.      Plaintiffs' Section 2 Claims Are Not "Refusal-to-Deal" Claims .................................... 4

      B.      Plaintiffs' Section 1 Claims Challenge Cognizable Concerted Action ......................... 6

II.     Google Is Not Entitled to Summary Judgment on the *Per Se* Claims ......................... 7

III.    Google Is Not Entitled to Summary Judgment on Timeliness Grounds .................................... 12

IV.    Google Is Not Entitled to Summary Judgment on Standing ..................................... 16

      A.      Consumers Have Standing to Recover Damages for IAPs and Subscriptions .............. 17

      B.      Consumers "Participate" in the Market for In-App Payment Solutions ...................... 19

      C.      Consumers Also Have Antitrust Standing in Repealer Jurisdictions ........................... 21

V.      Google Is Not Entitled to Summary Judgment on Plaintiffs' Tying Claims .......................... 21

      A.      Google Play and GPB Are Separate Products ............................................................. 21

      B.      Google Coerces Use of GPB ....................................................................................... 23

VI.    Google's Motion Should Be Denied Under Rule 56(d) .............................................. 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899)..................................12

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)......................6, 24

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999).......................19

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...............................................................3

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019)............................................................. passim

*Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332 (1982)...........................................11

*Aryeh v. Canon Business Solutions*, 55 Cal.4th 1185 (2013) ..........................................21

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................................17

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021) ...........9

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ....................14, 15

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ..........................................3, 19, 20

*Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674 (9th Cir. 1976)..........................3

*Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008)................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)................................................................3

*Chamber of Com. v. City of Seattle*, 890 F.3d 769 (9th Cir. 2018) ....................................12

*Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368 (9th Cir. 1983)..................................20, 21

*City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992) ..........................2, 4, 13

*City of E. Chicago v. E. Chi. Second Century*, 878 N.E.2d 358 (Ind. Ct. App. 2007) .........15

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) ............................................12

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995)................................6

*Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008)......17

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986)..........................................9

*Eichman v. Fotomat Corp.*, 880 F.2d 149 (9th Cir. 1989) .........................................3, 13, 14

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262 (9th Cir. 2022)............20

iv

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

*Epic Games, Inc. v. Apple Inc.*, 2023 WL 3050076 (9th Cir. Apr. 24, 2023) ............................... passim

*Esco Corp. v. United States*, 340 F.2d 1000 (9th Cir. 1965) ................................................... 9

*Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163 (Iowa 2006) ..................................... 15

*Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975 (W.D. Wash. 2022) ..................................... 9

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ................................................ 11

*FTC v. D-Link Sys., Inc.*, 2018 WL 6040192 (N.D. Cal. Nov. 5, 2018) ................................ 4

*FTC v. Qualcomm*, 969 F.3d 974 (9th Cir. 2020) ............................................... 6, 12

*Glen Holly Entertainment v. Tektronix*, 343 F.3d 1000 (9th Cir. 2003) ......................................... 19, 21

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ............................... 14

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir. 1990) ................................... 23

*In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015) ................................ 12

*In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) .............. 21

*In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) ........................................... 21

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) .................................................. 18

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ........................... 9

*In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) ................................................. 18

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059 (N.D. Cal. 2007) ........................................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ........................ 18

*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) ................................................ 17

*Kauffman-Stachowiak v. Omni Hotels Mgmt. Corp.*, 2016 WL 4269504

    (N.D. Cal. Aug. 15, 2016) ................................................ 25

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ................................................ 14

*Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743 (N.D. Cal. 2022) ................................................ 13

*Klein v. Meta Platforms, Inc.*, 2022 WL 17477101 (N.D. Cal. Dec. 6, 2022) ........................................ 4

*L.A. Memorial Coliseum Commission v. NFL*, 791 F.2d 1356 (9th Cir. 1984) ................................... 20

*Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123 (4th Cir. 2021) ........................................ 14

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003) ........... 21

*Nat'l Coll. Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) .............................. 10

v

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)......................................................13

*Nat'l Soc'y of Pro. Engineers v. United States*, 435 U.S. 679 (1978) ...................................11

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ...............................................................9

*Oliver v. SD-3D LLC*, 751 F.3d 1081 (9th Cir. 2014) ....................................................12, 14

*Optronic Techs. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021).......................8, 9, 11

*Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984) ..................................................20

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) .........................................................2, 8, 11

*Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ...........................................15

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ...............................................................17

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963 (9th Cir. 2008)..........................23

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376 (9th Cir. 1981)..................9

*Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648 (N.C. 1992) ..........................15

*Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980)..............................18

*Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972 (N.D. Cal. 2022) .......................................11

*Solid Rock Ch., Disciples of Christ v. Friendship Pub. Charter Sch., Inc.*,
    925 A.2d 554 (D.C. 2007) ....................................................................................15

*State Dept. of Health & Human Svcs. v. Thompkins*, 695 S.E.2d 133 (N.C. 2010) ..................16

*State v. LG Elecs., Inc.*, 375 P.3d 636 (Wash. 2016) ........................................................15

*Teradata Corp. v. SAP SE*, 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ..............................23

*Toscano v. Professional Golfers Association*, 201 F. Supp. 2d 1106 (E.D. Cal. 2002) ................7

*Toscano v. Professional Golfers Association*, 258 F.3d 978 (9th Cir. 2001)...........................6, 7

*United States v. Bates*, 429 F.2d 557 (9th Cir. 1970) ......................................................10

*United States v. Lischewski*, 2020 WL 1433272 (N.D. Cal. Mar. 24, 2020) ...........................10

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019)..................................15

*US Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709 (S.D.N.Y. Mar. 24, 2017) .............15

*US Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ..............15

*Verizon Commc'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ..................5, 6

*Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448 (N.D. Cal. May 12, 2006)....................20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971) .................................. 13, 14

**Statutes, Constitutional Provisions, and Rules**

15 U.S.C. §§ 1 et seq. ........................................................................................... passim

15 U.S.C. §§ 12 et seq. ......................................................................................... passim

Ariz. Rev. Stat. § 12-510 ............................................................................................ 15

Cal. Bus. & Prof. Code § 16700 ........................................................................... 12, 21

D.C. Code § 12–301 .................................................................................................... 15

Fed. R. Civ. P. 56(a) ..................................................................................................... 3

Fed. R. Civ. P. 56(d) ................................................................................................... 25

La. Const. Art. 12, § 13 ............................................................................................... 15

Miss. Code Ann. 15-1-51 ........................................................................................... 15

Miss. Const. Art. 4, § 104 ........................................................................................... 15

N.C.G.S. § 75-16.2 ...................................................................................................... 16

Wash. Code Civ. P. § 4.16.160 ................................................................................... 15

**Other Authorities**

Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust Cases (2016 ed.) ............. 9

Areeda & Hovenkamp, *Antitrust Law* (2022) ...................................................... 13, 14

Ninth Cir. Manual of Model Civil Jury Instructions (2017 ed.) .................................. 9

Plaintiffs Epic Games, Match, Plaintiff States, and Consumer Plaintiffs hereby oppose Defendants' Motion for Partial Summary Judgment. For the convenience of the Court, Plaintiffs file a single consolidated brief. However, Google's Motion includes some arguments that are directed to only some Plaintiffs. Accordingly, while all Plaintiffs join the arguments in Sections I, III, V, and VI below that address common issues, only Epic and Match join Section II, and only the Plaintiff States and Consumer Plaintiffs join Section IV. Plaintiffs reserve and do not waive any rights, arguments, or issues pertaining to sections they have not joined.

<strong>INTRODUCTION AND STATEMENT OF ISSUES</strong>

For nearly 15 years, Google has deployed a web of unlawful anticompetitive practices to monopolize the markets for Android app distribution and in-app payment solutions. Through exclusivity and preferred payment arrangements with OEMs, payments to wireless carriers to disincentivize them from launching or supporting competing app stores, unnecessary technological barriers to the installation of competing app stores, agreements not to compete with potential app-store entrants, exclusionary contracts with developers, and more, Google has ensured that Google Play is the only viable way to distribute apps on Android and, through its tie, it has forced consumers and developers to use Google Play Billing ("GPB") for all in-app sales and purchases of digital content in those apps. Plaintiffs will prove all that at trial.

Google now attempts to prevent the jury from learning the full scope and history of its scheme under the guise of a "targeted motion." (Mot. 1.) As this Court has recognized, a complex antitrust case seldom contains "a pure issue of law with no genuine dispute of fact." (Dkt. 164 Tr. of Proceedings, Dec. 16, 2021.[1]) This case is no exception. Google's Motion rests on disputed facts and incorrect statements of law. All five of its arguments for summary judgment fail:

*First*, Google incorrectly contends that Plaintiffs seek to impose on Google a duty to deal with rivals. (Mot. 6-9.) This argument rests on a mischaracterization of Plaintiffs' challenge to a provision of Google's Developer Distribution Agreement ("DDA") that prohibits the distribution of app stores on

---

[1] Unless noted otherwise, citations to "Dkt." refer to the ECF number of documents filed on the MDL docket, 3:21-md-02981-JD; citations to "Match Dkt." refer to the ECF number of documents filed on 3:22-cv-02746-JD; and citations to "Ex." refer to exhibits from the Declaration of Michael J. Zaken filed in conjunction with this brief.

Google Play.  By twisting Plaintiffs' complaints to focus on one provision of one contract—ignoring that provision's role in Google's broader web of anticompetitive conduct—Google urges the Court to ignore the forest for a tree.  Google's "focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect" must be rejected.  *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).  Rather than an isolated refusal to deal, the DDA is one agreement (among several) in furtherance of a monopoly, and thus violates Section 2 of the Sherman Act.  And Google may not defeat Plaintiffs' Section 1 claims by recasting a provision of a *contract* between Google and developers as a unilateral refusal to deal.  As the Ninth Circuit recently confirmed with respect to a nearly identical agreement, Section 1 applies to *all* contracts that unreasonably restrain trade, including contracts of adhesion like the DDA.  *Epic Games, Inc. v. Apple Inc.*, 2023 WL 3050076, at *16 (9th Cir. Apr. 24, 2023) ("*Epic v. Apple*").

*Second*, Google moves for summary judgment on Epic's and Match's[2] claims that Google's "Project Hug" agreements with three would-be competitors—Riot, Activision, and Supercell—were agreements not to compete that are *per se* illegal.  (Mot. 9-13.)  But the law is clear:  horizontal agreements not to compete are *per se* illegal.  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990).  At best, Google's Motion raises disputed issues of fact regarding whether these Project Hug agreements are vertical or horizontal.  On summary judgment, that is not enough to foreclose *per se* treatment of these agreements.  Plaintiffs will prove at trial that these three competitors ███████████████████ ███████████████████████████████████████████████████████████ ████████████████████.  The jury must decide whether the agreements at issue are mere vertical distribution agreements or rather horizontal agreements not to compete.

*Third*, Google vaguely challenges as untimely "Plaintiffs' [c]laims [r]elated to [e]arly-Android [c]arrier [a]greements."  (Mot. 14-17.)  Google's Motion is an improper attempt to exclude evidence of a core component of its ongoing anticompetitive scheme.  No Plaintiff has brought claims for injunctive relief or damages predicated on the carrier agreements *alone*.  Rather, the carrier agreements were part of Google's years-long effort to acquire and maintain monopoly power, which continues today.  Because

---

[2] "Match" refers only to the four Match plaintiff entities.  (*See* Dkt. 380.)

Google's violation is continuing, Plaintiffs can recover for damages accrued within the limitations period, even if caused, in part, by pre-limitations-period conduct.  *See, e.g.*, *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("When a plaintiff alleges a continuing violation of the law, an overt act . . . restart[s] the statute of limitations.").

*Fourth*, Google asserts that the Consumer and State Plaintiffs lack antitrust standing to recover damages for in-app purchases ("IAPs") and subscriptions because the in-app payment solution market they pleaded does not involve direct sales from Google to consumers.  (Mot. 17-20.)  This too is incorrect.  Because the overcharged consumers pay Google directly for their purchases, those consumers have antitrust standing to seek damages under the Sherman and Clayton Acts.  *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019).  And because consumers' injuries are "inextricably intertwined" with Google's anticompetitive conduct, they have standing under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982) and its progeny.

*Fifth*, Google moves against Plaintiffs' claims that Google illegally ties Google Play—an app store that makes other apps available for download—to GPB, a payment solution for digital goods within apps.  (Mot. 20-24.)  Google argues that Google Play and GPB are one product *as a matter of law*.  But that is a distinctively factual question for the jury, and ample evidence shows that the opposite is true— indeed, in *Epic v. Apple*, the Ninth Circuit concluded that Apple's app store and in-app payment solution are separate products.  2023 WL 3050076, at *27-30.  Google's argument that it does not "coerce[] or force[]" (Mot. 23) all developers to use GPB likewise fails in light of the Ninth Circuit's rejection of a similar argument in *Epic v. Apple* and multiple disputes of material fact.

All of Google's arguments lack merit, and the Court should deny Google's Motion in its entirety.

## LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In making that assessment, "[t]he evidence of the non-movant is to be believed" and "all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  "These general standards for the granting of summary judgment become even more strict in the antitrust context." *Calnetics Corp. v. Volkswagen of Am., Inc.*,

532 F.2d 674, 683 (9th Cir. 1976).  "[T]rials are the best way to resolve legal disputes."  *FTC v. D-Link Sys., Inc.*, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018).

## ARGUMENT

### I.   Google Is Not Entitled to Summary Judgment that § 4.5 of the DDA Is Lawful

Google first attacks a claim that Plaintiffs have not made.  According to Google, Plaintiffs claim that "Google's policy of refusing to distribute other app stores through the Google Play store is anticompetitive and violates Section 1 and 2 of the Sherman Act."  (Mot. 7.)  In fact, Plaintiffs' Section 2 claims more broadly target the wide array of efforts that Google has undertaken to impede competing app stores from being distributed on Android devices.  Excluding those app stores from Google Play is just one element of Google's anticompetitive scheme.  And neither Plaintiffs' Section 1 nor Section 2 claims attack a unilateral Google "policy"; the DDA is a *contract* by which developers are forced to forgo competition with Google.

### A.   Plaintiffs' Section 2 Claims Are Not "Refusal-to-Deal" Claims

Google asserts that its decision not to "distribute its rivals' app stores" cannot give rise to Section 2 liability because Google "ha[s] no obligation under the antitrust laws to 'share its network with competitors.'"  (Mot. 7.)  Google attempts to isolate a single act—the prohibition on "distribut[ing] other app stores through the Google Play store"—from the complex and large web of anticompetitive practices that Google has implemented to foreclose competition and maintain Google's monopoly power. (Mot. 6-7.)  Google's "focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect" is "not . . . proper."  *City of Anaheim*, 955 F.2d at 1376; *see Klein v. Meta Platforms, Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022) (denying motion to dismiss plaintiffs' Section 2 claim where defendant's denial of access to software was part of the alleged anticompetitive course of conduct).

Plaintiffs have alleged, and will prove at trial, that Google effectively foreclosed *all* meaningful avenues by which competing app stores can reach Android devices—preinstallation by OEMs, downloading via Google Play, or direct downloading from the web.  For example, Google:

- █████████████████████████████████████████████████████████████████████

 ███████████████████████████████████████████████████████████████████ (Ex. 1

1    ████████████ Tr. 119:15-20; Ex. 2 GOOG-PLAY-000128863.R at -8877.R);

2    • ████████████████████████████████████████████████ (Ex. 1

3    ████████████ Tr. 249:3-252:9; Ex. 3 Gentzkow Tr. 192:23-193:16);

4    • ████████████████████████████████████████████ (*see, e.g.*,

5    Ex. 4 GOOG-PLAY-007035840 at -5840; Ex. 6 GOOG-PLAY-004146689.R at -6694.R

6    to -6698.R; Ex. 3 Gentzkow Tr. 93:22-94:4; 95:1-14; 98:15-99:4; *see also* Ex. 8 Bernheim Rpt.

7    ¶¶ 441-43); and

8    • ████████████████████████████████████████████████████

9    ██████████████████ (*see, e.g.*, Ex. 10 ████████ Tr. 54:12-55:10).

10        Complementing these exclusionary restrictions is Section 4.5 of the DDA, an agreement between

11   Google and developers that prohibits the distribution of competing stores through Google Play.

12   Specifically, it provides that developers "may not use Google Play to distribute or make available any

13   Product that has a purpose that facilitates the distribution of software applications and games for use on

14   Android devices outside of Google Play."  (Ex. 51 DDA Section 4.5.)  Google engineer ████████

15   explained that the "██████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ██████████████."  (Ex. 11 GOOG-PLAY-004283892 at -3892.)

18        Plaintiffs do not assert liability against Google for Section 4.5 of the DDA *on its own*; rather,

19   Plaintiffs challenge the thicket of restrictions Google employs to foreclose competing stores, which

20   includes Section 4.5.  Plaintiffs seek to remove this web of restrictions so that competing stores—and

21   ultimately all Android developers—can choose *not* to deal with Play, such that Android can be the open

22   platform Google has always promised it would be.

23        Google's web of anticompetitive conduct makes this case completely different from the refusal-

24   to-deal cases Google cites.  In *Trinko*, for example, customers of Verizon's rivals alleged that Verizon—

25   which was required by law to share its network with its competitors—had violated Section 2 solely on

26   the basis that it unilaterally delayed orders placed by its competitors' customers.  *Verizon Commc'ns Inc.*

27   *v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 402, 404 (2004).  Here, by contrast, Google has

28   implemented a broad and multifaceted anticompetitive scheme to *foreclose* Android app distribution that

is not a mere refusal to deal; instead, it involves a wide variety of interlocking technological and contractual restrictions on OEMs, developers, and consumers. These restrictions, imposed across the Android ecosystem, are different in kind from the mere "insufficient assistance" in *Trinko*. *See id.* at 410. Google's reliance on *FTC v. Qualcomm* likewise fails because there the Ninth Circuit examined (and reversed) a finding by the district court that independent of any other conduct, "Qualcomm's refusal to license rival chipmakers violates . . . an antitrust duty to deal under § 2 of the Sherman Act." 969 F.3d 974, 987 (9th Cir. 2020). Plaintiffs do not claim such an independent duty to deal, but only that Google's DDA provisions are actionable as part of its broader anticompetitive scheme.

### B.   Plaintiffs' Section 1 Claims Challenge Cognizable Concerted Action

Google argues that any effort by Plaintiffs "to evade *Trinko* by resorting to Section 1 of the Sherman Act . . . would be unavailing . . . because Plaintiffs are ultimately challenging Google's unilateral policy and design decision." (Mot. 7-8.) Not so. Plaintiffs challenge the DDA, which is a contract. The fact that Google coerces developers to enter into the contract is irrelevant to Section 1, which prohibits "[e]very contract . . . in restraint of trade," whether coerced or not. 15 U.S.C. § 1. Indeed, established Section 1 claims such as tying and exclusive dealing are almost always based on contracts of adhesion. *See, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1427 (9th Cir. 1995). And the Ninth Circuit has now rejected Google's exact argument in *Epic v. Apple*, holding that the district court "erred when it held that a non-negotiated contract of adhesion," like the DDA, "falls outside of the scope of Section 1." 2023 WL 3050076, at *16. That holding dooms Google's Motion on this ground.

The only Ninth Circuit case Google cites, *Toscano v. Professional Golfers Association*, 258 F.3d 978 (9th Cir. 2001), does not support its position. There, a golfer who failed to qualify for the Senior PGA Tour brought Section 1 claims against firms that sponsored individual golf tournaments on the ground that they accepted PGA Tour terms that allegedly harmed competition among golfers. *Id.* at 981-83. Importantly, in that decision, the court did not evaluate Toscano's claims against the entity that, like

1  Google, imposed the rules at issue.  *Id.* at 984.  Indeed, Toscano's Section 1 claims against that entity,

2  the PGA Tour, were *not* dismissed.  *See* 201 F. Supp. 2d 1106 (E.D. Cal. 2002).

3  ## II.  Google Is Not Entitled to Summary Judgment on the *Per Se* Claims

4  Epic and Match assert that Google entered agreements not to compete with developers Riot,

5  Activision, and Supercell (the "Potential Entrants") that are *per se* illegal under Section 1.  Plaintiffs

6  will show at trial that the Potential Entrants ████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████.  Ample evidence supports this claim:

9  **Riot.**  In 2018, Riot "██████████████████████████████████████████."  (Ex. 5

10 ████ Tr. 285:4-9.)  In response, Google "pulled all stops," including giving Riot $10 million in marketing

11 funds "to get Riot to stop their inhouse 'app store' efforts." (Ex. 47 GOOG-PLAY-007424789 at -4789.)

12 Google understood that, as a result, Riot "████████████████████████████████████████

13 ████████████" (Ex. 4 GOOG-PLAY-007035840 at -5840.)  To date, Riot has not launched an Android

14 app store.

15 **Activision.**  In 2019, ██████████████████████████████████████.  (Ex. 12

16 ████ Tr. 199:2-6.)  Activision ████████████████████████████████████████████

17 ████████████████████ (Ex. 13 AB-GOOG-000492 at -0495), and ████████████████████

18 ████████ (Ex. 12 ████ Tr. 46:8-47:24).  Activision then informed Google that it was "███

19 ████████████████████████████████████████████████████████████████████████

20 ██████████████████████████" (Ex. 15 GOOG-PLAY4-002193650 at -3650.)  Google understood

21 Activision's threat, recognizing that "[i]f this deal falls through" Activision "will launch their own

22 mobile distribution platform." (Ex. 46 GOOG-PLAY-007280918 at -0919.)  In response, Google agreed

23 to provide Activision with $360 million in benefits in a written agreement that prohibited Activision

24 from removing its apps from Google Play and from making content available on another store that is not

25 also on Google Play.  (Ex. 48 GOOG-PLAY-007847561 at -7561.)  The agreement reflects Google's

26 and Activision's mutual understanding that Activision would *not* launch its own Android app store.  To

27 date, Activision has not launched an Android app store.

28 **Supercell.**  In 2019, Supercell ████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ████████████████████." (Ex. 10 ██████ Tr. 177:21-178:5.) "██████████████████████

3 █████ ██ ████████████████████████████████." (*Id*. at 178:6-10.)  As a

4 result, Google ████████████████████████████████████████. (*Id*.

5 at 179:5-7.)  Among other things, Google ██████████████████████████████

6 ███████████████████████████████████████████████████

7 ███████████████████████████████████████████████████

8 ████████████████████. (*Id*. at 179:10-13, 181:24-182:6.)  To date, Supercell has not launched an

9 Android app store.

10       Under Section 1, agreements not to compete between actual or would-be competitors are "[o]ne

11 of the classic examples of a *per se* violation."  *Palmer*, 498 U.S. at 49; *see also Optronic Techs. v. Ningbo*

12 *Sunny Elec. Co.*, 20 F.4th 466, 481 (9th Cir. 2021) (*per se* illegal agreement not to compete with an

13 entity with "technical capability to manufacture the same" product).  Nonetheless, Google argues the

14 jury should not even be allowed to consider this evidence as proof of *per se* illegal agreements for three

15 reasons, none of which is sound.

16       *First*, Google argues that the relevant "agreements are vertical in nature" or at least "hybrid"

17 agreements with both horizontal and vertical elements because the Potential Entrants are also Google's

18 customers.  (Mot. 11.)  Google then asserts that such "hybrid" agreements must be "evaluated under the

19 rule of reason."  (Mot. 11-12.)  But agreements not to compete with potential competitors are illegal *per*

20 *se*, even when such agreements have vertical elements.  *Palmer*, 498 U.S. at 47 (agreement between a

21 national bar review company and a regional competitor to make the regional entity a distributor of the

22 national company in exchange for payments and a commitment not to expand outside of Georgia deemed

23 *per se* illegal); *see also Optronic*, 20 F.4th at 479-81 (parties to a *per se* illegal agreement not to compete

24 shared a vertical supply relationship because the consideration for the agreement included

25 "'prepayments' . . . for unshipped telescopes").  In those cases, it was irrelevant that the illegal

26 agreements involved parties in a vertical relationship (the license to goods and intellectual property in

27

28

*Palmer* and the sale of telescopes in *Optronic*)—agreements not to compete are "*per se* antitrust violations when engaged in by horizontal competitors." *Optronic*, 20 F.4th at 476.[3]

None of the cases Google relies on suggests otherwise. Those cases discuss concerted refusals to deal, not agreements not to compete. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1479-80 (9th Cir. 1986) (allegations that "both [defendants] refused to sell [plaintiff] the parts he sought and that they were aware of each other's refusals"); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1382 (9th Cir. 1981) ("'group boycott' rationale"); *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022) (quoting *Dimidowich*). Unlike agreements not to compete, which are categorically *per se* illegal, "courts are reluctant to pigeonhole all concerted refusals to deal as [*per se* illegal]." *Dimidowich*, 803 F.2d at 1480. Epic and Match do not allege concerted refusals to deal. Rather, the evidence will show that each Potential Entrant ███████████████████████████████████████████████████████████████. (Ex. 13 AB-GOOG-000492 at -0495; Ex. 5 ████ Tr. 285:4-9.) Thus, the agreements with the Potential Entrants were horizontal agreements not to compete subject to *per se* treatment. *See* Ninth Cir. Manual of Model Civil Jury Instructions, § 14 (2017 ed.) (citing Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust Cases, ch. 2.C, instr. 3 (2016 ed.) (*per se* instruction appropriate where plaintiff proves "defendants are . . . competitors *or potential competitors*" (emphasis added))).

*Second*, Google contends that Epic's and Match's interrogatory responses confirm that the rule of reason applies because "[w]hen asked to identify all the terms of the alleged agreements not to launch competing Android app stores, Epic and Match merely pointed to the written [Hug] contracts," which do not contain specific provisions that literally prohibit competing app stores. (Mot. 12.) Google is wrong. To begin, there is no requirement to identify specific, written contract provisions that prevent competition to maintain a *per se* claim for restraint of trade. *See Esco Corp. v. United States*, 340 F.2d

---

[3] Google's cases acknowledge that an agreement between competitors is horizontal. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) ("horizontal restraints involve agreements between competitors not to compete in some way"); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) ("[a] horizontal restraint is an agreement among competitors on the way in which they will compete with one another"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("horizontal market division[s] are *per se* illegal). None holds that the *per se* rule cannot apply where one party to a horizontal restraint is also a customer of the other.

9

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1000, 1007 (9th Cir. 1965) ("It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy [to restrain trade]."); *see also United States v. Lischewski*, 2020 WL 1433272, at *3-4 (N.D. Cal. Mar. 24, 2020).  Monopolists like Google have an interest in keeping their illegal, anticompetitive agreements secret; "[e]vidence of a conspiracy must ordinarily be based on inferences drawn from competent circumstantial evidence." *United States v. Bates*, 429 F.2d 557, 558-59 (9th Cir. 1970).

Here, there is ample circumstantial evidence for a trier of fact to find the existence of a *per se* illegal contract, even absent a specific contractual provision.  Epic's response to Google's Interrogatory No. 28 directs Google to *both* the written Hug agreements *and* "its Response to Interrogatory No. 30," which lists evidence outside of the contracts' text that the Potential Entrants secured payments from Google in exchange for agreements not to compete.  (Dkt. 480-12 Epic's R&Os to Google's Fifth Amended Interrogatories, Nos. 28, 30.)  Match's response similarly directs Google to the written Hug agreements and the same additional evidence.  (Dkt. 480-13 Match's R&Os to Google's Contention Interrogatories, Nos. 24, 26.)  Epic's and Match's responses point to a full suite of evidence Plaintiffs have unearthed showing that Google entered into agreements not to compete.

Even if Epic and Match *had* limited their contentions to the written terms of the Project Hug agreements themselves, summary judgment would still be inappropriate because the intended purpose and inevitable consequence of those terms was to prevent the Potential Entrants from launching competing Android app stores.  Google attempts to sidestep this argument by inaccurately recasting Epic's and Match's allegations.  Google argues that showing an agreement has an *actual* anticompetitive effect on the market is insufficient.  But what Epic and Match will show based on Google's internal documents is that the "*intended* effect" of the agreements was to block competing app stores.  (Mot. 12.) A jury can infer from this intent that the agreement between Google and its would-be competitors was a naked restraint on competition, not a restraint that is ancillary to a legitimate purpose.  (Ex. 47 GOOG-PLAY-007424789 at -4789.)  Moreover, direct proof of anticompetitive intent is not even necessary.  *Cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101 (1984) ("[G]ood motives will not validate an otherwise anticompetitive practice[.]").  If two competitors form an agreement with terms that inevitably result in one party not competing with the other, a jury can

reasonably conclude that the parties had the mutual intent to agree not to compete, which is *per se* illegal. *Nat'l Soc'y of Pro. Engineers v. United State*s, 435 U.S. 679, 692 (1978) (certain agreements are *per se* illegal due to their "nature and *necessary effect*" on competition (emphasis added)). The record evidence is more than is required to prove a *per se* violation of the antitrust laws.

*Third*, Google claims that the *per se* rule cannot apply because the relevant agreements "involve multi-faceted incentives from Google to its customers," and there is "no tradition of courts condemning agreements in which a firm offers incentives to customers willing to make investments in the firm's product." (Mot. 13.) Again, Google is trying to prevent the jury from deciding a material issue of disputed fact: whether the agreements were an offer of "incentives to customers" as Google suggests or, instead, agreements not to compete, as Plaintiffs intend to prove. That factual issue is crucial because courts regularly condemn as *per se* illegal agreements in which a firm offers complex incentives to secure an agreement not to compete, as Google has done here. *See, e.g.*, *Optronic*, 20 F.4th at 479-81. Indeed, *Palmer* involved customers who received non-monetary benefits (a license to IP and course materials) in exchange for an agreement not to compete. 498 U.S. at 47.

Google argues that *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013), holds that any agreement backed by "multi-faceted value exchanges" falls under the rule of reason. (Mot. 13.) Nothing in *Actavis*, however, establishes such a rule regarding "multi-faceted" contracts. In fact, the Court there stated that an agreement's complexity must not "immunize the agreement from antitrust attack." *Id.* at 147. Moreover, "*Actavis* concerned the unique context of 'reverse payment' settlements—settlements of patent infringement litigation that require 'the claimed infringer not to produce the patented product until the patent's term expires' in exchange for payment." *Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972, 982 (N.D. Cal. 2022). Google did not pay to settle litigation—it paid to shut down competition.

*Finally*, Google asserts that "[t]he Ninth Circuit has noted that *per se* treatment is particularly unsuited to dynamic markets, 'especially in technology markets.'" (Mot. 11.) The Supreme Court, however, has already rejected Google's argument. *See Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 350-51 (1982) ("[T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules."). There is no need to rejustify the *per se* rule for the type of agreements Google struck—basic market allocation

agreements that have been *per se* illegal since the 19th century.  *See Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899).  Notably, Google's sweeping statement is wholly unsupported by the cases it cites, which concern purely vertical restraints evaluated under the rule of reason, *see Qualcomm*, 969 F.3d 974, *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977); or apply no substantive antitrust law, *see Chamber of Com. v. City of Seattle*, 890 F.3d 769, 787 (9th Cir. 2018).  Accordingly, Google's Motion seeking dismissal of the *per se* claims should be denied.[4]

### III.   Google Is Not Entitled to Summary Judgment on Timeliness Grounds

Google argues that "any claim based on" its revenue sharing agreements ("RSAs") with carriers is time-barred.  (Mot. 14.)  Google's Motion should be denied for three independent reasons:  (1) Google improperly attempts to withhold from the jury important evidence of its unlawful scheme to acquire and maintain monopoly power; (2) Google ignores its numerous overt acts in furtherance of its ongoing scheme, which continues to this day; and (3) consumers and developers paid Google supracompetitive prices within the limitations period and can recover for damages accrued within the limitations period, even if caused, in part, by pre-limitations-period conduct.[5]

*First*, Google's Motion fails to consider the carrier agreements in the context of Plaintiffs' claims. The carrier agreements are part of a larger, *ongoing* scheme to achieve and maintain Google's market power in the Android App Distribution Market in violation of Section 2.[6]  (Ex. 16 GOOG-PLAY4-000339905 at -9905 ("█████████████████████████████████████████████████████████████ █████████████████████████████████");  Ex. 56 Singer Rpt. at 24-26 (carrier and OEM agreements "dissuaded (and in some cases prevented) them from developing, promoting, or offering alternative App stores, including their own stores").)  Indeed, Google's documents confirm that it "█

---

[4] This aspect of Google's Motion is limited to whether a *per se* instruction may be sought after the evidence comes in at trial.  (Mot. 9-13.)  Plaintiffs reserve the right to brief the appropriate standard if it is not *per se*.

[5] For the same reasons that Plaintiffs' claims are timely under the Clayton Act, Google is not entitled to a laches defense, *see Oliver v. SD-3D LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014), and Plaintiffs' state-law claims are timely, *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) (noting Cartwright Act statute of limitations is "functionally identical").

[6] *See* Dkt. 172 2d Am. Consumer Compl. ¶ 218 ("Google's contractual restrictions on OEMs, Mobile Network Carriers and developers further Google's monopolization of the Android Application Distribution Market") Counts 1-11 (no carrier-specific claims); No. 3:21-cv-05227, Dkt. 188 1st Am. State Compl. Counts 1-8 (no carrier-specific claims); Dkt. 378 Epic's 2d Am. Compl. Counts 1-13 (same); Dkt. 380 Match's 1st Am. Compl. Counts 1-15 (same).

1   █████████████████████████████████████." (Ex. 43 GOOG-PLAY-000439987.R at -0012.R.)

2   Google now seeks to conceal this evidence from the jury.  Setting aside that Google's request is a *motion*

3   *in limine* masquerading as a motion for partial summary judgment, the jury is permitted to learn about

4   the agreements that led to Google's present monopoly, even assuming *arguendo* they "fall outside the

5   statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002); *see* Areeda &

6   Hovenkamp, *Antitrust Law* ¶ 320 (2022) ("[A plaintiff can] rely on pre-limitation conduct in order to

7   establish the exclusionary practices portion of a monopolization claim.").  Google's attempt to keep the

8   jury from learning about the full history of its conduct should be rejected. *See City of Anaheim*, 955 F.2d

9   at 1376.

10          *Second*, Google has committed numerous overt acts during the limitations period to obtain and

11   maintain monopoly power.  "When a plaintiff alleges a continuing violation of the law, an overt act . . .

12   restart[s] the statute of limitations and the statute of limitations runs from the last overt act." *Eichman*,

13   880 F.2d at 160.  Plaintiffs' claims are timely if *any* of those acts fell within the limitations period. *See*

14   *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 795-97 (N.D. Cal. 2022) (analyzing five separate overt

15   acts in determining whether Section 2 claims were timely).  Google has committed overt anticompetitive

16   acts within the limitations period and continues to commit them through today.  (*See, e.g.*, Ex. 1

17   ████████ Tr. 86:17-87:2 (████████████████████████████); *see also* Ex. 53 Singer

18   Rpt. at 93-112 (identifying ███████, ████████, and other anticompetitive actions

19   within the limitations period).)  Thus, there is no basis to dismiss *any* of Plaintiffs' claims on statute-of-

20   limitations grounds.

21          *Third*, Google's ongoing supracompetitive commission—enabled in part by the carrier

22   agreements—is an additional overt acts that independently makes Plaintiffs' carrier agreement claims

23   timely.  The continued extraction of supracompetitive prices permits Plaintiffs to recover damages

24   incurred within the limitations period, even if caused, in part, by pre-limitations conduct. *See, e.g.*,

25   *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971).  In *Zenith*, the issue before the Supreme

26   Court was whether the statute of limitations "permit[s] Zenith to recover all of the damages it suffered

27   during the years 1959-1963 even though some undetermined portion of those damages *was the proximate*

28   *result of conduct occurring more than four years prior*." *Id.* at 333 (emphasis added).  The Court held

that Zenith could recover because claims for damages "accrue only on the date they are suffered." *Id.* at 339; *see Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) ("Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955."); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[E]ach overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the illegality at much earlier times." (citation omitted)).

Plaintiffs will prove at trial that Google's commission is supracompetitive because of Google's anticompetitive conduct, including but not limited to the RSAs.  (*See, e.g.*, Ex. 53 Singer Rpt. at 87-93 (analysis of carrier agreements), 128-60 (modeling but-for commission rates).)  Every time Google extracted its supracompetitive commission, Google committed an overt act in furtherance of a continuing antitrust violation.  "[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of that act." *SD-3C*, 751 F.3d at 1086.  "[A] purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 296 (2d Cir. 1979); *see also Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021) ("[E]ach time that Actelion sold Tracleer at a supracompetitive price after its patent expired, it illegally exercised monopoly power . . . thus committing an overt act that caused injury and violated the antitrust laws."); Areeda & Hovenkamp, *Antitrust Law* ¶ 320 (2022).[7]

The cases Google cites for the proposition that "it is irrelevant as a matter of law whether the carrier revenue-sharing contracts had some effect that lingered into the limitations period" (Mot. 15) concern a narrow exception to the usual rule that is inapplicable to this case.  In those cases, ongoing supracompetitive charges were found not to be individual overt acts because they were governed by negotiated pre-limitations contracts signed by the plaintiff and defendant.  *Eichman*, 880 F.2d at 160

---

[7] No plaintiff in this case seeks to use facts about the carrier agreements to recover damages prior to the four-year limitations period.  (*See* Ex. 53 Singer Rpt. at 203 (seeking Consumer and State damages starting August 16, 2016, four years prior to first consumer complaint); Ex. 18 Schwartz Rpt. at 229-30 (seeking Match damages starting July 7, 2017).)  Moreover, Epic does not seek to recover any monetary damages.

(defendant's "passive receipt of profits" from pre-limitations lease agreement with plaintiff was not an overt act); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("[W]e think of the performance of a contract as a manifestation of the 'overt act,' the decision to enter the contract, rather than an independent overt act of its own.").[8]  In those cases, the terms of the contract set the overcharge, and therefore the only overt act was the signing of the contract.  *US Airways*, 2022 WL 874945, at *6 (S.D.N.Y. Mar. 24, 2022) ("A defendant does not commit an overt act restarting the statute of limitations each time a plaintiff pays a defendant a supracompetitive price *pursuant to an anticompetitive contract to which they are a party*." (emphasis added)).  Here, the payments at issue are not governed by performance of the RSAs' terms, nor did any Plaintiff sign the RSAs.  And, even in *US Airways*, substantial evidence concerning the pre-limitations-period contracts was admitted at trial to prove liability for the remaining timely claims.  *See* 2017 WL 1064709, at *17 & n.11 (S.D.N.Y. Mar. 21, 2017) (evidence that defendant used market power "to impose the full-content contractual terms in the 2006 [time-barred] agreement, which further ingrained its market power").

*Finally*, Arizona, the District of Columbia, Indiana, Iowa, Louisiana, Mississippi, North Carolina, and Washington benefit from the doctrine of *nullum tempus occurrit regi*—a doctrine Google ignores and that provides that limitations periods do not run against the State.  *See Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 652-58 (N.C. 1992); *Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163, 168 (Iowa 2006); *Solid Rock Ch., Disciples of Christ v. Friendship Pub. Charter Sch., Inc.*, 925 A.2d 554, 559 (D.C. 2007); *City of E. Chicago v. E. Chi. Second Century*, 878 N.E.2d 358, 380 n.21 (Ind. Ct. App. 2007), *rev'd on other grounds*, 908 N.E.2d 611 (Ind. 2009); *State v. LG Elecs., Inc.*, 375 P.3d 636, 641-44 (Wash. 2016); La. Const. Art. 12, § 13; Miss. Const. Art. 4, § 104; Miss. Code Ann. 15-1-51; Ariz. Rev. Stat. § 12-510; D.C. Code § 12–301; Wash. Code Civ. P. § 4.16.160.  That rule defeats Google's argument that those Plaintiffs' state-law claims are untimely.  And because the early RSAs are relevant to those state law claims, Google cannot keep that evidence from the jury.[9]

---

[8] The other case Google cites, *Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), concerns a suit by a competitor, not a purchaser.  *Id.* at 999-1001.  "Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."  *US Airways*, 2022 WL 874945, at *6 (quoting *Eastman Kodak*, 603 F.2d at 295).

[9] For Indiana, *nullum tempus* applies only to its state-law antitrust claims, not its consumer protection claims.

Google's treatment of North Carolina law (Mot. 14 n.15) merits particular discussion.  N.C.G.S. § 75-16.2 provides a four-year limitations period for "any civil action" under the state antitrust and consumer protection laws.  The statute means the opposite of what Google contends.  The "any civil action" language is not specific enough to bind the State because it does not explicitly name the State as subject to the time limit.  *See State Dept. of Health & Human Svcs. v. Thompkins*, 695 S.E.2d 133, 135-37 (N.C. 2010) (citations omitted); *see also id.* (limitations period for "all claims" does not override *nullum tempus*).  North Carolina's state-law claims are not subject to a limitations period.

Accordingly, Google's Motion on this ground should be denied.

## IV.   Google Is Not Entitled to Summary Judgment on Standing

Over two years ago, Google moved to dismiss the Developer Plaintiffs' overcharge damages claims, including those relating to in-app content and subscription sales, on the theory that *only consumers* had standing to pursue them.  Google told the Court that the "Supreme Court's reasoning in *Apple* [*Inc. v. Pepper*] applies directly here, and bars Developer Plaintiffs' damages claims . . . [because] consumers pay Google directly and then Google remits payment back to developers."  (3:20-cv-05792-JD, Dkt. 71-1 at 3 ("Google MTD").)  According to Google back then, "'[t]he absence of an intermediary is dispositive.'"  (Google MTD at 3 (quoting *Pepper*).)  Apparently not anymore.  Google *now* contends that consumers "lack standing to recover antitrust damages for purchases of subscriptions and [IAPs]" because they do not "participate" in the market for in-app payment solutions, in which competition has been restrained.  (Mot. 17.)  Of course, IAPs comprise the vast majority of the commerce at issue.  (Ex. 52 Rysman Rpt. ¶ 53 (█████████████████████████████████████████).)

Google is wrong.  Consumers who pay overcharges have antitrust standing because they *pay Google directly* for products that are priced above competitive levels due to Google's antitrust violations.  Because no "intermediary" stands between them and Google, consumers have antitrust standing.  Google's authority simply confirms this fact.  And, in any event, consumers' injuries are "inextricably intertwined" with Google's anticompetitive conduct—including the tie-in of GPB for IAPs—such that they have standing under *McCready* and its progeny as well.  Finally, federal rules cannot be used to bar state-law claims in jurisdictions, including California, that have expressly expanded consumer standing.

### A. Consumers Have Standing To Recover Damages for IAPs and Subscriptions

Section 4 of the Clayton Act provides a broad right of action for redress of antitrust injuries: "any person who shall be injured in his business or property by reason of anything forbidden in antitrust laws may sue therefore." 15 U.S.C. § 15(a). Congress enacted that provision specifically to "creat[e] an effective remedy *for consumers* who were forced to pay excessive prices by the giant trusts." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983) (emphasis added). Thus, where a plaintiff "alleges a wrongful deprivation of her money because the price of the [product] she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under §4." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979). The Supreme Court has recognized one general exception: "when an antitrust violation occurs in a multi-tiered distribution system," the *Illinois Brick* rule bars the claims of a consumer who buys from an innocent intermediary. *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1122 (9th Cir. 2008).

In *Pepper*, the Supreme Court analyzed whether consumers such as those here have standing to bring claims for purchases they made through an app store like the Play Store. 139 S. Ct. at 1518-19. There, Apple argued that *Illinois Brick* barred consumers' claims because app developers set app prices. *Id.* at 1519. The Supreme Court rejected this argument, holding that "iPhone owners pay the alleged overcharge directly to Apple. The absence of an intermediary is dispositive." *Id.* at 1521. Indeed, the Court held that both consumers and developers could pursue damages against Apple: "[t]he consumers seek damages based on the difference between the price they paid and the competitive price. The app developers would seek lost profits that they could have earned in a competitive retail market. *Illinois Brick* does not bar either category of suit." *Id.* at 1525.

Here, as in *Pepper*, consumers have standing to recover damages for IAPs and subscription purchases—just as Google acknowledged two years ago. Consumers ███████ ████████ ██████ ██████████████████. (Ex. 20 █████ Tr. 100:1-24 (██████ ████████████████); Ex. 21 Singer Tr. 48:24-49:13 ("████████████ ████████████████████████████████████████████████████ ██ ████████████████████████████████████████████████████████").) For both

types of transactions, ███████████████████████████████████

███████████████████████████.  (Ex. 22  GOOG-PLAY3-000013195 (███████████

██████).)[10]  And for both categories of transactions, consumers paid overcharges to Google because of

its anticompetitive conduct.

      Google tries to distinguish *Pepper* on the basis that the Court described Apple as a "monopolistic

*retailer*," arguing that "Plaintiffs here do not allege any market in which Google is a retailer to consumers

of IAPs or subscriptions."  (Mot. 20.)  But Google overlooks the "dispositive" fact:  "the absence of an

intermediary."  (Google MTD at 3 (quoting *Pepper*, 139 S. Ct. at 1521).)  Nothing in *Pepper* turned on

the allegation that Apple served as a "retailer."  What matters under *Pepper* is, as Google said two years

ago, that "consumers pay Google directly and then Google remits payment back to developers."  (*Id.*

(quoting *Pepper*, 139 S. Ct. at 1521).)  This accords with longstanding precedent, such as *Royal Printing*

*Co. v. Kimberly Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), holding that if the violator transacts in

different markets, including markets not restrained by the violation, it can be held liable at every level.

*Id.* at 326 & n. 6; *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002); *In re Sugar*

*Indus. Antitrust Litig.*, 579 F.2d 13, 16-17 (3d Cir. 1978); *In re TFT-LCD (Flat Panel) Antitrust Litig.*,

586 F.  Supp. 2d 1109, 1117-18 (N.D. Cal. 2008).

      Google's contrary reading of *Pepper* relies entirely on Google's insistence that antitrust standing

is limited to buyers or competitors in the relevant market where the defendant's anticompetitive conduct

occurs, ignoring that consumers are market participants and pay Google directly for IAPs and

subscriptions, as discussed in Part B below.  Yet this supposed requirement finds no support in the case

law; in fact, the very cases Google cites expressly reject it.  For instance, Google purports to quote

*American Ad Management* in support of its argument that Plaintiffs can recover only for injuries in an

antitrust market in which they buy or sell.  (Mot. 17.)  But that is the *opposite* of what the Ninth Circuit

held.  In *American Ad Management*, the Ninth Circuit rejected the notion that a plaintiff must be a

"competitor or consumer" in the relevant market to have standing, describing it as nothing more than a

"rough gloss on the *Associated General*/*Bhan* 'market participant' test."  *Am. Ad Mgmt., Inc. v. Gen.*

---

[10] These terms apply to all Google Payments without specifically referencing GPB by name.

*Tel. Co. of Cal.*, 190 F.3d 1051, 1057-58 (9th Cir. 1999) ("[I]t is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff."). Consequently, the Ninth Circuit held that a broker had standing to challenge a restraint that lowered the price of ads and, in turn, plaintiff's commissions—even though the broker did not buy or sell ads. *Id.* at 1057.

Google also points to *Glen Holly Entertainment v. Tektronix* for the proposition that "[c]onsumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." (Mot. 18 (quoting 343 F.3d 1000, 1008 (9th Cir. 2003)).) Yet that case held it was an *error* to "limit a purchaser/consumer's actionable antitrust injury to situations where the purchaser/consumer has made or intends to make purchases in the relevant market," explaining that "this understanding of antitrust injury is too restrictive." *Id.* at 1010.

Notably, Google concedes that consumers can pursue damages arising from app purchases. ████

████████████████████████████████████████████████████████

████. (Ex. 23 Tucker Rpt. ¶¶ 373-83 ("████████████████████████████████████████████

████████████████████████").) This means that, by Google's logic, consumers would have antitrust standing to seek overcharge damages for IAPs and subscription purchases if Google were correct about the relevant market in this case. This convoluted result is precisely why antitrust standing does not turn on such distinctions: regardless of how the relevant market is defined, as "the immediate buyers from the alleged antitrust violators . . . [consumers] may sue." *Pepper*, 139 S. Ct. at 1521.

### B.      Consumers "Participate" in the Market for In-App Payment Solutions

Even if *Pepper* did not establish that Plaintiffs have standing as direct purchasers, the Supreme Court has long recognized that even plaintiffs who make *no* purchases from a defendant have standing where their injury is—as here—"inextricably  intertwined" with the conduct at issue. In *McCready*, a subscriber in an employee insurance plan challenged a scheme to restrict health insurance reimbursement for psychologists. 457 U.S. at 467. The defendants argued that the subscriber was not a psychologist or a buyer of health insurance, and therefore lacked antitrust standing. The Supreme Court disagreed. Because the denial of reimbursement was "the very means" by which the conspiracy was carried out, the subscriber's injury was "a necessary step in effecting" the anticompetitive ends, and she had standing to

1   sue.  As the Supreme Court explained, it was sufficient that the subscriber was "within that area of the

2   economy endangered by th[e] breakdown of competitive conditions."  *Id.* at 479-80.

3          Shortly after *McCready*, the Ninth Circuit held that plaintiffs may have antitrust standing where

4   "it is clear that their interests would directly be served by enhanced competition in the market," even if

5   they "are neither consumers nor competitors in the relevant market."  *Chelson v. Oregonian Pub. Co.*,

6   715 F.2d 1368, 1371 (9th Cir. 1983).  The Ninth Circuit has applied this rule expansively.  In *Ostrofe v.*

7   *H.S. Crocker Co.*, for example, the court held that a whistleblower discharged by a cartelist could

8   essentially bring a wrongful termination claim under the Clayton Act.  740 F.2d 739, 745-46 (9th Cir.

9   1984).  And in *L.A. Memorial Coliseum Commission v. NFL*, the Ninth Circuit ruled that a football venue

10  could challenge an NFL rule affecting NFL members.  791 F.2d 1356, 1363 (9th Cir. 1984); *see also*

11  *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1267, 1274-75 (9th Cir.

12  2022) (consumers' injury "inextricably intertwined" with power company's "unlawful scheme to reduce

13  solar-energy competition"); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1066 (N.D. Cal.

14  2007) (consumers' injury "inextricably intertwined" with boycott of retailer); *Visa U.S.A. Inc. v. First*

15  *Data Corp.*, 2006 WL 1310448, at *9 (N.D. Cal. May 12, 2006) (merchant acquirer could pursue

16  damages caused by restraint of competition in the market for network processing).

17         In this case, the harm to consumers is "integral" to, and "inextricably intertwined" with, Google's

18  unlawful conduct in the market for in-app payment solutions.  *McCready*, 457 U.S. at 479, 484.  Like

19  *McCready*, collecting payments via GPB is "a necessary step in effecting the ends" of Google's

20  anticompetitive conduct, making plaintiffs' injury "inextricably intertwined" with the violation.  *Id.*

21  Consumers must pay overcharges, to Google, every time they make an IAP or buy a subscription, even

22  years after they download the relevant app from Google.  Dr. Singer calculated "overcharges from the

23  consumers' perspective" (Ex. 21 Singer Tr. 54:13-20), while Dr. Rysman's variety model showed how

24  consumers would benefit in a world absent Google's anticompetitive conduct through an increase in the

25  supply of apps (Ex. 41 Rysman Tr. 286:5, 291:15-20).  There is little doubt that consumers in this case

26  would be "directly served by enhanced competition."  *Chelson*, 715 F.2d at 1371.  Consumers

27  accordingly have federal antitrust standing to seek damages in the in-app payment solution market.

28

### C.   Consumers Also Have Antitrust Standing in Repealer Jurisdictions

Google asserts in passing that its arguments apply equally to the Cartwright Act.  (Mot. 18.)  But the cases Google cites predate the California Supreme Court's decision in *Aryeh v. Canon Business Solutions*, 55 Cal.4th 1185, 1195 (2013).  Since then, federal courts in this district regularly reject Google's position.  *See In re Cal. Gasoline Spot Mkt. Antitrust Litig.*, 2022 WL 3215002, at *3 (N.D. Cal. Aug. 9, 2022); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1073 (N.D. Cal. 2015).  Furthermore, applying *Associated General Contractors* to the Cartwright Act here would undo California's express expansion of consumer remedies.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003) ("Under California law, an indirect purchaser participates (indirectly) as a customer in the relevant market, and thus may suffer a cognizable antitrust injury.").[11]  And Google ignores the dozens of other laws of the 38 jurisdictions other than California under which the States bring damages claims.  Even if the Court accepted Google's incorrect arguments about federal and California law, Google has not even carried its burden as the moving party with respect to these other jurisdictions.  Accordingly, the Court should deny Google's Motion on standing.

### V.   Google Is Not Entitled to Summary Judgment on Plaintiffs' Tying Claims

Google argues that it should be granted summary judgment on Plaintiffs' tying claims because "Google Play and GPB are not 'two distinct products or services'" and Plaintiffs cannot show "that Google Play and GPB are tied."  (Mot. 20-24.)  Google fails to show that no reasonable juror could disagree with its contentions, which require the resolution of disputed facts.  In addition, the Ninth Circuit's decision in *Epic v. Apple*, among other precedent, forecloses Google's arguments.  Indeed, Google relies on the district court's findings in *Epic v. Apple* that the Ninth Circuit held were "either clearly erroneous or incorrect as a matter of law."  2023 WL 3050076, at *28.

### A.   Google Play and GPB Are Separate Products

Google contends that Google Play and GPB are not separate products.  (Mot. 20-23.)  The Ninth Circuit expressly rejected a substantively identical contention in *Epic v. Apple*.  There, the Ninth Circuit held that Apple's "App Store and [Apple's payment solution] clearly can be separated because Apple

---

[11] *Metro-Goldwyn-Mayer* is otherwise inapposite as it concerned the operator of a platform used to distribute copyrighted works attempting to challenge a refusal to license copyrighted works to a licensor that used the platform.  269 F. Supp. 2d at 1217, 1220.

*already does* so in certain contexts, namely that [Apple's payment solution] is not required for in-app purchases of physical goods."  2023 WL 3050076, at *28 (emphasis in original).

The same is true for Google—it has never required developers selling or consumers buying physical goods to use GPB, and indeed *forbids* its use for such transactions.  (Ex. 25 Payments Policy.) It was only after this litigation was filed that Google began requiring developers selling digital content that may be "consumed outside the app itself" to use GPB, and accordingly, consumers were only then required to use GPB to purchase such content.  (Ex. 26 GOOG-PLAY-000064254 at -4254 (Prior Payments Policy).)  And prior to 2012, Google did not require *any* developer to use GPB.  (Ex. 50 Android Developers Blog, "In-App Billing on Android Market:  Ready for Testing.")  *See Epic v. Apple*, 2023 WL 3050076, at *28 (discussing Apple's historical practice of "permit[ing] developers to use their own in-app payment systems").  In fact, Google did not offer in-app payment processing until years *after* launching its app store.  (Ex. 42 Android Developers Blog, "Android Market: Now available for users"; Ex. 28 Android Developers Blog, "In-app Billing Launched on Android Market.")

As in *Epic v. Apple*, the evidence here also shows there is substantial demand for non-GPB payment systems.  2023 WL 3050076, at *28.  Many developers now subject to Google's tie historically have used non-GPB systems (exclusively or alongside GPB), including Match,[12] ██████████ ████, Epic Games, ████████████████████████████████████).  (Ex. 44 GOOG-PLAY-000838161 at -8161; Ex. 29 GOOG-PLAY-007346079 at -6084, -6087 to -6088; *see also* Ex. 30 ████ Tr. 173:23–174:10, 223:20–225:8, 306:25–307:4; Ex. 45 GOOG-PLAY-003334312 at -4314.)

Developers (including Match and ████) have also expressly requested to use their own non-GPB systems.  (Ex. 49 GOOG-PLAY-011270137 at -0139 to -0140 (███████████████████ ████████████████████████); Ex. 31 ████ Tr. 32:2-17 (████████████████████ ██████████████████); *see also* Ex. 10 ████ Tr. 252:23-253:1.)  Further, in 2022, Google introduced the User Choice Billing program, which allows certain developers to offer non-GPB systems alongside GPB and allows consumers to decide which payment solution to use—further showing there

---

[12] For example, Match.com and OurTime have offered non-GPB payment systems since the apps were first published on Google Play in 2010 and 2014, respectively.  (Match Dkt. 12-2 Foster Decl. ¶¶ 32, 33, 36.)

is separate demand.  (Ex. 32 "Enrolling in User Choice Billing Pilot.")

Google cites *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963 (9th Cir. 2008), to argue that Google Play and GPB are not separate products "as a matter of law."  (Mot. 20-21.)  To start, this is a question of fact.  *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615-16 (9th Cir. 1990) ("Kodak's argument [that two products form a single product market] presents, at best, a disputed issue of fact."), *aff'd*, 504 U.S. 451 (1992).  *Rick-Mik* also is factually inapposite because, unlike here, it involved a franchise, which "almost by definition, necessarily consist[s] of 'bundled' and related products or services—not separate products."  532 F.3d at 974.

If anything, *Rick-Mik* supports Plaintiffs.  It instructs courts to consider "'indirect evidence of consumer demand for the tied product separate from the tying product.'"  532 F.3d at 975.  That "includes firm behaviors," including whether "'competitive firms always bundle the tying and tied goods' together."  *Teradata Corp. v. SAP SE*, 2018 WL 6528009, at *12 (N.D. Cal. Dec. 12, 2018) (quoting *Rick-Mik*, 532 F.3d at 965).  Here, ███████████████████████████████████████████████████████████████ .  (*See* Ex. 33 ███████ Tr. 33:14-16; Ex. 34 ████████████ Tr. 215:5-216:4.)  And in-app billing service providers exist that do not distribute apps.  (*See* Ex. 52 Rysman Rpt. ¶ 247 (discussing, *e.g.*, Square's In-App Payments API).)

In sum, the evidence Plaintiffs offer now—at the summary judgment stage—is even stronger than the evidence on which the Ninth Circuit relied to find separate products following a full bench trial in *Epic v. Apple*.  Summary judgment, therefore, is inappropriate.

## B.   Google Coerces Use of GPB

Google also argues there is no "tie" because Google does not "coerce or force" *all* developers that use Google Play to use GPB; rather, "[m]any" apps are "available for free and do not monetize in-app activity."  (Mot. 23.)  Again, Google relies on a portion of the district court decision in *Epic v. Apple* that the Ninth Circuit expressly rejected.  Like Google, Apple argued "that there is no tie because 'thousands of developers . . . offer no [IAPs]'" and are therefore not required to use Apple's payment system.  *Epic v. Apple*, 2023 WL 3050076, at *28 n.20.  The Ninth Circuit easily disposed of this argument in a footnote, explaining that Apple's developer agreement "essentially provides: 'Apple will sell your app-distribution transactions only if you buy your in-app-purchase processing *requirements*

from Apple.'"  *Id*.  The same is true here:  if a developer on Google Play (such as Match) offers digital goods for sale in the app, Google forces that developer to use GPB as the payment solution.  (*See* Ex. 51 DDA Section 4.1; Ex. 25 Payments Policy (Google webpage explaining that "[s]tarting June 1, 2022, any app that is still not compliant will be removed from Google Play"); Ex. 35 GOOG-PLAY-011378120 at -8122 (███████████████████████████████████████████████████ ███████████████████).)  Moreover, Google does not claim there is a technological need for the tie.

Regardless, whether Google coerces the use of GPB is a question of fact that should not be resolved at summary judgment.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914 (9th Cir. 2008) (reversing summary judgment on tying claim in part because of disputed fact issues regarding coercion).  For example, Google argues that "developers can pursue many monetization strategies beyond the sale of [IAPs]" that do not require use of GPB.  (Mot. 24.)  But triable issues of fact exist as to whether developers can avoid Google's tie by implementing these monetization strategies without facing unreasonable hurdles or costs.  *See Aerotec*, 836 F.3d at 1179 (a tie exists "when a seller 'adopts a policy that makes it unreasonably difficult or costly to buy the tying product . . . without buying the tied product.'").  Match, for example, has developed its business based on an IAP monetization strategy that it implemented more than a decade ago and have invested significant resources, time, and money to develop and maintain.  (*See, e.g.*, Match Dkt. 12-2 Foster Decl. ¶¶ 32, 33, 36.)  Epic Games, too, relies on an IAP monetization strategy for its mobile apps (Dkt. 378 Epic's 2d Am. Compl.¶ 11(a); Dkt. 386 Defendants' Answer to Epic's 2d Am. Compl. ¶ 11; *Epic v. Apple*, 2023 WL 3050076, at *3), and it would not want to degrade its users' experiences by including advertisements within its apps.

Google's arguments for summary judgment as to Plaintiffs' tying claim fail under Ninth Circuit precedent and ignore triable issues of material fact.  This prong of Google's Motion too should be denied.

**VI.    Google's Motion Should Be Denied Under Rule 56(d)**

On May 9, 2023, nine days before this opposition brief was due, Google informed Plaintiffs for the first time that "due to errors," Google "will be producing additional documents in the coming weeks," and that "Google's prior collections did not include certain documents in Google Drive, including Microsoft Office and PDF files, as well as certain files located in shared/team drive folders."  (Ex. 37 May 9, 2023 Email from G. Pomerantz to Plaintiffs and May 10, 2023 Letter from G. Bornstein to

Google; *see also* Ex. 38 May 18, 2023 Letter from G. Bornstein to Google.)  Google has since confirmed that to date, it has identified at least 160,000 custodial documents that hit on Plaintiffs' search terms and that it had failed to collect and review, and that the final count will be higher—potentially significantly so.  Google also confirmed that these errors affected *every* custodian's collection because, among other "errors," Google failed to collect documents from the custodians' hard drives.  Google has not yet produced any of these newly collected documents.

Federal Rule of Civil Procedure 56(d) permits courts to deny a summary judgment motion if the non-moving party shows that "it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  "[S]ummary judgment is disfavored where relevant evidence remains to be discovered." *Kauffman-Stachowiak v. Omni Hotels Mgmt. Corp.*, 2016 WL 4269504, at *7 (N.D. Cal. Aug. 15, 2016). While Google's Motion should be denied for the reasons explained above, it would be manifestly unfair to Plaintiffs for the Court to enter judgment in favor of Google on any of Plaintiffs' claims when Google failed to produce these documents nearly two years after representing to the Court that it had "completed substantial production of custodian documents" (Dkt. 56 at 3), in addition to the numerous Chats that Google intentionally destroyed.[13]

## CONCLUSION

Google's Motion for Partial Summary Judgment should be denied in its entirety.

---

[13] Deferral of the motion would be an inadequate remedy.  Plaintiffs intend to try this case in November as the Court has ordered.  The schedule should not be placed at risk due to Google's late production of documents.

Dated:  May 18, 2023

CRAVATH, SWAINE & MOORE LLP
Christine Varney *(pro hac vice)*
Gary A. Bornstein *(pro hac vice)*
Yonatan Even *(pro hac vice)*
Lauren A. Moskowitz *(pro hac vice)*
Justin C. Clarke *(pro hac vice)*
Michael J. Zaken *(pro hac vice)*
M. Brent Byars *(pro hac vice)*

FAEGRE DRINKER BIDDLE & REATH LLP
Paul J. Riehle (SBN 115199)

Respectfully submitted as to Sections I, II, III, V, and VI,

By: */s/ Gary A. Bornstein*
Gary A. Bornstein

*Counsel for Plaintiff Epic Games, Inc.*

Dated:  May 18, 2023

BARTLIT BECK LLP
Karma M. Giulianelli

KAPLAN FOX & KILSHEIMER LLP
Hae Sung Nam

Respectfully submitted as to Sections I, III, IV, V, and VI,

By: */s/ Karma M. Giulianelli*
Karma M. Giulianelli

*Co-Lead Counsel for the Class in In re Google Play Consumer Antitrust Litigation*

Dated:  May 18, 2023

PRITZKER LEVINE LLP
Elizabeth C. Pritzker

Respectfully submitted as to Sections I, III, IV, V, and VI,

By: */s/ Elizabeth C. Pritzker*
Elizabeth C. Pritzker

*Liaison Counsel for the Class in In re Google Play Consumer Antitrust Litigation*

Dated:  May 18, 2023

OFFICE OF THE UTAH ATTORNEY GENERAL
Brendan P. Glackin
Lauren M. Weinstein

OFFICE OF THE ARIZONA ATTORNEY GENERAL
Jayme L. Weber

Respectfully submitted as to Sections I, III, IV, V, and VI,

By: */s/ Brendan P. Glackin*
Brendan P. Glackin

*Counsel for the Plaintiff States*


Dated:  May 18, 2023

HUESTON HENNIGAN LLP
Douglas J. Dixon
Christine Woodin
Joseph A. Reiter

Respectfully submitted as to Sections I, II, III, V, and VI,

By: */s/ Douglas J. Dixon*
Douglas J. Dixon

*Counsel for Plaintiffs Match Group, LLC et al.*

1

## E-FILING ATTESTATION

2      I, Gary A. Bornstein, am the ECF User whose ID and password are being used to file this

3 document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the signatories

4 identified above has concurred in this filing.

5

6                                                                */s/ Gary A. Bornstein*
                                                                 _____
7                                                                 Gary A. Bornstein

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD