# Exhibit 11



A Service of



Budzinski, Oliver; Ruhmer, Isabel

**Working Paper**

# Merger simulation in competition policy: a survey

MAGKS Joint Discussion Paper Series in Economics, No. 2008,07

**Provided in Cooperation with:**

Faculty of Business Administration and Economics, University of Marburg

*Suggested Citation:* Budzinski, Oliver; Ruhmer, Isabel (2008) : Merger simulation in competition policy: a survey, MAGKS Joint Discussion Paper Series in Economics, No. 2008,07, Philipps-University Marburg, Faculty of Business Administration and Economics, Marburg

This Version is available at:
http://hdl.handle.net/10419/30108

**Standard-Nutzungsbedingungen:**

Die Dokumente auf EconStor dürfen zu eigenen wissenschaftlichen Zwecken und zum Privatgebrauch gespeichert und kopiert werden.

Sie dürfen die Dokumente nicht für öffentliche oder kommerzielle Zwecke vervielfältigen, öffentlich ausstellen, öffentlich zugänglich machen, vertreiben oder anderweitig nutzen.

Sofern die Verfasser die Dokumente unter Open-Content-Lizenzen (insbesondere CC-Lizenzen) zur Verfügung gestellt haben sollten, gelten abweichend von diesen Nutzungsbedingungen die in der dort genannten Lizenz gewährten Nutzungsrechte.

**Terms of use:**

*Documents in EconStor may be saved and copied for your personal and scholarly purposes.*

*You are not to copy documents for public or commercial purposes, to exhibit the documents publicly, to make them publicly available on the internet, or to distribute or otherwise use the documents in public.*

*If the documents have been made available under an Open Content Licence (especially Creative Commons Licences), you may exercise further usage rights as specified in the indicated licence.*





**Joint Discussion Paper Series in Economics**

**by the Universities of**

**Aachen · Gießen · Göttingen Kassel · Marburg · Siegen**

ISSN 1867-3678

## No. 07-2008

## Oliver Budzinski & Isabel Ruhmer

## Merger Simulation in Competition Policy: A Survey

**Oliver Budzinski**
**Philipps-University Marburg**
**Faculty of Business Administration and Economics**
**Am Plan 2, D-35032 Marburg**
**Tel: ++49-6421-282 3080 Fax: ++49-6421-282 8974**
**Email: budzinski@wiwi.uni-marburg.de**

**Isabel Ruhmer**
**Center for Doctoral Studies in Economics (CDSE)**
**University of Mannheim**
**email: iruhmer@mail.uni-mannheim.de.**

**This paper can be downloaded from**
**http://www.uni-marburg.de/fb02/makro/forschung/magkspapers/index_html%28magks%29**

**Coordination: Bernd Hayo • Philipps University Marburg • Faculty of Business Administration & Economics • Universitätsstr. 24, D-35032 Marburg**
**Tel: ++49-6421-2823091, Fax: ++49-6421-2823088 e-mail: hayo@wiwi.uni-marburg.de**

# Merger Simulation in Competition Policy: A Survey[◊]

## *Oliver Budzinski[#] & Isabel Ruhmer[*]*

**Abstract**: Advances in competition economics as well as in computational and empirical methods have offered the scope for the employment of merger simulation models in merger control procedures during the past almost 15 years. Merger simulation is, nevertheless, still a very young and innovative instrument of antitrust and, therefore, its 'technical' potential is far from being comprehensively exploited and teething problems in its practical use in the antitrust environment prevail. We provide a classification of state-of-the-art merger simulation models and review their previous employment in merger cases as well as the problems and limitations currently associated with their use in merger control. In summary, merger simulation models represent an important and valuable extension of the toolbox of merger policy. However, they do not qualify as a magic bullet and must be combined with other, more traditional instruments of competition policy in order to comprehensively unfold its beneficial effects.

**JEL:** L40, C15, K21

**Keywords:** merger simulation, merger control, antitrust, oligopoly theory, auction models, mergers & acquisitions

**Contents**:

1. Introduction ................................................................................................................. 1
2. An Introductory Guide to Merger Simulation ......................................................... 2
   2.1 Oligopoly Theory ................................................................................................... 2
   2.2 Simulating Mergers ............................................................................................... 4
3. Types of Merger Simulation Models ......................................................................... 5
   3.1 Towards a Classification Scheme ......................................................................... 5
   3.2 Bertrand Models ..................................................................................................... 6
   3.3 Cournot and Supply Function Models ............................................................... 12
   3.4 Auction Models .................................................................................................... 13
4. Merger Simulation Models in Competition Policy Practice: Prospects,
Problems and Limits .................................................................................................... 16
   4.1 Merger Control Cases with Simulation Models: An Overview ...................... 16
   4.2 Problems of the Use of Merger Simulation as an Antitrust Instrument ......... 25
   4.3 Ex Post Evaluation of the Performance of Merger Simulations ..................... 31
5. Conclusions ................................................................................................................ 32
References ....................................................................................................................... 32

[◊] The authors thank Ulrich Schwalbe, Wolfgang Kerber and Arndt Christiansen for valuable comments on earlier versions of the paper, the participants of the 30th Hohenheimer Oberseminar (Nuernberg, April 2008) for helpful discussion, and Barbara Güldenring for valuable editorial assistance.

[#] PD Dr. Oliver Budzinski, MACIE – Marburg Centre for Institutional Economics, Chair of Institutional and International Economics, Philipps-University of Marburg, email: budzinski@wiwi.uni-marburg.de.
[*] Isabel Ruhmer, Center for Doctoral Studies in Economics (CDSE), University of Mannheim, email: iruhmer@mail.uni-mannheim.de.

# 1. Introduction

The computational simulation of welfare effects of real-world (proposed) horizontal mergers in oligopolistic markets has become an increasingly important instrument of competition policy since the mid-1990s, both in the U.S. and in the EU. Merger simulation models (MSM) have been employed both by antitrust authorities and merging companies as well as by courts in order to assess the pro- or anticompetitive character of proposed mergers. Despite some setbacks, it seems likely that the merger policy tool 'simulation models' will play an even more important role in the future. In general, every "[m]erger simulation uses a standard oligopoly model calibrated to observed prices and quantities to predict the effects of a merger on the prices and quantities of the merging firms and their rivals" (*Froeb* & *Werden* 2000: 134). It aims at giving numerical predictions of price and quantity changes and, in doing so, constitutes a considerable departure from the more traditional structural merger analysis mainly based on changes in market shares and concentration ratios.

The reasons for the increased popularity of MSM in antitrust practice are manifold (*Baker* & *Rubinfeld* 1999: 386-387). Firstly, progress in industrial economics has revealed new types of anticompetitive effects of mergers in oligopolies (in particular unilateral effects theory and auction theory), while, at the same time, emphasizing the importance of explicitly recognizing pro-competitive effects of mergers (e.g. efficiency gains). An assessment of these effects requires a detailed analysis of the concrete welfare effects of a specific merger proposal. Secondly, progress in methods and computation techniques has allowed for increasingly complex simulations, based upon real-world data. Thirdly, the same technological progress has increased the availability of market data (such as prices and quantities). In particular, data from scanner cashpoints must be mentioned in this context. Fourthly, competition policy has increasingly embraced (industrial) economic theory and economic instruments. In the course of the so-called Post-Chicago Antitrust Economics in the U.S. (since the early 1990s) (*Brodley* 1995; *Baker* 1999a) and the so-called More-Economic Approach in the EU (since the early 2000s) (*EAGCP* 2005; *Röller* 2005; *Neven* 2006), the two most important antitrust regimes in the world have become more receptive of innovative economic assessment instruments and, moreover, contributed to their development by actively demanding a more sophisticated economic input.

Against the background of the increasing importance of MSM, we provide a survey on MSM and their employment in merger policy that serves two goals: (i) providing an overview on the working mechanisms of this new tool and (ii) reviewing its performance in practical antitrust so far. After Section 2 introduces the basic features of MSM, section 3 reviews the mainstream of the currently available simulation techniques and approaches. Then, section 4 surveys the major antitrust cases in which merger simulations have been employed and, in doing so, identifies existing limitations and problems of MSM as a policy instrument. Finally, section 5 provides a conclusion.

# 2. An Introductory Guide to Merger Simulation

## 2.1 Oligopoly Theory

Modern, game-theoretic oligopoly theory is predominantly built upon three standard models[1]: Cournot-competition (quantity competition), Bertrand-competition (price competition) and auction theory. While theory additionally explores on alternative oligopoly models (including the quasi-oligopolistic models of monopolistic competition), antitrust analysis of horizontal mergers has recently focused on these three basic types whenever oligopolistic market structures have been identified (*Kaplow* & *Shapiro* 2007; *Froeb* & *Werden* 2008; *Kerber* & *Schwalbe* 2008).

In general, there is a widespread consensus that Cournot models are most adequate if products are rather homogeneous, i.e. costumers have no (or insignificant) preferences for specific suppliers of the product (so that the products are perfect substitutes). Examples include markets for natural resources, like crude oil, or vitamins, electricity, etc. In such markets, suppliers experience strong incentives to either vigorously compete with each other or to tacitly collude and, in a coordinated way, drive the price above the competitive level. In rather narrow homogeneous oligopolies, mergers tend to increase the probability of the collusive equilibrium because the reduction in the number of players facilitates tacit coordination. As homogeneous markets tend to endorse the rule of one price, competition via quantities (Cournot competition) is viewed to be an appropriate model, in particular with respect to the collusion effect (so-called 'coordinated effects theory'; *Kühn* 2008).

Things are different in markets for heterogeneous (differentiated) goods where customers have considerable preferences, for instance for brands or specific goods characteristics, like in most markets for consumers goods. If customers enjoy preferences, they no longer view the competing products to be perfect substitutes anymore. Instead, competitors in heterogeneous markets supply imperfect substitutes. This involves several important implications that complicate analysis. For instance, the rule of one price does not apply since costumers are willing to pay a bit more for the preferred product compared to the competing ones. Secondly, if one competitor increases its price, some costumers (but not all) will switch to another supplier, however, they will distribute unevenly among the competitors. In other words, the degree of substitution, the cross-price elasticity, among the differentiated products differs and thus matters. Two firms in a heterogeneous oligopoly can be close competitors (i.e. their products are close substitutes) or more distant competitors. As a consequence, mergers in heterogeneous oligopolies offer scope for the merged entity to increase prices for its products since a certain share of costumers of merging company A will view the product of merging company B as the best alternative and thus react to an increase of $price_A$ by switching to $product_B$. While company A finds a price increase unprofitable in the pre-merger equilibrium,

---

[1] We focus on mergers in oligopolistic markets since this is where modern theory yields new insights and considerably influences merger control. Mergers to monopoly or clear single-firm dominance are better understood and not subject to current research in the same extent. Furthermore, we restrict our survey to horizontal mergers since this is the area in which merger simulation has exclusively been applied up to date.

it might find it profitable post-merger since it now controls the best alternative for some of its customers. The assessment of mergers becomes more complex as the effect of a merger depends on the cross-price elasticities, i.e. it matters who merges with whom. Generally, the anticompetitive effect of a merger increases with an increasing cross-price elasticity between the products of the merging companies, i.e. a merger between product-differentiated firms is more harmful if close substitutes are involved (compared to more distant substitutes). This puts the importance of market shares into perspective: a merger of close substitutes leading to a comparatively small combined market share might be more harmful than a merger between distant substitutes leading to a significantly higher combined market share. The effect of the merged entity experiencing a certain scope for increasing prices is usually called unilateral effects theory (because neither tacit nor explicit coordination among the oligopolists is required). Unilateral effects are predominantly ascribed to heterogeneous markets and Bertrand competition[2] (price competition) is the preferred model to appropriately picture these effects.

Thus there is a widespread consensus that Bertrand competition is the first choice for heterogeneous oligopolies whereas Cournot competition is the first choice for more homogeneous oligopolies (*Kaplow & Shapiro* 2007; *Froeb & Werden* 2008). The pro- or anticompetitive effects of mergers in homogeneous Cournot-oligopolies predominantly depend on present (in contrast to future) market characteristics, with market shares representing a meaningful indicator, as well as on the former interaction of the suppliers, in particular the pre-merger degree of interfirm coordination or collusion. In other words, the *analysis of the hitherto development* of the relevant market is of paramount importance. Therefore, empirical methods that estimate past market structure and behaviour represent the generally employed quantitative economic techniques (domain of econometrics). Demand is important regarding the own-price elasticity, whereas cross-price elasticities usually do not play a considerable role (perfect or near-perfect substitutes). In contrast, on heterogeneous markets, demand becomes the decisive aspect, in particular the probable reaction of customers to a unilateral post-merger price increase by the merged entity. Therefore, *predictive analysis*, in particular the accurate estimation of demand and cross-price elasticities, becomes more important: the focus is on predicting the behaviour of customers, i.e. predicting prices and quantities in the post-merger equilibrium. Thus, unilateral effects cases represent one domain of merger simulation.

In some markets, products are traded in a way reminding of auctions. Next to suppliers that actually auction their products, for instance, markets for products that are sold on a rather low-frequent basis and, moreover, include elements tailormade for the individual customer often possess the following or similar characteristics; customers call for tenders, thereby specifying their particular needs. Suppliers then submit tenders and a multiple-round selection

---

[2] Note that analyzing Bertrand competition with heterogeneous products departs from the standard textbook case where Bertrand competition with homogeneous goods leads to the same results as perfect competition (the original *Bertrand* (1888) result). Price competition with heterogeneous goods, in contrast, generally leads to prices above the competitive level.

procedure eventually leads to a transaction. Examples include markets for business software, user specific technical equipment (e.g. mining) or services for the public sector like forest timber service or hospitals[3], etc. If mergers occur on such kind of markets, auction models represent the first choice to simulate the competitive effects (*Klemperer* 2008).

## 2.2 Simulating Mergers

As already seen above, the various effects a merger might cause high dependence on the characteristics of the underlying market. Hence a variety of merger simulation models evolved. However, most merger simulations are based upon common basic assumptions and, generally[4], can be described in roughly the same way as a multiple-step process (inter alia *Crooke* et al. 1999: 208-209; *Kokkoris* 2005: 330-331). First, a functional form of demand that matches consumer behaviour in the best possible way has to be chosen. Frequently proposed models are linear, log-linear, logit, AIDS (Almost Ideal Demand System) or multiple-step demand (see section 3). Based on the assumed demand function, cross-price and own-price elasticities can be estimated or empirically deducted. This first part of the simulation process is usually called "front-end" analysis (*Werden* 1997: 97). The second step consists of calibration of the demand systems meaning that the parameters are specified in a way so that the calculated elasticities yield the prices and market shares actually observed in the pre-merger market. Third, the supply side is modelled by assuming an oligopoly model that most closely describes the competition between firms in the market. In many cases, Bertrand competition is the first choice, because it allows inferring marginal costs describing the production process directly from the first-order conditions for profit maximization. Using the information on marginal costs a complete empirical model of the pre-merger market can be calibrated. Fourth, in a final step, the new equilibrium after the merger can be simulated using the model that was calibrated with pre-merger empirical data, but adjusting market shares to the post-merger situation. In doing so, one implicitly assumes that all firms behave non-cooperatively and that the form of competition, the demand system and the functional form of marginal cost do not change due to the merger. The only change that is implemented concerns the merging parties – the competition between them is internalized (*Kokkoris* 2005: 332). The second part of the simulation process including calibration of the demand and supply side as well as the simulation itself is usually called the "back-end" analysis (*Werden* 1997: 97).

The above-outlined description only holds in absence of efficiency gains and reactions of competitors. However, mergers might increase the productive efficiency, leading to a reduction in variable costs. Hence, the possibility of improved efficiency needs to be checked and, eventually, post-merger marginal costs must be adapted (*Crooke* et al. 1999: 209). Furthermore, reactions of rival firms like product repositioning, market entry or exist must be

---

[3] In the U.S., hospitals bid for long-term contracts with so-called Preferred Provider Organizations (PPO) which provide individual health insurance. PPO insurants are obliged to go hospitals with such contracts in case of illness (*Dalkir* et al. 2000).

[4] Simulations via auction models might differ regarding their functioning in various points from the other forms.

considered. Yet, their formal inclusion into the simulation process is difficult and cannot be generalised (*Budzinski* & *Christiansen* 2007a).

# 3. Types of Merger Simulation Models

## 3.1 Towards a Classification Scheme

An comprehensive classification of the various MSM currently in use can rarely be found. To the best of the authors' knowledge, only *Bergeijk* and *Kloosterhuis* (2005: 6) suggest a differentiation between six forms of models currently in use: logit models, auction models, Bertrand models, Cournot models, econometric models and supply function models. This classification, however, causes some confusion since the two categories logit and Bertrand models are not mutually exclusive. Instead, most Bertrand models use a logit model to estimate the demand side of the model. Most other authors rather concentrate on models based on a certain form of competition and differentiate them according to the assumed form of demand. *Goppelsröder* and *Schinkel* (2005: 56), for example, distinguish only between simulation methods using an econometrically estimated demand model and methods assuming an appropriate functional form of demand.

We propose an alternative two-stage classification of MSM based on different criteria. *Crooke* et al. (1999: 206) stated that a merger simulation is based on three key assumptions: the chosen form of competitive interaction, the shape of marginal cost curves and the demand system in the market. While marginal costs are generally assumed to be invariant in the relevant range for merger analysis, several forms of competition and various functional systems of demand are used to develop MSM. Therefore, a classification according to the assumed form of competition and system of demand seems appropriate and more consistent.

At the first stage, models are classified according to the assumed form of competition that best describes the market. Bertrand models, auction models as well as Cournot and supply function models are identified as three different types of models. On the second level of classification the most commonly used model type – the Bertrand model – is split up with respect to the chosen demand system. As explored in section 2.1, the demand system entails a specific importance in case of heterogeneous price competition, whereas quantity competition is predominantly used for more homogeneous markets where other factors drive the welfare effects. With regard to the demand specification currently in use, the following subtypes can be identified: linear and log-linear demand models, discrete choice demand models, AIDS and PCAIDS models as well as multi-level demand estimation. Figure 1 illustrates the described classification scheme.

*Budzinski & Ruhmer: Merger Simulation* 6

**Figure 1: Classification scheme for MSM**



### 3.2 Bertrand Models

The following models differ with respect to the chosen demand form but share the same basic assumptions of the Bertrand model. In particular, market entry shall not occur even in the case of a price rise. Marginal costs are supposed to be constant over the relevant range of output (see for example *Hausman & Leonard* 1997: 321). The marginal costs that are needed to calibrate the supply side of a simulation model are recovered in a similar way for all following models by using first-order conditions of profit maximization (for a formal representation see for example *Werden* 1997: 98-99). In order to solve these first-order conditions for marginal costs, information on prices and quantities as well as on own- and cross-price demand elasticities is needed. The latter have to be discovered using one of the subsequently described demand forms. The decision for a certain demand system is of crucial importance, as each demand system is characterized by specific curvature properties that significantly influence the simulation outcome (e.g. *Lundmark & Nilsson* 2003: 114).[5] Everything else held equal, the log-linear demand predicts the greatest price increase, followed by AIDS, whereas logit and linear demand yield significantly lower price increases (*Crooke* et al. 1999: 205ff).

*Linear and Log-linear Demand Models*

The simplest models of demand are linear or log-linear functions. They both have the attractive property of constant own- and cross-price elasticities of demand that can be incorporated in a regression equation as coefficients (*Werden* 1997: 99). Equations (1) and (2) show general representations of linear and log-linear demand, respectively, with $z_k$ being a vector of demand shift variables, q being quantities and p prices:

**(1)** $\qquad q_i = a_i + \sum_j b_{ij} p_j + \sum_k \gamma_{ik} z_k$

---

[5] This is because mergers most likely have significant effects on competition. Therefore, a substantial movement along the demand curve away from pre-merger equilibrium must be expected (*Crooke* et al. 1999: 206).

**(2)**      $\log q_i = \alpha_i + \sum_j \beta_{ij} \log p_j + \sum_k \gamma_{ik} z_k$

The linear demand model makes predictions of the price effects of a merger most convenient, because it allows solving the problem analytically rather than numerically (*Werden* 1997: 99).[6] The assumption of constant elasticities of demand, however, receives considerable criticism. It seems unrealistic that while a merger changes prices and market shares in a significant way, it does not change demand elasticities at all (*Werden* 1997: 99). Instead, own and cross-price elasticities of a product are expected to change with the level of prices. Moreover, the assumption of linear demand is generally criticized as an inadequate approximation of actual demand behaviour (*Werden* 1997: 100). It often results in the prediction of negative quantities for highly asymmetric mergers unless one imposes non-negativity constraints (*Crooke* et al. 1999: 209). In some cases, a log-linear demand system does not even provide a post-merger equilibrium at all (*Crooke* et al. 1999: 210). As a result, linear and log-linear models are scarcely used. If applied, the resulting price increases of a merger are to be interpreted only as rough indicators of a possible effect.

*Discrete Choice Demand Models*

Discrete choice models are commonly used to obtain the demand structure of differentiated products markets when market-level data on quantities, prices and other product characteristics is available. It is a tractable and parsimonious method based on parametric restrictions of the demand structure (see *Berry* 1994: 244). The general idea of discrete-choice demand emanates from the assumption of a consumer utility function depending on observable product characteristics, including price, and unobservable product characteristics as well as individual-specific coefficients[7]. Consumers will choose to buy a unit of the product that maximizes their personal utility function.

In almost all discrete-choice models, an outside good or option is specified representing the possibility that a consumer may decide not to choose any of the available products (see inter alia *Berry* 1994: 245ff; *Nevo* 2000a: 400-401). Without the definition of an outside good a general increase in price would have no influence on total demand - a contradiction to microeconomic theory. The problem resulting from the inclusion of the outside option is that market shares can no longer be calculated directly from quantities observed. *Berry* (1994: 247) and *Berry* et al. (1995: 845-846) propose to set the potential market size equal to the number of households or to estimate it using aggregate market-level data.

The choice of a functional form and the distribution of consumer specific terms that influence utility designate the type of discrete choice model (*Berry* 1994: 245). In the past few years a variety of models has come into use for merger analysis. The most popular one is the simple logit demand or Antitrust Logit Model (ALM). Besides, nested logit and random coefficients models can be frequently found. Complexity and computational efforts rise while approximation becomes more realistic from ALM over nested logit to random coefficients

---

[6] For a formal representation, see *Werden* et al. (1996: 99-100) and *Hausman* et al. (1994: 173-174).
[7] If consumer-specific coefficients are to be considered, data on individual characteristics has to be available.

models. A restrictive property of all discrete choice models is that only one out of a finite number of products is chosen only one time in the considered time period. In some industries, especially for day-to-day products, this does not represent actual consumer behaviour (*Nevo* 2000a: 401).

### *Logit Demand Models*

Formal delineations for logit demand models can be found in numerous papers (e.g. *Berry* 1994: 245ff; *Berry* et al. 1995: 845ff; *Werden* et al. 1996: 85ff). It is assumed that there are $N$ firms in a certain market with each firm producing one product. The utility $U(\xi_i, p_j, x_j, \nu_i, \theta)$ which a consumer i derives from product j of firm j ($j \in N$) is denoted as a random utility-function, linear in parameters of observed product characteristics $x_j$, unobservable attributes $\xi_i$, price $p_j$ and demand parameters $\theta$. The term $\nu_i$ captures consumer specific terms not observed by the econometrician. If it is furthermore assumed that there is only one consumer-specific taste parameter $\varepsilon_{ij}$, the utility function can be written as:

(3) $\qquad U(\xi_i, p_j, x_j, \nu_j, \theta) \equiv \mathbf{x}_j \beta - \alpha p_j + \xi_j + \varepsilon_{ij} \equiv \delta_j + \varepsilon_{ij}$

$\qquad \delta_j = \mathbf{x}_j \beta - \alpha p_j + \xi_j$

In this case variation in consumer tastes enters the model only through $\varepsilon_{ij}$ while $\xi_j$ can be interpreted as the mean of consumers' valuations of an unobserved product characteristic like quality and $\delta_j$ is the mean utility level of product j. If $\varepsilon_{ij}$ is furthermore assumed to be independently and identically distributed (i.i.d.) across consumers and products with the "extreme value" distribution function $\exp(-\exp(-\varepsilon))$, then the market share of product j, representing its choice probability, is given by the logit formula:

(4) $\qquad s_j(\delta) = \dfrac{e^{\delta_j}}{\left(\displaystyle\sum_{k=0}^{N} e^{\delta_k}\right)}$

If there exists an outside option 0 of not buying any of the products in the market and its mean utility is normalized to zero, it follows that:

(5) $\qquad \ln(s_j) - \ln(s_0) = \delta_j \equiv \mathbf{x}_j \beta - \alpha p_j + \xi_j$

and $\delta_j$ is identified directly from algebraic calculation including market shares that can be estimated using simple instrumental variables regression on differences in log market shares on ($x_j, p_j$) (*Berry* 1994: 250).[8]

---

[8] Demand-side instrumental variables should ideally be variables that shift costs but are uncorrelated with the demand side. See *Nevo* (2000b: 532ff) for a detailed summary of possible instruments.

The own-price and cross-price elasticities of demand for a particular good, $\eta_{jj}$ and $\eta_{jk}$, can be calculated using the estimated parameter $\alpha$, observed prices $p_j$ and market shares $s_j$ as well as the aggregate elasticity of demand $\eta$ that can be inferred from the estimated parameters. In detail:

**(6)**      $\eta_{jj} = -\alpha p_j (1 - s_j)$

**(7)**      $\eta_{jk} = \alpha p_k s_k$

**(8)**      $\eta = \alpha \bar{p} s_0$ [9]

It follows that the logit model consists of only two demand parameters: the aggregate elasticity of demand $\eta$, which controls for substitutability between the products in the market and the outside good, and $\alpha$, which controls for substitution among the "inside the market" products (*Werden* 1997: 101). The demand system of the simulation model can finally be calibrated by solving the logit probability functions for $\mathbf{x}_j \beta$ after setting $\mathbf{x}_0 \beta$ to arbitrary values (*Werden* 1997: 101).

The described logit model is estimated using Maximum Likelihood (see for example *Ben-Akiva & Lerman* 1991: 118ff). Emphasis must be put on possible endogeneity problems concerning prices and other product characteristics. By allowing this problem, an instrumental variables approach can be used. In general, the use of logit models is supported by industrial economists with reference to its computational simplicity and little information requirements (*Werden & Froeb* 1994: 421; *Werden* et al. 1996: 83). Logit models offer at least rough estimates of merger price effects, what justifies its usage in cases with no priors about individual preferences or where preferences cannot be examined empirically. Finally, no matter how rough logit estimations may be, they are still considered as a "quantum leap beyond traditional antitrust analysis" (*Werden* et al. 1996: 84, 89).

The greatest limitation of logit specification is due to its restrictive assumption of "Independence of Irrelevant Alternatives (IIA)" (*Ben-Akiva & Lerman* 1991: 108-111).[10] The IIA property states that the ratio of choice probabilities of any two alternatives is entirely unaffected by the systematic utilities of any other alternatives, i.e.:

**(9)**      $$\frac{s_j(\delta)}{s_l(\delta)} = \frac{e^{\delta_j} \Big/ \left( \sum_{k=0}^{N} e^{\delta_k} \right)}{e^{\delta_l} \Big/ \left( \sum_{k=0}^{N} e^{\delta_k} \right)} = \frac{e^{\delta_j}}{e^{\delta_l}}$$

This implies that a consumer's switch to other products in reaction of a price increase for one product is proportionally to the relative shares of these products. The IIA property greatly

---

[9]  $\bar{p}$ : share-weighted average pre-merger price of all goods.

[10] The IIA property follows from several assumptions of the logit model from which the mutual independence of the $\varepsilon_{ij}$ is seen as the crucial one (*Ben-Akiva & Lerman* 1991: 109).

facilitates estimation, because the model can be estimated using only a limited subset of the full choice set. Moreover, it enables to forecast, for example, the demand for a new product. Nevertheless, it is unrealistic in the majority of merger cases (*Hausman* & *McFadden* 1984: 1222). In many real markets, consumers do not view all other products as equally substitutable (*Werden* & *Froeb* 1994: 420). If a logit model is nevertheless applied to a market with differentiated products, its data fit should be checked by a test of the IIA assumption (*Hausman* & *McFadden* 1984).

### Nested Logit Models

The nested logit model is a generalization of the simple multinomial logit model which was developed to overcome the problem of IIA. In order to account for different levels of substitutability, the $\varepsilon_{ij}$ are separated into an identically and independently distributed shock component and a nest-specific component which is allowed to be correlated across products that are grouped into one of the multiple predetermined exhaustive and exclusive nests. In most papers (see for example *Werden* & *Froeb* 1994: 412), one nest is defined which divides the choice set into two subsets: one for the outside good and another for the inside goods. Furthermore, the inside goods can be grouped into different nests on a second hierarchical level. Computational effort increases with the number of nests to be considered. The result of the nesting structure is that substitution across groups is smaller than within. Within the nests, however, the IIA property continues to hold (*Nevo* 2000b: 523ff). Hence, a certain restriction of the substitution possibilities still exists (*Werden* 1997: 103).

In general, the nested logit allows more realistic demand estimation while the advantages in computation of the logit model persist, but only in the event that an a priori division into subgroups is reasonable. If products can be classified according to multiple criteria, the hierarchical order of the nests according to these criteria matters since elasticity estimates are highly sensitive to a change of order of the classification criteria (*Nevo* 2000b: 525).[11] Furthermore, *Bresnahan* et al. (1997: 38) stated that there is no way to decide which ordering is the right if several seemed to be theoretically reasonable.

### Random-coefficients Logit Models

While logit and nested-logit assume that all consumers have the same preference for certain product characteristics and the consumer-specific influence was captured solely by $\varepsilon_{ij}$, the random-coefficients model allows interaction between individual and product characteristics (*Berry* et al. 1995: 846). Utility for a certain good is composed of a mean utility component and a consumer-specific deviation from that mean which depends on the interaction between consumer preferences and product characteristics (*Berry* et al. 1995: 848). Random-coefficients models are estimated using a General Methods of Moments (GMM) estimator (see for example *Berry* 1994).

---

[11] The General Extreme-Value Model (*Bresnahan* et al. 1997) solves the problem of ordering.

Random-coefficients logit models have several advantages in comparison to the simple and the nested logit model. The most important is that it produces demand elasticities that are more realistic in that they account for different levels of substitutability (for a detailed discussion of advantages see *Nevo* 2000b: 515ff). However, these advantages come to the cost of high complexity of computation and the need for consumer-specific data (*Nevo* 2000b: 532).

### *AIDS and PCAIDS Models*

The Almost Ideal Demand System developed by *Deaton* and *Muellbauer* (1980) and gives an arbitrary first-order approximation to any demand system. It is not based on a functional form of demand, but allows for a flexible representation of own- and cross-price elasticities determined by the data (*Hausman* & *Leonard* 1997: 327; *Epstein* & *Rubinfeld* 2001: 888). As the formal development of the AIDS according to *Deaton* and *Muellbauer* (1980) is very complex, only the basic idea (following *Coloma* 2006, as well as *Epstein* & *Rubinfeld* 2001) is given.

Consider a market of $N$ products, each one produced by a different firm. According to AIDS, the share $s_i$ of a product i depends on the logarithmized prices of all brands in the market and on other demand-shifting variables in the following way:

$$
\begin{aligned}
s_1 &= a_1 + b_{11}\ln(p_1) + b_{12}\ln(p_2) + ... + b_{1N}\ln(p_N) + b_{1Z}Z \\
s_2 &= a_2 + b_{21}\ln(p_1) + b_{22}\ln(p_2) + ... + b_{2N}\ln(p_N) + b_{2Z}Z \\
&\vdots \\
s_N &= a_N + b_{N1}\ln(p_1) + b_{N2}\ln(p_2) + ... + b_{N3}\ln(p_N) + b_{NZ}Z
\end{aligned}
$$

**(10)**

The coefficients $b_{ij}$ ($i, j = 1,..,N$) need to be determined in order to calculate the own-price and cross-price elasticities, used to simulate the merger price effect. If the market shares are positive and add up to one, the so-called "own-coefficients" $b_{ii}$ and the "cross-coefficients" $b_{ij}$ have the same sign as the corresponding elasticities. The problem with AIDS is that estimation of the coefficients is difficult to perform in cases of many different products. A market with $N$ products gives rise to $N^2$ coefficients. Hence, estimation requires a large data set (e.g. supermarket scanner data) or the imposition of additional assumptions that reduce the demand parameters to be estimated (see for example *Hausman* et al. 1994; *Hausman* & *Leonard* 1997).[12] The estimation of AIDS with scanner data, however, is not free of econometric problems and is limited to products mainly sold in supermarkets, wherefore *Epstein* and *Rubinfeld* (2001) proposed the Proportionality-Calibrated AIDS (PCAIDS) model that reduces the number of required parameters while retaining many of the properties of AIDS.

PCAIDS is a calibrated demand model that necessitates information only on product market shares, overall price elasticity and the price elasticity of one single product in the market. To

---

[12] As a consequence, AIDS has only been applied to few real mergers.

achieve this simplicity, the assumptions of proportionality, homogeneity and symmetry are made (*Coloma* 2006: 589). According to *Epstein* and *Rubinfeld* (2001: 891), the restrictive assumption of proportionality is arguable when data is limited and the merging firms do not sell unusually close or distant substitutes. Additionally, PCAIDS guarantees proper signs of and consistent magnitudes for the elasticities – in contrast to AIDS, whose estimation sometimes yields elasticities which contradict economic theory. Yet, PCAIDS is highly restrictive since its proportionality assumption resembles the logit's IIA assumption. Likewise concerning the logit model, a specification of nests was proposed for the PCAIDS model to overcome this problem (*Epstein* & *Rubinfeld* 2004). Recently, *Coloma* (2006) proposed an estimation of PCAIDS models instead of the above described calibration. His model resembles the AIDS estimation, but incorporates the restrictions of PCAIDS and allows estimation even if price data is limited to a subset of firms. Coloma admits, however, that estimates may be less precise than with the original AIDS model.

*Multi-level Demand Estimation*

*Hausman* et al. (1994) as well as *Hausman* and *Leonard* (1997) proposed to estimate demand in differentiated product markets using a model of multi-level demand estimation. Their general idea is to divide the demand system into overall demand in the market – the top level – and competition between brands – the bottom level. An intermediate level that deals with different product segments is also possible. Suppose the car market is to be analysed. The top level describes total demand for cars, whereas on the second level demand in different segments, e.g. sports, family and compact cars, is considered. On the bottom level, interest lies on the competition between the different brands in each segment. Overall own- and cross-price elasticities for each product can thus be detected on the basis of an estimation of all three levels and the combination of the resulting estimates. Proceedings are bottom-up and the theory of price indices is used to guarantee consistent estimation on the higher levels. On the lowest level AIDS specification is used while second and top level estimates are based on log-linear demand.

The advantages of the multi-level demand estimation are due to the merits of estimating the demand structure rather than assuming a certain functional form (*Hausman* and *Leonard* 1997: 322), although the properties of AIDS and log-linear demand used on the different levels have to be taken in mind. Most importantly, detailed product level data is needed to carry out AIDS.

### 3.3 Cournot and Supply Function Models

Due to the reasoning presented in section 2.1, only a few papers (f.i. *de Maa* & *Zwart* 2005; *Smidt* 2005) present Cournot or supply function models. Cournot models are used to calculate the price effects of a merger in markets where quantities are the strategic parameters to be

chosen.[13] Supply function models can be interpreted as a generalization of the Cournot model where firms choose their strategy using a supply curve with respect to prices instead of a fixed quantity. This type of a supply curve, which is upward sloping, generates a set of bids of price-quantity pairs (see *de Maa* & *Zwart* 2005: 160). In both models the market price is determined as the Nash equilibrium where every producer chooses his quantity $q_i$ or supply function $q_i(p)$ such that he maximizes profit given the quantities or supply functions of his competitors. In order to reproduce real market behaviour more accurately, production capacity constraints may be incorporated.

To determine Nash equilibrium and market price, one needs information on the number of firms in the relevant market, their production capacities, cost structures as well as information on market demand, which possibly requires being estimated (*de Maa* & *Zwart* 2005: 159). In the simple Cournot model the equilibrium solution is that mark ups are given by the market share divided by demand elasticity (*Tschantz* et al. 2000: 204). While this solution will be unique and easily calculated in the simple case of constant market shares and no production constraints, simulation is necessary if capacity constraints are included and market shares are variable(*de Maa* & *Zwart* 2005: 159). For supply function models, the strategy space is not one-dimensional but an infinitely dimensional set of functions, hence solution becomes analytically and numerically more difficult (*de Maa* & *Zwart* 2005: 160). The problem will be to predict which of the many equilibrium supply functions a producer will choose. In general, the merger price effects can be calculated by calibrating each of the two models with different capacity and cost structures pre- and post-merger when solving for the Nash equilibrium.

As already noted, Cournot models are relatively easy to simulate if all necessary data is available. In contrast, supply function models have a much more complex mathematical structure but seem to be more realistic in describing firms' behaviour. In general, Cournot models are to provide an upper bound on the results of supply function models (*de Maa* & *Zwart* 2005: 158).

### 3.4 Auction Models

Hitherto, basically two distinguished types of auction models were used for merger simulation: second-price and first-price auction models (*Dalkir* et al. 2000; *Tschantz* et al. 2000; *Brannman* & *Froeb* 2000; *Froeb* et al. 1998). Note that the exact specification of an auction setting, however, must be found on a case-to-case basis.

#### *Second-price Auctions*

The subsequent description follows *Froeb* et al. (1998) as well as *Brannman* and *Froeb* (2000). Additional assumptions are that the valuations $V$ of the bidders are private information and consist of two independent components: an idiosyncratic component $X_i$ and

---

[13] It is somehow counterintuitive to calculate price changes instead of reactions in market shares when quantities are the strategic parameters though. This might be another reason why there cannot be found many simulations using Cournot Models.

a common component $Y$. $X_i$ is assumed to be an independent extreme value process with location and spread parameters $(\eta_i, \mu)$. $Y$ is an independent random variable with mean zero and variance $\sigma^2$ that is seen as common knowledge and can be ignored in the following analysis, as it does not influence the identity of the winning bidder, the winning bid or the change in winning bids after a merger. Now the winning probabilities of each bidder (that correspond to the expected market share), the prices (that correspond to the second highest value) and the merger effects can be calculated by using the simplifying properties of the extreme value distributed idiosyncratic components.[14] The probability that bidder i has the highest valuation of the item to be auctioned and therefore will win has some interesting properties: first, if the variance of the value distribution increases $(\mu \to 0)$, the winning probabilities converge to $1/n$ which means that the heterogeneity between the different bidders decreases. In contrast, if the variance decreases $(\mu \to \infty)$, the heterogeneity is of high importance and the market share of the bidder with the highest valuation approaches one. Second, the distribution of the maximum of bidder values satisfies the IIA property meaning that the distribution does not depend on the ordering of the bidder values. Using the IIA property, the probability of observing a certain ordering among the two highest bidders can be inferred. Furthermore, the distribution of winning bids is derived as the distribution of the second-highest value conditional on the identity of the high-value bidder. It can be shown that the expected price or winning bid decreases if the expected share or winning probability rises. This is because the high-value firm does not bid against itself.

In principle, the moments of the distribution of the second-highest bid could be used to construct a methods of moments (MM) estimator for the winning bid using auction data. However, this is problematic because at every auction a unique item is sold or purchased so that the data are characterised by a significant level of heterogeneity across items. By including the common component $Y$, a between-auction variance is added to the estimation. Hence, a differentiation between the within-auction variance that one is interested in and the between-auction variance of the distribution becomes impossible. Therefore, *Froeb* et al. (1998: 6) propose to estimate the distribution parameters using the differences between losing bids. This eliminates the between-variance. Estimation of this difference is possible using a two-step, limited-information, maximum-likelihood (LIML) estimator if data on bidder identities and shares, bidder characteristics including the ones of losing bidders, as well as the values of bids (including losing bids) across the sample of auctions are available. First, the firm- or bidder-specific characteristics are used to estimate the logit probability of winning and the expected values of winning bids simultaneously. In this case, the shares are used as proxies for the probabilities of winning. Second, the fitted probabilities are employed to construct the likelihood for the difference between the second- and third-highest bids. If no data on losing bids is available, this method cannot be applied. The only solution in this case is to drop step number two. A distinction between a large within-variance and a large

---

[14] For a detailed description of the properties of an extreme value function see *Froeb* et al. (1998: 3).

common-variance is therefore not feasible. Finally, the merger price effect is calculated using the estimated distribution parameters and the changed winning probability of the merged firm. The new winning probability equals the sum of the shares of each merging partner since the merged firm will win each auction that either of the original firms would have won. The price effect of the merger depends on the variance of the idiosyncratic component in two ways: a great variance increases both the amount and the variance of the price effect. The common component does not influence the price effect at all.

In summary, this method is suitable in industries where a second-price oral auction is the best way to describe market behaviour. Nevertheless, the model has some limiting properties. First, it is based on the IIA property whose disadvantages have already been discussed in detail in the section on logit demand models. Furthermore detailed data on many auctions in the market is necessary in order to apply a LIML estimator. Lastly, the model treats every auction observed as independent. This might not be true if bidder-capacity constraints or bid-rotation schemes are to be expected (*Brannman* & *Froeb* 2000: 284).

### *First-price Auctions*

A model for the simulation of merger effects in markets of asymmetric first-price, sealed-bid, private-value auctions is proposed by *Dalkir* et al. (2000). In their model, sellers are bidding in order to sell a good to a unique buyer. The lowest price each bidder is able to bid corresponds to its cost. It is assumed that each bidder has some number $k_i$ of cost draws from a technology density function from which he can choose the lowest one. The lowest cost draw $c_i$ corresponds to the bidders valuation of the good and consists of a common and a bidder-specific random component, $\mu$ and $\varepsilon_i$, respectively.

**(11)**     $c_i = \mu + \varepsilon_i$

While $\mu$ is common knowledge, $\varepsilon_i$ is private and only its distribution is known to all bidders. It is assumed to be i.i.d. over a common support $[-\Delta, \Delta]$ with $\mu \geq \Delta > 0$. The buyer purchases a fixed quantity of the service or good at disposition at the lowest bid price. His valuation of the contract $v = \mu + \Delta$ is common knowledge. In consequence, the price in equilibrium, i.e. the lowest bid, ranges from $\mu - \Delta$ to $\mu + \Delta$.

If the merger price effects are analysed in the described setting, two situations have to be distinguished. First, consider a symmetric pre-merger market where each firm only has one cost draw to choose from. A merger will create asymmetry as only the merged firm will have the opportunity to choose the lowest from several cost draws. Second, firms might have different numbers of draws before the merger – an asymmetric situation. In this case the post-merger situation can possibly lead to more symmetry in the auction. In the symmetric pre-merger setting, a bidder maximizes its profit by setting its bid equal to the best-response with respect to price given its costs and the number of bidders in the market and the equilibrium can be found analytically. For the asymmetric case *Dalkir* et al. (2000: 404ff) show that equilibrium exists under certain limiting conditions, but it has to be found numerically. It is

worth noting that in this equilibrium it is possible for another bidder than the one having the lowest cost to get the good. Hence, cost-inefficiencies may arise in asymmetric first-price auctions.

The merger effects are calculated by calibration of the model using pre-merger information on market shares and the range of the density function of costs $[\mu - \Delta, \mu + \Delta]$. *Dalkir* et al. (2000) recommend gaining information on the spread of the cost function from technical staff or administrators. Then the change of prices can be simulated using the calibrated model. It is possible to estimate the effects that arise from asymmetric firms merging to become symmetric and vice versa. The simulation results *Dalkir* et al. (2000) present for hypothetical mergers[15] suggest that symmetry-increasing mergers have much smaller effects than symmetry-decreasing ones.

Critique of the model first considers the simple form of cost density function that is assumed. As *Tschantz* et al. (2000: 211) note, the merger effects crucially depend on the variance of the underlying distribution. Hence, the price effect can be totally over- or underestimated if costs would be better modelled by a more complex distribution. However, the authors state that "it appears that the uniform [distribution function], with its 'fat tails' tends to represent a 'worst case' scenario in terms of merger price effects" (*Dalkir* et al. 2000: 400). This implies that their model results could serve as an upper bound. Nevertheless, it is questionable if reliable data for the cost structure and market demand (shares) needed to calibrate the model can be observed.

The type of auction model chosen to simulate the merger is of high importance in case of asymmetry, as the results might differ significantly according to the chosen framework. *Tschantz* et al. (2000: 207ff) compare prices, shares and revenues as well as expected merger effects in first- and second-price auctions. Their main conclusions are that low-value (high cost) firms win more frequently and at better prices in sealed auction and that the effects of a symmetry-decreasing merger are smaller in sealed-bid auctions. Furthermore, the predictions of an auction model depend on assumptions about costs or value distributions. Finally, it is difficult to provide statistical measures for the reliability of the simulated price effects (*Baker & Rubinfeld* 1999: 421).

## 4. Merger Simulation Models in Competition Policy Practice: Prospects, Problems and Limits

### 4.1 Merger Control Cases with Simulation Models: An Overview

Since the mid-1990s, merger simulations have been introduced to practical merger control cases as an additional tool to assess expected competitive effects by both federal U.S. antitrust agencies (the Federal Trade Commission [FTC] and the Antitrust Division of the Department of Justice [DoJ]) and the European Commission. Yet, the number of real merger cases where

---

[15] They vary the number of firms and the form of (a-)symmetry pre- and post-merger as well as the coefficient of spread that characterises the cost density function.

simulation models have been applied by an antitrust authority or one of the merging parties is still somewhat small.[16] In the following, we review the most important cases in US and European merger litigation.

### *Interstate Bakeries/Continental Baking Co. & Kimberly-Clark/Scott Paper*

In 1995, the DoJ challenged two proposed mergers: the acquisition of Continental Baking by Interstate Bakeries and Kimberly-Clark's acquisition of Scott Paper. In both cases, MSM had been prepared as evidence for litigation – in the first case by the competition authority, in the second case by one of the merging companies. However, the MSMs finally did not come to use as both complaints were settled with mutual agreements outside the court.

Continental Baking and Interstate Bakeries were two of the three largest producers of white pan bread in the U.S., and their merger would have resulted in a monopoly for Interstate Bakeries in Southern California and the Midwest. *Werden* (2000) prepared an expert report on behalf of the DoJ that included a simulation model.[17] According to standard SSNIP analysis[18], bread industry studies as well as own- and cross-price elasticity estimations, the relevant markets were the localized (in particular metropolitan areas) and brand-wisely differentiated markets for white pan bread. Therefore, simulations of post-merger prices for the Los Angeles area and the Chicago area were carried out assuming Bertrand competition and logit demand, "a relatively simple methodology for making more precise predictions of the price effects of mergers in differentiated products industries" (*Werden* 2000: 145). In doing so, the original market delineation became more flexible as only the merging firms' products and its closest substitutes were included since exclusion of less close substitutes does not cause an overestimation of the price effects. Possible market entries were not considered and the problems involving the IIA assumption and other limitations of the logit demand model were not discussed. The results of the simulation based on point estimates for demand elasticity predicted a substantial increase of prices in both markets, thus supporting the complaint by the DoJ. Increases are biggest for the merging brands – 10% for Continental Baking and 5% for Interstate Bakeries – while the overall price increase lies between 3.1% in Chicago and 5.9% in Los Angeles.[19]

The DoJ complaint against Kimberly-Clark and Scott Paper, seeking a clearance of the merger under certain divestitures, was based upon expected price increases and competition lessening in markets for facial tissue and baby wipes (*DoJ* 1996). In preparing its defence, Kimberly-Clark commissioned a MSM by Hausman and Leonard as their economic

---

[16] Nevertheless, all of the model types described in section 3 have been used at least in one merger case described in the following.

[17] With demand estimation still being preliminary, the draft report eventually came to use as an attachment to the author's declaration for the U.S. DOJ in opposition to Interstate Bakeries' effort to modify the final judgement three years after its pronouncement (*Werden* 2000: 139).

[18] SSNIP = Small but Significant Non-transistory Increase in Price; standardized hypothetical monopoly test regularly used by U.S. antitrust authorities to define relevant markets (*Kerber & Schwalbe* 2008: 262-280).

[19] Note that when the upper bound of the confidence interval of demand elasticity estimates is used to calculate price effect, the results vary strongly between the two markets. In Chicago, the price increases are all only slightly smaller, whereas, in Los Angeles, they drop to 2.3% and 1.9% for Continental and Interstate, respectively, and to 1.3% for all products due to the much wider confidence interval for Los Angeles.

consultants. They employed a multi-level demand estimation model to simulate prices for the bath tissue market based on weekly scanner data from 1992 to 1995 (*Hausman & Leonard* 1997). The predicted price increases absent efficiency gains for the bath tissue brands of Kimberly-Clark (Kleenex) and Scott Paper (Scott Tissue and Cottonelle) were about 2.4%, 1.2% and 1.4% and stated as not significantly different from zero. If efficiency gains[20] are taken into consideration, the price effects become smaller or even negative (*Hausman & Leonard* 1997: 336) – a result that was certainly in line with Kimberly-Clark's interest. Yet, the model does not generate completely consistent results (*Epstein & Rubinfeld* 1999). Several estimated cross-price elasticities are negative which contradicts the assumption of all products in the market being substitutes. Furthermore, many of the estimated cross-price elasticities are of low precision making the predicted price effects highly uncertain (*ibid.*: 901). Alternative model approaches like logit demand simulation or PCAIDS do not produce completely different price changes though (*Epstein & Rubinfeld* 2001). For example, logit predictions for Kleenex are higher than the multi-stage demand results, whereas those for Cottonelle are smaller. *Hausman* and *Leonard* (1999: 336) interpret this as a consequence of the restrictions put on cross price elasticities in logit models.

### *Staples/Office Depot*

The proposed but eventually blocked merger between Staples and Office Depot (*U.S. District Court for the District of Columbia* 1997), the two largest office superstore chains in the U.S., represents a landmark case for the employment of modern quantitative economic instruments. Despite not being a merger simulation case in the narrow sense, we briefly discuss it due to its paramount importance as it "highlights the power of [quantitative and empirically based forecasts of future prices] when it can be obtained and when it tells a clear story consistent with the available documentary and testimonial evidence" (*Baker* 1999b: 21). This key case first applied unilateral effects theory, extensive econometric analysis, the influence of significant efficiencies and the likelihood of entry analysis all at once.[21]

Both parties to the trial provided extensive econometric evidence and expert testimonies (Warren-Boulton and Ashenfelter for the FTC; Hausman for the defendants) to the court, playing an important role in the litigation (*Baker* 1999b: 11). The expert group of the FTC stated in court that the proposed merger of Staples and Office Depot would lead to a price increase of 5 to 10% in overlapping markets. The models used to explore how Staples prices vary by time and store in reaction to a change in the number of Office Depot stores nearby were simple reduced-form price equations explaining prices by variables (for instance, the number and identity of nearby superstore and non-superstore rivals as well as determinants of costs and demand) that were assumed to be exogenous or predetermined. For the simulation of post-merger prices two different scenarios were considered: the defendants proposed to assume all Office Depot stores near Staples to be shut down while the FTC fostered the idea

---

[20] They have been estimated to correspond to a 24% marginal cost reduction by Kimberly-Clark.
[21] See on this case inter alia *Baker* (1999b); *Baker & Rubinfeld* (1999); *Dalkir & Warren-Boulton* (2004); *Baker & Pitofsky* (2008).

that all Office Depot stores will be converted into Staples stores. The underlying data set applied by the FTC covered around 400 Staples stores in more than 40 cities over 18 month on a monthly basis.

The FTC econometrically analysed which prices Staples charged in presence or absence of an Office Depot store using a cross-sectional approach. They found that prices were significantly lower when Staples had to compete with Office Depot and that a merger would allow Staples average price increases by over 7%. The defendants criticised the model design, speculating that the cross-sectional comparison was biased upwards because of the omission of variables controlling for market-specific costs possibly resulting from local zoning or congestion charges. As an alternative, the defendants' economic expert submitted a panel fixed-effects model (incorporating dummy variables for the individual stores, thereby controlling for unobservable costs, as they are not expected to vary over time) that produced considerably smaller price increases of just 1%. However, the FTC disagreed and concluded that the lower estimates of the defendants' fixed-effects model were caused by conceptional measurement errors of the rivalry variables[22]. In line with this reasoning, the results of the FTC expert's own fixed-effects simulation did not differ much from the first cross-sectional regression estimates.[23] Furthermore, the FTC supposed Staples' fixed-effects model to suffer from sample selection bias, since it excluded all observations in California.

Another key discussion in the process concerned efficiencies and the pass-through rates of the resulting merger-specific cost savings. While the defendants argued that Staples' pass-through rate was about two thirds, the FTC economists developed a model that estimated them to be only about 15%. The model explicitly distinguished between industry-wide costs and Staples' firm-specific costs. The judge finally opted for the latter model and concluded that possible merger efficiency gains would not be passed through to the consumers and, therefore, cannot countervail the expected price increases. All in all, the judge's decision to accept quantitative economic evidence represents a milestone and, furthermore, encouraged the use of both econometric studies and simulation techniques.

*Volvo/Scania*

During the 1999 merger control procedure of the proposed merger between Sweden's Volvo and Scania[24], the European Commission commissioned a simulation study carried out by Ivaldi and Verboven. This study received some controversy throughout the proceedings and, eventually, the *Commission* (2000: 22) declared that "[g]iven the novelty of the approach and the level of disagreement, [it] will not base its assessment on the results of the study".

---

[22] The merging parties' expert measured the presence of rivals by non-overlapping circles of 0 to 5, 5 to 10 and 10 to 20 miles from the Staples stores. The FTC's expert, however, argued that all rivals in a metropolitan area have to be included. An inclusion of this criterion in addition of the measure used by the merging parties increased the simulated price effect from 1% to 2.5-3.7%. The defendants finally conceded in trial that the use of the metropolitan area-based measure of competition was more reasonable.

[23] The FTC cross-section estimates led to a price increase of 7.1% due to the merger, the fixed-effects based price effect was about 7.6% in overlap markets.

[24] Relevant markets included manufacture and sale of trucks, buses, construction equipment, marine and industrial engines.

However, "the results of such econometric studies can be a valuable supplement to the way the Commission has traditionally measured market power" (*ibid.*). Based upon more traditional analysis, the Commission declared the merger to be incompatible with the common market as it would have created a dominant position of Volvo in the market for heavy trucks, touring, inter-city and city buses in several North-European countries.[25]

*Ivaldi* and *Verboven* (2005a) performed simulation based on a nested logit model using panel data on list prices and horsepower for two types of trucks for each of the seven major truck manufacturers in 16 different European countries in 1997 and 1998. According to their model specification, three nests were distinguished: rigid trucks, tractor trucks and outside goods. Furthermore, country- and firm-specific dummies, as well as instrumental variables accounting for price endogeneity were included. The total number of products in the market including the outside goods was defined as average total sales in 1997-1998 multiplied by a market factor $r = 4.0$ that was chosen after sensitivity tests had proven this value to be rather conservative in prediction of prices. However, the strict time limit of EU merger control proceedings restricted sensitivity analysis and caused some very simplifying and debatable assumptions (*Ivaldi* & *Verboven* 2005a: 680, 690). In general, the results indicated serious anticompetitive price effects of more than 10-23% for rigid trucks and 7-13% for tractor trucks in the Scandinavian countries and Ireland for the merging parties, while the price responses by competitors were small. The 95% confidence interval of consumer surplus loss, measured as increase in the industry price index, was negative for all countries under consideration. Possible efficiency gains, a predicted 5% marginal cost saving, would not lead to an increase of consumer surplus in the five Nordic countries.

Volvo's own economic advisors criticised the model as flawed and unreliable (*Hausman* & *Leonard* 2005). First, they claimed substantial measurement errors in the data because it did not account for optional features, for instance, it referred to list prices instead of actual transaction prices and considers only two observations on each truck model in each country.[26] In consequence, a downward bias in the estimated price elasticities was expected, leading to an upward bias in price effects. Furthermore, they criticised the lack of a specification test and performed several tests on their own, indicating inadequateness of the IIA assumption of the nested logit model and considerable differences in the demand parameters between several subgroups of countries. Other points of criticism concerned the choice of the market factor $r$ and the compatibility of simulation results with economic theory and the particular market. The controversy among the economic advisors triggered an academic debate entailing mutual criticism of the employed tests, methods, models and interpretation of the economic results (*Hausman* & *Leonard* 2005; *Ivaldi* & *Verboven* 2005a,b).

*Lagardère/Natexis/VUP*

---

[25] In Sweden, Finland, Norway, Denmark and Ireland the combined market shares of the merging parties lie between 49 and 91% (*European Commission* 2000: 19).

[26] With the words of *Walker* (2005: 478) "a study based on prices nobody pays for trucks nobody buys".

In the 2003 Lagardère/Natexis/VUP merger, the European antitrust authority actually referred to a simulation in its decision (*European Commission* 2004a; *Röller & Friederiszick* 2007). The model withstood the opposing parties' criticism and was accepted by the Commission as robust and reliable. The transaction between Lagardère (communication, media and publishing) and Natexis/VUP (inter alia creative publishing) was eventually cleared under several conditions including significant divestitures (*European Commission* 2004a: 178).

The Commission's experts, Foncel and Ivaldi, concentrated on the differentiated products market for general literature in paperback and hardcover format and estimated demand using nested logit (*Ivaldi* 2005). Data on prices and volume was provided by the IPSOS market research institute and made available by the merging parties. In their model, consumers' demand decisions were assumed to be hierarchical in that first the type of book, e.g. humour, thriller or love story, and on a second level a specific book is chosen. The simulated price increase for the merging parties' books was reported as 4.84% if paperback and hardcover books are seen as one market with a 95% confidence interval running from 3.74 to 5.45%. Distinctive estimations for the two book types lead to price changes of 5.51% for paperbacks and only 1.59% for hardcover books, wherefore the *European Commission* (2004a: 179) concluded that the bulk of the average price increase must be due to the increase in paperback books.

The critique of the merging parties focused on market definition. First, they argued that the model neglects the vertical structure of the book market. Second, they claimed that the model does not sufficiently differentiate between paperback and hardcover. Finally, the model was said to not take into account the way how publishing and book price determination work in reality (*European Commission* 2004a: 179ff). The *Commission* judged all these critical arguments as unfounded and declared the study as "particularly robust by reason of the very large number of observations, the stability of the various parameters estimated, the high degree of statistical power of the tests provided, and the simulation of a confidence interval for the calculation of a price increase" (*European Commission* 2004a: 179, fn 543). In consequence, the study was used in support of its concerns for anticompetitive merger effects.

*Nuon/Reliant*

In 2003, Nuon, a leading Dutch energy utility company, notified its acquisition of Reliant Energy Europe, one of the major electricity generators in the Netherlands, to the national competition authority (Nederlands Mededingingsautoriteit – NMa). Part of the following NMa investigation were two different simulation models developed by external consultants from Energy Study Center (ECN) and Frontier Economics. After their in-depth analysis, the NMa decided to approve the merger under serious divestiture conditions (*de Maa & Zwart* 2005: 150ff). Nuon, however, appealed the NMa decision at the Court of Rotterdam, submitting critical reviews of the agency's MSMs by economists from NERA Economic Consulting (*NERA* 2005). After revision of all evidence, the court annulled the decision of the competition agency, dismissing the results of the MSMs as unreliable and the parties' interpretation of them as arbitrary.

The electricity market belongs to the exceptional cases where the use of a Cournot or supply function model can be adequate (inter alia homogeneous product, lack of short term demand elasticity, the absence of storage request to balance production and demand at every moment to a certain price, demand varies considerably by time, capacity limits of production and transmission are of great importance; *de Maa* & *Zwart* 2005: 153). Most data needed to model oligopolistic price equilibria were available. The ECN employed a Cournot model for all electricity generators in the Netherlands, Belgium, Germany and France. The calculated price effects were highest for peak hours of demand in winter (about 7.9%) and lowest for base hours in summer (3.4%) with an average price increase estimated to be about 5.9% (*de Maa* & *Zwart* 2005). Yet, it is questionable if the model adequately represents industry behaviour, because estimated and observed market prices differ by a great amount for demand elasticities that are assumed to be realistic. However, the difference might be the result of the generators' fearing of regulatory intervention if they set profit maximising prices or that longer term considerations not included in the model resulted in the over prediction (*de Maa* & *Zwart* 2005).

In contrast to ECN, the Frontier Economics team estimated a supply function model restricted to Dutch generators with different supply curves for each hour of the day. In order to reduce possible strategies, supply functions were restricted to correspond to marginal cost curves multiplied by a constant mark up factor from a finite set lying between 1 and 15. In result, multiple pre- and post merger equilibrium prices for each demand level and all possible mark up combinations for all producers were found (*de Maa* and *Zwart* 2005: 166). Interpretation of these equilibria as well as the choice of the right equilibrium is therefore of special interest. Higher price equilbria seemed to occur earlier in the post merger situation. In the following, the NMa chose to concentrate on the change of maximum, minimum and median price equilbria due to the merger. While the lower bound prices hardly increased at all, the median price level increased about 13%, averaged over all hours of the year. For the maximum price level the increase was even higher. Sensitivity tests that allowed for a more realistic price responsiveness of industrial demand led to smaller price effects close to the above mentioned Cournot results. Nevertheless, the NMa interpreted the model's outcomes as evidence for the strengthening of Nuon/Reliant's dominant position in the Dutch power market.

In response to the NMa's decision, Noun appealed on court and its economic advisors harshly criticized the supply function model (*NERA* 2005). As they were not allowed to view the original model, they built a 'shadow model' based on the available general descriptions and investigated its properties. NERA's critique mainly consisted of two points. First, they found that the outcomes crucially depended on the assumption of large steps between the mark up levels which represented the strategies available to the generators. They judged them as unrealistic because they ruled out the possibility of small price reductions. Consequently, many Nash equilibria were only sustainable because small reductions in prices which would have been profitable in reality were ruled out by assumption. Second, no basis for the choice of median prices as the likely outcome in pre- and post merger situations was provided. In

NERA's opinion the merger might possibly be a disturbance that changes industry from a pre-merger equilibrium of maximum prices to an equilibrium with minimum prices post-merger. Hence, a price increase can only be inferred from the multiple equilibria system with certainty if the maximum pre-merger price was smaller than the minimum post-merger price.

### Oracle/PeopleSoft

So far, the most discussed case seems to be the Oracle/PeopleSoft merger[27], the only case that was suited both in the EU and the U.S. It allows for an explicit comparison of two different MSM applied to the same industry. Moreover, the Oracle/PeopleSoft case was the first to have a full-blown merger simulation model to be discussed in an U.S. courtroom and the first to have a simulation model developed by Commission economists in-house. Despite the MSMs on both sides of the Atlantic pointed to considerable anticompetitive effects from the merger, neither the U.S. nor the EU competition agencies eventually managed to block the merger (*European Commission* 2004b; *U.S. District Court for the Northern District of California* 2004).

In 2003, Oracle, a U.S. company that develops, manufactures and distributes enterprise application software (EAS), database and application server software, launched a hostile bid for its U.S. rival PeopleSoft (*European Commission* 2004b: 3). Oracle and PeopleSoft were the second and third largest vendors of EAS worldwide behind SAP at that point in time, and both the DoJ and the Commission started in-depth investigations expecting serious anticompetitive effects from the merger. The DoJ asked *McAfee* (2004) to develop a simulation model measuring the unilateral effects of the merger.[28] An English auction model was chosen that allowed for multiple bidders and multiple rounds of bidding. Necessary variables and assumptions for calibration included – inter alia – market shares which should proxy the probability of winning and a measure of the pre-merger level of competition. The market shares were calculated for two comparatively narrowly delineated relevant markets: high function Financial Management Systems (FMS) and high function Human Resources (HR) software in the U.S., comprising only Oracle, PeopleSoft and SAP as relevant competitors and ignoring smaller competitors and possible entrants. *McAfee* (2004: 2) decided not to include any efficiency gains because he found substantial support for small marginal costs in the software industry that are unlikely to fall as a result of the merger. The simulated price increases for different scenarios ranged from 5 to 11% for FMS and from 13 to 30% for HR.

The Commission's expert team developed a sealed-bid auction model where the vendors know the identity of their competitors but cannot observe the monetary value customers assign to the different competing products (see *Bengtsson* 2005 for details). The vendors choose their bid absent information on their competitors' bids based on a calculation of

---

[27] See inter alia *Keyte* (2004); *Bengtsson* (2005); *Pflanz* (2005); *Botteman* (2006); *Werden* (2006); *Zimmer* (2006); *Budzinski* & *Christiansen* (2007).
[28] For the following details on the model see *U.S. District Court for the Northern District of California* (2004: 150-151, 195ff).

expected profits depending on price and winning probability. Costs are ignored in the model, as they are assumed to be sunk before the bidding. The relevant market was defined similarly to the U.S. model as the high function HR and FMS software market, but worldwide instead of limited to the USA. In difference to the DoJ specification, however, the Commission included possible efficiency gains through the differentiation of two scenarios – a pessimistic one where the product quality did not change after the merger and an optimistic one with an increase in product quality. Furthermore, the model was calibrated assuming different pre-merger quality levels and levels of uncertainty of the product quality for the products in the FMS and HR market. In consequence, this led to a wide range of price and consumer surplus effects. In the HR market, where Oracle's pre-merger product was assumed to be of minor quality in comparison to its competitors, price increases varied from 6.8% in the pessimistic scenario under high uncertainty to 25.5% in the optimistic scenario with low uncertainty. In the FMS market, the Commission assumed that SAP first offers a product superior to its two competitors and that Oracle could improve its quality by 10% post-merger in the optimistic scenario. In result, price increases from 13.9 to 30% depending on the level of uncertainty and the underlying scenario were found. In general, customers were harmed both through the loss of choice and the increase in price, both effects depending on the level of substitution between the merging products (*Bengtsson* 2005: 147).

In summary, both models found high and rather similar price effects (see table 1) despite different auction forms and market definitions. This can be viewed in support of the robustness of the results to alternative model specifications (*Budzinski & Christiansen* 2007a: 153). Nevertheless, the U.S. model was rejected by court and the EU model abandoned by the Commission, both with reference to (i) a lack of reliability of the results and (ii) false market definitions, in particular the ignorance of additional smaller competitors in the MSMs. Surprisingly, the simulation model was completely rejected rather than adjusted to the broader market definition both in the European and the U.S. litigation.[29] Although the *U.S. District Court* (2004: 45) and the *Commission* (2004b: 48) explicitly highlighted the general usefulness of merger simulations (*Zimmer* 2006: 693), high standards regarding the reliability and certainty of the predictions were set on both sides of the Atlantics and the available MSMs struggled to meet them.

**Table 1: Simulated Price Increases for the Oracle/PeopleSoft Merger**

| Price increase | U.S. DOJ | European Commission* |
|---|---|---|
| Market for high function FMS | 5 – 11 % | 6.8 – 21.1 % |
| Market for high function HR | 13 – 30 % | 14.3 – 29.9 % |

\* These figures relate to the pessimistic scenario without efficiencies.

---

[29] *Zimmer* (2006: 693) supposes that it might have been due to a lack of time or the fact that the Commission actually preferred to abandon the model and clear the case instead of risking to conflict with the before announced U.S. judgement. *Botteman* (2006: 96) even reports that an economist from the Commission engaged in the case had explained that the integration of additional buyers would have increases the complexity of the MSM to an extent that inconsistent price effects would have resulted.

*Source: Bengtsson (2005) and U.S. District Court for the Northern District of California (2004).*

### 4.2 Problems of the Use of Merger Simulation as an Antitrust Instrument

The question whether merger simulation should be used as a competition policy instrument at all can easily be answered in the affirmative. Every method that adds information and improves decision-making in merger control cases is welcomed to contribute to improve antitrust. In addition, MSMs force the experts to reveal the underlying assumptions of the models and, thereby, contribute to transparency and clearness of the line of argument. Nevertheless, a survey on merger simulation as an antitrust instrument must also point to the limitations and problems of this innovative instrument. After all, using merger simulation as an antitrust instrument implies that real-world policy decisions are based upon its result and that it counts as evidence and must stand the requirements of law. In the following, we review seven fields of (sometimes rather practical) problems that have occurred in this context in the literature as well as in the actual proceedings (as discussed in the preceding section).

*Data Availability*

One obvious limitation for the use of merger simulation is data availability. Comprehensive and precise data is required in order to calibrate MSM so that reliable results can be derived. In many markets, such data is simply not available. We suppose that this is the main reason why the number of cases involving merger simulation is still somewhat limited (see also *Ivaldi* 2005: 103). Although a lack of data also affects the quality of other methods of assessing mergers, for instance structural or qualitative analysis, the effect is particularly severe regarding quantitative tools since they cannot be carried out without sufficient data at all.

*Form of Competition*

Obviously, the reliability of MSM as antitrust instruments depends on an adequate identification of the underlying competition process. As seen in chapter 3, oligopoly theory (as well as auction theory for markets with corresponding characteristics) with its basic distinction between price- and quantity competition supplies the theoretical fundament. Thus the quality of the results depends on how adequate (advanced!) Bertrand- and Cournot models describe real market competition. This might impose some limitations if neither class of models suffices to match a given case as real-world competition is a complex and multifaceted phenomenon whose features reach beyond available advanced oligopoly models.[30] This limitation should become lessened in the course of theory progress; however, it will not be completely erased.

A related problem refers to the possibility of structural interruptions that are caused by the merger in question. MSM predict future prices and quantities by employing a model of the

---

[30] For instance, *Slade* (2006: 22) argues that in case of differentiated product industries focus should be shifted to 'brand fit' instead of thinking about market definition and market shares. She claims that a 0/1 classification of whether brands belong into the same market or not is not helpful in many applications since the dimensions along which different brands compete might be continuous.

pre-merger market, calibrated with pre-merger data and adjusted to the post-merger situation by parameters like market share, cost variables or measures of product variability In doing so, these models assume that the form of competition will not change due to the merger – for instance, Bertrand-competition will remain Bertrand-competition and not switch to Cournot-competition. While this assumption may be unproblematic in many cases, there is some plausibility, however, for the occurrence of other cases (*Werden* 1997: 98). Mergers in narrow oligopolies are considered to be a particularly rewarding area for merger simulation (because of their complex economic effects). If the market structure changes in a narrow oligopoly, say for instance from 4 to 3 or 3 to 2, this implies a particularly severe change of the business environment for the oligopolists and, therefore, their adjustment of strategies might be more than marginal. Considerable changes in the way oligopolists are competing tend to overstrain MSM because of the missing nexus to measurable past market behaviour. As insights from cognitive economics (e.g. *Kahneman* 2003a, 2003b) demonstrate, decision-makers tend to *create* alternative strategies not until the 'old' recipes fail (new framing; adjustment of mental models), in other words, changes in the form of competition can hardly be simulated because they are not predictable and non-anticipatable, as they are non-existent before the new situation actually takes place.

### Neglect of Non-quantifiable and Long-run Competitive Effects

Currently available merger simulation model tend to focus on short-run price and output effects (*Bengtsson* 2005: 141). The underlying reasons are (i) the importance of these effects for welfare, (ii) the quantifiability of these effects, and (iii) these effects used to dominate theoretical industrial economics, wherefore a large number of well-developed models with this focus is available. However, there is more to competition than short-run price and output effects – and these additional dimensions of competition also contribute to welfare (e.g. *Farrell* 2006). Competition represents a superior coordination mechanism for economic behaviour because it induces allocative efficiency (short-term welfare effects), innovative efficiency (incentives to innovate and imitate; mid-term welfare effects), adaptive efficiency (keeping the economy flexible regarding changing environments; evolutionary welfare effects; long-term welfare effects), consumer sovereignty (producers are induced to adjust their supply according to the preferences of the consumers) and contributes to economic freedom (liberal welfare effects) (e.g. *Budzinski* 2008a).

Inter alia*, Scheffman* (2004), *Bengtsson* (2005) and *Walker* (2005, 487-490) point out that even short-run (often) non-quantifiable and non-price elements of competition – like e.g. barriers to entry and exit, buyer power, brand, promotion and placement effects, shelf space competition, strategy effects on/of market participants, etc. – can hardly be included in MSM since the available oligopoly and auction models do not capture these dimensions of competition.[31] This is even truer for mid- and long-run effects like innovation or adaptability. It must be emphasized that the tendency to neglect these kinds of welfare-relevant effects is not the result of some sort of appreciation or deliberate decision. Instead, it comes as an

---

[31] See for an expert debate on this issue *Froeb*, *Scheffman* and *Werden* (2004).

(unintended?) by-product: these effects are not included in MSM because they cannot be modelled and/or quantified. However, lacking ability to make a phenomenon mathematically feasible or to quantify the respective variables does not mean that these effects carry less importance for real-world welfare. Therefore, reliance on MSM in real-world merger cases might entail the risk of neglecting some important welfare effects, thereby causing deficient decisions. More structural or other more qualitative assessment tools, however, can provide information about non-quantifiable effects and even if this information was restricted to plausibility arguments[32], these methods would inject additional knowledge that is important to protect competition and increase welfare.

Again, these limitations might well be alleviated as theory and simulation techniques progress. However, it must also be considered that some effects might remain being non-quantifiable due to their nature.

### *Competing Models*

Each MSM inevitably must simplify the underlying real case (complexity reduction) in order to create meaningful information or, as *Joan Robinson* (1962: 33) puts it: "A model which took account of all the variegation of reality would be of no more use than a map at the scale of one to one." At the same time, the inevitable simplification and complexity reduction offers scope for the construction of competing models and their injection into antitrust cases by interested parties – as it has happened in the some of the existing cases (see section 4.1). As a consequence, a selection problem exists: which MSM among the competing proposals is most adequate for a given case, i.e. mirrors most appropriately the relevant features of the simulated real market? One way to deal with this selection problem is to define standards for the 'technical' quality of MSMs acceptable for antitrust cases (*Werden* et al. 2004). Although this important step should reduce the scope for arbitrarily composed models, it cannot completely prevent that competing models with incompatible predictions, all of which fulfil these standards, are injected into an antitrust procedure by the parties.[33] The complex multi-parameter character of merger cases in competitive markets implies that different models with mutually contrary conclusions regarding the pro- or anticompetitive impact of a given merger proposal most likely refer to differing ways of reducing real-world complexity. In other words, the elaborate modelling of one parameter usually comes at the expense of a stronger simplification of another, so that incompatible MSMs of the same case simplify on different

---

[32] In most cases, the more traditional instruments allow for a much deeper analysis and assessment than mere plausibility arguments.

[33] Two examples that did not involve MSMs illustrate this point: Both in the Microsoft cases and in the eventually aborted GE-Honeywell-merger, well-respected economic experts came to completely contrary conclusions. This triggered to elaborate discourses within the scientific community of economics without achieving a consensus in regard to which side's analysis was more appropriate. See for an illustrative reading *Bresnahan* (2001); *Fisher* & *Rubinfeld* (2001); *Gilbert* & *Katz* (2001); *Schmalensee* (2001); *Werden* (2001); *Evans* & *Salinger* (2002); *Nalebuff* (2002); *Reynolds* & *Ordover* (2002); *Gerber* (2003); *Evans* et al. (2005).

parameters or, respectively, put their modelling emphasis on different parameters.[34] As a consequence, the solution of the selection problem becomes aggravated by two effects:

(i)     The policy dimension of the selection problem refers to political interests of experts (working for the competition authority or the merging companies or their competitors, customers or suppliers) as well as to the problem whether law courts and judges are sufficiently equipped to understand and appropriately deal with the proposed models (e.g. *Mandel* 1999; *Posner* 1999; *Hovenkamp* 2002).[35] Partisan models injected by the parties to an antitrust case need not be of insufficient quality just because they are biased. Furthermore, from an economic perspective of self-interested agents and agencies, the competition authorities are not necessarily completely unbiased either. If each side to a trial sends (f.i. equally) high-ranked experts to defend their case, then it might become rather difficult for a decision body, for instance a law court, to discriminate between the proposed models. 'Neutral' experts appointed by the decision body (if it is nonpartisan) might offer a solution (that, however, is associated with some practical caveats).

(ii)    The analytical dimension of the selection problem refers to the theoretical availability of a 'best' model. Even if no distortions by biased experts, interested parties and insufficiently equipped authorities existed (*ideal antitrust procedure*), it might be impossible to unambiguously identify the most appropriate model among the available ones due to them being all imperfect and possessing the same 'distance' to the underlying real case (*Budzinski* 2008b).

Although the problem of contrary opinions in principle is inherent to all types of assessment methods for competitive impact, quantitative instruments are particularly vulnerable in this regard. The reason lies in the factual effects of quantitative evidence for the applied standard of proof.

### Problems of Predictive Quantitative Economic Evidence

Injecting the results of MSMs as evidence into court procedures of merger cases has revealed an additional caveat. When it comes to assessing this type of economic evidence, the degree of certainty plays an important role. For instance, in Oracle, the clear and consistent predictions of the MSM were dismissed because they were assessed to be not sufficiently certain due to an incomplete modelling of the case (see section 4.1). Apart from the fact that economic modelling can never be complete in that sense (see the preceding paragraphs), some confusion seem to result from a mix-up of forensic and predictive evidence. If one applies the same standard of proof to MSM-results as to forensic evidence, then this actually implies the underlying assumption that the evolution of the world is deterministic. In an indeterministic world, an asymmetry between forensic and predictive methods exists: the results of a MSM-

---

[34] A simultaneous increase in the complexity of each parameters modelling has its limits because of the necessity to reduce real-world complexity.

[35] *Slade* (2006) discusses a respective trade-off between simplicity and accuracy of MSMs that somewhat constitutes a dilemma problem.

model can never achieve a degree of certainty comparable to the genetic fingerprint[36], simply because future effects can not be perfectly foreseen.[37] Now of course, this is equally true for qualitative reasoning about merger effects. However, numerical predictions entail a sense of precision – actually a pseudo-precision[38] – that is suitable for mechanically increasing the expectations on the degree of certainty of that prediction. The problem of the interaction of predictive quantitative economic evidence and the standard of proof as well as the allocation of the burden of proof has not yet been sufficiently analysed (for a preliminary attempt see *Budzinski & Christiansen* 2007b). However, there is empirical indication from the U.S. that a stronger reliance on quantitative economic evidence might unintentionally weaken antitrust enforcement, in particular in the area of merger control, for exactly these reasons (*Baker & Shapiro* 2007).

### Costs-Benefit-Analysis of Merger Simulation

The use of MSMs in merger control procedure targets a clear benefit: improving the quality of the decisions in order to reduce erroneous decisions.[39] However, as there can be no free lunch, the employment of MSM entails some additional costs (*Voigt & Schmidt* 2005; *Christiansen* 2006). This includes 'direct' costs like costs of data collection, payment for expertise, computer hours, manpower, etc. as well as costs in terms of a potential extension of the duration of proceedings and possibly a reduction in legal certainty (*Zimmer* 2006). The latter might result from a decreased predictability of the outcome of the competitive assessment: a more structural analysis along the lines of rather rough proxies might be easier to anticipate by business companies in advance of the actual authority decision than the outcomes of a detailed simulation. Since rational business companies consider competition laws and authority practice when designing a merger project, decreased legal certainty represents additional costs for merger activities, including efficiency-increasing ones. Furthermore, next to the increased costs for the competition agencies that employ MSMs, the merging parties (and its competitors) are likely to bear additional costs throughout the proceedings. On the one hand, notification and submission requirements increase with the use of simulation instruments (usually no compensation is paid for costs of material provision of the merging companies). On the other hand, the merging parties would possibly want to challenge the simulation by the authority by commissioning an own simulation with perhaps differing results. In some cases, even competitors might want to inject an own model in order to serve their interests.

---

[36] In this respect, it is inappropriate to attempt to sell MSMs to courts as the 'economic variant of the genetic fingerprint' – moreover, it entails the danger of raising non-accomplishable expectations.

[37] The effects from the inevitable complexity reduction and the fundamental uncertainty of future mutually reinforce each other.

[38] "Precise numerical outputs are reported, but with no sense of the confidence that can be placed in the estimates. This produces a false sense of precision" (*Hansen & Heckman* 1996: 98).

[39] Details depend on the concrete criterion that a jurisdiction applies to mergers. These criterions differ across jurisdictions, examples being the change of consumer welfare, the change of total welfare, weighted combinations of the changes of consumers' and producers' surplus, creation or strengthening of market domination, public interest, and many more.

Altogether, MSMs are not cheap instruments and an economical merger control procedure must assess whether the expected benefits (decision improvement) exceed the costs. If the effects of merger proposals are quite clear-cut, say for instance, in a monopolisation case or in a case where no competition concerns arise at all, then the costs of MSMs are likely to exceed the benefits. However, if a merger proposal includes pro- and anticompetitive effects and the net effect on competition is rather unclear after a more general structural analysis, then additional information like simulation results are more likely to yield benefits that outscore the costs.

### Case-by-case Analysis versus Rule-based Competition Policy

A related issue is the controversy between the proponents of a more rule-based merger control and the advocates of merger control by case-by-case analysis. In a way, this controversy relates to the more general debate on per se rule versus rule of reason in antitrust. However, in practice, merger control is virtually always a matter of rule of reason. Notwithstanding this, applying a rule of reason still offers scope for having more or less differentiated rules and assessment criteria, for instance classifying mergers and treating classes of mergers as a whole versus completely analysing each single merger. The question is how in depth should we look into a single merger case, or, in other words, what is the optimal degree of rule differentiation (*Christiansen* & *Kerber* 2006; *Kerber* et al. 2008).

The availability of the instrument MSMs alone might favour a tendency towards more case-by-case analysis. The pros and cons of such a development mirror the cost-benefit analysis in the preceding paragraphs. However, MSM might also play a useful role for a more rule-based merger control. The application of MSMs might yield valuable insights about the competitive effects of certain types of mergers, thus allowing for designing better rules for these classes of mergers (without applying it on a merger-by-merger basis to all further similar cases).

### Conclusions for Merger Control

At times, comments about the potentials of MSM seem to suggest that they are suitable to replace the structural analysis of competition cases: "Merger simulation (…) eliminates much of the subjective and idiosyncratic judgment otherwise inherent in the assessment of mergers" (*Crooke* et al. 1999: 206), or: "With merger simulation, transparent formal economic modelling substitutes for intuition. Merger simulation thereby replaces subjective and unverifiable surmise with objective and verifiable calculation" (*Werden* 2005: 43). However, the discussion of the limitations of merger simulation as an antitrust instrument demonstrates that over-optimism might lead to welfare-endangering policy advice. Once again, MSM represent an important and highly useful addition to the more traditional instruments of merger control. However, a simulation-based analysis needs to be complemented by a more traditional analysis in order to actually reap its benefits. Furthermore, more research is necessary as to when a given case should be subject to an elaborate and costly simulation since for economic reasons its utility (improvement of decision quality) must cover its costs. This refers to the necessity of a rigorous analysis of the adequate differentiation of rules.

### 4.3 Ex Post Evaluation of the Performance of Merger Simulations

Although merger simulation models are frequently used in antitrust analysis, up to now only few studies exist that try to review ex post how successful merger simulations have been in predicting price effects (*Ashenfelter* & *Hosken* 2008: 8; *Werden* et al. 2004: 1). *Nevo* (2000a) applied a Bertrand-type simulation model with random-coefficients logit demand to two mergers in the ready-to-eat (RTE) cereal industry[40] and calculated the cost efficiencies necessary to compensate the price effect. Using post-merger data, he was able to partially evaluate the performance of the model and the sensitivity to different assumptions. In general, the model's predictions are fairly close to the actual outcomes suggesting that simulation is potentially useful. However, due to a lack of detailed post-merger data his statement is based on an informal analysis instead of formal tests. Besides, other dimensions of non-price competition between cereal producers like strategic decisions concerning advertising or new brand introduction could have had a direct, maybe countervailing influence on prices as well.

A second study conducted by *Pinske* & *Slade* (2004) deals with two mergers in the UK brewing industry in 1995.[41] They used a semiparametric continuous-choice specification which combines the simplicity of logit and nested logit demand with the flexibility of random coefficients models. Marginal costs were not inferred from Nash-Bertrand equilibrium but obtained from a detailed engineering study of beer-production, distribution and retailing costs. In summary, their findings show that their model was able to produce price effects that closely matched reality despite neglecting several aspects of firms' behaviour. Furthermore, the results supported the case decision of the British antitrust authority.

*Peters* (2006) predicted the price effects for five different U.S. airline mergers that have been completed between 1986 and 1987 and compared them to observed post-merger prices. He employed a rich publicly available dataset and estimated both a nested logit model and a generalized extreme value (GEV) model[42]. Comparing his simulation results to actual price increases[43], he concluded that the predicted increases of the GEV are closer to the observed changes than those of the nested logit. However, even the GEV only modestly predicted the real changes. In result, Peters' analysis did not prove merger simulation to be able to closely predict price changes due to mergers in the airline industry. However, merger simulation might be ill suited to the airline industry in general as the pricing cannot be described

---

[40] These were the 1993 merger of Kraft Foods and RJR Nabisco as well as the acquisition of Ralston Purina's cereal brand Chex by General Mills in 1996.

[41] The merger of Courage/Scottish and Newcastle was allowed in 1995, while the one between Bass/Carlsberg and Tetley was eventually prohibited in 1997. Therefore, their simulation using 1995 data concerned two scenarios: (i) undoing the Scottish/Newcastle merger and (ii) forecasting the effect of the Bass/Carlsberg and Tetley merger.

[42] This model is a generalization of the nested logit that permits substitution to depend on multiple discrete characteristics. For details see *Bresnahan* et al. (1997).

[43] As some portion of the observed price change is assumed to be caused by other exogenous forces, like inflation, fluctuations in the fuel price, etc., the author calculated a relative price change as the difference between observed percentage price change and an average industry-wide percentage price change across all markets.

appropriately by any stationary oligopoly model employable in simulation (*Werden* et al. 2004: 1; *Peters* 2006: 629).

In summary, very few studies exist and they produce rather mixed results. From this, *Ashenfelter* and *Hosken* (2008: 36) conclude: "it seems that the evaluation of merger simulation models by a comparison of predicted and actual outcomes is in its infancy. In view of the extensive use to which these models are put, a careful evaluation of their effectiveness seems long over due." Taken seriously, this would imply a more cautious approach towards basing real merger control decisions on simulation results until more ex post evaluations of the performance of MSMs are available.

For instance, a field study along the following lines would be of particular value for practical merger control policy. A systematic testing of the tool MSM could be done by using real world experiments or tournaments. Several experts are asked to submit a MSM for a specific real merger case in a certain market (without employing them in the merger control decision). Then, the actual performance of the post-merger market serves as the benchmark for the submitted predictions. Despite being somewhat elaborate and expensive, such tournaments would be likely to produce important theoretical and practical insights, last but not least because of the inherent competitive character. They might be even superior to such ex post analysis that, in hindsight, attempts to reproduce actual market development (pseudo predictions). In contrast to such – doubtlessly valuable – 'hindsight simulations', the 'tournament simulations' would entail real lack of knowledge about future market development at the time of simulation (real predictions), thereby enhancing the explanatory power of the performance test.

## 5. Conclusions

Advances in competition economics as well as in computational and empirical methods have offered the scope for the employment of MSM in merger control procedures during the past almost 15 years. Merger simulation is, nevertheless, still a very young and innovative instrument of antitrust and, therefore, (i) its 'technical' potential is far from being comprehensively exploited and (ii) teething problems in its practical use in antitrust prevail. We provide a classification of state-of-the-art MSM and review their previous employment in merger cases as well as the problems and limitations currently associated with its use in merger control. In summary, MSM represent an important and valuable extension of the toolbox of merger policy. However, they do not qualify as a magic bullet and must be combined with other, more traditional instruments of competition policy in order to comprehensively unfold its beneficial effects.

## References

Ashenfelter, O. & D. Hosken (2008), *The Effect of Mergers on Consumer Prices: Evidence from Five Selected Case Studies*, NBER Working Paper Series No. 13859, Cambridge, MA.

Baker, J. B. & C. Shapiro (2007), *Reinvigorating Horizontal Merger Enforcement*, Discussion Paper, Berkeley.

Baker, J. B. & D. L. Rubinfeld (1999), Empirical Methods in Antitrust Litigation: Review and Critique, in: *American Law and Economics Review*, Vol. 1(1/2), pp. 386-435.

Baker, J. B. (1999a), Developments in Antitrust Economics, in: *Journal of Economic Perspectives*, Vol. 13 (1), pp. 181-194.

Baker, J. B. (1999b), Econometric Analysis in FTC v. Staples, in: *Journal of Public Policy & Marketing*, Vol. 18 (1), pp. 11-21.

Baker, J. B. & R. Pitofsky (2008), A Turning Point in Merger Enforcement: Federal Trade Commission v. Staples, in: D. Crane & E. M. Fox (eds.), *Antitrust Stories*, Foundation Press, forthcoming.

Ben-Akiva, M. & S. R. Lerman (1991), *Discrete Choice Analysis*, 7th print, Cambridge, Mass.: MIT Press.

Bengtsson, C. (2005), Simulating the Effect of Oracle's Takeover of PeopleSoft, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 133-149

Bergeijk, P. A. G. van & E. Kloosterhuis (2005), How to Merge with Law and Economics?, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 1-12.

Berry, S. T. (1994), Estimating Discrete-choice Models of Product Differentiation, in: *RAND Journal of Economics*, Vol. 25 (2), pp. 243-262.

Berry, S., J. Levinsohn & A. Pakes (1995), Automobile Prices in Market Equilibrium, in: *Econometrica*, Vol. 63 (4), pp. 841-890.

Bertrand, J. (1888), Review of 'Théorie Mathématique de la Richesse Sociale' and 'Recherches sur les Principes Mathématiques de la Théorie des Richesses', in : *Journal des Savants*, Vol. 67, pp. 499-508.

Botteman, Y. (2006), Mergers, Standard of Proof and Expert Economic Evidence, in: *Journal of Competition Law and Economics*, Vol. 2 (1), pp. 71-100

Brannman, L. & L. M. Froeb (2000), Mergers, Cartels, Set-Asides, and Bidding Preferences in Asymmetric Oral Auctions, in: *The Review of Economics and Statistics*, Vol. 82 (2), pp. 283-290.

Bresnahan, T. F. (2001), *The Economics of the Microsoft Case*, SIEPR Discussion Paper No. 00-50, Stanford University.

Bresnahan, T. F., S. Stern & M. Trajtenberg (1997), Market Segmentation and the Sources of Rents from Innovation: Personal Computers in the late 1980s, in: *RAND Journal of Economics*, Vol. 28 (0), pp. S17-S44.

Brodley, J. P. (1995), Post-Chicago Economics and Workable Legal Policy, in: *Antitrust Law Journal*, Vol. 63 (2), pp. 683-695.

Budzinski, O. & A. Christiansen (2007a), The Oracle/PeopleSoft Case: Unilateral Effects, Simulation Models and Econometrics in Contemporary Merger Control, in: *Legal Issues of Economic Integration*, Vol. 34 (2), pp. 133-166.

Budzinski, O. & A. Christiansen (2007b), *Economic Instruments and Standards of Proof in Merger Control: Lessons from Oracle and Sony/BMG*, 5th INFER Workshop on Competition Theory and Policy, ZEW, Mannheim, November 15-17, 2007, http://www.uni-marburg.de/fb02/wipol/team/wiss-ma/christi/download/Presentation_Budzinski_Christiansen_INFER.pdf.

Budzinski, O. (2008a), Monoculture versus Diversity in Competition Economics, in: *Cambridge Journal of Economics*, Vol. 32 (2), pp. 295-324.

Budzinski, O. (2008b), *A Note on Competing Merger Simulation Models in Antitrust Cases: Can the Best Be Identified?*, available at SSRN: http://ssrn.com/abstract=1116181.

Christiansen, A. & W. Kerber (2006), Competition Policy with Optimally Differentiated Rules Instead of "Per se Rules vs. Rule of Reason", in: *Journal of Competition Law and Economics*, Vol. 2 (2), pp. 215-244.

Christiansen, A. (2006), *The Reform of EU Merger Control - Fundamental Reversal or Mere Refinement?*, available at SSRN: http://ssrn.com/abstract=898845.

Coloma, G. (2006), Econometric Estimation of PCAIDS Models, in: *Empirical Economics*, Vol. 31, pp. 587-599.

Crooke, P., L. M. Froeb, S. Tschantz & G. J. Werden (1999), Effects of Assumed Demand Form on Simulated Postmerger Equilibria, in: *Review of Industrial Organization*, Vol. 15, pp. 205-217.

Dalkir, S., J. W. Logan & R. T. Masson (2000), Mergers in Symmetric and Asymmetric Noncooperative Auction Markets: the Effects on Prices and Efficiency, in: *International Journal of Industrial Organization*, Vol. 18, pp. 383-413.

Dalkir, S. & F. R. Warren-Boulton (2004), Prices, Market Definition, and the Effects of Merger: Staples-Office Depot (1997), in: J. E. Kwoka & L. J. White (eds.), *The Antitrust Revolution: Economics, Competition, and Policy*, 4th Ed., Oxford: Oxford University Press, pp. 52-72.

Deaton, A. & J. Muellbauer (1980), An Almost Ideal Demand System, in: *American Economic Review*, Vol. 70 (3), pp. 312-326.

EAGCP (2005), *An Economic Approach to Art. 82*, Report of the Economic Advisory Group for Competition Policy for the European Commission, DG Competition, Brussels http://europa.eu.int/comm/competition/publications/studies/eagcp_july_21_05.pdf.

Epstein, R. J. & D. L. Rubinfeld (2001), Merger Simulation: A Simplified Approach with New Applications, in: *Antitrust Law Journal*, Vol. 69 (3), pp. 883-919.

Epstein, R. J. & D. L. Rubinfeld (2004), Merger Simulation with Brand-Level Margin Data: Extending PCAIDS with Nests, in: *Advances in Economic Analysis & Policy*, Vol. 4 (1), Art. 2.

European Commission (2000), *Case No Comp/M.1672, Volvo/Scania*, downloaded 09/07/2007 from http://ec.europa.eu/comm/competition/mergers/cases/decisions/m1672_en.pdf.

European Commission (2004a), *Case No Comp/M.2978, Lagardere/Natexis/VUP*, (7 January 2004), downloaded on 10/07/2007 from http://ec.europa.eu/comm/competition/mergers/cases/decisions/m2978_20040107_600_en.pdf.

European Commission (2004b), *Case No Comp/M.3216, Oracle/PeopleSoft*, (26 October 2004), downloaded on 10/07/2007 from http://ec.europa.eu/comm/competition/mergers/cases/decisions/m3216_en.pdf.

Evans, D. S. & M. Salinger (2002), Competition Thinking at the European Commission: Lessons from the Aborted GE/Honeywell Merger, in: *George Mason Law Review*, Vol. 10 (3), pp. 489-532.

Evans, D. S., A. L. Nichols & R. Schmalensee (2005), *US vs. Microsoft: Did Consumers Win?* NBER Working Paper Series 11727, Cambridge, Mass.: National Bureau of Economic Research.

Farrell, J. (2006), Complexity, Diversity, and Antitrust, in: *The Antitrust Bulletin*, Vol. 51 (1), pp. 165-173.

Fisher, F. M. & Rubinfeld, D. L. (2001), U.S. v. Microsoft: An Economic Analysis, in: *The Antitrust Bulletin*, Vol. 46 (1), pp. 1-69.

Froeb, L. M. & G. J. Werden (2000), An Introduction to the Symposium on the Use of Simulation in Applied Industrial Organization, in: *International Journal of the Economics of Business*, Vol. 7 (2), pp. 133-137.

Froeb, L. M. & G. J. Werden (2008), Unilateral Competitive Effects of Horizontal Mergers, in: P. Buccirossi (ed.), *Handbook of Antitrust Economics*, Cambridge, Mass.: MIT Press, pp. 43-104.

Froeb, L. M., D. Scheffman & G. J. Werden (2004), Whither Merger Simulation?, in: *The Antitrust Source*, May, pp. 1-15, http://www.abanet.org/antitrust/source/05-04/whither.pdf.

Froeb, L. M., S. T. Tschantz & P. Crooke (1998), *Mergers among Asymmetric Bidders: A Logit Second-Price Auction Model*, available at SSRN: http://ssrn.com/abstract=69415.

Gerber, D. J. (2003), The European Commission's GE/Honeywell Decision: US Responses and their Implications, in: *ZWeR Journal of Competition Law*, Vol. 1 (1), pp. 87-95.

Gilbert, R. J. & Katz, M. (2001), An Economist's Guide to U.S. v. Microsoft, in: *Journal of Economic Perspectives*, Vol. 15 (2), pp. 25-44.

Goppelsröder, M. & M. P. Schinkel (2005), On the Use of Economic Modelling in Merger Control, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 53-78.

Hansen, L. P. & J. J. Heckman (1996), The Empirical Foundations of Calibration, in: *Journal of Economic Perspectives*, Vol. 10 (1), S. 87-104.

Hausman, J. & D. McFadden (1984), Specification Tests for the Multinomial Logit Model, in: *Econometrica*, Vol. 52 (5), pp. 1219-1240.

Hausman, J. & G. K. Leonard (1997), Economic Analysis of Differentiated Products Mergers using Real World Data, in: *George Mason Law Review*, Vol. 5 (3), pp. 321-346.

Hausman, J. & G. K. Leonard (2005), Using Merger Simulation Models: Testing the Underlying Assumptions, in: *International Journal of Industrial Organization*, Vol. 23, pp. 693-698

Hausman, J., G. K. Leonard & J. D. Zona (1994), Competitive Analysis with Differentiated Products, in: *Annales d'Économie et de Statistique*, Vol. 34, pp. 159-180.

Hovenkamp, H. (2002), Economic Experts in Antitrust Cases, in: D. L. Faigman et al. (eds.), *Modern Scientific Evidence: The Law and Science of Expert Testimony*, St. Paul: Thomson/West, pp. 111-143.

Ivaldi, M. & F. Verboven (2005a), Quantifying the Effects from Horizontal Mergers in European Competition Policy, in: *International Journal of Industrial Organization*, Vol. 23, pp. 669-691

Ivaldi, M. & F. Verboven (2005b), Quantifying the Effects from Horizontal Mergers: Comments on the Underlying Assumptions, in: *International Journal of Industrial Organization*, Vol. 23, pp. 699-702

Ivaldi, M. (2005), Mergers and the New Guidelines: Lessons from Hachette-Editis, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 92-106

Kahneman, D. (2003a), A Psychological Perspective on Economics, in: *American Economic Review*, Vol. 93 (2), pp. 162-168.

Kahneman, D. (2003b). Maps of Bounded Rationality: Psychology for Behavioral Economics, *American Economic Review*, Vol. 93 (5), pp. 1449-1475.

Kaplow, L. & C. Shapiro (2007), Antitrust, in: A. M. Polinsky & S. Shavell (eds.), *Handbook of Law and Economics*, Vol. 2, Amsterdam: Elsevier North Holland, pp. 1073-1225.

Kerber, W. & U. Schwalbe (2008), Economic Principles of Competition Law, in: F. J. Säcker et al. (eds), *Competition Law: European Community Practice and Procedure*, London: Sweet & Maxwell, pp. 202-393.

Kerber, W., J. P. Kretschmer & G. von Wangenheim (2008), *Optimal Sequential Investigation Rules in Competition Law*, Working Paper.

Keyte, J. A. (2004), Arch Coal and Oracle: Put the Agencies on the Rope in Proving Anticompetitive Effects, in: *Antitrust*, Fall 2004, pp. 79-86.

Klemperer, P. (2008), Competition Policy in Auction and Bidding Markets, in: P. Buccirossi (ed.), *Handbook of Antitrust Economics*, Cambridge, Mass.: MIT Press, pp. 583-624.

Kokkoris, I. (2005), Merger Simulation: A Crystal Ball for Assessing Mergers, in: *World Competition*, Vol. 28 (3), pp. 327-348.

Kühn, K.-U. (2008), The Coordinated Effects of Mergers, in: P. Buccirossi (ed.), *Handbook of Antitrust Economics*, Cambridge, Mass.: MIT Press, pp. 105-144.

Lundmark, R. & M. Nilsson (2003), What Do Economic Simulations Tell Us? Recent Mergers in the Iron Ore Industry, in: *Resources Policy*, Vol. 29 (1), pp. 111-118.

Maa, J. de & G. Zwart (2005), Modelling the Electricity Market: Nuon-Reliant, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 150-171.

Mandel, M. J. (1999), Going for Gold: Economists as Expert Witnesses, in: *Journal of Economic Perspectives*, Vol. 13 (2), pp. 113-120.

McAfee, R. P. (2004), *Testimony of R. Preston McAfee in United States v. Oracle*, Monday, June 21, 2004, downloaded on 20/07/2007 from http://vita.mcafee.cc/PDF/OracleTestimony.pdf.

Nalebuff, B. (2002), *Bundling and the GE-Honeywell Merger*, Working Paper 22, Yale School of Management.

NERA (2005), *Case Closed: The Role of NERA Economists in Nuon/Reliant and Nuon v. NMa*, downloaded on 10/07/2007 from http://www.nera.com/image/CC_Nuon_EN539-v3%20(2).pdf.

Neven, D. J. (2006), Competition Economics and Antitrust in Europe, in: *Economic Policy*, Vol. 21 (48), pp. 742-791.

Nevo, A. (2000a), Mergers with Differentiated Products: the Case of the Ready-to-eat Cereal Industry, in: *RAND Journal of Economics*, Vol. 31 (3), pp. 395-421.

Nevo, A. (2000b), A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, in: *Journal of Economics & Management Strategy*, Vol. 9 (4), pp. 513-548.

Peters, C. (2006), Evaluating the Performance of Merger Simulation: Evidence from the U.S. Airline Industry, in: *Journal of Law and Economics*, Vol. 49 (2), pp. 627-649.

Pinske, J. & M. E. Slade (2004), Mergers, Brand Competition, and the Price of a Pint, in: *European Economic Review*, Vol. 48, pp. 617-643.

Pflanz, M. (2005), 'Oracle/PeopleSoft': The Economics of the EC Review, in: *European Competition Law Review*, Vol. 26 (3), pp. 123-127.

Posner, R. A. (1999), The Law and Economics of the Economic Expert Witness, in: *Journal of Economic Perspectives*, Vol. 13 (2), pp. 91-99.

Reynolds, R. J. & Ordover, J. A. (2002), Archimedean Leveraging and the GE/Honeywell Transaction, in: *Antitrust Law Journal*, Vol. 70 (1), pp. 171-198.

Robinson, J. (1962), *Essays in the Theory of Economic Growth*, London: Macmillan.

Röller, L.-H. & H. W. Friederiszick (2007), Ökonomische Analyse in der EU Wettbewerbspolitik. Ein erstes Résumé, in: C. Baudenbacher (ed.), *Neueste Entwicklungen im europäischen und internationalen Kartellrecht*, Basel: Helbing & Lichtenhahn, pp. 353-376.

Röller, L.-H. (2005), Economic Analysis and Competition Policy Enforcement in Europe, in: P. Van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers: Theory, Competition Policy and Case Studies*, Cheltenham: Elgar, S. 11-24.

Scheffman, D. (2004), *Whither Merger Simulation?*, http://www.ftc.gov/speeches/other/040129scheffman.pdf.

Schmalensee, R. (2001), *Lessons from the Microsoft Case*, EUI Working Papers, Florence: European University Institute.

Slade, M. E. (2006), *Merger Simulations of Unilateral Effects: What Can We Learn from the UK Brewing Industry?*, Department of Economics Discussion Paper, University of Warwick.

Smidt, C. (2005), Modelling Danish Mergers: Approach and Case Studies, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 172-183.

Tschantz, S., P. Crooke & L. Froeb (2000), Mergers in Sealed versus Oral Auctions, in: *International Journal of the Economics of Business*, Vol. 7 (2), pp. 201-212.

U.S. Department of Justice (1995), *Final Judgement: U.S. v. Kimberly-Clark Corp. and Scott Paper Co.*, downloaded on 10/07/2007 from http://www.usdoj.gov/atr/cases/f0400/0482.htm.

U.S. District Court for the District of Columbia (1997), *Redacted Memorandum Opinion, Federal Trade Commission v. Staples*, Inc., 970 F. Supp. 1066, downloaded on 06/07/2007 from http://www.fordham.edu/law/faculty/patterson/antitrust/materials/staples.pdf.

U.S. District Court for the Northern District of California (2004), *Findings of Fact, Conclusions of Law and Order Thereon, U.S. v. Oracle Corporation*, downloaded on 09/09/2004 from http://www.usdoj.gov/atr/cases/f205300/205388.pdf.

Voigt, S. & A. Schmidt (2005), *Making European Merger Policy More Predictable*, Dordrecht: Springer.

Walker, M. (2005), The Potential for Significant Inaccuracies in Merger Simulation Models, in: *Journal of Competition Law and Economics*, Vol. 1 (3), pp. 473-496.

Werden, G. J. & L. M. Froeb (1994), The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy, in: *The Journal of Law, Economics & Organization*, Vol. 10 (2), pp. 407-426.

Werden, G. J. & L. M. Froeb (1995), *Simulation as an Alternative to Structural Merger Policy in Differentiated Products Industries*, EAG 95-2, Economic Analysis Group, U.S. Department of Justice, Washington, D.C.

Werden, G. J. (1997), *Simulating the Effects of Differentiated Products Mergers: A Practitioners' Guide*, Economic Analysis Group, Proceedings of NE-165 Conference, June 20-21, 1996, Washington, D.C.

Werden, G. J. (2000), Expert Report in United States v. Interstate Bakeries Corp. and Continental Baking Co., in: *International Journal of the Economics of Business*, Vol. 7 (2), pp. 139-148

Werden, G. J. (2001), Microsoft's Pricing of Windows and the Economics of Derived Demand Monopoly, in: *Review of Industrial Organization*, Vol. 18 (3), pp. 257-262.

Werden, G. J. (2005), Merger Simulation: Potentials and Pitfalls, in: P. A. G. van Bergeijk & E. Kloosterhuis (eds.), *Modelling European Mergers. Theory, Competition Policy and Case Studies*, Cheltenham: Edward Elgar, pp. 37-52.

Werden, G. J. (2006), Unilateral Effects from Mergers: the Oracle Case, in: P. Marsden (ed.), *Handbook Of Research In Trans-Atlantic Antitrust*, Cheltenham: Edward Elgar, pp. 1-15.

Werden, G. J., L. M. Froeb & D. Scheffman (2004), *A Daubert Discipline for Merger Simulation*, February 16, 2004. Draft, available at http://www.ftc.gov/be/daubertdiscipline.pdf.

Werden, G. J., L. M. Froeb & T. J. Tardiff (1996), The Use of the Logit Model in Applied Industrial Organization, in: *International Journal of the Economics of Business*, Vol. 3 (1), pp. 83-105.

Zimmer, D. (2006), Vorzüge und Leistungsgrenzen quantitativ-ökonomischer Analysen in Fusionskontrollverfahren: das Beispiel Oracle/PeopleSoft, in: I. Brinker & R. Bechtold (eds.), *Recht und Wettbewerb: Festschrift für Rainer Bechtold zum 65. Geburtstag*, München: Beck, pp. 677-695.