UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | MDL Case No. 21-md-02981-JD <br> Member Case No. 20-cv-05671-JD <br><br> **ORDER RE UCL CLAIM AND INJUNCTIVE RELIEF** |

This order gives the reasons for the permanent injunction to be entered in *Epic Games, Inc. v. Google LLC et al.*, Member Case No. 20-cv-05671-JD. It also resolves Epic's equitable claims against Google under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

**BACKGROUND**

In the order denying Google's post-verdict motion for judgment as a matter of law or a new trial, Dkt. No. 984 (JMOL Order),[1] the Court discussed in detail the jury's unanimous verdict against Google and the trial evidence that supported the verdict. In summary, after testimony by forty-five witnesses about Google's Play Store practices presented over fifteen days of trial, the jury found in favor of Epic on: (1) monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; and (3) tying under Section 1 of the Sherman Act and the Cartwright Act. *Id*. at 3-4; Dkt. No. 866 (Jury Verdict). Epic's

---

[1] Unless otherwise noted, all docket number references are to the ECF docket for *In re Google Play Store Antitrust Litigation*, Case No. 21-md-02981-JD.

equitable claim under the California Unfair Competition Law is for the Court to decide.[2]

Epic seeks an injunction as the remedy on the jury verdict. To help determine an appropriate injunction, the Court held extensive post-verdict hearings on what an injunction should seek to accomplish, and where it should refrain from acting. Epic kicked off the proceedings by filing a proposed injunction. Dkt. No. 952. Google responded with more than 90 pages of objections. Dkt. No. 958. To ensure a fully developed record on the remedy, the Court invited each side's experts to present their views in concurrent expert evidentiary hearings. One hearing involved testimony by four economists, two for each side of the case. Dkt. No. 978. A second hearing involved technology experts sponsored by Epic, and three Google engineers. Dkt. No. 1001. In each hearing, the witnesses were directed to focus their comments on issues specific to the jury verdict and the facts in evidence at trial. *See* Dkt. Nos. 977, 1000. In conjunction with the hearings, the parties filed statements by the economists, Dkt. Nos. 952, 957, and the technology experts and engineers. Dkt. Nos. 981, 985. The Federal Trade Commission filed an amicus brief, which the Court accepted. Case No. 20-cv-05671-JD, Dkt. No. 686-1. After the evidentiary hearings concluded, the Court heard closing arguments from the parties on the issue of the remedy. Dkt. No. 1000 at 95:18-155:1.

Overall, each side had a virtually unlimited opportunity to present its views about the scope and content of an injunction. Google's request for even more discussion is not well taken. *See*, *e.g.*, Dkt. No. 958 at 11. Google took full advantage of the Court's open-ended procedures, as the voluminous post-verdict docket entries readily attest. As the Court noted in the JMOL Order, it bears mention that Google has, on several occasions, fired a blunderbuss of comments and complaints that are underdeveloped and consequently unhelpful in deciding the issues. *See* Dkt. No. 984 at 4. More of the same is not warranted at this closing stage of the case.

**DISCUSSION**

**I.    THE UCL CLAIM**

Before turning to the injunction, Epic's final claim under the California Unfair

---

[2] The Court is advised that the parties have resolved Google's breach of contract counterclaim and there are no remaining counterclaims or defenses for resolution. Dkt. No. 1002.

Competition Law (UCL) must be resolved. The UCL prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Epic has alleged that Google violated the unlawful and unfair prongs of the UCL. Dkt. No. 378 ¶¶ 295-96. These are equitable claims entrusted to the Court's sound discretion. *See Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cnty.*, 9 Cal. 5th 279, 292 (2020) ("the causes of action established by the UCL . . . are equitable in nature and are properly tried by the court rather than a jury").

The disposition of the unlawful prong is straightforward. The jury concluded that Google's Play Store conduct violated the Sherman Act and Cartwright Act. *See* Dkt. No. 866. As Google has rightly said, this means that Google necessarily violated the unlawful prong of the UCL. *See* Dkt. No. 1000 at 152:2-21; *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.") (citation omitted).

The unfair prong is more nuanced because it is "intentionally framed in . . . broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) (internal quotations and citations omitted). California state courts have formulated two tests relevant here. To support "any finding of unfairness to competitors," the Court decides whether the defendant's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 186-87. To support a finding of unfairness to consumers, the Court balances "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Progressive W. Ins. Co. v. Yolo Cnty. Superior Court*, 135 Cal. App. 4th 263, 285-86 (2005) (citation omitted). The inquiries are not "mutually exclusive" and will have some

substantive overlap. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) (citing *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144 (2000)).[3]

Whether Epic is characterized as a competitor (such as the provider of a competing in-app billing service) or a customer (such as a developer and distributor of Android apps, including for a time on the Google Play Store), the unfairness prong has been violated. The jury found that Google's conduct violated the antitrust laws and substantially harmed competition in the relevant markets, and directly injured Epic. The jury rejected Google's proffered procompetitive justifications for its conduct. Consequently, the Court concludes that Epic has prevailed on the UCL claim against Google under the unlawful and unfair prongs. Judgment will be entered in favor of Epic.

## II.    THE INJUNCTION

### A.    Legal Standards

#### 1.    The Federal Antitrust Laws

An injunction on the federal antitrust verdict is governed by Section 16 of the Clayton Act, 15 U.S.C. § 26. Under Section 16, "[a]ny person, firm, corporation, or association" is entitled to "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws, . . . , when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." To warrant an injunction, a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). Injunctive relief is "wholly proper" when there is "nothing indicating that" a clear violation of the antitrust laws that has already been found

---

[3] In *Lozano*, our circuit acknowledged that the question of "how to define 'unfair' in the consumer action context after *Cel-Tech*" has not been completely settled by the California courts. 504 F.3d at 736 (emphasis omitted). More recently, our circuit stated that "[u]nder the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law,'; (2) whether the practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,'; or (3) whether the practice's impact on the victim outweighs 'the reasons, justifications and motives of the alleged wrongdoer.'" *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020) (internal citations omitted).

"had terminated or that the threat to [plaintiff] inherent in the conduct would cease in the foreseeable future." *Id.* at 131-32.

The plain words of Section 16 must be read with the purpose of the antitrust laws in mind. "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also North Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 502 (2015) ("Federal antitrust law is a central safeguard for the Nation's free market structures.") (citing *Topco*, 405 U.S. at 610). The question has been asked whether our tech-based economy has outgrown the federal antitrust laws, which date back to 1890 when the Sherman Act was signed into law. In the Court's view, it has not. The broad provisions of the Sherman Act provide all of the tools needed to address the issues presented in this case, as they have for over a century in a constantly changing national economy. Google has not suggested otherwise.

The tools available for a remedy are powerful. As the Supreme Court has emphasized, injunctive relief under Section 16 is meant to restore economic freedom in the relevant markets and break the shackles of anticompetitive conduct. "In exercising its equitable jurisdiction, a federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith*, 395 U.S. at 132 (cleaned up); *see also United States v. Loew's, Inc.*, 371 U.S. 38, 52 (1962) (relief should be "adequate to prevent the recurrence of the illegality which brought on the given litigation."). "The relief in an antitrust case must be effective to redress the violations and to restore competition. The District Court is clothed with large discretion to fit the decree to the special needs of the individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quotations and citations omitted). "Antitrust relief should unfetter a market from anticompetitive conduct and 'pry open to competition a market that has been closed by defendants' illegal restraints.'" *Id.* at 577-78 (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir.

2001) ("remedies decree in an antitrust case must seek to unfetter a market from anticompetitive conduct, to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.") (quotations and citations omitted).

To these ends, the Court is charged with making "a reasonable judgment on the means needed to restore and encourage the competition adversely affected by" the anticompetitive conduct. *Ford Motor*, 405 U.S. at 578; *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (district court is "empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences."). A remedy is not limited simply to prohibiting conduct found to be anticompetitive. Rather, the Court has discretion to fashion a remedy directed to the effect of the anticompetitive conduct. *See Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1209 (D.C. Cir. 2004). As our circuit has concluded, "[i]f the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 486 (9th Cir. 2021) (quotations and citation omitted).[4]

### 2. UCL

The UCL provides an independent state-law basis for an injunction. "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. For Google's UCL violations, the Court may make "such orders . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." *Id.* To be sure, "[e]ven where the UCL authorizes injunctive relief pursuant to state law, a federal court must also ensure that the

---

[4] The California Cartwright Act also provides for an antitrust injunction. *See* Cal. Bus. & Prof. Code Section 16750(a). The parties have treated Epic's Cartwright Act claims as being coterminous with the Sherman Act claims for purposes of both liability and remedy, and so no additional discussion of the Cartwright Act is needed here.

6

relief comports with 'the traditional principles governing equitable remedies in federal courts.' To issue an injunction, the court must find: '(1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. Injunctive relief should be no 'more burdensome to the defendant than necessary to provide complete relief to the plaintiff[].'" *Epic Games*, 67 F.4th at 1002 (citations omitted).

Epic did not need to spell out this four-factor test in post-verdict briefing, for good reason. All of the elements were thoroughly established by the jury verdict and the evidence at trial. In pertinent part, Epic established that it suffered an irreparable injury. It was, in the language of the UCL, illegally and unfairly foreclosed from using its own in-app billing services while distributing its Fortnite app through the Google Play Store because of Google's anticompetitive practices. Epic was also illegally and unfairly foreclosed from competing in the market for Android in-app billing services for digital goods and services transactions, again because of Google's anticompetitive conduct. These harms are ongoing and cannot be made right simply by Google writing Epic a large check. Considering the balance of hardships between Epic and Google, a remedy in equity is warranted, and the public interest, which is perfectly aligned with the restoration of free and unfettered competition, would be well served by a permanent injunction.

Consequently, injunctive relief on the UCL claim is warranted, and the scope of that relief is coterminous with the injunction for the violations of the antitrust statutes. In setting the scope of the injunction, the Court has been mindful that Google must not be unduly inhibited in its ability to compete in legitimate ways by, for example, improving its products or its pricing.

### B. Geographic Scope

The initial question for the injunction is where it will apply geographically. The jury found a relevant geographic market of worldwide except for China for both of the product markets, which was a conclusion that was amply supported by the evidence at trial. *See* JMOL Order at 14-15. Even so, the permanent injunction is limited to the United States.

7

1    This is due mainly to principles of comity and deference to the rights of other countries to
2    address anticompetitive conduct under their own laws and regulations.  The record indicates that
3    enforcement agencies around the world are investigating Google's conduct with respect to the
4    Play Store.  *See*, *e.g.*, Dkt. No. 700 at 3 (granting Google's motion in limine to "exclude evidence
5    or argument re foreign proceedings and investigations"); Dkt. No. 644-2 at ECF pp. 61-68
6    (discussing foreign investigations and regulatory reports); *see also* Dkt. No. 958 (Google's
7    Objections) at 87-89 (describing extensive legal, investigative, regulatory, and other informal
8    proceedings underway in foreign jurisdictions).  It is neither the right nor the duty of a United
9    States court to preempt the enforcement powers of other nations by imposing an injunction that
10   would operate within their borders.  Consequently, the Court elects, as a prudential matter, not to
11   interfere in the administration of antitrust laws outside the United States.  *See Mujica v. AirScan*
12   *Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("International comity is a doctrine of prudential
13   abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate
14   claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction
15   under principles of international law.'") (citation omitted).

16   **C.    Specific Provisions On Anticompetitive Conduct**

17   "When it comes to fashioning an antitrust remedy, we acknowledge that caution is key."
18   *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021).  Epic's proposed injunction
19   made many good points, as did its economists in the post-verdict proceedings.  But Epic's
20   proposal also threatened a degree of judicial oversight that would amount to micromanagement of
21   Google's business.  It is not for the Court to decide the day-to-day business issues of Android app
22   distribution and in-app billing.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*
23   *LLP*, 540 U.S. 398, 415 (2004) (Court should not "assume the day-to-day controls characteristic of
24   a regulatory agency") (quotations and citation omitted).  Consequently, the Court declines to
25   impose several of the injunction terms urged by Epic.
26   Even so, important remedial measures can be imposed that do not demand excessive
27   judicial oversight.  The trial made this determination a straightforward task.  For example, in light
28   of the jury verdict and supporting evidence, it is perfectly appropriate that Google be enjoined

8

1  from sharing Play Store revenues with current or potential Android app store rivals, and from
2  imposing contractual terms that condition benefits on promises intended to guarantee Play Store
3  exclusivity. Google itself agreed with these conduct remedies. *See* Dkt. No. 1000 at 120:16-19
4  (Google's counsel agreeing that "the two prohibitions . . . that Dr. Bernheim discussed, those can
5  be a part of the injunction with certain modifications"); *id*. at 98:21-105:9 (Epic's counsel
6  discussing Dr. Bernheim's two prohibitions). The prohibitions along these lines are stated in
7  paragraphs 4 through 8 of the injunction, and they closely track the evidence of anticompetitive
8  conduct at trial as summarized in the JMOL Order. *See* Dkt. No. 984 at 17-20.

9  The revenue share and contractual prohibitions will be in effect for a period of three years.
10 This is because the provisions are designed to level the playing field for the entry and growth of
11 rivals, without burdening Google excessively. *See Mass. v. Microsoft*, 373 F.3d at 1231-32
12 (Court's task is to redress the harm done to competition "by restoring conditions in which the
13 competitive process is revived and any number of competitors may flourish (or not) based upon
14 the merits of their offerings."). As competition comes into play and the network effects that
15 Google Play unfairly enjoys are abated, Google should not be unduly constrained as a competitor.
16 Some of the prohibited conduct might be legitimate when done by a company without monopoly
17 power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (Scalia, J.,
18 dissenting) ("Where a defendant maintains substantial market power, his activities are examined
19 through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or
20 that might even be viewed as procompetitive -- can take on exclusionary connotations when
21 practiced by a monopolist.") (citation omitted); *see also McWane, Inc., v. F.T.C.*, 783 F.3d 814,
22 836-37 (11th Cir. 2015) (same).

23 The injunction also includes provisions to remediate the anticompetitive "consequences"
24 of Google's illegal conduct. *See Prof'l Eng'rs*, 435 U.S. at 697; *see also Optronic Techs*., 20
25 F.4th at 486 (Court may order relief that represents a "reasonable method of eliminating the
26 consequences of the illegal conduct."); *U.S. v. Microsoft*, 253 F.3d at 103 (injunction should "deny
27 to the defendant the fruits of its statutory violation.").
28

9

The consequences to be remediated are intertwined with the network effects of Google's dominant position in the relevant markets. The Court instructed the jury, without objection by either side, that the Google Play Store is a "two-sided platform market" that "offers products or services to two different groups who both depend on the platform to intermediate between them." Dkt. No. 850 (Final Jury Instructions) at ECF p. 22 (No. 18). For the Play Store, "developers who wish to sell their apps" are on one side of the market and "consumers that wish to buy those apps" are on the other. *Id*. "Network effects" in this context means that the greater the number of developers, the greater the number of users, and vice versa. As Google put it in an internal slide that was introduced at trial, Google understood that "Users come to Play because we have by far the most compelling catalog of apps/games," and "Developers come to Play because that's where the users are." Trial Tr. at 1211:23-1212:1.

Senior Google executive Jamie Rosenberg testified about network effects in connection with the slide deck entitled, "Amazon competitor deep dive," which was presented to Rosenberg's team in 2017. Trial Tr. at 1207:13-22; Dkt. No. 886-50 (Trial Ex. 682). The slides discussed the threat posed by the Amazon app store, a potential competitor of the Google Play Store. Trial Tr. at 1207:24-1208:1. Under the heading, "Good News," Google said that "Amazon is yet to establish critical mass" and noted that "Play benefits from network effects." *Id*. at 1211:7-22. As Google acknowledged in the slides, "Amazon will struggle to break those network effects": "Users won't go to Amazon because their catalog of apps/games is very limited"; and "Developers won't focus on Amazon because they don't have users." Trial Tr. at 1212:5-9. Other evidence along these lines was also presented to the jury.

The picture drawn by this evidence is telling. Even a corporate behemoth like Amazon could not compete with the Google Play Store due to network effects. Consequently, the injunction must overcome the effects by providing access to the catalog of Play Store apps for a period of time sufficient to give rival stores a fair opportunity to establish themselves. This will be three years on the terms stated in the injunction.

Google's main objection to catalog access is that the anticompetitive conduct found by the jury was not proven to be a significant cause of these network effects. *See* Dkt. No. 1000 at 122:9-

10

11. Google says that any network effects in the relevant market are attributable to its role as a first mover in the markets, and so are not subject to remediation.

The point is not well taken. The network effects presented during trial are a feature of any two-sided market such as the Google Play Store. Although Google may legitimately claim some early mover advantage, it was not entitled to maintain and magnify network effects, and thereby entrench its dominant position, through the anticompetitive conduct found by the jury. It bears emphasis that Rosenberg's testimony and the Amazon slides concerned events in 2017, well after the original launch of the Play Store and the start of the relevant time period in August 2016. Eight months into the time period in which Google engaged in anticompetitive conduct, it was well aware that "to get more developers, Amazon needs more users." *Id*. at 1213:18-20. This frank admission was made precisely while Google was erecting barriers to insulate the Play Store from competition.

Consequently, the salient question is not whether Google's anticompetitive conduct caused the network effects. Rather, the question is whether Google engaged in anticompetitive conduct that had the consequence of entrenching and maintaining its monopoly power in a two-sided market. The jury answered that question in the affirmative. In effect, Google unfairly enhanced its network effects in a way that would not have happened but for its anticompetitive conduct.

This is why the injunction must not only prohibit the specific anticompetitive conduct that Google engaged in, but also undo the consequence of Google's ill-gotten gains. As the FTC aptly said in an amicus brief, "[n]etwork effects can confer a powerful incumbency advantage to dominant digital platforms, creating barriers to entry and to competition. . . . The incumbent platform operator -- which had been motivated to attract both users and developers by offering innovative, low-cost services before establishing dominance -- may become less incentivized to compete after it achieves market power and builds a moat insulating itself from competition." Dkt. No. 686-1 at 9. The injunction must bridge the moat.

Even so, the catalog access provision is narrowly tailored to remediate the unfairly enhanced network effects Google reaped without unfairly penalizing its success as a first mover. To that end, if a rival app store does not have a relationship with a developer and so cannot fulfill

11

a download request by a user, the rival will direct the download request to the Google Play Store. In that case, the Google Play Store will fulfill the download request and keep the associated revenue, if any, and the download will be made pursuant to the Google Play Store's policies. All that the catalog access does is level the playing field for a discrete period of time so that rival app stores have a fighting chance of getting off the ground despite network effects and the disadvantage of offering a "catalog of app/games" that is too "limited" to attract users and developers in a two-sided market. Trial Tr. at 1212:6-7.

So too for the injunction provision that prevents Google from excluding rival app stores from the Play Store. Witness Rosenberg testified that another barrier faced by the Amazon app store was a "significant hurdle to switching to Amazon APK." Trial Tr. at 1214:18. This referred to the fact that, to get the Amazon store on their Android device, a user would need to "sideload" it (*i.e.*, download it from a website or platform other than the Play Store), which subjected the user to a "quite complex" process imposed by Google that "involve[d] 14 steps." *Id*. at 1214:21-1216:22. Rosenberg agreed that "Google recognized at the time that as a result of the unknown source warning [resulting in at least 14 steps], the hurdles [to download] were too high for most users." *Id*. at 1216:23-1217:2. Rosenberg also agreed that, because the "Google Play Store is preloaded on the home screen of virtually every Android phone through the MADA," and rival stores were excluded, a user trying to download a rival app store outside the Play Store would almost always face the barrier of the "unknown sources install flow." *Id*. at 1206:9-22. Other witnesses at trial including other Google executives testified that the "friction" Google built into acquiring apps outside the Play Store was highly effective in discouraging users from even trying. *See*, *e.g.*, Trial Tr. at 762:20-763:2, 1361:11-13. So for a limited period of time, the injunction will lower the barriers for rival app stores to get onto users' phones by enjoining Google from prohibiting the presence of rival app stores in the Google Play Store.

As Google has suggested, there are potential security and technical risks involved in making third-party apps available, including rival app stores. The Court is in no position to anticipate what those might be, or how to solve them. Consequently, Google will have room to engage in its normal security and safety processes. To the extent Google imposes requirements

along these lines on rival app stores, it will be bear the burden when challenged of establishing that the requirements were strictly necessary to achieve safety and security for users and developers.

Google has said on many occasions that catalog access and hosting rival store apps amount to forcing it to do business with rivals, in contradiction of "the general rule" that "even monopolists 'are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'" *Viamedia, Inc., v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (quoting *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)). Not so. The Court has fully agreed for the duration of this case that a refusal to deal with a potential rival may not be the basis of antitrust liability. The jury was expressly instructed on that point. Dkt. No. 850 at ECF p. 33 (No. 24). Nothing in the verdict or the evidence at trial condemned Google for not extending a helping hand to a rival.

The problem for Google is that the case is now in the remedy phase, not the liability phase. The question at hand is not whether Google violated the antitrust laws by failing to aid rivals, but what measures are necessary to restore fair competition in the face of the barriers found by the jury. The jury heard abundant evidence that Google used a variety of means to ensure that the Play Store was the only fully developed Android app marketplace for users and developers. This evidence included the MADA and RSA agreements and Google's conditioning of access by OEMs to Google's Android services on preinstallation of the Google Play Store on the home screen of Android devices. The use of burdensome "scare screens" to discourage sideloading of apps is another example of evidence heard by the jury. Requiring Google to allow other app stores to be distributed through the Play Store for a discrete period is a modest step to correct the consequence of unlawfully preventing rival stores from reaching users and developers.

In this context, Google's frequent mentions of *Trinko* are misplaced. The Supreme Court affirmed the district court's dismissal of a complaint alleging monopolization under Section 2 against Verizon for not sharing access to its telephone network with competitors as required by Congress in the Telecommunications Act of 1996. *Trinko*, 540 U.S. at 401-02. The Supreme Court declined to extend the reach of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

1   585 (1985), with the famous remark that "*Aspen Skiing* is at or near the outer boundary of § 2

2   liability." *Trinko*, 540 U.S. at 409. But the Court also re-affirmed the holding of *Aspen Skiing*

3   that "[t]he high value that we have placed on the right to refuse to deal with other firms does not

4   mean that the right is unqualified." *Id*. at 408 (quoting *Aspen Skiing*, 472 U.S. at 601). The Court

5   added that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute

6   anticompetitive conduct and violate § 2." *Id*.

7   The Court ultimately determined that the situation in *Trinko* did not rise to that level based

8   on the specific characteristics of the telecom industry. As the Court instructed, "[a]ntitrust

9   analysis must always be attuned to the particular structure and circumstances of the industry at

10  issue." *Id*. at 411. A factor of "particular importance" was that Congress had already created a

11  regulatory structure in the Telecommunications Act "designed to deter and remedy

12  anticompetitive harm." *Id*. at 412. The protective hand of such regulation meant that any

13  additional benefit of antitrust enforcement would be "small," and that the "'regulation

14  significantly diminishes the likelihood of major antitrust harm.'" *Id*. (quoting *Concord v. Boston*

15  *Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990)). The Court also noted that the complaint did not

16  allege facts indicating that Verizon's conduct was prompted by "anticompetitive malice" or

17  "dreams of monopoly." *Id*. at 409.

18  None of this has anything to do with the injunction here. As discussed, this is not a case in

19  which a refusal to deal with a rival was the basis of Section 2 liability. The facts, markets, and

20  regulatory environment here are also starkly different. Google seems to find a "vibe" in *Trinko* to

21  the effect that the remedy for a monopolist's anticompetitive conduct cannot involve affirmative

22  conduct with respect to a rival. *Trinko* says nothing of the sort, and Google's frequent mention of

23  the case is simply a red herring.

24  Google also overlooks the fact that an antitrust remedy may trump what might be deemed

25  traditional boundaries of property rights. "Even constitutionally protected property rights such as

26  patents may not be used as levers for obtaining objectives proscribed by the antitrust laws." *Ford*

27  *Motor*, 405 U.S. at 576 n.11. Section 16 "states no restrictions or exceptions to the forms of

28  injunctive relief a private plaintiff may seek, or that a court may order. Rather, the statutory

language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." *California v. American Stores Co.*, 495 U.S. 271, 281 (1990) (cleaned up). Consequently, the "purpose of relief in an antitrust case is 'so far as practicable, (to) cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.' Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (U.S. 1973) (citations omitted). The Court may "consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations. [¶] The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 697-98. It is "entirely appropriate" for an injunction to "go[] beyond a simple proscription against the precise conduct previously pursued." *Id*. at 698. If a well-grounded fear arises that the injunction is too broad, "the burden is upon the proved transgressor to bring any proper claims for relief to the court's attention." *Id*. (quotations omitted).

Our circuit's conclusions in *Optronic Technologies* further undermine Google's position. There, the jury "properly found that Orion had been forced to pay inflated prices as a result of the market power exerted by Sunny and Synta following the unlawful Meade acquisition," and so ordering Sunny to supply Orion on non-discriminatory terms was a "reasonable method of remedying the harm to [Orion]." *Optronic Techs.*, 20 F.4th at 486. This was true because the district court "can order conduct to 'avoid a recurrence of the [antitrust] violation and to eliminate its consequences.'" *Id*. (quoting *Prof'l Eng'rs*, 435 U.S. at 698). The same goes here.

During closing arguments on the remedy, Google also relied on *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), stating that "in that case, the Ninth Circuit said that the district court had erred when it ordered Kodak to sell parts that were manufactured by someone else." Dkt. No. 1000 at 127:21-25. In Google's view, "it's the same thing here. It's legal error to order Play to have to distribute someone else's app store. Same reasoning as in *Kodak*." *Id*. at 128:1-3.

15

1    This is an odd position to take. The circuit's reasoning in *Kodak* had nothing to do with
2    Kodak's freedom not to deal with its rivals. The circuit modified the portion of the district court's
3    injunction that "require[d] Kodak to sell all parts for Kodak equipment, whether or not Kodak
4    manufactures those parts." *Kodak*, 125 F.3d at 1225. The circuit believed that the "'all parts'
5    requirement creates barriers for non-Kodak original-equipment manufacturers by requiring them
6    to price replacement parts at levels necessary to attract ISOs away from Kodak's parts counter. It
7    also unnecessarily entrenches Kodak as the only parts supplier to ISOs." *Id*. As was the case with
8    Google's reliance on *Trinko*, none of this bears on the facts and issues in this case.

9    As discussed, the Court has no intention of running Google's business as a "central
10   planner." *Trinko*, 540 U.S. at 408; *see also* Dkt. No. 1000 at 127:8-10 ("I have no intention of
11   having a highly detailed decree that ends up impairing competition or micromanaging as a central
12   planner."). The terms of the injunction are plainly worded and largely self-executing, and will not
13   embroil the Court in day-to-day business operations. To the extent technical issues about security
14   and the like come up, the injunction establishes a Technical Committee made up of one person
15   selected by each side, plus a third person to be selected by the parties' two nominees, to resolve
16   the issue in the first instance. The Court will act only as needed to resolve issues that cannot be
17   resolved by the committee.

18   **D.     Tying**

19   Overall, the injunction breaks the illegal tie by prohibiting Google from requiring that
20   developers use Google Play Billing in apps distributed on the Google Play Store. Epic asked the
21   Court to also prohibit what it called an "economic" tie, *see*, *e.g.*, Dkt. No. 977 at 92:23-93:1,
22   which would have ensnared the Court in a detailed rate-setting exercise beyond its proper role.
23   *See Town of Concord, Mass. v. Boston Edison Co*., 915 F.2d 17, 25 (1st Cir. 1990). There is no
24   need for the Court to take on that task because the remedy for the monopoly violation under
25   Section 2 will also resolve the tying violation found by the jury. The restoration of free
26   competition in the relevant markets is the best medicine for correcting fees and prices.

27   The Court has addressed Google's main contentions with respect to the injunction. As
28   noted, Google's modus operandi in this case has been to deluge the Court in an ocean of

16

1  comments, many of which were cursory and undeveloped.  The Court declines to take up Google's
2  objections that were not fully developed in their presentation to the Court.

## CONCLUSION

A permanent injunction will be entered against Google for Epic's Sherman Act, Cartwright Act, and UCL claims.  The effective date of the injunction is November 1, 2024, to give Google time to bring its current agreements and practices into compliance.  After Epic's attorney's fees and costs are awarded, *see* 15 U.S.C. § 26, judgment will be entered for Epic on the Sherman Act, Cartwright Act, and UCL claims, and this MDL member case, *Epic Games, Inc. v. Google LLC et al.*, No. 20-cv-05671-JD, will be closed.

**IT IS SO ORDERED.**

Dated:  October 7, 2024

JAMES DONATO
United States District Judge