Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**OPPOSITION TO GOOGLE'S AND SPOTIFY'S ADMINISTRATIVE MOTIONS TO SEAL TRIAL EXHIBITS AND PORTIONS OF DEPOSITION OF SANDRA ALZETTA** |

1    Plaintiff Epic Games, Inc. ("Epic") submits this Opposition to Google and Spotify's Motion
2 to Seal Trial Exhibits and Portions of Deposition of Sandra Alzetta. This Court should deny
3 Google's attempts to hide highly relevant trial evidence from the public.
4    In March 2022, Google and Spotify announced a deal that would allow Spotify to offer its
5 own payment solution alongside Google Play Billing in its Android app.[1] Google has described the
6 agreement as a "pilot" for "User Choice Billing", but that label is inaccurate and misleading.
7 Google's "User Choice Billing" pilot program allows certain non-game developers to utilize an
8 alternative payment solution alongside Google Play.[2] But, so called "User Choice Billing"
9 introduces a new 26% fee on in-app purchases Google does not handle, making any choice illusory.
10 Spotify's agreement, on the other hand, is very different. ███████████████████
11 ████████████████████████████████████████████████████
12 ███████ to Google when users choose Spotify's in-app payment solution (and Google is thus
13 not involved in the transaction at all). And Spotify pays an ████████████████████
14 ██████ when users choose to use Google Play Billing. Google claims those terms reflect the
15 ████████████████ of Google Play Billing, but they are clearly far from Google's typical
16 model—or the terms of the User Choice Billing program Google offers to a subset of developers.
17    Google and Spotify now seek to seal their entire agreement and prevent any discussion of
18 the terms of the agreement in open court.[3] This request should be denied. Google and Spotify have
19 failed to explain why disclosure of the terms of the agreement would result in any harm to either of
20 their businesses. Negotiations are not ongoing: the key terms of the Spotify agreement were
21 finalized over a year ago. And neither Google nor Spotify has articulated how disclosure of these
22 terms would disadvantage them in relation to third parties. In reality, Google seeks to conceal from

---

[1] Spotify and Google Begin Rolling Out User Choice Billing — Spotify, (Nov. 10, 2022), https://newsroom.spotify.com/2022-1-10/spotify-and-google-begin-rolling-out-user

[2] Exploring User Choice Billing with First Innovation Partner Spotify, (Mar. 23, 2022), https://android-developers.googleblog.com/2022/03/user-choice-billing.html; Continuing Our Commitment to User Choice Billing, (Nov. 10, 2022), https://android-developers.googleblog.com/2022/11/continuing-our-commitment-to-user-choice-billing.html.

[3] Spotify has also requested to seal some information related to internal data analysis.

the public core evidence bearing on its anticompetitive conduct, which will form an important part of the body of evidence on which the jury will reach its decision.

**DISCUSSION**

As this Court has noted, "[a] hallmark of our federal judiciary is the 'strong presumption in favor of access to court records'". (MDL Dkt. No. 79 at 1.) Moreover, where "the material to be sealed goes to the very heart of the suit, the public interest in access is especially great". *Tevra Brands LLC v. Bayer Healthcare LLC*, No. 19-cv-4312, 2020 WL 1245352, at *2 (N.D. Cal. Mar. 16, 2020). That is even more true in a case alleging violations of the antitrust laws, "which are matters where the public interest is particularly strong". (MDL Dkt. No. 79). Thus, the law requires that parties seeking to seal court records present "compelling reasons" that are "supported by specific factual findings that outweigh the general history of access and public policies favoring disclosure". *Kamakana v. Cty & Cnty. Of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination or exposure to future litigation will not, without more, compel the court to seal its records". *Id.*

The terms of Google's agreement with Spotify are undoubtedly relevant to this litigation and of public importance. One of Google's core arguments is that its revenue share of up to 30% reflects the value Google Play provides to developers, and that its payment policy is a necessary part of its business model. The Spotify agreement shows that Google's revenue share and payments policy are arbitrary and allow Google to use its monopoly power to extract exorbitant profits from developers. Epic has also shown that one of Google's strategies is to pay off "agitators", like Spotify, that pose a risk to its business model. (Trial Tr. 419:4-19.) The terms that Google provided to Spotify are an example of the great lengths Google has gone through and the large payouts it is willing to engage in, to prevent competition. Google should not be allowed to use the sealing process to conceal the details of its anticompetitive conduct from the public.

Google's and Spotify's arguments fall far short of demonstrating the compelling reasons needed keep the terms of the agreement from the public. *First*, Google and Spotify argue that disclosure of the information will impair future negotiations with other parties. (MDL Dkt. Nos. 749 at 2, 750 at 1.) But neither party has provided any example of how it would be competitively

disadvantaged by disclosure of the rate that Spotify pays to Google.  (*See* Trial Tr. 684:22-24) ("I don't see much room for being better than this, so I'm not hearing a reasonable explanation about how this is in any way going to disadvantage Spotify.")  The cases Spotify cites to support its position arise in the context of disclosure of pricing and other terms in *licensing agreements*, which are fundamentally different from the agreement here.[4]  As this Court has stated, the Spotify agreement "has none of the competitive disadvantages of a license." (Trial Tr. 686:2-11.)  With a license, the downstream licensees compete based on the price they pay, such that the disclosure of that price bears directly on competition.  Similarly, for the licensor, the knowledge of the price paid by licensee A would directly affect the price demanded by licensee B.  Here, the agreement is, as counsel acknowledges, not an "off-the-shelf" agreement.  (Trial Tr. 686:12-21).  It is bespoke and, unlike a license agreement, there is no direct bearing on a parallel contract.

*Second*, Spotify argues that disclosure will harm its ongoing negotiations with Google.  But there are no ongoing negotiations on the rate Spotify will pay to Google.  Spotify has locked in its price with Google.  "Blanket claims" by Google and Spotify "that their competitive standing[s] could be significantly harmed" do not meet their high burden.  *Tevra*, 2020 WL 1245352, at *3.

*Third*, Spotify argues that the deal terms "unquestionably constitute a trade secret".  (MDL Dkt. No. 749 at 3.)  The rate Spotify pays to Google for payment processing is not a formula, pattern or other compilation of information like a trade secret.  The Court has already rejected that argument.  (*See* Trial Tr. 683:14-19) ("A trade secret is something that has value because it's not known and it can't be something in a contract, so it's not a trade secret.")

Google and Spotify fail to allege any specific and compelling reasons to seal the information, and thus, their requests should be denied.

---

[4] Only two cases cited are outside of a license agreement.  Both are inapposite.  *First*, in *Asetek Holdings, Inc. v. CMI USA, Inc.*, the plaintiff sought to seal sales relationship agreements, because, in addition to being commercially sensitive the disclosure of the agreements would constitute a breach of the agreements.  2014 WL 12644231, at *2 (N.D. Cal. Sept. 23, 2014).  The court relied on both reasons when it granted the request to seal.  *Id.*  There has been no similar assertion here.  *Second*, in *Philips v. Ford Motor Company*, Ford sought to seal pricing information related to "pricing and decision costs" that could reveal its "motives, goals, and strategies with respect to automobile design and development".  2016 WL 7374214, at *4 (N.D. Cal. Dec. 20, 2016).  No similar argument regarding the implication of the pricing is made here.

- 3 -
OPPOSITION TO GOOGLE'S AND SPOTIFY'S ADMINISTRATIVE MOTIONS TO SEAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD

| | | |
|---|---|---|
| 1 | Dated: November 10, 2023 | CRAVATH, SWAINE & MOORE LLP |

Dated: November 10, 2023

CRAVATH, SWAINE & MOORE LLP
   Christine Varney *(pro hac vice)*
   Gary A. Bornstein *(pro hac vice)*
   Timothy G. Cameron *(pro hac vice)*
   Yonatan Even *(pro hac vice)*
   Lauren A. Moskowitz *(pro hac vice)*
   Justin C. Clarke *(pro hac vice)*
   Michael J. Zaken *(pro hac vice)*
   M. Brent Byars *(pro hac vice)*

FAEGRE DRINKER BIDDLE & REATH LLP
   Paul J. Riehle (SBN 115199)

Respectfully submitted,

By: /s/ *Gary A. Bornstein*
   Gary A. Bornstein

*Counsel for Plaintiff Epic Games, Inc.*