Renata B. Hesse (SBN 148425)
(hesser@sullcrom.com)
Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California  94301
Telephone:     (650) 461-5600
Facsimile:      (650) 461-5700

Shane M. Palmer (SBN 308033)
(palmersh@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:     (212) 558-4000
Facsimile:      (212) 558-3588

*Attorneys for Non-Party Spotify USA Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc.* v. *Google LLC*, No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**DECLARATION OF SANDRA ALZETTA PURSUANT TO CIVIL LOCAL RULE 79-5(f)(3) AND IN RESPONSE TO EPIC'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER ANOTHER PARTY'S MATERIAL SHOULD BE SEALED (MDL DKT. NO. 775)**<br><br>Judge:  Hon. James Donato |

I, Sandra Alzetta, declare as follows:

1. I am a Vice President and the Global Head of Commerce and Customer Service at Spotify. I submit this declaration pursuant to Local Civil Rule 79-5(f)(3) in support of Epic Games, Inc.'s ("Epic") Administrative Motion to Consider Whether Another Party's Material Should Be Sealed (MDL Dkt. No. 775), which was filed on November 10, 2023.

2. I first began working at Spotify in January 2019, as Vice President, Global Head of Payments. I have been in my current role as Vice President, Global Head of Commerce and Customer Service, since December 2022. My responsibilities in that role include managing Spotify's current payment methods, developing strategy with respect to future payment methods, and negotiating agreements with third parties. I can testify competently to the facts set forth in this declaration based on personal knowledge of those facts or on conversations I had with knowledgeable individuals at Spotify.

3. Spotify operates the world's most popular audio streaming subscription service. Spotify's streaming service first launched in Sweden in 2008 and launched in the United States in 2011. With a presence in more than 180 countries and territories, Spotify's platform includes more than 574 million monthly active users, including 226 million subscribers to its Premium service as of September 30, 2023.

4. On November 10, 2023, Epic filed an Opposition (MDL Dkt. No. 774) to Spotify's Administrative Motion to Seal Portions of the Deposition of Sandra Alzetta and Exhibits Thereto (MDL Dkt. No. 749) ("Spotify's Motion"). Certain portions of Epic's Opposition were redacted in the version that was filed on the public docket. At Spotify's request, Epic provided an unredacted copy of the Opposition, which I have reviewed.

5. The redacted portions of Epic's Opposition describe certain terms of Spotify's carefully negotiated agreement with Google regarding User Choice Billing and the Google Play Store. That agreement is one of the documents that Spotify sought to seal in Spotify's Motion; I understand that the parties have designated this agreement at trial as Exhibit 1532.

6. Exhibit 1532 was the product of years of discussions between Spotify and Google, and Spotify personnel invested thousands of hours discussing and analyzing the terms of

a potential agreement with Google. And implementing the payment-related flows contemplated by the agreement required both Google and Spotify to make significant investments in research and development. To this day, Spotify and Google continue to negotiate regarding the implementation of certain aspects of the agreement, including the payment-related terms that are described in Epic's Opposition.

7. The terms of Exhibit 1532—which was the first agreement of its kind, as Spotify was Google's first User Choice Billing partner—are highly confidential and commercially sensitive, and Spotify would be competitively harmed in its business by the disclosure of those terms through any public filing. Public disclosure of the terms of the agreement would disadvantage Spotify in its future negotiations with other parties, undercut deal terms, drive up the prices Spotify would pay (consequently impacting its revenues), and generally harm Spotify's ability to compete and grow its business. To protect the confidentiality of the agreement's terms, Section 7 of the agreement contains a confidentiality provision making its terms subject to a Non-Disclosure Agreement between the parties, and it prohibits Spotify and Google from making public statements about the UCB agreement without the other's written approval.

8. The market for audio and music streaming apps is highly competitive. Because Spotify does not directly control a widely-used channel for distributing its audio streaming app to a large number of users, our business model not only depends on our ability to acquire content or negotiate licenses with content rights holders on favorable terms, but also requires us to simultaneously negotiate with distribution partners to keep distribution costs as low as possible. Furthermore, Spotify strives to offer its audio streaming service on every type of device and on every platform where its users are present. As such, Spotify has thousands of agreements with payment partners and distribution partners (including original equipment manufacturers such as mobile, TV, gaming, and auto partners, as well as app providers and commercial partners), and it is continuously negotiating and renegotiating with those partners to ensure that its audio streaming service is available wherever its users are, on terms that are favorable for Spotify.

9. If the terms of Spotify's User Choice Billing agreement with Google were publicly disclosed, Spotify's existing and/or potential partners could use that information in negotiations to extract terms and conditions from Spotify that they may not have otherwise been able to. Spotify's partners may also make demands in deal negotiations that Spotify cannot agree to, which will cause harm to Spotify and to consumers if we cannot conclude those deals. Moreover, Spotify's audio-streaming competitors could use the information to inform their own business strategies, including with respect to product strategy and distribution in competition against Spotify. Spotify's competitors could also demand the same or similar terms from their own distribution partners, diminishing the competitive advantage that Spotify was able to obtain through its years-long relationship with Google and the tens of thousands of hours that Spotify has invested in negotiating and implementing the User Choice Billing agreement. For those reasons, Spotify's business model depends on the terms of its distribution agreements such as this one remaining confidential.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this November 17, 2023 in London, United Kingdom.

/s/ Sandra Alzetta
Sandra Alzetta

**ATTESTATION**

I, Shane M. Palmer, am the ECF User whose ID and password are being used to file this document with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered counsel. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories concur with this filing.

Dated: November 17, 2023

/s/ Shane M. Palmer
Shane M. Palmer

-3-