Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE &
REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC et al.*,
Case No. 3:20-cv-05671-JD

Case No. 3:21-md-02981-JD

**JOINT SET OF PROPOSED
FINAL JURY INSTRUCTIONS
AND OBJECTIONS**

Judge:  Hon. James Donato
Trial Date:  November 6, 2023
Time:  9:00 am
Place:  Courtroom 11, 19th Floor

# TABLE OF CONTENTS

1

2

**Page**

Stipulated Instruction No. 1 Re DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW.............1

Stipulated Instruction No. 2 Re CLAIMS AND DEFENSES ..................................................2

Stipulated Instruction No. 3 Re BURDEN OF PROOF – PREPONDERANCE OF THE
    EVIDENCE............................................................................................................3

Stipulated Instruction No. 4 Re CORPORATIONS - FAIR TREATMENT ...........................4

Stipulated Instruction No. 5 Re WHAT IS EVIDENCE .....................................................5

Stipulated Instruction No. 6 Re WHAT IS NOT EVIDENCE ..............................................6

Stipulated Instruction No. 7 Re DIRECT AND CIRCUMSTANTIAL EVIDENCE ...................7

Stipulated Instruction No. 8 Re DEPOSITION IN LIEU OF LIVE TESTIMONY ..................8

Stipulated Instruction No. 9 Re RULING ON OBJECTIONS................................................9

Stipulated Instruction No. 10 Re CREDIBILITY OF WITNESSES ....................................10

Disputed Instruction No. 11  CHAT SPOLIATION ADVERSE INFERENCE INSTRUCTION .......11

Stipulated Instruction No. 12 Re EXPERT OPINION .......................................................12

Stipulated Instruction No. 13 Re STIPULATIONS OF FACT ............................................13

Stipulated Instruction No. 14 Re CHARTS AND SUMMARIES .........................................15

Disputed Instruction No. 15  ANTITRUST LAWS—PURPOSE  Offered by Plaintiff .................16

Disputed Instruction No. 15 Re ANTITRUST LAWS—PURPOSE  Offered by Defendants..............17

Plaintiff's Argument Re Disputed Instruction No. 15 ANTITRUST LAWS—PURPOSE .................18

Defendants' Argument Re Disputed Instruction No. 15 ANTITRUST LAWS—PURPOSE.............20

Disputed Instruction No. 16 Re SECTION 2 OF THE SHERMAN ACT –
    MONOPOLIZATION – ELEMENTS  Offered by Plaintiff ......................................21

Disputed Instruction No. 16 Re SECTION 2 OF THE SHERMAN ACT –
    MONOPOLIZATION – ELEMENTS Offered by Defendants .................................22

Plaintiff's Argument Re Disputed Instruction No. 16 SECTION 2 OF THE SHERMAN ACT –
    MONOPOLIZATION – ELEMENTS........................................................................23

Defendants' Argument Re Disputed Instruction No. 16 SECTION 2 OF THE SHERMAN ACT
    – MONOPOLIZATION – ELEMENTS.....................................................................25

Disputed Instruction No. 17 Re MONOPOLIZATION – MONOPOLY POWER – DEFINED
    Offered by Plaintiff ..............................................................................................27

Disputed Instruction No. 17 Re MONOPOLIZATION – MONOPOLY POWER – DEFINED
    Offered by Defendants ........................................................................................28

Plaintiff's Argument Re Disputed Instruction No. 17 MONOPOLIZATION – MONOPOLY
    POWER – DEFINED .............................................................................................29

Defendants' Argument Re Disputed Instruction No. 17 MONOPOLIZATION – MONOPOLY
    POWER – DEFINED .............................................................................................31

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Disputed Instruction No. 18 Re MONOPOLIZATION – RELEVANT PRODUCT MARKET
        Offered by Plaintiff ............................................................................................ 32

Disputed Instruction No. 18 Re MONOPOLIZATION – RELEVANT PRODUCT MARKET
        Offered by Defendants ........................................................................................ 33

Plaintiff's Argument Re Disputed Instruction No. 18 MONOPOLIZATION – RELEVANT
        PRODUCT MARKET ........................................................................................... 35

Defendants' Argument Re Disputed Instruction No. 18 MONOPOLIZATION – RELEVANT
        PRODUCT MARKET ........................................................................................... 37

Disputed Instruction No. 19 Re RELEVANT PRODUCT MARKET – AFTERMARKETS
        Offered by Plaintiff ............................................................................................ 39

Disputed Instruction No. 19 Re RELEVANT PRODUCT MARKET – AFTERMARKETS
        Offered by Defendants ........................................................................................ 40

Plaintiff's Argument Re Disputed Instruction No. 19 RELEVANT PRODUCT MARKET –
        AFTERMARKETS ................................................................................................ 41

Defendants' Argument Re Disputed Instruction No. 19 RELEVANT PRODUCT MARKET –
        AFTERMARKETS ................................................................................................ 43

Disputed Instruction No. 20 Re RELEVANT PRODUCT MARKET –SUPPLY
        SUBSTITUTABILITY  Offered by Plaintiff ......................................................... 45

Disputed Instruction No. 20 Re RELEVANT PRODUCT MARKET –SUPPLY
        SUBSTITUTABILITY  Offered by Defendants ..................................................... 46

Plaintiff's Argument Re Disputed Instruction No. 20 RELEVANT PRODUCT MARKET –
        SUPPLY SUBSTITUTABILITY ........................................................................... 47

Defendants' Argument Re Disputed Instruction No. 20 RELEVANT PRODUCT MARKET –
        SUPPLY SUBSTITUTABILITY ........................................................................... 49

Disputed Instruction No. 21 Re RELEVANT GEOGRAPHIC MARKET Offered by Plaintiff ........... 50

Disputed Instruction No. 21  RELEVANT GEOGRAPHIC MARKET  Offered by Defendants ......... 51

Plaintiffs' Argument Re Disputed Instruction No. 21 RELEVANT GEOGRAPHIC MARKET ......... 52

Defendants' Argument Re Disputed Instruction No. 21 RELEVANT GEOGRAPHIC
        MARKET ............................................................................................................. 54

Disputed Instruction No. 22 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY
        POWER – TYPES OF PROOF Offered by Plaintiff .............................................. 55

Disputed Instruction No. 22 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY
        POWER – TYPES OF PROOF Offered by Defendants .......................................... 56

Plaintiff's Argument Re Disputed Instruction No. 22 MONOPOLIZATION – EXISTENCE OF
        MONOPOLY POWER – TYPES OF PROOF ........................................................ 57

Defendants' Argument Re Disputed Instruction No. 22 MONOPOLIZATION – EXISTENCE
        OF MONOPOLY POWER – TYPES OF PROOF ................................................... 59

Disputed Instruction No. 23 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY
        POWER – DIRECT PROOF  Offered by Plaintiff .................................................. 60

Disputed Instruction No. 23 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF  Offered by Defendants .................................. 62

Plaintiff's Argument Re Disputed Instruction No. 23 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF ................................ 64

Defendants' Argument Re Disputed Instruction No. 23 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF ......................... 66

Disputed Instruction No. 24 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF  Offered by Plaintiff .................................. 68

Disputed Instruction No. 24 Re MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF  Offered by Defendants ............................ 71

Plaintiff's Argument Re Disputed Instruction No. 24 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF ...................... 73

Defendants' Argument Re Disputed Instruction No. 24 MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF ....................... 75

Disputed Instruction No. 25 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS  Offered by Plaintiff .................................................. 77

Disputed Instruction No. 25 Re MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS Offered by Defendants ................................................ 80

Plaintiffs' Argument Re Disputed Instruction No. 25 MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ........................................................ 84

Plaintiffs' Argument Re Inclusion of Section 1 Instructions in Disputed Instruction No. 25 MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ......................................... 86

Defendants' Argument Re Disputed Instruction No. 25 MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY POWER THROUGH ANTICOMPETITIVE ACTS ........................................................ 88

Disputed Instruction No. 26 MONOPOLIZATION – NO DUTY TO DEAL Offered by Plaintiff ............................................................... 90

Disputed Instruction No. 26 MONOPOLIZATION – NO DUTY TO DEAL Offered by Defendants ............................................................ 91

Plaintiff's Argument Re: Disputed Instruction No. 26 MONOPOLIZATION – NO DUTY TO DEAL ............................................................ 92

Defendants' Argument Re: Disputed Instruction No. 26 MONOPOLIZATION – NO DUTY TO DEAL .......................................................... 94

Stipulated Instruction No. 27 Re SECTION 1 – RESTRAINT OF TRADE ........................ 95

Disputed Instruction No. 28 Re SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE  Offered by Plaintiff ...................... 96

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Disputed Instruction No. 28 Re SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE  Offered by Defendants .................................................. 98

Plaintiff's Argument Re Disputed Instruction No. 28 SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE .................................................. 99

Defendants' Argument Re Disputed Instruction No. 28 SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE ...................................... 101

Disputed Instruction No. 29 Re AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE  Offered by Plaintiff .................................................. 103

Disputed Instruction No. 29 Re AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE  Offered by Defendants .................................................. 105

Plaintiff's Argument Re Disputed Instruction No. 29 AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE .................................................. 106

Defendants' Argument Re Disputed Instruction No. 29 AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE .................................................. 107

Disputed Instruction No. 30 Re GOOD INTENT NOT A DEFENSE  Offered by Plaintiff .............. 110

Disputed Instruction No. 30 Re GOOD INTENT NOT A DEFENSE  Offered by Defendants .......... 111

Plaintiff's Argument Re Disputed Instruction No. 30 GOOD INTENT NOT A DEFENSE.............. 112

Defendants' Argument Re Disputed Instruction No. 30 GOOD INTENT NOT A DEFENSE .......... 114

Disputed Instruction No. 31 Re RULE OF REASON – SECTION ONE CLAIMS  Offered by Plaintiff .................................................. 115

Disputed Instruction No. 31 Re RULE OF REASON – SECTION ONE CLAIMS  Offered by Defendants .................................................. 116

Plaintiff's Argument Re Disputed Instruction No. 31 RULE OF REASON - SECTION ONE CLAIMS .................................................. 118

Defendants' Argument Re Disputed Instruction No. 31 RULE OF REASON - SECTION ONE CLAIMS .................................................. 120

Disputed Instruction No. 32 Re RULE OF REASON: PROOF OF COMPETITIVE HARM  Offered by Plaintiff .................................................. 122

Disputed Instruction No. 32 Re RULE OF REASON: PROOF OF COMPETITIVE HARM  Offered by Defendants .................................................. 124

Plaintiff's Argument Re Disputed Instruction No. 32 RULE OF REASON: PROOF OF COMPETITIVE HARM .................................................. 125

Defendants' Argument Re Disputed Instruction No. 32 RULE OF REASON: PROOF OF COMPETITIVE HARM .................................................. 127

Disputed Instruction No. 33 Re RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS  Offered by Plaintiff .................................................. 129

Disputed Instruction No. 33 Re RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS  Offered by Defendants .................................................. 130

Plaintiff's Argument Re Disputed Instruction No. 33 RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS ............................................................................. 131

Defendants' Argument Re Disputed Instruction No. 33 RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS ............................................................................. 133

Disputed Instruction No. 34 Re RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS  Offered by Plaintiff ................................................................ 135

Disputed Instruction No. 34 Re RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS  Offered by Defendants .......................................................... 136

Plaintiff's Argument Re Disputed Instruction No. 34 RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS ............................................................... 137

Defendants' Argument Re Disputed Instruction No. 34 RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS ............................................................... 139

Stipulated Instruction No. 35 Re INTRODUCTION TO TYING ........................................ 140

Stipulated Instruction No. 36 Re RATIONALE FOR PROHIBITION OF TYING ARRANGEMENTS ..................................................................................... 141

Disputed Instruction No. 37 Re ELEMENTS – PER SE ILLEGAL TYING  Offered by Plaintiff ...................................................................................... 142

Disputed Instruction No. 37 Re ELEMENTS – PER SE ILLEGAL TYING  Offered by Defendants ............................................................................ 143

Plaintiff's Argument Re Disputed Instruction No. 37 ELEMENTS – PER SE ILLEGAL TYING ................................................................................................. 144

Defendants' Argument Re Disputed Instruction No. 37 ELEMENTS – PER SE ILLEGAL TYING ................................................................................................. 145

Disputed Instruction No. 38 Re ELEMENTS – RULE OF REASON TYING  Offered by Plaintiff .................................................................................. 146

Disputed Instruction No. 38 Re ELEMENTS – TYING UNDER THE RULE OF REASON Offered by Defendants ......................................................................... 147

Plaintiff's Argument Re Disputed Instruction No. 38 ELEMENTS – TYING UNDER THE RULE OF REASON ................................................................................ 148

Defendants' Argument Re Disputed Instruction No. 38 ELEMENTS – TYING UNDER THE RULE OF REASON ................................................................................ 149

Disputed Instruction No. 39 Re TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS  Offered by Plaintiff ......................................... 150

Disputed Instruction No. 39 Re TYING – PRESENCE OF TWO PRODUCTS  Offered by Defendants ............................................................................ 151

Plaintiff's Argument Re Disputed Instruction No. 39 TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS ......................................... 152

Defendants' Argument Re Disputed Instruction No. 39 TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS ......................................... 153

Disputed Instruction No. 40 Re TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING  Offered by Plaintiff.................................................................. 154

Disputed Instruction No. 40 Re TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING  Offered by Defendants............................................................ 155

Plaintiff's Argument Re Disputed Instruction No. 40 TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING ................................................ 156

Defendants' Argument Re Disputed Instruction No. 40 TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING ................................................ 157

Disputed Instruction No. 41 Re TYING – PER SE AND RULE OF REASON: EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT  Offered by Plaintiff ................................................................................................................ 158

Disputed Instruction No. 41 Re EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT  Offered by Defendants .................................... 159

Plaintiff's Argument Re Disputed Instruction No. 41 EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT .................................... 160

Defendants' Argument Re Disputed Instruction No. 41 EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT .................................... 161

Disputed Instruction No. 42 TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT Offered by Plaintiff ............................................... 162

Disputed Instruction No. 42 Re TYING – RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT Offered by Defendants ............................................................ 163

Plaintiff's Argument Re Disputed Instruction No. 42 TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT ...................................... 164

Defendants' Argument Re Disputed Instruction No. 42 TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT ...................................... 165

Disputed Instruction No. 43 Re TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE  Offered by Plaintiff ....................................................... 167

Disputed Instruction No. 43 Re TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE  Offered by Defendants ................................................. 168

Plaintiff's Argument Re Disputed Instruction No. 43 TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE ....................................................... 169

Defendants' Argument Re Disputed Instruction No. 43 TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE ................................................ 171

Disputed Instruction No. 44 Re INJURY AND CAUSATION  Offered by Plaintiff........................ 173

Disputed Instruction No. 44 Re INJURY AND CAUSATION  Offered by Defendants.................... 175

Plaintiff's Argument Re Disputed Instruction No. 44 INJURY AND CAUSATION ........................ 177

Defendants' Argument Re Disputed Instruction No. 44 INJURY AND CAUSATION..................... 178

Disputed Instruction No. 45  COMPETITIVE BENEFITS OUTSIDE THE RELEVANT
      MARKET Offered by Plaintiff............................................................................................. 179

Disputed Instruction No. 45 COMPETITIVE BENEFITS OUTSIDE THE RELEVANT
      MARKET Offered by Defendants....................................................................................... 180

Plaintiff's Argument Re Instruction No. 45  COMPETITIVE BENEFITS OUTSIDE THE
      RELEVANT MARKET........................................................................................................ 181

Defendant's Argument Re Instruction No. 45  COMPETITIVE BENEFITS OUTSIDE THE
      RELEVANT MARKET........................................................................................................ 183

Disputed Instruction No. 46 Re STATUTE OF LIMITATIONS Offered by Plaintiffs..................... 185

Disputed Instruction No. 46 STATUTE OF LIMITATIONS  Offered by Defendants..................... 186

Plaintiffs' Argument Re Disputed Instruction No. 46 STATUTE OF LIMITATIONS ..................... 187

Defendants' Argument Re Disputed Instruction No. 46 STATUTE OF LIMITATIONS ................. 188

Stipulated Instruction No. 47 Re BREACH OF CONTRACT - INTRODUCTION .......................... 190

Disputed Instruction No. 48 Re BREACH OF CONTRACT - ELEMENTS  Offered by
      Plaintiff ............................................................................................................................... 191

Disputed Instruction No. 48 Re BREACH OF CONTRACT – ELEMENTS  Offered by
      Defendants .......................................................................................................................... 192

Plaintiff's Argument Re Disputed Instruction No. 48 BREACH OF CONTRACT –
      ELEMENTS.......................................................................................................................... 193

Defendants' Argument Re Disputed Instruction No. 48 BREACH OF CONTRACT –
      ELEMENTS.......................................................................................................................... 194

Stipulated Instruction No. 49 Re BREACH OF THE IMPLIED COVENANT OF GOOD
      FAITH AND FAIR DEALING – ESSENTIAL FACTUAL ELEMENTS ........................... 195

Disputed Instruction No. 50 Re AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL
      UNDER THE ANTITRUST LAWS  Offered by Plaintiff...................................................... 196

Disputed Instruction No. 50 Re AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL
      UNDER THE ANTITRUST LAWS  Offered by Defendants................................................. 197

Plaintiff's Argument Re Disputed Instruction No. 50 AFFIRMATIVE DEFENSE—
      CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS .......................................... 198

Defendants' Argument Re Disputed Instruction No. 50 AFFIRMATIVE DEFENSE—
      CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS .......................................... 200

Stipulated Instruction No. 51 Re INTRODUCTION TO CONTRACT DAMAGES........................ 202

Stipulated Instruction No. 51 Re CONTRACT DAMAGES ........................................................... 203

Disputed Instruction No. 52 Re UNJUST ENRICHMENT  Offered by Plaintiff.............................. 204

Disputed Instruction No. 52 Re UNJUST ENRICHMENT  Offered by Defendants......................... 205

Plaintiff's Argument Re Disputed Instruction No. 52  UNJUST ENRICHMENT ............................ 206

Defendants' Argument Re Disputed Instruction No. 52 UNJUST ENRICHMENT......................... 208

Disputed Instruction No. 53 Re AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—
ILLEGALITY DEFENSE  Offered by Plaintiff ...................................................... 210

Disputed Instruction No. 53 Re AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—
ILLEGALITY DEFENSE  Offered by Defendants ................................................. 211

Plaintiff's Argument Re Disputed Instruction No. 53 AFFIRMATIVE DEFENSE—UNJUST
ENRICHMENT—ILLEGALITY DEFENSE ........................................................ 212

Defendants' Argument Re Disputed Instruction No. 53 AFFIRMATIVE DEFENSE—UNJUST
ENRICHMENT—ILLEGALITY DEFENSE ........................................................ 214

Stipulated Instruction No. 54 Re UNJUST ENRICHMENT DAMAGES ............................ 215

Disputed Instruction No. 55 Re AFFIRMATIVE DEFENSE—UNCLEAN HANDS  Offered
by Plaintiff ......................................................................................... 216

Disputed Instruction No. 55 Re AFFIRMATIVE DEFENSE—UNCLEAN HANDS  Offered
by Defendants ...................................................................................... 217

Plaintiff's Argument Re Disputed Instruction No. 55 AFFIRMATIVE DEFENSE—
UNCLEAN HANDS ................................................................................... 218

Defendants' Argument Re Disputed Instruction No. 55 AFFIRMATIVE DEFENSE—
UNCLEAN HANDS ................................................................................... 220

Stipulated Instruction No. 56 Re DAMAGES ON MULTIPLE LEGAL THEORIES ................. 222

Stipulated Instruction No. 57 Re DUTY TO DELIBERATE ......................................... 223

Stipulated Instruction No. 58 Re CONSIDERATION OF THE EVIDENCE – CONDUCT OF
THE JURY ........................................................................................... 224

Stipulated Instruction No. 59 Re USE OF NOTES ................................................. 225

Stipulated Instruction No. 60 Re COMMUNICATION WITH THE COURT ....................... 226

Stipulated Instruction No. 61 Re RETURN OF VERDICT ......................................... 227

**Stipulated Instruction No. 1 Re**
**DUTIES OF JURY TO FIND FACTS AND FOLLOW LAW**

Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. You will each be given a copy of these instructions to refer to during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. You must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy. You should also not be influenced by any person's race, color, religion, national ancestry, or gender.

All of this means that you must decide the case solely on the evidence before you. Please keep in mind that you took an oath to do so.

Do not read into these instructions or anything I may say or do that I have an opinion regarding the evidence or what your verdict should be. That is for you to decide.

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 1

1

2

**Stipulated Instruction No. 2 Re
CLAIMS AND DEFENSES**

3          I will give you a brief summary of the positions of the parties.

4          The Plaintiff is Epic Games, Inc. ("Epic").

5          The Defendants are Google LLC and certain of its affiliates ("Google").

6          Epic asserts that Defendant Google has violated federal and state antitrust laws through a

7  variety of means that foreclose competition in an alleged market for Android app distribution and in an

8  alleged market for in-app billing services on Android devices. Epic alleges that Google's conduct

9  harms mobile app developers and consumers by increasing prices and reducing quality and innovation.

10          Google denies Epic's claims.  Google contends that the relevant market is not limited to

11  Android, but also includes Apple's iOS and other platforms where users and developers can engage in

12  transactions for digital content.  Google further contends that its conduct has not foreclosed

13  competition, but rather has promoted competition by enabling Android to compete with iOS and other

14  platforms.  Google contends that its conduct benefited users and developers.

15          Google also brings counterclaims against Epic.  Google alleges that Epic willfully violated

16  Google's Payment Policy and that, by doing so, Epic violated its contractual obligations to Google.

17  Google alleges that Epic was unjustly enriched at Google's expense.  Google has the burden of proving

18  these counterclaims.

19          Epic denies Google's counterclaims.  Epic contends that Google's Payment Policy is illegal and

20  a violation of the antitrust laws, and Google therefore cannot enforce that Policy.

21

22  Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 2

23

24

25

26

27

28

1
2

**Stipulated Instruction No. 3 Re**
**BURDEN OF PROOF – PREPONDERANCE OF THE EVIDENCE**

3
4
5

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

6
7

You should base your decision on all of the evidence, regardless of which party presented it.

8

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 3

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stipulated Instruction No. 4 Re**
**CORPORATIONS - FAIR TREATMENT**

The parties in this case are corporations. All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers, performed within the scope of their authority.  An act is within the scope of a person's authority if it is within the range of reasonable and foreseeable activities that an employee, agent, director, or officer engages in while carrying out that person's business.

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 4

1
2

**Stipulated Instruction No. 5 Re**
**WHAT IS EVIDENCE**

3

The evidence you are to consider in deciding what the facts are consists of:

4

       1.    the sworn testimony of any witness;

5

       2.    the exhibits that are admitted into evidence;

6

       3.    any facts to which the lawyers have agreed; and

7

       4.    any facts that I may instruct you to accept as proved.

8
9

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 5

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stipulated Instruction No. 6 Re**
**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence, any facts to which the lawyers have agreed, and any facts that I may instruct you to accept as proved. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.     Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.     Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

3.     Testimony that was excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

4.     Anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 6

1

2

**Stipulated Instruction No. 7 Re**
**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

3

4

5

6

7

   Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

8

9

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 8 Re**
**DEPOSITION IN LIEU OF LIVE TESTIMONY**

During the trial, you heard testimony by witnesses in the form of previously recorded trial and deposition testimony rather than live here in court. A deposition is the sworn testimony of a witness taken before trial. The witness was placed under oath to tell the truth, and lawyers for each side asked questions. The questions and answers were recorded.

Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony, in the same way as if the witnesses had been present to testify.

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 11

1

**Stipulated Instruction No. 9 Re**
**RULING ON OBJECTIONS**

2

3          There are rules of evidence that control what can be received into evidence. When a lawyer

4   asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was

5   not permitted by the rules of evidence, that lawyer objected. If I overruled the objection, the question

6   was answered, or the exhibit received. If I sustained the objection, the question was not answered, or

7   the exhibit was not received. Whenever I sustained an objection to a question, you must ignore the

8   question and must not guess what the answer might have been.

9          Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore

10  that evidence. That means that when you are deciding the case, you must not consider the stricken

11  evidence for any purpose.

12

13  Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 9

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 10 Re**
**CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness said, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.    the opportunity and ability of the witness to see or hear or know the things testified to;

2.    the witness's memory;

3.    the witness's manner while testifying;

4.    the witness's interest in the outcome of the case, if any;

5.    the witness's bias or prejudice, if any;

6.    whether other evidence contradicted the witness's testimony;

7.    the reasonableness of the witness's testimony in light of all the evidence; and

8.    any other factors that bear on believability.

Sometimes a witness may have said something that is not consistent with something else he or she said. Sometimes different witnesses gave different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 10

1

2

**Disputed Instruction No. 11**
**CHAT SPOLIATION ADVERSE INFERENCE INSTRUCTION**

3

4

5

It remains under discussion whether the Court will provide a mandatory adverse inference instruction.  The Parties intend to request the Court's views on how to best present the issue for resolution.  Google continues to object to the inclusion of such an instruction.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Stipulated Instruction No. 12 Re
EXPERT OPINION**

3      You have heard testimony from expert witnesses who testified to opinions and the reasons for

4   their opinions. This opinion testimony was allowed because of the education or experience of the

5   expert witness.

6      Such opinion testimony should be judged like any other testimony. You may accept it, reject it,

7   or give it as much weight as you think it deserves, considering the witness's education and experience,

8   the reasons given for the opinion, and all the other evidence in the case.

9

10  Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 13 Re**
**STIPULATIONS OF FACT**

The parties have agreed to certain facts that I will now read to you. You must treat these facts as having been proved.

1.      Google LLC is a wholly-owned subsidiary of Alphabet Inc.;

2.      Google offers various products and services, including Android OS, Chrome, Gmail, Drive, Maps, Play, Search, YouTube, Google Cloud, and Search Ads 360;

3.      A mobile operating system ("OS") provides multi-purpose computing functionality to a mobile device such as a smartphone or a tablet;

4.      To be useful to consumers, a mobile OS must be able to run software applications or "apps";

5.      A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that are compatible with the OS;

6.      An "app" is software separate from the mobile OS that runs on a mobile device and adds specific functionalities to a mobile device;

7.      Consumers use apps to perform a variety of tasks on their mobile devices;

8.      Entities that manufacture mobile devices—such as Samsung or Motorola—are referred to as original equipment manufacturers ("OEMs");

9.      OEMs pre-install an OS on the mobile devices that they manufacture and sell;

10.      Instead of developing their own OS, almost all OEMs today license a third party's OS for their devices;

11.      Apple does not license iOS to other OEMs;

12.      The Google Play Store is an app store owned by Google that distributes apps on devices running the Android OS;

13.      To distribute an app on the Google Play store, app developers must first enter into Google's Developer Distribution Agreement, referred to as the DDA;

14.      The predecessor to the Play Store was called Android Market;

1    15.    Google acquired the Android mobile operating system in 2005;

2    16.    Google launched Android Market in October 2008;

3    17.    Google launched its in-app billing service in 2011;

4    18.    Google's Android Market app store was rebranded as the Google Play store in

5    March 2012;

6    19.    Timothy Sweeney is Epic Games, Inc.'s ("Epic") controlling shareholder, CEO,

7    and board chairman;

8    20.    In April 2020, Epic made the decision to make Fortnite available for download

9    through the Play store;

10    21.    Epic signed Google's DDA.

11    22.    On August 13, 2020, Epic filed its complaint against Google.

12

13    Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 8

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 14 Re**
**CHARTS AND SUMMARIES**

During trial, certain charts and summaries were shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  Some of those charts or summaries may have been admitted into evidence, while others were not.

Charts and summaries are only as good as the evidence that supports them.  You should, therefore, give them only such weight as you think the evidence supporting them deserves.

Source: Preliminary Jury Instructions (Dkt. 733) Instruction No. 13

**Disputed Instruction No. 15**
**ANTITRUST LAWS—PURPOSE**
**Offered by Plaintiff**

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

Source: ABA Model Jury Instructions in Civil Antitrust Cases 1.A

1
2

**Disputed Instruction No. 15 Re**
**ANTITRUST LAWS—PURPOSE**
**Offered by Defendants**

3

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Plaintiff's Argument Re Disputed Instruction No. 15**
**ANTITRUST LAWS—PURPOSE**

3        Pursuant to the Court's instructions on November 15, 2023 to remove references to Match in

4   the joint proposed final jury instructions, the Parties hereby submit a revised set of proposed

5   instructions, together with their respective position statements regarding instructions on which they

6   still have not been able to reach agreement.  As discussed below, Epic's proposed instructions closely

7   follow the ABA Model Instructions.  That was true of Epic's initial proposed instructions, but

8   consistent with the Court's direction, Epic has further revised its prior proposed instructions to hew

9   even more closely to the Models, subject only to instructions necessary to preserve Epic's positions on

10  relevant law.

11       By contrast, Google's proposed instructions deviate substantially from the Models, and the

12  latest set of revisions has only widened the gap.  As an example, in Google's proposed instruction for

13  Monopolization—Willful Acquisition and Maintenance—which already bore almost no resemblance

14  to the relevant Model Instruction—Google has proposed yet another paragraph that deviates from the

15  Model.  Google has also maintained its bespoke language in the following disputed instructions:

16          •    No. 17: Monopolization—Monopoly Power—Defined
            •    No. 18: Monopolization—Relevant Product Market
17          •    No. 22: Monopolization—Existence of Monopoly Power—Types of Proof
            •    No. 23: Monopolization—Existence of Monopoly Power—Direct Proof
18          •    No. 24: Monopolization—Existence of Monopoly Power—Indirect Proof
            •    No. 25: Monopolization—Willful Acquisition or Maintenance
19          •    No. 35: Rule of Reason—Section One Claims
            •    No. 36: Rule of Reason—Proof of Competitive Harm
20          •    No. 37: Rule of Reason—Evidence of Procompetitive Benefits
            •    No. 38: Rule of Reason—Balancing the Competitive Effects
21

22       Epic respectfully directs the Court to its argument on each disputed instruction, which

23  succinctly identifies Epic's attempts to conform its proposed instructions to the Models and Google's

24  significant departures from the Models.

25       Even though Epic takes its proposed Antitrust Laws--Purpose instruction directly from the

26  Models, Google objects entirely to this Model Instruction.  Google cannot dispute that this Model

27  Instruction accurately states the purpose of the antitrust laws–the language is drawn directly from the

28  Supreme Court's decision in *Northern Pacific Railway v. United States*, 356 U.S. 1, 4 (1958) ("The

1    Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free

2    and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction

3    of competitive forces will yield the best allocation of our economic resources, the lowest prices, the

4    highest quality and the greatest material progress. . . ."); s*ee also FTC v. Qualcomm*, 969 F.3d 974, 988

5    (9th Cir. 2020) (quoting same language).

6         Epic submits that the Model Instruction is appropriate to educate the jury regarding the scope

7    of the antitrust laws, and explain why the jury should give careful attention when deliberating on

8    Epic's antitrust claims.  For these reasons, the ABA Model Instruction has repeatedly been given to

9    juries hearing antitrust cases in this District.  *See Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF,

10   Dkt. No. 468, at 24 (N.D. Cal. Mar. 4, 2020) ("Jury Instruction 20 re Purpose of the Sherman Act");

11   *Smithkline Beecham Corp. v. Abbot Lab.*, No. C 07-5702 CW, Dkt. No. 485, at 8 (N.D. Cal. Mar. 3,

12   2011) (Final Jury Instruction:  "Antitrust Claims – Purpose of Antitrust Laws"); *Advanced*

13   *Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, No. C 04-02266 JW, Dkt. No. 1942, at 6

14   (N.D. Cal. Oct. 27, 2010) (Closing Instruction:  "The Sherman Act"); *Hynix Semiconductor Inc. v.*

15   *Rambus*, C-06-00244 RMW, at 22 (N.D. Cal. Mar. 25, 2008) ("Jury Instruction No. 18

16   Monopolization-General Purposes of the Antitrust and Patent Laws").

17        Further, this Instruction is particularly appropriate because Google has defended certain of its

18   conduct by contending that consumers and developers benefit from having fewer app stores on

19   Android phones and only Google Play Billing for digital goods and services transactions occurring in

20   apps obtained from the Google Play Store.  In the Sherman Act, however, Congress made a policy

21   determination that competition—rather than central planning—produces better outcomes.  *See*

22   *Northern Pac. R.R.*, 356 U.S. at 4 ("the policy unequivocally laid down by the Act is competition").

23   Together with the more specific instructions explaining the particular elements of Epic's claims, this

24   Instruction reinforces that the jury's ultimate focus in applying the antitrust laws is determining

25   whether Google's conduct has restrained competition.  Epic respectfully submits that this Instruction

26   should be given at the outset of the substantive instructions regarding Epic's antitrust claims.

27

28

1

2

**Defendants' Argument Re Disputed Instruction No. 15**
**ANTITRUST LAWS—PURPOSE**

3

4

5

6

7

8

Google objects to this instruction in its entirety.  This instruction is redundant of other instructions proposed by the parties, and therefore needlessly adds to an already-lengthy jury charge.  Indeed, the Court did not read this instruction to the jury in the recent *Avnet* trial.  *See In re Capacitors Antitrust Litig.*, No. 3:17-md-02801-JD (N.D. Cal. May 17, 2023), ECF No. 1923.  Here, various instructions explain—in greater detail than here—the  types of conduct proscribed by the antitrust laws.  As a result, there is no reason to read the instruction here.

9

10

11

In addition to being superfluous, the instruction lacks balance.  The instruction suggests that the antitrust laws are being enforced in this case to protect competition without explaining that many types of competition on the merits are lawful, even under the antitrust laws.

12

13

For these reasons, Google submits that the Court should not include this instruction in its final charge to the jury.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 16 Re**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**
**Offered by Plaintiff**

Epic brings two types of antitrust claims, which I will now explain. First, the antitrust laws prohibit companies from willfully acquiring or maintaining monopolies in relevant markets through anticompetitive conduct. Second, the antitrust laws prohibit contracts or agreements that unreasonably restrain competition.

I will first explain Epic's monopolization claims under Section 2 of the federal Sherman Antitrust Act.  Epic alleges that it was injured by Google's unlawful monopolization of two alleged markets.  Epic alleges that those markets are:  (1) an Android app distribution market and (2) a market for Android in-app billing services for digital goods and services transactions.

To prevail on a claim that Google has monopolized an alleged market, Epic must prove each of the following elements by a preponderance of the evidence for that market:

    1.      that the alleged market is a valid antitrust market;

    2.      that Google possesses monopoly power in the alleged market;

    3.      that Google "willfully" acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct; and

    4.      that Epic was injured in its business or property because of Google's anticompetitive conduct.

If you find that Epic has proven each of these elements by a preponderance of the evidence with respect to any market, then you must find for Epic and against Google on the claim for unlawfully monopolizing that market.  If you find that Epic has failed to prove any of these elements with respect to any market, then you must find for Google and against Epic on the claim for unlawfully monopolizing that market.  You may find that Google has monopolized both, either or neither of any markets at issue.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.1

**Disputed Instruction No. 16 Re**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**
**Offered by Defendants**

Epic brings two types of antitrust claims, which I will now explain. First, the antitrust laws prohibit companies from willfully acquiring or maintaining monopolies in relevant markets through anticompetitive conduct. Second, the antitrust laws prohibit contracts or agreements that unreasonably restrain competition.

I will first explain Epic's monopolization claims under Section 2 of the federal Sherman Antitrust Act. Epic alleges that it was injured by Google's unlawful monopolization of two alleged markets. Epic alleges that those markets are: (1) an Android app distribution market and (2) a market for Android in-app billing services for digital goods and services transactions.

To prevail on a claim that Google has monopolized an alleged market, Epic must prove each of the following elements by a preponderance of the evidence for that market.

    1.    that the alleged market is a valid antitrust market;

    2.    that Google possesses monopoly power in the alleged market;

    3.    that Google willfully acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct that is not justified by offsetting efficiencies; and

    5.    that Epic was injured in its business or property because of Google's anticompetitive conduct.

You should consider whether Epic has proven its claim as to each of the alleged markets separately. If you find that Epic has failed to prove any of these elements, then you must find for Google and against Epic on its claim. If you find that Epic has proven each of these elements by a preponderance of the evidence, then you must find for Epic and against Google on the claim.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.1

States' Counts 1, 5, 8; Consumers' Counts 1, 4; Epic's Counts 1, 6; Match Plaintiffs' Counts 2, 8

**Plaintiff's Argument Re Disputed Instruction No. 16**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**

Epic's proposal hews closely to the ABA Model Instruction, adapted only to fit the circumstances of this case.  Specifically, in addition to specifying the markets alleged here, Epic proposes one minor modification that captures the fact that Epic claims monopolization of two separate markets, instructing the jury that it "may find that Google has monopolized both, either or neither of the alleged markets."  This is appropriate, as the jury can find that Google monopolized either or both of the markets (or, of course, none of the markets).

Google's proposal seeks to further deviate from the Model—and to do so in ways that would only confuse the jury.  *First*, Google asks to add an instruction that "[y]ou should consider whether Epic has proven its claims as to each of the alleged markets separately".  That instruction risks confusing the jury because it may be read to suggest that the jury may find for Epic *only if* it finds that Google monopolized *both* of Epic's alleged markets.  Google then compounds that risk when it proposes that the jury be instructed that:  "If you find that Epic has failed to prove any of these elements, then you must find for Google and against Epic on its claim.  If you find that Epic has proven each of these elements by a preponderance of the evidence, then you must find for Epic and against Google on the claim."  This again suggests that if the jury finds for Google on any of the elements with respect to *either* market, it must find for Google on all monopolization claims. Epic's version of this language instead instructs the jury to consider the elements of Epic's claims separately "with respect to an alleged market" and to render a verdict as to "that market", making clear that the jury can find liability as to "both, either or neither of the alleged markets", as per the language proposed by Epic.

*Second*, Google seeks to diverge from the Model by adding the following bolded language, which does not appear in the Model, to the element of willful acquisition or maintenance of monopoly: "that Google willfully acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct **that is not justified by offsetting efficiencies**".  Google's addition is incomplete and misleading for two independent reasons.  *First*, Google mentions a component of its own defense—offsetting efficiencies—without mentioning how Epic may overcome that defense—

1    either by (a) showing that such efficiencies could be achieved through means that are substantially less

2    restrictive of competition, or (b) showing that anticompetitive harms substantially outweigh such

3    efficiencies.  The jury is likely to be misled that Google's alleged efficiencies can themselves justify

4    even conduct that has significant anti-competitive effect on balance.  Google's addition is also

5    unnecessary (in addition to being misleading) because the subsequent instruction concerning this

6    element of the claims (*see* Instruction No. 16) will explain how efficiencies should factor into the

7    jury's consideration.  *Second*, rather than instructing the jury that it may consider efficiencies only

8    after they are proven by Google, Google's instruction assumes that there are (or may be) "offsetting

9    efficiencies" before the jury has determined that there is any proof of such efficiencies.  This is an

10   independent reason to reject Google's addition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 16**
**SECTION 2 OF THE SHERMAN ACT – MONOPOLIZATION – ELEMENTS**

The Court should instruct the jury that Epic must prove "that Google willfully acquired or maintained its monopoly power in the alleged market by engaging in anticompetitive conduct **that is not justified by offsetting efficiencies.**"  Epic's proposed instruction incorrectly omits the bolded language, which is important to remind the jury of the governing law that anticompetitive conduct involves "attempting to exclude rivals on some basis other than efficiency."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).

"[T]he elements of the established actions for 'monopolization' and 'attempted monopolization' are vital to differentiate between efficient and natural monopolies on the one hand, and unlawful monopolies on the other."  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 548 (9th Cir. 1991).  This is because "[a] firm may acquire a monopoly simply by virtue of being a better competitor.  For example, a firm may have better production methods or be more innovative than its past and prospective competitors. . . . Because this type of monopolist behaves in an economically efficient manner, the antitrust laws do not stand as an obstacle to its existence."  *Id.* at 547.  Thus, the Supreme Court has specifically stated that a plaintiff asserting a claim under Section 2 must prove "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  And the Ninth Circuit has explained that "an act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the prices of goods above competitive levels or diminishes their quality."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  The Court should adopt Google's version of this instruction because, by referencing procompetitive efficiencies, only Google's proposed instruction will give the jury a complete overview of the analysis they are required to perform.

There is nothing confusing about that proposition in Google's proposed instruction.  That is especially so because later instructions also explain the analysis the jury is to perform under the rule of reason, which also focuses on efficiencies.

Finally, Google's language—that the jury "should consider whether Epic has proven its claims

as to each of the alleged markets separately"—is necessary to account for the fact that Epic's has introduced evidence about more than one market.  This will simply guide the jury through its analysis by explaining that the markets should be considered separately.  Contrary to Epic's argument, Google's instruction does not suggest that Epic must prove that Google monopolized both alleged markets.

**Disputed Instruction No. 17 Re**
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**
**Offered by Plaintiff**

To prove its monopolization claims, Epic must prove that Google has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level (or reduce or maintain quality below the competitive level) or exclude competition for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether Epic has met its burden of proving monopoly power in a relevant market.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.2 (with edits described in Epic's Argument)

1

2

**Disputed Instruction No. 17 Re**
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**
**Offered by Defendants**

3    To prove its monopolization claim, Epic must prove that Google has monopoly power in a

4  relevant antitrust market.  Monopoly power is an extreme degree of what is called market power, which

5  is the power to maintain prices above (or quality below) a competitive level by restricting output below

6  a competitive level in a relevant antitrust market, considering both app users and app developers.  More

7  precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above (or reduce

8  or maintain quality substantially below) the competitive level for a significant period of time. However,

9  possession of monopoly power, in and of itself, is not unlawful.

10    I will provide further instructions about how you may determine whether Epic has met its

11  burden of proving monopoly power in a relevant market.

12

13  Source: ABA Model Civil Antitrust Jury Instruction 3.A.2; Ohio v. Am. Express Co., 138 S. Ct. 2274

14  (2018)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiff's Argument Re Disputed Instruction No. 17**
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**

Epic's instruction is nearly verbatim to the cited ABA Model Instruction.  Epic only makes two minor revisions to the Model—both of which Google has also requested.  *First*, Epic clarifies in the second sentence of the Model that a firm has a monopoly if it *maintains* (in addition to raises) prices substantially above competitive levels.  Such clarification is necessary in a monopoly maintenance case where a defendant may have "already exercised [the] power to charge a supracompetitive price".  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 n.7 (9th Cir. 2023).  *Second*, Epic agreed to Google's proposal to clarify that monopoly power can exist when a firm has the ability to profitably decrease *quality* (as an alternative to raising price and excluding competition).

Beyond the two agreed-upon edits, Google has significantly revised the Model to include highly argumentative and unnecessary language.  *First*, in the second sentence of the Model, Google added language defining monopoly power as "**an *extreme degree* of what is called market power**".  This is contrary to Ninth Circuit law.  *See Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 541, 481 (9th Cir. 1992) (describing monopoly power as only "something greater" than market power); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 801, at 318 (2d ed. 2002) ("the Sherman Act § 2 notion of monopoly power . . . is conventionally understood to mean 'substantial' market power").  Moreover, it would be confusing to define monopoly power in relationship to market power, a concept that is not defined until the Court gets to subsequent instructions concerning Epic's Section 1 claims.  Google wrongly seeks to raise Epic's burden of proof through improper rhetoric.  *See Curtis v. City of Oakland*, 2016 WL 1138457, at *4 (N.D. Cal. Mar. 23, 2015) ("It is well established that instructions should not be argumentative or slanted in one party's favor." (citation omitted)).

*Second*, in the third sentence of the Model, Google proposes adding a statement that the jury should "**consider[] both app users and app developers**".  To be sure, if the jury finds the Android app distribution market to be two-sided, then the market would include both app developers and consumers who use Android app distribution, and the jury then needs to consider the effects on both.  Epic contends that the alleged in-app billing services market is not two-sided, nor does it include app

1     users.  Google's instruction suggests either that the jury must find that market to be two sided—an

2     instruction that is clearly argumentative and improper—or that the jury "consider both app users and

3     app developers" even as to one-sided markets (that do not involve users), a proposition that is contrary

4     to law.  Simply put, in a case involving two markets, one of which is alleged to be two-sided and one

5     of which is alleged to be single-sided, there is no basis to include a general instruction on two-

6     sidedness in a general instruction pertaining to both markets.

7         Google's proposal that the jury should "consider" app users and app developers in assessing

8     monopoly power also leaves the jury adrift as to how app users and app developers should be

9     considered or in what way considering both sets of customers relates to monopoly power.  These

10    points are covered elsewhere in Epic's proposed instructions.  *See, e.g.*, Instruction No. 18 Re

11    Monopolization – Relevant Product Market.  At Google's request, Epic has proposed instructions to

12    explain how the jury should define two-sided markets and evaluate competitive harms and benefits in

13    such markets, based on the Supreme Court's holding in *Ohio v. American Express*, 138 S. Ct. 2274

14    (2018).  *See, e.g.*, Monopolization:  Relevant Product Market, Monopolization:  Geographic Market,

15    Monopolization:  Willful Acquisition or Maintenance, Rule of Reason:  Competitive Harms, Rule of

16    Reason:  Competitive Benefits.  Epic's proposed instructions concerning how the two-sidedness of a

17    market informs market definition and the rule of reason analysis (*see e.g.*, Instructions Nos. 18, 37, 38)

18    sufficiently cover the topic without adding complexity that would only confuse or mislead the jury.

19       .

20

21

22

23

24

25

26

27

28

1

2

**Defendants' Argument Re Disputed Instruction No. 17**
**MONOPOLIZATION – MONOPOLY POWER – DEFINED**

3    Google's proposed instruction correctly explains to the jury the difference between monopoly

4    power and market power.  "Monopoly power differs in degree from market power, requiring 'something

5    greater.'"  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *Eastman Kodak*

6    *Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)).  "Courts have described the distinction as

7    'substantial' market power or an 'extreme degree' of market power."  *Epic Games, Inc. v. Apple Inc.*,

8    559 F. Supp. 3d 898, 1028 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded,* 67 F.4th 946 (9th

9    Cir. 2023).  Because this case implicates both monopoly power and market power, and because the

10    distinctions between those two concepts will not be immediately apparent to a lay jury, it makes sense

11    to explain the differences in a single instruction.

12    Moreover, the markets at issue are two-sided, so it is appropriate to tell the jury to consider both

13    app users and developers.  *First*, it is undisputed that the alleged Android app distribution market is two-

14    sided.  *Second*, the alleged market for Android in-app billing services is also two-sided.  "As the name

15    implies, a two-sided platform offers different products or services to two different groups who both

16    depend on the platform to intermediate between them."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280

17    (2018).  "The key feature of transaction platforms is that they cannot make a sale to one side of the

18    platform without simultaneously making a sale to the other."  *Id.*  In-app billing services products meet

19    that definition:  like the credit cards in the *AmEx* decision, Google Play Billing (among other things)

20    facilitates transactions between users and developers.   In-app billing services, therefore, is a

21    quintessential two-sided market, and the instructions should reflect that.

22

23

24

25

26

27

28

1

2

**Disputed Instruction No. 18 Re**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**
**Offered by Plaintiff**

3

4

5

6

In this case, Epic contends that there are two different relevant product markets: Android app distribution and Android in-app billing services for digital goods and services transactions. You should consider whether Epic has proven by a preponderance of the evidence either or both of the markets they have alleged.

7

8

In determining the relevant market, the "area of effective competition" must be determined by reference to (1) a product market, and (2) a geographic market.

9

10

11

12

13

14

15

In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view. This does not mean two products must be identical to be in the same relevant market. It means they must be, as a matter of practical fact and the actual behavior of consumers, substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other. What you are being asked to do is to decide which products compete with each other.

16

17

18

19

20

21

22

23

The parties contend that one or more markets alleged in this case are two-sided, which means that they include services that are offered to two different groups simultaneously.  For example, an app store connects app developers who wish to sell their apps and the consumers that wish to buy those apps.  In this example, app developers may be one side of the market, and consumers may be the other side of the market, and each are receiving services from the app store.  If you find that there is a relevant market that is two-sided, the market includes the services that are provided to both sides of the market, and you should consider both sides of the market in applying these instructions to evaluate Plaintiff's claims based on the markets you have found to be two-sided.

24

25

Source: 3A Fed. Jury Prac. & Instr. § 150:66 (6th ed.) (with edits described in Epic's argument)

26

27

28

**Disputed Instruction No. 18 Re**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**
**Offered by Defendants**

In this case, Epic contends that there are two different relevant product markets: Android app distribution and Android in-app billing services for digital goods and services transactions.  Epic does not bring a claim that Google has harmed competition in a licensable operating system market. You should consider whether Epic has proven by a preponderance of the evidence either or both of the markets its has alleged.

In determining the relevant market, the "area of effective competition" must be determined by reference to (1) a product market, and (2) a geographic market.  If you find that Epic has  proven a valid relevant product market, then you should continue to evaluate the remainder of Epic's claims as they pertain to that market.  However, if you find that Epic has failed to prove such a market, then you must find in Google's favor on Epic's claims.

In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view. This does not mean two products must be identical to be in the same relevant market. It means they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other. What you are being asked to do is to decide which products compete with each other. The relevant product market must reflect commercial realities.

Some of the relevant markets that the parties allege in this case involve products that are two-sided platforms:  they offer products or services to two different groups who both depend on the platform to intermediate between them.  The value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases.  In order to define a relevant market involving a two-sided platform, you must take into account consumers on both sides of the market—in this case, both users and developers.

In determining the relevant product market, you must be able to determine what, if any, economic forces restrain Google's freedom to raise prices above the competitive level (or reduce quality below the competitive level) by restricting the production level, considering both sides of the alleged relevant

1    markets.  The most likely and most important restraining force will be actual and potential competition

2    from other firms and their products.  This includes all firms and products that act or likely could act as

3    restraints on Google's power to raise prices above the competitive level or reduce quality below the

4    competitive level because customers could switch to other products if Google tried to do so.  All the

5    firms and products that exert such restraining force are within what is called the relevant product market.

6

7    Source: 3A Fed. Jury Prac. & Instr. § 150:66 (6th ed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Plaintiff's Argument Re Disputed Instruction No. 18**
**MONOPOLIZATION – RELEVANT PRODUCT MARKET**

3       Epic's instruction is based on the Federal Jury Practice Model, as authorized by the Ninth

4    Circuit Manual of Model Civil Jury Instructions.  Epic and Google stipulated to certain edits thereto.

5    *First*, Epic and Google agreed to remove the first introductory paragraph of the Model to make this

6    instruction more concise.  *Second*, Epic and Google agreed to revise the language of the second

7    paragraph of the Model to account for the fact that Epic alleges two different relevant product markets

8    as opposed to just one.  *Third*, the Parties agreed to propose a separate geographic market instruction

9    (*see* Instruction No. 21), and removed the final paragraph of the Model from this instruction.

10       In addition, at Google's request, Epic agreed to add a new paragraph to the Model explaining

11    how the jury should define a two-sided market.  However, the Parties disagree on the exact language

12    that should be used.  Epic's proposed definition of a two-sided market—a market that "includes

13    services that are offered to two different groups simultaneously"—is based on *Ohio v. American*

14    *Express*, 138 S. Ct. 2274, 2286 (2018) ("[Two-sided] platforms facilitate a single, simultaneous

15    transaction between participants.").  Epic's language then includes an example of a potential two-sided

16    market based on the subject matter of this case (*i.e.,* a market that includes app stores that facilitate

17    transactions between app developers and app consumers).  Epic's language then directs the jury what it

18    should do if it finds there is a relevant two-sided market—"you should consider both sides of the

19    market in applying these instructions to evaluate Epic's claims based on the markets you have found to

20    be two-sided"—again based on *Ohio v. American Express*. *Id.* at 2287.  By contrast, Google's

21    proposed two-sided market language instructs the jury to *assume* that this case involves "two-sided

22    platforms" that should be treated as two-sided markets.  This is misleading as Epic does not contend

23    that one of its alleged markets—for in-app billing services—is two-sided or includes app users.

24    Moreover, Google's statement that the "value" of the two-sided platform it has asked the jury to

25    assume exists will invariably rise as more participants join is confusing and improperly argumentative;

26    indeed, it may suggest to the jury that for two-sided markets, a complete monopoly is preferable to

27    competition.  Although the *American Express* Court observed that "two-sided platforms **often** exhibit

28    what economists call 'indirect network effects'", Google's instruction improperly tells the jury to

assume that all "two-sided platforms" exhibit such characteristics.  138 S. Ct. at 2280.  Google is free to present evidence and argument about the supposed "value" of its platform and the factors that increase that value. But the jury instructions should not include such argument. Google has made three additional substantial, unsupported changes to the Model.  *First,* Google has added the following two lines to the end of the second paragraph in its instruction:  "If you find that Epic has proven a valid relevant product market, then you should continue to evaluate the remainder of Epic's claims as they pertain to that market.  However, if you find that Epic has failed to prove such a market, then you must find in Google's favor on Epic's claims".  That is contrary to law.  Even if the jury does not agree with the Epic's alleged markets, they should still consider the remainder of the elements of Epic's claims as to any markets they did find.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting "radical" argument to the contrary).[1]  *Second*, Google adds a vague, out-of-context statement that "The relevant product market must reflect commercial realities", but does not explain to the jury what commercial realities they refer to or how that should inform the jury's determination.

*Third*, Google adds a highly argumentative paragraph to the Model that directs the jury to consider the economic forces that restrain Google itself, and to accept or at least presume that "[t]he **most likely and most important** restraining force [on Google] will be actual and potential competition from other firms and their products".  Including this language would mislead the jury by improperly instructing them that "actual and potential competition" is both "most likely" and "most relevant" constraint on Google, and that this is somehow relevant to assessing market definition.  Google is free to argue its market power is constrained by competition, but that has nothing to do with market definition and would not be an issue for the Court's instruction.  Rather, it is the type of argument Google may make through expert testimony or closing argument.  *See Curtis v. City of Oakland*, 2016 WL 1138457, at *4 (N.D. Cal. Mar. 23, 2015). Likewise, *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023) is inapplicable because it held—on a motion to dismiss—that "the alleged markets lack sufficient clarity to state an antitrust claim plausibly." *Id.* at 956.

---

[1] In *Apple*, the district court found its own market—a decision the Ninth Circuit affirmed.  That disposes of Google's theory that a plaintiff cannot win in such circumstances.  *Apple*, 67 F.4th at 978 (accepting "a third in-between market").

1

2

### Defendants' Argument Re Disputed Instruction No. 18
### MONOPOLIZATION – RELEVANT PRODUCT MARKET

3

4      Epic's proposed instruction does not require Epic to prove a relevant market, nor does it

instruct the jury regarding critical features of market definition.  This is incorrect as a matter of law.

5      "Failing to define a relevant market alone is fatal to an antitrust claim."  *Coronavirus Reporter*

6  *v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023).  "Without a defined relevant market in terms of

7  product or service, one cannot sensibly or seriously assess market power."  *Id.*  Epic takes the Ninth

8  Circuit's decision from its litigation against Apple out of context.  There, the district court rejected

9  both parties' market definition following a bench trial.  The Ninth Circuit explained that such a

10 decision by the district court did not end the case.  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978

11 n.9 (9th Cir. 2023).  But that decision does not support Epic's suggestion that if *the jury* could

12 conceive of *any* market, then it should consider the remainder of Epic's claim.  Epic cites no precedent

13 for a jury finding its own market after rejecting the plaintiff's proffered markets.  That would preclude

14 meaningful appellate review absent a special verdict form in which the jury explains the relevant

15 market it finds.  That is fundamentally different from the *Epic v. Apple* litigation, where the court

16 accepted the defendant's proposed market.  Moreover, because *Epic v. Apple* was a bench trial, the

17 district court issued findings of fact and conclusions of law regarding the relevant market, enabling

18 appellate review.  The same could not be done with a jury.  The law is clear:  in order to succeed, Epic

19 must prove a relevant market.  *Coronavirus Reporter*, 85 F.4th at 957 ("Because Plaintiffs-Appellants

20 do not meet the threshold step of defining a relevant market, we reject their antitrust claims and need

21 not proceed further with the analysis"); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("A

22 threshold step in any antitrust case is to accurately define the relevant market[.]").

23      Further, Epic's proposed instruction fails to instruct the jury on critical features of market

24 definition.  Epic's market definition instruction does not incorporate the concept of constraints on the

25 exercise of market power.  "The goal in defining the relevant market is to identify the market

26 participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict

27 output."  *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  Epic's

28 market definition instruction omits that a relevant market includes firms and products that constrain a

price increase above the competitive level or constrain a reduction in quality below the competitive

level.  "There can be no doubt as a matter of case law, the Merger Guidelines, and economic theory,

that market constraints work not only to limit one's ability to raise prices above a competitive level,

but also to limit one's ability to reduce quality or service below competitive levels."  *Cmty. Publishers,*

*Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1153 n.8 (W.D. Ark. 1995), *aff'd sub nom. Cmty. Publishers,*

*Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998).  The evidence at trial will support this principle.

Indeed, Epic's own expert, Dr. Bernheim, opines that "[t]he standard approach to defining an antitrust

market" involves whether a firm "could profitably raise prices significantly above (or reduce quality

significantly below) competitive levels, despite the possibility of substitution to other products,

assuming the alternatives are competitively priced."

1
2

**Disputed Instruction No. 19 Re**
**RELEVANT PRODUCT MARKET – AFTERMARKETS**
**Offered by Plaintiff**

3

Epic opposes the inclusion of this instruction for the reasons in Epic's Argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 19 Re**
**RELEVANT PRODUCT MARKET – AFTERMARKETS**
**Offered by Defendants**

Epic's alleged relevant markets are limited to products or services for Android apps used on Android-branded mobile devices.  Epic contends that the Android app distribution market is a so-called aftermarket for products that consumers use after they have purchased mobile devices.  You are to presume that when consumers buy mobile devices, they make a knowing choice to limit their options in aftermarkets for products and services for Android devices such that competition between mobile devices is a factor in competition among those products and services.  In order to prove the contrary, Epic must prove that (1) technical limits on what products work on mobile devices are not generally known when consumers purchase those devices; (2) significant information costs prevent consumers from accurately calculating the total cost of a mobile device and products and services used on that device; and (3) there are significant monetary or non-monetary costs to switching mobile devices.  Epic must also prove that the Android app distribution market satisfies the criteria for a relevant market on which I have previously instructed you.

Source: Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 976-77 (9th Cir. 2023)

1

2

**Plaintiff's Argument Re Disputed Instruction No. 19**
**RELEVANT PRODUCT MARKET – AFTERMARKETS**

3      Epic objects to Google's proposal to give a separate Instruction regarding "Aftermarkets" in its

4 entirety.  The Parties agree that the jury should be instructed regarding how to define a relevant

5 antitrust market generally, based on Model versions of those instructions.  Google's bespoke additional

6 Instruction regarding "Aftermarkets" is unnecessary and misleading because Epic does not contend

7 that the alleged markets constitute "aftermarkets" subject to the analysis proposed by Google.

8      Unlike in the "single-brand aftermarkets" cases cited by Google, the markets alleged by Epic

9 are not determined by or dependent on consumers' choices to purchase a durable good from the alleged

10 monopolist.  *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992); *Epic Games v.*

11 *Apple*, 67 F.4th 946 (9th Cir. 2023).  In *Kodak*, the alleged "aftermarket" included consumers who had

12 chosen to buy printing equipment from the alleged monopolist, Kodak.  That aftermarket "for antitrust

13 purposes is determined by the choices available to Kodak equipment owners".  *Kodak*, 504 U.S. at

14 482.  And because "services and parts for Kodak equipment are not interchangeable with other

15 manufacturers' service and parts, the relevant market . . . is composed of only those companies that

16 service Kodak machines".  *Id.*  Similarly, in *Apple*, the court explained that "the relevant market for

17 antitrust purposes can be an aftermarket—where demand for a good is entirely dependent on the prior

18 purchase of a durable good in a foremarket".  *Apple*, 67 F.4th at 976.  The markets alleged in *Apple*

19 involved consumers who had purchased durable goods sold exclusively by the alleged monopolist, and

20 the *Apple* court applied the aftermarket analysis to those consumers.  *See, e.g., id.* at 979 (considering

21 whether Apple had changed its policy "after some portion of consumers purchased their foremarket

22 durable goods" from Apple).

23      Unlike in *Kodak* and *Apple*, the Android app distribution market is not based on consumers

24 who have purchased their mobile devices from Google.  Rather, most consumers have purchased their

25 Android devices from mobile device manufacturers like Samsung; Google sells a very small minority

26 of Android-compatible phones.  Epic also does not contend that the in-app billing services market is an

27 aftermarket; this market includes app developers who use such services to facilitate in-app transactions

28 and have not purchased durable equipment from anyone.  These facts distinguish this case from *Apple*,

1    where Apple maintained proprietary control over:  the mobile devices it exclusively sold (iPhone), the

2    proprietary and non-licensable operating system used on those devices (iOS), and the app distribution

3    available to consumers who had purchased iPhone (its App Store).  By contrast, Google has described

4    the Android OS as open-source, Google licenses components of that OS to many other manufacturers

5    of mobile devices, and Google purports to allow (rather than exclude, as Apple does) alternative app

6    distribution channels for Android OS devices (although Google then uses anticompetitive means to

7    prevent such competition).  Even if, as Google's proposed instruction says, the alleged relevant

8    markets are "limited to products or services for Android apps used on Android-branded mobile

9    devices," that does not require an aftermarkets instruction.  Consumers' choices still do not depend on

10   whether they have bought a durable good—the mobile device—from Google or from another

11   manufacturer of mobile devices.

12        Google's proposed Aftermarkets instruction should therefore be rejected.  If the Court did

13   consider giving an aftermarket instruction, it should not adopt Google's proposal, which contains other

14   legal errors.  For example, Google seeks to instruct the jury that there is a "presumption" that

15   consumers knowingly limit their subsequent choices when making foremarket purchases; but the Ninth

16   Circuit has held that the aftermarket analysis, if it does apply, asks whether aftermarket restrictions are

17   "not generally known".  *Id*. at 980-81.  Google also proposes to ask the jury whether "technical limits

18   on what products work on mobile devices" were known, but the correct analysis would focus on

19   whether "the challenged aftermarket restrictions" were "generally known", *id*. (emphasis added), and

20   Epic does not challenge the fact that some products do not work on mobile devices because of

21   technical limits.

1
2

**Defendants' Argument Re Disputed Instruction No. 19**
**RELEVANT PRODUCT MARKET – AFTERMARKETS**

3      Google's proposed instruction reflects the law recognized in the *Epic v. Apple* case that was

4   dispositive on the issue of whether Epic had proven its alleged relevant market.  That same law was

5   recently reiterated by the Ninth Circuit in *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 956-57

6   (9th Cir. 2023) (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)).  The jury should

7   be instructed on that law so that they do not reach a result in this case that is inconsistent with the

8   result in the *Epic v. Apple* case based merely on an incorrect instruction.

9      An alleged market where the purchase of a product that depends on the purchase of a durable

10   good in a foremarket is known as an aftermarket.  *See Epic Games, Inc.*, 67 F.4th at 976.  Epic's

11   alleged market for Android app distribution depends on the purchase of an Android device that uses

12   the Android operating system.  Epic alleges that Google has monopoly power and has harmed

13   competition in an alleged market for Android distribution that includes the Google Play store but not

14   the Apple App Store because consumers that have purchased an Android device cannot use the Apple

15   App Store on that device.  As a result, Epic has alleged an aftermarket.  *See Coronavirus Reporter*, 85

16   F.4th at 956 (explaining that because the plaintiffs "allege[d] downstream markets in a manner that

17   implies the Apple App Store's apps constitute their own market," they had alleged "a single-brand

18   market").

19      In *Epic v. Apple*, Epic alleged an aftermarket limited to the Apple App Store that did not

20   include the Google Play store because consumers that purchase iPhones cannot use the Play store on

21   those devices.  The Ninth Circuit held that Epic had not proven a separate market for the Apple App

22   Store.  In doing so, the Ninth Circuit held that the Supreme Court's decision in *Eastman Kodak Co. v.*

23   *Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) "placed the burden on a plaintiff to rebut the economic

24   presumption that ... consumers make a knowing choice to restrict their aftermarket options when they

25   make a foremarket purchase." 67 F.4th at 979; *Coronavirus Reporter*, 85 F.4th at 956 ("Plaintiffs-

26   Appellants do not demonstrate that iOS end consumers lacked awareness that buying an iPhone

27   constrains which apps would be available to them through the App Store.").  Google's proposed

28   instruction correctly instructs the jury regarding this presumption.

এ

1    The Ninth Circuit further explained that, to overcome this presumption and "establish a single-

2   brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are not generally

3   known when consumers make their foremarket purchase; (2) significant information costs prevent

4   accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4)

5   general market-definition principles regarding cross-elasticity of demand do not undermine the

6   proposed single-brand market." 67 F.4th at 977.  Epic's failure to satisfy this test was dispositive of its

7   ability to prove a market for the Apple App Store that did not include the Google Play store.  In this

8   case, the jury should be instructed on this law in evaluating whether Epic has proven a separate market

9   for Android app stores like the Google Play store that does not include the Apple App Store.

10    The key issue with respect to an aftermarket is whether competition in the foremarket will

11   prevent a firm from raising prices above or reduce quality below the competitive level in the

12   aftermarket.  For example, in *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451 (1992), the

13   key issue was "whether competition in the equipment market" for copiers "will significantly restrain

14   power in the service and parts markets." *Id.* at 470.  Kodak argued that "it could not have the ability to

15   raise prices of service and parts above the level that would be charged in a competitive market because

16   any increase in profits from a higher price in the aftermarkets at least would be offset by a

17   corresponding loss in profits from lower equipment sales as consumers began purchasing equipment

18   with more attractive service costs." *Id.* at 465–66.  Similarly here, the question will be whether

19   vigorous competition between iPhones and Android phones restrains Google from operating the

20   Google Play store without regard to the Apple App Store.  The jury should be instructed on Ninth

21   Circuit law regarding that critical issue.

22    Because this case involves an aftermarket, and because Google's instruction accurately states

23   Ninth Circuit law, the Court should adopt Google's proposed instruction.

1

**Disputed Instruction No. 20 Re**
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**
**Offered by Plaintiff**

2

3    Epic opposes the inclusion of this instruction for the reasons in Epic's argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 20 Re**
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**
**Offered by Defendants**

In deciding whether Epic has proven a relevant product market, you may also consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to which the producers of one product would be willing to shift their resources, such as intellectual property, manufacturing facilities, or personnel to producing another product in response to an increase in the price or decrease in the quality of the other product. Such producers, to the extent that they exist, can increase supply and, therefore, drive prices or quality back to competitive levels, defeating any effort by a would-be monopolist to charge significantly higher prices or significantly lower product quality.

Take two shoe manufacturers, for example. The first manufacturer produces shoes for women, while the second manufacturer produces shoes for men. Generally speaking, men's and women's shoes are not reasonably interchangeable and, therefore, might be thought of as being in a separate product markets. However, it is possible that the men's shoe manufacturer could quickly shift its resources to start producing women's shoes if the women's shoe manufacturer raised its prices or decreased its quality significantly and vice versa. Although women would not buy men's shoes, nor would men buy women's shoes, the ability of each manufacturer to alter its production could prevent the other manufacturer from raising prices or decreasing quality significantly. Thus, in this example, men's and women's shoes would be included in the same market.

If, in determining the products in the relevant product market you find that there are manufacturers that have the ability to alter their production to manufacture products that can reasonably be substituted with Google's—even though they do not presently compete with Google—you may consider whether the existence of these potential alternative suppliers can influence the prices or quality of the Google Play store. However, if you find that there are no others who would switch production to products that would compete with Google's, you may define the market solely on your evaluation of whether the existing allegedly competing products are reasonable substitutes for each other.

Source:  ABA Model Civil Antitrust Jury Instructions 3.A.5

1

2

**Plaintiff's Argument Re Disputed Instruction No. 20**
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**

3          Epic objects to Google's proposal that the jury be separately instructed to consider supply

4   substitutability as an element of market definition.  The dominant view among antitrust courts and

5   regulators is that market definition focuses on demand-side substitutability.  *See* 2010 Horizontal

6   Merger Guidelines § 4 ("Market definition focuses solely on demand substitution factors, i.e., on

7   customers' ability and willingness to substitute away from one product to another in response to a price

8   increase or a corresponding non-price change such as a reduction in product quality or service.").

9   Even the few courts that have considered supply-side substitutability when defining antitrust markets

10  recognize that courts generally focus on demand-side substitutability, and may only consider supply-

11  side substitutability as an additional or subsidiary consideration.  *See FTC v. Meta Platforms, Inc.*,

12  2023 WL 2346238, at *13 (N.D. Cal. 2023) ("Although relevant markets are generally defined by

13  demand-side substitutability, supply-side substitution also informs whether alternative products may be

14  counted in the relevant market").  The *Meta Platforms* court, for example, drawing on the Supreme

15  Court's 1962 opinion in *Brown Shoe v. United States*, 370 U.S. 294, considered the issue as one of

16  ***seven*** "practical indicia" that could inform the analysis of whether plaintiffs had properly alleged a

17  relevant market.  *Id*.  But neither that court nor *Brown Shoe* suggested that the factor that *Brown Shoe*

18  described as "unique production facilities" and that others describe as "supply-side substitution" could

19  substitute for, or be considered on parity with, the fundamental question of demand substitution.  By

20  providing a separate instruction on just this topic, the ABA Model Instructions erroneously elevate the

21  weight and importance of this issue to market definition, if it should be given any weight at all.

22          The parties have proposed a general market definition instruction, drawn from Federal Jury

23  Practice and Instructions, that straightforwardly explains that market definition involves determining

24  "if one item could suit buyers' needs substantially as well as the other" and "what you are being asked

25  to do is to decide which products compete with each other".  *See* Instruction No. 18.  Nonetheless,

26  Google proposes giving a lengthy, complicated instruction that is drawn not from this simplified

27  instruction, but from a separate set of longer and more convoluted market definition instructions found

28  in the ABA Model.  Indeed, Google's proposed instruction on this one issue alone is ***longer*** than the

1    general product market definition instruction proposed by the parties.  Google's proposal thus not only

2    proposes a dubious legal instruction, but it will also mislead the jury into thinking that this issue is the

3    most important and dispositive consideration.

4         The problems with Google's proposed instruction are further compounded by the fact that the

5    proposed instruction is itself confusing.  The instruction is highly repetitive; after explaining what

6    supply elasticity is in the first paragraph, the instruction repeats the same concept again and again in

7    different wording in the following paragraphs.  *See Temblador v. Hamburg-American Lines*, 368 F.2d

8    365, 367 (9th Cir. 1966) (holding that a judge may conclude that "to repeat the same words would

9    make them no more clear, and to indulge in variations of statement might well confuse" (quoting

10   *United States v. Bayer*, 331 U.S. 532, 536 (1947))).  The instruction also uses a confusing example

11   related to shoe manufacturers, which has no relevance to the contentions in this case.  There is no

12   analogy to this case because Google proffers no explanation as to what supplier is standing on the

13   outskirts of the markets at issue and could somehow enter those markets to compete with Google's

14   distribution or payment services.  The jury instructions in this case will already be long; having an

15   additional page of confusing instruction on this issue is not only unnecessary, but poses a grave risk of

16   misleading the jury about the nature of a central issue in this case.

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 20**
**RELEVANT PRODUCT MARKET –SUPPLY SUBSTITUTABILITY**

Google's proposed instruction is taken from the ABA Model Civil Antitrust Jury Instructions and is necessary to ensure that the instructions are consistent with Ninth Circuit law.

One facet of market definition involves determining whether consumers would switch to other products if prices increased or quality decreased below the competitive level.  However, under Ninth Circuit law, "defining a market on the basis of demand considerations alone is erroneous."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995).  Rather, "[a]reasonable market definition must also be based on 'supply elasticity.'"  *Id.*  "If producers of product X can readily shift their production facilities to produce product Y, then the sales of both should be included in the relevant market."  *Id.*  Thus, in *Rebel Oil*, the Ninth Circuit held that it would have been erroneous to exclude "full-serve gasoline" from a market that includes self-serve gasoline because "sellers of full-serve gasoline can easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps, expanding output and thus constraining any attempt by ARCO to charge supracompetitive prices for self-serve gasoline."  *Id.*  Here, too, the jury should be instructed that firms' ability to shift supply to products that compete with Google Play is relevant to market definition so that they do not erroneously exclude those firms from the relevant market.

**Disputed Instruction No. 21 Re**
**RELEVANT GEOGRAPHIC MARKET**
**Offered by Plaintiff**

The relevant geographic market is the area in which Google faces competition from other firms that compete in the relevant product markets and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product quality in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Epic has the burden of proving the relevant geographic market by a preponderance of the evidence. In this case, Epic claims that the relevant geographic market is worldwide, excluding China. In determining whether Epic met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

1. the geographic area in which Google sells and where Google's customers are located;

2. the geographic area to which Google's customers turn (or can turn) for supply of the product;

3. the geographic area to which Google's customers have turned or have seriously considered turning;

4. the geographic areas that app developers view as potential sources of competition; and

5. whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

Source: ABA Model Civil Antitrust Jury Instruction 3.2.A.6 (with edits described in Plaintiffs' argument)

**Disputed Instruction No. 21**
**RELEVANT GEOGRAPHIC MARKET**
**Offered by Defendants**

The relevant geographic market is the area in which Google faces competition from other firms that compete in the relevant product markets and to which customers can reasonably turn for purchases.  When analyzing the relevant geographic market, you should consider whether changes in prices or product quality in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market selected must both correspond to the commercial realities of the industry and be economically significant.  The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Epic has the burden of proving the relevant geographic market by a preponderance of the evidence.  In this case, Epic claims that the relevant geographic market is worldwide, excluding China. In determining whether Epic met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which Google sells and where Google's customers–that is, both app developers and app users–are located;

- the geographic area to which app developers and app users turn (or can turn) for supply of the product;

- the geographic area to which app developers and app users have turned or have seriously considered turning;

- the geographic areas that app developers view as potential sources of competition; and

- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

In defining a geographic market involving a two-sided platform, you must take into account both developers and users.

Source:  ABA Model Civil Antitrust Jury Instruction 3.2.A.6

**Plaintiff's Argument Re Disputed Instruction No. 21**
**RELEVANT GEOGRAPHIC MARKET**

Epic's instruction is taken verbatim (with adjustments to placeholder language) from the ABA Model Instruction.

Google proposes three changes to the Model, all of which should be rejected. *First*, Google adds a sentence to the first paragraph stating that "[t]he geographic market selected must both correspond to the commercial realities of the industry and be economically significant." This language is vague and risks misleading the jury. It is unclear what "commercial realities" Google is referring to, and the term is undefined by both Google and the Model. The same is true for the term "economically significant". With no understanding of what this sentence or its terms mean, including them in the instructions risks confusion and inappropriately raising Epic's burden.

*Second*, Google seeks two additions concerning two-sided markets: Google seeks to (a) note in the first factor that its customers are "both app developers and app users" and (b) adds a sentence to the end of the Model instruction stating that "[i]n defining a geographic market involving a two-sided platform, you must take into account both developers and users." These additions should be rejected since they are redundant, unnecessary and will lead to jury confusion. This is misleading and inaccurate because Epic does not contend that one of their alleged markets—for in-app billing services—is two-sided or includes app users. The jury must determine whether to credit Google's contention that the at-issue market is, in fact, two-sided before they proceed to "take into account both developers and users", as Google proposes. Google's instruction pre-determines that issue. Instead, as in Epic's proposed instructions regarding Relevant Product Market (Plaintiff's Disputed Instruction No. 18), jurors should be instructed first to determine if an alleged market is two-sided.

Google's additions do not provide any additional direction for the jury but instead inject confusion into the instruction, because they do not specify how the jury should "consider" app users and app developers in the context of defining a geographic market. Epic has already included discussion on how the jury should consider two-sidedness when defining the relevant product market. *See, e.g.*, Instruction No. 18 Re Monopolization – Relevant Product Market. There is no reason to repeat these

concepts in this Instruction.   Epic's proposed instructions fairly and adequately cover the issues presented.

1

2

**Defendants' Argument Re Disputed Instruction No. 21**
**RELEVANT GEOGRAPHIC MARKET**

3

Epic has omitted a crucial detail from this instruction–that the jury must consider both sides

4
of the alleged markets.  The markets at issue are two-sided.  It is undisputed that the alleged Android app

5
distribution market is two-sided.  Moreover, the alleged market for Android in-app billing services is

6
also two-sided.  *See* Google's Argument Re: Instruction No. 17.  As the Ninth Circuit has explained,

7
"to establish that a practice is anticompetitive in certain two-sided markets, the plaintiff must establish

8
an anticompetitive impact on the 'market as a whole.'"  *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32

9
F.4th 824, 839 (9th Cir. 2022).  As the Supreme Court explained in *Am. Express*:

10

11

12

13

14

> two-sided platforms often exhibit what economists call 'indirect network effects.'
> Indirect network effects exist where the value of the two-sided platform to one group of
> participants depends on how many members of a different group participate.  In other
> words, the value of the services that a two-sided platform provides increases as the
> number of participants on both sides of the platform increases. A credit card, for example,
> is more valuable to cardholders when more merchants accept it, and is more valuable to
> merchants when more cardholders use it.  To ensure sufficient participation, two-sided
> platforms must be sensitive to the prices that they charge each side.

15
*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280-81 (2018) (citations omitted).  For these reasons, the

16
Supreme Court in *Am. Express* held that "courts must include both sides of the platform—merchants and

17
cardholders—when defining the credit-card market."  *Id.* at 2286.  The need to consider both sides of

18
the market pertains to both the geographic and product market inquiries.  It would make little sense to

19
define a product market accounting for both sides of the market and then define a geographic market

20
that accounts for only one side of the market.  For example, it would make no sense to define a market

21
that includes the Play store that accounts for prices and quality for both users and developers but then

22
define the geographic market solely based on prices or equality for users and ignore prices or quality for

23
developers.

24

25

26

27

28

1

**Disputed Instruction No. 22 Re**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**
**Offered by Plaintiff**

2

3     Once you determine what the relevant market is, then you should determine whether Google

4     has monopoly power in that market.

5     You can consider two kinds of proof to determine whether Google has monopoly power: (1)

6     direct proof and (2) indirect proof. In the following instructions, I will explain to you these two kinds

7     of proof that you can consider.

8

9     Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.7, 3.A.8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 22 Re**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**
**Offered by Defendants**

If you find that Epic has proven a relevant market, then you should determine whether Google has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. You must consider the monopolization claims separately with respect to the two relevant markets alleged here: (i) Android app distribution and (ii) Android in-app billing services for digital goods and services transactions. You may find that Google has monopolized both markets, one of the markets, or neither of the markets.

You can consider two kinds of proof to determine whether Google has monopoly power: (1) direct proof and (2) indirect proof. In the following instructions, I will explain to you these two kinds of proof that you can consider.

If you find that Google has monopoly power in a relevant market, then you must consider the remaining elements of this claim.  If you find that Google does not have monopoly power, then you must find for Google and against Epic on its claim.


Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.7, 3.A.8

1
2

**Plaintiff's Argument Re Disputed Instruction No. 22**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**

3      The Parties here offer a sign-posting instruction, derived from the ABA Model Instructions, to

4   introduce the concept of monopoly power before giving the jury instructions on the methods by which

5   such monopoly power is proved.

6      Google's proposed Instruction, however, erroneously instructs the jury that they should only

7   proceed to consider Epic's proof of monopoly power if Epic has proven the relevant markets that Epic

8   has alleged.  The law requires the opposite:  the jury must consider the remaining elements of Epic's

9   monopolization claims even if the jury agrees with Google's contentions about the scope of the

10  relevant markets or comes to a different conclusion than the parties altogether.  *Epic Games v. Apple*,

11  67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting "radical argument that, where the parties offer dueling

12  market definitions, the case immediately ends if the district court finds that the record supports the

13  defendants' proposed market (or a third in-between market, as was the case here) rather than the

14  plaintiff's market").  Google's instruction that the jury "must consider the monopolization claims

15  separately with respect to the two relevant markets alleged here" also erroneously instructs the jury to

16  determine whether the elements of Epic's monopolization claims are met only with respect to the

17  markets alleged by Epic, again contrary to this principle.

18     Moreover, Google's proposed instruction includes redundant sentences that need not be

19  repeated.  *First*, Google proposes stating that "[a]s I instructed you earlier, monopoly power is the

20  power to control prices, restrict output, or exclude competition in a relevant antitrust market."  This is

21  taken verbatim from Instruction No. 17, Monopoly Power—Defined ("Monopoly power is the power

22  to control prices, restrict output, or exclude competition in a relevant antitrust market.").  *Second*,

23  Google seeks to add that if the jury "find[s] that Google has monopoly power in a relevant market,

24  then you must consider the remaining elements of this claim. If you find that Google does not have

25  monopoly power, then you must find for Google and against Epic on this claim."  This language is

26  pulled verbatim from the conclusion of the section on monopoly power, where such a concluding

27  sentence belongs.  *See* Instruction No. 24, Monopoly Power—Indirect Proof ("If you find that Google

28  has monopoly power in a relevant market, then you must consider the remaining elements of this

claim. If you find that Google does not have monopoly power, then you must find for Google and against Epic on this claim.").  There is no need to repeat it here, at the introduction to the types of proof that demonstrate monopoly power.  By repeating verbatim these sentences from different places within the instructions, Google risks confusing the jury and increasing the burden on Epic.  *See Temblador*, 368 F.2d at 367 (holding that a judge may conclude that "to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse").  Google's proposed instruction should be rejected.

1

2

**Defendants' Argument Re Disputed Instruction No. 22**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – TYPES OF PROOF**

3

4

5

6

7

8

Through its proposed instruction, Epic attempts to evade the requirement that it must prove a relevant market.  Epic elides that requirement by starting its instruction with "Once you determine what a relevant market is," rather than asking whether Epic has proven a relevant market.  Through this instruction, Epic (1) flouts the requirement that it must prove a specific market and (2) invites the jury to find a market other than the markets it has offered into evidence.  But that is not the law.  *See* Google's Argument Re: Instruction No. 18.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The law is clear that Epic must prove a relevant market.  "A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"  *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)); *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 957 (9th Cir. 2023) .  As the Supreme Court explained in *Am. Express*, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."  *Am. Express*, 138 S. Ct. at 2285; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("To prevail on a § 2 monopoly claim the ISOs were required to prove that Kodak: (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power.").  Therefore, a Section 2 plaintiff must first "define the relevant market" and then "show that the defendant owns a dominant share of that market."  *Eastman Kodak*, 125 F.3d at 1202; *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 993 (9th Cir. 1986); *see Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998) ("The burden is on the plaintiff to define both components [product and geographic] of the relevant market."); *Double D. Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("It is the plaintiff's burden to define the relevant market.").

24

25

26

27

28

**Disputed Instruction No. 23 Re**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**
**Offered by Plaintiff**

There are two ways to provide direct proof of monopoly power, which I will now explain.

**Raising or Maintaining Prices Above Competitive Levels**

In order to provide direct proof of monopoly power, Epic has the burden of proving that Google has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. Epic must prove that Google has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Epic also has the burden of proving that Google has the power to maintain prices above a competitive level for a significant period of time. If Google attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

**Power to Exclude Competition**

In the alternative, in order to provide direct proof of monopoly power, Epic must prove that Google has the ability to exclude competition. For example, if Google attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Google has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Google would lose a substantial amount of sales if it raised prices substantially, or that Google's profit margins were low compared to its competitors, or that Google's margins go up and down or are steadily decreasing, might be evidence that Google does not have monopoly power.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.8 (with edits described in Plaintiff's argument)

**Disputed Instruction No. 23 Re**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**
**Offered by Defendants**

There are two ways to provide direct proof of monopoly power, which I will now explain.

**Raising or Maintaining Prices Above Competitive Levels**

In order to provide direct proof of monopoly power, Epic has the burden of proving that Google has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels and reduce or maintain the quality of goods or services in the relevant market below competitive levels, considering both app users and app developers. Epic must prove that Google has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Epic also has the burden of proving that Google has the power to maintain prices above a competitive level and quality below the competitive level for a significant period of time. If Google attempted to maintain prices above competitive levels or reduce quality below competitive levels, but would lose so much business to other competitors that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

**Power to Exclude Competition**

In the alternative, in order to provide direct proof of monopoly power, Epic must prove that Google has the ability to exclude competition. For example, if Google attempted to maintain prices above competitive levels or reduce quality below competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase or quality reduction would become unprofitable and would have to be withdrawn, then Google does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Google has monopoly power. Epic cannot prove monopoly power simply by pointing to high profitability margins without also providing competent evidence for what competitive margins should be. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than

other companies for similar goods or services over a long period of time may be evidence of monopoly power although it is not sufficient, on its own, to prove monopoly power. By contrast, evidence that Google would lose a substantial amount of sales if it raised prices substantially or reduced quality substantially, or that Google's profit margins were low compared to its competitors, or that Google's margins go up and down or are steadily decreasing, might be evidence that Google does not have monopoly power.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.8

**Plaintiff's Argument Re Disputed Instruction No. 23**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**

Epic's proposed instruction is only slightly modified from the ABA Model Instruction and is rooted in case law.  *First*, Epic replaces the first paragraph of the Model Instruction (which is redundant with the "Types of Proof" instruction) and replaces it with a neutral introductory sentence. *Temblador*, 368 F.2d at 367 (holding that a judge may conclude that "to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse").  *Second*, Epic adds headings to sections of the instruction on raising or maintaining prices above competitive levels and on the power to exclude competition.  *Third*, the Parties agree to add an introductory clause to the second section, "Power to Exclude Competition", to explain that Epic, "in the alternative" to a showing of Google's power to maintain or raise prices above competitive levels, Epic can prove monopoly power through evidence of Google's power to exclude competition.  This introductory language is helpful to the jury and consistent with the law.  *See United States v. du Pont Co.*, 351 U.S. 377, 391 (1956) (defining monopoly power as "the power to control prices or exclude competition"). *Finally*, Epic deletes the last sentence (which indicates that the jury must find for defendant if Epic fails to prove monopoly power directly) because Epic will introduce both direct and indirect proof of monopoly power, and a similar sentence appears at the conclusion of the subsequent instruction on indirect proof.

Google's revisions should be rejected.  In the second, third, fourth and fifth paragraphs, Google revises the Model Instruction to state that, to prove monopoly power, Epic has the burden of proving that Google both (a) has the power to maintain prices above competitive levels, ***and*** (b) has the power to "reduce or maintain the quality of goods or services in the relevant market below competitive levels."  That is an incorrect statement of the law.  The Supreme Court has repeatedly held that ***either*** increased prices ***or*** reduced quality or output is direct evidence of monopoly power.  *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, ***such as*** a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"

1   (emphasis added) (quoting 7 Areeda & Hovenkamp ¶ 1511, p. 429 (1986))); *see also United States v.*

2   *Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("monopoly power [is] 'the power to control prices or

3   exclude competition'" (quoting *United States v. du Pont Co.*, 351 U.S. 377, 391 (1956)).  Further,

4   Google's argument that Epic must prove both increased prices and decreased quality defies economic

5   sense, as these are merely two sides of the same coin:  unless demand is entirely inelastic, increased

6   prices will almost invariably cause consumers to buy less, thus decreasing output, and vice versa.

7   Moreover, Google itself concedes in its proposed Monopolization—Willful Acquisition or

8   Maintenance instruction that "[i]n order to have an anticompetitive effect, an act must harm the

9   competitive process and thereby harm consumers by resulting in prices that are above the competitive

10  level *or quality or output* that is below the competitive level."  *See also* Defendants' Proposed

11  Instruction No. 25 ("Some examples of harm to competition include increased prices, fewer

12  transactions, decreased production levels, and reduced quality."). This demonstrates that the ABA

13  Model Instruction is sound.

14        In the fifth paragraph, Google revises the Model Instruction to state that "Epic cannot prove

15  monopoly power simply by pointing to high profitability margins without also providing competent

16  evidence for what competitive margins should be."  Again, not so.  In *Epic Games, Inc. v. Apple Inc.*,

17  559 F. Supp. 3d 898 (N.D. Cal. 2021), *rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023), the court

18  rejected the need for a comparison to a competitive margin, finding that, "under *any normative*

19  *measure*, the record supports a finding that [defendant's] operating margins tied to [its app store] are

20  *extraordinarily high*."  *Id.* at 953.  Because Apple's "persistently high economic profit is suggestive of

21  market power", the court concluded that "even without comparison to other stores, the operating

22  margins strongly show market power".  *Id.* at 993-94.  On appeal, the Ninth Circuit refused to reverse

23  the court's finding that the defendant's prices were probative of market power.  67 F.4th at 984-85.

24  Moreover, Google's proposed instruction places an unwarranted burden on Epic, ignoring the fact that

25  a defendant's sustained monopoly power in a relevant market may render it impossible for a plaintiff to

26  provide evidence for what competitive margins should be.  The Court should reject Google's

27  unsupported changes to the ABA Model Instruction.

28

1
2

**Defendants' Argument Re Disputed Instruction No. 23**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – DIRECT PROOF**

3

Epic's jury instruction on "direct proof" of monopoly power is contrary to controlling law in two

4

critical respects.

5

*First*, Epic erroneously proposes that it can meet its burden of proving monopoly power by

6

presenting evidence either that "Google has the power to maintain prices above a competitive level for

7

a significant period of time" *or* "in the alternative" evidence that "Google has the ability to exclude

8

competition" without more.  That is incorrect as a matter of law.  The Supreme Court holds that "[m]arket

9

power is the ability to raise price profitably *by restricting output*."  *Ohio v. Am. Express Co.*, 138 S. Ct.

10

2274, 2288 (2018) (quoting Areeda & Hovenkamp § 5.01) (emphasis added by Supreme Court).  "Where

11

... output is expanding at the same time prices are increasing, rising prices are equally consistent with

12

growing product demand."  *Id.* at 2288.  As the Ninth Circuit has explained:

13

14

> A predator has sufficient market power when, *by restricting its own output*, it can restrict
> marketwide output and, hence, increase marketwide prices. Prices increase marketwide
> in response to the reduced output because consumers bid more in competing against one
> another to obtain the smaller quantity available.

15

16

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (internal citations omitted,

emphasis added); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021) ("Unless the firms have the

17

power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes

18

sense to understand their cooperation as benign or beneficial.") (quoting *Polk Bros., Inc. v. Forest City*

19

*Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985)).  The ABA model instruction correctly provides that a

20

plaintiff must "prove that defendant has the power to maintain prices above a competitive level" *and*

21

"[s]imilarly, plaintiff must prove that defendant has the ability to exclude competition."  ABA Model

22

Civil Antitrust Jury Instr. 3.A.8.

23

*Second*, Epic's proposed instruction is incomplete because it would not instruct the jury that

24

monopoly power also involves the power to reduce quality below a competitive level.  "There can be

25

no doubt as a matter of case law, the Merger Guidelines, and economic theory, that market constraints

26

work not only to limit one's ability to raise prices above a competitive level, but also to limit one's

27

ability to reduce quality or service below competitive levels."  *Cmty. Publishers, Inc. v. Donrey Corp.*,

28

1  892 F. Supp. 1146, 1153 n.8 (W.D. Ark. 1995), *aff'd sub nom. Cmty. Publishers, Inc. v. DR Partners*,

2  139 F.3d 1180 (8th Cir. 1998); *see also* Merger Guidelines § 0.1, n. 6 ("Sellers with market power also

3  may lessen competition on dimensions other than price, such as product quality, service, or

4  innovation.").  The evidence at trial will support this instruction.  Epic's own expert, Dr. Bernheim,

5  opines that Google can "exercise its monopoly power by persistently raising prices above competitive

6  levels (and/or reducing quality)."

7          *Third*, Epic's proposed instruction fails to account for the situation where, as here, a two-sided

8  market is asserted.  The Supreme Court holds that where a two-sided market is at issue, it is necessary

9  to evaluate both sides of the market to evaluate any alleged competitive impact.  *Ohio v. Am. Express*

10 *Co.*, 138 S. Ct. 2274, 2287 (2018) ("Evaluating both sides of a two-sided transaction platform is also

11 necessary to accurately assess competition. . . . Thus, competition cannot be accurately assessed by

12 looking at only one side of the platform in isolation").  Moreover, the questions of whether a market is

13 two-sided and how competition is to be assessed in such a market are issues of law, so the jury must be

14 instructed on these considerations.  *U.S. Airways, Inc. v. Sabre Holdings*, 938 F.3d 43, 58 (2d Cir. 2019).

15 That the relevant market here is two-sided is particularly critical for the inquiry into monopoly power

16 because, as the Supreme Court has recognized, "Price increases on one side of the platform likewise do

17 not suggest anticompetitive effects without some evidence that they have increased the overall cost of

18 the platform's services."  *Am. Express*, 138 S. Ct. at 2286.  Thus, Epic's proposal to have the jury

19 consider "prices" without any consideration of both sides of the platform – app developers and app users

20 – is legal error and should be rejected.  Google's proposed instruction properly reflects the Supreme

21 Court's guidance for assessing two-sided markets.

22

23

24

25

26

27

28

**Disputed Instruction No. 24 Re**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**
**Offered by Plaintiff**

If you find that Epic has proven a relevant market, then you should determine whether Google has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market. Epic has introduced evidence of the structure of their markets to show that Google has monopoly power. The evidence presented by the parties includes evidence of Google's market share, including market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors. If this evidence establishes that Google has the power to control prices and exclude competition in the relevant antitrust markets, then you may conclude that Google has monopoly power in those market.

**Market Share**

The first factor that you should consider is Google's share of the relevant markets. Based on the evidence that you have heard about Google's market shares, you should determine Google's market shares as a percentage of total sales in the relevant markets. Google must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Google for sales), the entry and exit by other companies, and the number and size of competitors. Along with Google's market share, these factors should inform you as to whether Google has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Google has monopoly power. However, if you find that the other evidence demonstrates that Google does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Google has monopoly power.

**Market Share Trends**

The trend in Google's market share is something you may consider. An increasing market share

1   may strengthen an inference that a company has monopoly power, particularly where that company has

2   a high market share, while a decreasing share might show that a company does not have monopoly

3   power.

4           **Barriers to Entry**

5           You may also consider whether there are barriers to entry into the relevant market. Barriers to

6   entry make it difficult for new competitors to enter the relevant market in a meaningful and timely

7   way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the

8   large financial investment required to build a plant or satisfy governmental regulations, specialized

9   marketing practices, and the reputation of the companies already participating in the market (or the

10   brand name recognition of their products).

11           Evidence of low or no entry barriers may be evidence that Google does not have monopoly

12   power, regardless of Google's market share, because new competitors could enter easily if Google

13   attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry

14   along with high market share may support an inference that Google has monopoly power.

15           **Entry and Exit by Other Companies**

16           The history of entry and exit in the relevant market may be helpful to consider. Entry of new

17   competitors or expansion of existing competitors may be evidence that Google lacks monopoly power.

18   On the other hand, departures from the market, or the failure of firms to enter the market, particularly

19   if prices and profit margins are relatively high, may support an inference that Google has monopoly

20   power.

21           **Number and Size of Competitors**

22           You may consider whether Google's competitors are capable of effectively competing. In other

23   words, you should consider whether the financial strength, market shares, and number of competitors

24   act as a check on Google's ability to price its products. If Google's competitors are vigorous or have

25   large or increasing market shares this may be evidence that Google lacks monopoly power. On the

26   other hand, if you determine that Google's competitors are weak or have small or declining market

27   shares, this may support an inference that Google has monopoly power.

28

1

## **<u>Conclusion</u>**

2    If you find that Google has monopoly power in a relevant market, then you must consider the

3  remaining elements of this claim. If you find that Google does not have monopoly power in any

4  relevant market, then you must find for Google and against Epic on the claim with respect to that

5  relevant market.

6

7  Source: ABA Model Civil Antitrust Jury Instruction 3.A.7 (with edits described in Plaintiff's

8  argument)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 24 Re**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**
**Offered by Defendants**

To demonstrate market power indirectly, Epic must show that Google owns a dominant share of that market, and show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.

**Market Share**

Google must have a significant share of the market in order to possess monopoly power. Based on the evidence that you have heard about Google's market share, you should determine Google's market share as a percentage of total sales in the relevant market. The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 65 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power.

**Barriers to Entry**

Even if you find that Google has a high share of a relevant market that Epic has proven, you must next determine whether there are barriers to entry into the relevant market. A mere showing of substantial or even dominant market share alone cannot establish market or monopoly power.  Epic must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output if the defendant raises price above competitive levels or reduces quality below competitive levels.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Evidence of low or no entry barriers is evidence that Google does not have monopoly power, regardless of Google's market share, because new competitors could enter easily if Google attempted to raise prices for a substantial period of time.  If you find that Epic has not proven that there are entry barriers in a relevant antitrust market, then you must find that Epic has not proven indirectly that Google has monopoly power in that market.

**Entry and Exit by Other Companies**

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Google lacks monopoly power.

1  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if

2  prices and profit margins are relatively high, may support an inference that Google has monopoly power.

3  **Number and Size of Competitors**

4         You may consider whether Google's competitors are or were capable of effectively competing.

5  In other words, you should consider whether the financial strength, market shares, and number of

6  competitors act as a check on Google's ability to price its products. If Google's competitors are vigorous

7  or have large or increasing market shares, this may be evidence that Google lacks monopoly power. On

8  the other hand, if you determine that Google's competitors are weak or have small or declining market

9  shares, this may support an inference that Google has monopoly power, although it is not sufficient on

10  its own to prove that Google has monopoly power.

11  **Conclusion**

12         If you find that Google has monopoly power in a relevant market, then you must consider the

13  remaining elements of Epic's claim for monopolizing that market. If you find that Google does not have

14  monopoly power in a relevant market, then you must find for Google and against Epic on its claim for

15  monopolizing that market.

16

17  Source: Adapted from ABA Model Civil Antitrust Jury Instruction 3.A.7; *Rebel Oil Co v. Atl.*

18  *Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)

19

20

21

22

23

24

25

26

27

28

**Plaintiff's Argument Re Disputed Instruction No. 24**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**

Epic's instruction is a near copy of the ABA Model Instruction.  This instruction, in slightly modified form, was given in *SmithKline Beacham Corp. v. Abbott Labs.*, 07-cv-5702 (N.D. Cal.) and *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D. Cal.).  *See* Final Jury Instructions at 11-14, 07-cv-5702, ECF No. 485 (N.D. Cal. Mar. 25, 2011); Jury Instructions at 44-45, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020).

Google proposes deleting most of Epic's first paragraph, which explains that the indirect forms of proof of monopoly power are intended to inform the ultimate question of whether Google has monopoly power—i.e., "the power to control prices and exclude competition"—as described in the immediately preceding instruction. Google's proposal seeks to misdirect the jury away from that question by requiring that Epic "show that the defendant owns a dominant share of that market, ***and*** show that there are significant barriers to entry ***and*** show that existing competitors lack the capacity to increase their output in the short run."  Google also makes corresponding changes to each of the subsections on these topics.  But Google's authority, *Rebel Oil Co v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), does not require this Court to give this instruction. To begin with, *Rebel Oil* was decided nearly 30 years ago, and the ABA Model Instruction has not been revised as Google proposes. And for good reason.  The *Rebel Oil* court assessed whether there was a genuine issue of disputed fact regarding market power in the context of alleged predatory pricing.  Contrary to Google's proposed instruction, the court held that there was no universal requirement that a plaintiff demonstrate barriers to entry during a period of anti-competitive conduct.  *Id*. at 1440 ("We know of no authority that would require, as proof of market power, evidence of entry barriers throughout the period of predation.").

Google's proposal that the jury be instructed that Epic must show "existing competitors lack the capacity to increase their output" is similarly unjustified.  While it is true that the *Rebel Oil* court found competitors' ability to expand their operations to cut against a finding of market power, the court found evidence of "excess capacity" to be relevant because it informed the ultimate question of whether a dominant firm has "the ability to control output and prices—the essence of market power".  *Id*. at 1441.  This is the basic legal principle that the ABA Model Instruction already explains; evidence of market structure, including barriers to entry and excess capacity, is relevant to the ultimate

1    question of market power.  Google's proposal would eliminate the focus on that ultimate issue in favor

2    of improperly elevating subsidiary factual considerations.  The jury should not be instructed on out-of-

3    context holdings from cases involving disparate factual circumstances when the Model instruction

4    adequately covers the topic.  *See Heath v. Cast*, 813 F.2d 254, 261 (9th Cir. 1987).

5         The Court should also reject Google's proposals to deviate from the Model so as to delete or

6    mangle other factors relevant to monopoly power.  For example, Google proposes to delete an

7    instruction allowing the jury to consider market share trends, contrary to law.  *Air Passenger Comp.*

8    *Res. Sys.*, 694 F. Supp. at 1460 ("[H]istorical trends within the industry" are relevant to a finding of

9    market power).  Google proposes to inform the jury that barriers to entry exist only when "new rivals

10   are ***barred***" from entry, again contrary to law, which does not require absolute bars on entry.  *E.g,. Los*

11   *Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993) (barriers to entry exist

12   based on "additional long run costs" incurred by new entrants or "factors that deter entry while

13   permitting incumbent firms to earn monopoly returns").  Google also seeks to delete from the Model

14   relevant examples of barriers to entry, including intellectual property, large financial investments

15   required to compete, and the reputation of companies already operating in the space.  These are all

16   cognizable barriers to entry, *see* Areeda & Hovenkamp, *Antitrust Law* ¶ 941, appearing in the Model

17   Instruction.  Google further proposes to instruct the jury that it should consider whether competitors

18   "are ***or were*** capable of effectively competing", even though Epic's case focuses on Google's ***ongoing***

19   monopoly maintenance, which is based on current market conditions.

20        *Finally*, Google seeks to mislead the jury by informing it that "[a] market share below 65

21   percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power"

22   without also informing the jury, as the Model does, that "if you find that the other evidence

23   demonstrates that Google does, in fact, have monopoly power despite having a market share below 50

24   percent, you may conclude that Google has monopoly power".  Google's proposal to substitute a 65%

25   standard for the 50% standard provided by the Model is contrary to law.  Google's own authority states

26   that "numerous cases" use a 50% threshold in determining whether plaintiffs have made a prima facie

27   showing of monopoly power.  *See Rebel Oil*, 51 F.3d at 1438; *see also Aya Healthcare Servs. v. AMN*

28   *Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1333 (S.D. Cal. 2020).

1
2

**Defendants' Argument Re Disputed Instruction No. 24**
**MONOPOLIZATION – EXISTENCE OF MONOPOLY POWER – INDIRECT PROOF**

3

    The jury instruction proposed by Epic on "indirect proof" of monopoly power is contrary to

4

controlling law in two specific respects.

5

    *First*, Epic proposes language stating that "[a] market share below 50 percent is ordinarily not

6

sufficient to support a conclusion that Google has monopoly power."  While that is consistent with the

7

ABA model instruction, the implication is contrary to Ninth Circuit authority.  In this Circuit, the market

8

share threshold for finding a prima facie case of monopoly power is generally no less than 65 percent

9

market share.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997)

10

("Courts generally require a 65% market share to establish a prima facie case of market power"); *see*

11

*also Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986) ("[A]s far as we know,

12

neither the Supreme Court nor any other court has ever decided whether a market share as low as 60-

13

69% is sufficient, standing alone, to sustain such a finding").  Indeed, a Fourth Circuit decision observed

14

that "the Supreme Court has never found a party with less than 75% market share to have monopoly

15

power. And we have observed 'that when monopolization has been found the defendant controlled

16

seventy to one hundred percent of the relevant market.'"  *Kolon Indus. Inc. v. E.I. DuPont de Nemours*

17

*& Co.*, 748 F.3d 160, 174 (4th Cir. 2014) (citations omitted).  Epic compounds this legal error by

18

proposing that the jury "may conclude that Google has monopoly power" even if it finds "a market share

19

below 50 percent," which is contrary to controlling Ninth Circuit law.

20

    Similarly, Epic's proposal that the jury may find monopoly power from "an increasing market

21

share" regardless of Google's actual market share is contrary to the authorities discussed above and

22

should be omitted.  Epic's proposed low threshold, along with their attempts to instruct the jury to find

23

monopoly power regardless of any market share findings, misstate the law, and they must be rejected.

24

Google's proposal is consistent with controlling authority.

25

    *Second*, and relatedly, Epic proposes to instruct the jury to consider "barriers to entry" with no

26

reference to any findings on market share.  This would improperly permit a finding of "monopoly power"

27

even if the jury finds that Google had a low market share or permit a finding of monopoly power without

28

proof of barriers to entry.  That is also contrary to Ninth Circuit law.  A finding of monopoly or market

power requires that "a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, *and* (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (emphasis added). Thus, *even if* a defendant is found to have a high—above 65%—market share, a jury can conclude it lacks monopoly power by finding low barriers to entry. Epic derides the Ninth Circuit's *Rebel Oil* decision as being nearly 30 years old. But Ninth Circuit case law from this very month confirms that "a plaintiff *must* … show that there are significant barriers to entering [the] market." *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (emphasis added). Epic flips this precedent on its head in seeking to allow the jury to find monopoly power solely from barriers to entry even in the absence of a high market share. Epic's proposal is contrary to the law and must be rejected. Google's proposed instruction follows Ninth Circuit law.

**Disputed Instruction No. 25 Re**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**
**Offered by Plaintiff[2]**

To prove their monopolization claims, Epic must prove that Google willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.  In evaluating alleged harm in a market that you have found to be two sided, you must consider whether there is harm to either or both sides of the market.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

---

[2] Epic offers here the ABA Model Instruction relevant to their Section 2 claims.  Google's proposed instruction includes a heavily revised version of this ABA Model Instruction as well as language from certain revised Model Instructions copied from the instructions relevant to *Section 1* claims.  Epic objects both to Google's proposed revisions to this proposed instruction as well as to their proposal to include the additional language copied from the Section 1 instructions.  Because Google has insisted on combining these instructions and because Epic cannot address both such objections in a single position statement, it respectfully submits two positions statements, one covering each objection.

1   In determining whether Google's conduct was anticompetitive or whether it was legitimate

2   business conduct, you should determine whether the conduct is consistent with competition on the

3   merits, whether the conduct provides benefits to consumers in the market that Google has

4   monopolized, and whether the conduct would make business sense apart from any effect it has on

5   excluding competition or harming competitors.  In evaluating alleged benefits in a market you have

6   found to be two-sided, you must consider whether there are benefits in either or both sides of the

7   market.

8   The acts or practices that result in the acquisition or maintenance of monopoly power must

9   represent something more than the conduct of business that is part of the normal competitive process or

10  commercial success. They must represent conduct that has made it very difficult or impossible for

11  competitors to compete and that was taken for no legitimate business reason. You may not find that a

12  company willfully acquired or maintained monopoly power through anticompetitive means if it has

13  acquired or maintained that power solely through the exercise of superior foresight and skill; or

14  because of natural advantages such as unique geographic access to raw materials or markets; or

15  because of economic or technological efficiency, including efficiency resulting from scientific

16  research; or by obtaining a lawful patent or patents; or because changes in cost or consumer preference

17  have driven out all but one supplier.

18  In summary, you must determine whether Google's conduct has caused substantial harm to

19  competition in a relevant market.  If there was harm to competition, you must determine whether

20  Google has justified its conduct by proving that its conduct was reasonably necessary to achieve

21  competitive benefits for consumers in that relevant market.  However, if you find that Google could

22  have readily achieved any benefits using reasonably alternative means that would have caused

23  substantially less harm to competition, those benefits cannot justify Google's conduct.  You must then

24  balance any harms you found against any benefits you found.  You must consider any harms and

25  benefits in both sides of the market for any market you have found to be two-sided.  If the harms to

26  competition resulting from Google's conduct substantially outweigh the benefits, then you must find

27  that Google willfully acquired or maintained monopoly power through anticompetitive acts.

28  If you find that Epic has proven by a preponderance of the evidence that Google willfully

acquired or maintained monopoly power through anticompetitive acts, then you must consider whether Epic has proved the remaining elements of these claims. If, however, you find that Epic did not prove this element by a preponderance of the evidence, then you must find for Google and against Epic on these claims.

Source: ABA Model Civil Antitrust Jury Instruction 3.A.9 (minus examples included in Model)

**Disputed Instruction No. 25 Re**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**
**Offered by Defendants**

To prove its monopolization claims, Epic must prove that Google willfully acquired or maintained monopoly power through anticompetitive acts or practices (so called "exclusionary conduct").

Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  In order to prove that Google has acquired or maintained monopoly power in a relevant market through anticompetitive acts, Epic must demonstrate that Google's challenged conduct has resulted in a substantial harm to competition in a relevant market that harms consumers in that market, considering both app users and app developers.  In order to have an anticompetitive effect, an act must harm the competitive process and thereby harm consumers by resulting in prices that are above the competitive level or quality or output that is below the competitive level.

Harm to competition is to be distinguished from harm to a single competitor or group of competitors, or a single side of the market, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, fewer transactions decreased production levels, and reduced quality. However, evidence that conduct has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an injury to competition because both effects are fully consistent with a free, competitive market.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business

purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Google's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers in the market that Google has monopolized, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors. The acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason.  Under the antitrust laws, a company generally does not have any duty to aid its competitors. Therefore, in evaluating this claim, you may not base your decision on Google's policy against distributing competing app stores through the Google Play Store.

You must determine whether Epic has proven an anticompetitive effect for each of the acts that Plaintiffs allege were anticompetitive.  If you find that Plaintiffs have not proven that an alleged act has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason, then that act cannot be an anticompetitive act that enabled Google to unlawfully acquire or maintain monopoly power in a relevant market.

You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent or patents; or because changes in cost or consumer preference have driven out all but one supplier.

The fact that Google could design its products differently does not mean that Google has engaged in anticompetitive acts.  A product improvement by itself does not violate the antitrust laws, even if it is

performed by a monopolist and harms competitors as a result.  A product design that benefits consumers does not violate the antitrust laws absent some other associated anticompetitive conduct.

If you find that Epic has not proven by a preponderance of the evidence that Google's challenged conduct has resulted in a substantial harm to competition in the relevant market that harms consumers in that market, then you must find for Google on Epic's claim that Google has unlawfully monopolized that market.

You must determine whether Epic has proven an anticompetitive effect for each of the acts that Epic alleges were anticompetitive.  If you find that Epic has not proven that an alleged act has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason, then that act cannot be an anticompetitive act that enabled Google to unlawfully acquire or maintain monopoly power in a relevant market.

If you determine that Epic has proven that the challenged conduct resulted in substantial harm to competition that causes harm to consumers in a relevant market, considering both app users and app developers, then you next must determine whether the conduct also benefits competition in other ways.  Conduct that benefits competition can include conduct that increases output, enhances efficiency, reduces prices or enhances consumer appeal.  You may consider benefits to competition that impact the relevant market in which Google allegedly harmed competition as well as benefits to competition in related markets. If you find that the challenged restraint does result in competitive benefits, then Epic must prove that all (or virtually all) of the procompetitive benefits could be achieved through substantially less restrictive means.  In determining whether all of these procompetitive benefits could reasonably have been achieved through substantially less restrictive means, you must assess such factors as whether other means to achieve Google's objectives were substantially more or less expensive and more or less effective than the means chosen by Google.  You must, however, give a wide berth to Google's business judgment.  You may not find that there was a substantially less restrictive alternative if that alternative would cost significantly more to Google.  An alternative that would require Google to give away Android, Google Play, the Google Play store, or other applications and services for free cannot be considered a viable less restrictive alternative.

If Epic is unable to show that Google could achieve all the procompetitive benefits of challenged

conduct through a less restrictive alternative that would be at least as effective and that would not impose significant costs on Google, then you must find for Google on Epic's claim that Google used the challenged conduct to unlawfully acquire or maintain a monopoly unless Epic proves that competitive harm of the challenged conduct substantially outweighs the competitive benefits. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is lawful and justified.

In conducting this analysis, you must consider the benefits and harm to competition and consumers (meaning users and developers), not just to a single competitor or group of competitors. However, in conducting this balancing, you must give wide berth to business judgments before finding liability. You should not second-guess whether Google's challenged conduct was reasonably necessary as a matter of degree. You may not balance the competitive effects of Google's challenged conduct or conclude that it is anticompetitive based on your personal views of whether the conduct is fair or desirable or whether permitting or prohibiting the conduct would be sound policy; only the effect on *competition* matters.

As I noted earlier, Epic alleges that Google has acquired or maintained monopoly power in relevant markets through a variety of anticompetitive acts. You must evaluate for each alleged anticompetitive act whether Google could achieve the same procompetitive benefits of that act through substantially less restrictive means. If Epic has not proven by a preponderance of the evidence that any procompetitive benefits could be achieved through substantially less restrictive means as defined by the instructions I have given you, then you must find for Google on Epic's monopolization claim.

Source: Adapted from ABA Model Civil Antitrust Jury Instructions 3.A.9, 1.C. 3, 1.C.4, and Ninth Circuit Model Instruction 1.7.

1

2

**Plaintiff's Argument Re Disputed Instruction No. 25**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**

3

Google's proposed instruction regarding "Willful Acquisition or Maintenance" is actually an

4

amalgamation of separate Model Instructions:  (1) a heavily edited version of the "Willful Acquisition"

5

Model Instruction given in **Section 2 cases**, and (2) heavily edited versions of two Model Instructions

6

given in **Section 1 cases.  (**Evidence of Competitive Benefits and Balancing the Competitive Effects.)

7

In this position statement, Epic objects to Google's version of the "Willful Acquisition or

8

Maintenance" Instruction.  In the next position statement, Epic objects to Google's proposal to include

9

the Section 1 instructions out of order here, in connection with the Section 2 claims.

10

Epic's "Willful Acquisition or Maintenance" Instruction is a near copy of the ABA Model

11

Instruction.  Epic modified the Model only to remove inapplicable and lengthy examples of

12

anticompetitive conduct not usefully explained in this case.  At Google's request, Epic also has agreed

13

to add concise language to the Model to reflect the Supreme Court's holding that competitive harms

14

and benefits on both sides of a market are analyzed in two-sided markets, *Ohio v. American Express*,

15

138 S. Ct. 2274 (2018).

16

In the first paragraph, Google seeks to insert a parenthetical referring to anticompetitive acts or

17

practices as "so-called 'exclusionary conduct'".  This modification pejoratively introduces the term

18

"exclusionary conduct" and does nothing to "fairly and adequately cover the issues presented" because

19

the term "exclusionary conduct" is never defined in the instruction.  *Gantt v. City of L.A.*, 717 F.3d

20

702, 706 (9th Cir. 2013).  The Model fully addresses the conduct constituting willful acquisition or

21

maintenance of monopoly power without the confusing detour to "exclusionary conduct".

22

Similarly, by stating "an act must harm the competitive process and thereby harm consumers",

23

Google pulls its preferred language from the case law with no justification, adding unnecessary words

24

that solely risk confusing the jury.  Google is not entitled to insert every piece of favorable language it

25

can pull from case law into the jury instructions.  *See Heath*, 813 F.2d at 261 ("a court is not required

26

. . . to incorporate every proposition of law a party suggests").  And that language is particularly

27

confusing here, where the "consumers" include app developers, not just app users.

28

In the third paragraph, Google adds the sentence "[h]owever, evidence that conduct has the

1    effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an

2    injury to competition because both effects are fully consistent with a free, competitive market."

3    Though this language appears in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), the Ninth

4    Circuit went on to explain that such effects can be the consequence of an antitrust violation: "to prove

5    a violation of the Sherman Act, the plaintiff must show that diminished consumer choices and

6    increased prices are the result of a less competitive market due to either artificial restraints or predatory

7    and exclusionary conduct." *Id.* at 990.

8            In the seventh paragraph, Google adds that "Under the antitrust laws, a company generally does

9    not have any duty to aid its competitors. Therefore, in evaluating this claim, you may not base your

10   decision on Google's policy against distributing competing app stores through the Google Play Store."

11   Again, Google is choosing its favored language from case law and risks misleading the jury about the

12   proper analysis and about the nature of Epic's claims.  Epic does not assert that Google has a duty to

13   deal with its competitors.  As Epic explained in its Opposition to Google's Motion for Summary

14   Judgment, it challenges Google's prohibition on the distribution of app stores through the Google Play

15   Store as part of "the thicket of restrictions Google employs to foreclose competing stores."  Summ. J.

16   Opp., ECF No. 509 at 5.  Google's "focus on specific individual acts of an accused monopolist while

17   refusing to consider their overall combined effect" is "not . . . proper."  *City of Anaheim v. S. Cal.*

18   *Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *see Klein v. Meta Platforms, Inc.*, 2022 WL

19   17477101, at *2 (N.D. Cal. Dec. 6, 2022).  Similarly, Google adds an eighth paragraph, stating that

20   Epic must prove that each of Google's acts was anticompetitive.  But, again, it would not be proper to

21   focus on specific individual acts of an accused monopolist while refusing to consider their overall

22   combined effect.  *City of Anaheim*, 955 F.2d at 1376.

23           Google likewise seeks to add a tenth paragraph—again absent from the Model—stating that

24   Google's "product improvement" or "product design that benefits consumers" cannot violate the

25   antitrust laws even if Google is a monopolist and the conduct results in harm to competitors.  Aside

26   from being contrary to law, the terms "product improvement" and "product design that benefits

27   consumers" are left wholly undefined.  Google's modification to the last paragraph—to state when the

28   jury must find for Google, without stating when it must find for Epic—is inappropriately one-sided.

**Plaintiff's Argument Re Inclusion of Section 1 Instructions in Disputed Instruction No. 25**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**

Google proposes to add here, in connection with Epic's *Section 2* claims, two instructions that are heavily modified versions of certain ABA Model Instructions on *Section 1* claims.  (Instruction Nos. 37, 38 (Evidence of Competitive Benefits and Balancing the Competitive Effects).)  These Instructions are specific to Epic's Section 1 claims; common sense and the ABA Model Instructions do not suggest or warrant giving any corollary instruction in connection with Epic's Section 2 claims. Epic therefore objects entirely to giving these Instructions in connection with the Section 2 claims.

In the alternative only, if the Court agrees with Google's request to give these Section 1 instructions within the Section 2 instructions, Epic also objects to the contents of Google's proposed instructions for the reasons identified in Plaintiff's Argument Re Instructions Nos. 37 and 38. Google's proposed instructions heavily modify the ABA's Model Instructions for Section 1 claims, and Epic requests that the Court give Epic's versions of the rule of reason instructions.  *See* Disputed Instructions Nos. 37 and 38.  To avoid duplication of Epic's substantive objections to Google's proposed instructions, Epic respectfully refers the court to its statements concerning the proposed Section 1 claims where those proposed instructions appear in order below.  Plaintiff's Arguments re Disputed Instruction Nos. 37, 38.

Google contends that duplicating these Section 1 instructions and giving them out of order, in connection with Epic's Section 2 claims, is necessary because courts have recognized the similarity between the rule of reason analysis in Section 1 and Section 2 claims.  *See FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020).  But Section 2 instructions already explain how the rule of reason operates in the Section 2 context.  For example, Instruction No. 25 on Willful Acquisition or Maintenance instructs the jury to "determine . . . whether the conduct provides benefits to consumers in the market that Google has monopolized", and to determine whether Google's "conduct was reasonably necessary to achieve competitive benefits for consumers in that relevant market".  As a further compromise, Epic added a paragraph to the Willful Acquisition or Maintenance Model Instruction that summarizes the four-step burden shifting framework, using language drawn from the Section 1 Model Instructions, to make clear that the four-step process also applies in the context of the

1    Section 2 claims.  (See Instruction No. 25 (Paragraph beginning "In summary . . .".))

2          Google's proposal to replicate here the Section 1 instructions *in addition to* the Section 2

3    instructions poses serious risk of jury confusion.  Because the existing Section 2 instructions and the

4    Section 1 instructions that Google seeks to graft onto them both discuss the rule of reason elements,

5    Google's proposal to repeat that analysis will erroneously suggest that the jury needs to go through two

6    rule of reason analyses under Section 2, which the jury will naturally conclude must be distinguishable

7    from one another.  The suggestion that Epic needs to scale two rule of reason analyses would

8    improperly raise Epic's burden on its Section 2 claims.  *See Temblador v. Hamburg-American Lines*,

9    368 F.2d 365, 367 (9th Cir. 1966) (holding that a judge may conclude that "to repeat the same words

10   would make them no more clear, and to indulge in variations of statement might well confuse"

11   (quoting *United States v. Bayer*, 331 U.S. 532, 536 (1947))).  By contrast, Epic' more modest addition

12   of the "In summary..." paragraph into the Willful Acquisition or Maintenance instruction hews more

13   closely to the Model Instructions and provides ample guidance to the jury without the risk of jury

14   confusion.  Further, Epic's proposal will not require the Court to give the same Section 1 instructions

15   twice—once in connection with Section 2 and again in connection with Section 1—or else to use a

16   potentially confusing cross-reference to remind the jury of the Section 1 rule of reason analysis once

17   the Court reaches the Section 1 instructions.

18         Finally, Google seeks to add two Section 1 instructions relevant to its defense—Evidence of

19   Competitive Benefits and Balancing the Competitive Effects—without the corresponding Section 1

20   Model Instruction informing the jury about how Epic may prove competitive harm in the first place.

21   Google thus unfairly seeks to tip the scales in its favor.  Google's proposal to use cherry-picked out-of-

22   order instructions should be rejected.  If the Court is inclined to use Google's Section 1 instructions out

23   of order, then Epic submits that the Court should include all the instructions relating to the burden-

24   shifting framework at this juncture, and the Court should use the Section instructions proposed by Epic

25   (Disputed Instructions Nos. 36, 37, 38), rather than those proposed by Google, for the reasons explained

26   in the Epic's statements concerning those proposed instructions.  *See* Plaintiff's Argument Re Disputed

27   Instruction Nos. 36, 37, 38.

28

1

**Defendants' Argument Re Disputed Instruction No. 25**
**MONOPOLIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPOLY**
**POWER THROUGH ANTICOMPETITIVE ACTS**

2

3        Epic's proposed instruction contradicts controlling authority in many respects.

4        *First*, Epic does not adopt the burden-shifting framework that applies to Section 2 claims. The

5 "anticompetitive-conduct requirement is 'essentially the same' as the Rule of Reason inquiry applicable

6 to Section 1 claims." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *FTC*

7 *v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

8
9
10
11

> Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

12 *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted). Epic's instruction does not

13 reflect this burden-shifting framework and therefore would not apprise the jury of the law.

14        *Second*, Epic's proposed instruction misstates the law in providing that if Epic proves that

15 Google's conduct harmed competition in a relevant market, then Google must prove that the conduct

16 "was reasonably necessary to achieve competitive benefits for consumers in that market." Courts "have

17 found it appropriate in some cases to balance the anticompetitive effects on competition in one market

18 with certain procompetitive benefits in other markets." *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir.

19 1994); *accord In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir.

20 2020) (Smith, J., concurring) (courts "have permitted defendants to offer procompetitive effects in a

21 collateral market as justification for anticompetitive effects in the defined market") (citing cases).[3]

22        *Third*, Epic's instruction contradicts the Supreme Court's instructions regarding how to assess

23

24 ———————————

[3] *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) (considering whether preserving demand for tickets to college football games could justify restriction of competition for licensing TV broadcasts)*; NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (citing *Board of Regents*, 468 U.S. at 95-96)*; see also O'Bannon v. NCAA,* 802 F.3d 1049, 1072 (9th Cir. 2015) (crediting NCAA's justification that compensation rules "promote amateurism, which in turn plays a role in increasing consumer demand for college sports" even though rules "ha[d] a significant anticompetitive effect on the college education market"); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1395-97 (9th Cir. 1984) (enhancing NFL's football ability to "compet[e] with other forms of entertainment" could justify rule limiting competition among NFL teams for stadium locations).

25

26

27

28

competitive effects in a two-sided market.  The Supreme Court holds that "[e]valuating both sides of a two-sided transaction platform is [] necessary to accurately assess competition." *Ohio v. Am. Express*, 138 S. Ct. at 2287.  Epic's instruction contradicts this precedent by providing that the jury can consider effects on "either or both sides of the market."  That is not the law.

*Fourth*, Epic would not inform the jury that it "must evaluate whether each type of alleged exclusionary practice has the requisite anticompetitive effect."  *United States v. Google, LLC*, __ F.Supp.3d __, 2023 WL 4999901, at *12 (D.D.C. Aug. 4, 2023).  The federal court in Washington, D.C. hearing the antitrust case against Google related to its search engine rejected the position of the government to the contrary.  That ruling is consistent with the Ninth Circuit's decision in *FTC v. Qualcomm*, where it considered the effects of each allegedly anticompetitive act.  *See* 969 F.3d at 993. The D.C. Circuit in *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), used the same approach.

*Fifth*, the jury should not balance competitive effects if Epic fails to prove a less restrictive alternative.  The Supreme Court and Ninth Circuit have referred to "a three-step" or "three-part" test. *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021); *Qualcomm, Inc.*, 969 F.3d at 991; *O'Bannon*, 802 F.3d at 1070.  Indeed, in its recent petition for a writ of certiorari in its litigation against Apple, Epic argued that under Ninth Circuit law, a defendant who prevails at Step 3 effectively prevails in the litigation.[4] Google has proposed language regarding balancing in the event that this objection is overruled.

*Sixth*, because Epic has offered evidence that Google refused to distribute competing app stores through the Google Play store, the jury must be instructed that Google has not duty to aid its competitors. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

*Finally*, evidence that Google should design its security review differently is insufficient.  "To weigh the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010).  "Absent some form of coercive conduct by the monopolist, the ultimate worth of a genuine product improvement can be adequately judged only by the market itself."  *Id.*

---

[4] *See* Petition for a Writ of Certiorari, *Epic Games, Inc. v. Apple, Inc.*, No. 23-____, at 17 (S. Ct. 2023).

1

**Disputed Instruction No. 26**
**MONOPOLIZATION – NO DUTY TO DEAL**
**Offered by Plaintiff**

2

3

4          Epic objects to the inclusion of this instruction for the reasons stated in Epic's argument,

5    below.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 26**
**MONOPOLIZATION – NO DUTY TO DEAL**
**Offered by Defendants**

You  have heard evidence that Google's Developer Distribution Agreement prohibits the distribution of other app stores through the Google Play store.  I instruct you that it is not unlawful for Google to prohibit the distribution of other app stores through the Google Play store, and you should not infer or conclude that doing so is unlawful in any way.


Source:  *Verizon Communications v. Trinko*, 540 U.S. 398 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

1

2

**Plaintiff's Argument Re: Disputed Instruction No. 26**
**MONOPOLIZATION – NO DUTY TO DEAL**

3       On November 9, 2023, Google filed a request that the Court instruct the jury that Google has

4  no duty to deal with its competitors by permitting Android app stores to be distributed through the

5  Google Play Store.  (Dkt. 768.)  This instruction is unwarranted.

6       *First*, this instruction is inappropriate because Epic neither asserts that Google has a duty to

7  deal with its competitors nor has implied to the jury that Google bears such a duty to the jury.  As Epic

8  explained in its Opposition to Google's Motion for Summary Judgment, Epic challenges Google's

9  prohibition on the distribution of app stores through the Google Play Store as part of "the thicket of

10  restrictions Google employs to foreclose competing stores."  (Dkt. 509 at 5.)  In its decision on

11  Google's motion for partial summary judgment, the Court expressly permitted Epic to "reference § 4.5

12  of the Developer Distribution Agreement by way of background and context, but [it] may not argue or

13  suggest that § 4.5 is unlawful either on its own or in combination with other alleged practices."

14  (Dkt. 700 at 1.)  Now, Google argues that Epic engaged in "argumentative" questioning, necessitating

15  this instruction, by twice asking whether Google "refuses to distribute third party app stores on Google

16  play" and once asking whether this is "one of the requirements that a developer cannot distribute an

17  alternative app store through Google Play."  (Dkt. 768 at 2.)  But this questioning in no way suggests

18  that Google's conduct was unlawful.  Instead, it is precisely what the Court permitted Epic to do—

19  adduce evidence as background and context that developers may not distribute third-party app stores

20  through Google Play.  Indeed, the Court has already brushed aside Google's concern:  "it wasn't raised

21  in opening argument as a point against Google, and it will not be raised in closing argument, and I

22  think a context question is probably okay."  (Trial Tr. 782:10-12.)

23       *Second*, the language of Google's proposed instruction is confusing and risks prejudicing the

24  jury against Epic.  Google asks the Court to inform the jury that it "should not infer or conclude that

25  [refusing to distribute third-party app stores through Google Play] is unlawful in any way."  goes well

26  beyond the Court's indication that it might consider giving an instruction "just for clarity" (Trial Tr.

27  800:3-9), and it could lead the jury to conclude that other restrictions on the distribution of app stores

28  on Android (*e.g.*, the sideloading frictions imposed by Google, Google's agreements with OEMs

preferencing Google Play, Google's payments to developers pursuant to Project Hug) are similarly not unlawful.  By seeking to cure contrived jury confusion when there is none, Google itself risks confusing the jury.

*Third,* this instruction asks the jury to "focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect"."  *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992); *see Klein v. Meta Platforms, Inc.*, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022).  This is improper.    As the Court explained in its ruling on Google's partial motion for summary judgment, it is entirely appropriate for Epic to present Section 4.5 of the DDA as background and context to explain Google's anticompetitive conduct.

*Finally*, the instruction is unnecessary because Google elsewhere seeks to instruct the jury that it has no duty to deal with its competitors.  Specifically, in its proposed Monopolization—Willful Acquisition and Maintenance instruction, Google seeks to inform the jury that "[u]nder the antitrust laws, a company generally does not have any duty to aid its competitors.  Therefore, in evaluating this claim, you may not base your decision on Google's policy against distributing competing app stores through the Google Play Store".  Google proposes to offer this instruction immediately after its proposed Monopolization—Willful Acquisition instruction.  If adopted, Google's Monopolization—Willful Acquisition instruction will render this instruction superfluous and risk placing excessive weight on Google's argument.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re: Disputed Instruction No. 26**
**MONOPOLIZATION – NO DUTY TO DEAL**

Because Google has no duty to distribute app stores through the Google Play store, this Court granted Google's motion for summary judgment on "plaintiffs' claim that Google unlawfully prohibits the distribution of other app stores on Google Play."  MDL ECF No. 700 at 1.  The Court further held that Epic "may not *argue or suggest* that § 4.5" of Google's Developer Distribution Agreement—the policy that prohibits developers from distributing app stores through the Google Play store—"is unlawful either on its own or in combination with other alleged practices."  *Id.* (emphasis added).

Despite that instruction, during trial on November 8, Epic's counsel *twice* asked a Google witness whether Google "*refuses* to distribute third party app stores on Google Play."  Trial Transcript ("Trial Tr."), 743:16-23 (Nov. 8, 2023) (emphasis added).  When the witness explained that the policy was motivated by Google's desire to keep users safe, Epic's counsel responded that he would get to this "*so-called* safety reason," and continued: "In fact, it's one of the requirements that a developer cannot distribute an alternative app store through Google Play, correct?" *Id.* at 744:1-3 (emphasis added).  The questioning was argumentative and suggested to the jury that Google's refusal to deal was unlawful.

Google raised this issue with the Court on November 8 and 9, 2023.  The Court told Epic, "no more of the: You don't have third party stores" evidence.  Trial Tr. 800:10-11 (Nov. 9, 2023).  Epic's counsel told the Court, "We don't intend to touch that issue again."  Trial Tr. 799:15-16. Notwithstanding that representation, Epic elicited testimony on this issue again, this time through Epic's chief executive, Mr. Sweeney.  *See* Trial Tr. 2022:3-10 (Nov. 20, 2023) (eliciting testimony that Epic "wanted to make our own app store available for Android.  We wanted to be able to distribute that app store both through Google Play and through our website.").  At the same time that counsel elicited that testimony, counsel showed the jury a document that stated that goal in plain terms.  *See* Ex. 5488.

Epic opened the door to this instruction knowing that it should not elicit such testimony.  The law is clear that Google has no duty to deal.  *Verizon Commc'ns v. L. Offs. of Curtis V. Trinko*, 540 U.S. 398 (2004); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).  Because Epic opened the door, prejudice exists, and the only way to cure that prejudice is through a jury instruction.

1

2

**Stipulated Instruction No. 27 Re**
**SECTION 1 – RESTRAINT OF TRADE**

3      In addition to its monopolization claims, Epic challenges Google's conduct under Section 1 of

4   the Sherman Act and California state law. Section 1 prohibits contracts, combinations and conspiracies

5   that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act and

6   California state law, Epic must prove the following:

7           1.   the existence of a contract, combination or conspiracy between or among at least

8                two separate entities;

9           2.   that the contract, combination or conspiracy unreasonably restrains trade; and

10          3.   that the restraint caused Epic to suffer an injury to its business or property.

11

12   Sources: ABA Model Civil Antitrust Jury Instruction 1.B; *In re Capacitors* (Direct Purchaser Trial,

13   Case No. 17-md-02801) Instruction No. 18 (with edits described in Plaintiff's argument)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 28 Re**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**
**Offered by Plaintiff**

The first type of agreement Epic challenges is an alleged agreement not to compete. Epic claims that Google violated Section 1 of the federal Sherman Act by agreeing with non-parties Activision, Riot Games, and Supercell that those companies would not compete with Google in the distribution of Android apps. If you find the existence of such an agreement according to the elements I will describe, that agreement would be *per se* unlawful. *Per se* means that, to find Google liable on this particular claim, you are not required to determine whether the alleged agreement not to compete had anticompetitive effect, whether Epic successfully proved the existence of any relevant antitrust market where such effects would occur, or whether the agreement could be justified by any competitive benefits.

A business has the right to select on its own the products that it will manufacture or sell. Likewise, a business may decide not to make or sell a product, provided that the decision results from the exercise of an independent business judgment and not from any agreement with a competitor or potential competitor. The Sherman Act, however, prohibits agreements between competitors or potential competitors that they will not compete with one another.

A *per se* agreement not to compete is an agreement between two or more competitors (or potential competitors) to agree not to compete in making or selling a product that they would have otherwise competed in making or selling. By way of example, this includes an agreement by two or more competitors that a product sold by one of them will not be sold by the other, to confine their manufacturing efforts to particular or different products, or to require one to discontinue sales or production of a product that the other will continue to sell.

To prevail on this claim, Epic must prove each of the following elements by a preponderance of the evidence:

1. Google and at least one of Activision, Riot Games, or Supercell are or were competitors or potential competitors;

2. Google and at least one of Activision, Riot Games, or Supercell entered into an contract, combination or conspiracy;

3.   Google and at least one of Activision, Riot Games, or Supercell agreed they would not compete with each other in the distribution of Android apps, and in particular that Activision, Riot Games, or Supercell would not launch Android app stores that would have competed with the Google Play Store; and

4.   Epic was injured in its business or property because of the agreement.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Google and against Epic on this claim. If you find that the evidence is sufficient to prove all four elements, then you must find for Epic and against Google on Epic's claim alleging a *per se* agreement not to compete.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.C.3

**Disputed Instruction No. 28 Re**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

1

2

**Plaintiff's Argument Re Disputed Instruction No. 28**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Nearly five months ago, Google represented to this Court "that *all* claims by *all* Plaintiffs are triable to the jury, with the exception of the claims brought under California's Unfair Competition Law." *See* May 12, 2023 Joint Submission Regarding Trial Proposal at 3 (ECF 411) (emphasis added).  At trial, Epic has presented ample evidence that Google engaged in agreements not to compete with potential competitors.  (*See* Trial Tr. 457:8-10 (quoting document stating "If the deal falls through, Mr. Zerza claims that [Activision] will launch their own mobile distribution platform"); 1894:13-21 ("Q. 'Without this deal, ABK claims they will launch their own mobile distribution platform partnering with another major mobile company.'  Do you see that?  A. I do.  Q. And you characterized this as a risk because at the time you believed this claim to be credible; right?  A. Yes. This is one of the risks of losing the deal, yes. Yep."); 473:12-15 ("Riot agreed to put aside their off-Play distribution platform and launch on Play in April"); 477:4-7 ("[T]he Project Hug agreement would . . . assist in stopping Riot from starting its own Android app store and getting launches on Play"); 815:21-25 ("Google was concerned that Supercell's decision to create a web store could attract the attention of other large developers that followed suit, right? A. Yes."); 816:11-13 ("One of the gives that Google would make [to Supercell] would be up to $24,000,000 in cash incentives; you understood that, right? A. Yes.")  Yet Google objects to the inclusion of *any* instruction on Epic's Section 1 claim on the ground that the claim should *not* go to the jury unless and until the Court determines that the agreements at issue should be considered under the *per se* rule.

21

22

23

24

25

26

27

28

Given the evidence presented at trial, Epic's proposed *per se* instruction is warranted.  Epic's proposed instruction on this issue aligns closely to the language of the ABA Model Instruction on market allocation agreements.  The Model contemplates that market allocation in this context "means to limit, divide up or not to compete".  *See also* Areeda & Hovenkamp, *Antitrust Law* ¶ 2030 (*per se* illegal market allocation agreements include agreements requiring participants to refrain from "expanding into a market in which another participant is a . . . potential rival").  The Model is therefore appropriate, and Epic has done so subject only to limited changes detailed below.  Epic proposes adding a first paragraph to distinguish this claim from the other types of claims the jury must consider,

1    in particular Epic's rule of reason claims.  This is necessary because the Model does not include

2    signposting language for cases that include both *per se* and rule of reason claims.  This paragraph

3    therefore explains the features distinguishing Epic's *per se* claims by (a) recounting the specific

4    conduct Epic challenges as part of this *per se* claim (including the counterparties to the challenged

5    agreements); and (b) explaining that, for a *per se* claim, the jury need not (i) find the agreement to have

6    anticompetitive effects (*Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1383

7    (9th Cir. 1981) (in a *per se* case the "jury [is] not required to find the existence of an anticompetitive

8    purpose or effect")); (ii) find Epic to have proven a relevant market (*In re Sunday Ticket Antitrust

9    Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (in a *per se* case "plaintiffs [a]re not required to establish a

10   relevant market")); or (iii) consider any procompetitive justifications offered by Google (*Arizona v.

11   Maricopa Cty. Med. Soc'y* , 457 U.S. 332, 345 (1982)).

12       In Epic's second paragraph, Epic proposes adding that an agreement with a "potential

13   competitor" not to compete is *per se* illegal.  This is consistent with the law.  *Palmer v. BRG of Georgia,

14   Inc.*, 498 U.S. 46, 49 (1990) (holding an agreement not to compete between potential competitors was

15   *per se* unlawful).  Indeed, the Model explains "[t]he Sherman Act, however, prohibits agreements

16   between competitors or potential competitors to allocate product markets" and, as noted, defines

17   "allocate" to include an agreement "not to compete".  In Epic's third paragraph, Epic proposes replacing

18   "conspiracy to allocate product markets" with "*per se* agreement not to compete" with "potential

19   competitors" because that is the conduct Epic challenges, and Epic's challenge is consistent with the

20   law.  *Id.*  In Epic's fourth paragraph, Epic proposes changes specific to its claims that are generally

21   contemplated by placeholders that are included in the Model.  Finally, in Epic's last paragraph, Epic

22   again proposes modifying the Model to note that Epic challenges an agreement not to compete, which,

23   as discussed above, is both helpful to the jury and consistent with the law.

24

25

26

27

28

1

2

**Defendants' Argument Re Disputed Instruction No. 28**
**SECTION 1 – RESTRAINT OF TRADE – PER SE AGREEMENT NOT TO COMPETE**

3

4

5

6

7

8

9

10

11

12

13

14

15

        The Court should not instruct the jury on Epic's *per se* Section 1 claims.  It would be an error to submit a *per se* and rule of reason claim to the jury based on the same conduct, because the proper mode of analysis is not a jury question.  "[T]he decision of what mode of analysis to apply–per se, rule of reason, or otherwise–is entirely a question of law for the Court[.]"  *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1007, 1010 (N.D. Cal. 2008); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) ("Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization…").  The Court must decide this issue before instructing the jury.  The ABA notes to this instruction direct that the *per se* "instruction is appropriate if a court determines that the alleged restraint is illegal per se.  If a court determines that the alleged restraint should be evaluated under the rule of reason, the jury should be instructed in accordance with the rule of reason instructions."  *See* Notes to ABA Model Civil Antitrust Jury Instruction 2.B.1.  Here, the *per se* instruction is inappropriate for two reasons:  *First*, the claims fail as a matter of law. *Second*, no party seeks or can prove damages for these claims.

16

17

18

19

20

21

22

23

24

         Where a claim does not involve "garden-variety horizontal division[s] of a market," *per se* treatment is inappropriate.  *Metro Indus. Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th Cir. 1996).  Epic based this claim on Google's Games Velocity Program ("GVP") contracts with three game developers. The contracts  involved various incentives for the developers to place their games on the Google Play store.  *Per se* treatment would be erroneous because the contracts are far from garden-variety.  Rather, they involve multi-faceted incentives from Google to its customers.  There is no tradition of courts applying *per se* rules to agreements in which a firm offers incentives to customers willing to invest in the firm's product. The "complexities" of multi-faceted value exchanges require rule-of-reason treatment.  *FTC v. Actavis*, 570 U.S. 136, 159 (2016).

25

26

        In an attempt to paint the GVP agreements as garden-variety market divisions, Epic has tried to adduce evidence that the agreements are horizontal.[5]  But there can be no dispute that the contracts

27

28

_____

[5] A fact that, on its own, does not warrant *per se* treatment.  *E.g.*, *Aya Healthcare Servs. Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (analyzing horizontal agreements under rule of reason).

involve a vertical relationship between Google as an application distributor and game developers as Google's customers. *See, e.g.*, Trial Tr. 1928:9-13 (Nov. 20, 2023) (Testimony of Don Harrison that he does not think of Activision Blizzard King as a competitor but rather, "I think ABK is mostly a partner"). The evidence is unrebutted that these agreements involved getting developers to launch their games on Google's store, that is, as Google's customers in a vertical relationship . *See, e.g.*, Trial Tr. 442:13-17 (Nov. 7, 2023) (Testimony of Lawrence Koh explaining the requirement that Games Velocity Program developers launch their titles on the Google Play Store); *id.* at 849:25-850:1 (Nov. 9, 2023) (Testimony of Purnima Kochikar that the purpose of the Games Velocity Program was for the developers to "simship, mean[ing] launch [their] title on the same day and date on Play as any other store of any other platform").

As a result, even if Epic shows that these agreements have horizontal aspects (which they do not), where a claim involves hybrid agreements—*i.e.,* agreements with vertical and horizontal elements—the rule of reason applies. "That is because the interplay between the vertical and horizontal components" of the agreement "muddies the theoretical economic conclusions that a court might draw," making it impossible for a court to condemn it *per se*. *Winn-Dixie Stores, Inc. v. Eastern Mushroom Mktg.*, 2023 WL 5521221, at *6, --- F.4th ---- (3d Cir. Aug. 28, 2023); *Frame-Wilson v. Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1385 (9th Cir. 1981). This case does not involve one of the few circumstances where it can be "predict[ed] with confidence that [the agreements] would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 878 (2007).

**Disputed Instruction No. 29 Re**
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**
**Offered by Plaintiff**

To prove an agreement or contract, Epic must prove both of the following elements by a preponderance of the evidence:

        1.  that an agreement or contract existed; and

        2.  that Google knowingly became a party to that agreement or contract.

To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a contract or agreement is an understanding between two or more persons or entities. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of an agreement, the evidence need not show that its members entered into any formal or written agreement. It is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Epic were agreed upon to carry out the alleged agreement, nor that all of the means or methods that were agreed upon were actually used or put into operation. It is the agreement or understanding to restrain trade that constitutes a potential violation of the antitrust laws.  Therefore, you may find an agreement existed regardless of whether it succeeded or failed.

Epic may prove the existence of the contract or agreement through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the contract or agreement.

Direct evidence of an agreement may not be available, and therefore an agreement also may be shown through circumstantial evidence. You may infer the existence of an agreement from the circumstances, including what you find the persons actually did and the words they used.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

Source: ABA Model Civil Antitrust Jury Instruction 2.A.1 (with edits described in Plaintiff's argument)

**Disputed Instruction No. 29 Re**
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**
**Offered by Defendants**

To prove a contract, Epic must prove both of the following elements by a preponderance of the evidence:

      1.  that a contract existed; and

      2.  that Google knowingly became a party to that contract.

To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a contract is an understanding between two or more persons or entities. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of a contract, the evidence need not show that its members entered into any formal or written agreement.

Epic may prove the existence of the contract through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the contract.

Direct evidence of a contract  may not be available, and therefore a contract also may be shown through circumstantial evidence. You may infer the existence of a contract from the circumstances, including what you find the persons actually did and the words they used.  Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a contract.  If they acted similarly but independently of one another, without any common purpose, then there would not be contract.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.A.1

1
2

**Plaintiff's Argument Re Disputed Instruction No. 29**
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**

3

Epic has adapted its proposed instruction from the ABA Model Instruction.  Epic has deleted

4

certain material that is inapplicable in light of the factual contentions in this case.  For example, Epic

5

deleted instructions, which Google proposes to keep, stating that "Mere similarity of conduct among

6

various persons, however, or the fact that they may have associated with one another and may have

7

met or assembled together, does not by itself establish the existence of a contract.  If they acted

8

similarly but independently of one another, without any common purpose, then there would not be

9

contract."  But this is irrelevant here because, unlike in a cartel case, Epic does not rely on "similarity"

10

of conduct by the participants of a conspiracy as a basis on which to infer the existence of a disputed

11

agreement with respect to many claims.  Epic instead relies principally on written agreements, and

12

even where Epic relies on both written agreements and extracontractual understandings, those claims

13

do not rely on similarity of conduct between Google and its counterparties.  Rather, pursuant to the

14

agreements not to compete, each of Google's counterparties agreed *not* to enter the app distribution

15

market that Google has monopolized.  Google's proposal to include this instruction risks misleading

16

and confusing the jury.

17

Google also seeks to delete all references to "agreement" from Epic's proposed instruction,

18

each of which appears in the Model.  That deletion is unwarranted.  The text of the Sherman Act itself

19

states that "[e]very contract, combination . . . , or conspiracy, in restraint of trade" is illegal.  15 U.S.C.

20

§ 1.  By deleting all references to the term "agreement," Google seeks to mislead the jury into

21

believing that only formal contracts not to compete are illegal under the Sherman Act.  But it is black-

22

letter law that a Plaintiff need not prove an express or written contract to win a Section 1 claim.  *See,*

23

*e.g., Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965) ("It is not necessary to find an

24

express agreement, either oral or written, in order to find a conspiracy [to restrain trade].").  Rather, it

25

is enough to prove an understanding between the parties.  *United States v. Lischewski*, 2020 WL

26

1433272, at *3-4 (N.D. Cal. Mar. 24, 2020).  Agreements not to compete are illegal, whether they are

27

written or oral.  Google's attempts to inform the jury otherwise should be rejected.

28

Google also proposes to delete text that reads, "It is not essential that all persons acted exactly alike, nor

is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Epic were agreed upon to carry out the alleged agreement, nor that all of the means or methods that were agreed upon were actually used or put into operation." These instructions appear in the Model, are helpful in the context of this case and are supported by law. *See United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948) ("acquiescence in an illegal scheme" violates the Sherman Act); *Spectators' Commc'n Network v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001) ("Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy.").   Google's proposed deletions should therefore be rejected.

1
2

**Defendants' Argument Re Disputed Instruction No. 29**
**AGREEMENT—DEFINITION, EXISTENCE, AND EVIDENCE**

3

Epic's proposed instruction suffers from two legal infirmities: (1) it includes language specific

4

to *per se* claims even though Epic's claims are subject to the rule of reason and (2) it omits crucial

5

language from the ABA model instruction about what does not constitute a contract or conspiracy.

6

*First*, Epic has attempted to propose a *per se* instruction for its rule of reason claims.

7

Specifically, Epic's  instruction tells the jury that the agreement need not have been carried out,

8

stating:

9
10
11
12

> It is also not necessary that all of the means or methods claimed by
> Plaintiffs were agreed upon to carry out the alleged agreement, nor that all
> of the means or methods that were agreed upon were actually used or put
> into operation. It is the agreement or understanding to restrain trade that
> constitutes a potential violation of the antitrust laws.  Therefore, you may
> find an agreement existed regardless of whether it succeeded or failed.

13

*See* Epic's Proposed Instruction No. 33.  This language would allow the jury to find Google liable

14

based on the mere existence of an agreement.  But the hallmark of rule-of-reason analysis is assessing

15

effects on competition.  *E.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 (9th Cir. 2023) (rule of

16

reason is used "to determine a restraints 'actual effect' on competition" (quoting *Am. Express*, 138 S.

17

Ct. at 2284)).  Indeed, the cases that the ABA cites to support this language in its model instruction

18

involved *per se* restraints.  *See United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1966) (*per se*

19

restraint of trade); *United States v. Paramount Pictures*, 334 U.S. 131, 142 (1948) (price-fixing

20

conspiracy); *Interstate Circuit v. United States*, 306 U.S. 208 (1939) (hub-and-spoke price-fixing

21

conspiracy).

22

*Second*, Epic has deleted important language from the ABA's model instruction about what

23

*does not* constitute evidence of a "contract, combination, or conspiracy."  Specifically, Epic omits:

24
25
26
27

> Mere similarity of conduct among various persons, however, or the fact
> that they may have associated with one another and may have met or
> assembled together, does not by itself establish the existence of a contract
> or conspiracy.  If they acted similarly but independently of one another,
> without any common purpose, then there would not be contract or
> conspiracy.

28

1    *See* Epic's Proposed Instruction No. 33.  Omitting that language could lead to the jury erroneously

2    finding a contract, combination, or conspiracy, based on mere parallel conduct.  It is hornbook law that

3    parallel conduct does not suffice to show an agreement.  "[A]ntitrust law limits the range of

4    permissible inferences from ambiguous evidence in a § 1 case."  *Matsushita Elec. Indus. Co. v. Zenith*

5    *Radio Corp.*, 475 U.S. 574, 588, 106 S. Ct. 1348, 1356 (1986).  Thus, "conduct as consistent with

6    permissible competition as with illegal conspiracy does not, standing alone, support an inference of

7    antitrust conspiracy."  *Id.*  Rather, "[t]o survive a motion for summary judgment or for a directed

8    verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude

9    the possibility' that the alleged conspirators acted independently."  *Id.*  Consistent with these

10   principles, the Ninth Circuit has upheld jury instructions stating that "mere similarity of conduct" is not

11   enough to prove a contract, combination, or conspiracy in the context of a Section 1 claim, *United*

12   *States v. Lischewski*, 860 F. App'x 512, 514 (9th Cir. 2021), and the Court included this language in its

13   recent charge to the jury in the *Capacitors* MDL.  *See In re Capacitors Antitrust Litig.*, No. 3:17-md-

14   02801-JD, ECF No. 1923 (N.D. Cal. May 17, 2023),  Instr. 17.  It should do so here, too.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 30 Re**
**GOOD INTENT NOT A DEFENSE**
**Offered by Plaintiff**

2

3     If you find that Google engaged in a *per se* agreement not to compete, it is not a defense that

4 Google acted with good motives, thought its conduct was legal, or that the conduct may have had some

5 good results.

6

7 Source: ABA Model Civil Antitrust Jury Instruction 2.B.3 (with edits described in Plaintiff's

8 argument)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 30 Re**
**GOOD INTENT NOT A DEFENSE**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

**Plaintiff's Argument Re Disputed Instruction No. 30**
**GOOD INTENT NOT A DEFENSE**

Google claims this instruction should be excluded because no instruction on Epic's *per se* claims should go to the jury.  Epic has addressed this objection and noted the ample evidence showing that Google secured *per se* illegal agreements not to compete in its argument on the Instruction No. 27 Re *Per Se* Agreement Not to Compete, above.

A defendant accused of a *per se* illegal agreement cannot avoid liability by attempting to show that the challenged agreement had a beneficial purpose or intent.  *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224-25 (1940) ("Whatever economic justification particular [*per se* illegal] agreements may be thought to have, the law does not permit an inquiry into their reasonableness.  They are all banned because of their actual or potential threat to the central nervous system of the economy.")  Such evidence is irrelevant as a matter of law, and it is error to consider it for the purposes of a *per se* claim.  *See Maricopa Cty.*, 457 U.S. at 357 (reversing the lower court for finding a *per se* scheme legal due to its purported procompetitive justifications).  Yet here, Google concedes it will contend that the Games Velocity Program—including the agreements subject to *per se* claims— promotes competition.  *See* Google's Trial Brief, ECF No. 639 ("Google offered developers a better deal to use the Play store".).

The jury must therefore understand that it cannot consider Google's procompetitive justification arguments when determining whether Google violated Section 1 of the Sherman Act by agreeing not to compete with potential competitors.  This instruction is "necessary to state [the] law correctly and to avoid misleading the jury".  *Kisor v. Johns-Manville Corp.*, 783 F.2d 1337, 1342 (9th Cir. 1986) (finding that, when giving an instruction is necessary to correctly state the law and avoid misleading the jury, "refusal to give [an] instruction [is] error").  Indeed, failing to instruct the jury that evidence of beneficial purpose or intent should not be considered in assessing a *per se* illegal agreement would practically invite the jury to commit error by "[in]adequately inform[ing] the jury on the law."  *Altria Grp., Inc. v. United States*, 658 F.3d 276, 286 (2d Cir. 2011).  This instruction should be provided on that basis alone.

Finally, Google notes that it intends to draft a position statement objection to Epic's *per se*

1    instructions.  Epic disagrees such a position statement is needed and directs the Court to the evidence it

2    identifies in its argument on Instruction No. 27 in support of its *per se* agreement not to compete claim,

3    but Epic reserves the right to reply to any position statement filed or lodged by Google.

**Defendants' Argument Re Disputed Instruction No. 30**
**GOOD INTENT NOT A DEFENSE**

This instruction applies only to *per se* claims. Google objects to this instruction in its entirety on grounds that Plaintiffs' *per se* Section 1 Agreement Not to Complete claim should not go to the jury. *See* Defendants' Argument re: Instruction No. 28.

.

**Disputed Instruction No. 31 Re**
**RULE OF REASON – SECTION ONE CLAIMS**
**Offered by Plaintiff**

Under Section 1 of the Sherman Act, except for certain agreements known to be *per se* unlawful, which I have addressed, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether any of the restraints challenged here is unreasonable. The restraints challenged here are the agreements that Google requires mobile app developers to enter as a condition of distributing apps on Google Play (called the DDA agreements); alleged agreements with Google's alleged competitors or potential competitors such as Facebook, Activision, Riot Games, or Supercell; agreements with original equipment manufacturers that sell mobile devices (including the MADA and RSA agreements); and agreements with cell phone carriers (such as AT&T, Verizon, and T-Mobile) (including the RSA agreements).

In making this determination, you must first determine whether Epic has proven that the challenged restraints have resulted in a substantial harm to competition in a relevant product and geographic market. If you find that Epic has proven that the challenged restraints result in a substantial harm to competition in a relevant market, then you must consider whether the restraints produce countervailing competitive benefits. If you find that they do, then you must balance the competitive harm against the competitive benefit. However, if you find that the competitive benefits could be achieved through substantially less restrictive alternatives, then you may not consider them when balancing harms against benefits. The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 1.C.3A

1
2

**Disputed Instruction No. 31 Re**
**RULE OF REASON – SECTION ONE CLAIMS**
**Offered by Defendants**

3    Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be

4   unreasonable.  You must determine, therefore, whether each of the alleged agreements challenged here

5   is unreasonable by applying what is known as the rule of reason.

6    The goal of the rule of reason is to distinguish between restraints with anticompetitive effect

7   that are harmful to the consumer and restraints stimulating competition that are in the consumer's best

8   interest.  In order to make that determination, you will apply a similar set of legal requirements that I

9   instructed you about earlier regarding Epic's monopolization claims.

10    In order to prove that a challenged agreement was an unreasonable restraint of trade, Epic must

11   first prove that Google had market power in a relevant antitrust market where trade was allegedly

12   restrained.  I have already instructed you regarding how to define the relevant antitrust market.  You

13   must apply those same instructions in defining the market for purposes of determining whether a

14   challenged restraint was an unreasonable restraint of trade.  You cannot properly apply the rule of

15   reason without an accurate definition of the relevant market because without a definition of the market

16   there is no way to measure Google's ability to lessen or destroy competition.

17    Earlier, I instructed you regarding monopoly power.  Market power, which Epic must

18   demonstrate Google has in a relevant antitrust market in order to prove an unreasonable restraint of

19   trade, is closely related to monopoly power.  As I explained earlier, monopoly power is an extreme

20   degree of market power, which is the power to maintain prices above a competitive level by restricting

21   output or maintain quality below a competitive level in a relevant antitrust market, considering both

22   app users and app developers.  Accordingly, in determining whether Google has market power in a

23   relevant antitrust market, you should apply the same instructions that I gave you earlier regarding

24   monopoly power while accounting for the fact that monopoly power requires something greater than

25   market power.  As with monopoly power, market power can be proven both directly and indirectly and

26   a high market share, while some evidence of market power, is not sufficient to prove market power

27   without proof of barriers to entry.  However, a market share of less than 50 percent is presumptively

28   insufficient to establish market power.

1    If you find that Google does not have market power in a relevant antitrust market, then you

2  must find for Google on Epic's claim that Google unreasonably restrained trade.

3

4  Source:  Adapted from ABA Model Civil Antitrust Jury Instruction 1.C.3A

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Plaintiff's Argument Re Disputed Instruction No. 31**
**RULE OF REASON - SECTION ONE CLAIMS**

Epic's instruction is nearly verbatim to the cited ABA Model Instruction.  The Model instruction, in appropriately modified form, was given in *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D. Cal.).  *See* Final Jury Instructions at 8, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020).

Epic's instruction differs from the Model only in that it fills in a placeholder included in the Model for a description of the challenged restraint.  Here, Epic identifies the restraints it challenges in neutral terms that will assist the jury in reaching their conclusion.  The same approach was taken in the instruction given in *Sumotext*.  *See id.*

In contrast, Google's proposed instruction is a complete rewrite of the ABA Model Instruction it is purportedly adapted from and deviates from the law.  *First*, Google asserts that a finding of market power is necessary to a finding that Google's conduct unreasonably restrains trade.  That is inconsistent with *Ohio v. American Express*, which holds that plaintiffs can show anticompetitive effects directly or indirectly:  either directly through "proof of actual detrimental effects on competition" or indirectly through "proof of market power plus some evidence that the challenged restraint harms competition."  *American Express*, 138 S. Ct. at 2284.  A showing of market power is thus unnecessary if the Plaintiff presents direct evidence of anticompetitive effects.  It is also inconsistent with ABA Model Civil Antitrust Jury Instruction 1.C.2, which provides that "If defendant does not possess market power", it is merely "less likely" that the challenged restraint will have harmful effects on competition.  *Second*, Google asserts that "a high market share, while some evidence of market power, is not sufficient to prove market power without proof of barriers to entry".  As explained in Epic's argument on the Monopoly Power:  Indirect Proof instruction, this is contrary to precedent instructions in this District and the Model.  *See* Plaintiff's Argument Re Instruction No. 24. Google also repeats its incorrect and argumentative rhetoric that it proposed in Section 2 instructions (*see* Plaintiff's Argument Re Instruction No. 17) that "monopoly power is an extreme degree of market power", even though monopoly power is not even at issue in these Section 1 claims.

*Third*, Google asserts that "a market share of less than 50 percent is presumptively insufficient to establish market power."  Not only is this not stated in the Model, it is inconsistent with the law.

1    *ThermoLife Intl. LLC v. Neogenis Labs Inc.*, 18-CV-02980-PHX-DWL, 2021 WL 1400818, at *9 (D.

2    Ariz. Apr. 14, 2021) ("[T]he Ninth Circuit has suggested that an allegation of a market share exceeding

3    30% may be sufficient to establish presumptive market power" (citing *Rebel Oil*, 51 F.3d at 1438).).

4         *Finally*, Google seeks to add a final paragraph stating "If you find that Google does not have

5    market power in a relevant antitrust market, then you must find for Google on Epic's claim that Google

6    unreasonably restrained trade."  As noted above, this is inconsistent with *American Express*.  138 S.

7    Ct. at 2284.  Moreover, there is no basis to divert from the Model instruction here, which provides that

8    it is merely "less likely" that Google restrained trade if it does not possess market power.  Google's

9    proposed instruction should accordingly be rejected.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Defendants' Argument Re Disputed Instruction No. 31**
**RULE OF REASON - SECTION ONE CLAIMS**

3      The Court should adopt Google's proposed instruction, which tracks controlling precedent and

4    accurately defines market power, and thereby provides the proper guidance to the jury to perform its

5    task under the rule of reason.

6      The language Google proposes comes directly from controlling authority.  For example,

7    Google's language explaining the goal of the rule of reason is drawn from the Supreme Court's *Leegin*

8    decision.  There, the Supreme Court explained that, "[i]n its design and function the rule distinguishes

9    between restraints with anticompetitive effect that are harmful to the consumer and restraints

10   stimulating competition that are in the consumer's best interest."  *Leegin Creative Leather Prods., Inc.*

11   *v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Similarly, the statement that the jury "cannot properly apply

12   the rule of reason without an accurate definition of the relevant market because without a definition of

13   the market there is no way to measure Google's ability to lessen or destroy competition" also comes

14   from Supreme Court authority.  In *Ohio v. Am. Express Co.*, the Court explained that "courts usually

15   cannot properly apply the rule of reason without an accurate definition of the relevant market.

16   'Without a definition of the market there is no way to measure the defendant's ability to lessen or

17   destroy competition.'"  138 S. Ct. 2274, 2285 (2018) (citation omitted).  Epic once again states its

18   position that it need not succeed on proving a relevant market.  Contrary to Epic's argument, it must do

19   so, even in the context of a Section 1 claim.  *Id.*; *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955

20   (9th Cir. 2023) (describing market definition requirement in context of Section 1 and Section 2

21   claims); Google's Argument Re: Instruction No. 15.  Further, when instructing the jury that they must

22   find a relevant antitrust market, it makes sense to refer the jury back to the Court's previous

23   instructions on relevant market.  This will avoid confusion.

24      The Court should also adopt Google's instruction because it accurately defines market power for

25   the jury.  Because the jury must assess market power as part of the rule of reason, *id.*, the concept should

26   be defined here.  And Google's explanation of market power should be accepted because it is based on

27   controlling law.  "[N]umerous cases hold that a market share of less than 50 percent is presumptively

28   insufficient to establish market power."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438

1

2    (9th Cir. 1995) (collecting cases).  Google's instruction reflects that authority.  Google also correctly

3    explains that barriers to entry are a requirement for finding market power.  *Id.* at 1439 ("The plaintiff

4    must show that new rivals are barred from entering the market and show that existing competitors lack

5    the capacity to expand their output to challenge the predator's high price.").

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Disputed Instruction No. 32 Re**
**RULE OF REASON: PROOF OF COMPETITIVE HARM**
**Offered by Plaintiff**

3      As I mentioned, to prove that the challenged restraint is unreasonable, Epic first must

4 demonstrate that the restraint has resulted or is likely to result in a substantial harm to competition.

5 Although it may be relevant to the inquiry, harm that occurs merely to the individual business of

6 plaintiff is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a

7 single competitor or group of competitors does not necessarily mean that there has been harm to

8 competition.

9      Furthermore, Epic must show that the harm to competition occurred in an identified market,

10 known as a relevant market. As I've described, there are two aspects to a relevant market. The first

11 aspect is known as the relevant product market. The second aspect is known as the relevant geographic

12 market. It is Epic's burden to prove the relevant market.

13      If you find that Epic has proven the existence of a relevant market, then you must determine

14 whether Epic also has proven that the challenged restraint has or is likely to have a substantial harmful

15 effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a

16 reduction in competition that results in the loss of some of the benefits of competition, such as lower

17 prices, increased output, or higher product quality. If the challenged conduct has not resulted in or is

18 not likely to result in higher prices, decreased output, lower quality, or the loss of some other

19 competitive benefit, then there has been no competitive harm, and you should find that the challenged

20 conduct was not unreasonable.  In determining whether the challenged restraint has produced or is

21 likely to produce competitive harm in a market you have found to be two-sided, you must consider

22 harms to either or both sides of the market.  In determining whether the challenged restraint has

23 produced or is likely to produce competitive harm, you may look at the following factors:

24      1.  the effect of the challenged restraint on prices, output, product quality, and service;

25      2.  the purpose and nature of the challenged restraint;

26      3.  the nature and structure of the relevant market;

27      4.  the number of competitors in the relevant market and the level of competition

28         among them, both before and after the challenged restraint was imposed; and

5.   whether Google possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. If you have found that Google has monopoly power in a relevant market, then Google necessarily has market power in that relevant market. However, you may find that Google has market power in a relevant market even if Google does not have monopoly power because market power requires less than monopoly power. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Google possesses market power is Google's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Google has, or at relevant times had, market power include:

1.   Google's profit margins;

2.   whether Google is capable of raising or maintaining prices above competitive levels;

3.   whether there are barriers to entering a market;

4.   whether Google can force developers, consumers, or others to accept undesirable contract terms; and

5.   whether Google can exclude or has excluded competition, or prevented competitors or potential competitors, from entering a market.

If Google does not possess a substantial market share, it is less likely that Google possesses market power.  If Google does not possess market power, it is less likely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.2 (with edits described in Plaintiff's argument)

**Disputed Instruction No. 32 Re**
**RULE OF REASON: PROOF OF COMPETITIVE HARM**
**Offered by Defendants**

If Epic has proven that Google has market power in a relevant antitrust market where Google allegedly restrained trade, then you must determine whether each challenged agreement resulted in substantial harm to competition and harmed consumers.  The process for making that determination is the same process that I instructed you to use in determining whether Google had acquired or maintained monopoly power using anticompetitive acts.  I will briefly repeat those instructions so they are clear to you.  You must apply these instructions to each challenged agreement.

In order to demonstrate that a challenged agreement harmed competition, Epic first must demonstrate that the restraint had an anticompetitive effect, accounting for both app users and app developers.  In order to have an anticompetitive effect, an act must harm the competitive process and thereby harm consumers by resulting in prices that are above the competitive level or quality that is below the competitive level.  Although it may be relevant to the inquiry, harm that occurs merely to the individual business of Epic or a competitor is not sufficient, by itself, to demonstrate harm to competition generally.  That is, evidence of harm to a single user, developer, competitor, or group of competitors does not necessarily mean that there has been harm to competition.  Further, evidence that conduct has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an injury to competition because both effects are fully consistent with a free, competitive market.

If you find that Epic has not proven by a preponderance of the evidence that a challenged agreement has resulted in a substantial harm to competition in the relevant market that harms consumers in that market, considering both app users and app developers, then you must find for Google on Epic's claim that the agreement was an unreasonable restraint of trade.

Source:  Adapted from ABA Model Civil Antitrust Jury Instruction 1.C.3B

**Plaintiff's Argument Re Disputed Instruction No. 32**
**RULE OF REASON: PROOF OF COMPETITIVE HARM**

Epic's proposed instruction is taken nearly verbatim from the ABA Model Instructions. The Model instruction, in appropriately modified form, was given in *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D. Cal.). *See* Final Jury Instructions at 9-10, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020). Epic proposes minor deviations from the Model that are specific to this case. Specifically, Epic adds two sentences that do not appear in the Model, explaining that if the jury finds that Google has monopoly power, it necessarily has market power, but if the jury finds that Google does not have monopoly power, it may still have market power. This instruction is helpful to the jury in orienting them to the different standards that apply to the Section 1 and Section 2 claims they will have to address. The ABA Model lacks such instructions because it does not appear to contemplate that a jury would need to decide both Section 1 and Section 2 claims in the same case. The remainder of Epic's instructions are minor changes that are contemplated by the Model itself, such as describing the "factors relevant to the facts of the case, such as the existence of barriers to entry or potential competitors".

Google's proposed instruction is again a complete rewrite of the ABA Model Instruction and deviates from the law. *First*, Google seeks to add that "[i]n order to have an anticompetitive effect, an act must harm the competitive process and thereby harm consumers by resulting in prices that are above the competitive level or quality that is below the competitive level." Google is not entitled to multiply jury instructions by inserting misleading language or holdings from caselaw it deems favorable to its position when the existing instruction already permits the jury to decide the issue presented. *See Heath*, 813 F.2d at 261 ("A court is not required to instruct the jury in words chosen by a party nor to incorporate every proposition of law a party suggests. It is sufficient if the instructions as given allow the jury to determine intelligently the issues presented."). And as noted above, the proposed language will be particularly confusing to the jury here, where the ultimate "consumers" in some of the harmed markets are app developers, rather than users. *Second*, Google seeks to add that "evidence that conduct has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently prove an injury to competition because both effects are fully consistent with a

1    free, competitive market."  Again, Google improperly selects isolated language from case law that

2    risks misleading the jury, and moreover confusingly focuses the instructions on "consumers" without

3    an explanation who those consumers would be in the present case.  Though this language appears in

4    *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), the Ninth Circuit went on to provide appropriate

5    context that Google omits, explaining that "to prove a violation of the Sherman Act, the plaintiff must

6    show that diminished consumer choices and increased prices are the result of a less competitive market

7    due to either artificial restraints or predatory and exclusionary conduct."  *Id.* at 990.  Thus, contrary to

8    the implication of Google's proposed Instruction, reduced consumer choice and increased consumer

9    price are probative of a Sherman Act violation when they are caused by anti-competitive conduct.  The

10   Model is therefore appropriate.

11        *Finally*, Google again seeks a one-sided paragraph at the end of its proposed Instruction,

12   informing the jury that they must find for Google if Epic fails to prove substantial harm to competition,

13   without reciprocally informing the jury of next steps if they find Google's conduct did harm

14   competition, as the Model does.  Google's additional paragraph also improperly attempts to direct the

15   jury to consider the effects of each "challenged agreement" in isolation; rather, the jury should

16   consider the effects of the challenged agreements in the context of all of Google's anti-competitive

17   conduct.  *See City of Anaheim*, 955 F.2d at 1376 ("it would not be proper to focus on specific

18   individual acts of an accused monopolist while refusing to consider their overall combined effect").

19   There is no basis to divert from the Model as Google proposes.  Google's proposed revisions should be

20   rejected.

21

22

23

24

25

26

27

28

1

2

### Defendants' Argument Re Disputed Instruction No. 32
### RULE OF REASON: PROOF OF COMPETITIVE HARM

3      Epic's proposed jury instruction on its burden to prove competitive harm misstates the law and

4  is incomplete.

5      *First*, Epic's instruction fails to tell the jury that it must consider both sides of the market.

6  Rather, Epic suggests that the jury can decide whether to consider harm on "either or both" sides of the

7  market.  That is directly contrary to law. The Supreme Court holds that where a two-sided market is at

8  issue, both sides of the market *must* be evaluated.  *Ohio v. Am. Express Co.*,138 S. Ct. 2274 (2018).

9  *See* Defendants' Argument re: Instruction Nos. 17, 21.

10      *Second*, Epic's reference to profit margins is erroneous.  Profit margins provide little to no

11  evidentiary value on the question of monopoly or market power.  "[T]he inference that a defendant that

12  enjoys healthy profits only does so because of an unhealthy market structure is not a strong one."  *In re*

13  *IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 981 (N.D. Cal. 1979).  This is because

14  "competitive firms may be highly profitable merely by virtue of having low costs as a result of

15  superior efficiency."  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406,

16  1412 (7th Cir. 1995).  "Many courts have disparaged the evidentiary value of high profits to indicate

17  monopoly power."  *High Tech. Careers v. San Jose Mercury News*, No. 90-CV-20579, 1995 WL

18  115480, at *3 (N.D. Cal. Mar. 14, 1995).

19      Even if "profit margins" were relevant, Epic's instruction omits critical factors.  "The ability to

20  earn high profit margins or a high rate of return does not necessarily mean that defendant has

21  monopoly power. Other factors may enable a company without monopoly power to sell at higher

22  prices or earn higher profit margins than its competitors, such as superior products or services, low

23  costs, or superior advertising or marketing."  ABA Model Civil Antitrust Jury Instr. 3.A.8.  Epic's

24  error is magnified because it improperly ask the jury to consider "profit margins" in a vacuum, without

25  reference to margins of comparable firms.  But it is only by comparison to comparable firms that

26  Google's profit margins could be probative.  *See Amex*, 138 S. Ct. at 2288.  Any consideration of

27  profits must focus on whether the defendant has "an ability to sell at higher prices or earn higher profit

28  margins *than other companies for similar goods or services* over a long period of time."  ABA Model

1    Civil Antitrust Jury Instr. 3.A.8 ).  Asking the jury to consider "profit margins" without comparison to

2    "other companies" with "similar goods or services" is legal error.

3           Epic next asks the jury to consider "whether there are barriers to entering a market" but that is

4    not the proper inquiry.  For such barriers to matter, they must "protect the properly defined . . .

5    market," and also be "significant."  *United States v. Microsoft Corp.*, 253 F.3d 34, 82 (D.C. Cir. 2001);

6    *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  Moreover, any barriers

7    considered by the jury must be cognizable under the antitrust laws.  *Rebel Oil*, 51 F.3d at 1439

8    (explaining the "main sources of entry barriers"). Moreover, the jury *must* find barriers to entry.  As

9    the Ninth Circuit explained in *Rebel Oil*, a "plaintiff *must* show that new rivals are barred from

10   entering the market and show that existing competitors lack the capacity to expand their output to

11   challenge the predator's high price."  *Id.*  By treating barriers to entry as a mere factor, rather than a

12   requirement, Epic's instruction is erroneous.

13          *Finally*, Epic's proposal to have the jury consider "whether Google can force developers,

14   consumers, or others to accept undesirable contract terms" is erroneous because it has nothing to do with

15   "market power," *i.e.*, "the ability to raise prices above those that would be charged in a competitive

16   market."  *NCAA v. Board of Regents*, 468 U.S. 85, 109 n.38 (1984).  Standardized contract terms are

17   commonplace.  *See*, *e.g.*, *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176-77 (9th Cir. 2014)

18   (discussing standardized "terms of use" agreements).  They are not an indicator of market power or

19   anything else relevant to this issue, and Epic's proposal should be rejected.

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 33 Re**
**RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS**
**Offered by Plaintiff**

If you find that Epic has proven that a challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether Google has proven that the restraint also benefits competition in other ways. In determining whether there are benefits in a market you have found to be two-sided, you must consider benefits to either or both sides of the market. If you find that the challenged restraint does result in competitive benefits in the market where Google has restrained trade, then you also must consider whether the restraint resulted in competitive benefits that were not achievable through substantially less restrictive means. If Epic proves that any of the benefits were achievable through substantially less restrictive means, then those benefits cannot be used to justify the restraint.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.3 (with edits described in Plaintiff's argument)

1
2

**Disputed Instruction No. 33 Re**
**RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS**
**Offered by Defendants**

3   If Epic has proven that challenged conduct resulted in substantial harm to competition that

4   causes harm to consumers in a relevant market, considering both app users and app developers, then

5   you next must determine whether the conduct also benefits competition in other ways.  Conduct that

6   benefits competition can include conduct that increases output, enhances efficiency, reduces prices or

7   enhances consumer appeal.  You may consider benefits to competition that impact the relevant market

8   in which Google allegedly harmed competition as well as benefits to competition in related markets. If

9   you find that the challenged restraint does result in competitive benefits, then Plaintiffs must prove that

10   all (or virtually all) of the procompetitive benefits could be achieved through substantially less

11   restrictive means.  In determining whether all of these procompetitive benefits could reasonably have

12   been achieved through substantially less restrictive means, you must assess such factors as whether

13   other means to achieve Google's objectives were substantially more or less expensive and more or less

14   effective than the means chosen by Google.  You must, however, give a wide berth to Google's

15   business judgment.  You may not find that there was a substantially less restrictive alternative if that

16   alternative would cost significantly more to Google.  An alternative that would require Google to give

17   away Android, Google Play, the Google Play store, or other applications and services for free cannot

18   be considered a viable less restrictive alternative.

19   As I noted earlier, Epic alleges that Google has acquired or maintained monopoly power in

20   relevant markets through a variety of anticompetitive acts.  You must evaluate for each alleged

21   anticompetitive act whether Google could achieve the same procompetitive benefits of that act through

22   substantially less restrictive means.

23   If Epic has not proven by a preponderance of the evidence that any procompetitive benefits

24   could be achieved through substantially less restrictive means as defined by the instructions I have

25   given you, then you must find for Google on Epic's monopolization claim.

26

27   Source: ABA Model Civil Antitrust Jury Instruction 1.C.3

28

1

2

**Plaintiff's Argument Re Disputed Instruction No. 33**
**RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS**

Epic's proposed instruction is nearly verbatim from the ABA Model, was given in

appropriately modified form in *Sumotext Corp. v. Zoove, Inc.*, Final Jury Instructions at 13, 16-cv-

1370, ECF No. 468 (N.D. Cal., Mar. 4, 2020).  Epic makes two minor changes from the Model.  *First*,

Epic explains that Google bears the burden to prove benefits to competition in a rule of reason

analysis.  *See NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021).  *Second*, Epic makes minor alterations to

the Model to explain that the jury "must consider whether the restraint resulted in competitive benefits

that were not achievable through substantially less restrictive means."  This aligns the instruction with

the Supreme Court's recent decision in *NCAA v. Alston*, and correctly articulates the standard that the

jury must apply.  *See* 141 S. Ct. at 2162 ("[The] rule of reason [asks whether] substantially less

restrictive means exist to achieve any proven procompetitive benefits").  Previously, Epic included a

clause in the above instruction informing the jury that they cannot consider procompetitive

justifications offered by Google that arise outside the relevant market(s) in this case.  While supported

in law (*see United States v. Topco Assocs.*, 405 U.S. 569, 610 (1972)), Epic removed this language to

comply with the Court's request that the Parties conform their proposed instructions to the ABA

Models.  Instead, Epic submits a single, standalone instruction on this point.  (*See* Instruction No. 45

Re Competitive Benefits Outside the Relevant Market.)

In contrast, Google again completely rewrites the Model.  *First*, Google seeks to instruct the jury

it may consider benefits in "related markets".  Google fails to explain what "related markets" are, and

the instruction is inconsistent with *Topco*.  *Second*, Google adds that "Epic must prove that all (or

virtually all) of the procompetitive benefits could be achieved through substantially less restrictive

means".  Google's language would mislead the jury into believing that if Epic fails to prove that ***all***

claimed pro-competitive benefits could be achieved, the jury must return a verdict for Google.  However,

even if some pro-competitive benefits could not be achieved through less restrictive means, the jury must

balance the unattained benefits against the harm to competition, as explained in the Models and required

by law.  *See FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020) ("If the plaintiff cannot rebut the

monopolist's procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive

harm of the conduct outweighs the procompetitive benefit'"); *United States v. Microsoft*, 253 F.3d 34,

59 (D.C. Cir. 2001) ("In cases arising under § 1 of the Sherman Act, the courts routinely apply a similar balancing approach under the rubric of the 'rule of reason'").  Google also adds argumentative language that the jury "must, however, give a wide berth to Google's business judgment", which is taken out of context from *Alston*, 141 S. Ct. at 2163.  But the Court was simply explaining that, in applying the rule of reason, "the district court honored [certain] principles", like giving a wide berth to the defendant's business judgment.  *Id.* at 2163-64.  The district court had evaluated whether an alternative "represented a significantly (not marginally) less restrictive means", *id.* at 2164, which is reflected in Epic's proposal ("substantially less harm to competition").  Relatedly, Google inserts an argument that the jury "may not find that there was a substantially less restrictive alternative if that alternative would cost significantly more to Google."  Although the Ninth Circuit has considered defendants' costs, the Supreme Court and other Circuits have not.  *See Alston*, 141 S. Ct. at 2126 (the test is whether "substantially less restrictive means exist to achieve any proven procompetitive benefits"); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,* 883 F.3d 32, 45 (2d Cir. 2018) (not adopting district court's use of "cost" as an element of the inquiry); *United States v. Brown Univ.,* 5 F.3d 658, 679 (3d Cir. 1993); *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 497 (5th Cir. 2001).  Google's addition would mislead the jury to disqualify alternatives that cause substantially less harm to competition on the basis of Google's *own* administrative burden in adopting such alternatives.  *Third*, Google adds that "[a]n alternative that would require Google to give away . . . applications and services for free cannot be considered a viable less restrictive alternative."  Google may argue that Epic's proposed alternatives would be equivalent to requiring Google to "give away" services, but that is disputed and not the law.  Epic argues that Google benefits from the developers and users who use Android and the Google Play Store without paying Google a monetary.  Google may bias the jury with this argumentative and slanted language into jury instructions.  *Finally*, Google adds that the jury "must evaluate for each alleged anticompetitive act whether Google could achieve the same procompetitive benefits of that act through substantially less restrictive means."  But "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect."  *City of Anaheim*, 955 F.2d at 1376.  That principle applies with no less force when an accused monopolist engages in several anticompetitive restraints that violate Section 1.

1

**Defendants' Argument Re Disputed Instruction No. 33**
**RULE OF REASON: EVIDENCE OF COMPETITIVE BENEFITS**

2

3        Epic's proposed instruction is flawed in several respects.

4        *First*, Epic's proposed instruction contradicts the Supreme Court's decision in *Ohio v.*

5  *American Express* regarding how to assess competitive effects in a two-sided market.  In that case, the

6  Supreme Court explained that "[e]valuating both sides of a two-sided transaction platform is []

7  necessary to accurately assess competition" and "competition cannot be accurately assessed by looking

8  at only one side of the platform in isolation."  138 S. Ct. 2274, 2287 (2018).  Epic's proposed

9  instruction contradicts this precedent by providing that the jury can consider the effects of Google's

10  challenged conduct on "either or both sides of the market."  That is not the law.  *See* Defendants'

11  Argument re: Instruction No. 25.

12        *Second*, Epic modifies the model instruction by asking whether Google has proven competitive

13  benefits "in the market where Google has restrained trade."  As an initial matter, the jury cannot be

14  instructed that "Google restrained trade" as that directs them to assume a critical disputed

15  fact.  Further, Epic's proposed instruction misstates the law in providing that if Epic proves that

16  Google's conduct harmed competition in a relevant market, then Google must prove that the conduct

17  "was reasonably necessary to achieve competitive benefits for consumers in that market."  Courts

18  "have found it appropriate in some cases to balance the anticompetitive effects on competition in one

19  market with certain procompetitive benefits in other markets."  *Sullivan v. NFL*, 34 F.3d 1091, 1112

20  (1st Cir. 1994); *accord In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268

21  (9th Cir. 2020) (Smith, J., concurring) (courts "have permitted defendants to offer procompetitive

22  effects in a collateral market as justification for anticompetitive effects in the defined market") (citing

23  cases).[6]

24  ───────────────

25  [6] *See NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984) (considering whether
26  preserving demand for tickets to college football games could justify restriction of competition for
    licensing TV broadcasts); *NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d at 1268 (citing
27  *Board of Regents*, 468 U.S. at 95-96); *see also O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir.
    2015) (crediting NCAA's justification that compensation rules "promote amateurism, which in turn
28  plays a role in increasing consumer demand for college sports" even though rules "had a significant

1    *Third*, the last sentence of Epic's proposed instruction misstates the law on less restrictive

2  alternatives as set forth by the Supreme Court.  Epic seeks an instruction that the jury must find for Epic

3  if Epic can show *any* "reasonably available alternative means that create substantially less harm to

4  competition."  Under Epic's formulation, Google must demonstrate that it used the least restrictive means

5  regardless of cost or effectiveness.  That is not the law.  In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the

6  Supreme Court held that "antitrust law does not require businesses to use anything like the least

7  restrictive means of achieving legitimate business purposes. To the contrary, courts should not second-

8  guess degrees of reasonable necessity so that the lawfulness of conduct turn[s] upon judgments of

9  degrees of efficiency." *Id*. at 2161 (internal citation and quotations omitted).  The Court added that "[a]s

10 we have discussed, antitrust courts must give wide berth to business judgments before finding

11 liability." *Id*. at 2163.  This 2021 Supreme Court decision post-dates the ABA model instructions, so

12 they should be modified on this point to reflect controlling precedent.  Google's proposed jury instruction

13 properly reflects the Supreme Court's holding in *Alston* and the jury should be instructed on the relevant

14 considerations as directed by the Supreme Court.

15

16

17

18

19

20

21

22

23

24

25

26

_____

27 anticompetitive effect on the college education market"); *Los Angeles Mem'l Coliseum Comm'n v.*
*NFL*, 726 F.2d 1381, 1395-97 (9th Cir. 1984) (enhancing NFL's football ability to "compet[e] with
28 other forms of entertainment" could justify rule limiting competition among NFL teams for stadium
locations).

**Disputed Instruction No. 34 Re**
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**
**Offered by Plaintiff**

If you find that a challenged restraint resulted in competitive benefits in a relevant market that were not achievable through substantially less restrictive means, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers in the market, not just to a single competitor or group of competitors. If you have found a market that is two-sided, you must balance the harms and benefits in both sides of the market.  Epic bears the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct substantially outweighs its benefits.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.4 (with edits described in Plaintiff's argument)

**Disputed Instruction No. 34 Re**
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**
**Offered by Defendants[7]**

If Epic is unable to show that Google could achieve all the procompetitive benefits of challenged conduct through a less restrictive alternative that would be at least as effective and that would not impose significant costs on Google, then you must find for Google on Epic's claim that Google used the challenged conduct to unlawfully acquire or maintain a monopoly unless Epic proves that competitive harm of the challenged conduct substantially outweighs the competitive benefits. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged conduct is lawful and justified.

In conducting this analysis, you must consider the benefits and harm to competition and consumers (meaning users and developers), not just to a single competitor or group of competitors. However, in conducting this balancing, you must give wide berth to business judgments before finding liability.  You should not second-guess whether Google's challenged conduct was reasonably necessary as a matter of degree.  You may not balance the competitive effects of Google's challenged conduct or conclude that it is anticompetitive based on your personal views of whether the conduct is fair or desirable or whether permitting or prohibiting the conduct would be sound policy; only the effect on *competition* matters.

Epic bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

Source: ABA Model Civil Antitrust Jury Instruction 1.C.4; Ninth Circuit Model Instruction 1.7

---

[7] Google objects to inclusion of this instruction entirely, but offers this as its proposed version in the event its objection is overruled.

1
2

**Plaintiff's Argument Re Disputed Instruction No. 34**
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**

3
4

Epic's proposed instruction is taken nearly verbatim from the ABA Model Instructions.  The

Model, in appropriately modified form, was given in *Sumotext Corp. v. Zoove, Inc.*, 16-cv-1370 (N.D.

5

Cal.).  *See* Final Jury Instructions at 14, 16-cv-1370, ECF No. 468 (N.D. Cal. Mar. 4, 2020).  Epic's

6

sole substantive change is that it explains that the burden is on Epic to prove that the anticompetitive

7

effect of the conduct substantially outweighs its benefits only by a preponderance of the evidence.

8

This is black-letter law.  *See Alston*, 141 S Ct. at 2160.  Epic also makes minor alterations to the Model

9

Instructions to explain that the jury "must consider whether the restraint resulted in competitive

10

benefits that were not achievable through substantially less restrictive means."  This aligns the

11

Instruction with the Supreme Court's recent decision in *NCAA v. Alston*, and correctly articulates the

12

standard that the jury must apply.  *See* 141 S. Ct. 2141, 2162 (2021) ("[The] rule of reason [asks

13

whether] substantially less restrictive means exist to achieve any proven procompetitive benefits").

14

Previously, Epic included a clause in the above instruction informing the jury that they cannot consider

15

procompetitive justifications offered by Google that arise outside the relevant market(s) in this case.

16

While supported in law (*see United States v. Topco Assocs.*, 405 U.S. 569, 610 (1972)), Epic has

17

removed this language in order to comply with the Court's request that the Parties conform their

18

proposed instructions to the ABA Model Instructions.  Instead, Epic submits a single, standalone

19

instruction on this point.  (*See* Instruction No. 45 Re Procompetitive Justifications Outside the

20

Relevant Market.)

21

Google proposes major deviations from the Model.  *First*, Google reiterates from its proposed

22

changes to the prior instruction that "[i]f Epic is unable to show that Google could achieve the

23

procompetitive benefits of challenged conduct through a less restrictive alternative that would be at

24

least as effective and that would not impose significant costs on Google, then you must find for Google

25

on Epic's claim that Google used the challenged conduct to unlawfully acquire or maintain a

26

monopoly unless Epic proves that competitive harm of the challenged conduct substantially outweighs

27

the competitive benefits."  As discussed above, although the Ninth Circuit has considered the

28

defendants' costs in evaluating less restrictive alternatives, the Supreme Court and other Circuits have

1    not considered defendants' costs when assessing less restrictive alternatives.  *See* Plaintiff's Argument

2    re Disputed Instruction No. 37, Competitive Benefits.  Google's addition would mislead the jury into

3    disqualifying alternatives that clearly cause substantially less harm to competition on the basis of

4    Google's *own* administrative burden in adopting such alternatives.

5         *Second*, Google seeks to change "the restraint is not unreasonable", as it appears in the Model,

6    to "the conduct is lawful and justified".  There is no basis for this change.  It is again inconsistent with

7    the Model and the *Sumotext* instruction.

8         *Third*, Google yet again seeks to state that the jury "must give wide berth to business judgments

9    before finding liability" and that they "should not second-guess whether Google's challenged conduct

10   was reasonably necessary as a matter of degree."  Google has no basis to propose adding this

11   argumentative language.  Google appears to be taking out of context similar language from *NCAA v.*

12   *Alston*, 141 S. Ct. 2141, 2163 (2021).  But, as explained above, the Court was simply explaining that,

13   in applying the rule of reason and crafting an injunction, "the district court honored [certain]

14   principles", one of which was affording the defendant's business judgment a wide berth.  *Id.*  Google's

15   proposed addition is unnecessary in addition to being prejudicially slanted in Google's favor.

16   Moreover, this language is vague and risks confusing (and potentially misleading) the jury.

17   *Fourth*, Google seeks to add that the "jury may not balance the competitive effects of Google's

18   challenged conduct or conclude that it is anticompetitive based on your personal views of whether the

19   conduct is fair or desirable or whether permitting or prohibiting the conduct would be sound policy."

20   This limiting language is unnecessary, as the parties have stipulated in the Duty to Deliberate

21   instruction that the jury must "not allow personal likes or dislikes, sympathy, prejudice, fear, or public

22   opinion to influence" them.  There is no justification to duplicate it here.  Finally, Google includes a

23   footnote stating that it objects to the Court offering this balancing instruction in its entirety, but it

24   provides no sound basis for omitting this essential step in the rule of reason analysis.  *See FTC v.*

25   *Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020) ("If the plaintiff cannot rebut the monopolist's

26   procompetitive justification, 'then the plaintiff must demonstrate that the anticompetitive harm of the

27   conduct outweighs the procompetitive benefit'"); *see also United States v. Microsof*, 253 F.3d 34, 59

28   (D.C. Cir. 2001).

1

2

**Defendants' Argument Re Disputed Instruction No. 34**
**RULE OF REASON: BALANCING THE COMPETITIVE EFFECTS**

3

4

5

6

7

8

9

10

11

12

13

14

15

Because there is no fourth step to the rule of reason, the jury should not be instructed on a fourth step. The jury should not balance competitive effects if Epic fails to prove a less restrictive alternative at the third step of the rule of reason analysis. The Supreme Court has referred to "a three-step, burden-shifting framework" for applying the rule of reason. *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021). Likewise, to determine whether a restraint is unlawful, the Ninth Circuit "appl[ies] a three-step, burden-shifting framework." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (referring to rule of reason as a "three-part burden-shifting test"); *O'Bannon v. NCAA*, 802 F.3d 1049, 1070 (9th Cir. 2015) ("follow[ing] the three-step framework of the Rule of Reason"). Indeed, in its recent petition for a writ of certiorari in its litigation against Apple, Epic argued that under Ninth Circuit law, a defendant who prevails at Step 3 effectively prevails in the litigation. *See* Petition for a Writ of Certiorari, *Epic Games, Inc. v. Apple, Inc.*, No. 23-____, at 17 (S. Ct. 2023) (arguing that under Ninth Circuit law, a defendant who prevails at Step 3 effectively prevails in the litigation).

16

17

18

19

20

21

22

23

However, if the Court deviated from controlling precedent and gave such an instruction, it should give the instruction proposed by Google. On the balancing step, Epic has the burden to "demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). "[C]ourts should generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices." *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994). Moreover, Google's proposed instruction accurately describes the burdens of proof and the less restrictive alternative analysis.

24

25

26

27

28

1

2

**Stipulated Instruction No. 35 Re
INTRODUCTION TO TYING**

3       Epic also claims that Google engaged in an unlawful tying arrangement. A tying arrangement is

4   one in which the seller will sell one product or service (referred to as the tying product) only on the

5   condition that the buyer also purchase a different product or service (referred to as the tied product)

6   from the seller, or at least agrees not to purchase the tied product or service from any other seller. In

7   this case, Epic claims that Google's app distribution product (the Google Play Store) is the tying

8   product and its in-app billing service (Google Play Billing) is the tied product.

9

10  Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.E.1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Stipulated Instruction No. 36 Re
RATIONALE FOR PROHIBITION OF TYING ARRANGEMENTS**

3

4

5

6

7

Not all tying arrangements are unlawful. The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (app distribution services) to force a buyer to purchase the tied product (in-app billing services) that the buyer might have preferred to purchase elsewhere.  I will now instruct you regarding how to determine whether, if there was a tying arrangement, that alleged tying arrangement is unlawful.

8

9

Source: ABA Model Civil Antitrust Jury Instruction 2.E.2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 37 Re**
**ELEMENTS – PER SE ILLEGAL TYING**
**Offered by Plaintiff**

Epic asserts *per se* tying claims. To prevail on a *per se* tying claim, Epic must prove each of the following elements by a preponderance of the evidence:

1.  Android app distribution services (like the Google Play Store) and Android in-app billing services for digital goods and services transactions (like Google Play Billing) are separate and distinct services;

2.  Google will distribute Android apps through the Google Play Store only on the condition that the app developers use Google Play Billing for in-app transactions of digital goods and services;

3.  Google has sufficient market power via the Google Play Store with respect to Android app distribution to enable it to restrain competition from other Android in-app billing services;

4.  The alleged tying arrangement has foreclosed a substantial volume of commerce as to Android in-app billing services; and

5.  Epic was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all five elements, then you must find for Epic and against Google on Epic's *per se* tying claims. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Google and against Epic on Epic's *per se* tying claims. Because these are *per se* tying claims, if these elements are met, you need not determine whether the tying arrangements could be justified by competitive benefits to find Google liable.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.E.3

1
2

**Disputed Instruction No. 37 Re**
**ELEMENTS – PER SE ILLEGAL TYING**
**Offered by Defendants**

3

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

**Plaintiff's Argument Re Disputed Instruction No. 37**
**ELEMENTS – PER SE ILLEGAL TYING**

3       Epic offers the ABA Model Instruction on *per se* tying in slightly modified form.  Aside from

4 standard modifications primarily contemplated by placeholders in the Model, Epic proposes to add a

5 final sentence stating that "[b]ecause these are *per se* tying claims, if these elements are met, you need

6 not determine whether the tying arrangements could be justified by competitive benefits to find Google

7 liable."  This language is consistent with the case law.  *Cascade Health Solutions v. PeaceHealth*, 515

8 F.3d 883, 913 (9th Cir. 2008); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 997 (9th Cir.

9 2023) ("A tie is per se unlawful if (1) the defendant has market power in the tying product market, and

10 (2) the 'tying arrangement affects a "not insubstantial volume of commerce" in the tied product

11 market.'").  Moreover, as discussed in Epic's argument on the *per se* Section 1 instruction, it is

12 particularly important that the jury understand that Google's procompetitive justifications are

13 irrelevant to Epic's *per se* claims because Google will argue the existence of procompetitive

14 justifications for its conduct in this case.  Google's Trial Brief, ECF No. 639 at 6 ("Google's

15 challenged conduct is procompetitive.").  Absent this language, the jury may improperly consider those

16 procompetitive justifications in considering Epic's *per se* tying claim, which would be error.

17 *Maricopa Cty.*, 457 U.S. at 357.

18       Google disputes that this instruction should be offered.  Google similarly argued that  Epic's *per*

19 *se* tying claim should be dismissed at summary judgment.  *See* Defendants' Mot. for Summ. J., ECF

20 No. 480 at 20-24.  Its argument was predicated on language from *Epic v. Apple* stating that "[b]ased on

21 the record, we do not have the level of confidence needed to universally condemn ties related to app-

22 transaction platforms that combine multiple functionalities."  67 F.4th at 997.  But, at its hearing on

23 Google's motion for summary judgment, this Court explained that the Ninth Circuit in *Apple* was "saying

24 act with caution and humility until there's a clear record about the industry" and that "[t]here is no per

25 se barrier in Epic that forevermore this cannot be considered per se."  Mot. Summ. J. Hearing Tr. 40:8-

26 9, 21-22.  This reasoning is sound.  There is no basis to conclude that, as a matter of law, Epic's *per se*

27 tying claim is foreclosed.  The jury should therefore be instructed on *per se* tying.

28

**Defendants' Argument Re Disputed Instruction No. 37**
**ELEMENTS – PER SE ILLEGAL TYING**

The *per se* instruction contravenes Ninth Circuit precedent and should not be given.  Google objects to each of Epic's *per se* instructions in their entirety.  The Ninth Circuit holds that "*per se* condemnation is inappropriate for ties 'involv[ing] software that serves as a platform for third-party applications." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 997 (9th Cir. 2023) (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 34, 89 (D.C. Cir. 2001)).  Evaluating Epic's similar claim against Apple, the Ninth Circuit explained that the alleged tie at issue was not "plainly anticompetitive" such that it could be "conclusively presumed illegal." *Id.* (citations omitted).  The Ninth Circuit said that it lacked the requisite experience to "have the level of confidence needed to universally condemn ties related to app-transaction platforms that combine multiple functionalities." *Id.*  After performing its analysis, the Ninth Circuit held that the alleged tie was *lawful*. *Id.* at 998 ("Applying the Rule of Reason to the tie involved here, it is clearly lawful.").

The same result is required here.  Given that the Ninth Circuit found the *Epic. v. Apple* tie to be *lawful*, it would be impossible for this court to "have the level of confidence needed to universally condemn" the alleged tie in this case. *Id.* at 997.

1

**Disputed Instruction No. 38 Re**
**ELEMENTS – RULE OF REASON TYING**
**Offered by Plaintiff**

2

3        In addition, Epic also asserts rule of reason tying claims against Google. To prevail on its rule

4  of reason tying claims, Epic must prove by a preponderance of the evidence each of the elements I just

5  gave you for *per se* tying claims plus the following sixth element:

6            6.   The tying arrangement has unreasonably restrained trade in that it had a substantial

7                 adverse effect on competition in a relevant market.

8        If you find that the evidence is sufficient to prove all of these elements, then you must find for

9  Epic and against Google on Epic's rule of reason tying claims. If you find that the evidence is

10  insufficient to prove any one of these elements, then you must find for Google and against Epic on

11  Epic's rule of reason tying claims.

12

13  Source: Adapted from ABA Model Civil Antitrust Jury Instruction 2.E.4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 38 Re**
**ELEMENTS – TYING UNDER THE RULE OF REASON**
**Offered by Defendants**

To prevail on its tying claim, Epic must prove each of the following elements by a preponderance of the evidence:

1.  App distribution services and in-app billing services are separate and distinct products;

2.  Google will provide app distribution services only on the condition that the buyer also use Google Play Billing, or that the buyer not use in-app billing services from any other supplier;

3.  Google has sufficient market power with respect to the app distribution services to enable it to restrain competition as to an alleged market for in-app billing services;

4.  the alleged tying arrangement has foreclosed a substantial volume of commerce as to an alleged market for in-app billing services;

5.  the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to an alleged market for in-app billing services; and

6.  Epic was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must consider Google's business justification defense, which I will instruct you on later.  If you find for Epic on all six of these elements and against Google on Google's business justification defense, then you must find for Epic and against Google on Epic's tying claim.  If you find that the evidence is insufficient to prove any one of these elements, then you must find for Google and against Epic on Epic's tying claim.  Alternatively, if you find for Google on Google's business justification defense, then you must find for Google on Epic's tying claim.


Source: ABA Model Civil Antitrust Jury Instruction 2.E.4

**Plaintiff's Argument Re Disputed Instruction No. 38**
**ELEMENTS – TYING UNDER THE RULE OF REASON**

Epic has proposed a Rule of Reason Tying instruction that adds the only non-overlapping element not already explained in Epic's proposed *Per Se* Tying instruction.  Google disputes that a *per se* tying instruction be given.  Epic here addresses each of the elements of rule or reason tying, though Epic submits that if the jury is instructed on *per se* tying, it will only be necessary to add the additional instruction on market effects in the instruction on rule of reason tying.

Epic proposes an instruction that closely tracks the ABA Model Instruction, with the following revisions.  Epic proposes replacing the "product A" placeholder in the Model with "Android app distribution services (like the Google Play Store)" and the "product B" placeholder in the Model with "Android in-app billing services for digital goods and services transactions (like Google Play Billing)".  This accurately describes Epic's claims in neutral terms, and provides helpful parentheticals to the Google services that Epic's claims refer to.  Epic proposes additional minor edits to the language of the Model to ensure it comports with Epic's claims.

Google proposes several modifications from the Model that should be rejected.  *First*, Google disputes Epic's description of "product A" and "product B".  Google submits that product A should be "App distribution services" and product B should be "in-app billing services."  This description should not be given to the jury, as it misrepresents Epic's claims.  Epic asserts that product A, the tying product, is Google's Android app distribution services (namely, the Google Play Store) and that product B, the tied product, is Google's Android in-app billing services for digital goods and services transactions (Google Play Billing).  Google's product A description is inadequate because it is overbroad, including all app distribution services (regardless of platform or device) and Google's product B description is inadequate for the same reason, and also because Epic solely alleges that Google has tied Android in-app billing services for digital goods and services to Google Play.  *Second*, Google refers to product A and product B as products, when Epic describes them as services.  This should be rejected because ***Google itself*** refers to each as "services"; namely, "App distribution services" and "in-app billing services".  That description is apt

1

2

**Defendants' Argument Re Disputed Instruction No. 38**
**ELEMENTS – TYING UNDER THE RULE OF REASON**

3

4

5

Because the *per se* claim should be dismissed as a matter of law, there is no reason to have an instruction dedicated to only this element.  *See* Google's Argument re: Instruction No. 37.  Rather, the Court should give Google's instruction on the elements of a rule-of-reason tying claim.

6

7

8

9

If the Court does give this instruction, as explained in Google's Argument re: Instruction No. 39, the products at issue should not be described as broad categories of products (e.g., app distribution services) but, instead, should be described as the products at issue in this case (i.e., the Google Play Store and Google Play Billing).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 39 Re**
**TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS**
**Offered by Plaintiff**

To determine whether Android app distribution services (like the Google Play Store) and Android in-app billing services for digital goods and services transactions (like Google Play Billing) are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough Android app developers would want to use in-app billing services separate from the Android app distribution services they are using, so that providers would be induced generally to provide Android app distribution and in-app billing services separately, then Android app distribution and in-app billing services are separate products.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.5, with second paragraph added based on *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995-96 (9th Cir. 2023)

1
2
**Disputed Instruction No. 39 Re**
**TYING – PRESENCE OF TWO PRODUCTS**
**Offered by Defendants**

3   To determine whether the Google Play store and Google Play Billing are separate and distinct

4   products, you should consider whether there would be demand for each of them if they were offered

5   separately.  If enough app developers would want to use app distribution services like the Google Play

6   Store alone and in-app billing services like Google Play Billing alone to induce sellers generally to

7   provide access to them separately then they are separate products.  On the other hand, if there is very

8   little demand for one of the products by itself, that is, without the other product, then the Google Play

9   store and Google Play Billing are not two separate products for the purposes of the tying claim, even if

10   they are sometimes used separately.

11   Products may be separate products even if one of them is useless without the other.  The

12   relevant issue is whether there is sufficient demand from customers to induce sellers to provide them

13   separately, even if the customer needs to obtain both products from one or more suppliers.

14

15   Source: ABA Model Civil Antitrust Jury Instruction 2.E.5

16
17
18
19
20
21
22
23
24
25
26
27
28

**Plaintiff's Argument Re Disputed Instruction No. 39**
**TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS**

Epic has revised this instruction from its prior proposal to hew more closely to the relevant Model Instruction.  Now, there is no substantive difference between Epic's instruction and the Model—Epic only fills in placeholder language from the Model.

Epic objects to Google's description of product A and product B in their instruction.  Google describes product A as "the Google Play store" and product B as "Google Play Billing".  By narrowing these descriptions to the Google Play store and Google Play Billing, Google limits the two-products inquiry to its own products.  But the two-products inquiry is not limited to the specific products offered by the defendant.  Instead, it asks whether the ***type*** of products offered by the defendant are separate products.  For example, in *United States v. Microsoft*, the focus of the two-products inquiry was whether operating systems and browsers, generally, were separate products, not whether Windows and Internet Explorer were separate products.  253 F.3d at 85-89; *see also Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) (asking whether the product category of "services" is separate from the product category of "parts").  By limiting the inquiry to only the specific products it sells, Google may mislead the jury into finding that the Google Play store and Google Play Billing are the same product not based on their "functional relation", *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984), but on irrelevant factors like Google's choice of branding and appearance.  Google's proposed instruction should be rejected.

**Defendants' Argument Re Disputed Instruction No. 39**
**TYING – PER SE AND RULE OF REASON: PRESENCE OF TWO PRODUCTS**

The Court should give Google's proposed instruction, which adheres to the ABA's model instruction and, more importantly, the law.

Epic proposes to erroneously ask the jury whether types of products are distinct, rather than the products at issue in this case—the Google Play store and Google Play Billing.  The relevant question is whether "the tying and tied goods are two separate products."  *See United States v. Microsoft Corp.*, 253 F.3d 34, 85 (D.C. Cir. 2001) (considering whether Windows and Internet Explorer are separate products); ABA Model Civil Antitrust Jury Instr. 2.E.5 (same).  Epic obfuscates and confuses the inquiry by asking about broad categories of products (Android app distribution services and in-app billing services) rather than the products at issue in this case (the Google Play store and Google Play Billing).  Rather than focus on broad product categories, Google's instruction focuses on the precise question before the jury.

The Court should reject Epic's instruction, which lacks a basis in the law, and instead give Google's proposed instruction, which is neutral, legally sound, and based on the ABA's model instruction.

**Disputed Instruction No. 40 Re**
**TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING**
**Offered by Plaintiff**

You may find that a tie exists between the Google Play Store and Google Play Billing if you find that Google refuses to distribute Android apps through the Google Play Store unless Android app developers agree to use Google Play Billing to facilitate the sale of digital goods or services in those apps. You may also find that a tie exists if Google effectively coerced Android app developers into using only Google Play Billing. To prove coercion, Epic must prove by a preponderance of the evidence that Google exploited its control over the Google Play Store to force Android app developers to use Google Play Billing for these transactions, when the app developers either did not want to use Google Play Billing at all, or might have preferred to use a different in-app billing service, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion.

If Google has made the use of the Google Play store and Google Play Billing together the only viable economic option, you may find that Google has effectively tied the Google Play store to Google Play Billing.  However, there is no coercion if the Google Play store and Google Play Billing are offered separately and separate use is economically feasible.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.7  (with edits described in Plaintiff's argument)

1

2

**Disputed Instruction No. 40 Re**
**TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING**
**Offered by Defendants**

3

4

5

6

7

8

9

You may find that a tying arrangement exists between the Google Play store and Google Play Billing if Google either refused to distribute apps on the Google Play store unless developers also agreed to use Google Play Billing (or not to use in-app billing services from another supplier).  To prove coercion, Epic must prove by a preponderance of the evidence that Google exploited its control over the Google Play store to force developers into using Google Play Billing, when developers might have preferred to use other billing services on different terms, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.

10

11

12

13

If Google has made the use of the Google Play store and Google Play Billing together the only viable economic option, you may find that Google has effectively tied the Google Play store to Google Play Billing.  However, there is no coercion if the Google Play store and Google Play Billing are offered separately and separate use is economically feasible.

14

15

Source: ABA Model Civil Antitrust Jury Instruction 2.E.7

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiff's Argument Re Disputed Instruction No. 40**
**TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING**

Epic proposes an instruction that closely tracks the Model, with some minor, justified modifications.  Epic proposes replacing placeholder language at the beginning of the Model with "[y]ou may find that a tie exists between the Google Play Store and Google Play Billing if you find that Google refuses to distribute Android apps through the Google Play Store unless Android app developers agree to use Google Play Billing to facilitate the sale of digital goods or services in those apps."  Epic proposes similar edits to placeholders elsewhere in the instruction.  This accurately describes Epic's claims in neutral terms, and is consistent with the law.  Epic proposes additional minor edits to the language of the Model to ensure it comports with Epic's claims.

Google's proposed Instruction omits language from the ABA Model that Epic retains, which is: "You may also find that a tie exists if Google effectively coerced Android app developers into using only Google Play Billing."  Google's Instruction does go on to explain *how* Epic proves coercion, but provides no explanation as to how such a showing of coercion impacts the jury's consideration of Epic's claims.  The jury should be instructed that a finding of effective coercion establishes the "conditioning" element of Epic's tying claim.

1

2

**Defendants' Argument Re Disputed Instruction No. 40**
**TYING – PER SE AND RULE OF REASON: PROOF OF CONDITIONING**

3        Rather than propose a legally correct instruction, Epic has distorted the law to fit its arguments

4   on the merits.  In doing so, Epic has introduced error.

5        Rather than ask whether Google conditions distribution on the Google Play store on the use of

6   Google Play Billing, Epic narrows this instruction to ask whether Google conditions the use of the

7   Google Play store on the use of Google Play Billing in one of the few circumstances that Google Play

8   Billing is required—that is, for in-app purchases.  Epic's instruction effectively tells the jury to

9   consider the only scenario in which Google Play Billing is required, while ignoring the many ways that

10  developers could avoid using Google Play Billing.  In effect, Epic is asking whether a tie exists if

11  developers choose to distribute apps through the Google Play store *and also* choose to monetize

12  through the specific method of in-app purchases of digital content.  That is not the test.  "A tie only

13  exists where 'the defendant improperly imposes conditions that explicitly or practically require buyers

14  to take the second product if they want the first one.'"  *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, 836

15  F.3d 1171, 1178 (9th Cir. 2016).  Google, on the other hand, has proposed even-handed language

16  derived from the ABA's model instruction that is supported by the law.  ABA Model Civil Antitrust

17  Jury Instruction 2.E.7.

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 41 Re**
**TYING – PER SE AND RULE OF REASON: EXISTENCE OF MARKET POWER WITH**
2
**RESPECT TO THE TYING PRODUCT**
**Offered by Plaintiff**

3

4        You must next determine whether Google has market power with respect to the tying product

5   (in an alleged market for Android app distribution services).  I have already instructed you on the

6   meaning of market power.  You must apply that instruction when determining whether Google has

7   market power with respect to the tying product.  In addition, if you have found that Google has

8   monopoly power in a relevant market, then Google necessarily has market power in that relevant

9   market. However, you may find that Google has market power in a relevant market even if Google

10  does not have monopoly power in that market because market power requires less than monopoly

11  power.  Further, if Google's share of the market for the Android app distribution services is below 30

12  percent, Google does not have market power for the purposes of the tying claim. But if Google's

13  market share of the market for Android app distribution services is above 30 percent, you may consider

14  that in determining whether Google has market power.

15

16  Source: ABA Model Civil Antitrust Jury Instruction 2.E.8  (with edits described in Epic's argument)

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Disputed Instruction No. 41 Re**
**EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT**
**Offered by Defendants**

3

4

5

6

You must next determine whether Google has market power with respect to the tying product (in an alleged market for Android app distribution services).  I have already instructed you on the meaning of market power.  You must apply that instruction when determining whether Google has market power with respect to the tying product.

7

8

Source: ABA Model Civil Antitrust Jury Instruction 2.E.8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiff's Argument Re Disputed Instruction No. 41**
**EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT**

Epic proposes adding two sentences that are not in the relevant ABA Model Instruction, and proposes keeping two sentences from the relevant ABA Model Instruction that Google proposes deleting.

Epic proposes adding that "if you have found that Google has monopoly power in a relevant market, then Google necessarily has market power in that relevant market. However, you may find that Google has market power in a relevant market even if Google does not have monopoly power in that market because market power requires less than monopoly power." This is supported in the law, as it is well-established that if an entity has monopoly power, it has market power. *Epic Games*, 67 F.4th at 998 ("Monopoly power differs in degree from market power, requiring something greater.") These sentences correctly state the law and will clarify the relationship between the showing required for Epic's Section 2 monopolization claims (monopoly power) and the corresponding showing that is relevant to their consideration of Section 1 restraint of trade claims (market power). This addition is necessary because the ABA Model does not contemplate instructions covering both Section 1 and Section 2 claims, and without them the jury may be confused into believing that the two sets of claims require an equivalent showing on this issue—or may even reach internally inconsistent conclusions.

Epic proposes keeping the following two sentences from the Model that Google proposes deleting: "if Google's share of the market for the Android app distribution services is below 30 percent, Google does not have market power for the purposes of the tying claim. But if Google's market share of the market for Android app distribution services is above 30 percent, you may consider that in determining whether Google has market power." Not only are these taken verbatim from the Model, they are consistent with the law. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004) (using 30% as a presumptive but not binding cut-off for market power). There is no basis to delete this language that would assist the jury in reaching its decision.

1

2

**Defendants' Argument Re Disputed Instruction No. 41**
**EXISTENCE OF MARKET POWER WITH RESPECT TO THE TYING PRODUCT**

3

4      In the context of these lengthy instructions, there is no need to instruct the jury on the meaning

5  of market power twice.  Rather, the Court should adopt Google's proposed instruction, which refers to

   previous instructions on market power.

6      Moreover, the Court should not adopt Epic's proposed instruction because it is erroneous

7  insofar as it suggests that a market share above 30 percent indicates market power.  "[N]umerous cases

8  hold that a market share of less than 50 percent is presumptively insufficient to establish market

9  power."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (collecting cases).

10 Some cases have stated that a 30 percent share is insufficient to find power in the tying product market.

11 *See Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 27 (1984); *accord Sherwin-Williams Co.*

12 *v. Dynamic Auto Images, Inc.*, 2017 WL 3081822, at *7 (C.D. Cal. Mar. 10, 2017).  But that is not

13 inconsistent with Google's proposed instruction.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

**Disputed Instruction No. 42**
**TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL**
**VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**
**Offered by Plaintiff**

4

5

6

7

If you determine that the Google Play Store and Google Play Billing are separate products that have been tied to one another and that Google has market power in Android app distribution, then you must determine whether Epic has proven that Google has foreclosed a substantial amount of interstate commerce with respect to Android in-app billing services for digital goods and services transactions.

8

9

10

11

In determining whether Google has foreclosed a substantial amount of commerce with respect to Android in-app billing services for digital goods and services transactions, you should first consider the total dollar amount Google earned from Google Play Billing by the tying arrangement in absolute terms.

12

13

14

15

With respect to Epic's rule of reason tying claim only, you should also consider whether there has been a substantial adverse effect on competition in a relevant market due to the tying arrangement. If there was not a substantial adverse effect on competition in a relevant market due to the tying arrangement, then you must find in favor of Google on the rule of reason tying claim.

16

17

18

19

There is no substantial foreclosure if only a small percentage of sales in the market for Android in-app payment solutions for digital goods and services transactions was affected by the tying arrangement. There also is no substantial foreclosure if you find that Android app developers would not have used Android in-app payment solutions at all in the absence of the tying arrangement.

20

21

22

Source: ABA Model Civil Antitrust Jury Instruction 2.E.9 (with edits described in Plaintiff's argument)

23

24

25

26

27

28

**Disputed Instruction No. 42 Re**
**TYING – RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF**
**COMMERCE WITH RESPECT TO THE TIED PRODUCT**
**Offered by Defendants**

If you determine that the Google Play Store and Google Play Billing are separate products that have been tied to one another and that Google has market power in an alleged market for Android app distribution services, then you must determine whether Epic has proven that Google has foreclosed a substantial amount of interstate commerce with respect to an alleged market for in-app billing services.

In determining whether Google has foreclosed a substantial amount of commerce with respect to an alleged market for in-app billing services, you should first consider the total dollar amount of Google's sales of in-app billing services achieved by the tying arrangement in absolute terms.

If the dollar amount of Google's sales of in-app billing services was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to the market for in-app billing services due to the tying arrangement.  In making that determination, you should apply the instructions regarding anticompetitive effect that I provided to you earlier.  If there was not a substantial adverse effect on competition with respect to a market for in-app billing services due to the tying arrangement, then you must find in favor of Google on Epic's tying claim.

There is no substantial foreclosure if only a small percentage of sales in the market for in-app billing services was affected by the tying arrangement.

1

2

**Plaintiff's Argument Re Disputed Instruction No. 42**
**TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL**
**VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**

3

4

5

6

7

8

9

10

11

12

Epic has revised this instruction from its prior proposal to more closely match the relevant Model Instruction.  Aside from replacing placeholder language with descriptions of product A and product B discussed further in Epic's prior arguments on the tying instructions, Epic proposes modifying the Model because Epic asserts both rule of reason and *per se* tying claims.  A substantial adverse effect on competition is only an element of a rule of reason tying claim.  *Epic Games*, 67 F.4th at 997 ("A tie is per se unlawful if (1) the defendant has market power in the tying product market, and (2) the tying arrangement affects a not insubstantial volume of commerce in the tied product market.").  Thus, Epic proposes language clarifying that the Model Instruction language concerning adverse effect on competition is only applicable to the rule of reason tying claims ("With respect to the Plaintiff's rule of reason tying claim only . . .").

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Defendants' Argument Re Disputed Instruction No. 42**

2

**TYING – PER SE AND RULE OF REASON: FORECLOSURE OF A SUBSTANTIAL VOLUME OF COMMERCE WITH RESPECT TO THE TIED PRODUCT**

3      Google objects to Epic's proposed instruction on grounds that *per se* tying instructions are

4 inapplicable to this case as a matter of law.  *See* Defendants' Argument re: Instruction No. 37.

5      Insofar as Epic's instruction addresses the rule-of-reason analysis, it is flawed, because it asks

6 about substantial foreclosure in a relevant market rather than in the tied product market particularly.

7 This misstates the law.  The Ninth Circuit has stated many times that there must be substantial

8 foreclosure in the tied product market.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th

9 Cir. 2012) ("The potential injury to competition threatened by this practice is that the tying

10 arrangement will either 'harm existing competitors or create barriers to entry of new competitors *in the*

11 *market for the tied product*[.]'" (emphasis added)); *id.* ("courts distinguish between tying arrangements

12 in which a company exploits its market power by attempting 'to impose restraints on competition *in*

13 *the market for a tied product*' (which may threaten an injury to competition) and arrangements that let

14 a company exploit its market power 'by merely enhancing the price of the tying product' (which does

15 not)." (emphasis added)); *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1088–89 (9th Cir. 2009)

16 (holding that a plaintiff must prove "the tying arrangement affects a 'not insubstantial volume of

17 commerce' in the tied product market."); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th

18 Cir. 2008) ("A tying arrangement is a device used by a seller with market power in one product market

19 to extend its market power to a distinct product market.").  Accordingly, the Court should adopt

20 Google's proposed instruction.

21      *United States v. Microsoft* does not support Epic's instruction.  In that case, the government

22 alleged that Microsoft had tied its browser, Internet Explorer, to the Windows operating system.  With

23 respect to the government's Section 1 tying claim, the D.C. Circuit held that "plaintiffs must show that

24 Microsoft's conduct unreasonably restrained competition" and that "[m]eeting that burden 'involves an

25 inquiry into the actual effect' of Microsoft's conduct on competition *in the tied good market*, the

26 putative market for browsers."  253 F.3d 34, 95 (D.C. Cir. 2001) (emphasis added).  Although the

27 government also alleged that this practice harmed competition in the market for the tying product–

28

operating systems like Windows–for purposes of the government's Section 2 claim, the Court did not say that this theory was a permissible Section 1 tying theory.

**Disputed Instruction No. 43 Re**
**TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE**
**Offered by Plaintiff**

Google contends that the alleged tying arrangement is justified. However, if you find that Epic has proven all elements of its *per se* tying claims, it is not a defense to the *per se* claim that Google's arrangement was justified.

When considering Epic's rule of reason tying claims, you should consider whether Google has proven, by a preponderance of the evidence, a business justification for the tying arrangement. Google has the burden of proof on this issue.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google. In making this determination, you should consider whether the justification Google offers is the real reason that it imposed the tying arrangement.

You must also consider whether Google's claimed legitimate business purpose could reasonably have been realized through substantially less restrictive means. Even if some type of constraint is necessary to promote a legitimate business interest, Google must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Google's claimed legitimate business purpose could reasonably have been achieved through other means, you may assess such factors as whether other means to achieve Google's objective were more or less expensive and more or less effective than the means chosen by Google, but even if alternative means would cost Google more to use, those costs do not prevent those means from being substantially less restrictive of competition.

If you find that Google could reasonably have achieved its claimed legitimate business purpose by less restrictive means, then you may find that there was no business justification and find for Epic on the tying claims. If you find  that there were no less restrictive means to achieve competitive benefits in a relevant market, then you must balance those competitive benefits against competitive harms resulting from the tying arrangement.  If the competitive harm substantially outweighs the competitive benefits, then the tying arrangement is unreasonable and then you must find for Epic.

Source: ABA Model Civil Antitrust Jury Instruction 2.E.11  (with edits described in Epic's argument)

**Disputed Instruction No. 43 Re**
**TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE**
**Offered by Defendants**

Google contends that the alleged tying arrangement is justified.  If you find that Epic has proven all of the elements of a tying claim, then you should consider whether Google has proven, by a preponderance of the evidence, a business justification for the tying arrangement.  Google has the burden of proof on this issue.

Google contends that the tying arrangement is justified because, among other things, it enables Google efficiently to collect compensation for the use of its services and intellectual property and ensures that Google can receive compensation for its services and intellectual property.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google. If Google shows that its policy had a legitimate purpose, then Epic must prove that the procompetitive benefits of Google's policy could be achieved through substantially less restrictive means.

In determining whether all of Google's legitimate objectives could reasonably have been achieved through substantially less restrictive means, you may assess such factors as whether other means to achieve Google's objectives were substantially more or less expensive and more or less effective than the means chosen by Google.  You must, however, give a wide berth to Google's business judgment.  You may not find that there was a substantially less restrictive alternative if that alternative would cost significantly more to Google.

If you find that Epic has demonstrated that Google could reasonably have achieved its legitimate business purposes by substantially less restrictive means, including without significantly increased costs, then you may find that there was no business justification and find for Epic on the tying claim.  If you find that the tying arrangement serves a legitimate business purpose of Google, and that Epic has not demonstrated that there are substantially less restrictive means reasonably available without significantly increased costs to achieve that purpose, then you must find for Google and against Epic on the tying claim.

Source:  ABA Model Civil Antitrust Jury Instruction 2.E.11.

**Plaintiff's Argument Re Disputed Instruction No. 43**
**TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE**

Epic has revised this instruction from its prior proposal to match more closely the relevant Model Instruction.  Epic proposes only minor changes from the Model.  Aside from filling placeholders, Epic proposes to explain that "it is not a defense to the per se claim that Google's arrangement was justified" and that Google's business justification only be considered "[w]hen considering Epic's rule of reason tying claims".  This is black-letter law (*see Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 996 (9th Cir. 2023)), and important to help the jury distinguish the elements of the Epic's *per se* tying claim from its rule of reason tying claim.  Epic also proposes edits to the last paragraph to clarify that, even if Epic does not prove less restrictive alternatives as to any benefits, the jury must still balance those benefits against the harms resulting from the tie.  *FTC v. Qualcomm*, 969 F.3d 974, 991 (9th Cir. 2020). Previously, Epic included a clause in the above instruction informing the jury that they cannot consider procompetitive justifications offered by Google that arise outside the relevant market(s) in this case.  While supported in law (*see United States v. Topco Assocs.*, 405 U.S. 569, 610 (1972)), Epic has removed this language in order to comply with the Court's request that the Parties conform their proposed instructions to the ABA Model Instructions.  Instead, Epic submits a single, standalone instruction on this point.  (*See* Instruction No. 45 Re Competitive Benefits Outside the Relevant Market.)

Google's proposed instruction includes major changes to the Model and should be rejected.

*First*, Google adds a lengthy second paragraph outlining in detail its proposed procompetitive justification.  The language in Google's proposed paragraph is biased in Google's favor.  For example, Google requests the Court instruct the jury that "Google Play Billing offers a consistent, trustworthy experience to users", that "Google Play Billing protects users by protecting their sensitive data and enabling them to cancel subscriptions easily", that "[i]t allows developers to design, distribute, and monetize their apps easily", and "[i]t allows for the existence of the freemium model".  These statements are all facts that Google may try to *prove*, and Google may argue in closing, but they are not proper jury instructions.  *See, e.g.*, *Curtis v. City of Oakland*, 2016 WL 1138457, at *4 (N.D. Cal. Mar. 23, 2015) ("It is well established that instructions should not be argumentative or slanted in one party's favor" (citing *United States v. Maxwell*, 579 F.3d 1283, 1304 (9th Cir. 2009)).

*Second*, Google proposes deleting language from the Model instructing the jury to "consider whether the justification Google offers is the real reason that it imposed the tying arrangement." This Model language Google proposes deleting is black-letter law. *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[A] procompetitive justification [must be] nonpretextual".) *Third*, Google proposes deleting the fifth paragraph of the Model, which identifies factors the jury may consider in determining whether Google's purported procompetitive justifications may be achieved through other means. Google proposes replacing that paragraph with one explaining that "if Google shows that its policy had a legitimate purpose, then Epic must prove that all (or virtually all) the procompetitive benefits of Google's policy could be achieved through substantially less restrictive means." Google's language would mislead the jury into believing that if Epic fails to prove that ***all*** of the claimed pro-competitive benefits could be achieved, the jury must return a verdict for Google. However, even if some pro-competitive benefits could not be achieved through less restrictive means, the jury must balance those benefits against the harm to competition, as explained in the Models and required by law. *Qualcomm*, 969 F.3d at 991; *see also Apple*, 67 F.4th at 986 (although "Apple was entitled to 'some compensation'" Epic needed only provide evidence "calibrated to achieving that general goal, instead of one achieving the level of compensation that Apple currently achieves"). Later, Google proposes adding that "You may not find that there was a substantially less restrictive alternative if that alternative would cost significantly more to Google", and other similar language. As noted above, though the Ninth Circuit may have considered defendants' costs when considering less restrictive alternatives, the Supreme Court and other Circuits have not. *See* Plaintiff's Argument re Instruction No. 37, Competitive Benefits. Google's addition may mislead the jury to reject alternatives that clearly cause substantially less harm to competition on the basis of Google's *own* administrative burden in adopting such alternatives. Finally, Google proposes adding "You must, however, give a wide berth to Google's business judgment." Google takes out of context similar language from *NCAA v. Alston*, 141 S. Ct. 2141, 2163 (2021). But the Court was simply explaining that, in applying the rule of reason analysis set forth in Plaintiff's proposed instruction and in crafting an injunction, "the district court honored [certain] principles", including that the district court gave the defendant's business judgment a wide berth. *Id.* Google's proposed addition is prejudicially slanted in Google's favor.

1

2

**Defendants' Argument Re Disputed Instruction No. 43
TYING – RULE OF REASON: BUSINESS JUSTIFICATION DEFENSE**

3       Epic's proposed instruction is legally flawed.

4       *First*, Epic's proposed instruction asserts that "it is not a defense to the per se claim that

5   Google's arrangement was justified."  That is not the law in the Ninth Circuit.  *Mozart Co. v.*

6   *Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1348 (9th Cir. 1987) ("We have recognized that

7   antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying

8   arrangement").  Indeed, in its lawsuit against Apple, Epic conceded as an "undisputed principle" that

9   "[t]he Ninth Circuit has 'recognized that antitrust defendants may demonstrate a business justification

10  for an otherwise per se illegal tying arrangement.'"  *Epic Games, Inc. v. Apple, Inc.*, Case No. 20-CV-

11  05640-YGR (N.D. Cal.), ECF No. 276 at 48.  In addition, as explained in Defendants' Argument re:

12  Instruction No. 37, Epic's proposed "*per se*" instruction is improper as a matter of law because its

13  tying claim must be assessed under the rule of reason.  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946,

14  997 (9th Cir. 2023).  But even if a *per se* claim is presented to the jury, an instruction on the business

15  justification defense must be given.

16      *Second*, Epic improperly omits the second paragraph of the ABA model instruction.  This

17  paragraph describes the business justifications for the alleged tying arrangement so that the jury is

18  informed what justifications it should consider.  Epic's attempt to omit this paragraph is an obvious

19  attempt at denying the jury critical information needed to make the requisite assessment of the asserted

20  justifications.  Google's proposed instruction properly reflects governing law and the ABA model, and

21  Epic's modifications must be rejected.

22      *Third*, Epic incorrectly suggests that the jury must find for Epic unless Google demonstrates there

23  were no less restrictive means available to achieve legitimate business objectives – i.e. that Google must

24  demonstrate it used the least restrictive means.  That is not the law and is contrary to controlling Supreme

25  Court authority.  In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the Court held that "antitrust law does not

26  require businesses to use anything like the least restrictive means of achieving legitimate business

27  purposes. To the contrary, courts should not second-guess degrees of reasonable necessity so that the

28  lawfulness of conduct turn[s] upon judgments of degrees of efficiency."  *Id*. at 2161 (internal citation

1

2      and quotations omitted).  The Court added that "[a]s we have discussed, antitrust courts must give wide

3      berth to business judgments before finding liability."  *Id*. at 2163.  Google's proposed jury instruction

4      properly reflects the Supreme Court's holding in *Alston* and the jury should be instructed on the relevant

5      considerations as directed by the Supreme Court.  *See also* Defendants' Argument re: Instruction No. 33

6      (explaining legal principles that control the least restrictive alternative analysis).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 44 Re**
**INJURY AND CAUSATION**
**Offered by Plaintiff**

If you find that Google has violated the antitrust laws as alleged by Epic, then you must consider whether Epic was injured as a result of Google's violations of the antitrust laws by applying the following elements.

Epic is entitled to a verdict that Google is liable if it can establish these elements of injury and causation:

1.  Epic was in fact injured as a result of Google's alleged violations of the antitrust laws;

2.  Google's alleged illegal conduct was a material cause of Epic's injury; and

3.  Epic's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Epic to establish the fact of damage, it must prove that it was injured as a result of Google's alleged violations of the antitrust laws. Proving the fact of damage does not require Epic to prove the dollar value of its injury. It requires only that Epic proves that it was in fact injured by Google's antitrust violations.

Second, Epic must offer evidence that establishes by a preponderance of the evidence that Google's alleged illegal conduct was a material cause of Epic's injury. This means that Epic must have proved that some damage occurred to it as a result of Google's alleged antitrust violations, and not some other cause. Epic is not required to prove that Google's alleged antitrust violations were the sole cause of its injury; nor need Epic eliminate all other possible causes of injury. It is enough if Epic has proved that the alleged antitrust violations were a material cause of its injury.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against–such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

Finally, Epic must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Epic's injuries were caused

by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Epic's injuries are antitrust injuries. On the other hand, if Epic's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Epic's injuries are not antitrust injuries and Epic may not recover damages for those injuries under the antitrust laws.

In summary, if Epic can establish that it was in fact injured by Google's conduct and that Google's conduct was a material cause of its injury, then Epic is entitled to a verdict that Google has violated the antitrust laws.

Source: Adapted from ABA Model Civil Antitrust Jury Instruction 6.A.1

**Disputed Instruction No. 44 Re**
**INJURY AND CAUSATION**
**Offered by Defendants**

If you find that Google has violated the antitrust laws as alleged by Epic, then you must consider whether Epic was injured as a result of Google's violations of the antitrust laws by applying the following elements:

1. Epic was in fact injured as a result of Google's alleged violations of the antitrust laws;

2. Google's alleged illegal conduct was a material cause of Epic's injury; and

3. Epic's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Epic to establish that it is entitled to recover damages, it must prove that it was injured as a result of Google's alleged violations of the antitrust laws. Proving the fact of damages does not require Epic to prove the dollar value of its injury. It requires only that Epic proves that it was in fact injured by Google's antitrust violations.

Second, Epic must offer evidence that establishes by a preponderance of the evidence that Google's alleged illegal conduct was a material cause of Epic's injury. This means that Epic must have proved that some damage occurred to it as a result of Google's alleged antitrust violations, and not some other cause. Epic is not required to prove that Google's alleged antitrust violations were the sole cause of its injury; nor need Epic eliminate all other possible causes of injury. It is enough if Epic has proved that the alleged antitrust violations were a material cause of its injury.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against–such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

Finally, Epic must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Epic's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would

otherwise harm consumers, then Epic's injuries are antitrust injuries. On the other hand, if Epic's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Epic's injuries are not antitrust injuries and Epic may not recover damages for those injuries under the antitrust laws.

In summary, Epic must establish that it was in fact injured by Google's conduct, that Google's conduct was a material cause of its injury, and that the injury was the type that the antitrust laws were intended to prevent.

Source: ABA Model Civil Antitrust Jury Instruction 6.A.1

1

2

**Plaintiff's Argument Re Disputed Instruction No. 44**
**INJURY AND CAUSATION**

3        Epic proposes the ABA Model Instruction, with the following modifications.  In the second

4  paragraph, Epic proposes indicating that "Epic is entitled to a verdict that Google is liable if it can

5  establish these elements of injury and causation."  Elsewhere in the instruction, Epic alters references

6  to plaintiffs seeking money damages to make clear that Epic seeks no money damages.  Conversely,

7  Google deletes material language from the Model Instruction.  *First*, Google deletes that "Epic is

8  entitled to a verdict that Google is liable if it can establish these elements of injury and causation",

9  before listing the elements of injury and causation.  This language is pulled directly from the Model.

10 *Second*, Google modifies the final paragraph to state that Epic "must establish that it was in fact

11 injured by Google's conduct", unlike the Model, which provides that "Epic is entitled to a verdict that

12 Google has violated the antitrust laws" if Epic "can establish that it was in fact injured by Google's

13 conduct".  Again, Epic's proposed language is pulled directly from the Model.

14        Previously, Epic included a clause in the above instruction informing the jury that they cannot

15 consider procompetitive justifications offered by Google that arise outside the relevant market(s) in

16 this case.  While supported in law (*see United States v. Topco Assocs.*, 405 U.S. 569, 610 (1972)), Epic

17 has removed this language in order to comply with the Court's request that the Parties conform their

18 proposed instructions to the ABA Model Instructions.  Instead, Epic submits a single, standalone

19 instruction on this point.  (*See* Instruction No. 45 Re Competitive Benefits Outside the Relevant

20 Market.)

21        Epic's position is that its proposed instruction is a more faithful adaptation from the Model

22 Instruction than Google's, and submits that Google's proposed instruction should therefore be rejected.

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 44**
**INJURY AND CAUSATION**

There is only a single substantive point of dispute between the parties' proposed instructions—Epic would provide a supposed "summary" of the instruction that contains oversimplified and inaccurate statements of law. *See* Epic's proposed instruction ("In summary, if Epic can establish that it was in fact injured by Google's conduct and that Google's conduct was a material cause of its injury, then Epic is entitled to a verdict that Google has violated the antitrust laws."). Epic repeats that refrain in the first and last paragraphs of its proposed instruction. That is error. Epic's proposed instruction would inappropriately compel a verdict in its favor if it shows simple injury and causation only. But there are more elements to an antitrust claim than injury and causation, and there are circumstances in which Epic might show injury but still would not be "entitled to a verdict." For example, if Google proves the elements of the business justification defense to Epic's tying claim, then Epic would not be entitled to a verdict, regardless of the jury's findings on injury. Epic, likewise, would not be entitled to a verdict in the event that the jury finds for Google when it applies the rule-of-reason factors. Epic's "summary" of complex legal issues risks that the jury ignores the complexities of the instructions elsewhere and thus reach an erroneous result.

Whether Epic is entitled to a verdict in its favor is up to the jury and is a determination the jury will make with reference to *all* of the Court's instructions, not this single instruction on injury and causation. By asking the Court to instruct otherwise, Epic invites error. Epic's instruction would replace the complexity and nuance of all of the other instructions and reduce the question of the jury's ultimate verdict to this single instruction. That would be error.

1

**Disputed Instruction No. 45**
**COMPETITIVE BENEFITS OUTSIDE THE RELEVANT MARKET**
2
**Offered by Plaintiff**

3        For Epic's Monopolization, Section 1 Rule of Reason, and Rule of Reason Tying claims,

4   Google claims that competitive harms caused by its conduct are outweighed by competitive benefits.

5   If you find for Epic that Google's conduct has resulted in harm to competition in the markets for

6   Android app distribution and/or Android in-app billing services, you may only consider evidence of

7   competitive benefits offered by Google that benefit competition within the markets for Android app

8   distribution and/or Android in-app billing services.  Evidence of benefits to competition outside the

9   markets for Android app distribution and/or Android in-app billing services cannot justify Google's

10  conduct.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 45**
**COMPETITIVE BENEFITS OUTSIDE THE RELEVANT MARKET**
**Offered by Defendants**

2

3      Google opposes the inclusion of this instruction for the reasons in Google's Argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Plaintiff's Argument Re Instruction No. 45**
**COMPETITIVE BENEFITS OUTSIDE THE RELEVANT MARKET**

3       In the Parties' prior joint submission of proposed jury instructions, Epic proposed modifying

4   certain ABA Model Instructions to explain that the jury may not consider Google's purported

5   procompetitive justifications that arise outside the relevant market(s) where harm is found to occur.

6   (*See* Dkt. 679.)  In an effort to reach compromise and to abide by the Court's request that the Parties

7   hew closely to the Model Instructions, Epic has removed these modifications from its proposed

8   instructions and instead offers this standalone jury instruction on the same point.  Epic initially offered

9   to remove this instruction entirely if Google would stipulate that it would not argue that Epic waived

10  the right to raise this point on appeal, but Google refused.

11      Epic's instruction is warranted under the law—procompetitive justifications that arise in

12  relevant markets other than those in which the defendant has restrained trade cannot be considered

13  under the rule of reason.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see Sullivan*

14  *v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994).  In dicta in the *Topco* decision, the Supreme Court

15  explained that competition "cannot be foreclosed with respect to one sector of the economy because

16  certain private citizens or groups believe that such foreclosure might promote greater competition in a

17  more important sector of the economy." *Topco*, 405 U.S. at 610.  In *Sullivan*, the First Circuit agreed,

18  holding that it would be "improper to validate a practice that is decidedly in restraint of trade simply

19  because the practice produces some unrelated benefits to competition in another market". *Sullivan*, 34

20  F.3d at 1112.  And in *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978), the D.C. Circuit

21  held that procompetitive benefits in the market for the production of professional football games could

22  not be offered to justify competitive restraints in the market for players' services.  *Id.* at 1186.

23      The Ninth Circuit, however, has not decided this issue.  In *Paladin Associates, Inc. v. Montana*

24  *Power Co.*, 328 F.3d 1145 (9th Cir. 2003), the Ninth Circuit considered but did not rule on the issue,

25  explaining that it may be that "procompetitive effect should not be considered in our rule of reason

26  analysis, based on the theory that procompetitive effects in a separate market cannot justify anti-

27  competitive effects in the market [analyzed here.]"  *Id.* at 1157 n.11 (citing *Topco*, 405 U.S. at 610).

28

1    Likewise, in *Epic v. Apple*, the Ninth Circuit expressly "decline[d] to decide this issue here." *Epic*

2    *Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).

3         In *Sullivan* and *Smith*, the First and D.C. Circuits correctly applied the Supreme Court's

4    admonition from *Topco* that procompetitive justifications outside the market where competition was

5    harmed are irrelevant under the rule of reason.  This Court should do the same and offer the foregoing

6    jury instruction proposed by Epic.

**Defendant's Argument Re Instruction No. 45**
**COMPETITIVE BENEFITS OUTSIDE THE RELEVANT MARKET**

Epic cites no model for this instruction because there is none.  Epic's instruction, which would limit the jury's ability to consider the procompetitive benefits of Googles' conduct, is flawed as a matter of law.

Google will show procompetitive benefits in the markets as defined by Epic.  For example, Google will show its conduct makes Android phones more competitive with iPhones, which increases the number of Android phones sold and, in turn, the number of transactions involving Android apps.  That is a procompetitive effect in the alleged market for Android app distribution.  *Cf. Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 990 (9th Cir. 2023) ("increasing the total number of iOS device users," thereby "increasing App Store output," was a procompetitive justification that "relate[s] to the app-transactions market").

Google, however, will also show that its conduct enhances competition in related markets, such as competition between Android phones and iPhones.  Epic's bespoke instruction would improperly limit the jury's consideration of these procompetitive benefits.  As the Ninth Circuit explained in *Epic v. Apple*, "the Supreme Court has considered cross-market rationales in Rule of Reason and monopolization cases."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 989 (9th Cir. 2023).   For example, in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), the Supreme Court considered a procompetitive rationale in market for photocopiers in a case where the plaintiff alleged harm to competition in a relevant market of Kodak-brand service and parts.  *Id.* at 482–84.  Similarly, in *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984), the Supreme Court considered whether preserving the demand for tickets to college football games could justify restrictions on competition for licensing TV broadcasts.

The Ninth Circuit also "ha[s] previously considered cross-market rationales when applying the Rule of Reason."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th at 989.  In *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1395-97 (9th Cir. 1984), the Ninth Circuit held that enhancing the NFL football's ability to "compet[e] with other forms of entertainment" could justify a rule limiting competition among NFL teams for stadium locations.  Similarly, the *FTC v. Qualcomm*, 969 F.3d 974,

996 (9th Cir. 2020), the Ninth Circuit credited "Qualcomm's reasonable, procompetitive justification" of licensing its intellectual property only at the device level to avoid "'multi-level licensing,' leading to inefficiencies and less profit." *Id.* at 996. But the asserted relevant markets in which Qualcomm was alleged to have restrained trade were "CDMA and premium LTE modem chips." *Id.* at 993. Thus, the court properly considered Qualcomm's procompetitive justification which supported its IP licensing practices, distinct from the specific relevant chip market alleged.

Other courts likewise "have found it appropriate in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets." *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994); *accord In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (Smith, J., concurring) (courts "have permitted defendants to offer procompetitive effects in a collateral market as justification for anticompetitive effects in the defined market") (citing cases). Indeed, courts have held that it is error to instruct a jury otherwise. *Sullivan*, 969 F.3d at 1112.

Epic's out-of-context citation to *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972), is not to the contrary. *Topco* involved a *per se* violation of Section 1: a naked market allocation conspiracy between horizontal competitors. *Id.* at 608. The Supreme Court stated that its "inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated per se rules." *Id.* at 609–10. The Court explained that "the rule of reason used by the District Court is irrelevant to the issue before us." *Id.* at 609. Accordingly, *Topco* merely explains the logic of why courts condemn horizontal agreements without considering their social utility. It does not stand for the proposition that procompetitive effects in related markets are irrelevant as a matter of law under the rule of reason. As the Ninth Circuit explained in *Epic v. Apple*, the Supreme Court and prior Ninth Circuit precedent has considered such procompetitive benefits to be cognizable. The Court should decline to give Epic's erroneous instruction.

1

2

**Disputed Instruction No. 46 Re**
**STATUTE OF LIMITATIONS**
**Offered by Plaintiffs**

3

4

 Epic disputes that an instruction on the statute of limitations is warranted for the reasons stated

in its argument.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 46**
**STATUTE OF LIMITATIONS**
**Offered by Defendants**

2

3        The statute of limitations for the antitrust laws does not permit recovery of damages for any

4   injuries caused by conduct that occurred prior to August 13, 2016.  In particular, you have heard evidence

5   in this case about agreements that Google reached before August 13, 2016.  Those agreements are outside

6   of the limitations period.  You may not consider those agreements to be part of the conduct that Epic is

7   challenging in this case.  Agreements that Google reached before August 13, 2016, may be considered,

8   at most, as background to help you understand the claims and counterclaims in this case.

9        If you find that Epic suffered injuries caused by conduct that occurred both before and after

10   August 13, 2016, then you must apportion liability between the two periods and you may find Google

11   liable only for the portion of the injuries caused by conduct that occurred after August 13, 2016.

12

13   Source:  *In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal.), ECF No. 2899, at 36

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Plaintiff's Argument Re Disputed Instruction No. 46**
**STATUTE OF LIMITATIONS**

3

4       Epic objects to the inclusion of any Statute of Limitations instruction as it relates to Epic's

claims because Epic does not seek damages on any claims, and statute of limitations is solely a defense

5    to damages claims.  *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1084 (9th Cir. 2014) ("Because Plaintiffs

6    seek only injunctive relief under federal law, their federal antitrust claim is subject to the equitable

7    doctrine of laches and not the four-year statute of limitations in section 4B of the Clayton Act, 15

8    U.S.C. § 15b.").  This is clear from the first sentence of the Model—a sentence Google itself includes

9    in its proposed instruction—which states that "[t]he statute of limitations for the antitrust laws does not

10   permit recovery of damages for any injuries caused by conduct that occurred prior to August 13,

11   2016."  Google's instruction has no relevance to claims involving Epic.  And, in any event, a statute of

12   limitations instruction is unnecessary given this Court's disposition on Google's motion for partial

13   summary judgment.  (*See* August 3 Hearing Tr. 28:14-15 (Google's motion for summary judgment on

14   statute of limitations grounds "is denied. There will be no further written order on that.").)  Google's

15   proposed instruction should be rejected.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Defendants' Argument Re Disputed Instruction No. 46**
**STATUTE OF LIMITATIONS**

3          Epic cannot base liability on alleged restraints that occurred outside of the four-year limitations

4   period.  *See* 15 U.S.C. § 15a.  When Google made this argument in its motion for partial summary

5   judgment, 3:21-md-02981-JD, ECF No. 483, at 14, Plaintiffs responded by representing to the Court

6   that "No plaintiff in this case seeks to use facts about the carrier agreements to recover damages prior

7   to the four-year limitations period."  3:21-md-02981, ECF No. 511-01, at 14 n.7.  The Court expressly

8   relied on Plaintiffs' representation to deny this aspect of Google's motion as moot.  August 3, 2023

9   Hr'g Tr. at 26:6-11 (explaining that Plaintiffs' footnote 7 alleviates Google's statute-of-limitations

10  concern).  Based on the Court's ruling, at most, Epic can rely on pre-limitations period conduct for

11  "table setting."  *Id.* at 26:17.  But, as the Court rightly understood Plaintiffs' representation, they had

12  "expressly renounced they're going to make any argument for damages or anything else based on those

13  older agreements."  *Id.* at 26:17-21.  Plaintiffs then affirmed the Court's understanding, saying that, at

14  most, they would use pre-limitations agreements as "part of the story."  *Id.* at 29:3-8.  The colloquy

15  ended with the Court telling Plaintiffs that the Court was "banking on Footnote 7," and Plaintiffs'

16  counsel stating, "All right.  Thank you."  *Id.* at 29:16-22.

17          Epic has taken an 180-degree turn.  Epic now proposes an instruction, contrary to previous

18  representations, that would permit the jury to find Google liable for pre-limitations period conduct.

19  Epic has removed Google's proposed language that "Agreements that Google reached before August

20  13, 2016, may be considered, at most, as background to help you understand the claims and

21  counterclaims in this case."  But that sentence Google proposed directly reflects Plaintiffs'

22  representations to the Court in their summary judgment opposition brief and during the hearing, as

23  described above.  Worse still, Epic has deleted Google's proposed sentences that "Those agreements

24  are outside of the limitations period.  You may not consider those agreements to be part of the conduct

25  that Epic is challenging in this case."

26          Epic is now turning its back on previous representations, and is seeking an instruction that

27  would permit recovery based on pre-limitations conduct.  The Court should not allow this

28  gamesmanship.  For all of the reasons Google argued on summary judgment, Epic should not be

1   permitted to recover for pre-limitations period conduct.  Rather, the Court should give the instruction

2   proposed by Google, which is based on an instruction the Court read recently in the *Capacitors* MDL.

3   *See In re Capacitors Antitrust Litig.*, No. 3:14-cv-03264-JD (N.D. Cal.), ECF No. 2899, at 36.

1

2

**Stipulated Instruction No. 47 Re**
**BREACH OF CONTRACT - INTRODUCTION**

3

4

   Google claims that Epic agreed to follow the terms of Google's Developer Distribution Agreement and its incorporated Payments Policy.

5

6

7

   Google claims that Epic breached Google's Developer Distribution Agreement by using payment solutions other than Google Play Billing to process in-app purchases and subscriptions for Android apps that were distributed through the Google Play store.

8

9

   Google also claims that Epic's breach of Google's Developer Distribution Agreement caused harm to Google for which Epic should compensate Google.

10

   Epic denies Google's claims for breach of contract.

11

12

Source:  Adapted from CACI Instr. No. 300

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Disputed Instruction No. 48 Re**
**BREACH OF CONTRACT - ELEMENTS**
**Offered by Plaintiff**

3

To recover damages from Epic for breach of contract, Google must prove all of the following:

4
5

    1.  That Epic agreed to follow the terms of Google's Developer Distribution
        Agreement;

6
7
8

    2.  That Epic, by using a payment solution other than Google Play Billing to sell digital
        goods in apps distributed in the Google Play Store, did something that the
        Developer Distribution Agreement prohibited it from doing;

9

    3.  That Google was harmed; and

10
11

    4.  That Epic's breach of the Developer Distribution Agreement was a substantial
        factor in causing Google's harm.

12
13

Source: Adapted from CACI Instr. No. 303

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed Instruction No. 48 Re**
**BREACH OF CONTRACT – ELEMENTS**
**Offered by Defendants**

To recover damages from Epic for breach of contract, Google must prove all of the following:

1.  That Epic agreed to follow the terms of Google's Developer Distribution Agreement;

2.  That Epic did something that the Developer Distribution Agreement prohibited it from doing;

3.  That Google was harmed; and

4.  That Epic's breach of the Developer Distribution Agreement was a substantial factor in causing Google's harm.

Source: Adapted from CACI Instr. No. 303

1

2

**Plaintiff's Argument Re Disputed Instruction No. 48**
**BREACH OF CONTRACT – ELEMENTS**

3

4       Epic and Google both adhere to the relevant CACI Model instruction on this point.  The sole

difference is that Epic proposes identifying the specific term of the DDA that Google claims Epic

5

breached (namely, that Epic used a payment solution other than Google Play Billing to sell digital goods

6

7 in apps distributed in the Google Play Store), whereas Google proposes stating that "Epic did something

that the Developer Distribution Agreement prohibited it from doing".  Epic's proposal to identify the

8

9 specific term that Google alleges Epic breached is necessary because, without that language, the jury

10 will not be instructed on the provision that Google alleges Epic breached.  If the jury does not understand

11 the provision that Google alleges Epic breached, it may render a decision unsupported by the facts and

12 the law.  Google's proposal to merely state that Epic's breach may consist of Epic doing "something that

13 the Developer Distribution Agreement prohibited it from doing" is plainly insufficient to instruct the

14 jury on this point.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Defendants' Argument Re Disputed Instruction No. 48**
**BREACH OF CONTRACT – ELEMENTS**

3

4

The parties' proposed instructions are nearly identical. The only dispute comes in the parties'

5 description of the second element.  As to that element, Epic asks the Court to instruct "That Epic, by

6 using a payment solution other than Google Play Billing to sell digital goods in apps distributed in the

7 Google Play Store, did something that the Developer Distribution Agreement prohibited it from doing."

8 *See* Epic's proposed instruction.  Google, on the other hand, asks the Court to instruct "That Epic did

9 something that the Developer Distribution Agreement prohibited it from doing."  *See* Google's proposed

10 instruction.  Google's proposed second element comes directly from the model.  CACI offers the

11 following language as an element of the claim: "That [name of defendant] did something that the contract

12 prohibited [him/her/nonbinary pronoun/it] from doing."  *See* CACI 303.  All Google has done is change

13 the placeholder language to reflect the parties in this case.  Epic, on the other hand, has included a

14 narrative about the breach.  Epic may provide that narrative in its closing argument, not the jury

15 instructions.  The Court, therefore, should adopt Google's instruction, which adheres to the model.

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 49 Re**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING –**
**ESSENTIAL FACTUAL ELEMENTS**

In every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another. Generally speaking, it means being faithful to one's duty or obligation. However, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.

Google claims that Epic violated the duty to act fairly and in good faith. To establish this claim, Google must prove all of the following:

1. That Epic agreed to follow the terms of Google's Developer Distribution Agreement;

2. That Epic breached the Developer Distribution Agreement to avoid Google's service fees;

3. That by this conduct, Epic did not act fairly and in good faith; and

4. That Google was harmed by Epic's conduct.

Source: Adapted from CACI Instr. No. 325

1
2

**Disputed Instruction No. 50 Re**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**
**Offered by Plaintiff**

3

Epic claims that Google's Payments Policy cannot be enforced even if Google proves all the

4

elements of a breach claim because it violates the federal and state antitrust laws.

5

To succeed, Epic must prove that the Payments Policy or Developer Distribution Agreement

6

violated the antitrust laws because they were an illegal tie, an illegal restraint of trade, or anticompetitive

7

conduct that was used to monopolize a relevant market, according to the instructions I have given you

8

regarding Epic's antitrust claims.

9

If you decide that Epic has proven any of these antitrust claims, then the Payments Policy is not

10

enforceable, and Epic cannot be liable for breach of contract or breach of the implied duty of good faith

11

and fair dealing.

12

13

Source: Adapted from CACI Instr. No. 337 (Affirmative Defense—Novation).

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**Disputed Instruction No. 50 Re**

2

**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS
Offered by Defendants**

3

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Plaintiff's Argument Re Disputed Instruction No. 50**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**

3      Google seeks damages for breach of contract arising from alleged violations of the DDA and

4  the Payment Policy incorporated into the DDA.  Epic therefore proposes that the jury be instructed that

5  the illegality of the agreements is an affirmative defense to Google's counterclaims under federal law.

6  *United Food Com. Wkrs. v. Food Employers*, 827 F.2d 519, 525 (9th Cir. 1987) (recognizing "antitrust

7  illegality" as a "defense to performance of a contract").  The proposed instruction is new because the

8  CACI does not provide a relevant model.  To comport with the Court's request that the Parties adhere

9  to the CACI in drafting their counterclaim instructions, Epic has removed all references to the legality

10  of the DDA in its instructions concerning breach.  Instead, Epic respectfully submits that the Court

11  should instruct the jury with this standalone instruction on Epic's illegality defense.

12      Google opposes his instruction based on its erroneous contention that the illegality of the

13  contract is a ***matter of law*** to be decided by the Court.  It may be true that the illegality of a contract

14  can be decided as a matter of law when that question does not turn on disputed factual claims, or

15  possibly when the issue depends on factual disputes that are ***independent*** of any claims to be decided

16  by a jury.  July 22, 2021 Minute Order at 2 (ECF 67) (recognizing that the Court would take up

17  equitable claims after the jury trial only "to the extent an equitable claim is independent of the legal

18  claims").  Not so here.  Rather, one of the central factual disputes in this case is whether Google has

19  entered into anti-competitive agreements, including the DDA, that violate the Sherman Act.  The

20  Parties agree that these Sherman Act claims must be heard and determined by the jury.  The jury thus

21  will necessarily need to decide whether the DDA violates the Sherman Act, which is the same issue

22  that would excuse any breach of the DDA pursuant to the illegality defense.  Because "the same finder

23  of fact must resolve all intertwined factual issues, . . . the defenses as a whole must be tried to the

24  jury."  *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1102-03 (N.D. Cal. 2007)

25  (citing *Beacon Theatres*, 358 U.S. at 509).

26      As the Court has recognized, even if Epic's illegality defense could be characterized as an

27  equitable matter for the Court, "as a general organizing principle, the Court intends to utilize a jury as

28  the finder of fact for issues common to the legal and equitable claims".  July 22, 2021 Minute Order at

2 (ECF 67) (citing Seventh Amendment cases).  Indeed, Plaintiffs have a Seventh Amendment right to have overlapping issues resolved by the jury.  *Id.*; *see also Ross v. Bernhard*, 396 U.S. 531 (1970).  Because Epic's affirmative defense of illegality overlaps with its antitrust claims, that defense cannot be resolved by the Court "as a matter of law" as Google proposes.

Google's proposal is also impractical.  Google proposes that the jury return a verdict as to its breach of contract counterclaims, but not as to Epic's affirmative defenses to those same claims.  At best, Google's proposal would result in the jury wasting time and effort in determining counterclaims that would be unnecessary in light of the jury's verdict on the Sherman Act claims.  At worst, Google's proposal could set up an impermissible conflict between the jury's verdict and the Court's determination of Epic's defenses, if the jury first returned a verdict in favor of Google on the counterclaims, but the Court later determined that the jury's verdict was erroneous because Epic has prevailed on its affirmative defenses.  The Seventh Amendment does not permit such a result.  *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1476 (9th Cir. 1993) (explaining that factual findings by a court that are inconsistent with the factual findings of a jury "must give way under the Seventh Amendment")

Finally, denying an instruction on 'Epic's illegality defense would prejudice Epic by failing to inform the jury that any breach by it is excused if Epic demonstrates that the contract violates the antitrust laws, leading the jury to believe that Epic's conduct was inexcusable.  Google has articulated no legitimate reason why the jury should be deprived of legally accurate information on that topic.

1
2

**Defendants' Argument Re Disputed Instruction No. 50**
**AFFIRMATIVE DEFENSE—CONTRACT IS ILLEGAL UNDER THE ANTITRUST LAWS**

3          Google objects to this instruction in its entirety.  *First*, "the determination of whether the

4   contract is illegal or contrary to public policy, are questions of law for the court," not the jury. *LUX*

5   *EAP, LLC v. Bruner*, 2018 WL 6016973, at *7 (C.D. Cal. July 31, 2018); *Dunkin v. Boskey*, 82 Cal.

6   App. 4th 171, 183 (2000); *OCA v. Christie*, 415 F. Supp. 2d 115, 119 (D. Conn. 2006); 17A Am. Jur.

7   2d Contracts § 322.

8          *Second*, the fact that this defense has been asserted against a breach of contract claim that is

9   triable to a jury does not change this result. The fact that a claim will be tried to a jury does not mean

10  that an affirmative defense to the claim will also be tried to the jury.  *Granite State Ins. Co. v. Smart*

11  *Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996); *Int'l Fin. Servs. Corp. v. Chromas Techs.*

12  *Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004) ("Even when a plaintiff is entitled to a jury trial on his

13  legal claims, the district court must nonetheless make an independent judgment as to any equitable

14  issue.").

15         In *BC Tech*, for example, the Tenth Circuit affirmed a trial court's decision not to instruct the

16  jury on illegality defense to a breach of contract claim because under Utah law (which is the same as

17  California law on this point) "the legality of a contract is [a question] for the court to decide."  *BC*

18  *Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 701-02 (10th Cir. 2012). Similarly, in *Meta*

19  *Platforms*, the district court rejected an antitrust illegality defense to a contract claim as a matter of

20  law, holding that the defense was "a question of law to be determined from the circumstances of each

21  particular case." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1243-44, 1252 (N.D.

22  Cal. 2022) (citation omitted).

23         *Third*, other analogous affirmative defenses, such as patent misuse and inequitable conduct, are

24  tried to the court, not a jury. *See, e.g.*, *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 507 F. Supp. 2d 870,

25  871–72 (N.D. Ill. 2007); *Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 WL 308919, at *5

26  (N.D. Cal. Jan. 25, 2013).

27         *Fourth*, Epic's proposed instruction is wildly overbroad.  Any illegality defense to a breach of

28  contract claim based on a violation of the antitrust laws has been narrowly circumscribed by the

1  Supreme Court, directing that courts should be reluctant to "create a policy of nonenforcement of
2  contracts beyond that which is clearly the requirement of the Sherman Act." *Kelly v. Kosuga*, 358 U.S.
3  516, 519 (1959).  Thus, even if a contract violates the antitrust laws, a court should decline to enforce
4  the contract only if "the judgment of the Court would itself be enforcing the precise conduct made
5  unlawful by the Act." Id. at 520; *see Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982).

6       Based on these principles, in *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus.*
7  *Sachsen GmbH*, 867 F.3d 692 (6th Cir. 2017), the Sixth Circuit rejected an illegality defense.  The
8  court instead upheld the contract at issue as enforceable, noting that "the policy interest in preventing
9  [the purchaser] from obtaining the benefit of its bargain without paying applies."  *Id*. at 699.  So too
10  here.  Epic's asserted defense would have it obtain the benefits of the DDA for no consideration at all.

**Stipulated Instruction No. 51 Re**
**INTRODUCTION TO CONTRACT DAMAGES**

If you decide that Google has proved its claims against Epic for breach of contract or breach of the implied covenant of good faith and fair dealing, you also must decide how much money will reasonably compensate Google for the harm caused by the breaches. This compensation is called "damages." The purpose of such damages is to put Google in as good a position as it would have been if Epic had performed as promised or not breached the implied covenant of good faith and fair dealing.

To recover damages for any harm, Google must prove that when the contracts were made, all parties knew or could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as a result of the claimed breaches.

Google also must prove the amount of its damages according to the following instructions. It does not have to prove the exact amount of damages. You must not speculate or guess in awarding damages.

Google claims damages for breach of the obligation to pay money.

Source:  CACI 350

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Stipulated Instruction No. 51 Re**
**CONTRACT DAMAGES**


To recover damages for the breach of a contract to pay money, Google must prove the amount due under the contract.


Source: CACI Instr. No. 355

1

**Disputed Instruction No. 52 Re**
**UNJUST ENRICHMENT**
2                                    **Offered by Plaintiff**

3        Google alleges that Epic have been unjustly enriched as a result of those companies not paying

4 the service fee collected through Google Play Billing.  If you find that Google's Payments Policy covers

5 the same subject matter as Google's claim for unjust enrichment, then Google cannot prevail on this

6 claim.

7        The mere fact that a recipient has obtained a benefit without paying for it does not itself establish

8 that a recipient was unjustly enriched.

9        To establish this claim, Google must prove the following:

10        1.  That Epic received a benefit from Google as a result of Google's technical assistance;

11        2.  That Epic knowingly accepted the benefit; and

12        3.  That, at the time Google conferred that benefit, the relevant parties expected that Google

13 would be compensated by Epic for it; and

14        4.  That Epic unjustly retained that benefit, such that it would be inequitable for Epic to retain

15 the benefit without paying for its value.

16

17 Source: Adapted from 1 Witkin, Summary 11th Contracts §§ 1050, 1057, 1073 (2023); *MH Pillars Ltd.*

18 *v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citing <u>*Hernandez v. Lopez*</u>, 180 Cal. App. 4th

19 932, 938 (2009), *as modified* (Dec. 28, 2009))

20

21

22

23

24

25

26

27

28

1

**Disputed Instruction No. 52 Re**
**UNJUST ENRICHMENT**
**Offered by Defendants**

2

3    If you find the Developer Distribution Agreement not to be a valid contract, then you must decide

4 whether Epic was unjustly enriched.

5    Google alleges that Epic has been unjustly enriched as a result of those companies failing to pay

6 the service fee collected through Google Play's billing system.

7    To establish this claim, Google must prove the following:

8    1:    that Epic received a benefit from using the Google Play store, including by diverting

9 services fees that Google was entitled to by implementing the hotfix;

10    2:    that Epic unjustly retained that benefit.

11    For purposes of this claim, a benefit means any type of advantage, including earning money,

12 saving money, or preventing an expense or loss.

13

14 Sources:  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2021); *Tufeld Corp. v.*

15 *Beverly Hills Gateway, L.P.*, 86 Cal. App. 5th 12, 31-32 (2022); *Prof. Tax Appeal v. Kennedy-Wilson*

16 *Holdings, Inc.*, 29 Cal. App. 5th 230, 238 (2018); *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1077-78

17 (N.D. Cal. 2009)

18

19

20

21

22

23

24

25

26

27

28

**Plaintiff's Argument Re Disputed Instruction No. 52**
**UNJUST ENRICHMENT**

Google's proposed instruction is untethered to California law for several reasons.  It should be rejected.

*First*, at a minimum, the jury should be instructed that Google cannot seek recovery under an unjust enrichment theory when its contract claim covers the same subject matter.[8]  Google's own proposed instructions make clear that Google seeks recovery because it is supposedly "entitled" to service fees under its contract; this is simply breach of contract under another name.  "[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights."  *California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.*, 94 Cal. App. 4th 151, 172 (2001).  "When parties have an actual contract covering a subject, a court ***cannot—not even under the guise of equity jurisprudence***—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract."  *Hedging Concepts, Inc. v. First All. Mortg. Co.*, 41 Cal. App. 4th 1410, 1420 (1996), *as modified on denial of reh'g* (Feb. 22, 1996) (emphasis added).  An express agreement defining the parties' rights bars unjust enrichment even when that agreement is found to be unenforceable.  *See Ryan v. Mike-Ron Corp.*, 226 Cal. App. 2d 71, 75 (1964).  This is true even when the agreement is unlawful.  *Owens v. Haslett*, 98 Cal. App. 2d 829, 833 (1950) (the law "precludes recovery on principles of quasicontract for benefits conferred under an illegal bargain, as well as an action on the bargain itself" (citation omitted)).  Google improperly omits this information from its proposed instruction.

*Second*, unjust enrichment is not a cause of action under California law, which should instead be a claim for quasi-contract. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("As the district court correctly noted, in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.' . . . The return of [a] benefit is the remedy

---

[8] Specifically, Epic requests that the following sentence be read to the jury: "If you find that Google's Payments Policy covers the same subject matter as Google's claim for unjust enrichment, then Google cannot prevail on this claim."  Epic's Proposed Instr.

1    typically sought in a quasi-contract cause of action." (citations and quotations omitted)).  Indeed,

2    Google has identified no model jury instruction for a claim of unjust enrichment.

3         *Third*, even if Google could assert a claim based on a theory of unjust enrichment (it cannot)

4    Google omits the second element in Epic's Proposed Instruction, which is required under California

5    law.  "The doctrine applies where plaintiffs, while having no enforceable contract, *nonetheless have*

6    *conferred a benefit on defendant which defendant has knowingly accepted* under circumstances that

7    make it inequitable for the defendant to retain the benefit without paying for its value."  *Hernandez v.*

8    *Lopez*, 180 Cal. App. 4th 932, 938 (2009), *as modified* (Dec. 28, 2009) (emphasis added).  Google's

9    cited cases in its "Sources" for its proposed instruction confirm this.  *See* Defendants' Proposed Instr.

10   Sources (citing *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2021) (quoting

11   the same from *Hernandez*)).

12        *Fourth*, Google further  omits the third element in Epic's Proposed Instruction, which is also

13   required under California law.  Google " must show the circumstances were such that 'the services

14   were rendered under some understanding or expectation of both parties that compensation therefor was

15   to be made.'"  *E.J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123, 1127 (2014) (quoting

16   *Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore*, 162 Cal. App. 4th 1331, 1344

17   (2008)) ("The underlying idea behind quantum meruit is the law's distaste for unjust enrichment."); 1

18   Witkin, Summary 11th Contracts § 1073 (2023) ("To entitle the plaintiff to recover [under unjust

19   enrichment], the circumstances must be such as to warrant the inference that ***it was the expectation of***

20   ***both parties*** during the time that the services were rendered ***that compensation should be made***."

21   (emphases added)).  Omitting this element is inconsistent with California law.

22        For these reasons, Epic respectfully request that the Court reject Defendants' Proposed

23   Instruction and adopt Epic proposed Instruction.

24

25

26

27

28

1

2

### Defendants' Argument Re Disputed Instruction No. 52
### UNJUST ENRICHMENT

3
4
5
6
7
8

As an initial matter, Epic's assertion that unjust enrichment is not a cause of action under California law is incorrect.  Time and again, California courts have recognized unjust enrichment as a cause of action. *E.g.*, *Prof. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 29 Cal. App. 5th 230, 242 (2018) (overruling judgment sustaining demurrer to unjust enrichment claim); *FDIC v. Dintino*, 167 Cal. App. 4th 333, 346 (2008); *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 50 (1996) (holding that plaintiff was "entitled to seek relief under traditional equitable principles of unjust enrichment").

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The Court should adopt Google's proposed instruction.  Epic's proposal adds elements that are not part of the claim.  Most notably, Epic's proposed element–that "at the time Google conferred that benefit, the relevant parties expected that Google would be compensated by Epic for it"–is not part of a unjust enrichment claim, but a quantum meruit claim. The source Plaintiffs cite for that element, Witkin on Contracts Section 1073, is not on point.  That Section of Witkin addresses "services performed at request," and it addresses a different theory of recovery, quantum meruit.  *E.g.*, *E.J. Franks Constr., Inc. v. Sahota*, 226 Cal. App. 4th 1123, 1127 (2014) (explaining that quantum meruit does not provide recovery for services gratuitously rendered and, rather, plaintiff must show that the parties expected compensation to be made).  "Quantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered. To recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made." *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (2004) (quotation marks and citations omitted).  Google does not assert a quantum meruit claim.

24
25
26
27
28

As to unjust enrichment, the claim Google asserts, California law is clear that there are two elements, and those are the elements proposed by Google in its instruction.  Epic's case, *Hernandez v. Lopez* does not purport to change the well established two-element framework of an unjust enrichment claim.  It simply describes a scenario in which an unjust enrichment claim might arise.  *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009).  Cases that set forth the elements of the claim are consistent

and clear; there are only two elements to this claim. *E.g.*, *Kennedy-Wilson Holdings*, 29 Cal. App. 5th
at 238 ("The elements of a cause of action for unjust enrichment are simply stated as receipt of a
benefit and unjust retention of the benefit at the expense of another." (citation and quotation marks
omitted)); *Tufeld Corp. v. Beverly Hills Gateway, L.P.*, 86 Cal. App. 5th 12, 31-32 (2022) (same);
*Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). Even Epic's authority, *MH Pillars Ltd. v.
Realini*, describes unjust enrichment as a two-element claim. 277 F. Supp. 3d 1077, 1094 (N.D. Cal.
2017) ("The elements of a claim of quasi-contract or unjust enrichment are (1) a defendant's receipt of
a benefit and (2) unjust retention of that benefit at the plaintiff's expense."). Indeed, when the district
court in *Epic v. Apple* cited *Hernandez*, it, too, described an unjust enrichment claim as having only
two elements: "[1] receipt of a benefit and [2] unjust retention of the benefit at the expense of
another." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1065 (N.D. Cal. 2021). Epic should
not be permitted to add elements that are not part of the claim to the jury instructions through its out-
of-context citation to *Hernandez*.

**Disputed Instruction No. 53 Re**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**
**Offered by Plaintiff**

Epic claim that Google's claim for unjust enrichment cannot be enforced because Google's Payments Policy violates the federal and state antitrust laws.

To succeed, Epic must prove that the Payments Policy violated the antitrust laws because it is an illegal tie, an illegal restraint of trade, or anticompetitive conduct that was used to monopolize a relevant market, according to the instructions I have given you regarding Epic's antitrust claims.

If you decide that Epic have proved these antitrust claims, then Epic cannot be liable for unjust enrichment.

Source: Adapted from 1 Witkin, Summary 11th Contracts § 1054 (2023)

**Disputed Instruction No. 53 Re**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**
**Offered by Defendants**

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

1

2

**Plaintiff's Argument Re Disputed Instruction No. 53**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**

3       Google seeks restitution for quasi-contract / unjust enrichment arising from alleged violations

4   of the Developer Distribution Agreement ("DDA") and the Payment Policy incorporated into the

5   DDA.  Epic therefore proposes that the jury be instructed that the illegality of the agreements is an

6   affirmative defense to Google's quasi-contract / unjust enrichment claim under federal law.  "[A]

7   guilty party to an illegal contract cannot recover in quasi contract for the benefit conferred."  *Ryan v.*

8   *Mike-Ron Corp.*, 226 Cal. App. 2d 71, 75 (1964) ("That the application of this rule may leave one of

9   the parties unjustly enriched is generally deemed unimportant since the purpose of the rule is not to

10   effect justice between the parties, but to discourage transactions in derogation of the public Interest.");

11   *Owens v. Haslett*, 98 Cal. App. 2d 829, 833 (1950) (the law "precludes recovery on principles of

12   quasicontract for benefits conferred under an illegal bargain, as well as an action on the bargain itself"

13   (citation omitted)).  The proposed instruction is bespoke because the CACI does not provide a relevant

14   model.

15       Google opposes his instruction based on its erroneous contention that the illegality of an

16   agreement is a ***matter of law*** to be decided by the Court.  It may be true that the illegality of a contract

17   can be decided as a matter of law when that question does not turn on disputed factual claims, or

18   possibly when the issue depends on factual disputes that are ***independent*** of any claims to be decided

19   by a jury.  *See* July 22, 2021 Minute Order at 2 (ECF 67) (recognizing that the Court would take up

20   equitable claims after the jury trial only "to the extent an equitable claim is independent of the legal

21   claims").  Not so here.  Rather, one of the central factual disputes in this case is whether Google has

22   entered into anti-competitive agreements, including the DDA, that violate the Sherman Act.  The

23   Parties do not dispute that these Sherman Act claims must be heard and determined by the jury.  The

24   jury thus will necessarily need to decide whether the DDA violates the Sherman Act, which is the same

25   issue that would excuse any unjust enrichment under the DDA pursuant to the illegality defense.

26   Because "the same finder of fact must resolve all intertwined factual issues, . . . the defenses as a

27   whole must be tried to the jury."  *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084,

28   1102-03 (N.D. Cal. 2007) (citing *Beacon Theatres*, 358 U.S. at 509); *Shum v. Intel Corp.*, 630 F. Supp.

2d 1063, 1077–78 (N.D. Cal. 2009), *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010) (citing *Shum v. Intel Corp.*, 499 F.3d 1272, 1279 (Fed.Cir.2007)) ("Under the Seventh Amendment, a party has a right to a jury trial on any equitable claim that shares common issues of fact with a legal claim asserted by the party.").

As the Court has recognized, even if Epic's illegality defense could be characterized as an equitable matter for the Court, "as a general organizing principle, the Court intends to utilize a jury as the finder of fact for issues common to the legal and equitable claims". July 22, 2021 Minute Order at 2 (ECF 67) (citing Seventh Amendment cases). Indeed, Epic has a Seventh Amendment right to have overlapping issues resolved by the jury. *Id.*; *Ross v. Bernhard*, 396 U.S. 531 (1970). Because Epic's affirmative defense of illegality overlaps with its antitrust claims, that defense cannot be resolved by the Court "as a matter of law" as Google proposes.

Google's proposal is also impractical. Google proposes that the jury return a verdict as to its unjust enrichment counterclaim, but not as to Epic's affirmative defense to that same claim. At best, Google's proposal would result in the jury wasting time and effort in determining a counterclaim that would be unnecessary in light of the jury's verdict on the Sherman Act claims. At worst, Google's proposal could set up an impermissible conflict between the jury's verdict and the Court's determination of Epic's defense, if the jury first returned a verdict in favor of Google on the counterclaim, but the Court later determined that the jury's verdict was erroneous because Epic has prevailed on its affirmative defense. The Seventh Amendment does not permit such a result.

Finally, denying an instruction on Epic's illegality defense would prejudice Epic by failing to inform the jury that any unjust enrichment under the DDA and the Payments Policy is excused if Epic demonstrate that the contract violates the antitrust laws. Google has articulated no legitimate reason why the jury should be deprived of legally accurate information on that topic.

1

2

**Defendants' Argument Re Disputed Instruction No. 53**
**AFFIRMATIVE DEFENSE—UNJUST ENRICHMENT—ILLEGALITY DEFENSE**

3

4

5

   For the reasons stated in its previous objections, the illegality defense is a question of law for the court, not a question of fact for the jury, and this instruction is overbroad, in any event.  *See* Defendants' Argument re: Instruction No. 50.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Stipulated Instruction No. 54 Re**
**UNJUST ENRICHMENT DAMAGES**

3

       If you find that Epic was unjustly enriched, then you must award Google restitution.

4

       This means that Epic must restore to Google the value of the benefits that Epic retained, but that

5

really should belong to Google.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 55 Re**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**
**Offered by Plaintiff**

Epic contend that the doctrine of unclean hands bars Google from prevailing on its counterclaims. Not every wrongful act constitutes unclean hands. The misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine. There must be a direct relationship between Google and the claimed harm by Epic so that it would be unfair to allow Google to recover on its counterclaims.

Source: Adapted from *Padideh v. Moradi*, Case No. 16CV292889 (Santa Clara Cty. Ct. Jan. 16, 2020), *aff'd by Padideh v. Moradi*, 89 Cal. App. 5th 418, 444 (2023)

1

2

**Disputed Instruction No. 55 Re**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**
**Offered by Defendants**

3

Google opposes the inclusion of this instruction for the reasons in Google's Argument.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Plaintiff's Argument Re Disputed Instruction No. 55
### AFFIRMATIVE DEFENSE—UNCLEAN HANDS

Google asserts—for the first time—that the affirmative defense of unclean hands does not apply to Google's counterclaims, despite this affirmative defense appearing in Epic's Answers to Google's Counterclaims.  Dkt. 144 (Epic's Eighth Defense).  Google specifically has claimed that because *Padideh v. Moradi*, finds that "[t]he defense of unclean hands may be raised in an action . . . for malicious prosecution," 89 Cal. App. 5th 418, 425 (2023), unclean hands is not available as an affirmative defense in other types of cases, including contract and fraud cases.

Google is wrong that the affirmative defense of unclean hands is unavailable outside the context of malicious prosecution.  "In California, the doctrine of unclean hands may apply to legal as well as equitable claims and to both tort and contract remedies" *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 638 (1995), as modified on denial of reh'g (June 29, 1995) (citation omitted); *Defense of Unclean Hands*, 3 Witkin, Summary 11th Agency § 269 (2023) ("The doctrine of unclean hands provides that . . . the court will neither enforce a contract that is illegal or against public policy, nor relieve one of the parties to a fraud from its consequences.").  "The general principle behind the 'clean hands' doctrine is that a court will neither aid in the commission of a fraud by enforcing a contract, nor relieve one of two parties to a fraud from its consequences, where both are in pari delicto. Any unconscientious conduct in the transaction may give rise to the defense."  *Burton v. Sosinsky*, 203 Cal. App. 3d 562, 573 (1988); *see also Seymour v. Cariker*, 220 Cal. App. 2d 300, 305 (1963) (reversing trial court's striking of affirmative defense of unclean hands in action involving reformation of deed "since both the claim of unclean hands and fraud claimed in the second affirmative defense in the answer were stricken, we believe this to be error").

*Padideh* also recognizes that the unclean hands doctrine applies beyond malicious prosecution cases.  *Padideh*, 89 Cal. App. 5th at 437 ("We note that the unclean-hands doctrine is available as a defense in both equitable actions decided by a court and legal actions more often decided by a jury."); *id.* at 449–50 (unclean hands is appropriate where conduct "is shown to have occurred in a transaction or matter directly related to and infecting the one presently before the court, and that it has affected the equitable relationship between the litigants").

1    Moreover, the instruction that Epic has offered for unclean hands has been directly affirmed

2  and approved of by the California Court of Appeal.  *See Padideh v. Moradi*, Case No. 16CV292889

3  (Santa Clara Cty. Ct. Jan. 16, 2020), *aff'd by Padideh v. Moradi*, 89 Cal. App. 5th 418, 444 (2023)

4  (stating that the unclean hands jury instruction was "accurately described").  Google has not provided

5  any competing instruction.

6    Google's conduct—and the conduct that will be proven at trial—justifies inclusion of an unclean

7  hands affirmative defense.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument Re Disputed Instruction No. 55**
**AFFIRMATIVE DEFENSE—UNCLEAN HANDS**

Google objects to this instruction in its entirety.  Epic's unclean hands defense is not triable to the jury.

Epic missteps by relying on California *state court cases* suggesting that a *state trial court* may submit the unclean hands defense to the jury.  In the federal courts, "*federal law* governs whether a party is entitled to a jury trial and if so, on what issues," including "in a diversity action." *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1026-27 (9th Cir. 1996) (emphasis added). Indeed, "[t]he characterization of the issues 'as legal or equitable for purposes of whether a right to a jury trial is indicated must be made by recourse to federal law.'" *Id.* (citation omitted).

Under federal law, "a litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature." *Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996).  Accordingly, "[e]ven when a plaintiff is entitled to a jury trial on his legal claims, the district court must nonetheless make an independent judgment as to any equitable issue." *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004); *see also Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 WL 308919, at *4 (N.D. Cal. Jan. 25, 2013).

Federal courts hold that unclean hands is an equitable defense to which no jury right attaches. *See, e.g.*, *Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2019 WL 3099725, at *6 (C.D. Cal. Apr. 15, 2019) ("[U]nclean hands is an equitable defense tried to the Court."); *Hope Medical Enters. v. Faragon*, 2021 WL 2941546, at *6 n.2 (C.D. Cal. July 12, 2021) (holding that unclean hands is an equitable defense that does not trigger a jury right); *Freescale Semiconductor, Inc. v. ChipMOS Techs.*, 2013 WL 308919, at *5 (N.D. Cal. Jan. 25, 2013) ("Patent misuse arises from the equitable doctrine of unclean hands and is considered to be an equitable defense and claim.").

*Cal-Agrex, Inc. v. Tassell*, 408 F. App'x 58, 61 (9th Cir. 2011) is directly on point. In that case, the plaintiff won a breach of contract claim, and the defendant argued on appeal that the district court erred in refusing to instruct the jury on unclean hands. The Ninth Circuit rejected this argument: "[T]he district judge did not err in making a determination himself as to the viability of that defense. 'The

application or rejection of the clean hands doctrine in a given case is equitable in nature and within the discretion of the trial court.'" *Id.* (citation omitted).

The defense is unavailable for the additional reason that Epic does not itself have clean hands. Under both federal and California law, a party can only assert the unclean hands defense if that party's hands are clean. *See, e.g., DD Hair Lounge, LLC v. State Farm Gen. Ins. Co.*, 20 Cal. App. 5th 1238, 1246 (2018) ("[Plaintiff] must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim."); *RLI Ins. Co. v. City of Visalia*, 297 F. Supp. 3d 1038, 1058 (E.D. Cal. 2018), *aff'd*, 770 F. App'x 377 (9th Cir. 2019) ("The unclean hands doctrine bars recovery by a plaintiff (1) whose behavior is tainted by inequity or bad faith (2) that occurred in acquiring the right he now asserts"). There is no dispute that Epic intentionally and in bad faith misled Google and submitted a noncompliant version of its game Fortnite to the Google Play store in order to avoid paying anything to Google for the services it provides. Epic's hands are unclean.

**Stipulated Instruction No. 56 Re**
**DAMAGES ON MULTIPLE LEGAL THEORIES**


Google seeks damages from Epic under more than one legal theory. However, each item of damages may be awarded only once, regardless of the number of legal theories alleged.

You will be asked to decide whether Epic is liable to Google under the following legal theories:

1.   breach of contract;

2.   breach of the implied covenant of good faith and fair dealing; and

3.   unjust enrichment.

The following items of damages are recoverable only once under all of the above legal theories:

1.   Google's claimed lost service fees.


Source: CACI Instr. No. 3934

1
2

**Stipulated Instruction No. 57 Re
DUTY TO DELIBERATE**

3       When you begin your deliberations, elect one member of the jury as your presiding juror who

4   will preside over the deliberations and speak for you here in court.

5       You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your

6   verdict, whether liable or not liable, must be unanimous.

7       Each of you must decide the case for yourself, but you should do so only after you have

8   considered all the evidence, discussed it fully with the other jurors, and listened to the views of your

9   fellow jurors.

10      Do not be afraid to change your opinion if the discussion persuades you that you should. But do

11  not come to a decision simply because other jurors think it is right.

12      It is important that you attempt to reach a unanimous verdict but, of course, only if each of you

13  can do so after having made your own conscientious decision. Do not change an honest belief about the

14  weight and effect of the evidence simply to reach a verdict.

15      Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy,

16  prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's

17  race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, economic

18  circumstances, or position in life or in the community.

19      It is your duty as jurors to consult with one another and to deliberate with one another with a

20  view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate

21  to reexamine your own views and change your opinion if you become persuaded that it is wrong.

22

23  Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 31

24
25
26
27
28

**Stipulated Instruction No. 58 Re**
**CONSIDERATION OF THE EVIDENCE – CONDUCT OF THE JURY**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet social media site, blog, website or other feature. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report the contact to the Court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the Court immediately.

Source:  In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 32

**Stipulated Instruction No. 59 Re**
**USE OF NOTES**

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 33

**Stipulated Instruction No. 60 Re**
**COMMUNICATION WITH THE COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through Ms. Clark, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me or Ms. Clark—how the jury stands, numerically or otherwise, on any question submitted to you, including the questions of Google's liability or Epic's liability, until after you have reached a unanimous verdict or have been discharged.

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 34

1

2

**Stipulated Instruction No. 61 Re
RETURN OF VERDICT**

3

4

5

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise Ms. Clark that you are ready to return to the courtroom.

6

7

Source: In re Capacitors (Avnet trial, Case No. 17-cv-7046) Instruction No. 35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  DATED:  November 22, 2023                CRAVATH, SWAINE & MOORE LLP
                                            Christine Varney *(pro hac vice)*
2                                           Gary A. Bornstein *(pro hac vice)*
                                            Timothy G. Cameron *(pro hac vice)*
3                                           Yonatan Even *(pro hac vice)*
                                            Lauren A. Moskowitz *(pro hac vice)*
4                                           Justin C. Clarke *(pro hac vice)*
                                            Michael J. Zaken *(pro hac vice)*
5                                           M. Brent Byars *(pro hac vice)*

6                                           FAEGRE DRINKER BIDDLE & REATH LLP
                                            Paul J. Riehle (SBN 115199)
7
                                            Respectfully submitted,
8
                                            By: */s/ Gary A. Bornstein*
9                                               Gary. A. Bornstein

10                                          *Counsel for Plaintiff Epic Games, Inc.*

11 DATED:  November 22, 2023                MUNGER, TOLLES & OLSON LLP

12

13                                          By: */s/ Glenn D. Pomerantz*
14                                              Glenn D. Pomerantz
                                                *Attorneys for Defendants Google LLC et al.*
15

16

17 DATED:  November 22, 2023                MORGAN, LEWIS & BOCKIUS LLP

18

19                                          By: */s/ Brian C. Rocca*
20                                              Brian C. Rocca
                                                *Attorneys for Defendants Google LLC et al.*
21

22

23

24

25

26

27

28

1

## **E-FILING ATTESTATION**

2

I, Rebecca L. Sciarrino, am the ECF User whose ID and password are being used to file this

3

document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the signatories

4

identified above has concurred in this filing.

5

6

        */s/ Rebecca L. Sciarrino*
        DRAFT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28