**Volume 8**

**Pages 1540 - 1785**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, | ) ) ) **NO. 21-md-02981-JD** |
| _____ | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| EPIC GAMES, INC., | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
|   VS. | ) **NO. 3:20-cv-05671-JD** |
| | ) |
| GOOGLE, LLC., et al., | ) |
| | ) |
|         Defendants. | ) |
| _____ | ) |

San Francisco, California
Wednesday, November 15, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

        CRAVATH, SWAINE & MOORE LLP
        825 Eighth Avenue
        New York, New York  10019
  BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
      **YONATAN EVEN, ATTORNEY AT LAW**
      LAUREN MOSKOWITZ, ATTORNEY AT LAW
      MICHAEL ZAKEN, ATTORNEY AT LAW
      MICHAEL BYARS, ATTORNEY AT LAW
      ANDREW WIKTOR, ATTORNEY AT LAW

        HUESTON HENNIGAN LLP
        620 Newport Center Drive, Suite 1300
        Newport Beach, California 92660
  BY:  **JOHN HUESTON, ATTORNEY AT LAW**

        HUESTON HENNIGAN LLP
        523 W. 6th Street, Suite 400
        Los Angeles, California  90014
  BY:  **JOSPEH A. REITER, ATTORNEY AT LAW**


For Defendants:

        MUNGER, TOLLES & OLSON LLP
        350 South Grand Avenue - 50th Floor
        Los Angeles, California  90071
  BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
      **KURUVILLA J. OLASA, ATTORNEY AT LAW**

        MUNGER, TOLLES & OLSON LLP
        601 Massachusetts Avenue NW
        Suite 500 East
        Washington, DC  20001
  BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
      **LAUREN BELL, ATTORNEY AT LAW**

        MORGAN, LEWIS & BOCKIUS LLP
        One Market - Spear Street Tower
        San Francisco, California  94105
  BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

**I N D E X**

Wednesday, November 15, 2023 - Volume 8

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| | | |
| **RASANEN, KIRSTEN** | | |
| (SWORN) | 1556 | 8 |
| Direct Examination by Mr. Hueston | 1556 | 8 |
| Cross-Examination by Mr. Kravis | 1626 | 8 |
| Redirect Examination by Mr. Hueston | 1661 | 8 |
| Recross-Examination by Mr. Kravis | 1679 | 8 |
| | | |
| **KLEIDERMACHER, DAVID NOAH** | | |
| (SWORN) | 1681 | 8 |
| Direct Examination by Mr. Even | 1681 | 8 |
| Cross-Examination by Mr. Olasa | 1737 | 8 |
| Redirect Examination by Mr. Even | 1772 | 8 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 290 | | 1602 | 8 |
| 436 | | 1598 | 8 |
| 762 | | 1726 | 8 |
| 768 | | 1700 | 8 |
| 1172 | | 1711 | 8 |
| 1417 | | 1579 | 8 |
| 1436 | | 1557 | 8 |
| 1438 | | 1668 | 8 |
| 1440 | | 1577 | 8 |
| 1442 | | 1561 | 8 |
| 1764 | | 1618 | 8 |
| 1766 | | 1610 | 8 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 1768 | | 1613 | 8 |
| 5820 | | 1570 | 8 |
| 5945, page 46 | | 1750 | 8 |
| 5973 | | 1643 | 8 |
| 8009 | | 1777 | 8 |
| 8033 | | 1676 | 8 |
| 8539 | | 1572 | 8 |
| 8554 | | 1586 | 8 |
| 8555 | | 1592 | 8 |
| 8574 | | 1567 | 8 |
| 8576 | | 1729 | 8 |
| 9051 | | 1770 | 8 |
| 9052 | | 1770 | 8 |
| 9053 | | 1770 | 8 |
| 11409 | | 1625 | 8 |

PROCEEDINGS

```
 1   Wednesday - November 15, 2023                    9:21 a.m.

 2                     P R O C E E D I N G S

 3                          ---oOo---

 4        (Proceedings were heard out of the presence of the jury:)

 5        THE CLERK:  Calling Civil 20-5671, Epic Games, Inc.

 6   vs. Google LLC, and Multidistrict Litigation 21-2981, In re

 7   Google Play Store Antitrust Litigation.

 8        MR. BORNSTEIN:  Good morning, Your Honor.  Gary

 9   Bornstein for Epic Games.

10        MR. POMERANTZ:  Good morning, Your Honor.

11   Glenn Pomerantz on behalf of Google.

12        THE COURT:  Now, who do we have today?

13        MR. BORNSTEIN:  We have Kirsten Rasanen, who's a

14   Google witness.  Our other live witness today, another Google

15   witness, is Dave Kleidermacher, and we are also hoping between

16   the two to fit in the Amazon video.

17        THE COURT:  All right.  Now, what are the -- just

18   roughly, what are the Google witnesses going to be covering?

19        MR. BORNSTEIN:  I'm going to defer to Mr. Pomerantz on

20   Rasanen.  Mr. Kleidermacher is a security witness, a technical

21   person.

22        THE COURT:  Security.  Okay.  And then you're

23   calling --

24        MR. POMERANTZ:  No.  They're calling --

25        MR. BORNSTEIN:  No.  We're calling Rasanen.  It's just
```

1    not me who's calling Rasanen.  I can let Mr. Hueston talk in

2    more detail about her -- the exam.

3         **THE COURT:**  All right.  That's fine.  I'm not worried

4    yet about things getting cumulative, but we are hearing a lot

5    of the same stuff now.  All right?  I think we've heard a lot

6    about Samsung Galaxy, a lot about MADA, a lot about RSA.

7         **MR. BORNSTEIN:**  If it would be helpful, Your Honor, I

8    can give you a preview of where we're landing on schedule and

9    the like.

10        **THE COURT:**  I would like to and also as part of that I

11   want to when are the economists coming in.

12        **MR. BORNSTEIN:**  So our expectation, if things go as we

13   hope, is we're going to finish our fact witnesses tomorrow.

14        **THE COURT:**  Tomorrow?

15        **MR. BORNSTEIN:**  Tomorrow.

16        **THE COURT:**  Okay.

17        **MR. BORNSTEIN:**  You know, I know we have a little bit

18   of a shorter day tomorrow because we have the other thing

19   happening at 3:00 o'clock.

20        **THE COURT:**  Oh, by the way, on that, so we're going to

21   end at 2:45 tomorrow, and I just told the jury that means we're

22   probably going to truncate the afternoon break a little bit.

23   So we'll be more or less on track.  We shouldn't lose too much

24   time.

25        **MR. BORNSTEIN:**  Okay.

PROCEEDINGS

1          THE COURT:  Go ahead.

2          MR. BORNSTEIN:  Yeah.  So assuming we can get all that

3     in, it's possible, Your Honor, we have a video or something

4     that flops over to the next day; and we do have two very short

5     videos, about 15 minutes total between the two of them, that

6     are finance people that we want to play right before the

7     accountants testify just so the jury has that fresh.

8          THE COURT:  Okay.

9          MR. BORNSTEIN:  But then what Mr. Pomerantz and I were

10    discussing, subject to your approval obviously, is we have

11    three pairs of expert witnesses, the topics being security, our

12    computer science people; the accountants who are very brief;

13    and then the economists.

14       Our hope was that if we were able to have time on Monday,

15    we could do both pairs, the security and the accountants, all

16    in one day; and then we would start the economists and

17    hopefully get our main economist off and on on Tuesday.

18         THE COURT:  What are the accountants doing?

19         MR. BORNSTEIN:  The accountants are covering the

20    profits issues, so they'll be explaining our perspective and

21    obviously Google's perspective on the degree of profitability

22    of the Play Store.

23       And then the economists will talk about --

24         THE COURT:  You just mean a net profit margin?  Is

25    that all --

PROCEEDINGS

```
 1          MR. BORNSTEIN:  Correct.

 2          THE COURT:  You all can't agree on that?

 3          MR. BORNSTEIN:  Correct, unfortunately.

 4          THE COURT:  Are you within spitting distance?

 5          MR. BORNSTEIN:  The main issue, Your Honor, I think,

 6  is how the costs should be allocated, and we do have a

 7  different perspective on that.  There was some testimony about

 8  that with Mr. Pichai.

 9          THE COURT:  Let me ask you this, I'll ask

10  Mr. Pomerantz:  Doing it 100 percent your way, what is the net

11  profit margin?

12          MR. POMERANTZ:  I don't know.

13          THE COURT:  Just roughly.

14          MR. POMERANTZ:  I'm not handling those experts.  Can I

15  just speak with Mr. Rocca for a second?

16                  (Pause in proceedings.)

17          MR. POMERANTZ:  Your Honor, the company does not do

18  the analysis at the level that is being presented in this case;

19  that is, how much of the Android costs should be allocated to

20  Play.  So simply what we are showing is that Android costs

21  obviously are relevant to Play because there would be no

22  Play Store without it, and that someone would have to allocate

23  some of those costs to Play, and they are relying on figures

24  which allocate none of those costs to Play.

25      But I do not -- we do not offer a calculation of what the
```

PROCEEDINGS

1   margin would be if you allocated those costs because that isn't

2   the way Google ever does it.

3       So the question is simply the fact that they're relying on

4   both profit numbers and margins that clearly do not include any

5   Android costs we think is not the right way for the jury to

6   think about that, and that's the point of the testimony.

7           THE COURT:  Okay.  I'm just -- I don't want a huge --

8   is this going to be a big discussion about GAAP?

9           MR. BORNSTEIN:  No, Your Honor.  The gist of the

10  testimony that our expert will provide, you know, as it appears

11  in his report, is that he is relying on the documents that go

12  to senior management and the board that do have profit margin

13  figures; and the gist of it is, if this is what the board is

14  relying on, then those are sensible numbers, and he can tie

15  them out and show how those numbers make sense.  It should be

16  quick testimony.

17          THE COURT:  You can't get those in evidence.  Who's

18  going to get those board documents into evidence?

19          MR. BORNSTEIN:  Oh, that's why we have the 15 minutes

20  of video that we want to play before the economists.

21          THE COURT:  It will be in evidence, and then he's

22  going to say:  As an accountant, my conclusion would be their

23  net profit margin is X, or something like that?

24          MR. BORNSTEIN:  Correct.

25          THE COURT:  Okay.  That shouldn't take more than an

1    hour.

2         **MR. BORNSTEIN:**  I agree.

3         **THE COURT:**  Okay.  By the way, when I say GAAP, it's

4    G-A-A-P is what I was referring to.

5         Okay.  So we're not going to get into all that.  I don't

6    want any arcana about accounting rituals and dances and things

7    like that.

8         **MR. BORNSTEIN:**  Absolutely.

9         **THE COURT:**  I see a lot of that in my security cases.

10        **MR. BORNSTEIN:**  This should be pretty straightforward,

11   Your Honor.

12        **THE COURT:**  Okay.  So the economists, when are we

13   going to get to the economists?

14        **MR. BORNSTEIN:**  So if we get all the security computer

15   science folks and the accountants done on Monday, even if it

16   maybe takes a little bit more than our typical day, then we can

17   start the economists on Tuesday.  I think we can get our main

18   economist on and off the stand on Tuesday.

19        **THE COURT:**  Tuesday.  This is going to be back to

20   back.

21        **MR. BORNSTEIN:**  Yes.  And then the other economist

22   would start after the break.  So they'll be back to back, but

23   there would be obviously the holiday in between.

24        **THE COURT:**  Why is Monday going to be tight with

25   just -- we're going to do an hour on accounting.  Okay.  So --

**PROCEEDINGS**

1        **MR. BORNSTEIN:**  I'm not sure how long --

2        **THE COURT:**  You're going to spend four hours on

3   security?

4        **MR. BORNSTEIN:**  I would hope to get that done more

5   quickly, Your Honor, I do.  I just -- the way things are going,

6   I'm not sure.  I'd like to get them all done.

7        **THE COURT:**  If we finish the way I'm thinking we

8   should, how are you going to fill that time if your fact

9   witnesses are all done?

10       **MR. BORNSTEIN:**  Well, we can start -- we'll be ready

11  to begin the economists on Monday if we have time.

12       **THE COURT:**  Okay.  Let's do that.  Just have someone

13  ready to go.

14       **MR. BORNSTEIN:**  Of course.  Yeah.

15       **THE COURT:**  Okay.  All right.  Well, that's good news.

16  Your fact witnesses will be done tomorrow.

17       **MR. BORNSTEIN:**  Yeah.

18       **THE COURT:**  All right.  Oh, so it's time to start

19  getting into the final jury instructions again.  I went through

20  them briefly.  They have to be de-Matched.  Okay?  They have

21  "Match" all over them.  You have to do that, so give me a new

22  one of those.

23       And, also, you're pretty good on this, but really just

24  strictly adhere to our model instructions or the ABA proposed

25  ones.  All right?  Please, no editing.

1       On CACI, the California state ones, I didn't spend an

2   enormous amount of time on it because we're not quite ready for

3   that yet; but, you know, this is mainly for Google's

4   counterclaims.

5       So CACI has form instructions, for example, on a

6   counterclaim for breach of contract.  And for some reason there

7   are almost a page of disputes about the breach of contract form

8   instruction, which I cannot imagine makes any sense whatsoever.

9       So really go back, look at CACI.  And, I mean, one of them

10  says there's a dispute over the introduction to the breach of

11  contract instruction.  You must solve these things.  Okay?

12  Because I haven't looked at it, but I can guarantee you based

13  on my long experience, the breach of contract is just going to

14  be just some fairly noncontroversial statements about the

15  contract.  Okay?  So just make all that happen.  All right?

16      So how about by next Wednesday?

17          MR. BORNSTEIN:  That's fine, Your Honor.

18          THE COURT:  Okay.  You know, because I don't want

19  to -- I usually have them done before this point, but we

20  weren't able to do that here, which is fine, but I don't want

21  to do this at the last minute.

22      Okay.  Let's talk right now.  What about the Spotify

23  thing?  Is that for today or not?

24          MR. BORNSTEIN:  We do not need to play it today.  I

25  think we could have time depending on how long the witnesses

PROCEEDINGS

1   go --

2           **THE COURT:**  All right.

3           **MR. BORNSTEIN:**  -- but that would be our --

4           **THE COURT:**  We'll talk about it at the end of the day

5   then.

6           **MR. BORNSTEIN:**  Sure.

7           **THE COURT:**  Okay.  So we're all set otherwise?

8           **MR. BORNSTEIN:**  The only other thing that we had to

9   raise is in preparation for the hearing at 3:00 tomorrow.

10          **THE COURT:**  Yes.

11          **MR. BORNSTEIN:**  We just wanted to see if Your Honor

12  had any guidance for us about what would be most useful in

13  terms of questioning and presentation and the like.

14          **THE COURT:**  Well, it would be good to have someone --

15  look, I know you have a lot of work to do, either side, but

16  this has to be resolved.  So it would be good to have a very

17  short kind of summary exam of everything we know so far about

18  what has -- what was and was not done with respect to Chat

19  preservation, but I really want to focus it on what the

20  in-house people were doing under -- who is it going to be?  Is

21  it going to be Kent Walker?

22          **MR. POMERANTZ:**  I believe so.

23          **THE COURT:**  Or I should ask you.  Kent Walker?

24          **MR. POMERANTZ:**  I believe so, Your Honor.

25          **THE COURT:**  Okay.  So I want to find out from

**PROCEEDINGS**

 1   Mr. Walker what he and his team were doing.  Now, if his answer

 2   is "I delegated it to X," you need to have that person here.

 3   So figure that out before they come in.  All right?

 4        I made a point of saying President Truman's line of "The

 5   buck stops here."  So I don't want any buck passing.  All

 6   right?

 7        Now, the CEO, appropriately in my view, as a nonlawyer,

 8   said, "Ask Mr. Walker."  I don't want to hear from Mr. Walker

 9   "Ask Ms. X."  Okay?  Unless she's here or he's here.  So make

10   sure that happens.  All right?  So I want an accounting of

11   that.

12        I want an understanding of who on the outside counsel team

13   was involved in this and who is responsible for organizing the

14   hold with respect to in-house counsel and what they did or did

15   not do.  You can ask questions along those lines.

16        I'm going to look at the litigation hold documents.  Did

17   you lodge those yet?

18             **MR. POMERANTZ:**  No.  We will today, Your Honor.

19             **THE COURT:**  All right.

20        Okay.  And I want to make sure that those are adequate

21   under the circumstances, and then I may pick it up from there.

22   You can certainly ask any questions you want to.  Okay?

23             **MR. BORNSTEIN:**  And is it your expectation --

24             **THE COURT:**  And at the end of that, not necessarily,

25   but we'll probably have some additional briefing on permissive

**PROCEEDINGS**

1  versus mandatory instruction.

2      **MR. BORNSTEIN:**  All right.  And is your expectation,

3  Your Honor, we would go first on the exam?

4      **THE COURT:**  Yes.  Okay?  Is that all right?  Are you

5  good with that?

6      **MR. BORNSTEIN:**  Absolutely.

7    And Mr. Pomerantz and I discussed earlier, I represented

8  we would absolutely argue no waiver, but we would like to

9  receive whatever documents are they provide to the Court as

10  well on lit hold.

11      **THE COURT:**  Yeah.  In all likelihood that will happen.

12  I just have to do a little bit more thinking on that.

13      **MR. BORNSTEIN:**  Thank you.

14      **THE COURT:**  I'm not going to have you do a blind exam.

15    Okay.  Let's bring the jury in, please.

16      **MR. BORNSTEIN:**  Thank you, Your Honor.

17    (Proceedings were heard in the presence of the jury:)

18      **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc.

19  vs. Google LLC, and Multidistrict Litigation 21-2981, In re

20  Google Play Store Antitrust Litigation.

21    Counsel.

22      **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

23  Bornstein for Epic Games.  I am joined today by John Hueston,

24  Michael Zaken, Yonatan Even, Lauren Moskowitz, Andrew Wiktor,

25  and Joe Reiter.

PROCEEDINGS

1          **MR. POMERANTZ:**  Good morning, Your Honor.

2    Glenn Pomerantz on behalf of Google, and with me is Lauren

3    Bell, Steve Sparling, Kuru Olasa, and Jonathan Kravis.

4          **THE COURT:**  Okay.  Members of the jury, we're making

5    very good progress.  And I talked with the lawyers a little bit

6    about our schedule for the next couple of days.  Now, remember,

7    as I said before, it's a live show so things happen, but here's

8    our best projection.

9          Epic is going to wrap up its fact witnesses tomorrow.

10   Okay?  We'll start hearing expert witnesses on Monday and

11   Tuesday, and then there might be a couple defense-related or

12   counterclaim-related witnesses after that, but we're on or

13   ahead of schedule right now.  Okay?

14         Remember, that's -- we'll see what happens, but right now

15   it's trending the right way in terms of being on track.  Okay?

16         So we will start at 9:00 a.m. tomorrow, and I have another

17   proceeding I have to attend to so we'll end at 2:45 tomorrow on

18   the dot, just right on the dot, which means I'm probably going

19   to trim the afternoon break just a little bit to make sure that

20   we don't lose too much time.  Okay?

21         All right.  Who do we have next?

22         **MR. HUESTON:**  Good morning, Your Honor.  Epic Games

23   calls Ms. Kirsten Rasanen.

24         **THE CLERK:**  Please stand and raise your right hand.

25   \\\

1          **<u>KIRSTEN RASANEN</u>**,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4          **THE WITNESS:**  Yes, I do.

5          **THE CLERK:**  Thank you.  Please be seated.

6       Please state your full name for the Court and spell your

7    last name.

8          **THE WITNESS:**  My name is Kirsten Rasanen.  It's

9    R-A-S-A-N-E-N.

10         **THE CLERK:**  Thank you.

11                    **<u>DIRECT EXAMINATION</u>**

12   BY MR. HUESTON:

13   **Q.**   Good morning, Ms. Rasanen.

14   **A.**   Hi.

15   **Q.**   You've worked at Google since around 2012; is that right?

16   **A.**   Yes, that's right.

17   **Q.**   And you've held a number of roles at Google over time?

18   **A.**   Correct.

19   **Q.**   And so starting in 2014, you worked as a strategic partner

20   manager at Google Play; right?

21   **A.**   That's right.

22   **Q.**   And you were responsible for managing Google's

23   relationships with developers of social and music apps; right?

24   **A.**   That's right.

25   **Q.**   And in August of 2017, your role expanded and your title

1  became director of Play partnerships; correct?

2  **A.**    Yes.

3  **Q.**    In that role, you supervised Google employees who managed

4  relationships with app developers; right?

5  **A.**    Yes.

6  **Q.**    So let's talk about Google's payment policy; and so for

7  that, you have a couple binders in front of you.  I'll ask if

8  you could turn to Exhibit 1436.  It should be numbered in those

9  tabs.

10  **A.**    Sorry.

11  **Q.**    Do you see Tab 1436?

12  **A.**    Yes.  Thank you.

13  **Q.**    Okay.  And just glancing at that first page, you recognize

14  this as a prior version of Google's payments policy; right?

15  **A.**    Yes.

16          **MR. HUESTON:**  We move this into evidence at this time,

17  Your Honor.

18          **MR. KRAVIS:**  No objection.

19          **THE COURT:**  It's admitted.

20      (Trial Exhibit 1436 received in evidence.)

21  **BY MR. HUESTON:**

22  **Q.**    Okay.  And we have it up on the screen, and let's go under

23  the subheading that says, quote, "In-app Purchases."  It says,

24  quote (as read):

25              "Developers offering products within another category

1          of app downloaded on Google Play must use Google Play

2          in-app billing as the method of payment, except for the

3          following cases..."

4          Do you see that?

5    **A.**   Yes.  I'm sorry.  Am I supposed to see it on this screen

6    too or no?

7    **Q.**   It should be on the screen.  Do you see it there?

8    **A.**   No.  This screen is dark.

9          **THE COURT:**  Oh.  Is that on?

10         **THE WITNESS:**  It doesn't seem to be.

11         **THE COURT:**  Okay.  Let's me just take a look.

12         Are you sure it's not on?

13         **THE WITNESS:**  I can't see anything.  I had to touch it

14   to wake it up.  I apologize.

15         **THE COURT:**  It's okay.

16         **THE WITNESS:**  Okay.  Yes.  I'm sorry for the delay.  I

17   see it.

18   **BY MR. HUESTON:**

19   **Q.**   No worries.  It's now awake?

20   **A.**   Yes.

21   **Q.**   So looking now at the document on the screen, "In-app

22   Purchases" (as read):

23         "Developers offering products within another category

24         of app downloaded on Google Play must use Google Play

25         in-app billing as the method of payment except for the

RASANEN - DIRECT / HUESTON

1          following cases..."

2          Right?

3  A.    Yes.

4  Q.    And if we look at the second exception, it says (as read):

5          "Payment is for digital content that may be consumed

6          outside of the app itself."

7          Right?

8  A.    Yes.

9  Q.    And Google had that exception in its payments policy for

10  as long as you had worked there; right?

11  A.    Correct.

12  Q.    But in 2017 you began working on updating the payments

13  policy to explicitly require Google Play Billing for all

14  developers selling digital goods and services; right?

15  A.    Yes.

16  Q.    And before making that change, you spoke to developers to

17  get what you called honest feedback; right?  Their honest

18  feedback and reaction; right?

19  A.    Yes.

20  Q.    So I'd like to go over some of the feedback you received

21  from developers.

22          You recall that developers said that they did not want to

23  give up their optimized legacy payment platforms; right?

24  A.    Yes, to some extent.  I don't know if those were the exact

25  words but, yes.

1  **Q.**   Okay.  Well, in other words, developers had customized

2  their billing platforms specifically for their apps; right?

3  **A.**   That's right.

4  **Q.**   Okay.  So let's go to Demo 1, and we'll just put that up

5  on the screen.

6       The first developer concern, did not want to give up

7  customized billing platforms.  That's one of the concerns you

8  heard; right?

9  **A.**   Yes.

10  **Q.**   Okay.

11  **A.**   At that time, that is one of the concerns we heard.

12  **Q.**   Right.  We're focused on that time period.

13       And we can put the demonstrative down.

14       And developers, in fact, told you that they believed their

15  customized billing platforms would perform better than

16  Google Play Billing; right?

17  **A.**   They believed that, yes.

18  **Q.**   Right.  For example, Spotify told you its billing system

19  was better for Spotify than Google Play Billing would be;

20  right?

21  **A.**   That is what they told us.

22  **Q.**   And they told you its billing system had capabilities --

23  sorry.

24       Are you all set?

25       All right.  They told you that its billing system had

1    capabilities that Google Play Billing lacked; right?

2    **A.**   Correct.

3    **Q.**   So let's go to Exhibit 1442 in your binder.

4        And you recognize this as an e-mail you sent in

5    November 2017 to members at Google; right?

6    **A.**   Yes.

7            **MR. HUESTON:**  We move to admit this at this time,

8    Your Honor.

9            **MR. KRAVIS:**  No objection.

10           **THE COURT:**  It is admitted.

11       (Trial Exhibit 1442 received in evidence.)

12   **BY MR. HUESTON:**

13   **Q.**   On your screen I'm going to turn your attention to the

14   bottom of the second page, it goes onto the third page, and

15   under, quote, "Product Concerns," it says (as read):

16           "Spotify believes that their platform has

17       capabilities that GPB" -- Google Play Billing -- "lacks."

18       That's what you reported; right?

19   **A.**   That's right.

20   **Q.**   And Spotify also had concerns about the, quote, "lack of

21   control that would result from using Google Play Billing

22   instead of their own platform"; right?

23   **A.**   That's right.

24   **Q.**   And those concerns included platform capabilities,

25   ownership of customer relationships, and deep knowledge of user

1  behavior; right?

2  **A.**   That's right.

3  **Q.**   And Spotify also told you it believed Google should not,

4  quote, "act as gatekeepers," end quote, restricting developer

5  choice; right?

6  **A.**   That is what is reported here, yeah.

7  **Q.**   Well, you recorded that there; right?

8  **A.**   Yeah.  I think I pulled this out of the document, but I

9  did write this in the e-mail.

10  **Q.**   Right.  Yeah.  In fact, you wrote (as read):

11       "Hi, Jamie.

12       "The doc has lots of detail, but key concerns and

13  arguments revolve around..."

14  Those are the points you picked out and set forth for

15  Mr. Rosenberg; right?

16  **A.**   I agree, yes.

17  **Q.**   And you reported to him; right?

18  **A.**   I did not report directly to him at the time, but I was in

19  his organization.

20  **Q.**   Okay.  So we can take that document down.

21  And it wasn't just Spotify; right?  Match also told you

22  that its billing system performed better than Google Play

23  Billing; right?

24  **A.**   They did tell us that.

25  **Q.**   And you agree that Match had a quite sophisticated billing

1    platform; right?

2    **A.**    I did -- yeah.  They reported that they did, yes.

3    **Q.**    Okay.  Well, you agree that Google Play Billing in some

4    ways is not as good at the time as Match's billing system;

5    right?

6    **A.**    I did write that at the time, yes.

7    **Q.**    And so let's look a little more closely at that.

8         Let's go to Exhibit 704.  It's already in evidence so we

9    can just pull it up.

10        And you'll see this is an e-mail chain that includes you

11   and others at Google.  Do you see that?

12   **A.**    I do see that.

13   **Q.**    Okay.  And the subject is "Tinder and Google Play

14   Billing"; right?

15   **A.**    Yes.

16   **Q.**    With bracket "Concern."  Do you see that?

17   **A.**    Yes.

18   **Q.**    And so now I'm going to turn on this --

19             **THE COURT:**  You need to get a little closer and keep

20   your voice up, please.

21             **THE WITNESS:**  I apologize.  Sure.

22             **THE COURT:**  Yeah, that's fine.

23             **THE WITNESS:**  Sorry.

24             **THE COURT:**  That's all right.

25   \\\

RASANEN - DIRECT / HUESTON

1    BY MR. HUESTON:

2    Q.   No worries.

3        We're now going to turn to the second e-mail on the second

4    page, and that's from you on January 12th, 2017, to Sameer

5    Samat and others at Google; right?

6    A.   That's right.

7    Q.   We go to the second bullet down.  It says (as read):

8            "The larger, most profitable services like Match,

9        Zoosk, and eHarmony began as web businesses 10 to 20 years

10       ago and are actually quite sophisticated in terms of churn

11       reduction, reengagement, and buyer conversion.  In some

12       ways our billing platform is not as good as theirs

13       currently are."

14       You wrote those words; right?

15   A.   Yes.

16   Q.   And that's what you thought at that time; right?

17   A.   Yes, that's what I wrote.  I said "in some ways," uh-huh.

18   Q.   And Badoo was another app that was very proud of their

19   proprietary billing system; right?

20   A.   Yes.  I'm not sure I recall Badoo specifically, but

21   they're another dating app that had a proprietary billing

22   system.

23   Q.   Okay.  Well, let's look at Exhibit 8582.

24       Okay.  Do you see that in front of you?

25   A.   (Witness examines document.)  At this time I don't think

1   it's me.

2   **Q.**   Okay.  Do you recall -- without looking at the document,

3   do you recall that Badoo had been expressing that they were

4   very proud of their proprietary billing system and had prickled

5   at the notion of becoming exclusively Google Play Billing?

6   **A.**   I don't recall pride or prickle, but I know they did not

7   want to use Google Play Billing, that's correct, sir.

8   **Q.**   All right.  Fair enough.

9        Let's move to a different concern.  Another concern

10   developers had is that Google's service fee they felt were too

11   high; right?

12   **A.**   That was one of the concerns.

13   **Q.**   Right.  So let's come back to Exhibit 704, and going to

14   the end of the same paragraph we just saw, you write, quote (as

15   read):

16        "They tell us 30 percent rev share is still

17        prohibitive for exclusive adoption."

18        Do you see that?

19   **A.**   Yes.

20   **Q.**   And you were referring to the 30 percent service fee that

21   Google was charging at this time for transactions processed by

22   Google Play Billing; right?

23   **A.**   Yes.

24   **Q.**   And by "prohibitive," you meant prohibitively high; right?

25   **A.**   Yes.  I believe -- I believe so; but, again, I'm not sure

RASANEN - DIRECT / HUESTON

1  if I meant prohibitively high.  Yeah, it says that it was

2  prohibitive.

3      This was a long time ago.  I'm really sorry.  I don't know

4  what I meant.

5  **Q.**  Understood.  But looking at this, it's in the context of a

6  30 percent rev share is still prohibitive, prohibitively costly

7  or high; right?

8  **A.**  Yes.

9  **Q.**  Okay.  And Match asked to pay Google a service fee that

10 was closer to the fees that Match pays other payment

11 processers; right?

12 **A.**  Yes.  They wanted to pay the same fee as a standard

13 payment processer.

14 **Q.**  Right.  And you understood that the standard payment

15 processers typically charge a fee closer to 5 percent; right?

16 **A.**  I think so at the time.  I don't know what it says here,

17 but that sounds right.

18 **Q.**  That sounds right.

19     And Netflix had a similar complaint to Match; right?  Do

20 you remember that?

21 **A.**  Yes.  That was a little earlier than this but, yeah.

22 **Q.**  Okay.  And you recall Netflix also felt that Google Play

23 Billing did not drive incremental value that justified its rev

24 share; right?

25 **A.**  I -- again, I don't recall Netflix's specific objections.

 1   They did not want to use Google Play Billing either.

 2   **Q.**   Okay.  Let's see if I can help you on this --

 3          **THE COURT:**  You really have to keep your voice up.

 4          **THE WITNESS:**  Okay.  I'm sorry.

 5          **THE COURT:**  I'm having trouble hearing.  Okay?

 6          **THE WITNESS:**  Apologies.  I will do my best.

 7   **BY MR. HUESTON:**

 8   **Q.**   Let's see if I can help you with that.  Let's go to

 9   Exhibit 8574 in your binder.

10   **A.**   In my binder?

11   **Q.**   Yeah.

12   **A.**   Okay.  Sorry.  8574?

13   **Q.**   Yes.

14   **A.**   (Witness examines document.)  Okay.  Sorry.

15   **Q.**   Okay.  And you recognize this as an internal Google

16   briefing document for an executive meeting between Netflix and

17   Google; right?

18   **A.**   Yes, I do.

19          **MR. HUESTON:**  Move this into evidence at this time.

20          **MR. KRAVIS:**  No objection.

21          **THE COURT:**  It's admitted.

22       (Trial Exhibit 8574 received in evidence.)

23   **BY MR. HUESTON:**

24   **Q.**   Let's go to page 4 of this document, and on page 4, we'll

25   highlight it, you can see where it says, quote (as read):

1                "Payments:  Google Play Billing still hasn't driven

2          incremental value that justifies the increased rev share."

3          Right?

4     A.   That's what it says here, yes.

5     Q.   Okay.  And the rev share, of course, that's the fee that

6     Google charges; right?

7     A.   That's correct.

8     Q.   And below that it says, quote (as read):

9                "Netflix also working with these same payment

10         providers and operators as Google is.  Netflix fees are 1

11         to 3 percent with these partners with Google Play Billing

12         it's 10 percent and no incremental revenue."

13         Right?

14    A.   That's what it says here.

15    Q.   Right.  So it says that Netflix only pays a rev share of

16    10 percent versus 30 percent for games; right?

17    A.   It says 10 percent, yes.

18    Q.   Yeah.  So even for a developer that pays only 10 percent,

19    they were still saying that Google Play Billing's fees were too

20    high here; right?

21    A.   Yes.

22    Q.   Okay.  So let's go back to the demonstrative and put

23    Demonstrative Number 2.

24         Google fees are too high was another developer concern

25    that you were hearing; right?

1   **A.**   That's what they said.

2   **Q.**   Okay.  Let's go on to another related point here.

3         During opening, the Google lawyer claimed that the service

4   fee pays for all the benefits of Google Play, not just payment

5   processing.

6         So I wanted to ask you:  In your view, is one of those

7   supposed benefits making apps available for download on the

8   Google Play Store?

9   **A.**   I think one of the benefits of Google Play is making apps

10  available for download, sure.

11  **Q.**   Okay.  But Google sometimes charges its 30 percent service

12  fee even when a user has not downloaded the app from the Google

13  Play Store; correct?

14  **A.**   I don't know if that's true.

15  **Q.**   Okay.  Let's --

16  **A.**   Maybe you can --

17  **Q.**   I'll help you with that.

18  **A.**   Thanks.

19  **Q.**   Let's go to Exhibit 5820 in your binder for

20  identification.

21  **A.**   Sorry.  This is a big binder.

22  **Q.**   No worries.  It's a big binder.

23  **A.**   And 5820?

24  **Q.**   5820, yeah.

25  **A.**   (Witness examines document.)  Okay.

RASANEN - DIRECT / HUESTON

1   **Q.**   It should be an e-mail dated December 5th, 2017, and

2   you're copied on it.  Do you see your name?

3   **A.**   Yeah, I'm copied here.

4       **MR. HUESTON:**  We move it into evidence at this time,

5   Your Honor.

6       **MR. KRAVIS:**  No objection.

7       **THE COURT:**  Admitted.

8   (Trial Exhibit 5820 received in evidence.)

9   **BY MR. HUESTON:**

10   **Q.**   And now on the screen, if we go to the section titled

11   "Play Payment Policy Requirement," Mr. Sayigh writes (as read):

12       "Play's updated policy will state explicitly that

13      developers must use Google Play Billing exclusively if the

14      app is (1) Play-distributed."

15      Do you see that?

16   **A.**   That's right.

17   **Q.**   And it goes on to say, quote (as read):

18       "Note that (1) includes preinstalled apps which are

19      subsequently updated managed by Play.  So if carrier

20      preinstalls an app but uses Play for updates, that app is

21      within bounds of our policy."

22      Do you see that?

23   **A.**   Yes, that's right.

24   **Q.**   All right.  So the e-mail refers to carriers preinstalling

25   an app, not Google; right?

1  **A.**    That's right.

2  **Q.**    Okay.  And so to be clear, those preinstalled apps,

3  they're not downloaded from Google Play Store, right, if

4  they're preinstalled?

5  **A.**    They're updated through Play, that's correct.

6  **Q.**    Well, they may be updated, but if they are -- if they're

7  preinstalled, they're not downloaded as apps from the Google

8  Play Store; right?

9  **A.**    Not initially, correct.

10  **Q.**    Okay.  But under the updated policy referenced here,

11  Google requires those apps to use Google Play Billing and pay

12  Google's full service fee; right?

13  **A.**    If they are updated by Play, that's right.

14  **Q.**    Right.  Even though they are preinstalled and not

15  initially downloaded by the Google Play Store; right?

16  **A.**    Not initially downloaded, but their updates are downloaded

17  from Play.

18  **Q.**    Okay.  Now, another benefit that Google claims it provides

19  is app discovery; right?

20  **A.**    Yes.

21  **Q.**    And, in fact, yesterday the jury heard Google's CEO,

22  Mr. Pichai, say that Google Play Store is the primary source of

23  discovery for users.  Do you agree with that statement?

24  **A.**    For many apps it is.

25  **Q.**    For many apps.  Well, you're aware that many people don't

1  use the Google Play Store for any kind of app discovery at all;

2  right?

3  **A.**  I don't -- I don't know.  Can you qualify many?  What do

4  you mean?

5  **Q.**  Well, let's go --

6  **A.**  Some people do not use the Google Play Store, that's

7  correct.

8  **Q.**  Well, let's go to your own words before this lawsuit was

9  filed.  Let's go to Exhibit 8539 in your binder.

10      If you can identify that as an e-mail you sent to your

11  colleagues at Google.

12  **A.**  (Witness examines document.)  Oh, in India, yes, that's

13  right.

14          **MR. HUESTON:**  We'd move it into evidence at this time.

15          **MR. KRAVIS:**  No objection.

16          **THE COURT:**  It's admitted.

17      (Trial Exhibit 8539 received in evidence.)

18  **BY MR. HUESTON:**

19  **Q.**  Okay.  And let's go to the second page on the screen, and

20  we see an e-mail that you sent on July 30th, 2018; right?

21  **A.**  Yes.  It's the same one here, yes.

22  **Q.**  Okay.  And you sent the e-mail to other Google employees

23  to tell them what you had learned while traveling in India;

24  right?

25  **A.**  Yes.

1  **Q.**   Okay.  And I'm going to move to the fourth paragraph here

2  on your screen, and you write, quote (as read):

3         "First and foremost, this trip was a lot of myth

4      busting for me."

5      Do you see that?

6  **A.**   I do.

7  **Q.**   And then three paragraphs down you then wrote, quote (as

8  read):

9         "Users do know what the Play Store is and they

10      actually use it but only for installs."

11      That was your language; right?

12  **A.**   That was my language, yeah.

13  **Q.**   And it's in bold; right?

14  **A.**   Yeah, it is.

15  **Q.**   And you then wrote (as read):

16         "Every user we spoke with -- I personally talked to

17      10 or so, the group met at least 100 overall -- knew the

18      Play Store and used it for many/most of their app

19      installs, but they don't use the Play Store for any kind

20      of app discovery at all."

21      You wrote that; right?

22  **A.**   Yes, I wrote that.

23  **Q.**   And, again, you bolded the words "They don't use the

24  Play Store for any kind of app discovery at all" and you

25  underlined "don't"; right?

RASANEN - DIRECT / HUESTON

1    **A.**   I did.

2    **Q.**   And then you wrote (as read):

3            "All their new apps and game suggestions came from

4        friends, family, or social media, sometimes ads.  They

5        just use Play to install."

6        Do you see that?

7    **A.**   I do.

8    **Q.**   And let's go to the third page, second-to-last paragraph,

9    that begins "Play Store offers little value for app discovery."

10   Do you see that?

11   **A.**   I do.

12   **Q.**   And you then wrote (as read):

13           "Since the Play Store does little as of yet to aid

14       discovery or rediscovery, our value prop is limited to

15       that of a data pipe and app version management platform if

16       users update," exclamation point.

17       Right?

18   **A.**   I wrote that.

19   **Q.**   So now let's go to the first page of Exhibit 8539 where

20   your colleague Lei Zhang responded to you on the following day

21   on August 1st, 2018?  Do you see that up on the screen?

22   **A.**   I'm just getting there.

23   **Q.**   Okay.  It's also up on the screen.

24   **A.**   Thank you.

25   **Q.**   In the four lines down in the first large paragraph of the

1    e-mail, she writes (as read):

2            "By the way, I feel the observation of 'they don't

3        use the Play Store for any kind of app discovery at all'

4        is not only applicable to India."

5        Do you see that?

6    **A.**   That's what he wrote, yeah.  That's right.

7    **Q.**   That's right.  Thank you for the correction.

8        And he also wrote that the only app discovery for his own

9    family is through word of mouth and YouTube; right?

10   **A.**   Yes.

11   **Q.**   And you said he wrote that, but you agreed with that,

12   didn't you?

13   **A.**   That -- I may have.  You're going to show me where I did?

14   **Q.**   Sure.  I'm happy to do that.

15   **A.**   Okay.

16   **Q.**   In fact, you responded (as read):

17           "On the discovery piece, you're right, Lei.  This is

18       not a EM-specific issue."

19       Right?  Do you see that?

20   **A.**   Yes, I wrote that.

21   **Q.**   And "EM" means emerging market; right?

22   **A.**   It does.

23   **Q.**   Okay.  And so what you were saying here is that even in

24   countries that are not emerging markets, users don't use the

25   Google Play Store for any kind of app discovery; right?

1  **A.**   Yes.  This is an issue in other countries too.

2  **Q.**   Right.  And, by the way, when a user in India downloads an

3  app from the Google Play Store and purchases digital content,

4  the developer has to pay Google's service fee; right?

5  **A.**   That's right.

6  **Q.**   There's no discount even if Google did not provide any app

7  discovery; right?

8  **A.**   There is no discount for certain features of the services.

9  The services are one bundle.

10  **Q.**   All right.  And that's true for users in other emerging

11  markets and, in fact, throughout the world; right?

12  **A.**   For some, yes.

13  **Q.**   Now, developers also had concerns that Google's service

14  fee would affect the prices developers charge consumers; right?

15  You heard that complaint?

16  **A.**   We heard that some developers charged more in app stores

17  than they did outside.

18  **Q.**   Well -- yeah.  Sorry.

19       Specifically developers were concerned that they would

20  need to charge a higher price to consumers in order to make up

21  for the 30 percent fee that Google takes; right?

22  **A.**   Some developers did that.

23  **Q.**   Okay.  That was a concern that they brought up to you,

24  that they'd have to do that if they were required to pay the

25  30 percent; right?

1   **A.**   That was a concern they brought up, that they may do that,

2   yeah.

3   **Q.**   Let's go to, in your binder for identification,

4   Exhibit 1440.  And you should recognize this as an e-mail you

5   wrote to Jamie Rosenberg February of 2018.

6   **A.**   Okay.

7          **MR. HUESTON:**  We move this into evidence at this time,

8   Your Honor.

9          **MR. KRAVIS:**  No objection.

10          **THE COURT:**  It's admitted.

11      (Trial Exhibit 1440 received in evidence.)

12   **BY MR. HUESTON:**

13   **Q.**   And an e-mail to Jamie Rosenberg and Sameer Samat; right?

14   **A.**   That's right.

15   **Q.**   And these two folks, of course, were senior Google Play

16   executives at the time; right?

17   **A.**   They were, yes.

18   **Q.**   And you wrote this e-mail to provide an update on your

19   discussions with Netflix and Spotify regarding Google Play

20   Billing; right?

21   **A.**   Yes, my discussions and my colleagues' discussions.

22   **Q.**   Right.  And looking a few lines down, it says (as read):

23          "Not good news:

24          "Spotify.

25          "Spotify thinks they'll have to charge more for users

1          acquired using Google Play Billing."

2          Right?

3    **A.**    That's what they -- yeah, that's what they were concerned

4    about.

5    **Q.**    In fact, Spotify believed they would have to charge users

6    more if Google required it to use Google Play Billing and pay

7    Google's service fee; right?

8    **A.**    They were concerned that they would, yes, they would want

9    to.

10   **Q.**    Okay.  So let's go back do the demonstrative, this will be

11   Demonstrative 3, and add that concern, "Higher prices for

12   consumers."

13          All right.  And now let's go to another issue developers

14   raised.

15          You recall they also expressed concern that Google's

16   policy prohibited them from informing users of cheaper payment

17   options; right?

18   **A.**    Yes.  I think that was -- I'm not sure if it was the

19   current policy or the new policy, the contemplated policy; but,

20   yes, that was one of the things Spotify talked to us about.

21   **Q.**    Okay.  Well, let's dig into that a bit.

22          Let's go to Exhibit 1417 in your binder.  Take a look at

23   the last e-mail.

24          You'll recognize your e-mail there on Monday,

25   October 16th, 2017, the last e-mail on the first page of that.

RASANEN - DIRECT / HUESTON

1   Do you see your name?

2   **A.**   Sorry.  You're saying what's the number?  14?

3   **Q.**   1417.

4   **A.**   1417.

5        (Witness examines documents.)  Are these in order?  Oh,

6   I'm sorry.  Gosh.  Sorry.

7   **Q.**   Okay.

8   **A.**   Okay.  I'm here.  Sorry.

9   **Q.**   This is an e-mail chain, and you have an e-mail near the

10  bottom of the first page; right?

11  **A.**   Yes, I do.

12  **Q.**   Okay.

13       **MR. HUESTON:**  Move this into evidence at this time,

14  Your Honor.

15       **MR. KRAVIS:**  No objection.

16       **THE COURT:**  It's admitted.

17       (Trial Exhibit 1417 received in evidence.)

18  **BY MR. HUESTON:**

19  **Q.**   And you recall Spotify telling you that requiring

20  Google Play Billing is not what's best for users or developers;

21  right?  Do you see the highlighted language?

22  **A.**   In their opinion they thought that this policy update may

23  not be right for users and developers.

24  **Q.**   Right.  What they say exactly here is (as read):

25            "We thought Google would remain an open platform and

RASANEN - DIRECT / HUESTON

1    do what's right for users and developers."

2    That's what they told you, you put in quotes; right?

3  **A.**  That is what they said.

4  **Q.**  And going to the second page, you list several,

5  quote/unquote, "key takeaways"; right?

6  **A.**  Yes.

7  **Q.**  Okay.  And then going down to "Pricing Parity User

8  Communications," you write (as read):

9         "They would want to be able to tell users that they

10       can purchase for less elsewhere.  Something our new policy

11       will expressly prohibit."

12   That's what you wrote; right?

13  **A.**  That is what I wrote.

14  **Q.**  Okay.  Let's go back to the demonstrative, Demonstrative

15  Number 4, and add that concern.

16   "Prohibition on telling users that they can purchase for

17  less elsewhere"; correct?  That's what we just covered?

18  **A.**  That's what we just covered.

19  **Q.**  All right.  Now, Spotify told you that if it had to raise

20  prices in its Android app because of Google's service fees, it

21  would like to inform users that subscriptions were less

22  expensive if purchased outside the app; right?

23  **A.**  Yes.  That's what we just covered I think.

24  **Q.**  Okay.  Well --

25  **A.**  It's different.  I'm sorry.  Can you maybe ask your

1  question again?

2  **Q.**   I think let's move -- I'll move on to the next question.

3       You remember, for instance, that Spotify told you they

4  could offer less expensive options on the Internet; right?

5  **A.**   They did tell us that.

6  **Q.**   And Spotify's goal was to let the user choose his or her

7  preferred payment processer; right?

8  **A.**   That was one of the discussions that we had with them.

9       Well, sorry.  If I can correct.  I don't think it was the

10 user choosing a preferred payment processer.  I think -- I

11 don't know that users know what a payment processer is.  I

12 think Spotify wanted to do that.

13 **Q.**   Okay.  Well, you understood that you were told that

14 Spotify's goal was to let the user choose his or her preferred

15 payment processers; correct?

16 **A.**   I'm not sure if that's what -- how I framed it.

17 **Q.**   Okay.

18 **A.**   You may show me that.

19       **MR. HUESTON:**  Well, Your Honor, deposition Tab 1 at

20 page 132, lines 11 to 15.

21                 (Pause in proceedings.)

22       **THE COURT:**  That's fine.

23       **MR. HUESTON:**  Okay.  Let's put it up.

24 BY MR. HUESTON:

25 **Q.**   And you remember taking -- being subject to deposition,

1   being under oath, and giving testimony; right?

2   **A.**   Yes, I do.

3   **Q.**   Okay.  (as read):

4        **"QUESTION:**  Ms. Igo also told you Spotify's goal was to

5        let the user choose his or her preferred payment

6        processer; is that correct?

7        **"ANSWER:**  According to this e-mail, yes, that's correct."

8        That was your testimony; right?

9   **A.**   Yes.

10  **Q.**   Okay.  We can put that down.

11       But Google's policy would have prohibited Spotify from

12  informing users that they could purchase a subscription for

13  less outside the app; correct?

14  **A.**   That was the contemplated policy as I understand it, yes.

15  **Q.**   Right.  In fact, Google's policy would have made it harder

16  for Spotify to fully inform users of their purchasing options;

17  right?

18  **A.**   From within -- I think it was from within the app, yes.

19  **Q.**   And Spotify told you that that wasn't fair to users;

20  right?

21  **A.**   Perhaps they told me that.

22  **Q.**   Okay.  Well, they told --

23  **A.**   They --

24  **Q.**   -- they told you it wasn't fair to users not to inform

25  them of a less expensive option; correct?

RASANEN - DIRECT / HUESTON

1    **A.**   To that effect, yes.

2    **Q.**   Okay.  And then you wrote, going back to the document (as

3    read):

4              "They believe users should be fully informed of their

5         choices; disadvantaging app users by not being able to

6         tell them that pricing is lower elsewhere isn't fair to

7         users.  The user must be able to make a fully informed

8         choice."

9         You wrote that; right?

10   **A.**   I did.

11   **Q.**   And you understood that Spotify's view was that its users

12   must be able to make a fully informed choice; right?

13   **A.**   They thought so, yes.

14   **Q.**   Okay.  But you don't have an opinion one way or the other

15   on whether it's good for users to be fully informed of their

16   purchase options before making a purchase, do you?

17   **A.**   I don't think it's a bad thing for users to be informed of

18   their choices.

19   **Q.**   Okay.

20        **MR. HUESTON:**  Your Honor, let's go to the deposition,

21   Tab 1, page 136, lines 5 through 13.

22                  (Pause in proceedings.)

23        **THE COURT:**  Okay.

24        **MR. HUESTON:**  Let's play the video, please.

25                  (Video was played but not reported.)

1  BY MR. HUESTON:

2  Q.   Okay.  And, Ms. Rasanen, you don't have an opinion on

3  whether Spotify's goal of fully informing users before they

4  make a purchase decision was a good goal?  You don't have an

5  opinion on that either; right?

6  A.   As I said before, I think there's a lot of -- in my

7  deposition, there's -- how they inform users is what they were

8  arguing about.  I -- of course, users being informed of their

9  choices and options is a good thing.

10       MR. HUESTON:  Okay.  Your Honor, I'd like to go to

11  deposition page 135, line 23, to page 136, line -- 135, line

12  23, to 136, line 3.

13               (Pause in proceedings.)

14       THE COURT:  Okay.  It's not particularly -- all right.

15  Go ahead.

16       MR. HUESTON:  All right.  Let's play this video clip.

17           (Video was played but not reported.)

18  BY MR. HUESTON:

19  Q.   All right.  Now, relatedly you heard complaints from

20  developers that Google's own apps were not required to use

21  Google Play Billing; right?  You heard that?

22  A.   We did hear that, yes.

23  Q.   In particular, developers were concerned that YouTube,

24  which is one of Google's apps, didn't use Google Play Billing.

25  You remember that; right?

RASANEN - DIRECT / HUESTON

1    A.    Yes.

2    Q.    And you recall it's true that as late as at least June of

3    2018, YouTube was still strongly resisting using Google Play

4    Billing; right?

5    A.    They were not using Google Play Billing; and, yes, that's

6    correct.   I don't know strongly resisting, but they were not

7    using Google Play Billing.

8    Q.    Okay.   Fair enough.

9          Now, the fact that YouTube wasn't using Google Play

10   Billing made it extremely tough for Google to have

11   conversations externally with developers about adopting

12   Google Play Billing; right?

13   A.    That is correct.

14   Q.    So let's go to Exhibit 8554, and you'll recognize that in

15   your binder.

16   A.    Oh, I'm sorry.

17   Q.    I apologize.   I didn't direct you.

18   A.    I'm not sure where I'm looking.

19   Q.    All good.

20   A.    85?

21   Q.    8554.

22   A.    8554.   Okay.

23   Q.    And this is an e-mail you sent to a Paul Feng and others

24   at Google; right?

25   A.    Yes, it is.

1    **MR. HUESTON:**  Okay.  We move to admit this at this

2  time, Your Honor.

3    **MR. KRAVIS:**  No objection.

4    **THE COURT:**  It's admitted.

5    (Trial Exhibit 8554 received in evidence.)

6  **BY MR. HUESTON:**

7  **Q.**  Up on the screen I'm going to show you the bottom e-mail

8  on the first page to you from Karan Gambhir.  Do you see that?

9  **A.**  Yeah, I do.

10 **Q.**  Okay.  And at the bottom of his e-mail, he writes, quote

11 (as read):

12    "As it is still at an initial stage, would be timely

13    to talk to YouTube to align them to our policy on digital

14    content apps using Google Play Billing exclusively for

15    payments.  It is an extremely tough conversation

16    externally when partners point out that Google apps

17    themselves do not follow our policy."

18    Do you see that?

19 **A.**  I do.

20 **Q.**  All right.  So let's go back to the demonstrative and put

21 that reason up on our chart.

22    And so we've just added yet another developer concern,

23 "Google apps themselves do not follow our policy."  Do you see

24 that?

25 **A.**  I see that.

1   Q.   Okay.  And, in fact, Google was so reluctant to use

2   Google Play Billing that you considered faking it to make

3   YouTube's billing flow look like Google Play Billing even

4   though it wasn't actually using Google Play Billing; right?

5   A.   Faking it?  Did we?

6   Q.   Well, let's -- let me --

7   A.   I'm sorry.  You said Google wasn't using Google Play

8   Billing.  You mean YouTube; correct?

9   Q.   YouTube.

10  A.   Let's be clear.  Okay.  Great.

11  Q.   It was reluctant to use Google Play Billing?

12  A.   That's right.

13  Q.   And that was enough of a problem that you considered

14  faking it to make the billing flow look like Google Play

15  Billing even though it wasn't actually using Google Play

16  Billing.  Do you remember that?

17  A.   We considered a lot of different options in this case.  I

18  think it's also -- sorry.  I know you don't want me to get into

19  a lot of detail.

20  Q.   Well, just that was one of the options that you

21  considered?

22  A.   We considered what the interface looked like on YouTube

23  and whether or not there was a way for YouTube interface to

24  match Google Play Billing.

25  Q.   To look like it even though it wasn't using Google Play

1    Billing; right?

2    **A.**    Yes.

3    **Q.**    Yes.

4    **A.**    We considered that.

5    **Q.**    And so let's just go to Exhibit 8555.  Let's pull it up.

6    It's already in another e-mail chain you're on.  Subject line:

7    "Re Reviewing YouTube payment flow as part of the policy work."

8    Do you see that?

9    **A.**    Yes.

10   **Q.**    And in the middle of the page, Larry Yang writes he has

11   reviewed the YouTube billing flows and have a proposal for what

12   needs fixing and what doesn't; right?

13   **A.**    Yes.

14   **Q.**    And he asks you if you would like to join because he

15   recalls that, quote, "This was flagged as a risk from business

16   development or policy"; right?

17   **A.**    That's what he wrote, yes.

18   **Q.**    And then you respond to that.  Let's go to that.  You

19   respond (as read):

20          "This is a risk insofar as YouTube sets an example

21      for the developer ecosystem.  So if we can get them

22      looking like Google Play Billing, it eliminates the 'but

23      Google's own apps aren't using it' argument and just makes

24      things a bit cleaner."

25      That's what you wrote; right?

RASANEN - DIRECT / HUESTON

1   A.   I did write that.

2   Q.   So the plan was, as one of the options, to get YouTube to

3   look like Google Play Billing even though they weren't still

4   using Google Play Billing; right?

5   A.   It was to have YouTube interface match the Google Play

6   Billing interface.  They were, in fact, actually on the same

7   platform, but -- so we were trying to figure out how we could

8   match the look of YouTube.  It's a bit more complicated but,

9   yes, that is what I wrote.

10   Q.   That is what you wrote?

11   A.   It is.

12   Q.   Because this is September of 2017, well before we

13   established earlier YouTube still wasn't using Google Play

14   Billing then and in 2018; right?  We already covered that.

15   A.   Yeah.  I don't know when they -- when they switched to

16   Google Play Billing, but it was sometime.  This was before they

17   switched.

18   Q.   This was before they switched?

19   A.   That's right.

20   Q.   And so what you wrote is "Let's get YouTube to look like

21   Google Play Billing"; right?

22   A.   That is what I wrote.

23   Q.   All right.  Now, you also heard concerns that developers

24   did not want to grant Google access to their sales and billing

25   data.  That was another concern that was raised; right?

1    **A.**   Yes, that was one of the concerns.

2    **Q.**   And, in fact, developers had concerns that Google would

3    use that data to gain a competitive advantage; right?

4    **A.**   That was what they were worried about, yes.  We wouldn't

5    do it, but that's what they were worried about.

6    **Q.**   It's their worry; and so, for example, Spotify told you

7    that they were worried about YouTube's music business and that

8    providing data about their subscriptions to Google would

9    present a conflict of interest or would somehow be used by

10   Google in conflict with their business interests.  Do you

11   remember that?

12   **A.**   I don't remember that.  Maybe you can point me to it.

13   **Q.**   Let's go to your deposition.

14          **MR. HUESTON:**  Your Honor, deposition page 327,

15   line 13, to 328, line 5.

16                        (Pause in proceedings.)

17          **THE COURT:**  That's fine.

18          **MR. HUESTON:**  Okay.  Let's put it up and I'll just --

19   on the screen.

20   **BY MR. HUESTON:**

21   **Q.**   (as read):

22          ▪**QUESTION:**  It says Spotify has concerns providing data to

23          subscriptions management center.  What is the

24          subscriptions management center?

25          ▪**ANSWER:**  I believe this references the place within

1    Google Play or potentially Android as a whole.  I'm not

2    sure which.  A user would go to see what they are

3    subscribed to and manage those subscriptions, cancel,

4    pause, reinstate, et cetera.

5    ▪**QUESTION:**  Okay.  It says 'Conflict of

6    interest/competition concerns.'  Do you know what that

7    refers to?

8    ▪**ANSWER:**  I believe this is them being worried about

9    YouTube's music business and being concerned that

10   providing data about their subscriptions to Google would

11   somehow present a conflict of interest or be somehow used

12   by Google in conflict with their business interests."

13   That's what you said; right?

14   **A.**   Yeah.

15   **Q.**   Okay.  So let's go back to the demonstrative and put that

16   concern on the list, Demonstrative 6.

17        And now we've added "Worried about providing data to

18   Google."  That was yet another developer concern; correct?

19   **A.**   Yes.

20   **Q.**   All right.  Now, we've discussed multiple concerns that

21   developers had about Google changing its policy to require that

22   they use Google Play Billing; right?

23   **A.**   That's right.

24   **Q.**   And, again, according to Google, it was your job to help

25   developers; right?

1  **A.**   That's right.

2  **Q.**   And Google even touted you as being in the developers'

3  corner.  Do you remember that?

4  **A.**   I was a develop -- I presented the developer point of view

5  to the company, yeah, and represented the developer in company

6  conversations.

7  **Q.**   Well, in fact, you recall Google describing you as being,

8  quote, "in the developer's corner"?  Do you remember

9  representations like that?

10 **A.**   That is how we think about BD; but to be fair, like not

11 all developers have good intent, so I'm not always in -- I'm

12 not, like, always in the developers' corner.  I am there to

13 represent developers' questions and feedback and interests and

14 bring it to the team to share their feedback on the things that

15 we're doing.

16 **Q.**   Okay.  Well, let's go to Exhibit --

17      **THE COURT:**  Before you do that, 8555 is not in

18 evidence yet.

19      **MR. HUESTON:**  All right.  Sorry, Your Honor.  We'd

20 move that into evidence at this time.  Thank you.

21      **MR. KRAVIS:**  No objection.

22      **THE COURT:**  It's admitted.

23      (Trial Exhibit 8555 received in evidence.)

24      **THE COURT:**  Okay.  Go ahead.

25 \\\

1   BY MR. HUESTON:

2   Q.   Let's now look at Exhibit 8573 in your binder.

3        And looking at the cover page, you'll recognize this as a

4   deck used to onboard new people; right?

5   A.   Yeah.

6            MR. HUESTON:  Move this into evidence at this time.

7            MR. KRAVIS:  This one I object.  It was not a

8   disclosed exhibit.

9            MR. HUESTON:  It's impeachment, Your Honor.  We're

10  going to get the "in your corner," which is part of this.

11           THE COURT:  Which page?

12           MR. HUESTON:  That page will be on page 270 after I

13  show references to her in some earlier slides.

14           THE COURT:  Okay.  It's just that one page?

15           MR. HUESTON:  That's what I'll get to after I show

16  Slide 265 with -- that features her.

17           THE COURT:  I will admit the three slides you use

18  only.

19           MR. HUESTON:  Let's see, so if I -- there's one --

20           THE COURT:  Whatever they are, but just only the ones

21  you mention.

22           MR. HUESTON:  Your Honor, may I just -- one other

23  slide to make sure this all --

24           THE COURT:  Do as many as you want, but I will admit

25  only the ones you use.

1    **MR. HUESTON:**  Just the ones I'm going to.  That's

2    great.  Thank you.

3    **BY MR. HUESTON:**

4    **Q.**  So let's now go to Slide 265.

5    **A.**  Sorry.  What --

6    **Q.**  We can put that one up on the screen actually to make it

7    easy.

8         And here's the slide.  This is a slide about you; right?

9    "Who am I"?

10   **A.**  That is.

11   **Q.**  Okay.  And that's because you would be one of the

12   presenters during onboarding from time to time; right?

13   **A.**  I was at one time at least, yeah.  I'm not sure if I did

14   it more than that.

15   **Q.**  Okay.  And on the very next page -- let's go to that

16   one -- it says "Global BD team to help developers"; right?

17   **A.**  Yes.

18   **Q.**  And your picture is there on the left there under "Apps";

19   right?

20   **A.**  That's right.

21   **Q.**  Now let's go to page 270, and this says, quote (as read):

22        "Our team gets in the ring.  We're in the developers'

23        corner."

24        That's what you tell new hires; right?

25   **A.**  We tell the new hires a lot of things about what we do,

1  and one of the things we do is represent developers; and

2  insomuch as that, we are in the developers' corner.

3  **Q.**   Right.

4  **A.**   We're one of the only teams in the organization that works

5  directly with developers.

6  **Q.**   Sure.  Black-and-white simple message (as read):

7         "We're in the developers' corner with a boxing ring

8         corner."

9         Right?  You're there; right?

10  **A.**   That's what that says.

11  **Q.**   Okay.  Well, it's the onboarding presentation that you

12  participated in; right?

13  **A.**   Yep.

14  **Q.**   Okay.  Now, after you heard about the developers' concerns

15  and you shared them with your coworkers at Google, Google went

16  ahead and changed its billing policy to require Google Play

17  Billing, didn't it?

18  **A.**   Some years later, yes.

19  **Q.**   Okay.  And, again, the truth is you didn't consider it

20  part of your job to ensure fairness when dealing with

21  developers; right?

22  **A.**   I didn't -- can you restate that?  What do you mean?

23  **Q.**   Sure.  You didn't consider it part of your job to ensure

24  fairness when dealing with developers even though you were

25  portrayed as being in their corner; right?

1   **A.**   I would disagree with the characterization that I didn't

2   want to have a fair developer ecosystem.

3   **Q.**   Okay.

4         **MR. HUESTON:**   Your Honor, page -- deposition page 73,

5   lines 9 to 15.

6                        (Pause in proceedings.)

7         **THE COURT:**   That's fine.

8         **MR. HUESTON:**   Okay.   Let's play the video.

9                  (Video was played but not reported.)

10  **BY MR. HUESTON:**

11  **Q.**   And, Ms. Rasanen, so doing your job to the best of your

12  ability did not involve considering whether you thought Play's

13  conduct to developers was fair; right?

14  **A.**   My job was not to determine whether Play's conduct was

15  fair or not fair.   My job was to work with developers to create

16  great apps for the ecosystem -- for the platform for Android

17  and to make sure the developers were following our policies.   I

18  didn't write the policies.

19  **Q.**   Right.   So even though you've been described as being in

20  the developers' corner, it wasn't part of your job, as you've

21  described it, to consider fairness to developers; right,

22  Ms. Rasanen?

23  **A.**   It really was not part of my job to consider the fairness

24  element for developers.   It was -- I was there to represent

25  their feedback and points of view as you have shown, and I

1  think I did that pretty well, but I wasn't making the policies.

2  **Q.**   Okay.  Let's move to a different topic.

3       We've hard a lot of testimony in this trial about

4  competition between Apple and Android, but I want to ask you

5  specifically.

6       You understand that Android dominates the market for

7  smartphones; right?

8  **A.**   Android has more smartphone users than Apple does, yeah --

9  **Q.**   Well --

10  **A.**   -- today.

11  **Q.**   -- not just like 51 percent to 49 percent.  In fact, about

12  85 percent of smartphones are Android phones; right?

13  **A.**   I don't believe so today; but several years ago, yes, that

14  was true.

15  **Q.**   Well, at least as of a board of directors presentation in

16  2020, that was true; right?

17  **A.**   Yes.  If you show me that and it says that, then, yes,

18  that was what was represented to the board.

19  **Q.**   Let's briefly look at that.

20  **A.**   Sure.

21  **Q.**   Lets go to Exhibit 436.  And you'll see the front page

22  titled "Board of Directors Update January 2020"; right?

23  **A.**   I'm sorry.  I'm still getting there.

24       (Witness examines document.)  Okay.  Yep.

25            **MR. HUESTON:**  We'd move this into evidence at this

RASANEN - DIRECT / HUESTON

```
 1   time.
 2              MR. KRAVIS:  No objections to 436.
 3              THE COURT:  It is admitted.
 4         (Trial Exhibit 436 received in evidence.)
 5   BY MR. HUESTON:
 6   Q.   Okay.  And let's go to Slide 14 of this, and it states in
 7   this slide to the board of directors at Google (as read):
 8              "Android has 85 percent share of global smartphones
 9         with over 2.4 billion active devices."
10         Right?
11   A.   That's what it says.
12   Q.   Okay.  And the users of those 2.4 billion active devices,
13   they can't use the Apple App Store, right, if they've got a
14   Google phone?
15   A.   Correct.  Apple App Store doesn't work on Google phones.
16   Only Apple phones.
17   Q.   Right.  The only way an Android user can use the Apple App
18   Store is by switching to an Apple iPhone; right?
19   A.   As far as I know, that's right.
20   Q.   Yeah.  And you also know that there are lots of barriers
21   to switching between Apple and Android phones; right?
22   A.   Yeah.  Yes.
23   Q.   And one of the primary reasons that Android users don't
24   switch to an Apple phone is cost; right?
25   A.   That is one of the reasons, yeah, that's right.
```

RASANEN - DIRECT / HUESTON

1   **Q.**   Cost is one of the primary reasons you've recalled; right?

2   **A.**   Yeah, there are only a few.

3   **Q.**   Okay.  Well, we'll see if there's a few.

4        In particular, let's focus on this point (as read):

5           "IPhones typically have been more expensive than

6        Android phones, so it can be cost prohibitive for Android

7        users to switch to an iPhone."

8        Right?  You agree with that statement; correct?

9   **A.**   Yes.

10  **Q.**   Okay.

11  **A.**   Typically.

12  **Q.**   Let's go to Rasanen Demonstrative 7.

13       So we're going to put this on a slide that we're going to

14  build called "Reasons People Don't Switch."  And we've just

15  covered cost; right?

16  **A.**   Yes.

17  **Q.**   And we've covered that that was one of the primary reasons

18  you recalled; right?

19  **A.**   That's correct.

20  **Q.**   Okay.  And that's because a smartphone is a big investment

21  that you know, and you know that people do not buy new phones

22  very often; right?

23  **A.**   Yeah, that's right.  Not -- I mean, you can tell me how

24  much "very often" is, but it is not something people do every

25  day, that's correct.

1  Q.   Well, you recall that Google had studied this internally

2  at the time, and it was about once in every 2.8 years; does

3  that sound right?

4  A.   That sounds about right, yeah.

5  Q.   Great.

6       And so let's now build to the next part of the

7  demonstrative.

8       So another barrier to switching is time; right?  People

9  keep their phones about 2.8 years on average; right?

10 A.   Yeah.  I don't know if I would call that a barrier to

11 switching, though.

12 Q.   Okay.

13 A.   Right?  Do you know what I mean?

14 Q.   Well -- and we'll get -- well, when people buy a new

15 phone -- let's explore that a little bit.

16      So if Android was interested in getting an Apple user to

17 switch to an Android phone, not everybody is ready to just jump

18 and switch to a phone; right?

19          MR. KRAVIS:  Objection.  Lack of foundation.  Calls

20 for speculation.

21          THE COURT:  Overruled.

22      Go ahead.

23          THE WITNESS:  Can you say that again?

24 BY MR. HUESTON:

25 Q.   Sure.

1    If, in fact, Google is interested in getting -- switching

2  in your favor, get an Apple iPhone user to come on over and

3  switch and buy an Android phone, one of the issues is that

4  people are not ready to just switch phones on a given day;

5  right?  In other words, they're not switching phones every

6  month, every two months?  As we just covered, it's once in

7  almost three years; right?

8  **A.**   Yeah, it is.  It's once every three years, but I guess my

9  position would be that you don't switch phones frequently

10  because there are other things that prevent you, not just

11  because of time; right?

12    You don't switch phones because, as you said, it is a big

13  investment, and so people don't make a big investment every

14  day.  Not everyone can afford to.

15    So I don't think it's necessarily everyone just hangs onto

16  a phone for three years.  There are reasons they don't switch.

17  I guess that's where I'm saying time is not a reason in and of

18  itself that people don't switch, if that's --

19  **Q.**   Right, not in and of itself.

20    Let's look at other reasons besides cost which we just

21  covered.

22    So let's go to Exhibit 290, and you'll recognize this as a

23  January 2017 Google document titled "Pixel Switching Study."

24  Do you see that?

25  **A.**   Yes.  Sorry what was the timing?

1    Q.    Yeah.

2    A.    Yep.

3    Q.    It's January 2017.

4          MR. HUESTON:  Okay.  We move this into evidence at

5    this time.

6          MR. KRAVIS:  No objection.

7          THE COURT:  It's admitted.

8    (Trial Exhibit 290 received in evidence.)

9    BY MR. HUESTON:

10   Q.    And let's go scroll past Slide 2, which is just a table of

11   contents, to the very first substantive slide, Slide 3.

12         And it says, quote (as read):

13              "We know users approach switching smartphone brands

14         with caution."

15         Right?

16   A.    Yes.

17   Q.    And now let's go to the executive summary of this deck at

18   Slide 14.  Do you see that?

19   A.    I do.

20   Q.    And the primary conclusions set forth here, as you've

21   recalled in testimony before, is that switching is not easy for

22   consumers; that is a multistep process and everyone goes

23   through something different when they're switching; right?

24   A.    Yes.

25   Q.    Okay.  And so the first conclusion in this Google study is

1  that one of the hurdles is switching ecosystems; right?

2  **A.**   That's right.

3  **Q.**   So the consumer has to learn how to use both a new

4  operating system and a completely different new platform around

5  it; right?

6  **A.**   Yes.

7  **Q.**   And the second conclusion here in this Google study is

8  that learning a new operating system feels a lot like learning

9  a foreign language; right?

10  **A.**   That's what it says on this slide, yeah.

11  **Q.**   It's a Google slide; right?

12  **A.**   Yeah.

13  **Q.**   And the third point in this Google study is that it --

14  quote (as read):

15          "It really is not as easy as one, two, three to

16      switch."

17      Right?

18  **A.**   Right.

19  **Q.**   And below that it says (as read):

20          "Transferring data and setting a new phone on a

21      different operating system involves an average of 40 steps

22      and can take as long as nine hours if you use the Cloud."

23      Right?

24  **A.**   That's what it says.

25  **Q.**   And the next finding there is that, quote (as read):

1              "There is no one place within Google for help

2         switching to an Android device."

3         Right?

4    A.   That's what it says.

5    Q.   And the fifth finding is that (as read):

6              "A successful transfer of data does not by itself

7         equal a successful switch."

8         Right?

9    A.   That's what it says.

10   Q.   And for that reason there are a bunch of other things

11   you've testified that the user needs to learn for the switch to

12   be successful; right?

13   A.   Yes.

14   Q.   In fact, switching happens, as you've recalled it, in

15   three different phases, involving prep work, data transfer, and

16   then adapting to the new phone; right?

17   A.   Is that how I recalled it in my deposition?

18   Q.   Does that sound right?

19   A.   It sounds right.  I don't know if that's exactly how I

20   said it.

21   Q.   That's close enough.

22        Let's go to Demonstrative 9 and put all the reasons we

23   just discussed from the Google document here as to reasons

24   people don't switch.

25        Switching phones equals switching ecosystems, it feels a

1  lot like learning a foreign language, transfer and setup

2  involves an average of 40 steps and nine houser, there's no one

3  place for help, and a successful transfer of data does not

4  equal a successful switch.  We've just covered all those

5  reasons; right?

6  **A.**   From this study, yes.

7  **Q.**   Right.

8       And another one of the biggest reasons that users don't

9  switch is concerns about whether data will be lost during the

10  transfer from one platform to another; right?

11  **A.**   (Witness examines document.)  Sorry.  Yes, that's right.

12  **Q.**   So let's flip to Slide 5 of that deck.

13       In fact, that's what the Google document says.  It states

14  that, quote (as read):

15           "Losing data is one of the biggest concerns with

16       switching."

17       Right?

18  **A.**   Yeah, that's what this pixel switching study says.

19  **Q.**   Right.  So let's go back to the demonstrative and add

20  losing data as another barrier to switching.

21       Let's go back, Demonstrative 10, we've added that point;

22  right?

23  **A.**   Yes, you've added that.

24  **Q.**   And then back to the Google presentation.

25       That same slide we were on mentions learning a new

1  operating system, which we discussed earlier, apps/features

2  incompatible and phone spec inequality; right?

3  **A.**  That's what this study says, yeah.

4  **Q.**  And so let's just quickly add that to the demonstrative.

5  It's Demonstrative 11.  We've just added that reason.

6      And yet another reason why IOS users in particular don't

7  switch is that they're very attached to key Apple features.

8  You understand that; right?

9  **A.**  Yes.

10 **Q.**  So in going back to the slide deck, that was also covered

11 in the study at Slide 7, it states, quote (as read):

12          "IOS users are very attached to key features in the

13      Apple ecosystem."

14      Right?

15 **A.**  That's right.

16 **Q.**  And what's featured here is iMessage, Facetime,

17 Apple Music, and emojis; right?

18 **A.**  Yeah.

19 **Q.**  Now, we don't see the Apple App Store here listed, do we?

20 **A.**  We do not see the app store listed, no.

21 **Q.**  Or any third-party apps listed here on this picture of the

22 key features that IOS users are very attached to; right?

23 **A.**  That's right.  Third-party apps being --

24 **Q.**  If we can quickly go back -- thank you.  Sorry to

25 interrupt.

1  **A.**   It's okay.

2  **Q.**   Quickly go back to the demonstrative and add that, users

3  are attached to key features.  We just covered that as yet

4  another reason; right?

5  **A.**   Yes.

6  **Q.**   Okay.  Now, beyond that Google study that we've just

7  covered and what we've just been listing here on the slide,

8  there are additional hurdles to switching; right?

9  **A.**   Yeah, there may be.  Yes.  Yes, there are.

10 **Q.**   Okay.  Yeah.  So you'll recall that a user's technical

11 acumen and habits could also be a hurdle to switching; right?

12 **A.**   Yes.  If you're not technically savvy, it can be hard.

13 **Q.**   Okay.  Let's quickly add that to the demonstrative, user's

14 technical acumen.

15        And another reason why users don't switch is because they

16 may have committed to products beyond just the phone; right?

17 **A.**   Can you clarify?

18 **Q.**   Other products in an ecosystem like in an Apple ecosystem.

19 **A.**   Oh, sure, yeah.  Like an Apple Watch, for example.

20 **Q.**   Okay.  And -- so let's go back to Exhibit 436, page 17,

21 and this is titled, quote, "Users are also buying into an

22 ecosystem, not just a mobile device"; right?

23 **A.**   That's correct.

24 **Q.**   And you know that buying into an ecosystem means more than

25 just literally buying; right?  It means consumers investing in

1   or using many different devices with one of these ecosystems;

2   right?

3   **A.**   Yes.  Within one operating system or ecosystem, yeah.

4   **Q.**   And so the conclusion in this deck is that users who have

5   more than one Apple device or service are much less likely to

6   switch to Android; right?

7   **A.**   That's right.

8   **Q.**   And so for instance looking at the blue bar, it shows --

9   it's a little hard to see, but I think you can see (as read):

10           "94 percent of Apple iPhone users who also own an

11      Apple Watch will likely choose an iPhone for their next

12      phone."

13      Right?

14   **A.**   That's right.

15   **Q.**   And if we go to the last bar (as read):

16           "If a person owns more than that, an iPhone, an

17      iPad, an Apple TV, and an Apple Watch, now we're almost

18      100 percent certain they will not switch to another

19      operating system."

20      Right?

21   **A.**   That's what this says, yeah.

22   **Q.**   And like Apple, the Android ecosystem also includes

23   hardware devices aside from just Android phones; right?

24   **A.**   The Android ecosystem does, yes.

25   **Q.**   Yeah.  You've got your own watches, tablets, and TVs;

RASANEN - DIRECT / HUESTON

1   right?

2   **A.**   It's a little bit different but, yes.  They're Android.

3   **Q.**   Sure.  You've got your Android ecosystem; right?

4   **A.**   Yeah.  It's not the same as Apple, but it is Android's

5   ecosystem.

6   **Q.**   Of course, yes.

7       And let's go to Demonstrative 14 and add "committed to

8   other devices in the ecosystem."  That's what we've just

9   covered; right?

10  **A.**   That's what we just covered.

11  **Q.**   Okay.  So now let's go to a related topic.

12      Because of these barriers, the many that we've covered,

13  you know that very few people switch between Android and Apple

14  when they purchase a new phone; right?

15  **A.**   Very few people?

16  **Q.**   Right.

17  **A.**   I mean, millions of people.  I don't know how we qualify

18  "very few."  Maybe we should get into the numbers.

19  **Q.**   Let's do that.  Let's quantify that.

20      So let's go to Exhibit 1766 in your binder.

21  **A.**   Okay.

22  **Q.**   And you should recognize that as a presentation entitled

23  "Android Consideration, Likely Purchasers and Recent

24  Purchasers"; right?

25  **A.**   Yes.

1    MR. HUESTON:  We move this into evidence at this time.

2    MR. KRAVIS:  No objection.

3    THE COURT:  It is admitted.

4    (Trial Exhibit 1766 received in evidence.)

5    BY MR. HUESTON:

6    Q.   So if we go to the second page entitled "Study Timeline."

7    And this study was conducted, according to the timeline,

8    from about March of 2021 through September of 2021; right?

9    A.   That's right.

10   Q.   Okay.  Now let's go to Slide 14, and this slide is called

11   "Likely Purchasers, March 2021, Key OEM and OS Metrics"; right?

12   A.   Yes.

13   Q.   If you look at the bottom right table called "Lower Funnel

14   Metrics of Potential Switchers," we see a yellow column showing

15   how many likely purchasers were considering other operating

16   system; right?

17   A.   Yes.

18   Q.   All right.  And there's reference -- Apple IOS would be an

19   operating system; right?

20   A.   Yes.

21   Q.   So coming back up to the slide here, the yellow column

22   indicates that only 17 percent of people who responded to the

23   survey and had an Android phone had even considered purchasing

24   an Apple iPhone; right?

25   A.   That's what it says, yes.

1  Q.   And you'll agree with me that people consider doing lots

2  of things they don't end up doing; right?

3  A.   Yes, I agree with that.

4  Q.   Right.  And sometimes one of the reasons why people don't

5  actually do something that they considered is there are

6  barriers in the way; right?

7  A.   Yes.

8  Q.   And so we discussed already numerous barriers that will

9  prevent or discourage people from switching from Android to

10  Apple phones.  That was the chart we covered; right?

11  A.   Yep.

12  Q.   And here in this, study only a subset of the people who

13  considered switching actually took the next step and said that

14  they intended to do so; right?

15  A.   That's right.

16  Q.   Right.  So if we look at the orange column, it reports

17  that only 7 percent of the people who had an Android device and

18  were likely purchasers of a new smartphone intended to switch

19  to Apple; right?

20  A.   That's right.

21  Q.   And on the other side of that, only 9 percent of people

22  who had an Apple device and were likely purchasers of a new

23  smartphone intended to switch to Android; right?

24  A.   That's right.

25  Q.   And if we go to "Key Takeaways" on Slide 8, "Key Takeaways

1 under "Switchers"; do you see that?

2 **A.**   I see that.

3 **Q.**   It says (as read):

4        "Device users are loyal to their operating system."

5      Right?

6 **A.**   Yes.

7 **Q.**   That was the takeaway under "Switchers" for this study;

8 right?  The key takeaway?

9 **A.**   Yes.

10 **Q.**   And then it repeats the statistic we just looked at:  In

11 the U.S. 9 percent of likely smartphone purchasers currently

12 using iPhones intended to switch to Android while 7 percent

13 of current Android users intend to switch to iPhones; right?

14 **A.**   Yes.

15 **Q.**   Keep those numbers in mind.  We'll go to a new

16 demonstrative now.  We're numbering this 15.

17      And just put those numbers up.

18      This is what we just looked at, the Exhibit 1766, and

19 percentage of those switching 7 to 9 percent.  That's what we

20 just saw; right?  We saw the 7 percent number intend to switch

21 and 9 percent; right?

22 **A.**   Yes.  That intend to, yeah, that's right.

23 **Q.**   That's right.

24      So staying with the study, going back out of the

25 demonstrative back to the deck, let's go to Slide 17, which is

1  entitled "Recent Purchasers March 2021."  Do you see that?

2  **A.**  I do.

3  **Q.**  And going to the lower right box, the one called

4  "Switchers," and this shows the percentage of recent phone

5  purchasers who actually switched operating systems, that it was

6  less than half of what folks were considering, ranging between

7  6 and 12 percent; right?

8  **A.**  That's right.

9  **Q.**  Okay.  And so let's go to the demonstrative and put that

10  up there because you recall there were several studies that

11  Google did on this; right?

12  **A.**  Yes, I do.

13  **Q.**  All right.  So we've just shown that range there, 6 to

14  12 percent.

15      Now let's look at another Google study about switching

16  that was done.

17      Let's go to Exhibit 1768, which you should find in your

18  binder there, and recognize as a June 2020 presentation

19  entitled "Android Brand Health."  Do you see that?

20  **A.**  I do.

21          **MR. HUESTON:**  We move this into evidence at this time.

22          **MR. KRAVIS:**  No objection.

23          **THE COURT:**  It's admitted.

24      (Trial Exhibit 1768 received in evidence.)

25  \\\

1   BY MR. HUESTON:

2   Q.   Let's go to page 6 of this exhibit.

3        And this slide explains why even though we saw a larger

4   percentage of people considering the other operating system,

5   the actual intent to switch is, in words here in bold,

6   incredibly low; right?  Those are Google's words on this slide;

7   right?

8   A.   That's right.

9   Q.   And it says in Google's own words (as read):

10       "While owners may consider the other operating

11       system, the intent to use the operating system is

12       incredibly low.  Potentially driven by high switching

13       costs and/or loyalty to their existing operating system."

14       Do you see that?

15  A.   I see that.

16  Q.   And so this slide explains, right, what we were just

17  discovering with the other study; that very few people who

18  consider another operating system actually intend to switch?

19  Right?

20  A.   A low percentage.

21  Q.   Yeah.  Well, in their words, "incredibly low"; right?

22  A.   In their words, yeah.

23  Q.   And "their words" is Google's words; right?

24  A.   In this particular study, yes, that is right.

25  Q.   Okay.  Now let's look at the use intent section of the

1    chart, and the question that those results are showing is,

2    quote (as read):

3              "Which one of the following smartphone operating

4         systems would you most likely choose?"

5         You see the language there in the legend?

6    A.    I do.

7    Q.    And the chart shows that only 4 percent of current IOS

8    users report being most likely to use an Android device in the

9    future; right?

10   A.    Right.  I'm just orienting myself.

11   Q.    Sure.

12   A.    Can you say that again?

13   Q.    Sure.

14        The chart shows, if you look right above that legend

15   there, that only 4 percent of current IOS users -- see the

16   black there and the 4 percent in black?  And you look to the

17   legend on the right, it says --

18   A.    Yeah.  Yeah.

19   Q.    So 4 percent of current IOS users report being more likely

20   or most likely to use an Android device in the future; right?

21   A.    Yes, 4 percent.

22   Q.    Okay.  And then, similarly, the chart shows that only

23   6 percent of Android owners reported that they would most

24   likely choose an Apple device; right?

25   A.    Yeah.  6 percent of Android would go to Apple, yeah.

1    Q.   Okay.  So let's go back to the demonstrative and put those

2    figures up so we have them all in mind.

3         So back to -- now we're at Demonstrative 17, and we've

4    added from this study, Exhibit 1768, 4 to 6 percent; right?

5    A.   That's right.

6    Q.   And let's look at just one more internal Google data

7    point.

8         I'm going to show you Exhibit 1764.  It's actually an

9    Excel spreadsheet, but I'm just going to show you a screenshot.

10   It's there in the binder, and I think you're going to recognize

11   that.

12   A.   1764?

13   Q.   Yeah.  This is -- this is something that we've --

14        MR. HUESTON:  One moment, Your Honor, if I may.

15             (Pause in proceedings.)

16   BY MR. HUESTON:

17   Q.   And this is, in fact, a spreadsheet that you are familiar

18   with; right?

19   A.   Yes, I am.  Yes.  I was educated on this, yes.

20   Q.   Yeah.

21        MR. HUESTON:  So we'd move this into evidence at this

22   time.

23        MR. KRAVIS:  So I do have an objection here.  Not to

24   the spreadsheet, but I haven't seen this screenshot before.  It

25   wasn't disclosed to us this way.  I'm happy to look at it at

 1   the break, but I don't know what this is.

 2           THE COURT:  Oh, okay.

 3           MR. HUESTON:  We're not going into the screenshot.

 4           THE COURT:  Good news.  It's time for the morning

 5   break anyway.

 6       So I'll see is you back at 11:05.  All right?  And I'll

 7   clean all this up before you get back.

 8           THE CLERK:  All rise.

 9       (Proceedings were heard out of the presence of the jury:)

10           THE COURT:  Okay.  The witness can step out.

11       No communications about your testimony, please.

12       What is the issue?  Please don't give the big speeches.

13   Just hand up and say whatever your concern is.

14       Okay.  What's the issue?

15           MR. HUESTON:  I think I can put this to rest.  I

16   showed the screenshot just so she could identify it.  I'm

17   actually just going to go into the Excel and pull out some

18   figures.

19           MR. KRAVIS:  Oh.

20           MR. HUESTON:  I'm not going to enter it.  It was just

21   for her to identify, "Oh, yes, I looked at this Excel."  So I'm

22   not moving that screenshot into evidence.

23           MR. KRAVIS:  Okay.  I mean, I will say I'm not

24   certain -- this is the 30(b)(6) witness.  It's the corporate

25   representative.

 1      We have no objection to the admission of the spreadsheet.

 2   I'm not certain whether she will recognize it in this form.  I

 3   know she's familiar with the full spreadsheet.  I have no

 4   objection to it -- but we have no objection to its admission.

 5           THE COURT:  All right.

 6           MR. HUESTON:  And I'm only going to point out a couple

 7   things that she testified to.

 8           THE COURT:  It's admitted over no objection.

 9      (Trial Exhibit 1764 received in evidence.)

10           THE COURT:  So, Mr. Hueston, I want you to give me,

11   not necessarily now but today, Exhibits 1764, 1766, and 1768 in

12   a blown-up -- I can't read these.

13           MR. HUESTON:  Okay.  Will do, Your Honor.

14           THE COURT:  And I have good vision.  Just for me.

15           MR. HUESTON:  I will.

16           MR. KRAVIS:  I'm sorry, Your Honor.  May I raise one

17   more issue with respect to this witness?

18           THE COURT:  Yes.

19           MR. KRAVIS:  This witness was Google's corporate

20   representative, and so I have not objected to the admission of

21   the studies here.  She was prepared on them as part of her role

22   as corporate representative.

23      I would like to ask her about just one additional study

24   that she was also prepared on.  I'm raising it with the Court

25   now because the foundation is a little bit different.  It's not

 1  something she used in her personal --

 2          THE COURT:  Well, why don't you -- have you talked

 3  about it?

 4          MR. HUESTON:  Well, we tried to speak last night,

 5  Your Honor, and our objection is --

 6          THE COURT:  Which one is it?  Is it in here?

 7          MR. HUESTON:  He'll have to pull it up.  It's a study

 8  that she will admit she had no familiarity with and, in fact,

 9  did not testify about it at her deposition.

10      And what I understand Google wants to do from the meet and

11  confer is have her bring this hearsay document in that she has

12  no familiarity with, which is entitled "A Perspective on

13  Android Prioritization" with legend notes.  You can tell it's a

14  draft only, "A Perspective.  Please provide feedback

15  throughout."

16      She will have to admit she didn't provide any feedback,

17  know anything about this.  And my understanding is Google is

18  now going to try to make a point, bring in hearsay as opposed

19  to the admissions that we get to do through a 30(b)(6) that

20  wasn't something part of deposition, that she has no part of,

21  to make an affirmative point.

22          THE COURT:  You can try to lay a foundation; but if

23  she hasn't seen it before, hasn't worked on it, and the other

24  factors, then, you know, I probably won't allow it.

25          MR. KRAVIS:  Well, she has seen it before in the

1  course of preparing as a 30(b)(6) witness.  This was --

2       **THE COURT:**  She wasn't deposed on it, though.  They

3  didn't ask her to testify about it; correct?

4       **MR. KRAVIS:**  Well, to be clear Epic did identify this

5  as one of the documents that they asked her to prepare on in

6  her capacity as the 30(b)(6) witness.  They identified 14

7  documents they wanted her to be prepared on, and this was one

8  of them.

9       **MR. HUESTON:**  Well, it never came up at all in the

10  deposition.  There was no testimony about it and, Your Honor,

11  for good reason.  There's nothing in here for us as an

12  admission, and it would be improper to take some 30(b)(6) who's

13  never testified about this and try to use that as a vehicle to

14  bring in self-serving hearsay on a document that she can't even

15  explain.

16       **MR. KRAVIS:**  But that was their choice.  They chose

17  the documents on which to educate the corporate representative.

18       **THE COURT:**  Well, I know, but you have control over

19  every Google witness.  You could have brought in the person who

20  actually knew something about that.  So the objection is

21  sustained.

22     Let me ask you a question.  Why are these copies all so

23  bad?  Why were they produced that way?

24       **MR. HUESTON:**  That's the way they were produced,

25  Your Honor.

1        **THE COURT:**  How is that even possible?

2        **MR. HUESTON:**  Believe me, I'd love to actually create

3   them more crisply.  We do the best we can.

4        **THE COURT:**  I'm concerned about the jury not being

5   able to read these things back in the jury room.

6        **MR. HUESTON:**  Agree.  We'll try even harder.

7        **THE COURT:**  I don't understand how documents that

8   should have been razor clear got produced this way, but we're

9   going to have to have something that is intelligible to the

10  jury on the admitted evidence USB drive.

11       These are -- I cannot read them, and I suspect that the

12  jury is not going to be able to do it either.  Okay?  And I

13  don't want to have to require people to use glasses or

14  magnifying devices or anything else.

15       **MR. HUESTON:**  Got it.

16       **THE COURT:**  You're going to have to work something

17  out.

18       **MR. HUESTON:**  We will.

19       **THE COURT:**  All right.  See you at 11:05.

20       **THE CLERK:**  All rise.  Court is in recess.

21              (Recess taken at 10:52 a.m)

22            (Proceedings resumed at 11:05 a.m)

23       (Proceedings were heard in the presence of the jury:)

24       **MR. HUESTON:**  Thank you, Your Honor.

25  \\\

1  BY MR. HUESTON:

2  Q.   Ms. Rasanen, we're now going to pull up that Excel

3  spreadsheet on your screen.

4  A.   Okay.

5  Q.   And we're going to go to the switching problem tab, and

6  we're going to go to column Y, which you testified about in

7  your deposition.

8       But column Y, row 41, do you recall that showed

9  92.9 percent of Android users worldwide who got new phones were

10 expected to stay on Android; right?

11 A.   (Witness examines document.) Yes.

12 Q.   Okay.

13 A.   Yes.  Sorry.  I'm just orienting myself on this

14 spreadsheet again.

15 Q.   Of course.  Fair enough.

16      And only 6.93 percent of Android users who get new phones

17 are expected to switch to IOS.  That's what this showed; right?

18 A.   That's what this showed, yeah.

19 Q.   Okay.  So now quickly back to finish our demonstrative,

20 Demonstrative 18.  Let's put that number on the slide.

21      We just covered 1764, 6.9 percent; right?  Do you see

22 that?

23 A.   Yes.

24 Q.   Okay.  And so just staying on this demonstrative for a

25 moment, we've seen there are four entries, but it's three

**RASANEN - DIRECT / HUESTON**

1   different studies here showing four different statistics;

2   right.  The first two are Exhibit 1766.  That was the first

3   study.

4   **A.**   Yes.

5   **Q.**   And then there were two other studies.  A total of three;

6   right?

7   **A.**   That's right.

8   **Q.**   None of these studies examined how many users who switch

9   because Google Play Store is better or worse than the Apple App

10  Store; right?  You saw nothing like that in these studies?

11  **A.**   I don't think so, but we didn't go over all of them, but I

12  don't think so.

13  **Q.**   Yeah.  We haven't seen any of that; right?

14  **A.**   Not today, no we haven't.

15  **Q.**   And, in fact, these studies included users who switched

16  for any reason at all; right?

17  **A.**   That's right.

18  **Q.**   Right.  These studies included people who switch because

19  of a phone's cost.  We covered that; right?

20  **A.**   Yes.  Some of the studies included that, yes.

21  **Q.**   Or they switch because of hardware difference; right?

22  **A.**   Yes.

23  **Q.**   Or user interface, if they're comfortable with something

24  or not; right?

25  **A.**   Yes.

**RASANEN - DIRECT / HUESTON**

1  **Q.**   Or what their family or friends recommend; right?

2  **A.**   Yes.

3  **Q.**   Or any other of a number of reasons that don't involve an

4  app store; right?  That's what we've been reviewing here today;

5  right?

6  **A.**   That's right.

7  **Q.**   In fact, the same studies we just looked at show that

8  people primarily buy smartphones for reasons other than the app

9  store; right?  That's what we've reviewed?

10  **A.**   I don't know that we reviewed studies that say why they

11  buy.  We talked about why they switch or don't switch.

12  **Q.**   Well, let me show you one then.

13  **A.**   Sure.

14  **Q.**   Let's go to Exhibit -- it's already in -- 1766, and let's

15  go to a slide that addressed that.

16      This is Slide 37, and this one says on the left, right,

17  "Top Reasons for Smartphone Purchase"?  Do you see that?

18  **A.**   Yes.

19  **Q.**   And the top reason is "I like the smartphone brand";

20  right?

21  **A.**   That's right.

22  **Q.**   The next one says "My prior smartphone stopped working or

23  slowed down"; right?

24  **A.**   Yes.

25  **Q.**   Third and fourth reasons are about price; right?  Do you

**RASANEN - CROSS / KRAVIS**

1  see that?

2  **A.**  I see.

3  **Q.**  And if you keep going all the way down the list of top

4  reasons, nowhere in that list is the app store identified as a

5  reason for purchasing a smartphone; right?

6  **A.**  The app store, no.

7      **MR. HUESTON:**  Pass the witness.

8      **THE COURT:**  Okay.  Mr. Hueston, are you going to move

9  these charts into evidence?

10     **MR. HUESTON:**  Yes, Your Honor, we would move those

11  charts into evidence.

12     **THE COURT:**  All right.  Any objection?

13     **MR. KRAVIS:**  No objection.

14     **THE COURT:**  Okay.  Those are admitted.

15     **THE CLERK:**  What exhibit number are they admitted

16  under?

17     **THE COURT:**  Oh.  How are we going to do that, Lisa?

18  We just moved these charts into evidence.  What exhibit number

19  are we going to give them?

20     **THE CLERK:**  11409.

21     **THE COURT:**  Okay.  This will be 11409.

22     (Trial Exhibit 11409 received in evidence.)

23     **THE COURT:**  Okay.  Go ahead.

24     **MR. KRAVIS:**  Thank you, Your Honor.

25  \\\

1            <u>CROSS-EXAMINATION</u>

2   **BY MR. KRAVIS:**

3   **Q.**   Good morning, Ms. Rasanen.

4   **A.**   Hello.

5   **Q.**   Let me start by asking you a bit about your background.

6        When did you start working at Google?

7   **A.**   I started working at Google in 2012.

8   **Q.**   And I think I heard you testify earlier that sometime

9   around 2014 you became a strategic partner manager in the

10  Google Play Store.  Did I hear that right?

11  **A.**   That's right.

12  **Q.**   Were there particular categories of partners that you were

13  focused on in that role?

14  **A.**   In that role I was specifically focused on social and

15  music partners.

16  **Q.**   What were -- what would be examples of social and music

17  partners that you were focused on in that role?

18  **A.**   In my role, I was focused on Facebook, Twitter, Snapchat,

19  Pandora, iHeart Radio.  The list goes on.

20  **Q.**   And what were your responsibilities as a strategic partner

21  manager?

22  **A.**   In 2014 when I joined, we were really focused on making

23  sure that key developers were launching apps on Android and not

24  only on IOS.  And we were making sure that they were aware of

25  and using our Android platform products and features in their

**RASANEN - CROSS / KRAVIS**

1    apps.  And then just helping them get their apps promoted in

2    the Play Store and, of course, that they were following all our

3    policies.

4    **Q.**   I want to ask you about one exhibit that my colleague

5    showed you during his examination that refers to your role.

6         I'm going to direct you back to 8573.  I can't put it up

7    on the screen, but I think you have it in the binder in front

8    of you.

9    **A.**   One second.

10   **Q.**   Okay.

11   **A.**   Sorry.  This is a monster.

12        (Witness examines document.)  This is the onboarding

13   document?

14   **Q.**   Yes.

15   **A.**   Okay.

16   **Q.**   The slide with the boxing ring.

17   **A.**   Yes.

18   **Q.**   Now, the text of the slide I think reads (as read):

19        "Our team gets in the ring.  We're in the developers'

20        corner."

21        Can you just explain to the jury how you understood your

22   role with respect to developers as a strategic partner manager?

23   **A.**   Yeah.  My role was to be a direct interface with app

24   developers in the Play Store and work with them to help them

25   adopt our products and features and hear their feedback, and

1    bring that feedback back to the team so that we could

2    understand the developers' perspective.

3    **Q.**   And why does the Google Play Store or why did, at the time

4    you were there, the Google Play Store have people who did those

5    kinds of things with developers as a strategic partner manager?

6    **A.**   I think at the heart of it, it was really important for us

7    to make sure that we had all of the apps and games on the

8    platform, on Google Play, so that when Android users were

9    looking for something, that it was there and that it was good

10   and that it felt like a quality app on the platform.

11   **Q.**   And the words on the slide "We were in the developers'

12   corner."  Did you understand that to mean that as a strategic

13   partner manager, you were always just supposed to do whatever

14   the developer wanted?

15   **A.**   No.

16   **Q.**   How did you understand that?

17   **A.**   We were supposed to represent the developers' point of

18   view and make sure that our team understood how developers were

19   using our products, our features, our APIs.  We were making

20   sure that, you know, their feedback was heard and interpreted

21   and addressed to the best of our ability and when appropriate.

22   **Q.**   And I think you previously testified that around 2017 you

23   took on a larger role?

24   **A.**   I did, yes.

25   **Q.**   And what were your responsibilities in that larger role

**RASANEN - CROSS / KRAVIS**

1  starting in 2017?

2  **A.**   In 2017 I took on sort of broader management of the Play

3  business development team, specifically for apps and looking

4  after them, and then our scaled partner management organization

5  as well.

6  **Q.**   And did there come a time around 2019 when you left the

7  Play Store team altogether?

8  **A.**   Yeah.  Early 2019.

9  **Q.**   All right.  I'd like to ask you now about the payments

10  policy.  I think you got some questions about that in the

11  previous examination.  Do you remember that?

12  **A.**   Yes.

13  **Q.**   And I'd like to show you again what has been entered into

14  evidence as Exhibit 1436.  I think you've got your choice of

15  binders for this one.  I think it might be in either one.

16  **A.**   If we're going to stick with this one, I might as well

17  stay here for now.  Okay.

18  **Q.**   And, Ms. Rasanen, I think I heard you testify previously

19  that you recognize that as an older version of the payments

20  policy.  Did I get that right?

21  **A.**   Yeah.  I think this is an older one than what the

22  policy -- this -- I know this is an older one than what the

23  policy is today.

24  **Q.**   I'd like to ask you some questions now about the policy,

25  and I'd like to start, do you see about two paragraphs down it

1   references in-store purchases?

2   **A.**   Yes.

3   **Q.**   What are in-store purchases?

4   **A.**   So an in-store purchase is when an app is available in the

5   Google Play Store but the consumer, the user, has to actually

6   buy it before they download it, and they -- so they can't use

7   it without paying for it first.

8   **Q.**   And whose decision is it whether a user has to pay money

9   for a particular app before downloading it first in the

10  Play Store?

11  **A.**   That's the developer's decision.

12  **Q.**   Now, the sentence here reads (as read):

13          "Developers charging for apps and downloads from

14      Google Play must use Google Play's payment system."

15      What does that mean?

16  **A.**   That means that if your app is distributed via Google Play

17  and you're charging users for your app or content of your app,

18  you must use Google Play's billing platform.

19  **Q.**   And when the developer uses Google Play's payment system,

20  does Google collect a service fee on that transaction?

21  **A.**   Yes.

22  **Q.**   Now, let me direct your attention further down.  There's

23  the words "in-app purchases."  Do you see that?

24  **A.**   Yes.

25  **Q.**   What are in-app purchases?

1  **A.**   So in this case the user can download the app for free,

2  and they can potentially -- they can use pieces of the app but

3  there are some things in the app that the developer wants the

4  user to pay for.

5  **Q.**   And what would be, not all of them, but just one or two

6  examples of things that would fall in the category of in-app

7  purchases as you just defined it?

8  **A.**   So, again, there's lots of things people can buy in an

9  app.  People can buy swords or gems in a game.  They can buy

10  like a subscription to the *New York Times*.  They can also buy,

11  you know, batteries or lightbulbs from Amazon.  Things like

12  that.

13  **Q.**   Let me direct your attention to the first bullet under

14  "In-app Purchases."  It reads (as read):

15           "Developers offering products within a game

16      downloaded on Google Play or providing access to game

17      content must use Google Play in-app billing as the method

18      of payment."

19      What does that mean?

20  **A.**   That means that if a developer has designated their app as

21  a game, specifically in the game category within the

22  Play Store, they have to use Google Play Billing.

23  **Q.**   That's games specifically?

24  **A.**   That's games specifically.

25  **Q.**   Now let me direct you to the next bullet (as read):

**RASANEN - CROSS / KRAVIS**

1        "Developers offering products within another category

2     of app downloaded on Google Play must use Google Play

3     in-app billing as the method of payment..."

4     And then it says "except for the following cases," we'll

5  get to that in a moment; but setting aside "except for the

6  following cases," what does the first part of that sentence

7  refer to?  What does that mean?

8  **A.**   This is basically saying that if a developer is not a game

9  but they are offering products for sale in their app, whether

10  it's digital or otherwise, they must use Google Play Billing.

11     Sorry.  Not otherwise.  Whether -- if it's a digital

12  product, they have to use Google Play billing.

13  **Q.**   And as with the in-store purchases, if the developer uses

14  Google Play Billing for these in-app purchases, does Google

15  collect a service fee on the transaction?

16  **A.**   Yes.

17  **Q.**   Now I want to ask you about those exceptions, the second

18  exception listed there, but before I do that, I'd just like to

19  ask you about why the Play Store has this policy.

20     So other than like a one-time fee, when a developer puts

21  their app in the Play Store, does the developer pay Google any

22  upfront fee?

23  **A.**   Only the first time as you mentioned.

24  **Q.**   And what is the one-time first-time fee?

25  **A.**   $25.

**RASANEN - CROSS / KRAVIS**

1  **Q.**   And when a user downloads a developer's app from the

2  Play Store, does the developer then have to pay Google a

3  per-download fee?

4  **A.**   Not if they are not using -- if they're not a paid app.

5  In the first instance we talked about, yes; but for any

6  free-to-download app, they do not pay a fee.

7  **Q.**   Okay.  So if there's no upfront fee and there's no

8  per-download fee, then how does Google charge money for the

9  benefits that the Play Store provides to app store developers?

10 **A.**   We charge a service fee for any developer that is charging

11 users directly within their app for digital content.

12 **Q.**   And is that the payments policy we were just looking at?

13 **A.**   Yes.

14 **Q.**   Now, have you heard the expression "Google makes money

15 only when the developer makes money"?  Have you heard that

16 before?

17 **A.**   Yeah.

18 **Q.**   What is your understanding of what that means?

19 **A.**   So for us it's the principle of being aligned to developer

20 success.  We want to help our developers.  We know we help our

21 developers earn revenue, and so we align our interests with

22 theirs; and when they charge a user from within their app for

23 digital content used on a mobile phone, we recognize a share of

24 that fee, and that's our service fee.

25 **Q.**   Now, I want to ask you about the second exception under

1  the second bullet.

2       Do you see where it reads (as read):

3           "Payment is for digital content that may be consumed

4       outside of the app itself; e.g., songs that can be played

5       on other music players"?

6       Do you see that?

7  **A.**   I do.

8  **Q.**   Now, that is listed as an exception to the billing policy.

9  Do I have that right?

10 **A.**   You do.

11 **Q.**   All right.  What does that mean?

12 **A.**   So this has been in the policy as long as I worked on the

13 store, and what this refers to is actually a little bit

14 archaic.  It's when apps used to sell things like MP3s or

15 e-books that could be used outside of that app itself.  So you

16 could take -- you could buy an e-book from Kobo as an app, and

17 then you could take that and you could use that somewhere else.

18 You could use it in a PDF reader on your laptop or you could

19 use it, you know, on your phone, but you didn't need Kobo to

20 consume that content.

21      MP3 is another example.  You can buy an MP3 from -- I'm

22 forgetting the names of the apps that sold MP3s.  Amazon at one

23 point sold MP3s.  You could take that MP3, Amazon sells it to

24 you as a piece of content, a MP3 that you own, and you can then

25 use that MP3, play it anywhere you want:  On your iPod or on

1    your, you know, laptop music player.  It was not specifically

2    tied to the app where you bought it.

3    **Q.**   And the example you were just using, the MP3, is that, in

4    fact, written into this version of the policy?

5    **A.**   It is.

6    **Q.**   Now I'm going to ask you some more questions about this,

7    and just for ease of reference on my questions I'm going to

8    call this the outside-the-app exception.  Okay?

9    **A.**   Okay.

10   **Q.**   Okay.  Now, did there come a time when you were working in

11   the Play Store when some developers who sold subscriptions in

12   their apps told Google that those developers believed that this

13   exception applied to them?

14   **A.**   Yes.

15   **Q.**   And can you give just one or two examples of developers

16   that you worked with who fall into that category who told

17   Google that they believed this exception applied to them?

18   **A.**   Yes.  Spotify was one of them.  The Match app was one of

19   them.

20   **Q.**   So I just want to be clear about what this means,

21   exception means.  I'm going to use Match as an example.

22        In the ordinary course, under the payments policy with no

23   exception, how would Google collect a service fee for the

24   benefits that the Play Store provides to Match?

25   **A.**   In the ordinary course with no exception, they would --

1   Google would have collected a share of the paid services that

2   Match offered through its Android app.

3   **Q.**   And so when Match took the position that this

4   outside-the-app exception applied to them, then how did Match

5   process the transaction when a customer bought something inside

6   their Android app in the Play Store?

7   **A.**   They used their own billing -- their own billing platform,

8   their own billing service.

9   **Q.**   So in that circumstance when Match took the position that

10  the outside-the-app exception applied to them, did Google

11  collect any service fee from Match?

12  **A.**   No.

13  **Q.**   By the way, during this time period, did the Apple App

14  Store have a similar or comparable outside-the-app exception?

15  **A.**   No.

16  **Q.**   Now, in your role as a strategic partner manager, did you

17  participate in conversations with some of these app developers

18  about this issue, why they believed the exception applied to

19  them?

20  **A.**   I did.

21  **Q.**   And what did those developers tell you about why they

22  believed this exception applied to them?

23  **A.**   They believed that because they had a website, that was

24  covered in the exception; that it was -- the service could be

25  used outside of the app on the web -- in their own website on

1  the web.

2  **Q.**   So in that interpretation, the service they buy in the app

3  and use on the web is a little like the MP3 example you gave

4  earlier?

5  **A.**   No, not really.  Because if you buy Match -- a

6  subscription for a Match service, you can't use that in another

7  dating service or another app or another service anywhere.  You

8  have to go to Match website in order to use it.

9  **Q.**   Okay.  So I asked you about the position you heard from

10  app developers.

11     During this time period, so your work in the Play Store,

12  what was Google's position as to whether this outside-the-app

13  exception applied to the developers that you'd been talking

14  about?

15  **A.**   We did not think it applied to those developers.

16  **Q.**   And why did Google think that this exception did not apply

17  to those developers?

18  **A.**   For the same reason I explained.  We did not believe that

19  having an app and a website of the same service was the same as

20  buying a piece of content and using it somewhere else not

21  related to the service.

22  **Q.**   All right.  I want to talk with you now about why Google

23  took that position, why Google wanted these developers we've

24  been talking about to use Google Play Billing.

25     Were there security considerations there?

**RASANEN - CROSS / KRAVIS**

1   **A.**   Yes, very much so.

2   **Q.**   What were those security considerations?

3   **A.**   So, I mean, Android as a whole is very -- we are very

4   security conscious.  We want to make sure any Android user is

5   protected and any piece of content, any app that's sold through

6   the Play Store, we want to make sure that's safe and secure.

7         And in payments is one thing where, you know, if there's a

8   bad actor, a bad app in the store who uses methods to defraud

9   users in any way, we take that really seriously.  And so using

10  our payments platform, we knew it was safe and secure.  We

11  could guarantee it.

12  **Q.**   And if a user has a negative experience with another

13  billing service they use from an app they acquire from the

14  Play Store, how does that impact the Google Play Store?

15  **A.**   I mean, the Play Store is where they got that good; and if

16  they bought an app or they -- sorry -- they downloaded an app

17  and they bought something in that app and they were hurt in

18  some way, whether financially injured, that reflects very

19  poorly on the Play Store because that means we allowed an app

20  that would do that into the Play Store and we sold it

21  effectively, we distributed it to the user, and that's not a --

22  that's not something we ever want to happen.

23  **Q.**   Okay.  So setting aside security for a moment, which you

24  just talked about, were there other aspects of the overall user

25  experience that led Google to prefer that these developers

1   we've been talking about use Google Play Billing?

2   **A.**   Yeah.  It's not necessarily just about, you know, stealing

3   from users.  There's also just sort of a transparency,

4   consistency, and purchase management aspect to it that we

5   really thought was valuable to users and important for users.

6   **Q.**   And in addition to the user experience, did Google also

7   believe there was a fairness issue between large developers and

8   small developers when it came to the application of this

9   exception?

10  **A.**   Yeah.  I mean, some of the largest developers have lots of

11  money and resources and people and experience to be able to

12  develop their own complex billing systems.  And a smaller

13  developer, a start-up, a new developer doesn't have that

14  experience, doesn't have that, the resources, to be able to do

15  that.  And so we have this idea, this concept that we cared a

16  lot about, this level playing field.  We wanted to give

17  everybody a shot in the same way.

18  **Q.**   And, finally, you mentioned, I think previously, that

19  Google Play Billing was how Google collected the service fee.

20  Did I hear that correctly?

21  **A.**   Yes.

22  **Q.**   And so in reaching its conclusion about whether this

23  exception should apply to these developers, did Google also

24  consider that issue, the issue of the service fee?

25  **A.**   Yes.

1  Q.   And how so?

2  A.   Well, if the small developer who can't develop their own

3  billing system has to pay the service fee and the biggest

4  developers in the space don't have to pay the service fee, that

5  is also disadvantaging the smaller developers.

6  Q.   Now, if Google's position was that this exception did not

7  apply and the developers are taking the position that the

8  exception did apply, why didn't Google just kick the developers

9  out of the Play Store?

10 A.   I mean, because it's really important as a store to have

11 all the things that people are looking for and that people

12 want.  I mean, if you have a -- if you're a toy store owner and

13 there's a toy store down the street that has the hottest toy of

14 the season and you don't have it, you're going to lose

15 customers.

16      And so for us it was really important that we had -- we

17 called it parity.  You probably see that in some of these

18 documents.  We wanted to be at parity with the Apple App Store

19 and make sure we had all the same apps with the same quality as

20 Apple does.

21 Q.   And so rather than just kicking the developers out of the

22 store, did there come a time when Google chose instead to

23 clarify how this exception applied?

24 A.   Yes.

25 Q.   And were you out of the Play Store business by then?

1   **A.**   I was.

2   **Q.**   I'd like to take a look at one of the documents that my

3   colleague showed you during his examination when you were

4   talking with him about the exception.  It's Exhibit 704.

5       Now, Ms. Rasanen, I think you testified earlier that this

6   is an e-mail exchange that you participated in about the

7   outside-the-app exceptions issue that we've been discussing for

8   Match apps.  Do I remember that correctly?

9   **A.**   Yes.

10   **Q.**   I'd like to direct your attention to the second page of

11   the document, and I'd like to show you again the e-mail that I

12   believe my colleague showed you that you wrote on January 12th,

13   2017, at 10:06 a.m.  Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   I'd like to direct your attention to the number two in

16   the -- I'd like to direct your attention to the paragraph

17   numbered two in your e-mail.  Do you see that?

18   **A.**   I do.

19   **Q.**   It reads (as read):

20       "The larger, most profitable services like Match,

21   Zoosk, and eHarmony began as web businesses..."

22   Do you see that?

23   **A.**   Yes.

24   **Q.**   So what are Match, Zoosk, and eHarmony?

25   **A.**   These are dating services.

**RASANEN - CROSS / KRAVIS**

1  **Q.**   And at this time did they have apps in the Google Play

2  Store?

3  **A.**   They did.   I'm not sure about eHarmony, but Match and

4  Zoosk, absolutely.

5  **Q.**   Match and Zoosk anyway?

6  **A.**   Yes.

7  **Q.**   The sentence goes on to read (as read):

8          "... and are actually quite sophisticated in terms of

9          churn reduction."

10         Do you see that?

11 **A.**   Yes.

12 **Q.**   Are you familiar with the phrase "churn reduction"?

13 **A.**   I am.

14 **Q.**   What is churn reduction?

15 **A.**   Churn reduction is a term used to describe preventing

16 people from leaving your service.   So in the case of a Match,

17 it would be preventing people from unsubscribing from Match's

18 services.

19 **Q.**   All right.   I'd like to ask you a few more questions about

20 that, and to do that I'll ask you to turn to another document.

21 I don't think this is in evidence yet.   It's Exhibit 5973 in

22 the -- yes, right.

23      Ms. Rasanen, do you recognize Exhibit 5973 as an e-mail

24 chain that you participated in from June of 2018?

25 **A.**   Yes.   Yes, I do.

1    **Q.**   And what is the subject matter of this e-mail?  What is

2    this talking about?

3    **A.**   Sorry.  I was going to say the subject says "Sorry" -- "Re

4    Sorry."  This is discussing the Match Group and communication

5    with the Match Group.

6         **MR. KRAVIS:**  At this time we move trial Exhibit 5973

7    into evidence.

8         **MR. HUESTON:**  No objection.

9         **THE COURT:**  It is admitted.

10        (Trial Exhibit 5973 received in evidence.)

11   **BY MR. KRAVIS:**

12   **Q.**   So, Ms. Rasanen, I want to direct your attention to the

13   third -- the bottom of the third page of e-mail.  Do you see at

14   the bottom of the third page there is an e-mail on June 19th,

15   2018, at 11:56 a.m. from Adrian Ong?

16   **A.**   Yes.

17   **Q.**   Who is Adrian Ong?

18   **A.**   Adrian Ong was the overall Match Group's Google contact.

19   So he was sort of the partner manager from Match Group to

20   Google.

21   **Q.**   And do you see Mr. Ong writes (as read):

22        "Thank you.  I also have an update on some GBP tests

23        we have run."

24        Let me just stop there.

25        Do you have an understanding of what GBP refers to here?

**RASANEN - CROSS / KRAVIS**

1  **A.**    I think he means GPB, Google Play Billing.

2  **Q.**    The sentence continues (as read):

3         "Unfortunately, not very positive.  Negative revenue

4         impact due to package mix shift to shorter term packages

5         and significantly lower retention rates on renewal."

6         Do you see that?

7  **A.**    Yes.

8  **Q.**    What is your understanding of what Mr. Ong was

9  communicating in that sentence?

10  **A.**    So Match at this time was running some tests, and what

11  they found is that Google Play Billing, in their view, did not

12  perform as well as their own service did.  It was a negative

13  impact on revenue.

14      "Package mix shift" means that essentially consumers who

15  were on the Match service only had the options to buy

16  two-month, four-month and six-month subscriptions; and on

17  Google Play Billing, we offer one-month subscriptions.  And so

18  they were seeing a lot of people move from a two-month

19  subscription to a one-month subscription.  If I'm remembering

20  correctly, that's what this refers to.

21  **Q.**    I want to direct your attention a little bit further up

22  the chain to another e-mail from Mr. Ong.  This one starts on

23  the bottom of page 2 and goes to the top of page 3.  It's the

24  e-mail on June 19th, 2018, at 1:47 p.m.  Do you see that?

25  **A.**    Yes.

**RASANEN - CROSS / KRAVIS**

1    **Q.**   Now I want to direct your attention to the third numbered

2    paragraph in Mr. Ong's e-mail.  It's at the top of page 3 of

3    the exhibit.  Are you with me?

4    **A.**   Yep.

5    **Q.**   Mr. Ong writes (as read):

6          "On that note, retention I think is the real issue

7       since the customer is having the same experience

8       regardless of payment method.  My hypothesis here is that

9       GPB" --

10      And, again, that's Google Play Billing?

11   **A.**   That is Google Play Billing.

12   **Q.**   (as read):

13         "My hypothesis here is that GPB makes it much easier

14      to cancel a subscription, which is positive from a

15      customer experience perspective, but clearly will have

16      negative LTV impact across most, if not all, of our brands

17      if this holds true across the board."

18      Do you see that?

19   **A.**   I do.

20   **Q.**   That's kind of a mouthful.  What did you understand

21   Mr. Ong to be saying there?

22   **A.**   Google Play Billing makes it clear and easy for people to

23   manage their subscriptions and cancel them in an easy way and

24   Match Group does not.  And so this, again, is going back to a

25   churn reduction.  This -- they would keep people on their

1  subscriptions because it was hard to cancel them and so they

2  had people continuously paying.

3  **Q.**   I want to direct your attention to the next e-mail up in

4  the chain, which is on page 2, and it's on June 19th, 2018, at

5  12:23 p.m. from someone named Brandon Barras.  Do you see that?

6  **A.**   I do.

7  **Q.**   And who is Mr. Barras?

8  **A.**   Brandon was on my team.  He reported to me, and he was the

9  direct partner manager for the Match Group at this time.

10 **Q.**   And Mr. Barras there, the first thing he writes is "Minus

11 Match."  Do you see that?

12 **A.**   Yes.

13 **Q.**   Do you have an understanding in this context of what

14 "minus Match" means at the top of Mr. Barras' the e-mail?

15 **A.**   Yes.  This is sort of common practice in our internal

16 communications.  We will forward an e-mail that a partner

17 wrote, but take them off the thread so that we can discuss the

18 contents without the partner on the e-mail.

19 **Q.**   I want to direct your attention to the third paragraph

20 that starts "Re Number 3."  Do you see that?

21 **A.**   Yes.

22 **Q.**   And I think we were just looking at a third numbered

23 paragraph in Mr. Ong's e-mail.  Do you remember that?

24 **A.**   Yes.

25 **Q.**   All right.  So here Mr. Barras writes (as read):

RASANEN - CROSS / KRAVIS

1            "Re Number 3, this is actually incredibly important

2       to our business to respect user intent.  We believe it

3       yields better long-term outcomes for developers as well

4       when they allow their users choice when it comes to their

5       products, even if that is leaving."

6       Do you see that?

7  A.   Yes.

8  Q.   What did you understand Mr. Barras to mean when he wrote

9  that sentence in response to number three in Mr. Ong's e-mail?

10 A.   So this is -- this is Brandon.  He was composing a

11 response for our senior leader to send back.  She was the

12 person in touch with Mr. Ong.  And he was basically saying:  We

13 really believe that we want to respect users' intent, and we

14 have seen that it is actually better for developers if they do

15 the same.  They will end up having a longer term, a healthier

16 relationship with that consumer if they make it clear for them

17 how to do what they want to do even if that means they're going

18 to leave the service.

19 Q.   From the Google Play Store's perspective, is it good for

20 users if subscriptions are harder to cancel?

21 A.   No.

22 Q.   Why not?

23 A.   I mean, again, it's about the user's choice; right?  You

24 want to make sure that the user is paying for something that

25 they actually want; and if you make it hard for them to cancel

**RASANEN - CROSS / KRAVIS**

1    and that's how you keep them on the service, it doesn't mean

2    they actually want to put them through too many steps to

3    cancel.  They might give up and they'll keep paying you.  We

4    don't think that's good for users.

5    **Q.**   And are there things that the Google Play Store has done

6    to make it easier for users to cancel in-app subscriptions?

7    **A.**   Yeah.  There's a -- we've created what's called a

8    subscription center where users can go and see all of the

9    current subscriptions, and they can relatively easily click a

10   couple times and cancel that subscription.

11        We also do things like proactively e-mail a user before

12   their subscription renews so that they understand the payment

13   is coming up and if they want to cancel, they can go to the

14   subscription fairly easily and just cancel the subscription.

15   **Q.**   Now, I think my colleague showed you some documents

16   referencing the service fee that applied to some of these apps

17   that sold subscriptions around this time.  Do you remember

18   that?

19   **A.**   Yes.

20   **Q.**   Did Google -- did the Google Play Store have programs in

21   place at this time that lowered the service fee that applied to

22   some of these subscription apps?

23   **A.**   We did.

24   **Q.**   Have you heard of something called the Living Room

25   Accelerator Program or LRAP?

1    **A.**    Yes.

2    **Q.**    What is LRAP?

3    **A.**    Living Room Accelerator Program is a program that

4    streaming video providers can participate in.  We call it

5    Living Room because you watch streaming video in your living

6    room.

7         And so developers who fit this category can participate in

8    the program; and by working with us across multiple surfaces,

9    so integrating their app and making their app available on your

10   Android TV and in your Android car, Android auto, and on the

11   mobile device, we would give them a lower service fee in

12   recognition of participating across multiple services.

13   **Q.**    What was the lower service fee that Google -- the Google

14   Play Store charged to developers enrolled in the Living Room

15   Accelerator Program at this time?

16   **A.**    I believe it was 10 percent.

17   **Q.**    And can you just give us a couple of examples of apps that

18   would have fallen into the Living Room Accelerator Program?

19   **A.**    Yeah.  Apps like Netflix or Hulu, HBO.  These were the

20   kinds of apps that would fit that program.

21   **Q.**    And are you familiar with another program with the acronym

22   ADAP?

23   **A.**    Yes, ADAP.

24   **Q.**    Yeah.  I've forgotten what it stands for.  Can you tell us

25   what ADAP stands for?

**RASANEN - CROSS / KRAVIS**

1   **A.**   It is the Audio Developer Accelerator Program.

2   **Q.**   And what was the Audio Developer Accelerator Program?

3   **A.**   Very similar to the Living Room Accelerator Program.   It

4   was aimed at audio apps or music services that could stream

5   music.   Same concept.   We worked with them to participate

6   across multiple platforms to make your app available on Android

7   auto for listening in the car or on TVs, for listening on TVs.

8   Things like that.   Same concept.

9   **Q.**   Were the ADAP apps also eligible for a lower service fee?

10  **A.**   They were.

11  **Q.**   And do you recall what that service fee was for ADAP

12  around this time?

13  **A.**   The same 10 percent.

14  **Q.**   Now, why did Google offer developers programs like LRAP

15  and ADAP?

16  **A.**   So for content apps, music and video content apps, their

17  business model is such that they have to pay to license the

18  content that they share with users, that they give to users and

19  make available.   They have to pay movie studios, TV studios,

20  and all the music studios for the content that they make

21  available to their users, and it's very expensive.

22       And so it's one of those things where they don't actually

23  make that much money per user given the expense of servicing

24  those users.   And so we wanted to find a way to keep them on

25  the Play Store and to keep them using Google Play Billing

RASANEN - CROSS / KRAVIS

1  because, again, we believed in that security and transparency

2  aspect and we wanted to find a way to make sure we had, you

3  know, commensurate business interests.  So we were able to do

4  that through these programs.

5  **Q.**    Now, in response to Google's decision to clarify this

6  exception in the payments policy that we've been talking about,

7  did some of these larger subscription developers choose a model

8  called consumption only?

9  **A.**    They did.

10 **Q.**    Are you familiar with the term "consumption only"?

11 **A.**    Yes.

12 **Q.**    I want to talk with you about what exactly that means, and

13 I'd like to use Netflix as an example.  Is that okay?

14 **A.**    Sure.

15 **Q.**    Is Netflix, in fact, an app that is consumption only?

16 **A.**    Yes.

17 **Q.**    So in the consumption only model, does Netflix get to put

18 its app in the Play Store?

19 **A.**    Yes.

20 **Q.**    And in the consumption only model, does Netflix sell

21 subscriptions inside the app that's in the Play Store?

22 **A.**    No.

23 **Q.**    Where does Netflix sell subscriptions instead?

24 **A.**    They sell their subscriptions through their website.

25 There may be other surfaces as well, but the web, I think, is

1   the most common one.

2   **Q.**   And so if Netflix is selling the subscriptions on their

3   website, in the consumption only model, can a user who buys the

4   subscription on the website then use it inside the app they've

5   downloaded from the Play Store?

6   **A.**   Yes.

7   **Q.**   And how exactly would they do that?

8   **A.**   So you go to netflix.com on your computer, or even on your

9   phone, you can go to their mobile website too, and you would

10  buy a subscription.  So you would create your account.  You

11  would choose your subscription plan.  You would buy it.

12       So in creating your account, you've now created a login.

13  So you have a user ID and a password that you can then take

14  into the Netflix Android app distributed by Play Store, enter

15  your password; and since you've paid for the service elsewhere,

16  it works.

17  **Q.**   And for an app like Netflix that uses that model, this

18  consumption-only model that you've described, does Netflix pay

19  Google any service fee?

20  **A.**   No.

21  **Q.**   And is that the case even though the Netflix app remains

22  in the Google Play Store?

23  **A.**   Yes.

24  **Q.**   Now I want to talk with you about those switching studies

25  here; but before I do that, just one final topic before we

1  leave this subject.

2      I think you were asked some questions during my

3  colleague's examination about the policies that apply regarding

4  developers communicating lower prices to users.  Do you

5  remember those questions?

6  **A.**   I do, yes.

7  **Q.**   Does the Google Play Store have policies about those

8  communications?

9  **A.**   I believe they do now.  I don't know what they were when I

10  was there.

11  **Q.**   Yeah, that was going to be my next question.

12      Are you familiar with those policies?  Was that your area

13  or is that somebody else?

14  **A.**   That was after me.  That was not during my time.

15  **Q.**   All right.  Let's talk about the switching studies.

16      What does switching refer to here?

17  **A.**   So switching is when any user on one mobile platform,

18  mobile operating system, moves to another mobile operating

19  system.  So if you are on an iPhone and you switch to an

20  Android, that's called -- you choose Android for your next

21  phone, that's a switcher.

22  **Q.**   Now, let me just start with a big-picture question here.

23      My colleague showed you a couple of pretty lengthy slide

24  decks and this really big spreadsheet.  Why does Google do

25  this?  Why does Google do these studies about switching as

RASANEN - CROSS / KRAVIS

1    you've described it?

2    **A.**    I mean, we really want to understand the state of Android

3    and how popular Android is or is not because our business is

4    built on top of Android, and so we need to understand how our

5    business is doing compared to our competition.

6    **Q.**    I want to ask you about a couple of the studies that you

7    testified about a moment ago.

8        Could you turn, please, to Exhibit 1766?

9    **A.**    The other binder?

10   **Q.**    It's actually in both, I think.

11   **A.**    Great.

12   **Q.**    And this is in evidence, so we can publish it.  Thank you.

13   **A.**    Got it.

14   **Q.**    And, Ms. Rasanen, is this the Android consideration study

15   that you were asked about a moment ago?

16   **A.**    Yeah, that's right.

17   **Q.**    All right.  I'd like to direct your attention to page 8 of

18   the exhibit, please.  And I believe this slide is labeled "Key

19   Takeaways."  Do you see that?

20   **A.**    Yes.

21   **Q.**    And do you see in the -- there are three columns there?

22   **A.**    Yep.

23   **Q.**    And the middle one is labeled "Switchers"?

24   **A.**    Yes.

25   **Q.**    So my colleague asked you about the second paragraph here.

RASANEN - CROSS / KRAVIS

1  I want to ask you about all of them.

2      Can you read the first paragraph for us, please?

3  **A.**   Yes.  The first paragraph says (as read):

4          "Roughly one-fifth of IOS (22 percent) and Android

5      (17 percent) users are considering the other OS,"

6      operating system.

7  **Q.**   What does "OS" refer to here?

8  **A.**   Operating system.  Sorry.

9  **Q.**   And so what is your understanding what it means when it

10  says roughly one fifth of IOS and Android users are considering

11  the other OS?

12  **A.**   So consideration is one of the shopping phases that we

13  examine; and consideration means if somebody ask you would you

14  consider any of these different devices, you say, "Yes, I would

15  consider that."  So this means they would consider it; they

16  wouldn't rule it out.

17  **Q.**   Now, my colleague asked you about the second paragraph.

18  Let me direct your attention to the third paragraph.

19      Can you read that one for us, please?

20  **A.**   Yes.  (as read):

21          "OS switching behavior is limited, yet the rate of

22      switching OS is two times higher for switchers to IOS

23      (12 percent) than switchers to Android (6 percent)."

24  **Q.**   And what is your understanding of what that paragraph

25  means?

**RASANEN - CROSS / KRAVIS**

1   **A.**   Two times as many people leave Android and go to IOS as

2   the reverse.

3   **Q.**   Now, these documents refer to these things in percentage

4   terms; but just to get some absolute numbers out here, how many

5   Android phones are there in the world today?

6   **A.**   Over 3 billion.

7   **Q.**   And how many iPhones are there in the world today?

8   **A.**   Around a billion, give or take, I think.

9   **Q.**   So in that context, 3.5 billion Android phones in the

10   world, do studies that show switching numbers like 12 percent,

11   even 6 percent, is that a concern to Google?

12   **A.**   Yeah.

13   **Q.**   Why?

14   **A.**   Those are huge numbers of people.  Six may seem like a

15   small number, but 6 percent of 3 billion is -- help me do the

16   math -- 180 million; is that right?  It's a lot.  It's big

17   numbers.

18   **Q.**   I'm not going to do the math for you.

19   **A.**   Okay.

20   **Q.**   Let me turn to -- briefly to the other study you were

21   shown, Exhibit 1768, please.  This has also, I believe, been

22   admitted into evidence.

23   **A.**   Yes.

24   **Q.**   And this is the Android brand health study you were asked

25   about?

**RASANEN - CROSS / KRAVIS**

1    **A.**   Mm-hmm.

2    **Q.**   Is that a yes?

3    **A.**   Yes.

4    **Q.**   Okay.  Now, I think my colleague asked you some questions

5    about not seeing references to app stores on some of these

6    slides.  Do you remember that?

7    **A.**   I do.

8    **Q.**   Let me ask you to turn to page 8 of this document.

9         Let me ask you first about the sentence here, and then

10   I'll take you to another page.

11        I'm sorry.  I have you on the wrong page.  Could you look

12   at page 16 for me, please?

13   **A.**   Sure.

14   **Q.**   Now, Ms. Rasanen, can you just read for us the -- what it

15   says at the top there under "Security"?

16   **A.**   It says (as read):

17             "Security.

18             "But a concerning trend for security:  As more IOS

19        owners say their phone is secure, fewer Android owners say

20        the same (quarterly delta increased from minus four

21        percentage points to minus 10 percentage points).  And

22        perceived lack of app security continues to rise among

23        those who say Android isn't secure."

24   **Q.**   And do you see that there's like a white box there on the

25   left-hand side that says "Which phones are secure?"  Do you see

RASANEN - CROSS / KRAVIS

1   that?

2   **A.**   Yes.

3   **Q.**   What are the numbers that are reflected in that box?

4   **A.**   So this is, if I'm reading this correctly, looking at how

5   user -- how iPhone owners and Android owners think about the

6   security of their phone.

7   **Q.**   And just looking at the numbers that are pulled out here,

8   if you look at the top rows, which numbers are higher on this

9   measure of security?

10  **A.**   iPhone owners think their phones are more secure than

11  Android.

12  **Q.**   Now I'm going to turn you to the next page, Slide 17.

13  This is the one I was thinking of.

14      Do you see a reference to the app stores on this slide?

15  **A.**   Yes.  It says "Safety & App Stores."

16  **Q.**   Can you read for us, please, the text that appears under

17  that heading?

18  **A.**   It says (as read):

19          "The trend continues to play out in owner's

20      perceptions of their own app store's safety.  That said,

21      75 percent of Android owners say Google Play is a safe

22      place to get apps even while less than half are aware of

23      Google Play Protect."

24  **Q.**   And do you see another white box on the left-hand side?

25  **A.**   Yes.

RASANEN - CROSS / KRAVIS

1    Q.    It reads (as read):

2              "Which store is a safe place to get apps?"

3         Do you see that?

4    A.    Yes.

5    Q.    Could we blow that up, please?

6         What is it that's being measured here?

7    A.    Again, similar to how these iPhone and Android users

8    feel about the security of their phone, this one is

9    demonstrating how they perceive the security of their app

10   store.

11   Q.    Last one.  I'm going to ask you to dive back into that

12   spreadsheet you were shown.  It's been entered into evidence as

13   1764.

14        Do you have it up in front of you?

15   A.    Yes, here it is.

16   Q.    You can also look at it on the screen.

17   A.    Oh, thanks.

18   Q.    It may be helpful to look at both.

19   A.    Small type either way.  Got it.

20   Q.    All right.  I just have a few questions for you on this

21   document.  I'm going to ask you to identify a couple of the

22   rows and then take you to the columns.  Okay?

23   A.    Sure.

24   Q.    All right.  Now, I think my colleague asked you about

25   row 41.  That's grand total; right?

1    **A.**    Yes.

2    **Q.**    And do you see -- what is row 38?

3    **A.**    38 are the same metrics for the U.S.

4    **Q.**    And "U.S." here refers to United States?

5    **A.**    Yeah, United States.   Sorry.

6    **Q.**    Okay.   So with those in mind, 38 and 41, I want to take

7    you to columns Y and Z.

8    **A.**    Yes.

9    **Q.**    And can you remind us what we are looking at in columns Y

10   and Z?

11   **A.**    So this is the column showing how many people -- this is

12   switching probability.   So this is how many people are likely

13   to switch from Android to Android and Android to IOS.

14   **Q.**    And is it the column Z that is showing the Android to IOS?

15   **A.**    Yes, that's right.

16   **Q.**    The switching?

17   **A.**    That's right.

18   **Q.**    So let me start with the 41, the grand total.

19        I think you testified that on this sheet the number of

20   reported Android to IOS switchers is 6.93 percent.   Do I have

21   that right?

22   **A.**    Yes.

23   **Q.**    And, again, that is in the context of 3.5 billion Android

24   phones in the world?

25   **A.**    Yes.

1  **Q.**   Now let me -- now let me show you finally the row that was

2  the U.S. row.  I think you said that one is row 38; right?

3  **A.**   Yes.

4  **Q.**   What is the switching number Android to IOS for phones in

5  the United States?

6  **A.**   Almost 14 percent.

7  **Q.**   Thank you, Ms. Rasanen.

8       **MR. KRAVIS:**  I have no further questions.

9       **THE COURT:**  Okay.  Any brief recross?

10      **MR. HUESTON:**  Yes, Your Honor.

11                  **REDIRECT EXAMINATION**

12  **BY MR. HUESTON:**

13  **Q.**   Ms. Rasanen, I want to pick up where counsel left off

14  there.

15      Let's talk about the math that's been put up.  There were

16  numbers like 12 percent and 6 percent that you just reviewed;

17  right?

18  **A.**   Yep.

19  **Q.**   Now, the math -- and, look, I'm not a math major and this

20  gets -- and neither are you, but let's try to focus with what's

21  clear here.

22      The right number is not looking at 6 percent of 3-point --

23  3 billion users; correct?

24  **A.**   The -- well, the right number?  Which right number?  What

25  do you mean?

1  Q.   Well, let's explore.

2       That 3-billion number is all the people we estimate who

3  owned phones at that time; right?

4  A.   Yes, that's correct.

5  Q.   Okay.  And you'll agree with me that only a fraction of

6  that number, of all Android users, buy a new phone at a given

7  time?

8  A.   I think we established every three years.

9  Q.   Yeah.

10 A.   One out of every three years.  That would be about a

11 billion every year --

12 Q.   Yeah.

13 A.   -- give or take.

14 Q.   So, you know, you can't say 6 percent of 3 billion because

15 3 billion people are not every day going "I need to buy a new

16 phone"; right?

17 A.   That's right.

18 Q.   So it's a much smaller number that we're talking about

19 here.

20      You'd agree that the percentage -- that Android does not

21 lose 6 percent of its users a year based on 3 billion.  It's a

22 much smaller number based on the much smaller group of folks

23 who are actually looking to buy a new phone on a

24 once-in-every-three-year basis; right?

25 A.   So every three years --

**RASANEN - REDIRECT / HUESTON**

1  Q.   Right.

2  A.   -- Android loses 6 percent.  Every one year they lose

3  6 percent of a billion, which is still a pretty big number.

4  Q.   Okay.  And that's if that math holds, but that's a lot

5  smaller of a number; right?  Because we're talking about people

6  who are considering buying a new phone, and it's once every

7  three years; right?  It's not every user.

8  A.   Sure.  But that happens every year, right.

9  Q.   And let's talk about whether you're losing more or Apple

10  is losing more.

11      It's not a one-way street; right?  Users also switch from

12  Apple to Android.  That's the other part of the math that's

13  missing there; correct?

14  A.   Yes, some do.

15  Q.   Yeah.  In fact, more than some.  One of the studies we

16  looked at showed that more people intended to switch from Apple

17  to Android than the other way around; right?

18  A.   Again, that's intent, yes.  That doesn't mean they did.

19  Q.   Well, let's, again, look at what the study said.

20  Exhibit 1766 already admitted at Slide 8.

21  A.   1766?

22  Q.   I'm going to put it up on the screen.

23  A.   Oh, great.

24  Q.   And this shows here 9 percent of IOS likely purchasers

25  intend to switch to an Android while 7 percent of Android

1   likely purchasers intend to switch to an IOS device; right?

2   **A.**   That's how many intend to.  The next paragraph shows how

3   many did.

4   **Q.**   Right.  So that means 7 percent intend to switch away

5   Android but 9 percent are switching towards an Android

6   according to this, by intent; right?

7   **A.**   By intent.

8   **Q.**   Yeah.  So the math is going your way here on this one;

9   right?

10  **A.**   Except that the total raw numbers are actually not equal;

11  right?

12  **Q.**   Well --

13  **A.**   7 percent of, let's call it, a billion is more people than

14  9 percent of Apple's one-third, which would be what?

15  300 million.  So it is not more people.  It is a percentage of

16  a different piece.

17  **Q.**   Sure.  But this set of percentages showing you're winning

18  the percentage game at least in this snapshot; right?

19  **A.**   In intent, not in actual purchase.

20  **Q.**   In intent.

21       And over time to see what had happened, we've seen Android

22  become the dominant operating system; right?  85 percent of all

23  smartphones today globally are Android devices; right?

24  **A.**   I don't know if it's 85 percent today.  The study you

25  showed me was from -- or the board of directors note was from

RASANEN - REDIRECT / HUESTON

1    2020.

2    **Q.**   Right.

3    **A.**   So that's sometime ago; and if we have this high switching

4    taking place, it wouldn't be 85 percent today.

5    **Q.**   Well, counsel didn't show you a different number.  We've

6    just seen the 85 percent; right?

7    **A.**   That's right.

8    **Q.**   Okay.  Now let's talk about app security.

9         Google's lawyer showed you some slides that claim that

10   smartphone users care about app security; right?

11   **A.**   Yes.

12   **Q.**   And, in fact, as we covered, there are many other factors

13   that influence a consumer's choice of smartphone; right?

14   **A.**   There are other factors, yes.

15   **Q.**   Now, one slide that counsel did not show you in

16   Exhibit 1768 is Slide 13, which puts all this in perspective.

17        Let's go to that.  Put it up on the screen, please.

18             **THE CLERK:**  I'm sorry, what exhibit?

19             **MR. HUESTON:**  Sure.  It's Exhibit 1768 at Slide 13 --

20   at 13.  There it is.

21   **BY MR. HUESTON:**

22   **Q.**   And this states that, quote (as read):

23             "Compatibility" --

24        First of all, the title here is "Likelihood to use

25   Android."  Do you see that?

1   **A.**   Yes, I do.

2   **Q.**   And it states that (as read):

3          "Compatibility, enjoyment, ease of use, high quality,

4      and fast are most likely to influence the use of Android

5      devices."

6      Right?

7   **A.**   Yes.

8   **Q.**   And then it kind of ranks them from left to right; right?

9   In terms of, like, the bigger reasons with fewer percentages

10  down to the right with the less important reasons; right?  Do

11  you see that?

12  **A.**   Yes.

13  **Q.**   Okay.  Now, if you look at the list, if we start on the

14  left-hand side, I've tried to do this, I have to count -- if

15  you look at each description there, compatible with devices I

16  own, enjoyable to use, easy to use, you can keep going and

17  counting all the way to the right.

18      And see if you agree with me that you have to go all the

19  way down to the 14th down on the right before you see anything

20  resembling security.  "Trustworthy," do you see that?

21  **A.**   I see "Trustworthy."

22  **Q.**   That's 14th of the reasons there; right?

23  **A.**   Do you want me to count?

24  **Q.**   One, two, three, four, five, six, seven, eight, nine...

25  **A.**   Yes, 14.

1    Q.   Okay.  The 14th reason.

2        And, by the way, there's nothing here -- in looking at all

3    those reasons, there's nothing on here at all about the app

4    store being better or worse as a reason; right?

5    A.   I don't see that, no.

6    Q.   Right.  And just quickly, next slide, also not shown to

7    you, we see the drivers of likelihood to use Apple IOS; right?

8    A.   Yes.

9    Q.   And, again, those drivers are, to quote the slide here,

10   similar to the ones we just saw from Android; right?

11   A.   Yes.

12   Q.   And you see the same top five right there:  Compatibility,

13   enjoyment, ease of use, helpful, and fast; right?

14   A.   You see trustworthy is a little further up the list.

15   Q.   That's right.  And nothing at all about the app store or

16   app quality, right, listed there?

17   A.   I don't think so.  That's right.

18   Q.   Thank you.

19       Let me ask you about -- you were talking about LRAP and

20   ADAP; right?

21   A.   Yes.

22   Q.   And you said that these -- in your testimony, I believe

23   you said that these were designed to help some developers with

24   their margins; right?  If they were maybe struggling with

25   profitability; right?

RASANEN - REDIRECT / HUESTON

1   **A.**   Yes.

2   **Q.**   But that's not the real reason for, in fact, coming up

3   with LRAP and ADAP, was it?

4   **A.**   I don't -- what do you mean?

5   **Q.**   Well, you remember that the real reason for coming up with

6   LRAP and ADAP was to quiet down the agitation of those

7   developers that were spreading the word that this was not good

8   for them?  Do you remember that?

9   **A.**   I don't remember that.

10  **Q.**   Okay.  Let's go to Exhibit 1438.

11       You'll recognize this as an e-mail that you're sending at

12  the top.

13          **MR. HUESTON:**  And we move this into evidence at this

14  time.

15          **THE WITNESS:**  Okay.

16          **THE COURT:**  Is there any objection?

17          **MR. KRAVIS:**  No objection.

18          **THE COURT:**  All right.  It is admitted.

19       (Trial Exhibit 1438 received in evidence.)

20  **BY MR. HUESTON:**

21  **Q.**   And I want to quickly go to page 1 and highlight the

22  following language.  He asks there -- if we can pull it out --

23  "Is it signing up to LRAP, ADAP, or the MDF in the form of

24  contracts?"  Do you see that?

25  **A.**   I do.

**RASANEN - REDIRECT / HUESTON**

1  **Q.**  And, in fact, what it says here right before that (as

2  read):

3          "I'm not clear on what form a partner's agreement not

4      to agitate needs to take to get us comfortable with a

5      policy announcement on the proposed time frame.  Is it

6      signing up to the LRAP, ADAP, or the MDF?"

7      Those were the three alternatives for contracts to deal

8  with the cited issue of agitation, right, in these words with

9  Mr. Rosenberg in an e-mail with you?  Right?

10 **A.**  They were contemplated agreements that we could enter into

11 with these developers.

12 **Q.**  Right.

13 **A.**  That is true.  You mentioned --

14 **Q.**  To deal with agitation; correct?

15 **A.**  Sorry.  To deal with developers complaining, that's right.

16 But you asked me if LRAP and ADAP were created for this reason,

17 and that's not accurate.

18 **Q.**  Well, except in this document --

19 **A.**  These were existing programs.  Sorry.  I just wanted to be

20 really clear.

21 **Q.**  Sure.  And I want to be clear too.

22      The document says (as read):

23          "I'm not clear on what form a partner's agreement not

24      to agitate needs to take.  Is it signing up to LRAP, ADAP,

25      and MDF?

**RASANEN - REDIRECT / HUESTON**

1      That's how it's posed here; right?

2  **A.**   That's what he asks, yes.

3  **Q.**   Three alternatives, yes, to come up with a way by contract

4  to keep the complainers from no longer agitating; right?

5  That's one of the reasons?

6  **A.**   He's asking the question if it's feasible to help these

7  developers by entering into one of these particular agreements.

8  **Q.**   I'm sorry.  So helping them not to agitate; is that your

9  testimony?

10  **A.**   Well, they're complaining because they're upset, and so we

11  want to help them so that they're not upset anymore and that

12  they aren't going to complain about us.

13  **Q.**   I see.

14  **A.**   It's bad for business if developers are complaining about

15  you.  We don't -- we don't -- we want to make them happy.  You

16  just established earlier that I'm supposed to be in their

17  corner representing their interests, and so that's -- these are

18  some of the ways that we thought about potentially working with

19  these developers.

20  **Q.**   Okay.  And after hearing all those complaints that we went

21  through and I built a demonstrative with -- remember that?

22  **A.**   I do.

23  **Q.**   -- you and Google decided to help them by eliminating the

24  exception and forcing all of them to exclusively use

25  Google Play Billing?  That's what happened after all those

1    complaints; right?

2    **A.**   I wasn't there.  That is where we are today.

3    **Q.**   That is where you are today?

4    **A.**   I don't know what happened in between when I left and when

5    the policy changed.

6    **Q.**   That's where you are today; right?  You know that?

7    **A.**   That's my understanding.

8    **Q.**   Okay.  Now I want to talk about this retention issue you

9    brought up on Exhibit 5973.

10        Let's pull that up.

11        And you focused here on an e-mail from Mr. Ong and in

12   particular this reason number three area; right?  This number

13   three area.

14        Let's go to it.

15        Number three, that's what counsel asked you about; right?

16   **A.**   Yes.

17   **Q.**   On that note retention I think is the real issue.

18        I want to actually show you and the jury the rest of the

19   e-mail to get the right context here.

20        In Mr. Ong's e-mail, he actually identifies several issues

21   with Google Play Billing's performance; right?

22   **A.**   He does.

23   **Q.**   Let's look at number two, which counsel didn't bother

24   showing you.  He writes that (as read):

25             "They were forced to use a 1/3/6 product mix to set

1          up an even test since I've heard that apparently Google

2          will now not be supporting the 2/4/8 month mix, which we

3          find optimizes conversion for POF."

4          Right?

5     A.   Yes.

6     Q.   Yeah.  There were some acronyms there.  But to break it

7     down quickly, he's referencing product mix, and you know that's

8     referring to options for the length of subscriptions; right?

9     A.   I do.

10    Q.   And that they usually offer two-, four-, and eight-month

11    long subscriptions, which they find optimizes conversion,

12    right, for Plenty of Fish?  That's POF?

13    A.   Yes.

14    Q.   But they were forced to change to 1/3/6 months because

15    Google didn't support 2/4/8; right?  That's what he was

16    pointing out?

17    A.   During their test, yes, we did not have those options

18    available so they had to test with what we have.

19    Q.   Sure.  And then as a result of switching to that 1/3/6

20    month package, Match saw, quote, "more users shift into

21    one-month packages which results in lower LTV for them"; right?

22    A.   For Match, yes.

23    Q.   Yeah.  And LTV is lifetime value; right?

24    A.   That's right.

25    Q.   So it was causing a reduction in the lifetime value this

1    change; right?  That was one of the complaints he was raising

2    here in the e-mail; right?

3    **A.**   Yes, because users could choose a lower cost alternative.

4    **Q.**   Well, and then let's go to four.

5        That wasn't all he complained about.  He also writes in

6    number four (as read):

7              "We then compute a 30 percent rev share on top of

8         these numbers, and we're looking at a world of pain."

9         That's the words; right?

10   **A.**   Those are the words he used.

11   **Q.**   No small issue.  A world of pain; right, ma'am?

12   **A.**   In his view.

13   **Q.**   Okay.  And you didn't discuss any of those problems Match

14   had with Google Play Billing in the review of your e-mail with

15   Google's counsel; right?

16   **A.**   I did not.

17   **Q.**   Let's talk about the one thing you did talk about, this

18   retention issue.

19       He did write that retention is significantly worse; right?

20   **A.**   Yeah.  Is that -- I'm sorry.  That's what he said.

21   **Q.**   That's what three is.

22   **A.**   Yeah.  I think he said --

23   **Q.**   And you -- I think you testified that you interpreted that

24   to mean that Mr. Ong didn't like making it easy for people to

25   cancel their subscriptions, words to that effect; right?

1   **A.**   Yeah.  If we could look at the text again, that's

2   basically what he says.

3   **Q.**   Yeah.  Pop it on the next page.

4        And there it is.  That's the paragraph you were talking

5   about; right?

6   **A.**   Yeah, that's right.

7   **Q.**   But to be clear, Mr. Ong was just sharing the,

8   quote/unquote, "hypothesis" for why retention was worse on

9   Google Play Billing; right?

10   **A.**   Yes.  He used the word "hypothesis."

11   **Q.**   Yeah.  And a hypothesis, that's just an unproven theory;

12   right?  That's what a hypothesis is --

13   **A.**   Okay.

14   **Q.**   -- right?

15        And so you don't actually know the reason why retention

16   was an issue on Google Play Billing, do you?

17   **A.**   He said, "I think the real issue is retention and that

18   would prevent them from using Google Play Billing."

19   **Q.**   A hypothesis among other issues outlined here; right?

20   **A.**   Yes.

21   **Q.**   Okay.  And you're also aware that there are other factors

22   that affect retention; right?

23   **A.**   Yes.

24   **Q.**   Okay.  Let's go to 8033.  It should be in your binder.  An

25   e-mail that you sent.

**RASANEN - REDIRECT / HUESTON**

1  **A.**   Sorry.  I'm trying to get there.  Eight...

2  **Q.**   8033.

3  **A.**   I'm sorry.  Is it in this one (indicating)?

4  **Q.**   That's because we don't have the right binder in front of

5  you.

6         **MR. HUESTON:**  If we can, Your Honor, we'll pass up the

7  binder.

8         **THE COURT:**  That's fine.

9         **MR. HUESTON:**  My apologies.

10         **THE WITNESS:**  I'm getting a little tired.

11  **BY MR. HUESTON:**

12  **Q.**   Sorry to pile them on.

13  **A.**   It's okay.

14       You want this one back?  Okay.

15       Okay.  Now, where are we going?  8033?

16  **Q.**   Right.  And if you can just tell me you recognize this is

17  an e-mail that you sent.

18  **A.**   8033, this is the --

19  **Q.**   Yep.

20  **A.**   -- mobile app speedy activity update?  Am I on the right

21  one?

22  **Q.**   It should be an e-mail from you on February 20th, 2018.

23  **A.**   Yeah.

24         **MR. HUESTON:**  Okay.  We move that into evidence at

25  this time.

1           **MR. KRAVIS:**  No objection.

2           **THE COURT:**  Admitted.

3      (Trial Exhibit 8033 received in evidence.)

4 **BY MR. HUESTON:**

5 **Q.**   Let's put that up, and if we flip to page 2.

6      This is activity report January 29th to February 16th;

7 right?  It's a summary of what's happening that week; right?

8 **A.**   Yes.

9 **Q.**   Okay.  Let's go to page 2 and entry for "Watcha Play."

10 And, Ms. Rasanen, you know Watcha Play is like the Netflix of

11 Korea; right?

12 **A.**   I don't recall Watcha Play, but I'll take your word for

13 it.

14 **Q.**   Okay.  And the entry here says that there was a

15 Watcha Play subscription retention study meeting; right?

16 **A.**   Yeah.

17 **Q.**   And it says (as read):

18           "Watcha Play has implemented 100 percent Google Play

19      Billing since July 2017 and shared its insight on

20      potential reasons why retention might be lagging in

21      Google Play Billing versus other FOPs."

22      Right?

23 **A.**   Yes.

24 **Q.**   So Watcha Play experienced lower retention when using

25 Google Play Billing; right?

RASANEN - REDIRECT / HUESTON

1   **A.**   Is that what it says?  Yeah.

2   **Q.**   Yes?

3   **A.**   Potential reasons why retention might be lagging, uh-huh.

4   **Q.**   Right.  And potential, that's hypothesis.  They're trying

5   to figure it out; right.

6   **A.**   Yeah.

7   **Q.**   Okay.  And one is -- they list them here.  One is

8   involuntary churn on DCB higher price due to Google Play

9   Billing; right?

10   **A.**   Yes.

11   **Q.**   And "DCB" means direct carrier billing; right?

12   **A.**   It does.

13   **Q.**   And that's a form of payment that Google Play Billing

14   accepts; right?

15   **A.**   It is.

16   **Q.**   And another potential culprit listed is higher price due

17   to Google Play Billing implementation; right?

18   **A.**   Yes.

19   **Q.**   And which refers to the fact that Watcha Play had to

20   charge a higher price when they implemented 100 percent

21   Google Play; right?

22   **A.**   They chose to do that, yes.

23   **Q.**   And, by the way, Google Play Billing making it easier to

24   cancel, you don't see words to that effect here as one of the

25   hypotheses; right?

**RASANEN - REDIRECT / HUESTON**

1  **A.**   I do not.

2  **Q.**   Okay.  We can take that down.

3      Now, counsel also talked to you about, you know, Apple as

4  being the main reason for much of this; but isn't it true,

5  Ms. Rasanen, that Google was worried primarily about other

6  Android developers distributing apps, not Apple?

7  **A.**   Sorry.  Can you --

8  **Q.**   Sure.

9      Isn't it true that what Google was really worried and

10  focused on was other Android developers distributing apps;

11  right?  That was the focus?

12        **MR. KRAVIS:**  Objection.  Beyond the scope.

13        **THE COURT:**  Overruled.

14      Go ahead.

15      **THE WITNESS:**  I wouldn't say Google was really worried

16  about that and not about Apple, no.

17  **BY MR. HUESTON:**

18  **Q.**   Okay.  Let's go back to Exhibit 8573 admitted for certain

19  slides.

20      I'm only going to go to Slide 35 here, and this is a

21  Google Play deck.  Let's go -- it's the onboarding deck for all

22  new employees, and this slide is titled "What we worry about";

23  right?  Do you see it?

24  **A.**   I do.

25  **Q.**   And take a look at this closely, nowhere on this slide

1   does it say "Apple"; right?

2   **A.**   That's right.

3   **Q.**   In fact, under "app distribution," there are three logos

4   and none of them is Apple; right?

5   **A.**   That's right.

6   **Q.**   And Facebook, Amazon, WeChat, they're all available on

7   Android; correct?

8   **A.**   Yeah.  Is that middle one Amazon?  I think that's one

9   store.

10   **Q.**   Okay.  All available on Android; right?

11   **A.**   Yes.

12         **MR. HUESTON:**  Pass the witness.

13         **THE COURT:**  Very briefly, please.

14                 <u>**RECROSS-EXAMINATION**</u>

15   BY MR. KRAVIS:

16   **Q.**   Ms. Rasanen, I have just one question for you about the

17   slide you were just shown.

18   **A.**   Okay.

19   **Q.**   It's 8573, Slide 35.

20   **A.**   Okay.  Can we see it again?  Sorry.  I don't have it in

21   front of me.

22   **Q.**   Is it possible using their system to get this up for her

23   because it's really small and we can only see a part of it?

24   Can we do that.

25         8573, Slide 35.  Do you see on the left-hand side it says

PROCEEDINGS

1    "Games"?

2    **A.**    Yes.

3    **Q.**    Do you see there's a little, like -- there's a cell phone

4    there?

5    **A.**    Yes.

6    **Q.**    Can you see what's being depicted on that phone?

7    **A.**    That's an Apple.

8    **Q.**    It's a what?

9    **A.**    That's an Apple logo on that phone.

10   **Q.**    Thank you.

11         **THE COURT:**   Okay.  We'll take our lunch and come back

12   about 10 to 1:00.

13         **THE CLERK:**   All rise.

14       (Proceedings were heard out of the presence of the jury:)

15         **THE COURT:**   Okay.  The witness is discharged.

16                     (Witness excused.)

17         **THE COURT:**   See you in a bit.

18           (Luncheon recess was taken at 12:20 p.m.)

19   **AFTERNOON SESSION**                                      **1:00 p.m.**

20         **THE CLERK:**   We're back on the record.

21         **THE COURT:**   Who's next?

22         **MR. EVEN:**   Your Honor, Epic calls Dave Kleidermacher.

23         **THE CLERK:**   Please stand and raise your right hand.

24   \\\

25   \\\

1          <u>**DAVID NOAH KLEIDERMACHER**</u>,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please be seated.

6         Please state your full name for Court and spell your last

7    name.

8              **THE WITNESS:**  My name is David Noah Kleidermacher.  My

9    last name is spelled K-L-E-I-D-E-R-M-A-C-H-E-R.

10             **THE CLERK:**  Thank you.

11             **THE COURT:**  Okay.  Go ahead.

12                  <u>**DIRECT EXAMINATION**</u>

13   BY MR. EVEN:

14   **Q.**   Good afternoon, Mr. Kleidermacher.

15   **A.**   Good afternoon.

16   **Q.**   My name is Yonatan Even.  I represent Epic.

17        You have a binder there.  Do you see it?

18   **A.**   Yes.

19   **Q.**   So we'll be using it throughout, so I appreciate if you

20   keep that at hand.

21        You joined Google in 2017; correct?

22   **A.**   Yes.

23   **Q.**   And you're Google's vice president of engineering;

24   correct?

25   **A.**   Yes.

1  Q.   And as Google's vice president of engineering, it is your

2  responsibility to ensure security on Android devices; correct?

3  A.   Yes.

4  Q.   Now, I want to talk to you a little bit about malware.

5  Okay?

6       Malware is software that is doing something maliciously

7  with intent to harm in some way; correct?

8  A.   Yes.

9  Q.   And malware can get onto an Android device from a variety

10  of sources; correct?

11  A.   Yes.

12  Q.   One way, for instance, that malware can get onto a device

13  is from the Google Play Store; correct?

14  A.   Correct.

15  Q.   Now, obviously it can get onto the device from other

16  stores and other aspects; correct?

17  A.   Correct.

18  Q.   Now, when it comes to app stores, fighting malicious apps

19  is much like a game of Whack-A-Mole; correct?

20  A.   It can be referred to that way I suppose.

21  Q.   In fact, you did refer to it that way in the past;

22  correct?

23  A.   I may have, yes.

24  Q.   And you play this game of Whack-A-Mole, when you play it,

25  the larger the catalog of apps in the app store, the more

1  difficult the challenge is to keep malware out of that app

2  store; correct?

3  **A.**   I think that's generally true.

4  **Q.**   Sir, it is correct, isn't it, that the larger the catalog,

5  the more difficult the challenge is; correct?

6  **A.**   I think it's generally true, yes.

7  **Q.**   Sir, it's not just generally true.  It is true; right?

8  The larger the catalog --

9  **A.**   Well, I say generally because you can have a store that

10  would be larger but not as safe -- but safer than a smaller

11  store if they weren't doing as good a job.

12          **MR. EVEN:**  Sir, Your Honor, if I can turn to the

13  deposition at page 175 at lines 11 to 19.

14          **THE COURT:**  175?

15          **MR. EVEN:**  Correct.  At 11 to 19.

16                  (Pause in proceedings.)

17          **THE COURT:**  Okay.

18          **MR. EVEN:**  Can you pull that up?

19  **BY MR. EVEN:**

20  **Q.**   Sir, you were deposed in this case; correct?

21  **A.**   Yes.

22  **Q.**   And you gave testimony under oath?

23  **A.**   Yes.

24  **Q.**   And so were you asked and did you answer the following?

25  (as read):

1   "QUESTION:  And part of that is a numbers game; correct?

2   There is just too many apps for you to whack them, all the

3   moles, and make sure that they don't get their heads back

4   up?

5   "ANSWER:  Yeah, certainly -- yes, it is true that the

6   larger the catalog, the more difficult the challenge is."

7   Did you get this question and answer this response under

8   oath?

9   A.   Yes.

10  Q.   Now, the Google Play Store has millions of apps; correct?

11  A.   Did you say a million?

12  Q.   Millions.

13  A.   Millions, yes.

14  Q.   And tens of thousands of apps are submitted to the Google

15  Play Store each day for review and distribution; correct?

16  A.   That's correct.

17  Q.   And that makes the game of Whack-A-Mole for the Google

18  Play Store very challenging; correct?

19  A.   We have many challenges, yes.

20  Q.   Now, you believe that certainly for a store the size of

21  the Google Play Store, malware is not a problem that will ever

22  go away; correct?

23  A.   Correct.

24  Q.   One of the ways to reduce malware in an app store is to

25  offer a more curated app store with a smaller number of apps;

**KLEIDERMACHER - DIRECT / EVEN**

1   correct?

2   **A.**   That can reduce risk.

3   **Q.**   And you proposed that Google create a curated app store

4   experience through something named Project Cake; correct?

5   **A.**   I have made proposals of that sort in the past, yes.

6   **Q.**   And one of those proposals was dubbed Project Cake;

7   correct?

8   **A.**   It was more of a conceptual idea; but, yes, you can call

9   it a proposal.

10  **Q.**   And under Project -- your Project Cake proposal, the

11  Google Play Store would be bifurcated or divided into two

12  separate user experiences; correct?

13  **A.**   Correct.

14  **Q.**   And one of the experiences within the Google Play Store

15  would contain a set of apps that are curated; right?

16  **A.**   They would be more curated.

17  **Q.**   More curated.

18      Okay.  And in this curated portion of the Google Play

19  Store, the apps would be thoroughly vetted such that they will

20  pose no or very little risk; correct?

21  **A.**   That was the idea, yes.

22  **Q.**   And the curated portion of the Google Play Store that you

23  had in mind would include fewer than 50,000 of the most popular

24  apps on Android; correct?

25  **A.**   That was the general idea.

**KLEIDERMACHER - DIRECT / EVEN**

1  Q.  And that is somewhere between 1 and 2 percent of the

2  overall apps on the store; correct?

3  A.  Yes.  The concept didn't -- wasn't so important exactly

4  the number; but, yes, generally true.

5  Q.  And those apps you believed could represent as much of

6  90 percent of the downloads from the store; correct?

7  A.  The concept of Cake had a variety of versions where the

8  percentages might change, and it might be 90 percent, it might

9  be 60 percent, 50 percent, et cetera.

10  Q.  Okay.  Then you'd have a separate experience that would be

11  offered within the Google Play Store that hosts sort of the

12  long tail of less popular apps, and that would be less vetted

13  and less curated; correct?

14  A.  That is generally correct.  Popularity wouldn't

15  necessarily be the top but, yes.

16  Q.  Sir, just a yes or no.  I don't need the commentary.  Your

17  counsel, I'm sure, will give any further color that's needed.

18      And the less curated portion of the Google Play Store apps

19  would be less thoroughly vetted and then users would be told

20  that they are proceeding at a higher risk; right?

21  A.  Not necessarily less thoroughly vetted.

22  Q.  Sir, we've already established, I think, that you said

23  that in the more curated part they would be more thoroughly

24  vetted; correct?

25  A.  It's not clear what level of vetting.  I don't think the

KLEIDERMACHER - DIRECT / EVEN

1  proposal was that clear.

2  **Q.**   About the level of vetting.

3       In the more curated part, there would be more vetting;

4  correct?

5  **A.**   Can you explain what you mean by "vetting"?

6  **Q.**   Sir, there would be more vetting; correct?

7  **A.**   I'm not sure that is consistent with my proposal.

8  **Q.**   Sir, you remember I just asked you and you just answered

9  that the apps would be thoroughly vetted such that they will

10  pose no or very little risk --

11  **A.**   Thoroughly vetted --

12  **Q.**   -- in the curated part?

13  **A.**   Thoroughly vetted, sure.

14  **Q.**   Now, the ability to curate is not unique to Google;

15  correct?

16  **A.**   Can you please repeat that?

17  **Q.**   The ability to curate the store is not unique to Google.

18  Other people can do that; correct?

19  **A.**   Other people can do curation, sure.

20  **Q.**   And other stores, other distributors, could offer curated

21  app stores just like the curated experience you suggested in

22  Project Cake; correct?

23  **A.**   I'm sorry.  Are you saying does that already exist?

24  **Q.**   I'm saying other stores, other distributors, could offer

25  curated app stores just like the curated experience that you

1  suggested in Project Cake; correct?

2  **A.**   Oh, theoretically, yes.

3  **Q.**   And, in fact, other stores could offer stores with far

4  fewer than 50,000 apps, and they could be even more thoroughly

5  vetted than what you've suggested under Project Cake; correct?

6  **A.**   There could be less than 50,000, yes.

7  **Q.**   And Project Cake never launched; correct?

8  **A.**   Not in the exact concept that I proposed.

9  **Q.**   There is no highly curated, highly vetted portion of the

10  Google Play Store currently open to the general public;

11  correct?

12  **A.**   Incorrect.

13  **Q.**   Sir, Project Cake did not launch; right?

14  **A.**   That is -- my proposal has not launched in that form, but

15  there are other curated spaces.

16  **Q.**   And a highly curated app store created by -- for Android

17  by someone other than Google, could be safer and higher quality

18  than the Google Play Store currently is; correct?

19  **A.**   I think the Apple App Store is an example of a probably

20  slightly more curated store.

21  **Q.**   And there could be such a store on Android; correct?

22  **A.**   That seems possible, yes.

23  **Q.**   For example, if a Game Store with about 3,000 games

24  launched on Android, that could be much more thoroughly vetted

25  than anything that's done on the Play Store for 5 million or

KLEIDERMACHER - DIRECT / EVEN

1   4 million apps; correct?

2   **A.**   In theory, that could be possible.

3   **Q.**   Now, there are several ways for users to install apps on

4   their Android devices; correct?

5   **A.**   Correct.

6   **Q.**   And one way a user can install an app is by downloading it

7   from the Google Play Store?

8   **A.**   Yes.

9   **Q.**   And another one is the user can do it from the web;

10  correct?

11  **A.**   Yes.

12  **Q.**   Now, if a user downloads from the app store, they have no

13  security warnings; correct?

14  **A.**   I guess that's correct.

15  **Q.**   And if a user tries to download an app from the website,

16  from the web, the user would get a warning that the app he or

17  she is trying to install is from what's known as an unknown

18  source; correct?

19  **A.**   The user has to confirm the unknown source first.

20  **Q.**   So they will get a warning that this is an app that's

21  coming from an unknown source, and you need to go and change

22  the settings; correct?

23  **A.**   The user has to confirm the unknown source, correct.

24  **Q.**   And after user enables downloading from unknown source in

25  their phone settings, the user is still going to meet several

**KLEIDERMACHER - DIRECT / EVEN**

1  other warnings before he or she can download and install the

2  app from the web; correct?

3  **A.**   I'm not sure what warnings you're referring to.

4  **Q.**   Sir, after you enable downloading from unknown sources,

5  the user is still going to meet several other warnings before

6  they can download and install the app from the web; correct?

7  **A.**   The user will have to perform some other consents.

8  **Q.**   That's a yes, sir?

9  **A.**   That's a yes to the consents, yes.

10 **Q.**   And you agree that the more difficult a user interface is

11 to navigate, the more likely the user is to cancel out of

12 the -- of the flow; correct?

13 **A.**   I think there can be negative friction that would cause a

14 user to cancel out, yes.

15 **Q.**   Now, at the time of your deposition, you were not familiar

16 with the detailed user interface for the unknown sources

17 install flow; correct?

18 **A.**   Maybe not all the details.

19 **Q.**   Sir, you were not familiar with the detailed user

20 interface of unknown sources; correct?

21 **A.**   I'm generally familiar with it, but not all the -- maybe

22 not all the specific details of every UI, every user interface.

23        **MR. EVEN:**   Your Honor, if I may turn to page 130,

24 line 6 through 14.

25        **THE COURT:**   130?

1           **MR. EVEN:**  130, lines 6 to 14.

2                       (Pause in proceedings.)

3           **THE COURT:**  No.

4    BY MR. EVEN:

5    **Q.**   At the time of your deposition you were aware of only two

6    warnings that a user sees before directly downloading something

7    from the web:  One that he or she needs to go into the settings

8    and change the settings, and then another warning where the

9    user needs to confirm the download; correct?

10   **A.**   Are we talking about just downloading an app --

11   sideloading an app from the Internet?

12   **Q.**   Downloading from the web any kind of app, you were aware,

13   at the time of your deposition, of two warnings; right?

14   **A.**   There would be the approval of the unknown source and then

15   the operating system would also ask for a confirmation to

16   install.

17   **Q.**   Those were the only two you knew about, right, at the

18   time?

19   **A.**   I don't recall what I testified at -- what my deposition

20   was at the time.

21   **Q.**   Okay.  At the time of your deposition you did not recall

22   any other specific warnings other than those two; correct?

23   **A.**   Do you mean operating system consents?

24   **Q.**   I mean, other than these warnings, you were not aware of

25   any others other than one that the user needs to go into the

1   setting and change the setting and then another warning where

2   the user needs to confirm the download?

3   **A.**   So you're asking me if I remember what I said back then or

4   are you asking me what I know now?  I'm confused.

5   **Q.**   I'm asking whether at the time you did not recall any

6   other warnings.

7   **A.**   I don't remember what I said at the time.

8                         (Pause in proceedings.)

9            **MR. EVEN:**  Your Honor, 130:18 to 131 at 11.

10                        (Pause in proceedings.)

11           **THE COURT:**  That's fine.

12           **MR. EVEN:**  Can we put that up, please?

13  **BY MR. EVEN:**

14  **Q.**   Sir, at your deposition were you asked these questions and

15  gave these answers under oath?  (as read):

16       **"QUESTION:**  So you're aware of at least two warnings:  One

17       that the user needs to go into the settings and change the

18       settings, and then another warning where the user needs to

19       confirm the download?

20       **"ANSWER:**  Yes.

21       **"QUESTION:**  And there may be multiple other warnings, and

22       your testimony is you just don't know about them?"

23       And you said (as read):

24          "I know browsers will often ask before a file is

25       downloaded for a -- they may warn the user before the file

1          itself is actually downloaded to the machine.  I'm aware

2          of that as a common warning that browsers do.  I can't

3          recall any other specific warnings right now."

4          Was that your testimony at the time?

5     **A.**    It appears to be, yes.

6     **Q.**    Now, given that you don't -- you did not clearly recall

7     the user interface of direct downloading and the installation

8     warnings, I take it you did not design the user interface for

9     direct downloading; correct?

10    **A.**    I did not design the user interface.

11    **Q.**    And if the jury saw evidence of install flows that

12    involved 17 steps or 14 steps, those additional steps were not

13    added to that user interface or install flow by you as the head

14    of security on Android; correct?

15    **A.**    I did not implement any flows.

16    **Q.**    Google has something called reputation scores for

17    developers that publish on the Google Play Store; correct?

18    **A.**    We have risk measurements for developers, correct.

19    **Q.**    And Google has a reputation score or a risk measurement

20    for somebody like Adobe, for instance?

21    **A.**    If they are published on the store, then we would have

22    some measurement.

23    **Q.**    And Adobe is published on the store; correct?

24    **A.**    I actually don't know, but it sounds like they would be.

25    **Q.**    Okay.  And Microsoft is on the store; correct?

1   **A.**   Microsoft is, yes.

2   **Q.**   So you would have a reputation score for Microsoft?

3   **A.**   We would have some risk measurements for that.

4   **Q.**   And Google never identified any Adobe apps as potentially

5   harmful; correct?

6   **A.**   I don't know.

7   **Q.**   Well, you don't recall sitting here today any instances

8   where Google identified any apps from Adobe as potentially

9   harmful; correct?

10   **A.**   From Adobe, no, I don't recall any.

11   **Q.**   And -- strike that.

12       If a user -- a user would not be able to download anything

13   from microsoft.com or adobe.com without confronting security

14   warnings and enabling downloading from unknown sources;

15   correct?

16   **A.**   To download an app, it would go through the flow that we

17   just discussed.

18   **Q.**   Now, when that warning comes up and says that this is an

19   unknown source, Google does know who Adobe and Microsoft are;

20   correct?

21   **A.**   The warning is an operating system warning.

22   **Q.**   I understand that.  And that operating system warning is

23   telling the user that what they're trying to do is download

24   something from an unknown source.

25       And my question to you is:  Google does know who Microsoft

1    and Adobe are; correct?

2    **A.**    Does -- when you say "Google," I'm not sure what you mean.

3    Like --

4    **Q.**    You know who Microsoft and Adobe are?

5    **A.**    I personally know who Microsoft is.

6    **Q.**    And you know who Adobe is; correct?

7    **A.**    I know who Adobe is.

8    **Q.**    Now, Google never built a system that would assess the

9    security of adobe.com, for instance; correct?

10   **A.**    We have not built such a system.

11   **Q.**    And Google chose not to use its existing risk factors or

12   reputation score in any way to inform the risk assessment of a

13   download from adobe.com; correct?

14   **A.**    Correct.

15   **Q.**    Instead, Google chose to design Android to identify any

16   download from the web as coming from an unknown source without

17   any particularized assessment of risk for that particular

18   download; correct?

19   **A.**    There are exceptions but, generally speaking, the

20   operating system views Internet downloads as coming from an

21   unknown source.

22   **Q.**    Now, because of the game of Whack-A-Mole that we discussed

23   on the Google Play Store, the Google Play Store does, in fact,

24   have malicious apps on it at all times; right?

25   **A.**    Yes.

**KLEIDERMACHER - DIRECT / EVEN**

1   **Q.**   In fact, you once called the Google Play Store -- you

2   mentioned that it's viewed as a Dumpster fire of abuse and

3   malware; correct?

4   **A.**   I've used that hyperbole at one point.

5   **Q.**   Okay.  So I want to take a quick look at a demonstrative

6   we put together, and that's Demonstrative Trial Exhibit 10.  I

7   think you'll find it at the end of your binder, but you can

8   look at it on the screen.

9        So I want to take a look at this slide.  On the left we

10   have "S-ON Sexual Therapy by Sona Grid," which has 2.4 stars

11   and 5,000-plus downloads.  That's something that's available on

12   the Play Store now.  We captured this yesterday.  Okay?

13   **A.**   Okay.

14   **Q.**   And on the right we have the Adobe Acrobat Reader from

15   Adobe that has 4.6 stars and more than 500 million downloads;

16   correct?

17   **A.**   That's what appears on the screen.

18   **Q.**   Now, let's look at some of the reviews on S-ON, and you

19   see that people give it one star and say it's garbage, promise

20   to help you and then tell you to pay without helping,

21   et cetera.  Do you see that?

22   **A.**   I see it.

23   **Q.**   And yet a user would not get any warning screen when the

24   user downloads S-ON from the Play Store; correct?

25   **A.**   There would be no consent for the source.

1  **Q.**   And if Adobe Acrobat were available from adobe.com, the

2  users would have to march through the entire unknown sources

3  install flow to download that app; correct?

4  **A.**   Unless they've already enabled unknown sources.

5  **Q.**   In which case they will flip the system change, but they

6  will still go through several warnings; correct?

7  **A.**   If they already enabled unknown sources, then they would

8  just have to install the app.

9  **Q.**   Sir, we'll look at that later and see whether there are

10  warnings or not.

11      Assuming this is an initial install, they will have to go

12  through the entire unknown sources flow; correct?

13  **A.**   By initial install, you mean?

14  **Q.**   The first time they're installing something from the web.

15  **A.**   They'd have to authorize the install first.

16  **Q.**   And so Android is designed to signal to the user that

17  downloading S-ON from the Google Play Store is safer, maybe far

18  safer, than downloading Adobe Acrobat from adobe.com; correct?

19  **A.**   The operating system is designed to treat preloaded app

20  sources differently from non-preloaded app sources.  That's

21  just how it was designed.

22  **Q.**   The system is designed to send a message to users that

23  downloading S-ON from the Play Store is perfectly safe whether

24  down -- whereas, downloading Adobe Acrobat from adobe.com is

25  coming from an unknown source and is dangerous to their phone;

1  correct?

2  **A.**   There is a user consent in one case and there's not in the

3  other case.

4  **Q.**   And the one case where there is no user consent is S-ON

5  from the store, and where there is user consent with warning

6  signs is Adobe Acrobat from adobe.com; correct?

7  **A.**   You'd have to have the -- you'd have to authorize the

8  browser to install first.

9  **Q.**   Now, you believe, don't you, that downloading an app from

10  the developer's own website is actually the best option -- we

11  can put that down -- is actually the best option from the

12  perspective of authenticity and developer control; correct?

13  **A.**   I wouldn't necessarily agree with that.

14          **MR. EVEN:**   Your Honor, if we can, page 394.  I believe

15  that's Tab B.

16          **THE COURT:**   Which lines?

17          **MR. EVEN:**   Lines 19 to 25.

18                  (Pause in proceedings.)

19          **THE COURT:**   Okay.

20  BY MR. EVEN:

21  **Q.**   This says (as read):

22          "**QUESTION:**   And five minutes later you chimed in again and

23          said that's why placing the Canonical app on your website

24          is actually the best from the perspective of authenticity

25          and developer control; correct?"

1        "ANSWER:   I see the words there, yes."

2    A.   I see the words.

3    Q.   Those words are words that you wrote, correct, at the

4    time?

5    A.   I wrote those words.

6    Q.   Now, one of the reasons that you thought that it's better

7    to put something on the -- to put the Canonical app on the

8    website is that you thought that the Google Play Store actually

9    is not very good at keeping knockoffs out of the Google Play

10   Store; correct?

11   A.   So the -- having things on a separate website, it doesn't

12   mean it's necessarily authentic, so...

13   Q.   Sir, that's not what I asked at all.

14        One of the reasons you thought that putting something on

15   the website is the best option for the developer in terms of

16   authenticity and control is that the Google Play Store is not

17   particularly good at keeping knockoffs off the store; correct?

18   A.   Putting it on the website doesn't mean it's instantly

19   better for authenticity.

20   Q.   Sir, it's a yes-or-no question.

21        You believe that the Google Play Store is not very good at

22   keeping out knockoffs; correct?

23   A.   No.  I believe it's pretty good.

24   Q.   If you can turn to Exhibit 768 in your binder.

25        Do you see that this is a series of Chat messages between

1   yourself and Mr. Eugene Liderman?

2   **A.**   Yes.

3          **MR. EVEN:**   Your Honor, I'd like to admit this into

4   evidence at this point.

5          **MR. OLASA:**   No objection, Your Honor.

6          **THE COURT:**   It's admitted.

7       (Trial Exhibit 768 received in evidence.)

8   **BY MR. EVEN:**

9   **Q.**   If you go to page 2, Mr. Kleidermacher, there's a message

10  at 6:52:14, and you see that it says (as read):

11          "The only problem left in my mind on the app store

12      thing is the reality that we're not particularly good at

13      keeping knockoffs off the store."

14      Do you see that?

15  **A.**   I do.

16  **Q.**   And you said that at the time?

17  **A.**   At the time, yes, in 2020.

18  **Q.**   Correct.   This is one month after this litigation began;

19  correct?

20  **A.**   Yes.

21  **Q.**   So now that there's litigation, you changed your mind?   Is

22  that your testimony?

23  **A.**   Well, we've gotten better -- much better at it over time.

24  **Q.**   Knockoff apps are inherently more dangerous than original

25  apps; correct?

**A.**   A knockoff app would be inherently more dangerous than an original app.

**Q.**   Now, on a PC, Google does not offer the Chrome browser in the Microsoft Windows store; correct?

**A.**   I don't know.

**Q.**   Do you know that on the Mac, Google does not offer the Chrome browser in the Mac store?

**A.**   I do not know.

**Q.**   Do you know that on both PC and Mac Google offers the Chrome browser for download directly from Google's website?

**A.**   Sorry.  I'm not familiar.

**Q.**   If that's true, we'd have to assume that Google views this as safe; right?

**A.**   I actually don't know what you're talking about.

**Q.**   You don't know what the Chrome browser is?

**A.**   No, I'm not familiar with the Chrome browser on these other platforms.

**Q.**   If you can take a look at Exhibit 8591.

    Do you recognize this as the online instructions by Google to users as to how to install the Chrome browser on a Microsoft Windows computer?

**A.**   I'd have to take your word for it.  I don't -- I'm not familiar with this document.

**Q.**   Do you see that that is what the document is; right?

**A.**   It says "Computer" -- it says "Download from a computer."

1    So I guess that means Windows.  I don't really know what that

2    means.

3    **Q.**    Okay.

4    **A.**    Oh, I see it mentions Windows later on.  That makes sense.

5              **MR. EVEN:**  Your Honor, I'd like to admit Exhibit 8591.

6              **MR. OLASA:**  Objection, Your Honor.  Foundation.

7              **THE COURT:**  What are you going to ask him about it?

8              **MR. EVEN:**  I just want to show what the flow looks

9    like, Your Honor.

10             **THE COURT:**  That's fine.  Go ahead.

11             **MR. EVEN:**  Thank you.

12             **THE COURT:**  Make it quick, though.  Okay?

13             **MR. EVEN:**  Very quick, Your Honor.

14   **BY MR. EVEN:**

15   **Q.**    Sir, if you go into -- under Windows, do you see that this

16   says to download the installation file?  Do you see that?

17   **A.**    Yes, I see that.

18   **Q.**    And if prompted, click run or save, and then you get one

19   question:  Do you want to allow this app to make changes to

20   your device?  Google tells users to click yes.  Do you see

21   that?

22   **A.**    Yes.

23   **Q.**    And then it essentially says "Start Chrome"; correct?

24   **A.**    "Start Chrome," I see that, yes.

25   **Q.**    And you understand that Google suggests from this flow

**KLEIDERMACHER - DIRECT / EVEN**

1  that there are no changes to the operating system that are

2  necessary and no warning signs; correct?

3  **A.**   I'm not sure what you're getting at.

4  **Q.**   Sir, I'm getting at a very simple point.  There are no

5  changes -- in this flow that's given by Google to its users on

6  Windows, there are no warning signs that a user needs to click

7  through and no changes to the operating system; correct?

8  **A.**   Based on the explanation on the page.  I mean, I can take

9  the --

10  **Q.**   This is Google's explanation on the page; yes?

11  **A.**   On how to install on a Windows machine.

12  **Q.**   You see that in this explanation, that is what Google

13  tells its users?

14  **A.**   I see a bunch of steps that you'd have to follow to

15  install Chrome on a Windows machine.

16  **Q.**   And none of them include any warning signs or changes to

17  the operating system settings; correct?

18  **A.**   Change to settings?

19  **Q.**   Correct.

20  **A.**   I do not see changes to settings.  I just see a consent.

21  **Q.**   Let's talk a little bit about -- you can close out of

22  this.

23         Let's talk a little bit about app review.

24         Any app that would be distributed to consumers through

25  Google Play Store goes through an automated analysis review;

1  correct?

2  A.  Yes.

3  Q.  And tens of thousands of apps go through that review every

4  day?

5  A.  Yes.

6  Q.  And at least as of the time of your deposition, a high

7  percentage of apps are subject only to the automated review

8  process; correct?

9  A.  Reasonably high percentage, yes.

10  Q.  Has that changed since then?

11  A.  I don't know what the numbers are.

12  Q.  Okay.  But a high percentage goes through automated review

13  and then gets on the store; correct?

14  A.  If it's -- if it's not flagged for some risk, yes.

15  Q.  And a small minority of apps that go through the automated

16  review process are flagged and are sent for further human

17  review; correct?

18  A.  I believe it's roughly 25 percent, but something like

19  that.

20  Q.  25 percent.  So is 25/75?

21  A.  Roughly, yeah.

22  Q.  Yeah.

23      Now, Google digitally signs apps that have passed its

24  review process; correct?

25  A.  It by default does that.  It hasn't always done that, but

1   nowadays it does that.

2   **Q.**   And a digital signature by Google means that it's

3   essentially an encrypted piece of code that is used to verify

4   the provenance and authenticity of an app when it's installed;

5   correct?

6   **A.**   It is not -- it's not about encryption.  It's more about

7   digitally signing the app --

8   **Q.**   Okay.

9   **A.**   -- for authenticity.

10   **Q.**   For authenticity and provenance; correct?

11   **A.**   Correct.

12   **Q.**   And by provenance and authenticity, what that really means

13   is that the signature confirms that the app has not been

14   altered in any way after the review was completed; correct?

15   **A.**   It authenticates that the app came from Google and hasn't

16   been tampered with.

17   **Q.**   I think we're saying the same thing.

18       Now, Google currently sends its reviewed apps and signed

19   apps only to the Google Play Store for distribution; correct?

20   **A.**   Can you please repeat that?

21   **Q.**   When the review process ends, Google takes the signed

22   package and sends it to the store for distribution; correct?

23   **A.**   Correct.

24   **Q.**   Google could send a signed app back to the developer if it

25   wanted to; correct?

1   **A.**   Send it back...   That may happen in some cases.   I don't

2   know.

3   **Q.**   But there's no technical impediment for Google taking a

4   signed review packet and sending it back to the developer;

5   correct?

6   **A.**   If it's a single package, then it seems plausible.

7   **Q.**   And if Google did that, the developer could then

8   distribute that fully reviewed Google-signed app from a

9   location other than the Google Play Store; correct?

10  **A.**   Yes.

11  **Q.**   Do you know that Apple, in fact, has a similar mechanism

12  called notarization on Mac computers?

13  **A.**   At a high level, I'm familiar with that.

14  **Q.**   And what happens in notarization in Apple, the developer

15  sends the app to Apple, Apple scans it, signs it, sends it back

16  to the developer; correct?

17  **A.**   I don't know about the scanning part; but, yes, I believe

18  it is signed by Apple.

19  **Q.**   The developer then distributes the app wherever they want

20  on Mac; correct?

21  **A.**   I believe that's how it works.

22  **Q.**   Now, Google is not the only company in the world that

23  knows how to review apps; correct?

24  **A.**   No.

25  **Q.**   No, it's not correct or, no, it's not the only company?

**KLEIDERMACHER - DIRECT / EVEN**

**A.**   No -- sorry.  No, we're not the only entity in the world that knows how to do the review apps.

**Q.**   So, for example, the App Defense Alliance has introduced something called a Mobile Application Security Assessment; correct?

**A.**   That is correct.

**Q.**   And Google recently has introduced a new independent security review badge on the Play Store for certain apps that undertake independent voluntary security review with the App Defense Alliance; correct?

**A.**   Yes.

**Q.**   And I take it that Google believes that the App Defense Alliance knows what it's doing?

**A.**   It knows what it's doing about that particular security standard, yes.

**Q.**   And Google could also identify other third-party review firms that it trusts to conduct an independent security review; correct?

**A.**   Yes.

**Q.**   And those third -- trusted third parties could review and sign apps available for direct downloading; correct?

**A.**   They could review and sign apps.

**Q.**   They can review -- take apps from developers, review them, sign them so that people will know that they're authentic and their provenance have not been tampered with, as you said, and

KLEIDERMACHER - DIRECT / EVEN

1   then those apps could be directly downloaded or sold or

2   distributed through another store; correct?

3   A.   That seems possible.

4   Q.   Now, in addition to your review process, Google has

5   already -- has also invested a lot of resources making it more

6   difficult to -- more difficult to exploit the Android operating

7   system itself; correct?

8   A.   Yes.

9   Q.   And Google has also invested in mechanisms that identify

10  malware on Android devices regardless of their source; correct?

11  A.   We do invest some resources there.

12  Q.   And one such mechanism is what's called Google Play

13  Protect; correct?

14  A.   Google Play Protect is technology that's used for both the

15  Google Play Store and for other sources.

16  Q.   And so it checks for malware regardless of the source,

17  both from the Play Store and from other sources and on the

18  device; correct?

19  A.   They're different reviews, but it does check.

20  Q.   And Google Play Protect is a technology that's preloaded

21  on all Android devices; correct?

22  A.   No.

23  Q.   It's preloaded on all Android devices that have the Google

24  services; correct?

25  A.   Yes.

1    Q.    And currently Google Play Protect is the primary way that

2    Google identifies malware on Android devices; correct?

3    A.    Yes.

4    Q.    And Google Play Protect identifies malware on Android

5    devices with a malware scanning functionality; correct?

6    A.    We do malware review.  It's a review program.  It contains

7    many pieces, yes.

8    Q.    Now, historically, Google Play Protect checked every app

9    at installation regardless where it came from by comparing it

10   to a block list of millions of apps that are known to be

11   malicious or suspicious based on Google's experience; correct?

12   A.    That is one thing that Google Play Protect does, yes.

13   Q.    Today Google Play Protect also uses realtime scanning at

14   the code level to identify novel malicious apps; correct?

15   A.    That is another technology that Google Play uses.

16   Q.    And there are others as well on top of this; right?

17   A.    There are others, yes.

18   Q.    And all these processes keep evolving and getting better

19   because Google Play Protect scans 125 billion apps daily or

20   thereabouts; correct?

21   A.    The general technology is improving every day.

22   Q.    Google Play Protect can also use the block list to

23   whitelist certain apps as safe; correct?

24   A.    Google Play Protect -- are you talking about for non-Play,

25   for sideloaded apps.

KLEIDERMACHER - DIRECT / EVEN

1  Q.    I'm talking for anything.  Google Play Protects has the

2  capability for Google to come and say "Here is the signature of

3  a specific APK.  You must treat this one as safe going on --

4  going forward"; correct?

5  A.    I think that is theoretically possible to do.

6  Q.    In fact, Google asked Epic at some point to provide the

7  information necessary for its security team to be able to

8  identify the authentic version of the Fortnite app from

9  fortnite.com; correct?

10  A.    Can you please repeat that?

11  Q.    Google asked Epic to provide the information necessary for

12  its security team to be able to identify the authentic version

13  of Fortnite that was downloaded from fortnite.com?

14  A.    You're saying did we ask -- did Google ask Epic to provide

15  the unique fingerprint of the app?

16  Q.    Correct.

17  A.    That seems like something that could have happened.  I

18  don't recall.

19  Q.    So take a look at 1172 in your binder.

20  A.    Did you say 1172?

21  Q.    Correct.

22  A.    (Witness examines document.)  Okay.

23  Q.    And do you see that this is a series of e-mails, and you

24  are on the top one dated August 2018?

25  A.    Yes.

1    **MR. EVEN:**  Your Honor, I move to admit Exhibit 1172.

2    **MR. OLASA:**  No objection, Your Honor.

3    **THE COURT:**  It's admitted.

4    (Trial Exhibit 1172 received in evidence.)

5    **BY MR. EVEN:**

6    **Q.**  If you go to page 4, it's 2:48, there's an e-mail from

7    Mr. Porst.  Do you see that?

8    **A.**  Yes.

9    **Q.**  And do you see that Mr. Porst is saying (as read):

10         "I would appreciate it if we could whitelist the

11         official Fortnite before launch.  I don't want to get in a

12         situation where any of the automated scores or any human

13         review flags Fortnite accidentally"?

14    Do you see that?

15    **A.**  Yes.

16    **Q.**  And so does that refresh your recollection that, in fact,

17    this whitelisting is something that can be done, and apparently

18    your team has done in the past, for apps that come outside of

19    Play?

20    **A.**  This whitelist is referring to specifically ensuring that

21    Google Play Protect wouldn't warn the app for being malicious.

22    **Q.**  Correct.

23         All right.  And so Google can decide that a certain app is

24    safe and whitelist it in Google Play Protect so Google Play

25    Protect won't flag it as malware by mistake; correct?

1   **A.**   Yes.

2   **Q.**   And when Google does that with that information, Google

3   still does not exempt that app from going -- needing to go

4   through unknown sources for the installation; correct?

5   **A.**   Correct.  This was done just to avoid a mistake during the

6   launch.

7   **Q.**   All right.  Let's talk a little bit about the Epic launch.

8   Okay?

9        In 2018 after Epic announced it would launch Fortnite on

10  Android but not on the Google Play Store, Google formed what

11  was known as the Fortnite Task Force; correct?

12  **A.**   Yes.

13  **Q.**   And the task force was formed before the launch; correct?

14  **A.**   Yes.

15  **Q.**   And the task -- the purpose of the task force was to track

16  badness related to Fortnite; correct?

17  **A.**   Correct.

18  **Q.**   If you go to Exhibit 761 in the binder.  This one was

19  previously admitted.

20       If we go to page 3, you see there's an e-mail there from

21  Mr. Samat at 8:50?

22  **A.**   Yes.

23  **Q.**   You can also see it on the screen if that's more

24  convenient, Mr. Kleidermacher.

25       And Mr. Samat writes (as read):

**KLEIDERMACHER - DIRECT / EVEN**

1          "Main point, something is wrong.  The Epic installer

2      never asked me to turn on unknown sources."

3      Right?

4  **A.**   Yes, I see that.

5  **Q.**   Now, still on page 3 at 9:00 a.m., you respond to

6  Mr. Samat.  Do you see that?

7  **A.**   (Witness examines document.)

8  **Q.**   Again, it's on your screen.

9  **A.**   Just above, yes, I see it.

10  **Q.**   And you say (as read):

11          "Samsung store has install apps permission, so

12      perhaps the Epic installer is leveraging that (e.g., via

13      Samsung API) versus doing a direct install on its own."

14      Did I read that correctly?

15  **A.**   Yes.

16  **Q.**   And that was right; right?  You saw this, understood it,

17  and a day later the rest of the team understood that's exactly

18  what the launcher was doing; correct?

19  **A.**   Yes.

20  **Q.**   And then you say (as read):

21          "That would be a clever way for them to avoid the

22      unknown sources friction entirely."

23      Correct?

24  **A.**   Yes.

25  **Q.**   In your e-mail you did not express any concern about this

1  usage of the installer; correct?

2  **A.**   I had concerns, but not in this e-mail.

3  **Q.**   In this e-mail there's no concern that you --

4  **A.**   In this particular e-mail, there is no concern.  Oh, there

5  is a concern.  I guess "Adding GPP leads to investigate" I

6  guess expresses some level of concern.

7  **Q.**   That's not saying that you know of a security issue;

8  correct?

9  **A.**   Could you please repeat that?

10  **Q.**   You did not tell anyone that you think there is a security

11  issue; correct?

12  **A.**   I don't really know what I was thinking when I asked them

13  to investigate.  Usually when I ask them to investigate, it's

14  for some concern, a safety concern, the Google Play Protect

15  team.

16  **Q.**   You did not have a specific concern at least?

17  **A.**   Yeah, I don't know what I was thinking at that point.

18  **Q.**   Okay.  Now, following this, the launcher and the APK for

19  Fortnite went to the task force, and security members of the

20  task force took a deep dive into the installer; correct?

21  **A.**   There was a review performed on the installer, yes.

22  **Q.**   And on August 13, if you go to page 2, you see that

23  8:03 a.m. Mr. Cunningham is reporting (as read):

24          "Took a deep dive on Friday and discovered a

25      vulnerability in the Fortnite installer."

KLEIDERMACHER - DIRECT / EVEN

1          Do you see that?

2    A.    Yes.

3    Q.    Now, do you see that this is a Monday e-mail; correct?

4    A.    Yes.

5    Q.    And so Mr. Cunningham reports that he found the

6    vulnerability three days earlier; correct?

7    A.    Three days later.

8    Q.    Three days earlier.  He says "On Friday" -- "I took a deep

9    dive on Friday" --

10   A.    Oh, I see what you're saying.  Yes.  You're comparing to

11   Friday, okay.

12   Q.    I take it Mr. Cunningham did not think this security

13   vulnerability was super urgent that it warranted weekend

14   alerts?

15   A.    I recall all of us being very concerned about it.

16   Q.    He waited three days; correct?

17   A.    He started on Friday.  I don't -- I can't tell from what's

18   written here how long he spent on it.

19   Q.    He said, "I took a deep dive -- deeper look on Friday and

20   discovered"; correct?

21   A.    That's what it says on the page.

22   Q.    After reporting that he discovered the vulnerability,

23   Mr. Cunningham goes onto say (as read):

24          "A Project Zero style external bug would be the most

25       fun," exclamation point.

KLEIDERMACHER - DIRECT / EVEN

1      Correct?

2  **A.**   I see that.

3  **Q.**   Project Zero is a team of security researchers at Google

4  who perform vulnerability research on popular software?

5  **A.**   Yes.

6  **Q.**   And they're completely separate from your team; correct?

7  **A.**   Correct.

8  **Q.**   About 20 minutes later Mr. Tian Lim responds

9  congratulating Mr. Cunningham for really good work.  Do you see

10  that?

11  **A.**   Yes.

12  **Q.**   And another 20 minutes after that on page 1, Mr. Rosenberg

13  chimes in and says "Lots of pieces to coordinate."  Do you see?

14  Do you see that?

15  **A.**   Yes, I see that.

16  **Q.**   And the first piece that Mr. Rosenberg says needs to be

17  coordinated is PR; correct?

18  **A.**   Are you talking about the parenthetical that says "PR

19  partners, Epic, et cetera"?

20  **Q.**   Yes.

21  **A.**   I see that.

22  **Q.**   And PR is public relations; correct?

23  **A.**   Correct.

24  **Q.**   Not security?

25  **A.**   Public relations.

```
 1   Q.   Mr. Wallows then responds and says (as read):

 2             "We are tracking a newly formed WG around Fortnite

 3        here."

 4        Do you see that?

 5   A.   Yes.

 6   Q.   "WG" means working group?

 7   A.   Yes.

 8   Q.   And where he writes "here" and we see an underline, that's

 9   a link to a Google doc or something like that; correct?

10   A.   Presumably.

11   Q.   So turn to Exhibit 122 in your binder.

12   A.   Okay.

13   Q.   This is a document from your files titled "Fortnite Task

14   Force," and it's essentially a rolling notes from those

15   meetings?

16   A.   Yes.

17             MR. EVEN:  Your Honor, I'd like to admit 122 at this

18   point.

19             MR. OLASA:  No objection, Your Honor.

20             THE COURT:  It's admitted.

21             MR. EVEN:  Thank you, Your Honor.

22   BY MR. EVEN:

23   Q.   And you attended multiple of the meetings that are on this

24   document; correct?

25   A.   I believe I did, yes.
```

**KLEIDERMACHER - DIRECT / EVEN**

1  **Q.**   If you turn to page 16, you see in the middle of the page

2  there's a list of attendees at a meeting of the Fortnite Task

3  Force?

4  **A.**   Yes.

5  **Q.**   And so you were in attendance along with Jamie Rosenberg

6  Mr. Sameer Samat, Purnima Kochikar, Mr. Cunningham, and others;

7  correct?

8  **A.**   Correct.

9  **Q.**   Some of the others are Tristan Ostrowski; right?

10 **A.**   Yes.

11 **Q.**   And he's a lawyer for Play; correct?

12 **A.**   He's a lawyer for our general area, yes.

13 **Q.**   Okay.  And Lydia Ash was there; correct?

14 **A.**   Yes.

15 **Q.**   And Lydia Ash, I understand, is a staffer in Mr. Pichai's

16 office; correct?

17 **A.**   No.

18 **Q.**   What is your understanding of Ms. Ash's --

19 **A.**   Lydia is the chief of staff for Sameer.

20 **Q.**   For Sameer.  Okay.  And Sameer you mean Mr. Samat?

21 **A.**   Mr. Samat.

22 **Q.**   Okay.  And Colin Smith was there?

23 **A.**   Correct.

24 **Q.**   And he is in public relations again; correct?

25 **A.**   Public relations, yes.

1   Q.   The third bullet under "Raw Meeting Notes" states (as
2   read):
3          "Need to get the word out on PR side, even as we're
4       working to fix it."
5       Do you see that?
6   A.   Yeah, I see that.
7   Q.   And "fix it," that's a reference to the vulnerability;
8   correct?
9   A.   I believe so.
10  Q.   You see in the first bullet point it says (as read):
11         "Fortnite's distribution strategy has created a
12      vulnerability."
13      Do you see that?
14  A.   Yes.
15  Q.   And you understand that the need to get the word out on
16  the PR side, that's a reference to the word out on the
17  vulnerability; correct?
18  A.   That is logical, yes.
19  Q.   The eighth bullet point says (as read):
20         "It's not hard for Epic to fix this issue.  They
21      should have it fixed within 90 days."
22      Do you see that?
23  A.   I see it.
24  Q.   And 90 days are referred to because it is industry
25  standard to wait 90 days before publicly disclosing a

1   vulnerability; correct?

2   **A.**   No, that's not correct.

3   **Q.**   90 days' disclosure deadline is not the standard?

4   **A.**   90 days is the deadline for fixing the bug, for fixing the

5   vulnerability.

6   **Q.**   You don't think that 90 days is the industry standard for

7   disclosure?

8   **A.**   It is typically used as a deadline to encourage developers

9   to fix the bug within 90 days.

10   **Q.**   So you give them 90 days to fix it and then you disclose;

11   correct?

12   **A.**   The disclosure could happen afterwards.

13   **Q.**   The disclosure could happen more than 90 days after?

14   **A.**   No.  It can happen also sooner.

15   **Q.**   If you go --

16        **MR. EVEN:**  Your Honor, if I may, at page 344, line 24,

17   to 345 at 8.

18                (Pause in proceedings.)

19        **THE COURT:**  Go ahead.  That's fine.

20   **BY MR. EVEN:**

21   **Q.**   Sir, were you asked and gave these answers in your

22   deposition under oath?  (as read):

23        **"QUESTION:**  You say that public disclosure of the flaw is

24        90 days per industry standard; right?"

25        You say:  "I see that."

1    "QUESTION:  And that was your position as of August 15,

2    2018; correct?

3    "ANSWER:  The 90-day disclosure deadline or time limit is

4    industry standard, yes."

5    Was that your testimony?

6  A.  I see that, yes.

7  Q.  And that speaks to disclosure; correct?  That's what you

8  were saying?

9  A.  Yes, but the 90 days is used for the deadline to fix.

10 Q.  Sir, you testified the 90-day disclosure is industry

11 standard; correct?

12 A.  Many times the fix and disclosure are combined.

13 Q.  Can we put it up again?

14    Did you or did you not -- my question is very simple.  Did

15 you or did you not testify under oath that 90-day disclosure is

16 industry standard?

17    We can put it back up if we need to.

18 A.  I see what it says on the page, yes.

19 Q.  Towards the bottom of this page 16 there's a bullet that

20 starts with "Sameer."  Do you see is that?

21 A.  Sameer -- yes, I see it -- questioned.

22 Q.  Yes.  And this is a reference to Mr. Samat; correct?

23 A.  Yes, it is.

24 Q.  And per these notes, Mr. Samat said (as read):

25        "Question is what we want to do pulling back a bit.

1          Ultimately we want Samsung to stop this kind of stuff

2          enabling the Fortnite installer."

3          Do you see that?

4     A.   I see it.

5     Q.   The bullet continues, and two lines down it says (as

6     read):

7               "We want the world to know that this is not safe to

8          do this.  We need to make it safe and have an aggressive

9          future action for GPP.  We need to lay down a case for the

10         reasons why we have to do this."

11         Do you see that?

12    A.   Yes, I see that.

13    Q.   And then on Samsung he says (as read):

14              "What is the best way to make them feel a tremendous

15         amount of heat?"

16         Correct?

17    A.   Yes.

18    Q.   And the "this" that Mr. Samat is talking about that must

19    be stopped is distribution of apps off-Play; correct?

20    A.   I believe he's referring to the vulnerability, stopping

21    that.

22    Q.   That's your understanding of what he said, sir?

23    A.   It was a dangerous vulnerability, and I know he was

24    worried about the vulnerability.

25    Q.   That's your statement, that when he said, "This is

1  complicated, we want to send a message to the world not to do

2  this," this is about this vulnerability?

3  **A.**   We were very concerned about the vulnerability, yes.

4  **Q.**   And he says again (as read):

5       "We want Samsung to stop this kind of stuff enabling

6       the Fortnite installer..."

7       That's not the vulnerability.  That's stopping Samsung

8  from allowing people to have launchers or apps exclusively on

9  their store; correct?

10 **A.**   The vulnerability was specific to the way they were

11 distributing the app store with that API.

12 **Q.**   If you go to the fourth bullet up on the raw meeting

13 notes, you see that this says (as read):

14      "This is essentially a Man-in-the-Disk vulnerability

15      that we had identified in theory but had not seen an

16      exploit."

17      Right?

18 **A.**   Yes.  I see that.

19 **Q.**   That means you haven't seen anyone exploiting this;

20 correct?

21 **A.**   This particular bug?

22 **Q.**   This particular bug or any bug like it.

23 **A.**   It's very rare for us to see evidence of an exploit.

24 **Q.**   We may talk a little bit about that later.

25      The "putting an incredible amount of heat on Samsung," you

1    understood that that was a desire to send a clear message to

2    Samsung that Google should be the entity handling distribution

3    of apps; correct?

4    **A.**    You're talking about what Sameer said?

5    **Q.**    Yes.

6    **A.**    I don't think I should speculate for Sameer.  I know he

7    was concerned about the vulnerability.

8    **Q.**    You are speculating for Sameer on that, but --

9    **A.**    I know he was concerned about the vulnerability part.

10   **Q.**    All right.  We'll talk a little bit about that later.

11          If you go to page 17, you see this says towards the bottom

12   of the page (as read):

13              "The first to do is Ed, Dave K, we should give them

14          15 days to fix."

15   **A.**    I see that.

16   **Q.**    And 15 days is 75 days less than the industry standard;

17   correct?

18   **A.**    Yes.

19   **Q.**    Now, if you go to page 18, you say on page 18 under point

20   three (as read):

21              "On day 15, regardless of whether Samsung or Fortnite

22          has taken action, a blog post will be published outlining

23          this vulnerability."

24          Do you see that?

25   **A.**    I see it.

1    **Q.**   And so instead of giving 90 days, planning to give 90

2    days, as industry standard and get this fixed, which would be

3    the correct response to a real security concern, what Google

4    said is "On day 15, regardless of what has been done to fix,

5    we're going to publish"; correct?

6    **A.**   That was -- that didn't happen.  I don't know why it was

7    written here.  Like, maybe it was discussed.

8    **Q.**   I agree it didn't happen.  It didn't happen because you

9    thought, as a security measure, that is the wrong approach;

10   correct?

11   **A.**   I don't recall having an opinion on this point.

12   **Q.**   You don't recall that you had a position that public

13   disclosure of the flaw should be 90 days per industry standard?

14   **A.**   So for security vulnerabilities, generally 90 days to fix,

15   but we also have malware fixes that have to be done within

16   15 days.  And I think we were debating quite a bit between

17   whether we view that as a potentially harmful app or a

18   vulnerability.

19   **Q.**   Sir, if you turn to Exhibit 762, page 1.

20        You see this is an e-mail from you to -- between you,

21   William Luh, and others?

22   **A.**   Yes.

23        **MR. EVEN:**  Your Honor, I'd like to admit 762 at this

24   point.

25        **MR. OLASA:**  No objection, Your Honor.

1          **THE COURT:**  It's admitted.

2     (Trial Exhibit 762 received in evidence.)

3  **BY MR. EVEN:**

4  **Q.**   Do you see that there's an e-mail from you that says (as

5  read):

6          "There's a bit of debate remaining on this 15 versus

7     90 day issue"?

8     Do you see that?

9  **A.**   Yes.

10  **Q.**   And you say (as read):

11          "My position is:  Public disclosure of the flaw

12     (e.g., blog details, buganizer) is 90 days per industry

13     standard."

14  **A.**   I see that.

15  **Q.**   So there was a debate, and you said 90 and others said 15;

16  correct?

17  **A.**   You can see there's more debate in that note.

18  **Q.**   I understand.  Your position was 90; correct?

19  **A.**   That's what -- at the time that's what I guess I said,

20  yes.

21  **Q.**   Okay.  You can take that down.

22     Now, you worked with Mr. Cunningham on crafting a message

23  to Epic; correct?

24  **A.**   I don't recall.

25  **Q.**   Well, you recall that Google sent a message to Epic on

1    August 15?

2    **A.**   I know we were communicating with Epic in this time frame,

3    but I don't remember specifically who sent the messages.

4    **Q.**   Okay.  But you remember that what we saw was that one of

5    the points were that you and Mr. Cunningham were supposed to

6    work on a script for Epic; correct?

7    **A.**   Oh, yes, from that previous page we just looked at, yes.

8    **Q.**   Correct.  And if that was the decision, safe to assume

9    that you did work on that; correct?

10   **A.**   I don't recall personally working on it.

11   **Q.**   Let's take a look at 8576.

12       Do you recognize that as the bottom half, as the e-mail

13   that actually went to Epic?

14   **A.**   I see the note that Edward sent to Epic at the bottom.

15   **Q.**   And you would have seen it at the time; right?  This did

16   not go out without you looking at it?

17   **A.**   I actually don't know if I looked at it before it went

18   out.

19   **Q.**   Sir, you were tasked with writing this.  Do you think that

20   this went out to Epic with a script that you and Ed worked on

21   together without Mr. Cunningham -- sorry -- without you looking

22   at it?

23   **A.**   I don't recall looking at it.

24   **Q.**   You see that it has the -- it is August 15; correct?

25   **A.**   Yes.

**KLEIDERMACHER - DIRECT / EVEN**

1  **Q.**   So two more days --

2         **MR. EVEN:**  Well, I would like to admit this into

3  evidence, Your Honor.

4         **MR. OLASA:**  Objection, Your Honor.  Foundation.

5         **THE COURT:**  Why don't you lay a little bit more

6  foundation.

7  **BY MR. EVEN:**

8  **Q.**   Sir, you were involved in these meetings around the task

9  force; correct?

10 **A.**   I was involved in some of the meetings, yes.

11 **Q.**   And you worked with Mr. Cunningham on the security aspects

12 related to the vulnerability; correct?

13 **A.**   Yes.

14 **Q.**   And you and Mr. Cunningham had discussed the 15 versus

15 90 days to be sent to Epic as a timeline for fixing; correct?

16 **A.**   I don't recall speaking to him one on one about it.

17 **Q.**   One on one, generally --

18 **A.**   There was a lot of communication about it in the task

19 force.

20 **Q.**   And you understood that a message has been sent to Epic to

21 alert them; correct?

22 **A.**   I do understand that a message was sent.

23 **Q.**   No, no.  You understood at the time that a message was

24 sent; correct?

25 **A.**   Yeah, I know a message was sent at some point.

KLEIDERMACHER - DIRECT / EVEN

1   Q.   And you would have known at the time, as the head of

2   security, that the message was sent at the time that it was

3   sent; correct?

4   A.   Presumably I would have known in this general time frame,

5   within days I would expect.

6          MR. EVEN:  Your Honor, I would like to admit it at

7   this point, please.

8          MR. OLASA:  No objection, Your Honor.

9          THE COURT:  Okay.  It's admitted.

10   (Trial Exhibit 8576 received in evidence.)

11   BY MR. EVEN:

12   Q.   Now -- so this is August 15; correct?

13   A.   Yes.

14   Q.   And that's when it was sent; correct?

15   A.   Yes.

16   Q.   And in this message you see that you actually prevailed,

17   and had at the bottom it says (as read):

18          "Please note that the bug is subject to a 90-day

19       disclosure deadline."

20       Correct?

21   A.   Yes, I see that.

22   Q.   So your position prevailed, correct, at that point?

23   A.   I guess -- there was a lot of debate about that.  I didn't

24   have a super strong opinion about it on the 90 and 15 days but,

25   sure.

1   Q.   And then it says (as read):

2         "After 90 days elapse or a patch has been made

3         broadly available, the bug report will become visible to

4         the public."

5   A.   I see that.

6   Q.   Now, you recall that Epic -- this took five days to get to

7   Epic.  Epic, unlike Google, took this very seriously and moved

8   very swiftly and fixed the bug within a day?

9   A.   Sorry.  Did you say "unlike Google"?

10  Q.   Correct.  Google took five days we just saw.  Epic fixed

11  it --

12  A.   We took it very seriously.

13  Q.   You took it very seriously.  You took five days to send

14  this to Epic; correct?

15  A.   Google took this vulnerability very seriously.

16  Q.   Google took five days to send notice of the vulnerability

17  to Epic, the party that was actually supposed to fix it;

18  correct?

19  A.   If you say five days, but we took it very seriously.

20  Q.   We saw that Mr. Cunningham found it on the 10th, on the

21  Friday, and it was sent to Epic on the 15th; correct?

22  A.   Okay.

23  Q.   That's five days?

24  A.   We took it very seriously, but sounds like five days.

25         **THE COURT:**  Okay.  Listen to the question, please.

1    It's either yes or no or I don't know.  You're arguing too

2    much.  Okay?  It's a very simple question.

3              **THE WITNESS:**  Okay.

4              **THE COURT:**  So let's start it -- take it from the top,

5    please.

6              **MR. EVEN:**  Thank you, Your Honor.

7    **BY MR. EVEN:**

8    Q.   Google took five days from the time Mr. Cunningham found

9    the vulnerability until it noticed it to Epic; correct?

10   A.   I assume that's correct.

11   Q.   And then Epic --

12             **THE COURT:**  Why are you assuming?

13             **THE WITNESS:**  Because I don't remember the five days.

14             **THE COURT:**  Then just say that, "I don't know."

15             **THE WITNESS:**  Okay.  I don't know if it's five days.

16             **THE COURT:**  The witness doesn't know.  Okay?

17   **BY MR. EVEN:**

18   Q.   You saw that the notice went out on the 15th; correct?

19   A.   I see that.

20   Q.   And Epic then fixed it around the 16th; correct?  Do you

21   recall that?

22   A.   I recall that it was fixed rapidly.

23   Q.   Okay.  And Epic then asked Google to wait the full 90 days

24   before disclosing the vulnerability so users could have a

25   chance to patch their devices; correct?

1   **A.**   I recall that, yes.

2   **Q.**   And as the head of security, your view at the time was

3   that it behooved Google to give Epic some time to distribute

4   the update and push to users so that they can update before the

5   vulnerability becomes public; correct?

6   **A.**   We would want to give time for the patch to be

7   distributed.

8   **Q.**   And your belief at the time was that while Google

9   sometimes disclosed some vulnerabilities in as little as

10   30 days, here Google could wait as long as it needed to strike

11   the right balance in protecting users and avoiding panic;

12   correct?

13   **A.**   We would always want to strike the right balance, correct.

14   **Q.**   And you shared your views on this with the task force;

15   correct?

16   **A.**   We discussed this a lot.

17   **Q.**   That's a, yes, you shared this with the task force?

18   **A.**   We discussed the vulnerability disclosure dates with the

19   task force.

20   **Q.**   Okay.  If you go back to 122.  This time go to page 9.

21       At the bottom of the page contains notes from another

22   meeting of the Fortnite Task Force; correct?

23   **A.**   Okay.

24   **Q.**   And the first bullet meeting note says (as read):

25           "Tristan checked in with Kristen legal counsel.  We

```
 1          give 7 to 14 days to get the message out."
 2          Do you see that?
 3   A.   I see it.
 4   Q.   And Tristan is a lawyer; correct?
 5   A.   Yes.
 6   Q.   And Kristen, based on this parenthetical, is a lawyer?
 7   A.   Yes.
 8   Q.   And then it says (as read):
 9              "We don't wait longer just because."
10   A.   I see that.
11   Q.   Just because it's not a security reason; correct?  It's
12   not a security term of art?
13   A.   It doesn't appear so.
14   Q.   If you go to page 8, this is another summary of another
15   meeting.  This time Ms. Shannon Newberry was added to the
16   attendees.  Do you see her name up there?
17   A.   I do.
18   Q.   And Ms. Newberry is a communications PR person; correct?
19   A.   I believe so.
20   Q.   And at that meeting Google decided to make Fortnite's
21   vulnerability public early on August 24; correct?
22   A.   I see that, yes.
23   Q.   And so August 24 is not 90 days after August 15th;
24   correct?
25   A.    Nine days.
```

1   **Q.**   Nine days?

2   **A.**   Yes.

3   **Q.**   It's not 90.  It's not 15.  It's not 14 as Kristen and

4   Tristan said just because.  It's nine days after the disclosure

5   to Epic; correct?

6   **A.**   Yes.

7   **Q.**   And what Google decided here in the first bullet point

8   is -- sorry -- in the last bullet point under "Decided" is that

9   (as read):

10          "Ed to flip the bug on 8/24 at early morning LON time

11      just past the precise 8/23, 4:12 p.m., seven-day

12      extension."

13      Do you see that?

14   **A.**   Yes.

15   **Q.**   So essentially what this is saying is "We'll wait on the

16   dot one second after we have seven days, then Shannon can tip

17   people off on Friday if nobody has picked it up organically";

18   correct?

19   **A.**   That's what it says.

20   **Q.**   That is not standard security practice for Google;

21   correct?

22   **A.**   Incorrect.

23   **Q.**   All right.  We'll talk about that in a second.

24          **THE COURT:**  Let's take our afternoon break.  We'll

25   come back at 2:30.

1     **THE CLERK:**  All rise.

2                    (Recess taken at 2:15 p.m.)

3                (Proceedings resumed at 2:35 p.m.)

4       (Proceedings were heard in the presence of the jury:)

5     **THE COURT:**  Okay.  Let's resume.

6  **BY MR. EVEN:**

7  **Q.**   Mr. Kleidermacher -- Mr. Kleidermacher, if you can turn to

8  page 6 on Exhibit 122.

9       And you see there are more meeting notes here under "Bug

10  filed."  It says that, in fact, Mr. Cunningham did make the bug

11  public, and Ms. Newberry did tip off Android Central and the

12  security reporter at Wired.  Do you see that?

13  **A.**   I see that.

14  **Q.**   And it also says further down that the story was, in fact,

15  picked up by Android Central while the meeting was ongoing;

16  correct?

17  **A.**   Yes.

18  **Q.**   And as you told me at your deposition, as the head of the

19  security of Android at Google, you cannot recall a single other

20  time in Google's history where, in addition to releasing a blog

21  post, Google decided to tip off the press about a security

22  vulnerability; correct?

23  **A.**   I believe that PR as a normal --

24  **Q.**   Sir --

25  **A.**   I say, no.  I would have to say no.

1          MR. EVEN:  Your Honor, 362.

2          THE COURT:  262?

3          MR. EVEN:  362, line 17, through 363, line 8.

4                    (Pause in proceedings.)

5          THE COURT:  That's fine.

6    BY MR. EVEN:

7    Q.   Sir, at your deposition did you give me these answers

8    under oath?  I asked (as read):

9          "QUESTION:  And you sitting now, can you remind me -- can

10         you tell me another case where there was a vulnerability

11         that Google on top of releasing a blog post decided to tip

12         reporters so that -- to make sure that they pick up on the

13         blog post?

14         "ANSWER:  Again, I don't recall specifically.

15         "QUESTION:  So you can't tell me another incident like

16         that right now?

17         "ANSWER:  Not particularly."

18         Were these the answers you gave at the time?

19   A.   At the time, yes.

20         MR. EVEN:  I pass the witness.

21         THE COURT:  Okay.

22         MR. OLASA:  May I proceed, Your Honor?

23         THE COURT:  Yes.

24   \\\

25   \\\

1          <u>**CROSS-EXAMINATION**</u>

2     **BY MR. OLASA:**

3     **Q.**   Good afternoon, Mr. Kleidermacher.

4     **A.**   Good afternoon.

5     **Q.**   Counsel for Epic asked you whether it was safer to

6     download apps from a developer website.  Do you recall that?

7     **A.**   Yes.

8     **Q.**   Can users be tricked into visiting the wrong website for a

9     developer?

10    **A.**   Yes.  That happens a lot.

11    **Q.**   And is it a common form of deception?

12    **A.**   It is.

13    **Q.**   And can users visit the wrong website by just mistake?

14    **A.**   Yes.

15    **Q.**   Let's take the plaintiff in this case, Epic.  Is Epic's

16    website epic.com?

17    **A.**   It is not.

18    **Q.**   What is Epic's website?

19    **A.**   Epicgames.com.

20    **Q.**   And before Fortnite launched on Android in 2018, were

21    there fake websites offering fake versions of Fortnite?

22    **A.**   Yes.

23    **Q.**   Let's talk about the Fortnite Task Force counsel for Epic

24    was just asking you about.

25          Did you participate in this task force?

**KLEIDERMACHER - CROSS / OLASA**

1    **A.**    Yes.

2    **Q.**    And why was the task force created?

3    **A.**    We created it to monitor the security and safety risks

4    related to the Fortnite launch.

5    **Q.**    And what were those risks?

6    **A.**    Malware risks.  We were worried very much about the

7    malware risks that we talked about.  We were also worried about

8    the user just being generally more at risk from the unknown

9    source being turned on.

10   **Q.**    Why would the unknown source be turned on?

11   **A.**    In order to sideload, you would turn on the unknown

12   sources and that would possibly expose the user to more

13   malware.

14   **Q.**    Let's look at Exhibit 122.  It's in the binder before you.

15   And we can put it up on the screen.

16       **MR. OLASA:**  Oh.  I'm sorry.  We should hand out some

17   binders.

18       **THE COURT:**  Thank you.

19   **BY MR. OLASA:**

20   **Q.**    Mr. Kleidermacher, do you recall looking at Exhibit 122

21   with Epic's counsel?

22   **A.**    Yes.

23   **Q.**    And what is this document?

24   **A.**    This document is a running notes document relating to the

25   task force.

KLEIDERMACHER - CROSS / OLASA

1   Q.   And was this task force created by the Android security

2   team?

3   A.   It was created by my team, yes.

4   Q.   And that's the team you supervise?

5   A.   Yes.

6   Q.   It's a little blurry, but what is that symbol at the very

7   top of the document?

8   A.   That symbol says "Google Play Protect."

9   Q.   What is Google Play Protect?

10  A.   That is our -- the product that does anti-malware, and

11  that's the icon for it.

12  Q.   And is Google Play Protect something within the Android

13  security team?

14  A.   Yes, it is.

15  Q.   Now, on the first page do you also see an objective

16  listed?

17  A.   Yes.

18  Q.   The objective is (as read):

19          "To quantify and protect users who install Fortnite

20       (unknown sources required for installation) or a fake MUWS

21       Fortnite."

22       Do you see that?

23  A.   Yes.

24  Q.   There's some tech jargon here.  Can you tell the jury what

25  that means?

**KLEIDERMACHER - CROSS / OLASA**

1  A.   Sure.  As I mentioned, we were worried about two primary

2  risks to the user.  First, we were worried about the use of

3  unknown sources and how that might increase the instances of

4  malware.

5       And then, secondly, we were also worried about just

6  general attacks on the user through malware that could be like

7  fakes, knockoffs of Fortnite.  And MUWS stands for mobile

8  unwanted software, which is essentially malware.

9  Q.   Was the purpose of the Fortnite Task Force to stop the

10 Fortnite launch?

11 A.   It was not.

12 Q.   Was the purpose of the task force to interfere with the

13 Fortnite launch?

14 A.   No, it was not.

15 Q.   Did the task force efforts help the Fortnite launch?

16 A.   I believe it helped protect users.

17 Q.   Now, the document we're looking at, I think you said it

18 had entries for various internal meetings.  Would the earliest

19 meeting in time appear at the start or the end of the document?

20 A.   At the end.

21 Q.   All right.  Let's turn to page 19.

22 A.   Okay.

23 Q.   Is the entry at the bottom the earliest meeting recorded

24 in this document?

25 A.   Yes.

KLEIDERMACHER - CROSS / OLASA

1   Q.   Who were the attendees?

2   A.   Attendees Dave K, that's me; Jason, Sebastian, Jenny,

3   William.

4   Q.   Were all these attendees members of the Android security

5   team?

6   A.   Yes, they are -- they were at the time.

7   Q.   All right.  Let's go to page 16 now, and I think counsel

8   was showing you an entry there.

9        Now, in the middle of page 16, these are notes from

10   another meeting; right?

11   A.   Yes.

12   Q.   And counsel, I believe, showed you this meeting in his

13   examination; right?

14   A.   Yes.

15   Q.   Now, some of these attendees are not part of the Android

16   security team; is that right?

17   A.   Correct.

18   Q.   So why were attendees who are not part of the Android

19   security team meeting with you about a security issue?

20   A.   Well, they were all part of the overall response.  So you

21   had -- obviously we had lawyers there to provide legal advice.

22   Jamie was our primary contact.  So communication to Epic

23   happened through him.

24   Q.   What were you responding to?

25   A.   Well, in this particular meeting we were responding to the

1  vulnerability that we discussed earlier.

2  **Q.**   Can you tell the jury, what is a vulnerability?

3  **A.**   A vulnerability is a flaw in software that would put the

4  user at risk by enabling attackers to exploit the user in some

5  way.

6  **Q.**   Now, one of the attendees of this meeting was Colin Smith;

7  right?

8  **A.**   Correct.

9  **Q.**   What was Colin Smith's role in the company?

10  **A.**   He was leading our public relations at the time.

11  **Q.**   Why were you meeting with someone in public relations in

12  connection with a security issue?

13  **A.**   With any security incident response team, public relations

14  is an important part of that response team, managing the

15  communications.

16  **Q.**   Why?

17  **A.**   There are oftentimes with vulnerabilities and other kinds

18  of incidents where you must communicate to the public and you

19  must interact with members of the press, et cetera.

20  **Q.**   So we were talking earlier about this vulnerability, and

21  these meeting notes reflect that vulnerability; right?

22  **A.**   Yes.

23  **Q.**   In fact, the first bullet says (as read):

24        "Fortnite's disk strategy has created a

25        vulnerability."

KLEIDERMACHER - CROSS / OLASA

1       Do you see that?

2   A.   Yes.

3   Q.   What was the specific vulnerability in Epic's Fortnite

4   installer?

5   A.   So we mentioned earlier the Man-in-the-Disk vulnerability.

6   What happened there is the installer would download the app,

7   say Fortnite, and store it in external storage instead of the

8   private storage of the installer itself.  And because it was

9   installed in this external storage, it means it was available

10  to any other application on the device to actually overwrite or

11  tamper with the application.

12       And so if there was malware on the device, it could

13  literally change the Fortnite application entirely, including

14  replacing it with malware.  So that was a significant

15  vulnerability.

16  Q.   If Google had not found this vulnerability, could users

17  have been harmed?

18  A.   It would have added risk to users, yes.

19  Q.   How?

20  A.   Well, we saw lots of examples of malware authors trying to

21  exploit the launch of Fortnite; and if this vulnerability

22  became known by an attacker, then they could use this

23  vulnerability to do damage to the user.

24  Q.   After Google discovered the vulnerability, did it

25  immediately tell the public?

1   **A.**   We did not immediately tell the public.

2   **Q.**   Why not?

3   **A.**   We followed a responsible disclosure process, which is

4   what security research teams do.

5   **Q.**   So what did you do as part of that process?

6   **A.**   We -- once we understood the vulnerability, we

7   communicated it to the developer, in this case Epic, and

8   Samsung was involved as well.

9   **Q.**   And after you communicated the vulnerability to Epic, did

10   Epic fix the vulnerability?

11   **A.**   Epic did fix the vulnerability.

12   **Q.**   And once Epic fixed the vulnerability, did Google disclose

13   the vulnerability to the public?

14   **A.**   We disclosed it after the vulnerability was fixed, yes.

15   **Q.**   Why?

16   **A.**   It is common in security research teams to

17   publish/disclose vulnerability information after the

18   vulnerability is fixed.  There's a number of reasons for that.

19   We want to inform the user.  The user may take action to help

20   protect themselves.  We inform the research community.  They

21   may also learn from it and actually contribute to the research,

22   and just generally make the world aware so that they can stay

23   protected.

24   **Q.**   Now, Epic's lawyer asked you earlier about whether

25   disclosing a vulnerability after 90 days is industry standard.

KLEIDERMACHER - CROSS / OLASA

1  Do you remember that?

2  **A.**   Yes.

3  **Q.**   Can you explain this industry standard?

4  **A.**   Yes.   The reason why security teams often use -- 90 days

5  is not universal, but it's common.   The reason why security

6  teams have a 90-day deadline is to encourage, and some may say

7  pressure, the developer to fix that bug in a reasonable time

8  frame.

9  **Q.**   And did you provide this context to Epic's lawyer in your

10  deposition?

11  **A.**   I attempted to, yes.

12         **MR. OLASA:**   Your Honor, I'd like to show 346 in

13  Volume 2, 11 to 23.

14         **THE COURT:**   You want what?

15         **MR. OLASA:**   Rehabilitation, Your Honor.

16         **THE COURT:**   You want to do what?

17         **MR. OLASA:**   I'd like to show the jury 346, 11 to 23,

18  in Tab 2 as rehabilitation.

19         **THE COURT:**   No.   Denied.   Let's not ask that again.

20  Okay?   Including that type of question.

21  **BY MR. OLASA:**

22  **Q.**   And what about the 90-day versus 15-day issue you were

23  discussing with Epic's counsel?   Is 15 days a standard in some

24  instances?

25  **A.**   It's a standard for patching apps that have some sort of

1   flaw of malware.

2   **Q.**   And ultimately in this case did Google select 90 days or

3   15 days?

4   **A.**   We selected 90 days for the time to fix.

5   **Q.**   And once Epic fixed the vulnerability under the standard

6   procedure, was Google then free to disclose the vulnerability?

7   **A.**   Yes.  It is common for security teams to disclose a

8   vulnerability after it has been patched.

9   **Q.**   All right.  I'd like to turn to a different topic.

10      Mr. Kleidermacher, does Android use security and privacy

11   as one way to attract and retain users?

12   **A.**   Yes.

13   **Q.**   And does Android compete with Apple's IOS operating system

14   on security and privacy features?

15   **A.**   Yes, we do.

16   **Q.**   And as part of your work, do you inform yourself about

17   Apple's security and privacy efforts on its IOS operating

18   system?

19   **A.**   Yes.

20   **Q.**   And do you aim to make sure that Android security is as

21   good or better than the security of Apple's IOS?

22   **A.**   Yes.

23   **Q.**   Why is that your goal?

24   **A.**   Well, we want -- first of all, we want to protect users as

25   best as we can; and if we make the cost to exploit users

**KLEIDERMACHER - CROSS / OLASA**

1    higher, then we will move the attackers onto a different

2    platform, like our competitors' platform.

3         In addition, we also want to have a good reputation for

4    security because security and privacy is a purchasing factor

5    for consumers, and that's important for the product.

6    **Q.**   Does Apple's IOS allowed sideloading?

7    **A.**   It does not have a consumer flow for sideloading.

8    **Q.**   So can a consumer get apps directly from the Internet on

9    an iPhone?

10   **A.**   There is no supported method of doing that.

11   **Q.**   And can consumers get apps from an alternative app store

12   on an iPhone?

13   **A.**   They cannot.

14   **Q.**   Is Android different in that respect?

15   **A.**   Android is different.

16   **Q.**   How?

17   **A.**   Android from the beginning was designed to enable an open

18   ecosystem of app source, including third-party app sources as

19   well as directly downloading from the Internet.

20   **Q.**   Does sideloading affect how Android competes with IOS on

21   the dimension of security?

22   **A.**   Very much so.

23   **Q.**   How?

24   **A.**   Well, it makes our job much more difficult.

25   **Q.**   Why?

**KLEIDERMACHER - CROSS / OLASA**

1   **A.**   When you download -- when you are downloading apps from

2   the Internet, you have -- you don't have the same signals that

3   you would have when downloading from an app store.  So it's

4   inherently more risky, and it makes my and my team's job much

5   more difficult.

6   **Q.**   As part of your job, do you stay informed on Apple's

7   public statements about Android security?

8   **A.**   Yes.

9   **Q.**   Why?

10   **A.**   Again, it's important to understand how we're competing

11   with them and how they're competing with us so we can do the

12   best we can.

13   **Q.**   Have you ever seen Apple use sideloading as a way to

14   attack or diminish Android's security reputation?

15   **A.**   Yes.

16   **Q.**   And do those attacks affect your work?

17   **A.**   Yes.

18   **Q.**   Why?

19   **A.**   Well, if they are attacking a weakness in the platform,

20   then that can cause a loss of trust, which, again, is a problem

21   with competition, with us competing against Apple on security.

22   **Q.**   Could you turn to Exhibit 5945 in the binder we handed

23   you?

24   **A.**   Yes.

25   **Q.**   Have you seen this document before?

KLEIDERMACHER - CROSS / OLASA

1    **A.**    I have.

2    **Q.**    What is this document?

3    **A.**    The Android feature audit document is a marketing document

4    that is performing a competitive analysis between IOS and

5    Android.

6    **Q.**    Was this document presented to you in the course of your

7    work at Google?

8    **A.**    Yes.

9    **Q.**    Do you know why this document was presented to you?

10   **A.**    The marketing team wanted to ensure that we had a rigorous

11   analysis of differences to help inform our work.

12   **Q.**    Does page 46 of this document discuss the marketing team's

13   assessment of Android's security and privacy protections?

14   **A.**    Did you say page 46?

15   **Q.**    Yes.

16   **A.**    Yes.

17   **Q.**    And did you rely on page 46 of this document in connection

18   with your work on Android security?

19   **A.**    Yes.  This is a summary of trust privacy and security, so,

20   yes.

21          **MR. OLASA:**  Your Honor, I'd move to admit

22   Exhibit 5945.

23          **MR. EVEN:**  Your Honor, I object on hearsay and

24   foundation.  It's a marketing document.  It's not clear to me

25   how the witness --

1    **THE COURT:**  All right.  Why don't you lay a little bit

2    more of a foundation.

3    **MR. OLASA:**  Sure.

4    **BY MR. OLASA:**

5    **Q.**   Mr. Kleidermacher, as part of your work on Android

6    security, do you inform yourself on how marketing or consumer

7    perception of Android security affects competition with IOS?

8    **A.**   Yes, we do, and it's one of the things we track and

9    compare ourselves against.

10   **Q.**   And is this document part of that effort?

11   **A.**   Yes.

12   **Q.**   And was this a document you received in the ordinary

13   course of business at Google?

14   **A.**   Yes.

15   **Q.**   And did you rely on page 46 to inform your work in

16   competing with Apple's IOS on privacy and security?

17   **A.**   Yes.

18   **MR. OLASA:**  Your Honor, I move again to admit

19   Exhibit 5945, and I'd be happy to limit it to the --

20   **THE COURT:**  I'll admit that one page.  Go ahead.  Just

21   page 46.

22   (Trial Exhibit 5945, page 46, received in evidence.)

23   **BY MR. OLASA:**

24   **Q.**   All right.  Mr. Kleidermacher, could you turn to page 46

25   of the document?

KLEIDERMACHER - CROSS / OLASA

1    A.    (Witness examines document.)   Okay.

2    Q.    Does this page report the marketing team's assessment of

3    Android's privacy and security?

4    A.    Yes.

5    Q.    And do you see the bar on the right that says "Privacy and

6    Security"?

7    A.    Yes.

8    Q.    What was your understanding of the meaning of this bar?

9    A.    The marketing team had performed a sort of measurement of

10   the relative capabilities in privacy and security between the

11   two platforms.   They had some form of scoring rubric, and the

12   result of their scoring shows that IOS has an 18 percent

13   advantage.

14   Q.    And there are a number of bullets to the left of that

15   chart.   Do you see that?

16   A.    Yes.

17   Q.    Can you take a look at the second bullet?

18   A.    Okay.

19   Q.    That bullet says (as read):

20         "The ability to install unknown apps in Android is a

21   major security vulnerability."

22         Do you see that?

23   A.    Yes.

24   Q.    What was your understanding of that bullet?

25   A.    Well, it's stating what we've been talking about already,

KLEIDERMACHER - CROSS / OLASA

1  which is the sideloading from the Internet adds a lot more risk

2  and is viewed as a major security vulnerability.

3  **Q.**  You can put that document aside, Mr. Kleidermacher.

4      Would removing Android's sideloading consent screens while

5  keeping the ability to sideload affect Android's competition

6  with Apple on security?

7  **A.**  Yes.

8  **Q.**  How?

9  **A.**  If we remove those consent screens, more users would be

10  harmed and that would hurt security for Android.

11  **Q.**  We'll come back to the sideloading consent screens a

12  little later.

13      All right.  Mr. Kleidermacher, let me back up and properly

14  introduce you to the jury.

15      I think I heard you say you joined Google in May 2017; is

16  that right?

17  **A.**  Yes.

18  **Q.**  Where did you work before that?

19  **A.**  Before that I worked at BlackBerry.

20  **Q.**  How long did you work there?

21  **A.**  A little over two years.

22  **Q.**  What was your job at BlackBerry?

23  **A.**  I was the chief security officer responsible for security

24  of BlackBerry's products.

25  **Q.**  And did BlackBerry make smartphones?

**KLEIDERMACHER - CROSS / OLASA**

1   **A.**   That was one product that BlackBerry made, yes.

2   **Q.**   Before your time at, BlackBerry, where did you work?

3   **A.**   I worked for a company called Green Hill Software.

4   **Q.**   What did Green Hills do?

5   **A.**   Green Hill Software built secure operating systems that

6   are running in security-critical systems, such as medical

7   devices, connected cars, and airplanes.

8   **Q.**   And did your job at Green Hills involve computer security?

9   **A.**   It did, yes.

10   **Q.**   So how long in total in your career have you worked on

11   computer security issues?

12   **A.**   I've dedicated my entire career to it; over 30 years.

13   **Q.**   Let's turn back to your time at Google.

14       What products and services at Google are you responsible

15   for?

16   **A.**   I'm responsible -- I'm the engineering VP for Android,

17   Google Play, and the Made by Google Products security And

18   privacy.

19   **Q.**   All right.  We talked a little bit about malware earlier.

20   Have you also heard the term "potentially harmful apps" or

21   "PHAs"?

22   **A.**   Yes.

23   **Q.**   What does that term mean?

24   **A.**   That's a term that our team invented.  It is synonymous --

25   practically synonymous with malware.

1    Q.   And is part of your job to inform yourself about the risks

2    of malware to Android devices and users?

3    A.   Yes.

4    Q.   And can PHAs or malware come from well-known developers?

5    A.   It can come from well-known developers.

6    Q.   We heard the term spyware?

7    A.   Yes.

8    Q.   What is spyware?

9    A.   Spyware is a type of malware that is attempting to collect

10   sensitive information from the user in a way -- without the

11   users knowledge or authorization.

12   Q.   And who makes malware?

13   A.   A number of different entities make malware.  It can range

14   from a single teenager who's just trying to make a point, to

15   organized criminal gangs, all the way up to state-sponsored

16   attackers.

17   Q.   And how does malware get onto a user's device,

18   Mr. Kleidermacher?

19   A.   The typical way that malware gets onto devices is from the

20   user installing it.

21   Q.   Have you heard the term "social engineering"?

22   A.   Yes.

23   Q.   What is social engineering in the context of malware?

24   A.   Social engineering is when an attacker is attempting to

25   trick the user to do something to reduce or harm their own

KLEIDERMACHER - CROSS / OLASA

1    security, such as installing malware.

2    **Q.**   As part of your job, do you keep track of significant

3    malware attacks on Android?

4    **A.**   Yes.

5    **Q.**   Can you give the jury a recent example of a significant

6    malware attack on Android?

7    **A.**   Sure.  A recent campaign -- malware campaign on Android is

8    something called FluBot.  You can Google it.  FluBot malware

9    campaign was a massive malware attack that was performed

10   through the sideloading of malware onto Android devices.

11   **Q.**   As part of your work on Android security, did you inform

12   yourself on how FluBot spread and infected devices?

13   **A.**   Yes.

14   **Q.**   Have you given presentations on FluBot?

15   **A.**   I have.

16   **Q.**   How did FluBot get installed on a particular user's

17   device?

18   **A.**   Well, the initial infection of FluBot was through social

19   engineering.  So the attackers sent SOS messages with innocuous

20   looking messages, like "There's a package you haven't received

21   and I can help you fix that.  Just install this app."  And so

22   the user would then install the app, and that is how the

23   malware initially got onto the devices.

24   **Q.**   Would a user know that they were installing something

25   called FluBot?

**KLEIDERMACHER - CROSS / OLASA**

1  **A.**    No.   They thought they were just being helped by this

2  entity.

3  **Q.**    And what would FluBot do once it was on a particular

4  user's device?

5  **A.**    So FluBot would use additional social engineering to

6  convince the user, trick the user, to giving the malware

7  application even more privileges, such as accessibility

8  permissions, which is one of the most powerful permissions on

9  the operating system.

10  **Q.**    And how widespread was FluBot?

11  **A.**    FluBot -- hundreds of millions of devices were attacked by

12  FluBot.

13  **Q.**    And what were the consequences to an Android user whose

14  device was infected by FluBot?

15  **A.**    So the purpose of the FluBot malware was to steal banking

16  credentials.   So once the malware obtained these extra

17  permissions, it would then have the ability to go into your

18  financial information through your e-mail, through any data on

19  the phone, and then completely wipe you out, wipe your finances

20  out from the bank, and then worm its way onto other devices.

21  **Q.**    Did Android sideloading consent screens reduce the harm of

22  FluBot?

23  **A.**    Yes.

24  **Q.**    Does Google try to keep Android users safe from malware

25  like FluBot?

**KLEIDERMACHER - CROSS / OLASA**

1    **A.**   Yes, we do.

2    **Q.**   And do you supervise those efforts?

3    **A.**   Yes.

4    **Q.**   How many people on your team work on Android security

5    issues?

6    **A.**   My team has approximately 400 people.

7    **Q.**   Do other teams at Google also contribute to Android

8    security?

9    **A.**   Yes.

10   **Q.**   Does Google have a trust and safety team that contributes

11   to Android security?

12   **A.**   Yes.  They're our sister team.

13   **Q.**   How many people on the trust and safety work on Android

14   security?

15   **A.**   Our trust and safety team does a lot of our reviews, and

16   they have a -- thousands of people.

17   **Q.**   All right.  So I want to talk about the Google Play Store,

18   and I want to walk through the process of how an app gets onto

19   the Google Play Store.

20        First, does a developer have to submit its app to Google

21   before it can get on the Google Play Store?

22   **A.**   Yes.

23   **Q.**   And once the app is submitted, does Google review the app

24   before putting it on the store?

25   **A.**   Yes.

1  **Q.**   At a high level, what are the components of this review?

2  **A.**   So there is -- for a new app there's a human review to

3  examine it for compliance to a number of policies, such as

4  content policies.  If the app is using an icon similar to a

5  different brand, then we'll look to see if it's impersonating,

6  as one example.

7      Then there is concurrent machine-base review.  So we have

8  built a sophisticated infrastructure that will examine the

9  application as well as the developer signals looking for

10  signals of risk.  And if there is a risk that is identified in

11  the application, then it will go to further human review; and

12  those further human reviewers will then -- will often then be

13  needed to actually confirm certain types of policy violations,

14  such as a malware violation.

15  **Q.**   All right.  I want to talk briefly about the machine

16  review.

17      Does Google's machine review examine the code of the

18  actual application?

19  **A.**   It does, yes.

20  **Q.**   And does Google's machine review actually run an app to

21  see how it behaves?

22  **A.**   Yes.  We call that dynamic analysis.

23  **Q.**   How long did it take Google to develop its machine review

24  technology?

25  **A.**   All of that infrastructure, static dynamic analysis, and

1   all the AI that we built into the system we have been

2   developing for many years.

3   **Q.**   And does this review technology include Google's

4   intellectual property?

5   **A.**   Yes, it does.

6   **Q.**   And do you review this technology to be a competitive

7   advantage of the Google Play Store?

8   **A.**   Yes.

9   **Q.**   I want to talk about human review briefly.

10      Why does Google Play's app review process include human

11   review?

12   **A.**   There are aspects of policy enforcement that require human

13   judgment.  The example I gave earlier where you might have an

14   icon that is impersonating another icon, sometimes there's gray

15   area and the human needs to have judgment there.

16      And in the case of behavior, like malware behavior, the AI

17   algorithms will often output a risk score, like a 70 percent

18   probability of malware, and we obviously suspend the app based

19   on a 70 percent probability so humans are used then to reverse

20   engineer and actually understand the capabilities of the

21   application.  So to confirm the malware.

22   **Q.**   All right.  Turning back to the overall process, if no

23   malware is identified at the end of this review process, what

24   happens?

25   **A.**   If there are no signals of risk, then the app will be

**KLEIDERMACHER - CROSS / OLASA**

1  published.

2  **Q.**   And does Google Play also review all updates to apps?

3  **A.**   Yes.

4  **Q.**   Why does Google Play review an update to an app?

5  **A.**   Well, when -- it is not uncommon for a malware author to

6  first publish a clean version of the app and then subsequently

7  publish an update that would then be malicious, so it is

8  important to review every app.

9  **Q.**   Do all apps and app updates go through Google Play's

10  review process?

11  **A.**   All apps, whether the initial publication or the update,

12  all have to be reviewed.

13  **Q.**   And what about human review?  Do all apps and all app

14  updates go through the human review component of Google Play?

15  **A.**   Not all updates.

16  **Q.**   How does Google determine whether to do human review of an

17  app?

18  **A.**   So as I mentioned earlier, the AI systems, when they

19  detect a reasonably high probability of risk, then they -- that

20  will flag the app for then further human review to confirm it.

21  **Q.**   Is an app or app update ever published on the Google Play

22  Store before this review process is complete?

23  **A.**   Not that I'm aware of.

24  **Q.**   Does this review process we were discussing help Google

25  catch malware before it is published on the store?

**KLEIDERMACHER - CROSS / OLASA**

1   **A.**   Yes.

2   **Q.**   Does this review process help keep users safe?

3   **A.**   Yes.

4   **Q.**   Does this review process detect all malware?

5   **A.**   No.  It isn't possible to detect all malware.

6   **Q.**   But does malware make it onto the Google Play Store?

7   **A.**   Occasionally, yes.

8   **Q.**   And does Google try and remove that malware?

9   **A.**   We try to remove it as fast as we can, yes.

10  **Q.**   Now, counsel asked you in his examination about something

11  called App Defense Alliance reviews.  Do you recall that?

12  **A.**   I do.

13  **Q.**   Are those reviews in any way a substitute for Google Play

14  App Store review?

15  **A.**   It is not a substitute.

16  **Q.**   Why not?

17  **A.**   The App Defense Alliance is basically certifying against a

18  minimum baseline of security requirements.  These are pretty --

19  pretty basic things, like are you encrypting data.  So the

20  reviews that we perform are far, far more comprehensive than

21  that, including the malware reviews as one example.

22  **Q.**   Counsel also asked you some questions about a technology

23  called Google Play Protect.  Do you recall that?

24  **A.**   Yes.

25  **Q.**   And counsel asked you questions about how that technology

1  reviews apps that are outside Play.  Do you recall that?

2  **A.**   Yes.

3  **Q.**   Does Google Play Protect provide the same level of

4  protection for apps downloaded outside the Play Store as

5  compared to apps downloaded on the Play Store?

6  **A.**   It does not.

7  **Q.**   Why?

8  **A.**   So on the Play Store, Google Play Protect has signals

9  about the behavior of the application, but it also has a lot of

10  signals about the developer and other signals, like even

11  payment signals, from interacting with the store.  Those

12  signals actually contribute approximately two-thirds of the

13  findings of malware.  So it's a really important part.

14      And when we download an app from the Internet, all we have

15  is the app and we do not have that other information to help

16  the system be smarter about malware detection.

17  **Q.**   And has Google Play Protect reviewed all apps that are

18  outside the Play Store?

19  **A.**   No.

20  **Q.**   As the head of Android security, do you think it would be

21  feasible for Google to provide the same level of review to apps

22  outside the Play Store as it does to apps inside the

23  Play Store?

24  **A.**   We can't make the Internet safe.

25  **Q.**   Are you aware of any major consumer operating system in

**KLEIDERMACHER - CROSS / OLASA**

1  which the creator of the operating system is responsible for

2  reviewing all the apps on the operating system?

3  **A.**   Yes.

4  **Q.**   Which one?

5  **A.**   That would be IOS.

6  **Q.**   And how does Apple achieve that?

7  **A.**   Well, they have the walled garden where the only place you

8  can get apps is from the IOS app store.

9  **Q.**   All right.  So we talked about sideloading earlier.  Can

10  you remind the jury, what is sideloading?

11  **A.**   Sideloading is the downloading of an application from the

12  Internet.

13  **Q.**   And does Android show any consent screens if a user

14  attempts to sideload?

15  **A.**   Yes.

16  **Q.**   All right.  I'd like to put up a demonstrative.

17       Can we go to Demonstrative 1?

18       Are these the screens -- these consent screens you

19  described, Mr. Kleidermacher?

20  **A.**   Yes.

21  **Q.**   Why does Android show these consent screens when a user

22  attempts to sideload?

23  **A.**   The operating system wants to have an affirmative consent

24  from the user that they understand the risks they're

25  undertaking.

1  Q.   All right.  Let's go through these screens.

2       The first screen, what is its purpose?

3  A.   This first screen is -- is a --

4           MR. OLASA:  Ms. Nicols, can we zoom in on the first

5  screen?

6           THE WITNESS:  Yes, thank you.

7       Yeah, so this screen is the operating system asking the

8  user to affirm the use of this source of applications.

9  BY MR. OLASA:

10 Q.   And this screen says that (as read):

11          "Your phone isn't currently allowed to install

12      unknown apps from this source.  You can change that in

13      settings."

14      What is an unknown app?

15 A.   An unknown app is just an app that comes from an unknown

16 source.

17 Q.   And what is a source?

18 A.   A source -- any -- the way Android works, any application

19 can be a source of another app.  Applications by downloading,

20 they're becoming a downloader of other applications.

21 Q.   In this example, what is the source?

22 A.   In this example, the source is Chrome, the browser.

23 Q.   And if you click on the settings button in the first

24 screen, what happens?

25 A.   When you click on settings, you go to the next screen in

1    the middle, which takes you to the toggle which enables the

2    source.

3              MR. OLASA:  All right.  Ms. Nicols, can we zoom into

4    the second screen?

5    BY MR. OLASA:

6    Q.   All right.  And if the user gets to the second screen and

7    toggles that toggle, what happens?

8    A.   That means that the operating system now knows that the

9    user has confirmed that this source can be -- can install apps.

10   Q.   And what is the purpose of this screen?

11   A.   The privilege to install apps is one of the most powerful

12   and dangerous permissions on the operating system, and so we

13   want to make sure that the user is willing to trust that

14   source.

15   Q.   Would eliminating these first two screens affect user

16   security?

17   A.   Yes.

18   Q.   All right.  So let's talk about the third screen we see

19   there.  What's the purpose of that third screen?

20   A.   This screen is the operating system affirming the -- an

21   install of an app.

22   Q.   And why does the operating system show this third screen?

23   A.   Well, if the -- if an app install wasn't affirmed or

24   consented by the user, then the installer or the app source

25   could just install any number of apps in the background, and

1    that is exactly what hostile downloaders or malware can do.

2    The user should always confirm each install.

3             MR. OLASA:  Mr. Nicols, can you take out the

4    highlighting?

5    BY MR. OLASA:

6    Q.   So let's say the browser, in this case the browser, had

7    already received permission to install apps and the user had

8    already gone through screens one and two on some previous

9    occasion.  Are you with me?

10   A.   Yes.

11   Q.   In that case, what would happen if the user tried to

12   install a new app from the browser?

13   A.   So if another app was installed through the browser, then

14   the user would only see the third screen.

15   Q.   And this third screen --

16            MR. OLASA:  Mr. Nicols, can we go on to the next

17   demonstrative?

18   BY MR. OLASA:

19   Q.   Is this the screen the operating would show if the browser

20   had already received permission to install apps?

21   A.   Yes.

22   Q.   Now, if a user downloads an app from a web browser, will

23   the user sometimes see an additional screen?

24   A.   Can you repeat the question?

25   Q.   Sure.

KLEIDERMACHER - CROSS / OLASA

1      Do web browsers also provide warnings on some occasions to

2  the user?

3  A.   Yes.

4           MR. OLASA:  All right.  Can we look at the next

5  demonstrative, Ms. Nicols?

6  BY MR. OLASA:

7  Q.   Are these the examples of web browser warnings we were

8  talking about?

9  A.   Yes.

10 Q.   What's the example on the left?

11 A.   The example on the left is the Chrome browser and the

12 message that the Chrome browser displays to the user when a

13 file is downloaded.

14 Q.   And what's the example on the right?

15 A.   The example on the right is the Edge browser, Microsoft

16 Edge browser, and the warning that it shows when downloading an

17 app from the Internet.

18 Q.   Are these screens shown by the Android operating system?

19 A.   No.

20 Q.   So why is the user seeing these screens?

21 A.   Because the browsers are -- decided to provide that

22 warning.

23 Q.   If the user is trying to sideload from a nonbrowser app,

24 like a file manager, would the user see these messages?

25 A.   It would be -- the file manager in that case would be

1    responsible for any user experience there.

2    **Q.**    Mr. Kleidermacher, have you prepared videos of the

3    sideloading process to help explain this process to the jury?

4    **A.**    Yes.

5    **Q.**    And did you make these videos?

6    **A.**    I did.

7    **Q.**    And are they representative of the sideloading process on

8    a Pixel device?

9    **A.**    Yes.

10   **Q.**    What operating system was this device running?

11   **A.**    It's running our latest operating system, Android 14.

12   **Q.**    All right.  Let's watch the first video.

13               (Video was played but not reported.)

14   **BY MR. OLASA:**

15   **Q.**    Mr. Kleidermacher, is this video representative of the

16   flow for installing an app directly from a website?

17   **A.**    It's the flow for installing the app store.

18   **Q.**    And if the app that was installed was not an app store but

19   a game, could the user then just go ahead and play the game?

20   **A.**    Yes.  At that point they could play the game.

21   **Q.**    All right.  Let's watch the second video.

22               (Video was played but not reported.)

23   **BY MR. OLASA:**

24   **Q.**    What are we watching right now, Mr. Kleidermacher?

25   **A.**    This is the installation of the Fortnite app.

KLEIDERMACHER - CROSS / OLASA

1    Q.   And this downloading screen, is that something that the

2    operating system does?

3    A.   No.  That is coming from Fortnite or Epic.

4    Q.   Is Fortnite a big game?

5    A.   It is a game.

6    Q.   Mr. Kleidermacher, why did we see the consent screens

7    again in this video?

8    A.   In this video, the Epic Games installer had not been --

9    had not been authorized by the user yet, so it was the first

10   attempt to download a game invokes the authorization for the

11   installer.

12   Q.   Let's watch the final video.  I promise.

13            (Video was played but not reported.)

14   BY MR. OLASA:

15   Q.   What did the screens show, Mr. Kleidermacher?

16   A.   This shows the installation of another app from the same

17   app store.

18   Q.   And this time did we see the consent screens to enable a

19   new source?

20   A.   No.  Because the user has already confirmed the use of the

21   app store, so any subsequent app installation will only have

22   the single screen.

23   Q.   Now, Mr. Kleidermacher, are these screens, the screens we

24   were looking at, designed to present users from sideloading?

25   A.   No.

**KLEIDERMACHER - CROSS / OLASA**

1   **Q.**   What is the purpose of these screens?

2   **A.**   The operating system wants to confirm the user's intent to

3   install the app.

4   **Q.**   How would removing these consent screens affect your

5   ability to keep Android devices secure?

6   **A.**   Removing these consent screens would make users less safe,

7   and it would make my job and my team's job much harder.

8   **Q.**   Why?

9   **A.**   Because the user doesn't have a moment to reflect on the

10   risk that they're taking and make an informed decision.  These

11   installations would just happen without the user's knowledge in

12   some cases, and that would put them at increased risk.

13   **Q.**   As a technological matter, could Google remove the ability

14   to sideload an Android?

15   **A.**   As a technical matter, we could remove that capability.

16   **Q.**   Did Google have to go out of its way to allow sideloading

17   on Android?

18   **A.**   That was part of the initial design, yes.

19         **MR. OLASA:**  Your Honor, I'd like to move the videos we

20   just watch into evidence for the jury's reference.

21         **MR. EVEN:**  No objection.

22         **THE COURT:**  Okay.  They're admitted.

23         **THE CLERK:**  Is there an exhibit number?

24         **MR. OLASA:**  We'll get one right after this.

25         (Trial Exhibits 9051, 9052, and 9053 received in

1          evidence.)

2     **BY MR. OLASA:**

3     **Q.**   Now, Mr. Kleidermacher, you told the jury earlier that you

4     worked at BlackBerry; correct?

5     **A.**   Correct.

6     **Q.**   And as BlackBerry's chief security officer, was it your

7     job to keep BlackBerry devices safe for users?

8     **A.**   Yes.

9     **Q.**   What operating system did BlackBerry smartphones use?

10    **A.**   They used multiple operating systems.   In the earlier

11    days, there was a proprietary operating system called

12    BlackBerry OS; and then later on when I joined the company in

13    2015, BlackBerry made devices based on Android.

14    **Q.**   When BlackBerry used its own operating system, did that

15    operating system support sideloading?

16    **A.**   It did not.

17    **Q.**   And when BlackBerry switched to the Android operating

18    system, were you BlackBerry's chief security officer?

19    **A.**   Yes.

20    **Q.**   And when you were BlackBerry's security officer, would you

21    have shipped an Android BlackBerry device that allowed

22    sideloading but didn't have sideloading warnings?

23    **A.**   I would not.

24    **Q.**   Why not?

25    **A.**   Because, again, the consent is an important part of

1    security, and that would have reduced the security of the

2    product.

3              **MR. OLASA:**  All right.  Pass the witness, Your Honor.

4              **THE COURT:**  Okay.  Any brief recross?

5              **MR. EVEN:**  Thank you, Your Honor.

6                         <u>**REDIRECT EXAMINATION**</u>

7    **BY MR. EVEN:**

8    **Q.**   So, Mr. Kleidermacher, I actually would like to begin with

9    the videos.

10        So the videos were pre-prepared; correct?

11   **A.**   I just made them yesterday.

12   **Q.**   You just made them before today?

13   **A.**   Yes.

14   **Q.**   And on them you never stopped to, like, actually read any

15   of the warnings; correct?

16   **A.**   It was a recording of the -- it was a screen recording.

17   **Q.**   It was a very quick screen recording where you just

18   clicked through; correct?

19   **A.**   I was -- I literally just pressed record and recorded

20   exactly what I did.

21   **Q.**   All right.  So let's maybe read them so we understand what

22   we're talking about.

23        If we can -- I'm going to need your help, please, to bring

24   up the first security warning first.  Blow up the one that says

25   "For your security."

1        Okay.  So this says (as read):

2             "For your security, your phone currently isn't

3        allowed to install unknown apps from this source."

4        Correct?

5   A.   Correct.

6   Q.   And so this tells the user downloading from here is less

7   safe; correct?

8   A.   It is telling the user that you should think about what

9   you're doing before you proceed.

10  Q.   And the "here" in this particular one is Chrome, the

11  entire worldwide web; correct?

12  A.   This source is Chrome.

13  Q.   And this setting is for Chrome.  It's not going to say

14  adobe.com versus some other website; correct?  It's just

15  Chrome.

16  A.   It is an app -- it is a source of installs of apps,

17  Chrome.

18  Q.   I understand.

19  A.   Websites are not --

20  Q.   And the source --

21  A.   -- sources of installs.

22  Q.   Sorry.  I didn't mean to talk over you.

23       The source that we're talking about here is Chrome at

24  large, not any particular website; correct?

25  A.   It is the browser.

1   **Q.**   It is the browser.

2        Because you have not built any system to try and assess

3   the security of any particular website; correct?

4   **A.**   Correct.

5   **Q.**   Now let's go to the next screen.

6        This screen says (as read):

7             "Your phone and personal data are more vulnerable to

8        attack by unknown apps.  By installing apps from this

9        source, you agreed you are responsible for any damage to

10       your phone or loss of data that may result from their

11       use."

12       Correct?

13  **A.**   Yeah, that's what it says, yes.

14  **Q.**   And that is intended to convey and does convey to the user

15  that by installing something from the web, they are waiving

16  some kind of warranty; right?

17  **A.**   The operating system has a generic message for approving

18  an installation source, and that's what it is.

19  **Q.**   Sir, the generic message suggests that you are going to be

20  responsible for the damage from this download; correct?

21  **A.**   Sources of apps are a very powerful and dangerous

22  permission.

23  **Q.**   You're going to be responsible -- you, the user, are going

24  to be responsible for damage to your phone or loss of data;

25  correct?

1  **A.**  That's what the words say.

2  **Q.**  Okay.  Now, when I download S-ON, for instance, from the

3  Play Store, I'm not going to get any warning; correct?

4  **A.**  You will not see this warning.

5  **Q.**  But me as the user, I'm still going to be fully

6  responsible to any damage to my phone or loss of data; right?

7  Google is not going to make me whole?

8  **A.**  I don't know -- I don't know about that.

9  **Q.**  There's no warranty in the Play Store; correct?  This

10  suggests that I'm waiving a warranty.  That's just false;

11  right?

12  **A.**  I actually don't know.

13  **Q.**  You don't know that there isn't a warranty by the

14  Play Store saying "Everything you download from here is so

15  safe, we'll give you a new phone and compensate you for the

16  loss of data"?

17  **A.**  I'm not aware of the warranties in the product.

18  **Q.**  Okay.  You talked a little bit about Exhibit 5945.  Do you

19  see that?

20       **TECH PERSONNEL:**  Ms. Clark, can you switch it over?

21  BY MR. EVEN:

22  **Q.**  And 5945 is a marketing slide deck; correct?

23  **A.**  Yes.

24  **Q.**  And the input here is not from you.  It's from the

25  marketing department; correct?

1   **A.**   Yes.

2   **Q.**   They wrote it?

3   **A.**   Correct.

4   **Q.**   Okay.  So when somebody wrote that "The ability to install

5   unknown apps in Android is a major security vulnerability,"

6   that's the marketing department writing that?

7   **A.**   That is correct.

8   **Q.**   Let me go back for a second to an exhibit we talked about,

9   which is 8576, and that is the letter that you sent to Epic.

10      And on the second page, do you see that there's a

11   reference at the very end to a recent blog from Checkpoint.  Do

12   you see that?

13   **A.**   Yes.

14   **Q.**   And Checkpoint is a security company; correct?

15   **A.**   Yes.

16   **Q.**   A well-known security company; correct?

17   **A.**   I know them.

18   **Q.**   Okay.  And you were talking a little bit about

19   Man-in-the-Disk and how serious of a threat that is; right?

20   **A.**   Yes.

21   **Q.**   And Man-in-the-Disk, just so we understand, I think you

22   said that actually, is the risk there is that a phone that

23   already has malware, that malware can use the vulnerability to

24   install a second malware on top of it; right?

25   **A.**   Yes.

1    Q.   And if you can turn to Exhibit 8009 in your binder.

2    A.   (Witness examines document.)  Yes, okay.

3    Q.   Okay.  You see that that is, in fact, the Checkpoint

4    release from August 12, 2018, that you referenced?

5    A.   Yes.

6              MR. EVEN:  I'd like to admit 8009.

7              MR. OLASA:  No objection, Your Honor.

8              THE COURT:  It's admitted.

9         (Trial Exhibit 8009 received in evidence.)

10   BY MR. EVEN:

11   Q.   So let's go and see what Checkpoint said about this.

12        This is the exact same Man-in-the-Disk vulnerability;

13   correct?

14   A.   I believe so.

15   Q.   And this was discovered and published on August 12, 2018,

16   before Mr. Cunningham found the vulnerability in Epic's

17   launcher; correct?

18   A.   I believe that's before.  I'm not 100 percent sure.

19   Q.   It's a day before he at least reported it to you.

20   A.   Okay.  Okay.

21   Q.   All right.  So let's see what Checkpoint said about this

22   vulnerability.

23        Let's first go to page 9.

24        And on page 9 at the bottom it says (as read):

25             "From experience it would seem that mere guidelines

1          are not enough for OS vendors to exonerate themselves of

2          all responsibility for what is designed by app

3          developers."

4          Did I read that correctly?

5     A.   I'm sorry, what page are you on?

6     Q.   9.  It's on your screen, sir.  It's probably easier.

7     A.   Okay.  I see it on the screen.

8     Q.   And instead it says (as read):

9               "Securing the underlying OS is the only long-term

10         solution to protecting against this new attack surface

11         uncovered by our research."

12         Correct?

13    A.   Yes.

14    Q.   And the OS vendor is Google; right?

15    A.   Yes.

16    Q.   Okay.  Let's go to page 6.

17         And on page 6 you see at the top Checkpoint reports that

18    it checked several other apps to see whether they find this

19    vulnerability in the field; correct?

20    A.   Yes.

21    Q.   And at least two of these, Google Translate and Google

22    Voice Typing, both had the same vulnerability; correct?

23    A.   It wasn't the same exact vulnerability, but the same

24    family of attacks, Man-in-the-Disk.

25    Q.   This is the same Man-in-the-Disk vulnerability, I think

1    you said that already.  And Google Voice Typing and

2    Google Translate both had that vulnerability; correct?

3    **A.**    Yes.  I think it's important to understand it's a

4    different actual --

5    **Q.**    Sir, this is the vulnerability that Checkpoint is

6    reporting in --

7    **A.**    Same class -- sorry.

8    **Q.**    -- google's own apps; correct?

9    **A.**    Yes.

10            **THE COURT:**  Let's not interrupt each other.

11            **THE WITNESS:**  Sorry about that.

12            **THE COURT:**  Ask the question again.  Let's start from

13   the top.

14   **BY MR. EVEN:**

15   **Q.**    This is the vulnerability, the Man-in-the-Disk

16   vulnerability, as reported by Checkpoint, and they are

17   reporting that they found it in the field in two of Google's

18   own apps, Google Translate and Google Voice Typing; correct?

19   **A.**    It was the same class of vulnerability.

20   **Q.**    And they are reporting that they found it in two of

21   Google's own apps, Google Translate and Google Voice Typing;

22   correct?

23   **A.**    Yes.

24   **Q.**    And if you go to page 7, at the bottom you see that it

25   says (as read):

1        "Upon discovery of these application vulnerabilities,

2    we contacted Google."

3    Do you see that?

4    A.   Yes.

5    Q.   And jump to the next sentence.

6    It says (as read):

7        "A fix to the applications of Google was released

8    shortly after."

9    Right?

10   A.   I see that.

11   Q.   Now, Checkpoint follows the same 90-day industry standard;

12   correct?

13   A.   I don't know what their disclosure policy is.

14   Q.   Regardless of how long, fair to say that Google has known

15   about this vulnerability for quite some time from Checkpoint

16   because Checkpoint told them and Google managed to fix two of

17   its own apps; correct?

18   A.   We knew it when -- we knew about this report when they

19   reported it to us, August.

20   Q.   Prior to August 12, which is when they reported it to the

21   world; right?  They are reporting that they told you and that

22   you fixed it?

23   A.   Yes.

24   Q.   So you must have known about it before; right?

25   A.   Sorry.  Could you express the question one more time?

1   **Q.**   Checkpoint told you 90, 60, however many days prior to

2   August 12 that this vulnerability is an issue; correct?

3   **A.**   I don't know when they told us.

4   **Q.**   But you know that it's sometime -- enough time for Google

5   to understand and release fixes --

6   **A.**   Yes.

7   **Q.**   -- prior to August 12; correct?

8   **A.**   Yes.

9   **Q.**   And you're not aware sitting here today that Google fixed

10   its guidelines to developers, such as Epic, to make the

11   pitfalls of this vulnerability clearer; correct?

12   **A.**   Could you please repeat that?

13   **Q.**   You sitting here today, you're not aware of Google

14   actually changing its guidelines to -- so that developers like

15   Epic understand that this vulnerability has been identified by

16   Checkpoint, Google knows about it, Google hasn't fixed the OS

17   yet, but developers should take care when they are designing

18   their own apps not to repeat the mistakes that were done in

19   Google Translate, for instance?

20   **A.**   I really have lost your question.  Maybe you can simplify

21   it.

22   **Q.**   It's a pretty simple question.

23        Sitting here today, you do not know that Google released

24   any new guidelines to developers to say "Watch out.  This

25   vulnerability has been reported to us by Checkpoint.  You

1   should take the following five steps"?

2   **A.**   You're asking if Google released guidelines subsequent to

3   this report?

4   **Q.**   Subsequent to learning about the vulnerability from

5   Checkpoint.

6   **A.**   I don't know.

7   **Q.**   You're not aware of Google creating any task force about

8   Google Translate; correct?

9   **A.**   No.

10   **Q.**   You're not aware of any blog post about Google Translate?

11   **A.**   No.

12   **Q.**   You're not aware of Google tipping off any newspapers

13   about the vulnerability in Google's own apps; correct?

14   **A.**   No.

15            **MR. EVEN:**  No further questions, Your Honor.

16            **THE COURT:**  Okay.  The witness may step down.

17                      (Witness excused.)

18            **THE COURT:**  All right.  That's it for today.

19       Now tomorrow, let's do 9:00 o'clock.  The area around the

20   Asian Art Museum is going to be blocked off for a bit.  So if

21   you're driving in, just be aware of that.

22       Okay.  We'll go to 2:45 tomorrow.  And we'll end today, as

23   we always do, with our affirmation that we're going to put

24   everything out of mind, not read anything, not hear anything,

25   not discuss anything, certainly not research anything, look

 1   anything up on the Internet, or anything else.

 2        I'll see you tomorrow morning.

 3             **THE CLERK:**  All rise.

 4        (Proceedings were heard out of the presence of the jury:)

 5             **THE COURT:**  We're all set?

 6             **MR. POMERANTZ:**  Your Honor, a couple of things, if I

 7   may.

 8             **THE COURT:**  Yes.

 9             **MR. POMERANTZ:**  Your Honor had ordered us to lodge

10   some materials with you in connection with tomorrow's hearing.

11             **THE COURT:**  Litigation holds, yes.

12             **MR. POMERANTZ:**  Yes, Your Honor.  And I have them in

13   this binder.

14             **THE COURT:**  If you can hand them to Ms. Clark, please.

15   Thank you.

16        Anything else?

17             **MR. POMERANTZ:**  Your Honor, we -- Mr. Bornstein has

18   asked for a copy of them.  We obviously consider these to be

19   privileged, but we would take direction from Your Honor.

20             **THE COURT:**  Well, I think -- yes.  Let me -- I'll tell

21   you in the morning.  Okay?  Just I'll tell you in the morning.

22        Okay.  Anything else?

23             **MR. POMERANTZ:**  One other thing, Your Honor.  There is

24   a motion that we have filed relating to the sealing of some

25   information related to Apple.

1      **THE COURT:**  To Apple?

2      **MR. POMERANTZ:**  Apple, yes.

3      But based on my discussions with Epic's counsel during the

4      course of today, I expect we're going to work that one out.

5      **THE COURT:**  Oh, good.  Okay.

6      **MR. POMERANTZ:**  And we'll talk tonight, but I'm pretty

7      sure we're going to work it out.

8      **THE COURT:**  Is Apple coming tomorrow, is that the --

9      **MR. BORNSTEIN:**  I don't know, Your Honor.

10     **MR. POMERANTZ:**  They had sent us some exhibits that

11     relate to our agreements with Apple --

12     **THE COURT:**  Oh, I see.  Okay.

13     **MR. POMERANTZ:**  -- as something they want to use with

14     one of our witnesses tomorrow; and based on my conversations

15     with Epic's counsel, I believe we're going to work that one out

16     tonight.  But we'll notify Your Honor tomorrow if there's any

17     issues.

18     **THE COURT:**  Okay.

19     **MR. BORNSTEIN:**  Just one other question, Your Honor.

20     **THE COURT:**  Yes.

21     **MR. BORNSTEIN:**  For planning purposes, how long do you

22     anticipate you'll want to keep us tomorrow and how much time do

23     you expect we should be spending on an exam of the witnesses?

24     **THE COURT:**  Just budget an hour and see how it goes.

25     **MR. BORNSTEIN:**  Okay.  So we'll do something in

 1   15 minutes, whatever is useful for the Court.

 2            **THE COURT:**  Yeah.

 3            **MR. BORNSTEIN:**  Okay.  Thank you.

 4            **THE COURT:**  Oh, also, looking a little bit down the

 5   road, I rearranged my other commitment, so we will have trial

 6   on Monday, December 11th.  We will not have trial on Monday,

 7   December 4th.  All right?

 8       So that whole week, rather than Tuesday to Tuesday, will

 9   just be Sunday to Sunday.  Okay?

10       All right.  I'll see you in the morning.

11            **MR. BORNSTEIN:**  Thank you, Your Honor.

12            **THE CLERK:**  All rise.  The Court is in recess.

13            (Proceedings adjourned at 3:32 p.m.)

14                         ---oOo---

15                   <u>**CERTIFICATE OF REPORTER**</u>

16       I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   DATE:   Wednesday, November 15, 2023

20

21

22

23   _____

24        Kelly Shainline, CSR No. 13476, RPR, CRR
                 U.S. Court Reporter

25