Volume 9

Pages 1786 - 1866

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )  **NO. 21-md-02981-JD**
_____)
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )  **NO. 3:20-cv-05671-JD**
                                 )
GOOGLE, LLC., et al.,            )
                                 )
          Defendants.            )
_____)

San Francisco, California
Thursday, November 16, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**<u>APPEARANCES</u>**:

For Plaintiff:

                CRAVATH, SWAINE & MOORE LLP
                825 Eighth Avenue
                New York, New York  10019
      **BY:**  **GARY BORNSTEIN, ATTORNEY AT LAW**
            **YONATAN EVEN, ATTORNEY AT LAW**
            LAUREN MOSKOWITZ, ATTORNEY AT LAW
            MICHAEL ZAKEN, ATTORNEY AT LAW
            MICHAEL BYARS, ATTORNEY AT LAW
            ANDREW WIKTOR, ATTORNEY AT LAW

For Defendants:

                MUNGER, TOLLES & OLSON LLP
                350 South Grand Avenue - 50th Floor
                Los Angeles, California  90071
      **BY:**  **GLENN POMERANTZ, ATTORNEY AT LAW**

                MUNGER, TOLLES & OLSON LLP
                601 Massachusetts Avenue NW
                Suite 500 East
                Washington, DC  20001
      **BY:**  **JONATHAN KRAVIS, ATTORNEY AT LAW**
            **LAUREN BELL, ATTORNEY AT LAW**

                MORGAN, LEWIS & BOCKIUS LLP
                One Market - Spear Street Tower
                San Francisco, California  94105
      **BY:**  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

# I N D E X

Thursday, November 16, 2023 - Volume 9

**PLAINTIFF'S WITNESSES**                                    **PAGE**  **VOL.**

**WALKER, JOHN KENT  (OUT OF PRESENCE OF JURY)**
(SWORN)                                                    1801    9
Direct Examination by Ms. Moskowitz                        1801    9
Cross-Examination by Ms. Chiu                              1851    9

1   **<u>Thursday - November 16, 2023</u>**                          **<u>1:56 p.m.</u>**

2                          **P R O C E E D I N G S**

3                              **---oOo---**

4      (Proceedings were heard out of the presence of the jury:)

5          **THE CLERK:**  Calling Civil Case Number 20-5671 and

6   21-2981, Epic Games, Incorporated vs. Google LLC and In re

7   Google Play Store Antitrust litigation.

8      Will counsel please step forward and state your

9   appearances for the record?

10         **MR. BORNSTEIN:**  Good afternoon, Your Honor.  Gary

11  Bornstein for Epic Games.

12         **MR. POMERANTZ:**  Good afternoon, Your Honor.

13  Glenn Pomerantz for Google.

14         **THE COURT:**  Okay.  Where's the witness?  Do you want

15  to bring them in or her in?

16     Well, we lost a trial day.  It's never happened before

17  this way, but there's a first for everything.  People

18  exercising their speech rights.  So we'll have to make up for

19  it at some point.

20     I thought possibly a couple of hours on Wednesday, but I

21  think at this point people have travel plans already in place,

22  and I'm thinking mainly of the jurors.  So I think it might be

23  a little much to spring this on the jury on Monday, so we'll

24  just have to --

25         **MR. POMERANTZ:**  Your Honor, we had been talking about

**PROCEEDINGS**

 1  maybe December 1, which is the Friday of the week of after

 2  Thanksgiving.

 3         THE COURT:  Oh, that's possible.  Okay.  Yeah.

 4         MR. POMERANTZ:  We were just thinking about adding

 5  that day in there.

 6         THE COURT:  Just while we're here, so you're going

 7  to -- how many fact witnesses do you have for Monday?

 8         MR. BORNSTEIN:  We have two live fact witnesses and we

 9  have a few depositions that we are hoping to play.  It may be a

10  little much to fit into one day.  The testimony yesterday went

11  longer than either of us anticipated with those witnesses.  So

12  we have Don Harrison, who is a Google individual who had

13  partnership responsibilities; and then we're calling

14  Mr. Sweeney, the Epic CEO, live.

15         THE COURT:  All right.  So we'll do the experts on

16  Tuesday then?

17         MR. BORNSTEIN:  Well, the deposition run time that we

18  have is probably all in with the four witnesses about

19  two hours.  So I think having both live witnesses and all that

20  deposition time is going to be a lot for one day.  So we'll

21  have probably some spillover of the depositions into Tuesday.

22         THE COURT:  Will we start on Tuesday with the experts?

23         MR. BORNSTEIN:  Yes.

24         MR. POMERANTZ:  Your Honor, one correction.  So

25  Mr. Harrison is here today.  Obviously he didn't get on the

**PROCEEDINGS**

```
 1   stand.  He is on vacation with his family starting next Monday

 2   to the following Monday, and so we have not had a chance yet to

 3   discuss it with Mr. Bornstein.  I just found this out after

 4   court today when we went out there.  So we were going to

 5   request that Mr. Harrison testify anytime from Tuesday to the

 6   end of the week of -- anytime we can fit him in.

 7            THE COURT:  Work something out.  It should be okay.

 8   Right?

 9            MR. BORNSTEIN:  It's the first I'm hearing of it,

10   Your Honor, so I'll speak to Mr. Pomerantz.

11            THE COURT:  Okay.  So before we get to the main event

12   here, you had some other issues?

13            MR. BORNSTEIN:  Oh, just a few minor issues,

14   Your Honor.  One is the Court had requested some better copies

15   of documents.  We passed those up.

16            THE COURT:  Oh, yes.

17            MR. BORNSTEIN:  No, no.  I think we already provided

18   those to the deputy.

19       Oh, we got them back.  Okay.

20            THE COURT:  Are you going to put these in the record

21   so that the jury -- it was mainly for the jury to be able to

22   read them.

23            MR. BORNSTEIN:  We can certainly put them in the

24   record, Your Honor.

25            THE COURT:  Okay.  Here's what I think we should do.
```

PROCEEDINGS

```
1          MR. BORNSTEIN:  Right.  The --

2          THE COURT:  Before we send the case to the jury,

3   just -- you know, we've had a number of these.  I'm sure you

4   know them as well or better than I do.  Just find the ones that

5   aren't easily readable, and you-all can just fix them.  Okay?

6   There might be 24 or 36 of them.  I mean, there were a lot of

7   them.

8          MR. BORNSTEIN:  Yeah.

9          THE COURT:  So you can just do that, and Ms. Clark can

10  work with you in how to -- we won't re-mark them.  We'll just

11  swap them in.

12         MR. BORNSTEIN:  Understood.  We've had a little

13  difficulty on pagination issues and the alike, but I'm sure we

14  can sort that out.

15         THE COURT:  Okay.  What else?

16         MR. BORNSTEIN:  The other issue that we wanted to

17  raise is there's an evidentiary dispute.  This relates to one

18  of the depositions that we intend to play.  It's the deposition

19  of the chief financial officer, and we have a document which we

20  would like to introduce through her testimony.  It is a

21  financial planning deck.  I can have it passed up if Your Honor

22  would like to take a look at it.

23         THE COURT:  This is Google's CFO?

24         MR. BORNSTEIN:  Correct.

25         THE COURT:  Okay.  Yeah, why don't you hand that to
```

1    the CRD, please.

2            **MR. BORNSTEIN:**  Thank you.

3            **THE COURT:**  Thank you.

4       All right.  Which page or is it the whole thing?

5            **MR. BORNSTEIN:**  Well, we intend to rely on pages 61

6    and 62 of the document, but the objection is to foundation.  We

7    took the deposition of Ms. Porat, the CFO.  She testified that

8    although she did not specifically remember this document, that

9    it was prepared by the Google finance team; that she assumes it

10   would have come to her; that there are references in here to

11   someone on her team who is the person responsible for financial

12   planning and analysis; and that it, you know, would have come

13   from her.  And that Ms. Porat thinks the information in there

14   is useful and is the kind of thing that she would have

15   ordinarily reviewed and taken advantage of in the course of her

16   job.

17       And she just said she didn't remember this document

18   specifically, but otherwise laid what we believe is more than

19   adequate foundation.

20           **THE COURT:**  Well, does she remember the numbers?  I

21   mean, these seem like CFO numbers.

22           **MR. BORNSTEIN:**  Yes, Your Honor.

23           **MR. POMERANTZ:**  Your Honor --

24           **MR. BORNSTEIN:**  The first three numbers in the

25   columns, they're actually publicly reported Google information

 1  from SEC filings in the totals there in the bottom columns, and

 2  then the remainder are estimates for, you know, the same

 3  categories of information.

 4          **THE COURT:**  All right.

 5          **MR. BORNSTEIN:**  The significance of the document is it

 6  breaks out, as you can see, the cost and revenue into different

 7  line items that -- including Play, and is relevant to the

 8  profit issues that we discussed the other day.

 9          **THE COURT:**  Okay.

10          **MR. POMERANTZ:**  Your Honor, the deposition does --

11  we'd be happy to submit a copy -- does not state what

12  Mr. Bornstein just described.  What Ms. Porat testified to was

13  that she did not recall the document, that she did not know

14  when the document was created, that she did not know who

15  prepared the document or who it was prepared for, and that she

16  did not know the purpose of the document.  All of those things

17  are under oath in the deposition.

18      She said that this is not a common report; it's not a

19  standard report that comes out periodically.  And the

20  information that's laid out here, unlike what Mr. Bornstein

21  said, is not the way it's publicly reported other than the

22  bottom line, the totals.

23      And that --

24          **THE COURT:**  I think that's all he said, was the totals

25  were reported.

1    **MR. POMERANTZ:**  Right.  And so, you know, there was no

2    foundation.  They knew this when they took her deposition.

3    This was all under oath, that she was not the person who could

4    lay the foundation for this document; and we don't believe that

5    this can come into evidence through Ms. Porat because her sworn

6    testimony is she didn't know about this document.

7         **MR. BORNSTEIN:**  Your Honor, I'm happy to have the

8    deposition passed up.

9         **THE COURT:**  Let me ask you this, just if I may

10   interrupt.  Why isn't she going to be live?

11        **MR. BORNSTEIN:**  Well, we had -- we're happy to call --

12   if -- we had agreed we didn't need to bring her in.  We have a

13   very small amount of testimony from her.

14        **THE COURT:**  Well, I mean, it sounds like there's a

15   foundation issue that might be better with live testimony.

16        **MR. BORNSTEIN:**  Well, I'm happy to pass the deposition

17   transcript up.  We've marked the relevant pages.  I'm, frankly,

18   very surprised to hear Mr. Pomerantz's description.  She

19   testifies (as read):

20        "I would assume some or all of it would have come to

21     me just given the nature of what's in here.  This would

22     have been produced by the people in the finance team."

23     She lays a foundation.

24        **THE COURT:**  Let me ask you this:  Did she testify

25   about these numbers?

PROCEEDINGS

1      **MR. BORNSTEIN:**  She was asked about the specific

2    numbers that are in there.  This is --

3          **THE COURT:**  Did she agree with them?

4      **MR. BORNSTEIN:**  Well, they're the publicly reported

5    numbers down there on the bottom.

6          **THE COURT:**  No, I know, but the other stuff.  Did she

7    say "That looks right to me" or anything like that?

8      **MR. BORNSTEIN:**  She said that this was information

9    that was context that would be used for forecasting and trends

10   analysis.  She did not remember the specific numbers in there

11   one way or the other.

12         **THE COURT:**  Are you sure you don't want to have her

13   come in?

14     **MR. BORNSTEIN:**  Well, I'm happy -- if we're not going

15   to have her come in, what I proposed to Mr. Pomerantz was if

16   his view is that we don't have the right person, they just

17   bring the right person in.  We're happy to lay the foundation

18   with an individual who can come in here and do it.

19         **THE COURT:**  All right.  So who wrote this thing?

20     **MR. POMERANTZ:**  I don't know, Your Honor, but I do

21   know that this issue has been out there.  And the idea that

22   they can add a witness at this point -- if you remember, I had

23   Mr. Lockheimer on the stand.  He didn't have foundation of a

24   certain document.  Your Honor didn't let it into evidence.  Are

25   we going to, then, be able to call somebody to bring that

PROCEEDINGS

1  document into evidence because it didn't come in through

2  Mr. Lockheimer?

3      **THE COURT:**  But this is a different situation.  I

4  can't ask any questions of the video.  I can ask questions of

5  Mr. Lockheimer.

6      **MR. POMERANTZ:**  It wasn't the video.  It was a

7  different thing.  There was a document that I wanted to show

8  Mr. --

9      **THE COURT:**  No, no.  I can't -- this witness is on

10  video.

11      **MR. POMERANTZ:**  Oh, I understand.

12      **THE COURT:**  I can't ask her any questions.  I can ask

13  Mr. Lockheimer questions.  That's the difference.  It's live

14  versus recorded, and that's why this is not the same at all.

15      So --

16      **MR. BORNSTEIN:**  Your Honor, there's really no dispute

17  that this is an authentic Google finance department document.

18      **THE COURT:**  I'm not worried about that.  I don't think

19  you made this up.

20      **MR. BORNSTEIN:**  And the other thing I should say is

21  she is a custodian of the document.  This comes from her files.

22      **THE COURT:**  No, I understand that, but there is the

23  issue of -- you know, she has to have some connection to the

24  contents of the document such that she can answer intelligently

25  questions about it.

1       So why don't you hand me the deposition, but I think you

2   ought to start looking at bringing in -- just find this person.

3   If there's going to be an objection, find this person and let's

4   have them come in.

5           **MR. BORNSTEIN:**  Thank you, Your Honor.

6           **THE COURT:**  Okay.

7       All right.  Okay.  Is that it?

8           **MR. BORNSTEIN:**  That is all we had.

9       There was a sealing issue that I think has been raised by

10  Spotify.  I don't know if that needs to be addressed now.

11          **THE COURT:**  Maybe we'll do that today.  Is that going

12  to be for Monday?

13          **MR. BORNSTEIN:**  We hope to be able to play the

14  deposition on Monday if we can fit it in with time.

15          **THE COURT:**  All right.  We can probably do that.

16      Okay.  Now, let me just set the table for what we're doing

17  today.

18      As you-all know, we have spent a lot of time on the Chat

19  issues.  In my prior order, which is at Docket 469, I made a

20  number of findings of fact and conclusions of law based on the

21  testimony I received at that point.  Among those findings of

22  fact are:

23      Number one, Google employees use Chats for substantive

24  work and business discussions.

25      Number two, Google could have turned Chat history to on as

**PROCEEDINGS**

1   a default setting for all employees subject to the litigation

2   hold in this case but chose not to.

3       Three, Google did not follow-up with the custodians in

4   this case to audit or monitor their Chat preservation decisions

5   or practices.

6       Four, Google employees were advised of litigation holds

7   but were apparently unable or unwilling to follow the

8   instructions to preserve Chats.

9       And, five, each employee was effectively left to his or

10  her own -- to make his or her own call with respect to whether

11  to preserve a Chat communication or not.

12      Those findings are based on the record and are carved in

13  stone.  We are not relitigating those today.

14      What has concerned me is that in the course of our trial,

15  an abundance of new evidence has emerged that has underscored

16  all of these findings of fact.  Specifically, among other

17  events, all of the key witnesses from Google -- when I say "key

18  witnesses," the key witnesses for plaintiff's case -- from

19  Google testified that they did not make any effort to preserve

20  Chats.

21      The record also -- the evidence -- the trial evidence and

22  testimony also showed that these same witnesses actively asked

23  for Chat history to be turned off when they entered into

24  communications with colleagues who had the history on.

25      Witnesses also testified that they were unsure and at sea

**PROCEEDINGS**

1  about what subject matters and documents were within the scope

2  of the litigation hold here and did not receive adequate

3  guidance from the lawyers responsible for implementing the

4  hold.

5       And then all of that was capped off with the fake

6  privilege testimony by an in-house lawyer at Google.  And I

7  will say, now that we're out of the presence of the jury, and

8  I'm certainly not going to communicate this to the jury in any

9  way, shape, or form, but I found her testimony about what she

10 meant about the words "fake privilege" to be evasive and not

11 credible.

12      So I am now at a point where I am going to actively

13 consider making the inference -- adverse inference mandatory as

14 opposed to permissive.  It's currently permissive.  I'm

15 thinking about upgrading that to mandatory.

16      Here's what I -- I've asked Epic to do a little exam.

17 Here's what I'm particularly interested in hearing.

18      Number one, why was Chat history not set to on as a

19 default from the very beginning of this case?

20      Number two, why was Chat treated differently from e-mail?

21 The record has established that all e-mail was automatically

22 preserved for all custodians, no questions asked.  The same was

23 not done for Chat.  I do not understand why.

24      And then, three, I also want to know what Google has done

25 to fix this since this has all come out in this case.

1          So let's bring the witness up.  You can all start, and

2     then maybe we'll get some answers to those questions.

3          THE CLERK:  Raise your right hand.

4                    **JOHN KENT WALKER**,

5     called as a witness for the Plaintiff, having been duly sworn,

6     testified as follows:

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.

9          Please state your full name for the record and spell your

10    last name, please.

11         THE WITNESS:  John Kent Walker, W-A-L-K-E-R.

12         THE COURT:  Okay.  Please.

13         MS. MOSKOWITZ:  Thank you, Your Honor.

14                    **DIRECT EXAMINATION**

15    BY MS. MOSKOWITZ:

16    **Q.**   And I'm going to try to cut in real time some of the

17    rehashing that Your Honor just told me I don't need to do.

18         But good afternoon, Mr. Walker.

19    **A.**   Good afternoon, Ms. Moskowitz.

20    **Q.**   My name is Lauren Moskowitz, and I represent Epic.

21         You are currently the chief legal officer and president of

22    global affairs at Alphabet and Google; correct?

23    **A.**   That's right.

24    **Q.**   And before you were CLO, you served as the general counsel

25    of Google from 2006 until 2018; is that correct?

1  **A.**   Yes.

2  **Q.**   All right.  I'd like to pull up Exhibit 8030 in evidence

3  and look at that.  It will be on your screen as well.

4      And I'm going to focus on the bottom e-mail, which is from

5  September 16th, 2008.  And it is in your binder.  It's 8030.

6  It should be towards the back perhaps.

7  **A.**   Yes, I see.  Okay.

8  **Q.**   All right.  This is -- the bottom e-mail here is an e-mail

9  sent on your behalf to all Google employees in September 2008;

10 correct?

11 **A.**   It was sent by Bill Coughran, and I'm cosigning, yes.

12 **Q.**   On your behalf as well.  You see on the second page you're

13 a signatory?

14 **A.**   Yes.  When I say I'm cosigning, that's what I mean, yes.

15 **Q.**   Okay.  Sorry.  I didn't hear the cosign.

16     You were Google's general counsel at the time this e-mail

17 was sent?

18 **A.**   That's right.

19 **Q.**   So let's look at it a bit.

20     You start out the e-mail by pointing out that Google had

21 been involved in a lot of litigation and regulatory matters;

22 right?

23 **A.**   Yes.

24 **Q.**   You pointed out that much of what Google's work is done

25 online and that anything Google employees write could be the

1   subject of legal review in discovery; right?

2   **A.**   That's right.

3   **Q.**   And you specifically refer to Google being an e-mail and

4   instant messaging culture; right?

5   **A.**   Yes.

6   **Q.**   And that's a reference to the fact that Google employees

7   use both e-mail and instant messages to conduct its day-to-day

8   substantive work?

9   **A.**   I would say the vast majority is e-mail, but certainly we

10  also use instant messaging, yes.

11  **Q.**   But you said here that we are an e-mail and instant

12  messaging culture; right?

13  **A.**   Yes.

14  **Q.**   You didn't say that you only use e-mail primarily and that

15  sometimes people chat; right?

16  **A.**   No, but based on my experience, that's the fact.

17  **Q.**   That was your experience back in 2008?

18  **A.**   It's my experience that we use much more e-mail than we

19  use Chat, but we certainly use both.

20  **Q.**   All right.  Have you done any studies to quantify how many

21  Chats go out every day compared to e-mail?

22  **A.**   No.  I'm just reporting based on my personal experience.

23  **Q.**   Right.  And you're aware that your information governance

24  lead had not conducted any similar analysis?

25  **A.**   I don't know either way.

1  **Q.**   Have you spoken to Mr. Lopez in connection with any of the

2  matters in this case?

3  **A.**   I have not.

4  **Q.**   Okay.  Did you review his testimony?

5  **A.**   I did.

6  **Q.**   Okay.  Did you review both his Chats here in testimony and

7  his trial testimony?

8  **A.**   I'm not sure.  I believe I may have.

9  **Q.**   Do you remember seeing in there that he had done no

10  analysis whatsoever to determine how many Chats were conducted

11  on a day-to-day basis as compared to e-mail?

12  **A.**   I don't recall that.

13  **Q.**   Okay.  So everything that you're saying about your view of

14  Chats is based on how you use Chat?

15  **A.**   And how people use Chat with me, yes.

16  **Q.**   Okay.  But it's based on your engagement with the tool?

17  **A.**   That's correct.

18  **Q.**   Okay.  Have you done any question asking to understand how

19  prevalent the use of Chat is at the enterprise level besides

20  your personal experience?

21  **A.**   No.

22  **Q.**   So you were writing this e-mail and telling the entire

23  Google company that they all conduct a lot of their work

24  online; right?

25  **A.**   I'm not sure I was telling them.  I think they were aware

1    of that; but, yes, that's what the e-mail says.

2    **Q.**   Right.  The culture was people wrote things down and

3    communicated in writing?

4    **A.**   Yes.  And obviously in person as well but, yes.

5    **Q.**   Right.  But much of the work is done online it says;

6    right?

7    **A.**   Yes.

8    **Q.**   Yes?

9    **A.**   Yes, that's correct.

10   **Q.**   And so there was a change -- a change being announced

11   after a few paragraphs talking about how when people write

12   things down, they could end up being misconstrued in court.  Is

13   that basically the gist and the context of the first and second

14   paragraphs in this e-mail?  And please take a moment to look if

15   you need.

16   **A.**   Sure.

17       (Witness examines document.)  I would slightly -- I point

18   out that it says that things can be mis- -- sorry --

19   misconstrued or taken out of context, not just in court but

20   more generally.  And this was a general issue with regard to a

21   variety of things, the leak issues and the like.  But certainly

22   making sure that our records were accurate and appropriate for

23   court was part of the rationale for this.

24   **Q.**   Right.  And making sure that certain types of

25   communications were -- that could end up in court were not

1    going to be preserved; right?

2    A.   Well, if we're talking about these sections, this is part

3    of a larger records retention effort where we were going

4    through -- this is within my first year or so as general

5    counsel.  We were working to establish, based on industry norms

6    and advice from outside counsel, what periods were appropriate

7    for the retention of different kinds of materials.

8    Q.   Okay.  And that's your ordinary course document retention

9    as opposed to what you need to do during a legal hold; is that

10   a fair distinction that you're making?

11   A.   But both are important, and obviously there's an interplay

12   between those two.

13   Q.   Right.  And we'll get to that in a moment.

14        But in terms of the context that you were laying out here

15   for the change, and the change being to change the

16   enterprise-wide default setting for history to be off for all

17   Chats; right?  That's the change that was happening here?

18   A.   That's correct.

19   Q.   Okay.  And did you say that that was also based on outside

20   counsel advice?

21   A.   The overall -- it's 15 years ago, so I can't remember the

22   details of what was being advised on what; but there were

23   certainly different retention periods for different categories

24   of documents, including more transitory or femoral material.

25        E-mail, I remember we were hearing ranges of one to two

1  years for retention periods.  Here, this is with Chat, it was I

2  think a difference between 24 hours and 30 days, I believe.

3  It's been some time.

4  **Q.**  Right.  And so what you were doing here, though, was

5  setting the ordinary course retention period through this

6  e-mail to have off-the-record Chats be destroyed after 24

7  hours; right?  That's what the change was here?

8  **A.**  As I said, we weren't keeping them.  I don't mean to be

9  semantic here, but a business normally retains records for as

10  long as it needs them for business purposes.

11       And so we generally thought that unless there was a

12  special occasion, a special reason, to hold onto Chat, or in

13  this case I think it was called Talk at the time, 24 hours was

14  the default retention period there unless the employee would

15  turn it on --

16  **Q.**  Right.

17  **A.**  -- to change that hold period to 30 days.

18  **Q.**  Okay.  But just so that we're talking about the same

19  thing, a 24-hour retention period is the same thing as saying

20  that those would be destroyed after 24 hours permanently;

21  right?

22  **A.**  You used the word "destroyed."  I would say not retained

23  but, yes.

24  **Q.**  Right.  Deleted, destroyed; right?

25  **A.**  I don't know that we affirmatively delete.  The records

1   are no longer maintained in the ordinary course of business.

2   Q.   Okay.  They're purged and they are absolutely gone from

3   this earth; right?

4   A.   They're certainly not -- well, I say "certainly."  I don't

5   believe they're recoverable, yes.

6   Q.   Okay.  And that would be not a surprise to you to hear

7   that everyone who I've asked that question to has confirmed

8   that they are permanently deleted and destroyed?

9   A.   I'm not technically savvy enough to know how things might

10  be kept.

11  Q.   Okay.  So this policy was a change to the default setting

12  for all Google employees from history on to history off?

13  A.   That's correct.

14  Q.   And this policy remained in place for the next 15 years

15  until sometime in Q1 2023?

16  A.   Yes.

17  Q.   We'll get to that recent change in a moment, but I just

18  want to focus on what that 15-year period looked like, and I

19  wanted to talk specifically not about the business retention

20  period but what happens under a legal hold.  Okay?

21       So let's just talk about legal holds in general, and I

22  want to make sure we're on the same page.

23       You understand that when a legal hold or a litigation hold

24  is issued for a litigation or a regulatory matter, you

25  understand Google's obligated to preserve all documents and

1    data that are potentially relevant to that matter; right?

2    A.    Yeah, I think reasonable steps to make sure we're

3    preserving everything that's covered or, you know, potentially

4    related to a claim in litigation.

5    Q.    Right.  And those include affirmative steps to do that

6    right?

7    A.    Yes.

8    Q.    And that includes taking action to suspend all auto delete

9    functions that are otherwise in place; right?

10   A.    There are a variety of ways of being able to achieve that.

11   I think for many years we used direction to employees because

12   we felt that the overwhelming majority of the use cases for

13   Talk or Chat or similar instant messaging functionalities were

14   not of high-business utility; but where there was a litigation

15   hold, we would issue specific direction to employees to retain

16   those materials.

17   Q.    All right.  We'll get to what you said for Chats.

18         But let's just -- I think the judge just said this, but

19   you understand that when a Google employee was placed on a

20   legal hold, Google automatically preserved all e-mails and all

21   on-the-record Chats that that employee participated in; right?

22   A.    That's correct, yes.

23   Q.    They didn't have to take any action?

24   A.    That's right.

25   Q.    And, in fact, they couldn't take action?  They couldn't

1   delete it even if they wanted to?

2   **A.**   I believe that's right.

3   **Q.**   Right.  Even if they pressed a button to delete, it was

4   going to be retained?

5   **A.**   I believe that's right, yes.

6   **Q.**   And so that was true not just from e-mails, though, but

7   for on-the-record Chats?

8   **A.**   Yes.

9   **Q.**   And Google made a policy decision to treat on-the-record

10  Chats differently than off-the-record Chats?

11  **A.**   Well, if you're referring back to the 2008 decision, I

12  think there --

13  **Q.**   I'm not.  I'm not.

14  **A.**   Okay.

15  **Q.**   I'm talking about the retention.  I just want to make sure

16  you understand my question.

17  **A.**   Yeah.  I'm not sure actually.  Please.

18  **Q.**   For preservation for the last let's call it 5 to 10 years,

19  I'm not -- let's forget about 2008 for a second.  For the last

20  5 to 10 years when an employee went on a hold, on-the-record

21  Chats were automatically preserved, auto delete functions were

22  suspended.  You understand that?

23  **A.**   Yeah, the retention period was 24 hours for that class of

24  e-mail; and if they went on the record, I believe the retention

25  period was 30 -- 30 days, and they were automatically retained

1   per the litigation hold.

2   **Q.**   I think you're incorrect.

3        Have you reviewed the legal -- the retention policy for

4   Chats recently?

5   **A.**   I'm perhaps getting confused as between the current

6   approach and the approach as of some years ago.  So perhaps you

7   could restate your question.

8   **Q.**   All right.  Well, why don't we just look at it.

9   **A.**   Okay.

10  **Q.**   Exhibit 1.  It's in evidence.  It's in your binder, and we

11  can put it on the screen.

12       There's two parts to this document.  There's just your

13  normal retention period and then there's what's happening on a

14  legal hold.  Okay?

15  **A.**   Yeah.  Do you have a -- oh, sorry.

16  **Q.**   Exhibit 1.  It should be first there.

17  **A.**   Got it.  Yep.  Thank you.

18  **Q.**   This is the Google Chat retention policy from 2021.  So

19  before you made any changes --

20  **A.**   Mm-hmm.

21  **Q.**   -- right?

22  **A.**   Yes.

23  **Q.**   All right.  Let's just look at the retention periods for

24  now.

25       It's 24 hours of history is off, but 30 days for history

1  on with one person or a group Chat.  Do you see that?  This is

2  normal retention.

3  **A.**  Yes.

4  **Q.**  Okay.  So the only retention period that's 24 hours is

5  history off.  Do you understand that?

6  **A.**  Yes.

7  **Q.**  Okay.  And Threaded Rooms are 18 months normal course;

8  right?

9  **A.**  I believe so.  They -- we've had a variety of different

10 nomenclatures for Chats, Rooms, et cetera, so I'm less familiar

11 with what the policy was for Rooms and some of the other

12 instant messaging tools.

13 **Q.**  Who's in charge of setting this policy?

14 **A.**  Well, I think it probably goes back to our record

15 retention work.  I'm not sure in the -- you know, at the time

16 in 2008, I was involved with our engineering team.  That's

17 Mr. Coughran, who is the cosignatory of the e-mail.  In the

18 time since, I'm not sure who's directly responsible for

19 updating our retention policies.

20 **Q.**  Okay.  Well, let's look at the legal hold section of this.

21     Do you see where I am?

22 **A.**  I do, yes.

23 **Q.**  Okay.  So what this is trying to describe is what happens

24 to the retention periods for individuals on a legal hold.  Do

25 you agree with me?

1   **A.**   Yes.

2   **Q.**   Do you know who's responsible for this section of this

3   policy?

4   **A.**   I couldn't tell you the individual.  I am assuming it's

5   informed by our legal team as well as our engineering -- core

6   engineering team that does document storage.

7   **Q.**   Do you know who within the legal team?

8   **A.**   I do not.

9   **Q.**   I take it you did not look at this or approve it?

10  **A.**   I don't believe I did, no.

11  **Q.**   Okay.  This is saying that on-the-record Chats will be

12  preserved and Threaded Rooms will be preserved, but there's no

13  mention of the off-the-record Chats.  Do you see that?

14  **A.**   Well, there is a Chat retention FAQs link at the bottom

15  which I believe goes into the Chat policy in more specificity.

16  **Q.**   All right.  Well, I'm trying not to rehash too much here,

17  but let's just look at the second sentence on the top.  It

18  talks about all retention periods being paused for the below

19  categories.  Do you see that?

20  **A.**   Yes, I do.

21  **Q.**   Okay.  It does not -- the retention period for

22  off-the-record Chats of 24 hours is not paused under the legal

23  hold policy; right?

24  **A.**   That's correct.

25  **Q.**   Okay.  So those continued to be retained only for

1  24 hours; right?

2  **A.**  Yes.

3  **Q.**  Okay.  Even if someone was on a legal hold?

4  **A.**  I believe that's correct, yes.

5  **Q.**  Who decided to treat off-the-record Chats differently than

6  on-the-record Chats?

7  **A.**  I'm not sure.  I don't believe we had the engineering

8  functionality to do it, so I'm not sure that there was a

9  conscious decision in the way your question suggests.

10  **Q.**  When did your engineering department obtain that

11  functionality, sir?

12  **A.**  I believe it was earlier this year.

13  **Q.**  That's the first time that functionality became available,

14  or that's the first time they did it?

15  **A.**  I want to distinguish two points here.  One is the

16  retention period for material, as you say, in the ordinary

17  course, and that's certainly been available for some years.

18      I believe there's a second stage here, which is the

19  ability to implement particular litigation holds for e-mail

20  that's in a different state that tracks across the litigation

21  hold work, and that required additional engineering work that

22  we undertook at the earlier part of this year.

23  **Q.**  Did you read Mr. Lopez's testimony from January of this

24  year before this judge?

25  **A.**  I believe I did.  As you mention, I think Mr. Lopez had

1    several pieces of testimony.  I tried to review all the

2    relevant material here, but I can't confirm for sure.

3    **Q.**   Okay.  Before you did anything to change anything, you

4    understand he testified that you were fully capable from a

5    technical perspective to make the changes to actually change

6    the default to on and to keep the history on for all legal hold

7    recipients?

8    **A.**   I think I understand the distinction you're trying to

9    draw.  Was it technically possible to do after a fair amount of

10   engineering work?  The answer to that question is yes.  Did we

11   have the ability to flip a switch and retain the litigation

12   hold?  I believe the answer to that is no.

13        **THE COURT:**  The answer to that is not no.  The answer

14   to that is, yes, based on the record that was presented to me

15   by the Google witness in January.  That finding of fact is

16   carved in stone.  Don't dance around it.

17        **THE WITNESS:**  Okay.  I didn't mean to, Your Honor.

18        **THE COURT:**  Well, you are.  So that is carved in

19   stone.  You have had the ability to flip a switch to put Chat

20   default on on -- history on for all people subject to a

21   litigation hold.  So take that as a premise.

22        And go ahead.

23        **THE WITNESS:**  If I could --

24        **THE COURT:**  No.  Go ahead.

25        **THE WITNESS:**  -- please.

1      Okay.

2  **BY MS. MOSKOWITZ:**

3  **Q.**   So Google made a decision not to suspend the auto delete

4  period for history off Chats; right?

5  **A.**   Not to suspend the auto delete period.  Yeah, I believe

6  that's right because, again --

7           **THE COURT:**  Mr. Walker, you keep saying "I believe."

8           **THE WITNESS:**  Okay.

9           **THE COURT:**  Your CEO said the buck stopped with you.

10 So if you don't know, just say "I don't know."  But, please,

11 don't say "I'm guessing," "I believe," "I'm speculating."

12      I was told you're the man.  I was told by your lawyers

13 here.  I was told by your boss, the CEO.  If you don't know,

14 just say it.

15          **THE WITNESS:**  Okay.

16          **THE COURT:**  But telling me you believe is not useful.

17          **THE WITNESS:**  I understand.

18          **THE COURT:**  Now, let's try that question again,

19 please.

20          **THE WITNESS:**  Okay.

21 **BY MS. MOSKOWITZ:**

22 **Q.**   Google made a decision, a policy decision, not to suspend

23 the auto delete function for off-the-record Chats for legal

24 hold recipients; correct?

25 **A.**   We didn't implement -- and, Your Honor, this gets to your

1  question.  I'm sorry, but I'm caught in between her question

2  and --

3          **THE COURT:**  Just answer the question, please.

4          **THE WITNESS:**  We didn't implement the litigation hold

5  until -- we didn't put these e-mails -- sorry -- these Chats on

6  litigation hold until earlier this year, that's correct.

7  **BY MS. MOSKOWITZ:**

8  **Q.**  So until first quarter of 2023, Google's policy was not to

9  suspend the auto delete functionality for off-the-record Chats;

10  right?

11  **A.**  Our policy was to direct employees to comply with it --

12  **Q.**  Sir --

13  **A.**  -- but there was no automated way to do that.

14  **Q.**  Okay.  And we'll get to what you told employees.  I'm just

15  trying to speak one by one about right now suspending the auto

16  delete function.  Okay?  So let's just focus on that.

17      This is talking right here about retention periods getting

18  paused for certain categories of Chats; right?  That's what's

19  right on the screen here; right?

20  **A.**  Yes, that's right.

21  **Q.**  Okay.  And this is clearly stating that Google's policy

22  was not to suspend retention periods for off-the-record Chats;

23  right?

24  **A.**  That we were preserving all of these for longer than the

25  normal retention period, that's right; and that for other

1    material, it was to be preserved if it became on the record,

2    the on-the-record one-on-ones that are described here.

3    **Q.**   Okay.  Off -- I'm just going to try one more time, but

4    then I will move on.

5         This is making clear that the auto delete function, the

6    auto delete retention period of 24 hours was not going to be

7    paused for anyone on a legal hold for off-the-record Chats;

8    right?

9    **A.**   The 24-hour retention period was not being extended, yes.

10   **Q.**   It wasn't being paused, and that was -- okay.  It wasn't

11   being paused; right?

12   **A.**   We have a 24-hour retention period for this class of

13   documents.  We did not have -- I believe we had the technical

14   ability to turn that on, to turn -- to default people on to on

15   the record.  We did not --

16        **THE COURT:**  Well, your belief is not relevant because

17   there's already evidence in the record that says exactly the

18   opposite.  Okay?

19        So here's the question.  Let me ask you this -- you're tap

20   dancing around here, and this is turning out to be less helpful

21   than I hoped.  In one way it's more helpful.

22        But why didn't you just preserve the Chats, turn the

23   history on like you did for e-mail?  Why didn't you do that?

24        Look, it's already been established you could do it.  So

25   what was the policy reason why you didn't do that?  Why did you

1  leave it up to each individual employee to decide in his or her

2  own untrammeled discretion whether they were going to preserve

3  a communication?

4        THE WITNESS:  So as I recall Mr. Lopez's testimony, as

5  I point out, to turn -- we had the ability to turn -- to force

6  Chat to history on.  What we did not have the ability to do

7  immediately was to impose litigation holds that would carry

8  within -- for a subset of individuals that would track across

9  the various cases that we were tracking.  So that is what I was

10 trying to distinguish earlier.

11     Why didn't we do that earlier?  Why didn't we develop that

12 functionality earlier?  Because we believed that --

13        THE COURT:  No, that's not what I'm asking.

14        THE WITNESS:  Oh, I'm sorry.

15        THE COURT:  All right.  You try.

16 BY MS. MOSKOWITZ:

17 Q.   So I think you're referring to Mr. Lopez's testimony about

18 creating groups and for switching the group to history on.  Is

19 that what you're referring to?

20 A.   I believe that's right.

21 Q.   Are you aware that he testified that that was, in fact,

22 quite possible all along?

23 A.   The information that I have is that it took some

24 engineering work on our side to be able to establish not the

25 change to default on or off but the change to the handling

1    of --

2            **THE COURT:**  Let's move.  We're not -- this is a

3    finding of fact and a conclusion of law I've reached on a full

4    evidentiary record, and I am not going to go back and backhoe

5    for this witness.

6            So consider that carved in stone.  Take that as a premise.

7    You can go on to your next questions.

8    **BY MS. MOSKOWITZ:**

9    **Q.**   So over the past 15 years, did any in-house lawyer at

10   Google ever raise their hand and say they disagreed with how

11   Google was approaching its retention of off-the-record Chats?

12   **A.**   Not that I'm aware of.

13   **Q.**   Did any in-house lawyer ever ask to change the defaults or

14   the retention settings for hold recipients for any matter they

15   were overseeing?

16   **A.**   There were discussions of making sure we provided

17   appropriate direction to employees, but I don't remember a

18   conversation about changing the default periods.

19   **Q.**   All right.  Well, we'll come back to that.

20           Did any outside counsel ever ask Google to change its

21   approach for how it was handling off-the-record Chats for any

22   matters they were handling?

23   **A.**   Not that I'm aware of.

24   **Q.**   Are you aware that Google had to make some representations

25   to the parties and the Court in connection with this case about

**WALKER - DIRECT / MOSKOWITZ - OUT OF PRESENCE OF JURY**

1  Chats?

2  **A.**   I know there was an evidentiary hearing, but I don't know

3  the nature of the representations.

4  **Q.**   Even before the hearing, are you aware that counsel for

5  Google was making a series of representations to the parties

6  and to the Court about what Google's efforts at preservation

7  was -- were?

8  **A.**   I assume that's a normal part of the litigation, but I

9  don't have specific knowledge.

10  **Q.**   Do you know who at Google was involved in making or

11  reviewing those representations about what the Chats retention

12  policies were?

13  **A.**   I assume it was the litigators and the discovery counsel

14  in the case, but I have no firsthand knowledge.

15  **Q.**   It didn't make its way up to you?

16  **A.**   No.

17  **Q.**   Did the fact that we were having a trial about the Chats

18  issue back in January make it up to you?

19  **A.**   I was aware there was an evidentiary hearing about the

20  Chats issue, yes.

21  **Q.**   Did you participate in any way in selecting witnesses or

22  preparation for that?

23  **A.**   I don't believe I did, no.

24  **Q.**   Are you aware that counsel made a representation to the

25  Court that Google had taken appropriate steps to preserve all

1  evidence relevant to the issues reasonably evident in this

2  action?

3  **A.**    I don't have any knowledge one way or the other.

4  **Q.**    You have no idea who the source of that representation was

5  then?

6  **A.**    I do not.

7  **Q.**    Are you aware on -- that Google's counsel represented that

8  Google did not have the ability to change default history

9  settings for employees on a legal hold?

10  **A.**    I do not.

11  **Q.**    Do you know what the source -- who the source of that

12  representation was?

13  **A.**    I do not.

14  **Q.**    So you mentioned this and let's dig in.  We've been told

15  that the way Google handled legal holds for Chats was to tell

16  the recipients two things with respect to those Chats.  First,

17  don't Chat about issues relevant to the case; but, second, if

18  you violate that rule number one, turn history on.  Do I have

19  it about right?

20  **A.**    That seems about right, yes.

21  **Q.**    Did you approve of that procedure?

22  **A.**    At some early point, and I'm not -- not in particular with

23  this case, but early on I think that's even reflected to some

24  degree in the 2008 e-mail we talked about.

25  **Q.**    And so that's been the procedure, those sort of two

1   instructions from 2008 until first quarter of this year?

2   **A.**   Generally.  We've gone through, I'm sure, a variety of

3   policies over the years, but that's been the direction of

4   travel, yes.

5   **Q.**   And so at the outset of setting that policy, you were

6   involved in that?

7   **A.**   That's correct.

8   **Q.**   And so inherent in these instruction, I think as I asked,

9   it was an assumption that employees basically wouldn't follow

10  at least one of the rules and instructions; right?

11  **A.**   No.  That it might be necessary for them -- I think the

12  rule is generally don't have conversations about these topics;

13  but if there's a clear business need, then you should go on the

14  record to do so.

15  **Q.**   So you agree it's important for hold recipients to

16  understand their hold obligations and to comply with them;

17  right?

18  **A.**   I do.  I think I, in fact, may have had a hand in writing

19  some of our initial hold -- the format of our initial hold

20  notices to write them in plain English so they were easy to

21  understand.

22  **Q.**   Okay.  Well, we haven't seen those, so I'll just have to

23  take your word for it.

24       But let's just start with how folks understood the notice.

25       Was there any effort -- other than the plain language

1  that's written in the hold itself according to you, was there

2  any effort to ensure that employees did, in fact, understand

3  their legal hold obligations?

4  **A.**  Yes.  We sent multiple notices to them, including

5  reminders and amendment -- amended notices when the parties or

6  the claims would change.

7       The -- we also gave them a point of contact, typically the

8  litigator responsible for the matter, if they had any questions

9  about the scope of the hold.

10       And reached out, obviously, through a series of due

11  diligence steps to understand who should be subject to holds or

12  who should be ultimate custodians in a case.

13  **Q.**  Did you tell employees in that hold notice to communicate

14  with care -- to remember to communicate with care?

15  **A.**  I believe we did, yes.

16  **Q.**  And that was a reference to basically a reminder for them

17  to just not write things down when they're on a legal hold?

18  **A.**  No, I wouldn't characterize it that way.

19  **Q.**  Okay.  That's fine.

20  **A.**  I think we --

21  **Q.**  I'll just take your answer.

22  **A.**  Fine.

23  **Q.**  Are you aware that during her testimony -- well, let me

24  withdraw that.

25       Did you read and review the testimony of Margaret Lam from

1  this trial?

2  **A.**   Yes, I did.

3  **Q.**   Are you aware, then, that during her testimony Ms. Lam

4  stated that she thought she only had to preserve documents for

5  this entire multidistrict antitrust litigation if it had

6  something to do with Epic?

7  **A.**   Yes, I did.   I was concerned and disappointed to see that.

8  **Q.**   And, in fact, Ms. Lam also told the Court that no lawyer

9  ever talked to her about her preservation obligations, right,

10  when she first received the hold?

11  **A.**   I don't remember that in her testimony, but she may well

12  have.   I just don't remember either way.

13  **Q.**   So do you remember that she testified that when she did

14  ultimately down the road speak to a lawyer when she asked about

15  her preservation obligations, she was still left with an open

16  question as to whether she was only obligated to preserve if it

17  mentioned Epic?

18  **A.**   That would be surprising to me based on our ordinary

19  course.   We have a team of lawyers in our e-discovery group

20  that's specifically trained on privilege to provide advice if

21  these questions come up, and that's not my understanding of

22  privilege --

23  **Q.**   Well, did you since we --

24  **A.**   -- or retention requirements.   Excuse me.

25  **Q.**   Since you've reviewed her testimony, have you undertaken

1  to commence an internal investigation of where the breakdown

2  was in the process within your legal function?

3  **A.**   I don't want to get into individual personnel matters, but

4  we are following up, yes.

5  **Q.**   And have you identified to whom she spoke within the legal

6  department that left her with this open question?

7  **A.**   I don't know the answer to that.

8  **Q.**   And you understand that there was a serious breakdown with

9  respect to what she understood her legal hold obligations were;

10  right?

11  **A.**   She clearly did not understand what her legal hold

12  obligations were, that's correct.

13  **Q.**   You are aware that that wasn't just Ms. Lam that had that

14  problem; right?

15  **A.**   I'm actually not.  Ms. Lam's testimony was the one that I

16  am familiar with.

17  **Q.**   Okay.  Do you have any understanding that Mr. Rosenberg

18  sitting right where you are had literally no idea what the

19  issues were in this case when he was asked about what he did to

20  retain Chats?

21  **A.**   I have not reviewed Mr. Rosenberg's testimony, so I can't

22  speak to that.  But, again, I would say that our ordinary

23  course is to try to reach out to people and provide detailed

24  and specific instruction as to what the issues are in a case

25  and what the claims are.

1  Q.  Well, at any given time, though, Google is under a number

2  of litigation holds; is that fair?

3  A.  That's generally -- yes, that's correct.

4  Q.  In fact, for individual business people, they can be

5  subject themselves to multiple litigation holds at once; right?

6  A.  That's right.  That's why we provide the reminders that I

7  referred to, including kind of an index -- actually an index

8  and a link on a website to which holds are in place at any

9  given point.

10  Q.  Would it surprise you if some business people that

11  testified in deposition and in court in this case were on as

12  many as 10 legal holds at once?

13  A.  It's conceivable.

14  Q.  Some from the day they started?

15  A.  Again, it's conceivable.

16  Q.  And with that, by virtue of being on so many holds at once

17  and all these lists on a website that they can go look at,

18  isn't it fair to say that there are employees on legal holds

19  for whom basically everything they do in their day-to-day job

20  is relevant to one of those matters?

21  A.  I doubt that, honestly; but if your larger point is, you

22  know, is a lot of what they do relevant to this, that's

23  probably correct for some employees anyway.

24  Q.  Right.  And so you still, though, left it up to them to

25  decide for Chats which of those Chats were going to be

1    potentially relevant to any one of those matters, any one of

2    those items on these lists that are linked on these hold

3    notices that they can go visit?

4    **A.**    No, we really didn't.  We gave them clear and specific

5    direction that they should not use Chat to discuss those

6    matters; and if there -- in the rare case where they needed to

7    for business reasons have a longer retention period, they

8    should go on history on.

9    **Q.**    Did you do anything ever to audit that people were

10   listening to you and not using Chat to do exactly what they

11   were doing in their day-to-day business as part of an instant

12   messaging culture?

13   **A.**    I did not.

14   **Q.**    Nobody did; right?

15   **A.**    I don't know the answer to that question, but I think my

16   understanding generally is that we relied on the -- both a

17   combination of the multiple notices that were being sent out

18   and the follow-up from our litigation and e-discovery counsel

19   and outside counsel.

20   **Q.**    You didn't even have the capability to audit what was

21   going on in people's Chats; right?  You just didn't do it;

22   right?

23   **A.**    I'm not sure what you mean by the capability to audit what

24   was going on in their Chats.

25   **Q.**    If Mr. Lopez had testified there was no functionality for

1  them to -- for you, Google, to actually look at what people

2  were chatting and making sure that they weren't, in fact,

3  chatting about business topics covered by a legal hold.  No QC

4  whatsoever; right?

5  **A.**   We don't monitor internal employee communications, that's

6  correct.

7  **Q.**   Right.  So you didn't, in fact, do anything to make sure

8  that they were listening to your so-called instruction to not

9  use Chat to talk about issues relevant to any of the number of

10  legal holds they were under; right?

11  **A.**   We generally assume when we give employees direction, that

12  they'll follow those directions; and if they're not sure about

13  them, that they'll ask questions.

14  **Q.**   Right.  But you didn't do that for e-mails, sir.  Only for

15  Chats?

16  **A.**   That's because there's a very different balance between

17  the use of e-mail, which has much more business significance,

18  and Chat, which is oftentimes used for transitory, you know,

19  "Are you there?  Are you free for a call?" kinds of material.

20  **Q.**   Okay.  I think -- we're not --

21          **THE COURT:**  Okay.  You know, this has been a frequent

22  refrain, and the evidence is utterly refuted.  It is as plain

23  as day starting with Mr. Pichai on down that Chat was used

24  regularly by Google employees for substantive business

25  discussions.

1          So I will not accept an effort to marginalize it or

2     distinguish it from e-mail on that grounds because the record

3     is plain as day that that is not right.

4          Go ahead.

5     **BY MS. MOSKOWITZ:**

6     **Q.**   So for Chats, you expected your employees, hundreds,

7     thousands of employees, to stop what they were doing for every

8     instant message that they ever sent or received every day and

9     parse through a list of topics on some legal hold to decide

10    whether they should take an action to change a default setting

11    in their Chat before conducting the rest of their business; is

12    that -- that was the policy; right?

13    **A.**   It was our expectation that such Chats would be actually

14    really quite rare.  When we're making substantive business

15    decisions, for the most part they're done in meetings or

16    through e-mails or as a review of slide decks and materials.

17    **Q.**   All right.  So you're sticking with that.  You think that

18    was a completely reasonable choice?

19    **A.**   The choice to direct employees to follow litigation hold

20    materials I think was reasonable at the time.  As questions

21    arose as to whether or not employees were, in fact, following

22    those directions, we've actually subsequently changed our

23    policy.  And as His Honor referred to earlier, earlier this

24    year we actually have switched both dimensions that I referred

25    to earlier with regard to --

1   Q.   Yeah.   You did that after you got caught, sir; right?

2   A.   After we saw evidence that employees were not, in fact,

3   doing -- following the direction that they had been given,

4   whether because they misunderstood it or for some other reason.

5   Q.   And this was the first time in the 15 years of its history

6   that you ever had anyone questioning this policy at all?

7   A.   I don't remember prior -- your prior question was whether

8   we had had our lawyers asking whether or not we should change

9   the default hold periods for different kinds of documents.   I

10  don't remember those -- having those conversations.

11  Q.   Let me -- let me ask it more broadly.

12       At any time in the last 15 years before we and this Court

13  shone a light on what was going on, at any time before then,

14  did anybody ever, to your knowledge, raise their hand in any

15  way and say "What we are doing about off-the-record Chats is

16  wrong"?   Did anyone ever do that?

17  A.   I have no recollection of that, no.

18  Q.   Do you understand -- yes or no -- that it was wrong?   I

19  just want to understand where you're at today.

20  A.   Well, we believed that we were complying with our legal

21  obligations to take reasonable measures to retain documents

22  that were subject to litigation or relevant to legal claims

23  that were being made, starting when we were beginning this

24  process and creating retention periods for a whole variety of

25  documents.

1    And, you know, we believed that our direction to our

2    employees was appropriate and was -- we followed up, I would

3    say, conscientiously and provided resources for them if they

4    had questions.

5    **Q.**   Except for Ms. Lam it sounds like.

6    **A.**   Well, that was your characterization.  I don't -- I'm not

7    familiar with the facts of the conversation with Ms. Lam, what

8    she -- the conversations she may have had with lawyers,

9    et cetera, but I think it is clear she didn't understand what

10   appropriate retention was.

11   **Q.**   Did you look at any of her Chat messages?

12   **A.**   I did.

13   **Q.**   They're distressing, aren't they?

14   **A.**   I was surprised and concerned to see those, yes.

15   **Q.**   Right.  Because it wasn't just that she didn't understand

16   what the hold was.  She knew she was on a hold and was

17   specifically asking colleagues to turn history off so that her

18   Chats wouldn't be retained; right?

19   **A.**   My recollection is that she was -- I believe she

20   acknowledges that she's on a hold, and she asked people to take

21   history off.  I don't know why she did that.  I don't know what

22   the nature of the conversation was going to be, but it's

23   clearly not in line with the direction that we give to our

24   employees.

25   **Q.**   Okay.

1    **A.**   If the conversations were going to be having to do with

2    litigation, they should have been on on hold.

3    **Q.**   Right.  And you saw that they, in fact, were to do with

4    matters directly relevant to this case; right?

5    **A.**   I believe that's right.  I'm actually not familiar myself

6    enough with the matters here to be confident of that but, yes.

7    **Q.**   And you're aware beyond Ms. Lam that employees in relevant

8    business areas for this case continued to use Chats for

9    substantive business purposes after receiving a litigation hold

10   in this case; right?

11   **A.**   I'm familiar with a couple examples of that, yes.

12   **Q.**   A couple?

13   **A.**   That I'm familiar with, yes.

14   **Q.**   Okay.  So you're aware that Mr. Kolotouros so testified?

15   **A.**   That -- the distinction I would make is were there -- did

16   he ever do it or did he regularly do it.  It's my experience

17   that people do not regularly do this.  Could they ever do it?

18   Certainly that's possible.

19   **Q.**   Okay.  So when you say that, you think that they just

20   weren't using -- they were following rule number one, they just

21   weren't using Chats?  Is that your belief?

22   **A.**   That I think they were generally, as a rule, not using

23   Chats to make substantive business decisions or have subject --

24   I'll leave it at that.

25   **Q.**   What is that based on?  What is that based on?

1  **A.**   My personal experience of how people tend to use Chat

2  within the company.  Again, I don't want to exclude the

3  possibility of it might have happened, and it clearly did

4  happen in at least one or two cases, but I've not seen it being

5  done as a rule at Google.

6          **THE COURT:**  Well, I want to be clear about two things.

7  One, Ms. Lam just happened to have the draw of giving testimony

8  in court.  She is by no means a rogue example in the evidence I

9  have seen in this case.  She is a fairly typical example of

10  Google employees actively seeking to evade to preserve

11  business-related Chats by turning off history.

12      I just don't want her to be singled out.  She is not --

13  she had the unfortunate position of being the testimony

14  provider in court, but she is by no means alone nor is it just

15  one or two examples, Mr. Walker.

16      Go ahead.

17  **BY MS. MOSKOWITZ:**

18  **Q.**   You understand, do you not, that as a result of your Chat

19  retention policy, or lack thereof, that millions of potentially

20  relevant Chats were destroyed that could have been used in this

21  case?

22  **A.**   The only number I'm familiar with is that millions of

23  documents were produced.  I have no idea how many Chats were

24  might have been at issue here.

25  **Q.**   Right.  You just have no idea.  It could be that many?  It

1    could be more?

2    **A.**    It would surprise me if it's anything close to that many

3    because, as I say, typically, in my experience, which I think

4    is typical, there are many more e-mails sent in the course of a

5    day than there are Chats.

6    **Q.**    Okay.  And, again, you're basing that completely on how

7    you engage with e-mail and Chat; right?  You have no idea how

8    the rest of Google uses Chat and e-mail; right?

9    **A.**    I've been an employee of the company for 17 years.  I have

10   some idea based on that experience, but I wouldn't say that

11   I've done a survey, no.

12   **Q.**    Did you undertake any investigation -- beyond you sitting

13   at your own desk for the last 17 years and chatting with your

14   colleagues, did you undertake any investigation to understand

15   how prevalent the use of Chats were compared to e-mail at any

16   time?

17   **A.**    I did not personally, no.

18   **Q.**    Are you going to do that?

19   **A.**    I think we shifted our policy at this point, so I'm not

20   sure it's a live issue.

21   **Q.**    All right.  So let's talk about the change.

22         So Google made these changes after the evidentiary hearing

23   that this Court held back in January; correct?

24   **A.**    I believe that's right, yes.

25   **Q.**    And so Google informed the Court back in February that it

1  was turning history to on for the hold recipients in this case

2  and that those employees would not have the ability to change

3  history off.  Is that consistent with what you understand

4  happened back then?

5  **A.**  My understanding is that we've turned history on for

6  all -- anyone who is on a lit- -- well, sorry.  Let me start

7  again.

8       My understanding is we have turned history default on for

9  everybody in the company; and that for all cases where we have

10  a litigation hold, we are preserving by default all those

11  messages.

12  **Q.**  Okay.  I was going to get to the rest of the company, but

13  I think you just answered it.

14       So for now going forward, the current policy is history is

15  now on by default for all employees; yes?

16  **A.**  Yes.

17  **Q.**  And when that employee is on a legal hold, are they

18  prevented from turning history to off now?

19  **A.**  Yes.

20  **Q.**  Okay.  And so all Chats sent by all employees under a

21  legal hold are now being automatically preserved under a legal

22  hold?

23  **A.**  Yes.

24  **Q.**  Okay.  All retention periods are suspended or paused;

25  right?

1   **A.**   Yes.

2   **Q.**   Okay.  And -- well, withdrawn.

3        **MS. MOSKOWITZ:**  I think briefly on the fake privilege

4   issue, Your Honor, if we could look at 6056, which is in

5   evidence.

6        **THE COURT:**  Let me just be clear about this new policy

7   from a few months ago.

8        An individual cannot turn Chat history off if they're on a

9   hold?

10        **THE WITNESS:**  That is correct.

11        **THE COURT:**  So it's just like e-mail now?

12        **THE WITNESS:**  That is correct.

13        **THE COURT:**  All right.

14        Go ahead.

15   **BY MS. MOSKOWITZ:**

16   **Q.**   You're familiar with the Communicate with Care training at

17   Google?

18   **A.**   At a high level, yes.

19   **Q.**   Did you start that program?

20   **A.**   I'm not sure I was labeled, but we certainly, early in my

21   time, talked with employees about making sure they were

22   speaking accurately, correctly, not speculating, similar kinds

23   of things.

24   **Q.**   Okay.  That's sort of your summary of what the Communicate

25   with Care training is?

1  **A.**   Yes.

2  **Q.**   And you're familiar with this training here, this version

3  of Communicate with Care training that you said "What

4  training?"

5  **A.**   Yes, I am.

6  **Q.**   All right.  And some of the things that are in this

7  document looked familiar to me from your 2008 e-mail.  Some of

8  the same principles are in both documents; right?

9  **A.**   I haven't read it closely enough to be able to give you a

10 good answer there.

11 **Q.**   Did you review this before you came here today?

12 **A.**   I looked at it at a high level, but I didn't crosswalk it

13 against the 2008 e-mail.

14 **Q.**   We don't need to do that.  The Court has the documents.

15      Let's go to page 30 briefly.

16      This is a portion of the Communicate with Care that deals

17 with privileged and confidential.  Do you see that?  It's also

18 on the screen, sir.

19 **A.**   Give me just a moment, please.

20      (Witness examines document.)  Yes, okay.  I've got it.

21 Yes.

22 **Q.**   All right.  So this page notes (as read):

23           "In the beginning that while phrases like

24           'confidential,' 'sensitive,' and 'private' may alert

25           Googlers to the sensitivity of your communication, they

1        won't protect it from being disclosed in the course of a

2        legal or investigative matter."

3        Right?  Do you see that?

4   **A.**   I do.

5   **Q.**   So the only way to protect it from being disclosed in the

6   course of a legal or investigative matter is if it were

7   protected by the attorney-client privilege; right?

8   **A.**   Or work product privilege or various other privileges but,

9   yes.

10  **Q.**   I didn't hear what the other privilege was.

11  **A.**   Attorney -- sorry -- attorney work product.

12  **Q.**   Oh, work product.

13  **A.**   Yes.

14  **Q.**   I'm sorry.  I didn't hear the work product.

15  **A.**   Yes.

16  **Q.**   Okay.  So if an employee wants to protect a document from

17  disclosure in a case, it has to be marked attorney-client

18  privileged or work product?

19  **A.**   No.  Two challenges.  One, it's not whether the employee

20  wants or not.  Of course, it's a question of:  Was it a

21  privileged document?

22       And, two, that determination is not based on whether it

23  was marked or not.  The marking is a convenience for the review

24  teams, but the ultimate decision about whether or not to

25  disclose a document is based on whether or not it's, in fact,

1  giving or receiving legal advice or attorney work product.

2  **Q.**   Do you have an understanding that that was not widely

3  understood by folks at Google, your nuance there?

4  **A.**   I get that attorney-client privilege can be a confusing

5  question.  I believe most people understood that, but it's

6  certainly possible that some did not.  In fact, I -- we

7  repeated this training on a frequent basis online, in training

8  in person by reminding people of this.  So, you know, we try

9  our best to get this point across.

10 **Q.**   All right.  But you warn people that if you want it

11 protected from disclosure, confidential, sensitive, and private

12 isn't going to get the job done; right?

13 **A.**   And, in fact, no labeling gets the job done in your

14 phrase.  It is really a question of whether or not giving or

15 seeking legal advise or prepared at the direction of counsel in

16 preparation for litigation.

17 **Q.**   You're aware that Google was ordered to make a production

18 of additional documents after the evidentiary hearing we had

19 back in January?

20 **A.**   I'm actually not aware of that, no.

21 **Q.**   Okay.  Have you read the two Chats that we shared with the

22 Court and then marked with Ms. Garber earlier last week?

23 **A.**   I'm familiar with two Chats from Ms. Garber; yes.

24 **Q.**   Did you read them?

25 **A.**   I did.  I was, again, concerned and taken aback by those.

1  This is not a concept -- her phrase of "fake privilege" is not

2  one I have heard of or seen or her related being used by

3  anybody at Google during my tenure with the company.

4       THE COURT:  Well, she said there was at least one

5  other case where it came up.  What case was that?

6       THE WITNESS:  My understanding of her testimony was

7  that there was an allegation in a different case -- and I'm not

8  sure which case that was, Your Honor -- that an employee had

9  added a lawyer for privilege purposes improperly.  I'm not

10  sure -- I don't recall what the case was.

11       THE COURT:  Okay.  But --

12       MS. MOSKOWITZ:  Maybe I can help.

13       THE COURT:  -- I mean, you hadn't heard of that other

14  case either?

15       THE WITNESS:  Well, I'm familiar that in the course of

16  back and forth that there's sometimes claims that -- disputes

17  over whether something was appropriately privileged or not

18  privileged, certainly that's right; but I don't specifically

19  have recollection of a claim being made that we were improperly

20  using the privilege.

21       THE COURT:  So you had seen or heard the fake

22  privilege obligation before that?

23       THE WITNESS:  I'd never heard the phrase "fake

24  privilege."  I --

25       THE COURT:  You just said you'd never heard of it, but

1  she said, "Not only did I say it, but there's all of this other

2  litigation about it."  You're 0 for 2?  You hadn't heard either

3  one?

4          **THE WITNESS:**  I had never heard of the phrase; and

5  whether I'd ever heard of an allegation in litigation that one

6  of our employees improperly added a lawyer to a thread or a

7  communication or to invoke privilege, I honestly don't

8  remember.

9  **BY MS. MOSKOWITZ:**

10  **Q.**    Maybe I'll try to translate.

11         Do you remember hearing any allegations about silent

12  attorney e-mails?

13  **A.**    No.

14  **Q.**    Does that ring a bell?

15  **A.**    No.  I've never heard -- I don't remember hearing the

16  phrase "silent attorney e-mail."

17  **Q.**    So you're not aware that in the DOJ Search case that

18  you're on trial for right now, this same allegation came up?

19  **A.**    I remember there were -- well, I don't know if it's the

20  same allegation.  I remember there was a concern about Chat

21  retention generally, that's certainly right; but I did not

22  realize or was not aware that there was an allegation that was

23  similar that somebody was inappropriately adding a lawyer in an

24  attempt to create privilege, presumably one that would have

25  been reviewed by our discovery team before the determination

1    was made.

2    **Q.**    So your discovery team has reviewed millions, tens of

3    millions of e-mails over the course of your time as GC?

4    **A.**    Yeah.   I believe we've arguably produced more material

5    than many other companies out there, yes.

6    **Q.**    Have you done any studies or analysis to see how many

7    times documents have been marked as attorney-client privilege

8    that were not, in fact, actually privileged?

9    **A.**    I don't know that we have.   I'm not familiar with

10   anything; and, again, the test is -- the label can be simply a

11   convenience.

12   **Q.**    I'm just asking if you've done any work.

13   **A.**    Not that I'm aware of.

14   **Q.**    Okay.   Do you think that that work might be worthwhile to

15   make sure that your employees are, in fact, understanding this

16   thorough training they get to make sure they're not mismarking

17   their documents?

18   **A.**    The marking of the documents is not the critical point.

19   The critical point is --

20   **Q.**    I just want to under --

21   **A.**    Yeah.

22   **Q.**    I think it actually is.   So I'm just asking -- well, let's

23   just step back.

24          Is one of the ways that a document gets into the pile for

25   potential privilege review a marking that says something along

1  the lines of "attorney-client privilege"?

2  **A.**   I believe it is, yes.

3  **Q.**   Okay.  So step one, if you want to keep your document out

4  of discovery, is to mark it that way; right?

5  **A.**   Again, I'm not sure --

6  **Q.**   I'm not saying it's going to work.  I'm just saying, if an

7  employee doesn't want a document to be produced in litigation,

8  a surefire way to get it into a pile set aside is to mark it

9  attorney-client privileged; right?

10 **A.**   I would say it the reverse.  If you don't mark something

11 as privileged, it's less likely to be reviewed for privilege.

12 **Q.**   Okay.

13      All right.  So a lot of documents are set aside in this

14 pile and reviewed, tens of millions maybe even, and you have

15 not done any work to understand whether, in fact, there is a

16 systematic problem with how employees at Google are, in fact,

17 treating those words and actually sort of mismarking those

18 documents?  That's not been done?

19 **A.**   Our focus has been on making sure that we're making

20 accurate privilege determinations; and in many cases, even

21 though somebody has mistakenly marked documents privileged, we

22 will still turn that over, as I believe we've done in this case

23 in a number of documents.

24 **Q.**   So you've done no analysis or investigation to understand

25 how prevalent the practices at Google of copying lawyers into

1  e-mails even where no legal advice is actually being sought?

2  **A.**   I'm not aware of any such study.  I'm not honestly aware

3  of how you would do it because in many cases, the lawyers may

4  be copied into a message not for the purposes of trying to

5  create privilege but because it's useful for the lawyer to have

6  that context or background for future issues.

7  **Q.**   Right.  So basically what you're saying is, lawyers get

8  copied in even when no legal advice is being sought or received

9  and it's marked attorney-client privileged; right?

10  **A.**   That sometimes happens, yes.

11  **Q.**   Right.  Like "Ms. So and So, please advise"; right?

12  That's not even seeking legal advice.  You've seen that happen?

13  **A.**   I have.  Again, we do our best to make sure employees

14  understand the scope of the privilege, but some misunderstand

15  and it's a continuing reason we offer training on a recurring

16  basis when you come onboard the company and periodically during

17  your time.

18  **Q.**   Don't you think that the fact that one of your legal team

19  referred to this practice as fake privilege implies that

20  there's actually a concerted effort going on to hide documents

21  from discovery under the cloak of attorney-client privilege?

22  **A.**   I absolutely don't.  Look at the --

23  **Q.**   Sir, I just -- if you don't, you don't.

24  **A.**   No, I don't.  I think --

25  **Q.**   That's not how you interpret her use of that term?

1    **A.**   That is not how I interpret the use of the term, and I

2    think it's inconsistent with the training we were just looking

3    at.

4    **Q.**   That's one of your legal team, though, sir, right, that

5    said it?

6    **A.**   She is a member of the legal team, that's correct.

7    **Q.**   She said it to another member of the legal team; right?

8    **A.**   That's also correct.

9    **Q.**   In fact, that member of the legal team is, in fact, in

10   charge of one of the core areas at issue in this case; right?

11   **A.**   But not somebody on the --

12   **Q.**   Do you know that one way or the other?  If he's -- all I'm

13   asking is if he's involved in one of the core areas.

14   **A.**   He is not involved in the privilege determinations or the

15   litigation side of this case.  He is what we call a product

16   counsel.

17   **Q.**   Understood, sir.  I'm not asking if he actually was the

18   one to decide whether to hide those documents at the end of the

19   day, but whether he was, in fact, on an area relevant to this

20   case where he was joking with one of his colleagues of your

21   team about being copied on e-mails when it was for a fake

22   privileged reason.

23   **A.**   My recollection of the e-mail exchange was not that he was

24   joking but that it was Ms. Garber's comment.

25   **Q.**   It was, but didn't he respond and say "What are you

1   talking about?  What do you mean fake privilege?"

2   **A.**   I don't recall exactly how he responded.  I recall her

3   testimony being essentially that she meant mistaken invocation

4   of privilege.

5   **Q.**   Yeah, we heard that, sir, but that's not the word she

6   used; right?  She used "fake privilege"; right?

7   **A.**   That's correct.

8   **Q.**   And when you reviewed those e-mails, did you look anywhere

9   around that comment to see if Mr. Ostrowski said, "I have no

10  idea what you're talking about about fake privilege"; right?

11  **A.**   I don't believe he said that.

12  **Q.**   He didn't; right?

13  **A.**   No.  No.

14  **Q.**   Okay.  You would agree it's completely wrong for

15  individuals in the business to be copying in lawyers when they

16  were not, in fact, seeking legal advice, right, and asking them

17  "Please advise for fake privilege"?  That's wrong; right?

18  **A.**   I would not agree that it's wrong for employees to copy in

19  lawyers.  We copy in lawyers for lots of different reasons, and

20  employees may mistakenly think that something is privileged or

21  label it as privileged but, again, subject to the review by our

22  discovery team to make sure that we're only invoking privilege

23  where legal advice is actually being given or received by a

24  lawyer.

25  **Q.**   Has anyone at Google ever escalated to you the fact that

1  lawyers are being improperly copied into e-mails?

2  **A.**  As stated, I don't think so.  I mean, the lawyers are part

3  of it.  The notion of the product counsel I referred to before

4  is that the product counsel are fairly well embedded in the

5  individual product teams, so there are a variety reasons why

6  you might want to copy in lawyers to provide them information

7  about business developments so they can ultimately provide

8  legal counsel.

9  **Q.**  Are you aware how many documents were originally retained

10  that ultimately had to be rereviewed and de-prived, as we say,

11  in this case based on attorneys not being actually copied for

12  legal advice?

13  **A.**  I'm not.

14  **Q.**  Do you know what the process was for us to have to go

15  through and actually get that -- get Google to do that for us?

16  **A.**  I'm not familiar with that, no.

17  **Q.**  Any idea what -- that happened in the DOJ Search case for

18  the lawyers there to do the same thing?

19  **A.**  Other than generally knowing that there's often a back and

20  forth with regard to the scope of privilege and getting

21  disclosure on that, I have no specific involvement -- no

22  knowledge of what happened in those specific cases.

23  **Q.**  Right.  No information about the judge --

24          **THE COURT:**  Well, what did you have to do?

25          **MS. MOSKOWITZ:**  I don't have the perfect chronology of

1   it for this case, Your Honor, but we did have a numerous back

2   and forth, including being informed by what was going on in the

3   DOJ case when that was unfolding, and Judge Mehta did, in fact,

4   have to order them to rereview thousands and thousands of

5   e-mails off their privilege log that they -- we forced them to

6   do the same thing for us for these silent attorney e-mails.

7       I can get for Your Honor a more detailed chronology,

8   including whatever briefing would be helpful.

9           THE COURT:  Well, just roughly -- just roughly, I'm

10  not tying your hands, but how much additional lawyer time on

11  your end was that?

12          MS. MOSKOWITZ:  I would hesitate to even guess,

13  Your Honor, right now.  I don't want to speculate, but I

14  certainly can go back and think about that and go back to our

15  correspondence timeline.  It's now a couple years old.

16          THE COURT:  It's also a bit of a fox-in-the-henhouse

17  problem too; right?  You're asking people to rereview their

18  privilege assertions without any independent check.

19          MS. MOSKOWITZ:  That's right.  That's right.

20          THE COURT:  Go ahead.

21  BY MS. MOSKOWITZ:

22  Q.   So I think you mentioned that you were unhappy to see

23  Ms. Garber's fake privilege language; is that fair?

24  A.   Yes, it is.

25  Q.   Have you done anything to instigate a new training for all

1    of your in-house legal department?

2    **A.**   We are following up, and, again, I don't want to get into

3    individual cases, but we do provide specialized training for

4    the lawyers about how to do this.

5    **Q.**   What about the business people?  Are you going to train

6    them more carefully about not copying people in for the wrong

7    reasons?

8    **A.**   I believe that the training we referred to earlier

9    actually pretty clearly spells out when you should and

10   shouldn't seek legal advice -- what's appropriate legal advice,

11   ways of seeking legal advice, and clarifies that privilege only

12   extends to bona fide efforts to give and receive legal advice.

13   **Q.**   Have you taken any steps to ensure that documents have not

14   been withheld from production in this case or other cases due

15   to fake privilege?

16   **A.**   I don't believe we have withheld documents based on fake

17   privilege.  The point --

18   **Q.**   Well, how do you know that if you haven't looked into it?

19   I'm just asking if you've looked into it.  Have you?

20   **A.**   Our normal process is looking into it in a sense by going

21   back and reviewing and understanding the context of individual

22   documents.  That's why we work with outside counsel and

23   discovery expert and privilege experts to make those

24   determinations.

25           **MS. MOSKOWITZ:**  Your Honor, unless it would be

1    helpful --

2            **THE COURT:**  That's fine.

3            **MS. MOSKOWITZ:**  -- for me to fish around a little

4    more, no further questions.

5            **THE COURT:**  That's fine.  Thank you.

6        Anything to ask, Google?

7                    <u>**CROSS-EXAMINATION**</u>

8    BY MS. CHIU:

9    **Q.**  Mr. Walker, you just testified that Google changed its

10   policy for the default settings for Chats earlier this year.

11   Could you explain to the Court why Google made that decision?

12   **A.**  It became clear that we had employees who were not

13   following the directions we had given them or the advice of our

14   legal team; and so notwithstanding the fact that e-mail, by and

15   large, was being used for personal reasons or for transitory

16   communication reasons, there was a risk that we were not fully

17   disclosing all of the communications.

18       And so we felt the safer course of action, the more

19   prudent approach was to go to default on for all employee

20   communications, and to develop the functionality necessary to

21   have litigation holds apply to e-mail -- sorry -- Chat

22   communications that were being held by people on litigation

23   hold.

24   **Q.**  Mr. Walker, counsel showed you Exhibit 8030, the memo from

25   2008.  Do you remember that?

1    **A.**    Yes, I do.

2    **Q.**    Could you just explain why Google changed the default

3    setting at that time to become history off?

4    **A.**    Yes.  So this, again, was part of a larger records

5    retention program where we were looking at a range of records,

6    financial records, contracts, et cetera, and talked with people

7    in the industry, legal standards, outside counsel, to

8    understand what norms were around this.

9        It was -- we thought at the time it was a somewhat unusual

10   case of instant messaging because most companies back then

11   didn't actually have their own instant messaging services.

12   They were relying on AOL instant message or ICQ or various

13   other services like that.

14       So we took the approach of saying these are transitory

15   records that should be retained for 24 hours unless an employee

16   wants to extend it for 30 days because it's of significant

17   business value.

18   **Q.**    Now, in 2008 you were general counsel of Google; is that

19   right, Mr.Walker?

20   **A.**    Yes, it is.

21   **Q.**    Did you have any prior legal experience that helped inform

22   your approach to records retention when you came to Google?

23   **A.**    Yes.  I had served -- for some years I'd been a federal

24   prosecutor here in San Francisco for about five years and in

25   Washington, D.C., and had some experience with the importance

1    of evidentiary preservation.

2        I had also worked at a variety of technology companies

3    here in the Valley just as electronic records were becoming

4    more of a thing, more used in a business context, and so we had

5    developed some expertise about how to process, retain, and

6    identify those records.

7        When I came to Google, we did not have a, what I would

8    call, a robust records retention program.  So one of the things

9    I was working on during my first year with our compliance team

10   and our engineering team was to try and get on top of this

11   problem.

12       Google was in a unique situation in that at least at the

13   time we had 13 times more electronic e-mail than the average --

14   per capita than the average company did.  So we had a

15   significant storage problem.  We had a significant review

16   problem.  Even though we were -- even as we were --

17           THE COURT:  I'm sorry.  But another fact that was

18   established by the record was nobody ever did any studies of

19   the cost or burden or technological requirements for

20   preservation.  So I'm not accepting any evidence that this was

21   burdensome technologically.  This undercuts everything that I

22   was told at the prior hearing and that I relied on in my order.

23   So we're not going to rehoe that.

24       Go ahead.

25           THE WITNESS:  If I could be clear, Your Honor, I was

1    thinking about 2008 rather than --

2          **THE COURT:**  Go ahead.

3    **BY MS. CHIU:**

4    **Q.**   Mr. Walker, if I could just direct your attention to

5    Exhibit 8030 when you communicate the change for the default

6    setting for Chats.

7          What did you mean -- what did Google mean when the change

8    was to avoid inadvertent retention of instant messages?

9    **A.**   We had had several cases in which Chat, then called Talk,

10   or at least a similar instant message program called Talk, had

11   resulted in very long disclosure of days' or weeks' worth of

12   Chats between various employees, including a variety of

13   sensitive personnel matters.

14         That had led to employees being concerned about the

15   potential disclosure of that material to reviewers, whether on

16   our side, from other parties, or more generally being leaked,

17   et cetera.  So we were trying to acknowledge that and say that

18   the core business rationale for holding on to content was for

19   business communication; and, you know, if you needed to use it

20   for short periods of time, we'd hold on to it for short periods

21   of time.

22   **Q.**   And is that why you communicated that employees should

23   turn history on or go on the record when they were speaking

24   about issues relevant to a legal hold?

25   **A.**   Yes.  The last paragraph there that we were speaking about

1   earlier specifically directs them to do that, and we've

2   reiterated that guidance in our policies, in our direct

3   communications to them.

4       I believe the Court now has something like up to 2021

5   different notices in this case in particular to try to clarify

6   that.  I believe the average custodian in this case probably

7   got in excess of 10 different notices as claims changed, and we

8   tried to update that.  So we've tried --

9           **THE COURT:**  I do have those notices.  I didn't produce

10  them because I did discuss them in -- I discussed the substance

11  of them in my prior order, and there was no need to -- they're

12  not really germane to anything.

13      I mean, really here's the issue, if I can be slightly

14  folksy about it.  You know, when you go out to dinner, it

15  doesn't matter what's printed on the menu.  What matters is

16  what the kitchen puts on the plate.

17      And in this case what matters is:  What was the discovery

18  that was or was not put on the plate?  Not did I send out

19  elegant communications, but whether I enforced those

20  communications, whether I made employees live up to their

21  obligations, whether I made sure that people who may be having

22  conversations that are substantive and material to a case not

23  be given untrammeled discretion to decide not to preserve them,

24  and do the things that you know -- I mean, you've made a point

25  now of highlighting your electronic discovery background.

1          Well, that cuts two ways, Mr. Walker.  Of all people, you

2   should have known -- I'm not talking about 2008.  Okay?  I'm

3   talking about 2020 -- all right? -- 12 long years after that

4   policy, and you of all people should have known that at that

5   point there was no excuse for not preserving Chats.  With all

6   that background, you were in an enhanced position to know that.

7          That's my conclusion.  I'm not asking for a response.

8          But anyway, go ahead.

9   BY MS. CHIU:

10  Q.   Mr. Walker, was the intent by Google in 2008 to change the

11  default settings to history off to avoid Google's discovery

12  obligations in litigation?

13  A.   Absolutely not.  It was a joint effort between our legal

14  teams and our engineering teams to streamline our process of

15  e-discovery generally while simultaneously building up the

16  teams that were doing outreach to make sure we were covering

17  all the right custodians.

18         We have one of the larger discovery teams, including

19  people who specialize in this work; and part of what they do is

20  to reach out to custodians and answer questions, advise them,

21  especially if they become then sort of designated -- sorry --

22  people on litigation hold.  I should distinguish.

23         We put far more people on litigation hold than ultimately

24  necessarily our negotiated custodians for a given case, but we

25  work with all those folks to make sure that they are doing --

1    that they are understanding their obligations.

2    **Q.**   Mr. Walker, why didn't Google audit compliance with the

3    legal hold instructions relating to Chats?

4    **A.**   We believed that the detailed direction we were giving to

5    our employees, coupled with the training we were providing and

6    the follow-up notices, were sufficient to direct them to act in

7    compliance with company policy.

8    **Q.**   Mr. Walker, I'd like to talk to you a little bit about the

9    legal hold process at Google.

10       When Google is involved in litigation, who exactly is

11   responsible for preparing and administering the legal hold?

12   **A.**   That would be a combination of the litigators in a

13   particular case; our e-discovery counsel who work internally,

14   including people who are expert on privilege; and outside

15   counsel in many cases.

16   **Q.**   And is the legal hold tailored to each specific case, if

17   you know?

18   **A.**   Yes, it is.  The -- there -- some of the legal hold is

19   consistent, but we do tailor it to the individual claims that

20   are made in specific cases, and we do detail the kinds of

21   materials more specifically that should be retained.

22   **Q.**   I think you mentioned that employees received the

23   litigation hold instructions by e-mail.  Is there any other

24   source that -- or resource that employees receive to remind

25   them of their hold obligations?

1  **A.**   We specifically call out the individual attorney that they

2  can go to if they have questions, typically the litigator or

3  the e-discovery counsel on a case.

4       There's also material on our intranet that talks about the

5  various provision.  We looked at one such document earlier, but

6  there are other documents that go more specifically into Chat

7  requirements and appropriate ways of handling Chat.

8  **Q.**   I think you might be referring to the Chat FAQs; is that

9  right, Mr. Walker?

10  **A.**   I am, at least that.  There may be others.

11  **Q.**   And if you could turn to Exhibit 10002.

12       Is that the Chat FAQs that you were referring to?

13  **A.**   Yes, it is.

14  **Q.**   And can you just point out to the Court what instructions

15  on this page are relevant to informing employees about their

16  hold obligations?

17  **A.**   The section at the bottom of the first page, which is

18  headed "Under what circumstances should history settings be

19  turned on in Chat?"

20  **Q.**   And, Mr. Walker, are there any other internal sites where

21  employees can go to see what litigation holds are subject --

22  they are subject to?

23  **A.**   Yes.  When we send out our e-mail reminders with regard to

24  preservation practices, there is a link to an individualized

25  page where any given individual can understand what holds they

1    are on.

2    **Q.**   Mr. Walker, I'd like to turn to the discussion of

3    privilege that we just had.  Could you -- what was your

4    reaction when you learned that in-house lawyers at Google were

5    using the term "fake privilege"?

6    **A.**   Again, I was -- I was disappointed.  I was surprised.  I

7    had never heard of the term before.  It's not something we

8    train people to do.  To the contrary, we train people not to do

9    that; that the notion is that legal privilege should be --

10    attorney-client privilege should be limited to giving or

11    receiving legal advice from a lawyer.

12    **Q.**   Does Google's legal department instruct Google employees

13    to falsely mark information as privileged to avoid their being

14    produced in litigation?

15    **A.**   Absolutely not.  To the contrary, we repeatedly, both in

16    writing and I, myself, and senior members of our team, have

17    gone out and provided customized training to employees at

18    large, to our most senior management folks, walking through the

19    different types of privilege, how they apply differently in the

20    United States and around the world.

21    **Q.**   And I think you mentioned, Mr. Walker, that sometimes

22    business employees may mistakenly add a lawyer or label a

23    communication as privileged when there is no request for legal

24    advice.  Could you explain that a little bit more?

25    **A.**   Sure.  I think there are a couple of things could be

1  happening there.  Sometimes the question of whether something

2  is privileged is, in fact, confusing and they're choosing to

3  err on the side of marking something privileged when they're

4  mistaken about that.  We hope to catch that kind of mistake in

5  the course of our normal discovery review.

6      They may also be noting something as privileged as

7  background for later legal advice that's being conveyed based

8  on just general awareness of the situation; a business deal is

9  progressing and somebody is going to be interested in

10  understanding a potential legal issue down the road.

11      Sometimes they just make mistakes.  They think of the word

12  "privilege" as similar to "confidential."  But, again, we do

13  our best to catch that through the discovery review process.

14  **Q.**  Now, counsel walked through some training, and I believe

15  you discussed it in your testimony.

16      Is Google committed to doing additional training with

17  employees to confirm they understand how to label

18  communications as privilege properly?

19  **A.**  We do.  And some of the training that you've seen and

20  additional training we're providing provides, you know, correct

21  answer -- indicates that somebody has a correct answer or an

22  incorrect answer based on whether or not somebody is

23  appropriately using the invocation of privilege or not.

24  **Q.**  Mr. Walker, who makes the decisions about what materials

25  should be produced or withheld in litigation on the basis of

1  privilege at Google?

2  **A.**   Again, that's a combination of our litigator on a given

3  case, our e-discovery team, which includes discovery lawyers,

4  privilege lawyers, and outside counsel in many or most cases.

5  **Q.**   Mr. Walker, do you believe that there is a culture of

6  concealment at Google regarding the production of information

7  in litigation?

8  **A.**   Absolutely not.  As I noted before, I believe we produce

9  more documents than most any company I can think of, and we go

10  to extraordinary measures to have a large number of people on

11  litigation hold in the first place, to provide detailed review

12  of what they need to do.

13      We send out surveys to understand who might have relevant

14  information either now or potentially in the past.  If the

15  claims go back some years, there may have been people

16  previously in those jobs.  We try and identify those people so

17  we can pull them in, and then we work with them to identify the

18  full scope of what they might have that's relevant.

19  **Q.**   And, Mr. Walker, do you believe that Google takes its

20  obligations to preserve and produce information in litigation

21  seriously?

22  **A.**   Very much so.

23          **MS. CHIU:**  No further questions, Your Honor.

24          **THE COURT:**  Okay.  You may step down.  Thank you.

25          **THE WITNESS:**  Thank you, sir.

1          (Witness excused.)

2          **THE COURT:**  Well, what are we going to do about this?

3     Epic, what are your ideas?

4          We'll clean up.  You can just leave all that there.

5          Okay.  Go ahead.

6          **MS. MOSKOWITZ:**  Your Honor, I think there is

7     sufficient evidence that you've heard over the course of, I

8     guess, almost a full year and change now to justify a mandatory

9     inference instruction.

10         We have given Your Honor authority for that being well

11    within your discretion, even before the more that we heard, but

12    we're happy to do more briefing, whatever will be helpful.  We

13    can --

14         **THE COURT:**  Let's just think off the top of our heads.

15    I'm not tying anyone's hands, yours or Google's.

16         What would the mandatory instruction say?  Just roughly.

17         **MS. MOSKOWITZ:**  Your Honor, I think it would be

18    something along the lines of that you have determined that a

19    category of documents, Chats, were destroyed by Google, they

20    were deleted and not preserved; and that the jury should --

21    must infer -- must infer -- that the evidence that would have

22    been contained in those documents would have been bad -- better

23    language than that -- unhelpful or --

24         **THE COURT:**  Adverse.

25         **MS. MOSKOWITZ:**  -- adverse to their case or the facts

PROCEEDINGS

 1  they want to establish.  I'm definitely not doing a good job

 2  paraphrasing that.

 3      **THE COURT:**  Here's my issue:  I'm a little concerned

 4  about what is the jury going to take away from that.  I mean,

 5  it's a little -- I don't like the inference instructions, not

 6  because of anything you've said, but it's just not clear to me

 7  what a jury does with that.

 8      What would you argue in closing?

 9      **MS. MOSKOWITZ:**  Your Honor, I think the issue is that

10  we are going to argue that we have a lot of documents and

11  there's a lot of, "Well, what doesn't it say?  And what don't

12  we have?" and that there's no connecting of the dots, and

13  things like that.  So we are arguing circumstantial evidence on

14  some of these things.  We think we have a lot of it.

15      But, boy, do we think, and I think they're entitled to

16  think, that those Chats between the business people talking

17  about this, not in the light but in the dark, would have said

18  exactly what we're getting at really happened.  And we can --

19      **THE COURT:**  Can you tie a mandatory instruction to

20  specific Chats?  Let's -- I don't want to return to just one

21  person because it's not fair, but let's take Ms. Lam.

22      You have:  Here's what we're about to talk about.  Maybe

23  that gives the jury some guidance.  Okay.  You can presume now

24  that this conversation would have said something adverse to

25  Google with respect to whatever this topic was where the

1  witness said, "Let's turn Chat off -- Chat history off."

2       So, in other words, I don't want to just invite open-ended

3  inferences.  I think it might be better, if you can, just think

4  about that.  Okay?  Maybe you can -- maybe we can carve

5  inferences -- not carve -- maybe we can conjoin inferences to

6  specific Chat histories if you want to do that.  That might be

7  a better way to go.  Okay?

8       You have an abundance of evidence.  This is not -- this is

9  not a case where you're going to win, if you do, who knows,

10  it's up to the jury -- this is not a case where if you win,

11  it's because the jury filled in the blanks with inferences.

12  There is more than enough, probably without any inference

13  instruction, for a reasonable jury to decide.  I would deny a

14  directed verdict at this point, for example.  Okay?

15       Now, whether they do or not is up to them, but you have

16  enough, so it's really a *Grace* note in some respects as a

17  proportionate response as to an intentional failure to preserve

18  relevant evidence.

19       So just think about it.  Okay?

20       **MS. MOSKOWITZ:**  We will, Your Honor.

21       And just as we think about it, I know Your Honor

22  previously had not wanted to give any sort of recitation of

23  facts about, like you kind of just did for us before Mr. Walker

24  took the stand, but that could also be something, if you were

25  not prepared to do the mandatory language at the end of it but

 1   maybe a little bit more meat on the bones, but I know you did

 2   not want to do that before.  If that's back on the table, we

 3   could --

 4          **THE COURT:**  Here's the problem:  When it comes from me

 5   it, takes on extra heft.  So it's just the way it is with

 6   juries.

 7          All right.  Google, what are we going to do about this?

 8          **MR. POMERANTZ:**  Your Honor, I think what would be

 9   helpful would be for counsel to -- for Epic to consider

10   Your Honor's comments today, propose what they think should be

11   done, and let us respond to it.

12          There is a lot of history here.  Your Honor, has a pretty

13   complete record, and we'd like to see what they were going to

14   propose.  There's obviously also a lot of law in this area that

15   we've all briefed already, but now --

16          **THE COURT:**  I know, that's true, but I mean, to argue

17   against my own point, I also don't want to unfairly -- look,

18   they got lucky that a couple of Chats leaked through.  Okay?

19   So it's not entirely fair to limit Epic just to the couple of

20   Lottery wins they might have happened to have with getting the

21   Chats.

22          So your task is going to be to think about how to make it

23   broader because I don't know if Ms. Lam and a couple of others

24   are going to be enough as a proportionate sanction.  So I

25   understand what you're saying, but don't leap on that point too

1    much.  I want both of you to think about something that's a

2    halfway ground.  Do you know what I mean?

3         **MR. POMERANTZ:**  That's fair, Your Honor, and we will

4    be happy to talk with them, as I do every night, so I'm happy

5    to continue to have conversations with them on this topic.

6         **THE COURT:**  Who did all this?  You-all came in later.

7    Who was responsible for all of this at the beginning of the

8    case?

9         **MR. POMERANTZ:**  I don't really have the full history.

10   I know that Morgan Lewis and O'Melveny were in the case before

11   us, but I also know that there was a significant team in-house

12   at Google that is involved both -- I think, as Mr. Walker was

13   saying, litigators, which I think what he means is an in-house

14   litigation group and then a separate discovery, which I'll call

15   an e-discovery team.  So I think it's all -- you know, all of

16   them were probably involved.

17        **THE COURT:**  Okay.

18       All right.  Anything else for today?

19        **MS. MOSKOWITZ:**  Not from plaintiff, Your Honor.

20        **THE COURT:**  All right.  I'll see you on Monday.  Thank

21   you.

22        **MS. MOSKOWITZ:**  Thank you.

23        **THE CLERK:**  Court is in recess.

24              (Proceedings adjourned at 3:30 p.m.)

25                    ---oOo---

1

2

3                          <u>**CERTIFICATE OF REPORTER**</u>

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, November 16, 2023

8

9

10

11    _____

12            Kelly Shainline, CSR No. 13476, RPR, CRR
                      U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25