**Volume 13**

**Pages 2519 - 2763**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE<br>ANTITRUST LITIGATION,<br><br>―――――――――――――――――<br>THIS DOCUMENT RELATES TO:<br><br>EPIC GAMES, INC.,<br><br>          Plaintiff,<br><br>  VS.<br><br>GOOGLE, LLC., et al.,<br><br>          Defendants.<br>―――――――――――――――――| )<br>)<br>)   **NO. 21-md-02981-JD**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **NO. 3:20-cv-05671-JD**<br>)<br>)<br>)<br>)<br>) |

San Francisco, California

Tuesday, November 28, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York  10019
BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
**YONATAN EVEN, ATTORNEY AT LAW**
**LAUREN MOSKOWITZ, ATTORNEY AT LAW**
**MICHAEL ZAKEN, ATTORNEY AT LAW**
**BRENT BYARS, ATTORNEY AT LAW**
**ANDREW WIKTOR, ATTORNEY AT LAW**

For Defendants:

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue - 50th Floor
Los Angeles, California  90071
BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**

MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 East
Washington, DC  20001
BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
**LAUREN BELL, ATTORNEY AT LAW**

MORGAN, LEWIS & BOCKIUS LLP
One Market - Spear Street Tower
San Francisco, California  94105
BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**
**REBECCA L. SCIARRINO, ATTORNEY AT LAW**
**BRIAN ROCCA, ATTORNEY AT LAW**

MUNGER, TOLLES & OLSON LLP
560 Mission Street - 27th Floor
San Francisco, California  94105
BY:  **JUSTIN P. RAPHAEL, ATTORNEY AT LAW**
**KYLE W. MACH, ATTORNEY AT LAW**

## <u>I N D E X</u>

Tuesday, November 28, 2023 - Volume 13

| **<u>PLAINTIFF'S WITNESSES</u>** | **<u>PAGE</u>** | **<u>VOL.</u>** |
|---|---|---|
| | | |
| **<u>TADELIS, STEVE</u>** | | |
| (SWORN) | 2523 | 13 |
| Direct Examination by Mr. Even | 2524 | 13 |
| Cross-Examination by Mr. Mach | 2567 | 13 |
| Redirect Examination by Mr. Even | 2606 | 13 |

| **<u>DEFENDANT'S WITNESSES</u>** | **<u>PAGE</u>** | **<u>VOL.</u>** |
|---|---|---|
| | | |
| **<u>GENTZKOW, MATTHEW</u>** | | |
| (SWORN) | 2610 | 13 |
| Direct Examination by Mr. Raphael | 2611 | 13 |
| Cross-Examination by Mr. Even | 2682 | 13 |
| Redirect Examination by Mr. Raphael | 2709 | 13 |
| | | |
| **<u>TUCKER, CATHERINE ELIZABETH</u>** | | |
| (SWORN) | 2710 | 13 |
| Direct Examination by Mr. Rocca | 2711 | 13 |

## <u>E X H I B I T S</u>

| **<u>TRIAL EXHIBITS</u>** | **<u>IDEN</u>** | **<u>EVID</u>** | **<u>VOL.</u>** |
|---|---|---|---|
| 6989 | | 2611 | 13 |
| 6991 | | 2611 | 13 |
| 6993 | | 2611 | 13 |
| 6994 | | 2611 | 13 |
| 7002 | | 2711 | 13 |
| 7006 | | 2711 | 13 |
| 7008 | | 2711 | 13 |
| 7011 | | 2611 | 13 |
| 7020 | | 2611 | 13 |

## **I N D E X**

### **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 7028 | | 2611 | 13 |
| 7031 | | 2611 | 13 |
| 7073 | | 2611 | 13 |
| 7079 | | 2611 | 13 |
| 7089 | | 2611 | 13 |
| 7090 | | 2611 | 13 |
| 7095 | | 2611 | 13 |
| 7102 | | 2611 | 13 |
| 7114 | | 2611 | 13 |
| 7115 | | 2611 | 13 |
| 7178 | | 2611 | 13 |
| 7179 | | 2611 | 13 |
| 9708 | | 2611 | 13 |

| | |
|---|---|
| 1 | **<u>Tuesday - November 28, 2023</u>**                    **<u>9:06 a.m.</u>** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | (Proceedings were heard in the presence of the jury:) |
| 5 | **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc. |
| 6 | vs. Google LLC, and Multidistrict Litigation 21-2981, In re |
| 7 | Google Play Store Antitrust Litigation. |
| 8 | **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary |
| 9 | Bornstein for Epic Games.  I have with me Andrew Wiktor, Lauren |
| 10 | Moskowitz, and Yonatan Even. |
| 11 | **MR. POMERANTZ:**  Good morning, Your Honor. |
| 12 | Glenn Pomerantz on behalf of Google, and with me Michelle |
| 13 | Park Chiu, Lauren Bell, Steve Sparling, Jonathan Kravis, |
| 14 | Rebecca Sciarrino, and Kyle Mach. |
| 15 | **THE COURT:**  Okay.  Who's next? |
| 16 | **MR. BORNSTEIN:**  Your Honor, I'll defer to Mr. Even on |
| 17 | that. |
| 18 | **MR. EVEN:**  Good morning, Your Honor.  Epic calls |
| 19 | Professor Steve Tadelis. |
| 20 | **THE COURT:**  Okay. |
| 21 | **THE CLERK:**  Please raise your right hand. |
| 22 | **<u>STEVE TADELIS</u>**, |
| 23 | called as a witness for the Plaintiff, having been duly sworn, |
| 24 | testified as follows: |
| 25 | **THE WITNESS:**  Yes, I do. |

1      **THE CLERK:**  Thank you.  Please be seated.

2      Please state your full name for the Court and spell your

3  last name.

4      **THE WITNESS:**  Yes, my name is Steve Tadelis.  That's

5  T-A-D-E-L-I-S.

6      **THE CLERK:**  Thank you.

7      **MR. EVEN:**  Thank you, Your Honor.

8                    <u>**DIRECT EXAMINATION**</u>

9  BY MR. EVEN:

10  **Q.**  Good morning, Professor Tadelis.

11  **A.**  Good morning, Mr. Even.

12  **Q.**  I see that we have your slide deck up, so let's start with

13  that.

14      And if you can tell the jury a little bit about your

15  academic background.

16  **A.**  Sure.  I received a Ph.D. in economics from Harvard in

17  1997, and I am currently a professor of economics, business,

18  and public policy and I hold the Sarin Chair in strategy and

19  leadership at U.C. Berkeley at the Haas School of Business.

20  **Q.**  And how long have you been a professor?

21  **A.**  Just over 26 years.

22  **Q.**  And do you have a particular area of focus within

23  economics?

24  **A.**  Yes, I do.  For a bit over a decade, my focus in research

25  has been the economics of e-commerce and the economics of the

1   Internet; and, more broadly, I work in a field called

2   industrial organization, which includes the economics of

3   antitrust.

4   **Q.**   And have you held any positions related to e-commerce

5   outside of academia?

6   **A.**   Yes, I have.

7   **Q.**   Let's go to the next slide, and if you can explain that

8   briefly.

9   **A.**   Sure.  In 2011, I took a leave of absence from U.C.

10  Berkeley and I was hired by eBay to build and lead a team of

11  research economists and data scientists.

12      In 2013, I returned to Berkeley but continued doing

13  part-time work for eBay as a consultant.

14      In 2016, I started doing some work for Amazon and then

15  took another leave from Berkeley.  I spent a year at Amazon as

16  vice president for economics and market design, and returned to

17  Berkeley after a year and did about almost four years of

18  part-time work as an economist fellow and scholar at Amazon.

19  **Q.**   Have you ever done any economics work for Google?

20  **A.**   Yes.  A couple years ago, or a little more, Google

21  retained me as an expert for a patent in Canada.

22  **Q.**   And have you ever had any other interactions over the

23  years?

24  **A.**   Yes, research interactions.  The most recent was a few

25  months ago I was invited by a director of economics at Google

1    to present some of my recent research on digital advertising.

2          **MR. EVEN:**  Your Honor, Epic offers Dr. Tadelis as an

3    expert in economics, industrial organization, and the economics

4    of online commerce.

5          **MR. MACH:**  No objection, Your Honor.

6          **THE COURT:**  Okay.  He's qualified.

7    **BY MR. EVEN:**

8    **Q.**  Let's go to the next slide.

9          And if you can explain, please, at a high level what is it

10   that you were asked to do in this case, Professor Tadelis?

11   **A.**  Sure.  My assignment was to investigate whether Google's

12   conduct with respect to Google Play Billing harms competition

13   and consumers.

14   **Q.**  And have you formed any opinions on these questions?

15   **A.**  Yes, I have.  They can be summarized in three words:

16   Forcing, harming, and reinforcing.

17   **Q.**  Now let's go to the next slide and focus on your first

18   opinion.

19         At a high level, can you explain your first opinion about

20   forcing?

21   **A.**  Sure.  So effectively Google forces developers who wish to

22   distribute their apps through the Google Play Store to use

23   Google Play Billing for their in-app purchases of digital

24   goods.  This is often referred to as a coercive tie, a forced

25   tie.

1  **Q.**  So let's unpack this a little bit.

2      First of all, the jury has heard now a lot about

3  Google Play Billing as a payment solution.  At a very high

4  level, what is the function of a payment solution?

5  **A.**  A payment solution is what's required for payments to be

6  executed between a buyer and a seller.  Easiest to think,

7  whenever you walk into a Starbucks or a Safeway or a Macy's,

8  you're going to have those terminals.  That's part of the

9  system that takes the credentials, encrypts them so that

10  they're secure, sends them over for the processing.  The

11  processing includes communication with the bank that supports

12  the card, and then it returns an answer to the merchant was it

13  successful or not.  That's a payment solution.

14  **Q.**  So at Starbucks or at a supermarket, who decides which

15  terminals to use to process credit card payments?

16  **A.**  It would be the business, Starbucks or the supermarket.

17  **Q.**  And when we're talking online in an app, setting aside the

18  conduct at issue here for a second, who is it that would decide

19  which payment solution to use within an app?

20  **A.**  The developer who builds the app, if they want to have

21  in-app purchases, would have to integrate a payment solution,

22  and that's the developer's choice.

23  **Q.**  And, again, setting aside the conduct here, what would be

24  Google's involvement in in-app transactions?

25  **A.**  In-app transactions are between the user and the app or

1  developer, so they wouldn't play a role unless they are

2  processing the payments.

3  **Q.**   Now, you say in your opinion you talk about digital

4  content.   Why are you focusing your opinion on the sale of --

5  in-app sale of digital content as distinct from physical goods?

6  **A.**   That's because of the nature of the conduct.   Google

7  forces this use of Google Play Billing only for the sale of

8  digital content within the apps.

9  **Q.**   To your understanding, is there any functional or

10  technological differences between a payment solution that can

11  handle the sale of digital goods and a payment solution that

12  handles the sale of physical goods?

13  **A.**   My understanding is that there's no difference.   Just like

14  those terminals at a Starbucks or a car mechanic or a barber,

15  pretty much the transaction itself doesn't matter; it's the

16  payment that matters.

17  **Q.**   So let's turn to the forcing part of the opinion.

18      As a first step, what is the source of Google's power to

19  force developers?

20  **A.**   The source of Google's power comes from their high-market

21  power in the market for distribution, Google Play, that was

22  covered yesterday by Professor Bernheim.

23  **Q.**   And what makes you believe that Google has market power in

24  distribution?

25  **A.**   Well, the facts here in the case, Google Play, the

1    distribution, has over 80 percent worldwide market share.  If

2    you are a developer, you want to access -- what was it? --

3    close to 3 billion users.  Google Play is really the only game

4    in town to get that kind of access.

5    **Q.**   And what is the mechanism by which Google exercises this

6    power over developers to force them to integrate Google Play

7    Billing?

8    **A.**   It's done through the contract.  So Google has their

9    developer distribution agreement, the DDA.  A developer who

10   wants to distribute must sign that.  Within it, it has

11   references to other Google policies, including billing

12   policies, and in it it states simply that if you're selling

13   in-app digital content, you must use Google Play Billing.

14   **Q.**   Finally, you end your opinion by referencing something

15   called a coercive tie.  So before we even get to coercive, can

16   you explain at a high level what is a tie?

17   **A.**   Sure.  A tie would be a situation in which a company would

18   say "I have Product A.  If you want to buy it, you also have to

19   buy Product B which I am selling."  Product A is the tying

20   product and tying -- and Product B is the tie product.

21   **Q.**   So let's go to the next slide.

22        And can you explain how you view the tying issue in this

23   case?

24   **A.**   So here the narrative would be "I have distribution,

25   Google Play.  If you want to distribute through Google Play the

1  tying product and you want to process in-app digital content

2  for sale, then you must use Google Play Billing the tie

3  product."

4  **Q.**   Now, you characterize this tie as coercive.  What does it

5  mean for a tie to be coercive?

6  **A.**   Well, the nature of the term "coercive," it's a forced

7  tie.  Meaning that the people who are subject to it would

8  rather not have the tie and would rather not have to purchase

9  the tied product.

10 **Q.**   So let's take a look at the next slide.

11      And if you can explain to us what is it that you're

12 showing us here about tying and coerciveness.

13 **A.**   So this is an illustration of a noncoercive tie, and the

14 idea would be, imagine that today you want to buy sneakers.

15 You can buy them from Nike, Adidas, Puma, et cetera.  And what

16 if Nike suddenly says, "Well, if you want to buy my sneakers,

17 you also have to buy five pairs of my socks"?

18      The reason this wouldn't be coercive is, if you don't like

19 the Nike socks, that's fine.  You can buy sneakers from Adidas

20 or Reebok or Vans.

21      So in this case, it wouldn't be coercive because you have

22 alternatives that you could turn to and then buy the socks that

23 you like.

24 **Q.**   And if we go to the next slide, what is it that you're

25 showing us about coerciveness in this slide?

**A.**   So this would be a different world in which Nike is the

only game in town for sneakers so that if anyone wants sneakers

and Nike says "You also have to buy five pairs of my socks,"

people have no other choice even if they don't want the socks

and they would prefer another brand or style of socks.

**Q.**   So what makes you believe that Google's requirement that

developers use Google Play Billing in this case is a coercive

tie?

**A.**   Because the two components of what I just described in

this little example are in play here as well.  On one hand,

Google has the power to force through their market power in

distribution; and, second, there's a lot of evidence that this

forced behavior is causing developers to use a system that

otherwise they would prefer not to use.  They would prefer a

different payment solution system.

**Q.**   So let's take a look at some of this evidence.

In the next slide you talk about a case study about

digital content sellers.  What are you showing us here about

the preference of developers regarding payment solutions?

**A.**   Let me describe the nature of the case study.  Between

2011 and roughly 2020, Google had an exemption for using

Google Play Billing as the payment solution product; namely, if

you were a developer, an app, that was selling digital content

that could be consumed outside of the Android system, they

didn't force you to use Google Play Billing.

1      And, indeed, during that time, many developers chose not

2  to use Google Play Billing.  Here, we have just six very

3  familiar names of such developers that chose not to use it; and

4  later, once the tie was enforced and Google removed the

5  exemption, they were forced to use Google Play Billing.

6  **Q.**  Now, one of the developers you mention here is YouTube.

7  Why is YouTube important to your analysis?

8  **A.**  YouTube provides an interesting example that's slightly

9  different from the others.  So if we think of Amazon Kindle,

10  Tinder, Hulu, these are all companies that are not part of

11  Google; and, therefore, when they use Google Play Billing, at

12  the time they were going to pay 30 percent fees.

13      YouTube is a Google company.  They don't pay YouTube --

14  they don't pay Google.  Sorry.  They're part of Google, and

15  still they were not willing to use Google Play Billing until

16  the decision was forced upon them.

17  **Q.**  And do you have an understanding as to why YouTube did not

18  wish to use Google Play Billing?

19  **A.**  Yes, I do.  They basically felt that it was not providing

20  a lot of the features they need, not giving them competitive

21  advantage, and not allowing them to innovate.

22  **Q.**  Let's take a look at the next slide.

23      And what are you showing us about YouTube in this slide?

24  And this is Exhibit 1391 that's already in evidence.

25  **A.**  So here we have an exchange, a Chat exchange, between

1    Susan Wojcicki, who was the CEO of YouTube at the time, and

2    here she's corresponding with Mr. Lockheimer who gave testimony

3    in these hearings, and here's some of the things she said (as

4    read):

5              "It's damaging for our business against our

6         competitors.

7              "We need to know how we can innovate on billing and,

8         importantly, that we'll be stuck with a lot of larger

9         prioritization decisions that might be right for Play

10        Billing and bad for YouTube."

11        And there are a lot more of this nature.

12   **Q.**   And what do you understand Ms. Wojcicki to mean when she

13   talks about larger prioritizations that are right for Play

14   Billing but bad for YouTube?

15   **A.**   So Google Play Billing is trying to be a, you know, one

16   size fits all.  Different developers have different business

17   models, different interactions with their users, that might and

18   often will require different types of features in the solution

19   product.  So Google Play Billing is kind of aiming for the

20   masses but not allowing this kind of specialization.

21   **Q.**   Let's move to your next opinion.

22        And can you explain at a high level what your next opinion

23   is?

24   **A.**   Yes.  So a consequence of this forcing behavior is

25   basically that it harms competition in the market for payment

1  solutions for in-app purchases of digital content.

2  **Q.**   Let's go to the next slide.

3       And what are you showing us here about the types of harms

4  that you have identified?

5  **A.**   So there are basically three types of harms.   The first

6  and most immediate one is foreclosure.   That basically means

7  that Google's conduct prevents producers, manufacturers,

8  providers of payment solutions to fairly compete in this market

9  that we're discussing.

10      The second is the effect on the fees, the prices.   Because

11 there is no healthy competition, then fees and prices are

12 higher than they would be when -- if the tie were removed and

13 competition would be allowed to persist.

14      And last, there would be an impact on innovation and

15 quality.   When Google doesn't have to compete with other

16 payment solution providers, they lack the incentive to offer

17 the kind of innovations that are needed.   We saw some of the

18 examples mentioned by the YouTube's former CEO.

19 **Q.**   So let's begin with foreclosure.   How does Google

20 foreclose competitors?

21 **A.**   Well, very easily.   Through that contractual provision

22 that we discussed earlier.   By basically saying "You, a

23 developer, cannot use anyone but me for the sale of in-app

24 digital content."   It means that anyone but me is foreclosed

25 from this market.

**Q.**   And why do you believe that other payment solution

providers would wish to offer their payment solutions to

developers in this space?

**A.**   It's based on the evidence in the case.  So, for example,

Google identifies Square, Stripe, PayPal, and others, Addium,

and more, as companies that would enter, or they expect them to

enter, were the tie to be severed.

Furthermore, if you recall, between 2011 and 2020, there

were developers who didn't use Google Play Billing.  These

other companies serviced those developers.  Some of them

created their own solutions.

And I believe there was testimony given in these hearings,

both by Epic and by Paddle, that they would be happy to enter

this market was -- were entry allowed.

**Q.**   So let's talk a little bit about high prices, and you

mentioned that that is talking about fees and prices.  What do

you mean by higher prices?

**A.**   In particular, I mean the fees that developers are paying

for the payment solutions that are basically in this case

imposed on them.

**Q.**   Now, from the perspective of the developer, what is it

that triggers payment of fees to Google?

**A.**   So if I'm a developer and I decide to distribute an app,

the distribution is free; and the only time I am going to pay

something to Google is when I am selling in-app digital content

1   either a la carte or subscription.  So from the developer's

2   perspective, the payment will only happen for the sale of

3   in-app digital content.

4   **Q.**   Now, before we dig further into that, there have been --

5   there's been testimony in this case that Google provides many

6   more services beyond payment solutions, and so comparing the

7   fee that Google currently charges for in-app purchases to the

8   fee of other payment solutions is like comparing apples to

9   oranges.

10      Is that what you're doing here?

11  **A.**   No, that's not what I'm doing.  I'm doing something much

12  simpler.  I'm trying to answer the following question:  The

13  fact is that right now payment only happens, the fee only is

14  charged when an in-app digital content is sold, and Google is

15  charging fees of 15 and 30 percent.

16      The question I'm answering is:  If the tie were severed,

17  could they charge 15 to 30 percent for payment solution?  And

18  the answer to that is no.

19  **Q.**   Let's take a look at the next slide.

20      You can explain what we see here at a high level that

21  suggests to you that Google could not charge 15 or 30 percent

22  but for the tie.

23          **MR. MACH:**  Objection, Your Honor.  The inclusion of

24  Paddle on this slide is beyond the scope of his report.

25          **MR. EVEN:**  Your Honor, Paddle testified in this trial.

1    Professor Tadelis read it.  It's not any different than any of

2    the others on this slide.

3            **THE COURT:**  Okay.  You can go on for now.  Go ahead.

4            **MR. MACH:**  Thank you, Your Honor.

5            **MR. EVEN:**  Thank you.

6            **THE WITNESS:**  Could you repeat the question, Counsel?

7    **BY MR. EVEN:**

8    **Q.**   Can you at a very high level briefly explain why it is

9    that you think Google could not charge 15 or 30 percent but for

10   the tie?

11   **A.**    Okay.  So let's imagine that I'm a developer.  I have an

12   app.  I want to sell in-app digital content, and currently the

13   tie is there.  Let's imagine that it were removed.  It means

14   now that I could do the following shopping:  I could say "I

15   could use Google Play Billing.  That's going to be 30 percent.

16   Or I could use PayPal.  That's going to be about 8.8 percent or

17   Stripe 6.1 percent.  What should I choose?"

18       Anyone who is profit maximizing would not choose to pay a

19   30 percent fee when they could pay a 9 or a 6 or even a

20   10 percent fee.  So with that kind of competition, Google would

21   not be able to charge these kind of prices.

22   **Q.**   So let's talk a little bit about the slide to get a better

23   understanding of it because there's a lot there.

24       So, first of all, the slide speaks to an average in-app

25   purchase price of $9.30.  What do you mean by that?

1    **A.**   So the $9.30 comes from the following calculation:  I took

2    from the data provided by Google, I think it was 2016 to 2020,

3    all the transactions of in-app digital content, and I just

4    calculated the average fee of that -- the average price of that

5    transaction.

6         You know, you could buy some features in a dating app for,

7    say, 29.99 or something for a game for a dollar, divide it up

8    by the transactions, that's the $9.30.

9    **Q.**   Now, the jury has heard testimony that on Google Play --

10   with respect to Google Play, the fee is either 30 percent or

11   15 percent regardless of the transaction value.  Why is the

12   transaction value meaningful for the analysis you're doing on

13   this slide?

14   **A.**   So the other payment solution providers have a different

15   charging business model.  They typically will have a fixed fee

16   plus a percent for a transaction.  So because there's a fixed

17   fee and a percent, it means that the value of the transaction

18   is going to determine the percent of the fee.

19        Just as a simple example, if we take PayPal, their

20   structure is pretty much 50 cents for a transaction plus 3 and

21   a half percent of the transaction value.  So if we have a $9.30

22   transaction, 50 cents is about 5.3 percent.  Add to that

23   3.5 percent, you get 8.8 percent.

24   **Q.**   Now, have you examined what this chart would look like for

25   in-app purchases made at prices other than $9.30?

1  **A.**   Yes, I have done that examination.  It appears in my

2  report.  And the pattern we see here sustains itself; namely,

3  Google charges fees that are significantly more, several

4  multiples of the competitors or potential competitors.

5  **Q.**   All right.  So now let's turn to the Google bar here.

6      And, again, the jury has heard testimony about fees of

7  30 percent and 15 percent.  Why do you have 29.4 percent?

8  **A.**   Well, here I just calculated the average or effective fee

9  that Google is getting from the fees.  The way to think of it

10  is as following:  Imagine two developers; one pays 30 percent,

11  one pays 15 percent.  You might think, well, the average

12  between 30 and 15 is 22 and a half percent.  Well, that's true

13  if you're just counting developers.  But if the developer

14  that's charged 30 percent is selling a million dollars of

15  product and the developer that's charged 15 percent is selling

16  $1 worth of product, then the fee is pretty much going to be

17  30 percent on average.

18      Here, what this says is that most of the charges happen --

19  most of the value of the charges happen at 30 percent and not

20  at 15 percent.

21  **Q.**   Now, the jury has heard some testimony that after this

22  litigation began, Google reduced some of its fees on the first

23  year of subscription, the first million dollars, to around

24  15 percent.

25      How would those changes affect your calculation of

1  Google's effective fee?

2  **A.**   It would cause the 29.4 percent to drop.  This was

3  calculated for 2020, the 29.4 percent, so it would drop a bit.

4      If we kind of think a back-of-the-envelope calculation,

5  80 percent, roughly, of Google's -- of the Play revenues are

6  coming from fees on games, which are typically at 30 percent.

7  So even if all the rest of the 20 percent were sold at a fee of

8  15 percent, that would average to about 27 percent.  So this

9  could drop, say, to 28, 27 and a half, 28 and a half.  That

10  would be the range that I would expect it to be.

11  **Q.**   Now, you testified that this chart suggested but for the

12  tie, Google would not be able to charge the same rates for

13  Google Play Billing.

14      If the tie is severed and the fee that Google can charge

15  for payment solutions goes down, could Google introduce new

16  fees on distribution, for instance, that developers would have

17  to pay on top of any charge for Google Play Billing?

18  **A.**   Well, my analysis didn't include what Google might do were

19  the tie to be severed.  I have observed that Google has never

20  charged for anything but the in-app sale of digital content,

21  and they could do other things already.  So I think it's

22  unlikely, but that was not part of my analysis.

23  **Q.**   Now, you mentioned earlier the case study that happened

24  between 2011 and 2021 or so where some people were exempt from

25  the tie essentially.  What happened to the fees that Google

1 | charged at the time for those developers that were at least

2 | arguably under the exception?

3 | **A.**   So developers that were under the exception, Google would

4 | offer them fees that were much lower than the 30 percent.  I

5 | recall them to be in the range of 10 to 15 percent; and even at

6 | those lower rates, there were developers who chose not to use

7 | Google Play Billing.  I think Hulu and I think Spotify maybe.

8 | There were several developers that chose not to take it even at

9 | that better deal.

10 | **Q.**   So let's go to the next slide.  And this is from

11 | Exhibit 360 at page 24.  That's in evidence.

12 |     And what are you showing us here about the current level

13 | of Google's pricing?

14 | **A.**   So what this slide shows, this comes from a document I

15 | obtained from Google, and I want to point your attention to the

16 | two blue boxes at the right.  The top one has 6 percent blended

17 | average; the bottom one has 10 percent blended average.

18 |     The top one is Google's estimate of their break-even fee,

19 | which means that if they would have charged 6 percent, they

20 | wouldn't lose money and they wouldn't make money on

21 | Google Play.

22 |     And what we see in the 10 percent blended average, that is

23 | what Google believes they could charge -- the fees they could

24 | charge developers in this market; in other words, what they

25 | could charge were the tie to be severed.

1      So what we see here is that the current, say, 30 percent

2  is five times their cost, three times what they believe a

3  blended average cost-plus or what would be paid in the market

4  could be achieved.

5  **Q.**   And have you seen other documents other than this one that

6  showed you what Google thought internally would be the

7  consequence of severing the tie?

8  **A.**   Yes, I have.  I recall at least one document that had an

9  analysis that asked the question:  Were Google to sever the

10  tie, what would happen?  And they had pros and cons and

11  implications.

12      Under the pro, I recall them writing it promotes

13  competition, which obviously is true if you sever the tie.  And

14  in the con, one of the items they listed was a race -- likely

15  race to the bottom on fees with their potential competitors.

16  So Google was well aware that severing the tie would put price

17  pressure on payment solutions that they could provide.

18  **Q.**   Now, you talked about the fees to the developers.  What

19  would you expect to happen to the price to consumers if the tie

20  were severed?

21  **A.**   My expectation would be that prices of, say, digital

22  content to consumers would go down because some of the savings

23  from the reduced fees would naturally be passed on to the

24  users.

25  **Q.**   Have you tried to quantify what would be Google's rates

1  exactly if the tie is severed or how that would affect prices

2  to consumers?

3  **A.**   No, I have not.

4  **Q.**   And why not?

5  **A.**   Because what I was tasked to do is answer the question:

6  Is Google's conduct anticompetitive and does it cause harm?

7  The answer to that is clear.  I was not asked to quantify by

8  how much.  That would be only needed were I to try to quantify

9  damages.

10  **Q.**   So the next anticompetitive harm you mentioned was harm to

11  innovation and quality.  So let's go to the next slide and --

12       **THE COURT:**  Sorry.  Before we do that, so going back

13  to the developer's fees.  All right?  Let's say in a

14  hypothetical world Google eliminated all fees.  It went from

15  30 percent to zero.  Why do you expect a user would see any

16  benefit from that in terms of the prices the user pays for an

17  app?

18       **THE WITNESS:**  So if I may, let me start with a

19  different example and then go back in here.  Thank you.

20       **THE COURT:**  You're the expert.

21       **THE WITNESS:**  Imagine that I decide to open a pancake

22  shop, and I did some back-of-the-envelope calculations that

23  tells me this business will be profitable with the current

24  price that I believe I'm going to charge and what it's going to

25  cost me to buy flour and eggs and milk and so on.

1        And now I've set the price, I'm doing well, and suddenly

2   the cost of milk and eggs drop.  Well, it means that on every

3   set of pancakes, I'm going to earn more money that I sell.  If

4   I drop the price a little bit, I could sell more and more goods

5   and I'm going to get a wider margin than I would have gotten

6   were I have to reduce the price previously.

7        So when you change the cost of the goods I use to produce

8   my final output, then microeconomic analysis shows clearly that

9   some of that will optimally be passed on to users.

10       This is basically --

11            **THE COURT:**  You'll make it up with higher volume

12   because you're selling more?

13            **THE WITNESS:**  Exactly.  Exactly.

14            **THE COURT:**  Okay.  Thank you.

15            **THE WITNESS:**  If I may, you could think of it almost

16   like a two-step process.  Here's my price, here are my costs,

17   and I'm selling a certain amount.  When my costs drop, that's

18   one boost to my profits.  But now because of this wide margin,

19   I could afford to shave this down a little bit and then sell

20   even more.

21            **THE COURT:**  Okay.  Thank you.

22            **THE WITNESS:**  Sure.

23            **THE COURT:**  Go ahead.

24   **BY MR. EVEN:**

25   **Q.**   So turning to innovation and quality.

1    On this slide, let's take these one by one.  First of all,

2 you're showing us some features I understand.  Let's talk about

3 these.

4    The first one you say is "No customizable user interface."

5 What do you mean by that?

6 **A.**   So imagine that you're a developer with an app and you

7 have a certain aesthetic to it, you know, a certain set of

8 colors, et cetera, and you want everything within your app to

9 have that type of aesthetic.

10    Well, Google Play Billing has this one-size-fits-all

11 nature.  They don't allow you to customize what it's going to

12 look like.  Other payment solution providers do.

13 **Q.**   The next one is "No ability to distribute funds to

14 third-party sellers."  When does that kick in, or what kind of

15 developer would need that?

16 **A.**   So developers that are marketplaces would need that.

17 Let's take an example.  Bandcamp is a marketplace that connects

18 fans with music bands; and those bands through Bandcamp, they

19 sell music, which typically is digital content, and they sell

20 merchandise like caps and T-shirts and so on.  And what

21 Bandcamp does is it helps these bands sell the products to

22 users or their fans, it collects revenue, and then it keeps

23 some of the revenue to itself and some has to get split and

24 sent to the bands themselves.  That would be a typical

25 marketplace.

1    Google Play Billing doesn't allow that distribution of

2    funds to third-party sellers.  Bandcamp used PayPal when they

3    were allowed to do that for that reason -- or at least for that

4    reason.

5    **Q.**   The third one is "No ability to use across platforms."

6    What do you mean by that?

7    **A.**   So a good example for this would be a developer like

8    Microsoft.  So Microsoft sells software that could be used in

9    the Android's ecosystem, on Mac computers, on PCs.  And

10   Google Play Billing only works in the Android ecosystem, and it

11   doesn't -- is not intended to work on PCs or Macs.

12       So a company like Microsoft, if they weren't forced to use

13   Google Play Billing, they could use either something that they

14   build by themselves or, say, they purchased from PayPal, a

15   payment solution that would work across other platforms.  Now

16   they have to splinter it because they have to use different

17   solutions on different platforms.

18   **Q.**   And, finally, you say that there's no ability to use when

19   selling physical goods and services.  What does that mean?

20   **A.**   Well, as we discussed earlier, payment processing could

21   work for any kind of good.  The no ability is because, just

22   like Google forces developers to use Google Play Billing for

23   in-app digital content, it prohibits developers from using

24   Google Play Billing for any physical goods.  So anything that

25   you would buy, like a binder on Amazon or a ride through Uber,

1    they're not allowed to use Google Play Billing.

2        So if I'm a company where I'm selling both digital and

3    physical goods, I now have to integrate two different payment

4    solutions rather than just one.

5    **Q.**   Now, are these the only features that Google Play Billing

6    lacks?

7    **A.**   No.  There were many others.  So, for example, in some of

8    the correspondence between YouTube and the Play folks within

9    Google, there's a mention of, if I recall, dozens of features

10   that YouTube wanted and Google Play Billing didn't offer.

11       There are historical examples of developers like

12   meditation app Calm that wanted the ability to use one-day

13   subscriptions to give users the ability to try something

14   without having to commit.  Google Play Billing didn't offer

15   one-day subscriptions.  So those are some examples.

16   **Q.**   So let's go to your third and final opinion here, and that

17   speaks to something about reinforcing this time of Google's

18   market power, which you mentioned earlier.

19       Can you explain how a tie can reinforce market power in

20   the tying product?

21   **A.**   So the idea of what's happening here is as follows:  So we

22   have distribution that Professor Bernheim discussed yesterday,

23   we have payment solutions that I'm talking about today, and

24   Google is leveraging their power in distribution to tie --

25   that's the tying product -- to tie payment solutions.

1      If other major players, you know, Square, PayPal,

2  et cetera, would be able to enter and compete fairly for

3  payment solutions, that would help them create relationships

4  with developers who are on one side of this distribution

5  market, and that would help solve the chicken-and-egg problem

6  to then migrate over and start being successful in

7  distribution.

8  **Q.**   So you mentioned the chicken-and-egg problem.  At a high

9  level, what is a chicken-and-egg problem?

10 **A.**   Sorry for the jargon.  The chicken-and-egg problem could

11 be described as follows for two-sided markets:  Professor

12 Bernheim explained yesterday the nature of two-sided markets.

13 The developers are going to use Play because they believe there

14 are many users.  Users use Play because they believe there are

15 many developers.

16     It's very hard to penetrate an incumbent successful

17 two-sided market.  Because if I now started a new distribution

18 app and I came to a bunch of developers and say, "Hey, join my

19 store," they say, "Well, you don't have any users."  And if I

20 turn to users and say, "Hey, download my store," they say,

21 "Hey, you don't have any developers."

22     Once a company like PayPal or Square would be able to

23 provide these kind of payment solutions, they create

24 relationships with developers and developers could see them as

25 viable and successful partners.

1      Now, with that side of the market already in their
2  backyard, they could create a store and turn to developers and
3  say "We have this relationship.  How about putting your app on
4  my store?  I have these great terms."  There would be no reason
5  for developers not to try that, and that could jump start a
6  competition in distribution.
7  **Q.**  So let's go to the next slide.  And this is from
8  Exhibit 388 at page 98.  It's in evidence.
9      And as a first step, where is this slide coming from?
10 **A.**  So this is a slide from one of Google's documents, one of
11 their internal presentations, that describes pretty much the
12 rather sophisticated and complex scenario that I just
13 described.
14 **Q.**  And what was the context in which Google was trying to lay
15 out this sophisticated or complex idea?
16 **A.**  So as you see here from the title "How would ecosystem
17 evolve over time," evolve over time if the tie were severed, if
18 we were not forcing developers to use Google Play Billing.
19 **Q.**  So let's take a look at this slide more closely.
20     First of all, what is the list of companies that we see on
21 the right-hand side at the bottom?
22 **A.**  So you see GPay, Google Pay; Square; PayPal; Stripe;
23 Amazon; Facebook.  These are all providers that Google believes
24 would be entrants into payment solutions were they to sever the
25 tie.

1   Q.   And then there's a number processed on the left side.   So

2   let's take a look at that and take it one by one.

3   A.   Sure.

4   Q.   So we see Step 1, "Selective Deintegration."  What does

5   that mean?

6   A.   Okay.  So this would be Step Number 1.  Imagine that

7   tomorrow Google severs the tie.  There will be developers that

8   immediately are going to choose alternative solutions because

9   we know that during the time of the exemption, developers chose

10   to do that.

11        So we're going to get this entry by some of these payment

12   solutions that currently could only sell in nondigital goods.

13   That's what you see on the right-side top of that black box.

14   That's why they're sitting there.  And you can see that there's

15   a number one with an arrow.  That arrow moves them into digital

16   goods.  So that would be Step 1.

17        And then they describe how contagion leads to more

18   deintegration.  Developers are going to learn about other

19   developers who successfully deintegrated, and that will give

20   them an incentive to go ahead and disintegrate.

21   Q.   So then let's go to consolidation to a few primary service

22   providers.  What does that mean?

23   A.   So you could see that that number two also appears next to

24   the names of those companies because once the tie is severed,

25   there could be dozens of payment solution providers that are

1  going to try to sell their goods.  Typically, after an initial

2  period, the market shakes up a bit and a few prominent

3  providers that have the best solution products and possibly the

4  best prices, they're going to be the ones that remain, and here

5  are examples of what Google thinks about who might remain as

6  consolidated players in this market.

7      And then they describe that these primary service

8  providers would push towards distribution and discovery;

9  namely, that's the point where they could turn to developers

10  and say "We want to distribute.  Come join our store."

11  **Q.**  And what does the third step, "Displacement," mean?

12  **A.**  So displacement basically means that Google is no longer

13  going to be the only game in town, displacement of Google Play

14  as the preferred app store.  Currently Google Play is the

15  preferred app store.

16  **Q.**  Now, you said this is a rather complex process.  How

17  realistic is this three-step, laddering-up scenario?

18  **A.**  Well, not only is it realistic enough for Google to pay a

19  lot of attention to it, in the same documents where this was

20  provided, Google has, I recall, three examples where they

21  discuss a laddering up.  That's what they call this.  You know,

22  you enter in payments, then you ladder up into distribution.

23      One good example would be Shopify, which was a company

24  that basically dealt with payments for merchants and then

25  laddered up to become an e-commerce platform.

1          Another example of that might be more familiar is Netflix.

2     That, again, is in their documents where Netflix entered at the

3     time that Blockbuster existed by just distributing DVDs for

4     rent.   Then it went into streaming as one of the first players;

5     and then through that, they were able to enter the market for

6     content creation.   And now they are content providers.

7     Basically they have their own content.

8          So Google gave some examples in their documents.

9     **Q.**   I want to switch gears for a second and let's go and talk

10    a little bit about market definition.   I don't want to spend

11    too much time on it, but briefly.

12         What is the relevant market that you define here?

13    **A.**   So for me, the relevant market is payment solutions for

14    in-app purchases of digital content on Android smartphones.

15    **Q.**   So I'm going to refer to that as in-app payment market if

16    that's okay.   It's a lot --

17    **A.**   It's a mouthful.

18    **Q.**   -- of words.

19         We heard from Professor Bernheim at some length yesterday

20    about market definition and what is the process of going about

21    doing that.   Do you generally follow the same methodology laid

22    out by Professor Bernheim?

23    **A.**   Yes.   I followed the standard methodology.

24    **Q.**   And what alternatives to payment -- well, let me take a

25    step back.

1        What are the products in your market?

2   **A.**   So the immediate products in my market are going to be any

3   product that could do what Google Play Billing does.  So any

4   payment solution provider for digital content on Androids.  So

5   the PayPals and the Squares, all those companies, their

6   products are immediately in the market.

7   **Q.**   So what alternatives to payment solutions for in-app

8   purchases did you consider as potential candidates for

9   inclusion in this market?

10  **A.**   So as Professor Bernheim explained yesterday, the exercise

11  is:  If suddenly all these payment solution products become

12  more expensive or become of lower quality, what would I be able

13  to substitute to as a developer who wants to earn money?

14       Currently there are two other ways that you could earn

15  money.  One would be instead of selling these goods within the

16  app, you would sell them through a web store.  Alternatively,

17  you would just forego selling goods altogether and switch to an

18  advertising model.

19  **Q.**   So let's begin with web purchases.  Can you explain what

20  are web purchases?

21  **A.**   Sure.  So web purchase would be the situation where you're

22  in an app, you want to purchase something but you can't

23  purchase it in the app.  You leave the app, you open a web

24  browser, and then you would find whatever you're trying to buy

25  from that developer, pay for it, and then you could go back to

1    the app and continue doing what you're doing.

2    **Q.**   And what did you conclude regarding the substitutability

3    of in-app payment solutions with web purchases?

4    **A.**   That web purchases are not a viable substitute for in-app

5    purchases.

6    **Q.**   And why is that?

7    **A.**   It basically comes down to friction.  There is so much

8    more friction when you have web purchases than there are when

9    you have in-app purchases.

10   **Q.**   Let's take a look at the next slide.

11        What are you showing us here about the friction involved

12   in the different processes?

13   **A.**   So here what we see are the three steps necessary to do an

14   in-app purchase for the very first time you're doing an in-app

15   purchase.

16        So let's imagine that you're in some app, a game.  You

17   decide that you want to purchase something in the game, you

18   would click on that.  That's number one.

19        That brings you to step number two where you're

20   interacting with Google Play, and this is what I meant by the

21   standard way it looks.  It always looks like you see it here on

22   the screen.  The developer can't change the way that it

23   appears.  And now you can see -- maybe it's a little hard to

24   see -- "Add credit or debit card" in the middle.  I would need

25   to do that if I never gave those information to Google Play

1    Billing.

2        Once I complete the credentials and that information, I go

3    to Step 3 where it's just pay by and I go back to the app.

4    **Q.**   Let's go to the next slide.

5        What are you showing us here about this process?

6    **A.**   The next time I want to buy something within the apps, I

7    don't have to provide the credit card or debit card

8    information.  So I only have what used to be Step 1 and 3 as

9    Step 1 and 2.  I find what I want and I buy it.

10   **Q.**   And why do you call this one the typical in-app purchase?

11   **A.**   Because the first purchase only happens once, and every

12   other purchase is going to happen after that; therefore, that

13   would be typical.

14   **Q.**   So let's go to the next slide.

15       What are you showing us here about the different

16   processes?

17   **A.**   This is a representation of what a web store purchase

18   would look like.

19   **Q.**   And what are you showing us here about what this process

20   entails?

21   **A.**   So there are eight steps.  I'll just walk through them

22   quickly.  I think they'll be quite clear.

23       So I'm in the app.  I decide that I want to purchase

24   something.  So first I have to leave the app, and then I have

25   to open the browser.  That's going to be Step 2.  Once I open

1    the browser, I have to navigate to the developer's website or

2    store.  So I have to search for it.  Hopefully I know the name

3    of the developer and what I'm looking for.

4         I will then search.  Once I find it, I will go to the

5    store within the developer -- that's going to be Step 4 -- and

6    I need to find the digital content.  They may be selling many

7    things.

8         Once I've found the digital content, I now go to Step 5.

9    I have to enter my payment information.  If I already did that

10   in the past, then Step 5 would disappear just like Step 2

11   disappeared on the first slide, but the other steps would

12   remain.

13        I then have to confirm the successful payment in Step 6,

14   exit the browser, and then return to the app and continue what

15   I'm doing.

16   **Q.**   And why do you believe that the number of steps a user has

17   to go through to complete this process makes this a poor

18   substitute for an in-app sale?

19   **A.**   Because it is well established, both in publicly available

20   research and these companies who have these processes know very

21   well, that any additional amount of friction in any process

22   leads to dropoff along the process.  So friction would mean a

23   lower likelihood of completing the process.

24   **Q.**   Have you ever studied the effects of friction on online

25   commerce or online purchases?

1   **A.**   Yes.   Both at the times I was at eBay and when I was at

2   Amazon, there were many projects that dealt exactly with

3   friction.

4   **Q.**   Now, Mr. Pichai testified in this case that leaving an app

5   to make a purchase, quote, "breaks the experience for the

6   users."   How does that relate to your opinion?

7   **A.**   It relates exactly to what I'm showing you here on the

8   slide.   Not leaving the app, there were two steps and you're

9   done; leaving the app, a lot more friction and a lot more

10   dropoff.

11   **Q.**   Now, could a developer streamline what we're seeing here

12   on the slide somehow by -- for instance, by putting in links in

13   their app to cut through some of the steps at least?

14   **A.**   In principle, yes.   If you look at what's here on the

15   slide, then if at Step 1 there was a link that says "Click here

16   to purchase this item," you would go immediately to Steps 5

17   or 6.   So you would circumvent quite a bit.   However, Google

18   doesn't allow that.

19   **Q.**   And let's go to the next slide, which is Exhibit 8022,

20   which is in evidence.

21       What are you showing us here that's related to the

22   possibility of using links?

23   **A.**   So this is part of Google Play payment policy, and in

24   particular you'll notice in the title "Antisteering Provision."

25   "Antisteering provision" is what is -- the term used in a

1    provision in a contract that says "You cannot do this somewhere

2    else" or "You could not supply this somewhere else" or "You

3    could not buy this somewhere else."

4        And here, in particular, there's a list of thou shall not.

5    And in particular we see here at the bottom (as read):

6            "In-app user interface flows, including account

7        creation sign-up flows, that lead users to an app to a

8        payment method other than Google Play Billing system."

9        That is prohibited.

10   Q.   You also mentioned advertising --

11       THE COURT:  If I may, so this policy, is it your

12   understanding it applies to each and every app on the Google

13   Play Store?

14       THE WITNESS:  For digital content, for the sale of

15   digital content within the app, yes.

16       THE COURT:  For each and every digital content app on

17   the Play Store?

18       THE WITNESS:  That is my understanding.

19   BY MR. EVEN:

20   Q.   So let's turn to advertising, which you mentioned that you

21   also considered as a potential substitute or to include in the

22   market.

23       What did you conclude about the substitutability of

24   advertising in in-app sales of digital goods?

25   A.   I concluded that advertising is not a viable substitute

1  for in-app digital content.

2  **Q.**   And can you explain very briefly why not?

3  **A.**   Sure.  So I think the easiest way to think about this is

4  as follows:  We know that many developers choose to use in-app

5  digital content without advertising even though they're paying

6  30 percent fees.  If they advertise, they wouldn't pay any fees

7  on whatever revenue they're getting from advertising.

8       So you could think of developers that are currently

9  selling in-app digital content as potentially falling into two

10  groups.  One group would be developers for whom using ads would

11  significantly deteriorate the value of their product.  So think

12  of a game where you want to pay attention to the interaction or

13  streaming services.  Any ad really interrupts that, it

14  deteriorates the quality.  And, indeed, those developers choose

15  not to use advertising.

16       Alternatively, think of a developer like the *New York*

17  *Times*.  Before the Internet even existed, the *New York Times*

18  sold subscriptions to consumers who bought the *Journal*, the

19  *Times*, and they sold advertising to advertisers who advertised

20  within the pages of the *New York Times*.

21       They're doing the same thing online.  They are charging

22  for digital content, namely, access to the *New York Times*, and

23  they are charging -- they are displaying ads and getting ad

24  revenue.

25       Google Play is doing the same thing.  They're charging a

1   fee for distribution, and they're also allowing developers to

2   advertise.  So advertising for these developers is an

3   incremental source of income.  It's not a substitute source of

4   income.

5   **Q.**   Let's turn to the geographic definition of the market, if

6   I may.

7       Have you determined the geographic scope of the payment

8   solution market?

9   **A.**   Yes, I have.

10  **Q.**   And what is the geographic market that you define?

11  **A.**   It is global excluding China.

12  **Q.**   And we've heard a little bit from Professor Bernheim

13  yesterday as to why the market is global, excluding China, in

14  his defined market.  Is your analysis tracking essentially

15  Professor Bernheim's?

16  **A.**   Pretty much, yes.

17  **Q.**   And if the market here were found to be geographically

18  narrower, for instance, the U.S. only because of where we are

19  and where this court is, et cetera, would that change any of

20  your opinions?

21  **A.**   No, it would not.

22  **Q.**   Why not?

23  **A.**   Because the conduct that we're discussing and the harm is

24  happening here in the United States -- the forcing, the

25  harming, and the reinforcing -- and if anything, the market

1  power that the Google Play has in the United States, if I

2  recall from yesterday's presentation by Professor Bernheim, is

3  even higher than it is globally.  So it would be even more

4  pronounced.

5  **Q.**  So I want to talk a little bit very briefly about one

6  other thing that may be relevant to your analysis.

7      You focused on a tie, and the jury has now heard about a

8  program Google launched that is called User Choice Billing.

9  Does the User Choice Billing program alter your opinions in

10  this case in any way?

11  **A.**  No, it does not.

12  **Q.**  And before I turn to why the program does not change your

13  opinion, can you remind the jury briefly what is the User

14  Choice Billing program?

15  **A.**  Yes.  User Choice Billing is a pilot program that Google

16  started in 2022 where they offered a handful of developers -- I

17  think I'm remembering Hulu and Spotify, but I'm not 100 percent

18  sure if I'm remembering two of those participants -- where they

19  said "Alongside Google Play Billing you could offer another

20  payment solution and then give users the choice of which ones

21  they want to choose."

22  **Q.**  And why is it your view that the User Choice Billing

23  program does not solve the issues that you have identified that

24  arise from the tie?

25  **A.**  For two primary reasons.  First, it doesn't sever the tie.

1  You still have to integrate Google Play Billing.  So that's

2  still there.

3      Second, the way the fees were designed for User Choice

4  Billing, they were designed in a way that it would not be

5  profitable for a developer to actually adopt User Choice

6  Billing and, instead, just stick with Google Play Billing.

7  **Q.**   Let's go to the next slide.

8      And what are you showing us about those fees here?

9  **A.**   So this describes how User Choice Billing works.  So if

10  you're the developer that would be approached with this

11  program, you'd be offered the following:  If you just use

12  Google Play Billing, you will pay 30 percent.  If you choose to

13  use another service, another payment solution provider

14  alongside Google Play Billing and a user will click on that,

15  then whatever you pay to the other solution you're paying,

16  you're going to pay us 26 percent.  So, in other words, we're

17  going to knock off 4 percent from the 30 percent and create a

18  new fee that will be latched onto whatever you're paying to

19  your own solution provider.

20  **Q.**   So let's go to the next slide, which is Slide 25, and this

21  slide has also Exhibit 360 at page 24.

22      What are you showing us about what this -- the structure

23  for User Choice Billing?

24  **A.**   So the previous slide was -- you know, this is how Google

25  presents it -- this is how a developer should think about it.

1   If I just stick to Google Play Billing, I pay 30 percent.  What

2   will I pay if I use User Choice Billing?

3       Well, let's imagine that I'm as good as Google is when it

4   comes to the cost of processing.  Recall from a previous slide

5   Google estimated that it cost them 6 percent to do the

6   processing in the payment solutions.  Well, if I'm as good as

7   Google is, it means that it's going to cost me 6 percent for

8   payment solution and another 26 percent for Google.  That's

9   32 percent.  That is not such a good deal for me unless it's

10  really important for me to have my own payment solution because

11  I want some functionality that is important for me.

12  **Q.**  So in your view, does User Choice Billing offer a real

13  choice to developers?

14  **A.**  No, it does not.

15  **Q.**  And do you believe that Google was aware of the fact that

16  this cost structure may deter people from actually opting into

17  the program?

18  **A.**  Google's own analysis suggests they are very well aware of

19  this.

20  **Q.**  Let's take a look at the next slide.  This is Exhibit 388

21  at 46.

22      And what does this show us in terms of Google's design of

23  the User Choice Billing program at a high level?

24  **A.**  Be patient with me.  This is a challenging slide to

25  describe.

1    So remember that I started with that 30 and the 26, and

2    there was a 4 percent drop.  It could have been a 2 percent

3    drop or a 10 percent drop in that new fee.

4        This slide starts with the following statement, which is

5    in the title of the slide:  "Game theorizing price level."

6    Some large developers would take advantage of billing

7    optionality no matter the price, meaning that if Google said,

8    "If you want to use billing optionality, in other words, use

9    your own payment solution, and you're still going to have to

10   pay us 30 percent, there will be some developers that will say,

11   'Fine, we're using our own solution.'"

12       And what the slide describes at the very left at the

13   bottom where it says "Core Strategic Asset," this describes

14   that jump at what would happen if we just open it up and we

15   don't offer any other fee but 30 percent.  It doesn't matter

16   what you use, you pay 30 percent.  That jump are those

17   developers for whom this is a core asset, and they're going to

18   switch.

19   Q.   And what is it that Google currently does in terms of

20   where it's placed the actual new fee for transactions that

21   don't involve Google Play Billing?

22   A.   Sure.  So they didn't set that fee at 30.  They set it at

23   26.  So we could see it here.  Where it would sit given the

24   scale of the graph, it would sit roughly around here.  We see

25   that 4 percent on the top as opposed to zero corresponds to a

1    26 percent extra fee as opposed to 30.

2         And as we see here, that blue line between that core

3    strategic asset developers that would adopt even if there's no,

4    you know, lower fee of 26, even a 30, that blue line hardly

5    changes its height until we reach an area where it becomes

6    cheap enough for User Choice Billing to be a viable option for

7    developers.

8    Q.   Let's go to the next slide.

9         And what are you showing us here where the line all of a

10   sudden jumps up?

11   A.   So if you go back mentally to where I said, "26 plus 6,

12   that's 32, that's too much for me, I'm not going to use User

13   Choice Billing," well, what about 25?  No, still too high.  24?

14   No.  It's kind of break even.  23?  Oh, I might consider it.

15   22?  Now it's looking good.

16        That's what happens as we move to the right.  That green

17   region is where we're hitting those numbers that are

18   commensurate with this being a good deal for a developer.  That

19   would probably be an extra fee on the order of 18 to

20   24 percent, roughly, given the competitive benchmarking.

21   26 percent is way above that.

22   Q.   Let's go back to your assignment.

23        In your opinion, Professor Tadelis, does Google's conduct

24   related to Google Play Billing harm competition and consumers?

25   A.   Yes, in my opinion, it does.

1    **Q.**   What would you expect to see happen should Google's

2    coercive tie between Google and payment be severed?

3    **A.**   What I would suspect is entry by these competitors would

4    happen.  There would be price pressure on billing solutions and

5    prices -- fees would go down that developers and consumers

6    would benefit from, and innovation would be increased and

7    developers would have more variety of payment solutions to

8    choose from.

9    **Q.**   Now, would severing the tie resolve -- or necessarily

10   resolve all the competitive problems with Google's conduct?

11   **A.**   Not necessarily.  As we just saw with User Choice Billing,

12   you could have the appearance of severing the tie; but if

13   Google is able to leverage its market power in distribution,

14   they could design fees like User Choice Billing that would

15   change what is now a forcing tie into an economic tie.  It's

16   like you could choose that, but it's not economically in your

17   best interest.

18             **MR. EVEN:**  I pass the witness.

19             **THE COURT:**  Okay.  Let's stand up for a bit.  We'll

20   take our break in about 20 minutes.

21                    (Pause in proceedings.)

22             **THE COURT:**  Okay.

23                    (Pause in proceedings.)

24             **THE COURT:**  Okay.  Let's get going.

25   \\\

1        <u>**CROSS-EXAMINATION**</u>

2    **BY MR. MACH:**

3    **Q.**   Good morning, Professor Tadelis.  Nice to see you again,

4    sir.

5    **A.**   Nice to see you, Mr. Mach.

6    **Q.**   Now, you testified that the conduct at issue here

7    reinforces what you call Google's market power; right?

8    **A.**   Reinforces Google's market power in the distribution

9    market.

10   **Q.**   Right.  So I'd like to explore for a minute the reasons

11   that you think Google has market power.  Does that make sense?

12   **A.**   Sure.

13   **Q.**   And one of those reasons is that you think Google charges

14   more than payment processers charge; right?

15   **A.**   That is a consequence of their market power.

16   **Q.**   Sir, one of the reasons that you believe Google has market

17   power is that it charges more than payment processers; right,

18   sir?

19   **A.**   Than payment solution providers.

20   **Q.**   And when you say "payment solution providers," you're

21   distinguishing that from the firms that are listed in the chart

22   that you were shown by Mr. Even; is that what you're doing?

23   **A.**   I'm not sure I understand the question.

24   **Q.**   I'll clarify.

25        I'm just trying to understand.  When you say "payment

1   solution providers," the firms you're talking about are firms

2   like Braintree, PayPal, Square, Stripe, et cetera; right, sir?

3   A.   That's correct.

4   Q.   Okay.  And one of the reasons that you believe Google has

5   market power, is that you believe they charge more than firms

6   like that; correct?

7   A.   They are charging more than firms like that significantly,

8   yes.

9   Q.   Yes.  And that's one of the reasons you believe that

10  Google has market power; right?

11  A.   Uh-huh.

12  Q.   And you conduct a comparison of Google's -- Google Play

13  Billing fees with the fees charged by firms like that, like

14  Braintree, PayPal Stripe, et cetera; correct, sir?

15  A.   That's correct.

16  Q.   So I want to explore both sides of that comparison.  Okay?

17  A.   Sure.

18  Q.   Now, you already testified today that Google doesn't

19  charge 30 percent on average for those transactions; right?  It

20  charges something less than that?

21  A.   It was 29.4 percent, yes, in 2020.

22  Q.   In your report, you used 29.4 percent; correct?

23  A.   That is correct.

24  Q.   And you refer to that as Google's standard commission;

25  right, sir?

1    **A.**   I don't recall the exact words that I used, but that is

2    the calculation that I did, which I explained.

3    **Q.**   It wouldn't surprise you if you referred to it as a

4    standard commission; right?

5    **A.**   It wouldn't surprise me.

6    **Q.**   And you know, in fact, Google does not charge a flat

7    30 percent commission; right?

8    **A.**   It depends on the circumstances, that's correct.

9    **Q.**   Right.  And among those circumstances is the fact that you

10   know that 99 percent of developers who use Google Play Billing

11   pay 15 percent and not 30 percent; right?

12   **A.**   I recall seeing that number.  Their revenues are very low

13   but, yes, something along those lines.

14   **Q.**   Right.  My question is about developers.  99 percent of

15   developers don't pay the 30 percent commission; right, sir?

16   **A.**   I believe that's a number that Google presented, yes.

17   **Q.**   And you agree with it; right?  I'm just trying to be

18   clear.

19   **A.**   I can't refute it, correct.

20   **Q.**   So let's take a closer look at the products that you

21   compare Google Play Billing against, and to do this I want to

22   put up a demonstrative.

23        Phil, if we could put up Slide 3, please.

24        Now, this is the slide that counsel for Epic presented to

25   the jury in the opening statement.  Do you see how it cites

1   your report here down at the bottom?

2   **A.**   Yes, I do.

3   **Q.**   And you recognize these as figures that are drawn from

4   your report; right, sir?

5   **A.**   That is correct.

6   **Q.**   And this is a little bit different than this graphic that

7   you just presented in the sense that here we have Braintree,

8   and in your slide you had a different firm, Paddle; right?

9   **A.**   That is correct.

10  **Q.**   But you do stand by the figures that were presented here

11  to the jury; right, sir?

12  **A.**   Yes.

13  **Q.**   And one thing that I notice when I look at these

14  figures -- and, actually, Phil, let's go to Slide 4, if we

15  could.

16      This was also shown in the opening.  Here we have Google

17  added to the slide.  Do you see that, sir?

18  **A.**   Yes, I do.

19  **Q.**   And one of the things that I notice when I look at this,

20  is that Google's price appears to be higher than the others,

21  but there's a lot of variation across all of the rates.  You

22  agree with that; right?

23  **A.**   Yes, I do.

24  **Q.**   And it's possible that that variation exists because the

25  product that Square is offering and the product that Braintree

1    is offering, for example, are quite different; right?

2    **A.**    They have some differences.

3    **Q.**    And in order to know whether the comparisons of the

4    products that are shown in this chart is a fair one, you have

5    to understand whether the difference in underlying features of

6    the products is commensurate with the differences in price

7    between the products; right, sir?

8    **A.**    That would be fair.

9    **Q.**    You didn't attempt to make that comparison, did you, sir?

10   **A.**    The evidence about Google's lack of performance with

11   YouTube and other developers suggest that they do not have a

12   superior product.  So I believe that in my analysis it suggests

13   that, you know, double, triple that we see at 15 percent even,

14   wouldn't probably be justified by quality.

15   **Q.**    Sir, could you please take Volume 1 of the binder that

16   you've been handed?

17   **A.**    Volume 1, yes.

18          **MR. MACH:**  And, Your Honor, behind Tab 1 in Volume 1

19   is his deposition.

20          **THE COURT:**  Okay.

21          **MR. MACH:**  And I'd like to turn to page 188 starting

22   on line 25 and proceeding to the next page, 189, line 2.

23                    (Pause in proceedings.)

24          **THE COURT:**  That's fine.

25          **MR. MACH:**  Thank you, Your Honor.

1    BY MR. MACH:

2    **Q.**   Are you there, sir?

3    **A.**   Yes, I am.

4    **Q.**   Could we publish this, Phil.

5        Now, in your deposition you were asked about the

6    comparison of whether the underlying features in the products

7    and the differences in price were commensurate with those

8    differences in features.  Do you recall that?

9    **A.**   Yes, I do.

10        **THE COURT:**  Just read the Q and A.  Don't recall.

11   Just read it and move on.

12        **MR. MACH:**  I'm happy to, Your Honor.

13        **THE COURT:**  Okay.  All right.

14   BY MR. MACH:

15   **Q.**   And you were asked on line 25 (as read):

16        "You don't attempt to make that comparison, do you,

17   sir?"

18   You see that?

19   **A.**   Yes, I do.

20   **Q.**   And your answer was (as read):

21        "No, I do not."

22   Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   Essentially, in order for the comparisons to be

25   meaningful, the products offered by the providers need to be

TADELIS - CROSS / MACH

1    similar; right?

2    **A.**    Similar enough.

3    **Q.**    Right.  But none of the products shown in this chart,

4    except for Google's, offer app distribution; right?

5    **A.**    That is correct.

6    **Q.**    And obviously there are several other companies out there

7    that do offer app distribution on Android; right?

8    **A.**    Yes.

9    **Q.**    But you don't compare Google's fees for any other company

10   that does app distribution and payment processing, do you?

11   **A.**    That is correct.

12   **Q.**    For example, you know about the Samsung Galaxy Store;

13   right?

14   **A.**    Yes, I do.

15   **Q.**    And you know that Samsung's list price for payment

16   processing in that store is 30 percent; right?

17   **A.**    List price, yes.

18   **Q.**    And had you included the Samsung Galaxy Store in this

19   chart, we'd see it looking quite different; right?

20   **A.**    I wouldn't be able to include it the way I could include

21   Google.

22   **Q.**    Well, let's go to Slide 5, please.

23        Now, here on Slide 5 you see the list price that Samsung

24   has for payment processing in the Galaxy Store; right, sir?

25   **A.**    The list price, yes.

1    **Q.**    And then the elephant in the room is Apple.  You know,

2    that Apple charges a similar 15/30 commission structure as

3    Google; right?

4    **A.**    That is my understanding.

5    **Q.**    So let's put that up as well.  Let's do Slide 6, please,

6    Phil.

7         Now, sir, all three of the firms that we see in red on

8    this chart do something different than the firms that we see in

9    blue on this chart; right?

10   **A.**    That is correct.

11   **Q.**    And you're not offering the opinion that Samsung has

12   market power; right, sir?

13   **A.**    No, I'm not.

14   **Q.**    Essentially what Google is selling and what Stripe is

15   selling, they are not the same thing; right?

16   **A.**    That depends.

17   **Q.**    Well, you adopt opinions from Professor Bernheim in your

18   reports; right?

19   **A.**    Yes, I do.

20   **Q.**    And you were here in court yesterday when

21   Professor Bernheim testified; right, sir?

22   **A.**    Yes, I was.

23   **Q.**    Then you will recall that Professor Bernheim testified

24   that the fees that Google charges are a combined price for app

25   distribution and payment services.  You recall that; right,

1    sir?

2    **A.**    I do.

3    **Q.**    And you also recall that Professor Bernheim testified that

4    the service fee that Google charges is for app distribution and

5    payment services; right?

6    **A.**    I don't recall the exact words he used, but I recall him

7    saying something along those lines, yes.

8    **Q.**    Now, obviously a company like Braintree or PayPal, they

9    can't be charging that combined price, right, because they

10   don't offer both of those services?

11   **A.**    That's correct.

12   **Q.**    Phil, if we could, please, let's go back to Slide 4.

13        Now, I want to just take your comparison for what it is.

14   We'll set that aside for the moment and explore some other

15   aspects of this.

16        You told the jury that you looked at prices for

17   transactions at other sizes and the results remained the same.

18   Do you recall that?

19   **A.**    Yes.

20   **Q.**    So let's explore that a little bit.

21        So what you have here in this slide is the presentation

22   for the average in-app purchase price of $9.30; correct, sir?

23   **A.**    That's correct.

24   **Q.**    You know that is not the most common size of a transaction

25   on Google Play Billing; right?

1   **A.**   That is correct.

2   **Q.**   In fact, you'd have to acknowledge that a $9.30 change is

3   probably quite rare; right?

4   **A.**   The precise $9.30 might be rare.   The most common one was

5   $4.99, if I recall.

6   **Q.**   Right.   The most common one is $4.99, and the second-most

7   common one is 99 cents; right?

8   **A.**   That's my recollection, yes.

9   **Q.**   And you didn't report what these figures looked like for

10   those transaction, did you, sir?

11   **A.**   I believe that appears in my expert report.

12   **Q.**   I apologize, sir.   I meant you didn't report that here to

13   the jury today, not in your reports.

14   **A.**   That is correct.

15   **Q.**   In fact, you do report some of those results in the

16   documents that you disclosed in advance of trial; right?

17   **A.**   Which -- I'm sorry.   I'm confused about what it is that

18   you're asking me I'm reporting.

19   **Q.**   It was a confusing question, so that's fair.

20      I was agreeing with you.

21      You, in fact, do report some of those results in your

22   reports.   You just didn't report them here today; right, sir?

23   **A.**   That is correct.

24   **Q.**   All right.   So let's take a look at what those look like.

25      Phil, can we please go to Slide 10?

1      Now, sir, do you recognize these as the results that you

2  get for the most common transaction, $4.99?

3  **A.**   That looks familiar -- I mean, these look like the numbers

4  from my report.

5  **Q.**   Now, going back a minute, we know that most developers

6  don't pay 30 percent.  They pay 15; right?

7  **A.**   Developers, yes.

8  **Q.**   So let's go to Slide 11 for a moment.

9      So this is what this chart looks like if you use the most

10  common developer and you use the most common transaction;

11  right, sir?

12  **A.**   That would be correct.

13  **Q.**   So an app developer who chooses to use Braintree at

14  12.4 percent, that would save them 2.6 percent of revenue

15  compared to using Google Play; right?

16  **A.**   And possibly offer them solution options that don't exist

17  with Google Play.

18  **Q.**   Right.  Maybe the products have differences too; right?

19  **A.**   Mm-hmm.

20  **Q.**   But that would save them about 2.6 percent of their

21  revenue and the product would not be distributed to billions of

22  Android users at that price; right?

23  **A.**   So that would save them 2.6 percent of revenue, yes.

24      And what was the second part?

25  **Q.**   And for that savings, their product would not be

1    distributed to billions of Android users; correct?

2    **A.**    I'm -- so your question is confusing me because I think in

3    your assumption is that if I use Braintree, I can't distribute

4    on Google Play.  Is that the underlying assumption?

5    **Q.**    I'll try to simplify.

6         Braintree is not going to distribute the app for the

7    developer; correct, sir?

8    **A.**    That's correct, yes.

9    **Q.**    Now, we talked a moment ago about the fact that 99 cents

10   is the second-most common transaction.  Do you recall that?

11   **A.**    Yes.

12   **Q.**    And you calculated what some of those transactions look

13   like as well; right?

14   **A.**    That's correct.

15   **Q.**    So let's go to Slide 12, please.

16        Now, what you reported were these figures for PayPal and

17   Stripe; correct, sir?

18   **A.**    That's correct.

19   **Q.**    You did not include the results if you actually do that

20   transaction across the other firms that you discuss in your

21   report; right?

22   **A.**    That is correct.

23   **Q.**    Well, I've taken the liberty of running some of those

24   calculations, and I want to ask you about some of the results

25   that I got.

1          So, Phil, let's go to Slide 13, please.

2          So you know that Square charges a flat fee of 30 percent

3     and a percentage fee on top of that; right, sir?

4     **A.**    Yes.

5     **Q.**    So you know that for a 99-cent transaction, the

6     second-most common transaction on Google Play, Square would

7     actually charge more than Google would charge any developer for

8     that transaction; right?

9     **A.**    Are you referencing microtransactions or are you using the

10    listed 2.9 percent plus 30 cents per transaction from Square's

11    standard list?

12    **Q.**    I'm using the rates that you disclosed in Table 1 of your

13    report for Square, sir.

14    **A.**    I understand.  Those rates are not relevant for micro

15    payments, which is why I created this alternative for 99-cent

16    purchases.

17    **Q.**    Well, those are the only rates that you're aware of that

18    Square charges; right?  You don't report any other rates for

19    Square, do you, sir?

20    **A.**    I couldn't find rates for micropayments on Square --

21    **Q.**    Right.

22    **A.**    -- that's correct.

23    **Q.**    You're not aware of Square having a different set of rates

24    that would get you a result different than 33.2 percent, are

25    you, sir?

1    **A.**    That is correct.

2    **Q.**    Now let's go, please, to Slide 14.

3         Now, this is my math up on the screen.  I want to make

4    sure it's right.  We can work through them if we need to, but

5    I'll just ask you to simplify it.

6         You recognize these as the fees that would apply to a

7    99-cent transaction if you use the rates that you include in

8    your report; right, sir?

9    **A.**    Yes.  That would be erroneous, but I understand that.

10   **Q.**    Well, you're not disputing that if a Braintree customer

11   wants to process a 99-cent transaction, that Braintree would

12   charge them 52.1 percent of that transaction?  You're not

13   disputing that, are you, sir?

14   **A.**    I'm not disputing that.  I would suggest that a developer

15   who is engaging with the company PayPal that owns Braintree

16   would see that PayPal offers them three alternatives.  You

17   could use Braintree or PayPal not for micropayments -- they're

18   not intended for 99-cent transactions -- and pay us more than

19   50 cents on the dollar, or you could use our dedicated

20   micropayment, which would cost you 14.1 percent.  I would

21   expect the developer to choose the 14.1 percent.

22   **Q.**    Well, you're not disputing that these are the prices that

23   these companies have out in the marketplace that you consider

24   competitive, are you, sir?

25   **A.**    I'm not disputing that.  It's just not for this kind of

1    transaction.

2    **Q.**   Now, Stripe and Square on this chart, they don't own

3    Braintree; right, sir?  They don't have that relationship?

4    **A.**   That's correct.

5    **Q.**   So a Square customer or a Stripe customer, they're going

6    to pay more than Google for those transactions; right, sir?

7    **A.**   No, because I would expect a developer that wants to work

8    with Stripe would look at the 33.2; if they're not optimizing

9    and they're choosing the wrong solution, they would choose the

10   10.1.

11       And I would expect that developer to do their due

12   diligence and realize that Stripe and PayPal micropayments are

13   cheaper than all the other alternatives and they wouldn't

14   consider them.

15   **Q.**   And have you done an analysis of how many transaction are

16   completed at 99 cents on Stripe or Square?  You've not done

17   that, have you, sir?

18   **A.**   No, I have not.

19   **Q.**   You don't know that?

20   **A.**   I've not done that analysis.

21   **Q.**   Now, you added into the chart that you presented to the

22   jury a company called Paddle.  Do you recall that?

23   **A.**   Yes.

24   **Q.**   So I want to ask you a couple of quick questions about

25   that.

1    Paddle for the $9.30 transaction is more expensive than

2  the payment processers that you list; right?

3  **A.**   I did not have the information on Paddle's different types

4  of applications.  I took a number from the testimony, I

5  believe, that was given that 10 percent was mentioned.

6  **Q.**   Right.

7  **A.**   So I just used it because it was mentioned here in the

8  courtroom.

9  **Q.**   Right.  You took a 10 percent price for Paddle.  That's

10  what you presented, correct, sir?

11  **A.**   Correct.

12  **Q.**   My question is only that 10 percent price, that's higher

13  than the prices for the peer-payment processers that you showed

14  the jury; right?

15  **A.**   Payment solutions that I showed the jury, yeah.

16  **Q.**   And you read the testimony of Mr. Owens of Paddle; right?

17  **A.**   I read parts of it.

18  **Q.**   And you know then that Mr. Owens testified that he

19  wouldn't describe Paddle as a payment processer but, rather, as

20  something more; right?

21  **A.**   Payment solution.  You refer to processer and solution.  I

22  view them as different, so I just want to make sure we're using

23  the terms accurately.

24  **Q.**   Well, I do -- I want to make sure of that too, sir.

25    And I just want to be clear.  You have repeatedly referred

1    to firms like Braintree, PayPal, Stripe, Square, et cetera, as

2    payment processors; right?  You do that?

3    **A.**   Payment solution providers.  They also process payments,

4    but payment solutions are more than just payment processing.  I

5    think that in testimony that was given by Mr. Sweeney, he

6    described the difference that payment processing is just like

7    the Visa, MasterCard, that would be 2 and a half to 3 and a

8    half percent.  Payment solutions include dealing with refunds,

9    fraud detection, and a variety of other things.  So there's

10   more going on in solutions.

11   **Q.**   Now, you'll recall Table 1 in your report.  That's where

12   you list the rates for Braintree, PayPal, et cetera; right,

13   sir?

14   **A.**   Correct.

15   **Q.**   Right.  And that table is a description of the fee

16   structure for providers of payment processing services; right?

17   **A.**   I would have to look exactly on the details of the table

18   to give you an accurate answer.

19   **Q.**   If I could ask to turn to page 173 of your deposition.

20        **MR. MACH:**  Obviously we'll wait, Your Honor, while you

21   have a moment.

22        **THE WITNESS:**  Was that Volume 1 again?  Sorry.

23   BY MR. MACH:

24   **Q.**   Yes, sir.

25   **A.**   Thank you.

 1              THE COURT:  173?

 2              MR. MACH:  Yes, Your Honor.  173, lines 10 to 12.

 3              THE COURT:  No.  Next question.

 4              MR. MACH:  Thank you, Your Honor.

 5              THE COURT:  Let's just take our morning break and be

 6   back a little bit after 10:45.

 7              THE CLERK:  All rise.

 8                   (Recess taken at 10:34 a.m)

 9                (Proceedings resumed at 10:53 a.m)

10        (Proceedings were heard in the presence of the jury:)

11              THE COURT:  Okay.  Go ahead.

12              MR. MACH:  Thank you, Your Honor.

13   BY MR. MACH:

14   Q.   Welcome back, Professor.

15   A.   Thank you, Mr. Mach.

16   Q.   Phil, I'd ask you to put Slide 11 back up for us, please.

17        Professor Tadelis, you remember this is the slide that

18   shows processing for the most common in-app purchase?  Do you

19   recall that?

20   A.   Yes, I do.

21   Q.   And we talked about the fact that a developer in your

22   preferred world could choose to use Braintree at 12.4 percent

23   instead of 15 percent.  Do you recall that?

24   A.   Yes.

25   Q.   And I asked a question about the fact that that developer

1    couldn't use Braintree to distribute the product; right?

2    **A.**    That is correct.

3    **Q.**    And I think you pointed out, well, sure, that's true, but

4    Google will do this for free; right?

5    **A.**    That Google would do the distribution for free, that's

6    correct.

7    **Q.**    So now in that world that you're imagining, Google would

8    take the app, distribute the app, provide all of the other

9    services that they provide in connection with distributing the

10   app, but in the end they would receive nothing for that;

11   correct?

12   **A.**    Let me make sure I understand correctly.  Are you

13   suggesting that they would remove their fee?  I'm just not

14   quite clear on what is the counterfactual.

15   **Q.**    Sure.  I'm imagining the world that I think you're asking

16   for, where Google doesn't require app developers to use

17   Google Play Billing to complete in-app transactions.  Are you

18   with me?

19   **A.**    Yes.

20   **Q.**    And the world that you're imagining is one where Google

21   will distribute that app and provide all of the services

22   related to that, but before that transaction is complete, the

23   customer can go to Braintree and complete the transaction

24   there; right?

25   **A.**    Correct.

1   **Q.**   And in that world, Google receives nothing for all of the

2   services it provides, like distribution; correct?

3   **A.**   From this developer, that would be correct.

4   **Q.**   I want to shift a little bit to ask you some questions

5   about the geographic market.

6       And just so that we're understanding, your view is that

7   the geographic is one big market across the whole world except

8   for China; right?

9   **A.**   Correct.

10  **Q.**   And obviously China is a very large economy and very

11  populous.  We don't disagree on that; right?

12  **A.**   Absolutely.

13  **Q.**   And you also know that Apple sells a lot of iPhones in

14  China; right?

15  **A.**   I don't know how many iPhones Apple sells in China

16  actually.

17  **Q.**   And you exclude China because, among other things, you say

18  that the prominent payment solutions inside of China don't have

19  much overlap with those outside of China; right?

20  **A.**   Among other things, yes.

21  **Q.**   For example, you look at PayPal and Stripe and Square and

22  you find that only one of those has service in China; right?

23  **A.**   I believe that to be correct.

24  **Q.**   Now, once you exclude China, your market still includes

25  roughly 175 countries; fair?

1    **A.**    Sounds fair.

2    **Q.**    So I want to take a minute and explore whether the reasons

3    that you excluded China apply equally to countries that you did

4    not exclude.  Does that make sense?

5    **A.**    Sure.

6    **Q.**    So let's just take a country like Indonesia.  What are the

7    prominent payment solution providers in Indonesia?

8    **A.**    Sitting here right now, I have no recollection.

9    **Q.**    So obviously, then, you couldn't tell the jury whether

10   those prominent payment solution providers overlap with the set

11   that serves customers outside of Indonesia; right?

12   **A.**    Sitting here right now, I cannot do that.

13   **Q.**    I assure you I'm not going to do 175 countries.  I'll just

14   give you a couple of others.

15        Would it be the same answer if I gave you Egypt?

16   **A.**    That would be the same answer.

17   **Q.**    Or Brazil?

18   **A.**    That would be the same answer.

19   **Q.**    Or Germany?

20   **A.**    That would be the same answer.

21   **Q.**    Now, a moment ago we talked about the fact that those

22   payment solution providers that you do look at, like Stripe and

23   Square, only one does business outside of China.  I want to

24   focus on that.  Okay?

25   **A.**    Sure.

1    **Q.**   You're aware, aren't you, sir, that Square is only

2    available in eight of the 175 countries, approximately, that

3    are in your geographic market?

4    **A.**   That sounds right.  I remember Square being exceptionally

5    small.

6    **Q.**   So it's not available in China.  It's also not available

7    in more than 150 other countries that are in your market;

8    right?

9    **A.**   That's correct.

10   **Q.**   Braintree, similarly, is also only available in eight

11   countries; right?

12   **A.**   That number, I don't recall, but I take your word for it.

13   **Q.**   You wouldn't be surprised to find that; right?

14   **A.**   I would not be shocked to find that out.

15   **Q.**   And the countries that we're talking about, we're not

16   talking about small countries; right?  You know that Square is

17   not available in countries like Germany and Brazil and India?

18   You know that; right, sir?

19   **A.**   Correct.

20   **Q.**   The bottom line is, you couldn't tell the jury whether the

21   criteria you use to exclude China could be applied just as

22   equally to those countries; right?

23   **A.**   Well, you talked about one of the criteria.  The most

24   important criteria is that Google Play and Google Play Billing

25   are not offered in China.  So the conduct of the tie that I am

1   talking about here just doesn't exist in China, so excluding

2   China would be a natural thing to do.

3   **Q.**   Now, what about pricing?  Did you look at the degree to

4   which prices for the products that you compare Google Play

5   Billing against are the same across the world?

6   **A.**   You mean the fees?

7   **Q.**   Correct, sir.

8   **A.**   No, I have not done a comparison of fees across every

9   country.

10  **Q.**   So it wouldn't surprise you to know, for example, that

11  PayPal charges substantially higher fees outside of the

12  United States than it does in the United States; right?

13  **A.**   I don't know the exact numbers, but it wouldn't surprise

14  me that they would be different.

15  **Q.**   And it wouldn't surprise you to find that the fees that

16  they charge differ across the countries that are within your

17  geographic market; right?

18  **A.**   That is correct, that would not surprise me.

19  **Q.**   Now, you said in your direct examination that if we were

20  to narrow the geographic market only to the United States, that

21  that wouldn't affect your analysis; right?

22  **A.**   That is correct.

23  **Q.**   Now, I know that you don't view the world this way, but as

24  a percentage of smartphones, Apple has a vastly larger market

25  share in the U.S. than most other countries; right, sir?

1   **A.**   I -- yes, that is definitely correct.

2   **Q.**   So if we were talking about Apple, which I know you don't

3   do, you don't believe Apple should be considered, if we were

4   thinking about Apple --

5   **A.**   I'm not sure what I don't believe Apple should be

6   considered.

7   **Q.**   I didn't mean to mischaracterize.  I was trying to do

8   justice to your opinion.

9   **A.**   Oh, thank you.

10  **Q.**   I know that you don't think Apple is in the relevant

11  market.  That's fair; right?

12  **A.**   That is correct.

13  **Q.**   Okay.  But if it was, then looking at just the

14  United States, that would be material; right?

15  **A.**   Are we talking about the market for in-app payment

16  solutions for digital content?

17  **Q.**   I'm just saying if you don't limit things to Android and

18  you think about Apple, Apple's share is higher in the U.S. than

19  most other countries; right?

20  **A.**   So I'm sorry, could you repeat the last question?  Because

21  we kind of did a little switcheroo there.

22  **Q.**   Yeah.  I'm not trying to deceive.

23       If we're thinking about products outside of Android but in

24  things app distribution or in-app payment solutions, if you

25  were accounting for iOS and the related products, that that

TADELIS - CROSS / MACH

1  share would be considerably higher in the U.S. than most other

2  countries; right?

3  **A.**   In the U.S., yes, that's correct.

4  **Q.**   So let's turn to market shares for a minute.

5       You look at market shares as what you call indirect

6  evidence that Google has market power; right?

7  **A.**   That's correct.

8  **Q.**   But you don't have an accurate estimate of Google's market

9  share in the market as you define it; right?

10 **A.**   In the market for in-app payments for digital -- in-app

11 payment solution for digital content, that's correct, I do not

12 have an accurate number.

13 **Q.**   You conducted what you called a back-of-the-envelope

14 calculation.  Does that sound familiar?

15 **A.**   Yes, that does.

16 **Q.**   Now, like other -- the other economists in this matter,

17 you're very well compensated for your work; correct, sir?

18 **A.**   I am.

19 **Q.**   $1200 an hour plus a share of the revenue for the team

20 that supports you; right?

21 **A.**   That is correct.

22 **Q.**   You don't think that a case of this magnitude should be

23 decided on back-of-the-envelope calculations, do you, sir?

24 **A.**   That is one of many pieces of evidence that are in my

25 reports.

**TADELIS - CROSS / MACH**

1   **Q.**   And you know that beyond Google Play, there are many other

2   app stores that are available to Android users; right?

3   **A.**   That is correct.

4   **Q.**   And you know that some of those generate hundreds of

5   millions of dollars in revenue; right?

6   **A.**   Yes, about a 50th, if I recall correctly, of what Google

7   actually --

8   **Q.**   Well --

9   **A.**   -- receives.

10  **Q.**   I didn't mean to interrupt you.  Are you finished?

11  **A.**   I'm done.

12  **Q.**   Now, in your report, you look at just two of those:

13  Samsung Galaxy and Amazon; correct?

14  **A.**   That is correct.

15  **Q.**   But you don't include estimates for market share for any

16  other app store; right?

17  **A.**   No, I do not.  That was not part of my assignment.  The

18  distribution was handled by Professor Bernheim.

19  **Q.**   Well, the estimates of the market shares that you provide

20  for billing services also don't account for those other app

21  stores other than your estimates for Samsung Galaxy and the

22  Amazon Appstore; correct?

23  **A.**   That is correct.

24  **Q.**   And your estimates of market shares also don't account for

25  sideloading; correct, sir?

1    **A.**    That is correct.

2    **Q.**    And you didn't even analyze the question of whether

3    sideloading should be included in the market as you define it;

4    right?

5    **A.**    I discuss in my report that for sideloading, I can't tell

6    how many apps are processing in-app digital content, so I can't

7    do a calculation of that.

8    **Q.**    You don't know how many apps are sideloaded and you don't

9    know which payment processer was used for those sideloaded

10    apps; right?

11    **A.**    An accurate number, no.  What I do know is that over

12    80 percent, if I recall correctly, of apps are distributed

13    through the Google Play Store from Professor Bernheim's

14    analysis, and any app distributed through the Play Store must

15    use Google Play Billing.

16         So if we just think of the simple numbers of 80 through

17    the Google Play Store, 20 through everything else, and let's

18    just imagine that everything else is provided by other

19    suppliers and not by Google, then this 80 percent has to be

20    provided by Google because of the DDA agreement.

21    **Q.**    Well, a minute ago you told me your assignment was not to

22    focus on the app distribution market; right?

23    **A.**    Oh, I was talking about payment solutions at the moment.

24    **Q.**    But you don't have an estimate of market shares

25    attributable to sideloading for payment solutions; right?

1   **A.**   That's correct.

2   **Q.**   And market share is a number; right?  It's a number like

3   80 percent, 20 percent, 45 percent; right?

4   **A.**   That is correct.

5   **Q.**   And you didn't attempt to quantify Google's market share

6   in that manner; right?

7   **A.**   For payment solution, that's correct.

8   **Q.**   And, for example, your assessment of market shares doesn't

9   include a discussion of the One Store; right?

10  **A.**   That is correct.

11  **Q.**   But you do know that One Store is an example of an app

12  store that has significant market share at least in some

13  geographies; right?

14  **A.**   In some geographies, yes.

15  **Q.**   You know that the One Store has 18 percent market share in

16  what you've called the South Korean market; right?

17  **A.**   I don't recall that number off the top of my head, but

18  I'll take it.

19  **Q.**   I can refresh your recollection if you'd like to turn to

20  Tab 2.

21  **A.**   There's no need.  I believe that.

22  **Q.**   So you agree with me that One Store as an 18 percent

23  market share in what you call the South Korean market; correct?

24  **A.**   If it's documented, then I believe you, yes.

25  **Q.**   Let me turn for the last few minutes here to your

1  conclusion that Google's conduct has anticompetitive effects.

2  Okay?

3  **A.**   Sure.

4  **Q.**   Now, you accept that Google has the right to charge for

5  whatever it wants to charge for; right?

6  **A.**   Yes.

7  **Q.**   Including distribution; right?  Google has the right to

8  charge for that separately should it wish to do that?

9  **A.**   That is correct.

10  **Q.**   And you're familiar with the concept of what's called the

11  but-for world in antitrust; right, sir?

12  **A.**   Yes, I am.

13  **Q.**   The but-for world is the hypothetical world where Google

14  doesn't engage in the conduct that you find objectionable;

15  correct?

16  **A.**   That is correct.  That's the world where competition is

17  allowed for payment solutions.

18  **Q.**   Now, in the current world, most app developers who

19  distribute through Google Play don't monetize in a way that

20  requires the use of Google Play Billing; right?

21  **A.**   That's my understanding.

22  **Q.**   But they still get to distribute that product at no cost;

23  correct?

24  **A.**   Correct.

25  **Q.**   And you know that in the but-for world where, you know,

1    we're doing what you want done, Google might have to charge

2    fees for the other services that it doesn't charge for today;

3    right?

4    **A.**    Or it might not.

5    **Q.**    It might, it might not; right?

6    **A.**    Right.

7    **Q.**    It might?

8    **A.**    And it might not.

9    **Q.**    The relevant world, the relevant but-for world -- excuse

10   me -- that is one where the billing requirements that you

11   criticized are removed but then Google has the choice to set

12   fees for other parts of that platform; right?

13   **A.**    That is correct.

14   **Q.**    And it might do that as you said?

15   **A.**    It might or might not.

16   **Q.**    If it did that, the vast majority of developers would be

17   paying more than they do today; right, sir?

18   **A.**    Not necessarily.

19   **Q.**    Well, the vast majority of developers today don't pay

20   anything to distribute the product; right, sir?

21   **A.**    To distribute, that's correct.

22   **Q.**    Right.  So the vast majority of developers, if they did

23   have to pay to distribute that product, they would be worse

24   off, wouldn't they, sir?

25   **A.**    If they did have to pay, they would be worse off.

1    Q.   And you don't attempt to estimate the degree to which

2    prices for app distribution might increase; right?

3    A.   That's right.

4    Q.   You also don't attempt to estimate the degree to which

5    prices for payment processing that Google charges might

6    decrease in the but-for world; right?

7    A.   That is correct.

8    Q.   Now, I want to follow up on His Honor's question about the

9    effect of a lower service fee on consumers.   Okay?

10   A.   Sure.

11   Q.   Now, you remember that Google lowered its service fee from

12   30 percent to 15 percent for many developers; right?

13   A.   Yes.

14   Q.   And you're aware that Google provided data showing how

15   many of the developers who fell into the new 15 percent bucket

16   lowered their prices for in-app purchases of digital goods;

17   right?

18   A.   That sounds right.   I don't recall the exact details of

19   the data that was provided on that.

20   Q.   And you don't recall it because you didn't look at that

21   data to determine how many developers actually lowered their

22   prices to consumers when Google lowered the service fee to

23   those developers; correct?

24   A.   Sitting here right now, I don't recall if I looked at that

25   data or not.

1    **Q.**   Well, I'm not asking you if you've seen the data, sir.

2    I'm asking if you actually conducted an analysis of that

3    question.

4    **A.**   No, I have not conducted that analysis.

5    **Q.**   Have you ever seen such an analysis?

6    **A.**   Sitting here right now, I can't recall, but it's possible.

7    **Q.**   It wouldn't surprise you, would it, sir, if very few of

8    those developers passed along that price decrease?

9    **A.**   I wouldn't have a prior off which to base what I would

10   expect to happen.  It also depends on how long things would be

11   allowed to shake up, so to speak, for them to adjust.

12   **Q.**   So let me shift gears for a moment to the question of the

13   tie.  You know what I'm talking about; right?

14   **A.**   I hope so.

15   **Q.**   Okay.  Tying refers to an arrangement in which a seller

16   will sell a product, the tying product, to a buyer only if that

17   buyer agrees to purchase the seller's other product, the tied

18   product; right?

19   **A.**   That would be a correct description, yes.

20   **Q.**   And in this case, you say the tie product is distribution

21   through Google Play and --

22   **A.**   Tying.

23   **Q.**   Pardon me.  You're faster than I am.

24        The tying product is distribution through Google Play and

25   the tied product is Google Play Billing; correct?

1  **A.**   Correct.

2  **Q.**   So let's explore whether you really have those tied

3  together for the developers in our ecosystem.   Okay?

4      A developer who distributes a free app, they don't have to

5  purchase Google Play Billing and they can still get

6  distribution through Google Play; correct?

7  **A.**   That's correct.

8  **Q.**   And the same goes for a developer who monetizes in a

9  consumption-only model; right?

10  **A.**   Yep.

11  **Q.**   They don't have to do that; right?

12  **A.**   Correct.

13  **Q.**   And the same goes for a developer who uses advertising;

14  right?   They do not have to do that; correct?

15  **A.**   Correct.

16  **Q.**   So for each one of those developers, there is no

17  arrangement in which Google will sell the tying product only if

18  the buyer agrees to purchase the tied product; right?

19  **A.**   That is correct.

20  **Q.**   If you or I distributed an app, we could distribute it on

21  Google Play, and Google would not force us to use Google Play

22  Billing unless we made the particular choice to use a specific

23  business model; right?

24  **A.**   That is correct.

25  **Q.**   Now, you testified a little bit about your work for Amazon

**TADELIS - CROSS / MACH**

1  and eBay.  Do you recall that?

2  **A.**   Yes.

3  **Q.**   And when you worked at eBay, you don't recall having any

4  concerns that they had policies or practices that were

5  anticompetitive; right?

6  **A.**   That is correct.

7  **Q.**   And much like Google Play, eBay earns its money on the

8  completion of the transaction and much less money on the

9  listing of the transaction; correct?

10  **A.**   That's correct.

11  **Q.**   And when you worked for eBay, eBay owned a payment

12  processer too; right?  PayPal?

13  **A.**   Yes.

14  **Q.**   And when you worked at eBay, eBay didn't give users the

15  freedom to choose whichever payment processer they wanted to

16  when they completed transactions, did it?

17  **A.**   That is correct.

18  **Q.**   In fact, when you worked at eBay, eBay banned its

19  customers from using Google's payment processing product,

20  Google Checkout, even if users would have preferred that;

21  right?

22  **A.**   That is correct.

23  **Q.**   Now, your report also addresses antisteering provisions.

24  You remember that; right?

25  **A.**   Yes.

**TADELIS - CROSS / MACH**

1   **Q.**   And you can't think of any reason that might justify

2   Google's antisteering provision as you describe it; right?

3   **A.**   Not for the conduct that I am investigating, that's

4   correct.

5   **Q.**   But when you worked for eBay, eBay had an antisteering

6   policy; right?

7   **A.**   That is correct.

8   **Q.**   And eBay had an antisteering policy because if it didn't

9   have such a policy, users of the platform could take advantage

10  of the parts of the platform that were free or low cost and

11  then they could remove the transaction from the platform and

12  deprive eBay of the income it wanted to earn from its services;

13  right?

14  **A.**   That is correct.

15  **Q.**   And that antisteering policy, that's what allowed eBay to

16  actually pay for the platform; right?

17  **A.**   And make a profit, yes.

18  **Q.**   Nothing wrong with eBay doing that; right?

19  **A.**   That is correct.

20  **Q.**   And, again, when you worked at Amazon, you didn't think

21  there was anything anticompetitive about what Amazon was doing

22  either; right?

23  **A.**   That is correct.

24  **Q.**   And Amazon doesn't just sell its own product.  It's also a

25  platform that brings buyers and sellers together; right?

1   **A.**    Yes.  More than 50 percent now, in fact.

2   **Q.**    And they also have an antisteering policy; right?

3   **A.**    Yes, that's correct.

4   **Q.**    For example, on Amazon a seller can't provide a link or a

5   message that prompts a user to go to an external website to

6   complete a transaction; right?

7   **A.**    That is correct.

8   **Q.**    And obviously they have to do that because if a user could

9   take advantage of the platform to connect the buyer and the

10  seller but then take that transaction another place, eBay won't

11  get money for the services it's providing; right?

12  **A.**    Yes.

13  **Q.**    And you testified that you think Amazon's policy is fair

14  but Google's policy is not fair because you think Amazon treats

15  all customers exactly the same way.  Do you recall that?

16  **A.**    I recall that we had that discussion in our deposition,

17  yes.

18  **Q.**    We had that discussion, and what you said in that

19  discussion is that that's what was fair, Amazon treats all

20  sellers the exact same way; right, sir?

21  **A.**    That was one of the many things that I mentioned, yes.

22  **Q.**    And, in fact, for some products, Amazon charges

23  45 percent; right?

24  **A.**    That's correct.

25  **Q.**    For other products, Amazon charges 8 percent; right, sir?

1   **A.**   That's correct.

2   **Q.**   So, in fact, Amazon targets certain types of sellers for

3   high fees and others for low fees; right?

4   **A.**   Yes, they do.

5   **Q.**   And some of those fees obviously are higher than Google's?

6   **A.**   That's correct.

7   **Q.**   And it's not wrong for Amazon to want to avoid the result

8   of a user using the pieces of the platform they like but then

9   moving over and avoiding the parts of the platform they have to

10  pay for; right?

11  **A.**   Could you kindly repeat the question, sir?

12  **Q.**   Sure.

13       There's nothing unfair or wrong about Amazon wanting to

14  prevent a situation where users of the platform use the pieces

15  that they like but leave the platform when they're asked to pay

16  for it; right?

17  **A.**   There's something at the end that just throws me off.  I'm

18  sorry.

19  **Q.**   We've done so much, I'll move on.  We've got more to do.

20  **A.**   Okay.

21  **Q.**   It's not a problem.

22  **A.**   Thank you.

23  **Q.**   Last question about Amazon.

24       Sellers on Amazon also don't have the power to choose the

25  payment processer they like; right?

1    **A.**   Correct.

2    **Q.**   And if they did give sellers that option, Amazon would

3    have a hard time making money on the platform; right?

4    **A.**   That wouldn't be an option that would work well for the

5    way Amazon is charging.  What Amazon is like, is like the

6    purchasing of apps on the Play Store.  The interactions on

7    Amazon have no parallel to in-app purchases that happen between

8    the buyer and the app developer.

9    **Q.**   Counsel for Epic is welcome to ask more questions about

10   that if they'd like to explore it, sir.

11   **A.**   Sure.

12   **Q.**   Now, let me close with a couple of questions about Apple.

13        Apple offers payment solution services like Google does;

14   right?

15   **A.**   That's correct.

16   **Q.**   But you concluded that using their product is not a viable

17   substitute for developers; right, sir?

18   **A.**   That's correct.

19   **Q.**   But in order for two products to be substitutes, they

20   don't have to be viable substitutes for every consumer in the

21   market; right?

22   **A.**   That's correct.

23   **Q.**   And you're aware that there certainly are developers who

24   develop for iOS but they don't develop for Android; right?

25   **A.**   I understand that that occurs, yes.

1   **Q.**   And when a developer makes that choice, they develop for

2   iOS but don't develop for Android, Google is losing not just

3   the app in Google Play, they're also losing any potential

4   revenue they might get through Google Play Billing in that app

5   too; right?

6   **A.**   Not necessarily.

7   **Q.**   Well, if the app -- is your testimony that an app listed

8   on iOS generates revenue for Google through Google Play

9   Billing?

10   **A.**   No, that's not my testimony.

11   **Q.**   Now, you also know that there are lots of apps that

12   launched on iOS before they launched on Android; right?

13   **A.**   Yes.

14   **Q.**   You know Instagram did that?

15   **A.**   I don't recall who did it, but I know it's related to the

16   sim ship agreement or something like that.

17   **Q.**   But you know it happens; right, sir?

18   **A.**   I know it happened, yes.

19   **Q.**   And in those instances, the developers had a choice of

20   whether to develop for Android first or iOS first; right?

21   **A.**   I would assume that much, yeah.

22   **Q.**   Now, in your report you discuss some of the price changes

23   that Google put in place in January of 2018.  Do you recall

24   that?

25   **A.**   I believe that's the date, yes.

1    Q.   Those were price reductions; right, sir?

2    A.   Yeah.  That's when they moved to the 15 percent on the

3    first million, if I recall correctly.

4    Q.   Is that how you recall it, sir?

5    A.   That's how I recall it, but --

6    Q.   Me too, but I'm not the witness, sir.

7    A.   -- there's a lot of information in this case.

8    Q.   And it's clear that when Google did that price reduction,

9    they were taking into account the changes in Apple's prices for

10   its own payment processing service when deciding to -- whether

11   to make price changes of their own; right, sir?

12   A.   I believe reading that somewhere, yes.

13   Q.   Well, actually you said that; right, sir?

14   A.   Yes.  I believe that I also wrote that because it's part

15   of the information I obtained.

16           MR. MACH:  No further questions.  Thank you, sir.

17           THE COURT:  Okay.  Very, very briefly.

18           MR. EVEN:  I will do my best, Your Honor.

19           THE COURT:  I'm going to help you.  Very, very

20   briefly.

21                    <u>REDIRECT EXAMINATION</u>

22   BY MR. EVEN:

23   Q.   You recall the time difference between when Apple moved

24   its pricing to 15 percent --

25   A.   Yes.

1  **Q.**   -- and when Google moved its pricing to 15 percent?

2  **A.**   Apple dropped its prices around the middle of 2016, about

3  a year and a half before Google's response.

4  **Q.**   There was some question about Amazon and eBay.  You

5  started explaining why the policy on Amazon and eBay is

6  different from the policy that you were talking about here.

7  Can you explain that?

8  **A.**   Sure.  So if you want to have an analogy between, say,

9  Amazon and the Google Play Store, the analogy should only be

10  about the sale of the app itself.  Because if I'm a seller and

11  I sell these kind of microphones and I want to sell them

12  through Amazon, I sell them through Amazon, the transaction

13  happens on Amazon, amazon is performing the bill of sale or

14  whatever that is, and then they pay me.

15      If later after you bought this Shure microphone from me,

16  you will contact me and say, "Oh, I want to buy some

17  accessories that will allow me to lengthen or shorten it," you

18  could do that directly with me.  Amazon doesn't prevent this.

19  You can't buy in-app content on Google Play without Google Play

20  Billing.  They do prevent it.

21  **Q.**   You were asked some questions about the -- well, what's

22  called -- what is referred to by counsel as the apples and

23  oranges, and the fact that Google currently charges a price for

24  the bundle.  If the tie were severed, would Google be charging

25  a price for the bundle?

1  **A.**   Well, again, I don't know how Google will respond to the

2  tie that's severed; but if they want to offer payment

3  solutions, they will have to compete with the payment solution

4  providers.

5  **Q.**   Now, there was some questioning about whether Google would

6  in response try to impose a fee on distribution, for instance.

7       If Google thought that charging developers who currently

8  do not pay anything a distribution fee is something that's

9  profitable for Google, is there anything stopping Google from

10  doing that today before there's any change to the other

11  policies?

12  **A.**   Absolutely not, because, again, they currently have the

13  market power in distribution and, therefore, if currently it

14  would be in their best interest to charge for distribution and

15  make money, they would do it.  The fact that they're not doing

16  it now may suggest that that's not the right business model.

17  **Q.**   Okay.  I want to go back to a couple of questions you were

18  asked about whether there's actually a tie or not.

19       You presented today to the jury a slide with Nike being

20  the only game in town and tying socks.  Do you remember that?

21  **A.**   Yes.

22  **Q.**   If Nike was the only game in town for all sneakers but it

23  chose to tie the socks only to running shoes but not to cleats,

24  would that mean there's no tie?

25  **A.**   No.  There would be a tie with running shoes.

1  **Q.**  So now let's put up Slide 11 for a second.

2  Do you remember that Mr. Mach asked you a few questions

3  about this slide and he took out all the 30 percent that Google

4  charges and left only the 15 percent because that is apparently

5  the price that 99 percent of developers pay; correct?

6  **A.**  Yes.

7  **Q.**  How much of the actual revenue is generated by the people

8  who pay 15 percent?

9  **A.**  A small fraction of the revenue.

10  **Q.**  Now, you say at the top 4.99 is the most common in-app

11  purchase price.  Is 4.99 the most common in-app purchase price

12  for the people who sell only at 15 percent or for everyone?

13  **A.**  For everyone.

14  **Q.**  So this comparison is apples to oranges; correct?

15  **A.**  Absolutely.

16  **Q.**  Last question.  Mr. Mach showed you these very high bar

17  charts about how much a Stripe or a Square might charge under

18  their current schedule for microtransactions.  Do you remember

19  that?

20  **A.**  Yes.

21  **Q.**  Microtransactions are typically digital goods; correct?

22  **A.**  That is correct.

23  **Q.**  Does a Square have any incentive to develop a pricing

24  schedule for microtransactions while there is a tie in place

25  that doesn't allow it to provide microtransactions for digital

PROCEEDINGS

```
 1   goods?

 2   A.    Absolutely no incentive.

 3           MR. EVEN:  No further questions, Your Honor.

 4           THE COURT:  Okay.  You may step down.  Careful on your

 5   way down.

 6           THE WITNESS:  Thank you, Your Honor.

 7                        (Witness excused.)

 8           THE COURT:  Who do we have next?

 9           MR. RAPHAEL:  Google calls Professor Matthew Gentzkow,

10   Your Honor.

11           THE COURT:  Okay.  Let's take all these binders down,

12   please, from the prior witness.

13           THE CLERK:  Please raise your right hand.

14                        MATTHEW GENTZKOW,

15   called as a witness for the Defendant, having been duly sworn,

16   testified as follows:

17           THE WITNESS:  Yes, I do.

18           THE CLERK:  Thank you.  Please be seated.

19       Please state your full name for the Court and spell your

20   last name.

21           THE WITNESS:  My name is Matthew Gentzkow,

22   G-E-N-T-Z-K-O-W.

23           THE CLERK:  Thank you.

24           MR. RAPHAEL:  May I proceed, Your Honor?

25           THE COURT:  Yes.
```

1          **MR. RAPHAEL:**  Before I do so, the parties have agreed

2    upon the admission of a number of exhibits, and I'll read out

3    the numbers on those.

4          **THE COURT:**  Okay.

5          **MR. RAPHAEL:**  6989, 6991.

6          **THE CLERK:**  Wait a minute.  6989?

7          **MR. RAPHAEL:**  6991, 6993, 6994, 7011, 7020, 7028,

8    7031, 7073, 7079, 7089, 7090, 7095, 7102, 7114, 7115, 7178,

9    7179, and 9708.

10         **MR. EVEN:**  No objection, Your Honor.

11         **THE COURT:**  Okay.  They're admitted.

12         (Trial Exhibits 6989, 6991, 6993, 6994, 7011, 7020,

13          7028, 7031, 7073, 7079, 7089, 7090, 7095, 7102, 7114,

14          7115, 7178, 7179, and 9708 received in evidence.)

15         **MR. RAPHAEL:**  Thank you, Your Honor.

16                        **<u>DIRECT EXAMINATION</u>**

17   BY MR. RAPHAEL:

18   **Q.**   Good morning, Professor Gentzkow.

19   **A.**   Good morning.

20   **Q.**   Where do you work?

21   **A.**   I work at Stanford University.

22   **Q.**   And what is your title at Stanford?

23   **A.**   I'm the Landau Professor of Technology and the Economy.

24   **Q.**   And you are Dr. Gentzkow; correct?

25   **A.**   That's right, yep.

1  **Q.**  Where did you get your Ph.D.?

2  **A.**  At Harvard University.

3  **Q.**  And what did you get your Ph.D. in?

4  **A.**  Economics.

5  **Q.**  What did you do after getting your Ph.D. in economics from

6  Harvard?

7  **A.**  I went to the University of Chicago in the business school

8  there where I was a professor of economics.

9  **Q.**  And did you come to Stanford after the University of

10  Chicago?

11  **A.**  I did.  I moved in 2015 from there to Stanford.

12  **Q.**  What is the focus of your current research as an economics

13  professor at Stanford?

14  **A.**  Yes, and my main field is industrial organization, which I

15  think you've heard several times about.  Sort of a fancy word

16  for the study of competition of companies in markets.  And the

17  main focus of my research has been media and also digital

18  markets.

19  **Q.**  And have you published any articles in any professional

20  economics journals?

21  **A.**  I have.  I've published many articles.  I published in all

22  of the top journals in economics, as well as journals like

23  *Science and Nature* and others.

24  **Q.**  Have you won any awards or prizes for your work as an

25  economist?

1   **A.**   I have, yes.  I was recently elected to the National

2   Academy of Sciences.  I'm a fellow of the American Academy of

3   Arts and Sciences and the Econometric Society, and I've won a

4   variety of other awards and prizes including something called

5   the John Bates Clark Medal.

6   **Q.**   And what is the Clark Medal?

7   **A.**   The Clark Medal is given by the American Economic

8   Association to the American economist under the age of 40 who's

9   made the most significant contribution to economic thought and

10  knowledge.

11          **MR. RAPHAEL:**  At this time, Your Honor, we would

12  qualify Professor Gentzkow as an expert in economics and

13  industrial organization.

14          **MR. EVEN:**  No objection.

15          **THE COURT:**  He is qualified.

16          **MR. RAPHAEL:**  Ms. Clark, could we have control?

17      Thank you very much.

18  **BY MR. RAPHAEL:**

19  **Q.**   Now, just, Professor Gentzkow, given all that experience,

20  were you compensated for your work in this matter?

21  **A.**   I was, yes.

22  **Q.**   And at what rate?

23  **A.**   At a thousand dollars per hour, as well as a share of the

24  billings of Analysis Group, the economic consulting company

25  that I worked with.

**GENTZKOW - DIRECT / RAPHAEL**

1   **Q.**   And did you prepare a set of slides that we have on the

2   screen for your testimony today?

3   **A.**   I did, yes.

4   **Q.**   What was your assignment in this case?

5   **A.**   Yeah, so my assignment was to evaluate the challenged

6   conduct, the conduct of Google's that we've been talking about

7   in this case; to assess its impact on competition, on

8   consumers, and in particular whether it constitutes

9   anticompetitive -- what we call in economics anticompetitive

10  exclusion or foreclosure.

11  **Q.**   And what questions did you try to answer in carrying out

12  that assignment?

13  **A.**   Yes.  So there are two questions that are here on the

14  slide.  I think the kind of key starting point for all of this

15  from the perspective of an economist is -- what we care

16  ultimately about is:  How is all of this impacting consumers?

17  I think that's something that Dr. Bernheim and I, for example,

18  agree about.

19      And so the key questions I wanted to look at were:  First,

20  did this conduct create value for consumers?  What were the

21  potential benefits of it to consumes?  And then did it block

22  competition in a way that might have destroyed value for

23  consumers?

24      And just to be really clear, when I say "block

25  competition" here, I think there have been a few words used for

1   that concept:  Foreclosure --

2          THE COURT:  Okay.  Let's wait for the questions.

3          THE WITNESS:  Okay.

4          THE COURT:  Go ahead.

5   BY MR. RAPHAEL:

6   Q.   Sure.  Could you just explain the nature of that second

7   question that you looked at for your assignment?

8   A.   Yeah.  So I just meant to clarify just, when I say "block

9   competition," I don't mean that competition has to be blocked

10  entirely, but is it impaired or limited in some way that means

11  the net effect of all the conduct could be to destroy value for

12  consumers.

13  Q.   And what kinds of things does an economist do to try to

14  answer those questions you've described?

15  A.   So do a number of different things, but I would call out

16  kind of two of them that are maybe the center.

17       The first is applying economic principles and models and

18  literature that we've studied in other settings to this setting

19  to try to understand it.

20       And the other one is to look at data and do statistical

21  analysis to try to understand specifically what's happening

22  right here.

23  Q.   And you mention data.  What kind of data did you look at

24  in carrying out your assignment?

25  A.   Yeah, so I had access to quite a lot of data from Google

1  in this case, from Epic, as well as from third-party sources.

2  I think hundreds of millions of observations in that data all

3  together.

4  **Q.**   And in reviewing all that information, did you write a

5  report?

6  **A.**   I did, yes.

7  **Q.**   And what conclusions did you reach after conducting the

8  analysis that you describe?

9  **A.**   Yeah, so the main conclusion, bottom line is that I think

10  the conduct that we're talking about here clearly does create

11  value for consumers, and it does not block competition in the

12  way that I described.

13  **Q.**   Now, in reaching those conclusions, did you analyze

14  Google's conduct as a whole or just piece by piece?

15  **A.**   I would say I did both.  I considered it comprehensively

16  as a whole and what was the overall total impact of this

17  conduct putting it all together.

18      I also think it's really important to drill down and look

19  at the details of each piece of this and understand really

20  what's going on, so I tried to do that too.

21  **Q.**   Now, we've been using terms like "competition" or

22  "blocking" or "foreclosing" competition.  How do economists

23  distinguish between those two concepts?

24  **A.**   Yeah.  So I think there's an example, just to try to make

25  this concrete, that I think might be helpful.  So imagine that

1  we see three different companies competing in a market.  I have

2  here just like Company 1, 2, 3.  And suppose we see one of

3  those companies, like Number 2, is really succeeding in the

4  market, like it's attracting a large share of consumers, a

5  large share of consumers are coming to it.

6      The key thing we need to distinguish is:  Why is that

7  happening?  One possibility is that the reason it's happening

8  is because Company 2 is offering those consumers a lot of

9  value.  It's offering them a better deal than its competitors.

10 That would be competition.

11     Or the other possibility would be that somehow Company 2

12 has blocked the ability of Companies 1 and 3 to offer its deals

13 to consumers or those consumers' ability to access those deals.

14     And so at a high level, those are the two things we're

15 trying to separate here.

16 **Q.**  Just to tie that off, if in our example here if Company 2

17 is doing better than the other companies, does that tell you,

18 as an economist, that there's some problem with competition?

19 **A.**  No, not at all, because it could follow just from them

20 offering a better deal.

21 **Q.**  And so if the Google Play Store is doing better than the

22 Samsung store or the Amazon Appstore, does that mean that

23 there's some competition problem in the market?

24 **A.**  No, it does not.

25 **Q.**  Now, if Company 2 is getting more customers, you mentioned

**GENTZKOW - DIRECT / RAPHAEL**

1  they might be offering a better deal, what sort of things might

2  that entail?

3  **A.**   Yeah, so it could be most simply offering lower prices.

4  It could be higher quality, better customer service.   If we

5  were talking about stores here, it could be that it has a

6  bigger store, like this is maybe a supermarket and these other

7  companies are, like, little convenience stores.   It would not

8  be at all surprising if you have a big store with a Target or

9  Walmart with all kinds of products, lots of consumers would be

10  going to that store.

11  **Q.**   So is competition just about price for economists?

12  **A.**   No.   It's about all those other dimensions I just

13  mentioned.

14  **Q.**   Now, in this example here we're looking at people.   For an

15  economist, are consumers always people?

16  **A.**   No.   There are lots of settings where consumers means

17  other companies that one company is doing business with in one

18  way or another.

19  **Q.**   And who are the relevant consumers in this case for

20  purposes of your analysis?

21  **A.**   Yeah, so this case is obviously a little bit trickier than

22  this simple example.   I think the key thing about this case is

23  that Google's Android and also the Play Store within it are

24  platforms; and as platforms, they bring together different

25  participants and all of those are consumers.   So that includes

1    users.  It includes app developers.  It includes device makers,

2    cellular carriers.  All of those different participants are

3    consumers in this market.

4    **Q.**   And when analyzing the effect of the conduct, does an

5    economist have to look at both sets of those consumers?

6    **A.**   Yeah.  I would say all of them and, in particular, I think

7    maybe when you say "both," the main ones being the users and

8    the app developers.  I think that's where there's a lot of

9    focus certainly if we're talking about the Play Store.

10   **Q.**   And what are the signs of competition for users, for

11   example?

12   **A.**   I think competition for users looks like going out and

13   trying to give those users a better deal, make better phones

14   with better apps, and better app store.  All of those different

15   kind of features that are going to make that phone deliver more

16   value to the users.

17   **Q.**   And what are the signs of competition that you would

18   expect for developers and manufacturers?

19   **A.**   Yeah, so if you think about Google trying to attract

20   developers to its store or device makers to the Android

21   platform, it's going to try to give them a better deal.

22        How does it do that?  It could be giving various

23   incentives or rebates or discounts or revenue sharing, things

24   that make the profitability or attractiveness of investing in

25   their platform bigger from the point of view of those other

1   consumers.

2   **Q.**   So you mentioned incentives.  Did you hear Dr. Bernheim's

3   testimony about incentives?

4   **A.**   I did hear -- I guess I would say I heard him mention

5   incentives at several points in his testimony.

6   **Q.**   Do economists consider incentives to be anticompetitive?

7   **A.**   No.  I think -- I think the key point is that, broadly

8   speaking, competition very often involves trying to give

9   incentives to those consumers to choose your product.

10       So if we're giving incentives to device makers or to app

11   developers and the purpose of those incentives is to make it

12   more attractive for them to choose Google Play or to develop

13   really great phones for Android, that is precisely what

14   competition means.

15   **Q.**   And are those sorts of incentive payments unusual in the

16   economy?

17   **A.**   No.  There are lots and lots of firms that compete by

18   giving incentives in that way.

19   **Q.**   Now, in the course of your analysis, did you look at what

20   choices users and developers have with the iPhone?

21   **A.**   I did, yeah.  So I guess I think of this as sort of a

22   reference point.  Like, one of the core questions that

23   Dr. Bernheim talked about that we're wrestling with here is:

24   Has this conduct blocked or foreclosed ways that app developers

25   can reach users?  That's kind of the heart of this whole thing

1    in a lot of ways.

2        And I think a useful just reference point is if we ask

3    that question about Apple's platform, it's sort of true.  On

4    Apple's platform, there really is just one way that an app

5    developer can connect and share their app with a user.  That's

6    their app store.

7    **Q.**   And how does the situation compare on Android?

8    **A.**   Yeah.  So as I'm sure you've heard a fair bit about

9    already, on the Android platform it looks very different.

10   Instead of there being just one way for them to reach users,

11   there are a bunch of them, including preinstallation by OEMs,

12   other app stores like a Samsung Galaxy Store, direct

13   downloading, sideloading from websites, and of course the

14   Google Play Store as well.

15   **Q.**   Did you analyze whether Google's conduct prevented other

16   app stores from getting on to Android phones?

17   **A.**   I did, yes.

18   **Q.**   And what evidence did you look at in conducting that

19   analysis?

20   **A.**   Yeah.  So among all of that data that I was talking about,

21   one particular kind of data that I had access to has, for all

22   of the Android phones all over the world, which ones of them or

23   what share of them come out of the box with at least one other

24   app store besides Google Play preinstalled on the phone.

25   **Q.**   And is that the data that we're looking at on this slide

1   here?

2   **A.**   Yeah.  So this slide here shows the results of that

3   analysis.  These green bars are the share of Android devices in

4   each of these years, or at each of these dates, that had

5   another app store preinstalled.

6   **Q.**   And what did you find in these data?

7   **A.**   Yeah, so I guess if we look, you can see it's going up

8   over time; and if you look at, say, 2021 on the right-hand

9   side, about two-thirds of all Android devices as of that year

10  come with at least one other app store besides Google Play

11  preinstalled right there on the phone.

12  **Q.**   And did you look at similar data for the United States?

13  **A.**   I did, yes.

14  **Q.**   And what did you find in those data?

15  **A.**   Yeah, I think it looks pretty similar.  So here's the plot

16  for the United States, and you can see in 2021 68 percent of

17  all the phones come with at least one other app store

18  preinstalled.

19  **Q.**   So why did you include these data that you just mentioned

20  with the green bars, why did you include that in your analysis?

21  **A.**   Because I guess, as we were talking about, the key

22  question here is:  Have these other channels been blocked?  And

23  so if we're talking about other app stores in particular, are

24  other app stores prevented from reaching users?  This is one

25  piece of evidence, not the only one, that shows very directly

1    for many, many users they have those other app stores already

2    right there on their phone.

3    **Q.**   And just as a reminder, what percentage of iPhones come

4    with an alternative app store preloaded?

5    **A.**   Zero.

6    **Q.**   And did you look at data on whether consumers actually get

7    apps through other app stores or other channels outside of

8    Google Play?

9    **A.**   I did, yes.

10   **Q.**   And did you find any data that spoke to that?

11   **A.**   Yeah.  So I guess that's what's shown here.  So separate

12   data from the one that I was just talking about let's me look

13   at each -- the count of installations of apps that happen

14   outside of Google Play through all of those other channels.  So

15   sideloading and other app stores and so on.

16       As of May 2021, each month 3.2 billion apps are installed

17   that way.  And in the United States, you can see as of

18   May 2021, 190, roughly, million apps are installed that way --

19   or app -- I should say app installations happen each month.

20   **Q.**   Now, I see on the slide here you have some percentages and

21   some arrows going upward.  Why did you include those?

22   **A.**   So those arrows just refer to how did this change from

23   July 2019 to May 2021; and I think what you see there is it

24   went up by a lot, by 58 percent worldwide, 88 percent in the

25   U.S.  And that's, I think, significant here because a lot of

1  the conduct that we're talking about in this case, or at least

2  some of it -- Project Hug, RSA 3.0s -- those things happened in

3  2019.  So we might ask:  After Google did these things, did

4  that lead to the use of these other channels going down?  This

5  shows that, in fact, it went up over that period.

6  **Q.**   Now, do you recall Dr. Bernheim saying that this roughly

7  3 billion number was the wrong one to use?

8  **A.**   Yes, I do.  I think he said that we should focus on the

9  share instead.

10  **Q.**   Do you agree with that?

11  **A.**   I guess what I would say is, not in this context because

12  it depends what question we're asking.  I think it's absolutely

13  true that the number of these kinds of installations that

14  happen through Google Play each month is quite a lot bigger

15  than 3.2 billion.  That's clear.

16       What I'm asking here is not what share did those things

17  have but, rather, has this channel been blocked or do users

18  find themselves unable to use it.

19       And I think just if you think about the sideloading

20  warnings and all these different things we've been talking

21  about, this -- the level of the number, 3.2 billion, just shows

22  directly there are lots and lots of people every month who go

23  out and manage to do this on their Android phones lots and lots

24  of times.

25  **Q.**   Now, I think you mentioned that share data that

**GENTZKOW - DIRECT / RAPHAEL**

1    Dr. Bernheim mentioned.  I want to show you a chart that he

2    used.

3         Do you recall seeing this?

4    **A.**   Yes, I do, one of the charts to show to summarize the fact

5    that Google Play has this, roughly, 80 percent share of

6    downloads.

7    **Q.**   Does this chart and the data it shows tell you one way or

8    the other whether Google has done something to harm

9    competition?

10   **A.**   No, it doesn't, for exactly the reason we were talking

11   about at the beginning with Company 1, and Company 2, and

12   Company 3.  The question is not whether a lot of consumers are

13   choosing Google Play; the question is whether they're doing

14   that because it delivers them more value.  Or is it that

15   they're doing that because for some reason their ability to

16   transact in other places has been blocked or impaired.

17   **Q.**   Now, you mentioned two possible explanations there.  Did

18   you investigate which one fits the economic evidence?

19   **A.**   I did, yes.

20   **Q.**   And how did you go about doing that?

21   **A.**   I did a number of things, but one I think is informative

22   is to zero in on those cases we were talking about just before

23   where users have multiple app stores preinstalled right there

24   on their phone.

25        So I think the Samsung Galaxy phones are not the only

1  example of this but one example of this.  You can see on this

2  slide, this is just what a Samsung phone looks like when you

3  take it out of the box, or at least one example of that.  Those

4  phones have the Samsung Galaxy Store preinstalled on the home

5  screen right next to the Play Store.

6      So at least in this instance, if we're trying to

7  understand why are consumers choosing the Play Store more than

8  the Samsung Galaxy Store, at least in this instance, we know

9  those consumers have a free choice.  They're both right there

10  on their phone.  They're both one click away.

11     None of the conduct that we're talking about here is

12  preventing me at that point as a Samsung Galaxy user from

13  picking one or picking the other.  So this seemed like a good

14  kind of case to consider.

15  **Q.**  And what percentage of phones, Android phones, around the

16  world are made by Samsung and give consumers that choice you

17  mentioned?

18  **A.**  Yeah, well, I think those two things are actually

19  different.  The share that are made by Samsung is very large.

20  Samsung is the biggest Android device maker.  They have about

21  1.1 billion devices or 40 percent worldwide of all devices,

22  100 million in the U.S., 57 percent.

23     I think the share who offer this kind of choice is even

24  bigger because there are other phones besides Samsung that also

25  offer other app stores that are preinstalled side by side with

**GENTZKOW - DIRECT / RAPHAEL**

 1    the Play Store.

 2    **Q.**   So focusing just on those 1.1 billion Samsung devices, did

 3    you have any data that told you how often users that have that

 4    choice, which app store they actually use?

 5    **A.**   Yeah.  I think -- I mean, even yesterday we saw some

 6    evidence that might give you a hint of this.  The truth is that

 7    when consumers have those side by side, they -- a very large

 8    share of them opt to choose the Google Play Store.  One example

 9    of that data discovers 2017 to 2019.  If we look at of Samsung

10    users, what share of them each month choose to go to the

11    Play Store and what share of them each month choose to go to

12    the Galaxy Store, those numbers are like 83 percent compared to

13    19 percent.

14    **Q.**   Now, did you investigate whether it's the case that the

15    reason for those numbers is just that people haven't tried the

16    Galaxy Store?

17    **A.**   I did, yes.  There's some survey data that speaks to that

18    directly.  So this was like a survey of users of the

19    Samsung Galaxy phone where they were asked whether they had

20    tried the Samsung Galaxy Store, or used it at least once, and

21    65 percent say they have used it.  So at least for that large

22    share, not only is it right there, but they've actually gone

23    into the store and looked around and seen what it's like, and

24    they're still choosing Google Play at a very high rate.

25    **Q.**   Now, you've been talking about Samsung, and I think you

1  mentioned there's some other phones out there that maybe offer

2  a similar choice.  Did you look at similar data regarding other

3  app stores?

4  **A.**   Yeah.  I looked at a couple -- or I looked at, I guess,

5  all the ones where I was able to identify data.  Two of those

6  are the Amazon Appstore and the One Store.  One Store I think

7  was mentioned is a big app store in Korea particularly.

8      So looking at people who have the Amazon Appstore, how

9  often do they choose that, the rate at which they do is only

10  about 3 percent of the rate at which users choose the Google

11  Play Store; and for the One Store, that number is 4 percent.

12  So still, again, just like the Samsung case, much, much lower.

13  When people have a choice, they're overwhelmingly choosing

14  Play.

15  **Q.**   Did you investigate why consumers are making choices that

16  we're observing here where they choose the Google Play Store

17  more than the other app stores?

18  **A.**   Yes, I did.  I think you could basically step back and

19  think:  I don't know, if I have a choice between two app

20  stores, what are the factors that I'm going to consider?  Why

21  might I be choosing one much more than the other?

22  **Q.**   And was the number of apps in each app store a factor that

23  you considered?

24  **A.**   Yeah.  So that seems like the most obvious factor; if

25  you're choosing an app store, you're looking for apps.  And a

1   really natural explanation here is the simple fact that I think

2   you've already heard something about, that the Google Play

3   Store has something like 3.3 million apps in it, and these

4   competing app stores have far smaller numbers:  Samsung 191,000

5   roughly and Amazon at this point in time 476,000.

6   **Q.**   Now, I know you have a Ph.D. in economics, but I want to

7   ask you a simple question.

8        If you have more apps in a store, would you expect that

9   there would be a lot more downloads for that store?

10  **A.**   Yes.

11  **Q.**   Now, did you hear Dr. Bernheim testify that there was

12  something odd about Samsung having so few apps?

13  **A.**   I think he did use that word.  Yeah, I think he was

14  talking -- noting the fact that many other app stores have more

15  apps than the Samsung Galaxy Store and sort of wondering why

16  that might be.

17  **Q.**   And do you agree with him that there's something odd about

18  that?

19  **A.**   I don't find this odd.  I think there are a number of

20  reasons why Samsung might have fewer apps than Amazon.  One

21  that I think is consistent with the evidence I've seen is

22  Samsung was particularly pursuing a strategy focusing on games

23  and trying to get a lot of big games into its app store.  That

24  Epic Fortnite app is an example of that.  They attracted

25  Fortnite to their store.  So if you're a kind of a boutiquish

1  store focusing especially on games, that's one reason why you

2  might have fewer apps than another store that's trying to be a

3  broader kind of app store.

4  **Q.**   Now, do you agree with Dr. Bernheim's testimony that

5  Samsung wasn't interested in competing?

6  **A.**   No, I don't agree with that testimony.  I think, I guess,

7  a couple of things I would say about that.  One is -- I guess

8  broadly what I would say is the economic data that I have seen

9  is not consistent with that.

10      So, number one, there are examples of Samsung doing what

11  it looks like to me competing pretty hard.  For example, as I

12  said, they attracted the Fortnite app.  When Fortnite was

13  launched, it was the exclusive place you could get it was the

14  Samsung Galaxy Store.  And as you said, Fortnite at the time

15  was the biggest game in the world by some descriptions.

16      I think Dr. Bernheim said trying to attract big games as

17  an exclusive is one of the key ways that an app store might

18  compete, so it looked like they were doing that and trying

19  pretty hard.

20      And then the second piece I think of the answer to your

21  question is there was some suggestion -- there were these

22  discussions around Project Banyan and some discussion of

23  revenue sharing agreements with Google and Samsung.  The

24  economic evidence I've seen also does not look consistent to me

25  with Samsung somehow ceasing to compete after those things

**GENTZKOW - DIRECT / RAPHAEL**

1   happened.

2   **Q.**   And is some of the data that Dr. Bernheim showed a part of

3   that economic evidence?

4   **A.**   Yeah, I think that's an example.  This is the figure that

5   Dr. Bernheim showed yesterday with just the share of downloads

6   that these different app stores are accounting for.

7        If you kind of zoom in and look, Samsung is the gray one

8   there kind of in the middle.

9        And so if you look at what happened to Samsung's share of

10  those downloads across this period, remember, some of these

11  discussions and things that we were talking about happened in

12  the middle of -- earlier this period, its share continued to

13  increase.

14       And I've actually looked at the data that underlies this

15  chart.  The number of downloads through the Samsung

16  Galaxy Store from the beginning to the end of this period

17  didn't go down; it actually tripled.  It went from about

18  50 million to 150 million.

19  **Q.**   Now, this difference between the number of apps and the

20  different app stores, is it new that Google Play has a lot

21  more?

22  **A.**   No, absolutely not.  Google Play has, I think, succeeded

23  early on in competing to attract a lot of apps.  So this is an

24  example of some date from 2011.  So you can see way back in

25  2011, Google Play had 150,000 apps; the Amazon Appstore had

1    only 5,000.  If you looked at other competing app stores at

2    that point in time, they also had fewer.

3    **Q.**   And what does the fact that that was the case back, say,

4    in 2011 tell you as an economist?

5    **A.**   Yeah, I think it just -- suppose we sort of accept, like,

6    yeah, today one of the reasons a lot of consumers like Google

7    Play Store is because it has a ton of apps, then you might be

8    asking:  Well, why does it have a ton of apps and does that

9    have something to do with the conduct that we're talking about

10   here?

11         The fact that was true all the way back in 2011 says

12   that's not a new phenomenon.  It's certainly not a phenomenon

13   that is related to something like Project Hug or RSA 3.0.  It's

14   just been true in this market for a very long time.  Google

15   came in early, attracted a lot of apps, built a really

16   successful business even in these early years.

17   **Q.**   So you mentioned Project Hug.  I want to talk to you about

18   that for a while.

19         Can you just really quickly remind the jury of Project Hug

20   as you understand it?

21         **THE COURT:**  Next question.

22         **MR. RAPHAEL:**  Sure.

23   **BY MR. RAPHAEL:**

24   **Q.**   Well, let's just get a couple facts down to set up some

25   other questions I want to ask you.

**GENTZKOW - DIRECT / RAPHAEL**

1       Did the Project Hug agreements require developers to

2   distribute their games exclusively through Play?

3   **A.**   No, they did not.

4   **Q.**   So if a developer wanted to distribute through Google Play

5   and another app store and they had a Project Hug agreement,

6   were they free to do that?

7   **A.**   Absolutely.

8   **Q.**   And could Samsung and Amazon pay developers to launch

9   either exclusively in their store or in their store and the

10  Play Store?

11  **A.**   Yes.  I mean, I think they could take the Project Hug

12  agreement and still launch in Samsung's/Amazon store; and if

13  Samsung or Amazon or any companies like that wanted to have an

14  exclusive, they could outbid what Google was offering to offer

15  an -- to have the developer turn down the Project Hug deal and

16  take their deal instead.

17  **Q.**   And have you seen any economic evidence that companies

18  like Samsung or Amazon couldn't afford to do that?

19  **A.**   No, I haven't.  If you think about companies like Samsung

20  and Amazon, Amazon is a pretty big company with a lot of money,

21  and I don't really see any reason why if they wanted to adopt a

22  strategy of competing in this market by attracting some

23  exclusives early to kind of get off the ground and grow a

24  successful business, that Amazon would not be able to find the

25  money to do that.

1  Q.   Now, what was the effect of the Project Hug agreements on

2  the prices that developers paid to Google?

3  A.   Yeah.  So I think -- I mean, what it says on this slide

4  and the way I think about the Project Hug agreements is they

5  were basically offering a better deal to developers in exchange

6  for putting their apps in Google's Play Store.  They offered a

7  bunch of things:  Cloud credits, ad credits.  You've heard

8  about all these things.

9       But fundamentally it was saying:  If you agree to put your

10  app in our app store, we'll give you a bunch of things that are

11  of value.  And Google itself estimated about how much is that

12  value and what would that be equivalent to in terms of a price

13  reduction, a reduction in the service fee rate; and they

14  estimated that what they were offering developers was

15  equivalent to:  We'll lower our price by 17 percent for these

16  large target developers in exchange for them agreeing to put

17  their apps in the Play Store.

18  Q.   Is offering a discount a form of competition?

19  A.   Yes.  I think it's sort of the most classic -- lowering

20  your price is the most classic form of competition there is.

21  Q.   Now, you mentioned Google trying to attract developers.

22  Why is that important?

23  A.   I think in this particular situation, you can think about,

24  you know, Google is trying to build a successful app store.

25  What do you need to have a successful app store?  You need to

1    attract lots of developers.

2         And not only that, what Google is trying to build is an

3    app store that has a comprehensive set of apps so users know if

4    they go there, they're going to find the stuff that they want.

5    So as part of Google Play's strategy, it's critical to go out

6    and compete to make sure the biggest, most important, most

7    demanded app developers are going to find it in their interest

8    to put their apps in the Google Play Store.

9    **Q.**   And is there an example from elsewhere in the economy that

10   might help us understand that competitive dynamic better?

11   **A.**   Yeah.   There's an example that I found kind of helpful for

12   myself in trying to think through this, to go -- some of the

13   things in this case are complicated.   If we go back to kind of

14   an old-fashioned example, think about instead of an app store,

15   a brick-and-mortar store like Macy's.   Macy's also competes in

16   the market by trying to offer a great set of products to

17   consumers.   It also has a strategy to try to offer a

18   comprehensive set of products so you can go there and know

19   you're going to find all the things you expect to be there, all

20   these different brands and products.   So they, too, need to go

21   out and compete really hard to attract these manufacturers,

22   attract these products, to get them to choose Macy's as a place

23   to distribute their products.

24   **Q.**   And does that example of Macy's help you understand

25   Project Hug in any way?

**A.**   Yeah, it does.  I think it helps think about:  Well, what does Macy's do when it's doing this kind of competing?

So we could imagine a situation -- I think we're going to talk about Nike again here, and we just heard about Nike from Dr. Tadelis, so Nike maybe is a little bit of a theme, but my example too was thinking about, you know, think about the shoes that Macy's needs to attract to its store.  Nike is a big example of that.

So in order to -- suppose here that there's another store in town, call it Galaxy Shoes, which is also competing with Macy's and also trying to attract Nike to have its shoes in their store.  Macy's needs to compete for that business of Nike by offering Nike a great deal.

**Q.**   And so let's say that this other store, Galaxy Shoes you mentioned, was offering Nike a deal to sell shoes only in their store.  As an economist, if Macy's was trying to compete, what would you expect that they would do?

**A.**   Yeah, I think I would expect that they would try and go out and make the value proposition they were offering to Nike better.

It's obviously a great thing for Galaxy Shoes.  I think Dr. Bernheim and I agree that having an exclusive of a product everybody wants can be a really great strategy for a firm.  If this store was the only shoe store in San Francisco where you could buy Nike shoes, that would for sure be great for them.

```
 1          The point is, they don't -- it's not like they have a
 2     right to do that in a competitive market.  Their competitors
 3     don't really want them to do that.  That's not great for them
 4     to be the only place where you can buy Nikes.
 5          And so Macy's would go out and say, "Man, if they are
 6     going to go be the exclusive in this other store, we had better
 7     make the deal that we're offering them better so that it's in
 8     their interest to put their shoes in Macy's."
 9               THE COURT:  Okay.  We're going to take our lunch
10     break.  We'll be back at 12:30.
11               THE CLERK:  All rise.
12          (Proceedings were heard out of the presence of the jury:)
13               THE COURT:  These book-length answers are not going to
14     work.  So break it up with questions.  Shorter answers, more
15     targeted questions.  Okay?
16               MR. RAPHAEL:  I will do that, Your Honor.
17               THE COURT:  I'm going to start intervening, and you're
18     not going to like that.  All right?
19               MR. RAPHAEL:  I understand, Your Honor.
20               THE CLERK:  All rise.  Court's in recess.
21              (Luncheon recess was taken at 11:59 a.m.)
22     AFTERNOON SESSION                                  12:36 p.m.
23          (Proceedings were heard in the presence of the jury:)
24               THE COURT:  Okay.
25               MR. RAPHAEL:  Thank you, Your Honor.
```

GENTZKOW - DIRECT / RAPHAEL

1    BY MR. RAPHAEL:

2    **Q.**   Professor Gentzkow, before lunch I think we had gotten to

3    the point where Nike had offered something to -- excuse me --

4    where Macy's had offered something to Nike.  Do you recall

5    that?

6    **A.**   I do, yes.

7    **Q.**   All right.  Now, if Nike takes the deal that Macy's has

8    offered and doesn't launch exclusively in Galaxy Shoes, has

9    competition been harmed?

10   **A.**   No, it hasn't.

11   **Q.**   And just briefly, why not?

12   **A.**   That's not harm to competition.  That is competition if

13   Macy's offers Nike a bitter deal and Nike takes that deal.

14   **Q.**   And is the same thing true if Galaxy Shoes would have made

15   more money or grown faster if it was the only one who could

16   sell Nikes?

17   **A.**   Yes, it is true.  That's typically what happens in

18   competition, is that if somebody outcompetes you or competes

19   really hard, that often makes you worse off.

20   **Q.**   And would it change your mind if part of the deal was that

21   Nike had to bring out the hottest new shoe to Macy's as soon as

22   it was released?

23   **A.**   No.  I think a natural term of that agreement, if Macy's

24   was saying "We'll give Nike rebates or promotions or a special

25   Nike section of the store in exchange for Nike putting its

**GENTZKOW - DIRECT / RAPHAEL**

1  shoes in Macy's," it would be natural that one of the terms is

2  that doesn't just mean any shoes; it means Nike should put its

3  shoes -- greatest hottest new shoes when they're first

4  released.

5  **Q.**  And so let's just bring this quickly back to Project Hug.

6     Does the fact that a developer that had a Project Hug

7  agreement launched in the Play Store rather than exclusively

8  in, say, the Samsung Galaxy Store, does that mean that

9  competition was harmed?

10  **A.**  No, absolutely not, for the same reason.

11  **Q.**  Now, Dr. Bernheim talked about parity clauses.  Do you

12  recall that?

13  **A.**  I do, yes.

14  **Q.**  And in your opinion, do the parity clauses change the

15  conclusion that you just gave me?

16  **A.**  No, they don't.  They're like, I think, what we were just

17  talking about, putting the latest shoes.  Project Hug offers

18  valuable things to developers in exchange for putting their

19  apps in the Play Store, and it's very natural that one of the

20  terms of that is you don't put your apps there six months later

21  or a year later; you don't put degraded versions of them that

22  don't have as high quality or don't have the same gameplay.

23  We're offering you something, and what you're agreeing to in

24  return is putting those in the app store.

25  **Q.**  Now I want to change our example a little bit.  Suppose

1   that Nike is thinking about opening a Nike store, maybe not in

2   San Francisco but some new city, and pulling its shoes from

3   Macy's.  Are you with me?

4   **A.**   Yes, I am.

5   **Q.**   And if Macy's was competing in that situation, what would

6   an economist expect that Macy's would do?

7   **A.**   It would look very similar I think to the previous

8   example.  If Macy's is competing, they need to give Nike a

9   better deal to give Nike incentives to choose their store

10  rather than whatever alternative, like opening their own store,

11  that they're considering.

12  **Q.**   And if Macy's did that -- excuse me.

13       If Macy's did that, would that make it less attractive for

14  Nike to open its own store?

15  **A.**   Quite likely, yes.  I think whenever a firm offers one of

16  its consumers, another firm, a better deal to do business with

17  it like this, that makes it, all else equal, less profitable or

18  less attractive for that firm to go and do that same thing on

19  its own.  That's just the way competition works.

20  **Q.**   And is that an example of changing incentives?

21  **A.**   It is, yes.

22  **Q.**   And if the incentives for Nike to open its own store were

23  changed in that way, would an economist consider that to be

24  anticompetitive?

25  **A.**   No.

GENTZKOW - DIRECT / RAPHAEL

1  Q.   So just, again, to quickly bring it back to Project Hug,

2  does the fact that Activision or Riot did not open their own

3  app store indicate that Project Hug blocked competition in some

4  way?

5  A.   Certainly not necessarily.  If the reason they didn't open

6  their own app store was because Project Hug gave them a good

7  deal to put their apps in the Play Store and they, therefore,

8  chose that instead, that's exactly like this example.  I think

9  that's -- that is competition.

10  Q.   Just one or two more questions on Project Hug, and then

11  we'll move on.

12      If developers were totally free to open their own app

13  store and no agreement not to, would you still, as an

14  economist, expect to see the sorts of incentives that were

15  offered in those agreements?

16  A.   Definitely, yes.

17  Q.   And did Project Hug have any effect on the competitiveness

18  of Android phones compared to iPhones in your view?

19  A.   I would expect that it would in the simplest way because

20  having a great app store that's comprehensive and has all of

21  the apps consumers are looking for is one of the main selling

22  points in that competition in the phone market.

23  Q.   So Project Hug involved agreements with developers.  I

24  want to shift gears and talk about agreements with

25  manufacturers.

1        Now, let's just do a little bit of context and try to move

2   through this quickly.  When did the agreements with

3   manufacturers that the jury has heard about in this case begin?

4   **A.**    Yeah.  So almost all of those things started very early in

5   the life cycle of Android.  So this exhibit just shows the kind

6   of timeline of Android's growth.

7        It was introduced in 2008, and many of these things that

8   we've been talking about, the MADAs, the AFAs, which I think

9   you've heard something about, the security warnings, as well as

10  Revenue Sharing Agreements, not the premier tier Revenue

11  Sharing Agreements, but Google had Revenue Sharing Agreements

12  with carriers and OEMs also right from the beginning.

13  **Q.**    And how big of a player in the smartphone industry was

14  Android in that period of time?

15  **A.**    Not very big.  You can sort of see Android is the green on

16  this chart.  So they're a new entrant.  They don't have any

17  market share essentially.  In 2008, 2009, '10, even '11,

18  they're still quite small relative to the competition.

19  **Q.**    And can you just briefly explain whether that's important

20  for understanding whether Google's conduct today is

21  anticompetitive?

22  **A.**    Yes, I think it -- because all of these things were

23  introduced at a time where I think all of us would agree, that

24  I would certainly say that Google did not have monopoly power

25  or even substantial market power in those years, that means

1   there must be some pro competitive reason why introducing those

2   things made sense at that time.  There was some reason that

3   Google was creating all of these things that could not have

4   been, at that time at least, in order to extend monopoly power

5   or preserve monopoly power.

6   Q.   Now, back in this time period when, say, the security

7   warnings and the MADAs were launched, who were -- who did

8   Android phones have to compete with?

9   A.   They faced a lot competition at that point in time.  This

10  plot shows the market shares in that market in 2008.  There's

11  Apple who we've heard about.

12      They faced a number of other big players.  Microsoft at

13  that time had their own mobile operating system and were

14  investing heavily to promote it.

15      BlackBerrys were in the market, those things with the

16  keyboards you might remember.  Palm OS.  And actually the

17  largest operating system at that time was Symbian, which had

18  about half of the market.

19  Q.   Now, for those of us who may not be familiar with Symbian,

20  just briefly what was that?

21  A.   Yeah, Symbian was a coalition of a number of handset

22  makers, most prominently Nokia, who got together and developed

23  an operating system, as you can see from this, at that point in

24  time was the dominant operating system for smartphones.

25  Q.   And what happened to Symbian and some of the other

1  companies that were in the industry at that time?

2  **A.**   Yeah, so, in fact, all of these platforms, all of these

3  smartphone platforms other than Apple's, are no longer with us

4  and essentially failed.

5  **Q.**   And did the failure of any of these platforms have

6  anything to do with app stores?

7  **A.**   Yes.  I think they broadly had to do with the fact that

8  creating this kind of platform is challenging.  In particular,

9  Symbian, which failed here, there's been a lot of study of what

10  happened to Symbian, how did this really successful platform

11  crumble the way it ultimately did.

12      And one of the key things that both academic studies and

13  the founder of Symbian himself called out is the app store

14  fragmentation that existed on Symbian.  Basically there were

15  walled gardens where each device maker carrier had their own

16  app stores and there was no comprehensive app store where a

17  user could go or a developer could go to reach everybody.

18  **Q.**   And you mentioned those challenges that these companies

19  faced.  What was Apple's approach to overcoming those

20  challenges?

21  **A.**   If we think of those challenges as to how do we get device

22  makers and great devices and great app stores, the simple

23  answer for Apple is they do those things themselves.  They

24  control things directly.  They make the phones themselves, the

25  app store themselves, the apps themselves, and they configure

**GENTZKOW - DIRECT / RAPHAEL**

1  the phones themselves.  They solve these issues by direct

2  control.

3  **Q.**  And what approach did Google take with Android to solving

4  those challenges?

5  **A.**  Yeah, the approach of Google, as I'm sure everybody here

6  now knows, was very different.  They build Android with

7  partners, device makers, carriers, who themselves can make

8  their own phones, configure them themselves.

9  **Q.**  I want to ask you about the economics of that.  Does

10  economics tell us that that's an easy thing to do or a hard

11  thing to do?

12  **A.**  Yeah, I think economics would say that is a famously hard

13  thing to do.  The kind of central point of platform economics

14  is when you have all of these different players who come

15  together, their own incentives, what will do -- give them the

16  most profit individually, may not be well aligned with what it

17  takes to build a good platform.  And in order to have a

18  platform succeed, you need to find some way to align those

19  incentives and make the thing work for everybody.

20  **Q.**  And is there an example from economics that would help us

21  understand just at a high level that sort of dynamic you

22  mentioned?

23  **A.**  Yeah.  So that problem, the name that that goes by in

24  economics is a collective action problem, where separately we

25  don't do things so effectively but together we could create a

1    lot of value.

2        So a good example of that is like a pond where there are a

3    lot of fish, and we might all come and go fishing; and if each

4    of us comes and takes a kind of moderate portion of the fish,

5    the ecosystem thrives, we all get a lot of fish, a lot of value

6    is created.

7        However, each of us individually on our own might have

8    incentives to take more fish than that moderate portion; and if

9    we're just acting independently, we are going to -- we might

10   very well pull out too many fish and the whole ecosystem could

11   collapse and not produce all that value.

12   **Q.**   And how is a smartphone platform like the pond, just at a

13   high level?

14   **A.**   It's obviously not a pond, but I think that key aspect of

15   the collective action problem is the same.  The problem with

16   the pond is when I pull out the fish, I don't fully take a

17   count of how doing that impacts the fish stock and everybody

18   else.

19       In the same way, if a device maker makes choices like,

20   say, underinvesting and putting security updates on their phone

21   or putting a bunch of spammy apps on their phone that consumers

22   don't really want, or engaging in the type of fragmentation we

23   said sunk Symbian, where we say "You know what?  I'm going to

24   create my own walled garden app store on my own phone that only

25   will be accessible to my consumers," of those are things that

1   can be good for that player individually but bad for the

2   ecosystem as a whole.

3   **Q.**   Now, with that background I want to start -- talk in more

4   depth about the specific conduct, and I'd like to start quickly

5   with the MADAs.

6        The jury has heard a lot about the MADAs, and I just want

7   to ask you:  Did the MADAs, as an economist in your point of

8   view, contribute value for consumers?

9   **A.**   I think they very clearly did.  The MADAs are the

10  agreement by which Google licenses all of these apps that it

11  has created -- play, Gmail, and so on -- and gives them a way

12  or licenses, we would say, for free to device makers.  It does

13  that through the MADA; and having a bunch of great apps that

14  are available for free clearly makes Android phones better and

15  makes consumers better off.

16  **Q.**   Now, you said it makes Android phones better.  How would

17  increasing the number of Android phones sold affect the volume

18  of app downloads on Android?

19  **A.**   It would, I think, quite clearly increase it.  The more

20  phones are sold, the more things are going to be downloaded.

21  **Q.**   And is that an effect that an economist would consider pro

22  competitive?

23  **A.**   Absolutely, yes.

24  **Q.**   Now, has Dr. Bernheim identified any alternatives to the

25  MADAs that Google could have used to solve the problems you

1    mentioned or to deliver the value that you mentioned?

2    **A.**   Not to my knowledge, no.

3    **Q.**   And I think you touched on some of this earlier, but let

4    me address it directly.  Have the MADAs, in your opinion,

5    blocked competition?

6    **A.**   No, I don't think they have.

7         I think we might want the next slide.

8         I think the MADAS do not block other app stores from being

9    on the phones.  They do not block other app stores from being

10   on the home screen of phones.  There are many, many phones.

11   Here are a few examples that do that.

12        I think all the MADAs do is ask in exchange for giving

13   them free apps to the developers, one of the valuable things

14   that Google asks in return is that key apps, like the

15   Play Store, are put on the home screen so those devices, when

16   consumers take them out of the box, have the things they expect

17   where they expect them to be.

18   **Q.**   And does that make Android phones more competitive with

19   the iPhone?

20   **A.**   I think it does because that kind of out-of-the-box

21   experience is a key selling point of iPhones.

22   **Q.**   All right.  Let's talk about the RSAs now.

23        Now, RSAs are Revenue Sharing Agreements; right?

24   **A.**   Correct.

25   **Q.**   Are Revenue Sharing Agreements common in the economy?

**GENTZKOW - DIRECT / RAPHAEL**

1   **A.**   Yes, they're very common.   There are all sorts.   Book

2   publishers use Revenue Sharing Agreements.   TV networks use

3   Revenue Sharing Agreements.   Movie studios.   Epic itself, the

4   plaintiff in this case, uses revenue sharing as well.   You can

5   think of commissions that salespeople earn is like Revenue

6   Sharing Agreements.

7   **Q.**   And at a high level, how do economics -- at a high level,

8   how do economists think about Revenue Sharing Agreements?

9   **A.**   Yeah, I think the key thing in all of those is we're

10  saying is:  The thing we're doing together, more of the

11  revenue, the value of that, is going to be shared with you.

12      That means every -- if we're talking about selling phones,

13  every phone that you sell, you are going to earn more revenue

14  from it; and the more that people use it and download apps, the

15  more revenue you're going to earn from it.

16      That gives skin in the game, in a sense, to those

17  partners.   It says they are going to have incentives to work

18  harder, to invest more, to try to make great devices just like

19  a salesperson in a store, if they're earning commission, is

20  going to have incentives to work really hard to sell things.

21  **Q.**   Now, the jury has heard some about how Android and various

22  things are licensed for no cash price.   If that's the case, how

23  could Google offer a discount to phone manufacturers?

24  **A.**   Sure.   Yeah, so if you start from a price of zero and you

25  want to offer a discount to somebody, like cut the price,

1    obviously that means the price has to go down to something

2    negative.  And what is a negative price?  A negative price just

3    means I need to give money back to you.  That's what a negative

4    price would be.

5        So revenue sharing is a way of cutting the price, lowering

6    the price, by offering more back to the other party.

7    **Q.**   Again, just one or two facts to set up your economic

8    opinions.

9        Did manufacturers have to take an RSA 3.0 agreement to get

10   the Play Store on their phones?

11   **A.**   No, they did not.

12   **Q.**   And for those who did choose to take the RSA 3.0, did they

13   have to put every phone they made on the premier tier?

14   **A.**   No, they did not.  They could choose whichever devices

15   they wanted, put them on the premier tier, or the nonpremier

16   tiers.

17   **Q.**   Now, as an economist, let's talk about the first question

18   that you tried to answer.

19       With respect to RSA 3.0, did it create value for consumers

20   in your opinion?

21   **A.**   I think it clearly did.  So broadly, as we said, revenue

22   sharing gives device makers incentives to invest in and promote

23   Android and also Google's products and services.  It applied --

24   the exclusivity provisions applied not just to app stores but

25   to all of Google's -- many -- several of Google's different

1    apps.

2         And so they were giving incentive to device makers to have

3    clean devices that promote those apps.  And also you could

4    think, in a sense, to avoid some of that walled-garden

5    fragmentation that we saw in Symbian and some of these other

6    cases.

7    **Q.**   Did the RSA 3.0 relate to competition and security in any

8    way?

9    **A.**   It did as well.  So one of the other things you need to do

10   if you want to get that extra revenue sharing from the premier

11   tier is agree, as a device maker, to do upgrades, letter --

12   what are called letter upgrades, like new operating system

13   upgrades for the phones, on a timely basis and also install

14   security patches on the phones in a timely basis.  That's

15   something that many device makers on their own, historically

16   the data show, don't do.  And one of the things Google was

17   asking in exchange was agree to make sure you install those

18   security patches.

19   **Q.**   So let's talk about the other part of your assignment,

20   whether the RSA 3.0 blocked competition.

21        And just before we get there, when did RSA 3.0 begin?

22   **A.**   Yeah, so I think we saw that on the previous chart as

23   well.  This is one of Dr. Bernheim's.  They started -- they

24   were -- the first RSA 3.0s were signed in December of 2019.

25   **Q.**   And what significance does that have to your economic

1  analysis of the RSA 3.0?

2  **A.**   I think a really simple fact is the RSA 3.0 cannot have

3  impacted anything before December 2019.  So the entire period

4  of time where Google solved those collective action problems to

5  get this platform off the ground, to have it grow, to have it

6  thrive, to get all of those apps into the app store, and also

7  to achieve what we were looking at before, the fact that a lot

8  of consumers are choosing Google Play as we see in

9  Dr. Bernheim's diagram, all of those things precede the RSA 3.0

10  and, therefore, cannot be caused by the RSA 3.0.

11  **Q.**   All right.  So with that timeline in mind, did you look at

12  data regarding the Android devices that were sold after RSA 3.0

13  went into effect?

14  **A.**   I did, yes.

15  **Q.**   Do you have a -- is this a slide regarding that data?

16  **A.**   It is, yes.

17  **Q.**   All right.  Now what are we looking at in this graph on

18  this slide?

19  **A.**   Okay.  So this is from different data.  It's showing new

20  device activations and the share of those new device

21  activations each month that were covered by the premier tier.

22      So you can see before the RSA 3.0 was introduced,

23  obviously that was zero.  After it was introduced, it gradually

24  increased for a bit and then flattened out.  And over that

25  period from when they were introduced to August of 2022, the

 1   end of the data that I had, about 16 percent of all activations

 2   were on the premier tier.

 3   **Q.**   So you talked about the end of the data period that you

 4   had.  I think it goes to about August 2022.  The phones sold in

 5   that month, what percentage of them -- and, again, let me just

 6   ask you before I ask you that, is this worldwide data?

 7   **A.**   It is, yes.  This is worldwide, excluding China.

 8   **Q.**   Okay.  So back to my question in terms of August 2022.

 9   What percentage of Android phones sold in that month were

10   covered by the premier tier?

11   **A.**   Yeah, so you can see that's like the very right end of

12   this plot.  It's about 27 percent or so.

13   **Q.**   And just so we're clear, Dr. Bernheim talked about new

14   phones sold.  Do you remember that?

15   **A.**   I do, yes.

16   **Q.**   And is that what we're looking at with this data here?

17   **A.**   Yes, it is.  It's actually the same data that Dr. Bernheim

18   was looking at.

19   **Q.**   And so what percentage of Android devices that were sold

20   after RSA 3.0 went into effect had no requirement to make the

21   Play Store exclusive?

22   **A.**   That would be 84 percent; the difference, 100 minus this

23   16 percent.

24   **Q.**   Do you recall Dr. Bernheim presenting some percentages

25   about the RSA 3.0?

1    **A.**   He did, yeah.  The share who he reported being affected

2    was somewhat higher.  I think 40.5 percent.

3    **Q.**   And did Dr. Bernheim's data affect your conclusion about

4    the RSA 3.0?

5    **A.**   No, it didn't.  I think, as I said, we're looking at the

6    same data.  The difference arises because Dr. Bernheim, as he

7    said, is not including Samsung in these calculations.  So if we

8    take Samsung out, we have about 44.5 million devices activated

9    each month; and of those, 40.5 percent were on the premier

10   tier.

11   **Q.**   Was it appropriate, in your opinion, to leave Samsung out

12   as Dr. Bernheim did?

13   **A.**   I don't think so, no.  I think that the question that

14   we're asking here is:  To what extent did the RSA 3.0s block

15   the preinstallation of other app stores?  That's the kind of

16   heart of this question; right?

17        And if we want to understand what share of the market was

18   affected by that, Samsung is the largest Android device maker.

19   It's a device maker that on which other app stores are not

20   blocked.  In fact, almost all Samsung phones have other app

21   stores on them.  So if we want to try to understand how much of

22   the market, what share of the market was affected by the RSA

23   3.0s, it's essential to include the whole market in that

24   calculation.

25   **Q.**   And so what happens to the percentage that Dr. Bernheim

1   had if you add in the Samsung devices?

2   **A.**   Yeah, so you can see that here.  That Samsung brings the

3   total devices up to 67.7 million; and we get back a share,

4   which is what I told you before for August 2022, of about

5   27 percent.

6   **Q.**   Now, did you look at similar data for the United States?

7   **A.**   I did, yes.

8   **Q.**   And is that what we're looking at on the screen here?

9   **A.**   Yes.

10  **Q.**   And could you just quickly summarize the data for devices

11  sold after RSA 3.0 in the United States?

12  **A.**   Yeah.  You can see it looks somewhat similar and even

13  lower share of devices are affected.  It goes up a little and

14  then flattens out.  Overall 8.3 percent of activations over

15  that period were under the premier tier; and at the end of the

16  period, it was about 15 percent.

17  **Q.**   And you mentioned that this percentage in the

18  United States is lower than the data regarding the whole world.

19  Why is that?

20  **A.**   Well, I think there could be a number of reasons.  One of

21  them is that those device makers, like Xiaomi and Oppo and Vivo

22  that Dr. Bernheim highlighted, did put a fair number of their

23  devices on the premier tier.  Those OEMs do not have much

24  presence in the United States.  They sell very few phones in

25  the United States, and so that's one of the reasons why this

1    share is lower.

2    **Q.**    Now, we have been talking in this data about new phones

3    sold after RSA 3.0.  Did you also look at data on all of the

4    phones out in the market at the time those agreements were in

5    place?

6    **A.**    I did, yes.

7    **Q.**    Is that the data that we're looking at on this slide?

8    **A.**    Yes, it is.

9    **Q.**    And could you explain what you found when you looked at

10   that data?

11   **A.**    Yeah.  So, again, to be clear, before we were looking at

12   the kind of flow of new devices coming into the market.  This

13   is now the set of all active Android devices in November 2021,

14   including some that were sold before the premier tier came into

15   effect.  And if we look at that whole market, the premier tier

16   only covers about 7.4 percent of devices worldwide.

17   **Q.**    So what percentage of devices as of November 2021 around

18   the world had no requirement to make the Play Store the

19   exclusive app store?

20   **A.**    92.6 percent.

21   **Q.**    And, again, did you look at similar data for the

22   United States?

23   **A.**    I did, yes.  And, similarly, to what we saw before, that

24   share is even smaller.  So 4.6 percent were affected in the

25   United States and about 95 percent had no Play-exclusive

**GENTZKOW - DIRECT / RAPHAEL**

1    restrictions.

2    **Q.**    Now, why did you look at data regarding devices that were

3    sold both before and after RSA 3.0?

4    **A.**    Yeah.  I think both of those are -- of these things are

5    important to look at.  It's important to look at the new

6    devices.  This, I think, is also very important because if one

7    of the questions we're asking is what is the impact of this on

8    the market as a whole, how different would things have been in

9    the world for app developers, for users, in a world where the

10   RSA 3.0 didn't exist, at most that would have changed what was

11   happening with the little blue sliver of this pie chart.  And

12   so everything else as of November 2021 would have been the same

13   and could not have been changed by that.

14        So I think this is the appropriate thing to look at for

15   assessing the impact on the market as a whole at that point in

16   time.

17   **Q.**    All right.  Let's talk quickly about security.  It's

18   another thing the jury's heard a lot about.  I just want to ask

19   you a couple questions about it as an economist.

20        So how does an economist think about how security relates

21   to competition?

22   **A.**    Yeah, I think very simply, security is a characteristic of

23   smartphones that consumers really, really care a lot about for

24   obvious reasons; and, therefore, it's a key dimension that if

25   you want to be a successful phone maker, you better compete

**GENTZKOW - DIRECT / RAPHAEL**

1    hard to try to make really good.

2    **Q.**   And have the sideloading warnings that the jury's heard

3    about in your opinion blocked or foreclosed competition?

4    **A.**   No.   The conclusion overall of my analysis of this was

5    that they have not.   I think there are a number of data points

6    that speak to that.   Some of those I think you heard from

7    before, Dr. Qian, who presented some things related to that as

8    well.

9        I might show just one data point here that speaks to that.

10   This is data I had access to for the whole world, that for each

11   country shows what share of devices in that country have the

12   unknown sources setting activated.   So what share of all of the

13   devices in that country have the consumers downloaded at least

14   one app that required changing that setting.

15       So if we're trying to think about does that setting --

16   does the friction associated with that setting block users from

17   downloading apps if they want to, if they have a reason to --

18   **Q.**   Professor, what did you find in various countries when you

19   looked at that data?

20   **A.**   Yeah.   So then the data show there are many countries in

21   the world where the share of users who can do that is quite

22   high.

23   **Q.**   And what conclusion do you draw from the data showing that

24   those percentages are high?

25   **A.**   I would conclude that in Nigeria, in India, in Indonesia,

GENTZKOW - DIRECT / RAPHAEL

1    in Brazil, all of these places, when users do have a reason to

2    want to sideload apps, they don't seem to have a very hard time

3    doing that.

4    **Q.**   All right.  Let's talk now about the service fees.

5          And, first of all, are service fees themselves, just the

6    fee percentage, is that something that can be anticompetitive

7    conduct?

8    **A.**   Not on its own.  It could be -- it's a price that Google

9    is charging.  A price can be high or low, but it's not itself

10   exclusionary conduct.

11   **Q.**   All right.  Now just a few questions on context with the

12   service fees.

13         Does it cost Google a large amount of money to develop and

14   maintain Android and Google Play?

15   **A.**   Yes, it does.

16   **Q.**   And as a matter of economics, is it important for Google

17   to earn a return on those investments?

18   **A.**   Absolutely.  I think the key thing that economics teaches

19   us about markets, or one of them at least, is that firms are

20   acting in their own interests trying to maximize profits.  And

21   so if there are investments that they could make that would

22   create a lot of value for society, if there's not a way for

23   them to earn an economic return on those investments, they're

24   very likely not going to make them and that value for society

25   is not going to be created.

1   Q.   And is the same thing true for any intellectual property

2   that Google has in those investments?

3   A.   Yes.   In the same way you would not invest a lot of money

4   to develop intellectual property if you could not earn some

5   economic return on that investment.

6   Q.   Now, did you look at how many developers actually paid

7   service fees?

8   A.   I did, yes.

9   Q.   And what percentage of developers actually pay a service

10  fee?

11  A.   That percentage is very, very small.   You can see here the

12  share of developers in 2021 who paid no service fee to Google

13  whatsoever.   That was about 98 percent.   And so only about

14  2 percent were required to pay any service fee at all.

15  Q.   And the jury's heard some about a 30 percent service fee.

16  What percentage of developers pay a 30 percent service fee?

17  A.   Only 0.06 percent of developers.

18  Q.   Now, have you compared Google's service fees for the

19  Play Store to the service fees that other app stores charge?

20  A.   I have, yes.

21  Q.   All right.   Now, I think the jury's heard a number of

22  these figures.   I just want to ask you as an economist what the

23  results of your analysis were.

24  A.   Yeah.   So this is just one way of illustrating those

25  different service fees across platforms.   Google is the third

1    row up there.  So this range just shows the published service

2    fee rates for Google Play are 30 percent and 15 percent as we

3    all know.

4         And I won't read out all the details of this.  I think

5    just broadly, the conclusion is the service fee rates that

6    Google is charging are broadly similar to many other platforms

7    and in terms of the published rates are lower, like some

8    platforms like Nintendo and the PlayStation and the Samsung

9    Galaxy Store.

10   **Q.**  Now, have you looked at the service fees that Epic pays to

11   other app stores?

12   **A.**  I did, yes.

13   **Q.**  And is that what we're looking at on this slide?

14   **A.**  Yeah.  So this comes from Epic's own data, and it shows

15   how much did Epic pay in service fees and at what rate.  So you

16   can see that Epic paid Sony a 30 percent service fee on all of

17   its revenue from Sony.  That was about $470 million that it

18   paid.  It paid a 30 percent fee to Microsoft.  That was about

19   $260 million.  It paid a 30 percent fee to Nintendo.  That was

20   about $166 million.

21        I won't read all of them, but it also paid a 30 percent

22   fee to Google, which totaled about $3 million; and it paid

23   Samsung a little bit less than that at 12 percent.

24   **Q.**  And what do these service fee rates and data regarding

25   Epic tell you as an economist about whether competition has

1    been harmed?

2    **A.**   I think they say that this service fee rate that Google is

3    charging is aligned with what many other platforms are

4    charging, not just in their published rates but also in terms

5    of what's actually paid by a developer like Epic; and also that

6    Epic has paid these kinds of service fees at very high rates to

7    lots of other platforms.

8    **Q.**   All right.  So I want to talk about when developers pay

9    the service fee.

10       And I think you've heard, does Google charge developers

11   service fees on digital goods after an app has already been

12   downloaded?

13   **A.**   Yes.  So it charges the service fee regardless of whether

14   the app is monetized through the initial download fee or

15   through in-app purchases that happen after download.

16   **Q.**   And does that indicate to you as an economist that there's

17   some problem with competition?

18   **A.**   No, I don't think it does.

19   **Q.**   And could you briefly explain why not?

20   **A.**   I think -- so, first of all, the service fee, as I think

21   we've already heard in testimony, is a price that Google

22   charges for the value of the Play Store, and all of these

23   transactions depend on the match the Play Store makes between a

24   user and an app developer.  So if there was no match, there

25   would be no in-app transactions.  All of those later in-app

**GENTZKOW - DIRECT / RAPHAEL**

1    transactions only happened because the app was downloaded from

2    the Play Store.

3    **Q.**   And so we have two phones on the slide here.  Does this

4    help you understand the economic conclusion that you just gave

5    us?

6    **A.**   Yeah.  This is a particular example of one of the main

7    ways that these in-app purchases happen, not the only one,

8    which is sometimes called the freemium model.  So back in the

9    old days, it used to be the case when you -- most of the way

10   you paid for apps was you paid something like 4.99 when you

11   download it.  That's what this phone on the left shows.

12        Since then, the dominant model has shifted to one where

13   you don't pay anything for the download.  The app developer

14   says, "No, you can download our app for free.  Try it out.  See

15   if you like it."  And then you only pay a bit later at the end

16   of that free trial when you decide you want to upgrade to the

17   full version.

18        So that's what's shown here on the right.  Instead of

19   paying 4.99 when you download it, you might pay 4.99 a few days

20   or a week or somewhat later once you decide to upgrade to the

21   full version.

22   **Q.**   And is it Epic's business model to give Fortnite away for

23   free and then charge later?

24   **A.**   It is, yes.

25   **Q.**   And would it make economic sense to you that Epic would

1    pay a service fee if it charged upfront but not if it charged

2    later?

3    **A.**    No.  I think if you look at this example, from an economic

4    point of view, this 4.99 is very similar.  In both cases, the

5    developer is saying, "You know what?  If you want our product,

6    you pay us 4.99."  The only difference is that this freemium

7    model allows that transaction to happen a bit later after the

8    app has been downloaded, but otherwise economically, these

9    things are very similar.

10   **Q.**    Now, you mentioned the freemium model where it's free and

11   then you pay later.  What percentage of Google's revenue from

12   the Play Store comes from apps that charge not upfront but

13   sometime later?

14   **A.**    Yeah, it's a very large share.  So this is -- this

15   includes freemium, like the kind of free trials we were talking

16   about.  It also includes other in-app purchases; like in

17   Fortnite you buy V-Bucks and you might do that over time.

18        Putting all those things together, 99.5 of all app

19   developer revenue comes from those purchases that happen after

20   an app has been downloaded, and those are apps that charge

21   nothing for the download itself.

22   **Q.**    So if Google didn't collect any service fees for apps that

23   are free to download and then the developer charges later,

24   would Google make any money from the Play Store?

25   **A.**    It wouldn't make much money.  It would make that little

1   gray sliver there on the chart only.

2   **Q.**   And how would that affect Google's incentives to invest in

3   innovation or intellectual property?

4   **A.**   Well, as we said before, companies need to earn an

5   economic return.  The service fees in the Play Store are one of

6   the main ways that Google earns an economic return on its

7   investments in the Play Store and also its investments in

8   Android.

9        If it could only collect the service fee on downloads, it

10  would not earn any of that return for the most part, and its

11  incentive to make those investments to support the platform, to

12  keep improving the platform, would be dramatically diminished.

13  **Q.**   All right.  Let's talk now about the billing policy.

14       Did you listen to Dr. Tadelis' testimony about the billing

15  policy this morning?

16  **A.**   I did, yes.

17  **Q.**   And do you agree with his conclusions about the effect of

18  Google's billing policy on competition?

19  **A.**   No, I do not.

20  **Q.**   All right.  So to understand that, I want to ask you:  Is

21  there any economic reason why Google would want to require

22  developers to use its own billing system?

23  **A.**   I think there's a very clear and obvious one.  It's a

24  little bit like why you need to use a cash register in a store.

25  Google collects this service fee.  That's one of the main ways

1    that it earns a return.  It needs to do that from millions of

2    different apps and millions of different transactions that are

3    happening all over the world every day.

4        When those transactions happen through Google's billing

5    system, it can securely and efficiently collect that service

6    fee and remit the remainder to the developer, and that provides

7    a lot of value and efficiency to the market.

8    Q.  And is Google the only company or platform you're aware of

9    that uses that mechanism?

10   A.  No, it's not.  And I think actually a really important

11   data point to think about the economics of this is an

12   overwhelming share of the platforms that I am aware of, and

13   I've listed some of them here, all require you to use their

14   billing system when you make purchases.

15       So let me just call out a couple of examples.  Airbnb, if

16   you book a room on Airbnb with a host, the host cannot say what

17   billing -- how they want to collect payments.  You use Airbnb's

18   billing system.  Airbnb earns an economic return on its

19   investments by taking a commission.  That's the way they make

20   money, and they use that billing system.

21       So take a different example rover.com is a website where

22   you can find a dog walker or somebody to take care of your dog.

23   The person who takes care of my dog I found on rover.com.  We

24   met that person in 2020 when we first connected with him, and

25   we're still required today to make all of our purchases, the

1  payment for every time he walks our dog, through rover.com's

2  payment system.

3  **Q.**   Now, if platforms or apps like that could not require

4  their customers to use their own billing system, what would --

5  how would that affect their ability to earn a return?

6  **A.**   Yeah, so you could think about either of those examples.

7  Take the Airbnb example, say imagine what would happen if

8  Airbnb said, "Actually, you know what?  Hosts can collect money

9  for the room that you book however they want.  They can accept

10  cash or a check or PayPal, Stripe, whatever they want.  They

11  get to choose.  That's their business."

12      Think about the problem that Airbnb would then need to

13  solve.  With those thousands and thousands of transactions

14  happening every day, it would need some way, first of all, to

15  figure out how much is owed to it.  It would need a way for

16  those hosts to somehow send in that money to them.  It would

17  create a big incentive for hosts to try and avoid paying.

18  Like, "Hey, pay us some cash and we won't charge you."

19      So Airbnb would need a way to follow up and collect those

20  fees, enforce those fees.  It would need to process refunds, do

21  all kinds of other things.  All of those things are taken care

22  of automatically and efficiently if you just pay through

23  Airbnb's billing system.

24  **Q.**   So just to quickly bring this back to Google Play, would

25  it be more or less efficient for Google to collect its service

**GENTZKOW - DIRECT / RAPHAEL**

1  fee if it didn't require developers to use its own billing

2  system?

3  **A.**   I think it would be less efficient for the same reason.

4  Not impossible, but it would be less efficient.

5  **Q.**   Now I want to talk about physical goods.

6      Does Google charge service fees for both physical goods

7  and digital goods?

8  **A.**   No.  I think that's something that Dr. Tadelis mentioned

9  as well.  The service fee only applies to digital goods, not to

10  physical goods.

11 **Q.**   All right.  Let's talk about that in the context of the

12 billing policy.

13     If Google's billing policy was designed to collect

14 Google's fees, as I think you were just mentioning, would you

15 expect Google's billing system to be used for all transactions?

16 **A.**   No.  If the economic purpose of this requirement is to

17 collect the service fee securely and reliably, I would expect

18 Google to require that on exactly those transactions where

19 there are service fees, which means digital goods and not

20 physical goods.

21 **Q.**   Now, if Google was actually trying to monopolize billing

22 services, as I think we heard from Dr. Tadelis, what would your

23 expectation be about Google's policy in that situation?

24 **A.**   I mean, I can't say for sure what they would do in that

25 hypothetical, but a very natural thing is they might want to

1   take over and impose their coercive tie on all of these

2   products because they're all very valuable transactions.

3   There's a ton of transactions going through Amazon and all

4   these other places.  So if they were trying to make money from

5   monopolizing billing services, I think it would be quite likely

6   they'd try to do this for all those transactions.

7   **Q.**   And what does Google's policy actually require?

8   **A.**   Google's billing policy requires developers to use its

9   billing system in exactly those transactions where service fees

10  are owed and in none of the transactions where they're not

11  owed.  So that applies, in particular, it's required for

12  digital goods; it's not required for physical goods.

13  **Q.**   And what does that indicate to you about the reasons why

14  Google has the billing policy that it has?

15  **A.**   It seems very consistent with the purpose being to collect

16  the service fee.

17  **Q.**   Now, if developers could use their own billing system, as

18  Dr. Tadelis testified about, as an economist, would you expect

19  that Google would still charge service fees on in-app purchases

20  through those other billing systems?

21  **A.**   Absolutely.  We said this is a price for the services that

22  Google Play is providing.  Developers are consuming those

23  services, all of the valuable stuff, regardless of how they

24  collect the payment.  Just like if Airbnb didn't collect their

25  payments that way, they wouldn't get rid of their commission

1   and say, "Okay, rooms are now free.  We don't take any

2   commission."  Here, too, Google I would expect to charge their

3   service fee regardless -- or at least some service fee

4   regardless of what billing system you used to pay.

5   **Q.**   Now, if a developer doesn't want to pay Google's fee

6   today, does it have any choices that you've been able to

7   observe?

8   **A.**   Yes.  One of the things that Google expressly allows is

9   developers are welcome to collect payment for in-app goods and

10  services through lots of other channels, including on websites

11  of the various developers.

12  **Q.**   And have you identified some examples of developers that

13  do that?

14  **A.**   Yeah.  There are a number of examples.  Epic, as we've

15  talked about, is one.  There's lots of others.  You can go buy

16  a subscription to Spotify or the *New York Times* or Netflix on

17  their website.  Google collects no service fees.  You can then

18  use that subscription in your Android app.  The same is true

19  for Minecraft, you know, stuff for the Minecraft game, HBO Max

20  subscriptions, everything else on this slide.

21  **Q.**   So we've been down in the details a little bit.  I want to

22  step back again now, and I think just two more topics.

23       So are there any indicators that economists can look at to

24  see if conduct as a whole, not, you know, contract by contract,

25  but conduct as a whole is pro competitive or anticompetitive?

1  **A.**   There are, yes.

2  **Q.**   And what are some of those indicators?

3  **A.**   I think -- I think the standard things that we might look

4  at to see does this look consistent with a market where there's

5  competition creating value for consumers are what's happening

6  to the price, what's happening to quality, and ultimately

7  what's happening to output.  And if there is competition, we'd

8  expect that's lowering the prices, that's raising the quality;

9  and because of all of that, ultimately there's more output

10  being created.

11  **Q.**   So let's talk about prices first.  Did you look at whether

12  prices in the markets at issue here are going up?

13  **A.**   I did, yes.

14  **Q.**   And what did you look at to understand that?

15  **A.**   Yeah, so one of the things I looked at is what's shown in

16  this figure, which is what share of apps have to pay any

17  service fee.  You'll recall we said a large share of developers

18  don't pay service fees.  That hasn't always been true.  So

19  since about 2010, that's -- the share who pay any service fees

20  at all has fallen from almost 40 percent all the way down to

21  less than 10 percent.

22  **Q.**   And how about the service fee rates?  I just want to ask

23  you:  Are those going up?

24  **A.**   No, they're not going up.  They've been roughly -- this is

25  the 30 percent rate we talked about -- roughly constant over

1    time.

2    **Q.**    Now, did you hear Dr. Bernheim say that Google's prices

3    are going up?

4    **A.**    Yes.

5    **Q.**    And do you remember seeing this chart in his presentation?

6    **A.**    Yes, I do.

7    **Q.**    Do you agree with Dr. Bernheim that this chart shows that

8    Google's prices are going up?

9    **A.**    No.  So I think what this chart shows is how much revenue

10   Google gets per app download.  So take the total revenue

11   collected and divide it by the number of downloads.  I think

12   Dr. Bernheim said that that was the correct economic definition

13   of the price in this market, and that's something that I

14   disagree with.

15   **Q.**    And just briefly, why do you disagree with that?

16   **A.**    I think it might be helpful to just think about an

17   example.  Suppose that the service fee rate Google is charging

18   is constant at 30 percent, and suppose developers start doing

19   better and better.  For example, they introduce new games that

20   generate a lot of revenue.  They put new things in their games

21   that generate a lot of revenue.  The value the developers are

22   getting from the ecosystem is going up and up.  That would

23   increase Google's revenue-per-app download, but Google hasn't

24   changed their price there.  Google hasn't changed anything.

25   The service fee rate they're charging has stayed the same.

**GENTZKOW - DIRECT / RAPHAEL**

1     All that's happened is developers are doing better.

2   Usually when we raise the price, that makes the counterparty on

3   the other side have less surplus because we're talking more of

4   it.  This is different than that.

5   **Q.**   And you mentioned quantity.  What's happening to quality?

6   **A.**   So quality over the broad sweep in many different

7   dimensions has gone way up.  Android Google Play are way better

8   than they were in the past.  I'm not going to go through all

9   the things on this slide in detail, but it's just a list of

10  many of the new features that Google has introduced to Google

11  Play specifically on the developer side:  Support for new kinds

12  of payments, tools for developers to develop their apps,

13  analytics for developers to see how their apps are doing, and

14  lots of other things, a huge number of things over time that

15  have made quality higher.

16  **Q.**   All right.  The last indicator is output.  And, first of

17  all, why do economists look at output?

18  **A.**   Yeah, I think output is a rough, not perfect, but kind of

19  rough summary measure of how much value ultimately is being

20  created for consumers.  How much are we actually consuming and

21  using and getting value from?

22  **Q.**   And has output of Android smartphones been going up or

23  down since Android was released?

24  **A.**   It's gone dramatically up.  You can see that in this

25  figure.  So currently worldwide there are about 200 million

1  Android smartphones sold every quarter.

2  **Q.**   And how about app developers revenue?  I think you

3  mentioned this, but is that going up?

4  **A.**   That has also gone up dramatically over time.  You can see

5  that in this figure.  So it's currently about $8 billion per

6  quarter of revenue value that app developers are getting from

7  the Android ecosystem.

8  **Q.**   So we've been talking about the actual world with Google's

9  conduct.  Is there any evidence that you've been able to see as

10  an economist to test what the world would look like without

11  Google's conduct?

12  **A.**   Yes.  So I don't have the ability to compute that

13  precisely to tell you here's exactly what would happen.  I

14  would say a lot of the analysis that I've done and that I've

15  been talking about speaks to that broadly, but one data point I

16  think is interesting to look at for this specific question is

17  the case of China.

18  **Q.**   And just briefly, why do you think it's interesting to

19  look at China to see what the world might look like?

20  **A.**   Yeah, so I think we've said a couple of times today that

21  Google Play and the challenged conduct in this case are not in

22  China basically because the Chinese government doesn't allow

23  any of these things like the MADAs, for the most part Revenue

24  Sharing Agreements, the Google Play Store.  None of that stuff

25  is allowed in China.  And so we can think of that as in no way

1  a kind of perfect comparison but one example of the kind of

2  thing that can happen when those things that Google is doing to

3  address those collective action problems aren't there.

4  **Q.**   And so what do things look like for app developers in

5  China without Google's conduct?

6  **A.**   Yeah, so something that is true in China is there are

7  many, many app stores.  I think there are about 20 main --

8  excuse me -- 20 main app stores in China.  You might think that

9  leads to really low prices.  It actually leads to higher prices

10  in many cases.

11       There are many -- there are a number of examples in China

12  of app stores whose service fees are not 30 percent but

13  50 percent.  That fractured app store landscape looks a lot

14  like the walled gardens on Symbian.  Each device maker often

15  has their own app store.  They kind of fight with other app

16  stores to keep them off their phones.  There's a lot of copying

17  of apps without permission of the app developer across those

18  app stores.  It doesn't look so great for developers.

19  **Q.**   And what does the app landscape look like for users in

20  China?

21  **A.**   Similarly, it's not so great in many ways.  So there's a

22  lot more malware and security issues.  There are a lot of fake

23  apps.  So you try to download something and don't realize it's

24  not the real app.  Outdated apps.  A new version exists, but

25  somehow you're downloading a very old version.

1       And it's hard to find the apps you want because there are

2   20 different app stores.  It's a little bit like streaming

3   services where you have to kind of try to figure out where the

4   show you want to watch is.  Here, you have to look across all

5   the different app stores to figure out where the apps you want

6   are.

7   **Q.**   So before we wrap up, let's talk about Epic, the plaintiff

8   in this case.

9       In your opinion, was competition harmed in a way that

10  harmed Epic?

11  **A.**   No, I don't think so.

12  **Q.**   We talked before about the different channels that

13  developers can use.  Which of these channels has Epic used to

14  distribute Fortnite?

15  **A.**   All of them.

16  **Q.**   Let's talk about Epic and RSA 3.0.

17      The jury's heard a little bit about the Fortnite not being

18  able to run on every phone out there.  Did you look at data on

19  the percentage of Android devices that could actually run

20  Fortnite?

21  **A.**   I did, yeah.  So the Epic website shows a list of all of

22  the devices that are compatible with Fortnite.  So what I was

23  able to do was take that list, combine it with the data I

24  showed you before on which devices are covered by the premier

25  tier, to see, well, what share of the devices that are actually

1  able to play Fortnite were affected by the premier tier, and

2  that's what's shown in this plot.

3  **Q.**   And so what did you find in that data?

4  **A.**   So worldwide in 2021, of all Android devices that are

5  capable of running Fortnite, 0.4 percent of them were covered

6  by the premier tier terms of the RSA 3.0.

7  **Q.**   And did you look at similar data for the United States?

8  **A.**   I did, yes.  Similar, that number is 0.6 percent.

9  **Q.**   All right.  Now, we've been looking at a lot of these

10  percentages related to the RSA 3.0.  What conclusion do you

11  draw from the size of the percentages of devices covered by

12  RSA 3.0?

13  **A.**   I think putting all these data points together, on the new

14  phones, on the stock of phones, it says that whatever might

15  have been happening with the RSA 3.0s, they only ultimately

16  impacted a small share of the market, and the share of the

17  market that was affected was not that large.

18  **Q.**   I want to talk about Epic and the service fee and about

19  purchases of V-Bucks.

20       So did you look at data on how many Android users buy

21  V-Bucks on channels like these outside of Google Play's billing

22  system?

23  **A.**   I did, yes.

24  **Q.**   And is that the data that we have on this slide here?

25  **A.**   It is, yes.

GENTZKOW - DIRECT / RAPHAEL

1    **Q.**   And could you explain what you found in that data?

2    **A.**   Yes.  So I think it's maybe helpful to say very clearly

3    what these data show.

4         So this is looking, first of all, at the universe of

5    Android Fortnite players.  So the data here come from Epic, and

6    the data span the period from when Epic was first -- when

7    Fortnite was first available on Android in 2018 up to a little

8    bit later than this October, I think, 2020.  So Android

9    Fortnite users here is anybody who played Fortnite on Android

10   during that period.

11        And then I focused on the period of time where Fortnite

12   was available on Google Play to see what share of purchases

13   were going through Google Play's billing system versus other

14   billing systems or no purchases at all.

15   **Q.**   And what did you find when you looked at that?

16   **A.**   Yeah, so that's shown here.  So if you look at all of

17   those Android Fortnite players, in this time period, April to

18   August 2020, that's the period when it was available on Play,

19   69 percent of those players made no purchases; 29 percent of

20   them made purchases of V-Bucks, but only through other billing

21   systems, meaning they bought them on the PlayStation or they

22   bought them on Epic's website or they bought them somewhere

23   else; only about 2 percent of them made any purchases that

24   involved Google Play's billing system.

25   **Q.**   All right.  And I think this is the last time I'm going to

**GENTZKOW - DIRECT / RAPHAEL**

1   ask you this, but did you look at similar data for the

2   United States?

3   **A.**   Yes, I did.

4   **Q.**   And just quickly, what did you find there?

5   **A.**   I think you can see it in the figure.   The pattern is

6   very, very similar.   Here, 2.8 percent of Android Fortnite

7   players used Google Play's billing system.

8   **Q.**   All right.   We've looked at a lot of data.   I think this

9   is the last set of questions about data, and then we'll wrap

10  up.

11       So are you familiar with the concept of a natural

12  experiment in economics?

13  **A.**   I am, yes.

14  **Q.**   And just at a high level, what is a natural experiment?

15  **A.**   Broadly, a natural experiment just means something we can

16  find out in the world where something changed in a way that

17  let's us isolate an effect that we're interested in and measure

18  it clearly.

19  **Q.**   And did you find any natural experiments that are relevant

20  to the issues that we've been discussing in this case?

21  **A.**   Yeah.   I think a very natural, natural experiment to look

22  at here is this event here where part of the runup to this

23  case, Fortnite was pulled out of the Google Play Store.

24  **Q.**   And was Fortnite also removed at one time from the Apple

25  App Store?

1  **A.**   Yes, exactly.  So at that same time it was removed both

2  from the Play Store and from Apple's app store.

3  **Q.**   And what happened to Fortnite revenue on iPhones after

4  it was removed from the Apple App Store?

5  **A.**   So as you would expect, if it was the case that other

6  channels for app distribution are blocked, which remember we

7  said it kind of is on Apple because Apple's app store is the

8  only game in town, consistent with that, on Apple after

9  Fortnite is removed, the revenue that Epic was earning fell

10  essentially to zero.

11  **Q.**   And how does that compare to what happened in the

12  Google -- or excuse me -- on Android when Fortnite was removed

13  from the Google Play Store?

14  **A.**   It was very different.  So Epic's revenue fell a little

15  bit, fell by some, but it stayed much, much higher consistent

16  with the fact that on Android, the Play Store is not the only

17  game in town.  It is possible for users to download and play

18  Fortnite through many different channels.

19      This reflects both the fact that some users were able to

20  substitute from the Play version to, say, the Samsung Galaxy

21  version, as well as the fact that lots of people had already

22  downloaded Fortnite from the Galaxy Store or from the website,

23  and they were playing on those versions as well.

24  **Q.**   Now, you mentioned the revenue did go down a little bit.

25  Does that indicate anything to you?

1  **A.**   Well, I guess what it indicates is just that some people

2  do get value from the Play Store consistent with everything

3  we've been saying.  It's a great store.  Some people really

4  like getting their version of Fortnite there.  And so I don't

5  think it would make any sense to say nothing changes if

6  Fortnite's not on the Play Store, but I think the point is that

7  these other channels are very viable as well.

8  **Q.**   All right.  We've reached the end.  In conclusion, based

9  on your review of the economic evidence, has Google's conduct

10  harmed the competition or consumers?

11  **A.**   No.

12  **Q.**   And has Google's conduct benefited competition and

13  consumers?

14  **A.**   I think absolutely, yes.

15  **Q.**   And did the benefits of Google's conduct for competition

16  and consumers outweigh any harm for competition and consumers?

17  **A.**   I think clearly, yes.

18  **Q.**   And why do you say that?

19  **A.**   I think, as we said, I don't identify any harm to

20  competition here which I would characterize as substantial.  I

21  think the benefits to this conduct, if we imagine a world where

22  Google wasn't able to do any of these things that we've been

23  talking about, the impact that that could have on the Android

24  platform means that a lot of value would be lost and,

25  therefore, is created.  So I think the comparison of those two

 1  things, to me, seems very clear.

 2  **Q.**   And have you seen any alternatives that Google could have

 3  used to deliver the same value to consumers without any

 4  additional substantial costs?

 5  **A.**   Certainly not for many of the parts of the conduct we're

 6  talking about.

 7       **MR. RAPHAEL:**  I pass the witness, Your Honor.

 8       **THE COURT:**  Okay.  Let's stand up for a moment.  We'll

 9  take our afternoon break in a little bit.

10              (Pause in proceedings.)

11       **THE COURT:**  Okay.

12              **<u>CROSS-EXAMINATION</u>**

13  BY MR. EVEN:

14  **Q.**   Good afternoon, Professor Gentzkow.

15  **A.**   Good afternoon, Mr. Even.  Good to see you.

16       **THE COURT:**  Before we start, keep in mind this will be

17  balanced against any rebuttal.

18       **MR. EVEN:**  I'll keep that in mind.

19       **THE COURT:**  It is a wasting asset.  I want to be clear

20  about that.

21       **MR. EVEN:**  Understood, Your Honor.

22       **THE COURT:**  All right.  Go ahead.

23  BY MR. EVEN:

24  **Q.**   You billed Google at a thousand dollars per hour you said

25  on this case; correct?

1   **A.**   That's correct, yep.

2   **Q.**   As of the time of your deposition in March 2023, you had

3   worked about 750 hours on this case?

4   **A.**   That's correct, yep.

5   **Q.**   And in addition to that, you are being supported by an

6   expert shop called an Analysis Group of whose collections from

7   Google you receive 20 percent; is that right?

8   **A.**   That's correct.

9   **Q.**   And as of March 2023, you've collected about $2.2 million

10   from that source; correct?

11   **A.**   That's correct.

12   **Q.**   And so by March 2023, in addition to the 750 or all

13   together, rather, you've earned nearly $3 million from Google?

14   **A.**   That's correct.

15   **Q.**   How much have you earned from Google by now?

16   **A.**   I don't know.  I think it's something slightly higher than

17   that, but probably not much higher than that because most of

18   the work I did in the case was previous.

19   **Q.**   And what you're saying to this jury, all that money is

20   that everything they've heard about agreements not to compete,

21   payments to prevent contagion, all that is competition on the

22   merits?  That's the gist of your opinion?

23   **A.**   No.

24   **Q.**   Okay.  Let's take a look at that.

25         You said that one of the key questions that you were

1  trying to answer is whether Google's conduct blocked

2  competition in a way that destroyed value for consumers;

3  correct?

4  **A.**   Yes, that's right.

5  **Q.**   And you conclude that the answer is negative because in

6  your view, users and app developers are not foreclosed from

7  alternative means of app distribution; correct?

8  **A.**   I would say that's one of the inputs into that conclusion,

9  yes.

10  **Q.**   And it is your testimony that Google's conduct did not

11  substantially limit access to any form of app distribution;

12  correct?

13  **A.**   I think my conclusion is it did not substantially limit

14  access to forms of app distribution, yes, I think that's fair.

15  **Q.**   And you haven't defined exactly in your report or today

16  what "substantially limited" means; correct?

17  **A.**   I'm happy to define it for you if you would like.  I don't

18  think we talked about it today.

19  **Q.**   Let's try and test it a little bit, and let me try to

20  start with direct downloading and see whether we can agree on

21  whether Google's unknown sources install flow substantially

22  limits access to that channel.

23       You did not calculate any number to show how many users

24  are deterred from downloading competitive app stores because of

25  the unknown sources warnings; correct?

1    **A.**   Correct.

2    **Q.**   And, in fact, you're not even able to give an approximate

3    number of how many app stores, for instance, were not

4    downloaded because users were deterred by the unknown sources

5    warnings; correct?

6    **A.**   I wouldn't want to offer a specific number either way.

7    **Q.**   You couldn't even give an approximate number; correct?

8    **A.**   Yeah, I wouldn't want to give an approximate number

9    either.  That's not a specific quantitative analysis I've done.

10   **Q.**   Now, you were here yesterday for Professor Bernheim's

11   testimony; correct?

12   **A.**   Yes, I was.

13   **Q.**   And you saw that Professor Bernheim in Slide 35 --

14   sorry -- in Slide 22 of his demonstrative, which we can put up

15   if you need to look at it again -- it's also in your binder

16   before you -- has identified a 35 percent drop of users

17   specifically when warnings were shown during the unknown

18   sources install flow from the Epic Games app.  Do you remember

19   that?

20   **A.**   I remember seeing this, and I'm happy to tell you, if you

21   would like, what I infer from it.

22   **Q.**   Well, what I want to ask is:  Assuming Professor Bernheim

23   is correct in his testimony, is a 35 percent drop a substantial

24   limitation on access to this alternative distribution channel?

25   **A.**   I just want to make sure I understand the premise, what we

1  mean by saying it's correct.  I think the numbers in this chart

2  are correct, but I don't agree with the conclusion.

3  **Q.**   Sir, I'm asking a pretty simple question.

4  **A.**   Mm-hmm.

5  **Q.**   If Professor Bernheim is correct, the 35 number --

6  35 percent number is associated with a drop that happens during

7  and because of the warnings, would that be a substantial

8  limitation on access?

9  **A.**   If that were the case, I would not conclude from that,

10  certainly not from that alone, that this security warnings

11  substantially harm competition, no.

12  **Q.**   That's not enough?

13  **A.**   It's not about the number exactly.  It's about what was

14  the overall impact of what we're talking about here on

15  competition in the market.

16  **Q.**   All right.  Would a 50 percent drop be enough?

17  **A.**   Again, I think it's not about the specific number in

18  isolation.

19  **Q.**   Okay.  Let's go take a look at Exhibit 682, it's in your

20  binder, it's in evidence, and go to slide 11.

21  **A.**   Can I look at it on the screen or would you like me to

22  open the binder?

23  **Q.**   You can look at it on the screen.  Whatever is more

24  convenient for you.

25       Now, you see that the heading on this slide discusses

1   Amazon, and the jury has seen before, talks about how Amazon is

2   strongly promoting a 50 percent discount on in-app purchases,

3   but for now switching hurdle is too high for most users?  Do

4   you see that?

5   **A.**   I do, yes.

6   **Q.**   And if you go down to the rectangle, the blue rectangle on

7   the right, you see that it says "Significant hurdle to

8   switching to Amazon APK" and then it says "process is quite

9   complex, involves 14 steps."  Do you see that?

10  **A.**   That is right, yep.

11  **Q.**   And so you see that this is too much for most users.  So

12  more than 50 percent presumably.  Would that be substantial

13  limitation of access?

14  **A.**   I do not think that from this fact alone I would conclude

15  that there's been substantial harm to competition or

16  substantial limitation to access in the relevant sense.

17  **Q.**   Okay.  Now, you define foreclosure in your report, I

18  believe, as a significant impairment of rivals' ability to

19  offer their product to users.  Do you recall that?

20  **A.**   Yeah.  I think there's a second half to that sentence as

21  well, but that's the first half.

22  **Q.**   Okay.  And if most users cannot get to the product, isn't

23  that significant impairment?

24  **A.**   Again, I think it depends on looking at it holistically.

25  If a competitor goes out and does something that prevents most

1  consumers from accessing their rivals, that's something that

2  certainly in many circumstances could be --

3  **Q.**   Sir, I'm asking specifically about this slide in this

4  instance where Google itself says that its own unknown sources

5  install flow prevents most users from switching.  Is that

6  significant impairment or not?

7  **A.**   No, it's not, and I'm happy to tell you why not if you

8  would like.

9  **Q.**   Now, you've not relied on this document when you opined in

10  this case; correct?

11  **A.**   I can't say for sure.  I looked at a lot of documents and

12  I've seen documents similar to this that make a similar point,

13  but I don't recall for this exact document.

14  **Q.**   Another document that you did not rely on was the

15  deposition testimony from Mr. Morrill from Amazon that the jury

16  has seen, but you have since read it I assume; correct?

17  **A.**   I can't say for sure sitting here right now whether

18  I've -- read his deposition testimony you said?

19  **Q.**   Yes, which was played in court.

20  **A.**   Yes, I wasn't here when that was played, and the

21  transcripts I think that I saw did not have transcripts of

22  those things that were played on video; but, in any case, I

23  can't recall reading that.

24  **Q.**   Okay.  Mr. Morrill was asked and testified that 11 percent

25  of the people who were trying to download the Amazon Appstore

1   as of August 2020 actually went through the unknown sources

2   install flow and completed the download.  That's an 89 percent

3   drop.  Is that substantial limitation?

4   **A.**   Could you just say the question one more time?

5   **Q.**   Sure.

6       Mr. Morrill testified that 11 percent of the folks who

7   tried to download the Amazon Appstore through the unknown

8   sources install flow actually succeeded, meaning the other

9   89 percent were deterred during the process.

10      Is that substantial limitation on access to sideloading or

11  direct downloading as a means of distribution?

12  **A.**   I think clearly not, and I'm happy to tell you why not if

13  you would like.

14  **Q.**   Now, I want to talk a little bit about, while we're at it,

15  you have Slide 51.  Here you talk about evidence that people

16  know how to sideload; right?

17  **A.**   Yes.

18  **Q.**   And this is from the same data that was discussed here

19  with Dr. Qian and includes Chromecast and TVs and other things;

20  correct?

21  **A.**   Correct.

22  **Q.**   And this data also has I think more than a third

23  categorized as coming from an unknown country; correct?

24  **A.**   That's correct.  I would note that that doesn't affect

25  anything that's on this chart because --

1   Q.   Well, you have no idea how it affects what's on the chart

2   because if the 34 percent was added to one country or another,

3   you have no idea what the effect would be; correct?

4   A.   Sorry.  I just meant in the sense those data points are

5   not included in this figure.  That's all I meant.

6   Q.   I see.  So you just excluded the third that is unknown?

7   A.   When I was plotting things by country, I did not and could

8   not include things for which Google didn't know what country --

9   Q.   I think, yes, you excluded the 34 percent that are --

10  A.   Yes, definitely.

11  Q.   I apologize.

12       Now, even with these deficiencies, the data here shows low

13  percentages of devices where even one app has been allowed for

14  unknown sources in major western economies, like Japan and the

15  U.S. and the U.K. and Germany; correct?

16  A.   We can see the numbers.  I think it's 19 percent in the

17  U.S.

18  Q.   And 19 percent in the U.S. means that 81 percent of the

19  phones in the U.S. have never allowed unknown sources for

20  anything; correct?

21  A.   Correct.

22  Q.   And the same -- it's even higher for Japan, if you recall?

23  A.   The number who have not accessed it is higher.

24  Q.   Correct.  It's 85 percent?

25  A.   Yes, and that's consistent with my recollection.

1   **Q.**  And it's about 75 or 76 percent in Germany and the U.K.?

2   **A.**  That is also consistent with my recollection.

3   **Q.**  But it's very high in places like Yemen and Iran; correct?

4   **A.**  As well as all the places on this map that you can see.

5   **Q.**  All right.  Now, you understand that to download something

6   from a third-party store, you would need to allow unknown

7   sources for the browser to download that app store; correct?

8   **A.**  Let me make sure I'm parsing -- maybe you could say the

9   question one more time.  I want to make sure I get it right.

10   **Q.**  Sure.

11      If I want to download an app from the Amazon Appstore, I

12   first need to download the Amazon Appstore from the web;

13   correct?

14   **A.**  If it was not preinstalled.  I think the only thing to

15   clarify is it could be preinstalled and things would be

16   different.  If I could just say, if it was preinstalled, you

17   would not need to activate unknown sources; but if not, yes,

18   you would need to download it from a website.

19   **Q.**  And for that I would need to allow unknown sources for the

20   browser?

21   **A.**  Yes.

22   **Q.**  And then I would need to go into the Amazon store and

23   download an app from the Amazon store and need to allow unknown

24   sources for the Amazon store; correct?

25   **A.**  I believe so, yes.  There have been some changes to how

1   the app store flow works over time.  So certainly at some point

2   in time that was a correct description.

3   **Q.**   Sir, that is, Mr. Kleidermacher testified here that this

4   is the process today.  Do you have any reason to doubt that?

5   **A.**   Oh, no.  I trust him.

6   **Q.**   Okay.  So for download from a third-party app store you

7   would need to allow unknown sources for two sources, not one;

8   correct?

9   **A.**   Yes.

10  **Q.**   And you represented no data about how many devices have at

11  least two unknown sources enabled; correct?

12  **A.**   Correct.

13  **Q.**   And you understand that those numbers would by definition

14  be lower than what we're seeing here; correct?

15  **A.**   I do, yes.

16  **Q.**   And you understand, for example, that even though you

17  represented that 90 percent of U.S. devices have allowed at

18  least one app to install unknown sources, only 3 percent of

19  U.S. Android phones actually have an app store that was

20  directly downloaded from the web?

21  **A.**   I think that's the right number, yes.

22  **Q.**   Okay.  And in the face of all this evidence, it is your

23  opinion that the unknown sources install flow does not

24  substantially limit access of developers and users to direct

25  downloading as a distribution channel; correct?

1    **A.**    That is correct.

2    **Q.**    Okay.  Let's talk about other conduct at issue.

3    As an economist, I think you testified today you need to

4    look at conduct holistically; correct?

5    **A.**    Holistically and also down in the details individually.

6    **Q.**    So you need to look both at each conduct on its own and

7    holistically everything together; correct?

8    **A.**    Correct.

9    **Q.**    Now, you know, for instance, that Project Hug,

10   Project Banyan, and RSA 3.0 were designed as complementary

11   efforts to protect risks to the Google Play Store; correct?

12   **A.**    I think that's something that I recall at least somebody

13   in Google saying at some point in time.

14   **Q.**    That somebody was Mr. Jim Kolotouros?

15   **A.**    I take your word for it.

16   **Q.**    Okay.  And you have no reason to doubt that these three

17   projects were designed together as complementary project to

18   protect against a single identified risk to the Google Play

19   Store; correct?

20   **A.**    No.  What I would say is I have no reason to doubt that he

21   said that, he put that on his slide.

22   **Q.**    Okay.  That's good enough.

23   Now, you actually haven't looked at these three -- at

24   three projects together, did you?

25   **A.**    Project Hug, Project Banyan, and RSA 3.0?

1   **Q.**   Correct.

2   **A.**   Well, Project Banyan is somewhat special in that because

3   it never happened.  It was never implemented.  And so the focus

4   of my analysis was on things that actually happened in the real

5   world and what was their impact.  So I did not look in detail

6   at Project Banyan.

7   **Q.**   And you did not look at Project Hug and Project RSA .33 --

8   3.0 together either, did you?

9   **A.**   I certainly did.

10  **Q.**   You certainly did.  All right.

11       Now, you stated in your direct that you expected a

12  developer like Amazon, for instance, to match the Hug payments,

13  correct, if it were interested?

14  **A.**   No, I don't think that's -- I don't think I used the word

15  I would expect.

16  **Q.**   I think you said you would expect that they could match;

17  correct?

18  **A.**   Yes, I expect that they could, absolutely.

19  **Q.**   Okay.  And to understand -- sorry.

20       You understand that to attract someone like, for instance,

21  Activision Blizzard King, ABK, to a store like Amazon with

22  under 1 percent share, Amazon would need not only to match

23  whatever Google paid in Hug payments, it would also need to

24  compensate ABK for the loss of sales from not being on

25  Google Play, correct, if it wanted it exclusively?

1    **A.**    Yes, if they wanted it exclusively, yes, I think the

2    nature of competition is you want to pay somebody not to be in

3    somebody else's store, you're going to have to compensate them

4    to do that.

5    **Q.**    And when you're under 1 percent and you need to compensate

6    for somebody who's at 83 percent, you need to compensate them

7    with a lot of money; correct?

8    **A.**    I'm sure this would be a lot of money no matter what.  The

9    1 percent, I think the whole point might be that would get

10   bigger if you had these great exclusive apps.

11   **Q.**    Excellent.  My point exactly.

12        And you never considered how those things are exacerbated

13   by the fact that Amazon to grow, needs to go through the

14   unknown sources install flow; correct?  You didn't consider

15   those together?

16   **A.**    I considered the unknown sources flow and the impact of

17   that on these app stores, and that was part of my analysis

18   considering all of these things as context.

19   **Q.**    Sir, you have no place in your report or even in your

20   testimony today where you said:  Here's what it would look like

21   for an app store to actually match the Hug payments and go

22   through the unknown sources install flow to actually grow using

23   this exclusive content that they just paid hundreds of millions

24   or billions for; correct?

25   **A.**    Yeah, I -- certainly, I did not calculate the specific

1   thing that you just described.

2   Q.   Okay.  And you also did not present any testimony on how

3   that would be further exacerbated by the fact that if Amazon

4   wanted to be exclusive or even wanted to be alongside the

5   Play Store out of the box, as you called it, it would have to

6   somehow compensate the OEM for the RSA 3.0 payments that

7   they're getting from Google to keep Google Play exclusive;

8   right?  You did not look at that holistically either?

9   A.   I'm not sure that I would agree with that.  I can tell you

10  how I looked at that if you like.

11  Q.   That was not in your testimony today; correct?

12  A.   What would happen -- what was the impact of the RSA 3.0 on

13  Amazon and similarly situated app stores' ability to get

14  preinstalled is precisely what I was looking at in that

15  analysis.

16  Q.   No, no, sir.  I'm asking you:  Did you look at that

17  alongside the fact that to grow, they need to somehow jump over

18  the hoops of Hug and the fact that they need to be sideloaded

19  and the fact that they need to deal with RSA 3.0?  They need to

20  deal with all of this?

21  A.   I think, again, that analysis was alongside my

22  consideration of all of these things.  I did not -- I don't

23  know exactly what you have in mind, but I didn't do some

24  specific analysis that kind of added those things up in a

25  particular way.

 1   Q.   I hear you.  Let's talk briefly about this Project --

 2          THE COURT:  All right.  Let's take our afternoon

 3   break.  We'll be back at a little bit after 2:15.

 4          THE CLERK:  All rise.

 5               (Recess taken at 1:58 p.m.)

 6            (Proceedings resumed at 2:20 p.m.)

 7      (Proceedings were heard in the presence of the jury:)

 8          THE COURT:  Okay.  Go ahead.

 9          MR. EVEN:  Thank you, Your Honor.

10   BY MR. EVEN:

11   Q.   So, Professor Gentzkow, I want to quickly talk first about

12   Project Hug.

13        You know that Project Hug was intended to prevent, as

14   Mr. Koh testified, contagion whereby once top developers took

15   their gaming content off Google Play, other developers would

16   potentially follow suit.  You've seen that testimony?

17   A.   I think I have seen that testimony, yes.

18   Q.   You never mentioned a contagion risk in your testimony

19   today or in your report; correct?

20   A.   I don't believe I used the word "contagion."

21   Q.   And I'd like to only focus about the Project Hug deals

22   with ABK and Riot, if I may.

23        And it's your opinion in this case that there's no

24   evidence that you find convincing or credible that Google used

25   Project Hug to buy off potential entrants; correct?

1   **A.**   That is correct.  And buy off potential entrants in a

2   specific sense but, yes.

3   **Q.**   Okay.  Now, you understand that ABK and Riot, in fact,

4   signed Hug agreements and never opened a store; correct?

5   **A.**   That's correct.

6   **Q.**   And your expertise is not in assessing the credibility of

7   evidence; correct?

8   **A.**   The credibility of what, sir?

9   **Q.**   Of evidence, of testimony that the jury has heard, that's

10  not something you learned at Harvard?

11  **A.**   My expertise is certainly in assessing the credibility of

12  evidence.  I wouldn't say I have any particular expertise in

13  assessing testimony in a legal sense or anything like that.

14  **Q.**   Okay.  Not withstanding the testimony of Mr. Koh and

15  Ms. Kochikar and Mr. Harrison here and the warnings that went

16  to the Business Council, your view is that there's no credible

17  evidence in this case that Project Hug and these deals were an

18  example of Google buying off competitors; correct?

19  **A.**   That's correct.  And as I said, they are examples of

20  Google giving a deal to those competitors, to those firms, that

21  certainly changed their incentives to put their apps in Play --

22  **Q.**   Sir --

23  **A.**   -- but I would not characterize that as buying off.

24  **Q.**   In fact, you told -- your view is that even if there's a

25  formal agreement that says, "You, potential competitor will

1  take hundreds of millions of dollars in exchange for not

2  entering this market," that is at most an example of something

3  that could potentially be evidence in favor of buying off a

4  competitor; right?

5  **A.**  I think it certainly could potentially be evidence.  All

6  that qualification stands for is, in any given situation, we

7  need to look at the details carefully to see what we're talking

8  about.

9  **Q.**  In other words, even in your view as an economist, even

10 the existence of that letter, an explicit agreement, that says

11 "Here's $360 million.  You commit not to enter this market,"

12 you say this still would not be enough for you to find that

13 Google was buying off competitors?

14 **A.**  I did not say that.  I said that I would need to look at

15 the details, and we need to be clear about what happened.

16 **Q.**  Sir, your counsel can ask.

17     You said at the time that this could potentially be, but

18 you would need to look at other evidence in addition; correct?

19 **A.**  I can't conclude that anything is anticompetitive without

20 understanding exactly what circumstances we're talking about

21 and looking at the evidence.

22 **Q.**  That's exactly the problem, sir.

23     Let's talk quickly about RSA 3.0.  RSA 3.0, you had some

24 back and forth with Mr. Raphael about whether you should

25 include or exclude Samsung in the way you look at it; correct?

1   **A.**   Yes.

2   **Q.**   Now, you understand that as part of the three-project

3   program, RSA 3.0 was designed to target non-Samsung OEMs;

4   correct?

5   **A.**   I understand that several of those Google documents

6   suggest that that program was focused on non-Samsung OEMs, yes.

7   **Q.**   And Google had another project for Samsung; right?

8   Project Banyan?

9   **A.**   Google had that project, which never happened as we said.

10   **Q.**   I understand, sir, but you understand that Google had two

11   projects, one for non-Samsung and one for Samsung; correct?

12   **A.**   Yeah.  My goal with that is not to assess the success --

13   **Q.**   Sir, it's a simple question.  That is correct?

14   **A.**   Correct.

15   **Q.**   Let's proceed.

16      Now, RSA 3.0 is a deal where Google paid 20 to 25 percent

17   to OEMs -- 20 to 25 percent of Play and sometimes Search

18   revenue to OEMs to have Play as the only store on their phones;

19   correct?

20   **A.**   I wouldn't quite agree with that.  It paid that revenue

21   for a set of things that the OEMs were asked to do of which the

22   thing you mentioned is one.

23   **Q.**   I see.  So they paid it for exclusivity for Play plus

24   other things?

25   **A.**   Plus security updates, plus letter upgrades, and so on as

1    I said.

2    **Q.**   Okay.  Now, your view is that there's no evidence that an

3    equally efficient competitor in app distribution would not have

4    been able to profitably offer similar app store revenue sharing

5    terms to OEMs as those that were offered under the premier tier

6    terms offered in RSA 3.0; correct?

7    **A.**   I've seen no such evidence.

8    **Q.**   RSA 3.0 comes on top of a MADA; correct?

9    **A.**   I think in order to sign RSA 3.0, you need to have signed

10   the MADA, if that's what you mean.

11   **Q.**   And so while Google makes RSA 3.0 payments to gain

12   exclusivity, an equally efficient competitor paying an OEM the

13   same amount of money could at most buy the right to be placed

14   on the phone next to the Google Play Store; correct?

15   **A.**   Well, I think if an OEM was signing the MADA, part of what

16   they're agreeing to in the MADA in exchange for what they're

17   getting is to put Play on the phone.  So if they've signed the

18   MADA, what you said would be correct.

19   **Q.**   And so at that point if Google payed somebody a billion

20   dollars to be exclusive, Amazon comes and says "Here's a

21   billion dollars," all they get is to be next to the Google Play

22   Store on that phone; correct?

23   **A.**   Basically, yes, unless they were convinced not to have the

24   MADA.

25   **Q.**   Okay.  Now, you understand that to be exclusive on the

1  phone then, an equally efficient app store would need to

2  compensate the OEM not only for the lost RSA 3.0 revenue from

3  Google but also the loss of all the Google apps and the Google

4  APIs that come with the MADA; correct?

5  **A.**   It depends what we're asking them to do.  If they want to

6  be on the phone, no.

7  **Q.**   If they want to be exclusive on the phone, they need to

8  compensate the OEM for both RSA 3 and the MADA; correct?

9  **A.**   Yes.  The statement that I made that you quoted from my

10 report was not about exclusivity.

11 **Q.**   Sir, I'm just asking the question.

12      That is how this will operate as an economic matter in the

13 real life if somebody wanted to be an exclusive store on a

14 phone; correct?

15 **A.**   I completely agree about the exclusive case, yes.

16 **Q.**   Okay.  Now, you understand that the app store developers

17 do not typically have a collection of APIs that could replace

18 Google's APIs; correct?

19 **A.**   Correct.

20 **Q.**   And they don't have something to replace YouTube or

21 Google Maps?

22 **A.**   No, most of them don't.

23 **Q.**   They just have a store; right?

24 **A.**   Correct.

25 **Q.**   And they also don't typically have a search engine the

GENTZKOW - CROSS / EVEN

1  size of Google Search that would replace the Search revenue

2  that Google pays under RSA 3.0; correct?

3  **A.**   Correct.

4  **Q.**   Now, you understand that RSA 3.0 agreements were signed

5  with Xiaomi, Oppo, and Vivo?

6  **A.**   Yes.

7  **Q.**   And Xiaomi, Oppo, and Vivo received the highest rates

8  available under RSA 3.0; correct?

9  **A.**   They were certainly the highest of the ones that

10 Dr. Bernheim showed, and my recollection is consistent with

11 them being the highest overall.

12 **Q.**   And you understand that Oppo, Xiaomi, and Vivo are the

13 three OEMs that have the biggest stores alongside Samsung in

14 terms of app downloads; correct?

15 **A.**   I think that's right.

16 **Q.**   And you understand that Professor Bernheim showed

17 yesterday that each one of those now have 50 to 60 percent of

18 their new devices -- well, not now -- back in '21 or '22 they

19 already had 50 to 60 percent of their devices being subject to

20 the premier tier with Play exclusively on their phone; correct?

21 **A.**   Yes.  In terms of those new activations, yes.

22 **Q.**   All right.  So let's talk about Samsung a little bit.

23      Samsung phones represent nearly 40 percent of Android

24 phones; correct?

25 **A.**   Worldwide.

**GENTZKOW - CROSS / EVEN**

1 **Q.** Worldwide; is that right?

2 **A.** I believe so, yes.

3 **Q.** And the Galaxy Store is, therefore, nearly 40 percent of

4 Android phones; correct?

5 **A.** Yes.

6 **Q.** And the Galaxy Store, nonetheless, accounts for less than

7 1 percent of downloads while the Google Play Store is about

8 83 percent of downloads; correct?

9 **A.** I don't know those exact numbers, but I trust you, yes.

10 **Q.** All right.  And you believe that Samsung having 40 percent

11 of Play's footprint but only 1 percent of its download reflects

12 competition on the merits?

13 **A.** What I said is the choice of users who have both of those

14 things side by side to use the Google Play Store far more than

15 the Samsung Galaxy Store reflects their perceived value from

16 the Play Store being higher.

17 **Q.** Sir, what you're describing is competition on the merits;

18 correct?

19 **A.** Yes.  I just mean in that specific case of that specific

20 choice.

21 **Q.** I understand.  And you gave an example.  You said, "You

22 know, maybe we have a Walmart and they're looking over at a

23 convenience store and a lot more people would come to the

24 Walmart"; correct?

25 **A.** That is something I said, yes.

1   Q.   And in that analogy I understand that Samsung is the

2   bodega.

3   A.   I think you could apply that analogy to Samsung.

4   Q.   Okay.  You understand that Samsung -- there was a time

5   when Samsung tried to get some exclusive games; correct?

6   A.   I know that they got an exclusive on Fortnite's game, and

7   it seems consistent with my recollection that they may have

8   tried to get other exclusives, yes.

9   Q.   Okay.  And since that, you're not aware of any major games

10  that they got since 2018; correct?

11  A.   I'm not aware of any major exclusives.

12  Q.   And maybe it has something to do with it, but just after

13  they got that one game, Google launched both Project Hug that

14  paid -- that paid game developers not to go exclusive on any

15  store, including Samsung, and Project Banyan; correct?

16  A.   Can you say the question again?

17  Q.   Sure.

18       Just after Samsung landed Fortnite on an exclusive basis,

19  immediately Google launched both Project Hug and

20  Project Banyan; correct?

21  A.   I don't know the exact timing, but I agree that those

22  things followed the launch of Fortnite.  They were after.

23  Q.   Now, did you hear or read the testimony of Mr. Rosenberg

24  at trial?

25  A.   I read some of it.

1    Q.   You understand that Mr. Rosenberg testified at this trial

2    that under the proposed Project Banyan deal, Google Play Store

3    and Samsung would no longer compete on commercial terms for

4    developers?

5    A.   If you tell me that was his testimony, I'll believe you.

6    Q.   You did not analyze whether Project Banyan would have been

7    anticompetitive had it been completed; correct?

8    A.   Correct.

9    Q.   And I gather that without further analysis, you cannot say

10   one way or another whether an agreement not to compete between

11   a store with 80 percent and the second-largest store in the

12   ecosystem would be anticompetitive?  You just don't know?

13   There's more evidence --

14   A.   It's the kind of thing that would very often be

15   anticompetitive or could be, but I would need to analyze it

16   like anything else.

17   Q.   Now, you read that Mr. Rosenberg told his colleagues even

18   before Project Banyan was abandoned that certain RSAs are in

19   flight as an alternative arrangement to Banyan?

20   A.   I don't recall that -- say it one more time for me.  I'm

21   sorry.

22   Q.   Do you recall that Mr. Rosenberg said that even before

23   Banyan was canceled, he said, "Don't worry.  We have other RSA

24   agreements in flight to address the same issue"?

25   A.   Again, I don't recall that exact testimony, but I'm sure

1    you've got it right.

2    **Q.**   Do you recall the testimony that he said that no RSA

3    should be signed with Samsung unless Google could secure

4    confidence, quote/unquote, that Samsung would not lower its

5    fees to developers?

6    **A.**   Likewise, I take your word for it.

7    **Q.**   Okay.  Would an agreement between Play and Galaxy not to

8    lower the fees to developers be anticompetitive, or is that,

9    too, something you need more evidence to look into?

10   **A.**   And generally speaking, agreements not to keeping in price

11   are very often anti competitive.

12   **Q.**   You can't say one way or another?

13   **A.**   It's a general principle.  I would say as an economist,

14   I'm not going to weigh in on anything exactly what we're

15   talking about and thinking about it carefully.

16   **Q.**   I hear you.

17        So following Mr. Rosenberg's admonitions, Google did, in

18   fact, sign an $8 billion RSA agreement with Samsung?  You

19   understand that; right?

20   **A.**   Yes.

21   **Q.**   Since Project Banyan was in motion and through today,

22   Samsung has not pursued any additional exclusive content beyond

23   Fortnite; correct?

24   **A.**   Not that I'm aware of.

25   **Q.**   And since Project Banyan was in motion and through today

**GENTZKOW - CROSS / EVEN**

1    Samsung has not lowered its rev share to developers, has it?

2    **A.**    The question was has Samsung lowered its rev share to

3    developers?

4    **Q.**    Correct.

5    **A.**    I'm aware of a number that Samsung has negotiated rev

6    share rates that are different from its published rates, and I

7    have no knowledge how those have changed over time.

8    **Q.**    Now, you've not considered any of this testimony to

9    determine whether Samsung's almost nonexistent competitive role

10   in app distribution has more to do with the $8 billion it

11   receives from Google and maybe less to do with its competition

12   on the merits?

13   **A.**    I have analyzed that question, looked at the data, applied

14   the analysis we talked about, and reached my conclusion.

15   **Q.**    If we're talking about the analysis in your direct, what

16   you said is you've seen clear evidence that Samsung is trying

17   to grow because it grew from 0.92 percent to 0.94 percent, and

18   back in 2018 before all this happened it signed Fortnite?

19   That's the evidence you looked at?

20   **A.**    Those were two things that I said were economic evidence

21   that don't look consistent with them not competing.

22   **Q.**    Sir, if the jury concludes that Google and Samsung do, in

23   fact, have an understanding or a handshake deal that Samsung

24   would not compete with Play, would you consider that

25   anticompetitive?

1    **A.**   I think, again, as I said, it would depend on what we mean

2    by that, what exactly your counterfactual is, but I can

3    certainly think of scenarios where the jury could conclude some

4    kind of agreement, if an agreement was reached, that certainly

5    could be anticompetitive.

6            **MR. EVEN:**  No further questions.  Thank you.

7            **THE COURT:**  Okay.  Brief redirect.

8            **MR. RAPHAEL:**  Very brief, Your Honor.

9                        **REDIRECT EXAMINATION**

10   **BY MR. RAPHAEL:**

11   **Q.**   Mr. Even asked you some questions about considering

12   RSA 3.0 and sideloading all together.  Do you recall that?

13   **A.**   I do, yes.

14   **Q.**   So if the Amazon Appstore got preloaded on Android phones,

15   would anyone need to go through sideloading to download it?

16   **A.**   No, they would not.

17   **Q.**   And Mr. Even asked you some questions about Amazon or

18   another app store getting -- being the exclusive on any

19   particular phone?

20   **A.**   Yep.

21   **Q.**   If Amazon was on the -- preinstalled on an Android phone

22   next to the Play Store, is it your opinion that that gives them

23   an opportunity to compete?

24   **A.**   Absolutely, yes.

25   **Q.**   And Mr. Even asked you a bit about Samsung and the Revenue

1  Sharing Agreements.  Do you recall that?

2  **A.**   I do, yes.

3  **Q.**   At the time that Epic entered into an agreement with

4  Samsung to have Fortnite in the Galaxy Store, was Samsung

5  getting a Revenue Share Agreement with Google?

6  **A.**   It was, yes.  Samsung has had Revenue Sharing Agreements

7  with Google for quite a long time.  Since 2011 or so I believe.

8          **MR. RAPHAEL:**  No further questions, Your Honor.

9          **THE COURT:**  Okay.  You may step down.

10                  (Witness excused.)

11          **THE COURT:**  Who do we have next?

12          **MR. ROCCA:**  Google calls Professor Catherine Tucker.

13                  (Pause in proceedings.)

14          **MR. ROCCA:**  Your Honor and Ms. Clark, to expedite

15  things, the parties have agreed that three summary exhibits

16  reflecting Ms. Tucker's analysis can be admitted at this time.

17  I will wait till you're ready, Ms. Clark.

18          **THE CLERK:**  Please raise your right hand.

19              **CATHERINE ELIZABETH TUCKER**,

20  called as a witness for the Defendant, having been duly sworn,

21  testified as follows:

22          **THE WITNESS:**  Yes, I do.

23          **THE CLERK:**  Thank you.  Please be seated.

24      Please state your full name for the Court and spell your

25  last name.

1          **THE WITNESS:**  My full name is Catherine Elizabeth

2    Tucker, and my last name is spelled T-U-C-K-E-R.

3          **THE CLERK:**  Thank you.

4          **MR. ROCCA:**  And, Ms. Clark, Google offers into

5    evidence the following exhibits:  Exhibit 7002, Exhibit 7006,

6    and Exhibit 7008.

7          **MR. BORNSTEIN:**  There's no objection, Your Honor.

8          **THE COURT:**  Okay.  Those are admitted.

9         (Trial Exhibits 7002, 7006, and 7008 received in

10         evidence.)

11                         **DIRECT EXAMINATION**

12   **BY MR. ROCCA:**

13   **Q.**    Good afternoon.

14   **A.**    Good afternoon.

15   **Q.**    Can you please reintroduce yourself to the jury?

16   **A.**    Yes.  I'm Catherine Elizabeth Tucker.

17   **Q.**    Where do you work?

18   **A.**    So I am the Sloan Distinguished Professor at MIT,

19   otherwise known as the Massachusetts Institute of Technology.

20   **Q.**    Professor Tucker, your accent doesn't sound like you're

21   from Massachusetts.  Where are you from originally?

22   **A.**    No.  I grew up in the U.K., and I did my undergraduate

23   degree at Oxford University.

24         And then I ran away to Stanford University where I did my

25   Ph.D. in economics, and much like every other professor with a

1  specialization in industrial organization.

2  **Q.**   And do you focus on any particular area of economics?

3  **A.**   Yes.  So I look at what changes about business and how

4  companies compete when we move away from the physical world to

5  the digital world.

6  **Q.**   And is that a recognized field in economics?

7  **A.**   Yes, it is.  It's a growing field, and one of the things

8  I'm proud of is that I lead the group of economists who study

9  digital economics and economics of artificial intelligence as

10  part of the big American organization of economists, which is

11  called the MBR.

12  **Q.**   Has anyone outside of the academic context asked you to

13  share your research and your perspective in these areas?

14  **A.**   Yes.  So one of the things I was asked to do was I was

15  asked by the Federal Trade Commission, which is one of the

16  government authorities in the U.S. that looks at competition,

17  and I was asked to be the keynote speaker at a series of

18  meetings they had which were talking about how competition

19  economics changes when things go digital.

20  **Q.**   Professor, in connection with your research, have you ever

21  received funding from any organizations?

22  **A.**   Yes, I have.

23  **Q.**   What's your biggest funder so far?

24  **A.**   It would be the National Science Foundation and also the

25  Sloan Foundation.

1  **Q.**   Professor, do technology companies ever provide any

2  funding for your research?

3  **A.**   Yes, they do.

4  **Q.**   Has Google?

5  **A.**   Yes, they have.

6  **Q.**   When was the last funding that you received from Google

7  for a research project?

8  **A.**   That would be from Google 11 years ago; and then from an

9  industry association that Google was part of, I think that

10  would be about 8 years ago.

11  **Q.**   Professor, how are you compensated for your time in this

12  matter?

13  **A.**   So I am paid $1400 an hour, and then I receive a

14  percentage of the billings of my staff who assists me.

15         **MR. ROCCA:**   Your Honor, Google offers Professor

16  Catherine Tucker of MIT as an economist with a particular focus

17  on digital markets.

18         **MR. BORNSTEIN:**   No objection, Your Honor.

19         **THE COURT:**   Okay.  She's qualified on that topic.

20  **BY MR. ROCCA:**

21  **Q.**   Now that you've told the jury who you are, why don't you

22  tell them why you're here.  What was your assignment?

23  **A.**   Yes, of course.  So I was -- I'm here and my assignment

24  was to look at plaintiff's experts' market definition and also

25  their conclusions about monopoly power.

1  Q.   Professor, have you prepared a slide to help explain your

2  opinions in this case?

3  A.   Yes, I have.

4  Q.   Okay.  Let's start with your first opinion.

5       Can you please read it and explain it briefly at a high

6  level?

7  A.   Oh, yes.  So when it comes to product market definition, I

8  believe that Dr. Bernheim and Dr. Tadelis have got it wrong in

9  that if you look at the product which Android and the

10 Play Store offer, which is facilitating digital interactions

11 between app developers and app users, then Google's competing

12 with Apple among others.

13 Q.   So let's start with market definition.  What is market

14 definition to an economist like yourself?

15 A.   So market definition is an important first step when

16 you're trying to understand about conduct.  And by "conduct" I

17 mean all the things that we just heard Dr. Gentzkow talking

18 about.

19      And what market definition allows you to do is by

20 understanding what reasonable substitutes exist for consumers,

21 it then allows you to start to evaluate, well, is any conduct

22 you see in the market something which is creating value or

23 potentially destroying value.

24 Q.   Professor, you just said "reasonable substitutes."  Can

25 you describe to the jury how an economist looks to whether

1  something is a reasonable substitute or a meaningful

2  alternative service or product?

3  **A.**   Yes, of course.  So I think actually Dr. Bernheim

4  described it well yesterday in that what we do as economists is

5  we're trying to understand, well, you know, if it was the case

6  that prices go up or quality goes down in some way, you know,

7  will consumers be able to reasonably be easily switched to

8  something, and that's really what we're doing when we're

9  thinking about market definition.

10 **Q.**   Professor, you've already mentioned Professor Bernheim.

11 Did you have a chance to listen to Professors Bernheim and

12 Tadelis testify about the relevant product market?

13 **A.**   Yes, I did.

14 **Q.**   Do you agree with them?

15 **A.**   No, I don't.

16 **Q.**   Why not?

17 **A.**   Well, at the heart of it, I mean, just at the highest

18 level, what they've done is they've carved up a single, really

19 quite easy to understand market into lots of little pieces,

20 which allow them in some ways use to, you know, carve off

21 things but in a way which doesn't make sense.  And, you know, I

22 can explain what I think they got wrong.

23 **Q.**   I'd like to show you the slide that Professor Bernheim

24 showed yesterday to explain his relevant market.  Did you see

25 this yesterday?

1   **A.**   Yes, I did.

2   **Q.**   And then today Professor Tadelis offered this market

3   definition.  Did you see this?

4   **A.**   Yes, I did.

5   **Q.**   So you have combined them into a consolidated slide with

6   Professors Bernheim and Tadelis' relevant markets.  What was

7   your reaction to seeing this information?

8   **A.**   Well, when you look at it, what you see is that really in

9   quite a convoluted and complex way, making sure they draw these

10   small red lines and circles and other odd shapes in a way which

11   means that Apple is excluded from the market.

12       And my opinion is that this was a convoluted process; it's

13   just not correct.  And that when you look at both the facts and

14   data, it's very much the case that Android and the Play Store

15   is competing with Apple.

16   **Q.**   Professor, Dr. Bernheim indicated that it's important to

17   identify the needs and desires of the buyers of a service to

18   help define the parameters of a market.  Do you think his

19   approach to relevant market here achieved that goal?

20   **A.**   So I utterly agree that you need to think about the needs

21   and desires when you're thinking about the product market, but

22   my opinion is he got the needs wrong.  In the real need in this

23   market and what this market is about is that app developers and

24   app users want their interactions, digital interactions, to go

25   well.

TUCKER - DIRECT / ROCCA

1  Q.   Do you have a basic demonstrative to explain how you see

2  these interactions between app users and app developers?

3  A.   Yes, I do.

4  Q.   Okay.  What are you showing to the jury?

5  A.   Here I'm just showing that actually there's a far more

6  simple way than all these convoluted red lines of thinking

7  about this market, which is that you have app developers on the

8  one hand and app users on the others; and what Google and the

9  Play Store is doing, the need they're fulfilling, is making

10  sure that interactions between these two groups go well.

11  Q.   And you've used the term "interactions" a few times.  What

12  types of interactions are you referring to?

13  A.   Oh, so when I'm talking about interactions, I'm talking

14  about digital transactions, both paid and unpaid.

15  Q.   And where does Google Play fit into these interactions?

16  A.   So Google Play is a key way that Android is making sure

17  that these interactions between users and developers are going

18  well.  That's what I mean when I say "facilitation."

19  Q.   Professor, as an economist, what types of information did

20  you review to determine that this is the appropriate way to

21  look at the product market in this case?

22  A.   So the two big sources of information.  The first was I

23  read a lot of documents, both from Google and its competitors

24  and third parties; and then I also looked at a lot of data.

25  Q.   Professor, let's start with what you found in Google's

1   documents.

2       You have a simple demonstrative here.  What is this?

3   **A.**  All right.  So this is really summarizing what I saw when

4   reading Google's documents about how it thought about Play and

5   its relationship to Android and what it was doing.

6       And what it's saying here is that Play exists to make

7   Android better.  I think Dr. Bernheim used the language of

8   "differentiation" yesterday, but think of it as the idea is

9   that Play is helping Android compete by making it better by

10  making these interactions between app users and app developers

11  go better.

12  **Q.**  Professor Tucker, what are some examples of the way in

13  which Google Play allows Android to differentiate itself from

14  competition?

15  **A.**  Well, I'll just give you some examples from both sides

16  maybe.  But, you know, as an app user, it allows me to easily

17  find lots of apps, read lots of reviews, potentially download

18  the apps, see if I like it; and then if I go and pay for

19  something in the app, it's got, you know, a nice billing

20  system.  I can get refunds.  There's all this value being

21  created that way.

22      And then when it comes to app developers, well, of course,

23  what's great about Play for them is a lot of users.  You can

24  get your product out there.  For the app users, they can

25  actually play around with it, see if they like it.  And then,

1   again, they could handle billing and other things which, you

2   know, is useful for a developer.

3   **Q.**   Professor, do you have an opinion as to whether Apple

4   considers the availability of apps on iOS as central to the

5   ecosystem experience on iOS?

6   **A.**   Yes.

7   **Q.**   And have you seen any evidence from Apple that it views

8   the world in that way?

9   **A.**   Yes, I have.  This is actually a screenshot of an ad put

10  out by Apple, and I just want to highlight what that ad is

11  saying is:  Look, we have apps.  In other words, Apple is

12  saying:  A key reason to be choosing us is because we have

13  these apps for you.

14  **Q.**   Professor, have you seen any evidence from Apple that it

15  views Google as a competitor when it comes to app stores?

16  **A.**   Yes, I have.  So when I read Google -- sorry -- when I

17  read Apple documents, you know, there's some striking things

18  you see.  You see in big words "Competition" and then they list

19  the Google Play Store.  And then when they're looking at the

20  Google Play Store, they're like, "Oh, let's just compare

21  ourselves.  Are we doing as well as them?  You know, are we

22  competing?"  And so you see that in the Apple documents.

23  **Q.**   Why does it matter to you as an economist that Apple

24  considers Google to be its competitor?

25  **A.**   Well, it matters because when you're trying to understand

1  what firms are competing and, therefore, what are reasonable

2  substitutes or alternatives, it matters when you see a

3  competitor not part of this case saying actually "We're

4  competing against Google Play.  Our app stores are competing

5  against each other."

6  **Q.**   Now, Professor Bernheim yesterday suggested in his

7  testimony that his definition of "competition" was technical

8  and different than how business people may view competition.

9  What was your reaction to that testimony?

10 **A.**   Well, my memory of that testimony is Dr. Bernheim was

11 saying, yes, business people may say the word "competition,"

12 but economists, the way we use "competition," we use it a very

13 technical way and so you can ignore that, and I just don't

14 think that's correct.

15     Instead, what we usually do when we're thinking about

16 market definition is, yes, we do the data crunching the

17 numbers, but then we also look at the documents and we see:

18 Does what -- do our numbers and our analysis, qualitative

19 analysis of the documents agree?

20     It's not the case that if you ever find out that what

21 everyone's saying about this market disagrees with your

22 technical analysis, you usually go back and say "Maybe

23 something's gone wrong from my technical analysis."  You

24 wouldn't just say everyone's wrong.

25 **Q.**   Professor, in addition to describing each other as

1  competitors, have Google and Apple actually acted like

2  competitors in the real world when it comes to their respective

3  app stores?

4  **A.**   Yes, they have.

5  **Q.**   And what is this demonstrative that you've prepared for

6  the jury?

7  **A.**   So this is a demonstrative which is really looking at the

8  different features that both Google and Apple have introduced

9  over time.  And what I want you to see is that, you know,

10  sometimes its Apple, sometimes it's Google; but when one of

11  them release a feature, we see the other one match it again.

12  In other words, that's what we, as economists, call competing

13  on quality.  They're trying to match each other in terms of

14  what they're providing.

15  **Q.**   And what is the significance to you as an economist of

16  this kind of behavior in the real world?

17  **A.**   We tend to see it when firms are really competitors.

18  **Q.**   Besides product innovation, Professor, have Google and

19  Apple acted in other ways as competitors with respect to their

20  app stores?

21  **A.**   Yes, they have.

22  **Q.**   What is this?

23  **A.**   So this is me looking on them competing on price.  And,

24  again, as economists, when we see firms match each other on

25  price, as we're seeing in this diagram, again, that's evidence

1   they're competing.  We expect competitors to match each other's

2   prices, and that's what we're seeing in this diagram.

3   Sometimes one goes first, sometimes the other one goes first,

4   but the key thing is they're trying to match each other's

5   prices.

6   **Q.**   Professor, in the interest of time we're not going go

7   through each of these scenarios, but let's just focus on one.

8        The fourth set of bullets says (as read):

9            "Reduced service fee to 15 percent after the user's

10       first year of subscribing."

11       Do you see that?

12  **A.**   Yes, I do.

13  **Q.**   Did you see any evidence from that time period in 2017 to

14  determine how competition impacted Google's price decision?

15  **A.**   Yes.  So there's some independent evidence I reviewed

16  where they said, "Oh, we better match Apple."  And then I think

17  even yesterday Dr. Bernheim was discussing some of the evidence

18  in his cross-examination.  If you remember, it was a document

19  between Apple and Google.  Google was going, "Oh, no.  We

20  better match Apple if they're going to 15 percent."

21  **Q.**   I wanted to ask you about Dr. Bernheim's testimony on that

22  point.  He suggested that sometimes companies benchmark against

23  other companies, but that really isn't evidence of competition.

24  What was your reaction to that testimony?

25  **A.**   Well, again, first of all, I think he was using that

1   really to dismiss any idea of the fact that the Apple and

2   Google are scrutinizing each other's features and quality.  I

3   don't think, you know, any economist would sort of say this

4   kind of matching of pricing looks like benchmarking.  That's

5   not really how we would ever use that term.

6   Q.   Professor, just to remind the jury, who are the consumers

7   of the Google Play Store?

8   A.   So I know you've heard this before, but it's app users and

9   app developers.

10  Q.   Dr. Bernheim yesterday testified that these two groups of

11  buyers or users have a shared need.  I think that was his

12  quote.  Users who want to engage with developers, developers

13  want to engage with users.

14       Did you agree with that characterization?

15  A.   Yes.  I think that's -- I very much agree with the idea

16  that this is a shared need.  This is about an interaction and

17  making those interactions go well.  That's the key -- that's

18  the key product here.

19  Q.   Professor, since there are two groups of consumers of

20  Google Play, does that mean this is a two-sided market?

21  A.   Yes.

22  Q.   And what is the significance of that?

23  A.   It's significant because -- and I think you've heard this

24  before and I apologize -- that when you're bringing together,

25  as Google Play does, two groups of users, then what we usually

**TUCKER - DIRECT / ROCCA**

1   think of it becomes a platform and the job of that platform is

2   to make sure that those interactions happen and they go well.

3   **Q.**   On the developer side, Professor, if Google does not

4   attract enough developers of the best apps, how might that

5   impact competition on the consumer side?

6   **A.**   Well, if it's the case that you're not successful and

7   attracting the best apps, best developers, then as a consumer,

8   it just makes Google Play less attractive.  Why would I want to

9   use it as an alternative if I can't get the apps that I want?

10  **Q.**   Professor, does Google in your opinion face any

11  competitive risk of losing developers from Android to iOS?

12  **A.**   Very much so.

13  **Q.**   And how does this competition play out in your assessment?

14  **A.**   Well, this is, again, something where I disagree with

15  Dr. Bernheim; but the way that competition works here is that

16  you're ultimately, if you're Google Play, trying to attract the

17  best developers to make the best apps just in order to get

18  those users on board.  And to get the best apps, you need to

19  attract developer time and attention.

20       So let's imagine you're a small firm, 10 engineers.  What

21  you want to do is, you know, ideally you get five engineers

22  working on the Android app, five engineers working on the iOS

23  app.  That would be the ideal.

24       What is not the ideal and what Android has to compete

25  really hard to do is have a situation where you have seven

1    engineers working on the iOS app, three engineers working on

2    the Android app.

3    **Q.**   Professor, have you seen data explaining why Google has to

4    compete so hard for the attention of developers compared to

5    iOS?

6    **A.**   Yes, I have.

7    **Q.**   What is this?

8    **A.**   So this really explains why there's a danger that you're

9    not going to get the 50/50 split; in that if you look, this is

10   a graph which shows the average spending on a device from 2020

11   in the U.S., and it is telling you that the average Apple App

12   Store user is spending twice as much as the average user of the

13   Google Play Store.

14       And that just means that the Apple ecosystem is going to

15   be so much more attractive of your developer, you're going to

16   be attempted to put more engineering time there because that's

17   where you're making twice as much money.

18   **Q.**   Is there evidence, Professor, of Google struggling to

19   attract the attention of developers?

20   **A.**   Yes, there is.

21   **Q.**   What is this demonstrative?

22   **A.**   So this relates back to a Mario game, and it was really

23   important game.  It was the first game, the Mario game, that

24   Nintendo was releasing, which was designed for mobile handsets.

25       And what I want you to take from this demonstrative is

1    that the super-attractive important game, it was released,

2    first of all, on Apple in December 2016, and then over -- it

3    was only three and a bit months later that it ended up being

4    launched on Android.

5    **Q.**    And why is this significant in your opinion?

6    **A.**    Well, it's significant because imagine you've got a kid

7    who likes Mario and their friends are playing Mario on their

8    mom's phones because their moms have iPhones but you have an

9    Android phone and your kid's not playing it, you're going to

10   remember that.  That's going to be something which is going to

11   unsettle you and certainly make buying an Android phone the

12   next time pretty unattractive.

13   **Q.**    Are there any other examples that you've seen from

14   testimony in this case of this phenomenon that you're

15   discussing?

16   **A.**    Yes.

17   **Q.**    And what is the significance of the testimony from the

18   founder of Down Dog to your opinion?

19   **A.**    So this was testimony we heard a long time ago now at the

20   beginning of the trial, but it was from the developer who made

21   Down Dog, and what I want you to just remember is that he

22   testified that they launched the iOS app six months in

23   advance of releasing the Android app.

24        And, again, this is more evidence that Google just has to

25   compete really hard for this developer time and attention to

1  get their apps on Android.

2  **Q.**   If Android is struggling in this regard, Professor, what

3  happens if developers do not prioritize Android?  What is the

4  impact of that on users?

5  **A.**   Well, imagine we don't have that prioritization.  And, you

6  know, just, for example, I don't know if you remember the

7  release date of the Mario game, but just imagine that you as a

8  user, you know, you're trying to think, "Well, which phone do I

9  buy at Christmas?"  You think about your child.  You're like,

10  "Oh, right, I better get the one that has the Mario game."

11  That means they're going to end up having fewer users.

12       And with fewer users in place, especially losing ones who

13  are likely to spend money on your app, then that means that

14  developers have less incentive to put more engineering time in.

15  And then you get less engineering time and, again, you start to

16  get a really negative feedback loop.  And that's what I mean by

17  feedback loop.  It's this sort of vicious cycle if you're not

18  able to make this work.

19  **Q.**   Now, Professor, are you saying that any one bad

20  interaction, like an inability to get the Mario game, is going

21  to trigger every consumer to go run out and buy a different

22  phone?

23  **A.**   No.  No.  I mean, it's not just one thing going wrong.  I

24  mean, it could be one thing, but it's really about this

25  cumulative process; that if as an Android user you're

1   constantly noticing that you have less great games, less great

2   apps, they don't work as well as your friends with iPhones,

3   cumulatively that means that when it comes to deciding "What

4   phone am I going to be buying next," you're going to remember

5   that, and it's going to drive you away from Android.

6   Q.   But, Professor, Professor Bernheim yesterday asserted that

7   users don't switch enough for Apple to be considered a

8   reasonable substitute in this context.  Did you agree with that

9   opinion?

10  A.   No, I didn't.

11  Q.   So before we get to switching, let's talk about new

12  buyers, which are different than switchers.  Do you agree with

13  that?

14  A.   Yes, I do.  I mean, if you remember that sort of little

15  weigh scale Dr. Bernheim had, none of those considerations

16  apply for new users.

17  Q.   Professor, have you considered how many consumers in a

18  given year are buying their very first smartphone?

19  A.   Yes, I have.

20  Q.   Approximately how many?

21  A.   It's millions.

22  Q.   Are Google and Apple competing to attract these consumers

23  so that their first smartphone purchase is an Android phone in

24  the case of Google or an iPhone in the case of Apple?

25  A.   Very much so.

1  **Q.**   And who are these new users, by the way?

2  **A.**   So they're often teenagers, people getting their first

3  smartphone.  Their parents have just allowed them their first

4  smartphone, so they're often teenagers.

5  **Q.**   Professor, have you seen any data on how that competition

6  between Google and Apple is shaping up?

7  **A.**   Yes, I have.

8  **Q.**   Can you please describe this demonstrative?

9  **A.**   Yes, of course.  This is saying when you look at

10  teenagers, that group of new users choosing what phone to buy,

11  87 percent of them have chosen an iPhone; and then when you

12  ask them what they're going to do next, it's 88 percent of them

13  are actually choosing an iPhone.

14  **Q.**   As an economist, are these sort of figures relevant to

15  your opinion?

16  **A.**   Yes, and I would say that they -- they're very relevant

17  and they also explain why it is that Android and the Play Store

18  have to compete so hard against Apple.

19  **Q.**   Now let's turn to the concept of switching.  Is it

20  possible for a user to switch between an Android device and an

21  iOS device?

22  **A.**   Yes, it is.

23  **Q.**   Dr. Bernheim mentioned that scale that you just mentioned

24  a moment ago suggesting that it's very difficult to switch.  Do

25  you agree with him?

TUCKER - DIRECT / ROCCA

1    **A.**    No, I don't.

2    **Q.**    What is this demonstrative?

3    **A.**    Well, this demonstrative is just reminding us that

4    technology has evolved, and over time it's become easier and

5    easier to pull things out of your mobile phone because a lot of

6    things are on the Cloud.

7         And this is an example of this, which is it's a screenshot

8    actually from the Google Play Store.  And if you go to the

9    Google Play Store, you will see an app by Apple that you can

10   download which allows you to take your stuff from your Android

11   phone and move it to iOS.

12   **Q.**    Professor, what's the name of this app?

13   **A.**    It's called Move to iOS.

14   **Q.**    And who was the developer of this app?

15   **A.**    This is Apple.  Again, something which Dr. Bernheim's

16   world doesn't seem to allow that this could be happening.

17   **Q.**    Is there anything else that's notable about this

18   particular screenshot?

19   **A.**    Yes.  I mean, I can't help but notice 100 million

20   downloads, number six in top three tools.  I mean this is

21   something.  It shows you there's real competition here and

22   people really are trying to move.

23   **Q.**    Professor, is there a difference between potential

24   switching and actual switching?

25   **A.**    Yes, there is.

1   **Q.**   What is the difference?  To an economist, is there a

2   meaningful difference?

3   **A.**   There is a difference in that as economists, we're

4   interested in the potential to switch.  And why is that?  Well,

5   if you look at actual switching, it could just reflect that

6   everyone's happy, that people like where they are.

7       What you're really interested in is the potential to

8   switch; that is, if the price got too high or the quality went

9   down, could people reasonably easily switch to an alternative.

10  That's what we're interested in.

11  **Q.**   Does the potential of a user switching from an Android

12  device to an iOS Apple device lead to more competition

13  between Google and Apple on their app stores?

14  **A.**   Yes.

15  **Q.**   Have you seen any actual switching data?

16  **A.**   Yes, I have.

17  **Q.**   Let's start with this one.  What is this data?

18  **A.**   So this is data from Google itself, and it's looking at

19  people who went out and purchased smartphones.  And the first

20  thing it does is it says:  Well, what were they considering

21  doing?  And it's saying that when you look at them, around a

22  third of all users were considering switching between iPhone

23  and Android.

24  **Q.**   Professor, there's a similar percentage for the iOS

25  users on the right side, 35 percent, but what's the second row?

1   **A.**   Oh, so the second row is then saying who actually

2   switched, and what you should take from that data is that

3   though about the same percent were thinking of switching, in

4   the end Android has this problem that more people ended up

5   switching to iPhone.  That's what we call asymmetry, and

6   that's something which suggests that Google's put under a lot

7   of competitive pressure because it's losing more users in this

8   competitive battle.

9   **Q.**   Professor, have you seen any other data or research on

10  switching?

11  **A.**   Yes, I have.

12  **Q.**   And what is this demonstrative?

13  **A.**   So this is from a company named Kantar.  And I know it's

14  late in the day, so just briefly, what's really important about

15  it is that if you look at that column Android to iOS, it says

16  not only is Android losing more users than iOS, but it's also

17  losing the most valuable users.

18       And by "valuable," I mean people who are buying expensive

19  smartphones and they're, therefore, likely to be in an income

20  bracket where they're spending a lot of money on apps.  So it's

21  telling you not only is Android losing users to iOS, but it's

22  losing the users it really doesn't want to be losing.

23  **Q.**   Professor, have any large developers looked at this

24  switching issue?

25  **A.**   Yes, they have.

1  Q.   And please explain to the jury what you're seeing here

2  with this slide.

3  A.   Yes.  So this was really interesting data because it came

4  from Meta.  That's the company which makes Facebook and

5  Instagram.  And what Meta can actually do is because you're

6  using an app, they can really measure people and they can say,

7  "Okay.  This person was using Android to access Facebook.

8  Let's see if they keep on using Android."  It's a very

9  detailed, granular way of thinking about switching.

10      And what you can see from this is we look at after one

11  year, from 2019 to 2020, 14 percent of people have stopped

12  using Android to access Facebook.  And then if we look over a

13  four-year period, it's really quite bad.  It's 34 percent of

14  people have just stopped using Android.

15  Q.   And, Professor, as an economist, is this level of

16  switching meaningful?

17  A.   Yes.  I mean, losing this much of your user base, this is

18  really meaningful.

19  Q.   Now, thus far we've been focusing a lot on Google and

20  Apple.

21      Beyond competition with Apple, does Google Play compete

22  against other meaningful alternatives?

23  A.   Yes, it does.

24  Q.   At a high level, can you briefly describe those

25  alternatives?

1  **A.**   Let me -- maybe if I use an example.  So if we were to

2  think about something, say, like Disney Plus, I could buy my

3  Disney Plus subscription on my PC, I could buy it on my

4  Smart TV as I ended up doing.  There's lots of different places

5  I could buy that Disney Plus subscription, and this also is a

6  real reasonable substitute for people who are looking to buy,

7  say, a Disney Plus subscription.

8  **Q.**   Let's move from Disney Plus and talk about Fortnite.

9       Have you evaluated the different ways that Epic Games have

10 transactions with Fortnite users?

11 **A.**   Yes, I have.

12 **Q.**   So, Professor, let's focus on Fortnite players who use

13 their Android devices to play the game.

14      Have you looked at the data to see how those users on

15 Android are doing transactions with Epic?

16 **A.**   Yes, I have.

17 **Q.**   Okay.  Is that what this slide shows?

18 **A.**   Yes.  It's showing four months of data, millions of

19 transactions where I'm looking at what happened in those

20 four months when Fortnite was available on the Play Store.

21 **Q.**   And what did happen?

22 **A.**   Well, what you can see is that when we look at people who

23 opened up Fortnite on their Android phones, we see that out of

24 their spending, only 13.9 percent of it was actually spent on

25 Android.

1    **Q.**   Why does this matter from a market-definition perspective?

2    **A.**   Well, it matters because, remember, we're thinking about

3    reasonable alternatives.  And what I can see here is that these

4    Android players, you know, who were using Android -- Fortnite

5    on their Android phones, actually had lots of other

6    alternatives for how they could spend their money on Fortnite

7    and that actually Android was just a very small proportion

8    really of what they were spending their money on.

9    **Q.**   So, Professor, does that mean that Epic can use Android

10   app stores to distribute Fortnite to consumers, collect money

11   from those consumers in lots of different ways, and never pay

12   anything to Google?

13   **A.**   That's right.

14   **Q.**   Now, yesterday Dr. Bernheim testified you cannot play

15   Fortnite on a console while riding in a bus.  Do you remember

16   that testimony?

17   **A.**   Yes, I do.

18   **Q.**   What was your reaction to that?

19   **A.**   Well, my reaction to that is that if you've ever played

20   Fortnite, you know that you can buy your V-Bucks anywhere and

21   then use them on the bus.  You don't have to buy the V-Bucks on

22   the bus as Dr. Bernheim seemed to think.  The way the in-game

23   currency works is you can buy it anywhere and then potentially

24   use it on your Android phone on that bus.

25   **Q.**   Professor, would the competitors who are covered in the

1   green bar, the 13.9 percent, prefer that that bar be

2   100 percent?

3   **A.**   They would absolutely love it, yes.  I mean, obviously any

4   one of these bars they would love to be 100 percent here, but

5   they're not.

6   **Q.**   And they're not because are they losing those sales to the

7   other alternatives to -- for Epic to transact with gamers?

8   **A.**   Yes.  I mean, they're losing these sales.  They'd love it

9   to be 100 percent, but instead it's not and people are spending

10  money elsewhere.

11  **Q.**   Now, this morning Professor Tadelis testified that

12  Google Play is the only game in town when it comes to billing.

13  Do you remember him testifying to that?

14  **A.**   Yes.

15  **Q.**   What does this data say about that opinion of Dr. Tadelis?

16  **A.**   Well, you know, I think it really brings into question I

17  think what Dr. Tadelis called this coercive tie, if you

18  remember.  I mean, we don't see that here.  Instead what we see

19  is Android users being able to play in-game currency in lots of

20  different places.

21  **Q.**   Professor, does this analysis differ, by the way, if you

22  look at data outside of the United States?

23  **A.**   No, it doesn't.  I think it goes down a fraction --

24  13.6 percent, something like that.  Android is pretty much the

25  same.

1  Q.   On the left side of this data, it shows iOS at

2  6.5 percent.  What is going on with that?

3  A.   Well, again, this is something which doesn't -- wouldn't

4  really be possible in Dr. Bernheim's world in that what we're

5  seeing there is that people who've opened up Fortnite on

6  Android are still spending money on iOS.  Android is not

7  getting all that money.

8  Q.   By the way, which competitors are covered in that gray bar

9  under -- above iOS?

10  A.   Well, as we've heard a few times, on iOS is only one app

11  store.  So that would be the Apple App Store.

12  Q.   In the green bar, what competitors are covered?

13  A.   So you notice I call that Android, and that's because it's

14  both Google Play and the other app stores on Android.

15  Q.   Let's talk about one of those other app stores just

16  briefly, though.

17       First of all, how widespread are alternative app stores on

18  Android devices?

19  A.   Well, I think we heard that very well from Dr. Gentzkow,

20  and I seem to recall him saying something like 67, 68 percent

21  of all phones have one of these app stores preinstalled.

22  Q.   We won't go through all of that again.

23       Does the existence of an alternative like the Samsung

24  Galaxy Store matter to a developer like Epic?

25  A.   Yes, it does, and I think we heard actually from

1  Dr. Bernheim that Epic has put Fortnite on the Samsung

2  Galaxy Store.

3  **Q.**   Now, beyond the Samsung Galaxy Store, have you heard of --

4  you've heard of web browsers; right?

5  **A.**   Yes, I have.

6  **Q.**   Have you heard of the web browser fortnite.com/android?

7  **A.**   Yes, I have.

8  **Q.**   What is the significance of fortnite.com/android?

9  **A.**   Well, again it comes to these alternatives, and what's

10  important about it is that every phone has a mobile browser and

11  that you can use that mobile browser to go and visit

12  fortnite.com/android and buy in-game currency.

13  **Q.**   Have you seen any evidence as to whether American

14  consumers actually know how to use web browsers?

15  **A.**   Yes.  It won't surprise you to learn that American

16  consumers can use browsers; and, indeed, when I've looked at

17  the data about how these browsers are being used, unlike what

18  is suggested yesterday by Dr. Bernheim, what you see is people

19  really switching between, say, browsers and an app, you know,

20  especially for certain categories of apps, like news and social

21  media.

22  **Q.**   Now, is there any evidence that you've seen that Google

23  considers all of these different alternatives -- the Samsung

24  Galaxy Store, web browsers -- as potential competitors?

25  **A.**   Yes.

1   **Q.**   We'll move on to get things going.

2        Let's talk briefly about a part of Dr. Bernheim's

3   testimony called the SSNIP test.

4   **A.**   Oh, of course.

5   **Q.**   Do you recall that testimony?

6   **A.**   Yes, I do.

7   **Q.**   I think he also referred to the hypothetical monopolist

8   test.

9   **A.**   Yes, that's right.

10  **Q.**   Do you have any criticism of the use of a SSNIP test as

11  Dr. Bernheim described it during his testimony?

12  **A.**   Yes, I do.

13  **Q.**   Can you just briefly describe your assessment of that part

14  of his opinion?

15  **A.**   Yes, of course, and it helps explain why I didn't think

16  that a SSNIP test was appropriate to do here.  So you heard

17  from Dr. Bernheim that the SSNIP test is a technical thing that

18  economists can but don't always use when thinking about market

19  definition, but the issue comes from what the product is here

20  in using a SSNIP test.

21       Do you remember that Dr. Bernheim said there's a joint

22  need; app developers, app users?  But then when he described

23  his SSNIP test, it was done just from the perspective of an app

24  user and there was no attempt to incorporate any of these

25  feedback loops that we've talked about, which you really need

1  to do when you're thinking about a joint need.

2  So that's my critique of Dr. Bernheim, and also explains

3  why it was that I didn't think that a SSNIP test was something

4  which would be useful illuminating here.

5  **Q.**  Professor, a SSNIP test involves a test on price; is that

6  right?

7  **A.**  Yes, that's right.

8  **Q.**  Are there other elements of competition when it comes to

9  app stores specifically?

10  **A.**  Yes.  I mean, if you've been hearing all my examples, I've

11  been talking about quality and, you know, that's a really

12  important way that Google Play and Android is competing here.

13  **Q.**  Okay.  So we've been talking a lot about the product and

14  product market.  Can you just remind -- before we go to the

15  second opinion, can you just remind the jury, at the end of all

16  that testimony, what is your opinion with respect to the

17  relevant product market?

18  **A.**  So my opinion when it comes to relevant product market is

19  that plaintiff's experts got it wrong; and when you understand

20  that the product is the facilitation of interactions between

21  developers and app users, it becomes clear that Google's

22  competing both against Apple but also all these other means

23  that we saw those Fortnite users where they can actually also

24  be buying in-game currency.

25  **THE COURT:**  I'm sorry.  I'm having trouble.  What is

1    the relevant product market?  So Dr. Bernheim described it,

2    best of my recollection right now, as the in-app distribution

3    of -- the distribution of apps within the Android OS.  Okay?

4         What is your -- I don't understand.  What is your

5    definition of the relevant product market?

6              THE WITNESS:  So my relevant product market --

7              THE COURT:  Talk into the microphone so everybody can

8    hear you.

9              THE WITNESS:  Oh, sorry.

10        My relevant product market is the facilitation of digital

11   content transactions.

12   BY MR. ROCCA:

13   Q.   Professor, is that a --

14             THE COURT:  Facilitation?  What do you mean by that.

15             THE WITNESS:  So when I say "facilitation," I mean

16   making sure that these interactions between app developers and

17   app users go well.

18   BY MR. ROCCA:

19   Q.   Professor, before we move on from that topic, is it

20   possible for a relevant product market to cover a service?

21   A.   Yes, it can.

22   Q.   And in your opinion, is Google Play providing a service to

23   developers on the one hand and app users on the other hand?

24   A.   Yes, that's right.

25   Q.   And what is the service that Google Play is providing?

1   **A.**   So, again, it would be the service is the facilitation of

2   these digital content transactions which cover both paid and

3   nonpaid interactions.

4   **Q.**   Now let's turn to the geographic market.

5       What is your opinion with respect to the geographic

6   market?

7       **THE COURT:**   I'm sorry.   I'm going to have to go back

8   to my question.

9       Okay.   What is a digital content transaction?

10      **THE WITNESS:**   So a digital content transaction is

11  describing both -- so it's a way of getting the content out of

12  the app, that's the digital content, and then it's getting it

13  in the hands of the app user, and it covers both paid and

14  nonpaid types of transactions.

15      **THE COURT:**   Okay.

16      All right.   Go ahead.

17  **BY MR. ROCCA:**

18  **Q.**   Professor, let's talk about the geographic market.

19      What is your opinion with respect to the geographic

20  market?

21  **A.**   So my opinion of the geographic market is that it's the

22  United States.

23  **Q.**   And what is geographic market for the purposes of

24  antitrust market definition?

25  **A.**   So geographic market is another layer we economists put

1  onto market definition, is that we don't just think about the

2  product, which we've just been talking about, but we also

3  think:  Well, where are the reasonable substitutes

4  geographically for that product?

5  **Q.**  Can you please give the jurors an example from everyday

6  life of geographic market?

7  **A.**  Yes.  We heard one yesterday from Dr. Bernheim.  If you

8  remember, he was talking about supermarkets in

9  Southern California, Northern California.  They're probably not

10 reasonable substitutes.  You're not going to drive to a

11 Northern California one if you live in L.A.

12 **Q.**  Professor, your opinion here is that the geographic market

13 is the United States.  Why?

14 **A.**  Well, it goes back to this idea of reasonable substitutes.

15 And what I did in my analysis was I looked to see, well, are

16 other app stores in other countries really reasonable

17 substitutes for app users looking to have one of these

18 interactions with an app developer.

19 **Q.**  Professor, what is this demonstrative that you've prepared

20 for the jury to discuss this point?

21 **A.**  So this is actually a screenshot of the Korean One Store,

22 and what I want you to look at -- so the One Store is an app

23 store based out of Korea, and what I want you to do is take a

24 look at it and ask yourself:  How easy would it be for the

25 majority of American app users to use this as an alternative,

1    as a reasonable substitute for Google Play?

2    **Q.**   And from this example, what is your conclusion?

3    **A.**   Well, my conclusion is, no.  I mean, of course, there's a

4    small number of Americans who speak Korean; but even if you get

5    over the language barrier, to use this, you still have to have

6    an address in Korea, you know, a billing address, and be able

7    to use the currency and have Korean money.  It's going to

8    come -- it's going to be very hard to use.  It's not a

9    reasonable substitute for using an app store in America.

10   **Q.**   Beyond the Korean One Store, do you have other examples?

11   **A.**   Yes.  These are just screenshots from the Apple App Store

12   and the Google Play Store as it appears in Korea.  And, again,

13   you'll see there, you know, there may be reasonable

14   alternatives to the One Store; but, again, they're not a

15   reasonable alternative if you're thinking -- if you're based in

16   the U.S. and wanting to interact with an app developer.

17   **Q.**   So the plaintiff's experts just got this one wrong?

18   **A.**   Yes, they did.

19   **Q.**   As an economist, if Epic has not defined the proper

20   geographic market, has it defined an antitrust relevant market?

21   **A.**   No, they haven't.

22   **Q.**   All right.  Let's go to your third opinion, which states

23   Google does not have monopoly power.

24        First of all, what is monopoly power?

25   **A.**   Well, we've heard it a bit before, but basically I agree

1  with Dr. Bernheim that it is sustained and substantial market

2  power.

3  **Q.**   Is there a difference between monopoly power and market

4  power?

5  **A.**   Yes.  Again, monopoly power is substantial and sustained

6  market power.

7  **Q.**   If Google is trying to compete with Apple, does Google

8  have monopoly power?

9  **A.**   No, it doesn't.

10  **Q.**   Setting aside monopoly power, if Google is trying to

11  compete with Apple, does Google have enough market power to

12  cause harm to consumers?

13  **A.**   No, it doesn't.

14  **Q.**   Have you done a comparison of how Google and Apple are

15  doing in their competition?

16  **A.**   Yes, I have.

17  **Q.**   Let's look at that.  What is this demonstrative?

18  **A.**   So this is only looking at the Apple App Store and the

19  Google Play Store, but what it's illustrating is if you look at

20  them head to head in terms of the percentage of revenues

21  they're getting, then Google Play Store is lagging behind.

22  It's only getting 36 percent of revenues in the U.S.

23  **Q.**   And why is this significant from a perspective of monopoly

24  power?

25  **A.**   Again, because what you're asking is whether these

1  reasonable substitutes are, I think in Dr. Bernheim's words,

2  giving -- you know, allowing competitive discipline.  And when

3  you see, as we see here, something like the Apple App Store,

4  you know, just doing so much better than Google Play Store,

5  then that is competitive discipline.

6  Q.   If we look at this data worldwide but excluding China,

7  does -- what happens to the percentages?

8  A.   They shift a little bit.  Google -- the Google Play Store

9  goes up to 43 percent.

10 Q.   43 percent.  Would that change your opinion?

11 A.   No, it wouldn't.

12 Q.   Now, those charts just showed Google and Apple.  If Google

13 is competing against other platforms to facilitate transactions

14 between developers and users, how does that impact monopoly

15 power?

16 A.   So, again, for the same reason if, as we're seeing here,

17 all these reasonable alternatives that Android players are

18 using to buy their in-game currency, then, again, that is

19 competitive discipline which means there's not going to be

20 monopoly power.

21 Q.   Professor, this chart is limited to Android Fortnite

22 players.  Are there other Fortnite players?

23 A.   Yes, there are.

24 Q.   Have you looked at the data for all of the Fortnite

25 players beyond just Android?

TUCKER - DIRECT / ROCCA

1   **A.**   Yes, I have.

2   **Q.**   And what is this chart?

3   **A.**   Okay.  So this is looking -- you remember the first chart?

4   It was looking at people who'd actually opened up Fortnite on

5   their Android phone.

6        Now, if we look, though, at the universe of all people who

7   play Fortnite, we see that that's just a very small sliver of

8   what's going on.  And, indeed, Android is only 1 percent of

9   Epic's revenue from all Fortnite players.

10  **Q.**   What is the significance of this data?

11  **A.**   Well, again, it is important for thinking about reasonable

12  alternatives and why it is that when you see this sort of small

13  sliver of 1 percent of Android, again thinking:  Well, is

14  Google having to compete here?

15  **Q.**   And could you conclude from this data that Google Play is

16  a monopolist of anything?

17  **A.**   No.  It certainly not suggests that.

18  **Q.**   Now let's close out monopoly power by talking about the

19  factors that an economist might look to as evidence of a

20  monopolized market.  Okay?

21       What are the factors generally that you would consider?

22  **A.**   Well, we just heard those from Professor Gentzkow, but

23  what you look for is you look at price, you look at quality,

24  you look at output.

25  **Q.**   And we won't rehash.  Let's just start with output.

1      What is your conclusion about how output affects your

2   opinion on monopoly power?

3   **A.**   However you measure it, output has been exploding.

4   **Q.**   And is exploding output what you would expect to see if

5   Google had monopoly power?

6   **A.**   No.

7   **Q.**   How about innovation?  What did you find about innovation?

8   **A.**   When you look at innovation, these products have been

9   really improving over time.  So what I've observed is, you

10  know, a lot of incremental innovation.

11  **Q.**   And is increasing innovation the kind of thing you would

12  find if a market had been monopolized?

13  **A.**   No.

14  **Q.**   How about price?

15  **A.**   Well, we've heard this before, but prices, if anything,

16  have been going down for some app developers.

17  **Q.**   Now, is that consistent with what you would find in a

18  monopolized market?

19  **A.**   No.  In a monopolized market, you expect prices to be

20  going up and up.

21  **Q.**   Now, over time, has Google offered more services to users

22  and developers for the same or a lower price?

23  **A.**   That's exactly what it means to have lots of incremental

24  quality improvements and prices, if anything, to be going down.

25  **Q.**   Now, this is another demonstrative regarding platform fees

 1    by platform.  We've seen different versions of this.

 2         Generally speaking, what does this pricing level show to

 3    you as an economist about whether Google has monopoly power?

 4    A.   Well, again, when you look at this, you know, one thing

 5    you might expect to see is if a firm had monopoly power, is for

 6    its price to somehow be higher than everyone else, but that's

 7    not what we see here.

 8    Q.   Is Google's pricing competitive with other fees in the

 9    industry?

10    A.   Yes, it is.

11    Q.   Do you have an opinion as to whether Google is pricing its

12    services above competitive levels?

13    A.   I think this diagram makes it very clear they're not.

14    Q.   Now, the Epic Game Store you see is the last on the row,

15    and it has that one dot by itself?

16    A.   Yes.

17    Q.   Do -- does that have any significance to you as an

18    economist that the Epic Game Store is charging, I think,

19    12 percent as shown on this slide?

20    A.   Well, I mean, I always put it in the context of what

21    Dr. Bernheim acknowledged yesterday, which is the Epic Game

22    Store is losing money.  So I think you have to evaluate it in

23    that context.

24    Q.   Now, to close this out, Professor, is there anything else

25    about Google's business model that you find helpful to

1    considering the issue of monopoly power?

2    A.    Yes.

3    Q.    Have you looked at what percentage of apps that Google

4    distributes for free on the store?

5    A.    I have, yes.

6    Q.    And we've heard that testimony today already, but I'm

7    putting up a demonstrative.   What is this demonstrative?

8    A.    Okay.   This is just to remind us, ourselves, that when you

9    do the calculations and you look at apps, 96 percent of all

10   apps are not subject to Google's service fee.   They pay

11   nothing.

12   Q.    By the way, did you hear the testimony today from

13   Dr. Tadelis about the Amazon Marketplace at the very end of his

14   examination?

15   A.    Yes.

16   Q.    Do you know whether the Amazon Marketplace offers

17   96 percent of the transactions on that marketplace completely

18   free of charge?

19   A.    No, they definitely don't.

20   Q.    What is the economic rationale for Google to permit

21   developers to use its platform and not get any payment for it?

22   A.    Well, the reason it wants to give away all this stuff for

23   free is, remember, it's trying to make the Android attractive,

24   competitive with Apple.

25        And I can tell you, consumers love free stuff.   People

1  expect free apps, and so Google has this real incentive to try

2  and actually get a lot of free apps out there, allow customers

3  to try out apps, see if they like them, discover the value.

4  And that's what they're trying to do here to make their

5  ecosystem work.

6  **Q.**   Is it consistent with a monopoly to give away so much

7  value for free?

8  **A.**   It certainly would be very unusual.

9  **Q.**   And, finally, would it be common in your experience as an

10  economist for a monopolist to only make money when somebody

11  else makes money?

12  **A.**   No.  I mean, usually when you're thinking about monopoly

13  you're thinking about the extraction of money from consumers,

14  and instead what we're seeing here is that Google through

15  Android and Google Play are creating that value and only making

16  money once they've created that value.

17  **Q.**   And what does that say about whether Google is a

18  monopolist?

19  **A.**   Again, it's evidence against.

20        **MR. ROCCA:**  I pass the witness.

21        **THE COURT:**  Okay.  That's it for today.

22     So remember, as we always close each day, put everything

23  out of mind.  No research.  No thinking.  No talking about

24  this.

25     And we'll see you tomorrow morning at 9:00 a.m.

1        **THE CLERK:**  All rise.

2        (Proceedings were heard out of the presence of the jury:)

3        **THE COURT:**  All right.  You can step down.  You're

4   still under oath.  No communications with anyone about the

5   content or presentation of testimony.

6        Okay.  So what's happening?

7        You can go.

8        **MR. POMERANTZ:**  Your Honor, I think when

9   Professor Tucker is finished, it then turns to our case.  We

10  will be playing the two deposition excerpts from Activision and

11  Riot, which the jury's heard a lot about; and then we will turn

12  to our -- the first live witness of our case, which is

13  Rich Miner.  You heard about him in my opening.  And then we'll

14  move on to our other witnesses, and we feel like we are in a

15  position to get this done by Friday.

16       **THE COURT:**  Good.

17       **MR. BORNSTEIN:**  All we have, Your Honor, is, I'm a

18  broken record, a hope for the opportunity for rebuttal whether

19  it be at the conclusion of the week or if it needs to flop over

20  or sooner even.  We can do it back to back.

21       **THE COURT:**  How much time would you like to ask for?

22       **MR. BORNSTEIN:**  I would request a total of 45 minutes,

23  Your Honor.

24       **THE COURT:**  Well, let's just do it tomorrow and get it

25  over with.  All right?

 1          MR. BORNSTEIN:  Sure.

 2          MR. POMERANTZ:  Your Honor, we have had discussions

 3   about this rebuttal, and I did agree with Mr. Bornstein that --

 4          THE COURT:  I was told you all agreed.

 5          MR. POMERANTZ:  No, we did.  We did.  But the

 6   agreement was it would come at the end of our case, and that's

 7   what we would ask for, is that if they want the 45 minutes and

 8   Your Honor is okay with it, that it just come on Friday after

 9   we're done with our case so that we can put on our case next.

10   That was our agreement.

11          MR. BORNSTEIN:  That is what Mr. Pomerantz and I

12   discussed, but I'm -- however Your Honor wants to do it is

13   obviously what we'll do.

14          THE COURT:  Yes.  Okay.  That's fine.  Are you sure

15   you want to do that?

16          MR. POMERANTZ:  Yes, Your Honor.

17          THE COURT:  All right.  Okay.  We'll do it that way.

18   All right?

19          MR. BORNSTEIN:  Thank you, Your Honor.

20          THE COURT:  Okay.  That's great.

21      So we're going to have to start doing the jury

22   instructions soon.  You'll be closing on Monday the 11th.

23   Okay?  And we'll start talking tomorrow about the jury

24   instructions.

25      I do need a revised verdict form too.  So get that to me

1  tomorrow.  All right?  I'm going to have very limited

2  availability next week.  So get everything to me tomorrow, the

3  revised verdict form.  Okay?

4        **MR. BORNSTEIN:**  Yes, Your Honor.

5        **THE COURT:**  Now, where are you on -- okay.

6     We've seen a lot now.  Judgment day is coming.  Where are

7  you on settlement discussions?

8        **MR. BORNSTEIN:**  We're not, Your Honor.

9        **THE COURT:**  How can that be?  How would you not be

10  dual tracking this to try to reach an amicable agreement?

11        **MR. BORNSTEIN:**  I can have a conversation with my

12  client, Your Honor, but we have not had discussions.

13        **THE COURT:**  Okay.  You need to and you need to do that

14  next week.  All right?

15        **MR. BORNSTEIN:**  I will, Your Honor.

16        **THE COURT:**  Consider that a Court order.  All right?

17        **MR. BORNSTEIN:**  Understood.

18        **THE COURT:**  Now, we've talked about this before, but

19  what are you -- assuming you win -- I don't know, so don't

20  panic on the defense side.  I have no idea what the jury is

21  going to do.  I have no idea about posttrial proceedings.  If

22  you win, what are you planning to ask for?

23        **MR. BORNSTEIN:**  So, Your Honor, as we talked about a

24  little bit last time, the way we view it is there are three

25  main points.  One is to have the opportunity for Epic and for

1 other developers to have their own store without the various

2 restrictions and obstructions that have been the subject of

3 testimony.

4     **THE COURT:**  All right.  So they'll be freed from the

5 antisteering requirement.  Is that what you're talking about?

6     **MR. BORNSTEIN:**  Well, that's not what I'm talking

7 about right now, Your Honor.  The issue I'm talking about are

8 the downloading frictions that are disproportionate as you

9 heard Professor Mickens testify.

10     **THE COURT:**  Okay.  Eliminate the downloading

11 frictions.  They can operate an independent store.  They won't

12 be subject to antisteering requirements.

13   Okay.  What else?

14     **MR. BORNSTEIN:**  Correct.  And then there would be

15 freedom of payment options.  So what we're worried about,

16 Your Honor, is you've heard testimony about User Choice Billing

17 choice and the way it operates.

18     **THE COURT:**  When you say "freedom," do you mean

19 Google Play plus an alternative, like apparently is offered, or

20 you never mentioned Google Pay?

21     **MR. BORNSTEIN:**  Well, the real issue, Your Honor, is

22 at least to have the option to have an alternative.

23     **THE COURT:**  Okay.  That's already happening in some

24 instances; right?

25     **MR. BORNSTEIN:**  And to have -- well, it's a pilot

**PROCEEDINGS**

1   program.

2       But the other issue and it's not available --

3       **THE COURT:**  User Choice Program.  So that already

4   exists.  So you would like to be part of that program?

5       **MR. BORNSTEIN:**  No, Your Honor.  I'll be very clear.

6   First of all, it's a pilot program that's currently not

7   available for games and all of that.

8       But my problem with the program is the way the fees are

9   structured, as you heard in the testimony, creates no benefit

10  for those who choose to use an alternative platform because

11  they continue to be charged the 26 percent fee on top of

12  whatever it is that they need to pay for the process.

13      **THE COURT:**  You understand no matter what happens, I

14  and no federal judge is going to micromanage Google's business.

15  You know that.

16      **MR. BORNSTEIN:**  I do understand that.

17      **THE COURT:**  I am not going to set a fee for Google.

18  It's not going to happen.  So if you're worried about

19  26 percent, you've come to the wrong place because I can't help

20  you with that.

21      **MR. BORNSTEIN:**  I completely understand that,

22  Your Honor.  My full expectation is the expectation that the

23  antitrust laws are founded on; that if we remove the

24  obstructions to competition, Google will set a competitive fee.

25      **THE COURT:**  You need to tell me -- you should know by

1    now what are you going to ask for.  So you're going to ask for

2    what?  You want total freedom for your own billing system?  Is

3    that what you're going to ask for?

4              MR. BORNSTEIN:  That's correct, Your Honor.

5              THE COURT:  And what else?

6              MR. BORNSTEIN:  The freedom on stores, as I said, and

7    freedom on billing system; and the third pillar, the way we

8    have been talking about, is anticircumvention; just to ensure

9    that Google can't reintroduce the same problems through some

10   alternative creative solution, a standard kind of fence.

11             THE COURT:  Anticipatory injunctions are not going to

12   happen.  We don't do "Don't break the law injunctions."  We

13   don't do that.  So if you have a problem, you can come back,

14   but I can't -- I'm not going to write a menu of hypothetical

15   options that may or may not happen.

16             MR. BORNSTEIN:  I understand that, Your Honor.  We

17   would be --

18             THE COURT:  It sounds to me this is solvable.  Okay?

19   I haven't heard a word you said that is so unpalatable to

20   Google from the evidence I've seen that you-all can't be

21   talking.

22        This seems like something you ought to be able to do a

23   deal on.  They've done deals with Spotify.  Spotify pays

24   4 percent or 0 percent, has its own billing.

25        Okay, look, you're not going to get everything you want,

**PROCEEDINGS**

```
 1   and you need to be clear with your client about that who's
 2   sitting right behind you, that that's what's going to happen.
 3   Okay?
 4        So why don't you take that and do something with it.  This
 5   is a solvable business issue if you make it one.  You have to
 6   make it a solvable business issue.  I don't want to hear "We're
 7   not going to talk."  That's an inappropriate response.  Okay?
 8        So you're ordered to talk, and you do it substantively.
 9   Now, who do you want to have on your client side talking with
10   Mr. Bornstein's client?
11             MR. POMERANTZ:  I think we've had --
12             THE COURT:  I want to know the name.  Just tell me.
13   I'm past the point where I want this to happen without my
14   supervision.
15             MR. POMERANTZ:  Assuming he's available, Your Honor,
16   Don Harrison, who you've met.  He has led other discussions
17   with Epic.
18             MR. BORNSTEIN:  Your Honor, we did have a meeting at
19   the Court's order here in town.
20             THE COURT:  Now, why is he the right person?
21             MR. POMERANTZ:  He's in charge of the partnership
22   agreements of this type.
23             THE COURT:  He would be able to strike a deal?
24             MR. POMERANTZ:  He would have the authority to strike
25   the deal.
```

PROCEEDINGS

```
 1            THE COURT:  And who are you going to have on your

 2   side?

 3            MR. BORNSTEIN:  Mr. Sweeney.

 4            THE COURT:  All right.  You make that happen next

 5   week.  All right?  In-person meeting.  You both are going to be

 6   in town.  I want that to happen with this discussion in mind.

 7   Okay?

 8        Now, if you can't do it, you can't do it, that's fine, but

 9   you are going to try.  That is a requirement.  You must try.

10            MR. BORNSTEIN:  Understood, Your Honor.  We tried

11   once.  We will try again.

12            THE COURT:  Remember being 7 years old you had

13   broccoli, you had to take a bite.  You have to do that here.

14   All right?  You don't have to finish the whole plate, but you

15   are going to do it.

16        And you're both going to tell me, not the substance, I'm

17   not involved in that, but you're going to tell me some of the

18   mechanics about what's going on, how long you met, did you make

19   any progress, you know, things along those lines.  All right?

20        Okay.  All right.  We're good for tomorrow?

21            MR. BORNSTEIN:  I have one question, Your Honor.

22            THE COURT:  One question, yes.

23            MR. BORNSTEIN:  How long would Your Honor anticipate

24   giving us for closings in the event we don't reach a

25   resolution?
```

1           THE COURT:  Didn't I already -- I thought I already

2     set that.  Let me just check my order.

3           THE CLERK:  You did.  It's in the pretrial order.

4           THE COURT:  Didn't I give you an hour or something?

5           MR. BORNSTEIN:  I apologize, Your Honor.  Obviously if

6     it's in there, I have forgotten.

7           MR. POMERANTZ:  I did too because we discussed it this

8     morning, and neither one of us remembered.

9           THE COURT:  Let me just check.  I believe I gave

10    you --

11          THE CLERK:  One hour.

12          THE COURT:  -- one hour.

13          MR. POMERANTZ:  And, Your Honor, I understand that

14    Epic will have that one hour, they can split it however they

15    want between their closing and the rebuttal.

16          THE COURT:  Yes.

17          MR. BORNSTEIN:  You mean a rebuttal closing, not the

18    rebuttal testimony from our experts?

19          MR. POMERANTZ:  Correct.

20          MR. BORNSTEIN:  Okay.

21          THE COURT:  Yeah.  No, if you want to reserve time,

22    that's perfectly fine.

23          MR. BORNSTEIN:  Yes.

24          THE COURT:  But you get an hour total.

25        Where is that, Ms. Clark?

PROCEEDINGS

1    **THE CLERK:**  It's on page 4, Section 5.

2    **THE COURT:**  Page 4 of Docket 700?

3    **THE CLERK:**  Docket 491.

4    **THE COURT:**  Okay.  There it is.  Up to one hour for

5    closing.

6    Yeah, okay.  That should be more than enough.

7    All right.  So you're going to finish with this witness in

8    the morning?

9    **MR. BORNSTEIN:**  Correct.

10   **THE COURT:**  Okay.

11   **MR. BORNSTEIN:**  And then we'll hand it over to Google.

12   **THE COURT:**  You're going to finish with this witness

13   in the morning, and then you're going to do your thing.  Okay.

14   Good.

15   All right.

16   **MS. CHIU:**  Your Honor, just very quickly, if we may,

17   we have a third party whose deposition Google intends to play

18   tomorrow, and they have a sealing request.  Google has no

19   position on it, but I understand their counsel is here to

20   address Your Honor on it.

21   **THE COURT:**  Google has no position on it.  Okay.

22   Oh, is this -- who is this?

23   **MS. CHIU:**  This is Riot Games, Your Honor.

24   **THE COURT:**  Okay.  All right.  Yes.

25   **MR. BORNSTEIN:**  Just for the record, Your Honor, Epic

1   has no position on this either.

2         **THE COURT:**  Great.  Okay.

3         **THE CLERK:**  Counsel please state your name.

4         **MS. AMINIRAD:**  Shannon Aminirad.

5         **THE COURT:**  I have a 4:00 conference call so we're

6   going to have to be quick.

7        Okay.  Go ahead.

8         **MS. AMINIRAD:**  Shannon Aminirad, counsel for

9   Riot Games.

10       Your Honor, Riot Games filed an application to seal --

11        **THE COURT:**  Can you hand it to me?

12        **MS. AMINIRAD:**  Yes.  I have copies.  May I approach?

13        **THE COURT:**  Yes.

14       All right.  Let's just get to the punchline.  Which

15   document is it?

16        **MS. AMINIRAD:**  There are five exhibits.  They're all

17   internal documents, and they specifically discuss Riot's

18   negotiating strategy, and Riot is in the middle of negotiations

19   with the platform right now.

20        **THE COURT:**  I'm going to make life easy.  I'm going to

21   do the same thing I did for Spotify.  All right?  You have that

22   order.  It's on the transcript.

23       Any internal, purely internal, no.  Anything else, yes, it

24   will come in.  Okay?  So fees, whatever, that comes in.

25   Anything purely internal to Riot, you know, will not come in.

PROCEEDINGS

1    Look at the Spotify order.  That will give you the

2  paradigm.  That should do it; right?

3         **MS. AMINIRAD:**  Yes.  Thank you, Your Honor.

4       **THE COURT:**  Okay.  Thanks very much.  I'll see you in

5  the morning.

6       **THE CLERK:**  All rise.  Court is in recess.

7            (Proceedings adjourned at 3:51 p.m.)

8                 ---oOo---

9

10                **CERTIFICATE OF REPORTER**

11       I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:   Tuesday, November 28, 2023

15

16

17

18  _____

19       Kelly Shainline, CSR No. 13476, RPR, CRR
                U.S. Court Reporter

20

21

22

23

24

25