Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine Varney *(pro hac vice)*
cvarney@cravath.com
Gary A. Bornstein *(pro hac vice)*
gbornstein@cravath.com
Timothy G. Cameron *(pro hac vice)*
tcameron@cravath.com
Yonatan Even *(pro hac vice)*
yeven@cravath.com
Lauren A. Moskowitz *(pro hac vice)*
lmoskowitz@cravath.com
Justin C. Clarke *(pro hac vice)*
jcclarke@cravath.com
Michael J. Zaken *(pro hac vice)*
mzaken@cravath.com
M. Brent Byars *(pro hac vice)*
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**EPIC GAMES, INC.'S PROPOSED AMENDMENT TO PROPOSED VERDICT FORM**<br><br>Judge:  Hon. James Donato<br>Trial Date:  November 6, 2023<br>Time:  9:00 am<br>Place:  Courtroom 11, 19th Floor |

Epic Games, Inc. ("Epic") respectfully proposes one modest amendment to the Court's Proposed Verdict Form (Dkt. 851) to conform it to Epic's claims and theories of harm as well as the evidence adduced during trial.[1]  On page 4 of the Proposed Verdict Form, Question 5 describes the Project Hug agreements challenged by Epic as "Agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program".  Epic proposes that this description be modified to "Agreements with <u>app developers</u> under Google's Project Hug or Games Velocity Program".

Epic believes that this amendment is warranted because Epic's Section 1 Rule of Reason claims with respect to Project Hug do not depend solely on whether the counterparty app developer was an actual or potential competitor to Google.  Specifically, Epic advanced two theories of harm with respect to Project Hug agreements.  One theory of harm focused on Google entering agreements not to compete with three Hug developers that had voiced an intent to open their own Android mobile distribution platform—Activision Blizzard King, Riot and Supercell.  (Dkt. 378 (Epic's Complaint) ¶¶ 199-205.)  That theory of harm is reflected in the Proposed Verdict Form.  Under its Rule of Reason Section 1 claim, however, Epic also contended that Project Hug's sim-ship and content parity requirements, the existence of which Google does not dispute, prevent other Android app distribution platforms from competing effectively with the Google Play Store by depriving them of the ability to differentiate themselves through exclusive games and content from top developers.  As explained in Epic's complaint, "Google's agreements with top developers deprive competing Android app stores, including the Epic Games Store if it were to launch on Android, of inputs critical for success as a competing app distribution platform—for example, exclusive apps, content or other features from top developers."  (Dkt. 378 (Epic's Complaint) ¶ 213.)

Epic's claim that the Project Hug Agreements have harmed Epic and other potential app store competitors by depriving them of differentiating content was supported by ample evidence at trial:

---

[1] Like Proposed Verdict Form Question 5, Jury Instruction No. 27 (Dkt. 850 at 36) describes the Project Hug agreements as "alleged agreements with Google's alleged competitors or potential competitors (including Activision and Riot Games) under Google's Games Velocity Program or Project Hug".  Epic proposes that this description also be changed to "agreements with app developers under Google's Project Hug or Games Velocity Program".

- Epic witnesses testified that obtaining exclusive titles is critical to an emerging app store's success. (Trial Tr. 231:22-25 (Allison) ("[I]t was really important for us to get important games and strategic partnerships that players would be excited about exclusively for a timed exclusive period."); Trial Tr. 233:2-9 (Allison) ("[I]n order to build the business and get our players spending money, we needed to have some content you couldn't get anywhere else . . . . [C]onsoles have used timed exclusives as a business strategy to grow their platforms as well for decades, and we had never seen that in PC. So we also decided to pursue a very similar strategy."); Trial Tr. 236:6-12 (Allison) ("Q. If Steam had agreements in place with developers that prevented them from entering into exclusivity agreements with the Epic Game Store, how do you think that would have affected your ability to grow? A. Depending on the titles that those deals were for, we may not have gotten some of the key titles that were really important for our first couple of years.").)

- Google witnesses testified that a goal of Project Hug was to prevent competing app stores from obtaining exclusives. (Trial Tr. 442:23-443:15 (Koh) ("[Q. T]he developer who signed a Project Hug agreement could not launch either first or exclusively on any competing Android distribution platform; right? A. Yes. If they agreed to Project Hug, yes. . . . Q. It could have given [a competing] store a leg up on Google Play to have an exclusive popular game; right? A. Yes, and we could have lost – Google Play could have lost a lot of consumers by not having that content available."); *see also* Trial Tr. 1376:10-14 (Pichai) ("Q. And another way an app store could try to attract users and developers is to try to get exclusive content onto the store such that they are the only place that that user can go to get that content? A. Yes."); Trial Tr. 1105:16-20 (Kolotouros) ("[Q. [U]sers would switch to a new Android distribution channel if there was a strong draw of exclusive titles and/or a sustained pricing advantage; right? A. Yes.").)

- Professor Bernheim testified that the Project Hug agreements harmed competition by, among other things, preventing competing app stores from differentiating themselves

1   with exclusive content from key developers.  (*See* Trial Tr. 2401:19-22 ("[T]he Project
2   Hug agreements have provisions in them that prevent the competing app stores from
3   obtaining or even developing in cooperation with developers exclusive content that they
4   could offer [to differentiate themselves].").)

5 The proposed modified verdict form would allow the jury to consider both of Epic's theories of
6 anticompetitive conduct with respect to Project Hug.  Epic respectfully requests that the Court grant its
7 proposed modification.

| | | |
|---|---|---|
| 1 | DATED: December 7, 2023 | CRAVATH, SWAINE & MOORE LLP |

        Christine Varney *(pro hac vice)*
        cvarney@cravath.com
        Gary A. Bornstein *(pro hac vice)*
        gbornstein@cravath.com
        Timothy G. Cameron *(pro hac vice)*
        tcameron@cravath.com
        Yonatan Even *(pro hac vice)*
        yeven@cravath.com
        Lauren A. Moskowitz *(pro hac vice)*
        lmoskowitz@cravath.com
        Justin C. Clarke *(pro hac vice)*
        jcclarke@cravath.com
        Michael J. Zaken *(pro hac vice)*
        mzaken@cravath.com
        M. Brent Byars *(pro hac vice)*
        mbyars@cravath.com

FAEGRE DRINKER BIDDLE & REATH LLP
    Paul J. Riehle (SBN 115199)

Respectfully submitted,

By: */s/ Gary A. Bornstein*
    Gary A. Bornstein

*Counsel for Plaintiff Epic Games, Inc.*

**E-FILING ATTESTATION**

I, Gary A. Bornstein, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

                                        */s/ Gary A. Bornstein*
                                        Gary A. Bornstein