**Volume 17**

**Pages 3294 - 3442**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE           )
ANTITRUST LITIGATION,             )
                                  )  **NO. 21-md-02981-JD**
_____  )
THIS DOCUMENT RELATES TO:         )
                                  )
EPIC GAMES, INC.,                 )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )  **NO. 3:20-cv-05671-JD**
                                  )
GOOGLE, LLC., et al.,             )
                                  )
          Defendants.             )
_____  )


San Francisco, California

Monday, December 11, 2023


**<u>TRANSCRIPT OF PROCEEDINGS</u>**


STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

          CRAVATH, SWAINE & MOORE LLP
          825 Eighth Avenue
          New York, New York  10019
  BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
      **YONATAN EVEN, ATTORNEY AT LAW**
      **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
      **MICHAEL ZAKEN, ATTORNEY AT LAW**
      **ANDREW WIKTOR, ATTORNEY AT LAW**

For Defendants:

          MUNGER, TOLLES & OLSON LLP
          350 South Grand Avenue - 50th Floor
          Los Angeles, California  90071
  BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
      **KURUVILLA J. OLASA, ATTORNEY AT LAW**

          MUNGER, TOLLES & OLSON LLP
          601 Massachusetts Avenue NW
          Suite 500 East
          Washington, DC  20001
  BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
      **LAUREN BELL, ATTORNEY AT LAW**

          MORGAN, LEWIS & BOCKIUS LLP
          One Market - Spear Street Tower
          San Francisco, California  94105
  BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**

          MUNGER, TOLLES & OLSON LLP
          560 Mission Street - 27th Floor
          San Francisco, California  94105
  BY:  **JUSTIN P. RAPHAEL, ATTORNEY AT LAW**
      **KYLE W. MACH, ATTORNEY AT LAW**

# **I N D E X**

Monday, December 11, 2023 - Volume 17

|  | **PAGE** | **VOL.** |
|---|---|---|
| Jury Instructions | 3306 | 17 |
| Closing Argument by Mr. Bornstein | 3352 | 17 |
| Closing Argument by Mr. Kravis | 3386 | 17 |
| Rebuttal Argument by Mr. Bornstein | 3430 | 17 |
| Verdict | 3437 | 17 |

<u>**Monday - December 11, 2023**</u>                              <u>**8:35 a.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

(Proceedings were heard out of the presence of the jury:)

**THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc.
vs. Google LLC, and Multidistrict Litigation 21-2981, In re
Google Play Store Antitrust Litigation.

**MR. BORNSTEIN:**  Good morning, Your Honor.  Gary
Bornstein for Epic Games.

**MR. POMERANTZ:**  Good morning, Your Honor.  Glenn
Pomerantz on behalf of Google.

**THE COURT:**  Okay.  All right.  You're all set?

**MR. BORNSTEIN:**  Ready to go, Your Honor.

**THE COURT:**  Google?

**MR. POMERANTZ:**  Same here, Your Honor.

**THE COURT:**  Okay.

**MR. POMERANTZ:**  I do want to just tell you about what
we have agreed upon in terms of exhibits.

**THE COURT:**  Oh.  All right.

**MR. POMERANTZ:**  If this is the right time to do that,
I'd be happy to do so.

**THE COURT:**  Yeah.

**MR. POMERANTZ:**  So with respect to the exhibits
that -- the parties have been talking over the weekend and
worked things out at least between the two of us, and I just

1   want you to know what we're doing.

2        First, what's going to go to the jury?  What we've agreed

3   to is that the full copies of all of the exhibits are going

4   there with --

5             THE COURT:  Well, but I admitted a couple of things

6   only with one or two pages.

7             MR. POMERANTZ:  Correct.

8             THE COURT:  Okay.

9             MR. POMERANTZ:  And so as to those, I think what we've

10  decided is that's going to relate to the public record, but

11  that -- no.  I'm wrong.

12            THE COURT:  No.

13            MR. POMERANTZ:  Thank you.

14            THE COURT:  I admitted only the specific pages.

15            MR. POMERANTZ:  Yeah, okay.  As to those, they'll go

16  in that way.  I'm sorry.

17            THE COURT:  Just to be clear, nothing inadmitted will

18  go to the jury.  So if I --

19            MR. POMERANTZ:  Right.  Oh, yes.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  And then --

22            THE COURT:  You started to say that public-private.

23  No.  It's admitted, not admitted.

24            MR. POMERANTZ:  Was admitted will be going to the

25  jury.

 1          **THE COURT:**  But that and only that.

 2          **MR. POMERANTZ:**  And only that.

 3          **THE COURT:**  Yes.

 4          **MR. POMERANTZ:**  What will then be provided 10 days

 5     after the verdict, which is where I was going to next, whatever

 6     is provided to the jury is going to be made part of the court

 7     file.  So we'll obviously have that.

 8          There are five exhibits we are only --

 9          **THE COURT:**  10 days after the verdict?

10          **MR. POMERANTZ:**  That's the new local rule, Your Honor.

11          **THE COURT:**  No, I know, but that's -- okay.  All

12     right.  That's fine.

13          **MR. POMERANTZ:**  And then there are five exhibits,

14     which -- and only -- there's 311 admitted exhibits.  Five of

15     them are subject to an instruction the Court gave that only

16     those pages --

17          **THE COURT:**  Yes.

18          **MR. POMERANTZ:**  -- and those five exhibits, let me

19     just put them on the record so we have them, are 1492, 436,

20     1390, 5641, and 433.

21          Those we will only be putting on the public record the

22     pages that were actually shown in the courtroom and shown to

23     the jury, and I'm told that Epic does not oppose that.

24          Did I make a mistake?

25          **MR. EVEN:**  No, yeah, I don't think that's the exact

1    thing.

2        These are exhibits that I believe were introduced and

3    accepted into evidence in full.  My understanding is that

4    Google wants to file publicly only portions that were actually

5    shown in court.  We have no objection or really any position on

6    it, but we don't object to that if that makes --

7        **MR. POMERANTZ:**  Yeah, and maybe I wasn't clear,

8    Your Honor.  You said on page 576 that you don't have to file

9    the whole document, and then you said, "Just file whatever you

10   need," and what you didn't want was a whole bunch of

11   blacked-out pages.

12       **THE COURT:**  Right.

13       **MR. POMERANTZ:**  And so what we're going to do with

14   just five exhibits that are subject to your Court's guidance,

15   is we're just going to put the pages that were actually shown

16   to the jury, and that will resolve all of Google's sealing

17   motions.

18       **THE COURT:**  All right.  Good.

19       Okay?

20       **MR. EVEN:**  That's fine.

21       **THE COURT:**  Now, everything is loaded on the little

22   USB drive?

23       All right.  Good.

24       Okay.  Anything else?  Because I want to give you some

25   further dispositions on the verdict form.  Anything else?

1          **MR. POMERANTZ:**  No, Your Honor, not from us.

2          **THE COURT:**  Okay.

3      All right.  So we had some communications and filings last

4  week on the verdict form.  The final verdict form is now Docket

5  Number 861.  Rather than having you read tea leaves about what

6  I changed, let me be clear.

7      So with respect to Google's concern for Question 1 about

8  the addition of the use of anticompetitive conduct, as you saw,

9  I accepted that.  So both -- so Question 1 and Question 3 I

10  think now both say "By engaging in anticompetitive conduct..."

11      I also, in response to Google's observation, I moved up

12  the relevant market definition.  It makes perfect sense.  If

13  there's no relevant market, they should stop.  It shouldn't be

14  the other way around; find liability first and then the

15  essential element of a relevant market.  So that's up.

16      With respect to giving the jury some flexibility as the

17  finders of fact with respect to relevant product and geographic

18  market, *Epic v. Apple*, 67 F.4th 946, teaches that the finder of

19  fact needs to have some discretion in determining the market

20  definition.  It shouldn't just be "check the box."

21      So the jury will have that discretion.  Now whether that's

22  ultimately supported by substantial evidence, we'll see; but in

23  the first instance, the jury has the absolute right to

24  determine for itself as the finder of fact what the relevant

25  product and geographic markets should be.

1          With respect to the request by Google that each and every

2     element of every antitrust claim should be spelled out on the

3     jury form, that is denied.  Federal Rule of Civil Procedure 49

4     allows the use of a general verdict; nothing more is required.

5          Under governing law, any verdict that is reached is

6     assumed to have found all factual elements in support of that

7     verdict.  Nothing more is required.

8          Obviously if there are clear inconsistencies, we can take

9     that up later; but breaking the myriad of antitrust elements

10    down into individual inquiries is neither required nor is it

11    practicable or a good thing to do.  It's just going to end up

12    in an incomprehensible jury form.

13         With respect to Google's suggestion that the DDA is being

14    used twice, Epic has demonstrated that there are, in fact, two

15    separate claims for the DDA for the jury to consider, and so

16    they will be asked about the DDA as the verdict form lays out.

17         Let's see, with respect to the agreements generally, the

18    verdict form does adequately require details on relevant

19    markets and unlawful agreements.  That's all that's necessary

20    for a finding in Epic's favor on those points.

21         Breach of counterclaim.  They're going to be told that

22    Epic breached and it's in the amount of -- what is it? --

23    $398,000.  There's really nothing for the jury to do, so I'm

24    not going to ask the jury to do something that there is nothing

25    for them to render a verdict on.

1     With respect to Epic's concern about changing the

2   description of Project Hug to "app developers," now you-all

3   were the ones who initially said "competing" --

4   "competitors" -- okay? -- in your initial version of the

5   verdict.  So also "competition" captures what we're doing here

6   under the antitrust laws.  So that's why I declined to change

7   the agreements to "app developers" as opposed to "Google's

8   alleged competitors" or "potential competitors."

9     Oh, also with respect to the sim ship and content parity

10   requirements, that too needs to be spelled out as an element of

11   competition.  You can have a myriad of contract agreements that

12   may be restrictive but they're not anticompetitive, so that's

13   why I kept it that way.

14     You had a rather finely tuned point about flipping the

15   order of Play Store and Play Billing and the tying question.

16   I've declined to do that because the way I structured it now is

17   consistent with the ABA model instruction, and it just seems

18   plain as day what the tying product is and what the tied

19   product is, and I'm sure in your closing arguments you'll be

20   arguing that as well.

21     Okay.  So that's it.  The jury is trickling in.  We'll

22   have about 15 more minutes, and I'll read the instructions and

23   we'll close.

24     Now, I am going to lock the courtroom.  This is our

25   tradition in federal court during the reading of the jury

 1    instructions.  So stay seated.  Everybody who's here, stay

 2    seated.  There will be nobody going in and out.  And I estimate

 3    it will probably take about 45 minutes to get through those.

 4        Okay?  So I'll see you then.

 5            **THE CLERK:**  All rise.

 6                    (Recess taken at 8:44 a.m)

 7                    (Proceedings resumed at 9:08 a.m)

 8        (Proceedings were heard out of the presence of the jury:)

 9            **THE COURT:**  We all set?

10            **MR. BORNSTEIN:**  Yes, Your Honor.

11            **THE COURT:**  Let's bring out the jury, please.

12        (Proceedings were heard in the presence of the jury:)

13            **THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc.

14    vs. Google LLC, and Multidistrict Litigation 21-2981, In re

15    Google Play Store Antitrust Litigation.

16        Counsel.

17            **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

18    Bornstein for Epic Games.  I'm joined today by Allison Tilden,

19    Michael Zaken, Andrew Wiktor, Lauren Moskowitz, and Yonatan

20    Even.

21            **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

22    Pomerantz on behalf of Google, and with me here today are Kyle

23    Mach, Lauren Bell, Lara Kollios, Michelle Park Chiu, and

24    Jonathan Kravis, and Justin Raphael and Kuru Olasa.

25            **THE COURT:**  Okay.  All right.  Welcome back, members

**PROCEEDINGS**

1    of the jury.  I'm going to -- we're going to have a short

2    morning this morning in the sense that I'm going to read the

3    jury instructions and then we're going to do closing.  I expect

4    the case to be in your hands by noon, maybe a little before,

5    maybe slightly after.

6        And as we discussed before the break, we are going to have

7    9:00 to 5:00 days now until you reach a verdict.  All right?

8    If you need to stay later, of course you can do that, but just

9    plan on stay 9:00 to 5:00 until you reach a verdict.

10       So Ms. Clark is going to hand you the jury instructions to

11   follow along.

12       Now, our tradition in federal court is to seal the

13   courtroom so there are no distractions of people coming in and

14   out while I read the jury instructions.  And as we did at the

15   beginning of the case when I read the preliminary instructions

16   to you, it's very important that you just clear your mind.  You

17   can certainly read along as I'm reading or you can just listen

18   to what I'm reading.  Either way, though, this is a time for

19   you to pay maximum attention to these instructions.  They're

20   going to govern your deliberations and guide you in reaching

21   the verdict.  All right?

22       Now, they are a little bit on the long side so plan about

23   35 to 40 minutes to do this; and after that, we'll stretch a

24   little bit and go right into closings.

25       So is the courtroom sealed, Ms. Clark?

 1          **THE CLERK:**  The doors are locked, Your Honor.

 2          **THE COURT:**  Thank you.

 3      Okay.  Everybody set?  All right.

 4          **THE COURT:**  Instruction 1, Duty of the Jury.  Members

 5  of the jury, now that you have heard all of the evidence, it is

 6  my duty to instruct you on the law that applies in this case.

 7  You have each been given a copy of these instructions to refer

 8  to during your deliberations.

 9      It is your duty to find the facts from all of the evidence

10  in the case.  To those facts you will apply the law as I give

11  it to you.  You must follow the law as I give it to you whether

12  you agree with it or not.  You must not be influenced by any

13  personal likes or dislikes, opinions, prejudices, or sympathy.

14  You should also not be influenced by any person's race, color,

15  religion, national ancestry, or gender.

16      All of this means is that you must decide the case solely

17  on the evidence before you, and please keep in mind you took an

18  oath to do so.

19      Do not read into these instructions, or anything I may say

20  or do or did or said during trial, that I have an opinion about

21  the evidence or what your verdict should be.  That is for you

22  to decide.

23      I will give you a brief summary of the position of the

24  parties.

25      The plaintiff, as you know, is Epic Games.  The defendants

1   are Google LLC and certain of its affiliates, which we've been

2   calling Google collectively.

3       Epic contends that defendant Google has violated federal

4   and state antitrust laws through a variety of means that

5   foreclose competition in an alleged market for Android app

6   distribution and in an alleged market for in-app billing

7   services on Android devices.

8       Epic alleges that Google's conduct harms mobile app

9   developers and consumers by increasing prices and reducing

10  quality and innovation.

11      Google denies Epic's claims.

12      Google contends that the relevant market is not limited to

13  Android but also includes Apple's iOS and other platforms

14  where users and developers can engage in transactions for

15  digital content.

16      Google also contends that its conduct has not foreclosed

17  competition but rather has promoted competition by enabling

18  Android to compete with iOS and other platforms.  Google

19  contends that its conduct benefited users and developers.

20      Now, Google has also brought a counterclaim against Epic

21  alleging that Epic breached the Developer Distribution

22  Agreement called the DDA.  Epic and Google have now stipulated

23  to the following:

24      One, Epic incorporated its own payment solution into

25  Fortnite on Google Play as an alternative to Google Play

1    Billing which violated the terms of the DDA.

2        Two, Epic did not pay Google the amount of $398,931.23 in

3    fees that Google would have received if transactions processed

4    using Epic's payment solution were used instead -- were instead

5    processed through Google Play Billing.

6        So on the basis of these stipulations, you will no longer

7    be asked to address Google's counterclaim.

8        Corporations and Fair Treatment.  The parties in this case

9    are corporations.  All parties are equal before the law, and a

10   corporation is entitled to the same fair and conscientious

11   consideration by you as any party.

12       Under the law, a corporation is considered to be a person.

13   It can only act through its employees, agents, directors, or

14   officers; therefore, a corporation is responsible for the acts

15   of its employees, agents, directors, and officers performed

16   within the scope of their authority.

17       An act is within the scope of a person's authority if it

18   is within the range of reasonable and foreseeable activities

19   that an employee, agent, director, or officer engages in while

20   carrying out that person's business.

21       Now, the evidence you are to consider in deciding what the

22   facts are consists of, one, the sworn testimony of any witness;

23   two, the exhibits that are admitted into evidence; three, any

24   facts to which the lawyers have agreed; and, four, any facts

25   that I may instruct you to accept as proved.

1    Now, in reaching your verdict, you may consider only the

2  testimony and exhibits received into evidence, any facts to

3  which the lawyers have agreed, and any facts that I may

4  instruct you to accept as proved.

5    Certain things are not evidence and you may not consider

6  them in deciding what the facts are.  I will tell you what

7  those things are.

8    One, arguments and statements by lawyers are not evidence.

9  The lawyers are not witnesses.  What they have said in their

10  opening statements, closing arguments, and at other times is

11  intended to help you interpret the evidence but it is not

12  evidence.  If the facts as you remember them differ from the

13  way the lawyers have stated them, your memory controls.

14    Two, questions and objections by lawyers are not evidence.

15  Attorneys have a duty to their clients to object when they

16  believe a question is improper under the rules of evidence.

17  You should not be influenced by the objection or the Court's

18  ruling on it.

19    Three, testimony that was excluded or stricken or that you

20  may have been instructed to disregard is not evidence and must

21  not be considered.  In addition, some evidence was received

22  only for a limited purpose; and when I have instructed you to

23  consider certain evidence only for a limited purpose, you must

24  do so and you may not consider that evidence for any other

25  purpose.

1      Four, anything that you may have seen or heard when court

2  was not in session is not evidence.  You are to decide the case

3  solely on the evidence received at trial.

4      Now, evidence may be direct or circumstantial.  Direct

5  evidence is direct proof of a fact such as testimony by a

6  witness about what that witness personally saw or heard or did.

7  Circumstantial evidence is proof of one or more facts from

8  which you could find another fact.  You should consider both

9  kinds of evidence.  The law makes no distinction between the

10  weight to be given to either direct or circumstantial evidence.

11  It is for you to decide how much weight to give any evidence.

12      Now, there are rules of evidence that control what can be

13  received into evidence.  When a lawyer asked a question or

14  offered an exhibit into evidence and a lawyer on the other side

15  thought that it was not permitted by the rules of evidence,

16  that lawyer objected.  If I overruled the objection, the

17  question was answered or the exhibit received.  If I sustained

18  the objection, the question was not answered or the exhibit was

19  not received.

20      Whenever I sustained an objection to a question, you must

21  ignore the question and must not guess what the answer might

22  have been.  Now, sometimes I ordered you to disregard or ignore

23  that evidence.  That means that when you are deciding the case,

24  you must not consider the stricken evidence for any purpose.

25      Now, during the trial, you heard testimony by witnesses in

1   the form of previously recorded trial and deposition testimony

2   rather than live here in court.  A deposition is the sworn

3   testimony of a witness taken before trial.  The witness was

4   placed under oath to tell the truth and lawyers for each side

5   asked questions.  The questions and the answers were recorded.

6   Insofar as possible, you should consider deposition testimony

7   presented to you in court in lieu of live testimony in the same

8   way as if the witness had been present to testify.

9       On deciding the facts in the case, you may need to decide

10  which testimony to believe and which testimony not to believe.

11  You may believe everything a witness said or part of it or none

12  of it.  In considering the testimony of any witness, you may

13  take into account the opportunity and ability of the witness to

14  see or hear or know the things testified to; the witness'

15  memory; the witness' manner while testifying; the witness'

16  interest in the outcome of the case, if any; the witness' bias

17  or prejudice, if any; whether other evidence contradicted the

18  witness' testimony; the reasonableness of the witness'

19  testimony in light of all the evidence; and any other factors

20  that bear on believability.

21      Now, sometimes a witness may have said something that is

22  not consistent with something else he or she said.  Sometimes

23  different witnesses gave different versions of what happened.

24  People often forget things or make mistakes in what they

25  remember.  Also, two people may see the same event but remember

1   it differently.  You may consider these differences, but do not

2   decide that testimony is untrue just because it differs from

3   other testimony.  However, if you decide that a witness has

4   deliberately testified untruthfully about something important,

5   you may choose not to believe anything that witness said.  On

6   the other hand, if you think the witness testified untruthfully

7   about some things but told the truth about others, you may

8   accept the part you think is true and ignore the rest.

9       The weight of the evidence as to a fact does not

10  necessarily depend on the number of witnesses who testify.

11  What is important is how believable the witnesses were and how

12  much weight you think their testimony deserves.

13      Now, you heard testimony from expert witnesses who

14  testified to opinions and the reasons for their opinions.  This

15  opinion testimony was allowed because of the education or

16  experience of the expert witness.  Such opinion testimony

17  should be judged like any other testimony.  You may accept it,

18  reject it, or give it as much weight as you think it deserves

19  considering the witness' education and experience, the reason

20  given for the opinion, and all the other evidence in the case.

21      Now, during trial, certain charts and summaries were shown

22  to you in order to help explain the content of books, records,

23  documents or other evidence in the case.  Some of those charts

24  or summaries may have been admitted into evidence while others

25  were not.  Charts and summaries are only as good as the

1  evidence supporting them.  You should, therefore, give them

2  only such weight as you think the evidence supporting them

3  deserves.

4      Now, the parties have agreed to certain facts, and I'm

5  going to read these to you now.  You must treat these facts as

6  having been proved.  You don't have to worry about making a

7  decision.  These are carved in stone.

8      1, Google LLC is a wholly owned subsidiary of Alphabet

9  Inc.

10     2, Google offers various products and services including

11 Android OS, Chrome, Gmail, Drive, Maps, Play, Search, YouTube,

12 Google Cloud, and Search Ads 360.

13     3, a mobile operating system called OS provides

14 multipurpose computing functionality to a mobile device such as

15 a smartphone or a tablet.

16     4, to be useful to consumers, a mobile OS must be able to

17 run software applications or apps.

18     5, a mobile OS facilitates the use of apps through code,

19 such as application programming interfaces, also known as APIs,

20 which app developers use to create apps that are compatible

21 with the OS.

22     6, an app is software separate from the mobile OS that

23 runs on a mobile device and adds specific functionalities to a

24 mobile device.

25     7, consumers use apps to perform a variety of tasks on

their mobile devices.

8, entities that manufacture mobile devices, such as Samsung or Motorola, are referred to as original equipment manufacturers or OEMs.

9, OEMs preinstall an OS on the mobile devices that they manufacture and sell.

10, instead of developing their own OS, almost all OEMs today license a third party's OS for their devices.

11, Apple does not license iOS to other OEMs.

12, the Google Play Store is an app store owned by Google that distributes apps on devices running the Android OS.

13, to distribute an app on the Google Play Store, app developers must first enter into Google's Developer Distribution Agreement, which we've called the DDA.

14, the predecessor to the Play Store was called Android Market.

15, Google acquired the Android mobile operating system in 2005.

16, Google launched Android Market in October 2008.

17, Google launched its in-app billing service in 2011.

18, Google's Android Market app store was rebranded as the Google Play Store in March 2012.

19, Tim Sweeney is Epic Games controlling shareholder, CEO, and board chairman.

20, in April 2020, Epic made the decision to make Fortnite

1  available for download through the Play Store.

2      21, Epic executed Google's DDA.

3      22, Epic incorporated its own payment solution into

4  Fortnite on Google Play as an alternative to Google Play

5  Billing, which violated the terms of the DDA.

6      23, Epic did not pay Google $398,931.23 in fees that

7  Google would have received if transactions processed using

8  Epic's payment solution were instead processed through

9  Google Play Billing.

10      And, 24, on August 13, 2020, Epic filed its complaint in

11  this case against Google.

12      You have seen evidence that Google Chat communications

13  were deleted with the intent to prevent their use in

14  litigation.  You may infer that the deleted Chat messages

15  contained evidence that would have been unfavorable to Google

16  in this case.

17      Let's talk about the burden of proof now for the claims.

18  When a party has the burden of proving any claim or affirmative

19  defense by a preponderance of the evidence, it means you must

20  be persuaded by the evidence that the claim or affirmative

21  defense is more probably true than not true.  You should base

22  your decision on all of the evidence regardless of which party

23  presented it.

24      Now, the purpose of the antitrust laws and the Sherman Act

25  is to preserve free and unfettered competition in the

1   marketplace.  The Sherman Act rests on the central premise that

2   competition produces the best allocation of our economic

3   resources, the lowest prices, the highest quality, and the

4   greatest material progress.

5        Now, Epic brings two types of antitrust claims, which I

6   will now explain.

7        First, the antitrust laws prohibit companies from

8   willfully acquiring or maintaining monopolies in relevant

9   markets through anticompetitive conduct.

10       Second, the antitrust laws prohibit contracts or

11  agreements that unreasonably restrain competition.

12       I will first explain Epic's monopolization claims under

13  Section 2 of the federal Sherman Antitrust Act.

14       Epic alleges that it was injured by Google's unlawful

15  monopolization of two alleged markets.  Epic alleges that those

16  markets are, one, an Android app distribution market; and, two,

17  a market for Android in-app billing services for digital goods

18  and services and transactions.

19       To prevail on a claim that Google has monopolized an

20  alleged relevant market, Epic must prove each of the following

21  elements by a preponderance of evidence for that market:

22       One, that the alleged relevant market is a valid antitrust

23  market.

24       Two, that Google possesses monopoly power in the alleged

25  relevant market.

1    Three, that Google willfully acquired or maintained its

2    monopoly power in the alleged relevant market by engaging in

3    anticompetitive conduct.

4    And, four, that Google was injured in its business or

5    property because of Google's -- sorry -- that Epic was injured

6    in its business or property because of Google's anticompetitive

7    conduct.

8    If you find that Epic has failed to prove any of these

9    elements with respect to either market, then you must find for

10   Google and against Epic on the claim for unlawfully

11   monopolizing that market.

12   If you find that Epic has proven each of these elements by

13   a preponderance of the evidence for either market, then you

14   must find for Epic and against Google on the claim for unlawful

15   monopolizing that market.

16   Now, to prove a monopolization claim, Epic must prove that

17   Google has monopoly power in a relevant antitrust market.

18   Monopoly power is the power to control prices, restrict output,

19   or exclude competition in a relevant antitrust market.  More

20   precisely, a firm is a monopolist if it can profitably raise or

21   maintain prices substantially above or reduce or maintain

22   quality substantially below the competitive level for a

23   significant period of time.  However, possession of monopoly

24   power in and of itself is not unlawful.

25   I will provide further instructions to you about how you

 1   may determine whether Epic has met its burden of proving

 2   monopoly power in a relevant market.  We're going to start with

 3   the relevant product market.

 4        In this case, Epic contends that there are two different

 5   relevant product markets:  An Android app distribution market

 6   and a market for Android in-app billing services for digital

 7   goods and services and transactions.

 8        You should consider whether Epic has proven by a

 9   preponderance of the evidence either or both of the markets it

10   has alleged.

11        Now, in determining the relevant market the, quote, "area

12   of effective competition," close quote, must be determined by

13   reference to, one, a product market; and, two, a geographic

14   market.

15        In determining the product market, the basic idea is that

16   the products within it are interchangeable as a practical

17   matter from the buyer's point of view.  This does not mean two

18   products must be identical to be in the same relevant market.

19   It means they must be, as a matter of practical fact and the

20   actual behavior of consumers, meaning in this case users and

21   developers, substantially or reasonably interchangeable to fill

22   the same consumer needs or purposes.

23        Two products are within a single market if one item could

24   suit buyer's needs substantially as well as the other.  What

25   you are being asked to do is to decide which products compete

1   with each other.

2       The parties contend that one or more markets alleged in

3   this case are markets for two-sided platforms.  In a two-sided

4   platform market, a platform offers services or -- products or

5   services to two different groups who both depend on the

6   platform to intermediate between them.

7       For example, an app store connects app developers who wish

8   to sell their apps and consumers that wish to buy those apps.

9   In this example, app developers may be one side of the market

10  and consumers may be the other side of the market, and each are

11  receiving services from the app store.

12      In order to define a relevant market involving a two-sided

13  platform, you must take into account consumers on both sides of

14  the market; in this case, both users and developers.

15      Now, the relevant geographic market is the area in which

16  Google faces competition from other firms that compete in the

17  relevant product markets and to which consumers can reasonably

18  turn for purchases.

19      When analyzing the relevant geographic market, you should

20  consider whether changes in prices or product quality in one

21  geographic area would have a substantial effect on prices or

22  sales in another geographic area, which would tend to show that

23  both areas are in the same relevant geographic market.

24      A geographic market may be as large as global or

25  nationwide or as small as a single town or neighborhood.

1    Now, Epic has the burden of proving the relevant

2  geographic market by a preponderance of the evidence.  In this

3  case, Epic claims that the relevant geographic market is

4  worldwide, excluding China.

5    In determining whether Epic has met its burden and

6  demonstrated that its proposed geographic market is proper, you

7  may consider several factors, including the geographical area

8  in which Google sells and where Google's customers are located;

9  geographic area to which Google's customers turn or can turn

10  for supply of the product; geographic area in which Google's

11  customers have turned or have seriously considered turning; the

12  geographic areas that Google's customers view as potential

13  sources of competition; and whether governmental licensing

14  requirements, taxes, or quotas have the effect of limiting

15  competition in certain areas.

16    If you determine that any of Epic's alleged markets are

17  two-sided markets, then you should consider both sides of that

18  market in determining the relevant geographic scope of that

19  two-sided market.

20    Now, if you find that Epic has proven a relevant market,

21  then you should determine whether Google has monopoly power in

22  that market.  You can consider two types of proof to determine

23  whether Google has monopoly power.  One, direct proof; and,

24  two, indirect proof.  I will explain these to you in the

25  following instructions.

1      Let's start with direct proof.  There are two ways to

2  provide direct proof of monopoly power:  Raising or maintaining

3  prices above competitive levels.  In order to provide direct

4  proof of monopoly power, Epic has the burden of proving that

5  Google has the ability to raise or maintain the prices that it

6  charges for goods or services in the relevant market above

7  competitive levels or to reduce or maintain the quality of

8  goods and services in the relevant market below competitive

9  levels.

10      Epic must prove that Google has the power to do so by

11  itself; that is, without the assistance of and despite

12  competition from any existing or potential competitors.

13      Epic also has the burden of proving that Google has the

14  power to maintain prices above a competitive level or quality

15  below a competitive level for a significant period of time.  If

16  Google attempted to maintain prices above competitive levels or

17  reduce quality below competitive levels but would lose so much

18  business to other competitors that the price increase or

19  quality reduction would become unprofitable and would have to

20  be withdrawn, then Google does not have monopoly power.

21      Power to Exclude Competition.  In the alternative, in

22  order to provide direct proof of monopoly power, Epic must

23  prove that Google has the ability to exclude competition.  For

24  example, if Google attempted to maintain prices above

25  competitive levels or reduce quality below competitive levels

but knew competitors could enter the market, relevant market,

or existing competitors could expand their sales and take so

much business that the price increase or quality reduction

would become unprofitable and would have to be withdrawn, then

Google does not have monopoly power.

    The ability to earn high profit margins or a high rate of

return does not necessarily mean that Google has monopoly

power.  Other factors may enable a company without monopoly

power to sell at higher prices or earn higher profit margins

than its competitors; such as superior products or services,

low costs, or superior advertising or marketing.

    However, an ability to sell at higher prices or earn

higher profit margins than other companies for similar goods or

services over a long period of time may be evidence of monopoly

power.

    By contrast, evidence that Google would lose a substantial

amount of sales if it raised prices or reduced quality

substantially or that Google's profit margins were low compared

to its competitors or that Google's profit margins go up or

down or are steadily decreasing might be evidence that Google

does not have monopoly power.

    Let's talk about indirect proof.  Epic may prove Google's

monopoly power indirectly.  I instructed you earlier monopoly

power is the power to control prices and exclude competition in

a relevant antitrust market.  Epic has introduced evidence of

1   the structure of their proposed relevant markets to show that

2   Google has monopoly power.

3       The evidence presented by the parties includes evidence of

4   Google's market share, market share trends, barriers to entry

5   and exit by other companies, and the number and size of other

6   competitors.

7       If this evidence establishes that Google has the power to

8   control prices and exclude competition in a relevant antitrust

9   market, then you may conclude that Google has monopoly power in

10  that market.

11      Let's talk about market share.  The first factor that you

12  should consider is Google's share of a relevant market.  Based

13  on the evidence that you have heard about Google's market

14  shares, you should determine Google's market share as a

15  percentage of total sales in the relevant market.  Google must

16  have a significant share of the market in order to possess

17  monopoly power.

18      In evaluating whether the percentage of market share

19  supports a finding of monopoly power, you should also consider

20  other aspects of the relevant market, such as market share

21  trends; the existence of barriers to entry, that is, how

22  difficult is it for other producers to enter the market and

23  begin competing with Google for sales; the entry and exit by

24  other companies; and the number and size of competitors.

25      Along with Google's market share, these factors should

1  inform you as to whether Google has monopoly power.  The higher

2  the company share, the higher the likelihood that a company has

3  monopoly power.

4      Now, with respect to market trends, the trend in Google's

5  market share is something you may consider.  An increasing

6  market share may strengthen an inference that a company has

7  monopoly power particularly where that company has a high

8  market share while a decreasing share might show that a company

9  does not have monopoly power.

10     And with respect to barriers of entry, you may also

11  consider whether there are barriers to entry in the relevant

12  market.  Barriers to entry make it difficult for new

13  competitors to enter the market in a meaningful and timely way.

14     Barriers to entry might include intellectual property

15  rights, such as patents or trade secrets; the large financial

16  investment required to build a plant required to satisfy

17  government regulations; specialized marketing practices; and

18  the reputation of the companies already participating in the

19  market or the brand name recognition of their products.

20     Evidence of low or no entry barriers may be evidence that

21  Google does not have monopoly power regardless of Google's

22  market share because new competitors could enter easily if

23  Google attempted to raise prices for a substantial period of

24  time.  By contrast, evidence of high barriers to entry along

25  with high market share may support an inference that Google has

1   market power.

2        Now, the history of entry and exit in the relevant market

3   may be helpful for you to consider.  Entry of new competitors

4   or expansion of existing competitors may be evidence that

5   Google lacks monopoly power.  On the other hand, departures

6   from the market or the failure of firms to enter the market,

7   particularly if prices and profit margins are relatively high,

8   may support an inference that Google has monopoly power.

9        You may consider whether Google's competitors are capable

10  of effectively competing.  In other words, you should consider

11  whether the financial strength, market shares, and number of

12  competitors to act as a check on Google's ability to raise

13  prices of its products.  If Google's competitors are vigorous

14  or have large or increasing market shares, this may be evidence

15  that Google lacks monopoly power.  On the other hand, if you

16  determine that Google's competitors are weak or have small or

17  declining market shares, this may support an inference that

18  Google has monopoly power.

19       Now, if you find that Google has monopoly power in a

20  relevant market, then you must consider the remaining elements

21  of Epic's claim for monopolization of that market.

22       If you find that Google does not have monopoly power in

23  any relevant market, then you must find for Google and against

24  Epic on the claim for monopolizing that market.

25       Now, to prove the monopolization claims, Google must prove

1   that -- I'm sorry -- Epic must prove that Google willfully

2   acquired or maintained monopoly power through anticompetitive

3   acts or practices.

4        Anticompetitive acts are acts other than competition on

5   the merits that have the effect of preventing or excluding

6   competition or frustrating the efforts of other companies to

7   compete for customers within the relevant market.

8        Harm to competition is to be distinguished from harm to a

9   single competitor or group of competitors which does not

10   necessarily constitute harm to competition.

11        Some examples of harm to competition include increased

12   prices, decreased production levels, and reduced quality.  In

13   evaluating alleged harm on a market that you have found to be

14   two-sided, you must consider whether there is harm to the

15   two-sided market as a whole.

16        Mere possession of monopoly power if lawfully acquired

17   does not violate the antitrust laws.  The acquisition or

18   maintenance of monopoly power by supplying better products or

19   services, possessing superior business skills, or because of

20   luck is not unlawful.

21        A monopolist may compete aggressively without violating

22   antitrust laws and a monopolist may charge monopoly prices

23   without violating the antitrust laws.  A monopolist's conduct

24   only becomes unlawful when it involves anticompetitive acts.

25        The difference between anticompetitive conduct and conduct

1   that has a legitimate business purpose can be difficult to

2   determine.  This is because all companies have a desire to

3   increase their profits and increase their market share.  These

4   goals are an essential part of a competitive marketplace, and

5   the antitrust laws do not make these goals or the achievements

6   of these goals unlawful so long as a company does not use

7   anticompetitive means to achieve these goals.

8        Now, determining whether Google's conduct was

9   anticompetitive or whether it was legitimate business conduct,

10  you should determine whether the conduct is consistent with

11  competition on the merits, whether the conduct provides

12  benefits to consumers, and whether the conduct would make

13  business sense apart from any effect it has on excluding

14  competition or harming competitors.

15       In evaluating alleged benefits in a market that you have

16  found to be two-sided, you must consider whether those

17  benefits -- whether there are benefits to the two-sided market

18  as a whole.

19       Now, the acts or practices that result in the acquisition

20  or maintenance of monopoly power must represent something more

21  than the conduct of business that is part of the normal

22  competitive process or commercial success.  They must represent

23  conduct that has made it very difficult or impossible for

24  competitors to compete and that was taken for no legitimate

25  business reason.

1    You may not find that a company willfully acquired or

2 maintained monopoly power through anticompetitive means if it

3 has acquired or maintained that power solely through the

4 exercise of superior foresight and skill or because of natural

5 advantages, such as unique geographic access to raw materials

6 or markets or because of economic or technological efficiency,

7 including efficiency results from scientific research, or by

8 obtaining a lawful patent or patents, or because changes in

9 cost or consumer preferences have driven out all but one

10 supplier.

11    In summary, you must first determine whether Epic has

12 proven that Google's conduct has caused substantial harm to

13 competition in a relevant market.  If Epic has done so, you

14 must then determine whether Google has justified its conduct by

15 proving that its conduct was reasonably necessary to achieve

16 competitive benefits for consumers in that relevant market.

17    However, if Epic has proven that Google could have readily

18 achieved the same benefits using reasonably available

19 alternative means that would have created substantially less

20 harm to competition, then those benefits cannot justify

21 Google's conduct.  In other words, if you find that Google has

22 proven a pro competitive rationale, then you must determine if

23 Epic has met its burden to prove the existence of a

24 substantially less restrictive alternative to achieve Google's

25 pro competitive rationale.

1    To qualify as a substantially less -- as substantially

2    less restrictive, an alternative means must be virtually as

3    effective in serving the defendant's pro competitive purpose

4    without significantly increasing cost.

5    You must then balance any competitive harms that you found

6    against any competitive benefits you found.  In doing so, you

7    may consider any harms or benefits on both sides of the market

8    for any market you have found to be two-sided.  If the harms to

9    competition resulting from Google's conduct substantially

10   outweigh the competitive benefits, then you must find that

11   Google willfully acquired or maintained monopoly power through

12   anticompetitive acts.

13   If you find that Google willfully acquired monopoly power

14   through anticompetitive acts in a relevant market, then you

15   must consider whether Epic has proved the remaining elements of

16   its claim that Google monopolized that market.

17   If, however, you find that Google did not willfully

18   acquire or maintain monopoly power through anticompetitive acts

19   in a relevant market, then you must find for Google and against

20   Epic on Epic's claim that Google monopolized that market.

21   As a general rule, businesses are free to choose the

22   parties with whom they will deal as well as the prices, terms,

23   and conditions of that dealing.

24   Now, you have heard evidence that Google's Developer

25   Distribution Agreement, what we call the DDA, prohibits the

distribution of other app stores through the Google Play Store.
It is not unlawful for Google to prohibit the distribution of
other app stores through Google Play Store, and you should not
infer or conclude that doing so is unlawful in any way.

Now, in addition to the monopolization claim, Epic
challenges Google's conduct under Section 1 of the Sherman Act
and California state law.  Section 1 prohibits contracts,
combinations, and conspiracies that unreasonably restrain
trade.

To establish a violation of Section 1 of the Sherman Act
in California state law, Epic must prove the following:

One, the existence of a contract, combination, or
conspiracy between or among at least two separate entities.

Two, that the contract, combination, or conspiracy
unreasonably restrains trade.

And, three, that the restraint caused Epic to suffer an
injury to its business or property.

Now, to prove an agreement or contract to restrain trade,
Epic must prove both of the following elements by a
preponderance of the evidence:

One, that an agreement or contract to restrain trade
existed; and, two, that Google knowingly became a party to that
agreement or contract.

To act knowingly means to participate deliberately and not
because of mistake or accident or other innocent reason.  The

1   basis of a contract or agreement is an understanding between

2   two or more persons or entities.  An agreement or understanding

3   between two or more persons exists when they share a commitment

4   to a common scheme.

5        To establish the existence of agreement, the evidence need

6   not show that the persons or entities entered into a formal or

7   written agreement.  It is not essential that all persons acted

8   exactly alike nor is it necessary that they all possess the

9   same motive for entering the agreement.

10       It's also not necessary that all of the means or methods

11   claimed by Epic were agreed upon to carry out the alleged

12   agreement to restrain trade nor that all the means or methods

13   that were agreed upon were actually used or put into operation.

14       It is the agreement or understanding to restrain trade in

15   the way alleged by Epic that constitutes a potential violation

16   of the antitrust laws.  Therefore, you may find an agreement to

17   restrain trade existed regardless of whether it succeeded or

18   failed.

19       Now, Epic may prove the existence of the contract or

20   agreement to restrain trade through direct evidence,

21   circumstantial evidence, or both.  Direct evidence is explicit

22   and requires no inferences to establish the existence of a

23   contract or agreement.  Direct evidence of an agreement may not

24   be available and, therefore, an agreement may also be shown

25   through circumstantial evidence.  You may infer the existence

1    of an agreement from the circumstances, including what you find

2    the persons actually did and the words they used.

3         Now, in determining whether an agreement or understanding

4    between two or more persons to restrain trade has been proved,

5    you must consider the evidence as a whole and not in piecemeal

6    fashion.

7         Now, under Section 1 of the Sherman Act, a restraint of

8    trade is illegal only if it's found to be unreasonable.  You

9    must determine, therefore, whether any of the restraints

10   challenged here are unreasonable.  The restraints challenged

11   here are the agreements that Google requires mobile app

12   developers to enter into as a condition of distributing apps on

13   Google Play Store, and these are called the DDA agreements;

14   alleged agreements with Google's alleged competitors or

15   potential competitors, including Activision and Riot Games

16   under Google's Games Velocity Program or Project Hug; and

17   agreements with original equipment manufacturers, OEMs, that

18   sell mobile devices.  These are the MADA and RSA agreements.

19        In making this determination, you must first determine

20   whether Epic has proven that a challenged restraint has

21   resulted in a substantial harm to competition in a relevant

22   product or geographic market.  If you find that Epic has proven

23   that the challenged restraint results in a substantial harm to

24   competition in a relevant market, then you must consider

25   whether Google has proven that the restraints produced

1   countervailing competitive benefits.

2       If you find that they do, then you must balance the

3   competitive harm against the competitive benefit.  However, if

4   you find that the competitive benefits could have been achieved

5   through substantially less restrictive alternatives, then you

6   may not consider those benefits when balancing harms against

7   benefits.

8       The challenged restraints are illegal under Section 1 of

9   the Sherman Act only if you find that the competitive harm

10  substantially outweighs the competitive benefit.

11      Now let's break these steps down a little bit.

12      As I mentioned, to prove that the alleged restraint is

13  unreasonable, Epic must first demonstrate that the restraint

14  has resulted or is likely to result in substantial harm to

15  competition.  Although it may be relevant to the inquiry, harm

16  that occurs merely to the individual business of the plaintiff

17  is not sufficient by itself to demonstrate harm to competition

18  generally.  That is, harm to a single competitor or group of

19  competitors does not necessarily mean that there has been harm

20  to competition.

21      Epic must also show that the harm to competition occurred

22  in an identified market known as a relevant market.  As I've

23  described, there are two aspects of a relevant market.  The

24  first aspect is known as the relevant product market.  The

25  second aspect is known as the relevant geographic market.  It

1    is Epic's burden to prove the existence of a relevant market.

2        If you find that Epic has proven a relevant market, then

3    you must determine whether Epic has also proven that the

4    challenged restraint has or is likely to have a substantial

5    harmful effect on competition in that market.

6        A harmful effect on competition or competitive harm refers

7    to a reduction in competition that results in the loss of some

8    of the benefits of competition, such as lower prices, increased

9    output, or higher product quality.

10       If the challenged conduct has not resulted in or is not

11   likely to result in higher prices, decreased output, lower

12   quality, or the loss of some other competitive benefit, then

13   there has been no competitive harm and you should find that the

14   challenged conduct was not unreasonable.

15       In determining whether the challenged restraint has

16   produced or is likely to produce competitive harm in a market

17   that you have found to be two-sided, you must consider harms to

18   the two-sided market as a whole.

19       Now, in determining whether the challenged restraint has

20   produced or is likely to produce competitive harm, you may look

21   at the following factors:

22       The effect of the challenged restraint on prices, output,

23   product quality, and service; the purpose and nature of the

24   challenged restraint; the nature and structure of the relevant

25   market; the number of competitors in the relevant market and

the level of competition among them, both before and after the challenged restraint was imposed; and whether Google possesses market power.

Now, the last factor, market power, has been defined as an ability to profitably raise prices for a substantial period of time above those that would be charged in a competitive market. A company that has monopoly power in a relevant market necessarily has market power in that market. However, a company can have market power in a relevant market even if it does not have monopoly power because market power requires less than monopoly power.

A firm that possesses market power generally can charge higher prices for the same goods and services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.

An important factor in determining whether Google possesses market power is Google's market share; that is, its percentage of the products or services sold in the relevant market by all competitors.

Other factors that you may consider in determining whether Google has, or at relevant times had, market power include whether Google is capable of raising or maintaining prices above competitive levels, whether there are barriers to entering the market, and whether Google can exclude or has

1    excluded competition or prevented competitors or potential

2    competitors from entering the market.

3        If Google does not possess a substantial market share, it

4    is less likely that Google possesses market power.  If Google

5    does not possess market power, it is less likely that the

6    challenged restraint has resulted or will result in a

7    substantial harmful effect on competition in the market.

8        Now, if you find that Google has proven that a challenged

9    restraint resulted in substantial harm to competition in a

10   relevant market, then you must next determine whether Google

11   has proven that the restraint also benefits competition in

12   other ways.

13       If you find that the challenged restraint does result in

14   competitive benefits, then you must also consider whether those

15   competitive benefits were achievable through a substantially

16   less restrictive means.  To qualify as substantially less

17   restrictive, an alternative means must be virtually as

18   effective in -- let me start that again.

19       To qualify as substantially less restrictive, an

20   alternative means must be virtually as effective in serving the

21   defendant's pro competitive purpose without significantly

22   increasing costs.

23       If Epic proves that any of the competitive benefits were

24   achievable through substantially less restrictive means, then

25   those benefits cannot be used to justify the restraint.

1      Now, if you find that a challenged restraint resulted in

2  competitive benefits in a relevant market that were not

3  achievable through substantially less restrictive means, then

4  you must balance those competitive benefits against the

5  competitive harm resulting from the same restraint.

6      If the competitive harm substantially outweighs the

7  competitive benefits, then the challenged restraint is

8  unreasonable.

9      If the competitive harm does not substantially outweigh

10  the competitive benefits, then the challenged restraint is not

11  unreasonable.

12      In conducting this analysis, you must consider the

13  benefits and harm to competition and consumers in the market

14  not just to a single competitor or a group of competitors.

15      If you have found a market that is two-sided, you must

16  balance the harms and benefits on both sides of the two-sided

17  market as a whole.

18      Epic bears the burden of proving by a preponderance of the

19  evidence that the anticompetitive effect of the conduct

20  substantially outweighs its benefits.

21      This will be the last claim.  Epic also claims that Google

22  engaged in an unlawful tying arrangement.  A tying arrangement

23  is one in which the seller will sell one product or service,

24  referred to as the tying product, only on the condition that

25  the buyer also purchase a separate product or service, referred

1   to as the tied product, from the seller, or at least agrees to

2   not purchase the tied product or service from any other seller.

3        Now, in this case, Epic claims that Google's app

4   distribution product, the Google Play Store, is the tying

5   product and its in-app billing service, Google Play Billing, is

6   the tied product.

7        Not all tying arrangements are unlawful.  The essential

8   characteristic of an invalid tying arrangement is a seller's

9   exploitation of its market power over the tying product -- in

10   this case, app distribution services -- to force a buyer to

11   purchase the tied product -- in this case, in-app billing

12   services -- that the buyer must have preferred to purchase

13   elsewhere.

14        I'm going to discuss with you now how to determine whether

15   if there was a tying arrangement, that alleged arrangement is

16   unlawful.

17        Now, to prevail on the tying claim, Epic must prove each

18   of the following elements by a preponderance of the evidence:

19        One, Android app distribution services like the Google

20   Play Store and Android in-app billing services like Google Play

21   Billing are separate and distinct products.

22        Two, Google will provide Android app distribution services

23   through the Google Play Store only on the condition that app

24   developers also use Google Play Billing for in-app

25   transactions.

 1       Three, Google has sufficient market power with respect to

 2  the Android app distribution services to enable it to restrain

 3  competition as to an alleged market for Android in-app billing

 4  services.

 5       Four, the alleged tying arrangement has foreclosed a

 6  substantial volume of commerce as to an alleged market for

 7  Android in-app billing services.

 8       Five, the tying arrangement was -- has unreasonably

 9  restrained trade in that it had a substantial adverse effect on

10  competition as to an alleged market for Android in-app billing

11  services.

12       And, six, Epic was injured in its business or property

13  because of the tying arrangement.

14       If you find that the evidence is sufficient to prove all

15  six of these elements, then you must consider Google's business

16  justification defense, which I will instruct you on in a

17  moment.

18       If you find for Epic on all six of these elements and

19  against Google on Google's business justification defense, then

20  you must find for Epic and against Google on Epic's tying

21  claim.

22       If you find that the evidence is insufficient to prove any

23  one of these elements, then you must find for Google and

24  against Epic on Epic's tying claim.

25       Alternatively, if you find for Google on Google's business

1    justification defense, then you must find for Google on Epic's

2    tying claim.

3        Now, to determine whether the Google Play Store and

4    Google Play Billing are separate and distinct products, you

5    should consider whether there would be demand for each of them

6    if they were offered separately.  If enough Android developers

7    would want to use Google Play Store alone and Google Play

8    Billing alone, then they are separate products.

9        On the other hand, if there is very little demand for one

10   of the products by itself, that is, without the other product,

11   then Google Play Store and Google Play Billing are not two

12   separate products for the purpose of the tying claim even if

13   they are sometimes sold separately.

14       Products may be separate products even if one of them is

15   useless without the other.  The relevant issue is whether there

16   is sufficient demand from customers to induce sellers to

17   provide them separately even if the customer needs to obtain

18   both products from one or more suppliers.

19       You may find that a tying arrangement exists between the

20   Google Play Store and Google Play Billing if Google refuses to

21   distribute Android apps through the Google Play Store unless

22   Android app developers agree to use Google Play Billing to

23   facilitate the sale of digital goods or services in those apps.

24       You may also find that a tie exists if Google effectively

25   coerced Android app developers into using only Google Play

1   Billing.

2       To prove coercion, Epic must prove by a preponderance of

3   the evidence that Google exploited its control over the Google

4   Play Store to force Android app developers to use Google Play

5   Billing when the app developers either did not want to use

6   Google Play Billing at all or might have preferred to use

7   Google Play Billing on different terms and that any appearance

8   of choice was illusory.  Mere sales pressure or persuasion is

9   not coercion.

10      If Google has made the use of the Google Play Store and

11  Google Play Billing together the only viable economic option,

12  you may find that Google has effectively tied the Google Play

13  Store to Google Play Billing.  However, there is no coercion if

14  the Google Play Store and Google Play Billing are offered

15  separately and separate use is economically feasible.

16      You must determine whether Google has market power with

17  respect to the tying product in an alleged market for Android

18  app distribution services.  I've already instructed you on the

19  meaning of market power, and you must apply that instruction

20  here when determining whether Google has market power with

21  respect to the tying product.

22      If you determine that Google Play Store and Google Play

23  Billing are separate products that have been tied to one

24  another and that Google has market power in Android app

25  distribution, then you must determine whether Epic has proven

1  that Google has foreclosed a substantial amount of commerce

2  with respect to Android in-app billing services.

3       In determining whether Google has foreclosed a substantial

4  amount of commerce with respect to Android in-app billing

5  services, you should first consider the total dollar amount

6  Google earned from Google Play Billing by the tying arrangement

7  in absolute terms.

8       If the dollar amount Google earned from Google Play

9  Billing was substantial, you should next consider whether there

10  has been a substantial adverse effect on competition with

11  respect to Android in-app billing services due to the tying

12  arrangement.  If there is not a substantial adverse effect on

13  competition and Android in-app billing services due to the

14  tying arrangement, then you must find in favor of Google on the

15  tying claim.

16       There is no substantial foreclosure if only a small

17  percentage of sales in the alleged market for Android in-app

18  billing services was effectively -- was affected by the tying

19  arrangement.  There is also no substantial foreclosure if you

20  find that the Android app developers would not have used

21  Android in-app billing services at all in the absence of tying

22  arrangements.  Google contends that the alleged tying

23  arrangement is justified.

24       If you find that Epic has proven all of the elements of

25  the tying claim, then you should consider whether Google has

proven by a preponderance of the evidence a business justification for the tying claim.  Google has the burden of proof on this issue.

Google contends that the tying arrangement is justified because it enables Google efficiently to collect compensation for the use of its services and use of its intellectual property and ensures that Google can receive compensation for its services and intellectual property.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google.  In making this determination, you should consider whether the justification Google offers is the real reason that it imposed the tying arrangement.

You must also consider whether Google's claimed objective could reasonably have been realized through substantially less restrictive means.  If some type of constraint is necessary to promote a legitimate business interest, Google must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Google's claimed legitimate business purpose could reasonably have been achieved through substantially less restrictive means, you may assess such factors as whether other means to achieve Google's objectives were more or less expensive and more or less effective than the means chosen by Google.

1      To qualify as substantially less restrictive, an

2  alternative means must be -- to substantially -- to qualify --

3  let me take that from the top.

4      To qualify as substantially less restrictive, an

5  alternative means must be virtually as effective in serving the

6  defendant's pro competitive purpose without significantly

7  increasing costs.

8      If you find that Google could reasonably have achieved its

9  claimed legitimate business purpose by a substantially least

10  restrictive means, then you must -- then you may find, may

11  find, that there was no business justification and find for

12  Epic on the tying claims.

13      If you find that the tying arrangement serves a legitimate

14  business purpose at Google and that there are not substantially

15  less restrictive means reasonably available to achieve that

16  purpose, then you must find for Google and against Epic on the

17  tying claim.

18      Okay.  We're getting towards the end.

19      If you find that Google has violated the antitrust laws as

20  alleged by Epic, then you must consider whether Epic was

21  injured as a result of Google's violations of the antitrust

22  laws by applying the following elements.  Epic is entitled to a

23  verdict that Google is liable if it can establish these

24  elements of injury and causation:

25      One, Epic was, in fact, injured as a result of Google's

1  alleged violations of the antitrust laws.

2      Two, Google's alleged illegal conduct was a material cause

3  of Epic's injury.

4      And, three, Epic's injury is an injury of the type that

5  the antitrust laws were intended to prevent.

6      The first element is sometimes referred to as injury in

7  fact or fact of damage.  For Epic to establish injury in fact

8  or fact of damage, it must prove that it was injured as a

9  result of Google's alleged violations of the antitrust laws.

10     Proving the fact of damage does not require Epic to prove

11 the dollar value of its injury.  It requires only that Epic

12 proves that it was, in fact, injured by Google's antitrust

13 violations.

14     Second, Epic must offer evidence that establishes by a

15 preponderance of the evidence that Google's alleged illegal

16 conduct was a material cause of Epic's injury.  This means that

17 Epic must have proved that some damage occurred to it as a

18 result of Google's alleged antitrust violations and not some

19 other cause.

20     Epic is not required to prove that Google's antitrust

21 alleged antitrust violations were the sole cause of its injury

22 nor need Epic eliminate all other possible causes of injury.

23 It is enough if Epic has proved that the alleged antitrust

24 violations were a material cause of its injury.

25     You should bear in mind that businesses may incur losses

for many reasons that the antitrust laws are not designed to

prohibit or protect against, such as where a competitor offers

better products or services or where a competitor is more

efficient and can charge lower prices and still earn a profit.

Finally, Epic must establish that its injury is the type

of injury that the antitrust laws were intended to prevent.

This is sometimes referred to as antitrust injury.

If Epic's injuries were caused by a reduction in

competition, acts that would lead to a reduction in

competition, or acts that would otherwise harm consumers, then

Epic's injuries are antitrust injuries.

On the other hand, if Epic's injuries were caused by

heightened competition, the competitive process itself, or by

acts that would benefit consumers, then Epic's injuries are not

antitrust injuries and Epic is not entitled to a verdict that

Google has violated the antitrust laws.

In summary, if Epic can establish that it was, in fact,

injured by Google's conduct, that Google's conduct was a

material cause of its injury, and that Epic's injury was the

type that the antitrust laws were intended to prevent, then

Epic is entitled to a verdict that Google has violated the

antitrust laws.

Now, the relevant time period for the antitrust laws

preclude recovery in this case for any injury caused by conduct

that occurred prior to August 13th, 2016.

1        Now, you have heard evidence in this trial about

2   agreements that Google reached before August 13th, 2016.  Those

3   agreements may be considered as background to help you

4   understand the claims and counterclaims in this case, but you

5   may not consider those agreements to be part of the conduct

6   that Epic is challenging in this case.  You may consider only

7   Google's conduct that occurred after August 13th, 2016, in

8   determining its liability in this case.

9        Now let's turn to your duties as deliberating.

10       When you begin your deliberations, you will elect one

11   member of the jury as your presiding juror.  If you watch TV

12   dramas, that's often called the foreperson.  In federal court

13   we say "presiding juror."  All right?  So you're going to elect

14   one person as your presiding juror who will preside over your

15   deliberations and speak for you here in court.

16       You will then discuss the case with your fellow jurors to

17   reach agreement if you can do so.  Your verdict, whether liable

18   or not liable, must be unanimous.

19       Each of you must decide the case for yourself, but you

20   should do so only after you have considered all the evidence,

21   discussed it fully with the other jurors, and listened to the

22   views of your fellow jurors.

23       Do not be afraid to change your opinion if the discussion

24   persuades you that you should, but do not come to a decision

25   simply because other jurors think it is right.

1    It is important that you attempt to reach a unanimous

2  verdict but, of course, only if each of you can do so after

3  having made your own conscientious decision.  Do not change an

4  honest belief about the weight and effect of the evidence

5  simply to reach a verdict.

6    Perform these duties fairly and impartially.  Do not allow

7  personal likes or dislikes, sympathy, prejudice, fear, or

8  public opinion to influence you.  You should also not be

9  influenced by any person's race, color, religion, national

10  ancestry, gender, sexual orientation, profession, occupation,

11  economic circumstances, or position in life or in the

12  community.

13    It is your duty as jurors to consult with one another and

14  to deliberate with one another with a view towards reaching an

15  agreement if you can do so.

16    During your deliberations, you should not hesitate to

17  reexamine your own views and change your opinion if you become

18  persuaded that it is wrong.

19    Now, because you must base your verdict only on the

20  evidence received in the case and on these instructions, I'm

21  going to remind you again, as we've done each day of trial,

22  that you must not be exposed to any other information about

23  this case or the issues it involves.

24    So except for discussing the case with your fellow jurors

25  during your deliberations, do not communicate with anyone in

1    any way and do not let anyone else communicate with you in any

2    way about the merits of the case or anything to do with it.

3    This includes discussing the case in person, in writing, by

4    phone, or electronic means via e-mail, text messaging, or any

5    Internet social media site, blog, website, or other feature.

6         This applies to communicating with your family members,

7    your employer, the media or the press, and anybody who is

8    involved in this trial.

9         If you are asked or approached in any way about your jury

10   service or anything about this case, you must respond that you

11   have been ordered not to discuss it and report the matter

12   immediately to Ms. Clark, and I will take it up at that point.

13        Do not read, watch, or listen to any news or media

14   accounts or commentary about the case or anything to do with

15   it.

16        Do not do any research, such as consulting dictionaries,

17   searching the Internet, or using any other reference materials.

18        And do not make any investigation or in any other way try

19   to learn about the case on your own.

20        The law requires these restrictions to ensure that the

21   parties have a fair trial based on the same evidence that each

22   side has had an opportunity to address.

23        A juror who violates these restrictions jeopardizes the

24   fairness of these proceedings, and a mistrial could result that

25   would require the entire trial process to start over.

 1          Now, if any juror is exposed to any outside information,

 2     you should let Ms. Clark know right away.

 3          Now, some of you have taken notes during trial.  Whether

 4     or not you took notes, you should rely on your own memory of

 5     what was said.  Notes are only there to assist your memory.

 6     You should not be overly influenced by your notes or the notes

 7     of your fellow jurors.

 8          And then, finally, if it becomes necessary to communicate

 9     during your deliberations with me, you can send a note to me

10     through Ms. Clark.  One of you needs to sign it.  So you can

11     send a signed note, hand it to Ms. Clark.

12          No member of the jury should ever communicate with me

13     except by a signed writing.  Okay?  And I will respond to the

14     jury concerning the case -- it says "only in writing or here in

15     open court."  I always do it in open court.  It will be like

16     the questions you asked during trial.  Okay?  Just put it down,

17     sign it.

18          If you send out a question, I'll talk with the lawyers a

19     little bit, which may take up some time.  You should continue

20     your deliberations while you're waiting for my response.

21          Remember, this is very important, on anything you send out

22     of the jury room, do not tell anyone -- me, Ms. Clark, or

23     anyone -- how you stand numerically or otherwise on any

24     question submitted to you, including the questions of Google's

25     liability or Epic's liability, until you have reached a

1    unanimous verdict or have been discharged.  So don't say

2    anything about, you know, "Here's the vote count.  Here's how

3    we're feeling."  Just ask the question and sign it and send it

4    out.

5         Now, you're going to have a verdict form in there.  It

6    will be waiting for you when the deliberations start.  After

7    you have reached a unanimous agreement on a verdict, your

8    presiding juror will complete the verdict form according to

9    your deliberations, sign it and date it, and advise Ms. Clark

10   that you are ready to return to the courtroom, at which point

11   everybody will get together again and I will read the verdict

12   to the parties.  Okay?

13        So that was a long reading.  Let's take a 10-minute break

14   and then -- okay.  We'll go to 10:40.  We'll take 15 minutes

15   and we'll have our closings.

16             **THE CLERK:**  All rise.

17                  (Recess taken at 10:26 a.m)

18                  (Proceedings resumed at 10:47 a.m)

19        (Proceedings were heard out of the presence of the jury:)

20             **THE COURT:**  Okay.  Bring in the jury.

21        (Proceedings were heard in the presence of the jury:)

22             **THE CLERK:**  We're back on the record in Civil 20-5671,

23   Epic Games, Inc. vs. Google LLC, and Multidistrict Litigation

24   21-2981, In re Google Play Store Antitrust Litigation.

25             **THE COURT:**  Okay.

1          **MR. BORNSTEIN:**  Thank you, Your Honor.

2                          **CLOSING ARGUMENT**

3          **MR. BORNSTEIN:**  Good morning.  It's nice to talk to

4    everybody directly again after sitting across the table for a

5    while not being able to talk.

6          I'll start just by saying thank you.  Thank you for all of

7    the time that you-all have put in to be here for what is very

8    important to us and to the parties and I think to the industry

9    more generally.  Thank you for all the sacrifices I'm sure you

10   have made in your jobs and your personal lives.

11         Also, thank you for the attention that you've paid.  It's

12   been clear just sitting here watching everybody that you have

13   really taken this in, given it a lot of attention.  There's

14   been a lot of stuff.  There's been a lot of evidence.  So thank

15   you very much for what you've done so far and for what you're

16   about to do as well.

17         My job in the closing statement is to do primarily two

18   things.  One is to summarize some of all of this evidence that

19   we've seen during the course of the trial.

20         We believe that this trial has revealed the truth about

21   what Google has done to keep the Google Play Store as the

22   dominant -- far-and-away dominant path for app distribution on

23   Android phones, and it has led to higher prices for developers,

24   higher prices for consumers, and less innovation and quality.

25   I'll walk through some of that evidence.

1          The second thing I'm going to do is try to help you fit

2     that evidence into the legal framework that the Court just laid

3     out for you.  You've gotten the instructions.  As the Court

4     said, you're going to get a verdict form that you're going to

5     have to fill out back in the room, and I'm going to give you at

6     least our thoughts on how you ought to fill out that form based

7     on the evidence that we have seen here in the courtroom.

8          Now, there are three claims, as the Court explained, that

9     you will be asked to decide on:  Monopolization, unreasonable

10    restraints of trade, and tying.  They're complicated, you heard

11    the instructions, but there are two main points that are

12    relevant to each of these claims:  Power and conduct.  What

13    power does Google have in the relevant market and what conduct

14    has Google engaged in?  Has it been anticompetitive conduct

15    that has caused consumer harm through higher prices and lower

16    quality?

17         So I'm going to start with power and where Google's power

18    comes from, and it comes from its control over Android.  As

19    we've seen, Google is the only source, the only source for a

20    smartphone maker that needs an operating system.  That's the

21    green.  That's Android.  That's Google.  The only thing that is

22    otherwise out there is Apple, which does it all by itself and

23    doesn't make its operating system available to third parties.

24    So if you are a smartphone maker and you want an operating

25    system, your only choice is Google.

1    Samsung, Motorola, everybody else.  And, in fact, here's
2    what Motorola had to say about it (as read):
3         "What would happen if Motorola didn't have access to
4    Android?
5         "I don't think we would be in the smartphone
6    business."
7    So this gives Google tremendous power.  It uses that power
8    to get the OEMs, the smartphone makers, to sign agreements,
9    like the MADA that we've heard about, that enable another
10   monopoly, a monopoly in app distribution.  And it is clear that
11   Google has a monopoly in app distribution on Android.
12   Remember this slide?  I showed you this in the opening.
13   This is the share of app installs, the downloads onto Android
14   phones that Google Play has as compared to all other app
15   stores.  Month after month after month it has approximately
16   95 percent, and this was never disputed during trial.  This is
17   an undisputed fact.
18   And where is the competition?  I showed you this too.
19   Samsung, the biggest of the OEMs.  It's just that little orange
20   sliver.  So Google has no real challenger in Android app
21   distribution.  It has a monopoly, but it's power and conduct.
22   Having a monopoly by itself is not unlawful.  So what
23   conduct has Google engaged in?  What this case is about is what
24   Google has done to maintain this monopoly.
25   As Professor Bernheim explained when he was here, the

1   economist, anticompetitive conduct is different from pro

2   competitive conduct.  Regular, ordinary competition is when you

3   lower prices, you make your product better, your quality better

4   to bring people in.  Anticompetitive conduct is when you make

5   it harder for the other guy, when you make it more challenging

6   for the rival to win business by making their product worse, by

7   making it harder to access or harder to use.  And then if you

8   make the other guy's product worse, you don't have to lower

9   your prices.  You can keep yours high.  You don't have to

10  innovate.

11       To be anticompetitive, conduct does not have to completely

12  shut rivals out, and the parties' experts agreed on this.

13  Professor Gentzkow for Google; Professor Bernheim, Epic's

14  expert.  To be anticompetitive, the competition doesn't have to

15  be blocked entirely.  It just has to be impaired or limited in

16  some way.  This is an agreed standard.

17       And the trial has shown a very bright light on exactly

18  what Google has done to impair the competition, and there are

19  two main strategies that we've seen throughout the trial:

20  Bribe and block.

21       The bribe is paying other companies not to compete.  The

22  payments are cash sometimes.  The payments are other things of

23  value sometimes.  They don't have to be cash like the picture.

24  Project Hug is an example.  The revenue share agreements are an

25  example.  Value being paid to competitors or potential

 1   competitors not to compete.

 2        The block, these are things like the scare screens that

 3   come up during the direct downloading process or the exclusive

 4   agreement in the RSA 3.0 premier tier that completely prohibits

 5   any other app stores from being preinstalled on those premier

 6   tier phones.  Those are blocks.

 7        And as Professor Bernheim explained, these are classic

 8   competitive -- or anticompetitive strategies that are used and

 9   recognized by economists to be used by dominant firms to

10   protect their monopolies.

11        So let me set the stage for Google's conduct.  In the

12   beginning when Android was new, this is what it told people:

13   Google's not going to take a percentage when developers make

14   sales.  Over time, as Android grew, that changed, and

15   internally they recognized "We are now lying to our developers

16   about what we are doing."

17        The result of that change, the Google Play Store that we

18   know now has produced extraordinary profit, margins that are

19   growing and growing and growing reaching 71 percent in 2021.

20        Mr. Samat, you didn't meet him, he's the head of the

21   Google Play Store, he didn't come to trial, he had a different

22   slide that you did see showing the profits in a less scientific

23   way:  Bags of money and a big bag line going up.

24        Google knew that these profits could not last unless it

25   took action to prevent competition.  This is what Mr. Gennai

1    said (as read):

2            "The size and margins of the market are making it

3        attractive for new entrants.  In other words, we're making

4        so much money, our margins are so big, competition is

5        going to come in."

6        And he described, and I will describe, what they did to

7    prevent the competition.

8        So what have they done?  What is the anticompetitive

9    conduct at issue?  It starts by requiring in the MADA that the

10   Google Play Store be the default -- be on the default home

11   screen of every device, and then Google systematically blocks

12   the only two alternatives to get an app store on there.

13       The first is direct distribution.  I'll start there.  And

14   you have seen multiple times -- and I won't do it again -- you

15   have seen all the screens that pop up when people try to

16   download directly from the web.

17       I want to talk instead about the data and what the data

18   shows about the effect of all those screens.  So here's one

19   piece of data.  We saw this with Professor Bernheim.  When

20   people tried to download the Fortnite installer to get Fortnite

21   on their phone on Android, 35 percent of the people who tried

22   fell off.  They stopped when they hit those warning screens and

23   the challenging install flow that Google requires OEMs to

24   create.

25       And mind you, this is for Fortnite.  Anybody who knows

1   somebody who likes Fortnite, people really wanted Fortnite at

2   the time.  This is a super-popular game and 35 percent of them

3   stopped.  If we're talking about another app, this number would

4   be considerably bigger.

5       Here's another example of data.  Mr. Morrill from Amazon

6   explained only 11 percent of the people who tried to get the

7   Amazon Appstore on their phone made it all the way through the

8   install flow.

9       Google knew this was a problem.  Internally they were

10  looking at what was happening to the Amazon Appstore.  They

11  knew the switching hurdle was too high because the process was

12  so complex.  They understood this.

13      Now at trial they did try to make it look easy.  At trial

14  they presented a video from Mr. Kleidermacher, the head of

15  security at Google, that breezed through the direct download

16  process really quickly.  You couldn't really read the warning

17  screens.  I accept that the head of security at Google knows

18  how to make it through all of the screens and make it through

19  the install flow in a prebaked demonstration, but that doesn't

20  mean that the regular users are going to make it through.  As

21  we saw, the data says differently.

22      Now, Google presented also some purported data of its own.

23  In their opening statement, Google told you, and I want to

24  quote this, "More than a billion Android users have enabled

25  sideloading on their devices."  That sounded great.  I wrote it

CLOSING ARGUMENT / BORNSTEIN

1    down at the time too because I was surprised.

2         Well, it's not true.  It was a misleading statement, and

3    the evidence showed that at trial.  The data on which that

4    claim was based -- you may remember Professor Qian was on the

5    stand at the time.  That wasn't smartphones.  That was

6    Smart TVs.  That was little Chromecast sticks.  That was

7    appliances.  There were 880 million devices in there that were

8    from unknown countries, places where Google Play isn't even

9    available.  That data was unreliable.  That number was

10   meaningless and misleading.

11        Here is real data -- not from me, not from Epic -- from

12   Google's expert:  Only 3 percent of Android phones in the

13   United States have successfully downloaded an app store from

14   the web.

15        So this is conduct that impairs competition.  It hurts

16   competitors' ability to compete, it is anticompetitive, and

17   supports the monopolization claim that you will be asked to

18   decide on.  So direct distribution not a feasible option.

19        So what about preinstallation?  Preinstallation is where

20   Google brings out its favorite statistics about an alternative

21   store being present, being preinstalled on about 60 percent of

22   Android phones, but let's remember what that actually looks

23   like.

24        These down here (indicating), you can barely see them on

25   the chart, these are 13 all together of the Android stores that

1   are preinstalled on some phones.  They barely make it to

2   5 percent together.  This is the competition they're talking

3   about from those 60 percent of phones.

4        So how does Google achieve this?  Again, what is the

5   conduct?  Mr. Kolotouros explained to us that in 2019 there

6   were two projects going on at the same time, RSA 3.0 and

7   Project Banyan, and they were part of a strategy together.

8   They are unreasonable restraints of trade you'll be asked to

9   decide on, and they are part of the monopolization practices as

10  well.

11       Start with the RSA 3.0 premier tier agreements.  It is not

12  a matter of dispute that these were exclusive agreements.

13  Mr. Kolotouros explained this too.  OEMs may not install any

14  other store on their device, period, full stop, undisputed.

15  This is both a bribe and a block.

16       It's a bribe for the OEMs; in other words, the OEMs are

17  being paid not to install their own stores.  We know this

18  because Google talked about it internally.  At the time that

19  the RSA 3.0 and Banyan were being discussed, Mr. Gennai

20  explained that a rev share would be better to disincentivize

21  other app stores from being preloaded.  Well, they went further

22  with this rev share agreement.  It's a complete and total

23  exclusive and a block.

24       As Professor Bernheim showed, the RSA 3.0 agreements were

25  also targeted, they were targeted at the OEMs that were

1  actually in a position to start or expand their store, the ones

2  who were getting traction:  Xiaomi, Oppo, Vivo, OnePlus, and so

3  on.  These are the ones that Google paid the highest revenue

4  share to.  They were the ones who had a store.  Right?  It

5  wasn't random.  Google knew exactly what it was doing.  It was

6  targeting the competition.

7       And when I say the RSA 3.0 agreements were also a block,

8  what I'm talking about is non-OEM stores like Epic store.  Epic

9  tried to get its store, you may remember, on OnePlus.  It

10  couldn't because of the premier tier agreements.

11  Mr. Kolotouros again (as read):

12       "OnePlus was not able to preload the Epic Game Store

13       on the premier tier devices."

14       And you heard Mr. Stolfus explain at length, the Epic guy

15  who testified by deposition, about how -- about how they were

16  blocked.

17       Now, these agreements, the RSA 3.0 agreements,

18  anticompetitive conduct, and they reached 27 percent of new

19  devices as of August 2022, which is the last date for which we

20  have data in the case.  That's one out of every two devices

21  other than Samsung.  One out of every two.

22       So what about Samsung?  As Mr. Kolotouros said, there was

23  a separate strategy for Samsung done at the same time.  The

24  specific approach that was undertaken then in 2019 when the RSA

25  3.0 started was Project Banyan, a blatantly illegal effort to

1   shut down Samsung's store.

2       In negotiating the deal, Mr. Rosenberg said, "This would

3   be so that the teams were not out competing with each other."

4       Mr. Gennai understood the problem.  He said, "We would

5   prefer to hide it in some way."  And you may remember in his

6   testimony he professed not even to know what that meant.

7       Samsung knew what it meant.  Samsung, when it got these

8   proposals, said that they were to prevent unnecessary

9   competition on Store.

10      Shortly after this document came in, shortly after Samsung

11  memorialized what was really going on, Google had to shut it

12  down, and they did.  Project Banyan didn't happen.

13      But Project Banyan was just one incident in a long history

14  of Samsung and Google agreeing not to compete in one way or

15  another.  So before Banyan, this is what Samsung was saying to

16  Google.

17      What happened, you may remember Mr. Lockheimer was on the

18  stand, Samsung had started a new change to its store.

19  Mr. Lockheimer was surprised and upset, and to reassure

20  Mr. Lockheimer that "No, no, no, we weren't really competing,

21  we weren't doing something wrong here," Mr. Yoon at Samsung

22  says "We definitely don't want to compete with Play Store."

23      This is not an isolated incident.  Two years later in

24  2016, this is a proposal from Google, "Hey, how about no

25  Galaxy Store?  Wouldn't that be great?  And you guys, you can

1    stop wasting resources on your store.  That's what you get out

2    of this.  We get no store.  You can stop spending money on it."

3         This happened also after Banyan was ended.  Mr. Rosenberg

4    extracted from Samsung, and he admitted this, he extracted from

5    Samsung an assurance that Samsung would not have exclusive game

6    launches as part of its strategy.  Right?  This was after

7    Fortnite was on Samsung but not on Google Play.  Google was

8    upset.  Mr. Rosenberg exchanged texts that you saw with people

9    at Samsung, and he got this promise from them and he

10   acknowledged it.

11        Mr. Gennai testified after Banyan fell apart that he

12   wanted to establish an even closer relationship with Samsung,

13   and so they did.  They entered into a new revenue share

14   agreement where Samsung was paid $8 billion over the term of

15   that agreement.

16        And these are just the terms they were willing to tell us

17   about.  Mr. Rosenberg in internal communications -- he's the

18   guy who signed and negotiated this deal -- in internal

19   communications, he explained a precondition for the rev share

20   arrangement with Samsung is to achieve structural alignment on

21   the business model.  You don't achieve structural alignment on

22   a business model with your competitor.  That is not

23   competition.

24        And he goes on.  He says "If we can't use rev share to

25   secure confidence that they won't drive the price down, then

 1   we're not going to do it."  And he even puts "secure
 2   confidence" in quotes there in his parenthetical about getting
 3   legal advice.
 4        So the result of all this, these agreements spoken and
 5   unspoken, is that while the Samsung store is on 40 percent of
 6   devices, it is just that little orange sliver of supposed
 7   competition in the data and on the chart.
 8        And as Samsung committed to Mr. Rosenberg, there had been
 9   no new exclusive games on the Samsung Galaxy Store since
10   Fortnite, there has been no reduction in rev share, and there
11   is a limited catalog of apps.  Just five of the top 20 apps are
12   on the Samsung Galaxy Store as Professor Bernheim showed.
13   They're just not competing.
14        So all of these agreements, the RSA 3.0, the various
15   Samsung agreements, these are unreasonable restraints of trade,
16   and they support the monopolization claim and they make
17   preinstallation not an option.
18        So I'll talk about another project, Project Hug.  I talked
19   a lot about Project Hug, but Project Hug is important.
20   Remember how it started.  It's when Epic launched Fortnite off
21   the Google Play Store.  Epic generally believed that it could
22   do so and succeed as it had done in PC.
23        Mr. Sweeney told Google Epic believes in open platforms.
24   This is driven by the principle of open platforms.  Epic has
25   been consistent on this point from then until now.

1      And Google's immediate response?  Well, to propose a
2  special deal.  $208 million in value.  We'll put that in the
3  bribe category.  You may remember Mr. Sweeney had some choice
4  words about it on the stand, and he said no at the time.

5      This deal was motivated by fears of what Google repeatedly
6  called contagion, contagion, contagion.  Some witnesses tried
7  to tell you that "contagion" meant that apps might leave
8  Android and only be on iOS.  That's nonsense.  There has not
9  been a single app, and the Google people admitted this, a
10  single app that has given up the 3 billion potential users that
11  are available on Android just to be on iOS.

12      Mr. Rosenberg, he acknowledged what was going on.  He used
13  the term "contagion" and he explained that Google used the term
14  "contagion" to describe the risk of other developers following
15  Epic.  "Following Epic" means going off the Google Play Store,
16  launching on Android off the Google Play Store.

17      Epic didn't launch only on iOS.  If Apple -- if iOS,
18  getting the exclusive is what Google was really concerned
19  about, why did they not come forward with a special deal with
20  the $200 million in value when Epic launched Fortnite on iOS
21  but not on Android for the months and months that that
22  happened?

23      No, when Google finally came forward with the special deal
24  was when there was competition on Android, when Epic was
25  launching off of Play and competing with direct distribution.

1    That's what got Google worried.  That's the competition that

2    was at issue.

3        And the proposal to Epic was a prototype for Project Hug,

4    and we have a document that lays out the strategy.  Way back in

5    the opening Google told you that Mr. Gennai, Paul Gennai, would

6    come and he would testify about Google's business model and how

7    it supposedly competes.  Well, he did.  Boy, did he ever.  Not

8    how Google anticipated, but Mr. Gennai, who was the author of

9    this document, he explained the threats to the Google Play

10   Store and the combination of tactics to be used in response.

11       He testified originally that this was just a set of notes

12   that he prepared for himself.  He had to admit on

13   cross-examination that that was not true and that this was

14   shared with other senior executives at Google.

15       And what he explains, first of all, is one of his tactics

16   is that competing on price would be a race to the bottom.  That

17   would be bad.  We don't want to compete on price.  He even

18   acknowledged this in testimony.  He was thinking when he wrote

19   "race to the bottom," that if somebody came and negotiated with

20   us, other people might find out, they might negotiate too, and

21   they'd try to negotiate us down too, and that was a series of

22   steps that would really turn out badly for us.  We did not want

23   to have to compete on price.

24       And so they took a different approach.  You can see under

25   the highlighting he says "We wanted to come up with something

1    where," quote, "it lowers the effective rev share while

2    maintaining the prevailing rate."  They keep the 30 percent and

3    they secretly funnel money and other value back to the

4    developer through Cloud credits, through YouTube sponsorships,

5    and all other goodies and prizes.

6        It's exactly what they tried to do with Epic.  And if

7    there's any doubt, this is Hug.  This is what Project Hug is:

8    Preventing developers from launching off-Play by paying them a

9    bribe.

10       And this money came with a catch.  It was not just a

11   discount; right?  People who took the Hug money needed to agree

12   to launch their apps only on the Google Play Store first -- or

13   I should put this differently -- needed to launch on the Google

14   Play Store at the same time as they launched everywhere else.

15   In other words, they couldn't launch only somewhere else and

16   they had to have the same content available in both places, and

17   this prevents differentiation.  It's a key method of

18   competition.

19       I showed you this in opening.  This is a way that new

20   companies can compete.  They can have exclusive content.  They

21   can bring people to the store.  If you're a new entrant

22   competing against somebody with 95 percent share, this is not a

23   very effective sales strategy to say "I've got all the same

24   stuff that guy has."  But that's what Project Hug did, and

25   thereby blocked people from differentiating themselves.

1     The other thing Project Hug did was it actually prevented

2     some developers from launching their own store at all.  This is

3     a little retrospective that Google did of Project Hug; and they

4     identified certain developers, Riot and Activision or ABK are

5     two of them, that were considering launching their own

6     distribution platforms.  See it says "GVP."  That's Games

7     Velocity Program.  That's the same thing as Hug.

8     So let's take these one by one.  Activision first.

9     Activision, Google knew, was considering launching its own

10    store.  This is Mr. Harrison explaining that to his colleagues

11    in Google.  But we also have the Activision documents that say

12    this.  This is a deck from Activision.  Path one that they were

13    considering was what they called enterprise negotiation with

14    Google; but if they didn't secure real savings with Google --

15    sorry -- if they did secure real savings with Google, they

16    would prioritize -- deprioritize path two; path two, building

17    their own store.  If they got the money from Google, they would

18    deprioritize building their own store.

19    And this was not just a notional fictional thing they were

20    talking about.  They had put work into it.  They had a pilot

21    going.  They had built what the store would look like.  They

22    had dedicated people to work on it.  This was happening, but it

23    got shut down.  As they said, they pivoted away from this

24    strategy once they struck the $360 million Hug deal with

25    Google.

1     Riot is similar.  Here it's pretty straightforward.  Epic

2  says -- excuse me -- Google says Riot agreed to put aside their

3  off-Play distribution platform.  And it wasn't just once.  It's

4  more than once.  Riot stopped.  They paid Riot to stop their

5  in-house app store efforts.

6     And surprise, surprise, neither Activision nor Riot nor

7  any other Hug developer has ever launched its own Android store

8  or launched its games outside of Play on Android at all.  So

9  through these agreements, Google has engaged in unreasonable

10  restraints of trade and monopolization.

11     Now, each of these alone is anticompetitive, but you need

12  to view them all together.  Professor Bernheim explained this

13  too.  They're mutually reinforcing things, each of which makes

14  the other worse than it would be by itself.  Google viewed it

15  that way.

16     GDAF, that's just the same thing as RSA 3.0.  Google

17  recognized that these things all work together to, as they say

18  on top, protect against Play risk.  You see Hug in there, you

19  see Banyan in there, and you see the RSA 3.0 called GDAF.  So

20  that's app distribution.

21     Let me talk about payments for a minute.  Google -- this

22  is our tying claim.  Google has engaged in a tie.  It has tied

23  distribution through the Google Play Store to Google Play

24  Billing.  And like the prior claims, it requires power, it

25  requires conduct.  The power is the power in distribution, and

 1   the conduct is this tie.  These products don't have to go

 2   together.  They go together only because Google has a contract

 3   that makes it so.

 4       The billing solution and the distribution option, the

 5   store, are separate functions; and as Mr. Miner told us, they

 6   were developed and launched by different groups within Google.

 7   They are separate products.  He says it here:  A separate

 8   product.  Google Checkout, that's the old name for

 9   Google Billing.  Android Market, that's the old name for the

10   Google Play Store.  He acknowledges separate products.

11       And it's obvious that they're separate products because

12   there are all of these developers who were selling digital

13   content on the Google Play Store for years without using

14   Google Play Billing subject to an exception that existed for a

15   while; but when Google chose to close the exception, they had

16   to change their practices.  That shows you these things are

17   separate, and they are tied only because Google arbitrarily

18   ties them.

19       And developers hate it.  We had a parade of people come

20   through here and complain about the quality -- not just the

21   price but also the quality of Google Play Billing.  They don't

22   want to use it.  They think they can do better with their own

23   solutions or with competitors like Stripe or like PayPal.  The

24   most dramatic example, of course, is YouTube, Google's own

25   company, that doesn't want to use Google Play Billing and

1    objected to the tie.  Ms. Wojcicki, the president of YouTube,

2    she says "It's damaging for our business."  They don't want to

3    do it.

4         And there are other companies that will compete if they

5    can.  Epic would.  And you met Mr. Owens.  He told you, this is

6    the guy from Paddle, he said, "I'd hope we'd be able to

7    compete," but he can't.  And because there is no competition

8    because of the tie, the price does not reflect competition

9    either.

10        Google recognized internally that the breakeven point,

11   what it could charge to cover its costs, was 6 percent.  It's

12   roughly in line with what other companies charge; but because

13   of the tie, Google charges an awful lot more.

14        Now, Google has argued in response that this is not a fair

15   comparison because Google also provides distribution services

16   and discovery services as part of the price.  Google's own

17   documents say that it's not providing value that is aligned

18   with how much developers pay, that the 30 percent is arbitrary.

19        And as Google says, most developers actually do get

20   distribution and discovery for free.  They pay zero.  It's only

21   when they use Google Play Billing that they pay the fee.  And

22   as Professor Tadelis told you, if that tie were severed, if

23   people didn't have to use Google Play Billing, then Google

24   would have to compete, and there's no way it could be charging

25   29.4 percent for the payments against the competition.

1    Would Google make less money at that point?  Yes.  Yes, it

2  would.  At least that's what ordinarily happens when monopolies

3  get broken, they stop making monopoly profits.

4    But you heard uncontested testimony from Mr. Barnes that

5  even at 12 percent Google would still make $5 billion a year.

6  That's not a bad business.

7    Now, it's not an answer for Google to say, as it does, and

8  it did it again and again, that other platforms also charge

9  30 percent because those comparisons are false comparisons.

10  They focused, remember, on game consoles.

11    As Professor Bernheim explained, the economics of the

12  different platforms is different.  The 30 percent fee, it gives

13  Google a 70 percent, 71 percent or more margin.  It gives the

14  game console's profits that are much, much lower.  As you were

15  told by Epic's chief financial officer who testified by

16  deposition, Mr. Gelber, that's because they sell their

17  hardware, the consoles, they sell their hardware at a loss.

18  It's just a different business.

19    The comparison you never hear Google talk about is the

20  comparison to computers -- right? -- PCs and Macs.  They are

21  open platforms.  And an Android phone is an awful lot more like

22  a computer than it is like an Xbox or a PlayStation.

23    Mr. Miner, one of the founders of Android, he testified

24  they're like little computers in your pocket, the Android

25  phones.  And he's exactly right about that.

**CLOSING ARGUMENT / BORNSTEIN**

1    So the truth is, we don't know what a competitive rate

2  would be on the Android platform because the market has never

3  been allowed to operate freely.  The only way to know what the

4  competitive rate is is to let competition happen, but Google

5  has not allowed it to happen.

6    Now I've given you a lot of evidence and a lot of slides,

7  so I want to go dark for a second here.  I want to talk about

8  the evidence we don't have, the evidence I can't show you, the

9  evidence that Google destroyed.

10    As you know, Google directed its employees to direct its

11  most sensitive communications to Chat, and those history off

12  Chats Google intentionally deleted.  They deleted them for the

13  express purpose of keeping them from us and keeping them from

14  you.  They did it when this litigation had already been filed

15  and when they had a legal obligation to preserve those

16  documents.

17    Here's what they said about it.  I have some Chats we were

18  able to get; right?  They said that they do it in order not to

19  leave a trail because there's legal sensitivity, and they

20  laughed about it.  This is an attack on the judicial process.

21    Even the CEO of Google was involved.  This is Mr. Pichai.

22  Not only did he tell people to turn history off, he then

23  attempted to delete his effort to delete the evidence.  And to

24  make matters worse, he came in here, he stood there and he told

25  you this was a glitch.  This was no glitch.  We know this

because we see it in other Chats.

Here's Ms. Lam on the bottom.  When she updated one of her Chats, it said "Updated on" and it reproduced the things. Mr. Pichai, he tried to delete his, it did the exact same thing.  It just said "deleted" instead of "updated."  This was no glitch.  This is how the program works.

Now, in its instructions you heard the Court tell you that you may infer that the Chats Google deleted may have been unfavorable to Google in this case.  It's because the Chats really matter.

Google witness after Google witness after Google witness came in here and sat on the stand and failed to give straight answers.  In many cases they gave sworn testimony that was contradicted by the documents that we do have.

Think about how many times we were able to prove something because we had a document, and that's why the destruction of Chats is so important.  By intentionally destroying those documents, Google's channel for its most sensitive communications, Google intentionally made it harder for us to prove our case.  And that is why in considering whether we have proven our case, you can and you should conclude that as damning as the documents we have are, the ones that they deleted would have been even more damning.

So what comes now?  I'm going to talk to you about what you have to do next.  You have your instructions from the

1  Court.  They're detailed.  They're nuanced.  It's not my place

2  to pluck out sort of little pieces from everything the Court

3  gave you and tell you "Here are the ones I like and maybe

4  ignore the ones I don't."  You consider them as a whole.

5      My job is to talk to you about the verdict form, which

6  you'll get afterwards, as the Court told you.  I'm going to

7  tell you how we believe the evidence requires you to fill it

8  out.

9      So here's the first question you'll get.  It's about

10  market definition, and you're asked whether by a preponderance

11  of the evidence we have proven the existence of the market.  As

12  the Court explained, that just means -- "preponderance" means

13  just more likely than not, 50.00001 percent.  This is not

14  beyond a reasonable doubt like in a criminal case.  Is it more

15  likely than not?  Now, we don't believe there's anything that's

16  really a close question here, but this is the standard that

17  applies.

18      So we have proven two relevant markets:  Android app

19  distribution, that's where the Google Play Store operates; and

20  Android in-app payment solutions for digital content, that's

21  where Google Play Billing operates.

22      In response, as an alternative, Google has given you this:

23  Professor Tucker defines a market for the making sure that

24  certain things go well.  She was asked in court whether there

25  is anything online that is not part of her definition of a

1    relevant market, and she was literally unable to come up with

2    anything.  Her market definition is so broad, so

3    incomprehensible that it is -- and I don't use the word

4    lightly -- it is absurd.  The only markets that have been

5    defined here are the markets for Android app distribution and

6    Android in-app payment solutions.

7        Now, I have one other thing to say about market

8    definition, which is Apple.  Because Google has -- they've

9    staked their case really on the idea of market definition and

10   the fact that the Apple App Store is in the distribution

11   market.  This is false.  This is not the real world.  This is a

12   litigation strategy, and we know this again from the documents.

13   It is not what people said at the time.  The documents, to the

14   extent we have them, they tell the real story.  So let's look.

15       Mr. Gennai back in 2019, he says:  The biggest priority

16   for Q1 is what Play should do in the face of increasing app

17   store competition.  Where?  On Android.  He talks about other

18   OEMs.  He talks about other platforms like Epic.  He says not a

19   word about Apple.

20       Mr. Gennai again:  The defense of Google Play as the

21   preeminent Android, Android, app distribution store.  And, by

22   the way, notice what he calls his own business:  Android app

23   distribution.  Consistent with how Professor Bernheim defines

24   the market.

25       Same thing in Banyan -- oh, there's no call-out there.

1   There we go.

2       Same thing in Banyan.  The existential question is:  How

3   do we continue to keep Play as the preeminent distribution

4   platform for Android?

5       Project Hug.  Ms. Kochikar explained:  This is an effort

6   to address fragmentation -- remember, that's just code word for

7   competition -- within the Android ecosystem.

8       And all of this is backed up by the economics.  It's not

9   just the documents.  Professor Bernheim gave you the

10  quantitative analysis.  I am going to leave the numbers to him,

11  but I do want to talk for a minute about the kind of

12  substitution that matters.

13      Consumers can't substitute from the Google Play Store to

14  the Apple App Store unless they buy a new phone, but they have

15  to buy a new phone, and that happens in what

16  Professor Gentzkow, Google's expert, called the phone market.

17  And switching in the phone market from one OS to another is

18  low.  Here's what Google said:  The intent to use another OS is

19  incredibly low.  The number of OS switchers is small.

20      The numbers we've seen, they're like high single-digit

21  percentages, and percentages are what matter as

22  Professor Bernheim explained.  It's not the absolute numbers.

23  When you're thinking about market definition, you think about

24  share.  You heard that in the instructions again and again just

25  now.  You don't think about the absolute numbers.

 1        But even the percentages and the numbers that we've seen,
 2   they are inflated in the following way:  Professor Tucker
 3   agreed on cross-examination that the relevant question in
 4   defining the market in which the Google Play Store operates is
 5   not how many people switch phones in general for things like
 6   the camera or the battery or because they have a cool foldable
 7   that Mr. Lockheimer showed us or because they like the blue
 8   iMessage bubbles; what matters is how many people switch
 9   because of the app store.  And we've seen Google documents top
10   reasons for smartphone purchase, the app store isn't even
11   there.

12        People also talked -- excuse me -- Google also talked
13   about developer switching as a thing they worry about.  Nobody
14   leaves Android to be on iOS alone.  One of their witnesses
15   said this.  You need to be at the very least on Apple and
16   Google in order to succeed.  It's like 101 in mobile
17   publishing.

18        So Apple is not the "get out of jail free card" that
19   Google wants it to be.  The Apple App Store is not in the
20   relevant market.  So when it comes time for you to answer this
21   market definition question, the relevant product markets we
22   believe are Android app distribution and Android in-app payment
23   solutions for digital content.  They're also in the
24   instructions the Court gave you in Instruction 16.

25        On the geography side worldwide except China, this is what

1    we've proven for both:  China is excluded because the Google

2    Play Store and Google Play Billing are not permitted to operate

3    there, but the conduct is the same otherwise on a global basis.

4    As Mr. Miner testified, an important part of the Google Play

5    Store was to have one place worldwide.

6         And as Professor Bernheim and Professor Tadelis explained,

7    because the conduct is the same everywhere and competitive

8    conditions are broadly similar, you don't need to make

9    fine-grain distinctions country by country.  There's no

10   analytical benefit.  There's no point.  Worldwide market.

11        All right.  Set aside market definition.  I'm going to run

12   through, I hope relatively quickly, the different claims that

13   we've brought and what we believe you ought to be writing on

14   the form for those.

15        So the first monopolization, unreasonable restraints of

16   trade, and time.  You'll get a question about monopolization.

17   Has Google willfully acquired or maintained monopoly power

18   through anticompetitive conduct?  Again, by a preponderance --

19   all these questions, by a preponderance of the evidence,

20   50.0001 percent.  Now, part of that question is whether Google

21   has monopoly power.  Remember power and conduct?

22        Monopoly, as Professor Bernheim testified, doesn't mean

23   literally just one.  As was in the Court's instructions, it's a

24   company that can exclude competition or that can keep prices

25   substantially above the competitive level for a significant

 1   period of time even if there are other smaller competitors.

 2   And based on the indicators that you will see in the

 3   instructions, in Number 22 in particular, there should be

 4   little doubt that Google has monopoly power in the relevant

 5   markets.

 6       This is Google's share in app distribution, this big green

 7   wall (indicating); and because of the tie, it's an equally big

 8   share in payments.  It has lasted for years and years and years

 9   and years.  There are huge barriers to entry, and we saw there

10   are massive and increasing profits.

11       Now, has Google maintained this power through

12   anticompetitive conduct?  I think I just spent a half an hour

13   explaining why.  Yes.  We had a whole trial hearing the conduct

14   that Google has engaged in, how it has had anticompetitive

15   effects that harm consumers, that harm developers, and that

16   harm innovation in the relevant markets.

17       So what ways on the other side, what justifications has

18   Google offered for this?  Well, there's Apple.  We've talked

19   about this one.  What Google was actually doing was fending off

20   competition on Android.  That's what they said to themselves in

21   their own documents.  It's not Apple.

22       They've said fragmentation.  Professor Gentzkow testified

23   that, "Oh, if they didn't have some of these agreements,

24   Android would go the way of old operating systems like Symbian

25   that didn't succeed."  But the agreements that we're talking

1  about, they're 2018, 2019, 2020 and beyond, after Android was

2  already the monopoly operating system in smartphones.

3  The argument that this was needed to prevent operating

4  system fragmentation doesn't hold up.  By 2018, '19, and '20,

5  fragmentation just means competition.  Quashing fragmentation

6  is the problem; it is not a justification.

7  The last thing they offer is security.  Now, this applies

8  only to a subset of the conduct that we have challenged.

9  There's nothing about Project Hug or the RSA 3.0 agreements or

10  the other revenue share agreements that we've talked about that

11  relate to security.  For that reason alone, you should check

12  "Yes" on monopolization because security doesn't apply.

13  But as to direct downloading even, which is where Google

14  does bring up security concerns, security does not justify the

15  specific things that Google actually does.  The install flow

16  does not need to be as complicated as it is.  The warnings are

17  far scarier than they need to be.  Professor Mickens shared

18  with you some alternatives that would be much more user

19  friendly.

20  And Google doesn't have to treat all apps outside the

21  Google Play Store as if they were unknown dangers.  Remember,

22  Mr. Pichai was asked whether the Amazon Appstore is treated

23  exactly the same as illstealyourinfo.com, and he acknowledged,

24  that's right, they don't make any distinction at all.

25  Professor Mickens explained that there is a better and

1    substantially less restrictive way to do it.  Google can

2    achieve its security objectives by separating review from

3    distribution.  They could have the apps reviewed either

4    themselves or by trusted third parties, and then let the

5    developers distribute the reviewed apps however they want.

6         The evidence showed that Android can accommodate this.

7    The evidence showed this already happens on Macintosh

8    computers.  It's what Apple does in the real world.  It's like

9    precheck at the airport.  You can sign up.  You get like a

10   background check, like getting your app reviewed, and then you

11   get a smoother install flow, smoother access to the airplane.

12   That's all it is.  It's very feasible.  Google doesn't have to

13   do what it does.  Security does not justify it.

14        One last point on this.  If you get to the end of the road

15   after the anticompetitive effects and you work your way through

16   these purported justifications, you still have to balance

17   whether the anticompetitive effects are worse than whatever it

18   is that Google is legitimately trying to achieve in a least

19   restrictive way, the overwhelming anticompetitive effects here

20   of Google's conduct clearly outweigh any plausible

21   justification in the balance.  Google has cemented its

22   monopolies in both of these markets.  So the answer on

23   monopolization should be "Yes."

24        Let's talk about the other claims.  Unreasonable restraint

25   of trade.  This one focuses on specific agreements.  The answer

1    is "Yes," by the way.  This one focuses on specific agreements.

2    You will be asked about the specific agreements on the verdict

3    form.

4        The DDA agreements, these are the Developer Distribution

5    Agreements, they unreasonably restrain trade by imposing the

6    tie that we talked about of Google Play Billing and also by

7    imposing the antisteering restrictions.  This is the

8    restriction that says that as a developer, you can't even tell

9    your users in the app about where to go to buy things more

10   cheaply.

11       Mr. Simon, the yoga guy from Down Dog, he was here the

12   first day of trial, and he showed you, he tried to do this and

13   he wasn't allowed.  So, yes, the DDA agreements are

14   unreasonable restraints of trade.

15       The Project Hug agreements I talked about at length.

16   They, too, unreasonable restraints of trade given the way they

17   stop alternative stores and they prevent others from getting

18   access to differentiating content.

19       And last, the agreements with OEMs, unreasonable

20   restraints of trade.  They require the Google Play Store to be

21   on the default home screen.  The RSA 3.0 premier tier prevents

22   anything else from being preinstalled.  And the agreements with

23   OEMs are also the source of those direct download restrictions.

24   That's why OEMs do it because they have to because they've

25   agreed to in the agreements with Google.  Every one of these is

1  a problem; but if you, again, take them all together, we

2  clearly have unreasonable restraint of trade.

3      Tying.  This one I know I've covered; right?  There's a

4  tie.  There's the Google Play Store, there is market power, and

5  Google Play Billing is contractually required to be used.

6      The last set of questions you'll get -- you'll see they're

7  not quite in this order, but the last set of questions you'll

8  get is about injury.  Have we been harmed?  Has Epic been

9  harmed by each of these violations of law?

10     Again, the answer -- like for all of these, the answer we

11 believe is "Yes."  Epic has been harmed as a developer.  It

12 can't distribute apps the way it wants to.  It can't have its

13 own payment solution.  It can't tell users about other ways to

14 buy things in the app, and it is forced to pay higher prices

15 and get lower quality as a result.

16     But Epic is not only injured as a developer, and this is

17 important.  Epic is injured in other ways.  It's injured as a

18 store.  Remember the Epic Game Store?  It wants its store

19 directly downloaded, it wants its store preinstalled, and it

20 wants exclusive content for its store to differentiate itself,

21 but it cannot get those things because of what Google has done.

22     And Epic has been injured as a payment provider.  It

23 cannot offer its payment service to other developers on the

24 Google Play Store.

25     So let me end with just a few words about why we're here

1   and about Epic.  Epic is a pretty special company.  You've

2   heard it has repeatedly pushed to change things in the industry

3   that it believes are wrong:  Cross-play between PlayStation and

4   Xbox.  It's breaking Steams dominance in PC game stores, and

5   Epic took on this battle too.

6        Project Liberty was a very deliberate effort to call

7   attention to the wrongfulness of what Google has done.  You

8   heard on the second day of trial, Mr. Koh, he acknowledged that

9   had Epic not pursued Project Liberty and broken the rules,

10  Google would never have allowed the world to see that it was

11  possible.

12       So from the first day of trial, Epic has been very open

13  about having broken the rules.  So that's why, as the judge

14  says, you're not going to be asked to decide the counterclaim

15  here.  But Epic did it because Epic made the choice to stand up

16  for what is right and, yes, Epic is going to benefit

17  financially as well, so will lots of developers and so will the

18  consumers who are currently stuck paying higher prices.

19       Epic is a business, it wants to make money; but if that's

20  all Epic wanted, it could have taken a special deal in 2018

21  when hundreds of millions of dollars were on offer.  It could

22  have negotiated for even more, but it said no.  What Epic wants

23  is for the conduct to stop for Epic's benefit and for all other

24  developers too.  Because Epic is fighting a monopoly, everyone

25  benefits if Epic wins.

1      So let's talk about Google at the end.  What Google has

2  done is egregious, and this trial has shown it.  A dominant

3  company with a monopoly store that has systematically,

4  repeatedly, deliberately, and unlawfully used its power and its

5  resources to make it so other companies can't fairly compete.

6      The proof that we have, to the extent it hasn't been

7  destroyed, is overwhelming, and so we ask you to check "Yes" to

8  all these questions and find that Google has violated the law

9  in Android app distribution and Android in-app payment solution

10 markets.

11     So I'll end where I started with a big thank you.  Again,

12 you've given me lots of attention and I'm grateful for that,

13 and I will be back a little bit later because I'm saving some

14 time for rebuttal.  So thanks very much.

15     **THE COURT:**  Okay.  You have about eight minutes for

16 rebuttal.

17     All right.  Defendant.

18     **MR. KRAVIS:**  Thank you, Your Honor.

19     Can we switch over control?  Thank you.

20                    **<u>CLOSING ARGUMENT</u>**

21     **MR. KRAVIS:**  Epic just spent nearly an hour arguing

22 that Google is an unlawful monopolist, but the evidence that

23 you have actually seen in this trial shows over and over again

24 competition, and that competition starts here:  The competition

25 between Android phones and iPhones.

1    No one seriously disputes that these phones compete.  No

2    one seriously could.  And you have seen that the conduct at

3    issue in this case is how Android phones compete with

4    iPhones:  The operating system, the phone manufacturer

5    agreements, the security messages, and of course the app

6    stores.

7        You have seen that app stores have been critical to the

8    competition between Android phones and iPhones since the very

9    beginning.  As Rich Miner, one of the cofounders, told you, a

10   critical piece of the early strategy for Android was to make

11   life easy for developers.  This was the innovation, the simple

12   elegant brilliance of the Google Play Store.  If we give

13   developers at least one place to distribute their apps to

14   consumers all over the world no matter what brand of phone they

15   have, no matter who their carrier is, then we will have the

16   best apps; and if we have the best apps, then more people will

17   buy Android phones.

18       And so from the beginning, the competition between the

19   phones has also been a competition between the app stores, the

20   Apple App Store and the Google Play Store.  You have seen the

21   evidence of that competition during this trial.  Service fees

22   going down.  Never up, always down.  Competitive improvements

23   to the quality of the two stores.

24       And you have seen that today the field of competition is

25   much broader than just Google and Apple.  There are other

1    Android app stores, like the Samsung Galaxy Store.  There's

2    direct downloading from a website.  There are other platforms

3    like PCs and game consoles and streaming services.  Today app

4    developers like Netflix and Match sell subscriptions directly

5    from their websites.  All of these choices mean more

6    competition for the Google Play Store.

7         Now, notwithstanding all of these choices, Epic has

8    brought antitrust claims against Google.  Epic cannot prevail

9    on those claims for four reasons.

10         First, the Google Play Store competes with the Apple App

11    Store.  For every one of its claims, Epic has told you that the

12    relevant market is just Android, Android and only Android.  For

13    every one of its claims, Epic has asked you to pretend that

14    the iPhone just doesn't exist.  Epic is wrong about that; and

15    as you will see on the verdict form, this simple point is fatal

16    to all of Epic's claims.

17         Second, consumers and app developers have lots of choices

18    and the Google Play Store competes with all of those other

19    choices.

20         Third, Epic has not shown that Google engaged in any

21    anticompetitive conduct.  In their opening statement and here

22    again today Epic told you they would prove that Google has used

23    bribes and blocks to cut off competition.  The evidence that

24    you have actually seen and heard during this trial has not

25    shown anything like that.

1      So if that's the case, then what is this trial really

2  about?  What this is really about is Epic wants to use the

3  Google Play Store for free, and this is the fourth reason why

4  Epic cannot win this case.  The antitrust laws do not require

5  Google to give away its services for free.

6      Now, Epic has tried to make it sound like the Play Store

7  charges an exorbitant service fee, but that's not what the

8  evidence has shown at all.  The service fee that the Google

9  Play Store collects is at or below the fees charged by other

10  app stores.

11      Now, my colleague described this a moment ago as a false

12  comparison, but this is the right comparison because these are

13  the companies, these are the stores that are providing the same

14  kinds of services as the Google Play Store, the distribution of

15  apps to consumers around the world.

16      The real false comparison is the one that Epic keeps

17  trying to make.  Epic keeps trying to compare the Play Store

18  service fee to the rates charged by payment processers like

19  PayPal and Stripe and Square.  You saw this in their opening.

20  You saw it during the trial.  You saw it again today.

21      But every witness, including Epic's CEO Mr. Sweeney,

22  agreed this is not a fair comparison because these companies do

23  not provide services that is anything like what the Google Play

24  Store provides.  PayPal and Stripe do not distribute apps to

25  billions of consumers around the world.

1       Epic told you in its opening statement and again today

2   that this trial was about helping out small developers, but

3   you've seen that's not true.  In fact, 97 percent of all

4   developers in the Google Play Store pay nothing, no service fee

5   at all.  It is only about 1/10th of 1 percent of the developers

6   who are in the store, the biggest game companies like Epic, who

7   actually pay 30 percent.

8       Epic has told you they're not seeking damages, but the

9   evidence showed that this case is all about money.  As

10  Mr. Sweeney admitted when I asked him, Epic wants you to give

11  them a deal that they don't have and they haven't been able to

12  get anywhere else -- not in the Samsung Galaxy Store, not in

13  the Apple App Store, and not on the game consoles -- a deal

14  that would effectively allow them to use the Play Store for

15  free.

16      Let's start with number one.  The evidence has shown that

17  the Google Play Store competes with the Apple App Store.  It is

18  Epic's burden to prove what the relevant market looks like, and

19  it is Epic's burden to prove that Google has monopoly power or

20  market power in that market.

21      As you will see, this is Jury Instruction Number 18, for

22  all of its claims, Epic has argued that the relevant market is

23  limited to Android, Android and only Android, and Epic is wrong

24  about that.  How do you know?  How do you know what the

25  relevant market looks like?  Well, Jury Instruction 18 tells

1    you that too.

2         When it comes to identifying the relevant market, what you

3    are being asked to decide is which products compete with each

4    other.  Which products compete with each other.  The evidence

5    has shown that the Google Play Store competes with the Apple

6    App Store, and that means the stores are in the same market.

7         And because Google and Apple are in the same market,

8    Google cannot have monopoly power or market power.  As this

9    slide shows, the Apple App Store has 64 percent of the market

10   in the United States.  Google cannot have monopoly power or

11   market power when Apple controls 64 percent of the market, and

12   Epic has never argued otherwise.

13        Now I want to walk through with you the evidence of the

14   competition between these stores now; and as we do that, I'd

15   like you to keep something in mind.  As Epic's own economist

16   admitted during the trial, economics is not abstract math.

17   Economics is about conditions in the real world.

18        Well, the folks in the real world who work in these stores

19   told you about the competition between the Google Play Store

20   and the Apple App Store.  I'm going to talk about two of them

21   today:  Purnima Kochikar and Carson Oliver.  Purnima Kochikar

22   is the vice president of partnerships for Google Play, and she

23   told you during this trial that the Google Play Store competes

24   with the Apple App Store for users and for developers.

25        The stores compete for users because the quality of the

1   app stores is tied to the quality of the phones.  It is apps

2   that allow our phones to do the things that we expect them to

3   do -- shop, connect on social media, play games -- and so the

4   quality of the experience you have with the phone depends on

5   the quality of the apps in the app store.

6       In our opening statement we told you that during this

7   trial Epic would try to break the phone apart, and that is

8   exactly what they've done.  This is probably the best example.

9   This was Epic's economists trying to explain how it can

10  possibly be that Google and Apple are not in the same market.

11  This is Epic trying to break the phone apart.

12      You've got one market for hardware.  You've got another

13  market for the operating system.  You've got another market for

14  the app stores.  And Apple's just kind of sitting down there at

15  the bottom, and somehow it just happens to turn out that Google

16  is always the only company in every relevant market.  This

17  convoluted gerrymandered explanation is just not consistent

18  with common senses.

19      What do I mean by that?  Well, imagine a customer buys a

20  phone, they take it home and turn it on, and it's got a lousy

21  app store on it.  They can't find the apps they want.  The apps

22  they can find are low quality.  And every time a new app comes

23  out, they've got to wait six months to get it in their app

24  store.  You don't need a Ph.D. in economics to figure out

25  what's going to happen next.  The next time around they're

1    going to buy a different phone.

2        You heard about this from Sundar Pichai, Google's CEO.  He

3    could not have been any more clear.  Android phones cannot

4    compete against the iPhone without a great app store on them

5    like Google Play.

6        And the evidence you have seen, the documents you have

7    seen during this trial show exactly what he means.  This is

8    Exhibit 2903.  This is a study that Epic's counsel showed to

9    Paul Gennai.  It's what some witnesses called a switching

10   study.  It's looking at why consumers switch between Android

11   phones and iPhones.

12       This is pages 27 and 39 of Exhibit 2903, and you can see

13   right here this study shows that the quality of apps and the

14   quality of app stores is one reason why consumers switch.

15       Now, during his closing argument, my colleague showed you

16   some other studies that showed different reasons, and that's

17   okay.  That's fine.  We're not here arguing that the apps in

18   the app stores are the only reason why someone might switch to

19   an iPhone, but these studies show that it is a reason why

20   they might switch.

21       And you can see this clear as day.  You can see this

22   connection between the app store and the phone.  You can see it

23   as clear as day in this Apple advertisement we showed you

24   during the trial.  During the trial, we showed you the whole

25   video.  I'm just showing you a few screenshots here.

 1        You can see there's the Android icon on the left and the

 2   Apple icon on the right.  Apple is saying in this ad, the

 3   message is unmistakable, the Apple App Store is better than the

 4   Google Play Store, and that is a reason to switch to the

 5   iPhone.

 6        So when Epic's counsel stands up here and says, "Well, you

 7   can't buy an Android app in the Apple App Store and you can't

 8   buy an iOS app in the Play Store," that is just missing the

 9   point.  The competition between the stores is tied to the

10   competition between the phones.

11        Now, during this trial, Epic tried to convince you that

12   this competition for consumers doesn't really exist because

13   Android phone owners don't actually switch to iPhones.  The

14   evidence showed that Epic is wrong about that.

15        During the trial, you heard a few different numbers on

16   switching rates.  The number you heard from Epic's own expert,

17   Professor Bernheim, was that the rate of Android users

18   switching to iPhones is somewhere around 12 percent.  And you

19   heard the number going the other way, iPhone to Android is

20   somewhere around 6 percent.

21        This means that on net, Android is losing 6 percent of its

22   users to iPhones every year.  You heard during the trial that

23   on average about 1 billion Android users buy a new phone every

24   year.  6 percent of that number is about 60 million Android

25   users switching to an iPhone every year.

1     Now, you heard from my colleague, "Well, don't think about

2  it in terms of absolute numbers," but that's sure how the

3  Google people think about it.

4     You heard about this from Purnima and Hiroshi Lockheimer

5  and Sundar Pichai and Kirsten Rasanen, the absolute number does

6  matter to them.  These numbers are really concerning to Google.

7     Google does not want to lose 60 million Android users to

8  the iPhone every year.  What business would?  Do you know a

9  business that would not be concerned about losing 60 million

10  customers every year?  I do not.

11     And because of this, because the quality of the apps and

12  the quality of the app store is a reason, it doesn't have to be

13  the only reason but it is a reason why people choose to buy a

14  particular phone, the stores want to have the best apps.

15     And so Purnima told you the competition between the Google

16  Play Store and the Apple App Store is also a competition for

17  developers.  The two stores compete fiercely for the limited

18  resources of developers because each one wants the best apps in

19  their store.

20     Purnima told you she spends her days trying to convince

21  developers to devote their time and resources to building and

22  improving their apps for the Google Play Store.  She told you

23  her job can be pretty tough.  App developers tend to put their

24  apps in the Apple App Store first because iPhone users tend

25  to spend more money.

 1        And you heard about many examples of this during the

 2   trial.  Epic's own hit game Fortnite launched on iPhones

 3   first.  Nintendo launched Super Mario Run on iPhones first.

 4   Purnima gave you other recent examples:  Clash of Clans,

 5   Clubhouse, ChatGPT.

 6        During this trial, you did not hear a single example of an

 7   app that launched on Android before it launched on the

 8   iPhone.

 9        Purnima also told you about the app quality of the app.

10   This is when the iPhone version of an app works better than

11   the Android version of the same app.

12        Purnima testified about the effect that this document had

13   on her state of mind, her thinking about how she does her job.

14   Purnima told you her reaction when she read things like:  Play

15   isn't helping Android.  We don't have some of the apps and

16   games Gen Zers care about.  The ones we have are cringy and

17   don't work well.  She told you her reaction.  She said, "This

18   is not good.  It's not good for the Google Play Store, it's not

19   good for Android phones, it's not good for Android users, and

20   it's not good for competition."

21        Purnima described this slide as a call to action.  She

22   said, "My team and I have to go out and we have to find the

23   apps that people care about, and we have to get them in the

24   store."

25        So what does Epic say to this?  Epic says, essentially,

 1   Purnima and her team have been wasting their time.  Epic says

 2   there's actually no reason for Purnima to spend all this time

 3   talking to developers because developers are going to build

 4   their apps for both iPhone and Android no matter what.  Today

 5   my colleague put it as no one leaves.  This, again, just misses

 6   the point.

 7          What Purnima told you and what the evidence shows is that

 8   app developers are just like the rest of us.  They can't do

 9   everything at the same time.  They have to prioritize which

10   apps to build first and which apps to update first.

11          This is more common sense.  App developers have to start

12   somewhere.  You heard about it from the yoga guy, Ben Simon, at

13   Down Dog from the very first day of trial.  App developers have

14   to start somewhere; and if they always start with the iPhone,

15   then Android users have to wait months every time a new game or

16   a new app comes out.

17          And it also means that lots of apps aren't going to work

18   as well on Android phones as they do on iPhones because the

19   iPhone version gets updated first.  Well, what do you think is

20   going to happen?  More people are going to buy iPhones.

21          And it's not just Google telling you this.  The Apple App

22   Store sees it the same way.  This is Carson Oliver.  He is the

23   senior director of business management in the Apple App Store.

24   He's kind of like Apple's Purnima.  And he could not have been

25   any more clear.  He testified that the Apple App Store competes

1   with the Google Play Store.  He told you that the Apple App

2   Store provides resources to developers to try to bring their

3   apps to the store.  And he told you it doesn't stop there.

4   Once the app is in the store, Apple continues to provide tools

5   to developers.  Why?  So that they will update and refine and

6   improve the iPhone versions of their apps first.

7        Now, in light of the testimony from Purnima Kochikar and

8   Carson Oliver about competition between the two stores, what

9   would you expect to see?  Well, as Epic's counsel told you in

10  his closing argument today, competition is when you lower your

11  prices or you make your product better, and in this case you've

12  seen both.

13       Let's start with price.  The evidence showed that the

14  service fees charged by the Google Play Store and the Apple App

15  Store have never gone up.  They have only gone down.  During

16  this trial, you heard evidence about several of those fee

17  reductions.  This is Exhibit 5956.

18       In 2015, Google started hearing that Apple was offering a

19  lower service fee to media apps, and you can see what

20  Mr. Lockheimer says, quote (as read):

21            "I'm worried that we're about to massively lose this

22       developer base.  Any ideas on what we could do to remain

23       competitive?"

24       To remain competitive.  Well, Google did remain

25  competitive, you heard about this, by launching programs that

1    lowered the service fee in the Play Store for media developers,

2    like HBO and Showtime, to around 15 percent or even 10 percent.

3    They were called Living Room Accelerator Program or LRAP or the

4    ADAP.  You heard that this affected apps that appear on Android

5    TVs and apps that appear in the Play Store on Android phones.

6    It lowered the service fee.

7         Here's another example.  This is Exhibit 5996.  About a

8    year later Google started to hear rumors that Apple was

9    lowering its subscription service fee.  You can see

10   Mr. Rosenberg says in this e-mail (as read):

11             "We need to assume the rumor is true and plan

12        accordingly."

13        Well, Apple did end up lowering its fee to 30 percent for

14   the first year of the subscription and 15 percent after that.

15        And you saw what happened next.  This is Exhibit 5674.

16   It's a slide deck that we went over during Mr. Rosenberg's

17   testimony.  You're looking right now at page 8 of Exhibit 5674,

18   and you can see right there at the top "Competition:  Apple and

19   Amazon at 30 percent for 12 months."  Competition.

20        This is the Google Play Store saying "Our competitors are

21   charging a lower price.  How can we respond?"  Well, you heard

22   that Google, once again, did respond.  It lowered its service

23   fee first to match Apple and then to beat Apple.  Today Google

24   charges a lower service fee for subscriptions, 15 percent

25   across the board, than Apple does.

1      All of the documents you just saw were created years

2   before this lawsuit was filed, and they all showed Google

3   competing with Apple on price.  This is not the behavior of a

4   monopolist.  A monopolist does not lower its prices to match

5   competition.  This is the behavior of a competitor.

6      In fact, as you heard from Mrinalini Loew, today Google

7   charges a 15 percent service fee for all subscriptions for

8   media developers and for the first million dollars in revenue

9   that every developer earns every year.

10      In Epic's view of the world where the Google Play Store is

11   a monopolist, this should not be happening.  If the Google Play

12   Store and the Apple App Store are not really competitors, they

13   should be raising their prices, not lowering them.

14      Now, my colleague in his closing statement today showed

15   you examples of some documents where folks at Google are also

16   talking about competition within Android.  And, again, that's

17   fine, that's okay.  We're not disputing that Google also

18   competes within Android.  The point is that the competition

19   also extends to the Apple App Store, and those documents do not

20   contradict that in any way.

21      Okay.  That's price.  How about quality?  Here's a slide

22   from Professor Tucker.  It shows various improvements that the

23   Google Play Store and the Apple App Store have made over time.

24      Here again, you heard testimony about some specific

25   examples.  Mr. Gennai told you about improvements to the Play

**CLOSING ARGUMENT / KRAVIS**

1   developer console adding tools to help developers make Android

2   versions of their apps better.  He told you about the kids

3   choice section and promo codes and preregistration and

4   subscription game services.  Each time one store makes an

5   improvement and the other store responds.

6        You also heard about this from Mr. Oliver, the Apple App

7   Store guy.  In fact, you saw e-mails where he and his team are

8   reacting to public announcements about improvements in the

9   Play Store.  This is one example.  It's Exhibit 6848.

10       These changes don't happen right away.  You heard from the

11  witnesses they take time.  They affect thousands of developers

12  and billions of consumers.  And you saw examples where some

13  time passed between the service fee reductions or the store

14  improvements.  The key point here is these reductions and

15  improvements happened and Epic cannot explain why.

16       What Epic is really saying about competition between the

17  stores is:  We know better.  We understand better than the

18  people who actually work in these stores who their competition

19  is.

20       Maybe the clearest example of this was testimony from

21  Professor Bernheim.  We asked him (as read):

22            "Is the way you think about competition, like,

23       different from how people who actually work at these

24       companies think about competition?"

25       And here's what he said (as read):

**CLOSING ARGUMENT / KRAVIS**

1      "This makes no sense."

2      The word "compete" does not have some special meaning for

3  economists and a different meaning for the rest of us.   The

4  jury instructions you just heard do not have some special

5  definition of "competition."   You know what a competitor is.

6  It's someone you're trying to win business from.   This is true

7  for economists and it's true for the people who work at these

8  companies.

9      The reason you keep hearing the witnesses use the word

10  "competition" and the reason that you keep seeing documents

11  that say "competition" is because the stores actually compete.

12      This brings me to the second reason why Epic cannot win

13  this case.   The Play Store's competition is not just Apple.

14  App developers and consumers today have lots of choices.   They

15  have choices about where to distribute their apps, where to

16  download apps, and they have choices about where and how to

17  make digital purchases.

18      You heard about this from Professor Tucker.   She called

19  these digital interactions, downloading apps and making digital

20  purchases.   And she explained to you that these other choices,

21  these other places to engage in digital transactions are also

22  part of the relevant market because those other choices are

23  more competition for the Play Store.

24      Epic's own game Fortnite is a good example of all the

25  choices out there for developers to distribute their apps.

1    Epic can make Fortnite available to consumers in its own store

2    on PC, on consoles, on streaming services, and in the Apple App

3    Store.

4         Now, you heard Epic's counsel criticize Professor Tucker's

5    market definition, but Professor Tucker's market definition is

6    the only one you heard that takes into account all of these

7    other choices that actually exist in the real world for

8    consumers and developers.

9         Professor Bernheim's definition of the market just

10   pretends as though these other choices don't exist.  And the

11   same is true of Epic's closing argument.  All those charts Epic

12   showed you, the big green wall I think was how my colleague

13   described it, what's missing from all of those charts is these

14   other choices that consumers and developers have, the Apple App

15   Store and all the others.

16        On Android, Epic can also choose to distribute its app

17   through another app store, like the Samsung Galaxy Store.  This

18   is a choice that Epic does not have on the iPhone.  This is

19   the home screen of a Samsung Galaxy phone, and you can see

20   right here on the home screen Samsung preinstalls its own app

21   store, the Samsung Galaxy Store, right next to the Play Store.

22        This right here is competition built into about

23   100 million Android phones in the United States and about

24   1 billion Android phones around the world.

25        On Android, developers like Epic can also distribute their

1   apps directly from a website.  This is called direct download

2   or sideloading.  This is another choice that Epic does not have

3   on the iPhone.

4        Now, developers like Epic can sell digital goods on all of

5   these platforms, all of the platforms we've talked about.  As

6   Mr. Sweeney said:  You can by V-Bucks anywhere you can play

7   Fortnite.

8        In addition, app developers can also sell digital goods

9   directly from a website.  You heard about lots of examples of

10  this during the trial.  Netflix, Disney Plus, Spotify.  There's

11  more on the screen.  The idea here is you go to the website,

12  you buy a subscription, and you open the app and can use the

13  subscription you bought on the website inside the app.

14       Selling subscriptions on a website is one more choice that

15  developers have for digital transactions.  Professor Tucker's

16  market definition takes account of this choice;

17  Professor Bernheim just ignores it.

18       Now, Epic didn't really talk about these other choices in

19  its closing, but the evidence at trial showed that Epic does

20  the vast majority of its business through these other choices.

21  You can see this in data from 2020.

22       This slide shows purchases that were made by Fortnite

23  users that played Fortnite on Android at least once, and what

24  this shows is that during the time that Fortnite was available

25  on Google Play, those Android gamers, only 2 percent of them

1   actually purchased something using Google Play Billing.  The

2   other 98 percent either didn't buy anything at all or they made

3   a purchase using one of those other choices, like a game

4   console or Epic's website or the Galaxy Store.

5        So why does this matter?  Why do these other choices

6   matter.  This matters because more choices mean more

7   competition for digital transactions; and as we just talked

8   about, competition is how you figure out what the relevant

9   market is.

10        Remember, when a customer chooses to buy something using

11   one of these other choices on an iPhone or a game console or

12   a PC or another Android app store or direct download or on a

13   developers website, when a customer chooses to buy something

14   using one of those other choices, the developer pays Google no

15   service fee.

16        So if Google wants developers and users to choose the

17   Play Store, if Google wants to earn that service fee, it's got

18   to compete with these other choices.  That means that all of

19   these other choices are in the relevant market; and with these

20   choices in the market, Epic cannot show that Google has

21   monopoly power or market power.

22        This brings us to the third reason why Epic cannot win.

23   Epic has not shown that Google engaged in any anticompetitive

24   conduct.

25        Now, as you will see on the verdict form, once you

 1   conclude that the Google Play Store competes with the Apple App

 2   Store, you do not have to reach the questions about conduct.

 3   Once you decide that Epic has improperly defined the relevant

 4   market to exclude Apple, that's it, you're done.

 5        But Epic also has to show that Google engaged in

 6   anticompetitive conduct that substantially harmed competition,

 7   and they haven't done that.  How do you know?  Well, let's

 8   start with what anticompetitive conduct does not mean.

 9        This is Jury Instructions 23 and 21.  Anticompetitive

10   conduct does not mean the Play Store was successful.  This is

11   important because it shows why Epic is wrong when it points to

12   Google's profits and says those profits show harm to

13   competition.

14        These are from Jury Instructions 23 and 21.  They say

15   companies can make high profits for reasons that have nothing

16   to do with unlawful monopoly power, and that is exactly the

17   case here.

18        As you heard during this trial, the Play Store was an

19   incredible innovation when it came to distributing apps on

20   mobile phones, and you heard that Google has built on that

21   innovation over the years.  Today the Play Store has millions

22   of apps.  It allows developers to reach billions of Android

23   users around the world.  It provides all kinds of tools and

24   services to consumers and developers.  You heard about a bunch

25   of them during the trial.

1   Play has succeeded because it has allowed developers to

2   succeed distributing their apps.  Remember, the service fee

3   model means that Google makes money only when the developer

4   makes money.  Those profit numbers that Epic spent so much time

5   talking about show that developers are succeeding in the

6   Play Store.

7   And the data shows that consumers like the Play Store

8   better.  More than 1 billion phones come with the Google Play

9   Store and the Samsung Galaxy Store preinstalled right next to

10  each other on the home screen.  This is competition sitting

11  right there on the home screen.  Consumers can choose with the

12  click of the button.  And Professor Gentzkow showed you that

13  those consumers choose the Play Store 83 percent of the time.

14  This is Google winning the competition because it has a

15  better store, and there's a reason for that.  You heard during

16  this trial that Google has invested over $40 billion developing

17  and improving Android, the operating system that supports the

18  Play Store.  There is no dispute that the Play Store would not

19  exist without Android, yet Epic did not include those Android

20  costs in the profit numbers that they showed you.

21  Okay.  That's what anticompetitive conduct does not mean.

22  So what does it mean?  This is Jury Instruction 23, quote,

23  "conduct that has made it very difficult or impossible for

24  competitors to compete and that was taken for no legitimate

25  business reason."

1    Epic has not met this standard.  Epic has not shown that

2  Google made it very difficult or impossible for others to

3  compete.

4    Also, Google has shown that it has legitimate business

5  reasons for its conduct.  That conduct is how Google competes.

6  And because Google has legitimate business reasons for its

7  conducts, it's not enough for Epic to just come in here and

8  complain.  Epic has to offer an alternative.

9    This is Jury Instruction 23 (as read):

10    "Because Google has shown a pro competitive reason

11    for its conduct, Epic has to give you an alternative that

12    is virtually as effective and without significant

13    increased costs.  The law calls this a substantially less

14    restrictive alternative."

15    You have not seen this in this trial.  For each category

16  of conduct, Epic has not offered a substantially less

17  restrictive alternative.  For all but one of them, it hasn't

18  even tried.

19    Now, in their opening, Epic promised you that they would

20  show you bribes and blocks.  For each category of conduct, Epic

21  has not delivered on that promise.

22    Let's start with sideloading.  Sideloading is when an

23  Android user downloads an app directly from a website.  Now, as

24  you heard during this trial, downloading an app through

25  sideloading is riskier than getting an app through the Google

1    Play Store.  As Professor Qian showed you, apps can carry

2    malware that do all kinds of bad things to your phone, and so

3    the Google Play Store screens every app for malware before it

4    gets put in the store.

5        But Google cannot screen every single app on the Internet.

6    As Dave Kleidermacher, the head of security, put it "Google

7    cannot make the Internet safe."

8        So what does Google do about this?  Well, when an Android

9    user starts to sideload an app for the first time, the phone

10   shows the user a message.  The idea here is, given the risks

11   involved, let's make sure the user understands what they're

12   actually doing.

13       Now, in their opening, Epic told you that there's, like,

14   16 steps here; and you may have noticed that as the trial went

15   on, the number of steps just kept growing.  There was a slide

16   with 17, a slide with 18.  Andrew Grant from Epic said 20

17   steps.  None of that turned out to be true.

18       Epic's own expert admitted that this right here is all the

19   Android operating system itself requires for sideloading:

20   Three steps.  And, remember, you go through this process once.

21   The first time you start sideloading on your phone, you get the

22   screen, you turn on the permission, you don't have to worry

23   about it again.

24       And Epic's own security expert agrees with this approach.

25   My colleague in his closing described these as scare screens,

CLOSING ARGUMENT / KRAVIS

1  but Epic's security expert, Professor Mickens, the guy from

2  Harvard, did not say that these sideloading messages should be

3  eliminated.  Just the opposite.  He agreed users should have to

4  see these screens before they start sideloading.  So what does

5  he want?  He just thinks the steps should be compressed.

6      Now, what evidence did you see during this trial that

7  compressing three steps into two steps or even into one step

8  would fix some alleged competitive harm?  You have seen no such

9  evidence.

10     Professor Mickens himself said nothing about the effect on

11 competition that compressing these steps would have.  So we

12 asked Dr. Bernheim (as read):

13         "Have you measured what would happen if Google

14     actually adopted Professor Mickens' proposal and

15     compressed these steps?"

16     And he said (as read):

17         "No.  I haven't measured that."

18     Epic has shown you no evidence that compressing the

19 messages in the way its expert suggests would increase

20 competition.

21     And, remember, compressing these steps in the way that

22 Epic just described would require Google to implement a whole

23 new system called notarization that nobody in the world

24 actually uses for app security so that Android would know

25 whether every single app has been reviewed by Google.

1    My colleague just said, "Well, this is pretty simple.  It

2    will be like creating precheck for app stores."  Can you

3    imagine what the cost would be to just create precheck for app

4    stores?  You have to imagine, by the way, because

5    Professor Mickens didn't tell you and he didn't look into it.

6        Remember, the less restrictive alternative has to be

7    without significantly increased cost.  Requiring Google to

8    create precheck for app stores is not without significantly

9    increased costs.  It is not a less restrictive alternative.

10       What Professor Mickens' proposal would do is make it

11   harder for Google to compete with Apple.  Remember, Apple does

12   not allow sideloading on the iPhone at all.  And Apple

13   attacks Google on security all the time.  Even Epic's own

14   security expert admitted this.

15       The sideloading messages are pro competitive.  They help

16   Android phones compete with iPhones on security, and they

17   keep Android users safe.

18       The antitrust laws do not require Google to compete with

19   Apple on security with one hand tied behind its back.

20       All right.  Let's talk about the manufacturer agreements.

21   The MADA is the agreement that gives phone manufacturers the

22   option to preinstall popular Google apps on their phones, like

23   Google Maps and Search and YouTube and the Play Store.  Here

24   again, this conduct is how Google competes with Apple.  With

25   all these companies out there building Android phones, Google

1    wants to make sure that when you buy an Android phone and you

2    bring it home and you take it out of the box and you turn it

3    on, it does the things you expect a phone to do.

4          It offers an experience that is competitive with the

5    iPhone.  It has maps.  It has e-mail.  It has an app store on

6    it.

7          Now, you heard Epic say throughout the trial that these

8    phone manufacturer agreements are coercive and terrible, but

9    they did not present to you any testimony from an Android

10   manufacturer.  We did.

11         This is Eric Christensen from Motorola.  You saw his

12   deposition video in our case.  Take a look at what he says

13   about the MADA.  It is not just Google telling you this.  This

14   is an Android phone manufacturer telling you "This agreement

15   helps us build better phones at a lower cost."  This is pro

16   competitive.

17         And there's no harm to competition here because the MADA

18   does not prohibit the phone manufacturer from preinstalling

19   other apps on the phone, including other app stores.  In fact,

20   as Professor Gentzkow showed you, I think my colleague called

21   this our favorite statistic, in 2020 and 2021, 68 percent of

22   Android phones sold in the United States came with a second app

23   store preinstalled on the phone.  This is Exhibit 6993.

24         And Epic has offered you no less restrictive alternative.

25   They have given you no alternative way for Google to partner

1   with phone manufacturers to build high-quality competitive

2   phones at a lower cost.

3   Let's talk about RSA 3.0.  RSA 3.0 is a Revenue Sharing

4   Agreement.  Here again, the agreement is pro competitive.

5   Google offers phone manufacturers more resources to build some

6   of their phones, not all of their phones but some of their

7   phones, to be more competitive with the iPhone.  Better

8   security, operating system updates, a cleaner experience, that

9   kind of thing.

10  And, remember, this is not an all-or-nothing deal.  You

11  heard that RSA 3.0 has something called a premier tier.  The

12  phone manufacturer can decide to put just a few of its phones

13  in the premier tier, and that's exactly what the data shows.

14  If you look at the new phones that have been made in the

15  United States since RSA 3.0 came out, it is only about

16  8 percent of the new Android phones that fall into the premier

17  tier.  And if you look at all of the phones in the U.S., not

18  just the new ones, the number is even smaller.  It's under

19  5 percent.  This is Exhibit 6989.

20  This means that either way you slice it, just the new

21  phones or all the phones, the premier tier did not affect over

22  90 percent of the Android phones in the United States.  Why

23  does that number matter?  Because an agreement that affects

24  this few phones cannot substantially harm competition, and

25  that's what the law requires.  An agreement that affects under

1    10 percent of phones does not make it very difficult or

2    impossible for competitors to compete.  The other 90 percent of

3    the phones are still out there.

4        Now, you may remember that Epic's economist Dr. Bernheim

5    showed you a much larger number of RSA premier tier phones, and

6    my colleague, I think, mentioned a much larger number in his

7    closing today.  He said it's close to 50 percent, 40-some

8    percent.

9        So why is that?  Why is it that we are saying under

10   10 percent and they're saying like 40-some percent?  Well, if

11   you listen closely to Dr. Bernheim's testimony, he told you

12   that he got to a higher number by just ignoring a whole bunch

13   of phones.  He took out all of the Samsung phones from his

14   calculations.

15       Remember, Samsung is the largest Android phone

16   manufacturer in the world.  The Samsung Galaxy Store comes

17   preinstalled on virtually all Samsung phones, and Dr. Bernheim

18   just disregarded them.

19       From a competitive perspective -- and this is an antitrust

20   case, so we're talking about a competitive perspective -- from

21   a competitive perspective, this makes zero sense.  It's not

22   like there's some world where companies are out there competing

23   on non-Samsung phones only.  There's no, like, non-Samsung

24   Android app competition.  Dr. Bernheim gets to a higher number

25   by just pretending that all of the phones made by the largest

1    phone manufacturer in the world don't exist.

2        When you set aside the fuzzy math and you actually count

3    the Samsung phones, you see that this agreement does not come

4    anywhere close to meeting the standard for anticompetitive

5    conduct.

6        All right.  So much for the alleged blocks.  Let's talk

7    about the alleged bribes.  There were two of these that Epic

8    promised you in their opening:  Project Hug and Project Banyan.

9    They have not delivered on either one.

10       Let's start with Hug.  At the beginning of this trial,

11   Epic told you that it would prove that 3 of the 21 Project Hug

12   agreements were payoffs to big game developers not to open

13   their own Android app stores:  Riot, Activision, Supercell.

14   The evidence has shown nothing like that.

15       The written agreements themselves don't say this.  The

16   Activision and Riot contracts are in evidence.  They are

17   Exhibits 153 and 162.  You can review them during your

18   deliberations; and when you do, you will see they say nothing,

19   nothing about the developers not being able to open their own

20   app stores.

21       Epic says, "Well, there must be some, like, secret side

22   deals about not opening competing app stores."  The evidence

23   has not shown that either.

24       Every single witness who testified in this trial about

25   these agreements from Google and from the game developers,

 1   every single witness said under oath that no such agreement

 2   existed:  Purnima Kochikar and Lawrence Koh from Google, Mark

 3   Sottosanti from Riot, Armin Zerza from Activision.  In fact,

 4   Mr. Zerza from Activision told you "We're free to do this.  We

 5   looked into opening an app store."  And my colleague just

 6   showed you an example -- a document of them opening an app

 7   store.  It's Exhibit 1978.

 8       Mr. Zerza told you "We didn't open an app store, not

 9   because we have some secret side deal with Google, but because

10   it didn't make any financial sense for us."

11       Now, let's just be perfectly clear about what Epic is

12   saying about this evidence.  Epic is asking you to believe that

13   every single one of these witnesses is lying under oath.  Even

14   Epic's own economist wouldn't say this.  Even

15   Professor Bernheim, who was willing to tell you the word

16   "compete" doesn't actually mean compete, even

17   Professor Bernheim did not testify that the Hug deals were

18   bribes.  That should tell you everything you need to know about

19   this argument right there.

20       So what evidence did Epic show you to support the

21   extraordinary claim that these written agreements were actually

22   bribes, that these witnesses were lying?  Any communication

23   between the companies referencing some kind of secret deal?

24   No.  What they showed you was a handful of internal documents

25   where Lawrence Koh and Purnima Kochikar talk about off-Play

1   distribution or the possibility of Riot or Activision opening

2   an app store.

3        Remember what Riot and Activision themselves told you.

4   Under these deals, they were free to open an app store if

5   that's what they wanted to do.  And remember what Purnima and

6   Lawrence told you about those documents.  They told you:  These

7   are tough negotiations between big companies.  These are

8   negotiating positions, but we did not think it was likely that

9   a company like Activision is going to open its own Android app

10  store.

11       And you know who agrees with them?  Mr. Tim Sweeney.

12  Mr. Sweeney testified that he talked to Armin Zerza at

13  Activision, the same Mr. Zerza that you heard from.  After a

14  few phone calls, Mr. Sweeney reached the same conclusion as

15  Purnima and Lawrence:  This guy doesn't really want to open an

16  Android app store.  He just wants some leverage to get a better

17  deal with Google.

18       What about Supercell?  You heard from Epic's lawyers in

19  their opening that there was some secret deal with Supercell

20  not to open a web store.  Just one problem.  It's not true.

21  You heard it from Purnima.  Supercell opened a web store.  They

22  have it to this day.  You might remember Purnima's answer "You

23  can Google it."

24       The evidence does not show that Hug was a bunch of secret

25  side deals.  What the evidence did show is that the Project Hug

1    agreements are pro competitive, they are Google competing for

2    the business of big game developers like Activision and Riot.

3        A moment ago we looked at all the different choices that

4    developers have when it comes to distributing their apps and

5    making sales on their apps.  Well, off-Play distribution in

6    these documents refers to the game developers choosing other

7    options instead of the Play Store, and Google is allowed to

8    compete with those options by offering the developers a better

9    deal.  That's what Project Hug was.

10       When Activision and Riot come to Google and say "We want a

11   better deal or we're going to distribute our game somewhere

12   else," the law does not require Google to just watch them walk

13   out the door.  Google is allowed to offer a better deal, and

14   giving your customers a better deal is the essence of

15   competition.

16       Now, in their closing argument, you heard Epic talk about

17   exclusivity.  Remember, the Project Hug deals themselves do not

18   require the game developers to distribute their games only in

19   the Play Store.  The deals just say:  You make your game

20   available to our users at the same time you make it available

21   anywhere else.

22       Well, but Epic says:  That means we can't offer our own

23   exclusive deals to launch an Android app store.  To borrow a

24   phrase from my colleague, this is an absurd argument to hear

25   from Epic.  Epic owns one of the most popular video games in

1  the world, Fortnite.  You heard a lot about it during this

2  trial.  Witnesses described it as a cultural phenomenon.  If

3  Epic wants to use an exclusive deal to open its own Android app

4  store, it can offer an exclusive on its own game, Fortnite, or

5  it can offer an exclusive on Fortnite to another company to

6  open their own Android app store.

7       And here, again, Epic has not even tried to offer you a

8  less restrictive alternative.  They have not even tried to

9  explain how Google could keep these developers in the

10  Play Store in some other way.

11       Now, in some of the slide decks and e-mails about

12  Project Hug, my colleague showed them to you, you saw folks at

13  Google use the word "contagion," and Purnima told you what this

14  meant to her.  It means somebody else making a decision would

15  think Android is not as attractive because people are making

16  decisions on which platform to build.

17       The idea here is pretty simple.  If one game developer

18  leaves the store, maybe other game developers will leave the

19  store too, and Purnima told you that's bad for the store.

20  Google wants the best games in its store.  It doesn't want them

21  distributed somewhere else, whether it's another Android app

22  store or it's iOS only.  The Project Hug deals were not

23  exclusivity deals.  It's just:  Bring the games into our store

24  to our customers at the same time.

25       "Contagion" in this sense is not the kind of thing a

1    monopolist has to worry about.  A monopolist doesn't have to

2    worry about its customers choosing other options because the

3    customers don't have other options.  That's what it means.

4         But you can see in these documents Google is concerned

5    about the developers choosing other options because Google is

6    not a monopolist.  Google is competing.

7         The other so-called bribe that is a deal that never

8    actually happened, Project Banyan.  Now you saw that Samsung

9    sent Google a term sheet that said "Prevent unnecessary

10   competition."  Those were Samsung's words, not Google's words.

11        Soon after, Jamie Rosenberg sent this e-mail to the Google

12   team, this is Exhibit 6066, telling the folks at Google the

13   project had been shut down.  That was the end of

14   Project Banyan.

15        Then the documents, my colleague showed you the e-mail

16   from nine years ago, the deck from seven years ago, were all

17   before this e-mail shutting down Project Banyan.  This is

18   important because a deal that never happened cannot

19   substantially harm competition.

20        Now, because Epic has no actual evidence that

21   Project Banyan harmed competition, they ask you to speculate

22   that there must have been some secret handshake deal between

23   Google and Samsung.

24        Let's be clear.  There is no evidence in this case of any

25   secret handshake deal.  None.  Not a single witness testified

1   to this.  Not a single document shows it.  This is pure

2   speculation on Epic's part.  And here's what Jamie Rosenberg

3   told you about this:  Handshake deal with Samsung, absolutely

4   not.

5        Also, the evidence you saw about the relationship between

6   Epic and Samsung totally undermines any kind of secret deal

7   theory.  This is an e-mail that Tim Sweeney received from

8   Samsung in April 2020.  This is Exhibit 9200.  Mr. Sweeney had

9   just told Samsung that Epic was going to launch Fortnite in the

10  Play Store.

11       Take a look at Samsung's reaction.  They are not happy.

12  They tell Mr. Sweeney "We don't want Fortnite in the

13  Play Store."  They tell Mr. Sweeney "Look at all the stuff

14  we're doing to improve the quality of our store.  You're going

15  to love it here."  And they tell him "We're going to have to

16  renegotiate our whole relationship with Epic based on this."

17       Does this look to you like a company that has entered into

18  a secret deal not to compete with the Play Store?  No.  This is

19  a company that is competing with the Play Store, and they are

20  unhappy that their big game is now going to their competitor.

21       My colleague also referenced the November 2020 agreement

22  between Google and Samsung.  If you look at it, you will see

23  and the testimony said there is no agreement about exclusivity

24  in that deal.  To this day, Samsung puts the Samsung

25  Galaxy Store on the home screen of virtually every phone.

1        Let's talk for a minute about Chats.  You heard evidence

2   that Google employees did receive instructions on Chats.

3   Google employees were told, number one, don't use Chats to talk

4   about the subject matter of the case; and, number two --

5            **MR. BORNSTEIN:**  I'm sorry to rise, Your Honor, but I

6   believe this is contrary to the Court's order.

7            **THE COURT:**  Walk carefully.  Go ahead.

8            **MR. KRAVIS:**  I will, Your Honor.

9        Google employees were told, number one, don't use Chats to

10  talk about the subject matter of the case; and, number two, if

11  you must do so, preserve the Chat, for example, by turning

12  history on.  And you received a jury instruction on this.  My

13  colleague mentioned it.  This instruction tells you that you

14  may infer that lost Chats contained evidence that would have

15  been unfavorable to Google.

16       It is up to you to decide what weight to give that

17  evidence; and as you're making that decision, consider this:

18  The facts remain unchanged.  The data in this case is

19  unchanged.  The evidence from third parties remains unchanged.

20  You saw abundant evidence in all of these categories outside of

21  the Chats.

22       And consider time and again during this trial you saw Epic

23  overreach.  They told you they would prove the Hug agreements

24  were bribes.  That's not so.  They told you they would prove

25  that Google paid Supercell not to open a web store.  Supercell

1    has a web store to this day.  They didn't even mention

2    Supercell in their closing.  They showed you a Chat from

3    Google's CEO about turning history off that Epic's own lawyers

4    admitted has nothing to do with this case.  So ask yourself:

5    Is the argument about Chats just one more overreach?

6         What does Epic really want out of this lawsuit?  Since the

7    very first day of this trial -- this is the last topic --

8    you've heard Epic's lawyer tell you that Epic is here to

9    protect consumers and small developers.  The evidence has shown

10   that is not true.

11        You know that this case is not about consumers because, as

12   we sit here today, Epic does not reduce prices for consumers

13   based on service fees in its own store.  Epic pays console

14   manufacturers like Sony, Microsoft, and Nintendo a 30 percent

15   fee.  Epic pays Samsung a 12 percent service fee.  In its own

16   store, Epic pays no service fee, yet Epic does not pass those

17   savings, as we sit here today, on to consumers.  Epic pays

18   30 percent in the console stores.  Epic pays 12 percent to

19   Samsung.  Epic pays no service fee in its own store, but

20   everywhere the price of V-Bucks is the same, 8.99.  As

21   Mr. Sweeney admitted, in its own store Epic pockets the

22   savings.

23        Now, you heard there's a reason for this.  It's because

24   Epic has a deal with Sony, a company that has given Epic over a

25   billion dollars.  Now let's just be clear.  Epic is allowed to

1   do this.  Epic is allowed to take a billion dollars from Sony

2   and agree not to pass on the savings from the service fee in

3   its own store to consumers.

4       Here's what Epic can't do:  Epic can't pocket the money in

5   its own store, and then stand up here and tell you that it's

6   looking out for the consumers.  Epic's actions speak louder

7   than its words.

8       Epic is also not here to protect small developers.  As you

9   heard during this trial, it is about 1/10th of 1 percent of

10  developers who pay the 30 percent service fee that Epic would

11  pay in the store.  97 percent of the developers in the store

12  pay no service fee at all.

13      What's really going on here is Epic wants a special deal

14  as Mr. Sweeney admitted when I asked him:  Epic wants you to

15  give them a deal that they don't have and they haven't been

16  able to get anywhere else?  What he wants is to be able to

17  offer Epic's own billing system in the Play Store so that Epic

18  doesn't have to pay Google any service fee at all.

19      It is not surprising that Epic does not have this deal

20  with Apple or Microsoft or Sony or Nintendo or even Samsung.

21  This amounts to giving away all of the benefits of the store

22  for free.

23      I asked Mr. Sweeney about this when he testified.  I said

24  (as read):

25          "Your lawyers keep saying you're not seeking damages,

CLOSING ARGUMENT / KRAVIS

1    but you would make hundreds of millions of dollars from

2    this; right?"

3    And do you remember what he said?  (as read):

4         "Not hundreds of millions.  Billions."

5    I asked him (as read):

6         "You don't have this deal with these other app

7    stores; right?  You want a special deal in the

8    Play Store?"

9    And he said (as read):

10        "Yes, I would love that, a deal I don't have anywhere

11   else."

12   Of course, he would love that.  We would all love to get

13   something amazing for free; but, members of the jury, the

14   antitrust laws do not require Google to give away its services

15   for free.

16   And this is true for the other developers too.  Epic

17   showed you a slide with other developers that have said they

18   wanted their own billing systems.  Remember what that means.

19   "Our own billing system" means the Play Store collects no

20   service fee at all from those developers for the benefits it

21   provides.

22   Of course, the developers would like a better deal.

23   They're businesses too and they're allowed to negotiate for the

24   best deal that they can get, but the law does not require the

25   Play Store to give away its services for free.

1   And to see exactly what I mean about this, to see that

2   Epic is just in this for the money, all you have to do is look

3   at Project Liberty.  The testimony you heard from Mr. Sweeney

4   and other Epic employees was unequivocal.  Epic knew that the

5   Hotfix violated its agreements with Google, and Epic did it

6   anyway.

7       Now, as you heard in the jury instructions, Epic has now

8   stipulated that they breached the contract with Google, and

9   this evidence shows that this was just a self-serving deception

10  to get a special deal for Epic that they don't have anywhere

11  else.

12      You saw the deposition testimony of an Epic employee named

13  Han Stolfus.  He was the guy at Epic who worked with Google to

14  bring Fortnite to the Play Store.  He was asked during his

15  deposition how he felt about Project Liberty.  Watching that

16  video in court was incredibly uncomfortable.  You could see

17  that Mr. Stolfus was visually upset by Project Liberty.  You

18  saw him ask "Are we just pawns in Tim's game?"  This testimony

19  tells you what this was all really about for Epic, making money

20  any way they could.

21      That's the evidence you heard during this trial.  Let's

22  talk for a minute about the decisions that you'll have to make

23  when you deliberate.

24      When you start your deliberations, you'll receive a

25  verdict form in the jury room.  The verdict form has a series

 1    of questions for you to answer.  I'm going to walk through with

 2    you now the answers to those questions.

 3        The first set of questions relates to Epic's

 4    monopolization claim.  Question 1 asks whether Epic has proved

 5    the existence of a relevant antitrust market.  The answer to

 6    question one is "No."  Throughout this trial and today in their

 7    closing, Epic has argued that the relevant antitrust market is

 8    Android and only Android.

 9        And for the reasons we've discussed, that's wrong.  The

10    relevant antitrust market, you define it based on competition.

11    And you have seen abundant evidence that the Google Play Store

12    competes with the Apple App Store.  That means that Epic has

13    not proved a relevant antitrust market limited to Android, so

14    the answer to question one is "No."

15        As you'll see on the verdict form, because the answer to

16    Question 1 is "No," the form tells you you can jump to

17    Question 6.  But if you conclude that the answer to Question 1

18    is "Yes," then you'll get to Question 3.

19        Question 3 asks whether Google engaged in anticompetitive

20    conduct.  The answer to that question is also "No."  For the

21    reasons we discussed a moment ago, the conduct challenged by

22    Epic is not anticompetitive; it is how Google competes.  And

23    Epic has not shown you any less restrictive alternatives.

24        Moving on to Question 6, Question 6 asks whether Google

25    has entered into agreements that unreasonably restrain trade in

1   a relevant antitrust market.  Again, the answer is "No" for the

2   same reasons we just discussed.  The relevant antitrust market

3   includes Apple, and Epic has not defined it that way; and

4   Epic -- and Google has not unreasonably restrained trade

5   because Google has not engaged in anticompetitive conduct.

6   Because the answer to Question 6 is "No," you can skip 7, 8,

7   and 9.

8       Question 10 asks about the tying claim.  With the tying

9   claim, Epic says that Google used the Google Play Store to

10  force developers to also use a separate product, Google Play

11  Billing.  This claim fails right out of the gate because Epic

12  has to show, and they have not shown, that the Google Play

13  Store and Google Play Billing are separate products.  This is

14  Jury Instruction 33.

15      Remember what Mrinalini told you about the relationship

16  between the Store and Google Play Billing.  She said

17  Google Play Billing is not a distinct and separate product.  It

18  is a feature of the store.  Earlier you saw Epic trying to

19  break the phone apart.  Here they're trying to break the store

20  apart.  These are not two separate products.  They're both

21  part -- they're part of the store.

22      Armin Zerza, the guy from Activision, told you exactly the

23  same thing.

24      And there's another problem here.  Epic has to prove that

25  Google forces app developers that use the store to also use

1    Google Play Billing, and the evidence has shown that's not

2    true.  In fact, you saw the developers have choices about

3    whether and how to make money from their apps; and it is only

4    the developers who choose to make sales in their apps who are

5    required to use Google Play Billing.  No one is forced to use

6    Google Play Billing, and 97 percent of the developers in the

7    store use the Play Store without using Play Billing at all.

8         Finally, Google has shown that it has a business

9    justification for Play Billing.  As Mrinalini told you,

10   collecting the service fee through the billing system is a

11   reliable and efficient way to collect the fee.  This is why

12   pretty much every other app store out there uses the same

13   model.  They all use their billing system and only their

14   billing system to process transactions, and that's how they

15   collect their fee.

16        Google Play Billing also makes in-app purchases secure,

17   which helps consumers, it helps developers, and it helps

18   Google.  Epic has shown no less restrictive alternative here.

19   They've shown you no way that Google could have done it

20   differently from all of these other companies.  For all of

21   those reasons, the answer to Question 10 is also "No."

22        Now, Epic's lawyer will have one more chance to talk with

23   you, and then you will start your deliberations; and as you're

24   talking it all through, remember, this is an antitrust case.

25   This is a case about competition.

1    During this trial, you have seen abundant evidence of

2    competition.  You heard from the folks who work in the Google

3    Play Store and the Apple App Store.  You saw price changes;

4    always lower, never higher.  You saw competitive improvements

5    to the quality of the store.  And you saw that the conduct in

6    this case is how Google competes on security, on the users'

7    experience with the phone, and on bringing great apps to the

8    store.

9        All of this evidence of competition is the answer to this

10   case.  All of this evidence shows that Google is a competitor.

11   It has not unlawfully acquired monopoly power, it has not

12   harmed competition; and, therefore, you should find in favor of

13   Google on all questions.

14       Thank you, members of the jury, for your time and for your

15   attention.

16       **THE COURT:**  Okay.  Eight minutes for rebuttal.

17       **MR. BORNSTEIN:**  Ms. Clark, do we have the control?

18                    **REBUTTAL ARGUMENT**

19       **MR. BORNSTEIN:**  All right.  So let's talk about Apple.

20   That's where they started, that's where they ended, let's talk

21   about Apple.

22       My colleague referred to all the witnesses who came in

23   here and testified:  Oh, yeah, we compete.  We compete with

24   Apple.  "We compete with Google," said Mr. Oliver.

25       This is what is happening in the courtroom.  I agree with

 1    Google, we need to look at the real world.  Yes, people came in

 2    here and said the words.  What did they say in their documents?

 3    That tells you what they actually believed in the real world.

 4        So which documents did Google choose to show you today as

 5    evidence of app store competition?  Oh, my gosh.  Let's look

 6    at, first of all, Slide 33 from Google's presentation.

 7        This was the first document they showed you.  This is a

 8    document that is not about phones.  This document is about

 9    Apple TV.  If you read it, you say "It's at our weekly TV

10    meeting," the topic of apps for TV came up.  And this isn't

11    just me saying it.  Let's look at our Slide 117.

12    Mr. Lockheimer, Hiroshi Lockheimer, came in here.  He testified

13    about this document.  He is the author of these words.

14        Do we have the slide?

15        Mr. Lockheimer came in here, and he testified that that

16    document was about the Play Store on TV.  It is not a document

17    about competition between phones.

18        I'll show you another one if we can.  If we look at

19    Slide 34, their Slide 34.  It's another document they chose to

20    show you in their closing just now.  This one is about a change

21    in price on subscriptions.  This e-mail is in May of 2016,

22    May 28.

23        Let's see what happens on May 30.

24        Can we have our Slide 118, please?

25        Two days -- sorry -- five days later on June 7 they decide

1   at Google (as read):

2           "Let's keep our billing policy as it is for now.  No

3       need for deal review at this time."

4       They chose not to change their price despite believing

5   that Apple was changing theirs.  And as Mr. Rosenberg

6   subsequently told you in the next slide, it took a year and a

7   half -- Slide 119 -- a year and a half before Google actually

8   changed its subscription price; and during that time, not a

9   single developer pulled out of the Play Store to focus on

10  iOS.  There is no switching as a result of these supposed

11  changes in competition between the sides.

12      Let me look, please, at their Slide 23.

13      This is a document that they showed you about absolute

14  numbers of switching to persuade you.  Again, not looking at

15  percentages, at absolute numbers.

16      I'll do some math.  They claim 60 million people are

17  switching from Android to iOS every year.

18      Let's look at their Slide 21.

19      On their Slide 21 over there on the left where they have

20  highlighted "Poor selection of apps to choose from" -- if we

21  can blow that up -- it's about 7 percent.  That gray bar

22  represents Android to iOS switchers.  7 percent of the people

23  in Google's own survey said it mattered to them about the apps

24  in terms of their switching.  So that's 7 percent of 60 million

25  that actually matter for app store competition.  That takes us

1  down to 4.2 -- 4.2 million out of a billion people.  That is

2  not serious competition between the stores.  That share is

3  tiny.

4       You also need, moving from Apple, to view the conduct

5  together.  Mr. Kolotouros, he testified that RSA 3.0 and Banyan

6  were part of a single strategy.  That is why we have data about

7  RSA 3.0 and we have data about Samsung.

8       Can we please put up our Slide 127?

9       This is not our data.  This is Professor Gentzkow's data,

10  and what he has, he shows you it's not 5 percent coverage for

11  RSAs, it's 27 percent coverage.  27 percent.  And these are the

12  ones that are not Samsung; right?  27 percent of new

13  activations are not Samsung.

14       When you put Samsung together with this 27 percent, you've

15  got two out of three phones -- Samsung is 40 percent, you've

16  got two out of three phones that are affected by this

17  comprehensive strategy.  That is an unreasonable restraint of

18  trade that does contribute to monopolization.

19       I'll make two other quick points.  One is about the use of

20  the instructions that you heard.

21       Can we put up Jury Instruction 21, please?

22       You got snippets in Google's closing of instructions and

23  you got misleading snippets where there were sentences left

24  out.  So you got read at the very bottom -- can we blow up the

25  very bottom, please?  Last paragraph.  The whole last

 1    paragraph, please -- you got part of this, you got this part

 2    that says that the ability to earn high profit margins does not

 3    necessarily mean that Google has monopoly power.

 4        What you didn't get read was the next sentence further

 5    down that says that the ability to sell at higher prices or

 6    earn higher profit margins over a long period of time -- on to

 7    the next page -- may be evidence of monopoly power.  Right?

 8    You got little pieces.  You didn't get the whole thing.  You

 9    need to read these instructions as a whole and not take them

10    apart.

11        Last point I'll make is -- if we can have Exhibit Number

12    388, please -- Google recognizes the benefits of competition.

13    Google was considering its own changes to its business model.

14    Google recognized that if it did provide, as it says here on

15    top, store optionality, there would be user-facing innovation.

16    What would happen, over on the left we see app stores would

17    become first class citizens if there were a level playing field

18    on Android.

19        And now look, it's in gray, it's a little hard to read

20    under Number 2, there's increased -- under Number 2, "There's

21    increased competition leading to better user experience and

22    content."  Google knows it.

23        And let's look at Number 3, by the way.  The question is:

24    In that world, would Google Play win?  Would Google Play

25    maintain its business model and its pricing?  Would users

1   choose Google Play?  There are question marks at the end.

2   Google's asking the question:  If there's competition, would it

3   win?  Maybe.  Maybe not at the same price, maybe not at all,

4   but maybe it wouldn't.  And so Google has been stopping the

5   competition so that it wouldn't have to have these questions

6   posed, it wouldn't have to deal with the question mark.

7       Thank you very much.

8       THE COURT:  All right.  Members of the jury, that

9   concludes closing statements.  Ms. Clark is going to take you

10  back to the jury room with the verdict form, and you'll have

11  lunch and then dive in for deliberations.

12      THE CLERK:  All rise.

13      (Jury beginning deliberations at 12:49 p.m.)

14  (Proceedings were heard out of the presence of the jury:)

15      THE COURT:  Now, Ms. Clark is going to discuss with

16  both sides the need to be promptly available when the jury

17  comes back.  I have a practice of no more than about five

18  minutes.  It's been a long road for the jury, as you all know,

19  and we're not going to have them wait excessively for the

20  verdict to come back.

21      Who knows what the result will be, but my thanks for

22  prepping the case well.  It came in well.  It came in

23  efficiently.  As we say in contracting, it was on time.

24  Whether it was under budget is between you and your clients,

25  but certainly on the outward-facing side, it went well.  So my

1    thanks for that.

2         And I'll see you when the verdict comes back.

3              **THE CLERK:**  All rise.

4                        (Recess taken at 12:50 p.m.)

5                   (Proceedings resumed at 4:06 p.m.)

6         (Proceedings were heard out of the presence of the jury:)

7              **THE CLERK:**  We're back on the record and Calling Civil

8    20-5671, Epic Games, Inc. vs. Google LLC, and Multidistrict

9    Litigation 21-2981, In re Google Play Store Antitrust

10   Litigation.

11        Counsel.

12             **MR. BORNSTEIN:**  Good afternoon, Your Honor.  Gary

13   Bornstein for Epic Games.

14             **MR. POMERANTZ:**  Good afternoon, Your Honor.  Glenn

15   Pomerantz on behalf of Google.

16             **THE COURT:**  Okay.  I have been advised that the jury

17   has reached a unanimous verdict.  Let's bring them in, and I

18   will read the verdict to you.

19        (Proceedings were heard in the presence of the jury:)

20             **THE COURT:**  All right.  Members of the jury, I've been

21   advised that you've reached a unanimous verdict; is that right?

22        Who is your presiding jury?  Mr. Klopp?  Okay.  Would you

23   hand the verdict to Ms. Clark, please?

24        Okay.  Here is the verdict.

25   \\\

Question 1:  Did Epic prove by a preponderance of the evidence and in accordance with the instructions given to you, the jury, the existence of a relevant antitrust market?

Answer:  Yes.

Question 2:  If you answered yes to Question 1, please identify each relevant product market and associated geographic market that Epic proved.

Answer Number 1:  Android app distribution market as a relevant product market with a relevant geographic market of worldwide, excluding China.

Answer 2:  Android in-app billing services for digital goods and services transactions as the relevant product market with worldwide, excluding China, as the relevant geographic market.

Question 3:  Did Epic prove by a preponderance of the evidence and in accordance with the instructions given that Google willfully acquired or maintained monopoly power by engaging in anticompetitive conduct in any market that you specified in response to Question 2?

Answer:  Yes.

Question 4:  If you answered yes to Question 3, specify each relevant product market and associated geographic market for your answer.

Answer 1:  Android app distribution market is the relevant product market with worldwide, excluding China, as the relevant

geographic market.

Answer 2:  Android in-app billing services for digital goods and services transactions with worldwide, excluding China, as the relevant geographic market.

Question 5:  If you answered yes to Question 3, did Epic prove by a preponderance of the evidence and in accordance with the instructions given to you that it was injured as a result of Google's violation of the antitrust laws?

Answer:  Yes.

Question 6:  Did Epic prove by a preponderance of the evidence and in accordance with the instructions given that Google entered into one or more agreements that unreasonably restrained trade in a relevant antitrust market?

Answer:  Yes.

If you answered yes to Question 6, which of these agreements did you find to be unreasonable restraints of trade in accordance with the instructions given?

Answer:  Yes, to DDA agreements.

Answer:  Yes, to agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program.

Answer:  Yes, agreements with OEMs that sell mobile devices, including MADA and RSA agreements.

Question 8:  If you answered yes to Question 6, please specify each relevant product market and associated geographic

1  market for your answer.

2      Answer Number 1:  Android app distribution market with a

3  geographic market worldwide, excluding China.

4      Answer 2:  Android in-app billing services for digital

5  goods and services transactions with a geographic market of

6  worldwide, excluding China.

7      Question 9:  If you answered yes to Question 6, did Epic

8  prove by a preponderance of the evidence and in accordance with

9  the instructions given that it was injured as a result of

10  Google's violation of the antitrust laws?

11      Answer:  Yes.

12      Question Number 10:  Did Epic prove by a preponderance of

13  the evidence and in accordance with the instructions given that

14  Google unlawfully tied the use of the Google Play Store to the

15  use of the Google Play Billing?

16      Answer:  Yes.

17      Question Number 11:  If you answered yes to Question 10,

18  did Epic prove by a preponderance of the evidence and in

19  accordance with the instructions given that it was injured as a

20  result of Google's violation of the antitrust laws?

21      Answer:  Yes.

22      Ladies and gentlemen, is that your unanimous verdict?

23          **ALL:**  Yes.

24          **THE COURT:**  Okay.  Would anybody like to poll the

25  jury?

PROCEEDINGS

1      **MR. BORNSTEIN:**  No, Your Honor.

2      **MR. POMERANTZ:**  No, Your Honor.

3      **THE COURT:**  Okay.  All right.  Thank you very much for

4  your service.  I say this on behalf of myself, on behalf of the

5  Northern District of California, your fellow federal citizens,

6  and also the parties that worked so hard to present this case

7  to you.  You did magnificent service.

8      You are now done, fully discharged.  You may be asked by

9  maybe somebody representing one of the parties or by the media

10  questions about the case.  Now, here are the rules, and I want

11  you to embrace this and make sure that you're comfortable with

12  what I'm going to say.

13      You do not owe anyone the time of day.  Your service is

14  over.  You do not have to answer any questions.  You do not

15  have to do anything at all at this point.

16      So if anyone approaches you and asks to talk with you and

17  you don't want to do it, you just say "No" and that's the end

18  of the matter.

19      If anyone is persistent, if anyone bothers you, if anyone

20  pressures you in any way or makes you feel uncomfortable in any

21  way, you let Ms. Clark know, and I will intervene immediately

22  to put a stop to it.  Okay?  You do not have to say a word to

23  anyone.

24      Now, if you choose to say something, here are the rules.

25  You cannot ever under any circumstances discuss anything that

1  happened in the jury room.  You cannot describe votes.  You

2  cannot describe any topics of discussion.  You can't describe a

3  word of what happened in that jury room space.  That is for you

4  and for you alone.  Okay?  Even I don't have any right to have

5  any insight into that.

6      Okay.  If you choose to talk, you must limit your comments

7  purely to comments on, for example, how you thought the lawyers

8  or the witnesses presented the case, or something along those

9  lines, but you cannot discuss your internal deliberations or

10 any deliberations that you had in the jury room.

11     All right.  Thank you very much.  Thank you.  See you

12 again not for a long time because you're now discharged.  You

13 now discharged your federal duties.  Okay?

14         **THE CLERK:**  All rise.

15     (Proceedings were heard out of the presence of the jury:)

16         **THE COURT:**  All right.  Well, Mr. Pomerantz, what

17 would you like to do next?

18         **MR. POMERANTZ:**  I guess I would like to have an

19 opportunity to talk to my clients, talk to the other side, and

20 then have time with the Court.

21         **THE COURT:**  Okay.  I think that's a good plan.  I was

22 going to encourage you to do that.  There is no reason to fast

23 track post-trial motions.  All right?  It's been a long

24 engagement so far.  We have plenty of time to work things out.

25 Plus there will be some holiday time coming up.  There are no

1   constraints on the time limit.

2       So I suggest you meet and confer, talk with your client,

3   decide what the next course of action will be.

4       How about if we do this:  This is without any prejudice to

5   a Rule 50 or Rule 59 motion, but why don't we just meet again

6   maybe the second week of January.  Is that too soon?

7           **MR. BORNSTEIN:**  That's fine, Your Honor.

8           **MR. POMERANTZ:**  That works well, Your Honor.

9           **THE COURT:**  Okay.  What would that -- what's that

10  second Thursday in January, Ms. Clark?

11          **THE CLERK:**  That would be January 11th.

12          **THE COURT:**  Okay.  January 11th it is.  All right?

13  And you can let me know what's happening, and at that time we

14  can also set a briefing schedule.  Okay?

15      I think the right thing to do is if, if, maybe you won't,

16  but if we proceed to a JMOL motion, we're going to do that

17  before we do any orders with respect to injunctive relief.

18  Okay?

19      All right.  You-all get to go home now.  Thanks very much.

20          **MR. BORNSTEIN:**  Thank you, Your Honor.

21          **THE COURT:**  Yep.

22          **THE CLERK:**  All rise.  Court's in recess.

23          **THE COURT:**  All right.  Here is the verdict.

24          **THE CLERK:**  Thank you.

25              (Proceedings adjourned at 4:18 p.m.)

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, December 11, 2023

8

9

10

11    _____

12         Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25