Message

| | |
|---|---|
| **From:** | Eric Christensen [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C670E308519241818135F75DC97435E2-ECHRISTENSE] |
| **Sent:** | 2/12/2021 8:13:08 PM |
| **To:** | Sergio Buniac [████████@motorola.com] |
| **Subject:** | Google Search Agreement details |
| **Attachments:** | 2020 Google Revenue Search Agreement Summary (Mobile Incentive Agreement) (1).pptx; Lenovo New RSA (Fully Executed).pdf |

Sergio,

Per your request in today's call, here is a summary of the Google Search agreement as well as the full contract.

Happy to answer questions.

Thanks,
Eric



CONFIDENTIAL

MOTO-NDCAL-00207107

**EXHIBIT 1231-001**



EXHIBIT 1231-002

 # Summary of 2020 Google Revenue Search Agreement (RSA)

Google Mobile Incentive Agreement (RSA) will be the single Google Revenue agreement beginning Feb 1, 2020*

| Key Term | Description |
|---|---|
| Term | Feb 1, 2020 - Jan 31, 2022 (Google has renewed for year 2) |
| Business Groups | MBG, PCSD and Medion |
| Geographies | All countries included in the MADA agreement (China is excluded in the MADA agreement so out of scope for this agreement) |
| R&Os | Risk remains low for FY2020, risk of monthly revenue in 2021 dropping from $6M to $3.9M due to omitting Google Key on select North American devices |
| CY2020 Incentives | $8M one-time bonus for Foundation Tier Devices (SP + tablets) if 55M Devices achieved in 2020 or 50M Foundation Tier Phones |

*Other agreements will be terminated once this is executed; if overlap Google can net off the amount Google provides under other agreements from the amount of Premier Tier Monthly Incentive

** Company must meet all the requirements set forth in Sections 4 (Foundation Tier Device), Sections 5 (Premier Tier Device) and 7 (Company Obligations) to earn this incentive the incentives under the agreement

© 2016, Motorola Mobility LLC. CONFIDENTIAL

**EXHIBIT 1231-003**

 Impact of non-compliance

- Compliant device % (applies to total <u>activations</u>, not SKUs)

| Proportion | Monthly Revenue 2020 (Lenovo) | Monthly Revenue 2021 (Lenovo) |
|---|---|---|
| >95% | $5.3m | $6.0m |
| 80% - 94% | $3.5m | $3.9m |
| 60% - 79% | $1.6m | $1.8m |
| 40% - 59% | $700k | $700k |
| 20% - 39% | $550k | $550k |

Additional Details

© 2016, Motorola Mobility LLC. CONFIDENTIAL

**EXHIBIT 1231-004**

 Requirements

- "All devices" means all Android devices in ROW markets (not China), which includes Android Tablets, Medion smartphones, and Jerry's smartphones that ship outside of China starting in 2020.
- Our obligations include everything we do in the current RSA plus,
  - ○ Assistant button on all devices (some exceptions in early 2020 due to timing and for foldables)
  - ○ Several more preloads including Google Pay, Google Wallet and others.
  - ○ We allow 4 additional screens in out-of-box setup to promote Google services.
  - ○ They dictate app placement of default home screen and +1 screen. The -1 screen remains "Google Discover" like today.
  - ○ Google Power Button Experience to be mapped to additional functionality based on Google's requirement (probably Google wallet for payment)
- We are prohibited from:
  - ○ Pre-loading our own or third party apps that are similar to theirs including: Wallets, payment apps, Browsers, Search providers, other assistants like Alexa, or apps that download other apps such as Digital Turbine or another app store

Carrier waivers:

- Requirement(s) can be waived on a carrier SKU if we can reasonably demonstrate we won't get ranging.
- No waiver process would apply to US retail SKUs.

© 2016, Motorola Mobility LLC. CONFIDENTIAL

**EXHIBIT 1231-005**

 Other Terms & Conditions

- If Google finds greater than [15%] volume drop, Google may (i) withhold from the Premier Tier Monthly Incentive an amount proportional to the percentage that Company is lower than the corresponding Baseline Value in the next month, and/or (ii) reduce the amount of Premier Tier Monthly Incentive proportionately until the next measurement period.

- Google gets proportional downside protection if our quarterly activations are less than 15% YoY.  If our quarterly activations are less than 40% YoY, they have the right to terminate the deal.  We get proportional upside if we activate more than 15% over the 50m units in year 2.

- Additional incentives are included if we upgrade all of our devices (OS upgrades); may forgo given net business case is negative given the number of devices we are planning.

© 2016,  Motorola  Mobility LLC.  CONFIDENTIAL

5

**EXHIBIT 1231-006**

 Potential Risks & Restrictions

- Any deviation in the portfolio, where device would not be considered a Foundation Tier device; cannot do Amazon editions beginning Feb 1, 2020.

- All BU's must comply with the agreement; no deviation can occur to receive the maximum revenue

- Google Key - under discussion (carriers do not want this; Google should give waivers for carriers but not retailers; Products are Kiev, Borneo, Minsk, Guam, Denver, and Viking (subject to ranging) in NA)

- Prohibited to load our own apps similar to Google payment apps, Browers, Search providers, other assistants like Alexa, or apps that download other apps such as Digital Turbine or another app store

- Waivers for carrier SKUs; low risk but needs to be managed carefully

- Volume drop of more than 15% can trigger Google to withhold and/or reduce the premier tier monthly incentive

- Google may terminate the Agreement with an immediate effect if Company is more than 40% lower in activations compared to the corresponding Baseline Value.

- Company will use best efforts to ensure a minimum of 20% of Premier Tier Devices activations, for every twelve-month period, are in the following geographies: the United States, Canada, Japan, Australia, and New Zealand. If the above percentage is not met, Google may decrease in its sole discretion the amount of Premier Tier Monthly Incentive.

© 2016, Motorola Mobility LLC. CONFIDENTIAL

6

**EXHIBIT 1231-007**



# thank you

**Note: Moto branded products are designed and manufactured by or for Motorola Mobility LLC, a wholly owned subsidiary of Lenovo.**

**EXHIBIT 1231-008**

Google Confidential

## GOOGLE MOBILE INCENTIVE AGREEMENT



| | Google LLC<br>Google Asia Pacific Pte. Ltd.<br>Google Ireland Limited<br>Google Commerce Limited<br><br>*Address for Legal Notices:*<br>▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮ | Mobile Partnerships: Ethan-Young Chang, Christopher Li<br><br>Partner Engineering: Alex Medina, Iwei Lin<br><br>Google Legal: Marie Mackey |
|---|---|---|

| COMPANY CONTACT DETAILS | | | |
|---|---|---|---|
| | **Company Contact Information:** | **Company Technical Contact:** | **Company Legal Notices to:** |
| **Attention:** | Eric Christensen | Michelle Ilag | Lanqing Wang |
| **Title:** | Exec. Director SW Product Management | Account Manager | Commercial Counsel |
| **Address, City, State, Postal Code, Country:** | ▮▮▮▮▮▮ | ▮▮▮▮▮▮ | ▮▮▮▮▮▮ |
| **Phone:** | ▮▮▮▮▮ | ▮▮▮▮▮ | ▮▮▮▮▮ |
| **Fax:** | | | |
| **Email:** | ▮▮▮▮@motorola.com | ▮▮▮▮@motorola.com | ▮▮▮▮@motorola.com |

**Effective Date:** February 1, 2020

**Initial Term:** Starting on the Effective Date and continuing through January 31, 2021 (inclusive) ("**Initial Term**").

**Extension:** Google may determine at its sole discretion to extend the Initial Term through January 31, 2022. Google will notify Company of its decision by October 1, 2020.

**Term:** The "Term" means the Initial Term and, if Google elects to extend the Initial Term, the Extension ("**Term**").



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MOTO-NDCAL-00207109

**EXHIBIT 1231-009**

Google Confidential

This Google Mobile Incentive Agreement, including all attachments (collectively referred to as the "**Agreement**"), effective as of the date noted above (the "**Effective Date**"), is made between:

**GOOGLE LLC**, organized in the state of Delaware, **GOOGLE ASIA PACIFIC PTE. LTD.**, organized in Singapore, **GOOGLE IRELAND LIMITED**, organized in Ireland, and **GOOGLE COMMERCE LIMITED**, organized in Ireland (In this Agreement, "Google" will mean Google LLC, Google Asia Pacific Pte. Ltd., Google Ireland Limited, and/or Google Commerce Limited as the context requires), on the one hand; and

**LENOVO GROUP LTD**, organized in Hong Kong ("**Company**"), and, solely for the purpose of receiving payments under this Agreement on behalf of Company, **MOTOROLA MOBILITY LLC** ("**Designated Payee**"), a Delaware limited liability company and an Affiliate of Company whose principal place of business is at 222 W. Merchandise Mart, Suite 1800 Chicago, Illinois, 60654, USA (or any successor Designated Payee requested by Company and accepted by Google pursuant to Section 11.4), on the other hand.

## BACKGROUND

A.    Company desires to receive, and Google wishes to provide, certain financial incentive in relation to Company's Android phones and tablets, as set out in the Agreement below;

B.    Company is willing to ensure on its Android phones and tablets an enhanced experience for end users, as set out in the Agreement below; and

C.    Nothing in this Agreement is intended to restrict Company from entering into incentive agreements with other parties that are not in violation of this Agreement, or to restrict end users from installing or using alternatives to the Google Applications on Company's Android phones and tablets.

## AGREEMENT

1.    **DEFINITIONS**

1.1    "**Active Foundation Device**" means on or after the applicable Launch Date, a Foundation Tier Device that has checked-in to Google servers via Google Applications at least once in the 28 days before the Measurement Date (Security) (as defined in Section 1.19).

1.2    "**Ad**" means an advertisement served by Google to an End User.

1.3    "**Affiliate(s)**" means, with respect to Google or Company, any current or future company controlling, controlled by, or under common control with Google or Company, as the case may be, where "control" means ownership, directly or indirectly, of the shares of a company representing fifty percent (50%) or more of the voting rights in such company for the portion of the Term during which such company meets this criteria.

1.4    "**Alternative Assistive Service**" means any assistive service that is substantially similar to Google Assistant (as determined by Google in its sole discretion).

1.5    "**Alternative Functions**" means any applications, features, or functionality that are substantially similar to the following (as determined by Google in its sole discretion): Chrome Browser, Phone, Contacts, Messages, Gboard, Gmail, Google Calendar, Google Lens, Google One (Backup & Restore), Google Pay, and Google Photos.

2



**EXHIBIT 1231-010**

DocuSign Envelope ID: D7AC4332-E5A1-458B-8FBA-B68EE47F3C34

1.6     "**Alternative Play Service**" means any service that is substantially similar to Google Play (as determined by Google in its sole discretion).

1.7     "**Alternative Search Service**" means any search service that is substantially similar to Google Search (as determined by Google in its sole discretion).

1.8     "**Alternative Service**" means any Alternative Search Service, Alternative Visual Search Service, Alternative Assistive Service, Alternative Play Service, or Alternative Functions.

1.9     "**Alternative Visual Search Service**" means any visual search service that is substantially similar to Google Lens, excluding such a service that: (a) is solely developed, branded, owned, and made available by Company only for Devices, and (b) does not incorporate or rely upon any third-party commercial or consumer service (in each case as determined by Google in its sole discretion).

1.10     "**Android**" means the open-source application framework, libraries, runtime, and kernel which are published at http://android.googlesource.com (or successor sites) as integrated in accordance with the instructions published at https://source.android.com (or successor sites), and any software development kits (SDK) made available at http://developer.android.com (or successor sites).

1.11     "**Android Compatible Device(s)**" means, for each version of Android, phones and tablets that comply with the Android Compatibility Definition document, which can be found at the Android compatibility website (http://source.android.com/compatibility (or successor sites) and which may be updated from time to time).

1.12     "**Android Go Device**" means Low Ram Devices as specified in the current and effective Android Go Amendment to the MADA.

1.13     "**Application Dock**" means the collection of applications on the bottom row of the Default Home Screen which is also visible in the same location and format on all screens (except on the Minus One Screen) regardless of End User's subsequent swipes to the left or the right.

1.14     "**Assistant Access Point**" refers to the following points on a Device (which Google may update in its sole discretion): the assist intent when invoked via long press on the home button or via a hardware or other physical affordance on the Device, the Google Gesture, the Google Hotword, the Google Search Application, and Messages (if preloaded), and excludes points on any other Google, Company, or third-party service or applications.

1.15     "**Baseline Value**" means the total number of activations for smartphone or tablet Devices during calendar year 2019, either a quarter or the full calendar year.

1.16     "**Chrome Browser**" means Google's Chrome browser.

1.17     "**Client Application**" means any application, plug-in, helper, component, or other executable code that runs on an End User's Device.

1.18     "**Client ID(s)**" means the unique alphanumeric code(s) that Google provides to Company pursuant to this Agreement that is used to identify Devices.

1.19     "**Compliance Target (Security)**" means that, as measured on the 28th day of a particular calendar month ("**Measurement Date (Security)**"), for each Device Model of Active Foundation Devices, at least 25% of the Active Foundation Devices of the applicable Device Model have

3



**EXHIBIT 1231-011**

Google Confidential

had a Security Update performed with a security patch level no more than 90 days old as at the Measurement Date (Security).

1.20    "**Contacts**" means Google's contacts management Android application.

1.21    "**Default Functions**" means the following applications will serve as the default Android system intents: Chrome Browser, Files by Google, Gboard, Gmail, Google Calendar, Google Pay, Google Photos, Google Play, Messages, and Phone. Google may add new default Android system intents in the future and both parties will discuss in good faith whether such changes can be technically made and, if so, on what timeline.

1.22    "**Default Home Screen**" means the layout(s) of icons and widgets (prior to any changes made by End User) that are visible across all display(s) on a Device immediately after a Launcher starts, including the lock screen and/or the notification tray. For clarity, if a Device has multiple displays of sufficient size (the parties agree that, as of the Effective Date, this means greater than 2.7" but may be adjusted over time), then such Device has (1) multiple Default Home Screens if it has multiple layouts such as a foldable device; and (2) only one Default Home Screen if it only has a single layout across multiple displays.

1.23    "**Destination Page**" means any web page (or equivalent) which may be accessed by clicking on any portion of any Valid Result or Ad.

1.24    "**Device**" means each Android Compatible Device manufactured by Company or a Company Affiliate and approved by Google that is sold or distributed in the Territory during the Term under the MADA or, for Devices distributed in the EEA, the EMADA.

1.25    "**Device Model**" refers (1) on and after April 1, 2020 (or a later date, in which case Google will provide Company with a written notice no later than February 29, 2020), to "Product" as defined in the Google Mobile Services (GMS) Requirements found at https://support.google.com/androidpartners_gms/answer/7351400, as may be updated from time to time, and (2) prior to April 1, 2020, to a Device as it is sold and marketed to the End User.

1.26    "**EEA**" means those countries set forth in https://support.google.com/androidpartners_gms/answer/9071728 (or such other URL as may be provided by Google from time to time).

1.27    "**EMADA**" means, for Devices distributed within the EEA, the current and effective European Mobile Application Distribution Agreement entered into between Google and Company (including any related amendments or extensions).

1.28    "**End User**" means a human end user of a Device.

1.29    "**Exempted Devices**" mean the following Devices, which are not required to be configured as Foundation Tier Devices or Premier Tier Devices under this Agreement: (a) the following Medion-developed and -branded smartphones and tablets: E1042X, E1043X, and E1052X, and any additional Medion-developed and -branded smartphones and tablets approved by Google for Launch between November 1, 2019 and September 30, 2020, (b) NEC-developed and -branded smartphones and tablets approved by Google for Launch between November 1, 2019 and September 30, 2020, and (c) FCCL (Fujitsu Client Computing Limited)-developed and -branded and Fujitsu-branded tablets Launched at any time during the Term. For the sake of clarity, none of these Exempted Devices will be counted as a Foundation Tier Device or Premier Tier Device, nor will they be considered when calculating the Device Enrollment Base % nor, unless expressly specified, any other metric under this Agreement.

4



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-012**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EF47F3C34

Google Confidential

**1.30** "**Files by Google**" means the service offered by Google that provides file browsing, storage management, and file sharing functionality.

**1.31** "**Foundation Tier Bonus Incentive**" has the meaning set forth in Attachment A.

**1.32** "**Foundation Tier Device**" means a Device that meets the requirements set out in Section 4.1.

**1.33** "**Foundation Tier Monthly Incentive**" has the meaning set forth in Attachment A.

**1.34** "**Fraudulent Act**" means an act which (a) directly or indirectly generates queries, actions, impressions of, or clicks on Valid Results or Ads through any automated, deceptive, fraudulent, or other invalid means (including, but not limited to, click spam, robots, macro programs, and Internet agents); or (b) encourages or requires End Users or any other persons, either with or without their knowledge, to take actions regarding Ads through any methods that are manipulative, deceptive, malicious, or fraudulent (including by either clicking on Ads or offering incentives that, in any such case, are manipulative, deceptive, malicious, or fraudulent).

**1.35** "**Gesture**" means a specific movement-activated trigger that enables movement commands on a Device which can be provided by either Google (a "**Google Gesture**"), Company (a "**Company Gesture**"), or a third party.

**1.36** "**Gmail**" means the email service offered by Google.

**1.37** "**Google Applications**" means the machine-readable binary code version of the Google applications found at https://support.google.com/androidpartners_gms/topic/9159858 (or such other URL as may be provided by Google from time to time).

**1.38** "**Google Assistant**" means the assistive service offered by Google that may be accessed or invoked from a Device via the Assistant Access Points.

**1.39** "**Google Calculator**" or "**Calculator**" means the service offered by Google for managing calculator.

**1.40** "**Google Calendar**" or "**Calendar**" means the service offered by Google for managing calendars.

**1.41** "**Google Clock**" or "**Clock**" means the service offered by Google for managing time.

**1.42** "**Google Discover**" (formerly known as Google Feed) means the service offered by Google that collates and presents certain information and content to the End User on their Device, which may include information and content drawn from the End User's search history and topics selected by the End User to follow.

**1.43** "**Google Docs/Sheets/Slides**" or "**Google DSS**" or "**DSS**" means the productivity service offered by Google.

**1.44** "**Google Duo**" or "**Duo**" means the video calling application offered by Google.

**1.45** "**Google Folder**" means the icon clearly labeled or branded "Google" that provides direct access to the End User-facing Android Go Applications.

**1.46** "**Google Home**" or "**Home**" means the service offered by Google for controlling smart home appliances.

5



**EXHIBIT 1231-013**

DocuSign Envelope ID: D7AC4332-F5A1-4588-8EBA-B68EE47F3C34

Google Confidential

1.47    "**Google Keyboard**" or "**Gboard**" means the keyboard application offered by Google for Android.

1.48    "**Google Lens**" or "**Lens**" means the visual search service offered by Google.

1.49    "**Google News**" or "**News**" means the application offered by Google that offers End Users access to breaking news stories.

1.50    "**Google One**" means the subscription service offered by Google that includes cloud storage and other subscription member benefits.

1.51    "**Google Pay**" means the services offered by Google that facilitate in-store payments (and/or other NFC transactions), in-app remote payments, and peer-to-peer payments. Google Pay functionality may be accessed from the Google Pay application or via various methods on an Android-operated device, including via a Google Pay wallet shortcut.

1.52    "**Google Photos**" means the photo and video gallery application offered by Google.

1.53    "**Google Play**" means the marketplace created and operated by Google, by which digital content, media, and services, including apps, games, books, magazines, video, music or other digital content, media, and services (including subscriptions) are distributed. Google reserves the right to re-name such marketplace from time to time.

1.54    "**Google Podcasts**" means the services offered by Google for accessing spoken audio that may be accessed from the Google Podcasts app, Google Search, Google Assistant, Google Discover, Google Podcasts for web, hyperlinks, or other distribution mechanisms.

1.55    "**Google Product Geo-Availability Chart**" means the list of Google Applications and associated information (including geo-availability) set out at https://docs.google.com/spreadsheets/d/1fyVh5eQCdPy2tX4JpwH3uMIukDoWy-RsFWrxqaXk_w4/edit#gid=1812606466 (as such URL may be changed or replaced by Google at its sole discretion from time to time).

1.56    "**Google Search**" means the search and advertising services offered by Google at Google.com (or another domain owned by Google or its Affiliates at which a similar service is offered) that may be accessed from the Google Search Application, the Chrome Browser, the Google-provided widget (through which Google Lens and the Google Assistant may be accessed), ImageSearch, third-party browsers, keyboards, and Launchers of a Device.

1.57    "**Google Search Application**" means the Google application that includes the following services or features (which Google may update from time to time in its sole discretion): (1) access to Google Search via the Google Search service icon and Google Discover and/or its successors; (2) handling of voice searches and search intents; and (3) access to the Google Assistant.

1.58    "**Hotword**" means a voice-activated trigger that enables voice commands on a Device which can be provided by either Google (a "**Google Hotword**"), Company (a "**Company Hotword**"), or a third party.

1.59    "**ImageSearch**" means visual searching by Device camera, excluding Google Lens, as an input into Google.com (or a local domain owned by Google or its Affiliates at which a similar service is offered).

1.60    "**Incentive**" means Foundation Tier Monthly Incentive for Foundation Tier Devices, and if

6



**EXHIBIT 1231-014**

Google Confidential

Company complies with the requirements to receive Foundation Tier Bonus Incentive or Premier Tier Monthly Incentive, such incentive as applicable.

1.61    "**Incentive Implementation Requirements**" means version 1.044 dated 2020-02-04 of the technical requirements for Incentives which may be updated from time to time by Google in its sole discretion. Changes will be communicated in writing via email or such other format as Google may require. For convenience, the Incentive Implementation Requirements as of the Effective Date are attached as Exhibit E.

1.62    "**including**" means "including without limitation."

1.63    "**Intellectual Property Rights**" means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations, and reinstatements thereof, now or hereafter in force and effect worldwide.

1.64    "**Launch**" means the initial distribution of a Device Model in accordance with the terms of this Agreement.

1.65    "**Launch Date**" means, for any Device Model, the first date on which at least five thousand (5,000) smartphone Devices of any Device Model or at least one thousand (1,000) tablet Devices of any Device Model, as applicable, have checked into Google servers via the Google Mobile Services (GMS) applications.

1.66    "**Launcher**" means a user interface that is (1) initiated by the KEYCODE_HOME key event in Android (e.g. pressing on the "home" button or any applicable gesture intended to invoke the Default Home Screen), or (2) started after initial boot-up or subsequent power up of the Device.

1.67    "**Letter Upgrades**" means installation of the then latest version of Android made available by Google at http://source.android.com (or any successor sites).

1.68    "**Liability**" means any liability, whether under contract, tort, or otherwise, including for negligence.

1.69    "**MADA**" means the current and effective Mobile Application Distribution Agreement entered into between Google and Company (including any related amendments or extensions).

1.70    "**Manufacturer Suggested Retail Price**" or "**MSRP**" means a Device's recommended retail price to End Users excluding any discounts and any applicable value-added taxes (VAT), as defined at the time of Launch and at the country level for such Device.

1.71    "**Messages**" means Google's Standard Based Messaging Application that may be used to receive and send standards-based messages (including SMS, MMS, and RCS messages).

1.72    "**Minus One Screen**" means the screen accessed by the End User by swiping their finger once from left to right on the Default Home Screen.

1.73    "**Phone**" means Google's voice calling application.

1.74    "**Plus One Screen**" means the screen accessed by the End User by swiping their finger once from right to left on the Default Home Screen.

1.75    "**Premier Tier Device**" means a Device that meets the requirements set out in Section 5.1.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MOTO-NDCAL-00207115

**EXHIBIT 1231-015**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

1.76   "**Premier Tier Monthly Incentive**" has the meaning set forth in Attachment A.

1.77   "**quarter**" or "**quarterly**" means, unless otherwise expressly specified in this Agreement, the three consecutive months beginning January 1, April 1, July 1, or October 1, as applicable, which is also known as the calendar quarter.

1.78   "**Query**" means any End User query input through a Search Access Point or an Assistant Access Point.

1.79   "**Release Date**" means any day during the Term on which Google makes available the then latest version of Android at http://source.android.com (or any successor sites).

1.80   "**Results Page**" means the results page rendered through the Search Access Points and the Assistant Access Points in response to a Valid Query but does not include (1) any Google-owned and -operated site or application (e.g., YouTube, Google Maps, etc.) that runs within Google.com or the applicable Google local country domain, and/or (2) any site or application that is linked to from a results page.

1.81   "**Search Access Point**" means the places on a Device, which Google determines in its sole discretion and specifies in writing (as may be modified from time to time via written notice by Google), that are capable of utilizing or invoking Google Search, including if Company configures Devices as Premier Tier Devices those access points listed in Attachment B.

1.82   "**Search Launcher Services API**" means API and library sets provided by Google to enhance Google Search Application features on Devices or successor APIs and library sets as designated by Google.

1.83   "**Security Updates**" means installation of every element of a Google-approved security patch on a Device as set out in https://source.android.com/security/bulletin (or successor sites) such that all common vulnerabilities and exposures identified by Google and posted in the public security bulletin for the date of the update, are fixed, unless otherwise approved by Google in writing.

1.84   "**Service Access Point**" means an Assistant Access Point or a Search Access Point.

1.85   "**Standards-Based Messaging Application**" means an Android Application that enables standards-based messaging (i.e., standards-based messaging services provided (by Telecom Operators, historically) to End Users including SMS, MMS, and RCS).

1.86   "**Taxes**" means all government-imposed charges, including taxes, duties, imposts, and withholdings, but not taxes based on Google's or Company's net income, net worth, asset value, property value, or employment.

1.87   "**Telecom Operator(s)**" means a company that provides wireless service that allows End Users to access the Internet.

1.88   "**Territory**" or "**Territories**" means the country or countries in which distribution of one or more Google Applications is permitted as set forth in the Google Product Geo-Availability Chart, which Google may update in its sole discretion, except that Turkey will not be a Territory.

1.89   "**Transaction Taxes**" means Taxes that are imposed on the purchase price or cost of goods or services, including value-added taxes (VAT), goods and services taxes (GST), sales taxes, and transfer taxes.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY          MOTO-NDCAL-00207116

**EXHIBIT 1231-016**

Google Confidential

**1.90**  "**Valid Query**" means a Query received by Google which: (1) contains the applicable Client ID as specified by Google to Company; (2) is not generated by any Fraudulent Act, as reasonably determined by Google; and (3) has not been modified, deleted, or appended in whole or in part by Company except as technically required in order to fulfill the obligations of this Agreement.

**1.91**  "**Valid Result**" means a search or assistive result(s) on a Results Page that results from a Valid Query as determined solely by Google.

**2.**    **SCOPE**

**2.1**   This Agreement applies only to Devices sold or distributed in the Territory. Unless otherwise agreed in writing by Google, Company will ensure that all Devices that Company sells or distributes in the Territory, and all Devices that Company's Affiliates sell or distribute in the Territory, meet the requirements of a Foundation Tier Device (as set forth in Section 4.1), except for (a) Devices distributed solely in Russia where Company and/or Company's Affiliates may choose on a Device-by-Device basis whether to configure a Device as a Foundation Tier Device and (b) Exempted Devices. Subject to Attachment D, Company may seek and, at Google's discretion, obtain from Google a waiver on some requirements. Subject to Section 11.1 (Incentive), Company may choose on a Device-by-Device basis to configure a Foundation Tier Device so that it meets the additional requirements for a Premier Tier Device (as set forth in Section 5.1). For the avoidance of doubt, Company is under no obligation to configure any Foundation Tier Device so that it meets the additional requirements of a Premier Tier Device.

**2.2**   Company is responsible for all acts and omissions of Company Affiliates in connection with Devices, as though such acts and/or omissions were carried out by Company itself. For the sake of clarity, any act or omission of a Company Affiliate that would be a breach of this Agreement if carried out by Company, will be deemed to be a breach of this Agreement by Company.

**3.**    **SETUP REQUIREMENTS**

**3.1**   In respect of any Device under this Agreement, Company must meet the following requirements (the "**Setup Requirements**"):

(a)    correct implementation on the Device of the appropriate Client ID(s) in compliance with the following:

Google may provide Company with more than one Client ID (e.g., for Foundation Tier Devices and Premier Tier Devices (where applicable) for each of Google Search, Google Assistant, etc.). Company will (i) ensure that the appropriate Client ID(s) for a particular Device is/are correctly implemented (as reasonably instructed by Google) on such Device prior to its distribution, and (ii) use the applicable Client ID(s) for all Valid Queries. Google may modify Client IDs from time to time in its sole discretion upon notice to Company, and Company will implement the modified Client ID(s) on all applicable Devices within 60 calendar days after Google's notice to Company.  For the sake of clarity, Company may not change the Client ID(s) assigned by Google without Google's prior written instruction or consent, may only implement Client IDs on Devices as instructed by Google, and may not add new Client IDs to any devices other than the Devices; and

(b)    correct implementation on the Device of (i) the Search Launcher Services API to ensure support for (1) Google Discover on Minus One Screen (in connection with Section 4.1(c)), (2) Google Hotword, and (3) search interface prewarming, and (ii) the applicable setup screens in connection with the out-of-box experience, in accordance with guidelines and instructions provided by Google.

9



**EXHIBIT 1231-017**

Google Confidential

**4.    FOUNDATION TIER DEVICE**

4.1    **Requirements for Foundation Tier Monthly Incentive.** For any Device to qualify as a Foundation Tier Device, and for Company to receive Foundation Tier Monthly Incentive for such Device under this Agreement in accordance with Section 11 and Attachment A, the following requirements must be met:

(a)    Company must comply with all Setup Requirements (as set forth in Section 3.1) including the additional set-up flow integration required in Incentive Implementation Requirements. Company will implement up to four (4) additional Setup Wizard Screens ("**Google Services Setup Wizard Screens**"). Once Google provides Company with supporting software components for these Setup Wizard Screens, both parties will collaborate on a timeline for commercial deployment. For clarity, these Google Services Setup Wizard Screens are incremental to the mandatory Setup Wizard requirements in GMS requirements;

(b)    Company must comply with the Incentive Implementation Requirements subject to the following subclauses below and Attachment D. In the event of any direct conflict between (i) the terms in the Incentive Implementation Requirements, and (ii) the terms of this Agreement, this Agreement will prevail with respect to the directly conflicting terms unless otherwise agreed between the parties.

(i)    The Device must integrate with and present Google Discover or other Google service or experience in Google's discretion on the Minus One Screen; and

(ii)    Company must preload those Google applications as set forth in the Incentive Implementation Requirements ("**Google Application Preloads**"). Google may change which Google Applications Company is required to preload on Foundation Tier Devices with 90 days prior written notice to Company. During the Term, the number of incremental Google Application Preloads, at any time, will not exceed (i) seventeen (17) total applications. Incremental Google Application Preloads are those that are not required to be preloaded under GMS requirements, the MADA or, as applicable, the EMADA;

(iii)    With 90 days prior written notice to the Company, Google will have the right to designate the placement of Google Application Preloads shortcut icons on the bottom row of the Default Home Screen, Application Dock, and Plus One Screen ("**Google Application Placements**") subject to the following limitations: (i) up to 4 icons if an Application Dock has 5 columns (or up to 3 icons if an Application Dock has 4 columns); (ii) up to 4 icons if a Default Home Screen has 5 columns (or up to 3 icons if a Default Home Screen has 4 columns); and (iii) up to 4 icons on the Plus One Screen. For all other Google Application Placements, Google may choose for them to be placed in the Google Folder in an order designated by Google;

(iv)    With 90 days prior written notice to the Company and subject to Google providing Company with necessary Google-supporting software components to complete the request, Google will have the right to require Company to map the power button or side key press functionality to an additional experience defined by Google ("**Google Power Button Experience**") as set forth in Incentive Implementation Requirements. The Google Power Button Experience will maintain the following functionality: (i) emergency call, (ii) screenshot, (iii) restart, and (iv) power-off;

(v)    If Company is unable to comply with all the requirements as provided in

10



**EXHIBIT 1231-018**

Google Confidential

accordance with this Section 4.1(b), Company may request a waiver from Google which may be granted at Google's sole discretion. Google will not change the requirements in this Section 4.1(b) more than once every six months during the Term. For the sake of clarity, any such change to requirements under this Section 4.1(b) will only apply to Foundation Tier Device Models that have not launched or have not reached Company's software lock date; and

(c)     The Device must comply with Section 4.3 (Configuration).

**4.2     Requirements for Foundation Tier Bonus Incentive.** For Company to receive Foundation Tier Bonus Incentive for any Foundation Tier Device under this Agreement in accordance with Section 11 and Attachment A, the following requirements must be met:

(a)     The Device must be qualified as a Foundation Tier Device; and

(b)     Company must achieve requirements set out in Section 1.2 of Attachment A.

**4.3     Configuration.** Company will not and will not allow any third party to do any of the following with respect to Foundation Tier Devices except as specified in Section 6 (Permitted Activities):

(a)     include in any manner on a Foundation Tier Device (including via over-the-air prompt, out-of-box experience, or non-End User-initiated download or update) any Alternative Service, or any application, service, or functionality that has the primary purpose of providing access to any Alternative Service;

(b)     introduce, promote, or suggest (including via over-the-air prompt) an Alternative Service to an End User;

(c)     (i) change in any manner (A) the default search settings from initial factory settings for Google Applications that are preloaded on a Foundation Tier Device, (B) any active Hotword or active Gesture that is preloaded on a Foundation Tier Device, or (C) Google Search, Google Assistant (including any active Hotword or active Gesture), or Default Functions, in each case that are preloaded on a Foundation Tier Device; or (ii) prompt End Users to change, or engage in any promotion or campaign that suggests to End Users that they change in any manner any of the items in (i); provided, however, that Company will not be responsible under this subsection (c) for the conduct of a third-party retailer of Foundation Tier Devices who does not comply with this subsection (c) so long as Company does not have any commercial arrangement with such third-party retailer to engage in conduct that is not in compliance with this subsection (c), and Company does not prompt, suggest, promote, or use other means that direct, instruct, or encourage such third-party retailer from being in compliance with this subsection (c).

**4.4     Letter Upgrade Obligations.**

(a)     Company will use commercially reasonable efforts to provide Letter Upgrades to Devices in accordance with the following:

(i)     **Category 1**: For all premium and mass-premium Device Models (Manufacturer Suggested Retail Price of US$400 and above) Launched during the calendar year of 2020, Company will provide at least one (1) Letter Upgrade.

(ii)     **Category 2**: For all mid-tier Device Models (Manufacturer Suggested Retail Price of US$150-$400) Launched during the calendar year of 2020, Company will provide at least one (1) Letter Upgrade.

11



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-019**

Google Confidential

(iii) **Category 3**: For all entry-tier Device Models (Manufacturer Suggested Retail Price of US$150 and below) Launched during the calendar year of 2020, Company will provide at least one (1) Letter Upgrade.

(iv) **Category 4:** For all mid-tier Device Models (Manufacturer Suggested Retail Price of US$150-$400) Launched during the calendar year of 2020, Company will provide a second Letter Upgrade in addition to the first Letter Upgrade provided under **Category 2**.

(v) **Category 5**: For all entry-tier Device Models (Manufacturer Suggested Retail Price of US$150 and below) Launched during the calendar year of 2021, Company will provide one (1) Letter Upgrade.

(b) Google and Company will discuss in good faith and determine whether or not the requirements in **Category 4** or **5** are waived for a specific Device Model, if upon a mutually agreed upon assessment any of the following occurs: (i) the Foundation Tier Device does not have sufficient RAM to support such Letter Upgrade, (ii) board support package (BSP) support from applicable application processor (AP) (i.e. system-on-chip (SOC)) partners is insufficient, (iii) Company, in its reasonable discretion, determines that such Letter Upgrade will materially impair device performance, and/or (iv) if Telecom Operator(s) object or fail to provide reasonable support.

**4.5    Security Update Obligations.**

(a) For a period of twenty-four (24) months after the applicable Launch Date, unless otherwise approved by Google in writing, Company will implement Security Updates on Device Models of Active Foundation Devices in order to meet the Compliance Target (Security). Company is solely responsible for implementing the Security Updates or, as applicable, for ensuring that its subcontractor (subject to Section 17.4) implements the Security Updates.  As between Company and Google, Company is responsible for bearing all fees and costs associated with Security Updates (e.g., Telecom Operator's testing and acceptance, etc.) for itself and, as applicable, any subcontractor. Company will only implement the Security Updates on Device Models of Foundation Tier Devices using Google's, Company's, or Company's subcontractor's over-the-air infrastructure. Company will inform Google of any stability problems or other problems with meeting the Compliance Target (Security).  Google and Company will work together to resolve such problems through their Technical Account Managers.

(b) If Company fails to complete Security Updates so as to meet the Compliance Target (Security), Google may withhold build approvals for any future Foundation Tier Devices.

(c) For the purposes of this section only, when determining whether Company meets the Compliance Target (Security), those Android Compatible Devices manufactured, and branded, by Company that launched in calendar years 2018 and 2019 under the obligations of (i) the Google Mobile Revenue Share Agreement 2017 effective as of June 1, 2017 (as amended, "**Previous Revenue Share Agreement**"), (ii) GFW Device Program Agreement effective as of December 1, 2018, and (iii) Smart Stand Device Program Agreement effective as of October 21, 2019, will be counted as Active Foundation Devices.

**5.    PREMIER TIER DEVICE**

**5.1    Device Requirements.** For any Device to qualify as a Premier Tier Device, and for Company

12



**EXHIBIT 1231-020**

Google Confidential

to receive Premier Tier Monthly Payment for such Device under this Agreement in accordance with Section 11 and Attachment A, the following requirements must be met:

(a)   The Device must be qualified as a Foundation Tier Device by complying with all requirements set forth in Section 4 (Foundation Tier Device);

(b)   The Device must comply with all requirements set forth in Attachment B (Premier Tier Service Access Points); and

(c)   The Device must comply with Section 5.2 (Configuration).

5.2   **Configuration.** Company will not and will not allow any third party to do any of the following with respect to Premier Tier Devices except as specified in Section 6 (Permitted Activities):

(a)   (i) change in any manner the default search and browser settings from initial factory settings for Google Applications that are preloaded (in accordance with Attachment B) on a Premier Tier Device, or (ii) prompt End Users to change, or engage in any promotion or campaign that suggests to End Users that they change, any of the items in (i); provided, however, that Company will not be responsible under this subsection (a) for the conduct of a third-party retailer of Premier Tier Devices who does not comply with this subsection (a) so long as Company does not have any commercial arrangement with such third-party retailer to engage in conduct that is not in compliance with this subsection (a), and Company does not prompt, instruct, suggest, promote, or use other means that direct, instruct, or encourage such third-party retailer from being in compliance with this subsection (a).

5.3   **Additional Requirements.**

(a)   **Product Development.** Google and Company will collaborate in good faith to develop and optimize Android software, Foundation Tier Devices and Premier Tier Devices, including with respect to device and software testing for both Foundation Tier and Premier Tier Devices. The parties, through their Business and Technical Managers, will meet to review Foundation Tier and Premier Tier Devices and to discuss opportunities for optimization within a reasonable time period prior to Launch and following Launch as mutually determined by the parties. For the sake of clarity, Google's involvement in the technical development of devices intended to qualify as both Foundation Tier and Premier Tier Devices is solely of an advisory nature, and Google is under no obligation to provide direct development, engineering, or related resources, except as otherwise agreed to in this Agreement or in such other agreements as may be entered into between the parties.

(b)   **Test Devices Support.** Company will provide Google with up to three (3) Devices for testing and verification purposes ("**Test Devices**") and will use commercially reasonable efforts to provide the Test Devices at a minimum of eight (8) weeks before initial device factory firmware approval. At Google's written request, Company will provide (i) up to twenty (20) additional Test Devices for Device Models each calendar year for country-specific testing and product development purposes with a number to be discussed on a country-by-country basis and (ii) pre-production verification testing samples for the purpose of Google's testing and verification.

(c)   **Bug Fixes.** If Google notifies Company of bugs that impact the performance of any Google products and services to be preloaded, preinstalled, or otherwise included in accordance with Attachment B (Premier Service Access Points) on Test Devices, Company will troubleshoot and resolve such bugs within a commercially reasonable time period, as mutually agreed to by the parties.

13



**EXHIBIT 1231-021**

Google Confidential

**6.    PERMITTED ACTIVITIES**

**6.1    Geographic Exceptions**

(a)    Notwithstanding anything to the contrary in Sections 4.3 or 5.2 or Attachment B, for Devices that are solely distributed in the jurisdictions listed in Attachment C, Company may preload, distribute, or otherwise install in a folder on the Default Home Screen and/or may preload, distribute, or otherwise install on any screen, other than the Default Home Screen or the Minus One Screen:

(i)    a Company or third-party application or widget that is an Alternative Search Service; and/or

(ii)    a Company or third-party browser that uses an Alternative Search Service.

(b)    Notwithstanding anything to the contrary in Sections 4.3 or 5.2 or Attachment B, for Devices that are solely distributed in Russia, (i) Company may preload, distribute, or otherwise install (A) any Alternative Search Service and/or any browser on any screen and (B) any application that is substantially similar (as determined by Google in its sole discretion) to any of the Core Applications or Flexible Applications (other than Google Search and Google Chrome) set forth in the Google Product Geo-Availability Chart on any screen except the Minus One Screen; and (ii) Company is not obligated to integrate with and present Google Discover or other Google service or experience in Google's discretion on the Minus One Screen.

(c)    Notwithstanding anything to the contrary in Sections 4.3 or 5.2 or Attachment B, for Devices that are solely distributed in the EEA, Company has no obligation to make Google Assistant and Google Lens accessible via the Google-provided widget where the End User has selected a search engine other than Google Search from the search engine choice screen that is displayed on initial device set-up. For the sake of clarity, Company's display of the search engine choice screen in the EEA in accordance with Google's instructions will not be a breach of any Section of this Agreement. For the sake of clarity, Company is still required to implement Google Search Services API on such Devices.

(d)    Notwithstanding anything to the contrary in Section 4.3, for Foundation Tier Devices only that are distributed in the EEA, Company is not obligated to integrate with and present Google Discover or other Google service or experience in Google's discretion on the Minus One Screen.

**6.2    End Users.** For the sake of clarity, nothing in this Agreement restricts End Users from installing or using alternatives to Google Applications.

**6.3    Off-Device Promotions.** For the sake of clarity, nothing in this Agreement restricts Company from engaging in off-Device promotions of third-party hardware that feature any Alternative Service, even if such promotions refer to an Alternative Service that is compatible with that hardware (in-store or otherwise), so long as that hardware is not bundled for sale or distribution with Devices and such promotions are not targeted to any group that is comprised of all or substantially all End Users of Devices.

**6.4    Geo-Availability of Google Applications.** Nothing in this Agreement requires Company to preload or distribute any Google Application on any Device in a country or territory where preload or distribution of such application is not permitted under the Google Product Geo-Availability Chart.

14



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    MOTO-NDCAL-00207122

**EXHIBIT 1231-022**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

**7.    COMPANY OBLIGATIONS**

7.1    **MADA and EMADA.** Company is a party to a valid and effective MADA and, for Devices distributed in the EEA, a valid and effective EMADA; and Company will at all times during the Term remain in compliance with the MADA and, for Devices distributed in the EEA, the EMADA.

7.2    **Policy Obligations.** Company will not, and will not allow any third party to:

(a)    (i) change the order or content of or block or filter any search results or ads provided by Google on Devices (including commingling Valid Results or Ads with non-Google-provided search results or advertising), (ii) display any search results or ads provided by Google to any third parties other than End Users, or (iii) display any search results or ads provided by Google in pop-up, pop-under, exit windows, expanding buttons, or animation or other similar methods on Devices;

(b)    use information obtained from any Google Application, including (i) click tracking of search results or ads provided by Google on Devices; (ii) recording, collecting, using, or storing any information or data from a Query or result, including any audio data or metadata, received as a result of an End User's use of, or authentication with, any Google Application, including the Google Assistant; or (iii) performing other monitoring of search results or ads provided by Google, except pursuant to Section 7.3 (Monitoring Queries);

(c)    redirect an End User away from a Destination Page, modify the Destination Page, intersperse any content between any search results or ads provided by Google and any Destination Page, or do or fail to do anything that in any way implies that Google is responsible for any Destination Page; or

(d)    directly or indirectly access, launch, and/or activate Google Search, Google Assistant, or Google Play, including Google Play Ads, through or from any Client Application for Foundation Tier Devices, and Attachment B for Premier Tier Devices.

7.3    **Monitoring Queries.** Company may only monitor Queries in order to comply with applicable law, if such monitoring does not affect the integrity of any Queries, Valid Results, Google Search, the Google Assistant, Google Lens, Google Applications, or the End User experience.

7.4    **Ad Blocking.** Company will not, and will not allow any third party to, install or otherwise enable any ad blocking functionality on any Device. It will not be a breach of this Section 7.4 if an End User chooses to install or otherwise enables any ad blocking functionality on a Device as long as Company did not preload, or otherwise install, present, promote, or suggest (including via over-the-air prompt) such ad blocking functionality to the End User.

7.5    **Maintenance.** During the Term and for a period of two (2) years thereafter, Company will not and will not allow any third party to: (a) modify any of the software or hardware setting of a Device outside Company's normal business activities including updates to Company's own applications, Company's own maintenance releases, or provision of Letter Upgrades; (b) encourage any End User to modify any of the software or hardware settings of a Device; or (c) otherwise engage in any activity that encourages or enables any End User to modify the degree to which the End User interacts with the software or hardware settings of a Device.

**8.    [Intentionally Omitted]**

**9.    MANAGEMENT**

Company and Google will each appoint (1) a business partner manager (the "**Business**

15

**EXHIBIT 1231-023**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

**Manager**") who will be the single point of contact for all business, go-to-market, and operational activities and (2) a technical account manager (the "**Technical Manager**") who will be the primary point of contact for all technical and deployment activities. Company and Google will notify each other of the name and contact details for their Business Manager and Technical Manager promptly after the Effective Date. Either party may change its Business Manager and Technical Manager by notifying the other party in writing.

**10.   DATA COLLECTION AND REPORTS**

10.1   **Data Collection.**   Each party's privacy and security policies will apply with respect to the user information collected by such party.

10.2   **Device Enrollment Forecast.**

(a)   Before the Launch of any Device Model during the Term, Company will provide Google with a written notice of whether Company intends such Device Model to be enrolled into either of Foundation Tier or Premier Tier, and which tier the Device Model will be enrolled into. Company will use commercially reasonable efforts to provide such a notice to Google at least two (2) months before Launch of each such Device Model.

(b)   During the Term, Company will provide a monthly Foundation Tier Devices and Premier Tier Devices shipment volume forecast through to the remainder of the Term based on the geographies Google requests from time to time.

(c)   Within the first 15 days of the beginning of each calendar month, upon written request from Google, Company will provide a written report to Google detailing the following information for the previous calendar month:

(i)   the total number of Foundation Tier Devices and Premier Tier Devices that were distributed in aggregate and, where requested by Google, broken down by distribution channel and country.

10.3   **Google Reports.** Google and Company will work together in good faith to agree on the format of quarterly reports detailing the proportion, based on actual search results, attributed to each major Company product category (for clarity, smartphones vs. tablets) as agreed by the parties. Google will provide reports on a quarterly basis.

**11.   PAYMENT AND TAXES**

11.1   **Incentive.** Subject to the terms and conditions of this Agreement, Google will pay Company the Incentive in accordance with this Section 11.1 and Attachment A.  Payment may be made by Google as a single, consolidated payment or as multiple payments in Google's sole discretion. No Incentive will be payable if Company is in breach of Sections 3 through 5 (Devices) or Section 7 (Company Obligations).  In addition, although Company may choose whether to configure any Devices on a Device-by-Device basis as Premier Tier Devices, once a Device first meets the additional requirements to be a Premier Tier Device, and Company becomes eligible to receive Premier Tier Monthly Incentive in respect of such Premier Tier Device, it will be a breach of the applicable provision(s) in Sections 3 through 5 if Company or any third party acting on Company's instructions: (a) subsequently makes any changes to that Premier Tier Device so that such Device no longer meets the requirements to be a Premier Tier Device, and/or (b) carries out any acts or omissions in connection with that Premier Tier Device that are prohibited under this Agreement.

11.2   **Payment Timing.**   Payment of the Incentive will be made monthly by the last day of the calendar month following the calendar month to which it applies.  Google will pay Foundation

16



**EXHIBIT 1231-024**

Google Confidential

Tier Bonus Incentive payments as set forth in Attachment A.

**11.3     Payor.** In accordance with applicable law and regulations, Google operates multiple local Google Affiliates to process transactions, and payments from Google to Company may be made by one or more of these Google Affiliates, which will satisfy Google's payment obligations under this Agreement. The parties will discuss in good faith operational adjustments and tax withholding modifications if Google opts to pay from an Affiliate other than the US entity.

**11.4     Designated Payee.** Designated Payee is included as a party to this Agreement solely for the purpose of receiving payments due to Company under this Agreement on behalf of Company. For the avoidance of doubt, Company hereby directs Google to make all payments due to Company under this Agreement to Designated Payee and hereby acknowledges and agrees that any payment made by Google to Designated Payee will fulfill Google's payment obligations to Company under this Agreement. Designated Payee hereby acknowledges and agrees that it is an Affiliate of Company, is a resident of the United States for U.S. federal income tax purposes, and has agreed and is entitled to receive payments made by Google under this Agreement on behalf of Company. Designated Payee furthermore agrees that it will fulfill any tax obligation, comply with any tax documentation requests, and make any tax certification that is described under Section 11.9 (Taxes). Company and Designated Payee agree to indemnify and hold harmless Google for any loss incurred as a result of Google complying with Company's payment direction under this Section 11.4 and any tax liabilities, adjustments, penalties, interest, or costs incurred by Google as a result of Designated Payee's failure to provide any tax documentation or information described under, or to otherwise comply with the provisions of, Section 11.9 (Taxes). Company agrees to provide a written request to Google at least ninety (90) days prior to the proposed effective date of any change to the Designated Payee or payment direction under this Agreement, which Google shall acknowledge and consider in good faith.

**11.5     No Other Payment Obligations.** Except as set forth in this Agreement, (a) Google and Company will each retain any and all revenue generated from provision of their respective products or services and (b) neither party will be required to account to the other party or otherwise make any other payment to the other party regarding the Google Applications or Google services, the Devices, or any revenue generated by the other party, unless otherwise agreed in a separate written agreement signed by the parties.

**11.6     Bank Details.** For payment and tax purposes, Company will provide any information reasonably required by Google, including Company's bank account information.  Company will not receive Incentive prior to Google's receipt of such information.

**11.7     Adjustments.** In addition to other rights and remedies Google may have, Google may (a) offset any payment obligations to Company that Google may incur under this Agreement against any product or service fees owed to Google and not yet paid by Company under this Agreement or any other agreement between Company and Google and (b) withhold and offset against its payment obligations under this Agreement, or require Company to pay to Google within 30 calendar days of any invoice, any amounts Google may have overpaid to Company in prior periods under this Agreement.

**11.8     Currency.** All payments due to Company in accordance with this Section and Attachment A will be in U.S. Dollars. Any charges for converting foreign currency will be Company's responsibility.

**11.9     Taxes.**

(a)     <u>Transaction Taxes</u>.  All payments under this Agreement are inclusive of Transaction Taxes. Company is responsible for charging and paying any Transaction Taxes

17

**EXHIBIT 1231-025**

Google Confidential

required to be charged by any governmental tax authority in connection with any payment made by Google to Company under this Agreement.

(b)     <u>Withholding Taxes</u>. If Google is required under applicable law to withhold Taxes from its payments to Company and remit such Taxes to any governmental taxing authority, then Google will pay to Company the remaining net amount after such Taxes have been withheld and within a reasonable timeframe provide to Company a copy of an official tax receipt, a copy of filed forms with taxing jurisdiction, or other appropriate evidence of any taxes imposed on payments made under this Agreement. Company agrees to timely provide, as soon as reasonably practicable, any tax documentation or certification requested by Google, including IRS Forms W-8 or W-9.  Company hereby certifies that any services that it is deemed to perform pursuant to this Agreement are not performed in the United States or Singapore and furthermore agrees to provide written notification to Google at least ninety (90) days prior to any such services being performed in the United States or Singapore.

## 12.    TERM AND TERMINATION

12.1    **Term.**  This Agreement will commence on the Effective Date and will continue until the end of the Term, unless earlier terminated as provided in Section 12.2 or 12.3.

12.2    **Termination of this Agreement.** Either Google or Company may suspend or terminate this Agreement with immediate effect by giving written notice to the other party if such other party:

(a)     is in material breach of this Agreement where the breach cannot be remedied;

(b)     is in material breach of this Agreement where the breach can be remedied, but such other party fails to remedy that breach within 30 calendar days after receiving written notice of such breach;

(c)     is in material breach of this Agreement more than twice for which written notice is given regardless of whether the second or subsequent breach can be remedied; or

(d)     ceases its business operations or becomes subject to insolvency proceedings and the proceedings are not dismissed within 90 calendar days.

12.3    **Termination of MADA and EMADA.** If the MADA or, for devices distributed in the EEA, the EMADA, is terminated for any reason, this Agreement will automatically terminate.

12.4    **Material Breach.**  For purposes of determining whether a "material breach" has occurred, the parties agree that a breach by either party of Section 2 (Scope), Sections 3 through 5 (Devices), Section 7 (Company Obligations), Google's failure to make an undisputed monthly payment under Section 11 (Payment and Taxes) and Attachment A (Incentive), Section 13 (Confidentiality and Publicity), or Section 14 (Intellectual Property Rights) is a material breach of this Agreement.  The prior sentence should not be interpreted to imply that a breach of any other Section of this Agreement will not be a material breach of this Agreement.

12.5    **Special Suspension.** Notwithstanding anything to the contrary in this Agreement, if the government or controlling body of any country or territory imposes any law, restriction or regulation that (a) makes it illegal to distribute or make available in such country or territory any Google application or service (e.g., Google Search, Google Assistant, Google Play, etc.) covered under this Agreement, or (b) places a substantial burden on Google, where substantial is measured with respect to Google's economic benefit under this Agreement, as determined by Google in its reasonable and good faith judgment (such substantial burden, a "**Substantial Burden**"), then Google may suspend the proportion, in Google's determination, of the Incentive

18



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-026**

Google Confidential

payments payable in connection with the applicable Google application(s) or service(s) in such country or territory until the law, restriction or regulation is repealed, nullified or modified so that it is no longer illegal or a Substantial Burden to distribute or make available the applicable Google application(s) or service(s) in such country or territory ("**Special Suspension**"). As a condition to make the Special Suspension, Google will provide Company with prior written proof(s) in the form of laws, restrictions, or regulations issued by the government or controlling body to prove the circumstance provided in this Section has occurred. For the sake of clarity, a party being added to the U.S. Department of Commerce's Entity List or any other action by the U.S. Government that would prohibit Google's ability to perform its obligations under this Agreement constitutes a Substantial Burden, which qualifies for a Special Suspension.

12.6 **Effect of Termination of this Agreement.** Upon expiration or termination of this Agreement for any reason:

(a) all rights and obligations of each party hereunder will immediately terminate except as stated in Section 12.7 (Survival);

(b) Company will not install or have installed any Client ID on any new Device after the date this Agreement expires or terminates; and

(c) Google and Company will each return or destroy all copies of Confidential Information in its possession of which it is aware and to which it has access and is reasonably able to destroy or delete (which, for the avoidance of doubt, does not include archived backup copies which are not in live working use and which are no longer easily accessible or retrievable), including from all hard disks and memory.

12.7 **Survival.** The provisions of Sections 1 (Definitions), 4.4 (Letter Upgrade Obligations), 4.5 (Security Update Obligations), 7.2 (Policy Obligations), 7.5 (Maintenance), 11.9 (Taxes), 12.6 (Effect of Termination of this Agreement), 12.7 (Survival), 13 (Confidentiality and Publicity), 14 (Intellectual Property Rights), 16 (Limitation of Liability), and 17 (General), and any other clauses which under their terms or by implication ought to survive, will survive expiration or termination of this Agreement. Notwithstanding the foregoing, Sections 4.4 (Letter Upgrade Obligations), 4.5 (Security Update Obligations), 7.2 (Policy Obligations), and 7.5 (Maintenance) will not survive expiration or termination of this Agreement if Company terminates this Agreement pursuant to Section 12.2.

13. **CONFIDENTIALITY AND PUBLICITY**

13.1 "**Confidential Information**" is information disclosed by one party (or its Affiliates) to the other party (or its Affiliates) under this Agreement that is marked as confidential or would normally be considered confidential information under the circumstances. Confidential Information does not include information that becomes public through no fault of the recipient, that is independently developed by the recipient, or that is rightfully given to the recipient by a third party without confidentiality obligations.

13.2 **Confidentiality Obligations.** The recipient will not disclose the Confidential Information, except to Affiliates, employees, agents, subcontractors, or professional advisors ("**Delegates**") who need to know it and who have a legal obligation to keep it confidential. The recipient will use the Confidential Information only to exercise rights and fulfill obligations under this Agreement. The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations. The recipient may disclose Confidential Information when required by law after giving reasonable notice to the discloser, if permitted by law.

13.3 **Publicity.** Neither party may make any public statement regarding this Agreement without the other party's prior written approval.

19



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-027**

Google Confidential

## 14. INTELLECTUAL PROPERTY RIGHTS

Company acknowledges that, as between the parties, Google (and/or its licensors) retains all right, title, and interest, including all Intellectual Property Rights, in and to the Google Applications (including Default Functions), Google Search, and the Google Assistant. Company has, and will acquire, no rights in the foregoing. Google acknowledges that, as between the parties, Company (and/or its licensors) retains all right, title, and interest, including all Intellectual Property Rights, in and to the Devices. Google has, and will acquire, no rights in the Devices.

## 15. REPRESENTATIONS AND WARRANTIES

Each party represents and warrants to the other party that it has full power and authority to enter into this Agreement, and that the execution and delivery of this Agreement, and the performance of its obligations hereunder, will not constitute a breach or default of or otherwise violate any agreement to which such party or any of its Affiliates are a party.

## 16. LIMITATION OF LIABILITY

16.1  **Limitations.**  Subject to Section 16.2 (Exceptions to Limitations), (a) neither party will be liable (under any theory) for incidental or punitive damages, and (b) neither party's aggregate Liability for any claim arising out of or related to this Agreement will exceed US$1,000,000.

16.2  **Exceptions to Limitations.**  Nothing in this Agreement excludes or limits either party's Liability for: (a) breaches of confidentiality obligations, (b) violations of the other party's Intellectual Property Rights, (c) Google's failure to pay Incentive payable under this Agreement, (d) Company's failure to comply with the terms of Section 3 through Section 5 (Devices) or Section 7 (Company Obligations) of the Agreement, or (e) matters for which Liability cannot be excluded or limited under applicable law.

16.3  **Exclusive Remedy.**  Subject to Section 16.2 (Exceptions to Limitations), to the maximum extent permitted by applicable law, each party's exclusive remedy for breaches of this Agreement will be monetary damages, except that either party may seek injunctive relief in connection with (a) breach or potential breach of Section 13 (Confidentiality and Publicity) and (b) violations of a party's Intellectual Property Rights.

16.4  **Allocation of Risk.**  The parties agree that (a) the mutual agreements made in this Section 16 reflect a reasonable allocation of risk, and (b) neither party would enter into this Agreement without these limitations on liability.

## 17. GENERAL

17.1  **Notices.**  All notices of termination or breach must be in English, in writing and addressed to the other party's Legal Department. The address for notices to Google's Legal Department is legal-notices@google.com. All other notices must be in English, in writing, and addressed to the other party's Partner Manager. Notice will be treated as given on receipt, as verified by written or automated receipt or by electronic log (as applicable).

17.2  **Assignment.**  Neither party may assign any part of this Agreement without the written consent of the other, except to an Affiliate where: (a) the assignee agrees in writing to be bound by the terms of this Agreement, (b) the assigning party remains liable for obligations under this Agreement if the assignee defaults on them, and (c) the assigning party has notified the other party of the assignment. Any other attempt to assign is void.

17.3  **Change of Control.**  During the Term, if a party experiences a change of control (for example,

20

**EXHIBIT 1231-028**

Google Confidential

through a stock purchase or sale, merger, or other form of corporate transaction): (a) that party will give written notice to the other party within 30 days after the change of control; and (b) the other party may immediately terminate this Agreement any time between the change of control and 30 calendar days after it receives that written notice.

17.4 **Subcontracting.** Either party may subcontract any of its obligations under this Agreement but will remain liable for all subcontracted obligations and its subcontractors' acts or omissions.

17.5 **Force Majeure.** Neither party will be liable for failure or delay in performance to the extent caused by circumstances beyond its reasonable control.

17.6 **No Waiver.** Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

17.7 **No Agency.** This Agreement does not create any agency, partnership, or joint venture between the parties.

17.8 **No Third-Party Beneficiaries.** This Agreement does not confer any benefits on any third party unless it expressly states that it does.

17.9 **Counterparts.** The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

17.10 **Amendments.** Any amendment must be in writing, signed by both parties, and expressly state that it is amending this Agreement.

17.11 **Entire Agreement.** This Agreement states all terms agreed between the parties and supersedes all other agreements between the parties relating to its subject matter. In entering into this Agreement, neither party has relied on, and neither party will have any right or remedy based on, any statement, representation, or warranty (whether made negligently or innocently), except those expressly stated in this Agreement.

17.12 **Severability.** If any term (or part of a term) of this Agreement is invalid, illegal, or unenforceable, the rest of the Agreement will continue in force unaffected.

17.13 **Governing Law.** This Agreement is governed by California law, excluding California's choice of law rules. ALL CLAIMS ARISING OUT OF OR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT WILL BE LITIGATED EXCLUSIVELY IN THE FEDERAL OR STATE COURTS OF SANTA CLARA COUNTY, CALIFORNIA, USA, AND THE PARTIES CONSENT TO PERSONAL JURISDICTION IN THOSE COURTS.

[Signature Page Follows]



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MOTO-NDCAL-00207129

**EXHIBIT 1231-029**

DocuSign Envelope ID: D7AC4332-E5A1-458Q-8FBA-B68EE17F3C34

Google Confidential

IN WITNESS WHEREOF, the parties have executed this Agreement by persons duly authorized as of the Effective Date.

**LENOVO GROUP LTD**

By _Paul pitarra_

Name _Paul pitarra_

Title _Executive Director, Procurement_

Date _2/25/2020_

**GOOGLE LLC**

By _[signature]_

Name _Jamie Rosenberg / Authorized Signatory_

Title

Date


2020.02.25
12:41:03
-08'00'

**MOTOROLA MOBILITY LLC**, solely for the purpose of receiving payments under this Agreement

By _Paul pitarra_

Name _Paul pitarra_

Title _Executive Director, Procurement_

Date _2/25/2020_

**GOOGLE ASIA PACIFIC PTE. LTD.**

By _S. Lavanya_

Name _Lavanya Swetharanyan / Director / Google Asia Pacific Pte. Ltd_

Title

Date


2020.02.2
6 14:47:05
+08'00'

**GOOGLE COMMERCE LIMITED**

By _Fionnuala Meehan_

Name _Fionnuala Meehan / For, Fionnuala Meehan (Board Director)_

Title

Date

2020.02.26
14:31:04 Z

**GOOGLE IRELAND LIMITED**

By _Fionnuala Meehan_

Name _Fionnuala Meehan / For, Fionnuala Meehan (Board Director)_

Title

Date

2020.02.26
14:31:19 Z

22



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MOTO-NDCAL-00207130

**EXHIBIT 1231-030**

DocuSign Envelope ID: D7AC4332-E5A1-458B-8FBA-B68EE47F3C34

Google Confidential

**ATTACHMENT A**

**INCENTIVE**

Subject to the terms and conditions of the Agreement (including Section 11 (Payment and Taxes)), during the Term, Google will pay Company Incentive as follows:

**1.      FOUNDATION TIER DEVICE**

**1.1      Foundation Tier Monthly Incentive.** Google will pay US$500,000 per month, provided Company meets all the requirements set forth in Sections 4 (Foundation Tier Device) and 7 (Company Obligations) in a given calendar month during the Term ("**Foundation Tier Monthly Incentive**").

**1.2      Foundation Tier Bonus Incentive.** If Company (i) is eligible for and receives Foundation Tier Monthly Incentive, and (ii) (x) completes any of the Categories defined in Section 4.4 (Letter Upgrade Obligations), and (y) meets all the requirements set forth in Section 4.5 (Security Update Obligations), Google will provide the corresponding monthly incentive or one-time bonus payment in accordance with the following ("**Foundation Tier Bonus Incentive**"). For the avoidance of doubt, Google will provide Foundation Tier Bonus Incentive in addition to Foundation Tier Monthly Incentive that Google provides pursuant to Section 1.1 of this Attachment A.

- US$150,000 per calendar month for the rest of the Term, if **Category 1** is completed.
- US$200,000 per calendar month for the rest of the Term, if **Category 2** is completed.
- US$200,000 per calendar month for the rest of the Term, if **Category 3** is completed.
- A "Categories 1 through 3 completion bonus" of US$250,000 per calendar month for the rest of the Term, if **Categories 1, 2,** and **3** are all completed (in addition to the amounts set forth in the first three bullets above for completion of Categories 1, 2 and 3).
- A one-time bonus payment of US$3,500,000, if **Category 4** is completed by March 31, 2022.
- A one-time bonus payment of US$3,500,000, if **Category 5** is completed by March 31, 2022.

Separately, Company has the opportunity to earn a one-time bonus payment as follows:

- A one-time bonus payment of US$8,000,000 payable by March 26, 2021, if Company reaches either of the following metrics (such metrics, the "**Bonus Targets**"): (1) a total of 55.0 million Android Compatible Devices manufactured by Company and distributed or sold in the Territory that are smartphones or tablets are activated during the Initial Term or (2) a total of 50.0 million Android Compatible Devices manufactured by Company and distributed or sold in the Territory that are smartphones only are activated during the Initial Term. For purposes of this calculation, Android Compatible Devices that are Company-manufactured and -branded and that are covered under the Previous Revenue Share Agreement, as well as covered under this Agreement, meeting the criteria of the preceding sentence will be counted. For the sake of clarity, Foundation Tier Devices for which Google opts to waive a requirement in writing or under Attachment D but that otherwise meet all the other Foundation Tier Requirements will be counted as Foundation Tier Devices.

**1.3      Foundation Tier Incentive Measurement.** Google or its Affiliates will measure within ten (10) days after the 28th day of each month ("**Foundation Tier Bonus Incentive Measurement Date**") whether Company has completed any of the Categories and has met the criteria for an additional one-time bonus payment mentioned above. Google or its Affiliates will use commercially reasonable efforts to notify Company of its measurement results within fourteen (14) days after the Foundation Tier Bonus Incentive Measurement Date.

**1.4      Foundation Tier Incentive Payments.** Payments related to Foundation Tier Monthly Incentives and Foundation Tier Bonus Incentives will be made by the last day of the calendar month

23



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-031**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

following the calendar month in which the measurement was performed.  All other terms regarding payments will be subject to Section 11 (Payment and Taxes) of this Agreement.

## 2.    PREMIER TIER DEVICE

**2.1        Premier Tier Monthly Incentive.** In addition to any payments payable under Section 1 (Foundation Tier Device), subject to Sections 2.2 through 2.5 of this Attachment A, if any Device meets all the requirements set forth in Sections 5 (Premier Tier Device) and 7 (Company Obligations) of the Agreement, Google will provide one of the following monthly incentives ("**Premier Tier Monthly Incentive**") to Company in the amount specified below.

From February 1, 2020 to January 31, 2021:

- US$4,800,000 for any calendar month, if the Device Enrollment Base % (as defined below) is equal to or more than 95%;
- US$3,000,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 80% but less than 95%;
- US$1,100,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 60% but less than 80%;
- US$200,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 40% but less than 60%; or
- US$50,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 20% but less than 40%.

From February 1, 2021 to January 31, 2022, only if this Agreement is extended by Google:

- US$6,000,000 for any calendar month, if (a) the Device Enrollment Base % is equal to or more than 98% AND (b) Company met the Bonus Targets;
- US$5,500,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 95%;
- US$3,400,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 80% but less than 95%;
- US$1,300,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 60% but less than 80%;
- US$200,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 40% but less than 60%; or
- US$50,000 for any calendar month, if the Device Enrollment Base % is equal to or more than 20% but less than 40%.

For purposes of the foregoing, "**Device Enrollment Base %**" will be calculated based on the last day of each calendar month, by Google using Google's activations data, as (i) the cumulative number of activations of Premier Tier Devices Launched during the Term *divided by* (ii) the cumulative number of activations of Foundation Tier Devices, Premier Tier Devices, and other Devices Launched during the Term.
- For the avoidance of doubt, the number of Foundation Tier Device activations will include activation of any Foundation Tier Device for which Google opts to waive a requirement under this Agreement (either in writing or under Attachment D) but that otherwise meets all the other Foundation Tier Device requirements, and the number of Premier Tier Device activations will include activation of any Premier Tier Device for which Google opts to waive a requirement under this Agreement (either in writing or under Attachment D) but that otherwise meets all the other Premier Tier Device requirements; however, Exempted Devices (as defined in Section 1.29 of the Agreement) will not be included.
- For clarity, the Device Enrollment Base % will be 100% from the Effective Date until the date of Launch of the first Premier Tier Device Model under this Agreement, after which the Device Enrollment Base % formula will be used. Company will use best efforts to Launch the first

24



**EXHIBIT 1231-032**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

Premier Tier Device Model under this Agreement by no later than March 31, 2020.

**2.2      Adjustment by Activation Performance**

(a)      <u>Baseline Value Comparisons</u>. Google will monitor, on a quarterly basis, performance of activations of Android Compatible Devices manufactured by Company and distributed under this Agreement or under the Previous Revenue Share Agreement against a corresponding Baseline Value, starting from April 1, 2020 and continuing through the Term. The Baseline Values will represent Company's quarterly activations of Android Compatible Devices manufactured by Company in calendar year 2019. There will be four total Baseline Values, which are:

- Q1-2019 Baseline Value
- Q2-2019 Baseline Value
- Q3-2019 Baseline Value
- Q4-2019 Baseline Value

For clarity, calendar year 2020 quarterly activations will be compared against the same quarter activations of calendar year 2019, which are the Q1-2019 through Q4-2019 Baseline Values. Furthermore, if this Agreement is extended, calendar year 2021 quarterly activations will also be compared against the calendar year 2019 Baseline Values. For clarity, Android Compatible Devices that are Company-manufactured and -branded and that are covered under the Previous Revenue Share Agreement, as well as covered under this Agreement, meeting the criteria of the preceding sentence will be counted.

(b)      <u>Activations Performance Decline</u>.

(i)      If, for any quarter during the Term, Google finds greater than 15% volume decrease in activations compared with the corresponding Baseline Value, Google may at its sole discretion (A) withhold from the Premier Tier Monthly Incentive payable in the next month an amount proportional to the percentage by which Company is lower than the corresponding Baseline Value, and/or (B) reduce the amount of Premier Tier Monthly Incentive proportionately until the next measurement period.

(ii)      If, for the final quarter of the Term, Google finds that Company has fewer activations compared with the Q4-2019 Baseline Value, Company will ship a number of Premier Tier Devices after the Term that represents the difference between actual activations during such final quarter and the Q4-2019 Baseline Value.

(iii)      Notwithstanding anything to the contrary in this Agreement, Google may terminate this Agreement with immediate effect if Company is more than 40% lower in activations compared to the corresponding Baseline Value.

(c)      <u>Activations Performance Increase</u>.

(i)      If Google finds greater than 15% volume increase in activations during the Initial Term over 55.0 million Android Compatible Devices (smartphones and tablets) manufactured by Company for distribution or sales in the Territory or over 50.0 million Android Compatible Devices (smartphones only) manufactured by Company for distribution or sales in the Territory, Google may (A) increase the Premier Tier Monthly Incentive by an amount proportional to the percentage that Company is higher than the corresponding Baseline Value in the next month, and/or (B) increase the amount of Premier Tier Monthly Incentive proportionately until the next measurement period. For the avoidance of doubt, the number of Foundation Tier Device activations will include activation of any Foundation Tier Device for which Google opts to waive a requirement under this Agreement (either in writing or under Attachment D) but that otherwise meets

25



MOTO-NDCAL-00207133

**EXHIBIT 1231-033**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

all the other Foundation Tier Device requirements, and the number of Premier Tier Device activations will include activation of any Premier Tier Device for which Google opts to waive a requirement under this Agreement (either in writing or under Attachment D) but that otherwise meets all the other Premier Tier Device requirements; however, Exempted Devices (as defined in Section 1.29 of the Agreement) will not be included.

**2.3      Geography.** Company will use best efforts to ensure a minimum of 20% of Premier Tier Device activations, for every twelve-month period, are in the following geographies: the United States, Canada, Japan, Australia, and New Zealand. If the above percentage is not met, Google may decrease in its sole discretion the amount of Premier Tier Monthly Incentive.

**2.4      Premier Tier Incentive Measurement.** Google or its Affiliates will measure within ten (10) days after the 28th day of each month ("**Premier Tier Monthly Incentive Measurement Date**") whether Company has met the criteria for the Premier Tier Monthly Incentive and whether any adjustments are to be made.  Google or its Affiliates will use commercially reasonable efforts to notify Company of its measurement results within fourteen (14) days after the Premier Tier Monthly Incentive Measurement Date.

**2.5      Premier Tier Incentive Payment.**  Payments related to Premiere Tier Monthly Incentives will be made by the last day of the calendar month following the calendar month in which the measurement was performed.  All other terms regarding payments will be subject to Section 11 (Payment and Taxes) of the Agreement.

**3.      ADJUSTMENT OF OTHER PROGRAMS.**

Notwithstanding the foregoing or anything else in the Agreement, from the Effective Date, Google reserves the right to cease all payments available under all other agreements or programs in effect between Company and/or its Affiliates, on the one hand, and Google and/or its Affiliates, on the other hand, including those agreements or programs listed below (which, for the sake of clarity, may not be a comprehensive list):

1. GFW Device Program Agreement effective as of December 1, 2018 between Google LLC and Motorola Mobility LLC
2. Smart Stand Device Program Agreement effective as of October 21, 2019 between Google Asia Pacific Pte. Ltd. and Lenovo PC HK Ltd.
3. Google Productivity Apps Mobile Distribution and Marketing Agreement effective as of October 25, 2016 between Google LLC and Motorola Mobility LLC, as subsequently amended
4. Google Placement Bonus Agreement effective as of November 11, 2017 between Google LLC and Motorola Mobility LLC, together with all subsequent amendments, including Placement Bonus Program Addendum Agreement No. 2: Google News App, effective as of September 26, 2018

26



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    MOTO-NDCAL-00207134

**EXHIBIT 1231-034**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

**ATTACHMENT B**

**PREMIER TIER SERVICE ACCESS POINTS**

Subject to Section 6 (Permitted Activities), (i) all Search Access Points on Premier Tier Devices must utilize Google Search, and (ii) each of the below-listed Service Access Points must meet the Minimum Usage and Placement Requirements.

| Service Access Point | Minimum Usage and Placement Requirements |
|---|---|
| Browser frame on all implemented, preloaded, or otherwise installed browsers (aka Omnibox, address bar, in-frame search box) | Set to Google.com or, if applicable, set to send invalid URLs as search query to Google.com. |
| Default home page/start page on all implemented, preloaded, or otherwise installed browsers | Set to Google.com or, if applicable, local Google domain in the country in which Premier Tier Device is distributed. |
| New tab page on all implemented, preloaded, or otherwise installed browsers | Set to Google.com or, if applicable, local Google domain in the country in which Premier Tier Device is distributed. |
| All search intents actions, requests, and defaults on the Premier Tier Device, as determined by Google, including "search" and "Web search" intents | Set to Google.com or, if applicable, local Google domain in the country in which Premier Tier Device is distributed. |
| Implemented, preloaded, or otherwise installed Launcher(s) | Set to Google.com or, if applicable, local Google domain in the country in which Premier Tier Device is distributed. |
| Chrome Browser | Set as a default browser to handle all browser intents.<br><br>Chrome Browser icon placed on the Application Dock. |

27



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-035**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34

Google Confidential

## ATTACHMENT C

1. Australia
2. Brazil
3. EEA
4. India

28



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**EXHIBIT 1231-036**

DocuSign Envelope ID: D7AC4332-E5A1-4588-8FBA-B68EE47F3C34
Google Confidential

**ATTACHMENT D**

**EXEMPTIONS TO INCENTIVE IMPLEMENTATION REQUIREMENTS AND SECTION 4.1 OF THIS AGREEMENT**

**1.     Changes to Incentive Implementation Requirements**

1.1     Section 2.1 (Minimum hardware specifications). In Section 2.1 of the Incentive Implementation Requirements, the following Devices will be exempt from compliance with the Assistant hardware button requirement set forth therein:

- Motorola- and Lenovo-manufactured and -branded smartphones that are generally known (internally or by their market name) as follows: Moto G8 family, Moto E6 family, Moto Edge family, Moto Razr family, Moto One Fusion/+/5G, Lenovo Legion gaming device, and Lenovo ultra-low tier device.
- All Lenovo-manufactured and -branded tablets Launched during the Term.

1.2     Section 3.4 (GMS SetupWizard). The final bullet in Section 3.4 of the Incentive Implementation Requirements is deleted in its entirety and replaced with the following:

- "Assistant setup wizard integration MUST be implemented per Assistant requirements as described in the link as of the Effective Date. If Google makes any change to these requirements after the Effective Date, Company MUST implement the change within a commercially reasonable timeframe."

1.3     Section 3.5.1 (Google Apps Preloads). The following sentences are added to the end of Section 3.5.1 of the Incentive Implementation Requirements:

"The requirement that Google Fit be preloaded on all Foundation Tier Devices will only apply to Device Models Launched after April 1, 2020.
The requirement that Google Applications (as listed in "Preloads Location" under Section 3.5.1) be installed in the system partition of all Foundation Tier Devices will only apply to Device Models Launched after April 1, 2020."

1.4     Section 3.5.5 (Google Pay). The final sentence of Section 3.5.5 of the Incentive Implementation Requirements is deleted in its entirety and replaced with the following:

- "Pay specifications MUST be implemented per the Pay specifications requirements described in the link as of the Effective Date. If Google makes any change to these requirements after the Effective Date, Company MUST implement the change within a commercially reasonable timeframe."

1.5     Section 3.5.8 (Google Apps Placement). The following is added to the end of Section 3.5.8 of the Incentive Implementation Requirements:

- "Google Fit and Wallet shortcut MUST be added to the Google Folder on all Foundation Tier Devices subject to a timeframe and technical details to be agreed by the parties in good faith."

1.6     Section 3.6 (OEM application preloads).

(a) In Section 3.6 of the Incentive Implementation Requirements, the line "MUST be available in Google Play" is deleted and replaced with the following:

29



**EXHIBIT 1231-037**

DocuSign Envelope ID: D7AC4332-E5A1-458B-8FBA-B68EE47F3C34

Google Confidential

- "MUST be available in Google Play, except for the following:
  - An application provided by an SOC or hardware partner that is required for core functionality of the Device in Google's discretion and has no user-visible icon executable from the launcher or app tray.
  - An application that has been approved in writing by Google for a waiver."

   (b) In Section 3.6 of the Incentive Implementation Requirements, the line "MUST NOT contain INSTALL PACKAGES permissions" is deleted and replaced with the following:

- "OEM Application preloads MUST NOT contain INSTALL_PACKAGES permissions except for the following:
  - App stores owned and operated by Telecom Operators who have their Client ID on the Device
  - App stores owned and operated by Company
  - An application that has been approved in writing by Google for a waiver."

**1.7**    <u>Section 4.1 (Text Spec)</u>. The first line of Section 4.1 of the Incentive Implementation Requirements is deleted in its entirety and replaced with the following:

"The following text spec MUST be included on web assets and/or user manuals in connection with Foundation Tier Devices and Premier Tier Devices:

- Text spec: "with easy access to the Google apps you use most".


**2.**      **Telecom Operators' Device Ranging Exception**

**2.1**    Company represents and warrants that its initial device ranging proposals to Telecom Operators will be in accordance with all requirements and obligations in this Agreement, However, if, after discussing the initial proposals with the Telecom Operators, any Alternative Function requirement, Default Function requirement, or Incentive Implementation Requirement materially impacts Company's ability to obtain a Telecom Operator ranging decision for a Device, Google will in good faith consider waiving such requirement for such Device in a timely manner provided Company provides evidence of such impact.

**2.2**    For clarity, any waiver that may be granted by Google pursuant to Section 2.1 of this Attachment D above will not disqualify a Device that would otherwise qualify as a Foundation Tier Device or a Premier Tier Device from being a Foundation Tier Device or a Premier Tier Device, as applicable.



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY          MOTO-NDCAL-00207138

**EXHIBIT 1231-038**

Google Confidential

**ATTACHMENT E**

**INCENTIVE IMPLEMENTATION REQUIREMENTS**

See attachment.

31



**EXHIBIT 1231-039**