Pages 1 - 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )   NO. 21-md-02981-JD
_____)
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   NO. 3:20-cv-05671-JD
                                 )
GOOGLE, LLC., et al.,            )
                                 )
          Defendants.            )
_____)

San Francisco, California
Thursday, January 18, 2024

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**<u>APPEARANCES</u>**:

For Plaintiff:

          CRAVATH, SWAINE & MOORE LLP
          825 Eighth Avenue
          New York, New York  10019
    BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
          **YONATAN EVEN, ATTORNEY AT LAW**

For Defendants:

          MUNGER, TOLLES & OLSON LLP
          350 South Grand Avenue - 50th Floor
          Los Angeles, California  90071
    BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**

          MORGAN, LEWIS & BOCKIUS LLP
          One Market - Spear Street Tower
          San Francisco, California  94105
    BY:  **MICHELLE PARK CHIU, ATTORNEY AT LAW**
          **BRIAN C. ROCCA, ATTORNEY AT LAW**

          MUNGER, TOLLES & OLSON LLP
          560 Mission Street - 27th Floor
          San Francisco, California  94105
    BY:  **JUSTIN P. RAPHAEL, ATTORNEY AT LAW**
          **DANE P. SHICKMAN, ATTORNEY AT LAW**

Also Present:  Eamon Kelly, Attorney at Law
               Benjamin Siegel, Attorney at Law

<u>**Thursday - January 18, 2024**</u>                          <u>**10:40 a.m.**</u>

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  Calling Civil 20-5671, Epic Games, Inc. vs. Google LLC, and Multidistrict Litigation 21-2981, In re Google Play Store Antitrust Litigation.

Counsel.

**MR. BORNSTEIN:**  Good morning, Your Honor.  Gary Bornstein for Epic Games.  I'm joined by Yonatan Even, and I believe we have the developer plaintiffs with us as well.

**MR. KELLY:**  Eamon Kelly with the developer plaintiffs joined by Ben Siegel.  We just have one issue once you're done with Epic's --

**THE COURT:**  Why are the developers here?

**MR. KELLY:**  Your Honor, we filed an administrative motion with respect to --

**THE COURT:**  You're not on the calendar, so --

**MR. KELLY:**  Well, we --

**THE COURT:**  -- please return to the gallery.  Thank you.

**MR. KELLY:**  No problem.  Thank you, Your Honor.

**THE COURT:**  Okay, Mr. Pomerantz.

**MR. POMERANTZ:**  Good morning, Your Honor.  Good to see you.

Glenn Pomerantz on behalf of Google.  With me is

```
1    Michelle Park Chiu, Brian Rocca, Dane Shikman, and Justin
2    Raphael.
3              THE COURT:  Who had COVID?
4                         (Hand raised.)
5              THE COURT:  Oh, I'm sorry to hear that.  You're okay
6    now?  You recovered?
7              MR. POMERANTZ:  I'm fine, Your Honor.  Thank you for
8    the accommodation.
9              THE COURT:  Okay.  Well, I was a little surprised by
10   the briefing schedule.  Trial ended a while ago, so I have a
11   superb short-term RAM, but it's starting to be a wasting asset.
12   We can't -- I can't do this through April.  That's just not
13   going to work.
14             Here are the page limits:  30 for opening, 30 for
15   opp., 15 for reply.
16             Defendant, you file that two weeks from today.  You've
17   had plenty of time to get ready.  I mean, I can't imagine you
18   need more time.
19             Is two weeks okay for an opposition?
20             MR. BORNSTEIN:  I'm sorry, Your Honor, did you say --
21             THE COURT:  Two weeks okay for an opposition?
22             MR. BORNSTEIN:  For doing --
23             THE COURT:  All right, three.  The burden has been on
24   them.  They've been thinking about the motion.  You haven't
25   seen it.  I'll give you 21 days, three weeks.  Okay?  And then
```

1     a reply one week after that.  I'll set all these dates up.

2     We've got to get this thing done.

3          Now, who knows what will happen.  I'm not prejudging

4     the JMOL, but you-all have proposed we talk about a remedy more

5     or less at the same time, actually even earlier.  I did not

6     understand your proposal.

7          Are you settling?  It looked tantalizingly like you

8     are settling and --

9          **MR. BORNSTEIN:**  Well, I can give Your Honor some --

10         **THE COURT:**  -- that would relieve me of an enormous

11    amount of JMOL work.  So what -- are you settling?

12         **MR. BORNSTEIN:**  There is no settling in the offing

13    right now, Your Honor.  I can give you some background on the

14    proposal, and --

15         **THE COURT:**  Please, I mean, don't -- obviously, and I

16    know you won't, don't tell me anything I shouldn't hear, but go

17    ahead.

18         **MR. BORNSTEIN:**  Yes.  Yes, of course.

19         And I'll start by apologizing.  I have a little bit of

20    a cough myself.  I did not catch it from Mr. Pomerantz so it's

21    not COVID.

22         **THE COURT:**  It's not COVID?

23         **MR. BORNSTEIN:**  Not COVID but I may cough

24    occasionally.  I'm sorry about that.

25         **THE COURT:**  There is a judge on this floor who

1     would -- well, anyway, he has an interesting policy against

2     coughing.

3            All right.  Go ahead.

4            **MR. BORNSTEIN:**  When Mr. Pomerantz and I originally

5     spoke about how to proceed, we did agree that we would, subject

6     to the Court's approval, have the remedy proceedings happen

7     sort of in parallel with the JMOL briefing on the understanding

8     that if ultimately the verdict were upheld, it would make sense

9     to have a remedy in place sooner rather than later.  So that

10    was the background behind that.

11           In terms of the specific proposal here, our idea had

12    been why don't we just meet and confer on a schedule and

13    present it to the Court jointly, or separately if we're unable

14    to do that.

15           Google said that they preferred to see what our

16    proposed remedy was before negotiating a schedule even.  We

17    thought that was unnecessary; but in the interest of avoiding

18    disputes, we agreed to give them an indicative sense of what it

19    was we intend to ask for so that we can negotiate a schedule.

20    So that was an accommodation that we made to Google, and we

21    were prepared to do that.

22           **THE COURT:**  Well, Google is signaling they're willing

23    to listen.

24           **MR. POMERANTZ:**  Your Honor, let me -- I actually want

25    to step back a step further.

```
 1              So our initial position was that the injunctive relief
 2    briefing should follow the resolution of the JMOL, and that's,
 3    I think, consistent with something Your Honor said before we
 4    broke for the holidays.  However, they --
 5              THE COURT:  Well, I have to say that was what I was
 6    thinking.
 7              MR. POMERANTZ:  Yes.
 8              THE COURT:  I didn't know it was going to go on this
 9    long.
10              MR. POMERANTZ:  That was our initial position.
11              THE COURT:  Yeah.
12              MR. POMERANTZ:  They wanted them to move forwards, and
13    we're just trying to make this work.  What we cared about was
14    understanding what they're asking for and thinking about what
15    it would take to respond to that while allowing Your Honor to
16    resolve the JMOL and new trial motion before we had to get in
17    front of you and argue about the injunctive relief.
18              And so the schedule that ended up working out, which
19    is a compromise on both sides, was that they -- I wanted them
20    to send us their injunctive -- proposed injunctive relief by
21    now.  They wanted to do it the day after we saw Your Honor.
22              THE COURT:  Let me ask you this:  Don't you already
23    know?  I mean, I sent you to a settlement.  Did we do it during
24    trial as well or just before trial?
25              MR. BORNSTEIN:  Before trial more than once,
```

1    Your Honor.

2           **THE COURT:**  Okay.  I mean, is the demand going to be

3    any -- I mean, you already know, don't you, Mr. Pomerantz?

4           **MR. POMERANTZ:**  I think we actually also did it

5    during --

6           **MR. BORNSTEIN:**  And during.  We did.  It was after the

7    evidence before closing, that's right.

8           **THE COURT:**  Yeah, that's what I thought.  You went

9    during -- okay.

10          But it's a scant 45 days ago.  I mean, it's going to

11   be the same.  Don't you already kind of know what they're going

12   to ask?

13          **MR. POMERANTZ:**  Well, no.  I think there's -- I mean,

14   obviously I absolutely think it's going to be somewhat

15   different.  And Mr. Bornstein to date --

16          **THE COURT:**  It's probably going to be a lot more now

17   so...

18          **MR. POMERANTZ:**  Well, Mr. Bornstein to date -- no.

19   It's going to be -- I'm not going to get into what our -- the

20   substance of our discussions.

21          **THE COURT:**  But they have a verdict in hand.  I

22   mean --

23          **MR. POMERANTZ:**  I understand.

24          **THE COURT:**  I don't think they're going to give you a

25   50 percent discount on prior terms.

1          **MR. POMERANTZ:**  We need to know specifically what they

2     think they can get based on the verdict, which may or may not

3     be the same as what they might ask for in a settlement

4     discussion, which can take on anything that the parties might

5     agree to.  Here they're limited to whatever the verdict

6     justifies.

7          When the parties are talking just simply across the

8     table, we can agree on anything that makes sense to both

9     parties; and so we are now in a more confined set of issues

10    that one would consider for injunctive relief.  We can always

11    discuss settlement, which can take on any number of items.

12         And so what we want to --

13         **THE COURT:**  I'm not really following.  I don't see the

14    verdict as being as much of a handcuff as you do.  It seemed

15    pretty definitive about every practice that was challenged here

16    was condemned as anticompetitive.  That's a pretty large door

17    to drive an injunction through.

18         I kind of understand what you're saying.  Let me

19    suggest this:  I would actually prefer to do the JMOL.  It

20    makes more analytical sense to do it first; but if you want to

21    get going, you should get going.

22         Now, I will tell you if we get past the JMOL -- and

23    we'll see, I'm not prejudging anything -- I am actually going

24    to want to hear from Dr. Bernheim and anybody you want on the

25    defense side, Dr. Leonard, someone who was in the trial --

1  okay? -- I don't want a new person, about potential remedies.

2          Okay.  In a Section 2 case, I think it benefits to

3  have some antitrust economists' advice on conduct economies.

4  All right?  Now, what I end up doing with it, I don't know, but

5  I do want to have their input.

6          So what I would envision -- and you two can take it

7  from here and give me the benefit of your thinking -- we will

8  have a hearing, an evidentiary hearing.  Dr. Bernheim will say

9  "Here, in my professional expert view, is what an appropriate

10  conduct remedy would be given these anticompetitive findings by

11  the jury."  And then you would have, the defense side, someone

12  offer their counterperspective.

13          So I really would like to do that.  All right?  So

14  that means you need to get something on the table for them to

15  start to at least have a template to frame their opinions.

16          **MR. BORNSTEIN:**  Yes, Your Honor.  And that was our

17  expectation as well, that there would be expert testimony

18  without prejudging --

19          **THE COURT:**  I thought this was a novelty.  I was

20  excited that this was a novel groundbreaking idea.  When did

21  you come up with that?

22          **MR. BORNSTEIN:**  Well -- excuse me, Your Honor -- we

23  were contemplating something of the sort --

24          **THE COURT:**  Interesting.

25          **MR. BORNSTEIN:**  -- because we thought it would be

 1   helpful to the Court to have a foundation on which to enter the

 2   injunction.

 3          THE COURT:  I see.

 4      MR. BORNSTEIN:  We -- without prejudging it, we were

 5   considering, depending on what types of defenses Google

 6   presents, that we might ask Professor Mickens, our computer

 7   science expert, to speak to the Court as well should that be

 8   necessary.  We don't know what Google is going --

 9          THE COURT:  You mean with respect to the click-through

10   screens and all that?

11          MR. BORNSTEIN:  Correct.

12          THE COURT:  Okay.

13      MR. BORNSTEIN:  And we don't know what Google is going

14   to say about the feasibility, the appropriateness of the

15   injunctive relief we may ask for.  That was the reason we

16   wanted to get this process going.

17          THE COURT:  I would like to emphasize one thing, and I

18   said this, I believe, earlier in the case.  A United States

19   district judge, whether me or anyone else or any Article III

20   judge in the federal judiciary, is not going to micromanage

21   Google.  All right?  So I'm not going to say -- I said this

22   before -- I'm not going to say you can have four click-through

23   screens and not eight.  I can't do that.  Okay?  I can't say

24   you can use this word but not that in the warnings that we saw.

25          I have grave doubts -- I'm willing to hear what you

1    both have to say, but I have grave doubts that I am in any

2    position to set a fee that developers might pay.  Okay?  These

3    are all things that are beyond the ken of Article III judges.

4    So that's why I want to hear broad strokes mainly from the

5    economists about conduct remedies, and I think it's quite a

6    challenging question.

7            Now, you have a resounding verdict as it currently

8    stands.  Translating that into action is going to be an

9    interesting project.  Okay?

10           So why don't you two start talking.  Do you want to

11   set some dates?  Do you want to give Mr. Pomerantz a firm,

12   complete demand in two weeks, something like that?

13           **MR. BORNSTEIN:**  Well, if we're going to deviate from

14   the schedule that we proposed, which we're happy to do, what I

15   had proposed to Mr. Pomerantz was that we would make, you know,

16   a full firm demand.  I do think we need some more time to do

17   that.

18           **THE COURT:**  More than two weeks?

19           **MR. BORNSTEIN:**  I meant more than the one day that we

20   had --

21           **THE COURT:**  No, two weeks from today.  How about that?

22           **MR. BORNSTEIN:**  Two weeks from today.

23           And when you say "a firm demand," is Your Honor

24   referring to things like proposed ordering language and the

25   like or just --

1        **THE COURT:**  "Firm demand" meaning if Mr. Pomerantz

2   picked up the phone and said, "Yes," you would have a deal.

3   That's what I mean.

4        **MR. BORNSTEIN:**  Okay.

5        **THE COURT:**  And not, "Oh, but there's more."

6        **MR. BORNSTEIN:**  Great.  Now --

7        **THE COURT:**  Or how about this:  You need to send a

8   proposal to him that if Google wired you one-word acceptance,

9   you would be done.

10        **MR. BORNSTEIN:**  Okay.

11        **THE COURT:**  That's what I want you to share.

12        **MR. BORNSTEIN:**  Right.

13        **THE COURT:**  Mr. Pomerantz is going to counter in

14   exactly the same way.  If you do not find the plaintiff's

15   proposal to be acceptable, you will propose -- Google will

16   propose a counter such that if Epic picked up the phone and

17   said, "Done," you would have a deal locked in.  Okay?  That's

18   the level of detail, specificity, and completeness I want.

19        So Epic will -- don't serve this.  This is all off the

20   docket.  Just send it to Mr. Pomerantz in two weeks; and,

21   Google, you will respond two weeks after that.

22        Now, if this doesn't work, you will just tell me in a

23   one-line joint statement that the case has not resolved or

24   settled.  Okay?  And then you can do whatever you want with me

25   should we get to remedy stage.

1           **MR. BORNSTEIN:**  May I make one request on that,

2    Your Honor?

3           **THE COURT:**  Sure.

4           **MR. BORNSTEIN:**  Assuming that we can't get to closure,

5    which is it at least a reasonable possibility based on

6    experience, may we at the same time submit to Your Honor a

7    joint proposed process for what will happen next; or if we

8    can't --

9           **THE COURT:**  Let's do that right now.  What's going to

10   happen next is I will issue the JMOL order.  Then I will

11   schedule in short order a remedy hearing, and you will have

12   your economists come and talk with me about the remedy.  All

13   right?

14          And before that, let's say a week before that

15   hearing -- we'll put this all on some kind of date -- Epic, you

16   will file a proposed injunction, all the terms and conditions

17   you want.  Okay?  And we'll take it from there.

18          **MR. POMERANTZ:**  Your Honor, do you contemplate that

19   there would be some briefs filed in advance of the evidentiary

20   hearing where the experts --

21          **THE COURT:**  No.  Let's just start with the hearing and

22   the remedy, and then I'll decide if I need to have any briefing

23   on anything.  I think the experts may open some doors of

24   inquiry, and I don't want to set any schedules before then.

25          Now, while you're here, let me just ask you.  What did

1    Apple just do?  I understand Epic's not wild about it, at least

2    based on public statement, but what did Epic -- what did Apple

3    just do?

4            **MR. BORNSTEIN:**  So as one bit of background, as

5    Your Honor knows, the injunction against Apple is limited to

6    the antisteering provisions and so forth.  I don't mean to

7    cabin it precisely, but --

8            **THE COURT:**  No, I understand.

9            **MR. BORNSTEIN:**  -- in my understanding, generally

10   speaking, of what Apple has done is they have, first of all, in

11   our view, not complied; but in terms of specifically what they

12   have actually done is -- and Mr. Even will keep me honest on

13   this -- they have allowed developers to apply for permission to

14   participate in the providing of other payment systems or

15   information about and links to other payment systems.

16           Apple has then specified in a variety of ways what it

17   is developers must do, what those alternative links must look

18   like, certain warning screens that will pop up if a user goes

19   to use -- take the alternative that's made available, is

20   imposing fees on the developers when a user goes to use the

21   other option that is made available.

22           **THE COURT:**  Oh, there's a fee for using an alternative

23   payment system?

24           **MR. BORNSTEIN:**  Yes.  My understanding is that fee is

25   either 27 percent when there's a 30 percent fee or 12 percent

1  when there's a 15 percent fee under Apple rules.

2        And all of this is done, as I understand it, in a

3  dedicated web view that the -- not a dedicated web -- in a

4  website that the developer needs to set up, not a typical

5  website that you would -- you know, I'll take Netflix just as

6  an example.  You know, you might go to the Netflix website.

7  You sign up.  Here Netflix would be required to set up a

8  separate dedicated website solely for purposes of making these

9  purchases through an iPhone.  The fees would be charged --

10        **THE COURT:**  And then you --

11        **MR. BORNSTEIN:**  -- and there are a variety of other

12  restrictions.

13        **THE COURT:**  And your understanding is this is not even

14  a self-choice thing?  Apple still has to approve it on

15  developer-by-developer basis?

16        **MR. BORNSTEIN:**  Correct, because Apple has imposed a

17  whole set of requirements.  And I'm sure I haven't captured all

18  of them so I don't want them to be taken as a complete text on

19  everything they have done, but it is an incredibly burdensome

20  and onerous set of hoops they have put on developers to jump

21  through in order to take advantage of the Court's injunction.

22        **MR. POMERANTZ:**  Your Honor, if I may.

23        I'm not familiar with a lot of the things that

24  Mr. Bornstein just talked about, but there is one thing I just

25  want Your Honor to be aware of, because of what you heard

1    during the trial, that is different between Google and Apple.

2            We are piloting User Choice Billing.  You heard about

3    User Choice Billing.  So in the Apple situation, you click and

4    you go outside of the Apple App Store and you go to some other

5    website.  What User Choice Billing allows is that that

6    alternative billing is right there inside the app and the

7    consumer sees it at the same time as they're checking out of

8    the store.  And so -- and my understanding is Apple is not

9    using User Choice Billing.  So it requires clicking a button

10   and then leaving the store.

11           We allow that choice -- at least this pilot program

12   UCB, User Choice Billing, allows that choice right there in the

13   app.  And so it's a difference that may matter as we go

14   forward, and I just wanted to keep that front and center.

15           **THE COURT:**  No, I understand.  Just remind me.  The

16   choice is Play Store, Google Play -- Google Billing,

17   Google Play Billing, or whatever the developer selects, but it

18   will be within the Play Store environment and there's no

19   restriction on what the developer can choose.  Google is not

20   going to interfere in the choice of alternative billing.

21           **MR. POMERANTZ:**  The only -- I think the only thing is

22   technological concerns to make sure that there isn't something

23   that harms the user; but, fundamentally, the developer gets to

24   choose what that alternative billing system is.

25           **THE COURT:**  All right.  And why is this a pilot

1    program?  I thought it was being rolled out.  Is it still a

2    pilot program.

3            **MR. POMERANTZ:**  It is a pilot program at this point in

4    the United States.  It is actually rolled out outside the

5    United States.

6            **THE COURT:**  Oh.

7            **MR. POMERANTZ:**  And as Your Honor will see, it's part

8    of the settlement with the states.

9            **THE COURT:**  So when is it going to be rolled out fully

10   in the U.S.?

11           **MR. POMERANTZ:**  It probably will -- that timing will,

12   at least in part, depend upon the final approval of the

13   settlement with the states.

14           **THE COURT:**  And at that point any developer can

15   self-select for it, no questions asked by Google; is that

16   right?

17           **MR. POMERANTZ:**  The no questions asked --

18           **THE COURT:**  Understanding the technical bits.

19           **MR. POMERANTZ:**  -- and protecting the consumer but

20   basically, yes.  I think the developer gets to choose.  And

21   whether they choose to do it themselves, like a bigger company

22   might choose to do it themselves, or to hire some third party

23   to do it for them, that's going to be a choice for the

24   developer.

25           **THE COURT:**  And what is Google going to charge the

1  developers for using their own payment system?

2       **MR. POMERANTZ:**  I think what they will charge is a

3  service fee that is designed to cover all of the things that

4  the prior service fee was covering except for the payment

5  processing fee.

6       **THE COURT:**  Well --

7       **MR. POMERANTZ:**  I'm not sure if that final number has

8  been set, but there was evidence in the trial that 26 percent

9  for a fee that would otherwise have been 30 percent or

10 11 percent for a fee that would have otherwise have been 15.

11      **THE COURT:**  There was also evidence everybody else who

12 does this as a business charges 4 percent.  Google is not going

13 to charge 4 percent?

14      **MR. POMERANTZ:**  It depends on what this is but, no,

15 that's not what we're planning on doing.

16      **THE COURT:**  All right.  Okay.

17      **MR. BORNSTEIN:**  I'll refrain from commenting on User

18 Choice Billing until we get into the merits unless Your Honor

19 has questions about it.

20      **THE COURT:**  No.  That day will come.

21      Okay.  So -- oh, please, when you file -- each of you,

22 when you file your JMOL briefs, I want all of the transcript

23 cites in a binder or two.  Okay?  Just make a little evidence

24 compendium for me that you are citing.

25      We just don't have the time to go through everything

and dig things up.  So if you cite someone's testimony, have
that page in a little one or two binder set.  All right?  If
it's an exhibit, just have that one portion of the exhibit in
the one or two binder set.  I would prefer it to be joint if
you're able to do it, but I'm not sure you'll be able to.

Here's what I would like to do.  If Google cites it,
don't do it again for me.  Okay?  You can just cite their
binder.  All right?  If you have new things to add, you can do
that of course, but don't give me a duplicate of everything
Google cited and then your things.  All right?  That will cut
down the volume.

MR. BORNSTEIN:  And is Your Honor asking for hard copy
binders to be delivered to chambers?  Is that --

THE COURT:  Yeah.  I want -- this time I do want
courtesy copies of everything.  So two of everything -- two
sets of everything that each of you file sent to chambers,
please.

MR. BORNSTEIN:  And may I ask one clarification --

THE COURT:  Sure.

MR. BORNSTEIN:  -- on the process we have going?  I
just want to make sure.

If we're delivering to Google in two weeks a proposed
injunction that is --

THE COURT:  Deal ready.

MR. BORNSTEIN:  -- fit for acceptance, yes --

1              **THE COURT:**  You should send electronically and just

2     have a click yes button at the bottom.  All right?  That's an

3     enforceable click wrap contract.

4              Okay.  Go ahead.

5              **MR. BORNSTEIN:**  Is the idea that Google would then

6     provide us in response a comparably detailed injunction?

7              **THE COURT:**  Yes.  Mr. Pomerantz is going to give you

8     an equally detailed just click yes, ready-to-go response.  All

9     right?

10             I'm not going to see any of this.  This is all between

11    you two.

12             **MR. BORNSTEIN:**  Understood.

13             **THE COURT:**  All right.  At the same time Mr. Pomerantz

14    is also filing his opening brief two weeks from today.

15             Okay.  Anything else?

16             **MR. BORNSTEIN:**  I assume there will be time should we

17    want to discuss other procedures that need to be done before a

18    hearing, that Mr. Pomerantz and I can discuss that and be back

19    to the Court with our thoughts.

20             **THE COURT:**  What are they?  We already worked that

21    through.

22             I'm going to set a hearing on injunctive relief for

23    probably March, middle of March.  You're going to have your

24    economists ready to go, each side.

25             And I would advise, it's up to you, but you might, I

1   assume, show the economists your settlement communications so

2   they at least know what your expectations are on each side, and

3   I'll take their testimony.

4          And a week before that you're going to file what you

5   want me to do, and then we'll hear from the defendants about

6   why they don't like it.

7          MR. BORNSTEIN:  Right.  The one thing that I would

8   like to add to the schedule if possible, Your Honor, is to have

9   some kind of response from Google prior to the hearing.  If

10  we're submitting to Your Honor and to Google what it is we

11  would like to do, I'd like to have some sort of formal

12  understanding from Google so that going in --

13         THE COURT:  You want to hear their objections?

14         MR. BORNSTEIN:  Yes.

15         THE COURT:  All right.  That's fine.

16         All right.  You do it two weeks before and then Google

17  will object a week after and a week before the hearing.  Okay?

18         MR. BORNSTEIN:  Thank you, Your Honor.

19         THE COURT:  Now, I'm envisioning the testimony to be

20  more of a hot-tub kind of discussion not a Q and A.  All right?

21  So just -- in fact, we may even do it as a hot tub.  I'll just

22  have them sit there and say a very open-ended question to get

23  the ball rolling, and we'll go from there.  All right?  And

24  then we'll have attorney comments after that.

25         MR. BORNSTEIN:  One last unrelated point, Your Honor.

1      **THE COURT:**  I really would like Dr. Bernheim on your

2  side.  You can do whoever -- I mean, you have to chose whomever

3  testified because I know who they are.  They've been qualified.

4  I don't want a new person now.

5      So, I mean, I would favor Dr. Bernheim and

6  Dr. Leonard.  Of course, it's up to you on who you think is

7  appropriate.

8      **MR. BORNSTEIN:**  One completely unrelated point,

9  Your Honor, is you may recall there was one claim that we had

10  brought, the California UCL claim, which was not presented to

11  the jury and is, as a technical matter, before the Court.  I

12  think it should be relatively uncontroversial given the jury

13  verdict, but I just want to make sure it didn't get lost in the

14  shuffle.

15      **THE COURT:**  It's not lost but, I mean, it's completely

16  redundant; isn't it?

17      **MR. BORNSTEIN:**  I think so, Your Honor.  I'd have to

18  think about that a little bit more, but --

19      **THE COURT:**  It does not widen the scope of your

20  relief.  There was no restitution demand so --

21      **MR. BORNSTEIN:**  That may be right, Your Honor.  I

22  think it's probably straightforward given that there's a

23  finding of unlawfulness; therefore, under the unlawful prong,

24  it should be a slam dunk.  I was just kind of going through and

25  checking the boxes to make sure that that got addressed by

1    somebody along the way.

2          **THE COURT:**  Why don't you two just see if you can

3    stipulate to a resolution?  Okay?  It should be relatively

4    easy.

5          **MR. BORNSTEIN:**  Very good.

6          **THE COURT:**  Okay.  Anything else from Google?

7          **MR. POMERANTZ:**  No, Your Honor.

8          **THE COURT:**  All right.  I'll set the schedule and I'll

9    see you back soon.  Thanks.

10          **MR. BORNSTEIN:**  Thank you, Your Honor.

11                (Proceedings adjourned at 11:06 a.m)

12                        ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, January 18, 2024

_Kelly Shainline_

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter