Pages 1 - 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE             )
ANTITRUST LITIGATION,               )
                                    )   **NO. 3:21-md-02981-JD**
_____ )
                                    )
STAT OF UTAH, et al.,               )
          Plaintiff                 )
                                    )   **NO. 3:21-cv-05227-JD**
   VS.                              )
                                    )
GOOGLE, LLC, et al.                 )
_____ )
                                    )
IN RE GOOGLE PLAY CONSUMER          )   **NO. 3:21-cv-05761-JD**
ANTITRUST LITIGATION                )
_____ )

San Francisco, California
Monday, February 26, 2024

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

STENOGRAPHICALLY REPORTED BY:
Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**<u>APPEARANCES</u>**:

For Plaintiffs:

                        DEPARTMENT OF JUSTICE
                        OFFICE OF THE ATTORNEY GENERAL
                        Antitrust Section
                        455 Golden Gate Avenue, Suite 11000
                        San Francisco, California  94102
            BY:  **PAULA BLIZZARD**
                        **Senior Assistant Attorney General**
                        **CARI JEFFRIES**
                        **Deputy Attorney General**
                        **BRIAN D. WANG**
                        **Deputy Attorney General**
                        **MICHAEL JORGENSON**
                        **Supervising Deputy Attorney General**

                        MOLOLAMKEN LLP
                        600 New Hampshire Avenue, N.W.
                        Washington, DC  20037
            BY:  **LAUREN WEINSTEIN**
                        **Attorney At Law**

                        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                        275 Battery Street, 29th Floor
                        San Francisco, California  94111
            BY:  **BRENDAN P. GLACKIN**
                        **Attorney At Law**

                        BARTLIT BECK LLP
                        1801 Wewatta Street, Suite 1200
                        Denver, Colorado  80202
            BY:  **KARMA GIULIANELLI**
                        **Attorney At Law**

                 **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**<u>APPEARANCES</u>:  (CONTINUED)**


For Defendants:

                MUNGER, TOLLES & OLSON LLP
                350 South Grand Avenue - 50th Floor
                Los Angeles, California  90071
        **BY:  GLENN POMERANTZ**
             **KURUVILLA J. OLASA**
             **Attorneys at Law**


                MORGAN, LEWIS & BOCKIUS LLP
                One Market
                Spear Street Tower
                San Francisco, California  94105
        **BY:  SUJAL J. SHAH**
             **Attorney At Law**

1  **Monday - February 27, 2024**                    **1:35 p.m.**

2                    **P R O C E E D I N G S**

3                        ---oOo---

4      **THE CLERK:**  Calling civil 20-5761, In Re Google Play

5  Consumer Antitrust Litigation, Civil 21-5227, State of Utah,

6  et al. versus Google LLC, and Multidistrict Litigation 21-2981,

7  In Re Google Play Store Antitrust Litigation.

8      Counsel.

9      **MS. BLIZZARD:**  Good afternoon, Your Honor.  Paula

10  Blizzard for the California Department of Justice and the

11  53 plaintiff states and territories.

12      With me today I have from my office Brian Wang, Cari

13  Jeffries, Mike Jorgenson, and also our two counsel from Utah

14  Lauren Weinstein and Brendan Glackin.

15      **MS. GIULIANELLI:**  Good morning, Your Honor.  And Karma

16  Giulianelli on behalf of consumers is here as well.

17      **MR. POMERANTZ:**  Good afternoon, Your Honor.  Glenn

18  Pomerantz on behalf of Google.

19      And with me at the table are Lara Kollios, Sujal Shah, and

20  Kuru Olasa.

21      **THE COURT:**  Okay.  Ms. Blizzard, you're going to

22  handle the states' side?

23      **MS. BLIZZARD:**  I am, Your Honor.

24      **THE COURT:**  All right.  I have some questions.  Now

25  let me just be clear, the subsequent developments are not part

1    of the assessment of the settlement.  Okay.  It would not be

2    fair to disrupt a deal that you both made on pretrial

3    information that you had available then based on the outcome.

4    So I wouldn't approve this or deny it based on anything that

5    happened at the trial or the verdict.  So that's completely

6    separate.  It has no impact on what I'm going to ask about

7    today.

8        But I still have some questions based solely on what you

9    have presented to me.

10       The first one, which I think is surprisingly elusive, is

11   what is my standard of review for this?  This has been

12   presented as kind of Rule 23 light.  I know that *parens patriae*

13   cases are a little vague on the standard, but you tell me,

14   Ms. Blizzard, what standard am I supposed to apply?

15       **MS. BLIZZARD:**  Yes, Your Honor, thank you.  And Paula

16   Blizzard for the plaintiff states.

17       The -- you've accurately characterized it.  It is Rule 23

18   light.  So we bring cases -- we are here today to talk about

19   the *parens patriae* portion of our settlement.  Not all our

20   claims were *parens* claims.

21       Before the *parens* claims, those require your approval.

22   All the states sued under federal law, that is, 15 USC 15c of

23   the Clayton Act that gives us the *parens* authority.

24       15 USC b(1) requires notice to be given.  B(2) requires

25   consumers to be given a chance to opt out.  15 c(C) requires

court approval of settlements.  And then 15e provides that the money may be distributed in a manner the court authorizes.

So that is not Rule 23, but it's close.  And so what most courts have done around the country when they were evaluating a *parens* settlement is they have usually applied the Rule 23 class action standards.

Here what we have briefed for you are the procedural guidance for class action settlements in the Northern District. We picked that up.

I would refer you to the two most similar cases I think we have found.  *California v. eBay*, that was the California Attorney General.  We had an antitrust case against eBay.  It had federal and state claims.  It had *parens* and non*parens* claims.  And there again we followed the Rule 23 guidance.  And that went up on appeal, and there was preliminary approval, final approval, and approval by the Ninth Circuit.

And so our recommendation to you is that you look to the Northern District class action procedures for guidance, but you do, I believe, have the option to deviate if you so choose as long as you stay within the ones I just read to you from the Clayton Act.

**THE COURT:**  Well, I'm not sure I'm going to go quite that far because the Supreme Court has been, I think, pretty clear that Rule 23 does not govern these proceedings, at least on the *parens patriae* part.  However, I am going to use the

1    standard of fair, reasonable, and adequate in looking at these

2    provisions.

3        Now when we get to technicalities about notice, I think

4    those are just going to be on the due process side, not on the

5    Rule 23 side.  But they come -- they eventually converge.

6        So I am going to look at this through the lens of whether

7    this is fair, reasonable, and adequate for the releasing

8    parties.  And that's my next question.

9        I cannot tell who the settlement consumers, as used in the

10   settlement agreement, I can't tell who those people are.  Who

11   are they?  Who are the settlement consumers?

12       **MS. BLIZZARD:**  So I believe we used the term "eligible

13   consumers" also.  So eligible consumers are consumers who made

14   a purchase either of an app or an in-app purchase through the

15   Google Play Store through the Google systems between August of

16   2016 and I believe it's September 30th of 2023.

17       So those are the people that are governed by our

18   settlement and are eligible to make claims across -- I'm sorry.

19   And they have to have an address --

20       **THE COURT:**  But an eligible consumer is defined in I

21   think section 1.15 as any person whose legal address on a

22   Google payment profile was in one of the settling states.  So

23   an eligible consumer is anyone who lived in California or any

24   of the other 52 jurisdictions and had a Google billing profile;

25   right?

1    **MS. BLIZZARD:**  Yes, when they purchased an app or made

2    an in-app purchase.

3        **THE COURT:**  That's an enormous number of people.

4        **MS. BLIZZARD:**  Yes, it's approximately 127 million

5    people.  Because we have been working with Google to gather

6    this information and so, yes, it is a huge number of people.

7        **THE COURT:**  I saw that number and let's just use that

8    for now.  I saw the 127 million.

9        And settlement are people who don't opt out.  So let's

10   assume that there's a traditional opt out rate of zero or

11   1 percent, which has been, you know, historically reasonable in

12   my experience, long experience in these cases.

13       So this is going to bind about 127 or so million

14   Americans.  That's the vision.

15       **MS. BLIZZARD:**  Correct.

16       **THE COURT:**  Okay.  And they are releasing every claim,

17   state or federal, antitrust or unfair competition, or anything

18   like that, that was or could have been brought in this case.

19       So basically there are going to be 127 million people are

20   going to be releasing any consumer or antitrust claim they

21   might have had related to the Google Play Store or Google Play

22   Billing functionality that is discussed in the complaint.

23       **MS. BLIZZARD:**  Basically, yes, Your Honor.  And I

24   would refer you to one point --

25       **THE COURT:**  And they're going to release that not only

```
 1   for events up through the date of the settlement but

 2   prospectively for seven years.

 3          MS. BLIZZARD:  Correct.  That is in 1.6, the

 4   definition of claims.

 5          THE COURT:  I think you can see where I'm going.  This

 6   seems remarkably broad for the compensation that you are

 7   proposing to pay for these claims.

 8          MS. BLIZZARD:  Your Honor, we think the majority of

 9   the value of the settlement actually is in the injunctive

10   relief which is --

11          THE COURT:  We're going to spend a lot of time on

12   that.

13          MS. BLIZZARD:  Okay.

14          THE COURT:  But just for right now you're asking

15   127 million fellow citizens to give up -- or maybe noncitizens

16   too, to give up a bushel of claims in a hotly contested area.

17   Doesn't that seem a little broad?  And not just for events to

18   date, but for whatever the future holds, whatever events may

19   happen seven years from now.

20          MS. BLIZZARD:  Yes, Your Honor.  We --

21          THE COURT:  I have to say I find the seven-year part

22   to be particularly concerning because I have -- I have never

23   granted and I have excised in Rule 23 context prospective

24   relief.  I don't think that's fair to a class.

25          MS. BLIZZARD:  I understand, Your Honor.  I will say
```

1    on behalf of the 53 attorneys general which are tasked with

2    representing their citizens and weighing when to release

3    claims, when to not, when to bring antitrust claims, of which

4    we have many, that the assessment together of the 53 attorneys

5    general was that this settlement, particularly with its strong

6    injunctive relief, struck the right balance and achieved

7    certainty and --

8    **THE COURT:**  Well, you're basically just saying take

9    our word for it, this is a good deal.  This is what never flies

10    in the Rule 23 context when a plaintiff lawyer and a defense

11    lawyer get up and said, "Your Honor, don't worry about it.  We

12    thought this thing through.  Life is easy for you.  Just sign

13    here."  That's not going to work.  Okay?

14    **MS. BLIZZARD:**  Okay.

15    **THE COURT:**  So I understand you all love the

16    settlement.  That's not the issue.  The question is, is this

17    fair, reasonable, and adequate for the 127 million people or so

18    who are going to be giving up a lot of claims going forward in

19    the future.

20    **MS. BLIZZARD:**  So our belief is that it is fair,

21    reasonable, and adequate.  And I will point out that the Ninth

22    Circuit has asked -- has suggested, directed that you consider

23    the participation of the government as being entitled to

24    significant weight when you are evaluating class actions.

25    But with that being said --

1      **THE COURT:**  I have no question about that.  And I

2  personally believe there are important issues of federalism,

3  maybe even to some extent separation of powers that come into

4  play here.  And I intend to give that complete respect because

5  that, I believe, as a federal judge, in the modesty of our

6  position, is the appropriate thing to do.

7      That said, I am now looking at a family sitting in the

8  state of Idaho who wonders why they can't be part of a class

9  action because I approved something that pulled the rug under

10  them for anything that happens next seven years or anything

11  about this case that they may not like.  And I'm having a hard

12  time answering how that's fair, reasonable, and adequate for

13  those people.

14      **MS. BLIZZARD:**  So, Your Honor, a few points.

15      One is obviously we spent a lot of time drafting how

16  "claims" is defined.  It does require an identical factual

17  predicate.  We went -- that is where the 1.6 claims, which is

18  where the seven years is found.

19      You know, I think from Google's standpoint, they certainly

20  argued that they need some assurance that there won't be

21  another case tomorrow.  And that is how we arrived at the seven

22  years because that is the longest length of the terms of the

23  settlement.

24      **MR. POMERANTZ:**  Your Honor, if I may follow up from

25  what Ms. Blizzard said because I was going to point to exactly

1    the same two provisions that Ms. Blizzard just did.

2        We did not want the claims to be limited to the identical

3    factual predicate.  And that is something that the states

4    insisted on for probably some of the same concerns that

5    Your Honor has.

6        And second, we can't be in a position where we settle, pay

7    a lot of money, agree to a lot of injunctive relief, and then

8    get sued the next day for the exact same conduct.

9        And so this was the negotiations that led to this and we

10   do think that we need some protection so that we're not going

11   to get sued the next day for the same thing.  And we think that

12   the identical factual predicate puts a limitation on how

13   broadly we can claim --

14       **THE COURT:**  I don't really get that argument.  If you

15   just keep doing the same thing over and over again, why is it

16   inappropriate for you to get sued?  I mean, so you've paid up

17   through whatever today's date is, if I approved it today

18   hypothetically.  I'm not, but if I did.  But if you are going

19   to just double down and keep doing what you got sued over in

20   the first place, why is it, as you're suggesting, unfair you

21   get sued again?

22       **MR. POMERANTZ:**  Because that's not all that we agreed

23   to.  We also agreed to significant injunctive relief.  So we

24   are changing our behavior.  And the states insisted on things

25   that they felt would be sufficient competition in the markets

1    that they were concerned about.

2         And so having gone so far as to agree to a lot of

3    injunctive relief that the states asked for, then it seems to

4    us that we have resolved the issues that they've raised not

5    just with money, but with changes.  And we didn't want to get

6    sued the next day when we've made the changes that the states

7    demanded of us as part of a settlement.

8         **THE COURT:**  Well, I think I'm going -- we're going to

9    have some supplemental briefing after all of this.  I'm just

10   going to kind of flag these issues.  I'm not trying to put

11   anybody on the spot right now.  I want to get considered

12   thinking about this, but these are the things that are giving

13   me some pause.

14        I also couldn't quite figure out, just going back to the

15   money side, 127 million claimants, how much on average is each

16   of those people going to get?

17        **MS. BLIZZARD:**  So we're still evaluating that.  And

18   let me just go over basically how it works.

19        The monetary relief, as you will recall, our damage theory

20   was both an overcharge theory, an amount of pass-through, but

21   more importantly the surviving damages theory was a loss of

22   innovation, right, a loss of variety in the apps model.  That

23   was Dr. Rysman.  That was our model that survived, unlike

24   Dr. Singer who was excluded.

25        So the question is how do we value that and how do we

1    compensate consumers primarily for a loss of innovation?

2        So we have settled on a minimum of $2.

3            **THE COURT:**  Two?  $2 per person?

4        **MS. BLIZZARD:**  That's the minimum.  And then it is

5    proportional to how much you spent.  Okay.  So people who are

6    very heavy users of Google Play, and there are people who are

7    going to be receiving thousands, if not tens of thousands of

8    dollars, and are very heavy users, they will receive much more,

9    but every one of those 127 million has a minimum of $2.

10       So --

11           **THE COURT:**  I need a little more clarity on what the

12   distribution graph is going to look like.

13           **MS. BLIZZARD:**  Okay.

14           **THE COURT:**  So if you're expecting 80 percent of this

15   127 million to get two bucks, I need to know that.  If there

16   are going to be some outliers who get 50,000 each because they

17   have a gaming addiction, I need to know that.

18       But I just -- I don't have any visibility right now into

19   how this money is going to get distributed.  It looks to me,

20   just as a matter of basic math, any single person isn't going

21   to be getting much.  In other words, it's going to be one of

22   those, you know, old school undesirable consumer claims where

23   everybody gets four bucks and maybe a coupon, which we just

24   don't do anymore.  Okay.  Because nobody cashes those checks --

25           **MS. BLIZZARD:**  So the good news is --

1          **THE COURT:** -- it just doesn't happen.

2     So I just need to know. One of the things you're going to

3     have to do for me --

4          **MS. BLIZZARD:** Yes.

5          **THE COURT:** -- I'm not expecting you to read tea

6     leaves or predict the future with, you know, the accuracy of a

7     CPA, but I just need to know your best educated assessment of

8     what is the average recovery going to be per person. And if

9     it's tilted or skewed in some strange way that I just, you

10    know, 90 percent get $2 and 10 percent get 100,000, I need to

11    know that. Okay. Just some visibility into that.

12         Now turning to this injunctive relief, let me just start

13    with user -- the user choice thing for billing. So the idea is

14    Google is -- I hesitate to say open the door -- but Google is

15    going to allow developers to propose their own billing system

16    in addition to Google Play.

17         **MS. BLIZZARD:** Right.

18         **THE COURT:** So I just have a couple questions. So no

19    matter what, every developer is still going to have to use

20    Google Play Billing, but they can add their choice of an

21    alternative if they want to do that; right?

22         **MS. BLIZZARD:** Yes. I would say that developers can

23    present multiple choices to users. They will present

24    Google Play Billing, but they can also present right next to it

25    "use our billing system and get 10 extra lives for a dollar

 1    less," for instance.

 2         **THE COURT:**  I understand.  But the baseline is every

 3    developer -- every developer is still going to have to offer

 4    Google Play Billing?

 5         **MS. BLIZZARD:**  That is correct, Your Honor.  We are

 6    not removing Google Play Billing and making it completely an

 7    option.

 8         **THE COURT:**  I didn't see anything here about the fees

 9    Google is going to charge.

10         **MS. BLIZZARD:**  Correct.

11         **THE COURT:**  So what if a developer decides just to use

12    Google Play Billing, is the Google Play fee structure changed

13    in any way by the settlement?

14         **MS. BLIZZARD:**  Let me make one correction to something

15    I just said, and then I'll answer that question.

16         **THE COURT:**  Sure.

17         **MS. BLIZZARD:**  So if a user sideloads an app or gets

18    it from an alternate app store, call it the Microsoft

19    Activision Game Store, okay, if they get it through that, then

20    they're not going to have to use Google Play Billing.  Okay?

21    So it's only when they downloaded the app through the

22    Play Store when they used Google's distribution mechanism that

23    they have to use Google Play Billing.

24         **THE COURT:**  I'm with you on that.

25         **MS. BLIZZARD:**  With me on that.  Great.

1    Okay.  So your question was what about the fee.  You will

2  see in our settlement on -- it's provision 15.1 that the

3  attorneys general take no position on the fees that Google may

4  charge.  This is because --

5          **THE COURT:**  All right.  So you didn't strike any deals

6  on capping Google Play Billing fees.

7          **MS. BLIZZARD:**  We do not believe the government should

8  be dictating a fee or deciding what it should be at any given

9  point in time.  What we have done --

10          **THE COURT:**  You say that, but you're -- now all those

11  claims, you want to dismiss anybody else having a shot at

12  saying that.  So, in other words, if a bunch of consumers

13  wanted to bring a lawsuit saying, well, we don't think Google

14  should charge 30 percent, they're giving away -- you're giving

15  away their rights to sue on that in this agreement, aren't you?

16          **MS. BLIZZARD:**  So the agreement is set up so that the

17  competition will force down those fees rather than a government

18  edict.  And I will say the consumers --

19          **THE COURT:**  Let's just pause for a moment.  That

20  wasn't my question.

21    Your agreement is telling these 127 million consumers that

22  if they don't like Google's fees, they can't sue.

23          **MS. BLIZZARD:**  Because we represent them --

24          **THE COURT:**  The answer is yes.

25          **MS. BLIZZARD:**  Yes.

1          **THE COURT:**  I'm correct.

2          **MS. BLIZZARD:**  The answer is yes.  The government

3    is -- the answer is yes.  But we -- the AGs represent them and

4    the consumer class represented them, and that class was

5    decertified.  So those --

6          **THE COURT:**  Well, just because one consumer class

7    didn't make it doesn't mean another one won't.

8          **MS. BLIZZARD:**  Understood.  They can also --

9          **THE COURT:**  That turned on a flaw in the expert

10   testimony.  It didn't turn on a flaw in the case.

11         **MS. BLIZZARD:**  They can also opt out or be excluded,

12   of course, as we've discussed.  But --

13         **THE COURT:**  Now what about fees --

14         **MS. BLIZZARD:**  -- as we know, that will be a low

15   percentage.

16         **THE COURT:**  What about fees that Google is going to

17   charge, let's say a developer takes advantage of the so-called

18   user billing choice and puts its own billing platform side by

19   side Google's.  What fee is Google going to charge that

20   developer for the use of its own billing platform?

21         **MS. BLIZZARD:**  I believe -- well, it's up to Google,

22   but I believe they have publicly reported that it will be

23   around 26 to 27 percent.

24         **THE COURT:**  The key part is the settlement leaves it

25   up to Google, right?

1          **MS. BLIZZARD:**  It does because we believe we're in an

2    open competition to drive down those prices.  Because users can

3    get their apps a lot of other ways and then they won't go

4    through Google Play Billing at all.

5          **THE COURT:**  The evidence I saw at court suggests

6    that's not true.  Now I'm not backtracking on my earlier

7    statement.  But, however, I did see a lot of evidence about how

8    the way this market works.  There was not a lot of evidence

9    that there are other routes of getting these apps.

10          **MS. BLIZZARD:**  That's -- that's why we're trying to

11    break open the market.  We think there will be a, for instance,

12    Microsoft Activision app store.  We think there will be, once

13    we have taken away all of the things Google was doing to pay

14    people off not to have app stores, to prevent them from

15    launching with special versions, to prevent them from launching

16    earlier, they required price parity, they required all these

17    things that we have now taken away that we think will allow

18    competing app stores and sideloading to function much better,

19    and that will drive down the prices.

20          **MR. POMERANTZ:**  Your Honor, if I may --

21          **THE COURT:**  I understand you think that, but I

22    can't -- it's very hard for me to say something is fair,

23    reasonable, and adequate on a wing and a prayer.

24          **MR. POMERANTZ:**  Your Honor --

25          **THE COURT:**  And if it turns out that I'm wrong and

1    you're wrong, these rights have been signed away.

2            **MR. POMERANTZ:**  Your Honor, if I may just follow up,

3    though, with something that Ms. Blizzard said.

4        So this agreement -- this settlement agreement doesn't use

5    terms like Project Hug or premier tier of RSA 3.0.  And

6    Your Honor knows what I'm talking about when I say those

7    things.

8            **THE COURT:**  Oh, yes, I do.

9            **MR. POMERANTZ:**  This agreement directly addresses the

10   concerns that were raised about certain of the key provisions

11   in the Project Hug's deal.

12       So, for example, section 6.5, that's a provision that

13   directly addresses Project Hug.  The other provisions directly

14   address the exclusivity provisions of the RSA 3.0 deal.  That's

15   6.6 and 6.7.

16       And so there are very specific provisions that -- the

17   states were raising the same allegations and we had -- we spent

18   a long time negotiating how do we resolve your concerns about

19   Project Hug or about RSA 3.0 or about sideloading.  And those

20   were all things that they alleged that we addressed and

21   committed to make changes to in order to resolve their

22   concerns.

23       And so I think that this -- these injunctive relief

24   provisions do address the competition concerns that the states

25   and the consumers were raising.  And I know that it's what they

1  demanded as part of the settlement in order to, as Ms. Blizzard

2  says, open up the market.

3     Ms. Blizzard is not mentioning Microsoft Activision just

4  pulling it out of hypothetical thin air.  On the last day of

5  our trial, Microsoft announced that it was going to be

6  launching a new Android app store.  That was after it

7  consummated its acquisition of the Activision game store, of

8  the Activision game company.

9     So now here's Microsoft owning one of the largest game

10  developers, announcing that it's going to open up an Android

11  app store.  What this agreement does is it allows Microsoft,

12  and anybody else but I'll use Microsoft as an example, to get

13  preloaded onto Android devices by just cutting a deal with an

14  OEM, and Google can't do anything about it because of the

15  commitments made in this settlement agreement.

16     Microsoft can go out and get exclusive rights to games

17  because we can no longer enforce any catalog-wide sim ship

18  commitments, the Project Hug commitment that was of concern.

19     So this agreement is designed to address the concerns that

20  the states and the consumers allege in their complaint, which

21  were the same concerns alleged in the other complaints that are

22  part of this MDL.

23        **THE COURT:**  Let me ask you this, Ms. Blizzard.  So on

24  many points in the conduct section, there are comments to the

25  effect that, you know, developers can do this and do that

1  subject to meeting Google's minimum requirements and user

2  experience guidelines such as privacy, security, safety, and so

3  on.

4      So my concern is that it's so open-ended that there's

5  going to be a number of ambiguities, problems, possible

6  roadblocks down the road when Google says, well, for example,

7  when you try to download a third-party -- an app from a

8  third-party source, you got to go through, I think it was

9  something like 12 or 14 screens.  Google says, well, we have to

10  do that.  If we don't do that, we're going to have -- I know

11  you have a couple screen elisions that may reduce one or two of

12  those, but I think my overall point stands which is that's an

13  awfully vague and open-ended provision to put into one party's

14  hands to define as it will going forward.  I'm a little

15  concerned there aren't any boundaries on that.

16      **MS. BLIZZARD:**  Understood, Your Honor.  Two things.

17      One is we do have a monitor in this case that will be

18  doing regular reports and will be evaluating complaints and

19  evaluating assessment.  Of course, the states attorneys general

20  retain all of our existing compulsory process and our ability

21  to investigate Google at will.

22      We do believe there are valid security and user experience

23  concerns.  It also cannot be an open-ended free-for-all where

24  somebody can put behind a link a complete scam or pornography

25  or whatever else they want to pop up and take all the privacy

and violate other state laws.  So there need to be some guidelines.

The issue as you put it is how do we police that and how do we review that?  We need to give Google some ability to impose some guidelines here.

We worked with Google to develop the language.  There were cases where, as you say, we said you must put this on this warning screen.  There were other cases where we left it more open-ended.  That was based on the evidence in the case.

And then we have a monitor.  And we'll get regular reports.  We have a very active developer community, as you may be aware, who will not hesitate to tell us that there has been a problem or that Google is --

THE COURT:  Well, this is part of my concern.  I have to say I didn't really understand the function.  Is the monitor the final arbiter of all these disputes?

MS. BLIZZARD:  The monitor is not the final arbiter. The monitor reviews, reports, sends us information.  The attorneys general retain the right to continue investigating and to enforce their settlement.  And, of course, Your Honor, you will retain jurisdiction to enforce the settlement terms as well.

THE COURT:  This seems like a lot of kicking the can down the road and not fixing it now.  It's not hard for me to envision that eight months after approval, if you ever get to

1    that point, there's already a big dispute about whether what

2    Google is requiring for safety and security is legit or is it

3    another anticompetitive effort, as others might describe it.

4    And then you've got to wind your way through this monitor

5    process for a year, and then it comes back to me.  And we're

6    two and a half years down.  And consumers have no right to sue.

7    And I'm deciding the same questions that should have been

8    decided by the settlement agreement if it had a little bit more

9    clarity to it.

10        **MS. BLIZZARD:**  So, Your Honor, we picked areas where

11    we could be clear based on the evidence that we had.  So in the

12    sideloading warnings, we said here's the specific language.

13    Here are the specific screens that have to be compressed.

14    Right?

15        Where we could be clear based on the evidence we had, we

16    were very clear.  It is impossible to write a settlement

17    agreement that will block every crazy thing a company might

18    want to do if they're determined to do it at some future point.

19        **THE COURT:**  I don't disagree with that, but I don't

20    think just saying we'll work it out later and you can protect

21    security is sufficiently concrete.

22        **MR. POMERANTZ:**  Your Honor, and we can work on it, but

23    I just want to let you know what's driving this.  Security is

24    an evolving thing.  There's always somebody out there who's

25    trying to do something to cheat, to cheat Google, to cheat the

consumer, to cheat the developer.  They're trying to, you know,
steal their information.  And every single time we think we fix
something, somebody, you know, comes up with a new way of
trying to get around it.

And so that's why companies like Google and all the
technology companies out there, big and small, are constantly
having to change things to deal with the new security problem
that arises.

And because of that, you know, we can't -- what this
agreement is designed to do is to give us the flexibility to
deal with the next security problem that arises.  But if we
claim it's for the next security problem but it's really for
some illegitimate, anticompetitive reason, that's what the
purpose of this -- of this independent professional is supposed
to do.

We have to report an art change.  We change doing from X
to doing Y, and here's why we changed it.  So we have to
disclose our change, and we have to explain why we changed it.

And then that independent person can come in and look at
that and make a report to the states about whether they think
that change really was for a legitimate security reason or not.

That's why this independent professional is going to have
technical capabilities because they're going to have to check
on these kinds of things.  It's not just going to be some
lawyer out there.  It's going to be somebody who has real

1   technical capabilities who can give the states a straight-up

2   report.  And then if the states think we did something that's

3   in violation of the agreement, they can come to us or go

4   enforce the --

5        THE COURT:  Okay, that's fine, but I just -- I really

6   come back to the individuals who are giving up a lot here.  I

7   mean, why is this just a conversation between the states and

8   Google with a monitor?  What about the 127 million people who

9   are actually paying your fees, actually downloading apps from

10  your store, actually affected by this conduct?  They don't have

11  a seat at the table, and they can't sue.

12       MR. POMERANTZ:  They are having the benefit of having

13  all of the state antitrust enforcers and all of the resources

14  they have helping to look after their rights.  Because you know

15  127 million people aren't going to do that.  And so you have

16  the states coming in here and playing that role on their

17  behalf, which is exactly why you have laws that allow the

18  states to do that.

19       THE COURT:  Do you really need to release the claims

20  of the individuals?

21       MS. BLIZZARD:  Your Honor, the settlement is here as a

22  package.  Obviously everything was negotiated.  There are

23  injunctive terms, there are monetary terms, there are

24  compliance, there are definitions.  You have a large number of

25  state laws as well in addition to the federal claims.

1    We struck the deal we could.  I do not know if Google

2    would settle if they weren't releasing the individual claims in

3    this instance.  And obviously we are entitled to represent our

4    citizens *parens patriae*.

5         **THE COURT:**  There's no doubt about that, but you have

6    to do it in a way that gives them a fair, adequate, and

7    reasonable outcome.  That's where I'm getting hung up.  I'm

8    just not seeing it right now.

9         So here's what I'd like you to do.  I'd like you to

10   address -- I'll put this in the minutes too.  But address the

11   issues that I've raised.  I do want some understanding of why

12   you think -- I mean, the crux of this case is the overcharge,

13   the so-called overcharge.  All right.  And that's 30 percent on

14   the Play Store if you do it Google's way.  And the evidence at

15   trial was it's 27 percent if you use User Choice Billing.

16        So that's what's affecting your citizens in each of these

17   states.  That's the bottom line.  That's money out of their

18   wallets.  And I don't see this effecting that in any way other

19   than a hope that with some market engineering there's a better

20   day seven years, five years, three years down the road.  That's

21   a bit of a stretch.

22        **MS. BLIZZARD:**  I may disagree on the stretch, but the

23   reality is we had jointly retained Hal Singer to do the

24   pass-through analysis and to do that, the straight overcharge

25   analysis, and he was Dauberted.  He was no longer available to

1  us.  Our sole remaining damages expert was Dr. Rysman and his

2  theory of loss of variety and loss of innovation and he also

3  had some analysis related to --

4          **THE COURT:**  Which as I recall, I thought sounded

5  pretty good at the hot tub.

6          **MS. BLIZZARD:**  It sounded excellent.  I think -- I

7  think it was a complete winner.

8          **THE COURT:**  But then you settled.

9          **MS. BLIZZARD:**  The issue, if I may, the issue with

10 Dr. Rysman --

11         **THE COURT:**  You folded after you got four aces.

12         **MS. BLIZZARD:**  I did not get four aces.

13         **THE COURT:**  How does that work?

14         **MS. BLIZZARD:**  Here's why I didn't have four aces.

15 Okay.  Dr. Rysman's theory was that loss of innovation was

16 compensable under the antitrust laws.  The Clayton Act says

17 business or property.  And property has been defined by the

18 U.S. Supreme Court as something you can hold.  It was not at

19 all clear that this was going to survive -- you may love it, I

20 may love it.  Whether the Ninth Circuit and the U.S. Supreme

21 Court would let --

22         **THE COURT:**  You know, this is true in every case.  I'm

23 just -- I'm sorry, that's just true in every case.  It's just

24 true in every case.  I mean, there's some cases where it's more

25 true and some cases where it's less true, but that is the whole

1  premise of settlement.  Uncertainty.  We get that.  Okay.

2      You banked on a degree of uncertainty.  It's up to you.

3  That's your call.

4      All I'm saying is my job is to make sure that people don't

5  get left holding a bag of nothing.  And right now I'm not

6  saying this is a bag of nothing, but it's a bag of not great.

7      **MR. POMERANTZ:**  Your Honor, on the monetary side, I

8  just recall, and I know Your Honor was deep into this, but

9  there was plenty of evidence of what was the effect on

10  consumers when the service fee is reduced from a higher rate to

11  a lower rate, from 30 percent to 15 percent.  And that showed

12  that almost no developers passed on that savings.

13      That is the harm you're talking about.  Your Honor

14  referred to overcharge.  That is the harm.  And there is almost

15  no harm.

16      Our expert, Greg Leonard, he estimated -- even accepting

17  all of their assumptions, he estimated that based on what

18  actually happens with pass-through, it can't be any more than

19  $40 million of damages.

20      **THE COURT:**  Oh, I remember that.  But we didn't --

21  that may come up in Phase II should we get there.

22      **MR. POMERANTZ:**  No, but we never -- but all I'm saying

23  is that we ended up settling for many multiples of $40 million

24  because that's what they were demanding in order to get a deal

25  done.

1          So it's not like this number is so low.  To us, we had to

2     pay a lot to get this settlement done compared to what the

3     evidence on pass-through really shows.

4          **THE COURT:**  Let me ask you this.  Now I'm just --

5     conversation point, okay?  I'm certainly not tying my hands or

6     yours.

7          If I were to approve this, what would the impact be on the

8     possibility of an injunction in the Epic v. Google case?

9          **MS. BLIZZARD:**  Your Honor, I think you have all the

10    choices in front of you.  That is a separate case brought by an

11    individual developer with separate objectives that I don't know

12    exactly what they want injunctive relief, I'm sure they're

13    going to tell you.

14         **THE COURT:**  Let's just talk hypothetically.  This is

15    purely hypothetical.  I want to underscore this.  I have no

16    idea.  We still have the JMOL.  Who knows what will happen.

17    And then after that, we have the whole discussion on the

18    injunction.  So this is all completely hypothetical just for

19    the purposes of peeking around the corner to do some planning.

20         But you, for example, are going to allow Google to

21    continue to insist that every developer feature the

22    Google Billing Play in addition to anything else, but the

23    baseline is every developer still has to use it.

24         What if the relief in Epic was that they didn't need to do

25    that, that a developer could use its own billing app entirely

1  independent and not have to feature Google's Billing services?

2  What's going to happen then?

3       **MS. BLIZZARD:**  Your Honor, I think that you're free to

4  impose more restrictive terms.  I would say if you imposed

5  less, that would be a problem for our settlement, but if you

6  decide that you should impose more based on the evidence in

7  that case, then that is certainly within your power.  For apps

8  that are downloaded through Google Play to start with, not

9  sideloaded, not through separate app store --

10       **THE COURT:**  Well, and I understand, I hear what you're

11  saying.  That seems a bit glib.  I mean Google is paying

12  $700 million to get all these terms.  You really think I can

13  just impose a completely contrary set of terms to Google's

14  disadvantage and they can't come back to you and say we can't

15  do this, we didn't get the benefit of our bargain here?

16       **MS. BLIZZARD:**  Your Honor, they made the bargain with

17  us knowing that they still had both Epic and Match out there at

18  that time.  And we have a deal, we have a settlement.  We

19  believe it gets us certainty.  I would predict that anything

20  with Epic v. Google is going to be on appeal for years.  So we

21  also think that we can get injunctive relief and money to

22  consumers faster with this settlement, certainly one of our

23  considerations.

24       And, no, I don't think Google can complain they didn't get

25  the benefit of the bargain.  They knew where they stood.  They

 1    struck this deal with us.  And if you decide to order more in
 2    Epic v. Google, you are free to do that.
 3          **MR. POMERANTZ:**  Your Honor, I have actually not
 4    thought about the hypothetical that Your Honor posed.  So I
 5    don't want --
 6          **THE COURT:**  I understand.
 7          **MR. POMERANTZ:**  -- I don't want to commit.
 8    But let me -- I do want to note one thing.  Your Honor
 9    knows about Project Liberty.  When Epic put up the alternative
10    billing screen that they proposed, it had Google Play Billing
11    and Epic billing together on the slide.
12    So what Epic was proposing back when they decided to
13    challenge Google was User Choice Billing, that is, that it
14    would give Google Play Billing and Epic billing on the same
15    choice screen.
16          **THE COURT:**  I understand, but I have a strong
17    suspicion Epic's views may have changed.
18          **MR. POMERANTZ:**  Maybe.  But, Your Honor, just think
19    about if you're the consumer, you're the user, do you want to
20    have one choice or do you want to have two choices?  And don't
21    forget, I don't think about Epic.  Let' just say -- let's
22    change it from --
23          **THE COURT:**  If one choice is pay me 2 percent and the
24    other choice is pay me 27 or 30 percent, who knows what a
25    consumer will do.

1          **MR. POMERANTZ:**  No, the user, the user.

2          **THE COURT:**  Yes, consumer, the person buying the

3    product.

4          **MR. POMERANTZ:**  So let's change the name from

5    Epic Games to Pirate Games.  So now this Pirate Games developer

6    puts two things up there.  If I'm a user, I'm sitting there

7    saying I could save some money if I pick Pirate Games, but do I

8    really trust Pirate Games?

9          And what User Choice Billing does is it gives users a

10   choice.  And my bet is that users will make different choices.

11   Some will say I'm willing to buy from Pirate Games in order to

12   save some money.  Another one will say I'm not sure I know

13   enough about Pirate Games.  I'm worried about the security of

14   my financial information.  I'm going to pick Google Play

15   Billing.

16         And that's why, because this was such a good thing for

17   users.  And again the states and the consumers, that's who they

18   represent, the users.  And the users are clearly better off if

19   they get a choice of Google Play Billing or Pirate Games

20   Billing because --

21         **THE COURT:**  If you're going to call it Pirate Games,

22   yes.  Why don't you just call it Steal My Secret Financial

23   Information.com.

24         Okay.  No one is going to pick that option, Mr. Pomerantz.

25         **MR. POMERANTZ:**  It's just my point is that if you

1  don't really know whether you can trust the alternative, some

2  people in today's world say I got to go with who I trust.

3      And users are going to want to have that choice.  And so

4  because we were sitting there negotiating with representatives

5  of the users, this is something that we were able to agree to.

6      I would be surprised -- I don't know what Google -- I'm

7  sorry.  I don't know what Epic is going to propose, but I do

8  know when it was their turn to put up an alternative billing

9  system --

10         THE COURT:  You're supposed to know at this point.  I

11  asked you to meet --

12         MR. POMERANTZ:  I'm not going to get into that.

13         THE COURT:  Oh, you do know.  You don't have to tell

14  me and you shouldn't.

15         MR. POMERANTZ:  No, no.

16         THE COURT:  It hasn't happened yet?

17         MR. POMERANTZ:  There's two things.  One, what do you

18  propose for settlement purposes.

19         THE COURT:  Yes.

20         MR. POMERANTZ:  Versus what do you hand to the judge

21  for, you know, that you're asking.  We don't --

22         THE COURT:  Let's just take a detour.  You have had

23  those conversations?

24         MR. POMERANTZ:  Yes.

25         THE COURT:  Okay.

 1              **MR. POMERANTZ:**  We have followed Your Honor --

 2          **THE COURT:**  You're surprising me.  Okay.  Good, we're

 3   past that.

 4          **MR. POMERANTZ:**  I'm just saying that when it comes

 5   time to submit a proposed injunction to Your Honor for

 6   consideration --

 7          **THE COURT:**  I understand.

 8          **MR. POMERANTZ:**  -- I don't know what they're going to

 9   propose.

10          **THE COURT:**  How much time would you like to get back

11   to me on these things?

12          **MS. BLIZZARD:**  I would like --

13          **THE COURT:**  I prefer you take a reasonable amount of

14   time.  You don't have to rush.  But how much would you like?

15          **MS. BLIZZARD:**  So can I raise one other issue that

16   relates to the timing?

17          **THE COURT:**  Yes.  Yeah.

18          **MS. BLIZZARD:**  All right.  Our settlement requires

19   Google to put the $700 million into escrow 45 days after you

20   approve the notice, the preliminary approval.  Which means the

21   money is not in escrow --

22          **THE COURT:**  I think they're good for it.

23          **MS. BLIZZARD:**  -- which means we are losing interest

24   every day.

25          **THE COURT:**  What are you worried about?

1    **MS. BLIZZARD:**  Because -- because if ultimately I

2    convince you that this is a good settlement, then that money

3    that would be earned, the interest, which is $100,000 a day,

4    will go to the consumers.

5    So what is most important to me as I stand here right now,

6    even if you don't approve the notice, you want me to come back,

7    I'm happy to come back on all these points, I would like you to

8    order Google as of today, 45 days from now, to put the money --

9    **THE COURT:**  The daily interest on 700 million is only

10   100,000?

11   **MS. BLIZZARD:**  $100,000 every day.

12   **THE COURT:**  What's the interest rate?

13   **MS. BLIZZARD:**  We put it in T-bills, 5 percent give or

14   take.

15   **THE COURT:**  Five percent of 700 million is not

16   100,000.

17   **MS. BLIZZARD:**  I did the math before coming.

18   **THE COURT:**  All right, I'll take your word for it.

19   Well, Mr. Pomerantz, what do you want to do?  They're

20   worried about the loss of interest.

21   **MR. POMERANTZ:**  Yeah.  I mean, you know, it was a

22   negotiated part of the deal.  We obviously have been working

23   well with the states.  We would -- you know, it's not what we

24   bargained for, I'll be honest with you.  We were willing to put

25   it in.  It's a company decision, if I can talk to my client.

1          **THE COURT:**  That's fine.  Okay.  So we'll have to deal

2     with that separately.

3          But how much time would you like to get back to me?  Do

4     you want to do 30 days, 45?

5          **MS. BLIZZARD:**  Yeah.  30 days is fine, Your Honor.

6     Honestly, if I can't get the money in escrow, I'd say seven

7     days.  But if I can get the money in escrow, then 30 days.

8          **THE COURT:**  Now, Google, do you want to respond as

9     well?

10         **MR. POMERANTZ:**  Yeah, probably, Your Honor.

11         **THE COURT:**  That's fine.

12         **MR. POMERANTZ:**  We would appreciate it.  I think we

13    can respond at the same time.

14         **THE COURT:**  Yeah, let's do that.  Do you want to do it

15    jointly or do you just want to do it separately?

16         **MR. POMERANTZ:**  No.  I think we probably have

17    different information to provide to Your Honor, or perspective,

18    but I think we can probably file at the same time.

19         **THE COURT:**  So the touchstone is I need a better

20    demonstration of why this is fair, reasonable, and adequate for

21    127 million people will be giving up.

22         And everything I've asked has been guided by that inquiry.

23    Okay.  So just that's what you should be coming back to again

24    and again and again.  I think you get it.

25         **MS. BLIZZARD:**  Yes.

1          **THE COURT:**  All right.  I will see you in -- well,

2    I'll get it in 30 days, and if we need another hearing after

3    that, I'll let you know.

4         Okay.  Thanks for coming in.

5          **MR. POMERANTZ:**  Thank you, Your Honor.

6              (Proceedings adjourned at 2:21 p.m.)

7                     ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Tuesday, February 27, 2024

8

9

10

11          _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                     U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25