1  Brian C. Rocca, S.B. #221576
   brian.rocca@morganlewis.com
2  Sujal J. Shah, S.B. #215230
   sujal.shah@morganlewis.com
3  Michelle Park Chiu, S.B. #248421
   michelle.chiu@morganlewis.com
4  Minna Lo Naranjo, S.B. #259005
   minna.naranjo@morganlewis.com
5  Rishi P. Satia, S.B. #301958
   rishi.satia@morganlewis.com
6  **MORGAN, LEWIS & BOCKIUS LLP**
7  One Market, Spear Street Tower
   San Francisco, CA 94105-1596
8  Telephone: (415) 442-1000

9  Richard S. Taffet, *pro hac vice*
   richard.taffet@morganlewis.com
10 **MORGAN, LEWIS & BOCKIUS LLP**
   101 Park Avenue
11 New York, NY 10178-0060
   Telephone: (212) 309-6000
12

13 Neal Kumar Katyal, *pro hac vice*
   neal.katyal@hoganlovells.com
14 Jessica L. Ellsworth, *pro hac vice*
   jessica.ellsworth@hoganlovells.com
15 **HOGAN LOVELLS US LLP**
   555 13th St. NW
16 Washington, D.C. 20001
   Telephone: (202) 637-5600
17

18 *Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

19
20         **UNITED STATES DISTRICT COURT**
21        **NORTHERN DISTRICT OF CALIFORNIA**
22           **SAN FRANCISCO DIVISION**

23 **IN RE GOOGLE PLAY STORE**          Case No. 3:21-md-02981-JD
   **ANTITRUST LITIGATION**
24                                      **REPLY IN SUPPORT OF GOOGLE'S**
   THIS DOCUMENT RELATES TO:           **RENEWED MOTION FOR JUDGMENT**
25                                      **AS A MATTER OF LAW UNDER RULE**
   *Epic Games Inc. v. Google LLC et al.,* Case  **50(B) OR FOR A NEW TRIAL UNDER**
26 No. 3:20-cv-05671-JD                 **RULE 59**

27                                      **ORAL ARGUMENT REQUESTED**

28                                      Judge: Hon. James Donato

1

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

2

3  A.  The Jury Verdict Depends on Legally Flawed Market Definitions. ................................1

4  B.  Legal Errors in the Jury Instructions Require a New Trial. ............................................3

5  C.  There Is Insufficient Evidence to Support the Jury's Verdict. .......................................5

6  D.  Google Is Entitled to a New Trial Based on Erroneous Evidentiary Rulings. ...............14

7  E.  This Case Should Have Been Tried to the Bench. ........................................................15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-ii-

REPLY IN SUPPORT OF GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR
FOR A NEW TRIAL, Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
    592 F.3d 991 (9th Cir. 2010) ................................................................................................10

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) ..............................................................................................7, 8

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012) .................................................................................................7

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) ..................................................................................................8

*City of Anaheim v. Southern California Edison Co.,*
    955 F.2d 1373 (9th Cir. 1992) .................................................................................................5

*Coronavirus Reporter v. Apple Inc.,*
    85 F.4th 948 (9th Cir. 2023) ...................................................................................................9

*Dang v. Cross,*
    422 F.3d 800 (9th Cir. 2005) ...............................................................................................3, 4

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992) ................................................................................................................2

*Epic Games, Inc. v. Apple Inc.,*
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................................................ *passim*

*Epic Games Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) ....................................................................................... *passim*

*Feinstein v. Service Solutions Group LLC,*
    464 F. App'x 670 (9th Cir. 2012) .........................................................................................15

*FN Herstal SA v. Clyde Armory Inc.,*
    838 F.3d 1071 (11th Cir. 2016) .............................................................................................15

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ...................................................................................3, 8, 11, 12

*Georgia-Pac. Consumer Products LP v. Four-U-Packaging, Inc.,*
    701 F.3d 1093 (6th Cir. 2012) .................................................................................................1

*Howard v. City of Coos Bay,*
    871 F.3d 1032 (9th Cir. 2017) .................................................................................................1

REPLY IN SUPPORT OF GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR
FOR A NEW TRIAL, Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

# **TABLE OF AUTHORITIES**
(cont'd)

**Page(s)**

*Jack Walters & Sons Corp. v. Morton Building, Inc.*,
    737 F.2d 698 (7th Cir. 1984) ............................................................................8

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................4

*Les Shockley Racing, Inc. v. National Hot Rod Ass'n*,
    884 F.2d 504 (9th Cir. 1989) ............................................................................7

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    726 F.2d 1381 (9th Cir. 1984) ..........................................................................4

*McGinest v. GTE Service Corp.*,
    247 F. App'x 72 (9th Cir. 2007) ......................................................................2

*Menasha Corp. v. News America Marketing In-Store, Inc.*,
    354 F.3d 661 (7th Cir. 2004) ............................................................................5

*Mondragon v. Fernandez*,
    No. C 08-05772 RMW, 2012 WL 2590185 (N.D. Cal. July 3, 2012) ......................................15

*NCAA v. Alston*,
    594 U.S. 69 (2021) ....................................................................................12, 15

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ..............................................................................6, 7, 12

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ..........................................................................9

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    967 F. Supp. 2d 1347 (N.D. Cal. 2013) ..............................................................5

*Pacific Bell Telephone Co. v. LinkLine Communications, Inc.*,
    555 U.S. 438 (2009) ..................................................................................5, 11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................7

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) ......................................................................11, 12

*Smith v. Pro Football, Inc.*,
    593 F.2d 1173 (D.C. Cir. 1978) ........................................................................4

-iv-

**TABLE OF AUTHORITIES**
(cont'd)

Page(s)

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013)...................................................................................7

*Sullivan v. National Football League*,
    34 F.3d 1091 (1st Cir. 1994) ..................................................................................4

*Tan Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020).................................................................................14

*Tanaka v. University of Southern California*,
    252 F.3d 1059 (9th Cir. 2001)............................................................................5, 6

*United States v. Castillo-Mendez*,
    868 F.3d 830 (9th Cir. 2017).................................................................................15

*United States v. Google, LLC*,
    —F. Supp. 3d—, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) ....................................5

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972) ................................................................................................4

*Waymo LLC v. Uber Technologies, Inc.*,
    No. C 17-00939 WHA, 2018 WL 646701 (N.D. Cal. Jan. 30, 2018).......................14

*Yue v. Chordiant Software, Inc.*,
    No. C 08-00019 JW, 2010 WL 11575579 (N.D. Cal. Apr. 22, 2010) ......................14

-v-

REPLY IN SUPPORT OF GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR
FOR A NEW TRIAL, Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

Epic's emphasis on the length of the trial and the size of the record cannot overcome the legal precedent requiring judgment for Google.  Google's motion should be granted.

### A.       The Jury Verdict Depends on Legally Flawed Market Definitions.

Epic does not dispute that Google lacks sufficient market power if Apple's App Store were part of the relevant markets.  *See* Opp. 3–6, ECF[1] 932.  Epic's case thus hinges on whether the relevant markets are limited to Android.  For two independent reasons, the answer is no.

**1. *Preclusion*.**  In *Epic v. Apple*, the question of whether Google Play and Apple's App Store compete in the relevant markets was squarely presented, fully litigated, and resolved decisively against Epic.  Mot. 1–5, ECF 925.  Issue preclusion bars Epic from relitigating that determination.

Epic argues that this case does not involve the "same issue" litigated in *Epic v. Apple*.[2] That is wrong.  Courts approach the "same issue" analysis practically, examining whether a party has raised the same arguments, evaluated under the same legal standard, and whether the earlier case would "reasonably be expected to have embraced" the same issues.  *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017) (citation omitted).  Google's motion showed that Epic's "evidence and arguments" related to competition between Google and Apple are "largely identical."  *Id.* at 1043–44; *see* Mot. 2–3.  Epic does not even try to address Google's showing, but rather insists that this case is different because it involves Google's *conduct*, rather than Apple's.  Opp. 3–4.  But Google has not sought preclusion on whether its *conduct* was anticompetitive, and preclusion does not require that *all* issues in a case be the same.  *See, e.g.*, *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (applying issue preclusion in trademark case involving "different defendants"; "different geographic regions"; and "different consumers").

---

[1] Unless otherwise specified, references to "ECF" are to the docket for No. 3:21-md-02981-JD and references to "Tr." are to the trial transcript.

[2] Notably, Epic does not contest the remaining preclusion elements—whether it had a full and fair opportunity to litigate the issue, and whether the issue was necessary to decide.  *See* Opp. 2–3. Epic also no longer seriously contends that Google's preclusion argument is untimely.  *Id.* at 4 n.1.

1   Fundamentally, preclusion protects "the public interest" against "inconsistent results."

2   *McGinest v. GTE Serv. Corp.*, 247 F. App'x 72, 75 (9th Cir. 2007).  Google's "main competitor"

3   Apple was not subject to antitrust liability in a suit brought by Epic because Apple competes with

4   Google.  *Epic Games, Inc. v. Apple Inc.* ("*Apple I*"), 559 F. Supp. 3d 898, 1024, 1030, 1036 (N.D.

5   Cal. 2021), *aff'd in part, rev'd in part*, 67 F.4th 946 (9th Cir. 2023) ("*Apple II*").  But here, the

6   jury's verdict holds Google liable on the basis that no such competition exists.  Issue preclusion

7   guards against such plainly inconsistent results, which themselves undermine competition where

8   Apple and Google face different outcomes while subject to the same legal standards.

9   **2. *Aftermarkets.***  Epic's argument that the Ninth Circuit's framework for defining a single-

10   brand market does not apply elevates "formalistic distinctions" over "actual market realities."

11   *Apple II*, 67 F.4th at 978 (citation omitted).  Epic concedes an aftermarket is one "entirely

12   dependent on the prior purchase of a durable good in a *foremarket*," Opp. 5 (quoting *Apple II*, 67

13   F.4th at 976 (emphasis added)), and does not dispute that its markets are "entirely dependent" on

14   the prior purchase of an Android device.  *See id.*; *accord* Mot. 5–6 (citing Epic attorneys and

15   witnesses admitting as much).  Under controlling precedent, that requires applying the legal

16   framework for single-brand aftermarkets.  *Apple II*, 67 F.4th at 976–77.  Moreover, the

17   aftermarket inquiry is "whether competition in the [foremarket] will significantly restrain power in

18   the [aftermarkets]."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.15

19   (1992).  The record showed that competition between iPhones and Android phones drives Google

20   and Apple to compete over app stores.  *See, e.g.*, Tr. 3091:14–3092:11 (Oliver); Tr. 1399:24–

21   1400:8 (Pichai).

22   Epic provides no legal authority or economic rationale for why it matters that Google

23   licenses the Android operating system instead of manufacturing or selling *all* Android devices.

24   Opp. 5.  In fact, in *Epic v. Apple*, Epic argued it made no difference whether "the foremarket is

25   smartphone operating systems or the smartphone itself" and that, in the "foremarket," "iOS's main

26   competitor in the relevant market [is] Android."  *Epic Games Inc. v. Apple, Inc.*, Nos. 21-16056 &

27   21-16695 (9th Cir. May 25, 2022), ECF 163, at 6, 61.  Here, the trial record showed that Google

28   generates significant revenue from Android devices.  *See* Tr. 1935:10-12 (Harrison);

-2-

1   Tr. 2649:7-20 (Gentzkow); ECF 886-35, Ex. 434; ECF 886-36, Ex. 436.  Google's incentive to

2   keep those devices competitive with iPhones can constrain Google with respect to the Play store

3   even though Google does not make all Android devices.  Tr. 2719:14–2733:18 (Tucker).

4          Epic was thus required to rebut "the 'economic presumption that . . . consumers make a

5   knowing choice to restrict their aftermarket options' when they make a foremarket purchase," 67

6   F.4th at 979 (citation omitted), *i.e.*, that consumers generally know they cannot use Apple's App

7   Store on Android devices.  Regarding app distribution, Epic cites *no* evidence suggesting

8   consumers were unaware that Apple's App Store was unavailable on Android devices, which is

9   the relevant "restriction."  *See* Opp. 6.[3]  On the contrary, Epic's own expert conceded that users

10  are "choosing the set of apps that are available on that platform" when they choose a phone.  Tr.

11  2456:16-17 (Bernheim).  As for in-app payments, Epic cites a single Google witness's testimony

12  that she doesn't know "that users know what a payment processor is."  Opp. 6 (quoting Tr.

13  1581:10-11 (Rasanen)).  That sheds no light on whether consumers know they could not use

14  Apple's billing system on an Android device.  Even if there were *some* evidence on Epic's side,

15  however, that would at most mean Google is entitled to a new trial.  *See Dang v. Cross*, 422 F.3d

16  800, 804-805 (9th Cir. 2005) (A party "is entitled to an instruction about his or her theory of the

17  case if it is supported by law and has foundation in the evidence.") (citation omitted)).  Epic does

18  not argue that there was no prejudice if an aftermarket instruction was warranted.  *See* Opp. 6.

19       **B.      Legal Errors in the Jury Instructions Require a New Trial.**

20       **1.  *Cross-market justifications.***  Epic does not defend the Court's exclusion of cross-

21  market justifications based on *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020).  Epic instead

22  claims that considering procompetitive effects outside the relevant market "conflicts with the

23  fundamental purpose of market definition."  Opp. 7.  As *Apple II* recognized, however, both the

24  Ninth Circuit and the Supreme Court have "considered cross-market rationales" in Rule of Reason

25

26  ───────────────

27  [3] Epic's assertion that users did not know about Google's agreements with OEMs and developers
    is irrelevant.  None of these agreements affects whether consumers' choice of an Android device
    restricts their ability to choose the Apple App Store and, in any event, there is no requirement that

28  users know the specific source of any aftermarket limitations.

-3-

1    cases.  67 F.4th at 989 (collecting cases).  Considering cross-market rationales makes sense:

2    Reducing competition in a single-brand market can "stimulate interbrand competition," promoting

3    the exact type of competition antitrust laws are designed to "protect."  *Leegin Creative Leather*

4    *Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 890 (2007) (citation omitted).

5        Epic's attempts to avoid this precedent fail.  Epic cites cases that do not apply the Rule of

6    Reason, *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609 (1972); predate the Supreme

7    Court's express consideration of cross-market justifications, *id.*; *Smith v. Pro Football, Inc.*, 593

8    F.2d 1173 (D.C. Cir. 1978); or recognize that benefits must be in related markets to be cognizable,

9    *Smith*, 593 F.2d at 1186; *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994);

10   *Topco*, 405 U.S. at 610, which is the precise instruction that Google requested, ECF 806 at 82,

11   130.  Dr. Bernheim agreed that smartphones and app distribution are related.  Tr. 2380:14–2381:6

12   (Bernheim).  Epic cites no authority that a jury may only consider cross-market justifications in

13   cases involving intrabrand markets.  Opp. 7–8.  Regardless, the markets in this case *were*

14   "intrabrand" in the relevant sense.  At Epic's urging, the jury determined that the markets were

15   limited to Android devices.  Tr. 3378:18-23 (Epic Closing); Tr. 3439:2-6 (Verdict);  *see also Los*

16   *Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1397 (9th Cir. 1984)

17   (competition within the NFL constitutes intrabrand competition); *Sullivan*, 34 F.3d at 1112 (same).

18       It does not matter that *Apple II* reserved the question of whether cross-market justifications

19   are appropriate.  *Cf. Dang*, 422 F.3d at 807–08 (district court erred by not giving an instruction

20   even where Ninth Circuit had not yet stated "explicitly" a legal point that "was implicit in [its]

21   past decisions").  Here, ample testimony supported Google's assertion that its conduct stimulated

22   competition in the market for smartphones and similar devices.  *See, e.g.*, Tr. 494:9-16 (Koh); Tr.

23   1121:16–1161:17 (Kolotouros); Tr. 2649:12-20 (Gentzkow).  The jury should therefore have been

24   instructed to consider that procompetitive effect.  *Dang*, 422 F.3d at 806–07.

25       Epic falls well short of its burden to prove that not doing so was harmless.  *See Id.* at 811.

26   The Court rejected Google's request to clarify expressly that the jury could consider related

27   markets.  *See* Mot. 8.  Instead, as Epic acknowledges, Opp. 13, the Court instructed the jury to

28   consider whether Google's conduct had procompetitive benefits "in th[e] relevant market"—*i.e.*,

-4-

1   the market the jury found.  Tr. 3328:11-16.  The Court did not override that instruction by

2   negative implication when it omitted the phrase "relevant market" in subsequent instructions.  *See*

3   Tr. 3332:22–3333:1.  Epic's assertion that "the jury considered" and "rejected" Google's claim of

4   cross-market benefits is thus inconsistent with the Court's instructions.  Opp. 8.

5       **2.  *Aggregating Conduct.***  Epic fails to cite any case holding that the jury was not required

6   to evaluate each category of conduct for anticompetitive effects.  Opp. 6–7.  One case merely

7   allows courts to aggregate effects when a defendant enters the *same type of contract* with multiple

8   parties, *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1362

9   (N.D. Cal. 2013), and says nothing about aggregating different types of conduct.  And while Epic

10  cites an outdated Ninth Circuit case allowing individual acts to be assessed for "synergistic"

11  effects, *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992), intervening

12  Supreme Court precedent has rejected this reasoning, *see, e.g.*, *Pac. Bell Tel. Co. v. LinkLine*

13  *Commc'ns, Inc.*, 555 U.S. 438, 452 (2009).  Finally, Epic is wrong about *United States v. Google,*

14  *LLC*, —F. Supp. 3d—, 2023 WL 4999901 (D.D.C. Aug. 4, 2023).  There, the court "agree[d]"

15  Google was correct when it made the same argument it makes here.  *Id.* at *10, *12.[4]

16      **3.  *Balancing*.**  Google preserves its argument that the Court's instruction that the jury

17  "balance any competitive harms that you found against any competitive benefits you found,"

18  regardless of whether Epic proved "the existence of a substantially less restrictive alternative," Tr.

19  3329:5-6, 3328:23-25 (Instructions), is contrary to Supreme Court precedent.  *See* Mot. 11.

20      **C.     There Is Insufficient Evidence to Support the Jury's Verdict.**

21      **1.  *Market Definitions*.**  To justify excluding web payments, Epic points to evidence that

22  "consumers *prefer* to make [in-app] purchases."  Opp. 10 (emphasis added).  That is not the legal

23  test.  *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (consumer's "personal

24  preference" was "irrelevant"); *Menasha Corp. v. News Am. Mkg. In-Store, Inc.*, 354 F.3d 661, 665

25

26  ─────────────
    [4] Epic suggests that the jury found each of Google's separate actions anticompetitive.  Opp. 7 n.3.

27  Not so.  For Epic's Section 2 claim, the jury was never asked to assess specific conduct.  ECF 866
    at 3.  And the verdict form on the Section 1 claim lumped together agreements under MADA and

28  RSA, without specifically mentioning Project Banyan or sideloading.  *Id.* at 5.

(7th Cir. 2004) ("consumer preference is economically irrelevant").  The question is whether out-of-app payment systems "fill the same consumer needs or purposes" as in-app payment systems. Tr. 3318:15-22 (Instructions).  Undisputed evidence establishes that they do.  Developers can sell the *same* "in-app goods and services" on websites as within the app itself.  *See, e.g.*, Tr. 2670:8-20 (Gentzkow); Tr. 314:4-11 (Simon).  Even if web sales are not perfect substitutes because some sales "dropoff" when users leave the app, Tr. 2556:13-23 (Tadelis), the test is whether websites are "*reasonabl[y]*" interchangeable, *Tanaka*, 252 F.3d at 1063 (citation omitted).  Epic's focus exclusively on "*developers'* perspective," Opp. 10, ignores that the jury was required to assess actors on both sides of the transaction, *Ohio v. Am. Express Co.*, 585 U.S. 529, 546 (2018), which according to Epic's own expert involves developers *and app users*, Tr. 2527:25–2528:1 (Tadelis); Tr. 3318:20-21 (Instructions).

For geographic markets, the legal test is similarly "consumer substitution."  Tr. 2476:5-10 (Bernheim); *see also* Tr. 3319:15-23 (Instructions).  Yet Epic failed to show U.S. users can or do substitute Google Play for the foreign Android app distributors or in-app payment solutions.  Mot. 13 (collecting Epic's own experts' concessions).  Epic urges the Court not to consider whether *users* could reasonably substitute app stores in other countries, Opp. 11, but the law requires accounting for both sides of an indisputably two-sided app store, Tr. 3319:15–3320:19 (Instructions); *Amex*, 585 U.S. at 546.  Epic fails to do so by focusing solely on areas "affected by Google's challenged conduct" or where "*Google* believes it faces competition."  Opp. 11 (emphasis added).

**2. *Direct Proof of Anticompetitive Effects.***  Epic does not contest that Google's extraordinary investments in the Play store have steadily increased quality, and it did not prove reduced output or increased prices, either.

**Output.**  Uncontested evidence established that output of devices, downloads, and in-app transactions has been rising.  Mot. 16.  Epic argues that *Google* "has not shown . . . that output would not have expanded more rapidly absent Google's exclusionary conduct."  Opp. 13.  But as plaintiff, *Epic* had that burden.  Epic does not and cannot point to any evidence that there would have been even more downloads or in-app transactions absent Google's conduct.  *See* Opp. 12–14.

1    Epic claims that "[a]n output reduction can be shown by a reduction in consumer choices

2  for a product or service."  Opp. 12.  But "reducing consumers' choices" alone is not "an injury to

3  competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).  Indeed,

4  Epic's evidence does not establish reduced choice or output.  Epic cites testimony that "Google's

5  practices were responsible for" Amazon's or other stores' "lack of success."  Opp. 13.  Evidence

6  that Amazon's share of output was lower is not proof that the market's output was lower and is

7  consistent with competition rather than harm to consumers.  "To show a lessening of competition,

8  it is not enough to show that the number of rivals has been reduced," *Rebel Oil Co. v. Atl.*

9  *Richfield Co.*, 51 F.3d 1421, 1447 (9th Cir. 1995), and even "removal of one or a few competitors

10  need not equate with injury to competition," *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884

11  F.2d 504, 508 (9th Cir. 1989).

12    **Prices.**  Epic does not dispute that an inference of supracompetitive pricing is

13  "implausible" where an alleged monopolist's prices are no higher than when the company faced

14  competition.  *Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013).  Epic's own expert testified

15  that Google's service fee rates have been declining since Google "match[ed] Apple's service fee"

16  when Play was a "small entrant."  Tr. 2480:22–2481:20 (Bernheim).  The trial evidence thus

17  showed that Google's service fees were not supracompetitive as a matter of law.  Indeed, Epic

18  cites no case finding that a defendant who reduced prices charged a supracompetitive price.

19    Epic continues to describe Google's prices and profits as "high," Opp. 14, but the legal

20  standard is whether Google's price "was higher than the price one would expect to find in a

21  competitive market," *Amex*, 585 U.S. at 547–48.  Epic could not meet that standard because it did

22  not introduce any evidence of what the price would be in a competitive market.  *See* Opp. 14–15.

23    Epic argues that Google's "net commission" was "higher than other Android app stores."

24  Opp. 14.  But Epic's CEO conceded that Google charged "the most prevalent rate," Tr. 2032:14-

25  16 (Sweeney), and its own expert agreed that Google's rates were in the same range as other

26  Android app stores' rates, Tr. 3206:2-18 (Bernheim).  Regardless, Epic's failure to dispute that

27  quality has increased renders any price premium insufficient because "[g]enerally you must pay

28  more for higher quality."  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d

-7-

REPLY IN SUPPORT OF GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR
FOR A NEW TRIAL, Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

1406, 1412 (7th Cir. 1995). Epic's expert Dr. Bernheim did not do "any work to determine the quality of other app stores compared to the quality of Google Play." Tr. 2493:12-17 (Bernheim).

Epic cannot manufacture a price increase by pointing to the ratio of all service fees paid to Google divided by the total number of downloads of apps from the Play store. Epic calls that average an "effective" price, Opp. 15, because it is not a price at all, and, as Epic's expert agreed, it is not a price that any developer actually pays, Tr. 2490:16–2491:8. Moreover, because Google's service fee rates are a percentage of developers' prices, *developer* price hikes will increase the ratio, regardless of anything Google does.

**3. *Indirect Proof of Anticompetitive Effects*.** Epic's indirect evidence at most established that Google's rivals might have been better off if Google could not try to compete. That is not harm to "competition itself." *Qualcomm*, 969 F.3d at 996 (emphasis omitted).

**GVP / Project Hug.** Overwhelming evidence showed that there was no horizontal agreement not to compete between Google and any app developer in the Games Velocity Program ("GVP"), known as Project Hug. Mot. 17. Epic does not dispute that the GVP agreements offered developers credits that functioned as discounts on their service fees. Epic's expert testified that discounting is a form of competition. *See* Tr. 2505:7-19 (Bernheim). Epic emphasizes that the GVP discounts were not available to developers that decided to launch their games exclusively on another app store, but it cites no antitrust case requiring a defendant to ensure that rivals can become its customers' exclusive supplier. Opp. 15–16. The "focus" of antitrust law is "on protecting the competitive process" not "individual competitors." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008).

Epic argues that Activision and Riot "abandoned" supposed plans to open their own stores after the GVP agreements. Opp. 16. But the record showed that these developers had other reasons not to open their own app store. Mot. 17. More importantly, evidence that discounts changed customers' incentives to "make-or-buy" is insufficient as a matter of law. *See Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984). Offering a better deal inherently renders it more attractive to buy and less attractive to make. If that effect could support antitrust liability, offering a better deal—the essence of competition—would be unlawful.

**MADA.**  Dr. Bernheim testified to a "presumption among economists [] that when firms without market power do something, it's pro-competitive." Tr. 2479:19-21 (Bernheim).  The MADA thus was presumptively procompetitive because Google introduced it as a small entrant without market power.  *See* Tr. 2479:22–2480:5 (Bernheim).  Epic tellingly ignores this testimony. Epic notes that the MADAs required OEMs to preinstall Play on the default home screen.  But Epic cannot dispute that these provisions left OEMs free to preinstall *additional* app stores right next to Play or that 68% of Android devices came preinstalled with the Play store and at least one additional app store.  Tr. 2621:15–2622:18 (Gentzkow).  Epic points to "the very low number of app installations from those stores," Opp. 17 n.13, but evidence that users overwhelmingly choose Play instead of an app store next to it proves that Google successfully competed by offering a better product.  Regardless, proof that rivals cannot distribute products "by their most preferred means" fails to establish liability.  *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 957 (9th Cir. 2023); *see also Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997).

**RSA 3.0.**  Google's RSA 3.0 Premier Tier agreements gave OEMs incentives to preinstall only Google Play if they chose.  Epic does not dispute that these agreements applied to less than 10% of Android devices, and only 16% of Android devices outside of China, after RSA 3.0 went into effect.  Tr. 2656:2–2657:1, 2653:19-23, 2655:10-16 (Gentzkow).  Nor does Epic dispute that these percentages are too low to establish substantial foreclosure as a matter of law.  Mot. 20 n.9 (collecting cases).  That is grounds for judgment as a matter of law on the RSA 3.0 agreements.

Epic argues that 60% of new devices *made by certain Chinese OEMs* were covered by the RSA 3.0 Premier Tier agreements.  Opp. 18.  That figure is insufficient as a matter of law because it does not account for the "total market," *Omega Env't*, 127 F.3d at 1162, including Samsung devices that Epic concedes were "not affected by RSA 3.0 agreements," Opp. 18.  Epic argues that Samsung devices "were affected by other Google agreements," *id.*, but Epic cites no evidence of any Google agreement with Samsung to share Play revenue in exchange for exclusive pre-installation of the Play store, and there was none.  Finally, Epic does not dispute that OEMs could stop enrolling devices in the Premier Tier at any time, which "negate[s] substantially [the] potential to foreclose competition." *Omega Env't*, 127 F.3d at 1163.

**Sideloading.** Faced with its own expert's testimony that sideloading warnings and consent screens should not be removed, Tr. 2147:1-7, 2196:25–2197:20 (Mickens), Epic fails to show that a reasonable jury could have found this conduct anticompetitive. Epic does not dispute that the warnings were first introduced when Google was a small entrant, which according to Dr. Bernheim makes them presumptively procompetitive. Tr. 2479:19–2480:8 (Bernheim). Epic likewise ignores Google's argument that the warnings are a product improvement, which "does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999–1000 (9th Cir. 2010). Epic argues that "data that showed that over a third of users trying to directly download Fortnite were deterred by Google's warning messages," Opp. 19, but that data includes no information on *why* users stopped. Epic's experts never investigated whether any users would have made a different decision if they faced different warnings. Tr. 2500:17-24 (Bernheim).

**Banyan.** "Epic agrees that no final agreement was signed between Google and Samsung consummating Project Banyan." Opp. 19. Epic instead argues that a revenue-sharing agreement between Google and Samsung "harmed competition" between app stores. *Id.* But that subsequent agreement included no terms relevant to Samsung's app store, Tr. 1112:4-21 (Kolotouros), Tr. 1249:18–1250:5 (Rosenberg), and did not affect Samsung's ability to place the Galaxy Store on Android phones next to Google Play, Mot. 22.

**DDA.** Google's DDA includes some limits on developers' ability to use Google's IP or services without paying for them. Epic does not dispute that protecting such value is procompetitive. *See Apple II*, 67 F.4th at 985–86. Nor does Epic point to any evidence that competition would be more robust if developers could include links to leave an app and buy on the web. Epic argues that the DDA prevents "out-of-app payment solution options," such as "web purchasing, from becoming more viable alternatives." Opp. 19 n.14. This simply underscores the tension in Epic's case: If web purchases are "alternatives," they should be in the relevant market.

**4. *Tying Claim.*** Epic identifies no valid less restrictive alternative for requiring the use of Google's billing system for fee-bearing transactions. Epic cannot dispute that efficiently collecting a fee for valuable IP and services used in the Play store is a procompetitive justification.

-10-

1    *See Apple II*, 67 F.4th at 986.  And Epic does not explain how developers using entirely separate

2    billing systems would be "virtually as effective" in collecting fees for the value Google provides

3    "without significantly increased cost." *Id.* at 990 (alterations and quotations omitted).  As in the

4    *Apple* case, Epic's "failure of proof" regarding how Google could collect compensation for the

5    value of its IP and services is fatal to its tying claim. *Id.* at 992–93.

6            Epic argues that the Play store would be profitable at lower service fee rates.  Opp. 22.

7    This invitation for the Court to engage in the very "price administration" that the Supreme Court

8    has instructed courts to "avoid," *Pac. Bell Tel. & Co.*, 555 U.S. at 452–53 (citation omitted),

9    underscores that Epic's true motivation is to reduce its costs rather than to restore competition.

10   Epic cannot explain how decimating Google's return on the Play store would not come with

11   "significantly increased cost," *Apple II*, 67 F.4th at 990, for Google.  Moreover, Epic's evidence

12   that the Play store would be profitable at a 12% service fee assumed that developers would pay

13   fees on *all* of the transactions they paid for in the actual world. *See* Tr. 2327:4-16, 2328:14-15,

14   2329:4-5 (Barnes).  However, Epic's position has been that developers should pay Google nothing

15   at all if they use a different billing system.  No record evidence shows Play would be profitable in

16   that scenario.  Epic claims that "Google did not originally contemplate monetizing Google Play"

17   and "did not even offer in-app payment processing until years after launching Google Play."  Opp.

18   21.  That says nothing about whether Play could compete today if paying for it were optional.

19          Epic argues that Google's justification for its billing policy was pretextual.  Hardly.

20   Google established that its billing policy involves "greater efficiency or enhanced consumer

21   appeal." *Qualcomm*, 969 F.3d at 991 (citation omitted); Tr. 1645:1–1648:14 (Rasanen); Tr.

22   3144:5–3145:6, 3146:11–3147:10 (Loew).  Epic cannot dispute that most platforms require users

23   to use the platform's billing system for transactions that entail a fee.  Tr. 2666:8–2667:2

24   (Gentzkow).  Nor does Epic dispute that conduct that is "consistent with current industry practice"

25   supports an inference that the conduct is procompetitive. *Qualcomm*, 969 F.3d at 996.

26          Epic also does not address that competitive companies essentially "always bundle" their

27   platform with their billing system, which means that use of a store and the store's billing services

28   are "no[t two] separate products." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963,

975 (9th Cir. 2008) (citation omitted).  Epic instead points to evidence that developers "would use an alternative payment solution if [they] could."  Opp. 20.  This merely shows that some developers would prefer to avoid paying for Google's services and IP if they could.

**5. *Less Restrictive Alternatives.***  Epic hardly attempts to identify adequate less restrictive alternatives in the trial record, instead arguing that it did not have to do so because Google failed to prove its procompetitive justifications.  *See* Opp. 22.  This argument overstates Google's burden at Step 2, which is merely to show a "procompetitive *rationale*," meaning "'a [1] nonpretextual *claim* that [the defendant's] conduct is [2] indeed a form of competition on the merits.'"  *Apple II*, 67 F.4th at 986 (quoting *Qualcomm*, 969 F.3d at 991) (emphasis added).  The burden then "shifts back to the plaintiff" to prove that the asserted "procompetitive efficiencies" can be achieved via substantially less restrictive means.  *Amex*, 585 U.S. at 542.  In any event, Epic fails to knock down Google's procompetitive rationales or identify proper "less restrictive alternatives."

**MADA and Revenue Sharing.**  Epic ignores undisputed testimony that "Google began these practices before it even had significant market share" and does not dispute that this triggers a presumption of procompetitiveness.  Mot. 25; *see* Opp. 22–23.  Citing *NCAA v. Alston*, 594 U.S. 69 (2021), Epic argues that abandoning a restraint that is *ineffective* for asserted procompetitive purposes can be a less restrictive alternative, but it cites no evidence that MADA and RSA 3.0 *are* ineffective for Google's asserted purposes.  *See* Opp. 23.  Remarkably, Epic relies on testimony showing "that revenue sharing provisions were added to agreements with OEMs in response to competitive pressure."  *Id.*  Exactly:  This evidence *confirms* revenue sharing is competitive. Indeed, Epic does not dispute that providing OEMs access to free high quality apps and incentivizing higher-performing and more secure devices are procompetitive.  Epic complains that Google offered "no explanation" for why it needed "preinstallation and placement requirements in the MADA or an exclusivity requirement for RSA 3.0."  *Id.*  But Epic's own expert testified that these provisions are how Google "derives value" from the agreements.  Tr. 2387:22–2388:19 (Bernheim).  Epic does not explain why an agreement in which Google offered a better deal in exchange for no value in return would have been "virtually as effective" without "significantly increased cost" for Google.  *Apple II*, 67 F.4th at 990, 992 (citation omitted); *see* Opp. 23.

-12-

**Sideloading.**  As to sideloading, Epic primarily claims that Google's security rationale was pretext.  It relies on evidence that Google did not alter the warnings depending on the source, *see* Opp. 24, but that is entirely consistent with a policy that seeks to guard against unvetted threats no matter the source, Tr. 1764:10-20, 1769:23–1770:12 (Kleidermacher), Tr. 2235:4–2237:9 (Qian).  Epic's claim that Google's sideloading warnings "deter app downloads and significantly degrade the consumer experience," Opp. 24, is legally irrelevant because Epic did not even attempt to show that its proposed alternatives—"such as notarization," *id.*—could be achieved "without significantly increased cost."  *Apple II*, 67 F.4th at 992 (citation omitted).  Epic's expert admitted that Google could incur additional costs from notarization.  Tr. 2173:16–2174:19 (Mickens).

**GVP.**  Epic's argument that GVP's purpose "was to 'mitigate' competition in distribution of Android apps," Opp. 24, reinforces that the GVP agreements were a competitive response.  The only alternative to GVP that Epic identifies is providing "discounts to developers to distribute their applications on Google Play without requiring sim-ship or parity terms."  *Id.*  But those terms simply ensured that Google would get the benefit of giving developers a better deal.  If developers could receive credits with Google businesses without having to launch their apps in the Play store, then Google would be giving developers something for nothing.  That alternative would not have been "virtually as effective" without imposing "significantly increased cost" on Google.  *Apple II*, 67 F.4th at 990, 992 (citation omitted).  Epic claims that Google "in no way explains" why simultaneous-ship and parity terms improved "the availability and quality of Android apps."  Opp. 24 (citation omitted).  But the trial record showed that "[i]f great apps and games don't launch on day and date on a device, then chance[s] are people will move to a competing platform."  Tr. 849:16-18 (Kochikar).  Epic also claims the jury could have found this rationale pretextual.  The closest Epic comes, however, is evidence that GVP was part of a "risk-mitigation strateg[y] to protect Google Play from competition," Tr. 1082:19-23, which is just another way of saying that Google sought to improve its product to compete.[5]

---

[5] Epic's less-restrictive-alternative argument on the DDA incorporates by reference its argument on the tying claim, and fails for the same reason.  *Compare* Opp. 25, *with supra* pp. 10–12.

**D.      Google Is Entitled to a New Trial Based on Erroneous Evidentiary Rulings.**

**1.  *Privilege.***  Google did not waive its objections regarding testimony about privilege.  After the Court initially cautioned Epic not to "go overboard," Google re-raised the issue before Ms. Garber or Mr. Pichai testified and the Court decisively resolved the issue against Google without leaving further room to re-raise the issue.  10/19/2023 Hr'g Tr. 27:5-8; Tr. 783:13–785:25; *see Tan Lam v. City of Los Banos*, 976 F.3d 986, 1005 (9th Cir. 2020) (an issue is preserved when there is no "indication that [an] objection 'might be subject to reconsideration'").

Epic does not dispute that it has never argued to this Court that Google improperly withheld information on the basis of the attorney-client privilege.  It would therefore be "misleading [] to suggest to the jury that [Google's] internal privilege designations translated neatly into obstruction of discovery."  *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2018 WL 646701, at *21 (N.D. Cal. Jan. 30, 2018).  Epic says questioning about privilege was admissible "in order for Epic to prove its claims regarding the suppression of evidence."  Opp. 28.  That is exactly the problem and the prejudice.  Where Epic has never argued to this Court that Google suppressed evidence based on privilege, suggesting that Google was using lawyers to suppress evidence was clearly prejudicial because it would incorrectly allow "the jury to infer that [Google] was improperly withholding evidence."  *Yue v. Chordiant Software, Inc*., No. C 08-00019 JW, 2010 WL 11575579, at *4 (N.D. Cal. Apr. 22, 2010).

**2.  *Chats.***  The start date for the chat-related sanction was critically important because this Court cannot "enforce litigation holds in other cases."  Tr. 3237:3-5.[6]  Yet the Court precluded Google from explaining that limitation during closing arguments.  Epic argues that Google was not prejudiced because Epic did not specifically insinuate during its own closing that the sanction pre-dated August 2020.  However, given the pervasive references to the chats issue throughout trial, *see* Opp. 26 (citing some of many examples), Google needed to clarify the limits of the sanction because much of the conduct Epic challenged pre-dated August 2020.  Because Google was precluded from "clear[ing] away jury confusion," a new trial is warranted.  *United States v.*

---

[6] Google's motion preserved its objection to the sanction for appeal, while recognizing that this Court has made its final decision on that issue.  Mot. 28–29.

1    *Castillo-Mendez*, 868 F.3d 830, 839 (9th Cir. 2017).

2        **3.  *Epic v. Apple.***  Epic does not dispute that antitrust law requires "careful analysis of

3    market realities," *Alston*, 594 U.S. at 93, or that the market fact that Apple was unlikely to change

4    its existing model in light of the outcome of *Epic v. Apple* supported Google's procompetitive

5    justifications.  Instead, Epic argues that evidence of the outcome would have prejudiced Epic.  *See*

6    Opp. 29–30.  But Epic itself informed the jury that it was challenging both Apple's and Google's

7    business models, *see, e.g.*, Tr. 2020:8-9, proving that Epic understands the relevance of its earlier

8    suit and greatly mitigating any prejudice to Epic.

9        **E.    This Case Should Have Been Tried to the Bench.**

10        Epic does not dispute that courts have held that consent to a jury trial may be withdrawn

11    until "days before" trial.  *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1079 (11th Cir.

12    2016); *see* Opp. 30.  Epic seeks to distinguish these cases, asserting that it would have been

13    "prejudiced" by switching to a bench trial.  Opp. 30.  But Epic does not offer "any tangible

14    [example] to support its cursory claim" of prejudice.  *Feinstein v. Serv. Sols. Grp. LLC*, 464 F.

15    App'x 670, 671 (9th Cir. 2012).  Epic's *ipse dixit* cannot be credited.

16        Epic is also wrong that Google ever consented to a binding jury.  The Court previously

17    cited a single sentence from a May 2023 filing, when there were still multiple parties seeking

18    damages entitled to a jury trial.  *See* Mot. 29.  That statement did not indicate whether Google

19    would *continue* to consent to a jury trial if all other plaintiffs settled.[7]

20        Epic claims that treating the jury verdict as advisory *now* would prejudice it, but the case it

21    cites contemplates that a court may be within its discretion to do so.  *Mondragon v. Fernandez*,

22    No. C 08-05772 RMW, 2012 WL 2590185, at *3 (N.D. Cal. July 3, 2012).  In any event, the

23    solution would not be to treat the erroneously ordered jury verdict as binding, but to order a new

24    trial given that Epic "was simply not entitled to a jury trial."  *FN Herstal*, 838 F.3d at 1089.

25

---

26    [7] Epic's reliance on Google's request that the jury try the affirmative elements of its breach of

27    contract claim—which triggered a Seventh Amendment right—is misplaced.  There was no
      meaningful overlap of issues, and the Court ultimately and correctly recognized that there was no

28    triable issue of fact on the contract claims.

DATED:  February 29, 2024

Respectfully submitted,

By:   /s/ Glenn D. Pomerantz
Glenn D. Pomerantz

**MUNGER TOLLES & OLSON LLP**
Glenn D. Pomerantz
Kuruvilla Olasa
Jonathan I. Kravis
Justin P. Raphael
Nick R. Sidney
Dane Shikman
Rebecca L. Sciarrino
Jamie B. Luguri
Lauren N. Beck

**MORGAN, LEWIS & BOCKIUS LLP**
Minna Lo Naranjo
Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Rishi P. Satia

**HOGAN LOVELLS US LLP**
Neal Kumar Katyal
Jessica L. Ellsworth

*Counsel for Defendants*

REPLY IN SUPPORT OF GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR
FOR A NEW TRIAL, Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

# E-FILING ATTESTATION

I, Glenn D. Pomerantz, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that counsel for Defendants have concurred in this filing.


/s/ Glenn D. Pomerantz
Glenn D. Pomerantz

REPLY IN SUPPORT OF GOOGLE'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL, Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD