ROB BONTA
Attorney General of California
PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
MICHAEL W. JORGENSON (SBN 201145)
Supervising Deputy Attorney General
BRIAN D. WANG (SBN 284490)
CAROLYN D. JEFFRIES (SBN 319595)
Deputy Attorneys General
**OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA**
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-4400
  Fax: (415) 703-5843
  E-mail: Paula.Blizzard@doj.ca.gov
*Counsel for Plaintiff State of California*

(Additional Counsel on Signature Page)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO:<br><br>*State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD<br><br>*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | **STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED *PARENS PATRIAE* SETTLEMENT**<br><br>Judge: Hon. James Donato |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

I.     Proposed Release ................................................................................. 1

II.    Monetary Relief and Distribution ...................................................... 5

III.    Injunctive Terms and Expected Functions of the Monitor .................... 7

      A.    The privacy, security and user experience allowances are not open-ended. .................................................................................... 8

          1.    Preloaded app stores .......................................................... 8

          2.    App distribution and sideloading ....................................... 9

          3.    Billing............................................................................... 10

      B.    The ICP and the States will ensure Google's compliance. ...................... 11

IV.    Injunctive Provisions and Restoration of Competition ......................... 13

      A.    Elimination of exclusivity deals and preloading prohibitions.................. 14

      B.    Better support for third-party app stores .................................. 14

      C.    Allowing developers to favor third-party app stores ............................. 15

      D.    Allowing developers to tell users about cheaper ways to pay ................. 15

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Berry v. Schulman*
807 F.3d 600 (4th Cir. 2015)................................................................................................. 3

*Blue Cross & Blue Shield United v. Marshfield Clinic*
65 F.3d 1406 (7th Cir. 1995)................................................................................................ 14

*Doe v. Déjà Vu Consulting, Inc.*
925 F.4d 886, 900 (6th Cir. 2019)......................................................................................... 2

*Elna Sefcovic, LLC v. TEP Rocky Mt.*
LLC, 807 F. App'x 752 (10th Cir. 2020)................................................................................ 3

*Estorga v. Santa Clara Valley Transp. Auth.*
No. 16-cv-02668-BLF, 2017 WL 2604665 (N.D. Cal. June 9, 2017) ...................................... 2

*Hastings v. Principal Life Ins. Co.*
No. 21-cv-00047, 2021 U.S. Dist. LEXIS 245180 (S.D. Iowa July 28, 2021)......................... 4

*Hesse v. Sprint Corp.*
598 F.3d 581 (9th Cir. 2010)................................................................................................. 2

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*
85 F.4th 1070 (11th Cir. 2023) .......................................................................................... 2, 3

*In re Google Play Developer Antitrust Litigation*
No. 3:20-cv-05792-JD, Dkt. No. 218-1 (Ex. B, § 13.1) ......................................................... 4

*In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*
No. 14-md-2541-CW, 2017 U.S. Dist. LEXIS 201104 (N.D. Cal. Dec. 6, 2017)..................... 4

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*
No. 05-MD-1720, 2019 U.S. Dist. LEXIS 217583 (E.D.N.Y. Dec. 16, 2019) ......................... 3

*In re Western States Wholesale Natural Gas Antitrust Litig.*
725 F. App'x 560 (9th Cir. 2018) .......................................................................................... 2

*Kappel v. LL Flooring, Inc.*
91 F.4th 174 (4th Cir. 2024) ................................................................................................. 3

*Larson v. Liberty Mut. Fire Ins. Corp.*
2020 WL 3714526 (D. Haw. July 6, 2020)............................................................................. 2

ii

### TABLE OF AUTHORITIES
#### (continued)

Page

*Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*
654 F.3d 242 (2d Cir. 2011)................................................................... 3

*McAdams v. Robinson*
26 F.4th 149 (4th Cir. 2022) ................................................................. 2

*Nat'l Super Spuds, Inc. v. New York Mercantile Exchange*
660 F.2d 9 (2d Cir. 1981) (Friendly, J.)................................................ 3

*Pac. Bell Tel. Co. v. linkLine Communs., Inc.*
555 U.S. 438 (2009)............................................................................ 14

*Reppert v. Marvin Lumber & Cedar Co.*
359 F.3d 53 (1st Cir. 2004).................................................................. 3

*Texas v. Am. Tobacco Co.*
463 F.3d 399 (5th Cir. 2006)................................................................ 3

*Todd v. United Parcel Serv., Inc.*
No. 2:23-CV-02398-DJC-AC, 2024 WL 418677 (E.D. Cal. Feb. 5, 2024) ........................... 2

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*
396 F.3d 96 (2d Cir. 2005).................................................................. 2

STATUTES

Employee Retirement Income Security Act of 1974 (ERISA) ...................................... 4

OTHER AUTHORITIES

*Epic's Remedy Following Google Case Jury Verdict*, Epic Games, April 11, 2024,
https://www.epicgames.com/site/en-US/news/epics-remedy-following-google-
case-jury-verdict;.............................................................................. 14

Tim Bradshaw, *Microsoft Plans Mobile Games App Store to Rival Apple and
Google*, Financial Times, March 19, 2023............................................. 14

STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED
*PARENS PATRIAE* SETTLEMENT
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

**INTRODUCTION**

On February 26, 2024, the Court held a hearing on Plaintiff States' Motion to Give Notice of Proposed *Parens Patriae* Settlement, Dkt. No. 522 in Case No. 21-cv-05227-JD. The Court issued a minute order afterwards directing the States and Google to file supplemental briefs addressing a number of questions. Accordingly, the States respectfully submit this brief, which describes (i.) the limited scope of the proposed release, (ii.) the amount, expected distribution, and reasonableness of the proposed monetary relief, (iii.) the definitive nature of the injunctive provisions and the role of the monitor in ensuring compliance, and (iv.) the ability of those injunctive provisions to restore competition and lower prices. The States hope these clarifications can further assure the Court that the Proposed Settlement is fair, reasonable, and adequate.

## I.   PROPOSED RELEASE

At the notice hearing, the Court expressed concern about the scope of the release— specifically, about the Plaintiffs' decision to release certain claims prospectively. *See* Tr. 8:25- 13:16. But the proposed release is wholly consistent with binding precedent in this circuit and settlements this Court has approved in the past, including in this case. In fact, it is far more limited than releases that extend into perpetuity, but nevertheless have been approved by this and other courts.

In exchange for significant monetary and injunctive relief, the States released a range of claims "that were asserted in the State AG Action or could have been asserted" by a state Attorney General, whether in a sovereign capacity or in a *parens patriae* capacity on behalf of consumers. *See* Settlement Agreement, Dkt. No. 522-2, §§ 11.1-11.3. The Individual Plaintiffs agreed to a parallel release. *Id.* The precise claims that the Plaintiffs agreed to release are identified in § 1.6 of the Agreement: claims "that were asserted [or] could have been asserted, known or unknown, against the Released Parties, that have accrued as of the Effective Date or that accrue no later than seven years after the Effective Date," so long as the claims arise from an "identical factual predicate" to the claims in the Plaintiffs' complaints. *Id.* § 1.6.

Importantly, the release does not apply to any consumer claims arising out of a *different* factual predicate, including claims brought by Eligible Consumers[1] who will get relief under this Settlement. The release also does not apply to any consumer who first purchased an app from Google Play or first made an in-app purchase through Google Play Billing after September 30, 2023—even if they seek to bring a claim arising out of the same factual predicate—nor to any consumer who decides to opt out of the Settlement.

Moreover, all consumers—even those getting relief under this Settlement—get their claims back after the seven-year expiration of the release. This will allow consumers who release their claims now to bring the exact same claims in seven years based on the same facts, without having to litigate whether their claims are grounded in an "identical" factual predicate. The seven-year limit is a term that *restores* consumers' claims after the expiration of the Settlement's injunctive terms. It therefore *narrows* the release, which otherwise would release *all* claims on the identical factual predicate *forever*.

The release is consistent with precedent. Under Ninth Circuit law, a class settlement agreement may release class members' claims without offending due process, so long as the released claims are "based on the identical factual predicate as that underlying the claims in the settled" action. *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008)); *see also In re Western States Wholesale Natural Gas Antitrust Litig.*, 725 F. App'x 560, 563 (9th Cir. 2018). This principle extends to future claims. *See, e.g., Todd v. United Parcel Serv., Inc.*, No. 2:23-CV-02398-DJC-AC, 2024 WL 418677, at *3-4 (E.D. Cal. Feb. 5, 2024); *Larson v. Liberty Mut. Fire Ins. Corp.*, 2020 WL 3714526, at *7-8 (D. Haw. July 6, 2020); *Estorga v. Santa Clara Valley Transp. Auth.*, No. 16-cv-02668-BLF, 2017 WL 2604665, at *5 (N.D. Cal. June 9, 2017).

The law is much the same in other circuits. *See, e.g., In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1087-90 (11th Cir. 2023); *McAdams v. Robinson*, 26 F.4th 149, 160 (4th Cir. 2022); *Doe v. Déjà Vu Consulting, Inc.*, 925 F.3d 886, 900 (6th Cir. 2019); *Wal-*

---

[1] "Eligible Consumers" are individuals with a legal address in their Google Payments Profile in one of the States when they purchased an app from Google Play or made an in-app purchase through Google Play Billing from August 16, 2016 through September 30, 2023. *See* Settlement Agreement § 1.15.

STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED
*PARENS PATRIAE* SETTLEMENT

1    *Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005); *Reppert v. Marvin Lumber*

2    *& Cedar Co.*, 359 F.3d 53, 58-59 (1st Cir. 2004); *Elna Sefcovic, LLC v. TEP Rocky Mt.*, LLC,

3    807 F. App'x 752, 765 (10th Cir. 2020) (citing *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d

4    456, 460 (2d Cir. 1982)).

5         This rule makes sense, particularly for settlements with injunctive relief, like the one here.

6    "Releases, of course, are a standard feature" of settlements. *Berry v. Schulman*, 807 F.3d 600, 616

7    (4th Cir. 2015). Indeed, "the release of claims that form the basis of litigation is the raison d'etre

8    of any settlement." *Id.* And "[p]arties often reach broad settlement agreements encompassing

9    claims not presented in the complaint in order to achieve comprehensive settlement . . .

10   particularly when a defendant's ability to limit his future liability is an important factor in his

11   willingness to settle." *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654

12   F.3d 242, 247-48 (2d Cir. 2011). Including these types of releases, particularly in exchange for

13   injunctive relief, is fair because injunctive relief is typically intended to serve, at least in part, as a

14   remedial measure that will prevent future injuries from being incurred. *Cf. id.* at 248.

15        At the same time, "[a]n advantage to the class, no matter how great, simply cannot be

16   bought by the uncompensated sacrifice of claims of members, whether few or many, which were

17   not within the description of claims assertable by the class." *Nat'l Super Spuds, Inc. v. New York*

18   *Mercantile Exchange*, 660 F.2d 9, 19 (2d Cir. 1981) (Friendly, J.). The fair and reasonable limit

19   on the scope of a release of future claims is to apply the release only to those claims that are

20   based on an identical factual predicate as the present claims being released. *Kappel v. LL*

21   *Flooring, Inc.*, 91 F.4th 174, 182-83 (4th Cir. 2024). In this way, "the doctrine mirrors res

22   judicata." *In re Blue Cross Blue Shield*, 85 F.4th at 1190.

23        This case law validates courts' regular approval of settlements that include the release of

24   future claims, sometimes for a fixed number of years and sometimes indefinitely. *Compare In re*

25   *Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-MD-1720, 2019

26   U.S. Dist. LEXIS 217583, at *209-24 (E.D.N.Y. Dec. 16, 2019) (releasing future claims that

27   "accrue no later than five years after" the settlement became final), *with, e.g., Texas v. Am.*

28   *Tobacco Co.*, 463 F.3d 399, 401 (5th Cir. 2006) (describing a settlement releasing all past and

future claims); *In re NCAA Ath. Grant-In-Aid Cap Antitrust Litig.*, No. 14-md-2541-CW, 2017 U.S. Dist. LEXIS 201104, at *16-18 (N.D. Cal. Dec. 6, 2017) (approving settlement releasing "any and all past, present, and future claims"); *Hastings v. Principal Life Ins. Co.*, No. 21-cv-00047, 2021 U.S. Dist. LEXIS 245180, at *38 (S.D. Iowa July 28, 2021) (upholding a release of future claims of breach of an ERISA fiduciary duty). The developer class settlement approved in this case included a similar release of "any and all past, present, and future claims . . . that were brought, could have been brought, or arise from the same facts underlying the claims asserted in the Action." *In re Google Play Developer Antitrust Litigation*, No. 3:20-cv-05792-JD, Dkt. No. 218-1 (Ex. B, § 13.1).

The States' proposed release is narrower than the indefinite releases in the cases discussed above because it releases future claims based on an identical factual predicate only for the next seven years, rather than in perpetuity. The seven-year provision was a hard-fought win for the States in the negotiation. Google refused to agree to any settlement that might allow the States or consumers to reap the benefits of this Settlement only to immediately file an identical suit based on the same factual predicate seeking additional damages or injunctive relief. But the States sought to preserve their ability—and the ability of consumers bound by the Settlement—to sue Google at some future time even on the exact same facts. The expiration of the release term aligns with the end of the agreed-upon injunctive relief. When Google is no longer bound by the Settlement's injunctive terms, States and their consumers enjoy an unfettered ability to sue again should Google resume the exact same conduct with similar anticompetitive effects. While the States expect the Settlement's injunctive terms to meaningfully open competition and prevent future anticompetitive conduct, the seven-year limit provides a backstop in case that belief is misplaced.

The Parties respectfully ask the Court to approve this carefully negotiated compromise, which results in a narrower release than that allowed under the law and in the developers' settlement and preserves the ability for the States and consumers nationwide to re-examine whether Google is engaging in the exact same conduct after the injunctive provisions expire.

4

STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED
*PARENS PATRIAE* SETTLEMENT
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

## II.   MONETARY RELIEF AND DISTRIBUTION

Under the Settlement Agreement, more than a half billion dollars in monetary relief will be distributed using an innovative process with an exceptionally high success rate. The Settlement Agreement established a Settlement Fund of $630 million to settle claims on behalf of the Eligible Consumers who do not opt out of the Settlement and to pay the costs of notice and claims administration and any award of Consumer Counsel fees and costs.  Settlement Agreement § 5.1.1. After accounting for those costs, the States presently expect that $515 million will be available for distribution to Eligible Consumers.

Under the States' distribution plan, each Eligible Consumer will receive somewhere between $2 and $20,034.[2] The average settlement award will be approximately $4.41.

The vast majority of Eligible Consumers will receive $2. More specifically, 87 million people (or 75% of Eligible Consumers) will receive that threshold amount. Taking into account that group's relatively small spend on the Play Store, this distribution is both fair and reasonable.

For this group of Eligible Consumers who will receive $2, the average total spend in the Play Store is $56.49. If we assume that Google collected a 30% service fee on that spend, it means that Google collected $16.95 from each Eligible Consumer in this group. That $16.95 should theoretically be the *maximum* possible damages award that an Eligible Consumer in this spend category could receive, and that assumes both that Google was entitled to *no* service fee (a theory never advanced by States or Consumer Counsel) *and* that consumers were the only ones harmed by Google's overcharge (meaning developers suffered no harm at all).

If we modify those assumptions and instead assume that (1) Google is entitled to half of its service fee (meaning it should keep 15%, instead of 30%, of each transaction) and (2) consumers and developers will share the cost savings from that service-fee reduction equally, then the total damages for a consumer who spent the average of $56.49 on the Play Store is $4.23. (In this world, consumers and developers would each have a cost savings of 7.5% on each transaction,

---

[2] These figures are subject to some minute changes: 20,856 of the six billion transactions Eligible Consumers made between August 16, 2016 through September 30, 2023 were conducted in foreign currencies because the consumer was abroad at the time of the transaction. These transactions need to be converted to U.S. dollars before they can be included in the allocation calculations. That process is underway.

1  and $4.23 is 7.5% of $56.49.) Recovering as damages in a settlement $2 of that $4.23—47%—is

2  both fair and reasonable, because any settlement reflects a compromise.

3         The numbers are even more reasonable if we look at this particular group's median spend.

4  The median total spend for the group receiving $2 is $27.96. Using that figure, if we assume that

5  Google is entitled to half of its 30% service fee and that consumers and developers would equally

6  split the savings from a reduction in the service fee, then the damage suffered would be $2.10—

7  almost exactly the same amount that each Eligible Consumer in this group is taking home under

8  the Settlement. In other words, these consumers are receiving in a settlement basically 100% of

9  their damages.

10         With respect to the distribution of these payments, the majority of Eligible Consumers will

11  receive their share of the distribution automatically through either PayPal or Venmo, the two most

12  widely used electronic payment services, without having to complete a claim form or take any

13  affirmative action. The distribution process will work as follows: PayPal will first send an email

14  to the email address that each Eligible Consumer provided Google in connection with his or her

15  Google Play account.[3] That email will notify Eligible Consumers of an incoming payment. If the

16  Eligible Consumer has a PayPal account, and the email associated with that PayPal account

17  matches the email account associated with the Eligible Consumer's Google Play account, then

18  payment will be made directly to that account without the Eligible Consumer having to take any

19  action. Otherwise, the Eligible Consumer has two options to receive payment from PayPal: (1) set

20  up a new PayPal account or (2) redirect the payment to an existing PayPal account that is

21  associated with a different email address than the one the Eligible Consumer used on Google

22  Play. The Eligible Consumers have thirty (30) days to take one of those options, if they wish.

23  PayPal will send periodic reminder emails to notify Eligible Consumers who have not yet

24  received payment of these options.

25

26

27  ───────────────
[3] These are the same email addresses that Google provided the States to use for notice purposes. See States'
Unopposed Motion to Give Notice of Proposed *Parens Patriae* Settlement; Memorandum of Points and Authorities

28  in Support Thereof (Dkt. No. 522 in Case No. 3:21-cv-05227-JD), at 15.

STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED
*PARENS PATRIAE* SETTLEMENT
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

1      After this process has played out through PayPal, the Venmo portion of the distribution

2  process will proceed along the exact same lines for those Eligible Consumers who did not receive

3  their distribution payments through PayPal.

4      The States conservatively estimate that at least 70% of Eligible Consumers will receive

5  their distributions through PayPal or Venmo.[4] In addition, there will be a supplemental claims

6  process that will commence after the Venmo payments have been made. Eligible Consumers who

7  do not have and do not want PayPal or Venmo accounts, who no longer have access to the email

8  address or phone number associated with their Google Play account, or who expected a

9  distribution payment but did not receive one will have an opportunity to request their distribution

10  payment. Eligible Consumers who receive payments through this supplemental claims process

11  can select the method by which they receive payment (*e.g.*, ACH transfer, paper check).

12  **III.  INJUNCTIVE TERMS AND EXPECTED FUNCTIONS OF THE MONITOR**

13      The Court expressed concern that certain injunctive terms in the Settlement are "open-

14  ended" because they allow Google to "implement reasonable terms tailored to protect user

15  security, privacy and safety." But these provisions are not "open-ended." They do not undermine

16  Google's obligations to open the relevant markets to competition; they simply recognize that

17  consumers have legitimate privacy and security interests and permit Google to protect those

18  interests. The allowance is narrow and will be monitored by the Independent Compliance

19  Professional ("ICP") and the States. The Settlement is fair, reasonable, and adequate—it strikes

20  an appropriate balance between the concerns the States and Consumer Counsel raised about

21  Google's conduct without prohibiting Google from protecting the legitimate interests of

22  consumers who use Android devices. Additionally, in no way does the Proposed Settlement limit

23  or restrict the Court's powers in related proceedings; the Court is free to impose injunctive relief

24  more stringent than those in this Settlement.

25

26

27

28  [4] *See* Declaration of Lana Cooper in Support of States' Unopposed Motion to Give Notice of Proposed *Parens Patriae* Settlement (Dkt. No. 522-7 in Case No. 3:21-cv-05227-JD), at ¶¶ 10-11.

7

STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED
*PARENS PATRIAE* SETTLEMENT
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

**A.      The privacy, security and user experience allowances are not open-ended.**

The Settlement's injunctive terms address Google's anticompetitive behavior in a number

of areas. There are six injunctive terms that include some sort of qualification related to privacy,

security, or user experience, and these fall into three categories: (1) preloaded app stores, (2) app

distribution and sideloading, and (3) billing.[5]

**1.      Preloaded app stores**

Sections 6.7 and 6.8 of the Settlement Agreement require Google to allow OEMs to grant

installer rights to applications that are preloaded on an Android mobile device (§ 6.7) and to

preload third-party app stores on an Android mobile device (§ 6.8). Under the Settlement, Google

cannot require OEMs to obtain its consent before granting installer rights or preloading third-

party app stores, and Google cannot reject a mobile device build because an OEM is planning to

preload a third-party app store on that device. These provisions—along with the two unqualified

provisions regarding third-party app stores (Settlement Agreement §§ 6.6, 6.9)—address the ways

in which Google has stifled app store competition on Android devices and will enable third-party

app stores to enter the market by being preloaded on devices and able to install apps as seamlessly

and effectively as the Google Play Store.

The installer rights and preloading terms of the Settlement contain identical qualifications

that "allow Google to take reasonable steps that are tailored to protect user privacy or security."

*Id.* §§ 6.7, 6.8. Any time an application is downloaded on an electronic device (whether a desktop

computer or a smartphone), there are risks, including data theft and malware. Because Google is

the developer of the Android operating system, it is reasonable to permit Google to protect user

privacy and security where applications are preloaded on an Android device and then enabled to

install other applications.

The Settlement Agreement also permits Google to enforce "generally applicable policies

relating to content and functionality" and to adopt "neutral user experience guidelines" applicable

---

[5] There are four injunctive terms that are not qualified by privacy, security, or user experience; these are the terms regarding price parity provisions (Settlement Agreement § 6.4), title launch and feature parity provisions (*id.* § 6.5), OEM deals with preload or home screen exclusivity for the Google Play Store (*id.* § 6.6), and third-party app stores on Android (*id.* § 6.9).

1  to all app stores on Android devices, including the Google Play Store. Settlement Agreement

2  §§ 6.7, 6.8. The first of these qualifications will allow Google to continue enforcing its policies

3  regarding certain types of apps even when a user might be attempting to download the app from a

4  preloaded third-party app store rather than the Google Play Store; the Settlement Agreement is

5  intended to address Google's monopoly over app distribution and in-app payments, not to give

6  apps that violate Google policies relating to, for example, "inappropriate or illegal content,

7  gambling and crypto mining functionality" a new route onto Android devices. *Id.* §§ 6.7.2(a),

8  6.8.2(a). The second qualification regarding "neutral user experience guidelines" lets Google

9  adopt neutral user experience standards that *all* preloaded app stores (including Google Play)

10  must meet, so long as user experience is their true purpose and they are not designed to

11  disadvantage competitors. This term will allow Google to continue making Android design

12  decisions, and the States and the ICP will assess those decisions to ensure that they are truly

13  neutral.

### 2.  App distribution and sideloading

15  Section 6.2 of the Settlement Agreement broadly provides that Google will continue to

16  technically enable Android devices to let the consumer install apps through means other than the

17  Google Play Store. Section 6.10 requires Google to revise Android's Default Sideloading Flow to

18  make it easier for consumers to sideload apps should they choose to do so.[6] Sections 6.2 and 6.10,

19  together with the ones discussed above (Settlement Agreement §§ 6.6-6.9), will further promote

20  app store competition by enabling consumers both to sideload apps and app stores as well as to

21  use sideloaded apps and app stores more seamlessly.

22  Section 6.2 ensures that Android will remain an open platform but allows Google to

23  "implement reasonable restrictions that are tailored to protect user privacy, security and/or

24  safety." As reflected in § 6.10.1(c), sideloading applications "could place [a consumer's] phone

25  and data at risk." For this reason, the Settlement Agreement does not prevent Google from

26  "continu[ing] to innovate on security and privacy related to sideloading" (*id.* § 6.10.2) or from

27
28

[6] The language consolidating two of the warning screens to reduce friction was a hard-fought compromise obtained after multiple negotiation sessions with Google, during which Google walked through the sideloading process, and explained that some of the screens were mandated by OEMs, while others were necessary to protect user security.

1    maintaining other optional security features like Google Play Protect and the Advanced

2    Protection Program (*id*. § 6.10.3).

3          ### 3.    Billing

4          Moreover, the Settlement Agreement requires Google to allow app developers that sell in-

5    app digital goods and services to offer an alternative in-app billing system alongside Google Play

6    Billing (*id.* § 6.3) and, importantly, to inform consumers about (i) different pricing or promotions

7    that may be available through the alternative in-app billing system and (ii) the service or other

8    fees associated with Google Play Billing (*Id.* § 6.11). These two provisions will address Google's

9    monopoly over in-app billing by permitting alternative in-app billing systems and then helping

10   developers make inroads through promotion, steering consumers to less expensive systems if they

11   so choose.

12         The user choice billing provision is qualified by the billing system's need to "meet

13   Google's minimum requirements and user experience guidelines (or other comparable UCB

14   guidelines) tailored to protect Users (e.g., privacy, security and/or safety)." *Id.* § 6.3.1(c).

15   Electronic payment systems carry at least as much risk as application downloads, and possibly

16   more. For instance, if an alternative in-app billing system sent a consumer's payment information

17   (credit card or bank account numbers) over the internet unencrypted, that information could be

18   stolen and used to run up more charges or to steal the consumer's money directly from the bank.

19   It is reasonable to allow Google to protect Android users through neutral policies that will hold all

20   billing systems on Android to appropriate security standards.

21         The in-app "calls to action" portion of the anti-steering provision contains the qualification

22   that "Google may require developers to adhere to reasonable user experience and security

23   guidelines, so long as those guidelines do not prohibit the developer from providing the calls to

24   action that Google is required to allow." *Id.* § 6.11.4(c). And "Google may impose certain

25   reasonable design limitations using its developer and User Choice Billing policies, but it may not

26   prevent developers from communicating the existence of any [Google Play Billing] service or

27   other fees." *Id.* § 6.11.5. These qualifications allow Google to impose reasonable restrictions on

28   how developers inform consumers about alternative payment options within the app so that the

1   calls to action do not negatively affect users. As with the user experience terms in §§ 6.7 and 6.8,

2   the States and the ICP will monitor Google's compliance.

3                                              * * *

4         As a further control, in § 6.12, Google agreed that it may not "(i) offer any inducement

5   (whether or not monetary) to any third party, (ii) impose a term or condition of accessing a

6   Google product or service, or (iii) make a technological change, if such inducement, term or

7   condition, or technological change would have the purpose and effect of violating" the other

8   commitments it made in the Settlement Agreement. In other words, Google may not try to

9   circumvent its obligations by implementing pretextual "security and privacy" terms. And as

10  explained below, the Settlement does not leave Google's compliance entirely within its sole

11  discretion. Instead, it tasks the ICP with investigating and reporting on Google's compliance to

12  the States for five years from the Effective Date of the Settlement. *Id.* §7.6.[7]

13        Finally, the Court is free to impose more stringent injunctive conditions on Google in

14  related matters if the Court chooses to do so; the Proposed Settlement does not in any way limit

15  or restrict the power of the Court with respect to related cases.

16        **B.    The ICP and the States will ensure Google's compliance.**

17        Section 7 of the Settlement Agreement provides that an ICP will be appointed and tasked

18  with monitoring Google's compliance with the Settlement. This provision requires Google to

19  prepare an initial report for the ICP within four months of the Settlement taking effect, followed

20  by four annual reports in twelve-month increments until the final report is submitted about five

21  years after the Settlement takes effect. *Id.* § 7.2.8. Google's reports must address, at a minimum,

22  "any substantive changes or modifications" concerning *all* of the injunctive relief qualifications

23  discussed above. *Id.* § 7.2.2. The ICP will review Google's reports and supporting documentation

24  to "evaluate the accuracy" of Google's assertions. *Id.* § 7.2.3. The ICP is specifically empowered

25  to "ask Google for [additional] information" that it needs to evaluate Google's claims. *Id.* § 7.2.4.

26  The agreement further permits the States to "refer credible complaints to the ICP if, as a result of

---

27  [7] This length is coterminous with the longest duration of any of the injunctive terms described above, with the single
    exception of § 6.2's provision that Android will remain open for at least the next seven years. The parties agreed that
28  a monitor would not be required to detect Google's failure to keep Android open for that time.

1  those complaints, the States have a good faith basis to believe that Google has materially

2  breached" the Settlement's injunctive terms. *Id.* § 7.2.5. The ICP will prepare an addendum to

3  Google's report stating the results of the ICP's evaluation and investigation along with

4  confirmation that Google fully cooperated with the ICP. *Id.* § 7.2.6. Google is solely responsible

5  for paying the ICP and ICP staff. *Id.* § 7.3.3.

6     The ICP will help ensure compliance and is part of what makes the Settlement as a whole

7  fair, reasonable, and adequate. The ICP process will require Google to prepare a report each year

8  delineating all the changes it has made to its policies or its platform that could affect its

9  compliance. Google's reports must specifically address each of the provisions that could create a

10  degree of "open-endedness" in the injunctive terms. Once Google has reviewed and documented

11  its decisions, the ICP will have access not only to Google's reports and supporting documentation

12  but to additional Google books, records, and personnel if the ICP determines that it needs further

13  information to assess compliance. *Id.* § 7.2.4. Although the Settlement does not give the ICP

14  authority to direct Google's activities, *see id.* § 7.5.2, the ICP and its staff will have the technical

15  expertise to assess whether Google is in fact complying with the terms of the Settlement and will

16  report back to the States in an addendum to Google's report.

17     With the ICP in place, combined with the States' existing investigatory powers and a

18  vigilant developer community, the States are well positioned to enforce the Settlement's terms.

19  The States have explicitly reserved their right to investigate any potential compliance deficiencies

20  directly, which can be accomplished with the States' existing compulsory process and

21  investigatory tools. The developer community can also serve as a powerful check on Google's

22  compliance: Most of the Settlement Agreement's terms change Google's policies toward OEMs

23  and app developers rather than regulate Google's relationship with consumers directly (a notable

24  exception being § 6.1's provision that Google will keep Android open). These business partners

25  can and will report potential violations to the States, and the States will then be able to use their

26  considerable authority as government enforcers to identify instances of noncompliance.

27     Should it become necessary, the States will also be much better positioned to seek

28  enforcement from this Court than would a consumer who needed first to discover the violation.

1  For instance, a consumer within an app that only had Google Play Billing would not know

2  whether that single option was because of further anticompetitive behavior on Google's part or

3  because the app developer chose not to offer an alternative in-app billing system. Similarly, a

4  consumer who buys a new Android phone that has only the Google Play Store preloaded would

5  not know if an alternative app store had sought a preload agreement with an OEM but been

6  unable to obtain it due to conduct that violates the Settlement. With the ICP's help, the States

7  stand poised to protect consumers by enforcing the Settlement, should the need arise.

8  **IV.   INJUNCTIVE PROVISIONS AND RESTORATION OF COMPETITION**

9     During the February hearing, the Court noted that the proposed Settlement did not "strike

10  any deals on capping Google Play Billing fees." Hearing Tr. 18:5-6. The Court correctly noted

11  that Google charges fees as high as 30% via Google Play Billing and as high as 27% via User

12  Choice Billing, and asked the Settling Parties to explain how the injunctive provisions will keep

13  money in consumers' wallets via "market engineering." *Id.* 27:9-21.

14     As the Court recognized at the hearing, with "the way [the Android app distribution] market

15  works," there currently are not a lot of "other routes of getting these apps" besides using Google

16  Play. *Id.* 19:7-9. That lack of alternative distribution channels is how Google has been able to

17  charge its high commissions. If consumers do not have choices, then consumers will end up

18  paying whatever Google charges. But, if consumers do have choices, then competition should

19  lead to lower prices. Choice in app distribution channels is fundamentally what the proposed

20  Settlement seeks to enable.

21     The core of the Settlement's injunctive provisions prohibit Google from enforcing Google

22  Play exclusivity deals, blocking preloaded competing third-party app stores, limiting operating

23  system support for competing app stores, prohibiting developers from offering special deals on

24  competing app stores, or silencing developers from telling users about cheaper ways to pay.

25  These provisions will address the overarching issue that the Court identified: the lack of other

26  routes to getting Android apps. The increase in competition should lower fees for consumers

27

28

1  without making States act as price regulators for digital platforms, a function that is well outside

2  of the expertise of state attorney generals.[8]

3       **A.   Elimination of exclusivity deals and preloading prohibitions**

4       After thousands of pages of briefing and a jury trial, the Court is very familiar with

5  Google's interlocking agreements that prohibit mobile network operators and OEMs from

6  preloading third-party app stores onto Android smartphones and tablets. The Proposed Settlement

7  eliminates these prohibitions: § 6.6 prevents Google from entering into or enforcing deals with

8  OEMs that require preload exclusivity or home screen exclusivity for the Google Play Store, § 6.7

9  prevents Google from entering into or enforcing OEM deals that block the granting of "installer

10 rights" to preloaded apps, and § 6.8 prevents Google from requiring that OEMs obtain its consent

11 before preloading third-party app stores.

12      Once the settlement is in effect, competing app stores will be able to negotiate with device

13 manufacturers and network operators and be preloaded onto new Android phones and tablets.

14 Consumers will have access to multiple app stores on Android devices after the settlement is in

15 effect. Epic and Microsoft have publicly announced their intention to launch Android app stores.[9]

16      **B.   Better support for third-party app stores**

17      Section 6.9 of the Settlement requires Google to maintain Android operating system

18 support for third-party app stores installed through non-Play-Store channels, including by

19 enabling automatic background updates of apps installed from those third-party app stores. This

20 provision ensures that third-party app stores can compete with the Google Play Store on an equal

21 basis, allowing consumers to choose among competitors without impacting their user experience.

22

23

---

24 [8] *See, e.g.*, *Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 454 (2009) ("How is a judge or jury to determine a 'fair price?' . . . How can the court determine this price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years?") (citing *Concord v. Boston Edison Co.*, 915 F.2d 17, 23-25 (1st Cir. 1990)); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) ("[T]he antitrust laws are not a price-control statute or a public utility or common-carrier rate-regulation statute.")

25

26

27 [9] *See, e.g.*, *Epic's Remedy Following Google Case Jury Verdict*, Epic Games, April 11, 2024, https://www.epicgames.com/site/en-US/news/epics-remedy-following-google-case-jury-verdict; Tim Bradshaw, *Microsoft Plans Mobile Games App Store to Rival Apple and Google*, Financial Times, March 19, 2023, https://www.ft.com/content/7707705e-b288-4531-b30d-7fa993325018.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.   Allowing developers to favor third-party app stores**

Sections 6.4 and 6.5 of the Settlement prohibit Google from generally enforcing "most favored nation" clauses that require a developer to launch its app catalog on Google Play at the same time as on other Android app stores, or to offer its titles with the same or better prices or features on Google Play as on other app stores.

After the Settlement goes into effect, competing app stores will be able to offer consumers special deals that the Google Play Store will not have, such as earlier access to games, unique features, or lower prices. Consumers will have a reason to use those preloaded third-party app stores, to which they will now have easy access.

**D.   Allowing developers to tell users about cheaper ways to pay**

Finally, as discussed *supra*, Section 6.11 of the Settlement prohibits Google from limiting developers' ability to tell users about cheaper ways to pay. Once the Settlement takes effect, developers will be able to tell users *within the app*, "save 10% if you pay on our website or re-download our game through the XYZ app store." This, too, will encourage consumers to use alternative channels to the Play Store.

\* \* \*

In combination, these injunctive provisions allow competing app stores access to Android devices and give consumers a reason to use those competing app stores. Once consumers start using other app stores and billing systems, Google will be forced to compete on price, quality, or both, and those changes will redound to the benefit of consumers.

**CONCLUSION**

For the foregoing reasons, the States respectfully request that this Court enter an order finding that the Settlement is likely to be approved, directing dissemination of notice to Eligible Consumers, and establishing a final approval hearing schedule.

| | |
|---|---|
| 1 | Dated:  April 17, 2024 |

Respectfully submitted,

**OFFICE OF THE CALIFORNIA
ATTORNEY GENERAL**

By:    /s/ Paula L. Blizzard
Paula L. Blizzard
Brian D. Wang
Carolyn D. Jeffries

**OFFICE OF THE NORTH CAROLINA
DEPARTMENT OF JUSTICE**

By:    /s/ Jessica V. Sutton
Jessica V. Sutton
Sarah G. Boyce

**OFFICE OF THE ARIZONA
ATTORNEY GENERAL**

By:    /s/ Jayme L. Weber
Jayme L. Weber

**OFFICE OF THE UTAH
ATTORNEY GENERAL**

By:    /s/ David N. Sonnenreich
David N. Sonnenreich
Marie W.L. Martin

**OFFICE OF THE TENNESSEE
ATTORNEY GENERAL AND
REPORTER**

By:    /s/ S. Ethan Bowers
S. Ethan Bowers
Tyler T. Corcoran

*Counsel for the Plaintiff States*

STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO GIVE NOTICE OF PROPOSED
*PARENS PATRIAE* SETTLEMENT
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>E-FILING ATTESTATION</u>**

I, <u>Brian Wang</u>, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each signatory identified above has concurred in this filing.

<u>/s/ Brian Wang</u>

17