Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
Rishi P. Satia, Bar No. 301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000

*Counsel for Defendants*

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*States et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD<br><br>*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Case No. 3:21-md-02981-JD<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S FEBRUARY 29, 2024 ORDER**<br><br>Judge:      Hon. James Donato<br>Courtroom: 11, 19th Floor,<br>            450 Golden Gate Ave,<br>            San Francisco, CA 94102 |

# TABLE OF CONTENTS

Page

I.   THE PROPOSED RELEASE IS CONSISTENT WITH OTHER CLASS ACTION
     RELEASES AND WITH THE REMEDIES IN THE SETTLEMENT ............................ 1

     A.   The Proposed Release is Consistent with the Law.................................... 1

     B.   The Proposed Release is Appropriate in Light of the Settlement
          Agreement's Remedies ............................................................................ 3

II.  THE PROPOSED MONETARY RELIEF IS FAIR, REASONABLE, AND
     ADEQUATE ..................................................................................................... 4

     A.   The Exclusion of Dr. Singer's Damages Model Created Substantial Risk
          and Uncertainty Regarding Consumers' Damages Claims.................................... 5

     B.   The States' Alternative Damages Theory Also Carried Substantial Risk and
          Uncertainty ..................................................................................................... 6

     C.   The Proposed Monetary Settlement Is Fair, Reasonable, and Adequate ............... 7

III. THE SETTLEMENT PROVIDES MEANINGFUL CHANGES WHILE
     MAINTAINING FLEXIBILITY TO PROTECT SECURITY, PRIVACY, AND
     USER EXPERIENCE ....................................................................................... 8

IV.  THE INDEPENDENT COMPLIANCE PROFESSIONAL PROVIDES
     ADDITIONAL ASSURANCE OF THE SETTLEMENT'S EFFECTIVENESS............ 12

V.   THE SETTLEMENT AGREEMENT APPROPRIATELY ADDRESSES
     COMPETITION RATHER THAN PRICES ...................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Apple Electronic Books Antitrust Litig.*,
  No. 12-cv-3394 (S.D.N.Y.) ................................................................................................ 2

*Balderas v. Massage Envy Franchising, LLC*,
  No. 12-cv-06327-NC, 2014 WL 3610945 (N.D. Cal. July 21, 2014) ................................... 7

*Bhan v. NME Hosps., Inc.*,
  669 F. Supp. 998 (E.D. Cal. 1987), *aff'd*, 929 F.2d 1404 (9th Cir. 1991) .............................. 7

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*,
  85 F.4th 1070 (11th Cir. 2023) ........................................................................................... 1

*California v. eBay, Inc.*,
  No. 5:12–cv–05874–EJD, 2015 WL 5168666 (N.D. Cal. Sept. 3, 2015) .............................. 7

*Cameron et al. v. Apple*,
  No. 4:19-cv-3074 (N.D. Cal.) .............................................................................................. 2

*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020) ......................................................................................... 4, 8

*In re GSE Bonds Antitrust Litig.*,
  No. 19-cv-1704 .................................................................................................................... 2

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) ............................................................................................... 3

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ........................................................................................... 14

*In re Int'l Air Transp. Surcharge Antitrust Litig.*,
  No. 3:06-md-1793 (N.D. Cal.) ............................................................................................. 2

*In re Intuniv Antitrust Litig.*,
  No. 16-cv-12653-ADB, 2020 WL 8373393 (D. Mass. Dec. 9, 2020) ................................... 2

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ................................................................................................ 1

*Maciel v. Bar 20 Dairy LLC*,
  No. 1:17-cv-00902-DAD-SKO, 2021 WL 1813177 (E.D. Cal. May 6, 2021) ........................ 7

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ............................................................................................... 5

*Nat'l Collegiate Athletic Ass'n v. Alston*,
  594 U.S. 69 (2021) ............................................................................................................ 14

DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S FEBRUARY 29, 2024 ORDER
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
    No. 4:14-md-2541 (N.D. Cal.) ..................................................................................... 2

*Nelson v. Avon Products*,
    Case No. 13-cv-02276-BLF, 2017 WL 733145 (N.D. Cal. Feb. 24, 2017) ............................ 6

*Offs. for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ................................................................................. 5, 8

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720 (MKB) (JO), 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019),
    *aff'd sub nom Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704
    (2d Cir. 2023) ................................................................................................... 1, 2

*Perkins v. Linkedin Corp.*,
    No. 13-CV-04303-LHK, 2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ................................. 8

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ............................................................................................. 7

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................................ 4, 7

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*,
    No. 1:14-MD-2503-DJC, 2017 WL 5710424 (D. Mass. Nov. 27, 2017) ............................... 2

*Stetson et al. v. West Publishing Corp.*,
    No. 2:08-cv-810 ................................................................................................... 2

*Stovall-Gusman v. W.W. Granger, Inc.*,
    No. 13-cv-2540, 2015 WL 3776765 (N.D. Cal. June 17, 2015) ....................................... 7

*United States v. Microsoft Corp.*,
    147 F.3d 935 (D.C. Cir. 1998) ............................................................................... 9

*In re Wellbutrin XL Antitrust Litig.*,
    No. 2:08-cv-2431, 2012 WL 13224382 (E.D. Pa. Nov. 7, 2012) .................................... 2

*Wren v. RGIS Inventory Specialists*,
    No. C–06–05778 JCS, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) .................................. 5

**Statutes**

15 U.S.C. § 15(a) ................................................................................................. 7

15 U.S.C. § 15d .................................................................................................. 6

Google respectfully submits this supplemental brief in response to the Court's February 29, 2024, Order, which directed the parties to address certain issues relating to the proposed Settlement Agreement ("SA") between States, Consumers, and Google.  ECF No. 944 (Feb. 29, 2024).

## I.  THE PROPOSED RELEASE IS CONSISTENT WITH OTHER CLASS ACTION RELEASES AND WITH THE REMEDIES IN THE SETTLEMENT

The Court directed the parties to address "[t]he proposed release, which would apply prospectively for the next 7 years." ECF No. 944 (Feb. 29, 2024). Specifically, the Settlement Agreement releases claims "that have accrued as of the Effective Date or that accrue no later than seven years after the Effective Date"—but only if those claims were asserted in the litigation or "arise from an identical factual predicate" as the claims that were asserted.  SA § 1.6. The scope of this release is both consistent with the law and is appropriate in light of the ongoing remedies in the Settlement Agreement.

### A.  The Proposed Release is Consistent with the Law

"Releases of future claims are an important part of many settlement agreements" and are commonly approved and enforced in the class action context. *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1088 (11th Cir. 2023); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) ("the Settlement's release of claims regarding future infringements is not improper"). In *Blue Cross*, for example, after the district court approved a settlement agreement in a multi-district antitrust class action an objector argued on appeal that "the settlement violates public policy by releasing prospective antitrust claims." *Blue Cross*, 85 F.4th at 1083. The Eleventh Circuit rejected this argument, noting that "no public policy prohibits prospective releases in antitrust cases." *Id.* at 1088.

The proposed release is also consistent with other approved class action settlements. For example, in the *Payment Card Interchange Fee* antitrust class action, the Eastern District of New York approved a settlement agreement that, like the Settlement Agreement in this case, released claims that "accrue no later than five years after" final settlement approval. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JO), 2019 WL

1

6875472, at *25 (E.D.N.Y. Dec. 16, 2019), *aff'd sub nom Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023). Like the Settlement Agreement here, the agreement in *Payment Card* limited the temporal scope of the release to a specified period of time (there, five years, here, seven). The Court explained that releases of future claims "are acceptable" where, as in this case, "the future claims releases are those based on a continuation of conduct at issue and underlying the original claims." *Id.* at *25.

Other approved settlement agreements, including in this District, go beyond the settlement in *Payment Card Interchange Fee*—they provide *no* temporal limitation, releasing future claims indefinitely. For example, in a settlement involving conduct remedies, a class of developers released Apple from "any and all past, present, and future claims … that arise from the same facts underlying the claims asserted in the Action…." *Cameron et al. v. Apple*, No. 4:19-cv-3074 (N.D. Cal.) ECF No. 451-1 ¶ 10.1; *id.* ECF No. 491 (order approving settlement). Similar examples abound.[1]

The Settlement Agreement also releases only those claims that were actually asserted by States or Consumers or that "arise from an identical factual predicate" as the actually-asserted claims. SA § 1.6 (last sentence). That limitation ensures that the Settlement Agreement is

---

[1] *See, e.g., In re NCAA Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-md-2541 (N.D. Cal.), ECF No. 560-1, ¶ A(1)(x), as amended, ECF Nos. 582, 612 (settlement agreement releasing "any and all past, present, and future claims…."); *id.* ECF No. 746 (order approving settlement); *In re Int'l Air Transp. Surcharge Antitrust Litig.*, No. 3:06-md-1793 (N.D. Cal.), ECF No. 218-1, ¶ 1.17 (settlement releasing claims that each class member "ever had, now has, or hereafter can, shall, or may have…"); *id.* ECF No. 293 (order approving settlement); *Stetson et al. v. West Publishing Corp.*, No. 2:08-cv-810, ECF No. 139-1, ¶ 56 (N.D. Cal.) (releasing claims each class member "ever had, now has, or hereafter can, shall, or may have…"); *id.* ECF No. 179 (order granting final approval of settlement); *id.* ECF No. 195 (order amending final approval order); *In re Apple Electronic Books Antitrust Litig.*, No. 12-cv-3394 (S.D.N.Y.), ECF No. 531-1 (settlement agreement releasing "past, present, and future claims," "whether or not accrued in whole or in part"); *id.* ECF No. 340 (order granting preliminary approval of settlement); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, No. 1:14-MD-2503-DJC, 2017 WL 5710424 (D. Mass. Nov. 27, 2017) (approving settlement that released claims "known or unknown, suspected or unsuspected, accrued or unaccrued[.]"); *In re Wellbutrin XL Antitrust Litig.*, No. 2:08-cv-2431, 2012 WL 13224382 (E.D. Pa. Nov. 7, 2012) (approving settlement that released claims "known or unknown, suspected or unsuspected, … accrued or unaccrued"); *In re Intuniv Antitrust Litig.*, No. 16-cv-12653-ADB, 2020 WL 8373393 (D. Mass. Dec. 9, 2020) (similar); ; *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704, ECF No. 267-1, ¶¶ ll, 39 (S.D.N.Y.) (settlement agreement releasing "any and all manner of claims, … which the Settling Plaintiff Parties ever had, now have, or hereafter can, shall, or may have…"); *id.* ECF No. 430 (order approving settlement).

1   consistent with Ninth Circuit law. *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A

2   settlement agreement may preclude a party from bringing a related claim in the future 'even

3   though the claim was not presented and might not have been presentable in the class action,' but

4   only where the released claim is 'based on the identical factual predicate as that underlying the

5   claims in the settled class action.'" (citation omitted)).

6          Finally, as an additional limitation on the breadth of the release, the Settlement Agreement

7   also establishes that claims that accrue after seven years from the "Effective Date"[2] are not

8   released.  SA §1.6. That seven-year limitation means that any claim—for example, a tying or

9   monopolization claim—that accrues at that point in time is not released, even if it arises out of the

10  identical factual predicate as the claims in this litigation. In this respect, the Settlement

11  Agreement's release is narrower than the scope of a class-action release available under the law

12  and is consistent with (or narrower) than releases approved by the federal courts. *See supra* p. 2

13  (describing cases).

14      **B.      The Proposed Release is Appropriate in Light of the Settlement Agreement's
           Remedies**

15

16         States and Consumers alleged in this litigation that Google engaged in a variety of

17  anticompetitive conduct relating to Android app distribution and in-app payments. To resolve

18  those allegations, the Settlement Agreement includes detailed remedial provisions that prevent

19  Google from engaging in the challenged conduct and that also require Google to take affirmative

20  steps that make it easier for third-party app stores—whether pre-installed or sideloaded—to

21  distribute apps on Android. SA § 6. These conduct remedies remain in force for varied durations,

22  from four to seven years. And if Google fails to comply, the States can bring that issue to the

23  Court's attention and seek enforcement. In addition, Google has agreed to a payment of $630

24  million to resolve the alleged injury caused to U.S. consumers by the conduct challenged in this

25  litigation. SA § 5.1.1.

26         In exchange for agreeing to expansive changes to its business—and the way it operates the

27

28  ---
    [2] The Effective Date, defined in Section 1.14, refers to the date following the Court's final
    approval of the Settlement and the expiration of the time for appellate review.

Android ecosystem—and a $630 million consumer settlement fund, Google should reasonably be able to expect that the same consumers it is settling with cannot sue Google again regarding the same conduct resolved by this settlement. Google's compliance with the terms of the settlement—including conduct changes that extend years in the future—should provide peace with the settling consumers for the conduct that was challenged in this litigation and settled in the Settlement Agreement. Otherwise, the settling consumers could accept all the benefits of the settlement, including the injunctive relief provisions and the settlement fund, but still file suit the day after final settlement approval against Google based on identical antitrust allegations.

## II.      THE PROPOSED MONETARY RELIEF IS FAIR, REASONABLE, AND ADEQUATE

The Court directed the parties to address "the average monetary relief to be distributed to the eligible consumers" and to provide more information regarding the "the expected distribution of the monetary relief in general."  ECF No. 944 (Feb. 29, 2024). Google understands that the States' brief provides more detail as to why the average and median monetary relief, as well as the expected distribution of relief, shows that the monetary relief is fair, reasonable, and adequate. Google submits these additional points as to the reasonableness of the overall consumer settlement fund.

The Settlement Agreement provides for $630 million in monetary relief to eligible settlement consumers. SA § 5.1.1. The fairness of the settlement award must be evaluated by comparing the terms of the compromise with the likely rewards of litigation. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citation omitted).[3] In addition, in evaluating a settlement's terms, the Court must account "for the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Id.* at 1121 (internal quotation marks omitted).

Even in situations where the monetary relief "amount[s] to only a fraction of the potential

---

[3] As the Court recognized at the preliminary approval hearing, "subsequent developments" such as the verdict in *Epic v. Google*, "are not part of the assessment of the settlement." Hr'g Tr. 4:24-5:7 (Feb. 26, 2024); *see e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) ("At the time of settlement, the risk remained that the nationwide class might be decertified.").

recovery," that fact "does not *per se* render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). "This is particularly true in cases. . .  where monetary relief is but one form of the relief requested by the plaintiffs." *Offs. for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982). Indeed, district courts have found that settlements for substantially less than the plaintiffs' claimed damages were fair and reasonable, especially when taking into account the uncertainties involved with litigation. *Wren v. RGIS Inventory Specialists*, No. C–06–05778 JCS, 2011 WL 1230826, at *8 (N.D. Cal. Apr. 1, 2011).

Here, the proposed monetary relief is fair, reasonable, and adequate considering (1) the Court's order decertifying the consumer class and rejecting Dr. Hal Singer's damages models; (2) a comparison of the proposed settlement distribution to the overcharge that consumers were alleged to have suffered; and (3) the substantial risk and uncertainty facing the States' alternative damages theory.

### A.   The Exclusion of Dr. Singer's Damages Model Created Substantial Risk and Uncertainty Regarding Consumers' Damages Claims

States and Consumers planned to rely on Dr. Hal Singer to prove overcharge damages at trial. Dr. Singer purported to calculate how much more consumers paid as a result of Google's anticompetitive conduct.  But in August 2023, the Court rejected this overcharge damages model, *see* ECF No. 588, and decertified the consumer class, *see* ECF No. 604. Dr. Singer's model was predicated on the theory that developers would pass through reductions in a service fee to consumers in the form of lower prices for apps, in-app purchases, and subscriptions. But as this Court found, Dr. Singer's "pass-through model is not within accepted economic theory and literature" and thus "does not give the jury a sound basis on which to make a reasoned and reasonable judgment about antitrust impact and damages."  ECF No. 588 at 16-17.

That left the States and Consumers with *no* overcharge damages theory. Nor was there a reasonable prospect that States and Consumers could have offered an alternative overcharge damages model.

Google's expert, Dr. Greg Leonard, offered his own calculation of overcharge damages. He analyzed data from Google's prior service fee reductions and found that developers generally

did not pass through service fee reductions and that the pass-through rate was, statistically, not distinguishable from zero. ECF No. 487-3, Leonard Rep., ¶ 51. He also found that, *at most*, developers passed through an average of 3% of any service fee reductions to consumers. Thus, even accepting Dr. Singer's overcharge model, using Dr. Leonard's upper bound for the pass-through rate only results in approximately $40 million in alleged damages to consumers—substantially *less* than the proposed settlement. *Id.* Ex. 2 ¶ 185. The monetary relief afforded by the settlement is more than 15-times the amount of damages calculated by Google's expert.

The Court's rejection of Dr. Singer's overcharge damages model—and the underlying problems with proving pass-through of alleged overcharges—weighs in favor of approving settlement. *See Nelson v. Avon Products*, Case No. 13-cv-02276-BLF, 2017 WL 733145 (N.D. Cal. Feb. 24, 2017) (where plaintiffs conceded "inherent problems with proof of damages," the risk to plaintiffs of proceeding with trial weighed in favor of approving settlement).

**B.   The States' Alternative Damages Theory Also Carried Substantial Risk and Uncertainty**

The States also planned to rely on an alternative damages model offered by their expert, Dr. Marc Rysman, who calculated aggregate damages based on a novel "variety model," which does not purport to measure overcharge damages. Google had unique statutory challenges to this model—challenges that would be reviewed *de novo* on appeal. Therefore, this model carried significant and unusual litigation and appellate risk, weighing in favor of the settlement.

*First*, in Google's view Dr. Rysman's model was legally deficient because it only calculated *aggregate* class-wide damages, not individual damages. *See* ECF No. 526 at 6. Google's position is that under the plain text of the Clayton Act, the States may use aggregate methods to calculate damages *only in price-fixing cases*. 15 U.S.C. § 15d. The legislative history confirms that this limitation was intentional. *See* H. Rep. at 2076-2078 (Mar. 18, 1976); S. Rep. at 15318-15337 (Sep. 7. 1976). Because this case does not involve price fixing, Google's position is that the States needed to have a method to calculate damages for individual consumers. Without any method to calculate individual "variety" damages, the States would have had no viable alternative damages calculation method to present at trial. To the extent the Court had rejected

this statutory argument, Google could have sought *de novo* review before the Ninth Circuit.

*Second*, Dr. Rysman's novel "variety model" damages theory purported to place a dollar amount on "how much happier consumers would be if they had more variety of apps." ECF No. 484-1, Ex. 3 (Rysman Dep. Tr. at 81:22-82:1). Google argued that an injury to "happiness" does not qualify as injury to "business or property," as required by the Clayton Act. *See* 15 U.S.C. § 15(a); *id.* § 15c(a); *Bhan v. NME Hosps., Inc.*, 669 F. Supp. 998, 1013 (E.D. Cal. 1987), *aff'd*, 929 F.2d 1404 (9th Cir. 1991) ("Personal injuries are not compensable under the Sherman Act."); *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("The phrase 'business or property' … exclude[s] personal injuries suffered."). Again, this statutory argument would be subject to *de novo* appellate review.

### C.      The Proposed Monetary Settlement Is Fair, Reasonable, and Adequate

Given these hurdles to the States' ability to establish damages, the monetary portion of the settlement provides a significant benefit to consumers by providing "certain recovery in the face of uncertainty in litigation." *California v. eBay, Inc.*, No. 5:12–cv–05874–EJD, 2015 WL 5168666, at *4 (N.D. Cal. Sept. 3, 2015); *see also Rodriguez*, 563 F.3d at 966 (citing Federal Judicial Center, Manual for Complex Litigation § 21.62, at 316 (4th ed. 2004)).

Moreover, the proposed monetary relief represents approximately five percent of the alleged damages estimated by the plaintiffs (as noted, the relief is substantially *more* than Google's experts' estimates). This is within the range of settlement amounts and recovery rates approved by district courts. *See Maciel v. Bar 20 Dairy LLC*, No. 1:17-cv-00902-DAD-SKO, 2021 WL 1813177 (E.D. Cal. May 6, 2021) (approving settlement where approximate net settlement fund amounted to 3% of maximum recovery); *Stovall-Gusman v. W.W. Granger, Inc.*, No. 13-cv-2540, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) (approving settlement where net amount represented 7.3 percent of plaintiffs' estimated trial award); *Balderas v. Massage Envy Franchising, LLC*, No. 12-cv-06327-NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (settlement of approximately 5% found to be preliminarily fair).

Finally, in assessing the consideration obtained in a settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall

fairness." *Offs. for Justice*, 688 F.2d at 628. Thus, the monetary relief contemplated by the settlement—including its relation to potential recovery at trial—must be analyzed in conjunction with the substantial non-monetary relief afforded to the States and their represented citizens.

In addition to the monetary relief provided by the settlement, Google has agreed to significant and meaningful changes with respect to its Android and Google Play businesses in the United States. The changes are designed to address the competition concerns raised by State and Consumer Plaintiffs in this litigation. This non-monetary relief benefits the millions of consumers that will continue to purchase apps on Android and Google Play—even those not bound by the settlement—which the Court should weigh in its fairness evaluation. *See Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *2 (N.D. Cal. Feb. 16, 2016) (finding that LinkedIn's revisions to user disclosures and permissions screens, and implementation of functionality for user contacts and invitations were non-monetary relief that weighed in favor of final approval of the settlement); *Campbell*, 951 F.3d at 1123 (affirming district court's approval of settlement agreement where the district court found that the settlement's injunctive relief, which included a year-long privacy disclosure requirement on Facebook's Help Center page, had value to absent class members).

### III.   THE SETTLEMENT PROVIDES MEANINGFUL CHANGES WHILE MAINTAINING FLEXIBILITY TO PROTECT SECURITY, PRIVACY, AND USER EXPERIENCE

The Court directed the parties to address "the open-endedness of some of the proposed injunctive relief provisions." ECF No. 944 (Feb. 29, 2024). At the preliminary approval hearing, the Court indicated that it was referring to provisions in the Settlement Agreement that allow Google to implement guidelines for "privacy, security, safety." H'rg Tr. 21:21-22:15 (Feb. 26, 2024).

Consumers face significant threats to their security and privacy—threats that constantly evolve as bad actors develop and invest in new ways to deliver dangerous software.[4] New forms of malware can spread rapidly and inflict significant damage on users, including stealing their

---

[4] *See Cyber Threats and Advisories*, Cybersecurity and Infrastructure Security Agency, https://www.cisa.gov/topics/cyber-threats-and-advisories (last accessed, April 15, 2024).

passwords and banking information.[5] To combat harmful software, Google needs the ability to innovate, make design changes, and adopt guidelines to protect consumers' privacy, security, safety, and overall user experience. *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998) ("Antitrust scholars have long recognized the undesirability of having courts oversee product design."). No one in this litigation has suggested otherwise. Indeed, as the States noted at the preliminary approval hearing, "there are valid security and user experience concerns" and "we need to give Google some ability to impose some guidelines here." Hr'g Tr. 22:22-23:5 (Feb. 26, 2024). But due to the rapidly evolving nature of the threats and the sophistication of bad actors, it is not possible to foresee every kind of security and privacy threat Google may need to respond to or the types of innovations that would improve the user experience. Unduly limiting Google's flexibility to adopt privacy and security safeguards risks eroding the safety of and trust in Google Play and the Android ecosystem, which would be harmful to both users and developers.

Accordingly, rather than attempt to micromanage Google's product design in this fast-paced and critical area, the Settlement Agreement takes the following approach: First, the agreement imposes specific obligations on Google that are designed to resolve the States' allegations of anti-competitive conduct. Second, the agreement recognizes that, in some cases, in carrying out those obligations Google may need to take reasonable actions that are tailored to protecting user security and privacy. Third, the agreement imposes limitations on the type of conduct Google may engage in to protect user security and privacy. Finally, in addition to these restrictions, Google must also report certain types of changes to an Independent Compliance Professional, who is tasked with verifying Google's assertions of compliance with the Settlement Agreement.

For example:

**1.** **Installer Rights:**  Under the Settlement Agreement, Google (1) may not enter into or enforce provisions in agreements that would prevent an OEM from granting app installation rights to third-party app stores on U.S. mobile devices and (2) may not require its consent before

---

[5] *See Takedown of SMS-based FluBot spyware infecting Android phones*, Europol, https://www.europol.europa.eu/media-press/newsroom/news/takedown-of-sms-based-flubot-spyware-infecting-android-phones (last accessed, April 15, 2024).

an OEM installs a third-party app store.  SA §§ 6.7, 6.8.  These commitments are designed to resolve States' and Consumers' concerns that Google was impairing the ability of legitimate third-party app stores to obtain preload agreements with OEMs.

But these provisions in the Settlement Agreement also recognize that there are situations in which it would be appropriate and reasonable for Google to adopt policies that affect the pre-installation of an app store in order to protect user privacy or security.  Because security and privacy threats evolve rapidly, it would not be practical to enumerate every possible example of a policy that Google could reasonably adopt.  Instead, the agreement permits Google to take steps to protect user privacy and security so long as those steps are both "reasonable" and "tailored."

As an example, the agreement notes that Google may adopt neutral user experience requirements for app stores so long as those requirements (a) apply to *all* pre-installed app stores, *including Google Play*, (b) the purpose of the requirements is to protect the user experience, *and* (c) the requirements are not designed to disadvantage other app stores. SA §§ 6.7.2(b), 6.8.2(b). The Settlement Agreement would therefore allow Google to adopt pro-consumer, neutral policies, such as rules that prohibit app stores from distributing illegal or harmful content, rules that prohibit app stores from spying on the user, or neutral rules that require the disclosure of the privacy policies of apps in the app store.  Indeed, many third parties, including the American Civil Liberties Union and Amnesty International have urged Google to adopt more stringent policies to protect users from harmful pre-installed apps.[6]

As an additional safeguard, Google must report and explain any policies adopted under these provisions to the Independent Compliance Professional, who is tasked with verifying Google's assertions of compliance. SA § 7.2.2.

**2.**     **Preload Exclusivity & Home Screen Placement**:  Under the Settlement Agreement, Google may not enter into agreement provisions "with the purpose or effect of securing preload exclusivity or home screen exclusivity of Google Play" on a U.S. mobile device. SA § 6.6.1. The Settlement Agreement does not provide any exceptions or limitations with

---

[6] *See, e.g.*, Open Letter to Google, *https://privacyinternational.org/advocacy/3320/open-letter-google* (last accessed, April 16, 2024).

1    respect to this remedy, including for security or privacy reasons.

2        **3.**    **Sideloading:**  In Google's view, there is no reasonable dispute that sideloading

3    (i.e., the direct downloading of apps or app stores from the internet) can involve significant

4    security risks and that informed user consent is therefore essential with respect to sideloading. For

5    example, the federal Cybersecurity Infrastructure & Security Agency warns users to "reduce the

6    risk of downloading [potentially harmful apps] by limiting your download sources to official app

7    stores, such as your device's manufacturer or operating system app store. Do not download from

8    unknown sources."[7] Similarly, the California Attorney General has warned users about the risks

9    of obtaining apps from untrusted sources: "Make sure apps you install on a mobile device come

10   from the Apple App Store for iPhones or Google Play for Android devices."[8] And in response to

11   the Court's questioning during the *Epic v. Google* trial, Dr. Mickens—a security expert who was

12   co-retained by the States and Epic—did not suggest removing the security steps in the Android

13   sideloading flow; instead he suggested only that the steps be "compressed." Trial Tr. 2147:1-7.

14       Notwithstanding the security risks of sideloading, the States identified particular concerns

15   with specific screens and warning language in the sideloading flow. Under the Settlement

16   Agreement, Google has agreed to address these concerns. Specifically, Google must simplify the

17   sideloading flow, including by eliminating a particular screen and warning that the States had

18   raised concerns about and by allowing the user to enable sideloading without having to separately

19   visit a settings screen. SA § 6.10. The Settlement Agreement appropriately recognizes, however,

20   that Google may warn users that there may be risks from sideloading and includes exemplar

21   neutral language that the States have pre-approved.

22       Because user security is a constantly evolving area, the agreement also recognizes that

23   Google may continue to innovate with respect to security and privacy in connection with the

24   sideloading of apps, but that freedom to innovate is not unlimited. Google may not "introduce

25   additional material complexity or burden" into the flow "solely because an app was sideloaded."

26

27   ---
     [7] https://www.cisa.gov/news-events/news/privacy-and-mobile-device-apps (last accessed, March 17, 2024).

28   [8] https://oag.ca.gov/privacy/facts/online-privacy/protect-your-computer (last accessed, March 17, 2024).

SA § 6.10.2.  Google must also report and explain "any innovations and changes to Android's default sideloading warnings" to the Independent Compliance Professional.  SA § 7.2.2.

In sum, the Settlement Agreement draws an appropriate balance by addressing the concerns raised by the States about the sideloading flow while not attempting to micromanage Google's ability to protect users in a constantly-evolving security landscape.

**4.** **User Choice Billing:**  Under the Settlement Agreement, Google will permit developers to participate in a User Choice Billing program, which will allow developers to offer users alternative in-app billing services alongside Google Play Billing. SA § 6.3.

Of course, allowing a developer to offer alternative in-app billing comes with many security, privacy, and user experience concerns. For example, an app developer might intentionally or inadvertently incorporate a billing system that misuses or does not properly secure user financial data. A developer may fail to properly disclose the price or the terms of a subscription to users. Or a developer may not make it clear to the user when the user is about to buy something. Indeed, the Federal Trade Commission has repeatedly taken action against app developers for misleading billing practices. For example, in December 2022, the FTC entered a $245 million settlement "with Epic Games for using digital dark patterns to bill Fortnite players for unintentional in-game purchases."[9] The FTC noted that Epic designed "in-game purchases in a way that made it easy for an inadvertent button push to lead to unwanted charges."  *Id.*

Accordingly, the Settlement Agreement commits Google to offering developers User Choice Billing, but permits Google to require developers to meet user experience guidelines. That discretion is not unlimited; those guidelines must be "tailored" to protecting Users. SA § 6.3.1(c). In addition, Google must report and explain any such guidelines to the Independent Compliance Professional. SA § 7.2.2.

## IV.   THE INDEPENDENT COMPLIANCE PROFESSIONAL PROVIDES ADDITIONAL ASSURANCE OF THE SETTLEMENT'S EFFECTIVENESS.

Google understands that the States' brief explains how the Settlement Agreement provides

---

[9] https://www.ftc.gov/business-guidance/blog/2022/12/245-million-ftc-settlement-alleges-fortnite-owner-epic-games-used-digital-dark-patterns-charge (last accessed, March 17, 2024).

for an Independent Compliance Professional ("ICP") who will assist the States in assuring Google's compliance with the Agreement. In particular, the ICP provisions are designed to assist the States in (1) ensuring that Google is complying with the requirements of the Agreement and (2) verifying that any actions Google takes with respect to what the Court has described as "open-ended" provisions are reasonable and tailored to protect the security, privacy, and user experience of Android mobile device users.  SA § 7.

Thus, the ICP plays an important role in assisting the States to ensure Google's compliance with the settlement terms. The ICP will have access to relevant information, bridging any information gap between Google and the States, and will be able to apply his or her expertise to independently assess any technical or contractual terms to confirm Google is complying with its commitments.

Ultimately, the ICP provision in the settlement is designed to provide the States with an independent evaluation of Google's compliance. The ICP, along with the provisions designed to give Google the flexibility to address security, privacy, and/or user experience issues (*see* Section III, above), work in concert to provide consumers with the benefit of the settlement commitments *and* a safe, trusted, and well-functioning Android ecosystem.

## V.   THE SETTLEMENT AGREEMENT APPROPRIATELY ADDRESSES COMPETITION RATHER THAN PRICES

The Court also directed the parties to address "[a]ny other issues and factors" that it should consider in evaluating the settlement. ECF No. 944. As the Court observed, the Settlement Agreement does not address the "fees Google is going to charge." Hr'g Tr. 16:8-9 (Feb. 26, 2024).

Rather than attempt to impose prices, the Settlement Agreement is focused on competition, which is the proper price-setting mechanism under the antitrust laws. In order to ensure that a competitive market exists, the States secured from Google unprecedented conduct commitments that address each of the key issues that the States have challenged in this litigation. *See* Mot. to Give Notice at 5-7, ECF No. 522, No. 3:21-cv-05227. The States have obtained remedies that specifically address the concerns they raised about Project Hug (SA §§ 6.4, 6.5),

1   pre-installation exclusivity provisions in RSA 3.0 agreements (SA § 6.6), pre-installation rights

2   for third-party app stores (SA §§ 6.7, 6.8), sideloading warnings (SA § 6.10), and steering and

3   alternative billing (SA §§ 6.3, 6.11).

4       As a result, in the U.S., for the periods of time specified in the Settlement Agreement,

5   Google cannot enter into exclusivity deals with OEMs for the Google Play store; Google cannot

6   seek exclusive home screen placement for the Google Play store; Google cannot enter into

7   agreements with OEMs restricting the installation of other app stores; Google is limited in its

8   ability to secure exclusive content for the Google Play store; Google must take steps to make

9   sideloading (i.e. direct downloading of apps from the internet) easier; Google must support user

10  choice billing, and Google must allow app developers significant flexibility to steer users to other

11  payment options.

12      By including these provisions, which directly respond to the States' complaints in this

13  litigation, the Settlement Agreement ensures that competition, and the value that Play delivers to

14  users and developers, will drive prices.

15      Google submits that this focus on conduct rather than prices is appropriate.  Even in the

16  context of an antitrust remedy, prices should be set by the market, not by courts or State

17  Attorneys General.  *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102 (2021) ("Judges

18  must be wary, too, of the temptation to specify the proper price, quantity, and other terms of

19  dealing–cognizant that they are neither economic nor industry experts.") (internal quotation

20  marks omitted); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir.

21  1997) ("direct price administration" is "beyond our function").

22      Additionally, any observation that the Settlement Agreement does not prescribe the fees

23  that Google is going to charge must also be considered against the reality that (i) the vast majority

24  of app developers do not incur a service fee, *Epic v. Google* Trial Tr. 3143:16-19 (Loew); (ii) of

25  those app developers that do incur a service fee, 99% incur a service fee of 15% or less, *Epic v.*

26  *Google* Trial Tr. 3143:23-25 (Loew); (iii) as part of the Court-approved settlement with the

27  developer class, Google agreed to maintain a 15% reduced service fee program on the first $1

28  million of developer earnings each year for approximately three years, No. 3:20-cv-05792-JD,

1   ECF No. 218-1 at 12 (§ 5.2.1); (iv) during the period of this litigation, service fees have been

2   lowered to 15% for all in-app subscriptions;[10] and (v) Google's Play store has a range of

3   programs (with reduced service fees) that take into account the economics of different industries

4   and app models, *see, e.g., Epic v. Google* Trial Tr. 1648:20-1651:4 (Rasanen).

8   Dated:  April 17, 2024                    Respectfully submitted,

9                                             By:    /s/ *Glenn D. Pomerantz*
10                                                   Glenn D. Pomerantz

11                                            Glenn D. Pomerantz, Bar No. 112503
                                              glenn.pomerantz@mto.com
12                                            Kuruvilla Olasa, Bar No. 281509
                                              kuruvilla.olasa@mto.com
13                                            **MUNGER, TOLLES & OLSON LLP**
14                                            350 South Grand Avenue, Fiftieth Floor
                                              Los Angeles, California 90071
15                                            Telephone: (213) 683-9100

16                                            Justin P. Raphael, Bar No. 292380
                                              justin.raphael@mto.com
17                                            Dane P. Shikman, S.B. #313656
                                              dane.shikman@mto.com
18                                            Rebecca L. Sciarrino, S.B. #336729
                                              rebecca.sciarrino@mto.com
19                                            **MUNGER, TOLLES & OLSON LLP**
20                                            560 Mission Street, Twenty Seventh Fl.
                                              San Francisco, California 94105
21                                            Telephone: (415) 512-4000

22                                            Jonathan I. Kravis, *pro hac vice*
23                                            jonathan.kravis@mto.com
                                              **MUNGER, TOLLES & OLSON LLP**
24                                            601 Massachusetts Ave. NW, Ste 500E
                                              Washington, D.C. 20001
25                                            Telephone: (202) 220-1100

---

[10] *See Evolving our business model to address developer needs*, Android Developers Blog, *available at* https://android-developers.googleblog.com/2021/10/evolving-business-model.html (last accessed, April 16, 2024).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
Rishi P. Satia, Bar No. 301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone:  (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY  10178-0060
Telephone: (212) 309-6000

*Counsel for Defendants*

DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S FEBRUARY 29, 2024 ORDER
Case Nos. 3:21-md-02981-JD; 3:21-cv-05227-JD; 3:20-cv-05761-JD

# E-FILING ATTESTATION

I, Sujal J. Shah, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

/s/ Sujal J. Shah
Sujal J. Shah