Pages 1 - 139

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
IN RE GOOGLE PLAY STORE        )
ANTITRUST LITIGATION,          )
                               )   NO. 21-md-02981-JD
_____)
THIS DOCUMENT RELATES TO:      )
                               )
EPIC GAMES, INC.,              )
                               )
          Plaintiff,           )
                               )
  VS.                          )   NO. 20-cv-05671-JD
                               )
GOOGLE, LLC., et al.,          )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Thursday, May 23, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    CRAVATH, SWAINE & MOORE LLP
                    825 Eighth Avenue
                    New York, New York  10019
              BY:   **GARY BORNSTEIN, ATTORNEY AT LAW**
                    **YONATAN EVEN, ATTORNEY AT LAW**
                    **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
                    **MICHAEL ZAKEN, ATTORNEY AT LAW**
                    **MALIKAH WILLIAMS, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES CONT'D:**

For Defendants:

                    MUNGER, TOLLES & OLSON LLP
                    350 South Grand Avenue - 50th Floor
                    Los Angeles, California  90071
            BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
                 **KURUVILLA J. OLASA, ATTORNEY AT LAW**


                    MUNGER, TOLLES & OLSON LLP
                    601 Massachusetts Avenue NW
                    Suite 500 East
                    Washington, DC  20001
            BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**
                 **LAUREN BELL, ATTORNEY AT LAW**


                    MUNGER, TOLLES & OLSON LLP
                    560 Mission Street - 27th Floor
                    San Francisco, California  94105
            BY:  **DANE P. SHIKMAN, ATTORNEY AT LAW**


                    MORGAN, LEWIS & BOCKIUS LLP
                    One Market - Spear Street Tower
                    San Francisco, California  94105
            BY:  **SUJAL SHAH, ATTORNEY AT LAW**
                 **LEIGHA BECKMAN, ATTORNEY AT LAW**


                    HOGAN LOVELLS US LLP
                    555 13th Street N.W
                    Washington, D.C. 20004
            BY:  **REEDY SWANSON, ATTORNEY AT LAW**


Also Present:        **Michael Lyons**
                     **Douglas Bernheim**
                     **Steven Tadelis**
                     **Matthew Gentzkow**
                     **Gregory Leonard**

<u>**Thursday - May 23, 2024**</u>                          <u>**11:10 a.m.**</u>

P R O C E E D I N G S

---o0o---

**THE CLERK:**  All rise.  Court is now in session.  The Honorable James Donato presiding.

**THE COURT:**  Good morning.

**ALL:**  Good morning.

**THE CLERK:**  Please be seated.

Calling Civil 20-5671 Epic Games, Inc., v. Google, LLC, and Multi-District Litigation 21-2981, In Re:  Google Play Store Antitrust Litigation.

Counsel.

**MR. BORNSTEIN:**  Good morning, Your Honor, Gary Bornstein for Epic Games.  I am joined today back in the gallery by Yonatan Even, Lauren Moskowitz, Michael Zaken, and Malikah Williams.

**THE COURT:**  Okay.

**MR. POMERANTZ:**  Good morning, Your Honor, Glenn Pomerantz on behalf of Google.  And with me, not at counsel table Leigha Beckman, Dane Shikman, Kuru Olasa, Jonathan Kravis.  Sujal Shah, as well, Your Honor.

**THE COURT:**  Okay.  It's a partner name test.

(Laughter.)

**THE COURT:**  All right.  We're all set?

**MR. BORNSTEIN:**  Yes, Your Honor.

1          **THE COURT:**  Who did we have at the table?  I know the

2     two economists and --

3          **MR. BORNSTEIN:**  And Mr. Lyon will not be speaking,

4     but.  He is here in case we need some technical assistance.

5          **THE COURT:**  Okay.  Let's just introduce who's sitting

6     at the table, please.  Why don't we start with you.

7          **MR. BORNSTEIN:**  Great.  On our side, we have Professor

8     Steven Tadelis and Professor Douglas Bernheim.

9          **THE COURT:**  Okay.

10          **MR. POMERANTZ:**  We have here, Your Honor, Professor

11     Mathew Gentzkow and Dr. Greg Leonard.

12          **THE COURT:**  All right.  So we're going to do this in a

13     hot tub style.  So, Lawyers, you two can return to the bench.

14     And let me put a frame on what we're doing.

15          So today I've asked you in to take testimony on the

16     injunctive relief that I'm going to order in the wake of the

17     jury verdict.  Now there are going to be two principles, two

18     broad principles that guide our discussion today.  And the

19     first principle is:

20          We are not writing on a clean slate.  The jury has

21     concluded that Google monopolized illegally the Android app

22     distribution market and the Android in-app billing services

23     market for digital goods.  The facts and the evidence behind

24     the jury's verdict are now carved in stone.  This is not an

25     opportunity to argue with that record, to try to supplement it,

1    to try to get around it, tap dance on it, or anything else.  It

2    is here and it is here to stay.

3         I was a little concerned about Google's 90 pages of

4    objections to the proposed injunction that the plaintiffs

5    submitted because it came perilously close to crossing that

6    line on several occasions.  But we will not be doing that

7    today.

8         Now, there may be some fact disputes that are specific to

9    the relief that I need to decide.  I'll tip my hand a little

10   bit and tell you right now, the friction related to the

11   security screens may be one of them that was not in it.  We

12   heard a lot about it a trial.  That was not an issue that the

13   jury necessarily had to decide.

14        So I may end up having to do some relief-specific dispute

15   resolution, but that is it.  We are not in any way rewriting

16   history or revisiting what led to the jury's verdict of illegal

17   monopolization.

18        The second guideline is, I'm going to share with you the

19   legal standards I'm working under.  And I know you-all

20   economists aren't lawyers, but you need to know what I'm going

21   to be doing because this is how I'm going to hear what you're

22   saying to me.  And I have picked, out of a number of sources, a

23   formulation that Justice Douglas gave in *Ford Motor Company v.*

24   *United States*, 405 U.S. 562 at pages 577, 578, and that's from

25   1972.

1        And Justice Douglas formulated the relief task as this (as

2    read):

3            "Antitrust relief should unfetter a market from

4        anticompetitive conduct and pry open to competition a

5        market that has been closed by defendant's illegal

6        restraints."

7        That is the lens through which I'm going to be taking your

8    testimony today.

9        To put a little bit of a finer point on it, our circuit

10   recently held in a case called *Optronic Technologies, Inc., v.*

11   *Ningbo* -- N-I-N-G-B-O -- *Ningbo Sunny Electronic Company*,

12   20 F.4th 466 at page 486.  This is a 2021 case.  (as read):

13           "If the jury finds that monopolization or

14       attempted monopolization has occurred, the available

15       injunctive relief is broad, including to terminate

16       the illegal monopoly, deny to the defendant the

17       fruits of its statutory violation, and ensure that

18       there remain no practices likely to result in

19       monopolization in the future."

20       So those are my goals.  You're going to help me make my

21   decision about what I should or should not do to realize the

22   legal standards that I'm operating under.

23       Now, the other thing I want to mention -- it goes without

24   saying, but I think it's important to emphasize -- this case is

25   about the opportunity to compete generally; it is not about

```
1   aiding a specific competitor for or potential competitor.  I am

2   not looking for relief that's going to give a helping hand just

3   to Epic.  That is not what I'm doing.  That's the wrong thing

4   to do.

5        What we are doing is leveling the playing field, lifting

6   the barriers, and making sure that anybody who chooses to

7   compete with Google in these two markets found by the jury has

8   a free and unfettered opportunity to do so.

9        That is what I'm looking for.  So it is a systemic remedy.

10       Now, I am going to turn it over to each of you.  We're

11  going to, as I said -- I know at least a couple of you were

12  here for the prior hot tub -- start with the plaintiffs and

13  we'll get a response from the defendant as kind of we go down

14  this.  But here is what I'm looking for:  I'm looking for

15  specific actions.

16       All right?

17       I thought, to be honest, the draft -- proposed draft

18  injunction from Epic was too open-ended for my taste.  That's

19  not something -- it's not a criticism, but I'm telling you what

20  I need is specific recommendations for action that are directed

21  to two things:  Terminating Google's illegal conduct --

22  all right? -- making sure that door is closed.  Everything that

23  led up to the antitrust verdicts.

24       And the second thing is:  What should be done in addition

25  to that to restore the opportunity to compete for all potential
```

```
 1    competitors.

 2        All right?  Those are the two touchpoints that I want you

 3    to -- as you talk today and discuss this, keep that in mind.

 4        Okay?  So specificity is what I'm looking for --

 5    all right?-- to the extent you can do it.

 6        Okay.  Now, it seems to me -- I don't want to in any way

 7    constrain your testimony.  It seems to me that identifying what

 8    we can proscribe as prior conduct might be relatively easy.  By

 9    that, I have in mind specific contractural provisions that we

10    heard a lot about at trial, for example.

11        The next step, you know, what to do to make sure that

12    Google doesn't keep the fruits of its illegal conduct and

13    doesn't continue to poison the well in the future might be a

14    little bit more broad.  Okay?

15        But let me start with the plaintiffs.  You can just dive

16    right in.

17            DR. BERNHEIM:  Okay.  Thank you, Your Honor.  I am

18    Douglas Bernheim.

19            THE COURT:  Okay.  And before we do that, let me --

20    because we're already broadcasting on Zoom.  The two cameras

21    should be facing the two witnesses.  So one, I think, is facing

22    the podium right now.  So maybe Mr. Bornstein can help reorient

23    that and maybe have to lower it a little bit.

24        Yeah.  That'd be great.

25        And then Mr. Pomerantz can do the same for -- good.  Okay.
```

```
 1         Can we look on the screen, Lisa, and make sure that
 2    they're looking right?  Okay.  That looks pretty good.  Okay.
 3         All right.  And just when you speak -- I know there's only
 4    one microphone, but if you have to pass it back and forth, that
 5    would be great.  Okay.
 6         Please go ahead, Professor.
 7              DR. BERNHEIM:  Of course.  Thank you.
 8         So I have prepared some slides that are -- well, frankly,
 9    I think they're more for helping me with memory, but it may be
10    useful for you to be able to see them, too, because they have
11    terse summaries of the points that I'm making.
12         So, Mr. Lyon, could you put up Slide Number 3?
13              THE COURT:  Is there a hard copy I could get, or no?
14              DR. BERNHEIM:  There is.  We can provide it.  I'm sure
15    we can.
16              THE CLERK:  Do we have two hard copies?
17              THE COURT:  Two, if you have them, but at least one,
18    please.
19         Don't give me yours.
20              DR. BERNHEIM:  I have two.
21              THE COURT:  You do?  Okay.  That would be great.
22    Thanks.
23         All right.  Thank you.  Okay.
24         Dr. Bernheim, go ahead.
25              DR. BERNHEIM:  All right.  So this slide just lists
```

1    the categories of things that we think a remedy needs to do

2    beginning with Item Number 1 -- is to prohibit the specific

3    anticompetitive practices.  But a remedy that focuses very

4    narrowly, just on those specific things, is going to be easily

5    circumvented.  So the remedy needs to preclude categories of

6    things, and I'll be more specific about that, what those

7    categories are in a minute.

8         So that's the -- Point Number 2.  It must preclude related

9    conduct that could yield substantially similar outcomes.

10        Third, it has to give rise to an opportunity to compete on

11   the merits with Google Play, despite the ongoing competitive

12   advantages that Google Play enjoys by virtue of its past

13   anticompetitive action, because there are durable effects of

14   that on competition going forward.

15        And the last principle just says that, to the extent

16   possible, we should avoid inhibiting Google from competing on

17   the merits.

18        So the next slide, Slide Number 4, gives a high-level

19   summary of what the components of the remedy are.  And then

20   just to look forward, if you look at the next few slides -- so,

21   for example -- I'm sorry.

22        On Slide 4, the first point is to prevent Google from

23   entering into or enforcing agreements of the type the jury

24   found to impair competition.

25        The next slide has that as its title.  That would be Slide

Number 5.  And it lists the specific things that we think fall into that category.

     And then there's a slide for each of the other points on Slide Number 4.

     So Number 1, preventing Google from entering in or enforcing agreements of the type that were found to impair competition.

     Second, to prevent Google from imposing undue restrictions on direct downloading.

     Third, to require nondiscriminatory access to Android and other Google products and services, because that's another possibility for circumvention if Google were to make those things contingent --

     **THE COURT:**  So is that just -- is that the security friction point?

     **DR. BERNHEIM:**  It's also possibly access to APIs.

     **THE COURT:**  Okay.

     **DR. BERNHEIM:**  Which are not currently conditional but could be made conditional.

     **THE COURT:**  All right.

     **DR. BERNHEIM:**  And then the final point is to mitigate the continuing competitive advantages, which we have several provisions designed to address those.

     So I'm not sure if it's best to walk through every one of these points --

1          **THE COURT:**  You know, I have the draft.  I've studied

2     it quite a bit.  I would like to get just to the specifics.

3          **DR. BERNHEIM:**  Okay.

4          **THE COURT:**  You can use your topic headings.  That's

5     actually useful.  But how -- what would you stuff under

6     Number 1, for example?

7          **DR. BERNHEIM:**  Okay.  So let me -- let me make what I

8     think is the most useful characterization of what's included

9     under Number 1.

10         What we are concerned about is two types of conduct:

11         The first type of conduct is conduct that makes value --

12    which could be financial value, it could be other value --

13    conditional upon another party either dealing with a Google

14    Play rival or acting as a Google Play rival.

15         And this sort of conduct, for the most part, is easy to

16    identify because the agreements would have provisions in them

17    that reference rivals.  Okay?  They would say these things are

18    conditional in some sense.

19         It gets a little bit tricky because in some cases

20    conditionality can be established by a nod and a wink, and --

21    particularly, if a party has a lot of power, if they're

22    dominant in the market and parties are worried about pleasing

23    them.

24         So we add one more thing:  Beyond this, you can't write

25    things that are conditional upon -- you know, value can't be

1   conditional upon dealing with a rival or acting as a rival.  We

2   also suggest that the remedy should include the requirement

3   that these agreements have an explicit provision that says, "No

4   terms or conditions or renewal are conditional upon dealing

5   with a rival or acting as a rival," so that the counterparty,

6   if it's an OEM, if it's a developer, they know that's in the

7   contract; they have recourse and they have reassurance.

8           **THE COURT:**  All right.  Now, let's just tie this a

9   little bit to the trial evidence that I hope you recall.

10          **DR. BERNHEIM:**  Yes.

11          **THE COURT:**  So the MADA and RSA agreements, as I

12  recall, arguably had clauses about not doing business with

13  rivals or putting Google in a position where it always came out

14  first if there was some dealing with a rival, a home screen or

15  priority.

16      So what specifically -- keeping those actual contracts

17  that we heard about at trial in mind, how would you formulate a

18  proscription related to those?

19          **DR. BERNHEIM:**  Well, I think you can formulate a broad

20  proscription that doesn't need to specify every specific

21  category of conduct because there are a lot of categories of

22  conduct, and there are other things that Google could turn to.

23      So the ideal, in my mind -- and I'm talking as an

24  economist now --

25          **THE COURT:**  Of course, yes.

1          **DR. BERNHEIM:**  The ideal, in my mind, would be to have

2     a provision that simply says broadly, "The agreements with

3     parties like OEMs, developers, others who might be

4     distributors, cannot include provisions that specify terms that

5     are conditional on dealings with a rival or acting as a rival."

6          **THE COURT:**  All right.  Well, can't it be conditional

7     on excluding a rival?

8          **DR. BERNHEIM:**  Well, that would be -- that would be --

9     excluding a rival would be the most extreme example.  But

10    another example would simply be if you deal with a rival, then

11    you're not going to have access to certain things that are

12    valuable.

13         That would be a concern that Google could begin to use

14    that strategy.

15         **THE COURT:**  So maybe one way to put it would be:

16    Cannot be conditioned on agreements with rivals or potential

17    rivals.

18         Just leave it at that.

19         **DR. BERNHEIM:**  Yes.  That's essentially what -- what

20    this is trying to get at.  And I'm not sure exactly what the

21    wording should be, but if the provision is crafted in a

22    relatively broad way, it's still specific.  It still says that

23    a violation would have to be -- to have a violation, you'd have

24    to be able to point to a provision in a contract that

25    explicitly references some sort of dealings with a rival.

```
 1              THE COURT:  And in your review as an economist, that

 2     would directly redress the contractual restrictions that the

 3     jury saw at trial?

 4              DR. BERNHEIM:  Yes, with one category of exceptions

 5     that I'm coming to.

 6              THE COURT:  Okay.

 7              DR. BERNHEIM:  And the second category is the sharing

 8     Google Play --

 9              THE COURT:  If I may just jump in -- so we really need

10     to tie all of this to the anticompetitive conduct that was

11     proven at trial.

12              DR. BERNHEIM:  Right.

13              THE COURT:  So that's why I'm going to ask you to make

14     sure that everything you tell me is, in fact, economist

15     response --

16              DR. BERNHEIM:  Yes.

17              THE COURT:  -- to the anticompetitive conduct,

18     contract agreements, and other conduct that we saw at trial.

19        Okay?

20              DR. BERNHEIM:  Yeah.  So a great example of this first

21     thing, the conditionality, is the RSA 3.0 agreements that said

22     to the OEMs, "Your compensation, your payments are going to be

23     different if you -- if you have -- if you preload a rival app

24     store."

25          That's a perfect example of a conditional provision in an
```

1  agreement.  And I think one could broadly say that such

2  conditional provisions that reference dealings with rivals or

3  activities as rivals, are contrary to the remedy.  And that

4  would not just deal with a lot of what we saw, that Google did,

5  at trial, but would also encompass alternatives that Google

6  might think about going to.

7          **THE COURT:**  Before we get to that next point, though,

8  let's define "rival."

9          So a rival would be who?

10         A company seeking to open a competitive -- seeking to open

11  an Android app store?

12         **DR. BERNHEIM:**  That would be the main class of rivals.

13         In principle, it could be if a developer is distributing

14  off Google Play, then it is acting as a rival for the purpose

15  of its own distribution, even though it doesn't have its own

16  app store.  And the -- what would be required is a provision

17  that says, "Google cannot make value that it gives to that

18  developer" --

19         **THE COURT:**  If I may -- I'm going to interrupt you a

20  lot.  I apologize in advance.

21         So I see.  So it doesn't have to be opening up -- I'll

22  just call it a macro store.  It can be one developer saying, "I

23  want my app to be available through my own direct download or

24  through Samsung" or something like that.

25         That would be, in your view, also a rival?

1              **DR. BERNHEIM:**  Yes.  I think that that's important.

2         These are all activities that are rivalrous in terms of

3    app distribution, and we're only talking about rivalry in terms

4    of app distribution, so this ought to be focused on that.

5         But -- yes, that's the essence of it.

6              **THE COURT:**  You said you had something else, a

7    carve-out or something --

8              **DR. BERNHEIM:**  Yes.  The other -- it's not a

9    carve-out.  It's another category of conduct that arose at

10   trial, which is sharing Google Play revenues with actual or

11   potential competitors.  And even when Google does not have

12   explicit provisions in contracts that reference activities

13   as -- as rivals or dealings with rivals, app distribution

14   rivals.  It also has --

15             **THE COURT:**  Was Activision -- what were the examples

16   at trial of that?  I remember --

17             **DR. BERNHEIM:**  This would be RSA 3.0, revenue sharing,

18   Google Play revenue sharing.  Now, in the RSA 3.0 agreements,

19   there were various different kinds of revenue sharing.

20   Sometimes they shared, I don't know, search revenue, ad

21   revenue, something like that and occasionally Google Play

22   revenue.

23        And the sharing of Google Play revenue was coming up in

24   the context of OEMs that had their own app stores, which was

25   essentially sharing profits with a rival.  This is, you know,

1  kind of basic violation of antitrust principles.

2       Nothing was made conditional on the -- well, I'm sorry.

3  The RSA 3.0 also had some conditionality.  But for this

4  provision, even aside from the conditionality, sharing profits

5  with a rival discourages the rival from competitive action.

6            **THE COURT:**  Sharing Play Store profits.

7            **DR. BERNHEIM:**  I'm sorry?

8            **THE COURT:**  Sharing Google Play Store profits.

9            **DR. BERNHEIM:**  Specifically Play Store profits.

10           **THE COURT:**  All right.  So that is your formulation of

11 how to address the prior anticompetitive conduct that led to

12 the jury verdict?

13           **DR. BERNHEIM:**  Yes, as well as similar conduct that

14 could be used to accomplish the same objective.

15           **THE COURT:**  All right.  Let me just turn to your

16 colleagues here.

17       What's wrong with that, Defendants?  It sounds fairly

18 reasonable and well-targeted to the evidence at trial.

19           **DR. GENTZKOW:**  Yeah, I think --

20           **THE COURT:**  Why don't you say who you are.

21           **DR. GENTZKOW:**  Matthew Gentzkow.

22       So we, I think, broadly agree on some of the high-level

23 principles that this should address the conduct that was found

24 to be illegal at trial.  I think it's important that it do so

25 in a way that lets market outcomes be determined by competition

1  and market forces when possible.

2      I think that it's important, as Dr. Bernheim and

3  Dr. Tadelis have both said, that it preserve Google's ability

4  to compete in the market to the extent possible.

5      I think there's two main areas of disagreement.  One of

6  them is with regard to some of the provisions that Dr. Bernheim

7  has described as leveling the playing field, which we haven't

8  really gotten to yet --

9          THE COURT:  All I want you to do now is -- you know,

10  Dr. Bernheim said, "Here's what I would recommend, to terminate

11  the illegal conduct underlying the jury's monopolization

12  verdict."

13      So what I'm asking you is:  Is there any objection to

14  that?

15      It sounded all quite straightforward.  I don't see how

16  that would hobble Google's ability to compete in a fair way,

17  but you tell me.

18          DR. GENTZKOW:  I think the first thing to say is that

19  the state settlement already rules out any exclusivity

20  agreement.

21          THE COURT:  There is no state settlement because I

22  haven't approved it.  So let's just stick with this case.

23          DR. GENTZKOW:  The one thing that I think would be an

24  appropriate remedy is, as is in the state settlement, ruling

25  out exclusivity of either pre-installation or placement on home

1    screens of devices, those kinds of contracts that are

2    explicitly conditioned on the behavior of rivals.

3        I think that where we disagree is the breadth of that

4    provision, how far it goes and what other conduct should be

5    ruled out.  I think that the -- the proposed injunction spans

6    conduct that even would disincentivize a rival in any way

7    from --

8            THE COURT:  Let me just jump in.

9        Let's just focus on what we're talking about here.  Okay?

10       So let's see if I can put a clearer articulation.

11       Dr. Bernheim has just proposed, in response to my

12   question, two categories of things that should be proscribed,

13   in other words, Google should be forbidden to do.

14       One is:  It cannot condition any of its agreements with a

15   party on not dealing or having agreements or interactions with

16   rivals or potential rivals, and it can't engage in revenue

17   sharing from the Google Play Store with competitors.

18       So just focusing on those two things, I don't see any

19   reason why that would in any way unduly or unreasonably

20   constrain Google's ability to compete, while at the same time,

21   those provisions seem well-crafted to the evidence at trial to

22   correct the illegal conduct that led to the monopoly verdict.

23   So that's what I want you to kind of focus on.

24           DR. GENTZKOW:  So I think on the sharing of revenue

25   from the Google Play Store, the question is to what extent that

1  prohibits conduct that would fall within the bounds of

2  competition.  So there are a lot of cases in which it makes

3  sense for Google to offer to, for example, OEMs, when it's

4  competing for space on their devices, incentives to choose the

5  Play Store to install the Play Store.  That has taken the form

6  of revenue-sharing contracts in the past, and those revenue

7  sharing contracts involve incentives for those OEMs to install

8  Google Play Store.

9          **THE COURT:**  But isn't that incentive based on not

10  installing a rival store?  I mean, that's the whole point of

11  the incentive; right?

12          **DR. GENTZKOW:**  Well, not necessarily.  I think that's

13  the crux of the question is:  What about incentives that are

14  not conditioned on anything about the behavior of rivals?

15      I think if we narrowly --

16          **THE COURT:**  Just to jump in, I'm looking in a

17  pragmatic way as what is the consequence.  Okay?

18      So, you know, someone may say, "Oh, this is revenue

19  sharing with an OEM because we want to be on the home screen."

20      But if the practical effect is the revenue sharing is

21  essentially motivating an OEM not to put a rival play store on,

22  you have achieved an anticompetitive goal, even though it may

23  be cloaked in a competitive-phrased way.

24      So looking at the actual result, help me understand how

25  revenue sharing from the Google Play Store with a potential

competitor that results in the competitor not posting a rival

play store is not a reasonable way of constraining

anticompetitive conduct.

**DR. GENTZKOW:**  Yeah.  I think that -- I think that

banning that kind of revenue sharing has the potential to harm

those OEMs.  Because although there could be cases where that

is excluding a competitor, there's a whole range of cases in

which that is a form of competition.  And --

**THE COURT:**  What's a form of competition?

**DR. GENTZKOW:**  That offering revenue sharing to OEMs

in exchange for placing a play store, if there's no reference

to rivals, ruling that out entirely, has the potential to shut

down competition much more broadly in the market and harm

competition because there are lots of cases in which OEMs have

scarce real estate on their devices that is -- that app stores

are competing for placement on those devices.  And if this

is -- if we say there's no ability to offer revenue sharing at

all in part of that competition, competition is going to be

weakened as a result.

**THE COURT:**  All right.  Let's pause on that.

Dr. Bernheim, your colleague is saying that it's too

broad.  They should be allowed to revenue share because there

are totally legitimate reasons for that.

**DR. BERNHEIM:**  Well, I disagree with that.

Dr. Gentzkow, in his testimony just now and in his

 1   declaration in making that argument, doesn't explain what the

 2   harm would be if the compensation to the OEM is something other

 3   than Google Play revenues.

 4        As I said before, they can share other revenue streams, so

 5   they can make payments for various things.  I mean, we're

 6   proscribing some things, payments for things that are

 7   conditional on dealing with a rival.  But to the extent they

 8   are allowed to do something, they can bid for that with other

 9   revenue streams.  It doesn't have to be Google Play revenue.

10        And I would add to that --

11        **THE COURT:**  So you're really anchoring it to the

12   source of the revenue coming from Google Play.

13        **DR. BERNHEIM:**  For that, again --

14        **THE COURT:**  The revenue sharing.

15        **DR. BERNHEIM:**  -- two categories of conduct.  But if

16   we're talking about revenue sharing, what we're worried about

17   is Google Play revenue because Google Play is functioning as a

18   competitor in the app distribution market, and therefore should

19   not be allowed to share its revenues or profits with other

20   competitors in the app distribution market.  That's -- that's

21   the line.

22        The other thing that I would point out is that -- at trial

23   I think I talked about this -- I've looked at the agreements

24   with the various OEMs, and the thing that's really striking is

25   that Google Play -- Google used various kinds of compensation.

 1   They shared various different kinds of revenue streams.

 2        Where you see them sharing Google Play revenue --

 3   particularly Google Play revenue at high rates -- is when you

 4   have the, you know, the Chinese OEMs, like Xiaomi, coming up

 5   and having their own apps stores.  And all of a sudden, Google

 6   says, "Well, how about some -- how about a larger share of

 7   Google Play revenue?"

 8        This is the problem.  It's not that they're giving the

 9   OEMs money.  It's that they're either giving the OEMs money

10   specifically not to foster competition, or they're giving them

11   money in the form of the revenue stream that the OEMs should be

12   competing with.

13        **THE COURT:**  Okay.  Seems like a reasonable point,

14   Dr. Gentzkow.

15        **DR. GENTZKOW:**  Yeah.  Well, I think --

16        **THE COURT:**  That would address your issue.  As

17   Dr. Bernheim is articulating it, Google would be perfectly free

18   to bargain for home screen territory or whatever they want to

19   do as long as it doesn't come from Google Play store revenue.

20        **DR. GENTZKOW:**  Yeah.  I think if we've narrowed the

21   scope of it in that way, so that any other revenue sharing is

22   acceptable, and any other conduct outside of that, which is not

23   revenue sharing but other forms of incentives that are part of

24   competition, are acceptable, I think we're closer to agreement.

25        I think Google Play Store revenue --

1          **THE COURT:**  Now you're talking like a lawyer.

2      Do you have an agreement or not as economists?

3                          (Laughter.)

4          **DR. GENTZKOW:**  Yeah.  I think the disagreement is just

5  there are conditions -- there are cases in which sharing

6  revenue from the Google Play Store is also consistent with

7  efficiency because the -- from an economic point of view,

8  revenue sharing, in general, gives incentives to the

9  counterparty -- in this case, the OEM -- to make investments,

10  to do promotions, to work hard, to create more value out of

11  that relationship.

12      Google Play revenue is one of the main ways that an

13  Android device produces revenue overall.  There's search

14  advertising revenue.  There's revenue from the Google Play

15  store.

16      From an economic point of view, limiting that has a

17  potential efficiency consequence because if there are

18  investments that an OEM makes that lead a user to download more

19  apps, to spend more time on their phone, to make more purchases

20  in apps, those are going -- the OEM is going to have less

21  incentive to do those things under a revenue-sharing contract

22  if it doesn't include Google Play revenue.

23      So I think there are efficiency reasons why that kind of

24  revenue sharing makes sense as well.

25          **THE COURT:**  Okay.  Let me ask you, leaving revenue

1    sharing aside, the other point from Dr. Bernheim was just

2    making sure that no agreement is conditioned on not dealing

3    with rivals, basically.

4        What's wrong with that?  I mean, that's actually -- it's

5    an independence clause; let's call it that.  Each contract will

6    have to have an independence clause saying you're perfectly

7    free to deal with anybody else on any terms you want.

8            DR. GENTZKOW:  Yeah.  I think that, again, if -- that

9    becomes very close to the terms that are already in the state

10   settlement which says you can't -- Google cannot make any

11   agreements with an OEM, for example, that explicitly reference

12   rivals in the context of exclusivity.  So say --

13           THE COURT:  All right.  So, in other words, you agree

14   that that's an okay provision.

15           DR. GENTZKOW:  I think that's an okay provision in the

16   context of exclusivity.

17           THE COURT:  All right.  Okay.

18       That seems to be Category 1 for proscribing prior conduct.

19       Now, looking more broadly, how do you address those other

20   factors that I've read from the cases about, which is, making

21   sure that Google does not continue to reap fruit from its

22   statutory violations and give some assurance to the public this

23   isn't going to happen again, in creative ways?

24       That -- admittedly, I'm going to have a hard time

25   predicting, but there may be some formulations that will at

1    least cabin the creativity in some constructive way.

2         Yes.  Yeah.

3         **DR. BERNHEIM:**  So I think my starting point is that if

4    you eliminated all of the conduct that we observed in the past,

5    as well as similar conduct, if you just proscribe that and

6    nothing else, that would not be sufficient because had it not

7    been for the conduct, we would have seen competition emerging.

8    We would be in a different place today, in 2024, than we would

9    have been -- than we actually are in 2024 as a result of the

10   past conduct.

11        And merely removing the conduct doesn't mean that

12   competition bursts out all of a sudden.  It takes time to

13   evolve for a number of reasons -- one of which I'll get into in

14   a second.

15        So, you know, if all you did was prohibit these categories

16   of conduct, you're not going to get to where we would have been

17   in 2024.  And you're not going to get to where we would have

18   been in 2026, when 2026 arrives.  You know, you're going to be

19   in a lower trajectory in terms of competition.

20        Part of the reason for that is -- a large part of the

21   reason for that is that Google has -- Google Play has inherent

22   advantages because of the phenomena that we discussed at trial

23   called network externalities, the chicken and the egg problem.

24        As an app store I need users to get developers.  I need

25   developers to get users.  If I'm the dominant app store and I

have both, both are kind of going to stay there.  If I don't

have either, it's hard to get the ball rolling.  There are

strategies that I talked about at trial, like getting some

exclusive conduct -- content that will help get the ball

rolling.

But it's slow.  It takes time.  It's difficult.  And it's

not just a matter of not having resources, not having money

available; it's a matter of laboring at a competitive

disadvantage relative to the party that benefits from all of

these network externalities.

The important point about that is that those advantages

exist in significant part because of past conduct.  Past

conduct is what creates the dominance that we observe today,

that thereby creates the network externalities that make it

hard for competitors to break in to compete today.

So in my view, one of most important things that we need

to do is to find a way to mitigate the network externalities,

and we've offered, I think, a simple and creative proposal for

doing that.  And part of the beauty of this proposal is that it

is built on something that Google has already done, which is

its Alleyoop arrangement with, I think it was, Facebook and one

other party.

And that's basically saying, you can have another

distributor of apps, say another app store that uses -- that

serves -- that may have its own products but also serves as a

```
 1    storefront for Google Play.  So if they've not signed up a
 2    developer, they can still piggyback on the Google Play catalog
 3    and list those apps on their own app store.
 4            THE COURT:  If I can just jump in --
 5            DR. BERNHEIM:  Yes.
 6            THE COURT:  This gave me a little bit of pause, and
 7    I'll just -- I'll tell you why.  And I'm speaking, of course,
 8    as a federal judge, not as an economist, but the app store's
 9    dominance, as the jury found, was directly correlated and
10    caused by some illegal antitrust conduct.
11        However, it certainly is a possibility and, in my mind, a
12    probability that there was perfectly legitimate conduct that
13    also led to the app store being the biggest player in town.
14        I'm a little reluctant to say -- if I'm understanding you
15    correctly, and please correct me if I'm not.
16        I'm a little reluctant to say anybody tomorrow can say,
17    "I'm going to open an Android App Store and, Google, you stock
18    my catalog with everything you are offering today for free, and
19    you will never realize a penny of profit from any sales that --
20    or any billing that goes through my app store."
21        I just -- how do you -- that seems a bit overbroad.
22            DR. BERNHEIM:  Wait, wait, wait.  I'm --
23            THE COURT:  How is Google going to --
24            DR. BERNHEIM:  If I've understood you, the last thing
25    you said sounds like it's not the remedy that we proposed.  So
```

1    let me just restate --

2         **THE COURT:**  Oh.  All right.  But access to -- letting

3    a third party, tomorrow, have complete access to all the apps

4    currently available in the Google Play Store is part of your

5    proposal.

6         **DR. BERNHEIM:**  It is.  But all of the revenues go to

7    Google Play.

8         **THE COURT:**  Oh, I missed that part.  All right.  Tell

9    me about that.

10        **DR. BERNHEIM:**  This is very important.

11        **THE COURT:**  Yes.

12        **DR. BERNHEIM:**  That's what I meant by it only being a

13   storefront.

14      So they get to basically port the Google Play catalog onto

15   their store, list all those apps.  If they've not established a

16   direct relationship with a developer, then this is all just

17   piggybacked on Google Play.  The sale is at Google Play's terms

18   and conditions.  It is just passed through to Google Play.

19   Google Play keeps all of the revenues.  Nothing has happened

20   other than you've mitigated the network externality.

21        **THE COURT:**  How is that new Play Store entrant going

22   to make money?

23        **DR. BERNHEIM:**  Ah.  So the new Play Store entrant

24   makes money by signing up developers.  Once it signs up

25   developers, it starts listing things on its own site that are

1    things that are -- it's stocking in its store.

2        And if the user gets on that side and says, "I'm going to

3    download this app," and it's an app where the rival store

4    actually has the relationship with the developer -- okay.  So

5    they don't need to piggyback on Google Play for that one --

6    that's their sale.  They get to keep that.  They get to keep

7    the revenues from that.

8        So in the meantime, the only disadvantage they are at as a

9    competitor is -- well, the disadvantage that they would have

10   been at as a competitor from having a smaller catalog, which is

11   the source of the network externality issues, that's removed.

12   And they don't get any benefit from that other than removing,

13   you know, that disadvantage, having a smaller catalog.  Other

14   than that --

15       **THE COURT:**  And then you're -- and the rival who gets

16   access to this catalog could then approach each developer in

17   the Google Play Store catalog and offer its own deal and say,

18   for example, "I'm opening my new storefront.  I'm going to have

19   access.  All your money and deal terms with Google are going to

20   stay in place unless you sign with me, in which case I'll give

21   you a better fee deal."

22       **DR. BERNHEIM:**  Exactly.  And that's how competition is

23   supposed to work.

24       **THE COURT:**  This specifically addresses the network

25   effect problem that we heard about at trial.

1          DR. BERNHEIM:  That's what it's designed to do.  It

2    mitigates the network --

3          THE COURT:  And is there a cap on duration?  Is it

4    six years?

5          DR. BERNHEIM:  Yes.  It's a six-year cap.

6          THE COURT:  Doesn't that seem a bit long?

7          DR. BERNHEIM:  Well, the length of this is a judgment

8    call, and it's, honestly, not an exact science.  Let me tell

9    you my reasoning for six years.  But obviously, ultimately,

10   it's a judgment.

11         THE COURT:  Well, this -- I want to hear from an

12   economist why six years is the number.

13         DR. BERNHEIM:  Exactly.

14     So I think about it this way:  There are sort of

15   two stages to entering.  The first is you have to, you know,

16   make your app store.  And that's not a simple process.  You

17   heard testimony from Google witnesses about that at trial.

18   Google -- they testified that Google had to make large

19   investments in its app store, that its app store has all sorts

20   of things that they invested in creating.  Things like app

21   discovery.  This is not a quick process.

22         So you need to give potential entrants some time to

23   develop and launch their app stores.  And what I'm thinking, in

24   my mind, that's okay.  They need a couple of years to do that,

25   two or three years.

1        Now, after they do that, now you have competing app stores

2   out there that are potentially viable competitors.  They need

3   enough time to establish a base of users and a base of

4   developers that will be robust, and therefore, competitively

5   sustaining; it's viable once this provision expires.

6        And so, in my mind, the appropriate length of time was an

7   additional three years.  The reason three years is that that's

8   is one phone purchase cycle.

9        So if they're trying to compete through -- through

10  preloading, then one phone -- one phone purchase cycle

11  basically gives the competitor a shot at the entire market once

12  they finish developing and launching their app store.

13       So that's the thinking behind the period.  But I readily

14  acknowledge that this is not an exact science.  What we're

15  trying to do is a bit of rough correction for the advantages

16  that Google has but shouldn't have because they're derived from

17  its past conduct.

18       **THE COURT:**  All right.  I'm just going to call on

19  Dr. Gentzkow.  I don't know how you're dividing the labor.

20       **DR. GENTZKOW:**  I'll take this one too.

21       **THE COURT:**  What's the response to that?  Why isn't --

22  how is that unduly burdensome on competition?

23       **DR. GENTZKOW:**  Yeah.  So let me make several points.

24  The first is to agree with something that you said which is

25  that the network effects that we're talking about here and

 1    those advantages that Google has represent something that

 2    existed before any of the conduct that was at issue in the

 3    case.  And my understanding, what the jury considered at trial,

 4    was conduct starting in 2016.

 5         If we roll back the clock to 2016, at that point, the

 6    Google Play Store already had a very large catalog of apps.  It

 7    already had a large number of users.  Those network effects

 8    were very much in place.  In fact, as early as 2011, the Google

 9    Play Store had a huge catalog -- much larger than its rivals

10    already at that point in time, when I think even plaintiffs'

11    experts have said Google didn't have any market power, monopoly

12    power, at that point in time.

13         So Google was a new entrant that competed successfully.

14    That's where these network effects come from.  So the

15    suggestion that we should try to create a level playing field

16    in the sense of eliminating those, I think is not at all --

17         **THE COURT:**  But I think my concern is you're

18    overweighting that the jury has found that illegal

19    monopolization conduct, at a minimum, bolstered and protected,

20    built a moat around, so to speak, whatever natural advantages

21    Google had established at that point.

22         I need to address that.  So I'm definitely not going to

23    say just because there were some first-mover advantages and so

24    on that are totally legitimate, there won't be a consequence.

25    But maybe the way to address that is just have a much shorter,

1  you know, like a two-year horizon, rather than a six-year

2  horizon.

3          DR. GENTZKOW:  I understand and I'm not saying there

4  shouldn't be any consequence.  I'm just saying that should

5  certainly not be to eliminate the network effects or try to

6  remove that advantage entirely because it's one that Google won

7  through competition.

8      Second point that I think is really important is that --

9  we were talking about the service fee revenue and how that's

10  going to flow, I think it's crucial that the overwhelming

11  majority of apps on the Play Store don't generate any service

12  fee revenue, or very, very little.

13     A lot of what provides value to users is those apps --

14  which many of them are free, many of them provide little

15  revenue -- that there's going to be very little incentive to

16  compete for, and Google is going to be asked to share all of

17  that intellectual property with its rivals.

18          THE COURT:  What intellectual -- Google is hosting a

19  third-party app.  What's the intellectual property that's being

20  shared?

21          DR. GENTZKOW:  There's an entire infrastructure that

22  they have built to host those apps, to provide for downloads of

23  those apps.

24          THE COURT:  That's all going to be happening over the

25  a rival -- through the a rival store.  It's not going to be

1   using Google's service, is it?

2           DR. GENTZKOW:  As I understand the proposal, and

3   Dr. Bernheim can correct me if I've got it wrong, what is

4   envisioned here is, if I'm a rival app store and a user -- so

5   first of all, a user can come to the store and now see all

6   3 million -- or more than 3 million apps that are in Google

7   Play.

8       If a user wishes to download one of those apps, Google is

9   obligated to provide the service of downloading the app for the

10  user, putting that up on their phone, fulfilling that download.

11  So there's intellectual property associated with that.

12          THE COURT:  Yeah, but you're also saying there's cost

13  associated with that.

14          DR. GENTZKOW:  And there's costs to Google associated

15  with that.

16          THE COURT:  Let's pause a minute.

17      So, Dr. Bernheim, let's say -- let's make this a little

18  more concrete.  Let's say there's an app for growing cucumbers

19  that generates zero revenue because five people a year download

20  it.  Google does have some costs, sunk or otherwise, in getting

21  that out to the five cucumber people.

22      How do you account for that?

23          DR. BERNHEIM:  In the following way:

24      Professor Gentzkow is forgetting about the other feature

25  of this remedy that creates very strong incentives, which is

1  that this provision expires -- and we can, you know, return to

2  the issue of how long that period should be, but it expires

3  after a certain amount of time.  Now, think about the

4  incentives that creates for the competing app store with

5  respect to all of the smaller apps, all the apps that don't

6  generate revenue.

7        Professor Gentzkow is essentially arguing that what a

8  competing store might do is focus on, say, the top 250 apps.

9  Go to those developers -- that's where most of the revenues

10  are, you try and create relationships with those developers,

11  but you don't bother with any of the others.

12        Okay.  That means, at the end of six years, or however

13  long you want to make it, your app store has 250 apps and you

14  lose access to everything else.  So now you're back in the

15  situation where Google has a catalog with 3 million-plus apps

16  and you, as a competitor, only have this small subset of apps.

17  There's no way you're going to survive at that point.

18        So in order to be viable when this provision expires, a

19  competing app store must be broadly developing relationships

20  with developers and bringing developers online so that they

21  have a robust catalog when the provision expires.

22        **THE COURT:**  So, in other words -- just to jump in.

23        In other words, they would be needing to put their own

24  work into making sure the cucumber app was available

25  independently on their store.  Particularly, one way to

1    mitigate that, in my view -- or ameliorate it, would be a

2    shorter window, two or three years, of allowing the access.

3    That would put a real fire under the a rival to -- if network

4    effects is really the issue, they're going to have to work hard

5    to make sure that those 3 million apps are as freely available,

6    whether they generate money or not, on their own site.

7            DR. BERNHEIM:  I think you're totally right to focus

8    on the length of time as the right policy lever here.  And my

9    only hesitation there is whether two or three years are enough,

10   because we've heard a lot about how hard it is to create a

11   really top-notch app store.

12           THE COURT:  No, I understand.  And there is a

13   balance -- and I want to be clear that Google, as an illegal

14   monopolist, will have to pay some penalties.  So I'm not -- I'm

15   not at all averse to having them bear some costs.  But there is

16   a point where that crosses a line to being unreasonable.

17   Remember that the standard here is what is reasonable.

18           DR. BERNHEIM:  Yes.  But --

19           THE COURT:  And six years of that strikes me as an

20   awfully long time.

21           DR. BERNHEIM:  Also bear in mind, though, that Google

22   is distributing apps for -- as Professor Gentzkow just said,

23   for the vast majority of its catalog currently without deriving

24   directly any revenue from that.

25           So I think that what that's telling us is that the cost of

1    this distribution is not terribly high, particularly compared

2    with the profits that Google has earned by virtue of its

3    monopolization.  We had testimony about that at trial.

4         **THE COURT:**  Well, it certainly goes to the issue of

5    not retaining the fruits of illegal conduct.  So if they had to

6    pay back a little bit, that's perfectly within the realm of

7    possibility.

8         **DR. BERNHEIM:**  That's the argument, yes.

9         **THE COURT:**  Okay.  Dr. Gentzkow, what -- seems like a

10   good response.

11        **DR. GENTZKOW:**  Yes.  I think that -- two points that

12   are crucial.

13        First, Dr. Bernheim and Epic's essential argument at trial

14   was that app stores can successfully enter the market without

15   having all of those other -- that whole catalog of free apps

16   because they can do it by having exclusives on a small number

17   of top games, top apps; and that is what we actually see

18   happening in the market.  There are new entrants already.

19   Microsoft just announced it's going to create an Android app

20   store relatively recently; I think it's opening this summer.

21        There are other app stores around the world which being

22   are created.  In India, the largest games company just said

23   they're introducing --

24        **THE COURT:**  Can I just jump in?

25        I will ask you to help me.  I don't recall testimony at

1  trial to the effect that Google's network externalities can be

2  overcome by just having a select few number of high-end

3  developers on your store.

4          DR. GENTZKOW:  We could go back to look at the

5  detailed record, but central -- this was in the context, for

6  example, of the Project Hug agreements, which one of the main

7  reasons that -- I think, in Dr. Bernheim's testimony, as I

8  recall, that he objected to those because it prevented those

9  developers from opening app stores with exclusive content or

10 distinctive content, differentiating themselves from the Play

11 Store.  And he made the specific case that that is a viable

12 strategy.  But for the challenged conduct, those app stores

13 would have been able to enter and succeed.

14         THE COURT:  Okay.

15         DR. GENTZKOW:  The second thing that I think is really

16 important to point out here is that what we're talking about,

17 this catalog sharing, has the potential to really harm

18 developers and to harm users, have a lot of unintended

19 consequences that are really hard to foresee.

20     This is a pretty radical reengineering of the market.  I

21 think Dr. Bernheim described it in his statement as decoupling

22 the two sides of the market.

23     So we're changing things dramatically here in ways that

24 could potentially cause more harm than good.  And I just want

25 to flag some potential harms from the developers' point of

1  view.

2      Think about the developer in this.  I'm a developer.  I

3  come along.  I put my app in the Play Store.  That app is now

4  going to appear in any other Android app store, of which there

5  are dozens and dozens, some of them more reputable than others.

6  I have no control over that, as I understand the proposal.

7      And my app could appear next to objectionable content.

8  There are app stores that host pornography and other content

9  that I might not want my app next to.  So my apps are being

10 distributed potentially without my consent, or at least in ways

11 that I might not anticipate.

12     And the other form of harm is this is going to shut down

13 or at least substantially diminish --

14         THE COURT:  Let's pause on that.

15     So the concern is the developer may be in company on an

16 app store the developer dislikes and will have not necessarily

17 any prior knowledge of that and may, I assume, have no

18 possibility to fix that.  Even if they discover they're next to

19 something objectionable that they don't like, they wouldn't

20 necessarily be able to get off that app store.

21         DR. GENTZKOW:  And I think that's --

22         THE COURT:  That's a harm to developers.  Other than

23 hurt feelings, how is that a harm to developers?

24         DR. GENTZKOW:  Because it could undermine their brand.

25 It could undermine the reputation that they have with users if

1   users see that.

2       Let me just say that I think the content that it's next to

3   is just one example.

4       THE COURT:  I'm trying to put a -- something concrete

5   on what the harm is.  I mean, I understand a developer may -- I

6   mean, to take an extreme example, there might be a religiously

7   charged app and somebody does not want it to be next to

8   something they consider to be morally reprehensible.  They

9   certainly would have moral injury, so to speak, from being

10  unhappy that they're in an app store with products that they

11  find incompatible with their viewpoints.

12      But what is the harm?  There's no economic harm, is there?

13      DR. GENTZKOW:  I think the economic harm would come

14  from a user seeing that app in that context and having their

15  evaluation of this religious app that they were thinking of

16  downloading, say.  They see it in a context next to some

17  objectionable content, and they think, "This is a developer

18  that puts their app in this app store.  That's maybe not the

19  app that I want to download."

20      And so demand, from an economic point of view, is reduced

21  by seeing it.  There's also -- just to flag other versions of

22  this, other reasons why a developer might want to limit the set

23  of app stores or apps they're distributed through.  These are

24  all over the world, so there may be legal implications of

25  having my app distributed in other countries that have

 1  different legal regimes.  They might be in different currencies

 2  and different languages.  So that's potentially problematic.

 3    And --

 4    **THE COURT:**  I'm having -- so the premise of

 5  Dr. Bernheim's access point is, this is all going to be

 6  Google's business as usual.  It's just coming from a different

 7  portal.  Until that developer strikes an individual deal with

 8  the -- and I'm sorry.

 9    Until that app store owner strikes an individual deal with

10  a developer, it's all Google.  It's 100 percent Google.

11  Nothing is different except you're walking through, you know, a

12  different door to get into Google.  So these are all -- Google

13  has already solved all these problems.

14    You know, like, an app that might be illegal in Iran, for

15  example, is probably not in the Play Store already or -- I

16  mean -- so I'm just not getting it.  You're going into the

17  Google Store just through a side door, but it's all Google

18  otherwise, until this developer strikes a deal.  And at that

19  point, the developer is going to know exactly what app store

20  they're on because they're negotiating a deal directly with

21  that app store, so there won't be any surprises.

22    So I'm having trouble understanding how this is actually a

23  concrete issue.

24    **DR. GENTZKOW:**  If I understand the way it's

25  envisioned, just that that app, although it's being -- the

1  downloads are being fulfilled by Google and it's being shared

2  out from Google, it's appearing in that other app store And

3  those app stores are going to be distributed in, potentially,

4  places where the Google Play Store is not, and they're going to

5  host content that might appear alongside it.

6          So I think that's --

7              **THE COURT:**  Wouldn't Google in fulfilling it already

8  have executed all those restrictions?  They would know they

9  can't fulfill an app in a certain country.

10             **DR. GENTZKOW:**  Well, I think that that -- Google might

11  have apps in the Play Store which it offers in certain

12  countries but not in other countries, potentially.

13         But I think administering this, there needs to be some

14  procedure here then to determine from Google's point of view,

15  are they going to get consent from developers to share their,

16  the developers', intellectual property out through all of these

17  app stores?

18         Are developers going to have an opportunity to opt out of

19  doing that?

20         Is there going to be a system, if a developer does see

21  their app in a context that they don't like, for them to

22  redress that, to ask for it to be removed?

23         So I think -- I think all of those things are going to

24  make it potentially harmful to developers.

25         And the other point --

1              **THE COURT:**  Let's just pause in that for a moment.

2       Dr. Bernheim, do you have any response to that?

3              **DR. BERNHEIM:**  Sure.  So let me begin with this last

4       point about the supposed harms from catalog sharing.

5              The thing about distributing all over the world, I just

6       think is a nonissue for exactly the reason you were raising,

7       Your Honor.

8              Somebody tries to buy the app through another app store

9       and they're going to get a message back from, you know,

10      indirectly from Google that says:  "Not available in your

11      area."

12             And I don't -- I don't see how that -- how that ends up

13      being a problem.

14             The issue about no control by developers, you may end up

15      with your app next to some unsavory content.  I haven't

16      actually seen any evidence that developers are concerned about

17      this.  This seems a bit hypothetical to me, so I'm not sure

18      that there's any real problem there; but if you became

19      convinced that there was a problem there, I think that there

20      are alternatives available in terms of tweaking the remedy.

21             You know, you could incorporate a developer opt-out

22      option.  Now, if you did that, there are a couple of things

23      that would be very important.  One is that the opt-out should

24      be store specific, rather than broadly opting out of everything

25      because I -- I'm sorry.

1          The hypothesis here is that there are certain stores out

2     there that may be doing unsavory things, so you don't want the

3     developers' only option to be:  To avoid that one store, I have

4     to opt out of these 10 others.

5          **THE COURT:**  Well, I was actually -- I'll tip my hat.

6          I was actually thinking more of an opt-in.  What about

7     that?  Every time a store opens -- I'm just talking off the top

8     of my head on this part, but every time a store opens, Google

9     sends a notice saying:  "Would you like to opt in to be

10    available on this other platform?"

11         **DR. BERNHEIM:**  Right.  There's a literature on opt-in

12    and opt-out in behavioral economics, and what it shows is that

13    there tend to be very strong default effects, the default

14    effect being whatever you establish as the default, you get a

15    lot of people just not changing the default.

16         So if you establish the default to be opt-out so that

17    people have to opt in, you're going to have a much smaller

18    fraction of developers who end up opting in.

19         If, on the other hand -- and some of that is

20    unintentional; right?  It's:  They get the message.  They

21    ignore the message.

22         Doing it the other way around puts more of the onus on

23    this fairly uncommon developer who's bothered by this sort of

24    thing.  It's like the default here is that you're opted in.  If

25    that bothers you, you do have an option to remove.

1          Let me just add --

2          **THE COURT:**  Actually, just to jump in, so as an

3     economic principle --

4          **DR. BERNHEIM:**  Yeah.

5          **THE COURT:**  -- opting in is going to be much less

6     effective in dealing with network effects than opting out.

7          **DR. BERNHEIM:**  That's correct.

8          **THE COURT:**  Okay.  All right.

9          **DR. BERNHEIM:**  Okay.  What I would add in terms of

10    what else would be needed if you go for the opt-out option is

11    the provisions that we talked about a little while ago, about

12    Google not being allowed to write contracts that are

13    conditional on activities as a rival or interactions with a

14    rival.  They would have to apply to opt out, too.  You don't

15    want Google incentivizing opt-out, or that's going to defeat

16    the whole purpose.

17         And we probably would also want that provision that I

18    described earlier that says -- you know, in the contract with

19    the developer, it says:  Nothing in here -- none of the terms

20    in here are conditional on your opt-out decisions.

21         **THE COURT:**  This is probably beyond your expertise,

22    but how would the opt-out work?

23         **DR. BERNHEIM:**  So this is getting into a technical

24    question.  I can tell you how I envision it, and then other

25    parties who know more about the technical details are going to

1    have to say what's feasible and what isn't feasible.

2         But you could imagine that a developer, when first listing

3    a -- a -- an app on Google Play simply gets a screen on which

4    there are listed a bunch of stores, and you know, they can

5    check the ones that they don't want to be listed on.

6         **THE COURT:**  Well, we've gotten 3 million installed.

7    Let's say next week somebody opens -- or week after the

8    injunction is out, if I did this --

9         **DR. BERNHEIM:**  Yeah.

10        **THE COURT:**  -- 10 stores open up.

11        **DR. BERNHEIM:**  Right.

12        **THE COURT:**  Now, is that developer going to get

13   10 opt-out requests for each of those stores?

14        **DR. BERNHEIM:**  For a new store, we would have to have

15   some process of reaching out to the developers.  It seems like

16   that could be a fairly easily automated process.

17        **THE COURT:**  Through Google?

18        **DR. BERNHEIM:**  Through Google.  I'm not sure it would

19   need to happen, you know, literally the moment that a store

20   pops up.  It might be enough to do it once a month, for

21   example.  Developers get a message that says:  During this past

22   month we have the following new stores.  Please indicate

23   whether you want to opt out of any of those.

24        **THE COURT:**  This is a little bit more detail than we

25   need, but this would be a one-time only opt-out?  What if

six months later you decide the store is going in a direction
you don't like.

      **DR. BERNHEIM:**  No.  They should be able to get back
into the system and opt out.

      **THE COURT:**  Okay.  So it's -- it's one ask, and then
you can ask yourself if --

      **DR. BERNHEIM:**  I think you probably should be able to,
yes.

      **THE COURT:**  All right.  Dr. Gentzkow?

      **DR. GENTZKOW:**  Yeah.  So I think the first thing I
would say just on the characterization of economics is I think
that same behavioral economics literature that Dr. Bernheim is
referencing shows that if the default is opt-in, there are
going to be a very large number of developers that are opted in
without realizing that, without paying attention to it, without
noticing this notification that might come through their
e-mail.

    So I think the problem, from my point of view, with making
the default be for every developer on Play to be shared in
every Android app store is that those of them that would suffer
some harm from that, there are going to be a lot of them that
don't recognize that.  I think the opt-in version of that --

      **THE COURT:**  But they could -- if it turns out later
that someone says, "Hey, this is a bad deal," they can tell
Google or tell the store, tell the rival store, "We don't want

1   to be here anymore."

2           DR. GENTZKOW:  They could -- they could opt out later.

3           THE COURT:  What's wrong with that?  Look, I have to

4   do something to overcome the network effects.  This seems

5   reasonably tailored to that.  Leaves it up to the developer.

6       So if you're worried about harm, who better to decide the

7   harm than the -- or the risk of harm than the developer itself?

8           DR. GENTZKOW:  Yeah.  And I think that is satisfied by

9   the opt-in version of it that gives developers who would like

10  to participate in this the option to do that.  I also think

11  that, even under that provision, there's harm to the developers

12  because there's going to be less competition in this market.

13      We're going to be reducing the amount of competition.

14  Right now, all of these app stores have incentives to compete

15  for service fee revenue from apps but also for the apps that

16  are going to be part of their catalog they can show to users.

17          THE COURT:  Well, but that's why they'll have a

18  two-year horizon.  So for two years -- two years you get to --

19  to build your base on a Google Play Store that is, at least in

20  part, the fruit of illegal conduct.  After two years, if you

21  haven't locked in those developers, they're gone.

22          DR. GENTZKOW:  And so just --

23          THE COURT:  So you will lose as the rival store.  You

24  will lose if you haven't locked in your own independent deals.

25      So doesn't that address that issue for competition?

1          **DR. GENTZKOW:**  I don't think it fully addresses that

2    issue because for that -- for the duration of that period of

3    time, there are going to be less incentives to --

4          **THE COURT:**  Well, of course.  There's a remedial

5    period in the wake of the verdict of monopolization.  That just

6    comes with the territory.

7          Okay.  There's going to be a two-year period when we have

8    to make things right.  It's like my recovering from the

9    shoulder surgery.  I've got six months where I have to do

10   things that I don't want to do and can't do things that I do

11   want to do; but at the end of it, I'm going to be great.  Okay?

12         So this is the two-year -- this is the equivalent.

13         **DR. GENTZKOW:**  Yeah.

14         **THE COURT:**  So for two years, maybe there'll be

15   technically reduced competition.  But I just don't see that

16   because those developers -- or those app stores are under a gun

17   literally; that if, at the end of that two-year period, they

18   haven't locked in their deals, Epic is gone, all the top people

19   are gone.  And that's got to be a huge spur to competition.

20         **DR. GENTZKOW:**  Yeah.  So I think it's -- I think I

21   just -- I just need to highlight the harm that could happen

22   during that period of -- during the term of that provision.

23         **THE COURT:**  Dr. Bernheim?

24         **DR. BERNHEIM:**  A couple of things.  First, I just

25   wanted to address the length for one second because you have

1   mentioned two years.

2         THE COURT:  Because -- I know I keep saying two.  It's

3   not a scientific number, but --

4         DR. BERNHEIM:  So on that, one other possibility to

5   consider is to say that there is some period of time which

6   could be a longer period of time, like six years, wherein if an

7   app store launches, it gets two years of catalog sharing after

8   that.  Up to the total limit of six years.

9         What I'm concerned about is if you just say two years,

10  starting from 2024, you're going to get stores launching late

11  in that two-year period, and they're just not going to get much

12  of a benefit.  Whereas, if it is once you launch you get the

13  two years, as long as that total amount of time doesn't exceed

14  six years, that would be a better way to ensure that rivals,

15  once they launch, are going to benefit from this provision.

16        That said --

17        THE COURT:  That would seem, though, to actually maybe

18  be a bit of a restraint on competition.  So, basically, you

19  have six years of restrained competition as opposed to

20  two years.

21        I understand what you're saying about if somebody decides

22  in month 14 or month 18 to launch, they may have only

23  six months of access, but that's their choice.  I mean --

24        DR. BERNHEIM:  Well, it's just not feasible for some

25  of them.  So Amazon may be ready to launch right away.  So

1   Amazon launches right away, 2024.  2026, they lose catalog

2   access.  It doesn't go beyond the two years.  So what you're

3   doing for Amazon lasts two years in providing the access and no

4   more.  You could do it that way.

5       But if somebody, you know, a new entrant goes "Hey, the

6   rules of the game have totally changed.  We're not ready to

7   launch an app store but this is a great market," you don't want

8   them taking close to two years.  It's going to take time --

9           **THE COURT:**  I understand.  But I also don't think

10  someone should have the ability to wait for four years and then

11  say, "Now I want in."  That just seems a little much.

12          **DR. BERNHEIM:**  This is a matter of adjusting the

13  lengths of time so that they seem reasonable.  So is it

14  four years?  Is it three?  Is it two and two?

15      I'm just suggesting that there's an additional --

16          **THE COURT:**  Nuance.  I see.

17          **DR. BERNHEIM:**  -- avenue for you to work with -- this

18  is a judgment call.  This part of it is really not an exact

19  science.  So it's a judgment call, but you have two pieces to

20  work with here rather than one.

21          **THE COURT:**  Okay.

22          **DR. BERNHEIM:**  The other thing that I wanted to

23  address is this opt-in/opt-out thing where Professor Gentzkow

24  has made an argument that it should be opt-in rather than

25  opt-out.

1          And I think the thing to keep in mind is that the vast

2     majority of developers are very unlikely to want to opt out,

3     given their awareness of it.

4          Remember how this works.  If they want, they don't have to

5     sign up with any other app store.  Their relationship could

6     still be entirely with Google, Google's terms and conditions,

7     everything with Google; right?  And the only additional thing

8     that happens is they may get some additional sales that happen

9     to originate in other stores.

10         That's the only change.

11         So I think the majority -- the vast majority of developers

12    are going to go "This is a great deal.  We're getting free

13    exposure in additional locales.  Why is that bad?"

14         So there may be an occasional developer who says:  We

15    really care about this issue of being sullied by something else

16    on this particular store.

17         Any developer that feels that way is going to have the

18    motivation and the opportunity to opt out.  The ones who care

19    about this can opt out.

20         I don't think that the fact that there may be a small

21    number of those should mean that we use this inertia effect to

22    contrive an outcome that is going to work in Google's favor.

23         **THE COURT:**  Okay.  Dr. Gentzkow, you're going to

24    describe potential harms to users, and then we'll take a short

25    break after that.  Okay?

1      **DR. GENTZKOW:**  Yeah.  I think there are potential

2  harms to users, first of all, from diminished competition

3  because --

4      **THE COURT:**  All right.  For a two-year period or

5  four-year period, that is just going to happen, but --

6      **DR. GENTZKOW:**  For that duration, there would also be

7  harm to users.

8      **THE COURT:**  Why is that a harm to a user, if the

9  stores multiply?  That makes it a lot easier to find the app

10  you want.

11      **DR. GENTZKOW:**  Just in a sense that in a two-sided

12  market in economics, one of the reasons why you're competing to

13  attract users is because you want to attract developers -- this

14  is the chicken-and-egg kind of issue that Dr. Bernheim referred

15  to -- and if I no longer need to attract developers, I'm going

16  to compete less for users.

17      There's another part of this proposal which we haven't

18  talked about which Epic has referred to in the proposed

19  injunction as "library porting."  I don't know if that is still

20  part of the proposal; but if it is, that also, I think,

21  involves substantial harm to users that we'd want to discuss.

22      **THE COURT:**  Okay.  Dr. Bernheim?

23      **DR. BERNHEIM:**  Your Honor, honestly, I don't

24  understand the diminished competition point.

25      **THE COURT:**  I'm struggling myself, but I'm not an

1   economist.  So help me.  Help me.

2          **DR. BERNHEIM:**  Right now we don't have meaningful

3   competition.  This remedy is creating a pathway to competition.

4   And on that pathway, all the parties have strong incentives to

5   compete.  The rival app stores have incentives to sign up

6   developers so that they can get revenue streams and so that

7   they're not dead in the water when this provision expires.

8          Google has incentives to continue to sign up developers so

9   that they're not at a disadvantage.

10          **THE COURT:**  And maybe change their fee structure too.

11          **DR. BERNHEIM:**  Right.

12          So all of a sudden, you have competition bursting out.  I

13   just don't understand the point about reduced competition.

14          Library porting is a longer issue, and Professor Gentzkow

15   hasn't explained the objections yet, so --

16          **THE COURT:**  Let's do this.  Let's take a 10-minute --

17   we'll come back at 12:40, and we'll pick it up at the library

18   porting.  Thank you.

19          **THE CLERK:**  All rise.  Court is in recess.

20                    (Recess taken at 12:26 p.m.)

21               (Proceedings resumed at 12:45 p.m.)

22          **THE CLERK:**  Remain seated and come to order.

23          We're back on the record in Civil 25-671, Epic Games, Inc.

24   v. Google, LLC, and Multi-District Litigation 21-2981, In Re:

25   Google Play Store Antitrust Litigation.

1          **THE COURT:**  Okay.  We stopped with the library issue.

2     Dr. Bernheim?

3          **DR. BERNHEIM:**  I'm happy to dive into library porting.

4          **THE COURT:**  Yes, please.

5          **DR. BERNHEIM:**  I think Professor Gentzkow hadn't

6     explained the objections to it yet.

7          **THE COURT:**  Okay.  Let's set the table then.

8     Dr. Gentzkow?

9          **DR. GENTZKOW:**  So the library porting remedy, I think

10    it's important to describe again what it amounts to, to

11    describe what it amounts to, which is that any app store on my

12    phone can present me with a screen.  And if I click on it, that

13    app store takes over all of the other apps on my phone that

14    were downloaded from Google Play that are in that app store.

15    It now controls their updates and it now gets all of their

16    service fee revenue.

17         So let me highlight three problems with that.

18         The first, I think, just to keep in focus, along with the

19    catalog access remedy, this is part of a really radical

20    restructuring of the market, what Dr. Bernheim has described,

21    turning a two-sided market into a one-sided market is a pretty

22    dramatic restructuring.

23         Second, I think, something we haven't touched on that is

24    really important to keep in focus is that the technology for

25    none of these things exists right now.  Dr. Bernheim alluded to

Alleyoop -- we can talk more about that, but it's incorrect in
my understanding that there is any technology existing that
would not require development of a substantial new product to
do this.

And third, as I alluded to before the break, I think this
has the potential to really harm users.  Think about like what
it's setting up is a situation where any app store that gets a
user to click on one button can take over the service fee
revenue from all of their apps.  That's an enormous economic
incentive for app stores to get users to click on a button and,
I think, looking out at the economy broadly, situations where
firms have huge incentives to get users to click on something
tend not to work out very well.

There's a huge possibility, coming back to behavioral
economics, as Dr. Bernheim was talking about.  We know
consumers are not super attentive to those things, and that is
going to give the app stores a huge incentive to bombard them
with messages trying to get them to do that, to put up a
deceptive message that tries to get them to click on it, maybe
inadvertently.

**THE COURT:**  I'm having trouble understanding that.

What I -- what you seem to be saying is consumers benefit
from a monopoly.  I don't agree with that.  Just because
there's one source, so you won't be bombarded with competing
messages or ads you don't want, that's not -- I don't see that

1   as consumer harm.

2        I mean, yes, okay, maybe -- maybe because Google has a

3   chokehold on the market, which is illegally acquired through

4   monopolistic conduct, life is less cluttered for users.  But to

5   me, it seems perfectly fine to say competition will have a lot

6   more outreach from competing stores.

7        Why is that a harm?

8        DR. GENTZKOW:  I think it's a really important

9   question because I think there's a huge distinction between

10  economic competition and what this would entail.

11       Remember that all of these apps on my phone were

12  discovered and downloaded through another app store that

13  provided all the services to do that.

14       What these other app stores are competing for is not to

15  deliver more value to consumers.  There's not a proposition

16  here of "You will click on this if -- because our app store is

17  better, because we're offering lower prices.  There's -- all we

18  need to do is get you to click on one button."

19       And so while there is some competitive incentive there, I

20  think there's going to be a tremendous likelihood that the

21  competition is not on the margin of giving value, but of

22  tricking consumers, using dark patterns, using deceptive

23  marketing to get them to click on something.

24       THE COURT:  This all seems completely speculative to

25  me.

1      Where is all this coming from?

2      It seems to me that you're just presuming, without any

3  evidence in the record, that this is going to devolve into a

4  sort of dystopian nightmare of competing app stores.

5      Why isn't it equally probable, if you're just speculating,

6  that the opposite will happen, this would be a golden age of

7  consumer choice?

8          DR. GENTZKOW:  I think it's important to say there is,

9  as you said, in the record, no evidence either way on what

10  would happen with this because it's completely outside of

11  anything that was considered at trial.  So there's a risk -- at

12  a minimum, I would say there is a risk that it could create

13  substantial harms of the kind we're talking about.

14          THE COURT:  I just don't see why you say that.  That's

15  what I'm saying.  I don't -- yes.  Okay.  I mean, that is just

16  like saying, there's an equally reasonable probability that it

17  will be the best thing that's ever happened.  So it's a

18  value-neutral choice.

19          DR. GENTZKOW:  Yeah, I think it's -- I think that it

20  is creating something completely new that has never existed

21  before that has the potential to create real harm for users.

22      Think about what happens.  I downloaded the Aptoide App

23  Store.  I click on this button.  I'm a user who creates a lot

24  of revenue.  I play a lot of games.  I have a lot of apps on my

25  phone.  The Aptoide App Store takes over all of those apps and

1   now -- first of all, as part of this, as I understand it, that

2   app store has access to a list of all of the apps on my phone.

3   There are privacy risks associated with that.  I could have a

4   cancer-related app.  I could have an app that reveals my --

5         **THE COURT:**  Well, but Google is already doing that.

6         **DR. GENTZKOW:**  Google is already doing?

7         **THE COURT:**  Google already knows what all the other

8   apps are on your phone.  So what difference does it make if

9   another store does?

10        **DR. GENTZKOW:**  Because consumers consent to and

11  understand that as part of relationship with Google.  They're

12  not anticipating that all of those apps are --

13        **THE COURT:**  Consent?  Have you read user -- terms of

14  use that most of these tech companies have?

15        **DR. GENTZKOW:**  The --

16        **THE COURT:**  The consent to give away everything in

17  your portfolio, every private information.  I see these

18  constantly.  Every judge in this district does.

19        **DR. GENTZKOW:**  I understand.

20        **THE COURT:**  Okay?

21    I mean, if you want to talk about consent, every time you

22  sign up for one of these tech services, you have given away

23  basically everything you consider to be private.  So I don't

24  understand -- so what difference does it make if another app

25  store has equal footing to that same information?  How is that

1  harmful to consumers?

2       DR. GENTZKOW:  The expectation, I think, that a

3  consumer has of their relationship with Google, if you have an

4  Android phone -- I think if we surveyed -- I do not have

5  quantitative evidence on this --

6       THE COURT:  I find this to be unproductively

7  speculative.

8     What is the economic point you're trying to -- I think,

9  you know, you're not in a situation to guess what consumers may

10 or may not think.

11    What is the economic -- what is the economic harm to the

12 users?  None of this so far is an economic harm, which is your

13 area.  What is the economic harm to users?

14      DR. GENTZKOW:  I think the economic harm comes from

15 the consumer's potential to have, as part of this transaction,

16 their privacy compromised, their security compromised,

17 potentially, through --

18      THE COURT:  But you don't know any of that.  You have

19 no data for that.  And you have no data to show that that would

20 be any different from what Google is currently doing.

21      DR. GENTZKOW:  Right.  I recognize that --

22      THE COURT:  Right?  You don't.  So --

23      DR. GENTZKOW:  But I would also just note that, part

24 of the reason why there's no data for that in the record is

25 because this whole proposal of restructuring the market in this

1  way is one that we haven't had evidence about at all.  And so,

2  at the minimum, it has the potential to do a lot more harm than

3  good.  Those risks are --

4      **THE COURT:**  I just don't see that.  I mean, you keep

5  saying that, but that's just your saying it.  I mean, you have

6  no evidence for that.  And it's not a matter of not having a

7  record.

8      You should know, or you might have known what Google does.

9  You haven't said this would be anything different from what

10  Google does.  That's the only touchpoint that really matters.

11      Is this anything different from what Google already does?

12  And I don't think you're in a position to say one way or the

13  other.

14      Are you?  Maybe you are.

15      **DR. GENTZKOW:**  I think it is completely different than

16  what Google does because there is a no analogous provision or

17  no analogous technology in the Google Play Store to take over

18  apps that were downloaded through other app stores on the --

19      **THE COURT:**  That doesn't speak to the privacy and

20  security concerns that you believe may be a problem.

21      I just don't see it.

22      **DR. GENTZKOW:**  Dr. Bernheim referenced behavioral

23  economics before.  That, I think, is in my area of expertise.

24      Behavioral economics, as we were just talking about, says

25  that consumers are at risk and can frequently make decisions,

1   like clicking on a button, without fully understanding the

2   consequences of it.

3        And the consequences -- we're setting something up where

4   the consequences of a user clicking on a button that they don't

5   fully understand can be quite serious here.  And we're also

6   creating a huge economic incentive for app stores to get users

7   to do something that might not be in those users' interest.

8        It's not competition in the form of trying to give those

9   users more value.  It's setting up a specific economic

10  incentive to potentially deceive consumers, to get them to do

11  something which may not be in their own interest; there are

12  many examples of that elsewhere in the economy.  And that is --

13  tends to be something which does not produce the kind of value

14  that we associate with the company.

15       **THE COURT:**  I find that to be entirely speculative.

16       Look, this is -- you know, this has been Google's strategy

17  in the objections -- the 90 pages of objections -- that there's

18  a terrifying world of chaos and anarchy that's just around the

19  corner if there's competition in the app store market.

20       I don't buy it.  I just don't buy it.  That's just

21  somebody who doesn't want to change their illegal ways.

22       **DR. GENTZKOW:**  I think it's not --

23       **THE COURT:**  There is going to be a remedy.  Okay?

24       And if it causes a period of two years or four years or

25  six years of adjustment, that's -- that's the consequence of

1    having violated the antitrust laws.  There is going to be --

2    there's going to be -- we're going to be walking on new terrain

3    for a while.  Okay?

4         So that's just -- that's just -- this is the consequence

5    of breaking the antitrust laws.  We have to do things in a

6    different way.  And you must do things in a different way.

7    That is sort of necessarily true after the verdict.

8         So to, you know, jump up and down as Google has been doing

9    and say, "Well, the different way is inevitably going to be a

10   world nobody wants to live in" is just unfounded.  I'm sorry.

11   It's just not -- I mean, it's just equally probable it's going

12   to be, as I said three times already, heaven on earth.

13        So, I mean, competition in our system is presumed to

14   create heaven on earth, much more so than monopolistic conduct,

15   illegal monopolist conduct.

16        But anyway, Dr. Bernheim, is there anything you want to

17   add to some of those points or respond to?

18        **DR. BERNHEIM:**  Sure.  First of all, I'd like to

19   correct a misstatement about the remedy.

20        It is not true that the remedy allows another app store to

21   take over the revenue for all of the apps that a customer has

22   through Google Play.  It must be that that rival has

23   established relationships, direct relationships with the

24   developers.

25        So it's only a subset of the apps.  It's only the ones for

1    which they have the agreement with the developers.

2         I just want to make sure that that --

3              THE COURT:  I'm with you.  I understand that.

4              DR. BERNHEIM:  Okay.  Now --

5              THE COURT:  Can I just add, what about library

6    porting, specifically?

7              DR. BERNHEIM:  Sorry?

8              THE COURT:  Library porting, specifically.

9              DR. BERNHEIM:  Yes.  Library porting, specifically.

10        Addressing some of the concerns that Professor Gentzkow

11   raised with respect to maybe consumers can be induced to make a

12   bad choice, I honestly don't see the distinction that he's

13   making about this not being the case with other competition.  I

14   mean, this is a risk of competition in all contexts that,

15   you know, some competitors will try and trick people.  It's

16   going to be true here, too.  But we think that competition

17   generally is beneficial.

18        The protection that we have here is that, first of all,

19   the consumer must consent explicitly.  You can't share

20   anything, you can't shift their apps, unless they consent.

21        And second, in contrast to what we talked about a little

22   while ago, this is opt-in rather than opt-out.  Okay?  The

23   consumer has to say, yes, affirmatively, you have my permission

24   to do this.

25        So all the factors that Professor Gentzkow and I were

1    agreeing about earlier about the importance of default effects

2    will work to make it so that what he's -- you know, what he's

3    fearing is not going to be as significant.

4         **THE COURT:**  Can I just make sure we're on -- I'm -- I

5    was thinking -- so unlike developers who may have existing

6    relationships with the Play Store and they need to opt out

7    affirmatively, if that's the way I decide to go, in the

8    marketplace, the consumer makes his or her own personal choice

9    about how to acquire an app.

10        So if they love the default option of Google Play Store,

11   then they can stick with that for the rest of their purchasing

12   life.  If, for whatever reason, they want to shop around, it's

13   their intentional, knowing, and informed choice to buy an app

14   from another store.  And if it turns out that the store serves

15   a bad product or lies or cheats or steals, they just won't go

16   back to that store.

17        I mean, it seems to me that is actually the ultimate

18   safeguard.  And, you know, I see the other end, the deceptive

19   conduct, a lot in this courtroom, and it has market

20   consequences.  If you get a reputation for being a shady spot,

21   where you download this and your address book is going to get

22   hacked, no one is going to do business with you again.  And you

23   know as well as I do that word gets out like wildfire on the

24   internet, sometimes incorrectly, but -- okay.

25        All right.  So we agree that the opt-in is really a good

1   protection for the consumer.

2           **DR. BERNHEIM:**  I think it's adequate protection.  We

3   understand that no system is going to be perfect.

4       If -- there are a few other things I would say about

5   library porting, if I may.

6           **THE COURT:**  Yes.

7           **DR. BERNHEIM:**  You can think about library porting as

8   consisting of a few different elements.

9       The first element, consider the following scenario:  Let's

10  say we've got my app store and somebody has purchased an app

11  through my app store but it was -- I was piggybacking on Google

12  Play, so it's actually Google Play's app -- okay? -- because I

13  didn't have a relationship with the developer.

14      Now I create a relationship with the developer.  For that

15  app -- and I know that that customer has that app because I'm

16  the one that facilitated the download.  Okay?

17      For that app, the developer should be in a position of

18  going to the user and saying, "Hey, you downloaded it on my

19  site.  I will now give you some points if you'll move the

20  ownership over to my store so that, you know, you're coming out

21  ahead."

22      After all, that -- that store made the investment in

23  helping the consumer discover that app.  So that's the first

24  piece.  Okay.

25      Now you go a little bit beyond that and you say, "Well,

1    what about the other apps?"  You've got -- my app store now has

2    other apps that this customer bought through Google Play,

3    didn't download them through my store, but I do have

4    relationships with the developers.

5         Should I be able to solicit the user to shift other apps

6    over to my store?

7         And, I think, the answer is, of course.  You can do that

8    now; right?  You just go to the user and say, "Just remove the

9    current app from your phone and then re-download it from my

10   website."

11        That is -- that is switching ownership of the app from one

12   app store to another.  They can do that now.  All we're doing

13   is making that process a bit less friction -- less friction in

14   that process.

15              **THE COURT:**  Okay.

16              **DR. BERNHEIM:**  Okay?  And then library porting has a

17   third element, which is the user can go to Google Play and say,

18   "Hey, I want you to give the list of the apps that I have on my

19   phone to this other app store so that they can switch the ones

20   that they now, you know, have direct relationships with

21   developers."

22        This is the one I think that Professor Gentzkow's concern

23   is raising the privacy issues because, otherwise, another app

24   store has no way of getting that information.  They're only

25   getting information that, you know, they already know because

1    they were responsible for downloading the app or, you know, the

2    user is affirmatively trying to switch the ownership of some

3    other app.

4         I don't think that the -- that the privacy part of this is

5    a big deal.  But if, you know, you were concerned about the

6    privacy part, you know, that piece of it is a separate -- like

7    I said, library porting has these three pieces, and you can

8    kind of think of them as being somewhat separable.

9             **THE COURT:**  Well, here's how I think about it:  If

10   you're going to download an app store, you're going to have

11   terms of service, and you're going to have informed,

12   quote/unquote -- because nobody ever reads them -- but informed

13   consent by the user as to what that app store is going to do

14   when it's platformed on your personal device.

15        I think that -- I mean, that is enough to put privacy in

16   the hands of user in a way that they can decide.  So if they

17   read -- there's a new app store and they read it and it says,

18   "Oh, no.  This app store says it's going to canvass every app I

19   have on my phone and send back a message to the home office.  I

20   don't like that," then maybe one point of competition will be,

21   you know, the private app store.

22        That's our -- that's our selling point.  We will never ask

23   you to reveal anything about yourself, and that's why you

24   should shop with us.  And that's how we're going to

25   differentiate ourselves from everybody else.  We don't poke

1   around your phone.

2       So I'm not -- I'm not troubled about the -- it -- the

3   privacy will be in the control of the consumer, as far as I can

4   tell.  I've heard nothing, and it's certainly consistent with

5   every other technology app and device I've seen in 10 years on

6   the bench.

7       So, no.  You may -- you may raise other points which is,

8   is there truly consumer choice?  That's not our issue.  So, you

9   know, that's for a different case, but -- okay.

10      All right.  I would like to -- we still have Google

11  billing to talk about.  We've heard a lot now, Dr. Bernheim, on

12  remedies for past conduct and opening up the market for

13  opportunities to compete fairly, are there any other big-ticket

14  items you want to raise?

15          **DR. BERNHEIM:**  There were a couple of other items that

16  were focused on opening up the market.  One of them was for a

17  period of time requiring Google Play to distribute competing

18  app stores.  The purpose of this is, again, you don't want to

19  have these remedies -- this portion of the remedy in place for

20  very long.

21      If you are a competing app store, you have two ways of

22  distributing your app.  One is through preloading.  And, you

23  know, we need to give them enough time to go through a preload

24  cycle, but you can also have, you know, downloads independent

25  of preloading.

And the thing about downloads is everybody -- all the
Google Android users are kind of trained at this point to go to
Google Play, and it's going to take a while to undo that.

So if you make these apps available on -- the competing
app stores available on Google Play for a limited period of
time, you are offsetting the advantage that Google Play has
acquired by virtue of its past anticompetitive conduct as the
dominant go-to provider of app store distributions.  So that
would be a temporary provision to provide some offset for that
advantage.

**THE COURT:**  So how would that work in practice?  Let's
say there's -- I'm not agreeing -- there's a six-year remedial
period.  An app store opens up in year four, would a year be
sufficient, from an economist point of view, to be -- to
require Google to make that app store available?

**DR. BERNHEIM:**  Again, it's --

**THE COURT:**  Six months?  I mean, how much time --

**DR. BERNHEIM:**  It's a judgment call, and it's hard to
be precise about that.

**THE COURT:**  But from an economist point of view,
dealing with network effects, what would the estimate be?  I
know it's an estimate, but --

**DR. BERNHEIM:**  You know, this is more of a gut
reaction than an estimate.

I think, to acquire a robust user base, you're probably

1   talking about a couple of years; but this is a gut reaction.  I

2   can't point to hard evidence on the time frame.  Unfortunately,

3   this is the part of this -- as I've been saying, the length of

4   time is the part of this that is not an exact science.

5             **THE COURT:**  But it would be the case that, regardless

6   of the period of time, one year, two years, six months, market

7   forces would decide whether that store lives or dies.  So if

8   they're on Google Play for a year or two years, they don't get

9   any traction, that's -- then they're done.

10            **DR. BERNHEIM:**  They're done.  That's absolutely right.

11            **THE COURT:**  Okay.  All right.  Okay.

12       And was there anything else on the app store side?

13            **DR. BERNHEIM:**  I'm not thinking of anything, as I sit

14   here.

15            **THE COURT:**  Okay.  Dr. Gentzkow, on the posting of

16   competing stores for a certain period of time on Google's

17   website.

18            **DR. GENTZKOW:**  Yeah.  So there are a couple of points,

19   that distributing your competitor's products is a form of

20   enforced free riding, which has significant consequences.

21   There's not a technical infrastructure to do this right now, as

22   I understand it; it might require some modifications.

23       But I think the most important point here is potential

24   harm to users coming from the fact that, when a user comes to

25   Google Play, they expect a certain level of security

1  protections.  Google has invested a huge amount over time to do

2  security screening in the Play Store to make sure that the apps

3  are safe.

4      And so a question that I think would need to be answered

5  with anything like this is:  How do we make sure that any app

6  stores which are offered on the Play Store meet the same kind

7  of security standards, privacy standards, and other standards

8  that people expect when they come to Google Play.  That's a

9  much, much harder problem trying to look at an app store and

10  figure out:  Is it going to be safe?

11      The Aptoide App Store, the APKPure App Store, one of these

12  app stores that comes to the door and says, "We'd like to be

13  distributed on Google Play," we have to figure out of it's --

14      **THE COURT:**  Let me jump in for a moment.  You should

15  jump in, too, if I'm wrong, if I'm recollecting incorrectly,

16  but I'm glad you mentioned this.

17      I want to talk about sideloading and friction and security

18  issues too.  So at trial, the testimony about sideloading is

19  Google cannot determine whether a third-party app has been

20  vetted for security purposes if it's just being downloaded on

21  the side.

22      And the answer to -- Google's answer to that was, at least

23  in part, to have 12 to 18 screens, I think it was, telling the

24  user over and over again, "This is all on you.  Proceed at your

25  own risk.  Click 'yes' 12 times to manifest your desire to

1  proceed at your own risk."  So, in other words, they just push

2  it onto the consumer.

3       Why isn't that effectively the answer -- that's too many

4  screens.  We'll talk about that in a minute.  But why isn't

5  that effectively the answer here?

6       Why is it Google's problem?  Google just tells the

7  consumer, "Hey, you're not in our ecosphere anymore so --

8  you're not in our ecosystem anymore, so good luck.  It's all on

9  you."

10      What's wrong with that?

11          DR. GENTZKOW:  I think because there is this

12  expectation that consumers have and a brand that Google has

13  established saying, "Things we distribute through the Play

14  Store are safe and secure," from the --

15          THE COURT:  I understand.  But you're telling

16  consumers, "Now you're walking out of the garden.  Proceed on

17  your own risk."  So you're directly addressing that.

18      You're not subject to, "Whatever we do, you're now on your

19  own.  Are you sure you want to do this?"

20      And they say yes or no.

21      Why isn't that the answer?

22          DR. GENTZKOW:  I think that would be a step in the

23  right direction, but it would not address the concern fully

24  because distributing any app store that comes along, even --

25  even the, you know, side -- apps downloaded through

 1   sideloading and other channels, there are some security

 2   protections in place and so I think the security risk involved

 3   in an app store that is downloaded are substantially higher.

 4       **THE COURT:**  Well, let me be clear:  If Google is going

 5   to have the requirement of making other app stores available

 6   within Google Play, it's -- I would imagine it's going to be

 7   certainly fine for Google Play to make sure that app is okay,

 8   the app itself is not a problem.

 9       So Google is not being to forced to put up malware under

10   the guise of an app store.  That is not going to happen.  So

11   Google will vet the app store, say, "This looks great,

12   according to all our normal vetting processes.  And, Consumer,

13   if you want to walk through that door, you know, go -- go on on

14   your own.  That's your choice."

15       **DR. GENTZKOW:**  Yeah --

16       **THE COURT:**  How is that a harm to anybody?

17       **DR. GENTZKOW:**  I think it's just, again, app stores

18   pose particular risks because Google cannot inspect, at that

19   time, what are the -- all of the apps on the store and what

20   will be the apps on the store in the future.

21       There's also, just to flag a potential harm here to OEMs,

22   because -- and to carriers who currently compete for

23   pre-installation.  So right now, OEMs benefit from the fact

24   that app stores that are looking for distribution have to

25   compete for their business to try to get preloaded on the

phones.  If, for a period of time, all of those app stores can automatically be distributed through Google Play, they are not going to be competing at all or at least certainly as hard --

THE COURT:  Yes, for 24 months that will be true and that's -- that is the consequence of having an illegal monopoly.

I know we've gone to this -- gone around this pole a couple of times but, yes, there are going to be some time for the remedial period when competition may not be perfect from an economist's point of view.  That is the nature of remedial work.

You've got to repair the damage, and sometimes that means you're going to have a slightly less-than-ideal situation until equilibrium or market forces are restored.  So I'm not -- I'm not at all concerned about the fact that for a two-year, whatever, six-year period, things may not be ideal from a competitive point of view because we're making them ideal through that time period.  It's just the cost of going forward.

DR. GENTZKOW:  I would note, respectively, that six years is very, very different from two years --

THE COURT:  Well, I've already said I'm a little worried about six years.  I understand that.

DR. GENTZKOW:  And I think my role is just to try to highlight the magnitude of these potential harms.  I understand it's your job to decide.

1          **THE COURT:**  Let me ask you this -- well, actually,

2    let's close out.

3      Any response to that, Dr. Bernheim?

4          **DR. BERNHEIM:**  Sure.  Professor Gentzkow mentioned

5    several arguments.  One is that the app stores would be free

6    riding on the Google Play Store because they would be

7    distributed on Google Play for free.  Google has emphasized

8    over and over again that the vast majority of the

9    3 million-plus apps on the app store basically free ride

10   because they don't generate any revenue directly for Google

11   Play.

12     So if you've got, you know, 3 million-plus apps that are

13   already free riding and you add a few more stores to that, I

14   just can't imagine that that's a meaningful problem.

15     Technical infrastructure, all we're talking about is

16   putting an app in an app store so that it could be downloaded

17   through the app store.  We're not experts in the technical part

18   of this, but I'm having trouble understanding why it can't

19   simply be downloaded as an app.

20     Most of what Professor Gentzkow said focused on security

21   issues.  And what I'm troubled by in the arguments that he was

22   making is that it sounds like these are objections to

23   competition.  He's saying that there are stores out there that

24   may not be maintaining security standards, and that that is

25   going to be problematic.

1          Well, yes, if you open up competition, I mean, there are

2     security -- things you can do to ensure adequate security.  And

3     I know we're going to get to that.  But, you know, the security

4     risk that's posed isn't specific to it having been downloaded

5     through the Google Play Store.

6          This is a statement about competitors, and the underlying

7     theme there is that competitors are bad and you shouldn't allow

8     them because they pose security risk.

9               **THE COURT:**  Yes.  I mean, to my ear, it sounds very

10    close to saying, "We need to be a monopoly to protect you."

11              **DR. BERNHEIM:**  That is right.

12              **THE COURT:**  And I just don't buy that.

13              **DR. GENTZKOW:**  Could I respond, Your Honor?

14              **THE COURT:**  Yes.

15              **DR. GENTZKOW:**  Just to that point, because I think

16    it's not just competition.  I think part of competition is a

17    firm's ability to build their product and their brand and

18    reputation with consumers.

19         If I have a store, Target, that I have developed, that

20    stands for, in consumers' mind, a whole bunch of things that

21    I've worked to build, that's how I compete.  Then, being forced

22    to put a bunch of stuff in my Target store that is potentially

23    dangerous -- toys for kids with lead paint -- that are not

24    really consistent with my brand, is undermining competition

25    because it makes it harder for consumers to identify with those

brands, and it makes it harder for firms to compete in the marketplace.  So I don't think this is just competition.

Requiring a competitor to distribute the products of their rivals is a very unusual thing in markets, and it has significant downsides from the perspective of competition.

THE COURT:  It may be, but this is a tech market and this is a monopolization of a tech market, and I think there is room for innovation, and remedy calls for some creativity and flexibility, given the circumstances.  So I'm not at all put off by the fact that this may not happen in the distribution of petroleum products or agricultural products.  Different market, different time, different conditions.

I wanted to ask -- I don't want to cut anything off you had to add, but there are some -- there were concerns about SIM shipping, feature parity.  That would probably all shake out in the provision that would say "You can't have any agreements that would affect" -- okay.

DR. BERNHEIM:  Conditionality, yes.

THE COURT:  The last thing I have to say --

DR. GENTZKOW:  Can I make one point on that, Your Honor?

THE COURT:  Sure.

DR. GENTZKOW:  I just want to be clear.  Since -- when we talked about before, I believe what we were talking about was, on all of those provisions, something that's restricted to

1   explicit clauses referencing rivals related to exclusivity --

2          **THE COURT:**  You make the lawyer in me nervous when you

3   start putting in modifiers like "explicit."

4      I'm not -- you either say it or you don't.  I'm not going

5   to say it has to be a specific word or anything else.  But if

6   the intent is to do it, that's enough.  You can't do that.

7          **DR. GENTZKOW:**  I just want to make sure that we're

8   clear.  There's some language in the proposed injunction about

9   conduct which even disincentivizes, changes the incentives of

10   firms to do those things.

11          **THE COURT:**  Oh, okay.  I think I might be able to

12   jump -- I'm not using language like that.  I'm writing the

13   injunction.

14          **DR. GENTZKOW:**  I just want to make very clear --

15          **THE COURT:**  I understand what you're saying and I --

16   there are -- I said earlier, I believe at the start, I found

17   some of it to be too open-ended and too vague.

18      Remember, that injunction has to be enforceable in a

19   contempt proceeding, and you can only do that if someone is on

20   clear notice you can't do something.  So that is effectively

21   what I'm going to have to do.

22      This may be -- this is the last point I want to raise.  If

23   you have anything else, I'm happy to hear from both of you on

24   the app store, but, you know, the security thing.  Here is what

25   I'm thinking, and I'm going to just talk out loud here, among

1  friends, for a moment.

2       There is a complicated world of security that, as a

3  district judge, I should not be involved in.  Okay?

4       All I want to be involved in is the friction.  So there

5  was testimony from, I think, Professor Mickens -- if I'm

6  getting his name right -- about you don't need 12 to 18

7  screens.  You can accomplish this in -- I can't remember how

8  many he said -- but a fraction of that.  Okay?

9       I want to focus just on that portion.  That is all, I

10 think, an injunction could do, is -- I can reduce the friction.

11 It's clear.  It's understandable.  It's doable based on the

12 evidence done at trial, and I don't need to wade into all of

13 the tremendously complicated, possibly, security issues that

14 lurk behind that.

15      So it seems to me this is part of the app market because

16 there was evidence at trial that the friction Google put into

17 those multiple screens was intentionally done to discourage

18 sideloading, direct loading, and getting apps from a source

19 other than Google's own Play Store.

20      So are you comfortable with the idea that just reducing --

21 and I also think it ties into one of my main themes, which I

22 hope is becoming clear, trust the consumer to make his or her

23 own choice.  So if you want to shop outside of Google, and you

24 feel like you're giving up a security blanket, that's fine;

25 just do it knowingly and intelligently.  Okay.

1    So I'm perfectly fine having a couple of screens saying

2   you're -- you know, whatever Google is going to say about

3   security and safety.

4        Does that seem okay?

5        I mean, there must be some degree of accommodation between

6   reasonable security and not having it so burdensome.

7   I believe -- I can't remember who it was.  It might have been

8   Ms. Kochikar who said, the number of security screens was

9   abysmal.  I think that was her word, "abysmal."  Her own word.

10  Google's own word.  "This is abysmal.  We're doing it.  This is

11  abysmal."

12       So how do we get to reasonable from abysmal?

13       **DR. BERNHEIM:**  You know, this is venturing into an

14  area where economic expertise is speaking less clearly to the

15  issue because this is about security.  You know, I'm not a

16  security expert, and I suspect the other economists are kind of

17  in the same boat.

18       You know, reducing the number of screens, making simple

19  warnings, simple one-time decision, I think the remedy has some

20  language that goes in that direction.

21       That seems reasonable to me.  The economic principle that

22  we introduced concerning security, if I could add to that, is

23  basically a parity provision; that if you want to avoid

24  micromanaging everything Google does with respect to security,

25  then one possibility is to say:  Look, we're not concerned with

1    the level of what you're doing on security.  We're concerned

2    about it being uneven.  We're concerned about you doing one

3    thing for Google Play and another thing for your rivals.

4         And if you have some sort of a parity provision that says

5    the same security standards have to apply to both, then you

6    can't have that manipulation, which is what we've seen --

7              THE COURT:  Let me just jump in.

8         The way I've been thinking about this is -- I think it's

9    the same concept, but maybe slightly different --

10   nondiscriminatory; in other words, that is the phrase I'm

11   using, but I can't just say that.  That's like -- there has to

12   be something in it.

13        So from an economist's point of view, how would you

14   phrase -- it's like a rule, but it can't be so vague that it's

15   subject to a misunderstanding.

16        Is there some way an economist would put that?

17             DR. BERNHEIM:  I'm not sure I have an easy solution to

18   that.

19             THE COURT:  That might require another proceeding.

20   Okay.

21        Okay.  Doctor?

22             DR. GENTZKOW:  So I would say, first of all, I

23   agree -- I think I agree that reducing that 15 screens seems

24   appropriate.  The state settlement already includes a

25   provision -- which I understand that is not agreed to, but that

1    I think is a good model for what would work here.

2        Under the state settlement, Google has already agreed to

3    reduce the -- that friction down, the key parts of that, this

4    unknown source of setting and warnings and all this stuff, down

5    to one screen.

6        There's just a single screen.  It has a, you know,

7    condensed message warning the user, "Click once, you've

8    authorized the source to download things."  So I think just to

9    suggest -- I think that achieves the goal.

10       Second --

11           **THE COURT:**  Can I just -- now, your understanding is

12   that's totally divorced from any actual tech issues.

13       In other words, what you're proposing is there will be one

14   screen saying whatever it is:  You're leaving the Google

15   ecosystem.  You may be subject to problems.  Are you okay with

16   this?

17       I'm paraphrasing.

18           **DR. GENTZKOW:**  Yeah.

19           **THE COURT:**  And then after that, they say yes, and

20   they're done, and there's no other friction from Google.

21           **DR. GENTZKOW:**  That is what is in the state

22   settlement.  I just want to be clear.  There are some -- there

23   are some other things like, for example, if you're using a

24   browser, whenever you download something from a browser, there

25   is usually another wanting that just says:  Are you sure you

1   want to download this thing?

2        **THE COURT:**  Oh, sure.  Firefox may have its own thing.

3   That's not Google.  I'm just talking about Google.

4        **DR. GENTZKOW:**  Chrome also has those things --

5        **THE COURT:**  Okay.  Chrome.  But that's -- yeah.  All

6   right.

7        **DR. GENTZKOW:**  Yeah.

8       So, but I think, essentially, that already has reduced

9   that friction to one screen, and I think that's a good model.

10      I want to respond really strongly to what Dr. Bernheim

11  said about parity, because I think a fundamental issue here is

12  that apps downloaded from these different sources are not

13  equal.  The risks associated with an app downloaded from Play

14  and the risk associated with an app -- you know, we're talking

15  about things that extend out to, like, my mother gets a text

16  message that looks like it's from FedEx, and it has a link that

17  says, "Hey, click here to download on app to track your

18  package."  And she clicks on it, and an app is installed and it

19  can see her financial information, steal -- so that's what

20  we're talking about.

21      I don't think parity is appropriate in thinking about:  We

22  want to have user choice, but what is the information that

23  needs to be provided to the user?

24      It had better be different if Google knows that you

25  clicked a link in a text message and you're coming to a source

1  that looks like that, versus --

2       **THE COURT:**  Well, let me -- my goal is to avoid

3  getting into any of that.

4       I just want to -- the testimony at trial was it's the

5  friction that causes a problem.  I don't -- there wasn't

6  testimony at trial that I recall saying sideloading is causing

7  people to lose all their bank account money because it's

8  nothing but, you know, overseas malware.

9       It was really just Google is putting all these screens in

10  to actively discourage people from shopping from another site.

11  That's the antitrust issue.  That's what I want to address.

12       I don't see actually any reason to get into the actual,

13  you know, nondiscriminatory, non- -- you know, parity.  I

14  just -- I don't -- I don't see that.  I mean, I don't see how

15  not addressing that would actually adversely affect the remedy.

16       In other words, why, from an antitrust perspective, would

17  I have to address that?  I don't see a reason to.  As long as

18  the friction point is eliminated, a consumer knowingly and

19  intelligently volunteers to download, isn't that the end of the

20  issue from an antitrust point of view?

21       **DR. BERNHEIM:**  Well, I think you have to be, again,

22  worried about conduct that is not the same as the conduct that

23  we observed but conduct that Google could switch to that

24  accomplishes the same end.

25       If Google is in a position to start declaring, you know,

1  all competing stores' security risks, then, you know, there's a

2  problem with that.

3          **DR. GENTZKOW:**  If I could say --

4          **THE COURT:**  In other words, putting the warning screen

5  up on every store to kind of scare people at the get-go?

6          **DR. BERNHEIM:**  Yeah.  So when Professor Gentzkow is

7  making the point that, in an ideal world, you would use the

8  information that some app stores are presenting greater risks

9  than others and you'd fine-tune that, and that you need to be

10 able to discriminate to do that.

11      And that is true about the ideal world, but I think what

12 we learned through the trial is that Google abuses the

13 discretion to do that when they have the ability to

14 discriminate.  They do lots of things that make it difficult

15 for competitors.  They don't make that decision based on what's

16 ideal for customers.  They make that decision based on what

17 delivers the greatest profits to Google, what enlarges Google's

18 slice of the pie; and that is what we have to worry about.

19         **THE COURT:**  Well, I -- I agree to -- on the concept.

20 But what I'm suggesting is the reasonable accommodation is

21 instead of the abysmal -- quote/unquote, abysmal 12- or

22 16-screen forced march, you have one screen and one screen

23 only.

24      Isn't that -- that seems reasonable from an antitrust

25 perspective.  I think it is perfectly fine for Google to say:

1   Just be aware, this is not our product.  Don't call me when

2   something bad happens.  It's not our thing.  Please indicate

3   affirmatively you understand this by clicking "yes," and then

4   have a great time in the app store.

5       I mean, what's wrong with that?

6           DR. BERNHEIM:  Well, deciding how far to go on this is

7   certainly a judgment call and --

8           THE COURT:  But I'm just saying, from an antitrust,

9   anticompetitive conduct, that seems to solve the issue of the

10  friction point.

11          DR. BERNHEIM:  Narrowly construed, yes.

12          THE COURT:  All right.

13          DR. BERNHEIM:  The concern would be, more generally,

14  the friction point is about manipulating security issues to

15  discriminate against competitors.  Using security issues as a

16  smoke screen for disadvantaging competitors.  And that would be

17  the logic of having a nondiscrimination requirement here, is

18  you can do whatever you want with security but you can't do it

19  in a way that disadvantages the competitors.

20          THE COURT:  Okay.  Okay.  To my ear, that wraps up app

21  billing store.

22          DR. GENTZKOW:  Could I make one --

23          THE COURT:  Yeah, closing point.

24          DR. GENTZKOW:  -- point on that, Your Honor?

25          THE COURT:  Yes, please.

1          DR. GENTZKOW:  Is that okay?

2          THE COURT:  Yeah.

3          DR. GENTZKOW:  I would --

4          THE COURT:  Or app distribution store, not app

5    billing.

6          DR. GENTZKOW:  Yeah, if I could, just on the security

7    stuff.

8          THE COURT:  Yes.  Yep.  Go ahead.

9          DR. GENTZKOW:  All right.  So I think, number one, I

10   just want to flag that tying Google's hands on dealing with

11   security in order to deal with hypothetical future

12   anticompetitive new things they might dream up to do is a

13   really risky proposition.

14         THE COURT:  I agree with that, and I don't intend to

15   do it.  I'm just going to say --

16         DR. GENTZKOW:  That's great --

17         THE COURT:  -- you have to reduce --

18         DR. GENTZKOW:  I understood --

19         THE COURT:  However, let me just be clear, we're

20   reducing the abysmal experience designed to discourage people

21   from not using Google Play Store; that was anticompetitive.

22   But if it turns out that the one screen becomes a Trojan horse,

23   the injunction is going to have a period of time when people

24   come back to me.

25         DR. GENTZKOW:  Yeah.

1          **THE COURT:**  So that's --

2          **DR. GENTZKOW:**  Yeah, I think that's appropriate.

3      And so, just two other small points.

4      One, I think it's important -- you mentioned consumer

5  choice -- just that Google have the discretion to base those

6  warnings on signals that they have about the security risks of

7  different kinds of apps.  And there are cases where Google has

8  information that a particular app -- like in the example I

9  described -- has actual specific red flags associated with it

10  that make it a higher risk, and having some discretion to

11  reasonably deal with those kinds of cases, I think, is

12  important.

13      And then last, I would just note that that example about

14  the app sideloaded on a phone that is stealing financial

15  information was not a hypothetical example.  There is something

16  called the FluBot virus that did that, and was distributed --

17          **THE COURT:**  No, I -- I'm quite aware of that.  But

18  that can happen on a Google phone with no third party involved.

19  If your mother or my mother pushes that thing, it's going to

20  happen.  It doesn't matter whether it's in an app store or not.

21          **DR. GENTZKOW:**  We're just trying to make it less

22  likely to happen.

23          **THE COURT:**  Yeah.  So, I mean, everybody is equally

24  vulnerable, is my point.

25          **DR. GENTZKOW:**  We don't want to make them more

1  vulnerable.

2          **THE COURT:**  We're not.  They're equally vulnerable,

3  but anyway.

4      Okay.  Can we move to Google billing?  Is that going to be

5  a different team?

6      Okay.

7          **DR. TADELIS:**  Same team, different name.  Steven

8  Tadelis.

9          **THE COURT:**  Tadelis.

10          **DR. TADELIS:**  Thank you, Your Honor.

11          **THE COURT:**  Of course.  All right.  This one may be a

12  little more straightforward, I don't know, but --

13          **DR. TADELIS:**  Straightforward, I would probably say.

14          **THE COURT:**  So I think we have the benefit now of how

15  concrete and specific I would like the discussion to be, so

16  I'll let you take it from there.

17          **DR. TADELIS:**  I will be very concrete and specific.

18      So Remedy Number 1, the jury found an illegal tie.  The

19  remedy should be to sever the tie.  And when I use the term

20  "sever the tie," I mean, it in two ways.

21      First, the physical severing, so, no, you don't need to

22  use Google Play Billing in any form or shape.

23      And two, I mean a lack of an economic tie that Google

24  could do through strategically engineering prices in a way that

25  would basically discourage the use of alternative billing

1   solutions.

2        The second, the jury found that Google willingly engaged

3   in anticompetitive conduct to establish or maintain monopoly in

4   billing.  As part of the remedy there, no anti-steering -- so

5   to allow the developers to steer users to use different ways of

6   paying.

7        And then, finally, making sure that through the -- all the

8   other levers of power that Google has, not to undermine these

9   two remedies.  Simple.

10        **THE COURT:**  Well, okay, let -- we need to unpack all

11   that.

12        So for severing the tie, the proposition would be a

13   developer is perfectly free to bill for in-app services using

14   any system they want -- their own, Stripe -- you know,

15   whoever -- or Google.

16        **DR. TADELIS:**  Correct.

17        **THE COURT:**  Okay.  So that's Proposition 1.

18        The developers are perfectly free to tell customers who

19   may be paying through Google Pay, "why don't you try us?  We'll

20   give you frequent-flyer points or whatever.  It's going to be a

21   lower -- lower price" -- whatever they work out.

22        Okay.  That's fine.

23        Here is the issue that has been bothering me since trial.

24   So there was an abundance of testimony that, even under this

25   user-choice proposal, Google was still asking developers to pay

1    something like 27 percent.  It was about a 3 percent discount,

2    which turned out to be nothing, because if you don't use Google

3    Play, you've got to pay somebody, and that usually paid them 3

4    or 4 percent.  So you ended up still paying 30 percent, it's

5    just that only 27 percent went to Google as opposed to the full

6    30.

7         So what do you do about that 27 percent?

8              **DR. TADELIS:**  So it was 26, but who's counting.

9              **THE COURT:**  Yeah.  All right.  Okay.  You are, you're

10   the economist.

11             **DR. TADELIS:**  So I have no beef with Google charging

12   26 percent or 16 percent or 73 percent for whatever they want

13   to charge on distribution.

14        My beef is with the delta between charging without Google

15   Play Billing and charging with Google Play Billing.

16        In other words, the added fee to use Google Play Billing,

17   on top of all the other benefits they claim developers are

18   getting, should be no less than the cost for Google to deliver

19   those services; and currently that 4 percent is less than their

20   cost.

21        So going exactly to your concern, if I'm a developer and

22   now Google is offering me user-choice billing -- which,

23   importantly, does not sever the tie physically; user-choice

24   billing says you could use something else in addition to Google

25   Play Billing.

1          **THE COURT:**  I'm with you on that.  Let's assume --

2          **DR. TADELIS:**  But let's assume there is --

3          **THE COURT:**  It's all gone.

4          **DR. TADELIS:**  -- a tie but they just --

5          **THE COURT:**  It's a new day.  A developer can do

6    anything he or she wants.

7          **DR. TADELIS:**  Perfect.

8         And then Google says, "If you want to use our system

9    completely, including Google Play Billing, you'll pay us, say,

10   30 percent.  If you don't want to use Google Play Billing,

11   you're going to pay us 26 percent" -- which means that to not

12   use Google Play Billing, it would only be beneficial for a

13   developer if they could find a payment solution product that is

14   less than 4 percent.

15        That doesn't exist today because the costs of a billing

16   solution product are higher than 4 percent.

17         **THE COURT:**  Well, then how would you formulate what

18   Google could do?

19         **DR. TADELIS:**  So from testimony I gave at trial and

20   documents that Google produced, Google's -- Google currently

21   believes that their average cost is about 6 percent.  So that

22   would be a floor on what they could charge for the added use of

23   Google Play Billing.

24        In the remedy, there's actually a call for Google to

25   release that number to the -- I forget the name of the

1    committee.  It's not the audit committee --

2              THE COURT:  Yeah.  I should jump in.

3         We're not doing committees.

4              DR. TADELIS:  Okay.

5              THE COURT:  If there's an issue with enforcement, you

6    will turn to the Court, but I'm not --

7              DR. TADELIS:  Then Google will --

8              THE COURT:  We're not -- that's -- that's way too much

9    for this case.

10        But I'm not sure I'm understanding.  So here's what I'm

11   thinking:  A developer decides to use her own billing system.

12   It's a completely self-contained ecosystem.  You buy through my

13   app, you pay me through my billing system.  Okay.  Nothing to

14   do with Google other than being on the Google --

15             DR. TADELIS:  It was like a different app store?

16             THE COURT:  Well, no, they're -- they're on a Google

17   app store --

18             DR. TADELIS:  Oh, they're on a Google app store.

19             THE COURT:  -- but they're going to do all of their

20   business with you, financially, as a user, through their own

21   in-app billing service that doesn't use Google Pay.

22        So you're saying that Google should be able to charge that

23   developer 6 percent of that transaction?

24             DR. TADELIS:  No.  I'm saying that Google would not be

25   charging them for billing.  I'm not preventing Google from

1    charging for the fact that they have been discovered through

2    Google Play -- the Google Play Store, et cetera.

3        If Google is providing -- let's make it simple -- two

4    different services, distribute through Google Play, don't use

5    Google Play Billing, there's going to be a fee for that.

6            **THE COURT:**  And how does this stop -- how is that fee

7    to be set?

8            **DR. TADELIS:**  Google decides what that fee is.

9            **THE COURT:**  Okay.  And the idea is that if Google sets

10   it too high, the developer will just opt out?

11           **DR. TADELIS:**  The developer might choose not to

12   distribute through Google Play.

13           **THE COURT:**  Okay.  So I don't have to be involved in

14   regulating that fee at all?

15           **DR. TADELIS:**  Absolutely not.

16           **THE COURT:**  Okay.  So in other words, your proposal is

17   just -- just -- just decouple billing --

18           **DR. TADELIS:**  It's decoupling --

19           **THE COURT:**  -- from Google billing.

20           **DR. TADELIS:**  -- and making sure that the extra cost

21   to use Google Play Billing is no less -- the extra price, or

22   fee, to use Google Play Billing is no less than the cost for

23   Google to provide that product.

24           **THE COURT:**  Why do I have to give antitrust attention

25   to that?

1      If the developer can do whatever he or she wants, what

2   difference does it make?

3          **DR. TADELIS:**  Could I direct you to one of the slides

4   that I actually used in testimony, Your Honor?

5          **THE COURT:**  I don't have that here.

6          **DR. TADELIS:**  Oh, no.  It's in the -- oh, sorry.

7                    (Pause in proceedings.)

8          **THE COURT:**  Okay.

9          **DR. TADELIS:**  This is Slide Number 8 --

10         **THE COURT:**  Yes.

11         **DR. TADELIS:**  -- in my slide deck.

12      This is a slide that I used in my testimony, and it --

13   it's a slide that comes from Google.  I have added on what you

14   see here in red.

15      And what Google did in this slide, as part of their

16   internal deliberations, they called it game theorizing price

17   level.  "Game theory" is a fancy word for a set of tools to

18   analyze strategic interactions.  So this is basically

19   strategically choosing a price level.

20      They start by saying:  Some large developers would take

21   advantage of billing optionality no matter the price.

22      What they mean by that is, they'll say, "You can use

23   Google Play Billing.  We're charging you 30 percent.  If you

24   don't use Google Play Billing, we're still charging you

25   30 percent."

1      They might still choose to do that.  That's that initial

2  jump you see at the very left where it goes, like, from zero to

3  the core strategic asset.  And that's trying to describe those

4  developers who would choose their own billing system regardless

5  of the fee.

6      Now, what they next do is show that you have to give

7  enough of a discount -- that's what you call on the billing

8  optionality discount on top -- to reach that zone where you see

9  the blue line curving up; that's when developers would start

10  integrating alternative billing solutions.

11      So what's the idea there?

12      So let's take the current user choice billing that we

13  know.  Google says:  If you're not using Google Play Billing,

14  we're only going to charge you 26 percent.  Use whatever you

15  want.

16      Now, of course, if any billing solution is going to cost

17  me more than 4 percent, I, as a developer, would make a mistake

18  by choosing that, so I'll just stick with Google Play Billing.

19  That's why that blueline is not budging when you go from 30 to

20  26.

21      It's only when you go to something, and again, if this

22  graph is done to scale, which I'm assuming here, you'd have to

23  go down to something like 22, 21 percent to start getting that

24  pickup -- which makes sense because if you would actually turn

25  to what is Slide 3 in the deck that I just gave you, you see

1   that pretty much if you ignore micropayments, nothing is

2   cheaper than 6.1 percent as a billing solution.

3       And Square, for example, is not that prominent.  If we

4   take PayPal, that's a very prominent global provider,

5   8.8 percent.  That would mean that that discount would have to

6   be on the order of 9 percent for a developer to say, "Okay.  I

7   will now use PayPal instead of Google Play Billing."

8       That's what this describes here.

9       So what Google is able to do by playing with these two

10  prices, the bundle versus only distribution, is replace the

11  coercive tie with a tie through economic incentives.  And as

12  long as they're pricing the delta below their costs, this is

13  not different, conceptually, from predatory pricing, so to

14  speak.  That's the idea here.

15      **THE COURT:**  In other words -- that makes sense to me.

16  So no below-cost pricing, basically.  Okay.

17      **DR. TADELIS:**  Exactly.

18      **THE COURT:**  And is it your understanding that costs is

19  something that can be easily determined through GAAP

20  procedures?

21      I mean, I hear in other cases tremendous fights about what

22  constitutes cost.  So this has to be something that is a

23  readily measurable number.

24      **DR. TADELIS:**  Yes, I believe that is feasible, not too

25  difficult.

1          **THE COURT:**  Why do you believe that?

2          **DR. TADELIS:**  Here's what I would look for.  I've been

3    teaching cost allocations for economic decisions for about

4    20 years, so I'm going to share exactly what I would share in

5    my MBA classroom.

6       If we take the product Google Play Billing, there are

7    going to be costs associated with it.  Those costs are going to

8    start with the obvious variable costs of payment processing.

9    Those are typically on the order of 2 1/2 to 3-plus percent.

10      Then on top of that, you're going to need, say, servers

11   that are dedicated to that.  You're going to need customer

12   service to deal with fraud, and you're going to need some

13   engineering that deals with fraud detection.  In other words,

14   there will be someone at Google who is in charge of Google Play

15   Billing.  There will be an army of people and services under

16   that person that is part of that business.

17      The test that I want is simple:  If you shut that down,

18   what falls off your balance sheet?

19      Those are the costs.

20          **THE COURT:**  Did we see any records to that effect at

21   the trial?  I don't remember.

22          **DR. TADELIS:**  I have not seen records of that.

23          **THE COURT:**  We saw some cost records, as I recall, but

24   was it for this?

25          **MR. EVEN:**  I believe what we saw, internal analysis by

1   Google that reached a bottom-line number in the 6 to -- I think

2   in the 6 percent range where Google said, "At 6 percent, we

3   think we're kind of breaking even, and we think that the cost

4   to developers from others would be 10 percent."

5           **THE COURT:**  We did see some internal Google financial

6   documents calculating the cost of the 6 percent figure.

7           **MR. EVEN:**  I believe they were kind of strategic

8   analysis of Google in other areas where they said, "We talked

9   to the finance folks, and the finance folks told us 6 percent

10  is, more or less, roughly our internal cost."

11      Back at the time.  Obviously, these things changes from

12  year over year.

13          **THE COURT:**  All right.  Thank you.  Okay.

14          **MR. POMERANTZ:**  My name is Glenn Pomerantz.

15      That is not what that evidence showed.  That was not the

16  financial analysis as -- I think Mr. Even was saying it was

17  strategic analysis.

18      The kind you're talking about, really a careful

19  consideration of the costs, that's not what was in evidence in

20  this case.

21          **THE COURT:**  Okay.  I'll go back and look, but

22  all right.

23      Okay.  Well, who's handling this for the defendant?

24      Dr. Leonard.  Okay.

25          **DR. LEONARD:**  I think this --

1          **THE COURT:**  It seems like a relatively straightforward

2    solution from your colleague.

3          **DR. LEONARD:**  Well, I'll disagree with that a little

4    bit.

5          First of all, I'm Greg Leonard, just to identify myself.

6          Let me just start at the end.  Is 4 percent, you know,

7    enough of a floor on the price of Google Play Billing for

8    rivals to complete?

9          We actually have evidence about that because we have

10   developers in the case who testified about it.  And, in fact,

11   Mr. Sweeney testified that to get -- I think he called it an

12   equivalent to Google Play Billing would be 2 to 4 percent.  So

13   4 percent, obviously, should be enough for Epic to do it.

14         There are other -- if you look at -- I don't want to go

15   through them all, but on page 12 of my slide deck, you'll see

16   some other evidence that I summarized on that point.

17         The other thing I want to get to is:  If the floor is to

18   be set according to cost, there's, first of all, a question of

19   what cost are we talking about?

20         And Your Honor may be familiar in antitrust predatory

21   pricing cases, you know, you could look at average variable

22   cost.

23         Here, as I understand the proposed injunction, they're

24   saying you should look at average total cost.  And that really

25   has the danger of chilling competition -- right? -- because it

would prevent Google from discounting their price for Google

Play Billing to meet competition that might be a price above

their variable cost, and then it would mean the transactions

would contribute to their variable profit and contribute to

paying their fixed costs.

    **THE COURT:**  So you would use average variable costs?

    **DR. LEONARD:**  Well, if you were going to do this at

all.  But now let me get to my real point, which is, if I were

Your Honor, I would not want to be engaging every year in

proceedings on what Google's costs are, and that's definitely

going to happen.

    **THE COURT:**  I don't intend to.  If someone has a

problem with it, they can come back and say you're cheating.

But I don't intend to be proactive.  This is just -- sets a

rule for other people to test.  I'm not going to do it.  I'm

not an accountant.  I'm not --

    **DR. LEONARD:**  No, no, I understand.  But what I'm

saying is I think you'll get those proceedings whether you want

them or not.

    **THE COURT:**  If they're good, then they'll win; and if

they're frivolous, they'll be dismissed.  I mean, that just

sort of comes with injunctions.

    But what I'm looking for now is -- so the proposition is:

Sever the tie with Google -- Google billing.

    And that seems perfectly appropriate given the antitrust

verdict.  Is there any reason that you would say it's not?

      **DR. LEONARD:**  Well, I think Dr. Gentzkow actually will address that part of it.  I was really going to talk about the billing.  But let me just say a couple of things about it because I do have some thoughts about it.

    I mean, Number 1 is, user choice billing does sever the tie in the sense that there's going to be an alternative billing system, if a developer wants to do it, up there that a user can choose from.

    And secondly, if you think about this --

      **THE COURT:**  That's not consistent with the evidence at trial.

      **DR. LEONARD:**  In what sense?

      **THE COURT:**  User play billing was not a true alternative and looked -- the conclusion of the jury from the evidence that I see is that that was a fig leaf, not a decoupling of a tie.

    So, you know, I'm not going to have a situation where Google gets, in all circumstances, to tell every developer: You most offer our billing system.

    You must offer it?  No.  They can bargain for that. Developers can negotiate that.  If they want to do, that's fine.

    It's none of my business, but I'm not going to get into a situation, given the evidence at trial, where Google can shove

1   that down developers' throats.  That's just not going to

2   happen.

3       So what I would like to hear is a very straightforward

4   proposition.  Just decouple and let developers bill any way

5   they want.  They may choose Google.  They may choose not.

6       But what's wrong with that from an antitrust perspective?

7           DR. LEONARD:  Well, I think that there are reasons why

8   users -- from a developer's point of view, that may be what a

9   developer would want.  But from a user's point of view, as I

10  understand, users may want to have a single -- an option to

11  have a single billing system on all the apps that they might

12  purchase or are making that purchases from.

13      And that's one, I think, reason to have Google Play

14  Billing alongside an alternative billing system.  And if you

15  think about it, Google --

16          THE COURT:  But isn't that something a developer would

17  rapidly pick up on?  I mean, if consumers -- okay.  What I hear

18  you saying -- maybe I'm wrong, you can correct me.

19      You're saying:  Consumers may want single-point billing.

20  All right?  No matter where they shop, they want to have just

21  one pay point.  They don't want to have to give their credit

22  card five different times to five different stores.

23      Okay.  That's fine.  But if they don't want to do that,

24  they won't buy from that store, and the developer will rapidly

25  realize this was a bad idea.  We'll do something else.

1          But that's exactly what we want to do.  We want to open up

2     the opportunity to compete.  Let developers and users make

3     these choices which they cannot do now because they must use

4     Google's proprietary system.

5          That's what we're trying to get at.  I just don't see

6     anything wrong -- I mean, yes, of course, there may be some

7     decision points down the road as the system shakes out.  That's

8     not a reason not to do it.

9               DR. TADELIS:  May I add something, Your Honor?

10              THE COURT:  Yeah.

11              DR. TADELIS:  Even now, Google being the monopolist

12    doesn't offer unified billing for their users because they

13    prohibit the use of Google Play Billing for physical good apps.

14              THE COURT:  Oh, yes.  That's right.  I remember that.

15              DR. TADELIS:  Because on Amazon you can't use Google

16    Play Billing, and on Uber you can't use Google Play Billing,

17    and on Walmart -- and we could stay here for five more hours

18    and me listing all those --

19              THE COURT:  Well, the relevant argument was just

20    digital services --

21              DR. TADELIS:  I understand.

22              THE COURT:  -- for that reason.

23              DR. TADELIS:  Exactly.

24              THE COURT:  It was for that reason.  I do know that.

25    So that -- that is an important observation because those are

1    huge touchpoints in the app world.  But anyway -- okay.  Go

2    ahead.

3          DR. GENTZKOW:  Let me just jump in with one small

4    point, and then I'll hand it back to Dr. Leonard.

5          This is Matthew Gentzkow again.  Thanks.

6          Just on the question of whether developers can do this

7    themselves if there's an incentive to, I think the one thing

8    that's important from an economic point of view to recognize is

9    this offering users of digital goods a unified billing system

10   has the property of a collective action problem because that's

11   a benefit that you get when there's consistency across all of

12   the apps.

13         THE COURT:  But just to jump in, we just were

14   reminded, timely, that that, in fact, is not true for an

15   enormous number of the highest end apps. Walmart, Amazon, Uber,

16   you don't do it.  You can't pay through Google.

17         So it already exists that you can't -- the Google world is

18   already fragmented that way.

19         DR. GENTZKOW:  It is fragmented in the sense that

20   there are different things for physical goods.  But for digital

21   goods, there's a specific value to consistency.  Things like

22   being able to track all of my subscriptions; parental controls

23   on apps that I can use across all of the apps; being able to

24   get refunds for digital goods that I've purchased in different

25   apps.

1          Those are all things where what I need is consistency

2     across the set of digital goods that I have purchased, and

3     that's something which provides a collective benefit to users

4     when it's consistent.  And an individual developer may have

5     financial incentives to do something different that's not --

6     they are not individually going to take a count of what is the

7     cost of imposing or creating that inconsistency.  So I think

8     that's the one sense --

9          **THE COURT:**  That may be true, but if the consumer

10    doesn't like that, they won't do business with that app store

11    If they say, "I'm a busy person and I hate doing math.  I just

12    want to have one place where I put my credit card," they won't

13    do business with an app store that doesn't offer that.  So the

14    market will correct, and the app store will go out of business

15    maybe, or lose an enormous amount of revenue.

16         So I'm not -- I'm just -- this is akin to the argument of

17    we need to be a monopoly to protect you.  Now you're saying we

18    need to be a monopoly because, you know, the consumer's life is

19    going to require payment headaches.  That's not -- I'm not

20    buying that.

21         **DR. GENTZKOW:**  Yeah.  I just -- I just want to be

22    clear that, in that instance, if a developer decides to offer a

23    different billing system and chooses not to offer the

24    consistent one, the costs of that don't just fall on that

25    developer or that developer's immediate user as they fall more

1  broadly.  So there is a form of collective action problem there

2  in making that decision.

3          **THE COURT:**  Okay.

4          **DR. TADELIS:**  I could just restate what you said, Your

5  Honor.  If I --

6          **THE COURT:**  Do it for me.

7          **DR. TADELIS:**  If I am an app developer and I'm going

8  to want to use my own system and it's going to say you have to

9  put in your credentials and say 30 percent or 60 percent of

10  users don't like that hassle, there will be another app

11  developer who could create the exact same app and use Google

12  Play Billing and get all those customers, all those users to

13  use their app.

14          **THE COURT:**  Another competition point.

15          **DR. TADELIS:**  That's the competition point, exactly.

16          **THE COURT:**  Another opportunity to compete.  Okay.

17      Well, that seems to solve Google billing.

18      Is there anything else?

19          **DR. TADELIS:**  Could I just make a comment about the

20  average variable costs that --

21          **THE COURT:**  Yes, please.  Yeah.

22          **DR. TADELIS:**  -- put in?

23      I think that's erroneous for at least two reasons, and I

24  also think that I'm being conservative in what I'm suggesting

25  or what the remedy is suggesting.

1        First of all, the way I understand it, the whole debate

2    about average variable/average total is to determine liability.

3    Liability was determined here already in court.  And now we're

4    asking:  How do we make sure that competition could prevail in

5    billing solutions?

6        Second, if I think about the following:  Right now,

7    there's only one product.  It's Google Play Billing.  So

8    whatever Google has to spend annually to maintain that product,

9    any other provider is going to have to spend similarly unless

10   they're more efficient -- which of course, they should have a

11   benefit from being more efficient.

12       What I'm not including here is any sunk costs that Google

13   may have incurred years ago in developing the first stage,

14   which means that this is disadvantaging de novo suppliers of

15   these type of billing solutions.  So PayPal, Stripe, clearly,

16   they already are in this business.  But if someone new wants to

17   come in, they would even have to invest sunk costs that are not

18   even measured as part of the ongoing business.

19          **THE COURT:**  Is that something that could be solved

20   with a two-year horizon?  Or I mean, maybe --

21          **DR. TADELIS:**  Oh, no, no.  This is not about the

22   two-year horizon.  This is just about -- this is an ongoing

23   business that operates and provides billing solutions.  That

24   business is going to have to spend, not only those variable

25   costs that we discussed -- payment processing -- but a whole

1    host of other costs that should be on the ledger of any

2    reasonable accounting, from what I understand.

3         **THE COURT:**  What do you -- just -- this may be unfair

4    to ask on the fly, but can you ballpark what the difference

5    would be between using average variable cost and average total

6    cost?

7         **DR. TADELIS:**  Oh, sure.  So Dr. Leonard, in his

8    report, quotes Sweeney -- Mr. Sweeney, as well as others, that

9    are throwing out numbers of the 2.6, 3, 3.2.  Those are all

10   payment processing.  Those are not payment solutions.

11        There was testimony in this courtroom, I believe by

12   Mr. Allison, who heads the Epic store, where he, I believe,

13   quoted that the payment processing is somewhere between 4 and

14   6 percent.  And, again, I want to --

15        **THE COURT:**  There was a lot of evidence about

16   6 percent being kind of the conver- -- figure on which multiple

17   people converged.  Yeah.

18        **DR. LEONARD:**  Your Honor, can I -- if I may?

19        **THE COURT:**  Just before -- let him just finish this.

20        **DR. LEONARD:**  Okay.

21        **DR. TADELIS:**  So here we see these companies that are

22   providing -- this is Slide Number 3 -- that are providing

23   payment processing solutions for -- payment solution products

24   for web, right, because they're not allowed on Android.  And we

25   see these numbers all seem to be in this similar ballpark, 6.1,

1    6, 8.8, and there are many others.

2         And these are companies for whom payment solutions is

3    their bread and butter.  You'd expect them to be relatively

4    efficient.  And there is competition here.  These prices are

5    meaningful.  All the prices we see on Google Play are not

6    meaningful because they're happening within the bubble of a

7    monopoly.

8              **THE COURT:**  Okay.

9              **DR. LEONARD:**  And I would say that -- I mean, who

10   knows what these numbers are for, what kind of bells and

11   whistles are being offered here that a developer may not need?

12   And we shouldn't be valuing this at the bell-and-whistle price.

13   We should be figuring out what the cost would be for a

14   developer to get processing.

15        And, again, we have testimony, including from Mr. Sweeney,

16   about the numbers there.  So that's Point Number 1.

17        Point Number 2 is, it's not easy to figure out what

18   Google's costs are.  Remember, that's what the proposal says;

19   it says it would be Google's cost, average total cost of

20   processing.

21        Dr. Tadelis said, "Oh, there must be a group of people at

22   Google who do Google Play Billing customer support."  It

23   actually turns out not to be true.  This I actually know.  The

24   cost for customer support are for all of Play.  And some of

25   those people may work on Google Play issues, but figuring out

how much of their costs would be associated with Google Play

Billing versus other aspects of Play -- which, of course, are

significant -- would be very difficult and would require --

      **THE COURT:**  Well, then if that's fair, then we have to

use a proxy, and the proxy would be the numbers in Slide 3.

    I mean, look, I'm not going to -- this has also been a

consistent theme in Google's objections.  "It's just too hard

to do.  We can't figure it out."

    Okay.  Then if you can't do it, we'll go to a proxy, and

the best next proxy is 6.1 percent from Stripe.

      **DR. LEONARD:**  I think -- but shouldn't it be what the

developers themselves said it should be, which is less than

4 percent?

      **THE COURT:**  Sweeney is one developer.  There are

3 million -- there are 3 million apps.  3 million different

developers may be --

      **DR. TADELIS:**  Mr. Sweeney talked about payment

processing.

      **THE COURT:**  What's that?

      **DR. TADELIS:**  Mr. Sweeney spoke about payment

processing.

      **THE COURT:**  Talked about payment processing.  So if

you-all can't do it, the answer is -- and it doesn't get

done -- the answer is, I'll take the next best substitute,

which is probably one of these numbers.

1              **DR. LEONARD:**  Yeah.  But I'm saying to you that I

2    don't think those numbers are the accurate number that you

3    would want to use, and that the testimony we got from

4    developers --

5              **THE COURT:**  Let me put it this way:  There's going to

6    be a number.  And if you can't give it to me, I will take what

7    I think is the next best reasonable -- look, this is -- the

8    touchstone here is reasonable.

9         Okay?

10             **DR. LEONARD:**  Right.

11             **THE COURT:**  We all know what Stripe does.  They

12   process financial transactions for other people.

13        If Google is going to process a financial transaction for

14   a third-party developer -- okay? -- why is it different from

15   Stripe?

16        If you can't come up with a number yourself because it's

17   too hard and your accounting doesn't do it, nobody knows, I

18   don't have an alternative but to take a proxy.

19             **DR. LEONARD:**  Well, again, I think 4 percent is the

20   number, so I'm offering that up to you based, again, on what

21   developers themselves said.

22        Also, Google's own costs, the 6 percent, that's -- turns

23   out to be quite high because there are certain relatively

24   rarely used forms of payment that Google offers, like direct

25   carrier billing that are very expensive.  But I find it very

1    doubtful than an entrant into the space would offer those.

2         Google sort of offered them as a legacy-type thing.

3    They've been declining over time, but they do push up that

4    6 percent -- to 6 percent.  If you look just at credit cards,

5    debit cards, PayPal, the number is more like, again, 4 percent

6    or less.

7         So I think 4 percent is a reasonable number to do here.

8    And remember, this is going to be the floor on what Google Play

9    Billing can charge.  So if that floor is too high and Google

10   Play -- Google can charge -- is constrained on how much they

11   can cut their price to compete, there's going to be less

12   competition, and there's going to be higher prices in the

13   marketplace overall.

14        So I think it's pretty important to get, as you said, a

15   reasonable number here that will not chill competition from

16   Google.  Yes, we want to try to correct the issues that exist

17   in the marketplace, but at the same time, we also don't want to

18   overly handcuff Google.

19        **THE COURT:**  Oh, for sure.  That goes without -- I

20   understand, but I'm not going to accept "We don't know, so do

21   whatever you want."  That is --

22        **DR. LEONARD:**  No, no.  Yeah.  And I'm not offering

23   that.  I'm saying 4 percent is the right number.

24        **THE COURT:**  All right.

25        **DR. LEONARD:**  Could I just add one other thing?

1              **THE COURT:**  Sure.  Yeah.

2              **DR. LEONARD:**  I mean, the logic of this is that there

3    was market power in app distribution, and that created the

4    ability for Google to form the tie and then have market power

5    in this billing system stuff.

6         It seems to me that once you've got strong remedies which,

7    Your Honor, of course is --

8              **THE COURT:**  On the app?

9              **DR. LEONARD:**  Distribution side -- it solves itself.

10   And you're probably going to get, you know,

11   vertically-integrated firms competing -- in other words, ones

12   that have their own billing system -- they're going to come in

13   and they're going to be app store with a billing system;

14   they're going to compete with Play.  And in that situation, you

15   don't really have to worry about the price of Google Play.

16             **THE COURT:**  I'm glad you mentioned it because I am

17   thinking.  Look, I want to make -- the injunction has to be

18   crystal clear, simple, and direct.  So, obviously, both as a

19   legal matter, tying, and just as a conceptual matter, it has

20   occurred to me that the reforms that maybe I may order for the

21   app distribution market are going to have impacts on how people

22   bill.  And so why not just say:  You cannot require anyone to

23   use -- any developer to use Google billing system.

24        Stop.  Just stop at that point.

25        Why isn't that enough?

1      **DR. TADELIS:**  The reason is that all the remedies that

2    Dr. Bernheim explained in order to open up competition

3    distribution are necessary.  They do not guarantee that Google

4    will be dislodged from its strong monopoly position at the

5    moment because it has those two sides of the market there.

6      Remember that we discussed or -- here in the courtroom,

7    this whole idea of these apps are going to try, they're going

8    to get the catalog, but after two years, if they don't get

9    enough traction, they're just going to die; that is a

10   possibility.

11     There is a possibility if the only thing we do is

12   everything we discussed and sever the tie, but don't put limits

13   on Google Play Billing add-on price that creates an economic

14   tie, that in four years, or six years, we are exactly where we

15   are today, everything expires and --

16     **THE COURT:**  I don't see how that would be true.  If

17   there are fundamental reforms in the app distribution market,

18   and I decouple Google Play Billing from Google App Store,

19   totally, can't require anybody to use it, no user choice, none

20   of that --

21     **DR. TADELIS:**  Right.

22     **THE COURT:**  -- it seems to be the world fixes itself,

23   and I don't have to worry about 4 percent, 6 percent, Stripe,

24   or anything else.

25     And I'm really not attracted to the idea of having

1   vagaries like average total cost, average variable cost.  It

2   just doesn't make a lot of sense to me.

3        So I am not hearing a good reason why not just to stop

4   there from an antitrust perspective.

5             **DR. BERNHEIM:**  May I, Your Honor?

6             **THE COURT:**  Ask your colleague.

7             **DR. TADELIS:**  I have something I would like to say

8   about that.

9             **THE COURT:**  Okay.  Please.

10            **DR. BERNHEIM:**  My concern there isn't so much that the

11  other remedies will fail.  My concern is that the other

12  remedies will take time to work.

13            **THE COURT:**  Yes.

14            **DR. BERNHEIM:**  Because competition doesn't burst out

15  all of a sudden.  So there will be a period of time during

16  which Google Play continues to have monopoly power, probably

17  several years.

18       During that period of time, if it uses that monopoly power

19  to effectuate a tie which was found to be, by itself, a

20  violation of the antitrust law, it's doing something, you know,

21  that the other -- that is -- that is contrary to the antitrust

22  law, that the other remedies may resolve and probably will

23  resolve in a longer term, but not during this shorter period of

24  time.

25            **THE COURT:**  Okay.  So you're saying there's going to

1    be a covert or de facto tie, but how?

2        I mean, if -- let's say I take, across the board,

3    everything we've discussed in the app store side and ban the

4    forced use of Google Play Billing, I just -- I'm not seeing how

5    a covert tie can emerge even for a six-year period.

6            DR. TADELIS:  Let me explain that, Your Honor.

7        So here we could go back to Slide Number 8.

8            THE COURT:  Eight.  Okay.

9            DR. TADELIS:  Yes.

10       So Google chose the 4 percent not based on cost, because

11   we've seen an internal document where they estimated their

12   break-even cost to be 6 percent.

13       The 4 percent was set in a very safe zone where, if we

14   charged 30 percent for everything and only 26 percent for

15   distribution without GPB, it is in no developer's incentive

16   economically to adopt anything but GPB.  Because if we go back

17   to Slide 3, everything else is going to cost 6 percent or more,

18   I might as well pay 30 than 32 or 33 or 38.

19       So by allowing Google to strategically manipulate the

20   difference between fees with and fees without billing

21   solutions, they could effectively create an economic tie that

22   works just as good as the coercive tie.

23       We need to create a gap that's large enough for a

24   reasonable competitor, like Stripe, to come in and say, "We

25   could offer this service.  We could offer it as cheap or maybe

even a bit cheaper than Google," because it is their bread and

butter.  And now a developer will have the incentive to pay

Google the fat fee for distribution and pay a smaller fee for

the add-on --

**THE COURT:**  If that's the case -- I understand what

you're saying.

If that's the case, why look at Google's costs at all?

Why not just look at what is the most efficient rival able to

offer as an alternative and use that?

**DR. TADELIS:**  So I don't want to prevent Google from

competing on the merits.  Let's imagine that tomorrow, after an

injunction is put in place, Mr. Pichai says, "Okay.  We need to

make our billing system the best, the fastest, the nimblest

that we can.  I'm going to take 500 engineers from Search and

200 engineers from Play, and put them on Google Play Billing,"

and in six months Google manages to create a product that is

actually less costly than Stripe or Square --

**THE COURT:**  Maybe they can actually do 4 percent.

**DR. TADELIS:**  Maybe they can.  I don't want to prevent

them from being able to compete on the merits.

Now, if you feel more comfortable saying, "Well, from

Slide 3, I see there is a competitive market where the lowest

places seem to be around 6, even 5.5 from micropayments, but

that's a bit of an anomaly, so 6. I feel comfortable that that

is representative of an efficient competitive solution," then

1  all power to you, Your Honor.

2      But then if Google is able to do something more

3  effectively and show that their costs are cheaper, then that

4  would put them at a disadvantage.

5      **THE COURT:**  Well, why not put the burden on Google to

6  do that then?  They can come in and tell me.

7      **DR. TADELIS:**  That's your choice, Your Honor.

8      **THE COURT:**  I mean, I would set Stripe 6 percent,

9  PayPal, whatever it is.  And Google innovates and wants me to

10  do a different number, they can come and prove it.

11      **DR. TADELIS:**  I'm perfectly fine with that.

12      **THE COURT:**  I just don't want to be involved in

13  adjudicating costs.  It's just not the right thing for a

14  federal judge to be doing.  Once is probably too much, but

15  certainly not a constant basis.

16      So why not just do that?  You can always come back and

17  tell me, "We've cracked the code, and we can deliver all this

18  for 3 percent now."

19      **DR. LEONARD:**  I think the problem is:  Where do these

20  Stripe numbers come from?

21      I mean, are these offers that Stripe made to actually

22  process and handle transactions within Play?  Because if they

23  weren't, then I don't know that it's really a good estimate of

24  what Stripe would be willing to do.

25      **THE COURT:**  If you want me to use 4 and they want 6,

 1    I'll do 5.  I mean, this is how things get done in a reasonable

 2    fashion.  I'll do 5.  I have no touchpoint or data from you,

 3    Google -- not you personally -- from Google that gives me any

 4    number whatsoever, and all I hear is "We can't tell you."

 5        So the answer is going to be:  I have to do something to

 6    replace that.  So if you don't like 6 percent, and you think

 7    Mr. Sweeney has committed to 4, then I'll take the average.

 8    I'll take the middle number, 5.

 9        I mean, I just need a reasonable proxy, and that's really

10    all that we get here.  But it has to be concrete and does not

11    require me to be a CPA in my spare time, which I am not.

12            **DR. LEONARD:**  Something else, again, I'd just urge you

13    to look at, is in my statement.  I talk about a document, the

14    same one that Dr. Tadelis was looking at, in which Google

15    estimates its costs, again, for various forms of payment.

16        And for credit cards and debit cards and everything, we're

17    talking about less than 4 percent in the United States.  So I

18    really do think that 4 percent is the right number, and I think

19    I've got, again, some evidence that could help you get to that

20    point, Your Honor.

21            **DR. TADELIS:**  If I may, Your Honor.

22            **THE COURT:**  Yes.

23            **DR. TADELIS:**  All the numbers he's referring to are

24    payment processing, not for payment solution products.

25            **THE COURT:**  I don't think we had any evidence about

1    payment solution products; did we?

2           **DR. TADELIS:**  The only evidence that I found coming

3    from Google was that document where they claimed that 6 percent

4    is their break-even.

5           **THE COURT:**  Okay.  This is, I think, all that I need.

6       Is there anything else plaintiffs would like to raise?

7           **DR. TADELIS:**  No.  I spoke about the anti-steering.  I

8    spoke about severing the tie, and then there are the other

9    elements of nondiscrimination based on -- similar to what

10   Dr. Bernheim explained.  If you're not using Google Play

11   Billing, you shouldn't be penalized by not having access to

12   other Google products.

13          **THE COURT:**  Okay.  Defendants?

14          **DR. GENTZKOW:**  Maybe just one point I'd add on the

15   anti-steering that Dr. Tadelis referenced.

16       The specific way that that's described in the proposed

17   injunction, the one little detail is it eliminates the ability

18   for Google to have minimal user experience and content

19   requirements, like making sure that the form that users are

20   shown is consistent with other billing -- like minimal security

21   requirements.

22       So I would just say in that anti-steering provision, there

23   is that provision in the state settlement which provides a

24   template of allowing steering of all sorts, advertising prices,

25   promotions, off-app purchases, letting users know about

1    Google's fees and so --

2            **THE COURT:**  This is the reverse of the plaintiffs'

3    side.  When people start on the defense side saying, "Of

4    course, we have to have minimum security provision," you can

5    drive a truck through that.  I mean, that's all in the eye of

6    Google, and I can't do that.

7            I can't say -- I can't have equally vague -- I can't say

8    "disincentives" is too vague and at the same time say "minimum

9    security provisions" is not too vague.  They're both equally

10   vague.

11           It's late in the day and I've forgotten the henhouse

12   analogy.  It's giving the chicken the right to write its own

13   ticket.  It's a ridiculously horrible metaphor, but I think you

14   get the point.  Okay.

15           All right.  Any larger points, Dr. Gentzkow?

16           **DR. GENTZKOW:**  No.  I think we're good.

17           **THE COURT:**  Okay.  All right.

18           This was tremendously helpful.  I enjoyed the discussion.

19   I enjoyed the professionalism of the comments.  I found it to

20   be of considerable aid to the Court, so let me thank both

21   sides.

22           Now, why don't we have the lawyers come up just for a

23   second.

24           Here is the one thing that may require some additional

25   testimony; and that is, I would like to know more about the

1    mechanics necessary for catalog access.

2         I don't know what that means in terms of what Google might

3    have to do.  I don't know whether that is a huge amount of

4    work, whether it's something an engineer can do in an

5    afternoon, whether it's off-the-shelf technology, whether it's

6    custom work; I don't know anything, you know, about what that's

7    going to be.

8         So how would you like to handle that?

9         MR. BORNSTEIN:  Well, as a starting point, Your Honor,

10   we do have evidence in the record already on that as --

11        THE COURT:  Do we?  We do.

12        MR. BORNSTEIN:  As Dr. Bernheim said, we know this is

13   something that Google did through the Alleyoop mechanism in

14   connection with the deal that it had with Facebook and the

15   process it was working on through Project Banyan that

16   ultimately got stopped.

17        THE COURT:  Well, the question I had, though, was

18   Alleyoop really exactly what catalog access would look like

19   here?

20        MR. BORNSTEIN:  It's the same concept, Your Honor,

21   where there would be -- and Banyan is the same thing, where

22   there would be Google as the back end, it would host the apps.

23   It would have the commerce relationship with the -- with the

24   developer.

25        And then, when the user went onto Facebook, or in the

1    Banyan example, the Samsung store, there would be a process

2    through which the app would be served to the user who was on

3    one of those alternative sites or stores where Google was

4    working the back end.

5        It's the same -- the same concept.  That's why, frankly,

6    we thought of the remedy this way in order to minimize the

7    problem.  We knew Google had already achieved it.

8            **THE COURT:**  Well, I just don't know whether that could

9    be ported to an infinite number of app stores.

10           **MR. POMERANTZ:**  Your Honor, that is our --

11           **THE COURT:**  I mean, I don't really know how that's

12   going to work.  And it may be that simple, I don't know, but I

13   don't have evidence right now.

14           **MR. POMERANTZ:**  Your Honor, there's significant

15   differences, you know, from a technical/mechanical sense for

16   what Epic is asking for here with respect to catalog access and

17   what happened with Alleyoop.

18       Alleyoop was a test with Facebook and, I think, one or two

19   others in which there had to be a lot of integration between

20   them.  It never was rolled out.  And it involved -- Facebook

21   already had a relationship with the developers who were

22   involved because they were advertising on Facebook.

23       This involves a totally different animal.

24       So I do think Your Honor needs evidence.  If Your Honor is

25   seriously considering catalog access, and it sounds like you

1    are, we definitely need a record for Your Honor to decide

2    whether that really makes sense.  We need both to look at the

3    technical implications of it, and we need to look at the

4    economic implications of it.

5         And more generally, Your Honor, I would request, given the

6    nature of the relief that Epic is seeking that was not

7    addressed at trial -- many of these things were not addressed

8    at trial.

9         **THE COURT:**  Oh, I don't agree with that.  I have been

10   very, very careful to tie all this together.  I do not agree

11   with that at all, Mr. Pomerantz.

12        **MR. POMERANTZ:**  Well, I'll give you --

13                   (Simultaneous cross-talk.)

14                   (Reporter interruption.)

15        **THE COURT:**  I have been extraordinarily conscious of

16   tying everything we've discussed today to the evidence at

17   trial, and I think the record is going to amply demonstrate

18   that.

19        **MR. POMERANTZ:**  If I could just --

20        **THE COURT:**  This is just -- that is just not right to

21   say that this is coming out of left field.  I don't agree with

22   that at all.

23        **MR. POMERANTZ:**  I'll come back to home plate.

24        The catalog access that we're talking about now was not at

25   all discussed during the trial.

1          **THE COURT:**  It's a remedy.

2          **MR. POMERANTZ:**  I know.  That's what I'm saying, we

3     need --

4          **THE COURT:**  It was not part of -- it was not part of

5     the illegal conduct that --

6          **MR. POMERANTZ:**  Well, that's the point, Your Honor.

7     When the remedy is going beyond the evidence trial, we need to

8     have the opportunity to put evidence in.

9          **THE COURT:**  No, no.  Okay.  I -- it's not going beyond

10    the evidence at trial in the sense that it is untethered to the

11    illegal monopoly conduct.  That is absolutely not true.

12         It is supplemental evidence I need to decide with respect

13    to the remedy that I'm inclined to order.  That part is true.

14         But to suggest -- and maybe you're not, but I want to be

15    crystal clear here that this is something that is just dropping

16    out of the heavens and no one has ever had to look at it before

17    because it's completely unrelated to the illegal conduct is not

18    true.  It is a consequence that I just need a little more

19    factual information on.  So --

20         **MR. POMERANTZ:**  I was focusing on the supplemental

21    evidence that Your Honor was discussing --

22         **THE COURT:**  All right.  What I would like to do is

23    probably have -- now, I don't know what you need to evaluate

24    whatever Google is going to say.  Do you need a deposition?  I

25    mean, what -- you need to have a fair opportunity to be

1    prepared to do your thing.

2        So how do you want to do that?

3        **MR. BORNSTEIN:**  I agree with that, Your Honor, because

4    I don't know what Google is going to say.  I have -- I mean, I

5    don't think Mr. Pomerantz intended to say, as he did, that

6    Alleyoop was never implemented.  The record at trial showed

7    that it actually was implemented in the real world.

8        **THE COURT:**  He did say it wasn't implemented.

9        **MR. BORNSTEIN:**  Yeah -- no.  I understand that.  The

10   evidence showed what it showed.  But it -- we absolutely will

11   need to be able to respond.

12       Your Honor has made the point, I think, fairly that the

13   primary response from Google to pretty much every remedy is:

14   Gosh, Your Honor, that's just so hard.

15       So I come to this with a fair degree of skepticism about

16   what we're hearing.  And I do think we need to have opportunity

17   to have a fair --

18       **THE COURT:**  All right.  Well, let's -- let's just do a

19   plan here.  Then I want to talk about the friction thing.

20       We've got to get this done.  This has been going on for a

21   long time.  So I want to balance that against your need to

22   be -- each side to be fully and fairly informed.

23       So here's one way of doing it -- and I'll leave it up to

24   you, you two are probably even better situated to suggest it

25   than I am -- but Google can make a proffer, you could do some

1  discovery based on that proffer, and deposition -- maybe, if

2  you wanted to retain an expert, I'm reluctant to do that, but

3  if you needed to, you might.

4      You can do it that way or you could -- I don't know what

5  all -- I don't know what plan B would be.

6        **MR. BORNSTEIN:**  No, I think it's reasonable, Your

7  Honor, what you've suggested, because we do need to have the

8  proffer --

9        **THE COURT:**  Okay.

10        **MR. BORNSTEIN:**  -- and the information.  And I was

11  going to get to the point -- Your Honor beat me there -- about

12  trying to be expeditious in making this happen.  We're just

13  about, you know, five months from the jury verdict already.

14        **THE COURT:**  Yeah.  Some things happened in between, so

15  it's not entirely a slothful judge, if that's --

16        **MR. BORNSTEIN:**  I've noticed, but was not about to

17  ask.

18        **THE COURT:**  Okay.  All right.

19      So why don't you do that, Mr. Pomerantz.  Make a proffer

20  and tell your colleague here why you think it's technologically

21  and economically not feasible, or whatever you want to say, and

22  then we'll take a deposition.  Make sure you've got somebody

23  ready to go and try to do it in 35 to 45 days.  I mean --

24        **MR. POMERANTZ:**  Your Honor, if I could -- if I could

25  ask a couple of things.

1          **THE COURT:**  Sure.

2          **MR. POMERANTZ:**  First, obviously, if when they -- they

3   should give us their response, and if they have a witness, be

4   it an expert or otherwise, we should have the ability to take

5   that person's deposition as well.

6       I would like to ask, Your Honor, if we could --

7          **THE COURT:**  Well, they may not.  It may just be

8   cross-examination.

9          **MR. POMERANTZ:**  But it may not be, Your Honor.  If

10  they don't have a witness, then that's fine.

11         **THE COURT:**  All right.  Okay.

12         **MR. POMERANTZ:**  I would ask that we could do that with

13  respect to three specific remedies, because I think they all

14  involve the issues you're talking about:  Catalog access, which

15  is the one Your Honor mentioned; the friction issue with

16  sideloading, which is --

17         **THE COURT:**  No.  I think that's -- listen.  If you all

18  already agreed in the proposed state settlement that there's

19  going to be one screen and one screen only, I probably will

20  just look at that.

21         **MR. POMERANTZ:**  If they're okay with that, then that's

22  fine.  We don't need to go further.

23         **THE COURT:**  It's really a matter more what I'm okay

24  with.  If I'm okay with it --

25         **MR. POMERANTZ:**  Okay.  You'll let us know if there's

1  anything more --

2       THE COURT:  Now, I want to look at that provision, and

3  if it truly is one screen, one screen only, "Here's what you're

4  doing.  Be aware of it, and good luck," I'll probably think

5  about that.  All right?

6     In fact, that's really all I need for right now.  Now, if

7  I change my mind, I'll let you know.

8       MR. POMERANTZ:  Your Honor, there's one other remedy

9  that I'd ask the opportunity to do something similar as catalog

10 access, and that's the distribution of third-party stores

11 through Play.  That also involves some technology that doesn't

12 currently --

13      THE COURT:  That's fine.  You can fold that in.  All

14 right?  Just maybe -- we'll have tech day.  Okay?  So Tech

15 Part A will be -- Catalog Part B will be posting third-party

16 stores.

17      MR. POMERANTZ:  Your Honor, if I could have one

18 moment.

19      THE COURT:  Yeah.  Or hosting third-party stores, I

20 should say.

21      MR. POMERANTZ:  And, Your Honor, as part of

22 cataloging -- I think this included -- but as part of catalog

23 access, we would also like to address library porting.  That

24 also has technology and economic issues.  They couple it with

25 their catalog access.  They're together in the proposed remedy.

1    **THE COURT:**  I think it's less of an antitrust rather

2    than -- that's fine.  If you want to put that in, that's fine.

3    **MR. POMERANTZ:**  Thank you.

4    **THE COURT:**  But just one and done on tech.  That's it.

5    Okay?

6       So how much time would you like?  Well, how much time for

7    your proffer, Mr. Pomerantz?

8    **MR. POMERANTZ:**  Just one second.

9    (Pause in proceedings.)

10   **MR. POMERANTZ:**  Your Honor, if we could have the

11   60 days instead of 45, that would be --

12   **THE COURT:**  That's too long.  You should be able to do

13   this much more quickly than that.  I'll give you 30 days for

14   the proffer.  I just can't -- look, it can't be that hard.  I

15   mean, it just can't be that hard.  So 30 days.  Then what?  A

16   deposition or --

17   **MR. BORNSTEIN:**  I think, depending on what this

18   proffer looks like, certainly, at least one deposition.  I

19   assume what they're going to do is they're going to give us

20   documents that support what they're saying to us, and they're

21   going to give us a witness who signs a declaration.

22      And if there are -- obviously, if there are multiple

23   witnesses, we'll need to hear from -- from each of them.

24   **THE COURT:**  Well, here's what I'm imagining -- and

25   I'll leave it up to you -- but Mr. Pomerantz is going back to

1   Google, and they're going to ask an engineer to say, "What

2   would you have to do to make catalogs available to third-party

3   app stores?  And what would you have to do to handle the

4   library -- to host competing app stores on the Google App in

5   terms of your technology?"

6       Just can't be that hard.  I mean, five engineers,

7   two engineers, one engineer can easily do that in 30 days.

8   That person will be the witness, and then you'll depose that

9   person, and then I guess you'll need to tell Mr. Pomerantz

10   30 days later, "Here's why we disagree."

11       And if you have a witness, he'll get to depose him.

12       So I want to have this done by August at the latest.

13   Okay?

14       So 30 days for round -- for Google's proffer.  30 days for

15   your response, and then a week for any depositions related to

16   you.  You can take -- depose them within a week, and I'll see

17   you back in August, I guess.

18       **MR. BORNSTEIN:**  And if I could just be clear on the

19   scope of what we're talking about here, because the subject

20   Mr. Pomerantz raised is the technical problems, the

21   engineering.

22       **THE COURT:**  Yes.

23       **MR. BORNSTEIN:**  There's obviously been a lot of

24   discussion today about the doom and gloom of security and

25   what's going to happen to users, and I want to make sure that's

actually not what we're talking about on this proffer.  We're

focusing on the engineering resources that would be required on

Google's side to make this happen.

      THE COURT:  What does Google have to do to make this

app store -- slew of app stores available?

      MR. BORNSTEIN:  Got it.

      THE COURT:  You know, that kind of a thing.

      MR. POMERANTZ:  Your Honor, he used the word

"technological."  Also, the economics of that, so --

      THE COURT:  If you want to say "It'll cost us

$8 billion," which -- whatever.  Yeah.  How much it costs, that

would be fine.

      Listen, it's perfectly fine for a monopolist to pay some

money.  That's not -- the fact that it costs the monopolists

some money to fix their wrongdoing, there's nothing wrong with

that; it's just if it's unreasonable.  That's -- that's the

only thing.  If it's an unreasonable amount, then I'll take a

look at it.

      But if it turns out Google has to spend $250,000 to make

this work, I don't think I'm going to have a problem with that.

      MR. POMERANTZ:  Your Honor, a couple of other things,

if I may.

      THE COURT:  Yeah.

      MR. POMERANTZ:  So the last time we had spoken on this

issue, you had deferred the question of further briefing which

1    we would request --

2              **THE COURT:**  Further briefing?

3              **MR. POMERANTZ:**  On the overall remedies.  We have not

4    yet submitted briefs on the remedies.  We submitted objections,

5    but that's different --

6              **THE COURT:**  You admitted 90 pages.

7              **MR. POMERANTZ:**  Your Honor, that was --

8              **THE COURT:**  How much -- what more could you possibly

9    say?  You didn't even have the right --

10        Well, anyway, go ahead.

11             **MR. POMERANTZ:**  We would request -- I think there's

12   more that we would say in the form of a brief that you cannot

13   put into the form of an objection.

14             **THE COURT:**  We'll have closing arguments.  Okay?

15   We'll do that.  That's going to be -- I don't need any more

16   paper.

17        I mean, I really doubt there's more that you can say than

18   in 90 pages, but you certainly won't -- at the end of this,

19   probably that same August day, we'll do an hour on tech.  I

20   don't think it's going to take anything more than -- as long as

21   this did.  This was very important, very useful to me, as I

22   said, and I'm grateful for the economists.  Then we'll do

23   closing argument on it.  And then I want to get this thing out

24   by, I don't know, Labor Day, maybe.

25        Forget I said that.  I'm going to get it out as soon as I

1    can -- you know, promptly.

2           **MR. POMERANTZ:**  Yes.  Your Honor, we don't need to

3    decide this today, but I guess I'd like to plant a seed with

4    Your Honor.

5           **THE COURT:**  Yes.

6           **MR. POMERANTZ:**  So you're going to obviously write

7    this injunction, and it's complicated and --

8           **THE COURT:**  Oh, I don't think it will be.  Not in a

9    way that you may suggest.

10          **MR. POMERANTZ:**  No.  But I understand, things could

11   creep in inadvertently that you didn't intend, that we could

12   highlight.

13      Not to reargue anything, but just to look at the way you

14   worded something and point it out to you.  So one thing we

15   would ask --

16          **THE COURT:**  I'm not really inclined to draft by

17   committee, Mr. Pomerantz.  So you can take it up on appeal if

18   you don't like it.  Okay?

19      All right.  Is that it for today?

20          **MR. BORNSTEIN:**  Thank you very much for the time, Your

21   Honor.

22          **THE COURT:**  Thank you.  I really want to thank both of

23   you for making this happen, and it was -- I can't say enough

24   how much I appreciated it.  Okay?

25      All right.  Thanks a lot.

1          **MR. POMERANTZ:**  Thank you.

2          **MR. BORNSTEIN:**  Thank you.

3          **THE CLERK:**  All rise.  Court is in recess.

4               (Proceedings adjourned at 2:31 p.m.)

5                         ---o0o---

6

7                  <u>**CERTIFICATE OF REPORTER**</u>

8          I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled matter.

10

11  DATE:   Friday, May 24, 2024

12

13

14

15

16  _____
    Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
17          Official Reporter, U.S. District Court

18

19

20

21

22

23

24

25