Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20001
Telephone: (202) 637-5600

*Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD

Case No. 3:21-md-02981-JD

**DECLARATION OF VITOR BACCETTI IN SUPPORT OF GOOGLE'S PROFFER REGARDING EPIC'S PROPOSED REMEDIES**

Judge: Hon. James Donato

**DECLARATION OF VITOR BACCETTI**

1. I am a Group Product Manager at Google. In that role, I am responsible for app distribution at Google Play. The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2. I am a Group Product Manager at Google. In that role, I am responsible for app distribution at Google Play. The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

3. I have reviewed the portions of Epic's proposed injunction relating to Catalog Access, Library Porting, and Distribution of Third Party Stores through the Play store. I offer this declaration to describe the technical implementation and anticipated resource allocation required for some of these remedies. This declaration reflects my current analysis within the short timeframe provided and based on the limited description of the remedies set forth in Epic's proposed injunction. If Google were ordered to implement these remedies, it is possible that Google could encounter unanticipated issues requiring different methods of implementation, which may entail a different resource burden and cost.

4. Because of my role, this declaration is focused on the changes that Google would need to make to the Play store in order to implement some of these remedies.

**Catalog Access**

5. In this section, I describe the technical means by which Google would implement the "catalog access" remedy if ordered to do so, as well as the resources required and timeline for implementation.

Implementation of Catalog Access

6. If Google were ordered to implement the catalog access remedy over its objection, Google could export metadata associated with the apps in its catalog, for which developers have opted in, to a server for authorized third-party stores to access. The authorized third-party stores could use that metadata to display those Play apps in their storefronts. If a user attempts to install a Play app on the third-party storefront, the Play store would facilitate and actually perform the installation. That app would be treated as a Play-installed app by Google going forward.

*Metadata Export*

7. There are over 1 million developers and around 3.2 million published apps on the Google Play store.

8. Google would regularly export metadata associated with these apps in its catalog to a server and refresh it on a daily basis. The metadata could include basic data pertaining to the app itself (e.g., app name and package name, developer name, image of app icon, and app category), as well as some basic information provided by the developer about the app, such as the countries in which the app is distributed and whether the app offers in-app purchases. The export would not include any user data, which includes reviews of the app given by other users. The export would also exclude data generated by Google, like auto-translations, age ratings, and install counts.

9. Subject to agreed-upon terms of service, including meeting reasonable eligibility criteria, Google could grant to authorized third-party app stores access and a limited license to this metadata for the purpose of displaying Play apps that are not already in the third-party app stores' own catalogs. Google could host this metadata to be accessible to an authorized third-party store's serving system.

10. Third-party app stores could populate their storefronts from both the metadata export of Play apps, and their own local databases containing apps published directly to their stores. When displaying apps to users, the third-party store could merge the results to create a single user-facing catalog inside the third-party's storefront.

*Installation by Play Store*

11. When inside the third-party storefront, if a user clicks to install an app that the developer distributes to that third-party store, then Play would have no involvement in fulfilling the install. When the user, by contrast, clicks to install a Play-sourced app that is displayed pursuant to the process described above, then Google would implement the following process to fulfill the installation.

12. If not already a Play user, users would be required to agree to relevant terms of service and be signed in with a Google account before proceeding to the app installation process. The same conditions apply for users when visiting the Play store through other means.

13. If the package does not exist, or the user or device is not one which the developer has permitted to install the app, then the user will see a message informing the user that the app is not available.

14. If the package exists and the user and device are ones which the developer has permitted to install the app, then a user interface will appear from Play that gives the user additional information about the app, and contains an install button if they are eligible to install the app. The user can install the app from that user interface, without leaving the third party store.

15. Google, rather than the third-party app store, would generate this user interface, with Play branding, so that the user is on notice that this app originates from the Play store and they are agreeing to Play's terms and conditions, just as if they were installing the app directly from the Play storefront itself. In addition, there are regulatory requirements in certain jurisdictions regarding the content of the information displayed to users at the point of install, and because Play is fulfilling the install then Google must ensure that it is meeting those requirements.

16. Google may also need to build and implement an additional security layer that ensures that the app store seeking to call the Application Programing Interface ("API") from Play that generates the overlay interface is, in fact, an app store that the developer has authorized to make the app available through catalog access. This mechanism would involve building and maintaining, in real time, a list of approved callers of the Play API described above. Google may also decline to serve requests for apps when the app's developer has not consented to share their metadata with the third-party store calling the API.

17. This process fulfills the requirement in Epic's proposed injunction that the install occur through a "background process similar to the Alley Oop integration offered by Google to certain third-party Developers." I was the product manager for some time for the "Alley Oop" project at Google, which is known externally as the Google Play App Access Program. This was a beta project that Google created for "publisher" developers—*e.g.*, Twitter, Pinterest, Facebook—

to integrate so that users who click on app install ads would not have to leave the publisher's app in order to have Play fulfill the install of the app being advertised. The install process I describe above to implement Epic's catalog access remedy would be very similar to our previous Alley Oop program.

18. Because the Play store is handling the installation and subsequent updates of the app, Google would treat the app exactly as if it was installed directly from the Play storefront. For example, the user can receive and redeem Play points for qualifying in-app purchases, and Play can communicate with the user to provide updates as well as notifications about Play store products and promotions, just like any other Play customer. Because the user installed the app from Play, the user would be considered a Play customer.

*Developer Consent Mechanism on Developer Console*

19. As part of its implementation of catalog access, Google would give developers a mechanism to provide consent to participate in catalog access through the Google Play Console. The Google Play Console is the platform that developers use to manage their apps in the Play store, including setting parameters for how and to whom the apps may be distributed. Google would also provide developers who opt in to catalog access with additional options that allow the developers to be more specific in selecting which authorized third-party app stores they want Google to give access to their apps.

20. Providing this consent mechanism for developers is critical. Developers may have reasons why they do not want their apps to be distributed by a certain app store, or in a storefront next to "unlocked" or pirated versions of the same apps, or in an environment with illegal or inappropriate content that may hurt the developer's brand, such as pornographic or violent content. Moreover, developers own IP rights in their apps, including the app icon image that Google would need to share with third-party stores. In addition, many developers *themselves* have licenses from other third-parties. For example, Kabam Games, Inc., relies on content from Disney and Marvel to distribute the "Marvel Contest of Champions" and "Disney Mirrorverse" games on the Play store. For these reasons, Developers need the right to control the distribution of their IP and the IP they have sublicensed. Based on my experience as a product manager for app distribution,

copying (or "scraping") the publicly available app information from the Play store, and then distributing unauthorized versions of those apps in other stores is common—and it is very frustrating for some developers.

21. If Google were to make developers' apps available to third-party stores *by default*, and merely allow an objecting developer to opt out of the program, this could present some practical problems for non-consenting developers. For example, it may be that a third-party store could have already obtained the developer's IP and metadata from an earlier Google export, *before* the developer noticed the option in the Play Developer Console or had time to opt out of the program. In that circumstance, there would be no way for Google to "claw back" that information—including potential trademarks in the developer's app icon—from a third-party store.

22. Not only could a third-party store make available a developer's app icon and associated information over the developer's objection, but it could assist users in installing the app through Play over Google's objection too. In particular, the third-party store could simply deep-link the user to the Play store install page, and the Play client would have no way of determining that the user originated from a store that the developer had not approved to receive the app through catalog access.

*Eligibility Criteria and Terms of Use*

23. As part of its implementation of catalog access, Google would likely seek to set eligibility criteria to ensure that only legitimate and safe app stores could obtain access to the approximately 3 million apps in Google's catalog. For example, Google works hard to protect data from leaks and hackers, so it may require that the third-party store have reasonably sufficient safeguards to protect developers' data that Google would be required, by this order, to export.

24. Moreover, without any eligibility criteria, any app could declare itself an "app store" and instantly get access to the millions of apps in Google's catalog, without actually resembling an app store in any sense. For these reasons, Google would implement eligibility criteria that would include, for example, a requirement that an app store has a minimum number of apps in its own catalog and the basic infrastructure to conduct app store business; a requirement

that the app store forbid malware, pirated or unlocked apps, and other illegal content; has catalog review procedures in place to enforce those rules; and has agreed to terms of use with Google.

*Charging Model*

25. If ordered to undertake the efforts described above, Google would build a fair and reasonable model for receiving compensation for this value, including the value of the catalog of Google's apps. I am aware of no precedent for a company providing its entire digital catalog for a competitor to display in its own storefront, as contemplated by Epic's proposed injunction, so it will take work to determine what a fair and reasonable fee model would be. This may include cross-functional efforts within Google to develop policies, assess relevant rules in various jurisdictions, evaluate third-party app store economics, and more.

26. Google will incur costs in connection with maintaining an infrastructure and processes to facilitate and manage commercial relationships with third-party stores. While some of those costs are fixed, others will depend in some measure on the number of third-party app stores that choose to participate in catalog access. That work will necessarily involve time dealing with these stores as a business customer, including dealing with disputes and, in some circumstances, potential escalations to senior executives. Depending on the fee model that Google adopted, Google may need to develop an infrastructure to identify and monitor eligible installs, as well as to invoice, audit, and securely process payments.

*Alternative Approach*

27. I believe the above-described model of implementing catalog access achieves the letter and spirit of what Epic's proposed injunction requests.

28. An alternative approach may be to directly connect Play's catalog and systems to the discovery functions of the third-party store. In essence, when a user is browsing or searching within a third-party storefront, the third-party store would query Play in real time in response to a user search prompt, and Play would deliver the necessary metadata that is specific to that request so that the third-party store can then process and render the information for the user. Google could achieve this either at the server level—connecting Google's servers with those of third-party stores—or at the on-device client level.

29. This approach has downsides for both Google and third-party stores. First, this would require Google to establish a deeper technical integration with its competitor app stores, partnering with those stores on the discovery function within their storefronts. This level of partnership increases the entanglement between Play and its competitors, and introduces additional opportunities for disputes, escalations, etc. Because of the added complexity and the need to collaborate more with third-party stores, it also may increase costs and time to implement the remedy.

30. Second, this approach would not involve giving access to Play's catalog, so the third-party store would not have that catalog to organize and build their own discovery functions within their storefront. Particularly, if a third-party store is seeking to differentiate from Play and compete for users, this approach would make that kind of differentiation more difficult because the third-party store would not have the ability to use the catalog to organize and build its own discovery functions, recommendations, and merchandising capabilities within its storefront.

31. Finally, this approach would require Google to build, support, and maintain servers to handle the traffic of users browsing another app store.

Estimate of Costs & Timeline

32. In this section, I address expected resource requirements, and timeline, to implement the catalog access remedy as described above. To make these resource requirement estimates, I am drawing on my experience as a Product Manager in the Google Play organization over the last 8 years, during which I have overseen the development of multiple features from inception to launch.

33. To implement this catalog access remedy, and then to maintain it on an ongoing basis for the duration required, I estimate the following resource commitments. These estimates assume that the export contains the types of app-related metadata described above, and that developers can consent on a per-app-store basis. Because we have never launched a program like catalog access before, I do not have a prior model on which to base these estimates, so there is some uncertainty about the specific resource requirements, but I have attempted to do our best to predict the resources that would be required to implement the remedy.

| Resources / FTEs | Duration Required | Scope |
|---|---|---|
| Initial Scoping & Design | | |
| 1 Product Manager (PM) | 3 months | Overall solution |
| 1 Senior Software Engineer (SWE) | 3 months | Overall solution |
| Implementation & Launch | | |
| 1 PM | 6-9 months | Data sync & developer consent |
| 6 SWE | 6-9 months | Data sync & developer consent |
| 2 SWE Eng Prod | 6-9 months | Data sync & developer consent |
| 1 Technical Program Manager (TPM) | 6-9 months | Data sync & developer consent |
| 1 Tech Writer (TW) | 6-9 months | Data sync & developer consent |
| 1 Legal Counsel | 6-9 months | TOS / DDA / Other Policy |
| 2 XFN Resources (Policy, Program Manager) | 6-9 months | TOS / DDA / Other Policy |
| 1 PM | 6-9 months | TOS / DDA / Other Policy |
| 1 SWE | 6-9 months | TOS / DDA / Other Policy |
| 1 PM | 6-9 months | Installation User Interface and APIs |
| 5 SWE | 6-9 months | Installation User Interface and APIs |
| 1 SWE Eng Prod | 6-9 months | Installation User Interface and APIs |
| 1 UX Designer | 6-9 months | Installation User Interface and APIs |
| 1 TPM | 6-9 months | Installation User Interface and APIs |
| 2 Business Dev Managers | 6-9 months | Outreach and support for developer consent |
| Mechanism for More Frequent Updates | | |
| 7 SWE | 6-9 months | Mechanism for lower latency refreshes of app metadata |

| | | |
|---|---|---|
| 2 SWE Eng Prod | 6-9 months | Mechanism for lower latency refreshes of app metadata |
| 1 TPM | 6-9 months | Mechanism for lower latency refreshes of app metadata |
| Onboarding of Stores | | |
| 3 Technical Solutions Consultant/Engineer (TSC/TSE) | 3 months | Partner support for integrating with metadata export and new APIs |
| 1 TPM | 3 months | Partner support for integrating with metadata export and new APIs |
| Build & Implement Charging Model[1] | | |
| 7 SWE | 6-9 months | Implement charging and payments |
| 4 SWE | 6-9 months | Implement features for policy enforcement and security |
| 1 TPM | 6-9 months | General support for charging model |
| 1 PM | 6-9 months | General support for charging model |
| 2 Finance | 6-9 months | General support for charging model |
| 2 Tax | 6-9 months | General support for charging model |
| 2 Legal Counsel | 6-9 months | General support for charging model |
| Policy Enforcement | | |
| 2 SWE | 6 months | Implement automated signals for detecting issues and support compliance |
| Ongoing Maintenance & Policy Enforcement Support | | |
| 2 Software Reliability Engineer (SRE) | 2-6 years | Support production and uptime requirements |
| 3 SWE | 2-6 years | Ongoing updates to infrastructure |
| 1 SWE Eng Prod | 2-6 years | Ongoing updates to infrastructure |

[1] This does not include the burden and costs of new commercial relationships, and adding new dimensions to the very significant commercial relationships that Google has with large partners. For example, these costs do not include the costs of dealing with disputes, escalations, and other related other issues.

| 2 Trust & Safety (T&S) | 2-6 years | Policy, enforcement and partner engagement |
|---|---|---|

34. In addition, Play currently already fulfills billions of new app installs per week, and tens of billions of updates per week. The proposed injunction will increase that volume by an unknown margin, but potentially by a significant amount, and Play will incur additional costs to process that increased volume. That includes operating expenses relating to serving and network costs. Because I cannot predict the incremental addition of new installs as a result of these remedies, I cannot offer a precise cost estimate.

35. Finally, for many of our projects we build in buffer time to account for unforeseen technical and product issues that are common when building new and complex systems. On most engineering projects we add between 20-30% buffer to account for unknowns and unexpected issues here. Here that buffer is especially important because we have no model for having to implement a project like this in the past, so there are any number of unknowns that could delay the process. For example, we may have underestimated the complexity of the design or the implementation cost of a component of the solution. For these reasons, I assume a 30% buffer on all estimates above.

36. As indicated by the above time-estimates, I anticipate that, operating very quickly, it will take at least 12-16 months before catalog access would be ready to come online. The design, scoping, and building of each aspect described above would need to be complete before the catalog access experience can be ready for third-party app stores.

**Distribution of Third-Party Stores Through Play**

37. In this section, I describe the changes necessary to set up the Play store to be able to distribute third-party app stores, as described in Epic's proposed injunction.

Implementation of Remedy

38. The Play store as it exists today is designed to distribute apps, not app stores. To implement the remedy proposed in Epic's injunction, Google would have to develop new flows in the Google Play Console to allow developers to declare an app as an app store, agree to abide by

Play store policies, and accept additional terms of service. For reference, the currently operative Developer Distribution Agreement, to which all developers must adhere, is attached as **Exhibit A.**

39. Google would also make changes across many surfaces in the Google Play Console to add support for app stores. It would have to create new Play store surfaces to handle the display of app stores within the store as well. We will need to design mechanisms for Play Store users to identify when an app is a store and make changes across the Play Store surfaces to support this. In addition, Google would likely build and implement a warning that advises users when they are about to install an app store.

40. In addition, Google would have to establish eligibility criteria for app stores to be distributed through the Play store, and will have to develop human processes and technology to monitor and enforce compliance with those rules. This includes policies relating to inappropriate or illegal content, piracy and impersonation, and malware.

41. The need to set parameters on app store eligibility is particularly important for the purpose of this remedy, because of the fee evasion opportunity it presents. Epic's proposed injunction forbids Google from charging "any fees in connection with the distribution of Third-Party App Stores on the Google Play Store (including any fees on any sales made by such app stores or in apps distributed directly . . . ." Proposed Injunction § II.A.2.ii. As written, without eligibility parameters, any developer can create a "launcher" for its highly monetized game or app and distribute the launcher through Play under the guise of an "app store." For example, when Epic distributed Fortnite on Android, it did so through the "Epic Games Launcher," a package with install permissions that the user could download and then subsequently use to install Fortnite. Because the injunction as written would not allow Play to charge a service fee to app stores distributed through Play, developers could adopt this "launcher" approach and hide their most popular apps in a shell or launcher designated as an "app store." It is therefore critical that Google be permitted to adopt fair and reasonable criteria for what constitutes an app store for the purpose of this remedy.

Estimate of Costs & Timeline

42. In this section, I address expected resource requirements, and timeline, to implement Epic's proposal that Play distribute other app stores. As noted above, for these estimates I am drawing on my experience as a Product Manager in the Google Play organization over the last 8 years, during which I have overseen the development of multiple features from inception to launch.

43. These estimates account only for the resource commitments necessary to change the Play store and associated policies to implement this remedy. My estimates do not include the work that other organizations may undertake to implement this remedy, including Android engineering or our Trust & Safety and app review teams.

| **Resources / FTEs** | **Duration Required** | **Scope** |
|---|---|---|
| Initial Scoping & Design | | |
| 1 PM | 3 months | Developer Console |
| 1 PM | 3 months | Policy, Trust & Safety |
| 1 TPM | 3 months | General support |
| 1 Senior SWE | 3 months | Developer Console |
| 1 Senior SWE | 3 months | Policy, Trust & Safety |
| 1 Legal Counsel | 3 months | General support |
| 1 Policy FTE | 3 months | General support |
| Implementation & Launch - Play Console | | |
| 1 PM | 9 months | Changes to Play Console to support publishing of App Stores |
| 4 SWE | 6-9 months | Changes to Play Console to support publishing of App Stores |
| 1 SWE Eng Prod | 6 months | Changes to Play Console to support publishing of App Stores |
| 1 UX Designer | 6 months | Changes to Play Console to support publishing of App Stores |

| | | |
|---|---|---|
| 1 TPM | 9 months | Changes to Play Console to support publishing of App Stores |
| 1 Legal Counsel | 6-9 months | Changes to Play Console to support publishing of App Stores |
| Implementation & Launch - Play Store Client | | |
| 1 PM | 9 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| 6 SWE | 6-9 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| 1 SWE Eng Prod | 6 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| 1 UX Designer | 6 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| 1 UX Researcher | 6 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| 1 TPM | 9 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| 1 Legal Counsel | 6-9 months | Changes to consumer Play store to support discovery and installation of third-party app stores |
| Implementation & Launch - Install APIs | | |
| 1 PM | 6 months | Implement support for new Android APIs relating to install permissions |
| 2 SWE | 6 months | Implement support for new Android APIs relating to install permissions |
| 1 SWE Eng Prod | 6 months | Implement support for new Android APIs relating to install permissions |

| Policy Design & Launch | | |
|---|---|---|
| 1 Policy FTE | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| 1 PM | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| 3 SWE | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| 1 PgM | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| 1 Legal Counsel | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| 1 XFN (Government Affairs and Public Policy) | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| 1 Ops FTE | 9 months | Build initial policies for app stores, including eligibility and new terms of services |
| App Store Review Program Launch | | |
| 3 PgM | 9 months | Stand up baseline process for review |
| 3 TSC | 9 months | Stand up baseline process for review |
| 8 T&S | 9 months | Stand up baseline process for review |
| 4 TVC (Temporary Vendor Contractor) | 9 months | Stand up baseline process for review |
| Ongoing Maintenance - Engineering Support | | |
| 2 SWE | 2-6 years | Ongoing updates to engineering infrastructure |
| 1 PM | 2-6 years | Ongoing updates to engineering infrastructure |

| 1 SWE Eng Prod | 2-6 years | Ongoing updates to engineering infrastructure |
|---|---|---|
| Ongoing Maintenance - App Store Review Program Support | | |
| 1 PgM | 2-6 years | Support app store review program |
| 1 T&S | 2-6 years | Support app store review program |
| 1 TVC | 2-6 years | Support app store review program |
| Ongoing Maintenance - Policy & Policy Enforcement Support | | |
| 1 Policy FTE | 2-6 years | Support policy updates and enforcement |
| 1 PM | 2-6 years | Support policy updates and enforcement |
| 1 SWE | 2-6 years | Support policy updates and enforcement |
| 1 Ops FTE | 2-6 years | Support policy updates and enforcement |

44. As the above time-estimates indicate, I anticipate that it will take at least 12-16 months before Play will be ready to distribute other app stores. This includes the same 30% buffer discussed above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of June 2024, in New York, NY.




Vitor Baccetti