Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20001
Telephone: (202) 637-5600

*Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**DECLARATION OF DAVID KLEIDERMACHER IN SUPPORT OF GOOGLE'S PROFFER REGARDING EPIC'S PROPOSED REMEDIES**<br><br>Judge: Hon. James Donato<br><br>**PUBLIC REDACTED VERSION** |

52050241.1

KLEIDERMACHER DECLARATION ISO OF GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

DocuSign Envelope ID: 49D63448-2C4E-48AC-83AC-CD5675922B7B

# DECLARATION OF DAVID KLEIDERMACHER

1. I, David Kleidermacher, am Vice President of Engineering for Security and Privacy for Android and Made-by-Google Products and Services. Since I joined Google in 2017, I have been responsible for Android security and privacy engineering. I am familiar with Google's efforts to combat the harmful effects of malware on Android. The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them..

2. I have reviewed the portions of Epic's proposed injunction relating to Catalog Access, Library Porting, and Distribution of Third Party Stores through the Play store. I offer this declaration to describe the technical implementation and anticipated resource requirements for some of these remedies. This declaration reflects my current analysis within the short timeframe provided and based on the limited description of the remedies set forth in Epic's proposed injunction. If Google were ordered to implement these remedies, it is possible that Google could encounter unanticipated issues requiring different methods of implementation, which may entail a different resource burden and cost.

3. Because of my role, this declaration is focused on the security risks, as well as the increased operational demands and additional costs of vetting third-party stores.

## Security Risks of Third-Party App Stores

4. On its own store, the Google Play store, Google establishes and enforces policies regarding the apps that Google will distribute. For example, Google has policies to protect users from malware and privacy risks, and Google prohibits apps that violate the law, such as apps with illegal content or pirated apps (i.e. apps that are distributed without the authorization of the app developer). Before an app can be listed on the Play store, Google reviews these apps for compliance with its policies. Google also reviews updates to apps for compliance with its policies. Copies of the relevant Play store policies are attached as **Exhibit A**.

5. By contrast, third-party app stores establish their own policies and criteria for the apps they will list. There is no "standard" or minimum requirement for safety of app stores, or their developers, today. Nor do we have a good way of measuring the risk that a particular third-party app store may pose to users. If Google Play distributes any third-party app store, without

reviewing the apps hosted by that store, Google itself would be exposing Android users and its own Play customers to potentially significant risks that are outside Google's ability to manage.

6. The proposed injunction's failure to define an "app store" amplifies these risks further. At a software level, Android does not have the concept of an "app store." Instead, the operating system merely distinguishes between apps that have the permission to install other apps and apps that lack that permission. To the extent an "app store" in Epic's proposed injunction merely means "any app capable of installing other apps," then the injunction will provide a powerful new tool for bad actors to harm users. This is because any app—including harmful or malicious apps—would be able to elect to become an app installer and thereby unlock an entitlement to be (a) distributed by Play, (b) access Play's catalog, and (c) request library porting of the user's apps.

## Vetting Apps of Third-Party Stores Distributed by Play

7. Because there does not exist any practical means of obtaining independent confidence in the safety of a third-party store, to manage this risk Google would apply its own Trust & Safety processes—including app and developer review—to review those stores' apps. Thus, if Google were ordered to permit the distribution of third-party app stores through Play, Google would likely extend its existing app review functions for Play apps to vet the catalog of apps distributed by third-party stores.

8. Google Play's app review process for Play apps is labor-intensive. As I testified at trial, there is a human review for all new apps to determine compliance with a number of Play's policies. There is also a sophisticated infrastructure that conducts a machine-based review, examining the application and developer for signals of risk. If a risk is identified by our automated processes, and our algorithms cannot determine at a very high degree of precision whether an app is malicious, then the app will be further evaluated by a human. Google also reviews all app updates using a machine-based review, and the update may be flagged for additional human review if our system determines that the update is suspicious or may violate our policies. An app or update is not published until Play completes the above review process.

1  Google conducts the above review for millions of new apps and updates every year.  (By way of
2  example, in March 2024 alone we reviewed nearly 2.7 million new apps and updates).

3        9.     If Google were ordered to distribute third-party app stores through the Play store,
4  then Google would extend this process to the catalogs of stores that Play is required to distribute.
5  If Google did this, then in order to continue to be distributed on Play, the third-party store would
6  have to allow Google to perform this app review for all apps and updates that the third-party store
7  intended to publish.  No app or update could be published on the third-party storefront distributed
8  through Play unless Google had cleared that app or update pursuant to Google's policies, which
9  would include at least the same safety and content policies that Google applies to apps distributed
10  directly on Play.

11        10.    Google may also modify Android to require that no app can be installed from such
12  a Play-distributed store unless it has been approved pursuant to Google's app review process.
13  This may require technical and product collaboration between Google and third-party stores
14  distributed through Play, as Play would effectively be in a position of approving the catalog of
15  competitor stores.

### Review of Third-Party Store Behavior

17        11.    In addition to vetting the third-party app catalog, Google also would likely require
18  the app store itself to follow Play's policies.  For example, Play has privacy policies and policies
19  requiring disclosure of certain information to the user.  Because it would be distributed by Play,
20  the app store would likely need to adhere to these policies.  Google would also have to develop
21  and implement behavior policies for third party app stores distributed through Play.

22        12.    Google may also consider extending aspects of its Mobile Bundled Apps (MBA)
23  Policies, which apply to all preloaded apps, to other apps and app stores regardless of source, in
24  order to respond to the increased risk that this remedy would have for users.  Google may also
25  consider revising its Android policies relating to malware and mobile unwanted software to cover
26  the behavior of third-party stores.  Google's current MBA Policies are attached as Exhibit B.

27        13.    For example, whatever remedy Google must adopt, one protection that Google
28  needs to retain at the operating system level is the prohibition on non-preloaded apps

52050241.1     -3-

KLEIDERMACHER DECLARATION ISO OF GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

automatically and silently installing other apps without user consent (i.e., when the user has not expressed an intention to install). Automatic and unconsented installs are a significant security risk. One recent example was the Redstone installer, a pre-installed system app on Android devices sold in Germany that automatically installed malware on users' devices.

*Costs*

14.  As the head of Android security and privacy engineering, I am familiar with the costs for reviewing Play apps, and the rough breakdown of those costs. I estimate that the total cost to run app review, on an annual basis, is roughly ▮▮▮▮▮▮. Below is a rough estimate of how these costs are allocated for Play app review today.

| Team / Function | $/year |
|---|---|
| ▮▮▮▮▮▮ | ▮▮ |
| ▮▮▮▮▮▮ | |
| ▮▮▮▮▮▮ | |
| ▮▮▮▮▮▮ | |
| ▮▮▮▮▮▮ | |
| ▮▮▮▮▮▮ | ▮▮ |
| ▮▮▮▮▮▮ | ▮▮ |
| ▮▮▮▮▮▮ | ▮▮ |

|   |   |
|---|---|
| 1 | ■ |
| 2 |   |
| 3 |   |
| 4 |   |
| **TOTAL** | ■ |

15. It is difficult to determine with precision the costs of extending the Play's app review efforts to third-party store catalogs.

16. First, it is difficult to predict how many new apps and updates Google will have to review after this injunction takes effect.

17. Second, it is difficult to distinguish between costs that are fixed, on the one hand, and variable costs that would increase with each incremental addition in new app submissions to review, on the other. While all of the above costs are variable (i.e., they will increase as Google must expand its operations to review additional apps), not all of them will increase linearly with each incremental new app submission that Google must review.

18. Finally, because we would be reviewing apps that are not typically submitted to Play, but to stores with lower safety and content standards than Play has, I expect that some aspects of the work outlined above will increase at a disproportionately rapid pace. In other words, even a small increase in the number of apps we review from third-party stores may result in a disproportionately large additional review effort by some of our teams, because those apps may present new attack scenarios that we have yet to analyze. I do not know exactly what that cost increase would look like because we have not yet done such a comprehensive review of third-party catalogs.

19. Moreover, the changes being considered are significant and novel, and thus any cost estimate I offer is necessarily tentative and may not end up being accurate if Google is forced to make these changes.

20. That being said, based on my experience in this industry and as the head of security and privacy engineering at Android for over seven years, including experience working with other app stores to address risky apps in their catalog that present risks for Android users, I believe a 20

52050241.1    -5-

KLEIDERMACHER DECLARATION ISO OF GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

percent growth in the above costs to be a reasonably likely possibility. That is a conservative estimate, depending on the number of additional apps proposed for publication by Play-distributed third-party stores, our cost increase may be significantly higher.

21. Assuming a conservative 20 percent cost increase, given that our existing costs are approximately ▓▓▓▓ for app review efforts (described above), I estimate a cost increase of over ▓▓▓▓

*Timeline*

22. To implement the above changes, I estimate it will take roughly one year, which is a conservative estimate. Hiring and training additional individuals to address the growing trust and safety needs described above—including likely hundreds of additional reviewers—takes a significant amount of time. In the past, it has taken at least that amount of time to hire and train fewer reviewers than what the above changes would likely require. In addition, making major changes to Play and/or Android policies that impact all Android app developers is a time-intensive process, involving cross-functional planning and developer feedback cycles. Those changes also need to account for the time it takes for app stores to change their existing practices to become compliant with new policies, which in some circumstances can take many months.

*Alternative Measures Are Insufficient*

23. I understand that one alternative to third-party catalog review may be to display a warning screen to the user informing them that they are entering, or installing an app from, another app store and consequently Play is not responsible for whatever harm may occur thereafter. In my view as the head of engineering for Android security, that is not sufficient. As an initial matter, when viewed in tandem with Epic's proposed catalog access remedy, it may be that a significant number of the apps that a user sees in a third-party storefront actually *do* come from Play. More fundamentally, unlike when a user sideloads a third-party store which does not involve Play, this particular remedy would require the Google Play store itself to install the third-party store on the device, so Google would be involved in facilitating the later installation of potentially harmful, pirated, or inappropriate apps. Users, including parents of children who may access inappropriate or harmful apps, may complain to Google about subsequent security or content issues because of

Play's involvement in facilitating the install. Google therefore has a legitimate interest in protecting not only Android, but also its own "Google Play" brand, and for that reason it may need to undertake the same review process for third-party catalogs as it does for its own Play apps.

24. Another alternative to third-party catalog review may be to rely on the scans that Google Play Protect ("GPP") conducts for apps that are distributed outside of Play, but I also do not think that would be sufficient to protect users. GPP scans for known malware on an established "blocklist," and for unknown malware via machine flags, but the review resources for unknown malware scans are relatively less extensive. And as I testified at trial, we receive important signals about an app's potential security risks because of the fact that the app and its developer are on Play. So if an app is distributed off-Play (including in a Play-distributed third-party storefront), then Google Play Protect has much less capability of detecting potential harm to users. Finally, Google Play Protect's automated scans are not able to make judgments with certainty about content policy violations and other issues, which is why we have human review for Play apps and updates that are flagged.

*    *    *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of June 2024, in Palo Alto, CA.



David Kleidermacher

52050241.1

-7-

KLEIDERMACHER DECLARATION ISO OF GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD