1   Paul J. Riehle (SBN 115199)
    paul.riehle@faegredrinker.com
2   **FAEGRE DRINKER BIDDLE & REATH LLP**
    Four Embarcadero Center, 27th Floor
3   San Francisco, CA 94111
    Telephone: (415) 591-7500
4
    Gary A. Bornstein (*pro hac vice*)
5   gbornstein@cravath.com
    **CRAVATH, SWAINE & MOORE LLP**
6   375 Ninth Avenue
    New York, New York 10001
7   Telephone: (212) 474-1000

8   *Counsel for Plaintiff Epic Games, Inc.*

9   [Additional Counsel Appear on Signature Page]

10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13                **SAN FRANCISCO DIVISION**

14
    **IN RE GOOGLE PLAY STORE**          Case No. 3:21-md-02981-JD
15  **ANTITRUST LITIGATION**

16  THIS DOCUMENT RELATES TO:            **EPIC'S RESPONSE TO GOOGLE'S**
                                         **PROFFER REGARDING EPIC'S**
17  *Epic Games, Inc. v. Google LLC et al.,*   **PROPOSED INJUNCTION**
    Case No. 3:20-cv-05671-JD
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    APPROACH TO GOOGLE'S PROFFER .................................................................3

II.   CATALOG ACCESS ...............................................................................................3

    A.    Google's Proposed Implementation of Catalog Access Is Flawed ......................4

        1.    Google's Proposal that Developers Opt-In to Catalog Access Will
            Materially Diminish the Effectiveness of the Remedy ...........................4

        2.    Imposing Eligibility Criteria on Stores Participating in Catalog
            Access Would Limit the Effectiveness of the Remedy ...........................6

        3.    Google Seeks To Improperly Limit the Metadata To be Shared ...............8

        4.    Google's Proposed User Interface Could Introduce Unnecessary
            Friction ...................................................................................................9

        5.    Google Should Refresh the Catalog at Least as Often as It Is
            Updated for the Play Store ......................................................................9

        6.    Google Should Not Be Able To Impose Fees for Catalog Access ...........10

    B.    Google's Cost and Resourcing Estimates Are Inflated........................................10

III.  LIBRARY PORTING .............................................................................................12

    A.    Android 14's Capabilities Do Not Adequately Address Harm to
        Competition.........................................................................................................13

    B.    Google Can Implement Library Porting with Minimal Further Updates .............14

        1.    Google Can Implement Multi-App Ownership Transfer..........................14

        2.    Google Can Integrate "Transfer Ownership" Rather Than "Clear
            Ownership" Permissions ........................................................................15

        3.    Google Can Display a Neutral Screen for User Consent..........................16

    C.    The Costs to Google of Implementing Library Porting Are Trivial ....................17

IV.   DISTRIBUTION OF THIRD-PARTY STORES .....................................................17

    A.    Carrying Third-Party Stores Would Require Trivial Changes .............................18

    B.    Google's Proposal To Vet All Apps on Third-Party Stores Is Inappropriate ........19

    C.    Google Should Not Impose Eligibility Criteria on App Stores ...........................21

    D.    Google Should Create Parity by Adding Screens to the Play Store .....................22

    E.    Google Should Not Charge for Third-Party App Store Distribution....................24

1

F.      The Costs Google Estimates in Connection with Distributing Third-Party
        Stores Are Unreliable and Need Not Be Incurred ...................................................24

**CONCLUSION** ...........................................................................................................................**25**

1

# TABLE OF AUTHORITIES

**Page(s)**

2

**Cases**

3

*Comedy Club, Inc. v. Improv W. Assocs.*,
  553 F.3d 1277 (9th Cir. 2009) ............................................................................5

4

*Ford Motor Co. v. United States*,
5
  405 U.S. 562 (1972)..........................................................................................19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On December 11, 2023, a jury found that Google unlawfully engaged in anticompetitive conduct in both the Android app distribution market and the market for Android in-app billing services for digital goods and services transactions.  (Dkt. 866.)  At every step since that verdict was handed down, Google has sought to chip away at the jury's findings.  After first seeking to vacate the jury's verdict, *see* Dkt. 925, Google next filed over 90 pages of unsolicited objections attacking every aspect of Epic's proposed injunction (the "Proposed Injunction"), including the very premise of imposing any injunction at all.  (*See* Dkt. 958 at 2 (objecting to the Proposed Injunction as, *inter alia*, "unnecessary" given the States' Settlement).)  During the May 23, 2024 proceeding, this Court advised Google that, despite its objections, "[t]here is going to be a remedy. . . . [a]nd if it causes a period of two years or four years or six years of adjustment, . . . that's the consequence of having violated the antitrust laws."  (May 23, 2024 Hearing Tr. 64:23-65:1.)

Google nevertheless asked for permission to submit a proffer and the Court permitted Google to address "the tech work required and economic costs, if any" of three of Epic's proposed remedies:  (i) third-party app store access to the Play Store's catalog; (ii) "library porting", *i.e.*, transferring the update ownership of users' apps from the Play Store to third-party app stores; and (iii) distribution of third-party app stores on the Play Store.  (Dkt. 978 at 1; Dkt. 981, Google's Proffer Regarding Epic's Proposed Injunction ("Proffer"), at 1.)  Importantly, in Google's Proffer, ***Google does not say that the proposed remedies are infeasible***.  Instead, Google's Proffer is yet another attempt to weaken the remedy for its unlawful conduct.  Google adds unnecessary hurdles and proposes implementation methods that would make the injunction substantially less effective.  Google materially inflates the costs of compliance and then suggests that those inflated costs should excuse it from having to right its past wrongs.  However, as this Court has made clear, "Google, as an illegal monopolist, will have to pay some penalties" and "bear some costs".  (May 23, 2024 Hearing Tr. 38:12-17.)

*First*, Google's proposed implementation of catalog access through a metadata export to third-party stores, while acceptable in concept, introduces a series of unnecessary steps and omits critical parts of the catalog.  Google seeks to render the remedy ineffective by limiting

1  the content of the data that will be shared with app stores and how frequently that data will be

2  updated, imposing inappropriate eligibility requirements for participating app stores, potentially

3  introducing unnecessary complications to obtain user consent that could discourage users from

4  downloading apps available via catalog access, and assessing a fee for catalog access.  Google's

5  cost estimates for implementing this remedy are wildly inflated and its timeline is unreasonable.

6         *Second*, Google attempts to avoid implementing a library porting remedy by

7  arguing that new features of Android 14 are sufficient to achieve the Proposed Injunction's

8  goals.  However, as Google recognizes, Android 14 lacks key functionality required by the

9  library porting remedy.  And as its Proffer makes clear, implementing that additional

10  functionality would be a straightforward extension of Android 14's current capabilities, which

11  even Google estimates would cost no more than $██ million.  While this figure is inflated,

12  Google's Proffer confirms that library porting is a cost-effective and achievable remedy.

13         *Third*, Google argues that distributing third-party app stores on the Play Store will

14  require a "fundamental redesign" of the Play Store.  That is not so.  Google can easily distribute

15  third-party app stores on the Play Store *today*; the only current obstacle is Google's own rule

16  against it.  In its Proffer, Google resists the simple solution of changing the rule and insists on a

17  variety of new measures, including most notably that Google must review every app appearing in

18  the catalog of a third-party app store to assess compliance with *Google's* content policies, as if

19  those apps were being submitted directly to the Play Store.  But they are not.  There is no

20  technical need for this new layer of review; it is a commercial choice by Google and a serious

21  impediment to the effectiveness of this remedy.  This unnecessary and inappropriate layer of

22  review is also the single largest cost, by far, that Google claims it will incur in complying with

23  the Proposed Injunction.  Distributing third-party app stores requires little more than hosting

24  those stores' APKs in the Play Store and making them available for download.

25         Google's objective is clear:  create unnecessary complications and costs to portray

26  the proposed remedies as unduly burdensome, while also watering down their effectiveness, so

27  as to keep the relevant markets as close to the monopolistic status quo as possible.

28

**I.    APPROACH TO GOOGLE'S PROFFER**

This Court permitted Google to make a proffer describing "the tech work required and economic costs, if any", for providing catalog access, library porting and distribution of third-party app stores.  (Dkt. 978 at 1.)  Instead of limiting itself to the subject at hand, Google frequently attempts to reargue the merits of the remedies.  (*See, e.g.*, Proffer at 1-2 (attacking the remedies as a harm to consumers); *id.* at 8-9 (arguing that the catalog access remedy would upend Google's relationship with app developers); *id.* at 13 (asserting that library porting is unnecessary).)  As the Court has noted, however, the parties are "not writing on a clean slate"; the "facts and the evidence behind the jury's verdict are now carved in stone"; and the parties have already provided detailed submissions on the merits of the proposed remedies such that it is "doubt[ful] there's more that [Google] can say".  (May 23, 2024 Hearing Tr. 4:20-24, 137:17-18.)  Accordingly, Epic does not respond here to Google's merits arguments.

Google's Proffer sets forth at a high level how it intends to implement the requested remedies and then estimates the costs, timing and feasibility of its proposed implementations.  In response, Epic explains (a) where Google proposes implementations that would unduly limit the effectiveness of the remedy, (b) where Google proposes implementations that are needlessly complex and costly, and (c) the costs and timeline of a reasonable and effective implementation of the remedies.

**II.    CATALOG ACCESS**

The Proposed Injunction requires Google to "provide Third-Party App Stores access to the Google Play store app catalog" for a period of six years.  (Dkt. 952, Proposed Injunction, at 7.)  The purpose of this remedy is to "mitigate[] the network externalities that insulate Google's illicitly acquired market power" and to "jump-start[] the competitive process by decoupling the user side of the market from the developer side.  In effect, it provides rival app stores with immediate scale on the developer side, allowing them to compete for users on the merits without confronting a chicken-and-egg problem."  (Dkt. 952-1, Statement of B. Douglas Bernheim ("Bernheim Stat."), ¶ 63.)

Google does not dispute that it is technically feasible to provide third-party stores

with access to the Play Store's catalog of apps.  (*See* Proffer at 3-4; Ex. 2 to Zaken Declaration, Excerpts of Deposition Transcript of Vitor Baccetti ("Baccetti Tr.") 93:2-12.)  Google proposes to implement catalog access by exporting certain metadata from the Play Store to servers accessible by third-party stores, which Epic agrees is a reasonable solution in principle (among other possible reasonable solutions).  However, Google's proposal severely undercuts the effectiveness of this approach, elevating Google's own commercial interests above the interests of opening up competition.  Specifically, Google's proposal (1) requires developers to opt in to having their apps listed on third-party stores, (2) requires stores to meet ill-defined "eligibility criteria", (3) places unreasonable limitations on the catalog data that is exported, (4) potentially introduces complications to obtain user consent that could discourage users from downloading apps available via catalog access, (5) limits the frequency of catalog database export, and (6) imposes unjustified fees.  Epic addresses each of these deficiencies in turn.

Google estimates that implementation of catalog access on its terms will cost approximately $███ million and take 12-16 months to implement.  As discussed below, Google's cost estimates and timeline are inflated and unsupported.

## A. Google's Proposed Implementation of Catalog Access Is Flawed

### 1. Google's Proposal that Developers Opt-In to Catalog Access Will Materially Diminish the Effectiveness of the Remedy

Google seeks to substantially limit the effectiveness of catalog access by allowing it only for those apps whose developers affirmatively opt-in.  Specifically, Google proposes giving developers a mechanism to opt-in to catalog access in the Google Play Console.  Developers would be provided with individual check boxes to "identify the authorized third-party app stores that would have access to the app metadata".  (Proffer at 8; Dkt. 981-1, Declaration of V. Baccetti ISO Google's Proffer Regarding Epic's Proposed Remedies, ("Baccetti Decl.") ¶ 19.)  This approach would drastically undermine the catalog access remedy by depriving third-party app stores of the benefit of the full scale of the Play Store.

The goal of catalog access is to overcome the indirect network effects that make it challenging for new stores to gain traction:  users are less likely to go to the store if there are few apps, and developers are less likely to list their apps if there are few users.  Giving rival stores

access to the Play Store catalog helps address this chicken-and-egg problem by making available the wide range of apps that users seek, which Google alone has been able to amass through its misconduct.  For this remedy to be truly effective, third-party app stores need a comparable selection and scale of apps as the Play Store.  But if developers are required to opt in to catalog access, that is exceedingly unlikely to happen because many developers will fail to take the necessary steps to opt-in—not because they oppose it, but for reasons such as inadvertence, unawareness, inattentiveness or error.  As Dr. Bernheim explained:

> There's a literature on opt-in and opt-out in behavioral economics, and what it shows is that there tend to be very strong default effects. . . So if you establish the default to be opt-out so that people have to opt in, you're going to have a much smaller fraction of developers who end up opting in.

(May 23, 2024 Hearing Tr. 46:11-47:1 (Bernheim)); *see also* May 23, 2024 Hearing Tr. 47:2-8 (The Court: "[S]o as an economic principle . . . Opting in is going to be much less effective in dealing with network effects than opting out."  Dr. Bernheim:  "That's correct.").

An opt-in mechanism is all but guaranteed to gut the catalog access remedy—and Google never disputes that point or even seems to consider it.  Nothing in Google's Proffer addresses the ineffectiveness of an opt-in regime to achieve the goal of the injunction, and there is no evidence that Google's ██████████████████████████████████████ ████████████████████████████████████████████████████.

Google's insistence on an opt-in regime is not based on feasibility or cost,[1] but on a pretextual concern that "implementing catalog sharing on an opt-out basis would violate developers' intellectual property rights" and effectively enjoin non-party developers.  (Proffer at 9-10 (citing *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009)).)  However, Google wrongly equates an opt-out regime with no choice at all.  Under an opt-out regime, developers can still choose not to participate in catalog access.  (May 23, 2024 Hearing Tr. 54:4-9, 54: 17-20.)  *Comedy Club* is not to the contrary.  In that case, the injunction under review sought to prevent non-parties from taking certain actions.  *See* 553 F.3d at 1282-83.

---

[1] Mr. Baccetti ████████████████████████████████████████████████████████████ ████████████████████████████ (Baccetti Tr. 236:4-9)

Here, the Proposed Injunction does not require non-party developers to do anything—they are not parties to the injunction, they are not bound by the injunction, and they can decide to opt-out of catalog access at any time.

Google also complains that it "would have no technical way to prevent a third-party app store from continuing to use the metadata already in its possession" if the developer opted out after catalog access was first granted.  (Proffer at 9.)  This argument does not withstand scrutiny.  Google can prohibit this behavior in its terms of service.  (Baccetti Tr. 249:16-250:22 ("███████████████████████████████████████████.").)  And in the hypothetical situation where a third-party app store violates those terms, Google can still refuse to install apps improperly listed by a third-party app store.  (Baccetti Tr. 252:18-253:1 ("███████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████."); Declaration of James Mickens ("Mickens Decl.") ¶¶ 27-31.)  That would solve the problem.  Third-party app stores are unlikely to continue listing apps that are not available to be installed, which would be a terrible user experience that would hurt the app store.

       2.   <u>Imposing Eligibility Criteria on Stores Participating in Catalog Access Would Limit the Effectiveness of the Remedy</u>

Google insists that it "would need to develop eligibility criteria for third-party app stores to mitigate the risk that catalog access would legitimize app stores that distribute malware, violate the intellectual property of developers . . . , or otherwise promote illegal activity or objectionable content".  (Proffer at 11.)  Google should not be able to act as a gatekeeper, determining which of its rivals can take advantage of the catalog access remedy.  Google states that these eligibility criteria would include whether a store has "(1) a minimum number of apps in its own catalog and the basic infrastructure in place to conduct app store business; (2) bans on malware, pirated apps, and other illegal content; (3) procedures in place to enforce those bans; and (4) reasonably sufficient safeguards to protect the metadata" as well as agreement to terms of

1  service to ensure compliance with local laws and regulations.  (*Id.* at 12.)  Moreover, Google

2  states that it would "need to develop and implement an ongoing audit . . . to ensure third-party

3  app stores enrolled in catalog access continue to meet those criteria".  (*Id.* at 11.)  Imposing such

4  criteria on third-party app stores would give Google a veto right over its competitors and would

5  undermine the effectiveness of this remedy.  For example, allowing Google to impose a

6  requirement of a minimum number of apps that a store must already have in its catalog to qualify

7  as an app store re-creates the chicken-and-egg problem that catalog access is designed to address.

8  (Bernheim Stat. ¶ 63.)

9         The thrust of Google's argument is that catalog access could give Google's

10  "imprimatur" to stores trafficking in malware or illegal content and damage the Play Store brand.

11  (Proffer at 11.)  That is not so.  Apps installed by the Play Store through catalog access could be

12  clearly branded as such, enabling users to distinguish between Play Store apps and apps sourced

13  from the third-party store.  To the extent some users might not appreciate the difference, the

14  theoretical potential for an impact on the Play Store brand would be a small price to pay for

15  restoring competition.  Having violated the antitrust laws, Google cannot insist on watering

16  down the remedy to protect its brand from speculative harms.

17         Google also claims, without support, that users will be harmed because they are

18  "more likely to download malware that is intermingled with Google's catalog".  (*Id.*)  That is

19  pure supposition (Mickens Decl. ¶¶ 24-26), which again ignores the fact that apps installed by

20  the Play Store could be branded accordingly, while apps installed by the third-party store will not

21  have Google branding.   That argument also ignores the other protections against malware

22  present on Android devices, such as Google Play Protect ("GPP"), which will continue to protect

23  users.  (*See* Section IV.B.)

24         Google's separate contention that catalog access will harm developers by

25  allowing legitimate versions of their apps to sit alongside pirated versions is unfounded.  Google

26  has made no showing that developers will be harmed by having their apps available, along with

27  the millions of other apps in the Play Store catalog, on a store that also has some pirated

28  software.  And developers that are concerned about a particular store can opt out.  Stores that do

1   a poor job weeding out bad apps will gain that reputation with users and developers alike, and

2   they will fail.  It is time for Google to allow the market to work.

3          3.      Google Seeks To Improperly Limit the Metadata To be Shared

4          Google's restrictions on the metadata it proposes to share would severely limit the

5   effectiveness of the catalog access remedy.  Google does not precisely define the types of catalog

6   data that would be provided but states that it "could" include "basic data pertaining to the app"

7   and "basic information provided by the developer about the app".  (Baccetti Decl. ¶ 8.)  That is

8   far too narrow to be useful.  As a baseline principle, Google should be required to provide the

9   same data that appears in the Play Store's own catalog.  (May 23, 2024 Hearing Tr. 7:5-8 (The

10  Court:  "What we are doing is leveling the playing field, lifting the barriers, and making sure that

11  anybody who chooses to compete with Google in these two markets found by the jury has a free

12  and unfettered opportunity to do so.").)

13         Rather than state precisely what data it will provide as part of catalog access,

14  Google explains what data it will omit, including "reviews of the app given by other users" and

15  "data generated by Google, like auto-translations, age ratings and install counts".  (Baccetti Decl.

16  ¶ 8.)  There is no technical or security reason for withholding this data.  (Declaration of Michael

17  D. Ernst ("Ernst Decl.") ¶ 34.)  **Google does not claim otherwise.**  In fact, Google already

18  provides comparable information in other Google offerings like its Google Maps Places API,

19  which makes user reviews and ratings available to developers that incorporate Google Maps

20  data.  (*Id*.)  The information at issue is publicly available—not just to Play Store users, but to

21  users of any browser running on any OS.  *See* https://play.google.com/store/apps?device=phone.

22         Instead of a technical justification, Google argues that user reviews and "███

23  ███████████████████████████████████████████████████████████████.

24  (*See, e.g.*, Baccetti Tr. 109:13-24 ("███████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████.").)  But Google was *able* to gather user reviews and other

27  such information because it had maintained a large user base through anticompetitive conduct.

28  The purpose of catalog access is to mitigate the advantage that Google has maintained, by

providing rival stores with competitive tools that Google's unlawful conduct denied them.

████████████████████████████████████████████████████████.  (*Id.* 112-

113.)  The same is true for information like install counts, which stores use to provide more

useful search results.  Withholding such key information would degrade the quality of third-party

stores and undermine the purpose of the remedy, solely to maintain an edge for the Play Store.

4.      Google's Proposed User Interface Could Introduce Unnecessary Friction

Google proposes that for downloads of apps that are available in a third-party

store via catalog access, the "interface would contain Play branding, so that the user is on notice

that they are downloading an app from the Play Store (rather than the third-party store) and that

they are signed into a Play Store account and are agreeing to the Play [Store's] terms and

conditions, just as if they were installing the app directly from the Play store itself".  (Proffer

at 5.)  Google further proposes that a user interface from the Play Store will appear with

"additional information about the app" that contains another "install button" that the user needs

to click to install the app "without leaving the third party store".  (Baccetti Decl. ¶14.)

There is no security reason to have two screens (one generated by the third-party

app store and one generated by Google) rather than one screen requesting user consent to install

an app.  In order to prevent the addition of unnecessary friction, the third-party app store could

call an API that requests the display of Google's interface once a user selects an app from their

search results, thereby avoiding the need for two screens.  (Mickens Decl. ¶ 32-33.)  Any such

user interface should be restricted to neutral language to ensure that users are not discouraged

from downloading apps made available through catalog access.

5.      Google Should Refresh the Catalog at Least as Often as It Is Updated for
the Play Store

Google proposes to "regularly export [catalog data]" and "refresh it on a daily

basis." (*See* Baccetti Decl. ¶ 8.)  Daily refreshing is insufficient to put third-party app stores on

the same footing as the Play Store ████████████████████████████████████████

████████████████████████████.  (Baccetti Tr. 96:23-97:14.)  To ensure that other

stores have the same apps and offerings as the Play Store, Google should be required to export

the metadata as often as the corresponding data is updated for the Play Store.

Google does not contend that a more frequent export is infeasible, nor could it, as

████████████████████████████████████████████████████.  (Baccetti Decl. at 8-9 ("Mechanism

for More Frequent Updates"); Baccetti Tr. 95:14-98:23.)  Instead, Google contends that creating

a mechanism for more frequent than daily updates would require 6-9 months of work from nine

software engineers and one technical program manager.  (Baccetti Decl. at 8-9; Baccetti

Tr. 94:13-22.)  Google provides no basis for this extraordinary claim, and there is none.  Epic

addresses these wildly inflated estimates below.  (*See* Section II.B.)

      6.    <u>Google Should Not Be Able To Impose Fees for Catalog Access</u>

Google proposes to "charg[e] third-party app stores for the services provided by

Google through catalog access."  (Proffer at 10.)  That is inappropriate.  The purpose of catalog

access is to allow competing stores to overcome the network effects that help perpetuate the

dominant position that Google maintained through anticompetitive conduct, not to create a new

revenue stream for Google.  Google should not further profit by requiring its rivals to pay for

access to the breadth of apps that Google unlawfully denied them.  Even without charging other

stores for catalog access, Google will still profit from it.  Play Store apps that are listed on third-

party stores through catalog access will be treated as Play Store-distributed apps for all other

purposes, including Google's ability to collect fees from in-app purchases.

**B.    Google's Cost and Resourcing Estimates Are Inflated**

Google asserts that catalog access would be "extremely challenging and costly"

and that "implementing it would cost approximately $████ million to $████ million" with

"████████████████████████████████████████████████████████████

████████████████████████."  (Proffer at 7; *see also* Baccetti Decl. ¶¶ 32-35; Dkt. 981-4,

Declaration of Christian Cramer ISO Google's Proffer Regarding Epic's Proposed Remedies

("Cramer Decl.") ¶ 12.)  Google estimates it would take "12-16 months to implement this

remedy".  (Baccetti Decl. ¶ 36.)

Google's time estimate is exaggerated and unworkable.  For this remedy to be

successful, it must be implemented in short order.  Third-party app stores are already at a

competitive disadvantage, and undue delay will only further undermine their ability to compete

in the marketplace.  As explained by Epic's expert, Dr. Michael Ernst—a computer science professor and software engineering expert—12-16 months is far too high of an estimate for implementation from a technical perspective, as Google can reuse or adapt the metadata server used to populate the web version of the Play Store and reuse components of the Alley Oop process.  (Ernst Decl. ¶¶ 48-49; Baccetti Tr. 208:10-210:20.)

Furthermore, Google's cost estimates are inflated.  *First*, Mr. Baccetti developed these cost estimates and timeline predictions based on the assumption that Google would implement the catalog access remedy in the exact manner described by Google in its Proffer and in Mr. Baccetti's declaration.  (*See* Baccetti ¶ 33.)  As explained above, Google's suggested approach includes several unnecessary steps, all of which pile on unnecessary costs and time.

*Second*, Google's Proffer and supporting declarations estimate significant costs that are speculative.  Mr. Baccetti testified that ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████.  (Baccetti Tr. 5:21-6:8.)  Moreover, Mr. Baccetti acknowledges that he did not "have a prior model on which to base these [resource and timeline] estimates, so there is some uncertainty about the specific resource requirements".  (Baccetti Decl. ¶ 33.)  And Mr. Cramer, who purportedly performed the actual cost calculations, had no basis for them.  Mr. Cramer testified ██████████████████████████████.  (Ex. 4 to Zaken Declaration, Excerpts of Deposition Transcript of Christian Cramer ("Cramer Tr.") 16:13-17:16.)  He also testified that █████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.[2]  (Cramer Tr. 22:1-25:14, 55:3-19.)  In fact, while his declaration states that he reviewed Mr. Baccetti's declaration prior to making his calculations (Cramer Decl. ¶ 11), Mr. Cramer testified ████████████████ ████████████████████████████████████  (Cramer Tr. 30:16-18, 31:1-6.)

---

[2] Mr. Cramer testified that ████████████████████████████████████████ ████████████.  The cost information was based on Google "█████████████████ ████████████.  (Cramer Tr. 25:20-28:7.)  He did not verify ████████████████ ████████████████████████████████████████████████████████████████████.  (*Id.* at 66:1-69:12, 74:10-75:16, 77:17-78:23.)

1     *Third,* Google has arbitrarily padded its estimates with 20%-30% buffers in both

2 time and cost.  The only explanation Google provides for this buffer is Mr. Baccetti's " ████

3 ██████████████████████████████████████████████████████████████

4 ████████ ".  (Baccetti Tr. 302:8-18.)  Google does not provide any evidence or analysis to

5 account for this buffer beyond an assertion that it is customary do so on the Play Store team.

6 (*See* Baccetti Decl. ¶ 35; Cramer Decl. ¶ 11; Cramer Tr. 52:11-53:2 ("██████████

7 ███████████████████████████████████████████████████████

8 ████████████████████ .").)  Despite applying the buffer, ██████████████

9 █████████████████████████ . (Cramer. Tr. 53:3-24.)

10     Dr. Ernst estimates that using practical plans, Google could implement catalog

11 access in 2-3 months at a cost of less than $781k.  (Ernst Decl. ¶¶ 59-60.)

12 **III.   LIBRARY PORTING**

13     The Proposed Injunction would require Google to "allow Users to provide Third-

14 Party App Stores with access to a list of apps installed by the Play Store on the User's GMS

15 Device.  Google shall provide Users with the ability, subject to a one-time User permission, to

16 change the ownership for any or all of those apps such that the Third-Party App Store becomes

17 the update owner for those apps when those apps are directly distributed by the Third-Party App

18 Store."  (Proposed Injunction at 7.)  Google's Proffer confirms that it can implement Epic's

19 library porting remedy at a cost of less than $██ million.  Google's primary objections to Epic's

20 proposed remedy are (a) that its current Android 14 design is close enough to Epic's proposed

21 remedy that it need not undertake any additional efforts, and (b) that library porting *could* harm

22 consumers *if* app stores are able to claim the ownership rights to apps they cannot in fact update.

23 Neither objection has merit.  The current design of Android 14 would not achieve the goals of

24 Epic's proposed remedy and is insufficient to cure the effects of Google's anticompetitive

25 conduct.  Further, the hypothetical harms to users raised in Google's Proffer will not materialize

26 if the remedy is implemented as Epic intended, which Google confirms is technically feasible.

27 Finally, implementing library porting in the manner that Epic proposes would not result in an

28 increase to the cost estimate Google has put forward.

1

A.     **Android 14's Capabilities Do Not Adequately Address Harm to Competition**

2          Google argues that Epic's proposed library porting remedy is unnecessary

3  because, in its view, the current version of the Android operating system, Android 14, "largely

4  achieve[s] the goal of library porting".  (Proffer at 14.)  This is a merits argument, on which

5  Google already had the opportunity to be heard and which is not responsive to the questions the

6  Court ordered to be addressed in the Proffer.  Regardless, that challenge is without merit.

7          The feature of Android 14 on which Google relies is called "update ownership",

8  which allows the app store that originally installs an app to "own" the delivery of future updates

9  and prevents competing app stores from delivering updates.  (Proffer at 13-14.)  Google points

10  out that, on an app-by-app basis, competing stores can request that a user "clear" the update

11  ownership from an app so that the competing store can deliver updates.  (*Id.* at 14.)  When a user

12  consents to this, update ownership does not transfer from one app store to another, but is instead

13  cleared entirely such that *any* app store on the user's phone can update the app.  (*Id.*)

14          Google concedes that Android 14 lacks two features that would be required by the

15  Proposed Injunction, which are necessary for the remedy to be effective.  *First*, Android 14

16  requires "update ownership" changes to be made on an app-by-app, as opposed to a "bulk",

17  basis.  That means users seeking to switch updates away from the Play Store to a competing store

18  would need to give consent dozens of times in order to move all of their apps.  That would

19  unduly limit switching and preserve the Play Store's current advantage.  While Google argues

20  that this process would not be "particularly burdensome *on the app store*" (Proffer at 14

21  (emphasis added)), its Proffer ignores the burden and hassle of subjecting *users* to a barrage of

22  consent screens—a point Google's witness conceded in deposition.  (*See* Ex. 3 to Zaken

23  Declaration, Excerpts of Deposition Transcript of Edward Cunningham ("Cunningham

24  Tr.") 173:12-174:10 ("█████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████████.").)

26  Therefore, in addition to app-by-app changes, the Proposed Injunction requires that users be able

27  to transfer the "update ownership" of all apps available on a given store with a single consent.

28          *Second*, Android 14 does not allow users to transfer ownership—it only allows

users to "*clear* ownership" such that all app stores can update an individual app.  (Proffer at 14.)  This creates a situation where multiple app stores compete to update the same app, a phenomenon known as "clobbering", which can result in poor user experience and the loss of user data.  (*Id.* at 13.)  Google's introduction of "update ownership" in Android 14 was purportedly intended to minimize clobbering, but it nonetheless allows an app to be clobbered after a user agrees to "clear ownership".  (*Id.*)  Google's proposal to continue to allow clobbering would disincentivize users from moving ownership of updates away from the Play Store and to third-party stores.  And Google's proposed use of the "clear ownership" function would allow the Play Store to continue delivering updates, even when the user would prefer to have updates delivered only by a competing store.  To facilitate switching and to allow other stores to build relationships with users, the Proposed Injunction requires that users be able to *transfer* the responsibility of updating apps to a store of the user's choice, to the exclusion of all other stores.

**B.    Google Can Implement Library Porting with Minimal Further Updates**

Google's Proffer confirms that it can, with relative ease, implement both features of the library porting remedy in the Proposed Injunction.  Google's objections to the wisdom of doing so—and the complications Google proposes to introduce—are without merit.

1.    Google Can Implement Multi-App Ownership Transfer

Google does not argue that it would face technical challenges in designing an API for multi-app transfer of update ownership.  (*See, e.g.*, Proffer at 15-16.)  That is because Epic's proposal is simply an extension of Google's current "update ownership" APIs.  Google already allows app stores to request update permission on an app-by-app basis, and implementing multi-app ownership transfer would primarily involve "introducing a new Android API to request a bulk ownership change, with a correspondent 'behind-the-scenes' permission that app stores would declare in their app manifest and that governs the use of this API."[3]  (Proffer at 15.)

---

[3] Google's proposed implementation also includes a mechanism that would require developers to consent to have their app's update ownership permissions transferred through a multi-app transfer.  (Cunningham Decl. ¶ 20.)  Requiring developers to "opt in" to multi-app transfer would be redundant and unnecessary, given that library porting requires developers to have already entered into a relationship with, and made their apps available on, select third-party stores.  Google offers no justification for this proposed additional consent.

1    Implementing the multi-app ownership transfer will be simple as it only requires repetition of the

2    already-designed app-by-app transfer.  (Ernst Decl. ¶ 87.)

3              Without denying the feasibility of this implementation, Google argues that it

4    would "harm users".  (Proffer at 15.)  But Google's examples of "harm" do not withstand

5    scrutiny.  For example, Google argues that "users may have good reasons to prefer to have

6    different apps updated by different app stores."  (*Id.*)  Even if true, the Proposed Injunction does

7    not require multi-app ownership transfer to the exclusion of app-by-app transfer.  (*See* Ernst

8    Decl. ¶ 76.)  Both can be available to users, with multi-app transfer functioning as a convenience

9    to users who, for example, "trust the policies of a particular store more than another".  (Dkt. 981-

10   3, Declaration of E. Cunningham ISO Google's Proffer Regarding Epic's Proposed Remedies,

11   ("Cunningham Decl.") ¶ 18; Cunningham Tr. 188:11-18.)  Google next argues that app-by-app

12   transfer is "consistent with the way users already make decisions about installation of apps" and

13   that multi-app transfer "is likely to confuse the user . . . [who] may not realize that the

14   consequences of agreeing to that request will be to lose protection against having *any* app store

15   update *any* app on the device."  (Proffer at 16.)  Google cites no data to support its assertions

16   regarding how users currently understand "update ownership" and the level of confusion that

17   multi-app ownership transfer would introduce, ████████████████████████.[4]  (*See*

18   Proffer at 15; Cunningham Decl. ¶ 18; Cunningham Tr. 135:14-136:2.)

19              2.    Google Can Integrate "Transfer Ownership" Rather Than "Clear
                     Ownership" Permissions
20

21            Google does not argue that it would face technical challenges in designing an API

22   to "transfer ownership" of app updates.  (*See* Proffer at 16-17; Cunningham Decl. ¶ 30.)  Google

23   instead claims that implementing "transfer ownership" would harm users; but these claims too

24   are unfounded.  Google's primary objection is the possibility that "an app store could ask the

25   user to 'transfer ownership' of an app that the app store does not actually distribute", leaving the

26

27        [4] Google asserts that "a host of additional problems" would arise were it to interpret the
     Proposed Injunction to require "that an app store can issue a single request for permission to
28   automatically update all apps acquired from any source in the future."  (Cunningham Decl. ¶ 22.)
     But the Proposed Injunction mandates multi-app ownership transfer of the apps installed on a
     user's device, not a future-facing transfer of apps which a user subsequently chooses to install.

1    app orphaned and unable to be updated.  (Proffer at 17.)  But Google elsewhere acknowledges

2    the simple fix to this purported problem:  allow developers to specify which app stores are

3    authorized to accept "update ownership" permissions.  The developer will know which app

4    stores it is supplying with its APK.  Accordingly, "[a] developer could embed a statement inside

5    the APK file indicating . . . whether particular app stores are authorized to change ownership of

6    the app."[5]  (*Id.* at 18.)  In other words, update ownership would not be transferred to a third-party

7    app store unless the developer has indicated that the store can deliver the updates.  (Ernst Decl.

8    ¶¶ 69, 78.)  Moreover, as Google indicates, when a user consents to transfer ownership of an app,

9    Android can delay "[t]he actual change in update ownership for each app . . . until the app store

10   successfully installs an update for each app."  (Proffer at 15.)  While Google's statement that

11   "[t]he Android operating system has no way to tell whether an app store actually distributes any

12   particular app" is true (*id.* at 17), Mr. Cunningham acknowledged that the Android operating

13   system ███████████████████████████████████████████████████████████████████████

14   ██████  (Cunningham Tr. 203:8-21).  This action can be used as a trigger to switch over the

15   ownership for that app.  (Ernst Decl. ¶ 78.)  As a result, the user will not risk "inadvertently

16   shutting off updates".  (Cunningham Decl. ¶ 29.)

17            3.    Google Can Display a Neutral Screen for User Consent

18            The Proposed Injunction calls for Google to allow users to transfer ownership of

19   apps from the Play Store to a third-party app store "subject to a one-time User permission".

20   (Proposed Injunction § II.D.1.ii.)  Currently, when a store requests permission to update an app

21   in Android 14, the user is presented with a dialog warning that, "By updating from a different

22   source, you may receive future updates from any source on your phone.  App functionality may

23   change." (Cunningham Decl. ¶ 12.)  To comply with the Proposed Injunction, Google "would

24   create a new update ownership dialog", given that some of the language in Google's current

25   _____

26   [5] Google's proposed opt-in consent for developers to have update ownership transferred rather
     than just cleared is unnecessary.  Google "████████████████████████" to include an opt-in
27   mechanism for developers in Android 14.  (Cunningham Tr. 105:16-106:4.)  Given the
     protections that this design contemplates to prevent an app from being orphaned, there is no
28   reason for a developer to care about whether ownership can be transferred versus cleared.  This
     is especially true because those permissions can only be transferred to stores that carry the
     developer's app; developers should have no problem if ownership is transferred to those stores.

1   dialog would be inapplicable.  (*Id.* ¶ 30.)  Google has not "███████████████████████"

2   the new dialog it proposes to display to users (Cunningham Tr. 219:25-220:9), and Epic

3   accordingly is unable to respond to Google's proposal.  The permission dialog should contain

4   neutral language that does not add artificial friction similar to that which Google has used to

5   discourage direct download of apps from third-party app stores.  (Bernheim Stat. ¶ 53.)

6          **C.      The Costs to Google of Implementing Library Porting Are Trivial**

7                 Mr. Cramer estimates that the library porting remedy will cost Google between

8   $██  million and $██ million.  (*See* Cramer Decl. ¶ 13.)  Mr. Cramer testified that he was not

9   involved in determining the resources necessary to carry out library porting and that he generally

10  followed the same uninformed process as he did for his estimates in catalog access.  (Cramer Tr.

11  39:8-40:3.)  None of Epic's proposed modifications, which generally serve to streamline the

12  remedy, would make this implementation any more costly to Google.

13                In fact, Google's already low estimates appear inflated.  For example, despite the

14  fact that library porting will build on Android 14's existing infrastructure, Google estimates that

15  ████████████████████████████████████████████████████████████████████████

16  ████████████████████████.  (Cunningham Tr. 94:6-19 (emphasis added).)  Further, Google insists

17  that these changes must be integrated into an on-cycle update of the Android operating system

18  and that they would take at least one-year to implement.  (Cunningham Decl. ¶ 46.)  As

19  explained by Dr. Ernst, changes necessary to implement library porting affect top layers of the

20  Android OS and are thus simpler to execute.  (Ernst Decl. ¶ 81.)  Dr. Ernst estimates that Google

21  can execute the components necessary to implement library porting (ownership data fields, UI

22  checkboxes for ownership transfer, transfer ownership permission API and bulk transfer) in one

23  month at a cost of less than $320k.  (Ernst Decl. ¶ 90.)

24  **IV.    DISTRIBUTION OF THIRD-PARTY STORES**

25                Epic's proposed remedy requires Google to "allow distribution of competing

26  Third-Party App Stores on the Google Play Store".  (Proposed Injunction § II.D.2.)  Google does

27  not dispute that it is simple as a technical matter to list third-party app stores in the Play Store

28  today without making any changes to Android.  As Google acknowledges, because app stores are

1   just apps, the Play Store can easily distribute them just as it distributes any other kind of apps.

2   Rather than dispute the technical feasibility of the remedy, Google adds unnecessary changes

3   that would diminish its effectiveness, and then complains about the cost of those unnecessary

4   changes.  The Court should not allow Google to obstruct the remedy, and it should not consider

5   the costs Google would incur in engaging in obstruction as a reason not to proceed.

6       **A.      Carrying Third-Party Stores Would Require Trivial Changes**

7               Google argues in its Proffer that distributing app stores on the Play Store would

8   "require a fundamental redesign" of the Play Store.  (Proffer at 20.)  This is false.  The VP of

9   Engineering for Security and Privacy for Android confirmed that Google could list third-party

10  stores on the Play Store today.  (Ex. 1 to Zaken Declaration, Excerpts of Deposition Transcript of

11  David Kleidermacher ("Kleidermacher Tr.") 40:14-44:25; *see also* Ernst Decl. ¶ [●].)  What

12  Google calls a "fundamental redesign" is in reality two trivial changes to allow developers to

13  identify their app as an app store and to allow users to find app stores.

14              *First*, as Mr. Baccetti conceded, creating a way for a developer to identify its app

15  as an app store would be a "███████████████████████████████████████."  (Baccetti Tr.

16  323:20-324:3.)  Google can then leverage existing flows to direct the developer to sign relevant

17  terms of service or other agreements.  (Ernst Decl. ¶ 97.)  Google already has terms of service

18  that govern apps that can install other apps, which would require minimal updates to account for

19  the distribution of third-party app stores.  (*Id.*)  These updates would be straightforward

20  extensions of the Google Play Console's current design and capabilities.

21              *Second*, Google contends that it would need to create a way "to handle the display

22  of app stores within the store" (Proffer at 20), but that too is extremely simple.  Currently, the

23  Play Store contains 49 app categories, such as "games", "dating" and "dining".  (Ernst Decl.

24  ¶ 96.)  Google can easily create an additional category for app stores.  (*Id.*)  No more is needed.

25              Separately, Google proposes to add a new warning screen "that advises users

26  when they are about to download an app store."  (Proffer at 20.)  This added friction is neither

27  necessary nor appropriate.  Users who have just made the affirmative decision to download an

28  app labeled as an app store do not need to be presented with a screen notifying them that they are

"about to download an app store," particularly when they will subsequently be presented with a consent screen before that new app store can install an app on their device.  (*See* Proposed Injunction § II.D.2.1.)  Google makes no effort to explain or justify this added friction.

**B.      Google's Proposal To Vet All Apps on Third-Party Stores Is Inappropriate**

Google's Proffer states that if it had to make third-party app stores available on the Play Store, it *likely* would conduct "initial and ongoing review of all apps and updates in the app store's catalog for compliance with Play's security and content policies."  (Proffer at 20.)  Google states that it "would subject the catalogs of those third-party app stores to the same rigorous review" that Google applies to the apps in the Play Store's catalog.  (*Id*. at 21.)  This would include vetting all apps in the third-party store's catalog for compliance with <u>all</u> Google policies.  (Proffer at 21; Kleidermacher Tr. 134:25-135:20.)  Any update to any app on the third-party store would be subject to the same review.  (Proffer at 21.)  This burdensome vetting of apps in third-party app stores would allow Google to retain its position as gatekeeper of Android app distribution, will thwart competition, and is contrary to the remedy's intent to "pry open to competition a market that has been closed by defendants' illegal restraints".  *Ford Motor Co. v. United States*, 405 U.S. 562, 577-578 (1972).  This vetting should not be permitted.[6]

*First*, Google's proposed vetting procedures are entirely hypothetical.  Although Google presents this app review as its plan of record, Mr. Kleidermacher testified that "██████ ████████████████████████████████████████████.  (Kleidermacher Tr. 129:8-130:4; 156:25-157:4, ("████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████.  (*Id*. at 21:24-22:2.)

*Second*, giving Google the ability to reject apps from being carried on third-party stores would undermine competition.  If Google has control over which apps are listed in its competitors' stores, the opportunities for abuse are endless.  Giving Google this review power

---

[6] If the Court permits Google to vet apps carried by third-party stores for compliance with Play Store policies, the costs should not be considered in assessing the burden of the remedy.

1    would allow it to interfere with competitors' strategies by withholding or delaying approval of

2    apps and updates.  Even if Google applied its review criteria neutrally and faithfully, this would

3    prevent competing stores from differentiating themselves by carrying apps that Google would

4    not carry.  Additionally, to perform this review, Google would need access to the catalogs of its

5    competitors—including new and unreleased titles.  Google thus would know which of its

6    competitors were carrying which titles.  Google should not be allowed to convert a remedy for its

7    anticompetitive conduct into another means of gaining an anticompetitive advantage.

8            *Third*, Google's principal justification for reviewing its competitors' apps, namely

9    that "the reputation for safety, security, and content moderation that the Play store has spent over

10   a decade and billions of dollars building would be irreparably damaged" if the Play Store

11   distributed third-party stores that contain apps that violate its guidelines, is unsupported.  (Proffer

12   at 21.)  Google does not cite any authority that protecting a monopolist's brand is a relevant

13   consideration in remedying its anticompetitive conduct.  Further, Google's claim is premised on

14   the idea that a user who downloads an app containing "harmful" content from a third-party store,

15   which was itself downloaded from the Play Store, will associate that content with the Play Store,

16   rather than with the store from which it was downloaded.  Google offers no evidence to support

17   this view, ██████████████████████████████████████████████████

18   ████████████████████████████████████████████".

19   (Kleidermacher Tr. 92:12-19.)  But Mr. Kleidermacher's "<u>strong opinion</u>" cannot outweigh the

20   contrary evidence and the various means Google has to address this purported harm.  The Play

21   Store currently hosts apps that contain user-generated content that violates Google's content

22   guidelines, such as Reddit, Instagram and BitTorrent.  Google does not vet the content of these

23   apps and has offered no evidence that it is blamed for "harmful" content available on those apps.

24   Apps downloaded from a third-party store would be one level further removed from Google.  In

25   addition, Google can try to *compete* on the basis that apps on the Play Store are safer.  If true, the

26   market will reward Google for doing a better job than others in vetting its catalog.

27           *Fourth*, Google's treatment of other app stores currently on Android confirms that

28   the review of apps on third-party stores is premised on purported brand damage, not security

1   concerns.  Google █████████████████████████████████████████

2   ████████████████, similar to the review it performs for all Play Store apps, even though

3   apps on those stores could pose the exact same risks to users.  (*See id.* at 72:24-73:7.)  Instead,

4   ███████████████████████████████████, which scans all apps for malware at the time

5   of install, regardless of the source of the install.  (*Id.* at 54:11-55:7; Mickens Decl. ¶ 56.)  GPP

6   can continue to do that work for apps downloaded from third-party stores on the Play Store.

7   (Dkt. 981-5, Declaration of D. Kleidermacher ISO Google's Proffer Regarding Epic's Proposed

8   Remedies, ("Kleidermacher Decl.") ¶ 24; Kleidermacher Tr. 215:12-19.)

9        **C.**    **Google Should Not Impose Eligibility Criteria on App Stores**

10        In addition to reviewing the apps on third-party stores, Google's Proffer indicates

11   that it may impose eligibility criteria on the third-party stores themselves.  This too is merely a

12   recommendation that lacks any executive input or sign off.  Google has not decided ████████

13   █████████████████████████████████████████████████████████████

14   █████████████████████████████████.  (Kleidermacher Tr. 66:10-67:3; Baccetti

15   Tr. 350:19-351:14.)  Epic's ability to respond to this nebulous recommendation is limited, but as

16   noted above, Epic rejects any effort by Google to homogenize the content of third-party app

17   stores by imposing its own content guidelines on all stores distributed through the Play Store.

18        Google argues that some criteria to define an app store are required to prevent fee

19   evasion, but Google declines to offer such a definition.  (Proffer at 22; Kleidermacher Decl. ¶ 6.)

20   Google's Developer Distribution Agreement ("DDA") already has a definition of an app store:

21   "any Product that has a purpose that facilitates the distribution of software applications and

22   games for use on Android devices outside of Google Play."  (Ex. 5 to Zaken Declaration, DDA

23   at 5.)  Mr. Kleidermacher testified that ████████████████████████████

24   ████████████████████████████████████████████████.[7]

25   (Kleidermacher Tr. 124:4-125:8.)  Epic's expert considers an app store to be "an application that

26   enables the user to install other apps", consistent with Google's DDA.  (Ernst Decl. ¶ 24.)

27

28      [7] Mr. Kleidermacher also ███████████████████████████████████ (Kleidermacher Tr. 120:17-121:3.)

1

### D.    Google Should Create Parity by Adding Screens to the Play Store

2      The Proposed Injunction requires that the download process for apps on third-

3 party app stores be the same as the download process for apps on the Play Store, except that

4 Google may present the user with a "single one-tap screen" asking the user to allow the third-

5 party app store to install other apps.  (Proposed Injunction §§ II.B.1.i, II.B.2.i.)  To effectuate

6 this remedy, Google proposes an unduly complicated change to the Android operating system,

7 which would put more control in Google's hands, to address a security risk of Google's own

8 making.  There is a simpler and more effective way to achieve parity in the download process

9 between the Play Store and third-party stores, as described below.

10      As currently configured, the Play Store has what is called an INSTALL_

11 PACKAGES permission, which allows the Play Store to install apps on a user's device without

12 having Android verify user consent.  That allows the Play Store to install apps immediately after

13 a user clicks an "Install" button, or even to install apps silently without user consent.  One

14 possible way to give third-party app stores parity would be to allow them to have the

15 INSTALL_PACKAGES permission.  However, this would enable third-party app stores to

16 install apps on a user's device even if the user did not give consent, which is a powerful

17 capability that third-party app stores do not need to compete effectively.

18      Accordingly, Android currently has a separate permission, called

19 REQUEST_INSTALL_PACKAGES, which applies to app stores downloaded by a user.

20 (Cunningham Decl. ¶ 57.)  When an app store with the REQUEST_INSTALL_PACKAGES

21 permission tries to install an app, Android generates a confirmation dialog asking the user "Do

22 you want to install this app?".  This dialog serves a valid security purpose, but because it does

23 not appear when users download apps through the Play Store (which has the

24 INSTALL_PACKAGES permission and thus does not trigger an Android-generated prompt),

25 there is a lack of parity that gives the Play Store a competitive advantage.

26      Google proposes to make revisions to the Android operating system to create a

27 third type of permission that would remove the Android-generated confirmation dialog that

28 REQUEST_INSTALL_PACKAGES presents before an app is installed.  The precise contours of

this new permission are not clear from Google's submission, but it appears that Google is contemplating something that, without other measures being taken, would enable the app store "to install additional apps without any consent by or even notification to the user".  (Cunningham Decl. ¶ 62.)  Having created this problem, Google then proposes two separate measures to "mitigate" it.  *First*, the permission would be granted "by the installer of the app store", meaning that for app stores distributed on the Play Store, it would be the *Play Store* that controls the granting of the permission.  (Cunningham Decl. ¶ 63.)  In other words, the Play Store would be the gatekeeper to the permission for all third-party app stores distributed by it.  (*Id.*)  *Second*, Google proposes to engineer a solution in Android to confirm that frictionless downloads are only available in response to a proactive install decision taken by the user, but Mr. Cunningham testified that he " ███████████████████████████████████████████████

████████ ."  (Cunningham Tr. 259:12-260:10.)  Even if feasible, Google's proposal would be unnecessarily costly and time-consuming to implement.

As an alternative to re-designing the operating system to create a new permission, Google could easily create parity by adding a confirmation screen to the Play Store install flow. The simplest way to do this would be to add a screen in the Play Store's install flow that is identical to the "Do you want to install this app?" confirmation that is presented by Android when asked to install an app by a store with the REQUEST_INSTALL_PACKAGES permission.  (Ernst Decl. ¶ 106.)  This would be easy to implement because it would not require *any* changes to the Android operating system.  (*Id.*)

This additional screen would not limit the Play Store's competitiveness, because the Play Store and third-party stores would have identical screens in their install flows.  Nor would it harm users, who could easily install apps by clicking the "Install" button in the Play Store and then confirm their consent with a single Android-generated dialog.  That is how installation works today on iOS devices:  users click the "Get" button in the App Store, and then the operating system confirms their consent.  (Ernst Decl. ¶ 106.)  In fact, the iOS install flow has another step, because iOS confirms the user's identity.  Even with the additional screen, the Play Store would still have a simpler install flow than iOS.

Adding a screen to the Play Store install flow can be accomplished with little cost and in little time.  (Ernst Decl. ¶ 106.)  Should Google nevertheless wish to pursue a more time-consuming and costly route, it could do so, provided it maintains install flow parity between the Play Store and competing stores.  But the costs associated with Google's implementation decision should not weigh against imposing this remedy, which can be achieved more efficiently.  Nor should Google be allowed to delay while it pursues the more costly and complicated route.

**E.   Google Should Not Charge for Third-Party App Store Distribution**

Recognizing that it would violate the Proposed Injunction, Google nonetheless argues that it should be entitled to charge for providing third-party app stores with distribution through the Play Store.  Google argues that it would otherwise "be required to provide these valuable services to its competitors . . . for no compensation whatsoever."  (Proffer at 24.)  That ignores the reason for this remedy.  Google was found by the jury to have unlawfully excluded its competitors from the market for Android app distribution.  Google should not be allowed to charge new fees for policies it is required to implement as a result of its violation of the law.

**F.   The Costs Google Estimates in Connection with Distributing Third-Party Stores Are Unreliable and Need Not Be Incurred**

Google's cost estimates for distributing third-party stores include unnecessary costs that should not be considered, *i.e.*, the cost to review apps in third-party stores and the cost to build a new consent screen warning users they are downloading an app store.  Neither step should be permitted, so neither cost should be incurred.

Google's estimated cost for reviewing apps on third-party stores is also unreliable. Mr. Kleidermacher ███████████████████████████████████████████████ ████████████████████████████████████.  (Kleidermacher Tr. 166:21-167:3; *see also id.* at 200:23 (acknowledging this figure is "████████████").)  Mr. Kleidermacher arrived at his estimate by summing five buckets of costs that he claims approximate the annual cost of app review for the Play Store, totaling $██ million.  (Kleidermacher Decl. ¶ 14; Kleidermacher Tr. 163:25-164:20, 170:23-172:5.)  The first of these five categories is in fact a sum of seven separate full-time equivalent ("FTE") line items, representing the labor costs associated with app

review, that purportedly amount to a combined $██ million.  For some FTEs included in these

seven line items, Mr. Kleidermacher accounted for ████████████████████████

████████████████████████████████████████████████████████████

████████.  (Kleidermacher Tr. 179:19-25,181:22-182:5.)  Two of the five categories that

make up Mr. Kleidermacher's estimate, which together add another $██ million to the total

estimated annual cost of app review, come with a disclaimer that "because we have never

accounted for this before, it is imprecise."  (Kleidermacher Decl. ¶ 14.)  This collection of

inaccurate inputs sums to a total of $██ million in app review costs per year.  (*Id.*)

Taking the already dubious estimate of $██ million, Mr. Kleidermacher decided

that it would be reasonable to assume that those costs would increase by 20 percent annually if

Google decided to vet the apps in third-party stores, to the tune of more than $██ million per

year.  (Kleidermacher Decl. ¶ 21.)  He provides no basis for this assumption, and he concedes

that many of the costs will not increase linearly.  For example, he writes that the increase in

growth of the App Safety team's costs is "not quite linear" (Kleidermacher Decl. ¶ 14;

Kleidermacher Tr. 170:23-171:10.), yet he "████████████████████████████

████████████████████" (Kleidermacher Tr. 171:11-17).  Instead, he used the same

"████████████████████" of 20 percent across all the line items because he found it "███

████████████████████████.  (*Id*. at 187:23-188:11.)  Thus, both the

estimated $██ million base cost and the 20 percent growth rate are entirely unfounded.

Google's remaining projected costs are inflated (*e.g.*, the costs of redesigning the

Google Developer Console).  As Dr. Ernst explains, the cost of enabling the distribution of third-

party stores through the Play Store would be less than $100K, and would take one month.  (Ernst

Decl. ¶ 113.)

## **CONCLUSION**

Google's Proffer suggests unnecessarily complicated methods of implementation

that would hamper the remedy, and its costs and timeline estimates are unjustifiable.

Dated:  July 24, 2024

Respectfully submitted,


By:  /s/  *Gary A. Bornstein*
      Gary A. Bornstein

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Counsel for Plaintiff Epic Games, Inc.*