1

2

3

4

5

6

7

8

9    **UNITED STATES DISTRICT COURT**

10    **NORTHERN DISTRICT OF CALIFORNIA**

11    **SAN FRANCISCO DIVISION**

12

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**JAMES MICKENS DECLARATION IN SUPPORT OF EPIC'S RESPONSE TO GOOGLE PROFFER REGARDING EPIC'S PROPOSED INJUNCTION** |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ASSIGNMENT

1.  I have been retained by counsel for Epic Games, Inc. in this matter. I submitted two expert reports – an Affirmative Report on October 3, 2022, and a Reply Report on December 23, 2022 – and testified at trial on November 21, 2023, regarding Android security as it relates to app distribution mechanisms. I understand that Epic has proposed a permanent injunction, and Google has submitted a Proffer regarding the technical and costs challenges that it claims to be associated with implementing three of the remedies in Epic's proposal. Epic has asked me to evaluate the security arguments raised in Google's Proffer and in the four declarations filed by Google employees in response to Epic's proposed injunction.

2.  Specifically, Epic has asked me to evaluate the following questions:

    ▪ Across each of the three remedies discussed in Google's Proffer (catalog access, library porting, and distribution of third-party app stores on the Play Store), to the extent Google is proposing to make design changes in response to purported security arguments, are those security arguments legitimate?

    ▪ For any security concern that is legitimate, does the security issue result from Google's own choices about how to implement the remedy?  In other words, is the problem one that Google causes and could be addressed if the implementation of the remedy were done differently?

    ▪ If the security concern is legitimate and not a result of Google's implementation choices, is Google's method for addressing the security issue reasonable, or are there better/simpler ways to address those concerns, or ways that interfere less with the effectiveness of the remedy?

3.  Epic has informed me that Dr. Michael Ernst of the University of Washington has been asked to file a technical response to Google's design and costing estimates. Epic has also asked me to evaluate Dr. Ernst's proposals and opine whether they create additional security concerns.

4.  The opinions expressed in this report are based on the information available to me at this time. My work in this matter is ongoing and I reserve the right to revise or supplement my opinion if any additional information makes revision or supplementation appropriate.

5.  I am being compensated for my work on this case at the rate of $850 per hour. My compensation is not contingent upon the conclusions that I reach or the outcome of this matter. Please refer to my Affirmative Report submitted on October 3, 2022, for my CV.

## QUALIFICATIONS

6.  My name is James W. Mickens. I am the Gordon McKay Professor of Computer Science at Harvard University, a co-director of Harvard's Berkman-Klein Center for Internet and Society, and a co-director of Harvard's Institute for Rebooting Social Media. At a high level, my research expertise covers the domains of "systems" and "security."

- **Systems research** investigates methods for designing, building, and testing large, complicated programs. Systems research requires an understanding of both software (i.e., the computations that accomplish a particular task) and hardware (i.e., the electronic circuits that implement those computations). Systems researchers try to make it easier to build programs that are fast, correct, and do not crash.

- **Security research** explores how to build software and hardware that resist attacks launched by malicious actors. For example, many types of programs handle sensitive user data like financial statements or web browsing histories. Security researchers try to invent mechanisms in hardware and software that protect user data from attackers who wish to steal it or inappropriately modify it.

7.  As a professor, I teach a course about operating systems, giving students practical experience with designing, implementing, and testing a real operating system. The operating system is the most complex software on a device and is responsible for coordinating all activities on the computer; thus, an operating system is a primary determinant of the security and the performance of the software that runs on a computer.

8.   I also teach a course about systems security. In this class, I cover practical attacks on modern computers, and explain how to make systems robust to these attacks using cryptography, buffer overflows, and anonymous communication mechanisms like Tor.

9.   Both of my classes focus on the need for simple, understandable application programming interfaces (APIs) that allow different pieces of software to communicate efficiently with each other and with hardware devices. Both courses also discuss the security and operating systems of smartphones.

10. As an academic, I have published research in the top conferences in my field. For example, I have published 10 papers at the Symposium on Networked Systems Design and Implementation, a top conference in the field of distributed systems. I have also published in top security venues like the IEEE Symposium on Security and Privacy, and the Symposium on Network and Distributed System Security. My 2011 paper on web browser design received an "Audience Choice" award at the Symposium on Operating System Principles, and my 2019 Symposium of Cloud Computing paper on program debugging received a "Best Paper" award.

11. I have also served on program committees and acted as a reviewer for many of these conferences. For example, I served as the co-chair for the 2021 edition of the Symposium on Networked Systems Design. I have served as a reviewer for the Symposium on Operating Systems Design and Implementation, the IEEE Symposium on Security and Privacy, the Symposium on Operating Systems Principles, and the Conference of the ACM Special Interest Group on Data Communications.

12. Before coming to Harvard in 2015, I received a bachelor's degree in computer science from the Georgia Institute of Technology, and a PhD in computer science from the University of Michigan. At the University of Michigan, I received a Ford Predoctoral Fellowship and a Ford Dissertation Fellowship. Post-graduation, I spent seven years as a researcher in the Distributed Systems Group at Microsoft Research. I was also previously a visiting professor at MIT, where I worked with the Parallel and Distributed Operating Systems research group.

13. At Microsoft Research, my research examined two of the largest modern operating systems: Linux and Windows. One of my longest research projects introduced performance improvements to Windows. I have also published research related to accelerating web page loads for mobile phones. This research focused on using secure proxy methods to quickly deliver content to a user's phone.

# CATALOG ACCESS

### A.    Epic's Proposed Injunction for the Catalog Access Remedy

14. The first part of Epic's proposed injunction addressed in Google's Proffer involves the expansion of access to the Play Store's catalog of apps. Epic's proposed injunction distinguishes between app discovery and app distribution. An app store provides discovery for an app if the store allows a user to find the app; discovery merely requires a store to possess the appropriate catalog data (e.g., the name of the app, the app icon, the category of the app (e.g., game, news), and reviews and ratings of the app). An app store provides distribution for an app if the store possesses the APK for the app and is able to install the app and push app updates to user phones.

15. In the current Android ecosystem, the Play Store is the only store that enables the discovery and distribution of apps in the Play Store catalog. Epic's proposed injunction would make the Play Store catalog accessible to third-party app stores, such that a user of a third-party store could discover both Play Store apps as well as apps that are directly distributed via the third-party app store. If the user wanted to install a Play Store app discovered via a third-party store, the third-party store would delegate responsibility for the actual installation (distribution) to the Play Store app. If the user wanted to install an app that is directly distributed via the third-party store, the third-party store would be responsible for the installation, as in the current world.

### B.    Google's Proposed Implementation

16. To provide third-party app stores with access to Play's catalog, Google proposes to deploy a server that contains a snapshot of all catalog data belonging to on-Play apps. The snapshot, which Google would update once a day, would be available for downloading by authorized third-party stores; once a store has downloaded the snapshot to the store's own servers, the store could update its own catalog to include the Play Store apps referenced by the downloaded snapshot.

17. In Google's proposal, when a user decides to install an on-Play app through a third-party store front app,[1] the actual installation of the app would be handled by the Play Store app. Google seems to propose that, when a user discovers an on-Play app via a third-party store, the user must click through two screens to install the app: the installation screen shown by the third-party store, as well as a subsequent, Play-Store-generated screen that also contains an "install" button.[2] My understanding of this aspect of Google's proposal is based on the declaration of Vitor Baccetti, a Group Product Manager at Google.[3] Baccetti justifies the second screen as follows:[4] "Google, rather than the third-party app store, would generate this user interface, with Play branding, so that the user is on notice that this app originates from the Play Store and they are agreeing to Play's terms and conditions, just as if they were installing the app directly from the Play Store front itself. In addition, there are regulatory requirements in certain jurisdictions regarding the content of the information displayed to users at the point of install, and because Play is fulfilling the install then Google must ensure that it is meeting those requirements."

18. Google further proposes two additional modifications to the catalog access remedy proposed by Epic: eligibility criteria for participating app stores and a requirement that developers affirmatively "opt-in" to having their apps listed on other stores.

### i. Google proposes three eligibility criteria for stores that wish to participate in the catalog access program.

19. First, Google proposes eligibility criteria for stores that wish to participate in the catalog access program. The criteria require a store to (at least) have (1) a minimum number of apps in the store's non-Play catalog, (2) an explicit process to monitor non-Play apps for malware and other

---

[1] A "store front app" is an app through which a user can browse a store's catalog and initiate app installations. For example, Google provides a store front app that allows users to interact with the Play Store catalog. Samsung phones are often preinstalled with a store front app for the Samsung-operated Galaxy Store. Aptoide is a third-party app store with its own store front app that can be downloaded from the Internet.

[2] Google's Proffer Regarding Epic's Proposed Remedies, page 5, lines 2-14.

[3] Baccetti Decl. ¶ 14.

[4] Vitor Baccetti Decl. ¶ 15.

1   objectionable content, and (3) safeguards for ensuring that the store does not leak the Play Store

2   catalog to unauthorized parties.[5]

3       20. Google claims that these eligibility criteria are necessary because, it asserts, opening access

4   to the Play Store catalog would result in users installing malware at a higher rate than in the current

5   world.   In particular, Google argues that third-party stores with weak review processes may list

6   malicious apps alongside (what Google presumes are) malware-free Play apps.[6] Google then claims

7   that, on a malware-ridden third-party store, the (presumed) good reputation of Play Store apps may

8   transfer to the other apps on the third-party store, making users underestimate the risk involved with

9   installing (what Google presumes to be malicious) non-Play apps.[7]

10      **ii.    Google proposes a developer opt-in mechanism to prevent unauthorized**

11          **deep linking to an app's Play Store catalog page and to address the**

12          **revocability of developer consent.**

13      21. The second modification Google proposes is that developers use an explicit "opt-in"

14  mechanism for catalog access. In this approach, a developer's Play Store apps would only be

15  discoverable on a third-party store if the developer had first explicitly allowlisted the app store.

16  Further, when the Play Store received an installation request for an on-Play app via a third-party store,

17  the Play Store would only perform the installation if the request came from a store that the developer

18  had allowlisted.

19      22. One justification for the "opt-in" (as opposed to "opt-out") mechanism advanced by Google

20  is a concern that malicious third-party stores may try to "deep-link" users to the Play Store installation

21  page for an app. On Android, a deep link is a URL that, when clicked, directly triggers a piece of app

22  functionality. Google asserts that a third-party store front app could show a Play Store deep link like

23

24

25

26  [5] Google's Proffer Regarding Epic's Proposed Remedies, Pg. 12 Ln. 6-12.

27  [6] Google's Proffer Regarding Epic's Proposed Remedies, Pg. 11 Ln. 22-23.

28  [7] Google's Proffer Regarding Epic's Proposed Remedies, Pg. 11 Ln. 23-28.

1    `https://play.google.com?id=AppName`[8] which a user could tap to directly induce the Play

2    Store to show the Play Store page which contains information about the app and an "install" button;

3    such an approach would violate Google's desired workflow[9] in which the third-party store front

4    would invoke an API (defined by the Play Store) to initiate the installation. Google claims that Play

5    would have no way of detecting whether a user was directed to a Play Store installation page by an

6    eligible third-party store.[10]

7    23. A second justification for the "opt-in" mechanism is a concern that, in a world with expanded

8    access to the Play Store catalog, problems may arise if a developer attempts to "opt-out" of the

9    discoverability privileges belonging to a third-party app store.[11] For example, in an "opt-out" (as

10    opposed to "opt-in") framework, suppose that after initially having her app included in expanded

11    catalog access, a developer named Alice decides to opt-out of allowing the WidgetCo third-party store

12    to act as a discoverability mechanism for her on-Play app. Google claims that there would be no way

13    to prevent the WidgetCo store from continuing to list Alice's app using the app's old metadata

14    (collected when WidgetCo still resided in the allowlist for Alice's app).

15    **C.    Google's Proposal Introduces Friction that is Disproportionate to Risk**

16       **i.    Google's proposal for eligibility criteria is not justified by any legitimate**

17          **security concern.**

18    24. Google's requirement that an app store must have a minimum number of non-Play apps in its

19    native catalog is unjustified from a security perspective because the number of apps that a store hosts

20    does not indicate whether any of those apps are malicious. For example, Bob's store might contain

21    ten non-Play apps that are perfectly safe, whereas Charlie's store might contain two thousand non-

22    Play apps, half of which are harmful.  In this example, estimating the likelihood of user harm simply

---

[8] The real format for a Play Store URL is slightly more complex than the one in this example. For more details, see Google's documentation at https://developer.android.com/distribute/marketing-tools/linking-to-google-play#OpeningDetails.

[9] The desired workflow is described in Declaration of Vitor Baccetti ¶ 16.

[10] Baccetti Decl. ¶ 22.

[11] Google's Proffer Regarding Epic's Proposed Remedies, Pg. 9 Ln. 6-15.

by looking at the size of a store's non-Play catalog would miscalculate the true risk that users face. As I discussed during the trial, the risk associated with installing a particular app is based on whether the app behaves in harmful ways; the risk is not a function of the app's provenance.[12] For example, consider the APK associated with the Minecraft game; the risk of installing that APK is the same regardless of whether the APK is downloaded from the Play Store or a third-party store, since the risk is directly determined by whether the code in the APK will try to harm the user.

25. Google's second gatekeeping requirement is that a third-party store must have an explicit process to monitor non-Play apps for malware and objectionable content. However, as I discussed during the trial, Google has a long-standing history of scanning many off-Play apps for malware, and doing so without requiring direct engagement with third-party stores.[13]  Indeed, Google recently expanded the scope of such scanning, such that Android now performs installation-time scans of all apps that were previously unknown to Play Protect.[14] According to Google, this system now scans 125 billion apps daily.[15]  So, for a given app-to-install distributed via a third-party app store, Play Protect has either examined the app ahead of time, or will scan the app on-demand before the installation proceeds. Given Google's preexisting policy of scanning off-Play apps itself, there is no need for a gatekeeping requirement based on the extent of app reviewing done by third-party stores. David Kleidermacher, Vice President of Engineering for Security and Privacy for Android, claims that Play Protect would struggle to accurately scan off-Play apps because Play Protect "receive[s] important signals about an app's potential security risks because of the fact that the app and its developer are on Play."[16] However, this claim is not supported by Sebastian Porst, Security Engineering Manager for Android, who said that "███████████████████████

---

[12] Trial Tr. 2136: 9-17 (Mickens).

[13] *See* ¶ 219 and FN 213 of my Affirmative report.

[14] Trial Tr. 2131:16-2132:13 (Mickens); *See* https://security.googleblog.com/2023/10/enhanced-google-play-protect-real-time.html.

[15] *See* https://security.googleblog.com/2023/10/enhanced-google-play-protect-real-time.html.

[16] Kleidermacher Decl. ¶ 24.

[redacted]

[redacted] ,"[17]

26. Google's third gatekeeping requirement is that a third-party store must enforce "safeguards" to ensure that the third-party app store does not leak the Play Store's catalog. However, the Play Store catalog is already public. For example, normal users (or employees of third-party stores) can already peruse the catalog via the Play Store app or via Google web searches. Thus, it is unclear how Google would even define a requirement for third-party stores to "safeguard" information that has already been disclosed to the public.

### ii.    Google's stated concerns about deep-linking and the revocation of discoverability do not involve real security problems.

27. Google claims that the developer of an on-Play app would suffer harm if (1) the developer is unable to effectively revoke the discoverability of the developer's app in a third-party store, and that this might be compounded if (2) the store nonetheless provided a deep-link to the Play Store installer for the app. Google claims that these scenarios might cause developer anger if, e.g., a developer thinks that the apps on a particular third-party store are disreputable or otherwise inappropriate for listing alongside the developer's app.

28. Google's stated concern about the revocation of access to the Play Store catalog data is spurious. As I discussed above, this catalog data is already public, so access to it cannot be meaningfully "revoked." If a developer removes a third-party store from the discoverability allowlist of an app, but the store nonetheless continues to list that app (using old catalog data), then any installation attempt via the store will still need to be fulfilled by the Play Store, which can reject the installation request if the initiating store is not in the app's discoverability allowlist. Moreover, Google's concern with discoverability revocation applies to both opt-out and opt-in scenarios. A developer might choose to remove discoverability privileges from a particular store regardless of

---

[17] S. Porst Dep. Pg. 92-93.

1    whether those privileges were granted by default without explicit action by the developer (i.e., opt-

2    out), or were affirmatively granted as a result of the developer opting in (i.e., opt-in).

3        29. Google's concern about deep-linking also makes no sense. The Play Store's support for deep-

4    linking predates Epic's proposed injunction and is not a result of the injunction. The Play Store's

5    deep-link support has allowed for the kind of "reputational harm" that Google raises in its Proffer

6    ever since its inception. For example, in today's world, even without the entry of Epic's proposed

7    injunction, a web site that hosts objectionable content (from Google's perspective) can nonetheless

8    embed a deep-link to the Play Store installation page for an arbitrary app. Google apparently has no

9    problem with this kind of reputational harm, which has existed in the Android ecosystem for years.

10   Google's Proffer provides no reason why reputational harm via deep--linking is somehow worse if

11   the ostensibly-offensive embedder is a third-party store front app versus a web site.

12       30. It is also important to note that, from the perspective of security, an installation attempt that

13   is triggered via a deep link is still an installation attempt that is orchestrated by the Play Store. The

14   app which embeds the deep link (e.g., a third-party store front app, or a browser containing a page

15   with a deep link) cannot corrupt the installation process merely by allowing the user to click a deep

16   link. The Play Store can still reject the installation attempt if the triggering source is unauthorized; if

17   the source is authorized, the Play Store will still prompt the user for consent to install the app

18   referenced in the deep link.

19       31. In summary, Google's stated concerns about deep linking do not represent true security

20   concerns. Deep linking into the Play Store catalog has existed for years, and nothing about expanded

21   catalog access would introduce fundamentally new harms involving deep links.

22             **iii.**       **Google's proposed flow with two 'install' buttons is unnecessary from a**

23                         **security perspective**

24       32. As described above, Google seems to propose a two-screen process for allowing a user to

25   install an on-Play app through a third-party store: first the user must click on an "install" button

26   presented and controlled by the third-party store, and then the user must click through a subsequent,

27   Play-Store-generated screen containing an "install" button controlled by Play itself. The ostensible

28

1   reason for this approach is that (1) Google wants to ensure that a user is aware that, by installing the

2   on-Play app, the user must agree to Play Store terms and conditions, and (2) Google wants to fulfill

3   regulatory requirements in the local jurisdiction involving, e.g., information that must be shown at

4   the installation time of an app.

5   33. From the security perspective, only one installation screen is necessary to present the user

6   with enough context to provide informed consent. To make the installation friction be commensurate

7   with risk, the Play Store app could be modified to allow a third-party store to request the display of a

8   single installation button controlled by the Play Store; this would contain a Play-Store-rendered

9   "install" button as well as the information that Play must show with respect to local jurisdictional

10  requirements and the Play Store terms of service and so on. Using this approach, only a single button

11  would be needed to collect user consent in a way that Google trusts (because Google would control

12  what is displayed on the screen and how user consent is controlled).

13  34. Reducing the number of install steps from two to one would ensure parity of experience

14  between a user installing an on-Play app indirectly from a third-party store versus directly from the

15  Play Store itself. Alternatively, parity of experience could be provided by keeping Google's proposed

16  workflow for installation via third-party stores but adding a friction screen to the experience of

17  installing an on-Play app via the Play Store. I return to this topic below.

18  # LIBRARY PORTING

19  ### A.  Epic's Proposed Injunction for the Library Porting Remedy

20  35. The second part of Epic's proposed injunction involves the ability of on-Play apps to be

21  updated by third-party stores. The current Android 14 ecosystem allows the original installation

22  source for an app to request "update ownership" from Android; later, if a different installer attempts

23  to update the app, Android will show a consent screen to the user, prompting the user to explicitly

24  allow the different installer to update the app. If the user agrees, Android clears the ownership status

25  of the app, allowing any installer on the phone to now update the app in the future without triggering

26  a consent prompt.

27

28

36. Epic's proposed injunction requests two changes to the Android 14 status quo. First, Epic proposes to allow a user to transfer update ownership instead of clearing update ownership. Transfer semantics mean that, if update ownership changes from installer X to installer Y, then Y becomes the owning updater for the app, such that if installer Z later wants to update the app, Android will trigger a consent screen (instead of silently allowing the update to occur as with ownership clearing semantics).

37. Second, Epic proposes to allow batch transfers of update ownership. In the envisioned world, a user could employ a single consent screen to transfer update ownership for many apps at once. In contrast, Android 14 requires users to clear ownership (not transfer ownership) on an app-by-app basis.

### B.    Google's Proposed Implementation

38. Google proposes to comply with Epic's proposal by adding two functionalities to Android. First, Android would add "change ownership" functionality that would allow a store to acquire update ownership for an app that is already owned by another store. Second, Android would add what Google calls "bulk ownership" functionality; using a single consent screen, a store could acquire update ownership of one or more locally-installed apps that the store directly distributes.

39. To implement the "change ownership" functionality, Google proposes to modify Android to implement the Epic-defined transfer semantics instead of Android 14's clearing semantics. In particular, Google would modify the APK format so that developers could: (1) indicate that app ownership can be changed (rather than cleared); and (2) include an allowlist of app stores which the developer permits to take ownership of the app.[18] Android would only allow an app store to acquire ownership of a given app on a given user's device if that store is allowlisted.

40. To implement the "bulk ownership" capability, Google proposes to leverage the modified APK format described in the prior paragraph. Google proposes to modify the APK format so that developers could: (1) indicate whether the app ownership can be transferred via bulk operation, or

---

[18] Cunningham Decl. ¶ 31.

1    instead on a per-app basis; and (2) include an allowlist of app stores which the developer allows to

2    take ownership of the app via a bulk operation.[19] Google would introduce a new, single-screen

3    consent mechanism that would allow an app store to acquire update ownership for multiple apps at

4    the same time, so long as the relevant app developers have consented for the app store to gain

5    ownership via bulk. Android would generate the list of qualified apps in that screen by inspecting the

6    APKs of all locally-installed apps and finding the ones that allowlist a store to acquire update

7    ownership as part of a bulk transfer.

8       **C.      Epic's Proposed Implementation**

9       41. Whereas Google proposes to make four changes to the APK format, Epic's proposal calls for

10   a single APK change. In Epic's proposal, the developer would simply indicate which third-party app

11   stores are allowed to receive ownership of the app (whether via a bulk operation or via a per-app

12   operation). From Epic's perspective, whether ownership is transferred via a bulk operation or a per-

13   app operation is not important to a developer; the developer's primary concern is ensuring that the

14   developer's app can only be updated by a store that the developer trusts.

15      **D.      Epic's Proposed Implementation Addresses Google's Ostensible Security**

16                **Arguments**

17      42. Google raises several arguments about the proposed remedy and its implementation. For

18   example, Google contends that an app store could gain update ownership of an app that it does not

19   actually distribute. Such a store would be unable to distribute updates to the app, placing users at risk

20   if updates involved security-related fixes. However, this concern is unfounded because both Epic's

21   proposed injunction and Google's proposed implementation give a developer the power to decide

22   which app stores can acquire update ownership for the developer's apps. A developer who does not

23   trust a particular store to update apps can decide not to allowlist the store. Google argues that a

24   developer can make errors of judgment in choosing which stores are trustworthy enough to allowlist.

25   However, developers in the status quo world already have to make trust decisions about which stores

26

27   _____

28   [19] Cunningham Decl. ¶ 20.

1  should act as distribution hubs. Furthermore, Epic's proposed remedy reduces the likelihood (relative

2  to the Android 14 status quo) of uncoordinated/abandoned updates, since transfer ownership

3  semantics restrict the set of misbehaving app stores that can "clobber" an app (i.e., push updates to

4  an app they did not originally install) or fail to apply updates in a timely manner.

5      43. With respect to bulk ownership changes, Google claims that users may be confused by a "bulk

6  update" consent screen. However, well-known software presents bulk-operation screens in various

7  contexts without inducing mass confusion. For example, the "trash"/"recycle" bins on desktop

8  computers allow one, several, or all files in the bin to be permanently removed by a single operation.

9  Similarly, on smartphones, text messaging apps allow a user to do bulk selection of messages to

10  archive them, delete them, or move them to a different folder. Given user familiarity with bulk-

11  operation screens, there is no reason to think that a "bulk update" approach for update ownership in

12  the Android context will mystify users. Even if a user does somehow mistakenly transfer update

13  ownership for a particular app, the only valid updaters for that app are stores that the developer has

14  selected. Any such store is trusted by the developer to issue updates (including security updates) for

15  that app.

16  ## DISTRIBUTION OF THIRD-PARTY APP STORES

17      **A.  Epic's Proposed Injunction for the Distribution of Third-party App Stores on**

18          **the Play Store**

19      44. Epic's proposed injunction would require Google to distribute third-party stores through the

20  Play Store. Under the proposed injunction, Google would not be allowed to charge store operators a

21  fee for such distribution. Google disagrees with the no-charge approach and proposes ways to impose

22  distribution fees on third-party stores that wish to be disseminated via the Play Store. Such fee

23  structures are out of scope for my assignment, so I do not mention them further.

24      45. In the current world, each time a user attempts to download an app via an app store that is not

25  the Google Play Store or another pre-installed app store, Android generates a warning screen which

26  indicates that the user is about to download an app from an unknown source. The user is required to

27  navigate to device settings and enable installation from that app store before being presented with

28

1  another screen confirming the user's intent to install an app. Epic proposes that Google obtain user

2  consent for an app store to act as an installer via a "single one-tap screen asking the User to allow the

3  Third-Party App Store to install other apps."[20] Epic further requires that Google does not impose any

4  additional friction screens on third-party app stores beyond those associated with downloading apps

5  from the Play Store itself;[21] this requirement ensures parity of experience (see above) between using

6  the Play Store and using a third-party store.

7  ## B.    Google's Proposed Implementation

8  46. To enable third-party stores to be distributed via Play, Google makes three technical

9  proposals.[22] First, Google would "redesign" the Play Store to support the distribution of third-party

10  stores. The redesign would involve developer-facing changes to the Google Play Console so that

11  developers could declare an app to be an app store that respects various contractual agreements with

12  Google. Google would also redesign Play's user-facing store front app to provide visual indicators

13  that a particular app is a store front app. Play's store front app would also "implement a warning that

14  advises users when they are about to download an app store."[23]

15  47. Second, Google would create a process for vetting third-party stores, since, in Google's

16  envisioned world, Google would act as a gatekeeper for which third-party stores receive distribution

17  via Play. The vetting would consist of two parts: a review of the third-party store front app, and a

18  review of all apps distributed via that store front. The apps distributed via the store front would have

19  to comply with the Play Store's rules involving security and content. The store front app itself would

20  also have to comply with those rules and satisfy additional requirements that capture Google's

21  definition of a well-behaved store. Google notes that mere "launchers" like the Fortnite Launcher

22  would not meet Google's criteria for an app store. Google claims that the burden of this vetting would

23  be high; since both third-party app stores and their entire catalogs would be accessible through the

24  _____

25  [20] Proposed Injunction § II.D.2.i.

26  [21] Proposed Injunction § II.B.1.i.

27  [22] Google also makes a fourth proposal involving distribution fees, but I do not discuss such fees because they are outside the scope of my assignment.

28  [23] Google's Proffer Regarding Epic's Proposed Remedies. Pg. 20.

1  Play Store, and since third-party stores implement heterogeneous safety requirements, Google argues

2  that it would need to subject every third-party store front app and all the apps distributed by that store

3  front to the same review that is applied to on-Play apps. Google claims that expanding app review in

4  this manner will cost hundreds of millions of dollars over six years of an injunction.

5  48. Third, Google would change Android to modify how installation-related permissions are

6  handled. Google's specific proposal[24] is underspecified and difficult to fully understand. At a high

7  level, the proposal appears to suggest the following:

8  49. Third-party app stores distributed through the Play Store would have to list a new permission

9  in their manifests. The new permission is not given an explicit name in the  Proffer, but abstractly

10  speaking, the name would be something like `THIRD_PARTY_STORE_INSTALL_PACKAGES`.[25]

11  50. When the user installs a third-party store through the Play Store, the Play Store would decide

12  whether to grant the `THIRD_PARTY_STORE_INSTALL_PACKAGES` permission to the third-party

13  store.[26] The   Proffer does not explain how the Play Store would make this decision, or what types of

14  consent screens would be involved.

15  51. Suppose that the Play Store grants the `THIRD_PARTY_STORE_INSTALL_PACKAGES`

16  permission to the third-party store. Later, when the user tries to install apps via the third-party store,

17  the store will not generate a consent screen for each installation attempt.[27]  As noted by Footnote 6

18  on page 24 of Google's   Proffer, "to lessen the risk of silent background installation of harmful and

19  unwanted apps, Google may also require that installing a new app (without a confirmation dialog) be

20  permitted only in response to a proactive install decision by the user, for example by tapping an

21  'install' button that the store renders for the user." I interpret that quote as meaning that, when a third-

22  party store front app is submitted to the Play Store review process, Google will examine the app to

23  ensure that it only initiates installations in response to user consent.

24

25  ―――――――――――――――

26  [24] Google's Proffer Regarding Epic's Proposed Remedies. Pg. 23–24.

   [25] Google's Proffer Regarding Epic's Proposed Remedies. Pg. 24 Ln.4-6.

27  [26] Google's Proffer Regarding Epic's Proposed Remedies. Pg. 24 Ln. 6-8.

28  [27] Google's Proffer Regarding Epic's Proposed Remedies. Pg. 24 Ln. 8-10.

1    **C.    Epic's Proposed Implementation**

2    52. When a user initiates the installation of a third-party store via the Play Store, there is no

3    security justification for the Play Store to generate a warning which states that the user is about to

4    download a store. According to Google's own proposed implementation, the Play Store entry for the

5    third-party store would clearly label the app as a store. Additionally, when a user first attempted to

6    install an app through the store, Android would presumably show the user a consent screen to ensure

7    that the user is opting into the store acting as an installer.

8    53. Epic's proposed injunction requires parity of experience (see above) between installing an app

9    via the Play Store and installing an app via a third-party store.[28] As I described above, one way for

10    Google to ensure parity is to modify Android so that third-party stores can invoke a Google-controlled

11    install button that collects user consent to install an app. This approach would mean that installing an

12    app via the Play Store or a third-party store would generate a single consent screen that is trusted by

13    Google to actually gather consent. A single consent screen is all that is strictly necessary from the

14    security perspective. However, an alternative implementation for achieving parity of experience

15    would involve adding a consent screen to the Play Store.  Thus, both third-party app stores and the

16    Play Store would generate two consent screens (at least one of which comes from a Google-trusted

17    source like Android): (1) an "install" button within an app store and (2) a confirmation dialog asking

18    the user "Do you want to install this app?". This would apply whether a user is installing an app

19    directly from the Play Store or a third-party app store. This approach is less ideal from the perspective

20    of user experience but does enforce parity of experience and may incur less implementation effort (in

21    terms of Android/Play Store modifications) than a single-consent-screen approach. I understand that

22    Dr. Ernst will comment on this topic further, so I do not provide additional discussion of the

23    differences between a single-screen approach versus a two-screen approach.

24    54. From the security perspective, there is no distinction between "installers," "launchers," and

25    "app stores." This perspective is already shared by the Android OS—the operating system does not

26

27    ───────────────────────

28    [28] Proposed Injunction § II.B.1.i.

provide different installation-related permissions for "installers" versus "launchers" versus "app stores." Thus, from the security perspective, there is no reason for the Play Store to try to distinguish between installers and launchers and app stores; instead, any app that possesses the `THIRD_PARTY_STORE_INSTALL_PACKAGES` permission should be labelled as an app store in the Play Store user interface. Google's primary interest in these kinds of nomenclatural distinctions appears to be an economic one, not a security one. In particular, Mr. Baccetti states that the developer of a high-revenue app (e.g., a video game) could try to misleadingly label the app as an "app store" in order to benefit from Epic's proposed injunction on Google levying fees on app stores distributed via the Play Store.[29]

55. Google claims that distributing third-party stores via the Play Store would greatly increase Google's reviewing load. In Google's opinion, Google would have to subject not only the third-party store itself but also every app distributed by every third-party store on Play to the same review as all other apps distributed through Play.[30] Google already reviews every Play Store app, so Epic's injunction would not require Google to review those apps more often or more aggressively; indeed, Google's Proffer does not make this claim. Instead, Google's Proffer implies that (1) Google does not currently scan many off-Play apps, and (2) subjecting all apps distributed by third-party stores to the same review applied to Play Store apps would be extremely burdensome.

56. Neither of those two claims is reasonable. As I described during the Epic vs. Google trial, Google has a long-standing history of scanning many off-Play apps.[31] This approach is feasible for Google to do because Google's overall scanning costs are small relative to the scope at which Google operates.[32] Indeed, Google recently expanded the scope of such scanning, such that Android now triggers installation-time Play Protect scans of all apps that were previously unknown to Play

---

[29] Declaration of Vitor Baccetti ¶ 41.

[30] I do not address whether Epic's proposed injunction would permit Google to reject apps appearing on a third-party store for not complying with the Play Store's policies or whether, as a legal matter, the cost of reviewing those apps should be considered by the Court in assessing the appropriateness of the proposed remedy.

[31] *See* ¶ 219 and FN 213 of my Affirmative report.

[32] *See* ¶ 48 of my Rebuttal report.

1  Protect.[33,34] Moreover, Google uploads unknown apps to its servers for a full review via the Feed the

2  Marmots feature of Google Play Protect.[35]   Therefore, Google has either already reviewed many of

3  the apps hosted by Play-distributed third-party app stores, or can scan unknown apps at install time

4  and block the installation of apps that are malicious. From the security perspective, such scanning

5  will be sufficient to keep users safe. Further app review beyond scanning, including for example

6  human review for compliance with the Play Store's content policies, is not justified by security

7  concerns.   In summary, Google's complaints about the financial cost and scope creep of expanded

8  app review are greatly exaggerated, given that Google is already scanning many off-Play apps in a

9  manner that is sufficient to protect users.

10     57. Google's Proffer does not explain what Google would do if Google discovered malware on

11  a third-party store that was distributed via Play. If Google intends to blocklist third-party stores

12  which host "too much" malware, Google should make its definition explicit and allow well-behaved

13  third-party stores to understand Google's expectations. Furthermore, Google's malware threshold

14  should be applied to the Play Store as well. As discussed during the trial, the Play Store (like all

15  stores of large size) contains malware; thus, to the extent that Google believes the Play Store to be a

16  safe store, despite the existence of on-Play malware, Google should not blocklist a third-party store

17  that has similar (or smaller) levels of malware.

18

19

20

21

22

23

24

25  [33] See https://security.googleblog.com/2023/10/enhanced-google-play-protect-real-time.html.

26  [34] Doing such broad scanning of apps, regardless of their distribution source, is not unprecedented—Microsoft does
exactly this via its Windows Defender antivirus program, scanning all Windows apps, regardless of their provenance, to

27  keep Windows users safe.

28  [35] See FN 213 of my Affirmative report.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that I executed this declaration on this July 24, 2024, in Seattle, WA.

James Mickens (Jul 24, 2024 19:45 PDT)

JAMES W. MICKENS