# Ex. B to Cramer Declaration
## PUBLIC REDACTED VERSION

# EXHIBIT 1

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

--------------------------*

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

Case No.: 3:21-md-02981-JD

--------------------------*

STENOGRAPHIC AND VIDEO-RECORDED REMOTE VIRTUAL DEPOSITION OF

DAVID KLEIDERMACHER

Friday, July 12, 2024

9:02 a.m. PST

Stenographically recorded by:
Josephine H. Fassett, CCR, RPR

to answer that question on the grounds of attorney-client privilege.

MR. EVEN: I just want to understand your objection, Mr. Olasa. Is it your position that we're not entitled to know what Mr. Kleidermacher was asked to give a declaration on?

MR. OLASA: I think you're entitled to ask him about the declaration and the basis of the declaration, all of that. I don't think you're entitled to ask him about communications with counsel about the declaration.

MR. EVEN: Okay. I think we'll need to take that back. I disagree with that.

BY MR. EVEN:

Q. Did you ever consider the possibility of providing a declaration that went beyond the topics that made it into the declaration you actually ended up filing?

A. No.

Q. Did you review any materials not attached to your declaration in preparation for putting together your declaration?

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. Yes.

Q. And what materials did you review?

A. I reviewed the proposed injunction. I reviewed my prior declaration as well. I believe that is -- that's the only thing I can think of at the moment.

Q. Okay. So just so I'm clear. So one thing you reviewed, and I think you say in your declaration that you reviewed parts or portions of Epic's proposed injunction, is that right, in paragraph 2?

A. Yes, I did review that.

Q. And so is it, did you review the whole thing or did you review just portions of it?

A. I recall at least briefly reading the entire document. I spent through, probably spent through or skimmed through parts that weren't relevant to -- to things that I would be responding to.

Q. Okay. We'll get to that.

And then the other thing you say you reviewed is your prior declaration, that's the declaration that you've submitted in support of Google's prior sort of long filing in response to

the injunction?

MR. OLASA: Objection to form.

A. I read a -- I read my prior declaration. I don't recall exactly when in the past couple of weeks as we were developing this new declaration, whether it was before or after, I don't recall.

Q. All right. So let me take that one step at a time to make sure I understand your testimony.

You submitted a declaration in support of a 93-page document that Google submitted to the court, I believe, back in the spring, correct?

A. Yes.

Q. And is that the declaration about which you're talking about that you said you reviewed that in connection with preparing this new declaration?

A. Yeah, I reviewed it during the preparation. I don't recall precisely when I last -- when I first read that document, whether it was before the declaration composition or after.

Q. Got it. Thank you. That's helpful.

And so you did review the spring

HIGHLY CONFIDENTIAL - KLEIDERMACHER

declaration, let's call it that, I don't have its exact date memorized, but the spring declaration you reviewed, you just don't remember whether that was before you put pen to paper or during or at some other time, but prior to filing this June declaration, correct?

A. Correct.

Q. Okay. And other than the injunction and the prior declaration, sitting here today, you don't recall reviewing any other materials in connection with your preparation of the June 24 declaration; is that your testimony?

A. Not that I can recall. I -- that I certainly read before the document, before composing.

Q. Okay. Just to make sure we're on the same page. I didn't ask before you started composing, I asked: Have you read any other materials that you recall, other than your spring declaration and the proposed injunction, before you finalized your June 24 declaration and it was filed with the court?

A. I can't state definitively that there's any other document. I do not recall any other

HIGHLY CONFIDENTIAL - KLEIDERMACHER

document I certainly read before completing the declaration.

Q. Thank you.

Did you read Epic's proposed injunction prior to preparing the June 24 declaration?

Strike that. Let me reask that.

Did you read Epic's proposed injunction in whole or a portion thereof prior to being asked to prepare the June declaration?

A. I don't recall when I was specifically asked to prepare the declaration, so I can't say for sure.

Q. Do you remember if you read Epic's proposed injunction in connection with preparing your prior spring declaration?

A. Yes, I did.

Q. Who provided you with Epic's proposed injunction?

A. Same set of counsel we've been discussing.

Q. In your declaration you state, as we discussed, that you read portions of Epic's proposed injunction relating to catalog access, library porting, and distribution of third-party

stores through the Play Store. Do you see that in --

A. Yes.

Q. -- paragraph 2 of your declaration?

A. Yes, I see that.

Q. Who was it that instructed you to focus on these parts of Epic's injunction when you are perusing it?

MR. OLASA: Objection to form.

Mr. Kleidermacher, you can answer that question to the extent it doesn't reveal communications with counsel.

A. I don't recall counsel specifically -- I don't recall specific instructions beyond the -- beyond the -- have a read of it instruction.

Q. Do you understand that there was a proceeding in this case on May 23rd where the head court what's known as a "hot tub" involving economic experts discussing Epic's proposed injunction?

MR. OLASA: Objection to form.

A. I have heard the term "hot tub" in some -- one of the documents, but I don't, I don't know anything more than that. I don't know

anything of substance regarding the meeting.

Q. Okay. You were not in court during the May 23rd hearing; is that right?

A. Correct.

Q. And did you read the transcript of the May 23rd hearing?

A. I did not.

Q. Did you read the court's order of May 23rd which laid out the court's invitation for Google to file a proffer?

A. I did not.

Q. Do you have an understanding of what the court had instructed Google to file?

A. No.

Q. Do you have an understanding of what the court had instructed Google not to file?

A. No.

Q. Do you know whether the court invited Google to file any declaration or opinion addressing the security risks of third-party app stores?

A. No.

Q. Do you know whether the court invited Google to file anything about the security

HIGHLY CONFIDENTIAL - KLEIDERMACHER

implications of any of the remedies?

A. No.

Q. Your declaration is, in fact, about the security risks of third-party app stores, correct?

MR. OLASA: Objection to form.

A. That is a topic covered in the declaration.

Q. And your declaration does, in fact, cover the security implications of one of the remedies that Epic proposed, namely the distribution of third-party stores through the Play Store, correct?

A. My declaration does discuss security risks related to third-party app stores.

Q. Your declaration discusses security risks that you foresee emanating from a requirement from Google to distribute third-party stores on the Play Store, correct?

A. Yes.

MR. OLASA: Objection to form.

Mr. Kleidermacher, just give me a chance to interpose my objections.

Q. Did you consult with anyone at Google, other than lawyers, about the contents of any

HIGHLY CONFIDENTIAL - KLEIDERMACHER

aspects of your declaration?

A. No.

Q. So you spoke to no one about any portion of your declaration before you put it together?

MR. OLASA: Objection to form.

A. I don't recall discussing anything relevant to the contents of the declaration.

Q. Who drafted the first -- strike that.

Who put together the first draft of the declaration?

A. The declaration is composed of writing that I made as well as writing that the attorneys made.

Q. And my question is: Who did the first draft? Who took a blank piece of paper or a new Word document or, you know, Google document and started drafting something up, was that you or was that the lawyers?

MR. OLASA: Objection to form.

A. I don't know who started the first writing for the declaration as it was a composition of things I wrote as well as lawyers.

Q. Is it fair to say that the drafting process was an iterative process between yourself

HIGHLY CONFIDENTIAL - KLEIDERMACHER

and the lawyers?

A. Yes.

Q. And how many drafts did you exchange with the lawyers altogether?

MR. OLASA: Objection to form.

A. I wouldn't say there was exchange of drafts, we had a working document.

Q. I just want to make sure I understand the distinction you're drawing.

Did you have a working document, meaning you had like a document that is shared and people just entered their thinking into that?

A. Correct. There was a shared document where we had the opportunity to collaborate.

Q. And how long -- strike that.

Was that a -- strike that.

Was the shared document that you just described a shared Google document?

A. We were using Google documents, document sharing, to collaborate, yes.

Q. And does -- does Google Docs have a function that shows who created a document?

A. Yes.

Q. And if I -- if you were to look today

into the shared documents, who would be shown as the creator of the document, would that be you or would that be a lawyer?

A. I don't know.

Q. You find, if you flip through the declaration, can you ballpark for me how much, for the text, how much of the text is text that you put together and remain unchanged and how much of it is text that was either put together by the lawyers or was edited by the lawyers?

A. I find it difficult to ballpark that.

Q. Is the split closer to 50/50 or 90/10?

MR. OLASA: Objection to form.

A. I don't really know how to make an estimate that would be useful here.

Q. You have no clue who wrote more of this text, you or the lawyers?

A. I think it's --

MR. OLASA: Objection.

A. I think it's difficult because the document was collaborated. Because of the collaboration, their comments and edits and suggestions that occur which make it, I think, difficult to make an estimate.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Did anyone at Google -- well, strike that.

Other than yourself and lawyers, is there any other Google employee who had access to these shared documents?

A. Not that I'm aware of.

Q. Did anyone at Google review and provide feedback on the declaration, other than lawyers?

A. Not to me, not that I'm aware of.

Q. Those are two different questions -- different answers. Let me make sure I understand it.

You're not aware of anyone at Google who is not a lawyer who provided any feedback or comments on the declaration; is that your testimony?

A. Yes.

Q. Now, you're aware that Mr. Cunningham -- strike that.

Are you aware that Mr. Cunningham, Mr. Buchetti, and Mr. Kramer also submitted declarations alongside yours?

A. Yes.

Q. Were you aware that Mr. Cunningham,

the security and privacy aspects of the -- of these Google, made for Google, made by Google products, correct?

A. Yes.

Q. And by contrast you're not responsible for developing these made by Google products, correct?

A. My team would typically be responsible for small pieces of the product.

Q. And the small pieces of the product that you would be responsible for, or your team would be responsible for, are those portions of the product that pertain to security and privacy, correct?

A. Yes.

Q. And so if Google is, for instance, developing a new version of Google Maps, your team is not going to touch the user interface or the GPS functionality or anything like that unless it has some security aspect to it that you need to review and maybe contribute to, correct?

A. That seems fair.

Q. And instead, the team that would design the product itself would be a product team,

HIGHLY CONFIDENTIAL - KLEIDERMACHER

correct, for the particular --

MR. OLASA: Objection to form.

Apologies. Go ahead.

A. It would be a set of product teams working on those other parts of the product, yes.

Q. And so, for instance, here if the court ordered Google to have a storefront within the Play Store for listing third-party app stores, your team would not be the one responsible for designing that storefront, right, that would be a Play product team, correct?

A. That would be my expectation, yes.

Q. So before we get to the vetting, is it fair to say that the Play Store is technologically capable today of hosting and installing third-party stores?

A. I do not believe it -- I do not believe so.

Q. You don't believe that the Play Store is technologically capable of hosting an APK from like the Amazon store and getting it installed on phones?

A. I mean it -- obviously, the Play Store is capable of hosting APKs that can be downloaded.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

So as much as that's the minimum bar, then it could do other apps, other APKs, and host them. But I was -- sorry, go ahead.

Q. No. Sorry. I didn't mean to cut you off. Please.

A. I wasn't sure if you were maybe referring to like the actual proposed injunction and how that would work. And, obviously, it would be more work required to implement all aspects of that, and so that's why I was, that's why I was hesitating to say yes.

Q. I understand that you have a view that this requires a lot of work and a lot of cost and I read your declaration and we'll speak to all of that. What I'm asking now is just simply as a technological matter.

The Google Play Store -- well, let me take a step back.

An app store like the Amazon Appstore or the Epic Game Store, should it launch, is just an APK, it's another app, correct?

A. Correct.

Q. And the Google Play Store is capable today of hosting such an APK and installing it,

HIGHLY CONFIDENTIAL - KLEIDERMACHER

correct?

A. You mean without any modifications?

Q. Yes. As it is today. Well, there'll be rule modifications that we'll speak about, or policy modification and maybe other modifications that are -- that you think are necessary to secure stuff. But as a technical matter, Google Play Store today could ingest the Amazon store APK, host it, make it available to users, and install it on users' Android devices, correct?

A. You're asking if the Play Store can host APKs, and the answer to that question is yes.

Q. And I think you say that, in your declaration, "the app store doesn't have a technological distinction between an APK that is the Amazon store and an APK that is the Amazon retail store that it hosts today," correct? An APK is just an APK.

A. So you're -- I'm not sure I understand your question.

Q. All I'm saying is, you state in your -- strike that.

You state in your declaration that -- and we'll get to that -- that Android doesn't have

a technological or other definition of app store, correct?

A. Correct.

Q. For Android, "app store" is just another APK with certain permissions attached to it, correct?

A. Correct.

Q. And all I'm saying is: For the Play Store too, there is no technological or other distinction between -- well, strike that.

For the Play Store too there is no technological definition of an app store, it's just another APK that the store can host and can install on people's devices, correct?

A. There is an APK representing the Play Store.

Q. If there is an APK that represents the Amazon store, or the Epic Game store, the Play Store today would be capable of hosting that APK and getting it installed on people's devices as a technological matter, correct?

A. The Play Store has the capability to host and download APKs.

Q. And that includes APKs that can then

HIGHLY CONFIDENTIAL - KLEIDERMACHER

install other things?

A. That seems fair.

Q. And the only thing that currently prevents the Play Store from distributing third-party stores is a rule, not a technological impediment, correct?

A. Well, there's a -- there's an impediment in the safety parts of it, so by technological impediment you mean just like the physical app, like aspect of installing?

Q. Correct. And the only thing that currently prevents the store from installing third-party stores as a physical technological thing is just that there is a rule that says, "You the developer may not submit to us APKs that have the goal of installing other APKs outside of Play," correct?

A. I see what you're saying.

Yeah, so if we ignore safety, then the physical ability to install is there.

Q. And you understand that Google right now prevents that through a rule, correct?

A. We have policy against the distribution of third-party app stores, yes.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. And that policy is, in fact, part of what's known as the DDA, you know that?

A. I know a DDA exists, I don't, I don't know -- there may be multiple places where that policy is mentioned. I don't know if the DDA is the only place.

Q. Do you know that the DDA is one of the places where that policy is manifested?

A. I don't recall on reading the DDA in the past, so I can't say one way or the other, but...

Q. Okay. Maybe we'll get there later today.

THE VIDEOGRAPHER: Pardon, Mr. Kleidermacher, could you move to your left a little bit, you're getting off center.

Thank you so much. I appreciate it.

MR. EVEN: As am I, but nobody's recording me. Thank God.

Q. And so, just so we're clear. So your declaration addresses not the tech work or the cost of -- well, let me take a step back.

You said that you read Epic's injunction and the portions that are related to carrying

there is no standard or minimum requirement for safety of these stores or their developers today, correct?

A. Correct.

Q. And I think you also agreed with me that with the exception of, with the exception of malware or known malware, there is no, currently no Google-imposed standard or minimum requirement for the safety of the apps that third-party app stores carry and distribute, correct?

A. Beyond malware, I don't know of any other. I believe that's correct, yes.

Q. And Google does not and never has vetted the apps distributed by third-party stores before they were being installed by OEMs or Android users, correct?

A. Not in any comprehensive way.

Q. Can you detail the non-comprehensive way by which Google vetted the apps distributed by third-party stores before they were being installed by users from the web or by OEMs through pre-installation?

A. It's possible that some apps on those stores if they'd been installed prior to the

HIGHLY CONFIDENTIAL - KLEIDERMACHER

preload that they may have gone through a Play Protect scan, which again is not a full vetting of the app, but...

Q. Okay. So there are, setting aside Play Protect which applies to all apps regardless of source on all devices, right, that's how Play Protect operates?

A. If they're installed then they get some level of scan.

Q. I think we've established that either in court or in prior testimony. But Play Protect looks into or tries to identify malware prior to the -- to any installation of an app and as to the installed base of apps on all devices where it's operative, correct?

A. Play Protect will scan, will perform a scan at installation time.

Q. And Play Protect will run a scan at installation time on all apps regardless of source, correct?

A. Correct.

Q. And so setting aside Play Protect, which scans all the apps all the time on all devices, Google does not and never has vetted through an

HIGHLY CONFIDENTIAL - KLEIDERMACHER

app review or similar process the apps that are distributed by third-party stores before those stores were being installed by OEMs or by Android users, correct?

A. They do not go through our full trust and safety process review, correct.

Q. But according to your declaration, what you state is that Google would need to vet all the apps carried by these stores if these stores would be distributed on Google Play rather than being pre-installed by an OEM or downloaded by a user, correct?

A. You said need to do it. As the head of security, it's my opinion that that would be the right thing to do.

Q. Let me make sure I understand the distinction you're drawing.

You say that your declaration is not that that is what Google would need to do, but rather that is what you would recommend as head of security?

A. Correct.

Q. Who would you recommend this to?

A. I would recommend that to any final

decision-maker on the disposition of this if we were forced to do it.

Q. Setting aside whether this is a need or a recommendation by you, the gist of your declaration is that Google ought to vet all the apps carried by third-party stores, if those stores would be distributed by Google Play, even though Google does not perform such vetting for stores that are pre-installed by OEMs or downloaded from the web, correct?

A. Correct.

Q. All right. Let's talk a little bit more about that, and if you can turn to paragraphs 4 and 5 of your declaration. Are you there?

A. Yes.

Q. So these paragraphs come under the heading Security Risks of Third-Party App Stores, correct?

A. Yes.

Q. And these paragraphs are intended to explain why you believe Google would need to vet the apps carried by any stores that would be distributed through the Play Store, correct?

A. At least paragraphs 4 and 5 and perhaps

                 once Epic launches an Epic Game store on Android, that Epic Game store might be more secure than Google Play, correct?

A. I don't know how you would measure that.

Q. Well, let's start by the most obvious.

Epic currently has a few thousand games on it. Do you understand that?

A. I have no idea what it has on it.

Q. Okay. Let's assume a third-party store with a few thousand games from a reputable developer. Can we assume that?

A. Okay.

Q. You agree with me that it's much easier to ensure the security and safety of a store with 3,000 or 4,000 apps than to ensure the security and safety of the apps on the Play Store, correct?

A. I think if Google were vetting it, I think it would be easier for Google to do it.

Q. It would be easier for anyone who isn't tasked with both something the size of the Play Store and a 3,000 app store to vet the 3,000 one than to vet the Play Store, correct?

A. If an independent party, if the same party was vetting an app store of millions of apps

versus an app store of thousands of apps, then, all else being equal, the few thousand apps should be less work or should be easier.

Q. Now -- let me try it a different way.

The risk you identify is not that third-party stores are necessarily unsafe but rather that Google has no way of assessing their quality and security, correct?

A. The problem is not necessarily that Google doesn't know, the problem is that the lack of knowledge in measurement translates to user risk.

Q. Well, you specifically say in paragraph 5 that "Nor do we have a good way of measuring the risks that a particular third-party app store may pose to users," right?

A. That is what I said.

Q. And that is the crux of the problem that you are --

A. Yeah.

Q. -- that Google is being made to distribute stores that it does not know whether they're safe or not absent vetting, right?

A. And that is why it causes risk to users.

installing other apps with user consent as well or just without?

A. No. What I'm referring to is the risk of an installer being able to install apps without user consent.

Q. Okay. So when you say, "any app capable of installing other apps," you mean any app that has the install packages permission, right?

MR. OLASA: Object to form.

A. I'm not specifically saying that. I'm not specifically referring to any specific permission but more the behavior of the system. The future system such as not yet implemented.

Q. So let's assume we have something today that is capable of installing other apps such as the Amazon Appstore. Yes? Why would it give a powerful new tool for bad actors to harm users if that store were now distributed through the Play Store as opposed to being pre-installed by Samsung?

A. I'm not specifically referring to the Amazon store, I'm referring to the general capability of third-party app stores that allow installs without user consent.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Google also never told anyone at Google that here is the billions of dollars that Google needs to expand on that undertaking of vetting all the app stores on every pre-installed store, correct?

MR. OLASA: Objection to form.

A. I'm not sure how your second question is different from the first question. Are you asking if I've suggested that we should vet third-party apps? I think I already said no.

MR. OLASA: Objection to form.

Q. And I'm saying as part of that you also never tried to quantify the cost to Google of trying to do that?

A. I have not tried to quantify the cost to do that.

Q. Okay. Now, the fact that Android has no standard minimum requirements for the safety of app stores is a feature, not a bug of Android, correct?

MR. OLASA: Objection to form.

A. I would -- I don't -- wouldn't consider it a feature or a bug but more of a result of the way the ecosystem works.

Q. Well, it's not something that Google is

HIGHLY CONFIDENTIAL - KLEIDERMACHER

seeking to rectify, correct?

A. We constantly have discussions about the balance between improving safety, vetting developers, vetting apps and the control that the device manufacturer, such as Samsung, would expect and demand in the ecosystem.

Q. So that wasn't responsive to my question.

The fact that there is no standard or minimum requirement for the safety of app stores, third-party app stores, is not something that Google is currently working to rectify, correct?

MR. OLASA: Objection to form.

A. There has been some discussions about the possibility of creating such a standard, so I can't say there's been no work on that.

Q. Is there a workgroup that is currently developing changes to the matter, to the Google policies, to what Android does that would introduce standards or minimum requirements for the safety of app stores?

A. You're asking me if there's discussions within Google?

Q. No, I'm asking if there's an actual

workgroup that is working to change that actively.

A. Within Google, no.

Actually, can I amend that? I just thought of a clarification that makes that no "possibly," sort of.

Q. I'm all ears.

Page 68

HIGHLY CONFIDENTIAL - KLEIDERMACHER

[redacted]

Veritext Legal Solutions
212-279-9424 www.veritext.com 212-490-3430



HIGHLY CONFIDENTIAL - KLEIDERMACHER

[redacted]

Q. Now, at the end of paragraph 5 you state that if Google Play distributes any third-party app stores, app store -- sorry -- without reviewing the apps hosted by that store, Google itself would be exposing Android users and its own Play customers to potentially significant risks that are outside Google's ability to manage. Did I read that correctly?

A. Yes.

Q. Now, that sentence is intended to explain why you believe that the risk of unvetted third-party stores is unacceptable for Play distributed stores, correct?

A. Yes.

Q. And specifically that sentence is intended to explain why the risk of unvetted

third-party stores is unacceptable for Play distributed stores even though Google tolerates that risk when it comes to third-party stores that are distributed through other means like pre-installation or from the web, correct?

A. That seems fair.

Q. Now, the distinction you're drawing here is that when a third-party store is being downloaded from the Play Store, then Google itself, I think that's the crux of your statement, is a link in the causal chain that leads potentially to harm to users, correct?

A. I would say that it is due to the fact that it is a Google Play downloaded app store.

Q. And because it is a Google Play downloaded app store, in your view that makes Google part of the causal chain that leads to a heightened risk as opposed to stores that come from other places, correct?

A. I would say there is a stronger connection to the user experience because it's coming from the Google property.

Q. So you think Google is part of that user experience both for stores that are downloaded

HIGHLY CONFIDENTIAL - KLEIDERMACHER

from the web or pre-installed and for stores coming from Google but it plays a bigger role when those stores come from Play; is that the distinction you're drawing?

A. A bigger role from the respect of like brand damage, yes.

Q. Got it. I want to get to this brand damage point.

First of all, just to make clear. When you stated Google itself would be exposing Android users and its own Play Store customers to risk, you're not providing a legal opinion that Google could or should be held accountable to harm caused by apps that are downloaded from stores that were themselves downloaded from Play, correct?

A. I'm making a safety and security opinion.

Q. Okay. So you say you're making a safety and security opinion. I take it you're not making a legal opinion, that's what that means, right?

A. Yes.

Q. And you mentioned security and safety in the context of brand. Are you opining that users would view Google as the cause of harm if that

harm is caused by apps downloaded from non-Google stores that were themselves downloaded from Play?

A. Well, yes, because Google distributed them.

Q. Now, you do not cite any study or evidence to show that's what users would think, correct?

A. It's based on my experience.

Q. That's not what I asked. You do not cite any study or evidence to show that's what users would think, right?

A. I do not cite any studies in the declaration.

Q. And you're not an expert on what users think, correct?

A. I have significant experience in how users react to safety problems in the Google Play Store.

Q. You don't have any experience of how users react to safety issues in an app they downloaded from a third-party store when that store was downloaded from Play, correct, that would be a new experience for you?

MR. OLASA: Objection to form.

                                                            HIGHLY CONFIDENTIAL - KLEIDERMACHER

law, then it is theoretically possible to advertise.

Q. Google could even advertise, "I'm not doing it because I like it, I have a court order that makes me distribute these stores," correct?

A. If there is no law precluding an advertisement, then any advertisement in theory could be issued.

Q. Assuming Google advertises all these facts, is it still your view that users would somehow think that Google is responsible for harm emanating from an app they downloaded from a store that once upon a time they downloaded from Play?

A. There is no doubt in my mind that advertising would not preclude Google being blamed for the harm coming from third-party app stores distributed on Play.

Q. Is it your view that users just wouldn't understand that Google has nothing to do with this app?

A. That may be a reason why we would be blamed. They may not understand it.

Q. Do you have any evidence to show that users just wouldn't understand that apps

HIGHLY CONFIDENTIAL - KLEIDERMACHER

downloaded from Amazon have nothing to do with Google Play?

A. My experience is based on how users complain to Google about bad things happening in the store that are not directly related to anything Google did other than distribute it.

Q. I understand. Here nothing bad is going to happen from the Amazon store or from Play, it's only an app that was downloaded from Amazon and presumably or potentially doesn't even exist on Play. Is it your testimony that users with all of Google's might, Google can't explain to users sufficiently well such that users understand that Google doesn't have anything to do with that app?

A. It is my strong opinion that regardless of any advertising Google would do that Google would be blamed for harm coming from third-party app stores distributed from Google Play.

Q. And it's your testimony that Google is unable to explain to users such that users understand that Google has no affiliation or relationship to that app that was downloaded from another non-Google store simply because that third-party store was once upon a time downloaded

from Play?

A. The Google explanation, any Google explanation in the form of advertising or otherwise, in the form of disclosure or whatever, wouldn't prevent users from complaining to Google about the harm.

Q. And in your view Google -- strike that.

In your view those complaints would be grounded in user misunderstanding of the fact that Google has nothing to do with that third-party app?

A. I'm not saying it's totally due to misunderstanding. It would be grounded in the fact that the user was harmed and they were angry and they would think, how did this happen, and in their experience it came from Google Play, and we would be blamed.

Q. Would Google then explain to them, next time only download apps from the Google Play Store, that's what we told you for a year now?

A. I'm sure there are many things we would try to do to try to help assuage the brand damage.

Q. I'm not seeing the brand damage, that's why I'm asking, Mr. Kleidermacher.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Maybe I'm misunderstanding something, so let me start from the beginning.

Epic's proposed injunction simply says, if there's an app store, you will need to agree to distribute it, you Google, right?

A. Right.

Q. Why does the risk of doing that have anything to do with the definition of what is an app store?

A. Because there is no definition for app store in the Android operating system. So Epic is using a term that doesn't exist as an entity in the Android operating system.

Q. And when you say, "merely means any app capable of installing other apps," as opposed to what?

A. As opposed to apps that don't install other apps.

Q. Well, apps that don't install other apps clearly are not app stores, correct?

A. Yes -- well, I guess in the context of this discussion, yes.

Q. Okay. So, so what is exactly the issue here that you are identifying with -- or strike

that.

What is the definition that you think would prevent this from becoming a powerful new tool for bad actors to harm users?

A. Sorry, you're asking me to try to define app store?

Q. I'm asking what is the problem with the definition an app that is capable of installing other app in your view?

A. You're asking me what is the problem of an app that can install other apps?

Q. No, I'm asking you why is that a bad definition for app store.

A. Oh. The -- if an app is capable of installing other apps without user consent that would be a -- that would be a dangerous addition, that would be a dangerous change.

Q. Again, I think we're misunderstanding each other, so.

I understand that when you say "any app capable of installing other apps" what you really mean is any app capable of installing other apps without user consent, right? That is the problem you're identifying?

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. A bad app -- so any app that is capable of installing other apps potentially could be a vector of harm today by distributing through other channels, correct?

A. Like sideloading?

Q. Sideloading, pre-loading, et cetera.

A. Sure.

Q. And the only change here is that these apps will now be needed to be carried through the Play Store, correct?

A. That's not the only requirement.

Q. That's the only requirement --

A. There's plenty of other requirements in the injunction other than just you have to carry, carry the app store.

Q. Other operating systems such at Windows, Mac, macOS, Linux allow for the installation of third-party app stores, correct?

A. I actually don't know. I mean, I believe that is generally true, but I don't know the details of those other operating systems.

Q. I understand you don't know the details, but you understand that generally you can have Steam or the Epic Games Store or a host of -- or

the Adobe Store or a host of other stores that are apps that can install other apps being installed on a Windows PC or on a Mac or on a PC running Linux, correct?

A. Certainly Windows Steam I've heard of. And Linux, since it's a generic operating system, could support essentially arbitrary UIs, including app stores, so that seems fair.

Q. Okay.

A. I'm not sure that was enough to know whether MacOS supports app stores.

Q. Okay. If I tell you that Steam is available on Mac, that is not -- you don't have a basis to contest?

A. No.

Q. Okay. Are you aware of how these other operating systems define app store?

A. No.

Q. Do any of these other operating systems have any distinction between app stores and other apps except the ability to install apps?

A. I don't know.

Q. Did you look into any industry definitions of app store in preparing your

HIGHLY CONFIDENTIAL - KLEIDERMACHER

declaration?

A. Not during the preparation, no.

Q. Have you been able to find any broadly accepted definition of the term app store other than an app that is capable of installing other apps?

A. I have seen attempts to describe app stores in different ways than just the ability to install other apps.

Q. What other, what other vectors or parameters were used in those definitions?

A. The concept of having developers register, you know, go through the process of actually submitting an app would be one example of things I've seen before.

Q. Where did you see that?

A. The -- the U.K. government has something called a Code of Practice which is a document where they describe some minimum security requirements for app stores.

Q. Okay.

MR. EVEN: If we can -- let me mark as Exhibit 9003, if we can have Tab 15.

(Google Play Developer Distribution

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Agreement marked as Exhibit 9003, as of this date.)

MR. EVEN: Tell me once you have that up.

THE WITNESS: I'm not seeing anything update here.

Oh, here it is.

Okay. I have the document up.

BY MR. EVEN:

Q. Okay. Do you see that this is a document that is, the heading of which is Google Play Developer Distributor -- Distribution Agreement?

A. Yes.

Q. And do you understand that this is the document we discussed earlier today that's referenced to as the DDA?

A. That is what it appears to be.

Q. And you understand that every developer that wants to distribute anything on Google Play must sign one of these agreements or click-through?

A. That is my understanding.

Q. Okay. If you look under Definitions,

HIGHLY CONFIDENTIAL - KLEIDERMACHER

you see that there's a definition on page 2 of Products. Do you see that?

A. On page 2?

Q. Correct. Second page.

A. Products. Okay.

Q. And you see that it says: Software, content, digital materials, and other items and services as made available by developers via the Play concept. Do you see that?

A. Yes.

Q. Do you understand that products in this -- strike that.

Do you understand that the quintessential product alluded to here is an app?

MR. OLASA: Objection to form.

A. I do not know what's meant here by that.

Q. You understand that apps would be covered by products. It's a software that is made available by developers via the Play console, correct?

MR. OLASA: Objection to form.

A. I'm not familiar with this document, so no, I don't know what it's referring to.

Q. Okay. If you go to 4.5, that is on the

HIGHLY CONFIDENTIAL - KLEIDERMACHER

sixth page, I think. Sorry, fifth.

A. I see it.

Q. Do you see that this says: You may not use Google Play to distribute or make available any product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play. Do you see that?

A. Yes.

Q. Do you understand that this is a section that is intended to say you cannot distribute app stores on Google Play?

MR. OLASA: Objection.

A. I mean, it seems like a sensible interpretation, but I'm not familiar with the wording.

Q. Okay. You see that this speaks to products, let's assume for now that that includes apps, that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play. Do you see that?

A. Yes.

Q. Would that definition of app store help

HIGHLY CONFIDENTIAL - KLEIDERMACHER

alleviate the concerns you raise in number 6, in paragraph 6 of your declaration?

A. Are you asking if we, if we adopted this as a definition for app store whether it would remove my concern?

Q. Yes.

A. No.

Q. Okay. So the issue is not a lack of definition, the issue is the fact that there exists out there apps that are capable of installing other apps without user concerns; is that fair?

MR. OLASA: Objection to form.

A. My concern is that the scope of what would be distributing apps should be better specified, including its capabilities.

Q. And why does it need to be better specified?

A. Because what I'm worried about from the safety perspective is apps that is -- is someone creating an app that can then distribute other apps without the user, the user's consent.

Q. And you're concerned about it because you think it's a bad thing that we would have apps

that can install other apps without user consent, correct, as a security thing?

A. Yes.

Q. And you understand that the injunction does not require Google to change its policy as to whether people can or cannot build apps that can install other apps with or without user concern -- consent?

MR. OLASA: Objection to form.

A. Well, I think that is the concern. Because it wasn't, at least from my understanding, it wasn't clear, and it seemed to me an interpretation is that we would need to allow these apps to install.

MR. EVEN: Okay. We've been running about half an hour, so let's go off the record.

THE VIDEOGRAPHER: Very well. We are now going off the record at 12:29 p.m. Pacific and this ends Media Unit 3.

(Off the record.)

(Lunch recess.)

Google has not made a final decision on whether or not to implement vetting of apps on third-party stores should the court order such stores to be carried on Play?

A. Yes.

Q. Whose idea was it that Google would essentially vet all apps on third-party stores distributed on Play?

A. It was, it was my idea.

Q. Okay. And who besides you was involved in coming up with this idea?

A. Sorry, could you repeat that?

Q. Sure. Who besides yourself was involved in coming up and developing this idea?

MR. OLASA: Objection to form.

A. No one else contributed to my -- to the idea that I wrote in the declaration.

Q. Were there any meetings where vetting third-party app catalogs in connection with Epic's proposed remedy was discussed?

MR. OLASA: Mr. Kleidermacher, you can answer that question, but in answering please don't disclose the substance of any communications with counsel.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. No conversations beyond the discussions with counsel we alluded to earlier.

Q. And the discussion with counsel you alluded to earlier you mean discussions in the context of preparing your declaration, correct?

A. Correct.

Q. Who is the highest ranking Google executive that has signed off on this idea of vetting apps of third-party stores distributed by Play to date?

A. I'm not sure what you mean by "signed off," you mean approve the declaration?

Q. No. I mean, approve the idea that if Google is ordered to carry third-party stores on Play, that would be Google's response to go ahead and invest what you estimate to be half a billion dollars in vetting third-party stores?

A. Oh. We don't make decisions based on ideas.

Q. I'm not sure that's responsive to my question, so my question was: Who is the highest ranking Google executive that has signed off on this plan to date?

A. This isn't a plan.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Is it a contingency plan?

A. It is my recommendation of what we would do if forced to comply.

Q. Got it. Who would you be making this recommendation to should Google be ordered to carry third-party stores on Play?

A. Typically a recommendation like this would be reviewed by a wide range of people. The senior, senior stakeholders in the Android Ecosystem. Possibly all the way up to including Pichai.

Q. So you said you're directly reporting to Seang Chau these days. Am I butchering the name?

A. That's correct.

Q. Is that a he or a she? I apologize.

A. He. He.

Q. Would Mr. Chau be involved in the decision to adopt vetting of the catalogs of third-party stores?

A. I would expect he would at least be consulted.

Q. Would Mr. Samat be consulted or involved in that decision-making process?

A. That would be very likely.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Okay. What about Mr. Lockheimer, would he be involved?

A. No. He has since taken on a different role at Google.

Q. Got it. Who does Mr. Samat report to these days?

A. He reports to Rick who is the senior vice president of our division.

Q. And what is the last name of Rick?

A. It's escaping me at the moment.

Q. Is that Rick Osterloh?

A. Yes.

Q. Would Mr. Osterloh be involved in the decision-making process?

A. Very likely.

Q. Who does Mr. Osterloh report to?

A. He reports to the CEO of Google, Sundar.

Q. And you said that you believe Mr. Pichai potentially would be involved in the decision as well, correct?

A. Possibly.

Q. A decision requiring an expense of north of [REDACTED] a year, by your estimate, who would be authorized to approve that?

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. I mean, I have made large -- I have made proposals that are large and -- in terms of their scope, but I -- I don't recall estimating anything of in the realm of [REDACTED] of dollars -- actually, I made an estimate that something would cost [REDACTED] of dollars. Nothing is coming to mind right now.

Q. So this would be the first time you made that kind of recommendation?

MR. OLASA: Objection to form.

A. Yeah. The recommendation -- first of all, the estimates of the -- the estimates are rough estimates and I wouldn't say they're [REDACTED] either. In my case. In the case of the declaration, I did not state that they were [REDACTED]

Q. Okay. Your estimates here are in the range of [REDACTED] a year; is that right?

A. It is a rough estimate based on some percentage of growth, which I state is very, very difficult to estimate.

Q. Okay. Sorry. Didn't --

A. Based on that, based on those disclaimers, yes, it's in the [REDACTED]

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Is this the first time that you estimated that Google -- strike that.

Is this the first time that you've recommended Google adopt a measure that would cost roughly in the vicinity of [REDACTED] a year?

A. As I said with your earlier question, I have made large -- I have made proposals/recommendations that are very large in scope, but I do not -- have not attempted to estimate those in dollar for like that.

Q. Have you made recommendations that are large in terms of the cost associated with them that have been rejected?

A. Not that I can recall.

Q. If we go to paragraph 9 of your declaration, and here what you contemplate is that Google would extend its first-party app review -- strike that.

In paragraph 9 what you contemplate is extending Google's app review of the APKs that are carried on Play itself to the APKs of apps that are listed on third-party stores, correct?

A. Yes.

Q. And in the last sentence of this

HIGHLY CONFIDENTIAL - KLEIDERMACHER

paragraph you state, "No app or update could be published on the third-party storefront distributed through Play unless Google had cleared that app or update pursuant to Google's policies, which include at least the same safety and content policies that Google applies to apps distributed directly on Play," correct?

A. Correct.

Q. And as described here, your declaration suggests or presents a proposal but which Google would review all apps within third-party app stores for full compliance with Google's policies, correct?

A. Yes.

Q. And Google would also review any updates to any such apps for compliance with Google policies, correct?

A. Correct.

Q. Now, the proposal here requires a third-party store to make its entire catalog including yet-to-be published apps and updates available to Google Play for review, right?

A. Prior to publication, yes.

Q. And this would also require app

HIGHLY CONFIDENTIAL - KLEIDERMACHER

developers to submit all the apps they intend to distribute on third-party app stores to Google before they launch on the third-party store if that store is carried on Play, correct?

A. Google would need to review the -- put the application through our standard review process, whether that is a direct relationship with the -- exactly how that's implemented is unclear.

Q. Okay. And I think what you started saying there is that it's unclear whether Google would receive these APKs from the third-party store or directly from the developer; is that what you were saying?

A. Correct.

Q. Do you have an understanding of what is the goal of the remedies that the court is considering right now?

A. I wouldn't say that I have a literal understanding of all the remedies.

Q. What's your general understanding of why the court is contemplating imposing an injunction on Google?

MR. OLASA: Objection to form.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

apps from third-party stores first raised?

A. I believe -- I'm not sure, but first raised by whom? You mean as part of the declaration composition?

Q. By you, I guess, yeah.

A. When it was it first raised?

Well, to me it was early on in my thinking of the response to this because it seems really obvious that if you're going to review the apps, the only -- on a third-party store, the only way you can ensure that the app isn't published in a noncompliant fashion is you'd have to do some form of notarization where you actually sign the app and you execute some form of technical limitation that would ensure that the app can't just simply be installed and distributed without that review. It's a pretty common approach.

Q. Did you -- sorry. Didn't mean to cut you off.

Did you discuss this modification of the Android OS with anyone?

MR. OLASA: Mr. Kleidermacher --

Q. Other than lawyers. To be clear. Every time I ask you, other than lawyers.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. No.

Q. If Google is ordered to distribute third-party apps on the Play Store or a third-party store is on the Play Store, who would be the final decision-maker on whether or not to modify the Android OS to prohibit the installation of unapproved apps from third-party stores?

A. I don't know.

Q. Who do you think are the potential candidates for providing such approval?

A. That would include my manager Seang, his manager Sameer, and possibly the head of the Play and Android developer division, Sam.

Q. If you'd turn to paragraph 11, and here you write: In addition to vetting third-party app catalog, Google would also likely require the app store itself to follow Play's policies. Do you see that?

A. Yes.

Q. And by Play policies I gather that you mean the existing policies that apply to any third-party app?

A. Yes.

Q. And here again you say that Google would

likely require. I take it that Google has not yet determined even as a contingency plan whether or not it will require third-party app stores to follow the Play policy; is that right?

A. No decisions about anything in my proposal has been made, have been made.

Q. If you turn to the last sentence in paragraph 11, you state, "Google would also have to develop and implement behavior policies for third-party app store distributed through Play." Do you see that?

A. Yes.

Q. What would be included in behavior policies?

A. An example in the behavior policy might be the need to ensure that the app store does not silently install apps.

Q. Any other behavior policies that come to mind?

A. Nothing comes to mind.

Q. Behavior policies here are separate from the Play policies described in the first sentence of paragraph 11, right?

A. Right.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Is there a chance that the costs are closer to [REDACTED] or [REDACTED]

A. I mean, these are pretty rough estimates, so part of those estimates are more accurate than others. So, I mean, it's also -- it's -- I feel like it's in the [REDACTED] range. I feel pretty good about that estimate. If you say it's as high as [REDACTED] that feels a little high for me. [REDACTED] feels low to me. But is it possible that if a very, a very fine-grained analysis was done that we'd hit [REDACTED] or [REDACTED] I'd say it's possible.

Q. Okay. You're not staking your life on that, in other words. Okay. Understood.

So I want to talk a little bit about each of these numbers to try and see if we can get a little clarity on them.

So, first of all, you have seven sort of, you call it, team functions but are cost items that roll up into this [REDACTED] number, right?

A. Yes.

Q. And you provide no itemized breakdown in your declaration of how these seven different cost items figure into that aggregate [REDACTED]

HIGHLY CONFIDENTIAL - KLEIDERMACHER

number, right?

A. Right.

Q. And you provide no support in your declaration for how you reached the [redacted] sum for these seven items, correct?

A. It's supported -- the support that's in the declaration is what is written in the declaration.

Q. Okay. There's no math in the declaration, for instance, showing "I looked at one number, I looked at the other, I added them up, here's how I got to [redacted] correct?

A. In the declaration. I mean, obviously, I did that math but it's not in the declaration.

Q. Okay. And none of the other declarants provided any support for this [redacted] number either, correct?

A. I don't believe the other declarants were covering this same area of discussion.

Q. Presumably Google has internal budgets and documents that show its actual costs for these seven line items, right?

A. I'm not aware of a -- of an existing document that would cover all those things. It

would, it would be something that would have to be determined and examined, computed.

Q. And would that be -- well, strike that.

To try and determine and examine that, is there a finance team at Google that would be qualified to look at the actual financial data and estimate these costs?

A. I believe so, yes.

Q. But you did not speak to them in putting together this declaration, right?

A. I did not.

Q. You say you did do some math in your, I guess, in your head to reach this [REDACTED] number. You know what, let me not assume.

Did you create any documents on which you've done the math to get [REDACTED] for these seven items?

A. Yes.

Q. You have these notes?

A. I do.

Q. Okay.

MR. EVEN: We would ask you to please produce these notes.

(Request for production.)

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Of the seven cost items here, are those roughly equal to one another or do certain cost items garner higher cost than others?

A. Some of them are much higher. The first three rows in the [REDACTED] section are by far the biggest. They account for about 80 percent of the cost.

Q. So the first three are about [REDACTED]

A. Correct.

Q. And does the [REDACTED] number here reflect only what's typically referred to as FTEs or does it also include the cost of running servers, buildings?

A. It only includes -- that section only includes FTEs.

Q. Okay. So the first team or function of the seven that make up [REDACTED] in cost is app safety, right?

A. Yes.

Q. Do you supervise the app safety team?

A. I have supervised that team for the last seven years.

Q. And how many people are on the app

safety team?

A. Approximately [redacted]

Q. And you say that the app safety team develops and maintains on-device and back-end infrastructure used to protect users against app-related risks; is that right?

A. Yes.

Q. So, for instance, is Play Protect one of the things that the app safety team is in charge of developing?

A. Yes.

Q. What is the total cost of the app safety team per year?

A. My estimate is, it would be, it was [redacted] people and I was using [redacted] per person as my rough average FTE cost, so a multiple of those two numbers.

Q. [redacted] or so? Does that sound right?

A. Sounds right.

Q. Okay. Now, and is that [redacted] the number that you put in here?

A. Right. What I did was I estimated, I added up all the people and so I came up with this

[REDACTED] for app safety. It was [REDACTED] [REDACTED] [REDACTED] at [REDACTED] a pop, that's [REDACTED]

Q. Got it. All right.

Now, it sounds like these people do a lot more than app review; is that fair?

A. Yes.

Q. And so they do, for instance, you said Play Protect, right?

A. The App Safety row in particular, yes.

Q. But you didn't allocate any portion as the team app review related costs and non-app review related costs of that team, correct?

A. Within the app safety team, no, I did not.

Q. Now, Play Protect, for instance, would continue operating the same way with or without Epic's injunction, right?

A. No.

Q. No. That's fine.

Now, you say here that this is not quite linear about the app safety team, right?

A. Yes, correct.

Q. And that means that you don't think that that number, the [REDACTED] that you think it costs right now, would increase by 20 percent should there be a 20 percent increase in the number of apps to review, right?

A. Correct.

Q. Did you account for that nonlinearity anywhere in your calculations here?

A. Not directly, no.

Q. Did you account for the nonlinearity for any other line items on this chart in paragraph 14 of your declaration when coming up with the total estimate that you came up with?

A. I did not try to break down each, the level of linearity for each of those teams and functions.

Q. So your assumption in making that calculation was complete linearity essentially, right?

A. No. In my final cost of approximately [REDACTED] I'm assuming a certain growth in the overall program. And so it wasn't a 20 percent growth in the apps, it was a 20 percent growth in the overall cost to administer the program.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Got it. And that estimate is separate from the growth in the number of apps, I take it?

A. Yes. I did not attempt to assume any number, particular number of growth in apps.

Q. Okay. The second team or function of the seven that make up the [REDACTED] is Trust & Safety, Android & Play Operations, right?

A. Yes.

Q. And you talk about this in plural these teams, right?

A. It's just the name of the team. It's a single team.

Q. It's a single team. Okay.

And that team is in the Trust & Safety division?

A. Correct.

Q. And the Trust & Safety division is separate from your team, right?

A. Correct.

Q. And the Trust & Safety team is run by Laurie Richardson; is that right?

A. It reports into Laurie. I'm sorry. The Trust & Safety division reports to Laurie, yes, she leads it.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. And I take it that Ms. Richardson and not you would be responsible for the budget for the Trust & Safety, Android & Play team?

A. It would not be my budget, but the funding of trust and safety is a little bit, in the U.S., they have their budget, but there is some level of -- I don't know how you want to call it -- either allocation or distribution based on different product teams outside of trust and safety, so you can think of it as being funded.

So the Android Ecosystem would fund some aspects of trust and safety even though it's a different division.

Q. Okay. But the budget would not be your budget, it would be Ms. Richardson's budget?

A. I think it -- certainly from an accounting perspective it would look like it was coming from under Laurie.

Q. And is it fair to say that Ms. Richardson would be in the best position to estimate any increase in the costs of her team due to an increase in the number of apps to be reviewed or of the load of work that needed to be done?

HIGHLY CONFIDENTIAL - KLEIDERMACHER

trust and safety policy, other Android security engineering, Android framework, Play developer support and Android partner engineering -- all of these folks do things beyond app review, correct?

A. They should be in other ways to the overall trust and safety program, yes.

Q. And when you said that -- when you took the number of FTEs and multiplied it by [REDACTED] a year to come up with the numbers, you did not try to allocate as between their work on app review and other work that they do, correct?

A. What I did is, for the teams that are directly relating -- that only work on trust and safety the program, I allocated all of their FTEs, and that's for the first three rows. I allocated their -- 100 percent of their FTEs for the remaining four rows. I did not allocate 100 percent of the FTEs of those organizations, I allocated a percentage, which I estimated it as the portion -- they do quite different things, including trust and safety, and so I allocated a portion of that team that I felt was a reasonable estimate for their allocation towards the overall trust and safety program.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. Sir, none of that is in your declaration, correct?

A. It's not written here.

Q. Okay. So I need to go through it one by one, unfortunately, because I have no idea by now what you did.

So for app safety --

MR. OLASA: I'm fine with you continuing, but at a good point we need to take a break. We've been going for about an hour and twenty minutes.

MR. EVEN: Okay.

Q. On app safety we said you took 100 percent of the FTEs, multiplied that number by [REDACTED] a year and came up with a number, correct?

A. Correct.

Q. And you did not make any attempt to allocate between work that is app review related by these folks and work on other things which they contribute to the overall safety of Android like Play Protect, for instance, right?

A. Play Protect is included in the estimate.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Q. So that is a yes, you did not try to allocate between work that they do directly on app review and work that they do on other things, correct?

A. I just think the way you're phrasing it is a little confusing to me because Google Play Protect is part of app review.

Q. Google Play Protect, as we discussed earlier today, is something that Android performs on every app installed regardless of source, correct?

A. Correct, but Google Play Protect technology is part of the overall app review program and has -- it works differently based on whether you're sideloading or whether you're talking about Play Protect aspects that are reviewing apps on Play. They're not all one in the same thing.

Q. Sir, all I'm saying is, Play Protect has aspects to it that have nothing to do with app review, correct?

A. I believe 100 percent of Google Play Protect is involved in app review.

Q. That's not what I asked, sir.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

Play Protect is used in multiple places in Android that have nothing to do with app review, correct?

A. Incorrect.

Q. Okay. Play Protect scans, you said today, Play Protect scans every app that is downloaded/sideloaded, for instance, correct?

A. Correct.

Q. And that's not app review, correct?

A. I consider that part of the app review.

Q. You consider that part of the app review?

A. It's review of the app. It is doing app review.

Q. Okay. Sir, the scan for malware of apps that are sideloaded is not going to change based on your offer or your proposal to vet apps on third-party stores, correct?

A. The technology we develop that makes up Play Protect will evolve based on those changes.

Q. Sir, do you really not understand what it means to allocate costs if those costs benefit more than the vetting that you are contemplating here?

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. I -- there are many, many, many aspects of the technology that contributes to app review and safety and I didn't see a simple way to break things up in a different way.

Q. And that is perfectly a fine answer, sir. If you didn't see a simple way and therefore you didn't do it, that's fine. But I need to first understand that you understand what I'm talking about.

You understand that the Play Protect technology is used in the app review of apps to be distributed on Play and in other places on Android, correct?

A. Yes.

Q. And your suggestion is that Play Protect is now going to be extended to review the catalog of apps on third-party stores, correct?

A. Yes.

MR. OLASA: Objection to form.

Q. And that is not going to affect the fact that Play Protect is going to continue to be used in other places on Android, correct?

A. Google Play Protect will continue, the technology will continue to be used in other

HIGHLY CONFIDENTIAL - KLEIDERMACHER

places, correct.

Q. And you've done no attempt to allocate in the [REDACTED] a year that app safety costs between the benefits to the pre-distribution on Play app review and the benefit that inures to other places on Android such as the review of applications that are downloaded from sideloading, from preloaded app store; is that correct?

MR. OLASA: Objection to form.

A. The only method that, to me, was practical to make this estimate was to compute the cost of the trust and safety program, and then look at them in a percentage increase of that overall program, and that's what I did.

Q. Okay.

MR. EVEN: All right. Let's take a break.

THE VIDEOGRAPHER: All right. We are now going off the record at 2:47 p.m. Pacific and this ends Media Unit 4.

(Off the record.)

(Resumed.)

THE VIDEOGRAPHER: We're now going back on the record. The time is 3:01 p.m.

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. So initially I was concerned about the confidential information, and so upon discussing it with counsel, we decided to keep it at the high level in the actual declaration itself.

Q. Okay. Talking about Trust & Safety, Android & Play Policy, that's a team that you say develops and maintains safety policies, right?

A. Yes.

Q. Can you give me an example of what are safety policies that this team develops?

A. Sure. Examples would be the malware policy, the unwanted software policy, policies for what kinds of permissions apps are allowed to request and access.

Q. Are these -- are members of these teams engineers, lawyers; what are they?

A. They tend to be policy analysts. I'm not sure exactly what the official job role is, but most of them are policy experts.

Q. And you envision a 20 percent increase in the number of policy analysts Google would need to write all the new policies pertaining to third-party app stores distributed through Play Store?

HIGHLY CONFIDENTIAL - KLEIDERMACHER

A. That is not my assertion.

Q. What is your assertion that you foresee a need to -- well, what is the assumption -- strike that.

What is the assumption that you made with respect to the increase in cost stemming from the injunction as it pertains to the Trust & Safety, Android & Play Policy group?

A. I didn't allocate a specific -- as I described earlier, I calculated the cost, the annual cost of running the program and that assumed the overall cost might grow 20 percent over time. I did not allocate -- so that turned into [REDACTED] I did not allocate, of that [REDACTED] I did not go through all of these different sections and allocate a portion of that to the [REDACTED]

Q. Got it. You agree with me that some of these line items are going to be more linear than others, correct?

A. Correct.

Q. But you've not drawn that distinction here, you've gone and done one sort of blended price or cost increase across all line items,

HIGHLY CONFIDENTIAL - KLEIDERMACHER

correct?

A. Correct, I did consider that. And after looking through all the different roles and portions of the program, I just didn't -- it didn't -- I found it very difficult to do that in any way that can be explained that I thought made a lot of sense, and so I thought the easiest and most reasonable approach, given the amount of time constraint, was to calculate how much we were spending and assume a 20 percent growth in that.

Q. Okay. What is your educational background?

A. I have a university degree in computer science.

Q. Got it. Do you have any degree in economics or finance or business?

A. I do not.

Q. Google has a lot of people working for it that do have these kind of degrees, correct?

A. Yes.

Q. You mentioned the number [REDACTED] a year, where did you get that number from?

A. So I have seen on occasion, as we've done our annual planning, I've seen estimates for

FTEs, FTE costs, and those estimates obviously range quite widely depending on the role, level, and geography. My [REDACTED] estimate is based on what felt like a reasonable conservative average for the U.S., for which most of these, most of these people are in the U.S. I thought it was a conservative estimate. I've seen higher estimates for average FTEs in these roles, but I felt [REDACTED] was a reasonable conservative estimate.

Q. This is, again, based on your prior experience, it's not based on any document that you've looked at specifically for this, for purposes of this declaration?

A. Correct.

Q. And you certainly have not detailed in your declaration how you came up with that [REDACTED] number, correct?

A. It's just my estimate for a single FTE.

Q. Okay. The next line is Malware Reviewers. Those are the temps that you mentioned, correct?

A. Correct.

Q. And how did you get at [REDACTED] here?

A. I got this pretty directly from Ron. My