# Ex. C to Cramer Declaration

## PUBLIC REDACTED VERSION

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION
Case No. 3:21-md-02981-JD
-----------------------------------------X
IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
Epic Games Inc. V. Google LLC, et al.,
Case No: 3:20-cv-05671-JD

In re Google Play Consumer
Antitrust Litigation,
Case No: 3:20-cv-05761-JD

In re Google Play Developer
Antitrust Litigation,
Case No: 3:20-cv-05792-JD

State of Utah, et al., v.
Google LLC, et al.,
Case No: 3:21-cv-05227-JD
-----------------------------------------X

**HIGHLY CONFIDENTIAL -
UNDER PROTECTIVE ORDER**

VIDEOTAPED DEPOSITION OF VITOR BACCETTI, taken at Morgan, Lewis & Bockius, 101 Park Avenue, New York, Tuesday, July 16, 2024 at 9:02 a.m. Eastern Standard Time, before Dawn Matera, a Certified Shorthand Reporter and Notary Public.

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:02 a.m. EDT on Tuesday, July 16th, 2024. Please note that the microphones are sensitive and may pick up whispering and private conversation. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Vitor Baccetti being taken by counsel here in the matter of in Re Google Play Store Antitrust Litigation filed in the United States District Court for the Northern District of California, San Francisco division. Location of this deposition is Morgan Lewis & Bockius, LLP.

My name is Joe Raguso. I am with Veritext. I am the videographer. The court reporter is Dawn Matera, also with Veritext.

I am not authorized to administer an oath. I am not related

to any party in this action nor am I financially interested in the outcome.

Counsel's appearances will be noted on the stenographic record and the court reporter will now swear in the witness.

V I T O R B A C C E T T I, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MS. MOSKOWITZ:

Q. Good morning.

A. Good morning.

Q. My name is Lauren Moskowitz. I represent Epic in this matter. Can you just state again your full name for the record.

A. Yes, Vitor Baccetti.

Q. And what is your address?

A. [redacted]

Q. Have you ever been deposed before?

A. No.

Q. So there are lots of rules. I

am not going to go through them. I think a couple though to keep in mind is make sure you answer all of my questions audibly, and if you could do your best to wait until I finish my question before beginning your answer and I will try to wait for your answer before I begin my next question so that the record is clear, I would appreciate it; is that okay?

A. Yes.

Q. If at any point you don't understand one of my questions, please ask me to rephrase or clarify and if you do not do that, I will assume you understood the question; is that fair?

A. Yes.

Q. Is there any reason you cannot testify truthfully or accurately today?

A. No.

Q. What did you do to prepare for your deposition today?

A. So beginning of June, I think late May I heard that we need to prepare a response to Epic's injunction, proposed

injunction, so I was approached by our counsel and at the time, with a group of different people, we established a working group. I was a member of this working group and as part of this process I answer a number of questions. And eventually prepared a declaration that we submitted to the Court.

Q. I am going to ask you questions about all of that and leading up to your declaration. For now, sort of following all of that, your declaration went in and you found out you were going to be deposed today. Did you have any meetings to prepare for today's testimony?

A. Yes.

Q. And when were those meetings?

A. We had meetings to prepare for this deposition I believe like last week and maybe the week before.

Q. How many meetings do you recall?

A. I recall four meetings.

Q. Four. And how long approximately were each of those?

the Play console and see metrics, for example, which are effective metadata, they are analytics about the app. So we do have things like that. But I personally cannot think of any example here whether we would be providing to a third party information about an app.

So right now, I cannot think of anything specific that we would provide as such.

Q. Okay. So the next page here there is, at the top Metadata Export. Do you see where I am?

A. I do.

Q. This subsection describes technically how you would go about making -- doing the metadata export; is that right?

A. Yes, it does.

Q. And so paragraph 8, the first sentence there says, "Google would regularly export metadata associated with these apps in its catalog to a server and refresh it on a daily basis."

Do you see that?

A. I do.

Q. And given that this is your proposal, you at least, based on all of the working group discussions, think this is technically feasible to do?

A. Exporting the data to the server is technically feasible. It's quite complex, as reflected in the estimates of time and cost. Talking specifically about feasibility in isolation without other factors, yes, it's feasible.

Q. And Google is proposing to refresh the metadata it sends on a daily basis. How did you arrive at daily?

A. That's a good question. We looked -- as I was discussing with this group about how we would go about implementing such a mechanism, there were a lot of discussions about the complexity and the latency of refreshes would be a key driver for how complex this implementation would be.

Daily would be something that's simpler. However, there may be cases

where another party may want something faster. That's reflected on the cost tables.

If you go to page 8 of my declaration, you see something that says Initial Scoping of Design. Another says Implementation and Launch. And another from the bottom says Mechanism For More Frequent Updates.

The first one, Implementation and Launch, assumes daily refresher which is simpler.

To have something closer to real, quote unquote realtime updates, meaning having updates as they happen in a matter of seconds, minutes, that's what would be covered by this mechanism for more frequent updates, which adds an additional seven software engineers. Two software engineers who were responsible for productivity and testing and one technical program manager.

Going back to your question about daily basis, we did consider these things and we separated given the

complexity and cost of such implementation.

Q. And so, again, separating feasibility from cost to develop, it's technically feasible to do the refreshing more frequently than daily, it would just take more engineering work to get there?

A. More engineering work, more time, more complexity and all of these things.

Q. But technically feasible?

A. Technically feasible. More complex. Yes.

Q. And how often is the Google Play Store metadata about these apps updated in the ordinary course within Google Play?

A. It would have been on the developer. Developers may change, for example, they may choose to update the description of their app. They may change their icon.

Anyway, different things they can do. That depends truly on the developer itself. Developers may list

new things. May remove things from this list. They would happen -- having a daily refresh would mean this information is not synched for a period of time during that day.

So, yes, of course, if you're having a daily refresh, there could be like a period of time when there are some inaccuracies. But we are just calling out that element, since it adds significant complexity to have more frequent updates.

Q. Let me ask a more slightly different question to try to get at what I am asking.

Let's say the developer is on their console making a change to their icon or something, whatever it is. They click submit, something along those lines; is that how that process would generally look at a high level?

A. Yes, generally, yeah.

Q. The time between that send or submit to that appearing in the Google Play Store, how fast does that happen?

A. It would depend sometimes on the specific information. I can see in some cases, if you have a new version, for example, or something, it might be an app review or so on, assuming there is no additional review needed for that, it could be faster.

There is no such thing as instantaneous. But it could be something anyway, I assume within a few minutes or a few hours. I would need to get into discussions with my engineering team just to confirm exactly, but, yes, it would happen at some point.

Q. So just apples to apples, like forget about app review or anything, a change going live in Google Play is happening in the minutes-to-hours zone and it's being proposed to happen on a daily refresh basis on the metadata export, right?

MR. KRAVIS: Object to form.

A. Looking at the specific table, we called out these two options and we actually did cost the feasibility of

doing more frequent updates. So this would be an implementation decision that would need to be done as part of the scoping and all of the discussions.

It's technically feasible to make these things faster.

Q. Understood. And just focus on my question. My question was, what is being proposed is daily refresh, right?

A. That's the baseline, but we did cost the opportunity of making it more frequent than daily.

Q. And is the more frequent in data proposed to be the exact same amount of time as it would take for it to become live in Google Play?

A. It would be very similar.

Q. And that similar would be on the order of minutes to hours, whatever it takes for Google Play?

A. Yes, I would say so. I would need to check and discuss more, but that sounds reasonable.

Q. That same paragraph 8 then talks about what type of metadata or

categories of metadata would be part of that export. Do you see that?

A. Yes.

Q. And there is two categories I want to just sort of break them up. The first category is basic data about the app itself and the second category is basic information provided by the developer about the app, right?

A. Yes.

Q. So that first category, this basic data pertaining to the app itself, you have a parenthetical that has a list of examples following the e.g., right?

A. Yes.

Q. And those examples are app name and package name, developer name, image of app icon and app category; do you see that?

A. I do.

Q. Are those just examples or is that, from your perspective, an exhaustive list of the information that would be provided in this category as part of the metadata export?

paragraph 8, right?

A. I don't see it, no.

Q. Okay. Is that included in your estimate or is it not included in your estimate as a field for the metadata export?

A. I have not personally considered this particular category. We could consider that and I could see some other items being added to this list and our estimates have, I believe that we would assume that some actual things would be there. But I haven't committed to anything specific or made a detailed assessment.

Q. You also say in that same paragraph, second-to-last sentence in that paragraph, that "The export would not include any user data which includes reviews of the apps given by other users."

Do you see that?

A. I do.

Q. Why is Google excluding data like app reviews?

A. I would say specifically user data, that's like the key message that we say in the sentence. I believe that users may be surprised to have information like this shared with another party. I am not positive that if we have the authorization to share this information with a third party, either.

So the example here is app reviews, but I would consider it more broadly data provided by users concerning a specific app.

Q. And I am specifically asking for now about app reviews. Why not provide app reviews?

A. Reading the language in the proposed injunction and so on, I interpreted it as information provided by the developer. App reviews are not information provided by the developer. This is information provided by Google on our store by users engaged with our store. So I don't see that information as being in scope.

Q. So from your perspective, the

reason to exclude app reviews is because you didn't think it was something expressly called for by the proposed injunction?

A. I would focus on user's expectations and our ability to share this in addition to like what's required.

I would be -- personally as a user I would be surprised to see my data being exported to another party. And I am not sure in terms of service or so on even allows that kind of thing.

Q. Google maintains complete control of its terms of service?

A. I am not the expert on terms of service. I would refer that to internal counsel or so on. But I believe we control the terms of service.

Q. So you could change the terms of service to give users notice that their app reviews could be shared to or exported to third-party app stores, right?

MR. KRAVIS: Object to form.

A. One, I am not in a position to

say if we could do that. And, two, I believe they would need to consider if such change would require, for example, for users to agree to these terms.

So there is quite a bit of complexity, particularly as we think about different privacy regulations or so on. So I would not speculate on whether it would be required to change or if these changes would be able to be made.

Q. All right. So separate from what you are calling user expectation, and focusing on your review of the injunction, and not thinking that that was called for, what is your understanding of what the goal is of the information that's being exported under your proposed metadata export?

MR. KRAVIS: Objection to form.

A. I would go back to the title of this section, which is Catalog Access. A catalog I see as information provided to the developer by Google. I believe that is, I believe the critical distinction here.

User data or information that Google generates about this app or -- does not seem to be part of what I consider as a catalog.

Q. Why is the catalog in your mind only information provided by a developer as opposed to information about the product?

A. I will make an analogy to a physical catalog, for example, from a store or for like cosmetics, I don't know, Avon or something along these lines. Like that information is information that the person, the company that builds the -- produces the specific items adds there. I would not see what people think about this specific product there to be an inherent part of the catalog. I see these things as quite separate.

Q. Have you done any online shopping lately?

A. Yes.

Q. Amazon, for example?

A. Yes.

Q. Isn't one of the prominent pieces of information when you click on an item the number of stars and the number of reviews that it has gotten by purchasers?

MR. KRAVIS: Object to form.

A. I think that's a different question, though, if that's part of the catalog or not.

Q. A separate issue. When you online shop and you're looking at a product to potentially buy, do you or do you not see prominently featured star number with a number of reviews that it has gotten?

A. It's included in the page.

Q. It's included in the product page itself, when you click on an item, right?

MR. KRAVIS: Object to form.

A. It may be. It's hard to say without looking at a specific example.

Q. But in your mind, looking through a catalog of products, it is not part of what you would expect the

experience to be to see what other purchasers of that product have reviewed or thought of that product?

MR. KRAVIS: Object to form.

A. I may see that information on that page. I think that's as far as I can say. I cannot speculate if that's a catalog or not. I think that's a completely different question.

Q. You talked about user expectations a bit. Don't you think user expectations are to see, not just the name of the app and not just the icon of the app, but reviews of the app?

MR. KRAVIS: Object to form.

A. I would say the catalog access is part of a solution. I believe that we are obligated to provide some information. How that information is used, what another store does, that's not in control of Google. And, yes, I think they are free to show whatever, whatever information that would be relevant there.

My statement relates to the fact that we see and I interpret a

that it obtains from third parties as part of this export to third-party stores?

MR. KRAVIS: Object to form.

A. I believe that we need to do more work. This type of detail would be covered in the scoping discussion that we have in the cost estimates. It's not data provided by the developer.

Q. Well, that's not what this says. This says the export would exclude data generated by Google like auto translations, age ratings and install counts; do you see where I am?

A. Yes.

Q. Has a decision been made to exclude that data?

A. My preliminary answer in the declaration would exclude this data given the fact that we may not be allowed to share. However, to have a final answer, I need to do more work.

Q. So none of these are a final answer as to what it would exclude?

A. I believe we were aware of the

principles, we are not sharing age rating data, we are not sharing data generated by Google, I believe that gives a general idea. We need to look at each one individually so the response may change.

Q. And age ratings I think you said were not generated by Google. It was obtained by Google by a third party; is that what your testimony was?

A. I believe so. However, for full transparency this is a very complex area. The age ratings may depend on a lot of different geographies. So there is a quite a bit of nuance and I would need to consult with other people to have a final answer on this one.

Q. Whose idea was it to exclude data related to age ratings?

A. I discussed this with the group, with the working group that we had, and I heard in the group that that information was, we did not have an authorization to share. However, that's something that would require more diligence and so on.

Q. What about install counts, whose idea was it to exclude install counts?

A. I would say the install counts get back to the specific data generated by Google. That information would be excluded for that purpose.

Q. Just listen to my question. Whose idea was it to exclude install counts from the data that would be exported?

A. I discussed this in the working group. It clearly falls into data generated by Google since this is not provided by the developer. This is not provided by the user. And since we are separating different sections, different groups of data, I include it in my declaration.

Q. So was it your decision to create this data generated by Google category and to exclude it?

A. I need to refresh my memory. I don't recall exactly how it happen. It may have been something discussed with

have to Google, to Google's business, to users, et cetera, and I am mentioning this as another example of something that I do not see meeting the definition of an app store and the impact it would have to our business in the broader ecosystem.

Q. Let's look at 24, you talk about the app store and really it's the top of page 6, as you pointed out before the requirement that the app store forbid malware, pirated or unlocked apps and other illegal content. Let's start there. Do you see where I am?

A. I do.

Q. What do you mean by the illegal content, separate from malware, pirated or unlocked apps?

A. This would be something subject to legal review, et cetera. But for example, I am thinking here some contents may be illegal in different countries. For example, gambling. Gambling apps may not be legal in different jurisdictions. So having a process for which this could be assessed, I think that would be

important.

I am sure I could think of hundreds of categories of like illegal content. We think it's important for the policies in the store to take that into account and I also think users would agree with that.

Q. And when you say -- I'm going to sneeze at some point, maybe -- when you say that the stores, you expect them to have policies to prevent these things, are you saying that it's enough to have a policy against these things or that they have to have a perfect record of never letting any of these things through?

A. So what I say here is that they have a requirement that they forbid and they have review procedures in place to enforce. The specifics of how we would think about the review procedures and that enforcement, that is something that would be subject to much more detailed analysis. So there is an expectation that there is a process to review these things.

I am not saying here that we -- that it needs to be perfect; however, there is an expectation that this is something that would be worked on the details of how well this process works, et cetera, like the level of accuracy and so on, these would be things that we should consider as part of the detailed scoping exercise.

And I believe we have quite a few people working on that proposal for that reason, since it's quite complex.

Q. And so your intent is to have Google employees reviewing and vetting the third-party app store's policies and their systems in place, and how many employees they have and all of their infrastructure about how they are going to go about reviewing their own catalog as part of allowing them into even getting catalog access?

A. To have access to Google catalogs of apps, we are considering the implication of that to user safety, to our own brand, to our business and so on.

And having a solid process to review apps, to keep enforced, to keep that on an ongoing basis, we see that as a fundamental responsibility and would have a detrimental effect to all these other factors that I mentioned. So, yes, I think it's very important if they want to have access to this data.

Q. And so is that going to be -- well, let's look at the chart. Tell me where in the chart the folks that are going to be involved in vetting their policies and procedures, their app review processes and all of the things that we just talked about are involved in making sure that you think that they are sufficiently robust in how they are forbidding malware, pirated or unlocked apps and other illegal content?

A. Yes. So first on page 8 we have the Implementation and Launch, we have one legal counsel, two policy and program manager, one technical program manager and one software engineer for TOS, DDA and other policies. So that's a

A. I would say that there is another feature that implements this capability; however, the implementation of that feature and the implementation of the remedy for catalog access may be different or likely to be different. And so I want to make sure that it's clear it's not a matter of just it's already done. The catalog access piece is not done. There is significant work to happen there.

Q. I have no doubt that it's not done. I am saying that there are components, would you agree, components of what it would take to create a user interface for catalog access that at least overlaps, in part, with work that has already been done, either for Alley Oop or for the in-line installation program?

A. I want to be very mindful of the word "overlap." From a user perspective, there are features that behave in such a way.

However, it doesn't mean that

we can actually use as a component or code that was built is reusable in a way that's simple. Often, code is not built that way and it may require additional work.

So I want to be careful when we talk about overlap, that it doesn't mean that we can reuse the code because it's often not the case.

Q. So separate from being able to copy and paste, which I understand, are you saying that you're starting from scratch or can you at least reuse, in part, some of the code or the work that was done to arrive at a solution for any of those problems that you already solved for Alley Oop or for in-line installation in connection with putting it together for catalog access?

A. One, I don't want to speculate on the specifics since that's an implementation decision that will need to be discussed with the engineering team. Some may be reusable, unclear. Often it's not reusable and there are pieces

that need to be done differently. I discussed with our engineering team and the estimate that I received was reflected on the table. It may consider a certain level of reuse of code, but it still requires all the time that we are calling out on the table.

Q. So that's my question. Does your estimates include reusing anything or does it assume starting from scratch on everything, and if you don't know because it was given to you by someone else, you can say that, too?

A. So I talked to these folks. There is some pieces that could be reused and it's still, all this time, they were saying it's a lot of work that needs to be happening.

Q. Who said things can be reused, and what did they say can be reused?

A. That was part of the discussion of the working group. I relied on the advice of different parties of this working group. However, I wanted to remind us here that the working group, it

yes, somebody quite important.

Q. Anyone else more senior that you would expect to decide on this?

A. I believe that Mr. Bright would be the proper person.

Q. You say that in, in 21 you talk about an example where the third-party store may have already obtained the metadata from the export before the developer clicked opt-out, if they intended to. And you said there would be no way for Google to clawback the metadata, right?

A. Yes.

Q. Couldn't Google design a mechanism to claw it back?

A. Specifically, under a solution you're providing a database for another party. They would get this database. They would sync it to their own database and have a copy. And, eventually, on a daily basis on that page proposal or through a mechanism that updates more frequently, this data will be updated so they remain synced.

We don't have any mechanism to control if the other party has actually made a copy of that information and stored it locally. So even though Google in the new versions remove that data, there is no programmatic way for us to know if a copy was made in that case. We can mitigate that partially, that's why we talk about terms of use and terms of service. In that case, we can say you cannot use this data anymore, et cetera.

Q. Right.

A. From a technical perspective we cannot get that data that was already given.

Q. But you could have terms of service that mandates that they not use that old data or that they replace that old data with the new export. You could have all of those in your terms of service. Is that correct?

A. We could have that in terms of service, yes.

Q. You would expect that you would, in fact, have that in your terms

of service, right?

A. I would recommend that, yes.

Q. So in order for this to be an actual problem you would have to assume that the third-party app store is going to intentionally violate Google's terms of service and the app developer's consent?

A. Yes, in this case they would need to violate the terms of service and our enforcement mechanisms, if they didn't catch this, that's the risk, among other risks of an opt-out model.

Q. But specifically about this risk, this risk is mitigated by the terms of service unless you assume that these third-party app stores are going to intentionally violate those terms of service and expressly ignore the developer's decision to opt-out?

A. Yes, this impact would arise if they are ignoring these terms of service.

Q. Did you do any analysis to understand the likelihood of a third-party app store actually doing

saying that Google had affirmatively blocked competition by other app stores on Android, right?

A. I can only comment on the specific pieces that I have prepared. What I have read, as mentioned, I read the proposed injunction, I read the remedies, et cetera. I don't have enough information to get into the merits of the case and all of the arguments that were made at trial.

However, as I am thinking about this response, I am thinking very carefully about the impact of any proposed remedies to the developer's ecosystem and the viability and impact on their business. And in these assessments we have identified that a program that does not ask developers whether they want to affirmatively participate could have negative consequences there.

Q. I am trying to understand that, these are all separate from technical feasibility, would you agree with that? This is a policy decision that you are

making about concerns for developers, right, this is not a technical issue, agreed?

A. Let me think for a second here. Yes, looking at purely technical, both options are feasible and have different, but like likely in complexity, the time and so on, I believe, should be somewhat similar. However, these developer implications are very important. It's not only about could we, but I believe it's more should we consider this, given the potential impact to developers.

Q. What I am asking is given that you agree it's a policy decision, what I am saying is you made the policy choice to put the risk to developers, as you perceive it, over the risk that competition is never actually opened up because these app stores could never, in fact, get the catalog access that this injunction is designed to give them?

A. I would not say I made a choice. I made a recommendation, given my experience and the experience of

multiple people in the working group, regarding the impact to developer business and how they manage their distribution in different channels. The fact that they have sublicensed IP, and so on.

So my strong recommendation on this case, this is one. I believe it's not up to me or anyone in this room to decide what's actually is going to be implemented here.

Q. Well, has it been escalated beyond you or are you the only one who has ever recommended opt-out?

A. As I mentioned, that's my recommendation. I am not the final decision-maker. And the specifics of this proposal, et cetera, would be eventually, if needed, discussed with other people.

Q. Do you think whoever the decision-maker is should factor in the whole reason why we are here, and the conduct that was found to be anticompetitive and the spirit behind

that, violating intentionally your terms of service?

A. I believe given how unprecedented this whole remedy is, I am not sure how we would go about making such an analysis. However, I think it's important for us to call out the possibilities and what could arise here.

Q. But also under this scenario, you're contemplating not only an intentional violation of terms of service and an intentional ignoring of a developer's opt-out but you're also assuming that the third-party store would be intentionally keeping an app listed for download that Google Play would refuse to install and would break the user flow; aren't you?

A. I believe it's important to consider --

Q. I do want an answer to that question, before you tell me what it's important to consider.

A. So I am assuming here that developers, and there are bad actors out

there, can ignore terms of service and do something that is not necessarily what they agreed to do. That's what I am assuming here, and I am considering what are the consequences. At the same time I am also thinking about mitigation. So, for example, refusing to fulfill some of these requests is one way to mitigate this risk.

Q. Not only a way to mitigate it. Google would affirmatively refuse to install an app through all of those background checks you talked about, refuse to install an app that the developer had said I don't consent?

A. Yes, we would refuse in this case as proposed.

Q. Okay. So in this hypothetical scenario where this third-party app store said screw it, I don't care that I am not allowed to show this, I am still going to show it, it's setting the user up for failure because Google Play is not going to fulfill that download, right?

A. In that case we would not

fulfill that download, that's accurate.

Q. Do you think that's a logical thing for an app store to want to do, to present an app that when the user goes to click on it, it's going to get a pop-up that says this is not even available for you. That's not a very good user experience for the customers of that third-party app store, right?

A. I believe that we need to balance here, too, the developer intention and developer choices. So I believe in this case if the developer said I do not want my app distributed to this channel, you should take actions to that. And in this case, it may have an impact on the user journey. However, I think as a platform we are thinking about this as a whole it seems to be in the right balance.

Q. I am asking a different question. I am asking do you really think that it's in the third-party app store's interest such that they would actually do that, that even after consent

A. Yes, I have worked -- these projects that I mentioned tend to be lighter on the compliance piece, but I have worked on several projects relating to compliance to different regulations. I'm thinking of GMPR. So there have been different processes that I have been involved in some of these more regulatory aspects that take quite a bit of work. Specifically, the charging model. I did talk to people in the working group which worked close to how we charge developers and how we process payments. Specifically, Paul Cooper has a lot of experience in the space. So these estimates also rely on his expertise in this area.

Q. Let's quickly tick through the chart so I can understand where you think your experience was directly relevant as opposed to where you leaned on other members of the working group list.

I am going to skip initial scope and design for a minute. Let's talk about implementation and launch.

Is that in whole or in part coming from your own experience or were you relying on working group participants to help you there?

A. I would say all of these rely on my experience. I have received a little bit more input on the data sync and consent from colleagues working on the Play Console. However, I have shipped myself features in the Play Console in the past.

Q. What about mechanism for more frequent updates?

A. That one I would say is based on more of my own experience and working with other teams.

Q. Onboarding of stores?

A. Onboarding of stores that would also I say relies to my own personal feelings.

Q. Charging model I think we just talked about, mostly. Mr. Cooper?

A. Yes, Mr. Cooper had a significant role there.

Q. Policy enforcement?

A. Policy enforcement, these elements I have relied on Bethel's team on trust and safety and policy review.
Q. Is that also true for the next bucket, ongoing maintenance and policy enforcement support?
A. I would say the software liability engineer and the people working on infrastructure, that relies on my own personal experience. The trust and safety, that relies on the input from the trust and safety team.
Q. Bethel, et al?
A. Yes.
Q. In terms of -- you mentioned that you had done some work within the developer console previously.
A. Yes.
Q. Were any of the projects that you're aware of, in terms of making changes to the developer console or otherwise, did any of those feed into already done, such that we can lower our estimate because we can stand on the shoulders of those developments?

engineers for implementing and launching data synch and developer consent.

Q. Yup.

A. When we passed these tables to Mr. Cramer to prepare the declaration in terms of costs, there is a range. The upper bound of that range reflects the additional 30 percent of costs. That's what we have here.

Q. That's what I want to understand. Separate from what Mr. Cramer did from the dollars and cents side. Let's take the example you gave, six software engineers, six to nine months?

A. Yes. And let me clarify one element. Apologies. The six to nine months accounts for, we add on top of that this 30 percent. So it would be six to nine months and on top of this we add 30 percent.

Q. So the six to nine months isn't a lower months that's already been moved up?

A. No, this is, we already added

that and on top of that we add the 30 percent, if that makes sense.

Q. Nope, sorry. You said we already added that. So let's just talk about six to nine months for six software engineers. Let me just ask a basic question. Is there any buffer built into the six to nine months at all?

A. The 30 percent buffer is not included in the six to nine months. You would add the 30 percent on top of the six to nine.

Q. Okay. And is there any buffer built into the six software engineers?

A. No.

Q. So nothing in your charts have any buffer built in at all?

A. At the chart, no. We add the buffer on top of the chart.

Q. Christian Cramer's declaration is the only declaration that did any addition of any buffer?

A. For the cost, yes. We did contract for the 30 percent increase in terms of the time for here when we say,

if you look at paragraph 36, I say it would take 12 to 16 months.

This would account for three months of initial scoping plus six to nine. These things can run in parallel, so that would be 9 to 12. So the 12 percent piece is that 9 to 12. And the 16 is 30 percent on top of that.

Q. Okay. But in terms of your understanding, did that 12 to 16 months, get used by Mr. Cramer to quantify in any way?

A. I believe so, yes. We passed the same buffers and they have used the buffers to calculate the cost, and so on.

MS. MOSKOWITZ: So let's look at it. Let's look at Cramer. I just want to make sure that I am understanding.

I am going to hand you what I am going to mark as Exhibit 9009.

(Exhibit 9009, Mr. Cramer's declaration, was so marked for identification, as of this date.)

Q. Do you recognize this as

right?

A. Yes, they should match.

Q. And so what I am looking at, if you look at the sort of bottom he gives them aggregated numbers but he does not do any math unless you can tell me where on the 12 to 16-month overall timeline, that's what I just want to understand where I would look for that?

A. I believe it would be, if you look at page 4, you have the aggregate plus 20, aggregate plus 30 on the bottom.

Q. Yes.

A. I believe that's where the buffer is accounted for.

Q. Okay. That's fine. So that's a buffer on the total dollars?

A. Yes.

Q. Not so much on the 12 to 16 month --

A. Yes. The 12 to 16 month is accounted on my declaration on top of the numbers there. If that makes sense.

Q. Okay. So in terms of any multiplication by any 20 or 30 percent,

the only place it happens that translates into dollars is Mr. Cramer's declaration?

A. I believe so, yes.

Q. I think I understand. Let's look then at a couple more specific -- let me withdraw that and just go back to that buffer for a second.

Have you been involved in any projects that did not include a 20 to 30 percent buffer?

A. Sometimes, yes, there are projects that did not account. The 20 to 30 percent is -- comes based on my personal experience of projects that were budgeted too conservatively and ended up encountering this type of delay. So for that reason I am accounting explicitly for this type of buffer.

Q. Was the buffer range or concept discussed in the working group or is that something that you just drew upon your own experience to include?

A. That was based on my experience. I did discuss with Mr. Paul Cooper, who as a program manager, has

done many projects as such and he agreed with the same range.

Q. And I think you somewhere in here decided that rather than 20 to 30, you think 30 is appropriate? Let's look at paragraph 35, I found it, the last sentence.

A. I believe that I assume 30 percent on top, yes, for simplicity here.

Q. But in terms of your application, you didn't apply, other than the file 12 to 16 month?

A. Yes, I applied this on the timelines. Not on the estimates of time on the table and for individual items or the individual number of engineers or other people in each row.

Q. Let's go back to the chart, starting on page 8, the initial scoping and design. We've talked about them a few times. It sounds like they are, basically, going to be touching everything a little bit?

A. Yes. Yes, they would be touching a lot of different elements

example, any relevant fees or any relevant policies. This needs to be a clear example of something that it does not look like an app store, since there is only a single title that is downloading. And I think that's one example that without catalog access would need different terms to prevent.

Q. But that launcher would not also pass the eligibility criteria for catalog access?

A. I am saying let's say that, let's say for the sake of the argument that we are not getting catalog access, you are not getting catalog access but would still need access for this case to call out launcher package, which does not seem like a store from a user perspective. And they seem to be effectively trying to circumvent policies from the Play Store.

Q. I am not saying absent catalog access, you would need no eligibility criteria or you think it's appropriate.

I am trying to understand

sitting here right now is there any eligibility criteria that you would say, okay, I don't need this for catalog access but I do need this for third-party store distribution through Google Play; do you understand what I am asking?

A. I do. I think the amount of work that you would need to look at these policies. As I have mentioned we have done initial scoping to understand. It's virtually impossible for me to say right now that all of these criterias and say conclusively we can have a single one. I would not be surprised to have different criterias and having a different criteria and have the need to have two separate elements. And I would prefer at this stage to keep these two things separate.

Q. Would you be, would you view it as appropriate to put any content restrictions, not illegality, but like content restrictions where just Google doesn't think it's appropriate to have certain types of things, even though they are not illegal, in the Google Play

Store, would you apply such a policy for distributing third-party stores through the Google Play Store?

MR. KRAVIS: Object to form.

A. I would defer that to our policy teams, or so on. I believe the relevant reasons to have policies against objectionable content and that could have implications in our business. I would defer that to the policy experts as it's not for me to speculate on these matters.

Q. So that hasn't been decided yet?

A. No.

Q. In terms of the launcher issue that you mention in paragraph 41 and mentioned just a few moments ago, is the real concern there evasion of Google's 30 percent fee?

A. That's one of the many terms of service. Developer distribution agreement terms. But there are many other terms. I could see the same concern applying, for example, for some with objectionable content. Let's say

that you have a launcher for a pornographic app. So I could see the same concern applying here, you are using a launcher in a way to avoid some term that is available there.

Q. And what's your issue with a launcher that in turn launches a pornographic app, is your concern the Play brand or something else?

A. On the, one, starting from the point that we have reasons to have restrictions against different types of content. So let's start from there. Pornographic content being one of these. Or highly violent content being another one. So you can think of many categories that fall into that group. From a user perspective and how do they download, that immediately downloads another app and it only downloads one app in access launcher. It seems like it's effectively very similar.

So I can see a direct impact to our brand, so advertisers, concerns about people using their store and seeing this