# EXHIBIT A

Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20001
Telephone: (202) 637-5600

*Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Lauren N. Beck
lauren.beck@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. #336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**[PROPOSED] SUPPLEMENTAL BRIEF IN SUPPORT OF GOOGLE'S PROFFER REGARDING EPIC'S PROPOSED REMEDIES**<br><br>Judge: Hon. James Donato |

Google respectfully submits this supplemental brief in support of its proffer regarding Epic's proposed remedies. The sole purpose of this brief is to draw the Court's attention to several critical issues presented by the deposition testimony of Epic's remedy experts, Professor Michael Ernst and Professor James Mickens, which should be considered along with Google's and Epic's respective submissions on certain of Epic's proposed remedies. Pursuant to the Court's scheduling order, those depositions were taken last week, and so there is no other filing that would allow Google to bring the issues raised by these depositions to the Court's attention. Google's counsel and its declarants will be prepared to respond fully to Epic's response to Google's proffer at the hearing on August 14.

The deposition testimony of Epic's experts highlights several flaws in Epic's response to Google's proffer. First, the testimony of Professors Ernst and Mickens makes clear that the proposed remedies of catalog access and distribution of third party app stores would place the Court into the role of central planner and redesigner of the Play store's business. Second, Professor Ernst's testimony completely undermines Epic's contention that the proposed remedies discussed in Google's proffer could be "implemented" in a few months. Third, Professor Ernst's testimony confirms that his cost estimates do not include numerous tasks that Professor Ernst dismissed as "nontechnical." Finally, Professor Mickens disagreed with Epic's position that Google should not be permitted to review apps in the catalogs of third party app stores distributed through the Play store.

A.   **Epic's experts confirm that the Court would play the role of central planner.**

The testimony of Epic's experts confirms that the remedies of catalog access and distribution of third party app stores would require the Court to rule on complicated implementation details that are not discussed in Epic's proposed injunction based on standards that do not actually appear in the proposed injunction, both now and in the future.

*1. Definition of "app store."*   In its response to Google's proffer, Epic argued that "Google should not impose eligibility criteria on app stores" for distribution through Play. Epic's Response to Google's Proffer Regarding Epic's Proposed Injunction ("Resp.") at 21; *see also id.* at 6

-1-

[PROPOSED] SUPPLEMENTAL BRIEF ISO GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

(arguing that "imposing eligibility criteria on stores participating in catalog access would limit the effectiveness of the remedy").  The testimony of Epic's experts does not support that position.

Both experts acknowledged that requiring Google to distribute through Play any app with installer capabilities that calls itself an app store would allow any developer to evade the Play store's content policies and service fees using a "launcher."  A launcher is an application that simply installs another app on a user's device.  As Google explained in its proffer, *see* Google's Proffer Regarding Epic's Proposed Injunction at 22–23, Epic's proposed injunction could be understood to require Google to treat every launcher as an app store.  If (as Epic has proposed) Google is unable to apply a definition of "app store" or other eligibility criteria to this remedy, then any developer would be able to avoid Google's content policies and service fees simply by distributing its app through a launcher.

For example, Professor Ernst agreed that the proposed injunction would require Google to distribute through the Play store a launcher with the sole purpose of installing a pornography app, or a launcher with the sole purpose of installing a hate speech app, notwithstanding Play store policies prohibiting the direct distribution of such apps in the Play store.  Exhibit 1 to Kravis Declaration, Excerpts of Deposition Transcript of Prof. Michael Ernst ("Ernst Tr.") 298:18–302:24.  Professor Ernst testified that he could not think of a single Play store content moderation policy that could **not** be evaded by this "launcher" solution.  *Id.* at 303:20–304:8.  In addition, Professors Ernst and Mickens both acknowledged that developers could evade Google's service fees by distributing their apps through launchers.  *Cf. id.* at 294:21–298:17; Exhibit 2 to Kravis Declaration, Excerpts of Deposition Transcript of Prof. James Mickens ("Mickens Tr.") 232:21–233:2.  And Professor Mickens admitted that this launcher issue could have security implications for Android users, because users could see a significant increase in the number of installer apps on their devices, and these apps have "powerful abilities to corrupt the user's devices."  Mickens Tr. 233:13-17; *id.* at 238:11–242:10.

However, Epic's experts declined to offer a solution to this problem with Epic's proposed injunction.  Professor Mickens testified that the definition of "app store" for purposes of the injunction is a "complex landscape that…has a lot of interplay between…legal and economic

issues," and so "the judge needs to hear from economists and lawyers to think about…what the implications are for some particular definition." Mickens Tr. 240:8-18. He further testified that the "ideal" definition would distinguish between legitimate app stores (e.g. an independent games store with a small catalog of games) on the one hand and abusive launchers on the other, even though he himself could not identify a definition of "app store" that would accomplish this task. *Id.* at 139:5–142:17.

Professor Ernst acknowledged the launcher problem discussed above. Ernst Tr. 294:21–304:8. Professor Ernst also testified (contrary to Epic's position in its response) that Google should be permitted to refuse to distribute third-party app stores "that traffic in illegal content." *Id.* at 290:16–292:5. However, he declined to offer an opinion on the standard that should appear in the injunction, calling this a "policy question." *Id.* at 261:19–262:21.

Thus, Epic's experts appear to disagree with Epic's position that neither the injunction nor Google should set eligibility criteria for "app stores" seeking catalog access or distribution through the Play store. This "complex" policy issue is not discussed in Dr. Bernheim's report, or Epic's response to Google's proffer, or the declarations of Prof. Ernst or Prof. Mickens, and would presumably be left to the Court.

*2. Standard for implementation of catalog access.* Professor Ernst opined that Google should be required to implement catalog access so that the experience of searching, browsing, and viewing apps in third party app stores is "equally effective" to the experience offered by the Play store. Ernst Decl. ¶¶ 33, 34, 40. Those words do not appear in Epic's proposed injunction or in the report prepared by Dr. Bernheim analyzing the proposed injunction. At his deposition, Professor Ernst testified that he created the "equally effective" standard based on his interpretation of the "spirit of the proposed injunction." Ernst Tr. 76:7-14. Professor Ernst testified that his "equally effective" standard would require Google to provide third party app stores with the average rating and total downloads for each app, based on his own experience downloading apps from app stores as well as the experience of "anyone [he's] talked to." *Id.* at 79:17–80:17. Professor Ernst declined to opine whether the "equally effective" standard should also require Google, for example, to provide third party app stores with every individual review of

every app in the Play catalog, calling this a "policy question" presumably to be resolved by the Court. *Id.* at 80:25–81:13. Professor Ernst's repeated references to implementation requirements based on his understanding of the "spirit of the injunction" only serve to highlight that these remedies are both inappropriate and fail the requirement that an injunction be specific and definite enough to put parties on notice of what conduct is prohibited. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086–87 (9th Cir. 2004) (noting that Rule 65(d) reflects the "basic principle" that "those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits") (quotation and citation omitted); *Union Pac. R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (injunction must be "sufficiently precise" such that the defendant "receive[s] fair and precisely drawn notice of what [it] actually prohibits" in order to avoid "uncertainty and confusion." (quotation and citations omitted)).

  *3. Standard for evaluating installation flows.* Professors Ernst and Mickens also appeared to disagree on the standards to be applied to the installation flows for the catalog access and third party app store distribution remedies. Professor Mickens testified that Google should be required to create a customizable install screen that would allow the third party app store to add its own "flair" to the screen (a requirement that appears *nowhere* in the proposed injunction). Mickens Tr. 351:9–352:14 (the transcript refers to this, in error, as "flare"). By contrast, Professor Ernst testified that a Google-generated user interface would be "perfectly acceptable" in terms of his design, Ernst Tr. 151:4–152:11, and Professor Ernst did not calculate cost estimates for designing Professor Mickens' proposed customizable install screen.

  Similarly, Professor Mickens testified that, in order to ensure "parity" between the installation experiences in the Play store and in third party app stores distributed through the Play store, Google could be required to create a universal install screen for all app stores, which developers could customize and which would include a Google-controlled install button. Mickens Tr. 189:19–199:2 (the transcript refers to "parity," in error, as "parody"). Again, this proposal appears nowhere in the proposed injunction. And Professor Mickens acknowledged that the costs associated with creating such a universal install screen do not appear in Professor Ernst's declaration and have not been estimated by either party. *Id.* at 199:7-12. Here again, the approval

of Google's proposed implementation of the installation flows for catalog access and distribution of third party app stores would apparently be decided by the Court.

*4. Future implementation issues.*  Finally, Professor Ernst agreed that, based on his experience as a software engineer, "additional - - implementation decisions tend to arise as a project is being implemented." Ernst Tr. 156:24–157:6.  As Professor Ernst explained it, "you often learn more about a project as you implement it," and so Professor Ernst agreed "you have to kind of make decisions along the way." *Id.* at 157:5-10.  Professor Ernst agreed that "there are going to be…different new discoveries along the road," and "someone is going to have to make a choice about how to deal with those implementation decisions as they arise along the way." *Id.* at 157:11–158:20.  Based on Epic's numerous disagreements with Google's proposed implementation of catalog access and distribution of third party app stores in its proffer (and on the further implementation disagreements between Epic's own experts), it appears likely that those implementation decisions will be left to the Court to resolve issue by issue.

### B. Professor Ernst contradicts Epic's implementation times for the proposed remedies.

Epic's response to Google's proffer states that "Google could implement catalog access in 2-3 months." Resp. 12 (citing Ernst Decl. ¶¶ 59-60).  At his deposition, Professor Ernst testified it would actually take more like 6 ½ to 7 ½ months to make catalog access generally available to third party app stores.  Professor Ernst explained that the 2-3 month timeframe set forth in Epic's response reflects the time that he believes Google would need to have the catalog access program ready to be "roll[ed] out" to a few select participants for field testing.  Ernst Tr. 212:6-15.  Professor Ernst testified that he "agree[d] with [Google's] concerns about the need…to do sort of in-field testing." *Id.* at 209:8-22; 212:16–213:19.  Professor Mickens's testimony further reinforced the need for field testing.  He confirmed that changes to software can introduce security risks and that testing product changes is a common way to account for these security risks.  Mickens Tr. 68:11-13.

Professor Ernst testified that Google could perform field testing of catalog access simultaneously with the next round of field testing for the Android operating system initiated after

1  catalog access is ready.  Ernst Tr. 209:8-22.  As Professor Ernst put it, "there is a release leaving the station every three months, or more often.  And you just see which one's window you fit into, and then you get on to that release train."  *Id.* at 213:10-14.  Professor Ernst agreed that this is "totally standard practice."  *Id.* at 213:3-4.

In connection with his declaration, Professor Ernst did not provide an estimate for the time necessary for Google to perform the field testing required to release catalog access to the general public.  Ernst Tr. 213:20-25.  At his deposition, he testified that such testing might require an additional four and a half months (on top of the 2-3 months in Epic's estimate) with the caveat "don't hold me to it."  *Id.* at 214:2-11.  Professor Ernst testified that the same is true for his implementation time estimates for library porting and distribution of third party app stores—these estimates reflect only the time necessary to get the product ready for the next rollout to begin field testing.  *Id.* at 336:22–338:12.

To be clear—Google disagrees with Professor Ernst's time estimates, and Google's declarants will be present on August 14 to explain why.  But Professor Ernst's deposition testimony makes clear that even those estimates do not include the time necessary for field testing prior to release to the general public.

C. **Professor Ernst's estimates do not include numerous costs.**

Epic's response relies on Dr. Ernst's estimates for Google's costs to implement catalog access, library porting, and distribution of third party app stores.  At his deposition, Professor Ernst testified that these estimates do not include numerous costs associated with these remedies because he viewed those costs as "nontechnical" and therefore beyond the scope of his analysis.  Professor Ernst excluded from his estimates as "non-technical" the following costs:  (1) amending the Developer Distribution Agreement to permit catalog access, Ernst Tr. 252:3-21; (2) drafting terms of service and enforcing those terms of service for catalog access, *id.* at 252:23–253:14; (3) drafting and enforcing eligibility criteria for catalog access, *id.* at 254:4-21; (4) drafting and enforcing eligibility criteria for distribution of third party app stores, *id.* at 261:19–263:9; and (5) drafting, implementing, and enforcing changes to Play store policies to accommodate distribution of third party app stores, *id.* at 273:16–274:11.  In addition, Professor

Ernst's cost estimates do not include the work necessary to build and implement charging models for catalog access and distribution of third party app stores, since he assumed that Google would be ordered to provide these services for free. *Id.* at 253:18–254:3, 263:10–264:11. For these tasks, Epic has submitted no evidence to contradict Google's cost estimates.

        **D.**      **Prof. Mickens disagrees with Epic's position that Google should not be permitted to review apps on third-party stores distributed by the Google Play store.**

Epic's response to Google's proffer states that "Google's proposal to vet all apps on third-party stores [distributed through the Play store] is inappropriate." Resp. 19. But Prof. Mickens' testimony confirms otherwise.

*First*, Prof. Mickens admitted that pre-distribution app review (*i.e.* the review of apps before they are distributed to users) provides an additional layer of security, that such review can catch malware, and that *human* predistribution app review can provide an additional layer of security over automated machine review of apps, including because humans can catch certain types of malware that machines cannot catch. Mickens Tr. 78:22–81:2. Prof. Mickens' admissions undermine Epic's claim that Google should simply rely on the automated scanning features of Google Play Protect, "which scans all [non-Google Play] apps for malware at the time of install" to protect users. Resp. 21. Prof. Mickens also has not done any comparison of the malware detection rates of Google Play Protect's automated scans as compared to the efficacy of pre-distribution app review on the Google Play store and admitted that he did not have "[a]ny information to offer the Court" about the relative efficacy of Play Protect's automated scans versus the review that is done on the Play store. Mickens Tr. 306:20–307:7.

*Second*, Prof. Mickens does not appear to agree with Epic's purported concern that allowing Google to review apps on stores distributed by the Play store would "undermine competition." Mickens Tr. 348:6-10. According to Epic, allowing Google to conduct a pre-distribution review of apps distributed on other app stores would give Google a competitive advantage in the marketplace. Resp. 19–20. But Prof. Mickens confirmed that Epic's proposed injunction *already* allows Google to set up a review mechanism that includes non-Play apps and permits Google to block apps that do not agree to participate in this review. Mickens Tr. 124:7–

1  127:10.  Indeed, this aspect of the proposed injunction tracks Prof. Mickens's own "centralized
2  notarization" proposal, which he presented at trial, and which would result in Google reviewing
3  apps distributed outside the Play store.  ECF No. 844, Trial Tr. 2157:16–2158:21 (Mickens Direct)
4  (describing Prof. Micken's proposal for how Google could "review apps that are being distributed
5  outside of the Google Play Store"); Mickens Tr. 262:4-21.  As Prof. Mickens admits, under that
6  proposal "Google would have to receive a copy of new and unreleased titles to perform the
7  centralized notarization function."  Mickens Tr. 348:11–349:12.  Prof. Mickens testified that he
8  did not think this is "going to be a real problem in general."  *Id.* at 128:15–129:6.  In other words,
9  Epic's own proposals at trial and in its proposed injunction already assume that Google can and
10 will review apps that are distributed outside the Play store regardless of whether such a
11 mechanism would (in Epic's view) reduce competition.

-8-

[PROPOSED] SUPPLEMENTAL BRIEF ISO GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

DATED: August 7, 2024          Respectfully submitted,

By:    */s/ Jonathan I. Kravis*
      Jonathan I. Kravis

**MUNGER TOLLES & OLSON LLP**
Glenn D. Pomerantz
Kuruvilla Olasa
Jonathan I. Kravis
Justin P. Raphael
Nick R. Sidney
Dane Shikman
Rebecca L. Sciarrino
Jamie B. Luguri
Lauren N. Beck

**MORGAN, LEWIS & BOCKIUS LLP**
Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia

**HOGAN LOVELLS US LLP**
Neal Kumar Katyal
Jessica L. Ellsworth

*Counsel for Defendants*

-9-

[PROPOSED] SUPPLEMENTAL BRIEF ISO GOOGLE'S PROFFER RE EPIC'S PROPOSED REMEDIES
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

**E-FILING ATTESTATION**

I, Jonathan I. Kravis, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that counsel for Defendants have concurred in this filing.

*s/ Jonathan I. Kravis*
Jonathan I. Kravis