# EXHIBIT 2

Page 1

1            UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4            CASE NO. 3:21-md-02981-JD

5

6    IN RE:  GOOGLE PLAY STORE ANTITRUST
     LITIGATION

7

     THIS DOCUMENT RELATES TO:
8

9    EPIC GAMES v. GOOGLE LLC, et al.
     Case No. 3:20-cv-05671-JD
10

     IN RE:  GOOGLE PLAY STORE ANTITRUST
11   LITIGATION
     Case No. 3:21-md-02981-JD

12

13

14   "H I G H L Y   C O N F I D E N T I A L"

15

16      VIDEOTAPE DEPOSITION VIA ZOOM OF:

17            JAMES MICKENS, Ph.D.

18           FRIDAY, AUGUST 2, 2024

19

20

21

22

23

24   REPORTED BY:

25   SILVIA P. WAGE, CCR, CRR, RPR

HIGHLY CONFIDENTIAL

Page 2

1

2

3                                    August 2, 2024

4                                    10:01 A.M.

5

6        Videotape deposition of JAMES

7    MICKENS, Ph.D., via Zoom, pursuant to

8    agreement before SILVIA P. WAGE, a

9    Certified Shorthand Reporter, Certified

10   Realtime Reporter, Registered Professional

11   Reporter, and Notary Public for the

12   States of New Jersey, New York and

13   Pennsylvania.

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

Page 3

```
 1   A P P E A R A N C E S:
 2
     CRAVATH SWAINE & MOORE LLP
 3   Attorneys for Epic Games Inc., In Re:
     Epic Games v. Google LLC, et al.
 4   Two Manhattan West
     375 Ninth Avenue
 5   New York, New York  10001
     (212) 474-1000
 6   Mzaken@cravath.com
     Miwilliams@cravath.com
 7   BY:  MICHAEL ZAKEN, ESQ.
     BY:   MALIKAH WILLIAMS, ESQ.
 8
 9   MUNGER TOLLES & OLSON LLP
     Attorneys for Defendants
10   350 South Grand Avenue, 50th floor
     Los Angeles, California  90071
11   (213) 683-9100
     Kuruvilla.olasa@mto.com
12   BY:  KURUVILLA OLASA, ESQ.
13
14   A L S O   P R E S E N T:
15
     BRIAN SMITH, ESQ.
16   GOOGLE
17
     JAMES BUDKINS, VIDEOGRAPHER
18
19   BOB BRASCH, CONCIERGE
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

```
 1    software engineer actually sits down and
 2    writes the code to satisfy an
 3    implementation, is it common to then have
 4    another engineer review the code to
 5    ensure it doesn't introduce problems into
 6    the software?
 7         A.    That's pretty common, yes.
 8         Q.    Is that generally a best
 9    practice in the technology community?
10         A.    I think so, yes.
11         Q.    Is testing a product a common
12    way to account for security risks?
13         A.    Yes.
14         Q.    And is that true for when a
15    software developer introduces a new
16    feature to a software product?
17         A.    Yes.
18         Q.    And does testing often occur
19    in multiple phases including internal
20    testing, beta testing and other forms of
21    testing?
22              MR. ZAKEN:  Objection to form.
23         A.    There are a variety of ways
24    that testing can be accomplished.
25         Q.    Is it common for important
```

HIGHLY CONFIDENTIAL

Page 78

1          A.      Pre -- yes.

2          Q.      And is that the same as

3    prepublication app review?

4          A.      That's, typically, the

5    context in which I hear it, yes.

6          Q.      And so, if I use either term,

7    you'll understand what I mean; is that

8    right?

9          A.      Yes.

10         Q.      And predistribution app

11   review refers to the review of apps prior

12   to their distribution to users, correct?

13         A.      Correct.

14         Q.      And you agree that

15   predistribution app review provides an

16   additional layer of security, right?

17         A.      It can, yes.

18         Q.      And you agree that competent

19   predistribution app review can catch

20   malware, right?

21         A.      That's correct.

22         Q.      And competent predistribution

23   app review can catch things like phishing

24   apps, correct?

25         A.      It can, if done competently,

1    yes.

2        Q.    And for the Court Reporter am

3    I right that the term "phishing" is

4    spelled P-H-I-S-I-N-G?

5        A.    That is correct.

6            THE STENOGRAPHER:  Thank you.

7            MR. ZAKEN:  We've been

8        going about an hour and 20.  I

9        don't know it's maybe time for

10       like a five-minute break.

11           MR. OLASA:  Yeah, I'll be

12       ready in about a minute, if that's

13       okay.

14           MR. ZAKEN:  Sure.

15       Q.    And what is a "phishing app"?

16       A.    A "phishing app" is one that,

17   typically, tries to steal user

18   information in some way, for example, by

19   masquerading as a legitimate app or

20   legitimate website.

21       Q.    And competent predistribution

22   app review can catch things like

23   cryptojacking apps, right?

24       A.    A review process can catch

25   some of those apps, yes.

HIGHLY CONFIDENTIAL

Page 80

```
 1          Q.     And predistribution app
 2     review can involve both automated review
 3     and human review, right?
 4          A.     That is correct.
 5          Q.     Can human predistribution app
 6     review provide an additional layer of
 7     security for automated predistribution
 8     app review?
 9          A.     It can in some cases.
10          Q.     Why?
11          A.     Because there are sometimes
12     cases where humans might catch something
13     that automated algorithm would not.  Some
14     of these cases are subjective.  So, for
15     example, what is an app that provides
16     useless functionality; for example,
17     that's sort of a subjective thing where
18     human review is helpful to understand
19     that.  Your know, there are some things
20     that human or automated review can catch.
21     So, you know, automated review can catch
22     things like phishing apps in some case.
23          Q.     In other cases would a human
24     review be better at catching certain
25     types of phishing apps?
```

HIGHLY CONFIDENTIAL

Page 81

```
 1          A.    That may be the case depending
 2     on the type of app we're looking at.
 3               MR. OLASA:  Alright.  Why
 4          don't we take a break.  It's a
 5          good time.
 6          A.    Okay, thank you.
 7               THE STENOGRAPHER:  Wait.
 8               THE VIDEOGRAPHER:  Let me
 9          take us off the record.
10               Alright.  This is the end of
11          Media Unit 1.  We are going off
12          the record at 11:21 a.m. EDT.
13               (Recess taken 11:21 to 11:31
14          a.m.)
15               THE VIDEOGRAPHER:  This is
16          the beginning of Media Unit 2.  We
17          are on the record at 11:31 a.m. EDT.
18          Q.    Welcome back, Professor
19     Mikens.
20          A.    Hello.  Thank you.
21          Q.    Before the break, we were
22     talking about predistribution human
23     review, correct?
24          A.    Correct.
25          Q.    Can you give me some examples
```

Page 124

```
1        "apps/stores whose developers declined to

2        subject their app/stores to a generally

3        available distribution channel had

4        agnostic notarization-like process."

5            Do you see that?

6        A.    I do.

7        Q.    So am I reading this right

8        that Google could block an app store or

9        an app that declined to submit itself to

10       a review process?

11       A.    Not quite.  One reason not

12       quite is that there is an "or" in that

13       sentence.  So there's sort of two clauses

14       there.

15           And then with respect to the topic

16       of reviews, this gets back to this

17       question that we discussed earlier in the

18       deposition about the distinction between

19       distribution channels versus who does the

20       reviews.  So those are the some of the

21       textual things I would add there.

22       Q.    What is a "distribution

23       channel agnostic notarization-like

24       process"?

25       A.    Well, this is a thing that we
```

Page 125

1      -- by "we," I should say I discussed a

2      lot during the trial.  At a high level it

3      is a mechanism by which a particular app

4      can be certified to have been reviewed by

5      a high quality reviewer.

6          Q.    Is this a reference to your

7      centralized notarization and decentralized

8      notarization proposals at trial?

9          A.    It is a reference to processes

10     that are like those.  Although it's not

11     sort of, specifically, tied to any

12     particular implementation I mentioned at

13     trial.

14         Q.    Apologies.

15         Could Google satisfy this portion

16     of the injunction by implementing the

17     centralized notarization proposal that

18     you presented at trial?

19         A.    The answer is, yes.

20         Q.    So, if Google set up the

21     centralized notarization process you

22     described at trial, Google could under

23     this injunction block apps or stores who

24     declined to submit themselves to that

25     process; is that right?

HIGHLY CONFIDENTIAL

1          A.      With the caveats that are

2      provided in the injunction language

3      there.  Provided that, for example, the

4      notarization process that Google sets up

5      is generally available, meaning, that

6      anyone could submit their apps to it.

7          The distribution channel agnostic

8      is also important too, meaning, that

9      Google could not, for example,

10     discriminate and say, oh, all the apps

11     from this developer or that would be

12     distributed through this channel, we'll

13     just say they're bad, even though they're

14     not really bad.

15         Q.     But the review would have to

16     be distribution channel agnostic, right?

17         A.     Correct.

18         Q.     And if a developer elected

19     not to submit its app to this distribution

20     channel agnostic process, Google could

21     say, I'm sorry, Android is not going to

22     let you install that app; is that right?

23         A.     If I understand the setup,

24     correct.  So a develop -- so Google -- in

25     this imagined world, Google has set up

```
1    essentially, open submission to Play
2    Protect scanning let's say.  A developer
3    chooses nonetheless to not submit their
4    app to this open scanning process.
5         So, in that case, right, what that
6    language is saying is that Google can,
7    you know, impose frictions on that app
8    under that Clause I, because the
9    developer declined to subject their app
10   to this notarization process.
11        Q.    Are you concerned that by
12   allowing for this, the injunction allows
13   Google to get a preview of apps that
14   might be listed on a competitor's store?
15        A.    What do you mean by
16   "preview"?
17        Q.    Before the app could be
18   distributed on competitors and installed
19   by any users, it would have to go through
20   Google's review process in this
21   hypothetical, right?
22        A.    That is correct.  Although
23   that problem is not a new one that is
24   introduced by the injunction, as much as
25   -- malware scanners work now is they look
```

HIGHLY CONFIDENTIAL

Page 128

1    for novel apps, you know, apps that the

2    scanner hasn't seen.

3        And if you look, in fact, at the

4    way that Play Protect works now, Play

5    Protect right now will do an installation

6    time scan of any app that is unknown to

7    Play Protect.

8        So this preview challenge is

9    already sort of one that we see already.

10   So, for example, as soon as that app gets

11   on one person's phone, maybe it's the

12   developer phone, that, you know, is just

13   intended to be used for testing, that app

14   will be sent to Google.

15       Q.    So you're not concerned that

16   this provision would give Google an

17   unfair preview of apps that might be

18   listed on some other store; is that right?

19       A.    I mean, the -- I don't know

20   -- sorry, let me rephrase that.

21       From the security perspective,

22   there's not a problem here.  It sounds

23   like the preview challenge that you're

24   talking about is maybe one that's on the

25   side of the app developer maybe.  They

Page 129

1    don't want Google to learn about the app

2    ahead of time.

3         But I don't -- that is both outside

4    the scope of my assignment, but sort of

5    -- I don't think that's going to be a

6    real problem, in general.

7         Q.    Okay.

8         Alright.  Let's now turn to the

9    remedy on distribution of third-party

10   stores, which is on Page 7.

11        A.    Okay.

12        Q.    So this remedy begins by

13   saying, "For a period of six years Google

14   shall allow distribution of competing

15   third-party app stores on the Google Play

16   Store."

17        Do you see that?

18        A.    Sorry.  Where are you reading

19   from?

20        Q.    From the bottom of Page 7.

21        A.    Got it.  I see it, yes.

22        Q.    Okay.  And we discussed

23   earlier the policy question, as to what

24   an app store is, correct?

25        A.    Correct.

HIGHLY CONFIDENTIAL

Page 139

```
 1              MR. OLASA:  Yeah, I'll be
 2       ready in a couple of minutes.
 3              Does that work.
 4              MR. ZAKEN:  Okay.
 5       Q.    So Google today has policies
 6    against these unwanted apps that users
 7    could find abusive, correct?
 8       A.    It does.
 9       Q.    And could the creator of one
10    of those apps under this provision of the
11    Proposed Injunction, the Google Play
12    Store distributing third-party app store
13    provision, take this unwanted app, place
14    it in a shell store and then require
15    Google to distribute the shell store and
16    the app to the Google Play Store?
17       A.    All questions of this form
18    revolve around that policy debate.  So,
19    you know, my answer will be the same.
20              My answer is that depending on
21    whatever definition of an "app store" the
22    judge decides, the shell app that you
23    just mentioned may or may not, you know,
24    fall afoul the definition of an app
25    store.
```

1          Q.    Do you think that it would be
2     good from a security perspective for
3     Google to be required to distribute shell
4     stores that contain apps that have these
5     types of abusive properties?
6          A.    I think that the answer is
7     more subtle than the question implies.
8          The reason I think that is because
9     I can imagine a world where there is a --
10    just to use sort of -- the definition of
11    "installer" that we agreed upon for the
12    purposes of this deposition.
13         I can imagine there being an
14    installer, that is to say an app that can
15    install other apps, where the catalog
16    size for that installer is quite small.
17    It's just a handful of, let's say, games
18    from an Indy developer, for example.
19         And so, like in that case, the mere
20    fact that this installer has a small
21    number of apps that it can install, it
22    both isn't indicative of maliciousness in
23    and of itself and, also, that installer
24    might under the colloquial definition of
25    an "app store," it might seem like an

HIGHLY CONFIDENTIAL

1    "app store" to a regular user.

2         You know, I went to the app store

3    for this Indy game company.  The company

4    only has a handful of games.  But, yes

5    colloquially, the user thinks it as an

6    app store.

7         You know, this is why the policy

8    debate involves competing tensions, who

9    would want to preserve the ability of

10   this Indy developer to have a small size

11   game store, app store, while still trying

12   to prevent sort of the shell app/shell

13   store concerns that you mentioned.

14        Q.    Okay, I follow that answer.

15   But I just want to make sure I have it

16   right.

17        That you think the right resolution

18   of the policy debate would be to find a

19   way to allow that Indy game developers

20   colloquially defined app store, but

21   prevent the sort of shell app store that

22   contains an abusive app; am I right about

23   that?

24             MR. ZAKEN:  Objection to form.

25        A.    I would say that in an ideal

1    world, the definition of "app store" that

2    the Judge comes up with will have the

3    properties that you just described, that

4    we allow the Indy game store to exist,

5    even though its catalog is small, but we

6    nonetheless exclude that shell launcher

7    for some type of malicious app.

8         That is what an ideal definition

9    would allow.  However, you know it may be

10   the case that it's difficult to get an

11   ideal definition.

12        And so, you know, I don't want to

13   sort of make any claims about the

14   specific contours of the definition the

15   Judge will provide.  Because the Judge

16   needs to hear from the lawyers, from the

17   economists.

18        Q.   Why would it be a good idea

19   under the ideal definition of an "app

20   store" to exclude a shell app that

21   contains abusive apps?

22        A.    I mean, it's a good idea

23   because at a high level if there is an

24   app that is malicious, no ambiguity about

25   it, it's malicious.  It's not a gray

Page 189

1    envisioned by the injunction, that text

2    that we were just looking at.

3            Q.    Right, okay.

4            So your view is that as a background

5    principle, Android is going to be showing

6    this single click consent screen when a

7    user first attempts to install an app

8    through a new installer; is that right?

9            A.    That's my assumption, yes.

10           Q.    Okay.  So the word

11    "presumably" there is not meant to

12    express any doubt that this would happen;

13    is that right?

14           A.    Correct.  It's my

15    understanding of what would happen if the

16    envisioned world from the injunction were

17    true.

18           Q.    Okay.

19           Alright.  So then on Paragraph 53

20    you talk about "parody of experience,"

21    right?

22           A.    Correct.

23           Q.    And you say that -- in the

24    middle of that paragraph you say, "A

25    single consent screen is all that is

Page 190

1    strictly necessary from the security

2    perspective."

3        Do you see that?

4        A.    I do.

5        Q.    And here you are referring to

6    the actual installation of an app from

7    the third-party app store, correct?

8        A.    Correct, as compared to the

9    experience of installing an app via the

10   Play Store.

11       Q.    And what you are proposing is

12   a way to achieve a parody of experience

13   as between the Google Play Store and a

14   third-party app store distributed

15   on-Play, correct?

16       A.    Correct.

17       Q.    And your proposal -- one

18   proposal to ensure parody is to change

19   Android to create a Google controlled

20   install button; is that right?

21       A.    I would describe -- almost.

22   I would describe it as a proposal to

23   introduce a Google controlled installation

24   screen, which would include a Google sort

25   of control install button but would also

HIGHLY CONFIDENTIAL

Page 191

1    say some other text as well.

2         Q.    So what would this -- I'm a

3    little confused.  I don't see a reference

4    to a screen here.

5         I see a reference to a "Google

6    controlled install button."

7         Do you see that?

8         A.    Let's see.  So, if we look at

9    starting at sentence -- sorry, starting

10   at Line 9 on Page 18.  So I say, "One way

11   for Google to ensure parody is to modify

12   Android so that third-party stores can

13   invoke a Google controlled install button

14   that collects user consent to install an

15   app."

16        So that's talking about an install

17   button only in the context of that's what

18   the user clicks to give sort of

19   affirmative consent and then later on in

20   that very next sentence starting on

21   Line 11, "This approach would mean that

22   installing an app via the Play Store or a

23   third-party store would generate a single

24   consent screen."

25        And so that "single consent screen"

1      encompasses that install button that was

2      mentioned in Line 11.

3             Q.    I see.

4             So what you envision is that the

5      user selects an app and says, I want to

6      install this app, and then a screen would

7      pop up that contains some information

8      about the app and a button that allows

9      the user to proceed with the installation;

10     is that right?

11            A.    No.  So what this is

12     envisioning is that there is -- let me

13     give you an example.

14            So imagine that we're on an app

15     store, could be the Play Store, could be

16     the Kuru Store.  I do a search for

17     Tic-tac-toe app.

18            What that storefront app is going

19     to give me is a listing of, you know,

20     potential apps that are Tic-tac-toe apps.

21            So let's say I click on one of

22     those apps.  So now we're going to go to

23     a screen and that's the screen that I'm

24     talking about here that will show -- you

25     know, similar to what Play Protect

HIGHLY CONFIDENTIAL

1    already -- sorry, what the Play Store

2    already shows right now.

3          You know, I click on that catalog

4    index listing.  I go to a screen, which

5    shows information about the app, the

6    name, the icon and, you know, stuff like

7    this.  And then it will also have a

8    button that allows me to install that

9    app.

10         Q.    Aren't different app stores

11   going to want to display different

12   configurations of information about an

13   app?

14         A.    So one thing that -- that's

15   possible.  One thing that I mentioned

16   earlier in the declaration is that this

17   screen that Android presents may allow

18   the developer of the third-party store to

19   pass in some extra information to be

20   displayed along side this, you know,

21   Google control install button.

22         Q.    So let me give you an

23   example.

24         So Google today on a Google Play

25   Store has like a section for reviews of

HIGHLY CONFIDENTIAL

Page 194

```
 1    the app, right?
 2         A.    If you look at -- so it's
 3    like on the Play Store, for example.  If
 4    I look through that Tic-tac-toe app, see
 5    a bunch of listings, click on one of them
 6    and then the next screen I see will among
 7    other things give me an option to look at
 8    some reviews.  That's correct.
 9         Q.    And it, in fact, shows a
10    rating for the app as well, right?
11         A.    That's right.  That's right.
12         Q.    Ratings is based on user
13    reviews, right?
14         A.    That is correct.
15         Q.    And then there is like age
16    rating information shown on that screen,
17    right?
18         A.    That's correct.
19         Q.    And then some other
20    disclosures about the apps like privacy
21    practices and things like that, right?
22         A.    That's correct, yes.
23         Q.    And one of those things that
24    Google shows are things it collects from
25    the developer as part of the play review
```

```
 1    process, right?
 2         A.    Some of those things are --
 3    what are you referring to?
 4         Q.    Well, an example might be
 5    what the app's privacy policy is.
 6         That's something that the developer
 7    would provide Google, right?
 8         A.    That is correct.
 9         Q.    So all this information
10    you're saying would now be displayed on
11    an operating system level screen; am I
12    understanding that right?
13         A.    Well, the way to think about
14    it is that it would be displayed by a
15    Google controlled screen.
16              (Stenographer clarification.)
17              THE WITNESS:  Google
18         controlled screen.
19              THE STENOGRAPHER:  Thank you.
20         A.    Because from Google's
21    perspective, their concern is that Google
22    wants to ensure that the user has
23    provided affirmative consent for an
24    installation to proceed.
25         So, when I talk about this screen
```

```
 1    that's going to provide that trusted
 2    consent, from the perspective of Google,
 3    once again, you know, Google is the one
 4    who is worried that, for example, I'm a
 5    third-party store.  It may trigger a
 6    silent download and installation without
 7    actually getting real user consent.
 8          So, from Google's perspective, what
 9    Google would like is some way to verify
10    that an installation attempt from a
11    third-party store, actually, arose from
12    real user consent.  And so, when I talk
13    about this screen, the way to think about
14    it is that logically it's a screen that
15    Google provides and that Google trusts.
16          Now, mechanistically, you know, who
17    it's actually implemented by, is it the
18    Play Store storefront app, is it Android,
19    something -- you know, that's sort of an
20    implementation detail.
21          Q.    Okay.  So I'm having some
22    trouble envisioning this.
23          So let's say the Epic Game Store
24    launches on Android.
25          You with me?
```

HIGHLY CONFIDENTIAL

Page 197

1          A.     Yes.

2          Q.     Are you saying that the Epic

3    Game Store would have to use a Google

4    specified installation screen to install

5    apps on Android devices.

6          A.     I'm saying that one approach,

7    yes, is for the Epic Game Store, when it

8    wants to trigger the installation of,

9    let's say, Fortnite or whatever, you

10   know, what would that end-to-end process

11   look like.

12         So I go to the Epic Game Store.

13   Presumably, there's some search interface.

14   I type in "Fortnite."  I'm given maybe a

15   listing of things that match the Fortnite

16   string.

17         So I see a listing of, let's say,

18   four things.  Let's say there are four

19   things that are sort of related to

20   Fortnite from my search.

21         I find that entry.  That's the one

22   that I want.  I tap on that.  So now I'm

23   then show a screen that is the screen

24   that sort of shows information about the

25   Fortnite app.  And then it also has that

HIGHLY CONFIDENTIAL

Page 198

1    install button at the bottom of it.
2         Q.    So what if Epic wants to show
3    information that's different from what
4    Google shows on the Google Play Store?
5         A.    So my proposal is compatible
6    with Epic passing that information to the
7    Google controlled code, which displays
8    that consent screen.
9         Q.    What if Epic just wants to
10   show information or a panel that Google
11   hasn't even accounted for?
12        A.    I mean, that -- these are
13   problems that can be solved.  I mean, I
14   think that like, for example, one way
15   that problem could be solved is that
16   Google provides what's known as like a UX
17   template, so like U.X., User Experience
18   template, that says here's the basic
19   layout of this screen.  Here are the
20   parts that Google is not allow you the
21   third-party store to change, like the
22   position of the installation button, like
23   the color of it, you know, things like
24   this.
25            And that template might say, well,

HIGHLY CONFIDENTIAL

1    here's an area where you the third-party

2    app store can insert your own information.

3         Q.    Did you discuss this idea in

4    this level of detail with Professor Ernst?

5         A.    We did not discuss it at a

6    level of great detail.

7         Q.    Do you know if Professor Ernst

8    estimates for effort in work include

9    estimates for what you're now describing?

10        A.    I haven't looked at his

11   report.  So I'm not sure if he provides a

12   cost estimate for this.

13        Q.    And you're saying you didn't

14   describe this approach or this level of

15   detail to him, correct?

16        A.    I think he's aware of the

17   proposal.  Not "I think."  I know that he

18   is aware of the proposal at a high level.

19   But I don't know what he said about it in

20   his report.

21        I can say that, you know, as a

22   result of my trial experience, I did look

23   at Android source code, both open source

24   and closed source.  So I do have, I

25   believe, like, a good intuition for the

1    display what it wanted to display.

2         Q.    Are you suggest Google

3    implement both approaches simultaneously

4    and allow developers to pick which one

5    they want?

6         A.    Not necessarily.  I'm just

7    saying that there are different

8    approaches for satisfying this desire for

9    parody of experience while also keeping

10   users safer.

11        Q.    So I want to focus on this

12   first proposal that you have, which is

13   the single consent screen.

14        If Epic is unhappy with the

15   flexibility provided by that Google

16   screen, what does it do?

17        A.    It's -- it just has to deal

18   with the affordance as presented by the

19   OS.

20        I mean, that critique of what if so

21   and so was unhappy with a particular

22   design, that critique can be leveled at

23   any design change.  So, I mean, perhaps

24   some developers would be happy with the

25   change, some wouldn't.

HIGHLY CONFIDENTIAL

Page 203

1      But I think the fundamental issue

2   being discussed here is the parody of

3   experience and what are different ways to

4   achieve that parody of experience.

5      Q.    Okay.  Can you describe to me

6   what information should Google permit a

7   developer to show on this screen?

8      A.    For example, if Epic thought

9   that, for instance, it needs to provide

10  what the Google proffer calls

11  jurisdictional-related information

12  related to legal requirements that, let's

13  say, Germany required to be shown with an

14  app like Fortnite is installed.  I'm

15  making that specific example up.  But

16  that's like the jurisdictional

17  requirement that the Google's proffer

18  talked about.

19      And let me also note, too, that if

20  Epic in this world where we have this one

21  screen, this one trusted screen from

22  Google.  If Epic really dislikes it that

23  much then Epic can always add its own

24  screen that's controlled by Epic and is

25  shown before the Epic Game Store then

HIGHLY CONFIDENTIAL

Page 204

```
 1      launches the Google control consent
 2      screen.  It can do that if they want, you
 3      know.
 4           The reason -- the reason why the
 5      single screen approach, as implemented by
 6      Google, is attractive is because Epic
 7      doesn't have to do that, if it doesn't
 8      want to.
 9           You know, if Epic wants the
10      streamlined experience where you go to
11      the Epic Game Store, you search for some
12      app.  You see the list of things.  You
13      click on that app listing and then you
14      can immediately go to an install screen
15      that lets you install with sort of one
16      tap.  If it wants that experience it can
17      do that with my proposal.
18           If it doesn't like that for some
19      reason, if it doesn't like Google's UX
20      sort of flare on that screen, if it feels
21      like -- by "it," I mean Epic -- feels
22      like it can't fit inside the window that
23      Google gives it the necessary information,
24      Epic is always free to sort of have the
25      app listing in that search result go to
```

Page 205

1    another Epic controlled screen, which

2    then displays all this extra stuff that

3    Epic wants to display.  And then from

4    that screen, you go to the single one

5    that's displayed by Google.

6         Q.    Okay.  You say further in

7    that paragraph, "A single consent screen

8    is all that is strictly necessary from a

9    security perspective."

10         Do you see that?

11         A.    What page are you on?  Sorry.

12         Q.    I'm on Line 13 of Page 18,

13    Paragraph 53.

14         A.    Yes, thank you.

15         Q.    Why is any consent necessary

16    from a security perspective?

17         A.    Because you want the user to

18    be actively aware and endorsing of each

19    installation that takes place on the

20    user's phone.

21         Q.    So you agree that a single

22    consent screen when the user goes to

23    install an app is strictly necessary from

24    a security perspective, correct?

25         A.    Yes.

 1          Q.    And that single consent
 2    screen to install a particular app is
 3    different from the consent screen you
 4    were talking about earlier which would
 5    give an installer app the permission to
 6    install other apps, right?
 7          A.    Correct.  Those are two
 8    different sort of friction or close that
 9    we're talking about.
10          Q.    So I'm going to follow the
11    user journey in your proposal.
12          So the user would download a
13    third-party app store.
14          Are you with me so far?
15          A.    Yes.
16          Q.    The user would then go to
17    download a calculator app, correct?
18          A.    Through that third-party
19    store.
20          Q.    And then in the third-party
21    store, the user would get a single screen
22    that asks the user if they want to grant
23    that app install permissions, correct?
24          A.    At the point that the
25    installation was actually attempted.

1           Q.    But at that point, the

2     installer would say, do you want to grant

3     this Kuru Store the permission to install

4     apps.  Correct?

5           A.    Correct.  And, just to be

6     specific, it's not the installer that's

7     showing that screen.  It's Android that's

8     showing that screen.  And that's an

9     important distinction because you know --

10          Q.    Yes.

11          A.    -- the app store may not

12    decide to show that screen, if it was up

13    to it.

14          Q.    Let me back up.  That's a

15    good question.  Let's do this cleanly

16    because I want to make sure we're on the

17    same page.

18          So a user -- under your proposal, a

19    user can download an app store, correct?

20          A.    Yes.

21          Q.    And then they can go into app

22    store and select an app to download,

23    correct?

24          A.    Correct.

25          Q.    When that app is attempted to

Page 208

```
 1      be downloaded, if that is the first time
 2      the user has used that app store, the
 3      operating system will display a single
 4      screen, that's bypassable with one click
 5      that says, do you want to grant this app
 6      store the ability to install apps,
 7      correct?
 8           A.    Correct.
 9           Q.    And you're okay with that
10      screen correct?
11           A.    Yes.  And that's a one-time
12      screen.  Subsequent installs via that
13      third-party store will not trigger that
14      screen.
15           Q.    Okay.
16                MR. ZAKEN:  Sorry to
17           interrupt.  We're nearing almost
18           an hour and ten.  So, just after
19           this line of questioning.  If we
20           can just take like a ten-minute
21           break.
22           Q.    And then the user would also
23      see a screen that is for that specific
24      app that they're trying to install,
25      correct?
```

Page 209

1          A.    There will be a screen that

2     says, you know, for this Tic-tac-toe app,

3     here's the info about the Tic-tac-toe

4     app.  Do you want to proceed with the

5     installation -- or do you want to install

6     it, excuse.

7          Q.    And you believe that screen

8     is also necessary to ensure that the

9     user, in fact, wants to install that

10    particular app, correct?

11         A.    Correct.

12         Q.    And that should be an

13    operating system or a Google controlled

14    screen, correct?

15              MR. ZAKEN:  Objection to form.

16         A.    Well, I think that in the

17    proposal what we sort of been calling the

18    single screen proposal, yes, this screen

19    that you're now talking about is

20    controlled by Google and clicking on the

21    install button in that screen will then

22    immediately trigger the installation.

23         Q.    Okay.  Let's take that break.

24         A.    Okay.  Thank you.

25              THE VIDEOGRAPHER:  We are

HIGHLY CONFIDENTIAL

Page 210

1          going off the record.  The time

2          is 2:32 p.m.  And this concludes

3          Media Unit 3.

4                  (Recess taken 2:32 to 2:45

5          p.m.)

6                  THE VIDEOGRAPHER:  We are

7          on the record at 2:45 p.m. EDT

8          and this begins Media Unit No. 4.

9          Q.    Welcome back, Professor

10    Mikens.

11          A.    Thank you.

12          Q.    So I want to talk some more

13    about this single consent screen you've

14    proposed.

15          Have you determined that this

16    single consent screen is technically

17    feasible?

18          A.    I believe that it is

19    technically feasible, based on my review

20    of the Android source code, yes.

21          Q.    What part of the Android

22    operating system would be modified to

23    provide this screen?

24          A.    For example -- and I say,

25    "for example," because there are multiple

1    possible implementations for the screen.
2         But, for example, this screen could
3    be implemented through a modification of
4    the package install middleware, which was
5    discussed at great length during the
6    trial itself.
7         Q.    And did you discuss that
8    implementation solution with Dr. Ernst?
9         A.    I did not.
10         Q.    How could the operating
11    system be sure that the user has actually
12    seen this Android control button?
13         A.    The OS can be assured of that
14    because the OS is the entity which
15    determines, ultimately, what is shown on
16    the screen and what can occlude other
17    screens that are being shown.
18         So there's this notion of the Z
19    axis, the stacking ware.  You know, it
20    can be possible that one screen might try
21    to display over another screen.  But the
22    OS is, ultimately, the party that decides
23    what's at the stop of that stacking
24    order.
25         So, in other words, if the screen's

Page 212

1    implemented by Android, Android is the

2    entity that controls what is being

3    displayed to the user.

4        Q.    And so, under your proposed

5    approach, the entire screen including the

6    install button would be shown at the top

7    of the Z axis; is that right?

8        A.    That's one implementation,

9    yes.

10        Q.    Is there some other

11    implementation?

12        A.    For example, there are

13    possible implementations that involve the

14    Play Store app implementing the screen.

15    I spent the most time thinking about the

16    former implementation.  But there are

17    others that are possible as well.

18        Q.    How does this screen differ

19    from the screen that Android currently

20    displays when a non-pre-installed

21    installer attempts to install an app?

22        A.    I am not sure what screen

23    you're referring to.

24        Q.    Are you aware of a screen

25    that says, "do you want to install this

HIGHLY CONFIDENTIAL

Page 213

1    app?"

2        A.    Yes.   And that screen also

3    shows the name of the app that you're

4    trying to install.

5        Q.    Correct.

6        How does this screen you're

7    proposing differ from that screen?

8        A.    It differs because that

9    screen that you just mentioned, that

10   screen is sort of the -- a crude version

11   of the screen that I am talking about.  I

12   call it a crude version because that

13   screen is being displayed by Android

14   precisely because Google doesn't believe

15   that it can trust that a non-pre-installed

16   third-party store can be trusted to

17   actually get user consent for an

18   installation to proceed.

19       So that screen that you're talking

20   about is, basically, Android/Google, you

21   know, abstractly speaking saying, let's

22   make sure we actually get user consent

23   before we allow this installation to

24   proceed.

25       The screen I'm talking about is

Page 214

1    designed to, once again, provide parody

2    of experience between installing via the

3    Play Store and installing via a

4    third-party store.  And the envisioned

5    screen that I'm proposing would mean that

6    you wouldn't need the screen that you

7    were talking about, because the screen

8    that I am proposing would serve as this

9    trusted source of consent where the

10   person who needs to be convinced that

11   consent is being given is Google.  It's

12   Android.

13        Q.    But Google already -- just to

14   be clear, Android already has a trusted

15   source of consent in the existing screen,

16   correct?

17        A.    True.  But when we talk about

18   the parody of experience point, that

19   existing stream can't be used to satisfy

20   the parody of experience concerns that

21   we're talking about now.

22        Q.    I see.

23        So the reason for your proposal of

24   this new screen is to ensure parody of

25   experience; is that right?

1        A.    Yes, the goal is to ensure

2    that if a third-party app store so

3    chooses, it can get that parody of

4    experience in terms of friction screens

5    with respect to the play experience.

6        Q.    Okay.  And you have an

7    alternative proposal for parody, right?

8        A.    That is correct.

9        Q.    And in this alternative

10   proposal, Play would add an additional

11   consent screen to what it already has,

12   correct?

13       A.    That is correct.

14       Q.    From a security perspective,

15   what would this additional screen serve?

16       A.    From the security perspective,

17   it would not serve a purpose.  It's

18   designed to provide parody of experience.

19   The additional screen would not make

20   security worse.  It would add an

21   additional step, but a step that would

22   now be commensurate with the steps that

23   third-party stores incur.

24       Q.    And from a security purpose,

25   this additional screen you propose from

HIGHLY CONFIDENTIAL

Page 216

1      the Play Store doesn't serve a security

2      purpose, because Google is already

3      collecting consent from a user before

4      they install an app, correct?

5              A.    I would mostly agree with

6      that.  The caveat is that because Google

7      doesn't currently provide the affordance

8      that I'm proposing with respect to the

9      Google provided consent screen that other

10     applications can invoke.  That's why

11     there's currently this asymmetry between

12     the friction experiences on-Play versus

13     third-party stores.

14              So I just want to make it very

15     clear that the fact that Google right now

16     has that sort of small consent screen,

17     which says do you consent to the

18     installation of this app, okay or not

19     okay, the reason Google currently uses

20     that is because it hasn't adopted this

21     proposal that I'm suggesting whereby

22     there is a more full -- fully imagined

23     consent screen.

24              Q.    I understand your "fully

25     imagined consent screen."

Page 217

1          And now I want to focus on your

2     alternative proposal of adding a screen

3     to Play.

4          So I take it you believe the

5     injunction would be satisfied if Play

6     simply displayed the "do you want to

7     install this app screen" for apps

8     installed through the Play Store front;

9     is that right?

10         A.    Correct.  That would provide

11    parody of experience with respect to the

12    number of friction screens encountered by

13    the user.

14         Q.    You say that this approach is

15    "less ideal from the perspective of user

16    experience," correct?

17         A.    Correct.

18         Q.    Why is this approach "less

19    ideal from the perspective of user

20    experience"?

21         A.    Because there's an extra

22    screen and that extra screen has to be

23    clicked through.  It has to be engaged

24    with.  And so, from the security

25    perspective, only a single screen is

1    necessary.  And from the user experience

2    perspective, having that single screen

3    solution is, also, nice because there's

4    just one screen to sort of click through

5    and the user is still being given all of

6    the informed -- sorry.  The user is being

7    given all the information they need to

8    make an informed decision about whether

9    to install.

10         The two-screen approach doesn't

11   hurt security and it provides parody of

12   experience as well and, in fact, may be

13   easier for Google to implement.  And to

14   the extent to that that is a

15   consideration, that is an example of the

16   tradeoff when one thinks about how to

17   achieve parody of experience.

18         Q.    Now, when you say this

19   approach is "less ideal from the

20   perspective of user experience," it's

21   "less ideal" for both the Play Store and

22   for other third-party stores, correct?

23         A.    It is -- I believe that both

24   the Play Store and third-party stores

25   would prefer the first solution that I

Page 219

1    mentioned.

2        Q.    This proposal of adding a

3    screen to the Play Store would degrade

4    the experience of users in the Play Store

5    in order to achieve parody, correct?

6            MR. ZAKEN:  Objection to form.

7        A.    Well, I don't know that I

8    quite bring it like that.

9        I would say that there is -- an

10   outcome of the case, as I understand it,

11   is that parody of experience is an

12   important criteria to ensure that we find

13   on the Android ecosystem.

14       There is several ways that the

15   parody of experience can be provided.

16   One way is to, essentially, add a screen

17   to the Play workflow.  Another approach

18   is remove an unnecessary screen from the

19   security perspective from the third-party

20   app store flow.  So there's two different

21   ways of achieving that goal of parody

22   while not hurting user security, but

23   involving different tradeoffs in terms of

24   implementation cost and user experience.

25       Q.    Right.

1          Because the solution of removing
2     the screen involves creating another
3     screen, correct?
4          A.    Well, it involves the creating
5     of this affordance, which Android, for
6     example, would use to provide that
7     trusted consent screen.
8          Q.    But in your alternative
9     proposal of adding a screen to Play, that
10    solution achieves parody by making the
11    Play Store experience "less ideal from
12    the perspective of user experience,"
13    right?
14         A.    Correct.  There's an extra
15    screen that users have to go through.
16         Q.    Okay.  So now, again, focusing
17    on your proposal to add a screen to Play.
18         Play is also used to install system
19    software, correct?
20         A.    That is correct.
21         Q.    And, for example, Play can be
22    used to install system software at the
23    setup -- the initial setup of a phone,
24    correct?
25         A.    I believe that's correct, yes.

1          Q.     How would adding an
2     installation dialogue to Play affect the
3     installation of system software?
4          A.     System software -- and just
5     to clarify what we mean by "system
6     software," I interpret that as meaning
7     pre-installed apps that belong to Android
8     or other low level parts of the phone's
9     sort of OS or middleware.
10          Is that how you're defining
11     "system software"?
12          Q.     Let me clarify it.  I think
13     we're close.  But I would not include the
14     restriction that such software is
15     "pre-installed."
16          It is software that is low level
17     parts of the phone, operating system or
18     middleware.
19          Are you with me?
20          A.     Yes.
21          Q.     Okay.  So how would adding an
22     install consent screen to Play affect the
23     installation of system software?
24          A.     So, for system software, I
25     imagine that those updates would occur as

Page 222

1    they occur now.

2         Q.    I see.

3         So your proposal is that if we were

4    to go down this alternative path, which

5    is adding a screen to the Play Store,

6    that screen would be added for user

7    installed apps not for system software;

8    is that right?

9         A.    That's correct.

10        Q.    So it would be consistent

11   with the injunction, in your view, if

12   Play achieved parody of experience for

13   user installed software, but retained the

14   ability to install system software in the

15   background, correct?

16        A.    Perhaps.  I mean, I think

17   here we have to make sure that we

18   understand on the definition of "system

19   software."  So different people might

20   define that type of software differently.

21   And so we have to make sure that it

22   doesn't include software that would be by

23   a user considered to be sort of a

24   user-facing app.

25        Q.    Okay.  And who would draw the

Page 223

1    line between a user-facing app and system

2    software?

3        A.    Implementation-wise Google

4    would be the person or the entity that

5    draws that line.  Although from the

6    perspective of who defines what that line

7    is, that might be something that has to

8    come out of what the Judge decides.

9        Q.    Does the Proposed Injunction

10    from Epic have a way to distinguish

11    between system software and user-installed

12    software?

13        A.    I think that the injunction

14    does define that implicitly, in as much

15    as the injunction talks about software

16    that a user perceives that the user

17    installs or might conceivably install.

18        The reason that I say "conceivably,"

19    is because consider the case of a silent

20    install, you know, a drive by download of

21    an APK that a user didn't intentionally

22    want to install.  That app that's being

23    unintentionally installed, at least, in

24    theory, the user could have, you know,

25    installed that explicitly.  You know, it

```
 1    could have been a game or whatever.
 2          I distinguish that type of app and
 3    that type of installation from what I
 4    understand "system software" to be as
 5    core pieces of the OS or middleware where
 6    a user doesn't affirmatively seek out
 7    that type of software and try to install
 8    it through an app store.
 9          That type of software is, typically,
10    you know, sought out -- to the extent
11    that we can use that verb -- by Google or
12    by the OEM.
13          Q.    So is it your testimony that
14    the Proposed Injunction specifies criteria
15    by which one can determine whether a
16    particular app is system software or a
17    user-facing software?
18                MR. ZAKEN:   Objection to
19          scope.
20          A.    Well, what I'm saying is that
21    that question, I think, is already
22    answered by, for example, Google's
23    proffer, which also, I believe,
24    implicitly makes that sort of
25    definitional distinction.   Because
```

```
 1      there's nothing in Google's proffer, for

 2      example, that calls out sort of this

 3      special distinction, as you're defining

 4      it right now in this conversation.

 5           Q.    I understand, Professor

 6      Mikens.

 7           But I want to understand what the

 8      Proposed Injunction specifies or requires.

 9           Is there somewhere in the Proposed

10      Injunction I can look to see the criteria

11      to distinguish between system software

12      and user-facing software?

13           A.    The injunction itself doesn't,

14      specifically, call that out using that

15      dichotomy.

16           But, once again, if you look at the

17      text of the injunction, I think, it's

18      plain that that text is referring to user

19      perceived uses of an app store to install

20      software.

21           Q.    So your testimony is that

22      inherent in the language of the injunction

23      is a limitation in the injunction to

24      user-facing software; is that right?

25                 MR. ZAKEN:   Objection to form.
```

1        A.    I don't know if I would call

2    it a "limitation."

3        I would say that I think that both

4    the injunction and Google's own proffer

5    are focused on apps that are normal, not

6    system apps.  The kind that users would

7    naturally seek out through an app store.

8    I think neither the injunction nor the

9    proffer explore this issue of system

10    apps.

11        Q.    Does your declaration address

12    how system apps would be handled if Play

13    were to add an installation confirmation

14    screen, as in your alternative proposal?

15        A.    I think that my declaration

16    handles that, to the extent that the

17    Google's proffer and the injunction

18    handle that.  I think all of those

19    documents focus on the experience of

20    installing normal apps as a user would do

21    during typical interactions with an app

22    store.

23        Q.    Is there something in your

24    declaration that I can use to identify

25    the difference between a normal app and a

1    system app?

2         A.    I don't think that any of the

3    documents that we're discussing look at

4    that.  By that, I mean, the injunction,

5    the proffer or my declaration.

6         Q.    Now, in Paragraph 54 you note

7    that Google has, you know, attempted to

8    make some distinctions between installers

9    versus app stores versus launchers.

10        Do you see that?

11        A.    I do.  And, once again, I'm

12   looking at the physical copy.

13        Q.    Of course.

14        And, I mean, earlier we talked

15   about the policy implications of that

16   type of decision, right?

17        A.    Correct.

18        Q.    But you say that from a

19   security perspective, there is no reason

20   for the Play Store to try to distinguish

21   between installers and launchers and app

22   stores, right?

23        A.    Correct.

24        Q.    And you claim that Google's

25   primary interest in these type of

1          Q.    Okay, the only criteria.  Any

2     app that has a capability to install

3     other apps can declare -- can call itself

4     an app store.

5          Are you with me?

6          A.    Yes.

7          Q.    I'm a developer of a game, do

8     I then have an incentive to label my app

9     as an app store to evade Google's service

10    fee?

11              MR. ZAKEN:  Objection to form.

12         A.    I -- it's more complex than

13    that.  The answer is maybe yes, maybe no.

14    I mean, it depends on, you know, what the

15    terms of, you know, Google billing looked

16    like in the new world.  It depends on

17    whether the app developer is actually

18    trying to monetize the app via in app

19    purchases.  It depends.

20         Q.    Right.

21         So you don't rule out the

22    possibility that if the Court said that

23    the only criteria to be an app store is

24    that you have the ability to install

25    other apps, that, at least, some

Page 233

1    developers would have an incentive to

2    call their apps "app stores"?

3         A.    That's a possibility.

4         Q.    Okay.  And, in order to do

5    that, those apps would declare an install

6    permission, correct?

7              MR. ZAKEN:  Objection to form.

8         A.    Yes, they would have to -- if

9    they wanted to have the ability to

10   install other apps, yes, they have would

11   to declare some installation-related

12   permission in their manifest.

13        Q.    And you agree that installer

14   apps have powerful abilities to corrupt a

15   user's device, right?

16        A.    That's correct.  A bad

17   installer could do that.

18        Q.    And in a situation where many

19   more developers have an incentive to make

20   their apps installer apps, we could see a

21   significant increase in the number of

22   installer apps on a user's device,

23   correct?

24        A.    Maybe.  I mean, once again,

25   it depends on the specific sort of

HIGHLY CONFIDENTIAL

Page 237

```
 1      proposed world in the injunction gets rid
 2      of Play Protect on client side devices.
 3      So, to the extent that the user somehow
 4      installs some malicious device -- or
 5      malicious app, excuse me, Play Protect is
 6      still there to safeguard the user.
 7           Q.    I understand your answer,
 8      Professor Mikens.
 9           And you said you began with "not
10      necessarily" now.
11           Can you rule out that increasing
12      the number of installers on a device, as
13      compared to today, would put users at
14      risk?  Can you rule that out?
15           A.    I think that that way of
16      analyzing the situation can lead to some
17      specious reasoning.  I mean, in the same
18      way that like when we talked about bulk
19      ownership and Google is worried about
20      these places in which the user gets
21      confused about things.
22           Can they rule out, you know, the
23      fact that something will or will not
24      happen?
25           I mean, it's a more subtle
```

Page 238

1    situation than that.

2         So it is true that it is possible

3    that some developers might sort of engage

4    in this chicanerous behavior that you

5    mentioned, but it's also possible that

6    very few of them would do that because

7    their goal is not actually to act as an

8    installer and so they won't actually use

9    that permission they've ostensibly asked

10   for.

11        Q.   Can you rule out that if

12   there is a significant increase in the

13   number of installers on user devices, by

14   and large on Android, that there will be

15   greater risk to Android users?  Can you

16   rule that out?

17        A.   Well, that question is

18   predicated on an assumption that the

19   Judge will define an app store in a way

20   that serves that question, right.

21        I mean, you could imagine -- we

22   could imagine that the Judge takes this

23   sort of concern into consideration when

24   defining what it means for an app to be

25   an app store.

1         Q.     So now, as a security

2     researcher, do you think that this is

3     something that the Judge should really

4     take into account when issuing an

5     injunction, this risk of "chicanerous

6     behavior," as you put it?

7         A.     Well, I think that the Judge

8     should keep it in consideration in the

9     context of the larger ecosystem of

10    security mechanisms that Android has.

11        Q.     And so the Judge should take

12    this security implication into account

13    along with all the other factors the

14    Judge needs to consider, correct?

15        A.     It's a thing for the Judge to

16    consider, yes.

17        Q.     And the thing the Judge

18    should consider is the risk that with an

19    insufficient definition of an app store,

20    there could be greater risk to user

21    security, correct?

22             MR. ZAKEN:  Objection to form.

23        A.     Well, I -- it's -- that's

24    part of the thing the Judge can consider.

25    I mean, to the extent that we buy into

1    this hypothetical world, as I understand

2    it, is driven by developers who are

3    marking their apps as installers to

4    escape high Google fees, one way to solve

5    that is for Google to lower its fees.

6    Now, that's another thing that the Judge

7    could consider.

8         So I'm just saying this is sort of

9    a complex landscape that sort of has a

10   lot interplay between, you know, legal

11   and economic issues and that's why I'm

12   saying that, like, I was not asked in my

13   assignment to adjudicate this definition

14   of what an app store is and the judge

15   needs to hear from economists and lawyers

16   to think about, you know, what the

17   implications are for some particular

18   definition.

19        Q.    We've now identified, at

20   least, one potential security implication

21   for definitions of app stores, right?

22        A.    I would -- to a certain

23   extent.  I mean, the reason why I'm

24   qualifying that is because, once again,

25   there's still this universe of protections

HIGHLY CONFIDENTIAL

Page 241

1    that will be in place on an Android

2    device that are still in place in the

3    Proposed Injunction world.

4        Q.    So, Professor Mikens, you

5    know, I just want to be clear.

6        In this litigation, you're right,

7    the Court has to consider a lot of

8    things.

9        And I understand that you want to

10   provide the Court the best guidance

11   possible, correct?

12       A.    Correct.

13       Q.    And you want to make sure that

14   the Court takes security implications

15   seriously, correct?

16       A.    That's correct.

17       Q.    And I totally understand that

18   you have many disagreements with Google

19   on the way it has approached security.

20       But I want to ask you now because

21   the Judge is going to rely on this.

22       Is this "chicanerous behavior" of

23   being able to declare something as a

24   launcher or otherwise evade Google's

25   policies, could that put users at risk

Page 242

```
 1      and should the Judge do something about
 2      it in the definition of an app store to
 3      make sure that risk doesn't come about?
 4                  MR. ZAKEN:  Objection to form.
 5            A.     The Judge should consider
 6      that among other factors in the same way
 7      that we talked about two screens versus
 8      one screen.  It's not about security or
 9      about one other thing in isolation.  It's
10      constellation.
11            Q.     Thank you, Professor Mikens.
12      I really do appreciate that answer.  And
13      I understand you can't speak to all the
14      factors.
15            But you are a security expert and
16      the Judge is going to take what you say
17      here really seriously.
18            So I hope that where we end up here
19      is -- whether or not we agree or disagree
20      on a particular remedy, the Judge can
21      listen to your testimony and understand
22      where he should step into protect users.
23            Can we agree on that?
24            A.     We can mostly agree on that.
25      And, once again, I'm not trying to be
```

HIGHLY CONFIDENTIAL

```
 1    fighty or difficult.
 2         But I think that the way I, at
 3    least, hear this framing of the questions
 4    is you're saying if we focus solely on
 5    security, then how we would reason about
 6    what an "app store" is, how it should be
 7    defined.
 8         And what I'm saying is that there
 9    are other considerations as well.
10    Security is important.  But there are
11    other considerations.
12         As I understand it, this is an
13    antitrust trial.  And so, like, there are
14    economic reasons that have to be
15    considered as well.
16         That's key to the framing of the
17    questions that you've been asking.
18    You're proposing or hypothesizing that
19    chicanerous behavior would happen for an
20    economic reason, not because of an
21    intrinsic sort of malicious actor reason.
22    And so that's important.  Because there
23    are other things the Judge might consider
24    to reduce the security risk that you're
25    saying the Judge may want to be concerned
```

1    dedicates to policing off-Play sources,

2    right?

3          A.    That's correct.

4          Q.    Now, during trial, you do --

5    presented the Court with the centralized

6    notarization approach to security,

7    correct?

8          A.    Correct.

9          Q.    And on the centralized

10   notarization, Google would open its

11   review services to all apps on Google,

12   right?

13         A.    Correct.

14         Q.    And apps that went through the

15   centralized notarization review, would

16   get a lower friction install experience,

17   right?

18         A.    Right.

19         Q.    And apps that decline to go

20   through the review, would get a higher

21   friction install experience, right?

22         A.    Correct.

23         Q.    And you express the view that

24   the centralized notarization proposal

25   would require Google to scale up its

1    catalog for malware?

2         A.    "Any security downsides"?

3         Q.    Yeah, any security problems

4    that would occur if a third-party app

5    store reviewed the apps in its catalog

6    for malware.

7         A.    Well, I think the primary

8    concern, particularly, in your

9    hypothetical world is if a third-party

10   store claimed that it was reviewing apps

11   up to some quality bar, but that

12   third-party store was actually not

13   reviewing apps very well.

14        And, by the way, this is why in the

15   decentralized proposals that I made

16   during trial, why it's important for, you

17   know, Google to establish quality bars

18   for reviewing to avoid this very outcome

19   I just discussed.

20        Q.    Have you done any comparison

21   of the malware detection rate of Play

22   Protect's automated scans of off-Play

23   apps to Google Play's review of apps on

24   the Google Play Store?

25        A.    I have not done that study,

Page 307

1    no.

2        Q.    Any information to offer the

3    Court about the relative efficacy of

4    Google Play Protect's automated scans and

5    the review that's done on the Google Play

6    Store?

7        A.    I have not.  Although I will

8    point out testimony from the trial,

9    evidence from the trial, in which Google

10   employees said that there's no strong

11   signal about maliciousness that comes

12   from whether an app is on-Play or

13   off-Play.

14       Q.    Are you aware that

15   Mr. Kleidermacher testified at trial that

16   Play -- that the apps that are on-Play

17   provide Google with additional signals to

18   detect malware?

19       A.    That is correct.  But as I

20   cite on Page 9 and 10 of my declaration,

21   there's actually a quote from Porst, who

22   says that, 99 percent of the malware scan

23   that Play Protect does is exactly the

24   same regardless of the source of the

25   application, that there is no signal --

1           A.    I wouldn't frame it as that.

2      I would say that Google would have the

3      right to block or quarantine apps that

4      are known to be malware or that haven't

5      received that token.

6           Q.    And if Google abused that

7      right, it would undermine competition,

8      right?

9                MR. ZAKEN:   Objection to form.

10          A.    Correct.

11          Q.    Further in that paragraph,

12     you say, Additionally to perform -- Epic

13     says, "Additionally, to perform this

14     review, Google would need access to the

15     catalogs of its competitors including new

16     and unreleased titles."

17          Do you see that?

18          A.    I do.

19          Q.    Under a centralized

20     notarization approach, as you presented

21     it at trial, Google would get access to

22     the catalogs of its competitors including

23     new and unreleased titles, right?

24          A.    Google would need to see any

25     APK that it scans.  Although I would say

1       as a technical matter there are ways that
2       that scan can take place such that Google
3       would not learn the details of those
4       APKs.
5              Q.    Sure.
6              And -- but Google would have to
7       receive a copy of new and unreleased
8       titles to perform the centralized
9       notarization function that you proposed,
10      right?
11             A.    It would need to see the APKs
12      to scan, yes.
13             Q.    Okay.  Alright.  You can put
14      that document aside.
15             I have one last document I want to
16      talk to you about.
17                   (Deposition Exhibit 9023,
18             Michael D. Ernst Declaration in
19             Support of Epic's Response to
20             Google Proffer Regarding Epic's
21             Proposed Injunction, was marked
22             for identification.)
23             Q.    Alright.  Let me know when
24      you have Exhibit 9203 in front of you.
25             A.    Okay, I see this, yes.  I'm

1     clicking on that and you will now have to

2     wait, approximately, 15 seconds for it to

3     load.

4          Q.    Of course.  Thank you.

5          A.    Okay.  It has now loaded.

6          Q.    Great.

7          And is it Exhibit 9023 titled,

8     "Michael D. Ernst's Declaration in

9     Support of Epic's Response to Google's

10    Proffer Regarding Epic's Proposed

11    Injunction"?

12         A.    It is.

13         Q.    You haven't reviewed this

14    document before, correct?

15         A.    I have not.

16         Q.    In any form including as a

17    draft, correct?

18         A.    Correct.

19         Q.    Okay.  So I would like to

20    turn your attention to Page 17 of this

21    declaration.  There is a table.  It's

22    called, "Table 2."

23         Let me know when you're there.

24         A.    I see, yes.

25         Q.    Now, earlier we talked about

Page 351

1    catalog access, right?

2         A.    Correct.

3         Q.    And catalog access involved

4    Google using something like -- something

5    akin to its Alleyoop mechanism to perform

6    installations on behalf of third-party

7    app stores, correct?

8         A.    Correct.

9         Q.    In your proposal relating to

10   that install flow is that Google should

11   create a single screen that provides

12   whatever regulatory information Google

13   needs to provide advising an install

14   button that also allows developers to

15   provide some "flare," as you called it,

16   correct?

17              THE WITNESS:  Michael, did

18        you say something?

19              MR. ZAKEN:  Objection to form.

20              THE WITNESS:  "Objection to

21        form."

22        A.    That is one of the proposals

23   that I discuss.

24        Q.    And the "flare," as I

25   understand it, a developer provided

HIGHLY CONFIDENTIAL

Page 352

```
 1      information perhaps reviews or other
 2      information the developer wants to
 3      provide about that app, right?
 4           A.    Or that maybe the third-party
 5      app store wants to provide about that app.
 6           Q.    Sure.
 7           If the flare -- I apologize.
 8           The "flare" would be added by the
 9      third-party app store, correct?
10           A.    Correct.
11           Q.    And the "flare" could be the
12      third-party app store's user reviews or
13      something like that, right?
14           A.    For example.
15           Q.    Okay.  So, when I look at --
16      so this table is Professor Ernst's effort
17      estimates for catalog access.
18           Do you see that title?
19           A.    I do.
20           Q.    And he has a role for catalog
21      data server.
22           Do you see that?
23           A.    I do.
24           Q.    And that describes -- and the
25      then column, "Scope of New Functionality,"
```

HIGHLY CONFIDENTIAL

Page 364

1          CERTIFICATE OF REPORTER

2

3      I, SILVIA P. WAGE, CSR, CRR, RPR,

4    herby certify that the witness in the

5    foregoing deposition was by me duly sworn

6    to tell the whole truth, nothing but the

7    truth; said deposition was taken down in

8    shorthand by me, a disinterested person,

9    at the time and place therein stated.  The

10   testimony of said witness was thereafter

11   reduced to typewriting by computer under

12   my direction and supervision.  Before

13   completion of the deposition, review of

14   the transcript [X] was [ ] was not

15   requested.  If requested, any changes

16   made by the deponent (and provided to

17   the reporter) during the period allowed

18   are appended hereto.

19

        I further certify that I am not of

20   counsel or attorney for either or any

     of the parties to the said deposition,

21   nor in any way interested in the event

     of this cause, and that I am not

22   related to any of the parties thereto.

23

24

25   SIGNED_____ dated: August 5, 2024.

Page 367

1    IN RE:  GOOGLE PLAY STORE ANTITRUST LITIGATION

2    8/2/2024 - James Mickens, Ph.D. (#6837606)

3                    ACKNOWLEDGEMENT OF DEPONENT

4         I, James Mickens, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    James Mickens                     Date

13    *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25