Pages 1 - 155

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| IN RE GOOGLE PLAY STORE<br>ANTITRUST LITIGATION, | )<br>)<br>) | **NO. 21-md-02981-JD** |
| _____ | )<br>) | |
| THIS DOCUMENT RELATES TO: | )<br>) | |
| EPIC GAMES, INC., | )<br>) | |
| Plaintiff, | )<br>) | |
| VS. | )<br>) | **NO. 3:20-cv-05671-JD** |
| GOOGLE, LLC., et al., | )<br>) | |
| Defendants. | )<br>) | |
| _____ | ) | |

San Francisco, California

Wednesday, August 14, 2024

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:
Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**APPEARANCES**:

For Plaintiff:

           CRAVATH, SWAINE & MOORE LLP
           825 Eighth Avenue
           New York, New York  10019
    BY:  **GARY BORNSTEIN, ATTORNEY AT LAW**
         **YONATAN EVEN, ATTORNEY AT LAW**
         **LAUREN MOSKOWITZ, ATTORNEY AT LAW**
         **MICHAEL ZAKEN, ATTORNEY AT LAW**
         **MALIKAH WILLIAMS, ATTORNEY AT LAW**
         **SAMANTHA PARALIKAS, ATTORNEY AT LAW**

For Defendants:

           MUNGER, TOLLES & OLSON LLP
           350 South Grand Avenue - 50th Floor
           Los Angeles, California  90071
    BY:  **GLENN POMERANTZ, ATTORNEY AT LAW**
         **KURUVILLA J. OLASA, ATTORNEY AT LAW**
         **LAUREN N. BECK, ATTORNEY AT LAW**

           MUNGER, TOLLES & OLSON LLP
           601 Massachusetts Avenue NW
           Suite 500 East
           Washington, DC  20001
    BY:  **JONATHAN KRAVIS, ATTORNEY AT LAW**

           MORGAN, LEWIS & BOCKIUS LLP
           One Market - Spear Street Tower
           San Francisco, California  94105
    BY:  **BRIAN ROCCA, ATTORNEY AT LAW**

           HOGAN LOVELLS US LLP
           555 Thirteenth Street, NW
           Washington, DC 20004
    BY:  **JESSICA L. ELLSWORTH, ATTORNEY AT LAW**

Also Present:  Michael Ernst
              James Mickens
              Vitor Baccetti
              David Kleidermacher
              Edward Cunningham
              Christian Cramer

| | |
|---|---|
| 1 | **Wednesday - August 14, 2024**                    **10:03 a.m.** |

2                    **P R O C E E D I N G S**

3                        ---oOo---

4      **THE CLERK:**  Calling Civil 20-5671 and Multidistrict

5  Litigation 21-2981, Epic Games, Inc. vs. Google LLC and In Re

6  Google Play Store Antitrust Litigation.

7      **MR. BORNSTEIN:**  Good morning, Your Honor.  Gary

8  Bornstein for Epic Games, joined today by Lauren Moskowitz,

9  Yonatan Even, Malikah Williams, and Samantha Paralikas.

10      **MR. POMERANTZ:**  Good morning, Your Honor.  Glenn

11  Pomerantz on behalf of Google.  The people sitting at counsel

12  table I think on both sides are the witnesses who have

13  submitted declarations, not counsel; but with me in terms of

14  counsel are Jessica Ellsworth, Lauren Beck, Kuru Olasa,

15  Jonathan Kravis, Brian Rocca in the second row there.

16      **THE COURT:**  Okay.  We're at the final stage.  So

17  here's what we're going to do today:  I'm going to take the hot

18  tub testimony on some of these technical issues, follow that

19  with closing remarks on remedies generally.

20      In a moment of folly, I gave each of you up to 45 minutes,

21  perhaps you could make it 30.  I'll leave it up to you, but we

22  have talked a lot about this.  I'm interested to hear what you

23  have to say, but I'm not sure a full 45 minutes per side will

24  be necessary.

25      And then we have some odds and ends that we're going to

1    talk about to take us to judgment, and that's namely the UCL

2    claim that I have to do and then Epic's illegality defense to

3    the DDA contract, which we'll talk about at the end.

4        Now, for the tech tutorial part, we do have outside access

5    for interested viewers.  So we're going to have -- everybody

6    has -- we only have one camera -- remember, this is government

7    technology, we only have one camera per side.  So all the

8    speakers are going to have to sit on the same side of the

9    table, and we will angle the camera as well as we can to that

10   side.  If there are speakers that are out of view, we'll just

11   move the camera down.  Okay?

12       I can see right now that it looks very good for the most

13   part, but we'll have to just kind of shuffle around a bit.  All

14   right?

15       So, Counsel, you can retreat to the bench and we'll go

16   forward.

17       Actually, sorry, Mr. Bornstein, before you do that, who's

18   going to take the lead on the plaintiff's side?

19           **MR. BORNSTEIN:**  In terms of the experts or in terms of

20   the --

21           **THE COURT:**  No, in terms of the expert.  Is it going

22   to be Dr. Ernst?

23           **MR. BORNSTEIN:**  We have Professor Ernst --

24           **THE COURT:**  Professor Ernst?

25           **MR. BORNSTEIN:**  -- who's the gentleman sitting closest

1   to you, and Professor Mickens.  And the general division this

2   is Mr. Lyon, who's assisting us with the tech today.

3               **THE COURT:**  Yes.  Yeah.

4           **MR. BORNSTEIN:**  He won't be testifying.

5       The general division of labor between the two is that

6   Professor Mickens is focused more on security-related issues

7   and Professor Ernst has kind of a broader perspective on

8   things.  So --

9               **THE COURT:**  Let's start with Professor Ernst.  Okay?

10          **MR. BORNSTEIN:**  Okay.

11              **THE COURT:**  Now, who on Google's side, Mr. Pomerantz,

12  is going to respond?

13          **MR. POMERANTZ:**  We divided it up a little differently,

14  Your Honor, in terms of the expertise of the fairest gentlemen

15  at the table here.  So that I don't recall exactly -- I know

16  their declarations set forth what their -- what part of it --

17  and they know amongst themselves who will be answering

18  questions.  I believe one is dealing with the catalog access

19  remedy.

20              **THE COURT:**  Oh.  It's going to be by topic?

21          **MR. POMERANTZ:**  One is dealing with the library

22  porting remedy.

23              **THE COURT:**  All right.

24          **MR. POMERANTZ:**  And then I think all three of these

25  gentleman have a different expertise relevant to the remedy of

1  Play distributing third-party stores.

2      Mr. Cramer, who is sitting to my left, is available if

3  there's any questions about the costs, how we calculated

4  certain costs.

5          **THE COURT:**  All right.  So let's see if we can reduce

6  your headcount here for a bit for the camera.

7      So who is not planning on having anything to say in

8  response to Professor Ernst?

9          **MR. POMERANTZ:**  I think probably these three are the

10  ones who would be talking, and I don't think it probably would

11  be Dr. Cramer.

12          **THE COURT:**  Okay.  All right.  That sounds good.

13  We'll just put the camera on those three.

14      And you're good.  Okay?  So the plaintiff side is fine.

15      And it looks like the three right on that side of the

16  table?  Okay.  They're in good view too.  Okay?

17          **MR. POMERANTZ:**  Thank you, Your Honor.

18          **THE COURT:**  Okay.  Now, we're going to swear you all

19  in because this is going to be recorded testimony; but before I

20  do that, let me -- let me kind of give you some table setting

21  right now.

22      I have a mountain of materials that I have worked through:

23  Reports, declarations, arguments by the counsel, not to mention

24  everything we covered in the trial.  All right?  So I am deep

25  into this, and I am pleasantly surprised by three things, which

1   is there is at least at the conceptual level, as I understand

2   it, there is some agreement on concepts.  All right?  I know

3   the devil is in the details and we'll work on that.

4        But for catalog access, there is -- it looks to me that

5   there is some agreement that is technically feasible for that

6   to happen in a way that's not going to, you know, break the

7   bank or break anyone's backbone.

8        Same goes for what we're calling library porting.  That

9   term now seems a little outmoded.  It's more app ownership, but

10  there's at least some agreement that the technical challenges

11  can be overcome.

12       And it also looks like there is some agreement that the

13  distribution of third-party stores is an app is also not an

14  impossible task.

15       Now, two things for you to keep in mind.  I want to hear

16  more about this.  I want to explore the areas of disagreement,

17  but we are not micromanaging API-level disputes.  All right?  I

18  just need what I need to do to enter an injunction.  An

19  injunction provides guidance.  It is not a granular dictation

20  of what should or should not happen.  So keep it at high level.

21       The things I want to focus on are:  What are the actual

22  areas of dispute that need to be fixed?

23       And also one of the things I want both sides to address is

24  timeline.  Okay?  You know, Google is telling me it's going to

25  take eons for all this to happen.  I am skeptical about that

1    for a variety of reasons, not the least of which is Google

2    tells everybody every day in the world it's the best and the

3    brightest at what it does, so I find it hard to believe that

4    all that brainpower that is represented to the world can't

5    solve these problems in less than 16 months, but we'll hear

6    more about that.

7        Okay.  I'm less concerned about the costs, but we can --

8    if we need to, we can get into that.

9        Now, the other thing is, I am going to set up a technical

10   compliance and monitoring committee as part of the injunction.

11   So this is another reason I don't -- don't get too granular.

12   It's not going to be productive for me.  There will be a

13   mechanism for resolving highly specific disputes if they come

14   up in the future.  Okay?

15       So, now, anybody who's going to testify stand up, please,

16   and Ms. Clark is going to swear you in.

17           **THE CLERK:**  Will you please raise your right hands.

18               (All who will testify sworn.)

19           **ALL:**  Yes.

20           **THE CLERK:**  Thank you.

21           **THE COURT:**  Okay.  Professor Ernst, I'll turn it over

22   to you.

23           **PROFESSOR ERNST:**  Thank you very much.

24           **THE COURT:**  Now, make sure you have that microphone

25   right close to you too.

 1        **PROFESSOR ERNST:**  Sorry.  Is that acceptable?

 2        **THE COURT:**  Is that good, Kelly?

 3     Good.  Yeah.  Go ahead.

 4        **PROFESSOR ERNST:**  Mr. Lyon, could you please put up my

 5     slides?

 6        **THE COURT:**  Oh, is there a copy for me, hard copy?

 7     Actually two of them.  Do you have two hard copies?  That would

 8     be great.

 9                    (Pause in proceedings.)

10        **THE COURT:**  All right.  Thank you.

11     Okay.

12        **PROFESSOR ERNST:**  Great.

13     So, Your Honor, as you have already stated, I think all of

14     us agree that the proposed remedies are technically feasible.

15     They can be done.

16     Google has provided some effort estimates in terms of a

17     time and money.  I believe that those are inflated.  They

18     include nonincremental costs, things that Google was going to

19     have to do anyway; they include work that's not technically

20     necessary to achieve the injunction, the remedies; and their

21     estimates are high and contain excessive buffers in my view.

22     So I'm proposing a design that's essentially a subset of

23     their design that can be achieved much more quickly and much

24     more cheaply.  I think that that could be done in three months

25     at the cost of about a million dollars.

1        **THE COURT:**  Okay.  For the whole thing?

2        **PROFESSOR ERNST:**  That is correct, Your Honor.

3        **THE COURT:**  For everything?

4        **PROFESSOR ERNST:**  Yes.

5        **THE COURT:**  Three months, a million dollars.  Okay.

6    All right.  Go ahead.

7        **PROFESSOR ERNST:**  So to emphasize the way we're doing

8    the costing, so the blue here is what I have estimated.  These

9    are things that are technically necessary in order to achieve

10   the proposed remedies, and this is only the additional costs

11   beyond what Google is going to have to spend regardless.

12       And then Google has piled on a few other things.  They

13   are -- they're not acknowledging the code, the processes that

14   are already in place.  They've added a number of steps that are

15   not necessary and -- with, for instance, legal and policy

16   issues; and even though their estimates are in ranges, they've

17   added a buffer on top of that.

18       So now I'm going to talk about each of the three different

19   parts.  The first is catalog implementation.  Google proposed

20   two different possibilities.  One is to export the catalog.

21   The other is to allow app stores to query the catalog.  These

22   are both technically feasible.  They both will achieve the aim

23   of the remedy.

24       So in Google's proposal, they're going to give some subset

25   of the catalog data, but they don't say what it is.  So I can't

1    address the reasonableness of that.  I think they should export

2    anything that the Play Store uses.

3        Google's proposing to export an old version of the catalog

4    just once per day, but I think that --

5        **THE COURT:**  Wait just one second.

6        So when you -- by the way, I'm going to just pop in

7    constantly, so be prepared.

8        When you say Google should export what it already uses,

9    what do you mean by that?

10       **PROFESSOR ERNST:**  So Google has a catalog, and the

11   Play Store uses some parts of that catalog.  So anything the

12   Play Store reads that -- that's apparently what's needed for an

13   app store, and that same information should be provided to

14   third-party app stores in order to enable a level playing field

15   and an equally good user experience.

16       **THE COURT:**  So the concept is kind of an equal-access

17   concept?

18       **PROFESSOR ERNST:**  Yes, Your Honor.

19       **THE COURT:**  All right.

20       Okay.  Go ahead.

21       **PROFESSOR ERNST:**  So Google's proposing to update this

22   information just once a day, and I think it should be updated

23   equally as often as the catalog that the Play Store itself

24   uses.

25       **THE COURT:**  Is that more than once a day?

1          **PROFESSOR ERNST:**  Yes, Your Honor.

2          **THE COURT:**  Really?

3          **PROFESSOR ERNST:**  Yes.

4          **THE COURT:**  Okay.

5          **PROFESSOR ERNST:**  For example, if someone submits a

6    new app, then that app is going to become available on the

7    Play Store within minutes to hours.

8          **THE COURT:**  So equal access also then for the updates?

9          **PROFESSOR ERNST:**  Yes.

10         **THE COURT:**  Okay.

11         **PROFESSOR ERNST:**  So they propose that there should be

12   an alley-oop like mechanism for installing apps, Google Play

13   apps, from a third-party store.  And there's already --

14   alley-oop already exists.  I think that it could be modified or

15   its successor could be modified relatively quickly.

16         **THE COURT:**  Before we do that, alley-oop has been

17   floating around.  It came up a little bit in trial.  Just tell

18   me what you think alley-oop means.

19         **PROFESSOR ERNST:**  Oh, I'm sorry.

20         **THE COURT:**  I'm not sure everyone has the same -- you

21   tell me what you mean by alley-oop.

22         **PROFESSOR ERNST:**  Yes.  Alley-oop is a mechanism by

23   which some app developer can embed a button that will enable

24   the installation of an app from the Play Store.  For example,

25   while you're browsing Twitter, say, there will be an ad that

 1  says "Wouldn't you like to download this other app?  And then

 2  you can click on that, and the Google Play Store in the

 3  background will go ahead and install that app.

 4          **THE COURT:**  Okay.

 5          **PROFESSOR ERNST:**  And, similarly, if a third-party

 6  store is listing some apps that are in the Google Play Store,

 7  then we would like to be able to have the user install those

 8  without having to kick the user out of the third-party store

 9  and make them go to the Google Play Store.

10          **THE COURT:**  And how would that work just conceptually?

11          **PROFESSOR ERNST:**  So it could work similarly to

12  alley-oop.  So there could be an indication in the

13  Play Store -- so the Play Store -- sorry.  The third-party app

14  store will list a bunch of apps.  Some of those are from the

15  Play Store and they'll be branded as such and some are local to

16  the third-party store.  If someone clicks on the third-party

17  store app, then it just gets installed in the usual way.  There

18  will be a consent screen.

19      If they click on one of these Google-branded apps, the

20  ones in the Play Store, then it looks the same, the click looks

21  the same, but the process of installation is not done by the

22  third-party store.  The process of installation is done in the

23  background by the Play Store instead because it's a Play Store

24  app.

25          **THE COURT:**  That's the alley-oop part; right?

1          **PROFESSOR ERNST:**  Yes.

2          **THE COURT:**  Yeah, okay.

3          **PROFESSOR ERNST:**  Sort of sending control over.

4          **THE COURT:**  All right.

5          **PROFESSOR ERNST:**  So, yeah, I've described that.  And,

6    you know, given that the alley-oop mechanism exists and works

7    for a number of different publishers, I think it could be made

8    to work for the third-party app store.

9        So Google also proposes to establish eligibility criteria.

10   Not every app store would get access; just some.  Again, they

11   haven't said what these criteria are, so it's impossible for me

12   to comment on them.  But what I can comment is, there's no

13   technical reason, no security reason that that is needed.

14         **THE COURT:**  All right.  Well, I understand it, we'll

15   hear from Google, but the ostensible concern is there will be

16   malicious app stores or app stores that are false fronts or

17   somehow doing something that's equivalent of malware.

18       So as I understand it, what I thought you were saying in

19   your declaration -- you can tell me now if it's wrong -- is

20   that you just want Google to treat the app store apps like any

21   other app; right?  They already do some vetting for malware and

22   things like that, so not have any additional criteria above and

23   beyond that just because it's a third-party app store app;

24   right?

25           **PROFESSOR ERNST:**  That's right.  It's not technically

```
1   needed.  There's no security advantage from doing that.
2            THE COURT:  Why is that?
3            PROFESSOR ERNST:  Because -- oh.  Dr. Mickens --
4            PROFESSOR MICKENS:  I can speak to that.
5            THE COURT:  Sure.  Yeah.
6            PROFESSOR MICKENS:  Thanks.
7        So there's a couple reasons why that's not necessary.  One
8    important thing to keep in mind is that if a user discovers
9    a -- on Play app through a third-party app store the
10   fulfillment, the implementation of that installation, is still
11   handled by the Play Store ultimately.  There's no way that that
12   sort of third-party app that acted as that discoverability
13   interface could somehow corrupt in some way, like, the
14   installation of the app.  So there's no concern there.
15       Furthermore, even in the proposed world where we have some
16   mechanism, alley-oop like or some other way, to enable the
17   discoverability, all of the sort of security mechanisms that we
18   talked about *ad nauseam* at trial are still there:  The
19   sandboxing, Google Play Protect, so on and so forth.  So
20   there's not, you know, any sort of new security concern that's
21   being brought up through this new discoverability interface.
22            THE COURT:  Okay.  Go ahead.
23            PROFESSOR ERNST:  Thank you.
24       So another thing that was added that isn't a necessary
25   according to the injunction is a developer consent mechanism
```

1    for opting in.

2         **THE COURT:**  All right.  Let's just pause there.  I

3    want to kind of take this in tranches.

4         Okay.  So that's kind of the nuts and bolts for the

5    catalog part.  So who's going to take the lead on responding

6    for Google?

7         **MR. BACCETTI:**  I'll take the lead, Your Honor.  Can

8    you hear me.

9         **THE COURT:**  Yeah.  Just make sure the thing is closer

10   to you, please.  It's a little light.  Can you boom it out?

11        **MR. BACCETTI:**  I'll definitely speak louder.

12        **THE COURT:**  She can't hear you.

13        **THE CLERK:**  Bring the microphone closer to you.

14        **THE COURT:**  You're going to have to be loud and proud.

15   Okay?

16        All right.

17        **MR. BACCETTI:**  Sounds good.  Loud and proud enough

18   here?

19        **THE COURT:**  Okay.  Good.  All right.

20        **MR. BACCETTI:**  So I think that our four key things

21   here that create a difference in terms of the estimates that I

22   want to talk through, and they explain this difference between

23   three months and what we are talking in our proposal, which was

24   12 to 16 months.

25        The four main factors that I identify and I want to talk

 1   first, these top-level factors, and I can talk specifically

 2   about each one of them.

 3       The first one is assumptions about how much code can be

 4   reused.  I believe Mr. Ernst's declaration and the position is

 5   there's significant assumptions that we can reuse code that is

 6   available, which, in fact, it's not possible in many cases.  It

 7   may look similar from outside, but we have technical reasons.

 8   We analyzed it and we actually do not believe that much code

 9   can be used in many cases.

10           THE COURT:  Code for what?

11           MR. BACCETTI:  So, for example, he mentioned

12   alley-oop.  Alley-oop was described as a button.  Alley-oop is

13   actually not a button.  It's dialogue that shows a lot of

14   different information.  Alley-oop does not include, for

15   example, a mechanism to check if a particular developer has

16   consented to be distributed to this mechanism.  That's -- that

17   will be something that will be new.

18       Alley-oop only includes a check for the caller.  So, for

19   example --

20           THE COURT:  Okay.  Let's assume developer consent is

21   not an issue.  Does that make alley-oop a lot easier for

22   Google?

23           MR. BACCETTI:  There will be even -- even if we

24   exclude that, there may be differences in how it operates and

25   how it behaves.  So, like, the steps that we show different

1   screens, actually we have identified things that may be

2   different that we may need to do here, and that would add extra

3   complexity and cost.  So --

4        **THE COURT:**  But if you're not hung up on getting

5   developer consent each and every time, that will simplify

6   things a lot for Google; right?

7        **MR. BACCETTI:**  It would be one of the things that, for

8   example, alley-oop specifically would need to document; but

9   even within alley-oop, there are differences.  For example,

10  alley-oop was built to be used by apps that are in the

11  Play Store that we recognize, that we have a signature, that

12  really are part of our catalog already.

13       And if we're using third-party stores to trigger, there

14  may be technical differences in how we can verify if the caller

15  is authorized.  That goes for process of signature verification

16  that would be different.

17       So there are a lot of differences just on alley-oop, and

18  that reflects even on the description of alley-oop.  Alley-oop

19  is not a button.  It's something much more complicated and it

20  would need more work.

21       And this is reflected in other parts of the catalog access

22  piece too.  So, for example, the Developer Console, which is a

23  user -- is an interface, a website, that developers use to

24  upload their APKs to provide data, to describe it, and so on,

25  there will be meaningful changes there that need to happen.

1    And looking throughout consulting with many of my

2  colleagues, we could identify a lot of things that would need

3  to be changed, and I believe that the proposal as described by

4  Mr. Ernst is the tip of the iceberg and it would require more.

5    So that's the first factor, the -- which is specifically

6  the ability to reuse code.

7    The second factor is in terms of processes that we need to

8  do for launch.  Your Honor, you mentioned that Google has the

9  best and brightest, and we do take pride on the code that we

10  build and so on.  Building this type of code, it's not

11  something that comes actually cheap.  It's something that

12  actually requires processes where before someone implements,

13  they write a document and describe these changes.  There are

14  reviews where they're discussed with engineers.

15    **THE COURT:**  Look, let me just tell you about costs.  I

16  have the cost estimates.  I think they maxed out at 600 million

17  at the worst possible case from Google giving it every benefit

18  of the doubt, and that's a lot in my view.  It's something like

19  600 million.

20    You know, this is an antitrust remedy.  Okay?  You're

21  going to end up paying something to make the world right after

22  having been found to be a monopolist.  So I am much less

23  concerned about those figures given particularly the fact that

24  there are no damages in this case.  This work -- this money is

25  going to be all remedial to overcome the barriers to

 1  competition that Google was found to have erected.

 2      And given the amount of money that was in evidence at

 3  trial about how much Google makes year over year over year on

 4  Google Play Store, this is a drop in the bucket.  So I'm not --

 5  I'm more interested in timeline.

 6      And I also -- I'll be candid with you, it's not helpful to

 7  me just to say, "Oh, we have a lot of work to do."  Okay?  That

 8  Just is not that helpful.  I know there's some work to do.  I

 9  need more specifics.

10          **MR. BACCETTI:**  Of course.

11          **THE COURT:**  Why is it that alley-oop is not going to

12  work the way that Professor Ernst suggests?  Now, he gave you

13  three months and $1 million all in.  It's a good number and a

14  good time period.  So you need to tell me more in detail why

15  that's not feasible.

16          **MR. BACCETTI:**  Of course.  So, Your Honor, putting

17  costs aside --

18          **THE COURT:**  Because it does seem -- look, everything

19  I've seen looks feasible to me.  I'm not a software engineer.

20  No federal judge is.  I'm not in any way trying to intrude on

21  that space but, you know, exporting the metadata for the

22  catalog, everybody seems to say can work.  So --

23          **MR. BACCETTI:**  Yes.  Just to be very clear, I'm not

24  disputing the feasibility.  I think there is a lot of agreement

25  in this space.  I'm talking specifically, and even putting

costs aside, I'm talking about timelines.

So build -- there's actually a lot to be built.  It's --
the usability, as I mentioned, is not as high as assumed in the
estimates from the Epic experts.

**THE COURT:**  All right.  Well, how much do you have to
do that's new and how long would that take?

**MR. BACCETTI:**  So my estimate specifically just for
the line installs, which is being referred as alley-oop, which
is a previous program, I estimated six to nine months covering
actually everything from end to end, which starts from
designing it, just talking to engineers, looking at these
changes in detail, discussing, reviewing.

And, very importantly, I believe Mr. Ernst's declaration
does not take into account the time to test and to roll out.
So there's actually -- when we finish the code, we need to test
internally.  We test with the percentage of users.  Then we
roll it out.  And that's something that we do for every
feature, and it's extremely important for the security and the
safety and also the business of developers and so on.

Just like referring, for example, in the press recently,
CrowdStrike, there are a lot of examples if you roll out
software without the proper steps for validation, there could
be very serious consequences and that's, for example, not
accounted on the estimate.  It's just the time to build.

**THE COURT:**  Okay.  Let's just pause on that.

1        Professor Ernst?

2            **PROFESSOR ERNST:**  So Mr. Baccetti is right, that it is

3    very important to field test any changes.  And I was asked to

4    determine the tech costs of building the remedy, and that's

5    what I have.

6        So once they have a build of Android that contains all of

7    the things in the remedy, then they will have to field test it,

8    have people walk around using it, test on many different

9    devices.  So this is all a thing that they already do, and they

10   already do it at least four times a year, sometimes more,

11   because they make releases of Android at least four times a

12   year.

13       In terms of --

14           **THE COURT:**  So you're saying this could be folded into

15   the regular release cycle?

16           **PROFESSOR ERNST:**  Yes, to any of those releases, a

17   major or a minor release.  A major release is made once a year

18   usually in the beginning of the fall.  Minor releases are made

19   at least every three quarter -- at least every quarter.

20       So in terms of -- and those releases are just -- they're

21   sort of like a train leaving the station.  And the question is:

22   What I said was how long it takes to get to the platform.

23   Waiting for the next train and also, you know, the time for the

24   train to make the journey from a build inside Google to being

25   available to OEMs, that could take six weeks, that could take

1    four and a half months.  Those are ranges for what I believe it

2    would take.

3        So, yes, you definitely have to add that to my estimates

4    before you have something that's ready for OEMs.

5            **THE COURT:**  Okay.  Please.

6            **PROFESSOR ERNST:**  And, oh -- I'm sorry.

7            **THE COURT:**  Go ahead.

8            **PROFESSOR ERNST:**  With regard to not including -- so I

9    totally agree, I didn't include roll out.  My estimates do

10   include testing.  They do not include field testing.

11           **THE COURT:**  Okay.

12       All right.  Go ahead.

13           **MR. BACCETTI:**  Let me respond to some points here.

14       I think that there are some fundamental assumptions that

15   are incorrect that I want to point out.  Just looking just on

16   building things, for example, on the position of Mr. Ernst,

17   there was a comment that code review, which is a process

18   through which after an engineer builds something, another

19   engineer looks and checks to see if they agree with

20   implementation, if this is an implementation that is up to our

21   quality standards, that could happen in one day.  That's just

22   not realistic in my experience having worked as a product

23   manager at Google for eight years.  Even minor changes, one day

24   is a very fast turnaround.

25       And so even on implementation itself, I already have

1    fundamental concerns given the complexity and the amount of

2    changes I need to do here.

3        But then I want to talk about the release's piece.  So

4    there's also an incorrect assumption about how features in the

5    Play Store are released.  So the Play Store is released

6    separately from Android.  So we actually provide a version of

7    the Play Store sometimes when we are releasing something like

8    an Android version, et cetera, but the Play Store is

9    independent.  It doesn't need to run together, which means that

10   we need to run a separate process.  That needs to be done

11   separately.  And every new change we run a process called

12   experimentation where we actually test and see how it's

13   working.

14       So there's no such thing as it comes for free.  When you

15   are releasing a new feature, you need to have engineers working

16   collecting metrics, making sure that these things are looking

17   acceptable and there are no unexpected errors or so on.  So all

18   these things add cost.

19       And most importantly for the point as Your Honor was

20   discussing, time.  Like, at our scale when -- for this quality

21   of software and to be able to maintain and given the

22   criticality of our operation, it does take time and this is in

23   line with other projects that we have launched, which are

24   quite --

25           THE COURT:  Well, if you invest in more resources, it

1    would take less time; right?

2        **MR. BACCETTI:**  I already accounted for parallel work

3    strings.  So when I -- in my declaration, I provided a number

4    of tables.  There was an initial phase of design for

5    three months, and then everything after that was parallelized.

6    So I don't see a way to actually make it faster because there

7    is significant amount of work and a significant amount of risk

8    in testing and implementation and all these things that need to

9    happen for us to roll out.

10       **THE COURT:**  What is the risk of exporting the

11   metadata?

12       **MR. BACCETTI:**  The risk is not only, for example,

13   building something --

14       **THE COURT:**  You're already using it -- just to jump

15   in, you're already using it on your own end.  What's the risk

16   of sharing it with others?

17       **MR. BACCETTI:**  I'd like to -- I'd like to cover two

18   points here, Your Honor.

19       The first thing, on the already using it, it goes back to

20   the assumption of how we are using it and if we can reuse or

21   not.  The -- we are using it for a different purpose, which is

22   mostly to show a website or show a page with some information.

23       To be able to give this to an external party, we need to

24   create new infrastructure and new, for example, database or

25   something we do not provide today, and it's not aligned with

1   internal pieces of code that we have at Google.

2       Everything that we do inside Google is -- for example, the

3   declaration of Mr. Ernst talks about using an Oracle database.

4   We do not use Oracle.  We use internal tools that were built

5   for Google for our specifications, which are proprietary, which

6   are not industry standard.  So for us to provide this for

7   another party, people will not be able to use it and actually

8   would be probably quite complex for them.

9       So, first, we need to build something new that is suitable

10  for people to access.

11      And the second piece of the answer -- I'm sorry.  Can you

12  recap the question?  I just lost it.

13          **THE COURT:**  That's okay.

14      But, all right, even baking all this in, you still believe

15  it can be done in six to nine months?

16          **MR. BACCETTI:**  Six to nine months of implementation

17  and three months of design, and we added a buffer for the

18  complexity.

19      The point that I wanted to answer, you asked me what was

20  the risk.  The risk is not just, for example, building a

21  feature that does not work well for third-party stores.  The

22  risk is actually impacting our millions of developers and their

23  business and our users out there.  This is not something that

24  will be separate entirely from the Play Store.  It would be

25  part of our code base.  And if something breaks, it can break

1    our own business, and there are a lot of apps that are very

2    important.  There are apps that are used for installing

3    monitors.  There are apps that, like, are very important for

4    research.

5            THE COURT:  How would this break the Play Store?

6            MR. BACCETTI:  It could potentially break because we

7    will be touching a lot of different places all over the

8    Play Store to provide something like this.  So there's a

9    significant risk of rolling out something like this, especially

10   at Google scale.  We're talking about an operation that we have

11   billions of users, we have millions of developers.  And at this

12   scale, there are really high stakes; and if things breaks, as I

13   mentioned, we saw a few weeks ago with the CrowdStrike example,

14   things can actually be very dramatic and there could be serious

15   consequences out there.

16           THE COURT:  Anything about that, Professor Ernst?

17           PROFESSOR ERNST:  So catalog access is going to be a

18   read-only mechanism.  It doesn't require changes to the

19   Play Store.  I mean, if we're just talking about catalog

20   access, then there's no way that that could break the

21   Play Store.  If we're talking about something like alley-oop,

22   then they already have mechanisms to put that in place.

23           THE COURT:  Let's just talk about catalog access for

24   right now.  Okay?

25           PROFESSOR ERNST:  Great.

1          **THE COURT:**  Why is it, in your view, impossible to

2    break the Play Store with that?

3          **PROFESSOR ERNST:**  Dr. Mickens, do you want to take

4    that or shall I?

5          **PROFESSOR MICKENS:**  Sure.

6        I mean, I think the way to sort of think about catalog

7    access is that we're exposing this sort of read-only data to

8    external parties, and that shouldn't affect at a high level,

9    like the conceptual level, the way that the Play Store itself

10   is consuming that data.  Right?  Because nobody is trying to

11   concurrently, you know, at the same time, modify that.  We're

12   not allowing third-party stores, for example, to issue updates

13   to that data.

14       And so there's no security risk in taking this catalog

15   data, which is already public.  It's just not easily accessible

16   by, you know, sort of externals to Google parties.  There's no

17   security risk to, let's say, the Play Store in saying, "Hey,

18   other parties, here's this read-only data."  The Play Store

19   still gets to keep its own copy and it's not having its own

20   operations interfered with in any way by making that data

21   discoverable to third-party stores.

22          **THE COURT:**  When you say it's already public, what do

23   you mean by that?

24          **PROFESSOR MICKENS:**  So by that I mean there's nothing

25   sort of a secret about, let's say, a particular app's listing

1   in the Play Store.  So, you know, I go and I look for some

2   tic-tac-toe app in the Play Store, you know, I'll see some

3   information about that.  You know, what its rating is, who the

4   developer was, so on and so forth.  That's not hidden.  You

5   know, you can find that by searching for the app on the web,

6   for example, and then getting linked into the Play Store.

7   That's not secret information.

8       So nothing that we're talking about here in terms of

9   catalog access is sort of exposing, you know, secret corporate

10  jewels to the outside world.  It's just saying:  Let's make it

11  feasible for third parties to act as discoverability surfaces

12  for that data.  But that in no way is asking for these

13  third-party stores to have some type of deep integration with

14  what the Play Store is doing and how it's using that data.

15      **MR. BACCETTI:**  Let me respond to two things.  The

16  first one, the read-only comment, and the second one was about

17  the information being supposedly public.

18      Specifically to the read-only, even if you're reading

19  something, if you implement in a way that is problematic,

20  there's a bug, you can take down things.  So just the fact that

21  you're reading, you can still introduce a bug that a server has

22  a memory issue and it stops working and it ends up impacting

23  other operations.  So there is -- this is extremely complex.

24  We're talking about millions and millions of lines of code.  So

25  you can break things in ways that are unexpected, and that's

 1   why testing is so important and so on.

 2        So I just want to point out that it's not factually

 3   accurate that just because you are reading, you cannot break

 4   things.  You can break things when reading.

 5        The second point on the information being public, a subset

 6   of the information can be seen on the website if you go -- if

 7   you look for the tic-tac-toe game, you could see the app icon,

 8   you could see the name, and so on.  However, the catalog access

 9   is not just that information, and some information is not

10   available in that way.

11        For example, if you go to the website and you are a user

12   in the USA, you can see this is available in the USA.  You can

13   make an assumption that's the case.  You cannot know if that --

14   for example, it's available on another country; or you can tell

15   if this is available for your device, but you cannot tell if

16   this is available for an older or a newer Android version and

17   so on.

18        So there's information in the catalog access which is not

19   available in such a way on this website, and you actually would

20   need to provide it differently.  So just because we can see

21   some information doesn't mean that the catalog access is all of

22   that.  That's just the tip of the iceberg, and that adds

23   complexity and adds time and all these things.

24            **PROFESSOR MICKENS:**  May I respond?

25            **THE COURT:**  Yes.

1        **PROFESSOR MICKENS:**  So with respect to the first

2    concern, it is true that, you know, any change that gets made

3    to code could potentially cause some problem; and, yet, that

4    doesn't stop technology companies all the time from introducing

5    new features.  You know, in other words, like the spectre of

6    something possibly needing to be fixed or there being a bug,

7    that is the -- that is sort of the risk that we take in

8    software engineering in general.  So that sort of -- sort of

9    spectre in and of itself isn't sufficient to sort of justify

10   the --

11       **THE COURT:**  So it's an acceptable risk of business?

12       **PROFESSOR MICKENS:**  That's right.  There's no software

13   company out there that says, "Well, we're never going to ship

14   things unless we can guarantee that there are no bugs there."

15   Testing is important, I think everyone here agrees about that,

16   but --

17       **THE COURT:**  For years we were all subjected to beta

18   testing where half-baked things were potentially released and

19   we had to fix them as we struggled through all the mistakes

20   that were in them.  I mean, users, basically, you know, years

21   ago, you know, when those beta things where Company X decided

22   they're going to let the users figure out where all the

23   mistakes are rather than having their engineering team do it,

24   kind of a realtime, and then you get patches and updates and --

25       **PROFESSOR MICKENS:**  That's right.  So testing --

1          **THE COURT:**  -- and two months later it actually works.

2          **PROFESSOR MICKENS:**  That's right.  So just to be

3     clear, everyone here agrees that testing is a good thing.

4          **THE COURT:**  Yeah, but here's the only thing.  So your

5     colleague here is saying there could be a catastrophic -- this

6     is all -- I'm fine with some hiccups and road bumps, or

7     whatever you want to say.  That just comes with the territory

8     and Google is going to have to live with it.

9          Your colleague here has said, "Oh, it's going to break the

10    Play Store."  In other words, the Play Store will suddenly

11    blank out and be inaccessible is what I understand that to

12    mean; or it will crash, or whatever a catastrophic event would

13    be.

14         **PROFESSOR MICKENS:**  I don't think that that concern is

15    a realistic one in the sense that, for example, any change that

16    we might make to YouTube or to Chrome or to Windows or any

17    complex piece of software, perhaps it is the case that a bug

18    might arise that might do something catastrophic and, yet, that

19    doesn't prevent people from actually issuing updates and new

20    features and things like this.

21         So I think that when you're talking about sort of the

22    inherent risk of, you know, introducing new software, that's

23    the way to think about it.  You know, think about it too, like,

24    in terms of engineering of a bridge or a physical object.  You

25    know, you do best practices, you follow best design

1  methodologies, best testing methodologies, and you don't let

2  the possible spectre of something unexpected happen prevent you

3  from doing that new work.

4      **THE COURT:**  Now, even -- I hear that.  I agree with

5  that, but is that still six to nine months, in your view, for

6  catalog access?

7      **PROFESSOR ERNST:**  Your Honor, these are very simple

8  things to do.  Google is a master of handling large databases,

9  large data sets.  It's a master of presenting that information

10  to users.  And so, yes, it's possible there could be some bug.

11  I think it's highly unlikely.

12      Is it possible that they've built the code so badly

13  against every principle that Google stands for and that they

14  advertise that it would take much longer?  That's possible.  I

15  think it's unlikely.

16      We didn't hear any specifics about what all these lots and

17  lots of changes need to be.  Exporting a catalog, making a

18  database available, this is very easy.  Moving data from one

19  location to another, that's very easy.  So I don't see it

20  taking -- I don't see this as sort of a deep technical problem

21  that's going to touch millions and millions of lines of code.

22      **THE COURT:**  Okay.  Yes, closing comment on that?  And

23  then I want to go into developer choice.

24      **MR. BACCETTI:**  Yes, two things just to respond.

25      **THE COURT:**  Yeah.

1      **MR. BACCETTI:**  This like we have, there's no question

2  here on feasibility.  We're not disputing that this can be

3  implemented.  The point is years of experience releasing

4  software and, indeed, we have been fortunate to not have

5  serious issues that the software is down and so on.  That's not

6  a coincidence.  That comes from process of well-known, like,

7  book of, like, best practices that we follow, and that takes

8  time.  So that takes, for example, several months to test, to

9  see, and so on.  So it doesn't happen just because Google

10  engineers are bright.  There's a lot of work to make that

11  happen.

12      And I just want to make super clear as well that we --

13  this is coming from inside Google.  We know these processes and

14  we know how much time it takes, and that's not something that

15  is publicly available outside and I think it's difficult to

16  make assumptions like that.

17      **THE COURT:**  I understand what you're saying and I get

18  it, but I'm also a little skeptical of the "Take my word for it

19  because only I know."  We can't do that.  Okay?

20      **MR. BACCETTI:**  Of course.

21      **THE COURT:**  I mean, look, this is -- I'm not in any

22  way suggesting ill-motives or anything else on this particular

23  topic, but, you know, every person in this situation on

24  Google's side is going to say, you know, "Only I know all the

25  work it's going to take and nobody else does and take my word

for it, it's going to take two years."  I can't do that.

I appreciate the fact that there is an imbalance of information.  I understand that.  And Professor Ernst and his colleagues have not had an opportunity to actually do anything on the level that you know.  We're going to probably end up fixing that with this technical committee to some extent.  It's not going to micromanage Google.  It's not going to run Google's business or anything like that, but it will be there to solve these areas of disagreement.

But, you know, as a matter of drafting the injunction saying, "You know, you're just going to have to trust me, Judge, because for reasons I can't share with you right now, it's going to be a lot of work," I can't do that.  So if you can put metrics on it, that helps me.

I fully appreciate nobody wants to throw out software that's going to crash phones and Play Stores and make user lives miserable.  I get that.  And you will have the space to be safe, to be responsible, put out a good product.  There's no question that that's going to happen, but whether it takes 12 to 16 months or 3 to 6, that's the issue.

Okay.  We're going to go into developer choice, which is where I stopped you at that point.

**PROFESSOR ERNST:**  Great.  So Google proposes that by default, developers would not receive the benefits of being listed on third-party app stores.  They would need to

1  explicitly opt in.

2      Again, there's not a technical requirement for this.

3  There's not a security requirement for this.  If there is any

4  such mechanism, then I think it should be opt out rather than

5  opt in.  We should make the default be the common case.  The

6  common case is the developers will want to have the benefits of

7  being listed on a third-party app store.

8      **THE COURT:**  Let me ask you this:  Just at a high level

9  technically, how would opt out work?

10     **PROFESSOR ERNST:**  So the mechanism --

11     **THE COURT:**  So a catalog opens up and a third-party

12  app store comes into business, has full access to Google's

13  existing catalog, how would a developer say "I don't want to be

14  in that app store"?

15     **PROFESSOR ERNST:**  Okay.  So there are, I think, two

16  aspects here.  One is:  How does a developer say they don't

17  want to be in the catalog?  There's already a Developer Console

18  where, for instance, you upload new versions of your software.

19  So that could just have a tick box.

20     The second is --

21     **THE COURT:**  Where would that be?

22     **PROFESSOR ERNST:**  This is in Developer Console that is

23  used by developers who are uploading apps to the Google Play

24  Store.

25     **THE COURT:**  Okay.  And what kind of a box do they

1    check?  "Please keep me only on Google Play"?

2           **PROFESSOR ERNST:**  For example, yes.

3           **THE COURT:**  Or maybe another box would be "Ask me

4    every time a Play Store wants to" -- "a third-party Play Store

5    wants to feature me"?

6           **PROFESSOR ERNST:**  That would be technically possible,

7    yes.

8           **THE COURT:**  Or a box could be "I don't care.  Send me

9    wherever you want"?

10          **PROFESSOR ERNST:**  Right.

11          **THE COURT:**  You have three boxes and it literally is

12   that easy.  You're uploading your app on the Developer Console

13   and this is just one more little question to answer?

14          **PROFESSOR ERNST:**  If you want to allow opt out store

15   by store, then it would be more complicated.  For instance, if

16   there are 500 stores, you would need to have a way to specify

17   which of those 500 you want.

18          **THE COURT:**  Well, but that --

19          **PROFESSOR ERNST:**  But that's not technically

20   necessary.

21          **THE COURT:**  -- little box asks me every time a store

22   wants to host me would be sort of that?

23          **PROFESSOR ERNST:**  Sure.  That would be a way of

24   implementing that, Your Honor.

25          **THE COURT:**  But this is all easy, in your view?

```
 1          PROFESSOR ERNST:  Correct.

 2          THE COURT:  No fancy coding, no breaking the internet,

 3   anything like that?

 4          PROFESSOR ERNST:  No.  As you said, it's a few

 5   checkboxes.  I think Google is capable of doing that.

 6          THE COURT:  Okay.

 7      Okay, Google?

 8      MR. BACCETTI:  Specifically to the opt-out mechanism,

 9   the details here really matter.  We believe that having a way

10   to select different stores for it to be distributable would be

11   important.  I can see stores that are perfectly reputable.  The

12   developer may be happy to distribute in stores that distribute

13   objectionable content.  It may be pornography.  It may be

14   violent content.  So we do believe developers would find quite

15   important to select the stores in that case.

16      A second thing too is we need to think about this --

17          THE COURT:  So they would.  They can opt out of being

18   in that store.

19      MR. BACCETTI:  Yes.  And to this point, we also need

20   to think about this not in a static basis but on a dynamic

21   basis.  It would not be all the stores sign up and appear on

22   day one.  New stores would come up over time.  And I think

23   given the implications, like, a lot of companies have concerns

24   about brand safety.  If you're distributing, for example,

25   children's content, you don't want to be next to pornography.
```

1    So the point is:  If it's an opt-in mechanism, and I will

2    be -- as a developer, I will be concerned about my content

3    being by default available and I needing to constantly check

4    the Play Console to see if new stores are showing up and going

5    there and checking and removing.  So --

6    **THE COURT:**  Here's -- I'll just tip my hand a little

7    bit.  Reasoning from economics, and this is a case about

8    economics, developers are there to distribute their products,

9    so they want as many outlets as they can possibly get.  A

10   rational developer is going to want to be in every possible

11   store that developer can reach in order to maximize the

12   distribution of its app.  So that's baked in.  It's going to be

13   a rare day, in my view, that a developer is going to say "I

14   prefer not to be sold to customers through this conduit."

15   The second is thing is -- I think Professor Ernst pointed

16   this out -- there are already 3 million apps on the Google Play

17   Store.  So I'm sure if somebody found something objectionable,

18   one of those 3 million apps would probably be it.  Nobody seems

19   to have a problem with that probably because they want to

20   maximize distribution of their product through every available

21   channel.

22   So it may be there's a vibe objection.  I'm just going to

23   call it a vibe objection, "I don't like the vibe of being in

24   this particular store."  I have three problems with that.  I

25   don't know what store is going to be a theme store.  I mean,

```
 1   you know, it's -- how is any of the third-party store going to

 2   be any less diverse in its content or any more diverse in its

 3   than Google Play already is with 3 millions apps?

 4        The second thing is, if there's sort of a thematic store,

 5   the developer can simply opt out of it.  It's just not that

 6   hard.  I think that's going to be a rare day that somebody

 7   actually wants to sell a product is going to say "Close off

 8   that channel."  I'm not saying it's impossible.  I understand

 9   that there may be some fringe examples.  You know, an app for

10   evangelical Christians may have profound objections being in a

11   store that features what you call pornography.  I get that.

12        Those are one-in-a-million situations.  We're talking

13   about the middle of U-curve.  Okay?  Not the extremes.  So I

14   can't -- this sounds like an -- this is an extreme-end

15   objection not a -- not in the middle-of-the-U-curve objection.

16            MR. BACCETTI:  May I respond?

17            THE COURT:  Sure.  Yeah.

18            MR. BACCETTI:  One, just to be clear, I'm not an

19   economics expert, but I can point out examples that should

20   developers choose not to be available in multiple stores.  So

21   if you go to different stores, you would see that developers

22   chose not to be in certain stores.  And even Epic, they're not

23   available in every store out there.  There are a lot of

24   developers that choose not to be available out there.  So --

25   and companies do care a lot about brand safety and licensing
```

1    and very complicated IP issues.

2         **THE COURT:**  So you opt out.  You get a report from

3    Google:  Here's the stores that wants to host you, and you say

4    "I don't want that one."

5         Look, there are two things we're going to maximize as a

6    result of the monopolistic conduct:  Developer choice and user

7    choice.  All right?  Those have both been restrained according

8    to the jury's verdict.  So we're just butting it in the

9    developers' hands.  It's your product.  They're invested in it.

10   They're going to have every incentive in the world to monitor

11   the stores they're in; and if they say "I don't like this

12   store," take them off.

13        I just -- I don't hear any -- let me put it more germanely

14   for what we're doing today.  I don't hear any technical

15   objection to opt out.  You can do it; right?

16        **MR. BACCETTI:**  There's no technical question.  I'm

17   putting myself in the shoes of a developer with a complex

18   business and considerations about their brand safety and so on.

19        I see cases --

20        **THE COURT:**  All right.  That, we cannot do because

21   you're with Google, not the developers.

22        But all right, this is no technical objection to opt out,

23   so --

24        **PROFESSOR ERNST:**  That is correct.  And opt in and opt

25   out, neither one is more difficult technically.

1      **THE COURT:**  Right.  Now, we -- and Google agrees with

2   that.

3      We just talked a moment ago how if it is opt out, it's

4   going to make alley-oop and catalog access easier.  Is that

5   something you agree with?

6      **PROFESSOR ERNST:**  No.

7      **THE COURT:**  In other words, if the presumption is it's

8   all going to happen, you don't have to get special opt-in

9   permission; does that make life easier technically?

10      **PROFESSOR ERNST:**  Oh, yes.  So it will be less effort

11   for developers -- for the common-case developers.  You know,

12   developers are pretty sophisticated.  I think that they can

13   understand and handle, you know, choosing where they want to

14   distribute and where they don't want to.

15      **THE COURT:**  It's the world they live in.  They're

16   online citizens.  I mean, they know better than certainly most

17   federal judges about how to make this happen for themselves.

18   That's why I want them to decide, not the host.

19      Okay.

20      **PROFESSOR ERNST:**  Correct.

21      **THE COURT:**  Okay.  Anything else that you want to

22   touch on?

23      **PROFESSOR ERNST:**  So the last part of Google's

24   proposal is that they want to charge for access to the catalog.

25   There's nothing in the injunction that says that they should

1    charge for the catalog, and there's no technical reason,

2    there's no security reason to erect this additional barrier or

3    to turn it into a profit-making business center.

4            THE COURT:  Google?

5            MR. BACCETTI:  To be clear on the specifics here, as I

6    mentioned before, we did work parallelized, so there are

7    multiple work strings working together to ship different

8    features.  Removing or adding this particular feature, which we

9    believe it's warranted, would not increase the timeline, so

10   since the work will be happening in parallel.

11           THE COURT:  Okay.  What about the fees?

12           MR. BACCETTI:  The fees, it's something that we --

13   given the amount of time that we had, we had a limited amount

14   of time to come with the details, it's not something we looked

15   into detail into a pricing model or so on.  We do believe that

16   we will be creating value for developers, and it would be

17   reasonable to have some kind of model.

18           THE COURT:  Well, another way of putting it is you're

19   remediating monopolistic conduct.  What you're calling creating

20   value is --

21           MR. BACCETTI:  I can't comment on that.

22           THE COURT:  Basically, all I wanted to hear really was

23   the fee pitches; you think you should get paid for the work.

24   That's basically it.

25           MR. BACCETTI:  I add this to the scope, but I want to

be clear that removing -- even if we were to remove this piece,

which I would not recommend, it would not make the timeline

shorter because the work is happening in parallel.

      **THE COURT:**  All right.

  Okay.  Library porting, which is really more app

ownership.

      **PROFESSOR ERNST:**  Okay.  Two slides.

      **THE COURT:**  So the -- oh, is there a different slide?

      **PROFESSOR ERNST:**  Okay.  So library porting, I call

that change ownership or transfer ownership.

      **THE COURT:**  All right.

      **PROFESSOR ERNST:**  Currently there is one app store

that can own any particular app or ownership can be cleared,

and that enables something called app clobbering.  So what we

need to do -- there's no way to transfer ownership today.

  So Google's saying that they're going to have to update

the Android operating system to enable this, but there's an

existing field that contains either the initial store that

installed or it contains a null, which means nothing, which

means ownership cleared.  All we need to do is be able to

set -- is to set that field to a different store, and now that

store is the owner.

      **THE COURT:**  And then this is the user choice element.

So the user would choose which store they want their app to be

affiliated with?

1          **PROFESSOR ERNST:**  That is correct.

2          **THE COURT:**  How does that -- how does that -- just as

3     a technical matter, how does that get presented to the user?

4          **PROFESSOR ERNST:**  So I'm not recommending any one

5     particular design, but I can tell you several designs that

6     would work.  One possibility is that the user can -- there's

7     already a store section of the app info, and the user could

8     just click there and it would list all the stores that

9     distribute that particular app.

10          **THE COURT:**  Can I, just to help me?

11     Let's say I have -- we'll just use Fortnite.  Let's say I

12     already own Fortnite, I bought it on Google Play.  Now the

13     injunction comes in, and I decide I want to change the store to

14     some third-party store.  How would I -- how would I do that?

15          **PROFESSOR ERNST:**  So you'd go to the app info screen.

16     I think it's a long click on the icon.  You'd scroll to the

17     bottom where there's a section called "Store" already.

18          **THE COURT:**  It's already there?

19          **PROFESSOR ERNST:**  Google would need to add to the

20     section called "Store" something called a little, you know,

21     button or something for change ownership.

22          **THE COURT:**  Okay.  And let's say I click that, what

23     would happen next?

24          **PROFESSOR ERNST:**  The next thing that would happen

25     would be a list of all the stores that distribute Fortnite, and

 1   you would just click one of them -- you know, it would probably

 2   be a radio button implementation -- and then Android would set

 3   the field -- set the field that used to be set to Google Play.

 4        **THE COURT:**  Now, how would that other store list get

 5   populated?

 6        **PROFESSOR ERNST:**  Great.  So in my proposal, each app

 7   has in its manifest a list of all the stores that distribute

 8   it.

 9        **THE COURT:**  In the app itself from the developers?

10        **PROFESSOR ERNST:**  That's correct, yes.  So that's

11   essentially just a formal way of expressing business

12   relationships that already exist in the real world.  So if you

13   want to distribute your app through a new app store, you would

14   make an update that adds one element to that list.

15        **THE COURT:**  So you would basically -- all Google would

16   have to do is just port that list down to the store dropdown

17   menu for the user?

18        **PROFESSOR ERNST:**  That is correct.

19        **THE COURT:**  I'm using words like "port."  I'm not a

20   software -- you understand what I'm saying?

21        **PROFESSOR ERNST:**  I do.

22        **THE COURT:**  Okay.  Thanks.  All right.  You're rolling

23   with the judge.  Good.

24      Okay.  Google, what's wrong with that?  That sounds pretty

25   straightforward.

1          **MR. CUNNINGHAM:**  Your Honor, if I may take this.  My

2     name --

3          **THE COURT:**  You have to give your name to the

4     reporter, please.

5          **MR. CUNNINGHAM:**  Edward Cunningham, and I'm

6     representing Android operating system changes for some of these

7     proposed remedies.

8          **THE COURT:**  We're talking about app ownership now.

9     Yep, go ahead.

10         **MR. CUNNINGHAM:**  Understood.

11        So in this case, in this example that's just been given,

12    there's a few reasons why, and I think what you're asking me is

13    to --

14         **THE COURT:**  You need to speak up, and just -- yeah.

15    Go ahead.

16         **MR. CUNNINGHAM:**  Your Honor, I understand what you're

17    asking me about is presumably about the timelines and why --

18         **THE COURT:**  Let's just start simply.  So

19    Professor Ernst says this is easy as pie.  You put a dropdown

20    menu, all the store data is already provided.  Yes?  No?

21    What's Google's position on that?

22         **MR. CUNNINGHAM:**  It's not as easy as Professor Ernst

23    describes.

24         **THE COURT:**  All right.  Tell me why.

25         **MR. CUNNINGHAM:**  To begin with, as described in

1   Professor Ernst's declaration and as spoken about now, firstly,

2   there's the user -- the user interface considerations here,

3   these are new things that have to be built.

4       The mechanism, for example, for knowing which stores an

5   app can distribute itself in, I understand that Professor Ernst

6   has described this functionality existing already and it would

7   simply have to be extended to allow for a list to exist, but

8   that's based on an incorrect assumption about the existing

9   implementation of Android.

10      There is no existing facility for apps to declare which

11  stores they distribute with.  And there's quite a number of

12  complexities that as you start looking at those details, we

13  have to work out solutions for; and as far as I'm aware, none

14  of that has been spoken about in detail in either Epic's

15  proposed remedies or in the declarations.

16          **THE COURT:**  Let me just jump in.  I may have

17  misunderstood -- Professor Ernst, you can tell me if I did --

18  but I thought you said that developers already package the

19  store information somehow.

20          **PROFESSOR ERNST:**  No, that is not the case,

21  Your Honor.

22          **THE COURT:**  How do they get it up to Google?

23          **PROFESSOR ERNST:**  So there is this so-called

24  manifest --

25          **THE COURT:**  Manifest.

1      **PROFESSOR ERNST:**  -- that is included in each app and

2  developers write that in a language called XML, and it is very

3  easy to just add a new field to that XML.  It will look -- the

4  implementation will look just like the implementation of many

5  other fields that are already in that XML.  I do concede that

6  that information is not currently there.

7      **THE COURT:**  Okay.  But you're saying the store

8  owner -- the app -- the developers can add a manifest line or

9  section that says "Here are our stores"?

10      **PROFESSOR ERNST:**  Yes, that is correct.

11      **THE COURT:**  And they would be incentivized to do that

12  because they want to get out of Google Play Store for some

13  reason.

14      **PROFESSOR ERNST:**  That is correct.

15      **THE COURT:**  Okay.  So the burden would be on the

16  developers, which is fine.  This is all -- this is a new world

17  of independent actions.  So the developers are going to have to

18  do this.

19      Okay.  So, Google, assuming that they do that, no problem;

20  right?  You can do the dropdown menu for the user?

21      **MR. CUNNINGHAM:**  Your Honor, I wish it was as

22  straightforward as that.  And as we've looked at this proposal,

23  and this concept of the dropdown I haven't seen in detail, I

24  haven't seen anything about that until just now, however that

25  user interface is built or the mechanism through which the user

```
 1  goes to initiate that transfer, we're going to have to work out
 2  lots of complexities that in the straightforward case where we
 3  describe a user has installed, say, a game from Play and they
 4  might want to transfer and ship to another store, at face
 5  value, like, I concede that looks sort of straightforward; but
 6  we really need to work through all of the details because if we
 7  don't consider them, then something's going to break.
 8      So, for example, when we -- firstly, when we talk about
 9  the declaration in the manifest where the developer lists those
10  stores, we'll need to work out how exactly are those stores
11  identified.  That's not something that we've discussed or has
12  been spelled out, and that's important because when a developer
13  says they want to be distributed on, say, the Epic Game Store,
14  they're going to want to know that they are authorizing
15  distribution on specifically the Epic Game Store made by the
16  business entity Epic Games versus some other development.
17      THE COURT:  So put it in an address or something;
18  right?  I mean, it's not that hard; right?  Say "You can link
19  me to this address.  That's my store link."  Right?
20      MR. CUNNINGHAM:  And, Your Honor, by "address" you
21  mean what exactly?
22      THE COURT:  However you find things on the internet.
23  You say "I want this spot on the internet," which happens to be
24  the official Epic store.  "I'm going to give you all the usual
25  URL, or whatever information it is, to get there."
```

1          MR. CUNNINGHAM:  Yeah.

2          THE COURT:  So the developer does that.

3          MR. CUNNINGHAM:  I understand.

4          THE COURT:  So they tell you they're going to give

5     this all to you in the manifest.

6          MR. CUNNINGHAM:  And let's imagine the developer does

7     that -- and that could be one way of implementing that, and

8     there are other approaches -- we'll need to actually go and

9     build the operating system to now go and identify how is a

10    particular store matched with that particular address.

11         But this is functionality that doesn't exist today in the

12    operating system, and so when we go and firstly design the

13    mechanism for doing that, be that an address or some developer

14    signing information, we're going to have to work out what the

15    most appropriate way for that is that works well for

16    developers.

17         Secondly, we're going to have to work out the

18    implementation changes to make that work.  Taking the address

19    as an example -- again, I'm having to sort of think on the fly

20    here, we haven't worked through all the details, it's what

21    we're going to have to do as part of the timing -- the

22    operating system itself doesn't actually know for free which

23    URL is associated with a particular store, so we're going to

24    have to go and build that functionality.

25         And I wouldn't claim that any of this is infeasible.  I

1    think we're in broad agreement that a lot of what we're talking

2    about here is feasible, but this -- that will take some time.

3         **THE COURT:**  Well, what's your best estimate for how

4    long everything you envision would take?

5         **MR. CUNNINGHAM:**  Your Honor, in my declaration, I

6    believe I've described the resources required end to end.

7    We've said that it would take approximately a year, and that

8    includes the work from a couple of software engineers.  Again,

9    some of this is parallelized beyond the estimates provided by

10   Professor Ernst.

11        **THE COURT:**  I'm just talking about the change of app

12   ownership.  That alone is going to take a year?

13        **MR. CUNNINGHAM:**  Yes, and that includes not merely the

14   writing the code.  I believe that writing the code alone,

15   taking just this example we've spoken about, the identification

16   of the store, that would take more than a month of engineering

17   design and implementation.

18        **THE COURT:**  That's a month.  What happens with the

19   other 11 months?  A month I can live with.  Why does it take 11

20   more months after that to make this work?

21        **MR. CUNNINGHAM:**  So there are several -- we've just

22   spoken about one complexity that isn't -- hasn't been sort of

23   spelled out or addressed in detail, I believe, in the

24   declaration from Professor Ernst about the timings, the address

25   of identification of apps.

1          There are -- having thought about it for a bit of time in

2     preparing for this hearing and submitting our declarations,

3     there are several others of that nature.  For example, Epic's

4     experts have talked in general about the idea that a user will

5     download an app from a store.  They would then have the ability

6     to transfer that.

7          But we have to think about cases such as on a tablet

8     device that is shared in a family, for example, or an URL

9     setting.  We support the concept of there being multiple users

10    of a single hardware device.  You can have user accounts if

11    you'd like, so one account for me, one account for someone else

12    I share the device with, and we have our own separate versions

13    of Android.  It's much the same way that on, say, Windows or

14    Mac, you could sign in as different users.

15         Now, those users have their own apps.  They choose to

16    install apps from different stores.  They operate largely

17    independently.  They just happen to share the same device, and

18    now we face a sort of a tricky decision and design choice.

19         In the event that those two users install again, for

20    example, from the same store initially and then one of them

21    downloads a third-party store and opts through whatever flow

22    we've described to transfer ownership, what do we do for the

23    other user?  Which store is responsible for updating the app in

24    the future?

25         And it's easy to say, "Oh, well, of course, for the first

1  user who made the transfer, their app will be updated by that

2  other store.  For the user who stayed with the original store,

3  they'll continue getting updates from that store."  And I

4  understand from the deposition summaries that I read, that's

5  largely how Epic's experts envisioned it working.

6      But the fact of the matter is that Android doesn't support

7  the ability for multiple users to maintain separate copies of

8  apps from different stores, and so in that particular example

9  alone we're going to have to work out what we do.  Do we have

10 to add some exception for multiple users to say "Sorry, we're

11 just going to stop the library transfer" --

12     **THE COURT:**  This is really limited to the space where

13 multiple users are sharing the same device.

14     **MR. CUNNINGHAM:**  Yeah.  Exactly.

15     **THE COURT:**  This is not millions of people operating

16 their own personal phone they don't share with anybody; right?

17 That's not a problem.  This is just you have multiple -- if

18 there's a family -- a family tablet, that's the only situation.

19     **MR. CUNNINGHAM:**  This example is limited to that, but

20 in building the operating system, we have to consider all of

21 these cases because if we don't, the software, something will

22 break.  We'll end up of the millions of users who do use

23 devices in that manner, the first time someone tries to do a

24 transfer in that case, the device could crash.  It could

25 reboot.  Something might not work.

1      And so these are all of the complexities that we have to

2  design for.

3      **THE COURT:**  You can just tell the users, just tell

4  them you can only be one -- only one store can be affiliated

5  with an app.  That's it.  So if you move it, you're going to

6  move it for everybody or it's not going to work.  Just send a

7  message out.

8      **MR. CUNNINGHAM:**  And so maybe that is one of the

9  things we would have to build, I agree.

10     **THE COURT:**  You don't have to worry about it.  It's

11  all on the user.

12     **MR. CUNNINGHAM:**  Your Honor, yes, we can do that.  We

13  do have to worry about in what you described is something we

14  have to build.  We also have to think through, for example, in

15  doing that, we would be telling the primary user of the device

16  whoever attempted to transfer the app that someone else on the

17  device has installed.  Today we do not reveal information

18  across users.

19     **THE COURT:**  From my personal experiences with family

20  tablets there are no secrets.

21     We've been going for about an hour and 15 minutes.  We'll

22  take a 10-minute break.

23               (Recess taken at 11:10 a.m.)

24               (Proceedings resumed at 11:20 a.m.)

25     **THE CLERK:**  Back on the record in Civil 20-5671 and

1    Multidistrict Litigation 21-2981, Epic Games Inc. vs. Google

2    LLC and In re Google Play Store Antitrust Litigation.

3          **THE COURT:**  Okay.  Oh, you were about to -- well,

4    respond to your colleague's comments about his concerns.

5          **PROFESSOR ERNST:**  So Mr. Cunningham says there are

6    lots of complexities, but he was only able to identify two, and

7    those two are things that Google has already solved.

8          So in terms of identifying an app, there's a thing called

9    the application ID.  It's already used in updates to make sure

10   that you're updating -- as one aspect of updates to make sure

11   that you're updating the right app when an app store wants to

12   do an update, so the application ID can be reused.

13         The second issue was about a shared tablet.  Google has

14   also already solved this problem because there's already clear

15   ownership; and on a tablet, if one user clears ownership, it is

16   cleared for the entire tablet.

17         And so --

18         **THE COURT:**  So it's one owner per device, that's the

19   rule?

20         **PROFESSOR ERNST:**  Correct.  That's right.  Each app

21   has one owner on that particular device.

22         **THE COURT:**  Regardless of how many independent

23   downloads there might have been.

24         **PROFESSOR ERNST:**  That is my understanding,

25   Your Honor.

1          THE COURT:  Okay.

2          PROFESSOR ERNST:  So they could just take the same

3    mechanism.  You know, instead of clearing it, they could set it

4    to a different app store.

5          THE COURT:  Okay.  I want to close this out by talking

6    about batch multi -- multi-app batch transfer in moment, but

7    okay.

8        Last comments on that, Google?

9          MR. CUNNINGHAM:  Your Honor, with regards to the

10   specific points, again, I --

11         THE COURT:  Just responding to your colleague's

12   comments.

13         MR. CUNNINGHAM:  Yes.  So, firstly, for the app ID,

14   there is the concept of an app ID, but the app ID is not

15   uniquely identified across Android.  And so if a developer was

16   merely to indicate the app ID of, for example, the Epic Game

17   Store, there would be nothing to prevent another store to reuse

18   the app ID of Epic Games to identify themselves and pretend to

19   be Epic Games.

20       Again, we can solve this through mechanisms that we

21   discussed, like the URL approach.  That will take a little bit

22   of time.

23         THE COURT:  I came up with that.

24         MR. CUNNINGHAM:  I'm grateful for that, Your Honor.  I

25   don't want to give the impression that any of these things are

1    not solvable, but each of these pieces take --

2         **THE COURT:**  Listen, the baseline is you're going to do

3    some work.  I get it.  Okay?  I'm fine with that.  It's not

4    going to be 16 months.  It's going to be less than that.

5         **MR. CUNNINGHAM:**  It will not be 16 months.  I

6    estimated one year, Your Honor.

7         And we've just been talking about the implementation time

8    dealing with several complexities.  I've mentioned a good

9    number more.

10        And then the testing, in similar to Mr. Baccetti

11   describing testing required for Play, for an Android operating

12   system change, testing is no less important.  It's exacerbated

13   in its complexity because of the fact that Android is

14   distributed by OEMs.  Google does not control ultimately the

15   code on all of these devices, and so the testing will take

16   several phases.

17        And this is not detached from the actual engineering work.

18   We will begin with some closed -- with some testing developer

19   previews where we will publish an unstable version of the new

20   Android operating system.  We will get developers to test it.

21   They will try out all the new features and functionality, and

22   they will give us feedback when things don't work.

23        And in my experience over many years building operating

24   features, the bulk of the engineering work does not stop at the

25   time the developer previews begin.  In fact, it's at that point

1    that we start to learn about some of the aspects that we missed

2    when we were building it.  We'll get told by a developer, "Oh,

3    from my use case, the device now crashes when I try to, for

4    example, install my app because of the change you've made."

5    And then we have to sort of go back and make some engineering

6    changes, work out the solutions.

7        Beyond that, we go to public beta testing as you've

8    alluded to.  The OEMs themselves will do testing.  And so all

9    of this really does take more time than just the month.  And I

10   think Professor Ernst agrees with that, that it's not simply

11   just a month to make the change.

12       And so when I talk about --

13       **THE COURT:**  All right.  Listen, I'm not saying it's

14   going to take 30 days, but I'm not -- 16 months, one year,

15   Google can do better than that.  It's Google.  You can do

16   better than that.

17       But, anyway, let me -- let's move on to -- because I do

18   want to get to oral argument, let's -- all right.

19       So you have 150 apps.

20       **PROFESSOR ERNST:**  Yes.

21       **THE COURT:**  You don't want to go through a painful

22   process of sitting there night after night after night doing

23   each one individually.  How are we going to make life easy for

24   the user?

25       **PROFESSOR ERNST:**  So the way to do that, Your Honor,

1    is with bulk update.  So as we discussed, there will be a way

2    to change the owner of one app; but maybe you want to change

3    the owner of many apps, you know, because a different app store

4    is offering a better deal or because you want to move all the

5    games created by one particular company.

6        **THE COURT:**  I could see an app store wanting to

7    compete saying "You move all your apps to me, I'll give you,

8    you know, a million membership points or I'll give you

9    10 percent off for a month," or whatever, but that could be the

10   pitch.  They want everything because that's their meal ticket.

11       **PROFESSOR ERNST:**  Correct.

12   So suppose that you want to move some apps that were

13   originally downloaded from the Play Store to a separate store,

14   maybe the Epic Game Store.

15       So this is one possible design for the UI would be that

16   you would have a list of all the apps that the Epic Game

17   Store -- that are installed on your phone that the Epic Game

18   Store can install, and you select as many of those as you want.

19   Maybe there would be a "Select All" button as well.

20       **THE COURT:**  Is that coming from Epic then?  Is Epic

21   sending you this list?  Or where are you going to get that

22   list?

23       **PROFESSOR ERNST:**  Okay.  So there are several ways to

24   get that list.  I don't have an opinion about it because I

25   haven't analyzed them.

1      One possibility is to look at the manifests of all the

2  apps that are installed on your phone.  Any of them that list

3  this app store would appear in that list.

4      Another possibility --

5          THE COURT:  Sorry.  Let me just -- so what is it you

6  want Google to do?  To make this happen, what's your

7  expectation of what Google would need to do?

8          PROFESSOR ERNST:  So Google could provide a new API

9  that gives that information, but there's several ways to do it

10  without Google providing a new API.

11          THE COURT:  Hmm.  So they wouldn't have to do

12  anything?

13          PROFESSOR ERNST:  So Google is going -- okay.  You are

14  asking me specifically, as I understood it, about how do we get

15  the list.

16          THE COURT:  No, no.  I have 150 apps on my phone.  I

17  don't want to switch over.  I don't want to go into the store

18  function for each one --

19          PROFESSOR ERNST:  Yes.

20          THE COURT:  -- do the dropdown menu, and pick.  I just

21  want all of them to go to the beta third-party store that just

22  opened up.

23          PROFESSOR ERNST:  Yes.

24          THE COURT:  So what does Google need to do to make

25  that happen?

1        **PROFESSOR ERNST:**  Okay.  So Google needs to implement

2   a new API.  There will be an API to -- there's already an API

3   to clear ownership.  Google needs to create an API --

4        **THE COURT:**  That's an Android 14?

5        **PROFESSOR ERNST:**  That is correct, Your Honor.

6        **THE COURT:**  So right now Google can blank out all the

7   ownership for 150 apps.  So what --

8        **PROFESSOR ERNST:**  No.  They can do it for one app at a

9   time.

10       **THE COURT:**  Oh, one at a time.  Okay.  So how do we

11  get up to the group package?

12       **PROFESSOR ERNST:**  Great.

13      So assuming that this is possible for one app and there's

14  an API for that, then they would have a new API that can take a

15  list of apps and would just go through and do exactly the same

16  operation on each of them.

17       **THE COURT:**  Okay.  Technical issues with assembling

18  that list?

19       **PROFESSOR ERNST:**  Okay.  In terms of assembling the

20  list, Google could provide an API that gives exactly that list,

21  but there are other ways that could be done without Google

22  having to provide a new API.

23      For example, there's permission that permits an app to get

24  a list of all the apps that are installed on a phone.  The app

25  store could compare that to the list of apps that it

distributes.  That would be one way.

Another way would be for every app that's installed on the phone, look in its manifest to see what app stores distribute it.  Those are two different ways that wouldn't require a new API.

THE COURT:  Okay.  And how much work is this going to be, in your view, to make all that happen?  Let's start with doing a new API.  How much work that would be?

PROFESSOR ERNST:  Okay.  So some of the APIs I looked at are literally a line of code.

THE COURT:  One line?

PROFESSOR ERNST:  Yes.  This one I think would be a little more than that, but it's actually pretty simple. Assuming there's already an API that changes the ownership of one field, then all we need is a loop that does that to each of the elements of the list.

THE COURT:  Okay.  Google?

MR. CUNNINGHAM:  Your Honor, when --

THE COURT:  We're talking about batch moving to a new store.

MR. CUNNINGHAM:  I understand.

When Professor Ernst describes, if I heard correctly, two approaches that don't require a new API --

THE COURT:  Let's start with the macro API.  This redoing this one API, let's start with that.

1          MR. CUNNINGHAM:  The API that a store would call

2   giving a list of apps --

3          THE COURT:  Yes.

4          MR. CUNNINGHAM:  -- that they want to transfer in

5   bulk?

6          THE COURT:  Yes.

7          MR. CUNNINGHAM:  In my declaration, logically

8   speaking, that's what we've described would be implemented, an

9   API that the store provides a list of apps.  That, I think,

10  would -- broadly an aligned form would be an appropriate

11  approach.

12         THE COURT:  That's relatively easy to do?

13         MR. CUNNINGHAM:  Well, I think the scaffolding of

14  building the API that the developer would call relatively easy

15  to do.  The difficulty comes in, for example, how does the -- I

16  think it's being assumed here that the store would know which

17  of the existing installed apps it can update and become the

18  owner of.  And while a given store, for example, will know the

19  developers who have come and listed their apps in their store,

20  that store developer will not necessarily know for the existing

21  installed versions of the apps whether that current version of

22  the app lists them as a permitted owner.

23         And so we have to actually do engineering work to make

24  that work.  The dialogue that I think we're envisioning some

25  user interface is going to have to make sure that it only shows

1    apps that definitely can be transferred.

2         Another difficulty we're going to have to figure out, and

3    it became apparent through the highlights I saw of the

4    depositions of both experts, is where -- which declaration from

5    the -- which list from the app do we consider.  There are two

6    app versions at play here.  There's the version that's

7    currently installed and the version that will be updated in the

8    future by the new store.

9         We have to work out which list does Android consider, and

10   the choice there will -- that doesn't come for free.  The

11   engineering work to build that doesn't come for free either.

12   And so I'm not here to say that it's impossible to build.  I

13   think we can build it, and I believe we can build it in the

14   time that we've set out.

15        Now, for the bulk transfer and the transfer of ownership,

16   I have spent a considerable amount of time thinking about this.

17   In fact, we thought about a lot of this in the course of

18   building Android 14, and the Android 14 -- the Android 14

19   changes themselves took approximately the same amount of time

20   that I've described for this change, and so this change is no

21   less complex.

22        The Android 14 already supports -- you know,

23   Professor Ernst describes the possibility of a full loop.  It's

24   already possible for a third-party store to operate a full loop

25   on its own accord and pop up the existing dialogue.  It can

1  also be shown for every single app multiple times.

2          **THE COURT:**  So Google wouldn't have to do anything

3  then; right?

4          **MR. CUNNINGHAM:**  That is already supported, yes.

5          **THE COURT:**  Okay.  All right.

6      Okay.  Any closing thoughts on that issue?

7          **MR. CUNNINGHAM:**  As far as the bulk transfer is

8  concerned, Your Honor --

9          **THE COURT:**  Yeah.

10          **MR. CUNNINGHAM:**  -- my reigning thought is that in

11  having designed the Android 14 solution, and I understand that

12  you explained you didn't want to be prescriptive about user

13  interfaces, we made some user interface choices about there

14  being a simple dialogue, a very straightforward choice, whether

15  a user can proceed to, in the Android 14 version, clear

16  ownership.  As I understand it now, we're talking about

17  transfer.  We chose to do that as simple, straightforward

18  dialogue.  The user can do that as many times as they wanted.

19  That dialogue can be shown in quick succession by a store for

20  as many apps as it wants --

21          **THE COURT:**  Are you suggesting they serially would

22  have to do, say, 150 dialogue boxes?  I mean, people have

23  hundreds of apps.  You know this better than I do.  I want to

24  avoid, if we can, having someone to go manually through each

25  one.

1          **MR. CUNNINGHAM:**  I understand.

2      Your Honor, from my understanding of the proposal set

3  forth by Epic, even in a single-screen approach, I understand

4  some description of checkboxes needing to be checked/rechecked.

5  There still would be work need to be done.

6      As I say, it's possible for us to do.  We have -- we

7  thought about it, and in my role as a product manager working

8  with the engineering teams on Android 14, we thought carefully

9  about the risks, the pros and cons.  We went with the

10  implementation.  We stand by that.  I think that was the right

11  choice.

12      But if we were ordered to do so, we would do something

13  along the lines of what's been described here.  And in

14  considering the testing requirements, the need to make sure

15  that what we build doesn't break, the risk of in doing it wrong

16  impacting apps on millions of devices, I think what we've

17  proposed is a reasonable and accurate assessment based on many

18  similar operating system changes that we've done.  If it took

19  less time, then I would have said as much.

20          **THE COURT:**  Okay.  Let's -- third-party app stores

21  distribution.

22          **PROFESSOR ERNST:**  Okay.  Two slides.

23      So the third part of the remedy is that the Play Store

24  shall distribute app stores.  So currently there is a rule in

25  one of Google's agreements that says you're not allowed to

1   distribute most app stores on the Play Store.  You could --

2   there are some exceptions to that.

3       All that Google needs to do is to strike that from the

4   agreement, and then an app store is an app and so all the

5   mechanisms are already in place to distribute -- to search for

6   them, to distribute them, et cetera.

7           THE COURT:  Okay.  But I think Google's concern was

8   this is somehow going to be a portal to security chaos.

9           PROFESSOR MICKENS:  Sure.  So I can weigh in on the

10  purported security chaos, I believe is the term I heard the

11  court use.

12          THE COURT:  Yes.

13          PROFESSOR MICKENS:  So a couple things there.  So I

14  think that there's various aspects of the purported chaos that

15  are brought up.  I think one concern that was raised is sort of

16  an ostensible concern that there has to be some type of

17  redesign of the Play Store interface, such that when the user

18  is installing a third-party app through the Play Store, that

19  somehow there be like this additional splash screen or warning

20  screen that says, "Hey, by the way, User, are you aware that

21  you're about to install one of these third-party stores?"

22      That's not justified by security concerns.  Because if you

23  look at the way that the Play Store works now, when you go to a

24  particular app, it will be given a label in the play store

25  interface.  So it's a game or, you know, it's a health app, you

1    know, something like this.  And so an app store would

2    presumably be labeled as such.  So there's no security reason

3    to then say, "Okay.  I, as a user, decided to click 'Install'

4    on this thing and I'm given yet another warning that says,

5    'Hey, by the way, did you know that you're installing an app

6    store?'"

7         **THE COURT:**  We can presume the user has some

8    intentionality about knowing they're installing an app store is

9    what you're saying.  I agree with you on that.

10        What I was trying to -- and I want to hear what else you

11   have to say, but Google wants to have a whole eligibility

12   criteria checklist, and as apparently is ostensibly security

13   concerns.  What about all that?

14        **PROFESSOR MICKENS:**  Right.  Okay.  Let's address that

15   then.

16        So at a high level, the problem with those eligibility

17   criteria is that many of them don't speak specifically about

18   the security risk that users might face.  So let me be concrete

19   about that.

20        So one of these eligibility criteria is that a third-party

21   app store wouldn't be eligible for distribution to the

22   Play Store unless that third-party store had some minimum

23   number of apps that it distributed, you know, natively.  That's

24   not a metric of whether any of those apps are safe or unsafe.

25   That's just saying how many apps do you try to distribute.  And

1  so that requirement is totally detached from any notion of user

2  risk.  So that's just completely -- completely tangential to a

3  security issue.

4      There's also questions about restrictions on a

5  potential -- a third-party store distributing malware.  I think

6  the problem here is that, you know, we all think that malware

7  is a bad thing in this courtroom.  Nobody's against that.

8      A problem -- well, there's a couple problems.  One problem

9  is that Play Protect, this is Google's malware scanning

10  service, that's going to be scanning all apps on Play, off

11  Play.

12      **THE COURT:**  Including the third-party app stores?

13      **PROFESSOR MICKENS:**  Yes, Your Honor, that's correct.

14  And so that level of protection is already going to be there,

15  and so there's --

16      **THE COURT:**  That happens automatically, so to speak?

17      **PROFESSOR MICKENS:**  That's right.  And we --

18      **PROFESSOR ERNST:**  Today.

19      **PROFESSOR MICKENS:**  That's right, today.  That is

20  currently happening today.

21      So during trial we talked about several different

22  mechanisms through which Play Protect discovers apps that are

23  off Play.  So Google's already made this investment in putting

24  in this defense mechanism.

25      And, furthermore, if we look at these particular

eligibility criteria for third-party stores that would be
distributed through on Play, Google is saying, "Well, we want
to make sure that there's restrictions against these stores
distributing malware."  However, that is not what the
injunction calls a distribution agnostic mechanism for
determining the safety of apps, because Google is not imposing
those types of restrictions on third-party stores that are
distributed off Play.

And so there doesn't seem to be a legitimate security
justification for Google to impose this requirement only for
third-party stores distributed on Play, particularly given this
context that there are already the sandboxing that we talked
about during trial.  The Play Protect protections that we
talked about during trial, that's all still going to be there.

THE COURT:  Let me ask you this:  Do you -- can you
think of any third-party app store app eligibility criteria
that you think would be reasonable?  In other words, is there
anything you think just for that type of app you think it might
be reasonable for Google to do?

PROFESSOR MICKENS:  So I think that it is reasonable
for Google to be able to scan the storefront app itself for,
you know, a malicious content.

THE COURT:  Isn't that already happening?

PROFESSOR MICKENS:  Right.  And that's a thing that
they would already do; right?

 1          **THE COURT:**  Okay.  All right.

 2          **PROFESSOR MICKENS:**  Because like a third-party store

 3    is an app that would be distributed through the Play Store and

 4    Google would already have the right to look at that.

 5          **THE COURT:**  Let me fine tune -- I'm wondering above

 6    what currently happens for all apps, for example, Play Protect,

 7    whatever else, is there anything unique to a third-party app

 8    store app that you think Google might be reasonably entitled to

 9    do?

10          **PROFESSOR MICKENS:**  So I think that, if I understand

11    the context of your question, no, other than sort of the user

12    consent prompts that would have to be provided for interactions

13    with any app store.

14          **THE COURT:**  Right.

15          **PROFESSOR MICKENS:**  And, you know, I think that that's

16    what we see sort of in my declaration.  You need some way to

17    get the user to say, "Yeah, I agree to this thing being an

18    installer."

19          But other than that, there's already this set of defenses,

20    which Google seems to be fine with in many cases; like I said,

21    for the case of, you know, third-party stores that are

22    downloaded off Play.  But then there's all these additional

23    hoops that they're asking people to jump through if it's a

24    third-party store distributed via the Play Store, and that's

25    not justified from a security prospective.

```
 1           THE COURT:  Okay.  Google?

 2           MR. KLEIDERMACHER:  My name is Dave Kleidermacher,

 3   lead security for Android.

 4       I'd like to maybe first address the -- I think what is a

 5   fundamental misconception from Professor Mickens about how the

 6   scanning works.  Your Honor was asking about the level of

 7   safety that might be implied by access to third-party stores.

 8       When Google Play Protect doesn't install Time Scan, the

 9   primary purpose of that scan is to detect no malware or apps

10   that are similar to no malware.  It is not a binary "is it safe

11   or not" check.  The full review for safety requires human

12   review.  That's why we have thousands of human reviewers that

13   go through the safety process.

14           THE COURT:  Here's my question:  Why would you treat a

15   third-party app -- a third-party store app any differently from

16   the 3 million apps you already have?

17       I mean, you want all this vetting you want to do and all

18   this eligibility that apparently doesn't go to any other app,

19   just the one that's going to be competitive with Play Store.

20   I'm skeptical about that.  So I want to hear why, in your view,

21   it is absolutely essential that the Play Store app -- the

22   third-party store apps get this extra scrutiny.

23           MR. KLEIDERMACHER:  Actually, we're suggesting that we

24   should do the same, exactly the same review that we do on the

25   Play Store.  The Play Store review for safety is the best level
```

```
 1    of review for safety that we know how.  The install Time Scan

 2    does not provide a high level of safety.  We're just saying do

 3    the basic.  As part of the notarization of the app, we do a

 4    review of the app for safety.

 5             THE COURT:  So I may have misunderstood then because I

 6    thought there was a lot more.

 7        Google's proposal is it will be agnostic with respect to

 8    third-party store apps, meaning it will be -- they will be

 9    treated exactly no more, no less than any other app?

10             MR. KLEIDERMACHER:  As a Play Store app.  For the

11    review of a Play Store app, we're saying -- we're suggesting

12    that the review process for safety should be the same.

13             THE COURT:  Oh, okay.  All right.  I may have

14    misunderstood that.

15             MR. KLEIDERMACHER:  What Professor Mickens has been

16    saying is that --

17             THE COURT:  Before we do that, what was your

18    understanding?

19             PROFESSOR MICKENS:  Yeah, let's just make sure we

20    understand what we're all sort of proposing here.

21        So I thought what you were asking was about the safety of

22    the storefront app itself, and I said, "Well, yes, Google

23    should be able to review that in the same way that Google

24    reviews any app that is submitted to the Play Store."  Right?

25    Because this third-party store is going to be an on-Play app.
```

1          **THE COURT:**  Yeah.

2          **PROFESSOR MICKENS:**  And so I'm not proposing that

3    somehow Google wouldn't review that storefront app in the same

4    way that it would review any other app that's submitted to

5    play.

6          **MR. KLEIDERMACHER:**  Your Honor, I'm referring to the

7    apps within the store, not the app store app itself.  In order

8    to attain a reasonable level of safety for the apps that are

9    distributed on that third-party app store, they should be

10   reviewed for safety.

11         **PROFESSOR MICKENS:**  And so that's where I think the

12   challenge comes in when we look at the nondiscriminatory nature

13   that the injunction is looking for.  Because, you know, Android

14   already allows sideloading.  Right?  That's just a thing that

15   exists in the current ecosystem.

16         **THE COURT:**  With the 18 screens, but --

17         **PROFESSOR MICKENS:**  That's right.  That's right.

18   That's right.  That's right, which we've all had ingrained in

19   our memory at this point.

20      So Android already allows sideload; and even though

21   there's like this extra friction that in part the injunction

22   addresses, that's already part of the Android ecosystem.

23      For sideloaded apps -- let's say I take the same apps,

24   let's say the Minecraft app just to make it sort of concrete.

25   So you sideload that app, and then there -- and Google is fine

with a level of review that they have for off-Play apps --

right? -- which has largely the same machine-learning-based

components as I understand the testimony and evidence, and, you

know, will be reviewed in cases by a human.

So now when we look at -- but, however, that Minecraft app

wasn't sort of somehow needing to be submitted to the Play

review process *a priori*, you know, presubmission.  But now when

we're talking about these apps distributed via third-party

stores that are on Play, now there seems to be this requirement

that, "Oh, well, now we have to do this sort of like this extra

level of" --

**THE COURT:**  Well, that's what I'm asking about.  What

is this extra?  I'm not hearing what that is.

**MR. KLEIDERMACHER:**  So, again, Professor Mickens is

incorrect about how machine learning works for app review.

There is a review that can happen at install time; but to get

the full safety review, the machine learning actually runs on

the Cloud.  And when the machine learning actually detects

something that could be dangerous, it gets reviewed by humans

to verify that it's actually bad or not.  That is required for

the level of safety.

And if users are getting these apps from an app store

distributed through Google Play, then in order to ensure that

the user has a commensurate level at least as close to the

level of safety, I'm not saying it's exactly the same as the

1    Google Play apps on the Google Play Store, but a reasonable

2    level of safety is simply go through the same review process.

3    The machine learning runs.  If it detects something that's

4    potentially hazardous, we have thousands reviewers that will

5    review that app and confirm whether it's bad or not.  That's

6    all we're saying.  It's a standard level of safety review.

7            **THE COURT:**  All right.  So nothing extra for this?

8    Okay.

9            **PROFESSOR MICKENS:**  And just -- I don't think there's

10   actually a misunderstanding on how the machine learning models

11   works.  There is a distinction, as I understand it, between the

12   install scans and sort of like the fuller scans that will be

13   done by the machine learning models.  So I understand the

14   distinction between those.

15       But I think the sort of issue of contention here, as I

16   understand it, is that when we look at what's required for

17   Android to think that a sideloaded app is okay to run on

18   Android, that seems to be different, and we should talk this

19   out if it's not different.

20           **THE COURT:**  Let me just jump in here.  Here's what

21   I -- this is my understanding:  Right now you can directly

22   sideload, and Google is going to go through this process that

23   was just described before it will make -- let that happen.

24   Okay?

25       So now you're going to sideload, so to speak, but you're

 1    just going through a portal, which is the third-party store

 2    app.  Okay?  So -- and they're saying "We just want to do the

 3    same thing.  If it's coming through that third-party store app,

 4    we're just" -- right?

 5              MR. KLEIDERMACHER:  That's right.  If the machine

 6    learning models detect potentially risky behavior, we want to

 7    have the ability to have human review.

 8              THE COURT:  But no extra requirements, just the same

 9    as if it were sideloaded or some other third-party source?

10              MR. KLEIDERMACHER:  The -- there is a difference --

11    there could be a difference in the number of humans that are

12    allocated to reviewing those apps.  So today --

13              THE COURT:  Okay.  All right.

14              MR. KLEIDERMACHER:  So we're saying is if it's a

15    Google Play distributed store and the machine detects something

16    dangerous for user safety, we should --

17              THE COURT:  Let's just focus on my part, which is it's

18    the same criterion that you would use for a sideload app,

19    nothing extra.  In other words, you're not -- look, here's my

20    concern.

21         It looked to me -- and now you're helping me understand

22    that I may have misunderstood this -- Google was trying to

23    erect a variety of vetting and eligibility requirements that

24    were going to be special and unique to competitor third-party

25    store apps.  And what I hear you saying is, "No, it's going to

1  be the same safety vetting we do for any third-party sourced

2  app, whether it's through a Play Store app or sideloaded

3  directly"; right?

4      **MR. KLEIDERMACHER:**  The -- it is the same that we're

5  doing on Google Play to keep Google Play apps safe.  That's the

6  exact same level of review we're asking for.

7      **THE COURT:**  What's wrong with that?

8      **PROFESSOR MICKENS:**  Right.  And this -- so I think

9  this is also my sort of question as well, because what the

10  injunction asks for is this nondiscriminatory behavior; and if

11  the proposal that Google is making is, in fact, what we're

12  hearing right now, I guess I was confused about why this was

13  being called out, you know, explicitly in their proffer.

14      **THE COURT:**  But you agree that's okay to have the same

15  basic safety tests?

16      **PROFESSOR MICKENS:**  Yes, to the extent that those

17  tests are applied in a fair way.

18      **THE COURT:**  Nondiscriminatory way, yeah.  Okay.  All

19  right.

20      Yes, go ahead.

21      **PROFESSOR ERNST:**  So I'm not sure Mr. Kleidermacher

22  fully answered your question.  You asked will the criteria for

23  every app on the Android device be the same, sideloaded apps,

24  apps loaded via a third-party store that's not on Google Play,

25  apps loaded via a third-party store that is loaded on

1  Google Play.

2       **THE COURT:**  I think he said yes.

3       **PROFESSOR ERNST:**  He said it would be the same --

4  Mr. Kleidermacher, would all those be the same?

5       **MR. KLEIDERMACHER:**  What I'm saying is that the

6  machine learning models, as well as the backup human review, if

7  we detect something that's potentially harmful that we do in

8  Play --

9       **THE COURT:**  Let's talk like people here.  Is the

10  answer yes or no?  Is it the same yes or it's, no, it's not the

11  same?  Just tell me that.

12       **MR. KLEIDERMACHER:**  The machine -- all the machine --

13  the overall framework is the same.

14       **THE COURT:**  Your answer should start with the word

15  "yes" or "no."  Is it, yes, the same or, no, it is not?

16       **MR. KLEIDERMACHER:**  It's the same as Google Play.

17       **THE COURT:**  Can you say "yes" or "no"?  Is it, yes,

18  the same or, no, it is not?

19       **MR. KLEIDERMACHER:**  Maybe you can repeat the question.

20  I'm not sure.

21       **THE COURT:**  Just repeat it again, Professor.

22     Do you want me to read it back?  I'll read it back.

23                    (Pause in proceedings.)

24       **THE COURT:**  Just say yes or no.  All right?  Really

25  it's a binary thing.  You can tell me later what you think the

 1   song and dance is.  Go ahead.

 2          **MR. KLEIDERMACHER:**  To my understanding --

 3          **THE COURT:**  You haven't answered the question yet.

 4          **MR. KLEIDERMACHER:**  -- the answer is yes.

 5          **THE COURT:**  You need to wait.  Okay?  Let's have a

 6   clear record.

 7                     (Pause in proceedings.)

 8          **THE COURT:**  Mr. Ernst, so I'm not sure

 9   Mr. Kleidermacher fully answered your question.  You asked (as

10   read):

11          "Will the criteria for every app on the Android

12      device be the same, sideloaded apps, apps loaded by a

13      third-party store that's not on Google Play, apps loaded

14      via a third-party store that's loaded on Google Play?

15          **"THE COURT:**  I think he said yes.

16          **"PROFESSOR ERNST:**  Mr. Kleidermacher, would all those

17      be the same?"

18      Please just start your answer with "yes" or "no" so I

19   understand what you're saying.

20          **MR. KLEIDERMACHER:**  My answer is, yes, but --

21          **THE COURT:**  Okay.  But what?

22          **MR. KLEIDERMACHER:**  And the but is that the number of

23   the human resources that back up the machines can vary.  You

24   can -- you have a fixed set of humans, there's like 3,000 human

25   reviewers, you can put 100 percent of them on Google Play app

1  review or you can put 60 percent on Google Play app review and

2  40 percent on third-party app store review.

3      **THE COURT:**  Okay.  Leaving aside the allocation of

4  human review time, the criterion are all the same; right?

5      **MR. KLEIDERMACHER:**  What I'm saying is we would want

6  the level of safety for these third-party app stores to be as

7  close to the Google Play safety.  We want to actually have the

8  human review.

9      I think what Professor Mickens was suggesting, to my

10  understanding of his testimony, was that we only need the

11  install time automated scans and no human review, and that is

12  not -- we don't agree with that.

13      **THE COURT:**  He said yes.  So does that make life

14  easier?

15      **MR. POMERANTZ:**  Your Honor, I just don't want

16  confusion.

17      **THE COURT:**  I'm not confused.  This witness said yes

18  after significant instruction from me to give me a clear

19  answer.  I don't know why this is so difficult.

20      I read a question that has a yes-or-no answer, and you

21  said yes.  Now, I don't -- this whole tap-dancing thing is just

22  not productive for me particularly after two hours of this hot

23  tub.  Okay?

24      You're in a court of law.  You're not in an engineering

25  meeting at Google.  We don't equivocate.  When the judge says

1  "Give me a yes-or-no answer," you need to do that.

2      The record says the answer is yes.  Now, doesn't that

3  solve those problems?

4      **PROFESSOR MICKENS:**  Yes.  So as long as the answer is

5  a hard yes and there is no opportunity --

6      **THE COURT:**  There's one type of yes in a court of law;

7  yes, period.  There's no hard yes or soft yes.  It's yes.

8      **PROFESSOR MICKENS:**  I've now been revealed to not be a

9  lawyer.  Thank you.

10     So as long as the answer is yes, then there's no

11 opportunity for --

12     **THE COURT:**  It's totally nondiscriminatory.

13     **PROFESSOR MICKENS:**  -- nondiscrimination.

14     **THE COURT:**  All right.  Anything else we need to talk

15 about before we get into closing argument?

16     **PROFESSOR ERNST:**  We -- we've talked about

17 distributing third-party stores at length.  There are a number

18 of things that Google proposes that are not technically

19 required.  The new warning screen when they just said they

20 want -- when they've just clicked something that says "Here's

21 an app store."

22     **THE COURT:**  Well, that all comes under

23 nondiscriminatory.  You can't -- you can't do that.  That would

24 be discriminatory.

25     **PROFESSOR ERNST:**  Right.  And I think the last thing

1  is just that I proposed in my statement two different types of

2  designs for how many taps.  I proposed a one-tap mechanism and

3  a two-tap mechanism.

4       **THE COURT:**  I think that's more granular than an

5  injunction needs.

6       **PROFESSOR ERNST:**  Great.

7       **THE COURT:**  Remember, I'm not here to tell people how

8  to tap their phones.  Okay?  That's going to be up to the

9  compliance with the injunction.

10      **PROFESSOR ERNST:**  I have nothing more, Your Honor.

11      **THE COURT:**  Okay.  I think we have covered all of the

12  tech issues that are germane to the injunction.

13     Anything else plaintiffs?  Dr. Mickens?  Professor Ernst?

14      **PROFESSOR ERNST:**  No, Your Honor.

15      **PROFESSOR MICKENS:**  No, Your Honor.

16      **THE COURT:**  Okay.  Google, anything else?  Any closing

17  comments?

18      **MR. KLEIDERMACHER:**  No, Your Honor.

19      **THE COURT:**  Good.  Okay.

20     All right.  Let's get into our attorney presentations on

21  remedy.

22     Now, before I do that, though, I am going to institute

23  a -- or I'm going to create a commission, a committee.  Not

24  commission.  Committee.

25     Now, here's how this is going to work:  This is modeled on

1    other antitrust cases and I think it's an effective approach.

2    Each side will have one person, sort of a party person like you

3    were doing a three-person arbitration, and then those two

4    people will pick the third.  All right?  So you'll have someone

5    who is jointly selected by the two representatives on the

6    committee.

7         I would prefer counsel to have someone I have already

8    heard from.  I'm not going to necessarily tie your hands.  But,

9    for example, I would be interested in having someone like

10   Dr. Mickens or Professor Ernst on the committee.  I'm going to

11   leave it up to you, but my preference would be someone I've

12   heard from.  And then, Google, somebody here that I've already

13   heard from.  It makes it a lot easier for me to manage this

14   committee.

15        And then the person that they pick will be an industry

16   person who does software and apps, somebody who's just

17   generally knowledgeable about the field.  All right?

18        And what this commission will do -- committee, not

19   commission -- committee is going to, you know, help work out

20   timeline issues and some of these very nuts-and-bolts issues

21   about what should the API look like and things that ought to be

22   delegated, at least in the first instance, to experts in the

23   field.

24        I will, of course, resolve all disputes that the committee

25   cannot resolve, but I think it's going to be helpful to have

1   this.

2       And it will also monitor compliance.  It will be charged

3   with ensuring that Google is honoring the terms of the

4   injunction.  I have no reason to believe that it won't, but

5   this is just a safeguard to make sure everything is on the up

6   and up.  Okay?  So it's going to have kind of a dual function:

7   Problem solving and compliance monitoring.

8       Now, you-all will split the bill for that.  You'll will

9   pay whatever the customary rates are of the people who are in

10  50/50 shares, whoever is on the committee, and there will also

11  be probably 90-day status reports will be in the form of we'll

12  call them compliance reports, and then other things can be

13  raised in the context of that as well.

14      Okay.  So that's how that's going to work.  Before

15  everybody left, I wanted to share the fact that having people

16  I've seen in action will be useful to me.

17      Okay.  Our experts and declarants and witnesses can

18  retreat to the gallery, and we'll hear closing comments.

19          **MR. POMERANTZ:**  Your Honor, can the witnesses leave if

20  they so desire?

21          **THE COURT:**  Yes, they're perfectly free to leave.

22      And let's also reposition the cameras so they're on you

23  two as speakers.

24          **MR. BORNSTEIN:**  Your Honor, if I may, before I get

25  into the argument, there is one point relating to the hot tub

1  that I wanted to raise with the Court --

2      **THE COURT:**  Oh, sure.  Yeah.  Go ahead.

3      **MR. BORNSTEIN:**  -- where it may be more discussion

4  with one of the witnesses, so I wanted to flag before they all

5  left.  Maybe I'm too late for that.

6      **THE COURT:**  Oh, no, I'm fine.

7      **MR. BORNSTEIN:**  But the discussion at the end with

8  Mr. Kleidermacher around nondiscrimination, what he said today

9  is directly contrary to what he testified in his deposition

10 about the nondiscrimination issues.  So I want to make sure

11 that we're completely clear on what's happening here.

12     **THE COURT:**  Well, it's his testimony today that I'm

13 going to rely on, and he said that it's going to be

14 nondiscriminatory in every way, shape, and form.

15     **MR. BORNSTEIN:**  Well, the question, then, that that

16 raises for me is whether that means Google is now going to

17 start doing human-detailed review of sideloaded apps that it

18 doesn't currently do, which would be a problem.  Our

19 understanding of --

20     **THE COURT:**  You mean insisting on a human review for

21 every -- oh, I didn't think that was -- that's not customary

22 practice.  I would consider that to be discriminatory.

23     **MR. BORNSTEIN:**  Right.  I mean, the way it works now

24 is Google does the review that it chooses to do for apps that

25 are listed on Google Play, and that is what it is.  Google does

 1    this machine-level review for apps on that are sideloaded.

 2         THE COURT:  Right.  It gets kicked out if there's a

 3    problem.

 4         MR. BORNSTEIN:  And what I understood from Google's

 5    written submissions is that what Google intends to do is

 6    subject all apps that are on third-party stores that are

 7    distributed through Play to the detailed Google review,

 8    including Google content restrictions and the entire set of

 9    Google policies would then be applied to every single app on

10    the third-party stores, which we think, as we've explained in

11    our papers, does not make any sense and would be contrary to

12    the goals of remediating the conduct here.

13         THE COURT:  If it's a discriminatory treatment, it

14    won't be permitted.  Okay?  So if only that is going happen, if

15    only those apps are going to be subjected to a painstaking

16    human review, that's discriminatory because that holds up the

17    access to the apps.

18         MR. BORNSTEIN:  Right.  And if the way of fixing that

19    would be all of a sudden now to start subjecting all sideloaded

20    apps or all apps on third-party stores that are not on

21    Google Play to heightened review, in other words, making it

22    nondiscriminatory by, you know, moving up, that would be a

23    problem, Your Honor.

24         MR. POMERANTZ:  Your Honor, and to clarify, that's the

25    point I was --

1          **THE COURT:**  Save that for a day if it ever happens.  I

2     don't know if it's going to happen.  Maybe it won't.

3          **MR. POMERANTZ:**  Mr. Bornstein and I are in agreement,

4     and I believe Mr. Kleidermacher was trying to say the same

5     thing.  We are not intending to take sideloaded apps and apply

6     the human and machine review.

7          **THE COURT:**  That was my understanding.

8          **MR. BORNSTEIN:**  Then we have to --

9          **MR. POMERANTZ:**  And we are intending -- let me just --

10    we are intending to apply exactly the same review that we do

11    for apps that come into the Google Play Store.  We're intending

12    to apply that to any third-party stores and the apps in those

13    stores, and they'll be treated exactly the same.

14         **THE COURT:**  It sounds fine to me.  As long as nobody

15    is being burdened on the third-party side, that should be fine.

16         **MR. BORNSTEIN:**  Your Honor, this it's an enormous

17    burden on the third-party side.  This is, I think, a --

18         **THE COURT:**  They have 3 million apps.

19         **MR. BORNSTEIN:**  My point is not that they can't do it.

20    My point, Your Honor, is that what they are then doing is every

21    third-party store that wants to compete with Google is going to

22    have its apps subjected to Google's content policies if it's on

23    the Play Store.  So if a third-party store wants to carry an

24    app that, say, doesn't comply with Google's policies and it

25    wants to differentiate itself by carrying apps that Google

1  wouldn't allow, it's not going to be allowed to do that.

2         **THE COURT:**  What app would Google not allow?

3         **MR. POMERANTZ:**  I'll give you one example.  The

4  American Nazi Party app, imagine that some third-party store

5  comes in and says "We want to distribute these apps and we have

6  the American Nazi Party app."  We're going to say, "No.  You

7  can't do that.  That's contrary to our hate speech

8  prohibition."  So that store, if they want to get distributed

9  by Play, they just delete that app from their catalog and then

10 they can get distributed by Play.

11     Or let's say --

12        **THE COURT:**  Is that actually -- is that happening

13 right now?

14        **MR. POMERANTZ:**  Yes.  We -- right now if the American

15 Nazi Party app came to Play, Play would say "No."  And,

16 similarly, if there was an app that came in and it was known

17 malware, Play would say "No."  So now if an app store comes to

18 us in this remedy and it has that app in its store, we're going

19 to say "No."  If you take that app out --

20        **THE COURT:**  Yeah, but I consider that to be a

21 nondiscriminatory.

22        **MR. POMERANTZ:**  Yes.

23        **THE COURT:**  This is being applied system wide, so

24 that's nondiscriminatory.

25        **MR. BORNSTEIN:**  What's discriminatory, Your Honor, is

1  they're treating third-party stores distributed on Play

2  differently from third-party stores that are distributed off

3  Play.

4      So when Mr. Kleidermacher, for example, was asked this

5  question, he said that what they wanted to do was to vet the

6  apps that are carried by third-party stores when they're

7  distributed on Google Play even though Google does not perform

8  such vetting for stores that are installed by OEMs or installs

9  that are sideloaded.  That's a different treatment.  That's

10  discrimination.  In other words --

11      **THE COURT:**  So the Samsung store would not be

12  submitted to any of these reviews?

13      **MR. BORNSTEIN:**  Correct.

14      **THE COURT:**  So the Samsung store could feature the

15  American Nazi Party app?

16      **MR. BORNSTEIN:**  If the Samsung company chose to, yes.

17      **THE COURT:**  Okay.  That is -- how does Google reach

18  that outcome?

19      **MR. POMERANTZ:**  As long as it's not distributed

20  through Play, they can go put on it whatever they want.  The

21  Play policies won't apply.  If --

22      **THE COURT:**  It's because the Samsung store is

23  completely independent of Play.

24      **MR. POMERANTZ:**  They put it on their own phones.  They

25  don't need Play to put their store on their phones.

1          THE COURT:  I understand.

2          MR. POMERANTZ:  And it's up to them to decide what

3    goes into their stores.

4          THE COURT:  Well, here's -- so let's just think out

5    loud.  If you need to come and revisit this later when we

6    actually have some facts, we can do that, but let's just -- I

7    don't want to get too far ahead of us on speculation.

8          Look, here's the thing.  I am very seriously going to

9    consider and probably will order some from pretty widespread

10   access and porting, and all sorts of other things, as part of

11   the conduct remedy in this case based on the jury's verdict.

12   That will entail some overlap with Google Play.  All right?

13         I don't find it completely offensive that Google Play may

14   apply its own preexisting criteria to the content of

15   third-party stores for this overlap period.  It's not

16   necessarily discriminatory but, you know, if Google has a

17   standing rule right now, which is being litigated left and

18   right in other cases I have, about moderating the content of

19   social media, if they have a standing rule right now that says

20   no American Nazi Party apps on Google Play for the time period

21   if this is the result of the injunction, the entire Google Play

22   catalog is going to be made available to third-party app stores

23   and there will be a number of other similar remedies, I don't

24   think it's necessarily outrageous that Google Play can say no

25   Nazi apps for that time period.

1     **MR. BORNSTEIN:**  I'm not here to defend Nazi apps

2  obviously, Your Honor.  This is, like, *Skokie* here, I'm here to

3  defend the principle.

4     **THE COURT:**  I understand.

5     **MR. BORNSTEIN:**  But the issue is what this does.  If

6  Google is actually reviewing every single app on a third-party

7  store, it gives Google the gatekeeping authority that it has

8  already abused.

9     **THE COURT:**  All right.  Here's what I would like to

10  do, let's wait and see what the world -- what happens.  Okay?

11  If it turns out that all of a sudden the third-party store apps

12  are failing because of this, you can come back and see me.  I

13  can't do it in a vacuum.  All right?

14     There is an expectation of good will on everybody's part

15  to make this thing happen, and there's no covenant of good

16  faith necessarily in an injunction, but I just expect that to

17  happen.  So let's just see what happens.  Okay?

18     **MR. BORNSTEIN:**  Just one other point, if I could,

19  Your Honor.

20     Just to put it out there, the other thing that this does

21  is it gives Google previews of all of the apps that are going

22  to be on its competitors' stores.  Right?  If Google is

23  saying --

24     **THE COURT:**  Well, right now competitors know exactly

25  every app Google has.  So what's wrong with bilateral

1  transparency?

2      **MR. BORNSTEIN:**  Well, the issue is Google is a

3  gatekeeper; whereas, the other stores have no ability to --

4      **THE COURT:**  That's what I'm saying.  I have no

5  evidence right now that Google is going to let 1 one out of

6  every 10 sheep through the gate if that's what you're trying to

7  tell me.  We don't know that's going to happen.  The whole

8  flock may come in.  Okay?  Until you show me that 1 out of 10

9  sheep is coming in and 9 are being kept out in the field, I

10  just don't have anything to do.  We just have to wait.  All

11  right?  I'm not -- in the abstract, I am not going to enjoin

12  Google from enforcing its preexisting vetting rules as long as

13  they're applied in a nondiscriminatory fashion.  And if that

14  means that the American Nazis cannot get onto Google Play Store

15  through a covert channel and a third-party app, I think for the

16  period of time that this injunction is placed, that's okay.

17      Now, after that, you know, the whole point of this is to

18  grow a garden of competitor app stores and they'll be on their

19  own.  This is going to have a -- you know, this is a defeasible

20  injunction.  It's going to end in 48 months or whatever,

21  whatever time period I end up picking.  You know, so after

22  that, they can do whatever they want with Nazis.  For right

23  now, you're at Google's table a little bit.  I don't think it's

24  that offensive that there be some table-setting rules.

25      **MR. BORNSTEIN:**  The problem, Your Honor, is that if

the idea is for these stores to grow, Nazis is not -- it's

obviously the example that was picked for a good reason because

it's an offensive example, but if these stores are going to

grow, they're going to want to cultivate their own

personalities, they're going to want to differentiate

themselves, and they're not going to want to have their ability

to select apps, to market apps, be mediated by their primary

competitor.

**THE COURT:**  I'm completely on board with that.  I

agree.  And if you come back and tell me that they're being

killed in the cradle, I will listen.  Okay?  But until you have

some evidence that that's happening, it's a little premature to

start making rules.

Mr. Pomerantz understands what I'm saying.  So, look, this

is going to be it.  This is why we have a compliance committee

and this is why I'm going to retain jurisdiction forever to

make this happen.  Okay?

All right.  Plaintiff.

**MR. BORNSTEIN:**  Thank you, Your Honor.

Given the amount that Your Honor has already heard and

given the fact that it's evident that Your Honor has done a lot

of work in preparing at least portions of the injunction

already, my thought would -- was that it was not the best use

of your time for me to do a kind of jury-style closing

argument, and I was not intending to do that, but I was

1  thinking instead it would be helpful to focus on some

2  principles that we think are ones that the Court should have in

3  mind and also to respond to some of the more frequent responses

4  or objections that Google has made.

5          **THE COURT:**  Great.  Can I get a copy of this?  Do you

6  have a copy?

7          **MR. BORNSTEIN:**  Yes, of course.

8          **THE COURT:**  If you have two of them, that would be

9  great.

10         **MR. BORNSTEIN:**  Yes.

11      And I -- Your Honor, I do not intend to march through the

12  slide deck.

13         **THE COURT:**  That's fine.

14         **MR. BORNSTEIN:**  It's here for reference if needed.

15         **THE COURT:**  Yeah.  Thank you.

16      Just one second.

17                      (Pause in proceedings.)

18         **THE COURT:**  Okay.

19         **MR. BORNSTEIN:**  So our starting point, Your Honor, is

20  of course an adjudicated monopolist, and Google has been found

21  to have violated the law at this point in multiple ways, and

22  the issue before the Court is obviously what to do about it and

23  not to go back and assess whether or not a remedy is needed.

24      So the principles that we have previously articulated that

25  Professor Bernheim articulated when he was here that we think

1  makes sense for the Court to keep in mind in remedying the

2  violation of law are the following:

3      First of all, prohibiting the conduct that's been found

4  unlawful.  That seems pretty straightforward.

5      Second and importantly is prohibiting comparable conduct

6  that has a similar economic effect.  Because without

7  guardrails, without expanding the scope some, it becomes very

8  easy for Google, if it were so minded, to evade the injunction

9  and replicate the problems that the jury had identified.

10     We've presented the various law that addresses this issue

11 and, for example, the National Society of Professional

12 Engineers case, *Zenith Radio*.  The point, in other words, being

13 that there needs to be not just a narrow prescription of the

14 exact thing we heard about at trial, but something else.

15         **THE COURT:**  Remember, I read all these cases to you at

16 our last meeting, *Ford Motor*, it's all there.  Yeah, I

17 understand.

18         **MR. BORNSTEIN:**  Yeah.

19         **THE COURT:**  And as the FTC reminded me, do whatever

20 you want.  It's a rare day when you have to assure a federal

21 judge they have wide discretion of the FTC to do that.

22         **MR. BORNSTEIN:**  Okay.  So I'll go to my third and

23 fourth principles.

24     The third one is that we need to fix the market as it

25 sits -- right -- to remedy the current effects, the ongoing

1  effects, of the past misconduct, and that's really what we've

2  been spending time talking about earlier today on the

3  tech-expert issues.

4      And the last one we acknowledge is the Court should allow

5  Google to continue to compete in legitimate ways.  The goal is

6  not to prevent Google from engaging in ongoing permissible fair

7  competition that helps Google and helps everybody if they're

8  doing it the right way.

9      **THE COURT:**  I do have a question about that.  Can I

10  just jump in?

11      **MR. BORNSTEIN:**  Of course.  That's how I anticipated

12  this would be.

13      **THE COURT:**  I am sympathetic to the point that revenue

14  sharing from Play Store with potential competitors is probably

15  not going to happen, but what about just offering independent

16  incentives to partner with someone who may have been thinking

17  about doing a Play Store but Google offers incentives that

18  another third-party could compete with, at least in theory?

19      **MR. BORNSTEIN:**  Right.

20      **THE COURT:**  What's wrong with that?

21      **MR. BORNSTEIN:**  So you may remember, Your Honor, that

22  you had a colloquy with Professor Bernheim when he was here

23  about how to draw this line, and maybe we could turn to I

24  believe it's Slide 33.

25      **THE COURT:**  33?

1          **MR. BORNSTEIN:** I hope I got it right.  Yes.  Good.

2          **THE COURT:** Okay.

3          **MR. BORNSTEIN:** And I'm focusing here, Your Honor, on

4     answering the question on -- and this slide, by the way, I just

5     borrowed this from Dr. Bernheim.  This is not my slide, it's

6     his, from May.  And I'm focusing on number two here where he

7     identifies the categories of conduct that he described as

8     economically similar conduct that should be prohibited as part

9     of the injunction.  Your Honor covered the second bullet there,

10    "Sharing Google Play revenues."

11         And as to your question about just ordinary incentives,

12    Professor Bernheim drew a line -- it's grounded in economics,

13    we think it's grounded in the law -- between contracts that are

14    conditioned in some way on the counterparties dealing with a

15    rival or acting as a rival.

16         So, for example, if it were "We want to give a monetary

17    incentive to Developer X" and that monetary incentive is

18    conditioned on the developer either not putting its app on some

19    other store, that would be on the wrong side of

20    Professor Bernheim's line; or if it was conditioned, and I

21    think this may have been Your Honor's question, if it was

22    questioned on the developer saying "I'm not going to act as a

23    rival.  I'm not going to have my own store," that too would be

24    effectively buying off a competitor in the way that we heard

25    about at trial.

1          **THE COURT:**  But that's -- so that's -- okay.  To me

2     that comes under the catalog of forbidden contracting

3     principles, not -- it doesn't matter.  Revenue sharing, where

4     it's placed or not, is subsumed in that; right?  It's not --

5     the injunction doesn't have to talk about revenue sharing from

6     Play Store.  All you have to say -- all the injunction needs to

7     say -- we're just talking out loud, I don't know what the

8     conclusion will be -- is:  There cannot be contractual terms

9     conditioning noncompetition.

10         **MR. BORNSTEIN:**  So I think there are two pieces here

11    that do need to be addressed separately.  It's why there are

12    sort of the two different bullet points on the slide here.

13         What Your Honor just described is the issue of

14    conditioning incentives or rewards or monetary payments,

15    whatever terms of agreements, on not acting as a competitor or

16    not dealing with a competitor.

17         The principle about not sharing Google Play revenue

18    directly with a third party, that's not actually -- there's no

19    condition associated with that.  It is anticompetitive; but if

20    you think about how that agreement would be written, it would

21    be -- I'll take a real example, right? -- some of these RSA 3.0

22    agreements, it was we will pay you, we will pay Xiaomi, for

23    example, an OEM, X percent -- I can't remember what's

24    confidential or not -- x percent of our Google Play revenue,

25    and there were situations in which that was not even

1    conditioned on exclusivity or any rules around what other

2    stores could be on the device.

3        And so simply sharing your revenue --

4        **THE COURT:**  There has to be -- there has to be a

5    mutual exchange of promises or it's an illusory contract.

6        **MR. BORNSTEIN:**  Well --

7        **THE COURT:**  I mean, this is what I'm saying:  I don't

8    recall the RSA simply saying "Please accept $100 million a year

9    from your friends at Google," period.

10        **MR. BORNSTEIN:**  Yes, Your Honor.

11        **THE COURT:**  I don't think they said that.

12        **MR. BORNSTEIN:**  There were -- there were absolutely

13    some that were more restrictive, but you may recall

14    Professor Bernheim talked about targeting of Google Play

15    revenue sharing against those OEMs that had started to develop

16    their own stores.  Xiaomi was one of those examples.  Oppo and

17    Vivo were others.

18        **THE COURT:**  Yes, but those were all in an exchange for

19    a written promise not to pursue a rival store; in other words,

20    it wasn't just a gift.

21        **MR. BORNSTEIN:**  No, Your Honor, there were examples

22    where there -- that were exactly as you described.  There are

23    also examples of revenue sharing that did not have the

24    exclusivity aspect to it and that Professor Bernheim testified.

25        **THE COURT:**  Can you -- do you remember one?

1          **MR. BORNSTEIN:**  The ones that I recall are the ones

2    that I mentioned:  Oppo, Vivo, and Xiaomi.  We can certainly

3    get Your Honor references to the transcript.

4          **THE COURT:**  No, I can find it.  I'll find them.

5          All right.  Go ahead.

6          **MR. BORNSTEIN:**  And I don't want to suggest that the

7    type of agreements you're talking about didn't exist.

8    Certainly we heard a lot of testimony about RSA agreements that

9    had an exclusivity component to them, but Professor Bernheim

10   also spoke about and the jury heard testimony about Revenue

11   Sharing Agreements that did not have an exclusivity component

12   to them.  There was a lot else in the agreement certainly.

13   These were detailed, complicated agreements.  There was

14   consideration going both ways but not in some instances a

15   condition.

16        And so when Professor Bernheim was here in May, as he

17   explained, these are two different types of conduct that should

18   be covered by the injunction.  One being the condition -- I'll

19   call them the conditionality type of agreements on

20   noncompetition; and then separately sharing of Google Play

21   revenue itself, as he explained, has an anticompetitive effect

22   by diminishing the competitive incentives of --

23        **THE COURT:**  It only has an anticompetitive effect if

24   it's in exchange for not opening a rival store.  You can share

25   Google Play Store revenue for other purposes.

1          **MR. BORNSTEIN:**  Well, I disagree with that,

2     Your Honor.  I'll explain why.

3          Sharing of, for example, search revenue, that's a whole

4     separate issue I'm not addressing.  Sharing of Google Play

5     revenue with a potential competitor, take an OEM -- I'll use

6     Xiaomi again -- what that does is it creates an economic

7     incentive.

8          **THE COURT:**  Let me just jump in.  You're stacking the

9     deck by saying "potential competitor."  That means someone --

10    to my ear, that means someone who has already announced "I am

11    going to open a rival store."  So I understand that.  I agree

12    with you.  That would be -- that, to me, is paying not to

13    compete.

14         But the situation I'm asking about is you can share Google

15    Play Store revenue with a developer.  That developer has never

16    said a word about "I'm going to open a rival store."  And I

17    think to presume that every developer is a potential rival

18    store is not -- is counterfactual.

19         **MR. BORNSTEIN:**  Well, Your Honor, I think the way to

20    achieve the goal that you're talking about rather than calling

21    it sharing Google Play Store revenues, you just lower the price

22    to the developer.

23         **THE COURT:**  Isn't that what I'm trying to do, though?

24         **MR. BORNSTEIN:**  There can be incentives that are

25    not --

1    **THE COURT:**  I can't.  Google gets to compete.  They

2    have money.  They're a big company.  They're entitled to use

3    some of that to make their way in life.  Okay?

4        So just having this blanket ban on "You can't use a penny

5    from Google Play Store if it relates to a developer," I

6    can't -- that's too far.

7        **MR. BORNSTEIN:**  Well, Your Honor, that's a helpful

8    clarification because that's not what I'm suggesting.

9        Sharing Google Play revenues doesn't mean you can't use

10   money that you earned through Google Play to pay an incentive,

11   you want to say to a developer "I'll give you a million dollars

12   if you list with us."  That is not a thing we're concerned

13   about.

14       The types of agreements that Professor Bernheim described,

15   and I'm trying maybe in inarticulately to talk about now, are

16   situations where the sharing is as a percentage basis:  We're

17   going to give you X percent of the revenue from Google Play or

18   X percent of the revenue earned on your device.

19       Because what that does is it then starts to tie the

20   economic incentives of the counterparty to Google Play, and it

21   makes it so that there is a new calculus that the counterparty

22   has to go through in assessing whether or not to compete.

23   Every dollar that I earn in competition with Google Play is

24   less than I'm going to make from them through the revenue

25   sharing.

1        **THE COURT:**  All right.  Well, you're amending that

2  second bullet point to say "sharing a percentage of Google Play

3  revenues."  In other words, if you had an actual dollar figure,

4  you don't have a problem with that?

5        **MR. BORNSTEIN:**  If it's nonconditional, that's

6  correct, Your Honor.

7        **THE COURT:**  All right.  But just sharing a percentage

8  is the --

9        **MR. BORNSTEIN:**  That's right.

10        **THE COURT:**  Okay.  All right.

11    All right.  Go ahead.

12        **MR. BORNSTEIN:**  So with our principles that we're

13  trying to achieve, I want to walk through some of the

14  objections that have been raised.  I couldn't -- with triple

15  the time I couldn't go through every objection to each of the

16  different pieces.

17    I'm happy to answer any questions Your Honor has about

18  specific proposals within the remedy.  I know it's a detailed

19  thing.  I'm sure Your Honor has been through it and marked it

20  up.  So if there's anything specific, I can jump right there;

21  but aside from that, I thought what would be helpful would be

22  to go through some of the more general objections that Google

23  has repeatedly raised again and again.

24    One of them I think we've just walked through to some

25  degree, and it's the one that came up most frequently back in

May, which was the idea that our proposed injunction is too

vague in the portions that refer to creating incentives or

disincentives.  And what we've tried to do -- and I think I've

tried to walk through now, Professor Bernheim tried to do -- is

to draw this line that can be clear, that can be specific about

what is prohibited and what is not.

In all of the examples that are in Google's papers about

places in which they would be uncertain as to whether or not

conduct would be allowed are all examples of Google making its

product better or lowering its prices in some way.  Those are

all fine.  Those are not conditional.  Those are not sharing of

a percentage of revenue.  We're not seeking to prohibit those.

And I think the line that Professor Bernheim drew, which,

with the clarification we just discussed, appears on the slide,

is a clear one that's easy to implement and achieve the

economic principles that we've discussed.

The other issue I think is important to bear in mind is at

the end of the day there are always going to be edge cases.

There are going to be the extreme ends, to use the phrase

Your Honor mentioned earlier in talking to one of the Google

witnesses.  And as good as we all are as lawyers and judges in

using language to try to craft prohibitions, there will be

something at the margin that a clever person can try to find as

an edge case.

And so if the concern is that there might be edge cases,

1  well, that puts the burden on all of us to be as clear as we

2  can be, but it certainly doesn't militate in favor of not

3  having a remedy at all, which is that the way Google talks

4  about it.

5        **THE COURT:**  Of course.  Look, the injunction has to be

6  plain so Google knows what the rules of the road are, but it's

7  not going to be so detailed that I anticipate or attempt to

8  anticipate every possible thing that might happen and have a

9  remedy for it.  We're not doing that.

10       Look, the injunction is going to be about three pages

11  long.  Okay?  It's practical principles.  You come back to me

12  over the time period, which I do want to ask you about next,

13  when there are issues.

14       Now, here's what I'm thinking.  There must be a cap.  If I

15  go in the direction that you have urged and I have been

16  thinking about, there has to be some cap on the time period

17  that all this will be happening.

18       Now, Dr. Bernheim was admirably forthright in saying

19  six years was just a number and it's a judgment call and he's,

20  of course, right.  I do not believe six years is the right

21  number.  I think that's just too long.

22       Now, I don't know what the number would be below that.

23  I'm still thinking about it, and -- but what's your sense of

24  what a good number is?  I'll just give you some touch points.

25  Microsoft was five years.  An Intel/FTC decree was five years.

```
 1   People like five.

 2             MR. BORNSTEIN:  Okay.

 3             THE COURT:  I'm not saying that I like five or I don't

 4   like five, but...

 5             MR. BORNSTEIN:  If it's helpful, Your Honor, I can --

 6   I can give you some data points that informed our thinking

 7   behind this and maybe can inform the Court's thinking.

 8             THE COURT:  Some policies issues.

 9             MR. BORNSTEIN:  Yeah.  So one -- I mean, the

10   overarching principle, which Dr. Bernheim -- or Professor

11   Bernheim talked about is making sure we have enough time for

12   the market to correct itself.  And, as he said, it is a

13   judgment call.  Only one of us gets to make the judgment call

14   at the end of the day.

15       But the principles that -- or some of the facts that I

16   think the Court ought to keep in mind, one is the discussion we

17   had this morning about the timeline for implementation.  The

18   longer it takes to put this thing into place, the longer it

19   needs to be in place once it's there.  Right?  We can't have

20   a -- I'll take five -- we can't have a five- or even a six-year

21   injunction.

22             THE COURT:  Let me just jump in on that.  I mean, one

23   way to structure that is the injunction starts once the -- so

24   if it takes them a year, then cumulatively if I picked

25   five years, it's going to run for six calendar years.
```

1              **MR. BORNSTEIN:**  Yeah.

2          **THE COURT:**  We're not going to burn time.  It's not a

3      self-eating asset.  It's not a self-wasting asset.  So don't

4      worry about that.

5          **MR. BORNSTEIN:**  Okay.

6          **THE COURT:**  I'm not going to do that.

7          **MR. BORNSTEIN:**  Another point that Google has made in

8      the objections is that unlike with iOS where Apple generally

9      pushes out the updates to the operating system to everybody on

10     a pretty regular basis and if you have an iPhone from

11     two years ago, you can get the new operating system whenever it

12     comes out as long as you don't have something from, you know,

13     like 10 years ago, Android doesn't work that way.  Android

14     isn't updated in the field with the same regularity and

15     consistency across OEMs.

16         And so the data that we have looked at -- and we can

17     provide it to the Court.  It's not in what Your Honor has; but

18     in thinking about some of the discussions, we thought this was

19     relevant.  The data that we have looked at shows it takes in

20     the United States about 13 to 16 months for a new version of

21     Android to get to half of the existing base.  Globally it takes

22     closer to 22 or 23 months for a new version of Android to make

23     its way to only half of the existing devices in the field.

24         So keeping that in mind --

25             **THE COURT:**  So just to jump in, it takes 36 to

1    48 months to update every Android phone globally, roughly?

2         **MR. BORNSTEIN:**  My guess is there's some kind of tail,

3    Your Honor.  The data -- in other words, I don't know if

4    everybody --

5         **THE COURT:**  Faster?

6         **MR. BORNSTEIN:**  No.  I expect at some point it drops

7    off and there just isn't an update for everything.  Right?

8         So, for example, here we are it's August 2024.  Android 14

9    was released in the wild in about this time in 2022, and the

10   latest information -- this is publicly available from something

11   called Statcounter -- is that 49.4 percent, just about half now

12   in two years, globally have Android 14 installed.

13        When I say --

14        **THE COURT:**  Is that user choice phenomenon or the OEMs

15   aren't pushing it?

16        **MR. BORNSTEIN:**  I think it's a combination of there

17   being multiple OEMs that have different policies about pushing

18   it out.  There's different user bases in terms of people who

19   are more tech savvy and want the latest thing; others who are,

20   you know, less aware.

21        I raise all this to say that we need to make sure we have

22   enough time for the changes that are going to be implemented

23   that we were talking about this morning to get out there in the

24   field and have an effect on competition.

25        **THE COURT:**  All right.  So that would advocate for

1    something three years or more, not less than that.

2        **MR. BORNSTEIN:**  Right.  And the other principle, the

3    other factual item that Professor Bernheim mentioned, which

4    weighed into his thinking on the six years and we think makes

5    some sense to keep in mind, is the average replacement cycle of

6    a device, which is in the neighborhood of three years.  And so

7    the thought was we would want to have two replacement cycles.

8        That's literally where the six years came from, was to

9    have two replacement cycles in a phone in order to have these

10   changes propagate sufficiently into the market for them to have

11   an effect on the competitive landscape.

12       **THE COURT:**  Okay.

13       **MR. BORNSTEIN:**  So those were the principles that

14   animated our suggestion and would urge Your Honor to consider

15   in landing on a number.

16       **THE COURT:**  What about the other time issue, which is

17   Google's, I guess not surprising, insistence this is going to

18   take years and years and years to make happen?

19       **MR. BORNSTEIN:**  So --

20       **THE COURT:**  There's an information disparity, I

21   understand that.  You don't have access.  I already made my

22   views clear on that.  I have my own views about what I may do,

23   but anything to add on that?

24       **MR. BORNSTEIN:**  So that one, Your Honor, is more in

25   the camp of the two gentlemen who were sitting over here a

1    little while ago than it is in my camp.  With that said, we do

2    have now a record that we've developed through the course of

3    the depositions and through the testimony, both in writing and

4    today, that you've received from everybody.  My observations

5    would be, and Your Honor said this more pointedly than I will,

6    but that there was a bit of "We're Google.  We know what we're

7    doing.  Trust us.  This is more complicated than you think it

8    is, and we need some more time."

9        One interesting fact I noticed is during the course of the

10   discussion, just as an example, not to pick on Mr. Cunningham,

11   but he said for one of the remedies around library porting,

12   they would use two engineers and they can do it in 12 months.

13       And, you know, we do document review.  I have these

14   conversations with courts all the time and say, "Well, if I

15   have 10 reviewers, I can get it done in, you know, two months."

16   And the judge will say, "Well, use 20 reviewers."

17       And it may not be a completely linear function, but I do

18   think that if Google were sufficiently motivated by the power

19   of a federal court, it could move more quickly than it has

20   suggested.

21       So in order to get these things out into the field and

22   tested and so forth, I agree with what I interpreted from the

23   Court's comments earlier that a year is far too long.  I also

24   agree 30 days would be shorter than reasonable and within --

25   I'll borrow Professor Bernheim's observation that there's a

1  judgment call to be made about these things.

2      I do think it's important for the Court to keep in mind

3  that these are violations that have been going on for years and

4  years, including to this day, and there's no fault or slight

5  intended.  It's been -- the jury verdict was in December and

6  we've had proceedings that have made perfect sense, but that's

7  been more time that Google has engaged in conduct that the jury

8  has found to be unlawful.

9      And so having Google proceed with some expedition I

10  believe makes sense.  They've also been aware of our proposed

11  injunction since April when we filed it, and I don't want to

12  get into settlement discussions, but we obviously spoke

13  earlier.

14          THE COURT:  Okay.  Any closing thoughts?

15          MR. BORNSTEIN:  I guess the only other thing I want to

16  make sure I touch on because we haven't aired it, subject to

17  questions Your Honor might have about specific issues, is this

18  question that has come up a few times in writing from Google

19  about the geographic scope of the injunction where --

20          THE COURT:  Go ahead.

21          MR. BORNSTEIN:  Yeah.  So, I mean, the argument has

22  been on the Google side that the Court is limited to or at

23  least should limit the injunction to the United States.  We

24  disagree with that obviously.

25      The two bases that Google has offered for this are, number

```
 1   one, the FTAI statutory basis.  We believe they're wrong on

 2   that.  This is a case with a United States plaintiff, unlike

 3   any of the cases that they have cited.  In fact, in the

 4   Empagran case, which was a Supreme Court decision, there --

 5           THE COURT:  Supreme Court, yeah.

 6           MR. BORNSTEIN:  What's interesting about that one is

 7   there actually were U.S. plaintiffs and the cases were split.

 8   The U.S. case went forward but the foreign one stopped.

 9       We have the U.S. plaintiff here, and there are effects on

10   Epic, the U.S. plaintiff, that are occurring overseas.  I mean,

11   it's all over the news that Epic is launching the Epic Game

12   Store in Europe.  Epic is a store competitor around the world,

13   and this conduct is affecting Epic as a developer and as a

14   store competitor globally.

15           THE COURT:  Well, these are your arguments should be

16   the relief should follow the relevant geographic market as

17   found by the jury?

18           MR. BORNSTEIN:  That was going to be my last point,

19   Your Honor.

20           THE COURT:  If I may, I'm just going to jump in.

21       So, you know, Europe is not on the table.  The European

22   Union is not on the table; however, it is common knowledge to

23   me and I'm sure to you that the European Union already ordered

24   Apple and Google to do just about everything that you're asking

25   for in this case, more or less.
```

1    Now, as far as I am aware, Google has not departed the

2    European commercial space nor has Apple, and they're living up

3    to what the EU is ordering.  I know it's underway and not

4    everything has been done, but are there any lessons learned

5    from your point of view in the EU experience that you want to

6    tell me about?

7         **MR. BORNSTEIN:**  Yes, Your Honor.  One issue that has

8    absolutely come up, and I think there may have been some

9    testimony about this at trial even, is in the context of

10   compliance with some individual country laws in Europe --

11   there's one in the Netherlands, for example -- there have been

12   User Choice Billing like situations that Google has put into

13   place where there's been an ability for developers to use

14   alternative payment systems within the app or to steer outside

15   of the app, but there have been charges that have been levied

16   on those alternative pathways to pay, charges levied by Google

17   that have made it completely uneconomic for the developers to

18   choose that path.  So that's why we have a provision in our

19   injunction about this.

20        **THE COURT:**  I think the European Commission is taking

21   a look at that right now; right?

22        **MR. BORNSTEIN:**  I'm not 100 percent certain on the

23   status of the different European proceedings.  I know there has

24   been -- there are ongoing proceedings, but I don't want to

25   misrepresent the content of them.  But that is an important

1   lesson learned.

2        I guess another lesson learned, not so much from Europe

3   but across the Bay, is we have seen in the Apple proceedings,

4   which are public before Judge Gonzalez Rogers, an endless

5   degree of creativity in attempting to find the cracks that the

6   water can go through in an injunction, which just, to us,

7   underscores the importance -- and it sounds like Your Honor is

8   there already, but underscores to us the importance of both a

9   clear, broad scope but also monitoring and making sure that

10  compliance happens and compliance happens in a timely way.

11  That is an important lesson learned to us as well.

12        **THE COURT:**  Well, I agree with that.

13       Okay.  Good.

14        **MR. BORNSTEIN:**  Thank you, Your Honor.

15        **THE COURT:**  Thank you.

16       All right.  Google?

17        **MR. POMERANTZ:**  Thank you, Your Honor.

18       We have a deck that we'll hand up as well.  Just give me

19  one moment.

20        **THE COURT:**  Okay.

21                  (Pause in proceedings.)

22        **THE COURT:**  Go ahead.

23        **MR. POMERANTZ:**  Thank you, Your Honor.

24       Let me start with the remedies that Epic is proposing here

25  really are unprecedented.  We have looked for them and we

```
 1    haven't found a single case that has remedies that are even

 2    remotely comparable to many of the remedies that they're

 3    proposing.  Not a single case.  And it's not surprising because

 4    there is case law out there where the courts have said that

 5    these kind of remedies should not be ordered.

 6         Now, at the hot tub Your Honor cited the Ford case, and

 7    that case --

 8              THE COURT:  Just to be clear, I think I cited four of

 9    them.  I don't --

10              MR. POMERANTZ:  Ford and Optronic.  There may have

11    been some others, but --

12              THE COURT:  No.  It was more than that, but go ahead.

13    I have it here.  Go ahead.

14              MR. POMERANTZ:  The Ford case was the one that said

15    that an antitrust remedy should pry open markets to restore

16    competition.  And in the 50 years since Ford, the Supreme Court

17    and the Ninth Circuit have provided instructions on how to pry

18    open a market, and they've said that there are certain remedies

19    that the court should consider to pry open the market and

20    they've also said that there's certain kinds of remedies that

21    courts should not consider in prying open a market, and I want

22    to give you a few example because they're very directly related

23    to some of the remedies that Epic is seeking.

24         So on the screen is a couple of cases that stand for the

25    proposition that courts should not get involved in centrally
```

1    planning a market.

2         **THE COURT:**  Let me jump in.  I've already told you

3    this.  I have already said it is not the job of the federal

4    judge to micromanage a business.  I'm with you on this.

5         **MR. POMERANTZ:**  No, but you're --

6         **THE COURT:**  I completely agree.  To answer that first

7    point, we are not Communists.  We are not central planners.

8         **MR. POMERANTZ:**  And I will just tell you --

9         **THE COURT:**  I'm not going to have any role in that.

10   I've already assured you of that on multiple occasions.

11        **MR. POMERANTZ:**  But, Your Honor, first with respect to

12   centrally planning or reengineering a market, as you'll see in

13   a minute, Dr. Bernheim concedes that what Epic is doing with

14   catalog access is reengineering, it is centrally planning the

15   Android app distribution market.  And I'll get to his quote.

16       And when it comes to micromanagement, I have a couple of

17   the cases on board, Your Honor knows that, but having a

18   technical committee doesn't change the micromanagement concern.

19   Ultimately it's up to the Court to decide how to interpret and

20   how to apply its injunction, and we're going to show that

21   there's so many questions that Your Honor is going to have to

22   answer.

23       You heard it this morning from the various people on both

24   sides where you're going to have to figure out what metadata

25   goes out, how often does it need to be refreshed, what should

1  the user interface look like.

2       **THE COURT:**  Okay.  Let me just jump in.

3     I understand what you're saying.  Okay?  You need to tell

4  me if you're going to take this route, what is the remedy then?

5  Google has violated Section 2 through monopolistic conduct.  It

6  has harmed a variety of developers and end users and

7  competition itself.  Now you tell me what the remedy is.

8       **MR. POMERANTZ:**  Well, Your Honor, I do believe --

9       **THE COURT:**  If it's not going to be just some basic,

10 straightforward and, contrary to what you're suggesting,

11 tried-and-true solutions about nondiscriminatory access and

12 contracts that do not condition payments on anticompetitive

13 behavior, both of which are tried-and-true antitrust remedies,

14 you tell me what the answer is?  The answer is not, "Oh, it's

15 just so complicated."

16    You can't be too big to fail.  This is a sort of it's too

17 hard to engineer.  That's the -- you tell me what the remedy

18 is.

19      **MR. POMERANTZ:**  That is not our argument, Your Honor.

20 That is not our position.

21      **THE COURT:**  Tell me what the remedy is then,

22 Mr. Pomerantz.

23      **MR. POMERANTZ:**  There's a whole series of remedies,

24 some of which Dr. Bernheim has proposed, some of which are in

25 our settlement with the States, all of which when combined will

1  give -- should give Your Honor confidence there's will be

2  competition in the market.

3      What you can't do --

4          **THE COURT:**  Just tell me what they are.  You tell me.

5          **MR. POMERANTZ:**  They're all in our settlement,

6  Your Honor.  I mean, an example would be what we're doing with

7  sideloading, so that it is going to be easier to sideload,

8  which, by the way, courts --

9          **THE COURT:**  What about payments to competitors not to

10  compete?  What are you going to do about that?

11          **MR. POMERANTZ:**  We have some modifications to propose

12  to that provision, but I think that can be a core provision of

13  Your Honor's injunction.

14          **THE COURT:**  I'm just telling you, you tell me what the

15  answer is.

16          **MR. POMERANTZ:**  Your Honor, I do think that the two

17  prohibitions that Mr. Bornstein showed this morning that

18  Dr. Bernheim discussed, those can be a part of the injunction

19  with certain modifications, which I will get to.

20      But I don't think that Your Honor can say "Because we need

21  to pry open the market, I'm going to do central planning remedy

22  or micromanagement remedy."

23          **THE COURT:**  I'm not saying that.  I've expressly --

24          **MR. POMERANTZ:**  But that's what these are.

25          **THE COURT:**  If I may finish, Mr. Pomerantz.

1          **MR. POMERANTZ:**  I'm sorry, Your Honor.

2          **THE COURT:**  I have expressly advised you I will not

3   under any circumstances micromanage the business or be a

4   central planner.

5          But you're not addressing the key elements.  This is a

6   network effect case as well.  You must have remedies that are

7   more than just "I'm going to stop paying people to not compete

8   with me," because you are now an entrenched monopolist that has

9   taken advantage of the network effects of the online gaming

10  market, gaming app distribution market.  So you have to account

11  for that.

12         Now, you're throwing up all these parade of horribles

13  about, oh, if I open up the Play Store market to competition,

14  that's central planning reengineering the likes of which we

15  haven't seen since Soviet Russia, that's not right.

16         **MR. POMERANTZ:**  Your Honor, if that's what Your Honor

17  took from my comments, then I was not --

18         **THE COURT:**  That's what a central planner is.

19         **MR. POMERANTZ:**  Well, a central planner is saying, for

20  example, "I'm going to take all of the apps that are over here

21  in Play and I'm going to move it to this store and this store

22  and this store, and I'm going to then let that happen for a

23  number of years with the hope that at the end, some of those

24  stores will end up being competitors."

25         **THE COURT:**  How, then, do you solve the network

1  effects problem if you don't do that?

2      **MR. POMERANTZ:**  Well, first of all, Your Honor let's

3  talk about the network effects problem.

4      Can you turn to page -- Slide 8 for me, please?

5      So Dr. Bernheim said that the three remedies that we were

6  discussing this morning, which are catalog access, library

7  porting, and Play distributing third-party stores, they're all

8  designed to address network externalities, network effects, but

9  Epic never offered any evidence that the anticompetitive

10 conduct that was found by the jury was the significant cause of

11 those network effects.

12     The *Optronic* case, one of the cases Your Honor cited,

13 specifically says that there has to be a significant causal

14 connection between the remedy that's being sought and the

15 antitrust violation that was found.

16     **THE COURT:**  There is.  Google monopolized the app

17 market.  The effect of that is developers will only go to a

18 market where they can sell their goods and users will only go

19 to a market where there are tons of developers.

20     **MR. POMERANTZ:**  Well, let's look at what --

21     **THE COURT:**  That is the monopoly construct that Google

22 has implemented through its anticompetitive conduct.  The only

23 way to do that is to open up that construct.

24     **MR. POMERANTZ:**  We need to look at what caused the

25 network effect.  So let's start with Dr. Bernheim.  At trial he

1    conceded that the network effects that Your Honor is talking

2    about started with Google in 2008 creating a revolutionary

3    product -- it's right there on the screen -- and that because

4    they created a revolutionary product, that gave them a

5    first-mover advantage.

6         **THE COURT:**  Perfectly fine, and you are 100 percent

7    under *Trinko*, as Judge Scalia famously said, a dominant market

8    position or a monopoly is the just reward of an honest

9    competitor, words of that effect.  Perfectly fine.

10        What you can't do is then build a moat around that with

11   anticompetitive conduct, which is what the jury found happened

12   from 2016 on, to keep it in place.

13        **MR. POMERANTZ:**  But, Your Honor, that's --

14        **THE COURT:**  So the origin story is not that compelling

15   to me.  Sure, they came through and did something great and

16   then they -- once they got monopoly power, they engaged in

17   anticompetitive conduct to maintain it.

18        **MR. POMERANTZ:**  Your Honor, so we know that at least

19   the network effects were in part caused by being a first mover.

20   They were also --

21        **THE COURT:**  In part, yes, and then in part were

22   preserved by anticompetitive conduct.

23        **MR. POMERANTZ:**  I mean, if I may continue, Your Honor.

24        They were also in part caused by a lot of pro-competitive

25   things that Google Play did to benefit users and developers.

1          This is a slide from Dr. Gentzkow's testimony, and no one

2     disputes that they did a lot of different things that helped

3     developers and helped users.

4          And then you have the anticompetitive conduct that was

5     found by the jury.  So how much did that anticompetitive

6     conduct found by the jury contribute to the network effects as

7     compared to being a first mover or as compared to creating a

8     revolutionary product or as compared to all of these other

9     pro-competitive things?

10          And the point, Your Honor, is the *Optronic* case.  The

11     *Optronic* case required Epic to offer proof that the

12     anticompetitive conduct was a significant cause of those

13     network effects.  And you can scour the record, you can scour

14     all of the evidence in the case; there is not a single piece of

15     evidence that says network effects were significantly caused by

16     the anticompetitive conduct.  There's no jury finding on that

17     issue because the question wasn't presented to the jury.

18          **THE COURT:**  I just -- I'm sorry, but that is so

19     inherent in the jury's verdict that it strains credulity,

20     Mr. Pomerantz, that you would argue that.  We spent hours with

21     Dr. Bernheim and others talking about network effect and

22     network externalities and how that added up to a barrier to

23     entry that Google was exploiting for anticompetitive conduct.

24          **MR. POMERANTZ:**  What caused the network effects is the

25     question.

1          **THE COURT:**  You don't have to have a special

2     interrogatory on the jury form.  All the facts inherent in the

3     jury's findings are treated as having been established.

4          **MR. POMERANTZ:**  No, but you have to have evidence in

5     the record that shows that the anticompetitive conduct found by

6     the jury was a significant cause.  *Optronic* requires that.  And

7     I'm just asking Your Honor go to the record and look for proof

8     that says that the anticompetitive conduct was a significant

9     cause of the network effects, and I don't think you're going to

10    find it.

11         And, by the way, if I'm right, if they failed the *Optronic*

12    test, then all three of the remedies that we're talking about

13    this morning -- catalog access, library porting, and Play

14    distributing third-party stores -- they're not justified under

15    the *Optronic* test.

16         There are other reasons why those particular remedies

17    should not be ordered by the Court, and I want to turn to them.

18         Let me start with Play distributing third-party stores.

19    We think beyond the network effects and *Optronic* test, there's

20    three additional reasons I'd like to highlight why this

21    particular remedy should not be ordered, Play should not be

22    required to distribute its competitors' app stores.

23         The first is that the law makes clear that forcing Google

24    to distribute its competitor stores is going to make

25    competition worse, not better.  *Trinko* says that, a lot of

1   other cases say that.  Competition is going to be worse if you

2   impose a duty that you have to deal with your competitor.

3        And Your Honor knows that that risk is so great that the

4   law has said it's lawfully -- it's presumed lawful to refuse to

5   deal with your competitor, and that's why Your Honor granted

6   summary judgment on that aspect of Epic's claim.  That issue

7   was not presented to the jury because Your Honor granted

8   summary judgment on that issue.

9        Now, the FTC --

10       **THE COURT:**  This is the remedy stage now.  Now we've

11   got to fix the wrong.

12       **MR. POMERANTZ:**  Now, I'm going to that.

13       **THE COURT:**  This has nothing to do with that.

14       **MR. POMERANTZ:**  So the FTC said in its amicus brief,

15   just like Your Honor said, that *Trinko* was a liability case and

16   it's not a remedy case.  It's not a remedy after a jury

17   verdict.

18       But, Your Honor, there is this case of *NCAA vs. Alston*.

19   Your Honor's probably familiar with it.  It's Judge Wilken's

20   case.  It went all the way up to the Supreme Court.

21       And what that court said, and I have it highlighted right

22   at the top here where it says that similar considerations apply

23   when it comes to the remedy.  And then you read that list of

24   considerations that follows, and virtually every one of them

25   cites to *Trinko* because the same concerns that animated *Trinko*,

the harm to competition when you force one competitor to have

to deal with another to distribute their products, that is what

animates the remedy concern because you're going to force

Google to have to take its competitor stores and distribute

them.

THE COURT: Okay. Let me just jump in. I could not

agree more with every sentiment expressed on page 14 of your

slides. I have said that. I won't say it again. I have no

intention of having a highly detailed decree that ends up

impairing competition or micromanaging as a central planner.

I have no intention of doing anything that you're quoting

from the *Alston* case. I'm 100 percent with you. I'm not doing

it. This has nothing -- this doesn't say anything about

forcing Google to do business with a competitor. It's not even

on this slide.

MR. POMERANTZ: But you heard this morning over and

over again about all of the little decisions that matter that

are going to have to be decided before we figure out

third-party distribution of stores, catalog access, and library

porting.

Look at the *Kodak* case, Your Honor. I would ask

Your Honor to look at what the court rejected in the *Kodak*

case, Ninth Circuit case. That -- in that case, the Ninth

Circuit said that the district court had erred when it ordered

Kodak to sell parts that were manufactured by someone else.

```
 1    That was error.  And it's the same thing here.  It's legal
 2    error to order Play to have to distribute someone else's app
 3    store.  Same reasoning as in Kodak.
 4        There's a second reason why I think you should not order
 5    Google to have to distribute third-party stores, and that comes
 6    out of the case of Massachusetts vs. Microsoft.  In that case,
 7    the court said that district courts have less discretion to
 8    fashion a remedy when they don't have a liability finding to
 9    mark the way.  And that makes sense because when you don't have
10    a liability finding to mark the way, then the injunction has a
11    far higher risk of unintended consequences because it's
12    untethered to a specific finding of liability.
13        And that's what we have here because the Court properly
14    granted summary judgment on the issue of whether Play had a
15    duty to distribute its competitors' products.
16        THE COURT:  I'm sorry, what liability finding do you
17    think is missing in this case?
18        MR. POMERANTZ:  That Play has a -- that Play did
19    something anticompetitive by refusing to distribute its
20    competitors' stores.  Your Honor granted summary judgment on
21    that claim.  So there was no evidence of --
22        THE COURT:  I'm looking only at the verdict.  This
23    remedy is being keyed off exclusively from the verdict.
24        MR. POMERANTZ:  But that's my point.  There's no
25    liability finding.
```

1          **THE COURT:**  It's its liability findings under

2     Section 2 of the Sherman Act.

3          **MR. POMERANTZ:**  There is no liability --

4          **THE COURT:**  That's the liability finding that's going

5     to be addressed in the injunction.

6          **MR. POMERANTZ:**  We don't have evidence in the record

7     about the effects of forcing Google to distribute third-party

8     stores because that claim was never presented to the jury, and

9     that's because summary judgment was properly granted.

10         Let me turn now to the third reason why I think you should

11     not force Play to distribute the stores of its competitors.

12     It's unnecessary, Your Honor.

13         And let me show you this slide.  This is a slide that Epic

14     used in their -- I believe it was their closing argument.

15         And what they said were that there were two ways other

16     than Play, two ways other than Play to get an app store onto an

17     Android device:  Direct distribution, which refers to

18     sideloading, and preinstallation.  And then they drew a line

19     through those two because they said that there were roadblocks

20     that blocked them from being available.  For sideloading, the

21     roadblock was that there were too many warning screens, but

22     that roadblock is going to be removed by Your Honor's

23     injunction.

24         And for preinstallation they said that the roadblock was

25     the preload exclusivity provisions that Your Honor heard about

during trial, and that's also going to be eliminated by
Your Honor's injunction.

And so given that these other two paths are available
following your injunction, it is unnecessary to also impose a
duty on Play to distribute its competitor stores particularly
given the concerns expressed by *Trinko* and *Alston* and a lot of
other cases.

I'd like to now -- if Your Honor could turn specifically
to catalog access, that was Play's distribution of third-party
stores, and I'd like to highlight two additional objections to
this remedy.  The first is that it really does constitute the
impermissible central planning or reengineering that we saw in
some of the other cases; and, second, it's inconsistent with
the trial record.  Epic argued that they needed exclusives, not
catalog access, for competition for other app stores.

But before I go to those two points, and I'll just do them
briefly, I do want to just go through what "catalog access"
actually means here.  Because what it means is that Google
would have to send metadata of millions of apps, we said
3 million, to each Android app store that requests those apps.
And so that's going to happen not just once, but it's going to
involve many, many stores.

And, second, what Google is going to have to do then is
for each of those stores, it's going to have to use its own
intellectual property and its own propriety resources and

1  services to get an app downloaded whenever a user, a customer,

2  of one of the other stores wants an app that was made available

3  from Play's catalog.

4      **THE COURT:**  But you understand why this is all going

5  to happen.  It's because Google foreclosed competition for

6  years and years and years.  So we're opening the gate now and

7  letting competitors come in.  That's all you're talking about,

8  and you're saying, "Oh, it's going to be such a burden on

9  Google."  That's competition.

10      **MR. POMERANTZ:**  But, Your Honor.

11      **THE COURT:**  It's supposed to be a burden on everyone

12  because you're supposed to be fighting to win.  And when you

13  build a fence that keeps everybody out, is there going to be a

14  stampede when you finally open the gate?  Maybe.  Is that

15  wrong?  No.  You shouldn't have built the fence in the first

16  place.

17      **MR. POMERANTZ:**  We understand that Your Honor would

18  feel compelled to issue a remedy that addresses the findings of

19  the jury.  But what you can't do is issue a remedy that

20  conflicts with binding case law, and that's what this is.  This

21  is completely central planning and reengineering by a Court,

22  and we don't have to sort of guess about that.

23      Here's Professor Bernheim in his testimony -- in the

24  submission he made as part of these proceedings.  He said that

25  what catalog access is going to do is decouple the user side of

1   the market from the developer side.  Decouple the user side.

2       Your Honor, think about what he's saying there.  We have a

3   two-sided market here.  Everybody agrees it's a two-sided

4   market.  It has users and it has developers.  And he's saying

5   that what catalog access is going to do is make it a one-sided

6   market.  That's central planning, Your Honor.  That's

7   reengineering the market in exactly the way that the courts

8   have said courts should not do.

9       And even if you want a remedy, you can't do a remedy that

10  the courts have said should not be issued.  This is central

11  planning, and you can't -- you can't see it any other way when

12  Dr. Bernheim admits that it's turning a two-sided market into a

13  one-sided market, and it's exactly what he's saying right here.

14      There's a second reason, Your Honor, why I believe you

15  should not order the catalog access remedy and that's because

16  Epic never argued or offered any evidence that a competing app

17  store needs all of the apps in Play's catalog in order to

18  successfully compete against Play.  In fact, Your Honor, they

19  actually suggested the opposite.

20      So, Your Honor, will remember this slide.  Epic's counsel

21  used it in both the opening and the closing.  And what he said

22  was that -- Epic said that what other app stores needed were

23  exclusives by here and here alone.  That's what this slide

24  says.

25      And then he went next to this slide, and what this slide

1    says is "We sell the same stuff you can buy elsewhere."  And

2    Epic's counsel said, "This is what would not be very successful

3    for a competing app store."

4        And so Epic never told the jury that competing app stores

5    need all of the apps in Play's catalog.

6        **THE COURT:**  The jury is not writing the injunction; I

7    am.

8        **MR. POMERANTZ:**  But you need evidence.

9        **THE COURT:**  I have all the evidence I need from the

10   trial.  You foreclosed competition.  I have to even -- look,

11   we're going to tear the barriers down.  That's just the way

12   it's going to happen.

13       I mean, I have to be candid with you, Mr. Pomerantz, are

14   you just not accepting the verdict or the fact that the world

15   as it exists today is the product of monopolist conduct?  That

16   world is changing.

17       **MR. POMERANTZ:**  Your Honor, the verdict --

18       **THE COURT:**  This injunction is going to be part of

19   that.  Now, it's going to be done with all of the restraints

20   about central planning and not micromanaging front and center.

21   I have no intention of being in the business of doing any of

22   that for this case or any other antitrust case.

23       But when you have a world -- when you have a mountain

24   that's built out of bad conduct, you're going to have to move

25   that mountain.  That is what's going to happen.

1          **MR. POMERANTZ:**  I understand, Your Honor.

2      The burden is on Epic here.  Still at this phase the

3  burden is on Epic.  That's the *eBay* case.  That burden requires

4  them to point to evidence in the record that supports their

5  remedy.  For the remedy of catalog access, they have to point

6  to some evidence that another store needs all of the apps in

7  Play's catalog in order to be a successful competitor.  That

8  evidence is not there.  It's exactly the opposite.  They said

9  "We don't need all the apps in the play catalog.  What we need

10  is exclusives."

11      So while I understand Your Honor's desire to have a

12  remedy, there has to be actual evidence in the record that

13  supports that.

14          **THE COURT:**  You need to rephrase that.  I have no

15  desire for a remedy, Mr. Pomerantz.  I am implementing a

16  corrective measure following the jury's verdict.  Are we clear

17  on that?  This is not the judge's personal desire.

18          **MR. POMERANTZ:**  I'm not making a personal --

19          **THE COURT:**  I am administering a remedy after a

20  finding of antitrust violations by a United States federal

21  court jury.  So to suggest that this is my desire is completely

22  inappropriate.

23          **MR. POMERANTZ:**  Your Honor, I was simply saying that I

24  understand Your Honor has said --

25          **THE COURT:**  I have a commitment.  It is not a desire.

1    I have a commitment to remedy the wrong found by this jury.

2         **MR. POMERANTZ:** And all I'm suggesting, Your Honor, is

3    that Epic has a burden to give you and show you the evidence in

4    the record that supports the particular remedies that they're

5    seeking and they have the burden to show you case law that

6    authorizes a Court to issue that kind of a remedy, and I

7    think --

8         **THE COURT:** You know, you're just giving me bromides.

9    We know all of this. You're just reciting standards. You're

10   not applying them in any meaningful way that's helpful to me.

11   You're just not.

12        **MR. POMERANTZ:** I'm sorry, Your Honor. I'm doing my

13   best.

14        **THE COURT:** These are all bromides. Yes, we know all

15   this. We know what the burdens are. We know what the test of

16   the injunction is.

17        **MR. POMERANTZ:** If I could turn to library porting,

18   and I just want to make two simple points about this remedy.

19        The first is I think we've all acknowledged that

20   Android 14 does already allow this remedy to a significant

21   extent, not fully but to a significant extent.

22        And, second, Your Honor, the additional things that Epic

23   seeks beyond what Android 14 already provides, and you were

24   discussing it this morning, the bulk transfer and changing

25   ownership rather than clearing ownership, both of those require

```
 1    Google to modify the Android operating system.  That is a

 2    product redesign.  Android operating system is a product, and

 3    they're asking to have the Court order Google to redesign the

 4    Android operating system to implement this library porting

 5    remedy, and that is something that courts have said should not

 6    be ordered.  Courts should not get into the business of

 7    redesigning products.

 8         And in order to implement this remedy, it's going to

 9    require Google to redesign the Android operating system, and

10    there's case law -- I put two on the screen, but there's

11    others -- that say courts should not require product redesign

12    as part of a remedy.

13         And so, Your Honor, if I could just step back for a second

14    and take these three that we've been spending all morning

15    discussing and talk about them in combination, because when you

16    think about the combination of these three, they really are

17    going to severely weaken Android.

18         And I want to be clear.  I'm not saying that apps or

19    competition is going to weaken Android.  Competition among app

20    stores is something that Android allows and iOS does not.

21    That's not what I'm trying to say, Your Honor.

22         But what I am saying is that if you force Play to

23    distribute other app stores that distribute malware or pirated

24    apps or harmful apps or if you force Play to use its catalog to

25    promote app stores that traffic in malware or piracy, that
```

1   that's going to weaken the entire Android ecosystem.  It's

2   going to weaken the system.  It's going to hurt the developers

3   who need that system.  It's going to hurt the users of that

4   system.  It's going to hurt the OEMs who built their devices

5   based on that system.

6       Android is fighting this every day competing against

7   Apple, and this is going to hurt all of the people who depend

8   upon the Android ecosystem; and so we would urge, Your Honor,

9   to think hard about these three remedies in particular because

10  they really are a real problem for everybody who depends on

11  Android.

12      Now, I understood that Your Honor might want to issue one

13  or more of these remedies.  I thought that was possible

14  notwithstanding whatever arguments we have on legal authority

15  and the factual record to support it.

16      So I do want to suggest a few limits on these remedies for

17  Your Honor's consideration.  First, as you discussed at the

18  last hot tub, and it came up again today:  What's the duration

19  of this -- of these remedies?  And, Your Honor, we really would

20  ask you to consider the one- or two-year duration that we

21  discussed at the last hot tub.

22      Think of it this way, and I think this is the way you were

23  thinking about it at the last hot tub:  If an app store can't

24  get traction with consumers after a year or two of being

25  distributed by Play or if an app store can't convince

 1   developers to work directly with them after a year or two of

 2   having access to Play's catalog, then it's time to stop the

 3   duty to deal.  It's time to stop forcing Google to do business

 4   with its competitors to support its competitors.

 5        A year is probably plenty to see if they can get consumers

 6   and developers.  Certainly two years, Your Honor.  And given

 7   the underlying concerns that the law has, properly has, with

 8   having one competitor have to deal or distribute its

 9   competitors' product, we really do urge Your Honor to limit

10   these three remedies, or any of the three that you do, to one

11   or two years.

12        As to the other remedies, the prohibitions that I'll get

13   to in a minute here, you know, we think that those should also

14   be short.  Whether they have to be one or two years, I don't

15   know; but for these three remedies, Your Honor, I really think

16   consumers and developers will either decide they like or they

17   don't like those other app stores.  Those other app stores have

18   to prove themselves, and I really do think one or two years is

19   sufficient.

20        I understand the issue that you and Mr. Bornstein were

21   talking about, when does the one or two years start; and I do

22   think it should start whenever we're ready to roll out the

23   three remedies or the one or two remedies, whichever ones you

24   order, but I do think these should have a one- or two-year

25   duration.

1    The second thing is this whole issue of eligibility

2  criteria.  And I really don't think -- and I think Your Honor

3  was hitting on this too -- I don't think Play should be

4  required to use its extensive app catalog to promote any app

5  store that distributes malware -- I don't think Your Honor is

6  saying that either -- or pirated apps.

7    **THE COURT:**  You know, it's just -- it's just beyond

8  dispute that no one is going to be forced to feature malware,

9  spyware, ransomware, or anything bad as a result of this

10  injunction.  It's just not going to happen.

11    **MR. POMERANTZ:**  All right.  So --

12    **THE COURT:**  Okay.  So I don't know what it is you're

13  imagining, Mr. Pomerantz, but I have no intention of doing

14  anything that opens the door to somebody getting hurt online.

15    **MR. POMERANTZ:**  So, Your Honor, there is another issue

16  with respect to eligibility criteria that I want to commit,

17  which is:  What is an app store?  And it's a very --

18    **THE COURT:**  You know, we're way past that.  We've had

19  a trial.  We've had four years of litigation.  I don't -- your

20  next point, please.

21    **MR. POMERANTZ:**  Your Honor, can I just explain one

22  issue here so Your Honor can see where I'm going?

23    **THE COURT:**  We're not starting from what is an app

24  store, Mr. Pomerantz.  We're just not.  Okay?  There's just way

25  too much water under the bridge.

```
 1              MR. POMERANTZ:  All right.  So --
 2              THE COURT:  And let's wrap it up.  We're getting up
 3    near to your time.
 4              MR. POMERANTZ:  All right.  Let me turn, if I could --
 5    could you bring up Slide 42?
 6         So these are the two remedies that you and
 7    Mr. Bornstein -- you and Dr. Bernheim were discussing.  One
 8    relates to rivals.  One relates to revenue share.  I would
 9    simply point out, Your Honor, that Dr. Bernheim actually
10    specifically said at the last hot tub that the contract
11    provision needs to explicitly condition the -- something about
12    dealing with Google's rivals.
13         And the word "explicit" was something he choose to use,
14    and I think it's helpful, Your Honor, so that we're not sitting
15    there having to wonder whether this implicitly does condition
16    or not.  That was his word.  We agree with it because that way
17    it's easier for you to administer and it's easier for Google to
18    adhere to.
19         I will leave it to our objections on the issue of revenue
20    share.  There are a few modifications to the first provision
21    that I just want to point out.  I actually don't think these
22    will be controversial.
23         If we can pull up Slide 45.
24         Your Honor, I think that you want to make clear in this
25    rivals' provision that you're talking about Android rivals.
```

1  You're not talking about Apple.  And I think everybody agrees

2  with that.  When Epic wrote its injunction, they made it --

3  they limited it to Android rivals, and that makes sense given

4  that the jury accepted the market definition that Epic offered,

5  which was limited to Android app distribution.

6      We obviously need to be able to compete with Apple, and we

7  don't want anybody to -- we don't want the injunction to be

8  read otherwise.  So I think you just need to use the word

9  "Android" in that particular provision to make it clear that

10  it's the Android rivals that you're talking about.

11     The second issue that we would ask for is, you know:

12  Who's a rival and who's a potential rival?  With respect to

13  rivals, I think we're all in -- because Google has lots of

14  rivals.  So we want to make sure you're focusing on the right

15  rivals.

16     And Dr. Bernheim himself said that rivalry is in terms of

17  app distribution, so I think the right way to write that

18  provision is "an Android app distribution rival."  I think

19  they're in agreement with that.  That's the kind of rival that

20  we're talking about, is an Android app distribution rival.

21     And then the third is:  Who's a potential rival?  And I

22  think the word I have in my outline here is the same word you

23  used, which is a "potential rival" is someone who's announced

24  that they're going to open up an app store.  We know who has an

25  app store.  We all know that.  But if somebody has announced

1   that they are going to be opening up or considering opening up

2   an app store, well, then we at least know which -- what we mean

3   by a potential rival.

4       So, again, we would just ask that there be some --

5   something that helps us to know who a potential rival is

6   referring to.

7       The third point, Your Honor, is -- and, again, I don't

8   know that this is disputed -- that the injunction needs to be

9   clear that Google can still enter into an agreement with an OEM

10  to prohibit that OEM from preloading apps that might contain

11  malware or other harmful content.

12      And, again, I don't think this in any way affects the

13  objective of the remedy here.  We just want to make sure that

14  we can reach an agreement with an OEM that says "You can't put

15  malware.  You can't preload malware or you can't put other

16  harmful apps on the device."

17      In the States settlement, we dealt with this issue.  I

18  have it on the screen, Your Honor.  It's an example of what we

19  were talking about.  This is Section 6 point --

20          **THE COURT:**  I'm not -- I will not be including "for

21  avoidance of doubt" language.

22          **MR. POMERANTZ:**  Okay.  Well --

23          **THE COURT:**  You can do whatever you want and then if

24  there's a problem, someone can tell me if you're trying to

25  cheat or not, but this is way too granular for an injunction.

1          **MR. POMERANTZ:**  All right, Your Honor.

2      And then the last thing we would ask you to consider is

3  carving out deals that relate to a single app.  Here's a

4  situation that we're imagining:  We don't want price

5  competition to be unnecessarily suppressed.  So you don't want

6  the Epic app store to be able to go to a developer and pay less

7  than whatever the fair market value is for that developer's

8  rights.  But if Google can't compete, can't offer a competing

9  offer to the Epic Game Store, the developer is going to get

10  paid less.

11      So we have a balance that we think is the right balance

12  here.  We think the right balance is to prohibit Google from

13  entering into catalog-wide deals like Hug was.  The Hugs were

14  all your apps.  But for -- and Epic can do that and so can

15  other app stores.  They can go to a gaming developer and say

16  "We want to do a deal for your entire catalog."  Play will not

17  be able to do that kind of a deal.

18      But for a single app, let Play negotiate against Epic so

19  that the developer gets a fair market price for a single app.

20  And so we would ask for a carve-out where this -- where Play,

21  for a single app, we can bid against Microsoft or Epic or

22  whoever is for the rights to that app, and that way the

23  developer gets a fair market price.  Otherwise the developer is

24  going to get a below-market price to the benefit of Epic or

25  Microsoft.

1    With sideloading, I don't think we need to spend much time

2  on that.  We have agreed in the States settlement that the

3  Android warning screens --

4    **THE COURT:**  There is no State settlement.  I have not

5  approved it so --

6    **MR. POMERANTZ:**  No, no.  I'm just saying in the hot

7  tub Your Honor asked to have a single warning screen from the

8  Android operating system.

9    **THE COURT:**  Oh, I think -- my sense is the whole

10  sideloading warning screen thing has fallen by the wayside

11  given where we are right now.  So...

12    **MR. POMERANTZ:**  Okay.  I'll skip that.

13    On in-app billing, I just really want to address one thing

14  with respect to the fees.  They don't -- they are not asking

15  for any remedy that is -- that relates to the fee that Google

16  charges for everything other than building.

17    So whatever that fee is, Dr. Tadelis told you we're not

18  asking for anything from the Court in the injunction.  We can

19  set that fee at whatever price Google sets that fee at.

20    The only thing they ask for was that Your Honor impose a

21  price floor on how much Google can charge for Google Play

22  Billing if the user decides to pick Google Play Billing.

23    And, Your Honor, I would just say there's not -- it's not

24  appropriate here for the Court to set a floor for two reasons.

25  They want the floor to be average total cost, Play's average

total cost for Google Play Billing.  If that floor -- if

average total cost means what the law already says in terms of

predatory pricing, or maybe there were some below-cost

statutes, then they're just asking you to impose a

follow-the-law injunction, and you told us long ago you're not

going to do a follow-the-law injunction.

But if instead what they're asking to do is to set a floor

that's not imposed by the law, then they're asking you to be a

price setter, and that's something that *Alston* and other cases

specifically say courts should not do.

The other thing I wanted to mention, Your Honor -- if we

could go to Slide 57.

So this is a question of whether the developer -- whether

there's going to be two choices offered to the user or only one

choice when it comes to billing.  So we're at the billing

stage.

And on the left you will see that there's two options:

What we call Devvy and Google Play.  And on the right is just

one choice.  Here, Your Honor, we believe there should be two

choices presented to the user.  Both of those prices -- I just

want to make clear what's going on here.  Both of those prices

on the left, the 4.99 and 5.99, they're set by the developer.

The developer can choose to steer people, steer users to their

own billing system, by putting in a lower price.  And we think

that the *American Express* decision by the Supreme Court says

1    that when you look at a two-sided market, you want to look at

2    what's in the interest of both sides of the market.

3        The user is better off with two choices.  Many may say

4    "I'm going to pick the developer's choice.  It's cheaper and I

5    want to pay less," but some may say "I want to pick Google Play

6    Billing instead.  I know it costs more, but I trust them with

7    my financial information or I like their parental controls."

8        And so we just would ask Your Honor, when you're thinking

9    about the remedies for billing, to let Google have Google Play

10   Billing as one of the two choices available with the developer

11   picking the other one.  That's better for the user.  And,

12   again, it's the developer who's picking the prices.  That's

13   their choice, for both Google Play Billing and for Devvy.  And

14   so we would just ask Your Honor to pick the two choices rather

15   than the one.

16       Lastly, Your Honor, let me go to Slide 60, and this has to

17   do with the geographic scope.  Your Honor, the geographic scope

18   has to be limited to the United States.  We're in a U.S. court.

19   We're applying U.S. law for the purpose of protecting U.S.

20   consumers.  Other countries have their own competition laws,

21   and there are some similarities and there are some differences.

22       But we know in this instance, Your Honor, that foreign

23   regulators and courts are already currently looking at Play and

24   the conduct, and they're looking at it under the laws of those

25   jurisdictions.  That's happening in Korea and India and

1    Australia and the U.K. and Europe and elsewhere.  And Epic

2    itself is litigating these issues in the courts in Australia

3    and in the U.K. under the laws of those jurisdictions.

4         The law I have on the screen, Your Honor, and there's a

5    lot of it, is international comity law, and what that says is

6    that courts need to be careful about imposing U.S. law and U.S.

7    results onto foreign jurisdictions.

8         Here, the injunction should only apply to app distribution

9    in the United States and to in-app purchases in the

10   United States.  And think about what would happen otherwise.

11   Your Honor would say to Google "You need to go do this in all

12   of these countries around the world."  And one of those

13   countries would say, "No.  I want you to do something

14   different."  And I'm not making this up.

15        We provided evidence to Your Honor that in Thailand and in

16   Singapore and in several other jurisdictions the government

17   authorities are saying to Google "Make sideloading more

18   difficult because we are worried about security."

19        And Your Honor has said to Google "Make sideloading less

20   difficult."  And that's exactly why we want to have a U.S.

21   court decide what's going to happen in the U.S. and leave those

22   other regulators and courts to decide what's right for their

23   jurisdiction.

24        International comity tells you to be restrained, to leave

25   it to the United -- to limit it to the United States.  It's not

about how the jury defined the market.  International comity is

an overlay above that.  It's basically saying "We need to be

respectful of the laws of other jurisdictions and let them

decide for themselves what's right for competition in those

jurisdictions."

And now if I can just go to the last issue, Your Honor, it

is the last, which is the issue of -- go to slide 61 -- and

that's the effective date here.

So for the three remedies that we were talking about this

morning, I think these guys were telling you that they need to

be careful.  Let them do what they -- let them do what they

need to do.  These are engineers, Your Honor.  They weren't

here trying to persuade you of something.  They were telling

you what their life -- what their job experience is.

And we think that you need to be very careful.  We all

just lived through CrowdStrike where somebody did a mistake in

a piece of software and it had a big effect.

The Android operating system is a hugely important piece

of software.  You want to be careful.  The reason why Google

hasn't made those mistakes isn't because they have the smartest

people in the world, that's part of it, but it's also because

they do it carefully.  They do it carefully.  And I think the

time estimates they gave you was because of that concern.

When Professor Ernst said, "I didn't include field testing

in my estimates," he had estimated I think he said three months

and he didn't include field testing.  In his deposition he said

under oath that he estimated field testing to take four and a

half months give or take.

So if you add the four and a half months to the

three months that he did, you're already at seven and a half.

And so the distance between the two is not as great as it

seems.  They say seven and a half.  We say twelve.  And so,

Your Honor, I would just say that, you know, these people

weren't trying to blow smoke here.  This is their life.  This

is what they do for a living, and they really need the time to

get it right.

**THE COURT:**  And do you know what their managers say?

Do it faster.  That's what their managers say.  I guarantee you

every engineer who says, "You know, Boss, this is going to take

me -- I want to get this picture perfect.  Here's what we're

going to have to do.  It's going to be 24 months."  And I

guarantee you their manager says "That sounds great.  You've

got nine," and they do it.

**MR. POMERANTZ:**  And that --

**THE COURT:**  And they do it.

**MR. POMERANTZ:**  Right.  And then after that, it ends

up being 12 months.  That's what they were saying, "When I did

the Android 14 update the last time, it took me about that time

after my manager said do it faster, do it faster, do it

faster."  So, Your Honor, we would ask that.

1   As to the other remedies, we would ask that they don't

2   start for at least, you know, for 90 days, you know, like some

3   of the contract remedies just to get things in place.  And I

4   think Epic agrees with that, Your Honor, because they -- in

5   their proposed remedy, they had us advising the officers of the

6   company on how to comply within 90 days.  And so we would just

7   ask for other remedies to not start for at least 90 days after

8   Your Honor issues the injunction.

9   And in terms of how long those other remedies should go,

10  you know, we don't have a specific proposal, but while I do

11  believe that the three remedies at the top of the slide should

12  be limited to one or two years, the contract-related remedies,

13  you know, I think could be in the range of three years or so,

14  Your Honor.

15  **THE COURT:**  Okay.  Thank you.

16  All right.  This was a productive morning, particularly

17  with the witnesses.

18  Now here are the -- why don't you come back up,

19  Mr. Bornstein.

20  All right.  We have two little things here.  We've got the

21  UCL claim, which is reserved for me.  I think that's pretty

22  easy.  It really just overlaps with the antitrust verdict.  And

23  then you have your defense to -- your illegality defense for

24  the grand total of about 355,000.

25  I think there are two options here.  It's totally up to

1  you.  I can call for some additional briefing on that and we

2  can go through all that.  Maybe you just want to pay the 350

3  and drop the defense and save it for another day.

4       **MR. BORNSTEIN:**  Well, I would say, Your Honor, I think

5  we have briefed it.  I mean, I hear Your Honor saying maybe you

6  would want to receive some more in the event --

7       **THE COURT:**  I think at this point to make my life

8  easier, we're going to have to do something more with it, and

9  it's going to take me some time to -- I mean, it's up to you.

10 If you want to slog it through, it's fine.  I'm happy to do it.

11 But, you know, at this point it seems like kind of a tail and

12 the dog given the verdict.  You just want to save that fight

13 for another day, that might be an option for you to consider.

14      So why don't you advise me -- what is today?  Tuesday?

15 Wednesday?

16      **MR. BORNSTEIN:**  Wednesday, Your Honor.

17      **THE COURT:**  Why don't you advise me by Monday whether

18 you just want to just kind of cut -- you already agreed to the

19 amount.  It's 350 something -- you just want to cut the check

20 or whatever and just save that fight for another day and not

21 prejudiced.  You can just tell me on Monday.  All right?

22 Otherwise I'm going to have to set some briefing and maybe some

23 argument and see how that goes.

24      **MR. POMERANTZ:**  Your Honor, I'm sorry.  I just missed

25 on the UCL.  I'm not going back to that issue.

1          THE COURT:  Yeah, UCL.

2          MR. POMERANTZ:  On the UCL is Your Honor planning on

3     entering an order on the unlawful prong based on the jury's

4     verdict on the legality of --

5          THE COURT:  Well, I mean, I think that's the way it

6     was set up.  I have to go look at it.  I haven't looked at it

7     for a long time.

8          MR. POMERANTZ:  I don't think they asked for any

9     different relief for that claim.  We would just think that,

10    Your Honor, the right --

11         THE COURT:  They didn't ask for what?

12         MR. POMERANTZ:  Sorry?

13         THE COURT:  They didn't ask for what?

14         MR. POMERANTZ:  They did not ask for any different

15    relief under --

16         THE COURT:  That's what I'm saying.  They will

17    technically win, but it won't be anything -- it will have no

18    net effect on anything.

19         MR. POMERANTZ:  Right.  We would just ask that it be

20    under the unlawful prong because I think that is what the jury

21    verdict reflects.

22         THE COURT:  It was the Cartwright Act; wasn't it?  It

23    was the Sherman Act and the Cartwright Act.  Wasn't that the

24    UCL claim?

25         MR. BORNSTEIN:  Well, we had that aspect of it.  We

 1    also brought -- it wasn't presented to the jury because it was

 2    a UCL claim, but we have an unfair prong of the UCL statute as

 3    well.

 4        Your Honor --

 5        **THE COURT:**  So that would be *Celltech*, which is:  Did

 6    they violate the spirit of the antitrust law?  That seems about

 7    the same.

 8        **MR. POMERANTZ:**  As long as it's the unlawful act

 9    prong, Your Honor, we --

10        **THE COURT:**  No, no.  The unfairness prong, I think

11    it's under *Celltech*, if you violate the spirit of the antitrust

12    law, two competitors, they want to be a competitor, that's

13    enough for unfairness.  That's unfair when two competitors are

14    suing each other for antitrust law.  That's my recollection.

15    I'll test my recollection, but that's true, it's part and

16    parcel.  It's all the same.

17        **MR. POMERANTZ:**  Your Honor, I would need to talk to

18    others who are more steeped on that.  I just -- I know that we

19    would be okay with Your Honor entering, you know, your order

20    and your findings based on the --

21        **THE COURT:**  They don't like the word "unfair"?

22        **MR. POMERANTZ:**  I'm sorry, I just don't --

23        **THE COURT:**  What difference -- it's illegal versus

24    unfair, and illegal sounds worse to me.  Is this a cosmetic

25    thing?

1          **MR. POMERANTZ:**  I think it's the way the issues get

2    presented later on, and --

3          **THE COURT:**  No, it's *Celltech*.  If -- I'll take a look

4    at it.

5          **MR. POMERANTZ:**  Thank you.

6          **THE COURT:**  If it's all the same, I'll handle it.

7          **MR. BORNSTEIN:**  Okay.  Thank you, Your Honor.

8       To be clear, we did bring our claim under both prongs and

9    believe the jury's verdict supports a finding of liability

10   under both prongs.

11         **THE COURT:**  If my recollection of *Celltech* is right,

12   then that seems right.  But the whole point is it's not going

13   to change anything in any measurable way.  It's just tying up a

14   tiny little loose end, and you may see your way to just writing

15   a check.  Who knows?

16      Okay.  I'm planning to get this out promptly, by district

17   court standards, the Congress is now looking at a bill to

18   address the fact that we are facing very heavy caseloads and

19   without an adequate number of judges, that does not affect, of

20   course, the timeliness or quality of our work.  It just means

21   that we put in longer and longer hours to make sure those two

22   gold standards are honored.  So when I say I'll be doing this

23   promptly, it will be a couple of weeks at least, but it will be

24   promptly by district court standards.

25      Okay.  Thanks everybody for coming in.  I appreciate it.

1          **ALL:**  Thank you, Your Honor.

2                    (Proceedings adjourned.)

3                         ---oOo---

1

2

3                          **CERTIFICATE OF REPORTER**

4              I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, August 14, 2024

8

9

10

11    _____

12              Kelly Shainline, CSR No. 13476, RPR, CRR
                      U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25