Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Leigha Beckman, Bar No. 334611
leigha.beckman@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
Reedy C. Swanson, *pro hac vice*
reedy.swanson@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20004
Telephone: (202) 637-5600

*Counsel for Defendants*

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Dane P. Shikman, Bar No. 313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL** |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Judge: Hon. James Donato |

## **NOTICE OF MOTION & MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE OF MOTION AND MOTION RE GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL:

PLEASE TAKE NOTICE that on Thursday, November 21, 2024 at 10:00 a.m. Pacific time, in Courtroom 11, 19th Floor, 450 Golden Gate Avenue, before the Honorable James Donato, Defendants Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific PTE, and Google Payment Corp. (collectively, "Google"), will and do hereby move this Court for a partial stay of this Court's October 7, 2024 permanent injunction pending appeal.

Google seeks a ruling under Federal Rules of Civil Procedure 62(d) for a partial stay of the Court's October 7, 2024 injunction pending appeal. Google is entitled to a partial stay pending appeal because Google has more than a reasonable probability of success on its appeal of the jury's verdict and this Court's injunction; Google will suffer irreparable harm absent a partial stay; Epic Games will not be harmed by a partial stay; and a partial stay is in the public interest. As Google's contemporaneously filed administrative motion explains in greater detail, **Google also respectfully requests that the Court grant an immediate partial administrative stay of the November 1 effectiveness date by no later than noon, Pacific time, on Wednesday, October 16, 2024** to allow the Court time to consider this motion for a partial stay of the injunction pending appeal.

This motion is based on this Notice of Motion and Motion; the Memorandum that follows; the Declarations of David Kleidermacher, Vitor Baccetti, Chris Iannuccilli, and Jonathan Kravis and exhibits thereto; the Proposed Order filed herewith; and the pleadings and papers on file in this case.

In accordance with Local Rule 7-2(a), Google has noticed a hearing for this motion on the earliest available date, November 21, 2024; however, Google does not believe that a hearing is necessary on this motion and respectfully requests that the Court take the motion under submission on the papers. Alternatively, Google requests that the Court set an expedited hearing

1   as soon as practicable after expedited briefing is completed in accordance with Google's

2   contemporaneously filed administrative motion to expedite.

3

4       DATED:  October 11, 2024                Respectfully submitted,

5

6                                        By:  _____/s/ Neal Kumar Katyal_____
                                                    Neal Kumar Katyal
7

8                                        **HOGAN LOVELLS US LLP**
                                             Neal Kumar Katyal
9                                            Jessica L. Ellsworth
                                             Reedy C. Swanson
10
                                         **MUNGER TOLLES & OLSON LLP**
11                                           Glenn D. Pomerantz
                                             Kuruvilla Olasa
12                                           Justin P. Raphael
                                             Dane Shikman
13                                           Jonathan I. Kravis

14                                       **MORGAN, LEWIS & BOCKIUS LLP**
                                             Brian C. Rocca
15                                           Sujal J. Shah
                                             Michelle Park Chiu
16                                           Leigha Beckman

17                                           *Counsel for Defendants*

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL
Case Nos. 3:21-md-02981-JD, 3:20-cv-05671-JD

Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Leigha Beckman, Bar No. 334611
leigha.beckman@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
Reedy C. Swanson, *pro hac vice*
reedy.swanson@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 13th St. NW
Washington, D.C. 20004
Telephone: (202) 637-5600

*Counsel for Defendants*

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Dane P. Shikman, Bar No. 313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL**<br><br>Judge: Hon. James Donato |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... iii

MEMORANDUM ................................................................................................................ 1

REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY TO ALLOW FOR
    COMPLIANCE WITH FED. R. APP. P. 8(a) .................................................................. 2

LEGAL STANDARD ......................................................................................................... 3

ARGUMENT ...................................................................................................................... 3

I.    Google Has More Than A Reasonable Probability Of Success On Appeal ..................... 3

    A.    The Verdict Is Legally Unsound And Conflicts With Both Binding
        Precedent In *Epic v. Apple* And Controlling Authority On Market
        Definition ................................................................................................ 3

        1.    Preclusion Barred Epic's Requested Market Definitions .......................... 3

        2.    Epic Had To Prove Single-Brand Aftermarkets ...................................... 5

        3.    Jury Consideration Of Google's Procompetitive Justifications Was
            Wrongly Limited ................................................................................ 6

        4.    The Court Should Have Held A Bench Trial .......................................... 7

        5.    The UCL Liability Determination Depends On The Jury's Verdict ............ 8

    B.    The Court's Unprecedented Injunction Is Unjustified ..................................... 8

        1.    The Injunction's Scope Raises Substantial Questions For Appeal ............... 8

        2.    Procedural Issues Also Raise Substantial Questions For Appeal ............... 14

        3.    Epic Lacks Standing For Many Of The Remedies It Sought ...................... 16

II.   Without A Stay, Google Will Suffer Substantial Irreparable Harm ............................. 17

    A.    Forcing Google To Fundamentally Change Its Business And To Provide
        Services To Its Competitors Is Irreparable Harm ........................................ 17

    B.    Restructuring Google's Relationships With Its Partners Is Irreparable
        Harm ................................................................................................... 18

    C.    Jeopardizing Google's Goodwill And Brand Reputation Is Irreparable
        Harm ................................................................................................... 19

MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT
INJUNCTION PENDING APPEAL

D.    Hindering Google From Collecting Compensation For Its Investments
And Intellectual Property Is Irreparable Harm........................................................ 20

E.    The Injunction Imposes An Unworkable Compliance Timeline .......................... 21

III.    A Stay Furthers The Public Interest Given The Immediate And Harmful Effects
Of The Injunction On Millions of Non-Parties To This Litigation................................ 22

IV.    A Stay Would Not Harm Epic ........................................................................................... 23

CONCLUSION ................................................................................................................................. 23

MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT
INJUNCTION PENDING APPEAL

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Alivecor, Inc. v. Apple, Inc.*,
No. 21-cv-03958-JSW, 2024 WL 591864 (N.D. Cal. Feb. 13, 2024) ................................... 12

*Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) .......................................................................................... 12

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ............................................................................................ 3

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ........................................................................................ 17

*Apple Inc. v. Samsung Elecs. Co.*,
735 F.3d 1352 (Fed. Cir. 2013) ...................................................................................... 15

*Bally v. State Farm Life Ins. Co.*,
No. 18-cv-04954-CRB, 2020 WL 3035781 (N.D. Cal. June 5, 2020) .................................. 7

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) ...................................................................................................... 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................................... 16

*Clements v. Airport Auth. of Washoe Cnty.*,
69 F.3d 321 (9th Cir. 1995) .............................................................................................. 4

*Comedy Club, Inc. v. Improv West Assocs.*,
553 F.3d 1277 (9th Cir. 2009) ........................................................................................ 12

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) ............................................................................................. 6

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) .......................................................................................... 19

*Flores v. Barr*,
977 F.3d 742 (9th Cir. 2020) ............................................................................................ 3

*FN Herstal SA v. Clyde Armory Inc.*,
838 F.3d 1071 (11th Cir. 2016) ........................................................................................ 7

MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT
INJUNCTION PENDING APPEAL

*FTC v. Qualcomm Inc.*,
   935 F.3d 752 (9th Cir. 2019) ................................................................................ 2, 3, 17, 18

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ................................................................................................ 8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ...................................................................................................... 5, 11

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .................................................................................................... 14, 15

*EEOC v. BNSF Ry. Co.*,
   902 F.3d 916 (9th Cir. 2018) .............................................................................................. 10

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ("*Apple I*") ........................................................ 4, 23

*Epic Games, Inc. v. Apple Inc.*,
   67 F.4th 946 (9th Cir. 2023) ("*Apple II*") .............................................................. *passim*

*Epic Games, Inc. v. Apple, Inc.*,
   No. 21-16506 (9th Cir. Dec. 8, 2021) .................................................................................. 2

*Fortyune v. Am. Multi-Cinema, Inc.*,
   364 F.3d 1075 (9th Cir. 2004) ...................................................................................... 14, 15

*Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*,
   701 F.3d 1093 (6th Cir. 2012) .............................................................................................. 5

*Glen Holly Ent., Inc. v. Tektronix Inc.*,
   343 F.3d 1000 (9th Cir.), *opinion amended on denial of reh'g*,
   352 F.3d 367 (9th Cir. 2003) .............................................................................................. 22

*Hayes v. Heckler*,
   785 F.2d 1455 (9th Cir. 1986) ............................................................................................ 16

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ............................................................................................................ 11

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ............................................................................................ 19

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   609 F. Supp. 2d 951 (N.D. Cal. 2009) ............................................................................... 11

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ........................................................................................ 9, 11

*Int'l Franchise Ass'n, Inc. v. City of Seattle,*
    803 F.3d 389 (9th Cir. 2015) ................................................................................ 18, 19

*Kramer v. Banc of Am. Sec., LLC,*
    355 F.3d 961 (7th Cir. 2004) .......................................................................................... 7

*L.A. Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ........................................................................................ 14

*Lair v. Bullock,*
    697 F.3d 1200 (9th Cir. 2012) ...................................................................................... 17

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) .......................................................................................... 3

*Massachusetts v. Microsoft Corp.,*
    373 F.3d 1199 (D.C. Cir. 2004) ................................................................................ 9, 22

*Mid-W. Paper Prod. Co. v. Cont'l Grp., Inc.,*
    596 F.2d 573 (3d Cir. 1979) ........................................................................................ 14

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) ................................................................................................. 16

*Nat'l Collegiate Athletic Ass'n v. Alston,*
    594 U.S. 69 (2021) .............................................................................................. 8, 12, 13

*NCAA v. Bd. of Regents of Univ. of Okla.,*
    463 U.S. 1311 (1983) ................................................................................................... 17

*Newcal Indus., Inc. v. Ikon Off. Sol.,*
    513 F.3d 1038 (9th Cir. 2008) ........................................................................................ 5

*Nken v. Holder,*
    556 U.S. 418 (2009) ....................................................................................................... 3

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013) ...................................................................................... 8

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
    20 F.4th 466 (9th Cir. 2021) ..................................................................................... 9, 10

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009) ....................................................................................................... 8

*Paeste v. Gov't of Guam,*
    798 F.3d 1228 (9th Cir. 2015) ........................................................................................ 3

*SEC v. Stein,*
    906 F.3d 823 (9th Cir. 2018) .................................................................................. 3

*Snoqualmie Indian Tribe v. Washington,*
    8 F.4th 853 (9th Cir. 2021) ..................................................................................... 4

*Sullivan v. NFL,*
    34 F.3d 1091 (1st Cir. 1994) ................................................................................... 6

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .............................................................................................. 17

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
    574 U.S. 318 (2015) ................................................................................................ 7

*Union Pac. R.R. Co. v. Mower,*
    219 F.3d 1069 (9th Cir. 2000) .............................................................................. 15

*United States v. $11,500.00 in U.S. Currency,*
    710 F.3d 1006 (9th Cir. 2013) .............................................................................. 16

*United States v. Microsoft Corp.,*
    147 F.3d 935 (D.C. Cir. 1998) .............................................................................. 12

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................................................... 10

*U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC,*
    89 F.4th 1126 (9th Cir. 2023) ......................................................................... 10, 15

*Va. Ry. Co. v. Sys. Fed'n No. 40,*
    300 U.S. 515 (1937) .............................................................................................. 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP,*
    540 U.S. 398 (2004) ........................................................................................... 8, 12

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
    395 U.S. 100 (1969) .............................................................................................. 14

**RULES:**

Fed. R. App. P. 8(a) ..................................................................................................... 2

Fed. R. Civ. P. 65(d) ................................................................................................... 12

MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT
INJUNCTION PENDING APPEAL

Google seeks a stay pending appeal of this Court's unprecedented injunction.  The injunction requires a fundamental redesign of the Play store and Android ecosystem and impacts over a hundred million American consumers, more than a half million U.S. app developers, and countless Google business partners.[1]  The injunction imposes the vast majority of these changes with approximately three weeks' notice, a fraction of the 90 days Apple had to come into compliance with an injunction requiring a single product change.  To comply with the Court's sweeping order to overhaul Google's products, services, and contracts, Google must write new code, create new functionality, build new network infrastructure, extensively test all of the changes to avoid serious security problems, and fundamentally change its relationships with users, developers, OEMs, and carriers.  The injunction forces Google to provide services to its competitors, and it elevates a technical committee overseen by the Court to act as a central planner for resolving disputes and issues relating to the technology and processes at stake.

Google easily satisfies the legal standard for a stay pending appeal in this case.  First, Google has shown the necessary likelihood of success because there are—at minimum—serious questions on the merits, including whether Epic should have been permitted to avoid preclusive findings from its losing antitrust case against Google's principal competitor, Apple.  The injunction itself also raises a suite of important issues for appeal, including whether it exceeds the Court's authority and whether key provisions lack an evidentiary basis.

Second, the equities weigh heavily in favor of a stay.  The injunction requires Google to modify its product and business model in unprecedented ways that will affect over a hundred million non-parties to this lawsuit, including users, business partners, OEMs, and app developers.  These changes will irreparably harm Google and introduce serious safety, security, and privacy risks into the Android ecosystem, as well as consumer confusion.  If the Ninth Circuit reverses, the toothpaste cannot be easily put back in the tube—if it can be put back at all.  These changes not only jeopardize users and developers, but will inhibit Google's ability to compete on the merits,

---

[1]  Google seeks to stay the permanent injunction in its entirety except for ¶ 8.  Google already agreed to the changes required by ¶ 8 a year ago when it agreed to the State Settlement. Dkt. 522-2 at 21-22, 27-28, Case No. 3:21-cv-05227-JD.

1  including with Apple.  They will also require Google to incur many millions of dollars in

2  unrecoverable business costs and lose many thousands of hours of employee time, starting

3  immediately.

4  Given the very short timeframe—just three weeks—to implement a number of technically

5  and procedurally complex changes, there is a significant risk that they will not work properly or

6  cannot be accomplished at scale when implemented on November 1.  Even for the changes with a

7  longer timeline, absent a stay, Google will be forced to spend many millions of dollars between

8  now and the resolution of its appeal to try to meet a timeline for new capabilities and services that

9  fails to build in time for careful testing and roll out.  Neither these business expenses nor lost

10  revenues will be recoverable if the Ninth Circuit reverses.  Nor can Google undo the reputational

11  and brand harm Google faces while this injunction is in effect.

12  The Ninth Circuit has repeatedly—and recently—granted stays pending appeal in cases

13  like this one that test "the outer limits of the Sherman Act," even when those injunctions were far

14  less intrusive than the one here.  *FTC v. Qualcomm Inc.*, 935 F.3d 752, 757 (9th Cir. 2019) (per

15  curiam); *see also* Order, *Epic Games, Inc. v. Apple, Inc.*, No. 21-16506 (9th Cir. Dec. 8, 2021)

16  ("*Apple* Stay Order").  The injunction should not take effect until the appellate courts have

17  considered and resolved Google's arguments on the liability ruling and the injunction's scope.

18  **REQUEST FOR IMMEDIATE ADMINISTRATIVE STAY**
**TO ALLOW FOR COMPLIANCE WITH FED. R. APP. P. 8(a).**

19

20  Federal Rule of Appellate Procedure 8(a) requires a party to seek a stay pending appeal in

21  the district court before doing so in the appeals court unless doing so is "impracticable."  As

22  Google's contemporaneously filed motion for an emergency administrative stay explains, the

23  November 1 compliance deadline makes it impossible to fully brief a stay motion in this Court and

24  the Ninth Circuit before the injunction is scheduled to take effect.  An immediate administrative

25  stay until 30 days after this Court rules on this motion will allow for briefing on a stay pending

26  appeal to proceed in an orderly fashion in both courts.  If this Court does not grant an

27  administrative stay by **Wednesday, October 16, 2024 at noon Pacific time**, it will become

28

1   impracticable for Google to continue seeking relief from this Court before the compliance

2   deadline and Google will proceed to seek relief from the Ninth Circuit.

3                                    **LEGAL STANDARD**

4           Four factors govern whether to issue a stay pending appeal:  (1) whether the movant "has

5   made a strong showing that [it] is likely to succeed on the merits"; (2) whether the movant "will be

6   irreparably injured absent a stay"; (3) whether the public interest favors a stay; and (4) whether

7   issuing the stay "will substantially injure the other parties interested in the proceeding." *Leiva-Perez*

8   *v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (per curiam) (quoting *Nken v. Holder*, 556 U.S. 418,

9   434 (2009)).  Courts review these factors under a "sliding scale approach," whereby "a stronger

10  showing of one element may offset a weaker showing of another." *Al Otro Lado v. Wolf*, 952 F.3d

11  999, 1007 (9th Cir. 2020) (internal quotation marks omitted).  Alternatively, the Court has discretion

12  to issue a temporary stay while Google seeks a stay pending appeal from the Ninth Circuit.  *See*

13  *Paeste v. Gov't of Guam*, 798 F.3d 1228, 1241-42 (9th Cir. 2015).

14                                      **ARGUMENT**

15  **I.      Google Has More Than A Reasonable Probability Of Success On Appeal.**

16          The first factor asks whether Google can show "a reasonable probability or a fair prospect

17  of success," which is a lesser showing than whether it is "more likely than not" Google "will win

18  on" appeal.  *Qualcomm*, 935 F.3d at 755 (internal quotation marks omitted).  This standard is

19  satisfied by showing there are "serious questions going to the merits" when, as here, the equitable

20  factors strongly favor Google.  *Flores v. Barr*, 977 F.3d 742, 746 (9th Cir. 2020) (internal

21  quotation marks omitted); *see infra* pp. 17-23.  Google more than clears that bar.  The liability

22  verdict and injunction in this case are both contrary to precedent and procedurally defective.

23      **A.      The Verdict Is Legally Unsound And Conflicts With Both Binding Precedent**
              **In *Epic v. Apple* And Controlling Authority On Market Definition.**
24

25                **1.      Preclusion Barred Epic's Requested Market Definitions.**

26          Issue preclusion "bars parties from relitigating an issue if the same issue was adjudicated

27  in prior litigation." *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018).  It applies when "(1) the issue

28  at stake was identical in both proceedings; (2) the issue was actually litigated and decided in prior

proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (citation omitted).  The doctrine exists to avoid "inconsistent results." *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 330 (9th Cir. 1995).

Epic's parallel suit against Apple, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021) ("*Apple I*"), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023) ("*Apple II*"), filed the same day as this one, squarely addressed whether Google Play and the Apple App Store compete for app distribution or in-app purchases.  In both cases, Epic argued that the Google Play store and the Apple App Store did not compete because consumers who choose an Android device cannot use the Apple App Store and consumers who choose an Apple device cannot use the Play store.  *Compare* Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc. ("Epic Trial Br.") at 72 ¶ 44, 93-95 ¶¶ 175-177, 131-132 ¶¶ 225-228, *Apple I*, No. 4:20-cv-5640-YGR (N.D. Cal. May 28, 2021), Dkt. 777-3, *with* Trial Tr. 3376:7-14, 3378:18-20 (Epic Closing); Trial Tr. 2428:5-6, 2433:14-16, 2425:11-13 (Bernheim).  The *Apple* court rejected Epic's arguments after a bench trial on the merits; Epic appealed that ruling and lost.  *Apple I*, 559 F. Supp. 3d at 954-955, 958-960, 971, 976-978, 1024, 1030-32, 1036, 1043; *Apple II*, 67 F.4th at 973-999.  Preclusion thus should have applied here to prevent Epic from rearguing this issue.

As relevant here, *Apple* held that Google and Apple squarely compete in the market for digital transactions related to gaming apps.  *Apple I*, 559 F. Supp. 3d at 977 ("Apple has always viewed Google Play as a significant competitor"); *id.* at 992 n.454 ("This reinforces that Apple and Google compete with one another."); *id.* at 997 n.484 ("Google, of course, operates in the same market" as Apple); *id.* at 1000, 1004-05 (comparing App Store features with Google Play store features).  Issue preclusion should therefore have prohibited Epic from seeking a contradictory finding in its case against Google.  This Court erred in allowing the jury to consider market definitions that directly contradict *Apple* because they necessarily mean Apple and Google do not compete for those transactions.  Dkt. 866 at 3.

This Court rejected preclusion on the basis that the market definition issues in *Apple* "were plainly not the same as the issues litigated here."  Dkt. 984 at 7.  But *Apple*'s conclusion that the

App Store competes with Play for at least some digital transactions directly conflicts with the jury's conclusion that Google does not compete with Apple for any of those transactions.  The fact that Epic's asserted markets here were limited to the Play store and Android, rather than Apple's App Store and iOS, *see id.*, misses the point:  In determining whether a single-brand market existed for the Apple App Store, the *Apple* courts necessarily considered whether there was relevant competition between Apple and Android.  Epic's "failure of proof" on this issue in *Apple* does not make preclusion inapplicable.  *Id.* (quotation marks omitted).  Preclusion stops a party from having a second *opportunity* to relitigate issues after one full and fair opportunity to do so. *See Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100 (6th Cir. 2012) (preclusion means "[p]arties may not create new sets of facts").[2]

### 2.    Epic Had To Prove Single-Brand Aftermarkets.

This Court also applied the wrong legal framework to Epic's market definitions.  The markets that Epic asked the jury to find are "single-brand aftermarkets," as controlling precedent defines that term.  The Ninth Circuit's opinion in *Apple* confirms that a "single-brand aftermarket" is one in which "demand for a good is entirely dependent on the prior purchase of a durable good in a foremarket."  *Apple II*, 67 F.4th at 976.  That definition accords with how the term has been understood throughout Ninth Circuit and Supreme Court case law.  *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (describing aftermarket for Kodak services and replacement parts); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1049 (9th Cir. 2008) (similar for IKON replacement parts).

The evidence in this case established that both of Epic's Android-only markets constitute single-brand aftermarkets.  Google and Epic's witnesses *agreed*:  No demand for Android apps exists without the prior purchase of an Android device.  Trial Tr. 1412:11-14 (Pichai); Trial Tr. 2425:6-13 (Bernheim).  Because Epic sought to prove single-brand aftermarkets, it had to show— among other things—that "the challenged aftermarket restrictions are 'not generally known' when

---

[2] In any event, Epic's proof in this case was strikingly similar to its proof in *Epic v. Apple*, *see supra* p. 4, and it failed to introduce any evidence to support the same element on which its market definition claims foundered in *Apple*.

consumers make their foremarket purchase." *Apple II*, 67 F.4th at 977.  Thus, in *Apple*, Epic had to prove that Apple's customers did not know they would be unable to access the Play store and other competing app distributors.  *See id.*  The same rule should have applied here:  Epic had to prove that Android purchasers were unaware that Apple's App Store is inaccessible on Android devices.  Epic never attempted that showing, and the Court excused it from doing so.  *See* Trial Tr. 3248:28-3249:4; Dkt. 850 at 22 (jury instruction).

Refusing to hold Epic to the legal framework required by controlling Ninth Circuit precedent, including *Apple*, was error.  That framework applies when the relevant markets depend on the "purchase of a durable good."  *Apple II*, 67 F.4th at 976.  The fact that "Android devices are manufactured by many companies," not just Google, *see* Dkt. 984 at 8, does not even effectively distinguish *Apple*, because many retail vendors sell Apple devices.  Nor does the ability to have more than one app store on an Android device change the governing standard.  *Id.* at 9.  The "single brand" Epic argued for is app distribution and billing *on Android devices*.  That Google enabled users and developers to access multiple app stores on Android devices has no bearing on whether the purchase of an Android device is a purchase of a durable good.

### 3.   Jury Consideration Of Google's Procompetitive Justifications Was Wrongly Limited.

At trial, Google stressed that operating the Play store is an essential aspect of its broader competition with Apple.  This Court precluded the jury from considering that argument in connection with the procompetitive justifications for Google's conduct.  *See* Trial Tr. 3258:5-10; 3328:11-16; 3332:22-3333:1.  But the Supreme Court and the Ninth Circuit have consistently looked to "cross-market rationales in Rule of Reason and monopolization cases."  *Apple II*, 67 F.4th at 989 (collecting cases).  This case squarely presents this important issue, which has divided other circuits, *compare, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (looking to procompetitive justifications in related markets was error), *with Sullivan v. NFL*, 34 F.3d 1091, 1112-13 (1st Cir. 1994) (looking to procompetitive justifications in different markets is permissible).  This issue therefore squarely presents a "substantial question" that

1   warrants a stay.  *See Bally v. State Farm Life Ins. Co.*, No. 18-cv-04954-CRB, 2020 WL 3035781,

2   at *4 (N.D. Cal. June 5, 2020).

3              **4.   The Court Should Have Held A Bench Trial.**

4              The liability verdict also has a threshold flaw:  A jury never should have heard this case.  It

5   is a fundamental principle that "judges, not juries, determine equitable claims, such as requests for

6   injunctions."  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015).  Epic's

7   complaints sought exclusively injunctive relief.  *See* Dkt. 1 at 59; Dkt. 156 at 80; Dkt. 341 at 36,

8   Case No. 3:20-cv-05671-JD.  Accordingly, this Court should have held a bench trial—which is

9   exactly what happened to Epic's parallel claims in *Apple*.  Instead, the Court proceeded with a jury

10  trial even after all parties seeking damages had settled.  The Court relied primarily on a single

11  sentence from a joint filing, *see* Dkt. 505 at 3 (stating "all claims by all Plaintiffs are triable to a

12  jury"), and stray remarks in Google's opposition to bifurcation–both filed when Epic's case was

13  consolidated with numerous parties who were entitled to a jury trial (because they sought

14  damages), Dkt. 573 at 5.  This cannot be construed as consent to a jury trial on Epic's standalone

15  claims for injunctive relief.  When it became clear that all parties seeking money damages would

16  settle, and before jury selection, Google promptly requested a bench trial.  *See* Dkt. 730.

17             Even if these filings amounted to "consent" at the time to a jury trial on Epic's standalone

18  claims, courts have recognized that such consent may be withdrawn just "days before trial" where,

19  as here, the opposing party is not constitutionally entitled to a jury.  *FN Herstal SA v. Clyde*

20  *Armory Inc.*, 838 F.3d 1071, 1089-90 (11th Cir. 2016); *accord Kramer v. Banc of Am. Sec., LLC*,

21  355 F.3d 961, 968 (7th Cir. 2004).  This Court refused to hold a bench trial because it believed

22  Epic would be prejudiced by having to try its case to the Court, but neither this Court nor Epic

23  articulated any prejudice.  *See* Dkt. 984 at 28.  A claim of prejudice is particularly implausible

24  given that Epic specifically chose not to seek money damages.  That two circuits have rejected this

25  Court's reasoning shows a serious question exists as to whether a bench trial should have been

26  held.

27

28

### 5.   The UCL Liability Determination Depends On The Jury's Verdict.

Finally, the Court's UCL holding does not provide "an independent state-law basis for an injunction."  Dkt. 1016 at 6.  The Court concluded Google was liable under the UCL's "unlawful" prong for violating the Sherman Act,[3] and that Google was liable under the "unfair" prong because "[t]he jury found that Google's conduct violated the antitrust laws" and "rejected Google's proffered procompetitive justifications."  *Id.* at 3-4.  This holding thus derives entirely from the jury verdict.  If that verdict is vacated, the UCL holding will be too.

### B.   The Court's Unprecedented Injunction Is Unjustified.

### 1.   The Injunction's Scope Raises Substantial Questions For Appeal.

Despite this Court's disclaiming that the injunction turns the Court into a central planner, the injunction does exactly that. "[J]udges make for poor 'central planners' and should never aspire to the role." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 103 (2021) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 408 (2004)).  The injunction—by setting "the proper price, quantity, and other terms of dealing"—runs afoul of the substantive rules of antitrust law.  *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452-453 (2009) (citation omitted).

***First***, the injunction improperly requires Google to deal with its competitors.  Firms generally have no duty to deal with their rivals at all, let alone on court-ordered, favorable terms. *See Trinko*, 540 U.S. at 409; *FTC v. Qualcomm*, 969 F.3d 974, 993-994 (9th Cir. 2020).  "Forcing firms to help one another . . . risk[s] reducing the incentive both sides have to innovate, invest, and expand"—defying the very purpose of antitrust law.  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.).  This principle holds just as true in the remedial phase as the liability phase.  *See Alston*, 594 U.S. at 102 ("[s]imilar considerations" guide liability and remedial findings).

Contrary to these fundamental principles, the injunction requires Google to help anyone who is or wants to be a rival.  For three years, Google must distribute third-parties' app stores

---

[3] The Court also cited the Cartwright Act, but treated that claim "as being coterminous with the Sherman Act claims for purposes of both liability and remedy."  Dkt. 1016 at 6 n.4.

MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT
INJUNCTION PENDING APPEAL

through Play and allow any Android app store to offer Play's full catalog of apps to users of that store.  Injunction ¶¶ 11-12.  Google's expert explained these requirements will stifle competition while the injunction is in effect, Dkt. 957-1 at 3, 24, 26-27, 31-32, 35, and the Court acknowledged as much, *see* Dkt. 977 at 50:8-51:19 (acknowledging the anticipated injunction would reduce competition while in effect).  A remedy that *stalls* competition while in effect is reversible error.  *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997) (striking portion of remedy that "promote[d] free-riding").  The injunction removes incentives for a serious competitor to make significant resource investments during the injunction; doing so would make no business sense while the entire Play catalog is available for free to companies with neither the resources nor intent of making a long-term business of this kind.  That is precisely why antitrust law does not condone remedies that would give a defendant's rivals "the ability to clone [its] . . . products."  *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1219 (D.C. Cir. 2004).

Even if antitrust law authorized duty-to-deal remedies absent any proof the refusal to deal was itself anticompetitive—and it does not—duty-to-deal remedies are improper unless Epic showed a causal connection to the antitrust injury found by the jury.  Injunctive relief to eliminate a competitive advantage requires a finding of "significant causal connection" between the relief ordered and the violation found.  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (internal quotation marks omitted).  That proof is particularly important here, where the injunction forces Google to perform valuable services for competitors.  *See Microsoft*, 373 F.3d at 1231-33.

The catalog access and app store distribution remedies lack *any* connection to the theory of liability Epic presented at trial.  Epic *never* argued or presented evidence it was anticompetitive for Google not to share its app catalog with other Android app stores.  Epic instead argued that having *unique* content was the key to competition, not the *same* content as every other store.  Trial Tr. 2400:24-2401:15, 2409:8-2410:7 (Bernheim).  And Epic *could not* present evidence or argue that it was anticompetitive to refuse to distribute third-party app stores through Play; this Court rightly granted summary judgment against Epic on that duty-to-deal claim.  10/19/23 Hr'g Tr. at 5:3-6:2.

Nor is there evidence that these far-reaching remedies are necessary to undo "network effects." Dkt. 952-1 at 3. The record contains no evidence that Google's "network effects" are attributable to conduct that Epic challenged. In fact, undisputed trial evidence showed that the Play store derived at least some of its advantages from investment in product innovation and its first-mover advantage. Trial Tr. 2480:9-15 (Bernheim); Trial Tr. 2672:7-2673 (Gentzkow); Dkt. 957-1 at 7. An injunction cannot seek to eliminate competitive advantages absent evidence that anticompetitive conduct actually caused those advantages. *See Optronic*, 20 F.4th at 846.

At a minimum, the Court failed to make sufficient factual findings of a causal connection between the jury's verdict and the injunction issued. The Court's conclusion that Epic was not actually required to prove "whether Google's anticompetitive conduct caused the network effects" complained of, Dkt. 1016 at 11, is contrary to the law. Epic was required to present evidence of what portion of Google's network effects, if any, are attributable to the anticompetitive conduct that the jury identified. *See Optronic*, 20 F.4th at 486; *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001) (en banc) (per curiam). It did not do so.

Nor could the Court simply assume causation based on the jury's verdict. When sitting as a court of equity after a jury trial, it is legal error for a district court to rely on facts that it considers "implicit" in the jury verdict where the applicable finding does not "necessarily" follow from the jury's conclusions. *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1136, 1145 (9th Cir. 2023) (citation omitted). Here, nothing required the jury to specify which anticompetitive effects it attributed to Google's anticompetitive conduct—much less the *extent* to which those effects resulted from anticompetitive conduct versus competition on the merits. *See* Dkt. 866. The Court was therefore required to make specific factual findings, grounded in the record, that the alleged network effects targeted by the injunction resulted from Google's anticompetitive conduct. *See EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 929 (9th Cir. 2018).

Citing to a 2017 slide deck that credited "network effects" for the Play store's competitive advantage over Amazon's app store is an insufficient causal basis for the injunction. Virtually no network effects that Google had in 2017 could be attributable to any of the conduct Epic

challenged—which largely focused on agreements postdating 2017.  *See, e.g.*, Trial Tr. 411:14-16 (GVP); Trial Tr. 1052:23-1053:6 (RSA 3.0).  And the jury heard both that Amazon's store lacked "critical" features of competing app stores and that Amazon was investing far less than its competitors.  Trial Exh. 11405; Morrill Tr. at 286:02-11; Trial Tr. 2324:23-2325:5 (Google investment in Play); Morrill Tr. at 100:05-12 (Amazon investment in its app store).

Without findings of a causal connection, the injunction simply stands to harm Google.  *Infra* pp. 17-21.  That is an improper penalty, not a permissible injunctive remedy.  *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 969 (N.D. Cal. 2009) (permanent injunction "may deter future harm, but it may not punish").

**Second**, the injunction regulates prices in a way prohibited by *Kodak*.  Injunction ¶ 12 (limiting Google to a "reasonable fee" based on "actual costs"); *Kodak*, 125 F.3d at 1225.  *Kodak* condemned antitrust remedies that "forced sales at reasonable prices" instead of allowing companies to charge "what the market will bear."  *Id.* at 1225-26.  The price regulation here is even more unwarranted than it was in *Kodak*.  That case involved evidence of discriminatory and supracompetitive pricing for challenged products and services, *see Kodak*, 504 U.S. at 457, but this provision concerns pricing for an entirely new service that Google must develop from scratch to protect users in light of the Court's injunction.

**Third**, the injunction unlawfully forces over half-a-million non-party U.S. developers to grant Google a license to distribute their IP unless they opt-out of Google doing so.  Injunction ¶ 11.  Google Play's relationship with developers is predicated on agreements that Google will only distribute developers' apps on the Play store.  *See generally* Dkt. 981-2 (sample DDA).  Some developers also have additional limits on app distribution.  For example, Kabam Games, Inc. has sublicense agreements with Disney and Marvel for content that Kabam incorporates into games distributed on the Play store. *See* Dkt. 981-1 at ¶¶ 20-21.

The catalog access provision upends these limits.  It compels distribution of hundreds of thousands of non-parties' intellectual property without the necessary licenses in contravention of Google's license from developers, Dkt. 981-2 at §§ 5.1, 6.2, and in violation of many developers' sublicenses with other third parties, *see* Dkt. 981-1 at 4-5.  *See also* Baccetti Decl. ¶ 11.  The

1    injunction does not and cannot grant Google any authority to exceed those licenses.  *See* Fed. R.

2    Civ. P. 65(d) (injunction authority extends only to defendant and non-parties working "in active

3    concert or participation" with defendant); *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d

4    1277, 1287 (9th Cir. 2009) (narrowing injunction improperly imposed on non-parties).

5         Catalog access also creates other unintended consequences.  Users will be inhibited from

6    discerning the legitimacy of an app store based on the size of its catalog, which makes it likely

7    they will inadvertently download pirated, fake, or fraudulent versions of an app even if a

8    developer opts out of that store.  Kleidermacher Decl. ¶¶ 14-16.  And not opting out means

9    distribution side-by-side with pirated, offensive, or illegal content, raising another set of reputation

10   risks.  *Id.* at ¶ 16; *see also, e.g.*, Exh. A to Kleidermacher Decl.  In addition, Google has no way to

11   enforce a developer's decision to de-list its app from a particular app store because once the Play

12   metadata including that store has been sent to a third-party app store, Google has no way to claw it

13   back.  Dkt. 981-1 at ¶¶ 21-22.

14        **Fourth**, the injunction calls for detailed micromanaging of Google's products.  Courts are

15   not in the business of product design because they are ill-equipped to "weigh[] the benefits of an

16   improved product design against the resulting injuries to competitors."  *Allied Orthopedic*

17   *Applicants Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 991, 1000 (9th Cir. 2010); *United*

18   *States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998).  That is particularly true in highly

19   technical industries where courts lack the expertise to "explain or adequately and reasonably

20   supervise" the duty they are imposing.  *Alston*, 594 U.S. at 102 (quoting *Trinko*, 540 U.S. at 415);

21   *see also Alivecor, Inc. v. Apple, Inc.*, No. 21-cv-03958-JSW, 2024 WL 591864, at *17 (N.D. Cal.

22   Feb. 13, 2024) (declining remedy that would "micromanage" Apple's algorithms).

23        This Court's injunction purports to regulate conduct at a high level of generality.  But in

24   fact, it requires Google to write new code and create new functionality; constrains Google's

25   security efforts to those "strictly necessary and narrowly tailored"; and requires Google to rewrite

26   agreements with its partners and develop new billing and steering policies.  These provisions will

27   compel Google to modify its suite of products in hundreds, if not thousands, of ways.  *See, e.g.*,

28   Dkt. 1000 at. 25:19-26:10 (discussing build of new database); Dkt. 981-3 at 17-20 (discussing

changes to permit distribution of third-party app stores).  And the injunction poses endless

questions on how to achieve compliance.  *See, e.g.*, Kleidermacher Decl. ¶¶ 22-25; Dkt. 1000 at

10:24-12:9 (questions about providing and updating metadata); *id.* at 44:12-45:9 (questions about

interface design); *id.* at 24:3-25:9 (questions about software release).  Epic's expert admits that

"someone" will have to answer these many implementation questions.  Dkt. 996-3, at 156:24-

157:10, 158:13-17.  The injunction makes the Court that "someone," contrary to controlling

precedent.  Injunction ¶ 12 (stating that the Court will "serv[e] as the final word" on compliance

disputes "when necessary"); *see also Alston*, 594 U.S. at 103.  Judicially mandating a non-Article

III technical committee to mediate implementation issues in the first instance makes things worse,

not better, by circumventing settled precedent prohibiting courts from becoming central planners.[4]

*See, e.g.*, *Alston*, 594 U.S. at 102; *see also* Injunction ¶ 13.

> ***Fifth***, the injunction extends beyond what is necessary to redress the antitrust injury that

Epic asserted.  Epic's main theory at trial was that competitors could not "differentiate

[themselves] from Google Play" on Android.  Tr. 2400:20-2403:6; *accord* Tr. 3367:19-21.  The

contract and revenue share remedies addressed in this motion (¶¶ 4-7) go well beyond ending

contractual arrangements that prevent *others* from competing in this way; they threaten to prohibit

*Google* from competing on a level playing field by requiring it to refrain from competing for

differentiated content or placement on Android devices manufactured by third-party OEMs.  It

does not restore competition to prevent Google from competing to offer popular apps first or from

competing to incentivize OEMs and carriers to ensure that Android devices have an accessible,

safe, out-of-the-box option for downloading Android apps.  Trial Tr. 853:29-855:8, 1746:13-19,

2205:9-18.  And these restrictions not only harm competition across Android phones, but also

degrade competition between Android and Apple.

> The order accompanying the injunction does not explain why a narrower remedy would be

insufficient and does not explain why it has rejected the narrowing modifications Google

---

[4]      The technical committee in *Microsoft* was the result of a consent decree, not a judicial
mandate.  *See* Dkt. at 746 at 1, 9-13, *United States v. Microsoft Corp.*, No. 1:98-cv-01232
(D.D.C.).

requested at the hearing on August 14 that would have preserved Google's ability to compete in this area.  Dkt. 1000 at 140:24-141:10, 141:21-24, 147-11; 143:1-25.  To be clear, Google did not "agree with the[] conduct remedies" in ¶¶ 4-7.  Dkt. 1016 at 9.  It explained that two prohibitions offered by Dr. Bernheim "could be part of the injunction with certain modifications."  Dkt. 1000 at 120:16-19.  Even setting aside the requested modifications, Dr. Berheim's prohibitions themselves are *narrower* than ¶¶ 4-7 of the injunction.  *See* Dkt. 1004-2 at 45.

### 2.  Procedural Issues Also Raise Substantial Questions For Appeal.

For each remedy, the party seeking the injunction must (1) show that the provision is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court," *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (internal quotation marks omitted)); (2) satisfy each of the *eBay* factors, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); and (3) ensure that each provision provides "fair and precisely drawn notice of what the injunction actually prohibits," *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086-87 (9th Cir. 2004).  Epic's evidence falls short in all three respects.

*First*, there was no showing that Epic's proposed remedies were the least burdensome way to relieve *Epic*'s purported injury.  *Apple II*, 67 F.4th at 1002 (citing *L.A. Haven Hospice, Inc.*, 638 F.3d at 664)).  "This rule applies with special force where there is no class certification." *L.A. Haven Hospice*, 638 F.3d at 664.  The jury's verdict related to a single entity–Epic–and Epic never explained how compelling these remedies was necessary to remedy *Epic*'s antitrust injury.  The Court invoked the FTC's eleventh-hour amicus brief for the idea that an injunction can broadly undo the consequences of "ill-gotten gains."  Order at 11.  But the cases the FTC cited (Dkt. 686-1 at 6-8, No. 20-cv-05671-JD) discuss remedies that stop unlawful conduct.  *See, e.g.*, *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 105-108, 129-133 (1969); *Mid-W. Paper Prod. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 589-594 (3d Cir. 1979); *Va. Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 538-540, 549-552 (1937).  This injunction goes far beyond ceasing challenged conduct. *See California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990) (private antitrust plaintiffs not necessarily entitled to broad remedies).

**Second,** the Court failed to find that Epic satisfied the *eBay* factors, especially for the injunction's two most intrusive remedies:  catalog access and app-store distribution.  A plaintiff seeking a permanent injunction must prove (1) a significant threat of irreparable antitrust injury; (2) remedies available at law are inadequate to compensate for that injury; (3) the balance of hardships favor injunctive relief; and (4) an injunction would not disserve the public interest. *Apple II*, 67 F.4th at 1002; *eBay*, 547 U.S. at 391.  The Court did not apply those factors to Epic's proposed remedies; it assumed that the jury's liability finding warranted *all* the injunction's forward-looking relief.  That is inconsistent with the basic requirements of equity articulated in *eBay*.[5]

**Third,** key portions of the injunction are vague.  Although an antitrust injunction may not amount to micromanagement, it must be sufficiently clear to afford defendants "fair and precisely drawn notice of what the injunction actually prohibits." *Fortune*, 364 F.3d at 1086-87 (internal quotation marks and citation omitted); *see also Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (similar). The injunction's terms leave many things uncertain, such as the content of Google's terms of service governing the catalog access and third-party app distribution remedies; what catalog data Google must provide to third-party app stores; how often Google must refresh the data; what qualifies as an app store eligible for catalog access, etc.  The Technical Committee provision does not avoid the vagueness; Rule 65's call for specificity is not concerned with who quarterbacks enforcement disputes but with providing defendants clear guidance at the outset about what the injunction requires. *Fortune*, 364 F.3d at 1087.

---

[5]     The Court's brief discussion of the *eBay* factors in addressing Epic's UCL claim, *see* Dkt. 1016 at 6-7, does not resolve this shortcoming.  The propriety of injunctive relief is determined on a claim-by-claim basis. *E.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1359-75 (Fed. Cir. 2013).  And the *eBay* factors do not support an injunction on the UCL claim either.  The Court relied on the jury's general verdict rather than make factual findings that the injunction was warranted.  That is not how the analysis works. *Innovation Ventures*, 89 F.4th at 1136, 1145. Moreover, the future irreparable harms the Court said Epic faces–an inability to use its own in-app billing services while distributing Fortnite through the Google Play store and an inability to compete in the market for Android in-app billing services–suffer a basic evidentiary problem: Epic presented no evidence that it intends to re-launch Fortnite on Play or allow other developers to incorporate Epic Direct Pay into their Play-downloaded apps.

It was an abuse of discretion to issue the injunction without addressing numerous important issues Google raised in its objections to the proposed injunction.  A district court must show that it "consider[ed] the factors relevant to the exercise of its discretion" and explain its reasoning so that an appellate court can review it.  *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1011 (9th Cir. 2013); *Hayes v. Heckler*, 785 F.2d 1455 (9th Cir. 1986).  One of the issues left unaddressed is the State Settlement, which Google entered into with all the States and the District of Columbia before trial and which contains significant conduct remedies.  To determine whether additional conduct remedies were required or whether the injunction is "more burdensome to the defendant than necessary to provide complete relief to the plaintiff," *Apple II*, 67 F.4th at 1002 (citation and brackets omitted), the Court needed to consider the consented-to terms of that settlement; all 50 states and D.C. agreed those terms would "meaningfully open competition and prevent future anticompetitive conduct."  Dkt. 953 at 4.

### 3.   Epic Lacks Standing For Many Of The Remedies It Sought.

One final substantial issue for appeal relating to the injunction is Epic's lack of standing for the remedies it sought.  Article III standing for injunctive relief requires a future injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  When a theory of future injury depends on anticipated conduct of "independent decisionmakers," it is a "tall order" to establish standing for an injunction. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).  Plaintiffs must identify "a substantial risk that, in the near future, at least one" of those third parties will act in the way that contributes to the injury.  *Id.*

Epic's theory that the injunction will redress its injury depends on the anticipated conduct of independent decisionmakers, including third-party developers, OEMs, and mobile carriers.  *Id.* Epic was therefore required to show that the injunction will lead any of those entities to change their behavior in a way that redresses Epic's injury.  *See id.* at 1989-95 (illustrating that plaintiffs must support each link in the causal chain with evidence that an injunction would redress their injuries).  Epic failed to do so.  At minimum, Epic's failure to offer any proof that it can or will again offer its apps on the Play store leaves Epic without standing to seek an injunction related to

Play's billing policies.  Nor has Epic demonstrated, through evidence, that it faces imminent injury

from Play's anti-steering policy or Play's prohibition on third-party in-app payment solutions.

Epic does not distribute any apps on Play, so Epic is not subject to Play's steering or payment

policies.  Trial Tr. 530:17-19 (Koh).  Moreover, Epic uses its own billing system, Epic Direct Pay,

for in-app purchases, and therefore would not benefit from remedies intended to promote

competition from third-party billing services.  Dkt. 656-25.  Nor would such remedies benefit Epic

as a competitor in the in-app billing market because the record lacks evidence that Epic intends to

offer Epic Direct Pay as a billing option for third parties. The injunction cannot properly regulate

policies that Epic lacks standing to challenge.  *See Summers v. Earth Island Inst.*, 555 U.S. 488,

495-496 (2009).

## II.        Without A Stay, Google Will Suffer Substantial Irreparable Harm.

Whether Google faces irreparable harm turns on "anticipat[ing] what would happen as a

practical matter" if the stay is denied.  *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012)

(internal quotation marks omitted).  The injunction entered here compels significant changes to

Play and the overall Android ecosystem that will fundamentally transform Google's business

model and require it to create services and functionality that do not yet exist–and then give those

services to competitors for years.  Google will thus be irreparably injured absent a stay.

### A.        Forcing Google To Fundamentally Change Its Business And To Provide Services To Its Competitors Is Irreparable Harm.

Irreparable harm includes "fundamental business changes that . . . cannot be easily

undone" if an injunction is vacated on appeal.  *Qualcomm*, 935 F.3d at 756 (citing *NCAA v. Bd. of*

*Regents of Univ. of Okla.*, 463 U.S. 1311, 1313-14 (1983)); *Am. Trucking Ass'ns, Inc. v. City of*

*Los Angeles*, 559 F.3d 1046, 1057-59 (9th Cir. 2009)).  The injunction, by design, seeks to

"disrupt and change the whole nature of [Google's] business."  *Am. Trucking Ass'ns*, 559 F.3d at

1058.  And it imposes extensive changes on Google's contractual relationships with hundreds of

thousands of developers, OEMs, carriers, and other business partners.  *See Qualcomm*, 935 F.3d at

756 (requiring defendant "to enter new contractual relationships and renegotiate existing ones on a

large scale" is irreparable harm).

The injunction also requires Google to act as the back-end administrator for all competing app stores, after making its entire U.S. catalog of more than two million apps available to any competitor at the competitor's discretion.  Baccetti Decl. ¶¶ 6-7, 14, 17-19.  It is as though this Court ordered Target to offer its entire inventory through the websites of Wal-Mart, TJ Maxx, Dollar Tree, Kmart, JCPenney, and any local store that wants to offer consumers the products for sale at Target—complete with branding for those competing stores.  *See id.*  Any competitor, without having to make any investment, will immediately be able to make an offering that mirrors the Play store for the duration of the injunction.  *Id.*; Dkt. 957-1 at 30-31.  Google's representative testified that the catalog sharing remedy alone will require work from dozens of Google employees and cost tens of millions of dollars.  Dkt. 982-3 at 2-4.  That is money and employee resources that will have to be directed away from other projects and innovations, and that Google cannot get back even if the injunction is overturned.  *See* Baccetti Decl. ¶ 15.

The injunction then requires Google to build the functionality to safely and securely distribute competing app stores through Play.  Play's business is to distribute apps, not app stores, which presents a wholly different set of concerns and challenges.  Google estimates that it faces very substantial costs annually to create, implement, and maintain the infrastructure for the Play store to distribute third-party app stores.  Dkt. 982-3 at 6-8; Dkt. 982-4 at 4-6.  This too is money and employee resources that Google will be unable to direct to its existing business and efforts to be a leading tech innovator, irreparably injuring Google.  *See* Baccetti Decl. ¶ 23.

**B.**     **Restructuring Google's Relationships With Its Partners Is Irreparable Harm.**

Another effect of the injunction is to fundamentally redefine Google's contractual and business relationships with app developers, OEMs, and carriers.  That too is a form of irreparable harm.  *See Qualcomm*, 935 F.3d at 756.  If not stayed, the injunction (¶¶ 4-7, 9-10) will substantially impair Google's ability to compete on the merits against other app stores, including Apple's App Store.  If the Ninth Circuit reverses, there is no clear way for Google to make up the ground it lost—against Apple and with OEMs, carriers, and developers—due to its inability to compete when the injunction was in effect.  *See Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803

F.3d 389, 411 (9th Cir. 2015); Iannuccilli Decl. ¶¶ 3, 5, 13-16; *see also* Trial Tr. 897:7-19, 1121:19-1122:4, 1133:5-1137:22.

**C.    Jeopardizing Google's Goodwill And Brand Reputation Is Irreparable Harm.**

The injunction likewise jeopardizes the "goodwill" and brand reputation that Google has painstakingly built with Play customers since the store launched. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (loss of goodwill cannot readily be remedied with damages). Google has detailed this risk before, *e.g.*, Dkt. 981-3 at 21 (discussing an app store intentionally designed to distribute banking malware and use of spyware by state-sponsored hacking groups disguised as legitimate messaging apps), and reiterates here the harms that it faces absent a stay. Iannuccilli Decl. ¶¶ 3, 9-16.

For third-party app store distribution, the injunction creates untenable confusion about what security vetting measures are permissible–both authorizing Google's "normal" review process and requiring Google to prove its processes are "strictly necessary and narrowly tailored" (¶ 12). Google's standard review policies "are prophylactic and err on the side of protecting users" by "prevent[ing] security breaches before they occur." Kleidermacher Decl. ¶ 23; Dkt. 1000 at 76:14-77:6. If Google were required to adopt "[a] security policy that is entirely or primarily reactive to [] demonstrated threats," that would be "no security policy at all." Kleidermacher Decl. ¶ 24. By imposing this onerous "strictly necessary and narrowly tailored" standard and placing the burden on Google to meet it, the injunction imposes unwarranted burdens on Google continuing to conduct its highly effective security and content review processes. *Id.* ¶ 25.

Judicially mandated catalog sharing, without adequate vetting of who gets access to the catalog, means that malicious actors can open a sham store, masquerade as a legitimate platform, and intermingle harmful apps with legitimate apps secured through Google's catalog. Kleidermacher Decl. ¶ 14, 16; Baccetti Decl. ¶¶ 8, 10. Tactics like these place users at a serious risk of inadvertently downloading malicious, offensive, and illegal content. This can lead to irreversible financial and other harms for users. *See* Kleidermacher Decl. ¶¶ 7, 14. The same is

true for the provision requiring linkouts, ¶ 10, which leaves users exposed to a "significant risk of deceptive links that entice users to click on them with false, misleading, or insufficient information."  Kleidermacher Decl. ¶ 6.

Users want a safe and secure device, and app stores are at the center in providing the experiences that power that device.  As a result, when users experience harm from catalog sharing or third-party app store distribution, they are likely to assign some or all of the fault to Play. Iannuccilli Decl. ¶¶ 9-12.  This will lead users to avoid the Play store's services or switch to non-Android devices.  Iannuccilli Decl. ¶¶ 11, 15.  Developers may also choose not to continue offering their apps on Play because they are concerned about harms to their own brand, including association with explicit, offensive, or pirated content.  Iannuccilli Decl. ¶¶ 13-16.  As the Ninth Circuit has recognized, *Disney*, 869 F.3d at 866, these harms are particularly difficult to undo and will irreparably harm Google.

### D.    Hindering Google From Collecting Compensation For Its Investments And Intellectual Property Is Irreparable Harm.

The injunction's payment remedy allows developers to make a unilateral choice whether to permit Play users to use Google's payment system to purchase apps and in-app purchases.  This allows competitors to choose for users whether Google is even *allowed to participate* in the market for payment processing.  The overwhelming majority of Google Play's revenue comes from the top three percent of developers, Trial Tr. 1430:7-9, who have resources to offer their own payment processing options and leave Google's payment processing services sidelined.  The injunction thus will deprive Google of the most obvious mechanism for collecting a service fee and require Google to configure a costly and less efficient mechanism for auditing and collecting its service fee.  *See* Trial Tr. 2667:3-2668:4 (Gentzkow).  This in turn will leave Google with fewer resources to support and invest in its ecosystem, including the 97% of apps that are free to users.  Trial Tr. 3143:16-19.

Allowing developers to exclude Google from the payment processing market also creates serious security risks, including increased risks around data breaches.  Kleidermacher Decl. ¶¶ 10-12.  In short, under the injunction, users will not have the choice to select the most secure payment

1   option.  Those risks are exacerbated by the November 1 effective date for this provision, which

2   leaves Google insufficient time to take whatever steps it can to improve safety and security before

3   the billing remedy takes effect.  *Id.* ¶ 13.

4         **E.**      **The Injunction Imposes An Unworkable Compliance Timeline.**

5         The injunction's compliance deadlines greatly exacerbate the harm to Google, causing

6   further irreparable injury.  With two exceptions, the injunction becomes effective on November 1,

7   2024–little more than three weeks after it was issued.  Injunction ¶ 2.  The injunction provides

8   Google eight months to create and implement the catalog access and third-party app store

9   distribution remedies, *id.* ¶¶ 11-12—months shorter than Google's witnesses explained would be

10   necessary for a safe and secure roll-out of these changes to millions of U.S. Android devices and

11   users.

12         The eight-month timeline for Google to develop and review huge numbers of lines of new

13   code will undermine the stability of Android and the Play store and force security risks upon users,

14   developers, and OEMs.  Baccetti Decl. ¶¶ 5, 13, 20-22; Kleidermacher Decl. ¶¶ 8, 13, 17, 28; Dkt.

15   1000 at 34:1-16, 58:10-59:10, 67:12-19.  Even with parallel workstreams, it will take Google

16   many *months*, not weeks, to build the injunction's far-reaching remedies, which have never been

17   done before.  Dkt. 981-1 at ¶¶ 33-36 (catalog access); *id.* at ¶¶ 43-44 (distribution of third-party

18   app stores); Dkt. 981-3 at 19-20 (same).  Google will have insufficient time to conduct each stage

19   of its standard review process–which is designed to protect users–meaning that the "final product

20   will be lower quality as a result."  Baccetti Decl. ¶¶ 21-22; *see also* Dkt. 981-3 at 15-16.  The

21   injunction's lack of clarity on what security measures Google can implement only worsen the

22   inevitable security risks.  Baccetti Decl. ¶¶ 8-10 (catalog access); Kleidermacher Decl. at ¶¶ 23-25

23   (distribution); Iannuccilli Decl. ¶ 7 (distribution).

24         Android's and the Play store's track record and secure, reliable products exist precisely

25   because Google implements strict testing standards.  Dkt. 1000 at 34:1-11.  Courts are not

26   software engineers, and the Court offered no basis for its conclusion that the changes required by

27   the injunction can be done safely in eight months.  Compromising Google's high standards

28   threatens irreparable harm to the Google brand.

**III.     A Stay Furthers The Public Interest Given The Immediate And Harmful Effects Of The Injunction On Millions of Non-Parties To This Litigation.**

The public interest favors maintaining the status quo pending appeal.  The Play store has over a hundred million U.S. users.  Baccetti Decl. ¶ 5.  For many years, the Play store has offered a secure and efficient app store experience that protects users' privacy.  Iannuccilli Decl. ¶¶ 2-4.  Users and developers rely on Google to continue delivering this high quality experience.  *Id.* at ¶¶ 2-4, 13.  But the injunction threatens significant security risks related to linkouts, Kleidermacher Decl. ¶¶ 5-9, external payment processing, *id.* ¶¶ 10-13, third-party access to the Play catalog, *id.* ¶¶ 14-17, and distributing third-party app stores, *id.* ¶¶ 18-28.  *See also* Baccetti Decl. ¶¶  8, 10 (catalog access); Dkt. 957-1 at 33-34 (identifying academic research that distributing third-party app stores on Play would create "substantial security risks for users"), 41-42 (explaining that steering provision prevents Google "from establishing basic security protections that would limit malware, privacy violations, and user confusion").

Without a stay, the terms of the injunction put tens of millions of U.S. users at risk of privacy and data security threats on Android devices.  *See, e.g.*, Dkt. 981-3 at 21-22 (describing risks of third-party app stores); Dkt. 981-3 at 7-9; Kleidermacher Decl. ¶ 6, Dkt. 982-4.  The payment processing remedy (¶ 9) also takes choice *away* from users by allowing developers to dictate whether they may use Google Play Billing or not.  "[N]ot even the broad remedial discretion enjoyed by the district court extends to the adoption of provisions so likely to harm consumers."  *Microsoft*, 373 F.3d at 1219.

Preserving and promoting competition also serves the public interest.  *Glen Holly Ent., Inc. v. Tektronix Inc.*, 343 F.3d 1000 (9th Cir.), *opinion amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003).  As this Court has recognized, the injunction *stifles* competition for the period it is in effect.  *See* Dkt. 977 at 50:8-51:19 (stating that reduced competition "comes with the territory" of an injunction following a monopolization verdict).  The injunction will stifle competition not just by Google, but by other developers who will also have less ability or incentive to compete when all app stores have access to Google's entire catalog.  *See* Dkt. 957-1 at 29-30; *see also* Trial Tr. 2400:24-2401:15, 2409:8-2410:7 (Bernheim) (Epic's expert arguing that the ability to compete for

exclusives is important to competition).  Just as concerning, the injunction hampers Google's

ability to effectively compete with Apple.  *See* Iannuccilli Decl. ¶¶ 11, 14(d), 15.  It is strange

indeed that Apple is free to continue its "walled garden" approach, *Apple I*, 559 F. Supp. 3d at

922, while the injunction restrains Google—which already operates a far more open platform—

from providing a full counterweight to Apple's strength in the marketplace.  *See* Trial Tr. 2035:15-

24.

　　　　　The State Settlement likewise provides powerful additional evidence that the injunction is

not necessary to protect consumers or restore competition.  It includes extensive changes to the

challenged conduct, which the parties to that settlement agreed would be supervised by an

independent compliance professional.  *See generally* State Settlement 1-45.  That this Court's

injunction goes further than the remedy reached with all 50 States weighs in favor of a stay.

## IV.　　A Stay Would Not Harm Epic.

　　　　　Epic will not be harmed by a stay of the injunction pending appeal—particularly given that

Epic lacks standing to seek these remedies and a number of these remedies (*e.g.*, payments and

steering policies) will not impact Epic since it does not distribute any apps on Play and has not

announced any intent to do so again in the future.  *Supra* pp. 16-17.  In the meantime, Google is

committed to implementing the State settlement provisions after the settlement is finalized.  Epic

has made no showing why any additional injunctive relief is necessary or why it would be

irreparably harmed absent additional injunctive relief.  *See id.*  Finally, any harms to Epic from the

delay pending appeal pale when compared to the extensive and immediate harms facing Google,

users, and developers.

## CONCLUSION

　　　　　For the foregoing reasons, this Court should issue a stay pending appeal of all but

paragraph 8 of this Court's injunction, *see supra* n.1, and grant an immediate administrative stay

lasting until 30 days after this Court's resolution of this motion.

1

2  DATED:  October 11, 2024          Respectfully submitted,

3                                   By:    /s/ Neal Kumar Katyal

4                                          Neal Kumar Katyal

5                                   **HOGAN LOVELLS US LLP**
                                       Neal Kumar Katyal
6                                      Jessica L. Ellsworth
                                       Reedy C. Swanson
7

8                                   **MUNGER TOLLES & OLSON LLP**
                                       Glenn D. Pomerantz
9                                      Kuruvilla Olasa
                                       Justin P. Raphael
10                                     Dane Shikman
                                       Jonathan I. Kravis
11

12                                  **MORGAN, LEWIS & BOCKIUS LLP**
                                       Brian C. Rocca
13                                     Sujal J. Shah
                                       Michelle Park Chiu
14                                     Leigha Beckman

15                                  *Counsel for Defendants*

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL