1  Brian C. Rocca, S.B #221576                    Glenn D. Pomerantz, Bar No. 112503
   brian.rocca@morganlewis.com                     glenn.pomerantz@mto.com
2  Sujal J. Shah, S.B #215230                     Kuruvilla Olasa, Bar No. 281509
   sujal.shah@morganlewis.com                      kuruvilla.olasa@mto.com
3  Michelle Park Chiu, S.B #248421                **MUNGER, TOLLES & OLSON LLP**
   michelle.chiu@morganlewis.com                   350 South Grand Avenue, Fiftieth Floor
4  Leigha Beckman, Bar No. 334611                 Los Angeles, California 90071
   leigha.beckman@morganlewis.com                  Telephone: (213) 683-9100
5  **MORGAN, LEWIS & BOCKIUS LLP**
   One Market, Spear Street Tower                 Justin P. Raphael, Bar No. 292380
6  San Francisco, CA 94105                         justin.raphael@mto.com
   Telephone: (415) 442-1000                      Dane P. Shikman, Bar No. 313656
7  Facsimile: (415) 422-1001                       dane.shikman@mto.com
                                                  **MUNGER, TOLLES & OLSON LLP**
8  Neal Kumar Katyal, *pro hac vice*              560 Mission Street, Twenty Seventh Fl.
   neal.katyal@hoganlovells.com                   San Francisco, California 94105
9  Jessica L. Ellsworth, *pro hac vice*           Telephone: (415) 512-4000
   jessica.ellsworth@hoganlovells.com
10 Reedy C. Swanson, *pro hac vice*               Jonathan I. Kravis, *pro hac vice*
   reedy.swanson@hoganlovells.com                  jonathan.kravis@mto.com
11 **HOGAN LOVELLS US LLP**                       **MUNGER, TOLLES & OLSON LLP**
   555 13th St. NW                                 601 Massachusetts Ave. NW, Ste 500E
12 Washington, D.C. 20004                         Washington, D.C. 20001
   Telephone: (202) 637-5600                       Telephone: (202) 220-1100

13

14 *Counsel for Defendants*

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18

| 19 | **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
|---|---|---|
| 20 | | |
| 21 | THIS DOCUMENT RELATES TO: | **DECLARATION OF DAVID KLEIDERMACHER IN SUPPORT OF GOOGLE'S MOTION FOR A PARTIAL STAY PENDING APPEAL** |
| 22 | *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |
| 23 | | Judge:  Hon. James Donato |
| 24 | | |

25

## DECLARATION OF DAVID KLEIDERMACHER

1.      I am Vice President of Engineering for Security and Privacy for Android and Made-by-Google Products and Services.  Since I joined Google in 2017, I have been responsible for Android security and privacy engineering.  I am familiar with Google's efforts to combat the harmful effects of malware on Android.  The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2.       In my declaration in the District Court in support of Google's proffer regarding the technical implementation and anticipated resource allocation required for Epic's proposed remedies, I explained that:

   a.  Google has a slate of security, content, and privacy policies that it applies to all apps that are distributed on its Play store.  Google rejects all apps that do not comply with the stated policies.  By contrast, many third-party app distributors either have a different set of criteria for apps on their stores or fail to have security and privacy policies at all.  When an app or app update is submitted to Google that is out of compliance with Google's policies, it is rejected.

   b.  The Court's injunction recognizes that Google will need to vet apps on third-party stores to ensure that users aren't unreasonably exposed to security and privacy risk.  Alternative measures would not be sufficient to properly protect users from the risk of third-party app stores.  Dkt. 982-4.

3.      I participated in the remedies hearing held on August 14, 2024.  Dkt. 1000.

4.      I have reviewed the District Court's injunction.  I offer this further declaration to explain the security risks associated with the injunction and describe the resource burden and costs of attempting to mitigate those risks.  I have focused this declaration on any additions to my analysis from my earlier declaration resulting from the terms of the injunction as entered.

## Security Risks of Linkouts

5.      One of the prohibitions in the injunction is that Google cannot stop developers from providing certain links directly to users (¶ 10).

6.      Allowing developers to provide links directly to users creates significant risk of deceptive links that entice users to click on them with false, misleading, or insufficient information.  A malicious actor (whether an individual, enterprise, or state actor) could then use the linked website to smuggle malware onto a phone, steal a user's data, engage in a phishing or spear phishing attack, track a user's activities in other apps on the device, or otherwise jeopardize a user's privacy and security.  While Google devotes significant resources to reviewing *apps* in the Play store for malware, Google does not have the capability to review *websites* on an ongoing basis.  These potential threats are real; they can threaten user privacy and security, and also disrupt businesses and government agencies.  Sophisticated malicious actors even engage in bait-and-switch strategies to gain users' trust before exposing them to harmful content via links.  Developers also often lack full-time cybersecurity personnel, and thus may unwittingly expose users to harmful content if they have been compromised by malicious actors.

7.      Proactive security measures are crucial because once data has been lost once, it is extremely difficult to safeguard it again.  Put simply, trying to undo compromised data is like putting toothpaste back in the tube.  Users' data may be sold on the dark web to other bad actors, users could suffer financial loss or privacy invasions, and so on.  Even if a user *later* avoids the app or store that stole their data in the past, that cannot remedy the harms they will suffer from the fact that the data has been breached to begin with.

8.      Further, the injunction orders this feature to be operational by November 1, 2024–which is three weeks away.  This provides almost no time to develop any plans to mitigate the risks that linkouts pose to user security.

9.      To my knowledge, the company has never rolled out a new feature to millions of new users at scale in just three weeks.  The reason it has not done so is that such a roll out would create major security risks.  The recent Crowdstrike malfunction shows what can happen when an update to a major platform is pushed out too early.  In that case, a flaw in the programming related to an update of the software caused an entire platform to crash.  Because the platform was relied on by major businesses, like Microsoft and multiple airlines, there were worldwide service disruptions for several days after the incident.  Android and the Play store operate at scale and are used by many millions of American consumers.  Rushed updates at this scale can lead to major unintended issues that affect functionality of devices, and the privacy and security interests of millions of users.

### Security Risks of Implementing External Payment Processing

10.      Another of the prohibitions in the injunction is that Google cannot prevent developers from informing users about alternative payment methods other than Google Play Billing or prohibit the use of in-app payment methods other than Google Play Billing (¶ 9).

11.      If this remedy is implemented, I anticipate that many developers will quickly begin rolling out billing systems that allow them to collect highly sensitive information from users, including credit card numbers, addresses, email addresses, bank account numbers, and more.  The injunction does not provide for Google to impose conditions on how developers use that data once it has been collected or enforce security policies around the implementation of alternative billing mechanisms.

12.      Allowing developers to use alternatives to Google Play Billing also involves more developers collecting data from customers.  Increased data collection yields increased opportunities for data breaches.

Docusign Envelope ID: EFC32F96-72BB-442D-80E5-366D11894AE4

13.     The injunction orders this prohibition to become operational by November 1, 2024—which is just three weeks away.  This provides almost no time to develop any plans to mitigate the above mentioned risks.  As noted above, the recent Crowdstrike malfunction shows what can happen when an update to a major platform is pushed out without appropriate quality control or too early:  There can be unintended issues that affect basic functionality for millions of users.

**Security Risks of Allowing Third-Party Access to Google's App Catalog**

14.     The District Court's injunction requires Google to allow "third-party Android app stores to access the Google Play Store's catalog of apps."  (¶ 11).  Nothing in this provision states that Google is authorized to impose eligibility criteria and vet those third-party app stores to determine if they are legitimate app stores before granting them the ability to offer users access to the millions of apps available in the Play store catalog.  I understand that Google had explained to the Court that it would need to set eligibility criteria for safety and security reasons in its remedies proffer and accompanying declarations.  An inability to review the stores before allowing unfettered access will jeopardize user security because malicious actors can easily set up a shell third-party "store" and populate it with apps from Google Play, along with malicious, deceptive, or pirated content.  The legitimate apps populated from Google Play will make it much easier for bad actors to pose as legitimate stores.  As I explained above, *supra* ¶ 7, marketplace forces cannot fully correct for this problem because users who lose data or money will have no practical way of clawing it back.

15.     The developer opt-out mechanism will not resolve these concerns.  Even if a significant number of apps utilize the opt-out mechanism, the sheer number of apps currently on the Play store mean that many inevitably will not.  Moreover, a developer may have difficulty monitoring every new store to begin utilizing the catalog-sharing mechanism on a regular basis

and be unable to opt-out in a timely fashion when a new, malicious third-party store begins to offer their apps.

16.     In addition, even if a developer opts out of appearing in the Play catalog for a particular non-Play app store, for example because that app store carries pirated versions of the developer's app, it will be difficult or impossible for users who want to download that developer's app to know that the version(s) appearing in the non-Play store are pirated precisely because the non-Play store otherwise looks like it has the entire Play catalog available for download.  As one example, someone looking to download the Netflix app from a non-Play store that appears to offer the entire Play catalog may search for "Netflix" and—even though Netflix itself has opted out of appearing in this particular non-Play store precisely because the store has pirated versions of Netflix's app—the user's search will lead the user to pirated or fraudulent versions of Netflix's app.  **Exhibit A** to this declaration shows that this concern is not theoretical or hypothetical.

17.     I understand that Google detailed for the Court why the necessary timeline to broadly introduce catalog access is 12-16 months given the seriatim nature of creating this functionality, beta testing it, fixing issues, and then rolling it out broadly.  As discussed above, compressing the timeline for a substantial new product—in this case, one involving millions of apps distributed to potentially hundreds or even thousands of app stores—can create major unintended consequences that affect broader functionality of the platform.  The Court's accelerated implementation timeline thus exacerbates the security risks already associated with this provision.

## Security Risks of Distributing Third-Party App Stores

18.     I understand that the District Court's injunction will require Google to build the systems and technology necessary to distribute third-party app stores on Play (¶ 12).  Although

the injunction says that Google may not "prohibit" distribution of third-party app stores, in fact Play as it currently exists lacks the capability to safely distribute stores (as opposed to apps) and so Google would have to take a number of affirmative steps to allow for the distribution of third-party app stores through the Play store. Play has the capability and functionality to safely distribute *apps*–not app stores. For example, the Play store Developer Console does not currently include the capability to allow app developers to identify their app as an "app store," so that the Play store can grant the necessary permissions, identify the app as an app store for users when they see the app in the Play store, allow for developer agreement to relevant terms and conditions, etc.

19.     The injunction recognized the very real security risks imposed on Google by requiring it to build this capability. Although the injunction allows Google to implement some safety measures, the particular provisions with which Google must comply make it impossible to vet third-party app stores and their apps as thoroughly as is necessary to protect user security.

20.      Google has an extensive process to review apps that it lists on the Google Play store. Google establishes and enforces policies regarding the apps that Google will distribute. For example, Google has policies to protect users from malware and privacy risks, and Google prohibits apps that violate the law, such as apps with illegal content or pirated apps (i.e. apps that are distributed without the authorization of the app developer). Before an app can be listed on the Play store, Google reviews these apps and any subsequent updates for compliance with its policies. I have previously described those policies in my previous declaration submitted on June 24, 2024. Dkt. 982-4, at 1; Dkt. 981-6.

21.     By contrast, third-party app stores establish their own policies and criteria for the apps they will list. There is no "standard" or minimum requirement for safety of app stores, or their developers, today. Nor do we have a good way of measuring the risk that a particular third-party app store may pose to users.

22.     The injunction's mandates to Google related to its ability to vet third-party stores are fundamentally contradictory.  On the one hand, the injunction authorizes Google to implement "review measures . . . comparable to [those already] tak[en] for apps proposed to be listed in the Google Play Store."  (¶ 12).  But the very next sentence limits Google to only utilizing "technical and content requirements and determinations" if it can prove they "are strictly necessary and narrowly tailored."  (¶ 12).  Indeed, the injunction allows for third-parties to "challenge" Google's review determinations and policies and places the "burden of proving" the safety measures' necessity and tailoring on Google in such a contest.  (¶ 12).

23.     The injunction places Google in an impossible position of being unable to vet the catalogs of third-party app stores requesting distribution through the Play store with the same rigor that Google applies to vetting the apps that appear in the Play store catalog.  Google's existing policies and review mechanisms serve as the first line of defense against unwanted and dangerous security risks for Android users who download apps from the Play store.  As a result, the current policies are prophylactic and err on the side of protecting users from potentially dangerous content and risky features in order to prevent security breaches before they occur, which may necessarily impact some well-intentioned apps.  But the Court's requirement that Google only implement requirements that are "strictly necessary and narrowly tailored" contravenes that prophylactic purpose of vetting.

24.     The Court's requirement that Google bear the burden of justifying any security policies it imposes will likely exacerbate the problem.  Security policies by design anticipate problems that may or may not result.  A security policy that is entirely or primarily reactive to only demonstrated threats is no security policy at all.

25.     From a technical perspective, the Court's "strictly necessary and narrowly tailored" standard is also impossibly vague.  Google's engineers are trained to defend against *all* security risks to users.  It's hard to imagine what measures would be "strictly necessary" or

1    "narrowly tailored" to prevent security risks that would sufficiently protect users.  The same is

2    true for Google's "content standards"—would Google be permitted to treat its content standards

3    as established and face challenges only on the means of enforcement, or does the narrow

4    tailoring requirement apply to the underlying standards as well?  Attempting to thread that needle

5    in order to comply with the standard will lead to increased security risks and subsequent safety

6    failures for Android users.

7           26.    I have significant concerns about outsourcing decision-making around how

8    Google should protect against security risks to individuals not invested in Google's safety,

9    security, and reputation for a positive user experience, which is what the injunction appears to do

10   via the technical committee.  I am unaware of any company that permits outsiders to override the

11   company's internal assessment of necessary security protections and to force a lowering of those

12   protections.

13          27.    Even if Google were permitted to fully apply its normal vetting procedures to

14   third-party stores and the apps they offer, that would not fully mitigate the risk because Google

15   will continue to lack visibility and signals from third-party-store interactions that help Google's

16   AI safety models today.  Google Play's security and enforcement policies are effective at

17   mitigating threats, but they cannot entirely eliminate them.  Expanding that program to reach

18   other stores—and all their apps—will reduce the resources available to allocate to the Play store,

19   making Google's customers less safe.  While Google has a strong track record of preventing

20   fraudulent or malicious apps and those that violate content policies from reaching Play, the

21   increased number of additional apps to screen—and Google's comparative lack of visibility into

22   developers and apps offered on other stores—will mean that Google is unlikely to achieve the

23   same level of protection it has historically provided to Play customers.

24          28.    I understand Google originally detailed the required software engineering and

25   testing necessary to safely roll out third-party store distribution and explained that it would

require 12-16 months to implement.  As discussed above, compressing the timeline for a substantial new product can create major unintended consequences that affect broader functionality of the platform.  The Court's accelerated implementation timeline thus exacerbates the security risks already associated with this provision.

### Costs of Mitigating the Risks of Third-Party App Stores on Play

29.     After reviewing the injunction, I continue to believe that my prior estimates relating to cost of security for distributing third-party app stores are reasonably accurate.  Dkt. 982-4, at 4-6.  If anything, the possibility that Google might have to apply different app review policies for apps on Play and apps off Play may increase the associated costs, because it may involve developing and maintaining two separate systems and/or workflows, training people on two different systems, and so on.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 11th day of October 2024 in Fez, Morocco.



David Kleidermacher

# EXHIBIT A

