Nos. 24-6256, 24-6274

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, *et al*.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

---

**EMERGENCY MOTION FOR PARTIAL STAY OF PERMANENT
INJUNCTION PENDING APPEAL UNDER CIRCUIT RULE 27-3
[RELIEF NEEDED BY OCTOBER 31, 2024]**

---

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

*Counsel for Defendants-Appellants*

October 16, 2024

*(Additional Counsel Listed on Signature Page)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies the following:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Commerce Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Ireland Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Asia Pacific Pte. Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc.,

a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Date: October 16, 2024                    /s/ Neal Kumar Katyal

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION ...............................................................................................1

BACKGROUND .................................................................................................3

    *1. Contractual restrictions* ..........................................................................6

    *2. Billing restrictions* .................................................................................7

    *3. Duties to serve competitors* ...................................................................7

LEGAL STANDARD ...........................................................................................8

ARGUMENT .......................................................................................................9

I.    THERE IS A STRONG LIKELIHOOD GOOGLE WILL
    SUCCEED ON APPEAL...................................................................................9

    A.    The Liability Verdict Is Fatally Flawed ...........................................10

        1.    The District Court Committed Multiple Legal Errors In
        Allowing Epic To Exclude Apple From The Rule-of-
        Reason Analysis ......................................................................10

        2.    The District Court Disagreed With Other Circuits On
        Serious Legal Issues That Present Substantial Appellate
        Questions ................................................................................12

    B.    The Injunction Is Legally Flawed ......................................................14

        1.    The Injunction Makes The Court—And Its Technical
        Committee—Central Planners For Vague Prohibitions .............15

        2.    The Injunction Flouts Foundational Legal Limits On
        Remedial Authority .................................................................16

        3.    Epic Failed To Prove Article III Standing...................................19

## TABLE OF CONTENTS—Continued

Page

II.   THE EQUITIES STRONGLY FAVOR A STAY .....................................21

    A.   The Injunction Irreparably Harms Google ...........................................21

        1.   Mandating Changes That Affect User Safety And Security Will Irreparably Harm Google's Brand And Reputation.................................................................................21

        2.   Forced Changes To Google's Business Practices And Forced Service Of Competitors Is Irreparable Harm .................23

        3.   Forcing Google To Immediately Begin Incurring Millions Of Dollars To Design And Build The Ordered Remedies Is Irreparable Harm.....................................................25

        4.   An Unworkable Effective Date For Safe Implementation Is Irreparable Harm......................................................................25

    B.   The Public Interest Weighs In Favor Of A Stay Given The Immediate And Harmful Effects Of The Injunction On Millions Of Non-Parties To This Litigation........................................26

III.   EPIC FACES NO IRREPARABLE HARM FROM A STAY .................28

CONCLUSION ..................................................................................................29

CERTIFICATE OF COMPLIANCE

INDEX OF EXHIBITS

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ...............................................................15

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) .................................................................9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) .............................................................24

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)............................................................................20

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)..............................................................................20

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)............................................................................20

*Clements v. Airport Auth. of Washoe Cnty.*,
    69 F.3d 321 (9th Cir. 1995) .................................................................11

*Deslandes v. McDonald's USA, LLC*,
    81 F.4th 699 (7th Cir. 2023) ................................................................14

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ...............................................................21

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021)..........................................*passim*

*Epic Games, Inc. v. Apple Inc.*,
    67 F.4th 946 (9th Cir. 2023) .......................................................*passim*

*Epic Games, Inc. v. Apple Inc.*,
    No. 21-16506, 2021 WL 6755197 (9th Cir. Dec. 8, 2021) ..............2, 3

## TABLE OF AUTHORITIES—Continued

Page(s)

*Flores v. Barr*,
977 F.3d 742 (9th Cir. 2020) .................................................................9

*FN Herstal SA v. Clyde Armory Inc.*,
838 F.3d 1071 (11th Cir. 2016) .........................................................13

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ...........................................................16

*FTC v. Qualcomm Inc.*,
935 F.3d 752 (9th Cir. 2019) ......................................................*passim*

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) .............................................................16

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ..........................................................21

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .....................................................17, 19

*In re Victor Techs. Sec. Litig.*,
792 F.2d 862 (9th Cir. 1986) .............................................................25

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) .............................................................24

*Kramer v. Banc of Am. Sec., LLC*,
355 F.3d 961 (7th Cir. 2004) .............................................................13

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004) .........................................................17

*Murthy v. Missouri*,
144 S. Ct. 1972 (2024) .......................................................................20

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021) .................................................................15, 16, 17

i

## TABLE OF AUTHORITIES—Continued

Page(s)

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  463 U.S. 1311 (1983)...............................................................23, 24

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ...........................................12

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021)...............................................17

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)..............................................................19

*SEC v. Stein*,
  906 F.3d 823 (9th Cir. 2018) ...............................................10

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994)................................................14

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015)..............................................................12

*United States v. Anderson*,
  46 F.4th 1000 (9th Cir. 2022) .............................................12

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc)............................18

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*,
  540 U.S. 398 (2004)........................................................15, 16

**STATUTE:**

28 U.S.C. § 1292(a)(1)................................................................8

## INTRODUCTION

This is an antitrust case involving Google's app store for Android devices, Google Play.  At the request of a single competitor, Epic Games, the District Court ordered extensive redesigns to Play that will expose 100-million-plus U.S. users of Android devices to substantial new security risks and force fundamental changes to Google's contractual and business relationships with hundreds of thousands of Google partners.  The court gave Google *just three weeks* to make many of these sweeping changes—a Herculean task creating an unacceptable risk of safety and security failures within the Android ecosystem.

The injunction also requires Google to immediately start incurring millions of dollars in costs to develop and build entirely new capabilities and services for Play's rivals.  Play will have to make its catalog of two-plus-million apps appear in competitors' app stores, and Play will have to offer rival app stores to Play's entire user base.

Epic *lost* its parallel antitrust case challenging Apple's App Store, and this Court affirmed.  *Epic Games, Inc. v. Apple Inc*., 67 F.4th 946 (9th Cir. 2023).  The harms to ecosystem safety and security at issue in this appeal will degrade Google's ability to compete with Apple.  None of the sprawling remedies and corresponding harms can be easily reversed if Google's appeal succeeds.

A stay pending appeal is warranted.  Google has a strong chance of succeeding on appeal.  In its case against Apple, Epic lost on the question whether Google and Apple compete within the very markets that Epic asserted here.  This Court affirmed.  Violating basic preclusion principles, the court below allowed Epic to relitigate that issue.  It is pause-inducing that Apple, which requires all apps go through its proprietary App Store, is not a monopolist, but Google—which built choice into the Android operating system so device makers can preinstall and users can download competing app stores—was condemned for monopolization.

The injunction also violates basic antitrust principles by making the court a central planner for the Android ecosystem and forcing Google to service rivals.  The looming irreparable harm absent a stay is unmistakable: The injunction forces fundamental changes to Google's business model, hobbles Google's ability to compete, inflicts reputational harms, increases security and privacy risks for millions of users, magnifies burdens on device makers (OEMs) and over 500,000 developers, and requires Google to deal with rivals.

This Court should pause these sweeping changes until it has resolved Google's appeal.  That is exactly what this Court has repeatedly—and recently—done with injunctions that similarly test "the outer limits of the Sherman Act," *FTC v. Qualcomm Inc.*, 935 F.3d 752, 757 (9th Cir. 2019) (per curiam), and what this Court did in the parallel *Apple* litigation, *Epic Games, Inc. v. Apple Inc.*, No. 21-

16506, 2021 WL 6755197, at *1 (9th Cir. Dec. 8, 2021), where the district court's state-law-based injunction required a tiny fraction of the overhaul to the Play store ordered here.  A stay should be granted.[1]

## BACKGROUND

Android is an open-source operating system that powers smartphones, tablets, and other devices.  Google's launch of Android in 2008 began a long-running competition in mobile devices between Google and Apple, which uses its own iOS operating system to power iPhones and iPads.  Tr. 1122:20-1124:22.[2]  Google's Play store, like Apple's App Store, ensures that users have a secure and convenient way to populate their devices with apps, Tr. 1141:2-17, which, as we all know from daily experience, are "essential components of smartphones."  Tr. 2456:18-20.

Epic Games wanted to distribute the game *Fortnite* through Play and Apple's App Store without paying a commission.  Tr. 2014:3-4, 2088:23-2091:3.  When the companies refused, Epic devised a "highly choreographed attack" called "Project Liberty."  *Epic Games, Inc. v. Apple Inc.* ("*Apple I*"), 559 F. Supp. 3d 898, 935 (N.D. Cal. 2021), *aff'd in part, rev'd in part,* 67 F.4th 946 ("*Apple II*") (9th Cir. 2023). Epic secretly wrote code into *Fortnite* to circumvent the app stores' billing systems;

---

[1]     Google does not seek to stay ¶ 8 of the injunction, which Google previously agreed to in a settlement with state attorneys general. Dkt. 522-2 at 21-22, 27-28, Case No. 3:21-cv-05227-JD.

[2]     Unless otherwise specified, "Tr." refers to the trial transcript and "Dkt." refers to the multidistrict litigation docket, No. 3:21-md-02981-JD (N.D. Cal.).

Google and Apple kicked Epic out of their respective stores for violating contractual terms; and Epic sued Google and Apple separately, on the same day, asserting federal antitrust and California state-law claims against each. Tr. 2026:14-24, 2065:16-2076:15. Epic sought only injunctive relief. Tr. 2030:4-6.

Epic's suit against Apple went to a bench trial first. Epic argued that Apple's App Store competed in its own market, not with Android app stores like Play. *Apple II*, 67 F.4th at 970. The district court rejected Epic's Apple-only markets. It found Google was the "main competitor" of Apple's App Store in the relevant market and rendered judgment against Epic on all antitrust claims. *Apple I*, 559 F. Supp. 3d at 922, 1021 & n.580, 1023–26, 1030. This Court affirmed in relevant part. *Apple II*, 67 F.4th at 966, 980–81.

In this parallel suit, Epic likewise argued that Apple's App Store and Play operated in separate markets. Epic defined the relevant markets as "Android App Distribution" and "Android In-App Payment Processing," excluding Apple. Dkt. 82 at 25, 57. Epic challenged certain contracts between Google and OEMs, carriers, and developers. Unlike Apple's iOS, Google licenses Android to OEMs for free, and unlike Apple's single App Store, Android OEMs can preinstall competing app stores and users can download both apps and app stores from multiple sources. Epic alleged that the challenged agreements helped Play secure favorable placement on

Android devices and obtain better content, and also challenged Play's billing policies.

Epic's case was consolidated in a multidistrict litigation with cases filed by a group of states, other developers, and a putative class of consumers, all of whom sought damages. *See* Dkt. 1. As trial approached, every case except Epic's settled. In the State Settlement, Google and every state attorney general in the country agreed on changes that Google would make to the same contractual agreements that Epic had challenged. Dkt. 522-2 at 21-22, 27-28, Case No. 3:21-cv-05227-JD. That settlement has been awaiting preliminary approval in the District Court since December 2023.

The District Court refused to hold a bench trial on Epic's antitrust claims even though Epic sought only injunctive relief. Dkt. 725; Tr. 6:13-7:14. And although this Court had already affirmed the finding that Google and Apple compete, the District Court in this case reasoned that issue preclusion did not prevent Epic from relitigating this issue. Dkt. 984 at 7. As a result, the jury returned a verdict against Google after finding that the relevant markets excluded Apple. *See* Dkt. 850 at 22.

Having refused to hold a bench trial, the court lacked specific findings to use in crafting a remedy. The court nonetheless refused Google's request for standard legal briefing on remedies. Dkt. 1016 at 1. Instead, the court had Epic propose terms for an injunction unaccompanied by any legal brief, *see* Dkt. 952, let Google object,

*see* Dkt. 958, and held limited hearings focused on potential implementation of certain proposed remedies, *see* Dkt. 1000 (remedial hearing); Dkt. 977 (economist testimony); *see also* Dkt. 982 (Google's submission on feasibility).

On October 7, the District Court issued a sweeping injunction ordering Google to overhaul its products, services, and contracts. The injunction further forces Google to build new services specifically for its competitors.

The District Court adopted most of the injunctive provisions that Epic requested, without making detailed factual findings about their necessity or appropriateness. Sua sponte, the court created a "technical committee" comprised of an Epic representative, a Google representative, and a third representative to be chosen by the first two. It tasked the committee with resolving technology and implementation disputes; a party may seek judicial resolution of disputes the committee cannot resolve. (¶ 13). The prohibitions apply for three years from their effective date and fall broadly into three categories, the first two of which must be in effect by November 1—less than three weeks from today (and less than four weeks from issuance of the injunction).

### 1. *Contractual restrictions*.

The injunction significantly limits Google's ability to provide incentives to third-parties to make Play more attractive to users. It restrains Google from sharing Play revenue with entities that distribute or intend to distribute Android apps and

6

from conditioning "payment, revenue share, or access to any Google product or service" on a developer's agreement to launch an app first or exclusively on Play or not to launch a version with additional features elsewhere.  (¶¶ 4-6).  Google likewise cannot condition "payment, revenue share, or access to any Google product or service" on an OEM's agreement to preinstall Play in a particular location on a device.  (¶ 7).

### 2. *Billing restrictions.*

Although Epic offers no products through Play, the court ordered Google to change Play's billing policies for developers who *do*, making it harder for Google to collect fees for its developer services and for users to have a known, trusted source for payments.  Google may not require Google Play Billing be used in apps or for in-app purchases, may not prohibit developers from telling users "about the availability of a payment method other than Google Play Billing" or "about the availability or pricing of an app outside the Google Play store," and may not prevent developers from "providing a link to download the app" somewhere else.  (¶¶ 9-10).

### 3. *Duties to serve competitors.*

Google must build two new features to aid its rivals:  "catalog sharing," *i.e.*, functionality that enables competitors to offer the Play catalog of apps through their own stores (¶ 11), and "third-party app store distribution," *i.e.*, offering downloads of competing app stores through Play (¶ 12).  Although the latter can expose Play

users to safety and security issues, illegal goods and services, and content that violates Google's content standards (by including sexual content, hate speech, malware, or fraudulent material, among other concerns), Google cannot take steps to ensure third-party stores, and their apps, are safe, legal, and comply with Google's content policies unless Google can prove such measures "are strictly necessary and narrowly tailored."  (¶ 12).

Despite Google's evidence of the necessary timeline to safely and securely develop, build, and test catalog access and third-party app store distribution, the District Court ordered these remedies be fully operational in eight months—four months faster than Google's witness said was possible.  Dkt. 981-1 at 10, 15.

Google promptly appealed, *see* 28 U.S.C. § 1292(a)(1), moved to partially stay the injunction, and requested an administrative stay of the November 1 effective date to allow Google's stay motion to be resolved before the effective date.  The District Court set a hearing on Google's administrative motion for Friday, October 18, but has not acted on Google's request for an administrative stay.

## LEGAL STANDARD

To determine whether to issue a stay pending appeal, this Court considers (1) whether the movant "has made a strong showing that [it] is likely to succeed on the merits"; (2) whether the movant "will be irreparably injured absent a stay"; (3) whether the public interest favors a stay; and (4) whether a stay "will substantially

injure the other parties." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006-07 (9th Cir. 2020) (quotation marks omitted). "[A] stronger showing of one element may offset a weaker showing of another." *Id.*

"An applicant for a stay need not demonstrate that it is more likely than not they will win on the merits, but rather must show a reasonable probability or fair prospect of success." *Qualcomm*, 935 F.3d at 755. If "the balance of the hardships tips sharply" in the movant's favor and there are "serious questions going to the merits," a stay is warranted. *Flores v. Barr*, 977 F.3d 742, 746 (9th Cir. 2020) (quotation marks omitted).

## ARGUMENT

## I. THERE IS A STRONG LIKELIHOOD GOOGLE WILL SUCCEED ON APPEAL.

Google has a strong likelihood of success. Violating basic rules of issue preclusion, the court improperly permitted Epic to ask the jury to eliminate Google's "main competitor"—Apple—from the relevant markets. The court also upended the elementary principle that injunctive-relief claims are tried to the bench, not a jury. And the injunction itself contravenes multiple principles of antitrust law. There is a more than fair prospect this Court will reverse.

**A.   The Liability Verdict Is Fatally Flawed.**

> **1.   The District Court Committed Multiple Legal Errors In Allowing Epic To Exclude Apple From The Rule-of-Reason Analysis.**

Epic has never argued Google has sufficient market share to exercise monopoly power if Apple and Google are both in the relevant markets.  Its entire approach here, and in *Apple*, was to divide and conquer, asserting neither company competed against the other.  *Apple I*, 559 F. Supp. 3d at 921.  In *Apple*, that stratagem failed.  Epic should not have been granted a do-over here.

Issue preclusion bars parties from relitigating an issue that was squarely presented and necessarily decided in a prior litigation.  *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018).  Epic's parallel suit against Apple squarely addressed whether Google Play and the Apple App Store compete for app distribution or in-app purchases.  *Compare* Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc. at 72 ¶ 44, 93-95 ¶¶ 175-177, 131-132 ¶¶ 225-228, *Apple I*, No. 4:20-cv-5640-YGR (N.D. Cal. May 28, 2021), Dkt. 777-3, *with* Tr. 3376:7-14, 3378:18-20 (Epic closing); Tr. 2425:11-13, 2428:5-6, 2433:14-16.  The *Apple* court rejected Epic's arguments after a bench trial.  *Apple I*, 559 F. Supp. 3d at 954-955, 958-960, 971, 976-978, 1024, 1030-32, 1036, 1043.  Epic appealed, but this Court affirmed.  *Apple II*, 67 F.4th at 973-999.

10

As relevant here, *Apple* held that Google is a "significant competitor" of Apple in the "same market" for digital transactions—including app downloads and in-app purchases—related to gaming apps. *Apple I*, 559 F. Supp. 3d at 977, 997 n.484. That finding should have been the end of Epic's case here because Epic has never argued Google has monopoly power if Apple is in the relevant markets. The District Court nevertheless permitted Epic to relitigate the issue, *see* Dkt. 984 at 6-8, and the jury ultimately found that Google does not compete with Apple for paid app downloads or in-app purchases, directly conflicting with the findings this Court affirmed in *Apple*.

The District Court's reasoning holds no water. The Court dismissed the market definition issues as "plainly not the same," but its only explanation boiled down to the fact that this case is about Play and Android, and that case was about Apple and iOS. *See* Dkt. 984 at 7. That distinction makes no sense: The proper question is whether Epic should have been *allowed* to reargue the prior judicial finding that Google and Apple compete within the markets asserted here. Preclusion exists precisely to avoid such "inconsistent results." *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 330 (9th Cir. 1995).

The District Court compounded its error by instructing the jury to apply an entirely different legal framework to the market definitions in this case than the one the *Apple* district court applied, even though this Court confirmed the *Apple* district

court got the law right.  *See* Dkt. 984 at 8-9.  The *Apple* court correctly required Epic to prove that the markets for apps and in-app purchases are truly independent of the markets for smartphones and other devices; Epic's failure to make the necessary showing was the very reason its antitrust claim failed.  *Apple II*, 67 F.4th at 980-981; *Apple I*, 559 F. Supp. 3d at 984-987.  The court here excused Epic from making that same showing.  Tr. 3054:13-3056:17.  Such a direct conflict with Circuit precedent, including *Apple*, *see* 67 F.4th at 981 (citing *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008)), more than justifies a stay pending appeal.

### 2. The District Court Disagreed With Other Circuits On Serious Legal Issues That Present Substantial Appellate Questions.

At two critical junctures, the District Court refused to follow persuasive authority from other circuits.  Both are substantial questions for appeal, since affirmance would result in "unwarranted circuit split[s], a result [this Court] understandably avoid[s] if at all possible."  *United States v. Anderson*, 46 F.4th 1000, 1008 (9th Cir. 2022).

***First***, the court erred in refusing to hold a bench trial in a case seeking exclusively injunctive relief.  It is a fundamental principle that "judges, not juries, determine equitable claims, such as requests for injunctions," *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015), and Epic only ever sought injunctive relief.  The court nevertheless held a jury trial, concluding Google "consented" to a jury trial in a single sentence from a joint filing offering a proposal for a trial that

12

"*includes* Epic, the [developer] Plaintiffs, the States, and the individual consumer plaintiffs," *see* Dkt. 505 at 3 (emphasis added), and stray remarks in an opposition to a bifurcation motion—both filed when Epic's case was consolidated with cases brought by numerous parties who sought money damages and were entitled to a jury trial, Dkt. 573 at 5.

Even assuming these filings somehow amounted to "consent" to a jury trial on Epic's standalone injunctive-relief claims, other Circuits have recognized that such consent may be withdrawn even "days before trial" where, as here, the opposing party is not constitutionally entitled to a jury.  *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1089-90 (11th Cir. 2016); *accord Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th Cir. 2004).  There was no more showing of "prejudice" to Epic than in either of those cases, Dkt. 984 at 28; on the contrary, neither the District Court nor Epic has ever articulated any prejudice Epic would have suffered.  The prejudice to Google, by contrast, is clear:  The District Court repeatedly invoked the jury's verdict throughout the remedial proceedings, consistently dismissing Google's arguments that Epic failed to prove various aspects of its entitlement to an injunction by claiming the jury verdict settled a given issue, even where it was not an issue the jury confronted—much less necessarily decided.  *See, e.g.*, Dkt. 1016 at 11, 16; May 23 Hrg. Tr. 29:6-13; 59:2-4; 105:6-17.

**Second**, the court wrongly told the jury not to consider some of Google's key procompetitive justifications for its conduct. Google's case was built in significant part around demonstrating that keeping the Play store competitive with Apple's App Store is an essential aspect of ensuring Android devices remain competitive with iPhones. *See supra* p. 3. The court, however, refused to allow the jury to consider this competition if it found Apple outside the markets. *See* Tr. 3257:22-3258:12; 3328:11-16; 3332:22-3333:1. But the Supreme Court and this Court have consistently looked to "cross-market rationales in Rule of Reason and monopolization cases." *Apple II*, 67 F.4th at 989 (collecting cases). This issue has divided other circuits, underscoring that it presents a substantial question. *Compare, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023), *with Sullivan v. NFL*, 34 F.3d 1091, 1112-13 (1st Cir. 1994). There is at least a "reasonable probability" this Court will see the issue differently from the District Court. *Qualcomm*, 935 F.3d at 755.[3]

### B. The Injunction Is Legally Flawed.

Even if the liability verdict stands, the injunction cannot. The sweeping order goes far beyond what the law allows or the trial record could support—which is

---

[3]    The court describes Epic's claim under California's Unfair Competition Law as an "independent state law basis" for the injunction. Dkt. 1016 at 6. But the court's two-page liability analysis on the UCL depends entirely on the jury's verdict, *id.* at 3-4, and thus rises or falls with the verdict. The parties never even briefed whether Google violated the UCL.

unsurprising since the District Court never required Epic to file a legal brief supporting its proposals.

### 1. The Injunction Makes The Court—And Its Technical Committee—Central Planners For Vague Prohibitions.

Contravening basic antitrust principles, the injunction assigns micromanagement of Play and Android to the court and a court-created technical committee. *See, e.g., Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 103 (2021) ("judges make for poor 'central planners' and should never aspire to the role") (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 408 (2004)); *Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 991, 1000 (9th Cir. 2010) (courts are ill-suited to comparing "benefits of an improved product design against the resulting injuries to competitors").

To comply, Google will have to modify its products in hundreds, if not thousands, of ways. *See, e.g.*, Dkt. 1000 at 25:19-26:10 (discussing build of new database); Dkt. 981-3 at 17-20 (discussing changes to permit distribution of third-party app stores). It will have to answer major questions left open by the injunction such as: What security protections can Google adopt to ensure that alternative billing systems and external links provided to users are secure? What terms of service govern catalog access and third-party app distribution? What catalog data must Google provide to third-party app stores? How often? *See, e.g.*, Dkt. 1020-3 ¶¶ 5-

15

14, 22-25; Dkt. 1000 at 10:24-12:9 (questions about metadata); *id.* at 44:12-45:9 (questions about interface design); *id.* at 24:3-25:9 (questions about software release).

Google's answers to all these questions (and many others) are subject to review by Epic—*a single competitor interested in its own bottom line*—through Epic's appointee to the technical committee, and by the court. Delegating an injunction's interpretation to a non-Article III, non-consented-to technical committee is unprecedented and confirms the court understood the many lurking vagueness problems. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086-87 (9th Cir. 2004). Equally concerning, unlike rulings by special masters or magistrate judges, it is unclear whether Google can seek judicial review of technical committee decisions. Dkt. 1017 ¶ 13. And to the extent there is judicial review, it puts the court deep in the weeds of product functionality, contrary to controlling precedent. *See Alston*, 594 U.S. at 102-103.

### 2. The Injunction Flouts Foundational Legal Limits On Remedial Authority.

The injunction violates clear limits on an antitrust court's remedial authority in at least two major ways.

***First***, firms generally have no duty to deal with their rivals at all, let alone on court-ordered, favorable terms. *See Trinko*, 540 U.S. at 409; *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-994 (9th Cir. 2020). Yet, for three years, the injunction requires

Google to distribute rivals' app stores through Play and allow any rival store to offer Play's full catalog of apps to users of that store. Dkt. 1017 ¶¶ 11-12. The court acknowledged that these requirements will stifle competition while in effect by disincentivizing other stores from investing in building their own relationships with developers and app store infrastructure. Dkt. 977 at 50:8-51:19; *see also* Dkt. 957-1 at 24, 26-27, 31-32, 35.

The District Court rejected Google's argument that *Trinko* and its progeny apply beyond the liability phase. Dkt. 1016 at 13-14. But the Supreme Court has instructed that "[s]imilar considerations" apply at both phases of the case. *See Alston*, 594 U.S. at 102. And imposing a remedy that *stalls* competition is reversible error. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997) (striking portion of remedy that "promote[d] free-riding"); *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1219 (D.C. Cir. 2004) (striking a remedy that allowed "clon[ing]" defendant's products).

Imposing remedies that go beyond restraining unlawful conduct requires proof of a "significant causal connection" between the relief ordered and the violation found. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (quotation marks omitted). Here, the Court found on summary judgment that there was no duty-to-deal violation at all. 10/19/23 Hrg. Tr. at 5:3-6:2. The District Court nevertheless insisted that two duty-to-deal remedies—

catalog access and third-party store distribution—were necessary to overcome Google's "network effects"—*i.e.*, that developers are drawn to Play's large numbers of users and vice versa—and held it irrelevant "whether Google's anticompetitive conduct caused the network effects." Dkt. 1016 at 11.

But that is the whole ball game: Antitrust law cannot deprive a company of "network effects"—or any other competitive advantages—gained through legitimate competition. *See United States v. Microsoft Corp.*, 253 F.3d 34, 80 (D.C. Cir. 2001) (en banc). This Court is likely to reject the District Court's startling theory that an antitrust injunction must "level the playing field" *regardless* of whether a company's advantages are attributable to anticompetitive conduct.

Here, the catalog-access and app-store-distribution remedies lack *any* connection to Epic's liability theory. Epic *never* argued or presented evidence it was anticompetitive for Google not to share its app catalog with other Android app stores. Epic argued the opposite, insisting that *unique* content was the key to competition. Tr. 2400:24-2401:15, 2409:8-2410:7.

The court's citation to an internal Google slide deck from 2017 discussing Amazon does not supply the missing link. Dkt. 1016 at 11. At *most*, that evidence suggests that network effects contribute to Play's success; they do not suggest any causal connection between Google's anticompetitive conduct and those network effects. Quite the contrary: Virtually all the conduct Epic challenged *postdated*

18

2017, strongly suggesting Google's network effects predate and are thus independent of the challenged conduct. *See, e.g.*, Tr. 411:14-16; Tr. 1052:23-1053:6. Moreover, the court never acknowledged evidence that Amazon declined to make necessary investments to seriously compete, an alternative explanation for Amazon's lack of success. Trial Exh. 11405; Morrill Tr. at 100:05-12, 286:02-11; Tr. 2102:24-2103:11, 2324:23-2325:25.

***Second***, the injunction imposes direct price regulation, which this Court's precedents squarely foreclose. *Kodak*, 125 F.3d at 1225. *Kodak* concluded it was reversible error to require "forced sales at *reasonable* prices" instead of allowing companies to charge "what the market will bear" for their products and services. *Id.* at 1225-26 (emphasis added). The injunction here flouts that clear command, limiting Google to charging a "reasonable fee" for security services related to third-party store distribution that must be based on Google's "actual costs." Dkt. 1017 ¶ 12. The District Court was wrong to insert itself into Google's pricing decisions. *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 452-453 (2009); *Kodak*, 125 F.3d at 1225-26.

### 3. Epic Failed To Prove Article III Standing.

Epic failed to prove its standing to pursue the injunction. In a case where a single competitor seeks relief that will affect the entire alleged market, including

millions of non-parties, that omission is a particularly grave error.  *See California v. Am. Stores Co.*, 495 U.S. 271, 295 (1990).

Article III standing for injunctive relief requires a future injury that is "redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  When redressability depends on the anticipated conduct of "independent decisionmakers," plaintiffs must show there is a reasonable probability "that, in the near future" those third parties will act as predicted.  *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024).

Epic's redressability theory *assumes* that developers, OEMs, and mobile carriers will react to the District Court's injunction in a way that redresses Epic's injury.  *See, e.g.*, Dkt. 952-1 at 10-12.  But the law requires proof of that causal connection, *see Murthy*, 144 S. Ct. at 1989-95, and Epic offered no such proof during the remedies phase.

For the provisions related to Play's billing policies, *see* Dkt. 1017 ¶¶ 9-10, moreover, Epic has not even attempted to show any threat of ongoing injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-106 (1983).  Epic offered no proof that it can or will again offer apps on the Play store.  Epic is thus not subject to billing policies for apps offered there.  Epic also cannot assert injury as a potential billing competitor to Google because Epic offers no billing system for other third-party

stores to use. *See* Tr. 530:17-19. Article III prohibits the District Court from issuing an injunction at Epic's urging that does not impact Epic.

## II.  THE EQUITIES STRONGLY FAVOR A STAY.

### A.  The Injunction Irreparably Harms Google.

#### 1.  Mandating Changes That Affect User Safety And Security Will Irreparably Harm Google's Brand And Reputation.

The injunction injects real risks of security incidents, privacy breaches, financial harm, and other dangers that will irreparably harm Google by jeopardizing its hard-earned reputation for safety and security. Such reputational harm is irreparable. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017).

The injunction's prohibitions related to providing users links and enabling alternative billing (¶¶ 9-10) raise significant security risks, made worse by the three-week compliance deadline. As the head of Android security and privacy engineering has explained, unknown links could be used "to smuggle malware onto a phone, steal a user's data, engage in a phishing or spear phishing attack, track a user's activities in other apps on the device, or otherwise jeopardize a user's privacy and security." Dkt. 1020-3 ¶ 6. And external payment systems mean that new actors will soon be collecting "highly sensitive information from users, including credit

card numbers, addresses, email addresses, bank account numbers, and more." *Id.*
¶ 11. The court's timeline leaves virtually no time to mitigate these risks.

The catalog access and distribution of third-party stores are likewise fraught
with risk. There are hundreds of Android app stores, and access to the Play catalog
would give third-party app stores a veneer of legitimacy "by augmenting the
volume" of apps they contain. Dkt. 981-3 ¶¶ 71-77 (describing problematic app
stores). Despite Google's request to set eligibility criteria, the injunction leaves
uncertain what rules will govern the catalog-access remedy. Insufficient eligibility
criteria will "jeopardize user security" because, for example, "malicious actors" can
"easily set up a shell third-party 'store' and populate it with apps from Google Play,
along with malicious, deceptive, or pirated content." Dkt. 1020-3 ¶ 14. "The
legitimate apps populated from Google Play will make it much easier for bad actors
to pose as legitimate stores." *Id.* A developer's decision to opt-out from a particular
store will not tell users that similarly named apps in the store are pirated versions,
and it will be harder for users to recognize threats "because the non-Play store
otherwise looks like it has the entire Play catalog available for download." *Id.* ¶ 16.

With respect to the forced distribution of third-party stores, the injunction
injects substantial confusion by stating that Google must prove any vetting of the
content of those stores is "strictly necessary and narrowly tailored." Dkt. 1017 ¶ 12.
Like any good security policy, however, Google's vetting policies for apps on Play

"err on the side of protecting users" and are designed to "anticipate problems."  Dkt. 1020-3 ¶¶ 23-24.  As Android's head of security explains, "[a] security policy that is entirely or primarily reactive to only demonstrated threats is no security policy at all."  *Id.* ¶ 24.

These security risks not only threaten irreversible harm to users and developers, *infra* pp. 26-28, they threaten Google's reputation.  Play's global head of marketing explained that consumer surveys have "consistently show[n] that users seek out apps from the Play store, in part, because of [Google's] commitment to safety and security," and that "users consistently rank security as one of the most important considerations when selecting smart devices."  Dkt. 1020-2 ¶¶ 4, 11(b). Users who experience harm as a result of the injunction's remedies "are likely to be confused" and thus "likely to misattribute any harms they experience at least in part to the Play store and to Google."  *Id.* ¶¶ 9-10.  This, in turn, may lead users to "stop using the Play store [or] even switch away from Android devices to iPhones."  *Id.* ¶ 11.  It will be "exceptionally difficult—if not impossible—to reverse" the loss of trust in Google even if this Court ultimately reverses.  *Id.* ¶ 16.

> **2.    Forced Changes To Google's Business Practices And Forced Service Of Competitors Is Irreparable Harm.**

The injunction requires, by design, "fundamental business changes that … cannot be easily undone" if the injunction is vacated on appeal.  *Qualcomm*, 935 F.3d at 756 (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 463 U.S. 1311, 1313-

14 (1983)); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-

59 (9th Cir. 2009)).  These changes include costly alterations to Google's business

model that threaten to "disrupt and change the whole nature of [its] business."  *Am.*

*Trucking Ass'ns*, 559 F.3d at 1058.  Google must also "renegotiate existing

[contractual relationships] on a large scale."  *Qualcomm*, 935 F.3d at 756.  All of

this constitutes irreparable harm under Circuit precedent.

These changes will put Google "at a competitive disadvantage" against other

app stores, including its principal competitor, Apple's App Store.  *Int'l Franchise*

*Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).  That too "constitutes

irreparable harm."  *Id.*  The court wrongly suggested that Google "agreed" to the

contractual remedies in ¶¶ 4-7.  Dkt. 1016 at 9.  Google proposed *narrower* versions

of these provisions—in line with the remedies in the State Settlement—to address

the challenged conduct while preserving Google's ability to compete against major

potential Android app store competitors like Microsoft, and Apple's App Store.  Dkt.

1000 at 140:24-143:25.

Catalog sharing "threaten[s] developers' continued participation in the Play

store."  Dkt. 1020-2 ¶ 13.  By default, all apps are shared, which may mean they

appear alongside pirated or otherwise objectionable content like pornography or hate

speech in competing stores.  *See id.*; Dkt. 981-3 ¶¶ 20-77 (collecting real world

examples).  The opt-out mechanism imposes burdens on developers who will need

to constantly evaluate the stores in which their apps are available and the other content in those stores (which they may not want to be alongside). Dkt. 1020-2 ¶ 14. Developers who opt out, moreover, take on different risks, including that users will download a fake or fraudulent version of the developer's app—instead of the real thing—from what otherwise appears to be a legitimate app store offering the millions of apps in the Play catalog, Dkt. 1020-3 ¶ 16.

### 3. Forcing Google To Immediately Begin Incurring Millions Of Dollars To Design And Build The Ordered Remedies Is Irreparable Harm.

Irreparable harm includes unrecoverable business costs. *See In re Victor Techs. Sec. Litig.*, 792 F.2d 862, 864 (9th Cir. 1986). The cost of building, implementing and maintaining these remedies will be significant, likely over $100 million—much of which will not be recoverable after appeal. Dkt. 981 at 2; Dkt. 982-3 at 6-8; Dkt. 982-4 at 4-6; Dkt. 1000 at 19:15-19.

### 4. An Unworkable Effective Date For Safe Implementation Is Irreparable Harm.

Between now and November 1, there is not sufficient time to revise steering, payment, and linkout policies or to roll out major changes to millions of devices and users. As Android's head of security put it, "the company has never rolled out a new feature to millions of new users at scale in just three weeks." Dkt. 1020-3 ¶ 9. The "recent Crowdstrike malfunction" on another large-scale platform underscores that moving too fast "create[s] major security risks." *Id.* There, a software update's

25

programming flaw "caused an entire platform to crash" and "worldwide service disruptions for several days." *Id.* The November 1 compliance deadline here creates a similar risk. *See id.* ¶¶ 9, 13.

The court's arbitrary decision to require catalog access and third-party app store distribution in just eight months will similarly cause irreparable harm absent a stay. Google detailed why these changes required a 12-16 month timeline—and the consequences of having to develop, build, and roll out brand new services without adequate time to test them. Dkt. 1020-1 ¶¶ 14, 22; Dkt. 981-3 ¶¶ 47-62, 54-69; Dkt. 981-1 ¶¶ 32-36, 42-44. Put starkly, "compressing the timeline for a substantial new product—in this case, one involving millions of apps distributed to potentially hundreds or even thousands of app stores—can create major unintended consequences that affect broader functionality." Dkt. 1020-3 ¶ 17; *see also id.* ¶ 28 (same for third-party-store distribution).

## B. The Public Interest Weighs In Favor Of A Stay Given The Immediate And Harmful Effects Of The Injunction On Millions Of Non-Parties To This Litigation.

The injunction's provisions and compliance timeline expose users and developers to heightened risks of malicious, fraudulent, deceptive, pirated, and otherwise unlawful and harmful content. *See generally* Dkt. 1020-1, 1020-2, 1020-3. These harms are likewise irreparable. As Android's head of security noted, "trying to undo compromised data is like putting toothpaste back in the tube." Dkt.

¶ 1020-3 ¶ 7.  "Users' data may be sold on the dark web to other bad actors" in a vicious cycle that is "extremely difficult" to stop.  *Id.*  The injunction also forces over 500,000 non-party U.S. app developers to figure out whether to revoke the forced license to their intellectual property granted through catalog sharing and makes it harder for OEMs to generate competition for screen space on devices they build.  *See* Dkt. 1017 ¶ 10; Dkt. 981 at 9-10.

While promoting competition serves the public interest, the court below recognized that this injunction will *stifle* competition while in effect, because all app stores—regardless of effort, investment, or legitimacy, will have access to Play's catalog.  *See* Dkt. 977 at 50:8-51:19; Dkt. 957-1 at 29-30.  Just as concerning, the injunction hampers Google's ability to compete with Apple.  *See* Dkt. 1020-2 ¶¶ 11, 14(d), 15.  It is counterintuitive that Apple can continue its "walled garden" approach, *Apple I*, 559 F. Supp. 3d at 922, while the injunction restrains Google— which already operates a more open platform—from providing a counterweight to Apple in the marketplace.  *See* Tr. 2035:15-24.

The State Settlement likewise provides powerful evidence the injunction is unnecessary to protect consumers or restore competition.  Nearly a year ago, Google and every State, acting *parens patriae*, provided the court with a settlement that includes extensive changes to Google's contractual arrangements with business partners.  Dkt. 522-2, Case No. 3:21-cv-05227-JD.  The States explained that those

27

changes addressed the core alleged anticompetitive conduct while preserving Google's ability to compete. *Id.* at §§ 12.1, 12.2. The court refused to consider the agreed-to terms of that settlement or make findings as to why *additional* remedies were necessary and appropriate for Epic's claimed injuries. *See* Dkt. 1000 at 144:4-5 (faulting Google for invoking State Settlement). Approving the settlement would trigger conduct changes that will abate the conduct addressed at trial.

## III. EPIC FACES NO IRREPARABLE HARM FROM A STAY.

A stay pending appeal will not harm Epic, which will continue to distribute apps on Android via other app stores or user-initiated installations. A number of these remedies (*e.g.*, payments and steering policies) have no impact on Epic, because it distributes no apps on Play and offers no third-party payment platform to other developers who do.

Google remains committed to implementing the State Settlement. Its provisions address the very issues that Epic complained of at trial—ensuring opportunities for OEMs preinstallation, exclusive launch deals with developers, use of alternative billing options for developers who (unlike Epic) distribute their apps through Play, and downloads of apps directly from a website like Epic's. State Settlement §§ 6.3, 6.6, 6.8, 6.10. This reinforces Epic's lack of harm from a stay pending appeal.

## CONCLUSION

This Court should grant an immediate administrative stay.  It should then stay the October 7, 2024 injunction pending appeal, except for ¶ 8.

If the Court denies a stay, Google respectfully requests the Court extend the compliance deadlines in ¶¶ 4-7, 9-10, and 13 until 30 days after this Court rules.

Dated:  October 16, 2024

Respectfully submitted,

/s/ Neal Kumar Katyal

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Leigha Beckman
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Jonathan I. Kravis
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael
Dane P. Shikman
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

Pursuant to this Court's order of _____, 2024, I certify that this motion complies with applicable type-volume and length limitations because it contains 6,593 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

## INDEX OF EXHIBITS

| Exhibit | Document Description |
|---------|---------------------|
| A | Dkt. 1016 – Order re UCL Claim and Injunctive Relief |
| B | Dkt. 1017 – Permanent Injunction |
| C | Dkt. 82 – First Amended Complaint (excerpts) |
| D | Dkt. 505 – Joint Submission re Trial Proposal (excerpts) |
| E | Dkt. 573 – Defendants' Opposition to Motion to Bifurcate Trial (excerpts) |
| F | Dkt. 850 – Final Jury Instructions for *Epic* Trial (excerpts) |
| G | Dkt. 952 - Epic's Proposed Permanent Injunction |
| H | Dkt. 952-1 – Statement of B. Douglas Bernheim (excerpts) |
| I | Dkt. 957-1 – Statement of Matthew Gentzkow (excerpts) |
| J | Dkt. 981/982-2 – Google's Proffer re Epic's Proposed Remedies (Redacted/Sealed) |
| K | Dkt. 981-1 – Baccetti Declaration |
| L | Dkt. 981-3 – Cunningham Declaration |
| M | Dkt. 981-4/Dkt. 982-3 –Cramer Declaration (Redacted/Sealed) |
| N | Dkt. 981-5/Dkt. 982-4 –Kleidermacher Declaration (Redacted/Sealed) |
| O | Dkt. 984 – Order re Google's Renewed JMOL Motion |
| P | Dkt. 985 – Epic's Response to Google's Proffer |
| Q | Dkt. 1020-1 – Baccetti Declaration |
| R | Dkt. 1020-2 – Iannuccilli Declaration |

| Exhibit | Document Description |
|---------|---------------------|
| S | Dkt. 1020-3 – Kleidermacher Declaration |
| T | Dkt. 522-2, Case No. 3:21-cv-05227-JD – State Settlement |
| U | 10/19/2023 Hearing Transcript (Dkt. 707, Case No. 3:20-cv-5671) |
| V | 11/2/2023 Trial Transcript (Dkt. 834) (excerpts) |
| W | 11/7/2023 Trial Transcript (Dkt. 836) (excerpts) |
| X | 11/13/2023 Trial Transcript (Dkt. 839) (excerpts) |
| Y | 11/20/2023 Trial Transcript (Dkt. 843) (excerpts) |
| Z | Morrill Transcript (played by video during trial on 11/20/2023) (excerpts) |
| AA | 11/27/2023 Trial Transcript (Dkt. 845) (excerpts) |
| BB | 11/30/2023 Trial Transcript (Dkt. 848) (excerpts) |
| CC | 12/1/2023 Trial Transcript (Dkt. 849) (excerpts) |
| DD | 12/11/2023 Trial Transcript (Dkt. 867) (excerpts) |
| EE | Trial Exhibit #11405 (Dkt. 888-94) |
| FF | 5/23/2024 Hearing Transcript (Dkt. 977) |
| GG | 8/14/2024 Hearing Transcript (Dkt. 1000) |

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on October 16, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ *Neal Kumar Katyal*
Neal Kumar Katyal