# EXHIBIT FF

Pages 1 - 139

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
IN RE GOOGLE PLAY STORE           )
ANTITRUST LITIGATION,             )
                                  )   NO. 21-md-02981-JD
_____    )
THIS DOCUMENT RELATES TO:         )
                                  )
EPIC GAMES, INC.,                 )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )   NO. 20-cv-05671-JD
                                  )
GOOGLE, LLC., et al.,             )
                                  )
          Defendants.             )
_____    )
```

San Francisco, California
Thursday, May 23, 2024

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    CRAVATH, SWAINE & MOORE LLP
                    825 Eighth Avenue
                    New York, New York  10019
              BY:   GARY BORNSTEIN, ATTORNEY AT LAW
                    YONATAN EVEN, ATTORNEY AT LAW
                    LAUREN MOSKOWITZ, ATTORNEY AT LAW
                    MICHAEL ZAKEN, ATTORNEY AT LAW
                    MALIKAH WILLIAMS, ATTORNEY AT LAW


        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR
             Official Reporter, CSR No. 12219

```
 1   APPEARANCES CONT'D:

 2   For Defendants:
                             MUNGER, TOLLES & OLSON LLP
 3                           350 South Grand Avenue - 50th Floor
                             Los Angeles, California  90071
 4                      BY:  GLENN POMERANTZ, ATTORNEY AT LAW
                             KURUVILLA J. OLASA, ATTORNEY AT LAW
 5
                             MUNGER, TOLLES & OLSON LLP
 6                           601 Massachusetts Avenue NW
                             Suite 500 East
 7                           Washington, DC  20001
                        BY:  JONATHAN KRAVIS, ATTORNEY AT LAW
 8                           LAUREN BELL, ATTORNEY AT LAW

 9                           MUNGER, TOLLES & OLSON LLP
                             560 Mission Street - 27th Floor
10                           San Francisco, California  94105
                        BY:  DANE P. SHIKMAN, ATTORNEY AT LAW
11
                             MORGAN, LEWIS & BOCKIUS LLP
12                           One Market - Spear Street Tower
                             San Francisco, California  94105
13                      BY:  SUJAL SHAH, ATTORNEY AT LAW
                             LEIGHA BECKMAN, ATTORNEY AT LAW
14
                             HOGAN LOVELLS US LLP
15                           555 13th Street N.W
                             Washington, D.C. 20004
16                      BY:  REEDY SWANSON, ATTORNEY AT LAW

17
     Also Present:        Michael Lyons
18                        Douglas Bernheim
                          Steven Tadelis
19                        Matthew Gentzkow
                          Gregory Leonard
20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>Thursday - May 23, 2024</u>                    <u>11:10 a.m.</u> |
| 2 | P R O C E E D I N G S |
| 3 | ---o0o--- |
| 4 | THE CLERK:  All rise.  Court is now in session.  The |
| 5 | Honorable James Donato presiding. |
| 6 | THE COURT:  Good morning. |
| 7 | ALL:  Good morning. |
| 8 | THE CLERK:  Please be seated. |
| 9 | Calling Civil 20-5671 Epic Games, Inc., v. Google, LLC, |
| 10 | and Multi-District Litigation 21-2981, In Re:  Google Play |
| 11 | Store Antitrust Litigation. |
| 12 | Counsel. |
| 13 | MR. BORNSTEIN:  Good morning, Your Honor, Gary |
| 14 | Bornstein for Epic Games.  I am joined today back in the |
| 15 | gallery by Yonatan Even, Lauren Moskowitz, Michael Zaken, and |
| 16 | Malikah Williams. |
| 17 | THE COURT:  Okay. |
| 18 | MR. POMERANTZ:  Good morning, Your Honor, Glenn |
| 19 | Pomerantz on behalf of Google.  And with me, not at counsel |
| 20 | table Leigha Beckman, Dane Shikman, Kuru Olasa, Jonathan |
| 21 | Kravis.  Sujal Shah, as well, Your Honor. |
| 22 | THE COURT:  Okay.  It's a partner name test. |
| 23 | (Laughter.) |
| 24 | THE COURT:  All right.  We're all set? |
| 25 | MR. BORNSTEIN:  Yes, Your Honor. |

1          THE COURT:  Who did we have at the table?  I know the

2     two economists and --

3          MR. BORNSTEIN:  And Mr. Lyon will not be speaking,

4     but.  He is here in case we need some technical assistance.

5          THE COURT:  Okay.  Let's just introduce who's sitting

6     at the table, please.  Why don't we start with you.

7          MR. BORNSTEIN:  Great.  On our side, we have Professor

8     Steven Tadelis and Professor Douglas Bernheim.

9          THE COURT:  Okay.

10          MR. POMERANTZ:  We have here, Your Honor, Professor

11     Mathew Gentzkow and Dr. Greg Leonard.

12          THE COURT:  All right.  So we're going to do this in a

13     hot tub style.  So, Lawyers, you two can return to the bench.

14     And let me put a frame on what we're doing.

15          So today I've asked you in to take testimony on the

16     injunctive relief that I'm going to order in the wake of the

17     jury verdict.  Now there are going to be two principles, two

18     broad principles that guide our discussion today.  And the

19     first principle is:

20          We are not writing on a clean slate.  The jury has

21     concluded that Google monopolized illegally the Android app

22     distribution market and the Android in-app billing services

23     market for digital goods.  The facts and the evidence behind

24     the jury's verdict are now carved in stone.  This is not an

25     opportunity to argue with that record, to try to supplement it,

1    to try to get around it, tap dance on it, or anything else.  It

2    is here and it is here to stay.

3         I was a little concerned about Google's 90 pages of

4    objections to the proposed injunction that the plaintiffs

5    submitted because it came perilously close to crossing that

6    line on several occasions.  But we will not be doing that

7    today.

8         Now, there may be some fact disputes that are specific to

9    the relief that I need to decide.  I'll tip my hand a little

10   bit and tell you right now, the friction related to the

11   security screens may be one of them that was not in it.  We

12   heard a lot about it a trial.  That was not an issue that the

13   jury necessarily had to decide.

14        So I may end up having to do some relief-specific dispute

15   resolution, but that is it.  We are not in any way rewriting

16   history or revisiting what led to the jury's verdict of illegal

17   monopolization.

18        The second guideline is, I'm going to share with you the

19   legal standards I'm working under.  And I know you-all

20   economists aren't lawyers, but you need to know what I'm going

21   to be doing because this is how I'm going to hear what you're

22   saying to me.  And I have picked, out of a number of sources, a

23   formulation that Justice Douglas gave in *Ford Motor Company v.*

24   *United States*, 405 U.S. 562 at pages 577, 578, and that's from

25   1972.

1    And Justice Douglas formulated the relief task as this (as

2    read):

3            "Antitrust relief should unfetter a market from

4        anticompetitive conduct and pry open to competition a

5        market that has been closed by defendant's illegal

6        restraints."

7    That is the lens through which I'm going to be taking your

8    testimony today.

9    To put a little bit of a finer point on it, our circuit

10   recently held in a case called *Optronic Technologies, Inc., v.*

11   *Ningbo* -- N-I-N-G-B-O -- *Ningbo Sunny Electronic Company*,

12   20 F.4th 466 at page 486.  This is a 2021 case.  (as read):

13           "If the jury finds that monopolization or

14       attempted monopolization has occurred, the available

15       injunctive relief is broad, including to terminate

16       the illegal monopoly, deny to the defendant the

17       fruits of its statutory violation, and ensure that

18       there remain no practices likely to result in

19       monopolization in the future."

20   So those are my goals.  You're going to help me make my

21   decision about what I should or should not do to realize the

22   legal standards that I'm operating under.

23   Now, the other thing I want to mention -- it goes without

24   saying, but I think it's important to emphasize -- this case is

25   about the opportunity to compete generally; it is not about

```
 1   aiding a specific competitor for or potential competitor.  I am
 2   not looking for relief that's going to give a helping hand just
 3   to Epic.  That is not what I'm doing.  That's the wrong thing
 4   to do.
 5        What we are doing is leveling the playing field, lifting
 6   the barriers, and making sure that anybody who chooses to
 7   compete with Google in these two markets found by the jury has
 8   a free and unfettered opportunity to do so.
 9        That is what I'm looking for.  So it is a systemic remedy.
10        Now, I am going to turn it over to each of you.  We're
11   going to, as I said -- I know at least a couple of you were
12   here for the prior hot tub -- start with the plaintiffs and
13   we'll get a response from the defendant as kind of we go down
14   this.  But here is what I'm looking for:  I'm looking for
15   specific actions.
16        All right?
17        I thought, to be honest, the draft -- proposed draft
18   injunction from Epic was too open-ended for my taste.  That's
19   not something -- it's not a criticism, but I'm telling you what
20   I need is specific recommendations for action that are directed
21   to two things:  Terminating Google's illegal conduct --
22   all right? -- making sure that door is closed.  Everything that
23   led up to the antitrust verdicts.
24        And the second thing is:  What should be done in addition
25   to that to restore the opportunity to compete for all potential
```

```
 1   competitors.

 2        All right?  Those are the two touchpoints that I want you

 3   to -- as you talk today and discuss this, keep that in mind.

 4        Okay?  So specificity is what I'm looking for --

 5   all right?-- to the extent you can do it.

 6        Okay.  Now, it seems to me -- I don't want to in any way

 7   constrain your testimony.  It seems to me that identifying what

 8   we can proscribe as prior conduct might be relatively easy.  By

 9   that, I have in mind specific contractural provisions that we

10   heard a lot about at trial, for example.

11        The next step, you know, what to do to make sure that

12   Google doesn't keep the fruits of its illegal conduct and

13   doesn't continue to poison the well in the future might be a

14   little bit more broad.  Okay?

15        But let me start with the plaintiffs.  You can just dive

16   right in.

17            DR. BERNHEIM:  Okay.  Thank you, Your Honor.  I am

18   Douglas Bernheim.

19            THE COURT:  Okay.  And before we do that, let me --

20   because we're already broadcasting on Zoom.  The two cameras

21   should be facing the two witnesses.  So one, I think, is facing

22   the podium right now.  So maybe Mr. Bornstein can help reorient

23   that and maybe have to lower it a little bit.

24        Yeah.  That'd be great.

25        And then Mr. Pomerantz can do the same for -- good.  Okay.
```

1     Can we look on the screen, Lisa, and make sure that

2  they're looking right?  Okay.  That looks pretty good.  Okay.

3     All right.  And just when you speak -- I know there's only

4  one microphone, but if you have to pass it back and forth, that

5  would be great.  Okay.

6     Please go ahead, Professor.

7          DR. BERNHEIM:  Of course.  Thank you.

8     So I have prepared some slides that are -- well, frankly,

9  I think they're more for helping me with memory, but it may be

10 useful for you to be able to see them, too, because they have

11 terse summaries of the points that I'm making.

12    So, Mr. Lyon, could you put up Slide Number 3?

13         THE COURT:  Is there a hard copy I could get, or no?

14         DR. BERNHEIM:  There is.  We can provide it.  I'm sure

15 we can.

16         THE CLERK:  Do we have two hard copies?

17         THE COURT:  Two, if you have them, but at least one,

18 please.

19    Don't give me yours.

20         DR. BERNHEIM:  I have two.

21         THE COURT:  You do?  Okay.  That would be great.

22 Thanks.

23    All right.  Thank you.  Okay.

24    Dr. Bernheim, go ahead.

25         DR. BERNHEIM:  All right.  So this slide just lists

1   the categories of things that we think a remedy needs to do
2   beginning with Item Number 1 -- is to prohibit the specific
3   anticompetitive practices.  But a remedy that focuses very
4   narrowly, just on those specific things, is going to be easily
5   circumvented.  So the remedy needs to preclude categories of
6   things, and I'll be more specific about that, what those
7   categories are in a minute.
8       So that's the -- Point Number 2.  It must preclude related
9   conduct that could yield substantially similar outcomes.
10      Third, it has to give rise to an opportunity to compete on
11  the merits with Google Play, despite the ongoing competitive
12  advantages that Google Play enjoys by virtue of its past
13  anticompetitive action, because there are durable effects of
14  that on competition going forward.
15      And the last principle just says that, to the extent
16  possible, we should avoid inhibiting Google from competing on
17  the merits.
18      So the next slide, Slide Number 4, gives a high-level
19  summary of what the components of the remedy are.  And then
20  just to look forward, if you look at the next few slides -- so,
21  for example -- I'm sorry.
22      On Slide 4, the first point is to prevent Google from
23  entering into or enforcing agreements of the type the jury
24  found to impair competition.
25      The next slide has that as its title.  That would be Slide

1    Number 5.  And it lists the specific things that we think fall

2    into that category.

3         And then there's a slide for each of the other points on

4    Slide Number 4.

5         So Number 1, preventing Google from entering in or

6    enforcing agreements of the type that were found to impair

7    competition.

8         Second, to prevent Google from imposing undue restrictions

9    on direct downloading.

10        Third, to require nondiscriminatory access to Android and

11   other Google products and services, because that's another

12   possibility for circumvention if Google were to make those

13   things contingent --

14        THE COURT:  So is that just -- is that the security

15   friction point?

16        DR. BERNHEIM:  It's also possibly access to APIs.

17        THE COURT:  Okay.

18        DR. BERNHEIM:  Which are not currently conditional but

19   could be made conditional.

20        THE COURT:  All right.

21        DR. BERNHEIM:  And then the final point is to mitigate

22   the continuing competitive advantages, which we have several

23   provisions designed to address those.

24        So I'm not sure if it's best to walk through every one of

25   these points --

1          THE COURT:  You know, I have the draft.  I've studied

2     it quite a bit.  I would like to get just to the specifics.

3          DR. BERNHEIM:  Okay.

4          THE COURT:  You can use your topic headings.  That's

5     actually useful.  But how -- what would you stuff under

6     Number 1, for example?

7          DR. BERNHEIM:  Okay.  So let me -- let me make what I

8     think is the most useful characterization of what's included

9     under Number 1.

10         What we are concerned about is two types of conduct:

11         The first type of conduct is conduct that makes value --

12    which could be financial value, it could be other value --

13    conditional upon another party either dealing with a Google

14    Play rival or acting as a Google Play rival.

15         And this sort of conduct, for the most part, is easy to

16    identify because the agreements would have provisions in them

17    that reference rivals.  Okay?  They would say these things are

18    conditional in some sense.

19         It gets a little bit tricky because in some cases

20    conditionality can be established by a nod and a wink, and --

21    particularly, if a party has a lot of power, if they're

22    dominant in the market and parties are worried about pleasing

23    them.

24         So we add one more thing:  Beyond this, you can't write

25    things that are conditional upon -- you know, value can't be

 1    conditional upon dealing with a rival or acting as a rival.  We

 2    also suggest that the remedy should include the requirement

 3    that these agreements have an explicit provision that says, "No

 4    terms or conditions or renewal are conditional upon dealing

 5    with a rival or acting as a rival," so that the counterparty,

 6    if it's an OEM, if it's a developer, they know that's in the

 7    contract; they have recourse and they have reassurance.

 8          THE COURT:  All right.  Now, let's just tie this a

 9    little bit to the trial evidence that I hope you recall.

10          DR. BERNHEIM:  Yes.

11          THE COURT:  So the MADA and RSA agreements, as I

12    recall, arguably had clauses about not doing business with

13    rivals or putting Google in a position where it always came out

14    first if there was some dealing with a rival, a home screen or

15    priority.

16       So what specifically -- keeping those actual contracts

17    that we heard about at trial in mind, how would you formulate a

18    proscription related to those?

19          DR. BERNHEIM:  Well, I think you can formulate a broad

20    proscription that doesn't need to specify every specific

21    category of conduct because there are a lot of categories of

22    conduct, and there are other things that Google could turn to.

23       So the ideal, in my mind -- and I'm talking as an

24    economist now --

25          THE COURT:  Of course, yes.

1      DR. BERNHEIM:  The ideal, in my mind, would be to have

2   a provision that simply says broadly, "The agreements with

3   parties like OEMs, developers, others who might be

4   distributors, cannot include provisions that specify terms that

5   are conditional on dealings with a rival or acting as a rival."

6      THE COURT:  All right.  Well, can't it be conditional

7   on excluding a rival?

8      DR. BERNHEIM:  Well, that would be -- that would be --

9   excluding a rival would be the most extreme example.  But

10  another example would simply be if you deal with a rival, then

11  you're not going to have access to certain things that are

12  valuable.

13     That would be a concern that Google could begin to use

14  that strategy.

15     THE COURT:  So maybe one way to put it would be:

16  Cannot be conditioned on agreements with rivals or potential

17  rivals.

18     Just leave it at that.

19     DR. BERNHEIM:  Yes.  That's essentially what -- what

20  this is trying to get at.  And I'm not sure exactly what the

21  wording should be, but if the provision is crafted in a

22  relatively broad way, it's still specific.  It still says that

23  a violation would have to be -- to have a violation, you'd have

24  to be able to point to a provision in a contract that

25  explicitly references some sort of dealings with a rival.

```
 1              THE COURT:  And in your review as an economist, that
 2    would directly redress the contractual restrictions that the
 3    jury saw at trial?
 4              DR. BERNHEIM:  Yes, with one category of exceptions
 5    that I'm coming to.
 6              THE COURT:  Okay.
 7              DR. BERNHEIM:  And the second category is the sharing
 8    Google Play --
 9              THE COURT:  If I may just jump in -- so we really need
10    to tie all of this to the anticompetitive conduct that was
11    proven at trial.
12              DR. BERNHEIM:  Right.
13              THE COURT:  So that's why I'm going to ask you to make
14    sure that everything you tell me is, in fact, economist
15    response --
16              DR. BERNHEIM:  Yes.
17              THE COURT:  -- to the anticompetitive conduct,
18    contract agreements, and other conduct that we saw at trial.
19         Okay?
20              DR. BERNHEIM:  Yeah.  So a great example of this first
21    thing, the conditionality, is the RSA 3.0 agreements that said
22    to the OEMs, "Your compensation, your payments are going to be
23    different if you -- if you have -- if you preload a rival app
24    store."
25         That's a perfect example of a conditional provision in an
```

1   agreement.  And I think one could broadly say that such

2   conditional provisions that reference dealings with rivals or

3   activities as rivals, are contrary to the remedy.  And that

4   would not just deal with a lot of what we saw, that Google did,

5   at trial, but would also encompass alternatives that Google

6   might think about going to.

7           THE COURT:  Before we get to that next point, though,

8   let's define "rival."

9       So a rival would be who?

10      A company seeking to open a competitive -- seeking to open

11  an Android app store?

12          DR. BERNHEIM:  That would be the main class of rivals.

13      In principle, it could be if a developer is distributing

14  off Google Play, then it is acting as a rival for the purpose

15  of its own distribution, even though it doesn't have its own

16  app store.  And the -- what would be required is a provision

17  that says, "Google cannot make value that it gives to that

18  developer" --

19          THE COURT:  If I may -- I'm going to interrupt you a

20  lot.  I apologize in advance.

21      So I see.  So it doesn't have to be opening up -- I'll

22  just call it a macro store.  It can be one developer saying, "I

23  want my app to be available through my own direct download or

24  through Samsung" or something like that.

25      That would be, in your view, also a rival?

1       DR. BERNHEIM:  Yes.  I think that that's important.

2       These are all activities that are rivalrous in terms of

3  app distribution, and we're only talking about rivalry in terms

4  of app distribution, so this ought to be focused on that.

5       But -- yes, that's the essence of it.

6       THE COURT:  You said you had something else, a

7  carve-out or something --

8       DR. BERNHEIM:  Yes.  The other -- it's not a

9  carve-out.  It's another category of conduct that arose at

10  trial, which is sharing Google Play revenues with actual or

11  potential competitors.  And even when Google does not have

12  explicit provisions in contracts that reference activities

13  as -- as rivals or dealings with rivals, app distribution

14  rivals.  It also has --

15      THE COURT:  Was Activision -- what were the examples

16  at trial of that?  I remember --

17      DR. BERNHEIM:  This would be RSA 3.0, revenue sharing,

18  Google Play revenue sharing.  Now, in the RSA 3.0 agreements,

19  there were various different kinds of revenue sharing.

20  Sometimes they shared, I don't know, search revenue, ad

21  revenue, something like that and occasionally Google Play

22  revenue.

23      And the sharing of Google Play revenue was coming up in

24  the context of OEMs that had their own app stores, which was

25  essentially sharing profits with a rival.  This is, you know,

```
 1    kind of basic violation of antitrust principles.

 2          Nothing was made conditional on the -- well, I'm sorry.

 3    The RSA 3.0 also had some conditionality.  But for this

 4    provision, even aside from the conditionality, sharing profits

 5    with a rival discourages the rival from competitive action.

 6          THE COURT:  Sharing Play Store profits.

 7          DR. BERNHEIM:  I'm sorry?

 8          THE COURT:  Sharing Google Play Store profits.

 9          DR. BERNHEIM:  Specifically Play Store profits.

10          THE COURT:  All right.  So that is your formulation of

11    how to address the prior anticompetitive conduct that led to

12    the jury verdict?

13          DR. BERNHEIM:  Yes, as well as similar conduct that

14    could be used to accomplish the same objective.

15          THE COURT:  All right.  Let me just turn to your

16    colleagues here.

17          What's wrong with that, Defendants?  It sounds fairly

18    reasonable and well-targeted to the evidence at trial.

19          DR. GENTZKOW:  Yeah, I think --

20          THE COURT:  Why don't you say who you are.

21          DR. GENTZKOW:  Matthew Gentzkow.

22          So we, I think, broadly agree on some of the high-level

23    principles that this should address the conduct that was found

24    to be illegal at trial.  I think it's important that it do so

25    in a way that lets market outcomes be determined by competition
```

 1   and market forces when possible.

 2       I think that it's important, as Dr. Bernheim and

 3   Dr. Tadelis have both said, that it preserve Google's ability

 4   to compete in the market to the extent possible.

 5       I think there's two main areas of disagreement.  One of

 6   them is with regard to some of the provisions that Dr. Bernheim

 7   has described as leveling the playing field, which we haven't

 8   really gotten to yet --

 9           THE COURT:  All I want you to do now is -- you know,

10   Dr. Bernheim said, "Here's what I would recommend, to terminate

11   the illegal conduct underlying the jury's monopolization

12   verdict."

13       So what I'm asking you is:  Is there any objection to

14   that?

15       It sounded all quite straightforward.  I don't see how

16   that would hobble Google's ability to compete in a fair way,

17   but you tell me.

18           DR. GENTZKOW:  I think the first thing to say is that

19   the state settlement already rules out any exclusivity

20   agreement.

21           THE COURT:  There is no state settlement because I

22   haven't approved it.  So let's just stick with this case.

23           DR. GENTZKOW:  The one thing that I think would be an

24   appropriate remedy is, as is in the state settlement, ruling

25   out exclusivity of either pre-installation or placement on home

```
1   screens of devices, those kinds of contracts that are
2   explicitly conditioned on the behavior of rivals.
3        I think that where we disagree is the breadth of that
4   provision, how far it goes and what other conduct should be
5   ruled out.  I think that the -- the proposed injunction spans
6   conduct that even would disincentivize a rival in any way
7   from --
8             THE COURT:  Let me just jump in.
9        Let's just focus on what we're talking about here.  Okay?
10       So let's see if I can put a clearer articulation.
11       Dr. Bernheim has just proposed, in response to my
12   question, two categories of things that should be proscribed,
13   in other words, Google should be forbidden to do.
14       One is:  It cannot condition any of its agreements with a
15   party on not dealing or having agreements or interactions with
16   rivals or potential rivals, and it can't engage in revenue
17   sharing from the Google Play Store with competitors.
18       So just focusing on those two things, I don't see any
19   reason why that would in any way unduly or unreasonably
20   constrain Google's ability to compete, while at the same time,
21   those provisions seem well-crafted to the evidence at trial to
22   correct the illegal conduct that led to the monopoly verdict.
23   So that's what I want you to kind of focus on.
24             DR. GENTZKOW:  So I think on the sharing of revenue
25   from the Google Play Store, the question is to what extent that
```

 1   prohibits conduct that would fall within the bounds of

 2   competition.  So there are a lot of cases in which it makes

 3   sense for Google to offer to, for example, OEMs, when it's

 4   competing for space on their devices, incentives to choose the

 5   Play Store to install the Play Store.  That has taken the form

 6   of revenue-sharing contracts in the past, and those revenue

 7   sharing contracts involve incentives for those OEMs to install

 8   Google Play Store.

 9          THE COURT:  But isn't that incentive based on not

10   installing a rival store?  I mean, that's the whole point of

11   the incentive; right?

12          DR. GENTZKOW:  Well, not necessarily.  I think that's

13   the crux of the question is:  What about incentives that are

14   not conditioned on anything about the behavior of rivals?

15       I think if we narrowly --

16          THE COURT:  Just to jump in, I'm looking in a

17   pragmatic way as what is the consequence.  Okay?

18       So, you know, someone may say, "Oh, this is revenue

19   sharing with an OEM because we want to be on the home screen."

20       But if the practical effect is the revenue sharing is

21   essentially motivating an OEM not to put a rival play store on,

22   you have achieved an anticompetitive goal, even though it may

23   be cloaked in a competitive-phrased way.

24       So looking at the actual result, help me understand how

25   revenue sharing from the Google Play Store with a potential

 1  competitor that results in the competitor not posting a rival

 2  play store is not a reasonable way of constraining

 3  anticompetitive conduct.

 4          DR. GENTZKOW:  Yeah.  I think that -- I think that

 5  banning that kind of revenue sharing has the potential to harm

 6  those OEMs.  Because although there could be cases where that

 7  is excluding a competitor, there's a whole range of cases in

 8  which that is a form of competition.  And --

 9          THE COURT:  What's a form of competition?

10          DR. GENTZKOW:  That offering revenue sharing to OEMs

11  in exchange for placing a play store, if there's no reference

12  to rivals, ruling that out entirely, has the potential to shut

13  down competition much more broadly in the market and harm

14  competition because there are lots of cases in which OEMs have

15  scarce real estate on their devices that is -- that app stores

16  are competing for placement on those devices.  And if this

17  is -- if we say there's no ability to offer revenue sharing at

18  all in part of that competition, competition is going to be

19  weakened as a result.

20          THE COURT:  All right.  Let's pause on that.

21     Dr. Bernheim, your colleague is saying that it's too

22  broad.  They should be allowed to revenue share because there

23  are totally legitimate reasons for that.

24          DR. BERNHEIM:  Well, I disagree with that.

25     Dr. Gentzkow, in his testimony just now and in his

 1    declaration in making that argument, doesn't explain what the

 2    harm would be if the compensation to the OEM is something other

 3    than Google Play revenues.

 4         As I said before, they can share other revenue streams, so

 5    they can make payments for various things.  I mean, we're

 6    proscribing some things, payments for things that are

 7    conditional on dealing with a rival.  But to the extent they

 8    are allowed to do something, they can bid for that with other

 9    revenue streams.  It doesn't have to be Google Play revenue.

10         And I would add to that --

11         THE COURT:  So you're really anchoring it to the

12    source of the revenue coming from Google Play.

13         DR. BERNHEIM:  For that, again --

14         THE COURT:  The revenue sharing.

15         DR. BERNHEIM:  -- two categories of conduct.  But if

16    we're talking about revenue sharing, what we're worried about

17    is Google Play revenue because Google Play is functioning as a

18    competitor in the app distribution market, and therefore should

19    not be allowed to share its revenues or profits with other

20    competitors in the app distribution market.  That's -- that's

21    the line.

22         The other thing that I would point out is that -- at trial

23    I think I talked about this -- I've looked at the agreements

24    with the various OEMs, and the thing that's really striking is

25    that Google Play -- Google used various kinds of compensation.

1    They shared various different kinds of revenue streams.

2        Where you see them sharing Google Play revenue --

3    particularly Google Play revenue at high rates -- is when you

4    have the, you know, the Chinese OEMs, like Xiaomi, coming up

5    and having their own apps stores.  And all of a sudden, Google

6    says, "Well, how about some -- how about a larger share of

7    Google Play revenue?"

8        This is the problem.  It's not that they're giving the

9    OEMs money.  It's that they're either giving the OEMs money

10   specifically not to foster competition, or they're giving them

11   money in the form of the revenue stream that the OEMs should be

12   competing with.

13       THE COURT:  Okay.  Seems like a reasonable point,

14   Dr. Gentzkow.

15       DR. GENTZKOW:  Yeah.  Well, I think --

16       THE COURT:  That would address your issue.  As

17   Dr. Bernheim is articulating it, Google would be perfectly free

18   to bargain for home screen territory or whatever they want to

19   do as long as it doesn't come from Google Play store revenue.

20       DR. GENTZKOW:  Yeah.  I think if we've narrowed the

21   scope of it in that way, so that any other revenue sharing is

22   acceptable, and any other conduct outside of that, which is not

23   revenue sharing but other forms of incentives that are part of

24   competition, are acceptable, I think we're closer to agreement.

25       I think Google Play Store revenue --

```
 1            THE COURT:  Now you're talking like a lawyer.
 2       Do you have an agreement or not as economists?
 3                      (Laughter.)
 4            DR. GENTZKOW:  Yeah.  I think the disagreement is just
 5  there are conditions -- there are cases in which sharing
 6  revenue from the Google Play Store is also consistent with
 7  efficiency because the -- from an economic point of view,
 8  revenue sharing, in general, gives incentives to the
 9  counterparty -- in this case, the OEM -- to make investments,
10  to do promotions, to work hard, to create more value out of
11  that relationship.
12       Google Play revenue is one of the main ways that an
13  Android device produces revenue overall.  There's search
14  advertising revenue.  There's revenue from the Google Play
15  store.
16            From an economic point of view, limiting that has a
17  potential efficiency consequence because if there are
18  investments that an OEM makes that lead a user to download more
19  apps, to spend more time on their phone, to make more purchases
20  in apps, those are going -- the OEM is going to have less
21  incentive to do those things under a revenue-sharing contract
22  if it doesn't include Google Play revenue.
23            So I think there are efficiency reasons why that kind of
24  revenue sharing makes sense as well.
25            THE COURT:  Okay.  Let me ask you, leaving revenue
```

 1   sharing aside, the other point from Dr. Bernheim was just

 2   making sure that no agreement is conditioned on not dealing

 3   with rivals, basically.

 4       What's wrong with that?  I mean, that's actually -- it's

 5   an independence clause; let's call it that.  Each contract will

 6   have to have an independence clause saying you're perfectly

 7   free to deal with anybody else on any terms you want.

 8           DR. GENTZKOW:  Yeah.  I think that, again, if -- that

 9   becomes very close to the terms that are already in the state

10   settlement which says you can't -- Google cannot make any

11   agreements with an OEM, for example, that explicitly reference

12   rivals in the context of exclusivity.  So say --

13           THE COURT:  All right.  So, in other words, you agree

14   that that's an okay provision.

15           DR. GENTZKOW:  I think that's an okay provision in the

16   context of exclusivity.

17           THE COURT:  All right.  Okay.

18       That seems to be Category 1 for proscribing prior conduct.

19       Now, looking more broadly, how do you address those other

20   factors that I've read from the cases about, which is, making

21   sure that Google does not continue to reap fruit from its

22   statutory violations and give some assurance to the public this

23   isn't going to happen again, in creative ways?

24       That -- admittedly, I'm going to have a hard time

25   predicting, but there may be some formulations that will at

1  least cabin the creativity in some constructive way.

2      Yes.  Yeah.

3          DR. BERNHEIM:  So I think my starting point is that if

4  you eliminated all of the conduct that we observed in the past,

5  as well as similar conduct, if you just proscribe that and

6  nothing else, that would not be sufficient because had it not

7  been for the conduct, we would have seen competition emerging.

8  We would be in a different place today, in 2024, than we would

9  have been -- than we actually are in 2024 as a result of the

10 past conduct.

11      And merely removing the conduct doesn't mean that

12 competition bursts out all of a sudden.  It takes time to

13 evolve for a number of reasons -- one of which I'll get into in

14 a second.

15      So, you know, if all you did was prohibit these categories

16 of conduct, you're not going to get to where we would have been

17 in 2024.  And you're not going to get to where we would have

18 been in 2026, when 2026 arrives.  You know, you're going to be

19 in a lower trajectory in terms of competition.

20      Part of the reason for that is -- a large part of the

21 reason for that is that Google has -- Google Play has inherent

22 advantages because of the phenomena that we discussed at trial

23 called network externalities, the chicken and the egg problem.

24      As an app store I need users to get developers.  I need

25 developers to get users.  If I'm the dominant app store and I

1   have both, both are kind of going to stay there.  If I don't

2   have either, it's hard to get the ball rolling.  There are

3   strategies that I talked about at trial, like getting some

4   exclusive conduct -- content that will help get the ball

5   rolling.

6       But it's slow.  It takes time.  It's difficult.  And it's

7   not just a matter of not having resources, not having money

8   available; it's a matter of laboring at a competitive

9   disadvantage relative to the party that benefits from all of

10  these network externalities.

11      The important point about that is that those advantages

12  exist in significant part because of past conduct.  Past

13  conduct is what creates the dominance that we observe today,

14  that thereby creates the network externalities that make it

15  hard for competitors to break in to compete today.

16      So in my view, one of most important things that we need

17  to do is to find a way to mitigate the network externalities,

18  and we've offered, I think, a simple and creative proposal for

19  doing that.  And part of the beauty of this proposal is that it

20  is built on something that Google has already done, which is

21  its Alleyoop arrangement with, I think it was, Facebook and one

22  other party.

23      And that's basically saying, you can have another

24  distributor of apps, say another app store that uses -- that

25  serves -- that may have its own products but also serves as a

```
1    storefront for Google Play.  So if they've not signed up a
2    developer, they can still piggyback on the Google Play catalog
3    and list those apps on their own app store.
4              THE COURT:  If I can just jump in --
5              DR. BERNHEIM:  Yes.
6              THE COURT:  This gave me a little bit of pause, and
7    I'll just -- I'll tell you why.  And I'm speaking, of course,
8    as a federal judge, not as an economist, but the app store's
9    dominance, as the jury found, was directly correlated and
10   caused by some illegal antitrust conduct.
11        However, it certainly is a possibility and, in my mind, a
12   probability that there was perfectly legitimate conduct that
13   also led to the app store being the biggest player in town.
14        I'm a little reluctant to say -- if I'm understanding you
15   correctly, and please correct me if I'm not.
16        I'm a little reluctant to say anybody tomorrow can say,
17   "I'm going to open an Android App Store and, Google, you stock
18   my catalog with everything you are offering today for free, and
19   you will never realize a penny of profit from any sales that --
20   or any billing that goes through my app store."
21        I just -- how do you -- that seems a bit overbroad.
22             DR. BERNHEIM:  Wait, wait, wait.  I'm --
23             THE COURT:  How is Google going to --
24             DR. BERNHEIM:  If I've understood you, the last thing
25   you said sounds like it's not the remedy that we proposed.  So
```

 1   let me just restate --

 2          THE COURT:  Oh.  All right.  But access to -- letting

 3   a third party, tomorrow, have complete access to all the apps

 4   currently available in the Google Play Store is part of your

 5   proposal.

 6          DR. BERNHEIM:  It is.  But all of the revenues go to

 7   Google Play.

 8          THE COURT:  Oh, I missed that part.  All right.  Tell

 9   me about that.

10          DR. BERNHEIM:  This is very important.

11          THE COURT:  Yes.

12          DR. BERNHEIM:  That's what I meant by it only being a

13   storefront.

14      So they get to basically port the Google Play catalog onto

15   their store, list all those apps.  If they've not established a

16   direct relationship with a developer, then this is all just

17   piggybacked on Google Play.  The sale is at Google Play's terms

18   and conditions.  It is just passed through to Google Play.

19   Google Play keeps all of the revenues.  Nothing has happened

20   other than you've mitigated the network externality.

21          THE COURT:  How is that new Play Store entrant going

22   to make money?

23          DR. BERNHEIM:  Ah.  So the new Play Store entrant

24   makes money by signing up developers.  Once it signs up

25   developers, it starts listing things on its own site that are

```
 1    things that are -- it's stocking in its store.

 2         And if the user gets on that side and says, "I'm going to

 3    download this app," and it's an app where the rival store

 4    actually has the relationship with the developer -- okay.  So

 5    they don't need to piggyback on Google Play for that one --

 6    that's their sale.  They get to keep that.  They get to keep

 7    the revenues from that.

 8         So in the meantime, the only disadvantage they are at as a

 9    competitor is -- well, the disadvantage that they would have

10    been at as a competitor from having a smaller catalog, which is

11    the source of the network externality issues, that's removed.

12    And they don't get any benefit from that other than removing,

13    you know, that disadvantage, having a smaller catalog.  Other

14    than that --

15         THE COURT:  And then you're -- and the rival who gets

16    access to this catalog could then approach each developer in

17    the Google Play Store catalog and offer its own deal and say,

18    for example, "I'm opening my new storefront.  I'm going to have

19    access.  All your money and deal terms with Google are going to

20    stay in place unless you sign with me, in which case I'll give

21    you a better fee deal."

22         DR. BERNHEIM:  Exactly.  And that's how competition is

23    supposed to work.

24         THE COURT:  This specifically addresses the network

25    effect problem that we heard about at trial.
```

         1          DR. BERNHEIM:  That's what it's designed to do.  It
         2  mitigates the network --
         3          THE COURT:  And is there a cap on duration?  Is it
         4  six years?
         5          DR. BERNHEIM:  Yes.  It's a six-year cap.
         6          THE COURT:  Doesn't that seem a bit long?
         7          DR. BERNHEIM:  Well, the length of this is a judgment
         8  call, and it's, honestly, not an exact science.  Let me tell
         9  you my reasoning for six years.  But obviously, ultimately,
        10  it's a judgment.
        11          THE COURT:  Well, this -- I want to hear from an
        12  economist why six years is the number.
        13          DR. BERNHEIM:  Exactly.
        14      So I think about it this way:  There are sort of
        15  two stages to entering.  The first is you have to, you know,
        16  make your app store.  And that's not a simple process.  You
        17  heard testimony from Google witnesses about that at trial.
        18  Google -- they testified that Google had to make large
        19  investments in its app store, that its app store has all sorts
        20  of things that they invested in creating.  Things like app
        21  discovery.  This is not a quick process.
        22          So you need to give potential entrants some time to
        23  develop and launch their app stores.  And what I'm thinking, in
        24  my mind, that's okay.  They need a couple of years to do that,
        25  two or three years.

1      Now, after they do that, now you have competing app stores
2  out there that are potentially viable competitors.  They need
3  enough time to establish a base of users and a base of
4  developers that will be robust, and therefore, competitively
5  sustaining; it's viable once this provision expires.

6      And so, in my mind, the appropriate length of time was an
7  additional three years.  The reason three years is that that's
8  is one phone purchase cycle.

9      So if they're trying to compete through -- through
10  preloading, then one phone -- one phone purchase cycle
11  basically gives the competitor a shot at the entire market once
12  they finish developing and launching their app store.

13      So that's the thinking behind the period.  But I readily
14  acknowledge that this is not an exact science.  What we're
15  trying to do is a bit of rough correction for the advantages
16  that Google has but shouldn't have because they're derived from
17  its past conduct.

18          THE COURT:  All right.  I'm just going to call on
19  Dr. Gentzkow.  I don't know how you're dividing the labor.

20          DR. GENTZKOW:  I'll take this one too.

21          THE COURT:  What's the response to that?  Why isn't --
22  how is that unduly burdensome on competition?

23          DR. GENTZKOW:  Yeah.  So let me make several points.
24  The first is to agree with something that you said which is
25  that the network effects that we're talking about here and

 1   those advantages that Google has represent something that

 2   existed before any of the conduct that was at issue in the

 3   case.  And my understanding, what the jury considered at trial,

 4   was conduct starting in 2016.

 5        If we roll back the clock to 2016, at that point, the

 6   Google Play Store already had a very large catalog of apps.  It

 7   already had a large number of users.  Those network effects

 8   were very much in place.  In fact, as early as 2011, the Google

 9   Play Store had a huge catalog -- much larger than its rivals

10   already at that point in time, when I think even plaintiffs'

11   experts have said Google didn't have any market power, monopoly

12   power, at that point in time.

13        So Google was a new entrant that competed successfully.

14   That's where these network effects come from.  So the

15   suggestion that we should try to create a level playing field

16   in the sense of eliminating those, I think is not at all --

17             THE COURT:  But I think my concern is you're

18   overweighting that the jury has found that illegal

19   monopolization conduct, at a minimum, bolstered and protected,

20   built a moat around, so to speak, whatever natural advantages

21   Google had established at that point.

22        I need to address that.  So I'm definitely not going to

23   say just because there were some first-mover advantages and so

24   on that are totally legitimate, there won't be a consequence.

25   But maybe the way to address that is just have a much shorter,

1   you know, like a two-year horizon, rather than a six-year

2   horizon.

3        DR. GENTZKOW:  I understand and I'm not saying there

4   shouldn't be any consequence.  I'm just saying that should

5   certainly not be to eliminate the network effects or try to

6   remove that advantage entirely because it's one that Google won

7   through competition.

8        Second point that I think is really important is that --

9   we were talking about the service fee revenue and how that's

10  going to flow, I think it's crucial that the overwhelming

11  majority of apps on the Play Store don't generate any service

12  fee revenue, or very, very little.

13       A lot of what provides value to users is those apps --

14  which many of them are free, many of them provide little

15  revenue -- that there's going to be very little incentive to

16  compete for, and Google is going to be asked to share all of

17  that intellectual property with its rivals.

18       THE COURT:  What intellectual -- Google is hosting a

19  third-party app.  What's the intellectual property that's being

20  shared?

21       DR. GENTZKOW:  There's an entire infrastructure that

22  they have built to host those apps, to provide for downloads of

23  those apps.

24       THE COURT:  That's all going to be happening over the

25  a rival -- through the a rival store.  It's not going to be

```
 1   using Google's service, is it?

 2          DR. GENTZKOW:  As I understand the proposal, and

 3   Dr. Bernheim can correct me if I've got it wrong, what is

 4   envisioned here is, if I'm a rival app store and a user -- so

 5   first of all, a user can come to the store and now see all

 6   3 million -- or more than 3 million apps that are in Google

 7   Play.

 8      If a user wishes to download one of those apps, Google is

 9   obligated to provide the service of downloading the app for the

10   user, putting that up on their phone, fulfilling that download.

11   So there's intellectual property associated with that.

12          THE COURT:  Yeah, but you're also saying there's cost

13   associated with that.

14          DR. GENTZKOW:  And there's costs to Google associated

15   with that.

16          THE COURT:  Let's pause a minute.

17      So, Dr. Bernheim, let's say -- let's make this a little

18   more concrete.  Let's say there's an app for growing cucumbers

19   that generates zero revenue because five people a year download

20   it.  Google does have some costs, sunk or otherwise, in getting

21   that out to the five cucumber people.

22      How do you account for that?

23          DR. BERNHEIM:  In the following way:

24      Professor Gentzkow is forgetting about the other feature

25   of this remedy that creates very strong incentives, which is
```

1   that this provision expires -- and we can, you know, return to

2   the issue of how long that period should be, but it expires

3   after a certain amount of time.  Now, think about the

4   incentives that creates for the competing app store with

5   respect to all of the smaller apps, all the apps that don't

6   generate revenue.

7        Professor Gentzkow is essentially arguing that what a

8   competing store might do is focus on, say, the top 250 apps.

9   Go to those developers -- that's where most of the revenues

10  are, you try and create relationships with those developers,

11  but you don't bother with any of the others.

12       Okay.  That means, at the end of six years, or however

13  long you want to make it, your app store has 250 apps and you

14  lose access to everything else.  So now you're back in the

15  situation where Google has a catalog with 3 million-plus apps

16  and you, as a competitor, only have this small subset of apps.

17  There's no way you're going to survive at that point.

18       So in order to be viable when this provision expires, a

19  competing app store must be broadly developing relationships

20  with developers and bringing developers online so that they

21  have a robust catalog when the provision expires.

22            THE COURT:  So, in other words -- just to jump in.

23       In other words, they would be needing to put their own

24  work into making sure the cucumber app was available

25  independently on their store.  Particularly, one way to

```
1   mitigate that, in my view -- or ameliorate it, would be a
2   shorter window, two or three years, of allowing the access.
3   That would put a real fire under the a rival to -- if network
4   effects is really the issue, they're going to have to work hard
5   to make sure that those 3 million apps are as freely available,
6   whether they generate money or not, on their own site.
7           DR. BERNHEIM:  I think you're totally right to focus
8   on the length of time as the right policy lever here.  And my
9   only hesitation there is whether two or three years are enough,
10  because we've heard a lot about how hard it is to create a
11  really top-notch app store.
12          THE COURT:  No, I understand.  And there is a
13  balance -- and I want to be clear that Google, as an illegal
14  monopolist, will have to pay some penalties.  So I'm not -- I'm
15  not at all averse to having them bear some costs.  But there is
16  a point where that crosses a line to being unreasonable.
17  Remember that the standard here is what is reasonable.
18          DR. BERNHEIM:  Yes.  But --
19          THE COURT:  And six years of that strikes me as an
20  awfully long time.
21          DR. BERNHEIM:  Also bear in mind, though, that Google
22  is distributing apps for -- as Professor Gentzkow just said,
23  for the vast majority of its catalog currently without deriving
24  directly any revenue from that.
25          So I think that what that's telling us is that the cost of
```

 1    this distribution is not terribly high, particularly compared

 2    with the profits that Google has earned by virtue of its

 3    monopolization.  We had testimony about that at trial.

 4          THE COURT:  Well, it certainly goes to the issue of

 5    not retaining the fruits of illegal conduct.  So if they had to

 6    pay back a little bit, that's perfectly within the realm of

 7    possibility.

 8          DR. BERNHEIM:  That's the argument, yes.

 9          THE COURT:  Okay.  Dr. Gentzkow, what -- seems like a

10    good response.

11          DR. GENTZKOW:  Yes.  I think that -- two points that

12    are crucial.

13        First, Dr. Bernheim and Epic's essential argument at trial

14    was that app stores can successfully enter the market without

15    having all of those other -- that whole catalog of free apps

16    because they can do it by having exclusives on a small number

17    of top games, top apps; and that is what we actually see

18    happening in the market.  There are new entrants already.

19    Microsoft just announced it's going to create an Android app

20    store relatively recently; I think it's opening this summer.

21        There are other app stores around the world which being

22    are created.  In India, the largest games company just said

23    they're introducing --

24          THE COURT:  Can I just jump in?

25        I will ask you to help me.  I don't recall testimony at

1    trial to the effect that Google's network externalities can be

2    overcome by just having a select few number of high-end

3    developers on your store.

4          DR. GENTZKOW:  We could go back to look at the

5    detailed record, but central -- this was in the context, for

6    example, of the Project Hug agreements, which one of the main

7    reasons that -- I think, in Dr. Bernheim's testimony, as I

8    recall, that he objected to those because it prevented those

9    developers from opening app stores with exclusive content or

10   distinctive content, differentiating themselves from the Play

11   Store.  And he made the specific case that that is a viable

12   strategy.  But for the challenged conduct, those app stores

13   would have been able to enter and succeed.

14         THE COURT:  Okay.

15         DR. GENTZKOW:  The second thing that I think is really

16   important to point out here is that what we're talking about,

17   this catalog sharing, has the potential to really harm

18   developers and to harm users, have a lot of unintended

19   consequences that are really hard to foresee.

20         This is a pretty radical reengineering of the market.  I

21   think Dr. Bernheim described it in his statement as decoupling

22   the two sides of the market.

23         So we're changing things dramatically here in ways that

24   could potentially cause more harm than good.  And I just want

25   to flag some potential harms from the developers' point of

1  view.

2       Think about the developer in this.  I'm a developer.  I

3  come along.  I put my app in the Play Store.  That app is now

4  going to appear in any other Android app store, of which there

5  are dozens and dozens, some of them more reputable than others.

6  I have no control over that, as I understand the proposal.

7       And my app could appear next to objectionable content.

8  There are app stores that host pornography and other content

9  that I might not want my app next to.  So my apps are being

10 distributed potentially without my consent, or at least in ways

11 that I might not anticipate.

12      And the other form of harm is this is going to shut down

13 or at least substantially diminish --

14           THE COURT:  Let's pause on that.

15      So the concern is the developer may be in company on an

16 app store the developer dislikes and will have not necessarily

17 any prior knowledge of that and may, I assume, have no

18 possibility to fix that.  Even if they discover they're next to

19 something objectionable that they don't like, they wouldn't

20 necessarily be able to get off that app store.

21           DR. GENTZKOW:  And I think that's --

22           THE COURT:  That's a harm to developers.  Other than

23 hurt feelings, how is that a harm to developers?

24           DR. GENTZKOW:  Because it could undermine their brand.

25 It could undermine the reputation that they have with users if

1    users see that.

2         Let me just say that I think the content that it's next to

3    is just one example.

4         THE COURT:  I'm trying to put a -- something concrete

5    on what the harm is.  I mean, I understand a developer may -- I

6    mean, to take an extreme example, there might be a religiously

7    charged app and somebody does not want it to be next to

8    something they consider to be morally reprehensible.  They

9    certainly would have moral injury, so to speak, from being

10   unhappy that they're in an app store with products that they

11   find incompatible with their viewpoints.

12        But what is the harm?  There's no economic harm, is there?

13        DR. GENTZKOW:  I think the economic harm would come

14   from a user seeing that app in that context and having their

15   evaluation of this religious app that they were thinking of

16   downloading, say.  They see it in a context next to some

17   objectionable content, and they think, "This is a developer

18   that puts their app in this app store.  That's maybe not the

19   app that I want to download."

20        And so demand, from an economic point of view, is reduced

21   by seeing it.  There's also -- just to flag other versions of

22   this, other reasons why a developer might want to limit the set

23   of app stores or apps they're distributed through.  These are

24   all over the world, so there may be legal implications of

25   having my app distributed in other countries that have

```
 1   different legal regimes.  They might be in different currencies
 2   and different languages.  So that's potentially problematic.
 3        And --
 4        THE COURT:  I'm having -- so the premise of
 5   Dr. Bernheim's access point is, this is all going to be
 6   Google's business as usual.  It's just coming from a different
 7   portal.  Until that developer strikes an individual deal with
 8   the -- and I'm sorry.
 9        Until that app store owner strikes an individual deal with
10   a developer, it's all Google.  It's 100 percent Google.
11   Nothing is different except you're walking through, you know, a
12   different door to get into Google.  So these are all -- Google
13   has already solved all these problems.
14        You know, like, an app that might be illegal in Iran, for
15   example, is probably not in the Play Store already or -- I
16   mean -- so I'm just not getting it.  You're going into the
17   Google Store just through a side door, but it's all Google
18   otherwise, until this developer strikes a deal.  And at that
19   point, the developer is going to know exactly what app store
20   they're on because they're negotiating a deal directly with
21   that app store, so there won't be any surprises.
22        So I'm having trouble understanding how this is actually a
23   concrete issue.
24        DR. GENTZKOW:  If I understand the way it's
25   envisioned, just that that app, although it's being -- the
```

1   downloads are being fulfilled by Google and it's being shared

2   out from Google, it's appearing in that other app store And

3   those app stores are going to be distributed in, potentially,

4   places where the Google Play Store is not, and they're going to

5   host content that might appear alongside it.

6       So I think that's --

7           THE COURT:  Wouldn't Google in fulfilling it already

8   have executed all those restrictions?  They would know they

9   can't fulfill an app in a certain country.

10          DR. GENTZKOW:  Well, I think that that -- Google might

11  have apps in the Play Store which it offers in certain

12  countries but not in other countries, potentially.

13      But I think administering this, there needs to be some

14  procedure here then to determine from Google's point of view,

15  are they going to get consent from developers to share their,

16  the developers', intellectual property out through all of these

17  app stores?

18      Are developers going to have an opportunity to opt out of

19  doing that?

20      Is there going to be a system, if a developer does see

21  their app in a context that they don't like, for them to

22  redress that, to ask for it to be removed?

23      So I think -- I think all of those things are going to

24  make it potentially harmful to developers.

25      And the other point --

          THE COURT:  Let's just pause in that for a moment.

     Dr. Bernheim, do you have any response to that?

          DR. BERNHEIM:  Sure.  So let me begin with this last

point about the supposed harms from catalog sharing.

     The thing about distributing all over the world, I just

think is a nonissue for exactly the reason you were raising,

Your Honor.

     Somebody tries to buy the app through another app store

and they're going to get a message back from, you know,

indirectly from Google that says:  "Not available in your

area."

     And I don't -- I don't see how that -- how that ends up

being a problem.

     The issue about no control by developers, you may end up

with your app next to some unsavory content.  I haven't

actually seen any evidence that developers are concerned about

this.  This seems a bit hypothetical to me, so I'm not sure

that there's any real problem there; but if you became

convinced that there was a problem there, I think that there

are alternatives available in terms of tweaking the remedy.

     You know, you could incorporate a developer opt-out

option.  Now, if you did that, there are a couple of things

that would be very important.  One is that the opt-out should

be store specific, rather than broadly opting out of everything

because I -- I'm sorry.

1       The hypothesis here is that there are certain stores out

2   there that may be doing unsavory things, so you don't want the

3   developers' only option to be:  To avoid that one store, I have

4   to opt out of these 10 others.

5           THE COURT:  Well, I was actually -- I'll tip my hat.

6       I was actually thinking more of an opt-in.  What about

7   that?  Every time a store opens -- I'm just talking off the top

8   of my head on this part, but every time a store opens, Google

9   sends a notice saying:  "Would you like to opt in to be

10  available on this other platform?"

11          DR. BERNHEIM:  Right.  There's a literature on opt-in

12  and opt-out in behavioral economics, and what it shows is that

13  there tend to be very strong default effects, the default

14  effect being whatever you establish as the default, you get a

15  lot of people just not changing the default.

16      So if you establish the default to be opt-out so that

17  people have to opt in, you're going to have a much smaller

18  fraction of developers who end up opting in.

19      If, on the other hand -- and some of that is

20  unintentional; right?  It's:  They get the message.  They

21  ignore the message.

22      Doing it the other way around puts more of the onus on

23  this fairly uncommon developer who's bothered by this sort of

24  thing.  It's like the default here is that you're opted in.  If

25  that bothers you, you do have an option to remove.

 1      Let me just add --

 2           THE COURT:  Actually, just to jump in, so as an

 3   economic principle --

 4           DR. BERNHEIM:  Yeah.

 5           THE COURT:  -- opting in is going to be much less

 6   effective in dealing with network effects than opting out.

 7           DR. BERNHEIM:  That's correct.

 8           THE COURT:  Okay.  All right.

 9           DR. BERNHEIM:  Okay.  What I would add in terms of

10   what else would be needed if you go for the opt-out option is

11   the provisions that we talked about a little while ago, about

12   Google not being allowed to write contracts that are

13   conditional on activities as a rival or interactions with a

14   rival.  They would have to apply to opt out, too.  You don't

15   want Google incentivizing opt-out, or that's going to defeat

16   the whole purpose.

17      And we probably would also want that provision that I

18   described earlier that says -- you know, in the contract with

19   the developer, it says:  Nothing in here -- none of the terms

20   in here are conditional on your opt-out decisions.

21           THE COURT:  This is probably beyond your expertise,

22   but how would the opt-out work?

23           DR. BERNHEIM:  So this is getting into a technical

24   question.  I can tell you how I envision it, and then other

25   parties who know more about the technical details are going to

```
 1   have to say what's feasible and what isn't feasible.
 2        But you could imagine that a developer, when first listing
 3   a -- a -- an app on Google Play simply gets a screen on which
 4   there are listed a bunch of stores, and you know, they can
 5   check the ones that they don't want to be listed on.
 6        THE COURT:  Well, we've gotten 3 million installed.
 7   Let's say next week somebody opens -- or week after the
 8   injunction is out, if I did this --
 9        DR. BERNHEIM:  Yeah.
10        THE COURT:  -- 10 stores open up.
11        DR. BERNHEIM:  Right.
12        THE COURT:  Now, is that developer going to get
13   10 opt-out requests for each of those stores?
14        DR. BERNHEIM:  For a new store, we would have to have
15   some process of reaching out to the developers.  It seems like
16   that could be a fairly easily automated process.
17        THE COURT:  Through Google?
18        DR. BERNHEIM:  Through Google.  I'm not sure it would
19   need to happen, you know, literally the moment that a store
20   pops up.  It might be enough to do it once a month, for
21   example.  Developers get a message that says:  During this past
22   month we have the following new stores.  Please indicate
23   whether you want to opt out of any of those.
24        THE COURT:  This is a little bit more detail than we
25   need, but this would be a one-time only opt-out?  What if
```

```
 1   six months later you decide the store is going in a direction
 2   you don't like.
 3           DR. BERNHEIM:  No.  They should be able to get back
 4   into the system and opt out.
 5           THE COURT:  Okay.  So it's -- it's one ask, and then
 6   you can ask yourself if --
 7           DR. BERNHEIM:  I think you probably should be able to,
 8   yes.
 9           THE COURT:  All right.  Dr. Gentzkow?
10           DR. GENTZKOW:  Yeah.  So I think the first thing I
11   would say just on the characterization of economics is I think
12   that same behavioral economics literature that Dr. Bernheim is
13   referencing shows that if the default is opt-in, there are
14   going to be a very large number of developers that are opted in
15   without realizing that, without paying attention to it, without
16   noticing this notification that might come through their
17   e-mail.
18       So I think the problem, from my point of view, with making
19   the default be for every developer on Play to be shared in
20   every Android app store is that those of them that would suffer
21   some harm from that, there are going to be a lot of them that
22   don't recognize that.  I think the opt-in version of that --
23           THE COURT:  But they could -- if it turns out later
24   that someone says, "Hey, this is a bad deal," they can tell
25   Google or tell the store, tell the rival store, "We don't want
```

1  to be here anymore."

2        DR. GENTZKOW:  They could -- they could opt out later.

3        THE COURT:  What's wrong with that?  Look, I have to

4  do something to overcome the network effects.  This seems

5  reasonably tailored to that.  Leaves it up to the developer.

6     So if you're worried about harm, who better to decide the

7  harm than the -- or the risk of harm than the developer itself?

8        DR. GENTZKOW:  Yeah.  And I think that is satisfied by

9  the opt-in version of it that gives developers who would like

10  to participate in this the option to do that.  I also think

11  that, even under that provision, there's harm to the developers

12  because there's going to be less competition in this market.

13     We're going to be reducing the amount of competition.

14  Right now, all of these app stores have incentives to compete

15  for service fee revenue from apps but also for the apps that

16  are going to be part of their catalog they can show to users.

17        THE COURT:  Well, but that's why they'll have a

18  two-year horizon.  So for two years -- two years you get to --

19  to build your base on a Google Play Store that is, at least in

20  part, the fruit of illegal conduct.  After two years, if you

21  haven't locked in those developers, they're gone.

22        DR. GENTZKOW:  And so just --

23        THE COURT:  So you will lose as the rival store.  You

24  will lose if you haven't locked in your own independent deals.

25     So doesn't that address that issue for competition?

1          DR. GENTZKOW:  I don't think it fully addresses that

2     issue because for that -- for the duration of that period of

3     time, there are going to be less incentives to --

4          THE COURT:  Well, of course.  There's a remedial

5     period in the wake of the verdict of monopolization.  That just

6     comes with the territory.

7          Okay.  There's going to be a two-year period when we have

8     to make things right.  It's like my recovering from the

9     shoulder surgery.  I've got six months where I have to do

10    things that I don't want to do and can't do things that I do

11    want to do; but at the end of it, I'm going to be great.  Okay?

12         So this is the two-year -- this is the equivalent.

13         DR. GENTZKOW:  Yeah.

14         THE COURT:  So for two years, maybe there'll be

15    technically reduced competition.  But I just don't see that

16    because those developers -- or those app stores are under a gun

17    literally; that if, at the end of that two-year period, they

18    haven't locked in their deals, Epic is gone, all the top people

19    are gone.  And that's got to be a huge spur to competition.

20         DR. GENTZKOW:  Yeah.  So I think it's -- I think I

21    just -- I just need to highlight the harm that could happen

22    during that period of -- during the term of that provision.

23         THE COURT:  Dr. Bernheim?

24         DR. BERNHEIM:  A couple of things.  First, I just

25    wanted to address the length for one second because you have

1   mentioned two years.

2          THE COURT:  Because -- I know I keep saying two.  It's

3   not a scientific number, but --

4          DR. BERNHEIM:  So on that, one other possibility to

5   consider is to say that there is some period of time which

6   could be a longer period of time, like six years, wherein if an

7   app store launches, it gets two years of catalog sharing after

8   that.  Up to the total limit of six years.

9      What I'm concerned about is if you just say two years,

10  starting from 2024, you're going to get stores launching late

11  in that two-year period, and they're just not going to get much

12  of a benefit.  Whereas, if it is once you launch you get the

13  two years, as long as that total amount of time doesn't exceed

14  six years, that would be a better way to ensure that rivals,

15  once they launch, are going to benefit from this provision.

16     That said --

17         THE COURT:  That would seem, though, to actually maybe

18  be a bit of a restraint on competition.  So, basically, you

19  have six years of restrained competition as opposed to

20  two years.

21     I understand what you're saying about if somebody decides

22  in month 14 or month 18 to launch, they may have only

23  six months of access, but that's their choice.  I mean --

24         DR. BERNHEIM:  Well, it's just not feasible for some

25  of them.  So Amazon may be ready to launch right away.  So

```
 1    Amazon launches right away, 2024.  2026, they lose catalog
 2    access.  It doesn't go beyond the two years.  So what you're
 3    doing for Amazon lasts two years in providing the access and no
 4    more.  You could do it that way.
 5         But if somebody, you know, a new entrant goes "Hey, the
 6    rules of the game have totally changed.  We're not ready to
 7    launch an app store but this is a great market," you don't want
 8    them taking close to two years.  It's going to take time --
 9              THE COURT:  I understand.  But I also don't think
10    someone should have the ability to wait for four years and then
11    say, "Now I want in."  That just seems a little much.
12              DR. BERNHEIM:  This is a matter of adjusting the
13    lengths of time so that they seem reasonable.  So is it
14    four years?  Is it three?  Is it two and two?
15         I'm just suggesting that there's an additional --
16              THE COURT:  Nuance.  I see.
17              DR. BERNHEIM:  -- avenue for you to work with -- this
18    is a judgment call.  This part of it is really not an exact
19    science.  So it's a judgment call, but you have two pieces to
20    work with here rather than one.
21              THE COURT:  Okay.
22              DR. BERNHEIM:  The other thing that I wanted to
23    address is this opt-in/opt-out thing where Professor Gentzkow
24    has made an argument that it should be opt-in rather than
25    opt-out.
```

 1          And I think the thing to keep in mind is that the vast

 2    majority of developers are very unlikely to want to opt out,

 3    given their awareness of it.

 4          Remember how this works.  If they want, they don't have to

 5    sign up with any other app store.  Their relationship could

 6    still be entirely with Google, Google's terms and conditions,

 7    everything with Google; right?  And the only additional thing

 8    that happens is they may get some additional sales that happen

 9    to originate in other stores.

10          That's the only change.

11          So I think the majority -- the vast majority of developers

12    are going to go "This is a great deal.  We're getting free

13    exposure in additional locales.  Why is that bad?"

14          So there may be an occasional developer who says:  We

15    really care about this issue of being sullied by something else

16    on this particular store.

17          Any developer that feels that way is going to have the

18    motivation and the opportunity to opt out.  The ones who care

19    about this can opt out.

20          I don't think that the fact that there may be a small

21    number of those should mean that we use this inertia effect to

22    contrive an outcome that is going to work in Google's favor.

23          THE COURT:  Okay.  Dr. Gentzkow, you're going to

24    describe potential harms to users, and then we'll take a short

25    break after that.  Okay?

```
 1            DR. GENTZKOW:  Yeah.  I think there are potential
 2    harms to users, first of all, from diminished competition
 3    because --
 4            THE COURT:  All right.  For a two-year period or
 5    four-year period, that is just going to happen, but --
 6            DR. GENTZKOW:  For that duration, there would also be
 7    harm to users.
 8            THE COURT:  Why is that a harm to a user, if the
 9    stores multiply?  That makes it a lot easier to find the app
10    you want.
11            DR. GENTZKOW:  Just in a sense that in a two-sided
12    market in economics, one of the reasons why you're competing to
13    attract users is because you want to attract developers -- this
14    is the chicken-and-egg kind of issue that Dr. Bernheim referred
15    to -- and if I no longer need to attract developers, I'm going
16    to compete less for users.
17         There's another part of this proposal which we haven't
18    talked about which Epic has referred to in the proposed
19    injunction as "library porting."  I don't know if that is still
20    part of the proposal; but if it is, that also, I think,
21    involves substantial harm to users that we'd want to discuss.
22            THE COURT:  Okay.  Dr. Bernheim?
23            DR. BERNHEIM:  Your Honor, honestly, I don't
24    understand the diminished competition point.
25            THE COURT:  I'm struggling myself, but I'm not an
```

1   economist.  So help me.  Help me.

2          DR. BERNHEIM:  Right now we don't have meaningful

3   competition.  This remedy is creating a pathway to competition.

4   And on that pathway, all the parties have strong incentives to

5   compete.  The rival app stores have incentives to sign up

6   developers so that they can get revenue streams and so that

7   they're not dead in the water when this provision expires.

8          Google has incentives to continue to sign up developers so

9   that they're not at a disadvantage.

10          THE COURT:  And maybe change their fee structure too.

11          DR. BERNHEIM:  Right.

12          So all of a sudden, you have competition bursting out.  I

13   just don't understand the point about reduced competition.

14          Library porting is a longer issue, and Professor Gentzkow

15   hasn't explained the objections yet, so --

16          THE COURT:  Let's do this.  Let's take a 10-minute --

17   we'll come back at 12:40, and we'll pick it up at the library

18   porting.  Thank you.

19          THE CLERK:  All rise.  Court is in recess.

20              (Recess taken at 12:26 p.m.)

21              (Proceedings resumed at 12:45 p.m.)

22          THE CLERK:  Remain seated and come to order.

23          We're back on the record in Civil 25-671, Epic Games, Inc.

24   v. Google, LLC, and Multi-District Litigation 21-2981, In Re:

25   Google Play Store Antitrust Litigation.

 1          THE COURT:  Okay.  We stopped with the library issue.

 2     Dr. Bernheim?

 3          DR. BERNHEIM:  I'm happy to dive into library porting.

 4          THE COURT:  Yes, please.

 5          DR. BERNHEIM:  I think Professor Gentzkow hadn't

 6     explained the objections to it yet.

 7          THE COURT:  Okay.  Let's set the table then.

 8     Dr. Gentzkow?

 9          DR. GENTZKOW:  So the library porting remedy, I think

10     it's important to describe again what it amounts to, to

11     describe what it amounts to, which is that any app store on my

12     phone can present me with a screen.  And if I click on it, that

13     app store takes over all of the other apps on my phone that

14     were downloaded from Google Play that are in that app store.

15     It now controls their updates and it now gets all of their

16     service fee revenue.

17          So let me highlight three problems with that.

18          The first, I think, just to keep in focus, along with the

19     catalog access remedy, this is part of a really radical

20     restructuring of the market, what Dr. Bernheim has described,

21     turning a two-sided market into a one-sided market is a pretty

22     dramatic restructuring.

23          Second, I think, something we haven't touched on that is

24     really important to keep in focus is that the technology for

25     none of these things exists right now.  Dr. Bernheim alluded to

1    Alleyoop -- we can talk more about that, but it's incorrect in

2    my understanding that there is any technology existing that

3    would not require development of a substantial new product to

4    do this.

5         And third, as I alluded to before the break, I think this

6    has the potential to really harm users.  Think about like what

7    it's setting up is a situation where any app store that gets a

8    user to click on one button can take over the service fee

9    revenue from all of their apps.  That's an enormous economic

10   incentive for app stores to get users to click on a button and,

11   I think, looking out at the economy broadly, situations where

12   firms have huge incentives to get users to click on something

13   tend not to work out very well.

14        There's a huge possibility, coming back to behavioral

15   economics, as Dr. Bernheim was talking about.  We know

16   consumers are not super attentive to those things, and that is

17   going to give the app stores a huge incentive to bombard them

18   with messages trying to get them to do that, to put up a

19   deceptive message that tries to get them to click on it, maybe

20   inadvertently.

21             THE COURT:  I'm having trouble understanding that.

22        What I -- what you seem to be saying is consumers benefit

23   from a monopoly.  I don't agree with that.  Just because

24   there's one source, so you won't be bombarded with competing

25   messages or ads you don't want, that's not -- I don't see that

 1   as consumer harm.

 2        I mean, yes, okay, maybe -- maybe because Google has a

 3   chokehold on the market, which is illegally acquired through

 4   monopolistic conduct, life is less cluttered for users.  But to

 5   me, it seems perfectly fine to say competition will have a lot

 6   more outreach from competing stores.

 7        Why is that a harm?

 8        DR. GENTZKOW:  I think it's a really important

 9   question because I think there's a huge distinction between

10   economic competition and what this would entail.

11        Remember that all of these apps on my phone were

12   discovered and downloaded through another app store that

13   provided all the services to do that.

14        What these other app stores are competing for is not to

15   deliver more value to consumers.  There's not a proposition

16   here of "You will click on this if -- because our app store is

17   better, because we're offering lower prices.  There's -- all we

18   need to do is get you to click on one button."

19        And so while there is some competitive incentive there, I

20   think there's going to be a tremendous likelihood that the

21   competition is not on the margin of giving value, but of

22   tricking consumers, using dark patterns, using deceptive

23   marketing to get them to click on something.

24        THE COURT:  This all seems completely speculative to

25   me.

1      Where is all this coming from?

2      It seems to me that you're just presuming, without any

3  evidence in the record, that this is going to devolve into a

4  sort of dystopian nightmare of competing app stores.

5      Why isn't it equally probable, if you're just speculating,

6  that the opposite will happen, this would be a golden age of

7  consumer choice?

8          DR. GENTZKOW:  I think it's important to say there is,

9  as you said, in the record, no evidence either way on what

10  would happen with this because it's completely outside of

11  anything that was considered at trial.  So there's a risk -- at

12  a minimum, I would say there is a risk that it could create

13  substantial harms of the kind we're talking about.

14          THE COURT:  I just don't see why you say that.  That's

15  what I'm saying.  I don't -- yes.  Okay.  I mean, that is just

16  like saying, there's an equally reasonable probability that it

17  will be the best thing that's ever happened.  So it's a

18  value-neutral choice.

19          DR. GENTZKOW:  Yeah, I think it's -- I think that it

20  is creating something completely new that has never existed

21  before that has the potential to create real harm for users.

22      Think about what happens.  I downloaded the Aptoide App

23  Store.  I click on this button.  I'm a user who creates a lot

24  of revenue.  I play a lot of games.  I have a lot of apps on my

25  phone.  The Aptoide App Store takes over all of those apps and

 1   now -- first of all, as part of this, as I understand it, that
 2   app store has access to a list of all of the apps on my phone.
 3   There are privacy risks associated with that.  I could have a
 4   cancer-related app.  I could have an app that reveals my --
 5                THE COURT:  Well, but Google is already doing that.
 6                DR. GENTZKOW:  Google is already doing?
 7                THE COURT:  Google already knows what all the other
 8   apps are on your phone.  So what difference does it make if
 9   another store does?
10                DR. GENTZKOW:  Because consumers consent to and
11   understand that as part of relationship with Google.  They're
12   not anticipating that all of those apps are --
13                THE COURT:  Consent?  Have you read user -- terms of
14   use that most of these tech companies have?
15                DR. GENTZKOW:  The --
16                THE COURT:  The consent to give away everything in
17   your portfolio, every private information.  I see these
18   constantly.  Every judge in this district does.
19                DR. GENTZKOW:  I understand.
20                THE COURT:  Okay?
21        I mean, if you want to talk about consent, every time you
22   sign up for one of these tech services, you have given away
23   basically everything you consider to be private.  So I don't
24   understand -- so what difference does it make if another app
25   store has equal footing to that same information?  How is that

1    harmful to consumers?

2         DR. GENTZKOW:  The expectation, I think, that a

3    consumer has of their relationship with Google, if you have an

4    Android phone -- I think if we surveyed -- I do not have

5    quantitative evidence on this --

6         THE COURT:  I find this to be unproductively

7    speculative.

8        What is the economic point you're trying to -- I think,

9    you know, you're not in a situation to guess what consumers may

10   or may not think.

11       What is the economic -- what is the economic harm to the

12   users?  None of this so far is an economic harm, which is your

13   area.  What is the economic harm to users?

14        DR. GENTZKOW:  I think the economic harm comes from

15   the consumer's potential to have, as part of this transaction,

16   their privacy compromised, their security compromised,

17   potentially, through --

18        THE COURT:  But you don't know any of that.  You have

19   no data for that.  And you have no data to show that that would

20   be any different from what Google is currently doing.

21        DR. GENTZKOW:  Right.  I recognize that --

22        THE COURT:  Right?  You don't.  So --

23        DR. GENTZKOW:  But I would also just note that, part

24   of the reason why there's no data for that in the record is

25   because this whole proposal of restructuring the market in this

1   way is one that we haven't had evidence about at all.  And so,

2   at the minimum, it has the potential to do a lot more harm than

3   good.  Those risks are --

4          THE COURT:  I just don't see that.  I mean, you keep

5   saying that, but that's just your saying it.  I mean, you have

6   no evidence for that.  And it's not a matter of not having a

7   record.

8        You should know, or you might have known what Google does.

9   You haven't said this would be anything different from what

10  Google does.  That's the only touchpoint that really matters.

11         Is this anything different from what Google already does?

12  And I don't think you're in a position to say one way or the

13  other.

14       Are you?  Maybe you are.

15         DR. GENTZKOW:  I think it is completely different than

16  what Google does because there is a no analogous provision or

17  no analogous technology in the Google Play Store to take over

18  apps that were downloaded through other app stores on the --

19         THE COURT:  That doesn't speak to the privacy and

20  security concerns that you believe may be a problem.

21       I just don't see it.

22         DR. GENTZKOW:  Dr. Bernheim referenced behavioral

23  economics before.  That, I think, is in my area of expertise.

24         Behavioral economics, as we were just talking about, says

25  that consumers are at risk and can frequently make decisions,

```
 1    like clicking on a button, without fully understanding the

 2    consequences of it.

 3        And the consequences -- we're setting something up where

 4    the consequences of a user clicking on a button that they don't

 5    fully understand can be quite serious here.  And we're also

 6    creating a huge economic incentive for app stores to get users

 7    to do something that might not be in those users' interest.

 8        It's not competition in the form of trying to give those

 9    users more value.  It's setting up a specific economic

10    incentive to potentially deceive consumers, to get them to do

11    something which may not be in their own interest; there are

12    many examples of that elsewhere in the economy.  And that is --

13    tends to be something which does not produce the kind of value

14    that we associate with the company.

15            THE COURT:  I find that to be entirely speculative.

16        Look, this is -- you know, this has been Google's strategy

17    in the objections -- the 90 pages of objections -- that there's

18    a terrifying world of chaos and anarchy that's just around the

19    corner if there's competition in the app store market.

20        I don't buy it.  I just don't buy it.  That's just

21    somebody who doesn't want to change their illegal ways.

22            DR. GENTZKOW:  I think it's not --

23            THE COURT:  There is going to be a remedy.  Okay?

24        And if it causes a period of two years or four years or

25    six years of adjustment, that's -- that's the consequence of
```

1  having violated the antitrust laws.  There is going to be --

2  there's going to be -- we're going to be walking on new terrain

3  for a while.  Okay?

4      So that's just -- that's just -- this is the consequence

5  of breaking the antitrust laws.  We have to do things in a

6  different way.  And you must do things in a different way.

7  That is sort of necessarily true after the verdict.

8      So to, you know, jump up and down as Google has been doing

9  and say, "Well, the different way is inevitably going to be a

10  world nobody wants to live in" is just unfounded.  I'm sorry.

11  It's just not -- I mean, it's just equally probable it's going

12  to be, as I said three times already, heaven on earth.

13      So, I mean, competition in our system is presumed to

14  create heaven on earth, much more so than monopolistic conduct,

15  illegal monopolist conduct.

16      But anyway, Dr. Bernheim, is there anything you want to

17  add to some of those points or respond to?

18          DR. BERNHEIM:  Sure.  First of all, I'd like to

19  correct a misstatement about the remedy.

20      It is not true that the remedy allows another app store to

21  take over the revenue for all of the apps that a customer has

22  through Google Play.  It must be that that rival has

23  established relationships, direct relationships with the

24  developers.

25      So it's only a subset of the apps.  It's only the ones for

1    which they have the agreement with the developers.

2         I just want to make sure that that --

3              THE COURT:  I'm with you.  I understand that.

4              DR. BERNHEIM:  Okay.  Now --

5              THE COURT:  Can I just add, what about library

6    porting, specifically?

7              DR. BERNHEIM:  Sorry?

8              THE COURT:  Library porting, specifically.

9              DR. BERNHEIM:  Yes.  Library porting, specifically.

10        Addressing some of the concerns that Professor Gentzkow

11   raised with respect to maybe consumers can be induced to make a

12   bad choice, I honestly don't see the distinction that he's

13   making about this not being the case with other competition.  I

14   mean, this is a risk of competition in all contexts that,

15   you know, some competitors will try and trick people.  It's

16   going to be true here, too.  But we think that competition

17   generally is beneficial.

18        The protection that we have here is that, first of all,

19   the consumer must consent explicitly.  You can't share

20   anything, you can't shift their apps, unless they consent.

21        And second, in contrast to what we talked about a little

22   while ago, this is opt-in rather than opt-out.  Okay?  The

23   consumer has to say, yes, affirmatively, you have my permission

24   to do this.

25        So all the factors that Professor Gentzkow and I were

 1    agreeing about earlier about the importance of default effects

 2    will work to make it so that what he's -- you know, what he's

 3    fearing is not going to be as significant.

 4         THE COURT:  Can I just make sure we're on -- I'm -- I

 5    was thinking -- so unlike developers who may have existing

 6    relationships with the Play Store and they need to opt out

 7    affirmatively, if that's the way I decide to go, in the

 8    marketplace, the consumer makes his or her own personal choice

 9    about how to acquire an app.

10         So if they love the default option of Google Play Store,

11    then they can stick with that for the rest of their purchasing

12    life.  If, for whatever reason, they want to shop around, it's

13    their intentional, knowing, and informed choice to buy an app

14    from another store.  And if it turns out that the store serves

15    a bad product or lies or cheats or steals, they just won't go

16    back to that store.

17         I mean, it seems to me that is actually the ultimate

18    safeguard.  And, you know, I see the other end, the deceptive

19    conduct, a lot in this courtroom, and it has market

20    consequences.  If you get a reputation for being a shady spot,

21    where you download this and your address book is going to get

22    hacked, no one is going to do business with you again.  And you

23    know as well as I do that word gets out like wildfire on the

24    internet, sometimes incorrectly, but -- okay.

25         All right.  So we agree that the opt-in is really a good

1   protection for the consumer.

2          DR. BERNHEIM:  I think it's adequate protection.  We

3   understand that no system is going to be perfect.

4          If -- there are a few other things I would say about

5   library porting, if I may.

6          THE COURT:  Yes.

7          DR. BERNHEIM:  You can think about library porting as

8   consisting of a few different elements.

9          The first element, consider the following scenario:  Let's

10  say we've got my app store and somebody has purchased an app

11  through my app store but it was -- I was piggybacking on Google

12  Play, so it's actually Google Play's app -- okay? -- because I

13  didn't have a relationship with the developer.

14         Now I create a relationship with the developer.  For that

15  app -- and I know that that customer has that app because I'm

16  the one that facilitated the download.  Okay?

17         For that app, the developer should be in a position of

18  going to the user and saying, "Hey, you downloaded it on my

19  site.  I will now give you some points if you'll move the

20  ownership over to my store so that, you know, you're coming out

21  ahead."

22         After all, that -- that store made the investment in

23  helping the consumer discover that app.  So that's the first

24  piece.  Okay.

25         Now you go a little bit beyond that and you say, "Well,

1    what about the other apps?"  You've got -- my app store now has

2    other apps that this customer bought through Google Play,

3    didn't download them through my store, but I do have

4    relationships with the developers.

5          Should I be able to solicit the user to shift other apps

6    over to my store?

7          And, I think, the answer is, of course.  You can do that

8    now; right?  You just go to the user and say, "Just remove the

9    current app from your phone and then re-download it from my

10   website."

11         That is -- that is switching ownership of the app from one

12   app store to another.  They can do that now.  All we're doing

13   is making that process a bit less friction -- less friction in

14   that process.

15              THE COURT:  Okay.

16              DR. BERNHEIM:  Okay?  And then library porting has a

17   third element, which is the user can go to Google Play and say,

18   "Hey, I want you to give the list of the apps that I have on my

19   phone to this other app store so that they can switch the ones

20   that they now, you know, have direct relationships with

21   developers."

22         This is the one I think that Professor Gentzkow's concern

23   is raising the privacy issues because, otherwise, another app

24   store has no way of getting that information.  They're only

25   getting information that, you know, they already know because

1  they were responsible for downloading the app or, you know, the

2  user is affirmatively trying to switch the ownership of some

3  other app.

4      I don't think that the -- that the privacy part of this is

5  a big deal.  But if, you know, you were concerned about the

6  privacy part, you know, that piece of it is a separate -- like

7  I said, library porting has these three pieces, and you can

8  kind of think of them as being somewhat separable.

9          THE COURT:  Well, here's how I think about it:  If

10 you're going to download an app store, you're going to have

11 terms of service, and you're going to have informed,

12 quote/unquote -- because nobody ever reads them -- but informed

13 consent by the user as to what that app store is going to do

14 when it's platformed on your personal device.

15      I think that -- I mean, that is enough to put privacy in

16 the hands of user in a way that they can decide.  So if they

17 read -- there's a new app store and they read it and it says,

18 "Oh, no.  This app store says it's going to canvass every app I

19 have on my phone and send back a message to the home office.  I

20 don't like that," then maybe one point of competition will be,

21 you know, the private app store.

22      That's our -- that's our selling point.  We will never ask

23 you to reveal anything about yourself, and that's why you

24 should shop with us.  And that's how we're going to

25 differentiate ourselves from everybody else.  We don't poke

1    around your phone.

2        So I'm not -- I'm not troubled about the -- it -- the

3    privacy will be in the control of the consumer, as far as I can

4    tell.  I've heard nothing, and it's certainly consistent with

5    every other technology app and device I've seen in 10 years on

6    the bench.

7        So, no.  You may -- you may raise other points which is,

8    is there truly consumer choice?  That's not our issue.  So, you

9    know, that's for a different case, but -- okay.

10       All right.  I would like to -- we still have Google

11   billing to talk about.  We've heard a lot now, Dr. Bernheim, on

12   remedies for past conduct and opening up the market for

13   opportunities to compete fairly, are there any other big-ticket

14   items you want to raise?

15           DR. BERNHEIM:  There were a couple of other items that

16   were focused on opening up the market.  One of them was for a

17   period of time requiring Google Play to distribute competing

18   app stores.  The purpose of this is, again, you don't want to

19   have these remedies -- this portion of the remedy in place for

20   very long.

21       If you are a competing app store, you have two ways of

22   distributing your app.  One is through preloading.  And, you

23   know, we need to give them enough time to go through a preload

24   cycle, but you can also have, you know, downloads independent

25   of preloading.

```
 1        And the thing about downloads is everybody -- all the
 2   Google Android users are kind of trained at this point to go to
 3   Google Play, and it's going to take a while to undo that.
 4        So if you make these apps available on -- the competing
 5   app stores available on Google Play for a limited period of
 6   time, you are offsetting the advantage that Google Play has
 7   acquired by virtue of its past anticompetitive conduct as the
 8   dominant go-to provider of app store distributions.  So that
 9   would be a temporary provision to provide some offset for that
10   advantage.
11        THE COURT:  So how would that work in practice?  Let's
12   say there's -- I'm not agreeing -- there's a six-year remedial
13   period.  An app store opens up in year four, would a year be
14   sufficient, from an economist point of view, to be -- to
15   require Google to make that app store available?
16        DR. BERNHEIM:  Again, it's --
17        THE COURT:  Six months?  I mean, how much time --
18        DR. BERNHEIM:  It's a judgment call, and it's hard to
19   be precise about that.
20        THE COURT:  But from an economist point of view,
21   dealing with network effects, what would the estimate be?  I
22   know it's an estimate, but --
23        DR. BERNHEIM:  You know, this is more of a gut
24   reaction than an estimate.
25        I think, to acquire a robust user base, you're probably
```

```
 1    talking about a couple of years; but this is a gut reaction.  I

 2    can't point to hard evidence on the time frame.  Unfortunately,

 3    this is the part of this -- as I've been saying, the length of

 4    time is the part of this that is not an exact science.

 5              THE COURT:  But it would be the case that, regardless

 6    of the period of time, one year, two years, six months, market

 7    forces would decide whether that store lives or dies.  So if

 8    they're on Google Play for a year or two years, they don't get

 9    any traction, that's -- then they're done.

10              DR. BERNHEIM:  They're done.  That's absolutely right.

11              THE COURT:  Okay.  All right.  Okay.

12         And was there anything else on the app store side?

13              DR. BERNHEIM:  I'm not thinking of anything, as I sit

14    here.

15              THE COURT:  Okay.  Dr. Gentzkow, on the posting of

16    competing stores for a certain period of time on Google's

17    website.

18              DR. GENTZKOW:  Yeah.  So there are a couple of points,

19    that distributing your competitor's products is a form of

20    enforced free riding, which has significant consequences.

21    There's not a technical infrastructure to do this right now, as

22    I understand it; it might require some modifications.

23         But I think the most important point here is potential

24    harm to users coming from the fact that, when a user comes to

25    Google Play, they expect a certain level of security
```

 1    protections.  Google has invested a huge amount over time to do

 2    security screening in the Play Store to make sure that the apps

 3    are safe.

 4         And so a question that I think would need to be answered

 5    with anything like this is:  How do we make sure that any app

 6    stores which are offered on the Play Store meet the same kind

 7    of security standards, privacy standards, and other standards

 8    that people expect when they come to Google Play.  That's a

 9    much, much harder problem trying to look at an app store and

10    figure out:  Is it going to be safe?

11         The Aptoide App Store, the APKPure App Store, one of these

12    app stores that comes to the door and says, "We'd like to be

13    distributed on Google Play," we have to figure out of it's --

14              THE COURT:  Let me jump in for a moment.  You should

15    jump in, too, if I'm wrong, if I'm recollecting incorrectly,

16    but I'm glad you mentioned this.

17         I want to talk about sideloading and friction and security

18    issues too.  So at trial, the testimony about sideloading is

19    Google cannot determine whether a third-party app has been

20    vetted for security purposes if it's just being downloaded on

21    the side.

22         And the answer to -- Google's answer to that was, at least

23    in part, to have 12 to 18 screens, I think it was, telling the

24    user over and over again, "This is all on you.  Proceed at your

25    own risk.  Click 'yes' 12 times to manifest your desire to

1    proceed at your own risk."  So, in other words, they just push

2    it onto the consumer.

3        Why isn't that effectively the answer -- that's too many

4    screens.  We'll talk about that in a minute.  But why isn't

5    that effectively the answer here?

6        Why is it Google's problem?  Google just tells the

7    consumer, "Hey, you're not in our ecosphere anymore so --

8    you're not in our ecosystem anymore, so good luck.  It's all on

9    you."

10       What's wrong with that?

11           DR. GENTZKOW:  I think because there is this

12   expectation that consumers have and a brand that Google has

13   established saying, "Things we distribute through the Play

14   Store are safe and secure," from the --

15           THE COURT:  I understand.  But you're telling

16   consumers, "Now you're walking out of the garden.  Proceed on

17   your own risk."  So you're directly addressing that.

18       You're not subject to, "Whatever we do, you're now on your

19   own.  Are you sure you want to do this?"

20       And they say yes or no.

21       Why isn't that the answer?

22           DR. GENTZKOW:  I think that would be a step in the

23   right direction, but it would not address the concern fully

24   because distributing any app store that comes along, even --

25   even the, you know, side -- apps downloaded through

1    sideloading and other channels, there are some security

2    protections in place and so I think the security risk involved

3    in an app store that is downloaded are substantially higher.

4           THE COURT:  Well, let me be clear:  If Google is going

5    to have the requirement of making other app stores available

6    within Google Play, it's -- I would imagine it's going to be

7    certainly fine for Google Play to make sure that app is okay,

8    the app itself is not a problem.

9        So Google is not being to forced to put up malware under

10   the guise of an app store.  That is not going to happen.  So

11   Google will vet the app store, say, "This looks great,

12   according to all our normal vetting processes.  And, Consumer,

13   if you want to walk through that door, you know, go -- go on on

14   your own.  That's your choice."

15          DR. GENTZKOW:  Yeah --

16          THE COURT:  How is that a harm to anybody?

17          DR. GENTZKOW:  I think it's just, again, app stores

18   pose particular risks because Google cannot inspect, at that

19   time, what are the -- all of the apps on the store and what

20   will be the apps on the store in the future.

21       There's also, just to flag a potential harm here to OEMs,

22   because -- and to carriers who currently compete for

23   pre-installation.  So right now, OEMs benefit from the fact

24   that app stores that are looking for distribution have to

25   compete for their business to try to get preloaded on the

```
 1   phones.  If, for a period of time, all of those app stores can

 2   automatically be distributed through Google Play, they are not

 3   going to be competing at all or at least certainly as hard --

 4         THE COURT:  Yes, for 24 months that will be true and

 5   that's -- that is the consequence of having an illegal

 6   monopoly.

 7     I know we've gone to this -- gone around this pole a

 8   couple of times but, yes, there are going to be some time for

 9   the remedial period when competition may not be perfect from an

10   economist's point of view.  That is the nature of remedial

11   work.

12     You've got to repair the damage, and sometimes that means

13   you're going to have a slightly less-than-ideal situation until

14   equilibrium or market forces are restored.  So I'm not -- I'm

15   not at all concerned about the fact that for a two-year,

16   whatever, six-year period, things may not be ideal from a

17   competitive point of view because we're making them ideal

18   through that time period.  It's just the cost of going forward.

19         DR. GENTZKOW:  I would note, respectively, that

20   six years is very, very different from two years --

21         THE COURT:  Well, I've already said I'm a little

22   worried about six years.  I understand that.

23         DR. GENTZKOW:  And I think my role is just to try to

24   highlight the magnitude of these potential harms.  I understand

25   it's your job to decide.
```

1              THE COURT:  Let me ask you this -- well, actually,

2      let's close out.

3          Any response to that, Dr. Bernheim?

4              DR. BERNHEIM:  Sure.  Professor Gentzkow mentioned

5      several arguments.  One is that the app stores would be free

6      riding on the Google Play Store because they would be

7      distributed on Google Play for free.  Google has emphasized

8      over and over again that the vast majority of the

9      3 million-plus apps on the app store basically free ride

10     because they don't generate any revenue directly for Google

11     Play.

12         So if you've got, you know, 3 million-plus apps that are

13     already free riding and you add a few more stores to that, I

14     just can't imagine that that's a meaningful problem.

15         Technical infrastructure, all we're talking about is

16     putting an app in an app store so that it could be downloaded

17     through the app store.  We're not experts in the technical part

18     of this, but I'm having trouble understanding why it can't

19     simply be downloaded as an app.

20         Most of what Professor Gentzkow said focused on security

21     issues.  And what I'm troubled by in the arguments that he was

22     making is that it sounds like these are objections to

23     competition.  He's saying that there are stores out there that

24     may not be maintaining security standards, and that that is

25     going to be problematic.

 1        Well, yes, if you open up competition, I mean, there are

 2   security -- things you can do to ensure adequate security.  And

 3   I know we're going to get to that.  But, you know, the security

 4   risk that's posed isn't specific to it having been downloaded

 5   through the Google Play Store.

 6        This is a statement about competitors, and the underlying

 7   theme there is that competitors are bad and you shouldn't allow

 8   them because they pose security risk.

 9            THE COURT:  Yes.  I mean, to my ear, it sounds very

10   close to saying, "We need to be a monopoly to protect you."

11            DR. BERNHEIM:  That is right.

12            THE COURT:  And I just don't buy that.

13            DR. GENTZKOW:  Could I respond, Your Honor?

14            THE COURT:  Yes.

15            DR. GENTZKOW:  Just to that point, because I think

16   it's not just competition.  I think part of competition is a

17   firm's ability to build their product and their brand and

18   reputation with consumers.

19        If I have a store, Target, that I have developed, that

20   stands for, in consumers' mind, a whole bunch of things that

21   I've worked to build, that's how I compete.  Then, being forced

22   to put a bunch of stuff in my Target store that is potentially

23   dangerous -- toys for kids with lead paint -- that are not

24   really consistent with my brand, is undermining competition

25   because it makes it harder for consumers to identify with those

1  brands, and it makes it harder for firms to compete in the

2  marketplace.  So I don't think this is just competition.

3      Requiring a competitor to distribute the products of their

4  rivals is a very unusual thing in markets, and it has

5  significant downsides from the perspective of competition.

6      THE COURT:  It may be, but this is a tech market and

7  this is a monopolization of a tech market, and I think there is

8  room for innovation, and remedy calls for some creativity and

9  flexibility, given the circumstances.  So I'm not at all put

10  off by the fact that this may not happen in the distribution of

11  petroleum products or agricultural products.  Different market,

12  different time, different conditions.

13      I wanted to ask -- I don't want to cut anything off you

14  had to add, but there are some -- there were concerns about SIM

15  shipping, feature parity.  That would probably all shake out in

16  the provision that would say "You can't have any agreements

17  that would affect" -- okay.

18      DR. BERNHEIM:  Conditionality, yes.

19      THE COURT:  The last thing I have to say --

20      DR. GENTZKOW:  Can I make one point on that, Your

21  Honor?

22      THE COURT:  Sure.

23      DR. GENTZKOW:  I just want to be clear.  Since -- when

24  we talked about before, I believe what we were talking about

25  was, on all of those provisions, something that's restricted to

1    explicit clauses referencing rivals related to exclusivity --

2         THE COURT:  You make the lawyer in me nervous when you

3    start putting in modifiers like "explicit."

4       I'm not -- you either say it or you don't.  I'm not going

5    to say it has to be a specific word or anything else.  But if

6    the intent is to do it, that's enough.  You can't do that.

7         DR. GENTZKOW:  I just want to make sure that we're

8    clear.  There's some language in the proposed injunction about

9    conduct which even disincentivizes, changes the incentives of

10   firms to do those things.

11        THE COURT:  Oh, okay.  I think I might be able to

12   jump -- I'm not using language like that.  I'm writing the

13   injunction.

14        DR. GENTZKOW:  I just want to make very clear --

15        THE COURT:  I understand what you're saying and I --

16   there are -- I said earlier, I believe at the start, I found

17   some of it to be too open-ended and too vague.

18      Remember, that injunction has to be enforceable in a

19   contempt proceeding, and you can only do that if someone is on

20   clear notice you can't do something.  So that is effectively

21   what I'm going to have to do.

22      This may be -- this is the last point I want to raise.  If

23   you have anything else, I'm happy to hear from both of you on

24   the app store, but, you know, the security thing.  Here is what

25   I'm thinking, and I'm going to just talk out loud here, among

1    friends, for a moment.

2         There is a complicated world of security that, as a

3    district judge, I should not be involved in.  Okay?

4         All I want to be involved in is the friction.  So there

5    was testimony from, I think, Professor Mickens -- if I'm

6    getting his name right -- about you don't need 12 to 18

7    screens.  You can accomplish this in -- I can't remember how

8    many he said -- but a fraction of that.  Okay?

9         I want to focus just on that portion.  That is all, I

10   think, an injunction could do, is -- I can reduce the friction.

11   It's clear.  It's understandable.  It's doable based on the

12   evidence done at trial, and I don't need to wade into all of

13   the tremendously complicated, possibly, security issues that

14   lurk behind that.

15        So it seems to me this is part of the app market because

16   there was evidence at trial that the friction Google put into

17   those multiple screens was intentionally done to discourage

18   sideloading, direct loading, and getting apps from a source

19   other than Google's own Play Store.

20        So are you comfortable with the idea that just reducing --

21   and I also think it ties into one of my main themes, which I

22   hope is becoming clear, trust the consumer to make his or her

23   own choice.  So if you want to shop outside of Google, and you

24   feel like you're giving up a security blanket, that's fine;

25   just do it knowingly and intelligently.  Okay.

1      So I'm perfectly fine having a couple of screens saying

2   you're -- you know, whatever Google is going to say about

3   security and safety.

4      Does that seem okay?

5      I mean, there must be some degree of accommodation between

6   reasonable security and not having it so burdensome.

7   I believe -- I can't remember who it was.  It might have been

8   Ms. Kochikar who said, the number of security screens was

9   abysmal.  I think that was her word, "abysmal."  Her own word.

10  Google's own word.  "This is abysmal.  We're doing it.  This is

11  abysmal."

12     So how do we get to reasonable from abysmal?

13        DR. BERNHEIM:  You know, this is venturing into an

14  area where economic expertise is speaking less clearly to the

15  issue because this is about security.  You know, I'm not a

16  security expert, and I suspect the other economists are kind of

17  in the same boat.

18     You know, reducing the number of screens, making simple

19  warnings, simple one-time decision, I think the remedy has some

20  language that goes in that direction.

21     That seems reasonable to me.  The economic principle that

22  we introduced concerning security, if I could add to that, is

23  basically a parity provision; that if you want to avoid

24  micromanaging everything Google does with respect to security,

25  then one possibility is to say:  Look, we're not concerned with

1  the level of what you're doing on security.  We're concerned

2  about it being uneven.  We're concerned about you doing one

3  thing for Google Play and another thing for your rivals.

4      And if you have some sort of a parity provision that says

5  the same security standards have to apply to both, then you

6  can't have that manipulation, which is what we've seen --

7          THE COURT:  Let me just jump in.

8      The way I've been thinking about this is -- I think it's

9  the same concept, but maybe slightly different --

10 nondiscriminatory; in other words, that is the phrase I'm

11 using, but I can't just say that.  That's like -- there has to

12 be something in it.

13     So from an economist's point of view, how would you

14 phrase -- it's like a rule, but it can't be so vague that it's

15 subject to a misunderstanding.

16     Is there some way an economist would put that?

17         DR. BERNHEIM:  I'm not sure I have an easy solution to

18 that.

19         THE COURT:  That might require another proceeding.

20 Okay.

21     Okay.  Doctor?

22         DR. GENTZKOW:  So I would say, first of all, I

23 agree -- I think I agree that reducing that 15 screens seems

24 appropriate.  The state settlement already includes a

25 provision -- which I understand that is not agreed to, but that

1    I think is a good model for what would work here.

2         Under the state settlement, Google has already agreed to

3    reduce the -- that friction down, the key parts of that, this

4    unknown source of setting and warnings and all this stuff, down

5    to one screen.

6         There's just a single screen.  It has a, you know,

7    condensed message warning the user, "Click once, you've

8    authorized the source to download things."  So I think just to

9    suggest -- I think that achieves the goal.

10        Second --

11             THE COURT:  Can I just -- now, your understanding is

12   that's totally divorced from any actual tech issues.

13        In other words, what you're proposing is there will be one

14   screen saying whatever it is:  You're leaving the Google

15   ecosystem.  You may be subject to problems.  Are you okay with

16   this?

17        I'm paraphrasing.

18             DR. GENTZKOW:  Yeah.

19             THE COURT:  And then after that, they say yes, and

20   they're done, and there's no other friction from Google.

21             DR. GENTZKOW:  That is what is in the state

22   settlement.  I just want to be clear.  There are some -- there

23   are some other things like, for example, if you're using a

24   browser, whenever you download something from a browser, there

25   is usually another wanting that just says:  Are you sure you

```
 1    want to download this thing?
 2            THE COURT:  Oh, sure.  Firefox may have its own thing.
 3    That's not Google.  I'm just talking about Google.
 4            DR. GENTZKOW:  Chrome also has those things --
 5            THE COURT:  Okay.  Chrome.  But that's -- yeah.  All
 6    right.
 7            DR. GENTZKOW:  Yeah.
 8        So, but I think, essentially, that already has reduced
 9    that friction to one screen, and I think that's a good model.
10        I want to respond really strongly to what Dr. Bernheim
11    said about parity, because I think a fundamental issue here is
12    that apps downloaded from these different sources are not
13    equal.  The risks associated with an app downloaded from Play
14    and the risk associated with an app -- you know, we're talking
15    about things that extend out to, like, my mother gets a text
16    message that looks like it's from FedEx, and it has a link that
17    says, "Hey, click here to download on app to track your
18    package."  And she clicks on it, and an app is installed and it
19    can see her financial information, steal -- so that's what
20    we're talking about.
21        I don't think parity is appropriate in thinking about:  We
22    want to have user choice, but what is the information that
23    needs to be provided to the user?
24        It had better be different if Google knows that you
25    clicked a link in a text message and you're coming to a source
```

1    that looks like that, versus --

2         THE COURT:  Well, let me -- my goal is to avoid

3    getting into any of that.

4         I just want to -- the testimony at trial was it's the

5    friction that causes a problem.  I don't -- there wasn't

6    testimony at trial that I recall saying sideloading is causing

7    people to lose all their bank account money because it's

8    nothing but, you know, overseas malware.

9         It was really just Google is putting all these screens in

10   to actively discourage people from shopping from another site.

11   That's the antitrust issue.  That's what I want to address.

12        I don't see actually any reason to get into the actual,

13   you know, nondiscriminatory, non- -- you know, parity.  I

14   just -- I don't -- I don't see that.  I mean, I don't see how

15   not addressing that would actually adversely affect the remedy.

16        In other words, why, from an antitrust perspective, would

17   I have to address that?  I don't see a reason to.  As long as

18   the friction point is eliminated, a consumer knowingly and

19   intelligently volunteers to download, isn't that the end of the

20   issue from an antitrust point of view?

21        DR. BERNHEIM:  Well, I think you have to be, again,

22   worried about conduct that is not the same as the conduct that

23   we observed but conduct that Google could switch to that

24   accomplishes the same end.

25        If Google is in a position to start declaring, you know,

 1  all competing stores' security risks, then, you know, there's a

 2  problem with that.

 3            DR. GENTZKOW:  If I could say --

 4            THE COURT:  In other words, putting the warning screen

 5  up on every store to kind of scare people at the get-go?

 6            DR. BERNHEIM:  Yeah.  So when Professor Gentzkow is

 7  making the point that, in an ideal world, you would use the

 8  information that some app stores are presenting greater risks

 9  than others and you'd fine-tune that, and that you need to be

10  able to discriminate to do that.

11       And that is true about the ideal world, but I think what

12  we learned through the trial is that Google abuses the

13  discretion to do that when they have the ability to

14  discriminate.  They do lots of things that make it difficult

15  for competitors.  They don't make that decision based on what's

16  ideal for customers.  They make that decision based on what

17  delivers the greatest profits to Google, what enlarges Google's

18  slice of the pie; and that is what we have to worry about.

19            THE COURT:  Well, I -- I agree to -- on the concept.

20  But what I'm suggesting is the reasonable accommodation is

21  instead of the abysmal -- quote/unquote, abysmal 12- or

22  16-screen forced march, you have one screen and one screen

23  only.

24       Isn't that -- that seems reasonable from an antitrust

25  perspective.  I think it is perfectly fine for Google to say:

1   Just be aware, this is not our product.  Don't call me when

2   something bad happens.  It's not our thing.  Please indicate

3   affirmatively you understand this by clicking "yes," and then

4   have a great time in the app store.

5       I mean, what's wrong with that?

6           DR. BERNHEIM:  Well, deciding how far to go on this is

7   certainly a judgment call and --

8           THE COURT:  But I'm just saying, from an antitrust,

9   anticompetitive conduct, that seems to solve the issue of the

10  friction point.

11          DR. BERNHEIM:  Narrowly construed, yes.

12          THE COURT:  All right.

13          DR. BERNHEIM:  The concern would be, more generally,

14  the friction point is about manipulating security issues to

15  discriminate against competitors.  Using security issues as a

16  smoke screen for disadvantaging competitors.  And that would be

17  the logic of having a nondiscrimination requirement here, is

18  you can do whatever you want with security but you can't do it

19  in a way that disadvantages the competitors.

20          THE COURT:  Okay.  Okay.  To my ear, that wraps up app

21  billing store.

22          DR. GENTZKOW:  Could I make one --

23          THE COURT:  Yeah, closing point.

24          DR. GENTZKOW:  -- point on that, Your Honor?

25          THE COURT:  Yes, please.

```
 1              DR. GENTZKOW:  Is that okay?

 2              THE COURT:  Yeah.

 3              DR. GENTZKOW:  I would --

 4              THE COURT:  Or app distribution store, not app

 5    billing.

 6              DR. GENTZKOW:  Yeah, if I could, just on the security

 7    stuff.

 8              THE COURT:  Yes.  Yep.  Go ahead.

 9              DR. GENTZKOW:  All right.  So I think, number one, I

10    just want to flag that tying Google's hands on dealing with

11    security in order to deal with hypothetical future

12    anticompetitive new things they might dream up to do is a

13    really risky proposition.

14              THE COURT:  I agree with that, and I don't intend to

15    do it.  I'm just going to say --

16              DR. GENTZKOW:  That's great --

17              THE COURT:  -- you have to reduce --

18              DR. GENTZKOW:  I understood --

19              THE COURT:  However, let me just be clear, we're

20    reducing the abysmal experience designed to discourage people

21    from not using Google Play Store; that was anticompetitive.

22    But if it turns out that the one screen becomes a Trojan horse,

23    the injunction is going to have a period of time when people

24    come back to me.

25              DR. GENTZKOW:  Yeah.
```

```
 1              THE COURT:  So that's --

 2              DR. GENTZKOW:  Yeah, I think that's appropriate.

 3         And so, just two other small points.

 4         One, I think it's important -- you mentioned consumer

 5    choice -- just that Google have the discretion to base those

 6    warnings on signals that they have about the security risks of

 7    different kinds of apps.  And there are cases where Google has

 8    information that a particular app -- like in the example I

 9    described -- has actual specific red flags associated with it

10    that make it a higher risk, and having some discretion to

11    reasonably deal with those kinds of cases, I think, is

12    important.

13         And then last, I would just note that that example about

14    the app sideloaded on a phone that is stealing financial

15    information was not a hypothetical example.  There is something

16    called the FluBot virus that did that, and was distributed --

17              THE COURT:  No, I -- I'm quite aware of that.  But

18    that can happen on a Google phone with no third party involved.

19    If your mother or my mother pushes that thing, it's going to

20    happen.  It doesn't matter whether it's in an app store or not.

21              DR. GENTZKOW:  We're just trying to make it less

22    likely to happen.

23              THE COURT:  Yeah.  So, I mean, everybody is equally

24    vulnerable, is my point.

25              DR. GENTZKOW:  We don't want to make them more
```

```
 1   vulnerable.
 2           THE COURT:  We're not.  They're equally vulnerable,
 3   but anyway.
 4       Okay.  Can we move to Google billing?  Is that going to be
 5   a different team?
 6       Okay.
 7           DR. TADELIS:  Same team, different name.  Steven
 8   Tadelis.
 9           THE COURT:  Tadelis.
10           DR. TADELIS:  Thank you, Your Honor.
11           THE COURT:  Of course.  All right.  This one may be a
12   little more straightforward, I don't know, but --
13           DR. TADELIS:  Straightforward, I would probably say.
14           THE COURT:  So I think we have the benefit now of how
15   concrete and specific I would like the discussion to be, so
16   I'll let you take it from there.
17           DR. TADELIS:  I will be very concrete and specific.
18       So Remedy Number 1, the jury found an illegal tie.  The
19   remedy should be to sever the tie.  And when I use the term
20   "sever the tie," I mean, it in two ways.
21       First, the physical severing, so, no, you don't need to
22   use Google Play Billing in any form or shape.
23       And two, I mean a lack of an economic tie that Google
24   could do through strategically engineering prices in a way that
25   would basically discourage the use of alternative billing
```

1    solutions.

2        The second, the jury found that Google willingly engaged

3    in anticompetitive conduct to establish or maintain monopoly in

4    billing.  As part of the remedy there, no anti-steering -- so

5    to allow the developers to steer users to use different ways of

6    paying.

7        And then, finally, making sure that through the -- all the

8    other levers of power that Google has, not to undermine these

9    two remedies.  Simple.

10        THE COURT:  Well, okay, let -- we need to unpack all

11    that.

12        So for severing the tie, the proposition would be a

13    developer is perfectly free to bill for in-app services using

14    any system they want -- their own, Stripe -- you know,

15    whoever -- or Google.

16        DR. TADELIS:  Correct.

17        THE COURT:  Okay.  So that's Proposition 1.

18        The developers are perfectly free to tell customers who

19    may be paying through Google Pay, "why don't you try us?  We'll

20    give you frequent-flyer points or whatever.  It's going to be a

21    lower -- lower price" -- whatever they work out.

22        Okay.  That's fine.

23        Here is the issue that has been bothering me since trial.

24    So there was an abundance of testimony that, even under this

25    user-choice proposal, Google was still asking developers to pay

 1  something like 27 percent.  It was about a 3 percent discount,

 2  which turned out to be nothing, because if you don't use Google

 3  Play, you've got to pay somebody, and that usually paid them 3

 4  or 4 percent.  So you ended up still paying 30 percent, it's

 5  just that only 27 percent went to Google as opposed to the full

 6  30.

 7       So what do you do about that 27 percent?

 8           DR. TADELIS:  So it was 26, but who's counting.

 9           THE COURT:  Yeah.  All right.  Okay.  You are, you're

10  the economist.

11           DR. TADELIS:  So I have no beef with Google charging

12  26 percent or 16 percent or 73 percent for whatever they want

13  to charge on distribution.

14       My beef is with the delta between charging without Google

15  Play Billing and charging with Google Play Billing.

16       In other words, the added fee to use Google Play Billing,

17  on top of all the other benefits they claim developers are

18  getting, should be no less than the cost for Google to deliver

19  those services; and currently that 4 percent is less than their

20  cost.

21       So going exactly to your concern, if I'm a developer and

22  now Google is offering me user-choice billing -- which,

23  importantly, does not sever the tie physically; user-choice

24  billing says you could use something else in addition to Google

25  Play Billing.

1          THE COURT:  I'm with you on that.  Let's assume --

2          DR. TADELIS:  But let's assume there is --

3          THE COURT:  It's all gone.

4          DR. TADELIS:  -- a tie but they just --

5          THE COURT:  It's a new day.  A developer can do

6     anything he or she wants.

7          DR. TADELIS:  Perfect.

8       And then Google says, "If you want to use our system

9     completely, including Google Play Billing, you'll pay us, say,

10    30 percent.  If you don't want to use Google Play Billing,

11    you're going to pay us 26 percent" -- which means that to not

12    use Google Play Billing, it would only be beneficial for a

13    developer if they could find a payment solution product that is

14    less than 4 percent.

15      That doesn't exist today because the costs of a billing

16    solution product are higher than 4 percent.

17         THE COURT:  Well, then how would you formulate what

18    Google could do?

19         DR. TADELIS:  So from testimony I gave at trial and

20    documents that Google produced, Google's -- Google currently

21    believes that their average cost is about 6 percent.  So that

22    would be a floor on what they could charge for the added use of

23    Google Play Billing.

24      In the remedy, there's actually a call for Google to

25    release that number to the -- I forget the name of the

```
 1    committee.  It's not the audit committee --

 2              THE COURT:  Yeah.  I should jump in.

 3         We're not doing committees.

 4              DR. TADELIS:  Okay.

 5              THE COURT:  If there's an issue with enforcement, you

 6    will turn to the Court, but I'm not --

 7              DR. TADELIS:  Then Google will --

 8              THE COURT:  We're not -- that's -- that's way too much

 9    for this case.

10         But I'm not sure I'm understanding.  So here's what I'm

11    thinking:  A developer decides to use her own billing system.

12    It's a completely self-contained ecosystem.  You buy through my

13    app, you pay me through my billing system.  Okay.  Nothing to

14    do with Google other than being on the Google --

15              DR. TADELIS:  It was like a different app store?

16              THE COURT:  Well, no, they're -- they're on a Google

17    app store --

18              DR. TADELIS:  Oh, they're on a Google app store.

19              THE COURT:  -- but they're going to do all of their

20    business with you, financially, as a user, through their own

21    in-app billing service that doesn't use Google Pay.

22         So you're saying that Google should be able to charge that

23    developer 6 percent of that transaction?

24              DR. TADELIS:  No.  I'm saying that Google would not be

25    charging them for billing.  I'm not preventing Google from
```

```
 1    charging for the fact that they have been discovered through
 2    Google Play -- the Google Play Store, et cetera.
 3        If Google is providing -- let's make it simple -- two
 4    different services, distribute through Google Play, don't use
 5    Google Play Billing, there's going to be a fee for that.
 6        THE COURT:  And how does this stop -- how is that fee
 7    to be set?
 8        DR. TADELIS:  Google decides what that fee is.
 9        THE COURT:  Okay.  And the idea is that if Google sets
10    it too high, the developer will just opt out?
11        DR. TADELIS:  The developer might choose not to
12    distribute through Google Play.
13        THE COURT:  Okay.  So I don't have to be involved in
14    regulating that fee at all?
15        DR. TADELIS:  Absolutely not.
16        THE COURT:  Okay.  So in other words, your proposal is
17    just -- just -- just decouple billing --
18        DR. TADELIS:  It's decoupling --
19        THE COURT:  -- from Google billing.
20        DR. TADELIS:  -- and making sure that the extra cost
21    to use Google Play Billing is no less -- the extra price, or
22    fee, to use Google Play Billing is no less than the cost for
23    Google to provide that product.
24        THE COURT:  Why do I have to give antitrust attention
25    to that?
```

 1        If the developer can do whatever he or she wants, what

 2   difference does it make?

 3             DR. TADELIS:  Could I direct you to one of the slides

 4   that I actually used in testimony, Your Honor?

 5             THE COURT:  I don't have that here.

 6             DR. TADELIS:  Oh, no.  It's in the -- oh, sorry.

 7                       (Pause in proceedings.)

 8             THE COURT:  Okay.

 9             DR. TADELIS:  This is Slide Number 8 --

10             THE COURT:  Yes.

11             DR. TADELIS:  -- in my slide deck.

12        This is a slide that I used in my testimony, and it --

13   it's a slide that comes from Google.  I have added on what you

14   see here in red.

15        And what Google did in this slide, as part of their

16   internal deliberations, they called it game theorizing price

17   level.  "Game theory" is a fancy word for a set of tools to

18   analyze strategic interactions.  So this is basically

19   strategically choosing a price level.

20        They start by saying:  Some large developers would take

21   advantage of billing optionality no matter the price.

22        What they mean by that is, they'll say, "You can use

23   Google Play Billing.  We're charging you 30 percent.  If you

24   don't use Google Play Billing, we're still charging you

25   30 percent."

 1    They might still choose to do that.  That's that initial

 2  jump you see at the very left where it goes, like, from zero to

 3  the core strategic asset.  And that's trying to describe those

 4  developers who would choose their own billing system regardless

 5  of the fee.

 6    Now, what they next do is show that you have to give

 7  enough of a discount -- that's what you call on the billing

 8  optionality discount on top -- to reach that zone where you see

 9  the blue line curving up; that's when developers would start

10  integrating alternative billing solutions.

11    So what's the idea there?

12    So let's take the current user choice billing that we

13  know.  Google says:  If you're not using Google Play Billing,

14  we're only going to charge you 26 percent.  Use whatever you

15  want.

16    Now, of course, if any billing solution is going to cost

17  me more than 4 percent, I, as a developer, would make a mistake

18  by choosing that, so I'll just stick with Google Play Billing.

19  That's why that blueline is not budging when you go from 30 to

20  26.

21    It's only when you go to something, and again, if this

22  graph is done to scale, which I'm assuming here, you'd have to

23  go down to something like 22, 21 percent to start getting that

24  pickup -- which makes sense because if you would actually turn

25  to what is Slide 3 in the deck that I just gave you, you see