# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION

MDL Case No.  21-md-02981-JD
Member Case No. 20-cv-05671-JD

**ORDER RE UCL CLAIM AND
INJUNCTIVE RELIEF**

This order gives the reasons for the permanent injunction to be entered in *Epic Games, Inc. v. Google LLC et al.*, Member Case No. 20-cv-05671-JD.  It also resolves Epic's equitable claims against Google under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

## BACKGROUND

In the order denying Google's post-verdict motion for judgment as a matter of law or a new trial, Dkt. No. 984 (JMOL Order),[1] the Court discussed in detail the jury's unanimous verdict against Google and the trial evidence that supported the verdict.  In summary, after testimony by forty-five witnesses about Google's Play Store practices presented over fifteen days of trial, the jury found in favor of Epic on: (1) monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; and (3) tying under Section 1 of the Sherman Act and the Cartwright Act.  *Id.* at 3-4; Dkt. No. 866 (Jury Verdict).  Epic's

---

[1] Unless otherwise noted, all docket number references are to the ECF docket for *In re Google Play Store Antitrust Litigation*, Case No. 21-md-02981-JD.

equitable claim under the California Unfair Competition Law is for the Court to decide.[2]

Epic seeks an injunction as the remedy on the jury verdict. To help determine an appropriate injunction, the Court held extensive post-verdict hearings on what an injunction should seek to accomplish, and where it should refrain from acting. Epic kicked off the proceedings by filing a proposed injunction. Dkt. No. 952. Google responded with more than 90 pages of objections. Dkt. No. 958. To ensure a fully developed record on the remedy, the Court invited each side's experts to present their views in concurrent expert evidentiary hearings. One hearing involved testimony by four economists, two for each side of the case. Dkt. No. 978. A second hearing involved technology experts sponsored by Epic, and three Google engineers. Dkt. No. 1001. In each hearing, the witnesses were directed to focus their comments on issues specific to the jury verdict and the facts in evidence at trial. *See* Dkt. Nos. 977, 1000. In conjunction with the hearings, the parties filed statements by the economists, Dkt. Nos. 952, 957, and the technology experts and engineers. Dkt. Nos. 981, 985. The Federal Trade Commission filed an amicus brief, which the Court accepted. Case No. 20-cv-05671-JD, Dkt. No. 686-1. After the evidentiary hearings concluded, the Court heard closing arguments from the parties on the issue of the remedy. Dkt. No. 1000 at 95:18-155:1.

Overall, each side had a virtually unlimited opportunity to present its views about the scope and content of an injunction. Google's request for even more discussion is not well taken. *See*, *e.g.*, Dkt. No. 958 at 11. Google took full advantage of the Court's open-ended procedures, as the voluminous post-verdict docket entries readily attest. As the Court noted in the JMOL Order, it bears mention that Google has, on several occasions, fired a blunderbuss of comments and complaints that are underdeveloped and consequently unhelpful in deciding the issues. *See* Dkt. No. 984 at 4. More of the same is not warranted at this closing stage of the case.

## DISCUSSION

## I.     THE UCL CLAIM

Before turning to the injunction, Epic's final claim under the California Unfair

---

[2] The Court is advised that the parties have resolved Google's breach of contract counterclaim and there are no remaining counterclaims or defenses for resolution. Dkt. No. 1002.

United States District Court
Northern District of California

Competition Law (UCL) must be resolved.  The UCL prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Epic has alleged that Google violated the unlawful and unfair prongs of the UCL.  Dkt. No. 378 ¶¶ 295-96.  These are equitable claims entrusted to the Court's sound discretion.  *See Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cnty.*, 9 Cal. 5th 279, 292 (2020) ("the causes of action established by the UCL . . . are equitable in nature and are properly tried by the court rather than a jury").

The disposition of the unlawful prong is straightforward.  The jury concluded that Google's Play Store conduct violated the Sherman Act and Cartwright Act.  *See* Dkt. No. 866.  As Google has rightly said, this means that Google necessarily violated the unlawful prong of the UCL.  *See* Dkt. No. 1000 at 152:2-21; *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.") (citation omitted).

The unfair prong is more nuanced because it is "intentionally framed in . . . broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive."  *Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 1000 (9th Cir. 2023)* (internal quotations and citations omitted).  California state courts have formulated two tests relevant here.  To support "any finding of unfairness to competitors," the Court decides whether the defendant's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech*, 20 Cal. 4th at 186-87.  To support a finding of unfairness to consumers, the Court balances "the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Progressive W. Ins. Co. v. Yolo Cnty. Superior Court*, 135 Cal. App. 4th 263, 285-86 (2005) (citation omitted).  The inquiries are not "mutually exclusive" and will have some

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

1    substantive overlap.  *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007)

2    (citing *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144 (2000)).[3]

3         Whether Epic is characterized as a competitor (such as the provider of a competing in-app

4    billing service) or a customer (such as a developer and distributor of Android apps, including for a

5    time on the Google Play Store), the unfairness prong has been violated.  The jury found that

6    Google's conduct violated the antitrust laws and substantially harmed competition in the relevant

7    markets, and directly injured Epic.  The jury rejected Google's proffered procompetitive

8    justifications for its conduct.  Consequently, the Court concludes that Epic has prevailed on the

9    UCL claim against Google under the unlawful and unfair prongs.  Judgment will be entered in

10   favor of Epic.

**II.    THE INJUNCTION**

  **A.    Legal Standards**

    **1.    The Federal Antitrust Laws**

14        An injunction on the federal antitrust verdict is governed by Section 16 of the Clayton Act,

15   15 U.S.C. § 26.  Under Section 16, "[a]ny person, firm, corporation, or association" is entitled to

16   "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws, . . . ,

17   when and under the same conditions and principles as injunctive relief against threatened conduct

18   that will cause loss or damage is granted by courts of equity."  To warrant an injunction, a plaintiff

19   "need only demonstrate a significant threat of injury from an impending violation of the antitrust

20   laws or from a contemporary violation likely to continue or recur."  *Zenith Radio Corp. v.*

21   *Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).  Injunctive relief is "wholly proper" when

22   there is "nothing indicating that" a clear violation of the antitrust laws that has already been found

---

[3] In *Lozano*, our circuit acknowledged that the question of "how to define 'unfair'" in the consumer action context after *Cel-Tech*" has not been completely settled by the California courts.  504 F.3d at 736 (emphasis omitted).  More recently, our circuit stated that "[u]nder the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law,' or violates the policy or spirit of an antitrust law,'; (2) whether the practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,'; or (3) whether the practice's impact on the victim outweighs 'the reasons, justifications and motives of the alleged wrongdoer.'"  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020) (internal citations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   "had terminated or that the threat to [plaintiff] inherent in the conduct would cease in the

2   foreseeable future." *Id.* at 131-32.

3           The plain words of Section 16 must be read with the purpose of the antitrust laws in mind.

4   "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free

5   enterprise.  They are as important to the preservation of economic freedom and our free-enterprise

6   system as the Bill of Rights is to the protection of our fundamental personal freedoms."  *United*

7   *States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also North Carolina State Bd. of*

8   *Dental Examiners v. F.T.C.*, 574 U.S. 494, 502 (2015) ("Federal antitrust law is a central

9   safeguard for the Nation's free market structures.") (citing *Topco*, 405 U.S. at 610).  The question

10  has been asked whether our tech-based economy has outgrown the federal antitrust laws, which

11  date back to 1890 when the Sherman Act was signed into law.  In the Court's view, it has not.

12  The broad provisions of the Sherman Act provide all of the tools needed to address the issues

13  presented in this case, as they have for over a century in a constantly changing national economy.

14  Google has not suggested otherwise.

15          The tools available for a remedy are powerful.  As the Supreme Court has emphasized,

16  injunctive relief under Section 16 is meant to restore economic freedom in the relevant markets

17  and break the shackles of anticompetitive conduct.  "In exercising its equitable jurisdiction, a

18  federal court has broad power to restrain acts which are of the same type or class as unlawful acts

19  which the court has found to have been committed or whose commission in the future unless

20  enjoined, may fairly be anticipated from the defendant's conduct in the past."  *Zenith*, 395 U.S. at

21  132 (cleaned up); *see also United States v. Loew's, Inc.*, 371 U.S. 38, 52 (1962) (relief should be

22  "adequate to prevent the recurrence of the illegality which brought on the given litigation.").  "The

23  relief in an antitrust case must be effective to redress the violations and to restore competition.

24  The District Court is clothed with large discretion to fit the decree to the special needs of the

25  individual case."  *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quotations and

26  citations omitted).  "Antitrust relief should unfetter a market from anticompetitive conduct and

27  'pry open to competition a market that has been closed by defendants' illegal restraints.'"  *Id.* at

28  577-78 (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir.

2001) ("remedies decree in an antitrust case must seek to unfetter a market from anticompetitive conduct, to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.") (quotations and citations omitted).

To these ends, the Court is charged with making "a reasonable judgment on the means needed to restore and encourage the competition adversely affected by" the anticompetitive conduct. *Ford Motor*, 405 U.S. at 578; *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (district court is "empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences."). A remedy is not limited simply to prohibiting conduct found to be anticompetitive. Rather, the Court has discretion to fashion a remedy directed to the effect of the anticompetitive conduct. *See Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1209 (D.C. Cir. 2004). As our circuit has concluded, "[i]f the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 486 (9th Cir. 2021) (quotations and citation omitted).[4]

### 2. UCL

The UCL provides an independent state-law basis for an injunction. "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. For Google's UCL violations, the Court may make "such orders . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." *Id*. To be sure, "[e]ven where the UCL authorizes injunctive relief pursuant to state law, a federal court must also ensure that the

---

[4] The California Cartwright Act also provides for an antitrust injunction. *See* Cal. Bus. & Prof. Code Section 16750(a). The parties have treated Epic's Cartwright Act claims as being coterminous with the Sherman Act claims for purposes of both liability and remedy, and so no additional discussion of the Cartwright Act is needed here.

1  relief comports with 'the traditional principles governing equitable remedies in federal courts.' To

2  issue an injunction, the court must find: '(1) that [the plaintiff] has suffered an irreparable injury;

3  (2) that remedies available at law, such as monetary damages, are inadequate to compensate for

4  that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

5  remedy in equity is warranted; and (4) that the public interest would not be disserved by a

6  permanent injunction. Injunctive relief should be no 'more burdensome to the defendant than

7  necessary to provide complete relief to the plaintiff[].'" *Epic Games*, 67 F.4th at 1002 (citations

8  omitted).

9         Epic did not need to spell out this four-factor test in post-verdict briefing, for good reason.

10  All of the elements were thoroughly established by the jury verdict and the evidence at trial. In

11  pertinent part, Epic established that it suffered an irreparable injury. It was, in the language of the

12  UCL, illegally and unfairly foreclosed from using its own in-app billing services while distributing

13  its Fortnite app through the Google Play Store because of Google's anticompetitive practices.

14  Epic was also illegally and unfairly foreclosed from competing in the market for Android in-app

15  billing services for digital goods and services transactions, again because of Google's

16  anticompetitive conduct. These harms are ongoing and cannot be made right simply by Google

17  writing Epic a large check. Considering the balance of hardships between Epic and Google, a

18  remedy in equity is warranted, and the public interest, which is perfectly aligned with the

19  restoration of free and unfettered competition, would be well served by a permanent injunction.

20         Consequently, injunctive relief on the UCL claim is warranted, and the scope of that relief

21  is coterminous with the injunction for the violations of the antitrust statutes. In setting the scope

22  of the injunction, the Court has been mindful that Google must not be unduly inhibited in its

23  ability to compete in legitimate ways by, for example, improving its products or its pricing.

24         **B.    Geographic Scope**

25         The initial question for the injunction is where it will apply geographically. The jury

26  found a relevant geographic market of worldwide except for China for both of the product

27  markets, which was a conclusion that was amply supported by the evidence at trial. *See* JMOL

28  Order at 14-15. Even so, the permanent injunction is limited to the United States.

7

1     This is due mainly to principles of comity and deference to the rights of other countries to

2     address anticompetitive conduct under their own laws and regulations.  The record indicates that

3     enforcement agencies around the world are investigating Google's conduct with respect to the

4     Play Store.  *See*, *e.g.*, Dkt. No. 700 at 3 (granting Google's motion in limine to "exclude evidence

5     or argument re foreign proceedings and investigations"); Dkt. No. 644-2 at ECF pp. 61-68

6     (discussing foreign investigations and regulatory reports); *see also* Dkt. No. 958 (Google's

7     Objections) at 87-89 (describing extensive legal, investigative, regulatory, and other informal

8     proceedings underway in foreign jurisdictions).  It is neither the right nor the duty of a United

9     States court to preempt the enforcement powers of other nations by imposing an injunction that

10    would operate within their borders.  Consequently, the Court elects, as a prudential matter, not to

11    interfere in the administration of antitrust laws outside the United States.  *See Mujica v. AirScan*

12    *Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("International comity is a doctrine of prudential

13    abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate

14    claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction

15    under principles of international law.'") (citation omitted).

16    **C.       Specific Provisions On Anticompetitive Conduct**

17    "When it comes to fashioning an antitrust remedy, we acknowledge that caution is key."

18    *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021).  Epic's proposed injunction

19    made many good points, as did its economists in the post-verdict proceedings.  But Epic's

20    proposal also threatened a degree of judicial oversight that would amount to micromanagement of

21    Google's business.  It is not for the Court to decide the day-to-day business issues of Android app

22    distribution and in-app billing.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

23    *LLP*, 540 U.S. 398, 415 (2004) (Court should not "assume the day-to-day controls characteristic of

24    a regulatory agency") (quotations and citation omitted).  Consequently, the Court declines to

25    impose several of the injunction terms urged by Epic.

26    Even so, important remedial measures can be imposed that do not demand excessive

27    judicial oversight.  The trial made this determination a straightforward task.  For example, in light

28    of the jury verdict and supporting evidence, it is perfectly appropriate that Google be enjoined

United States District Court
Northern District of California

8

from sharing Play Store revenues with current or potential Android app store rivals, and from imposing contractual terms that condition benefits on promises intended to guarantee Play Store exclusivity. Google itself agreed with these conduct remedies. *See* Dkt. No. 1000 at 120:16-19 (Google's counsel agreeing that "the two prohibitions . . . that Dr. Bernheim discussed, those can be a part of the injunction with certain modifications"); *id.* at 98:21-105:9 (Epic's counsel discussing Dr. Bernheim's two prohibitions). The prohibitions along these lines are stated in paragraphs 4 through 8 of the injunction, and they closely track the evidence of anticompetitive conduct at trial as summarized in the JMOL Order. *See* Dkt. No. 984 at 17-20.

The revenue share and contractual prohibitions will be in effect for a period of three years. This is because the provisions are designed to level the playing field for the entry and growth of rivals, without burdening Google excessively. *See Mass. v. Microsoft*, 373 F.3d at 1231-32 (Court's task is to redress the harm done to competition "by restoring conditions in which the competitive process is revived and any number of competitors may flourish (or not) based upon the merits of their offerings."). As competition comes into play and the network effects that Google Play unfairly enjoys are abated, Google should not be unduly constrained as a competitor. Some of the prohibited conduct might be legitimate when done by a company without monopoly power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (Scalia, J., dissenting) ("Where a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or that might even be viewed as procompetitive -- can take on exclusionary connotations when practiced by a monopolist.") (citation omitted); *see also McWane, Inc., v. F.T.C.*, 783 F.3d 814, 836-37 (11th Cir. 2015) (same).

The injunction also includes provisions to remediate the anticompetitive "consequences" of Google's illegal conduct. *See Prof'l Eng'rs*, 435 U.S. at 697; *see also Optronic Techs.*, 20 F.4th at 486 (Court may order relief that represents a "reasonable method of eliminating the consequences of the illegal conduct."); *U.S. v. Microsoft*, 253 F.3d at 103 (injunction should "deny to the defendant the fruits of its statutory violation.").

The consequences to be remediated are intertwined with the network effects of Google's dominant position in the relevant markets.  The Court instructed the jury, without objection by either side, that the Google Play Store is a "two-sided platform market" that "offers products or services to two different groups who both depend on the platform to intermediate between them."  Dkt. No. 850 (Final Jury Instructions) at ECF p. 22 (No. 18).  For the Play Store, "developers who wish to sell their apps" are on one side of the market and "consumers that wish to buy those apps" are on the other.  *Id.*  "Network effects" in this context means that the greater the number of developers, the greater the number of users, and vice versa.  As Google put it in an internal slide that was introduced at trial, Google understood that "Users come to Play because we have by far the most compelling catalog of apps/games," and "Developers come to Play because that's where the users are."  Trial Tr. at 1211:23-1212:1.

Senior Google executive Jamie Rosenberg testified about network effects in connection with the slide deck entitled, "Amazon competitor deep dive," which was presented to Rosenberg's team in 2017.  Trial Tr. at 1207:13-22; Dkt. No. 886-50 (Trial Ex. 682).  The slides discussed the threat posed by the Amazon app store, a potential competitor of the Google Play Store.  Trial Tr. at 1207:24-1208:1.  Under the heading, "Good News," Google said that "Amazon is yet to establish critical mass" and noted that "Play benefits from network effects."  *Id.* at 1211:7-22.  As Google acknowledged in the slides, "Amazon will struggle to break those network effects": "Users won't go to Amazon because their catalog of apps/games is very limited"; and "Developers won't focus on Amazon because they don't have users."  Trial Tr. at 1212:5-9.  Other evidence along these lines was also presented to the jury.

The picture drawn by this evidence is telling.  Even a corporate behemoth like Amazon could not compete with the Google Play Store due to network effects.  Consequently, the injunction must overcome the effects by providing access to the catalog of Play Store apps for a period of time sufficient to give rival stores a fair opportunity to establish themselves.  This will be three years on the terms stated in the injunction.

Google's main objection to catalog access is that the anticompetitive conduct found by the jury was not proven to be a significant cause of these network effects.  *See* Dkt. No. 1000 at 122:9-

United States District Court
Northern District of California

1    11. Google says that any network effects in the relevant market are attributable to its role as a first

2    mover in the markets, and so are not subject to remediation.

3          The point is not well taken. The network effects presented during trial are a feature of any

4    two-sided market such as the Google Play Store. Although Google may legitimately claim some

5    early mover advantage, it was not entitled to maintain and magnify network effects, and thereby

6    entrench its dominant position, through the anticompetitive conduct found by the jury. It bears

7    emphasis that Rosenberg's testimony and the Amazon slides concerned events in 2017, well after

8    the original launch of the Play Store and the start of the relevant time period in August 2016.

9    Eight months into the time period in which Google engaged in anticompetitive conduct, it was

10   well aware that "to get more developers, Amazon needs more users." Id. at 1213:18-20. This

11   frank admission was made precisely while Google was erecting barriers to insulate the Play Store

12   from competition.

13         Consequently, the salient question is not whether Google's anticompetitive conduct caused

14   the network effects. Rather, the question is whether Google engaged in anticompetitive conduct

15   that had the consequence of entrenching and maintaining its monopoly power in a two-sided

16   market. The jury answered that question in the affirmative. In effect, Google unfairly enhanced

17   its network effects in a way that would not have happened but for its anticompetitive conduct.

18         This is why the injunction must not only prohibit the specific anticompetitive conduct that

19   Google engaged in, but also undo the consequence of Google's ill-gotten gains. As the FTC aptly

20   said in an amicus brief, "[n]etwork effects can confer a powerful incumbency advantage to

21   dominant digital platforms, creating barriers to entry and to competition. . . . The incumbent

22   platform operator -- which had been motivated to attract both users and developers by offering

23   innovative, low-cost services before establishing dominance -- may become less incentivized to

24   compete after it achieves market power and builds a moat insulating itself from competition."

25   Dkt. No. 686-1 at 9. The injunction must bridge the moat.

26         Even so, the catalog access provision is narrowly tailored to remediate the unfairly

27   enhanced network effects Google reaped without unfairly penalizing its success as a first mover.

28   To that end, if a rival app store does not have a relationship with a developer and so cannot fulfill

11

a download request by a user, the rival will direct the download request to the Google Play Store. In that case, the Google Play Store will fulfill the download request and keep the associated revenue, if any, and the download will be made pursuant to the Google Play Store's policies. All that the catalog access does is level the playing field for a discrete period of time so that rival app stores have a fighting chance of getting off the ground despite network effects and the disadvantage of offering a "catalog of app/games" that is too "limited" to attract users and developers in a two-sided market. Trial Tr. at 1212:6-7.

So too for the injunction provision that prevents Google from excluding rival app stores from the Play Store. Witness Rosenberg testified that another barrier faced by the Amazon app store was a "significant hurdle to switching to Amazon APK." Trial Tr. at 1214:18. This referred to the fact that, to get the Amazon store on their Android device, a user would need to "sideload" it (*i.e.*, download it from a website or platform other than the Play Store), which subjected the user to a "quite complex" process imposed by Google that "involve[d] 14 steps." *Id*. at 1214:21-1216:22. Rosenberg agreed that "Google recognized at the time that as a result of the unknown source warning [resulting in at least 14 steps], the hurdles [to download] were too high for most users." *Id*. at 1216:23-1217:2. Rosenberg also agreed that, because the "Google Play Store is preloaded on the home screen of virtually every Android phone through the MADA," and rival stores were excluded, a user trying to download a rival app store outside the Play Store would almost always face the barrier of the "unknown sources install flow." *Id*. at 1206:9-22. Other witnesses at trial including other Google executives testified that the "friction" Google built into acquiring apps outside the Play Store was highly effective in discouraging users from even trying. *See*, *e.g.*, Trial Tr. at 762:20-763:2, 1361:11-13. So for a limited period of time, the injunction will lower the barriers for rival app stores to get onto users' phones by enjoining Google from prohibiting the presence of rival app stores in the Google Play Store.

As Google has suggested, there are potential security and technical risks involved in making third-party apps available, including rival app stores. The Court is in no position to anticipate what those might be, or how to solve them. Consequently, Google will have room to engage in its normal security and safety processes. To the extent Google imposes requirements

along these lines on rival app stores, it will be bear the burden when challenged of establishing that the requirements were strictly necessary to achieve safety and security for users and developers.

Google has said on many occasions that catalog access and hosting rival store apps amount to forcing it to do business with rivals, in contradiction of "the general rule" that "even monopolists 'are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'" *Viamedia, Inc., v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (quoting *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)). Not so. The Court has fully agreed for the duration of this case that a refusal to deal with a potential rival may not be the basis of antitrust liability. The jury was expressly instructed on that point. Dkt. No. 850 at ECF p. 33 (No. 24). Nothing in the verdict or the evidence at trial condemned Google for not extending a helping hand to a rival.

The problem for Google is that the case is now in the remedy phase, not the liability phase. The question at hand is not whether Google violated the antitrust laws by failing to aid rivals, but what measures are necessary to restore fair competition in the face of the barriers found by the jury. The jury heard abundant evidence that Google used a variety of means to ensure that the Play Store was the only fully developed Android app marketplace for users and developers. This evidence included the MADA and RSA agreements and Google's conditioning of access by OEMs to Google's Android services on preinstallation of the Google Play Store on the home screen of Android devices. The use of burdensome "scare screens" to discourage sideloading of apps is another example of evidence heard by the jury. Requiring Google to allow other app stores to be distributed through the Play Store for a discrete period is a modest step to correct the consequence of unlawfully preventing rival stores from reaching users and developers.

In this context, Google's frequent mentions of *Trinko* are misplaced. The Supreme Court affirmed the district court's dismissal of a complaint alleging monopolization under Section 2 against Verizon for not sharing access to its telephone network with competitors as required by Congress in the Telecommunications Act of 1996. *Trinko*, 540 U.S. at 401-02. The Supreme Court declined to extend the reach of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

United States District Court
Northern District of California

13

585 (1985), with the famous remark that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. But the Court also re-affirmed the holding of *Aspen Skiing* that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Id*. at 408 (quoting *Aspen Skiing*, 472 U.S. at 601). The Court added that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Id*.

The Court ultimately determined that the situation in *Trinko* did not rise to that level based on the specific characteristics of the telecom industry. As the Court instructed, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Id*. at 411. A factor of "particular importance" was that Congress had already created a regulatory structure in the Telecommunications Act "designed to deter and remedy anticompetitive harm." *Id*. at 412. The protective hand of such regulation meant that any additional benefit of antitrust enforcement would be "small," and that the "'regulation significantly diminishes the likelihood of major antitrust harm.'" *Id*. (quoting *Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990)). The Court also noted that the complaint did not allege facts indicating that Verizon's conduct was prompted by "anticompetitive malice" or "dreams of monopoly." *Id*. at 409.

None of this has anything to do with the injunction here. As discussed, this is not a case in which a refusal to deal with a rival was the basis of Section 2 liability. The facts, markets, and regulatory environment here are also starkly different. Google seems to find a "vibe" in *Trinko* to the effect that the remedy for a monopolist's anticompetitive conduct cannot involve affirmative conduct with respect to a rival. *Trinko* says nothing of the sort, and Google's frequent mention of the case is simply a red herring.

Google also overlooks the fact that an antitrust remedy may trump what might be deemed traditional boundaries of property rights. "Even constitutionally protected property rights such as patents may not be used as levers for obtaining objectives proscribed by the antitrust laws." *Ford Motor*, 405 U.S. at 576 n.11. Section 16 "states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order. Rather, the statutory

14

language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." *California v. American Stores Co.*, 495 U.S. 271, 281 (1990) (cleaned up). Consequently, the "purpose of relief in an antitrust case is 'so far as practicable, (to) cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.' Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (U.S. 1973) (citations omitted). The Court may "consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations. [¶] The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 697-98. It is "entirely appropriate" for an injunction to "go[] beyond a simple proscription against the precise conduct previously pursued." *Id*. at 698. If a well-grounded fear arises that the injunction is too broad, "the burden is upon the proved transgressor to bring any proper claims for relief to the court's attention." *Id*. (quotations omitted).

Our circuit's conclusions in *Optronic Technologies* further undermine Google's position. There, the jury "properly found that Orion had been forced to pay inflated prices as a result of the market power exerted by Sunny and Synta following the unlawful Meade acquisition," and so ordering Sunny to supply Orion on non-discriminatory terms was a "reasonable method of remedying the harm to [Orion]." *Optronic Techs.*, 20 F.4th at 486. This was true because the district court "can order conduct to 'avoid a recurrence of the [antitrust] violation and to eliminate its consequences.'" *Id*. (quoting *Prof'l Eng'rs*, 435 U.S. at 698). The same goes here.

During closing arguments on the remedy, Google also relied on *Image Technical Services, Inc. v. Eastman Kodak Co*., 125 F.3d 1195 (9th Cir. 1997), stating that "in that case, the Ninth Circuit said that the district court had erred when it ordered Kodak to sell parts that were manufactured by someone else." Dkt. No. 1000 at 127:21-25. In Google's view, "it's the same thing here. It's legal error to order Play to have to distribute someone else's app store. Same reasoning as in *Kodak*." *Id*. at 128:1-3.

15

This is an odd position to take. The circuit's reasoning in *Kodak* had nothing to do with Kodak's freedom not to deal with its rivals. The circuit modified the portion of the district court's injunction that "require[d] Kodak to sell all parts for Kodak equipment, whether or not Kodak manufactures those parts." *Kodak*, 125 F.3d at 1225. The circuit believed that the "'all parts' requirement creates barriers for non-Kodak original-equipment manufacturers by requiring them to price replacement parts at levels necessary to attract ISOs away from Kodak's parts counter. It also unnecessarily entrenches Kodak as the only parts supplier to ISOs." *Id*. As was the case with Google's reliance on *Trinko*, none of this bears on the facts and issues in this case.

As discussed, the Court has no intention of running Google's business as a "central planner." *Trinko*, 540 U.S. at 408; *see also* Dkt. No. 1000 at 127:8-10 ("I have no intention of having a highly detailed decree that ends up impairing competition or micromanaging as a central planner."). The terms of the injunction are plainly worded and largely self-executing, and will not embroil the Court in day-to-day business operations. To the extent technical issues about security and the like come up, the injunction establishes a Technical Committee made up of one person selected by each side, plus a third person to be selected by the parties' two nominees, to resolve the issue in the first instance. The Court will act only as needed to resolve issues that cannot be resolved by the committee.

### D. Tying

Overall, the injunction breaks the illegal tie by prohibiting Google from requiring that developers use Google Play Billing in apps distributed on the Google Play Store. Epic asked the Court to also prohibit what it called an "economic" tie, *see*, *e.g.*, Dkt. No. 977 at 92:23-93:1, which would have ensnared the Court in a detailed rate-setting exercise beyond its proper role. *See Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990). There is no need for the Court to take on that task because the remedy for the monopoly violation under Section 2 will also resolve the tying violation found by the jury. The restoration of free competition in the relevant markets is the best medicine for correcting fees and prices.

The Court has addressed Google's main contentions with respect to the injunction. As noted, Google's modus operandi in this case has been to deluge the Court in an ocean of

comments, many of which were cursory and undeveloped. The Court declines to take up Google's objections that were not fully developed in their presentation to the Court.

## CONCLUSION

A permanent injunction will be entered against Google for Epic's Sherman Act, Cartwright Act, and UCL claims. The effective date of the injunction is November 1, 2024, to give Google time to bring its current agreements and practices into compliance. After Epic's attorney's fees and costs are awarded, *see* 15 U.S.C. § 26, judgment will be entered for Epic on the Sherman Act, Cartwright Act, and UCL claims, and this MDL member case, *Epic Games, Inc. v. Google LLC et al.*, No. 20-cv-05671-JD, will be closed.

**IT IS SO ORDERED.**

Dated: October 7, 2024

_____
JAMES DONATO
United States District Judge

17

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION

MDL Case No. 21-md-02981-JD

Member Case No. 20-cv-05671-JD

**PERMANENT INJUNCTION**

This permanent injunction is entered in MDL member case *Epic Games, Inc. v. Google LLC et al.*, Case No. 20-cv-05671-JD, on the jury verdict against Google under Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1, 2, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq., and the Court's finding that Google violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

1.      This injunction applies to Google LLC and each of its parent, affiliated, and subsidiary entities, officers, agents, employees, and any person in active concert or participation with them, who receive actual notice of this order by personal service or otherwise (together, Google).

2.      Unless otherwise stated, the effective date of the injunction is November 1, 2024.

3.      The geographic scope of the injunction is the United States of America.

4.      For a period of three years ending on November 1, 2027, Google may not share revenue generated by the Google Play Store with any person or entity that distributes Android apps, or has stated that it will launch or is considering launching an Android app distribution platform or store.

5.      For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer to launch an app first or exclusively in the Google Play Store.

United States District Court
Northern District of California

6. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer not to launch on a third-party Android app distribution platform or store a version of an app that includes features not available in, or is otherwise different from, the version of the app offered on the Google Play Store.

7. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an original equipment manufacturer (OEM) or carrier to preinstall the Google Play Store on any specific location on an Android device.

8. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an OEM or carrier not to preinstall an Android app distribution platform or store other than the Google Play Store.

9. For a period of three years ending on November 1, 2027, Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing. Google may not require a developer to set a price based on whether Google Play Billing is used.

10. For a period of three years ending on November 1, 2027, Google may not prohibit a developer from communicating with users about the availability or pricing of an app outside the Google Play Store, and may not prohibit a developer from providing a link to download the app outside the Google Play Store.

11. For a period of three years, Google will permit third-party Android app stores to access the Google Play Store's catalog of apps so that they may offer the Play Store apps to users. For apps available only in the Google Play Store (*i.e.*, that are not independently available through the third-party Android app store), Google will permit users to complete the download of the app through the Google Play Store on the same terms as any other download that is made directly

2

through the Google Play Store. Google may keep all revenues associated with such downloads. Google will provide developers with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store. Google will have up to eight months from the date of this order to implement the technology necessary to comply with this provision, and the three-year time period will start once the technology is fully functional.

12. For a period of three years, Google may not prohibit the distribution of third-party Android app distribution platforms or stores through the Google Play Store. Google is entitled to take reasonable measures to ensure that the platforms or stores, and the apps they offer, are safe from a computer systems and security standpoint, and do not offer illegal goods or services under federal or state law within the United States, or violate Google's content standards. The review measures must be comparable to the measures Google is currently taking for apps proposed to be listed in the Google Play Store. If challenged, Google will bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored. Google may require app developers and app store owners to pay a reasonable fee for these services, which must be based on Google's actual costs. Google will have up to eight months from the date of this order to implement the technology and procedures necessary to comply with this provision, and the three-year time period will start once the technology and procedures are fully functional. For the duration of this time period, the Technical Committee described in paragraph 13 below will in the first instance decide challenges to Google's review decisions, with the Court serving as the final word when necessary.

13. Within thirty days of the date of this order, the parties will recommend to the Court a three-person Technical Committee. Epic and Google will each select one member of the Technical Committee, and those two members will select the third member. After appointment by the Court, the Technical Committee will review disputes or issues relating to the technology and processes required by the preceding provisions. If the Technical Committee cannot resolve a dispute or issue, a party may ask the Court for a resolution. The Technical Committee may not extend any deadline set in this order, but may recommend that the Court accept or deny a request to extend. Each party will bear the cost of compensating their respective party-designated

United States District Court
Northern District of California

committee member for their work on the committee. The third member's fees will be paid by the parties in equal share.

14. The Court will retain jurisdiction over the injunction for all purposes. Google or Epic may request a modification of the injunction for good cause.

**IT IS SO ORDERED.**

Dated: October 7, 2024

_____
JAMES DONATO
United States District Judge

# EXHIBIT C

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EPIC GAMES, INC., a Maryland Corporation, | |
| Plaintiff, | Case No. 3:20-CV-05671-JD |
| v. | |
| GOOGLE LLC; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LIMITED; and GOOGLE PAYMENT CORP., | **FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF** |
| Defendants. | |

approach or combination of approaches that meets [their] needs", including by allowing users to directly download apps "from a website" or even by "emailing them directly to consumers".[7]

### A.   The Android App Distribution Market

#### i.   Product Market Definition

68.   There is a relevant market for the distribution of apps compatible with the Android OS to users of mobile devices (the "Android App Distribution Market"). This Market includes all the channels by which mobile apps may be distributed to the hundreds of millions of users of mobile devices running the Android OS. The Market primarily includes Google's dominant Google Play Store, with smaller stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind. Nominally only, the direct downloading of apps without using an app store (which Google pejoratively describes as "sideloading") is also within this market.

69.   App stores allow consumers to easily browse, search for, access reviews on, purchase (if necessary), download, and install mobile apps, using the mobile device itself and an Internet connection. OEMs find it commercially unreasonable to ship a smart mobile device to a consumer without at least one app store installed, as a consumer's ability to obtain new mobile apps is an important part of the value provided by smart mobile devices.

70.   App stores selling mobile apps are currently OS-specific, meaning they distribute only apps that are compatible with the specific mobile OS on which the app store is used. A consumer who has a mobile device running the Android OS cannot use apps created for a different mobile operating system. An owner of an Android OS device will use an Android compatible app store, and such app stores distribute only Android-compatible mobile apps. That consumer may not substitute an Android app store with, for example, Apple's App Store, as that app store is not available on Android

---

[7] Google Play Developers Page, *Alternative Distribution Options*, https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed July 20, 2021).

of apps in one monopolized app store, where Google controls which apps are featured and identified or prioritized in user searches.

## III. Google Unlawfully Acquired and Maintains a Monopoly in the Android In-App Payment Processing Market.

148.    By selling digital content within a mobile app rather than (or in addition to) charging a price for the app itself, app developers can make an app widely accessible to all users, then charge users for additional digital content or features, thus still generating revenue from their investment in developing new apps and content.  This is especially true for mobile game developers.  By allowing users to play without up-front costs, developers permit more players to try a game "risk free" and only pay for what they want to access.  *Fortnite*, for example, is free to download and play, but makes additional content available for in-app purchasing on an à la carte basis or via a subscription-based Battle Pass.  App developers who sell digital content rely on in-app payment processing solutions to process consumers' purchases in a seamless and efficient manner.

149.    When selling digital content, Android app developers are unable to utilize the multitude of electronic payment processing solutions generally available on the market to process other types of transactions.  Instead, through contractual restrictions and its monopoly in app distribution, Google coerces developers into using its own in-app payment processing solution by conditioning developers' use of Google's dominant Google Play Store on the use of Google's payment processor for digital content, thereby acquiring and maintaining monopoly power in the Android In-App Payment Processing Market.  Google thus ties its Google Play Store to its own proprietary payment processing solution, Google Play Billing, substantially foreclosing competition.

### A.    The Android In-App Payment Processing Market

#### i.    Product Market Definition

150.    There is a relevant antitrust market for payment processing solutions for the purchase of digital content, including virtual gaming products, that is consumed

within Android apps (the "Android In-App Payment Processing Market"). The Android In-App Payment Processing Market includes the payment processing solutions that Android developers could integrate into their Android apps to process the purchase of such in-app digital content.

151. Absent Google's unlawful conduct, app developers could integrate a compatible payment processor into their apps to facilitate the purchase of in-app digital content. Developers also would have the capability to develop their own in-app payment processing functionality. And developers could offer users a choice among multiple payment processors, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more.

152. Google offers separate payment solutions for the purchase of digital content and for other types of purchases even within mobile apps. Google Play Billing can be used for the purchase of digital content and virtual gaming products, while Google offers a separate tool, Google Pay, to facilitate the purchase of physical products and services within apps.

153. It is particularly important that app developers who sell in-app digital content be able to offer in-app transactions that are seamless, engrossing, quick, and fun. For example, a gamer who encounters a desirable "skin" within *Fortnite*, such as a Marvel superhero, may purchase it nearly instantly for a small price without leaving the app. Although *Fortnite* does not offer content that extends gameplay or gives players competitive advantages, other game developers offer such products—for example, "boosts" and "extra lives"—that extend and enhance gameplay. It is critical that such purchases can be made during gameplay itself, rather than in another manner. If a player were required to purchase game-extending extra lives outside of the app, the player may simply stop playing.

154. As another example, if a user of a mobile dating app encounters a particularly desirable potential dating partner, he/she can do more than "swipe right" or "like" that person, but can also purchase a digital item that increases the likelihood that

# EXHIBIT D

1

Karma M. Giulianelli (SBN 184175)
karma.giulianelli@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Weaetta St., Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100

Hae Sung Nam (*pro hac vice*)
hnam@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980

*Co-Lead Counsel for the Consumer Class in In re Google Play Consumer Antitrust Litigation*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc. in Epic Games, Inc. v. Google LLC et al.*

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY GENERAL**
160 E 300 S, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone: 801-366-0260

*Counsel for the Plaintiff States in State of Utah et al. v. Google LLC et al.*

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300 Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et al. in Match Group, LLC et al. v. Google LLC et al.*

Glenn D. Pomerantz (SBN 97802)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al.*

[Additional counsel appear on signature page]

---

JOINT SUBMISSION REGARDING TRIAL PROPOSAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | |
| *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | **JOINT SUBMISSION REGARDING TRIAL PROPOSAL IN RESPONSE TO COURT'S APRIL 21, 2023 ORDER** |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Judge: Hon. James Donato |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | |
| *Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD | |

Pursuant to the Court's minute order dated April 21, 2023 (MDL ECF No. 499), the parties in the above-captioned MDL action, by and through their undersigned counsel, submit this Joint Submission Regarding Trial Proposal. The parties held the in-person "trial summit" required by the Court's order in San Francisco on April 27, 2023. Lead trial counsel for all parties attended, with the exception of Mr. Reiter appearing in place of Mr. Dixon for the Match Plaintiffs in No. 22-cv-2746, as authorized by the Court. Following the April 27, 2023 summit, the parties have continued to meet and confer by telephone and e-mail with the involvement of lead trial counsel for all parties.

The parties take seriously the Court's admonition to "work it out." Apr. 20 Hr'g Tr. at 10:14. To that end, the consumer plaintiffs and Google have agreed that the consumer plaintiffs' class-capacity claims should not be tried until Google's pending 23(f) appeal is resolved. Further, Plaintiffs—who previously sought separate damages trials for the Match Plaintiffs and the States/Consumers—have agreed to try in the same antitrust liability trial all antitrust and consumer protection damages claims triable to the jury. Despite extensive discussion among the parties, two

1  disputes remain that the parties cannot resolve:  (1) whether the claims of the Plaintiff State AGs

2  and individual consumer plaintiffs should be tried in November along with the claims of Epic and

3  the Match Plaintiffs and (2) the timing of proceedings relating to equitable relief.  The parties'

4  respective positions on those issues follow after the parties' agreed proposals on trial structure and

5  other trial-related issues.

6  **I.      TRIAL STRUCTURE**

7          The Court directed the parties to meet and confer on the structure of the November 6 trial,

8  including which issues will be tried to the jury and which issues will be tried to the Court.  As

9  explained in Section III below, Google takes the position that the claims of the Plaintiff State AGs

10  and individual consumer plaintiffs should not be tried in November along with the claims of Epic

11  and the Match Plaintiffs.  Nevertheless, the parties have negotiated and here describe below their

12  agreed proposal for the structure of the trial if it includes Epic, the Match Plaintiffs, the States, and

13  the individual consumer plaintiffs (but not the class).  If the Court adopts Google's position, which

14  is disputed by Plaintiffs, that the States and consumers should not be part of the November trial,

15  then claims brought by the States and individual consumer plaintiffs can be removed from the

16  structure articulated in this Section.

17          **A.      Issues Triable to a Jury**

18          The parties agree that all claims by all Plaintiffs are triable to a jury, with the exception of

19  the claims brought under California's Unfair Competition Law, which are addressed below, and

20  claims that the States have brought under the laws of 38 states other than California.  With respect

21  to the States' state-law claims, the States and Google continue to discuss which aspects of the

22  claims that the States have brought under the laws of states other than California would be triable

23  to a jury and which would be triable to the Court.  The parties will continue to work on the issue

24  and will present a resolution to the Court (or a process for asking the Court to resolve any

25  disagreement) at an appropriate time.

26          The parties further agree that the damages claims of all Plaintiffs that seek damages should

27  be tried to the jury together with issues of liability.

28

# EXHIBIT E

1   Brian C. Rocca, S.B. #221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, S.B. #215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, S.B. #248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, S.B. #259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, S.B. #301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105
    Telephone: (415) 442-1000
8
    Richard S. Taffet, *pro hac vice*
9   richard.taffet@morganlewis.com
    **MORGAN, LEWIS & BOCKIUS LLP**
10  101 Park Avenue
    New York, NY 10178
11  Telephone: (212) 309-6000
12  *Counsel for Defendants Google LLC, et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
Rebecca L. Sciarrino, S.B. # 336729
rebecca.sciarrino@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO BIFURCATE THE TRIAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**

This Document Relates To:

*Epic Games Inc. v. Google LLC et al.,* Case No. 3:20-cv-05671-JD

*In re Google Play Consumer Antitrust Litigation,* Case No. 3:20-cv-05761-JD

*State of Utah et al. v. Google LLC et al.,* Case No. 3:21-cv-05227-JD

*Match Group, LLC et al. v. Google LLC et al.,* Case No. 3:22-cv-02746-JD

Case No. 3:21-md-02981-JD

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO BIFURCATE THE TRIAL**

Judge:     Hon. James Donato

Hearing:   September 7, 2023
Time:      10:00 a.m.
Ctrm:      11

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV.  ARGUMENT

## A.  **Plaintiffs Have Not Shown That Bifurcation Would Make Trial More Efficient**

### 1.  *Google Will Present Much of the Same Evidence in Defending Against Plaintiffs' Claims That It Will Present on Its Counterclaims*

In defending against Plaintiffs' antitrust case, Google will present much of the same evidence that it will present in support of its counterclaims. That is because Google's counterclaim evidence directly advances its antitrust defenses.

For example, one of Plaintiffs' principal claims is that Google illegally ties its billing system to the Google Play store by requiring developers to use Google Play Billing to process certain Play store transactions. As Google will show at trial, this requirement is justified because it is the most efficient way to ensure that Google is actually paid for the value it delivers through Android and the Play store. Google Play Billing enables Google to collect its service fee automatically as part of each transaction. If Google could not do that, then developers could take advantage of the Play store and Google's related support and services, and *not pay Google* for that value.

To prove that point at trial, Google will point to Epic's and Match's conduct. Epic secretly engineered a software mechanism to allow users to pay with Epic's billing system, sidestepping Google and the Google Play Billing policy completely. Match evaded paying the service fee it owed to Google for many years, and after Google attempted to enforce its billing requirement against Match, Match deceived Google about its intentions to comply. That evidence demonstrates exactly why Google requires developers to use its own billing system and how Google is unable to collect a service fee when developers violate its billing policy. Because Google has a right to present this evidence about Epic and Match at trial on Plaintiffs' tying claims, there is no efficiency to be gained from a separate trial on Google's counterclaims that relies on that same evidence.

Google also would present the same evidence in litigating its counterclaims as it will in defending against Plaintiffs' antitrust claims regarding the notifications and consent screens that are displayed when users attempt to download apps directly from the web (i.e., "sideload" them)

rather than download them from an app store. Plaintiffs challenge these warnings as "pretextual" because they apply to "even mainstream, non-malicious apps and app stores, such as the Amazon Appstore and Fortnite." Dkt. 188 ¶ 231, No. 21-cv-05227. Plaintiffs' experts even suggest that Google should make an exception for major developers that it believes are trustworthy rather than enabling consumers to decide for themselves which developers are safe. But the fact that Epic— one of the largest video game companies in the world—secretly submitted to Google a version of an app that circumvented Google Play Billing rebuts Plaintiffs' notion that all major developers can be trusted, and explains why Google does not make exceptions even for well-established developers. Google has every right to defend against Plaintiffs' antitrust claims by showing that there are trust and safety concerns connected to developers like Epic. That evidence also will support Google's counterclaims, so it would be inefficient to try them separately.

In short, Google anticipates that it would present much of the same evidence to defend against Plaintiffs' antitrust claims and prove its counterclaims. Plaintiffs thus cannot carry their burden to show that bifurcation would promote efficiency.

> **2.** *The Factual Overlap Between the Counterclaim Evidence and the Antitrust Claims Is Extensive*

More broadly, bifurcation would be inefficient because numerous subjects and witnesses are relevant to both Plaintiffs' claims and Google's counterclaims:

*First*, much of Plaintiffs' case involves provisions of the standard agreement that developers sign in order to distribute their apps using the Google Play store. Plaintiffs contend that agreement is unlawful. But that is the same agreement that Google alleges Match and Epic breached in its counterclaims. It would be inefficient to have the jury decide issues related to the same agreement in two separate phases of the trial.

*Second*, the trial of the States' own state-law claims will overlap with Google's counterclaims. In September 2020, Google publicly clarified that its developer contract required developers to use Google Play's billing system for a certain category of digital content sales, including sales by streaming services. The States allege that those September 2020 statements "were false and misleading with respect to streaming services" and violated various state laws.

# EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | MDL Case No. 21-md-02981-JD<br>Member Case No. 20-cv-05671-JD<br><br>**FINAL JURY INSTRUCTIONS FOR** *EPIC* **TRIAL** |

The Court will give these final instructions to the jury in the *Epic* trial, Case No. 20-cv-5671, on the morning of December 11, 2023, before the parties' closing arguments. They are based on the parties' proposed instructions, Dkt. Nos. 806, 833, the discussion at the jury charge conference on December 1, 2023, and the Court's practices.

For Google's request for a judgment on its breach of contract counterclaim, Dkt. No. 833 at 2 n.2, the Court will decide Epic's illegality defense after the jury returns its verdict, and will treat the parties' stipulated facts, *id.* at 1-2, as proved.

For Instruction Nos. 23 (Willful Acquisition or Maintenance of Monopoly Power Through Anticompetitive Acts), 29 (Evidence of Competitive Benefits), and 38 (Business Justification Defense), the Court will give the additional language requested by Google that "to qualify as 'substantially less restrictive,' an alternative means must be virtually as effective in serving the defendant's procompetitive purpose without significantly increased cost." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) (cleaned up).

Epic's request to add a balancing step at the end of Instruction No. 38 (Business Justification Defense) is denied. The Court will give the instruction consistent with the formulation in the ABA Model Civil Antitrust Instruction 2E.11. The Court will add a reference

to the "Rule of Reason" in the title of Instruction No. 38 (Tying **Under the Rule of Reason** -- Business Justification Defense), to remind the jury that the analysis for the tying claim is similar to the rule of reason analysis they are instructed on for Epic's other Sherman Act claims.

Neither side proposed separate instructions for Epic's California Cartwright Act claims. Both sides agreed to simply say "California state law" as a reference in the instructions, with nothing more. Consequently, the Court will refer to "California state law" in the verdict form, and will not ask separate verdict questions with respect to the Cartwright Act, or provide separate instructions for it.

The parties are directed to prepare and bring to court on the morning of December 11, eleven copies of the jury instructions for distribution to the jury. The copies for the jury should be double-sided and three-hole-punched, and should not include these cover comments or the ECF stamp header on each page.

**IT IS SO ORDERED.**

Dated: December 6, 2023

_____

JAMES DONATO
United States District Judge

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 IN RE GOOGLE PLAY STORE          MDL Case No. 21-md-02981-JD
  ANTITRUST LITIGATION
                                   Member Case No. 20-cv-05671-JD
8

9                                  **FINAL JURY INSTRUCTIONS**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

INSTRUCTION NO. 18

MONOPOLIZATION -- RELEVANT PRODUCT MARKET

In this case, Epic contends that there are two different relevant product markets:  an Android app distribution market, and a market for Android in-app billing services for digital goods and services transactions.  You should consider whether Epic has proven by a preponderance of the evidence either or both of the markets it has alleged.

In determining the relevant market, the "area of effective competition" must be determined by reference to (1) a product market, and (2) a geographic market.

In determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view.  This does not mean two products must be identical to be in the same relevant market.  It means they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably interchangeable to fill the same consumer needs or purposes.  Two products are within a single market if one item could suit buyers' needs substantially as well as the other.  What you are being asked to do is to decide which products compete with each other.

The parties contend that one or more markets alleged in this case are markets for two-sided platforms.  In a two-sided platform market, a platform offers products or services to two different groups who both depend on the platform to intermediate between them.  For example, an app store connects app developers who wish to sell their apps and the consumers that wish to buy those apps.  In this example, app developers may be one side of the market, and consumers may be the other side of the market, and each are receiving services from the app store.  In order to define a relevant market involving a two-sided platform, you must take into account consumers on both sides of the market -- in this case, both users and developers.

# EXHIBIT G

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**EPIC'S PROPOSED PERMANENT INJUNCTION** |

The Court, having considered the evidence presented during trial and the jury verdict delivered on December 11, 2023 (the "Verdict"), hereby grants a permanent injunction in favor of the Plaintiff Epic Games, Inc. ("Epic") and against Defendants Google LLC; Google Ireland Limited; Google Commerce Limited; Google Asia Pacific Pte. Limited; and Google Payment Corp (collectively, "Google"), as set forth below.

The goal of this injunction is to open up to competition the two markets found by the jury: the market for the distribution of Android apps ("Android App Distribution Market") and the market for Android in-app billing services for digital goods and services transactions ("Android In-App Payment Solutions Market"), to the benefit of developers of Android apps ("Developers"), developers of payment solutions for use in Android apps and users of Android mobile devices ("Users").

## I.  APPLICABILITY

This Order shall apply to Google and each of its parents, affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns, to any successor to any substantial part of the business that is the subject of this Order and to all other persons acting in concert with Google and with actual notice of this Order.

## II.  ANDROID APP DISTRIBUTION MARKET

Google is enjoined from enforcing contractual provisions, guidelines or policies, or otherwise imposing technical restrictions, usage frictions, financial terms or in-kind benefits that (i) restrict, prohibit, impede, disincentivize or deter the distribution of Android apps[1] through an Android app distribution channel other than the Google Play Store (an "Alternative Android App Distribution Channel"), including but not limited to, app stores other than the Google Play Store ("Third-Party App Stores"),[2] direct distribution via a web browser, pre-installation on an Android device, or any other means; (ii) have the effect of impeding or deterring competition among Android app distributors (including competition between Alternative Android App Distribution Channels and the Google Play

---

[1] Distribution includes both supply of apps by Developers and acquisition of apps by Users unless otherwise specified.

[2] For the avoidance of doubt, Third-Party App Stores include but are not limited to app stores owned and operated by mobile network carriers ("Carriers"), by original equipment manufacturers ("OEMs") or by Developers.

Store); and/or (iii) otherwise discriminate against or disadvantage Android app distribution through any Alternative Android App Distribution Channel.  To effectuate the injunctive relief, the Court orders the following specific remedies addressing Google's conduct in the Android App Distribution Market.

A. *No Agreements Not To Compete:*  Google is prohibited from engaging in the following conduct.

1. **Placement and Preinstallation Terms for Third-Party App Stores:**  Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that prohibits, limits or disincentivizes the placement of, preinstallation of, and/or grant of installation permissions ("Installation Permissions") by a Carrier or an OEM to, any Android app or Third-Party App Store, including on the basis of the availability or non-availability of such app or Third-Party App Store on the Google Play Store.

   i. For the avoidance of doubt, Google shall not require or incentivize a carrier or OEM to introduce any additional steps for a User to enable or access a preinstalled Third-Party App Store beyond the steps required to access the Google Play Store when it is preinstalled.

2. **Agreements with Actual or Potential Competing Distributors:**  Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that requires or incentivizes—including through the provision of any pecuniary or in-kind benefits, or through the imposition of any financial term or economic loss—any potential or actual provider of an Alternative Android App Distribution Channel (a "Competing Distributor") to scale back, refrain from increasing investment into, or abandon its distribution of Android apps or its entry into the distribution of Android apps, including, but not limited to, incentivizing Competing Distributors not to invest in Alternative

Android App Distribution Channels.  For the avoidance of doubt, this clause includes but is not limited to the following:

   i.  Google shall not offer any Competing Distributor a share of revenues from, or related to, the Google Play Store.

   ii.  Google shall not offer any Competing Distributor any share of revenues, from any source, that is tied to, related to, or conditioned on the development, preinstallation, launch or placement of any Alternative Android App Distribution Channel, including a Competing Distributor's abstention from any of the foregoing.

   iii.  In any agreement with a Competing Distributor, Google shall include a clear and express statement that the terms of that agreement, including the provision of any benefit or financial term, is not in any way conditional on the Competing Distributor's use, development, preinstallation, launch or placement of any Alternative Android App Distribution Channel, including a Competing Distributor's abstention from any of the foregoing.

3. **No Exclusivity:**  Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that requires or incentivizes the distribution of any Android app, or of any content available in or through an app, exclusively on the Google Play Store.

   i.  For the avoidance of doubt, any monetary benefit offered to a Developer to distribute any Android app through the Google Play Store in lieu of, or in parallel with, self-distribution of the same Android app, is prohibited by this Paragraph II.A.3.

4. **No MFNs/Limits on Differentiated Content:**  Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that sets a Developer's timing of the release of any Android app on the

Google Play Store, or the pricing or content of any app so released—or that incentivizes any of the foregoing to be set—in reference to the timing of the launch of such app, or the pricing or content thereof, on any Alternative Android App Distribution Channel, including, but not limited to, enforcing any sim-ship, most-favored nation ("MFN"), content parity or pricing parity requirement in any of Google's Project Hug agreements.

5. **No Restrictions on Removal of Developer Apps from the Google Play Store:** Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that prohibits the withdrawal of any Android app from the Google Play Store without Google's consent, including, but not limited to, enforcing the non-removal requirement in certain of Google's Project Hug agreements.

B. *Download Remedies:* With respect to distribution and download outside of the Google Play Store, Google is enjoined from each of the following.

1. **Parity of Install Flow Regardless of Source:** Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that prohibits or disincentivizes—through any technical, contractual, financial, or other means—the downloading, granting of permissions, installation and/or updating of any Android app through any Alternative Android App Distribution Channel. To implement the foregoing:

i. With respect to downloading from Third-Party App Stores, Google shall not impose, require, encourage or incentivize the imposition of any prompts, warnings, reminders, settings screens or other "friction" steps on the download of apps from Third-Party App Stores beyond the frictions associated with the downloading of apps from the Google Play Store itself.

      ii.  With respect to downloading outside of a Third-Party App Store, Google shall not impose, require, encourage or incentivize the imposition of any prompts, warnings, reminders, settings screens or other "friction" steps on devices, other than (a) a single one-tap screen asking in neutral language that the user confirm intent to proceed with the app installation or (b) as set forth in Paragraph II.B.2 below.

      iii.  On any given device, Google shall be required to display prompts, warnings, reminders, settings screens or other "friction" steps in connection with the installation of an app from the Google Play Store that are commensurate with those that are imposed (whether by Google, an OEM or a Carrier) in connection with installation from an Alternative Android App Distribution Channel.

  2.  Notwithstanding the above Paragraph II.B.1:

      i.  Google may include a single one-tap screen asking the user to allow a web browser or Third-Party App Store downloaded from an Alternative Android App Distribution Channel to install other apps upon the first installation attempt from such web browser or Third-Party App Store.

      ii.  Google may impose additional frictions and/or block the installation of apps/stores from the web or an app store for (i) apps/stores whose developers declined to subject their apps/stores to a generally available, distribution-channel-agnostic notarization-like process or (ii) apps/stores that are known malware.

C.   *Remedies Concerning Access to Android and Other Google Products or Services:*  With respect to access to Android's functionality and other Google products or services, Google is enjoined from each of the following.

  1.  **Parity of Access to Android Functionality Regardless of Source:**  Google shall not enforce any existing agreement, enter into any new agreement or

otherwise engage in any conduct that denies or impedes any Alternative Android App Distribution Channel, or any Android app that was downloaded through any Alternative Android App Distribution Channel, from having access to Android functionality and/or APIs and features (whether such functionality, APIs or features are considered part of Android Open Source Project ("AOSP") or Google Mobile Services ("GMS")) that is equivalent to the access had by any non-Google-owned Android app downloaded through the Google Play Store.

  i. For avoidance of doubt, Google shall grant equal access to Android operating system and platform features, including APIs like the PACKAGE_INSTALLER API, to Developers without discriminating based on the Developers' choice of app distribution channel. Google may not claim that features which are traditionally part of an operating system or platform are instead part of the Google Play Store.

2. **No Access Restrictions to Other Google Products or Services:** Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that conditions or impedes access to, restricts the use of, or conditions the terms of access to any of Google's products or services (other than its Google Play Billing ("GPB") service) on the basis of a Developer's actual or intended use of any Alternative Android App Distribution Channel.

  i. For the avoidance of doubt, prohibiting or disincentivizing the inclusion of a link to download or install any Android app through any Alternative Android App Distribution Channel in an advertisement for such an app that is handled or facilitated by Google Search, Google Ads, or similar services would be deemed a violation of this Paragraph II.C.2.

D. *Remedies To Promote Competition in Android App Distribution:* Google must undertake the conduct below in order to address the cumulative continuing effects of the conduct found to be unlawful and thereby restore competition in the Android App Distribution Market.

1.   **Google Play Store Catalog Access and Library Porting:**  For a period of six (6) years, Google shall provide Third-Party App Stores access to the Google Play Store app catalog.

   i.   On Android-compatible phones that preload what is currently named the GMS suite ("GMS Devices") or any similar package of Google apps and APIs made available to OEMs, Google shall allow Third-Party App Stores to access the Google Play Store's catalog of apps not then available on those Third-Party App Stores.  If a Third-Party App Store's User wishes to download and install an app not then available on that Third-Party App Store, Google shall have the Google Play Store download and install that app on the Third-Party App Store User's device through a background process similar to the Alley Oop integration offered by Google to certain third-party Developers.  Such apps installed by the Google Play Store shall be governed by the Google Play Store's distribution agreements with Developers, and Google may require the Third-Party App Stores to clearly indicate this to Users.

   ii.   Google shall allow Users to provide Third-Party App Stores with access to a list of apps installed by the Google Play Store on the User's GMS Device.  Google shall provide Users with the ability, subject to a one-time User permission, to change the ownership for any or all of those apps such that the Third-Party App Store becomes the update owner for those apps when those apps are directly distributed by the Third-Party App Store.

2.   **Google Play Store Distributing Third-Party App Stores:**  For a period of six (6) years, Google shall allow distribution of competing Third-Party App Stores on the Google Play Store.

i. The download process of Third-Party App Stores from the Google Play Store shall be identical in all respects to the download process of any other app from the Google Play Store, except that in connection with the first attempt to install an app from a Third-Party App Store downloaded from the Google Play Store, Google may present the User of a downloaded Third-Party App Store with a single one-tap screen asking the User to allow the Third-Party App Store to install other apps.

ii. Google shall not impose any fees in connection with the distribution of Third-Party App Stores on the Google Play Store pursuant to this Paragraph II.D.2 (including any fees on any sales made by such app stores or in apps distributed directly (*i.e.*, not through the access mechanism in Paragraph II.D.1) by these app stores).

3. **Mandating Placement of the Google Play Store:** For a period of six (6) years, Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that mandates or incentivizes the placement of the Google Play Store in any specific location on an Android device, including but not limited to the default home screen.

\* \* \*

Notwithstanding the preceding prohibitions, nothing in this section shall prohibit Google from engaging in bona fide competition on the merits with respect to the distribution of apps on Android, such as:

1. Making price or quality improvements to the Google Play Store to differentiate it from Alternative Android App Distribution Channels; and/or

2. Communicating to OEMs, Carriers, Developers and Users regarding any purported quality or price advantages of the Google Play Store over Alternative Android App Distribution Channels, or otherwise publicly promoting the Google Play Store.

## III.   ANDROID IN-APP PAYMENT SOLUTIONS MARKET

Google is enjoined from (i) restricting, prohibiting, impeding, disincentivizing or deterring the use of Android in-app payment solutions other than GPB ("Alternative In-App Payment Solutions"), and/or (ii) otherwise discriminating against Alternative In-App Payment Solutions, Developers that use Alternative In-App Payment Solutions, or any Android app or Third-Party App Store that uses Alternative In-App Payment Solutions.  To effectuate the injunctive relief, the Court orders the following specific remedies as it relates to Google's conduct in the Android In-App Payment Solutions Market.

A.   *Free Flow of Information Regarding Out-Of-App Purchasing Options*:

1.   Google shall not in any way limit, control, or restrict the ways an app can inform Users about out-of-app purchasing options.

2.   Google shall not restrict, prohibit, impede, disincentivize or deter Developers from informing Users about out-of-app purchasing options or from offering different prices for in-app purchases using GPB and using out-of-app payment options.

3.   Google shall not require Developers to use Google APIs (such as Google's "User Choice Billing" APIs) in order to invoke out-of-app purchasing options.

4.   Google shall not impose any Coercive Fees on transactions between a Developer and User made through out-of-payment options to which a User was "steered" by a link within an app.

   i.   The term "Coercive Fees" means fees that are higher than: Google's fees for a similar transaction utilizing GPB minus Google's average per-transaction total cost for handling in-app transactions in the preceding calendar year.

   ii.   Google shall disclose its calculation of the average per-transaction total costs for handling in-app transactions in any given year to the Compliance Committee provided for in Section IV, and shall make that

total cost public no later than its release of its audited financials for the corresponding calendar year.  For the avoidance of doubt, Google will not be required to calculate or disclose publicly its average per-transaction total cost for handling in-app transactions should it decide not to impose any fees on transactions between a Developer and User made through linked out-of-app payment options (as provided for in this Section) and not to impose any fees on in-app transactions using Alternative In-App Payment Solutions (as provided for in Section III.B) in a given year.

B.      *No Tying of Distribution to Payments (Contractual, Economic or Technical)*:

Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that requires the implementation of GPB in any Android app, including, but not limited to, enforcing Sections 1 and/or 2 of its Google Play Payments Policy.

    1.  Google shall not enforce or enter into contractual provisions, guidelines or policies, or impose technical restrictions or financial terms, that (a) restrict, prohibit, impede, disincentivize or deter Developers from integrating any Alternative In-App Payment Solution, whether alongside GPB or in lieu of GPB; or (b) restrict, prohibit, impede, disincentivize or deter Developers from offering different prices for in-app purchases using GPB and any Alternative In-App Payment Solution and/or making that price difference visible to Users.

    2.  Google shall not require Developers to use Google APIs (such as Google's "User Choice Billing" APIs) in order to invoke Alternative In-App Payment Solutions.

    3.  Google shall not impose any Coercive Fees on transactions made through Alternative In-App Payment Solutions.

C.    *No Discrimination on the Basis of Payment Solution*:

    1.   Google shall not reject for distribution, or otherwise disadvantage, any Android app submitted for distribution through the Google Play Store on the basis of the app's actual or intended integration of one or more Alternative In-App Payment Solutions, whether alongside GPB or in lieu of GPB.

    2.   Google shall not retaliate or threaten to retaliate against any Developer on the basis of such Developer's actual or intended integration of one or more Alternative In-App Payment Solutions into its app(s), whether alongside GPB or to the exclusion of GPB.

    3.   Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that imposes financial terms, technical limitations or otherwise restricts, prohibits or impedes access to the Android platform, any Android functionality and/or features or APIs, to any Android app (including any Third-Party App Stores) or Developer based on whether or not GPB is used by that app or that Developer as a payment solution exclusively or alongside Alternative In-App Payment Solutions.

    4.   Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that conditions or impedes access to, restricts the use of, or conditions the terms of access to any of Google's products or services based on whether or not an Android app or a Developer chooses to use GPB as a payment solution exclusively or alongside Alternative In-App Payment Solutions.

*     *     *

Notwithstanding the preceding prohibitions, nothing in this Section III shall prohibit Google from engaging in bona fide competition on the merits with respect to in-app payment solutions for Android apps, such as:

1.  Making price or quality improvements to GPB to differentiate it from Alternative In-App Payment Solutions.

2.  Communicating to OEMs, Carriers, Developers and Users regarding any purported quality or price advantages of GPB over Alternative In-App Payment Solutions, or otherwise publicly promoting GPB.

Further, nothing in this section shall prohibit Google from seeking a modification of the Court's Order regarding the Android In-App Payment Solutions Market (this Section III) on the basis of changed circumstances (*i.e.*, Google's loss of monopoly power in the Android App Distribution Market).

## IV.  COMPLIANCE

Google shall establish a compliance committee ("Compliance Committee") and retain a compliance officer ("Compliance Officer") in accordance with the below terms and conditions. The Compliance Committee shall be a committee of Google's Board of Directors, consisting of at least three members of the Board of Directors who are not present or former employees of Google and who meet the definition of "Independent Director" under NASDAQ Marketplace Rule 4200(a)(15).

The Compliance Officer shall report directly to the Compliance Committee and to the Chief Executive Officer of Google. The Compliance Officer shall be responsible for the development and supervision of Google's internal programs to ensure compliance with the antitrust laws and this Order. Google shall give the Compliance Officer all necessary authority and resources to discharge the responsibilities listed herein. The Compliance Officer may be removed only by the Compliance Committee for good cause shown and unrelated to carrying out the obligations set forth below in good faith, ordinary diligence and with loyalty to the assigned role.

The Compliance Officer shall have the following duties and responsibilities:

A.  Within ninety (90) days after entry of this Order, arrange for delivery to all executives of the Android, Google Play, and GPB business lines, and all officers and directors of Google ("Designated Google Personnel"), a copy of this Order together with additional informational materials describing the conduct prohibited and required by this Order;

B. Ensure that the Designated Google Personnel are annually briefed on the meaning and requirements of this Order and the United States antitrust laws and advising them that Google's legal advisors are available to confer with them regarding any question concerning compliance with this Order or the United States antitrust laws;

C. Obtain from each person described above within sixty (60) days of entry of this Order and annually thereafter, and for each person thereafter succeeding to such a position, a written certification under penalty of perjury pursuant to 28 U.S.C. 1746 that he or she: (i) has read, understands, and agrees to abide by the terms this Order; (ii) has to his or her knowledge either (a) not violated this Order or (b) violated this Order and sets forth the specific facts and circumstances of any violation of this Order; and (iii) has been advised and understands that his or her failure to comply with this Order may result in a finding of contempt of court;

D. On an annual basis, certify to the Court whether or not Google is fully compliant with this Order; and

E. Report promptly to the Court any credible evidence of violation of this Order and any Designated Google Personnel who has refused to sign the certificate required by Section IV.C above.

## V. ANTI-RETALIATION

Google is enjoined from taking any retaliatory actions against Epic or any of its affiliates in connection with or based on: (a) Epic's filing of its complaint against Google in this litigation; (b) Epic's proceeding against Google in the litigation that resulted in the jury verdict against Google; (c) Epic's pursuit of the injunctive relief contained herein: (d) Epic's August 2020 enablement of a direct payment option in *Fortnite* on the Google Play Store; (e) the steps Epic took to enable that Epic payment option; (f) Epic's 2018 launch of *Fortnite* on Android through an Alternative Android App Distribution Channel; or (g) Epic's actions prior to the 2018 launch (collectively "Prior Epic Actions"). For the avoidance of doubt, prohibited retaliatory actions include any conduct by Google that blocks or makes it disproportionately difficult or costly for Epic (as compared to any other entity) to develop,

distribute, update, publish, offer, make available, market, or advertise, any Android app, Third-Party App Store or Android in-app payment solution, including but not limited to by denying or burdening Epic's access to the Google Play Store or any other Google service. For the avoidance of doubt, a showing that Google is treating Epic differently than other developers will be *a prima facie* showing of non-compliance with this clause, and the burden will be on Google to prove that such disparate treatment is not retaliatory.

## VI.  <u>ADDITIONAL PROVISIONS</u>

This Court retains jurisdiction to enable Epic or Google to apply to this Court at any time for, or to act *sua sponte* to issue, further orders and direction as may be necessary or appropriate to carry out or construe this Order, to modify any of its provisions, to enforce compliance, and/or to punish violations of its provisions. Epic or Google may also seek modification of this Order by written motion and for good cause based on changed circumstances.

The use of headings in this Order is for ease of reference only. The headings have no legal effect, are not to be considered part of this Order and shall not be deemed to alter or affect the meaning or interpretation of any provision in this Order.

Dated:  April 11, 2024

Respectfully submitted,

By:      /s/ *Gary A. Bornstein*
              Gary A. Bornstein

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Counsel for Plaintiff Epic Games, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO**

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO<br><br>*Epic Games, Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD |

**STATEMENT OF B. DOUGLAS BERNHEIM**


**APRIL 11, 2024**

# Table of contents

I. Overview .............................................................................................................................1

II. Principles for an effective remedy ....................................................................................2

    II.A. An effective remedy must prevent Google from foreclosing, impairing, and/or disincentivizing
preinstallation through agreements with OEMs ..................................................3

    II.B. An effective remedy must prevent Google from impairing rival app distribution methods through
agreements with developers ....................................................................................6

    II.C. An effective remedy must prevent Google from imposing frictions on "off-Play" app installations............8

    II.D. An effective remedy must reestablish an even playing field to compensate for past harms to
competition .........................................................................................................10

    II.E. Impact of States' Settlement.........................................................................................12

III. Detailed description of remedy proposal .......................................................................15

    III.A. No agreements not to compete ...................................................................................16

    III.B. No undue restrictions on direct downloading ............................................................20

    III.C. No undue restrictions on access to Android or other Google products or services ...............................22

    III.D. Addressing the continuing effects of past anticompetitive conduct in Android app distribution ............24

    III.E. Google allowed to compete on the merits .................................................................28

# I. Overview

(1)  This Statement contains my opinions regarding potential remedies for Google's anticompetitive conduct found to be illegal in *In re Google Play Store Antitrust Litigation*.[1] The scope of my engagement in this matter focuses on remedies for Google's anticompetitive practices in Android app distribution. I understand that Epic has asked Dr. Tadelis to address remedies for Google's unlawful tie between app distribution and Google Play Billing.

(2)  In Section II below, I explain the economic principles that guide my analysis of potential remedies in this matter, and discuss generally how Epic's proposed injunction aligns with them. I also explain why aspects of the settlement reached between Google, plaintiff States, and class consumers (the "States' Settlement") do not align with these principles.[2] In Section III, I discuss in more detail each provision of Epic's proposed injunction that is within the scope of my opinion, and why these provisions are consistent with the principles I describe in Section II.

---

[1]   Jury Verdict, *In re Google Play Store Antitrust Litigation.*, No. 21-md-02981-JD (N.D. Cal. December 11, 2023), ECF Dkt. No. 606 [hereinafter, "Jury Verdict"].

[2]   Stipulation and [Proposed] Order re Deadlines in Consumers' and States' Actions in Light of Tentative Settlement, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD (N.D. Cal. September 5, 2023), ECF Dkt. No. 596; *see also* Settlement Agreement and Release, *State of Utah v. Google LLC*, No. 3:21-cv-05227-JD (N.D. Cal. Dec. 18, 2023), ECF Dkt. No. 522-2 [hereinafter, "States' Settlement"].

# II. Principles for an effective remedy

(3)    The jury found that Google "willfully acquired or maintained monopoly power by engaging in anticompetitive conduct" in the markets for (i) Android app distribution and (ii) Android in-app billing services for digital goods and services transactions.[3] The jury also found that several specific agreements Google entered into were "unreasonable restraint(s) of trade"[4] and "that Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing."[5]

(4)    As an economic matter, fixing the damage to the Android app distribution market caused by Google's conduct requires both (a) preventing Google from engaging in future anticompetitive conduct and (b) undoing the effects of Google's past anticompetitive conduct. I analyzed Google's conduct as well as competition in the Android app distribution market more broadly while preparing my testimony in this matter. I draw from that analysis as well as my background as an economist specializing in industrial organization, including antitrust and public policy, to offer opinions about an effective remedy here.

(5)    At minimum, any remedy for Google's anticompetitive practices must prohibit the conduct that allowed it to acquire and maintain monopoly power, including any practice that was deemed either an "unreasonable restraint of trade" or an unlawful tie. However, a remedy that does no more than narrowly prohibit the specific anticompetitive practices undertaken by Google in the past invites evasion.[6] An *effective* remedy must therefore also preclude related conduct that could yield substantially similar outcomes.

---

[3]    Jury Verdict, 3:19–25. The jury found the geographic market for each of these markets to be "Worldwide excluding China." Jury Verdict, 3:2–15.

[4]    Specifically, the jury found the following agreements to be "unreasonable restraint(s) of trade" in accordance with the given instructions: "DDA Agreements," "Agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program," and "Agreements with OEMs that sell mobile devices (including MADA and RSA agreements)." Jury Verdict, 5:14–23.

[5]    Jury Verdict, 7:3–8.

[6]    Concerns about narrowly tailored remedies that can be evaded are not just theoretical. Excessive narrowness of remedies has already prevented efforts in other jurisdictions to remedy anticompetitive conduct related to app distribution from being effective. For example, in 2021, Korea passed a new telecommunications law that allowed app developers to use third-party payment options for in-app purchases. Apple and Google responded to the law by charging new fees for developers using alternative payment systems. "Changes to Google Play's Billing Requirements for Developers Serving Users in South Korea," Google Play Console Help, accessed April 4, 2024, https://support.google.com/googleplay/android-developer/answer/11222040?hl=en;v; Kate Park, "Google, Apple Face Fines in South Korea for Breaching In-App Billing Rules," TechCrunch, updated October 6, 2023, https://techcrunch.com/2023/10/06/google-apple-face-fines-in-south-korea-for-breaching-in-app-billing-rules. In addition, Apple reduced the functionality of apps using alternative payment systems, forbidding them from also using the Apple payment system and adding the following warning message: "all purchases in this app will be managed by developer '<Developer Name>'. You will no longer be transacting with Apple. Your stored App Store payment method and related features, such as subscription management, Ask to Buy, Family Sharing, and refund requests, will not be available. Apple is not responsible for the privacy or security of transactions made with this developer." Underneath that message was a link to "learn more" and a button to cancel the transaction. Both Google and Apple have subsequently been fined for violations of the law. "Distributing apps using a third-party payment provider in South Korea," Apple Developer Support, accessed April 9, 2024, https://developer.apple.com/support/storekit-external-entitlement-kr/.

Statement of B. Douglas Bernheim

(6)     Further, to be effective in restoring competition, a remedy must give rivals an opportunity to compete on the merits with the Google Play Store despite the competitive advantages Google acquired from its anticompetitive conduct. This aspect of the remedy is particularly important given the strong network effects in the Android app distribution market.

(7)     Finally, to the extent possible, a remedy should also avoid inhibiting Google's ability to compete on the merits by improving its products or pricing, or by addressing legitimate security concerns.[7]

(8)     Below, I review the categories of anticompetitive conduct and agreements I identified during my trial testimony. In each case, I reference Google's past conduct, explain its anticompetitive effects, and describe the varieties of conduct an effective remedy would need to preclude. I also explain that, because app distribution is characterized by strong network externalities, an effective remedy must address past harms to competition by leveling the playing field. Then I discuss the States' Settlement and explain why it does not constitute an effective remedy.

(9)     Following this discussion of applicable principles, in Section III I address more specifically, on a provision-by-provision basis, each portion of Epic's proposed injunction that falls within the scope of my assignment.

## II.A. An effective remedy must prevent Google from foreclosing, impairing, and/or disincentivizing preinstallation through agreements with OEMs

(10)    Evidence presented at trial showed that Google's agreements with OEMs enhanced Google's ability to monopolize the relevant markets by foreclosing, impairing, and/or disincentivizing pre-installation of alternative app stores. In addition, the jury found "[a]greements with OEMs that sell mobile devices (including MADA and RSA agreements)" to be unreasonable restraints of trade.[8] Specifically:

---

[7]     Epic's Proposed Permanent Injunction [hereinafter, "Proposed Injunction"]. I discuss in more detail in Section III below why the Proposed Injunction does not prevent Google from competing on the merits.

[8]     Jury Verdict, 5:14–23.

Statement of B. Douglas Bernheim

■ RSA 3.0 "Premier Tier" agreements entirely prevent OEMs from preloading[9] competing app stores on certain devices.[10] Google targets these agreements primarily at OEMs that have developed their own app stores.[11]

■ Some RSA 3.0 agreements with OEMs include Google Play revenue sharing provisions.[12] Google targets these provisions, as well as the most generous revenue-sharing terms, primarily at OEMs that have developed their own app stores.[13] This conduct directly disincentives the distribution of competing app stores; it amounts to "buying off" rivals.[14] Note that Project Hug agreements, which are with developers rather than OEMs, similarly contain provisions that disincentivize the creation of competing app distribution platforms.[15] I discuss the remedy as it relates to developer agreements in more detail in Section II.B. below.

---

9   Preloaded apps and app stores are apps that are installed and licensed on new devices as part of the "out-of-the-box experience." Kolotouros Testimony, Tr. 1135:6–12. Throughout this Statement, I use "preloaded" and "preinstalled" interchangeably. Kolotouros Testimony, Tr. 1091:13–15.

10   See Lam Testimony, Tr. 980:10–14 (OEMs who receive premier tier revenue share payments cannot preinstall any app store other than Google Play); Kolotouros Testimony, Tr. 1053:20–24, 1071:20–24 (in order to qualify for the premier tier, an OEM may not install any app store other than Google Play); 1091:10–1092:2 (discussing Exhibit 627, the premier tier requirements document, confirming that it prevents an OEM from preinstalling an app store other than Google Play); Pichai Testimony, Tr. 1382:3–7 (OEMs are prohibited from installing a competing app store on devices that are enrolled in the premier tier); Gennai Testimony, Tr. 2950:13–18 (the terms of the RSA 3.0 premier tier agreement were that OEMs wouldn't preload another app store); see also Opening Expert Report of B. Douglas Bernheim, Ph.D., October 3, 2022 [hereinafter, "Bernheim Report"], ¶¶ 298–299, 395–399; Reply Expert Report of B. Douglas Bernheim, Ph.D., December 3, 2022 [hereinafter, "Bernheim Reply Report"], ¶¶ 320, 334–343; Bernheim Testimony, Tr. 2396:25–2397:7.

11   See Kolotouros Testimony, Tr. 1077:11–1083:24 (discussing Exhibit 624, a presentation which was presented to the Business Council about RSA 3.0 to "protect Google from key strategic risks," listing Chinese OEMs who "were all rapidly growing OEMs at the time" outside of China); Bernheim Report, ¶¶ 396-99; Bernheim Reply Report, ¶ 320; Bernheim Testimony, Tr. 2398:5–20 ("So a very large fraction of the phones associated with the OEMs who actually had competing app stores, they had to stop putting those app stores on the phones."), 2408:11–21 ("Q. Which OEMs got the most generous revenue sharing terms from Google? …you can see at the top of the list are Xiaomi, Oppo, and Vivo. These are the OEMs that had competitive preinstalled app stores, setting aside Samsung and setting aside the two that essentially disappeared. So what we see here is aggressive revenue sharing being given not to potential competitors but to actual competitors.").

12   See Lam Testimony, Tr. 980:3–6 ("Q. And under those RSA 3.0 agreements, you understand that Google pays Google Play revenue share to OEMs who elect their devices into the Premier Tier of that program, right? A. That's correct."); Bernheim Report, ¶¶ 396–99; Bernheim Reply Report, ¶ 320. Bernheim Testimony, Tr. 2407:16–2408:10.

13   See Kolotouros Testimony, Tr. 1083:25–1086:1 (discussing Exhibit 624, a presentation which was presented to the Business Council about RSA 3.0, describing Google "offering up to 16 percent Google Play revenue shares to OEMs", "[a]nd the way that's going to be spent, it says, is that was going to go to key Chinese OEMs" compared to "more like 4 to 8 percent revenue share for Google Play for smaller OEMs"); Bernheim Report, ¶¶ 396–99; Bernheim Reply Report, ¶ 320.

14   Bernheim Testimony, Tr. 2396:3–2397:7; see also Bernheim Testimony, Tr. 2398:5–2400:15 (premier tier agreements are targeted at OEMs with significant preinstallation of their competing app stores); 2407:14–2408:10; 2411:5–2412:3 (discussing Exhibit 624 at -018, a slide from a Google presentation, discussing Revenue Sharing Agreements as complementing Projects Hug and Banyan); 3189:20–3190:14 (the problem was not with revenue sharing generally, but instead that Google Play shared profits with its competitors, which disincentivizes competition); Kolotouros Testimony, Tr. 1082:19–23, 1083:16–24 (RSA 3.0 was a risk-mitigation strategy to protect Google Play from competition on the Android platform); 1072:21–1076:12 (discussing Trial Exhibit 623, an email from Tanu Raja forwarded by Mr. Kolotouros, which said that Google could use RSAs to "help[] stem the tide of emerging app stores"); Bernheim Report ¶¶ 348–349, 395–399.

15   The "Games Velocity Program" is synonymous with Project Hug; in this Statement, I refer to it as "Project Hug."

(11)    An effective remedy for this conduct must limit Google's ability to restrict preloading of competing app stores and prevent Google from sharing Google Play revenue with competing or potentially competing app distributors. It must also prevent Google from using its control of Android to impair competing app stores in other ways once these modes of conduct are proscribed. As discussed further below, Epic's proposed remedy addresses these requirements in three ways:

- Paragraph II.A.1 prohibits conduct that prevents or disincentivizes OEMs or carriers from preinstalling or granting install permission to competing app stores.[16] This provision addresses the RSA 3.0 premier-tier exclusivity provisions and the RSA 3.0 Google Play revenue-sharing provisions. It would also preclude efforts to stifle competing app stores by depriving them of install privileges. Paragraph II.A.1 also prohibits conduct that prevents or disincentivizes OEMs or carriers from preinstalling apps that are not app stores, in order to prevent Google from restricting the availability of preinstallation as a means of distributing individual apps.

- Paragraph II.A.2 prohibits Google from creating or enforcing agreements that require or incentivize potential or actual competing distributors to decrease or refrain from increasing investment in, or abandon altogether, distribution of Android apps or entry into the distribution of Android apps.[17] It also requires Google, in any agreement with a competing distributor, to include a "clear and express statement" that the terms of the agreement are not in any way conditional on "use, development, preinstallation, launch, or placement" of an alternative app distribution channel. The purpose of these provisions is, in part, to preclude Google from circumventing the preceding prohibitions by creating other disincentives for OEMs to launch their own app stores.[18]

- Paragraph II.C.1 prevents Google from disrupting alternative distribution channels and impairing apps downloaded from them by denying or impeding Google-Play-equivalent access to Android functionality and/or APIs or features.[19] The purpose of this provision is to preclude Google from circumventing the preceding prohibitions by withholding key Android functionalities from competing app stores or apps distributed outside of Google Play.

(12)    In addition to prohibiting the specific agreements discussed at trial, Epic's proposed remedy is broad enough to cover similar agreements Google might reach with OEMs as well as alternative strategies for impairing rival app stores, without impairing legitimate efforts by Google to compete.

---

[16]  Proposed Injunction, ¶ II.A.1.
[17]  Proposed Injunction, ¶ II.A.2.
[18]  Bernheim Testimony, Tr. 2409:5–2410:7; *see also* Bernheim Report, Section V.B.4.c.
[19]  Proposed Injunction, ¶ II.C.1.

## II.B. An effective remedy must prevent Google from impairing rival app distribution methods through agreements with developers

(13)    As I explained in my expert report and at trial, network externalities help Google sustain dominance in Android app distribution: the vast majority of consumers use the Google Play Store because virtually all developers distribute their apps through it, and virtually all developers distribute their apps through the Google Play Store because the vast majority of consumers use it (typically to the exclusion of other stores).[20] In such settings, a rival usually cannot compete effectively merely as a "we have most of the same stuff" platform.[21] Instead, the best strategy for overcoming network externalities is usually to offer something distinctive.[22] In the current context, a rival might hope to gain a foothold in the app distribution market by carrying content that is not available on the Google Play Store, such as exclusive games or unique content within prominent games.[23]

(14)    Evidence presented at trial showed that Google's Project Hug agreements with large developers enhanced its ability to monopolize the relevant markets by preventing rival app stores from offering distinctive content.[24] Such deals generally include the following terms:

- ■  Release parity: developers are required to release their apps on the Google Play Store at the same time or earlier than on other app stores.

- ■  Quality and promotion parity: developers are required to offer the same core content and features on other app stores as on the Google Play Store, and cannot promote their content more aggressively on other app stores.

- ■  Non-removal: developers cannot remove their apps from the Google Play Store without Google's permission.[25]

---

20    *See, e.g.*, Bernheim Testimony, Tr. 2401:3–7 ("In the context of Google Play, you've got users going to – smartphone users going to Google Play because the apps are there, and you've got developers putting their apps on Google Play because users are going there, and it's all kind of reinforcing."); Bernheim Report, ¶¶ 247–248; Bernheim Reply Report, ¶¶ 319–321.

21    Bernheim Testimony, Tr. 2400:20–2401:15; *see also* Bernheim Report, ¶ 436.

22    Bernheim Testimony, Tr. 2401:7–10 ("[T]o break into that [Google Play's dominance], you need to offer the consumer a compelling reason to do something else. And the way that that's typically done in these types of markets is to offer some sort of exclusive content….").

23    Bernheim Testimony, Tr. 2401:9–15.

24    Bernheim Testimony, Tr. 2401:16–22 (Project Hug provisions prevent competing app stores from offering exclusive content); 2403:7–2404:11 (Project Hug provisions prevent competitors' differentiation, which blocks the main viable entry strategy into the industry and discourages them from developing new content); 3188:17–3190:14 (Project Hug parity provisions discourage competitive investments); *see also* Koh Testimony, Tr. 442:18–443:18, 444:10–18 (Project Hug sim ship and feature parity requirements reduce Google Play's risk of losing out to other app stores); Bernheim Report, ¶¶ 339–342, 436–443. In addition, the jury found "[a]greements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program" to be unreasonable restraints of trade. Jury Verdict, 5:14–21.

25    Koh Testimony, Tr. 467:20–469:16 (confirming the non-removal requirement in Exhibit 153, the ABK Hug agreement); 482:13–483:9 (confirming the non-removal requirement in Exhibit 162, the Riot Games Hug agreement); *see also*

(15)    Additionally, evidence presented at trial showed that Google viewed key developers as threats to
enter the app distribution market with their own stores and to distribute off Google Play. The Project
Hug agreements with those developers disincentivized competition in Android app distribution by,
effectively, paying potential rivals not to develop competing app distribution methods.[26]

(16)    An effective remedy for this conduct must remove the artificial impediments to offering differentiated
content, and also preclude agreements that directly disincentivize large developers from offering
competing app stores. Epic's proposed remedy addresses this requirement in three ways:

■    As noted in the previous section, Paragraph II.A.2. prohibits Google from creating or enforcing
agreements that require or incentivize potential or actual competing distributors to decrease or refrain
from increasing investment in, or abandon altogether, distribution of Android apps or entry into the
distribution of Android apps. It also requires Google, in any agreement with a competing distributor,
to include a "clear and express statement" that the terms of the agreement are not in any way
conditional on "use, development, preinstallation, launch or placement" of an alternative app
distribution channel. The purpose of these provisions is, in part, to prevent Google from reaching
agreements with developers, such as Google's Project Hug initiatives,[27] that require or incentivize
developers to limit their investment in competing app distribution channels.[28]

---

Bernheim Report, ¶ 335; Bernheim Testimony, Tr. 2403:7–2404:11, 3189:10–19.

[26]    Bernheim Testimony, Tr. 2409:5–2410:7 (Project Hug payments reduced competitors' incentives to enter); 2411:2–
2412:3 (Exhibit 624 describes Project Hug as a risk mitigation strategy and refers to incentive mechanisms that
discourage competition); 2511:10–2512:3 (Project Hug payments are not simple discounts but instead are conditional on
Google getting something in exchange that allows it to block successful entry); Gennai Testimony, Tr. 2928:7–2936:14
(discussing Exhibits 136 and 591, which show Google Play's growth in its business model faced risk in increasing
competition from OEMs and third-party app stores, and Google could avoid a race to the bottom on pricing with
something like Project Hug); Koh Testimony, Tr. 422:4–6 ("[c]ompetition attracting more developers and more users
was—it's a—one of the key considerations for Project Hug"); 428:7–435:17 (discussing Exhibit 136, which describes
contagion risk to Google from competing Android app distribution platforms and requests Business Council funding for
Project Hug to prevent loss of top developers to those other platforms); 439:9–441:10 (some of the Project Hug
developers specifically told Google that they were considering starting their own competing Android app stores, and
Google specifically assumed that other developers targeted by Project Hug could also have the capabilities to launch
their own stores); 455:6–459:13 (discussing Exhibit 148, in which Karen Beatty writes that ABK preferred to enter into
a Hug deal rather than compete with Google); 477:11–482:1 (discussing Exhibit 156, in which Lawrence Koh explains
that Project Hug payments to Riot Games were money well spent towards the objective of making sure that Riot did not
launch its own app store); 485:8–13 (by the time Lawrence Koh left Google, Project Hug was working in that all Project
Hug developers were meeting the sim ship and feature parity requirements and keeping titles on Google Play); Marchak
Testimony, Tr. 629:12–15 (One criterion for selecting developers for Project Hug was that Google believed they may
forego Google Play); Kochikar Testimony, Tr. 776:24–777:3 (One of the justifications for Project Hug deals was the
risk that developers would launch titles outside of Google Play); 806:18–810:5 (If Google could secure a Project Hug
deal with ABK, then it would disincentivize ABK from investing in an alternative app store or finding other ways to
distribute its apps on Android); 811:10–812:12 (Google "pulled out the stops" to get a Project Hug deal "to get Riot
Games to stop their in-house app store effort"); Harrison Testimony, Tr. 1892:3–1895:22 (discussing Exhibit 8019,
Harrison advocated for a Project Hug deal with ABK with the rationale that it would mitigate the risk that ABK would
launch its own distribution platform); *see also,* Bernheim Report, ¶ 350.

[27]    Bernheim Testimony, Tr. 2409:5–2410:7; Bernheim Report, Section V.B.4.c.

[28]    Proposed Injunction, ¶ II.A.2. This provision would not prevent Google from incentivizing developer investment in
Google Play by lowering Google Play's price or improving its quality. The Proposed Injunction specifically allows
Google to engage in "bona fide competition on the merits with respect to the distribution of apps on Android," which

Statement of B. Douglas Bernheim

- Paragraph II.A.4 prevents Google from placing restrictions on developers' ability to offer differentiated content on competing app stores.[29]

- Paragraph II.A.5 prevents Google from prohibiting the withdrawal of apps from the Google Play Store without Google's consent.[30]

(17)   An effective remedy must also preclude alternative strategies through which Google could potentially achieve the same objective if parity provisions are disallowed. One possibility is that Google might enter into agreements with developers that require the exclusive distribution on Android of key Android apps and content through the Google Play Store. Paragraph II.A.3 explicitly precludes that conduct.[31]

(18)   A second possibility is that Google might use its control of Google Android functionalities and key Android-related products and services to punish developers who explore alternative app distribution methods.[32] The proposed remedy addresses this possibility in two ways:

- Paragraph II.C.1 mandates that Google provide parity access to Android functionalities for alternative Android app distribution channels, or apps downloaded through those channels.[33]

- Paragraph II.C.2 prevents Google from conditioning the use of Google products or services on a developer's actual or intended use of an alternative app distribution channel.[34]

## II.C. An effective remedy must prevent Google from imposing frictions on "off-Play" app installations

(19)   Evidence presented at trial showed that Google's restrictions on direct downloading and downloading from third-party app stores enhanced its ability to monopolize the Android app distribution market.[35]

---

includes "[m]aking price or quality improvements to the Google Play Store to differentiate it from Alternative Android App Distribution Channels…" Proposed Injunction, 10.

[29]   Proposed Injunction, ¶ II.A.4.

[30]   Proposed Injunction, ¶ II.A.5; *see also*, Koh Testimony, Tr. 467:20–469:16 (confirming the non-removal requirement in Exhibit 153, the ABK Project Hug agreement); 482:13–483:9 (confirming the non-removal requirement in Exhibit 162, the Riot Games Project Hug agreement); Bernheim Report, ¶ 335.

[31]   Proposed Injunction, ¶ II.A.3.

[32]   I discuss the importance to app developers of access to APIs generally, and to Google's proprietary Android APIs specifically, in Bernheim Report, ¶¶ 33–47.

[33]   Proposed Injunction, ¶ II.C.1.

[34]   Proposed Injunction, ¶ II.C.2.

[35]   Bernheim Testimony, Tr. 2389:1–2393:19 (discussing evidence of effects of Google installation frictions from Epic installation funnel data and OnePlus preinstallations, and concluding that Google's degradation of the download experience enhances Google Play's market power in the market for app distribution); Morrill Testimony, Tr. 169:21:170:6 (testifying that 11 percent of users who tried to download the Amazon Appstore through the unknown sources install flow actually succeeded); Rosenberg Testimony, Tr. 1216:23–1217:2 (discussing Exhibit 682, a slide deck showing how Google recognized that as a result of the unknown sources warning the hurdles were too high for

As I discussed in my report, such restrictions "diminished the success of competing app distribution initiatives."[36]

(20)    While Google should not be prevented from imposing legitimate security warnings to protect the safety of Android users, such warnings should not discriminate among apps based on the app store from which users download them, or discriminate against stores based on whether they are pre-loaded or obtained from the web. Prof. Mickens testified at trial that Google's unknown sources flow imposes frictions that are not commensurate with the risk from directly downloaded apps.[37] He proposed an alternative involving (i) a one-time user permission for an installer app to download other apps, and (ii) a warning plus an option to abort the download of any app that has not passed an automated malware check.[38] He also testified that Google could ensure app security by notarizing apps itself in a manner similar to the mechanism used by Apple on Mac computers, or by using third-party verification services such as those Google already employs for secure communication through its Chrome browser, Gmail, and other web services.[39] Finally, he testified that his proposals would make Android no less secure than it currently is, and might make it safer.[40]

(21)    Paragraphs II.B.1 and II.B.2 address this conduct by prohibiting Google from imposing unnecessary frictions to disincentivize users from obtaining apps outside of the Google Play Store, while still allowing Google the flexibility to block or impose frictions on apps or app stores that are known malware or are associated with developers who do not obtain proper notarization.[41]

---

most users to install the Amazon Appstore); Kochikar Testimony, Tr. 746:3–752:11 (discussing Exhibit 5718, which describes an 18-step process for installing the Amazon Appstore through the unknown sources install flow); 752:20–756:3 (discussing Exhibit 1517, her email to Jamie Rosenberg in which she described the experience of getting Fortnite on Android via direct downloading as "frankly abysmal" due in part to the 15 steps required); 759:10–761:10 (discussing Exhibit 917, a document she authored that says that "we know that [the install friction] will dramatically limit [Epic's] reach"); 762:19–763:2 (explaining how where there is friction, people fall out and do not complete purchases); Pichai Testimony, Tr. 1360:19–1362:24 (testifying that the steps involved in direct downloading are examples of frictions; the more friction there is, the less likely the user completes the flow).

[36]    Bernheim Report, Section VI.B.3.

[37]    Mickens Testimony, Tr. 2114:10–15.

[38]    Mickens Testimony, Tr. 2148:18–2157:5.

[39]    Mickens Testimony, Tr. 2157:6–2163:2.

[40]    Mickens Testimony, Tr. 2163:3–2164:1. Similarly, Google's Dave Kleidermacher testified that (i) trusted third parties could authenticate apps, (ii) Google has introduced a security review badge on the Google Play Store for certain apps that undertake voluntary security review with the App Defense Alliance, and (iii) Google can or could use various technological tools to distinguish safe apps from malware. Kleidermacher Testimony, Tr. 1706:22–1712:1.

[41]    Proposed Injunction, ¶¶ II.B.1 and II.B.2.

Statement of B. Douglas Bernheim

## II.D. An effective remedy must reestablish an even playing field to compensate for past harms to competition

(22)  As discussed in Section II.B, network effects in app distribution tend to reinforce and perpetuate the market power Google acquired and maintained illicitly.[42] Consequently, even if a remedy broadly prevented Google from engaging in the types of anticompetitive conduct the jury found to be illegal, Google's past conduct would still have a substantial and continuing impact on competition in Android app distribution. Mitigating the future effects of Google's past conduct requires additional remedial measures.

(23)  Competing app stores face a chicken-and-egg problem: enticing a significant number of users to consider an alternative to Google Play is challenging without a comparably comprehensive catalog of apps, and compiling such a catalog is challenging without a large base of users.[43] An app store can certainly attempt to build its user base through preload deals, direct downloading, and agreements with developers to offer exclusive content. However, all these measures are limited: the effects of preload deals are gradual because users tend to keep their mobile phones for several years; even simplified forms of direct downloading are considerably less convenient than preloading; and the benefits of offering exclusive content are transitory.[44] Given the market power that Google has maintained for years, a small app store faces hurdles for building a large and stable user base over a relatively short time frame, and its value proposition for developers is difficult to establish. And without the engagement of developers, the likelihood of building the user base becomes even more remote.

(24)  Epic's proposed remedy attempts to address these difficulties in three ways. For a period of six years:

- Paragraph II.D.1 allows competing app stores to access Google Play's app catalog "through a background process similar to the Alley Oop integration offered by Google to certain third-party Developers."[45] Google Play would still be allowed to earn revenue from its apps distributed in this way.[46]

---

[42]  I discussed network effects in my expert report. *See* Bernheim Report, ¶ 455.

[43]  Bernheim Report, ¶ 455.

[44]  Preloading on new devices is not likely to have widespread immediate effect on competition as users replace their phones every 2-3 years and preloads are not available on old devices. *See* Bernheim Testimony, Tr. 2434:2-11 (testifying that people buy a new phone "on average once every 2.7 years"); *see also* Lockheimer Testimony, Tr. 1500:3-7 (testifying that people replace phones every two or three years).

[45]  Proposed Injunction, ¶ II.D.1.i. I understand that Alley Oop denotes a mechanism by which Google Play acts as the backend to another developer's app-distribution efforts, *e.g.*, through an in-app ad. *See, e.g.*, Exhibit 136-043. Google describes Alley Oop as an "inline install solution powered by [Google] Play." Exhibit 1546-007. For a period of 15 months (six-month agreement extended by nine months), Google allowed Facebook to install its apps and others' apps outside of Google Play using Alley Oop. Exhibit 1546-007. *See also*, Bernheim Report, n. 1117; Bernheim Reply Report, n. 1238.

[46]  Apps distributed in this way "shall be governed by the Google Play Store's distribution agreements with Developers,"

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 72 of 645
Case 3:21-md-02981-JD Document 1033-1 Filed 10/16/24 Page 172 of 199

Statement of B. Douglas Bernheim

- Paragraph II.D.2 allows distribution of competing app stores on the Google Play Store.[47]

- Paragraph II.D.3 prohibits Google agreements with OEMs or carriers that mandate or incentivize placement of the Google Play Store in any specific location on an Android device.[48]

(25)     The first portion is critical because it ameliorates the chicken-and-egg problem by uncoupling the two sides of the market. The Alley Oop strategy allows rival app stores, for a limited period of time, to offer comprehensive catalogs on day one, and consequently lowers an obstacle (which was exacerbated by Google's past conduct) to those rival app stores' being able to compete for users on a more even playing field. A store that succeeds in acquiring users through attractive pricing, superior search features, user-friendly interfaces, and the like, will then be well-positioned to engage developers directly and persuade them to launch their apps in the store's own catalog. The network externalities that sustain Google Play's dominance would thereby be mitigated at least to some degree. At the end of six years, the stores that offer the best value propositions have a better prospect of attaining sufficient user bases and proprietary catalogs to compete without further access to the Google Play catalog.

(26)     The second portion of this remedy streamlines the process of acquiring new users but does not directly address the network externalities that protect the market power Google acquired and maintained illicitly. While distribution competitors can under the terms of the proposed injunction self-distribute their stores, Google's years of imposing frictions on direct downloads have trained users to rely on the Google Play Store to the exclusion of direct downloads, and as a result it will likely take some time to make them comfortable with direct downloading. Similarly, while distribution competitors ought to be able to reach agreements with OEMs to preinstall their app stores, that process would only impact the app distribution market with some delay—the large installed base of existing phones relative to new phones means that a substantial portion of Android users would be initially inaccessible through preloading deals. To make competing stores more readily accessible and visible to users, the Proposed Injunction requires Google, for a limited period, to make these stores available through the Google Play Store. Though the Google Play Store's policy of refusing to distribute competing app stores is not part of the conduct that the jury found to be illegal, and there are good reasons to be cautious about requiring the Google Play Store to carry competing stores in perpetuity, this temporary remedy for Google's other misconduct will help accelerate the transition to a more competitive Android app distribution market.

(27)     The third portion provides competing app stores with temporary and limited opportunities to offset the Google Play Store's illicitly acquired incumbency advantages with users by negotiating

---

but Users can transfer update ownership to a third-party app store if and when an app becomes available there. Proposed Injunction, ¶ II.D.1.i, ii.

[47]   Proposed Injunction, ¶ II.D.2.

[48]   Proposed Injunction, ¶ II.D.3.

comparable or more prominent placement. It does not, however, prohibit an OEM from placing the Google Play Store prominently if, in its judgement, its mobile phone offerings are thereby improved.

(28)  An important feature of these remedies is that they neutralize some of the advantages Google acquired through past anticompetitive conduct by enhancing the value competing app stores can offer users and developers, rather than by meaningfully impairing Google's ability to serve these constituencies. The benefit to users and developers is therefore direct with no significant risk of negative consequences to their interests.

## II.E. Impact of States' Settlement

(29)  Before the trial began, plaintiff States and a class of app consumers reached a settlement with Google regarding Google's anticompetitive conduct. I have reviewed the States' Settlement to determine whether it adequately accomplishes the goals of preventing Google from engaging in future anticompetitive conduct and undoing the effects of Google's past anticompetitive conduct. On the first point, the States' Settlement does not fully prohibit the conduct found to be anticompetitive at trial; neither does it adequately prevent Google from modifying that conduct to achieve the same anticompetitive objectives in a somewhat different way. On the second point, the States' Settlement makes no attempt to undo the effects of Google's past anticompetitive conduct.

(30)  With regard to preventing Google from "foreclosing, impairing, and/or disincentivizing pre-installation of alternative app stores through agreements with OEMs" (Section II.A. above), the States' Settlement does not preclude the full menu of anticompetitive provisions that Google has deployed or could deploy in its agreements with OEMs. The States' Settlement prohibits agreements with OEMs that (i) secure preload or home screen exclusivity for the Google Play Store,[49] (ii) prevent OEMs from granting installer rights to preloaded applications,[50] or (iii) require OEMs to obtain Google's permission to preload a third-party app store.[51] That is, if an OEM decides to develop an alternative app distribution channel, the States' Settlement prohibits some, but not all, of the strategies through which Google could hamstring that initiative. Specifically, the States' Settlement does not prevent Google from signing agreements, such as the RSA 3.0 revenue-sharing provisions, that disincentivize OEMs from preloading or featuring alternative app stores.[52] Furthermore, it does not explicitly prevent Google from penalizing an OEM for pre-loading a third-party app store by

---

[49]  States' Settlement, Section 6.6.

[50]  States' Settlement, Section 6.7.

[51]  States' Settlement, Section 6.8.

[52]  The States' Settlement also allows Google to enter into or enforce existing agreements with OEMs that provide it with non-exclusive placement rights on the home screen or any other screen. *See* States' Settlement, Sections 6.6.

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 74 of 645
Case 3:21-md-02981-JD Document 1052-1 Filed 10/16/24 Page 574 of 99

Statement of B. Douglas Bernheim

restricting access to Android functionality or restricting access to other important Google products or services.

(31) With regard to preventing Google from "impairing rival app distribution methods through agreements with developers" (Section II.B. above), the States' Settlement would allow Google to enter into some agreements with developers that would limit competition in Android app distribution. For instance, though the States' Settlement forbids contractual agreements between Google and developers that contain broad parity provisions (though for only four years), it does not prevent Google from reaching such agreements with respect to individual apps.[53] Because relatively few apps are popular enough to drive user engagement with alternative app stores, Google would likely be able to suppress competition just as effectively through more narrowly targeted restrictions. The States' Settlement also exempts (after two years) parity agreements referencing alternative app stores controlled by companies with revenues exceeding $100 billion.[54] This exemption is ill-conceived. Many of the likely entrants into Android app distribution are large companies such as Amazon, Microsoft, and Samsung, and vulnerability to network externalities is not primarily a function of a rival's resources. In addition, the States' Settlement does not prevent Google from signing agreements with developers to exclusively list their apps on the Google Play Store.[55] It also does not prevent Google from signing contracts with developers that disincentivize them from developing their own app distribution channels, which was a feature of some Project Hug agreements. Finally, it does not explicitly prevent Google from penalizing a developer that distributes through a competing app store by restricting access to Android functionality or restricting access to other important Google products or services.

(32) With regard to preventing Google from "imposing frictions on "off-Play" app installations" (Section II.C above), the States' remedy falls short of the Proposed Injunction's requirements concerning parity for off-Play installations, which could allow Google to technologically hinder off-Play distribution channels.[56] In addition, the States' Settlement is limited to certain Android versions.[57] The States' Settlement permits Google latitude to impose restrictions on direct downloading for "security and privacy," but Google has claimed this rationale as justification of its current imposition of excessive frictions on the direct downloading process.[58] Moreover, the States' Settlement would allow

---

[53] In the States' Settlement, Google commits not to enter into any price parity agreements with developers requiring them to offer equal or more favorable prices on Google Play's billing system as they offer on other billing systems or other means of distribution on mobile devices. In addition, Google agrees not to enter into any title launch or feature parity agreements with developers that commit them to launch their titles at the same time or earlier, or with the same or better features, on Google Play relative to any other app stores for mobile devices. However, this commitment contains an explicit exception for agreements reached on an app-by-app basis. *See* States' Settlement, Sections 6.4–6.5.

[54] States' Settlement, Section 6.5.2.

[55] States' Settlement, Section 6.5.2.

[56] Google commits to certain revisions of the default flow for directly downloaded apps for five years. States' Settlement, Section 6.10.

[57] States' Settlement, Section 6.9.

[58] States' Settlement, Sections 6.10.2; *see also* Pichai Testimony, Tr. 1364:16–19 ("Q. Okay. Now, Google claims that these warning screens are intended to protect users from downloading malicious apps; fair? A. That's correct.");

Google to impose new technological frictions on the installation and use of directly downloaded app stores after only four years.[59]

(33)   A further broad problem with the States' Settlement as a means of preventing Google from engaging in future anticompetitive conduct is that it includes a number of vague carve-outs that may effectively permit Google to continue its anticompetitive activities even with respect to the specific conduct the States' Settlement purports to address. For example, the States' Settlement:

- Allows Google to impose limitations on several of the remedies provided for in the States' Settlement based on "security and privacy."[60] Such carve-outs would permit Google to circumvent the remedies simply by citing security or privacy concerns as a justification.

- Allows Google to impose preinstallation restrictions on carriers as opposed to OEMs.[61]

- Limits numerous provisions to a short time period.[62]

(34)   Finally, concerning the need to "reestablish an even playing field to compensate for past harms to competition" (Section II.D. above), in contrast to the Proposed Injunction, the States' Settlement contains no provision to address the effects of Google's past anticompetitive conduct. Without additional remediation of this kind, potential competing app stores would be unlikely to provide robust competition to Google Play in a timely manner, thus substantially undercutting the effectiveness of the States' Settlement.

---

Kleidermacher Testimony, Tr. 1771:20–1772:2 (claiming that "sideloading warnings" are "an important part of security"); Qian Testimony, Tr. 2223:20–2224:2 (concluding that "sideloading consent screens in Android" are "prudent and consistent with industry best practices and the security principles that are well established"). Section 6.10.3 of the States' Settlement notes that any restrictions that the Settlement imposes on changes to Google's "Sideloading Flow" do not apply to "other security features such as Google Play Protect or the Advanced Protection Program." States' Settlement, Section 6.10.3.

[59]   Google commits to maintain particular functionalities for directly downloaded app stores for four years. States' Settlement, Section 6.9.

[60]   *See, e.g.*, States' Settlement, Sections 6.2, 6.3, 6.7, 6.8, 6.10 and 6.11. For example, Section 6.7 of the States' Settlement prohibits Google from entering into any new agreement or enforcing any existing agreement that prevents OEMs from granting installer rights to preloaded apps on their mobile devices but permits Google to take reasonable steps to protect "user privacy or security." States' Settlement, Section 6.7.1.

[61]   States' Settlement Sections 6.7 and 6.8.

[62]   *See, e.g.*, States' Settlement, Sections 6.4, 6.5, 6.6, 6.7, 6.8 and 6.10.

# III. Detailed description of remedy proposal

(35)     So far, I have limited my comments concerning Epic's proposed remedy for conduct impacting Android app distribution to broad observations concerning its consistency with general principles. Next, I evaluate the specific provisions of that proposal in greater detail. This section follows the proposal's organization, reproducing passages in bold for the sake of convenience before commenting on their purpose and appropriateness.

(36)     Section II of Epic's proposal begins with an articulation of Google's general responsibilities under the remedy:

**II. ANDROID APP DISTRIBUTION MARKET: Google is enjoined from enforcing contractual provisions, guidelines or policies, or otherwise imposing technical restrictions, usage frictions, financial terms or in-kind benefits that (i) restrict, prohibit, impede, disincentivize or deter the distribution of Android apps[63] through an Android app distribution channel other than the Google Play Store (an "Alternative Android App Distribution Channel"), including but not limited to, app stores other than the Google Play Store ("Third-Party App Stores"),[64] direct distribution via a web browser, pre-installation on an Android device, or any other means; (ii) have the effect of impeding or deterring competition among Android app distributors (including competition between Alternative Android App Distribution Channels and the Google Play Store); and/or (iii) otherwise discriminate against or disadvantage Android app distribution through any Alternative Android App Distribution Channel. To effectuate the injunctive relief, the Court orders the following specific remedies addressing Google's conduct in the Android App Distribution Market.**

(37)     This high-level articulation of the proposed remedy indicates that its general purpose is to prohibit the types of conduct the jury considered anticompetitive and unlawful. Comments on specific provisions follow. I discuss their necessity, their impact on the market, and why they are not unduly burdensome.

---

[63]   Distribution includes both supply of apps by Developers and acquisition of apps by Users unless otherwise specified.

[64]   For avoidance of doubt, Third-Party App Stores include but are not limited to app stores owned and operated by mobile network carriers ("Carriers"), by original equipment manufacturers ("OEMs") or by Developers.

## III.A. No agreements not to compete

(38)   Section II.A of the proposed remedy generally prohibits Google from entering agreements with OEMs, carriers, and/or competing distributors of the type the jury found to be illegal, as well as related agreements that would have similar effects on the Android app distribution market.

**II.A  No Agreements Not To Compete: Google is prohibited from engaging in the following conduct.**

**II.A.1  Placement and Preinstallation Terms for Third-Party App Stores: Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that prohibits, limits or disincentivizes the placement of, preinstallation of, and/or grant of installation permissions ("Installation Permissions") by a Carrier or an OEM to, any Android app or Third-Party App Store, including on the basis of the availability or non-availability of such app or Third-Party App Store on the Google Play Store.**

**II.A.1.i  For the avoidance of doubt, Google shall not require or incentivize a carrier or OEM to introduce any additional steps for a User to enable or access a preinstalled Third-Party App Store beyond the steps required to access the Google Play Store when it is preinstalled.**

(39)   Evidence and testimony presented at trial established that preloading potentially offers competing app stores a channel for achieving customer acceptance, but that the contractual restrictions on preloading Google contrives through RSA 3.0 severely limit the strategic viability of this option.[65] As discussed in Section II of this statement, the jury found these preloading restrictions to be unlawful.

(40)   Paragraph II.A.1 would prohibit Google from limiting or disincentivizing the preinstallation of Android apps or third-party app stores. This provision would prevent Google from utilizing the pertinent RSA 3.0 restrictions, or conduct that replicates its effects, to foreclose opportunities for preload deals between competing app stores and either OEMs or carriers. It would also help maintain the ability of developers to use preloading as a viable distribution method for their apps.

(41)   Paragraph II.A.1.i prohibits an alternate path through which Google might try to limit the preloading of app stores. It prevents Google from creating additional usage frictions for pre-installed third-party app stores. Without this prohibition, Google could nominally comply with Paragraph II.A.1 and allow preloading of third-party app stores but make them harder to use than the Google Play Store.

---

[65]   Bernheim Testimony, Tr. 2394:6–17.

Case: 24-6274  10/16/2024  DktEntry: 6.2  Page 78 of 645
Case 3:21-md-02981-JD  Document 1052-1  Filed 10/16/24  Page 97 of 99

Statement of B. Douglas Bernheim

(42)  In addition to prohibiting conduct the jury considered unlawful, this provision would prevent Google from undermining preload opportunities for third-party app stores in other ways. Consequently, it would enhance the viability of pro-competitive preloading agreements. However, the provision does not prevent Google from engaging in legitimate competition by reaching agreements with OEMs or carriers to preload the Google Play Store or other Google apps.

> **II.A.2 <u>Agreements with Actual or Potential Competing Distributors</u>:  Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that requires or incentivizes—including through the provision of any pecuniary or in-kind benefits, or through the imposition of any financial term or economic loss—any potential or actual competing provider of an Alternative Android App Distribution Channel (a "Competing Distributor") to scale back, refrain from increasing investment into, or abandon its distribution of Android apps or its entry into the distribution of Android apps, including, but not limited to, incentivizing Competing Distributors not to invest in Alternative Android App Distribution Channels. For the avoidance of doubt, this clause includes but is not limited to the following:**
>
>> **II.A.2.i Google shall not offer any Competing Distributor a share of revenues from, or related to, the Google Play Store.**
>>
>> **II.A.2.ii Google shall not offer any Competing Distributor any share of revenues, from any source, that is tied to, related to, or conditioned on the development, preinstallation, launch or placement of any Alternative Android App Distribution Channel, including a Competing Distributor's abstention from any of the foregoing.**
>>
>> **II.A.2.iii In any agreement with a Competing Distributor, Google shall include a clear and express statement that the terms of that agreement, including the provision of any benefit or financial term, is not in any way conditional on the Competing Distributor's use, development, preinstallation, launch or placement of any Alternative Android App Distribution Channel, including a Competing Distributor's abstention from any of the foregoing.**

(43)  Evidence and testimony presented at trial demonstrated that Google "buys off" actual and potential app distribution competitors through Project Hug payments to developers who are poised to promote the growth of alternative distribution channels, and by sharing Google Play revenues with OEMs through RSA 3.0 agreements.[66] As discussed in Section II, the jury found these agreements to be unlawful.

---

[66]  Bernheim Testimony, Tr. 2404:12–2406:19. *See also* Bernheim Report, Section VI.B.1.

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 79 of 645
Case 3:21-md-02981-JD Document 1053-1 Filed 10/16/24 Page 79 of 99

Statement of B. Douglas Bernheim

(44)  Paragraph II.A.2 would prevent Google from entering or enforcing agreements that require or incentivize potential or actual Android app distribution rivals from competing with the Google Play Store. Paragraphs II.A.2.i and II.A.2.ii provide examples of such contracts. Paragraph II.A.2.iii mandates that Google include in any agreement with a competing distributor an express statement that the agreement is not conditional on that distributor's relationship with any alternative Android app distribution channel. These provisions clarify that Google cannot give competing distributors a share of the Google Play Store's revenues under any circumstances, and that Google cannot share revenue from any other sources if the payments are conditional on its relationship with a competing channel of app distribution.

(45)  Prohibiting Google from "buying off" actual and potential competitors in Android app distribution will increase the incentives for rivals to compete with the Google Play Store. Conversely, nothing in Paragraph II.A.2, or indeed in any other part of the remedy, prevents Google from competing with rivals through strategies that enhance the value users and developers derive from its own offerings, for example by lowering the prices it charges for Google Play Store services or by investing in quality improvements.

> **II.A.3  No Exclusivity: Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that requires or incentivizes the distribution of any Android app, or of any content available in or through an Android app, exclusively on the Google Play Store.**

>> **II.A.3.i For the avoidance of doubt, any monetary benefit offered to a Developer to distribute any Android app through the Google Play Store in lieu of, or in parallel with, self-distribution of the same Android app, is prohibited by this Paragraph II.A.3.**

(46)  Paragraphs II.A.3 and II.A.3.i would prevent Google from requiring exclusive distribution of any app or app content through the Google Play Store. Because the existing Project Hug agreements do not include such requirements, these provisions go beyond prohibiting the conduct the jury deemed illegal at trial. Their purpose is to prevent Google from adopting alternative strategies for preserving the breadth-of-catalog advantages it derives from past anticompetitive conduct. By pursuing such strategies, Google could extinguish incipient competition from other app stores before it developed.

(47)  This provision does not prevent developers from distributing solely through the Google Play Store if they choose, as long as Google does not elicit that exclusivity through financial incentives.

> **II.A.4  No MFNs/Limits on Differentiated Content:  Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that sets a Developer's timing of the release of any Android app on the Google Play**

Store, or the pricing or content of any app so released—or that incentivizes any of the foregoing to be set—in reference to the timing of the launch of such app, or the pricing or content thereof, on any Alternative Android App Distribution Channel, including, but not limited to, enforcing any sim-ship, most-favored nation ("MFN"), content parity or pricing parity requirement in any of Google's Project Hug agreements.

(48)     As discussed in Section II.D of this statement, network externalities help Google Play sustain dominance in Android app distribution. In such settings, a rival cannot usually compete effectively as a "we have most of the same stuff" platform. Instead, the best strategy for overcoming network externalities is to offer distinctive content not available on the Google Play Store. Evidence and testimony at trial demonstrated that Google's Project Hug agreements with large developers enhanced its ability to monopolize the relevant markets by preventing rival app stores from pursuing this strategy.[67] The jury declared these agreements unlawful.

(49)     Paragraph III.A.4 would prevent Google from entering into contracts with developers that require parity between the Google Play Store and alternative distribution channels with respect to the features, prices, and release timing of apps. Enforcement of this provision would foster competition in Android app distribution by providing Google Play's rivals with opportunities to engage users through the provision of unique content. It does not prevent Google from encouraging developers to distribute through the Google Play Store by offering better terms or higher quality app distribution services.

**II.A.5** **No Restrictions on Removal of Developer Apps from the Google Play Store**: **Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that prohibits the withdrawal of any Android app from the Google Play Store without Google's consent, including, but not limited to, enforcing the non-removal requirement in certain of Google's Project Hug agreements.**

(50)     Paragraph II.A.5 forbids Google from prohibiting the withdrawal of apps from the Google Play Store without Google's consent.[68] This provision augments paragraph II.A.4 by allowing developers to distribute apps exclusively through rivals' app stores or other alternative channels even after the apps become available through the Google Play Store. It thereby expands the scope for rivals to provide unique content, making it easier for them overcome the network externalities that protect Google Play's illicitly acquired dominance.

---

[67]   Bernheim Testimony, Tr. 2403:7–2404:11. *See also* Allison Testimony, Tr. 213:7–215:25; Bernheim Report, Section VI.B.4.

[68]   Proposed Injunction, ¶ II.A.5. *See also,* Koh Testimony, Tr. 467:20–469:16 (confirming the non-removal requirement in Exhibit 153, the ABK Hug agreement); 482:13–483:9 (confirming the non-removal requirement in Exhibit 162, the Riot Games Hug agreement). *See also* Bernheim Report, ¶ 335.

Statement of B. Douglas Bernheim

(51)    This provision narrowly targets particular features of some Project Hug agreements, as well as substantially similar provisions.

## III.B. No undue restrictions on direct downloading

(52)    Paragraph II.B of the proposed remedy generally prohibits Google from discouraging app distribution through direct downloading by contriving artificial frictions such as unnecessarily complex procedures and excessive warnings, a practice the jury declared anticompetitive. The provision does not prevent Google from taking legitimate steps to protect Android users.

**II.B. <u>Download Remedies</u>: With respect to direct distribution and download outside of the Google Play Store, Google is enjoined from each of the following.**

> **II.B.1 <u>Parity of Install Flow Regardless of Source</u>: Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that prohibits or disincentivizes—through any technical, contractual, financial, or other means—the downloading, granting of permissions, installation and/or updating of any Android app through any Alternative Android App Distribution Channel. To implement the foregoing:**

>> **II.B.1.i With respect to downloading from Third-Party App Stores, Google shall not impose, require, encourage or incentivize the imposition of any prompts, warnings, reminders, settings screens or other "friction" steps on the download of apps from Third-Party App Stores beyond the frictions associated with the downloading of apps from the Google Play Store itself.**

>> **II.B.1.ii With respect to downloading outside of a Third-Party App Store, Google shall not impose, require, encourage or incentivize the imposition of any prompts, warnings, reminders, settings screens or other "friction" steps  on devices, other than (a) a single one-tap screen asking in neutral language that the user confirm intent to proceed with the app installation or (b) as set forth in Paragraph II.B.2 below.**

>> **II.B.1.iii On any given device, Google shall be required to display prompts, warnings, reminders, settings screens or other "friction" steps in connection with the installation of an app from the Google Play Store that are commensurate with those that are imposed (whether by Google, an OEM or a Carrier) in connection with installation from an Alternative Android App Distribution Channel.**

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 82 of 645
Case 3:21-md-02981-JD Document 1032-1 Filed 10/16/24 Page 382 of 99

Statement of B. Douglas Bernheim

**II.B.2** **Notwithstanding the above Paragraph II.B.1:**

**II.B.2.i** **Google may include a single one-tap screen asking the user to allow a web browser or Third-Party App Store downloaded from an Alternative Android App Distribution Channel to install other apps upon the first installation attempt from such web browser or Third-Party App Store.**

**II.B.2.ii** **Google may impose additional frictions and/or block the installation of apps/stores from the web or an app store for (i) apps/stores whose developers declined to subject their apps/stores to a generally available, distribution-channel-agnostic notarization-like process or (ii) apps/stores that are known malware.**

(53)  The potential for users to download apps, including app stores, directly from developers' websites represents an important opportunity for Google Play's app distribution rivals. Evidence and testimony at trial established that Google discourages direct downloading by contriving artificial frictions.[69] As discussed in Section II.C above, the jury found this practice to be unlawful because it impairs competition that would otherwise operate through that distribution channel.

(54)  Paragraph II.B would prohibit Google from contriving disproportionate download frictions that impair rivals' ability to distribute apps and app stores to users. It would thereby help to create a level playing field between the Google Play Store and alternative app distribution channels.

(55)  At the same time, these provisions will not degrade or otherwise change the functionality of the Google Play Store. Nor will the relief degrade the value of Android, since it explicitly allows Google to protect users by providing legitimate security warnings. More specifically, Paragraph II.B.1 simply ensures that the download process for rival app stores on Android is not inferior to the process for the Google Play Store and direct downloading is not subject to frictions beyond basic user consent.[70] In other words, it levels the playing field through a parity requirement rather than by imposing limits on security measures. Under this provision, Google is free to determine the security measures most appropriate for protecting the integrity of Android, and Google will have economic incentives to do

---

[69]  *See, e.g.,* Morrill Testimony, Tr. 161:12–162:14 ("Q. Okay. In 2013 on a compatible Android device how many clicks did it take to get to the Google Play Store? A. One. Q. And in 2013 on a compatible Android device how many clicks did it take to download an app store, other than the Google Play Store? A. Again, as written and per the process that was gone through in furtherance of this document, at least ten steps. Q. In 2013 what did Amazon experience the effect, if any, the sideloading process had on whether users downloaded app stores that competed with Google Play Store? A. As stated, our position is that is discouraged, strongly discouraged users from using the app store or I should say discovering the app store, not using, discovering and installing").

[70]  Specifically, Paragraph II.B.1.i prevents Google from imposing additional frictions when downloading an app from a Third-Party App Store as compared to the Google Play Store. Paragraph II.B.1.ii recognizes that user consent is required to direct download an app outside of an app store but prevents Google from imposing additional frictions. Paragraph II.B.1.iii prevents Google from allowing OEMs and Carriers to disadvantage other app stores compared to the Google Play Store.

Case: 24-6274  10/16/2024  DktEntry: 6.2  Page 83 of 645
Case 3:21-md-02981-JD  Document 1032-1  Filed 10/16/24  Page 483 of 99

Statement of B. Douglas Bernheim

so. Paragraph II.B.2.i allows Google to establish installation procedures involving a single one-tap screen on which Android users would authorize a third-party app store to install other apps. Significantly, Paragraph II.B.2.ii allows Google to block or impose additional frictions upon the download process for apps and app stores that are known malware or that are associated with developers who do not obtain proper notarization to ensure they are safe for users. Requiring the notarization process to be distribution-channel-agnostic ensures that Google cannot use the process to put rival apps and app stores at a disadvantage relative to Google apps and the Google Play Store.

## III.C. No undue restrictions on access to Android or other Google products or services

(56)    Paragraph II.C of the proposed remedy prohibits Google from degrading the quality of apps distributed through channels other than the Google Play Store (e.g., rival app stores and direct downloading) by denying them access to functionalities, APIs, Google apps, or features that are important for the functioning of apps on Android smartphones. Its objective is to foreclose anticompetitive strategies through which Google might achieve the same or similar outcomes as with the conduct the jury declared unlawful.

**II.C. Remedies Concerning Access to Android and Other Google Products or Services:  With respect to access to Android's functionality and other Google products or services, Google is enjoined from each of the following.**

> **II.C.1 Parity of Access to Android Functionality Regardless of Source: Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that denies or impedes any Alternative Android App Distribution Channel, or any Android app that was downloaded through any Alternative Android App Distribution Channel, from having access to Android functionality and/or APIs and features (whether such functionality, APIs or features are considered part of Android Open Source Project ("AOSP") or Google Mobile Services ("GMS")) that is equivalent to the access had by any non-Google Android app downloaded through the Google Play Store.**

>> **II.C.1.i For avoidance of doubt, Google shall grant equal access to Android operating system and platform features, including APIs like the PACKAGE_INSTALLER API, to Developers without discriminating based on the Developers' choice of app distribution channel. Google may not claim that features which are traditionally part of an operating system or platform are instead part of the Google Play Store.**

(57)  According to evidence and testimony presented at trial, the functionality of apps on Android smartphones depends critically on access to key application program interfaces (APIs) and other features of the Android operating system.[71] Google Android's developer services include Google Play Services, which are the APIs and SDKs in GMS comprising the set of supporting background software that helps provide basic functionalities for all Android applications. These services allow app developers to access functionalities such as Google Maps data and location services. The Google Android APIs for certain important functionalities, such as location services APIs, are higher quality than the corresponding AOSP APIs.

(58)  Google might attempt to circumvent the other features of the proposed remedy by denying critical APIs and services for apps downloaded through distribution channels other than the Google Play Store. To ensure that Google does not undermine the remedy through such strategies, Paragraph II.C.1 goes beyond prohibiting the conduct the jury deemed illegal at trial by preventing Google from impairing an app's access to key Android functionalities based on the channel through which it is distributed.

(59)  Significantly, these provisions do not prevent Google from improving its APIs or otherwise enhancing the functionality of Android as long as such enhancements are equally accessible to apps distributed through channels other than Google Play. Nor do these provisions prevent Google from improving the functionality of its own apps.

> **II.C.2** <u>**No Access Restrictions to Other Google Products or Services:**</u> **Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that conditions or impedes access to, restricts the use of, or conditions the terms of access to any of Google's products or services (other than its Google Play Billing ("GPB") service) on the basis of a Developer's actual or intended use of any Alternative Android App Distribution Channel.**
>
> > **II.C.2.i** **For the avoidance of doubt, prohibiting or disincentivizing the inclusion of a link to download or install any Android app through any Alternative Android App Distribution Channel in an advertisement for such an app that is handled or facilitated by Google Search, Google Ads, or similar services would be deemed a violation of this Paragraph II.C.2.**

(60)  Paragraph II.C.2 prevents Google from maintaining its monopoly power in app distribution by conditioning access to Google products or services on a developer's actual or intended use of an app distribution channel other than the Google Play Store. This remedy is related to but broader than the one in Paragraph II.C.1, which focuses specifically on preventing Google from using its monopoly power in Android, including its control of associated APIs and apps, to maintain its monopoly in app

---

[71]  Kolotouros Testimony, Tr. 1059:8–1060:7. *See also* Bernheim Report, § II.B.

Case: 24-6274    10/16/2024    DktEntry: 6.2    Page 85 of 645
Case 3:21-md-02981-JD  Document 1052-1    Filed 10/16/24    Page 85 of 99

Statement of B. Douglas Bernheim

distribution. Paragraph II.C.2 recognizes that Google has a broad suite of apps and services, such as Google Search, Google Ads or other similar services, that it could use to degrade app distribution through channels other than the Google Play Store or to punish developers who use or promote those channels. If Google could continue to limit the availability of these and other Google products and services to apps that are distributed on the Google Play Store, it would make distribution outside of the Google Play Store a less viable competitive alternative. To ensure a level playing field for all app distribution channels on Android smartphones, Google must not be permitted to place its rivals at a disadvantage relative to Google Play by withholding or degrading those other products or services.

## III.D. Addressing the continuing effects of past anticompetitive conduct in Android app distribution

(61)    As explained in Section II.D of this statement, network effects in app distribution ensure that, even if a remedy broadly prevented Google from engaging in the types of anticompetitive conduct the jury found to be illegal, Google's past conduct would still have a substantial and continuing impact on competition in Android app distribution. Attempting to neutralize the future effects of Google's past conduct requires additional remedial measures. Paragraph II.D of the remedy serves this purpose.

**II.D** **Remedies To Promote Competition in Android App Distribution**: **Google must undertake the conduct below in order to address the cumulative continuing effects of the conduct found to be unlawful and thereby restore competition in the Android App Distribution Market.**

> **II.D.1** **Google Play Store Catalog Access and Library Porting**:  **For a period of six (6) years, Google shall provide Third-Party App Stores access to the Google Play Store app catalog.**

> > **II.D.1.i** **On Android-compatible phones that preload what is currently named the GMS suite ("GMS Devices") or any similar package of Google apps and APIs made available to OEMs, Google shall allow Third-Party App Stores to access the Google Play Store's catalog of apps not then available on those Third-Party App Stores. If a Third-Party App Store's User wishes to download and install an app not then available on that Third-Party App Store, Google shall have the Google Play Store download and install those apps on the devices of a Third-Party App Store's Users through a background process similar to the Alley Oop integration offered by Google to certain third-party Developers. Such apps installed by the Google Play Store shall be governed by the Google Play Store's distribution agreements with Developers, and Google may require the Third-Party App Stores to clearly indicate this to Users.**

Statement of B. Douglas Bernheim

> **II.D.1.ii** Google shall allow Users to provide Third-Party App Stores with access to a list of apps installed by the Google Play Store on the User's GMS Device. Google shall provide Users with the ability, subject to a one-time User permission, to change the ownership for any or all of those apps such that the Third-Party App Store becomes the update owner for those apps when those apps are directly distributed by the Third-Party App Store.

(62)   The provisions in Paragraph II.D.1 would allow competing app stores to access the Google Play catalog through a process similar to Google's Alley Oop app distribution process, in which Google Play acts as the back end to another app store's consumer-facing front end.[72] Paragraph II.D.1.i details this process. Paragraph II.D.1.ii allows for a smooth transition from Alley Oop-like distribution to full distribution through a competing app store once that competing app store establishes a direct relationship with a developer.

(63)   Providing rival app stores with access to the Google Play Store app catalog mitigates the network externalities that insulate Google's illicitly acquired market power. It jump-starts the competitive process by decoupling the user side of the market from the developer side. In effect, it provides rival app stores with immediate scale on the developer side, allowing them to compete for users on the merits without confronting a chicken-and-egg problem. An immediate consequence is that rival app stores would have an opportunity to develop more robust preloading and placement relationships with OEMs. While the rival app stores will benefit strategically from the ability to offer a comprehensive app catalog, revenues from apps distributed through the Alley Oop mechanism will continue to flow to Google.

(64)   Developers will become increasingly willing to establish direct relationships with a rival app store as it builds its user base. Once a direct relationship exists, Paragraph II.D.1.ii allows users to transfer the responsibility of updating apps that were originally downloaded from the Google Play Store to the third-party app store such that the third-party app store would be responsible for automatic updates of apps (and would from that point forward be entitled to any ongoing revenues from the developer). Rival app stores may choose to incentivize these transitions. The resulting competition between Google Play and its rivals will directly benefit users.

(65)   The provision will be in effect for six years. Because a six-year period corresponds to roughly two phone-purchase cycles,[73] it will, in combination with other provisions of the proposed remedy (such as those that prevent Google from foreclosing opportunities for rival app stores to reach preloading

---

[72]   *See, e.g.,* Exhibit 136-043. Google describes Alley Oop as an "inline install solution powered by [Google] Play." Exhibit 1546-007. For a period of 15 months (six-month agreement extended by nine months), Google allowed Facebook to install its apps and others' apps outside of Google Play using Alley Oop. Exhibit 1546-007. *See also,* Bernheim Report, n. 1117; Bernheim Reply Report, n. 1238.

[73]   *See* Bernheim Testimony, Tr. 2434:2–11 (testifying that people buy a new phone "on average once every 2.7 years").

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 87 of 645
Case 3:21-md-02981-JD Document 1052-1 Filed 10/16/24 Page 88 of 99

Statement of B. Douglas Bernheim

agreements with OEMs) give app stores with attractive value propositions a chance to reach sustainable scale among users and developers.[74] The temporary nature of these provisions ensures that such stores will be highly motivated to promptly engage developers directly.

**II.D.2 Google Play Store Distributing Third-Party App Stores: For a period of six (6) years, Google shall allow distribution of competing Third-Party App Stores on the Google Play Store.**

> **II.D.2.i The download process of Third-Party App Stores from the Google Play Store shall be identical in all respects to the download process of any other app from the Google Play Store, except that in connection with the first attempt to install an app from a Third-Party App Store downloaded from the Google Play Store, Google may present the User of a downloaded Third-Party App Store with a single one-tap screen asking the User to allow the Third-Party App Store to install other apps.**

> **II.D.2.ii Google shall not impose any fees in connection with the distribution of Third-Party App Stores on the Google Play Store pursuant to this Paragraph II.D.2 (including any fees on any sales made by such app stores or in apps distributed directly (*i.e.*, not through the access mechanism in II.D.1) by these app stores).**

(66)   The provisions in Paragraph II.D.2 allow Google Play's rivals to distribute their app stores through the Google Play Store for a limited period of time. Paragraph II.D.2.i clarifies that downloading app stores distributed in this way should not be unduly burdensome relative to downloading other apps through the Google Play Store. However, as with direct downloads (discussed in Paragraph II.B), it allows Google to present a one-tap screen requesting install permissions. Paragraph II.D.2.ii clarifies that Google cannot charge any fees for such distribution. The purpose of this provision is to prevent Google from unduly limiting the viability of this distribution channel for app distribution competitors.

(67)   Creating opportunities for Google Play's rivals to distribute app stores through the Google Play Store helps address the fact that Google Play's past anticompetitive conduct has conditioned most users to seek apps only through Google Play. If third-party app stores were not available through Google Play, many users would not know where to find them or even to look for them at all. This temporary remedy would give third-party app stores a degree of visibility that Google's past anticompetitive conduct would otherwise deny them, and thereby assist them in competing immediately and more effectively for all Android users. Without this remedy, the benefits of emerging rivalry in app distribution could be frustrated by users' inability to find competing stores. This remedy complements Paragraphs II.A and II.B, discussed above, which remove obstacles to distributing competing app stores through preloading and direct downloading, respectively.

---

[74]   Lockheimer Testimony, Tr. 1500:3–7 (testifying that people replace phones every two or three years).

Case: 24-6274    10/16/2024    DktEntry: 6.2    Page 88 of 645
Case 3:21-md-02981-JD  Document 1052-1  Filed 10/16/24  Page 28 of 99

Statement of B. Douglas Bernheim

(68)    I understand that a firm's decision not to deal with its rivals can be a legitimate competitive strategy (and that the Court ruled that Google was not obligated as a matter of antitrust law to carry other app stores on Google Play), but I believe it appropriate here to require Google to carry competing stores on Google Play—for a limited period of time—as a remedy for Google's other conduct that was anticompetitive, and that would otherwise continue to impair competition in Android app distribution. Like Paragraph II.D.1, this provision goes beyond prohibiting the specific conduct, or substantially similar conduct, that was at issue in the trial, in order to counter the persistent impact of Google's past anticompetitive conduct.

(69)    As with Paragraph II.D.1, these provisions will be in effect for six years, or roughly two phone purchase cycles. Their temporary nature ensures that competing app stores will be highly motivated to develop and deploy other strategies for obtaining users such as preloading and direct downloading.

> **II.D.3 Mandating Placement of the Google Play Store: For a period of six (6) years, Google shall not enforce any existing agreement, enter into any new agreement or otherwise engage in any conduct that mandates or incentivizes the placement of the Google Play Store in any specific location on an Android device, including but not limited to the default home screen.**

(70)    The purpose of this provision is to provide competing app stores with temporary and limited opportunities to offset the Google Play Store's illicitly acquired incumbency advantages with users. In focusing on agreements involving placement, it goes beyond prohibiting the conduct the jury deemed illegal at trial.

(71)    Because of the Google Play Store's past dominance, users are generally far more familiar with it and accustomed to using it than the alternatives. It is therefore the default choice in the vast majority of cases. More prominent placement for the Google Play Store than for rivals reinforces this default status. Conversely, more prominent placement for a rival undermines the Google Play Store's default status, which translates into a greater potential for competitive success.[75] Paragraph II.D.3 introduces opportunities for the latter to occur. It accomplishes this objective by prohibiting Google from requiring or incentivizing OEMs or carriers to place the Google Play Store in a specific location on an Android device, such as at the top of the default home screen.

(72)    Under this provision, Google would still be free to mandate that an OEM or carrier include the Google Play Store and other Google apps on its devices. Critically, Paragraph II.D.3 does not prevent an OEM or carrier from choosing to place the preloaded Google Play Store or Google apps anywhere on a device, so long as that choice is not mandated or incentivized through a Google agreement. An

---

[75]    Bernheim Report, ¶ 289, n. 635.

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 89 of 645
Case 2:21-md-02981-JD Document 1052-1 Filed 04/16/24 Page 89 of 99

Statement of B. Douglas Bernheim

OEM that believes users will value prominent placement of the Google Play Store will be free to act on that belief.

(73)     This provision is limited to six years, or roughly two phone replacement cycles. In other words, the remedy provides rival app stores with a limited amount of time to weaken Google Play's incumbency advantage and associated default status.

## III.E. Google allowed to compete on the merits

(74)     Section II of the Proposed Injunction, which covers competition in the Android app distribution market, concludes with the following statement:[76]

**Notwithstanding the preceding prohibitions, nothing in this section shall prohibit Google from engaging in bona fide competition on the merits with respect to the distribution of apps on Android, such as:**

1. **Making price or quality improvements to the Google Play Store to differentiate it from Alternative Android App Distribution Channels; and/or**

2. **Communicating to OEMs, Carriers, Developers and Users regarding any purported quality or price advantages of the Google Play Store over Alternative Android App Distribution Channels, or otherwise publicly promoting the Google Play Store.**

As I discussed at trial and in my expert report, economists recognize key differences between anticompetitive exclusionary practices and competition on the merits.[77] Under competition on the merits, firms vie for customers and profits by improving their product offerings, for example by lowering prices and improving quality, increasing economic efficiency and consumer welfare in the process. The proposed remedies do not restrict or discourage Google from competing on the merits in Android app distribution by improving the Google Play Store, as opposed to limiting competition from alternative distribution channels through the anticompetitive and exclusionary practices identified at trial, in my expert reports, and in this statement.

---

[76]     Section III of the Proposed Injunction is outside the scope of this statement. I understand that Professor Tadelis is addressing that section of the Proposed Injunction in his statement.

[77]     Bernheim Testimony, Tr. 2376:8–2377:13. *See also* Bernheim Report Section V.A.

Statement of B. Douglas Bernheim

B. Douglas Bernheim

April 11, 2024

Date

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | **Case No. 3:21-md-02981-JD** |
| **THIS DOCUMENT RELATES TO:** | **Judge: Hon. James Donato** |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |

STATEMENT OF

# STEVEN TADELIS

ON BEHALF OF

# EPIC GAMES, INC.

**APRIL 11, 2024**

CONTENTS

I.  **Google's unlawful tie harms competition and consumers** ....................................................1

II. **The Proposed Injunction is necessary to restore competition to the market for Android In-App Payment Solutions** .......................................................................................7

  A.  No anti-steering .................................................................................................7

  B.  No tying of distribution to payments ..........................................................9

  C.  No discrimination on the basis of payment solution choice.............................11

  D.  Google is allowed to compete on the merits .................................................13

# I.   GOOGLE'S UNLAWFUL TIE HARMS COMPETITION AND CONSUMERS

1.  The jury found that Google "unlawfully tied the use of the Google Play Store to the use of Google Play Billing" and "willfully acquired or maintained monopoly power by engaging in anticompetitive conduct" in the market for Android in-app billing services for digital goods and services transactions ("Android In-App Payment Solutions").[1]

2.  I testified at trial that if the tie were severed, one would expect to see entry, reduced fees, and increased innovation in the market for Android In-App Payment Solutions.[2] However, this outcome depends on robust competition in the market for Android app distribution, where Google's power to coerce the tie originates.[3] An effective remedy for Google's tie must therefore address the tie not only directly but also indirectly, by creating conditions necessary for meaningful competition in Android app distribution and preventing Google from playing a game of "whack-a-mole" where it uses its power in the market for Android app distribution to achieve through other means many of the same ends as the tie does.

3.  In his statement, Dr. Bernheim describes remedies that address Google's unlawful conduct in the market for Android app distribution.[4] My analysis here complements Dr. Bernheim's by focusing on remedies that directly address the tie. Dr. Bernheim prefaces his analysis with principles that any effective remedy must embody: it must prevent Google from continuing to engage in the anticompetitive conduct found to have been unlawful, preclude related conduct that could have substantially similar anticompetitive effects, and undo the effects of Google's past anticompetitive conduct.[5] In addition, it should avoid inhibiting Google's ability to compete on

---

[1]   Jury Verdict, *In re Google Play Store Antitrust Litigation.*, No. 21-md-02981-JD (N.D. Cal. December 11, 2023) ("Jury Verdict"), 3:1-25; 7:3-8. The jury found the geographic market for each of these markets to be "worldwide, excluding China." Jury Verdict, 3:2-15.

[2]   Tadelis Testimony, Tr. 2566:1-8.

[3]   Statement of B. Douglas Bernheim, *In re Google Play Store Antitrust Litigation.*, No. 21-md-02981-JD (N.D. Cal., April 11, 2024) ("Bernheim Statement"), Section II.

[4]   Bernheim Statement, Section III.

[5]   Bernheim Statement, Section II.D.

the merits by improving its products or pricing, or addressing legitimate security concerns.[6] These principles apply equally to remedies for the tie.

4.  At trial, I focused my testimony on how Google imposes a coercive tie through the Developer Distribution Agreement ("DDA") and the associated Google Play Payments Policy: Google forces Android app developers ("Developers") who wish to distribute their apps through the Google Play Store to use Google Play Billing for all in-app purchases of digital goods.[7] The nature of a coercive tie is that people who are subject to it would rather not have the tie and would rather not have to purchase the tied product from the seller of the tying product.[8] The source of Google's power to coerce the tie is its market power in the market for Android app distribution.[9]

5.  As I explained in my trial testimony, Google's tie harms competition and consumers in the market for Android In-App Payment Solutions.[10] The tie prevents other providers of payment

---

[6]   Bernheim Statement, Section II.

[7]   Tadelis Testimony, Tr. 2526:17-25, 2531:6-15; Exhibit 10883 (example of a developer distribution agreement); Exhibit 8022-039 (Google Play Payments Policy); Simon Testimony, Tr. 291:10-16 (Google permits app developer Down Dog to use only Google Play Billing for its app distributed through Google Play).

[8]   Tadelis Testimony, Tr. 2530:4-9; 2531:16-2533:20; 2565:22-25 (discussing evidence, including Exhibit 1391, that developers, when given the choice, have used alternatives to Google Play Billing); Simon Testimony, Tr. 303:2-10 (Down Dog would use Stripe or PayPal if permitted).

[9]   Tadelis Testimony, Tr. 2528:17-2529:4. Dr. Bernheim testified to the existence and sources of Google's monopoly power in the market for Android app distribution. Bernheim Testimony, Tr. 2412:4-2413:19, 2447:14-2452:3. *See also,* Bernheim Statement, Section II.

[10]  Tadelis Testimony, Tr. 2533:21-2534:1. *See also*, Expert Report of Steven Tadelis on Behalf of Epic Games, Inc., October 3, 2022 ("Tadelis Opening Report"), Section VIII.A.

solutions from competing in this market.[11] Fees in the market are higher than they would be without the tie.[12] And with the tie, Google lacks the incentive to offer needed innovations.[13]

6.   As I also testified at trial, Google's tie reinforces Google's Android app distribution monopoly, by preventing a process Google has internally referred to as the threat of "laddering up".[14] The laddering up threat identified by Google is that if large Alternative In-App Payment Solutions providers such as Stripe or PayPal could replace Google Play Billing for many thousands of Developers, they could "ladder up" the scope of services they offer Developers by offering these Developers distribution services, thereby threatening the dominance of the Google Play Store in the distribution space.[15]

7.   Finally, Google's tie is reinforced by the Google Play Payments Policy's anti-steering provision: "apps may not lead users to a payment method other than Google Play's billing system"—for example, to a developer's web-based store, where the developer is free to use another billing solution.[16] The anti-steering provision makes it more difficult for Developers to effectively use web purchases, where Developers offer other payment methods, as alternatives to in-app purchases using Google Play Billing.[17] As I discussed at trial, web-based purchases using

---

[11]   Tadelis Testimony, Tr. 2534:5-9. Google identified Square, Stripe, PayPal, and others as entrants into the market if the tie were removed. Between 2011 and 2020, some developers used these other providers or created their own solutions. Tadelis Testimony, Tr. 2535:1-11; Exhibit 388-098. If permitted, Paddle would offer a competing solution; its services are largely comparable to Google Play Billing's and are substantially cheaper. Owens Testimony, 666:1-667:8.

[12]   Google's fee is higher than other providers' fees at their posted prices. Tadelis Testimony, Tr. 2535:15-2540:10; Tadelis Opening Report, Table 2; Owens Testimony, Tr. 675:4-8. Google estimated that it could charge only 10% without the tie. Tadelis Testimony, Tr. 2541:10-2542:4; Exhibit 360-024. During the period when some developers were exempted from using Google Play Billing, Google offered fees below its normal rates to the developers who took advantage of the exemption. Tadelis Testimony, Tr. 2540:23-2541:9. If Google's fees to developers went down, microeconomic analysis shows that some of that savings would be passed on to consumers. Tadelis Testimony, Tr. 2543:12-2544:22.

[13]   Tadelis Testimony, Tr. 2534:14-17. Google Play Billing lacks features that developers have demanded or would value. Tadelis Testimony, Tr. 2544:25-2547:15; Tadelis Opening Report, ¶ 211. YouTube's former CEO wrote that using Google Play Billing instead of its own solution was "damaging for [YouTube's] business" and would "hurt [YouTube] competitively." Exhibit 1391-001.

[14]   Tadelis Testimony, Tr. 2547:16-2552:8; Exhibit 388-098.

[15]   *Id.*

[16]   Exhibit 8022-039; Tadelis Testimony, Tr. 2557:19-2558:18.

[17]   Tadelis Testimony, Tr. 2554:2-2558:18.

alternative payment methods are not viable substitutes to in-app purchases that use Google Play Billing because of the user frictions that they involve.[18]

8.  I have analyzed whether the settlement between plaintiff States and the consumer class and Google ("States' Settlement")[19] is an effective remedy for the anticompetitive harms identified at trial. Dr. Bernheim has explained ways in which the States' Settlement falls short of an effective remedy relating to Android app distribution.[20] The States' Settlement also fails to address the tie effectively because it does not sever the tie, in the sense that it does not allow apps distributed via the Google Play Store to forego Google Play Billing for in-app purchases. Instead, under the States' Settlement, such apps can only offer an alternative billing system alongside Google Play Billing, through Google's existing User Choice Billing program.[21]

9.  Google's User Choice Billing program does not restore competition to the Android In-App Payment Solutions market,[22] for several reasons. First, as noted above, it does not sever the tie; Developers must still integrate Google Play Billing.[23] Since Developers—not users of Android mobile devices ("Users")—are the customers in the market for Android In-App Payment Solutions,[24] and since User Choice Billing does not allow Developers to freely choose their payment solution, it cannot be a valid remedy for the tie.

10.  Second, even the limited choice that Google supposedly offers to Developers under User Choice Billing is not a real choice in an economic sense.[25] Examination of the structure of User Choice Billing reveals a template for how Google could exploit its control of multiple markets to retain

---

18   Tadelis Testimony, Tr. 2554:2-9.

19   Settlement Agreement and Release, In re: Google Play Store Antitrust Litigation, No. 3:21-md-02981-JD (ND Cal, December 18, 2023) ("States' Settlement").

20   Bernheim Statement, Section II.E.

21   States' Settlement, Section 6.3. User Choice Billing allows some developers (excluding game developers) to offer users the choice of another billing system alongside, but not instead of, Google Play Billing. Loew Testimony, Tr. 3162:9-23. Google first offered User Choice Billing in 2022, after this litigation began. Kochikar Testimony, Tr. 718:13-18. By May 2023, only 75 or 80 of the millions of Android developers had signed up for User Choice Billing. Kochikar Testimony, Tr. 720:4-11.

22   Tadelis Testimony, Tr. 2561:5-11.

23   Tadelis Testimony, Tr. 2561:22-2562:2.

24   Tadelis Testimony, Tr. 2527:17-22.

25   Tadelis Testimony, Tr. 2563:12-14.

the tie. The design of User Choice Billing incentivized Developers to stick with Google Play Billing as the exclusive payment solution for in-app purchases despite the apparent choice.[26] Namely, Google designed the User Choice Billing pricing structure such that it would deter people from actually going into the program.[27] As I explained at trial, with reference to Figure 1 below, Google set the 4% "billing optionality discount" for User Choice Billing (vertical red dashed line) well below the level that, according to Google's estimates, would give Developers the financial incentive to de-integrate Google Play Billing (green shaded region).[28]

---

[26]    Kochikar Testimony, Tr. 724:2-11. Under User Choice Billing, Google charges its typical service fee minus 4% on transactions processed through the developer's alternative system. Google documents and testimony established that the weighted average cost of transaction processing is between 4% and 6%. *See* Exhibit 360-024; Kochikar Testimony, Tr. 726:8-22. Developers therefore pay the same or higher effective service fee with or without User Choice Billing. Kochikar Testimony, Tr. 728:9-22.

[27]    Tadelis Testimony, Tr. 2563:15-2565:21, Exhibit 388-046. *See also*, Tadelis Testimony, Tr. 2562:3-2563:14 (the User Choice Billing fees were designed in a way that it would not be profitable to adopt User Choice Billing). Google initially considered "pric[ing] the service fee for developers not using Google Play Billing at 5% less than those using Google Play Billing, essentially replacement value." Kochikar Testimony, Tr. 724:12-17, Exhibit 2698-046 (estimating Google's global payment processing cost at 5.6%). In 2019, Google estimated its break-even fee for Google Play Billing to be 6%. Tadelis Testimony, Tr. 2541:10-21; Exhibit 360-024. The current pricing structure for User Choice Billing (a 4% reduction for developers not using Google Play Billing) would require developers to obtain Android In-App Payment Solutions at a price below these estimates of Google's cost in order to pay lower overall processing fees for in-app transactions than they would by using Google Play Billing exclusively.

[28]    Tadelis Testimony, Tr. 2563:12-2565:21. As I explained at trial, the Google document depicted in Figure 1 shows that Google estimated that some Developers, for whom in-app billing was a core strategic asset, would de-integrate Google Play Billing no matter the size of the "billing optionality discount". *Id.*

**FIGURE 1: GOOGLE ANALYSIS OF USER CHOICE BILLING (ANNOTATED)**



Source: Tadelis Trial Demonstrative, slide 28 (from Exhibit 388-046).

11. Even if the tie were severed, without additional remedies to promote competition in Android app distribution, Google would still be able to frustrate Developers' ability to select Alternative In-App Payment Solutions for in-app purchases. Dr. Bernheim explained at trial and explains in his statement that network externalities protect Google's market dominance in app distribution.[29] If Google were to retain its market power in Android app distribution, it could still design fees like in User Choice Billing that would constitute an economic tie.[30] Accordingly, for the remedies related to the Android In-App Payment Solutions market to be effective, the remedies related to

---

[29]  Bernheim Testimony, Tr. 2401:3–7 ("In the context of Google Play, you've got users going to—smartphone users going to Google Play because the apps are there, and you've got developers putting their apps on Google Play because users are going there, and it's all kind of reinforcing."); Bernheim Statement, Section II.D. *See also*, Bernheim Report, ¶¶ 247–48; Bernheim Reply Report, ¶¶ 319–21. At trial, I also explained that it is very difficult to penetrate an incumbent market where such network externalities are present. Tadelis Testimony, Tr. 2547:16-2548:21.

[30]  Tadelis Testimony, Tr. 2566:9-17; Reply Expert Report of Steven Tadelis on Behalf of Epic Games, Inc., December 23, 2022 ("Tadelis Reply Report"), ¶ 129.

promotion of competition in Android app distribution discussed by Dr. Bernheim in his statement are necessary.[31]

## II. THE PROPOSED INJUNCTION IS NECESSARY TO RESTORE COMPETITION TO THE MARKET FOR ANDROID IN-APP PAYMENT SOLUTIONS

12. In this section, I explain the elements that are necessary to sever Google's coercive tie, which are found in Section III of Epic's proposed injunction ("Proposed Injunction"). For convenience, I reproduce each set of paragraphs in bold before commenting on why they are appropriate.

### A. NO ANTI-STEERING

**III.A. <u>Free Flow of Information Regarding Out-Of-App Purchasing Options</u>:**

1. **Google shall not in any way limit, control, or restrict the ways an app can inform Users about out-of-app purchasing options.**

2. **Google shall not restrict, prohibit, impede, disincentivize or deter Developers from informing Users about out-of-app purchasing options or from offering different prices for in-app purchases using GPB and using out-of-app payment options.**

3. **Google shall not require Developers to use Google APIs (such as Google's "User Choice Billing" APIs) in order to invoke out-of-app purchasing options.**

4. **Google shall not impose any Coercive Fees on transactions between a Developer and User made through out-of-payment options to which a User was "steered" by a link within an app.**

    i. **The term "Coercive Fees" means fees that are higher than: Google's fees for a similar transaction utilizing GPB minus Google's average per-transaction total cost for handling in-app transactions in the preceding calendar year.**

    ii. **Google shall disclose its calculation of the average per-transaction total costs for handling in-app transactions in any given year to the Compliance Committee provided for in Section IV, and shall make that total cost public no later than its release of its audited financials for the corresponding calendar year. For the avoidance of doubt, Google will not be required to calculate or disclose publicly its average per-transaction**

---

[31] Bernheim Statement, Section III.