01:09PM  1    DONE WITH THAT, SO WE DON'T HAVE TO DEAL WITH THAT.

01:09PM  2        NOW WE'RE GOING TO THE REMAINING ONES FOR EPIC AND MATCH.

01:09PM  3        STARTING WITH THE CLAIM THAT GOOGLE WANTS TO HAVE ME RULE

01:09PM  4    ON THE PLAINTIFFS' CLAIM THAT GOOGLE UNLAWFULLY PROHIBITS THE

01:09PM  5    DISTRIBUTION OF OTHER APP STORES ON GOOGLE PLAY, AND THIS GOES

01:09PM  6    TO THE DDA, THE DEVELOPER DISTRIBUTION AGREEMENTS.

01:09PM  7        GOOGLE ASSERTS THAT -- THE PLAINTIFFS ASSERT, THE

01:09PM  8    PLAINTIFFS STATE THAT THEY, QUOTE, "DO NOT ASSERT LIABILITY

01:10PM  9    AGAINST GOOGLE FOR SECTION 4.5 OF THE DDA ON ITS OWN," CLOSED

01:10PM  10   QUOTE, NOR ARE THEY CLAIMING AN INDEPENDENT DUTY TO DEAL.

01:10PM  11   THOSE ARE BOTH IN DOCKET NUMBER 511-1 AND 4-6.

01:10PM  12       SO BASED ON THAT IT'S MY UNDERSTANDING THAT THE PARTIES

01:10PM  13   ARE ACTUALLY IN SOME DEGREE OF AGREEMENT WHICH MAKES SENSE IN

01:10PM  14   LIGHT OF VERIZON COMMUNICATIONS V. TRINKO, T-R-I-N-K-O, 540

01:10PM  15   U.S. 398 AND A 2004 DECISION.  SO SUMMARY JUDGMENT IS GRANTED

01:10PM  16   FOR GOOGLE ON THAT ISSUE.

01:10PM  17       PLAINTIFFS MAY NOT ARGUE TO THE JURY THAT SECTION 4.5 OF

01:10PM  18   THE DDA IS INDEPENDENTLY UNLAWFUL OR IMPROPER, AND THEY ALSO

01:10PM  19   MAY NOT ARGUE THAT THE SAME CONTRACTUAL PROHIBITION IS SOMEHOW

01:10PM  20   TRANSFORMED INTO SOMETHING UNLAWFUL OR IMPROPER WHEN VIEWED IN

01:11PM  21   COMBINATION WITH OTHER ALLEGEDLY ANTICOMPETITIVE PRACTICES THAT

01:11PM  22   GOOGLE ENGAGED IN.

01:11PM  23       SO, IN OTHER WORDS, IF THE CARROT IS GOOD ON ITS OWN, THE

01:11PM  24   CARROT IS GOOD IN THE SOUP.  IT'S NOT GOING TO BE TRANSFORMED

01:11PM  25   INTO A BAD ELEMENT JUST UNDER SOME KIND OF MONOPOLY FRAUD

01:11PM 1    THEORY.  SO THAT'S THE DISPOSITION OF THE FIRST PORTION OF

01:11PM 2    GOOGLE'S MOTION.

01:11PM 3         GOOGLE NEXT REQUESTS SUMMARY JUDGMENT ON EPIC'S AND

01:11PM 4    MATCH'S CLAIMS CHALLENGING THE GAME VELOCITY PROGRAM

01:11PM 5    AGREEMENTS, THREE OF THOSE -- I WILL REFER TO THOSE AS THE GVP

01:11PM 6    AGREEMENTS -- ON THE GROUNDS THAT THEY ARE NOT PER SE

01:11PM 7    VIOLATIONS OF THE SHERMAN ACT.  REALLY THIS IS JUST KIND OF A

01:11PM 8    STANDARD ISSUE SHOULD THEY BE SEEN AS PER SE AS THE PLAINTIFFS

01:11PM 9    SUGGEST OR SHOULD THEY BE TREATED UNDER A RULE OF REASON

01:11PM 10   ANALYSIS AS GOOGLE REQUESTS.

01:11PM 11        I HAVE SOME QUESTIONS ABOUT THIS.  SO, MR. POMERANTZ, WHO

01:12PM 12   IS GOING TO TAKE THE LEAD ON YOUR SIDE?

01:12PM 13             MR. POMERANTZ:  I'LL DO MY BEST, YOUR HONOR.

01:12PM 14             THE COURT:  OKAY.  I JUST -- I'M HAVING TROUBLE

01:12PM 15   SEEING HOW THESE GVP AGREEMENTS ARE IN ANY WAY PROCOMPETITIVE?

01:12PM 16             MR. POMERANTZ:  THESE AGREEMENTS, YOUR HONOR, HAVE A

01:12PM 17   VERTICAL COMPONENT.  SO GOOGLE GOES TO GAME DEVELOPERS AND THEY

01:12PM 18   SAY TO THE GAME DEVELOPER, WE WANT YOU TO CONTINUE TO DO

01:12PM 19   BUSINESS WITH US.

01:12PM 20        AND SO THEY GO TO THE GAME DEVELOPER AND SAY IF YOU WILL

01:12PM 21   DO BUSINESS WITH US, WE WILL GIVE YOU A BETTER DEAL.  WE'LL

01:12PM 22   GIVE YOU A BETTER DEAL IF YOU STAY IN BUSINESS WITH US.

01:12PM 23        SO WHAT WE DO IS WE GIVE THEM ADDITIONAL CONSIDERATION FOR

01:12PM 24   STAYING IN BUSINESS WITH US.  AND IN EXCHANGE FOR THAT

01:12PM 25   CONSIDERATION -- THAT CONSIDERATION CAN BE ADVERTISING CREDITS

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5

 6

 7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

 8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

 9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10     HEREBY CERTIFY:

11          THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12     A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13     ABOVE-ENTITLED MATTER.

14

15

16                    IRENE RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074
17

18
                      DATED:  OCTOBER 20, 2023
19

20

21

22

23

24

25
```

# EXHIBIT V

**Volume 1**

**Pages 1 - 116**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, | ) ) ) | |
| | ) | **NO. 21-md-02981-JD** |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. 3:20-cv-05671-JD** |
| | ) | |
| GOOGLE, LLC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

San Francisco, California
Thursday, November 2, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**PROCEEDINGS**

1  be sure I understand, you mean after the folks come on you'd

2  like to do that?

3         **THE COURT:**  No, no.  Based on the written

4  questionnaires.

5         **MR. BORNSTEIN:**  I see.

6         **THE COURT:**  If there's anything you specifically want

7  to ask -- you know, you've had the questionnaires now for a

8  while, so if there's anything you want to specifically -- for

9  example, some of them, you know, expressed some mild opinions

10  on one side or the other.  If you have something you want me to

11  ask specifically, I'll be willing to consider that.  Okay?

12         **MR. BORNSTEIN:**  Great.

13         **THE COURT:**  All right.  Now, with respect to Google's

14  desire to abandon a jury trial at this point, which they stated

15  in the filing on November 1st, the request is denied.  I'll put

16  a little bit more of this in the minute order, but the salient

17  facts are that all the parties, including Google, agree that

18  Google's counterclaims against Epic are triable to a jury and

19  should be tried by a jury.

20      Google has also expressly agreed that the evidence for the

21  counterclaims against Epic is basically the same as the

22  evidence that will be produced in Epic's antitrust case.

23      And in addition to that Google, along with all the other

24  parties, has on several occasions in the case expressly agreed

25  that, quote, "all claims by all plaintiffs are triable to a

**PROCEEDINGS**

1    jury, with the exception of the claims brought under the
2    California unfair competition law and claims that the states
3    have brought under the laws of 38 other states other than
4    California," close quote.  That's from MDL Docket Number 505 at
5    page 3.  That's just an indicator of similar statements that
6    Google and the parties have made throughout the case.

7        Looking more broadly, I have discussed and urged a jury
8    trial on all issues from the very first day that we have walked
9    in here.  As I just indicated, all the parties reached a
10   consensus in favor of a jury trial.  My case management and my
11   scheduling orders have reflected a reliance on that
12   representation, and Epic and the other parties up to date, but
13   certainly Epic today, has also relied on the idea that we're
14   going to be having a jury trial.

15       So request to abandon a jury at this point is denied and
16   we're on our way to a jury trial.

17       Now, we'll take a break now.

18       What happens now, Ms. Clark?  Are they ready yet or 10
19   more minutes or --

20       **THE CLERK:**  I'm going to bring in the prospective
21   juror panel and seat them and take roll.

22       **THE COURT:**  Okay.  So there's going to be a little
23   roll taking thing.  You'll have about 15 minutes.  So I'm going
24   to leave and I'll come back, and then at that point before
25   Ms. Clark comes to get me, just let me know if you have any

**PROCEEDINGS**

```
 1        I actually forgot Tuesday was Election Day.  So just think

 2   about how you want to handle that.  Okay?  The polls are

 3   usually open till 8:00 in California.

 4        Okay.  All right.  I'll see you then.

 5             THE CLERK:  All rise.

 6        Court's in recess.

 7                  (Proceedings adjourned at 12:11 p.m.)

 8                           ---oOo---

 9

10

11              CERTIFICATE OF REPORTER

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:   Thursday, November 2, 2023

16

17

18

19        _____

20        Kelly Shainline, CSR No. 13476, RPR, CRR
                   U.S. Court Reporter
21

22

23

24

25
```

# EXHIBIT W

**Volume 3**

**Pages 323 - 578**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )  **NO. 21-md-02981-JD**
_____  )
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )  **NO. 3:20-cv-05671-JD**
                                 )
GOOGLE, LLC., et al.,            )
                                 )
            Defendants.          )
_____  )

San Francisco, California
Tuesday, November 7, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

1    A.    Yes, it was.

2    Q.    And you were one of the business leads on actually getting

3    individual Project Hug deals executed?

4    A.    That is correct.

5    Q.    You're familiar with the Business Council at Google?

6    A.    Yes, I am.

7    Q.    And the Business Council at Google is a group of Google

8    executives who approve certain projects that require

9    substantial spending; right?

10   A.    Yes, that's correct.

11   Q.    And as of April of 2019, that Business Council even

12   included the CFO of Google, Ruth Porat; correct?

13   A.    Yes, that was my understanding.

14   Q.    And Project Hug was presented to the Business Council in

15   April of 2019; correct?

16   A.    Yes, that is correct.

17   Q.    And you were part of the group that reviewed and provided

18   feedback on the presentation that was actually presented to the

19   Business Council at that meeting?

20   A.    Yes, that is correct.

21   Q.    If you could please turn your binder to Exhibit 136.  And

22   let me know when you're there, please.

23   A.    (Witness examines document.)  I see it now.

24   Q.    This is the presentation, the slide deck, that you worked

25   on that was presented to the Business Council in connection

 1  Fortnite on Google Play, Mr. Hans Stolfus from Epic reached out

 2  to us letting us know how appreciative he was of all the

 3  support that went into launching Fortnite on Google Play.

 4  Q.   Now, let's look at Mr. Stolfus' e-mail that's at the

 5  bottom of this page.

 6       Could you read the first paragraph of his e-mail to you?

 7  A.   (as read):

 8            "Sorry I had to drop from our call.  Thanks again for

 9       all the time and energy spent on getting Fortnite live on

10       the Google Play Store.  Wouldn't have happened without

11       24-hour support, so we recognize and appreciate it."

12  Q.   Mr. Koh, how did you feel when you received this e-mail

13  from Mr. Stolfus?

14  A.   I think I can speak to everyone that worked on this, and

15  that everyone was very, very proud and excited about getting

16  this launch out the door successfully.

17  Q.   Now, Mr. Koh, did there come a time when Fortnite was

18  removed from the Google Play Store?

19  A.   Yes.

20  Q.   And do you know why that happened?

21  A.   Several months after we successfully launched Fortnite on

22  Google Play, Epic without any heads-up or any notice bypassed

23  our standard submission process for any updates and introduced

24  a code update directly into the game that introduced a

25  violation of our payments policies.

**PROCEEDINGS**

1          THE COURT:  All right.  I'll see you in the morning.

2          MR. BORNSTEIN:  Thank you, Your Honor.

3          THE CLERK:  All rise.  Court's in recess.

4              (Proceedings adjourned at 3:38 p.m.)

5                      ---oOo---

6

7                 <u>CERTIFICATE OF REPORTER</u>

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:   Tuesday, November 7, 2023

12

13

14

15   _____

16          Kelly Shainline, CSR No. 13476, RPR, CRR
                U.S. Court Reporter

17

18

19

20

21

22

23

24

25

# EXHIBIT X

**Volume 6**

**Pages 1037 - 1302**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, | ) ) ) **NO. 21-md-02981-JD** ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| EPIC GAMES, INC., | ) ) |
| Plaintiff, | ) ) |
| VS. | ) **NO. 3:20-cv-05671-JD** ) |
| GOOGLE, LLC., et al., | ) ) |
| Defendants. | ) ) |

San Francisco, California
Monday, November 13, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

1   OEMs is Revenue Share Agreements; right?

2   **A.**   Yes.

3   **Q.**   The Revenue Share Agreement is sometimes known as RSA; is

4   that right?

5   **A.**   Yes.

6   **Q.**   And you oversee negotiation of RSAs between Google and

7   OEMs?

8   **A.**   Yes.

9   **Q.**   And you are involved in setting the strategy in connection

10  with RSAs?

11  **A.**   I was involved with setting the strategy, yes.

12  **Q.**   And Margaret Lam was also involved in setting strategy?

13  **A.**   Yes.

14  **Q.**   And there have been several versions of the form contract

15  for RSAs over the years; is that fair?

16  **A.**   Yes.

17  **Q.**   And for the period of 2016 to 2019, the RSAs that Google

18  entered into with OEMs was known as RSA 2.0; is that right?

19  **A.**   It is.

20  **Q.**   And the 2.0 indicated that that was Version 2 of the

21  template or the form of the RSA; right?

22  **A.**   Yes.

23  **Q.**   And in 2019 Google began entering into what has been

24  referred to as the RSA 3.0 agreements with OEMs; right?

25  **A.**   With the exception of Samsung, yes.

1   **Q.** But when the RSAs were entered into, they were known as

2   RSA 3.0 with the OEMs; is that right?

3   **A.** That is correct.

4   **Q.** And the RSA 3.0 agreements are now the third iteration of

5   the form contract?

6   **A.** That is correct.

7   **Q.** And under the RSA 3.0 agreements, OEMs can enroll their

8   devices in three different tiers; is that right?

9   **A.** That is correct.

10   **Q.** And each tier has different requirements that the OEM must

11   follow in order to qualify; right?

12   **A.** Yes.

13   **Q.** And as OEMs enroll their devices in higher tiers, they

14   take on more obligations and the revenue share they're entitled

15   to increases; right?

16   **A.** That is correct.

17   **Q.** The highest RSA tier is called the premier tier; right?

18   **A.** It is.

19   **Q.** And we also may see that as the Google forward tier?

20   **A.** That is correct, yes.

21   **Q.** So in order to qualify for the premier tier, an OEM may

22   not install any app store on their device other than

23   Google Play; right?

24   **A.** That is correct.

25   **Q.** And that's a way of saying that Google Play has

 1    tier, was intended to allow phone makers to configure devices

 2    or make devices a certain way that we believe were more likely

 3    to compete successfully with the iPhone and pay them the

 4    revenue share that goes with that set of features on a phone.

 5    **Q.**    You were also asked a lot of questions about something

 6    called Project Banyan.  Do you recall that?

 7    **A.**    I do.

 8    **Q.**    Did Project Banyan have anything to do with Android's

 9    competition with Apple?

10    **A.**    Yes.

11    **Q.**    And in what way?

12    **A.**    We were working with Samsung through Banyan and subsequent

13    efforts to see how we could create the best possible store

14    experience on Samsung phones, that was a very prominent

15    competitor to Apple, and so we were trying to essentially find

16    ways to work with them to get that best possible store

17    experience.

18    **Q.**    All right.  We'll come back to RSA 3.0 and Banyan in a few

19    minutes, but let's step back.

20         Is Android an operating system?

21    **A.**    It is.

22    **Q.**    And what is an operating system?

23    **A.**    It basically is a -- the base layer for a device, or in

24    this case a smartphone, that handles system resources and

25    device configuration and how it works with apps -- navigates

1   how apps work.

2   **Q.**   It's basically needed to make the phone run?

3   **A.**   The base software layer on the phone that everything else

4   sits on top of, that's right.

5   **Q.**   Who makes the Android operating system?

6   **A.**   I believe the majority of the code is contributed by

7   Google.

8   **Q.**   Is Android an open-source operating system?

9   **A.**   It is open source, yes.

10  **Q.**   What does it mean to be open source?

11  **A.**   Open source means that it basically is open and available

12  for free to anyone who wants to distribute it and use it.

13  **Q.**   And can anyone go onto the Internet, get the code, and

14  then modify it however they want?

15  **A.**   Yes.

16  **Q.**   Can another company go online, download Android, and then

17  use it to build a phone?

18  **A.**   Yes.

19  **Q.**   And can Android be used only to make phones or can it be

20  used for other types of things?

21  **A.**   It can be used for any one of a number of different

22  devices, yes.

23  **Q.**   Can you give examples of what else besides phones?

24  **A.**   Tablets, TVs, cars.  Even the Peloton uses Android.

25  In-flight entertainment screens use Android.

1  **Q.**  Have you heard the term "OEM"?

2  **A.**  Yes.

3  **Q.**  And what does that mean?

4  **A.**  It stands for original equipment manufacturer.

5  **Q.**  And that's essentially the companies that make phones?

6  **A.**  Yes.

7  **Q.**  Okay.  So to avoid more acronyms in this courtroom, maybe

8  we'll try to use the term "phone maker" --

9  **A.**  Okay.

10  **Q.**  -- rather than "OEM."  I'll do my best.

11      How many phone makers are there out there right now that

12  are making phones using the Android operating system?

13  **A.**  I think the number is measured in hundreds.

14  **Q.**  Can you just name some of the ones that are more known?

15  **A.**  Samsung, Sony, Sharp, Xiaomi, OnePlus, Motorola.  Those

16  are the more prominent ones.

17  **Q.**  And do any of those phone makers pay Google money to use

18  the Android operating system?

19  **A.**  They do not.

20  **Q.**  And is it your understanding that that's been the case

21  ever since it launched back in 2008?

22  **A.**  That's my understanding.

23  **Q.**  And if a phone maker decides that they want to use the

24  Android operating system, do they have to agree to do anything

25  for -- to pay Google in return?

 1  how to get apps on their phone.

 2  **Q.**   Is including a good app store as part of the core apps

 3  important to the competition between Android and Apple?

 4  **A.**   Yes.

 5  **Q.**   And how is that?

 6  **A.**   If the store on a phone is not as good as or better than

 7  what is offered on an iPhone, it's more likely for the user to

 8  stay with Apple, with iPhone.

 9  **Q.**   Now, the MADA provides, like if you put play on the phone,

10  you have to put it on the home screen; correct?

11  **A.**   That is correct.

12  **Q.**   Why does Google ask for that?

13  **A.**   It's part of the out-of-the-box experience.  So that if a

14  user is launching their phone for the first time, they can

15  quickly see that there's a store available for them to download

16  apps if there are other apps that they want to download on

17  their phone.

18  **Q.**   All right.  Can we put Demonstrative 3 on the screen?

19       And could you explain to the jury what is shown on this

20  screen here?

21  **A.**   This is the default home screen of a Samsung S23.

22  **Q.**   Now, does Google benefit from having Play on the home

23  screen of a Samsung phone, for example?

24  **A.**   It does.

25  **Q.**   How does Google benefit?

1

2

3                    **CERTIFICATE OF REPORTER**

4              I certify that the foregoing is a correct transcript

5       from the record of proceedings in the above-entitled matter.

6

7       DATE:    Monday, November 13, 2023

8

9

10

11       _____

12              Kelly Shainline, CSR No. 13476, RPR, CRR
                        U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT Y

**Volume 10**

**Pages 1867 - 2103**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE  )
ANTITRUST LITIGATION,   )
            )  **NO. 21-md-02981-JD**
_____)
THIS DOCUMENT RELATES TO:  )
            )
EPIC GAMES, INC.,     )
            )
     Plaintiff,  )
            )
 VS.         )  **NO. 3:20-cv-05671-JD**
            )
GOOGLE, LLC., et al.,   )
            )
     Defendants.  )
_____)

San Francisco, California
Monday, November 20, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

 1  ours.  We wanted to do a better job of handling customer

 2  payments and customer support resulting from those payments,

 3  and we didn't want to pay Google's 30 percent fee for payment

 4  processing, which was far in excess of the fees that we paid

 5  for payment processing through PayPal and Visa and MasterCard.

 6  **Q.**  Let me direct you to the second page of the e-mail, the

 7  top paragraph there.  You say (as read):

 8       "The future of smartphones is in open platforms where

 9       developers can choose freely among storefronts, in-app

10       payment services, cloud services, and engines.  This

11       future is going to come about one way or another."

12       What did you mean by that?

13  **A.**  I meant that I believed that Google's position was

14  untenable both legally and in terms of developer relations, and

15  that either Google could proactively change its terms itself

16  and give developers a better deal by unbundling

17  Google Play's -- or untying Google Play's billing from the

18  distribution service or that Google would be ultimately forced

19  through litigation or regulation.

20  **Q.**  Did you at this time think it was a realistic possibility

21  that Google would actually accept Fortnite with Epic's payment

22  system?

23  **A.**  Yes.

24  **Q.**  Why?

25  **A.**  Google's policies were really quite ambiguous.  Their

 1  with Epic Direct Pay for digital goods.

 2  **Q.**   So in light of the various harms that you've described,

 3  how much money is Epic seeking to be awarded in this lawsuit?

 4  **A.**   Epic is not seeking any damages.

 5  **Q.**   So what outcome is Epic looking for here?

 6  **A.**   We want the jury to find that Google has violated the law

 7  so that the Court can make Google stop enforcing these

 8  policies.

 9  **Q.**   And from your perspective, what would the effect of that

10  be on Epic?

11  **A.**   It would enable our business to expand and compete in a

12  wide variety of areas which are currently denied to us.  First

13  of all, we could -- if we are able to put Fortnite back onto

14  the Google Play Store, then we could reach billions of users

15  who currently we have no effective way to reach.

16       We would be able to collect payments directly from

17  customers and charge better prices with these 30 percent fees

18  removed as we were for a period of time.

19       And we would -- I'm sorry -- and we would be able to both

20  pass along savings to customers and make more profit for

21  ourselves with this 30 percent.

22  **Q.**   What would the effect be on the Epic Game Store if these

23  policies were changed?

24  **A.**   Well, the Epic Game Store has already reached more than

25  67 million monthly active users on PC and Mac where we're able

1    **A.**    Right.

2    **Q.**    Nintendo does not allow users to sideload a game like on a

3    Nintendo Switch; right?

4    **A.**    That's right.

5    **Q.**    And Nintendo does not allow other companies to put their

6    own app stores on the Nintendo Switch; right?

7    **A.**    Right.

8    **Q.**    Now let's talk about Apple.

9         Epic -- or, let's say, Apple took a 30 percent service fee

10   when Fortnite was in the Apple App Store; right?

11   **A.**    Yes.

12   **Q.**    Epic used Apple's billing system to process in-app

13   purchases when Fortnite was in the app store; right?

14   **A.**    Yes.

15   **Q.**    Apple does not allow users to sideload apps on the

16   iPhone; right?

17   **A.**    Right.

18   **Q.**    Apple does not allow other companies to put their own app

19   stores on IOS; right?

20   **A.**    That's right.

21   **Q.**    And when Fortnite was in the Apple App Store, Apple did

22   not allow Epic to use its own billing system to process

23   transactions; right?

24   **A.**    That's right.

25   **Q.**    So now let's talk about the Play Store.

1   **A.**   Yes.

2   **Q.**   This e-mail chain is from 2020; right?

3   **A.**   That's right.

4   **Q.**   Now, today you're still in an ongoing partnership with

5   Fortnite on Samsung phones; right?

6   **A.**   Yes, we are.

7   **Q.**   That partnership includes distributing Fortnite in the

8   Samsung Galaxy Store; right?

9   **A.**   Yes.

10  **Q.**   And that partnership includes preloading Fortnite on

11  Samsung phones; right?

12  **A.**   Yes.

13  **Q.**   And from your perspective, the relationship between Epic

14  and Samsung today is excellent; right?

15  **A.**   Yes.

16  **Q.**   Okay.  Let's talk about Project Liberty.

17      You were responsible for Epic deciding to pursue

18  Project Liberty; right?

19  **A.**   Yes, I am.

20  **Q.**   And, in fact, you asked the team to keep you in the loop

21  on the topic 100 percent; right?

22  **A.**   I believe I asked to be in on all major conversations.

23  **Q.**   Let me show you what I'm talking about.  If you could turn

24  to Exhibit 10684 in the binder please.

25  **A.**   (Witness examines document.)

 1   **Q.**   Are you with me?

 2   **A.**   Yes.

 3   **Q.**   Okay.  This is an e-mail chain from May of 2020; right?

 4   **A.**   Yes.

 5   **Q.**   You're on the e-mail chain; right?

 6   **A.**   I am.

 7   **Q.**   And this is an e-mail chain about the conduct that we've

 8   been talking about calling Project Liberty; right?

 9   **A.**   Yes.

10          **MR. KRAVIS:**  At this time we move 10684 into evidence?

11          **MR. BORNSTEIN:**  There's no objection, Your Honor.

12          **THE COURT:**  It is admitted.

13        (Trial Exhibit 10684 received in evidence.)

14   **BY MR. KRAVIS:**

15   **Q.**   And, Mr. Sweeney, I'm going to direct your attention to

16   the e-mail on the bottom of page 1.

17        This is an e-mail that you wrote on May 11th, 2020, at

18   12:44 p.m.; right?

19   **A.**   Yes.

20   **Q.**   And as we were talking about a moment ago, this e-mail

21   chain involves the conduct that we've been describing under the

22   name Project Liberty; right?

23   **A.**   Yes.  These are planning meetings for Project Liberty.

24   **Q.**   And in the e-mail you write (as read):

25              "Hi, Ed.  I don't seem to be invited to a Wednesday

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 429 of 645
Case 3:21-md-02981-JD Document 1035-4 Filed 02/06/24 Page 30 of 100

```
 1        meeting.  Please add me to all meetings on the topic.

 2        Please keep me in the loop on this topic 100 percent."

 3        Did I read that correctly?

 4   A.   Yes.

 5   Q.   Okay.  So let's walk through the timeline of events here.

 6        I think you testified about this on direct examination.

 7   Epic submitted a version of Fortnite to the Google Play Store

 8   in December of 2019; right?

 9   A.   Yes.

10   Q.   And just to sort of set the stage here, at that time in

11   December 2019, Fortnite was available for download in the

12   Samsung Galaxy Store; right?

13   A.   Yes.

14   Q.   And for Android devices, Fortnite was available for direct

15   download from Epic's website; right?

16   A.   Right.

17   Q.   And at this time Fortnite was also available in the Apple

18   App Store; right?

19   A.   Yes.

20   Q.   I think you testified that Fortnite first came to the

21   Apple App Store in March of 2018; right?

22   A.   That's right.

23   Q.   And the version of Fortnite that Epic submitted to the

24   Google Play Store in December of 2019 was rejected by Google;

25   right?
```

 1   **A.**   Yes.  Twice.

 2   **Q.**   And you knew that the version had been rejected because

 3   you saw the e-mail from the Google Play Store rejecting that

 4   version of Fortnite; correct?

 5   **A.**   We distributed -- we provided two versions of Fortnite to

 6   the Google Play Store, and they rejected both.

 7   **Q.**   So just to make sure we're talking about the same one,

 8   take a look at Exhibit 10026 in your binder.

 9   **A.**   (Witness examines document.)  Okay.

10   **Q.**   Mr. Sweeney, this is an e-mail chain about one of those

11   rejections; correct?

12   **A.**   Yes.

13   **Q.**   And you're on the top e-mail there; right?  The one from

14   you to Mr. Lockheimer?

15   **A.**   Right.

16   **Q.**   All right.

17           **MR. KRAVIS:**  At this time we move Trial Exhibit 10026

18   into evidence.

19           **MR. BORNSTEIN:**  No objection, Your Honor.

20           **THE COURT:**  It's admitted.

21       (Trial Exhibit 10026 received in evidence.)

22   **BY MR. KRAVIS:**

23   **Q.**   Okay.  So the top e-mail here is written by you; right?

24   **A.**   Yes.

25   **Q.**   On January 13th, 2020; right?

1    **A.**    Right.

2    **Q.**    It is written to Hiroshi Lockheimer and then some other

3    folks from Google are on the cc line; right?

4    **A.**    Right.

5    **Q.**    And if you look down in the first page, you will see that

6    your e-mail to Mr. Lockheimer and others is actually forwarding

7    another e-mail.  Do you see that on the bottom of page 1?

8    **A.**    Yes.

9    **Q.**    And if you flip to page 2, you can see that the e-mail

10   that you are forwarding to Mr. Lockheimer is signed by the

11   Google Play team; right?

12   **A.**    Right.

13   **Q.**    And then if you go back to page 1, you'll see that the

14   e-mail that you're forwarding is written to someone named

15   Haseeb; right?

16   **A.**    Yes.  Haseeb Malik.

17   **Q.**    Haseeb Malik was Epic's mobile publishing director; is

18   that right?

19   **A.**    Yes.

20   **Q.**    And if you look at the bold text under "Thanks for your

21   patience," it reads (as read):

22            "Status of Fortnite (com.epicgames.fortnite):

23        Suspended from Google Play due to policy violation."

24        Right?

25   **A.**    Yes.

1   Q.   And if you look further into the e-mail, it explains

2   exactly what the policy violation is; right?

3   A.   It explains Google's reasons for rejecting the app.

4   Q.   And if you look at the second page of the document, do you

5   see the paragraph that begins "Please note that all app

6   submissions..."  Do you see that?

7   A.   Yes.

8   Q.   The first sentence reads (as read):

9            "Please note that all app submissions must comply

10           with the developer program policies."

11   Did I read that correctly?

12   A.   Yes.

13   Q.   And then the e-mail goes on to say a little bit further

14   down, a couple sentences later (as read):

15           "Your app continues to violate payments policy, which

16           generally prohibits games published on Google Play from

17           providing a payment method other than Google Play Billing

18           to purchase in-app virtual currency or in-app digital

19           downloads."

20   Did I read that correctly?

21   A.   Yes.

22   Q.   Now, you saw this e-mail; right?

23   A.   Yes.

24   Q.   You know you saw it because you forwarded it to

25   Mr. Lockheimer a little bit later; right?

1    **A.**    That's right.

2    **Q.**    And you understood this sentence that we've highlighted

3    here, "Specifically your app continues to violate payments

4    policy," you understood what this sentence meant; right?

5    **A.**    Yes.

6    **Q.**    You know what in-app virtual currency is; right?

7    **A.**    Yes.

8    **Q.**    You know that in-app virtual currency includes things like

9    V-Bucks; right?

10   **A.**    That's right.

11   **Q.**    And you know that Epic pay or Epic Direct Pay is a payment

12   method other than Google Play Billing; right?

13   **A.**    Right.

14   **Q.**    And your e-mail to Mr. Lockheimer is dated January 13th of

15   2020; right?

16   **A.**    Yes.

17   **Q.**    So I heard you say on direct examination that you thought

18   these policies were ambiguous, but you understood from this

19   e-mail that as of January -- as of January 13th, 2020, you

20   understood from this e-mail that Google's payments policy

21   prohibited Epic from using Epic pay for purchases of V-Bucks?

22   You understood that; right?

23   **A.**    I understood that following this rejection, but there were

24   still confounding factors with other apps that Google was

25   allowing to do these things.  So this provided complete clarity

 1  to me of what Google's policies were.

 2  **Q.**   Just to make sure we're on the same page here, this e-mail

 3  that we're looking at provided complete clarity to you about

 4  what Google's payments policy required; right?

 5  **A.**   Yes.

 6  **Q.**   And this was as of January 13th, 2020; right?

 7  **A.**   That's right.

 8  **Q.**   And you knew that if Epic submitted another version of

 9  Fortnite that used Epic pay for purchases of V-Bucks, Google

10  was just going to reject it again; right?

11  **A.**   I would strongly expect that.

12  **Q.**   And so what you decided to do was to try to sneak that

13  version in; right?

14  **A.**   Yes, that's what we decided to do with Project Liberty.

15  **Q.**   And the way you decided to do that was by building a

16  version of Fortnite that Epic could change after it was in the

17  Play Store using something called a Hotfix; right?

18  **A.**   Yes.

19  **Q.**   So let's take a look at Exhibit -- if you could look in

20  your binder, please, at Exhibit 5530.

21          You've got to turn the binder the other way.  There's not

22  a lot of space up there, I know.

23  **A.**   I have it.

24  **Q.**   This is a slide deck entitled "Project Liberty Update"

25  dated July 1st of 2020; right?

1    **A.**    Yes.

2    **Q.**    All right.

3            **MR. KRAVIS:**  At this time we move Trial Exhibit 5530

4    into evidence.

5            **MR. BORNSTEIN:**  No objection, Your Honor.

6            **THE COURT:**  It's admitted.

7        (Trial Exhibit 5530 received in evidence.)

8    **BY MR. KRAVIS:**

9    **Q.**    So, Mr. Sweeney, I'm going to ask you to turn to page 4

10   with me.

11       And do you see at the top there it says "Goal"?

12   **A.**    Yes.

13   **Q.**    And the first goal reads (as read):

14           "On Apple and Android mobile devices publishers

15           allowed to offer third-party payment options for apps on

16           the Apple App Store and Google Play."

17       Did I read that correctly?

18   **A.**    Yes.

19   **Q.**    And now I want to direct you to the -- oh, and, by the

20   way, the reason that you mentioned both the Apple App Store and

21   Google Play Store here is because you launched Project Liberty

22   on these two app stores; right?

23   **A.**    That's right.

24   **Q.**    No other stores?  Just these two; right?

25   **A.**    There was a price drop that affected other platforms, but

1   Apple and Google are the only companies whose policies we

2   challenged.

3   **Q.**   Now, the next bullet reads "Strategy"; right?

4   **A.**   Yes.

5   **Q.**   And if you look at the third subbullet there, it says,

6   quote (as read):

7              "If either platform is unwilling, Hotfix option into

8        FN for users to select Epic payment process."

9        Did I read that correctly?

10  **A.**   Yes.

11  **Q.**   "FN" is Fortnite; right?

12  **A.**   Right.

13  **Q.**   And as we just saw, this deck is dated July of 2020;

14  right?

15  **A.**   Right.

16  **Q.**   This deck is after the January e-mail from Google about

17  the payments policy we just saw; right?

18  **A.**   Yes.

19  **Q.**   So at the time of this deck, you knew that this strategy

20  of using Epic payment process in Fortnite violated the payments

21  policy; correct?

22  **A.**   Yes.  I understood that when we -- if we launched the

23  Hotfix, then it would be in violation of the Google policies.

24  **Q.**   All right.  Let's talk about what a Hotfix is.

25       A Hotfix is an app development term; right?

1   **A.**   Yes.

2   **Q.**   It refers to making changes in an app through a server;

3   right?

4   **A.**   That's right.

5   **Q.**   Now, this is different.  A Hotfix is different from

6   submitting an updated version of the app to the app store;

7   right?

8   **A.**   Right.

9   **Q.**   Updates that are submitted to the Google Play Store, for

10  example, are reviewed by Google; right?

11  **A.**   Right.

12  **Q.**   Whereas, Google does not have the opportunity to review

13  Hotfixes; right?

14  **A.**   That's right.

15  **Q.**   The Hotfix we are talking about here enabled Epic direct

16  payment in Fortnite; right?

17  **A.**   Yes.

18  **Q.**   And you made that change to Fortnite using a Hotfix

19  because you expected that if you submitted this as an update to

20  the app store, Google would reject it; right?

21  **A.**   Yes.

22  **Q.**   And the reason that you expected Google would reject the

23  change if you submitted it to the store is because that's

24  exactly what Epic tried back in December of 2019; right?

25  **A.**   Yes.

1   Q.   Now, Google has an agreement with app developers called

2   the Developer Distribution Agreement; right?

3   A.   Yes.

4   Q.   And you knew that Epic was required to accept the

5   Developer Distribution Agreement to put its games in the

6   Play Store; right?

7   A.   That's right.

8   Q.   And you knew that Epic was also required to comply with

9   Google's developer program policies; right?

10  A.   Yes.

11  Q.   And you knew that adding the Epic direct payment option

12  through the Hotfix violated the payments policy; right?

13  A.   Yes.

14  Q.   And you did it anyway; right?

15  A.   We did it precisely for that reason.

16  Q.   Now, you gave the consoles a heads-up that this was

17  coming; right?

18  A.   Epic didn't disclose its Hotfix plans to consoles, but I

19  gave at least Microsoft an indication that something big was

20  going to happen in Fortnite.

21  Q.   Let's take a look at that.  Could you turn to Exhibit 9016

22  in your binder?

23  A.   (Witness examines document.)  Yes.

24  Q.   Mr. Sweeney, this is an e-mail exchange between you and

25  someone named Phil Spencer at Microsoft; right?

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 439 of 645
Case 3:21-md-02981-JD Document 1035-4 Filed 06/26/24 Page 42 of 100 2088

1    Can we look at Slide 38, please?

2    I think this is actually already in evidence as 8045.  I

3    think you testified on direct examination that this is what the

4    payment screen looked like after the Hotfix was implemented;

5    right?

6    A.    Yes.

7    Q.    And so the idea -- by the way, Epic Direct Payment, that's

8    Epic's payment system; right?

9    A.    Yes.

10    Q.    And Google Play Store, that's Google Play Billing; right?

11    A.    Right.

12    Q.    And so the idea here is that when a user decides to buy

13    some V-Bucks in the app downloaded from the Play Store and they

14    get to the checkout screen, they pick one of these two options;

15    right?

16    A.    Yes.

17    Q.    Now, just to be clear about this, you set both of these

18    prices; right?

19    A.    Yes.

20    Q.    It's not like -- the Google Play Store price, that's not

21    set by Google; right?  That is also set by you?

22    A.    Yes.

23    Q.    And what you want is for the rule to be that Google cannot

24    charge Epic any fee when the user picks Epic Direct Payment;

25    right?

 1  **A.**    Yes, that's what I would love.

 2  **Q.**    That's what you would love.  And the reason -- the reason

 3  that you would love that is because you can set both of these

 4  prices.  And as long as you set the Google Play Billing price a

 5  little bit higher, more people are going to choose Epic Direct

 6  Payment; right?

 7  **A.**    Yes.

 8  **Q.**    And when that happens, Google gets nothing; right?

 9  **A.**    That's right.

10  **Q.**    Now, you testified earlier that you're not seeking damages

11  in this case; correct?

12  **A.**    Right.

13  **Q.**    Mr. Sweeney, your company would make hundreds of millions

14  of dollars from this arrangement that we're looking at now on

15  the screen; isn't that right?

16  **A.**    Well, I think it would be billions of dollars.

17  **Q.**    All those service fees that you pay to the consoles, to

18  Samsung, all of those service fees vanish every time the

19  customer picks Epic Direct Payment; right?

20  **A.**    Yes, that's right.

21  **Q.**    And that would be the rule no matter how many millions of

22  users find your app in the Google Play Store; right?

23  **A.**    I would love that.

24  **Q.**    And that would be the rule no matter how many billions of

25  dollars in in-app purchases you make through the Google Play

1   Store; right?

2   **A.**   I think that would be awesome.

3   **Q.**   And just to be clear, no other company has given Epic this

4   deal; right?

5   **A.**   I don't believe that's currently correct.

6   **Q.**   Well, as of the time of this lawsuit at least, Apple did

7   not let Epic use its own billing system and avoid paying fees;

8   right?

9   **A.**   No.

10  **Q.**   Sony does not let Epic use its own billing system and

11  avoid paying fees; right?

12  **A.**   Right.

13  **Q.**   Microsoft does not let Epic use its own billing system on

14  Xbox to avoid paying fees; right?

15  **A.**   That's right.

16  **Q.**   Nintendo does not let Epic use its own billing system on

17  the Switch to avoid paying fees; right?

18  **A.**   Right.

19  **Q.**   Samsung does not let Epic use its own billing system to

20  avoid paying fees; right?

21  **A.**   I believe that has changed.

22  **Q.**   Well, as of the time of this lawsuit, that was not the

23  case; correct?

24  **A.**   Right.

25  **Q.**   And so what you are asking for in this lawsuit is a deal

```
 1   that you do not have with Apple and you do not have with any of

 2   the consoles; right?

 3   A.    That's what I would love to get out of this lawsuit.

 4             MR. KRAVIS:  Pass the witness.

 5             THE COURT:  Brief recross.

 6             MR. BORNSTEIN:  Thank you, Your Honor.

 7                       REDIRECT EXAMINATION

 8   BY MR. BORNSTEIN:

 9   Q.    Mr. Sweeney, counsel for Google just walked you through a

10   whole bunch of different platforms.  Do you recall that?

11   A.    Yes.

12   Q.    Did he mention personal computers?

13   A.    No.

14   Q.    Did he mention mackintosh computers?

15   A.    No.

16   Q.    What service fee, to use counsel's phrase, does Epic pay

17   on PCs, personal computers?

18   A.    Microsoft gets nothing when we distribute Fortnite

19   directly.

20   Q.    And what fee does Epic pay to Apple on Macintosh

21   computers?

22   A.    Zero.

23   Q.    And there was a chart that were a demonstrative that was

24   used in the beginning of your exam with all these different

25   platforms and 30 percent fees.  Do you recall that?
```

**PROCEEDINGS**

1   date in.

2          **THE WITNESS:**  Well, I think a good time would be

3   around like early 2020 when they were all available.

4          Let's see, my recollection is about 5 percent of Fortnite

5   revenue came from Apple IOS.  Roughly 0.5 percent came from

6   Android.

7          Let's see -- I'm sorry.  I'm bad at math, this kind of

8   math.

9          Let's see, and then the rest was distributed among PC and

10  console.  PlayStation was the number one platform for Fortnite.

11  I believe at peak PlayStation had about 30 percent, Xbox and PC

12  had about -- about 20 percent -- no.  I think -- sorry.  PC and

13  Nintendo Switch about 20 percent, and Xbox around 15 percent.

14  And I think that adds up to 105 percent.  So I'm sorry.

15         **THE COURT:**  Okay.  That's close enough.

16         All right.  Thanks a lot.  You can step down.

17                         (Witness excused.)

18         **THE COURT:**  Here, Lisa.  I'm going to give this to

19  you.

20         Who do we have next?

21         **MR. BORNSTEIN:**  Your Honor, our next witness is a

22  video deposition of a witness from Amazon.

23         **THE COURT:**  All right.

24         **MR. BORNSTEIN:**  The witness' name is Donn Morrill,

25  M. -- well, first name is D-O-N-N, last name M-O-R-R-I-L-L.

**PROCEEDINGS**

1              And, Your Honor, we have a few exhibits to move in in

2      advance without objection.

3              **THE COURT:**  Please.

4              **MR. BORNSTEIN:**  Ms. Clark has the sheet, but the

5      exhibits are 1362, 1363, 1366, 11405, 11406, and 11408.

6              **MR. KRAVIS:**  No objection.

7              **THE COURT:**  Okay.  They're admitted.

8          (Trial Exhibits 1362, 1363, 1366, 11405, 11406, and

9           11408 received in evidence.)

10             **MR. BORNSTEIN:**  Thank you, Your Honor.

11                  (Video was played but not reported.)

12             **THE COURT:**  That's it for today.

13         All right.  I've got another thing I have to attend to, so

14     we're going to stop at 3:30 on the dot.

15         Remember, as we talk about every day, clear your mind.

16     Put this all behind you.  No research.  No communications.  No

17     thinking about this.

18         I'll see you tomorrow morning at 9:00 a.m.

19             **THE CLERK:**  All rise.

20         (Proceedings were heard out of the presence of the jury:)

21             **THE COURT:**  Okay.  See you in the morning.

22                  (Proceedings adjourned at 3:30 p.m.)

23                         ---oOo---

24

25

1

2

3          **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Monday, November 20, 2023

8

9

10

11     _____

12     Kelly Shainline, CSR No. 13476, RPR, CRR
                  U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT Z

# Plf Affm, Def C included - w/ Blurred docs - 11_8 FINAL

## Designation List Report

**Morrill, Donn**                                          **2022-08-11**

| | |
|---|---|
| <span style="color:red">Plaintiff Affirmative</span> | <span style="color:red">00:32:29</span> |
| <span style="color:green">Defendant Counter</span> | <span style="color:green">00:19:25</span> |
| **TOTAL RUN TIME** | **00:51:54** |

Documents linked to video:

1362-BLURRED

1362-BLURRED-2

1362-BLURRED-3

1362-BLURRED-4

1364-NATIVE

1366

1366-BLURRED-2

11405

11406

11408



**ID: Morrill_Donn_COMBINED**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 90:22 Appstore, does the fact that the user | | | |
| | 90:23 used Amazon Coins, instead of U.S. | | | |
| | 90:24 dollars, reduce the amount the developer | | | |
| | 90:25 receives for that purchase? | | | |
| | 91:01 | | | |
| 91:04 - 91:09 | **Morrill, Donn 2022-08-11** | | 00:00:15 | Morrill_Donn_CO |
| | 91:04 A. The developer still receives | | | MBINED.35 |
| | 91:05 their full royalty entitlement even if | | | |
| | 91:06 the customer uses Coins for that | | | |
| | 91:07 transaction. | | | |
| | 91:08 Q. So who, if anyone, absorbs the | | | |
| | 91:09 costs of those Amazon Coins discounts? | | | |
| 91:11 - 91:11 | **Morrill, Donn 2022-08-11** | | 00:00:03 | Morrill_Donn_CO |
| | 91:11 A. Amazon absorbs that discount. | | | MBINED.36 |
| 94:23 - 95:19 | **Morrill, Donn 2022-08-11** | | 00:01:16 | Morrill_Donn_CO |
| | 94:23 Q. At the beginning of 2018 | | | MBINED.37 |
| | 94:24 approximately what proportion of the | | | |
| | 94:25 Amazon Appstore's total sales came from | | | |
| | 95:01 | | | |
| | 95:02 transactions on Android? | | | |
| | 95:03 A. Again, using the same | | | |
| | 95:04 definition of Android, doing some rough | | | |
| | 95:05 math here, for that given month of | | | |
| | 95:06 January $23 million as a percentage of 78 | | | |
| | 95:07 million across all devices, roughly a | | | |
| | 95:08 third, plus or minus. | | | |
| | 95:09 Q. Okay. At the end of 2021 | | | |
| | 95:10 approximately what proportion of the | | | |
| | 95:11 Amazon Appstore's total sales came from | | | |
| | 95:12 transactions on Android? | | | |
| | 95:13 A. Again, accounting for | | | |
| | 95:14 fluctuations and the definition of | | | |
| | 95:15 Android, the third-party or Android | | | |
| | 95:16 revenue was just north of 15 million, the | | | |
| | 95:17 total revenue across all device | | | |
| | 95:18 categories was 164 million, so roughly | | | |
| | 95:19 less than -- somewhat less than 10%. | | | |
| 100:05 - 100:08 | **Morrill, Donn 2022-08-11** | | 00:00:10 | Morrill_Donn_CO |
| | 100:05 Can you tell me approximately | | | MBINED.38 |

**Morrill_Donn_COMBINED - Plf Affm, Def C included - w/ Blurred docs - 11_8 FINAL**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 100:06   how much expense Amazon incurred in | | |
| | 100:07   connection with its app store from 2015 | | |
| | 100:08   through 2021 across those years? | | |
| 100:11 - 100:12 | **Morrill, Donn 2022-08-11** | 00:00:05 | Morrill_Donn_CO |
| | 100:11   A.   In aggregate, roughly 1.4 | | MBINED.39 |
| | 100:12   billion U.S. dollars. | | |
| 101:20 - 102:03 | **Morrill, Donn 2022-08-11** | 00:00:23 | Morrill_Donn_CO |
| | 101:20   Q.   What was the Amazon Appstore's | | MBINED.40 |
| | 101:21   approximate net profit for the four years | | |
| | 101:22   2018 to 2021? | | |
| | 101:23   A.   Looks like counsel has done | | |
| | 101:24   the math there in Excel. It looks like | | |
| | 101:25   positive -- again, I find those years | | |
| | 102:01 | | |
| 🔗 1364-NATIVE.<br>1.1 | 102:02   somewhat arbitrary -- but plus 300 | | |
| ✖ Clear | 102:03   million. | | |
| 103:03 - 103:14 | **Morrill, Donn 2022-08-11** | 00:00:31 | Morrill_Donn_CO |
| | 103:03   Q.   Do you know what it means for an | | MBINED.41 |
| | 103:04   application to be preinstalled on a | | |
| | 103:05   mobile device? | | |
| | 103:06   A.   I do, yes. | | |
| | 103:07   Q.   Can you please explain to the | | |
| | 103:08   jury what it means for an application to | | |
| | 103:09   be preinstalled on a mobile device? | | |
| | 103:10   A.   Sure. What it means is that | | |
| | 103:11   when a consumer opens that device and | | |
| | 103:12   turns it on the application is available | | |
| | 103:13   on that device. It doesn't have to be | | |
| | 103:14   downloaded and installed. | | |
| 107:16 - 107:19 | **Morrill, Donn 2022-08-11** | 00:00:08 | Morrill_Donn_CO |
| | 107:16   Q.   In 2013 was the Amazon | | MBINED.42 |
| | 107:17   Appstore preinstalled on Android devices | | |
| | 107:18   to the same extent as the Google Play | | |
| | 107:19   Store? | | |
| 107:22 - 108:12 | **Morrill, Donn 2022-08-11** | 00:00:48 | Morrill_Donn_CO |
| | 107:22   A.   Again, talking specifically | | MBINED.43 |
| | 107:23   about the Google Android devices, the | | |
| | 107:24   Amazon Appstore was not preinstalled. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 280:16    recommendation with a mechanism to mark a | | |
| | 280:17    recommendation as not interested." | | |
| | 280:18    Do you see that? | | |
| | 280:19  A.  I do. | | |
| | 280:20  Q.  And did I read that correctly? | | |
| | 280:21  A.  Yes, you did. | | |
| 281:06 - 281:17 | **Morrill, Donn 2022-08-11** | 00:00:24 | Morrill_Donn_CO |
| | 281:06  Q.  Moving down to the row that | | MBINED.123 |
| 🔗 11405.2.9 | 281:07    says Detail Page, do you see that? | | |
| | 281:08  A.  I do. | | |
| | 281:09  Q.  And for Detail Page, this was | | |
| | 281:10    another one where this memorandum puts a | | |
| | 281:11    checkmark in the Critical or Lost column. | | |
| | 281:12    Do you see that? | | |
| | 281:13  A.  I do, yes. | | |
| | 281:14  Q.  And then in the Comment field | | |
| 🔗 11405.2.10 | 281:15    it says, "For Detail Page Google and | | |
| | 281:16    Apple provided more full and consistent | | |
| | 281:17    app data."  Did I read that correctly? | | |
| 281:20 - 281:25 | **Morrill, Donn 2022-08-11** | 00:00:14 | Morrill_Donn_CO |
| | 281:20  A.  Yes, you did. | | MBINED.124 |
| | 281:21  Q.  So this was another area where | | |
| | 281:22    there is a gap between the features seen | | |
| | 281:23    on the Google Play Store and the Apple | | |
| | 281:24    App Store relative to the Amazon | | |
| | 281:25    Appstore. Do I have that right? | | |
| 282:04 - 282:05 | **Morrill, Donn 2022-08-11** | 00:00:04 | Morrill_Donn_CO |
| | 282:04  A.  Once the customer is inside | | MBINED.125 |
| | 282:05    the app store, that is accurate. | | |
| 286:02 - 286:07 | **Morrill, Donn 2022-08-11** | 00:00:13 | Morrill_Donn_CO |
| ⌦ Clear | 286:02  Q.  And out of the eight -- I'm | | MBINED.126 |
| | 286:03    sorry -- out of the 14 aspects studied | | |
| | 286:04    there were eight for which the Amazon | | |
| | 286:05    Appstore had critical defects as compared | | |
| | 286:06    to the competitive set as of this date, | | |
| | 286:07    correct? | | |
| 286:10 - 286:11 | **Morrill, Donn 2022-08-11** | 00:00:03 | Morrill_Donn_CO |
| | 286:10  A.  That's an accurate | | MBINED.127 |
| | 286:11    interpretation of this, yes. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 492:07  Q.  And you would agree that the | | MBINED.177 |
| | 492:08      Amazon Appstore and the Google Play Store | | |
| | 492:09      are each competing to attract | | |
| | 492:10      high-spending gamers, correct? | | |
| 492:14 - 492:20 | **Morrill, Donn 2022-08-11** | 00:00:20 | Morrill_Donn_CO |
| | 492:14  A.  One audience of our Appstore, | | MBINED.178 |
| | 492:15      our third-party Appstore is high-spending | | |
| | 492:16      gamers. I don't have any documents that | | |
| | 492:17      say that is Google's strategy. But it | | |
| | 492:18      seems to be a sound statement that Google | | |
| | 492:19      would want to attract high-spending | | |
| | 492:20      gamers. | | |

| | | |
|---|---|
| Plaintiff Affirmative | 00:32:29 |
| Defendant Counter | 00:19:25 |
| **TOTAL RUN TIME** | **00:51:54** |

Documents linked to video:

1362-BLURRED

1362-BLURRED-2

1362-BLURRED-3

1362-BLURRED-4

1364-NATIVE

1366

1366-BLURRED-2

11405

11406

11408

# EXHIBIT AA

**Volume 12**

**Pages 2292 - 2518**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, | ) )  ) | |
| | ) | **NO. 21-md-02981-JD** |
| _____ | ) ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. 3:20-cv-05671-JD** |
| | ) | |
| GOOGLE, LLC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California

Monday, November 27, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 454 of 645
Case 3:20-cv-00591-JD Document 854 Filed 10/16/24 Page 55 of 100

**BARNES - CROSS / ROCCA**

1  costs, and I want to show you this.  It's Exhibit 6956 in

2  evidence.  And it's quite small, but let me say this:  This

3  exhibit includes various categories of Google Play's costs;

4  correct?  This is your exhibit.

5  **A.**  Yes.  Well, this is not -- this is a summary-level

6  exhibit.  So there are additional -- I mean, there's more

7  detail behind each of these lines but, yes.

8  **Q.**  Right.

9     Why don't we zoom in on 2015, Phil.  I think that's

10  Slide 9.

11     Okay.  So there are categories of costs that you've

12  summarized as total directs cost of sales, infrastructure, and

13  total OpEx.  Do you see that?

14  **A.**  Yes.

15  **Q.**  And those add up to about $2.4 billion.  Does that look

16  about right?  I have a calculator here, but I think you

17  wouldn't be surprised --

18  **A.**  It's in the neighborhood.  I'm sure you've done the math

19  right.

20  **Q.**  Okay.  So just in 2015 alone, according to your exhibit,

21  Google Play spent about $2.4 billion to support its Play Store;

22  right?

23  **A.**  Those were the costs that Google Play incurred in

24  generating the revenue that it generated for 2015.

25  **Q.**  For 2015, right.

1      Let's put up the next slide, Phil.  So let's capture this

2  in a demonstrative.

3      This is $2.4 billion in app store costs in one year, 2015.

4  Are you with me so far?

5  **A.**   I am.

6  **Q.**   Okay.  Now, you didn't compare Google Play's costs to the

7  costs of any other app store, did you?

8  **A.**   No.  That was not part of my inquiry here.

9  **Q.**   For example, you didn't compare what Google spent on

10  Google Play with what Amazon spent on its app store, the Amazon

11  Appstore; right?

12  **A.**   No.  That wasn't part of my assignment.

13  **Q.**   Let's put up Slide 11, which is trial testimony from

14  Amazon.

15      Thank you, Phil.

16      And you see here that Mr. Morrill is asked (as read):

17        "How much expense did Amazon incur in connection with

18        its app store from 2015 through 2021?"

19      And you see that Mr. Morrill responds (as read):

20        "In the aggregate, roughly $1.4 billion."

21      Do you see that?

22  **A.**   I do.

23  **Q.**   Okay.  So in those seven years, according to Mr. Morrill's

24  testimony, Amazon spent $1.4 billion on its app store; right?

25  **A.**   I see that testimony.

 1    from apps, we have to think about new phones.  Of course

 2    there's an installed base, and that's going to dilute these

 3    numbers.  You've got to focus on the new phone -- new

 4    smartphone sales, and for those the numbers are much higher.

 5         But then the other thing important to keep in mind is how

 6    these RSA restrictions are targeted.  Okay?  What I'm showing

 7    in this figure is that Xiaomi, Oppo, and Vivo, the one with

 8    competing game stores -- these aren't potential competitors;

 9    these are actual competitors -- they're being hit quite

10    heavily.

11         Whereas, for example, Transsion, the third largest

12    worldwide smartphone provider according to these numbers, but

13    you saw in the previous table they didn't appear.  As far as I

14    know, they don't have a significant app store and they also

15    don't have these restrictions.

16    Q.   So besides direct downloading and preinstallation, any

17    other way for a competing app store to get onto an Android

18    phone?

19    A.   That's pretty much it for all practical purposes.

20    Q.   Okay.  So you talked about a third way in which Google has

21    obstructed rivals' ability to compete, which you say is

22    removing opportunities to differentiate themselves.

23         What do you mean by differentiation here?

24    A.   Right.  Well, what I'm talking about here is that in many

25    markets where you have a dominant firm that is benefiting from

 1    its position as the incumbent, it's hard to -- it's hard to

 2    make inroads against that.

 3         In the context of Google Play, you've got users going

 4    to -- smartphone users going to Google Play because the apps

 5    are there, and you've got developers putting their apps on

 6    Google Play because users are going there, and it's all kind of

 7    reinforcing.  And to break into that, you need to offer the

 8    consumer a compelling reason to do something else.

 9         And the way that that's typically done in these types of

10    markets is to offer some sort of exclusive content to say "We

11    have some sort of content here that actually you can't get

12    there so you ought to try us."  This is a way that companies

13    often successfully break into markets.  If they didn't

14    differentiate themselves, they'd just get squashed and they

15    wouldn't be competition.

16    Q.   What has Google done to prevent that kind of

17    differentiation?

18    A.   Here we come to the Project Hug agreements with

19    developers.  And the Project Hug agreements have provisions in

20    them that prevent the competing app stores from obtaining or

21    even developing in cooperation with developers exclusive

22    content that they could offer for this purpose.

23    Q.   There's been a lot of testimony about Project Hug in the

24    trial.

25         One thing that has been asserted, though, that I'd like to

 1   remember at this point in time whether it was some sort of a

 2   partnership or ownership, but there was an affiliation between

 3   the two companies.

 4   **Q.**   Excuse me.

 5        You also mentioned the Project Hug agreements with

 6   developers.  How do they fit into this buying-off-rivals

 7   framework?

 8   **A.**   Well, remember, the Project Hug agreements provided

 9   generous payments to the developers in exchange for agreeing to

10   these exclusionary provisions.  And if you're a developer,

11   think about the position that this is putting you in.  Some of

12   these developers -- there is indication in the trial testimony,

13   I think, certainly in the record, that some of the developers

14   considered launching game stores; and had they done that, they

15   would have been actually competing with Google Play.

16        Instead, they, by virtue of being induced through these

17   incentives to agree to these terms, put themselves in a

18   position where they couldn't even take the material that they

19   developed for their own apps and launch an app store and have

20   any exclusive content for their own apps.  So this would have

21   strongly discouraged them from entering.

22   **Q.**   Well, there's been some testimony that the agreements that

23   were signed by these developers, like Activision and Riot,

24   didn't actually prohibit the developers from opening their own

25   store.  What significance does that have to you as an

 1   economist?

 2   **A.**   Well, as an economist, I look at this as a matter of

 3   incentives, and I'm asking:  What -- how does the agreement

 4   affect the developer's incentives to entry -- enter?

 5        If you take away the developers's ability to have

 6   exclusive content for its own apps on its own store, you're --

 7   you know, you're cutting the ground out from underneath them.

 8   **Q.**   So we've walked through a number of different types of

 9   conduct.  As an economist, do you look at all of these one by

10   one or do you look at them together as a collective?

11   **A.**   Well, I think both.  I mean, I look at them one by one;

12   and taking them one by one, I consider them anticompetitive,

13   but it's really important not just to think of them one by one.

14   Here it's the collectivity of this conduct that's really

15   important.

16        The way to think about this is Google is erecting multiple

17   hurdles that a competitor would have to clear to be a

18   meaningful factor in app distribution, and it could get by one

19   hurdle, it could get by two hurdles.  If there's another hurdle

20   and it doesn't clear that one, that takes care of them.  So

21   it's important to think about them together.

22   **Q.**   Did you see any evidence in the record during your review

23   that suggested or supported your view about the importance of

24   reviewing this all as a whole?

25   **A.**   Yes.  I think internal Google documents confirmed that

1        And basically what we're asking is:  How much substitution

2    would there be in response to a 5 percent change in price?

3    **Q.**    And you refer to substitution here.  Are you talking about

4    people moving from using the Google Play Store to using the

5    Apple App Store, or do you mean something else?

6    **A.**    Well, yes, but indirectly.  So this would have to be

7    someone saying, "Okay.  I want to switch from the Google Play

8    Store to the Apple App Store.  I need to get rid of my Android

9    phone and get an Apple phone so that I can use the Apple App

10   Store."

11       So it's indirect.  The ability to substitute is very

12   indirect.  You can't use the Apple App Store on the Android

13   store, so you have to change phones.

14   **Q.**    All right.  So did you do any analysis to see how big a

15   SSNIP or a price increase here of the type you described would

16   be?

17   **A.**    Yes.  Well, one way to gauge it is to think about:  Okay.

18   What are the fees that Google Play collects for app

19   distribution over the life of the typical user's phone?  And we

20   have those statistics from Google.  That's about $10.82.

21       Okay.  Now, if Google Play were to increase those prices

22   by 5 percent, that number would go up -- increase the fees that

23   it's charging by 5 percent, that number, that $10.82, which is

24   the average, would go up by 5 percent, which is about 52 cents

25   over the life of a phone.

1   **A.**   Right.  So now I'm actually focused on that smartphone

2   market that was in the lower right on the -- and I should have

3   said "markets" plural -- that was in the lower right of the

4   previous figure.

5        There are a couple of things that I examined here.  One is

6   switching costs between platforms.  The other is these

7   platforms are actually targeting different customer segments

8   which limits substitution between them.

9   **Q.**   All right.  So let's talk about those.  What do you mean

10  by switching costs?

11  **A.**   Switching costs are costs and inconvenience that a

12  smartphone user incurs when they switch from one platform to

13  another.  So that would include things -- I think there's been

14  testimony about it -- things like learning a new operating

15  system, incompatibility with your other devices, things like

16  that.  Those are, whether they're monetary or not, they're real

17  costs, inconvenience, time.  A lot of people just don't want to

18  go through that.

19  **Q.**   And what did you find about the magnitude of the switching

20  costs here?

21  **A.**   Well, there are some estimates on the magnitude of

22  switching costs between these platforms in the academic

23  literature.  They're older estimates now.  They come from data

24  that was between 2011 and 2014.  At that point in time the

25  switching costs were measured as being equivalent to literally

1    if you were talking about smartphones, it would be 5 percent of

2    a much bigger number.  So the SSNIP would be bigger.  You'd be

3    considering more substitution for app distribution.  It's

4    5 percent of a small number, so there isn't going to be a lot

5    of substitution.

6    **Q.**    So the second bullet here, what do you mean when you say

7    that people pay little attention to app distribution prices

8    when they buy a phone?

9    **A.**    Right.  So this is another principle that comes from

10   behavioral economics.  When people buy durable goods -- a phone

11   is a durable good.  You have it for, you know, a long period of

12   time.  You just don't buy it and consume it right away.  You

13   know, cars, refrigerators, these are all durable goods.

14        What we know is that when people buy durable goods, they

15   don't pay a lot of attention to the operating costs of those

16   goods.  They pay some but they, to some significant extent,

17   ignore those costs when making those purchases; and that

18   further attenuates any effect of, you know, the -- a change in

19   the price of app distribution services on the choice of a

20   phone.

21        This is actually supported in this context by consumer

22   surveys that indicate which phone features are important to

23   them when they buy their phone.  And on the surveys that I've

24   seen, Play Stores often don't appear at all.  If they appear,

25   they're quite far down.  So this isn't front of mind when

Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 463 of 645
Case 3:21-md-02981-JD Document 1035-4 Filed 06/26/24 Page 64 of 100 2456

1  system is connected and has to work together; right?

2  A.   I'm not sure I'd say it that way, but approximately.

3  Q.   And when users purchase a smartphone today, their device

4  is either part of the Android ecosystem or the Apple ecosystem;

5  right?

6  A.   Yes.

7  Q.   And a smartphone ecosystem includes an operating system,

8  apps, and devices; right?

9  A.   Yes.

10 Q.   And when users buy a smartphone, they aren't just buying a

11 device, are they?

12 A.   No.

13 Q.   When users buy a smartphone, they're also choosing an

14 operating system and a set of apps for that system; right?

15 A.   Well, they're not choosing the apps when they buy the

16 phone.  They're choosing the set of apps that are available on

17 that platform.

18 Q.   Right.  And apps are essential components of smartphones;

19 right?

20 A.   Yes.

21 Q.   And apps are an essential part of a smartphone ecosystem;

22 right?

23 A.   Yes.

24 Q.   And so attracting app developers is critical to the

25 success of a mobile operating system; right?

**PROCEEDINGS**

1          **MR. BORNSTEIN:**  I'm going to press my luck here,

2    Your Honor, and say that makes the rebuttal really important.

3          **THE COURT:**  Well, not if there's two hours of

4    meandering cross-examination in between, and that will affect

5    my appetite for rebuttal.

6          **MR. BORNSTEIN:**  I hear you loud and clear.

7          **THE COURT:**  All right.

8        Okay.  And that goes for you too.

9        We'll see you tomorrow.

10          **MR. BORNSTEIN:**  Thank you, Your Honor.

11                (Proceedings adjourned at 3:45 p.m.)

12                        ---oOo---

13

14              **CERTIFICATE OF REPORTER**

15        I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18    DATE:   Monday, November 27, 2023

19

20

21

22    _____

23        Kelly Shainline, CSR No. 13476, RPR, CRR
                U.S. Court Reporter

24

25

# EXHIBIT BB

**Volume 15**

**Pages 2855 - 3065**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE     )
ANTITRUST LITIGATION,        )
                              )  **NO. 21-md-02981-JD**
_____)
THIS DOCUMENT RELATES TO:    )
                              )
EPIC GAMES, INC.,          )
                              )
       Plaintiff,       )
                              )
  VS.                    )  **NO. 3:20-cv-05671-JD**
                              )
GOOGLE, LLC., et al.,      )
                              )
       Defendants.      )
_____)

San Francisco, California

Thursday, November 30, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**PROCEEDINGS**

1      **MR. MACH:** I agree with that.

2      **MR. EVEN:** It's a defense to that. So if there is

3  nothing to defend against, we're happy to go.

4      **THE COURT:** Excellent. All that is out. When I say

5  "out," I just mean for the jury. All right? So don't --

6      **MR. EVEN:** Understood, Your Honor.

7      **THE COURT:** Yeah.

8      Okay. Now, let's see, actually that might be it for the

9  macro. I'm going to give you my final set, but I think that's

10  probably all I need for right now.

11      **MR. RAPHAEL:** Your Honor?

12      **THE COURT:** Yes.

13      **MR. RAPHAEL:** Could I be heard on the after-market

14  issue that you discussed yesterday? I think that's a really

15  important instruction about --

16      **THE COURT:** On which one?

17      **MR. RAPHAEL:** The after-market issue.

18      **THE COURT:** Oh. There is no after market. This is

19  not an after-market case.

20      **MR. RAPHAEL:** I think that's why I'd like to be heard

21  on it, Your Honor, if you'll indulge me.

22      **THE COURT:** Very briefly.

23      **MR. RAPHAEL:** Well, Your Honor, I think --

24      **THE COURT:** I'm sorry. I will let you do that. We

25  have other -- what is this breach of implied covenant? Why do

**PROCEEDINGS**

1  we need that?

2       I don't see how it's different at all from the breach of

3  contract claim.  We're going to get rid of that too; right?

4            **MR. MACH:**  Yeah, if we have the stipulation.

5            **THE COURT:**  Okay.  Yeah, that's out too.

6       Okay.  After market.  I know you want to be within

7  *Epic/Apple*, you're not.  This is a different case.  So there is

8  no after market or fore market.  They have a totally different

9  theory, and there hasn't been a word -- the word "after market"

10  has not been use by a single witness, including the experts in

11  this case.  So what is it you want to say?

12           **MR. RAPHAEL:**  Well, that's the issue I'd like to

13  address, Your Honor, because I think I'd like to point out to

14  the Court, if I have just a few moments, that I think their

15  theory in this case is actually exactly the same, and I think

16  their own words from both cases actually demonstrate that.

17           **THE COURT:**  I think that's actually dead wrong.  Okay?

18       And, by the way, the jury instructions are not based on

19  theory.  It's based on the evidence in the case.  There has

20  been zero mention, let alone evidence, of fore market or after

21  market.  So after market will not be given.  Okay?

22       So I'm going to take it from here.  All right?

23           **MR. POMERANTZ:**  Your Honor, I'm sorry.

24           **THE COURT:**  Yeah.

25           **MR. POMERANTZ:**  That issue is not based on whether

**PROCEEDINGS**

 1  those words were used.  The theory of this case by both sides,

 2  what we have said over and over again is when you buy a phone,

 3  you obviously consider what apps are available on that phone.

 4  That is a classic after-market theory.

 5      Their response --

 6      **THE COURT:**  I don't think that's right.  There's been

 7  a ton of evidence saying that people never even look at the app

 8  store when they make their phone choice.

 9      **MR. POMERANTZ:**  Well, obviously there's a dispute

10  about that because we just showed evidence today that that's

11  not true.

12      **THE COURT:**  In the *Apple* case, which I have looked at

13  quite extensively, the experts pitched it as fore market/after

14  market, some variation of *Kodak*.

15      Now, whether they decided to pursue that because they

16  didn't like the outcome in *Epic* or whatever, it doesn't matter.

17  It's not in this case.

18      **MR. POMERANTZ:**  But, Your Honor, you're talking --

19      **THE COURT:**  Am I -- are you doing that?  Is that your

20  theory?

21      **MR. EVEN:**  We haven't alleged it.  We're not pursuing

22  it.  It's not what our experts said, Your Honor.

23      **MR. POMERANTZ:**  Your Honor, the record is clear.  What

24  they came in here and argued was that once you buy a phone --

25  if you buy an iPhone, you can only go to the app store.  If

**CERTIFICATE OF REPORTER**

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, November 30, 2023

_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter

# EXHIBIT CC

**Volume 16**

**Pages 3066 - 3293**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION, | ) ) ) ) | **NO. 21-md-02981-JD** |
| ——————————————— THIS DOCUMENT RELATES TO: | ) ) | |
| EPIC GAMES, INC., | ) ) | |
| Plaintiff, | ) ) | |
| VS. | ) ) | **NO. 3:20-cv-05671-JD** |
| GOOGLE, LLC., et al., | ) ) | |
| Defendants. | ) ) | |
| ——————————————— | ) | |

San Francisco, California

Friday, December 1, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

```
 1          MR. RAPHAEL:  That "Epic proved substantial
 2    competitive effect that harms consumers in the relevant
 3    market," which comes from the AmEx case.  The harm to consumers
 4    is the touchstone of anticompetitive conduct.
 5          THE COURT:  Okay.  Please, this is not the first
 6    antitrust case I've done.
 7          MR. RAPHAEL:  I understand, Your Honor.
 8          THE COURT:  I know what the touchstone is.
 9       I think that's covered somewhere else, isn't it?
10          MR. EVEN:  Your Honor, A, I think it's covered
11    somewhere else; B, there are all kinds of -- whole pages of --
12          THE COURT:  In fact, it's actually on line 14 (as
13    read):
14             "You must determine whether Epic has proven that
15         Google's conduct has caused substantial harm to
16         competition in the market."
17          MR. RAPHAEL:  Your Honor, what we're requesting is
18    that that -- the instruction --
19          THE COURT:  I'm not going to do that.  That's
20    editorializing and that's not an adequate or proper statement
21    of the law for jury instruction purposes.  So that's denied.
22          MR. RAPHAEL:  The second proposal would be that the
23    instruction limits the competitive benefits for consumers in
24    that market.  That is on page 29, line 16.
25       We would propose the deletion of the phrase "in that
```

1    relevant market."  The Supreme Court and the Ninth Circuit in a

2    number of cases have considered benefits in related markets,

3    and we would propose that that phrase be deleted to permit

4    that.

5             **THE COURT:**  Have you read *Qualcomm* recently in the

6    Ninth Circuit?

7             **MR. RAPHAEL:**  Your, yes Honor.  Our position --

8             **THE COURT:**  A former judge of this court got roundly

9    reversed for taking into account other markets.  I'm not going

10   to do that.  That's denied.

11            **MR. RAPHAEL:**  Understood, Your Honor.

12            **THE COURT:**  Okay.  Let's move on to --

13            **MR. RAPHAEL:**  Your Honor, there are a couple more

14   points on this.  I apologize.  I will move through them

15   quickly.  I just would like the opportunity to preserve them.

16        We would request an instruction --

17            **THE COURT:**  You know, you're wanting to win the case

18   by ginning up favorable instructions.  That's not going to

19   happen.

20            **MR. RAPHAEL:**  I understand.

21            **THE COURT:**  That is a standing denial of any effort to

22   sort of editorialize, sway, color, spin, which is all that

23   you're pitching.  These are not substantively accurate, correct

24   instructions based either on the law or the evidence in this

25   case.  So keep that in mind on your next set of comments.

```
 1              THE CLERK:  All rise.  Court's in recess.

 2                  (Proceedings adjourned at 3:54 p.m.)

 3                           ---oOo---

 4

 5                   CERTIFICATE OF REPORTER

 6          I certify that the foregoing is a correct transcript

 7     from the record of proceedings in the above-entitled matter.

 8

 9     DATE:    Friday, December 1, 2023

10

11

12

13

14              Kelly Shainline, CSR No. 13476, RPR, CRR
                       U.S. Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT DD

**Volume 17**

**Pages 3294 - 3442**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE    )
ANTITRUST LITIGATION,      )
                            )
                            )  **NO. 21-md-02981-JD**
_____)
THIS DOCUMENT RELATES TO:    )
                            )
EPIC GAMES, INC.,         )
                            )
         Plaintiff,     )
                            )
  VS.                   )  **NO. 3:20-cv-05671-JD**
                            )
GOOGLE, LLC., et al.,     )
                            )
        Defendants.    )
_____)

San Francisco, California

Monday, December 11, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

1    You may not find that a company willfully acquired or

2   maintained monopoly power through anticompetitive means if it

3   has acquired or maintained that power solely through the

4   exercise of superior foresight and skill or because of natural

5   advantages, such as unique geographic access to raw materials

6   or markets or because of economic or technological efficiency,

7   including efficiency results from scientific research, or by

8   obtaining a lawful patent or patents, or because changes in

9   cost or consumer preferences have driven out all but one

10  supplier.

11   In summary, you must first determine whether Epic has

12  proven that Google's conduct has caused substantial harm to

13  competition in a relevant market.  If Epic has done so, you

14  must then determine whether Google has justified its conduct by

15  proving that its conduct was reasonably necessary to achieve

16  competitive benefits for consumers in that relevant market.

17   However, if Epic has proven that Google could have readily

18  achieved the same benefits using reasonably available

19  alternative means that would have created substantially less

20  harm to competition, then those benefits cannot justify

21  Google's conduct.  In other words, if you find that Google has

22  proven a pro competitive rationale, then you must determine if

23  Epic has met its burden to prove the existence of a

24  substantially less restrictive alternative to achieve Google's

25  pro competitive rationale.

1    of an agreement from the circumstances, including what you find

2    the persons actually did and the words they used.

3         Now, in determining whether an agreement or understanding

4    between two or more persons to restrain trade has been proved,

5    you must consider the evidence as a whole and not in piecemeal

6    fashion.

7         Now, under Section 1 of the Sherman Act, a restraint of

8    trade is illegal only if it's found to be unreasonable.  You

9    must determine, therefore, whether any of the restraints

10   challenged here are unreasonable.  The restraints challenged

11   here are the agreements that Google requires mobile app

12   developers to enter into as a condition of distributing apps on

13   Google Play Store, and these are called the DDA agreements;

14   alleged agreements with Google's alleged competitors or

15   potential competitors, including Activision and Riot Games

16   under Google's Games Velocity Program or Project Hug; and

17   agreements with original equipment manufacturers, OEMs, that

18   sell mobile devices.  These are the MADA and RSA agreements.

19        In making this determination, you must first determine

20   whether Epic has proven that a challenged restraint has

21   resulted in a substantial harm to competition in a relevant

22   product or geographic market.  If you find that Epic has proven

23   that the challenged restraint results in a substantial harm to

24   competition in a relevant market, then you must consider

25   whether Google has proven that the restraints produced

1    countervailing competitive benefits.

2        If you find that they do, then you must balance the

3    competitive harm against the competitive benefit.  However, if

4    you find that the competitive benefits could have been achieved

5    through substantially less restrictive alternatives, then you

6    may not consider those benefits when balancing harms against

7    benefits.

8        The challenged restraints are illegal under Section 1 of

9    the Sherman Act only if you find that the competitive harm

10   substantially outweighs the competitive benefit.

11       Now let's break these steps down a little bit.

12       As I mentioned, to prove that the alleged restraint is

13   unreasonable, Epic must first demonstrate that the restraint

14   has resulted or is likely to result in substantial harm to

15   competition.  Although it may be relevant to the inquiry, harm

16   that occurs merely to the individual business of the plaintiff

17   is not sufficient by itself to demonstrate harm to competition

18   generally.  That is, harm to a single competitor or group of

19   competitors does not necessarily mean that there has been harm

20   to competition.

21       Epic must also show that the harm to competition occurred

22   in an identified market known as a relevant market.  As I've

23   described, there are two aspects of a relevant market.  The

24   first aspect is known as the relevant product market.  The

25   second aspect is known as the relevant geographic market.  It

1    relevant market, and she was literally unable to come up with

2    anything.  Her market definition is so broad, so

3    incomprehensible that it is -- and I don't use the word

4    lightly -- it is absurd.  The only markets that have been

5    defined here are the markets for Android app distribution and

6    Android in-app payment solutions.

7         Now, I have one other thing to say about market

8    definition, which is Apple.  Because Google has -- they've

9    staked their case really on the idea of market definition and

10   the fact that the Apple App Store is in the distribution

11   market.  This is false.  This is not the real world.  This is a

12   litigation strategy, and we know this again from the documents.

13   It is not what people said at the time.  The documents, to the

14   extent we have them, they tell the real story.  So let's look.

15        Mr. Gennai back in 2019, he says:  The biggest priority

16   for Q1 is what Play should do in the face of increasing app

17   store competition.  Where?  On Android.  He talks about other

18   OEMs.  He talks about other platforms like Epic.  He says not a

19   word about Apple.

20        Mr. Gennai again:  The defense of Google Play as the

21   preeminent Android, Android, app distribution store.  And, by

22   the way, notice what he calls his own business:  Android app

23   distribution.  Consistent with how Professor Bernheim defines

24   the market.

25        Same thing in Banyan -- oh, there's no call-out there.

1        But even the percentages and the numbers that we've seen,

2    they are inflated in the following way:  Professor Tucker

3    agreed on cross-examination that the relevant question in

4    defining the market in which the Google Play Store operates is

5    not how many people switch phones in general for things like

6    the camera or the battery or because they have a cool foldable

7    that Mr. Lockheimer showed us or because they like the blue

8    iMessage bubbles; what matters is how many people switch

9    because of the app store.  And we've seen Google documents top

10   reasons for smartphone purchase, the app store isn't even

11   there.

12       People also talked -- excuse me -- Google also talked

13   about developer switching as a thing they worry about.  Nobody

14   leaves Android to be on iOS alone.  One of their witnesses

15   said this.  You need to be at the very least on Apple and

16   Google in order to succeed.  It's like 101 in mobile

17   publishing.

18       So Apple is not the "get out of jail free card" that

19   Google wants it to be.  The Apple App Store is not in the

20   relevant market.  So when it comes time for you to answer this

21   market definition question, the relevant product markets we

22   believe are Android app distribution and Android in-app payment

23   solutions for digital content.  They're also in the

24   instructions the Court gave you in Instruction 16.

25       On the geography side worldwide except China, this is what

1

2

3          **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Monday, December 11, 2023

8

9

10

11          _Kelly Shainline_

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT EE

# US Amazon Appstore - Consumer Q1-13

Program Summary
April 23, 2013

**amazon** benchmarking

Authors: Eric Schuler, Simon Lacasse

## Purpose

This program compared the user experience of the **Amazon Appstore** versus competitors. Our study focused primarily on the app store experience for **Amazon Appstore** on the Kindle Fire HD 7" (referred to as "Kindle Fire"), **Apple App Store** on the iPad Mini, and **Google Play** on the Nexus 7. Where appropriate, we also provided high-level analysis of the experience on the web, on phones (e.g., Android and iPhone), **Microsoft**'s Windows Store on the Surface, and **Facebook** App Center, with deeper analysis when deemed useful.

| Platform / Service | Web/ Desktop | Kindle Fire HD 7" | Nexus 7 | iPad | Android Phone | iPhone | Surface | Windows Phone |
|---|---|---|---|---|---|---|---|---|
| Amazon Appstore | ✓ | ✓ | | | ✓ | | | |
| Google Play | ✓ | | ✓ | | ✓ | | | |
| Apple App Store | ✓ | | | ✓ | | ✓ | | |
| Windows Store | ✓ | | | | | | ✓ | ✓ |

## Findings Summary

The following section is a high-level summary of our observations based on the time (Jan-Mar 2013) we spent using the various app stores and platforms included in this program.

Amazon's app selection trailed both Apple and Google, with Amazon carrying only 61% of the top 200 paid and top 200 free apps from Google Play. Where Amazon did not have selection gaps, Amazon's app versions were routinely behind versions offered on Google Play. Amazon's Appstore lacked any merchandised experience or editorial viewpoint beyond a single node (games). All other nodes were simply standard product lists with sorting/filtering options. We also noted that Amazon lacked web-based app management functionality, such as the ability to install apps to a specific device, update, or remove apps via the web. Google provided these features, allowing us to manage all of our apps and devices from the Google Play website. Amazon Appstore provided some innovative and useful features such as: Free App of the Day, Test Drive, and Whispersync; however, Test Drive and Whispersync were not yet widely implemented.

The following table shows the high-level summary of our findings by section. References coordinate to the relevant recommendations and questions in the Q&A section.

| Amazon Defects > or vs. Competitors > | None or Beat | Some or Matched | Critical or Lost | Comment |
|---|---|---|---|---|
| Selection | | | ✓ | **Amazon** carried 61% of the top 200 paid and top 200 free apps on **Google** Play. 25% of the missing apps were missing selection from developers who had other apps on the **Amazon** Appstore. **Amazon** received app updates later than **Google**. **Amazon** had outdated versions of some **Amazon** subsidiary apps compared to **Google**. **Amazon** was missing many key apps for non-Kindle Android devices due to "Kindle Tablet Edition" versions being offered exclusively. [R2 and Q1] |
| Selection Quality | | ✓ | | We found low-quality apps in all marketplaces; although **Amazon** and **Google** appeared to have a greater number of such apps compared to **Apple**. Kindle versions of some racing games appeared to have lower-quality graphics than **Google** or **Apple** versions. [Q1] |
| Merchandising | | | ✓ | **Apple** and **Google**'s merchandised content had a more curated and editorial feel (e.g., consistent merchandising across all categories, more relevant recommendations, editors picks). On Kindle, **Amazon**'s only merchandised category was games. **Amazon** did not provide any editorial content. [R3] |
| Search and Browse | ✓ | | | **Amazon** had the most robust search features and handled misspellings well across all platforms. **Google** and **Apple** both provided filters on age/maturity rating, and the ability to purchase from search; **Amazon** lacked these features. **Amazon** did not display any content for null result searches on Kindle. **Amazon** used categories on Kindle that were better suited as refinements (e.g., Test Drive). [Q2] |

Amazon Confidential

1

**EXHIBIT 11405**

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
**Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only**

AMZN-SEARCH-000214473
AMZ-GP_00001817

**EXHIBIT 11405-001**

| Amazon Defects > or vs. Competitors > | None or Beat | Some or Matched | Critical or Lost | Comment |
|---|---|---|---|---|
| Recommendations | | ✓ | | **Amazon** provided limited personalized recommendations. **Google's** recommendations were based on more than purchase and browsing history and included the reasons behind each recommendation with a mechanism to mark a recommendation as "not interested." [Q2] |
| Wish List | | ✓ | | No app store offered a wish list that was shopable by other users. **Amazon's** "Save for Later" feature did not sync across devices; **Google's** did. [Q6] |
| Detail Page | | | ✓ | **Google** and **Apple** provided more full and consistent app data including: complete version history (**Apple**), install count and trend (**Google**), and social gaming indication (**Apple**). **Amazon** Appstore Kindle detail pages did not behave like other on-Kindle stores. [Q3] |
| Customer Ratings and Reviews | | ✓ | | **Apple** and **Google** both provided the ability to filter reviews based on device and/or current version. **Google** showed customer device in reviews; **Amazon** did not provide this functionality. On-device **Amazon** Appstore did not allow for filtering of customer reviews by stars, while other Kindle stores (MP3, etc.) and the website did. [Q4] |
| Purchase Experience | | | ✓ | **Google** Play allowed for targeted delivery of purchased apps to specific devices that would download and install the apps immediately. **Apple** allowed us to turn on a setting that would automatically download and install any new apps purchased on a given account. Apps purchased from **Amazon's** website required manual syncing or waiting (up to a few hours) to download and install on our Kindle. [R1] |
| Gifting | | | ✓ | **Apple** allowed gifting of specific apps and for recurring allowance to a specified iTunes account. Despite providing ability to gift digital music and books, **Amazon** had no ability to gift apps. [Q6] |
| Social | | | ✓ | **Amazon** had limited sharing/social capabilities compared to competitors. [Q6] |
| App Management | | | ✓ | **Google** provided the ability to update, remove, and install from the cloud to a specific device from the web. **Google** displayed the release notes for updates on devices and the web in consistent locations. **Apple** included release notes for current update and all previous updates. **Amazon** did not surface release notes on devices and had the most steps to locate app updates. [R1 and Q7] |
| Parental Controls | | ✓ | | **Amazon** Appstore's parental controls were on-par with competitors. |
| Returns/Refunds | | | ✓ | **Google** offered a 15-minute return window that allowed for a refund without engaging customer service. All competitors, including **Amazon**, provided refunds despite policies stating otherwise. [Q8] |

## Findings By Section

All observations can be found in the "▶**Observations**" section below each section/chart. Observations that have a related question or recommendation are denoted with the recommendation/question number **[R/Q#]** to the right of the observation.

## I.   Selection

We performed analysis of top downloaded apps from **Google** Play compared to **Amazon's** selection. We installed a set of 53 common popular apps on our Kindle Fire (**Amazon**) and our Nexus 7 (**Google**) to monitor app version and update frequency. We disabled auto-updates and checked for app updates daily. We found that **Amazon** lacked many key apps and had outdated versions of apps and received app updated later compared to **Google** Play. We also noted that a number of apps purchased from **Amazon** could only be installed on our Kindle Fire and not on any of our other Android devices.

▶**Observations:**

1) Of the **53** tracked common apps, **21** had newer versions available on **Google** Play at the point of install. Over the duration of the study, **43** out of **53** apps had received at least one update on **Google** Play before the update was available on **Amazon**. **21** of these apps remained behind at the end of our study. **Amazon's** version of Facebook was out of date for 75 days, missing three interim updates. The six-day delay in publishing a recent Minecraft update broke multi-player functionality for users of versions obtained from **Amazon**. [R2 and Q1]

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214474
AMZ-GP_00001818

**EXHIBIT 11405-002**

2) We found **Amazon** subsidiary apps on **Amazon** Appstore that were out of date compared to **Google** Play. [R2]

| | ASIN | Amazon Appstore | Google Play |
|---|---|---|---|
| Airport Mania 2: Wild Trips | B005FNNIAG | 1.15 | 1.18 |
| Airport Mania 2: Wild Trips HD | B00683JNUQ | 1.19 | 1.20 |
| Air Patriots | B008KE3960 | 1.04 | 1.06 |
| Wag.com | B00AOAI2NI | 1.0.5 | 1.0.6 |
| Zappos | B004VA3X7M | 2.6.0 | 2.8.0 |

*App versions as of January 9, 2013*

3) We analyzed recent Distimo (an app analytics service) app data for top free and paid apps on **Google** Play[1] and found that **Amazon** carried only 61% of the top 200 free and top 200 paid apps. For the 157 missing apps, 43 were from developers for which Amazon had other titles. [R2]

4) From the Distimo data above, **Amazon** was missing key apps from developers for whom we did not have any offers. These apps included all apps from Google as well as Instagram, WhatsApp Messenger, Groupon, Firefox, and PayPal. We also noted the omission of time-sensitive sporting events apps, namely, The Masters and NCAA March Madness Live. [Q1]

5) Approximately 3,500 apps in the **Amazon** Appstore were offered as "Kindle Tablet Edition" exclusively.[2] Many of these apps did not have a non-Kindle Fire version available on the **Amazon** Appstore. Despite website detail page messaging showing "Available instantly for your Android device," these apps were only available on Kindle Fire. If we wanted these same apps on our other Android devices, we would need to buy the apps from **Google** Play. Apps purchased on **Google** Play could be installed on any Android device (excluding Kindle Fire). [Q1]

*Quality*

While we did not perform in-depth cataloging and comparisons of app features and functionality on an app-by-app basis, we did perform comparisons of **Google** and **Amazon** versions of a select number of apps. Over the course of the study, we found what we would consider low-quality apps in all marketplaces, although **Amazon** and **Google** appeared to have a greater number of such apps compared to **Apple**. **Apple** appears to pre-screen apps for quality.[3] **Google** appears to be working to reduce the volume of low-quality apps as it was recently reported that they purged 60k apps from their marketplace.[4]

▶**Observations:**

6) We found what we considered to be many low-quality apps offered on **Amazon**, many of which were paid apps. Examples included various photo gallery apps (both celebrity and "sexy girls"), apps that simply open a webpage of an eCommerce site or a list of links ("ioffer Market Place" (B006YCODU6), "Pizza coupons pizza delivery" (B004Y0RDDE)), and apps that appear to be knockoffs of popular apps or are using variations of popular app names ("temple runner" (B008X9T0PQ), "need 4 speed" (B00AY2YI66), "Facebook Home" (B00BG7PMQ8)). We found many of these apps by analyzing customer review data rolled up at a developer level (see full study document). [Q1]

7) For popular racing games, we found instances of games with lower-quality graphics on Kindle vs. Play or iOS, specifically related to reflections, surface details, and rendering details on horizons. We also noted a game (Riptide GP) that installed with a lower graphics setting on our Kindle Fire HD than on our Galaxy Tab 7 (even though both were installed from **Amazon** Appstore). [Q1]

## II.  Discovery

We evaluated the various discovery methods across app marketplaces both from the web and on-device. We included search, browse, merchandised/editorial content, and recommendations. We found **Apple**'s merchandising to be consistent across devices and across all categories in the **Apple** App Store, while **Amazon** had limited merchandised or editorial content.

*Merchandising*

**Apple** had merchandised landing pages for all 20 top-level categories, **Google** had merchandised landing pages for nine of 27 categories, while **Amazon** only had one merchandised category landing page.

---

[1] http://www.distimo.com/leaderboards/google-play-store/united-states

[2] http://tiny/11jsgrbal/kindle_tablet_edition

[3] https://developer.apple.com/appstore/guidelines.html

[4] http://techcrunch.com/2013/04/08/nearly-60k-low-quality-apps-booted-from-google-play-store-in-february-points-to-increased-spam-fighting/

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214475
AMZ-GP_00001819

**EXHIBIT 11405-003**

▶**Observations:**

8) Each of **Apple**'s 20 top-level categories had its own merchandised landing page with a highly-curated feel consisting of both app collections and single-app highlights. **Apple** also cross-merchandised magazines within a given category, for example, the Health & Fitness landing page included a widget for "Outdoor Adventure Magazines". [R3]

9) **Google** had merchandised landing pages for nine of 27 categories with highly-curated editorial features. [R3]

10) For **Amazon**, the only category with a merchandised landing page was the Games category. All others simply landed us in a browse node. On Kindle, selecting "Games" from Apps >> Store >> All Categories landed us in a non-merchandised browse node. [R3]

### *Search and Browse*

We compared various aspects of the search and browse experience across devices and websites.  **Amazon** generally had a better search experience than **Apple** or **Google**; however, there were opportunities for improvement in search, such as null search result handling and auto-complete to detail page functionality. We also found inconsistencies in Amazon's browse and refinement usage.

▶**Observations:**

11) **Google**'s search auto-complete surfaced a direct link to the detail page of a matched result. **Amazon**'s did not. [Q2]

12) **Amazon** did not provide the ability to purchase from search or browse. **Apple** supported this from all platforms while **Google** offered this feature on their website. [Q2]

13) **Amazon** lacked filtering by age or maturity rating, while **Google** and **Apple** both provided this. [Q2]

14) On the Kindle Fire, **Amazon** used attributes that were more suited for refinements as categories/nodes within Games, including: Everyone, Everyone 10+, GameCircle, Gamepad Enabled, and Test Drive. [Q2]

15) GameCircle games on the **Amazon** website were populated (423 games) in a custom node with no sorting or refinement options. On the Fire, GameCircle games were populated in a single category as opposed to a refinement.[Q2]

16) On both the Kindle Fire and the website, **Amazon** Appstore "New Releases" refinement contained a "coming soon" option which was entirely populated with apps that were currently available. [5] There were no apps that were coming soon. [Q2]

17) **Amazon** did not provide any content for null result searches on devices, while we did on the website. [Q2]

18) **Amazon** Appstore on Kindle Fire contained nodes for Ringtones and Browsers. Both of these nodes appeared to be unnecessary as the Kindle does not have a phone, and there are no alternative browsers available. [Q2]

### *Personalized Recommendations*

We evaluated the use of personalized recommendations across services, specifically the location and messaging. We found that **Google** used many different inputs to generate recommendations for us (and messaged those inputs in their recommendations). **Amazon** appeared to only utilize the standard amazon.com recommendations on the website and Kindle carousel.

▶**Observations:**

19) **Amazon** did not provide personalized recommendations beyond the standard widgets on the amazon.com website, the recommendation pane below the carousel on the Kindle home screen, and a widget on the Kindle Appstore. [Q2]

20) On-device, **Amazon** did not provide a mechanism to mark a recommendation as uninterested. This option existed on the amazon.com website and **Google** Play also offered this ability. [Q2]

21) **Amazon** did not provide context for specific recommendations (outside of the standard recommendations on the website (i.e., "Why recommended?" and "Fix this recommendation")). **Google** displayed a reason for each recommendation (e.g., "Popular with WatchESPN users", "Popular in your area", "Optimized for your device"). [Q2]

22) **Google** also utilized social networks for recommendations ("+1'd by your friends"). [Q2]

### *Wish List / Save for Later*

We evaluated the wish list / save for later functionality across device and websites. No marketplace had a functional wish list in the sense of allowing us to add apps and have others discover and purchase our wished-for apps.

▶**Observations:**

23) **Amazon** allowed us to add apps to our wish list, but while it was possible for others to see apps on our wish lists, it was not possible for them to purchase apps as gifts. [Q6]

24) **Amazon** provided a "Save for Later" feature on Kindle and the Appstore for Android; however, items added from one device were not viewable on the other devices on our account. **Google**'s wish list was shared between our devices. [Q6]

---

[5] http://tiny/1edxgpsgc/coming_soon

Amazon Confidential                                          4                                          Printed:

---

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER                    AMZN-SEARCH-000214476
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only                               AMZ-GP_00001820

**EXHIBIT 11405-004**

## III.  Detail Page

We evaluated information surfaced on app store detail pages across the web and devices. We looked at the level and consistency of developer information, release notes, social gaming indicators, product descriptions, images, videos, and customer reviews. **Google** and **Apple** provided more full and consistent app data including: complete version history (**Apple**), clearer permissions (**Google**), install count and trend (**Google**), and social gaming indication (**Apple**).

▶**Observations:**

25) **Amazon** did not display an app's last update date on any platform, while **Apple** and **Google** both displayed this. [Q3]
26) **Apple** displayed the complete history of an app's update release notes. **Amazon** generally only displayed release notes from the most-recent update. [Q3]
27) **Amazon** did not display release notes for an app's recent update on Kindle/Appstore for Android. **Google** and **Apple** both displayed this information on devices. [Q3]
28) **Amazon** did not identify games that were GameCircle enabled on GameCircle games detail pages.  **Apple** displayed the Game Center logo on detail pages for games that were Game Center enabled. [Q3]
29) **Amazon** Appstore on-device detail pages did not link to additional selection within an app's category or display sales rank, and as such, did not link to best sellers.

### Detail Page Consistency with other Kindle Fire Stores

We evaluated the consistency of detail pages across the various storefronts on the Kindle Fire.

▶**Observations:**

30) **Amazon** Appstore detail pages on the Kindle Fire scrolled the entire page, moving the buy button off the screen as we scrolled. This behavior occurred on both detail pages and review pages within the Appstore. Other Kindle stores, such as Books, did not exhibit this behavior. Instead, while scrolling content in the right frame, the left frame remained static and the buy button always remained visible. [Q3]

### Customer Ratings and Reviews

We evaluated the customer review submission and display functionality both on devices and on the web. We found that **Apple** and **Google** customer reviews provided a better evaluation experience as we could view reviews specifically for the current version of an app or from users of our specific device. This was particularly useful given the regular incremental updates and bug fixes made to apps and the vast array of phone and tablet models. We found that **Amazon**'s reviews lacked these filters, which led to older reviews which may no longer be accurate surfacing predominately (as witnessed by a "most helpful" review of the WatchESPN app, claiming it was incompatible with the Kindle Fire).

▶**Observations:**

31) **Apple** and **Google** provided mechanisms to filter reviews by version and/or device, Amazon lacked similar filters. [Q4]
32) **Google**'s reviews included an indication of the reviewer's version and device; **Amazon**'s lacked this information. [Q4]
33) No marketplace provided app ratings trend information (similar to Yelp). [Q4]
34) **Amazon**'s on-device reviews from the Amazon Vine program were missing the Vine Voice tag (of all digital stores on Kindle, only eBooks displayed this tag). Amazon.com help page stated: "A review written as part of the Vine™ Voice program *always includes this label*". [Q4]
35) **Amazon**'s on-device Appstore did not provide the ability to search within reviews, **Amazon**'s website did. [Q4]
36) **Amazon**'s on-device Appstore did not provide the ability to filter by stars, while eBooks, Newsstand, MP3, and Audiobooks all had this functionality on Kindle. [Q4]
37) **Amazon** did not allow customers to rate an app without also writing a 20-character or longer review. **Apple** and **Google** allowed customers to simply select a star rating. [Q4]

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214477
AMZ-GP_00001821

**EXHIBIT 11405-005**

## IV.  Purchase Experience

We evaluated the purchase experience from both the web and on devices. Apps purchased from the **Google** Play website downloaded and installed immediately to the device specified at time of purchase. Apps purchased on one **Apple** device were immediately installed on our additional devices. Apps purchased from **Amazon**'s website required manual intervention to download and install on our Kindle.

▶**Observations:**

38) After purchasing apps from the web, **Amazon** website messaging directed us to "Go to Apps > Cloud to see your purchased app to download and install." We went to this location; however, our app was not visible. An additional step was needed to manually sync our Kindle or we would wait an unknown amount of time for the app to appear in our cloud. We experienced many instances of having to wait multiple hours for purchased apps to automatically appear in our cloud. [R1]

39) When purchasing from **Google** Play's website we were prompted to select from our registered devices to install to. Once our purchase was complete, the app began immediately downloading and installing to that device. **Amazon** had no such feature. [R1]

40) **Apple** had a setting on devices that allowed users to turn on/off automatic downloads for music, apps, and books. When turned on, any app purchased on the same iTunes account from another device or computer would automatically download and install on our device. [R1]

41) We received individual **Amazon** order confirmation e-mails for all app purchases, including free apps. **Google** and **Apple** only sent confirmations for paid apps. **Apple** batched confirmations for multiple purchases in one e-mail. [Q5]

42) **Amazon** Digital Services, Inc. was listed as the seller of record on detail pages and order confirmations. **Apple** and **Google** both listed the developer as the seller. We were therefore charged sales tax on all of our **Amazon** purchases. Despite **Apple** listing developers as sellers of record, we were charged taxes on all iTunes app purchases; taxes varied by developer on our **Google** purchases. [Q5]

## V.  Gifting and Social

We evaluated gifting and social capabilities related to the app stores (not within apps themselves). Specifically, we looked at how and where we could share and how we could gift content from app stores. We found that **Amazon** did not support gifting of apps and had limited social capabilities from devices.

▶**Observations:**

43) **Amazon** did not support gifting of apps; **Apple** did. **Amazon** did support gifting of MP3s and Kindle books. [Q6]

44) **Apple** provided an "allowance" feature which allowed us to setup recurring credits to be applied to a specified iTunes account in amounts from $10 to $50 per month. **Amazon** had no such feature. [Q6]

45) **Apple** offered digital gifts via Facebook Gifts. We were unable to find similar gifting via Facebook from **Amazon**, **Google**, **Barnes & Noble**, or **Microsoft**. **Facebook** Gifts provided the ability to gift **Facebook** Games credit usable for in-app purchases directly from Facebook. **Amazon** did not offer any app-specific credit gifting.

46) **Amazon** Appstore on Kindle included a "share this app" link at the bottom of app detail pages. This only provided the ability to e-mail a link. **Amazon's** website provided links to share via Twitter, Facebook, and Pinterest. **Google** provided ability to share via all sharing methods (e.g., e-mail, social) installed on our device. [Q6]

47) During in-store visits to physical retailers as part of our Kindle Accessories benchmarking program, we visited two GameStop locations (one in Seattle, one in Anaheim) and observed **Google** Play and iTunes Appstore Gift Cards available for purchase on display near the tablet section. There were no **Amazon** Gift Cards for sale. At a Seattle RadioShack location, there were **iTunes** Gift Cards hanging on the hooks of every open (out of stock) merchandising slot in the store. Also, at Starbucks locations, we noted that **Apple** now includes apps in their "Pick of the Week" promotions. [Q6]

## VI.  Post-Install

We evaluated functionality available after apps had been installed on our devices including: notifications, viewing and managing updates, and uninstalling apps. We found that **Google** provided the most robust app management features.

▶**Observations:**

48) **Google** Play provided the ability to update, delete, or install our cloud apps to a specified device via the web. **Amazon's** website did not provide visibility to which apps where installed on which devices, nor did it provide the ability to delete from or install a cloud app to a specified device. [R1]

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214478
AMZ-GP_00001822

**EXHIBIT 11405-006**

49) **Apple** had the most robust notification management, allowing us to individually manage whether an app can send notifications or not, as well as what type of alert, if it is visible on the lock screen, and how many notifications to display from a given app. **Amazon**'s Kindle provided simple on/off notification management on an app-by-app basis.

50) **Google**'s on-device app update notifications included the title of the apps with updates (e.g., "Spotify. 1 New Update"). **Amazon**'s notification simply stated "New App Updates Available. 1 update available." [Q7]

51) Both the **Amazon** Appstore for Android App and the Kindle Fire Appstore required the most steps to locate the app update page (4). The fewest steps were **Google** Play (web: 1, Nexus 7: 2). On the Kindle Fire, there was no menu option to check for updates from the default view of the "Apps" tab (our library), we had to first access the "Store" section. [Q7]

52) **Apple** App updates on the iPad and iPhone were displayed in the App Store with the new version number, the update date and a summary of changes contained in the update. **Amazon** did not provide this information. [Q7]

53) In addition to allowing all apps to auto-update, **Google** Play provided the ability to specify specific apps to auto-update. **Amazon** only had an option for all or none, with no option to allow apps to auto-update on an app-by-app basis. [Q7]

## VII.    Returns/Refunds

We evaluated return and refund processes available for each service, as well as contacting customer service to attempt refunds for purchases. **Google** was the only service with a return window that allowed us to return items for refunds without contacting customer service. We were able to secure refunds for purchases from all services with minimal effort by contacting customer service.

▶**Observations:**

54) **Google** Play offered a 15-minute return window on app purchases. Apps could be returned directly from the device with no customer service interaction during this window. Returns of **Amazon** apps required a contact to customer service. [Q8]

55) Despite stated policies disallowing returns, we were able to return paid apps for refunds from **Google**, **Apple**, and **Amazon** by contacting their respective Customer Service departments.

Amazon Confidential

Printed:

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214479
AMZ-GP_00001823

**EXHIBIT 11405-007**

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214480
AMZ-GP_00001824

**EXHIBIT 11405-008**

**US Amazon Appstore - Consumer Q1-13**
Business Owner Response
April 23, 2013

**amazon** benchmarking

Authors: Eric Schuler, Simon Lacasse

*For full findings, please refer to the main Benchmarking Study.*

## Recommendations
*A selection of observations and responses from our studies will be included in a summary document periodically reviewed with the S-team.*

**R1.** **APP MANAGEMENT:** Amazon lacked the ability to manage apps from the website. Unlike Google Play, there was no method to specify a device to install to, push an app update, or remove an app from a specific device. Apps purchased from the web did not immediately appear on our Kindle Fire. We were required to manually sync or wait a number of hours and then manually download and install from the cloud.

**Recommendation:** Implement web-based app management to allow for installation, updates, and removals on a device-by-device basis.

**Response** [David Lindheimer]:

| Action | Owner | Estimated Completion Date |
|---|---|---|
| [Installation] Deliver over-the-air installation to device from retail web purchases, enabling near real-time remote installation if the device is powered on and connected via WiFi. This is part of the auto-delivery BRD. | lindheim | Q3 |
| [Updates] App updates is a P2 in the auto-delivery BRD. | lindheim | Not committed |
| [Removal] App deletion from web is a P2 in the auto-delivery BRD. | lindheim | Not committed |

**R2.** **SELECTION:** Amazon was missing a selection of top apps from developers who had other offers on Amazon. For the top 200 free and top 200 paid apps on Google Play, Amazon had 61% coverage. 25% of Amazon's selection gap was apps from developers that had other offers on Amazon. Amazon's app versions (including apps from Amazon and subsidiaries) were often out of date and updates routinely trailed Google Play. Of the 53 popular apps we tracked across Google Play and Amazon, 43 had updates available on Google before Amazon, 21 remained out-of-date at the conclusion of the study.

**Recommendation:** Work with app developers and on internal processes to understand and remove roadblocks to securing full selection and providing app updates in a manner consistent with that of Google Play.

**Response** [Steve Rabuchin]:
Selection is our highest priority in 2013.   We are adding significant new resources and focus to developer outreach in order to recruit the top ~5000 or so apps that matter most to customers as measured in the Google Play and Apple Appstore (top apps). The plan outlined below was rolled out within the Appstore on Friday, May 17.   More specifically we  are doing the following:
1.  Create one team under Kes focused on driving selection. We have already moved a few heads under Kes so he now owns all heads that manage developers or work on selection (currently 21 BIS, including Kes).
2.  Add more heads and align the team against more app categories.   Each category team will manically focus on the categories they own to be best in class. They would get all the apps that matter to their category and we would measure DWC by category.  New org would look like:
    a.  Games Team (manager + 14)
    b.  Book, Publishing and Education (manager +3)
    c.  Finance, Business and Productivity (manager +5)
    d.  Entertainment and Music (manager +4)
    e.  Sports, Health and Fitness (manager +2)
    f.  Lifestyle (manager +7)
    g.  Team of 8 L4 phone reps that call down developers in higher deciles of DWC (if this works we might scale it quickly)

Amazon Confidential

1

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214481
AMZ-GP_00001825

**EXHIBIT 11405-009**

      h.   Team lead on B (works across the org to ensure B selection)

      i.   Team lead on E (works across the org to ensure E selection)

3.   Each category team will hunt and farm new selection.   For example, we will have a larger games team.  More senior folks will each own 10 to 15 of the largest named developers (i.e. EA and Disney), less senior folks will own ~50 or so key developers, and phone reps will call into the list of 1000s of developers that represent important DWC apps, but that we never touch today.  This is somewhat similar to how AWS sales are organized (enterprise reps, mid-market named and mid-market territory reps).

4.   We will pragmatically move all unrelated selection responsibilities off of the team so they can focus primarily on driving all selection goals (new selection, version parity, adoption of APIs, penetration of existing developer catalogs, etc.). Activities that we will move off of this team are co-op funding goals, customer support issues, developer support issues, merchandising and marketing, and weekly reporting.   I have already identified homes for most of the non-selection work I have mentioned here.

5.   Create a new team (5 heads) to help run the operations of the selection team (implementing systems, BI, reporting, DWC calculations, prospecting lists, etc.).  This work is currently very manual and done by folks who should be getting more selection.

6.   Overall we will create an atmosphere of high energy, be goal focused, and celebrate our wins loudly!

As part of this new org direction we are adding 11 more incremental (L4 and L5) heads.   Breakdown is below:

| | |
|---|---|
| Total team required for new plan | 56 heads |
| Currently in budget on Kes's team | 31 heads (21 BIS + 10 to hire) |
| Moving Steve's int'l open heads to US | 14 heads |
| Incremental add (Approved) | **11 heads** |

**R3.**  **MERCHANDISING:** Amazon's Appstore lacked any merchandised experience or editorial feel in all categories, except for games. Apple's app store had consistent, highly-merchandised landing pages for every category.

**Recommendation:** Improve Appstore merchandising to have a consistent feel across all top-level categories, similar to Games.

**Response** [Alex Rouse]:  From a technology perspective, we plan to add dedicated merchandising pages for categories that drive 80% of demand weighted coverage (DWC) on Generation 6 devices in Q4'13.  To manage these placements actively worldwide (i.e. in an editorial versus automated manner), it is likely the team will require additional site merchandising bandwidth worldwide (the team is currently assessing headcount requirements).

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214482
AMZ-GP_00001826

**EXHIBIT 11405-010**

## Questions and Answers

**Q1. SELECTION** [Steve Rabuchin]:

    a.  What is our approach to filling selection gaps for developers who are not currently on the platform? Why do we not offer any Google apps? Why did we not have The Masters or the NCAA March Madness Live app?

        *Context: Out of the 157 missing apps from Google's top 200 paid and top 200 free, Amazon was missing 118 apps from developers with no presence on amazon.com. Included in these apps were all Google apps, Instagram, WhatsApp Messenger, Groupon, Firefox, and PayPal. We also noted five sporting event streaming apps for the NCAA tournament and The Masters were missing.*

        See answer in R2 of this document for how we plan to fill selection gaps for developers not currently on the platform. We are still pursuing Instagram, but since becoming part of Facebook those negotiations are tied to higher level strategic discussions. The Instagram team hasn't prioritized Kindle Fire development yet.  We do not offer the Google apps because we've been unable to reach an agreement with Google to offer those apps. We've made a strategic decision not to offer Groupon, Paypal, and Firefox on Kindle Fire and have therefore not targeted them in our developer outreach.  The Masters did not prioritize us for development for Android this year but are on their roadmap for Masters next year.  We reached out too late on the NCAA March Madness but are currently in discussions to be included in their roadmap for next year's tournament.

    b.  Why were some apps available only on Kindle Fire? Do we have plans to support multiple versions of the same app (Kindle-optimized/tablet/phone)? Should the detail page messaging be updated for Kindle-only apps?

        *Context: Approximately 3,500 apps in the Amazon Appstore were offered as "Kindle Tablet Edition" exclusively. These apps were not available for installation on non-fire devices. To install on other devices we owned beyond our Fire, we had to purchase again from Google Play. Amazon.com website availability messaging noted apps were available instantly on "your Android device."*

        There are approximately 56k apps in the Kindle Fire store and approximately 82K apps in our Android store. Some developers choose to only publish in our Kindle Fire store (and optimize for Kindle Fire) so you won't necessarily see all Kindle Fire apps in the Android store. Developers have a choice to publish their app in both stores but some have chosen not to publish to our Android store. At least one reason we have heard for this gap is that developers want us to support full multi-binary support for Android apps (ability to optimize their apps for all the different Android devices).  This work is currently on our roadmap for 2013.

    c.  Why did we experience degraded app quality on selected racing games compared to Google Play and Apple?

        *Context: We experienced lower-quality versions of some racing games compared to Play/Nexus and iTunes/iPad (NFS Most Wanted, Asphalt 7: Heat). Riptide GP's default graphics setting on our Kindle Fire HD was lower than our Galaxy Tab 7 (both installed via Amazon Appstore).*

        Our devices were designed with cost in mind.  Relative to our competitors our tablets are less capable in the areas of chipset/performance and memory.  Apps that require more powerful hardward sometimes don't peform as well when ported from Andriod (other tables) to Kindle Fire .

    d.  Do we have minimum app quality standards? How do we filter out low-quality apps? Do we monitor customer reviews, CS contacts, refunds, etc.? Do we have internal developer metrics similar to internal seller ratings? Are we utilizing any algorithms to penalize low-quality apps or lift high-quality apps in search/browse (similar to seasonality algorithms used in Softlines)?

        *Context: We found many low-quality apps such as picture galleries or apps with names similar to popular apps.*

        If an app passes through our self-service pipeline and is published we don't programmatically measure app quality standards once the app is live in the store. We use ratings and reviews from our customers to help identify quality, similar to Amazon.com.  We usually only marketing and merchandise the more popular, higher quality apps.  We do monitor top tier titles for poor customer reviews so that our vendor manager team and/or developer relations group can work with the developer to fix issues that might be causing their app/game to receive poor reviews (when we know the title is high quality or popular on other platforms).

        During our Weekly Business Review we monitor refund rates and CS contacts. If there are issues with a specific app we quickly address to correct.    CS also has an escalation path (and Andon Cord capability) to the business team if they identify an issue with any specific app or developer.

**Q2. DISCOVERY** [David Lindheimer]:

    a.  Have we considered linking auto-complete to detail pages for exact matches?

        *Context: Google returned results in auto-complete that linked directly to an app detail page.*

        We have added this feature to our consumer experience feature backlog, however it is not currently committed for 2013.

    b.  Have we considered enabling purchase directly from search/browse?

        *Context: Both Apple and Google allowed us to purchase directly from search/browse.*

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214483
AMZ-GP_00001827

**EXHIBIT 11405-011**

We previously enabled purchase from search, but it led to elevated customer service contacts because users were accidentally buying apps.  We will consider placing the feature back on our backlog, but it is not currently calendared for 2013.

c.  Do we have any plans to enhance search filters, such as adding age/maturity filters and GameCircle refinements?
*Context: Amazon lacked the ability to filter by age/maturity. There was no refinement for GameCircle enabled games; instead they were all placed in one custom node on the web with no browse or refinements. On the Kindle, GameCircle games were a category within games instead of a refinement. Other Categories on the Kindle included Gamepad Enabled, Everyone, Everyone 10+, and Test Drive.*
We have added these ideas to our backlog, however they are not currently committed for 2013.

d.  Have we considered enhancing our use of personalized recommendations to surface recommendation reasons, and allow easy dismissal of specific recommendations?
*Context: There were no personalized recommendations on the Kindle beyond a single widget on the Appstore homepage and the carousel on the Kindle homepage. Google's recommendations felt more personalized as they indicated the specific reason for the recommendation and provided a clear means to dismiss a specific recommendation.*
Yes, the goal of our "personalized Appstore" initiative is to deliver significantly more personalized recommendations with a compelling but unintrusive UI.  Certain aspects will be delivered in H2/2013.

e.  Should we provide recommendations or other relevant results in place of empty results on the Kindle Fire?
*Context: Null result searches resulted in a blank page on Kindle Fire.*
Yes, we will explore the surface area for exposing recommendations as part of the personalized Appstore initiative (delivering in 2H'13).

f.  Why does Amazon have a Ringtones and a Web Browsers node on the Kindle Appstore?
*Context: Kindle Appstore had a Ringtones and a Web Browsers node. Kindle has no phone, and there are no alternate web browsers available for Kindle, so these nodes are unnecessary and potentially confusing.*
On device, these should not be displayed – we will correct this bug in May 2013.  On web, we do not adjust the experience based on user's device.

## Q3. DETAIL PAGE [Alex Rouse]:

a.  Should we provide a more complete history of release notes for each app, including date of last update? Should Kindle display the release notes present on amazon.com?
*Context: Amazon's website displays release notes for an apps most-recent update ("What's New"). Kindle/devices do not display any release notes. Apple displays a full history of changes for all previous versions of an app.*
Yes, we are planning to add release notes to the detail page on Gen 6 tablets in Q3'13.

b.  Have we considered implementing developer badges or other developer-level rating systems?
*Context: Google surfaces a "Top Developer" badge for certain developers on app detail pages and in search/browse.*
Yes, we're launching a program called "Kindle Developer Select" (Q3'13) which will be a badge for developers who meet the program criteria.

c.  Have we considered adding a GameCircle indicator on GameCircle-enabled app detail pages?
*Context: Apple shows a Game Center icon on Game Center enabled app detail pages. Amazon makes no mention of GameCircle features on detail pages.*
Yes, this feature is included in the tablet 2.3 release in Q2'13.

d.  Should the Kindle App Store detail page behave more like other Kindle store detail pages?
*Context: For the Kindle Appstore detail pages, scrolling the screen moves the buy button off the screen. This is different than the behavior of every other on-device store on Kindle.*
Yes, in Gen6 Tablets, we have designed the Appstore detail page to be as consistent with device conventions, unless there is a strong reason to deviate. We do not currently have plans to update the Gen5 tablets to match.

## Q4. CUSTOMER RATINGS AND REVIEWS [David Lindheimer]:

a.  Should we implement the ability to filter reviews by version and device?
*Context: Google provided the ability to filter reviews by device and current app version only.*
Yes, this is on our backlog, but not currently committed for 2013.

b.  Have we considered implementing a ratings trend over time?
*Context: Apps are frequently updated by developers. Amazon currently has no method to filter customer reviews by version. A trend over time (similar to Yelp ratings) may arm customers with additional context when evaluating an app.*
Yes, this is on our backlog, but not currently committed for 2013.

c.  Why are app reviews on the Kindle and other devices missing the Vine Voice tag?
*Context: Amazon.com help states: "A review written as part of the Vine™ Voice program always includes this label", yet this tag is missing from app reviews on Kindle and other devices.*
Apps are not currently part of the Vine program.  We will add this feature when we incorporate apps into Vine.

d.  Should we provide the ability to search within reviews from devices?
*Context: Amazon's website provided the ability to search within reviews; Amazon's on-device appstores did not.*
We have added this feature to our backlog, but it is not currently committed for 2013.

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214484
AMZ-GP_00001828

**EXHIBIT 11405-012**

e. Should the Kindle Appstore reviews implementation be consistent with other Amazon stores on the Fire?
   *Context: Each digital store on the Kindle has a different reviews implementation. Apps did not allow us to filter reviews by star rating, other Kindle stores did.*
   We have added this work to our backlog, but it is not currently committed for 2013.

f. Should we allow for simple star ratings in addition to 20-word minimum reviews?
   *Context: Google and Apple allowed us to simply rate an app by stars; Amazon required a minimum 20-word review.*
   No, we believe that requiring minimum review text increases the quality and value of customer reviews. This approach is recommended by the Amazon reviews team. As part of the personalized Appstore initiative, we will also consider inclusion of a Netflix-style quick rating system to enhance our ability to serve personalized recommendations.

## Q5. PURCHASE EXPERIENCE [David Lindheimer/Ryan McCrate]:

a. Have we considered eliminating or batching e-mail order confirmations for free apps?
   *Context: Apple and Google only sent e-mail confirmations for paid apps; Apple batched multiple purchases in a single e-mail confirmations.*
   Yes, we have considered aggregating orders, including eliminating emails for free apps. To date, we have chosen to stay consistent with Amazon retail practices and to ensure device owners are aware of all purchases (including in-app purchases) in real time.

b. Why have we chosen ADSI as the seller of record for apps?
   *Context: Apple and Google both listed the developer as the seller of record for third-party developed apps.*
   The primary reason is to allow us to control customer pricing for the apps and in-app products in our store (e.g., to enable us to run promotions and discounts without developer involvement).

## Q6. GIFTING AND SOCIAL [David Lindheimer]:

a. Why are apps not giftable? Have we considered recurring credit gifting for digital goods (via Coins perhaps)?
   *Context: Other digital products on Amazon were giftable; apps were not, despite showing up in our wish list. Apple allowed for gifting of apps and provided an allowance feature that could be set to send a set amount of iTunes credit on a specific frequency.*
   We plan to offer allowances via Amazon Coins in 2013/Q4. Gifting of apps is in our backlog, but not currently committed for 2013.

b. Should "Save for Later" sync across devices?
   *Context: Apps added to our "Save for Later" list were only added on the specific device we added them from. Google Play's synced across devices.*
   We plan to remove the "Save for Later" feature from devices (starting with Generation 6 devices) as it has lower user engagement and low relevance for low-priced apps.

c. Should we consider selling Appstore-branded physical gift cards or running app promotions in retail outlets?
   *Context: We found Google and iTunes App Store branded gift cards in retail outlets. Apple's free "App Pick of the Week" cards were distributed in Starbucks stores.*
   With the launch of Kindle Fire (1st Generation), we launched an "Amazon Digital" gift card in both physical and digital form, with the belief that an ecosystem-wide message was more powerful and more consistent with the positioning of the Fire device. We still believe that to be true and don't plan to launch an Appstore specific gift card in 2013.

d. Should we offer more sharing options from app detail pages on Kindle Fire?
   *Context: Kindle Fire only allowed sharing of apps from detail page via e-mail.*
   Yes, this is part of the personalized Appstore proposal for H2/2013.

## Q7. POST-INSTALL [Alex Rouse] :

a. Should we reduce the number of steps to access app updates?
   *Context: Amazon required the most steps (4) to reach the app update screen. There was no way to check for app updates from our App Library on kindle, we had to first access the store. Google required 2 steps on device.*
   We have not considered this but can add it to our backlog. Given our auto-updating feature, we believe this is a low priority change (not currently calendared for 2013).

b. Should we include version release notes in app update notifications?
   *Context: Apple showed release notes on their app update screens.*
   Yes, this is scheduled for implementation with Generation 6 Tablets (but not currently committed in 2013 for backfill to earlier devices).

c. Have we considered allowing apps to auto-update on an app-by-app basis?
   *Context: Google provided this as an option at the time of app install and in the app settings. Amazon had an all-or-none approach to allowing auto-updates.*
   We believe that our current approach is a simpler experience for customers.

d. Have we considered including the app name in the update notification message?
   *Context: Google included the name of the app(s) with updates in notification; Amazon simply stated "X updates available."*
   We have not considered this but will add it to our backlog (not currently committed for 2013).

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214485
AMZ-GP_00001829

**EXHIBIT 11405-013**

**Q8. RETURNS/REFUNDS** [David Lindheimer]**:**

    a.   Should Amazon offer a return window?

        *Context: Google had a 15-minute return window that allowed us to uninstall an app for a full refund within 15 minutes with no CS interaction. Amazon required CS contacts to obtain a refund for an app.*

        We considered this but decided not to offer refunds for two reasons. First, it is not currently possible to determine whether a customer actually received an in-app purchase item on their device. Allowing refunds would open us and our developers up to significant fraud risk. Second, allowing refunds on apps would set precedent that could extend back to Amazon's other digital categories that do not currently accept refunds by policy. In practice, Amazon Customer Service has the flexibility to offer customers refunds in all Amazon digital categories, based on their judgment in dealing with specific customer contacts.

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214486
AMZ-GP_00001830

**EXHIBIT 11405-014**

| **amazon** benchmarking tenets |
| --- |
| • Amazon has a Divine Discontentment culture – relentlessly seek out companies providing superior Consumer, Seller and Developer customer experience to compare against. |
| • Measure top customer experience drivers, such as delivery speed, selection, in-stock availability, price and latency; ensure we test inputs we think we're good at. |
| • Utilize simple methodologies that pass the voting machine test – correct and believed to be correct. |
| • Speed matters in our business:<br>   ○ Identify customer experience improvement opportunities before customers do.<br>   ○ We do not accept being #2 to relevant competitors – We advocate for customers and business leaders respond to customer shortcomings with a sense of urgency. If in doubt, competitors are relevant and customers care. Business responses to benchmarking recommendations will start with "We will fix this by" or "We will not fix this because. |

HIGHLY CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER
Non-Party HIGHLY CONFIDENTIAL - Outside Counsel Eyes Only

AMZN-SEARCH-000214487
AMZ-GP_00001831

**EXHIBIT 11405-015**