8.1 You may remove Your Products from future distribution via Google Play at any time, but You agree to comply with this Agreement and the Payment Processor's Payments Profile terms of service for any Products distributed via Google Play prior to removal, including, but not limited to, refund requirements. Removing Your Products from future distribution via Google Play does not (a) affect the rights of users who have previously purchased or downloaded Your Products; (b) remove Your Products from Devices or from any part of Google Play where previously purchased or downloaded applications are stored on behalf of users; or (c) change Your obligation to deliver or support Products or services that have been previously purchased or downloaded by users.

8.2 Notwithstanding Section 8.1, in no event will Google maintain on any portion of Google Play (including, without limitation, the part of Google Play where previously purchased or downloaded applications are stored on behalf of users) any Product that You have removed from Google Play and provided written notice to Google that such removal was due to (a) an allegation of infringement, or actual infringement, of any third party Intellectual Property Right; (b) an allegation of, or actual violation of, third party rights; or (c) an allegation or determination that such Product does not comply with applicable law (collectively "**Legal Takedowns**"). If a Product is removed from Google Play due to a Legal Takedown and an end user purchased such Product within a year (or a longer period as local consumer law mandates) before the date of takedown, at Google's request, You agree to refund to the end user all amounts paid by such end user for such Product.

8.3 Google does not undertake an obligation to monitor the Products or their content. If Google becomes aware and determines that a Product or any portion thereof (a) violates any applicable law; (b) violates this Agreement, applicable policies, or other terms of service, as may be updated in accordance with their terms; (c) violates terms of distribution agreements with device manufacturers and Authorized Providers; or (d) creates potential liability for, or may have an adverse impact on, Google or Authorized Providers (for example, if a Product has an adverse economic, reputational or security-related impact); then Google may reject, remove, suspend, limit the visibility of a Product on Google Play, or reclassify the Product from Google Play or from Devices. Google reserves the right to suspend and/or bar any Product and/or Developer from Google Play or from Devices. If Your Product contains elements that could cause serious harm to user devices or data, Google reserves the right to disable the Product or remove it from Devices on which it has been installed. If Your Product is rejected, removed, or suspended from Google Play or from Devices pursuant to this Section 8.3, then Google may withhold payments due to Developer. For information about the appeal process if Your Product is subject to a Legal Takedown or has been removed or suspended, please, see here.

8.4 Google enters into distribution agreements with device manufacturers and Authorized Providers to place the Google Play software client application(s) on Devices. These distribution agreements may require the involuntary removal of Products in violation of the Device manufacturer's or Authorized Provider's terms of service.

# 9. Privacy and Information

9.1 Any data collected or used pursuant to this Agreement is in accordance with Google's <u>Privacy Policy</u>.

9.2 In order to continually innovate and improve Google Play, related products and services, and the user and Developer experience across Google products and services, Google may collect certain usage statistics from Google Play and Devices including, but not limited to, information on how the Product, Google Play, and Devices are being used.

9.3 The data collected is used in the aggregate to improve Google Play, related products and services, and the user and Developer experience across Google products and services. Developers have access to certain data collected by Google via the Play Console and certain Google Play APIs. Google relies on the European Commission's Standard Contractual Clauses for transfers of personal data out of the European Economic Area, Switzerland, and the United Kingdom to countries which are not covered by an adequacy decision (e.g., the United States). By using Google Play, you agree to the <u>Google Controller-Controller Data Protection Terms</u>. Your use of certain Google Play APIs may be subject to additional data transfer provisions or the specific, prevailing terms of service of Google Play APIs, such as the <u>Google Play Developer API Terms of Service</u>.

# 10. Terminating this Agreement

10.1 This Agreement will continue to apply until terminated, subject to the terms that survive pursuant to Section 16.9, by either You or Google as set forth below.

10.2 You may terminate this Agreement at any time. If You terminate this Agreement, You will unpublish all of Your Products and cease Your use of the Play Console and any relevant developer credentials.

10.3 Google may terminate this Agreement with You immediately upon written notice or with thirty (30) days prior written notice if required under applicable law if (a) You have breached any provision of this Agreement, any non-disclosure agreement, or other agreement relating to Google Play or the Android platform; (b) Google is required to do so by law; (c) You cease being an authorized developer, a developer in good standing, or are barred from using Android software; (d) Google decides to no longer provide Google Play; or (e) You or Your Product pose a potential risk for economic, reputational, or security-related harm to Google, users, or other third-party partners. Where allowed under applicable law, Google may also terminate this Agreement with You for any reason with thirty (30) days prior written notice. If Google terminates this Agreement, You will no longer have access to the Play Console. More information on account termination is located <u>here</u>.

10.4 After termination of this Agreement, Google will not distribute Your Product, but may retain and use copies of the Product for support of Google Play and the Android platform.

# 11. Representations and Warranties

11.1 You represent and warrant that You have all Intellectual Property Rights in and to Your Product(s), including the right to monetize Your Product(s) on Your own behalf and not solely acting as an agent or appointee on behalf of any other person.

11.2 If You use third-party materials, You represent and warrant that You have the right to distribute the third-party material in the Product. You agree that You will not submit material to Google Play that is subject to third -party Intellectual Property Rights unless You are the owner of such rights or have permission from their rightful owner to submit the material.

11.3 You represent and warrant that, as the principal to the transaction with the user, You are solely responsible for compliance worldwide with all applicable laws and other obligations.

11.4 You represent and warrant that all information that You provide to Google or users in connection with this Agreement or Your Products will be current, true, accurate, supportable and complete.

# 12. DISCLAIMER OF WARRANTIES

12.1 TO THE MAXIMUM EXTENT PERMITTED BY LAW, YOU UNDERSTAND AND EXPRESSLY AGREE THAT THE PLAY CONSOLE AND GOOGLE PLAY ARE PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTY OF ANY KIND.

12.2 TO THE MAXIMUM EXTENT PERMITTED BY LAW, YOUR USE OF THE PLAY CONSOLE AND GOOGLE PLAY AND ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE PLAY CONSOLE AND GOOGLE PLAY IS AT YOUR OWN DISCRETION AND RISK AND YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR OTHER DEVICE OR LOSS OF DATA THAT RESULTS FROM SUCH USE.

12.3 TO THE MAXIMUM EXTENT PERMITTED BY LAW, GOOGLE FURTHER EXPRESSLY DISCLAIMS ALL WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

# 13. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY LAW, YOU UNDERSTAND AND EXPRESSLY AGREE THAT GOOGLE, ITS SUBSIDIARIES AND AFFILIATES, AND ITS LICENSORS WILL NOT BE LIABLE TO YOU UNDER ANY THEORY OF LIABILITY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES THAT MAY BE INCURRED BY YOU, INCLUDING ANY LOSS OF DATA, WHETHER OR NOT GOOGLE OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF ANY SUCH LOSSES ARISING.

# 14. Indemnification

14.1 To the maximum extent permitted by law, You agree to defend, indemnify, and hold harmless Google, its affiliates, and their respective directors, officers, employees and agents, and Authorized Providers from and against any and all third party claims, actions, suits, or proceedings, as well as any and all losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees) arising out of or accruing from (a) Your use of the Play Console and Google Play in violation of this Agreement; (b) infringement or violation by Your Product(s) of any Intellectual Property Right or any other right of any person; or (c) You or Your Product(s)' violation of any law.

14.2 To the maximum extent permitted by law, You agree to defend, indemnify, and hold harmless the applicable Payment Processors and Authorized Providers (which may include Google and/or third parties) and the Payment Processors' and Authorized Providers' affiliates, directors, officers, employees, and agents from and against any and all third party claims, actions, suits, or proceedings, as well as any and all losses, liabilities, damages, costs, and expenses (including reasonable attorneys' fees) arising out of or accruing from Your distribution of Products via Google Play.

14.3 To the maximum extent permitted by law, You agree to defend, indemnify, and hold harmless Google, the applicable Payment Processor, and Authorized Provider, and each of their affiliates and their respective directors, officers, employees and agents, from and against any claims, actions, suits or proceedings as well as all losses, Taxes, liabilities, interest, penalties, or fines (including reasonable attorneys' fees) arising out of or accruing from any misdeclaration, misconfiguration, or miscategorization by You that impacts Taxes.

14.4. The indemnities in this section do not apply to the extent caused by Google's, Payment Processor's or Authorized Provider's (as applicable) negligence, wilful misconduct or breach.

# 15. Changes to the Agreement

15.1 Google may make changes to this Agreement with notice to Developer and the opportunity to decline further use of Google Play. You should look at the Agreement and check for notice of any

changes regularly.

15.2 Changes will not be retroactive. They will become effective, and will be deemed accepted by Developer, (a) immediately for those who become Developers after the notification is posted; or (b) for pre-existing Developers, on the date specified in the notice, which will be no sooner than 30 days after the changes are posted (except changes required by law which will be effective immediately).

15.3 If You do not agree with the modifications to the Agreement, You may terminate Your use of Google Play, which will be Your sole and exclusive remedy. You agree that Your continued use of Google Play constitutes Your agreement to the modified terms of this Agreement.

# 16. General Legal Terms

16.1 This Agreement, including any addenda You may have agreed to separately, constitutes the entire legal agreement between You and Google and governs Your use of Google Play and completely replaces any prior agreements between You and Google in relation to Google Play. Where required by applicable law, this does not affect liability for prior false, misleading or deceptive statements or misrepresentations. The English language version of this Agreement will control and translations, if any, are non-binding and for reference only.

16.2 You agree that if Google does not exercise or enforce any legal right or remedy contained in this Agreement (or which Google has the benefit of under any applicable law), this will not be taken to be a formal waiver of Google's rights and that those rights or remedies will still be available to Google.

16.3 If any court of law having the jurisdiction to decide on this matter rules that any provision of this Agreement is invalid, then that provision will be removed from this Agreement without affecting the rest of this Agreement. The remaining provisions of this Agreement will continue to be valid and enforceable.

16.4 You acknowledge and agree that each member of the group of companies comprising Google will be a third -party beneficiary to this Agreement and that such other companies will be entitled to directly enforce, and rely upon, any provision of this Agreement that confers a benefit on (or rights in favor of) them. Other than this, no other person or company will be a third -party beneficiary to this Agreement.

16.5 PRODUCTS ON GOOGLE PLAY MAY BE SUBJECT TO UNITED STATES' AND OTHER JURISDICTIONS' EXPORT CONTROL AND SANCTIONS LAWS AND REGULATIONS. YOU AGREE TO COMPLY WITH, AND NOT CAUSE GOOGLE TO VIOLATE, ALL EXPORT CONTROL AND SANCTIONS LAWS AND REGULATIONS THAT APPLY TO YOUR DISTRIBUTION OR USE

OF PRODUCTS, INCLUDING BUT NOT LIMITED TO (A) THE EXPORT ADMINISTRATION REGULATIONS MAINTAINED BY THE U.S. DEPARTMENT OF COMMERCE, (B) TRADE AND ECONOMIC SANCTIONS MAINTAINED BY THE U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL, AND (C) THE INTERNATIONAL TRAFFIC IN ARMS REGULATIONS MAINTAINED BY THE U.S. DEPARTMENT OF STATE. THESE LAWS AND REGULATIONS INCLUDE RESTRICTIONS ON DESTINATIONS, USERS, AND END USE.

16.6 Except in the case of a change of control (for example, through a stock purchase or sale, merger, or other form of corporate transaction), the rights granted in this Agreement may not be assigned or transferred by either You or Google without the prior approval of the other party. Any other attempt to assign is void.

16.7 If You experience a change of control, Google may, at its discretion, elect to immediately terminate this Agreement.

16.8 All claims arising out of or relating to this Agreement or Your relationship with Google under this Agreement will be governed by the laws of the State of California, excluding California's conflict of laws provisions. You and Google further agree to submit to the exclusive jurisdiction of the federal or state courts located within the county of Santa Clara, California to resolve any legal matter arising from or relating to this Agreement or Your relationship with Google under this Agreement, except that You agree that Google will be allowed to apply for injunctive relief in any jurisdiction. To the extent required under applicable law, You may have other ways to resolve disputes with Google as described in the Developer Program Policies. If You are accepting the Agreement on behalf of a United States government entity or a United States city, county, or state government entity, then the following applies instead of the foregoing: the parties agree to remain silent regarding governing law and venue.

16.9 Sections 1 (Definitions), 6.5, 10.4, 11 (Representations and Warranties), 12 (Disclaimer of Warranties), 13 (Limitation of Liability), 14 (Indemnification), and 16 (General Legal Terms) will survive any expiration or termination of this Agreement.

© Google  ·  Privacy & Terms  ·  Help      Change language or region:  United States - English

# EXHIBIT R

Docusign Envelope ID: 41E5D445-452B-4B8B-8B31-E5FBE7A86B8E

1 │ Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com

2 │ Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com

3 │ Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com

4 │ Leigha Beckman, Bar No. 334611
leigha.beckman@morganlewis.com

5 │ **MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower

6 │ San Francisco, CA 94105
Telephone: (415) 442-1000

7 │ Facsimile: (415) 422-1001

8 │ Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com

9 │ Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com

10 │ Reedy C. Swanson, *pro hac vice*
reedy.swanson@hoganlovells.com

11 │ **HOGAN LOVELLS US LLP**
555 13th St. NW

12 │ Washington, D.C. 20004
Telephone: (202) 637-5600

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Dane P. Shikman, Bar No. 313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

13 │

14 │ *Counsel for Defendants*

15 │ **UNITED STATES DISTRICT COURT**

16 │ **NORTHERN DISTRICT OF CALIFORNIA**

17 │ **SAN FRANCISCO DIVISION**

18 │

| 19 │ **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
|---|---|
| 20 │ THIS DOCUMENT RELATES TO: | |
| 21 │ *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | **DECLARATION OF CHRIS IANNUCCILLI IN SUPPORT OF GOOGLE'S MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL** |
| 22 │ | |
| 23 │ | Judge: Hon. James Donato |
| 24 │ | |

25 │

## <u>DECLARATION OF CHRIS IANNUCCILLI</u>

1.       I am the Senior Director and Global Head of Marketing for the Play store at Google.  My job responsibilities include overseeing product, go-to-market, and brand marketing for Google Play, across all audiences including users and developers.  I have over 30 years of experience in marketing, including over 13 years at Google working on products such as Google Maps, Google Photos, and Google Messages, among others. Prior to Google, I worked closely with classic brands such as McDonald's and Budweiser, and the University of Chicago.

2.       I have reviewed the District Court's injunction as well as the declarations of David Kleidermacher and Vitor Baccetti.  The facts and opinions set forth herein are based on my impressions of the subsequent harm that may impact user trust in the Android ecosystem and Google's reputation if required to implement the mandates of the injunction on the timeline that the Court has ordered.  The facts and opinions are within my personal knowledge and if called as a witness, I could and would competently testify to them.

3.       Google Play works hard to build a strong brand reputation and trust among OEMs and carriers, app developers, and users.  Our brand—and trust in it—is a critical part of a healthy Android and Play ecosystem, where consumers trust that they can safely choose the Play store for their app downloads, and developers feel confident that their apps will be displayed and promoted properly, consistent with their brands, with a strong return for the resource investment they make in the platform.

4.       From my experience, I can confirm that the Play store has performed very well in terms of earning consumer trust.  Google regularly conducts and reviews surveys relating to how consumers view Android and the Play store.  Survey data consistently shows that users seek out apps from the Play store, in part, because of our commitment to safety and security.  For example, internal Google survey data from 2020 that was discussed at trial indicated that 75% of

Android owners believed that the Play store is a safe place to get apps, and only 13% of Android owners expressed concern that apps downloaded from the Play store are not secure. Trial Ex. 1768, at 16-17. Implementing the injunction threatens to harm Google's hard-earned reputation with consumers in multiple ways.

5.     My understanding is that the injunction will require changes to Play's business that will create certain incentives and opportunities that may allow third-parties to harm Google's reputation for protecting users' safety and security. Two areas of particular concern are the injunction's requirement that Google grant third-party app stores access to the Play store's app catalog and the mandate that the Play store distribute third-party app stores through the Play interface. And these concerns exist for both the consumers and developers involved.

6.     The injunction requires Google to distribute its competitors' app stores through the Play store. As a result, the Play store will be providing users a way to download apps contained in those app stores that may not be in the Play store. In the past, Google has invested substantial resources to ensure that users feel they trust Google to protect them from malicious, deceptive, and inappropriate content in the Play store. Google has communicated that message to users in a variety of ways. For example, Android has advertised Google Play Protect—Google's process to ensure that apps users download are safe and free of malware, scanning 200 billion apps on devices worldwide every day—on social media.[1]

7.     Although the injunction permits Google to review the catalogs of third party app stores that request distribution through the Play store, the injunction limits that review to measures that are "strictly necessary and narrowly tailored." (¶ 12). I understand this raises questions about whether Google must conduct a less thorough review on the catalogs of app

---

[1] *See, e.g.*, @Android, X (June 29, 2023, 2:15 PM), https://x.com/Android/status/1674481673508122624.

1  stores distributed through Play and that these third-party app stores might be exempt from some

2  of the normal, rigorous quality checks that any app in the Play store is subject to.

3      8.    I also understand that the injunction does not discuss whether Google may

4  conduct vetting of third-party app stores participating in catalog sharing, which can expose users

5  to malicious or pirated apps that would not otherwise be available on the Play store.  Further, I

6  believe that apps will be added to those third-party app stores continually, making it difficult if

7  not impossible for Google to assess the quality and validity of  the third-party app store because

8  of the constantly shifting set of apps in its catalog.

9      9.    Based on my experience, I expect that if users experience harm from an app or

10  app store which they downloaded directly from the Play store or through the catalog sharing

11  program, with an opt out delivered by Google and the continued presence of the Play store on

12  their devices, they are likely to be confused about whether Google, the app developer, or the

13  third-party app store is to blame.  That confusion will make it difficult for users to know who to

14  contact in the event of a problem and thus create substantial frustration.

15      10.    Because of that confusion, some users are likely to misattribute any harms they

16  experience at least in part to the Play store and to Google.  That harm will deteriorate user trust

17  in the broader Android ecosystem and erode Google's reputation amongst consumers at large.

18  Trust is the cornerstone of a digital ecosystem; once trust is lost, it is very difficult to win back.

19      11.    If users attribute harms caused by third parties to the Play store, users are likely to

20  stop using the Play store and may even switch away from Android devices to iPhones.  My

21  concerns are based on information that I know and have learned in my role at Google as the

22  Senior Director and Global Head of Marketing for Google Play.

23      a.    Apple aggressively markets iOS as a more secure ecosystem than Android.  For

24      example, as was discussed at trial, Apple launched a series of advertisements in

25      which Apple successfully fends off a dramatized thief that otherwise glides easily

through Android's defenses.  Trial Ex. 6695.  In each advertisement, the side-by-side comparisons explicitly pit Apple's logo and security system against Android's. *Id.*

b.  Marketing surveys, including from within the last year, indicate that users consistently rank security as one of the most important considerations when selecting smart devices.

c.  Switching is already a common practice, and the statistics do not favor Android. Data discussed at trial indicate that approximately 17% of Android users actively consider switching to iOS.  Trial Ex. 1766, at 8.  There's already a quantifiable and significant trend of users switching from the Android ecosystem to Apple's iOS—a phenomenon that industry professionals call "churn."  One way to measure churn is through "net switching rates"—or the number of switchers to Android less the number of switchers to iOS expressed as a share of the total number of users replacing devices.  In a typical year, more switchers already move from Android smartphones to iOS smartphones than vice versa.  Trial Ex. 1766, at 8.  The switching disparity is particularly important because it can be difficult to persuade Android users who switch to Apple devices to switch back.

d.  Based on this data and my professional experience, I expect that increased exposure to harmful content from third-party app stores that a user downloaded to their device from the Play store will make switching from Android to iOS even more likely.

12.  I also expect that catalog sharing will have a similar effect.  Because the Court's remedy does not discuss whether Google must share the entire Play store catalog with third-party app stores regardless of what other apps are carried in those stores, catalog sharing may appear to legitimize app stores that contain malicious, deceptive, pirated, or inappropriate content by

making it appear that those stores have the support of the entire catalog of legitimate app developers whose products are available through the Play store. Users who have a bad experience with an app store that appears legitimate because it is populated with apps from the Play store may attribute those problems to Google.

13. The catalog sharing remedy will also likely threaten developers' continued participation in the Play store.

    a. In my extensive experience working with developers, I have found that developers put tremendous thought into which stores are allowed to carry their apps—app stores require continual investment of finite developer resources, they may require custom versions of their apps to best fit the audience of the app store, and they require constant monitoring of performance to maintain strong user experience and return on investment.

    b. One of the top concerns we hear from developers when they are choosing where to distribute their apps is whether pirated apps will be present. If an app store carries knock-off versions of an app purporting to offer similar content for a lower price, then users may be enticed to download the knock-off versions, depriving developers of the value of their intellectual property.

    c. In my experience, developers also care deeply about their brand image—just as Google does. Many developers do not want their apps to be featured alongside content that they find objectionable—for instance, apps with explicit or pornographic content or that promote hateful or discriminatory ideas.

14. I do not believe the opt-out provision will be sufficient to assuage developers' concerns regarding the dangers of catalog sharing for multiple reasons.

    a. For one thing, even developers who choose to opt out face significant risk of harm with catalog sharing. A developer's opt out just means that *its app* will not be

listed in a particular store.  But the store will still appear to be a legitimate store offering millions of apps to users because it will carry the rest of Play's catalog. Consumers may not have an easy way to know which developers have opted out. As a result, they may not know that when they search for an app to download that has opted out, the search results will actually be apps that look similar or have similar names but are in fact fake, pirated, or knock-off versions–because the real version is not available there.  The opt out will not protect developers from the harm of users being led to fake, pirated, or knock-off versions of the developer's app as a result of the veneer of safety and legitimacy provided to third-party app stores through Play catalog sharing.  If anything, when a developer opts out, it may create a stronger economic incentive for the affected app store to push a knockoff or pirated version of the app, so that users who search for the app that has opted out will receive a result and are more likely to download something.

b. In addition, I understand that Google's ability to control access to catalog sharing data is imperfect and that once data has been released it is difficult to claw back. Based on Google's experience in working with developers and knowing developers' sensitivities, some developers will likely choose not to run the risk that their apps may appear alongside objectionable content and will pull their apps from the Play store entirely as a result.

c. The opt-out mechanism also burdens developers, who will need to monitor which stores are participating and whether they want to offer their apps through those stores.  That decision may change from day to day, both as new stores are added and as the participating stores constantly change their own content.  Many developers prefer to minimize ongoing investment in their apps once they have launched, and these developers may not be well-positioned to engage in the

1    monitoring required by the catalog sharing provision.  We know of many

2    developers of older, much-loved apps that are in maintenance mode from

3    developers who will likely not pay attention to the opt out.  They trust that their

4    app is in the Play store, but will now be faced with the burden of their app being

5    downloaded from third-party stores they are unfamiliar with, or do not trust.

d. 6    The added burden on developers is particularly concerning because Android and

7    the Play store face constant competition from iOS and Apple's App Store for

8    developer attention and resources.  We consistently receive feedback that offering

9    apps on the Play store and Android comes at higher investment—and sometimes

10    lower return, due to our wider, more economically diverse user base—than

11    offering apps on iOS and the App Store.  Because the injunction imposes

12    additional burdens on developers who choose to offer apps on Android and

13    Play—including potentially frequent monitoring required to manage the opt-out

14    system—I am concerned that some developers may conclude that the additional

15    burdens are not worth it and stop offering their apps on Play or Android

16    altogether.

e. 17    The accelerated timeline would also put an undue burden on developers.

18    Developers will be faced with resourcing decisions for their presence on third

19    party app stores on an ongoing basis, and need time to determine if those are

20    warranted.  Developers will confront similar decisions each time a new app store

21    joins the program.

f. 22    Finally, by requiring Google to communicate to developers that they will be opted

23    into the catalog sharing program by default, developers might interpret the opt-in

24    program as a choice that Google has made and therefore understand it as an

25

Docusign Envelope ID: 4105D445-4E31-4986-A578-4DEF149F39C5

Case 3:21-md-02981-JD Document 1035-2 Filed 10/16/24 Page 16 of 100
Case: 24-6274, 10/16/2024, DktEntry: 6.2, Page 315 of 645

endorsement of the participating app stores. Developers who go on to have a bad experience in the program may in turn blame Google for these problems.

15.    I understand that the injunction's accelerated timeline increases the risk of security breaches or technical failures in any one component of the Android ecosystem. Critically, loss of trust at any level—apps, app stores, OEMs, the Play store, Android, Google— will corrode user trust in the ecosystem more broadly because it disrupts the entire experience for the user. That, in turn, makes it more likely that the user will switch out of the Android ecosystem in favor of competing operating systems, including iOS. Further, a loss of trust in the security of the ecosystem will erode developer trust in that system, causing them to pull or pause updates to their apps, further weakening the user experience.

16.    In my experience, these kinds of harms to a company's brand, reputation, and trust are exceptionally difficult—if not impossible—to reverse.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 11th day of October 2024 in Mountain View, California.



Chris Iannuccilli

# EXHIBIT S

1 | Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
2 | Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
3 | Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
4 | Leigha Beckman, Bar No. 334611
leigha.beckman@morganlewis.com
5 | **MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
6 | San Francisco, CA 94105
Telephone: (415) 442-1000
7 | Facsimile: (415) 422-1001

8 | Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
9 | Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
10 | Reedy C. Swanson, *pro hac vice*
reedy.swanson@hoganlovells.com
11 | **HOGAN LOVELLS US LLP**
555 13th St. NW
12 | Washington, D.C. 20004
Telephone: (202) 637-5600

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Dane P. Shikman, Bar No. 313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

13

14 | *Counsel for Defendants*

15 | **UNITED STATES DISTRICT COURT**

16 | **NORTHERN DISTRICT OF CALIFORNIA**

17 | **SAN FRANCISCO DIVISION**

18

| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
|---|---|
| **19** | |
| **20** THIS DOCUMENT RELATES TO: | **DECLARATION OF DAVID KLEIDERMACHER IN SUPPORT OF GOOGLE'S MOTION FOR A PARTIAL STAY PENDING APPEAL** |
| **21** *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |
| **22** | |
| **23** | Judge:  Hon. James Donato |
| **24** | |

25

Docusign Envelope ID: FFC39F96-...

### DECLARATION OF DAVID KLEIDERMACHER

1.      I am Vice President of Engineering for Security and Privacy for Android and Made-by-Google Products and Services.  Since I joined Google in 2017, I have been responsible for Android security and privacy engineering.  I am familiar with Google's efforts to combat the harmful effects of malware on Android.  The facts set forth herein are within my personal knowledge and if called as a witness, I could and would competently testify to them.

2.       In my declaration in the District Court in support of Google's proffer regarding the technical implementation and anticipated resource allocation required for Epic's proposed remedies, I explained that:

    a.  Google has a slate of security, content, and privacy policies that it applies to all apps that are distributed on its Play store.  Google rejects all apps that do not comply with the stated policies.  By contrast, many third-party app distributors either have a different set of criteria for apps on their stores or fail to have security and privacy policies at all.  When an app or app update is submitted to Google that is out of compliance with Google's policies, it is rejected.

    b.  The Court's injunction recognizes that Google will need to vet apps on third-party stores to ensure that users aren't unreasonably exposed to security and privacy risk.  Alternative measures would not be sufficient to properly protect users from the risk of third-party app stores.  Dkt. 982-4.

3.      I participated in the remedies hearing held on August 14, 2024.  Dkt. 1000.

4.      I have reviewed the District Court's injunction.  I offer this further declaration to explain the security risks associated with the injunction and describe the resource burden and costs of attempting to mitigate those risks.  I have focused this declaration on any additions to my analysis from my earlier declaration resulting from the terms of the injunction as entered.

Docusign Envelope ID: FEC39F96-736A...

## Security Risks of Linkouts

5.      One of the prohibitions in the injunction is that Google cannot stop developers from providing certain links directly to users (¶ 10).

6.      Allowing developers to provide links directly to users creates significant risk of deceptive links that entice users to click on them with false, misleading, or insufficient information.  A malicious actor (whether an individual, enterprise, or state actor) could then use the linked website to smuggle malware onto a phone, steal a user's data, engage in a phishing or spear phishing attack, track a user's activities in other apps on the device, or otherwise jeopardize a user's privacy and security.  While Google devotes significant resources to reviewing *apps* in the Play store for malware, Google does not have the capability to review *websites* on an ongoing basis.  These potential threats are real; they can threaten user privacy and security, and also disrupt businesses and government agencies.  Sophisticated malicious actors even engage in bait-and-switch strategies to gain users' trust before exposing them to harmful content via links.  Developers also often lack full-time cybersecurity personnel, and thus may unwittingly expose users to harmful content if they have been compromised by malicious actors.

7.      Proactive security measures are crucial because once data has been lost once, it is extremely difficult to safeguard it again.  Put simply, trying to undo compromised data is like putting toothpaste back in the tube.  Users' data may be sold on the dark web to other bad actors, users could suffer financial loss or privacy invasions, and so on.  Even if a user *later* avoids the app or store that stole their data in the past, that cannot remedy the harms they will suffer from the fact that the data has been breached to begin with.

8.      Further, the injunction orders this feature to be operational by November 1, 2024– which is three weeks away.  This provides almost no time to develop any plans to mitigate the risks that linkouts pose to user security.

9.     To my knowledge, the company has never rolled out a new feature to millions of new users at scale in just three weeks.  The reason it has not done so is that such a roll out would create major security risks.  The recent Crowdstrike malfunction shows what can happen when an update to a major platform is pushed out too early.  In that case, a flaw in the programming related to an update of the software caused an entire platform to crash.  Because the platform was relied on by major businesses, like Microsoft and multiple airlines, there were worldwide service disruptions for several days after the incident.  Android and the Play store operate at scale and are used by many millions of American consumers.  Rushed updates at this scale can lead to major unintended issues that affect functionality of devices, and the privacy and security interests of millions of users.

## **Security Risks of Implementing External Payment Processing**

10.     Another of the prohibitions in the injunction is that Google cannot prevent developers from informing users about alternative payment methods other than Google Play Billing or prohibit the use of in-app payment methods other than Google Play Billing (¶ 9).

11.     If this remedy is implemented, I anticipate that many developers will quickly begin rolling out billing systems that allow them to collect highly sensitive information from users, including credit card numbers, addresses, email addresses, bank account numbers, and more.  The injunction does not provide for Google to impose conditions on how developers use that data once it has been collected or enforce security policies around the implementation of alternative billing mechanisms.

12.     Allowing developers to use alternatives to Google Play Billing also involves more developers collecting data from customers.  Increased data collection yields increased opportunities for data breaches.

13.     The injunction orders this prohibition to become operational by November 1, 2024—which is just three weeks away.  This provides almost no time to develop any plans to mitigate the above mentioned risks.  As noted above, the recent Crowdstrike malfunction shows what can happen when an update to a major platform is pushed out without appropriate quality control or too early:  There can be unintended issues that affect basic functionality for millions of users.

**Security Risks of Allowing Third-Party Access to Google's App Catalog**

14.     The District Court's injunction requires Google to allow "third-party Android app stores to access the Google Play Store's catalog of apps."  (¶ 11).  Nothing in this provision states that Google is authorized to impose eligibility criteria and vet those third-party app stores to determine if they are legitimate app stores before granting them the ability to offer users access to the millions of apps available in the Play store catalog.  I understand that Google had explained to the Court that it would need to set eligibility criteria for safety and security reasons in its remedies proffer and accompanying declarations.  An inability to review the stores before allowing unfettered access will jeopardize user security because malicious actors can easily set up a shell third-party "store" and populate it with apps from Google Play, along with malicious, deceptive, or pirated content.  The legitimate apps populated from Google Play will make it much easier for bad actors to pose as legitimate stores.  As I explained above, *supra* ¶ 7, marketplace forces cannot fully correct for this problem because users who lose data or money will have no practical way of clawing it back.

15.     The developer opt-out mechanism will not resolve these concerns.  Even if a significant number of apps utilize the opt-out mechanism, the sheer number of apps currently on the Play store mean that many inevitably will not.  Moreover, a developer may have difficulty monitoring every new store to begin utilizing the catalog-sharing mechanism on a regular basis

and be unable to opt-out in a timely fashion when a new, malicious third-party store begins to offer their apps.

16.     In addition, even if a developer opts out of appearing in the Play catalog for a particular non-Play app store, for example because that app store carries pirated versions of the developer's app, it will be difficult or impossible for users who want to download that developer's app to know that the version(s) appearing in the non-Play store are pirated precisely because the non-Play store otherwise looks like it has the entire Play catalog available for download.  As one example, someone looking to download the Netflix app from a non-Play store that appears to offer the entire Play catalog may search for "Netflix" and—even though Netflix itself has opted out of appearing in this particular non-Play store precisely because the store has pirated versions of Netflix's app—the user's search will lead the user to pirated or fraudulent versions of Netflix's app.  **Exhibit A** to this declaration shows that this concern is not theoretical or hypothetical.

17.     I understand that Google detailed for the Court why the necessary timeline to broadly introduce catalog access is 12-16 months given the seriatim nature of creating this functionality, beta testing it, fixing issues, and then rolling it out broadly.  As discussed above, compressing the timeline for a substantial new product—in this case, one involving millions of apps distributed to potentially hundreds or even thousands of app stores—can create major unintended consequences that affect broader functionality of the platform.  The Court's accelerated implementation timeline thus exacerbates the security risks already associated with this provision.

## **Security Risks of Distributing Third-Party App Stores**

18.     I understand that the District Court's injunction will require Google to build the systems and technology necessary to distribute third-party app stores on Play (¶ 12).  Although

1    the injunction says that Google may not "prohibit" distribution of third-party app stores, in fact

2    Play as it currently exists lacks the capability to safely distribute stores (as opposed to apps) and

3    so Google would have to take a number of affirmative steps to allow for the distribution of third-

4    party app stores through the Play store.  Play has the capability and functionality to safely

5    distribute *apps*–not app stores.  For example, the Play store Developer Console does not

6    currently include the capability to allow app developers to identify their app as an "app store," so

7    that the Play store can grant the necessary permissions, identify the app as an app store for users

8    when they see the app in the Play store, allow for developer agreement to relevant terms and

9    conditions, etc.

10        19.    The injunction recognized the very real security risks imposed on Google by

11   requiring it to build this capability.  Although the injunction allows Google to implement some

12   safety measures, the particular provisions with which Google must comply make it impossible to

13   vet third-party app stores and their apps as thoroughly as is necessary to protect user security.

14        20.    Google has an extensive process to review apps that it lists on the Google Play

15   store.  Google establishes and enforces policies regarding the apps that Google will distribute.

16   For example, Google has policies to protect users from malware and privacy risks, and Google

17   prohibits apps that violate the law, such as apps with illegal content or pirated apps (i.e. apps that

18   are distributed without the authorization of the app developer).  Before an app can be listed on

19   the Play store, Google reviews these apps and any subsequent updates for compliance with its

20   policies.  I have previously described those policies in my previous declaration submitted on

21   June 24, 2024.  Dkt. 982-4, at 1; Dkt. 981-6.

22        21.    By contrast, third-party app stores establish their own policies and criteria for the

23   apps they will list.  There is no "standard" or minimum requirement for safety of app stores, or

24   their developers, today.  Nor do we have a good way of measuring the risk that a particular third-

25   party app store may pose to users.

Docusign Envelope ID: FEC3F06E-72EE-4693-8B7B-144DB13D82E2

22. The injunction's mandates to Google related to its ability to vet third-party stores are fundamentally contradictory. On the one hand, the injunction authorizes Google to implement "review measures . . . comparable to [those already] tak[en] for apps proposed to be listed in the Google Play Store." (¶ 12). But the very next sentence limits Google to only utilizing "technical and content requirements and determinations" if it can prove they "are strictly necessary and narrowly tailored." (¶ 12). Indeed, the injunction allows for third-parties to "challenge" Google's review determinations and policies and places the "burden of proving" the safety measures' necessity and tailoring on Google in such a contest. (¶ 12).

23. The injunction places Google in an impossible position of being unable to vet the catalogs of third-party app stores requesting distribution through the Play store with the same rigor that Google applies to vetting the apps that appear in the Play store catalog. Google's existing policies and review mechanisms serve as the first line of defense against unwanted and dangerous security risks for Android users who download apps from the Play store. As a result, the current policies are prophylactic and err on the side of protecting users from potentially dangerous content and risky features in order to prevent security breaches before they occur, which may necessarily impact some well-intentioned apps. But the Court's requirement that Google only implement requirements that are "strictly necessary and narrowly tailored" contravenes that prophylactic purpose of vetting.

24. The Court's requirement that Google bear the burden of justifying any security policies it imposes will likely exacerbate the problem. Security policies by design anticipate problems that may or may not result. A security policy that is entirely or primarily reactive to only demonstrated threats is no security policy at all.

25. From a technical perspective, the Court's "strictly necessary and narrowly tailored" standard is also impossibly vague. Google's engineers are trained to defend against *all* security risks to users. It's hard to imagine what measures would be "strictly necessary" or

Docusign Envelope ID: FFC38F96-7369-48AF-995D-1100111033DF

"narrowly tailored" to prevent security risks that would sufficiently protect users. The same is true for Google's "content standards"—would Google be permitted to treat its content standards as established and face challenges only on the means of enforcement, or does the narrow tailoring requirement apply to the underlying standards as well? Attempting to thread that needle in order to comply with the standard will lead to increased security risks and subsequent safety failures for Android users.

26.     I have significant concerns about outsourcing decision-making around how Google should protect against security risks to individuals not invested in Google's safety, security, and reputation for a positive user experience, which is what the injunction appears to do via the technical committee. I am unaware of any company that permits outsiders to override the company's internal assessment of necessary security protections and to force a lowering of those protections.

27.     Even if Google were permitted to fully apply its normal vetting procedures to third-party stores and the apps they offer, that would not fully mitigate the risk because Google will continue to lack visibility and signals from third-party-store interactions that help Google's AI safety models today. Google Play's security and enforcement policies are effective at mitigating threats, but they cannot entirely eliminate them. Expanding that program to reach other stores—and all their apps—will reduce the resources available to allocate to the Play store, making Google's customers less safe. While Google has a strong track record of preventing fraudulent or malicious apps and those that violate content policies from reaching Play, the increased number of additional apps to screen—and Google's comparative lack of visibility into developers and apps offered on other stores—will mean that Google is unlikely to achieve the same level of protection it has historically provided to Play customers.

28.     I understand Google originally detailed the required software engineering and testing necessary to safely roll out third-party store distribution and explained that it would

require 12-16 months to implement. As discussed above, compressing the timeline for a substantial new product can create major unintended consequences that affect broader functionality of the platform. The Court's accelerated implementation timeline thus exacerbates the security risks already associated with this provision.

### Costs of Mitigating the Risks of Third-Party App Stores on Play

29. After reviewing the injunction, I continue to believe that my prior estimates relating to cost of security for distributing third-party app stores are reasonably accurate. Dkt. 982-4, at 4-6. If anything, the possibility that Google might have to apply different app review policies for apps on Play and apps off Play may increase the associated costs, because it may involve developing and maintaining two separate systems and/or workflows, training people on two different systems, and so on.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 11th day of October 2024 in Fez, Morocco.



David Kleidermacher

# EXHIBIT A



Search Results for Netflix Apps &

apkfab.com/search?q=Netflix

APKFab

Editor's Choice | Reviews | News | Alternatives | TopTens | Hot Games | Hot Apps | Category | Discovery | English

Netflix

Search results for: Netflix

| App | Rating | Users |
|---|---|---|
| Netflix | 8.6 | 1M+ |
| Netflix | 4.1 | 1K+ |
| Netflix Movies & Shows | 7.3 | 46 |
| Free Netflix guide 2020-streaming... | 5.5 | 30 |
| Netflix | 4.7 | 15 |
| Free Netflix Movies and TV Shows HD info | 6.2 | 5 |
| Free Netflix Movies and TV Shows info | 6.7 | 5 |
| Kik chat | 6.6 | 2 |
| Netflix | | |
| Free Netflix accounts tips | 6.3 | |
| ControlPC - Remote for Netflix | 3.7 | 3 |
| DVD Netflix | 8.0 | 245 |
| Live netflix mobile Shows & Movies | 6.3 | 18 |
| Hack Netflix 2018 prank | 8.0 | 27 |
| Top Rated Movies for Netflix | 6.5 | 146 |
| Netflix VR | 5.2 | 514 |

# EXHIBIT T

# EXHIBIT A

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | **SETTLEMENT AGREEMENT AND RELEASE** |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | Judge: Hon. James Donato<br>Courtroom: 11, 19th Floor, 450 Golden Gate Ave, San Francisco, California, 94102 |

## Settlement Agreement and Release

The Parties, by and through their respective counsel, in consideration for and subject to the promises, terms, and conditions contained in this Settlement Agreement, hereby warrant, represent, acknowledge, covenant, stipulate and agree, subject to Court approval pursuant to applicable federal and state law, as follows:

**1.**     **Definitions**

As used herein the following terms have the meanings set forth below:

1.1     "Actions" mean the State AG Action and the Consumer Action.

1.2     "Affiliates," with respect to a Party, shall mean (i) all entities now or in the future controlling, controlled by or under common control with that party; (ii) all entities in the past controlling, controlled by or under common control with that party, for the period of time that such control exists or existed; and (iii) predecessors, successors or successors in interest thereof, including all entities formed or acquired by that party in the future that come to be controlled by that party. For purposes of this definition, "control" means possession directly or indirectly of the power to direct or cause the direction of management or policies of a company or entity through the ownership of voting securities, contract, or otherwise, and "entities" includes all persons, companies, partnerships, corporations, associations, organizations, and other entities.

1.3     "Android" means the Android operating system source code as published through the Android Open Source Project.

1.4     "Android-compatible" means a device (i) based on Android that (ii) complies with the Compatibility Definition Document and (iii) that passes the Compatibility Test Suite, as published and updated by Google from time to time through the Android Open Source Project.

1.5    "Attorneys' Fees and Expenses" means any attorneys' fees, costs, and expenses of any kind or description incurred by the States or Consumer Counsel or other attorneys, experts, consultants, or agents of the Plaintiffs or Eligible Consumers.

1.6    "Claims" means any claims, counterclaims, set-offs, demands, actions, rights, liabilities, costs, debts, expenses, attorneys' fees, damages, and/or causes of action of any type, including claims arising under federal or State antitrust, unfair competition or consumer protection laws, or State common or equitable law that were asserted, could have been asserted, known or unknown, against the Released Parties, that have accrued as of the Effective Date or that accrue no later than seven years after the Effective Date, arising from any of the facts, matters, transactions, events, occurrences, acts, disclosures, statements, omissions, or failures to act set forth or alleged in the Actions, whether brought as direct claims, representative claims, class claims, or *parens patriae* claims on behalf of the States or any other person or entity that the States represent.  For the avoidance of doubt "Claims" includes, and this Settlement Agreement releases, only claims that arise from  an identical factual predicate or claims made in any complaint filed in the Actions.

1.7    "Consumer Action" means *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD, pending in the Northern District of California, coordinated with other actions as part of MDL No. 2981, and previously captioned *Carr v. Google LLC*, as well as any actions consolidated by the Court with *In re Google Play Consumer Antitrust Litigation*.

1.8    "Consumer Counsel" means the law firms of Bartlit Beck LLP; Kaplan Fox & Kilsheimer LLP; Cotchett, Pitre & McCarthy, LLP; Korein Tillery LLC; Milberg Coleman Bryson, Phillips Grossman, PLLC; and Pritzker Levine LLP which have any and all authority and capacity necessary to execute this Settlement Agreement and bind all of the Individual

Plaintiffs who have not personally signed this Settlement Agreement, as if each of those individuals had personally executed this Settlement Agreement.

1.9 "Consumer Plaintiffs" means the plaintiffs in the Consumer Action.

1.10 "Court" means The United States District Court for the Northern District of California.

1.11 "Default Sideloading Flow" means the following three screens in Android versions prior to the Revised Sideloading Implementation Date: (1) the pop-up with the default text "For your security, your phone currently isn't allowed to install unknown apps from this source. You can change this in Settings," which appears if a source that has not been enabled for sideloading attempts to install an app, (2) the subsequent "Install unknown apps" screen that allows the user to enable sideloading from the specified source, and (3) the confirmation screen with the default language "Do you want to install this app?".

1.12 "Defense Counsel" means the law firms of Munger, Tolles & Olson LLP; Morgan, Lewis & Bockius LLP; Hogan Lovells; and Kwun Bhansali Lazarus LLP.

1.13 "Distribution Plan" means the plan or method of allocation of the Settlement Fund among Settlement Consumers. The Distribution Plan will be submitted to the District Court separately from the Settlement Agreement and is not part of this Settlement Agreement.

1.14 "Effective Date" means the first business day after which all of the following events and conditions of this Settlement Agreement have been met or occurred:

1.14.1 Google, the States, and Individual Plaintiffs have executed this Settlement Agreement; and

1.14.2 The Final Approval Order has become a final, non-appealable judgment approving the Settlement Agreement in all respects and is no longer subject to review,

3

reconsideration, rehearing, appeal, petition for permission to appeal, petition for writ of certiorari, or any other appellate review of any kind.

1.15    "Eligible Consumers" means individuals whose legal address in their Google payments profile was in one of the States when they purchased an app from Google Play or made an in-app purchase (including subscriptions) through Google Play Billing from August 16, 2016 through September 30, 2023.

1.16    "Final Approval Order" means a final judgment and order entered by the Court approving the Settlement Agreement and dismissing the Actions with prejudice and without the award of fees and/or costs (except as specified in this Settlement Agreement).

1.17    "Final Judgment" means a final judgment and dismissal of the Actions with prejudice.

1.18    "Forms of Notice" means any material that will be sent or disseminated to Eligible Consumers by the Settlement Administrator to notify Eligible Consumers of this Settlement, the process for receiving payments or submitting claims, and how to opt out of to the Settlement, including but not limited to the Notice, Summary Notice, the Settlement Website and the domain name for the Settlement Website, the content of any media, social media, or advertising campaign, and the script of any outbound telephone notice.

1.19    "Google" means Google LLC, Google Ireland Limited, Google Commerce Limited, Google Asia Pacific Pte. Limited, and Google Payment Corp.

1.20    "Google Play" means the Google Play store or any successor Google app store for Mobile Devices in the United States.

1.21    "ICP" means the Independent Compliance Professional as identified in Section 7.1.

4

1.22    "ICP Staff" means any personnel retained by the ICP subject to Section 7.3.1.

1.23    "Individual Plaintiffs" means all individual consumers who have pending claims against Google in MDL No. 2981, including Matthew Atkinson, Mary Carr, Daniel Egerter, Alex Iwamoto, Serina Moglia, and Zachary Palmer.

1.24    "Joining States" mean the following states, commonwealths, and territories of the United States, by and through their Attorneys General, in their sovereign capacity and as *parens patriae* on behalf of Eligible Consumers in such states, commonwealths, and territories: Alabama, Georgia, Hawaii, Illinois, Kansas, Maine, Michigan, Ohio, Pennsylvania, South Carolina, Wisconsin, Wyoming, Puerto Rico, and the U.S. Virgin Islands.

1.25    "Leadership Committee of the States" means California, North Carolina, New York, Tennessee, and Utah.

1.26    "Mobile Device" means Android-compatible smartphones and tablets sold in the United States, and no other types of devices.

1.27    "Motion for Approval of Notice" means the motion asking this Court to issue an Order authorizing the States to issue notice and preliminarily approve the Settlement.

1.28    "Notice" means the notice of this Settlement Agreement, which Plaintiffs will draft in consultation with Google, to be attached as an exhibit to the Motion for Approval of Notice and disseminated to Eligible Consumers in accordance with this Settlement Agreement.

1.29    "Notice Approval Order" means an order authorizing the States to issue notice of the Settlement to Eligible Consumers, preliminarily approving the Settlement Agreement, and preliminarily approving a proposed disposition of the Settlement Fund.

1.30     "Notice Date" means the date set forth in the Notice Approval Order for commencing the transmission of the Summary Notice.

1.31 "Original States" means the following states, commonwealths, and districts of the United States, by and through their Attorneys General, in their sovereign capacity and as *parens patriae* on behalf of Eligible Consumers in such states, commonwealths, and districts: Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Virginia, Vermont, Utah, Washington, West Virginia, and the District of Columbia.

1.32 "Parties" means Google, the States, and the Individual Plaintiffs.

1.33 "Plaintiffs" means the States and the Individual Plaintiffs.

1.34 "Potentially Interested Party" means a mobile OS provider, app store, company facilitating digital transactions regardless of platform, company providing billing services for digital transactions, mobile OEM, mobile carrier, or mobile app developer.

1.35 "Released Claims" means the claims defined under Section 11 of this Settlement Agreement.

1.36 "Released Parties" means (a) Alphabet Inc. and Google; (b) the past, present, and future parents, subsidiaries, Affiliates, divisions, joint ventures, licensees, or franchisees of the entities in part (a) of this paragraph; (c) the past, present, and future shareholders, officers, directors, members, agents, employees, independent contractors, consultants, administrators, representatives, fiduciaries, insurers, predecessors, successors, and assigns of any of the entities in parts (a) - (b) of this paragraph.

1.37 "Revised Default Sideloading Flow" means the Default Sideloading Flow as modified on or after the Revised Sideloading Implementation Date. For the avoidance of doubt,

the Revised Default Sideloading Flow does not encompass (1) an OEM's changes or modifications to Android's sideloading flow, (2) security warnings provided by a web browser vendor in connection with the download of executable files, (3) Google Play Protect, or (4) sideloading restrictions or warnings for consumers who have chosen to enroll in the Advanced Protection Program.

1.38    "Revised Sideloading Implementation Date" means the date that is the earlier of: (1) the date Google releases a new version (other than a pre-release or beta version) of Android that implements the revisions to the Default Sideloading Flow specified in Section 6.10 and (2) the release date of the first major version (other than a pre-release or beta version) of Android that is released six (6) months or more after the Effective Date.

1.39    "Settlement" or "Settlement Agreement" means the settlement agreement and release described in this document.

1.40    "Settlement Administrator" means a firm appointed by the Court, which shall provide settlement notice and administration services pursuant to the terms of this Settlement Agreement.

1.41    "Settlement Consumers" means and includes every Eligible Consumer who does not validly and timely request exclusion ("opt out") from the Settlement.

1.42    "Settlement Fund" means the fund established as described in Section 5.3.

1.43    "Settlement Fund Escrow Account" means an escrow account established, in consultation with Google, pursuant to Court order and held in a qualified settlement fund, as defined in Treasury Regulation § 1.468B-1 et seq., in a bank account deposit with a commercial bank with excess capital exceeding $1,000,000,000, with a rating of "A" or higher by S&P.

1.44    "Settlement Website" means a website created and maintained by the Settlement Administrator for the purpose of providing Eligible Consumers with notice of the Settlement.

1.45    "State AG Action" means *State of Utah v. Google LLC*, Case No. 3:21-cv-05227-JD, pending in the Northern District of California, coordinated with other actions as part of MDL No. 2981.

1.46    "State" means any one of the individual states, commonwealths, territories, or districts listed in Section 1.47.

1.47    "States" mean the following states, commonwealths, territories, and districts of the United States, by and through their Attorneys General, in their sovereign capacity and as *parens patriae* on behalf of Eligible Consumers in such states, commonwealths, territories, and districts: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

1.48    "States' Monetary Fund" means the fund established as described in Section 5.5.

1.49    "States' Monetary Fund Escrow Account" means an escrow account established, in consultation with Google, pursuant to Court order and held in a qualified settlement fund, as defined in Treasury Regulation § 1.468B-1 et seq., in a bank account deposit with a commercial bank with excess capital exceeding $1,000,000,000, with a rating of "A" or higher by S&P.

8

1.50 "Summary Notice" means a summary of the Notice, which Plaintiffs will draft in consultation with Google, that is sent to Eligible Consumers by electronic mail and/or other means approved by the Court and that provides instructions for accessing the Settlement Website and contacting the Settlement Administrator.

1.51 "User" means Mobile Device users in the United States.

## 2. Recitals

This Settlement Agreement is made for the following purposes and with reference to the following facts:

2.1 On August 16, 2020, Mary Carr brought a case on behalf of Consumer Plaintiffs. On October 21, 2020, Consumer Plaintiffs filed a Consolidated Class Action Complaint, and subsequently amended their complaint on August 30, 2021 and December 20, 2021. Consumer Plaintiffs' operative complaint alleges that Google monopolized an alleged Android app distribution market in violation of 15 U.S.C. § 2; engaged in unreasonable restraints of trade with respect to OEMs and app developers concerning the alleged Android app distribution market in violation of 15 U.S.C. § 1; monopolized an alleged Android in-app aftermarket in violation of 15 U.S.C § 2; engaged in unreasonable restraints of trade in an alleged Android in-app aftermarket in violation of 15 U.S.C § 1; unlawfully tied Google Play Billing to the use of Google Play in violation of 15 U.S.C. § 1; engaged in unreasonable restraints of trade with respect to OEMs and app developers concerning the alleged Android app distribution market in violation of the California Cartwright Act, Cal. Bus. & Prof. Code Sections 16700 et seq.; engaged in unreasonable restraints of trade in an alleged Android in-app aftermarket in violation of the California Cartwright Act, Cal. Bus. & Prof. Code Sections 16700 et seq; unlawfully tied Google Play Billing to the use of Google Play in violation of the California Cartwright Act, Cal. Bus. &

Prof. Code Sections 16700 et seq.; engaged in unlawful, unfair, and deceptive business acts and practices violating the California Unfair Competition Law, Cal. Bus. & Prof. Code Section 17200 et seq.

2.2     On July 7, 2021, the Original States (except for Louisiana and Texas) filed a Complaint on behalf of themselves and as *parens patriae* on behalf of consumers in their respective states alleging that Google monopolized the alleged Android app distribution market in violation of 15 U.S.C. § 2; engaged in unreasonable restraints of trade with respect to OEMs and app developers concerning the alleged Android app distribution market in violation of 15 U.S.C. § 1; unlawfully tied Google Play Billing to the use of Google Play in violation of 15 U.S.C. § 1; monopolized the alleged in-app payment processing market in violation of 15 U.S.C § 2; engaged in unreasonable restraints of trade in the alleged in-app payment processing market in violation of 15 U.S.C § 1; engaged in unlawful exclusive dealing in the alleged in-app payment processing market in violation 15 U.S.C. § 1; violated various state antitrust, unfair competition, and consumer protection laws based on the same conduct that formed the basis of their federal antitrust law claims and/or alleged false or misleading statements or other allegedly deceptive conduct. The Original States' Complaint sought damages, penalties, and injunctive relief.  The Original States (including Louisiana and Texas) filed an amended complaint on November 1, 2021 alleging substantially similar claims, but also adding state antitrust and consumer protection claims under Louisiana and Texas law.

2.3     On May 26, 2022, Consumer Plaintiffs moved to certify a class of consumers in 17 states and territories that were not represented by the Original States.  Google opposed the motion.  On November 28, 2022, the Court certified a damages class of consumers in the 17

states and territories not represented by the Original States, but subsequently decertified the class

on September 13, 2023.

2.4    After the Court indicated it would decertify the class, the Joining States decided to

join this Settlement Agreement.

2.5    Google disputes the claims alleged in the Actions and believes it has strong

defenses to these claims.  The Settlement is not an admission of wrongdoing, fault, liability, or

damage of any kind.  Google disputes that Plaintiffs' claims have merit and that Plaintiffs, or

Eligible Consumers, would be entitled to any relief.

2.6    Plaintiffs believe that the claims asserted in their respective Actions have merit

and have examined and considered the benefits to be obtained under this Settlement, the risks

associated with the continued prosecution of this complex and potentially time-consuming

litigation, and the likelihood of ultimate success on the merits, and have concluded that the

Settlement is fair, adequate, reasonable, and in their best interest and the best interests of Eligible

Consumers.

**3.    Confidentiality**

3.1    The Parties must comply with all portions of the Stipulated Third Amended

Protective Order, ECF No. 249 (May 25, 2022), and any other operative protective orders

entered in these Actions, including but not limited to Section 15 of the Stipulated Third

Amended Protective Order, ECF No. 249 (May 25, 2022), which requires the return, destruction,

or deletion of Protected Materials (as defined in that order), subject to archival copies as defined

in paragraph 15 of the Stipulated Third Amended Protective Order, ECF No. 249 (May 25,

2022).  For avoidance of doubt, under the Stipulated Third Amended Protective Order, ECF No.

249 (May 25, 2022), "final disposition of the action" refers to the final disposition of all member

11

cases in MDL No. 2981, *In re Google Play Store Antitrust Litigation*, No. 21-md-2981-JD. Notwithstanding the above, the Leadership Committee of the States and Consumer Counsel will comply with, and ensure compliance by Plaintiffs with, Section 15 of the Stipulated Third Amended Protective Order, ECF No. 249 (May 25, 2022), including the 60-day destruction and certification requirements, after the Effective Date.

3.2     Except as disclosed in the parties' Stipulation With Proposed Order Re Deadlines in Consumers' and States' Actions in Light of Tentative Settlement, ECF No. 596 (September 5, 2023), or as agreed to by the Parties in writing, this Settlement Agreement and its terms shall remain confidential until the Motion for Approval of Notice is filed with the Court.  Before the filing of that motion, the States, Consumer Counsel, and Defense Counsel may disclose this Settlement Agreement and its terms only to their respective clients and their respective experts, who will also maintain the confidentiality of this Settlement Agreement and its terms.

**4.      Amendment of Complaint in State AG Action**

4.1     In connection with the filing of this Settlement Agreement, the States shall seek approval from the Court to file an amended complaint that includes all of the parties identified in Section 1.47.  The amended complaint will track the allegations and claims of the existing operative complaint in the State AG Action, except that it will add the Joining States as plaintiffs, will add parallel federal claims for the Joining States, and may include state law claims for some or all of the Joining States that are parallel to the claims asserted by the Original States. Seven (7) days prior to filing the amended complaint with the Court, the States shall provide a copy to Google.  The States agree to stipulate to suspend any deadline to answer the amended complaint.

**5.      Monetary Consideration**

5.1     In consideration of the releases and dismissals set forth in this Settlement
Agreement, Google agrees to establish:

5.1.1   As described in Section 5.3, a Settlement Fund in the total amount of
$630,000,000 to settle claims of the Settlement Consumers.  The Settlement Fund is being paid
as compensatory restitution in order to settle, in whole or in part, the damages claims of
Settlement Consumers.  Pursuant to Section 5.4.1, notice and claims administration costs, taxes,
any award of Consumer Counsel Attorneys' Fees and Expenses, or other payments authorized by
the Court shall be paid from the Settlement Fund.

5.1.2   A States' Monetary Fund in the total amount of $70,000,000, as described
in Section 5.5, to be distributed directly to the States to settle claims asserted by each State in its
sovereign capacity.

5.2     Google's total financial commitment under this Settlement Agreement
shall be $700,000,000 and shall not exceed that sum for any reason including Attorneys' Fees
and Expenses, litigation costs, costs of settlement administration and notice, any pre-suit or post-
suit investigation costs, or taxes (e.g., taxes on interest generated by the Settlement Fund or the
States' Monetary Fund).  No portion of the Settlement Fund or the States' Monetary Fund shall
revert to or be refunded to Google after the Effective Date.

5.3     <u>Settlement Fund</u>: Google shall establish a Settlement Fund as follows:

5.3.1   Within fifteen (15) days after the later of (a) entry of the Notice Approval
Order or (b) receipt of detailed wire instructions and completed IRS Form W-9, including an
address and tax ID number, Google shall transfer $1,000,000 into the Settlement Fund Escrow
Account for settlement notice and administration.

5.3.2    Within forty-five (45) days after the entry of the Notice Approval Order, Google shall transfer the additional sum of $629,000,000 into the Settlement Fund Escrow Account.

5.3.3    All interest on the funds in the Settlement Fund Escrow Account shall accrue to the benefit of Settlement Consumers, except as specified in Section 5.3.8.  Any interest shall not be subject to withholding and shall, if required, be reported appropriately to the Internal Revenue Service by the escrow agent.  The Settlement Fund Escrow Account is responsible for the payment of all taxes.

5.3.4    The funds in the Settlement Fund Escrow Account shall be deemed a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1 et seq. at all times after the creation of the Settlement Fund Escrow Account. All taxes shall be paid out of the Settlement Fund Escrow Account. Google, Defense Counsel, and Plaintiffs shall have no liability or responsibility for any of the taxes.  The Settlement Fund Escrow Account shall indemnify and hold Google, Defense Counsel, and Plaintiffs harmless for all taxes (including, without limitation, taxes payable by reason of any such indemnification).  For avoidance of doubt, the States take no position on Google's tax liabilities.

5.3.5    The Settlement Administrator or an accountant jointly selected by the Parties shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)). Such returns (as well as the election described in the previous paragraph) shall be consistent with this paragraph and in all events shall reflect that all taxes (including the taxes, any estimated taxes, interest, or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided herein.

5.3.6   Within ten (10) days after the later of the Effective Date or Court approval of the Distribution Plan, the States will direct the Settlement Administrator to distribute funds from the Settlement Fund in accordance with the Distribution Plan and the States' instructions. The Settlement Administrator shall not disburse any portion of the Settlement Fund except as provided in the Distribution Agreement or by order of the Court.

5.3.7   All funds held in the Settlement Fund Escrow Account shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Distribution Agreement or further order of the Court.

5.3.8   <u>Refund Upon Termination.</u> In the event that the Court does not enter the Final Approval Order and Final Judgment or if for any other reason final approval of the Settlement does not occur, is successfully objected to, or successfully challenged on appeal, or the Effective Date is not reached, the remaining Settlement Fund (including accrued interest), less (a) any administration or notice expenses actually incurred, and (b) any amounts and taxes incurred or due and owing and payable from the Settlement Fund in accordance with this Settlement Agreement, shall be refunded to Google.

5.4      <u>Distribution to Settlement Consumers</u>:

5.4.1   After disbursement of any amounts for notice and claims administration costs, taxes, any award of Consumer Counsel Attorneys' Fees and Expenses, or other payments authorized by the Court, all remaining funds in the Settlement Fund shall be distributed according to a Court-approved Distribution Plan, for the benefit of Settlement Consumers.

15

5.4.2    The Distribution Plan shall be submitted to the Court for approval with the Motion for Approval of Notice.  Plaintiffs shall develop the Distribution Plan in consultation with Google.

5.4.3    The Distribution Plan shall not violate any term of this Settlement Agreement.  The terms of this Settlement Agreement shall control in the event there are any conflicting terms in the Distribution Plan.

5.4.4    The Parties agree and understand that any proposed Distribution Plan is to be considered by the Court separate from the Court's consideration of the fairness, reasonableness and adequacy of the settlement set forth in the Settlement Agreement and any order or proceedings relating to the Distribution Plan shall not operate to terminate or cancel the Settlement Agreement or affect the finality of the Final Approval Order, or any other orders entered pursuant to the Settlement Agreement, provided that Google's total financial commitment under this Settlement Agreement shall be $700,000,000.

5.5        States' Monetary Fund:  Google shall establish a States' Monetary Fund as follows:

5.5.1    Within forty-five (45) days after the later of (a) entry of the Notice Approval Order, or (b) receipt of detailed wire instructions and completed IRS Form W-9, including an address and tax ID number, Google shall transfer $70,000,000 into the States' Monetary Fund Escrow Account.

5.5.2    All interest on the funds in the States' Monetary Fund Escrow Account shall accrue to the benefit of the States.  Any interest shall not be subject to withholding and shall, if required, be reported appropriately to the Internal Revenue Service by the escrow agent. The States' Monetary Fund Escrow Account is responsible for the payment of all taxes.

16

5.5.3    The funds in the States' Monetary Fund Escrow Account shall be deemed a "qualified settlement fund" within the meaning of Treasury Regulation § 1.468B-1 et seq. at all times after the creation of the States' Monetary Fund Escrow Account. All taxes shall be paid out of the States' Monetary Fund Escrow Account. Google, Defense Counsel, and Plaintiffs shall have no liability or responsibility for any of the taxes.  The States' Monetary Fund Escrow Account shall indemnify and hold Google, Defense Counsel, and Plaintiffs harmless for all taxes (including, without limitation, taxes payable by reason of any such indemnification).  For avoidance of doubt, the States take no position on Google's tax liabilities.

5.5.4    An accountant jointly selected by the Parties shall timely and properly file all informational and other tax returns necessary or advisable with respect to the States' Monetary Fund (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)). Such returns (as well as the election described in the previous paragraph) shall be consistent with this paragraph and in all events shall reflect that all taxes (including the taxes, any estimated taxes, interest, or penalties) on the income earned by the States' Monetary Fund shall be paid out of the States' Monetary Fund as provided herein.

5.5.5    No disbursement of any portion of the States' Monetary Fund shall be made until after the Effective Date.

5.5.6     All funds held by the States' Monetary Fund Escrow Account shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant Section 5.5.5.

5.5.7    Refund Upon Termination. In the event that the Court does not enter the Final Approval Order and Final Judgment or if for any other reason final approval of the

17

Settlement does not occur, is successfully objected to, or successfully challenged on appeal, or the Effective Date is not reached, the States' Monetary Fund (including accrued interest), less any amounts and taxes incurred or due and owing and payable from the States' Monetary Fund in accordance with this Settlement Agreement, shall be refunded to Google.

5.6 The monetary payment to the States shall be apportioned among the States at their sole discretion. The payment may be used for any one or more of the following purposes, by the States' Attorneys General as they, in their sole discretion, see fit:

5.6.1 antitrust or consumer protection law enforcement;

5.6.2 deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account), for use in accordance with the state laws governing that account;

5.6.3 deposit into a fund exclusively dedicated to assisting state attorneys general enforce the antitrust laws by defraying the costs of a) experts, economists, and consultants in multistate antitrust investigations and litigation, b) training or continuing education in antitrust for attorneys in state attorney general offices, or c) information management systems used in multistate antitrust investigations and litigation;

5.6.4 payment of States' Attorneys' Fees and Expenses;

5.6.5 or for any other purpose as the attorneys general deem appropriate, consistent with the various states' laws.

**6. Commitments**

6.1 In consideration of the releases and dismissals set forth in this Settlement Agreement, Google makes the following commitments.

6.2 <u>App Distribution on Android</u>

18

6.2.1    For a period of at least seven (7) years from the Effective Date, Google shall continue to technically enable Android to allow the installation of third-party apps on Mobile Devices through means other than Google Play, including through third party app stores, provided that Google may implement reasonable restrictions that are tailored to protect user privacy, security and/or safety.

6.3    <u>User Choice Billing in the United States</u>

6.3.1    For a period of at least five (5) years from the Effective Date, subject to program guidelines (or other comparable UCB requirements), Google will give developers that choose to sell in-app digital goods and services the option to add an alternative in-app billing system alongside Google Play's billing system for their Users. At checkout, Users will be able to choose which in-app billing system to use. Specifically:

(a)    Developers can offer an alternative in-app billing option to Users next to Google Play's billing system;

(b)    Developers can encourage Users to choose their billing service through offering different pricing or promotion options (*e.g.* discounts);

(c)    Developers' alternative billing service will need to meet Google's minimum requirements and user experience guidelines (or other comparable UCB requirements) tailored to protect Users (e.g., privacy, security and/or safety);

(d)    Users choose which billing option to use via a neutral choice screen as described in Google's minimum requirements and user experience guidelines or other comparable UCB requirements.

19

6.3.2    If Google chooses to impose a service fee based on purchases made through an alternative billing service, it will require from developers the minimum amount of data necessary to support the offering of an alternative billing system and for collection of its service fee.  Google will not use this data for purposes of competing with those developers' apps.

6.4    <u>Price Parity Provisions</u>

6.4.1    For a period of at least five (5) years from the Effective Date, Google will not enter into any new agreement or enforce any provision of any existing agreement that commits a developer that distributes apps to Mobile Devices through Google Play to set prices for in-app purchases of digital goods and services sold using Google Play's billing system at a level that is equal to or more favorable than prices set for digital goods and services sold using other in-app billing systems or means of digital distribution on Mobile Devices.

6.5    <u>Title Launch and Feature Parity Provisions</u>

6.5.1    For a period of at least four (4) years from the Effective Date, Google will not enter into any new agreement or enforce any provision of any existing agreement that commits a developer to:

(a)    Launch their titles on Google Play for Users at the same time or earlier than any other app store for Mobile Devices, or;

(b)    Offer their titles on Google Play for Users with the same or better features as compared to any other app store for Mobile Devices.

6.5.2    Notwithstanding this commitment, Google may enter into an agreement with a developer that contains these types of provisions:

(a)    on an app-by-app basis; and/or

20

(b)     after two (2) years from the Effective Date, if such provisions concern alternative app stores owned or controlled by a company with annual revenues exceeding $100 billion.

6.6     <u>OEM Deals with Preload Exclusivity or Home Screen Exclusivity for Play</u>

6.6.1   For a period of at least five (5) years from the Effective Date, Google will not enter into any new agreement or enforce any provision of any existing agreement with the purpose or effect of securing preload exclusivity or home screen exclusivity of Google Play on a Mobile Device.

6.7     <u>Installer Rights</u>

6.7.1   For a period of at least four (4) years from the Effective Date, Google will not enter into any new agreement or enforce any provision in an existing agreement under which an OEM would be prevented from granting installer rights (i.e. the INSTALL_PACKAGES permission) to preloaded applications on their Mobile Devices, whether with or without Google's consent; provided, however, that Google may take reasonable steps that are tailored to protect user privacy or security.

6.7.2   For avoidance of doubt:

(a)     This provision does not prevent Google from enforcing generally applicable policies relating to content and functionality (e.g., inappropriate or illegal content, gambling and crypto mining functionality).

(b)     Google may adopt neutral user experience requirements that apply to all pre-installed app stores (including Google Play) so long as the purpose of those requirements is to protect the user experience

21

and the requirements are not designed to disadvantage other app stores.

6.8         <u>OEM Preload of Third-Party App Stores</u>

6.8.1    For a period of at least five (5) years from the Effective Date, Google shall not require its "consent" before an OEM preloads a third-party app store on a Mobile Device; provided, however, that Google may take reasonable steps that are tailored to protect user privacy or security. Google shall not reject a Mobile Device build on the basis of an OEM's inclusion of a third-party app store on the Mobile Device.

6.8.2    For avoidance of doubt:

(a)     This provision does not prevent Google from enforcing generally applicable policies relating to content and functionality (e.g., inappropriate or illegal content, gambling and crypto mining functionality).

(b)     Google may adopt neutral user experience requirements that apply to all pre-installed app stores (including Google Play) so long as the purpose of those requirements is to protect the user experience and the requirements are not designed to disadvantage other app stores.

6.9         <u>Third-Party App Stores on Android</u>

6.9.1    For a period of at least four (4) years from the Effective Date, Google will maintain functionality in Android such that if a third-party app store is sideloaded on a Mobile Device running on Android version 12+ and the User has allowed app installs from that source, that app store may update apps that it installs without the User needing to approve the updates.

22

6.9.2   For a period of at least four (4) years from the Effective Date, Google will maintain the following functionality in Android version 14+ for Mobile Devices:

    (a)    Google will support APIs that enable sideloaded app stores that have received User consent to install apps to avoid automatic updates taking place while the User is using the app.

    (b)    Google will support APIs that allow Users to confirm the installation of apps from a sideloaded app store before the app download begins; i.e., without having to wait until each app's download is complete.

    (c)    Preinstalled and sideloaded app stores will be able to maintain exclusive "update rights" to an app that they have installed; *i.e.*, the app store that originated the download may specify that updates to an installed app must come from its store unless the User agrees to allow an update from another source, provided however that Google may permit developers to opt out of this functionality.

    (d)    Sideloaded app stores that have received User consent to install apps may install feature splits, which allows for parts of an app to be downloaded on demand when the User decides to use a particular feature of the app. This avoids having to download the full app up-front.

6.10   <u>Sideloading</u>

6.10.1  For a period of at least five (5) years from the Revised Sideloading Implementation Date, Google will revise Android's Default Sideloading Flow for new versions of Android on Mobile Devices as follows:

(a)  The Revised Default Sideloading Flow shall combine into a single screen the following two screens in Android's default sideloading flow: (1) the pop-up with the default text "For your security, your phone currently isn't allowed to install unknown apps from this source. You can change this in Settings" and (2) the subsequent "Install unknown apps" screen that allows the user to enable sideloading from the specified source, such that a User is not required to visit the device's settings to enable sideloading.

(b)  The language in the Revised Default Sideloading Flow shall be accurate, but may clearly warn Users that there may be risks from sideloading.

(c)  The States agree that Google may use the following language (including foreign translations) or its substantial equivalent: "Your phone currently isn't configured to install apps from this source. Granting this source permission to install apps could place your phone and data at risk."

6.10.2  Nothing in Section 6.10 is intended to restrict Google's ability to continue to innovate on security and privacy related to sideloading; however, to the extent Google maintains a Revised Default Sideloading Flow in Mobile Devices, any such Google innovations or changes to that default sideloading flow must not materially increase the complexity or burden

24

of the flow except to the extent necessary to warn Users of legitimate risks of sideloading. For

the avoidance of doubt, Google cannot introduce additional material complexity or burden into

the Revised Default Sideloading Flow solely because an app was sideloaded, as opposed to being

downloaded from Google Play.

      6.10.3  This Section 6.10 applies only to the Default Sideloading Flow and

Revised Default Sideloading Flow in Mobile Devices and not to other security features such as

Google Play Protect or the Advanced Protection Program.

      6.11      <u>Anti-Steering</u>

      6.11.1  For a period of at least five (5) years from the Effective Date, Google shall

allow all developers who choose to participate in Google's User Choice Billing program and

offer an alternative in-app billing system, as described in Section 6.3 and subject to the

requirements therein, to:

> (a)     inform Users within the app about different pricing or promotions
> that may be available if the User uses the developer's alternative
> in-app billing system, and;

> (b)     allow Users who choose the developer's alternative in-app billing
> system to complete transactions using the developer's existing
> web-based billing solution in an embedded webview within its app.

      6.11.2  For a period of at least six (6) years from the Effective Date, Google shall

continue to allow developers to use contact information obtained outside the app or in-app (with

User consent) to communicate with Users out-of-app, including to promote alternatives to

Google Play's billing system.

6.11.3  For a period of at least six (6) years from the Effective Date, Google shall allow developers who choose to offer consumption only apps (i.e., apps that do not enable Users to purchase access to digital goods and services from within the app) to provide Users with accurate information within the app that informs Users about purchasing options outside the app including price information (without a hyperlink) (e.g., "Available on our website for $9.99").

6.11.4  Google shall allow developers who choose to offer non-consumption only apps (i.e., apps that enable Users to purchase access to digital goods and services from within the app) to provide Users with the same "calls to action" inside their apps that Apple is required to allow as a result of the injunction entered in *Epic v. Apple*.

(a)     Notwithstanding the foregoing, Google is not required to allow developers to include links that take a User outside an app distributed through Google Play to make a purchase and Google's obligations under this provision shall not exceed the following: allowing developers to provide Users with accurate information within the app that informs Users about purchasing options outside the app, including price information. E.g., "Available on our website for $9.99."

(b)     If the commitment in Section 6.11.4 goes into effect, Google will comply 6 months after Apple has complied with the *Epic v. Apple* injunction or 3 months after the Effective Date, whichever is later.

(c)     If the commitment in Section 6.11.4 goes into effect, Google may require developers to adhere to reasonable user experience and security guidelines, so long as those guidelines do not prohibit the

developer from providing the calls to action that Google is required
to allow by Section 6.11.4.

(d)     In the event that Google and the States disagree regarding the
meaning or implications of the *Epic v. Apple* injunction, they will
meet and confer.  If they are unable to reach agreement, either side
may petition the Court for a determination as to what Google's
obligations are with respect to the commitment in Section 6.11.4,
except that Google's obligations shall not exceed the limitations
specified in Section 6.11.4(a).

(e)     If the commitment in Section 6.11.4 goes into effect, Google will
abide by the commitment for a period of at least five (5) years
from the date Google complies under Section 6.11.4(b), but in no
event shall that period extend more than seven (7) years from the
Effective Date.

6.11.5  For a period of at least six (6) years from the Effective Date, Google shall
not prohibit developers from disclosing to Users any service or other fees associated with the
Google Play or Google Play's billing system.  Google may impose certain reasonable design
limitations using its developer and User Choice Billing policies, but it may not prevent
developers from communicating the existence and amount of any service or other fees.

6.12        Compliance

6.12.1  Where these commitments require Google to take or not take any action,
Google may not (i) offer any inducement (whether or not monetary) to any third party, (ii)
impose a term or condition of accessing a Google product or service, or (iii) make a

27

technological change, if such inducement, term or condition, or technological change would have the purpose and effect of violating the commitment.

**7.**         **Independent Compliance Professional**

    7.1     <u>Independent Compliance Professional</u>

        7.1.1    The ICP shall be named in an addendum to this Settlement Agreement prior to this Settlement being filed with the Court.

        7.1.2    If the ICP named in Section 7.1.1 does not finish his or her term as ICP, Google shall propose a new candidate for ICP. Google's proposal shall be subject to approval by the States, which shall not be unreasonably withheld. If Google and the States are unable to agree on a new ICP they will submit the matter to a private neutral decision maker for resolution.

    7.2     <u>Preparation of Compliance Reports</u>

        7.2.1    Google will prepare reports evaluating its compliance with the provisions in Section 6 of this Settlement Agreement. The reports will include an Initial Report, Annual Reports, and a Final Report ("Reports").

        7.2.2    Each Report should include, at a minimum, an explanation of any substantive changes or modifications covered by the following provisions of Section 6 of this Settlement Agreement: the reasonable restrictions that are tailored to protect user privacy and security (*see* Sections 6.2.1, 6.7.1, 6.8.1); any program guidelines referenced in this Settlement Agreement (*see* Section 6.3.1); any generally applicable policies relating to content and functionality referenced in Section 6 of this Settlement Agreement (*see* Sections 6.7.2, 6.8.2); any innovations and changes to Android's default sideloading warnings, including screenshots of each warning (*see* Section 6.10.2); the data being collected pursuant to the user-choice billing program (*see* Section 6.3.2); any reasonable user experience and security guidelines referenced

in Section 6 of this Settlement Agreement (*see* Sections 6.3.1(c), 6.3.1(d), 6.11.4); and any

design limitations referenced in Section 6 of this Settlement Agreement (*see* section 6.11.5).

These explanations should, wherever possible, incorporate the actual language from the

guidelines or policies and/or include depictions of any user-facing design elements and/or

language.

      7.2.3   Google will provide these Reports to the ICP along with documentation

reasonably necessary to support its assertions of compliance.  The ICP will then evaluate the

accuracy of assertions in the Reports.

      7.2.4   Google will cooperate fully with the ICP to allow the ICP to fulfill its

functions.  The ICP may ask Google for information reasonably necessary to evaluate the

accuracy of Google's assertions in the Reports, and Google will confer with the ICP on its

request and promptly provide information requested by the ICP that is reasonably necessary to

evaluate the accuracy of Google's assertions in the Reports including—to the extent reasonably

necessary to evaluate the accuracy of Google's assertions in the Reports—information from

Google personnel, books and/or records. For avoidance of doubt, nothing in this provision should

be read to suggest that the ICP must or should seek information from Google personnel.

      7.2.5   The States may refer credible complaints to the ICP if, as a result of those

complaints, the States have a good faith basis to believe that Google has materially breached one

of the provisions identified in Section 6.  The Leadership Committee of the States shall

determine in good faith whether the States deem a complaint credible.  Any complaint referred to

the ICP shall simultaneously be provided to Google.  If the ICP agrees that a complaint referred

by the States is credible, the ICP may consider the issues raised in the complaint in evaluating

the accuracy of Google's assertions in its next Report. The States reserve all rights to investigate any potential compliance deficiencies directly.

7.2.6    Upon the completion of its review, the ICP shall prepare an addendum (the "ICP Addendum") to Google's Reports that includes (1) the ICP's evaluation regarding Google's assessment of its compliance and (2) the ICP's confirmation that the ICP has consulted with Google and that Google has fully cooperated with the ICP's review.

7.2.7    The Report, along with the ICP Addendum, will be provided to the States.

7.2.8    The Initial Report will be drafted and provided to the ICP within 120 days of the Effective Date. The Annual Report will be drafted and provided to the ICP in 12-month intervals following the issuance of the Initial Report. The Final Report will be submitted to the ICP approximately five (5) years after the Effective Date.

7.3    <u>Staffing and Compensation</u>

7.3.1    If it is reasonably necessary for the ICP to retain additional personnel to discharge the ICP's functions, then the ICP may retain personnel who have the appropriate professional qualifications. Any such retention will be subject to Google's approval, which shall not be unreasonably withheld. The personnel retained by the ICP shall not have any conflicts unless the Parties choose to waive any such conflicts.  Any conflicts are only attributable to the person who is conflicted and not to the entire firm or institution that employs the conflicted person.  For purposes of this Section, a person is presumed to have a conflict if he/she:

(a)    is a current or former employee of Google, Epic Games, or Match Group, Inc. (or subsidiary thereof);

(b)    is a current employee of a State or a Potentially Interested Party;

30

(c)     has been, within the 12 months prior to being retained by the ICP, an employee of a State or a Potentially Interested Party;

(d)     is a current business consultant, or otherwise involved in competitive decision-making, for Google, Epic Games, Match Group, Inc. (or subsidiary thereof), or a Potentially Interested Party;

(e)     has been, within the 12 months prior to being retained by the ICP, a business consultant, or otherwise involved in competitive decision-making, for Google, Epic Games, Match Group, Inc. (or subsidiary thereof), a Potentially Interested Party;

(f)     is or has been an expert retained by any party to MDL No. 2981, In re Google Play Store Antitrust Litigation, No. 21-md-2981-JD, in the U.S. litigation or any foreign proceeding;

(g)     at the time of retention, is anticipated to become (1) an employee of Google, Epic Games, Match Group, Inc. (or subsidiary thereof), a State, or a Potentially Interested Party; (2) a business consultant, or to be otherwise involved in competitive decision making, for Google, Epic Games, Match Group, Inc. (or subsidiary thereof), or one of a Potentially Interested Party; or (3) an expert for Google, Epic Games, Match Group, Inc. (or subsidiary thereof), or a State in any U.S. or foreign proceeding on issues related to Google Play or Android.

7.3.2    If the ICP learns that a person he/she has retained is anticipating to become, or has become (1) an employee of Google, Epic Games, Match Group, Inc. (or subsidiary thereof), or a State; (2) a business consultant, or to be otherwise involved in competitive decision making, for Google, Epic Games, Match Group, Inc. (or subsidiary thereof), or one of Google's competitors; or (3) an expert for Google, Epic, Match Group, Inc. (or subsidiary thereof), or a State on issues related to Google Play or Android, the ICP shall promptly disclose the information to Google and the States.

7.3.3    The ICP is at the cost and expense of Google.

(a)    Google will pay the reasonable compensation and expenses of the ICP and approved persons retained by the ICP that are incurred in performing the ICP's functions under this Settlement Agreement. The ICP will be compensated consistent with rates or fees based on market rates.

7.4    <u>Confidentiality</u>

7.4.1    The ICP and ICP Staff will be subject to a confidentiality agreement drafted by Google and subject to approval by the Leadership Committee of the States, which shall not be unreasonably withheld, that will ensure the following:

(a)    The ICP and ICP Staff will maintain the confidentiality of all information and documents provided by Google ("materials"). Such information shall not be disclosed to anyone other than as specified in the confidentiality agreement or this Settlement Agreement.

32

(b)     The ICP and ICP Staff shall maintain the materials securely, and Google shall have the right to approve the location and safety measures for storage, such approval not to be unreasonably withheld.

(c)     The ICP and ICP Staff shall destroy all materials at the conclusion of the ICP's retention or the length of the Commitment in Section 6 that such material concerns, whichever is earlier.

(d)     The ICP and ICP Staff may disclose materials if legally required to do so as a result of a Court order, subpoena, or equivalent legal compulsion.  But if the ICP or ICP Staff is served with legal process, it shall immediately notify Google and shall give Google an opportunity to object/intervene.

7.4.2    The States agree that all Reports and supporting information, including any ICP Addenda, are highly confidential and cannot be disclosed, other than as may be ordered by a Court in any subsequent proceeding related to this settlement or as otherwise may be required by state law.  If a Report or ICP Addendum must be filed with the Court, the States agree that it will be designated "Highly Confidential," and will be placed conditionally under seal in accordance with Local Rule 79-5.  To the extent permitted by state law, the States shall treat any Reports and supporting information as exempt from disclosure under the relevant public records laws of each State and shall otherwise refrain from sharing or disclosing such Reports and supporting information.  In the event that a State receives a request seeking disclosure of any of the Reports or supporting information described in this Settlement Agreement and believes that such information is subject to disclosure under the relevant laws of

that State, the State agrees to provide Google with at least thirty (30) days advance notice before

producing the information, if permitted by the State's laws.  For the avoidance of doubt, if state

law does not allow a State to provide notice 30 days in advance of disclosure, that State shall

provide whatever advance notice, if any, is permitted under the applicable state law.  For the

further avoidance of doubt, Google may take appropriate action to defend itself against the

disclosure of such information.

7.4.3    Google shall not be required to disclose non-public source code or user

data containing personally identifiable information absent a showing from the ICP that there is

no other feasible way to obtain information reasonably necessary for the ICP to evaluate the

accuracy of Google's Reports. Any such information shall be kept strictly confidential and shall

be disclosed to the ICP and/or ICP Staff under terms and conditions that ensure the protection of

such information.

7.4.4    Under no circumstances shall Google be required to disclose information

that is privileged, including under the attorney-client privilege or information that Google is

prohibited from disclosing by law.

7.4.5    Google will provide information protected by an NDA only after

providing appropriate notice to the NDA counterparty.

7.5      <u>Only Express Authority</u>

7.5.1    The ICP has no authority not expressly provided herein and has no

authority to supplant any law of the United States or any State, or the specifics of any order by

any court.

7.5.2    The States retain all rights to determine whether they believe a violation of

the settlement has occurred and to take whatever action they deem appropriate. The ICP shall not

have the authority to direct Google to make any changes to comply with the Settlement, to alter Google's business practices or policies, or to participate in the business activities or management of Google.

7.6     The ICP will function for five (5) years from the Effective Date. Provisions in Section 6 with shorter durations will not be subject to this ICP provision once they have expired.

**8.     Notice and Settlement Administration**

8.1     The States shall seek appointment of a Settlement Administrator as part of the Notice Approval Order.  Subject to Court approval, the Settlement Administrator shall provide settlement notice and administration services, in accordance with the terms of this Settlement Agreement and as ordered by the Court in the Notice Approval Order.  As provided in Section 5.4.1, the reasonable costs of notice and the costs of administering the Settlement shall be paid out of the Settlement Fund.  Google shall not have any liability to any person or entity for the administration of the Settlement, receiving and responding to any inquiries from Eligible Consumers, or disbursement of the money in the Settlement Fund.

8.2     The Motion for Approval of Notice, as contemplated in Section 10.3, shall include a proposed form of, method for, and date of dissemination of Notice, which shall be drafted by Plaintiffs in consultation with Google.

8.3     Individual notice of the Settlement shall be provided as described in the Motion for Approval of Notice and as approved by the Court, with all expenses paid from the Settlement Fund.  The Motion for Approval of Notice shall recite and ask the Court to find that the notice program constitutes valid, due, and sufficient notice to Eligible Consumers, constitutes the best notice practicable under the circumstances, and complies fully with any requirements under federal or state law.

8.4     The Parties agree to propose to the Court at least the following forms and methods of notice to Eligible Consumers:

8.4.1    A copy of the Notice, the Settlement Agreement, the motions for the Final Approval Order and Final Judgment, and Court orders pertaining to the Settlement shall be posted and available for download on the Settlement Website maintained by the Settlement Administrator.

8.4.2    The Settlement Administrator shall send a copy of the Summary Notice to the email addresses, to the extent reasonably available, for Eligible Consumers who are or reasonably may be covered by the Settlement. The electronic version of the Summary Notice and Notice shall contain a direct link to the Settlement Website.

8.4.3    To facilitate the distribution of Notice, within thirty (30) days from the date the Motion for Approval of Notice is filed, Google shall provide the Settlement Administrator with the names and email addresses, to the extent reasonably available, for the Eligible Consumers who are or reasonably may be covered by the Settlement.

8.4.4    The names and email addresses disclosed to the Settlement Administrator, as described in Section 8.4.3, shall be provided to the Settlement Administrator solely for the purposes of providing notice, processing requests for exclusion, and administering payment.  The Settlement Administrator shall take all reasonable steps to ensure that all such information is used solely for the purpose of administering this Settlement.

8.4.5    The Settlement Administrator shall commence disseminating notice by the Notice Date.  If, despite using best efforts, the Settlement Administrator is unable to commence disseminating notice by the Notice Date, the Settlement Administrator shall inform the parties of

36

the status of the dissemination of notice and notify the parties when dissemination of notice has been commenced.

        8.4.6   In addition to the notice required by the Court, the parties may jointly agree to provide additional notice to Eligible Consumers covered by the Settlement.

    8.5    If the notice plan proposed in the Motion for Approval of Notice is not approved, or is modified in a material way by the Court, the Parties agree to work together to devise a revised notice plan that effectuates the intent of the Settlement.

## 9.    Process for Opting Out of Settlement

    9.1    The Notice shall provide a procedure and an opt-out deadline by which Eligible Consumers covered by the Settlement may exclude themselves from the Settlement.  Any Eligible Consumer who does not timely and validly request exclusion shall be bound by the terms of this Settlement. As soon as practicable after the opt-out deadline, the Settlement Administrator shall provide the Court and the parties with a list of Eligible Consumers who timely and validly requested exclusion from the Settlement.

## 10.    Court Approval

    10.1    The Parties will notify the Court by October 12, 2023 that this Settlement Agreement has been signed and will request that the Court vacate the trial date for the Actions. The Parties agree that the Plaintiffs shall submit this Settlement Agreement to the Court and shall apply for entry of the Notice Approval Order after the Parties have notified the Court that this Settlement Agreement has been signed.

    10.2    The Parties agree to recommend approval of the Settlement to the Court as fair and reasonable, and to undertake their best efforts to obtain approval of the Settlement. "Best

efforts" includes that the Parties may not oppose any application for appellate review by one of the Parties in the event the Court denies preliminary or final approval.

10.3      The States shall draft the Motion for Approval of Notice requesting issuance of the Notice Approval Order, and shall provide that draft to Defense Counsel at least seven (7) days prior to filing it.

10.4      In accordance with the schedule set in the Notice Approval Order, the States shall draft the motion for Final Approval Order and Final Judgment and shall provide that draft to Defense Counsel at least seven (7) days before filing such motion with the Court.

10.5      In the event that the Settlement is not approved (following the exhaustion of any appellate review), then (a) this Settlement Agreement shall be null and void and of no force or effect; (b) any payments made to the Settlement Fund Escrow Account and the States' Monetary Fund Escrow Account, including any and all interest earned thereon less monies expended toward settlement administration, notice, and taxes shall be returned to Google within 45 days from the date the Settlement Agreement becomes null and void; (c) any and all releases in this Settlement Agreement shall be of no force or effect; and (d) neither the Settlement Agreement nor any facts concerning its negotiation, discussion, terms, or documentation shall be referred to or used as evidence or for any other purpose whatsoever in the Actions or in any other action or proceeding. In such event, the Actions will proceed as if no settlement had been attempted; the Parties shall be returned to their respective litigation positions existing on September 5, 2023, so that the Parties may take any litigation steps that they otherwise would have been able to take absent the pendency of this Settlement; and the Parties will discuss whether any adjustments are needed in the schedules for their respective Actions.

**11.      Released Claims and Dismissal of Actions**

11.1    In consideration of the monetary provisions and commitments contained in this Settlement Agreement, and as of the Effective Date, each State will be deemed to have fully, finally, and forever released the Released Parties from all Claims that were asserted in the State AG Action or could have been asserted by each State's Attorney General in his or her sovereign capacity as chief law enforcement officer of his or her respective State.

11.2    In further consideration of the monetary provisions and commitments contained in this Settlement Agreement, and as of the Effective Date, each State will be deemed to have fully, finally, and forever released the Released Parties from all federal Claims that were asserted in the State AG Action or could have been asserted by or on behalf of any Settlement Consumer, including, but not limited to, Claims brought under 15 U.S.C. §15c.

11.3    In further consideration of the monetary provisions and commitments contained in this Settlement Agreement, and as of the Effective Date, to the extent allowable by law, each State will be deemed to have fully, finally, and forever released the Released Parties from all other Claims that were asserted in the State AG Action or could have been asserted by or on behalf of any Settlement Consumer, including, but not limited to, any state law Claims that were asserted or could have been asserted by a State acting as *parens patriae* for consumers in its respective State.

11.4    In further consideration of the monetary provisions and commitments contained in this Settlement Agreement, and as of the Effective Date, each Individual Plaintiff and their respective heirs, executors, administrators, representatives, agents, partners, successors, and assigns will be deemed to have fully, finally, and forever released the Released Parties from all Claims that were asserted or could have been asserted by any such Individual Plaintiff.

11.5 Notwithstanding the foregoing, with respect to the States only, the releases in this Settlement do not include a claim asserted by a State that is currently pending against Google in:

11.5.1 *State of Colorado, et al. v. Google LLC*, No. 1:20-cv-03715-APM (D.D.C.);

11.5.2 *State of Ohio ex rel. Yost v. Google LLC*, No. 21 CVH 06 0274 (Delaware County (Ohio) Court of Common Pleas);

11.5.3 *State of Texas v. Google LLC*, No. 22-01-88230-D (377th Judicial District Court, Victoria County, Texas);

11.5.4 *State of Texas v. Google LLC*, No. CV-58999 (385th Judicial District Court, Midland County, Texas);

11.5.5 *State of Texas, et al. v. Google LLC*, No. 1:21-cv-06841-PKC (S.D.N.Y.); *State of Texas, et al. v. Google LLC*, No. 4:20-cv-00957 (E.D. Tx.); *In re Google Dig. Advert. Antitrust Litig.*, MDL No. 3010;

11.5.6 *United States of America, et al. v. Google LLC*, No. 1-20-cv-03010 (D.D.C.);

11.5.7 *United States et al v. Google LLC*, 1:23-cv-00108-LMB-JFA (E.D. Va.);

11.5.8 Any ongoing investigation where Google has received civil investigatory demands, subpoenas or other compulsory process from any State. For avoidance of doubt, this carveout does not affect a release of (1) the claims actually asserted in the Actions and (2) claims that could have been asserted and arise from the identical factual predicate of claims in the Actions.

11.6 For avoidance of doubt, the releases in this Settlement do not include consumer protection claims, antitrust claims, or non-antitrust claims that do not arise from the factual

allegations or claims in the Actions. Nothing herein precludes law enforcement or the State from pursuing any law enforcement action with respect to any unrelated acts or practices not covered by this Settlement Agreement.

11.7     Covenant Not to Sue:

11.7.1   In further consideration of the monetary provisions and commitments contained in this Settlement Agreement, as of the Effective Date, each State's Attorney General covenants and agrees, to the fullest extent permitted by law, that he or she shall not hereafter seek to sue the Released Parties on any Released Claim on behalf of the Attorney General or any other person or entity or class thereof.

11.7.2   In further consideration of the monetary provisions and commitments contained in this Settlement Agreement, as of the effective date, each Individual Plaintiff covenants and agrees, to the fullest extent permitted by law, that he or she shall not hereafter seek to sue the Released Parties on any Released Claim on behalf of himself or herself or any other person or entity or class thereof.

11.8     In further consideration of the monetary provisions and commitments contained in this Settlement Agreement, it is the intent of the Parties that the Final Approval Order shall be deemed *res judicata* as to any such Released Claim.

11.9     After entering into this Settlement, the Settlement Consumers and/or Plaintiffs may discover facts other than, different from, or in addition to, those that they know or believe to be true with respect to the Claims released by this Settlement, but they intend to release fully, finally and forever any and all such Claims. This provision shall not expand the scope of the Released Claims into a general release. The Settlement Consumers and Plaintiffs expressly agree

that, upon the Effective Date, they waive and forever release any and all provisions, rights, and benefits conferred by:

(a) Section 1542 of the California Civil Code, which reads:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

(b) any law of any state, territory, or possession of the United States (or for any non-U.S. entity or person, their respective country, province, or state), or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

11.10   Upon the Effective Date, it is the intent of the Parties that the Actions shall be dismissed with prejudice.  The Leadership Committee for the States and Consumer Counsel shall have the responsibility for ensuring that the Actions are dismissed with prejudice in accordance with the terms of this Settlement.

11.11   Notwithstanding the foregoing, the release shall not include any claims relating to the continued enforcement of the Settlement or the Stipulated Third Amended Protective Order, ECF No. 249 (May 25, 2022), or any other operative protective order in the Actions.

11.12   The Court shall retain jurisdiction for the purposes of construction, modification, and enforcement of this Settlement Agreement.  In the event that any applications for relief are made, such applications shall be made to the Court.  To avoid doubt, the Final Judgment applies

to and is binding upon the Parties, the Settlement Consumers, and their respective heirs,
successors, and assigns.

**12.     Statements Regarding Liability; Use of Settlement Agreement in Future
Proceedings**

12.1     Google has indicated that, absent this settlement, it intends to vigorously contest
each and every Claim in the Actions, and Google denies all of the material allegations in the
Actions.  Google enters into this Settlement Agreement without in any way acknowledging any
fault, liability, or wrongdoing of any kind.  Google nevertheless has decided to enter into this
Settlement to avoid further expense, inconvenience, and the distraction of burdensome and costly
litigation; to obtain the releases, orders, and judgment contemplated by this Settlement
Agreement; and to provide users and developers more flexibility and choice while protecting
user safety and security, maintaining Google's ability to invest in the Android ecosystem, and
ensuring Google's ability to compete effectively with other platforms, including iOS.

12.2     The States and Individual Plaintiffs indicate that, absent this settlement, they
intend to vigorously prosecute each and every Claim in the Actions and prove all material
allegations in the Actions.  The States and Individual Plaintiffs enter into this Settlement
Agreement while maintaining that Google was at fault, liable and committed all the wrongdoing
alleged in the Actions.  The States and Individual Plaintiffs nevertheless have decided to enter
into this Settlement to avoid further expense, inconvenience, and the distraction of burdensome
and costly litigation; to obtain the relief, orders, and judgment contemplated by this Settlement
Agreement; and to provide users and developers more flexibility and choice while protecting
user safety and security, maintaining Google's ability to invest in the Android ecosystem, and

43

ensuring Google's ability to compete effectively with other platforms, including iOS, all of which are accomplished by the Settlement Agreement.

12.3    Neither this Settlement Agreement, nor any of its terms or provisions, nor any of the negotiation or proceedings connected with it, shall be construed as an admission or concession by Google of the truth of any of the allegations in the Actions, or of any liability, fault, or wrongdoing of any kind.

12.4    To the extent permitted by law, this Settlement Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction against, any action, suit, or other proceeding which may be instituted, prosecuted, or attempted for Claims, causes of action, and/or theories of relief covered by the covenant not to sue and/or the releases in this Settlement Agreement.

**13.    Modification or Termination of the Settlement**

13.1    Google or the States may, at its sole discretion, terminate this Settlement Agreement if the number of Eligible Consumers who seek exclusion from the Settlement exceeds ten percent (10%) of the total number of Eligible Consumers covered by the Settlement.

13.2    The terms and provisions of this Settlement Agreement may be amended, modified, or expanded by written agreement of the Parties and approval of the Court; provided, however, that after entry of the Final Approval Order and Final Judgment, the Parties may by written agreement effect such amendments, modifications, or expansions of this Settlement Agreement and its implementing documents (including all exhibits) without further notice to Settlement Consumers or approval by the Court if such changes are consistent with the Court's Final Approval Order and Final Judgment and do not materially alter, reduce, or limit the rights of Settlement Consumers.

13.3    If any of the non-monetary terms of the Settlement Agreement are affected by a change in legislation, regulation, law, court or agency order, or any material change in circumstances (e.g., a material, legitimate change in business model), Google and the States agree to meet and confer in good faith regarding an appropriate modification of the Settlement Agreement.  If Google and the States cannot agree on a modification, each side reserves the right to petition the Court for a change to the Settlement Agreement.

13.4    In the event the terms or conditions of this Settlement Agreement, other than terms pertaining to the Distribution Plan, are materially modified by any court, the States and/or Google may within thirty (30) days of such material modification, declare this Settlement null and void as provided in Section 10.5.  For purposes of this paragraph, material modifications include any modifications to the definitions of the Released Parties, the scope of the releases (as provided in Section 11), the amount of monetary relief (as provided in Section 5), and the terms of the commitments (as provided in Section 6).  In the event of any modification by any court, and in the event the Parties do not exercise their options to withdraw from this Settlement, the Parties shall meet and confer within fourteen (14) days of such modification to attempt to reach an agreement as to how best to effectuate the court-ordered modification.

13.5    If the Effective Date is not reached, this Settlement Agreement is without prejudice to the rights of any party hereto, and all terms, negotiations, and proceedings connected therewith shall not be deemed or construed to be an admission by any Party or evidence of any kind in these Actions or any other action or proceeding.

## 14.    Notices

14.1    All notices to the States shall be delivered via electronic mail (or if undeliverable via electronic mail, via overnight delivery) to:

Brian Wang
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
Brian.Wang@doj.ca.gov

Elinor R. Hoffman
Bryan L. Bloom
Morgan J. Feder
Benjamin Cole
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Elinor.Hoffmann@ag.ny.gov
Bryan.Bloom@ag.ny.gov
Morgan.Feder@ag.ny.gov
Benjamin.Cole@ag.ny.gov

Jessica V. Sutton
North Carolina Department of Justice
P.O. Box 628
Raleigh, NC 27602
jsutton2@ncdoj.gov

David McDowell
Ethan Bowers
Tennessee Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
David.McDowell@ag.tn.gov
Ethan.Bowers@ag.tn.gov

David N. Sonnenreich
Office of the Utah Attorney General
160 E 300 S, 5th Floor
Salt Lake City, Utah 84114
Email: dsonnenreich@agutah.gov

14.2   All notices to the Individual Plaintiffs shall be delivered via electronic mail to:

Karma Giulianelli
Karma.Giulianelli@BartlitBeck.com

46

Bartlit Beck LLP

Hae Sung Nam
HNam@kaplanfox.com
Kaplan Fox & Kilsheimer LLP

Nanci E. Nishimura
nnishimura@cpmlegal.com
Cotchett, Pitre & McCarthy, LLP

George A. Zelcs
gzelcs@koreintillery.com
Korein Tillery LLC

Peggy Wedgworth
PWedgworth@milberg.com
Milberg Coleman Bryson, Phillips Grossman, PLLC; and

Elizabeth Pritzker
ecp@pritzkerlevine.com
Pritzker Levine LLP

14.3    All notices to Google shall be delivered via overnight delivery and electronic mail

to:

General Counsel
Legal Department
Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
legal-notices@google.com

with a copy via electronic mail to:

Glenn Pomerantz
Kuruvilla Olasa
Munger Tolles & Olson LLP
350 South Grand Ave., 50th Floor
Los Angeles, CA 90071-3426
glenn.pomerantz@mto.com
kuruvilla.olasa@mto.com

and

Brian Rocca

Sujal Shah
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower, 28th Floor
San Francisco, CA 94105-1596
brian.rocca@morganlewis.com
sujal.shah@morganlewis.com

14.4    Notice recipients and addresses designated in Section 14 may be changed upon
written notice provided to all individuals identified in that Section.

## 15.    Miscellaneous

15.1    Nothing in this Settlement Agreement shall be interpreted to prohibit, require, or
endorse Google charging a service fee related to apps distributed through Google Play.

15.2    Nothing in this Settlement Agreement shall be construed to limit or control the
unilateral discretion of any OEM to decide how it configures its Mobile Devices.

15.3    Nothing in this Settlement Agreement shall be construed to limit or control how
Google configures its own Mobile Devices (e.g., Pixel) including, but not limited to, modifying
the version of Android installed on such Mobile Devices, selecting which apps or app stores to
preload on such Mobile Devices, and how or whether to permit sideloading on such Mobile
Devices.

15.4    Nothing in this Settlement Agreement shall apply to form factors other than
Mobile Devices.

15.5    The use of headings in this Settlement Agreement is only for ease of reference.
The headings have no legal effect and are not to be considered part of this Settlement
Agreement.

15.6    This Settlement Agreement may not be amended or modified in any respect
except upon the written consent of the Parties, provided that any amendment or modification to

Sections 6 and 7 of this Settlement Agreement needs written consent of Google and the States alone.

15.7     With respect to the provisions in Sections 6 and 7 of this Settlement Agreement, the States shall be the parties with the authority to seek to enforce these provisions in Court or otherwise.  The Individual Plaintiffs shall not have authority to enforce these provisions and shall rely on the States for any enforcement.

15.8     The undersigned each represent and warrant that each has authority to enter into this Settlement Agreement on behalf of the Party indicated below his or her name.

15.9     Individual Plaintiffs represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Consumer Action or any related action.

15.10   The Parties have jointly participated in the drafting of this Settlement Agreement. No Party hereto shall be considered the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

15.11   As used in this Settlement Agreement, the masculine, feminine, or neutral gender, and the singular or plural wording, shall each be deemed to include the others whenever the context so indicates.

15.12   Unless otherwise noted, all references to "days" in this Settlement Agreement shall be to calendar days.  In the event any date or deadline set forth in this Settlement Agreement falls on a weekend or federal legal holiday, such date or deadline shall be on the first business day thereafter that is not a federal legal holiday.

49

15.13   Google shall not be liable for any additional fees or expenses of the Plaintiffs or any Eligible Consumer in connection with or related to the Actions.  Google agrees that it will not seek to recover its attorneys' fees, expenses, or costs from the Plaintiffs after the Effective Date.

15.14   Any and all disputes arising from or related to this Settlement Agreement must be brought by the Parties and/or Settlement Consumers exclusively to the Court.  The Parties and Settlement Consumers irrevocably submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement unless otherwise noted herein. All terms of this Settlement Agreement and any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to choice of law or conflicts of laws principles; however, nothing in this Settlement Agreement shall operate as a waiver of any Party's position regarding the applicable law governing the underlying claims at issue in the Actions.

15.15   Unless otherwise ordered by the Court, the Parties may jointly agree to reasonable extensions of time to carry out any of the provisions of this Settlement Agreement.

15.16   Nothing in this Settlement Agreement shall alter or abrogate any prior Court orders entered in the Actions.

15.17   This Settlement Agreement may be executed in counterparts.  Facsimile or PDF signatures shall be considered valid as of the date they bear.

15.18   The Parties, together with the Leadership Committee of the States, Consumer Counsel and Defense Counsel, agree to prepare and execute all documents, to seek Court

approvals, to defend Court approvals, and to do all things reasonably necessary to complete the Settlement.

15.19   This Settlement Agreement is executed voluntarily by each of the Parties without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand the provisions of this Settlement Agreement and have relied on the advice and representation of legal counsel of their own choosing.

**FOR PLAINTIFF STATE OF UTAH:**

SEAN D. REYES, Attorney General

/s/ David N. Sonnenreich
DAVID N. SONNENREICH, Deputy Attorney General
MELISSA HOLYOAK, Solicitor General
MARIE W.L. MARTIN, Assistant Attorney General
SCOTT RYTHER, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES, Attorney General

/s/ Bryan L. Bloom
ELINOR R. HOFFMANN, Chief, Antitrust Bureau
BRYAN L. BLOOM, Senior Enforcement Counsel
MORGAN J. FEDER, Assistant Attorney General
BENJAMIN COLE, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN, Attorney General

/s/ Jessica V. Sutton
JESSICA V. SUTTON, Special Deputy Attorney General
SARAH G. BOYCE, Deputy Attorney General and General Counsel
JONATHAN MARX, Special Deputy Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI, Attorney General and Reporter

/s/ David McDowell
J. DAVID MCDOWELL, Deputy Attorney General
S. ETHAN BOWERS, Senior Assistant Attorney General
HAMILTON MILLWEE, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES, Attorney General

/s/ Jayme L. Weber
JAYME L. WEBER, Senior Litigation Counsel
ROBERT A. BERNHEIM, Unit Chief Counsel

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF COLORADO:**

PHILIP J. WEISER, Attorney General

/s/ Bryn Williams
BRYN WILLIAMS, First Assistant Attorney General
STEVEN KAUFMANN, Deputy Solicitor General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF IOWA:**

BRENNA BIRD, Attorney General

/s/ Noah Goerlitz
NOAH GOERLITZ, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF NEBRASKA:**

MIKE HILGERS, Attorney General

/s/ Colin P. Snider
COLIN P. SNIDER, Assistant Attorney General
JOSEPH M. CONRAD, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF ALABAMA:**

STEVE MARSHALL, Attorney General

/s/ Olivia W. Martin
OLIVIA W. MARTIN, Chief, Consumer Interest Division

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF ALASKA:**

TREG TAYLOR, Attorney General

/s/ Jeff Pickett
JEFF PICKETT, Senior Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF ARKANSAS**:

TIM GRIFFIN, Attorney General

/s/ Amanda J. Wentz
AMANDA J. WENTZ, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA, Attorney General

/s/ Brian Wang
PAULA BLIZZARD, Senior Assistant Attorney General for Antitrust
MICHAEL JORGENSON, Supervising Deputy Attorney General
BRIAN WANG, Deputy Attorney General
CAROLYN JEFFRIES, Deputy Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG, Attorney General

/s/ Jeremy Pearlman
JEREMY PEARLMAN, Associate Attorney General
NICOLE DEMERS, Deputy Associate Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF DELAWARE:**

KATHLEEN JENNINGS, Attorney General

/s/ Michael A. Undorf
MICHAEL A. UNDORF, Deputy Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

BRIAN SCHWALB, Attorney General

/s/ Adam Gitlin
ADAM GITLIN, Chief, Antitrust and Nonprofit Enforcement Section
ELIZABETH G. ARTHUR, Assistant Attorney General
MEHREEN IMTIAZ, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF FLORIDA:**

ASHLEY MOODY, Attorney General

/s/ R. Scott Palmer
R. SCOTT PALMER, Special Counsel and Chief of Complex Enforcement
JOHN GUARD, Chief Deputy Attorney General
LEE ISTRAIL, Assistant Attorney General
CHRISTOPHER KNIGHT, Assistant Attorney General
ANDREW BUTLER, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF GEORGIA:**

CHRISTOPHER M. CARR, Attorney General

/s/ Charles Thimmesch
MARGARET K. ECKROTE, Deputy Attorney General
JEFFREY W. STUMP, Senior Assistant Attorney General
CHARLES THIMMESCH, Senior Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF HAWAII:**

ANNE E. LOPEZ, Attorney General

/s/ Rodney I. Kimura
RODNEY I. KIMURA, Deputy Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF IDAHO:**

RAÚL LABRADOR, Attorney General

/s/ Stephanie N. Guyon
STEPHANIE N. GUYON, Deputy Attorney General
JOHN K. OLSON, Deputy Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF ILLINOIS:**

KWAME RAOUL, Attorney General

/s/ Elizabeth L. Maxeiner
ELIZABETH L. MAXEINER, Chief, Antitrust Bureau

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF INDIANA:**

TODD ROKITA, Attorney General

/s/ Scott L. Barnhart
SCOTT L. BARNHART, Chief Counsel and Director, Consumer Protection Division
MATTHEW MICHALOSKI, Deputy Attorney General
CHRISTI FOUST, Deputy Attorney General
RYAN FRASHER, Deputy Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF KANSAS:**

KRIS KOBACH, Attorney General

/s/ Lynette R. Bakker
LYNETTE R. BAKKER, First Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF COMMONWEALTH OF KENTUCKY:**

DANIEL CAMERON, Attorney General

/s/ Philip R. Heleringer
PHILIP R. HELERINGER, Executive Director of Consumer Protection
J. CHRISTIAN LEWIS, Commissioner of Consumer & Senior Protection
JONATHAN E. FARMER, Deputy Executive Director of Consumer Protection
ZACHARY J. RICHARDS, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF LOUISIANA:**

JEFF LANDRY, Attorney General

/s/ Patrick Voelker
PATRICK VOELKER, Assistant Attorney General, Public Protection Division

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF MAINE:**

AARON M. FREY, Attorney General

/s/ Christina M. Moylan
CHRISTINA M. MOYLAN, Chief, Consumer Protection Division

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF MARYLAND:**

ANTHONY G. BROWN, Attorney General

/s/ Schonette J. Walker
SCHONETTE J. WALKER, Assistant Attorney General and Chief of the Antitrust Division
GARY HONICK, Assistant Attorney General and Deputy Chief of the Antitrust Division

Dated: October 11, 2023


**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:**

ANDREA CAMPBELL, Attorney General

/s/ William T. Matlack
WILLIAM T. MATLACK, Assistant Attorney General, Chief, Antitrust Division
DANIEL LEFF, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF MICHIGAN:**

DANA NESSEL, Attorney General

/s/ Scott A. Mertens
SCOTT A. MERTENS, Assistant Attorney General, Corporate Oversight Division

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON, Attorney General

/s/ Justin Moor
JUSTIN MOOR, Assistant Attorney General
JAMES W. CANADAY, Deputy Attorney General
ZACH BIESANZ, Senior Enforcement Counsel

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF MISSISSIPPI:**

LYNN FITCH, Attorney General

/s/ Hart Martin
HART MARTIN, Special Assistant Attorney General, Consumer Protection Division

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF MISSOURI:**

ANDREW BAILEY, Attorney General

/s/ Michael Schwalbert
MICHAEL SCHWALBERT, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF MONTANA**:

AUSTIN KNUDSEN, Attorney General

/s/ Anna K. Schneider
ANNA K. SCHNEIDER, Bureau Chief, Office of Consumer Protection
ANDREW BUTLER, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF NEVADA:**

AARON D. FORD, Attorney General

/s/ Lucas J. Tucker
LUCAS J. TUCKER, Senior Deputy Attorney General
MICHELLE C. BADORINE, Senior Deputy Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF NEW HAMPSHIRE:**

JOHN M. FORMELLA, Attorney General

/s/ Alexandra C. Sosnowski
ALEXANDRA C. SOSNOWSKI, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN, Attorney General

/s/ Isabella R. Pitt
ISABELLA R. PITT, Assistant Section Chief for Antitrust and Deputy Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF NEW MEXICO:**

RAÚL TORREZ, Attorney General

/s/ Mark Swanson
MARK SWANSON, Assistant Attorney General
JUDITH PAQUIN, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF NORTH DAKOTA:**

DREW WRIGLEY, Attorney General

/s/ Elin S. Alm
ELIN S. ALM, Assistant Attorney General, Consumer Protection and Antitrust Division

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF OHIO:**

DAVE YOST, Attorney General

/s/ Sarah Mader
SARAH MADER, Assistant Attorney General, Antitrust Section
BETH A. FINNERTY, Section Chief, Antitrust Section

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF OKLAHOMA:**

GENTNER DRUMMOND, Attorney General

/s/ Caleb J. Smith
CALEB J. SMITH, Assistant Attorney General, Consumer Protection Unit

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF OREGON:**

ELLEN F. ROSENBLUM, Attorney General

/s/ Timothy D. Smith
TIMOTHY D. SMITH, Senior Assistant Attorney General
CHERYL F. HIEMSTRA, Assistant Attorney General
TIM D. NORD, Special Counsel

Dated: October 11, 2023


**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:**

MICHELLE A. HENRY, Attorney General

/s/ Tracy W. Wertz
TRACY W. WERTZ, Chief Deputy Attorney General
JOSEPH S. BETSKO, Assistant Chief Deputy Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF TERRITORY OF PUERTO RICO:**

DOMINGO EMANUELLI HERNÁNDEZ, Attorney General

/s/ Guarionex Díaz Martínez
GUARIONEX DÍAZ MARTÍNEZ, Deputy Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF RHODE ISLAND:**

PETER F. NERONHA, Attorney General

/s/ Stephen N. Provazza
STEPHEN N. PROVAZZA, Unit Chief Counsel for Consumer and Economic Justice

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF SOUTH CAROLINA:**

ALAN M. WILSON, Attorney General

/s/ Rebecca M. Hartner
REBECCA M. HARTNER, Assistant Attorney General
W. JEFFREY YOUNG, Chief Deputy Attorney General
C. HAVIRD JONES, Senior Assistant Deputy Attorney General
MARY FRANCES JOWERS, Assistant Deputy Attorney General
CLARK C. KIRKLAND, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF SOUTH DAKOTA:**

MARTY JACKLEY, Attorney General

/s/ Jonathan K. Van Patten
JONATHAN K. VAN PATTEN, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF TEXAS:**

KEN PAXTON, Attorney General

/s/ James Lloyd
JAMES LLOYD, Deputy Attorney General for Civil Litigation and Chief, Antitrust Division
TREVOR YOUNG, Deputy Chief, Antitrust Division
COULTER GOODMAN, Assistant Attorney General, Antitrust Division

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF VERMONT:**

CHARITY R. CLARK, Attorney General

/s/ Merideth Chaudoir
MERIDETH CHAUDOIR, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

JASON S. MIYARES, Attorney General

/s/ Tyler T. Henry
TYLER T. HENRY, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF TERRITORY OF THE VIRGIN ISLANDS OF THE UNITED STATES:**

ARIEL M. SMITH, Attorney General

/s/ Ariel M. Smith
ARIEL M. SMITH, Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF WASHINGTON:**

ROBERT W. FERGUSON, Attorney General

/s/ Amy N.L. Hanson
AMY N.L. HANSON, Managing Assistant Attorney General
BROOKE HOWLETT LOVROVICH, Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF WEST VIRGINIA:**

PATRICK MORRISEY, Attorney General

/s/ Douglas L. Davis
DOUGLAS L. DAVIS, Senior Assistant Attorney General

Dated: October 11, 2023


**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSH KAUL, Attorney General

/s/ Gwendolyn J. Lindsay Cooley
GWENDOLYN J. LINDSAY COOLEY, Assistant Attorney General

Dated: October 11, 2023

**FOR PLAINTIFF STATE OF WYOMING:**

BRIDGET HILL, Attorney General

/s/ Ryan Schelhaas
RYAN SCHELHAAS, Chief Deputy Attorney General

Dated: October 11, 2023

**FOR INDIVIDUAL PLAINTIFFS MATTHEW ATKINSON, MARY CARR, DANIEL EGERTER, ALEX IWAMOTO, SERINA MOGLIA, AND ZACHARY PALMER:**

_____

KARMA M. GIULIANELLI

Dated:   October 12, 2023

Bartlit Beck LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Phone: 303-592-3100
Email: karma.giulianelli@bartlitbeck.com

_____

HAE SUNG NAM

Dated: October 12, 2023

Kaplan Fox & Kilsheimer LLP
800 Third Avenue, 38th Floor
New York, NY 10022
Phone: 212-687-1980
Email: hnam@kaplanfox.com

**FOR DEFENDANT GOOGLE LLC:**


DDADFBBA5B5249E...

Cassandra Knight
Google LLC

Dated: 10/13/2023

**FOR DEFENDANT GOOGLE IRELAND LTD.:**


39ECEF3EAE374F9...

David M. Sneddon
Google Ireland Ltd.

Dated: 10/13/2023

**FOR DEFENDANT GOOGLE PAYMENT CORP.:**


643F3519B85240E...

Robert E. Andreatta
Google Payment Corp.

Dated: 10/12/2023

**FOR DEFENDANT GOOGLE COMMERCE LTD.:**


39ECEF3EAE374F9...

David M. Sneddon
Google Commerce Ltd.

Dated: 10/13/2023

DocuSign Envelope ID: BD5CE03A-AEAE-4D70-8D59-87B49EF7BFAD

**FOR DEFENDANT GOOGLE ASIA PACIFIC PTE. LIMITED:**

DocuSigned by:

*[signature]*

CDCE493750SC453

Lavanya Swetharanyan
Google Asia Pacific Pte. Limited

Dated: 10/12/2023

# EXHIBIT U

```
 1                UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                       SAN FRANCISCO


 3
      IN RE GOOGLE PLAY STORE
 4    ANTITRUST LITIGATION
      _____   CASE NO.  MD 21-02981 JD
 5    THIS DOCUMENT RELATES TO:         RELATED CASES:
                                                  CV 20-05671 JD
 6    EPIC GAMES, INC. VS. GOOGLE                 CV 20-05761 JD
      LLC, ET AL.,                                CV 21-05227 JD
 7                                                CV 22-02746 JD
      IN RE GOOGLE PLAY CONSUMER
 8    ANTITRUST LITIGATION,             SAN FRANCISCO, CALIFORNIA

 9    STATE OF UTAH, ET AL. V. GOOGLE   OCTOBER 19, 2023
      LLC, ET AL.,
10                                      PAGES 1 - 66
      MATCH GROUP, LLC, ET AL. V.
11    GOOGLE LLC, ET AL.,

12
                     TRANSCRIPT OF PROCEEDINGS
13             BEFORE THE HONORABLE JAMES DONATO
                    UNITED STATES DISTRICT JUDGE
14

15    A-P-P-E-A-R-A-N-C-E-S

16      FOR THE PLAINTIFF     CRAVATH SWAINE AND MOORE LLP 825
        EPIC GAMES:           BY:  GARY A. BORNSTEIN
17                                 YONATAN EVEN
                                   LAUREN ANN MOSKOWITZ
18                            EIGHTH AVENUE
                              NEW YORK, NEW YORK 10019
19
                    (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20

21
        OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                                  CERTIFICATE NUMBER 8074

23
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
24    TRANSCRIPT PRODUCED WITH COMPUTER.

25
```