1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT A

**[PROPOSED] BRIEF OF ECONOMISTS
AS A*MICI CURIAE* REGARDING THE PARTIES'
JOINTLY-FILED MOTION TO
MODIFY THE PERMANENT INJUNCTION**

1  DAVID C. DINIELLI (CA Bar No. 177904)
   *Tech Accountability & Competition Project,*
2  *a division of the Media Freedom*
   *and Information Access (MFIA) Clinic*
3  Yale Law School
   127 Wall Street
4  New Haven, CT 06511
   David.Dinielli@yale.edu
5  *Counsel for Economists as* Amici Curiae
6

7

8

9

10              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
11                 **SAN FRANCISCO DIVISION**

12

13  IN RE GOOGLE PLAY STORE ANTITRUST          )    Case No. 3:21-md-02981-JD
    LITIGATION                                 )

14  THIS DOCUMENT RELATES TO:                  )
                                               )
15  *State of Utah et al. v. Google LLC et al.,* )
    Case No. 3:21-cv-05227-JD                  )    **[PROPOSED] BRIEF OF ECONOMISTS**
16                                             )    **AS** ***AMICI CURIAE*** **REGARDING THE**
                                               )    **PARTIES' JOINTLY-FILED MOTION TO**
17  *In re Google Play Store Antitrust Litig.,*  )    **MODIFY THE PERMANENT**
    Case No. 3:21-md-02981-JD                  )    **INJUNCTION**
18                                             )
    *In re Google Play Consumer Antitrust Litig.,* )
19  Case No. 3:20-cv-05761-JD                  )
                                               )
20                                             )
                                               )
21                                             )    Judge: Hon. James Donato

22  _____

23

24

25

26

27

28  _____
            [PROPOSED] BRIEF OF ECONOMISTS AS *AMICI CURIAE*
                     Case No. 3:21-md-02981-JD

## I. INTRODUCTION AND INTEREST OF *AMICI*[1]

*Amici* are renowned scholars of economics and law: Paul Heidhues, Gene Kimmelman, Giorgio Monti, Fiona Scott Morton, Rupprecht Podszun, and Monika Schnitzer. They address this Court's three stated concerns regarding the parties' jointly-filed motion to modify the permanent injunction: (1) "whether the proposed modifications are consistent with the public interest and free and unfettered competition, which the antitrust laws are designed to protect"; (2) "whether the injunction as modified by the parties adequately redress the network effects of Google's anticompetitive conduct"; and (3) "whether material circumstances have changed to warrant a modification." Minute Order, Case No. 3:21-md-02981-JD, Nov. 6, 2025, Dkt. No. 1124 at 1.

Throughout their careers, each of the *amici* has demonstrated a deep commitment to understanding competition and to the ongoing project of ensuring that remedies for anticompetitive behavior are effective. Their commitment is revealed in their scholarship, teaching, and government service. In particular, *amici* are key contributors to the literature surrounding the very issues central to this case. *Amici* have contributed to this research on a broad level, but also regarding the specific characteristics of the market for app stores. This research, and the research that builds on it, regularly influences rulings and outcomes in antitrust cases, and is directly relevant to addressing the parties' proposed modifications to the permanent injunction court's consideration of the parties' proposed modifications to the permanent injunction in this case and their likely effect on competition.

## II. ARGUMENT

A major benefit of free markets is the possibility for consumers and workers to gain from competition. Sellers competing for the business of consumers offer lower prices and more quality and innovation. In addition, workers—and all suppliers—gain higher wages and better terms from competition among the buyers of their labor and inputs. As this Court recognized when it invited

---

[1] No party's counsel authored this brief in whole or in part and no person contributed money intended to fund its preparation or submission. *Cf.* Fed. R. App. P. 29(a)(4)(E). Nothing in this brief or the motion for leave to file it represents the views of the Yale Law School or Yale University or Tech Accountability & Competition Project, a division of the Media Freedom and Information Access (MFIA) Clinic at Yale Law School.

1  briefs of *amici curiae*, the purpose of United States antitrust law is to protect and maintain "the public
2  interest in free and unfettered competition." Dkt. No. 1124 at 1. Because the jury in this case found
3  that Google violated the Sherman Act, any remedy must restore competition to the market so that
4  consumers gain the benefits of rivalry and choice in app distribution. A remedy that is structured to
5  benefit end consumers is also likely to benefit Epic Games, as well as other operators of app stores,
6  which will be able to enter and compete for the business of consumers. Some of those stores will sell
7  content for families, or news, or cooking content. But some are likely to distribute gaming content
8  and therefore be in competition with Epic Games as well as Google Play.

9  It is not in the interest of either Epic or Google to make the entry of more competitors easier
10  because those entrants cut into their profits. For this reason, *amici* are concerned that the parties'
11  jointly-filed motion to modify the permanent injunction may lessen the competition that would
12  otherwise arise. Economic incentives indicate that this Court should be skeptical of purported
13  consumer benefits arising from a settlement agreement between the parties. During litigation—when
14  Epic wished to enter and Google wished to be a monopoly—the two companies were in opposition.
15  Now that both have the right to be in the market, their interests have become more aligned on the
16  issue of entry by others: both will make a larger profit in an app distribution market of two than in a
17  market with many entrants and vigorous competition. We urge this Court to evaluate the parties'
18  proposed new remedy with this (standard) economic framing in mind. Settlement prior to trial is often
19  favored by courts because it represents a compromise that is acceptable to both parties and saves the
20  court's resources. However, after liability has been found, neither of these factors is present. The
21  economic argument suggests that other, more socially harmful, motives are driving the agreement.

22  The parties' new proposal may have arisen because Epic and Google have found ways to
23  unlock new surplus which they are happy to share in part with consumers. But in our view, the new
24  proposed remedy makes entry harder for other app stores. In that case, the new proposal will shift the
25  benefits of competition available under the current remedy away from consumers to the (now) two
26  incumbents.

27

28

1    The remedy this Court ordered on October 7, 2024 (Dkt. No. 1017), in our opinion, is effective
2    and proportionate. Because of Google's actions, its store has accumulated a huge installed base of
3    users, reputation, and brand, which are difficult for entrants to overcome without a catalog or list that
4    enables efficient search on the platform. But the catalog element of the remedy makes it feasible for
5    entering app stores to become a default or a first choice for consumer search. By banning Google's
6    ability to use its many tools (derived from its market power) to favor its own app store, the remedy
7    opens up the app store market on Android to entrants. If the Court finds that the parties' modifications
8    risk weakening the competition established by the provisions in the original remedy, we recommend
9    continuing with the original well-designed remedy.

10    We have identified five aspects of the parties' proposed modifications to the permanent
11    injunction that we believe pose a risk to competition in the app store market on Android, and which
12    the Court should not permit to take effect. We explain below how to fix some of these problems.
13    However, if the parties are only interested in their complete package and reject any adjustment, our
14    recommendation is to continue to adhere to the original remedy.

15    1.  Under the parties' modifications, rival stores cannot be downloaded through Google Play. We
16        recommend rejecting this change. Enabling rival stores to be downloaded through the Google
17        Play store is a critical element of the remedy that reduces entry barriers for rival stores. Rival
18        stores will face significant friction entering the market monopolized by Google if they must
19        teach users how to download a store from the open web. By hosting stores that meet Google's
20        safety and security standards in Google Play, the monopolist helps restore competition.

21    2.  Under the parties' modifications, universal search, available through the Court's catalogue
22        requirement, is no longer available. This element of the remedy was valuable to small entrants
23        because universal search enables them to serve as the default store for a user and thereby
24        attract users and grow. We recommend rejecting this change. Again, the Court could simply
25        leave the original order in place. Or, if the Court is convinced that the technical hurdles
26        involved in running a catalog are too challenging for the engineers at Google, it could

27

28

alternatively require Google to maintain an up-to-date list of apps distributed by each store, including Google Play and all registered third party app stores. This list would be maintained in a format and with APIs that render it searchable and usable by any app developer or store that wished to create a universal search function. Third party stores would be responsible for given Google updated information, which in turn would be responsible for keeping the list current in real time. Small stores could then easily enable a universal search function in their stores.

3. Under the parties' modifications, Google may pay for placement of Google Play. This is a critical change that will enable Google to continue to defend its monopoly position. We recommend rejecting this change. The revenue from the monopoly scale and position enables Google to pay more than any rival for a prominent position for its store, thus entrenching Google Play's position and blocking entrants. Our recommended solution is to maintain the existing order that forbids paying for placement.

4. Under the parties' modifications, linkouts to content offered by developers on their own websites may incur a fee payable to Google. However, when a user clicks on such a link, the developer incurs the cost of hosting and delivering the content, and its delivery involves no Google resources. Such a fee unduly lowers returns to developers. We recommend rejecting this change. Absent Google's illegal conduct, developers would have competitive choices available on Android and would not need to link out at all. Google should not now be permitted to charge developers who attempt to obtain competitive costs by avoiding Google's bottleneck. Should the Court find that it is necessary to allow such a fee (and we disagree that it should), the Court should limit the fee.

5. Under the parties' modifications, there is no obligation for Google to present the user with neutral choice architecture for Google Billing and other options. We recommend rejecting this change. The rules must clearly allow an app developer to set a different price for each different billing solution, and other choices must always be offered alongside Google Billing.

1

2

3    A monopoly profit is the largest available, since the monopolist has full control of price,
4 quality, and every other dimension of competition and can choose them to maximize profit. The same
5 firm will make less profit in a duopoly and even less as more entrants compete for every consumer.[2]
6 Private enforcement of Section 2 is not designed to overcome this incentive problem. Rather, a
7 victorious plaintiff has an incentive to join with the monopolist to limit competition on the part of
8 others and share in that large monopoly profit. Both the monopolist and the challenger will earn more
9 as duopolists than they will under competition.

10    Thus the Sherman Act creates a setting in which both parties have the incentive to agree to a
11 private settlement that is not in the interest of consumers. This court's remedy was, in our view, an
12 excellent set of rules that would be very likely to return the market to a competitive state. We have
13 concerns that several of the changes agreed to by Epic and Google would backtrack on that progress.

14    **III. CONCLUSION**

15    For the reasons described above, it will be necessary for this Court to exercise careful
16 oversight of any agreement between these duopolists. The competitive conditions established by the
17 Court in its original remedy are at risk from the bilateral agreement. An agreement that enriches
18 duopolists at the expense of consumers threatens the very purpose of the U.S. antitrust law.

19

20 DATED: Jan. 14, 2026

DAVID C. DINIELLI (CA Bar No. 177904)
21                                                        *Tech Accountability & Competition Project,*
*a division of the Media Freedom*
22                                                        *and Information Access (MFIA) Clinic*
Yale Law School
23                                                        *Counsel for Economists as* Amici Curiae

24

25 [2] *See, e.g.* Steven C. Salop, The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the
Flawed Incremental Price-Cost Test, 81 Antitrust L.J. 371, 379 (2017) *available at*
26 https://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=2632&context=facpub; Donald A. Hay and Derek J.
Morris, Industrial Economics and Organization: Theory and Evidence 193 (Oxford University Press, 1991, 2nd ed.).
27

28

[PROPOSED] BRIEF OF ECONOMISTS AS *AMICI CURIAE*
Case No. 3:21-md-02981-JD
- 5 -

1

**APPENDIX**

2

**Paul Heidhues,** Professor of Behavioral and Competition Economics, Düsseldorf Institute for

3   Competition Economics (DICE), Heinrich-Heine University of Düsseldorf. Professor Heidhues has

4   published extensively in the fields of competition economics, behavioral economics, and consumer
protection regulation.[3]

5
**Gene Kimmelman**, Senior Policy Fellow, Tobin Center for Economic Policy at Yale University and

6   Research Fellow, Mossavar-Rahmani Center for Business & Government at the John F. Kennedy
School of Government at Harvard University. Gene Kimmelman has spent over thirty years working

7   with consumer advocacy nonprofits and has served as Chief Counsel Senate Antitrust Subcommittee,
Chief Counsel for Competition Policy and Deputy Associate Attorney General for the U.S.

8   Department of Justice.

9
**Giorgio Monti**, Professor of Competition Law at Tilburg Law School, Tilburg Law and Economics

10  Center, and Research Fellow, Centre on Regulation in Europe. Professor Monti's principal field of
research is EU competition law and he has published extensively about competition law and policy.

11

**Fiona Scott Morton** is the Theodore Nierenberg Professor of Economics at the Yale University

12  School of Management. Professor Scott Morton is a former Deputy Assistant Attorney General for
Economic Analysis (Chief Economist) at the Antitrust Division of the U.S. Department of Justice and

13  founder and director of the Thurman Arnold Project at Yale University. Professor Scott Morton has

14  published extensively on competition law, economics, and policy, as well as the digital economy.[4]

15  **Rupprecht Podszun**, Chair of Civil Law, German and European Competition Law at Heinrich Heine
University of Düsseldorf, Director of the Institute of Antitrust. Professor Podszun has published

16  extensively in the field of antitrust and competition law, with a focus on the media and internet.

17
**Monika Schnitzer**, Professor of Economics, Ludwig-Maximilians-University Munich.  Professor

18  Schnitzer has published extensively in the fields of comparative economics, innovation, competition,
and multinational corporations.

19

20

21

22

23

24

25  [3] Within the last three years, in collaboration with E.CA Economics, Professor Heidhues has been consulting for E.CA
Economics on work done by E.CA for Apple in the context of a competition case unrelated to the policies discussed here.

26

[4] Professor Scott Morton was retained as an economic expert for Epic Games in the *Epic v. Google* case in an early phase

27  of the proceedings, August 2021 to April 2022, and has had no relationship with either company since that time.

28