# Exhibit 1

Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
Alex A. Parkinson (*pro hac vice*)
aparkinson@kellogghansen.com
Jared M. Stehle (*pro hac vice*)
jstehle@kellogghansen.com
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999

Russell P. Cohen (SBN 213105)
russ.cohen@dechert.com
**DECHERT LLP**
45 Fremont Street, 26th Floor
San Francisco, California 94105
Tel: (415) 262-4500

*Counsel for* Amicus Curiae
*MICROSOFT CORPORATION*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC, et al.*
Case No. 3:20-cv-05671-JD

Case No. 3:21-md-02981-JD

**[PROPOSED] BRIEF OF MICROSOFT CORP. AS *AMICUS CURIAE* IN OPPOSITION TO JOINT MOTION TO MODIFY PERMANENT INJUNCTION**

Judge: Hon. James Donato

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

BACKGROUND .......... 3

ARGUMENT .......... 7

- I. THE PROPOSED MODIFICATIONS FAIL TO ADDRESS GOOGLE'S UNLAWFUL TYING .......... 7
- II. SETTLEMENT IN THESE CIRCUMSTANCES POSES RISKS TO COMPETITION .......... 11

CONCLUSION .......... 13

# TABLE OF AUTHORITIES

## CASES

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .......... 11

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .......... 11

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995) .......... 8

*Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025) .......... 9, 11

*Epic Games, Inc. v. Google LLC*, 147 F.4th 917 (9th Cir. 2025), *pet. for cert. pending*, No. 25-521 (U.S. filed Oct. 29, 2025) .......... 2-4

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) .......... 11

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) .......... 3, 11, 12

*Osborn v. Sinclair Refin. Co.*, 286 F.2d 832 (4th Cir. 1960) .......... 8

## PLEADINGS

*Epic Games, Inc. v. Google LLC*, No. 24-6256 (9th Cir.):

Brief of Microsoft Corp. (Nov. 1, 2024), DE 32 .......... 4-5

Brief of Microsoft Corp., (Jan. 7, 2025), DE 150 .......... 5

Plaintiff States' Unopposed Motion To Give Notice of Proposed *Parens Patriae* Settlement, *Utah v. Google LLC,* No. 3:21-cv-05227-JD (N.D. Cal. Dec. 18, 2023), ECF 522-2 .......... 10

## RULE

Fed. R. Civ. P. 60(b) .......... 13

Fed. R. Civ. P. 60(b)(5) .......... 13

## OTHER MATERIALS

Sarah Bond (@BondSarah_Bond), X (Oct. 10, 2024, 6:31 PM), https://x.com/BondSarah_Bond/status/1844506029599707255 .......... 6

Andrew Dubatowka, *Google Play's New U.S. Billing & Linking Policies: What Game Developers Need to Know*, Neon (Dec. 10, 2025), https://www.neonpay.com/blog/google-plays-new-u.s.-billing-linking-policies-what-game-developers-need-to-know .......... 9

Epic Games, *Epic FTC Settlement and moving beyond long-standing industry practices* (Dec. 19, 2022), https://www.epicgames.com/site/en-US/news/epic-ftc-settlement-and-moving-beyond-long-standing-industry-practices .......... 13

Epic Games, *Statement on Google's Settlement with State Attorneys General* (Dec. 18, 2023), https://www.epicgames.com/site/en-US/news/ statement-on-google-s-settlement-with-state-attorneys-general ...................................... 10

Google, *Payments*, https://support.google.com/googleplay/ android-developer/answer/9858738 ..................................................................... 5

Google, *Understanding Google Play's Payments policy*, https:// support.google.com/googleplay/android-developer/answer/ 10281818 ........................................................................................................... 5

Dean Shimabukuro, *Xbox April Update: Buy Games with the Xbox App on Mobile, Stream Your Own Game on Console, and More*, Xbox Wire (Apr. 16, 2025), https://news.xbox.com/en-us/2025/04/16/xbox-april -update-buy-games-xbx-app-stream-your-own-game-console/ ...................................... 5-6

Brady Snyder, *The Xbox app will now let you buy games from your Android phone*, AndroidCentral (Apr. 17, 2025), https://www.androidcentral .com/gaming/the-xbox-app-will-now-let-you-buy-games-from-your-android-phone ........................................................................................................... 6

Xsolla Blog, *New options for Android developers to offer external purchases in their games: What you need to know* (Oct. 7, 2025), https://xsolla .com/blog/new-platform-rules-for-android-and-what-developers-need -to-know ........................................................................................................... 9

## INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer hardware, software, and security features; it has been creating software platforms and application programming interfaces for application developers for more than 40 years. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing, in addition to a variety of commercial and enterprise technologies powered by artificial intelligence. Microsoft invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic technology markets.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues in this case. As part of its business, Microsoft sells hardware devices and is one of the leading operating systems for personal computers. Microsoft also provides online stores for applications that run on its consumer operating systems. In other parts of its business, Microsoft sells applications, software, and services that run on mobile operating systems produced by Google LLC ("Google") and Apple Inc. ("Apple"). Microsoft offers products that compete with Google, including – like Epic Games, Inc. ("Epic") – games for distribution on Android devices. Microsoft also is a global leader in digital, online, and computer security, protecting a significant amount of critical internet and computing infrastructure throughout the United States and the world.

Among its other provisions, the injunction that this Court issued – and that Google and Epic seek to modify – bars Google from requiring consumers and app developers (like Microsoft) to use Google's in-app payment processing system, Google Play Billing, for the purchase of digital goods or services within Android apps downloaded through the Google Play Store. In response to the injunction, Microsoft has undertaken significant efforts to prepare and launch new consumer

---

[1] No counsel for any party to this case has authored this *amicus* brief, in whole or in part, nor has any party to this case or their respective counsel contributed money to fund the preparation or submission of this brief. All parties consented to its filing.

offerings, which have won approval from Android users. Microsoft has a keen interest in the continued implementation of that and other provisions of the injunction, which have enabled innovation, spurred technological development, and promoted competition. These benefits have already accrued to consumers and will continue to do so; the Court should leave its injunction in place in the public interest.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This litigation began because Google required Epic, as a condition of access to distribution through the Google Play Store, to use Google Play Billing – and to pay 30% commissions – on in-app purchases made by users of Epic's Android *Fortnite* app. *See Epic Games, Inc. v. Google LLC*, 147 F.4th 917 (9th Cir. 2025), *pet. for cert. pending*, No. 25-521 (U.S. filed Oct. 29, 2025). Epic implemented code in its app to bypass Google Play Billing; Google then kicked Epic out of the Play Store. Epic sued, and after three-plus years of litigation and a 15-day trial, a jury determined that Google had violated the antitrust laws, including by "unlawfully tying use of the Play Store to Google Play Billing." *Id.* at 932. In direct response to that liability determination, this Court adopted as part of the remedial injunction a provision "prohibiting Google from requiring that developers use Google Play Billing in apps distributed on the Google Play Store." ECF 1016, at 16. That aspect of the injunction took effect July 31, 2025, and developers have been relying on it since. *Epic v. Google*, 147 F.4th at 929.

The modification to the injunction that Google and Epic now seek would effectively allow Google to restore that unlawful tie. In place of the straightforward prohibition contained in paragraph 9 of the Court's injunction, Google and Epic have proposed three dense paragraphs; that verbiage cannot disguise that the purpose and effect of the proposal is to *permit* what the injunction *prohibits*: requiring developers to implement Google Play Billing as a condition of access to the Play Store. There is zero justification for reversing this Court's injunction, and doing so would be against the public interest.

*First*, the anti-tying provision of the current injunction remedies the antitrust violation that the jury and this Court found, and it has enabled Microsoft and other developers to offer consumers

new applications through the Play Store that take advantage of the freedom to implement proprietary payment mechanisms that bypass Google Play Billing altogether. Under the parties' proposal, Google would be free once again to *require* implementation of Google Play Billing. The fact that developers would theoretically be permitted to offer additional payment options side-by-side with Google Play Billing does not address the harm: in Microsoft's experience, implementation of Google Play Billing for existing and multi-platform games is burdensome and impractical, and will likely make it impossible for developers like Microsoft to offer certain games and experiences to users. The harm is further exacerbated by the provision allowing Google to impose 20% commissions on most gaming transactions. This Court refused to engage in such rate-setting before, and it should not provide any judicial endorsement for Google's effort to make alternative billing systems uneconomic.

*Second*, the need for scrutiny of the proposed modification is underscored by the risk that the modification of the injunction is part of a scheme to harm competition and consumers for Google's private benefit. The provisions of the injunction are designed not just to redress any harms to the plaintiff but also "to restore economic freedom in the relevant markets and break the shackles of anticompetitive conduct." ECF 1016, at 5. They accordingly reduce Google's monopoly profits while benefiting competitors and consumers broadly. The Court should be alert to the possibility that the modification is designed to enhance Google's ability to earn supracompetitive profits while delivering other benefits to Epic. *Cf. FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) (noting anticompetitive risks from litigation settlement).

## **BACKGROUND**

**1.** Through the licenses to its Android mobile operating system that Google provides to smartphone manufacturers and agreements with app developers governing access to the Play Store, Google imposes various restrictions on the distribution of Android apps. Broadly speaking, Google "deters Android users" from obtaining apps other than through the Play Store. *Epic v. Google*, 147 F.4th at 931. Google took advantage of its dominance in the market for distribution of Android apps to force developers to use "only Google Play Billing to sell any digital content

that is to be used inside of the app." ECF 984, at 21.

The requirement that developers use Google Play Billing gave rise to this case. As described in the Ninth Circuit's opinion affirming the jury verdict and this Court's injunction, after it failed to achieve adequate distribution on Android phones in other ways, Epic, in 2020, "reluctantly decided to offer the *Fortnite* app on . . . the Google Play Store." *Epic v. Google*, 147 F.4th at 929-30. Shortly thereafter, "Epic embedded secret code into the app's software so that players making in-app purchases would bypass the required payment-processing systems by which . . . Google then charged 30% commission." *Id.* at 930. "Google . . . removed *Fortnite* from the Play Store . . . for noncompliance with their terms of service." *Id.* This litigation ensued.

After a 15-day trial, the jury found Google liable for violating the antitrust laws; this Court denied judgment as a matter of law, including with respect to the jury's finding that "Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing." ECF 984, at 20 (internal quotation marks omitted). After additional litigation over remedies, this Court entered an injunction that included several provisions to open the market for app distribution to additional competition and, in particular, to address Google's unlawful tie. Paragraph 9 of that injunction provides:

> For a period of three years ending on November 1, 2027, Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing. Google may not require a developer to set a price based on whether Google Play Billing is used.

ECF 1017, at 2 (¶ 9). Most of the injunction, including this provision, was stayed by the District Court pending appeal. *Epic v. Google*, 147 F.4th at 945 n.11. The Ninth Circuit affirmed the jury's verdict, this Court's denial of judgment as a matter of law, and this Court's injunction in full. *Epic v. Google*, 147 F.4th 917.

**2.** Microsoft filed *amicus* briefs in the Ninth Circuit in support of Epic both in opposition to Google's request for a stay of the injunction and in support of the judgment on the merits. *See* Brief of Microsoft Corp., *Epic Games, Inc. v. Google LLC*, No. 24-6256 (9th Cir.

Nov. 1, 2024), DE 32 (stay); Brief of Microsoft Corp., *Epic Games, Inc. v. Google LLC*, No. 24-6256 (9th Cir. Jan. 7, 2025), DE 150 (merits). As Microsoft explained in those filings, in response to this Court's injunction, Microsoft undertook significant work to prepare new consumer offerings – including an updated Xbox app for Android – that would enable cross-device gaming and in-game purchases, significantly improving the mobile gaming experience.

For many years, when Google's restrictions on in-app purchase methods were still in effect, Microsoft could offer consumers only two ways to play Xbox games on an Android device: either from a user's Xbox console or over the cloud, and always inside the native Android Xbox app. Google's restrictive pre-injunction Play Store policies degraded these experiences, with Google requiring the use of Google Play Billing in apps distributed on the Play Store for the purchase of digital goods or services, as well as prohibiting links from those apps to non-Google alternatives for in-app purchases.[2] Google also barred app developers from including in their apps links that would allow users to access websites where alternative purchase options would be available.[3] Accordingly, Microsoft was prevented by Google from allowing its Android users to purchase games through their existing Microsoft or Xbox accounts, had to disable in-game purchases inside the Android Xbox app or the Android Game Pass app, and could not give its users links to Microsoft websites where they could stream games and make game-based purchases in their secure Microsoft accounts.

In response to this Court's injunction – particularly the provision allowing developers to use alternatives to Google Play Billing – Microsoft updated the Xbox app for Android to enable cross-device gaming and in-game purchases, significantly improving the mobile gaming experience – just as it had said it would do:[4]

---

[2] *See* Google, *Understanding Google Play's Payments policy* (explaining that in general "purchases that require use of Google Play's billing system include . . . [d]igital items . . . [and] [c]loud software and services"), https://support.google.com/googleplay/android-developer/answer/10281818 (last visited Jan. 4, 2026); Google, *Payments* (prohibiting developers from "leading users to other payment methods via . . . links . . . [and other] user interface flows"), https://support.google.com/googleplay/android-developer/answer/9858738 (last visited Jan. 4, 2026).

[3] *See* Google, *Payments*.

[4] Dean Shimabukuro, *Xbox April Update: Buy Games with the Xbox App on Mobile, Stream Your*

- Customers now are able to buy Xbox games in the app and then click a link from that Android native app to a website (Xbox.com/Play) to stream the gameplay (both from Microsoft's data and cloud-storage centers and via remote access to the user's console) – just as if they had purchased the game on an Xbox console.
- That linked website allows customers to make additional purchases, including in-game purchases – new levels, tools, upgrades, and more – for immediate use without disrupting game flow, just as in-game purchases work on an Xbox console or PC.

All of these transactions take place using Microsoft's trusted and secure commerce system, the same way Microsoft customers make purchases on an Xbox console, on a PC, and on the web. Microsoft's innovative updates enable cross-play; gaming on Android mobile now provides the same experiences as gaming on an Xbox console, enabling customers to start a game on an Xbox console or PC and then continue the same gaming experience on the go via a link from the updated Android Xbox app or vice versa.

Android users have embraced these changes. With the injunction, Microsoft's long inability to offer these important cloud gaming services was "finally changing."[5] Using Microsoft's trusted, streamlined payment process it now "only take[s] two clicks on [a user's] Android phone to buy a new game."[6] By contrast, the old method could "be difficult on an Xbox due to controller limitations."[7] All these changes flow directly from the injunction, which removed the uncertainty Microsoft faced around Google's old policies.[8]

---

*Own Game on Console, and More*, Xbox Wire (Apr. 16, 2025), https://news.xbox.com/en-us/2025/04/16/xbox-april-update-buy-games-xbx-app-stream-your-own-game-console/.

[5] Brady Snyder, *The Xbox app will now let you buy games from your Android phone*, AndroidCentral (Apr. 17, 2025), https://www.androidcentral.com/gaming/the-xbox-app-will-now-let-you-buy-games-from-your-android-phone.

[6] *Id.*

[7] *Id.*

[8] *See* Sarah Bond (@BondSarah_Bond), X (Oct. 10, 2024, 6:31 PM) (Xbox president explaining that, as a result of the District Court's injunction, Microsoft will unveil new features where "players will be able to play and purchase Xbox games directly from the Xbox App on Android"), https://x.com/BondSarah_Bond/status/1844506029599707255.

**3.** Two months ago, Epic and Google informed the Court they had reached a settlement "contingent on the Court entering" a "Proposed Modified Injunction." ECF 1119, at 1. Among other changes, the Proposed Modified Injunction effectively eliminates the restriction on Google's requiring developers to use Google Play Billing. *See* ECF 1119-3, at 2. In place of the straightforward prohibition contained in paragraph 9 of the Court's injunction, the proposed modification would allow Google to require developers to implement Google Play Billing. Although Google is required to "permit apps installed/updated by the Google Play [S]tore to show alternative payment options," such alternatives "*shall* be shown side-by-side along with Google Play Billing." *Id.* (emphasis added); *see id.* (Google "may require side-by-side placement"). In addition, the Proposed Modified Injunction authorizes Google to impose a "service" fee for all "in-app and linked purchases"; for most in-game purchases, that fee is 20%.

## ARGUMENT

The parties' proposed modifications would permit Google to implement anew restrictions that impede competition and harm consumer welfare and that the jury found violated the antitrust laws. A requirement that developers implement Google Play Billing as a condition of access to the Play Store constitutes unlawful tying, and the fact that the injunction requires Google to allow developers to add *additional* in-app payment methods to their apps does not alleviate the harm from the tie. On the contrary, any modification that allows Google to force developers to implement Google Play Billing risks preventing Microsoft – and presumably other developers – from offering apps and in-app experiences that benefit users.

### I. THE PROPOSED MODIFICATIONS FAIL TO ADDRESS GOOGLE'S UNLAWFUL TYING

This Court should reject the parties' proposed modification to paragraph 9 of the injunction because the proposal fails to address Google's unlawful tying conduct. Google's tying conduct consisted of "coerc[ing] its customer – here, developers – to buy the tied product (Google Play Billing) in order to obtain the tying product (Google Play Store)." ECF 984, at 21. Paragraph 9 of the injunction bars that conduct: "Google may not require the use of Google Play Billing in apps

distributed on the Google Play Store." ECF 1017, at 2 (¶ 9). As this Court explained, the injunction's prohibition on "requiring that developers use Google Play Billing in apps distributed on the Google Play Store" "breaks the illegal tie." ECF 1016, at 16. The Proposed Modified Injunction, by contrast, permits that very unlawful conduct: "Google *may require*" display of Google Play Billing "side-by-side" with any alternative payment option. ECF 1119-3, at 2 (emphasis added).

**1.** The requirement that a customer purchase a second product as a condition of purchasing a first product constitutes tying, irrespective of whether the customer is prohibited from *also* purchasing the second product from a different seller. *See, e.g.*, *Osborn v. Sinclair Refin. Co.*, 286 F.2d 832, 838 (4th Cir. 1960) (tie does not "escape[] condemnation as an unreasonable per se restraint of trade because the buyer is not obligated to obtain all his requirements of the tied product from the seller"); *cf. Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) ("The 'not insubstantial' requirement can be satisfied by the foreclosure of a single purchaser, so long as the purchaser represents a 'not insubstantial' dollar-volume of sales."). As a practical matter, once a customer has been forced to buy a product from the defendant, the customer may have little demand for the product from a second seller. Consider a resort that requires guests to purchase access to a hotel-owned tennis club with every stay. Nothing would prevent guests from *also* purchasing access to a separate tennis club – but demand for such access would presumably be sharply reduced and might well make any separate tennis club not economically viable.

The same is true here. Even though the Proposed Modified Injunction formally allows the implementation of alternative payment methods, it is designed to discourage – if not outright prevent – their use. If a developer is forced to implement Google Play Billing as a condition of access to the Play Store, the developer has much less incentive to implement an additional form of in-app payment.

Moreover, the service fee that the Proposed Modified Injunction authorizes – up to 20% for most in-game purchases – likely eliminates (or all-but eliminates) any commission saving from

use of an alternative mechanism. *Cf. Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025) (finding Apple in contempt for charging a 27% service fee in violation of an injunction barring Apple from prohibiting developers from offering links to alternative payment mechanisms). After the settlement with Epic, Google informed developers that it would soon begin to charge for alternative billing payments; developers quickly saw that Google's new fee structure will make it uneconomic to employ alternative billing methods: "the math no longer works for alternative payments and webshop linking. . . . The value of these programs exists only while Google isn't collecting fees."[9] Paragraph 9 allows developers to escape the high commissions that Google charges for Google Play Billing; the Proposed Modified Injunction reproduces that harm.

Furthermore, allowing Google to force developers to implement Google Play Billing will obstruct innovation and threaten developers' ability to offer products that consumers want. For example, Microsoft's users now, for the first time, can buy Xbox games within their Android app to load onto their Xbox consoles – because of the original injunction. They also can complete in-game purchases of new levels, avatar outfits, upgraded features, and more, which likewise Microsoft could not offer before the injunction.[10] These purchases are made using *Microsoft*'s trusted payment platform. If Microsoft were required to implement Google Play Billing for these purchases, it would be impractical and uneconomic.

Were the Court to adopt the Proposed Modified Injunction, it is not clear that Microsoft could continue to offer the products it already has released. For one thing, Microsoft's business model and code base are incompatible with Google Play Billing. The Xbox mobile offerings are

---

[9] Andrew Dubatowka, *Google Play's New U.S. Billing & Linking Policies: What Game Developers Need to Know*, Neon (Dec. 10, 2025), https://www.neonpay.com/blog/google-plays-new-u.s.-billing-linking-policies-what-game-developers-need-to-know.

[10] Other developers have similarly hailed the benefits of the injunction in this regard, noting that the injunction "fundamentally reshapes the Google Play ecosystem, meaning for the first time, developers w[ould] no longer be locked into Google Play's billing system and exclusivity rules." Xsolla Blog, *New options for Android developers to offer external purchases in their games: What you need to know* (Oct. 7, 2025), https://xsolla.com/blog/new-platform-rules-for-android-and-what-developers-need-to-know.

not engineered at the code level to use Google Play Billing, and rewriting existing code to add an option for Google Play Billing – alongside the payment systems for which those games are already coded – would be prohibitively expensive and pose substantial compatibility, performance, and integration challenges. Moreover, many popular Xbox games are third-party titles, and Microsoft cannot rewrite their source code to integrate Google Play Billing for in-game purchases on Android. What is true for Microsoft is no doubt true as well for many other developers. Reimposition of the Google Play Billing requirement would not only raise costs for developers but also would block consumer-benefiting innovations altogether.

Epic's request for a modification to the injunction is hard to square with its position on the settlement that the states reached with Google. The state settlement, like the Proposed Modified Injunction, gives developers "the option to add an alternative in-app billing system *alongside* Google Play's billing system." Plaintiff States' Unopposed Motion To Give Notice of Proposed *Parens Patriae* Settlement, *Utah v. Google LLC,* No. 3:21-cv-05227-JD (N.D. Cal. Dec. 18, 2023), ECF 522-2, at 19 (emphasis added). And, like the Proposed Modified Injunction, the state settlement contemplates "a service fee based on purchases made through an alternative billing service." *Id.* at 20. And Epic *condemned* the states' settlement with Google, correctly pointing out that the states "settled with Google before trial to get a one-time payout *with no true relief for consumers or developers*," and that "developers who choose to use a third party payment option will be forced to use Google's deceptively-labeled 'user choice billing' system [which requires developers to use GPB alongside alternatives] rather than having creative freedom over the design of their payment systems."[11] Epic's request seeks a modification that would now permit this same conduct.

**2.** The Court should also reject the provisions of the Proposed Modified Injunction that purport to allow Google to impose service fees when developers use alternative payment methods. In adopting the injunction that is currently in force, this Court declined to engage in "a

---

[11] Epic Games, *Statement on Google's Settlement with State Attorneys General* (Dec. 18, 2023), https://www.epicgames.com/site/en-US/news/statement-on-google-s-settlement-with-state-attorneys-general (emphasis added).

detailed rate-setting exercise beyond its proper role." ECF 1016, at 16. Nothing in the Court's injunction addressed service fees; the Proposed Modified Injunction should not either.

To be clear, whether the imposition of some service fee tied to in-app purchases made using a mechanism other than Google Play Billing may be permissible in some circumstances, *cf. Epic v. Apple*, 161 F.4th at 1187-90, is not an issue that this Court needs to address. A 20% service fee, however, is "a prohibitive commission," and contrary to the terms of the injunction; it is another mechanism for Google to prevent developers from implementing alternative payment mechanisms and thus to reproduce the prohibited tie.

## II. SETTLEMENT IN THESE CIRCUMSTANCES POSES RISKS TO COMPETITION

There is a "strong judicial policy that favors settlements." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). But the preference for settlement should not obscure the risk that settlement may sometimes be a vehicle for anticompetitive agreement. *Actavis*, 570 U.S. at 154. In present circumstances, the Court should not ignore the risk that the settlement will benefit the parties to the settlement but harm consumers.

As this Court stated when it entered the injunction, "[t]he relief in an antitrust case must be effective to redress the violations and to restore competition." ECF 1016, at 5 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972)). An award of equitable relief, unlike an award of damages, is not intended merely to redress the private injuries of the plaintiff but also to "restore economic freedom in the relevant markets and break the shackles of anticompetitive conduct." *Id.* Injunctive relief does not govern solely the defendant's conduct vis-à-vis the plaintiff but the defendant's marketplace conduct more generally – and that makes sense, because to establish antitrust injury and thus liability, it is not enough for a private plaintiff to show that the defendant's conduct harmed the plaintiff; the plaintiff must show that defendant's conduct harmed *competition*. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Having established liability, secured an injunction, and won affirmance on appeal, however, a private plaintiff, in negotiating terms of a settlement, may not have the same incentive

to vindicate the public interest in competition. The Court's injunction, by constraining Google's exercise of monopoly power and opening markets to greater competition, benefits not just Epic but competitors and consumers generally. Were private parties able to obtain modifications to a competition-restoring injunction without establishing good cause, it would create incentives for a potentially anticompetitive bargain. The parties could agree that the defendant should be allowed greater freedom to suppress competition (and thus earn supracompetitive profits); moreover, the injunction could potentially be modified to benefit the plaintiff at the expense of *its* rivals; or the bargain between the parties could compensate the plaintiff more directly through a settlement payment. Such a bargain could be in the plaintiff's self-interest, if it provided a way for the parties to enhance and divide up the defendant's supracompetitive profits.

Just such concerns led the Supreme Court, in *FTC v. Actavis*, to recognize that some patent settlements in the pharmaceutical industry violate Section 1. In that context, holders of pharmaceutical patents may enter into settlements with manufacturers of generic drugs in which the patent-holder (plaintiff) pays the generic manufacturer (accused-infringer/defendant) to delay entry in exchange for a payment. (Because the plaintiff pays the defendant, these are called "reverse-payment" settlements.) As in this context, such settlements may threaten competition because, by delaying entry, the generic competitor allows the manufacturer of the brand-name drug to extend its monopoly and supracompetitive profits; the settlement amount allows the parties to divide those supracompetitive profits. Because pharmaceutical prices *after* generic entry fall sharply, even a fraction of those profits makes it worthwhile for the generic manufacturer to settle. *See Actavis*, 570 U.S. at 154. Mobile gaming may seem far afield from generic pharmaceuticals, but the basic concern is the same here.

To be sure, Microsoft is not privy to the terms of the full, unredacted settlement and makes no accusations. It is true, however, that the only in-game transactions that are subject to a reduced 9% service fee are those that "do not provide more than a de minimis gameplay advantage, including purchases for content, levels, events, or cosmetic items," while those that "provide more than a de minimis gameplay advantage" and "purchases with random outcomes (such as 'loot

boxes')" are subject to a 20% fee. This may work to the benefit of Epic's flagship product, *Fortnite*, which sells no items qualifying for the higher tier: as part of a 2022 settlement with the FTC, Epic reaffirmed that there were "[n]o pay-to-win or pay-to-progress mechanics in player-versus-player experiences," "[n]o paid random item loot boxes since 2019 and no gambling ever."[12] But it does not serve competition more broadly.

The point is more general: because the injunction serves the public interest in competition, the fact that Google and Epic agree that the modification is desirable does not carry any guarantee that the public interest is served. The injunction itself requires Epic and Google to show "good cause" for a modification, ECF 1017, at 4 (¶ 14); Federal Rule of Civil Procedure 60(b) allows modification when "applying [the injunction] prospectively is no longer equitable," for example, but not automatically. Fed. R. Civ. P. 60(b)(5). The anti-tying provision of the current injunction is resoundingly in the public interest, and this Court should not modify it.

## CONCLUSION

For the foregoing reasons, Microsoft respectfully requests that this Court deny Epic and Google's joint motion to modify the permanent injunction, ECF 1119.

Dated: January 16, 2026

Respectfully submitted,

/s/ *Aaron M. Panner*
Aaron M. Panner

Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
Alex A. Parkinson (*pro hac vice*)
aparkinson@kellogghansen.com
Jared M. Stehle (*pro hac vice*)
jstehle@kellogghansen.com
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999

[12] Epic Games, *Epic FTC Settlement and moving beyond long-standing industry practices* (Dec. 19, 2022), https://www.epicgames.com/site/en-US/news/epic-ftc-settlement-and-moving-beyond-long-standing-industry-practices.

Russell P. Cohen (SBN 213105)
russ.cohen@dechert.com
**DECHERT LLP**
45 Fremont Street, 26th Floor
San Francisco, California 94105
Tel: (415) 262-4500

*Counsel for* Amicus Curiae
*Microsoft Corporation*