# EXHIBIT A
## PUBLIC-REDACTED

**Confidential**

## REVISED BINDING TERM SHEET
## FRE 408 AND EQUIVALENT STATE LAWS ("TERM SHEET")

| Recitals and Confidentiality | |
|---|---|
| **1. Framing Recitals** | The Parties desire to: (i) resolve their disputes in *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.) (*Epic I*), (ii) achieve a global settlement of their legal and regulatory disputes; and (iii) avoid disputes and further legal and/or injunction compliance proceedings between them concerning or related to the subject matter of this term sheet ("Term Sheet") and Long-Form Agreement. |
| **2. Binding** | This Term Sheet, which contains all of the material terms of the Parties' agreement, shall become binding upon execution by authorized signatories (named below) and Board approvals. If either party fails to obtain board approval within 48 hours of signing, this agreement will be null and void.<br><br>Upon execution and Board approvals, this Term Sheet shall supersede and replace the Parties' prior term sheet dated October 31, 2025 ("Prior Term Sheet").  The Prior Term Sheet shall no longer have any force and effect with the exception of its "Confidentiality of Term Sheet" section, which shall remain in effect.<br><br>The parties intend that a long-form settlement agreement (the "Long-Form Agreement"), and any accompanying commercial agreements referenced herein, will be drafted and executed by the parties in due course following the execution of this binding Term Sheet.  Until such time as the Long-Form Agreement is executed, the terms of this Term Sheet shall govern. The parties will make reasonable efforts to finalize the Long-Form Agreement by July 31, 2026. |
| **3. Confidentiality of Long-Form Agreement** | Certain of the settlement terms will be confidential (subject to negotiation) and the Parties will agree to protections to prevent disclosure to third-parties, with limited exceptions for obtaining tax or legal advice, compulsion by a court or administrative agency (with reasonable notice to the other party). |
| **4. Applicability of Terms** | Unless otherwise specified, the terms of this agreement are not contingent on the Court in *Epic I* approving and entering the Revised Modified Injunction attached as Exhibit 4 to this Term Sheet and shall take effect regardless of whether the Court approves or rejects the Revised Modified Injunction. |

**Confidential**

| App Store Terms[1] Applicable in the United States | |
|---|---|
| **5. U.S. Registered App Stores** | If the Court in *Epic I* enters the proposed Revised Modified Injunction attached as Exhibit 4 to this Term Sheet, then Google shall extend the provisions of Section 7, below, including the Registered App Store program described in that Section 7, to the United States.  If the Court does not enter the proposed Revised Modified Injunction, Google shall not be obligated to extend the provisions of Section 7 to the United States. |
| **App Store Terms Applicable outside the United States** | |
| **6. Non-U.S. Terms** | The provisions of Sections 7 through 13 apply solely outside the United States and shall have no effect within the United States, including with respect to Android devices sold in the United States, users in the United States, the distribution of apps in the United States, app stores when distributing apps in the United States, or apps when distributed to users in the United States. |
| **7. Direct Downloading Screens Outside the U.S.** | Google agrees to make modifications to future versions of Android (starting with v17 in 2026, no later than QPR2) to simplify the installation flow of Registered App Stores for Android devices outside the United States; and for permissions upon first install from a Registered App Store, per Exhibit 1.<br><br>Google will prohibit, through contracts, the device certification process or otherwise, the introduction of more burdensome Android installation flows for Registered App Stores than, or subject them to obligations in addition to, those set forth in Exhibit 1.<br><br>In order to be eligible for the streamlined flows and permissions, Registered App Stores must:<br>- Qualify as a legitimate app marketplace<br>- Provide a transparent app store user experience<br>- Take reasonable steps to ensure trust, safety and system health<br><br>To be a Registered App Store, app stores would also need to be reviewed by Google's Android team for compliance with policies specifically identified in Exhibit 2, as well as, at Google's election, pay fees reasonably designed solely to cover the operational costs associated with the registration and |

---

[1] Developers who choose to distribute their apps on Google Play are required to sign a Developer Distribution Agreement (DDA). Google shall ensure that the DDA and all other agreements and policies necessary for distribution on the Play Store shall, at all times consistent with the Rollout section, not contain any terms or requirements that are inconsistent with or limit the obligations imposed on Google by this Term Sheet.

**Confidential**

| | |
|---|---|
| | review process. Such fees will not be revenue proportionate.<br><br>Google will continue to permit third-party app stores to operate on Android free of charge and will continue to permit the direct downloading of apps from developer websites and third-party stores without any fees being imposed for those downloads (or purchases made within them) unless the downloads originate from linkouts from apps and games installed/updated by Google Play (excluding web browsers). The foregoing sentence shall apply both inside and outside the U.S., regardless of whether the Court in *Epic I* enters the proposed Revised Modified Injunction. |
| **8. Steering Outside the U.S.** | 1. Google to permit steering to digital goods transactions via external web links or alternative in-app payment options. Alternative payment options shall be shown side-by-side along with Google Play Billing, unless local laws require Google to permit developers to offer alternative payment options without Google Play Billing shown side-by-side.<br><br>2. Google will not be required to permit links to downloads from within an app installed/updated from the Google Play store.<br><br>3. In order to ensure users are able to make a clear choice, the parties will agree upon fair UX guidelines for showing alternative payment processing side-by-side along with Google Play Billing including clear branding, and neutral messaging regarding responsibility for billing and refunds. Developers can show differentiated pricing and benefits. Google Play's Brand FOP icons, and price will appear with equal UX treatment as the developer's Brand and price. As long as the billing rate charged by Google does not exceed 6% (or, for up to a maximum of 10% of countries (which shall not include the UK, Canada, and EU) where Google incurs significantly higher costs of payments, does not exceed 7%), Google may require developers to display Play Points earned in the same side-by-side UX. Google may not require developers to display, or condition the receipt of any benefits on displaying, further Google marketing or promotional messages.<br><br>4. Google will provide an API to render the side by side flows for developers to optionally use. Developers can implement their own purchasing flow themselves subject to the prior paragraph.<br><br>5. When a user clicks on an external link in an app, Google |

**Confidential**

may show an information screen that communicates that the user will be going to an external website to conclude this digital purchase and Google Play is not involved in that purchase.  The information must be communicated in a neutral manner and give the user the option to never display this screen again for the app.  For avoidance of doubt, the screen shall not be designed to decrease the possibility of a successful completion of the transaction.  External links will be allowed to use parameters, like transaction IDs, such that the user be directed to a logged-in web session to complete a transaction.

6.  Google may assess a Service Fee (as described below in Section 9) on the value of transactions, including transactions processed by alternative payment processing or transactions made on the linked website within 24 hours of using an external link.  An API, to be defined by Google, will be made available and required to track these transactions for the primary purpose of facilitating payment and accounting.  The API will not be substantially different from the APIs Google currently has announced for the US, except insofar as reasonably necessary to comply with local regulations.[2] Google will not share data from the API with third parties or use data from the API for the purpose of ads targeting or competing with the developer's app.  The API will not interfere with the ability for developers to exercise the rights provided for under this agreement. Implementation of the API and compliance with requirements to report transactions (subject to audit) are required to enable linkouts. Google shall only be permitted to exercise the rights set forth in this clause 6 on versions of Android where Google makes the relevant API available.

7.  Google may review external links solely for compliance with reasonable Trust and Safety Requirements to protect users and their payment data and to address illegal or harmful content on the destination page (e.g., ensuring the Payments flow is compliant with appropriate payments standards (PCI), ensuring the destination does not have CSAM).

---

[2] *See* https://developer.android.com/google/play/billing/outside-gpb-backend
https://developer.android.com/google/play/billing/externalcontentlinks/integration
https://developer.android.com/google/play/billing/alternative/alternative-billing-without-user-choice-in-app
https://developer.android.com/google/play/billing/alternative/alternative-billing-with-user-choice-in-app

**Confidential**

| | |
|---|---|
| | 8. Google will not discriminate against any developer based on whether the developer offers alternative in-app billing or external purchasing links including but not limited to app review timelines, access to features in the store, or other Google services.<br><br>9. For the avoidance of doubt, nothing in this agreement requires Google to allow external links from apps other than web browsers installed/updated by Google Play to download apps or app stores. In the event Google is required to allow apps other than web browsers to host external links that facilitate the download of apps or app stores from apps installed/updated by Google Play, nothing in this Term Sheet shall be interpreted to prevent Google from charging for such apps or app stores following a successful download. |
| **9. Google Play Service Fee Outside the U.S.** | 1. Google shall retain discretion to set the price for its services within the pricing caps set forth below. For digital goods purchases set forth in this section, Google Android and Google Play shall not charge revenue proportionate or per-purchase fees for apps and games other than (1) the Google Play service fees set forth in this section; (2) fees for the use of Google Play Billing; or (3) applicable taxes. The fees below do not include the fee that Google may charge for Google Play's billing service, at its own discretion.<br><br>2. The pricing caps set forth in this paragraph will only apply to installs from users who first install or first update the app or game from the Google Play Store on or after the date specified in the Fee Rollout Schedule in Section 13 for the given region ("New Installs").<br><br>**Non-Recurring Purchases**:  Standard: 20%<br>                                             Games Level Up Program: 15%<br>                                             Apps Experience Program: 15%<br><br>**Subscriptions:**                    10%<br><br>3. Google shall retain discretion to set the fee for Google Play Billing (GPB). The fee caps listed above will apply regardless of the method of billing (e.g. Google Play Billing, alternative billing service, or linkout). However, |

**Confidential**

| | |
|---|---|
| | as noted, if the item is sold using GPB, an additional GPB fee will apply. |
| | 4. For purchases in apps or games installed or updated by Google Play not defined as "New Installs" above, Google may charge a service fee not to exceed 20% when payments are processed via external web links. |
| | 5. For avoidance of doubt, Epic retains discretion to set prices for the Epic Games Store and is not subject to these price caps. |
| **10. Games Level Up Program Outside the U.S.** | 1. The Games Level Up program referenced in Section 9 is designed to ensure gaming titles deliver a premium gaming experience to Android and Play users.  In order for a gaming title to be in the Games Level Up program, a developer must enroll in the program and ensure that the gaming title meets the requirements of the program. |
| | 2. The service fee cap for the Games Level Up program, as described above in Section 9, will become available in a country only once Google launches the Games Level Up program in that country, which shall occur upon the rollout date for that country, as described in Section 13 below or September 30, 2026, whichever is later. |
| | 3. The Level Up program: |
| |     a. must be open to all game developers in good standing; |
| |     b. must not condition program eligibility on integration with any other Google Service that subjects the developer to additional Google fees beyond those specified in Section 9 above; |
| |     c. must not condition program eligibility on, or impose technical or business terms that would as a practical matter require (1) exclusive integration with Google services or features or (2) integration in a way that precludes the game title from integrating additional substantially |

**Confidential**

equivalent alternatives that are available for that service or feature.  Notwithstanding the prior sentence, eligibility can be conditioned on exclusive integration with an      Android platform level API (e.g Vulkan), except where the developer uses a comparable technical solution to deliver substantially equivalent user / feature benefits.

d.  must not condition eligibility on, or impose technical or business terms that would as a practical matter require, exclusivity to Level Up or otherwise prevent the developer from participating in similar programs to Level Up associated with other stores, so long as those other stores' programs do not have terms that prevent the developer from using the Play Level Up program.

e.  must not include program requirements that would be as a practical matter unreasonable or infeasible to implement for developers on Play who earn more than $1M on Play annually

4.  To be in the Games Level Up Program, gaming titles must meet the following requirements. These requirements will be updated on a regular cadence with reasonable developer notice.

a.  Developers must publish titles on the following form factors with exemplary quality[3] (as defined by the requirements below) starting in 2026: Mobile & Large Screen (Tablet, Android PC, Play Games on PC); starting 2027: XR (with titles running in a 2D window on the XR device), TV, Auto, except where the form factor's constraints would meaningfully degrade a quality experience on that form factor (such as a location-based GPS experience on a TV), and except on particular devices where there is not a viable technical solution to provide a quality experience due to system constraints (e.g. memory, performance, storage, input, or operating system

---

[3] Core quality criteria will be evaluated on a set of flagship reference devices that will evolve over time.

**Confidential**

<table>
<tr>
<td></td>
<td></td>
<td>

version) . When a game title in the Level Up program is published on one of these additional form factors the service fee rate caps in Section 9 will apply to that game title on that form factor.[4]

   i.   Stability[5]: Frame rate stability, Crash rate, ANR, memory usage thresholds

   ii.   Quality[6]: Texture & model quality (metrics to be clearly defined) that are appropriate for device, Keyboard/Mouse & Controller support

   iii.   Maintain latest Android platform SDK standards (e.g 16kb, Vulkan)

   iv.   New titles need to be available on the following form factors: Mobile & Large Screen (Tablet, Android PC, Play Games on PC), XR (with titles running in a 2D window on the XR device), TV, and Auto, no later than their availability on other comparable non-Android platforms or such titles will not be eligible for the program benefits until 6mo after they fulfill all other program requirements across all form factors.

b.  Developers must offer a consistent gamer experience by meeting experiential standards across games, including:

   i.   For games that support user accounts, integrate with our federated identity (Play Games Services ("PGS") sign in) to enable social interoperability (see Section 12 below), provided Google makes these services available for use by apps distributed through third-party stores

   ii.   For games supporting saved game state, cloud saving of game progress (using any cloud provider)

   iii.   For games supporting achievements

</td>
</tr>
</table>

---

[4] Distribution on Play on all form factors will not be required.
[5] The specific standards for stability will be provided per form factor and will provide reasonable time for developers to implement.
[6] The specific metrics for quality will be provided per form factor and will provide reasonable time for developers to implement.

**Confidential**

| | |
|---|---|
| | and/or stats of any sort, integration with PGS achievements & Game stats API (powers leagues, quests, and other social challenges), provided Google makes PGS services available for use by apps distributed through third-party stores |
| | iv.  Support Play's Gamer Platform by providing rewards from classes of items that are already readily available in the title (e.g purchasable cosmetic items) to promote the developer's game. |
| | v.  Integration with Play Games Sidekick, including allowing Google to use in-game data (subject to appropriate user notice and controls) to improve Sidekick features such as tips and tricks, to the extent Sidekick is compatible with the title and any anticheat technology |
| **11. Apps Experience Program Outside the U.S.** | 1.  The Apps Experience Program referenced in Section 9 is designed to ensure apps titles deliver a premium experience to Android and Play users. In order for an app title to be in the Apps Experience Program, a developer must enroll in the program and ensure that the app title meets the requirements of the program. |
| | 2.  The service fee cap for the Apps Experience Program, as described above in Section 9, will become available in a country only once Google launches the Apps Experience Program in that country, which shall occur upon the rollout date for that country, as described in Section 13 below, or September 30, 2026, whichever is later. |
| | 3.  This program: |
| | a.  must be open to all app developers in good standing; |
| | b.  must not condition program eligibility on integration with any other Google Service that subjects the developer to additional Google fees beyond those specified in Section 9 above; |

**Confidential**

|  |  |
|---|---|
|  | c.  must not condition program eligibility on, or impose technical or business terms that would as a practical matter require (1) exclusive integration with Google services or features or (2) integration in a way that precludes the app title from integrating additional substantially equivalent alternatives that are available for that service or feature.  Notwithstanding the prior sentence, eligibility can be conditioned on exclusive integration with an Android platform level API (e.g Photo Picker), except where the developer uses a comparable technical solution to deliver substantially equivalent user / feature benefits. |
|  | d.  must not condition eligibility on, or impose technical or business terms that would as a practical matter require, exclusivity to the Apps Experience Program or otherwise prevent the developer from participating in similar programs to the Apps Experience Program associated with other stores, so long as those other stores' programs do not have terms that prevent the developer from using the Apps Experience Program |
|  | e.  must not include program requirements that would be as a practical matter unreasonable or infeasible to implement for developers on Play who earn more than $1M on Play annually |
|  | 4.  To be in the Apps Experience Program, apps titles must meet the following requirements. These requirements will be updated on a regular cadence with reasonable developer notice. |
|  | a.  Developers must publish titles on all required form factors with exemplary quality (as defined by the requirements below). Required form factors will vary based on the app's category, which will be published as part of the program requirements, where the form factor's constraints would meaningfully degrade a quality experience on that form factor (e.g., video playback on a |

**Confidential**

watch), and except on particular devices where there is not a viable technical solution to provide a quality experience due to system constraints (e.g. memory, performance, storage, input, or operating system version).When an app title in the Apps Experience program is published on one of these additional form factors the service fee rate caps in Section 9 will apply to that app title on that form factor.

i.  Stability[7]: Frame rate stability, Crash rate, ANR, memory usage thresholds, jank thresholds

ii.  Quality[8]: Utilize Jetpack Compose (or an equivalently capable alternative) to deliver a high quality app experience across all form factors (providing the same capabilities as, for example, Adaptive design, Edge to Edge rendering, Dynamic coloring & Theming, Baseline Profiles)

iii.  If supporting another comparable non-Android platform's design system, must also integrate Android's equivalent (e.g. Material UX, System Emoji, Physics-based motion)

iv.  Maintain latest Android platform standards (e.g 16kb, Predictive Back Nav, App Functions)

v.  New titles need to be available on the following form factors: Mobile & Large Screen (Tablet, Android PC), XR (with titles running in a 2D window on the XR device), TV, Wear (with at least companion app support), and Auto, no later than their availability on other comparable non-Android platforms or such titles will not be eligible for the program benefits until 6mo after they fulfill all other program requirements

---

[7] The specific standards for stability will be provided per form factor and will provide reasonable time for developers to implement.

[8] The specific metrics for quality will be provided per form factor and will provide reasonable time for developers to implement.

**Confidential**

| | |
|---|---|
| | across all form factors |
| | vi.    Implement category specific quality requirements as defined by the program (e.g CameraX and Photo Picker integration for social apps, Cast for M&E etc.) |
| | b.   Developers must offer a consistent apps experience by meeting experiential standards across apps, including: |
| | i.    For apps that support user sign in, Entitlement and Sign in restoration (e.g. offer Sign in with Google, Restore Credentials API). For the avoidance of doubt, any such requirements would not preclude use of other identification systems. |
| | ii.   Engage SDK integration (for supported categories) |
| | iii.   Maintain feature parity between Android and other comparable non-Android platforms within 3 weeks of the feature being available on any comparable platform, except if the feature is not feasible on the Android platform. For the avoidance of doubt, lack of feature parity prior to entry in the program does not prevent eligibility for the program. |
| | iv.   Support Play's Content discovery experiences by providing metadata and assets as required for the content vertical (e.g Comics to Comics hub in Play, Drama Shorts). Specification to be defined per vertical and shall not require developer to bear any substantial costs. |
| **12. Social Interoperability Outside the U.S.** | 1.   As part of Play Games Services, Google Play will offer a federated identity system for gaming, similar to Oauth, |

**Confidential**

| | |
|---|---|
| | that enables account linking between third party identity systems and a gamer's Play Games identity. Additionally, Google Play will extend the availability of Play Games identity to any third-party participating platform, enabling users to sign in with the Google Play ID on these platforms. <br><br> 2. Participating platforms will enable users to export their social graph from one platform and import it into another platform. <br><br> 3. Exact technical standards and details will be published at a later time with the goal of having the system available for initial use cases by the end of 2027. |
| **13. Rollout** | Google will roll out provisions relating to Steering (Section 8) and Google Play Service Fees (Section 9) on a schedule ("Fee Rollout Schedule") no later than the following: <br><br> ● European Economic Area and United Kingdom:  by June 30, 2026; <br> ● Australia: by September 30, 2026; <br> ● Korea and Japan:  by December 31, 2026; <br> ● Rest of World:  by September 30, 2027. <br><br> Google will roll out provisions related to the Games Level Up Program Outside the U.S. (Section 10) and the Apps Experience Program Outside the U.S. (Section 11) in each country by the later of September 30, 2026, and the Fee Rollout Schedule listed above. |
| **Other Terms** | |
| **14. Epic Reinstatement** | Outside the United States, Epic and its subsidiaries shall have the option to list or relist any of their respective games and other applications on the Google Play store (including Fortnite, but not the Epic Games Store), subject to Google's generally applicable policies. <br><br> In the United States, Epic and its subsidiaries shall have the option to list or relist any of their respective games and other applications on the Google Play store consistent with Google's generally applicable policies in the United States and any injunction in *Epic I* in force in the United States. |

**Confidential**

| | |
|---|---|
| | Google shall not treat Epic or its subsidiaries or their respective applications adversely based on any actions taken by Epic prior to the date of this Term Sheet in connection with the disputes that are the subject of this Term Sheet.<br><br>For avoidance of doubt, Epic will comply with the DDA and all Google Play Developer Policies in effect at the time it lists or relists any of its respective games and/or other applications on the Google Play Store.<br><br>Outside the United States, Epic will not insert links to transactions in apps installed/updated by Google Play until Google Play rolls out provisions relating to steering on the schedule described above, except where Google is required to allow such links pursuant to local laws or regulations. |
| **15. Metaverse Browser App Category** | ███████████████████████████████████████████████████████████████████████<br><br>MetaVerse Browsers", which will be defined (with further detail and description in the Long-Form Agreement) as apps or game apps that:<br><br>(a) ████████████████████████████████████████████████████████████████;<br><br>(b) ████████████████████████████████████████<br><br>(c) have the primary purpose of allowing the navigation and exploration of metaverse worlds;<br><br>(d) ████████████████████████████████████<br><br>(e) support virtual items and identity that are portable across different worlds in the metaverse browser; and<br><br>(f) must support modern security considerations including Sandbox capabilities, limitations on code execution, and secure connections. |

**Confidential**

|  | Any app that meets the definition of Metaverse Browser will be treated as such, regardless of whether it previously did not meet the definition or was not so categorized. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████: <br><br> • ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ <br><br> • ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ <br><br> • ████████████████████████████████████████ ████████████████████████████████████████. |
|---|---|
| **16.** ██████████████████ | See Exhibit 3 ("██████████████").  The Parties will use best efforts to finalize Exhibit 3 by 12 PM PT, March 3, 2026. |

| **General Terms** | |
|---|---|
| **17. Global scope** | This Term Sheet and the Long-Form Agreement will be global in scope, but particular Sections may apply only to certain countries, as specified in specific Sections of this Term Sheet. <br><br> This Term Sheet and the Long Form Agreement will be applicable to all current and future games and other apps of Epic and its subsidiaries. Subject to complying with the Registered App Store requirements, this Term Sheet and the Long-Form Agreement will cover the Epic Games Store. |
| **18. Form Factor** | This Term Sheet and the Long-Form Agreement shall cover smartphone and tablet devices and no other form factors. For the avoidance of doubt, any references to Android herein refers |

Confidential

| | to Android for smartphone and tablet devices. |
|---|---|
| **19. No admission of liability**. | Neither Party will admit any liability or concede the merit of any arguments or defenses. |
| **20. Dismissal of Claims** | Promptly upon execution of this Term Sheet, the parties will jointly petition the Court in *Epic I* to seek entry of the Revised Modified Injunction in the form attached hereto as Exhibit 4.

Within 5 days of this Term Sheet becoming binding, as described in Section 2, the parties will file papers necessary to effectuate a dismissal with prejudice (or the local equivalent) in all other jurisdictions in which Epic has pending claims against Google, and Google's Cert Petition before the Supreme Court.

Within 45 days of this Term Sheet becoming binding, as described in Section 2, Google shall pay Epic $▮▮▮▮ for its attorneys' fees and costs and Epic and Google shall waive and/or withdraw all global requests for attorneys' fees and costs. |
| **21. Withdrawal of pending regulatory complaints** | In accordance with local practice and procedures, and to the extent feasible, Epic will withdraw any written complaints that it previously lodged with governmental agencies or commissions or courts or tribunals about Google and the subject matter of this Term Sheet and/or the Long-Form Agreement.  For the avoidance of doubt, this provision requires reasonable, good faith efforts by Epic to request the withdrawal of written complaints that it submitted through any formal agency complaint process (e.g., a "Form C" complaint with the European Commission or a complaint with the Netherlands ACM); however, this provision does not restrict Epic's ability to respond to inquiries from government agencies.  For the avoidance of doubt, notwithstanding the non-disparagement provision below, nothing in this term sheet restricts Epic's advocacy or complaints regarding parties other than Google, including its advocacy regarding generally applicable changes such as app-related legislation where that advocacy does not seek to impose new obligations on Google beyond those set forth in this agreement. |
| **22. Cessation of advocacy against Google Play** | Epic may remain a member of advocacy groups such as the Coalition for App Fairness but will not advocate for further changes to the Google policies and practices that are the subject of this Term Sheet and/or the Long-Form Agreement, |

16

**Confidential**

| | |
|---|---|
| | except that Epic may speak in support of legislation or regulation proposed by others that imposes new obligations generally on closed mobile ecosystems comprised of smartphone and/or tablet categories, provided any such advocacy is directed specifically at the practices of companies other than Google. Nothing herein prevents Epic from advocating changes to the policies or practices of, or restricts Epic's advocacy or complaints regarding, other companies, including Apple. For the avoidance of doubt, notwithstanding the non-disparagement provision below, nothing in this term sheet restricts Epic's advocacy or complaints regarding parties other than Google, including its advocacy regarding generally applicable changes such as app-related legislation where this advocacy does not seek to impose new obligations on Google beyond those set forth in this agreement. |
| **23. Covenant not to sue or assist others to sue** | The Parties will agree to not sue each other or directly or indirectly support a third party that has sued or may in the future sue the other concerning or related to the subject matter of this Term Sheet (excluding the ▮▮▮ section) and the Long-Form Agreement or those matters covered by the release of claims; provided, however, this provision does not restrict (a) either party's ability to respond to validly issued discovery requests from third parties or other legally binding obligations to provide evidence in a proceeding, (b) either party from seeking to enforce the terms of this Term Sheet and/or the Long-Form Agreement or the modified injunction contemplated thereby, (c) either party from seeking to enforce the terms of the commercial agreements contemplated by this term sheet (*e.g.*, the ▮▮▮▮▮▮▮) or release any claims relating to the commercial agreements or (d) Epic from complying with its indemnity obligations to the consumer claimants in *Epic Games and Others v. Alphabet Inc, Google LLC and Others* (UK Competition and Appeal Tribunal, Case No. 1378/6/7/20), provided that Epic shall in good faith seek to end its indemnity obligations following dismissal of its litigation against Google in the UK.<br><br>Epic covenants not to assert claims against Google on or after the expiration of the provisions of this Term Sheet and/or Long-Form Agreement for conduct substantially similar to the conduct alleged in *Epic I* or *Epic Games, Inc. v. Google LLC*, No. 3:24-06843-JD (N.D. Cal.) ("*Epic II*")  so long as Google continues to comply with the Steering, Service Fee, and Direct Downloading provisions in Section 7 through 9 of this Term Sheet as well as the provisions of Section 5 of this Term Sheet in the event that Section becomes effective, unless the claims are based on new conduct by Google that is not substantially similar to the conduct that was the basis of *Epic I* or *Epic II*. |

**Confidential**

|  |  |
|---|---|
|  | This covenant shall survive the term of this Term Sheet and/or Long-Form Agreement. |
| **24. Release of claims** | The Parties will agree to a mutual release of all claims that (i) were or could have been raised in the litigation and (ii) concern or relate to the subject matter of the allegations in the litigation. The Parties will each waive the protections of Cal. Civil Code Section 1542. For the avoidance of doubt, the releases herein shall not apply to conduct occurring after the expiration of the applicable provision of this Term Sheet and/or the Long-Form Agreement or injunction addressing such conduct. |
| **25. Dispute escalation process**. | During the term of this Term Sheet and/or Long-Form Agreement, the Parties will agree to escalate to their respective designated executives any concerns or disputes concerning or related to the subject matter of this Term Sheet and/or the Long-Form Agreement. For the avoidance of doubt, the Parties agree this clause requires an attempt at pre-litigation dispute resolution, but does not restrict a party from responding to inquiries from government agencies. |
| **26. Non-disparagement** | The Parties agree to not disparage each other or their respective business practices related to: (i) the factual allegations, legal claims or remedies (proposed or imposed) in *Epic I*, *Epic II* or in any non-U.S. litigation or regulatory proceeding initiated by Epic against Google regarding similar subject matter; and (ii) the subject matter of this Term Sheet and/or Long-Form Agreement.  For the avoidance of doubt, nothing in this term sheet restricts Epic's advocacy or complaints regarding parties other than Google, including its advocacy regarding generally applicable changes such as app-related legislation where this advocacy does not seek to impose obligations on Google beyond those set forth in this agreement or its ability to respond to investigative requests by regulatory and legislative bodies.<br><br>In light of the totality of the commitments made by Google in this Term Sheet, Epic agrees that the terms in this Term Sheet are reasonable and appropriate.  Epic agrees that it will not object to fees that are within the pricing caps described in Section 9, including if such fees are assessed in the United States. |
| **27. Term** | This Term Sheet and/or the Long-Form Agreement shall expire 5 years from the actual date of the completion of the global rollout of the steering and service fee changes set forth in this Term Sheet; provided, however, (i) the provisions to be set forth in the Revised Modified Injunction shall expire upon the expiration of such provisions stated in the injunction, (ii) the |

Confidential

| | provisions related to confidentiality and release of claims shall survive the expiration of this Term Sheet and/or the Long-Form Agreement and (iii) the ████████████████ shall expire as provided in that agreement. |
|---|---|
| **28. Public Statement & Advocacy** | The Parties shall agree on the content of a joint statement, or acceptable separate statements, supportive of the business changes reflected in the Term Sheet, and reflecting the spirit of the Parties' new partnership.<br><br>Epic believes that the Google and Android platform, with the changes in this term sheet, are procompetitive and a model for app store / platform operations, and will make good faith efforts to advocate for the same.<br><br>The Parties will undertake reasonable efforts to defend the validity and enforceability of this Term Sheet before courts, government authorities and tribunals. |
| **29. Legal/Governance Provisions** | **Integration clause**. Until such time the Long-Form Agreement is executed, this Term Sheet is the entire agreement between the Parties with respect to the subject matter. Upon execution of the Long-Form Agreement, the Long-Form Agreement shall be the entire agreement between the Parties with respect to the subject matter.<br><br>**Representation by counsel.** Each Party's counsel represents they are not representing any other claimants against the other Party.<br><br>**Interpretation as joint drafting**. This Term Sheet and/or the Long-Form Agreement will be deemed to have been jointly negotiated and drafted.<br><br>**Authority to Bind Parties.** Each person executing this Term Sheet and/or the Long-Form Agreement on behalf of a Party or Parties represents they have the authority to execute it and bind that Party or those Parties.<br><br>**Attorneys' Fees/Costs.** Unless otherwise agreed to in the Long-Form Agreement and as set forth in Section 20 (Dismissal of Claims), each Party will bear their own attorneys' fees and costs.<br><br>**Governing law; exclusive forum**. This Term Sheet and the Long-Form Agreement will be governed by California law. Any dispute arising out of or relating to this Term Sheet and/or the Long-Form Agreement shall be brought in the Northern District of California. Notwithstanding the foregoing the governing law and forum for disputes arising out of or relating to the ████████ ████████████████ shall be as set forth therein.<br><br>**Compliance with Local Laws.** Each Party intends to comply with applicable laws, regulations and court orders in the jurisdictions in which they conduct business. Nothing in this |

Confidential

|  | Term Sheet or the Long-Form Agreement shall require or shall be interpreted to require either Party to violate applicable laws, regulations or court orders in any jurisdiction. Each party represents that, to their knowledge, nothing in this term sheet would cause such party to be in violation of any such applicable laws, regulations or court orders.

If a provision of this Term Sheet or Long-Form Agreement is determined to require an action that would be inconsistent with the laws, regulations, or court orders of a particular jurisdiction, the Parties shall: (i) not be required to take that action to the extent it would violate the laws, regulations, or court orders of that jurisdiction; and (ii) work in good faith to address that situation so that the Parties' commitments in this Term Sheet or Long-Form Agreement can be effectuated to the maximum extent possible without violating the laws, regulations, or court orders of that jurisdiction.

An "Invalid Provision" is defined as:

    (a) any provision or subpart of a provision in this Term Sheet that a court, governmental authority or tribunal (in each case, of competent jurisdiction) finds invalid or unenforceable;

    (b) any provision or subpart of a provision in this Term Sheet that a court, governmental authority or tribunal (in each case, of competent jurisdiction) informs a Party will be the subject of an investigation and said Party (after good-faith consultation with the other Party) reasonably believes the investigation will lead to a finding that the provision or subpart of a provision is invalid or unenforceable; or

    (c) any provision or subpart of a provision in this Term Sheet that the Parties come to agree would likely be found invalid or unenforceable under existing or new law or regulations.

With respect to an Invalid Provision: (i) any unaffected portions of the Invalid Provision and the other provisions in this Term Sheet will remain in full force and effect, provided that with respect to the Steering terms (Section 8) and the Service Fee term (Section 9), if one is deemed invalid then the other will be treated as invalid as well, (ii) neither Party shall have any right to terminate this Term Sheet as a result of such Invalid Provision; (iii) the Invalid Provision will remain in effect outside the affected jurisdiction to the maximum degree possible under the law; and (iv) the Parties will promptly use their utmost best efforts to modify such Invalid Provision (and, if necessary, any valid provisions or subparts thereof) to enable Google to develop alternative pricing structures in the affected jurisdiction that have the purpose and effect of retaining, to the maximum degree possible under the law, the benefits that would be |

**Confidential**

obtained by each Party under the Term Sheet if the Invalid Provisions were valid and enforceable. Notwithstanding anything to the contrary in this paragraph, should a court, governmental authority or tribunal in any jurisdiction prohibit Google from assessing any revenue proportionate fees on transactions processed by alternative payment processing or transactions made on a linked website using an external link, or fees on links to downloads in jurisdictions where required, the Parties will confer in good faith to consider modifications to this Term Sheet, including to the last paragraph of Section 7, in order to enable Google to develop alternative pricing structures in the affected jurisdiction that take into account the regulatory approach in said jurisdiction and the economic model that jurisdiction permits for other platforms.

**Authorization.** Where authorization or approval from a competition authority is required, or the Parties agree that it may be advisable to obtain, for any provision of this term sheet to come into force in a particular jurisdiction, the parties agree:

> (i)     to apply for such authorization or approval within the timeframes required by local law and to take all reasonably necessary steps to prepare that application, and to promptly provide any additional information requested, or respond to any questions raised, by the relevant authority; and

> (ii)     that the relevant provisions are conditional upon, and will not come into force in that jurisdiction unless and until, the grant of such authorization or approval; provided, however, that said authorization or approval is either unconditional or on conditions that are acceptable to Google (acting reasonably).

**Confidential**

## ACKNOWLEDGED AND AGREED BY

On behalf of Epic Games, Inc.                     On behalf of Google LLC

Tim Sweeney                                                 Lara Kollios
CEO                                                             Director, Regulatory Affairs
Epic Games, Inc.                                           Google LLC

DATE: _____                        DATE: _____
3/3/2026                                                          3/3/2026

**EXHIBIT 1**

# Unified Install and Permission flow





# Unified Install and Permission flow







# EXHIBIT 2

# App Store Definition

## 1.  Operate as a Legitimate Marketplace

- **Open Access:** Function as an open 3P marketplace for all eligible third-party developers, with clear, non-discriminatory policies, including, for stores who choose to allow ads, permitting developers to integrate any ad network compliant with applicable trust and safety policies.

- **Developer Authorization:** Maintain direct contractual relationships with developers and have their express authorization to distribute their apps.

- **IP Compliance:** Respect intellectual property rights and maintain a clear process for handling IP disputes.

## 2. Provide a Transparent User Experience

- **Primary Purpose:** The store's main function must be the discovery, installation, and management of apps from a diverse catalog. The Store must be consumer-facing (with a user destination and launcher icon) that is either pre-loaded or explicitly installed by the user. A store may have additional features beyond its main function, such as social features (friends, chat, game clip sharing), and utility features (authentication, parental controls, account and family management).

- **Clear App Information:** Display essential app details, including name, developer, description, version, and size.

- **User Control:** Ensure app installations and ownership changes occur only with explicit user consent and provide clear user controls for automatic or manual updates.

- **User Support:** Offer direct and accessible customer support channels.

## 3. Ensure Ecosystem Trust & Safety

- **Security:** Proactively and in good faith prevent the distribution of malware and Potentially Harmful Apps (PHAs) and prohibit illegal or fraudulent activity through robust policy enforcement.

- **Privacy & Compliance:** Publish and in good faith enforce clear privacy policies, do not materially violate applicable laws and regulations (e.g., GDPR, DSA), and manage government requests appropriately.

- **Technical Health:** Adhere to Android's technical requirements (e.g., target API levels) to ensure a high-quality, stable, and performant user experience.

- **User Safety:** Provide parental controls and enforce policies against deceptive or disruptive practices including advertising.

# Process

- All evaluations of compliance with app store registration requirements and related support functions shall be conducted by Android.  Google Play shall have no role in determining whether an app store meets the criteria for a registered app store or determining if an app store is compliant with policies.

- Where Android determines an app store is or becomes materially noncompliant with the app store registration criteria, Android will give the app store notice of the circumstances of non-compliance.

- Prior to any de-registration of an app store, Android shall provide the app store with an opportunity to cure.  The timing for the opportunity to cure depends on the nature and severity of the circumstances of non-compliance.  Android shall provide at least seven (7) days and up to thirty (30) days to cure, depending on the circumstances.  Android may provide extensions in the cure period if the app store has made substantial, good faith efforts to cure.

- A denial in registration or de-registration may occur without a cure period if the app store negligently or intentionally causes extreme user harm (e.g., intentional installation of known malware).

- Android shall provide a right to appeal registration decisions.

- Google Play shall be subject to these same requirements.

- For avoidance of doubt, Google will not use the above Trust & Safety requirements as a pretext to discriminate against any app store provider.

- The parties agree to review the volume of incidents and user harm detected by Google after 180 days to determine if the above measures are working as intended to keep consumers safe.

- * Further details will be provided in the Long-form agreement.

# EXHIBIT 3

**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



# EXHIBIT 4

**Revised Modified Injunction**

This modified permanent injunction is entered in MDL member case *Epic Games, Inc. v. Google LLC et al.*, Case No. 20-cv-05671-JD, based on the joint motion filed by the parties. This injunction supersedes the permanent injunction entered by the Court on October 7, 2024, ECF No. 1017.

1.      This injunction applies to Google LLC and each of its parent, affiliated, and subsidiary entities, officers, agents, employees, and any person in active concert or participation with them, who receive actual notice of this order by personal service or otherwise (together, Google). The term "Android" as used in this injunction refers to smartphones and tablets that run the Android operating system and the term "Android apps" refers to apps for Android smartphones and tablets.  The term "app" or "apps" means all applications, including games, but excludes app stores.

2.      Unless otherwise stated, the effective date of the injunction was October 29, 2025.

3.      The geographic scope of the injunction is the United States of America.

4.      For a period of three years ending on October 29, 2028, Google may not share revenue generated by the Google Play Store with any person or entity that distributes Android apps, or has stated that it will launch or is considering launching an Android app distribution platform or store.

5.      For a period of three years ending on October 29, 2028, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer to launch an app first, exclusively, or at the same time in the Google Play Store, anywhere in the world, as compared to the launch date of that app on another app distribution platform or store for smartphones and/or tablets in the United States. Notwithstanding the prior sentence, Google may condition a payment, revenue share, or access to any Google product or service on an agreement by an app developer to launch an app first, exclusively or at the same time on the Android platform, provided that the developer is free to choose any Android app store for distribution in the United States.

6.      For a period of three years ending on October 29, 2028, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer not to launch on a third-party Android app distribution platform or store in the United States a version of an app that includes features not available in, or is otherwise different from, the version of the app offered on the Google Play Store (anywhere in the world).

7.      For a period of three years ending on October 29, 2028, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an original equipment manufacturer (OEM) or carrier to refrain from placing a third party Android app store on any specific location on an Android device.

8.      For a period of three years ending on October 29, 2028, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an OEM or carrier not to preinstall an Android app distribution platform or store other than the Google Play Store.

9.      For a period of three years ending on October 29, 2028, Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing.  Google may not require a developer to set a price based on whether Google Play Billing is used.

10.     For a period of three years ending on October 29, 2028, Google may not prohibit a developer from communicating with users inside or outside of an app about the availability or pricing of an app (including an app store) outside the Google Play Store.  This paragraph does not require Google to permit a developer to include an in-app link leading to an app or app store download within apps installed or updated on the Google Play Store.

11.     For a period of three years, Google will permit third-party Android app stores to access the Google Play Store's catalog of apps so that they may offer the Play Store apps to users. For apps available only in the Google Play Store (i.e., that are not independently available through the third-party Android app store), Google will permit users to complete the download of the app through the Google Play Store on the same terms as any other download that is made directly through the Google Play Store. Google may keep all revenues associated with such downloads. Google will provide developers with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store.  Google will have until July 22, 2026 to implement the technology necessary to comply with this provision, and the three-year time period will start once the technology is fully functional.

12.     For a period beginning seven days after the Court enters this Modified Injunction through September 30, 2032, Google will continue to permit third-party app stores to operate on Android free of charge and will continue to permit the direct downloading of apps from developer websites and third-party stores without any fees being imposed for those downloads unless the downloads originate from linkouts from apps installed/updated by Google Play (excluding web browsers).  Starting no later than December 31, 2026 or 45 days after the Court enters this modified injunction, whichever is later, Google will develop and release a process to certify an Android app store as a "Registered App Store" and will maintain this feature through September 30, 2032.

    a.  Starting no later than December 31, 2026 or 45 days after the Court enters this modified injunction, whichever is later, and continuing through September 30, 2032, Google will modify future versions of the Android operating system so that a user can install a Registered App Store from a website by clicking on a single store install screen using neutral language. This will also grant the permission to the store to install apps.

      b.   Google may create reasonable requirements for certification as a Registered App Store, including but not limited to review of the app store by Google's Android team and the payment of reasonable fees to cover the operational costs associated with the review and certification process.  Such fees may not be revenue proportionate.

13.      The parties will recommend to the Court a three-person Technical Committee. Epic and Google will each select one member of the Technical Committee, and those two members will select the third member. After appointment by the Court, the Technical Committee will review disputes or issues relating to the technology and processes required by the preceding Paragraphs. If the Technical Committee cannot resolve a dispute or issue, a party may ask the Court for a resolution. The Technical Committee may not extend any deadline set in this order.  Each party will bear the cost of compensating their respective party-designated committee member for their work on the committee. The third member's fees will be paid by the parties in equal share.

14.      The Court will retain jurisdiction over the injunction for all purposes. Google or Epic may request a modification of the injunction for good cause.