Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999

Russell P. Cohen (SBN 213105)
russ.cohen@dechert.com
**DECHERT LLP**
45 Fremont Street, 26th Floor
San Francisco, California 94105
Tel:  (415) 262-4500

*Counsel for* Amicus Curiae
*Microsoft Corporation*

[Additional counsel listed on the signature block]

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC, et al.*<br>Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD<br><br>**[PROPOSED] BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY AS *AMICI CURIAE* IN OPPOSITION TO RENEWED JOINT MOTION TO MODIFY PERMANENT INJUNCTION**<br><br>Judge:  Hon. James Donato |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTEREST OF *AMICI CURIAE* ...................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................................................3

BACKGROUND ....................................................................................................................5

ARGUMENT ..........................................................................................................................8

      I.     THE COURT SHOULD NOT ELIMINATE THE
PROHIBITION ON EXCLUDING ALTERNATIVE APP
STORES FROM THE PLAY STORE..............................................................9

      II.    GOOGLE'S PROHIBITIVE FEES WOULD UNDERMINE
THE COURT'S INJUNCTION ...................................................................10

CONCLUSION .....................................................................................................................13

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

## **TABLE OF AUTHORITIES**

**CASES**

*Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025)............................................ 4-5, 11-12

*Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943 (N.D. Cal. 2025)............................................... 11

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025)..................................... 3, 7, 12

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,* 20 F.4th 466 (9th Cir. 2021) ........................... 4, 12

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) ................................................................. 9

*S.E.C. v. Worthen*, 98 F.3d 480 (9th Cir. 1996) ..................................................................................... 9

ii

## INTEREST OF *AMICI CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer hardware, software, and security features; it has been creating software platforms and application programming interfaces for application developers for more than 40 years.  Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate.  Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing, in addition to a variety of commercial and enterprise technologies powered by artificial intelligence.  Microsoft invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic technology markets.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues in this case.  As part of its business, Microsoft sells hardware devices and is one of the leading operating systems for personal computers.  Microsoft also provides online stores for applications that run on its consumer operating systems.  In other parts of its business, Microsoft sells applications, software, and services that run on mobile operating systems produced by Google LLC ("Google") and Apple Inc. ("Apple").  Microsoft offers products that compete with Google, including – like Epic Games, Inc. ("Epic") – games for distribution on Android devices.  Microsoft also is a global leader in digital, online, and computer security, protecting a significant amount of critical internet and computing infrastructure throughout the United States and the world.

In response to the injunction, Microsoft has undertaken significant efforts to prepare and launch new consumer offerings, which have won approval from Android users.  Microsoft has a keen interest in the continued implementation the injunction, which has enabled innovation, spurred technological development, and promoted competition.  These benefits have already accrued to

---

[1] No counsel for any party to this case has authored this *amicus* brief, in whole or in part, nor has any party to this case or their respective counsel contributed money to fund the preparation or submission of this brief.  The parties take no position on the filing.

1

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

consumers and will continue to do so; the Court should leave its injunction in place in the public interest.

Take-Two Interactive Software, Inc. ("Take-Two") is a leading developer, publisher, and marketer of interactive entertainment for consumers around the globe. Take-Two develops and publishes products principally through the Rockstar Games, 2K, and Zynga labels. Take-Two's games are some of the most recognizable franchises in the world – including *Grand Theft Auto*, *Red Dead Redemption*, *NBA 2K*, *WWE 2K*, *Words with Friends*, and FarmVille – and are played by hundreds of millions of people globally.

Most of Take-Two's mobile games are developed and published by its Zynga label. Zynga's business model depends on mobile app distribution platforms, such as the Google Play Store on Android devices and the Apple App Store on Apple devices, to make its games accessible to a wide audience of potential users. The fees, rules, and technical restrictions associated with distributing mobile apps on the Google Play Store materially impact Zynga's ability to appropriately price its products, efficiently acquire users, invest in innovation, and create high-quality gaming experiences for consumers.

Take-Two therefore has a strong interest in ensuring that mobile-distribution markets remain competitive, that developers have meaningful choice in distribution and payment solutions, and that platform fees and restrictions do not unduly burden game developers or ultimately harm consumers. These competitive conditions are a critical prerequisite to Take-Two's and other developers' ability to invest in mobile game development and to foster long-term consumer choice, value and engagement.

Supercell Oy ("Supercell") is a leading mobile game developer that operates globally with offices in Helsinki, San Francisco, Seoul, Shanghai, and London. Supercell develops and operates popular free-to-play games played by millions of users worldwide and distributes its games through app stores, including the Google Play Store. Supercell is one of the highest-grossing mobile game developers globally with a portfolio of commercially successful mobile games including flagship titles such as *Clash of Clans*, *Clash Royale*, *Hay Day*, *Boom Beach*, and *Brawl Stars*, which have

2

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

generated well over $20 billion in cumulative lifetime revenue and have amassed over seven billion global downloads.

The Google Play Store is a critical distribution channel for Supercell games. Multiple Supercell titles have individually surpassed 100 million to 500 million installs on Google Play, placing them among the most widely distributed and commercially successful applications on the platform. In comparison to Epic's popular *Fortnite* game listed as having more than 10 million downloads on Google Play, Supercell's *Clash of Clans*, *Clash Royale*, and *Brawl Stars* games are each listed on the Google Play Store individually as having more than 500 million downloads each.

As a developer whose business depends on fair, competitive, and transparent access to mobile games through app stores, Supercell has a substantial interest in ensuring that mobile distribution platforms and the injunction at issue promote innovation, consumer choice, and competition on the merits. App store restrictions that limit developers' ability to communicate with users to market competitive alternatives and to implement alternative payment solutions unreasonably restrain developers' ability to market, invest in, and distribute games to users, which negatively impacts developer expansion, the creation of new content, and user engagement. Modifying the injunction risks reversing the benefits that have only begun to accrue to the benefit of consumers, developers, third-party billing providers, and competition by reducing the restraints on procompetitive free-to-play mobile games that depend on the ability to generate fair profits through in-game purchases that are needed to reinvest in game development and innovation.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

"[I]njunctive relief under Section 16 [of the Clayton Act] is meant to restore economic freedom in the relevant markets and break the shackles of anticompetitive conduct." ECF 1016, at 5. The jury found that Google unlawfully monopolized the market for distribution of Android apps and unlawfully tied distribution through the Play Store to use of Google Play Billing for in-app purchases. As a consequence of its unlawful monopolization, by 2020, "the Play Store accounted for 95% of all Android app downloads in the United States." *See In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 932 (9th Cir. 2025). And by forcing developers to use Google Play Billing –

3

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

and to pay "hefty commission[s]" on in-app purchases – Google was able to reap "a 71% operating profit" on the Play Store as of 2021. *See id.* Under these circumstances, effective injunctive relief should not only "terminate the illegal monopoly" but also, critically, "*deny to the defendant the fruits of its statutory violation.*" ECF 1016, at 6 (quoting *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (emphasis added)).

The injunction that this Court entered in 2024 – and which took effect in July 2025 – was entered with those goals explicitly in mind. But the parties' proposed revisions to the injunction – although less egregious than those they previously proposed – would still significantly undermine the effectiveness of the Court's injunctive relief. *First*, the proposal to eliminate the provision barring Google from excluding rival app stores from the Play Store – and to replace it with a program for side-loaded Registered App Stores – would make it significantly more difficult for rival app stores to chip away at Google's app distribution monopoly. Android users in the United States have become habituated to obtaining apps through the Play Store, and *only* through the Play Store – one result of Google's exclusionary conduct. Accordingly, the most effective – potentially the only – way for users to discover alternatives to the Play Store is through the Play Store itself. There is no justification for replacing that aspect of the injunction with a less effective "Registered App Store" program.

*Second*, the announcement in the parties' Status Report that Google will impose fees comparable to those that prevailed before the injunction took effect perpetuates the tying that this Court has prohibited and allows Google to continue to reap the fruits of its unlawful conduct. Google has stated that those high commissions apply whether or not a developer utilizes Google Play Billing for in-app purchases; the additional fee for use of Google Play Billing is 5%. But it is not practical for a developer to implement an alternative billing mechanism simply to achieve such limited savings. *See Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1181 (9th Cir. 2025). Furthermore, although a prohibition on *any* fee for linked-out purchases is not a part of the Court's injunction – and although the Court made clear that it would not engage in any "detailed rate-setting exercise" to implement its prohibition on tying, ECF 1016, at 16 – the Court, as part of the

4

enforcement of the existing injunction, should require Google to demonstrate that the commissions they seek to charge are reasonable. *See Epic v. Apple*, 161 F.4th at 1186. That is the only way to ensure that Google cannot continue to reap the benefit of its unlawful conduct before the remedy has the chance to take hold.

## **BACKGROUND**

1.      As this Court recognized in adopting the permanent injunction in this case, the task of remediating Google's unlawful conduct requires the imposition of a broad and effective injunctive decree. Most fundamentally, Google's monopoly on distribution of Android apps is likely to be stubbornly durable as a result of the barriers to entry and expansion that Google has constructed. "The consequences to be remediated are intertwined with the network effects of Google's dominant position in the relevant markets." ECF 1016, at 10. "'Network effects' in this context means that the greater the number of developers, the greater the number of users, and vice versa." *Id.* "Developers come to Play because that's where the users are." *Id.* Accordingly, simply permitting the introduction of alternative app stores on Android does little to introduce effective competition into the market for app distribution or to dilute Google's monopoly. On the contrary, competitors have always had the theoretical ability to introduce alternatives to the Play Store; yet "[e]ven a corporate behemoth like Amazon could not compete with the Google Play Store due to network effects." *Id.*

The Court thus recognized that its injunction could not merely "prohibit the specific anticompetitive conduct that Google engaged in" but would also have to "undo the consequences of Google's ill-gotten gains" by overcoming the "enhanced network effects Google reaped." *Id.* at 11. Two aspects of the Court's injunction are specifically designed to help alternative app stores overcome Google's entrenched network-effects advantage. The first is to provide app stores access to "the catalog of Play Stores apps for a period of time sufficient to give rival stores a fair opportunity to establish themselves." *Id.* at 10. As the Court noted, the "catalog access provision is narrowly tailored": all it does is to provide that "if a rival app store does not have a relationship with a developer and so cannot fulfill a download request by a user, the rival will direct the

5

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

download request to the Google Play Store." *Id.* at 11-12.  The limits of that remedy are evident:  it removes one impediment to rival app stores' efforts to "get[] off the ground despite network effects and the disadvantage of offering a catalog of app/games that is too limited to attract users," while leaving Google's other significant advantages in place.  *Id.* at 12 (cleaned up).

The second aspect of the injunction that is aimed at network effects is the prohibition on Google's "excluding rival app stores from the Play Store."  *Id.*  This Court emphasized the evidence at trial showing that to get a rival app store on an Android device, a user would be required to "download it from a website or platform other than the Play Store" – a complex process involving a number of steps.  *Id.*  But the significance of access to the Play Store goes beyond avoiding the unnecessary friction that Google built into side-loading.  Because Google has preserved its monopoly on app distribution for years, most Android users have been conditioned to understand that the only way to obtain an app on their phones is by using the Play Store.   As the evidence at trial showed, "a user trying to download a rival app store outside the Play Store would almost always face the barrier of the unknown sources install flow."  *Id.* (internal quotation marks omitted). To have a chance at gaining user awareness and acceptance, an app must be able to reach users through the Play Store, and an app selling other apps is no exception to this rule.

**2.**      In November 2025, Epic and Google informed the Court they had reached a settlement "contingent on the Court entering" a "Proposed Modified Injunction."  ECF 1119, at 1. Among other changes, the Proposed Modified Injunction proposed to eliminate the "Catalog Access and Third-Party Store Distribution remedies" in this Court's injunction with a "Registered App Stores remedy" that, the Parties claimed, would "address[] the install frictions" that were "a major competitive challenge for rival app stores."  *Id.* at 1-2.

Among others, the Federal Trade Commission ("FTC") raised questions about whether the elimination of these remedies – notwithstanding the introduction of the Registered App Stores program – would leave in place "significant barriers to getting on users' phones."  ECF 1163-2, at 15.  "It is unclear how accessible, as a practical matter, users will find the website-based Registered App Store installation process."  *Id.*  And "it is also unclear how rival app stores will

6

be able to overcome Google's network effects without the robust catalog of apps that the catalog access remedy would provide." *Id.*

3.  As Microsoft described in its prior filing in response to the Parties' original motion to modify the injunction, the requirement that developers use Google Play Billing gave rise to this litigation.  That tying requirement harmed developers in part because it was the mechanism through which Google exacted its monopoly rents for use of the Play Store.  As the Ninth Circuit summed it up, "Google leveraged its significant market share in app distribution to maximize its profits from the Play Store.  For instance, all developers offering apps on the Play Store are required . . . to process in-app purchases using Google Play Billing and pay a hefty commission." *In re Google Play Store*, 147 F.4th at 932.

Paragraph 9 of the Court's injunction addresses the unlawful tie.  Paragraph 9 of that injunction provides:

> For a period of three years ending on November 1, 2027, Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing.  Google may not require a developer to set a price based on whether Google Play Billing is used.

ECF 1017, at 2 (¶ 9).

In addition to the proposal to modify the Catalog Access and Play Store Distribution remedies, the Parties' November motion to modify the injunction effectively eliminated the injunction's anti-tying provision.  In place of the straightforward prohibition contained in paragraph 9 of the Court's injunction, the proposed modification would have allowed Google to require developers to implement Google Play Billing.  Although Google would have been required to "permit apps installed/updated by the Google Play [S]tore to show alternative payment options," such alternatives would have had to "be shown side-by-side along with Google Play Billing."  ECF 1119-3, at 2; *see id.* (Google "may require side-by-side placement").  In addition, the Proposed Modified Injunction would have authorized Google to impose a "service" fee for all "in-app and linked purchases"; for most in-game purchases, that fee was 20%.

7

**4.**    Faced with opposition from third parties and skeptical comments from the FTC, and after a hearing at which the Court expressed its skepticism concerning the proposed modifications, the parties withdrew their original motion, and, on March 4, 2026, the Parties submitted a Renewed Joint Motion To Modify.  The relief requested serves to underscore just how much of an overreach their initial motion was.  For starters, the parties no longer claim that a modification of the Court's injunction is a pre-condition for their settlement to take effect.  In addition, the Parties have abandoned their effort to eliminate the catalog remedy.  And they have similarly ended their attempt to alter the anti-tying provision of the injunction.  But the Parties have *not* abandoned their efforts to eliminate the prohibition on Google excluding rival app stores from the Play Store, renewing their proposal to replace that provision of the injunction with Google's favored "Registered App Store" program.  *See* ECF 1179.[2]

Also on March 4, the Parties submitted a "Status Report" which included "an update regarding the specific fees Google intends to charge in connection with in-app purchases or external links."  ECF 1181, at 2.  For most non-recurring in-app purchases, Google will charge a commission of 20% (for apps installed after June 30) or 25% for existing installs.  If most purchases made on an external website are reached by clicking a link within an app – a "linkout" – Google will charge 20%.  And if a developer uses Google Play Billing, Google will charge an additional 5% fee on top of the 20% or 25% commission imposed for the transaction.  *See* ECF 1181-1.

## **ARGUMENT**

If the Parties' March 4 filings demonstrate anything, it is that Google will never willingly facilitate the dismantling of its monopoly or surrender the extraordinary profits that its monopoly brings.  That is no surprise, of course.  But the Parties' renewed motion provides no justification

---

[2] Indeed, despite this Court's injunction, and its skeptical reaction to Google's proposed modification, Google is continuing to impose burdensome conditions on alternative payment methods.  For example, before a developer can utilize external payment links, Google requires that it enroll in Google's External Content Links program or Alternative Billing program, both of which impose burdensome technical requirements such as integration of Google's external content links APIs, the display of "scare screens" about alternative payment methods, and tracking of external transactions.

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

for vitiating the alternative app store distribution remedy imposed by this Court. And the fee structure announced in the Parties' Status Report perpetuates the effective prohibition on use of alternatives to Google Play Billing while allowing Google to continue to extract monopoly profits from developers. The Court should not allow either result.

The governing legal standard is not in dispute: parties seeking to modify a permanent injunction must demonstrate "a significant change in factual conditions or in law"; if the parties meet that threshold, only then does the Court "consider whether the proposed modification is suitably tailored to the changed circumstances." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-84 (1992). Modification of a permanent injunction is extraordinary relief. *S.E.C. v. Worthen*, 98 F.3d 480 (9th Cir. 1996). Here, the parties have made no serious attempt to demonstrate any changed circumstances; regardless, the parties provide no justification for altering the remedy that this Court initially imposed.

## I.    THE COURT SHOULD NOT ELIMINATE THE PROHIBITION ON EXCLUDING ALTERNATIVE APP STORES FROM THE PLAY STORE

This Court's permanent injunction "prevents Google from excluding rival app stores from the Play Store." ECF 1016, at 12. When it imposed this remedy, the Court recognized that distribution through the Play Store "level[s] the playing field for a discrete period of time so that rival app stores have a fighting chance of getting off the ground despite network effects." *Id.*

The parties' proposal for a Registered App Store program significantly weakens the injunction by denying alternative app stores access to the sole *effective* means of gaining widespread acceptance by users of Android phones. The jury's core monopolization finding demonstrates that Google unlawfully made the Play Store the only realistic source for apps – even if there were other theoretical options. For this reason, Android users have become habituated to obtaining apps through the Play Store. Under any circumstances, persuading users that they should alter their fixed habits and begin to download apps from an alternative app store will be a tall order. Given the monopoly position of the Play Store, however, the only realistic way for users to discover alternatives to the Play Store is through the Play Store itself. Even though

9

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

Google has promised to reduce the friction associated with loading alternative app stores outside the Play Store, the proposal provides an inadequate substitute for download through the Play Store.

Furthermore, the Parties have offered no persuasive justification for altering the third-party app store distribution remedy. The parties argue (ECF 1179, at 7-8) that approval through the Registered App Store program will be more straightforward than approval for distribution through the Play Store, but this Court has already made clear that Google will "bear the burden . . . of establishing" that any security requirements imposed on third-party app stores are "strictly necessary to achieve safety and security for users and developers." ECF 1016, at 13. The Parties do not explain how the "safety and security" criteria that Google proposes to adopt for the Registered App Store program would be insufficient to address any legitimate security concerns associated with distribution of third-party app stores through the Play Store. To the extent Google suggests (ECF 1179, at 7) that it would be permitted to "fence out legitimate competitors" from the Play Store, this Court's injunction is directly to the contrary.

The parties also argue (ECF 1179, at 6-7) that the Registered App Store program will be available in the rest of the world and that some firms may welcome the opportunity to roll out the program in the United States as well. But nothing *prevents* Google from adding a Registered App Store program in the United States, so long as it also continues to comply with the injunction. As between the two, given the reality of Google's app distribution monopoly, a Registered App Store program will not provide as effective a mechanism for overcoming the network effects that the Play Store has built up over more than a decade of effective exclusivity in app distribution. One does not have to be cynical to suspect that this is precisely why Google continues to press for the change.

## II.    GOOGLE'S PROHIBITIVE FEES WOULD UNDERMINE THE COURT'S INJUNCTION

The parties' status report announces Google's intention to impose high fees for all in-app transactions, whether or not the developer uses Google Play Billing; the additional fee for use of

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

Google Play Billing is 5%.  This fee structure perpetuates the tying that this Court held was barred; furthermore, fees at the level that Google has proposed defeat a core purpose of injunctive relief, which is to deny Google the "fruits of its statutory violation."  ECF 1016, at 6.

*First*, the level of the discount that Google provides for developers who choose not to use Google Play Billing does not make it practical for a developer to implement an alternative billing mechanism simply to achieve savings of 5%.  In substance, Google's proposed fee structure is hardly different from the one that Apple adopted in response to the district court's injunction in *Epic v. Apple*.  There, Apple ostensibly dropped its prohibition on use of links to external payment mechanisms in response to the district court's order that it do so.  But Apple proceeded to charge a 27% commission on linked-out purchases – compared to a commission of 30% for purchases through Apple's IAP.  The district court found that such a commission structure defied its order requiring Apple to permit linked-out purchases because the 3% discount "made all alternatives to [its platform] economically non-viable."  *Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943, 992 (N.D. Cal. 2025), *aff'd in part*, *rev'd in part*, *and remanded by* 161 F.4th 1162 (9th Cir. 2025).

The Ninth Circuit affirmed in relevant part:  it agreed that "charging commissions on linked-out purchases gives [Apple] the power to prohibit them."  *Epic v. Apple*, 161 F.4th at 1180.  And by charging commissions on alternative purchase mechanisms that were only marginally lower than the commissions charged for use of IAP, Apple's commissions were "prohibitive."  *Id.* at 1181.  The same is true here:  charging a 25-30% commission for use of Google Play Billing and 20-25% for *not* using Google Play Billing does not make the latter an economically viable alternative.  At a minimum, to establish that the fee structure it proposes complies with Paragraph 9 of the injunction, Google should be required to provide evidence that its fee structure does not effectively reimpose the tie that the injunction prohibits.

*Second*, although a prohibition on *any* fee for linked-out purchases is not a part of this Court's injunction – and although the Court made clear that it did not intend to engage in any "detailed rate-setting exercise," to implement its prohibition on tying, ECF 1016, at 16 – the Court, as part of the enforcement of the existing injunction, should require Google to justify the

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

commissions it seeks to charge.  The Ninth Circuit recently confronted a similar situation when it reviewed the district court's order barring Apple from imposing any commission in connection with linked-out purchases.  As noted, the court of appeals agreed with the district court that the commissions that Apple had attempted to impose violated the district court's injunction.  But it held that permanently restricting Apple from charging *any* commission would be unduly punitive.  Instead, it held that Apple could comply with the injunction by "imposing a non-prohibitive, reasonable commission or fee to ensure security and privacy for users."  161 F.4th at 1186.  Any "reasonable fee," the court suggested, should be "based on Apple's 'actual costs' to 'ensure user security privacy.' "  *Id.*

There are strong remedial justifications for demanding at least that level of scrutiny here. Google's requirement that developers use Google Play Billing was the most important mechanism allowing Google to reap the rewards of its unlawful monopolization of app distribution – avoiding competition in payment processing was never the main goal.  As this Court noted when it originally entered the injunction, injunctive relief should be designed to "deny to the defendant the fruits of its statutory violation."  ECF 1016, at 6 (quoting *Optronic*, 20 F.4th at 486.  Google's commission announcement seeks to perpetuate the "hefty commission[s]" that allowed Google to reap operating profits in excess of 70%.  *In re Google Play Store Antitrust Litig.* 147 F.4th 917, 932 (9th Cir. 2025).  In addition, by setting commission rates far above the level required to deliver a reasonable return, Google can exercise leverage over developers by offering "discounts" in exchange for developers' agreement to various "programs" that effectively grant Google privileged access to user data, which Google can then use to reinforce its power in adjacent markets.  Supervision of Play Store commission rates is therefore necessary not just to make the distribution of apps more competitive but also to prevent Google from leveraging its dominance in app distribution to undermine competition elsewhere.

There is no need, as this Court has observed, for the Court to engage "in a detailed rate-setting exercise."  ECF 1016, at 16.  But requiring Google to justify the commissions it charges for in-app purchases and linked-out purchases is necessary to ensure that Google cannot evade the

spirit of the Court's anti-tying remedy.

## **CONCLUSION**

For the foregoing reasons, *Amici* respectfully request that this Court deny Epic and Google's Renewed Joint Motion To Modify Permanent Injunction, ECF 1179, and bar implementation of Google's Play Fees in the United States, ECF 1181, pending further submissions to establish that the fee structure complies with Paragraph 9 of the Court's injunction.

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD

Dated:  April 6, 2026

Respectfully submitted,

/s/ *Aaron M. Panner*
Aaron M. Panner

Aaron M. Panner (*pro hac vice*)
apanner@kellogghansen.com
**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999

Russell P. Cohen (SBN 213105)
russ.cohen@dechert.com
**DECHERT LLP**
45 Fremont Street, 26th Floor
San Francisco, California 94105
Tel:  (415) 262-4500

*Counsel for* Amicus Curiae
*Microsoft Corporation*

Becca J. Wahlquist (SBN 215948)
bwahlquist@kelleydrye.com
**KELLEY DRYE & WARREN LLP**
350 South Grand Avenue, Suite 3800
Los Angeles, CA 90071
Tel.: (213) 547-4900

Michael C. Lynch (*pro hac vice forthcoming*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Tel.: (212) 808-7800

*Counsel for* Amicus Curiae
*Take-Two Interactive Software, Inc.*

Susannah P. Torpey (*pro hac vice pending*)
storpey@winston.com
**WINSTON & STRAWN LLP**
200 Park Ave.
New York, New York 10166
Tel: (212) 294-6700

Jeanifer Parsigian (SBN 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Tel: (415) 591-1000

*Counsel for* Amicus Curiae
*Supercell Oy*

14

BRIEF OF MICROSOFT CORP., TAKE-TWO INTERACTIVE SOFTWARE, INC., AND SUPERCELL OY
OPPOSING JOINT MOTION TO MODIFY PERMANENT INJUNCTION | CASE NO. 3:21-MD-02981-JD