Benjamin Simon

539 Dale Dr.

Incline Village, NV 89451

Telephone: (206) 886-5615

Email: ben@downdogapp.com

Proposed Amicus Curiae, Pro Se

**FILED**

APR -6 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **MOTION FOR LEAVE TO FILE BRIEF OF AMICUS CURIAE BENJAMIN SIMON IN RESPONSE TO RENEWED JOINT MOTION TO MODIFY PERMANENT INJUNCTION** |
| *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |
| | Judge: Hon. James Donato |

MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF | CASE NO. 3:21-MD-02981-JD

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Benjamin Simon hereby moves this Court for leave to file a brief as amicus curiae in response to Epic and Google's renewed joint motion to modify the permanent injunction (MDL Dkt. No. 1179). The proposed amicus brief is attached hereto as Exhibit A. A proposed order granting this motion is attached as Exhibit B. Printouts of the Google support pages cited in the proposed brief are attached as Exhibits C, D, and E.

Epic and Google have taken no position on this filing; Google reserves the right to respond.

This motion is filed pursuant to the Court's March 11, 2026 Order (MDL Dkt. No. 1183), which provides that "[i]nterested parties may file by April 6, 2026, requests to file amicus briefs in connection with Epic and Google's renewed joint motion to modify the permanent injunction."

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. STANDARD FOR LEAVE TO APPEAR AS AMICUS CURIAE

District courts have broad discretion to accept amicus curiae briefs. Amicus briefs are "frequently welcome" in district court when the amicus has "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide" and the issues have "potential ramifications beyond the parties directly involved." NGV Gaming, Ltd. v. Upstream Point Molate, LLC, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) (quoting Cobell v. Norton, 246 F. Supp. 2d 59, 62 (D.D.C. 2003)); see also California v. U.S. Dep't of Labor, No. 2:13-cv-02069-KJM-DAD, 2014 WL 12691095, at *1 (E.D. Cal. Jan. 14, 2014). "The touchstone is whether the amicus is 'helpful,' and there is no requirement 'that amici must be totally disinterested.'" Id. (quoting Hoptowit, 682 F.2d at 1260). This Court has recognized this standard and has previously accepted amicus briefs in this litigation. See, e.g., MDL Dkt. Nos. 1156, 1159, 1163.

1

## II. MR. SIMON BRINGS A UNIQUE PERSPECTIVE AS A FORMER TRIAL WITNESS AND INDEPENDENT APP DEVELOPER

Benjamin Simon is the co-founder and CEO of Yoga Buddhi Co, doing business as Down Dog, a suite of six consumer fitness apps serving approximately 100,000 users per day on Android, iOS, and the web. Mr. Simon testified at trial in this action as a third-party witness for Epic Games on November 6, 2023. His testimony addressed the real-world impact of Google's billing requirements and anti-steering policies on independent app developers and their users.

Mr. Simon's proposed brief draws on his trial testimony and his direct experience operating a subscription app on Android, iOS, and the web to address the practical impact of the proposed fees and conditions on independent developers. This practical, developer-level perspective is not available from the parties and will assist the Court in evaluating the proposed modifications.

Mr. Simon's perspective is distinct from that of any party. Epic Games is both an app developer and the operator of a competing app store; its interests in how the injunction structures fees and distribution rights may differ from those of an independent developer like Down Dog, which has no interest in operating an app store and simply seeks to sell subscriptions to its users without incurring service fees on transactions that Google Play Billing does not process. Developers in this position would be significantly affected by the proposed modifications, and their practical perspective is not adequately represented by any party.

No party or party's counsel authored this brief in whole or in part. Mr. Simon prepared this brief himself and is filing it at his own expense.

## CONCLUSION

For the foregoing reasons, Mr. Simon respectfully requests that the Court grant this motion and accept the proposed amicus brief attached as Exhibit A.

2

Dated: March 30, 2026                    Respectfully submitted,

Benjamin Simon

Co-Founder and CEO, Down Dog

539 Dale Dr.

Incline Village, NV 89451

ben@downdogapp.com

*Amicus Curiae, Pro Se*

3

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, I served the foregoing Motion for Leave to File Brief of Amicus Curiae Benjamin Simon, including all exhibits, by electronic mail upon the following counsel of record for the parties:

Gary A. Bornstein

Cravath, Swaine & Moore LLP

gbornstein@cravath.com

*Counsel for Plaintiff Epic Games, Inc.*

Paul J. Riehle

Faegre Drinker Biddle & Reath LLP

paul.riehle@faegredrinker.com

*Counsel for Plaintiff Epic Games, Inc.*

Glenn D. Pomerantz

Munger, Tolles & Olson LLP

glenn.pomerantz@mto.com

*Counsel for Defendants*

Brian C. Rocca

Morgan, Lewis & Bockius LLP

brian.rocca@morganlewis.com

*Counsel for Defendants*

Kyle G. Bates

Hausfeld LLP

kbates@hausfeld.com

*Counsel for Developer Plaintiff Class*

Steve W. Berman

Hagens Berman Sobol Shapiro LLP

4

steve@hbsslaw.com

*Counsel for Consumer Plaintiff Class*

Hae Sung Nam

Kaplan Fox & Kilsheimer LLP

HNam@kaplanfox.com

*Counsel for Consumer Plaintiff Class*

Brendan P. Glackin

Lieff Cabraser Heimann & Bernstein LLP

bglackin@lchb.com

*Liaison Counsel for State Attorneys General*


On the same date, I caused the original filing to be sent via overnight courier to the Clerk of Court, United States District Court, Northern District of California, 450 Golden Gate Avenue, Box 36060, San Francisco, CA 94102-3489.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: March 30, 2026

Benjamin Simon

5

# Exhibit A

Benjamin Simon

539 Dale Dr.

Incline Village, NV 89451

Telephone: (206) 886-5615

Email: ben@downdogapp.com

Proposed Amicus Curiae, Pro Se

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **[PROPOSED] BRIEF OF AMICUS CURIAE BENJAMIN SIMON, CO-FOUNDER AND CEO OF DOWN DOG, IN RESPONSE TO RENEWED JOINT MOTION TO MODIFY PERMANENT INJUNCTION** |
| *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |
| | Judge: Hon. James Donato |

BRIEF OF AMICUS CURIAE BENJAMIN SIMON | CASE NO. 3:21-MD-02981-JD

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........................................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I. A SERVICE FEE ON LINKED TRANSACTIONS

       WOULD BE PROHIBITIVE IN PRACTICE ............................................................ 3

    II. THE "LINKOUT" CONCEPT IS TOO AMBIGUOUS

       TO SUPPORT A FEE REGIME ........................................................................... 4

    III. THE PARTIES' OWN CONDUCT CONFIRMS THAT

        FEES AND CONDITIONS ARE NOT AUTHORIZED ......................................... 5

CONCLUSION ................................................................................................................... 7

i

# TABLE OF AUTHORITIES

**CASES**

Epic Games, Inc. v. Apple Inc.,

    No. 4:20-cv-05640-YGR (N.D. Cal.),

    aff'd, No. 25-2935 (9th Cir. Dec. 11, 2025) ................................................................. 1, 5

**OTHER AUTHORITIES**

Google, An update regarding Google Play's policies for developers

    serving users in the US, Google Play Console Help (2025),

    https://support.google.com/googleplay/android-developer/answer/15582165 ............... 1, 5, 6

Google, Enrolling in the external content links program for

    users in the US, Google Play Console Help (2025),

    https://support.google.com/googleplay/android-developer/answer/16470497 ............... 1, 6

Google, Payments policy, Google Play Console Help (2025),

    https://support.google.com/googleplay/android-developer/answer/10281818 ............... 4

ii

## INTEREST OF AMICUS CURIAE

Benjamin Simon is the co-founder and CEO of Yoga Buddhi Co, doing business as Down Dog, a suite of six consumer fitness apps serving approximately 100,000 users per day on Android, iOS, and the web. Before founding Down Dog in 2015, Mr. Simon was a software engineer at Google.

Mr. Simon testified at trial in this action as a third-party witness for Epic Games on November 6, 2023. His testimony addressed the real-world impact of Google's billing requirements and anti-steering policies on independent app developers and their users — including the concrete harm caused when Google prohibited Down Dog from informing its Android users of cheaper subscription options available on its website. Mr. Simon also testified as a third-party witness in Epic Games, Inc. v. Apple Inc., No. 4:20-cv-05640-YGR (N.D. Cal.), including at evidentiary hearings concerning Apple's compliance with an injunction addressing similar anti-steering restrictions. No party or party's counsel authored this brief in whole or in part. Mr. Simon prepared this brief himself and is filing it at his own expense. He has no financial relationship with any party to this litigation. He testified, and files this brief, because Google's policies directly affect his business and his users.

## SUMMARY OF ARGUMENT

Amicus respectfully submits this brief to offer a practical, developer-level perspective on the parties' renewed proposal. The Revised Proposed Modified Injunction ("RPMI") omits fee provisions entirely, and the accompanying private settlement addresses fees only outside the United States. Yet Google has already announced an External Content Links Program that would charge fees — 10% for auto-renewing subscriptions, 20% for other digital transactions — and that immediately imposes enrollment requirements and link-specific restrictions on developers in the United States, publicly invoking the settlement as its basis. (See Exhibits C, D.) Amicus submits that Paragraph 9 already bars these restrictions, and offers three points drawn from direct experience in support.

1

First, any service fee on transactions that follow an in-app link would be prohibitive in practice. At trial, Mr. Simon testified that approximately half of Down Dog's Android users already subscribe on the company's website without any in-app link. A fee triggered by a link would therefore apply to far more transactions than the link actually generates. At any non-negligible fee rate, the rational response is to remove the link entirely — and the communication right that Paragraph 9 protects goes unexercised.

Second, any fee regime tied to the concept of a "linkout" would be unworkable because the concept is inherently ambiguous. There are many ways a developer can communicate a URL to a user, and developers with an economic incentive to avoid fees will inevitably find ways to route users to their websites without triggering whatever definition of "linkout" is adopted. The Existing Injunction avoids this problem entirely.

Third, the parties' own conduct confirms that the Existing Injunction does not authorize fees or conditions on developers' use of alternative payment methods. Google's initial compliance beginning October 29, 2025 imposed no fees, no enrollment requirements, and no link-specific restrictions. Google announced those restrictions only six weeks later, after settlement negotiations had begun. And Epic's acceptance of Google's proposed fees is a negotiated trade — not a legal interpretation of the injunction — that should not override the rights Paragraph 9 provides to all developers.

## ARGUMENT

Paragraph 9 of the Existing Injunction (Dkt. No. 1017, § 9) provides:

"Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing."

Before the Court can evaluate the parties' proposed modifications, it must determine what

2

Paragraph 9 already provides — and in particular, whether it permits Google to impose service fees, enrollment requirements, and conditions on the very alternatives and communications it protects.

## I.    A SERVICE FEE ON LINKED TRANSACTIONS WOULD BE PROHIBITIVE IN PRACTICE.

An in-app link directing users to a developer's website is the most natural way to exercise the communication right Paragraph 9 protects. At trial, Mr. Simon testified that when Down Dog included such a link, approximately 90 percent of users chose to purchase on the website rather than through Google Play Billing. (Trial Tr. 296:11–16.) But critically, after Google forced Down Dog to remove the link, approximately half of Android users still subscribed on the website — without any in-app communication whatsoever. (Trial Tr. 300:8–11; 294:21–23.)

This testimony reveals why any non-negligible fee on linked transactions would be prohibitive. The roughly 50 percent of users who subscribe on the website without any in-app link represent the baseline — users who find the website regardless of what the app says. A fee triggered by a link tap applies to every linked transaction, including the many baseline users who would have subscribed on the website anyway. At any non-negligible fee rate, the fee on baseline transactions alone exceeds the revenue the link generates. The rational response is to remove the link entirely — and the communication right that Paragraph 9 protects goes unexercised.

Google labels its proposed charge a "service fee," but the substance is what matters. The fee would apply to transactions processed entirely by third-party payment processors on the developer's own website, in which Google Play Billing played no role. Apps routinely open links to help pages, terms of service, social media profiles, and countless other destinations without any fee or precondition. Google proposes to charge a fee only for links that communicate the availability of an alternative payment method. Paragraph 9's first sentence prohibits Google from requiring Google Play Billing and from prohibiting alternatives; a fee on transactions processed through those alternatives burdens that choice. And because the fee is triggered not by the use of

3

an alternative payment method generally, but only when the developer includes a tappable in-app link, it is a fee on the communication itself — the precise communication Paragraph 9's second sentence protects.

## II.    THE "LINKOUT" CONCEPT IS TOO AMBIGUOUS TO SUPPORT A FEE REGIME.

The parties' proposed modifications, their settlement agreement, and Google's External Content Links Program all rely on the concept of a "linkout" — a link within an app that directs the user to an external destination. Fees are then assessed on transactions completed within a time window after the user follows the link. But the concept of what constitutes a "linkout" is far more ambiguous than it appears. Consider just four scenarios — developers with an economic incentive to avoid fees will inevitably devise others:

1. An in-app button labeled "Subscribe on our website" that opens the user's browser to downdogapp.com/purchase. This is plainly a "linkout."

2. A button in the app labeled "Get your discount" that sends the user an email containing a link to downdogapp.com/purchase. The user reaches the website through their email client. Is this a "linkout"? The transaction originated from an in-app action, but the link was delivered via email — a channel that Google's own payments policy explicitly carves out. (See Exhibit E.)

3. The same button, but instead of an email it sends a push notification. The user taps the notification, which opens downdogapp.com/purchase in their browser — reaching the website via a system notification rather than a tappable in-app element or an email.

4. Text displayed in the app reading: "Visit downdogapp.com/purchase for 33% off." The URL is plain text, not a tappable link. The user must type or copy it. Is this a "linkout"?

All four scenarios communicate the same information and lead to the same result: a user subscribing on the developer's website. Yet a fee structure tied to "linkouts" would treat them very differently. The first scenario clearly triggers a fee. The second and third are uncertain at minimum. And the fourth cannot trigger a fee at all — Google's External Content Links Program

4

requires the developer to call a Google API when the user taps a link, and where there is no tappable link, there is no API call to make. A rational developer would therefore display a plain-text URL rather than a tappable link, deliberately degrading the user experience to avoid the fee. That perverse result illustrates why tying a fee regime to the concept of a "linkout" is unworkable.

The parallel litigation in Epic Games, Inc. v. Apple Inc., No. 4:20-cv-05640-YGR (N.D. Cal.), confirms this concern. There, an injunction prohibiting Apple from blocking developers' use of "buttons, links or other calls to action" led to protracted disputes over what counted as compliant. Apple imposed fees, information screens, and design restrictions — formally complying while undermining the injunction's purpose. Judge Gonzalez Rogers found Apple in civil contempt, and the Ninth Circuit affirmed. See Epic Games, Inc. v. Apple Inc., No. 25-2935 (9th Cir. Dec. 11, 2025). Importing a "linkout"-based fee regime into this case would invite the same definitional battles.

The Existing Injunction avoids these problems entirely. Paragraph 9 draws a clear line: Google may not require Google Play Billing, may not prohibit alternatives, and may not suppress communication about alternatives.

## III. THE PARTIES' OWN CONDUCT CONFIRMS THAT FEES AND CONDITIONS ARE NOT AUTHORIZED.

Google's initial compliance with the Existing Injunction is the strongest evidence that Paragraph 9 does not authorize the fees and conditions Google now proposes. The injunction was entered on October 7, 2024, giving Google more than a year to plan its compliance before the effective date. Beginning on October 29, 2025, Google permitted alternative payments and external links in the United States without any service fees, enrollment requirements, or link-specific restrictions. (See Exhibit C.)

It was not until December 9, 2025 — six weeks later, after the parties had begun negotiating the proposed modifications — that Google announced its intention to impose fees

5

and program requirements through the External Content Links Program. (See Exhibit C.) Google framed the program as operating "in connection with the US District Court's order" — treating the Existing Injunction as permitting not only fees, but enrollment requirements, mandatory information screens, and restrictions on what developers may display on their own websites. (See Exhibit D.)

The parties' own prior filings confirm that this question is unresolved. In their first joint motion to modify the Existing Injunction, the parties acknowledged that they disagreed about "whether (and, if so, to what degree) Google may charge service fees on transactions processed using alternate payment methods." (Dkt. No. 1119 at 14.) If the parties who litigated this case cannot agree on whether the Existing Injunction permits such fees, third-party developers have no way to plan their businesses with confidence.

Epic's current position underscores why the Court should resolve this question rather than leaving it to private agreement. In the parties' joint status report (Dkt. No. 1181), Epic states that it "will not object to these fees" "[b]ased on Google's commitments to support open store competition, in-app and out-of-app payment competition, and other aspects of Android as an open platform." (Id. at 2.) Epic does not say the Existing Injunction permits the fees. It says it will accept them in exchange for other commitments from Google. That is a negotiated trade — and Epic's interests as both an app developer and the operator of a competing app store may differ from those of an independent developer like Down Dog. Down Dog has no interest in operating an app store and simply seeks to communicate with its users without incurring fees on transactions that Google Play Billing does not process. The injunction protects all developers, and its scope should be determined by the Court, not traded away in a private settlement.

Paragraph 9 does not say Google may not prohibit communication about alternatives "unless the developer pays a fee, enrolls in a program, and satisfies Google's conditions." It says Google may not prohibit such communication, full stop.

6

## CONCLUSION

Amicus respectfully requests that the Court:

1. Clarify that Paragraph 9 prohibits Google from imposing fees or conditions on developers' use of alternative payment methods or developers' communication with users about such alternatives;

2. Decline to construe any modification of the Existing Injunction as authorizing fees or conditions that the Existing Injunction does not permit; and

3. Decline to adopt any modification tied to the concept of a "linkout," as the inherent ambiguity of that concept will generate ongoing disputes and undermine the protections that Paragraph 9 was designed to provide.

The Existing Injunction's approach is simple and workable: Google may not require Google Play Billing, may not prohibit alternatives, and may not suppress communication about alternatives. Google's own initial compliance demonstrates that this approach works in practice. The Court should preserve this approach.

Dated: March 30, 2026

Respectfully submitted,

Benjamin Simon

Co-Founder and CEO, Down Dog

539 Dale Dr.

Incline Village, NV 89451

ben@downdogapp.com

*Amicus Curiae, Pro Se*

7

# Exhibit B

Benjamin Simon

539 Dale Dr.

Incline Village, NV 89451

Telephone: (206) 886-5615

Email: ben@downdogapp.com

Proposed Amicus Curiae, Pro Se

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **[PROPOSED] ORDER GRANTING MOTION OF BENJAMIN SIMON FOR LEAVE TO FILE BRIEF AS AMICUS CURIAE IN RESPONSE TO RENEWED JOINT MOTION TO MODIFY PERMANENT INJUNCTION** |
| *Epic Games, Inc. v. Google LLC* et al., Case No. 3:20-cv-05671-JD | |
| | Judge: Hon. James Donato |

Having considered Amicus Benjamin Simon's Motion for Leave to File an Amicus Curiae Brief and having given the parties notice and opportunity to be heard, the Court hereby GRANTS the Motion and ORDERS that Amicus Simon's brief be accepted as filed.

IT IS SO ORDERED.


Dated: _____, 2026          By: Hon. James Donato

United States District Judge

1

# Exhibit C

Case 3:21-md-02981-JD    Document 1192    Filed 04/06/26    Page 22 of 34

# An update regarding Google Play's policies for developers serving users in the US

On September 12, 2025, the Ninth Circuit upheld changes to Android and Google Play in an injunction entered by a US District Court in an ongoing US legal proceeding with Epic Games. As always, user trust and safety remains at the center of what we do, while following our SAFE principles ☑ .

Changes to our policies during the effective dates of the injunction will be published on this page.

> **To ensure compliance with the injunction as of October 29, 2025 we have made the following changes for apps on mobile and tablet form factors when serving users in the United States:**
>
> - Google will not prohibit a developer from communicating with users about the availability or pricing of an app outside the Google Play Store, and will not prohibit a developer from providing a link to download the app outside the Google Play Store or link to transactions.
> - Google will not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google will not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing. Google will not require a developer to set a price based on whether Google Play Billing is used.

## Additional updates on March 4, 2026:

We entered a new settlement agreement with Epic and the parties have asked the US District Court to enter a revised Modified Injunction. More details will be provided in the coming months.

Our current policies and programs remain in effect. Developers may continue to link users to external content or to offer alternative billing systems by complying with the following policies and programs (as launched on December 9, 2025):

- Payments policy ☑
- Alternative billing programs for all eligible developers serving US users
- External content links program for developers looking to link users in the US to external content

Additional changes to our policies consistent with the injunction will be published on this page.

---

## Need more help?
### Try these next steps:

**Post to the help community**
Get answers from community members

**Contact us**
Tell us more and we'll help you get there

# Exhibit D

Case 3:21-md-02981-JD    Document 1192    Filed 04/06/26    Page 25 of 34

# Enrolling in the external content links program for users in the US

 Developers currently using links to app downloads or transactions need to enroll in this program and meet these requirements by January 28, 2026.

 In the future, Google intends to apply a service fee on successful transactions and downloads completed via external content links. At this time, however, Google is not assessing these fees and is therefore not requiring developers in this program to report these transactions or downloads to Google.

The external content links program allows developers of Google Play-distributed apps to link users in the United States to external content, including to purchase in-app digital items or to download an app whose install and updates are not managed by Google Play. Additionally, developers can offer external links to purchase in-app digital items in lieu of or alongside Google Play Billing.

Developers must meet the eligibility and requirements set out below, and successfully complete their enrollment in this program prior to using external content links.

## Availability

This program is available in the US in connection with the US District Court's order. Google reserves the right to modify or terminate this program, including as a result of any changes to or termination of the US District Court's order.

## Requirements

Developers participating in this program must comply with the following requirements:

- Enroll and get approval for your app(s) and any linked external apps in the external content links program as explained below.
- Limit external content links to users in the US and its territories.
- Ensure all Play Apps enrolled in this program and any linked external apps comply with Play Developer Policies ☑ , with the exception of policies that are not applicable to linked apps, such as the Payments policy.

Case 3:21-md-02981-JD   Document 1192   Filed 04/06/26   Page 26 of 34

- If using Google Play Billing with this program, all users must be able to access Google Play Billing in a consistent and reliable manner.
- Integrate with the external content links APIs, which surface an information screen, enable parental controls, and facilitate transaction reporting once required.
- Provide customer support for users completing transactions or downloading apps outside of Play and provide a process to dispute unauthorized transactions.
- Offer refund methods for users completing transactions outside of Play, unless the user was clearly informed that the transaction is non-refundable before completing the purchase.
- All external content links must meet the destination requirements as outlined below.
- Once required, pay Google the applicable fees for qualifying transactions or app installs that are concluded outside the app following the external content link as outlined below.

## Destination requirements

All external content destinations must meet the following requirements:                    ⌄

In addition, to ensure a good user experience and keep Play's users safe, any destination for links to download need to:                                              ⌄

## Play Service Fees

 In the future, Google intends to apply a service fee on successful transactions and downloads completed via external content links. At this time, however, Google is not assessing these fees and is therefore not requiring developers in this program to report these transactions or downloads to Google.

Like our standard service fees, the fees associated with the external content links program reflect the value provided by Android and Play and support our continued investments across Android and Play ☑ . The following fees apply when a user completes any transactions or any app installs **within 24 hours of following an external content link:**

- **In-app item purchases**: 10% for auto-renewing subscriptions and 20% for other offers of in-app digital features and services. Transactions for the first $1M (USD) of total developer earnings annually will be charged at 10%.
- **App download event**: A fixed fee (subject to periodic adjustments) per install based on the app category of the linked external app being installed. The linked app category must be declared as part of transaction reporting.
  - Games: $3.65

- Apps: $2.85

# Eligibility

In order to be eligible for this program, your app(s) must be a mobile or tablet app or game serving users in the United States and its territories.

Please note that eligibility and requirements are subject to change.

# Enroll your app in the external content links program

To enroll in the external content links program, you must complete the following steps:

1. Review the requirements on this page to determine if your app(s) meets all the eligibility criteria.
2. Complete the external content links declaration form and complete any onboarding steps required to enroll in the program through Google's support team.
3. Integrate the external links APIs ⃞ in your app for external links prior to linking users out to purchase in-app digital items or to download an external app.
4. Enroll your app(s) that will be using external content links through Play Console on the **External content links** page (**Settings** > **External content links**).
5. If you are using external content links to link users to download an app, complete the following steps in Play Console:

   a. Register and submit all versions of the linked external app(s)                                    ⌄

   b. Declare all external content links to external app(s) in your Play app(s)                          ⌄

   c. When your external app(s) are updated, submit all updated versions and APKs of the linked external app(s)                                                                              ⌄

6. Once required, keep track of all transactions, including $0 transactions resulting from free trial purchases, and app installs completed through external content links for reporting through the external links APIs ⃞ .

If you have any additional questions, you can contact our support team here.

**Open declaration form**

# Frequently asked questions

Case 3:21-md-02981-JD    Document 1192    Filed 04/06/26    Page 28 of 34

Can I utilize external content links for users in other geographies beyond the US?    ⌄

Are game developers eligible for this program?    ⌄

Are all developers required to enroll in the external content links program?    ⌄

Is there a limit to the number of external content links I am allowed to have in my app?    ⌄

What types of transactions are we required to report when using external content links to link users to purchase in-app digital items?    ⌄

Why can't I select the external app when declaring external content links in the Play Console?    ⌄

Do I have to register the external apps that I link to?    ⌄

Can I make external content links available for only some of my apps?    ⌄

How can I notify Google of any changes to my app package enrollment selections?    ⌄

What are the steps to integrate with the external links APIs?    ⌄

If I am already participating in an alternative billing program, can I also participate in the external content links program?    ⌄

Can I use Google Play's billing system alongside external content links?    ⌄

## Need more help?

Try these next steps:



## Post to the help community
Get answers from community members



## Contact us
Tell us more and we'll help you get there

# Exhibit E

# Understanding Google Play's Payments policy

Google Play's billing system is required for developers offering in-app purchases of digital goods and services distributed on Google Play.

It enables you to easily transact with millions of users around the world and gives users safe ways to pay and the ability to manage their payments from a central location. Play's billing system plays a critical role in helping us maintain user trust and keep Google Play safe.

## About Google Play's billing system

Google Play's billing system is a service that enables you to sell digital products and content in your Android app. You can use Google Play's billing system to sell a one-time product or subscriptions on a recurring basis. Visit the Android Developers site ☑ to learn how to integrate Google Play's billing system into your app.

Unless otherwise permitted by the Payments policy ☑ , purchases that require use of Google Play's billing system include:

- Digital items (such as virtual currencies, extra lives, additional playtime, add-on items, characters, or avatars)
- Subscription services (such as fitness, game, dating, education, music, video, or other content subscription services)
- App functionality or content (such as an ad-free version of an app or new features not available in the free version)
- Cloud software and services (such as data storage services, business productivity software, or financial management software)

Purchases that are not supported by Google Play's billing system include:

- Purchases or rentals of physical goods (such as groceries, clothing, home appliances, or electronics)
- Purchases of physical services (such as transportation services, airfare, gym memberships, or food delivery)
- Payment of a credit card or utility bill

Google Play's billing system must not be used for peer-to-peer payments content that facilitates online gambling, or any product category deemed unacceptable under Google's Payments Center Content Policies ☑ .

# Frequently asked questions

Can I distribute my app on other Android app stores or my website? ⌄

Do Google's apps have to follow this policy too? ⌄

Can I communicate with my users about alternative ways to pay? ⌃

Yes. Outside of your app, you are free to communicate with your users about alternative purchase options. You can use email marketing and other channels outside of the app to provide subscription offers and even special pricing.

Within an app, developers may not lead users to a payment method other than Google Play's billing system unless Section 3, 8, or 9 of Payments policy ⌗ applies. This includes directly linking to a webpage that could lead to an alternate payment method or using language that encourages a user to purchase the digital item outside of the app.

Developers can refer users to administrative information – like an account management page, privacy policy, or to a help center – as long as the webpage does not eventually lead to an alternate payment method prohibited by the Payments policy.

For services and products that are consumption only (apps that do not enable users to purchase access to digital goods or services from within the app), developers may choose to provide additional information about purchasing options without direct links, including using language like:

- "You can purchase this book directly on our website"
- "Go to our website to upgrade your subscription to Premium"
- "This movie isn't available to rent in the app. However, any movie you rent through our website.com will be immediately available to view in the app"
- "Need extra lives? Head to our website to purchase more"

Can I communicate with my users about promotions on other platforms? ⌄

Can I have different app features, prices, and experiences depending on the platform? ⌄

Can I offer a consumption-only (reader) app on Google Play? ⌄

Does your billing policy change depending on my app category?            ⌄

Can I offer my customers refunds directly?            ⌄

Will Google Play allow cloud gaming apps?            ⌄

Should apps that provide goods or services like insurance, stock trades, investment consulting, or tax preparation and filing assistance use Google Play's billing system?            ⌄

My app provides clinical services. Should I use Google Play's billing system for those transactions?            ⌄

Does the requirement to use Google Play's billing system apply to purchases of goods or services that can't be used within the app?            ⌄

Do I need to use Google Play's billing system to sell gift cards in my app?            ⌄

Can I issue loyalty or reward points in my app without using Google Play's billing system?            ⌄

I'm a telecommunication or cable service provider. How does this policy affect my apps?            ⌄

What is the impact of regulatory developments in India and South Korean legislation on Google Play's Payments policy? Will I still be charged a fee if I no longer use Google Play's billing system?            ⌄

I am currently offering Google Play's billing system. Can I offer Google Play's billing system alongside an alternative billing system?            ⌄

How has the Digital Markets Act (DMA) impacted Google Play's Payments policy for users in the European Economic Area (EEA)?            ⌄

What is the impact of the U.S. District Court's recent decision on Play's Payments Policy?            ⌄

Do direct tips or contributions from user to creator require Play's billing system?            ⌄

I'm a developer of an app that offers 1:1 online paid services. Do I have to use Google Play's billing system?            ⌄

Case 3:21-md-02981-JD    Document 1192    Filed 04/06/26    Page 34 of 34

My app provides purchases of both digital and physical goods or services. How do I determine if Google Play's billing system is required for my app? ⌄

Does the Payments policy's requirement to use Google Play's billing system apply in countries where Google Play's billing system has not been launched yet? ⌄

I've submitted my app update to comply with Play's Payments Policy; however, my app was rejected due to needing login credentials for app review. Why does Google need login credentials and how can I resubmit my app for review correctly? ⌄

My app offers in-app purchases of tokenized digital assets, like NFTs. How do I determine if Google Play's billing system is required for such transactions? ⌄

# Related content

- Read our Payments policy ☑
- Learn how to implement Google Play's billing system ☑
- Read about why we updated our Payments policy ☑

---

## Need more help?
Try these next steps:


**Post to the help community**
Get answers from community members


**Contact us**
Tell us more and we'll help you get there