# Exhibit 1

Lee Hepner
**American Economic Liberties Project**
1025 Connecticut Ave. NW, Ste. 1205
Washington, D.C. 20036
(949) 412-7623
lhepner@economicliberties.us

Katherine Oh (*pro hac vice*)
**Demand Progress Education Fund**
700 Pennsylvania Ave. SE, Ste. 200
Washington, DC 20003
(202) 905-2835
kate@demandprogress.org

*Counsel for* Amici Curiae

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-CV-05671-JD | CASE NO. 3:21-MD-02981-JD<br><br>**[PROPOSED]** *AMICI CURIAE* **BRIEF OF AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND, AND OPEN MARKETS INSTITUTE**<br><br>JUDGE: HONORABLE JAMES DONATO |

**TABLE OF CONTENTS**

I.    INTEREST OF *AMICI CURIAE* ................................................................................................ 1

II.   BACKGROUND ........................................................................................................................ 2

III.  ARGUMENTS............................................................................................................................ 3

      A.    The Court Should Exercise Its Discretion To Protect Market Participants Excluded From The Parties' Private Negotiations............................................................................................. 3

      B.    The Proposed Settlement's Advocacy Restrictions Subvert The Remedial Purpose Of The Injunction ............................................................................................................................. 4

      C.    The Proposed Modifications Perpetuate Anticompetitive Restrictions On Developer Communications ..................................................................................................................... 6

      D.    The RPMI Removes Remedies Specifically Beneficial To Small And Independent Developers ............................................................................................................................. 7

      E.    The Private Settlement's Fee Structure and Tracking Requirements Could Reinforce Google's Monopoly Power..................................................................................................... 8

      F.    The Settlement's Architecture Deliberately Evades Judicial Oversight ............................. 9

      G.    The Combined Effect Is To Entrench Google's Gatekeeper Position Under The Guise of Reform ................................................................................................................................. 10

IV.   CONCLUSION.......................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982) ................................................................ 3

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).......................................................... 4

*In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025)......................................... 2

*Int'l Salt Co.*, 332 U.S. 392 (1947) ................................................................................................. 6

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982)..................................... 3

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ........................................................................ 3

*United States v. Glaxo Grp. Ltd.*, 410 U.S. 52 (1973)..................................................................... 6

*United States v. Oregon*, 913 F.2d 576 (9th Cir. 1990)................................................................... 3

**Other Authorities**

Sean Hollister, *Epic just admitted the "Coalition for App Fairness" was created solely by Epic*,
The Verge (Nov. 30, 2023) .......................................................................................................... 4

Sean Hollister, *In the hallway, Epic's attorneys are taking photos with the jurors.*, The Verge
(Dec. 11, 2023) ........................................................................................................................... 6

## I.   INTEREST OF *AMICI CURIAE*

*Amici* are nonprofit, nonpartisan research and advocacy organizations dedicated to protecting consumers from monopolistic practices and promoting open markets.

- American Economic Liberties Project (AELP) is a nonpartisan, nonprofit research and advocacy organization that supports fair and consistent enforcement of the antitrust laws. AELP's interest stems from its observation of the current case and the filing of an *amicus* brief with the Court of Appeals for the Ninth Circuit in *Epic Games, Inc. v. Google LLC, et al.,* Case No. 24-6256, Dkt. No. 159  (9th Cir. 2024). AELP was founded in 2020 to help translate developments in antitrust law and policy to the broader public, while ensuring that lawmakers, agency officials, enforcement personnel, and courts apply the rich history of antitrust law to contemporary market realities. AELP does not accept any funding or donations from for-profit corporations.

- Demand Progress Education Fund is a nonprofit that educates its nearly one million members and the broader public about the impacts of corporate power over our economy and democracy. It focuses its public education efforts on the intersection of technology, competition policy, and consumer protection, including digital market regulation and anticompetitive practices by technology companies.

- The Open Markets Institute is a non-profit organization dedicated to promoting fair and competitive markets. It does not accept any funding or donations from for-profit corporations. Its mission is to safeguard our political economy from concentrations of private power that undermine fair competition and threaten liberty, democracy, and prosperity. The Open Markets Institute regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public.

Together, *amici* are a coalition of organizations that support robust antitrust remedies that open markets to full and fair competition on the merits. Consistent with their commitment to

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

protecting consumers and promoting fair competition in digital marketplaces, *amici* have long sounded the alarm about dominant technology companies unlawfully wielding their market power to impede competitors, block new entrants, and harm consumers.

Here, *amici* have a strong interest in ensuring that any conclusion to this litigation that affects Google's Android app distribution and payment practices genuinely serves the public interest and makes good on the promise of an open, competitive Android ecosystem for all users and industry participants. *Amici* are concerned that the parties' Revised Proposed Modified Injunction ("RPMI") (MDL Dkt. No. 1179), filed on March 4, 2026, falls short of these goals. Instead, the RPMI is a self-serving private arrangement that risks entrenching — rather than dismantling — barriers to competition in the Android app distribution and in-app billing markets, particularly for small and independent Android developers. *Amici* urge the Court to reject the RPMI.

## II.     BACKGROUND

In August 2020, Epic Games, Inc. ("Epic") initiated this litigation with allegations that Google had engaged in anticompetitive conduct — such as through exclusionary agreements, revenue-sharing arrangements, and technical barriers — in violation of antitrust laws in connection with the Google Play Store. Compl., *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal. Aug. 13, 2020). A federal jury delivered a unanimous verdict on December 11, 2023 that found for Epic on all counts. On October 7, 2024, the Court entered a permanent injunction ("2024 Injunction") to remedy these violations and to dismantle the structural barriers protecting Google's monopoly. MDL Dkt. No. 1017.

Google's appeals of the verdict and the 2024 Injunction failed. *See In re Google Play Store Antitrust Litig.*, 147 F.4th 917 (9th Cir. 2025). After the parties' first bid to modify the injunction with the First Proposed Modified Injunction ("FPMI") (MDL Dkt. No. 1119) raised strong objections from the Court and others, the parties submitted the RPMI on March 4, 2026. The parties also included a Revised Binding Term Sheet ("Term Sheet") covering Epic and

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

Google's private settlement. MDL Dkt. No. 1179-2. On March 11, 2026, the Court issued an order inviting interested parties to file requests for leave to submit amicus briefs in connection with the RPMI by April 6, 2026. MDL Dkt. No. 1183. It is within this context that *amici* seek to represent the public interest in open markets and consumer protection.

**III.    ARGUMENTS**

> **A.  The Court Should Exercise Its Discretion To Protect Market Participants Excluded From The Parties' Private Negotiations**

*Amici* urge the Court to reject the proposed settlement in favor of a robust, court-ordered remedy akin to the permanent injunction issued on October 7, 2024. MDL Dkt. No. 1017. Only a transparent, court-supervised injunction can meaningfully restore competition and prevent the entrenchment of anticompetitive effects currently shielded by the parties' latest compromise.

A district court has the authority and duty to evaluate whether a settlement is fundamentally fair, reasonable, and consistent with the objectives of the underlying laws. *See United States v. Oregon*, 913 F.2d 576, 580-581 (9th Cir. 1990) (a consent decree must be "fair, adequate and reasonable" and "must conform to applicable laws")*; Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) (a court reviewing "a private consensual agreement negotiated between the parties" should ensure agreement is "not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."); *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003) (district courts should assess whether a class action settlement is "fair, reasonable, and adequate to all concerned") (quoting *Officers for Justice*, 688 F.2d at 625). As with a consent decree that "affects the public interest or third parties" which "imposes a heightened responsibility on the court to protect those interests," the Court should exercise its discretion in this matter to "protect those who did *not* participate in negotiating the compromise." *United States v. Oregon*, 913 F.2d 576 at 581 (referring to consent decrees and citing *Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982)).

Here, the RPMI fails to address the broader public interest and the needs of the wider developer ecosystem of app development, distribution, maintenance, and security. The parties' latest proposal contains serious flaws that come at the expense of competitors who were excluded from the negotiating table — specifically small and independent app developers. But the jury did not find that Google's conduct was unfair only to Epic; it found that Google's conduct harmed the entire Android ecosystem. By substituting the Court's 2024 Injunction with their latest bilateral agreement that leaves key structural barriers to competition largely intact, the parties are asking this Court to disregard the public interest and to leave the market subject to a monopolistic status quo.

**B. The Proposed Settlement's Advocacy Restrictions Subvert The Remedial Purpose Of The Injunction**

First, the Term Sheet accompanying the RPMI effectively neutralizes one of the industry's most vocal advocates for competition. As the creator of the Coalition for App Fairness (CAF), Epic has been central to the global push for mobile platform equity. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), slip op. at 16 (finding that Epic formed the Coalition for App Fairness as part of its campaign against the app store practices of Apple and Google); *see also* Sean Hollister, *Epic just admitted the "Coalition for App Fairness" was created solely by Epic*, The Verge (Nov. 30, 2023). The Term Sheet takes aim at this central role played by Epic and CAF, turning Epic from a successful antitrust litigant into a contractually obligated shield for the defendant. Specifically:

- **Section 21:** Requires Epic to withdraw existing governmental complaints, thwarting ongoing regulatory oversight and hindering antitrust enforcement agencies from leveraging the jury's findings to protect the broader market. MDL Dkt. No. 1179-2 at 17.
- **Section 22:** Prohibits Epic from advocating for "further changes to the Google policies and practices that are the subject of this Term Sheet." The exception is narrow, allowing Epic to "speak in support of legislation or regulation proposed by others that imposes

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

new obligations generally on closed mobile ecosystems" if the advocacy is "directed specifically at the practices of companies other than Google." MDL Dkt. No. 1179-2 at 17-18.

- **Section 26:** Requires Epic to stipulate that the Term Sheet provisions are "reasonable and appropriate." (This provision also states that "Epic agrees that it will not object to fees that are within the pricing caps described in Section 9, including if such fees are assessed in the United States.") MDL Dkt. No. 1179-2 at 19.

- **Section 28:** Compels both parties to "undertake reasonable efforts to defend the validity and enforceability of this Term Sheet before courts, government authorities and tribunals." MDL Dkt. No. 1179-2 at 20. While this obligation is formally mutual, its practical effect will fall disproportionately on Epic because Google would never intentionally undermine its own settlement. Thus, in practice, the provision operates as a one-way requirement for Epic to defend Google's framework before regulators and courts.

These provisions in the parties' agreement sideline CAF's creator, vastly diminishing the organization's credibility as an independent champion for industry-wide fairness and leaving smaller developers without their loudest advocate against Google's policies.

Second, the side deals within the private settlement create the appearance of a private payoff that disregards the jury's findings. While the parties maintain these deals are not technically contingent upon court approval of the RPMI, the optics suggest a classic value transfer. Specifically, Section 4 of the Term Sheet states that "Unless otherwise specified, the terms of this agreement are not contingent on the Court in *Epic I* approving and entering the Revised Modified Injunction. . . ." By offering Epic lucrative partnerships and preferential terms not available to the broader class of developers, Google is effectively using its monopoly gains to buy the complacency of its most dangerous litigant. From a market competition standpoint, this does nothing to lower barriers for the "one million game developers" Epic claimed to represent at

trial. Sean Hollister, *In the hallway, Epic's attorneys are taking photos with the jurors.*, The Verge (Dec. 11, 2023) (quoting Epic CEO Sweeney stating "The one million game developers who couldn't be here thank you.").

Antitrust remedies are meant to be instruments of public policy intended to "pry open to competition" a market that "has been closed by defendants' illegal restraints." *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 62 (1973) (quoting *Int'l Salt Co.*, 332 U.S. 392, 401 (1947)). By contractually requiring the prevailing plaintiff to cease its advocacy, withdraw its regulatory complaints, and affirmatively praise the monopolist's supposedly reformed conduct, the parties seek to privatize a public victory. The Court should reject their attempt to do so.

## C. The Proposed Modifications Perpetuate Anticompetitive Restrictions On Developer Communications

The cornerstone of a competitive, functioning market is the ability of sellers to communicate freely with buyers. In the digital app economy, this means developers must be able to inform their users about alternative, potentially cheaper, or more innovative ways to access software and services. The jury's verdict was a clear mandate to dismantle the informational barriers and anti-steering restrictions (which prevent developers from directing users to alternative purchasing choices) that Google instituted to insulate its Play Store from competition. However, the RPMI and Term Sheet fail to adequately remedy this core anticompetitive harm.

The RPMI removes Google's obligation to restrict developers from directing users to alternative app downloads. Paragraph 10 specifically relieves Google of any requirement to "permit a developer to include an in-app link leading to an app or app store download within apps installed or updated on the Google Play Store." MDL Dkt. No. 1179-2 at 37. This provision is further codified as a global rule in Section 8 of the Term Sheet. For small and independent developers, the resulting impact could be devastating because Google could still prohibit developers from placing a simple link within their Play-distributed app that informs users to

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

download their competing app directly from their non-Google website or at a competing app store for a discount.

By allowing Google to maintain a ban on in-app download links, the RPMI ensures that the millions of users who rely on the Play Store will remain unaware of, or unable to easily navigate to, the very competitors this Court's original injunction sought to empower.

**D. The RPMI Removes Remedies Specifically Beneficial To Small And Independent Developers**

The 2024 Injunction creates multiple pathways for developers of all sizes to reach users outside Google's ecosystem: a "Catalog Access" provision allowing rival Android app stores to offer the full Play Store catalog (¶ 11); a "Store Distribution" provision barring Google from blocking rival app stores from being distributed through Play Store (¶ 12); and the right for app developers to provide links to users to download apps from the web outside the Play Store (¶ 10). MDL Dkt. No. 1017.

The RPMI preserves Catalog Access but alters both Store Distribution and the download link right, replacing them with the Registered App Store program — a change that benefits only entities large enough to build, operate, and certify a full app store. In contrast, the developers most harmed by Google's monopoly — those with the least bargaining power and the greatest dependence on the Play Store — lose the most.

The RPMI's modification to the placement provision compounds the problem. The 2024 Injunction (¶ 7) prohibits Google from conditioning a payment to original equipment manufacturers (OEMs) on an agreement to preinstall the Play Store at a particular location on a device, such as the home screen. MDL Dkt. No. 1017 at 2. The RPMI's clause on OEMs (¶ 7) changes this restriction to allow Google to pay OEMs whatever it wishes for home-screen placement, so long as Google does not explicitly pay OEMs to block a competitor Android app store from a specific spot on the device. MDL Dkt. No. 1179 at 36. In practice, a well-funded placement deal between Google and a major device manufacturer can achieve the same

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

exclusionary effect. That is, Google has so much money that it can simply outspend its rival app stores for the best digital real estate on devices, thereby shrinking the incentive for OEMs to clutter the same home screen with other app stores and effectively pricing out Google's competitors. For a small or emerging app store attempting to compete under the Registered App Store program, this asymmetry recreates the very barrier the existing injunction was designed to eliminate because Google's deep pockets can buy exclusivity even without an explicit ban on competitors.

### E.  The Private Settlement's Fee Structure and Tracking Requirements Could Reinforce Google's Monopoly Power

The RPMI does not contain the prior FPMI's explicit fee caps (which capped service fees at 9% or 20%), which sparked criticism from the Court's independent expert, Dr. Nancy L. Rose, at the January 22, 2026 hearing. Renewed Joint Mot., MDL Dkt. No. 1179 at 5 (acknowledging that "the RPMI does not contain the provisions regarding service fees about which Dr. Rose raised a concern at the hearing" and citing Jan. 22, 2026 Hearing Tr. 121:19–122:11 (Rose)). However, the parties did not eliminate the fee structure — they moved it to the private settlement terms, outside this Court's supervisory authority.

Under the Term Sheet, Google may charge a service fee of up to 20% on non-recurring purchase transactions completed through alternative billing — including "transactions made on the linked website within 24 hours of using an external link" from a Play-distributed app. Section 8.6 (MDL Dkt. No. 1179-2 at 5-6). In practical terms, this means that if a user taps on a link in an app, navigates to the developer's own website, and buys something using the developer's own payment system within 24 hours, the developer owes Google up to 20% of the sale — even though Google provides no payment processing, fraud prevention, or customer service for that off-platform transaction itself. A core goal of the 2024 Injunction's alternative-billing provisions was to allow developers to process their own payments without paying a toll to the monopolist. Under the Term Sheet, that toll persists.

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

By their terms, these fee and tracking provisions apply internationally. MDL Dkt. No. 1179-2 at 3 ("provisions of Sections 7 through 13 apply solely outside the United States"). But their ramifications are not so contained, for two reasons.

First, the Term Sheet's fee-and-tracking regime will directly affect U.S.-based developers who serve international users — which includes most developers of any meaningful scale. A small U.S. developer that sells in-game items to players worldwide might not maintain separate web checkout systems for each geography. When the Term Sheet requires that developer to integrate a Google-defined tracking API and pay Google up to 20% on off-platform non-recurring transactions by its non-U.S. users, those compliance costs are borne by the U.S. business, and the resulting price increases are likely to be passed through to all users — including American consumers. The Term Sheet thus imposes real costs on U.S. developers and their U.S. customers even where the fee provisions nominally apply only abroad.

Second, the Term Sheet establishes the pricing norms that will govern Google's global fee structure, and nothing in the RPMI prevents Google from applying the same fee levels to purely domestic transactions by U.S. developers who are not parties to this agreement. In fact, the Term Sheet ensures that Epic — the private plaintiff with the standing, resources, and credibility to challenge those norms — will not object when Google brings them home: Section 26 specifically requires that Epic "will not object to fees that are within the pricing caps described in Section 9, *including if such fees are assessed in the United States*." MDL Dkt. No. 1179-2 at 19 (emphasis added). The plaintiff that secured the public remedy has contractually waived its right to challenge the fee structure that will govern the market.

**F.  The Settlement's Architecture Deliberately Evades Judicial Oversight**

The structural arrangement of the RPMI and the private settlement outlined by the Term Sheet is itself a cause for concern. By taking the fee provisions, the 24-hour rule, and the tracking API provisions out of the court-ordered injunction and moving them exclusively into a private contract between Epic and Google, the parties are placing the provisions with potentially

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

far-reaching consequences for small developers beyond the reach of this Court's supervisory authority.

Under the 2024 Injunction, the Technical Committee reviews disputes about "the technology and processes required by the preceding provisions" (¶ 13), and the Court serves as final arbiter. MDL Dkt. No. 1017. If Google were to impose an unreasonable fee or an onerous tracking requirement under the existing injunction's framework, a developer could raise the issue with the Technical Committee and, if necessary, seek resolution from the Court. Under the RPMI-plus-Term-Sheet structure, the fee regime and tracking API exist only in the private agreement. Small developers are not parties to that agreement. As such, they have no contractual standing to enforce its terms, no access to its dispute resolution provisions, and no mechanism to bring complaints about Google's conduct before the Technical Committee.

The cumulative effect of this architecture is to create a two-tier system of oversight. The provisions that preserve key protections for developers — such as Catalog Access, the prohibition on mandatory Google Play Billing, the revenue-sharing and exclusivity restrictions — remain in the court-ordered injunction, subject to the Technical Committee and the Court's jurisdiction. But the provisions that also directly affect small developers' ability to compete on price and build independent customer relationships — including the fee structure, the 24-hour tracking rule, and the mandatory API — exist only in the private agreement. *Amici* submit that whatever the parties' intentions, the practical effect of this structuring of the parties' latest agreement ensures that the provisions likely to be enforced against developers to their detriment operate beyond the Court's supervisory reach — while key provisions that are favorable to the parties' public narrative remain visible in the injunction.

**G. The Combined Effect Is To Entrench Google's Gatekeeper Position Under The Guise of Reform**

Viewed together, the parties' proposed modifications and settlement terms reveal a bilateral deal that preserves and strengthens Google's ability to make money by simply

10

controlling access to the market while narrowing the competitive alternatives available to developers. The net effect is a marketplace in which Google retains its gatekeeper position while key checks on that power have been neutralized by private contract.

This is not the restoration of competition the jury's verdict demanded. *Amici* respectfully ask the Court to decline to adopt the RPMI and instead to preserve the existing 2024 Injunction — the remedy that this Court carefully crafted, that the Ninth Circuit unanimously affirmed, and that provides meaningful relief to developers of all sizes.

## IV.    CONCLUSION

This case is a matter with major public interest components and implications for broader digital markets, not just a dispute between two private corporations. And the public interest is best served by the structural remedies originally ordered by this Court in October 2024, not by a sweetheart deal that leaves large swaths of the monopoly wall standing.

While Epic Games is entitled to resolve its own claims for its own commercial reasons, the Court should not allow it to extinguish the structural relief owed to the public. The Court should instead ensure that the negotiated terms adequately protect *all* developers — especially smaller and independent developers and the consumers who benefit from robust marketplace competition.

//

//

//

//

//

//

//

//

//

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD

For the foregoing reasons, *amici* respectfully request that the Court DENY the parties' Renewed Joint Motion to Modify the Permanent Injunction. *Amici* also urge the Court to decline to approve any injunction modifications unless the parties remove provisions in their private agreement that undermine the remedial purpose of the injunction.

Dated: April 6, 2026                    Respectfully submitted,


/s/ *Lee Hepner*
Lee Hepner

Lee Hepner
**American Economic Liberties Project**
1025 Connecticut Ave NW, Ste. 1205
Washington, D.C. 20036
(949) 412-7623
lhepner@economicliberties.us

Katherine Oh (*pro hac vice*)
**Demand Progress Education Fund**
700 Pennsylvania Ave. SE, Ste. 200
Washington, DC 20003
(202) 905-2835
kate@demandprogress.org

*Counsel for* Amici Curiae

BRIEF OF *AMICI CURIAE* AMERICAN ECONOMIC LIBERTIES PROJECT, DEMAND PROGRESS
EDUCATION FUND & OPEN MARKETS INSTITUTE | Case Nos. 3:21-MD-02981-JD and 3:20-CV-05671-JD