# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Case No. 3:21-md-02981-JD |

**DECLARATION OF DR. GREGORY K. LEONARD**

**June 16, 2026**

**TABLE OF CONTENTS**

**Page**

I.      QUALIFICATIONS ................................................................................................ 1

II.     ASSIGNMENT..................................................................................................... 1

III.    ANSWERS TO THE COURT'S QUESTIONS .................................................. 2

     A.     (#1) WILL THE REPLACEMENT OF THE PROVISION REQUIRING
           DISTRIBUTION OF ALTERNATIVE APP STORES ON GOOGLE
           PLAY STORE (GPS) [HEREINAFTER, THE GOOGLE PLAY STORE]
           WITH THE PROPOSED "REGISTERED APP STORE" PROGRAM
           CAUSE ANTICOMPETITIVE EFFECTS OR BARRIERS TO ENTRY
           OF RIVAL APP STORE PROVIDERS, PARTICULARLY FOR, BUT
           NOT LIMITED TO, SMALLER RIVALS? HOW WILL THIS
           PROPOSED MODIFICATION REMEDIATE ANTICOMPETITIVE
           EFFECTS IN LIGHT OF PRIOR TESTIMONY THAT USERS HAVE
           BEEN CONDITIONED BY GOOGLE'S MONOPOLIZATION OF APP
           DISTRIBUTION TO LOOK ONLY AT THE GOOGLE PLAY STORE
           FOR APP DISTRIBUTION?................................................................. 2

     B.     (#2) WHAT ARE THE ESTIMATED COSTS OF RIVALS TO REACH
           USERS VIA STORE DOWNLOADS ON THE INTERNET VERSUS A
           DOWNLOAD VIA THE GOOGLE PLAY STORE? WHAT SCALE OF
           OPERATIONS WOULD LIKELY BE NEEDED TO MAKE AN APP
           STORE BASED SOLELY ON INTERNET DOWNLOADS
           PROFITABLE GIVEN THOSE COSTS? WILL SUCH COSTS
           EXCLUDE ALL RIVALS OTHER THAN RIVALS WITH THE SCALE
           OF AMAZON, MICROSOFT, AND THE LIKE?................................................ 10

     C.     (#3) WHAT IS THE COMPETITIVE EFFECT OF DELETING THE
           PROVISION THAT GOOGLE CANNOT CONDITION PAYMENT,
           REVENUE SHARING, OR ACCESS TO GOOGLE PRODUCTS ON
           AN AGREEMENT WITH AN OEM OR CARRIER TO PREINSTALL
           THE GOOGLE PLAY STORE ON ANY SPECIFIC LOCATION ON AN
           ANDROID DEVICE?  WHY WOULD ALLOWING THOSE
           AGREEMENTS NOT REINSTATE THE EXCLUSIONARY
           PLACEMENT PRACTICES OF THE GOOGLE PLAY STORE?  WHAT
           EVIDENCE IS THERE THAT OEMS OR CARRIERS ARE WILLING
           TO PLACE MORE THAN ONE APP STORE IN A PROMINENT
           POSITION ON THE HOME SCREEN?................................................. 14

     D.     (#4) WHAT IS THE JUSTIFICATION FOR DELETING THE
           PROVISION THAT GOOGLE CANNOT PROHIBIT A DEVELOPER
           FROM PROVIDING A LINK TO DOWNLOAD AN APP OUTSIDE
           THE GOOGLE PLAY STORE?  IF THAT PROVISION IS DELETED
           WHAT WILL PREVENT GOOGLE FROM RETURNING TO ITS
           PRIOR PRACTICE OF BANNING SUCH LINKS?........................................ 18

**TABLE OF CONTENTS**
(continued)

**Page**

E.    (#5) IF SUCH LINKS ARE RETAINED, WHAT WILL THE COMPETITIVE EFFECTS BE IF GOOGLE CHARGED LINK-OUTS THE SAME SERVICE FEE AS FOR DISTRIBUTION THROUGH THE GOOGLE PLAY STORE? ................................................................. 22

F.    (#6) WILL THE PROPOSED MODIFICATIONS, TAKEN INDIVIDUALLY OR COLLECTIVELY, REDUCE THE INJUNCTION'S REDRESS OF THE NETWORK EFFECTS OF GOOGLE'S ANTICOMPETITIVE CONDUCT? ................................................. 31

## I.    QUALIFICATIONS

1.    My name is Gregory K. Leonard.  I testified in this matter at trial on December 1, 2023, and at the May 23, 2024 remedies hearing.  My updated curriculum vitae is attached to this declaration as Exhibit A.

## II.    ASSIGNMENT

2.    In this declaration, I provide answers to the questions posed by the Court in its Order Re Second Evidentiary Hearing re Proposed Injunction Modifications, issued on April 21, 2026.

3.    The materials I have considered in preparing this declaration include materials previously identified in Appendix B of my November 18, 2022 Expert Report ("Leonard Report"), materials previously identified in Appendix B of my June 14, 2023 Supplemental Report ("Leonard Supplemental Report"), materials previously identified in my May 2, 2024 Statement submitted to the Court ("Leonard Statement") and materials cited in this declaration.  I reserve the right to update or supplement my opinions based on additional information, including any report or deposition by the Court's appointed expert, Dr. Nancy Rose.

Declaration of Dr. Gregory K. Leonard

## III.    ANSWERS TO THE COURT'S QUESTIONS

**A.    (#1) Will the replacement of the provision requiring distribution of alternative app stores on Google Play Store (GPS) [hereinafter, the Google Play Store] with the proposed "Registered App Store" program cause anticompetitive effects or barriers to entry of rival app store providers, particularly for, but not limited to, smaller rivals? How will this proposed modification remediate anticompetitive effects in light of prior testimony that users have been conditioned by Google's monopolization of app distribution to look only at the Google Play Store for app distribution?**

Summary Answer

4.      Third-party app stores would not face significantly greater barriers to entry under the proposed Registered App Store Program than if they were available for download on the Google Play Store.  Simply being available for download on the Google Play Store would not create user demand for or make users aware of a third-party app store.  Rather, the store would have to engage in the same efforts at differentiation to generate demand and marketing to generate user awareness regardless of whether it was available for download on the Google Play Store or through the internet.  The Registered App Store program will address concerns regarding the downloading flow that may have deterred users from "sideloading" third-party app stores in the past by streamlining the downloading process.  To the extent users are conditioned to use the Google Play Store to download *apps*, it is unlikely that distributing third-party *app stores* on the Google Play Store, as required by the original injunction, would have a greater impact on competition than the Registered App Store program, which would be required by the modified injunction.  A user so conditioned would look to the Google Play Store for *app* downloads under either injunction.  Even if users are conditioned to go to the Google Play Store to download apps, many Android phone users also use PCs and thus are accustomed to downloading PC apps from the internet. The Registered App Store Program streamlines the downloading flow for third-party

Declaration of Dr. Gregory K. Leonard

2

app stores to make it more like the download process for PCs, which will make it easier for third-party app stores to overcome the effects of any conditioning.  Finally, user download is only one way that a third-party app store can obtain placement on a phone and compete with the Google Play Store.  The other way is to negotiate pre-installation directly with phone OEMs.  The modified injunction maintains the provisions of the original injunction that prevent Google from using contracts to obtain exclusive placement of the Google Play Store or otherwise influence the placement of third-party app stores.

Longer Answer

5.      The provision of the original injunction that would require Google to distribute third-party app stores through the Google Play Store was motivated in part by the concern that Google deterred users from downloading third-party app stores from the internet ("sideloading") by complicating the process.[1]  The Court's original injunction seeks to make user downloading of third-party app stores easier by requiring that Google allow third-party app stores to be available for download via the Google Play Store.  The proposed modification to the original injunction takes an alternative approach to making downloading of third-party app stores easier.  Specifically, the proposed modification would address the concerns with the sideloading process through the Registered App Store Program.[2]

6.      The primary competitive effects question is whether significantly greater user downloading of third-party app stores would occur if they were available for download in the

---

[1] Dkt. 1016, Order Re UCL Claim and Injunctive Relief, p. 12 ("Rosenberg agreed that 'Google recognized at the time that as a result of the unknown source warning [resulting in at least 14 steps], the hurdles [to download] were too high for most users.'...So for a limited period of time, the injunction will lower the barriers for rival app stores to get onto users' phones by enjoining Google from prohibiting the presence of rival app stores in the Google Play Store.").

[2] Dkt. 1179-4, Ex. C (Unified Install and Permission Flow).

Declaration of Dr. Gregory K. Leonard

Google Play Store as compared to if they were available for download from the internet with a streamlined flow for those stores who meet the program requirements.

7.      Merely being available for download in the Google Play Store does not ensure that an app (or app store) will achieve a significant number of downloads.  While millions of apps are available for download in the Google Play Store, most generate few downloads.  Moreover, because the Google Play Store has not carried third-party app stores in the past, users may not expect to find third-party app stores on the Google Play Store.  This lack of expectation is reinforced by the fact that nearly all other app stores, regardless of platform, do not distribute rival app stores.[3]  Thus, even if a third-party app store was available for download on the Google Play Store, it would have to differentiate and engage in promotional activity to build user awareness and user demand.

8.      Such promotion might involve advertising or obtaining exclusives with developers for apps or app features.  At trial, Dr. Bernheim testified that a critical way for an app store to overcome network effects would be to get exclusives to differentiate itself from the Google Play Store.[4]

---

[3] Dkt. 957-1, Statement of Matthew Gentzkow ("Gentzkow Statement"), ¶ 107.

[4] Trial Tr. 2401:7-15 (Bernheim) ("[A]nd to break into that, you need to offer the consumer a compelling reason to do something else.  And the way that that's typically done in these types of markets is to offer some sort of exclusive content to say 'We have some sort of content here that actually you can't get there so you ought to try us.'  This is a way that companies often successfully break into markets.  If they didn't differentiate themselves, they'd just get squashed and the[re] wouldn't be competition."); Epic's Closing Arg. Slides at 41-42 (showing a first store advertising exclusives and a second store selling "the same stuff you can buy elsewhere"); Trial Tr. 3367:19-21 (Epic's Closing) ("This is a way that new companies can compete. They can have exclusive content.  They can bring people to the store.").

Declaration of Dr. Gregory K. Leonard



(Source: Epic's Closing Slides, pp. 41-42)

The injunction makes obtaining exclusives from developers easier for third-party app stores because it prohibits Google from entering into agreements with developers that require the developer to provide the same apps or same app features to the Google Play Store as to other app stores.  Importantly, however, a third-party app store would also have the incentive to engage in these same promotional activities if it was available for download through the internet.  In sum, being available for download on the Google Play Store would not relieve a third-party app store of having to engage in promotion.  Under the original injunction, a third-party app store might place an ad on a website such as ESPN.com with a link that takes the user to the Google Play Store where the user can download the store.  Under the modified injunction, the store would

Declaration of Dr. Gregory K. Leonard

place the same ad, but the link would take the user to the store's own website where the user could download the store under the streamlined Registered App Store process.

9.      In contrast, the modified injunction is likely to increase competition in the long run because a third-party app store would not be dependent on the Google Play Store for distribution when the injunction ended.  Under the original injunction, a third-party app store would have to transition from being reliant on the Google Play Store for downloads to having to set up its own distribution from the internet.  This transition could be disruptive and alienate users.  In addition, during the period third-party app stores are being distributed from the Google Play Store, the investment incentives of the third-party app stores would be distorted.  During the injunction, third-party app stores will likely be reliant on Google for distribution in the United States and will invest in directing users to obtain the app store from the Google Play Store. But those investments would only have a limited return because the injunction is timebound. The Registered App Store Program lasts for a longer period and aligns with what Google is doing outside the United States, so investments in directing and training users to download the third party app store from the internet (through a streamlined Registered App Store Program process) will be consistent worldwide and will have greater long-term returns while reducing costs and operational complexity.

10.     The Court has asked what the effect of the modified injunction would be "in light of prior testimony that users have been conditioned by Google's monopolization of app distribution to look only at the Google Play Store for app distribution."  I understand that question to be asking whether users, having been conditioned to use the Google Play Store for app distribution, may not be accustomed to downloading third-party app stores from the internet such that the remedial

Declaration of Dr. Gregory K. Leonard

6

impact of the proposed modification will be limited relative to the original injunction.[5]

However, I believe any such differential in remedial impact will be small for several reasons.

11.    First, even if users are conditioned to download *apps* from the Google Play Store, that does not mean they are conditioned to download third-party *app stores* from the Google Play Store.  Indeed, as noted above, users have never been able to download third-party app stores from the Google Play Store (or most other app stores) in the past.

12.    Second, any user conditioning may have similar impacts regardless of whether the Court imposes the original injunction or the modified injunction.  A user conditioned to download apps from the Google Play Store may, because of that conditioning, be less likely to seek out and download a third-party app store even if that app store were available for download from the Google Play Store because that user is not looking for an alternative store.  Thus, any user conditioning is unlikely to be overcome by the original injunction's provision requiring Google to distribute third-party app stores alone.  Rather, to overcome any user conditioning, the third-party app store will have to differentiate itself, such as by obtaining exclusives, and undertake promotional activities to convince users to download the store, regardless of where it is available.  That promotional activity can just as easily direct users to download an app store directly from the internet (with a streamlined installation flow due to the Registered App Store Program)[6] as

---

[5] Some degree of conditioning likely would have occurred even in the absence of the conduct at issue in this case because Google would still have possessed some degree of first mover advantage as the originator and backer of the Android ecosystem.

[6] Testimony from Epic witnesses and Dr. Bernheim regarding download of app stores from the internet focused on user "drop-off" between the step of clicking to download the app store and seeing the "unknown sources" warning. Epic did not appear to have concerns with generating the initial interest from users in clicking to download the app store in the first place.  Trial Tr. 2390:18-21 (Bernheim) ("[W]hat I'm focused on here is moving between steps 2A and 3. That's the focus because that's where the warning messages show up, the messages that could potentially alarm a user and induce them to drop off"); Bernheim Tr. Demonstratives, p. 22 (showing minimal "dropoff" between a user's "Get started flow", "Saw download", and "Clicked to download"); Trial Tr. 2980:4-9 (Weissinger) ("37 percent would abandon the process" between "clicking download to actually opening the Epic Games app").

Declaration of Dr. Gregory K. Leonard

7

directing them to the Google Play Store.  Moreover, users likely vary in the extent of conditioning.  Some users may be subject to little conditioning and thus would be willing to try a third-party app store.  With the Registered App Store program addressing the concerns associated with downloading app stores from the internet, such users would face no significant barriers to using additional app stores besides the Google Play Store.

13.    Third, many mobile phone users also use PCs.  On PCs, apps are distributed via download from the internet.[7]  Thus, many mobile phone users will have downloaded an app to their PCs from the internet.[8]  It will be easier to overcome any user conditioning with users that are familiar with downloading apps from the internet on PCs because the Registered App Store program provides a viable avenue to download third-party app stores similar to the process used on PCs.[9]

14.    Fourth, a third-party app store can also be pre-installed on the phone by the OEM or carrier.  The original injunction contained provisions that prohibited Google from entering into agreements with OEMs and carriers that would give Google Play Store exclusivity on a phone or otherwise limit a rival app store's ability to negotiate with OEMs for pre-installation on phones. The proposed modifications to the original injunction leave these provisions in place.  Thus, the modified injunction will continue to make it easier for third-party app stores to gain placement on a user's phone through pre-installation.  Because pre-installation of an app store is a substitute

---

[7] See, e.g., the Microsoft app store for Windows at apps.microsoft.com or the Softonic app store at en.softonic.com.

[8] Epic witnesses described the process of downloading apps or app stores from PCs at trial.  Trial Tr. at 237:16-238:4 (Allison) ("Q. Before a PC user downloads the Epic Game Store or Steam, what changes, if any, do they need to make to their settings on their computer?  A. None.  Q. Before a user obtains downloads from the Steam store or the Epic Game Store, what kind of warnings do they see?  A. They don't typically get any."); *id.* at 1998:4-14 (Sweeney) ("[Y]ou would just go to fortnite.com and depending on your device, there would be a download button on the top right-hand corner of the website, you'd click it, and it would begin installing Fortnite on your device.").

[9]  Mr. Sweeney testified that the Registered App Store program "gives us confidence that installing stores from the web is a completely viable solution to reaching users on Android, as we had already found on PC and Mac."  H'rg Tr. (Jan. 22, 2026) at 95:1-6.

Declaration of Dr. Gregory K. Leonard

for post-purchase user download of the app store, a third-party app store has pre-installation as an alternative regardless of whether the Court orders Google to distribute third-party app stores in the Google Play Store or to have the Registered App Store Program. Pre-installation, and even placement on the home screen, would heighten user awareness and help a third-party app store overcome user conditioning.

15.    With regard to any concern about the ability of small third-party app stores to succeed, I note that the goal of the injunction is to remediate the effects of the conduct that the jury found to be unlawful. That is, the goal is restoring competition, not ensuring the success of any particular competitor.

16.    As the Court has noted, app stores are characterized by network effects. Given that, all else equal, the most likely outcome in a competitive marketplace is a small number of "large" app stores, rather than a large number of "small" app stores. One set of likely candidates to succeed as third-party app stores are firms with complementary businesses and previous experience with app stores. Microsoft, Samsung, Amazon, and Epic, which each have app store experience and complementary businesses, are prime examples. Firms of this type are most likely to overcome network effects. For the reasons noted above, I do not believe these types of firms face significantly higher barriers to competing if their app stores were available for download from the Internet than if their app stores were available for download from the Google Play Store.[10] Smaller third-party app stores that are focused on a niche segment (e.g., role-playing games or productivity apps), which is a potentially viable strategy for a small app store, will likely need to focus on some type of differentiation, such as offering exclusive games or apps. Again, for the reasons stated above, these niche app stores will need to engage in this type

---

[10] I understand that Epic in particular has expressed a preference for the Registered App Store program as compared to its app store being available for download in the Google Play Store.

Declaration of Dr. Gregory K. Leonard

9

of activity regardless of whether they are distributed via the Registered App Store Program or through the Google Play Store.

> **B.    (#2) What are the estimated costs of rivals to reach users via store downloads on the internet versus a download via the Google Play Store? What scale of operations would likely be needed to make an app store based solely on internet downloads profitable given those costs? Will such costs exclude all rivals other than rivals with the scale of Amazon, Microsoft, and the like?**

Summary Answer

17.     The costs to a third-party app store of raising user awareness and differentiating itself from the Google Play Store are likely to be similar whether the app store is available for download from the internet or available for download from the Google Play Store.  This is because simply being available for download on the Google Play Store, on its own, will not generate much visibility to users and thus not relieve the third-party app store from having to market and differentiate itself.  Other costs are also likely to be similar across the two alternatives.  Because app stores are characterized by network effects, I expect that competition will result in a few large app stores rather than many small app stores.  Firms like Microsoft, Amazon, Samsung, and Epic are well-positioned to compete.  Niche stores that are able to differentiate themselves through exclusives may also find success.  Because the goal of the injunction is to increase competition, not achieve a certain market structure, an outcome where several large stores and some smaller niche stores emerged to compete with the Google Play Store should be judged a success.

Longer Answer

18.     I am not aware of any evidence in the record about the absolute costs to reach users or otherwise operate third-party app stores that are distributed either through the internet or the

Declaration of Dr. Gregory K. Leonard

Google Play Store.  However, some conclusions can be drawn about the relative costs for third-party app stores distributed via the two methods.  For the reasons discussed above, the costs that a third-party app store would have to incur to reach users are likely to be similar whether the app store is downloaded from the Internet (under the proposed Registered App Store program) or from the Google Play Store.  This is because being available for download on the Google Play Store by itself will not lead to a reduction in the marketing and promotional costs that the third-party app store will need to incur.  Marketing costs per install will likely be *lower* under the Registered App Store program than for distribution of third-party app stores on the Google Play Store because the Registered App Store program will be available outside the United States and for a longer time.  It will be more cost-efficient for third-party app stores to run a single, global marketing campaign for Registered App Stores than a specialized campaign for the United States.  Moreover, a marketing campaign directing users to download a registered app store from the Internet will be applicable longer (six years vs. three years) than a marketing campaign directing users to download a third-party app store from the Google Play Store.

19.    In addition to building user awareness, a third-party app store might attempt to differentiate itself from the Google Play Store by obtaining exclusive apps or app content from developers.  Its marketing efforts could be centered around these points of differentiation.  During the trial, Epic witnesses and Dr. Bernheim discussed this type of differentiation as a method by which a third-party app store might compete with the Google Play Store.[11]  As noted above, other provisions of the injunction (not the subject of the proposed modifications), such as

---

[11] Trial Tr. 2401:7-15 (Bernheim) ("And to break into that, you need to offer the consumer a compelling reason to do something else.  And the way that that's typically done in these types of markets is to offer some sort of exclusive content to say 'We have some sort of content here that actually you can't get there so you ought to try us.'  This is a way that companies often successfully break into markets.  If they didn't differentiate themselves, they'd just get squashed and they [sic] wouldn't be competition."); *id.* at 414:9-14 ("Q. And having that exclusive content was one of the ways in which Samsung might have competed with the Google Play Store; right?  A. Yes.").

Declaration of Dr. Gregory K. Leonard

the prohibition on Google entering into agreements with developers to obtain the same apps and app features as other app stores, make it easier for a third-party app store to undertake such a competitive strategy.

20.     With regard to other types of costs, the cost-savings for a third-party app store from being available for download from the Google Play Store similarly will be small.  While downloading via the Internet may require a third-party app store to have additional technology infrastructure beyond what was needed if the store were downloaded from the Google Play Store, these costs would be incremental (the app store will require infrastructure to support the other aspects of its business, such as downloading apps to user phones, even if the store itself was downloaded from the Google Play Store) and likely relatively small (the store's downloading of the store app would be expected to constitute a small amount of activity compared to the store's downloading of apps).  Most third-party app stores already have this infrastructure in place and have already incurred the costs to distribute via the Internet.

21.     In addition to infrastructure costs, before being accepted into either the Google Play Store or the Registered App Store program, a third-party app store would have to incur costs to ensure that it can meet Google's respective standards.  These costs are likely higher under the original injunction than the modified injunction because Google's standards are more extensive for the Google Play Store than they would be for the Registered App Store program.  For example, the provision in the Court's injunction mandating that the Google Play Store distribute third-party app stores allows Google to ensure those stores, and the "apps they offer," do not "violate Google's content standards" and that "app store owners pay a reasonable fee … based on Google's actual costs" for reviewing the apps in the third-party stores that it distributes as those

Declaration of Dr. Gregory K. Leonard

stores would be distributed in Google's trusted environment.[12] The Google Play Store has content policies regarding "Child Endangerment," "Inappropriate Content," "Financial Services," "Real-Money Gambling, Games, and Contests," "Illegal Activities," "User Generated Content," "Health Content and Services," "Blockchain-based Content," "AI-Generated Content," and "Age-Restricted Content and Functionality."[13]  In contrast, the Registered App Store program, while ensuring a baseline for user security and safety, has no requirement that registered app stores meet Google's content standards and the Google Play Store performs no content review of the apps in those stores.[14]

22.    Finally, as noted above, the process of downloading an app store from the Internet will be more streamlined under the Registered App Store Program.  Many Android phone users also own PCs and will therefore be familiar with downloading PC apps from the Internet.  Therefore, third-party app stores are unlikely to have to incur significant costs to "train" users to download the app store from the Internet.

23.    Because a third-party app store's costs are likely to be similar whether it is available for download on the Google Play Store or the Internet, the scale required to be profitable will be approximately the same for the two alternatives.  As discussed above, because app stores are characterized by network effects, it is likely that the competitive outcome will involve a few large competitors and niche stores rather than many small competitors.  Firms with experience with app stores or with complementary businesses are likely candidates to compete on this basis. A competitor focused on a niche segment where it can differentiate itself from the larger players

---

[12] Dkt. 1017, ¶ 12.

[13] "Google Play Policy Center, Restricted Content", available at https://support.google.com/googleplay/android-developer/topic/9877466.

[14] Dkt. 1179-2, Ex. A (Revised Binding Term Sheet) at Ex. 2.

Declaration of Dr. Gregory K. Leonard

may also be competitive within that niche despite its small scale.  Microsoft, Amazon, Samsung, and Epic are examples of firms that are well-positioned to have a competitive impact on this marketplace.  Given the other provisions of the injunction, these firms do not need to be available for download in the Google Play Store to be competitive.  Because the goal of the injunction is to increase competition not achieve a particular market structure, the injunction will have been successful if it creates conditions such that niche stores and a few large competitors can compete.

**C.    (#3) What is the competitive effect of deleting the provision that Google cannot condition payment, revenue sharing, or access to Google products on an agreement with an OEM or carrier to preinstall the Google Play Store on any specific location on an Android device?  Why would allowing those agreements not reinstate the exclusionary placement practices of the Google Play Store?  What evidence is there that OEMs or carriers are willing to place more than one app store in a prominent position on the home screen?**

Summary Answer

24.    The competitive effect of this proposed modification would be to increase competition because the modified injunction would allow Google to compete for home screen placement while maintaining the prohibition against Google entering into agreements with OEMs or carriers that limit the placement of rival app stores.  Even in a situation where an OEM or carrier decides to place the Google Play Store on the home screen, it will have the incentive to also place a rival app store on the home screen as long as that store makes a payment that exceeds the opportunity cost to the OEM or carrier of the home screen space the store will occupy.  In practice, OEMs and carriers have demonstrated a willingness to put two app stores on the home screen.

Longer Answer

Declaration of Dr. Gregory K. Leonard

14

25.     Under the proposed modification, Google continues to be prohibited from conditioning payment, revenue sharing, or access to Google products on an agreement with an OEM or carrier for either (1) Google Play Store exclusivity for the home screen or the entire phone or (2) the relegation of rival app stores to or away from any particular location on the phone.  Thus, Google would still be unable to engage in contractual practices that exclude rival app stores from the home screen (or from devices altogether).  Google could not, for example, enter into a contract with an OEM that prohibited the OEM from placing a rival app store on the home screen to ensure the Google Play Store is the exclusive app store on the home screen.  The proposed modification, however, would allow Google to compete for home screen placement by paying an OEM or carrier for non-exclusive placement of the Google Play Store on the home screen.

26.     Absent the modification, Google would have no incentive to compete for home screen placement because it could not use a payment to secure non-exclusive placement of the Google Play Store on the home screen.  In contrast, with the modification, Google would have an incentive to make a payment to the OEM or carrier in response to the threat of being omitted from the home screen.  Moreover, because Google would still be prohibited from entering agreements with OEMs or carriers that dictated the placement of rival app stores, those stores would have the incentive to make their own payments to OEMs and carriers to secure placement on the home screen.  OEMs and carriers would have the incentive to put an additional app store on the home screen to the extent the payment exceeded the opportunity cost of the home screen space the app store would occupy.  This would be true for any incremental addition of any given app store.  The likely result would be an increase in total payments to OEMs and carriers.  Because the downstream device markets are competitive, greater payments to OEMs and carriers are likely to lead to lower phone prices or higher phone quality to the benefit of consumers.

Declaration of Dr. Gregory K. Leonard

27.     The proposed modification also is consistent with what Epic's expert, Dr. Bernheim, suggested to the Court at the May 23, 2024 hearing on Epic's proposed injunction.  At that hearing, Dr. Bernheim stated that a broad proscription of Google's conduct related to contractual provisions could be "The agreements with parties like OEMs, developers, others who might be distributors, cannot include provisions that specify terms that are conditional on dealings with a rival or acting as a rival."[15]  Dr. Bernheim's formulation is precisely what the proposed modification does—it prohibits Google from conditioning a payment on how an OEM or carrier treats a rival with respect to placement on a device.  This allows Google to compete for home screen placement, while preventing Google from interfering with a rival's ability to do so.

28.     Another competitive effect that must be considered is whether Google competing for non-exclusive home screen placement will decrease the incentives of an OEM or carrier from placing a second app store on the home screen such that Google is able to obtain *de facto* home screen exclusivity.  I do not think that is a likely effect of the proposed modification.

29.     Record evidence demonstrates that OEMs are in fact willing to have more than one app store on the home screen.[16]  Samsung is a prominent example.  Samsung pre-installs the Galaxy Store along with the Google Play Store on the home screen of its phones.[17]  The record evidence shows that the Galaxy Store came preinstalled on 57.1% of devices with Google Mobile Services ("GMS devices") in the US, or approximately 100 million devices.[18]  The Galaxy Store carries many popular apps carried by the Google Play Store.  For example, as of summer 2025, TikTok, Spotify, and Microsoft Outlook were among the most downloaded apps on the Samsung Galaxy

---

[15] H'rg Tr. (May 23, 2024) at 14:1-5.

[16] See, e.g., Gentzkow Tr. Demonstratives, pp. 37-38 (showing Android devices with the Samsung Galaxy Store, Vivo App Store, and Xiaomi's app store, GetApps, preloaded on the homescreen alongside the Play Store).

[17] Trial Tr. 2626:3-5.

[18] *Id.* at 2626:3-22.

store.[19]  This demonstrates that an OEM can have the incentive to put a second app store on the

home screen alongside the Google Play Store and that this app store can compete with the

Google Play Store for users downloading popular apps.  The record evidence also shows that

around 65.9% of all Android-branded GMS devices worldwide (excluding China) come

preinstalled with alternative app stores (e.g., Samsung Galaxy Store, Vivo Store, and Xiaomi

GetApps).[20]



Samsung Galaxy S23 — Vivo Y12s — Xiaomi Redmi Note 10

**Source:** Gentzkow Report, Exhibit 32 (S21 updated to S23).

(Source: Gentzkow Tr. Demonstratives, p. 38)

30.    It is important to note that, under the modified injunction, the OEM will be willing to add

additional app stores to the home screen as long as those stores make a payment that offsets the

OEM's opportunity cost of using that home screen space for the app store instead of another app.

Because the modified injunction prevents Google from making a payment to the OEM

conditional on the placement of the rival, Google has no ability to influence the payment the

---

[19] Adamya Sharma, "Samsung reveals top apps downloaded by US Galaxy users this summer," August 20, 2025, available at < https://www.androidauthority.com/samsung-galaxy-store-top-apps-summer-2025-3589333/>.

[20] Trial Tr. 2622:2-11; Gentzkow Tr. Demonstratives, p. 7 (data as of July 2021).

Declaration of Dr. Gregory K. Leonard

rival needs to make to obtain home screen placement.  The rival's payment need only exceed the OEM's opportunity cost.  Record evidence shows that there is ample room on the home screen of Android devices for other apps and app stores.[21]

31.     Although a rival app store would need to generate profit greater than the opportunity cost to make the necessary payment to the OEM for home screen placement, other provisions of the modified injunction, such as catalog access and the registered app store program, will help the rival achieve this outcome by making it more competitive with the Google Play Store.

>    **D.     (#4) What is the justification for deleting the provision that Google cannot prohibit a developer from providing a link to download an app outside the Google Play Store?  If that provision is deleted what will prevent Google from returning to its prior practice of banning such links?**

Summary Answer:

32.     As an initial matter, I note that this modification does not address linkouts to transactions, which were the focus of the case and the remedies proceedings, but rather linkouts to download apps, which were not a focus of the case or remedies proceedings.  Based on the record, the modification that would allow Google to prohibit download linkouts will improve the security of the Android ecosystem while not degrading the original injunction's goals with respect to competition and network effects.  Although download linkouts were not the subject of much testimony or record evidence, there was substantial testimony and evidence regarding the security risks of "sideloading" apps (which is the end result of a download linkout).  The security risks to users of linkouts may be even greater than those of sideloading because of the ability of

---

[21] Gentzkow Statement, ¶ 114 ("On typical GMS devices, all Google apps and icons together occupy less than half of the space available on the DHS, leaving ample room for other apps and app stores that the OEM might wish to install."); Gentzkow Tr. Demonstratives, p. 38 (see above image referenced in ¶ 29).

Declaration of Dr. Gregory K. Leonard

malicious actors to exploit links and because the Google Play Store is a trusted environment in which users may believe security vetting has already taken place.  Given the other structural changes that the modified injunction imposes, such as catalog access and the registered app store program, taking the additional step of requiring Google to allow download linkouts would provide little incremental benefit to competition while generating significant security risks.

<u>Longer Answer:</u>

33.     There are two types of links that a developer can provide inside an app ("linkouts") that are relevant to the Court's injunction.  First are links contained in an app that has been downloaded by the user via the Google Play Store that takes the user to a website where the user can directly download (i.e., "sideload") other apps (or re-download the same app) to his or her phone, i.e., outside of the Google Play Store.  I will refer to this type of linkout as a "download linkout."  While the app containing the download linkout (i.e., the "originating app") is downloaded via the Google Play Store, the apps to which the user is linked are downloaded outside of the Google Play Store (i.e, the "linked apps").  For download linkouts, the Google Play Store distributes and provides ongoing services to the originating app, but does not distribute or service the linked apps. The second type of linkout is a link offered inside an app downloaded by a user via the Google Play Store that allows the user to complete an in-app purchase on a website using a billing system other than Google Play Billing.  I will refer to this type of linkout as a "transaction linkout."  With a transaction linkout, the app provides a link to users to a billing system outside the app to complete the purchase of digital content that can then be used in the app, which the Google Play Store distributes and continues to service even after that transaction is completed.

Declaration of Dr. Gregory K. Leonard

34.     Epic's proposed injunction did not ask the Court to require Google to allow developers to include download linkouts in apps distributed and serviced by the Google Play Store.  Rather, it only requested that the Court require Google to allow transaction linkouts so developers could "steer" users to payment options outside the app.[22]  While the Court's injunction did not explicitly refer to transaction linkouts, it does require Google to allow developers to communicate with users regarding other ways to pay for in-app digital content.[23]  Google is currently complying with the original injunction by allowing developers to include transaction linkouts as well as download linkouts in apps distributed and serviced by the Google Play Store. The proposed modified injunction would not change the requirement that Google allow developers to communicate with users regarding other ways to pay for in-app digital content and Google will continue to allow developers to include transaction linkouts in apps distributed and serviced by the Google Play Store.

35.     With respect to download linkouts, there was little relevant testimony or record evidence presented during either the trial or remedy phases.  Download linkouts were not a focus of Epic at trial or during the remedies proceedings.  However, there was substantial testimony and evidence regarding the security risks of sideloading.  For example, David Kleidermacher, Google VP, Engineering, testified that the FluBot malware campaign was a massive malware attack that was performed through the sideloading of malware onto Android devices and affected hundreds of millions of devices.[24]  Other industry participants and members of the security community, including Samsung and the Cybersecurity and Infrastructure Security Agency (CISA), have also

---

[22] See Dkt. 952, Epic's Proposed Permanent Injunction, § 3.A.

[23] Permanent Injunction ¶ 9.

[24] Trial Tr. 1755:7-12.

cautioned against the risks of sideloading.[25]  This testimony and evidence is relevant because a download linkout is essentially a linkout to sideload.

36.    Additionally, when the Court's injunction was appealed, a number of amicus briefs highlighted, specifically, further security risks of download linkouts.  For example, inducing a user to click on a link to go to a website to download something is a well-known approach used by malicious actors to get users to download malware and other bad apps.  The Center for Cybersecurity Policy and Law described how malicious actors can "exploit external links" to "direct users to websites that mimic legitimate app downloads but instead deliver harmful software," including malicious apps that steal personal information, monitor user activities, or take control of device functionalities.[26] Similarly, former national security officials stated in their amicus brief that "[a]llowing developers to provide links directly to users creates an inherent security risk," further citing a government study that 9% of government employees had been targeted by phishing attacks and of those who were warned about their error, 43% went on to click at least one more malicious link.[27] The security risks to users of linkouts from apps distributed by the Google Play Store may be even greater because users view the Google Play Store as a trusted environment.[28]

---

[25] *Id*. at 2231:17-19, 2183:17-2185:15, Tr. Ex. 6596 (guidance from CISA stating "Do not download from unknown sources").

[26] Brief of Center for Cybersecurity Policy and Law as Amici Curiae In Support of Defendants-Appellants, Epic Games, Inc. v. Google LLC, No. 24-6256 & 24-6274 (9th Cir. 2024), pp. 6-7.

[27] Brief of Former National Security Officials and Scholars as Amici Curiae In Support of Defendants-Appellants, Epic Games, Inc. v. Google LLC, No. 24-6256 & 24-6274 (9th Cir. 2024), pp. 19-20.

[28] Brief of Center for Cybersecurity Policy and Law as Amici Curiae In Support of Defendants-Appellants, Epic Games, Inc. v. Google LLC, No. 24-6256 & 24-6274 (9th Cir. 2024), p. 12 ("The risk to users is exacerbated because the Play Store is a trusted environment in which users could previously rely on centralized security vetting."); Brief of Computer Security Experts as Amici Curiae In Support of Defendants-Appellants, Epic Games, Inc. v. Google LLC, No. 24-6256 & 24-6274 (9th Cir. 2024), pp. 16-17 ("Because Google has spent years cultivating a secure user experience within the Play Store and applications available on Play, users will be more prone to trust these links," exposing them to a variety of security risks).

Declaration of Dr. Gregory K. Leonard

37.    The modification to the injunction would allow Google to revert to prohibiting download linkouts and thereby help maintain the security of Android users, a procompetitive outcome. Any reduction in competition caused by a prohibition on download linkouts would be small given other provisions of the modified injunction that are designed to promote methods for users to obtain apps outside of the Google Play Store in a more secure fashion.  For example, the Registered App Store program will streamline the flow involved in downloading rival app stores and apps from rival app stores while providing better security than direct links to download apps from the internet.[29]  Dr. Bernheim described this "frictionless download parity with Google Play" as a "sustainable mode of competition."[30]  The provisions that prohibit Google from paying OEMs for exclusivity will allow rival app stores to obtain pre-installation and advantageous placement on phones.  The provisions that give rival app stores access to Google's catalog of apps will help rival app stores offer a wide range of apps to better compete with the Google Play Store.  Given these other structural changes that the modified injunction imposes, taking the additional step of requiring Google to allow download linkouts would provide little incremental benefit to competition while generating significant security risks.

> **E.    (#5) If such links are retained, what will the competitive effects be if Google charged link-outs the same service fee as for distribution through the Google Play Store?**

Summary Answer:

38.    Hypothetically, if Google charged the exact same fees for apps downloaded after a linkout as it charged for apps distributed and serviced by the Google Play Store (i.e., a

---

[29] A registered app store will be downloaded from the internet, but to be eligible for the program, the app store must "[p]roactively and in good faith prevent the distribution of malware and Potentially Harmful Apps (PHAs) and prohibit illegal or fraudulent activity through robust policy enforcement." Dkt. 1179-2 (Revised Binding Term Sheet).  By ensuring a certain level of security, the registered app store program will reduce the security risks associated with downloads outside the Google Play Store.

[30] H'rg Tr. (Jan. 23, 2026) 36:22-37:5.

Declaration of Dr. Gregory K. Leonard

percentage of sales of digital goods sold within the linked app), developers' incentives to linkout may be reduced.  However, Google in fact will charge a different type of fee for download linkouts than it will charge for in-app purchases made in apps distributed through and serviced by the Google Play Store.  Many developers would find it economically rational to show linkouts to users (particularly if they target high-value users for linkouts) because they would anticipate paying the Google Play Store a much lower effective fee for an app downloaded after a linkout than they would pay if that app was distributed and serviced by the Google Play Store. Therefore, a developer with an interest in linking out would not be deterred from doing so by the fees the Google Play Store charges for download linkouts.  Regardless, given that the provisions of the injunction create structural conditions that will foster competition, a further step of regulating prices is not necessary.

Longer Answer:

39.     I understand the Court is asking what the competitive effects would be if Google charged the exact same service fees for download linkouts as it did for apps distributed and serviced by the Google Play Store.[31]  I will note at the outset that if Google is required to continue allowing download linkouts, it is not in fact charging the same fee for download linkouts as apps distributed and serviced by the Google Play Store.  However, if, hypothetically, Google were to charge the same service fee for apps downloaded via a download linkout as it does for apps distributed and serviced by the Google Play Store, developers may not choose to offer a linkout

---

[31] In asking about the competitive effects if "Google charged link-outs the same service fee as for distribution through the Google Play Store," I assume the Court is asking about a scenario where Google charges the same exact fees—calculated as a percentage of all transactions for digital goods made inside the app—regardless of whether the app is distributed and serviced by the Google Play Store or if the user downloads the app outside the Google Play Store via a download linkout.

Declaration of Dr. Gregory K. Leonard

to download an app outside of the Google Play Store.[32] The reason is straightforward. If the Google Play Store fee is the same whether an app is distributed and serviced by the Google Play Store or downloaded outside the Google Play Store via a link, the developer has less incentive to take the extra steps, and potentially incur extra costs, to manage distributing and servicing the app on an ongoing basis outside the Google Play Store.

40.     However, a competitive effects analysis of this hypothetical pricing policy is not necessary because the Google Play Store is charging a different type of fee for download linkouts. While I continue to believe that allowing download linkouts introduces security risks for Android users while providing little incremental benefit to competition (compared to other provisions of the injunction), I note that this new download linkout fee provides a developer that is currently paying a service fee to the Google Play Store the flexibility to choose a different model that could reduce the effective fee it would pay to the Google Play Store (especially with respect to certain high-value users) compared to what it would currently expect to pay if it distributed an app through, and had it serviced by, the Google Play Store. In the United States, Google currently charges a service fee of up to 25% for in-app purchases in apps distributed and serviced by the Google Play Store (excluding any fees for use of Google Play Billing). For download linkouts, Google has announced it will charge a fixed fee every time a user successfully downloads an app within 24 hours of clicking the link. I understand that this fee is for the Google Play Store services that a developer receives for the originating app—i.e., an app that is distributed and serviced by the Google Play Store but contains a download linkout.

---

[32] In this scenario, some developers may still link to download an app outside the Google Play Store because they deem there are benefits to linking out that make it worthwhile to forego the Google services that the downloaded app would receive if the app was distributed through the Google Play store at the same price.

Declaration of Dr. Gregory K. Leonard

Google will charge a fixed dollar fee rather than a percentage of user spend.  Google has announced that, currently, the per-download fixed fee is $3.65 for games and $2.85 for apps.[33]

41.      Google charging a fee for download linkouts is consistent with a competitive marketplace.  The download linkouts appear in apps distributed and serviced by the Google Play Store and the developer benefits from the ongoing distribution services the Google Play Store provides to those "originating" apps, which include, among other things, access to the Google Play Store's secure and trusted environment, distribution to the Google Play Store's user base of 2.5 billion monthly active users globally, or  ~175 million users in the United States,[34] app discovery, developer support tools to build and optimize apps, user engagement and re-engagement tools, access to data and analytics, store infrastructure to seamlessly deliver optimized updates, and customer service.[35]

42.      To understand why it makes economic sense for Google to charge a fee for download linkouts, and why many developers that currently pay a service fee would consider paying a fixed fee for a download linkout for targeted users rather than the service fee on in-app sales to those users, a brief discussion of the Google Play Store's existing business model is warranted. The Google Play Store currently distributes and services most apps without charging any service fee.[36]  Its business model—which is common for app and games stores on mobile devices, PCs,

---

[33] Google is not currently charging the fixed fee for linkouts to downloads but plans to do so in the future.  These fees are "subject to periodic adjustments."  *See* "Enrolling in the external content links program in the US," https://support.google.com/googleplay/android-developer/answer/16470497?hl=en

[34] Trial Tr. 2626:20-22 (Gentzkow) (testifying that Samsung's 100 million devices in the United States represent 57% of the Android market).

[35] Trial Ex. 5816 ("How Google Play Works: 2019 Google Play Public Policy Report"); Trial Tr. 878:2-879:8.

[36] Trial Tr. 2660:9-14 (Gentzkow) ("Q. And what percentage of developers actually pay a service fee?  A. That percentage is very, very small.  You can see here the share of developers in 2021 who paid no service fee to Google whatsoever.  That was about 98 percent.  And so only about 2 percent were required to pay any service fee at all."); *id.* 2663:12-13 ("the dominant model" of Google Play "has shifted to one where you don't pay anything for the download.").

Declaration of Dr. Gregory K. Leonard

and consoles—is to only charge a subset of developers, i.e., those that sell digital goods that can be consumed in the app or game, a percentage of the in-app sales as a service fee.[37]  Setting aside the level of the Google Play Store's service fee, I do not understand the complaints at the heart of this case to be attacking this business model itself.[38]  Indeed, the business model has clear benefits for developers because it allows a developer to have free distribution of an app to a user and ongoing services before they know whether a user will become a paying user.[39]  The business model has enabled the wide distribution of free-to-play (or "freemium") games and free apps.  A developer pays a service fee to Google only if the user makes a purchase through the app.[40]  The Google Play Store therefore shares in the risk of distribution (which includes ongoing services) and only receives payment if the developer is successful, which encourages investments by developers and the Google Play Store by aligning incentives.

43.    Allowing download linkouts changes the economics of this business model because it facilitates fee avoidance.  Developers can use the Google Play Store for free distribution and ongoing services and then target users that are likely to spend money to download the same app (or other apps by the developer) outside the Google Play Store so the developer can avoid paying the Google Play Store a service fee on the spend of those users.  While it is economically rational for a developer to engage in fee avoidance, it is also rational for the Google Play Store to try to

---

[37] *Id.*

[38] Epic argued that the Google Play Store's fees were too high, but did not argue that the Google Play Store's business model of charging a percentage based fee based on the value of in-app transactions was inappropriate.  The Epic Games Store charges a similar percentage-based fee.  Trial Tr. 223:7-14 ("Q. What commission structure did Epic eventually decide on for its store? A. 88 percent to the developer and Epic takes 12 percent.").

[39] Trial Tr. 2663:13-17 (Gentzkow) ("The app developer says, 'No, you can download our app for free. Try it out. See if you like it.'  And then you only pay a bit later at the end of that free trial when you decide you want to upgrade to the full version... Instead of paying 4.99 when you download it, you might pay 4.99 a few days or a week or somewhat later once you decide to upgrade to the full version.").

[40] Trial Tr. 2662:8-15 (Google charges the service fee when "the app is monetized through the initial download fee or through in-app purchases that happen after download.").

Declaration of Dr. Gregory K. Leonard

seek remuneration for the valuable ongoing services it is providing the developer—including connecting the developer to users.

44.    Under Google's proposal to charge a fixed fee for download linkouts, a developer has flexibility to choose a business model that it expects will allow it to pay the lowest service fees. It can opt not to offer a given user a download linkout and instead proceed with obtaining distribution and ongoing services from the Google Play Store using the Google Play Store's traditional business model and avail itself of the risk sharing benefits of that model.  Many users that download a game or app may never be a paying user or pay a small amount; for these users, the developer will owe no or little fees to the Google Play Store under the traditional business model.  On the other hand, developers can target users that they expect to spend large amounts and encourage them to download apps outside of the Google Play Store by showing them linkouts to downloads.[41]  For example, if the developer is connected to a user through the Google Play Store and, through past spending habits or other signals which are provided through the Play Store, it expects the user to spend $100 in a game, it can show a link to the user to directly download the same game from a website (and even offer an incentive to do so).  If the user successfully downloads the app through a linkout, the developer would anticipate owing the Google Play Store $3.65 for $100 of expected revenue, or an effective fee percentage of 3.65%

---

[41] Many developers are sophisticated and know which users have a propensity to be high spenders in order to convert them to a paying user.  For example, Spotify's VP, Payments Sandra Alzetta testified regarding Spotify's ability to convert free users to paying or "premium" users, Dep. Tr. 169:03-108 (video excerpt played at trial); similarly, Tilting Point CEO Asi Burak testified about Google Play tools that allow him to get the "right players" to convert to paying users.  Burak Dep. Tr. 46:05-13 (video excerpt played at trial).  Developers can also access third-party mobile measurement partners and product analytics providers to track data like installs, user engagement, and in-app purchases and use that data to predict user CLV.  *See* Segwise, Predictive Analytics: Uses in Gaming App Marketing (Jan. 27, 2025).  Developers can then use this type of data to target high-spend users with special offers to encourage them to spend.  For example, game developer Rovio analyzed in-app spending behavior to predict future purchase behavior for users and then tailored its in-app messaging to certain user groups.  *See* Aarki, Rovio Case Study.  As another public case study example, game developer Wooga used a third-party predictive analytics tool to identify differences in players' willingness to pay and adjust prices accordingly.  As a result of tailoring its game economy according to user CLV, it saw a 24% jump in paying customers.  See Wappier, June's Journey Case Study | wappier.

Declaration of Dr. Gregory K. Leonard

(compared to fees, excluding billing, of up to 25% on in-app purchases inside the app). If the developer expects the user to spend only $4 on the app, it would not offer a linkout and instead would pay the Google Play Store service fee (approximately $1 or less in expectation). If the developer expects the user to never purchase anything in the app (or has a business model where it monetizes its app without selling in-app digital goods and services), again it would not offer the user a linkout and would pay nothing in Google Play Store service fees (in expectation).

45.     As a result, a developer that currently pays service fees to the Google Play Store has the incentive to target users it believes are high spenders and to get those users to download apps off of the Google Play Store. The developer would anticipate paying less in the fixed fee for a download linkout than it would pay in service fees to the Google Play Store under the traditional Google Play Store distribution model. As discussed in more detail below, I have analyzed user spend data and found that even with fixed fees for app downloads at $3.65 for games and $2.85 for apps—fees that were set based on relevant market benchmarks for app install ads—developers that currently pay a service fee to the Google Play Store could reduce the amount they pay to Google by showing download linkouts to users that represent a significant percentage of user spend on the Google Play Store.[42] Those developers could anticipate paying a lower effective fee to the Google Play Store, assuming that they can reasonably project how much a

---

[42] As described in more detail below, my analysis is based on user spend on the Google Play Store-distributed app and therefore assumes the app can maintain the same level of user spend when distributed and serviced outside of the Google Play Store, which may not be true since the Google Play Store provides valuable services to help developers increase the amount users spend in the app. My analysis also makes no assumption regarding any costs developers will incur to distribute and service apps outside the Google Play Store as these will likely vary depending on the developer and app. Rather my analysis is focused on a developer's view of the expected fees it anticipates paying to the Google Play Store.

user would spend in the app.  Thus, the fixed fee for a download linkout still affords developers the opportunity to offer download linkouts to many users, especially to high value users.[43]

46.     I analyzed whether the fee for a download linkout was less than what a developer would anticipate paying to Google if it distributed the app through, and had it serviced by, the Google Play Store and paid the Google Play Store service fee.[44]  Note that the fee for a download linkout is a fixed dollar amount for every app (within the respective Games and Apps categories), while the Google Play Store service fee depends on how much a user spends on in-app transactions and therefore varies across apps and users depending on a user's spend in a particular app. Therefore, the outcome of the comparison will, in general, vary from app to app and from user to user.  I obtained data from Google on the lifetime consumer spend by app.  I then calculated what the service fee per user would be for each app if the app was distributed and serviced by the Google Play Store based on the user spend.  Finally, for each app, I compared the fee for a download linkout to the service fee per user if the app was distributed and serviced by the Google Play Store.

47.     As noted above, I find that the apps for which the fee for a download linkout is less than the service fee per user if the app was distributed and serviced by the Google Play Store account for a significant percentage of total user spend.  Thus, the fixed fee for download linkouts allows the Google Play Store to get remuneration for the services it provides to originating apps while

---

[43] Although it may be lower cost from a fee perspective for developers to avoid the Google Play Store's service fees, they still may not offer download linkouts for other reasons that have nothing to do with the Google Play Store's fixed fees, such as user experience concerns, preference for Google Play developer tools, metrics, etc., or desire for the Google Play Store's other ongoing services such as updates.  The fact that developers may prefer distribution through the Google Play Store despite being able to distribute at lower fee elsewhere does not necessarily indicate Google is engaging in any anticompetitive conduct.  Rather it likely reflects the better value the Google Play Store provides to developers.

[44] This analysis was limited to apps that had paid a service fee to the Google Play Store during 2024 (the last year covered by the data).

Declaration of Dr. Gregory K. Leonard

still allowing developers to choose to show download linkouts if that would serve those developers' economic interests.[45]

48.     In any case, I will restate a point I made during the first injunction hearing:  given that the Court has crafted the injunction to create conditions that will foster competition by encouraging entry and expansion of rival app stores, the resulting increased competition will take care of prices; the further step of regulating prices is not necessary.[46]  Prof. Rose agrees with this point.[47] I note that the Court also stated in its order on injunctive relief that "[t]he restoration of free competition in the relevant markets is the best medicine for correcting fees and prices."[48]  I agree.

---

[45] I also have seen no evidence that Google's fees for transaction linkouts would deter developers that wish to offer such linkouts from doing so.  Google's new service fee structure separates the fee for non-billing services from the service fee for Google Play Billing, with the service fee for non-billing services being the same or lower when the app has a transaction linkout versus when the app sells digital content inside the app (i.e., in-app purchases).  In the United States, the fee for Google Play Billing is set to 5% of the transaction amount for in-app purchases if Google Play Billing is used to process the transaction. Other than billing, the services Google Play Store provides to an app are the same regardless of whether a user's transactions are conducted using Google Play Billing or via a transaction linkout to another billing system.  Therefore, one would expect that the fee that Google would charge for the non-billing services would be the same in both cases.  Epic's proposed injunction would have allowed Google to charge a service fee for transaction linkouts as long as the service fee was not "coercive." Dkt. 952, Epic's Proposed Permanent Injunction, at 9; Leonard Statement, at 3 n.2.  Epic defined the fee for transaction linkouts as "coercive" if the difference between the service fee with Google Play Billing and the service fee without Google Play billing was below its cost for providing Google Play Billing.  Leonard Statement, at 3 n.2.  As I testified in the remedies phase, the appropriate measure of cost is the average variable cost of Google Play Billing.  H'rg Tr. (May 23, 2024) 103:20-104:8.  I have seen no evidence that the Google Play Billing fee of 5% is below average variable cost in the United States.  I testified previously that a fee of 4% in the United States for Google Play Billing would have been above average variable cost.  *Id.* at 103:6-16; 115:19-21-116:7.  Also, Epic's expert Dr. Tadelis testified that Google could charge any amount it wanted for non-billing services and the Court did not need to be "involved in regulating that fee at all."  H'rg Tr. 97:3-15 (May 23, 2024); see also H'rg Tr. 95:11-15.  Because the Court has ordered remedies that address Android app distribution, competition will discipline any service fees for transaction linkouts. H'rg Tr. 117:6-15 (May 23, 2024) (Leonard).  Provisions of the injunction, such as catalog access, the Registered App Store program, and the prohibition on exclusionary contracting, will promote competition for the Google Play Store for non-billing services so that the Court need not involve itself in the pricing of non-billing services.

[46] H'rg Tr. 117:6-15 (May 23, 2024) (Leonard) ("Once you've got strong remedies…[d]istribution side – it solves itself. And you're probably going to get, you know, vertically-integrated firms competing…And in that situation, you don't really have to worry about the price of Google Play.").

[47] H'rg Tr. 122:9-15 (Jan. 22, 2026) (Rose) ("[P]rice regulation is not competition. It does not necessarily foster competition, and it frequently struggles to provide the benefits of a competitive market even under the direction of an expert agency regulator.  And I do not think the Court wants to start treading into those particular waters.").

[48] Order Re UCL Claim and Injunctive Relief, Dkt. 1016 at 16.

Declaration of Dr. Gregory K. Leonard

**F.    (#6) Will the proposed modifications, taken individually or collectively, reduce the injunction's redress of the network effects of Google's anticompetitive conduct?**

49.    The Court identified two obstacles that prevent third-party app stores from achieving "critical mass." First, the Court determined that third-party app stores are hindered by the chicken-and-egg problem of not being able to offer enough apps to attract users and not being able to offer access to enough users to attract developers. The Court's original injunction addressed the app side of this problem by requiring Google to provide third-party app stores with "catalog access" so that they can effectively offer users a broad range of apps. Google does not propose to change this aspect of the injunction.

50.    The second obstacle to a third-party app store achieving critical mass that the Court identified is the difficulty that a third-party app store faces in getting on a user's phone. Even if catalog access allowed a third-party app store to offer a wide range of apps, the store nevertheless may not be able to attract a large number of users if it is unable to get on users' phones. There are two avenues by which a third-party app store can get on a user's phone: contracting with the phone OEM for pre-installation on the phone and the user downloading the store to the phone after purchase. The modified injunction would prohibit Google from entering into contracts with OEMs that confer exclusivity on the Google Play Store or otherwise limit the placement of third-party app stores on the OEMs' phones.[49] This will make it easier for third-party app stores to obtain placement on the home screen.

51.    The other avenue for a third-party app store to get placement on a phone is by user download. The Court was apparently concerned that it would be difficult for users to sideload

---

[49] The original injunction would have gone further and prohibited Google from paying to obtain non-exclusive home screen placement. As discussed above, the modification likely increases competition by allowing Google to compete for home screen placement and thus likely increases payments to OEMs and carriers.

third-party app stores.  Under the original injunction, Google would have been required to make third-party app stores available for download on the Google Play Store.  The proposed modification would instead directly address the issue by streamlining the flow associated with sideloading.  Together with the provisions of the injunction prohibiting Google from influencing an OEM's placement of third-party app stores on phones, the Registered App Store program addresses the second obstacle to a third-party app store achieving critical mass.

52.    Accordingly, like the original injunction, the proposed modified injunction would address the network effects problems that the Court has identified, thereby making it easier for third-party app stores to achieve critical mass and increase competition.

53.    The remaining modification the Court specifically called out is allowing Google to prohibit download linkouts.  As discussed above, this modification has the procompetitive effect of improving Android security.  Given the robust app store competition that the other provisions of the modified injunction (catalog access for third-party app stores, the Registered App Store program that streamlines the flow in downloading third-party app stores, prohibitions on Google entering agreements with OEMs, carriers, or developers in ways that might limit the ability of third-party app stores to compete) is likely to foster, allowing Google to prohibit download linkouts is unlikely to have an anticompetitive effect on balance.

Declaration of Dr. Gregory K. Leonard

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____

Executed on this 16th day of June in Hillsborough, California.

# Exhibit A



# Gregory K. Leonard
## Vice President

PhD, Economics
Massachusetts Institute of Technology

ScB, Applied Mathematics-Economics
Brown University

Dr. Gregory K. Leonard is a vice president in the Antitrust & Competition Economics Practice of CRA. He specializes in applied microeconomics and econometrics. He has provided testimony before US federal and state courts, government agencies, and arbitration panels on issues involving antitrust, damages estimation, statistics and econometrics, surveys, valuation, and labor market discrimination.

Dr. Leonard has written extensively in the areas of antitrust, industrial organization, econometrics, intellectual property, class certification, and labor economics. His publications have appeared in journals such as the *RAND Journal of Economics*, the *Journal of Industrial Economics*, the *Journal of Econometrics*, the *International Journal of Industrial Organization*, and the *Antitrust Law Journal*, among others. Dr. Leonard's writings were cited by the Court of Appeals for the Federal Circuit in its *Uniloc* decision and his trial testimony was cited by the Supreme Court in its *Oracle v. Google* decision. He is the Editorial Board Vice Chair for Economics of the *Antitrust Law Journal* and has served as a referee for numerous economic journals.

Dr. Leonard has given invited presentations on antitrust and intellectual property issues at the (US) Federal Trade Commission, the US Department of Justice, the former Anti-Monopoly Bureau of China's Ministry of Commerce, the Supreme People's Court of China, and Japan's Fair Trade Commission. He served as a consultant on the issue of immunities and exemptions to the (US) Antitrust Modernization Commission.

## Papers and publications

"A Proposed Method for Measuring Competition Among Imperfect Substitutes." With J. Hausman and D. Zona. *Antitrust Law Journal* 60, 1992, pp. 889-900.

"Issues in the Contingent Valuation of Environmental Goods:  Methodologies for Data Collection and Analysis." With D. McFadden. In *Contingent Valuation: A Critical Assessment*, ed. by J. A. Hausman, North Holland Press, 1993.

"Assessing Use Value Losses Due to Natural Resource Injury." With J. Hausman and D. McFadden. In *Contingent Valuation:  A Critical Assessment*, ed. by J. A. Hausman, North Holland Press, 1993.

"Does Contingent Valuation Measure Preferences? Experimental Evidence." With P. Diamond, J. Hausman, and M. Denning. In *Contingent Valuation:  A Critical Assessment*, ed. by J. A. Hausman, North Holland Press, 1993.

"Competitive Analysis with Differentiated Products." With J. Hausman and D. Zona. *Annales d'Economie et de Statistique* 34, 1994, pp. 159-180.

"A Utility Consistent, Combined Discrete Choice and Count Data Model:  Assessing Recreational Use Losses Due to Natural Resource Damage." With J. Hausman and D. McFadden. *Journal of Public Economics* 56, 1995, pp. 1-30.

"Market Definition Under Price Discrimination." With J. Hausman and C. Vellturo. *Antitrust Law Journal* 64, 1996, pp. 367-386.

"Achieving Competition:  Antitrust Policy and Consumer Welfare." With J. Hausman. *World Economic Affairs* 1, 1997, pp. 34-38.

"Economic Analysis of Differentiated Products Mergers Using Real World Data." With J. Hausman. *George Mason Law Review* 5, 1997, pp. 321-346.

"Superstars in the NBA:  Economic Value and Policy." With J. Hausman. *Journal of Labor Economics* 15, 1997, pp. 586-624.

"Efficiencies From the Consumer Viewpoint." With J. Hausman. *George Mason Law Review* 7, 1999, pp. 707-727.

"Documents Versus Econometrics in Staples." With J. Hausman. Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1305691.

"The Competitive Effects of a New Product Introduction: A Case Study." With J. Hausman. *Journal of Industrial Economics* 30, 2002, pp. 237-263.

"Does Bell Company Entry into Long-Distance Telecommunications Benefit Consumers?" With J. Hausman and J. G. Sidak. *Antitrust Law Journal* 70, 2002, pp. 463-484.

"On Nonexclusive Membership in Competing Joint Ventures." With J. Hausman and J. Tirole. *RAND Journal of Economics* 34, 2003.

"Correcting the Bias When Damage Periods are Chosen to Coincide With Price Declines." With D. Carlton. *Columbia Business Law Review*, 2004, pp. 304-306.

"Competitive Analysis Using a Flexible Demand Specification." With J. Hausman. *Journal of Competition Law and Economics* 1, 2005, pp. 279-301.

"Using Merger Simulation Models:  Testing the Underlying Assumptions." With J. Hausman. *International Journal of Industrial Organization* 23, 2005, pp. 693-698.

"Application of Empirical Methods in Merger Analysis." With C. Dippon and L. Wu. Report to the Fair Trade Commission of Japan, June 27, 2005.

"A Practical Guide to Damages." With L. Stiroh. In *Economic Approaches to Intellectual Property, Policy, Litigation and Management*, ed. by G. Leonard and L. Stiroh, 2005.

"Applying Merger Simulation Techniques to Estimate Lost Profits Damages in Intellectual Property Litigation." In *Economic Approaches to Intellectual Property, Policy, Litigation and Management*, ed. by G. Leonard and L. Stiroh, 2005.

"Antitrust Implications of Pharmaceutical Patent Litigation Settlements." With R. Mortimer. In *Economic Approaches to Intellectual Property, Policy, Litigation and Management*, ed. by G. Leonard and L. Stiroh, 2005.

"Framework for Policymakers to Analyze Proposed and Existing Antitrust Immunities and Exemptions." With D. Bush and S. Ross. Report to the Antitrust Modernization Commission, October 24, 2005.

"Real Options and Patent Damages:  The Legal Treatment of Non-Infringing Alternatives and Incentives to Innovate." With J. Hausman. *Journal of Economic Surveys* 20, 2006, pp. 493-512 (reprinted in *Economic and Legal Issues in Intellectual Property*, M. McAleer and L. Oxley, eds., Blackwell Publishing, 2007).

"The Competitive Effects of Bundled Discounts." In *Economics of Antitrust:  Complex Issues in a Dynamic Economy*, ed. by L. Wu, 2007.

"Estimation of Patent Licensing Value Using a Flexible Demand Specification." With J. Hausman. *Journal of Econometrics* 139, 2007, pp. 242-258.

"Patent Damages and Real Options: How Judicial Characterization of Non-Infringing Alternatives Reduces Incentives to Innovate." With J. Hausman and J. G. Sidak. *Berkeley Technology Law Journal* 22, Spring 2007, pp. 825-853.

"Don't Feed the Trolls." With N. Attenborough and F. Jimenez. *les Nouvelles*, Vol. 42, September 2007, pp. 487-495 (reprinted in *Patent Trolls:  Legal Implications*, C.S. Krishna, ed., The Icfai University Press, 2008). With J. Johnson, C. Meyer, and K. Serwin.

"Are Three to Two Mergers in Markets with Entry Barriers Necessarily Problematic?" *European Competition Law Review* 28, October 2007, pp. 539-552. With N. Attenborough and F. Jimenez

"Economics and the Rigorous Analysis of Class Certification in Antitrust Cases." With L. Wu. *Journal of Competition Law and Economics* 3, 2007, pp. 341-356. With J. Johnson.

"Assessing the Competitive Effects of a Merger: Empirical Analysis of Price Differences Across Markets and Natural Experiments." *Antitrust*, Fall 2007, pp. 96-101.

"A Comparison of the Almost Ideal Demand System and Random Coefficients Logit Models For Use with Retail Scanner Data." With F. Deng. Working Paper, 2007.

"Incentives and China's New Antimonopoly Law." With F. Deng. *Antitrust*, Spring 2008, pp. 73-77.

"Use of Simulation in Competitive Analysis." With J.D. Zona. In *Issues in Competition Law and Policy*, ed. by W. Dale Collins, 2008.

"Allocative and Productive Efficiency." With F. Deng. In *Issues in Competition Law and Policy*, ed. by W. Dale Collins, 2008.

"In the Eye of the Beholder:  Price Structure as Junk Science in Antitrust Class Certification Proceedings." With J. Johnson. *Antitrust*, Summer 2008, pp. 108-112.

"Merger Retrospective Studies:  A Review." With G. Hunter and G. S. Olley. *Antitrust*, Fall 2008, pp. 34-41.

"Roundtable Discussion:  Developments—and Divergence—In Merger Enforcement." *Antitrust*, Fall 2008, pp. 9-27.

"Dispatch From China." *Antitrust*, Spring 2009, pp. 88-89.

"A Hard Landing in the Soft Drink Market – MOFCOM's Veto of the Coca-Cola/Huiyuan Deal." With F. Deng and A. Emch. *Antitrust Chronicle*, April 2009(2).

"Predatory Pricing after *linkline* and *Wanadoo*." With A. Emch. *Antitrust Chronicle,* May 2009(2).

"Farrell and Shapiro:  The Sequel." With M. Lopez. *Antitrust*, Summer 2009, pp. 14-18.

"掠夺性定价—美国与欧盟的法律及经济学分析" ("Predatory Pricing – Economics and Law in the United States and the European Union"), 法学家 (*Jurists' Review)*, 2009, pp. 100-110. With A. Emch.

"Revising the Merger Guidelines:  Second Request Screens and the Agencies' Empirical Approach to Competitive Effects." With L. Wu. *Antitrust Chronicle,* December 2009(1).

"How Private Antitrust Litigation May Be Conducted in China." With F. Deng and W. Tang. *Competition Law360*, January 6, 2010.

"Merger Screens:  Market-Share Based Approaches and 'Upward Pricing Pressure,'" *Antitrust Source*, February 2010. With E. Bailey, G. S. Olley, and L. Wu.

"Minimum Resale Price Maintenance:  Some Empirical Evidence From Maryland." With E. Bailey. *BE Journal of Economic Analysis & Policy* 10, 2010.

"Three Cases Reshaping Patent Licensing Practice." With E. Bailey and A. Cox. *Managing Intellectual Property*, March 2010.

"Econometrics and Regression Analysis." With J. Langenfeld, W. Li, and J. Morris. in *Proving Antitrust Damages:  Legal and Economic Issues*, ABA Section of Antitrust (2nd Edition), 2010.

"Patent Damages:  What Reforms Are Still Needed?." With M. Lopez. *Landslide* 2, May/June 2010.

"The Google Books Settlement:  Copyright, Rule 23, and DOJ Section 2 Enforcement." *Antitrust*, Summer 2010, pp. 26-31.

"The 2010 Merger Guidelines:  Do We Need Them? Are They All We Need?." *Antitrust Chronicle*, October 2010(2).

"Evaluating the Unilateral Competitive Effects of Mergers Among Firms with High Profit Margins." With E. Bailey and L. Wu. *Antitrust*, Fall 2010, pp. 28-32.

"Predatory Pricing in China—In Line With International Practice?." With A. Emch. *Legal Issues of Economic Integration* 37, 2010, pp. 305-316.

"What Can Be Learned About the Competitive Effects of Mergers From 'Natural Experiments'?." With G. S. Olley. *International Journal of the Economics of Business* 18, 2011, pp. 103-107.

"District Court Rejects the Google Books Settlement:  A Missed Opportunity?." *Antitrust Source*, April 2011.

"Making Sense of 'Apportionment' in Patent Damages." With E. Bailey and M. Lopez. *Columbia Science and Technology Law Review* 12, pp. 255-271, 2011.

"Rigorous Analysis of Class Certification Comes of Age." With J. Johnson. *Antitrust Law Journal* 77, 2011, pp. 569-586.

"Economic Analysis in Indirect Purchaser Class Actions." With F. Deng and J. Johnson. *Antitrust*, Fall 2011, pp. 51-57.

"Merger Assessment and Frontier of Economic Analyses (4): Empirical Methods in Antitrust Merger Review." With L. Wu. *Kokusai Shoji Houmu (International Business Law and Practice)*, Vol. 40, No. 3, 2012, pp. 391-401.

"Merger Assessment and Frontier of Economic Analyses (5): Empirical Methods in Antitrust Merger Review." With L. Wu. *Kokusai Shoji Houmu (International Business Law and Practice)*, Vol. 40, No. 4, 2012, pp. 557-564.

"Merger Assessment and Frontier of Economic Analyses (6): Empirical Methods in Antitrust Merger Review." With L. Wu. *Kokusai Shoji Houmu (International Business Law and Practice)*, Vol. 40, No. 5, 2012, pp. 731-739.

"Economists' Roundtable on Hot Patent-Related Antitrust Issues." With D. Carlton, C. Meyer, C. Shapiro. *Antitrust*, Summer 2013, pp. 10-21.

"Not So Natural Experiments." *Competition Policy International*, July 2013 (2).

"The Role of China's Unique Economic Characteristics in Antitrust Enforcement." With F. Deng. In *China's Anti-Monopoly Law: The First Five Years*, ed. by Adrian Emch and David Stallibrass, 2013.

"Reflections on Bazaarvoice." With P. Normann. *CPI Antitrust Chronicle*, March 2014 (1).

"An Introduction to Econometric Analysis." In *Econometrics: Legal, Practical and Technical Issues*, ABA Section of Antitrust (2nd Edition), 2014.

"The Econometric Framework." in *Econometrics: Legal, Practical and Technical Issues*, ABA Section of Antitrust (2nd Edition), 2014.

"Applying Econometrics to Estimate Damages." With J. Langenfeld, W. Li, and J. Morris. in *Econometrics: Legal, Practical and Technical Issues*, ABA Section of Antitrust (2nd Edition), 2014.

"Determining RAND Royalties for Standard-Essential Patents." With M. Lopez. *Antitrust*, Fall 2014, pp. 86-94.

"Reflections on the Debates Surrounding Standard-Essential Patents." *The Antitrust Source*, August 2015.

"Turning Daubert on Its Head:  Efforts to Banish Hypothesis Testing in Antitrust Class Actions." *Antitrust*, Spring 2016, pp. 53-59.

"Damages in Exclusionary Conduct Cases," With L. Haider in *Proving Antitrust Damages: Legal and Economic Issues*, ABA Section of Antitrust Law, 3rd Edition, 2017.

"Roundtable with Economists:  Discussing Practice and Theory with the Experts." With D. Carlton, P. Johnson, M. Maher, and C. Shapiro. *Antitrust*, Spring 2018, pp. 11-23.

"Comparative Analysis of Court-Determined FRAND Royalty Rates." With F. Deng and M. Lopez. *Antitrust*, Summer 2018, pp. 47-51.

The *Illinois Brick* Damages Edifice:  Demolition or Deconstruction?," *Antitrust Law Journal*, Vol. 84, 2022.

## Presentations

"Merger Analysis with Differentiated Products," paper presented to the Economic Analysis Group of the US Department of Justice, April 1991 (with J. Hausman and D. Zona).

"Assessing Use Value Losses Due to Natural Resource Injury," paper presented at "Contingent Valuation:  A Critical Assessment," Cambridge Economics Symposium, April 3, 1992 (with J. Hausman and D. McFadden).

"Contingent Valuation and the Value of Marketed Commodities," paper submitted to the Contingent Valuation Panel of the National Oceanic and Atmospheric Administration, U.S. Department of Commerce, August 12, 1992 (with J. Hausman).

"Economic Analysis of Differentiated Products Mergers Using Real World Data," paper presented to the George Mason University Law Review Antitrust Symposium, October 11, 1996 (with J. Hausman).

"Documents Versus Econometrics in Staples," paper presented to a program of the Economics Committee of the ABA Antitrust Section, September 5, 1997 (with J. Hausman).

Discussant, "New Developments in Antitrust" session, AEA meetings, January 7, 2000.

"In Defense of Merger Simulation," Department of Justice and Federal Trade Commission Merger Workshop, Unilateral Effects Session, February 18, 2004.

Discussant, "Proving Damages in Difficult Cases:  Mock Trial & Discussion," NERA Antitrust & Trade Regulation Seminar, July 10, 2004.

"Network Effects, First Mover Advantage, and Merger Simulation in Damages Estimation," LSI Workshop on Calculating and Proving Patent Damages, July 16, 2004.

"Early Exchange of Documents," LSI Workshop on Pre- and Early Stage Patent Litigation, July 23, 2004.

"Lessons Learned From Problems With Expert Testimony:  Antitrust Suits," LSI Workshop on Effective Financial Expert Testimony, November 4, 2004.

"Price Erosion and Convoyed Sales," LSI Workshop on Calculating & Proving Patent Damages, January 19, 2005.

"Economic Analysis of Rule 23(b)(3)," LSI Litigating Class Action Suits Conference, June 6, 2005.

"Early Exchange of Documents," LSI Workshop on Pre- & Early-Stage Patent Litigation, July 22, 2005.

"Issues to Consider in a Lost Profits Damages Analysis," Patent Litigation 2005, Practicing Law Institute, September 30, 2005.

"Antitrust Issues in Standard Setting and Patent Pools," Advanced Software Law and Practice Conference, November 3, 2005.

"New Technologies for Calculating Lost Profits," LSI Workshop on Calculating & Proving Patent Damages, February 27, 2006.

"Estimating Antitrust Damages," Fair Trade Commission of Japan, April 21, 2006."Economic Analysis of Rule 23(b)(3)," LSI Litigating Class Action Suits Conference, May 11, 2006.

"Permanent Injunction or Damages:  What is the Right Remedy for Non-Producing Entities?," San Francisco Intellectual Property Law Association/Los Angeles Intellectual Property Law Association Spring Seminar, May 20, 2006.

"Antitrust Enforcement in the United States" and "Economic Analysis of Mergers," Sino-American Symposium on the Legislation and Practice of Anti-Trust Law, Beijing Bar Association, Beijing, People's Republic of China, July 17, 2006.

"Economic Analysis in Antitrust," Chinese Academy of Social Sciences, Beijing, People's Republic of China, July 20, 2006.

"Issues to Consider in a Lost Profits Damages Analysis," Patent Litigation 2006, Practicing Law Institute, September 26, 2006.

"Comparison of the Almost Ideal Demand System and Random Coefficient Models for Use With Retail Scanner Data," Pacific Rim Conference, Western Economic Association, Beijing, People's Republic of China, January 12, 2007 (with F. Deng).

Discussant, "Applied Economics" Session, Pacific Rim Conference, Western Economic Association, Beijing, People's Republic of China, January 12, 2007.

"Balancing IPR Protection and Economic Growth in China," International Conference on Globalization and the Protection of Intellectual Property Rights, Chinese University of Political Science and Law, Beijing, People's Republic of China, January 20, 2007.

"The Use and Abuse of Daubert Motions on Damages Experts:  Lessons from Recent Cases," LSI Workshop on Calculating & Proving Patent Damages, February 27, 2007.

"Will Your Licenses Ever be the Same? Biotechnology IP Strategies," BayBio 2007 Conference, April 26, 2007.

"Tension Between Antitrust Law and IP Rights," Seminar on WTO Rules and China's Antimonopoly Legislation, Beijing, People's Republic of China, September 1, 2007.

"Issues to Consider in a Lost Profits Damages Analysis," Patent Litigation 2007, Practicing Law Institute, September 25, 2007.

Discussant, "Dominance and Abuse of Monopoly Power" Session, China's Competition Policy and Anti-Monopoly Law, J. Mirrlees Institute of Economic Policy Research, Beijing University, and the Research Center for Regulation and Competition, Chinese Academy of Social Sciences, Beijing, People's Republic of China, October 14, 2007.

"Opening Remarks," Seminar on China's Anti-monopoly Law and Regulation on Abuse of Intellectual Property Rights, Beijing, People's Republic of China, April 26, 2008.

"Issues to Consider in a Reasonable Royalty Damages Analysis," Patent Litigation 2008, Practicing Law Institute, October 7, 2008.

"Econometric Evaluation of Competition in Local Retail Markets," Federal Trade Commission and National Association of Attorneys General Retail Mergers Workshop, December 2, 2008,

"Merger Review Best Practices:  Competitive Effects Analysis," International Seminar on Anti-Monopoly Law:  Procedure and Substantive Assessment in Merger Control, Beijing, People's Republic of China, December 15-17, 2008.

"The Use of Natural Experiments in Antitrust," Renmin University, Beijing, People's Republic of China, December 18, 2008.

"China's Antimonopoly Law:  An Economist's Perspective," Bloomberg Anti-Monopoly Law of China Seminar, January 29, 2009.

Panelist, "Standards for Assessing Patent Damages and Their Implementation by Courts," FTC Hearings on the Evolving IP Marketplace, February 11, 2009.

"Economic Analysis of Agreements Between Competitors" and "Case Study:  FTC Investigates Staples' Proposed Acquisition of Office Depot," Presentation to Delegation of Antitrust Officials from the People's Republic of China, Washington, DC, March 23, 2009.

"Reasonable Royalties in the Presence of Standards and Patent Pools," LSI Workshop, April 20, 2009.

Presentations on Unilateral Effects, Buyer Power, and the Intellectual Property-Antitrust Interface to Delegation from the Anti-Monopoly Bureau of MOFCOM of the People's Republic of China, Washington, DC, May 10-11, 2009.

Panelist, "The Use of Economic and Statistical Models in Civil and Criminal Litigation," Federal Bar Association, San Francisco, May 13, 2009.

"Trends in IP Rights Litigation and Economic Damages in China," Pursuing IP in the Pacific Rim, May 14, 2009.

Presentation on the Economics of Antitrust, National Judicial College of the People's Republic of China, Xi'an, People's Republic of China, May 25-26, 2009.

"Case Study:  The Use of Economic Analysis in Merger Review," Presentation to the Anti-Monopoly Bureau of MOFCOM, Beijing, People's Republic of China, May 27, 2009.

"Economics and Antitrust Law," China University of Political Science and Law, Beijing, People's Republic of China, September 21, 2009.

"Case Study:  Economic Analysis of Coordinated Interaction," Presentation to the Anti-Monopoly Bureau of MOFCOM, Beijing, People's Republic of China, September 22, 2009.

"Relevant Market Definition," 4th Duxes Antitrust Law Seminar, Beijing, People's Republic of China, September 26, 2009.

"Expert Economic Testimony in Antitrust Litigation," Supreme People's Court, Beijing, People's Republic of China, February 2, 2010.

"New Case Law for Patent Damages," Law Seminars International Telebriefing, April 28, 2010.

"China/India:  Sailing in Unchartered Waters: Regulating Competition in the Emerging Economies – New Laws, New Enforcement Regimes and No Precedents," The Chicago Forum on International Antitrust Issues, Northwestern University School of Law Searle Center, May 20, 2010.

"Antitrust and Intellectual Property," Supreme People's Court, Beijing, People's Republic of China, May 26, 2010.

"Cartel Enforcement Trends in the United States," 2nd Ethical Beacon Anti-Monopoly Summit, Beijing, People's Republic of China, May 27, 2010.

Panelist, "The Future of Books and Digital Publishing: the Google Book Settlement and Beyond," 2010 American Bar Association Annual Meeting, August 7, 2010.

"Coordinated Effects" and "Non-Horizontal Mergers," Presentations to Delegation from India Competition Commission, US Chamber of Commerce, Washington, DC, October 26, 2010.

"UPP and Merger Simulation," Annual Conference of the Association of Competition Economics, Norwich, UK, November 11, 2010.

"Uniloc v. Microsoft:  A Key Ruling For Patent Damages," Law Seminars International Telebriefing, January 21, 2011.

"Correlation, Regression, and Common Proof of Impact," New York City Bar Association, January 19, 2011.

"Private Litigation Under China's New Antimonopoly Law," Bar Association of San Francisco, February 17, 2011.

"Competition Law and State Regulation:  Setting the Stage and Focus on State-Owned Enterprises," Competition Law and the State:  International and Comparative Perspectives, Hong Kong, People's Republic of China, March 18, 2011.

Panelist, "Booking it in Cyberspace:  The Google Book Settlement and the Aftermath," American Intellectual Property Law Association, San Francisco, May 13, 2011.

"Econometric Estimation of Cartel Overcharges," ZEW Conference on Economic Methods and Tools in Competition Law Enforcement, Mannheim, Germany, June 25, 2011.

Panelist, "Antitrust and IP in China," Antitrust and IP in Silicon Valley and Beyond, American Bar Association and Stanford University, Palo Alto, October 6, 2011.

Panelist, University of San Diego School of Law Patent Law Conference:  The Future of Patent Law Remedies, January 18, 2013.

"Economics Framework," US-China Workshop on Competition Law and Policy for Internet Activities, China's State Administration for Industry and Commerce (SAIC) and the U.S. Trade and Development Agency (USTDA), Shenzhen, People's Republic of China, June 4-5, 2013.

Panelist, "China Inside and Out," American Bar Association, Beijing, People's Republic of China, September 16-17, 2013.

Panelist, "Remedies in Patent Cases," Fifth Annual Conference on The Role of the Courts in Patent Law & Policy, Berkeley and Georgetown Law Schools, November 1, 2013.

"Royalty Base," LeadershIP Conference, Qualcomm Incorporated, March 21, 2014.

"Reflections on Natural Experiments," DG Comp, April 8, 2014.

Panelist, "Antitrust in Asia: China," American Bar Association Section of Antitrust Law, Beijing, People's Republic of China, May 21-23, 2014.

Panelist, "Patent Damages Roundtable," 2015 Intellectual Property Institute, University of Southern California Gould School of Law, Los Angeles, March 23, 2015.

Panelist, "IP and Antitrust – The Current State of Economic Analysis," Global Competition Review Live 2nd Annual IP & Antitrust USA, Washington, DC, April 14, 2015.

Panelist, "FRAND Royalty Rates After Ericsson v. D-Link," American Bar Association, May 15, 2015.

Participant, Patent Damages Workshop, University of California-Berkeley, March 3, 2016.

Panelist, "FRANDtopia – In a Perfect World," LAIPLA Spring Conference, May 5, 2018.

Panelist, "Chicago Forum on International Antitrust Issues," Northwestern Pritzker School of Law, June 15, 2018.

Panelist, "Competition in Digital Advertising:  Is There Online and Offline Convergence?," Challenges to Antitrust in a Changing Economy, Harvard Law School, November 8, 2019.

## Testimonies given in the last five years

*Plexxikon Inc. v. Novartis Pharmaceuticals Corporation,* United States District Court for the Northern District of California, Case No. 4:17-CV-04405-HSG (EDL), 2019 (Deposition), 2021 (Trial Testimony).

*District Council #16 Northern California Health & Welfare Trust Fund v. Sutter Health, et al,* No. RG15753647, 2021 (Deposition).

*In the Matter of Certain Digital Video-Capable Devices and Components Thereof,* Investigation No. 337-TA-1224, United States International Trade Commission, 2021 (Deposition).

*American Society of Composers, Authors and Publishers v. Radio Music License Committee,* Arbitration, 2021 (Hearing Testimony).

*PureWick Corporation v. Sage Products, LLC*, United States District Court for the District of Delaware, Case No. 1:19-cv-01508-MN, 2021 (Deposition), 2022 (Trial Testimony).

*In the Matter of: Determination of Rates and Terms for Making and Distributing Phonorecords (Phonorecords III),* before the Copyright Royalty Board Library of Congress, Docket No. 16-CRB-0003-PR (2018-2022), 2017-2022 (Reports, Deposition, Trial Testimony).

*In Re Caustic Soda Antirust Litigation*, United States District Court for the Western District of New York, Case No. 1:19-cv-003895-EAW-MJR, 2022 (Deposition).

*Bedford, Freeman & Worth Publishing Group, LLC d/b/a Macmillan Learning, Macmillan Holdings, LLC, Cengage Learning, LLC, Elsevier Inc., Elsevier B.V., McGraw Hill LLC, and Pearson Education Inc. v. Shopify, Inc*, United States District Court for the Eastern District of Virginia, Case 1:21-cv-01340, 2022 (Deposition).

*Athos Overseas, Ltd. v. YouTube, LLC and Google LLC*, United States District Court for the Southern District of Florida, Miami Division, Case No. 1:21-cv-21698-DPG, 2022 (Deposition).

*In Re Google Play Store Antitrust Litigation*, United States District Court for the Northern District of California, San Francisco Division, Case No. 3:21-md-02981-JD, Case No. 3:21-cv-05227, 2023 (Deposition, Trial Testimony).

*Broadcom Corporation, et al. v. Netflix, Inc.,* United States District Court for the Northern District of California, Case No. 3:20-cv-04677-JD (N.D. Cal.), 2023 (Deposition).

*SESAC, Inc., SESAC, LLC and SESAC Holdings, Inc. v. Radio Music License Committee, Inc.*, Arbitration, 2024 (Testimony).

*John Gregg v. Cooley LLP, et al.*, Superior Court for Mercer County, New Jersey, Civil Action No. MER-L-002332, 2024 (Deposition).

*C.R. Bard, Inc., et al. v. Medical Components Inc.*, United States District Court for the District of Utah, Case No. 2:17-cv-754 TS, 2024 (Deposition).

*In Re Google Digital Advertising Antitrust Litigation,* United States District Court for the Southern District of New York, Case No. 1:21-MD-03010 (PKC), 2025 (Deposition).

*In Re Interest Rate Swaps Antitrust Litigation,* United States District Court for the Southern District of New York, Case No. MDL No. 2704, Master Docket No. 16 MD 2704, 2025 (Deposition).

*Epidemic Sound, AB v. Meta Platforms, Inc., f/k/a Facebook Inc.*, United States District Court for the Northern District of California, San Francisco Division, Case No. 3:22-cv-4223, 2025 (Deposition).

*Teradata US, Inc., Teradata Corporation and Teradata Operations, Inc. v. SAP SE, SAP America, Inc. and SAP Labs LLC*, United States District Court for the Northern District of California, Case No. 3:18-cv-03670-WHO, 2021, 2026 (Depositions).

## Professional activities

Member, American Economic Association

Member, Econometric Society

Member, American Bar Association

Contributor, www.antitrust.org

Contributor, ABA Section of Antitrust Law, *Econometrics*, 2005

Associate Editor, *Antitrust*, 2007-2010

Senior Editor, *Antitrust Law Journal*, 2012-; Associate Editor, 2010-2012

Co-Editor, ABA Section of Antitrust Law Economics Committee Newsletter, 2009-2012

Member, Economics Task Force, ABA Section of Antitrust Law, 2011-2012

Member, ABA Delegation to International Seminar on Anti-Monopoly Law:  Procedure and Substantive Assessment in Merger Control, Beijing, People's Republic of China, December 15-17, 2008.

Member, Working Group for drafting the "Joint Comments of the American Bar Association Section of Antitrust Law and Section of International Law on the MOFCOM Draft Guidelines for Definition of Relevant Markets," 2009.

Member, Working Group for drafting the "Joint Comments of the American Bar Association Section of Antitrust Law and Section of International Law on the SAIC Draft Regulations on the Prohibition of Acts of Monopoly Agreements and of Abuse of Dominant Market Position," 2009.

Member, Working Group for drafting the "Joint Comments of the American Bar Association Section of Antitrust Law and Section of International Law on the SAIC Draft Regulations on the Prohibition of Acts of Monopoly Agreements and of Abuse of Dominant Market Position," 2010.

Referee: *Econometrica*, *Review of Economics and Statistics*, *International Journal of Industrial Organization*, *Review of Industrial Organization, Journal of Sports Economics*, *Journal of Environmental Economics and Management*, *Research in Law and Economics*, *Labour Economics*, *Eastern Economic Journal*, *Journal of Forensic Economics, Antitrust, Antitrust Law Journal, Journal of Competition Law and Economics, Advances in Econometrics.*

## Professional history

| | |
|---|---|
| 12/2019–Present | *Vice President*, Charles River Associates |
| 2012–2019 | *Partner*, Edgeworth Economics |
| 2008–2012 | *Senior Vice President*, NERA Economic Consulting |
| 2004–2008 | *Vice President*, NERA Economic Consulting |
| 2000–2004 | *Senior Vice President*, Lexecon, Inc. |
| 1991–2000 | *Director*, Cambridge Economics, Inc. |
| 1990–1991 | *Senior Analyst*, NERA Economic Consulting |
| 1989–1990 | *Assistant Professor*, Columbia University |

- Econometrics
- Statistics
- Labor Economics