# EXHIBIT A

Nos. 24-6256 & 24-6274

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, ET AL.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of California (Hon. James Donato)
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

---

## BRIEF OF *AMICUS CURIAE* THE CENTER FOR CYBERSECURITY
## POLICY AND LAW IN SUPPORT OF DEFENDANTS-APPELLANTS

Matthew D. Field
Harley L. Geiger
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-8281
mfield@venable.com
hlgeiger@venable.com

*Attorneys for The Center for Cybersecurity Policy and Law*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, counsel for the Center for Cybersecurity Policy and Law (the "Center") states:

*Amicus curiae* the Center is a section 501(c)(6) nonprofit organization. It has no parent corporations, and no publicly held corporation has a 10 percent or greater ownership interest in it.

*/s/ Matthew D. Field*
Matthew D. Field

**TABLE OF CONTENTS**

**Page(s)**

I.   STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*.....1

II.   SUMMARY OF ARGUMENT...................................................................2

III.   ARGUMENT..........................................................................................4

    A.   The District Court injunction creates material security and privacy risks..................................................................................................4

        1.   Effect of paragraphs 10 and 12 of the injunction on app store practices ...................................................................................5

        2.   The injunction creates a threat of malware and phishing. ..........6

        3.   The injunction will disrupt app store security processes. ..........8

    B.   The injunction disserves the public interest. ......................................10

        1.   The injunction puts individual users at risk. ...........................11

        2.   The injunction puts the broader digital ecosystem at risk. .......13

        3.   The injunction erodes security measures as a procompetitive market force. ........................................................................13

    C.   The injunction imposes an unreasonable burden. ..............................16

        1.   The injunction imposes unreasonable technical challenges. ....16

IV.   CONCLUSION....................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bateman v. U.S. Postal Serv.*,
  231 F.3d 1220 (9th Cir. 2000) ....................................................................2, 4

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)......................................................................................16

*Nat'l. Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978)......................................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................................3, 10

**Other Authorities**

Canadian Centre for Cyber Security, *An Introduction to the Cyber
  Threat Environment* (2022),
  https://www.cyber.gc.ca/sites/default/files/ncta-2022-intro-e.pdf. ......................7

Center for Cybersecurity Policy and Law, *Mobile Future: Pathways to
  Continued Improvement in Mobile Security and Privacy* (May
  2021), https://cdn.prod.website-
  files.com/660ab0cd271a25abeb800460/660ab0cd271a25abeb8004
  be_mobile-future-pathways-to-continued-improvement-in-mobile-
  security-and-privacy.pdf..............................................................5, 8, 11, 12, 14

Center for Cybersecurity Policy and Law, *Trusted App Stores:
  Protecting Security and Integrity* (Feb. 2024)
  https://cdn.prod.website-
  files.com/660ab0cd271a25abeb800460/660ab0cd271a25abeb8005
  cc_CCPL_TrustedAppStore.pdf..................................................1, 6, 7, 8, 11, 12

Charles Griffiths, *The Latest 2024 Phishing Statistics*, AAG (Jan. 1,
  2024), https://aag-it.com/the-latest-phishing-statistics/ (last
  accessed Nov. 19, 2024) ..................................................................................7

Derek Manky & Rob Rashotte, *Phishing Emails are More Believable Than Ever*, Fortinet (Oct. 9, 2023), https://www.fortinet.com/blog/industry-trends/what-to-do-about-phishing-emails. ..............................................................................................7

Federal Trade Commission, *Who Experiences Scams? A Story for All Ages*, FTC (Dec. 8, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/12/who-experiences-scams-story-all-ages. ...................................................................................................7

Fortinet, *How to Prevent Lateral Movement in Cybersecurity?* https://www.fortinet.com/resources/cyberglossary/lateral-movement (last accessed Dec. 12, 2024).............................................................13

Global Anti-Scam Alliance, *Global State of Scams – 2023* (2023), https://www.scribd.com/document/679758338/Global-State-of-Scams-Report-2023-Global-GASA-final .................................................7

Grand View Research, Mobile Application Market Size and Trends, https://www.grandviewresearch.com/industry-analysis/mobile-application-market (last accessed Nov. 15, 2024)..............................15

National Cyber Security Centre, *Threat Report on Application Stores* (2022) https://www.ncsc.gov.uk/files/Threat-report-on-application-stores-web-v2.pdf ........................................................................10

*Phishing Statistics*, AAG (Jan. 1, 2024), https://aag-it.com/the-latest-phishing-statistics/ (last accessed Nov. 19, 2024) ...............................7

iii

## I.   STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Center for Cybersecurity Policy and Law ("Center") is a nonprofit organization that develops, advances, and promotes best practices and educational opportunities among cybersecurity professionals. Its interest in this case is to ensure that courts give due consideration to security measures, security risks, and the pro-competition effects of security in fashioning equitable remedies related to app store competition and access. Centralized vetting by app stores significantly supports the security of mobile computing and has made mobile operating systems and apps more secure than traditional desktop computing.[2] This security has contributed to the widespread adoption and use of personal devices and a competitive market, and enabled the broad use of mobile devices in enterprises, businesses, and other sensitive contexts. If app stores are materially hindered in performing centralized

---

[1]    Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person – other than the amicus, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief. Defendant-Appellant Google is a member of the Center for Cybersecurity Policy and Law and has paid general dues for such membership but did not contribute any money intended to fund the preparation or submission of this brief.

[2]    *See* Center for Cybersecurity Policy and Law, *Trusted App Stores: Protecting Security and Integrity* 10-13 (Feb. 2024) https://cdn.prod.website-files.com/660ab0cd271a25abeb800460/660ab0cd271a25abeb8005cc_CCPL_TrustedAppStore.pdf [hereinafter "Center for Cybersecurity Policy and Law, *Trusted App Stores*"] (discussing how the Apple App Store's and Google Play Store's policies and procedures mitigate the risk of trojan apps and malware).

app vetting, we would be putting the security of most major enterprises at stake and undermining the potential of the entire mobile market. It is essential that this case not set a precedent for future injunctions that will create security risks for users and the broader digital ecosystem and erode the positive competitive effects of security.

## II.    SUMMARY OF ARGUMENT

If the Court does not overturn the District Court's decision on the merits, the Court should modify the District Court's injunction by striking paragraphs 10 and 12 and remand to the District Court for additional testimony focused on security and safety implications in fashioning an appropriate remedy.

The District Court failed to adequately consider the severe security risks that will result from its injunction. The District Court dismissed motions for additional testimony[3] despite itself acknowledging that the "[t]he Court is in no position to anticipate what those might be, or how to solve them."[4] The District Court rests its decision on an erroneous assumption that the security risks are insubstantial and readily manageable.[5] Yet by abandoning the caution that is key to fashioning an

---

[3]     See Order Re UCL Claim and Injunctive Relief at 2, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981 (N.D. Cal. Oct. 07, 2024) [hereinafter "District Court Order"] ("Google's request for even more discussion is not well taken.")

[4]     District Court Order at 12.

[5]     *See id.* at 12; *see also Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223 (9th Cir. 2000) ("A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact.").

antitrust remedy, [6] the Court's injunction creates material and widespread security risks.

Specifically, paragraphs 10 and 12 of the injunction will require the Google Play Store to host external links and third-party app stores.[7] This will expose 100 million Play Store users and the broader digital ecosystem to significantly higher risks from scams, malicious software, phishing, and other security and privacy threats. Mobile device users are not willing to, or even equipped, to make these technical determinations on their own, and based on our research, we consider it likely that this will significantly inhibit the ongoing growth of the mobile ecosystem. Part III.A of this brief discusses these risks.

By failing to adequately address the security implications, the District Court's injunction 1) Does a serious disservice to the public interest, including individual users and the broader digital ecosystem who will face a more dangerous mobile ecosystem;[8] and 2) Does not represent a reasonable method of addressing the

---

[6] *See* District Court Order at 8 (citing *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021)).

[7] Permanent Injunction at ¶¶ 10, 12, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981 (N.D. Cal. Oct. 7, 2024) [hereinafter "District Court Injunction"].

[8] *See* District Court Order at 8 (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023)) ("To issue an injunction, the court must find…that the public interest would not be disserved by a permanent injunction. Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff."); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy

conduct at issue.[9] Parts III.B and III.C of this brief discuss these aspects of the injunction.

## III.   ARGUMENT

### A.   The District Court injunction creates material security and privacy risks.

Paragraphs 10 and 12 of the District Court's injunction will each create widespread, material security and privacy risks, increasing users' exposure to malicious applications, phishing schemes, and data theft. The District Court is highly dismissive of these risks and improperly rests its decision on an erroneous assumption that the risks are insubstantial and readily manageable.[10] This error of fact is in part the result of the District Court declining to permit sufficient testimony regarding the security and safety implications of the injunction.[11]

Importantly, the injunction sets a dangerous precedent that may be re-applied to other inquiries into app store competition. There are more than 300 app stores worldwide, and it would be devastating to security and privacy if courts apply

---

of injunction.").

[9]   "The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." District Court Order at 15 (quoting *Nat'l. Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978)).

[10]   *See id.* at 12; *see also Bateman*, 231 F.3d at 1223.

[11]   District Court Order at 2 (citing to Objections to Epic's Proposed Injunction at 11, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981 (May 2, 2024)).

injunctions with provisions similar to paragraphs 10 and 12 to additional app stores that provide centralized security vetting and app curation.[12]

> 1. Effect of paragraphs 10 and 12 of the injunction on app store practices

Paragraph 10 of the District Court's injunction requires the Play Store to allow third-party app developers to provide links to download the apps from outside the Play Store.[13] Links can take users to any part of the Internet and can initiate the download of any software onto user devices, including malware. In addition, the content at the destination of a link can change, so a link that is benign on one day can lead a user to malware or harmful content on the next. This is a technique that is already used by malicious actors in other contexts, and techniques like URL rewriting can make these links almost impossible for users to evaluate themselves.

Paragraph 12 of the injunction requires the Play Store to allow the distribution of third-party app platforms and stores on the Play Store.[14] These app platforms and stores would host apps but might provide no curation or security vetting of their apps or developers. Additionally, the injunction does not allow for Google to place

---

[12] Center for Cybersecurity Policy and Law, *Mobile Future: Pathways to Continued Improvement in Mobile Security and Privacy* 5 (May 2021), https://cdn.prod.website-files.com/660ab0cd271a25abeb800460/660ab0cd271a25abeb8004be_mobile-future-pathways-to-continued-improvement-in-mobile-security-and-privacy.pdf [hereinafter "Center for Cybersecurity Policy and Law, *Mobile Future*"].
[13] District Court Injunction at ¶ 10.
[14] *Id.* at ¶ 12.

additional rules on app platforms and stores within the Play Store, even though these platforms and stores have significantly greater access to user data and device permissions than a typical app in the Play Store, and any apps downloaded from third-party stores can "directly interface with sensitive stored data and the mobile device's core functionality."[15] If a downloaded app is malware or highly vulnerable to compromise, it will put the security, privacy, and safety of the device user at risk.

The effect of each of these injunction provisions is to enable new pathways for malicious and harmful software to reach users through external links and apps, especially those that have been increasingly secured and safe over the past decade. This permission bypasses the Play Store's security screening processes that users depend on, exposing the 100 million users of the Play Store to risks that Google's security protocols were designed to prevent. As discussed in section III.A.3. of this brief, it will be significantly challenging for comparable security screening measures to be provided for the vastly increased scope of external links and apps from third-party app stores.

2. The injunction creates a threat of malware and phishing.

Requiring the Play Store, or any app store, to host external download links and third-party app stores materially elevates the risk to users of malware and phishing attacks. Malicious actors exploit external links and third-party apps to

---

[15] Center for Cybersecurity Policy and Law, *Trusted App Stores*, at 7.

direct users to websites that mimic legitimate app downloads but instead deliver harmful software.[16] Malicious apps compromise user security, privacy, and safety by stealing personal information, monitoring user activities, or taking control of device functionalities such as cameras and microphones.

Phishing emails and text messages that trick users into clicking links that download malicious software are already highly successful attack techniques for cybercriminals, scammers, and nation state actors.[17] Recent studies indicate that more than three-quarters of mobile users encountered at least one such scam in the past year,[18] and industry statistics show that phishing is the most common[19] — and one of the most effective[20] — ways to begin a cyberattack. These attacks are successful against every demographic and result in significant monetary losses.[21] The District Court's injunction would create an additional vector for such social

---

[16]     *Id.*

[17]     Canadian Centre for Cyber Security, *An Introduction to the Cyber Threat Environment* 2, 14 (2022), https://www.cyber.gc.ca/sites/default/files/ncta-2022-intro-e.pdf.

[18]     Global Anti-Scam Alliance, *Global State of Scams – 2023* 12-13 (2023), https://www.scribd.com/document/679758338/Global-State-of-Scams-Report-2023-Global-GASA-final.

[19]     Charles Griffiths, *The Latest 2024 Phishing Statistics*, AAG (Jan. 1, 2024), https://aag-it.com/the-latest-phishing-statistics/ (last accessed Nov. 19, 2024).

[20]     Derek Manky & Rob Rashotte, *Phishing Emails are More Believable Than Ever*, Fortinet (Oct. 9, 2023), https://www.fortinet.com/blog/industry-trends/what-to-do-about-phishing-emails.

[21]     Federal Trade Commission, *Who Experiences Scams? A Story for All Ages*, FTC (Dec. 8, 2022), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/12/who-experiences-scams-story-all-ages.

engineering attacks by increasing the likelihood that fraudulent links and harmful applications will reach users.

This risk is not theoretical. Reports indicate that mobile platforms are increasingly targeted by criminals and that most malware is distributed from sources that do not perform comprehensive checks of applications they provide.[22] As we noted in our report, "Android users of 'other top alternative markets' were five times riskier on average, and upwards of nineteen times more likely to come across malware or a malicious app than those that used the Google Play store," and "99.9% of mobile malware they discovered was hosted on third-party app stores."[23] For this reason, many government and private organizations advise against downloading apps from unofficial and untrusted sources.[24] Conversely, reports demonstrate that app stores that use centralized screening processes show significant reductions in the number of malicious apps on their stores.[25]

### 3. The injunction will disrupt app store security processes.

---

[22]     Center for Cybersecurity Policy and Law, *Mobile Future*, at 6 (citing Crowdstrike, 2019 Mobile Threat Landscape Report https://www.crowdstrike.com/resources/reports/mobile-threat-report-2019/ (last accessed Nov. 18, 2024)); Center for Cybersecurity Policy and Law, *Trusted App Stores*, at 8.

[23]     Center for Cybersecurity Policy and Law, *Trusted App Stores*, at 8.

[24]     *Id*. at 8-9.

[25]     Center for Cybersecurity Policy and Law, *Mobile Future*, at 9 (citing Risk IQ, *2020 Mobile App Threat Landscape Report* 5 (2021) https://www.riskiq.com/wp-content/uploads/2021/01/RiskIQ-2020-Mobile-App-Threat-Landscape-Report.pdf).

The Play Store, like some other app stores and platforms, uses centralized screening processes to help ensure that hosted apps do not expose users to unacceptable security risks. As part of these processes, hosted applications are scanned to prevent and remove malware prior to public availability, and external links are restricted due to the security and safety risks they present. Centralized security processes help app stores create a trusted environment for consumers and organizations, who often rely on the vetting of content to significantly reduce the likelihood that content downloaded from the app store is harmful malware. Such security screening is a key component of the utility of Google's conduct to the market in exercising control over the Play Store.[26]

The injunction disrupts those protections and the utility of Google's conduct. Requiring the Play Store to host external download links and third-party app stores dramatically increases the number of potential attack vectors, effectively expanding the "attack surface" for bad actors targeting mobile devices. The potential scale of external links and apps hosted on third-party stores hinders even well-resourced efforts at centralized security monitoring.

It is infeasible for an app store to ensure adequate security and safety vetting

---

[26]     District Court Order at 27-28 (quoting *Progressive W. Ins. Co. v. Yolo Cnty. Superior Ct.*, 135 Cal. App. 4th 263, 285-86 (2005)) ("To support a finding of unfairness to consumers, the Court balances 'the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'").

for every external link and its destination, especially as the content at the link destination can change at any time. It is also infeasible for an app store to provide security and safety vetting for every developer and app hosted in a third-party app store, and it is unclear whether the third-party app store would even remove apps that fail security vetting. As a result of the injunction and limitations on the kinds of vetting that Google can undertake before allowing third-party app stores, the likelihood of greater exposure of users to malware or harmful content through the Play Store would be significant.[27]

**B.      The injunction disserves the public interest.**

Because paragraphs 10 and 12 of the injunction introduce security, privacy, and safety risks to individual users and the digital ecosystem, the public interest is disserved by the District Court's injunction.[28] By mandating that the Play Store host external download links and third-party app stores, the injunction fundamentally shifts the responsibility of ensuring app security to end users and, by extension, to the organizations that rely on mobile devices within their networks. These users, and

---

[27]     *See* National Cyber Security Centre, *Threat Report on Application Stores* 7 (2022)      https://www.ncsc.gov.uk/files/Threat-report-on-application-stores-web-v2.pdf.

[28]     *See* District Court Order at 7 (quoting *Epic Games*, 67 F.4th at 1002) ("To issue an injunction, the court must find…that the public interest would not be disserved by a permanent injunction."); *see also Winter*, 555 U.S. at 9 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

many of these organizations, are not well equipped to replace this protection themselves.

This mandate jeopardizes the Play Store's 100 million users and threatens broader network security, affecting organizations, businesses, and government agencies. In addition, paragraphs 10 and 12 of the District Court's injunction would erode security standards and undermine the pro-competition market effects of security. These negative effects on the public interest would be greatly exacerbated if the precedent set in paragraphs 10 and 12 of the injunction were applied to other app stores.

### 1.   The injunction puts individual users at risk.

By disrupting the Play Store's security and safety screening processes, the injunction imposes a greater burden on individual users to assess the safety of links and apps. This places an unreasonable expectation on individual users, most of whom do not have the expertise or resources needed to sufficiently identify and avoid deceptive links and apps that lead to malware or harmful content.[29] Vulnerable populations are disproportionately at risk, including children, elderly individuals, and those with limited technical proficiency.

Numerous studies indicate that, despite the very real harm malicious apps can

---

[29]      Center for Cybersecurity Policy and Law, *Mobile Future*, at 7-8; *see also* Center for Cybersecurity Policy and Law, *Trusted App Stores*, at 9-10.

cause, mobile users are ill-equipped to take an active role in protecting themselves.[30] The mobile app ecosystem is complex, and privacy policies, permissions, and app developer assurances are difficult to assess.[31] For such reasons, many users do not want to be in charge of app security and prefer to rely on centralized security and safety vetting provided by app stores. With this vetting disrupted under the injunction, it is at best unclear if users will take proactive steps to mitigate the heightened risks they would face.

The risk to users is exacerbated because the Play Store is a trusted environment in which users could previously rely on centralized security vetting. That trust makes it more likely that users may fall victim to fraudulent links and apps, believing them to be vetted. The difficulty of distinguishing legitimate from fraudulent sources will lead to increased risk of user device compromise, identity theft, and financial fraud.

The breadth of apps on the Play Store compounds this challenge because of the sheer volume of potential attack vectors users would be expected to monitor. By requiring the Play Store to also host external links and third-party stores with additional apps, the District Court's injunction introduces a multitude of new pathways for unvetted software to reach users. Compromise of end user devices is

---

[30]     Center for Cybersecurity Policy and Law, *Trusted App Stores*, at 9.
[31]     Center for Cybersecurity Policy and Law, *Mobile Future*, at 8.

all but certain.

> 2.     <u>The injunction puts the broader digital ecosystem at risk.</u>

In today's interconnected digital environment, a compromised mobile device can serve as a gateway for malicious actors to access larger organizational networks. Personal or work devices are often connected to other assets, such as enterprise WiFi networks, email, cloud storage, and operational technology. Harmful software downloaded onto mobile devices through malicious applications or successful phishing attacks can enable attackers to move from the device to such assets, putting additional information and systems at risk. Such "lateral movement" is a common cyberattack technique.[32]

By significantly weakening the Play Store's ability to provide security for users, the District Court's injunction increases the likelihood that malware introduced through an unvetted external link could infiltrate sensitive networks. This risk is particularly troubling for government entities, critical infrastructure, businesses managing sensitive data, and other organizations that rely on secure mobile and app ecosystems to protect their data.

> 3.     <u>The injunction erodes security measures as a procompetitive market force.</u>

---

[32]     Fortinet, *How to Prevent Lateral Movement in Cybersecurity?* https://www.fortinet.com/resources/cyberglossary/lateral-movement (last accessed Dec. 12, 2024).

The injunction undermines rather than supports the competition that creates greater security and privacy for users. Curated app stores with centralized security measures create and support mobile ecosystems that allow competition to flourish. Security measures have increased user trust in the mobile ecosystem, which has enabled growth in mobile device and app usage.[33] Users value the security and privacy of mobile devices, but assuming most users can or want to manage their own security is something that the market has addressed by handling security upstream with the very centralized processes that the paragraphs 10 and 12 would overwhelm and disrupt. By weakening these protections, the injunction threatens to erode consumer trust, ultimately deterring users from engaging with apps that rely on a secure, centralized platform for distribution.

Security is not merely a restriction of particular malicious or problematic behaviors; it is a competitive benefit that promotes consumer trust, market engagement, and product differentiation, aligning with antitrust principles that recognize the procompetitive value of quality and safety in fostering a healthy, competitive market. Security measures within app stores promote consumer welfare by creating a trusted ecosystem where users feel safe to engage with apps, particularly for sensitive purposes such as finance, healthcare, and personal communications. A secure environment expands market output by encouraging

---

[33]     Center for Cybersecurity Policy and Law, *Mobile Future*, at 4, 9-10.

consumers to engage with a broader range of applications, thereby supporting economic growth in the app market. When users can trust the security of app stores, they are more likely to explore and download apps, enhancing developer reach and broadening consumer choice.

The presence of these protections has enabled the rapid growth of mobile app usage, with the global app market estimated to be valued at more than $252 billion in 2023, a growth partially driven by robust security frameworks that increase consumer trust.[34] When users perceive that app platforms are unsafe, they are less likely to participate, reducing overall market engagement and limiting app usage, which particularly affects small and new developers who rely on trusted ecosystems to reach consumers.

Creating more secure and trusted ecosystems is a way for app stores to differentiate themselves and compete. However, the District Court's order failed to fully consider how security measures support product differentiation and benefit competition. By requiring the Play Store to permit unvetted external links and third-party app stores, the injunction diminishes the security features that distinguish centralized app stores from alternative app distribution models. Casting uncertainty on the security of reputable app stores would significantly change the market, user

---

[34]     Grand View Research, Mobile Application Market Size and Trends, https://www.grandviewresearch.com/industry-analysis/mobile-application-market (last accessed Nov. 15, 2024).

perception, and ecosystem security as a whole.

### C. The injunction imposes an unreasonable burden.

Far from the "modest step" described by the District Court, paragraphs 10 and 12 of the injunction are significantly more burdensome than what is necessary to provide relief to the plaintiff.[35] The injunction poses major technical challenges while ignoring the positive effect of security protections on competition. Consequently, the injunction does not represent a reasonable method of addressing the conduct at issue.[36]

#### 1. The injunction imposes unreasonable technical challenges.

As noted in section III.A.3 of this brief, the District Court improperly relies on an erroneous assumption that the security risks of the injunction are insubstantial and readily manageable. It is infeasible for the District Court to expect Google to provide the equivalent to its current security and safety protections for the external links and third-party app stores the Play Store will be required to host under the injunction.

The District Court demonstrates its reliance on this erroneous factual

---

[35] District Court Order at 13; *see also Natl. Soc'y of Pro. Eng'rs*, 435 U.S. at 698 ("The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct.").

[36] "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also* District Court Order at 7 (same).

16

conclusion in multiple ways. These include the District Court's dismissal of calls for additional testimony on the complex security implications of the injunction,[37] as well as providing a mere eight months for Google to implement the changes needed to comply with the injunction.[38] The District Court further assumes that any "technical issues about security and the like" will be adequately overseen by a three-person committee jointly appointed with entities adverse to Google.[39]

The District Court's expectation that Google could simply adjust its security protocols to accommodate external links and third-party platforms disregards the technical and logistical realities of securing such a vast, decentralized app environment. The Court's suggestion that Google could implement such measures within a matter of weeks[40] ignores the significant development, testing, and monitoring that these security enhancements would require. Mobile security experts point out that any meaningful security infrastructure to manage decentralized links may take over a year to implement.[41] Moreover, even with extended timelines, comprehensive monitoring of all external links would remain infeasible due to the sheer volume of content, as described in section III.A.3 of this brief.

---

[37]       District Court Order at 2.

[38]       District Court Injunction at ¶¶ 11-12.

[39]       District Court Order at 16; District Court Injunction at ¶ 13.

[40]       District Court Injunction at ¶¶ 11-12.

[41]       *See* Brief of Computer Security Experts John Mitchell, et al. as *Amici Curiae* in Support of Defendants-Appellants and Their Application for Partial Stay of Permanent Injunction Pending Appeal at 9, Oct. 24, 2024, ECF No. 24.

Similarly, providing appropriate security for third-party app stores hosted in the Play Store will be difficult or impossible. Apps with dynamic content — like an app store that hosts varying content for installation — are not currently managed by Play Store policies and technical controls. Designing and building protections could take much longer than eight months.

The three-person "Technical Committee" required under the injunction does not alleviate the problems raised by the injunction. Such a committee lacks the resources and expertise to oversee all security and technical issues implicated by a project of this scale. The committee's effectiveness and decisiveness is further impaired by the District Court's requirement that the committee be appointed by parties adverse to each other, in active litigation with each other, and with differing business interests and approaches to innovation.[42] When this divided committee cannot resolve a technical or security issue, the injunction would force the parties to undertake the lengthy process of seeking additional resolution with the District Court.[43] In short, the "Technical Committee" proposal is a completely unrealistic solution to the serious risks created by the District Court's injunction, compounding rather than mitigating the unreasonable burden of the injunction.

---

[42]     District Court Injunction at ¶ 13.

[43]     *Id.*

18

## IV.    CONCLUSION

For the foregoing reasons, amicus respectfully asks the Court of Appeals to

modify the District Court's injunction to remove paragraphs 10 and 12, and, to the

extent not mooted by its decision on the merits, to remand to the District Court for

additional testimony on security considerations in fashioning an appropriate remedy.


Respectfully submitted,

/s/ *Matthew D. Field*
Matthew D. Field
Harley L. Geiger
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-4000

*Counsel for Amicus Curiae*
*The Center for Cybersecurity*
*Policy and Law*

Dated: December 4, 2024

19

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-6256, 24-6274 _____

      I am the attorney or self-represented party.

      **This brief contains 4,305 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

      I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

      [ ] it is a joint brief submitted by separately represented parties.

      [ ] a party or parties are filing a single brief in response to multiple briefs.

      [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Matthew D. Field_        **Date**    December 4, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                        *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on December 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

Dated: December 4, 2024

/s/ *Matthew D. Field*
Matthew D. Field

*Counsel for Amicus Curiae*
*The Center for Cybersecurity*
*Policy and Law*