# EXHIBIT B

**Nos. 24-6256 & 24-6274**

IN THE

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

– v. –

GOOGLE LLC, *et al.,*

*Defendants-Appellants.*

On Appeal from a Final Judgment of the United States
District Court for the Northern District of California (Donato, J.),
Nos. 3:20-cv-05671 & 3:21-md-02981

**BRIEF OF COMPUTER SECURITY EXPERTS
JOHN MITCHELL, SERGE EGELMAN, NIKITA BORISOV,
KEVIN BUTLER, AMIT ELAZARI, GUOFEI GU, AND SHARAD
MEHROTRA AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLANTS AND REVERSAL**

Robert T. Smith
Neal S. Mehrotra
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.,
Suite 800
Washington, D.C. 20006-3404
robert.smith1@katten.com
neal.mehrotra@katten.com
202-625-3500

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

Table of Authorities.......................................................................ii

Statement of Interest of *Amici Curiae*.......................................... 1

Introduction.................................................................................. 7

Argument...................................................................................... 9

I.      Paragraph 10 of the Permanent Injunction Will Lead to a
        Proliferation of Scam Links, Exposing More Than One-
        Hundred Million Users of Google's Play Store to Extensive
        Security Risks...................................................................... 15

II.     Paragraphs 11 and 12 of the Permanent Injunction Will Lead
        to an Explosion of Scam App Stores and Weaken Android's
        Security Ecosystem Worldwide............................................. 22

Conclusion ................................................................................... 32

Certificate of Compliance.............................................................. 33

Certificate of Service ................................................................... 34

## TABLE OF AUTHORITIES

Admin. Office of the U.S. Courts, *Electronic Filing Scam Targets Attorneys* (Nov. 6, 2024) ...................................................................... 7

Admin. Office of the U.S. Courts, *Information Systems and Cybersecurity – Annual Report 2022* .............................................. 21

Bitdefender, *Unveiling Mobile App Secrets: A 6-Month Deep Dive into Surprising Behavior Patterns*, Jan. 8, 2024 ................ 16, 25-26

Eduardo Blázquez, *et al.*, *Trouble Over-The-Air: An Analysis of FOTA Apps in the Android Ecosystem*, 2021 IEEE Symposium on Security and Privacy 1606 (2021) ..................... 9, 27

Federal Bureau of Investigation, *On the Internet: Be Cautious When Connected* ............................. 19

Federal Bureau of Investigation, *Spoofing and Phishing* .................................................................. 16

Anne Freer, *Google blocks 1.43 million policy-violating apps on Play Store*, App Business, May 5, 2023 ......................................... 28

Cassidy Gibson, *et al., Analyzing the Monetization Ecosystem of Stalkerware,* 2022 Proceedings on Privacy Enhancing Technology Symposium 105 (2024 Issue 4) ................................... 29

Global Anti-Scam Alliance, *Global State of Scams – 2023* .............................................. 18-19

Google, *Device and network abuse* .......................................................... 15

Platon Kotzias, *et al.*, *How Did That Get In My Phone? Unwanted App Distribution on Android Devices*, 2021 IEEE Symposium on Security and Privacy 53 (2021) ............................... 11, 17-18, 24

Nikita Samarin, *et al.*, *The Medium is the Message: How Secure Messaging Apps Leak Sensitive Data to Push Notification Services*, 2024 Proceedings on Privacy Enhancing Technology Symposium 967 (2024 Issue 1) ........................ 27, 29-30

Byron Tau, *Apple and Google to Stop X-Mode From Collecting Location Data From Users' Phones*, Wall St. J., Dec. 9, 2020 ....... 28

U.S. Dist. Ct., N.D. Cal.,
  *Beware of Fake Court E-mails* ..................................................... 7

The Verge,
  *Uber tried to fool Apple and got caught*, Apr. 23, 2017 ................. 31

Haoyu Wang, *et al.*, *Beyond Good Play: A Large-Scale Comparative Study of Chinese Android App Markets*, 2018 Internet Measurement Conference, Association for Computing Machinery (Oct. 31 – Nov. 2, 2018) ........................... 11

## STATEMENT OF INTEREST OF *AMICI CURIAE**

*Amici curiae* are current and former academics who have studied and researched in the areas of computer security and privacy, and who have extensive experience analyzing the security and privacy risks of mobile applications. As such, *amici* have a significant interest in computer security and ensuring that policymakers and courts make informed, rational decisions about privacy and data security.**

John Mitchell is the Mary and Gordon Crary Family Professor, professor of computer science, and by courtesy professor of electrical engineering and professor of education at Stanford University. He was previously chair of the Computer Science Department. Professor Mitchell's research focuses on programming languages, computer security and privacy, blockchain, machine learning, and technology for education. With over 250 publications and over 30,000 citations, he has

---

* No party or counsel for any party in this case authored this brief in whole or in part. No person or entity—other than *amici curiae* and their counsel—made a monetary contribution specifically for the preparation or submission of this brief.

** Although *amici* are affiliated with various academic and business institutions, they lend their support to this brief in only their individual capacities. Nothing in this brief should be construed as the position of the academic institutions and businesses with which they are affiliated.

- 1 -

led research projects on a range of topics, been a consultant or advisor to many companies, and served as editor-in-chief of the Journal of Computer Security.

Serge Egelman is the Research Director of the Usable Security and Privacy group at the International Computer Science Institute, which is an independent research institute affiliated with the University of California, Berkeley. He also holds a position as a research scientist within the Electrical Engineering and Computer Sciences Department at the University of California, Berkeley. He is a co-founder and Chief Scientist of AppCensus, Inc., which builds tools to test the privacy behaviors of mobile applications. He received his Ph.D. from Carnegie Mellon University's School of Computer Science; his research has been cited over 13,000 times; and he has testified before Congress on issues relating to the privacy and security of mobile applications.

Nikita Borisov is a Professor at the Department of Electrical and Computer Engineering at the University of Illinois at Urbana-Champaign. His primary research focus is on computer security and privacy. Professor Borisov's notable work includes an analysis of an early WiFi security suite (WEP), which led to a redesign of WiFi security, a

- 2 -

seminal instant messaging privacy protocol (OTR), which led to the design of forward-secure and deniable protocols that are used by WhatsApp and other popular systems, and an analysis of the privacy impact of sensors in mobile devices, which led to a redesign of relevant web application programming interface (API) permissions. He has received several awards, including the National Science Foundation's CAREER award for his research on Internet privacy in 2010 and best paper awards at the Association for Computing Machinery (ACM) Asia Conference on Computer and Communications Security in 2014 and the Web Conference in 2019. According to Google Scholar, Professor Borisov's publications have been cited over 11,000 times. In addition to conducting research and teaching, Professor Borisov has worked at Microsoft Research, Entrust, Inc., and Cloudflare. He received a Ph.D. in Computer Science from the University of California, Berkeley.

Kevin Butler is the director of the Florida Institute for Cybersecurity and a professor of computer and information science and engineering at the University of Florida. Professor Butler's research focuses on the security of computers—from embedded and mobile devices to cloud computing systems—and the data they generate. He has led a

- 3 -

research team that uncovered smartphone vulnerabilities that would allow hackers to take control of phones and extract private information without user knowledge. In response to his groundbreaking findings, LG and Samsung promptly developed a security patch. Professor Butler is a Senior Member of ACM and the Institute of Electrical and Electronics Engineers (IEEE), and he serves on the Computing Research Association Computing Community Consortium as an expert in computer security and privacy. According to Google Scholar, his work has been cited over 6,000 times, and he has received the National Science Foundation's prestigious CAREER Award. He received his Ph.D. in Computer Science and Engineering from the Pennsylvania State University.

Amit Elazari is a co-founder and the chief executive officer of OpenPolicy, the world's first tech-enabled policy intelligence and engagement platform, which aims to democratize access to policy to entities of all sizes. Dr. Elazari teaches at the School of Information and Cybersecurity at the University of California, Berkeley, and at Reichman University, and serves as a member of the External Advisory Committee for the UC Berkeley Center of Long-Term Cybersecurity. Prior to OpenPolicy, she was Head of Global Cybersecurity Policy at Intel

Corporation, responsible for shaping and executing Intel's global security policy and government affairs engagement across all of Intel technologies. She holds a Doctoral Degree in the Law (J.S.D.) from the University of California Berkeley School of Law.

Guofei Gu is a professor, the holder of the Eppright Professorship in Engineering, and the Director of the Secure Communication and Computer Systems (SUCCESS) Lab in the Department of Computer Science and Engineering at Texas A&M University. His research interests are in network and systems security, including software-defined programmable security, malware and intrusion detection, Artificial Intelligence security, and security related to mobile devices. Professor Gu is also an IEEE Fellow and an ACM Distinguished Member. According to Google Scholar, his work has been cited over 20,000 times. He received his Ph.D. in Computer Science from the College of Computing at the Georgia Institute of Technology.

Sharad Mehrotra is a Distinguished Professor of Computer Science at the University of California, Irvine. He is a fellow of ACM and of IEEE. Professor Mehrotra's research expertise spans database management, distributed systems, and secure databases, including computer and cloud

security, data privacy, cryptography, software engineering, and machine learning. He has received numerous awards and honors, including the 2011 SIGMOD Best Paper Award, the 2007 DASFAA Best Paper Award, DASFAA ten-year best paper award for 2013, the 1998 CAREER Award from the National Science Foundation, ACM ICMR Best Paper Award for 2013, IEEE SRDS Best paper award 2018, IEEE NCA best paper award 2019, and IEEE Percom 2022 Best Paper Award. His over 500 articles have been cited over 28,000 times according to Google Scholar. His pioneering contributions to the field include his work on encrypted search on database as a service that was recognized through the prestigious SIGMOD Test of Time award in 2012 and DASFAA ten-year best paper award in 2014. Prior to entering academia, Professor Mehrotra was a Scientist at Panasonic Technologies. He received his Ph.D. from the University of Texas at Austin in Computer Science.

## INTRODUCTION

The Internet can be a scary place—take the federal judiciary's recent experience. Lawyers and parties who had signed up for electronic filing notifications started receiving seemingly legitimate e-mail notifications with a link to access case documents on court websites. As it turned out, scammers were behind the e-mails; the websites they were directing people to were malicious; and some of those people were unwittingly surrendering sensitive personal information and installing malware on their computers. *See* Admin. Office of the U.S. Courts, *Electronic Filing Scam Targets Attorneys* (Nov. 6, 2024).[1]

To avoid being a victim of the scam, the federal judiciary advised users to "[n]ever download attachments or click on links from unofficial or questionable sources." *Id.* And users were instructed to validate e-mails and "case documentation directly through [their] local federal court's CM/ECF system." *Id.*; *see also* U.S. Dist. Ct., N.D. Cal., *Beware of Fake Court E-mails* (providing similar advice).[2]

---

[1] https://www.uscourts.gov/news/2024/11/06/electronic-filing-scam-targets-attorneys.

[2] https://www.cand.uscourts.gov/notices/beware-of-fake-court-emails/.

The Administrative Office of the U.S. Courts drew upon two sound practices when it comes to computer and information security. First, downloading questionable attachments or clicking on unverified links can present a serious security risk. Second, where there is a legitimate, centralized repository of information, users can use that source to verify that a specific communication is not a scam.

In this case, however, the District Court issued a permanent injunction that violates these principles as applied to the more than one-hundred million users whose devices run on Google's Android operating system. As explained below, the injunction will lead to an explosion of external links displayed within apps downloaded on Google's Play Store or through Play Store listings, increasing the likelihood that users will be directed to websites where they might inadvertently install malware onto their devices or surrender highly sensitive personal and financial information. And the injunction will lead to the proliferation of scam app stores, which will increase the prevalence of pirated and malicious apps on Android devices and impair the ability of users to verify the legitimacy of apps that they might wish to download.

In short, the permanent injunction will weaken the security of the entire Android ecosystem. Paragraphs 10 through 12 should be reversed.

**ARGUMENT**

Google's Android software is "the most used operating system ever"—more than Microsoft Windows or Apple Mac OS. Eduardo Blázquez, *et al.*, *Trouble Over-The-Air: An Analysis of FOTA Apps in the Android Ecosystem*, 2021 IEEE Symposium on Security and Privacy 1606, 1606 (2021).[3] Worldwide, over 2.5 billion devices—from smartphones to tablets and even some computers—are running on Android daily. *Id.*

Among its many virtues, Android's system is open. Unlike Apple, which forces its users to use Apple's App Store to download apps on Apple devices, Google does not force Android users to download and install apps using the Play Store, Google's online store for downloading Android apps. To the contrary, Android users may also download apps from third-party app stores or websites—referred to as sideloading. And unlike Apple, which is the exclusive manufacturer of devices that run Apple's iOS operating system (namely, iPhones and iPads), Google allows other

---

[3] https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=9519485.

manufacturers to produce devices that run Android. The result is a robust marketplace for both Android apps and the devices that run those apps.

Although Android's openness should be heralded for providing choice to consumers, it creates unique security challenges that Google has attempted to mitigate within one of the ecosystems that it controls: Google's Play Store. Google's approach to the Play Store is multifaceted, but two aspects warrant further explanation here. First, Google makes developers who wish to make their apps available on the Play Store adhere to a variety of security parameters, which include forbidding developers from embedding links in apps available on the Play Store to download apps outside of the Play Store—links that could misdirect users to malicious and unwanted websites. Second, Google invests substantial resources to prevent problematic applications from ever appearing in Google's Play Store, and Google removes applications when further investigation reveals that they are malicious or subject to security vulnerabilities.

Outside the Play Store and a handful of well-run third-party app stores like Amazon's Appstore and Samsung's Galaxy Store, it's the Wild

West. One study found that, globally, alternative markets are "on average five times riskier (3.2% VDR) than the Play market (0.6%)." Platon Kotzias, *et al.*, *How Did That Get In My Phone? Unwanted App Distribution on Android Devices*, 2021 IEEE Symposium on Security and Privacy 53, 54 (2021).[4] Some stores, like Amazon's, "are almost as safe as the Play market, but users of other top alternative markets have up to 19 times higher probability of encountering an unwanted app." *Id.* And that just focuses on third-party app stores. Downloads from the Web are currently rare "but have significantly higher risk (3.8% VDR) than downloads from markets, even alternative ones (3.2%)." *Id.*[5]

In this case, however, the District Court's injunction would weaken the security of Google's app ecosystem in two significant ways, adversely

---

[4] https://stage-www.nortonlifelock.com/content/dam/nortonlifelock/pdfs/research-papers/2021-research-papers/kotzias_sp21.pdf.

[5] Another study found that in China, where Google is not permitted to offer its Play Store, alternative app stores perform substantially worse in taking active measures to protect mobile users and legitimate developers from deceptive and abusive actors, showing a significantly higher prevalence of malware and fake and cloned apps than Google Play. *See, e.g.*, Haoyu Wang, *et al.*, *Beyond Good Play: A Large-Scale Comparative Study of Chinese Android App Markets*, 2018 Internet Measurement Conference, Association for Computing Machinery (Oct. 31 – Nov. 2, 2018), https://conferences.sigcomm.org/imc/2018/papers/imc18-final148.pdf.

affecting more than one-hundred million users based in the United States and others worldwide:

First, paragraph 10 of the permanent injunction would enjoin Google from prohibiting developers from embedding external links displayed within apps downloaded on Google's Play Store or through Google Play Store listings to download apps outside of the Play Store. 1-ER-4 (Permanent Injunction ¶ 10). By now, the benefits of Google's policy of prohibiting external links should be obvious—those links pose serious security concerns. As the federal judiciary's recent experience illustrates, a link can direct a user to anywhere on the Internet. But what makes the District Court's injunction worse is that, here, those links will be disseminated by a previously trusted source—in this case, an app that was downloaded from Google's Play Store or a Play Store listing—lulling users into a false sense of security. As detailed below, although Google can vet the apps that it posts to the Play Store, it cannot possibly vet every region of the Internet where an external link may direct a consumer. And the security risks here are staggering: Android malware can share private information with third parties, track use across other applications, disclose location data and the contents of a user's text

messages, initiate calls, access the phone's camera and microphone, and destroy or encrypt the data on infected devices.

Second, paragraphs 11 and 12 of the permanent injunction would combine to weaken the entire Android ecosystem for downloading apps. Under those paragraphs, Google must distribute competitor app stores through Google's Play Store and provide those competitors with access to Play's entire catalog of apps. *See* 1-ER-4-5 (Permanent Injunction ¶¶ 11-12). Although seemingly benign, these paragraphs will lead to the proliferation of scam app stores that can rely upon Google's backend work to give them the appearance of legitimacy. To be sure, Google may be able to vet the third-party-app-store *app* that it would be forced to distribute through the Play Store, but it cannot possibly vet all the third-party apps that each alternative app store would allow a user to download. Thus, a user encountering one of these app stores will see the same wealth of catalog offerings as Google's Play Store, and yet, there is nothing stopping these app stores from posting cloned or fake apps that install malware or steal users' personal and financial information. On top of that, the injunction's mandates could serve as a distraction to Google, weakening its own security parameters and depriving consumers of a

- 13 -

haven in which to verify the legitimacy of apps and protect themselves against malicious actors.

Moreover, the justifications for these specific provisions of the permanent injunction are not obvious. As noted above, Google already allows Android-device users to download applications from third-party app stores and websites. Developers are also free to communicate directly with potential consumers and make their applications available outside of Google's Play Store—without the need for developers to embed external links in the apps they make available on the Play Store. And although *amici* are by no means experts on competition law, it is not obvious how consumers are served by allowing anyone on the Internet to free-ride off Google's backend work to prop up an app store—particularly where there are already credible alternatives to the Play Store, including Amazon's Appstore, F-Droid, and Samsung's Galaxy Store (for those with a Samsung device).

Together, these provisions pose grave security risks that the District Court nowhere appeared to consider. *See* 1-ER-7-23 (Order Regarding UCL Claim and Injunctive Relief) (nowhere addressing the security issues posed by its permanent injunction and instead deferring

- 14 -

these issues to a technical committee). As a result, regardless of where this Court comes out on the merits, paragraphs 10-12 of the injunction should be set aside.

## I.   Paragraph 10 of the Permanent Injunction Will Lead to a Proliferation of Scam Links, Exposing More Than One-Hundred Million Users of Google's Play Store to Extensive Security Risks.

Under paragraph 10 of the District Court's injunction, Google may not prohibit developers from embedding in apps they distribute through the Play Store external links to download apps outside the Play Store. *See* 1-ER-4 (Permanent Injunction ¶ 10). That provision is a recipe for disaster.

Google currently prohibits developers from including external links to download applications in any application the developer distributes through the Play Store because such links pose a serious security risk. *See* Google, *Device and network abuse*.[6] Links can direct users to anywhere on the Internet.

As the federal judiciary now knows all too well, if the links direct users to sites that are malicious but appear legitimate, they could lead to

---

[6] https://support.google.com/googleplay/android-developer/answer/9888379?sjid=15808678161699361946-NC.

a variety of security risks. On Android devices, that could include tricking users into installing malware, directing users to provide credit card and other sensitive financial and personal information, stealing users' data, tracking users' activities on the Internet, and even accessing a device's location, text messages, microphone, and camera, or initiating and answering phone calls. *See* Bitdefender, *Unveiling Mobile App Secrets: A 6-Month Deep Dive into Surprising Behavior Patterns*, Jan. 8, 2024 (describing various types of malware that can operate on an Android device)[7]; *see also* Federal Bureau of Investigation, *Spoofing and Phishing* (describing the process by which cybercriminals can use links to cause users to "download malicious software, send money, or disclose personal, financial, or other sensitive information").[8]

The dangers of the District Court's permanent injunction are particularly significant because users would encounter these links in a previously trusted environment. Because Google has spent years cultivating a secure user experience within the Play Store and

---

[7] https://www.bitdefender.com/en-us/blog/labs/unveiling-mobile-app-secrets-a-6-month-deep-dive-into-surprising-behavior-patterns/.

[8] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/spoofing-and-phishing.

applications available on Play, users will be more prone to trust these links, exposing them to all the risks outlined above. *See, e.g.*, *How Did That Get In My Phone?*, *supra*, at 61 (explaining that "unwanted app developers have a large incentive to make their apps appear in the Play market since it provides the apps with higher visibility, reputation, and trust"). And whereas Google can scan and vet the applications that it makes available through the Play Store, mitigating the risk of malware and quickly removing malicious and unwanted applications from the Play Store and users' devices through centralized mechanisms, Google cannot possibly track every application available for download on the Internet that would be accessible through the kinds of external links mandated by the District Court. Rather, users would need to run antivirus scanning software from their individual devices, which can be helpful but is reactive, not a prophylactic mechanism at a centralized distribution point. Moreover, because well-run app stores like Google's Play Store are generally good at removing malicious apps, there has been less of a need for developers to create antivirus software for mobile devices—meaning that mobile users do not have the same access to antivirus software that has proliferated for traditional computers.

As noted above, Google does not force users of Android mobile devices to download applications through Google's Play Store; they are free to download applications from external sources (known as side-loading), including from third-party app stores. But for those users who elect to use Google's Play Store, many likely prefer Play's security features. Indeed, academic research suggests that malware has flourished on Android devices whose users have downloaded applications outside of Google Play. *E.g.*, *How Did That Get In My Phone?*, *supra*, at 54 (explaining that outside of the Play Store and a handful of other well-run third-party app stores, "users of other top alternative markets have up to 19 times higher probability of encountering an unwanted app," and the risks posed by web-downloads are "significantly higher" still).

Cybercriminal organizations, state-sponsored actors, and freelancers are already highly successful in tricking people over insecure forms of communication, including e-mails, text messages, and telephone calls. According to one study, 78 percent of mobile users experienced at least one scam in the last year, and those scams are most often initiated by sending links to get users to install malicious applications. Global

Anti-Scam Alliance, *Global State of Scams – 2023*, at 12-13.[9] Allowing malicious actors to communicate through applications downloaded on Google's Play Store will only exacerbate these problems, reducing those few regions of the Internet that users can generally trust. *See* Federal Bureau of Investigation, *On the Internet: Be Cautious When Connected* (warning Internet users not to access unverified links that could steer users to spoofed websites).[10]

The dangers of the District Court's order are not difficult to envision. Having impaired Google's ability to fully vet the developers and applications that appear on its Play Store and applications available through Play, the order exacerbates these problems by allowing developers to push seemingly benign links that will take users—likely unwittingly—outside Google's secure environment. Users could be directed to seemingly legitimate apps that instruct them to provide their financial and personal information—only to learn after it is much too late that they tendered that private information to cybercriminals. Children

---

[9] https://www.scribd.com/document/679758338/Global-State-of-Scams-Report-2023-Global-GASA-final.

[10] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/on-the-internet.

- 19 -

could download a seemingly safe gaming application only to be directed to sexually explicit materials. And still other users could be directed to follow prompts that, unbeknownst to them, install malware onto their Android devices, exposing them to a range of malicious applications that could share private information with third parties, track their use across other applications, disclose their location and the contents of their text messages, access their phone, camera, and microphone, and destroy the data on their devices.

Moreover, these risks are not limited to an individual user's Android device; they could expose business and governmental networks to illicit attacks. Among other things, cybercriminals could gain access to passwords and other sensitive information that Android users also use to access their work accounts. That, in turn, could expose State secrets and third-party intellectual property to theft or destruction. Likely for these reasons, the Administrative Office of the U.S. Courts recognizes the "threat" posed to its networks by court personnel accessing "malicious

websites." Admin. Office of the U.S. Courts, *Information Systems and Cybersecurity – Annual Report 2022.*[11]

The District Court did not appear to include any provision expressly authorizing Google to attempt to screen links from the standpoint of security or safety, *see* 1-ER-4 (Permanent Injunction ¶ 10), but assuming the permanent injunction is interpreted to make such an allowance, *see* 1-ER-5 (Permanent Injunction ¶ 12) (expressly authorizing some safety and security determinations), *amici* doubt Google would be able to do so. Google would be required to vet content on external web servers (*e.g.*, third-party app stores, developers' websites, etc.), which would involve a nearly infinite amount of content at unknown locations. And even if Google could undertake this Herculean task, there's no reason to believe an external webpage address (URL) vetted by Google will serve the same content when visited at a different time by someone else. Thus, there does not appear to be any safe way for Google to allow developers to make apps available for download within the Play Store that display links that allow users to download apps outside the Play Store.

---

[11]  https://www.uscourts.gov/statistics-reports/information-systems-and-cybersecurity-annual-report-2022.

Meanwhile, *amici* are unaware of any need on the part of Epic Games or any other developer to embed links to external apps in apps distributed on Google's Play Store. Developers are free to communicate directly with potential consumers and make their apps available outside of Google's Play Store, including directly over the Internet. As a result, there is no obvious explanation for the District Court's decision to expose users of Google's Play Store to heightened security risks—and the District Court never provided one. *See* 1-ER-7-23 (Order Regarding UCL Claim and Injunctive Relief) (nowhere addressing the security issues posed by its permanent injunction and instead deferring these issues to a technical committee).

## II. Paragraphs 11 and 12 of the Permanent Injunction Will Lead to an Explosion of Scam App Stores and Weaken Android's Security Ecosystem Worldwide.

Under paragraphs 11 and 12 of the permanent injunction, Google must distribute competitor app stores through Google's Play Store and provide those competitors with access to Play's entire catalog of apps. *See* 1-ER-4-5 (Permanent Injunction ¶¶ 11-12). The injunction permits Google to "take reasonable measures to ensure that the[se] platforms or stores, and the apps they offer, are safe from a computer systems and

- 22 -

security standpoint, and do not offer illegal goods or services under federal or state law within the United States, or violate Google's content standards." 1-ER-5 (Permanent Injunction ¶ 12). But if challenged, "Google will bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored." *Id.*

As explained below, these paragraphs present a host of problems that threaten to weaken Android's app ecosystem worldwide:

To start, paragraphs 11 and 12 will lead to the proliferation of scam and substandard app stores that can rely upon Google's backend work to hawk their wares. An app store with a sizeable catalog of apps requires investment and technical know-how to attract users and gain legitimacy. The injunction simply makes it too easy for malicious and substandard app stores to pose as legitimate. Under the injunction, Google must provide any applicant with access to the Play Store's entire catalog of apps. Google may attempt to impose security and safety standards on the third-party-app-store *apps* it is forced to carry on the Play Store, but it will "bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly

- 23 -

tailored." 1-ER-5 (Permanent Injunction ¶ 12). In addition, the District Court did not define these standards. Instead, it kicks these issues to a technical committee and gives Google's adversary, Epic Games, a valuable seat at that three-person table. *See* 1-ER-5-6 (Permanent Injunction ¶¶ 12-13). There is no mandate that Epic Games must act in the best interests of the more than one-hundred million Android users based in the United States. *See id.* Rather, Epic Games, a privately held company, will have a fiduciary obligation to act in the best interests of its shareholders. And if disputes bubble up to the District Court, it is unclear whether the court has the technical capabilities to resolve them.

The risks associated with scam and substandard app stores are already very real, and the District Court's injunction threatens to make the problem worse. As noted above, globally, Android users are 19 times more likely to download an unwanted app on some of the top alternative app stores. *How Did That Get In My Phone?*, *supra*, at 54. And the problem will only get worse if Google is forced to handover its entire app catalog and may remove malicious and substandard third-party-app-store apps from the Play Store only if it can prove to a technical

committee that its security and content determinations are strictly necessary and narrowly tailored.

Scam app stores lure users by appearing as legitimate, but they can fake and clone apps that wreak havoc on unsuspecting users. For example, one app disguised itself as a movie streaming service:

 

Bitdefender, *supra*, at note 6. This app was actually malware that "can access contacts data, calendar data, sensor data, send and receive SMS [text messages], read and write on external storage, access the device[’s] location, read or write [telephone] call logs or even redirect [calls] to a

different number, initiate or answer phone calls, record audio [using the device's microphone], recognize physical activity [from the device's proximity and other sensors], and access the camera" on the device. *Id.* Although this app was removed by Google from the Play Store, it is "still likely available to download from other sources." *Id.*

Moreover, criminals specifically target unsuspecting users by cloning "popular apps" like Netflix, Instagram, Spotify, and others to pry users of their passwords, infect their devices with malware, and obtain access to sensitive personal and financial information, *see id.*—an unfortunate practice that occurs within the Android ecosystem. Referred to as app repackaging, cybercriminals reverse-engineer an existing Android app to access its source code, modify it to include malicious or unauthorized code, and then redistribute the app without the original developer's permission. Paragraphs 11 and 12 of the permanent injunction would hand cybercriminals the tools needed to make more effective storefronts for listing such reverse-engineered apps, and Google would have to expand its resources to try to take them down.

Even benevolent but substandard app stores pose security and safety risks for consumers. Operating systems and apps require frequent

updates to ensure that they run properly and to eliminate security and safety vulnerabilities. Substandard stores risk disseminating out-of-date apps with critical security deficiencies.[12] Even after those issues are uncovered, legitimate app developers must disseminate updates to eliminate these issues from their applications. But platform fragmentation, including poorly performing app stores, can mean "millions of devices [can get] stuck on outdated and no-longer supported Android versions" and apps. *Trouble Over-The-Air*, *supra*, at 1606.

In contrast, well-run app stores improve the supply chain of apps by investing in the resources and technical know-how necessary to help block and remove malicious applications from the top down, benefitting millions upon millions of users quickly and efficiently. In 2022 alone,

---

[12] For example, developers frequently use third-party components, referred to as software development kits (SDKs), "so that developers do not need to waste time rebuilding specific functions from scratch." Nikita Samarin, *et al.*, *The Medium is the Message: How Secure Messaging Apps Leak Sensitive Data to Push Notification Services*, 2024 Proceedings on Privacy Enhancing Technology Symposium 967, 967 (2024 Issue 1), https://petsymposium.org/popets/2024/popets-2024-0151.pdf. When used responsibly, SDKs help developers provide common functionality while reducing engineering costs. *Id.* Yet research has "demonstrated that many software privacy issues"—for example, "the inappropriate disclosure of sensitive user information"—occur because developers do not correctly understand or use SDKs. *Id.*

Google helped "developers fix approximately 500,000 security weaknesses affecting around 300,000 apps with a combined install base of approximately 250 billion installs." Anne Freer, *Google blocks 1.43 million policy-violating apps on Play Store*, App Business, May 5, 2023.[13]

As an example, X-Mode had secretly embedded location-tracking software in a variety of apps, and the company then sold data of Americans' movements—which could include seeking care at medical providers or attending political events. Soon after this scheme was revealed, Google and Apple were successful in removing X-Mode's tracking software from any application present in their app stores. *See, e.g.*, Byron Tau, *Apple and Google to Stop X-Mode From Collecting Location Data From Users' Phones*, Wall St. J., Dec. 9, 2020.[14] That kind of coordinated action is simply not available at fly-by-night app stores.

As another example, Google's actions to ban from the Play Store "stalkerware" apps, which covertly track the location of targets who have unknowingly had these apps installed on their phones, led to a significant

---

[13] https://www.businessofapps.com/news/google-blocks-1-43-million-policy-violating-apps-on-play-store/.

[14] https://www.wsj.com/articles/apple-and-google-to-stop-x-mode-from-collecting-location-data-from-users-phones-11607549061.

reduction of available stalkerware, while outside the Play Store, many more new stalkerware apps have been discovered. Cassidy Gibson, *et al., Analyzing the Monetization Ecosystem of Stalkerware,* 2022 Proceedings on Privacy Enhancing Technology Symposium 105, 119 (2024 Issue 4).[15] This example shows how Google has improved the electronic and physical safety of mobile-app users in a manner that has proven ineffective outside of well-run app stores.

As the authors of one publication noted, the Internet has allowed anyone to "become a software engineer and distribute software worldwide," which is by and large "a good thing" but also "raises issues of professional responsibility that have long been addressed by other more mature branches of engineering." *The Medium is the Message*, *supra*, at 977. "In most jurisdictions, one cannot simply decide to become a civil engineer and erect a multistory building." *Id.* Plans are checked against building codes; the building is inspected at various stages of construction; and even after it is complete, the building can be condemned if it is no longer safe for habitation. *Id.* No comparable entities operate in the space of computer software even though "they may

---

[15] https://petsymposium.org/popets/2022/popets-2022-0101.pdf.

still pose risks to user safety—even lethal ones." *Id.* For example, "online messaging apps are increasingly used by activists living in oppressive regimes, who may find themselves in serious jeopardy if their communications are inappropriately revealed." *Id.* (citation omitted).

The District Court's injunction would make it too easy for people to set up an app store who, quite frankly, have no business doing so— because they are either malevolent or benevolent but incompetent or incapable. And the results are predictable: The Android ecosystem will become significantly less safe and secure for users worldwide if the District Court's injunction is implemented.

Although paragraph 12 of the permanent injunction permits Google to screen the third-party app stores that wish to be listed on the Play Store from the standpoint of security and safety, *see* 1-ER-5 (Permanent Injunction ¶ 12), it is not practical for Google to do so. As an initial matter, Google might be able to scan each third-party-app-store *app* that it posts to the Play Store, but Google cannot be reasonably expected to scan and vet the countless apps that each of these third-party app stores would make available to consumers. Moreover, even if this is possible, these third-party app stores could modify the content of the apps they

offer after their app stores go live, so that the content that Google screened no longer matches what these third-party app stores are offering for download. For example, one prominent app developer geofenced its app to appear to comply with Apple's App Store policies when that app detected that it was being run in Cupertino, California (Apple's headquarters), but secretly violated those policies when run elsewhere. The Verge, *Uber tried to fool Apple and got caught*, Apr. 23, 2017.[16] As this episode illustrates, even if Google could vouch for the content of the third-party app stores at some location and moment in time, malicious actors could serve "safe" versions of their apps when they are vetted and then serve malicious versions when they are not.

Lastly, the justifications for these specific provisions of the injunction are not obvious. Google already allows Android users to download applications from third-party app stores and websites, and Epic Games—one of the largest game developers on the planet—hasn't shown any need to access the entire catalog of Google's Play Store to build a competing app store. Finally, even if others would like to piggyback off

---

[16] https://www.theverge.com/2017/4/23/15399438/apple-uber-app-store-fingerprint-program-tim-cook-travis-kalanick.

- 31 -

Google's work, it is not obvious how consumers are served by allowing anyone on the Internet to open an app store—particularly where there are already sizeable alternatives to the Play Store run by companies with the resources to vet the apps that they distribute. Instead, the District Court's injunction risks *reducing* competition among app stores by allowing free riders to proliferate within the Android ecosystem.

## CONCLUSION

Paragraphs 10 through 12 of the permanent injunction pose grave security risks. As a result, regardless of this Court's decision on the merits, it reverse these paragraphs of the injunction.

Dated:  December 4, 2024                    Respectfully submitted,

/s/ Robert T. Smith
Robert T. Smith
Neal S. Mehrotra
Katten Muchin Rosenman LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006-3404
robert.smith1@katten.com
neal.mehrotra@katten.com
202-625-3500

*Counsel for Amici Curiae*

- 32 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-form and volume requirements. Specifically, the Brief of *Amici Curiae* is proportionately spaced; uses a Roman-style, serif typeface (Century Schoolbook) of 14-point; and contains 5,850 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Amici Curiae*

- 33 -

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2024, I electronically transmitted a copy of the foregoing Brief of *Amici Curiae* to the Clerk of the Court using the Appellate Case Management System (ACMS) for filing. Service will be accomplished electronically through the ACMS for all registered participants.

/s/ Robert T. Smith

Robert T. Smith
*Counsel for Amici Curiae*